UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555, 08-01420

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                 Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                 Debtor.

- - - - - - - - - - - - - - - - - - - -x

          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York

          June 3, 2009

          10:04 a.m.

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1    SECOND APPLICATION to Employ Certain Contract Attorneys as

2    Document Reviewers for the Examiner

3

4    DEBTORS' First Omnibus Motion for Authorization to Reject

5    Certain Executory Contracts

6

7    DEBTORS' Motion for Approval of Exchange Agreement With State

8    Street Bank and Trust Company

9

10   MOTION of the Debtors Authorizing the Establishment of

11   Procedures to Terminate Unfunded Commitments and Restructure

12   Corporate Loan Agreements

13

14   LBHI's Motion for Authorization and Approval of Settlement

15   Agreement with Pension Benefit Guaranty Corporation

16

17   MOTION of Unclaimed Property Recovery Service, Inc. for Relief

18   From the Automatic Stay

19

20   DEBTORS' Motion Approving the Assumption or Rejection of Open

21   Trade Confirmations

22

23

24

25

1    MOTION of Basso Capital Management, L.P. for Relief Concerning

2    Certain Contracts that Debtor Moved to Reject then Sought to

3    Assume Without Providing Sufficient Notice and an Opportunity

4    to Object

5

6    PRETRIAL Conference and Motion to Dismiss Adversary Proceeding

7    in 1140 LLC v. State Street, LCPI, et al.

8

9    DEBTORS' Motion for Approval of an Exchange Agreement with

10   State Street Bank and Trust Company

11

12   PRETRIAL Conference in LBSF v. Ballyrock ABS CDO 2007-1, et al.

13

14   LEHMAN Brothers Special Funding, Inc. v. BNY Corporate Trustee

15   Services Limited, Pretrial Motion Summary Judgment Conference

16

17   MOTION of Teva Pharmaceuticals Works Company for an Order

18   Authorizing Future Dividend Payments to be Made to a Non-Lehman

19   Brothers Inc. Account, or, in the Alternative Modifying the

20   Automatic Stay

21

22   MOTION of Teva Hungary Pharmaceutical Marketing Private Limited

23   Company for an Order Authorizing Future Dividend Payments to be

24   Made to a Non-Lehman Brothers Inc. Account, or, in the

25   Alternative Modifying the Automatic Stay

1  UNCLAIMED Property Recovery Service's Motion for Orders

2  Compelling Payment of Unclaimed Funds by the New York State

3  Comptroller, Lifting the Automatic Stay, or, Alternatively,

4  Providing Relief from the Automatic Stay, Allowing Payment for

5  Services Provided Post-Petition, and Other Relief

6

7  DEBTORS' Motion for Authorization to Establish Procedures to

8  Sell or Abandon De Minimis Assets

9

10  MOTION of GE Corporate Financial Services, Inc., as Loan

11  Servicer for Fusion Funding Limited and Fusion Funding

12  Luxembourg, S.A.R.O., for Relief From the Automatic Stay

13

14  DEBTORS' Motion for Authorization to Assume Unexpired Lease of

15  Nonresidential Real Property and Assume and Assign Unexpired

16  Leases of Real Property

17

18  MOTION of WWK Hawaii-Waikapuna, LLC, et al. for Relief From the

19  Automatic Stay

20

21  APPLICATION of Dechert LLP for an Award of Compensation and

22  Reimbursement of Expenses for the Period March 1, 2009 through

23  March 31, 2009-06-04

24

25

1    MOTION of the Official Committee of Unsecured Creditors for

2    Reconsideration of Court's September 17, 2008 Interim Order

3    Authorizing Debtor to Obtain Post-Petition Financing

4

5    MOTION of Official Committee of Unsecured Creditors of Lehman

6    Brothers Holding Inc. for Leave to Conduct Discovery of

7    JPMorgan Chase Bank, N.A.

8

9    DEBTORS' Motion for Authorization to Assume Certain Aircraft

10   Lease Agreements and to Consummate Certain Related Transactions

11

12   DEBTORS' Motion Approving the Assumption or Rejection of Open

13   Trade Confirmation

14

15   MOTION of BLT 39 LLC for Partial Reconsideration of Order

16   Approving the Assumption of Rejection of Open Trade

17   Confirmations

18

19   MOTION for Summary Judgment in Deutsche Bank AG v. Lehman

20   Brothers Holdings Inc.

21

22   PRETRIAL Conference in Nomura Global Financing Products Inc. v.

23   LBSF and LBI

24

25

1    PRETRIAL Conference in Aliant Bank v. Lehman Brothers Special

2    Financing, Inc., et al.

3

4    MOTION for Relief From Notice Period and Pre-Motion Conference

5    in State Street Bank and Trust Company v. Lehman Commercial

6    Paper Inc.

7

8    PRETRIAL Conference in Wong, et al. v. HSBC, et al.

9

10   NOTICE of Limited Objection to Trustee's Determination of Claim

11   and Motion for Order Directing the Trustee to Return Customer

12   Name Securities

13

14   NOTICE of Trustee's Motion for  Entry of Order Pursuant to

15   Sections 363 and 365 of the Bankruptcy Code and Federal Rules

16   of Bankruptcy Procedure 2002, 6004, 6006 and 9019 Authorizing

17   the Assumption and Assignment of Debtors' Rights and

18   Obligations Under a Patent License Agreement and a Software

19   License Agreement

20

21   NOTICE of Motion of Markit Group Limited for Relief From

22   Automatic Stay to Terminate Data Services Agreement and

23   Associated Addenda

24

25   Transcribed By:  Esther Accardi

A P P E A R A N C E S :

WEIL GOTSHAL & MANGES, LLP

     Attorneys for Debtors and Debtors-in-Possession

     767 Fifth Avenue

     New York, New York 10153


BY:   RICHARD P. KRASNOW, ESQ.

     JACQUELINE MARCUS, ESQ.

     RICHARD LEVINE, ESQ.

     RICHARD W. SLACK, ESQ.

     DENISE ALVAREZ, ESQ.



WEIL GOTSHAL & MANGES, LLP

     Attorneys for Debtors and Debtors-in-Possession

     1300 Eye Street, N.W.

     Washington, D.C. 20005


BY:   RALPH I. MILLER, ESQ.

```
1    A P P E A R A N C E S : (continued)

2    MILBANK TWEED HADLEY & MCCLOY, LLP

3         Attorneys for Creditors' Committee

4         One Chase Manhattan Plaza

5         New York, New York 10005

6

7    BY:   EVAN R. FLECK, ESQ.

8          DENNIS C. O'DONNEL, ESQ.

9          PAUL J. WESSEL, ESQ.

10         ROBERT J. LIUBICIC, ESQ.

11

12

13   JENNER & BLOCK, LLC

14        Attorneys for Examiner

15        One IBM Plaza

16        Chicago, Illinois 60611

17

18   BY:   ROBERT BYMAN, ESQ.

19

20

21   ALLEN & OVERY, LLP

22        1221 Avenue of the Americas

23        New York, New York 10020

24

25   BY:   MATTHEW A. BRUCKNER, ESQ.
```

1  A P P E A R A N C E S : (continued)

2  MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC

3      Attorneys for Teva

4      One Financial Center

5      Boston, Massachusetts 02111

6

7  BY:  WILLIAM W. KANNEL, ESQ.

8      LAURENCE A. SCHOEN, ESQ.

9

10

11  SECURITIES INVESTOR PROTECTION CORPORATION

12      805 15th Street, N.W.

13      Washington, D.C. 20005

14

15  BY:  KENNETH J. CAPUTO, ESQ.

16

17

18  LOCKE LORD BISSELL & LIDDELL, LLP

19      Attorneys for Wells Fargo Bank, N.A.

20      885 Third Avenue

21      New York, New York 10022

22

23  BY:  JOSEPH N. FROEHLICH, ESQ.

24

25

1    A P P E A R A N C E S : (continued)

2    BROWN RUDNICK

3         Attorneys for Newport Providence

4         Seven Times Square

5         New York, New York 10036

6

7    BY:    ANDREW DASH, ESQ.

8           DAVID J. MOLTON, ESQ.

9

10

11   SIDLEY AUSTIN, LLP

12        Attorneys for Black Rock

13        787 Seventh Avenue

14        New York, New York 10019

15

16   BY:    NICHOLAS P. CROWELL, ESQ.

17          ANDREW W. STERN, ESQ.

18

19

20   REED SMITH

21        Attorneys for Yarpa

22        599 Lexington Avenue

23        New York, New York 10022

24

25   BY:    JOHN SCOTT, ESQ.

1   A P P E A R A N C E S : (continued)

2   JENNER & BLOCK, LLP

3        Attorneys for Examiner

4        919 Third Avenue

5        New York, New York 10022

6

7   BY:   PATRICK J. TROSTLE, ESQ.

8

9

10  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

11       Attorneys for Barclays Capital

12       One Liberty Plaza

13       New York, New York 10006

14

15  BY:   LUKE A. BAREFOOT, ESQ.

16

17

18  CURTIS MALLET-PREVOST COLT & MOSLE, LLP

19       101 Park Avenue

20       New York, New York 10178

21

22  BY:   CINDI M. EILBOTT, ESQ.

23

24

25

1    A P P E A R A N C E S : (continued)

2    MARK L. LUBELSKY AND ASSOCIATES

3         Attorneys for Lighthouse 1440, LLC

4         123 West 18th Street

5         New York, New York 10011

6

7    BY:   MARK L. LUBELSKY, ESQ.

8

9

10   WHITE & CASE, LLP

11        Attorneys for Ad Hoc Group of Lehman Creditors

12        1155 Avenue of the Americas

13        New York, New York 10036

14

15   BY:   LISA THOMPSON, ESQ.

16        GERARD UZZI, ESQ.

17

18

19   PAUL BATISTA, P.C.

20        Attorneys for Unclaimed Property Recovery Service, UPRS

21        26 Broadway

22        New York, New York 10004

23

24   BY:   PAUL A. BATISTA, ESQ.

25

1   A P P E A R A N C E S : (continued)

2   HUGHES HUBBARD & REED, LLP

3       Attorneys for James W. Giddens, Trustee for SIPA

4       Liquidation of Lehman Brothers Inc.

5       One Battery Park Plaza

6       New York, New York 10004

7

8   BY:   JEFFREY S. MARGOLIN, ESQ.

9       JAMES KOBAK, ESQ.

10      DAVID WILTENBURG, ESQ.

11

12

13  STROOCK & STOOCK & LAVAN, LLP

14      Attorneys for Basso Capital Management L.P.

15      180 Maiden Lane

16      New York, New York 10038

17

18  BY:   HAROLD A. OLSEN, ESQ.

19      ERIC BROSTERMAN, ESQ.

20

21

22

23

24

25

1  A P P E A R A N C E S : (continued)

2  ORRICK HERRINGTON & SUTCLIFFE, LLP

3      Attorneys for Ballyrock

4      666 Fifth Avenue

5      New York, New York 10103

6

7  BY:   STEVEN J. FINK, ESQ.

8

9

10  NEW YORK STATE ATTORNEY GENERAL'S OFFICE

11  NEW YORK STATE DEPARTMENT OF LAW

12      The Capitol

13      Albany, New York 12224

14

15  BY:   NANCY LORD, ESQ.

16      NORMAN P. FIVEL, ESQ.

17

18

19  COUGHLIS STOIA GELLER RUDMAN & ROBBINS, LLP

20      Attorneys for Plaintiffs in Wong v. HSBC

21      655 West Broadway

22      San Diego, California 92101

23

24  BY:   PATRICK W. DANIELS, ESQ.

25

```
1   A P P E A R A N C E S : (continued)

2   BINGHAM MCCUTCHEN

3        Attorneys for State Street

4        One Federal Street

5        Boston, Massachusetts 02110

6

7   BY:   ANDREW PHELAN, ESQ.

8

9

10

11  TELEPHONIC APPEARANCES:

12  DUNCAN BARBER, ESQ. for Iron Bridge Homes, LLC

13  ROBERT GREENFIELD, ESQ. for Perry Capital

14  ROB HALDER for Tejas Securities Group

15  SCOTT  HARTMAN for Varde Partners

16  JAMES HEISER, ESQ. for US Bank

17  MEGHAN S. MICHELS for Baupost Group

18  WILL SUGDEN, ESQ. for Prudential Insurance Group

19  FRANKLIN TOP, ESQ. for US Bank

20  REBECCA ZUBATY, ESQ. for Citibank

21

22

23

24

25
```

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  We have a long

3     calendar.

4          MR. KRASNOW:  Good morning, Your Honor.  Richard

5     Krasnow, Weil Gotshal & Manges, LLP on behalf of the Chapter 11

6     debtors.

7          Your Honor, early this morning an amended agenda

8     letter was filed with the Court.  It appears as docket number

9     3747.  It was amended in order to reflect an additional

10    pleading with respect to an adversary proceeding matter which

11    will be addressed later on during the course of the hearing,

12    Your Honor.

13         Before we turn to the agenda, itself, Your Honor, I

14    just wanted to provide the Court with an update with respect to

15    one important pleading that was filed on Friday, Your Honor.

16    That was the debtors' motion seeking the establishment of a bar

17    date in the Chapter 11 cases, with the proposed bar date for

18    filing proofs of claims August 24th.

19         That application has been noticed for presentment for

20    June 12th.  And will be presented on that date for the Court's

21    consideration, unless there are objections.  In which event, it

22    will be considered on a hearing schedule for June 17th.  Prior

23    to the presentment date, the debtors will be filing amended and

24    restated schedules.  We anticipate that those will be filed no

25    later than June 15th, Your Honor.

1          THE COURT:  All right.

2          MR. KRASNOW:  Having noted that, Your Honor, if I may

3     turn to the amended agenda.  And with the Court's permission,

4     start with item number 1 under the uncontested matters heading.

5     That is an application filed by the examiner.  And I may turn

6     over the podium to examiner's counsel.

7          MR. BYMAN:  Good morning, Your Honor.  Robert Byman on

8     behalf of the examiner.

9          Your Honor, this is an uncontested motion, but I

10    thought I should use this opportunity to let you know that this

11    is our second application to hire contract attorneys.  There

12    will be a third.

13         We anticipate getting to a group of approximately

14    seventy contract attorneys in order to get through the volume

15    of documents that we have now collected and we anticipate

16    getting.  Without having that corpus of people we would not be

17    able to get through these documents in a reasonable period of

18    time.  And even so, with the seventy contract attorneys it's

19    going to be at least the end of August, we think, before we've

20    completed document review.

21         THE COURT:  It sounds like a dreadful job.

22         MR. BYMAN:  It's a dreadful job for those seventy

23    people, and the people that have to supervise them.  But it's a

24    necessary job.

25         THE COURT:  I understand that.

1       MR. BYMAN:  That, also, makes us advise the Court, as

2  we've already advised the U.S. Trustee, that we now project the

3  initial budget estimates that we made were, perhaps, too

4  optimistic.  We think now -- we're projecting that we may be as

5  much as twenty-five to thirty percent off of that initial

6  budget.  We've advised the U.S. Trustee of that, we intend to

7  talk to the fee committee of that and keep them advised.  And

8  if Your Honor wants more detail, we will give that to you, as

9  well, of course.

10      THE COURT:  Well, there will be an appropriate time

11  for that.

12      MR. BYMAN:  But with that, we're still working.  We

13  hope not to expand our budget in terms of time.  We still hope

14  to get you a report this year.

15      THE COURT:  Fine.  Your request to hire additional

16  contract attorneys is approved.

17      MR. BYMAN:  Thank you.  We have the hardcopy order and

18  disk.  Should I give it to Mr. Krasnow?

19      THE COURT:  Mr. Krasnow can be the keeper of orders.

20      MR. KRASNOW:  Thank you, Your Honor.

21      THE COURT:  And he can delegate that task to somebody

22  else on his staff.  No doubt he'll do that.

23      MR. BYMAN:  Thank you, Your Honor.

24      THE COURT:  Okay.

25      MR. KRASNOW:  Your Honor, we now turn to item number 2

on the agenda, which is the debtors' first omnibus motion for

authority to reject certain executory contracts.  That's motion

is noted as docket number 3589.

Your Honor, the motion as filed covered approximately

sixty-six operational-type contracts.  This has nothing to do

with the derivatives and the like, that were identified by the

debtors as contracts as to which the debtors no longer require

the services to be provided by the counterparties.  It is

uncontested.  There are no objections.  However, we were

contacted by Barclays who informed us that sixteen of the

contracts that had been listed in the schedules attached to the

motion had, in fact, been assumed and assigned to it.

In light of that, Your Honor, we have revised the

order that would be submitted to the Court if the Court grants

the motion to delete those particular contracts from the scope

of the motion.

THE COURT:  Just make sure you delete the right ones.

MR. KRASNOW:  Your Honor, we will we have.  In light

of the non-objection, based on the allegations set forth in the

motion, we would respectfully request that the Court grant the

motion as modified.

THE COURT:  The motion is granted as modified.

MR. KRASNOW:  Thank you, Your Honor.  The next item on

the calendar is the debtors' motion for an approval of an

exchange agreement with State Street Bank Trust Company.

1  That's at docket number 3580.

2      I would note, Your Honor, that this motion also
3  appears as item number 10 on the agenda, which is under the
4  adversary proceeding section.  Your Honor, this matter relates
5  to a master repurchase agreement that had been entered into
6  between Lehman Commercial Paper and State Street.  It was an
7  agreement pursuant to which -- based on the language in the
8  agreement, a thirty-seven commercial loans with attend and
9  servicing rights had been sold to State Street.  The adversary
10  proceeding, itself, had been commenced by State Street for the
11  purpose of obtaining a determination with regards to their
12  rights relative to those loans.

13      Up to this date, Your Honor, there had been
14  approximately twenty-two stipulations entered into -- or excuse
15  me, strike that, Your Honor.  Seven stipulations dealing with
16  twenty-two of the loans in which State Street asserted rights.
17  Which stipulations basically acknowledge the ownership rights
18  that State Street had, and provided for whatever additional
19  documentation was required in order to provide State Street
20  with comfort with respect to those loans, and its rights
21  thereto.

22      This particular motion is a little different in most
23  respect from those other stipulations.  It provides for an
24  exchange between State Street and the debtors with respect to
25  certain loans.  Under the terms of the stipulation four loans,

1  which were the subject of the repurchase agreement are being

2  transferred to the debtors.  These are loans in which the

3  debtors have determined, either based on just the value of the

4  loans themselves on a standalone basis, or because the debtors

5  have other loans to the borrowers that they could receive

6  significant value if they acquired all of the interest in those

7  particular loans.  A consideration for the transfer by State

8  Street to the debtors.  The debtors are transferring to State

9  Street three loans, all of which are described in the motion

10  and in an exchange agreement which was filed with the Court on

11  Friday, which were not -- those three loans were not the

12  subject of the repurchase agreement.  But they appeared to both

13  parties to equate, if you will, to the value of the loans that

14  State Street is relinquishing in favor of the debtors.

15      In addition, Your Honor, there are two loans.  If I

16  have the names right, Your Honor, I think it's 275 or 245 Park

17  Avenue, and a Cobo (ph.) loan which are the subject of the

18  repurchase agreements will be retained by State Street.  So

19  they are similar to the other loans as to which the debtors'

20  acknowledge State Street's interest.  But the motion, itself,

21  primarily deals with this exchange.  Your Honor, the committee

22  has been very much involved in the process that led to the

23  exchange agreement.  Indeed, they comment upon the agreement

24  themselves.  They have not filed any objection, I assume they

25  support this transaction in light of that and their

1    involvement.  And as I noted Your Honor, this is an uncontested

2    motion.  And, therefore, Your Honor, based on the allegations

3    set forth in the motion and my presentation, I would

4    respectfully request that the Court grant the relief requested.

5            THE COURT:  I reviewed the motion.  As a result of

6    which I'm actually able to understand your presentation.  Part

7    of --

8            MR. KRASNOW:  I hope I was clear, Your Honor.

9            THE COURT:  You were clear, but it's actually not a

10   very clear situation as I review this.  Because without any

11   clear representations as to reasonably equivalent value,

12   certain assets are being transferred to State Street and

13   certain assets are being exchanged for the benefit of Lehman.

14   I accept the representation that this is all for the benefit of

15   the estate.  The fact that no party-in-interest has objected is

16   meaningful to me.

17           Had there been an objection we might have ended up

18   with some more difficult issues of proof, in terms of

19   demonstrating the equivalence of value and/or the actual

20   benefit to the estate associated with bringing loans together

21   that, logically, belong together because they're secured by the

22   same real estate.  I'm happy to approve the transaction as

23   represented and as explained by you.

24           MR. KRASNOW:  Thank you, Your Honor.  Your Honor, the

25   next item on the agenda, which is item number 4, is being

1  handled by my partner, Ms. Marcus.

2  　　　MS. MARCUS:  Good morning, Your Honor.  Jacqueline

3  Marcus, Weil Gotshal & Manges on behalf of the Chapter 11

4  debtors.

5  　　　Your Honor, number 4 is the motion of the debtors for

6  an order pursuant to Section 105(a) and 363(b) of the

7  Bankruptcy Code and Bankruptcy Rule 9019(b) authorizing the

8  establishment of procedures to terminate unfunded commitments

9  and restructure corporate loan agreements.

10  　　　In this motion filed on May 14th the debtor seek

11  authority to engage in certain activities relating to the

12  management and maximization of their loan portfolio.

13  Specifically, the debtors seek authority to terminate or assign

14  unfunded commitments as well as to enter into restructuring

15  transactions with respect to their loan portfolio.

16  　　　As indicated on the agenda letter, a limited objection

17  was filed by National CineMedia LLC and an objection was filed

18  by U.S. Bank.  In addition, we were contacted by several other

19  parties who raised questions similar to those asserted in the

20  objections.  We have included language in the proposed order

21  which addresses both objections, and all parties-in-interest

22  have agreed to withdraw their objections on this basis.

23  　　　Specifically, the new language is intended to make

24  clear that nothing contained in the proposed order would

25  authorize the debtors to assign or terminate unfunded

commitments without complying with the terms of the relevant

documents.  The order contemplates consensual deals in which

all necessary consents and approvals have been obtained with

the debtors reserving their rights to argue in certain

circumstances, if appropriate, that the Bankruptcy Code

authorizes them to circumvent certain approval rights if we

come back to Court and seek approval on notice to the affected

parties.

So what this motion does is give the debtor the

authority to enter into these consensual deals and eliminates

any question as to whether the debtors are authorized to do

these kind of transactions.

In addition, as a result of issues raised by the

creditors' committee and the ad hoc group of Lehman Brothers'

creditors, we have made further changes to the proposed order.

We have clean and blacklined copies of the proposed order,

they've been distributed to everybody who's asserted an issue

or objection.  And if you'd like me to I can summarize what the

procedure is or we can walk through the blacklined order.

That's up to Your Honor.

THE COURT:  I'm familiar with the motion, I'm not

familiar with the changes that have been made as a result of

the discussions with the ad hoc group of Lehman Brothers'

creditors, a group that I came to learn about the first time

this morning when I received papers delivered on behalf of that

1   group.  Apparently, jointly represented by White & Case and

2   Dewey & Lebouf.  I read their statement, I understand that

3   they're now in support.

4       What I don't fully understand, however, is how the

5   procedures have been modified to make them more transparent.

6       MS. MARCUS:  If I may approach, Your Honor, and hand

7   up the blacklined order?

8       THE COURT:  You may.  Thank you.

9       MS. MARCUS:  I think it's probably easiest to go

10  through the changes.  Some of them are not particularly

11  substantive, so we'll hit the highlights.

12      With respect to the unfunded commitments, the

13  procedures remain the same with the exception that we have

14  agreed, and it's the top of page 3 of the blackline copy, that

15  periodically -- basically every month, the debtors will file

16  with the Court a report of all agreements to terminate unfunded

17  commitments or assign the corporate loans having unfunded

18  commitments.  The requirements for what should be included in

19  that report are included in that paragraph.  And to the extent

20  that the debtors have paid more than a million dollars in that

21  previous thirty-day period, the report would also set forth the

22  amount paid by each of the debtors.  And that is intended, I

23  think, to increase the transparency.  So if anybody questions

24  what's been done after the fact, perhaps, they can come back to

25  the Court and seek further relief.

1      With respect to the restructuring transactions, and

2  that's on the bottom of page 3, we have actually made a fair

3  number of changes in the procedure.  We've changed the

4  threshold and we've also included a reporting requirement.  So

5  now, with respect to the restructuring transactions, it's

6  basically three tiered system.  So if -- bear with me because I

7  want to get this right.  If the restructuring involves

8  corporate loans in which the debtors have no beneficial

9  interest, meaning, they perhaps participated out the entire

10  amount of the position, or the debtors have a beneficial

11  interest of less than twenty-five percent of the outstanding

12  amount, and the amount owed to the debtor is less than 100

13  million dollars, then no Court approval and no approval of the

14  creditors' committee is required and the debtors can proceed

15  with the proposed restructuring.

16      The second threshold is if the restructuring involves

17  corporate loans in which the debtors have at least twenty-five

18  percent -- wait, I'm sorry, I said it wrong.  Let me step back.

19      If the restructuring involves corporate loans in which

20  the debtors have a twenty-five percent interest or the amount

21  is more than 100 percent -- 100 million dollars, excuse me,

22  then we will report to the committee what we're doing.  If the

23  debtors' position is at least twenty-five percent and the

24  amount of the debtors' position, it's the and the or that's

25  critical, and the amount of the debtors' loan is more than

1     twenty-five million, then we will either get approval of the

2     committee or file a motion with the Court.  So that there is a

3     reporting element where it's either twenty-five percent or more

4     than 100 million dollars.  But there's an approval process

5     where it's twenty-five percent, and, at least, twenty-five

6     million dollars.  And I believe that that's acceptable to the

7     committee and the ad hoc committee.

8          In addition, there was also a reporting requirement

9     here where, again, on a monthly basis we would report what's

10    been done during the prior month.  And we have negotiated a

11    somewhat lower threshold so that the debtors don't have to

12    report every single structuring transaction, because in many

13    instances they have very small positions.  But if they hold, at

14    least, ten percent of a loan or the debtors' position is more

15    than fifty million dollars, then that will be included in a

16    report to be filed with the Court.  And, again, the actual

17    requirements of what's to be included is set forth in the

18    proposed order.

19          THE COURT:  What happens if somebody sees something in

20    a report and they don't like what they see?

21          MS. MARCUS:  At least the debtors' expectation is if

22    that were to happen then the party, whoever it might be, would

23    raise the issue with the debtors and we might have to

24    reconsider the protocols that we've worked out.

25          THE COURT:  As I understand this, the procedure will

1    not require in most instances notice hearing and Court approval

2    unless transactions are over the threshold amounts that you've

3    described.  But to the extent that within the universe of

4    credit transactions, even if someone on notice doesn't like

5    what occurred, that transaction remains final and unassailable,

6    correct?

7         MS. MARCUS:  Yes, with a caveat.  To the extent that

8    we're providing notice to the creditors' committee, and we've

9    been working on them with various issues from the inception of

10   the case on the loan side of this, the creditors' committee

11   will have the opportunity to certain objection to disagree with

12   the debtors' business judgment to raise issues.

13        If we get through that process and the committee and

14   the debtors are on board, and, therefore, no Court approval is

15   sought then it's final.

16        THE COURT:  Then it's final.  So the committee becomes

17   the gatekeeper and chief.

18        MS. MARCUS:  That's correct.

19        THE COURT:  Okay.

20        MS. MARCUS:  And the reason for the reporting, as I

21   understand it, is that way other parties-in-interest have some

22   understanding of the gatekeeping that the committee has been

23   doing.

24        THE COURT:  All right.

25        MS. MARCUS:  And based on that, Your Honor, all

1   parties-in-interest have agreed on the form of the order, and

2   we would request that the Court enter the order.

3           THE COURT:  I'm prepared to do that.  Comments from

4   the committee, and I'm guessing, also, from Mr. Uzzi, who I see

5   moving in the direction of pushing through the gate and coming

6   forward.

7           MR. UZZI:  Very briefly, Your Honor.

8           THE COURT:  Okay.  First from the committee.

9           MR. FLECK:  Good morning, Your Honor.  Evan Fleck from

10  Millbank Tweed Hadley & McCloy on behalf of the official

11  committee of unsecured creditors of the Chapter 11 debtors.

12          We agree with Ms. Marcus' description of the revisions

13  to the procedures.  And we thought it would be useful to

14  provide the Court with a bit of additional color with respect

15  to the committee-approval process.  Because as the Court noted,

16  the committee does view itself, in many respects, as the

17  gatekeeper with respect to transactions on the corporate loan

18  side.  As well as we've discussed and described to the Court

19  previously with respect to different asset classes, and all the

20  assets classes of these estates, the committee has formed

21  subcommittees that are specific to those areas, and reviews

22  very carefully with the estate teams those transactions.  We've

23  described to the Court the process in connection with

24  derivatives.  And this is no different, although the specifics

25  and the thresholds are different and appropriate for this

1  particular asset category.

2      Your Honor, there is a loan book subcommittee of the

3  creditors' committee that works with the committee's financial

4  advisors to review and consider transactions to provide

5  feedback to the estates.  In some cases, to determine that

6  transactions that come on a notice basis and on an approval

7  basis may not be acceptable or may require further discussion

8  with the committee's advisors.  And I'm describing the process

9  with respect to aspects that aren't the subject to this motion,

10  but thought it would be useful because it relates to the loan

11  book and the corporate loans.

12      And the committee is satisfied with the interaction to

13  date between the parties, the professionals and also the

14  business people on the committee and the Lehman estate team,

15  that the level of transparency and disclosure that the

16  committee has received and the interactive process that has

17  taken place to date, has provided the committee with comfort

18  that their review is complete and there's an opportunity to ask

19  questions and to be comfortable with the transactions that the

20  committee reviews, both with respect as we approach unfunded

21  commitments, we expect that will be the same.  And, also,

22  corporate loan transactions.  There are thresholds, and we've

23  discussed thresholds with the Court before in other asset

24  categories, they are based upon the committee's determination

25  with respect to materiality.  And recognizing that in certain

1    cases, given the number of transactions and the importance of

2    them, it makes them to have thresholds to allow for parties,

3    both to have a complete review process, but to allow the estate

4    to move forward and monetize assets where appropriate.

5          This motion also refers to certain transactions that

6    are in the ordinary course of the estate.  And we thought it

7    also useful to describe to the Court that there is a very

8    active dialogue between the committee and the debtors about

9    what constitutes ordinary course.  And in any -- across the

10    asset categories, in any instance, and there has been such

11    instances, where the committee has determined that a certain

12    transaction is not in the ordinary course.  And we've discussed

13    that with the debtors.  And without exception, where the

14    committee has taken that view, those transactions have come

15    before the Court for approval, with the parties reserving their

16    rights as to whether transactions of that type are ordinary

17    course.  So the committee believes that it has an active role

18    to that discussion as to what constitutes ordinary course and

19    when matters should be noticed and considered by this Court.

20          And, again, we're comfortable to date with respect to

21    that dialogue.  And I mentioned a comfortable to date, because

22    we do think it's appropriate to note that, both the debtors and

23    the committee, where we have a process in place here that's the

24    subject to this motion, may come back to the Court based upon

25    the progress of the cases to request that the process be

1    modified based upon where we are in the cases. And I think

2    that's a clear understanding of the parties, the committee and

3    the debtors.

4         With respect to this specific motion, Your Honor, the

5    committee -- I should say with respect to the ad hoc group of

6    Lehmans' creditors, the committee is certainly aware of their

7    existence and formation, and the committee has directed its

8    advisors to help educate this group with respect these cases as

9    part of the committee's statutory duty.

10         THE COURT: When did you first become aware of the

11    formation of this ad hoc group?

12         MR. FLECK: I believe it was a couple of weeks ago.

13         THE COURT: Okay.

14         MR. FLECK: Although, in the interest of full

15    disclosure, the committee has spoken with members of the ad hoc

16    group in advance of the formation of this group. But it was on

17    or about the time when they filed the notice of appearance on

18    the docket.

19         So consistent with the committee's statutory duties,

20    they've directed their advisors to work with this group on a

21    public basis, just as we've had other creditors of these

22    estates, to help educate them to receive feedback where they

23    have particular comments with respect to motions, or aspects of

24    the estate that they learn about and, either want information

25    from the committee, on a public basis, or want to provide

1    feedback.  And this motion is no different, where the committee

2    has received feedback from parties, including the had hoc

3    group.  The committee evaluated their comments and that helped

4    to inform the discussions that we had with the debtors, which I

5    believe the Court is aware, with respect to many motions -- in

6    fact, there are a few exceptions, where we have an iterative

7    process, either before a motion is filed or after a motion is

8    filed, where we discuss the relief requested, the form of order

9    and certain modifications are made in that process.

10           That's the update we wanted to provide for the Court.

11   I'd be happy to respond to any questions.

12           THE COURT:  No.  Thank you.  I appreciate the update.

13   Mr. Uzzi, do you want to speak?

14           MR. UZZI:  Yes, Your Honor, thank you.  Gerard Uzzi of

15   White & Case on behalf of the ad hoc group of Lehman Brothers'

16   creditors.  And, Your Honor, this is the first appearance on

17   behalf of this group, and it did just form a few weeks ago.  We

18   filed a notice of appearance a couple of weeks ago.  We'll get

19   a 2019 statement on file in very short order.

20           I can confirm the remarks of both counsel as far as

21   the resolution, as far as our concerns.  I think it's worth

22   noting that, both the committee and the debtors worked very

23   cooperatively with us in trying to address our concerns, and we

24   certainly do appreciate that.

25           I can also state that the committee has made

1    themselves available to us to try to help us and get educated

2    in these cases, and we also appreciate that, Your Honor.

3         We support the motion as modified, the procedures as

4    modified.  We think it makes sense.  Just to address one

5    question that Your Honor had.  We do agree that once a deal is

6    cut, whether that's a restructuring transaction or the

7    reduction in commitments it's final, even if there's a public

8    report later on.  We don't intend to interfere with that, the

9    procedures wouldn't make sense otherwise.  But we think the

10   public reporting allows everybody to take a look every once in

11   a while and see if the procedures make sense.  And that's all

12   we would ever do, is come back to Your Honor, and I don't

13   anticipate this, but seek maybe a modification of procedures.

14   But we wouldn't be seeking to unwind any prior transactions,

15   Your Honor.

16        I have nothing further, unless Your Honor has any

17   questions for me.

18        THE COURT:  I have no questions, thank you.

19        MR. UZZI: I appreciate it, Your Honor, thank you.

20        THE COURT:  Ms. Marcus, I'm prepared to approve this.

21        MS. MARCUS:  Thank you, Your Honor.

22        MR. KRASNOW:  Your Honor, we now move to the contested

23   motion portion of the calendar.

24        Before I address the first item in that regard, which

25   is the debtors' motion with respect to the pension plan, with

respect to those matters that Your Honor has addressed in the

early part of the agenda, at the conclusion of the hearing we

would propose to provide chambers with the disk or disks,

rather, with regards to the various orders to be considered by

the Court.

THE COURT: A single hand up will be fine.

MR. KRASNOW: Thank you, Your Honor.

Your Honor, the first item on the contested agenda

portion of today's hearing is docket number 3515. This is the

motion of Lehman Brothers Holding Inc or LBHI for approval of a

settlement agreement amongst LBHI, the employee benefit plans

committee of LBHI, and the Pension Benefits Guaranty

Corporation, or PBGC, that's dated as of May 4, 2009. A copy

of which settlement agreement is attached to the motion as

Exhibit A. It relates to the LBHI retirement plan; a defined

benefit pension plan covered by the Employee Retirement

Security Act of 1974 commonly referred to as ERISA.

Your Honor, this is a pension plan as to which LBHI

was the sponsor. It is a pension plan as to which there are

approximately 22,000 current and former Lehman employees and

beneficiaries, who are beneficiaries of that plan. It is a

pension plan that as of December 2007 was a fully funded

pension plan. But as with most pension plans there were a fair

number of investments with equity securities. And we all are

aware, Your Honor, of the volatility that we saw in the

1   marketplace in 2008.  And, in particularly, the volatility that

2   was experienced in the marketplaces on and after the

3   commencement of the LBHI Chapter 11 cases.

4           As a consequence of that market volatility, what had

5   been a fully funded pension plan became an under funded pension

6   plan as of December 2008, Your Honor.  As of December 2008,

7   Lehman -- at least LBHI and the Chapter 11 debtors were not

8   what they once had been.  Whereas, prior to the commencement of

9   these Chapter 11 cases, the Lehman employees -- there are over

10  twenty thousand plus Lehman employees, now we have

11  approximately hundreds of employees.  We were facing the

12  prospect if we continued this pension plan in place in having

13  to deal with funding -- again, if it's again maintained in

14  place, not only to deal with the under funding but to deal with

15  potential future under fundings, and the enterprise was not

16  what it once was and it did not seem that it would be

17  reasonable or appropriate for the debtors and its stakeholders

18  to take risks with respect to the volatility of the market and

19  future funding needs.

20          Thus, there was consideration being given prior to

21  December 12, 2008 as to the potential termination of the

22  pension plan.  A pension plan can be terminated through two

23  mechanisms.  One would be a voluntary termination, where you

24  have a fully funded plan.  That was something which Lehman

25  could have done, but the cost of doing that would have been

1  significant, far more that the cost attendant to this

2  settlement agreement.  The other is an involuntary termination.

3       Which way to go, Your Honor, and the thinking in that

4  regard became somewhat accelerated as a result of an action

5  commenced by the PBGC in the District Court of New York on

6  December 12th seeking an involuntary termination of the pension

7  plan.

8       The various activities that that resulted in and the

9  various agreements that were reached with respect to the PBGC

10  in connection with the District Court action are described in

11  some detail in the motion, itself, Your Honor.  One of the

12  things we hope the motion makes clear in this regard, is that

13  while LBHI is the plan sponsor, the parties who were and are

14  liable to the PBGC in the event of a termination by them with

15  regards to not only the unfunded portion of the pension plan,

16  itself, but is as well as what's characterized and stated in

17  ERISA as a premium.  That a entity that is in Chapter 11 and

18  emerges in Chapter 11 and who terminates or has their plan

19  terminated in Chapter 11, must pay a bankruptcy termination

20  premium.

21       That the parties who would have been liable with

22  respect to all of those items and those obligations, would have

23  been, not only, LBHI, but also all members of its controlled

24  group.  Which included, not only the Chapter 11 debtors, but as

25  well, nondebtors.  Many of whom had significant assets and were

1    in position to fully satisfy whatever claims might be asserted.

2    And those entities included what I would call the Neuberger

3    Berman Management business.

4         During the course of the months that ensued from

5    December 12, 2008 until May 4th, negotiations occurred between

6    the debtors, the PBGC and the active input from the creditors'

7    committee, all of which culminated in the settlement agreement,

8    itself, Your Honor.  And simply put, under the terms of the

9    settlement agreement, if approved by the Court, it would be a

10   payment to the PBGC of the sum of 127,600,000 dollars plus

11   interest.  Which amount represents a compromise of, both what

12   the plan's funding shortfall will be, which represents a much

13   smaller element of the compromises that occurred in connection

14   with the negotiations of this agreement, plus the amount of the

15   premium that is otherwise due and payable upon termination of a

16   plan.  Which amount, the absence of a compromise, would be

17   approximately eighty-one million dollars.

18        And I did not indicate earlier, Your Honor, but I

19   would note that the amount of the unfunded pension liability is

20   far in excess of 100 million dollars.  So in the absence of the

21   compromise that is evidenced by the settlement agreement, Your

22   Honor, the liabilities that would result from a termination of

23   the pension plan, were the PBGC to pursue its District Court

24   action in the absence of the settlement would probably exceed

25   in approximately 200 million dollars.

1        As I noted, Your Honor, the settlement contemplates

2   the payment of the amount indicated, the termination of the

3   pension plan, any turnover of the plan assets to the PBGC.

4        Your Honor, this motion was served on, what I will

5   call, the usual suspects.  But it was also served on the

6   approximately 22,000 beneficiaries under the plan.  With

7   respect to them, Your Honor, there was a specific form of

8   notice that was drafted with the input of the PBGC, the Lehman

9   Benefits people, and I think we passed it by the committee, as

10  well.  With the idea being we wanted to try to explain to the

11  beneficiaries what was happening here with as little legalize

12  as possible.  But with notice so that they could, if they had

13  any issues, questions, raise them.  And if they had any

14  questions, they would know where to go and what to do.

15       Your Honor, as a consequence of that notice, we

16  received as we expected we would, a fair number of e-mails land

17  telephone calls soon after that notice was received by

18  beneficiaries.  We received approximately fifty e-mails,

19  approximately 400 to 500 calls.  The focus of all of those

20  inquiries was basically, what does this mean to me?  And the

21  answer to that, Your Honor, is that notwithstanding the

22  termination of the pension plan that all of those beneficiaries

23  would be fully protected with regards to their entitlement

24  under the pension plan up to those amounts guaranteed by the

25  PBGC.  And it is our understanding that of the twenty-two some

1    odd thousand beneficiaries under the plan, there may be

2    approximately only eighteen individuals whose entitlements

3    under the pension plan may exceed the guaranteed amounts.

4         So the termination of the pension plan will not have a

5    material or any effect to substantially all of the

6    beneficiaries under the pension plan.  Which is why from our

7    perspective we view this settlement as a win-win for any

8    number of parties.  A win-win for the debtors, because they no

9    longer have the specter of the PBGC overlooking the

10   administration of these cases focusing, as well they should,

11   from their perspective on what disposition of assets may be

12   taking place, both with regards to the debtors and the

13   nondebtors, which could put their collectibility of the

14   unfunded pension plan at risk.  And this is a case that as a

15   result of the settlement -- and there may be others out there,

16   but I'm certainly not aware of the situation where there has

17   been the termination of a pension plan in a Chapter 11 where

18   there's an unfunded liability where the debtors are in a

19   position to satisfy in full, in cash the amount of that

20   unfunded pension liability.

21        And in doing so, Your  Honor, we move the PBGC from

22   the equation, not only from their oversight, if you will,

23   restrictions which we were facing and which are described in

24   the motion with respect to dispositions of assets.  But while

25   we are paying a fair amount of cash for it, we no longer have

1 to focus on the PBGC when we finally get to the plan process

2 here, a focus that you do see in a lot of the cases and a big

3 distraction.

4 From the perspective of the PBGC it's clearly win-win.

5 While there are compromises that came to play arriving at the

6 amount of the payment being made, if you just look at the

7 aggregate amount being paid, the aggregate amount that's being

8 paid represents the full amount of the unfunded pension

9 liability, however the actuaries, ours and theirs, may

10 calculate that. And notwithstanding the compromises that, in

11 fact, take it into account coming up with that sum. And that's

12 because the amount we're paying, albeit a very small fraction

13 with regards to the premium I alluded to.

14 And then, lastly, Your Honor, from the respect of the

15 beneficiaries, as I noted, their interest as to substantially

16 all of the beneficiaries are fully protected here. And that,

17 Your Honor, is why we characterize it as a win-win.

18 Your Honor, there have been only two pleadings that

19 have been filed in response to this motion. One was filed by

20 the creditors' committee, it was a statement in support. And

21 that statement indicates, it validates what I said earlier,

22 Your Honor. The committee was very much involved in the

23 process that led to the settlement agreement, both in terms of

24 the negotiations themselves and the agreement themselves.

25 The additional filing that was made and the reason why

1  this is on the contested calendar, is an objection, Your Honor,

2  that was filed by a Mr. George Di Russo.  And there are two

3  docket numbers for the objection, Your Honor, 3711 and 3729.

4  The reason for that, it's the same piece of paper, we had

5  received the objection the latter part of last week.  As of

6  Monday it had not been filed with the Court, and we thought it

7  was appropriate to file it on behalf of Mr. Di Russo.  And then

8  the following day his objection actually arrived at the Court.

9        Mr. Di Russo, who is a beneficiary of the pension

10  plan, and whose entitlements are below the guaranteed amount,

11  so he's not among the eighteen whose retirement payments may be

12  reduced as a result of the termination of the pension plan.

13  His objection does not relate to or refer to the pension plan

14  that is the subject of the motion and the settlement agreement.

15  It does not relate to the settlement agreement, itself.  His

16  objection focuses on a separate investment vehicle that was

17  offered to Lehman employees.  Something referred to -- and we

18  think this is the right name in his objection, as the Lehman

19  Brothers Partnership Account.  We believe that this is an

20  investment vehicle that was offered, not by LBHI, but rather by

21  LBI.  It is not a defined benefit pension plan.  It is not

22  covered by ERISA.

23        In his pleadings he asserts that he has a significant

24  claim with respect to this Lehman Brothers partnership account.

25  It appears that he has, in fact, filed a claim in that regard,

1    we believe, we haven't seen the claim, in the LBI case.  And in

2    his objection he seeks redress in terms of that claim.

3           As I noted, Your Honor, this Lehman Brothers

4    Partnership Account is not the LBHI pension plan and,

5    therefore, while we have put this matter under the contested

6    section of the agenda, as we must because there's an objection,

7    in fact, this objection is not an objection to either the

8    motion or the settlement agreement.

9           I do not know if Mr. Di Russo is in Court and so if he

10   is obviously --

11          THE COURT:  Let's find out.  Is anybody here by the

12   name of George E. Di Russo, or is there any lawyer here on Mr.

13   Di Russo's behalf.  There's no response, and based upon my

14   review of the CourtCall list I believe Mr. Di Russo is not on

15   the phone either.

16          MR. KRASNOW:  Your Honor, in light of that while we

17   can extend this hearing a bit through a proffer, I would submit

18   that under the circumstances based on the motion, based upon

19   the presentation I made and were, we, Your Honor, to make a

20   proffer, it would be consistent with the presentation in the

21   motion.  In light of the committee's support of this we would

22   respectfully request for the reasons outlined, that Your Honor

23   approve the settlement.

24          THE COURT:  Is there anyone who wishes to be heard

25   with respect to this matter?

1          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

2     Tweed Hadley & McCloy, for the committee.

3          Arising simply to confirm Mr. Krasnow's

4     representations about the committee's involvement.  From the

5     with this process and it's conclusions in terms of this also

6     being a win-win settlement for everyone involved.  Regardless

7     of whether you assume that the PBGC were to win the District

8     Court proceeding or whether they were to lose, that this is

9     still a better settlement for the debtors than we could

10    otherwise have hoped for.  And we fully support it.

11         THE COURT:  All right, fine.  Please state your name

12    for the record.

13         MS. EAGLE:  Sarah Eagle on behalf of the Pension

14    Benefit Guaranty Corporation, Your Honor.

15         And I would just like to say with regards to the

16    unfunded benefit liabilities they're being paid.  While there

17    were negotiations and numbers were honed to ensure that that

18    under funding wasn't any greater than needs be, the under

19    funding that has been agreed here by the Pension Benefit

20    Guaranty Corporation is completely in accordance with our

21    regulations.  But other than that, I have no qualm with

22    anything that was said and we fully support the motion.

23         THE COURT:  Fine.  It appears that all parties are in

24    a position to understand the motion and support it, I believe

25    based on my review of Mr. Di Russo's written objection, it is

1  not relevant to the motion filed relating to the settlement

2  agreement relating to the PBGC.  And I accept the

3  representations that have been made by counsel for the debtor

4  as the functional equivalent of an offer of proof in support of

5  the motion.  The motion appears to be reasonable for the

6  reasons stated within it, particularly, in that it frees up the

7  debtor from further transactional interaction with the PBGC as

8  to the PBGC's claims against the debtor and non-debtor

9  affiliates.  Under the circumstances, I approve the motion.

10     MR. KRASNOW:  Thank you, Your Honor.

11     The next contested matter on the contested portion of

12  the agenda item number 6, is a motion of Unclaimed Property

13  Recover Services Inc. for relief from the automatic stay,

14  docket number 3345.

15     Your Honor, this is a motion that while filed in the

16  LBHI Chapter 11 cases, relates, in fact, with an agreement of

17  LBI.  There is no agreement with this entity by any Lehman

18  entity other than LBI.  And, indeed, there is a related set of

19  pleadings that is identified in the SIPA portion of the agenda,

20  as item number 15, which is really the meat, if you will,

21  matters that need to be addressed in the context of this

22  request.  We would suggest, Your Honor, with the Court's

23  permission, that rather than addressing this by piecemeal, that

24  we include item number 6, if you will, when we get to item

25  number 15 of the LBI portion of the agenda.

1          THE COURT:  Let's defer attention to this until we get

2     to the LBI portion of the agenda.

3          MR. KRASNOW:  Your Honor, we now jump to item number

4     7, and that's being handled by my partner, Ms. Marcus.

5          MS. MARCUS:  Jacqueline Marcus on behalf of the Lehman

6     debtors.

7          Your Honor, this matter relates to the debtors

8     original open trades motion, which was filed back on November

9     14, 2008.  And pertains to only one open trade and that is the

10    Yarpa trade.

11         As Your Honor recalls, I'm sure, pursuant to an order

12    dated May 14th, the original order was vacated as to Yarpa, and

13    Yarpa was provided with time within which to object to

14    assumption of the trade.

15         On May 22nd Yarpa filed it's objection to the

16    assumption and essentially claims that the debtors cannot

17    assume the trade because it was terminated prior to the

18    petition date.  The debtors filed a reply on May 29th in which

19    they take issue on whether the Yarpa trade was properly

20    terminated under the applicable documents, which are the LMA

21    form of agreement and UK law.

22         And, Your Honor, all of our arguments are set forth in

23    our reply, I can summarize them if you like.  But I think it

24    might more efficient simply to talk about where we go from

25    here.  We have tried to engage in settlement negotiations, they

have not been fruitful.  So what I would suggest, subject to

hearing from Yarpa's counsel is we enter into a pretrial order,

like we have with other trades we have been unable to resolve,

and set a discovery schedule.

THE COURT:  Let's hear from Yarpa's counsel about what

you propose makes sense.

MR. SCOTT:  Good morning, Your Honor.  John Scott from

Reed Smith on behalf of Yarpa.

There's really only one issue for the Court's

consideration in connection with our objection.  It's whether

or not this trade terminated, as Ms. Marcus suggested.  And in

connection with making that determination there are three

issues that are presented for the Court's consideration.

First, what was required for the trade to close?

Second, whose obligation was it to make sure that those things

actually happened?  And third, at what point did it become

simply too late for the Yarpa trade to close.

It's our position, obviously that the trade terminated

two months prior -- at least two months prior to the petition

date and therefore it can't be assumed.

THE COURT:  You were doing some inconsistent things at

the time, though, including providing information to the agent

at the very same time that you take the position that the trade

was terminated.  I believe there are disputed issues of fact

here.  The matter can't be resolved on the basis of the

1    pleadings that I have before me and today's not the day for an

2    evidentiary hearing.

3          MR. SCOTT:  Your Honor, we're certainly prepared to go

4    forward with an evidentiary hearing if that's what the court

5    thinks is appropriate.  But I do want to --

6          THE COURT:  I think what's most appropriate is for the

7    parties to reach an agreement in which you can stipulate as to

8    as many facts as possible.

9          MR. SCOTT:  Okay.

10          THE COURT:  I'm assuming most of the facts are fairly

11    clear, some may not be.  To the extent there's an area where

12    you can't agree, we can have a hearing.

13          MR. SCOTT:  Okay.  We're certainly willing to work

14    with the debtors' counsel to submit a stipulation of agreed

15    facts if that's what the Court --

16          THE COURT:  Well, I suggest that what Ms. Marcus has

17    outlined as a procedure makes sense, which is that you meet and

18    confer regarding the terms of what amounts to a pretrial order.

19    This is not an adversary proceeding but in other similar

20    circumstances where we have contested matters involving open

21    trades, we're adopting procedures that are comparable to the

22    procedures that would apply in adversary proceedings in terms

23    of discovery to the extent necessary, stipulations of fact,

24    efforts to streamline the process.  And to the extent that the

25    parties in meeting and conferring with each other can also come

1    to some kind of business resolution, that's desirable as well.

2          So the process is not being done for the first time in

3    your case.

4          MR. SCOTT:  Okay.

5          THE COURT:  And I think it makes sense to proceed with

6    that same protocol.

7          MR. SCOTT:  We're willing to do that and we'll work

8    with Ms. Marcus to agree or comply with that requirement.

9          THE COURT:  That's fine.

10         MR. SCOTT:  If there's nothing else.

11         THE COURT:  There's nothing else, just a question of

12   when next we're going to pay attention to this.

13         MS. MARCUS:  I suggest we take it off the calendar

14   subject to entering into a pretrial order and then we'll talk

15   about --

16         THE COURT:  Fine

17         MS. MARCUS:  -- when it'll actually be heard.

18         THE COURT:  Good suggestion.

19         MS. MARCUS:  Your Honor, the next matter on the agenda

20   is number 8; it's the motion of Basso Capital Management, LP.

21   I'm sure Basso's counsel is here and my partner, Richard

22   Levine, will be responding to that motion.

23         (Pause)

24         MR. BROSTERMAN:  Good morning, Your Honor.  Melvin

25   Brosterman from Stroock & Stroock & Lavan on behalf of Basso.

1          This is a motion to vacate an order entered by this

2   Court in December, which as to Basso approved the assumption of

3   certain trades between Basso and Lehman Commercial Paper.  And

4   there are six good reasons for the vacature of the order.  And

5   those reasons are Bankruptcy Rule 6006, Bankruptcy Rule

6   9004(b), Bankruptcy Rule 9014, Bankruptcy Rule 7004, Bankruptcy

7   Rule 9013 and the most important reason, perhaps, is this

8   Court's order dated November 5.  Because in this Court's order

9   dated November 5, Your Honor required that notice be given by

10  November 7th by the debtor as to a class of trades.  It was

11  actually as to all trades but with the exception of a certain

12  class as to whether or not the debtor intended to reject or

13  assume those trades.  And Basso was given notice on November 7

14  by e-mail to somebody in the operations department at Basso in

15  a two-sentence simple e-mail that the trade that was

16  outstanding was going to be rejected.

17          The only thing that the debtor could have done

18  thereafter is it reserved the right to move from the rejection

19  column to the assumption column trades if the parties whose

20  trades had been rejected agreed to modify those trades.  That

21  was the one reservation, nothing else.

22          On November 14 a motion was filed with a long list of

23  exhibits, an omnibus motion.  That motion actually wasn't

24  served properly on anybody or at least on Basso, I don't want

25  to say on anybody.  And the reason it wasn't served properly on

1   Basso, although that's less of an issue in this case -- that

2   service of that is less of an issue is because it was a

3   contested matter and under the rules service has to be

4   performed in the same way that you service summons a complaint

5   and Basso was, I believe it was called a standard party under

6   this Court's case management order which meant that Basso was

7   one of those persons that had to be served in a way in which a

8   summons complaint would have to be served.

9        Had Basso, however -- Basso is not quarreling with the

10  service of that because it's like being named as a defendant in

11  a declaratory judgment action where all that the relief sought

12  against you is good, you have no problem with it.  You never

13  serve properly, you never appear, the relief is entered, nobody

14  will ever quarrel with the service.

15       What happened afterwards, though, is that on November

16  21 an e-mail, which is not good service, much longer e-mail

17  gets sent to the very same operations person and down about the

18  sixth of seventh paragraph at the bottom it says, and it does

19  say this, that the trade that we decided to reject we now

20  intend to assume.  That e-mail does not constitute a motion

21  within the meaning of 9013 or 9014 and it surely doesn't

22  constitute good service of a motion as required under Rule 704.

23       What happens next is, on November 20 -- no, excuse me,

24  on December 14, so this is now a month after Basso is first

25  notified that its trade would be rejected, there is, rather

1    than a new motion being filed or the old motion being withdrawn

2    or any motion being served properly, the debtor serves -- sends

3    an e-mail, again to the same person, which say here's a notice

4    of revised exhibits.

5        Now, again, we don't dispute that if somebody looked

6    through that list of revised exhibits they would see that the

7    Basso trade had been moved from the assumption column to the --

8    I'm sorry; the rejection column to the assumption column.  But

9    the one thing that's very clear is that nobody at Basso read

10    that, had an obligation to read that, that it's also not in

11    dispute, I don't believe it could be, that that notice of

12    revised exhibits, which was not a notice of motion, could ever

13    comport with any of the bankruptcy rules' requirements as to

14    motions.

15        Moreover, as the Court well knows, since this was an

16    omnibus motion under Rule 6006, given the amendments in 2007,

17    among other things it had to state in a conspicuous place what

18    was going to occur.  There was no notice of motions, simply a

19    notice of revised exhibits.

20        The first time Basso found out, when they truly found

21    out is in April, months after the original November 14 notice.

22    In April their lawyer who handles, not bankruptcy matters but

23    the closing of trades, gets a phone call from Lehman saying

24    when are we going to close the trade.  And the lawyer says,

25    what trade?  The trade was rejected.  And he says, no, no we

1    changed that from rejection to assumption. And indeed the

2    lawyer also had received one of the e-mails.

3         What's happened in the interim, which of course is why

4    we're here, is that on November 14, when the trade was

5    rejected, had the trade been assumed, had we gotten a motion at

6    that time that conformed with all of the rules, that was served

7    in the proper manner, what we could have done is hedge that

8    trade. Basso was buying at ninety-five; the market at that

9    time was in the seventies. Basso, once it found out the trade

10   was being assumed, that it would have an obligation to buy at

11   ninety-five, could go into the market and sell. It could hedge

12   its exposure with respect to that. When it learned it was

13   rejected, it did nothing because it no longer had an obligation

14   to buy. The market, since then, has gone and I don't exactly

15   know what it is today, probably down as low as in the teens and

16   right now it's probably hovering twenty-five to thirty.

17        So, the consequence of the debtors' failure to serve a

18   motion which met all of the requirements, was served on the

19   right people, complied with this Court's November 7 order is

20   that Basso did nothing and wasn't obligated to do anything to

21   hedge exposure. And by permitting the debtor to assume.

22        Now, even if assuming this Court were to permit that

23   to reserve, to do it the right way because they didn't do it

24   the right way, that's very clear, the consequence of that would

25   be by virtue of the failure to follow this Court's order Basso

1    will have been injured to the tune of roughly three-quarters of

2    a million dollars.  And the significance here is that this

3    Court's order on November 7th, if the Court may recall, was the

4    product of a motion to compel made by a variety of trade

5    counterparts who were arguing to this Court until it was

6    settled by stipulation that these are volatile markets, we need

7    to know whether the debtors' going to assume or reject it.  And

8    this Court gave the debtor, and the debtor agreed to it, a very

9    short timeframe to identify which trades it was going to assume

10   or reject.  And it also required in that order that those

11   trades it was going to assume be closed in as commercially

12   reasonable and an expeditious manner as possible.

13        So what happens is, Your Honor on December 14 I

14   believe it was, enters an order -- or December 16 -- grants the

15   debtors' 365 motion.  Basso never objects because Basso never

16   got notice, at least notice as in the form in which it's

17   required under the rules.  Months later, December, January,

18   February, March, April the debtor comes along and says we'd

19   like to close.

20        Now I appreciate, Your Honor, that this is a very

21   large case.  And that there are e-mail blasts going out all the

22   time.  And that there's a case management order that says who

23   you can serve by e-mail and when you can serve by e-mail.  But

24   in the case of Basso the only way Basso could have been served

25   was in the right way provided by the rules for service of a

1  summons complaint.

2       The only way a motion could have been made is by

3  conforming to Rule 6006, Rule 9004(b), have a nice big caption

4  there, Rule 9014, Rule 9013, none of those things occurred.

5  And most of the time, more or less, in this case that probably

6  wouldn't have mattered because if Basso had -- if it had gone

7  into the legal department of Basso as opposed to the operations

8  department at Basso somebody probably would have seen this and

9  read it more carefully and we probably wouldn't be here today.

10  But their failure is not simply excusable but largely

11  irrelevant because it's the equivalent of not answering a

12  complaint that we were never served with properly.  If somebody

13  e-mails me a summons of complaint I don't have to do anything

14  unless, of course, there was an order of the Court or some

15  other agreement on my part to accept service by e-mail, which

16  of course didn't exist here.

17       So the fact that I know that a summons of complaint

18  may have been filed, the fact that I know it's out there but

19  has never been served properly does not give rise to an

20  obligation on my part to respond.

21       We're not saying that Basso just sat there knowing

22  that service was improper and did nothing.  What I'm saying is,

23  that the e-mail, and there's an affidavit to this effect, that

24  went into the office person and she just never even noticed it

25  because what she knew was that the trade had been rejected and

1    in her mind, as somebody who processes trades, that's what an

2    operations person's done, it was unnecessary for her to look at

3    anything else regarding this trade because it had already been

4    rejected.

5         So what we're asking the Court to do is to vacate the

6    Court's order as to Basso permitting the assumption of the

7    trade because there was no authority to issue that order since

8    we had never been served and certainly never been served with a

9    motion that conformed to the requirements.  And to, in the same

10   order vacating the prior order, prevent the debtor from doing

11   what the debtor may very well say it can do right now which is

12   to make another motion to assume now -- let's see, September,

13   November, December, January, February, March, April, May, June,

14   seven months later -- seven months later a trade that Your

15   Honor required that they reject or assume on November 7th.

16        THE COURT:  Is it your position -- and I've read your

17   papers and I've listened to your argument.  Is it your position

18   that the debtor should be precluded from making such a motion?

19   They're certainly free to do that.  If I grant you the relief

20   that you're seeking we're going to be back in Court some day

21   unless you work this out.

22        MR. BROSTERMAN:  Okay.  They are free to do it unless

23   Your Honor finds on this -- this will come up in one of two

24   ways.  We raise the issue now.  We say, right now, under 105

25   they shouldn't be entitled to make that motion right now

1    because Your Honor's order -- because the only way they're

2    entitled to it is if Your Honor amends your earlier order of

3    November 5 and gives them permission to do this under these

4    circumstances.  And we say, it would be inconsistent with Your

5    Honor's powers under 105.

6         THE COURT:  All we have to do is go into due process.

7    They are not going to be squashed like a bug because you file a

8    motion that says you didn't get good service.  They'll have an

9    opportunity to get a do-over, as will you.

10        MR. BROSTERMAN:  Right.  Correct.  And if Your Honor

11   doesn't address it now, they'll have to address the issue of

12   whether or not, under the law in this district, they're allowed

13   that do-over.

14        THE COURT:  You'll have your opportunity to do that.

15   That's not happening today.

16        MR. BROSTERMAN:  Okay.

17        THE COURT:  What's happening today is we're deciding

18   whether or not you've made a good enough case to get to the do-

19   over phase of what may happen next.

20        MR. BROSTERMAN:  We can take it one step at a time.

21        THE COURT:  And that's exactly how we're going to take

22   it, one step at a time.

23        MR. BROSTERMAN:  And of course, Your Honor, we have --

24   it's not as if we don't talk to the debtor.  We're only here

25   because those conversations have resulted in us being here as

1  opposed to coming to a resolution.

2       THE COURT:  It's just a different form of

3  conversation.

4       MR. BROSTERMAN:  So if Your Honor vacates the order,

5  we have different form of conversation.  As of now, we don't

6  believe there's any basis for --

7       THE COURT:  Okay.  Well, let me find out what the

8  debtor says about all this.

9       MR. LEVINE:  Thank you, Your Honor.  This is Richard

10  Levine of Weil Gotshal for the debtors.

11       I listened carefully to Mr. Brosterman's presentation.

12  I obviously read his papers.  I would start by saying that I

13  think everything he said today is irrelevant to his motion.

14  His motion is under Rule 60(b) and Section 105.  Section 105 is

15  never mentioned in either his moving papers or his reply brief,

16  as far as I can remember, other than in the caption and maybe

17  the introductory sentence.  60(b) is not mentioned in his reply

18  brief.  He's made a bunch of arguments, all of which whether

19  they merit full or merit less, go to whether or not the

20  original motion should have been granted.  They don't go to

21  Rule 60(b).

22       Rule 60(b), which is the primary basis on which they

23  moved, allows someone to seek relief from a judgment that's

24  been already entered under very specific circumstances and

25  under very specific interpretations issued by the Supreme Court

1    of the United States.

2         Whether or not the original motion was properly

3    served, whether or not it complied with the bankruptcy rules,

4    whether or not it complied with all these other rules that

5    Mr. Brosterman has listed, many of which I think are

6    inapplicable, has nothing to do with whether the Rule 60(b)

7    motion relief should be granted.

8         As we establish in our objection, which his reply does

9    not respond to at all, no matter the merits of their

10   substantive arguments about why the order never should have

11   been entered, unless they can get through the 60(b) hurdle,

12   those arguments are not even properly before the Court.  And as

13   the case law establishes under the four issues that are looked

14   at by a court on 60(b), the primary issue is is there good

15   excuse for the movants delay.

16        THE COURT:  I think there is in this case.  And I'm

17   going to tell you why and then you can respond to the specific

18   concern that I have.

19        I read the e-mail.  The e-mail that notified the

20   operations person at Basso that the debtor had changed its mind

21   and was assuming what it had previously thought it was going to

22   be rejecting.  And it wasn't at all conspicuous.  I read it and

23   I started getting bored at about paragraph 3 because it was

24   filled with boilerplate right at the beginning.  References

25   made to blah, blah, blah and it went on with more blah, blah,

blah. And it wasn't until literally about the third line from the bottom of that very long e-mail, it's a full page, that it said in words that you really have to be reading with some care to recognize, oh by the way we changed our mind. It didn't even say that. It says, in legalese, we're assuming the trade.

It wasn't an e-mail that in the subject line, all in caps, said what out your rights are going to be affected; we've changed our mind, read this with care. It didn't say that. So I think that excusable neglect is a real problem here for you, not for the movant. I'd like you to explain why they shouldn't prevail on that standard.

MR. LEVINE: Okay. Thank you, Your Honor. I mean, I think your characterization of the November 21st e-mail is correct. I just want to note a couple of things. The person who we are referring to today as the operations person was the business contact, the person that Lehman was always dealing with on these trades.

THE COURT: Sure. A busy trader. A busy trader. The mentality kind of answers the question.

MR. LEVINE: Well, this was not a clerk. This was a real business person and it is a one-page e-mail. It is one, two, three, four, five, six paragraphs. It is the fifth paragraph, the first sentence of which, which says we're going to assume this trade. It's not buried. It's the first sentence of the operative paragraph.

1          Also remember, Your Honor, that this was only two

2     weeks after the deadline for notice in the stipulation, only

3     one week after the motion was filed.  And then when the revised

4     exhibits are served and filed, including with a black line

5     showing where the exhibits have changed and it clearly

6     indicates that this trade has moved from rejected to assumed,

7     it's sent not only to that business person but also to the

8     counsel who was handling these things.

9          And then Your Honor entered the order, the order

10     itself.  Now, the original stipulation and the Bankruptcy Code

11     and everyone else knows that the debtors' motion to reject is

12     not meaningless unless the Court grants the motion.  So the

13     idea that they had the right to stop paying attention when they

14     got the initial e-mail and got the motion and didn't even

15     bother to look at the order that Your Honor signed which listed

16     this very clearly as an assumed trade, to me that does not

17     satisfy reasonable neglect.

18          They can't just stop paying attention because the

19     debtors made a motion.  So it's not just the e-mail.  It's the

20     e-mail, it's the revised exhibits which are served on both

21     counsel, and the only counsel we knew of and the counsel we'd

22     been dealing with on closing trades on behalf of Basso, and the

23     business person get the revised exhibits.  And then Your Honor

24     enters an order which is what was either going to grant or deny

25     the debtors' motion, whether it was the original motion or the

1     motion with the revised exhibits.  So I think in that sense

2     they have not satisfied Rule 60(b).

3          And in terms of all the points that they're making now

4     about things like the stipulation, well the stipulation, of

5     course, they were not a party to.  Now I recognize that there

6     were some movements and the language of the stipulation is

7     general but we also know that if the debtors had missed the

8     deadline in the stipulation and one of the parties to the

9     stipulation or some other counterparty had raised it with the

10    Court by way of motion, the response by the Court would not

11    have been okay everything's rejected or you get whatever you

12    want.  It would have been an order to the debtors to comply

13    with the stipulation by a date certain and maybe with some

14    scolding by the Court.  And would have given the counterparties

15    a reasonable time to respond to the motion.

16         So the fact that -- even if we violated the

17    stipulation, it certainly doesn't result in getting Basso where

18    it wants to be today which is that the trade is somehow

19    magically rejected.  And I know Your Honor said we're not

20    getting there today anyway but it does seem to me that if they

21    had been paying attention to their rights, if they had been

22    reading the Court's order, if they had been reading the

23    exhibits that were served on them these issues would have been

24    resolved at the time as they were with other parties who found

25    themselves in similar situations.  And all would have been

1    resolved back in December, January instead of five months later

2    where, as Mr. Brosterman notes, the value of the debt has

3    fallen precipitously.

4         THE COURT:  I understand.  We're going to do what I'm

5    terming a do-over in this case.

6         MR. LEVINE:  Okay.

7         THE COURT:  I'm concerned about the allegations, not

8    so much of particular bankruptcy rules because when counsel

9    says there are six good reasons to support why I'm entitled to

10   relief and then proceeds to recite, without explanation,

11   bankruptcy rules by number.  He's talking in code.  He didn't

12   need to actually be more eloquent, however, because the issue I

13   had is due process.  It's not bankruptcy rule provisions it's

14   in the particulars of this case.

15        I'm concerned that there was insufficient effort

16   undertaken by the debtors to provide actual and conspicuous

17   notice to Basso Capital Management of the change in position

18   that took place with respect to this trade.  Had that been

19   done, we wouldn't be here.  And while you suggest that the e-

20   mail that I read, which you at first said I had read correctly

21   when I said blah, blah, blah on the record but then said well

22   it wasn't buried when it appeared in the fifth paragraph, I

23   think it was.  I don't think it was intentionally buried, I

24   think it was a document which, on reflection, might have been

25   crafted differently if it were to become an exhibit in a

1    litigated matter in front of me.

2         This was all happening very quickly.  I believe that

3    the mindset of a business person at Basso, and I have no idea

4    what that person was thinking and so counsel who attempts to

5    characterize what someone is thinking is not presenting with

6    any information that I'm taking seriously, this is just

7    argument but I also recognize how people function in the real

8    world.  And especially when information is being received by e-

9    mail in an office that I assume is a busy office, you're not

10   necessarily going to read to the end of a long e-mail message.

11   E-mails are designed, most appropriately, to be crisp.  Lawyers

12   tend not to write crisp e-mails because they're afraid that

13   some day they're going to be read into a record years later.

14        Business people, I think, routinely read and react and

15   delete or they don't read because they have other, more

16   pressing things to deal with.  And so in a setting in which the

17   mindset is we're going left and it turns out that instead we're

18   going right, people need to know pretty directly about that

19   change in direction.

20        So based upon my review of this, I'm satisfied that

21   while it's an unusual set of facts, I think that Basso has

22   satisfied its 60(b) obligation on excusable neglect but it's

23   going to be back in court unless it works something out on a

24   business basis with the debtor.  And just because I'm giving

25   everybody another opportunity, doesn't mean that any of the

1  issues are tilting one way or the other as to this trade.

2          MR. BROSTERMAN:  Thank you, Your Honor.  So we will

3  file a new motion unless we can resolve it, Your Honor.

4          THE COURT:  Okay.

5          MR. KRASNOW:  Your Honor, we're about to turn to

6  Section B of the agenda which relates to adversary proceedings.

7  And with the Court's indulgence, since there may be people in

8  the courtroom who have no involvement in the balance of the

9  calendar --

10          THE COURT:  And would like to leave.  Why don't we

11  take a break?  We've been here for a while, it's also warm.

12  For those who are sitting on the convectors, while I know

13  that's a place to sit it also manages to block all air

14  conditioning into the room.  So maybe when people choose to

15  leave and not come back during the break there'll be seating

16  for everybody and we'll be more comfortable.  Let's take a

17  break for ten minutes.

18          MR. KRASNOW:  Thank you, Your Honor.

19          MS. MARCUS:  Thank you.

20      (Recess from 11:24 a.m. until 11:37 a.m.)

21          THE COURT:  Be seated, please.

22          MR. KRASNOW:  Your Honor, Richard Krasnow, Weil

23  Gotshal & Manges LLP for the Chapter 11 debtors.  Jumping now,

24  Your Honor, to item 9 on the agenda, which relates to the

25  adversary proceeding 1440 LLC vs. State Street, et al.    I

1  believe, Your Honor, the matter today on the calendar with

2  respect to this adversary proceeding is a motion of State

3  Street.  So we will turn the podium over to State Street's

4  counsel.

5          THE COURT:  Okay.

6          MR. PHALEN:  Good morning, Your Honor.  Andy Phalen

7  from Bingham McCutchen on behalf of State Street Bank and

8  Trust.

9          What we have on for the hearing now, Your Honor, is

10  State Street's motion to dismiss the adversary proceeding that

11  was filed by LH 1440 Story, LLC.  And I think a little bit of

12  background is warranted.  The Court may remember a bit of this

13  matter because originally there's a --

14          THE COURT:  I remember it vividly.

15          MR. PHALEN:  Okay.  Vividly.

16          THE COURT:  So you don't -- you're welcome to provide

17  what background you wish to provide but I have a clear

18  recollection of the procedural background.

19          MR. PHALEN:  Okay then, very briefly.  There is a

20  larger adversary proceeding or original one that State Street

21  filed that Mr. Krasnow referred to earlier under which State

22  Street obtained approximately thirty-six -- thirty-seven loans

23  under a repo arrangement with Lehman.

24          This is one of those thirty-six loans and it is the

25  subject of an adversary proceeding filed by LH 1440 Story.

1          THE COURT:  And before that it was the subject of a

2    motion to intervene in the adversary proceeding.

3          MR. PHALEN:  Correct.  Correct.  And LH 1440 Story is

4    also referred to as Lighthouse, that's how I will refer to them

5    here.

6          The basis for the action is the fact surrounding the

7    Lighthouse project or 1440 Story.  They had a development

8    project to which Lehman, Lehman entities, Lehman Brothers,

9    loaned approximately 26.7 million dollars.  That loan, that

10   amount, was subdivided in the contract documents into three

11   parts; and acquisition loan of about fifteen million dollars, a

12   project loan of about six million dollars and a building loan

13   of about four million dollars.

14         Under the repo agreement State Street acquired the

15   acquisition loan from Lehman.  That acquisition loan of fifteen

16   million dollars was fully funded.

17         THE COURT:  Did State Street have any role in

18   selecting the collateral that was to be the subject of the repo

19   transaction?

20         MR. PHALEN:  No.  No, this was done at Lehman's

21   discretion, what the collateral was.

22         So in its repo and in its documents, documentation it

23   received under its repo, it had received the acquisition loan

24   specifically designated by the fifteen million dollar loan

25   amount.  The project also had, as I mentioned, a project loan

1 and a building loan. Those two have never been in State

2 Street's account and State Street has never obtained those, any

3 notes or documents concerning those specific loans.

4 THE COURT: And unlike the motion that we heard first

5 thing this morning, State Street presumably also has no desire

6 to reunite the sections of this loan because to do so would

7 provide some funding obligation.

8 MR. PHALEN: That is correct. And that's the

9 motivation here. Lighthouse is in the unfortunate situation of

10 having a counterparty that is in bankruptcy on those two other

11 loans. State Street doesn't want those but the key here is

12 that the contracts did not give State Street those loans.

13 Lighthouse's argument is that there was only one

14 indivisible twenty-six million dollar loan. And that by getting

15 the acquisition loan State Street also got the project loan and

16 the building loan.

17 We point to in our papers, and I will keep this brief,

18 we move to dismiss, the standard it high for us. But it is

19 based on the clear, unambiguous terms of the contract documents

20 that this case should be dismissed against Lighthouse. And let

21 me start with those and jump right into the language of those

22 agreements.

23 When State Street, under the repo, obtained its -- the

24 acquisition loan it actually got the original note, the

25 promissory note for the acquisition loan. And this was

1    attached to our brief, our motion to dismiss to the affidavit

2    of Ms. Yang, attachment A.  But the language in that promissory

3    note is telling and it is dispositive of the issue before the

4    Court.  It says -- first it identifies the loan as being in the

5    specific amount of 15.6 million dollars.  It then has, in

6    section -- and I will quote the Court two sections of it.  But

7    section 13, a specific term on transfer and that term says

8    "That the lender may, at any time, assign or otherwise transfer

9    to one or more transferees in one transaction or in separate

10   transactions, its right to payment of principal, all accrued

11   and unpaid interest thereon or any component of the debt or any

12   other right or benefit of the lender hereunder, under this

13   note".

14           This is a note that Lighthouse signed.  They're

15   claiming now an understanding that these could never be

16   transferred but it's inconsistent with the plain language of

17   the agreements that they signed, including this promissory

18   note, that's section 13 of the promissory note.

19           Section 21(d) of the promissory note also states, in

20   terms that are as clear if not more clear, "Borrower,

21   Lighthouse, acknowledges that lender" which was Lehman, "may

22   securitize this note or any replacement notes or otherwise

23   sell, assign, transfer or convey by pledge or otherwise, this

24   note or any replacement notes and all or any portion of

25   lender's interest therein or in the acquisition loan evidenced

1    hereby to third parties."  Clear, unambiguous language that

2    gave Lehman the right to transfer the individual acquisition

3    loan and its note.  No language in the promissory note or

4    elsewhere in the contract required that all three loans,

5    acquisition, project and building be transferred together.

6    Expressed terms that Lighthouse signed allowed them and

7    provided that they could be individually transferred.

8         This is not the only language that supports the motion

9    to dismiss in the acquisition, loan and project loan agreement.

10   There also is a transfer term.  And in that agreement, it's at

11   section 18.1, there is a provision that says, and I'll quote it

12   again because it is dispositive, "That the lender may, at any

13   time, sell, transfer or assign the note, this agreement, the

14   security interest, the conditional guarantee, the completion

15   guarantee and the other loan documents and any and all

16   servicing rights with respect thereto or grant participations

17   therein are issued pass three certificates," etcetera,

18   etcetera.  It says that it can be transferred.

19        Lighthouse signed this agreement.  They're claiming

20   now an understanding that conflicts with the expressed terms in

21   the agreement.  Under the standard for a motion to dismiss the

22   Court need not accept the conclusory allegations of a party

23   that are inconsistent with clear terms in the contract.  Here

24   we don't have just one term; we have three terms that I've read

25   from the promissory note and this acquisition loan agreement.

1    And further indicia of the party's intent that these would be

2    transferable is the fact that the parties, in section 7.4, also

3    agreed that not only could these individual loans be

4    transferred but they could be split.  There's a splitting

5    provision that enabled Lehman, if it chose to do so, to

6    subdivide the loans even into subparts.  Again, clearly showing

7    the party's intent that these would not be one indivisible

8    whole that could not be transferred.

9        THE COURT:  What would your position be if there were

10   another document that said don't worry about section 13 of the

11   note, this was always intended to be a singular transaction

12   because it would be disruptive of the intention of the borrower

13   for there to be a separation of the acquisition note from the

14   funding obligation which would destroy the intentions of the

15   transaction?  What would happen then?

16       MR. PHALEN:  That would not change the result here

17   because there's another expressed term, both in the contract,

18   the acquisition loan agreement and in the promissory note, in

19   all the contract documents themselves that is an integration

20   clause.  And it says that all of the understandings of the

21   parties are as set forth in the contract documents.

22       You may be dealing with a fraud issue there, another

23   issue perhaps as to Lehman but not as to State Street.  Here

24   there could be no reliance on such of a side letter or some

25   other document that exists because the expressed terms of the

1    agreement say that the four corners of the documents articulate

2    the entirety of the parties' positions.  Nor I would suggest,

3    Your Honor, here, for the additional reason that there has been

4    no suggestion whatsoever that there is such a document, would

5    it play into --

6         THE COURT:  Well, there's some memorandum that

7    referenced in 1440's papers suggesting that this was a singular

8    transaction instead of separate transactions.

9         MR. PHALEN:  The reference in the papers -- all these

10   loans have a myriad of related documents and loan documents.

11   They're very paper intensive.  There are many different

12   agreements.

13        THE COURT:  Indeed part of the problem here, from

14   1440's perspective and perhaps yours, is the very complexity of

15   the documentation.

16        MR. PHALEN:  It's not though because the memorandum

17   that Lighthouse refers to is the memorandum of option in which

18   Lehman had an option of the right of first offer to take an

19   additional ownership interest in the loan.  And in that

20   document that Lighthouse relies on --

21        THE COURT:  This is the 28.5 percent participation

22   interest?

23        MR. PHALEN:  This is actually -- there was a different

24   argument that Lighthouse had made which was that there's a

25   memorandum of offer.  And in that offer it says -- there's a

1   reference to there being only a single loan.  But we mention in

2   our reply brief, and I didn't see it on the agenda but I

3   believe a copy had been sent to chambers.

4        THE COURT:  I read your reply brief.

5        MR. PHALEN:  All right.  In there we point out that

6   that very memorandum to which Lighthouse was referring says

7   this memorandum is not to be used for any interpretation of the

8   contract itself, you need to look to their loan documents for

9   that purpose.  We cite that in the agreement.

10       The point that Your Honor next raised was the

11  participation fee, which provides for a 28.5 percent return or

12  up to that amount for the lender on this deal.  That same

13  argument, I think, goes along with the interest rate cap

14  agreement.  Lighthouse said, well if there are three loans

15  there must be three participation fees and 28.5 times three is

16  approximately ninety percent, we'd never make a profit in this

17  deal.

18       There's no contractual support for a trebling of the

19  participation fee.  The language in the agreement is clear.  It

20  says that the participation fee is 28.5 percent.  It also

21  defines, in the definition section on page 8 of the acquisition

22  loan, that loan, the term singular form loan, shall be used

23  individually or collectively as the context shall require.

24  When dealing with a participation fee the context is that there

25  is a single participation fee of 28.5 percent.  It is not one

1    that would be trebled because there are three individual loans.

2        It's the same point, Your Honor, for Lighthouse's

3    interest rate cap agreement.  Their argument is well if there

4    are three separate loans then Lighthouse needed to have three

5    separate interest rate cap agreements which would total, if you

6    had three of them, approximately, again, ninety million dollars

7    instead of twenty-six million dollars.  But if you look at the

8    language of the contracts it says there shall be one that

9    covers the entire notional amount of the loan, singular, but

10    not saying that it has to be trebled if you divide up the loan

11    into the acquisition loan, project loan and building loan.

12        It's also significant, I think Your Honor, in terms of

13    transferability.  If the parties really had intended that there

14    only be one loan, then Lighthouse's argument of singularity, a

15    single loan versus the plural loans, the grammar used in the

16    contract would fail of its own logic.  Because if there was

17    meant to be only a single loan why would the parties have

18    created and identified as defined terms in the contract an

19    acquisition loan, a building loan and a project loan.  And why

20    would they also have created, to go along with each of those

21    individual loans, a promissory note and security agreement.  A

22    promissory note for the building loan and a security agreement.

23    A promissory note for the development or project loan and a

24    security agreement.  They were little packages that could be

25    securitized just as the promissory note itself said.

1          So what we have here, Your Honor, is a situation where

2     the plaintiff is disappointed that its counterparty is in

3     bankruptcy and it may not receive its funding.  But it is

4     looking for another party to undertake those funding

5     obligations and it set its sights on State Street.  State

6     Street, under the contract, was never a party to those

7     agreements.  It never undertook those obligations and in fact

8     the expressed terms of the agreements indicate that State

9     Street did not assume the project and acquisition and building

10    loans when it obtained, under the repo, the acquisition loan.

11         If the Court has no more questions, I will reserve

12    what time I have left.

13         THE COURT:  Fine.

14         MS. ALVAREZ:  Good morning, Your Honor.  My name is

15    Denise Alvarez with Weil Gotshal & Manges, representing the

16    debtors.

17         As Your Honor is aware, the debtors have filed a

18    joinder to State Street's motion to dismiss.  All I have to add

19    at this time is while I understand that the documents are

20    complex, as you recognized, the main provision at issue here

21    and that I believe is dispositive here is section 13 of the

22    promissory note of the acquisition loan which provides that the

23    acquisition loan is separately transferable.

24         State Street has not responded to that argument in

25    their reply -- not State Street, I'm sorry.  1440 has not

1    responded to that argument and quite frankly, I think it's the

2    dispositive provision here.

3         Unless Your Honor has any other questions, I have

4    nothing further to add.

5         THE COURT:  All right.  Thank you.

6         MR. LUBELSKY:  Good morning, Your Honor.  Mark

7    Lubelsky for Lighthouse 1440, LLC.

8         Just to go back, briefly, to when we were here last,

9    and you said you were familiar with it; one of the items that

10   you had mentioned was that Lighthouse was clearly an aggrieved

11   party, which they are here.

12        Here, Lehman and State Street have cooperated quite

13   gentlemanly among themselves to do quite a savage thing.

14   Putting it in context, Lighthouse 1440, LLC is a locally owned

15   business by principals who all live and work here locally.  And

16   the intent of State Street and Lehman is to put Lighthouse 1440

17   out of business based upon a redraft of the agreements and to

18   jeopardize the personal assets of the three principals to

19   bankruptcy under potential guarantees.

20        THE COURT:  I know this is argument but I can't

21   imagine it's their intent to put your client out of business or

22   for the principals to be exposed to financial hardship.  I

23   suspect that their intent is purely to do what they believe to

24   be commercially reasonable in light of the repo transaction.

25        MR. LUBELSKY:  One of the things that counsel to State

1   Street mentioned was the intent to the parties.  And no one

2   from State Street is qualified to speak to the intent of the

3   parties.  State Street was not a party to the agreement.  State

4   Street did not participate in the negotiation or the execution

5   of --

6           THE COURT:  Did you?

7           MR. LUBELSKY:  I did not either but certainly

8   Lighthouse did.  And so his clients certainly can't speak to

9   the issue of the intent of the parties either.  But certainly

10  one document that does speak to the intent of the parties is

11  the memorandum of option agreement.  That's an agreement that's

12  actually executed by all and it states pretty clearly, "Lender

13  has on this day made a mortgage loan to borrower secured by the

14  property.  The terms of such loan are more particularly

15  described in A, the acquisition and project loan agreement and

16  B, the building loan agreement".

17          Now, when you go to the particulars of the acquisition

18  and project loan agreement and the building loan agreement, it

19  becomes pretty clear what the intent of the parties was, even

20  forgetting about the explicit language of the memorandum of

21  option agreement.  Each of the acquisition and project loan

22  agreement and the building loan agreement separately provides

23  for a 28.5 percent participation fee.  That doesn't make sense

24  unless it's one loan and one participation fee.  And other

25  documents, as set forth in our brief, make it clear that it's

 1    only one participation fee.

 2         THE COURT:  But how do you deal with the problem that

 3    the loan agreement does, by its expressed terms, provide for

 4    separate transfers.  The acquisition loan is transferable, the

 5    project loan is transferable and the building loan also

 6    transferable.

 7         MR. LUBELSKY:  I would say we have, obviously,

 8    contradictory provisions and that in and of itself, when there

 9    seems to be contradictory provisions, that each would produce a

10    dispositive result if it was followed.

11         THE COURT:  What contradicts the transferability

12    provisions?

13         MR. LUBELSKY:  Well, one thing would be the memorandum

14    of option agreement that says it's a single loan, that's it,

15    one mortgage.  And then when you go to -- for instance, when

16    you expand beyond the participation fee to the interest rate

17    cap, the interest rate cap in the building loan agreement

18    provides that the building, if taken literally, provides that

19    it's insured for six and a half times its value, that's clearly

20    not the intent of the parties.  Each of the acquisition and

21    project loan agreement and the building loan agreement provides

22    for its own interest rate cap agreement in the total principal

23    amount of the loan, as set forth in the memorandum of option

24    agreement and other agreements.

25         So it's -- additionally, there's nowhere in the loan

1    agreements anywhere that speaks to seniority if these notes are

2    divorced from each other.  What happens?  There is no mention

3    of the issues of seniority because it's a single loan.  There

4    is no means with which to apportion the participation fee under

5    the acquisition and project loan agreement if the acquisition

6    and project loan are divorced from each other because it was

7    never contemplated.  It's one loan.

8         Under these circumstances, certainly a motion to

9    dismiss would seem inappropriate because there is substantial

10   issues of fact as to what the parties intended.  And certainly

11   the memorandum of option agreement seems to be --

12        THE COURT:  How do those substantial issues of fact

13   affect State Street?  I can see, for purposes of the motion

14   we're now arguing, something to the argument that what the

15   parties intended, to the extent of ambiguity, at the time that

16   the documentation was being crafted may be relevant and may, as

17   a result, defeat a motion to dismiss brought by Lehman as a

18   joining party.  But as to State Street, State Street was, in

19   all respects, a stranger to this until the time of the repo

20   transaction.  And simply advanced a billion dollars in exchange

21   for purchasing certain identified loans of this -- this

22   acquisition loan being one of the thirty-six or thirty-seven in

23   question.

24        And from State Street's perspective, you're positing a

25   theory that taken to its extreme could really undermine the

1    repo market as it functions on a daily basis.  Parties

2    routinely purchase and repurchase as a form of financing

3    activity without a lot of diligence or overhang.  What has been

4    sold is repurchased, there's no need to pay close attention to

5    whether or not there's been a divorce of a particular loan from

6    a mate.  It becomes relevant here because of Lehman's

7    bankruptcy and the failure to perform the repurchase.

8         So I'm a little concerned about the development of

9    your argument to the point that it becomes a cloud over the

10   repo market.

11        MR. LUBELSKY:  I understand your concern, Your Honor.

12   My concern is for my clients.

13        THE COURT:  Correct.

14        MR. LUBELSKY:  And State Street's lack of due

15   diligence does not change the reasonable expectations of my

16   clients and whether that lack of due diligence was something

17   that was common in the industry for their own convenience so

18   that they could hire fewer people isn't really the issue.  And

19   maybe the issue is they need to employ more people so that they

20   can conduct sufficient due diligence before they take on

21   obligations that they don't know what they really consist of.

22        But State Street's lack of due diligence does not

23   change the reasonable expectations of the parties.

24        THE COURT:  Maybe you misunderstood my point.  I

25   wasn't suggesting that there was a due diligence obligation.  I

was suggestion, actually, that in the world that I recall

populating at one point, these transactions were routinely done

and as long as they were sufficiently over collateralized there

wasn't a lot of attention paid to whether or not a particular

loan properly belonged in a basket as long as it was apparently

transferable.

MR. LUBELSKY:  I understand the point, Your Honor.  I

still maintain none of that changes the reasonable expectations

of my client under any circumstances, whether the fact that

State Street never looked at the documents -- even looking at

the acquisition and project loan agreement, all you have to do

is look at the base sheet and you see that there's more than

one loan made up in the "loan".  That it's not the acquisition

loan and the "acquisition loan, never existed.  It's the

acquisition and project loan agreement.

And part of the problem with State Street's position

here is the notice of default that they served dated May 29,

2009.  It says, "This letter serves as notice that by operation

of Sections 10.1(a) and 10.1(b) of the loan agreement," I

assume they're referring to the acquisition and project loan

agreement and I assume they deliberately used merely the term

loan agreement, which certainly introduces a question of the

singular and the plural.  But under that agreement, the

counterparty is required to advance funds under the project

loan agreement.

1    So State Street is attempting to hold Lighthouse in

2  default of an agreement where it's entitled to several million

3  dollars of additional funding.  Certainly that's just an

4  absolute defeat of the reasonable expectations of Lighthouse,

5  both under the terms of the documents themselves and every

6  other document executed in this case.

7    I'm sorry, Your Honor.  Is there any additional items

8  you'd like me to directly address?

9    THE COURT:  No.

10   MR. LUBELSKY:  Thank you, Your Honor.

11   THE COURT:  Is there anything more?

12   MR. PHALEN:  Very briefly, Your Honor.

13   I think Your Honor put the Court's finger on point

14  here of what is important here.  It isn't a matter of doing

15  good or doing bad, of due diligence or lack of due diligence

16  here.  It's the repo market and what parties are enabled to do

17  in the repo market and what they're allowed and enabled to rely

18  on, all parties I mean, Lighthouse as well as Lehman as well as

19  State Street.  And that is, that the contracts articulate the

20  rights of the parties.  As to transfer, it says that these

21  loans, these notes, are individually transferable.

22   What I am hearing Lighthouse object to is not that --

23  on terms of whether the contracts are transferable or not but

24  that there seems unfairness because they were relying on Lehman

25  or relying on the project loan and the building loan future

1   funding in order to pay some of the acquisition loan.  That's a

2   disappointment with what unfortunately happened to Lehman.

3   It's not an argument under the contract about what State Street

4   got under the repo.

5       And under the repo and the concept of the repo, the

6   parties need to be able to rely on the terms of the contracts

7   that they have.  That's why they have the transfer provisions

8   that they do.  And that's why they have the integration clause

9   that they do, where it says there's nothing else out there.

10  This contract represents the full understanding of the parties

11  and the parties can't come in later to allege a different

12  understanding of what was meant.  The parties signed what the

13  contract said, the contract said transfer.  The expectation

14  shouldn't really be that there was -- that there could have

15  been a transfer.  And it is inconsistent to argue now that they

16  were expecting that they couldn't be separated when they signed

17  the documents that said that they could be transferred

18  individually and that that agreement articulated the fullness

19  of their position.

20      So the reasonable expectations of the parties, even if

21  the Court gets to that point, suggests or support the dismissal

22  of the complaint here because those expectations are

23  articulated in the contract documents which say that the

24  acquisition loan itself was separately and individually

25  transferable.  And that's all that State Street got.  And State

1    Street can't be put into the position of filling in for

2    Lighthouse's counterparty because that counterparty, on the

3    other two loans, cannot fund its obligations.

4            Thank you.

5            THE COURT:  Okay.

6            MR. LUBELSKY:  Your Honor, if I may for one quick

7    minute?

8            THE COURT:  Yes, one quick minute.

9            MR. LUBELSKY:  It sounds as if State Street may have a

10   claim against Lehman and that State Street's in the same exact

11   position as Lighthouse, it's a claim against Lehman.  But it

12   sounds like one of the things State Street is proposing or

13   implying is that Lehman somehow intentionally or

14   unintentionally deceived them as to what the loan constituted

15   by just terming it "the acquisition loan" when they put it into

16   the repo agreement.

17           THE COURT:  I didn't hear that.

18           MR. LUBELSKY:  Well, I think that underlies what

19   they're saying.  Lehman just termed it the acquisition loan for

20   their own convenient bookkeeping purposes.  And that's what

21   they put into the repo agreement and it may have been Lehman

22   did it innocently or didn't do it innocently.  But certainly

23   that misunderstanding that arose, doesn't arise to the

24   detriment of Lighthouse, it should arise to either the

25   detriment of State Street or Lehman.

1        THE COURT:  Okay.

2        MR. LUBELSKY:  Thank you.

3        THE COURT:  I said I was vividly familiar with this

4    dispute in part because I remember the argument that took place

5    along similar lines when counsel for 1440 LLC was seeking to

6    intervene as a party in the adversary proceeding brought by

7    State Street, which was the subject of the motion for approval

8    of exchange agreement with State Street Bank & Trust Company

9    which was heard this morning as uncontested matter number 3.

10        This dispute is an example of what happens when the

11    fourth largest investment bank in the United States before

12    bankruptcy is seeking to obtain liquidity.  But it's not just

13    what Lehman does; it's what financial participants do literally

14    every day of the week.

15        I really can't make any findings as to the intentions

16    of the parties at the time that this transaction was

17    structured.  And when I say this transaction I mean both the

18    real estate loan, in which 1440 LLC is borrower and the

19    separate transaction entered into between Lehman and State

20    Street, which is the billion dollar repo of which this is a

21    relatively small part.  But what this does point out is that

22    we're dealing with very complex documents both documents

23    relating to the real estate loan and documents relating to the

24    repo itself.

25        I received a submission from State Street last

1    evening, which I read.  There are a lot of papers that have

2    been submitted by the parties in reference to this dispute.

3    Rather than provide my thoughts from the bench today, I'm going

4    to reserve judgment on this and will either suggest that it be

5    listed at a future omnibus hearing for purposes of my providing

6    comments from the bench at that later time or I will issue a

7    written decision in connection with the motion to dismiss.

8         I will mention, however, that while I think State

9    Street makes a very persuasive argument on the issue of

10   transferability, Lehman Brothers, in its joinder papers, really

11   has done little more than to join in what State Street has

12   said.  Under the circumstances, to the extent that anybody's

13   trying to handicap outcomes here, I think it highly unlikely

14   that this motion will be granted as to Lehman.

15        Let's move on to the next item.

16        MR. KRASNOW:  Your Honor, Richard Krasnow again.  The

17   next item is number 10, which is the State Street matter that

18   was addressed earlier this morning as item number 3.  And so I

19   would skip that, Your Honor, and go to item number 11, which is

20   the Lehman Brothers special financing adversary proceeding

21   against Ballyrock and Mr. Slack will be addressing that.

22        (Pause)

23        MR. SLACK:  I get to say good afternoon, Your Honor.

24        THE COURT:  Good afternoon.

25        MR. SLACK:  This adversary proceeding was originally

1    brought by Lehman Brothers in order to protect 137 million

2    dollars that was being held by the trustee.  And it was in

3    connection with what's known as a credit default swap.  And the

4    party to the credit default swap were Ballyrock CDO and LBSF

5    while the provisions of the credit default swap, as Your Honor

6    probably is aware by now, are quite complex.

7        The actual terms of the deal between the parties was

8    not.  And that was essentially that if these underlying

9    reference obligations, which were mortgage backed securities,

10   performed well then the CDO would benefit. And if this pool of

11   mortgage-backed securities didn't perform well over time, then

12   LBSF would benefit.  And as we know, in the market what

13   happened was is mortgage-backed securities did not perform well

14   and LBSF was in the money in this case by about 400 million

15   dollars.

16       Not withstanding that, after the bankruptcy of LBHI,

17   the CDO attempted to terminate the credit default swap

18   transaction.  And after it attempted to terminate, it

19   liquidated the collateral and now wants to distribute the last

20   137 million dollars, which we believe belongs to the estate.

21       I think what makes some sense is to go through, Your

22   Honor, where we were a little over a month ago which was, we

23   had a -- after the adversary proceeding was filed the trustee

24   filed an interpleader action.  Your Honor has signed an order

25   which gave notice of the interpleader action.  And the update

that I want to provide the Court is we've now had four

noteholders show up and provide notice of appearances.  That's

Barclay's Bank, Long Island International, Black Rock Mortgage

and Long Hill 2006-1 and those four entities are represented by

two different law firms.

At today's pretrial I think there's really three items

to go over, Your Honor.  Number one is scheduling going

forward.  Number two is there was an order filed by the

trustee, essentially an interpleader order, with the idea of

crystallizing this action as an interpleader going forward.

And the trustee will address that, I think, in a couple of

minutes or trustee's counsel.

I think what's important, Your Honor, to know in terms

of the scheduling is that there are some important issues that

this action raises.  And it's important, I think, to the Court

and certainly to the debtor and the creditors that these issues

get a fair hearing and they not be jammed in rushed in a very

short period of time.

And to give you a preview of at least two of those,

Your Honor, as I said the CDO attempted to terminate this

transaction yet the provisions of the governing documents

require that before there's termination that they go out and

get a replacement to take, essentially, Lehman's position.  And

without doing that, it's our position that they could not

terminate.  That issue will not only be seen in this adversary

proceeding but in a number of other situations that confront

the debtor.

The second argument, which I think is going to, again,

be seen in a number of different either adversary proceedings

but certainly in negotiations with a number of counterparties,

is that if the termination was valid, the CDO has taken the

position that this 400 million dollars that Lehman was in the

money, they essentially get -- the debtor gets divested of

that.  We believe that that is an unenforceable penalty, as set

forth in our complaint.  And the idea that a debtor can be

divested of 400 million dollars in this case because of the

bankruptcy of a credit support provider which had obligations

as essentially a guarantor of just a very small fraction of

that 400 million, we believe can't stand.

The third issue, and again there's a couple of others,

is that we believe that this case raises an unenforceable ipso

facto clause by virtue of the fact, not of the termination but

of the fact that they've used the bankruptcy of Lehman to

change the priority of payments.  And again, all of these

issues are ones that are very, very important to the estate,

potentially worth billions of dollars.

And so while Your Honor will hear it in this case and

perhaps some other adversary proceedings that have already been

filed, these are issues that we certainly want to take the

right amount of time to make sure Your Honor has the full

picture.

So with that, Your Honor, I'd like to move to the
scheduling issue and the parties have had some discussions on
scheduling. There's little question that the noteholders, the
counterparties, wish to make motions to dismiss. One motion
has already been filed by the CDO itself. And we expect that
one or more of these other parties will either file separate
papers joining in or making new arguments. We obviously don't
know but we understand that there will be additional papers
filed.

So the first order of business is to set the schedule
for those motions. We've asked when the noteholders would like
to file those papers. We were told June 17th, that's fine with
us. I think the only dispute is then how much time we're going
to have to respond. We said given the issues, the fact that
we're going to have multiple submissions, that we wanted a date
that was six weeks out, which we think is not unreasonable
given the importance of these issues to the creditors, to the
debtors. And we've been told that the most the other side is
willing to give us is two weeks and that's the order that
they've suggested to the Court, that we get two weeks to file
our response.

And then in terms of the reply, we have no problem,
again, giving the noteholders as much time on reply as they
want, with the proviso that we would like, Your Honor, at least

1   ten days between the time the replies are filed and whenever

2   the Court chooses to hear it, either in an omnibus or at a

3   separate hearing.

4        So we've prepared a draft scheduling order.  It's on

5   disk and we're prepared, afterwards, to hand that up to Your

6   Honor.

7        The second issue that's been discussed relates to the

8   interpleader order.  As I said, that's going to be -- the

9   trustee has filed an order.  There has been, as far as I know,

10   one objection.  There is one other change; we had a comment

11   which we've given to the trustee.  They have no problem with it

12   changing, a typo that was in it.

13        THE COURT:  Anybody who objects to changing a typo is

14   acting unreasonably.

15        MR. SLACK:  So, Your Honor, the only objection there

16   is from the issuer, from Ballyrock.  And the issuer's objection

17   that remains is solely with respect to fees that it wishes to

18   get out of the fund itself to participate in the interpleader.

19   And we disagree, Your Honor, with the issuer's objection as

20   being out of place and not right and here's why.  The order

21   that's being presented by the trustee is, in an interpleader

22   sense, a very typical one that says if I'm coming to court and

23   bringing an interpleader, then I get my fees paid.  And Your

24   Honor actually approved in the last interim order the payment

25   of those fees and the parties do not have a problem with those

1     fees being paid going forward.

2         The issuer, however, is not the party bringing the

3     interpleader, it is an active litigant.  And there is no

4     authority within the interpleader rules that allow the

5     litigant, such as the issuer, to get its fees in an

6     interpleader order.  If there are other grounds that it has for

7     seeking fees from the fund, it can make that motion at another

8     time.  We're willing to represent to the Court that the fact

9     that it's made later than the interpleader is not going to be a

10     waiver of any of their rights.  At that point we will look at

11     their motion.  If they think they have separate grounds for

12     getting their fees and maybe we'll oppose it and maybe we

13     won't, we just don't think it's right today, Your Honor, for

14     this order and shouldn't delay the entry of that order.

15         So with that, I'm going to turn it over, I think, to

16     the trustee to present the interpleader order.

17         THE COURT:  All right.

18         MR. FROEHLICH:  Joe Froehlich from Locke Lord Bissel &

19     Liddell on behalf of Wells Fargo Bank N.A. as the trustee in

20     this matter.

21         THE COURT:  Mr. Froehlich, I received a copy this

22     morning of the order granting interpleader and I also read your

23     letter dated June 2 which accompanied that and which is on the

24     ECF system

25         MR. FROEHLICH:  Thank you, Your Honor.  Just to give

1    you the background of how that came about, when we were here

2    last time, Your Honor, we talked about the order that you

3    already entered, the notice provision.  And the trustee was

4    given the proper notice, the noteholders have appeared.  I

5    believe it was contemplated in that order, before this hearing,

6    we would hopefully submit the interpleader order and hopefully

7    be able to submit it to Your Honor on consent.  We circulated

8    that several days ago.  There was no objections except for the

9    objection of the CDO.  And the CDO had two objections.  One of

10   the objections they have since waived and the only remaining

11   objection is the objection that their fees should be included

12   in this order.

13       And I think as Mr. Slack suggested, we wanted the

14   interpleader order entered now.  We want the protections of the

15   interpleader.  We think we're entitled to the protections of

16   the interpleader.  We think there's no question that there's a

17   dispute over this fund and it's clear our client has no stake

18   in the fund.  We'd like to have the interpleader order so we

19   could step out of the way too, Your Honor, and stop incurring

20   fees.  This way the disputed funds would be larger.

21       The fact that we are now getting pulled in and sucked

22   into what may be motion practice over whether the CDO is

23   entitled to their fees or not and drags us into that further,

24   we would object to that and we really would like the

25   interpleader order entered today.

1    We think as far as the order goes itself, Your Honor,

2  we think it's, as Mr. Slack said, it's pretty common, fairly

3  vanilla.  If Your Honor has any questions about anything in the

4  order, I'd be glad to answer it.

5    THE COURT:  I reviewed the order.  I have no questions

6  about it.

7    MR. FROEHLICH:  Okay.

8    THE COURT:  But I would like to hear from counsel for

9  Ballyrock CDO as to -- go ahead.

10    MR. FINK:  Thank you and good morning.

11    THE COURT:  Please state your name for the record.

12    MR. FINK:  Steven Fink, Your Honor, Orrick Harrington

13  & Sutcliffe for the Ballyrock CDO.

14    Your Honor, the CDO is a stakeholder here just as the

15  trustee is a stakeholder here.  It has no financial interest in

16  the outcome of this dispute.  It has, however, been named as a

17  defendant in this adversary proceeding and under the document

18  that establishes the CDO, the indenture, the issuer has an

19  obligation or it has several obligations.  It's required to

20  enforce all of its material rights and remedies under the

21  credit default swap agreement, that includes the termination of

22  the credit default swap agreement which is challenged here by

23  Lehman.

24    In addition, the issuer has the obligation to insure

25  that there is no impairment of grants under the indenture.  And

1   those grants, under the indenture, include the distribution of

2   collateral proceeds in accordance with the priority of payments

3   established under the indenture.  That's what, again, Lehman is

4   challenging here, the distribution to the noteholders which

5   flows from the termination of the swap agreement.  And that

6   termination was properly accomplished after LBHI filed its

7   bankruptcy petition which is an event of default under the swap

8   agreement itself.

9        THE COURT:  This is not an opportunity to argue your

10  substantive position.  This is simply a chance for you to say

11  why the order shouldn't be entered without provision for your

12  counsel fees and I'm inclined to do that unless you provide me

13  with an awfully persuasive argument as to why my retained

14  ability to govern distribution isn't protection for you and

15  everybody else.

16       MR. FINK:  Thank you, Your Honor.  Understood.

17       Your Honor, the issuer, for the reasons I've just

18  given, is required to be here to litigate these issues but has

19  no financial interest and what counsel for Lehman --

20       THE COURT:  So you'll have a claim against the fund.

21  You'll make it at the proper time like every other

22  professional.

23       MR. FINK:  Your Honor, a point that Lehman's counsel

24  brought up was that -- he said that there's nothing under the

25  rules that provides for payment of the issuer's fees.  There's

1    nothing under the rules that provides for the payment of the

2    trustee's fees either.  It's a matter of equity under

3    interpleader practice.  It's developed over the years.  It's

4    not something that's provided for by rule and given that we're

5    exactly situated as the trustee here --

6    THE COURT:  How are you exactly in the same situation?

7    You're an active litigant in this litigation.  The trustee is

8    throwing the money into a fund and walking away and saying

9    fight over it gentlemen and you're one of the parties fighting.

10    MR. FINK:  We're exactly situated, Your Honor, in the

11    sense that we have no financial interest in the outcome of this

12    lawsuit.

13    THE COURT:  No, but you have an obligation, as you've

14    just said, to do the fighting.  So you'll do the fighting and

15    when it's all over you'll make a claim to be paid for the

16    fight.  If your documents don't provide explicitly for you to

17    have a claim that's payable right now, that's too bad.  Do your

18    documents so provide?

19    MR. FINK:  Your Honor, there's not an explicit

20    provision in the document.

21    THE COURT:  Then you're not entitled to any payment

22    under this order.  You'll be entitled to whatever claim you can

23    make at the appropriate time for an allowance out of the fund.

24    And since the interpleader order, as I've reviewed it, provides

25    that I'm the ultimate gatekeeper, to use that term again, as to

1    who gets what, when, you'll be protected.

2              MR. FINK:  Thank you, Your Honor.

3              THE COURT:  Now let's talk about timing.

4              MR. LACY:  Your Honor, can I just say -- I'm Rob Lacy

5    from Sullivan & Cromwell, I represent Barclays.  We completed

6    agree with the interpleader order.  We're delighted to see it

7    happen.

8              THE COURT:  I'm sorry; you completely agree?

9              MR. LACY:  We agree with the interpleader order.

10   We're delighted to see it entered.  I'm standing up simply to

11   make an observation on the record.  This -- the order contains

12   a provision concerning where the funds are going to be directed

13   in the interim.  There may be developments that will cause all

14   of the parties to want to move that investment.  And I take it

15   that if all of the parties agree that that money ought to be

16   moved into another vehicle, we can come back and make a new

17   submission on that.

18             THE COURT:  Yes.  And even if all the parties don't

19   agree but there is good cause for modification of the order,

20   there'll be an opportunity for a hearing and for an order that

21   modifies this as it relates to prudent investment of the funds.

22             MR. LACY:  Thank you, Your Honor.

23             THE COURT:  Let's talk about the timing of two weeks

24   versus six weeks.

25             MR. SLACK:  Your Honor, the way that the discussion

1    progressed yesterday is we had a proposal that would have

2    involved briefing schedule.  It initially came from the debtors

3    that went up to September.  We proposed a much shorter

4    schedule.  As I understand it, the debtors are in agreement

5    with everything we proposed except that we put in two weeks for

6    their opposition papers and they put in six.  That wasn't the

7    end of the discussion, we just ran out of time at that point.

8         THE COURT:  Would you like more time to discuss that

9    before the hearing is concluded or would you like me to pick

10   the number of weeks, because I'm prepared to do that too.

11        MR. SLACK:  Your Honor, could I just -- I do -- well,

12   do we want to discuss it?  If there's reason to discuss, we're

13   happy to discuss it.

14        THE COURT:  Why don't you take five minutes for a

15   discussion at it relates to that one aspect of this, otherwise

16   before the hearing is concluded and we can go on to the next

17   agenda item, I'll simply pick the number of weeks and I can

18   tell you right now, to facilitate the discussion, it won't be

19   two and it won't be six.

20        MR. SLACK:  I think it'll be easier to reach an

21   agreement on that basis, Your Honor.

22        THE COURT:  Right.

23        MR. KRASNOW:  Your Honor, item number 12 on the

24   agenda, Lehman Brothers Special Financing v. BNY.  That matter

25   is being handled by Mr. Ralph Miller.

1          MR. MILLER:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon, Mr. Miller.

3          MR. MILLER:  My name is Ralph Miller with Weil Gotshal

4     & Manges appearing as counsel for the plaintiff in this

5     adversary proceeding, Lehman Brothers Special Financing, Inc.,

6     which is usually called LBSF.

7          The only issue in this conference is whether a motion

8     for summary judgment may be filed by LBSF and I'd like to talk

9     about the schedule, which is unusual, and also talk about the

10    issue, which is narrow.

11         Starting with the schedule, Your Honor, this adversary

12    proceeding turns on interpretation of sections of the U.S.

13    Bankruptcy Code.  But it is in danger of being overtaken by a

14    proceeding in London before a court that has not dealt with the

15    Bankruptcy Code before.

16         LBSF has intervened in an action filed by one of the

17    noteholders against the defendant, in this case the NY

18    Corporate Trustee Services, and has sought a stay in order to

19    present really the third issue that my partner, Mr. Slack,

20    described in Ballyrock which is the ipso facto issue.

21         LBSF has a deadline of June the 11th; this is an

22    accelerated proceeding, to file all evidence in the High Court

23    of Justice Chancery Division, Royal Courts of Justice in London

24    to support its application for stay.  In the application we are

25    going to suggest to that court, which is about to enter its

1   summer recess that it would, perhaps, make sense to let this

2   matter proceed and see if we can get some guidance from this

3   Court when it returns in September.

4           THE COURT:  I'm smiling only because I think the

5   notion of a summer recess is so civilized.

6           MR. MILLER:  It is, Your Honor.  If, however, that

7   court does not stay the proceeding, it's indicated it will

8   decide that matter very promptly.

9           The issue in this particular adversary proceeding,

10  Your Honor, is purely one of statutory interpretation, under

11  Section 365, 541 and 560 of the United States Bankruptcy Code.

12  LBSF believes that the fairest and most efficient approach is

13  to submit a filed motion for summary judgment as part of its

14  evidence on June the 10th and in your gatekeeper role, of

15  course, we need your consent to make that filing.

16          I would like to thank counsel for the defendant, who

17  has graciously agreed to be here today on short notice so that

18  we can discuss the issue of filing.

19          I'd now like to talk a little more about schedule and

20  then about why we think it's a summary judgment case.  I want

21  to stress that the only question here is the filing of the

22  motion.  No one expects the motion, at the present juncture, to

23  be responded to on an expedited basis or resolved on an

24  expedited basis.  We would like, however, and we believe from

25  our counsel in London that the court in London would like to

1    have that issue submitted to this court and before the court

2    instead of still at the early stages.  And that's why a motion

3    for summary judgment, we think, is the most efficient way to

4    lay out arguments both for the parties involved and for the

5    court in London.

6         We are more than prepared to allow ample time for a

7    response by the trustee in this matter, BNY Corporate Trustee

8    Services, and should any other parties wish to intervene and

9    participate, we'd be happy to accept that as well.  So we're

10   not trying to rush a decision, we're simply trying to get

11   permission to file a motion for summary judgment.

12        THE COURT:  Let me follow up on something you just

13   said, because you said if other parties might be interested in

14   intervening.  It's obvious from the references made by your

15   partner during his preliminary remarks as to item 11 on the

16   agenda, the Ballyrock matter, that questions of the impact on

17   priority disposition and ipso facto clauses and safe harbor

18   provisions and the like may have broad application to other

19   transactions.

20        In referencing intervention, are you suggesting that

21   other parties who may have an interest in that purely legal

22   question might be welcomed by the debtor to submit amicus

23   briefs or other forms of expressions of interest in the outcome

24   or did I misread you?

25        MR. MILLER:  Well Your Honor, I'm actually referring

1    to the plaintiff in London, Perpetual Trust, when I --

2         THE COURT:  Then I did misread you completely.

3         MR. MILLER:  -- which is a large Sidney, Australia

4    based financial institution that appears to have little or no

5    contacts that we can find with the State of New York.  Should

6    they like to come into this court, we would more than welcome

7    their participation but we believe their selected forum is

8    London.  So I'm saying, that should Perpetual Trust, for

9    example, or some of the other noteholders, wish to come in then

10   there is no reason why the fact that we filed a summary

11   judgment would preclude that from doing that.  We're not trying

12   to cut off anyone else's rights, Your Honor.  Their position is

13   there should be no stay and if there's a U.S. Bankruptcy Court

14   question, it should be decided in London.

15        THE COURT:  I understand but I actually said something

16   that is well beyond that.

17        MR. MILLER:  Yes.

18        THE COURT:  And it may have been simply a

19   misinterpretation of the use of the term intervention.  But it

20   goes to, I think, the heart of what is probably a significant

21   issue in case administration that goes beyond this adversary

22   proceeding.  Namely, the pure legal question which you seek to

23   address by means of summary judgment is not tethered to

24   particular facts; it's a question of law.

25        MR. MILLER:  That's certainly true, Your Honor.  And

1  in the spirit of full disclosure to the Court, I should tell

2  you that this particular transaction, which involves about

3  seventy million U.S. dollars, ninety million Australian

4  dollars, is one of about 360 similar transactions known as the

5  Dante program in Asia, Europe and Australia.

6       THE COURT:  So how much is involved all together?

7       MR. MILLER:  About two billion dollars, I understand

8  Your Honor, is the amount involved in those 360 transactions.

9  This issue is particularly important here, Your Honor, because

10  these documents are governed by English law.  There's basically

11  two boxes on the standard ISDA forms, the 1992 and 2002 and

12  earlier agreements.  You can either select the law of the

13  United States and submit to jurisdiction in the State of New

14  York or you can submit the law of England and Wales and submit

15  to jurisdiction in London.

16       It has been typical that most American based

17  transactions in North America submit to New York jurisdiction

18  and U.S. law and the rest of the world has tended to select

19  English and Wales law and London for their location.

20       We do not, in this particular proceeding, question the

21  termination itself nor do we question the issue of whether

22  English law would authorize the enforcement of these documents,

23  which are quite different structurally from typical U.S.

24  documents in other ways, reflecting the difference in law.

25       For example, the indenture and other documents are

1    actually signed by all the parties and they're adopted in the

2    swap agreement, just to mention one of the structural

3    differences.  And many things in the U.S. documents that are

4    absolute are subject to the discretion of the trustee in

5    English documents.  So for various reasons, when you boil all

6    that down, the issue that emerges in this proceeding and most

7    of those in Asia and Europe is this question of whether the

8    redirection of payments after the liquidation, termination,

9    acceleration has occurred is within or without Section 560.

10           If it is within Section 560 and it's an integral part

11   of the liquidation, termination, acceleration, then perhaps it

12   is enforceable under the Bankruptcy Code.  LBSF, on the other

13   hand, believes that that is not within the safe harbor and if

14   so it is a facial ipso facto clause that says that the seventy

15   million U.S. dollars that LBSF is clearly entitled to receive

16   gets paid to somebody else first even though they're entitled

17   to it.  And because these are either special purpose vehicles

18   or they're trusts, there's only one set of money and when it's

19   gone, it's gone.

20           So as a practical matter, and we think these facts are

21   undisputed, if the Court in London directs BNY Corporate

22   Trustee Services to pay the ninety million dollars, Australian,

23   worth of assets to Perpetual Trust and other noteholders, the

24   fact that LBSF still has a claim for that amount is going to be

25   effectively depriving the estate of any right because there's

1     nothing left to get that claim from and those assets will be

2     disbursed to other parts of the world outside of the control of

3     this Court.

4             So this is a very material issue and all we ask today

5     is to be able to submit the issue and the papers in a fully

6     supported form in a motion for summary judgment motion that

7     we're prepared to file quickly.  We will work on the schedule

8     with any party who is concerned.  And responding to the Court's

9     specific question, obviously it's up to the Court what you

10    would like to consider in the way of submission.  But certainly

11    the debtors recognize that there may be other parties who are

12    going to want to be heard on these legal issues and we will

13    deal with those if they seek to come before the Court.  And we

14    want a full vetting of the issues and we want them to be

15    carefully considered.

16            THE COURT:  Fine.

17            MR. MILLER:  I am authorized, Your Honor, to say that

18    the unsecured creditors' committee does not oppose the filing

19    of this motion for summary judgment.

20            And with that I would like to let counsel for

21    defendant respond.  Thank you, Your Honor.

22            THE COURT:  Fine.  Mr. Schaffer, good afternoon.

23            MR. SCHAFFER:  Good afternoon, Your Honor.  Eric

24    Schaffer, Reed Smith.  I am here today for BNY Corporate

25    Trustee Services, as noted by Mr. Miller.  We have not yet

1    appeared in this case and my attendance here is not intended as

2    a formal appearance or a waiver of any procedural or

3    substantive rights.

4         Our view with respect to the limited issue presented

5    today is nothing needs to be filed or scheduled now.  We do

6    have an unusual situation with overlapping actions in different

7    courts.  As was noted earlier, the plaintiff in the London

8    proceeding, Perpetual Trustee Company Limited, is not here.

9         A complaint was filed in London in the High Court on

10   May 13.  LBSF indicated its interest -- its application to be

11   joined on May 20.  The next date there was an initial hearing

12   in that court at which time the English court set deadlines for

13   submission of materials, June 11 and June 25 as Mr. Miller

14   alluded to.

15        There was a scheduling conference on May 29th, at

16   which the Court set a trial date.  It's set to begin on or

17   within two weeks of July 6th.

18        Now, turning to the case that we have here, on May

19   20th, the same day that LBSF applied to be joined in England,

20   it filed the complaint here.  On June 1st, shortly after the

21   trial date was set in England, LBSF sent the Court the letter

22   that requested that we be here today.

23        At this point the trustee's response to the complaint

24   in this Court is due on June 22 and we're set for a pretrial on

25   July 15.  So we have one action in England with all the parties

1    and one here where an important part is missing.

2           So what's the trustee's position here today, Your

3    Honor?  Well, there is a very real dispute between Lehman and

4    Perpetual.  And the trustee very much wants to avoid any risk

5    of conflicting decisions between the two courts.  Of course, we

6    cannot deprive Perpetual of any rights in either court and

7    without attempting to respond to all of the points made by LBSF

8    in its letter to this Court; there are substantial connections

9    between these transactions and England.  It's not just English

10   law and consent to jurisdiction.  There's a lot there.  There

11   may or may not be a need for discovery with regard to those

12   points.

13          Our view is that LBSF does not need to file a summary

14   judgment motion now in order to make arguments in the English

15   court.  They don't need a placeholder here in order to argue

16   any of their points in England.  And so on that basis I think

17   filing or scheduling a motion here for summary judgment is

18   premature.

19          Again, our response isn't due yet.  If we filed a

20   motion, if we file something other than an answer or a

21   12(b)(6), that has to be disposed of first.  And we have a lot

22   of complex transactions to look at.  We may be responding with

23   a motion.  This is not the initial pretrial conference.  Again,

24   nothing has to be filed or scheduled now.

25          The last point I would make is harkening back to the

1  discussion in the Ballyrock proceeding, we should not get

2  "jammed and rushed" on these very important issues.

3       THE COURT:  I don't think that's what's going to

4  happen.  I think what's going on here, and tell me if you

5  agree, and I think this is also consistent with one of your

6  mission statements on behalf of your client, is that Mr. Miller

7  wants the ability to be able to file promptly a summary

8  judgment motion which will lay out, in great detail, the

9  arguments in support of Lehman's position with regard to

10  priority payment as it is impacted within Section 560 of the

11  Bankruptcy Code.

12       And what I envision happening is that that motion for

13  summary judgment, which no doubt will be quite detailed, I can

14  almost imagine it now there are footnotes and there are

15  references to legislative history and there are references to

16  scholarly articles to the extent there are any, that document

17  will end up as an attachment to some submission in London.  And

18  a judge who doesn't know, I suspect, Section 560 and may not

19  have a lot of familiarity with congressional history as it

20  relates to matters of this sort, will look at that and say I

21  don't think I want to deal with this.  Let's find out what the

22  judge in New York has to say, I'll defer as to that issue to

23  that court.

24       Assuming that happens, and by the way I'm making this

25  up literally as I say it.  Assuming that happens, you avoid the

1    risk of inconsistent outcomes which is beneficial to your

2    client and Lehman gets the ability to present its argument in

3    both courts.  My question to you is, what's wrong with that?

4         MR. SCHAFFER:  Your Honor, I really like the idea that

5    we're not subject to inconsistent decisions.  And I haven't

6    heard you suggest, in any way, that we're going to be deprived

7    of our ability to file motions or do whatever we think we need

8    to do.

9         THE COURT:  Absolutely not.  You're not going to be

10   jammed.

11        MR. SCHAFFER:  And we appreciate that.  Our biggest

12   concern is in some ways jurisdictional.  If the English court

13   were to say, and I too am making it up as we go, but if the

14   English court says I'm willing to be bound by whatever happens

15   in  New York and I'm willing to adopt that, that may go a long

16   way to resolving my concerns.

17        But if the English court says, the bankruptcy court in

18   New York can make its decision but it cannot enforce it here

19   and we will do whatever we think is appropriate here, we have a

20   problem.  And I appreciate that this Court has been, from the

21   very inception of this case, sensitive to international comity

22   and similar issues.  And there's no question that you

23   understand the issues that relate to the trustee.

24        THE COURT:  Right.  I take that as a yes.

25        MR. SCHAFFER:  Yes.

1          THE COURT:  Fine.  This shouldn't be a problem.  As a

2    result of that I'm going to give Mr. Miller the opportunity to

3    file a motion for summary judgment on a schedule that is highly

4    unusual and accelerated with the understanding that this

5    determination is made in large measure on the basis of my

6    having reviewed the letter which he submitted.  My recognition

7    that the schedule to be worked out for that motion practice

8    will not, in any way, prejudice the ability of Bank of New York

9    as trustee to respond to the arguments.  And with the

10   understanding that simply by permitting a summary judgment to

11   be filed I do not, in any way, indicate my views as to how I

12   will rule with respect to the merits of that motion nor do I

13   indicate, in permitting the motion to be filed, that it is

14   necessarily appropriate for a court in London to defer to me or

15   to pay any attention to the document.

16          But I do think that Lehman should have a full

17   opportunity to put its best foot forward as to this very

18   important issue.

19          MR. SCHAFFER:  Understood, Your Honor.

20          THE COURT:  Okay.  Thank you.  What happened to Mr.

21   Miller?  You won, does that mean you stay seated.

22          MR. MILLER:  Yes, thank you, Your Honor.  We will

23   submit an order later this afternoon or do you want to just

24   make this a ruling from the bench and rely on the transcript?

25          THE COURT:  There is no need for an order.  In the

1    ordinary course of bankruptcy practice, at least as it happens

2    in this courtroom, this kind of a conference would not

3    traditionally even be on the record nor would it happen in open

4    court.  What more typically happens is that somebody calls and

5    requests a telephone conference to get clearance to file a

6    motion for summary judgment, often at the conclusion of

7    discovery, sometimes during discovery.  There's no record of it

8    other than I say yes or no.  So now we have a record that I've

9    said yes, no need for an order.

10           MR. MILLER:  Thank you, Your Honor.

11           THE COURT:  There's somebody who wishes to be heard.

12   Excuse me.

13           MR. DANIELS:  Thank you, Your Honor.  I'm Patrick

14   Daniels from Coughlin Stoia Geller Rudman Robbins, LLP.  We're

15   plaintiffs in the -- represent plaintiffs in the Wong v. HSBC

16   action.  It's adversary proceeding 01120.

17           THE COURT:  It's not on the list.

18           MR. DANIELS:  That's correct.  We were item number 30.

19   We wanted to just inform you, we do intend to intervene in this

20   action, the LBSF v. Boni (ph.) for some of the reasons that

21   have already been identified that we believe that some of the

22   issues raised in that complaint may have a direct adverse

23   impact on our client's collateral, 1.6 dollars, probably, of

24   the two billion Mr. Miller referred to is related to

25   transactions with the Dante Trust.  And our concern is that

1    some of the issues that may be presented to you and adjudicated

2    would have a direct impact on our claims in this other action.

3              THE COURT:  I have no idea if that's true.  Your

4    matter was adjourned.  I let you speak.  And now you can sit

5    down.

6              MR. DANIELS:  Thank you.

7              THE COURT:  Did you work out a time?

8              MR. SLACK:  Your Honor, I'm happy to say that reason

9    prevailed and we do have a proposed schedule that all parties

10   have agreed to.

11             THE COURT:  I'd love to know the number of weeks.  I'd

12   like to know if it's the same number of weeks I would have

13   given you.

14             MR. SLACK:  It's going to be thirty days, Your Honor,

15   so one month is what we agreed to, which is slightly more than

16   four weeks but still within that ballpark.

17             Your Honor, the other thing that we discussed out

18   there, and obviously this is up to Your Honor in issuing an

19   order, is that the parties are agreeable that all the other

20   dates would be set, at least from our standpoint, after the

21   Court decides this motion.  So that we would suggest a

22   scheduling order that just deals with the schedule for the

23   motion and then have the rest of the dates decided after the

24   motion is decided.

25             THE COURT:  It's perfectly reasonable.

1          MR. SLACK:  Thank you, Your Honor.

2          THE COURT:  Okay.  That takes care of Ballyrock unless

3     there's somebody else who wishes to be heard.

4          UNIDENTIFIED ATTORNEY:  I'm standing up, Your Honor,

5     only because the agreement of the parties has put the hearing

6     on the motion on the omnibus hearing date on August 5 if that's

7     acceptable to the Court.

8          THE COURT:  I'll be here.

9          MR. KRASNOW:  Your Honor, we now turn to the LBI

10    section of the agenda.

11         THE COURT:  Before we turn to the LBI section of the

12    agenda, this is just a housekeeping issue; I know there are a

13    lot of people still in court.  It's five to 1; except for a ten

14    minute break we've taken no other breaks.  I'd like a best

15    estimate as to the timing for dealing with the LBI portion of

16    the agenda.  To the extent it's going to be a long time, I

17    might propose a lunch break.  To the extent it's going to be a

18    half hour, I think we can tough through it.

19         MR. WILTENBURG:  Your Honor, as Mr. Krasnow mentioned

20    earlier, there is one matter on the LBI calendar that involves

21    both LBI and LBHI.

22         UNIDENTIFIED SPEAKER:  Excuse me, we can't hear you.

23         MR. WILTENBURG:  I'm sorry; David Wiltenburg, Hughes,

24    Hubbard & Reef for the trustee.  I was noting that there are

25    three contested matters on the LBI calendar.  One of them, as

1    Mr. Krasnow mentioned earlier, involves both LBI and LBHI to

2    some extent.  One way to proceed would be to see if whether we

3    can finish that and therefore finish the LBHI matters prior to

4    the lunch break.  But we're, of course, happy to be guided by

5    Your Honor's preference on that.

6            THE COURT:  What's the length of the total agenda in

7    your best estimate?

8            MR. WILTENBURG:  It will probably be an hour, I would

9    estimate.

10           THE COURT:  I'll see you at 2 o'clock.

11           MR. WILTENBURG:  Thank you, Your Honor.

12       (Recess from 12:54 p.m. until 2:00 p.m.)

13           THE COURT:  Be seated, please.

14           MR. WILTENBURG:  Good afternoon, Your Honor.  David

15   Wiltenburg, Hughes, Hubbard & Reed representing the LBI

16   trustee.

17           As I mentioned before the break there are three

18   contested matters on the LBI calendar today.  And we also have

19   counsel from the trustee's office and from SIPA available to

20   respond to any questions the Court may have about the

21   controversies that are on or about the trustee's report that

22   was filed on Friday.

23           Of the three contested matters, one of them, item 15

24   is a matter that involves both LBI and LBHI.  So some portion

25   of our audience may feel that that's all they need to listen

1   to.  Of course we'll take them in any order but that would be

2   one way to go.

3          THE COURT:  Let's do what's most convenient for

4   counsel for LBHI in this instance.  Which probably means

5   starting with that.

6          MR. WILTENBURG:  Your Honor, that is item 15 on the

7   agenda.  And if I can briefly describe the series of events

8   that will perhaps illuminate the relationships among the

9   various pleadings that are mentioned in the agenda here.

10         The first pleading was the motion of UPRS to compel

11  the New York State Controller to turn over a certain property,

12  that was filed in early April.  It was apparent, from the face

13  of it, that UPRS was then engaged in trying to get possession

14  or control of property of LBI.

15         The trustee reviewed the situation and determined to

16  reject the 1990s contracts under which UPRS was purporting to

17  act.  Thereupon UPRS filed an objection to the trustee's

18  rejection of those contracts.  That accounts for a couple of

19  other items mentioned on the agenda.

20         And there's also been filed an objection by Mr.

21  William Kunst, and I would be glad to be corrected but it

22  appears to relate to some controversy that's separate from the

23  UPRS controversy.

24         And with that, I would assume that the moving party

25  would like to speak in support of the motion.

1        THE COURT:  Mr. Batista?

2        MR. BATISTA:  Good afternoon, Judge.  Paul Batista for

3   Unclaimed Property Recovery Service, UPRS.  Your Honor, it may

4   be useful to go over the factual history.

5        In the mid-1990s UPRS entered into a series of

6   contract with Lehman Brothers, Inc.  Under which, essentially,

7   Lehman Brothers, Inc., appointed UPRS its agent for all

8   dealings, particularly with the State of New York in terms of

9   efforts to recover unclaimed property belonging to Lehman

10  Brothers, Inc., and any of its predecessors, affiliates,

11  subsidiaries, sisters, brothers, the world.

12       THE COURT:  Probably not the world.

13       MR. BATISTA:  Not quite the world.  We performed under

14  that contract consistently, really up until this moment.

15  During the course of the relationship UPRS, acting as the

16  exclusive agent for LBI, recovered in excess of ten million

17  dollars in unclaimed funds held by the controller of the State

18  of New York.

19       Indeed, immediately prior to the filing of the various

20  petitions in September of 2008, UPRS obtained from the State of

21  New York two checks totally approximately 150,000 dollars, made

22  payable to Lehman Brothers, Inc.  Conveyed those checks to

23  Lehman Brothers, Inc.  This is all part of UPRS' ongoing

24  efforts on behalf of Lehman Brothers, pursuant to these

25  contracts.

1    Lehman Brothers, Inc., we learned shortly after the

2    bankruptcy filing, lost the checks or it may have been slightly

3    before the bankruptcy filing.

4    Lehman Brothers Inc. requested that UPRS continue not

5    only to make its general collection efforts to identify the

6    abandoned property, reclaim the abandoned property for LBI, but

7    with respect to the two missing checks LBI personnel filled out

8    various forms to have the comptroller replace those checks.

9    Even after the bankruptcy filing, and Mr. Gelb's

10   papers in support of our various positions testifies to this,

11   LBI's representatives, in effect, said continue doing your

12   work, we need you, continue doing your work.  That elicited

13   certain correspondence from the comptroller of the State of New

14   York, which administers unclaimed property claims.  And, in

15   fact, some of that correspondence, I see, was sent to Mr.

16   Giddens, the trustee, after he was appointed.  The gist -- and

17   at the present time, pursuant to a claim that UPRS has filed

18   and pursued on behalf of LBI, there is at least five million

19   dollars of unclaimed property belonging to LBI and presumably

20   its affiliates that has been identified and which we have every

21   reason to believe, and Mr. Gelb testifies to this in his

22   declaration, will, presumably in the very near future, be

23   turned over to Lehman Brothers pursuant to the claim that we've

24   filed.

25   My client has always been entitled to a ten percent

1  commission on funds actually recovered by LBI pursuant to these

2  agreements.  It pursued these efforts after the filing of the

3  petition.  And, in fact, when we finally filed a motion for

4  certain relief on April 13th of this year, and we've learned

5  this in the opposition papers we received last Friday from both

6  the trustee and LBHI, as soon as we filed our motion papers

7  LBHI and LBI also contacted -- they weren't aware, we submit,

8  they were not aware of the fact that this five million dollars

9  was identified and was going to be paid over to LBI.  And as

10 you know, very recently LBI served a notice of rejection of the

11 contract.  And it's essentially our position that whether

12 viewed as an administrative expense, post-petition expense,

13 that there shouldn't be any doubt that UPRS is entitled to the

14 recovery from the fund it has created, in effect, by pursuing

15 these claims, the ten percent fee to which it's entitled.  And,

16 indeed, the trustee indicated in papers filed last Friday that

17 the claim is now a six million dollar claim.  That is

18 undeniably linked to the efforts that have been made by my

19 client on behalf of LBI.  And it's our position that, again,

20 whether it's an administrative expense, we ought to be entitled

21 to deduct from this fund which has been created, the ten

22 percent commission that the contracts entitle us to.

23        THE COURT:  Well, I understand that's your position,

24 but let me ask you to explain a little bit more about how this

25 contractual arrangement actually functions, particularly at

1  this point, because you make arguments about it's not being

2  properly characterized as an executory contract.

3        MR. BATISTA:  Correct.

4        THE COURT:  Explain to me as best you can, and if we

5  need evidence we may have to defer this to another hearing,

6  mechanically how this works.  I understand that pre-petition

7  back in the mid '90s, '96, '97, Lehman Brothers entered into

8  some kind of a standard form contract with your client in which

9  your client undertook to, for a fee, locate unclaimed property.

10        MR. BATISTA:  Um-hum.

11        THE COURT:  And presumably, pre-bankruptcy, did that

12  with some success and collected a fee, without protest.

13  Assuming that property is identified as belonging to a

14  particular client, in this case Lehman Brothers, what happens

15  next?  And how does your client, through its efforts, confirm

16  that payment is made?  And how does your client get paid once

17  payment is made?

18        MR. BATISTA:  My understanding is that my client

19  undertakes the effort to -- and I'm not sure about the precise

20  details but the comptroller holds large quantities of property.

21  My client undertakes the effort to go through that universe of

22  unclaimed property held by the comptroller to identify anything

23  and everything that might arguably be property of LBI.  Once

24  it -- and this has been taking place through the ten to fifteen

25  years, these contracts that existed.  Once that's done, and my

1    client could certainly testify to the efforts that are

2    necessary, the comptroller is not anxious to part with any

3    funds.  And as I understand it, there are multiple forms that

4    need to be filed, sometimes refiled, conversations that take

5    place between UPRS and the comptroller's personnel.  And it's

6    really the -- just as a lawyer might do, it's the presentation

7    of a claim and any and all efforts that may go along with it.

8    It's not simply going down a list of assets on the third page

9    of The New York Times.  It's identifying the assets and

10   pursuing the claim.

11        The way the payment is made, my client doesn't collect

12   the payment; the money -- the funds are the funds of LBI.  And

13   historically the way this has happened, and I understand it's

14   happened to the tune of ten million dollars over the years, the

15   state sends a check payable to Lehman Brothers Inc. to UPRS;

16   UPRS sends it; she doesn't deposit it; sends that check to LBI.

17   And LBI, once it's deposited the check and recovered the funds,

18   does what it contractually committed itself to do; it writes

19   out a check for ten percent of the recovered funds.

20        That process that I've described was ongoing at the

21   time of these filings; it continued after these filings.  And

22   Mr. Gelb had submitted a declaration indicating that LBI

23   personnel, and indeed LBI personnel continued, in effect, to

24   assist UPRS in the recovery of these funds.  And indeed as long

25   ago as October of 2008, the trustee was certainly aware that we

1    were continuing those efforts.  And, again, those efforts today

2    have resulted in a fund that we thought was five million

3    dollars and apparently it's now six million dollars.

4         THE COURT:  Well, I'm assuming this doesn't happen on

5    the honor system.  I'm assuming that the state -- I believe

6    that the state may have a representative on the phone listening

7    into this hearing, based upon the CourtCall list, but that was

8    this morning's list and it may be that they're no longer

9    listening in.  But at some point if someone from the state

10   wishes to be heard on this, it's an open mic; as long as I know

11   it's about to happen.

12        MS. LORD:  Your Honor?

13        THE COURT:  I think we do have an open mic.

14        Who's that?

15        MS. LORD:  Nancy Lord from the New York State Attorney

16   General's Office.  I'm here with my colleague, Norman Fivel,

17   who's got more hands-on experience with this matter.  And if we

18   are going to be asked to speak and he's going to speak, I would

19   move his admission pro hac vice.

20        THE COURT:  I don't think we're quite to that point,

21   but if he needs to speak, that deemed motion is deemed granted.

22        MR. BATISTA:  No opposition.

23        THE COURT:  That's actually pretty funny.  We're not

24   to that point yet.  My question is really a question that goes

25   to Mr. Batista about process.  I'm assuming that the state,

1   which maintains this rather massive list of names and

2   addresses, some of them no longer good, is in the position of

3   stakeholder, something we talked about earlier during today's

4   hearing; that Unclaimed Property Recovery Service acts as a

5   finder, not just for purposes of reuniting property with its

6   owner but collecting a fee for doing so.  Assuming that certain

7   funds have been identified as belonging to a particular

8   claimant, what more, if anything, does Unclaimed Property

9   Recovery Service do to make sure that the payment is actually

10  made?  And what more, if anything, does Unclaimed Property

11  Recovery Service do to make sure that it is paid its fee?

12          MR. BATISTA:  Let me take up the second question

13  first.  I think, in fact, it is, so to speak the honor system,

14  the honor system within the confines of the contractual

15  commitment that LBI had under these agreements.  Again, UPRS

16  transmits the check, because the state has acknowledged for

17  years that UPRS is the agent for dealing with the state on

18  behalf of LBI.

19          THE COURT:  Does UPRS receive notice from the state

20  when a payment is being made to the claimant?

21          MR. BATISTA:  It receives a check.

22          THE COURT:  It receives the check or notice?

23          MR. BATISTA:  It receives the check.  The check.  I

24  don't -- I assume that in the ordinary course of UPRS

25  interfacing with the state there comes a point in time after

1    the state has done whatever it feels it needs to do to verify

2    UPRS's role and LBI's entitlement to the funds.  I assume there

3    comes a point in time when UPRS and LBI are made aware of the

4    fact that a check is in the mail.  I don't know that there's a

5    specific notice that is provided by the state to UPRS saying

6    hey, a check for five million dollars is in the mail.

7          And in terms of payment from LBI, it's the honor

8    system.  The check is delivered to Lehman Brothers, it deposits

9    the check, and either out of the proceeds of that check or out

10   of its -- whatever, whatever the source of the fund is, it pays

11   the fees that's due to UPRS, and has going back to when God was

12   a baby in 1996.

13         THE COURT:  There's no monitoring?  There's no

14   oversight?  There's no accounting?  It's just you trust that

15   Lehman Brothers, upon receipt of a 5 million dollar check, is

16   going to remit 500,000 dollars as a fee?

17         MR. BATISTA:  Well, I guess in term -- to the extent

18   that a contractual commitment is a form of monitoring and

19   oversight --

20         THE COURT:  No, it's really not.  A contractual

21   commitment is the source of a claim.  What I'm talking about is

22   how, in the ordinary course of business, an enterprise which

23   blows up with its fee income makes sure it's being paid all the

24   money that's due it.

25         MR. BATISTA:  You know, in candor, I'd have to ask Mr.

1    Gelb.  And if a hearing is necessary or an additional

2    affidavit, I'm sure we can do that.

3         THE COURT:  Okay.  The reason I'm asking these

4    questions, Mr. Batista, is that I'm intrigued by the whole

5    notion of whether or not this is or is not an executory

6    contract.  All these questions go to the question of

7    performance --

8         MR. BATISTA:  Understood.

9         THE COURT:  -- and what, if any, performance remains

10   due on the part of Unclaimed Property Recovery Service at this

11   point as to an amount which has not yet been paid to Lehman

12   Brothers.

13        MR. BATISTA:  I understand.

14        THE COURT:  Okay.

15        MR. BATISTA:  I understand.

16        THE COURT:  Why don't you proceed with your argument,

17   unless you're done.

18        MR. BATISTA:  Well, it's our position, of course, that

19   it is -- that the performance has been accomplished, that the

20   funds have been identified.  And, again, if it's necessary to

21   have a hearing we can put Mr. Gelb on the stand.  The funds

22   have been identified by Mr. Gelb, application was made for

23   those funds, and all that remains to be done, as far as Mr.

24   Gelb knows, is for the state to provide the five or six million

25   dollars that Mr. Gelb, UPRS, has identified and claimed.

1        So it's our position that this is not an executory

2   contract in the sense that it's a contract, a lease for

3   example.  The work has been done.  The fund has been

4   identified.  We're not seeking, although we would have been

5   glad to do so, to continue this work on behalf of LBI.  We're

6   simply looking to be paid for the work we've done, for the fund

7   we've created.

8        THE COURT:  Okay, and your position with respect to

9   the motion to reject?

10        MR. BATISTA:  Is that it should be denied.

11        THE COURT:  Because it's not an executory contract --

12        MR. BATISTA:  Correct.

13        THE COURT:  -- or for other reasons?

14        MR. BATISTA:  Essentially because it's not an

15   executory contract.

16        THE COURT:  Okay.

17        MR. BATISTA:  Okay?  Thank you.

18        THE COURT:  Thank you.

19        MR. WILTENBURG:  Your Honor, we tried to set forth in

20   our response some of the reasons why the relief that's sought

21   on this motion just can't be granted, and some of the, kind of,

22   gaps and understanding that appear to exist vis-a-vis how you

23   go about getting paid in bankruptcy.

24        One branch, of course, of the motion is the 500,000

25   dollar pre-petition claim.  And, of course, a pre-petition

1    contract claim is one that needs to be pursued if it's going to

2    be pursued via the claims process and via the kind of motion

3    practice that's been seen here.  Also, to the extent there is a

4    claim that's, in effect, a claim for a post-petition

5    administrative expense, the vehicle to get that kind of payment

6    is a motion pursuant to Section 503 of the Bankruptcy Code, and

7    that would call forth an inquiry into a lot of the questions of

8    whether there's really been benefit to the estate, exactly what

9    benefit that might be.

10          There's reference in these papers to a, I think, a

11   92,000 dollar lost check and a 43,000 lost check.  There is no

12   evidence that supports the idea of a five million dollar fund

13   existing.  There's also indication in LBHI's papers and our

14   papers as well that the comptroller, in effect, acted correctly

15   in saying to the claimant that it would not be appropriate for

16   them to release property of LBI without the trustee's

17   permission and approval.

18          Further, the discussions have progressed to the point

19   of realizing that there is a body of property there that

20   belongs both in some part to LBI and some part to other

21   affiliates, including entities that may now be affiliates of

22   LBHI.  There's a lot to be done to understand exactly what's

23   there.  Now, before that process plays out, it's going to be

24   hard to know whether any Section 503 claim is going to exist in

25   favor of UPRS.

1        Other points we've noted include that the contention

2    that no automatic stay protects the property of LBI, as opposed

3    to LBHI, is plainly wrong.  On the question of whether this is

4    an executory contract, we've noted the provisions of Section

5    365(g) of the Code which, in effect, imply that you test -- the

6    question of whether a contract is executory or not is tested as

7    of the filing date.  And we have a motion here that's based on

8    all kinds of propositions about performance allegedly rendered

9    after the filing date.  So, hard to see how the movant is going

10   to prevail on that contention.

11       Moreover, it appears that the main purpose or the --

12   the precise relief that the movant seeks is an order compelling

13   the New York State comptroller to do an act, that is, to turn

14   over to UPRS some unspecified amount of money -- I think it's

15   described as approximately five million dollars, right?  Well,

16   it's kind of going to be difficult for the Court to compel a

17   nonparty, such as the comptroller, to turn over such an amount

18   to UPRS.

19       So for all of those reasons we feel that the relief

20   sought, the kind of procedural format here, is inappropriate.

21   And if --

22       THE COURT:  Well, I certainly have the power in a

23   turnover action to cause a nonparty to turn over property to

24   the estate.  But that's -- you're saying that a party in the

25   position of unclaimed property lacks the ability to do that?

1    You could do that.

2    MR. WILTENBURG:  Your Honor, I think Court process and

3    due process would include making that entity a party to a

4    proceeding.

5    THE COURT:  Right.

6    MR. WILTENBURG:  That's not occurred here --

7    THE COURT:  Well, it could, though.

8    MR. WILTENBURG:  -- because --

9    THE COURT:  It's easily done.

10   MR. WILTENBURG:  Yes.

11   THE COURT:  Okay.  You're simply saying that as of the

12   current status of the pleadings there's no present ability to

13   cause that?

14   MR. WILTENBURG:  That's correct, Your Honor.

15   THE COURT:  Okay.

16   MR. WILTENBURG:  And for all of those reasons we feel

17   that the motion should be denied, certainly as to the portion

18   of it that seeks recovery on a pre-petition contract, and

19   deemed premature and procedurally improper to the extent it is,

20   in effect, asserting a claim under Section 503 of the Code.

21   THE COURT:  And what about your own motion for

22   rejection?  Is that -- we're hearing that at the same time?

23   MR. WILTENBURG:  Your Honor, that rejection was

24   noticed pursuant to the procedures that were put in place early

25   in the case.  As reflected in our papers, it was the trustee's

1  business judgment that it was not necessary to have this

2  contract in place.  Indeed, I think it's reflected that the

3  comptroller's office had reached out to the estate to discuss

4  the issue of correct disposition of Lehman property, broadly

5  defined.

6      So it was the determination that this contract was not

7  beneficial to the estate on an ongoing basis, and therefore the

8  trustee determined to reject it.

9      THE COURT:  And what's the procedural status of that

10  motion?

11      MR. WILTENBURG:  Your Honor, I believe it's a notice

12  that is -- will become effective absent a favorable ruling on

13  the objection to it.

14      THE COURT:  I'm just confused.  I'm trying to

15  understand if at this moment we are arguing your right to

16  reject that contract.  Is that before me right now?

17      MR. WILTENBURG:  I don't think so, Your Honor.  I

18  think it is purportedly raised by the objection.  You know, I

19  think it's going to be difficult to maintain that there can be

20  anything other than a pre-petition claim based on a rejected

21  contract.  And so maybe there will be a 503 claim down the road

22  sometime.

23      THE COURT:  I'm not making myself clear, or I don't

24  understand something, and it's probably the latter.  I must be

25  missing something.  You're seeking to reject a contract; the

1    contract counterparty alleges that contract can't be rejected

2    because it's not an executory contract.  Is the argument about

3    the status of that contract before me now as a matter that

4    calls for judicial resolution, or is it simply obliquely part

5    of what we're talking about in reference to the contested

6    matter brought on by UPRS's request for payment?

7          MR. WILTENBURG:  Well, I think the contested matter

8    that was initiated by the motion, that motion has to be denied

9    on any view of whether this contract is executory or not.

10    Whether the movant has raised sufficient argument --

11          THE COURT:  I'm asking you --

12          MR. WILTENBURG:  -- to keep it in play --

13          THE COURT:  Excuse me.  I'm asking you about what the

14    trustee has done.  What is the status of the purported

15    rejection of this underlying agreement?

16          MR. WILTENBURG:  It will --

17          UNIDENTIFIED SPEAKER:  Your Honor, excuse me, could we

18    have a moment, please?

19          THE COURT:  Yes, why don't you confer?  I'm just

20    looking for a point of clarification.

21    (Pause)

22          MR. WILTENBURG:  Your Honor, as I mentioned, the

23    rejection was done by notice pursuant to the procedures order

24    entered early in the case that governed assumption and

25    rejection of contracts.  Once that notice was published and

served on the counterparty, there was a time to object.  That

objection was made, and our papers are a response to the

objection.  And we would request on that branch of what's on

the calendar today that the Court enter an order approving the

rejection on the ground that that is, in fact, an executory

contract.

THE COURT:  All right.  So the answer to the question

"Is the rejection issue before me," the answer to that is yes?

MR. WILTENBURG:  On the second branch of the motion,

yes.

THE COURT:  Okay.  And what position do you take on

the subject of the contract as an executory contract?  I heard

you say that there was post-petition performance discussed in

reference to the administrative claim.  Is it your position

that for that reason and principally for that reason this must

be deemed an executory contract?

MR. WILTENBURG:  Yes, that you test for executory as

of the filing date.  And as Your Honor pointed out, I think, in

earlier portions of this discussion, it's not even clear that

performance has been completed even now, as certainly no funds

have been received, no benefit to the estate has flowed.

Probably whatever events might theoretically trigger a payment

to UPRS have simply not occurred.

THE COURT:  All right.  I'll hear from Mr. Krasnow.

MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

1     Gotshal & Manges, on behalf of LBHI.  And what may or may not

2     be clear to counsel for the movant here is that there is a

3     distinction to be made between LBHI and LBI.  As I noted, Your

4     Honor, this morning, the motion that we had on the calendar

5     this morning for the Chapter 11 cases was a motion that had

6     been filed by the movant seeking a modification of the stay in

7     the LBHI case with respect to an agreement that both counsel

8     has indicated, Mr. Gelb in his declaration has indicated, and

9     as a reading of the contract itself clearly indicates, is a

10    contract only with LBI.  And while counsel suggested in

11    argument that it was a contract for the benefit of LBI and its

12    affiliates, that observation is simply erroneous.  The

13    contract, on its face, in clear unambiguous language, says it

14    relates to LBI and successors and assigns.  LBHI is neither a

15    successor nor an assign.

16          The relief that they are seeking as it relates to LBI

17    is something that the trustee will address.  As it relates to

18    LBHI, there is simply no showing that can possibly be made that

19    the automatic stay in the LBHI Chapter 11 cases should be

20    modified in order to allow this claimant to do whatever they

21    propose to do with respect to do with LBI.  But more

22    importantly, Your Honor, a portion of the abandoned property,

23    which the State of New York is holding, includes property that

24    is due LBHI and may also be due to other Chapter 11 debtors.

25          There is, as I noted, Your Honor, and as the contract

1    clearly reflects, which is Exhibit A to the Gelb declaration,

2    there is no contract, whether it's executory or not, to which

3    LBHI or any of its affiliates other than LBI is a party.

4         We would note therefore, Your Honor, that as it

5    relates to LBHI, relief (gap in audio) should be denied.  And I

6    would request that the Court impress upon counsel that to the

7    extent the claimant here seeks to take any steps whatsoever to

8    try to obtain possession of any monies that may be due and

9    payable to any of the Chapter 11 debtors that are held by the

10   New York State, that to do so would violate the automatic stay.

11        I would also note, Your Honor, that in a -- it's

12   styled as an objection -- it's docket number 3734 -- that was

13   filed by the claimant here, dated June 1.  There are various

14   statements contained in here about actions that purportedly

15   were taken on or about May 4th by representatives of LBHI.

16   There is no declaration to support that.  As I noted, there was

17   no contract with LBHI and, therefore, I would say categorically

18   there were no representatives of LBHI who had any discussions

19   with UPRS.

20        Moreover, there is a baseless speculation contained in

21   paragraph 18 of this pleading in which counsel suggests that

22   the motivation of at least LBHI -- I'm sure it's not of LBHI

23   but maybe they're suggesting as to LBHI -- as to the opposition

24   that both LBI and LBHI are taking here is because there is a

25   design that there is some other third party other than the

1    estates who is interested in getting a fee.

2         Speaking for LBHI, every dollar that is collected from

3    the State of New York that represents abandoned property will

4    be paid in its gross amount to the estate without any payment

5    to any third party.

6         Your Honor, again, as it relates to LBHI, we would

7    request that the motion or motions be denied.

8         THE COURT:  Understood.  Thank you.

9         Anything more on this?

10        As to the last point made by counsel for LBHI, I

11   concur.  There is no entitlement to relief as to LBHI.  And to

12   the extent that relief is being sought by UPRS in the nature of

13   relief from the automatic stay to proceed to collect property

14   that belongs to LBHI, that request is denied both because there

15   appears to be no privity of contract between UPRS and LBHI and

16   because whatever property may reside within the possession of

17   the New York State Comptroller's Office, that property either

18   is property of LBI, LBHI or some other affiliate that may have

19   a proper claim to it in these cases which are not consolidated.

20        Given the uncertainty as to whose property it is, at

21   least in my mind the uncertainty, and given the strenuous

22   argument made by counsel for LBHI in the interest of protecting

23   whatever property interest LBHI may have, the automatic stay

24   clearly applies and is not being lifted now on the basis of

25   these assertions.

1    As to the dispute that exists as between UPRS and the

2    trustee of LBI's estate, I'm concerned that I do not have

3    sufficient detail in the record to confirm that we are dealing

4    with an executory contract.  It certainly appears to be an

5    executory contract based upon what I have been told.  And the

6    assertion by counsel for the claimant as to an entitlement

7    potentially to a post-petition administrative claim suggests

8    that there has been ongoing activity post-petition.

9    Nonetheless, there are papers that have been filed

10   and sworn to by Mr. Gelb as a principal of UPRS that at least

11   suggest that there may be a disputed issue of fact as to

12   performance.  To the extent there is such a disputed issue of

13   fact as to whether or not the contract in question is

14   executory, I'm going to hold this over to the next omnibus

15   hearing date for purposes of conducting what I hope will be an

16   extremely abbreviated evidentiary hearing limited to the

17   question of whether or not the question is executory.  Assuming

18   that I find that the contract is executory, it will be deemed

19   rejected.  To the extent that it's not, the parties will be

20   stuck with that determination, unless some other Court says I'm

21   wrong.  That hearing will take place on the next omnibus

22   hearing date.

23   My strong suggestion, however, to the parties is that

24   this is a fairly simple question to determine and that the

25   parties might spend their time productively conferring on basic

facts. Mr. Batista, if he recognizes that he has a loser, may

determine that it's not worth pressing the point. If he

believes he has a winner, I assume I'll see him again. But to

the extent that I determine that this is an executory contract

which is properly rejected on notice of the trustee, that does

not deprive Mr. Batista's client of an ability to participate

in the claims process by arguing whatever UPRS can properly

argue in terms of entitlement by reason of such rejection or by

reason of such post-petition performance if it can be

demonstrated.

In a sense, Mr. Batista's client sits neatly on the

horns of a dilemma. To the extent that there is post-petition

performance, it's pretty clear this is an executory contract,

but there also may be some claim to be asserted, whether or not

it's a good claim remains to be seen, as to possible

administrative treatment. To the extent that all performance

occurred pre-petition and there's really no post-petition

performance to be performed, we can have a hearing to determine

the proper characterization of the contract.

I would note, however, in passing, for whatever it may

be worth, that it is the unusual contract as to which there is

no performance of any sort due. And based upon the colloquy

that took place with counsel for UPRS, it seems to me that,

while it's unsworn colloquy, that there really does appear to

be some performance which ordinarily would be due in processing

1   these claims against the New York State Comptroller's Office.

2        With that I leave it to the parties to meet and

3   confer, and we'll have a further hearing only if necessary.

4        MR. KRASNOW:  Your Honor, may we submit an order that

5   denies the motion as it relates to LBHI --

6        THE COURT:  Yes.

7        MR. KRASNOW:  -- without prejudice to them?

8        THE COURT:  Absolutely.

9        MR. KRASNOW:  Thank you, Your Honor.

10       UNIDENTIFIED SPEAKER:  Thank you.

11       THE COURT:  Thank you.

12       MR. KOBAK:  Good afternoon, Your Honor.  James Kobak,

13  Hughes Hubbard, for the SIPA trustee.  If Your Honor pleases,

14  as you know, we filed a fairly extensive interim report on June

15  1st.  I don't really propose to make any presentation about

16  that report.  We like to think that it speaks for itself.  I do

17  have a couple of numbers that I can update because our bar date

18  for filing claims expired as of 12 o'clock Pacific Time, I

19  believe, on June 1st.  And I'm happy to entertain any questions

20  that Your Honor may have.

21       THE COURT:  I'll listen to your update.

22       MR. KOBAK:  Okay.  We actually received a number of

23  customer claims that surprised us at the last minute, so we

24  received about between 700 and 750, I believe, in the last two

25  days, or up to June 1st, which brings the total up to 11,911

customer claims. Of course, some of those claims are huge

omnibus claims on behalf of Barclays and so forth; some are

duplicative; some are claims that have been kind of lumped

together in an omnibus fashion, for instance, LBHI's claims.

But it is still a substantial number of claims. We also

received some 1,300 general creditor claims in the last couple

of days. So that brings that total to 8,095.

We've continued to work hard at trying to get through

the determination of claims. We've finally determined 2,200,

and for many of those, I think for 13,065, the time for

objections to be lodged with the Court has expired. We're in

the process of determining another 1,100, which I think several

hundred of those will clearly be done by the end of this week,

and the remainder will be done by the middle or end of next

week.

We've also issued 1,272 what we call deficiency

letters, which are letters where there's not much or any

information in the claim, trying to find out what the claim is

really about and whether it's been filed with the correct

entity. And so we have 1,272 of those outstanding. Our

experience to date has been that roughly ninety percent of

those fall by the wayside; they turn out to be duplicative

claims; they're against an entity that's not LBI; sometimes,

frankly, they don't really have anything to do with the LBI but

somebody filed a claim on the Web site.

1    So that still leaves a population of several thousand,

2  something over 2,000 claims.  And, in addition, we do have

3  these very, very complicated claims by the holding company, by

4  Libby, which is a very substantial claim, and several others.

5    So at this point I can't really give an estimate of

6  when we'll be finished with that process, although we are

7  making every effort to get through it as quickly as possible.

8    THE COURT:  Thank you for that report.

9    MR. KOBAK:  And I'm also here today to handle the Teva

10  motion.  But that's their motion, not mine, so I'll have to

11  turn the podium to someone else.  Thank you.

12    THE COURT:  Okay.

13    MR. KANNEL:  Thank you, Mr. Giddens.

14    Good afternoon, Your Honor.  And for the record it's

15  pronounced [tevah]; it's not the sandal company.  William

16  Kannel from Mintz Levin, representing the Teva entities.  Your

17  Honor, we filed these two motions, and procedurally 13 and 14

18  are effectively the same substantively, so I assume we will be

19  dealing with them together.

20    THE COURT:  We will deal with them together.

21    MR. KANNEL:  Yes.

22    THE COURT:  The arguments are identical.

23    MR. KANNEL:  The arguments are identical, Your Honor.

24  We filed these motions back on March 3rd.  The purpose of the

25  motions was to prevent the Teva entities from being compelled

1  to put into the SIPC estate post-commencement date their own

2  assets in the form of dividends.

3       We continued the motions voluntarily because we

4  received the phone call from counsel to SIPC saying that Teva

5  claims were pretty far up in the queue, that they would be

6  dealt with immediately and, if allowed, distributions would be

7  made that would not only obviously include the customer

8  property but would include the post-commencement date dividends

9  as well.

10      Sadly, and the reason we're here is, only part of that

11 happened.  Our claims have been allowed in full, but the

12 trustee reversed position after much back-and-forth and

13 indicated that they would not be making distributions on behalf

14 of our claims.  This is despite the fact that, as indicated in

15 the status report filed on Friday, they advanced 3.4 billion to

16 300 other customer claims.  And that's why we're pressing

17 forward with our motion today, Your Honor.

18      SIPC makes it clear that customers are to be treated

19 ratably.  It doesn't provide any basis on which certain types

20 of customers can be treated preferentially to other customers.

21 There's no basis on which prime brokerage account customers can

22 be treated differently than other customers with allowed

23 claims.  And there's no basis on which they can make other

24 payments to creditors, customer creditors with allowed claims,

25 and, by implication, prevent a situation where they don't have

1  to continue to advance funds to the estate and simply hold off

2  on paying ours and, even worse, compel us to augment the estate

3  for other customers with post-petition dividends, post-

4  commencement-date dividends, paid on property which they have

5  determined to be our customer property.

6      So despite any number of communications that our

7  claims would be paid immediately, and we attached as an example

8  to our motion an e-mail indicating that hey, if you even e-mail

9  me your declaration or release with respect to the claim we'll

10 get it processed for distribution immediately, they are now not

11 paying our claim, and we think our claim should be paid as an

12 allowed customer claim.  And even worse, Your Honor, they are

13 now telling us that we have to continue to put our post-

14 petition dividends on securities that are clearly ours into the

15 account.

16      There's nothing that compels us to continue to put our

17 own assets into this estate.  SIPC is all about getting money

18 out to the creditors; it's not about forcing creditors to

19 continue to put money into the SIPC estate.  We can't be

20 compelled to advance funds, which, under their theory, would

21 augment the customer property available to all customers

22 without --

23      THE COURT:  But let me understand something about --

24      MR. KANNEL:  Sure.

25      THE COURT:  -- this last point.  I take it that the

1    concern here as to both motions is that securities are held in

2    the LBI account; those securities are Teva securities which

3    receive, as other securities do, dividends when authorized and

4    paid by Teva, correct?

5           MR. KANNEL:  Correct.

6           THE COURT:  Those dividend payments go into the

7    account and they're held there.  Where would they go if they

8    weren't in the LBI account?  What would happen to those

9    dividends?

10           MR. KANNEL:  Well, I think the argument that I

11    understand the trustee to be making --

12           THE COURT:  No, I'm asking you, assuming you have

13    those securities in a different account, dividends would be

14    authorized, dividends would be issued, they would go to that

15    account.  Then what would happen to them?

16           MR. KANNEL:  We would have the choice to terminate the

17    account, as we do in this account agreement, but that of course

18    is stayed by the SIPC proceeding, and do whatever we wanted

19    with the proceeds of the dividends.  What's happening here

20    conversely --

21           THE COURT:  Are these effectively Treasury shares?

22           MR. KANNEL:  These are -- no, they're not effectively

23    Treasury shares.

24           THE COURT:  What are they?

25           MR. KANNEL:  This is Teva limited stock.  If you're

1    defining Treasury shares as shares held by the entity itself

2    that issued them, they're not Treasury shares in that they're

3    Teva limited stock which are held by Teva Pharmaceutical Works

4    and Teva Hungary Limited Company, the two movants here.  So

5    they're stocks that the subsidiaries own in their parent.  So

6    they're not Treasury shares, at least the way I normally think

7    of Treasury shares being held by the issuer itself.

8         THE COURT:  All right, but it's all in the family.

9         MR. KANNEL:  Excuse me?

10        THE COURT:  It's all in the family?

11        MR. KANNEL:  It is absolutely all in the family, and

12   the family is being asked to fund, to use the family metaphor,

13   Your Honor, to fund customer claims outside of the family when

14   the stock has already been decided -- the pre-petition shares

15   in the account have already been decided to belong to the

16   family.  Yes, I understand that they may have had an argument

17   before our claim was allowed:  How can we let you have the

18   dividends until we know that the underlying shares are yours?

19   Now the underlying shares are clearly ours, and they want to

20   hold onto the dividends.

21        THE COURT:  Okay.  These shares appear not to be

22   customer-named securities, however.

23        MR. KANNEL:  They are not customer-named securities.

24        THE COURT:  And do you know why that happened, because

25   you certainly have the capacity to so list them.  Why are they

1    unregistered?

2          MR. KANNEL:  I -- I think they are just held in street

3    name, like the vast bulk of securities are.  They are arguably

4    publicly traded.  They're ADRs, American depository receipts,

5    which represent shares in a trust which own the foreign shares.

6    Teva Limited is an Israeli company, Your Honor, so they're not

7    certificated shares and not registered shares.

8          THE COURT:  Okay.  So you want your money; it's as

9    simple as that?

10         MR. KANNEL:  Well, we'd like all of our money; at the

11   very least, we'd like to get our dividends back and be

12   prevented from having to subsidize and augment the estate with

13   post-commencement-date dividends, which are clearly in no way

14   part of the property that should be available to all of the --

15         THE COURT:  Seems like it's a two-part analysis, then,

16   for purposes of the trustee's response.  And I'd like to hear

17   from the trustee.

18         MR. KANNEL:  I think that's right, and that's

19   certainly how we wrote our papers, Your Honor.

20         THE COURT:  Okay.  Let me hear the trustee's position.

21         MR. KOBAK:  Thank you, Your Honor.  You know, we would

22   like nothing better than to give Teva all the property it's

23   claimed, that we have determined it has a claim to, an

24   allowable claim, but the same could be said of thousands and

25   thousands of other customers who have claims and are

1    proceeding.  So with respect to the first point, these are not

2    customer-named securities.  They have a claim in our

3    proceeding; the claim's been processed.  The claim has been

4    allowed.  That does not mean there will necessarily be enough

5    profit, enough proceeds, enough property to give them all the

6    shares that are allowed.  They have a net equity claim against

7    the fund of customer property, just like any other customer in

8    this proceeding.

9        We were hoping that we would be able to do a hundred

10   percent distributions immediately.  There have been various

11   things that have happened, claims that have been filed,

12   property that was not segregated perhaps as the way it should

13   have been, which temporarily at least make us unable to do

14   that.

15       So they have an allowed claim but it has not been

16   determined that they would be entitled to a hundred percent of

17   these shares.  And the only way they would have an absolute

18   right to these shares, as Your Honor noted, would be if they

19   were customer-named securities, and there's no dispute among us

20   that they're not.

21       So I think that they just have to wait in line like

22   everybody else.  And the trustee's doing everything he can to

23   determine claims to try to resolve disputes to be able to start

24   making distributions to people, whether it's partial or total,

25   whether it has to be done in a couple of stages or not.

1    THE COURT:  Answer this fairly obvious question; I'm

2    sure you're prepared for it.  Teva argues that it's just plain

3    unfair that 3.4 billion dollars in claims relating to prime

4    brokerage accounts somehow found their way to other homes for

5    the benefit of the parties who had those accounts.  And Teva,

6    itching for similar treatment, pushes and says, well, what

7    about us?  You say, well, sorry, you just have to wait in line.

8    What distinguished the 3.4 billion dollars that moved?

9        MR. KOBAK:  We -- that was part of a transfer-of-

10   customer-accounts process, which is handled by a separate

11   stat -- part of separate subsection of SIPA; it's 15 U.S.C.

12   Section 78-2(f), which deals with transfer of customer

13   accounts.  And that says that in order to facilitate the prompt

14   satisfaction of customer claims and the orderly liquidation of

15   the debtor, the trustee may, pursuant to terms satisfactory to

16   him, and subject to the prior approval of SIPC, sell or

17   otherwise transfer to any other member of SIPC, without consent

18   of any customer, all or part of the account of a customer of

19   the debtor.  It's not a net equity determination.

20       As we say in our trustee's report, it was clearly

21   contemplated by Judge Lynch's order.  I think it's fair to say

22   it was clearly contemplated in the proceedings before Your

23   Honor that one of the purposes of this whole SIPA liquidation

24   was to transfer accounts to Neuberger, to Barclays and so

25   forth.  Initially in the Barclays agreement, the asset purchase

1   agreement and the clarification letter, the prime brokerage

2   accounts were included among the accounts that Barclays was

3   going to take.  So it was part of the transfer process.  They

4   subsequently decided they did not want to take those accounts,

5   but they nevertheless had been teed up for transfer.  Indeed, a

6   lot of them were in the process of being transferred to Goldman

7   Sachs or other brokers.

8        So the trustee and SIPC, with a certain amount of

9   pressure from the regulators, felt that it was in the best

10  interest of the estate and of the market generally to have

11  these accounts transferred.  And that's why that occurred.

12       In point of fact, the prime brokers have not received

13  a hundred percent on the dollar.  In most cases they haven't

14  received anything close to it.  So it's not really as if a

15  hundred percent of these -- there's still, I think, over a

16  billion dollars that are owing to these people, and much of

17  that is being handled as part of the claims process.

18       THE COURT:  Okay.  Let's go to the question of these

19  dividends.  Teva makes a fairly compelling argument that

20  they're sort of captive and they're enhancing the estate each

21  time that a dividend is paid in respect of this stock, and

22  they're enhancing the estate at a time when, given the

23  statements made by the trustee, they don't have any adequate

24  assurance -- I'll use that term -- that they're going to be

25  paid back dollar for dollar, because it could turn out that the

1    claims against customer property turn out to break the buck.

2         MR. KOBAK:  Right.

3         THE COURT:  What do you about that?

4         MR. KOBAK:  Okay, well, the problem, Your Honor, is I

5    think they're in the same situation as everyone else that has

6    securities that might be able to say I had securities of this

7    class and series at Lehman, and there have been dividends that

8    were received.  Some of those -- their case might be a little

9    easier than some because there may not be a lot of other

10    competing claimants to these particular dividends, but with

11    respect to a lot of other securities that would be the case.

12         THE COURT:  Is there any prec --

13         MR. KOBAK:  I think it's very important to clarify one

14    thing, and I --

15         THE COURT:  Okay.  Yeah, I have a question for you and

16    then you can clar -- then clarify and I'll ask the question.

17         MR. KOBAK:  Okay.  We believe that this property has

18    to be allocated to pay customer claims.  It clearly derives

19    from customer property, and that's part of the definition in

20    SIPA.  But we have not -- we are not, and I apologize if this

21    wasn't clear in our papers -- the trustee has not taken the

22    position that all this money should just be lumped into the

23    fund of customer property along with the pre-filing-date

24    property.  Rather, we're putting it in a separate account and

25    we basically plan to deal with it differently.

1        The SIPA statute really does not give very much

2   guidance.  It doesn't really give any concrete guid --

3   definitive guidance on exactly how post-filing-date dividends

4   and interest should be paid to customers, whether it should be

5   part of a net equity type calculation where it's done on a pro

6   rata basis or whether somebody who could say I'm getting

7   ninety-five percent of my Teva shares, these are the only --

8   I'm the only claimant to the Teva interest in dividends that

9   have come in, I should at least get ninety-five percent of

10  that, which might give them a higher recovery than other

11  customers would get.

12       And we have not actually made a final determination at

13  this point as to exactly how we'll distribute those funds.

14  It's very difficult for us to do that without getting a further

15  view of exactly what the claims are and how they match up

16  against the dividends that have been received.

17       THE COURT:  You've actually, in part, answered the

18  question I was going to ask.  That question was what precedent,

19  if any, is out there to provide guidance as to who has rights

20  in dividends of this sort?

21       MR. KOBAK:  Mr. Caputo of SIPC is here, and he may

22  able to address that.  It's certainly my understanding -- I do

23  not believe that there's any case law on this.  I do not

24  believe that there's much, if any, legislative history on it.

25  It's my understanding from liquidations that we've been

1    involved in and from discussions with Mr. Caputo, but I'll let

2    him speak for himself, that basically SIPC -- in most

3    liquidations, the position has been taken that if you can

4    demonstrate a right to the underlying shares, the dividends

5    will probably follow that to the extent of your net equity

6    claim.  I think that's the position that has been taken.

7         Frankly, in all the years of SIPA, this has not been a

8    big issue because a lot of times, as I understand it, the

9    claims have been satisfied, in the first instance with SIPA,

10   cash advance and so forth, and it's been almost like an

11   accounting thing at the end, or it's been -- there have been a

12   very few number of accounts and it's been a very -- a fairly

13   simple exercise to figure out who might be entitled to what

14   dividends.  Unfortunately, our case is of a magnitude where

15   it's not going to be that simple.

16        THE COURT:  All right.  I wouldn't mind hearing from

17   Mr. Caputo, if he has anything to contribute on this subject.

18        MR. CAPUTO:  Thank you, Your Honor.  Kenneth Caputo on

19   behalf of the Securities Investor Protection Corporation.  With

20   regard to the dividends, Mr. Kobak is correct, there's no case

21   law that I'm aware of that talks about this issue.  It is

22   something that is hard to believe in forty years of a statute

23   hasn't really arisen, but I don't think it's arisen much

24   because it just hasn't been in this magnitude.  You just

25   haven't --

1     THE COURT:  Would you like me to write a decision on

2     this dispute right now?

3     MR. CAPUTO:  Not right now, but --

4     MR. KOBAK:  In my mind it depends on the decision,

5     Your Honor.

6     MR. CAPUTO:  Let me say a few things first, and then

7     you can perhaps proceed.  The only guidance that we can find is

8     from the statute itself.  And in the statute, it defines the

9     term "customer property" at 78.lll(4).  And the definition,

10    truncated but purposeful section, means cash and securities at

11    any time received, acquired or held by or for the account of a

12    debtor from or for the securities account of a customer.  At

13    any time.  Now, the statute, in various other portions, many,

14    many times actually, references the filing date as the key date

15    that the statute should look to determine a number of things.

16    It determines the value of securities for the purposes of your

17    pro rata share and for the purposes of the SIPA advance as of

18    the filing date.  It determines the allocation of property as

19    of the filing date, what is in the estate as of that period of

20    time.  All of the securities are valued as of the close of

21    business on the filing date.

22        So Congress used the term "filing date" many times

23    throughout the statute.  They did not do so here.  Instead they

24    said "at any time received".  So the question becomes why the

25    distinction?  And was it intended or not?  There's no

1   legislative history that we can find that really elucidates

2   what the purpose was.  But there may be in looking at the

3   purpose of the statute itself, the remedial purpose of SIPA

4   itself.  Generally speaking, SIPA is going to be involved in a

5   case only when there's a shortfall in the fund of customer

6   property.  If there's no shortfall and there's a hundred cents

7   on the dollar, there is no reason for SIPC's involvement to

8   protect customers.

9       So when you have a shortfall in the fund of customer

10  property, what Congress thought was the best mechanism to

11  provide for protection was to allow customers to share pro rata

12  across the board equally.  And when you share equally in a

13  fifty percent distribution or a ninety percent distribution,

14  and I'll use the case of Teva as a good way of getting to that

15  point, their claim has been determined but not yet paid.  We'd

16  love to see it paid in short order, absolutely.  However, what

17  they've determined is their value of their claim is everything

18  they've claimed.  Their claim is allowed.  One hundred percent

19  of the value of their claim is allowed as a claim.  It's a

20  different question of whether that claim will be paid at a

21  hundred percent, because what has to happen first is that the

22  trustee has to come before this Court and say look, I've got

23  this property that I've marshaled, I would like to allocate the

24  X percentage of that property to the fund of customer property,

25  because we think it clearly should go to customers, there may

1   be some other portions of the property that go to the general

2   estate.  When this Court approves that allocation, then the

3   estate has filled out the numerator of the fraction for what

4   will be ultimately distributed to customers:  the pro rata

5   share.  The denominator is the total value of all of the

6   claims, Teva's and everybody else.  We're not at that point.

7          Meanwhile, what happens is all of this other property

8   continues to come into the estate.  And in the past, because

9   the deficiency has been -- you know, it hasn't been as big of

10  an estate -- that pile of money is inured to the benefit of all

11  other customers.  As a practice, what SIPC has done is that it

12  has earmarked those dividends and the interest payments under

13  bonds for the allowed customer claim and moved that property

14  over to those customers in the ordinary course of the payment

15  of the claim.  We've never received objection on that because

16  customers are quite content.

17         THE COURT:  Let me understand what you just said,

18  because I think it's important.  You're saying that,

19  notwithstanding the fact that there is no legislative history

20  or applicable precedent, as a matter of ordinary-course

21  practice, SIPC will have dividends go with the securities to

22  the customer who has an entitlement to those securities?  Do I

23  understand you correctly?

24         MR. CAPUTO:  That's what we've done in the past,

25  correct.

1          THE COURT:  And nobody's ever complained?

2          MR. CAPUTO:  Correct.

3          THE COURT:  Does that mean that, assuming no motion

4    had been brought and we were just in the process of ordinary

5    claims administration, and I'm not holding you to a position on

6    behalf of your client at this point, I'm just asking what past

7    practice would suggest, that ordinarily the dividends that have

8    accumulated post-commencement date of the SIPA case as it

9    relates to the TEVA securities would belong to Teva as opposed

10   to being available for a distribution rate, I believe, to other

11   customers?

12         MR. CAPUTO:  That's correct.

13         THE COURT:  Okay.

14         MR. CAPUTO:  And here's where that all comes together

15   when you talk about a pro rata distribution and why the relief

16   sought by Teva today should be denied, and that is because we

17   don't have a pro rata calculation yet.  The trustee has not

18   moved this Court to allocate property of the fund to customer

19   property after the bulk transfer process.  This Court has not

20   entered an order telling the Court that X percentage of assets

21   marshaled are part of the fund of customer property

22   definitively and you can now go ahead and disburse them.

23         So, assuming a hypothetical that at this point there's

24   an eighty percent distribution of fund of customer property in

25   Lehman, at the end of the day, Teva in no way would be entitled

1     to one hundred percent of the post-filing date dividends

2     because they wouldn't receive back one hundred percent of the

3     shares; they would be getting eighty percent of their shares

4     back because that's their pro rata distribution.  Past practice

5     would say hey, we'll give you eighty percent of the dividends

6     that have accrued but not the other twenty.

7             It becomes more clear when you deal -- Teva's a unique

8     example because they're claiming their own shares, and it

9     perhaps is unlikely that somebody else is going to come into

10    the estate and claim Teva shares.  I don't know, but I haven't

11    looked at all 11,000 claims.  But let's assume it's unlikely

12    that somebody else is coming in and claiming the same shares.

13    Take the example of IBM.  There's going to be thousands of

14    claimants, perhaps, of positions in IBM in the estate.  And

15    let's assume that the estate marshals -- make it simple -- 100

16    shares of IBM but it has claims for 1,000 shares of IBM.  The

17    dividends that accrue during the pendency of the liquidation to

18    those one hundred shares clearly can't be given out a hundred

19    percent to every investor.  We didn't get it for every

20    investor; we didn't have all their shares.

21            And when the trustee then uses SIPC money to go out

22    into the marketplace and buy the replacement IBM shares, sure,

23    we don't have any statutory authority to advance funds to go

24    also pay the dividends that should have been accruing on that

25    stock.  We're simply to replace the custodial function of the

1    shares back into that person's account.

2         So when there's a positive where you have a race

3    that's locatable and everybody can point to it and say those

4    are my shares, you've determined I'm entitled to a hundred

5    percent of them, just hand them over and all the dividends,

6    that would be great if the world was just that simple.  But

7    Lehman is not that simple.  It's complex on a scale beyond

8    comprehension.  And you have claimants for shares that we have,

9    some we don't have, some we have to buy, bonds that are there,

10   some bonds are paying four percent, some bonds are paying six,

11   who gets the four, who gets the six?  It's a much more complex

12   matter than what this motion would perhaps lead this Court to

13   believe.  And it's premature at best.

14        One other point, and I think it's a practical point,

15   to be made as to why this motion should be denied.  There are

16   11,000 claims filed in this case involving more than 72,000

17   customer accounts.  Teva is ahead of the pack by having a

18   determination of their claim at this point in time.  They're in

19   a good position.  Once the estate moves forward to making a

20   distribution, they're right at the fore.  That's why I, in

21   fact, told counsel for Teva a while ago:  Hey, you're at the

22   lead of the pack, why don't you put your motion over for a

23   little bit, it'll work its way through.  But now that the

24   estate is not making distributions at this juncture, can't very

25   well go give them the property.

1    If the Court were inclined to grant the motion, SIPC

2    respectfully submits that the administration of this estate

3    would be transformed for one conducted by a trustee on a

4    claims-by-claims basis but would become one conducted by motion

5    practice before this Court.  And you have 11,000 claims.  We

6    think the trustee should be given the opportunity to conduct

7    the estate in an orderly fashion; he's proven he has done so.

8    The report that he has submitted to the Court is replete with

9    examples of his administration of the estate that has been

10   probably considered to be excellent so far.

11   So at this point we need a little more time to get to

12   that opportunity to disburse of the assets, and we'd be happy

13   to get there just as expeditiously as possible.

14   THE COURT:  Mr. Caputo, thank you very much.

15   MR. KANNEL:  May I, Your Honor?

16   THE COURT:  Mr. Molton seems --

17   MR. KANNEL:  Okay.

18   THE COURT:  -- anxious to throw his hat in this ring.

19   MR. MOLTON:  Good afternoon, Your Honor.  David Molton

20   of Brown Rudnick for the Newport group of funds.  And we're

21   here, Your Honor, because we're one of the 1,000 -- or a number

22   of the 1,000 prime brokerage customer claims that still have

23   not yet been decided.  And that was a number that we got from

24   paragraph 33 of the report filed on June 1st -- or, rather,

25   this past Friday.

1          As my friends from Teva had said, apparently 300

2    brokers --

3          THE COURT:  [tevah].

4          MR. MOLTON:  [tevah]; 300 broker dealers have been

5    resolved by way of the transfer.  And to the extent the

6    distributions are accruing on their securities, they're getting

7    them in full.

8          We are -- our claims have not yet been decided.  We're

9    not even at the midway of the line.  We're at the end of the

10   line, I guess -- and I refer to paragraph 47 of the report --

11   and the reason may be that we have certain interrelationships

12   with LBIE, and, as the trustee has reported, those create

13   situations which have left all the prime brokerage customers

14   who have LBI connections, even though they have prime brokerage

15   agreements with LBI, in a certain limbo pending some

16   determinations by the trustee.

17         We took a look, Your Honor, at the pleading filed on

18   Friday by the trustee and reacted because we saw in paragraph

19   13 just a couple of sentences a position that has ramifications

20   for not only us but the 1,000 other prime brokerage customers,

21   as well as, no doubt, other customers who have claims in that

22   we saw the assertion by the trustee as a general matter that,

23   under the SIPA law, all post-commencement distributions will be

24   deemed customer property for distribution pro rata to all

25   customers, notwithstanding the fact that we believe in our

1   situation we have rights to securities for which there are no

2   other claimants, much like Teva.

3         And, accordingly, Your Honor, we thought that this

4   presented an issue of law that, as Your Honor alluded to

5   earlier today with respect to some other matters, has global

6   ramifications for the administration of the trustee's estate,

7   and that is, looking at 78.lll(4), how are post-commencement

8   distributions to be treated in connection with a SIPA

9   proceeding?  And I think everybody here agrees that this is a

10   matter of first impression, and I no doubt believe Mr. Kobak's

11   statement that one of the reasons is that this is of such a

12   magnitude that usually claims are handled in a much more

13   expeditious manner, meaning that the issue of post-commencement

14   distributions really doesn't arrive.

15         We heard today, Your Honor, a different statement kind

16   of changing their position from Friday, the trustee's position

17   now from the representative of SIPC, who indicated to you that

18   there'll be a segregation of these post-commencement

19   distributions.  But we still heard the caveat that those

20   distributions won't in full follow the securities, that there

21   will be some pro rata reduction of those securities as well.

22         Your Honor, all we're here to say is this is a -- will

23   have a material -- that Your Honor's determination of this

24   issue, to the extent a claim is determined -- there is an

25   objection according with the SIPA procedure that comes before

1    Your Honor, as it's come here through a motion practice, will

2    have great financial ramifications for the great universe of

3    customer claimants whose claims have not yet been determined.

4    Indeed, Your Honor, on a consent order and -- consent

5    stipulation and order, this is going to be presented to Your

6    Honor tomorrow in connection with the BlackRock-advised funds;

7    that's 1150 on the docket.  I note in paragraph 5 that they

8    identify this issue as an issue that is going to be recurrent,

9    or it will be recurrent.  They identify it as an issue in their

10   case, paragraph 5:  "The Funds reserve their right to the

11   claims filed against LBIE for the return of any post-

12   commencement-date distributions, and the Trustee reserves all

13   rights as to such claims."

14        Accordingly, going back to Your Honor's earlier

15   comments this morning as to the proper administration of such

16   legal issues that have ramifications for the case as a whole,

17   we would submit, Your Honor, that to the extent that this issue

18   is not teed up now and is reserved for a later determination,

19   it should be done so with full notice to all interested

20   parties.  So everybody, not just us who took a look at

21   paragraph 13 on Friday afternoon but all interested parties,

22   can come in on this matter of first impression and give their

23   insight as to the legislative history, the structure and regime

24   of SIPA, and have Your Honor make an informed decision as to

25   this very important issue.

1      At the very least, Your Honor, we submit that, to the

2 extent Your Honor is going to proceed in determining this

3 issue, that Your Honor give us some time to put in papers on

4 that and, otherwise, in Your Honor's equitable capacity, at

5 least institute a procedure so that all interested parties can

6 have their say on this matter of first impression.  That's what

7 I have to say, Your Honor.

8      THE COURT:  Thank you, Mr. Molton.

9      MR. KANNEL:  Your Honor, I'd like to respond briefly

10 to Mr. Giddens's and Mr. Caputo's comments, and I'd like to

11 talk about the general claim issue, the unfairness issue, which

12 I do not think was responded to, and then specifically the

13 dividend issue, and then the parade of horribles that Mr.

14 Caputo sets forth about claims allowance by motion practice,

15 which is not the case here.

16      THE COURT:  Well, it is the case here.

17      MR. KANNEL:  What?

18      THE COURT:  It is the case here in that you, on behalf

19 of your client, are proceeding to jump the line by virtue of

20 motion practice.  So it's not a parade of horribles; right now

21 it's a parade of one.

22      MR. KANNEL:  Right, and I respectfully disagree with

23 Your Honor.  I do not think it's a parade of one.  Our claim

24 has been allowed.  We are seeking --

25      THE COURT:  Yes, but you are.  I'm not taking issue

1   with the fact that you're here.  You have every right to be

2   here.

3           MR. KANNEL:  Right.

4           THE COURT:  But you're here on a matter that is

5   ordinarily part of the claims administration process in a SIPA

6   case.  You have jumped the line.  You do have SIPA's attention;

7   you do have my attention.  That doesn't mean you're going to

8   win.

9           MR. KANNEL:  Right.  And, Your Honor, I would

10  respectfully think I --

11          THE COURT:  Which you should take as a hint.

12          MR. KANNEL:  Right.  I understand, Your Honor.  Let me

13  just raise a couple of points.  The unfairness issue, there is

14  nothing in the statute in the section that Mr. Giddens cited

15  that the trustee may sell or otherwise transfer to any other

16  member of SIPC without consent of any other customer.  That

17  doesn't provide that some customer claims are being treated

18  preferentially or entitled to be treated preferentially over

19  other customer claims.

20          Similarly, the prime brokerage accounts were not

21  customer-named securities, and nor do I think they fit into

22  this statutory section because, what I could tell from the

23  status report, they designated where they wanted their accounts

24  sent.  So it was not without consent of any property -- any

25  customer.

1          I have heard different things from Mr. Caputo, just in

2     his statement today, about how the dividends are to be treated.

3     I thought I heard both that if the underlying claim to the

4     securities is allowed, the dividends are to follow the

5     securities.  At the same time I heard if the customer property

6     estate is insolvent at the end of the day by twenty percent, I

7     think was his example, we lose twenty percent of our dividends.

8          I'm going to resist the urge to create legislative

9     history where there is none there, but one can equally argue

10    that the purpose of SIPC is ratable treatment of creditors.

11    And we have another statute that we're all familiar with which

12    does exactly that:  the Bankruptcy Code.

13         The prime brokerage accounts were not entitled to be

14    paid ahead of us.  There's no basis on which they were entitled

15    to ahead of us.  There's nothing in the Bankruptcy Code -- if

16    as -- if I take Mr. Caputo, at least part of what he said, that

17    the post-commencement date dividends are ours, there's nothing

18    in the Bankruptcy Code that compels us to advance our funds to

19    the estate without adequate compensation, Your Honor.  Thank

20    you.

21         THE COURT:  Is there anything more?

22         I'm satisfied based on the argument that's been

23    presented and my review of the papers that this dispute is not

24    yet ripe for determination.  There are multiple reasons why I

25    think that both of the Teva entities, while understandably

1    anxious to be paid and understandably concerned about having

2    their dividends trapped in an account at LBI, are not adversely

3    affected by delay.  Nothing's happening now.  No money is being

4    distributed to anyone.  Everything that we're talking about is

5    prospective and potential, not actual and real.

6          The comments made by Mr. Molton on behalf of his

7    client -- I'll resist the temptation to say that this was too

8    ripe a target for him to pile onto for him not to do just

9    that -- provided him with an opportunity to say, well, this is

10   an issue that affects us too, and it affects potentially 1,000

11   plus others, if there's going to be a determination that

12   affects rights in post-commencement-date accruals, that

13   determination should not be made without hearing from us, or

14   for that matter hearing from anyone else who may be interested

15   in the answer to that important question.

16          Furthermore, as Mr. Caputo has said quite clearly and

17   eloquently, this is a situation which is not free from doubt in

18   part because there is no clarity in the statute and there is no

19   guidance in precedent which governs what I must do.

20          And so without too liberally tossing around the

21   moniker "this is a case of first impression", this is in fact

22   an area that does not have a lot of guidance for the Court.  To

23   compound matters, this is also a situation in which it's not

24   yet clear whether there's even a meaningful economic issue,

25   because until such time as we know the extent of any shortfall

1    that may be recognized, this could be a situation quite

2    literally of no harm, no foul in which it's entirely possible

3    that Teva and other parties in Teva's position receive full

4    value.

5         To the extent that parties are being nicked in a

6    manner that's not material, it may not even be worth the

7    firepower of all these lawyers who are here arguing the point

8    to make so much noise about it.  That having been said, this is

9    obviously an issue which, both as to Teva individually and as

10   to others similarly situated generally, represents a

11   potentially significant economic issue.

12        I'm persuaded that I don't need to decide it now and

13   that's it a good idea for me to defer deciding it.  I think

14   I've provided all those reasons already in my statements to

15   this point.  I would hope, however, for what it's worth, that,

16   consistent with the statements generally made by counsel for

17   the trustee and by Mr. Caputo on behalf of SIPC, that the

18   claims resolution process can be expedited to the greatest

19   extent possible.  And to the extent that SIPC, on its own, can

20   derive a process for dealing with this issue which it can

21   recommend with a straight face, that would also be useful.

22        Those are my thoughts, and that's my determination.

23   Motion -- motions, plural, denied.

24        What's next?

25        UNIDENTIFIED SPEAKER:  I think that concludes our

1    calendar, Your Honor.

2            THE COURT:  That's terrific, because our court

3    reporter has to leave in two minutes.  So the timing was

4    perfect.

5            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

6            THE COURT:  We're adjourned.

7        (Proceedings concluded at 3:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        I N D E X

3

4                      R U L I N G S

5                                        PAGE LINE

6   Request to Hire Additional Contract       18    16

7   Employees Approved

8   Motion to Reject Certain Additional Contract 19   22

9   Employees Approved

10  Motion for Approval of Exchange Agreement  22    23

11  With State Street Bank Approved

12  Motion of Debtors to Authorizing the       34    20

13  Establishment of Procedures to Terminate

14  Unfunded Commitments and Restructure

15  Corporate Loan Agreements Granted

16  Motion to Approve Settlement with PBGC     45    9

17  Approved

18  Motion of UPRS to Compel the              134    14

19  New York State Controller to Turn

20  Over Certain Property Denied

21

22  New York State Attorney General's motion  121    21

23  to admit Norman P. Fivel, Esq. pro hac

24  vice granted

25

I N D E X

(continued)

R U L I N G S

                                          PAGE LINE

Motion of Teva Pharmaceutical Authorizing    165   23

Future Dividend Payments be Made to a

Non-Lehman Brothers Inc. Account, or,

in the Alternative Modifying the

Automatic Stay denied


Motion Authorizing Future Dividend Payments  165   23

be Made to a Non-Lehman Brothers Inc.

Account, or, in the Alternative Modifying the

Automatic Stay denied

C E R T I F I C A T I O N

I, Esther Accardi, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

ESTHER ACCARDI

Certified Transcriber (CET**D-485)

Veritext LLC

200 Old Country Road

Suite 580

Mineola, New York 11501

Date: June 4, 2009