William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice* admission pending)
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

**THE TRUSTEE'S MOTION FOR RELIEF PURSUANT TO THE**
**SALE ORDERS OR, ALTERNATIVELY, FOR CERTAIN**
**LIMITED RELIEF UNDER RULE 60(b)**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ............................................................................................................... 1

Jurisdiction And Venue .............................................................................................................. 6

Facts And Procedural History ..................................................................................................... 7

      The Asset Purchase Agreement ....................................................................................... 7

      The September 17 Hearing ................................................................................................ 9

      The Trustee's Appointment ............................................................................................. 10

      The Sale Hearing .............................................................................................................. 11

      The Sale Orders ................................................................................................................ 16

      The Clarification Letter .................................................................................................... 17

      Barclays' Agreement To Exclude The Clearance Box Assets At DTCC ........................ 20

      Any Transfer Of The Rule 15c3-3 Securities Was Conditional ...................................... 22

      The Agreements Do Not Convey Exchange Margin And Clearing Funds ...................... 25

      The Transfer And Assumption Agreement ...................................................................... 27

Argument ................................................................................................................................... 30

      I.     THE TRUSTEE IS ENTITLED TO AN ORDER FINDING
             THAT HIS INTERPRETATION OF THE SALE DOCUMENTS
             AND THE SALE ORDERS IS CORRECT ........................................................... 30

             A.     Under The Terms Of The Sale Documents,
                     The Trustee Is Entitled To The Disputed Assets ....................................... 30

             B.     The Sale Orders Do Not Authorize The
                     Transfers Of The Disputed Assets To Barclays ......................................... 33

      II.    THE TRUSTEE IS ENTITLED TO RELIEF UNDER RULE 60(b) ................... 34

             A.     Rule 60(b) Grants The Court Broad Discretion To Rectify
                     Any Mistakes In Connection With The Sale Orders ................................. 34

# REDACTED

B.  The Court Should Grant Rule 60(b) Relief
    Because The Court Did Not Intend To Provide Barclays
    With As Much As $█ Billion In Additional Estate Assets......................35

    1.  The Court Approved A Sale That Would Protect LBI
        Customers By, Among Other Things, Ensuring That There
        Was Sufficient Customer Property and Assets Left In The
        Estate To Satisfy Customer Claims ...............................................36

    2.  The Court Approved A Sale For No More
        Than $47.4 Billion In Purchased Assets .........................................38

C.  The Court Should Grant Rule 60(b) Relief To The Trustee
    Because The Trustee Did Not Intend To Provide Barclays
    With As Much As $█ Billion In Additional Estate Assets......................39

D.  The Court Should Grant Rule 60(b) Relief To The
    Trustee Under Principles Of Equity And Justice .......................................40

Conclusion ....................................................................................................................41

**Page(s)**

CASES

In re A.R. Baron Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ......................................38

In re Am. Freight Sys., Inc., 126 B.R. 800 (Bankr. D. Kan. 1991) ..............................36

Aramony v. United Way of Am., 254 F.3d 403 (2d Cir. 2001).....................................31

In re BCD Corp., 119 F.3d 852 (10th Cir. 1997)........................................................36

Compania Transatlantica Espanola, S.A. v. Hartford Accident & Indem. Co.,
    950 F.2d 105 (2d Cir. 1991)...............................................................................41

Corhill Corp. v. S. D. Plants, Inc., 9 N.Y.2d 595, 176 N.E.2d 37, 217 N.Y.S.2d 1 (1961) ..........31

Davis v. Musler, 713 F.2d 907 (2d Cir. 1983) ............................................................36

Gey Assocs. Gen. P'ship v. 310 Assocs., L.P., No. 02-Civ-0710 (SHS),
    2002 WL 31426344 (S.D.N.Y. Oct. 29, 2002), aff'd, 346 F.3d 31 (2d Cir. 2003) .....35, 36, 37

In re Hanover Square Sec., 55 B.R. 235 (Bankr. S.D.N.Y. 1985)................................38

HBO, Inc. v. Spectrum Elecs., Inc., 100 F.R.D. 379 (E.D. Pa. 1983) .........................40

Herrera v. Katz Commc'ns, Inc., 532 F. Supp. 2d 644 (S.D.N.Y. 2008) ......................33

Lindenbaum & Young v. New York, 79 Misc. 2d 638, 360 N.Y.S.2d 807
    (Sup. Ct. Kings Cty. 1974) ................................................................................33

Mazzone v. Stamler, 157 F.R.D. 212 (S.D.N.Y. 1994) ...............................................36

Meer v. Bugliarello, 147 A.D.2d 568, 537 N.Y.S.2d 617 (2d Dep't 1989).................31

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986) .........................................................36

In re New Times Sec. Servs., Inc., 463 F.3d 125 (2d Cir. 2006)..................................37

In re Schwartz, 64 B.R. 948 (Bankr. S.D.N.Y. 1986)..................................................36

Sec. Pac. Mortgage & Real Estate Servs., Inc. v. Herald Ctr. Ltd.,
    731 F. Supp. 605 (S.D.N.Y. 1990).................................................................41, 42

SEC v. F.O. Baroff Co., 497 F.2d 280 (2d Cir. 1974) .................................................38

SIPC v. Barbour, 421 U.S. 412 (1975) .................................................37

U. S. Naval Inst. v. Charter Commc'ns Inc., 875 F.2d 1044 (2d Cir. 1988) ...............................32

In re UAL Corp., 411 F.3d 818 (7th Cir. 2005) ...................................42

In re Weis Sec., Inc., 605 F.2d 590 (2d Cir. 1978) ...................................32

**STATUTES AND RULES**

17 C.F.R. § 240.15c3-3 (2009) ...................................................22

11 U.S.C. §§ 101-1330 ...................................................6

11 U.S.C. § 105 ...................................................1, 6

11 U.S.C. § 363 ...................................................1, 34

11 U.S.C. § 365 ...................................................1

11 U.S.C. § 549 ...................................................34

11 U.S.C. § 550 ...................................................34

15 U.S.C. § 78eee ...................................................6

15 U.S.C. § 78fff ...................................................37

28 U.S.C. § 157 ...................................................6, 17

28 U.S.C. § 1408 ...................................................6

28 U.S.C. § 1409 ...................................................6

Federal Rule of Bankruptcy Procedure 2002 ...................................................1

Federal Rule of Bankruptcy Procedure 2004 ...................................................2, 15, 23, 26

Federal Rule of Bankruptcy Procedure 6004 ...................................................1

Federal Rule of Bankruptcy Procedure 6006 ...................................................1

Federal Rule of Bankruptcy Procedure 9024 ...................................................1, 6, 35

Federal Rule of Civil Procedure 60 ........................................... *passim*

Securities Exchange Act of 1934 Rule 15c3-3 ........................................... *passim*

**TREATISES AND PERIODICAL MATERIALS**

22 N.Y. Jur. 2d Contracts § 251 (2009) ........................................................................................ 31

Michael E. Don & Josephine Wang, <u>Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers</u>, 12 Cardozo L. Rev. 509, 513, 519-20 (1990) ......................................................................................................... 38

Stephen P. Harbeck, <u>Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Securities Investor Protection Act</u>, 56 Am. Bankr. L.J. 277, 278 (1982) ............................................................................................................................. 38

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor") moves (the "Motion") for an order interpreting this Court's Sale Orders or, alternatively, under Rule 60(b) of the Federal Rules of Civil Procedure, made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure, for certain limited relief from the Sale Orders.

The "Sale Orders" refer to the Court's (i) Order under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 19, 2008 (the "LBHI Sale Order") (LBHI Docket No. 258) and (ii) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding (the "LBI Sale Order") (Docket No. 3).

### Preliminary Statement

1.     This Motion arises out of a dispute between the Trustee and Barclays Capital Inc. ("Barclays") regarding the sale of LBI's business.  Barclays has demanded billions of dollars of additional assets beyond those disclosed to the Court on Friday, September 19, 2008 and early Saturday morning, September 20, 2008 (the "Sale Hearing").  The deal that Barclays wants was supposedly documented over the ensuing weekend of September 20 and 21, 2008, and, according

to Barclays, gives it as much as $██ billion in additional assets from the LBI estate over and above the $47.4 billion in assets that were disclosed to the Court.[1]

2.  If upheld, Barclays' claims would materially and adversely affect the sale in a manner that was not disclosed to, or approved by, the Court at the Sale Hearing, would grant Barclays a windfall at the expense of the LBI estate, and could leave the estate with a substantial shortfall in customer property. The Trustee agreed to the sale on the understanding that it was consistent with what was presented to the Court and faithful to the fundamental principle of protecting customers and customer property in accordance with the Securities Investor Protection Act ("SIPA"), the statutory basis for this liquidation proceeding. As set forth below, the Trustee believes that Barclays overreaches and misinterprets key documents and events when it contends that the over-the-weekend events, which were never addressed in the Court hearings preceding approval of the sale, conveyed billions of dollars of additional assets from the LBI estate to Barclays. The inflated claims asserted by Barclays, which if allowed might have to be paid from property needed to satisfy customer claims, threaten a fundamental premise of the deal and of this proceeding under SIPA, which is to protect customers and their property.

---

1.  The $██ billion amount does not include ███Redacted███
██████████████████████████████████████████████████████████
██████ These additional benefits are described in the Rule 60 motion that Lehman Brothers Holdings, Inc. is filing concurrently with this Motion. Based on the Rule 2004 discovery conducted to date, the Trustee is filing a motion to join in LBHI's motion insofar as it relates to these additional benefits and incorporates by reference herein the discussion of these additional benefits contained in LBHI's motion. Accordingly, this motion does not repeat this discussion. The Trustee reserves his rights with respect to these additional benefits and instead focuses on the as much as $██ billion in assets that are in the particular dispute between the Trustee and Barclays and immediately affects his ability to make distributions to customers. As noted in the text, the Trustee seeks an order finding that his interpretation of the sale documents and the Sale Orders is correct, and that, therefore, Barclays is not entitled to these assets or, in the alternative, for Rule 60(b) relief.

3.     At the Sale Hearing, the Court was advised of the changes that the parties had agreed to make to the original Asset Purchase Agreement ("APA"). As presented to, and approved by, the Court, the revised deal called for Barclays to acquire the Business (as defined in the APA), certain real estate properties, and $47.4 billion of additional assets in exchange for a payment of $250 million plus the appraised value of the real estate, and Barclays' assumption of $45.5 billion in liabilities and certain cure costs and employee-related obligations.

4.     In addition to the Business and the real estate properties, Barclays has already obtained more than the $47.4 billion in assets disclosed to the Court. Yet it nevertheless claims that the so-called "Clarification Letter," which was executed two days after the Sale Hearing on September 22, 2008, somehow entitles it to as much as $█ billion of additional LBI assets (the "Disputed Assets"). The Disputed Assets that Barclays claims from the Trustee are the following:

> (i) approximately $█ billion in assets that were in LBI's "clearance boxes," primarily at the Depository Trust & Clearing Corporation ("DTCC"), consisting of approximately $█ billion that has been wrongfully transferred to Barclays and approximately $800 million that remains in the boxes;
>
> (ii) $769 million of securities that LBI had maintained in a reserve account "for the exclusive benefit of customers" pursuant to SEC Rule 15c3-3 or securities of substantially the same nature and value;
>
> (iii) approximately $█ billion in assets at the Options Clearing Corporation ("OCC"), consisting of approximately $1.3 billion in cash that has been wrongfully transferred to Barclays and approximately $█ billion in securities and █Redacted█ still held by the OCC; and
>
> (iv) as much as $1 billion in assets at other derivatives exchanges.

5.     As set forth in greater detail below, the Trustee submits that the Clarification Letter cannot properly be interpreted to convey these assets to Barclays. First, with respect to paragraph 4(i), above, Barclays, the Trustee and the DTCC entered into a letter agreement that expressly specified that the clearance box assets at the DTCC were "Excluded Assets" within the

meaning of the APA. Second, with respect to paragraph 4(ii), the Clarification Letter clearly provides that the $769 million of securities would be transferred to Barclays "to the extent permitted by applicable law," which means that they could be transferred only if, among other things, there was a sufficient excess in LBI's Rule 15c3-3 reserve account created for the protection of customers. Finally, with respect to the assets described in paragraphs 4(iii) and 4(iv), the Clarification Letter does not include as "Purchased Assets" the assets at the OCC and the other derivatives exchanges.

6.      The Trustee also respectfully submits that the Court never authorized any transfer of the Disputed Assets to Barclays. If, as Barclays purports to read them, the Clarification Letter or a separate agreement between the parties called the Transfer and Assumption Agreement ("TAA") were meant by Barclays to convey the Disputed Assets to Barclays, these agreements materially change the transaction that the Court approved and are, therefore, outside the scope of the Sale Orders. The Court did not otherwise approve these agreements, as they were never the subject of a motion for approval.

7.      To the extent, moreover, that the Clarification Letter, the TAA, and the Sale Orders could be read, as Barclays purports to read them, to approve transfers of any of the Disputed Assets from LBI to Barclays, the Trustee respectfully submits that relief is appropriate under Rule 60(b). Rule 60(b) authorizes the Court to grant relief from the Sale Orders because neither the Court nor the Trustee was ever told that the Clarification Letter and the TAA would materially change the deal or add, according to Barclays, up to $███ billion in additional assets to the sale. The Court approved the sale, at least in significant part, because it would protect customers, and the Trustee would not have agreed to the sale if he thought it would jeopardize his ability to satisfy customer claims in accordance with the SIPA mandate.

-4-

# REDACTED

8.     The Trustee, along with SIPC and all of the relevant regulatory authorities who appeared in Court to support the transaction, supported the sale because, at a time of great financial tumult in the United States markets, the sale was supposed to protect LBI's customers. Specifically, the sale would deliver their accounts to safe harbors with minimal disruption or delay in the customers' access to their property, preserve their right of recovery, and ensure that the Trustee had sufficient assets remaining in the LBI estate to satisfy customer claims. The Trustee believed that the sale was intended to maximize the value of the LBI estate, and he would not have executed the Clarification Letter or the TAA had he been told that they would, as Barclays now claims, relinquish as much as $███ billion in customer property and additional estate assets.

9.     Compelling the Trustee to transfer the Disputed Assets to Barclays would not only strip the LBI estate of assets that should be used to repay customers, but would award Barclays a windfall. Barclays Bank PLC has already reported a gain of £2.262 billion – or more than $4 billion – on the Lehman acquisition, which appears to be composed largely of the Disputed Assets. Barclays' June 2009 Interim Results Announcement indicates that Barclays is also claiming a right to additional assets that are not even reflected in that reported gain.

10.     Accordingly, the Court should reject Barclays' interpretation of the relevant agreements as inconsistent with the Sale Orders and as effecting a materially adverse modification of the transaction that the Court approved. In the alternative, the Court should grant the Trustee relief from the Sale Orders to the extent they can be read to authorize the transfers that Barclays claims. Specifically, the Trustee respectfully requests that the Court enter an order, in substantially the form attached hereto as Exhibit A:

(i) finding that the Trustee's interpretation of the Clarification Letter and the DTCC Letter is correct and consistent with the transaction that the Court approved;

(ii) finding that, to the extent that the Clarification Letter or the TAA may be read to transfer any of the Disputed Assets to Barclays, these transfers were never approved by the Court and are therefore outside the scope of the Sale Orders;

(iii) to the extent that the Sale Orders authorize the transfer of any of the Disputed Assets to Barclays, granting the Trustee relief from the Sale Orders under Rule 60(b);

(iv) requiring an accounting of all assets which Barclays has received or to which it claims entitlement under the Sale Orders and the actual value of all liabilities that it assumed under the Sale Orders;

(v) permitting the Trustee to take further discovery as necessary to assess the transaction on an accurate and complete record; and

(vi) awarding such other and further relief as this Court finds just and proper.

## Jurisdiction And Venue

11.     The Court has jurisdiction to decide this Motion pursuant to 15 U.S.C. § 78eee(b)(2) and (b)(4). This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended), and Rule 9024 of the Federal Rules of Bankruptcy Procedure. The Sale Orders also retained jurisdiction, pursuant to the Court's statutory powers under 28 U.S.C. § 157(b)(2), "to, among other things, interpret, implement, and enforce" their terms and provisions. (Maguire Decl. Ex. 1 (LBHI Sale Order) ¶ 20 (incorporated by reference in LBI Sale Order).)[2]

---

2. References to "Maguire Decl." are to the accompanying Declaration of William R. Maguire in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b).

**Facts And Procedural History**

12.     LBI had long been prominent within the securities industry as a brokerage and

clearing firm, SIPC member, and SEC-registered broker-dealer.  LBI was a subsidiary of LBHI

and formed part of a worldwide Lehman Brothers business that included affiliated entities in

North America, Europe, and Asia.

13.     On September 15, 2008, LBHI filed a voluntary petition under chapter 11 of the

Bankruptcy Code.  (LBHI Docket No. 1.)  The liquidation proceeding pertaining to LBI,

however, did not commence that day and LBI continued in business in the hope of preserving the

value of the business as a going concern, and thereby maximizing the opportunity for an orderly

cessation of LBI's activities as a broker-dealer and an orderly disposition of LBI customer

accounts.  (Leventhal Decl. ¶ 6.)[3]

**The Asset Purchase Agreement**

14.     On September 16, 2008, LBHI, LBI and LB 745 LLC agreed to sell to Barclays

certain assets belonging to LBI, as well as certain assets belonging to LBHI and LB 745 LLC

that related to the LBI business.  The parties' agreement was embodied in the APA.  (Maguire

Decl. Ex. 2.)  Pursuant to the APA, Barclays was to pay approximately $1.7 billion for certain

"Purchased Assets" and assume other obligations and expenses.  (Id. § 3.1.)

15.     The Purchased Assets broadly consisted of all the assets of LBHI, LBI, and their

subsidiaries that were used in connection with the Business (as defined in APA § 1.1), with the

---

3.  References to the "Leventhal Decl." are to the Declaration of Shari D. Leventhal in Support of Trustee's Motion
    for Entry of an Order Approving a Settlement Agreement.  (Docket No. 387.)

exception of (i) certain Excluded Assets (as defined in APA § 1.1) and (ii) assets from non-U.S. and non-Canadian operations (id. § 13.12).

16.      The Purchased Assets included, among other enumerated assets, certain proprietary securities having a book value of approximately $70 billion (the "Long Positions"), approximately $700 million in cash,[4] the Lehman worldwide headquarters located at 745 Seventh Avenue, New York, New York, and two New Jersey data centers. (Id. § 1.1.) The APA did not mention any of the Disputed Assets. (See id. § 1.1.)

17.      As consideration for the Purchased Assets, Barclays agreed to, among other things: (i) pay a cash amount consisting of the sum of $250 million plus the appraised value of the real estate (together, the "Cash Amount"), and (ii) assume certain liabilities, including short positions and repurchase agreements ("repos") relating to enumerated types of securities positions (the "Short Positions"). (Id. §§ 2.3(i), 3.1.) The Cash Amount was expected to be approximately $1.7 billion, and the book value of the Short Positions was approximately $69 billion. (Id. §§ 2.3(i), 3.1.)

18.      Barclays also agreed to continue to employ or to offer employment to numerous LBI employees. (Id. § 9.1(a).) This was an essential part of the sale that was intended to preserve the jobs of thousands of LBI employees. With respect to these employees, the APA requires Barclays to assume certain severance obligations and to pay bonuses in a specified aggregate amount. (Id. § 9.1(b), (c).)

---

4.    The APA is unclear about the amount of cash that would go to Barclays. (Compare Maguire Decl. Ex. 2 § 1.1, definition of "Purchased Assets" ¶ (a) with id. § 1.1, definition of "Excluded Assets" ¶ (b).) At the Sale Hearing, counsel for both LBHI and Barclays represented that this amount was approximately $700 million. (Maguire Decl. Ex. 3 (Sale Hearing Tr.) 53:21-23, 200:7-12.)

19.    Under the APA, Barclays also agreed to assume approximately $1.5 billion in certain contract cure costs.  (Id. § 2.5; Maguire Decl. Ex. 4 (September 17, 2008 Hearing Tr.) 24:1-4.)

20.    Overall, the parties agreed to a transaction that would provide Barclays with the LBI broker-dealer business and tens of thousands of customer accounts (see Maguire Decl. Ex. 3 (Sale Hearing Tr.) 249:3-11), Redacted ██████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████  Nonetheless, Barclays Bank PLC has reported a £2.262 billion, or more than $4 billion, gain on the Lehman acquisition that appears to be composed largely of the Disputed Assets.[5]  (Maguire Decl. Ex. 8 (Barclays Bank PLC Annual Report 2008) at 249.)

**The September 17 Hearing**

21.    On September 17, 2008, LBHI and its subsidiaries that had filed for bankruptcy moved the Court to (a) schedule a sale hearing, (b) establish sales procedures, (c) approve a break-up fee, and (d) approve the sale of the Purchased Assets.  In support of the $100 million break-up fee, LBHI's counsel, Harvey Miller of Weil, Gotshal & Manges LLP ("Weil"), explained to the Court that, in addition to the Cash Amount, Barclays would assume "an

---

5.  Barclays Bank PLC's Form 6-K for the period ending August 3, 2009 states that Barclays had not received approximately £2.2 ($4.07) billion of assets allegedly acquired under the sale by June 30, 2009 and that "[t]his amount is largely comprised of margin and collateral attributable to the acquired businesses and cash and securities receivable under the terms of the acquisition." (Maguire Decl. Ex. 7 n.15.) Moreover, "£1.8 [$3.3] billion of these assets were recognised as part of the initial accounting for the [Lehman] acquisition and are included in the balance sheet as at 30th June 2009." (Id.) The foregoing dollar figures are based on the exchange rate on September 22 of £1: $1.848.

exposure of $2.5 billion dollars" in connection with the retention of 10,000 to 12,000 Lehman employees, and approximately $1.5 billion in contract cure costs. (Maguire Decl. Ex. 4 (September 17, 2008 Hearing Tr.) 23:21-24:5.) At no point during this hearing was any reference made to the Disputed Assets.

22.     Counsel also represented to the Court that time was of the essence and that the assets to be sold were deteriorating in value. (Id. at 21:2-22:2.) This was a time of extraordinary distress in the financial markets and the parties feared that, if they did not close the sale quickly, there would be no LBI business left to sell. (Id. at 26:1-9, 29:1-12.) On the basis of these and similar representations, the Court scheduled the Sale Hearing on shortened notice for Friday, September 19, 2008. (Id. at 74:2-6.)

**The Trustee's Appointment**

23.     At approximately 2:30 p.m. on September 19, 2008, the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York entered the Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions of SIPA. Among other things, the LBI Liquidation Order appointed the Trustee and removed the case to this Court. (Case No. 08-CIV-8119 (GEL), Docket No. 3 (S.D.N.Y.).)

24.     At the hearing before Judge Lynch, Kenneth Caputo of SIPC emphasized that SIPC was seeking the appointment of the Trustee in an "unprecedented case." (Maguire Decl. Ex. 9 (September 19, 2008 Hearing Tr.) 4:16.) He asked the Court to take "immediate action to protect public customers and protect the fair and orderly markets," noting that the LBI Liquidation Order permits the Trustee to effect open transactions "so that public customers can get access to their funds and those accounts can be transferred out in the orderly course of business." (Id. at 4:17-5:1.) Mr. Caputo also explained that the proposed sale would permit

customer accounts to be moved to "acquiring broker-dealer entities, which of course is intended to afford customers immediate access to their accounts and to provide again for the fair and orderly markets that we seek." (Id. at 5:5-8.)

25. The Trustee had not been involved in the negotiation of the APA and had been provided with only limited information regarding the economics of the sale and the financial condition of LBI. (Kobak Decl. ¶¶ 4, 6, 9.)[6] Based on the information provided to him, the Trustee believed the sale to Barclays to be in the best interests of LBI customers. (Maguire Decl. Ex. 3 (Sale Hearing Tr.) 75:5-10.) Among other things, the Trustee believed that the deal would facilitate the transfer of customer accounts to solvent broker-dealers with minimal disruption to the customers' ability to access their accounts and that there would be sufficient customer property in the reserve account or otherwise segregated or available at depositories to support the transfer of the great bulk of customer accounts and satisfy any remaining customer claims. (Kobak Decl. ¶ 6; see also Maguire Decl. Ex. 3 (Sale Hearing Tr.) 55:23-56:3.)

**The Sale Hearing**

> The changes to the sale transaction:  Barclays' purchase of $47.4 billion in assets for $45.5 billion in liabilities.

26. The Sale Hearing commenced at approximately 4:30 p.m.  At the outset of the hearing, LBHI's counsel, Lori Fife of Weil, informed the Court that the deal had changed since the execution of the APA.  (See Maguire Decl. Ex. 3 (Sale Hearing Tr.) 46:19-25, 63:25-64:19.) Ms. Fife explained that instead of the approximately $70 billion in Long Positions and $69

---

6. References to the "Kobak Decl." are to the accompanying Declaration of James B. Kobak, Jr. in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief under Rule 60(b).

billion in Short Positions set forth in the APA, Barclays would be purchasing $47.4 billion in assets for $45.5 billion in liabilities.

> [O]riginally, we were selling assets that had a value of seventy -- approximately seventy billion dollars. And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets. So that has not changed from the original transaction . . . . Barclays is still agreeing to pay the cure amounts on any leases that it assumes or that we assume and assign to it. Barclays is also agreeing to the same employee compensation arrangements. And it is also agreeing to pay the 250 million dollars of goodwill to LBI. With respect to the real estate assets, Your Honor . . . . the purchaser [will] purchase the building[s] at the appraised amount[s] . . . . which [] were lower than we had anticipated.

(Id. at 47:1-48:1.)

27. The transaction as disclosed clearly contemplated that, in addition to purchasing real estate for its appraised value, Barclays would pay LBI cash and assume liabilities that totaled more than $49 billion, an amount that exceeded the $47.4 billion in assets that it was acquiring. Redacted

28. No one explained to the Court the composition of the $47.4 billion in assets and the $45.5 billion in liabilities, and no one mentioned any of the Disputed Assets to which

---

7. Redacted

Barclays now lays claim. The Court was simply advised that Barclays was purchasing $47.4

billion in assets and assuming liabilities of $45.5 billion "in connection with those assets."

(Maguire Decl. Ex. 3 (Sale Hearing Tr.) 47:5-6.)

29.  Redacted ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ [8]

The Court was assured that all material changes
to the sale had been disclosed.

30.  The parties advised the Court that they were drafting a letter agreement to reflect

the changes to the deal and clarify certain ambiguities in the APA. (See id. at 48:7-13, 54:8-10.)

Indeed, Ms. Fife informed the Court that the "major changes to the transaction," that is, the

changes that were "material," had been disclosed and agreed with the Court's admonition that

even a $500 million change would be "material." (Id. at 54:18-23.)

31.  This was intended to assure the Court that the letter agreement would not deviate

in material ways from what had been disclosed at the hearing and would not seek to transfer

additional assets out of the LBI estate. [9] As Ms. Fife informed the Court: "And just one other

thing I wanted to point out to Your Honor is that we are keeping approximately twenty million

dollars – twenty billion dollars of assets in LBI that are not being transferred. So those assets

will have value and will inure to the benefit [of] the SIPC estate." (Id. at 55:23-56:3.)

---

8.  To the extent that Barclays assumed $45 billion in liabilities instead of the $45.5 billion that was disclosed, it
received an additional $0.5 billion undisclosed benefit.

9.  Indeed, the draft version of the Clarification Letter that existed at the time of the Sale Hearing made no
reference to any of the Disputed Assets. (See Maguire Decl. Ex. 11.)

<u>The Court was told that cash was excluded from the sale</u>

32.     Ms. Fife advised the Court that: "There was a provision in [the] deal originally which required the debtors to transfer 700 million dollars in cash to Barclays. And that is no longer the case. There's no cash that's being transferred to Barclays." (<u>Id</u>. at 53:21-25.) This was apparently a response to an objection lodged by Lehman Brothers Inc. (Europe) ("LBIE"), which was concerned that its funds might be swept up in any cash transfer to Barclays. (<u>See id</u>. at 205:17-208:5.)

33.     Counsel for both Barclays and LBHI assured the Court that LBIE's concern had been mooted by excluding cash from the deal. Counsel for Barclays, Lindsee Granfield of Cleary Gottlieb Steen & Hamilton LLP, stated that "Barclays is making this transaction possible to claims by subsidiary creditors . . . [by] los[ing] the 700 million dollars in cash." (<u>Id</u>. at 200:7-12.) Counsel for LBHI, Harvey Miller, reminded the Court that "we're not transferring any cash to Barclays, that's out of the agreement." (<u>Id</u>. at 242:11-16.)

34.     On the basis of these representations, the Court noted, "I'm satisfied that given the fact that Barclays is not taking cash, and the only thing that came in to the debtor from Europe was cash, that in practical terms we should be safe." (<u>Id</u>. at 253:5-8.)

35.     The Disputed Assets include approximately $1.3 billion in cash at the OCC, which was improperly transferred to Barclays. (Maguire Decl. ¶ 2; Redacted ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Barclays' claim to that cash is directly contrary to the representations to the Court that cash was excluded from the sale.

> The Court's approval was based, at least in part,
> on the need to protect customer property.

36.     The Sale Hearing continued into the early hours of Saturday morning, September 20, 2008. The Court heard from a number of individuals, including Mr. Caputo of SIPC and the Trustee, both of whom spoke in support of the transaction. Mr. Caputo urged the sale to close "[a]s soon as possible" to "provide certainty to parties and counterparties so that they can take the actions that they deem necessary to protect their clients" and to "provide certainty to the hundreds of thousands of customers [of LBI]." (Maguire Decl. Ex. 3 (Sale Hearing Tr.) 73:20-24.) The Trustee emphasized that the "first role of a SIPA proceeding is to maintain orderly markets and try to preserve normalcy for customer accounts." (Id. at 76:18-21.) There were also representatives of the SEC, the Federal Reserve Bank of New York, and the CFTC who appeared in support of the sale. The Court incorporated into the record comments that these regulators had made at Wednesday's hearing. (Id. at 157:21-25.)

37.     At the conclusion of the hearing, the Court approved the sale, as it had been presented. The Court stated that "I understand this deal, not in every aspect but certainly in broad outline. I have notice." (Id. 84:18-19.) The Court also noted that "[t]he essential terms of the transaction, with modifications, have been understood at least for the last few days." (Id. at 85:7-8.)

38.     The Court observed that there was no better alternative transaction because, among other things, "[o]nly Barclays can deliver the customer accounts to safe harbors." (Id. at 249:3-11.) In particular, the Court concluded that "the customer property, which is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale." (Id. (emphasis added).)

39.     The Court further remarked that the adverse consequences of not approving the sale could be "truly disastrous," noting that "those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." (Id. at 250:13-21.)

**The Sale Orders**

40.     In the early morning hours of September 20, the Court entered the LBHI Sale Order. The LBHI Sale Order defines the "Purchase Agreement" as "that certain Asset Purchase Agreement, dated September 16, 2008, . . . collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008." (Maguire Decl. Ex. 1 (LBHI Sale Order) at 1.)

41.     The LBHI Sale Order finds that "the Debtors' estates would suffer immediate and irreparable harm if the relief in the Motion [seeking approval of the sale] is not granted on an expedited basis consistent with the provisions set forth herein and the Purchase Agreement, particularly given the wasting nature of the Purchased Assets." (Id. ¶ D.) The LBHI Sale Order further finds that "the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest." (Id. ¶ H.)

42.     The LBHI Sale Order approves "[t]he Purchase Agreement and all the terms and conditions thereto." (Id. at ¶ 3.) It authorizes and directs the Debtors to "(1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance

with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement." (Id.)

43.     The LBHI Sale Order provides that "[t]he Purchase Agreement and any related documents may be modified, amended or supplemented, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is agreed to between the Committee, the Debtors and the Purchaser." (Id. at ¶ 25.)

44.     The LBHI Sale Order further provides that in the event of an inconsistency between the "Purchase Agreement (including all ancillary documents executed in connection therewith)" and the Order, the "Order shall govern." (Id. at ¶ 27.) The Court retained jurisdiction over the LBHI Sale Order, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), "to, among other things, interpret, implement, and enforce" its terms and provisions. (Id. at ¶ 20.)

45.     The Court also entered the LBI Sale Order in the SIPA liquidation proceeding authorizing the Trustee to consummate the sale on behalf of LBI. (Maguire Decl. Ex. 14 (LBI Sale Order) at 1.)

**The Clarification Letter**

46.     Over the weekend following the Sale Hearing, the parties reworked the Clarification Letter. This was done in what can only be described as harried and extraordinary circumstances. Numerous issues arose that had to be resolved, and many of the individuals involved had already been working around the clock for days. Indeed, as the Court has recently observed: "things were happening very, very quickly. Very skillful lawyers and businesspeople

-17-

put together an extraordinary transaction in virtually no time. And it's conceivable that mistakes were made." (Maguire Decl. Ex. 15 (June 24, 2009 Hearing Tr.) 47:17-20.)

47.     Having just been appointed the day before and having had no prior involvement in the negotiation of the deal, the Trustee was not an active participant in the drafting process or in the negotiations concerning the Clarification Letter. (Kobak Decl. ¶ 9.) Based on the representations made to the Court, the Trustee believed that the Clarification Letter would simply give effect to the deal that had been described at the Sale Hearing. (Id. ¶¶ 9-10.)

48.     The Trustee first received a draft of the Clarification Letter on Sunday evening and received additional drafts later that night and on early morning Monday, only hours before the deal was to be closed. (See id. ¶ 10; Maguire Decl. Exs. 16-18.) The Trustee would not have authorized his counsel to sign the Clarification Letter if he believed that, as Barclays now claims, the Clarification Letter transferred billions of dollars in customer property and additional assets to Barclays. (Kobak Decl. ¶ 11.)

49.     The Clarification Letter was executed in the early hours of Monday morning, September 22, 2008. (Id.) Later that day, it was filed with the Court as an exhibit to the notice of filing of the "Purchase Agreement." (LBHI Docket No. 280.) As the Court has recently observed, the Clarification Letter was never presented to the Court in a separate motion for formal approval and has never been the subject of a formal court order. (Maguire Decl. Ex. 19 (August 11, 2009 Hearing Tr.) 106:17-107:3.)

50.     In relevant part, the Clarification Letter amends the definition of "Purchased Assets" in the Asset Purchase Agreement and replaces the "Long Positions" and the cash that previously was to be transferred to Barclays with:

> (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A . . . .
>
> (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B . . . .
>
> (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements.

(Maguire Decl. Ex. 20 (Clarification Letter) ¶ 1(a)(ii).)

51. The Clarification Letter also provides for the transfer, "to the extent permitted by applicable law," of "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." (Id. ¶ 8(ii).)

52. The Trustee did not understand that the Clarification Letter would effect any fundamental change in the sale. (Kobak Decl. ¶¶ 10-11.) The Trustee understood that Barclays was acquiring $47.4 billion in assets, as disclosed at the Sale Hearing, and did not understand, and was never advised by Barclays or anyone else, that the Clarification Letter could be read to grant Barclays billions of dollars of additional assets that had never been disclosed to the Court. (Id. ¶ 11.)[10]

---

10. Redacted

**Barclays' Agreement To Exclude The Clearance Box Assets At DTCC**

53.     Barclays claims that the addition of paragraph (B), above, entitles it to approximately $██ billion in additional assets.  While the draft of the Clarification Letter that the Trustee's advisors obtained on Sunday night indicated a transfer of certain assets in LBI's clearance boxes at the DTCC, in the face of serious concerns raised by DTCC, Barclays expressly agreed to exclude those assets from the sale.  (Maguire Decl. Ex. 23 (DTCC Letter) ¶ 1.)

54.     The DTCC is a privately-owned company that, through various subsidiaries, provides clearing, settlement and information services to the domestic and global securities industry.  In the week before the Sale Hearing, the DTCC grew concerned about LBI's ability to satisfy its liabilities to the DTCC in connection with its open trading positions.  (Maguire Decl. Ex. 24 (DTCC Annual Report 2008) at 13; Redacted ) On September 17, 2008, DTCC informed LBHI and Barclays that Barclays "would be required to assume the liabilities associated with the accounts maintained by LBI at the DTCC and its subsidiaries . . . in their entirety and irrespective of whether the assets or liabilities in a particular account were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI." (Maguire Decl. Ex. 1 (LBHI Sale Order) ¶ E.)

55.     Barclays ultimately refused to assume LBI's liabilities to DTCC beyond a limited $250 million amount (in effect funded solely by LBI).  (See First Amendment To Asset Purchase Agreement ¶ 4 (LBHI Docket No. 280); Redacted ) This left DTCC exposed to losses that might be incurred in clearing hundreds of billions of dollars of open LBI trades.  (Maguire Decl. Ex. 24 (DTCC Annual Report 2008) at 13.) Barclays' proposal to acquire LBI's assets at the DTCC increased DTCC's potential exposure by threatening to deprive it of an important source of collateral.  (Kobak Decl. ¶ 12.)

-20-

56. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ it appeared that DTCC's concerns might derail the entire transaction. For example,

Paolo Tonucci wrote in an email that the DTCC's concerns were "[p]ossibly fatal" (Maguire

Decl. Ex. 25), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Accordingly, Barclays agreed that it would exclude the assets at DTCC from

the sale. (Maguire Decl. Ex. 20 (Clarification Letter) ¶ 1; Kobak Decl. ¶ 13.)[11]

57. The parties recorded this agreement in the DTCC Letter, which the DTCC drafted

between late Sunday night and Monday morning. (Kobak Decl. ¶ 13.) On early Monday

morning, September 22, 2008, the DTCC, Barclays, and the Trustee executed the DTCC Letter.

(Maguire Decl. Ex. 23.) To satisfy DTCC's concern regarding LBI's ability to honor its

liabilities to DTCC arising from the winding down and closing of the LBI accounts, the DTCC

Letter specifically defines LBI's accounts as "Excluded Assets" under the APA.

58. The DTCC Letter provides:

> Winding Down of Accounts. Barclays has indicated, and hereby
> agrees, that all of the accounts maintained at the Clearing Agencies
> Subsidiaries (the "Accounts") constitute "Excluded Assets" within
> the meaning of the APA. Accordingly, pursuant to the authority
> granted to the Trustee in the Orders, the Trustee hereby instructs
> the Clearing Agency Subsidiaries to close out the pending
> transactions in the Accounts of the Clearing Agency Subsidiaries
> and to use the proceeds in accordance with the Rules and
> Procedures of the Clearing Agency Subsidiaries. Such liquidation
> transactions shall be transferred to, and closed out by, the relevant

---

11. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

> Clearing Agency Subsidiary, in the same manner as it closes out
> positions of Participants/Members for whom it has ceased to act.
>
> As part of this closeout process, the Trustee hereby authorizes
> DTC to accept and act upon instructions from NSCC to deliver
> securities from the DTC LBI Accounts to NSCC's account, in
> order to reduce or eliminate LBI's outstanding delivery obligations
> to NSCC.

(Maguire Decl. Ex. 23 ¶ 1 (emphasis added).)

59.     Based upon Barclays' express agreement that the LBI accounts at DTCC were

Excluded Assets, the Trustee understood that the LBI estate was to remain in possession of the

LBI assets in the DTCC clearance boxes.  (Kobak Decl. ¶ 13.)

**Any Transfer Of The Rule 15c3-3 Securities Was Conditional**

60.     SEC Rule 15c3-3 requires broker-dealers such as LBI to maintain separately one

or more cash reserve accounts containing the net amount of money the broker-dealer owes its

customers.  <u>See</u> Customer Protection – Reserves and Custody of Securities, 17 C.F.R.

§ 240.15c3-3 (2009).  This statutory minimum requirement is calculated weekly, and has to be

segregated in the form of cash or qualified securities in a "Special Reserve Bank Account for the

Exclusive Benefit of Customers" (the "Reserve Account").  <u>Id</u>. § 240.15c3-3(e).  With respect to

custody of customer fully paid and excess margin securities, the rule requires that the broker-

dealer may not pledge, hypothecate, or use such securities to support borrowing by the broker-

dealer, but must maintain them free of liens at "good control locations," available for prompt

return to the customer.  To the extent that the broker-dealer is not in compliance with custody

requirements, the Reserve Account deposit must be correspondingly increased.

61.     Although Barclays claims that paragraph 8(ii) of the Clarification Letter grants it

an absolute right to $769 million in securities, the transfer of securities contemplated by this

provision was only to be made "to the extent permitted by applicable law."  (Maguire Decl. Ex.

20 (Clarification Letter) ¶ 8(ii).) In the first instance, this meant that there had to be a sufficient excess in LBI's Rule 15c3-3 Reserve Account above the amount that was required to be reserved for the protection of customers.

62. LBI attempted to calculate its 15c3-3 requirement over the weekend of September 20 and September 21, 2008, but due to various difficulties, including a large number of fails and stock record breaks, it could not reliably determine whether there was a surplus or a deficit in the Reserve Account. (See Maguire Decl. Redacted

Ex. 27 ("the number of stock record breaks are overwhelming"); Redacted

) It now appears, based on the Trustee's investigation of LBI and facts learned in connection with the investigation of customer claims filed in this proceeding, that there was not in fact a surplus in those accounts. (Kobak Decl. ¶ 14.)

63. Even if there had been a sufficient excess in LBI's Reserve Account to permit the release of $769 million of securities, the release of those securities required regulatory approval. Redacted

The SEC "want[ed] to ensure that all customer balances [were] moved cleanly before authorizing the release of the cushions." (Maguire Decl. Ex. 30.) Redacted

-23-

Redacted

████████████████████████████████

████████████████████████████████

███████████████████████

64.     Because the conditions for this transfer were not met, Barclays never obtained the right to the $769 million in securities that its seeks under the Clarification Letter.  Nor did this right ever become unconditional. Redacted

████████████████████████████████

██████████████████

65.     The Trustee understood that the transfer of $769 million of securities under paragraph 8(ii) of the Clarification Letter was conditioned on there being an excess in the Reserve Account and did not believe this provision granted Barclays an absolute right to $769 million in securities.  (Kobak Decl. ¶ 14.)  That was the intent of the phrase "to the extent permitted by applicable law."  Barclays was entitled to these assets only if (i) there was an excess in the Reserve Account (as was believed to be the case at the time), (ii) there was regulatory approval to release funds or securities from the lock-up, and (iii) customer claims could be fully satisfied in the SIPA liquidation.  (Kobak Decl. ¶ 15.)  Unless there was a sufficient excess in the Reserve Account, any transfer to Barclays of an additional $769 million in securities would come at the expense of LBI customers.

66.     Moreover, the Trustee did not understand this provision to contemplate granting Barclays anything beyond the $47.4 billion in assets that were disclosed to the Court.  (Kobak Decl. ¶ 21.)  Thus, even if the Clarification Letter could be read to grant Barclays an unconditional right to these securities in violation of the rules required to protect customers, to

the extent that such a transfer exceeded the $47.4 billion in assets that were disclosed, that transfer would be outside the scope of the Sale Orders and therefore invalid.

**The Agreements Do Not Convey Exchange Margin And Clearing Funds**

67.     Barclays also claims approximately $▮ billion in margin at the OCC and has demanded as much as $1 billion in margin at other derivatives exchanges.  Barclays claims entitlement to these assets by virtue of the addition to the Clarification Letter's paragraph 1(a)(ii)(C), quoted above, of the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)."  Barclays apparently claims that this addition entitles Barclays not just to amounts held by LBI, but instead to amounts posted by LBI, and not just to margin required to fund any net liability incurred by Barclays in closing out the derivatives that Barclays was acquiring in the sale, but instead to <u>all</u> margin and <u>all</u> clearing funds that LBI posted at the OCC and other derivatives exchanges.

68.     The parenthetical on which Barclays relies does not mention margin or clearing funds, let alone the more than $▮ billion in margin and funds that was at the OCC.  Barclays' reading of this parenthetical is also inconsistent with the intent of the parties as reflected in the course of their negotiations and the drafting history of the Clarification Letter.

69.     Redacted

-25-

70.     Barclays designated senior executive Rich Ricci as its Rule 30(b)(6) witness on "[t]he negotiation and drafting of the Clarification Letter and of the TAA regarding the actual or proposed transfer to Barclays of . . . any Exchange Deposit to which Barclays claims entitlement under the Clarification Letter, TAA or otherwise" and "[t]he timing and extent of disclosures to the Bankruptcy Court . . . regarding the actual or proposed transfer to Barclays of . . . any Exchange Deposit to which Barclays claims entitlement under the Clarification Letter, TAA or otherwise." (Maguire Decl. Ex. 32 (Debtors' Third Rule 30(b)(6) Deposition Notice to Barclays on Issues Pertaining to Exchange-Traded Derivatives and Exchange Deposits, Schedule A, dated Aug. 12, 2009).)[12] Redacted

neither the APA nor the Clarification Letter makes any mention of any margin or clearing funds at the OCC or at any other derivatives exchange. Other than the disclosure months later in Barclays' annual report that Barclays had recognized a multi-billion gain on the acquisition, Red

71.     The drafting history also indicates that the parties did not intend under the Clarification Letter to transfer any margin or clearing funds to Barclays. On Sunday evening,

---

12. Redacted

September 21, 2008, the Trustee received a draft of the Clarification Letter that included a specific clause that would have transferred to Barclays the entirety of LBI's "margin" and "guaranty fund deposit" maintained in relation to customer property at any clearing agency. (See Maguire Decl. Ex. 16 ¶ 8(ii).) This language was deleted from the next draft that the Trustee received at 4:36 a.m. that Monday morning and never re-appeared in any subsequent draft or in the executed version of the Clarification Letter. (See Maguire Decl. Exs. 17-18, 20.) The seemingly innocuous parenthetical upon which Barclays now relies did not appear in any draft provided to the Trustee; it was contained only in the execution copy of the Clarification Letter. (See Maguire Decl. Ex. 20 ¶ 1(a)(ii)(C); Kobak Decl. ¶ 17.)

**The Transfer And Assumption Agreement**

72.     Over the course of the weekend following the Sale Hearing, the Trustee, Barclays, and the OCC executed the TAA, which provided that Barclays would step into the shoes of LBI at the OCC. (Maguire Decl. Ex. 34.)

73.     Specifically, the TAA provides:

> Lehman hereby sells, assigns, transfers, and sets over to Barclays . . . all of Lehman's rights, title, interests, powers, privileges, remedies, obligations and duties in, to, under, and in respect of [LBI's accounts at the OCC], as of the Effective Date including with respect to: (i) the Clearing Fund Deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regards to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises.

(Id. ¶ 1(a) (emphasis in original).)

74.     The purpose of the TAA was to protect the OCC from losses associated with winding down LBI's open option positions, without having to take the step of precipitously liquidating all of LBI's open positions at the OCC. (Kobak Decl. ¶ 18.) The Trustee was not

told and did not understand that the TAA would materially change the deal from the purchase of

$47.4 billion in assets that had been represented to the Court. (Id. ¶ 19.)

75.     In view of the Court's admonition that $500 million would be considered a

material change (supra ¶ 30), to the extent that Barclays claims that the TAA transfers to it more

than $■ billion in margin and clearing funds, the TAA effects a material adverse change to the

terms of the Purchase Agreement.  There was no disclosure to the Trustee, the Court, or anyone

of the magnitude of the sums involved.  The Court has never approved this material change.  The

TAA was never filed with the Court or presented to the Court for approval, and while the LBHI

Sale Order authorized additional agreements to implement the Purchase Agreement, it did not

authorize any such agreement to materially change its terms.  (See supra ¶ 43.)

76.     Moreover, Barclays' claims under the Clarification Letter and the TAA prejudice

LBI's compliance with the SEC's Rule 15c3-3 for the protection of customer property.  This is

because LBI included approximately $507 million of its deposits at the OCC as a debit item in

computing its required reserve for the protection of customers under Rule 15c3-3.  (See Maguire

Decl. Ex. 35 at 5 (including ($507,418,000) for "OCC Proprietary Qualified Collateral" in

15c3-3 reserve analysis).)  By counting its customer-related margin at the OCC as property

available for the protection of customers, LBI was permitted to maintain a commensurately

lower amount in its Reserve Account.  Transferring assets that were legally required to be

available for the protection of customer property would violate Rule 15c3-3 by depriving

customers of the protection required by the Rule.

77.     The Trustee's advisors were not involved in any business discussions in which

anyone agreed to give Barclays margin at the OCC or at other exchanges.  They were never

advised, and did not understand, that the Clarification Letter would materially and adversely

change the sale approved by the Court by inserting into the sale a transfer to Barclays of billions of dollars in undisclosed consideration, including some $▮ billion in additional LBI assets at the OCC and as much as an additional $1 billion of LBI assets at other derivatives exchanges. (Kobak Decl. ¶¶ 16, 20.) Similarly, Barclays did not disclose to the Trustee that the assets that it would claim as a result of adding the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" or as a result of entering into the TAA included some $1.3 billion in cash at the OCC. (Id. ¶ 20.) Rather, the Trustee understood that, in accordance with the representations made at the Sale Hearing, cash was excluded from the sale. (Id.)[13]

78.     Barclays' claim to these assets is, therefore, flawed in at least three respects. First, neither the APA nor the Clarification Letter grants Barclays the right to billions of dollars of margin and other deposits that it now claims. Second, no such transfer was ever disclosed to the Court and, to the extent that any such transfer would convey assets exceeding the $47.4 billion in assets that were disclosed or would convey any cash at all, such transfers would be beyond the scope of the Sale Orders. Finally, to the extent that any such transfer can be deemed to be authorized by the Sale Orders, the Trustee respectfully submits that this can only have been the result of mistake or inadvertence.

---

13. To give effect to the fact that cash was being excluded from the deal, the Clarification Letter states that, except as otherwise specified in the definition of "Purchased Assets," "'Excluded Assets' shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries . . . ." (Maguire Decl. Ex. 20 ¶ 1(c).)

## Argument

79.     The Trustee seeks an order finding that the Trustee's interpretation of the Clarification Letter is the correct one and that the Court did not approve the Clarification Letter, the TAA or the transfers that Barclays claims are contemplated therein. (Point I, below.) Alternatively, the Trustee seeks relief from the Sale Orders to the extent that they can be deemed to provide Barclays a right to any of the Disputed Assets. (Point II, below.)

## I.    THE TRUSTEE IS ENTITLED TO AN ORDER FINDING THAT HIS INTERPRETATION OF THE SALE DOCUMENTS AND THE SALE ORDERS IS CORRECT.

### A.    Under The Terms Of The Sale Documents, The Trustee Is Entitled To The Disputed Assets.

80.     Barclays has no rights to the DTCC clearance box assets because it expressly agreed in the DTCC Letter that the "accounts of LBI maintained at the Clearing Agencies Subsidiaries," were "Excluded Assets," and therefore not included in the sale. (See supra ¶¶ 56, 58.)

81.     The DTCC Letter specifically addresses LBI's clearance boxes at DTCC, and therefore supersedes the more general provision of the Clarification Letter, which refers simply to LBI's "clearance boxes," regardless of their location. See Meer v. Bugliarello, 147 A.D.2d 568, 568-69, 537 N.Y.S.2d 617, 617 (2d Dep't 1989) (holding that the relevant "specific procedures" in one agreement superseded the general principles in another); Aramony v. United Way of Am., 254 F.3d 403, 413-14 (2d Cir. 2001) (applying New York law to find that "specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate" (quotation omitted)); 22 N.Y. Jur. 2d Contracts § 251 (2009) ("Where there are general

and special provisions relating to the same thing, the special provisions control, even if there is inconsistency between specific provisions and the general provisions.").

82.    It makes no sense to construe these agreements any other way. If, as Barclays claims, the Clarification Letter transfers the DTCC clearance box assets to Barclays, it would render the entire DTCC letter a nullity and conflict with the deal that was explained to and approved by the Court. See Corhill Corp. v. S. D. Plants, Inc., 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38, 217 N.Y.S.2d 1, 3 (1961) ("It is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect." (quotations omitted)); see also U.S. Naval Inst. v. Charter Commc'ns Inc., 875 F.2d 1044, 1051 (2d Cir. 1988). Moreover, the Clarification Letter could not affect Barclays' undertaking in the DTCC Letter that the assets were "Excluded Assets" because DTCC was not a party to the Clarification Letter.

83.    Barclays' claim for $769 million in securities under ¶ 8(ii) of the Clarification Letter is similarly without merit because such a transfer could only have been made "to the extent permitted by applicable law." This meant, among other things, that there had to be a sufficient excess in LBI's Reserve Account under SEC Rule 15c3-3 and that LBI had to receive regulatory approval to release that excess. (See supra ¶¶ 61, 63.) As neither of these conditions was met, Barclays has no right to the $769 million in securities that it is demanding. (See supra ¶¶ 62, 64.)

84.    Barclays' claim that it has an absolute right to $769 million in securities, regardless of whether there was an excess or a deficiency in the Reserve Account for the protection of customers, is inconsistent with the express language of the Clarification Letter, with the ███Redacted███ understanding that regulatory approval was required, and with their

course of dealing. (See supra ¶¶ 61, 63, 65.) It is also inconsistent with the fundamental purpose of Rule 15c3-3, SIPA, and the sale, which was to protect public customers by safeguarding customer property. Customers are deemed as a matter of law to rely on the customer protection rules, and private parties are estopped from claiming that private contractual rights defeat the purpose of these requirements. See In re Weis Sec., Inc., 605 F.2d 590, 594-96 (2d Cir. 1978) (holding that lender was estopped from rescinding subordination agreement where rescission would defeat the public policy behind Rule 15c3). Accordingly, there is no merit to Barclays' claim that the Clarification Letter should be read to provide it with an absolute right to $769 million in securities.

85.     Finally, as explained in detail above, there is no evidence of any business negotiation, much less any agreement, between Lehman and Barclays to transfer as much as $██ billion in margin and clearing funds to Barclays. Neither the APA nor the Clarification Letter mentions the margin or clearing funds at the OCC or at other derivatives exchanges. (See supra ¶¶ 69-70.) Barclays relies on the inclusion in the APA of the term "derivatives" in the definition of "Purchased Assets" (see Maguire Decl. Ex. 2 (APA) § 1.1), Redacted ████████████

████████████████████████████████████

████████████████████████████████

████████████ ) The Clarification Letter similarly contains no reference to margin and clearing funds, and the single parenthetical "(any property held to secure obligations under these derivatives)" cannot fairly be read to confer upon Barclays as much as $██ billion in margin and other funds. (See supra ¶ 70.)

86.     The Trustee's reading of the Clarification Letter is consistent with "the well-established rule of construction in the law of contracts that contracts affecting the public interest

are to be construed in the manner most favorable to the public." Lindenbaum & Young v. New York, 79 Misc. 2d 638, 640, 360 N.Y.S.2d 807, 810 (Sup. Ct. Kings County 1974). The Trustee's reading of the Clarification Letter preserves the value of the LBI estate to satisfy claims of LBI's customers; Barclays interpretation, however, would require the Trustee to transfer the Disputed Assets to Barclays at the direct expense of LBI's customers and for the benefit of Barclays. See Herrera v. Katz Commc'ns, Inc., 532 F. Supp. 2d 644, 647 (S.D.N.Y. 2008) ("a meaning which serves the public interest . . . is preferred over a meaning which does not").

**B.      The Sale Orders Do Not Authorize The
            Transfers Of The Disputed Assets To Barclays.**

87.      Under § 363 of the Bankruptcy Code, any transfer of the Disputed Assets requires the approval of the Court. The Clarification Letter was never submitted to the Court on a separate motion and the TAA was never submitted to the Court at all. As the Sale Orders do not approve the Clarification Letter or the TAA to the extent that they materially change the sale transaction that was presented to and approved by the Court, Barclays is not entitled to the Disputed Assets and should return any portion of the Disputed Assets that was already transferred to it.

88.      The Trustee is entitled, under Sections 549 and 550 of the Bankruptcy Code, to the return of the estimated $███ billion in Disputed Assets that Barclays has already received. Section 549 of the Code provides that "the trustee may avoid a transfer of property of the estate - (1) that occurs after the commencement of the case; and . . . (B) that is not authorized under this title or by the court." 11 U.S.C. § 549. Section 550 provides that "to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1)

the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"

11 U.S.C. § 550(a). As the Court did not authorize the transfer of the Disputed Assets to

Barclays, the Trustee is entitled to avoid such transfers under Section 549 and to recover the

Disputed Assets under Section 550 of the Bankruptcy Code. These sections of the Code also

permit the Trustee to recover any other undisclosed benefits that Barclays reaped from the

transaction.

## II.  THE TRUSTEE IS ENTITLED TO RELIEF UNDER RULE 60(b).

89.  To the extent that the Sale Orders can be read to approve the Clarification Letter

or the TAA <u>and</u> Barclays can convince the Court that its undisclosed interpretation of the

Clarification Letter or the TAA entitles it to any of what may be as much as $█ billion in

additional assets, the Court should grant the Trustee relief from the Sale Orders because this

result was never intended by the Court or the Trustee and was clearly the result of mistake or

inadvertence. <u>See</u> Fed. R. Civ. P. 60(b).

90.  The Trustee respectfully requests relief under Rule 60(b) to protect the interests of

the estate pending the Court's review of the contractual dispute arising from Barclays' demands

for the Disputed Assets, including the Court's determination of the validity of the Clarification

Letter and the TAA to the extent that they purport to convey any of the Disputed Assets to

Barclays.

### A.  Rule 60(b) Grants The Court Broad Discretion To Rectify Any Mistakes In Connection With The Sale Orders.

91.  The Court may modify the Sale Orders, as necessary, pursuant to Rule 60(b) and

Federal Rule of Bankruptcy Procedure 9024. <u>See</u> <u>Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.</u>,

No. 02-Civ-0710 (SHS), 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002), <u>aff'd</u>, 346 F.3d 31,

34 (2d Cir. 2003). Rule 60(b) permits the Court, "[o]n motion and just terms . . . to relieve a

party or its legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect" or "(6) any other reason that justifies relief." Fed. R. Civ. P. 60(b).

92. Granting relief under Rule 60(b) is in the broad discretion of the court. Mazzone v. Stamler, 157 F.R.D. 212, 214-15 (S.D.N.Y. 1994) (citing Nemaizer v. Baker, 793 F.2d 58, 61-62 (2d Cir. 1986)). Because the purpose of Rule 60(b) is to strike a balance between the finality of judgments and doing substantial justice, the Rule should be "broadly construed to do substantial justice." Nemaizer, 793 F.2d at 61 (quotation omitted); In re Schwartz, 64 B.R. 948, 957 (Bankr. S.D.N.Y. 1986). Thus, "all doubts should be resolved in favor of those seeking relief." Davis v. Musler, 713 F.2d 907, 914-16 (2d Cir. 1983).

**B. The Court Should Grant Rule 60(b) Relief Because The Court Did Not Intend To Provide Barclays With As Much As $6.7 Billion In Additional Estate Assets.**

93. While the Court did not formally approve the Clarification Letter or approve the TAA at all, to the extent that there is any merit to Barclays' argument that the Sale Orders nevertheless authorize the Clarification Letter or the TAA, that authorization constitutes a mistake because the additional Disputed Assets were never disclosed to the Court.

94. Courts have granted Rule 60(b) relief on the basis of mistake and inadvertence, including those caused by insufficient disclosures. See Gey Assocs. Gen. P'ship, 2002 WL 31426344, at *2 (affirming bankruptcy court's decision to vacate an order approving a sale and break-up fee because the court was not informed that the purchaser was a stalking horse); In re Schwartz, 64 B.R. at 957 (vacating an order because of court's mistaken belief that a party was represented by counsel); In re BCD Corp., 119 F.3d 852, 860-62 (10th Cir. 1997) (affirming lower court's decision to set aside the original sale when it concluded that the confirmation had been granted through a mistake as to the terms of the sale); In re Am. Freight Sys., Inc., 126 B.R.

-35-

800, 803 (D. Kan. 1991) (affirming bankruptcy court's decision to vacate sale order because the court and creditors understood that the sale involved 11 acres of property with an appraised value of $1,330,000 to be sold at 70% of value and were not told that the sale actually involved 24 acres of property with an appraised value of $1,675,000 to be sold at 55% of value).

95.     In Gey Associates, the debtor sought relief from a sale order, which, among other things, had approved a break-up fee. 2002 WL 31426344, at *1. The court held that it had approved the break-up fee based on a "misunderstanding of [] material facts," specifically, that it had "not [been] aware of the continuing and active interest in the [debtor's] Property" of two competing bidders. See id. at *3 (quotation omitted). The court vacated the order under Rule 60(b)(1), holding that with the "knowledge of [the] matters that I now know, I would [not] have issued" the order. Id. On appeal, the district court affirmed, finding that "the [bankruptcy] court made a substantive mistake of fact in issuing the June 8 order." Id.

96.     If Barclays' view of the Sale Orders has any merit, then the Court issued the Sale Orders based on a "misunderstanding of [the] material facts," see id., because the sale that Barclays claims was approved is substantially and materially different from the deal that was disclosed to the Court at the Sale Hearing.

> 1.      **The Court Approved A Sale That Would Protect LBI Customers By, Among Other Things, Ensuring That There Was Sufficient Customer Property and Assets Left In The Estate To Satisfy Customer Claims.**

97.     As the Trustee noted when he addressed the Court at the Sale Hearing, the first order of business in a SIPA liquidation is to protect the rights of customers. See 15 U.S.C. § 78fff(a); SIPC v. Barbour, 421 U.S. 412, 413 (1975) (Congress created SIPC for the "purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit."); In re New Times Sec. Servs., Inc., 463 F.3d 125, 127 (2d

Cir. 2006) ("The principal purpose of SIPA is to protect investors against financial losses arising from the insolvency of their brokers." (quotation omitted)); SEC v. F.O. Baroff Co., 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry."); In re A.R. Baron Co., 226 B.R. 790, 793 (Bankr. S.D.N.Y. 1998) ("SIPA is designed to protect customers of registered broker-dealers who have entrusted those broker-dealers with cash or securities in the ordinary course of business."); In re Hanover Square Sec., 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("The act was designed to afford protection to public customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations to their public customers." (quotation omitted)).[14]

98.     Consistent with this purpose, the Court repeatedly noted that the sale was meant to protect the customers of LBI.  (See supra ¶¶ 38-39.)  Absent a mistake, the Court would not have approved the sale if it understood that it was approving a deal that would deplete the LBI estate of segregated and other customer property as well as LBI assets and threaten the ability of the Trustee to return customer property.

---

14. See also Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev. 509, 513, 519-20 (1990) (At the time of the publication of the law review article, Mr. Don and Ms. Wang served as Deputy General Counsel and as Associate General Counsel of SIPC, respectively.); Stephen P. Harbeck, Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Securities Investor Protection Act, 56 Am. Bankr. L.J. 277, 278 (1982) (Mr. Harbeck has served as President and CEO of SIPC since December of 2003, having served as General Counsel prior to that time.).

### 2. The Court Approved A Sale For No More Than $47.4 Billion In Purchased Assets.

99.     The Court approved a sale transaction that included $47.4 billion in purchased assets.  At the Sale Hearing, the Court was told:

> – Barclays was purchasing assets worth $47.4 billion (other than the Business and the real estate properties);
>
> – Barclays was "assuming liabilities" of $45.5 billion and assuming certain employment obligations and cure costs; and
>
> – Barclays was not getting any cash.

(See supra ¶¶ 26-27, 32-33.)

100.    There were no disclosures to the Court that the sale was anything different, much less what Barclays now claims it to be.  In particular, the Court was not told that:



> – Redacted
>
> – Redacted
>
> – Barclays would also obtain more than $█ billion in OCC margin and deposits, some $1.3 billion of which is in the form of cash;
>
> – Barclays would also obtain approximately $1 billion in other exchange margin and deposits;
>
> – Barclays would also obtain an additional $█ billion in clearance box assets; and
>
> – Barclays would also obtain $769 million in additional securities from LBI's Rule 15c3-3 lock-up or securities of substantially similar nature and value, even if there was no excess in the lockup account, even if a transfer from the lockup account was not legally permissible and even if the only way to pay Barclays was by using customer property and creating a shortfall in the amounts that can be returned to public customers.

(See supra ¶¶ 29, 66, 75, 77; n.7.)

101.    Thus, the Court could not have known that, despite its admonition that $500 million would be considered a "material" change (see supra ¶ 30), the Sale Orders would,

according to Barclays, approve a deal that would give Barclays (i) █████ Redacted

████████████████████████████████████████████████████████████████████ and (ii)

as much as another approximately $███ billion in <u>additional</u> assets, including, in direct violation

of the representations made to the Court, at least $1.3 billion in cash.  (<u>See</u> <u>supra</u> ¶¶ 29, 32-35.)

**C.    The Court Should Grant Rule 60(b) Relief To The Trustee
Because The Trustee Did Not Intend To Provide Barclays
<u>With As Much As $███ Billion In Additional Estate Assets.</u>**

102.    To the extent that the Sale Orders can be read to authorize the transfers that

Barclays now seeks, the Court should grant the Trustee relief under Rule 60(b) based on the non-

disclosures to the Trustee.  <u>See</u> <u>HBO, Inc. v. Spectrum Elecs., Inc.</u>, 100 F.R.D. 379, 383-84 (E.D.

Pa. 1983) (granting relief where non-movant erroneously failed to provide accurate information

at the TRO hearing, and the movant reasonably relied on the inadequate disclosures in agreeing

to the consent order).

103.    The Trustee, who entered the negotiations late in the process, had little

information concerning LBI, had no active role in drafting the Clarification Letter and the TAA,

relied on the representations made to the Court at the Sale Hearing, and believed that the sale

documents (including the Clarification Letter and the TAA) at closing corresponded to the

fundamental parameters of the sale disclosed to the Court.  (<u>See</u> <u>supra</u> ¶¶ 47, 52, 74, 77.)

104.    Like the Court, the Trustee was not told that the sale documents could be read to

transfer to Barclays as much as $███ billion in additional estate assets.  The Trustee's first

priority is the protection of customers, and he would not have authorized the signing of the

Clarification Letter, if he had known, as Barclays now claims, that:

> – A parenthetical clause added at the last-minute gave Barclays the right to more
> than $3 billion in margin and deposits at the OCC and other exchanges;

– It awarded Barclays approximately $███ billion in clearance box assets, despite the DTCC Letter and the parties' agreement to define the assets in the DTCC clearance box as Excluded Assets under the APA; and

– It awarded Barclays an absolute right to $769 in securities, regardless of whether there was any such excess in LBI's Rule 15c3-3 lock-up, whether the SEC or FINRA gave necessary regulatory approvals, and whether there was sufficient assets to pay customers.[15]

105. Nor would the Trustee have authorized the signing of the TAA if he had known that it awarded Barclays substantially more than the $47.4 billion of non-real estate assets disclosed to the Court at the Sale Hearing. Accordingly, the Trustee should be granted relief under Rule 60.

### D. The Court Should Grant Rule 60(b) Relief To The Trustee Under Principles Of Equity And Justice.

106. In deciding whether to grant relief from orders, courts also take account of equitable factors. See Compania Transatlantica Espanola, S.A. v. Hartford Accident & Indem. Co., 950 F.2d 105, 107 (2d Cir. 1991) (granting motion to vacate a stipulation on the basis of excusable neglect because plaintiff would otherwise suffer great harm, whereas defendants would receive a large windfall); Sec. Pac. Mortgage & Real Estate Servs., Inc. v. Herald Ctr. Ltd., 731 F. Supp. 605, 610 (S.D.N.Y. 1990) (granting relief from an order of foreclosure and sale where denying relief would cause plaintiff "enormous prejudice," but give adverse parties "a windfall which they never anticipated, and to which they have no reasonable entitlement"); see also In re UAL Corp., 411 F.3d 818, 823-24 (7th Cir. 2005) (a party's loss of a windfall is "not the kind of harm that a court should endeavor to avert").

---

15. Nor did the Trustee know that the spread between the $47.4 billion in assets and $45.5 billion in assumed liabilities (specified as the parameters of the revised sale transaction) was to be increased by billions of dollars.

107.    Equity and justice favor the grant of Rule 60(b) relief.  If the Sale Orders are permitted to stand in the way that Barclays interprets them, there would be enormous prejudice to the LBI estate and its customers, while Barclays would gain "a windfall which [it] never anticipated, and to which [it has] no reasonable entitlement." Sec. Pac. Mortgage, 731 F. Supp. at 610. The Trustee believes that there is a deficit in LBI's Reserve Account (see supra ¶ 62), so any further transfers to Barclays would come at the direct expense of LBI's customers and further enrich Barclays, which anticipates a gain of more than $4 billion on its acquisition of LBI's assets.  (See supra ¶ 20.)

## Conclusion

For the forgoing reasons, the Trustee respectfully requests that this Court grant his Motion and enter an order (i) finding that the Trustee's interpretation of the Clarification Letter and the DTCC Letter is correct and consistent with the transaction that the Court approved; (ii) finding that, to the extent that the Clarification Letter or the TAA may be read to convey any of the Disputed Assets to Barclays, that these transfers were never approved by the Court and are therefore outside the scope of the Sale Orders; (iii) to the extent that the Sale Orders authorize the transfer of any of the Disputed Assets to Barclays, granting the Trustee relief from the Sale Orders under Federal Rule of Civil Procedure 60(b); (iv) requiring an accounting of all assets which Barclays has received or to which it claims entitlement under the Sale Orders and the actual value of all liabilities that it assumed under the Sale Orders; (v) permitting the Trustee to take further discovery as necessary to assess the transaction on an accurate and complete record; and (vi) awarding such other and further relief as this Court finds just and proper.

Dated: New York, New York
September 15, 2009

HUGHES HUBBARD & REED LLP

By: _____
William R. Maguire

Seth D. Rothman
Neil J. Oxford
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice* admission pending)
1775 I. Street, N.W.
Washington D.C., 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

# **EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (JMP) SIPA

## ORDER GRANTING THE TRUSTEE'S MOTION FOR RELIEF PURSUANT TO THE SALE ORDERS OR, ALTERNATIVELY, FOR CERTAIN LIMITED RELIEF UNDER RULE 60(b)

Upon the motion dated September 15, 2009, of James W. Giddens (the "Trustee"), as

trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), for an order

interpreting this Court's Sale Orders or, alternatively, under Rule 60(b) of the Federal Rules of

Civil Procedure, made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure,

for certain limited relief from the Sale Orders[1] (the "Motion"); and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and it appearing that due and proper notice of the Motion and the relief requested therein

having been given in accordance with this Court's Order Pursuant to Section 105(a) of the

Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and

Case Management Procedures and Related Relief, dated November 7, 2008, and no other or

further notice need be given; and the relief requested in the Motion being in the best interests of

the Estate, customers and creditors; and the Court having reviewed the Motion; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein, and after due deliberation and sufficient cause appearing therefore, it is

hereby

---

1.     Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

FURTHER FOUND AND DETERMINED that:

A.      The Trustee's interpretation of the Clarification Letter is correct and consistent

with the transaction that the Court approved, and therefore:

> a.  ¶ 1(a)(ii)(B) of the Clarification Letter does not entitle Barclays to any of the clearance box assets at the DTCC;
>
> b.  ¶ 1(a)(ii)(C) of the Clarification Letter does not entitle Barclays to any of LBI's margin or clearing funds at the OCC or at other derivatives exchanges; and
>
> c.  ¶ 8(ii) of the Clarification Letter does not entitle Barclays to $769 million in securities.

B.      To the extent that the Clarification Letter or the TAA effect a material change to

the sale that was presented to the Court, they were never approved by the Court, in accordance

with section 363 of the Bankruptcy Code, and therefore, the transfers of the Disputed Assets (as

defined in the Motion) claimed by Barclays under those agreements are outside the scope of the

Sale Orders and such claim is hereby disallowed and expunged.

NOW, THEREFORE, notwithstanding any prior order of this Court to the contrary, or

any prior agreement between LBI and Barclays to the contrary, IT IS ORDERED THAT:

1.      The Motion is GRANTED in all respects.

2.      To the extent that the Sale Orders may be read to approve the transfers of the

Disputed Assets to Barclays, pursuant to Rule 60(b), the Sale Orders are modified to relieve the

Trustee of any obligation to transfer any of the Disputed Assets to Barclays.

3.      Barclays is required to file with the Court, with copies to the Trustee, the LBHI

debtors, the Committee, the Examiner, etc,. an accounting of all assets to which Barclays claims

entitlement under the Sale Orders, and all liabilities that it assumed under the Sale Orders.

4.      The Trustee is permitted to take further discovery as necessary to assess the transaction on an accurate and complete record.

5.      The Court shall retain exclusive jurisdiction to enforce this Order.

6.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits. Those parties who did not object, or who withdrew their objections, to the Motion are deemed to have consented to the Motion.

7.      The failure to specifically include any particular relief sought by the Motion, in this Order, shall nonetheless be considered granted, it being the intent of the Court that the Motion is granted in its entirety.

8.      That the stay of this Order provided by the Bankruptcy Rules (including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable to this Order, and this Order shall be effective and enforceable immediately upon entry.

Dated:   New York, New York
         October ___, 2009

                                    _____
                                    Honorable James M. Peck
                                    United States Bankruptcy Judge