William P. Weintraub, Esq.
Anne E. Beaumont, Esq.
FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP
1633 Broadway, 46th Floor
New York, New York 10019-6708
Telephone:   (212) 833-1100
Facsimile:   (212) 373-7945
E-mail:   abeaumont@fklaw.com

*Attorneys for Lazard Frères & Co. LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                      :
In re:                              :
                                      :  Case No. 08-01420 (JMP) SIPA
LEHMAN BROTHERS INC.,          :
                                      :
                    Debtor.  :
                                      :
------------------------------------------------------------x

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

       Lazard Frères & Co. LLC ("Lazard"), by and through its undersigned counsel, hereby objects to the denial of its claims against Lehman Brothers Inc. ("LBI"), which were assigned numbers 900005920, 900005921, 900005922, 900005923, 900005925, 900005926, 900005927 and 900005928 (the "Claims"), and respectfully requests a hearing on this objection as a contested matter under Rule 9014 of the Bankruptcy Rules, in accordance with the Court's Order Approving Form and Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Creditors; and Fixing Interim Reporting Pursuant to SIPA (Docket No. 241) (the

"Claims Notice Order") and the instructions included with the Trustee's determination of claim notices.

## LAZARD'S RELATIONSHIP WITH LBI

1. On or about June 14, 2007, Lazard entered into a Customer Account Prime Brokerage Agreement (the "PB Agreement") with LBI. (A copy of the PB Agreement is attached as Exhibit A.)

2. The PB Agreement sets forth the terms and conditions under which LBI was to open and maintain one or more prime brokerage accounts in Lazard's name and would "transact business with you as our customer." PB Agreement at 1. It further states that "[t]hroughout this Agreement references to 'you' and 'your' refer to you as our customer." *Id.* The PB Agreement also states that "A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ('LBI')." *Id.* ¶ 1. Thus, Lazard was a prime brokerage customer of LBI.

3. The eight accounts that are the subject of the Claims (the "Accounts") were opened at Lehman Brothers International (Europe) ("LBIE") by LBI for Lazard. As of the Commencement Date, the property in the Accounts consisted of long and short equity securities positions as well as a net cash balance of approximately $11.3 million.

## THE COLLAPSE OF THE LEHMAN ENTITIES AND
## THE RESULTING CONFUSION REGARDING THE LOCATION OF ASSETS

4. On September 15, 2008, LBI's corporate parent Lehman Brothers Holdings Inc. ("LBHI") filed a voluntary petition under chapter 11 of the Bankruptcy Code.

5. That same day, four European Lehman entities, including LBIE, were placed into administration proceedings in the United Kingdom.

6. On September 19, 2008 (the "Commencement Date"), this proceeding was commenced under the Securities Investor Protection Act of 1970, as amended ("SIPA"), with respect to LBI, a securities broker-dealer that was a subsidiary of LBHI. James W. Giddens was appointed as trustee (the "Trustee") under SIPA to liquidate LBI's assets.

7. On October 3, 2008, eighteen additional U.S. affiliates of LBHI also filed voluntary petitions under chapter 11 of the Bankruptcy Code.

8. Between September 2008 and January 2009, numerous other insolvency proceedings also were commenced in various foreign jurisdictions relating to other Lehman entities and/or affiliates.

9. These multiple proceedings and legal regimes, combined with the global scope of Lehman's operations, have contributed to the complexity of identifying and locating the property of customers of the various Lehman entities.

10. According to the LBIE administrators, the Lehman organization was managed and run along global product lines, with significant funding interdependencies among various Lehman entities. *See* PricewaterhouseCoopers, Lehman Brothers International (Europe) Administration, Frequently Asked Questions and Communications, http://www.pwc.co.uk/eng/issues/lehman_faq_1008.html. Public reports strongly suggest that, as a result, at the time the various insolvency proceedings were initiated, customer property was not necessarily in the possession of the entity that might have been expected to hold it. *See, e.g.,* Lehman Brothers Holdings Inc.

3

Operational Issues & Challenges, November 3, 2008, at 22 [*hereinafter* LBHI Presentation to Creditors] (explaining the "run on bank environment resulted in processing backup" contributing to LBIE never receiving $4 billion of payables from LBI as "[b]ankruptcy of LBHI disrupted chain of events").

11. For example, the Lehman entities are reported to have used a centralized cash management system, in which LBHI operated as a "central banker" for various Lehman entities (including LBI), lending cash to certain subsidiaries each day to cover shortfalls and sweeping excess cash back into LBHI's accounts at the end of the day. *See* Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) For Authorization to (i) Continue Using Existing Centralized Cash Management System, As Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing Bank Accounts and Business Forms; and (B) For An Extension of Time To Comply With Section 345(b) of the Bankruptcy Code LBHI, October 3, 2008, ¶¶ 9-10, 18 (LBHI Docket No. 669) ("Cash Management Motion"); LBHI Presentation to Creditors at 13-14. LBHI reportedly played this role with respect to not only U.S. subsidiaries, but also overseas subsidiaries such as LBIE. LBHI Presentation to Creditors at 13-14. Indeed, according to Lehman's Chief Restructuring Officers, Alvarez & Marsal North America, LLC, the Lehman organization operated a "zero balance cash management system" such that "LBIE would not expect to have cash at the beginning or end of the day." LBHI Presentation to Creditors at 13. Regulated subsidiaries such as LBI occasionally upstreamed cash to LBHI to pay down intercompany debts, or received cash from LBHI to fund shortfalls. Cash Management

4

Motion ¶ 17; LBHI Presentation to Creditors at 14. The movement of cash between, as well as the payment of expenses on account of, the various legal entities reportedly was tracked through intercompany accounting, reflecting debts due and owing between and among LBHI and its subsidiaries. Cash Management Motion ¶ 23. As a result, vast sums regularly moved among the Lehman entities, and when bankruptcy and insolvency proceedings were commenced, the "system was disrupted and most intercompany transfers came to a halt." *In re Lehman Bros. Holdings Inc.*, 404 B.R. 752, 761 (Bankr. S.D.N.Y. 2009). For example, according to the November 3, 2008 LBHI Presentation to Creditors, LBI owed LBIE $4 billion due, in part, to processing backups resulting from market concerns about Lehman's solvency. In the ordinary course, the funds would have flowed from LBI to LBIE on Monday, September 15, 2008. However, LBHI's bankruptcy disrupted the chain of events, and LBIE's cash reportedly was "stranded" at LBI. LBHI Presentation to Creditors at 22. It thus appears that some of LBIE's cash—perhaps including Lazard's—may have been held by LBI at the Commencement Date.

12. Numerous news reports also have described how these cash-management arrangements, together with other idiosyncrasies of the Lehman entities' business arrangements and the non-simultaneous institution of the Lehman entities' bankruptcy and insolvency proceedings have resulted in serious negative consequences for prime brokerage customers such as Lazard. Reports describe prime brokerage clients requesting that assets be transferred to another prime broker, only to discover that such transfers were not completed prior to institution of LBHI and LBIE's bankruptcy and insolvency proceedings. *See, e.g.,* Tom Cahill, *Lehman Hedge-Fund Clients Left Cold as Assets Frozen*, BLOOMBERG.COM, October 3, 2008 (describing difficulties of Lehman

5

prime brokerage clients and providing an example of incomplete asset transfer); *see also* LBHI Presentation to Creditors at 22 (describing back office delays). (A copy of the article is attached as Exhibit B). Indeed, the freezing of prime brokerage accounts threatened some customers with liquidation. *See* Helen Avery, *Prime Brokerage: The Day the Music Stopped*, EUROMONEY INSTITUTIONAL INVESTOR PLC, November 2008 (describing hundreds of hedge funds who lost assets held by Lehman's prime brokerage entities, difficulties transferring customer property in the days leading up to the bankruptcy filings, and negative consequences for prime brokerage customers stemming from structure of relationships among Lehman entities in the US and UK) (attached as Exhibit C); *see also* Exhibit B (Cahill, *Lehman Hedge-Fund Clients Left Cold as Assets Frozen*) (describing plight of Oak Group Inc. and MKM Longboat Capital Advisors LLP). Moreover, transfers of assets between the United Kingdom and the United States on the last business day prior to the LBHI bankruptcy filing, in accordance with the Lehman entities' cash-management system, has been the subject of numerous court filings, detailing the potential harm to prime brokerage customers whose property might, as a result, be held by a bankruptcy estate other than that of the prime broker. *See, e.g.,* Objection of Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and Institutional Benchmarks to the Debtors' Motion to (A) Schedule a Sale Hearing, (B) Establish Sale Procedures, (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, September 19, 2008 (LBHI Docket No. 175); Motion of the Harbinger

6

Funds for Leave to Conduct Rule 2004 Discovery of Debtor Lehman Brothers Holdings Inc., September 26, 2008 (LBHI Docket No. 373).

## THE CLAIMS

13. By notice dated December 1, 2008, the Trustee gave notice that customers of LBI who wished to be eligible for the maximum protection that may be afforded to them under SIPA were required to file claims with the Trustee within 60 days after the date of the notice, that is, by January 30, 2009.

14. On or about January 20, 2009, the Joint Administrators of LBIE issued an Update on Client Money and Client Assets held by Lehman Brothers Inc., a copy of which is attached as Exhibit D, indicating that the Joint Administrators would be filing an omnibus claim in this proceeding "on behalf of each of LBIE's customers whose cash, securities or other assets were (or should have been) held by LBI on the Filing Date." However, this update cautioned that, due to "missing or inaccessible records and IT data that complicate the compilation of claims" the Joint Administrators "cannot guarantee that the omnibus claim that it files on behalf of certain of its customers will identify every customer with securities, cash or other assets held by LBI through LBIE" and therefore "LBIE's customers may wish to pursue their rights in the SIPA proceeding by filing a claim on their own behalf with the Trustee as well." As described in this update, Lazard provided the Joint Administrators with "Customer Authorisations" to file claims on its behalf.

15. On January 26, 2009, Lazard filed timely customer claims for each of the Accounts. The property in the Accounts consists of long and short equity positions and a net cash balance of approximately $11.3 million (as of the Commencement Date).

7

16. On or about April 9, 2009, the LBIE Joint Administrators issued a further update, a copy of which is attached as Exhibit E, indicating that:

> The Joint Administrators filed an omnibus claim on behalf of all customers shown on LBIE's books and records that had securities, commodities, cash, or other property held with LBI on 12 September 2008. However as stated in the SIPC update dated 20 January 2009 (link provided above) LBIE has faced issues including missing or inaccessible records and IT data that complicate the compilation of claims. Consequently, LBIE cannot guarantee that the omnibus claim that it filed on behalf of certain of its customers will identify every customer with securities, cash or other assets held by LBI through LBIE and neither the Administrators nor LBIE accept any liability arising out of any inaccuracies or deficiencies in the information provided.

17. Lazard has not been provided with a copy of the omnibus claim filed by the LBIE Joint Administrators (the "Omnibus Claim") nor does it know the basis of the claims asserted therein.

18. Since it is unclear which of the various Lehman entities or affiliates currently hold Lazard's property, Lazard also has submitted claims against both LBHI and LBIE. Lazard nevertheless seeks only a single satisfaction of its claims.[1] Lazard also seeks to avoid a situation in which each Lehman entity—LBI, LBIE and LBHI—denies Lazard's claims on the grounds that another Lehman entity supposedly holds Lazard's property, which would leave Lazard without any recovery.

---

[1] "Customer" status under SIPA is predicated upon the specific securities or transaction for which a claim is made, and the statute contemplates that a claimant may be a "customer" with respect to some claims but not others. *See In re Stalvey & Assocs., Inc.*, 750 F.2d 464, 471 (5th Cir. 1985); *SEC v. F. O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974).

19. On or about September 2, 2009, the Trustee served notices (the "Determination Notices") upon Lazard denying all of the Claims in their entirety solely on the basis that the Accounts are with LBIE. (A copy of the Determination Notices is attached as Exhibit F.) However, the Determination Notices also state that "LBIE has filed claims with the Trustee for funds or *property held or believed to be held by LBI for the benefit of LBIE's customers*." (emphasis added).

## BASES FOR OBJECTION

### Lazard is LBI's Customer Under SIPA

20. Lazard first objects to the Determination Notices to the extent that they deny the Claims with respect to customer property that LBI holds for the benefit of Lazard.

21. All eight of the Trustee's Determination Notices expressly acknowledge the possibility that LBI may have received or acquired and/or may hold property for the benefit of customers of LBIE. These LBIE customers – which may include Lazard – fall squarely within SIPA's definition of customer.[2]

22. Consistent with this, LBI's PB Agreement repeatedly states that Lazard is LBI's customer. Indeed, the Trustee did *not* deny the Claims on the grounds that Lazard is not LBI's customer.

23. In the face of these facts, and the enormous amount of continuing uncertainty about where customer property was held at the Commencement Date, the

---

[2] SIPA defines as a "customer" of a broker-dealer any person "who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities account of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer." 15 U.S.C. § 78lll(2).

9

Trustee's outright denial of the Claims makes no sense. If LBI has any portion of Lazard's property, Lazard is LBI's customer as to that property, and Lazard is entitled to look to LBI for its return. Lazard should not be forced to wait for LBI to deliver the property first to LBIE (whose claim against LBI has no legitimate priority over Lazard's direct claim against LBI) and then to attempt to recover the property from LBIE in administration proceedings in the United Kingdom. Such a procedure contravenes the express statutory objectives of liquidation proceedings under SIPA, which include "*as promptly as possible* after the appointment of a trustee…to distribute customer property and…otherwise satisfy net equity claims of customers…" 15 U.S.C. § 78fff(a)(1) (emphasis added). It also presents the possibility of further prejudice to Lazard to the extent that it may diminish Lazard's recovery. The risk of prejudice is particularly high since information regarding the location of property owed to Lazard is in the possession of LBI and/or LBIE.

24. In these circumstances, it is inappropriate to deny the Claims at least until a determination has been made as to the location of Lazard's property, as well as the scope and allowability of the Omnibus Claim.

**LBI is Lazard's Prime Broker**

25. Lazard further objects to the Determination Notices to the extent that they otherwise deny the Claims.

26. Pursuant to the PB Agreement, Lazard is entitled to look to LBI, as Lazard's prime broker, for the return of its property held in the Accounts, which were opened pursuant to the PB Agreement. Among other things, although the PB Agreement exculpates LBI and its affiliates for liability where Lazard's property is held by

"unaffiliated, foreign banks and depositories," it does not exculpate these entities for liability where LBI's own affiliates hold such property.

## **CONCLUSION AND RESERVATION OF RIGHTS**

27. For these reasons, the Trustee should withdraw its denial of the Claims and allow them in their entirety.

28. In accordance with the Claims Notice Order and the instructions included with the Determination Notices, Lazard hereby requests that its objection be heard by the Court as a contested matter under Rule 9014 of the Bankruptcy Rules. Lazard reserves the right to request appropriate discovery in advance of any evidentiary hearing in this matter.

29. Lazard reserves all rights with respect to the Claims. Lazard further reserves all rights to amend or supplement this Objection or to file a reply to any response to this Objection filed by the Trustee or any other person.

Dated: October 2, 2009
New York, New York

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

s/ Anne E. Beaumont
William P. Weintraub
Anne E. Beaumont
1633 Broadway
46th Floor
New York, NY 10019-6708
Telephone: (212) 833-1158
Facsimile: (212) 373-7945
E-mail: abeaumont@fklaw.com
*Attorneys for Lazard Frères & Co. LLC*