James B. Kobak, Jr.
David W. Wiltenburg
Beatrice Hamza Bassey
Kenneth M. Katz
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

       LEHMAN BROTHERS INC.,

                   Debtor.

Case No. 08-01420 (JMP) SIPA

## MOTION FOR ORDER APPROVING TRUSTEE'S
## ALLOCATION OF PROPERTY OF THE ESTATE

# TABLE OF CONTENTS

Page

Preliminary Statement..................................................................................................1

Executive Summary ....................................................................................................3

    Statutory and Regulatory Framework........................................................................3

    Creation of the LBI Estate .........................................................................................4

    Allocation Scheme .....................................................................................................4

        Core Customer Property Including Compliance Shortfalls
        Allocated to Customer Property................................................................5

        Property Allocated to the General Estate ..................................................6

I.     BACKGROUND AND QUESTION PRESENTED ................................................6

II.    LEGAL AND REGULATORY FRAMEWORK....................................................9

    A.     SEC Regulatory Scheme................................................................................10

        1.     Rule 15c3-1: The "Net Capital Rule" ...............................................10

        2.     Rule 15c3-3: The Customer Protection Rule .............................13

        3.     Operation of the Customer Protection Rule...........................................16

            (i)     Possession or Control of Customer Securities ..............................17

            (ii)    The Reserve Account .................................................................18

    B.     SIPA Statutory Scheme..................................................................................20

        1.     Customers and "Customer Property".....................................................22

        2.     SIPA Mandates the Use of "Any Other Assets" to Cover
            Deficits in the Reserve Account ..........................................................25

    C.     The Trustee's Proposed Allocation Approach is Consistent With
        Prior SIPA Liquidations..................................................................................26

III.   STRUCTURE OF THE LBI ESTATE ................................................................29

    A.     Restructuring of LBI at and Around the Filing Date – the "PIK
        Notes" ...........................................................................................................29

    B.     The Purchase Agreement ................................................................................30

    C.     Customer Account Transfers...........................................................................32

    D.     Remaining Accounts and Claims....................................................................33

    E.     Assets Within the Trustee's Control ...............................................................35

IV.   LBI COMPLIANCE WITH CUSTOMER PROTECTION RULES ...............................36

    A.     LBI's 15c3-3 Customer Reserve Account Requirement ......................................38

1. Reserve Calculations Immediately Preceding and Following the Filing Date .................................................................38

2. Items Omitted or Incorrectly Reported in the Reserve Formula ....................................................................................40

    (a) Items Creating Known Shortfalls....................................41
        (i) FID Accounts Maintained at Chase .....................41
        (ii) Account Coding Errors ......................................42
        (iii) Assets Subject to LBIE Administration..............44
        (iv) OCC Deposit....................................................45
        (v) Customer Cash Claimed by LBIE.......................45
        (vi) Customer Property Exposed to Seizure During Pre-Filing Date Withdrawals................................................46

    (b) Items Currently Under Investigation .............................48
        (i) Overdraft in LBI's Main Operating Account....................49
        (ii) Inclusion of Unsecured Debits in Reserve Formula ..........51
        (iii) Customer Securities Included in the Barclays Repo..........51
        (iv) Assets Detained by Custodians Considered Good Control Locations................................................52
        (v) Other Reserve Computation Adjustments .........................53

B. Remediation and Cure of Reserve Account Deficits .............................53

V. ALLOCATION OF PARTICULAR ASSETS .................................................55

  A. "Core" Customer Property .......................................................55

    1. Customer Property Reserved or Segregated in Accordance with SEC Rules ............................................................56

    2. Assets Derived From or Traceable to Customer Property .........................56

    3. Value Provided by the Use or Realization of Customer Debits ................................................................57

  B. Amounts Corresponding to Reserve Account Deficiencies....................58

  C. General Estate Property ...........................................................60

VI. NOTICE....................................................................................61

VII. WAIVER OF SEPARATE MEMORANDUM OF LAW .................................61

VIII. NO PRIOR REQUEST ..............................................................61

IX. REQUESTED RELIEF..................................................................62

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

<u>In re A.R. Baron Co.</u>, 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ...................................20, 21, 27, 28

<u>In re Adler Coleman Clearing Corp.</u>, 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ..............................21

<u>In re Arbitration v. UBS Warburg LLC</u>, Index No. 119163/00, 2001 WL 1586978 (Sup. Ct. N.Y. County Oct. 2, 2001) ...............................................12

<u>In re Cybervest Securities, Inc.</u>, No. 03-2352-BKC-RBR-A, Order Granting Trustee's Motion for Approval of Investigatory and Final Reports and Account, and For Assignment to SIPC of Trustee's Final Judgment Against William Pang Chien (Bankr. S.D. Fla. Jul. 11, 2006) ...............................................28

<u>In re Cygnet Securities, Inc.</u>, No. 97-2651, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property (Bankr. D.N.J. Dec. 13, 2004)...............................................29

<u>Ferris v. Stephenson (In re MJK Clearing, Inc.)</u>, 286 B.R. 109 (Bankr. D. Minn. 2002) ..... *passim*

<u>In re Hanover Square Secs.</u>, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) .........................................21, 22

<u>In re Hanover, Sterling & Co.</u>, No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002)...............................................29

<u>Horwitz v. Sheldon (In re Donald Sheldon & Co.)</u> 148 B.R. 385 (Bankr. S.D.N.Y. 1992)........................................................................... *passim*

<u>In re Klein Maus & Shire, Inc.</u>, No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004)...............................................28

<u>In re Meridian Asset Management, Inc.</u>, No. 00-90029, Order Approving Final Report (Bankr. N.D. Fla. Dec. 6, 2006)...............................................28

<u>In re Michael William Ribant</u>, No. 98-90607-JJH, Order Approving Trustee's Final Report (Bankr. S.D. Ca. Aug. 31, 2001)...............................................28

<u>In re Michael William Ribant</u>, No. 98-90607-JJH, Trustee's Final Report (Bankr. S.D. Ca. Jul. 6, 2001)...............................................28

<u>Miller v. SEC</u>, 998 F.2d 62 (2d Cir. 1993) ...............................................17

Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51 (Bankr. S.D.N.Y. 1999), aff'd, 263 B.R. 406 (S.D.N.Y. 2001)......................................................12, 13

Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531 (S.D.N.Y. 1990)...........................14

Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.), 277 B.R. 520 (Bankr. S.D.N.Y. 2002) ................................................................................................................22

New Times Secs. Servs., Inc. v. Giddens (In re New Times Secs. Servs., Inc.), 463 F.3d 125 (2d Cir 2006)...............................................................................................20

In re Northstar Securities, Inc., No.01-3722-BJH, Order Approving Trustee's Investigatory and Final Reports, Account of Administration of Estate, and Request for Related Relief (Bankr. N.D. Tex. Feb. 12, 2008) ...............................................28

In re Park South Securities, LLC, No. 03-08024A, Order Approving Trustee's Final Report and Account, Approving Final Allocation of Property to the Fund of Customer Property and to the Genreal Fund, Approving Final Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors, Authorizing Disposition of Books and Records, Authorizing Abandonment or Assignment of Estate Property, Fixing Procedure for Discharge of Trustee and Closing of Estate, and Granting Other Relief (Bankr. S.D.N.Y. Oct. 30, 2008)...................................................................27

SEC v. F.O. Baroff Co., 497 F.2d 280 (2d Cir. 1974) ............................................................20, 22

SIPC v. Austin Securities, Inc., Order Granting Motion for Approval of Trustee's Investigatory and Final Reports and Account and for Assignment of Judgments to SIPC, No. 05-1144 (Bankr. E.D.N.Y. Nov. 20, 2007) ............................................27

SIPC v. Barbour, 421 U.S. 412 (1975) .............................................................................20, 21, 23

SIPC v. MJK Clearing, Inc., No. 01-4257, Memorandum of Law in Support of Motion to Approve Trustee's Customer Fund Determination and Allocation, Final Distribution to Customers and Distributions to SIPC (Bankr. D. Minn. May 10, 2004)......................27, 28

SIPC v. MJK Clearing, Inc., No. 01-4257, Order Approving Motion to Approve Trustee's Customer Fund Determination and Allocation, Final Distribution to Customers and Distributions to SIPC (Bankr. D. Minn. June 9, 2004)............................................28

SIPC v MJK Clearing Inc., No. 01-4257, Trustee's Investigatory Report, Final Report and Account Administration of the Estate (Bankr. D. Minn. Nov. 22, 2006) .........................28

SIPC v. MPI Financial, No. 01-2034, Order Approving Investigatory and Final Reports and Final Accounting of the SIPC, Trustee (Bankr. S.D. Ohio Oct. 7, 2005).........................28

SIPC v. Waddell Jenmar Secs., Inc. (In re Waddell Jenmar Secs., Inc.), 126 B.R. 935 (Bankr. E.D.N.C. 1991), aff'd, 991 F.2d 792 (4th Cir. 1993) ..................................57

Upton v. SEC, 75 F.3d 92 (2d Cir. 1996) ...................................................................14, 17, 18, 20

In re Vision Investment Group, Inc., No. 97-1035 B, Order Approving Third and Final
    Report and Final Accounting of the SIPC, Trustee (Bankr. W.D.N.Y. Dec. 13, 2005)..........28

In re Weis Secs., Inc., 425 F. Supp. 212 (S.D.N.Y. 1977), aff'd, 605 F.2d 590 (2d Cir.
    1978) ................................................................................................................................13

**STATUTES, RULES AND REGULATIONS**

Bankruptcy Cases and Proceedings, 28 U.S.C § 1334 ...................................................................1

Customer Protection – Reserves and Custody of Securities, 17 C.F.R. § 240.15c3-3 .......... passim

Fed R. Bankr. P. 5005 .....................................................................................................................1

Fed. R. Bankr. P. 9013 ....................................................................................................................1

Fed. R. Bankr. P. 9019(a) .........................................................................................................32, 49

Local Bankruptcy Rule 9013-1 .....................................................................................................63

Net Capital Requirements for Brokers or Dealers, 17 C.F.R. § 240.15c3-1 .......................1, 11, 12

Power of Court, 11 U.S.C. § 105 ..................................................................................................32

Procedures, 28 U.S.C. § 157 ...........................................................................................................1

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(a) et seq..................1, 3

Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa et seq. ............... passim

Use, Sale, or Lease of Property, 11 U.S.C. § 363 .........................................................................32

**LEGISLATIVE AND ADMINISTRATIVE MATERIALS**

In re A.G. Becker Paribas Inc., Exchange Act Release No. 20,492, 29 S.E.C. Docket 454,
    1983 WL 403192 (Dec. 15, 1983) .............................................................................54, 55

Alternative Net Capital Requirements for Broker-Dealers that Are Part of Consolidated
    Supervised Entities, Exchange Act Release No. 34,49830, 69 Fed. Reg. 34,428 (June
    21, 2004) .........................................................................................................................12

Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No.
    34,9856, 37 Fed. Reg. 25224 (Nov. 29, 1972).........................................................................13

D.A. Davidson & Co., SEC No-Action Letter, 1975 WL 9005 (June 12, 1975) ..........................55

H.R. Rep. No. 91-1788 (1970) (Conf. Rep.)................................................................10

H.R. Rep. No. 95-746 (1977).........................................................................................24

Hearings Before the Subcomm. on Consumer Protection and Finance of the Committee
   on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (Aug. 1, 2, and 3, 1977)
   (Hearings on H.R. 8331) (Report to the Board of Directors of the SIPC of the Special
   Task Force to consider possible amendments to the SIPA 1970).....................................21, 24

Hearings Before the Subcomm. on Consumer Protection and Finance of the Committee
   on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (Aug. 1, 2, and 3, 1977)
   (Hearings on H.R. 8331) (Section by Section Explanation of H.R. 8331 Amendments
   to SIPC)..............................................................................................................22

JP Morgan Securities, Inc., NYSE Hearing Board Decision 07-67, 2007 WL 1789954
   (May 3, 2007)......................................................................................................56

Net Capital Rule, Exchange Act Release No. 34,27249, 54 Fed. Reg. 40,395, 40,395,
   1989 WL 286288 (Oct. 2, 1989)...............................................................................11

Notice of Proposal to Amend Rule 15c3-1 Under the Securities Exchange Act of 1934,
   Exchange Act Release No. 34,9891, 1972 WL 126364 (Dec. 5, 1972) ..................................11

NYSE, Inc., Hearing Panel Decision 04-135, Standard & Poor's Secs., Inc., 2004 WL
   2331078 (Aug. 11, 2004).........................................................................................13

Obligations of Broker-Dealers to Maintain Physical Possession or Control and Certain
   Reserves, Exchange Act Release No. 34,9775, 37 Fed. Reg. 20260 (Sept. 28, 1972)............10

Reserves and Related Measures Respecting the Financial Responsibility of Brokers and
   Dealers, Exchange Act Release No. 34,9388, 36 Fed. Reg. 22312 (Nov. 24, 1971) ........16, 17

S. Rep. No. 91-1218 (1970) ...........................................................................................10

SIPA of 1970: Report of the Committee on Interstate and Foreign Commerce, 91st Cong.
   (1970), reprinted in H.R. Rep. No. 91-1613, at 4658 (1970)....................................................16

Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and
   Recommendations of the Securities and Exchange Commission, H.R. Doc. No. 92-
   231 (1971) ...........................................................................................................9

Thrift Trading Inc., SEC No-Action Letter, 1975 WL 10734 (Sept. 29, 1975) ...........................54

**TREATISES AND PERIODICAL MATERIALS**

1 Edward F. Greene et al., U.S. Regulation of the International Securities and Derivatives
   Markets (9th ed. 2008).............................................................................................20

Michael E. Don & Josephine Wang, <u>Stockbroker Liquidations Under the Securities
Investor Protection Act and their Impact on Securities Transfers</u>, 12 Cardozo L. Rev.
509 (1990) ................................................................................................................20

Michael P. Jamroz, <u>The Customer Protection Rule</u>, 57 Bus. Law. 1069 (2002) ...........................9

Michael P. Jamroz, <u>The Net Capital Rule</u>, 47 Bus. Law. 863 (1992) ............................................11

Stephen P. Harbeck, <u>Stockbroker Bankruptcy: The Role of the District Court and the
Bankruptcy Court Under the Securities Investor Protection Act</u>, 56 Am. Bankr. L.J.
277 (1982) ................................................................................................................21

Steven L. Molinari & Nelson S. Kibler, <u>Broker-Dealers' Financial Responsibility Under
the Uniform Net Capital Rule–A Case for Liquidity</u>, 72 Geo. L.J. 1 (1983) ...........................9

**OTHER AUTHORITIES**

FINRA, Interpretations of Financial and Operational Rules, Customer Protection –
Reserves and Custody of Securities, SEA Rule 15c3-3 (2008), <u>available</u> <u>at</u>
http://www.finra.org/Industry/Regulation/Guidance/FOR/index.htm ....................................49

Press Release, SEC, Chairman Cox Announces End of Consolidated Supervised Entities
Program (Sept. 26, 2008), <u>available</u> <u>at</u> http://www.sec.gov/news/press/2008/2008-
230.htm. ................................................................................................................12

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens, as Trustee (the "Trustee") for the SIPA liquidation of the business of

Lehman Brothers Inc. (the "Debtor" or "LBI"), by and through his undersigned counsel,

HUGHES HUBBARD & REED LLP, hereby applies for entry of an Order approving the

Trustee's proposed methodology for the allocation of LBI property pursuant to sections 78lll(4),

78fff(a)(1)(B), 78fff-2(b) and 78fff-2(c)(1) of the Securities Investor Protection Act of 1970

("SIPA"), 15 U.S.C. §§ 78aaa et seq., and Rule 9013 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") (the "Motion").  This Court has jurisdiction over this

Motion pursuant to 15 U.S.C. §§ 78eee(b)(2) and 78eee(b)(4), 28 U.S.C. §§ 157 and 1334 and

Fed R. Bankr. P. 5005.

In support of the Motion, the Trustee respectfully represents as follows:

**<u>Preliminary Statement</u>**

1.      Under SIPA's customer claims process, customers of LBI holding allowed claims

are entitled to "share ratably" in the fund of "Customer Property," based on each customer's "net

equity" as of the filing date.  15 U.S.C. § 78fff-2(c).  The statute contemplates that distribution of

customer property should occur as rapidly as possible.  15 U.S.C. § 78fff(a).  A complementary

regulatory scheme under the Securities Exchange Act of 1934 (the "Exchange Act"), of which

SIPA is effectively a part, seeks to ensure that a broker-dealer liquidation will result in full

satisfaction of customer claims.  See 17 C.F.R. § 240.15c3-1; 17 C.F.R. § 240.15c3-3.

2.      In order for the Trustee to achieve these goals through interim and final

distributions to LBI customers, there must first be determination of (or a sufficient basis to

estimate):  (i) the allowable customer claims and (ii) the customer property available to satisfy

such claims.  In the calculation that will determine each customer's "ratable" share, whether

100% or some lesser amount, the claims total is the "denominator," while the property total is the "numerator."

3.      Thousands of customer claims filed by the June 1, 2009 bar date are now the subject of intensive review and determination efforts by the Trustee's professionals. Allowable claims and filing date "net equity" are determined based upon securities or cash deposited by or for customers with LBI "in the ordinary course of its business" as a broker-dealer. 15 U.S.C. § 78lll(2). Given the extent of LBI's business, determining the total amount of claims eligible for customer treatment under SIPA is a substantial task. Complex "omnibus" claims covering numerous parties and transactions submitted by Barclays Capital Inc. ("Barclays"), Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers Holdings Inc. ("LBHI"), alone are asserted in amounts totaling well over twenty billion dollars. Thousands of other claims have been filed. While many customer claims have already been determined and achieved finality, there will be claims disputes, potentially involving novel legal issues, requiring resolution by the Court. The end result will be to fix or permit estimation of the "denominator" in the calculation that will establish ratable shares for customers.

4.      The present Motion begins the process to fix or permit reasonable estimation of the "numerator," the property deemed to be "customer property" within the meaning of SIPA and thus available on a priority basis to satisfy customer claims. An order establishing customer property allocation and the principles underlying such allocation is necessary and appropriate at this juncture in order to create a basis on which the Trustee can proceed on a timely basis with interim and final distributions to customers and other creditors of the LBI Estate.

## Executive Summary

### Statutory and Regulatory Framework

5.       As a broker-dealer registered with the Securities and Exchange Commission (the "SEC"), LBI was required to segregate and protect customer property and to maintain segregated reserve deposits sufficient to cover obligations to customers in accordance with SEC rules. Promulgated pursuant to section 15(c)(3) of the Exchange Act, these "customer protection" rules are designed to ensure – and to instill confidence in investors and securities markets – that financial failure of the firm will not result in shortfalls of property available to satisfy customer claims.

6.       As a member of the Securities Investor Protection Corporation ("SIPC"), LBI also is subject to the liquidation regime established by SIPA, enacted by Congress in 1970. SIPA seeks to achieve full customer protection by incorporating the SEC rules, and, where broker noncompliance leads to shortfalls, by allocating property to customers as necessary. In accordance with this statutory mandate, the many SIPA liquidations since its enactment in 1970 have taken an appropriately broad and inclusive approach to allocation of property as customer-related, and it is not unusual for virtually all property available to a failed broker-dealer to be deemed "customer property." Representative cases are summarized at pp. 26-28, infra.

7.       In any event, SIPA also contemplates that any surplus in the property allocated to the fund of "customer property" that is not necessary to satisfy customer and other priority claims becomes part of the General Estate.

8.       The statutes and rules that make up the federal scheme of customer protection are described in detail in Section II, infra, pp. 9-26.

**Creation of the LBI Estate**

9.       In the present case, LBI's business was deliberately restructured to remove most of its non-customer assets and businesses prior to the commencement of this proceeding on September 19, 2008 (the "Filing Date").  Thus, LBI's subsidiaries were transferred to Lehman ALI, Inc. ("Lehman ALI"), a subsidiary of LBHI, in return for a so-called Payment-In-Kind Note ("PIK Note") that provides, among other obligations of Lehman ALI, a duty to pay to LBI the fair market value of the stock in the transferred subsidiaries as of September 19, 2008.  Other intellectual property and real estate interests also were transferred from LBI.

10.       Further, in connection with the transfer to Barclays pursuant to the Asset Purchase Agreement (as amended and clarified from time to time, the "Purchase Agreement"), the great bulk of LBI's liquid assets that were not segregated or reserved for customers on the Filing Date, or the full value thereof, were transferred to Barclays.  This transfer also likely included some securities that should have been segregated for the benefit of customers, but were not.

11.       Factual background regarding the creation of the LBI Estate is described in detail in Section III, <u>infra</u>, pp. 29-36.

**Allocation Scheme**

12.       As explained below, the basic definition of "Customer Property" in SIPA is broad and provides that, at a minimum, what was or should have been set aside or reserved for customers under applicable regulations be allocated to Customer Property.  Based on the definition, the property available to the Trustee, the reality of what remained at LBI on the Filing Date, and the applicable segregation and compliance rules, the Trustee proposes the following scheme of allocation:

**Core Customer Property Including Compliance Shortfalls Allocated to Customer Property**

13.     The principal category of customer-related property to be allocated consists of the

"core" items described or enumerated in the SIPA definition of "Customer Property."  15 U.S.C.

§ 78lll(4).  Such items include:

- Securities held for customers pursuant to SEC Rule 15c3-3 (the "Customer Protection Rule" or "Rule 15c3-3");

- Cash segregated for customers in a special reserve account "for the Exclusive Benefit of Customers" pursuant to Rule 15c3-3 (the "Reserve Account");

- Assets derived from or traceable to customer property;

- Resources provided through the use or realization of customer-related debit items; and

- Finally, SIPA's definitional paragraphs were amended in 1978 to take in any other property of LBI's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers.  Thus, to the extent LBI had not maintained cash and securities in compliance with Rule 15c3-3 prior to the Filing Date, the Trustee is required to allocate property as necessary to remedy such non-compliance.

14.     The majority of the property under the Trustee's control falls into the first four of

the above categories.

15.     In addition, although the Trustee's investigation of LBI's customer protection

compliance is ongoing, it is already clear that there were significant lapses in LBI's compliance,

particularly during the confused period immediately before and following the chapter 11 filing of

LBHI on September 15, 2008 (the "LBHI Filing Date").  The gaps in compliance, which require

augmentation to Customer Property are now known to aggregate not less than $4.9 billion.  As

the Trustee's investigation continues, compliance gaps ultimately may exceed this figure

significantly and will likely require augmentation with much of the property available to the

Trustee in the near term.  Specific examples of non-compliance are described in detail in Section IV.A.2., infra, pp. 40-53.

<strong>Property Allocated to the General Estate</strong>

16.     SIPA provides that Customer Property not necessary to satisfy customer and other priority claims becomes part of the General Estate.  Thus, any excess of the property allocated to Customer Property will also become part of the General Estate after allowed customer claims have been satisfied in full.  Types of assets potentially allocable in whole or part to the General Estate (to the extent not required to cover compliance gaps as noted above) will include, for example, assets not traceable to customers, proceeds from the close-out of firm transactions, cash realized on residual firm property and contracts, and cash realized on the sale of the firm's ownership interests in exchanges and clearing firms.  The General Estate also may receive significant portions of any recoveries from the two PIK Notes, representing the value of the equity in the subsidiaries transferred from LBI to Lehman ALI immediately prior to the Filing Date, valued as of September 19, 2008, the book value of which was estimated at $1.6 billion as of the time the PIK Notes were issued.  The General Estate also may be supplemented by some of the monies obtained through preference and other avoidance actions and other litigation.

<strong>I.     BACKGROUND AND QUESTION PRESENTED</strong>

17.     LBI had long been prominent within the securities industry as a brokerage and clearing firm, SIPC member and SEC-registered broker-dealer subject to the Exchange Act.  LBI was a subsidiary of LBHI, and formed part of a worldwide Lehman enterprise that included affiliated Lehman entities in North America, Europe and Asia.

18. On September 15, 2008, LBHI shocked the financial community with its voluntary chapter 11 filing.[1] Of significance for purposes of the present Motion, and as more fully described below, LBI's liquidation proceeding did not commence on that day, but was deferred for a number of days in the hope of permitting an orderly cessation of LBI's activities as a broker-dealer and orderly disposition of LBI customer accounts.

19. On September 19, 2008, the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation of the Debtor Lehman Brothers Inc. (the "LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., No. 08-CIV-8119 (GEL) (S.D.N.Y. Sept. 19, 2008). The LBI Liquidation Order: (i) determined that LBI's customers were in need of the protections afforded by SIPA; (ii) appointed the Trustee as the trustee for the liquidation of LBI; (iii) removed the proceeding to this Court; and (iv) authorized the Trustee to take immediate possession of the property of LBI, wherever located. (Id. ¶¶ I, II, XIII, XIV.)

20. In accordance with SIPA's mandate to transfer customer accounts to solvent brokers where feasible, the LBI liquidation began with the transfer to other financial institutions of as many LBI accounts as could be administered in this way. By October of 2008, LBI had transferred over 72,000 Private Investment Management ("PIM") accounts to Barclays, and over 38,000 Neuberger Berman Private Asset Management ("PAM") accounts to Ridge Clearing & Outsourcing Solutions, Inc. ("Ridge"). By December, over 300 prime brokerage accounts had been transferred to other operating broker-dealers. (See Trustee's First Interim Report for the

---

1. LBHI's United Kingdom subsidiary LBIE also entered insolvency administration under the laws of the United Kingdom on September 15, 2008.

7

Period September 19, 2008 Through May 29, 2009, Docket No. 1151 (filed May 29, 2009)

("Trustee's Report") ¶¶ 13-33.)

21.     Remaining as claimants in this proceeding are largely non-PIM and PAM accounts as well as certain accounts for prime broker clients and institutional investors.  In addition, highly complex omnibus and multi-party claims have been filed by Barclays, LBHI and LBIE, purporting to assert claims on behalf of many account holders with unsatisfied claims. Many of the remaining account holders claim to be customers entitled to the protections created by SIPA and the other elements of the federal customer protection scheme.  While the gross amount of as-filed claims by these persons plainly includes substantial duplication, misunderstanding of SIPA coverage and other "noise," it is already clear that the colorable customer claims will approach – and, depending on how certain disputed issues are resolved, could exceed – the assets available to the Trustee for distribution.

22.     At stake in the present Motion is the Trustee's ability to deal with these remaining accounts and claims effectively, and in a manner consistent with the federal scheme of customer protection.  In round terms, the question presented is as follows:  what portion and what elements of the roughly $17 to $18 billion in cash and securities presently available to the Trustee (and of any additional cash or securities that may be subsequently recovered) may be allocated to the fund of Customer Property, and thus be available on a priority basis for satisfaction of customer claims?

23.     The following sections set forth the legal and practical aspects of the customer protection scheme, as they affected the business of LBI prior to the Filing Date and as they now affect the appropriate allocation of Customer Property.

## II.     LEGAL AND REGULATORY FRAMEWORK

24.     The modern scheme of customer protection under federal law was created in response to the so-called paperwork crisis of the late 1960s,[2] which led to the demise of hundreds of broker-dealers and jeopardized public confidence in securities markets.[3]  To restore confidence, and to address in particular the impact of broker-dealer financial failure on securities customers, Congress and the SEC established complementary statutory and regulatory schemes:

  (i)     Congress enacted SIPA in 1970, 15 U.S.C. §§ 78aaa et seq., thereby creating SIPC and establishing the law governing broker-dealer liquidations; significant amendments to SIPA in 1978 further enhanced customer protections; the Exchange Act applies to SIPA "as if" SIPA "was an amendment to, and was included as a section of" the Exchange Act.  15 U.S.C. §§ 78bbb.

  (ii)    Pursuant to the authority granted in section 15(c)(3) of the Exchange Act, the SEC promulgated rules setting minimum net capital requirements for broker-dealers and establishing segregation and deposit requirements for customer securities and cash.

This body of laws and rules provides a safety net for investors who choose to become customers of SEC-registered brokers or dealers who are SIPC members, with the goal of assuring them that securities entrusted to the broker-dealer (or their filing date value), and cash deposited for

---

2.  Beginning in 1967, the New York Stock Exchange ("NYSE") experienced unexpected increases in trading volume for which the industry was not prepared.  While the NYSE had projected that daily trading volume would range from nine to eleven million shares between 1965 and 1975, in reality, volume often reached fifteen million shares, and twenty and thirty million share days were experienced.  Neither the NYSE nor its members had the equipment or the trained personnel necessary to handle such volume.  See Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and Recommendations of the Securities and Exchange Commission, H.R. Doc. No. 92-231, at 13 (1971) (hereinafter "SEC Study"); Steven L. Molinari & Nelson S. Kibler, Broker-Dealers' Financial Responsibility Under the Uniform Net Capital Rule–A Case for Liquidity, 72 Geo. L.J. 1, 9-10 (1983).  According to the SEC Study, "there was an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments."  Id. at 11.  These circumstances resulted in a breakdown of control in many firms over the possession, custody, location, and delivery of securities, and the payment of money obligations to customers.  Hundreds of broker-dealers were unable to meet their obligations to customers and were merged, acquired or went bankrupt, exposing customers to risk of loss of cash and securities.

3.  See Michael P. Jamroz, The Customer Protection Rule, 57 Bus. Law. 1069, 1071-72 (2002); SEC Study, H.R. Doc. No. 92-231, at 13-14.

purposes of trading in securities, will be returned to the maximum extent practicable in the event of financial failure and liquidation.  S. Rep. No. 91-1218, at 1-4 (1970).

25.     As an SEC-registered broker-dealer and a member of SIPC, LBI was fully subject to these laws and rules, and to compliance oversight by the SEC, by self-regulatory organizations and by LBI's own internal and outside audit personnel.  The following paragraphs describe the legal and practical consequences of the applicable laws and regulations.

## A.     SEC Regulatory Scheme

26.     As part of its program to upgrade the financial responsibility and behavior of broker-dealers on a permanent basis, Congress amended section 15(c)(3) of the Exchange Act, to direct the SEC to prescribe "such rules and regulations as . . . necessary or appropriate in the public interest or for the protection of investors to provide safeguards with respect to the financial responsibility and related practices of brokers and dealers."  15 U.S.C. § 78o(c)(3)(A); see also Obligations of Broker-Dealers to Maintain Physical Possession or Control and Certain Reserves, Exchange Act Release No. 34,9775, 37 Fed. Reg. 20260 (Sept. 28, 1972); Ferris v. Stephenson (In re MJK Clearing, Inc.), 286 B.R. 109, 132 (Bankr. D. Minn. 2002); Horwitz v. Sheldon (In re Donald Sheldon & Co.), 148 B.R. 385, 390 (Bankr. S.D.N.Y. 1992).[4]  The resulting SEC rules, in their current form, are described in detail below.

### 1.     Rule 15c3-1: The "Net Capital Rule"

27.     The amended section 15(c)(3) of the Exchange Act authorized and directed the SEC to "establish minimum financial responsibility requirements for all brokers and dealers."  15 U.S.C. § 78o(c)(3)(A).  Under the Exchange Act, the SEC already had adopted Rule 15c3-1 –

---

4.  See also H.R. Rep. No. 91-1788, at *3 (1970) (Conf. Rep.) ("It is clear that the protections provided by the proposed SIPC fund are really only an interim step.  The long-range solution to these problems is going to be found in the ultimate raising of the financial responsibility of the brokerage community." (citation omitted)).

"the Net Capital Rule" – which "requires registered broker-dealers to maintain sufficient liquid assets to enable firms that fall below the minimum net capital requirements to liquidate in an orderly fashion."[5] Net Capital Rule, Exchange Act Release No. 34,27249, 54 Fed. Reg. 40,395, 40,395, 1989 WL 286288 (Oct. 2, 1989) (proposed rule amendments) ("SEC Release No. 34,27249"). "The primary purpose of the net capital rule . . . is to protect customers and creditors of registered broker-dealers from monetary losses and delays that can occur when a registered broker-dealer fails." Id.

28. Under the Net Capital Rule, as amended, a broker-dealer computes its net worth subject to certain exclusions as prescribed by rule. For example, the firm excludes assets not readily convertible into cash such as fixed assets, prepaid items, certain unsecured, partly secured, and other outstanding receivables, and insurance claims. See 17 C.F.R. § 240.15c3-1(c)(2)(iv). Similarly, the firm excludes liabilities "which are subordinated to the claims of creditors pursuant to a satisfactory subordination agreement," and such subordinated debt effectively becomes part of the firm's regulatory capital. 17 C.F.R. § 240.15c3-1(c)(2)(ii); see also Michael P. Jamroz, The Net Capital Rule, 47 Bus. Law. 863, 867 (1992).

---

5. Rules setting minimum capital requirements, long a feature of self-regulation by exchanges, have been integrated with federal customer protection schemes. In 1965, the SEC amended the Net Capital Rule to establish minimum levels of net capital for broker-dealers, because, among other reasons, "firms handling customer funds and securities should have sufficient capital so that they are not dependent upon customer assets to make up the principal working capital of the firm." SEC Release No. 34,27249, 54 Fed. Reg. at 40,396. In 1972, responding to the broker-dealer failures in the late 1960s, the SEC increased the minimum amounts finding that "undercapitalized new entrants to the business would cause harm to customers and potentially be a financial drain on the insurance-type fund maintained by [SIPC]." Id. The SEC recognized the "high price" paid by the securities industry as a result of insolvent broker-dealers, and re-designed the net capital rule "to enhance the protection of customer funds and securities held by broker-dealers [and] to protect the SIPC fund by requiring all broker-dealers to operate under a sound capital base." Notice of Proposal to Amend Rule 15c3-1 Under the Securities Exchange Act of 1934, Exchange Act Release No. 34,9891, 1972 WL 126364, at *1 (Dec. 5, 1972).

29.     The Net Capital Rule establishes two methods of compliance.  Under the "Aggregate Indebtedness Standard," a broker-dealer's aggregate indebtedness cannot exceed 1500% of its net capital.  17 C.F.R. § 240.15c3-1(a)(1)(i).  Under the "Alternative Standard," a broker-dealer may not permit its net capital to be less than 2% of aggregate customer debit items computed pursuant to SEC rules.  17 C.F.R. § 240.15c3-1(a)(1)(ii).  In addition, in 2004, the SEC established the Consolidated Supervised Entity ("CSE") program, which incorporates certain modifications to the Net Capital Rule.  A firm accepted into this program must maintain tentative net capital[6] of not less than $1 billion and net capital of not less than $500 million, and it must provide same-day notification to the SEC if its tentative net capital falls below $5 billion. 17 C.F.R. § 240.15c3-1(a)(7).  See Alternative Net Capital Requirements for Broker-Dealers that Are Part of Consolidated Supervised Entities, Exchange Act Release No. 34,49830, 69 Fed. Reg. 34,428 (June 21, 2004).  LBI, Goldman Sachs, Morgan Stanley, JP Morgan Chase ("Chase"), Citibank, Merrill Lynch and Bear Stearns were participants in the CSE program.[7]

30.     It is a violation of the Exchange Act for a broker-dealer to engage in securities transactions while out of compliance with the Net Capital Rule.  See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51, 64 (Bankr. S.D.N.Y. 1999), aff'd, 263 B.R. 406 (S.D.N.Y. 2001); In re Arbitration v. UBS Warburg LLC, Index No. 119163/00, 2001 WL 1586978, at *5 (Sup. Ct. N.Y. County Oct. 2, 2001) ("Once a broker-dealer fails to meet the net

6.   Generally, tentative net capital is a broker-dealer's net worth plus subordinated debt, after deducting most illiquid assets but before making haircut deductions.  See 17 C.F.R. § 240.15c3-1(c)(15) ("Tentative net capital shall mean the net capital of a broker or dealer before deducting the securities haircuts computed pursuant to paragraph (c)(2)(vi) of this section and the charges on inventory computed pursuant to Appendix B to this section . . . .").

7.   On September 26, 2008, the SEC announced its decision to end the CSE program, finding that the program was "fundamentally flawed from the beginning, because investment banks could opt in or out of supervision voluntarily."  Press Release, SEC, Chairman Cox Announces End of Consolidated Supervised Entities Program (Sept. 26, 2008), available at http://www.sec.gov/news/press/2008/2008-230.htm.

capital ratio required by the SEC Rule, it is required to immediately cease operations until it resumes compliance."); see also NYSE, Inc., Hearing Panel Decision 04-135, Standard & Poor's Secs., Inc., 2004 WL 2331078, at *1-2 (Aug. 11, 2004). When a broker-dealer falls out of net capital compliance, it must immediately report the violation. See In re Adler Coleman Clearing, 247 B.R. at 68.

31.     Customers and regulators rely on the firm's compliance with the Net Capital Rule and on the availability of the liquid assets that are counted as part of the regulatory capital. See, e.g., In re Weis Secs., Inc., 425 F. Supp. 212, 217 (S.D.N.Y. 1977), aff'd, 605 F.2d 590 (2d Cir. 1978); see also In re Adler Coleman Clearing, 247 B.R. at 68 ("Net capital is a derivation of net worth, excluding certain non-liquid, non-secured assets and other adjustments the SEC determine necessary to protect the investment community and its customers." (citation omitted)).

**2.      Rule 15c3-3: The Customer Protection Rule**

32.     The amended section 15(c)(3) of the Exchange Act also authorizes and directs the SEC to provide rules governing "the acceptance of custody and use of customers' securities and the carrying and use of customers' deposits or credit balances." 15 U.S.C. § 78o(c)(3)(A).[8] The resulting Rule 15c3-3 was intended to ensure that fully paid customer property and excess margin securities are not used to support borrowing by the broker-dealer, but are maintained at all times in good control locations, unconditionally available to satisfy customer claims in the event of a liquidation. Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34,9856, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972) ("SEC Release No. 9856"). Congress and the SEC were concerned that broker-dealers were using customer funds and funds

---

8.    See also Section 8 of the Exchange Act, 15 U.S.C. § 78h, which authorizes the SEC to promulgate rules limiting the broker's ability to "hypothecate" or "commingle" customer securities without written consent of the customer.

obtained through the use of customer securities to finance speculative activities and thus expose customers to risk of loss.[9]

33.     The SEC thus designed Rule 15c3-3 "to furnish the protection for the integrity of customer funds and securities."  See SEC Release No. 9856, 37 Fed. Reg. at 25224; see also Upton v. SEC, 75 F.3d 92, 96 (2d Cir. 1996) ("The purpose of the Rule is clear:  'to insure that customers' funds held by a broker-dealer . . . and the cash which is realized through the lending, hypothecation and other permissible uses of customers' securities are deployed in safe areas of the broker-dealer's business related to servicing his customers, or to the extent that the funds are not deployed in these limited areas, that they be deposited in a reserve bank account.'" (quoting SEC Release No. 9856, 37 Fed. Reg. at 25224) (alteration in original)); Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 547 (S.D.N.Y. 1990) ("Rule 15c3-3 is the rule that the Securities and Exchange Commission uses for protection of the assets of the customers of brokers and dealers.  It requires the broker-dealer to safeguard the customers' assets, to perform counts of any assets under their control and to maintain sufficient reserves in bank accounts specifically designated for the purpose to cover any amounts owing by the broker-dealer to their

---

9.   A commentator notes:

[a]s the true condition of the securities industry became apparent during the summer of 1970, the temper of the legislature shortened and their determination hardened."  . . . Senator Brooke of Massachusetts was particularly disturbed as to broker-dealers' utilization of customer assets to finance their own speculative activities.  He urged Congress to pass an amendment explicitly requiring the segregation of customers' free credit balances as well as fully paid securities." . . . Senator Brooke, however, was unable to muster enough support for his tough amendment . . . The language was later adjusted to require the maintenance of reserves. . . . Senator Brooke made it clear, however, that he expected the [SEC] to use its rulemaking powers to achieve the goals of the original proposed statute.

Molinari & Kibler, 72 Geo. L.J. at 13-14 n.80 (quoting Hurd Baruch, Wall Street: Security Risk 66-68 (Acropolis Books Ltd. 1971) and citing 116 Cong. Rec. 43,238, 40,901-04 (1970) (statement of Sen. Brooke)).

customers."); accord In re MJK Clearing, 286 B.R. at 132; In re Donald Sheldon, 148 B.R. at 390.

34.     As the adopting release made clear, the Customer Protection Rule's provisions for secure segregation and deposit are meant to "facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of a SIPC liquidation through a clear delineation in Rule 15c3-3 of specifically identifiable property of customers."  SEC Release No. 9856, 37 Fed. Reg. at 25225.[10]

35.     A related objective was to eliminate as far as possible the necessity for SIPC advances[11] to cover investor losses, thereby limiting the exposure of the SIPC fund,[12] and

_____

10.  The adopting release specified the following eight reasons for adoption of the rule:

(i) To insure that customers' funds held by a broker-dealer (both free credit balances and deposits which may be restricted as to withdrawal) and the cash which is realized through the lending, hypothecation and other permissible uses of customers' securities are deployed in safe areas of the broker-dealer's business related to servicing his customers or to the extent that the funds are not deployed in these limited areas, that they be deposited in a reserve bank account.  In this regard, the Commission has taken a broad view of the Congressional mandate by requiring that the reserve account include all funds which have as their source customer assets; (ii) to require a broker-dealer promptly to obtain possession or control of all fully-paid securities and excess margin securities carried by that broker-dealer for the account of customers and to require him to act within designated time frames where possession or control has not been established; (iii) to accomplish a separation of the brokerage operation of the firm's business from that of its firm activities such as underwriting and trading; (iv) to require a broker-dealer to maintain more current records.  Thus, Rule 15c3-3 requires a daily determination of security locations and periodic computations of the reserve; (v) to motivate the securities industry to process its securities transactions in a more expeditious manner.  This is particularly important in the area of the rule which penalizes a broker-dealer if a security is in a location which the Commission has determined to be unacceptable or has been out of the broker-dealer's possession for too long a period, as for example in transfer; (vi) to inhibit the unwarranted expansion of a broker-dealer's business through the use of customers' funds by prohibiting the use of those funds except for designated purposes; (vii) to augment the broad program of broker-dealer financial responsibility which the Commission has been developing as a result of the financial crisis experienced by the securities industry during the 1968-1970 period; and (viii) to facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of an SIPC liquidation through a clear delineation in Rule 15c3-3 of specifically identifiable property of customers.

11.  SIPC "advances" are intended to be temporary upfront payments to investors for property that might not otherwise be readily available either, for example, because of delays while the failed brokerage firm's records are being reconciled or because assets might need to be recovered for the fund of Customer Property from other sources.  When the statute was designed, Congress contemplated that SIPC would be able to recoup its advances from the fund of Customer Property once assets are marshaled.  See, e.g., SIPA of 1970: Report of the

(Footnote continued on next page)

ultimately the U.S. taxpayer, to claims resulting from payments to customers of failed brokers.

See Notice of Proposal to Amend Rule 15c3-1 Under the Securities Exchange Act of 1934, Exchange Act Release No. 34, 9891, 1972 WL 126364 (Dec. 5, 1972). The Customer Protection Rule plays a central role in assuring that customer property held by failed securities firms will be sufficient to satisfy customer claims, whether in a self-liquidation or a proceeding under SIPA.

### 3. Operation of the Customer Protection Rule

36. The Customer Protection Rule establishes rules for safeguarding and restricting the use of customer investment assets, whether in the form of securities or cash. The Rule, often described as a "segregation" rule, divides the customer and other activities of the firm and is designed to afford a "virtual 100 percent protection to customers." Reserves and Related Measures Respecting the Financial Responsibility of Brokers and Dealers, Exchange Act Release No. 34,9388, 36 Fed. Reg. 22312, 22312 (Nov. 24, 1971) ("SEC Release No. 34,9388").[13]

---

(Footnote continued from prior page)

Committee on Interstate and Foreign Commerce, 91st Cong., at 8 (1970), reprinted in H.R. Rep. No. 91-1613, at 4658 (1970) ("It is, of course, hoped and contemplated that, when the liquidation proceedings are completed, SIPC will receive back some moneys from the trustee."). This is especially so since the expectation was that if the broker-dealer had complied with the rules, the ultimately available customer property would be closely equivalent to amounts owed to customers.

12. SIPC assesses registered broker-dealers fees to establish a fund to reimburse customers for losses arising from certain unsatisfied claims resulting from the failure of a registered broker-dealer. See 15 U.S.C. § 78ddd(c).

13. "The operative features of the Special Account are designed to protect the integrity of customer-generated funds by insulating them against inroads from the broker-dealer's firm activities, whether they be underwriting, market making, other trading, investing or mere speculation in securities, meeting overhead or of any other nature whatever. The Special Account, therefore, should achieve a virtual 100 percent protection to customers with respect to 'the carrying and use of customers' deposits or credit balances' which is mandated by section 7(d) of the SIPC Act." SEC Release No. 34-9388, 36 Fed. Reg. at 22312 (emphasis added).

"The purpose behind the proposed rules is to afford as complete protection as possible to customers by the establishment of reserve requirements and otherwise with respect to their funds and securities in accordance with the intent of Congress, without depriving the industry of necessary and legitimate means to carry on customer oriented business." Id. at 22314.

### **(i)** **Possession or Control of Customer Securities**

37.     The first part of the Customer Protection Rule requires broker-dealers to have physical possession or good control of all fully-paid and excess margin securities[14] carried for the accounts of customers.  17 C.F.R. § 240.15c3-3(b); <u>see</u>, <u>e.g.</u>, <u>Upton</u>, 75 F.3d at 93; <u>Miller</u>, 998 F.2d at 63; <u>In re Donald Sheldon</u>, 148 B.R. at 390.  Paragraph (c) of the Customer Protection Rule defines the term "control" and specifies circumstances under which customer securities may be in the physical possession of a person other than the broker-dealer.  17 C.F.R. § 240.15c3-3(c)(1)-(6).  Generally, control of securities is deemed sufficient if they are "freely transferable" and there is certainty that the broker-dealer can obtain them promptly, without the payment of money or value.  Guidelines for Control Locations for Foreign Securities, Exchange Act Release No. 34,10429, 1973 WL 149250, at *2 (Oct. 19, 1973); <u>see</u> <u>also</u> Jamroz, 57 Bus. Law at 1085.  In industry terms, a location that meets the requirements is a "good control location."  (<u>See</u> the Affidavit of Daniel McIsaac submitted herewith ("McIsaac Aff.") ¶ 17.)

38.     If customer securities are not within the broker-dealer's possession or in a good control location, the broker-dealer must obtain possession or control promptly.  17 C.F.R. § 240.15c3-3(d).  Paragraph (d) requires the broker-dealer, "[n]ot later than the next business day" to "determine from his books or records the quantity of fully paid securities and excess margin securities in his possession or control and the quantity of fully paid securities and excess margin securities not in his possession or control."  <u>Id</u>.  If the broker-dealer does not have possession or control, it must take action to obtain those or similar securities, and may be required to use its own funds to purchase securities or make deposits to the Reserve Account,

---

14.  Excess margin securities are securities bought by customers on margin that are in excess of the amount the broker-dealer may hypothecate (or pledge) to finance the customers' margin purchases.  <u>See</u> 17 C.F.R. § 240.15c3-3(a)(5).

defined below, in order to cover the deficit. 17 C.F.R. § 240.15c3-3(d)(1)-(3). Compliance ensures that a customer's fully paid and excess margin securities (or the net monetary equivalent) will be in the broker's possession or control free of all claims or pledges if a broker-dealer fails. See Upton, 75 F.3d at 93; In re MJK Clearing, 286 B.R. at 130-31. (See also McIsaac Aff. ¶ 15.)

### (ii) The Reserve Account

39. The second part of Rule 15c3-3 requires the broker-dealer to maintain bank deposits "for the Exclusive Benefit of Customers" (the Reserve Account), in an amount equal to the net amount that the broker-dealer owes to customers, plus amounts generated by the use of customer securities.[15] 17 C.F.R. § 240.15c3-3(e). A computation is made each week as of close of business on Friday (or as required by the SEC) using a "Reserve Formula" to determine what is required to be kept on deposit. Id.; see also 17 C.F.R. § 240.15c3-3a. (Accord McIsaac Aff. ¶ 20.) Under the Reserve Formula, the broker-dealer calculates the total amount of "credit items,"[16] which include: (i) balances that represent money obligations to customers; (ii) amounts that the broker-dealer has obtained through the use of customer property; and (iii) certain reserves for operational inefficiencies. Subtracted from the total of credit items are "debit items,"[17] essentially fully secured receivables from customers or other persons involved with financing transactions on behalf of customers. See 17 C.F.R. §§ 240.15c3-3(e)(1); 17 C.F.R. § 240.15c3-3a.

---

15. The bank account must be free of all liens. In fact, the broker-dealer also is required to obtain a "written notification from each bank in which [the broker-dealer] has his reserve bank account or special account that the bank was informed that all cash and/or qualified securities deposited therein are being held by the bank for the exclusive benefit of customers of the broker or dealer . . . ." 17 C.F.R. § 240.15c3-3(f).

16. Credit items include monies owed by the broker-dealer to customers and those used to effectuate customer transactions. 17 C.F.R. § 240.15c3-3(a)(9)-(10).

17. Debit items basically represent monies owed to the broker-dealer by customers and/or to satisfy customer transactions. See 17 C.F.R. § 240.15c3-3(a).

40.     If the credits exceed the debits, the broker-dealer must deposit the excess in the Reserve Account.[18]  If the debits exceed the credits, no deposit is necessary.[19]  Required deposits must be made no later than one hour after the opening of banking business on the second following business day, that is, by 10 a.m. the Tuesday following the typical Friday calculation date.  17 C.F.R. § 240.15c3-3(e)(3).  Paragraph (g) of the Customer Protection Rule allows the broker-dealer to make withdrawals from the Reserve Account only from excess funds when the Reserve Formula computation indicates that excess cash or qualified securities have been deposited.  17 C.F.R. § 240.15c3-3(g).  Any violation of the Rule must immediately be reported to the SEC.  17 C.F.R. § 240.15c3-3(i).

41.     It is a violation of the Exchange Act for a broker-dealer to engage in securities transactions while in violation of the Customer Protection Rule.  Taken as a whole, the Customer Protection Rule means that a broker-dealer must maintain secure control of all property that would have to be delivered to customers in the event of a liquidation:  either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.  In this way, the Customer Protection Rule seeks to ensure full satisfaction of claims for cash and securities by customers of a liquidated broker-dealer, and "to protect customer funds and securities from general creditors of the broker-dealer in the event of a sudden liquidation."  Recognition of Foreign Broker-Dealer Regulation, Exchange Act Release No. 27,018, 1989 WL 1644769, at *8 (July 11, 1989); see also Upton, 75 F.3d at 93; 1 Edward F.

---

18.  17 C.F.R. § 240.15c3-3(e)(1).  The broker-dealer may not withdraw these funds unless another Reserve Formula computation is made before withdrawal which shows that no deposit, or a lesser deposit is necessary.  17 C.F.R. § 240.15c3-3(g).

19.  This, in effect, would represent a case where customers of the broker-dealer owe the broker-dealer more than the broker-dealer owes the customers.

Greene et al., U.S. Regulation of the International Securities and Derivatives Markets

§ 10.07[2][a] (9th ed. 2008).

**B.    SIPA Statutory Scheme**

42.    Congress enacted SIPA in 1970, effectively as an amendment to the Exchange Act, to protect customers who have entrusted the broker-dealer with cash or securities in the ordinary course of its business.  SIPC v. Barbour, 421 U.S. 412, 413 (1975) ("[SIPC] was established by Congress . . . for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit."); New Times Secs. Servs., Inc. v. Giddens (In re New Times Secs. Servs., Inc.), 463 F.3d 125, 127 (2d Cir 2006) ("'The principal purpose' of SIPA is 'to protect investors against financial losses arising from the insolvency of their brokers.'") (citation omitted); SEC v. F.O. Baroff Co., 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry." (citations omitted)); In re A.R. Baron Co., 226 B.R. 790, 793 (Bankr. S.D.N.Y. 1998) ("SIPA is designed to protect customers of registered broker-dealers who have entrusted those broker-dealers with cash or securities in the ordinary course of business.") (citations omitted); In re Hanover Square Secs., 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("The act was designed to 'afford protection to public customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations to their public customers.'" (citations omitted)).[20]  The declared purpose of a SIPA liquidation

---

20.  See also Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities Investor Protection Act and their Impact on Securities Transfers, 12 Cardozo L. Rev. 509, 513 (1990) (citing Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, Securities Industry Study, S. Doc. No. 13, 93rd Cong., at 32 (1973)) (At the time of the publication of the law review article, Mr. Don and Ms. Wang

(Footnote continued on next page)

proceeding is "to deliver customer name securities to or on behalf of customers . . . and to distribute customer property and . . . satisfy net equity claims of customers . . . ." 15 U.S.C. § 78fff(a); see also, Barbour, 421 U.S. at 421; In re A.R. Baron Co., 226 B.R. at 793; In re Adler Coleman Clearing Corp., 195 B.R. 266, 269 (Bankr. S.D.N.Y. 1996).

43.     As originally enacted in 1970, SIPA was viewed as an "interim step" pending the "ultimate raising of the financial responsibility of the brokerage community," which would be accomplished by the Customer Protection Rule and the Net Capital Rule (collectively, the "SEC Rules") described above.  See SIPA of 1970: Report of the Committee on Interstate and Foreign Commerce, 91st Cong., at 12 (1970), reprinted in H.R. Rep. No. 91-1613, at 4662 ("Interstate and Foreign Commerce Report"); see also, Barbour, 421 U.S. 415-418.

44.     The 1978 amendments to SIPA made significant changes.[21]  Most significantly for purposes of the present Motion, the components of "Customer Property" were greatly expanded in recognition of the SEC Rules that had come into force in the early 1970s following the original enactment of SIPA.  The 1978 amendment also retained many significant features, including the priority of customers in the fund of Customer Property and ratable sharing based

---

(Footnote continued from prior page)

served as Deputy General Counsel and as Associate General Counsel of SIPC, respectively; Ms. Wang is now the General Counsel of SIPC.); Stephen P. Harbeck, Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Securities Investor Protection Act, 56 Am. Bankr. L.J. 277, 278 (1982) (Mr. Harbeck has served as President and CEO of SIPC since December of 2003, having served as General Counsel prior to that time.)

21. 15 U.S.C. 78lll(4); see generally Hearings Before the Subcomm. on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess., at 117 (Aug. 1, 2, and 3, 1977) ("Hearings on H.R. 8331") (Report to the Board of Directors of the SIPC of the Special Task Force to Consider Possible Amendments to the SIPA of 1970 ); Harbeck, 56 Am. Bankr. L.J. at 278.

on filing date net equity.[22]  Further changes in 1978 facilitated bulk transfer of accounts, thereby providing the federal courts and SIPC with speedier and more flexible procedures for the protection of customers of insolvent brokers and dealers and the attendant liquidation of those brokers and dealers.[23]  The aspects of the amended SIPA scheme most relevant to the present Motion are described below.

### 1.      Customers and "Customer Property"

45.      SIPA affords special protections to "customers," a class that includes:

> any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.  The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

15 U.S.C. § 78lll(2).  Specifically excluded from the customer class are persons whose claims arise out of transactions with a foreign subsidiary, or persons who claim cash or securities that form part of the capital of the debtor, or are subordinated to the claims of the debtor's creditors.[24]

Id.

---

22.  See H.R. Rep. No. 95-746, at 11, 29 (1977); Hearings on H.R. 8331, at 180 (Section by Section Explanation of H.R. 8331 Amendments to SIPC); see also In re Hanover Square Secs., 55 B.R. at 238.

23.  See H.R. Rep. No. 95-746, at 42 (1977); Hearings on H.R. 8331, at 182 (Section by Section Explanation of H.R. 8331 Amendments to SIPC); 15 U.S.C. 78fff-2(f).

24.  In interpreting the literal words of SIPA, the Second Circuit has observed that courts should not "be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes."  F.O. Baroff, 497 F.2d at 282.  In other words, "fitting within the four corners of [the SIPA] definition does not automatically entitle a claimant to customer status."  Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.), 277 B.R. 520, 558 (Bankr. S.D.N.Y. 2002) (citations omitted).

46.     SIPA also contemplates two separate categories of estate property:  Customer Property and the debtor's General Estate.  15 U.S.C. § 78lll(4).  Customer Property is accounted for and distributed to customers in a manner that is separate and distinct from the debtor's General Estate.  Id.  The Trustee must allocate the property in his control between Customer Property and the General Estate of the debtor.  See 15 U.S.C. § 78fff-2(c)(1); 15 U.S.C. § 78fff(e).  This structure is designed to meet the requirement that Customer Property will be held in a secure fashion and for prompt return in the event of liquidation, and also facilitates the expeditious return of Customer Property by allowing the Trustee to satisfy customer claims before completing a potentially lengthy or contentious General Estate claims process.  See 15 U.S.C. § 78fff(a)(1); Interstate and Foreign Commerce Report, at 9-10.

47.     The definition of Customer Property enacted as part of the 1978 amendments is broad and inclusive and reads as follows:

> "[C]ustomer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

48.     Without limiting the definition of what may be considered Customer Property SIPA then provides guidelines for allocation of assets to the Customer Property fund as follows:

> The term "customer property" includes –
>
> (A)     securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78o(c)(3) of this title and the rules prescribed under such section;
>
> (B)     resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C)	any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and

(D)	any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

15 U.S.C. § 78lll(4).

49.	Subsections (A), (B) and (D) of this definition were added in the 1978 amendments.  See H.R. Rep. No. 95-746, at 34, 97-98 (1977).  Subsection (B) reflects the determination of Congress that fairness requires that value associated with customer debits – essentially loans to customers which operate in the Reserve Formula to reduce the Reserve Account requirement – be allocated as part of Customer Property.[25]

50.	Subsections (A) and (D) were added in recognition of the robust regulatory changes that had followed the original enactment of SIPA and the congressional directives to the SEC contained in the 1973 amendments to section 15(c)(3) of the Exchange Act.  These new parts of the definition of Customer Property aim to fulfill the promise of the enhanced regulatory scheme.  Thus, the "applicable laws, rules and regulations," referred to in subsection (D) of the definition of Customer Property above include the Customer Protection Rule, as promulgated by the SEC pursuant to congressional mandate in 1973.  As discussed in Section II.B.2., pp. 25-26, infra, the statute's reference to "any other property" to fill gaps caused by non-compliance also means precisely that – any firm property that would have been available to achieve compliance pre-liquidation becomes part of Customer Property if necessary to satisfy customer deficits.  See In re MJK Clearing, 286 B.R. at 132; In re Donald Sheldon, 148 B.R. at 390.

_____

25.	See Hearings on H.R. 8331, at 112-14, 119-21 (Report to the Board of Directors of the SIPC of the Special Task Force to Consider Possible Amendments to the SIPA of 1970).

## 2. SIPA Mandates the Use of "Any Other Assets" to Cover Deficits in the Reserve Account

51. Under SIPA § 78lll(4)(D), "if the debtor miscalculated the funds to be set aside . . . or otherwise underfunded such account, the trustee can recoup any deficiency from 'firm' property." In re Donald Sheldon, 148 B.R. at 390. This is because, in compliance with applicable laws, rules, and regulations, such assets should "have been set aside or held for the benefit of customers." Id.; accord In re MJK Clearing, 286 B.R. at 132 (finding debtor's other, non-15c3-3 accounts can be used to remedy the shortfall in the customer Reserve Account).

52. In MJK Clearing, the court stated the underlying principle as follows:

> "SIPA permits the trustee to look beyond the Special Reserve Account to the debtor's other (i.e. non-customer) bank accounts to make up any deficiency in the Special Reserve Account." . . . In the present case, there exists a massive shortfall in customer property. Application of the plain meaning of 15 U.S.C. § 78lll(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall . . . . Thus, if the debtor failed for any reason to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78lll(4)(D) would require the trustee to correct the debtor's error.

286 B.R. at 131-32 (citation omitted).

53. Thus, once the Trustee determines that there is a shortfall in assets because the debtor failed to maintain possession or control of customers' fully paid and excess-margin securities, or failed to maintain sufficient reserves in the Reserve Account, 15 U.S.C. § 78lll(4)(D) would permit the Trustee to look to the debtor's other property, to replace the missing securities, with cash if necessary, and to rectify any deficiency in the Reserve Account, as if the debtor had complied with the appropriate regulations. See id. at 130-32 ("SIPA requires the trustee to correct the debtor's failure to comply, and apportion that cash to 'customer property' as if the debtor had complied with the appropriate regulations." (citation omitted) (emphasis added)).

54.     The SEC also has made clear that "[t]he purpose behind [Rule 15c3-3] is to afford as complete a protection as possible to customers,"[26] and that, "[t]he Special Account, therefore, should achieve a virtual 100 percent protection to customers with respect to 'the carrying and use of customers' deposits or credit balances' which is mandated by section 7(d) of the SIPC Act." SEC Release No. 34,9388, 36 Fed. Reg. at 22312 (emphasis added).

55.     While final reconciliations are not complete, it is already clear that LBI was out of compliance with the Customer Protection Rule in significant respects, leading to a multi-billion-dollar shortfall in what should have been "set aside or held for the benefit of customers" within the meaning of 15 U.S.C. § 78lll(4)(D).  The known extent and potential impact of LBI compliance failures on the Trustee's allocations to Customer Property are set forth in Section IV, infra.

**C.     The Trustee's Proposed Allocation Approach is Consistent With Prior SIPA Liquidations**

56.     The allocation principles the Trustee proposes herein are consistent with prior SIPA liquidations, which have generally taken a broad and inclusive approach to the allocation of property as customer-related in accordance with statutory mandates.  In the vast majority of SIPC liquidations reviewed by the Trustee, virtually all estate property was allocated to the fund of Customer Property.[27]  For example, in SIPC v. Austin Securities, Inc., SIPC, as Trustee,

---

26.  SEC Release No. 34,9388, 36 Fed. Reg. at 22314.

27.  Twenty-nine of the thirty-one SIPC liquidations completed from 1998-2008 for which information was readily available through electronic means allocated virtually the entire estate to Customer Property or for the repayment of administrative expenses.

allocated $2,740,415 of $2,870,647 (or 95%) of the debtor's estate to Customer Property.[28]  In In re Park South Securities, LLC, 99% of the debtor's estate was allocated to Customer Property.[29] In SIPC v. MJK Clearing, Inc., the Trustee identified all the debtor's assets as Customer Property and supported such identification with the explanation that the vast majority of the assets were cash and securities received, acquired, or held by or for the account of the debtor from or for the securities accounts of the debtor's customers.[30]  The remaining assets fell under either the second part of the definition of Customer Property as "resources provided through the use or realization of customers debit cash balances and other customer-related debit items," or the fourth part of the definition as "other property of [MJK] which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of . . . customers . . . ."  Id. (citations omitted).[31]  Similarly, in In re A.R. Baron & Co., Inc., the Court allocated 97% of the debtor's estate to Customer Property.  After paying customer claims, the remaining funds fell into the General Estate and were used to repay SIPC, which already had advanced amounts

---

28. See Order Granting Motion for Approval of Trustee's Investigatory and Final Reports and Account and for Assignment of Judgments to SIPC, No. 05-1144 (Bankr. E.D.N.Y. Nov. 20, 2007).

29. See Order Approving Trustee's Final Report and Account, Approving Final Allocation of Property to the Fund of Customer Property and to the General Fund, Approving Final Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors, Authorizing Disposition of Books and Records, Authorizing Abandonment or Assignment of Estate Property, Fixing Procedure for Discharge of Trustee and Closing of Estate, and Granting Other Relief, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008).

30. See Memorandum of Law in Support of Motion to Approve Trustee's Customer Fund Determination and Allocation, Final Distribution to Customers and Distributions to SIPC ¶ 4, Adv. Proc. No. 01-4257 (Bankr. D. Minn. May 10, 2004).

31. See Order Approving Motion to Approve Trustee's Customer Fund Determination and Allocation, Final Distribution to Customers and Distributions to SIPC, No. 01-4257 (Bankr. D. Minn. June 9, 2004).  Customers received 100% of their allowed claims.  The remainder of the estate, after subtracting administrative costs, was used to pay general creditors.  See Trustee's Investigatory Report, Final Report and Account Administration of the Estate ¶¶ 56-57, No. 01-4257 (Bankr. D. Minn. Nov. 22, 2006).

sufficient to pay customers' allowed claims up to $500,000.[32]  Following reimbursement of SIPC

advances, and after other administrative expenses were paid, no amount was available for

distribution to general creditors.[33]

57.     Consistent with prior liquidations, the Trustee here expects that most of the LBI

Estate will be allocated to Customer Property.[34]  Under SIPA, excess Customer Property

32. See Trustee's Application for Orders Approving the Allocation of Property of the Estate Between the Customer Property Fund and the General Estate, No. 96-8831A SIPA (Bankr. S.D.N.Y. May 5, 2003); Order Approving the Allocation of Property of the Estate Between the Customer Property Fund and the General Estate and Approving Final Distributions, No. 96-8831A SIPA (Bankr. S.D.N.Y. June 12, 2003); Trustee's Final Report and Account and Related Relief, No. 96-8831A SIPA (Bankr. S.D.N.Y. Dec. 30, 2003); Order Approving Final Report and Account and Related Relief, No. 96-8831A SIPA (Bankr. S.D.N.Y. Feb. 10, 2004).

33. Id.; see also In re Meridian Asset Management, Inc., No. 00-90029, Order Approving Final Report (Bankr. N.D. Fla. Dec. 6, 2006) (allocating all of debtor's assets to customer property); In re Cybervest Securities, Inc., No. 03-2352-BKC-RBR-A, Order Granting Trustee's Motion for Approval of Investigatory and Final Reports and Account, and For Assignment to SIPC of Trustee's Final Judgment Against William Pang Chien, No. 03-2352-BKC-RBR-A (Bankr. S.D. Fla. Jul. 11, 2006) (allocating all of debtor's assets to customer property); Trustees Motion for Approval of Investigatory and Final Reports and Account, No. 03-2352-BKC-RBR-A (Bankr. S.D. Fla. May 31, 2006); In re Northstar Securities, Inc., No.01-3722-BJH, Order Approving Trustee's Investigatory and Final Reports, Account of Administration of Estate, and Request for Related Relief (Bankr. N.D. Tex. Feb. 12, 2008) (allocating 97% of debtor's estate to customer property); Trustee's Investigatory and Final Reports, No.01-3722-BJH (Bankr. N.D. Tex. Dec. 13, 2007); In re Vision Investment Group, Inc., No. 97-1035 B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation, Trustee (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); Motion for Approval of Third and Final Report and Final Accounting of the SIPC, Trustee, No. 97-1035 B (Bankr. W.D.N.Y. Nov. 17, 2005); SIPC v. MPI Financial, No. 01-2034, Order Approving Investigatory and Final Reports and Final Accounting of the Securities Investor Protection Corporation, Trustee (Bankr. S.D. Ohio Oct. 7, 2005) (allocating 99.8% of debtor's estate to customer property); Investigatory and Final Reports and Final Accounting of the SIPC, Trustee, No. 01-2034 (Bankr. S.D. Ohio Aug. 19, 2005); In re Klein Maus & Shire, Inc., No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); In re Michael William Ribant, No. 98-90607-JJH, Order Approving Trustee's Final Report (Bankr. S.D. Ca. Aug. 31, 2001) (allocating 98% of debtor's estate to customer property); Trustee's Final Report, No. 98-90607-JJH ¶¶ 14-15 (Bankr. S.D. Ca. Jul. 6, 2001); In re Cygnet Securities, Inc., No. 97-2651, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property (Bankr. D.N.J. Dec. 13, 2004) (allocating 84% of debtor's estate to customer property); In re Hanover, Sterling & Co., No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

34. This should be no surprise given the nature of a broker-dealer's business as reflected in the allocations in past SIPA cases.  Indeed, LBI was subject to the SEC's "business mix" rule, which requires the preponderance of a broker-dealer's revenue to be derived from "customer" as opposed to "firm" activity, 17 C.F.R. § 240.11a1-1(T)(b).  LBI had a substantial preponderance of such activity even before non-customer business and assets

(Footnote continued on next page)

remaining after satisfaction of customer claims and other priority items, "shall become part of the general estate of the debtor." 15 U.S.C. § 78fff-2(c).

### III.  STRUCTURE OF THE LBI ESTATE

58.     The structure of the LBI Estate was greatly altered by transactions at and around the Filing Date.  First, LBHI, as LBI's parent entity, effectively removed the bulk of LBI's non-customer business through an upstream transfer of LBI's stock ownership in its subsidiaries. Second, on September 16, 2008, certain of the chapter 11 debtors, LBI and Barclays entered into the Purchase Agreement.  As discussed below, both of these transactions removed to the maximum extent possible non-customer-related assets and operations in preparation for liquidation, and also removed substantial value from the LBI Estate that otherwise would have been available to satisfy customers and creditors.

**A.     Restructuring of LBI at and Around the Filing Date – the "PIK Notes"**

59.     Prior to the appointment of the Trustee on the Filing Date, LBI transferred its ownership interest in the stock of virtually all of its subsidiaries, as well as certain intellectual property, to Lehman ALI in exchange for two PIK Notes, based on the understanding that Lehman ALI, with assistance from LBHI, could maximize the value of each subsidiary and wind them down or arrange for their sale in an orderly fashion.  Each of the transferred subsidiaries held assets of varying types and amounts, including derivatives trading positions, asset

---

(Footnote continued from prior page)
were stripped away before the Filing Date so that a much more typical (though still extremely large) broker-dealer structure is now left to be liquidated for the protection of its customers under SIPA.  Thus, looking at the business being liquidated functionally further supports and explains the allocation proposed here as in many other SIPA cases.

management positions and other cash and securities.[35]  Also within the first few weeks following the Filing Date, LBI disposed of its interests in real estate.[36]  (See Trustee's Report ¶¶ 52, 63.)

**B.      The Purchase Agreement**

60.      Further, various provisions of the Purchase Agreement had the effect of transferring substantial net value to Barclays in return for little or no net consideration to LBI. Thus, an element added to the Purchase Agreement after Court approval was the transfer to Barclays of collateral underlying the "Barclays Repo," whereby approximately $49.7 billion in LBI securities was transferred to Barclays in return for a cash loan of only $45 billion.  (Decl. of Shari D. Leventhal in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement) (Dec. 5, 2008) ("Leventhal Decl.") ¶¶ 11-12.)

61.      The Barclays Repo evolved from interim financing arranged between the parties and federal regulators to permit LBI to operate during the week of September 15, 2008, following the chapter 11 filing of LBHI.  During that week, the Federal Reserve Bank of New York (the "New York Fed") financed LBI's payroll and operations on a fully secured basis, supported by LBI collateral.  By Wednesday, September 17, the New York Fed had funded $46.22 billion to LBI in cash and Treasury securities, secured by $50.62 billion in collateral at

---

35.  Under the PIK Notes, Lehman ALI agreed to pay LBI the fair market value of the equity in each transferred subsidiary as determined by Lazard Ltd. ("Lazard") pursuant to a methodology to be agreed between LBI and Lazard.  (See Katz Decl. Ex. A.)  The parties are still in discussions regarding amounts due to LBI under the PIK Notes.

36.  As of the Filing Date, LBI was the named tenant under twenty-two real property leases and subleases.  The Trustee transferred ten of these leases to Barclays pursuant to the Purchase Agreement.  With respect to the leased locations for which LBI was not required to provide occupancy to Barclays, the Trustee rejected five of them in October 2008, and one additional lease expired by its terms during that time.  LBHI and its subsidiaries continued to operate in the remaining leased locations, as well as in two of the four locations used by Barclays. While a formal agreement was finalized for the transfer or disposal of these leases, LBHI paid the rent.  An agreement was eventually memorialized in a "so ordered" stipulation entered by this Court on May 13, 2009, whereby the net amount to be contributed by LBI towards rent for the remaining leases amounted to over $2.4 million.  (See Stipulation and Order, Docket No. 1103 (May 13, 2009); see also Trustee's Report, part XVIII.)

LBI. As described by the New York Fed in prior submissions to this Court, making Treasury

funds available to LBI was a "carefully thought out decision" designed to "facilitate an orderly

wind down" of LBI. (Leventhal Decl. ¶¶ 6-9.)

62.     Also during the week of September 15, 2008, Barclays reached agreement with

Lehman representatives to purchase LBI's North American broker-dealer operations. As initially

conceived, the Barclays offer was to purchase certain assets of LBI and LBHI for $1.7 billion

(this was to include $250 million in cash as well as the appraised value of three of LBHI's and

LBI's real estate properties) and the assumption of certain obligations and expenses. In

preparation for this transaction, on September 17, Barclays agreed to replace the New York Fed

as secured lender to LBI. The parties apparently understood this to mean that Barclays would

provide funding that was secured by essentially the same securities that had been pledged by LBI

to the New York Fed.[37]

63.     Further, as the events unfolded during the week of September 15, LBI and LBHI

did not receive the $1.7 billion in cash that had been a principal element of consideration in the

Barclays offer. Instead, Barclays agreed to make a deposit of $250 million with the Depository

---

37. The device selected to effectuate the substitute secured financing was the Barclays Repo. However, pursuant to
a so-called "Clarification Letter" to the Purchase Agreement negotiated over the weekend of September 20 and
21, LBI exchanged the $49.7 billion in LBI securities for the $45 billion debt, a net transfer to Barclays of
nearly $5 billion in LBI property. In addition to the assets Barclays has already received under the Purchase
Agreement, Barclays has made formal demands (and filed corresponding claims in the claims process) for an
additional $2-3 billion of assets based on its interpretation of the Purchase Agreement and Clarification Letter.
These demands involve claims to items in LBI's former 15c3-3 account and clearing funds and other deposits
at exchanges or clearing agencies that may be needed to satisfy customer claims. The demands also include
property in clearance boxes at DTCC that may also be needed to satisfy customer claims and which Barclays,
the Trustee, and DTCC specifically agreed in a letter agreement were excluded assets under the purchase
transaction. The Trustee does not believe that the transfer of these additional assets, as well as approximately
$3 billion of similar assets that are already in the possession of Barclays, was approved by the Bankruptcy
Court on September 19, 2008. On September 15, 2009, the Trustee filed a motion for relief pursuant to the Sale
Orders or, alternatively, for certain limited relief under Rule 60(b). If the Trustee were not granted the relief
sought in its motion, the Trustee could be denied recovery of about $3 billion in cash and other assets
transferred to Barclays and might have to pay or release to Barclays an additional up to $3 billion dollars of
cash and securities, all of which could have a major impact on satisfaction of claims in this proceeding.

Trust & Clearing Corporation (the "DTCC"),[38] LBI's principal clearing agency, to secure LBI's obligations to the DTCC and its subsidiaries. Similarly, the appraised value of the real estate properties ($1.29 billion) was transferred to LBHI. (See Decl. of William R. Maguire in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, For Certain Limited Relief Under Rule 60(b), Docket No. 1684 (filed Sept. 15, 2009), Ex. 20.)

64. The financial effect of pre-Filing Date transfers to LBHI and Barclays was thus to remove most non-customer assets from the LBI Estate – as well as certain customer assets that were needed to satisfy customer claims but which may not have been properly set aside for customers – as it proceeded to liquidation.

## C. Customer Account Transfers

65. Pursuant to the Purchase Agreement, Barclays also acquired LBI's PIM accounts. The understanding and goal was that the PIM accounts would be transferred to Barclays for the protection of these account holders. Thus, beginning September 23, 2008, the Trustee, with the assistance of regulators and SIPC, undertook the unprecedented task of supervising the transfer of over 72,000 PIM accounts from LBI's books to Barclays's books. (Trustee's Report ¶¶ 18-21.)

---

38. The DTCC provides clearing, settlement and information services to the domestic and global securities industry in connection with a range of financial instruments. LBI utilized such services extensively in connection with its operations as a broker-dealer on behalf of customers, as well as in its proprietary trading. DTCC is comprised of six subsidiaries: (i) the Depository Trust Company ("DTC"); (ii) the National Securities Clearance Corporation ("NSCC"); (iii) the Fixed Income Clearing Corporation ("FICC"), which processes fixed income transactions; (iv) DTCC Solutions LLC, which delivers information-based and business processing solutions to financial intermediaries globally; (vi) DTCC Deriv/SERV LLC, which provides automated matching and confirmation services for over-the-counter ("OTC") derivatives trades, including credit, equity and interest rate derivatives, as well as related matching of payment flows and bilateral netting services; and (vi) EuroCCP, which is the DTCC's European subsidiary that provides pan-European, low-cost clearing services. (See Trustee's Report ¶ 79.)

66. In addition, prior to the Filing Date, LBI had served as Neuberger Berman's clearing broker. Shortly after LBHI filed for bankruptcy protection and as LBI's liquidation became foreseeable, Neuberger Berman negotiated to transfer clearing services for its PAM accounts to Ridge. Though not yet formally appointed, the Trustee collaborated with Neuberger Berman and Ridge with input from various federal regulators to assure the seamless conversion of clearing services for over 38,000 PAM accounts to Ridge. (Trustee's Report ¶¶ 13-14.)

67. Following the PIM and PAM transfers, the Trustee, with the assistance of SIPC, also transferred certain Prime Broker Accounts ("PBA") to operating broker-dealers. (Trustee's Report ¶¶ 25-26.) These transfers, as contemplated in the Trustee's order of appointment, protected many thousands of customers in accordance with the SIPA mandate.

## D. Remaining Accounts and Claims

68. Following the securities account transfers described above, a significant number of private investment and institutional accounts remain. In addition, three significant omnibus claims have been submitted, which, if allowed as customer claims, have the potential to exceed assets available for distribution.

69. Accounts for LBI's affiliated entities such as LBIE and LBHI were not transferred, and remain to be dealt with in the LBI claims process. Although LBI's books and records appear to be incomplete in some instances, it is clear that many of the affiliates agreed that in the event of liquidation, their claims would be subordinated to other claims against LBI's estate.[39] Such subordination meant, (i) that SEC Rules governing segregation and deposit

---

39. Typical language is found in the Amended and Restated Subordination Agreement between LBI and Lehman Brothers Special Financing, Inc., dated December 12, 2007 ¶¶ 1, 3-4:

(Footnote continued on next page)

requirements for customer property did not apply and (ii) that the subordinating party is not a "customer" within the meaning of SIPA.

70.     Prompt return of customer name securities in accordance with SIPA has been a priority for the Trustee.  Where customers claim securities that are in "customer name" as defined by 15 U.S.C. § 78lll(3), and where there is no indebtedness of the customer to the LBI Estate, these securities have been returned pursuant to 15 U.S.C. § 78fff-2(c)(2).

71.     Pursuant to 15 U.S.C. § 78fff-2(a)(3), customer claims must have been received by the Trustee on or before January 30, 2009, to be eligible for the maximum protection afforded under SIPA.  No claim may be allowed if received after June 1, 2009.  As of the final date for submitting claims, the Trustee had received over 12,500 purported customer claims as well as omnibus claims from Barclays[40] and LBIE.[41]  The Trustee has now determined the majority of these claims though many of the large and complex omnibus and prime broker claims remain, and several hundred claimants have filed objections to determinations denying or reclassifying

---

(Footnote continued from prior page)

The Lender's rights with respect to (i) any and all securities which such Lender may now or in the future lend to LBI, and (ii) any and all cash balances in any present or future securities or commodities accounts of the Lender's maintained by LBI (the "Accounts") will be subordinate in right of payment and subject to the prior payment of provision for payment in full of any indebtedness of any nature whatsoever which may now or hereafter be due to any present or future LBI creditor the claims of which are not similarly subordinated (any such indebtedness hereinafter "Senior Indebtedness"). . . . For purposes of this Agreement the term "subordinate to" means that if at the time LBI is required to return any securities loaned to it by the Lender or any payment is due to the Lender with respect to any debt, obligation or liability which LBI may have incurred with respect to said Lender and (i) a liquidation of LBI has been commenced under [SIPA] . . . then the Lender will not be entitled on account of any such securities loaned or payment due, to participate or share ratably or otherwise in the distribution of LBI's assets until all obligations with respect to any Senior Indebtedness have been fully satisfied or provision has been made therefor. . . . The Lender acknowledges that by agreeing to subordinate its rights with respect to any securities loaned to LBI and any other debts, obligations or liabilities which LBI may now or hereafter have to it, in the event of liquidation under SIPA it will not be treated as a customer by [SIPC].

40.  The Barclays claim is based on 75,778 accounts.

41.  The LBIE claim is based on 1,100 of LBIE's accounts.  (Trustee's Report ¶ 36.)

their claims.[42]  The face amount of the remaining claims and objections would far exceed the property available to the Trustee.  Although the Trustee believes that the amount will be substantially reduced as claims and objections are resolved, it is anticipated that allowed customer claims will approach and could exceed available property.  Whether and when full distributions can be made on the net equity of customer claims depends on, (i) the allocation of property which is the subject of the present Motion, (ii) resolution of objections, and (iii) the omnibus claims and the resolution of contingencies such as the Barclays' claims which are the subject of the Trustee's separate Rule 60(b) motion.

72.      The Trustee would like to be in a position to proceed with interim distributions to customers following determination of allowable customer claims, with reserves as appropriate for contingencies and disputed claims, although some of the disputes involving large dollar values will have to be resolved before distributions can proceed.  In any event, appropriate allocation of Customer Property through the present Motion is essential.

E.      **Assets Within the Trustee's Control**

73.      In the Trustee's First Interim Report for the period September 19, 2008 through May 29, 2009, the Trustee reported approximately $5.1 billion in cash and $11.2 billion in securities valued as of May 15, 2009.  (See Trustee's Report, Ex. 2.)  Based on current estimates, taking account of certain securities at non-US locations and some recoveries, and valuing securities as of September 19, 2008, the total property in the Trustee's control is approximately $17-18 billion.  Available cash appears likely to be accounted for by legacy 15c3-3 deposit amounts, pre- and post-petition dividends, interest and other distributions with respect to

---

42.  The Trustee has also received 7,556 general creditor claims, most of which will be determined after the determination of customer claims.

customer securities, known compliance shortfalls (see Appendix A, infra), and amounts corresponding to value derived from customer-related debits in the Rule 15c3-3 formula, (see Section V.3., infra). Regarding securities, even assuming substantial disallowance or other reduction of purported customer claims for securities, it appears that most or all available securities will be required to satisfy customer claims and to remedy compliance shortfalls.

## IV. LBI COMPLIANCE WITH CUSTOMER PROTECTION RULES

74. LBI maintained highly specialized and complex information systems to track the location and status of customer securities for purposes of the Rule 15c3-3 segregation requirement, as well as the constant fluctuation of customer credits and debits for purposes of the Reserve Account requirement.

75. As explained in the McIsaac Affidavit, a residual level of inaccuracy is to be expected given the scale and complexity of LBI's business. For one thing, where the ability of computer systems to produce accurate results depended on correct "coding" of each of the tens of thousands of accounts maintained by LBI, the results will reflect any coding inaccuracy until (if ever) the mistake is discovered. In other situations, time-sensitive "manual" intervention in the system by LBI employees was necessary to achieve compliance. As shown below, errors in coding of accounts and absence of appropriate intervention significantly impacted the reserve computation. (See McIsaac Aff. ¶¶ 23-25.)

76. Further, each "control location" must comply with its agreement regarding the status of LBI customer securities in its custody, especially regarding whether the securities may or may not be pledged or otherwise serve as collateral for the debts of LBI. Errors and disputes in this category appear to be responsible for significant instances of non-compliance and consequent seizure or detention of Customer Property by custodians to satisfy claimed debts of LBI. (See id. ¶ 26.)

77.     Finally, during the last week of LBI's operation as a broker-dealer, its compliance systems were not able to cope with the drastic and abrupt changes in LBI's financial condition and compliance obligations that occurred immediately before and after the chapter 11 filing of LBHI.  Thus, on Friday, September 12, 2008, its last day of "normal" operation prior to the LBHI Filing Date, LBI's calculation for its Reserve Account requirement stood at $5.7 billion.  As of the following Friday, the Filing Date, in the face of large stock record and general ledger breaks and the general collapse of LBI's liquidity, LBI employees, who would become Barclays employees upon the closing of the Purchase Agreement, were attempting to show that the Reserve Account requirement had declined to about $600 million, an average decrease of nearly $1 billion a day following LBHI's demise.  (McIsaac Aff.¶ 27.)

78.     These problems were exacerbated by the discontinuance by JP Morgan Chase ("Chase"), LBI's primary clearing bank, of LBI's real-time electronic access to the accounts LBI maintained at Chase, as occurred on September 18, 2008.  The inability to monitor these accounts impeded LBI's ability to keep accurate, up-to-date records and to process settlements of both customer and firm transactions on a timely and automated basis, thereby giving rise to significant unreconciled items.  Without access to this automated process, LBI was forced to rely on manual processes with greater susceptibility to human error.[43]  These manual processes likely contributed to some of the errors in LBI's reserve calculation as of September 19.  (See McIsaac Aff. ¶¶ 28-31.)

---

43.  In particular, as evident by internal LBI correspondence during the weekend of September 20 and 21, the processing of trades flowing through the Chase clearance, custody and customer segregated accounts, resulted in unusually large unreconciled items, or "breaks."  For LBI to accurately prepare its reserve calculation during this weekend, it would have had to resolve these "breaks" through numerous manual processes and adjustments.  (See McIsaac Aff. ¶ 30.)

79.     As summarized below, LBI's September 19 reserve calculation failed to take account of several factors – including some items that were not disclosed to regulators as the events were occurring and some that may not have been known to the LBI personnel performing the calculation – that required deposit of significant additional funds for LBI to maintain Rule 15c3-3 compliance on the day that SIPC commenced this proceeding for the protection of LBI's customers.

A.      **LBI's 15c3-3 Customer Reserve Account Requirement**

80.     LBI calculated its Rule 15c3-3 Reserve Account requirement as of the close of business each week, with a new calculation typically finalized and the money deposited by 10 a.m. the following Tuesday.  Exhibit 3 to the McIsaac Affidavit shows weekly fluctuation of the LBI-calculated requirement during the 60 days preceding the Filing Date, with the Reserve Account requirement reaching $5.691 billion as of the close of business on Friday, September 12, 2008, the last "normal" day of operation before the LBHI Filing Date.

1.      **Reserve Calculations Immediately Preceding and Following the Filing Date**

81.     Upon LBHI's chapter 11 filing on September 15, 2008, LBI personnel performed mid-week Reserve Account calculations, apparently to support withdrawal of funds from the Reserve Account during the week.  These calculations were based upon data showing rapid fluctuation in the levels of customer credits and debits that form the basis for the Reserve Formula and purported to show rapid decline in the deposit requirement during the week of September 15.  (See McIsaac Aff. Ex. 3.)

82.     LBI personnel were in communication with the SEC and the Financial Industry Regulatory Agency ("FINRA") regarding these calculations.  (See, e.g., Katz Decl., Exs. B, C.) In fact, SEC and FINRA personnel were in no position to audit or verify the accuracy of the calculations, and the records available to the Trustee do not reflect any  regulatory approval of

such withdrawals. However, it appears that at least $3.9 billion in customer reserves were withdrawn by LBI personnel from the Reserve Accounts during the week of September 15, including over $2 billion withdrawn from September 18 to 19, just before the filing. (Katz Decl., Ex. C.) It further appears that the calculations performed during this period were increasingly influenced by "manual" adjustments to data produced by LBI's information systems – these were essentially employee overrides of system-generated data entries. (See McIsaac Aff. ¶ 28.)

83.     The technical difficulties in performing reserve computations, exacerbated by the Chase electronic lock-out noted above, were severe. During the frantic weekend that began at close of business on September 19, LBI employees, many of whom were to become Barclays employees with generous compensation packages on Monday morning or shortly thereafter, ran multiple computations and performed numerous manual adjustments to figures produced by the firm's automated systems, in order to deal with a large number of stock record and general ledger "breaks," money fund "fails" and other unreconciled items.[44] (See McIsaac Aff. ¶ 28 & n.5.)

84.     As of September 21, LBI's employees were still producing reports showing that LBI's Reserve Account requirement was at least $3.1 billion as of Friday, September 19, 2008, although the amount actually on deposit was only $1.7 billion.[45] If correct, this calculation would mean that as of the Filing Date, LBI's Rule 15c3-3 Reserve Account was in deficit to the

---

44. LBI employees working through this weekend trying to recalculate the Reserve Account requirement faced major operational issues. One message reports a net debit of $1.9 billion, but goes on to state that this does not include bank overdrafts, unapplied customer cash, "numerous" stock record breaks or money fund fails, or around "8 bil worth of breaks" in the MTS system. LBI's director of operations stated on Saturday night, "[w]e cannot possibly solve this." (See McIsaac Aff., Ex. 5.)

45. By Sunday, September 21, 2008, calculations were still showing a deficit in the Reserve Account requirement. An email at 2:48 p.m. states, "We have a major issue with the Reserve Formula as [Barclays] think they are taking $1Bn from the reserve account and the calcs being run show a shortfall." (See McIsaac Aff., Ex. 9.)

extent of approximately $1.4 billion.  Ultimately, after continuing to adjust the numbers through the night of September 21 and into the following week, LBI/Barclays employees produced a revised computation purporting to show a surplus of several hundred million dollars in the Reserve Account, which surplus was proposed to be transferred to Barclays.  In fact, as detailed below, there was no "surplus," but a substantial shortfall in Reserve Account deposits on September 19, far greater than shown in any of the reports prepared by LBI personnel.

## 2. Items Omitted or Incorrectly Reported in the Reserve Formula

85.     Events occurring after the Filing Date and information discovered in the course of the Trustee's investigation show that significant items were omitted entirely or incorrectly reported by then-LBI personnel in LBI's Reserve Account calculations, such that the true deficit greatly exceeds whatever might be the outcome of parsing the calculations that were under discussion in the days immediately preceding and following September 19, 2008.

86.     Brief descriptions of the main items are set forth in the following paragraphs and in the McIsaac Affidavit.  It also should be noted that, although the SEC and FINRA were provided with some information – first in connection with mid-week Reserve Formula calculations performed by LBI/Barclays personnel and then in connection with requests to release "surplus" funds to Barclays – it does not appear that they were provided with sufficient disclosure regarding the issues identified below.

87.     Although the Trustee's investigation of LBI's customer protection compliance is ongoing, the currently identified lapses in LBI's compliance fall into two broad categories: (a) items aggregating not less than $4.9 Billion incorrectly omitted from the reserve calculation creating known shortfalls that would require augmentation with much of the currently available property, and (b) items aggregating billions of additional dollars that the Trustee is continuing to investigate, and which, depending on the outcome of the investigation and claims made by

customers in the claims process, would require augmentation to core Customer Property from remaining or then-available property at a later date.

(a) <strong>Items Creating Known Shortfalls</strong>

(i) <strong>FID Accounts Maintained at Chase</strong>

88.     As stated above, it is the obligation of the broker-dealer under Rule 15c3-3 to maintain possession or control of customer securities at good control locations and to insure that they are not used to satisfy debts of LBI.  Typically, the requirement is met by a "no-lien letter," in which the custodian undertakes not to assert any lien or right to property held in customer accounts.  (McIsaac Aff. ¶ 17.)

89.     LBI maintained accounts at Chase for certain of its Fixed Income Division Prime Broker clients (the "FID Accounts").  As of the Filing Date, approximately $630 million in customer securities and approximately $258 million in cash were held by Chase in the FID Accounts.  A no-lien letter had been duly executed by Chase at the inception of this relationship, and Chase knew or should have known that cash and securities in these accounts were Customer Property and could not be available to satisfy debts of LBI, both under the no-lien letter and under Rule 15c3-3.

90.     In the course of the liquidation, however, the Trustee discovered that Chase had seized fully-paid customer property contained in the FID Accounts for application to debts of LBI.  Upon investigation, it appears that the seizure was based on a contention by Chase (which the Trustee disputes) that it could disclaim obligations under the formal no-lien letter it had signed and seize customer property based on a theory that a course of dealing between Chase and LBI employees had somehow nullified the no-lien letter and rendered the customer property contained in the FID Accounts subject to seizure.  The issues raised by these events may become the subject of litigation in this Court.

91.     The merits of the dispute with Chase aside, the mere fact of the dispute means that customer securities in the Chase FID Accounts were at unacceptable risk of lien assertion, and that the value of the customer securities should have been included as a credit in the Reserve Formula.  (See 17 C.F.R. § 240.15c3-3(d);  McIsaac Aff. ¶ 34.)

92.     With respect to the cash contained in the FID accounts, LBI's Reserve Account computation was designed to display and protect such customer cash balances.  But after Chase seized these amounts, Chase terminated LBI's access to its electronic systems, and LBI no longer had the ability to view the balances in these Chase accounts.  Thus, when LBI conducted its final reserve computation over the September 20-21 weekend, the automated process did not capture the $258 million in customer cash that already had been seized by Chase.  Nor did it reflect the $630 million in securities that were not in "good control."  Taking account of both cash and securities, the Reserve Account deficit attributable to these events is not less than $891 million. (See McIsaac Aff. ¶ 35.)

### (ii)     Account Coding Errors

93.     To effectuate the correct allocation to customers for purposes of Rule 15c3-3 segregation and the Reserve Fund requirements, LBI's automated systems depended on correct coding of an account as "customer" or "noncustomer" at the time of account creation.  Thus, when LBI employees established customer accounts, they would assign account numbers that would instruct LBI's automated systems to include debits and credits in the Rule 15c3-3 reserve computation, and otherwise to distinguish them from non-customer accounts.  Among the available codings were designations for LBI affiliates that had signed subordination agreements

(which are not customers),[46] and LBI affiliates that had not (some of which may be customers, depending on the circumstances).  It is already clear that certain customer accounts were designated in LBI's systems as non-customer.  One such account was for Woodlands Bank, a U.S. domiciled Lehman affiliate that was not a signatory to a subordination agreement.  Because the account was coded in the subordinated affiliate account range, however, segregation instructions were not applied to Woodlands' securities.  This resulted in a segregation failure affecting these securities that ultimately were seized by Chase to cover a debt of LBI.  Whether or not Chase's seizure was lawful in other respects (which may be disputed), this segregation failure should have given rise to a credit in the Reserve Formula, and a corresponding increase in the Reserve Account requirement in the amount of not less than $534 million.  (McIsaac Aff. ¶ 37.)

94.     Other coding errors gave "customer" coding to non-customer accounts.  Such errors led to a reserve shortfall to the extent that debits in such mis-coded accounts exceeded credits, thereby reducing the Reserve Account requirement.  In addition, errors detected in the electronic program used by one of LBI's service providers to perform allocation of securities among LBI's accounts caused additional shortfalls.  Correction of these errors has resulted in the addition of $213 million to the Reserve Account requirement to date, with further adjustments possible as further errors are discovered.[47]  (McIsaac Aff. ¶ 38.)

_____

46. Under Rule 15c3-3(a)(1), as under SIPA, customer does not include a "person to the extent that person has a claim for property or funds which by contract, agreement, or understanding, or by operation of law, is part of the capital of the broker or dealer or is subordinated to the claims of creditors of the broker or dealer." 17 C.F.R. § 240.15c3-3(a)(1).

47. LBI also coded other accounts containing a significant amount of property as accounts for affiliates subject to subordination agreements.  The account holders have nevertheless submitted customer claims.  The Trustee may take the position that the accounts should be treated as subordinated by "agreement, understanding or operation

(Footnote continued on next page)

### (iii)     Assets Subject to LBIE Administration

95.     LBIE acted as custodian for some of LBI's customer business and thus held some LBI customer securities.  Historically, LBI deemed customer securities held by LBIE as property under the control of LBI for purposes of the customer protection rules.  Accordingly, LBI did not reflect credits in the Reserve Formula for the value of securities held at LBIE, or take other steps to obtain possession of equivalent securities, as would otherwise have been required.  (McIsaac Aff. ¶ 39.)  The Trustee currently believes that as of September 19, 2008, LBI had no less than $439 million in customer securities in custody with LBIE.  (See McIsaac Aff., Ex. 29.)

96.     If LBIE ever was a good control location for purposes of the Customer Protection Rule, it ceased to qualify for that status on September 15, 2008, when it entered administration, an insolvency process under English law.  (See McIsaac Aff. ¶ 40.)  From that time at the latest, there could be no question that LBI's property was no longer "freely transferable" as required by the SEC's guidelines for a "good control" location.  See Guidelines for Control Locations for Foreign Securities, Exchange Release No. 34,10429, 1973 WL 149250, at *2 (Oct. 19, 1973).  Moreover, the Trustee has no assurance that he will receive these securities or the full value thereof from LBIE as the LBIE estate is liquidated.  Accordingly, a credit of not less than $439 million for LBIE securities should have been included in the Reserve Formula, and LBI's Reserve Account was deficient by that amount.[48]  (McIsaac Affidavit ¶ 40.)

---

(Footnote continued from prior page)

of law."  But in the event they are determined to be customer accounts, there would be a significant additional shortfall in segregated customer property.

48. Similarly, LBI's fund of Customer Property should be supplemented by the $259 million of customer free cash that was supposed to be held in safekeeping by LBIE on behalf of LBI's customers.  The LBIE Administrators are applying in the High Court in London for directions concerning how LBIE's  "client money pool" should be constituted and distributed  following its "failure" under the applicable UK regulatory rules and the Trustee is appearing in those proceedings to seek the return of some or all of this cash.  However, to the extent that cash

(Footnote continued on next page)

### (iv)     OCC Deposit

97.     Included as a debit in LBI's Reserve Formula as of September 19, 2008 was $507 million, corresponding to a deposit with the Options Clearing Corporation ("OCC") ostensibly securing customer-related obligations of LBI.  This debit had the effect of reducing the Reserve Account requirement in the amount of $507 million (less 3%).  The Trustee is now involved in a dispute with Barclays over entitlement to the OCC Deposit.  To the extent that the Trustee is not successful in securing these funds from Barclays for the benefit of customers, the Reserve Formula debit and corresponding Reserve Account reduction were improper, and create an additional Customer Property shortfall.  (See McIsaac Aff. ¶ 45.)

### (v)     Customer Cash Claimed by LBIE

98.     The Trustee's investigation has further revealed that about $2.3 billion allegedly owed to LBIE's customers was not included in LBI's reserve computations as of September 12 and September 19, 2008, and therefore, was not included in the Reserve Account.  Prior to insolvency, LBIE submitted trades to LBI for execution on behalf of its customers.  On a daily basis, LBI and LBIE reconciled and settled their positions.  On September 10, 2008, LBI's position with LBIE showed a payable of approximately $2.3 billion to LBIE in an account used for LBIE customers' transactions.  (See McIsaac Aff. ¶ 41.)

99.     LBI personnel identified the issue and "[s]uspect[ed] it relate[d] to large client transfers."  (See McIsaac Aff. ¶ 42.)  The payable appears to have been related to LBIE customer

---

(Footnote continued from prior page)

was not properly segregated, there can be no assurance that the Trustee will receive all monies held by LBIE on behalf of LBI's customers.  In fact, on May 18, 2009, the LBIE Administrators notified the Trustee that "it appears that LBIE did not segregate money arising out of the business done with LBI or its other affiliates, save for certain sums which it held for some of LBI's underlying clients."  (See Katz Decl., Ex. D (emphasis added).)  Whatever cash, if any, is eventually recovered from LBIE will become part of the fund of Customer Property.

trades.  (Id.)  LBI's Senior Vice President of Regulatory Reporting observed that resolution of this issue was "critical for the reserve."  (Id.)  It appears that the balance was still being investigated by LBI when, on September 15, 2008, LBIE went into administration.  Ultimately, for reasons that are not clear to the Trustee, LBI personnel determined that the amount should not be included in the Reserve Formula as a credit.  (Id. ¶ 43.)  LBI internal documents suggest that the issue might have been discussed with regulators, but no indication has been found that the material facts concerning the issue were disclosed.  (See Katz Decl., Ex. E.)

100.    In the course of the claims process, LBIE has included this amount in the claims filed on behalf of its customers.  If, as LBIE claims, the $2.3 billion was in fact derived from money obligations to customers and is now a customer obligation of LBI, LBI should have included this amount on the credit side of the Reserve Formula.  (McIsaac Aff. ¶ 44.)  LBI did not do so, and accordingly, the LBI Estate may be faced with an additional Customer Property deficit of $2.3 billion.  (Id.)  In any event, the Trustee would be required to make appropriate reserves for this amount.[49]

### (vi)    Customer Property Exposed to Seizure During Pre-Filing Date Withdrawals

101.    During the period immediately preceding and following the Chapter 11 filing of LBHI, many customers of LBI attempted to withdraw cash and move securities to other brokers.  To the extent that actual delivery of cash was made to customers, this would reduce LBI's Reserve Account requirement, and throughout the week of September 15 LBI reported the volume of such deliveries (mainly by wire transfer) to the SEC in support of requests to

---

49. However, in the event that further investigation shows that the account had in fact been transferred or the claim for this payable was erroneously included in the LBIE claim as a customer item, the claims against the fund of Customer Property would be correspondingly reduced.

withdraw funds from the Rule 15c3-3 "lockup."[50]  Actual delivery of securities would also relieve LBI of Rule 15c3-3 custody requirements as to the delivered property.  However, as the unprecedented Lehman situation developed during the period surrounding the LBI filing, interruptions in the delivery process had the effect of exposing customer cash and securities to third party seizure in violation of the Customer Protection Rule.  (McIsaac Aff. ¶ 46.)

102.    One such example was cash from liquidation of foreign money market fund positions of LBI customers.  During normal operations, customers holding money market funds denominated in non-US currencies were tracked by LBI on its "ADP" system, which in turn fed information regarding customer holdings into the Rule 15c3-3 calculation.  During the week of September 15, customers holding approximately $82 million in such money market fund positions attempted to withdraw, instructing LBI to liquidate and wire transfer the proceeds.  To carry out this instruction, LBI's process included moving the proceeds of the liquidation of money market fund positions from LBI's ADP system, and recording them instead through LBI's RISC system, which was designed to handle foreign currency transactions and conversions, but (unlike ADP) did not automatically feed information regarding customer obligations into the Rule 15c3-3 calculation.  (McIsaac Aff. ¶ 47.)

103.    Following the liquidation of foreign money market fund positions and prior to wire transfer, the proceeds were deposited in an account at Citibank London.  This account apparently did not have a "no-lien" letter, and following the September 19 LBI filing the funds were seized by the bank.  Because the foreign money market fund liquidation proceeds and the customer obligations they represented were then being tracked by the RISC system, an

---

50.  See, e.g., Katz Decl. Exs. F, G, H.

appropriate credit in the Rule 15c3-3 calculation was not automatic, but depended on manual intervention to identify them as funds owed to customers. The notification to the preparers of the Reserve Formula did not occur, and the resulting credit was not included in the September 19, 2008 Reserve Formula. Whether or not the seizure was proper, the result was under-reported Reserve Formula credits in the amount of $82 million, with a corresponding shortfall in the Reserve Account. (McIsaac Aff. ¶ 48.)

104.    The Trustee's financial advisors are investigating whether cash from additional foreign money fund accounts that had been transferred to third parties at or around the Filing Date may also have been seized and overlooked in the Reserve computation.[51]

### (b)    Items Currently Under Investigation

105.    The following items are potentially significant items currently under investigation. It should be noted as well that, as the liquidation continues, further items arising from custody issues, improper debit items and other Reserve Formula errors may be added.

---

51. Another seizure of customer securities in the delivery process occurred on September 22, 2008, when DTCC "reversed" certain transfers of customer securities to other brokers, and liquidated them to cover debts of LBI to the clearing organization. On September 19, 2008, following LBI's bankruptcy, certain LBI customers requested transfer of their accounts to other broker-dealers. LBI submitted the request to National Securities Clearing Corporation ("NSCC"), a subsidiary of the DTCC, using a process known as the Automatic Account Transfer Service ("ACATS"). The transfer process was underway , when on September 22, NSCC reversed the ACATS transfers to cover obligations allegedly owed by LBI to DTCC, and began the process of winding down the LBI account. NSCC took possession of $842 million of securities held by LBI in its account on behalf of customers and liquidated $221 million worth of these customer securities. In the course of the liquidation, Barclays asserted, pursuant to its Asset Purchase Agreement with LBI, ownership of $689 million of these securities (including the $221 million in liquidated securities). The parties have since resolved this matter, and the Court approved the settlement agreement. See Order Approving Settlement Agreement Between Trustee, Barclays Capital Inc. and Depository Trust and Clearing Corporation (Feb. 11, 2009). Pursuant to the settlement, Barclays received $468 million in customer securities from DTCC, and the Trustee paid Barclays for the replacement value of the $221 million in securities liquidated by DTCC. The Trustee also received securities having a value of $374 million as a result of this settlement. See Motion Under Fed. R. Bankr. P. 9019(a) for Approval of Settlement and Compromise (Jan. 22, 2009).

### (i) Overdraft in LBI's Main Operating Account

106. An overdraft developed in LBI's main operating account at Chase as of September 19, 2008. Both firm transactions and customer transactions were executed through this account. Under Rule 15c3-3, overdrafts are "credit" items that are required to be reflected in the reserve computation. See 17 C.F.R. § 240.15c3-3a (Item 1, Note A); see also FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3, at 2656 (2008).[52]

107. The Chase overdraft was reflected on LBI's books as of September 19, 2008. Therefore, when LBI computed its reserve requirement as of September 19, it was required to reflect the overdraft as a credit in the Reserve Formula, increasing the reserve requirement dollar-for-dollar. (McIsaac Aff. ¶ 52.) LBI personnel were aware of this issue as they performed manual adjustments to the September 19 Reserve Account calculation on the weekend of September 20 and 21. An LBI internal email dated September 20, 2008, circulating a "Rough Estimate for 15c3-3" warned that that estimate had not taken account of "Bank overdrafts" and numerous other items.[53] (McIsaac Aff. ¶ 53.) While one responder stated that, "We cannot

---

52. Available at http://www.finra.org/Industry/Regulation/Guidance/FOR/index.htm).

53. The message states:

> Attached is the rough estimate for 15c3-3. The formula gives a net debit of 1.9 billion. However, this does not factor the following areas:
>
> - Bank overdrafts
> - Unapplied customer cash
> - Stock record breaks
> - Money fund fails
>
> The stock record breaks items [sic] has numerous items due to the banks being frozen last Friday. The following are the ADP breaks and unallocated that we would require assistance in resolving. [LBI Assistant

(Footnote continued on next page)

possibly solve this," others decided that the overdraft could be characterized as merely a "secured loan," and thus it was left out of LBI's Rule 15c3-3 Reserve Formula computation. (Id.)  Others again raised the overdraft on the Chase account the following day, and were advised:  "[w]e should ignore this."  (Id.)  Despite this instruction, the overdraft remained an open item into the following week.  (Id.)

108.    Subsequent events have shown that the Chase account was an under-secured overdraft account, with Chase claiming that LBI owes it billions in "clearance advances" plus interest charges on that amount.  The Trustee is continuing to investigate the origins, nature and actual amount of the overdraft, and its relationship to customer activity.  LBI would have been required to include, at the very least, the amount related to customer activity – or the entire overdraft amount if the customer component could not be readily ascertained – as a "credit" in the formula.  (McIsaac Aff. ¶ 54.)

109.    The Trustee continues to investigate this issue but notes that, should this investigation confirm that this amount is indeed an overdraft, the Trustee would be required to use other assets of the estate to remedy the deficiency in Customer Property arising from failure to include the overdraft balance in LBI's reserve calculation.[54]

---

(Footnote continued from prior page)
Vice President of Regulatory Reporting] will provide his items for MTS which I believe is around 8 bil worth of breaks.  These items will require more than normall [sic] time to investigate because of the volume.

(McIsaac Aff., Ex. 5.)

54.  In the event it turns out that the overdraft was over secured and there is a recovery of the excess, the Trustee could again make up for any temporary over-allocation to Customer Property by allocating excess Customer Property to the General Estate.

**(ii)     Inclusion of Unsecured Debits in Reserve Formula**

110.     The Reserve Formula permits customer credits to be offset by customer debits, thus reducing the cash lock-up requirement by amounts owed by customers to the broker-dealer. An important limitation on this rule is that the customer debits so deducted must be fully secured by collateral held by the broker-dealer. <u>See</u> 17 C.F.R. § 240.15c3-3a (Item 10); <u>see also</u> FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3, at 2721-22 (2008).

111.     The Trustee is currently investigating whether during the period preceding the Filing Date, LBI's Rule 15c3-3 calculation allowed unsecured or under-secured customer debits to be used in the Reserve Formula.  Should the investigation reveal such use of unsecured or under-secured customer debits, the Trustee would be required to allocate property as necessary to remedy the shortfall.  (McIsaac Aff. ¶ 56.)

**(iii)     Customer Securities Included in the Barclays Repo**

112.     As discussed in paragraphs 60-61, <u>supra</u>, LBI and Barclays entered into a repo transaction (the "Barclays Repo") to provide temporary liquidity to LBI in its final week of operation whereby approximately $49.7 billion in LBI securities was transferred to Barclays in return for a cash loan of $45 billion.  The Trustee's investigation has revealed that certain customer securities were included in the Barclays Repo transaction.  This inclusion was permissible under SEC Rule 15c3-3 so long as LBI included credits in the Reserve Formula to cover the greater of the market value or contract price of the securities.  <u>See</u> 17 C.F.R. § 240.15c3-3(b)(1); 17 C.F.R. § 240.15c3-3a (item 5).  (<u>See</u> <u>also</u> McIsaac Aff. ¶ 58.)  The Trustee's preliminary findings suggest that LBI personnel overlooked certain customer securities included in the Barclays Repo, causing a shortfall in the Reserve Account.  Thus, if LBI failed to include in the Reserve Formula the value of customer securities it transferred to Barclays in the

Barclays Repo, the Reserve Account would be short by a corresponding amount.  (McIsaac Aff. ¶ 58.)  The Trustee continues to investigate this issue.

### (iv)     Assets Detained by Custodians Considered Good Control Locations

113.     As stated above, it is the obligation of the broker-dealer under Rule 15c3-3 to maintain possession or control of fully paid and excess margin customer securities at good control locations and to insure that they are not used to satisfy debts of LBI.  To use a foreign bank as a good control location, LBI was required to establish a separate account or accounts at the bank for the benefit of customers, to obtain a written agreement from the bank, and to submit proper documentation to the SEC.  17 C.F.R. § 240.15c3-3(c)(4).  Moreover, under the SEC's guidelines:

> The foreign securities lodged abroad shall be considered to be in the control of the broker or dealer for whom they are held pursuant to paragraph (c)(4) and (7), (1) to the extent that such securities are not subject to any right, charge, security interest, lien or claim of any kind in favor of the foreign entity except for their safe custody or administration and (2) to the extent that beneficial ownership of such securities is freely transferable without the payment of money or value other than for safe custody or administration.

See Guidelines for Control Locations for Foreign Securities, Exchange Release No. 34,10429, 1973 WL 149250, at *2 (Oct. 19, 1973).

114.     LBI considered certain foreign banks, such as for example, Israel Discount Bank and Citibank Del Peru SA, as good control locations for custody of LBI customer securities.  Since LBI filed for bankruptcy, these banks have refused to return the customer securities they were holding on behalf of LBI to the Trustee.  The Trustee is investigating whether these and other foreign banks were properly treated as good control locations.  If they were not, there will be an additional shortfall in property required to be segregated for customers.  (McIsaac Aff. ¶ 60.)

### (v)    Other Reserve Computation Adjustments

115.    The Trustee's financial advisors are in the process of reviewing certain other items that formed the basis of LBI's September 19 reserve computation.  For example, the calculation as of September 19 included many billions in customer debit items for stock borrows and fails to deliver attributable to customer transactions.  See 17 C.F.R. § 240.15c3-3a (item 11). It is not possible at this time to forecast what portion of these debit items will actually be realized, as there will be litigation and collectability issues to address on a case-by-case basis.  In the event that LBI does not realize the full claimed value of the debit items, there will be an additional shortfall in customer property.  The full extent of this issue will not be known until the Trustee completes the process of closing-out and recovering on these open transactions. (McIsaac Aff. ¶ 61.)

116.    Further, the Trustee is investigating whether the market values used in the Reserve Formula computation were the proper values as of September 19, 2008.  In at least one case, the Trustee has identified a discrepancy between what LBI's systems showed as the market value of a customer's securities and what the customer now claims as the market value.  As the correct market values are determined, adjustments, whether to increase or decrease the amount that should have been locked up in the Reserve Account, may be identified.  (McIsaac Aff. ¶ 62.)

### B.    Remediation and Cure of Reserve Account Deficits

117.    The foregoing errors and omissions represent only what has been discovered in the liquidation to date, and it is likely that other items will emerge as the determination of customer claims continues.  By any measure, the deficit is substantial:  had the full facts been known and mistakes not made, billions of dollars in additional Reserve Account deposits would have been required to keep LBI in 15c3-3 compliance.

118.     For a regulated broker-dealer such as LBI, there can be no question that, had these gaps and instances of Rule 15c3-3 non-compliance been identified prior to the Filing Date, LBI management would have been compelled to devote all free resources of LBI, whether customer or proprietary, to filling the gaps and curing the violations.  This means that all free cash, all unencumbered securities that could be converted to cash, all realizable value in any form – whatever it took – would have been devoted to achieving compliance.  (McIsaac Aff. ¶ 49.)

119.     Regulators require strict adherence to customer protection rules.  Indeed, the SEC has warned that "[w]here the provisions of the rule are at odds with present operational methods or where they require the development of new recordkeeping information it is because in the judgment of the Commission such systems or information are necessary to a comprehensive program of investor protection consistent not only with express congressional intent but with the high standards of financial responsibility which must prevail in the brokerage community."  SEC Release No. 9856, 37 Fed. Reg. at 25225.

120.     As one relevant example, rules regarding treatment of overdrafts and other aspects of the Reserve Formula are strictly construed by the SEC, and even non-compliance of a temporary or technical nature is not tolerated.  For example, in a case where an overdraft was caused by a broker-dealer's deposits into an incorrect reserve account, the firm sought a "No Action" letter from the SEC.  The SEC refused the request and required the firm to reserve for such overdraft "without reducing such balances by other bank balances."  See Thrift Trading Inc., SEC No-Action Letter, 1975 WL 10734, at *1 (Sept. 29, 1975).  In In re A.G. Becker Paribas Inc., the SEC sanctioned a broker-dealer for failing to include overdrafts in its reserve computation and emphasized "the serious implications to the public and the securities industry" of violations of Rules 15c3-1 and 15c3-3.  See Exchange Act Release No. 20,492, 29 S.E.C.

Docket 454, 1983 WL 403192, at *2 (Dec. 15, 1983).  In another matter, the SEC advised a

broker-dealer that it could not net its twenty-one bank balances in order to avoid reserving for an

overdraft in a particular account, even though the firm had remarked that such an interpretation

was "frankly ridiculous."  D.A. Davidson & Co., SEC No-Action Letter, 1975 WL 9005, at *1

(June 12, 1975).  Even non-compliance caused by a broker-dealer's computer system

malfunction will not be excused.  In JP Morgan Securities, Inc., NYSE Hearing Board Decision

07-67, 2007 WL 1789954, at *2, 5 (May 3, 2007), the Enforcement Division of the New York

Stock Exchange fined a broker-dealer for errors arising out of its transition to a new computer

system.  Id.  In that case, JP Morgan "erroneously concluded that the settlement differences

flowing from the conversion [of the computer system] could be treated as bank reconciliation

items."  Id. at *4.

     121.    In a liquidation under SIPA, the result must be equally protective of customer

interests.  Where property "would have been set aside or held for the benefit of customers" in

compliance with applicable law but was not, "any other property of the debtor" may be devoted

to filling the gap.  15 U.S.C. § 78lll(4)(D); see also, In re Donald Sheldon, 148 B.R. at 390; In re

MJK Clearing, Inc., 286 B.R. at 131-32.  Pursuant to SIPA, the Trustee is thus authorized and

required to remedy reserve shortfalls by allocating assets as necessary to Customer Property.

(See Section II.B.2., supra.)

## V.    ALLOCATION OF PARTICULAR ASSETS

### A.    "Core" Customer Property

     122.    The Trustee has determined that certain categories of asset items constitute

Customer Property.  These assets constitute the bulk of the assets available to the Trustee.  The

majority of these assets were cash and securities received, acquired, or held by or for the account

of LBI from or for the securities accounts of LBI's customers.  The remainder are proceeds of

Customer Property or otherwise derived from, traceable, and/or tied to Customer Property, or otherwise specifically contemplated by the SIPA definition of Customer Property.

### 1. Customer Property Reserved or Segregated in Accordance with SEC Rules

123.    Cash and cash equivalents deposited and held by LBI in segregated accounts for the benefit of customers are plainly part of Customer Property within the meaning of 15 U.S.C. § 78lll(4), because such funds are held, "for the securities accounts of a customer."  The assets in this category include the accounts established pursuant to SEC Rule 15c3-3.  As of the Filing Date, approximately $1.7 billion was on deposit.  This amount has been reduced in connection with  the account transfers described above and other customer-related matters.  The remaining funds, together with such interest as may accrue in the future, clearly is part of Customer Property.

124.    Securities held for the benefit of customers also must be allocated to Customer Property, because they represent "securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer . . . ."  15 U.S.C. § 78lll(4).

### 2. Assets Derived From or Traceable to Customer Property

125.    "Proceeds" of customer assets also constitute Customer Property under the definition, as do proceeds from the sale of firm securities that are traceable to customer assets transferred by LBI. 15 U.S.C. § 78lll(4); see also SIPC v. Waddell Jenmar Secs., Inc. (In re Waddell Jenmar Secs., Inc.), 126 B.R. 935, 942 (Bankr. E.D.N.C. 1991) (granting customer claim for misappropriated proceeds from sale of customer's securities), aff'd, 991 F.2d 792 (4th Cir. 1993); In re Donald Sheldon, 148 B.R. 385 (holding that money received in exchange for the sale of firm securities traceable to customer securities transferred by the debtor constitutes customer property).

126.     Accordingly, the Trustee proposes to allocate to customer property categories of assets that are proceeds derived from customer assets.  These would include, for example, (i) the "Exhibit B" securities obtained in connection with the ACATS settlement,[55] (ii) cash from the sale of customers' securities, (iii) dividends and pre-Filing Date interest on customer securities, and (iv) cash proceeds from the redemption of customer securities, including proceeds earned after the securities have matured, proceeds from the "pay-down" of securities, and the "full call" (early redemption or repayment of debt prior to maturity) of securities.  Post-Filing Date dividends and interest derived from customer securities must also be viewed as Customer Property, but will be accounted for separately pending resolution of the claims process, as discussed with the Court during the hearing on June 3, 2009.  (See June 3, 2009 Hr'g Tr. at 163:21-165:23, Docket No. 1174.)

### 3.     Value Provided by the Use or Realization of Customer Debits

127.     Sub-paragraph (B) of SIPA's definition of Customer Property takes in "resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule." 15 U.S.C. § 78lll(4)(B).  Account transfers carried out by the Trustee in the course of the liquidation have produced significant values in this category.  Thus, when transfers were made of PIM, PAM and PBA accounts to receiving brokers, customer debits (essentially amounts owed by customers to LBI) were paid or credited to the LBI Estate.

128.     The relevant debit amounts were as follows:  approximately $1.46 billion for PIM, $550 million for PAM and $40.05 million for PBA.  These values must be allocated to

---

55.  See Motion Under Fed. R. Bankr. P. 9019(a) for Approval of Settlement and Compromise, Docket No. 586 (filed Jan. 22, 2009).  These securities having a 9/19 value of $374 million, were effectively purchased with customer value following DTC's reversal of the ACATS debit on September 22, 2008.

Customer Property as the Estate derived benefit from transfer or collection of customer debit items.

129.     Further, the Trustee asserts a right to receive approximately $507 million in collateral posted as margin at the OCC.  Broker-dealers who clear option transactions for their customers are required to post margin at the OCC.  As of the Filing Date, LBI had posted collateral to satisfy this requirement, and included a debit in the Reserve Formula computation of $507 million.[56]  Accordingly, any realization in this category must be included in Customer Property as "resources provided through the use or realization of customers' debit cash balances and other customer-related debit items."[57]

**B.      Amounts Corresponding to Reserve Account Deficiencies**

130.     As set forth in detail in Section IV, pp. 36-53, supra, the Trustee has identified substantial non-compliance with laws and regulations requiring deposits to Reserve Accounts for the benefit of LBI customers under Rule 15c3-3 as of the Filing Date.  Accordingly, to the extent that assets are within the Trustee's control, amounts that should have been deposited by LBI as an operating broker-dealer – but were not – may be included in Customer Property pursuant to SIPA.  See 15 U.S.C. § 78lll(4)(D); In re Donald Sheldon, 148 B.R. at 390; In re MJK Clearing, Inc., 286 B.R. at 131-32.

---

56. Pursuant to SEC rules when customer margin securities are used, both a debit and a credit for the market value of the requirement must be included in the Reserve Formula.  When firm collateral is used the value of that collateral, limited to the margin requirement, is included as a debit in the Reserve Formula.

57. Moreover, Barclays has demanded all of LBI's deposits held at the OCC.  The Trustee disputes this claim. Nonetheless, in the event that Barclays prevails, the $507 million (less 3%) that was recorded as a debit in the Reserve Formula was not an appropriate debit, and the Reserve Account requirement would be correspondingly increased.  (See McIsaac Aff. ¶ 45.)

131.    Section II.B.2., _supra_, at pp 25-26 sets forth the legislative background and legal framework for the Trustee's mandate to use "any other assets" to cover deficits in the Reserve Account.  As the _MJK_ court explained, a shortfall in customer property "drives the analysis" of what assets should be allocated to customer property, and "such a reading of customer property, and treatment of the debtor's assets is the only reading and treatment consistent with SIPA."  _In re MJK Clearing_, 286 B.R. at 132 (internal citations omitted); _see also_ _In re Donald Sheldon_, 148 B.R. at 390 (finding that debtor's firm cash may constitute customer property to the extent of any Reserve Account deficiency).

132.    The currently known extent and potential impact of regulatory compliance failures on the Trustee's allocations to Customer Property are detailed in Section IV above. These include at least the following items:  (i) the amounts in the FID accounts maintained at Chase ($891 million, pp. 41-42, _supra_); (ii) the Woodlands property seizure due to lack of customer coding ($534 million, pp. 42-43, _supra_); (iii) the value of securities subject to the LBIE administration ($439 million, p. 44, _supra_); (iv) the customer cash claimed by LBIE ($2.3 billion, pp. 45-46, _supra_); (v) coding and system errors ($213 million, p. 43, _supra_), (vi) customer property exposed to seizure during transfer process ($82 million, pp. 46-48, _supra_); and (vii) whatever portion of the Reserve Account debit resulting from the $507 million OCC deposit is not realized by the Trustee (p. 45, _supra_).  The compliance failures also potentially include any Reserve Account deficits from:  (i) LBI's omission or inappropriate exclusion of the Chase overdraft (pp. 49-50, _supra_); (ii) the inclusion of unsecured debits in the Reserve Formula (p. 51, _supra_); (iii) the inclusion of customer securities in the Barclays Repo (pp. 51-52, _supra_); (v) customer securities detained by custodians considered good control locations (amounts to be determined, p. 52, _supra_), and (vi) other necessary adjustments to the reserve computation (p. 53,

supra).  Thus, while final reconciliations are not complete, it is already clear that LBI was out of compliance with the Customer Protection Rule in significant respects, leading to a multi-billion-dollar shortfall in what should have been "set aside or held for the benefit of customers" within the meaning of 15 U.S.C. § 78lll(4)(D).  The Trustee's proposed allocation will cover these gaps.

**C.**     **General Estate Property**

133.     SIPA specifically provides that Customer Property in excess of what is necessary to pay claims of customers will become property of the General Estate for payment of administrative expenses in accordance with SIPA and applicable provisions of the Bankruptcy Code, and the satisfaction of claims of general creditors.

134.     Moreover, the process of marshalling assets of the LBI Estate is ongoing.  Such items as close-out of open transactions, proceeds of the PIK Notes, and recovery on affirmative claims are likely to produce additional assets.

135.     For example, the PIK Notes represent the fair market value of former LBI subsidiaries as determined by valuation to be undertaken by Lazard pursuant to a methodology to be agreed between LBI and Lazard.  A pro forma balance sheet provided to the Trustee prior to his appointment has valued these subsidiaries at $1.6 billion.  The Trustee has engaged financial advisors to assure that the PIK Notes are appropriately valued and that the customers and creditors of LBI receive the full benefit of these notes.  The Trustee also continues to investigate the value of the transferred subsidiaries, the transferred intellectual property, and other underlying facts and assumptions.  With respect to LBI's proprietary investments, the Trustee is engaged in analyzing these investments for potential sale, including various private equity investments owned by LBI.

136.     While this application is brought without prejudice to the Trustee's right to make allocation of such assets as are recovered by the Trustee or received in the future, and to seek the Court's guidance in doing so, the allocation of items to the fund of Customer Property proposed in the present Motion should be deemed final with respect to the property so allocated.

## VI.     NOTICE

137.     The Trustee has provided notice of the Motion pursuant to the Case Management Order entered in this proceeding.  (Docket No. 240.)  The Trustee submits that no other or further notice need be given.  The Motion is also available at the Trustee's website, www.lehmantrustee.com.

## VII.     WAIVER OF SEPARATE MEMORANDUM OF LAW

138.     As this application does not present any novel issue of law and the relevant authorities are cited herein, the Trustee respectfully requests that the requirement of a memorandum of law pursuant to Rule 9013-1 of the Local Rules for the Southern District of New York be waived.

## VIII.   NO PRIOR REQUEST

139.     No previous request for the relief sought herein has been made to this Court or any other court.

# IX.    REQUESTED RELIEF

WHEREFORE, the Trustee respectfully requests that the Court enter an order, in substantially the form attached hereto as Exhibit B: (i) approving the Trustee's determinations regarding the assets identified herein as part of Customer Property as that term is defined in 15 U.S.C. § 78lll(4); (ii) authorizing the Trustee to allocate pursuant to 15 U.S.C. § 78lll(4)(D), any property of LBI which the Trustee determines would, upon compliance with applicable laws, rules, and regulations, have been set aside or held for the benefit of customers to prevent shortfalls in Customer Property, including without limitation those shortfalls identified herein; and (iii) granting the Trustee such other and further relief as is equitable and just.

Dated:       New York, New York
            October 5, 2009

                               Respectfully Submitted,

                               HUGHES HUBBARD & REED LLP

                               By /s/ James B. Kobak, Jr.
                                     James B. Kobak, Jr.
                                     David W. Wiltenburg
                                     Beatrice Hamza Bassey
                                     Kenneth M. Katz
                               One Battery Park Plaza
                               New York, New York 10004
                               Telephone: (212) 837-6000
                               Facsimile: (212) 422-4726
                               Email: kobak@hugheshubbard.com

                               *Attorneys for James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

# EXHIBIT A

## RULE 15C3-3 COMPLIANCE ISSUES

| KNOWN SHORTFALLS | AMOUNT ($) |
|---|---|
| Securities in FID Accounts Seized by Chase | 629,545,623.00 |
| Cash in FID Accounts Seized by Chase | 257,862,000.00 |
| Account Coding Errors (Woodlands) | 533,847,208.90 |
| Account Coding Errors (ADP/944), identified by SEC, Trustee, & Barclays | 213,514,490.00 |
| Assets Subject to LBIE Administration | 438,916,777.07 |
| OCC Deposit[1] | 492,195,460.00 |
| Customer Cash Claimed by LBIE | 2,300,000,000.00 |
| Cash Seized During Liquidation of Foreign Money Market Fund Positions | 81,617,437.32 |
| **TOTAL IDENTIFIED SHORTFALLS** | **4,947,498,996.29** |

## ITEMS UNDER INVESTIGATION

Overdraft in LBI's Main Operating Account
Inclusion of Unsecured Debits in Reserve Formula
Customer Securities Included in the Barclays Repo
Assets Detained by Custodians Considered Good Control Locations
Other Reserve Computation Adjustments

---

1. This amount reflects a 3% deduction from the total deposit of $507,418,000. To the extent the Trustee recovers the deposit it will be allocated to Customer Property.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

        LEHMAN BROTHERS INC.,

                    Debtor.

Case No. 08-01420 (JMP) SIPA

**ORDER APPROVING TRUSTEE'S MOTION FOR**
**ALLOCATION OF PROPERTY OF THE ESTATE**

Upon consideration of the Motion by James W. Giddens, as trustee (the "Trustee") for the liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), for Approval of the Trustee's Motion for Order Approving Trustee's Allocation of Property of the Estate (the "Motion"), the Affidavit of Daniel McIsaac, dated October 5, 2009, and the exhibits thereto, and the Declaration of Kenneth M. Katz, dated October 5, 2009, and the exhibits thereto, and it appearing that due and proper notice of the Motion and the relief requested therein having been given in accordance with this Court's Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures and Related Relief, dated November 7, 2008, and no other or further notice needing to be given; and the Court having reviewed the Motion, responsive pleadings, if any, the arguments of counsel and the record in this case; and the Court having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein, and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY**:

**ORDERED** that the relief requested in the Motion be, and is hereby granted in all respects; and it is further

**ORDERED** that the Court approves the Trustee's determination that the assets identified in the Motion as "core customer property," or property having equivalent value, are part of and fully constitute "Customer Property" of LBI as that term is defined at 15 U.S.C. § 78lll(4). Accordingly, the Trustee is authorized to allocate those items identified as "core customer property," or other property having equivalent value, to LBI's fund of Customer Property for distribution to LBI's customers.

**ORDERED** that, pursuant to 15 U.S.C. § 78lll(4)(D),the amount of any property of LBI which the Trustee determines would, upon compliance with applicable laws, rules, and regulations, have been set aside or held for the benefit of customers to prevent shortfalls in Customer Property, including without limitation those shortfalls identified in the Trustee's motion papers, shall constitute and be allocated as part of "Customer Property."

**ORDERED** that the Trustee is authorized to make such interim distributions of the Customer Property established by this Order to satisfy allowed net equity claims of customers of LBI, as the Trustee believes to be prudent based on allowed and pending customer claims, the extent of Customer Property available, and any other contingencies for which the Trustee believes it prudent to reserve.

**ORDERED** that any stay of this Order provided by the Bankruptcy Rules (including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable to this Order, and this Order shall be effective and enforceable immediately upon entry.

Dated:    New York, New York

This ___ day of _____, 2009

_____
Honorable James M. Peck
United States Bankruptcy Judge