Edwin E. Smith
Joshua Dorchak
**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, New York 10022
(212) 705-7000

*Attorneys for MacKay Shields Credit Strategy*
*Fund Ltd. and MacKay Shields Credit Strategy Partners LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                 :

In re                                    :
                                          :

LEHMAN BROTHERS INC.,               : Case No. 08-01420 (JMP) SIPA
                                          :

              Debtor.                       :
                                          :

------------------------------------------------------------x

**OBJECTION OF CLAIMANTS MACKAY SHIELDS**
**CREDIT STRATEGY FUND LTD. AND MACKAY SHIELDS CREDIT**
**STRATEGY PARTNERS LP TO DETERMINATIONS OF CLAIM**

MacKay Shields Credit Strategy Fund Ltd. and MacKay Shields Credit Strategy Partners LP (the "Claimants"), by and through their undersigned counsel, hereby object (the "Objection") to the Notices of Determination of James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc. (the "Trustee"), denying Claimants' customer claims against Lehman Brothers Inc. ("LBI") in these proceedings, and respectfully state as follows:

**Background**

1.      In 2007, Claimants entered into Customer Account Agreements, Prime Brokerage (the "PBAs") with LBI.

2.      On information and belief, LBI and Lehman Brothers International (Europe) ("LBIE"), and possibly one or more of their affiliates (collectively with LBI and LBIE,

"Lehman") arranged for LBIE to handle the Claimants' prime brokerage accounts established pursuant to the PBAs (the "Customer Accounts"), including controlling securities or cash posted as collateral to the Customer Accounts or otherwise transferred to Lehman by the Claimants (collectively, the "Customer Assets").

3.      The Claimants provided the Customer Assets to Lehman, either directly to LBI or directly to LBIE.

4.      On September 15, 2008, LBIE entered Administration proceedings.

5.      On September 19, 2008 (the "Commencement Date"), the above-captioned SIPA proceedings (the "SIPA Case") were commenced.

6.      On information and belief, as of the Commencement Date, LBI as well as LBIE may have held some or all of the Customer Assets.

7.      The Claimants are entitled to the return of the Customer Assets, net of any obligations of the Claimants to Lehman (the "Net Equity"), from any Lehman entity or entities that hold the Customer Assets, including LBI.

8.      The Net Equity has not been returned to the Claimants by any Lehman entity.

9.      On or before January 30, 2009, the Claimants duly filed customer claims in the SIPA Case seeking recovery of any Customer Assets in the possession of LBI (the "Claims"). The Trustee assigned the Claims the claim numbers 900003957 and 900003968.

10.      The Claims include as exhibits the PBAs and other agreements entered into by the Claimants and Lehman.  The Claims, which are annexed hereto as Exhibit A1 and Exhibit A2, are incorporated herein by reference.

11.      On September 2, 2009, the Trustee served the Claimants with Notices of Trustee's Determination of Claim (the "Determinations").  The Determinations, which are annexed hereto

A/73160677.1

as <u>Exhibit B1</u> and <u>Exhibit B2</u>, read, in relevant part, as follows:

> The Trustee has made the following determination regarding your Claim:
>
> Your Claim is DENIED. The above-referenced account(s) (the "Account") is with Lehman Brothers International (Europe) ("LBIE"), not LBI. LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers.

12.     The Claimants object to the Determinations for the reasons set forth below.

## **<u>Grounds for Objection</u>**

13.     There are two independent reasons why the Determinations should be overruled and the Claims should be granted as customer claims in the SIPA Case.

14.     First, there is no dispute that LBI entered into the PBAs with the Claimants. Accordingly, LBI is contractually liable to the Claimants as customers for any of the Customer Assets that LBI holds in connection with the PBAs, whether the Customer Assets were provided by the Claimants directly to LBI or to LBIE.

15.     Second, to the extent the Customer Assets were transferred to LBI by LBIE or were held by LBI for the benefit of LBIE, LBI should be liable to the Claimants as customers under the Securities Investor Protection Act of 1970, as amended ("SIPA"), which provides, in relevant part:

> [N]o advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established to the satisfaction of the trustee, from the books and records of the debtor or from the books and records of a broker or dealer or bank, or otherwise, that **the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer** or bank (which customers are not themselves a broker or dealer or a person described in paragraph (4)), in which event **each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor**.

3

15 U.S.C. § 78fff-3(a)(5) (emphasis added).

16.     If LBIE transferred the Customer Assets to LBI or they were otherwise held by LBI for the benefit of LBIE, LBIE transferred the Customer Assets or was the account holder of the Customer Assets in LBIE's capacity as broker or dealer in connection with transactions for the Claimants as its customers. The Claimants are not brokers or dealers or banks. Accordingly, the Claimants are separate customers of LBI with respect to the Customer Assets held by LBI. *See id.*

17.     The cursory Determinations simply ignore, rather than rebut, LBI's contractual obligations to the Claimants under the PBAs and LBI's statutory obligations to the Claimants under the SIPA. Accordingly, the Determinations should be overruled.

**<u>Reservation of Rights</u>**

18.     The Claimants have insufficient information concerning (a) the relationship between LBI and LBIE with respect to the Customer Assets, (b) the disposition of the Customer Assets by LBIE or LBI, and (c) the current location of the Customer Assets.

19.     The Claimants reserve the right to demand discovery on these subjects, in the event the Determinations are overruled but the Claims remain subject to any further objection.

20.     The Claimants reserve all rights to supplement or amend this Objection for any reason, including as a result of further information that the Claimants may acquire about the relationship between LBI and LBIE and the disposition of the Claimants' assets by Lehman.

21.     In the event this Court determines that the Claims do not qualify as customer claims, the Claimants hereby request that the Claims be reclassified as noncustomer claims based

A/73160677.1

on, among other things, LBI's contractual liability to the Claimants under the PBAs.[1]

## Contact Information

22.     Any replies or correspondence concerning this Objection should be directed to the undersigned attorneys on behalf of the Claimants.

## Conclusion

For the reasons set forth above, the Claimants respectfully request that the Determinations be overruled and the Claims be granted as customer claims under SIPA, and for such further relief as this Court deems just and proper.

Dated: New York, New York
       October 7, 2009

**BINGHAM MCCUTCHEN LLP**

By: /s/ Joshua Dorchak
       Edwin E. Smith
       edwin.smitrh@bingham.com
       Joshua Dorchak
       joshua.dorchak@bingham.com
       399 Park Avenue
       New York, New York  10022
       (212) 705-7000

       *Attorneys for MacKay Shields Credit Strategy Fund Ltd. and MacKay Shields Credit Strategy Partners LP*

---

[1]     On or before June 1, 2009, Claimants filed noncustomer claims against LBI asserting LBI's liability for the Customer Assets on several grounds.  The Claimants reserve all rights in connection with these noncustomer claims.

A/73160677.1

**<u>Exhibit A1</u>**

**Claim Of MacKay Shields Credit Strategy Fund Ltd.**

A/73160677.1



SECURITIES INVESTOR PROTECTION CORPORATION

Office Use Only:
Claim Number _____

Date Received _____

## CUSTOMER CLAIM FORM

### LEHMAN BROTHERS INC.

Account Name: MacKay Shields Credit Strategy Fund
Ltd., with MacKay Shields LLC as Investment Adviser

Daytime Phone: 212-230-3805

Account Number: 05604090

Email: Byron.Spivack@mackayshields.com

Address: 9 West 57th Street, New York, NY 10019

Contact Person: Byron H. Spivack

Taxpayer I.D. Number
(Social Security No.) 98-0540507

## PLEASE NOTE

- **A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.**

- **TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.**

- **THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.**

- **ALL CLAIMS ARE DATED AS OF THE DATE RECEIVED BY THE TRUSTEE.**

- **YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.**

- **IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.**

- **LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.**

A/72815326.2

This customer claim form must be completed electronically online at www.lehmantrustee.com or mailed promptly, together with supporting documentation, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR 97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

A/72815326.2

2

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

   a. Lehman Brothers, Inc. ("LBI") owes me a credit or cash in the amount of:  **SEE EXHIBIT A**

   b. I owe LBI a debit or cash in the amount of:  $0

   c. If you wish to repay the debit balance listed in point b. above please insert the amount you wish to repay and attach a check payable to "James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc." If you wish to make a payment, **it must be enclosed** with this claim form.  N/A

2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

   **<u>Please Do Not Claim Any Securities You Have In Your Possession</u>**

   |  |  | <u>YES</u> | <u>NO</u> |
   |---|---|---|---|
   | a. | LBI owes me securities: | X | |

   **SEE EXHIBIT A**

   |  |  | | |
   |---|---|---|---|
   | b. | I owe LBI securities: | | X |

   c. If yes to either, please list below (or in additional pages as necessary):

| Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|---|
| | | | LBI Owes Me (Long) | I Owe LBI (Short) |
| | SEE EXHIBIT A ATTACHED | | | |
| | | | | |

If additional space is needed, attach additional pages providing the information in the exact format

## 3. COMMODITY FUTURES CLAIMS

| | YES | NO |
|---|---|---|
| Do you have a claim based on a commodity futures account? | | X |

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim:_____

Basis for Claim: _____

_____

_____

_____

_____

## WHEN COMPLETING THE ABOVE PLEASE KEEP IN MIND:

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.

- Proper documentation can speed the review, allowance and satisfaction of your claim.

- Please enclose copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim, and any other documentation or correspondence you believe will be of assistance in processing your claim.

- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.

- If, at anytime, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.**

NOTE: IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | <u>YES</u> | <u>NO</u> |
|---|---|---|---|
| 4. | Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | <u>X</u> | |
| | | **PLEASE SEE EXHIBIT A** | |
| 5. | Has there been any change in your account since September 19, 2008? . | | <u>X</u> |
| 6. | Are you or were you a party to a repurchase or reverse repurchase agreement, a director, officer, partner, shareholder, lender to, or capital contributor of LBI? | | <u>X</u> |
| 7. | Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | | <u>X</u> |
| 8. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | | <u>X</u> |
| 9. | Is this claim being filed by or on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | | <u>X</u> |
| 10. | Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | | <u>X</u> |
| 11. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | | <u>X</u> |

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

      Full name: <u>Bingham McCutchen LLP, Attention: Joshua Dorchak</u>

      Address: <u>399 Park Avenue, New York, New York 10022</u>

Phone number: (212) 705-7784

Email address: joshua.dorchak@bingham.com.

If more than one person is assisting you, attach additional pages providing the information in the exact format above.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date: 1/27/09                                Signature: _____

MacKay Shields Credit Strategy Fund Ltd.,
by MacKay Shields LLC as Investment
Adviser

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

6

<u>**EXHIBIT A**</u>

Lehman Brothers Inc. ("***LBI***") and MacKay Shields Credit Strategy Fund Ltd., MacKay Shields LLC as Investment Adviser ("***Claimant***") are parties to a Customer Account Agreement Prime Brokerage (the "***Prime Brokerage Agreement***"). The Prime Brokerage Agreement is undated, but executed in 2007, between Claimant and LBI as signatory for itself and the Lehman Brothers affiliates listed therein. The Agreement is attached as EXHIBIT B.

Claimant and Lehman Brothers International (Europe) ("***LBIE***") are parties to a Margin Lending Agreement also undated, but executed in 2007 in connection with the Prime Brokerage Agreement ("***Lending Agreement***" together with the Prime Brokerage Agreement and all documents executed in connection therewith, collectively, the "***Agreements***"). The Lending Agreement is attached as EXHIBIT C.

Claimant believes LBI may be in possession of customer property of Claimant under the Agreements. Claimant is also pursuing recovery from LBIE. Claimant files this Claim as a precaution, in the event that any cash or securities of Claimant were transferred to and are currently held by LBI.

Claimant files this Customer Claim Form, with Exhibits (collectively, the "***Claim***") under compulsion of the deadline for customer claims established by order of the Bankruptcy Court for the Southern District of New York (the "***Court***"), in order to protect the Claimant from forfeiture of claims by reason of such deadline. Claimant reserves its right to amend this Claim for any purpose, including to add claims for interest or reimbursement of legal fees and other expenses, to the extent allowed by law.

In the event this Claim is determined not to constitute a "customer claim" for purposes of LBI's liquidation proceeding under the Securities Investor Protection Act (the "***Proceedings***"), this Claim should constitute a duly and timely filed general unsecured claim against LBI in the Proceedings.

This Claim also encompasses any contingent claims that may arise in connection with any rejection of the Prime Brokerage Agreement by LBI and any other executory contract to which the Claimant may be a party with LBI.

This Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e)

a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

## EXHIBIT B

Customer Account Agreement Prime Brokerage by and between Lehman Brothers Inc. and MacKay Shields Credit Strategy Fund Ltd., with MacKay Shields LLC as Investment Adviser, undated but executed in 2007.

# Customer Account Agreement Prime Brokerage

## LEHMAN BROTHERS INC.

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
(212) 526-7000

| Title: | Account (and Group) No.: |
|---|---|
| MacKay Shields Credit Strategy Fund, Ltd. | : |

### Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby. You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose investment manager or general partner is (and you covenant and agree that any successor investment manager or general partner appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a QPAM representation letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities, commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or

Loan hereunder. The Borrower hereby agrees to repay any such Loan in accordance with the provisions of this Agreement.

(b) Fees for securities Loans ("Loan Fees") are computed from the first to the last calendar day of each month, based on the market value of the securities borrowed by Borrower and such rate as Lender shall inform the Borrower from time to time with respect to the Loaned Securities (the "Lending Rate"). The Lending Rate in respect of any security, or all securities, may be changed at any time by Lender on notice to the Borrower.

(c) Loan Fees shall be due and payable in arrears on the first business day of the month following the month in which the Loan Fee is accrued.

(d) Lender shall be entitled to receive from Borrower any "Distributions" (as defined below) with respect to securities that are the subject of Securities Loans to Borrower to the full extent as if the securities had not been loaned to Borrower. Any cash Distributions made on or in respect of the securities loaned shall be paid by the transfer of cash to Lender by Borrower on the date any such Distribution is paid in an amount equal to such Distribution. Non cash Distributions to which Lender is entitled shall be added to the Securities Loan on the date of the Distribution and shall be considered part of the Securities Loan for all purposes, except that if the Securities Loan has been terminated, Borrower shall immediately transfer the non cash Distributions to Lender.

(e) "Distribution" shall mean with respect to any security that is the subject of a Securities Loan at any time, any distribution made on or in respect of such security, including, but not limited to: (i) cash and all other property, (ii) stock dividends, (iii) securities received as a result of split ups of such securities and distributions in respect thereof, (iv) interest payments, (v) all rights to purchase additional securities, and (vi) any cash or other consideration paid or provided by the issuer of such securities in exchange for any vote, consent or the taking of any similar action in respect of such security.

(f) Immediately upon Lender's demand at any time from time to time and for any reason whatsoever, the Borrower shall repay to Lender the aggregate principal amount of any Loans outstanding, together with accrued interest and Loan Fees. Interest shall accrue on any amounts (including unpaid interest and Loan Fees) not paid immediately upon demand at the interest rate plus 2% per annum.

(g) Borrower will pledge in respect of the Loans, pursuant to this Agreement, securities, cash and other investment property and assets of such types, in such amounts and at such times as Lender shall from time to time request.

(h) Notwithstanding the foregoing, the parties agree that any of Lender's or Agent's affiliates may act as agent in accordance with any Loan entered into hereunder. Lender, Agent and any subagent that they may appoint shall have no responsibility or liability to the Borrower or Lender with respect to the performance of either such party under this Agreement, and Lender, Agent and any subagent that they may appoint shall not be deemed to endorse or guarantee any transaction effected hereunder.

(i) All Loans are demand loans. Upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver equivalent securities under any or all Loans of securities. The inclusion of Section 6 hereof shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

(j) Borrower acknowledges that if it borrows any Hong Kong securities, Borrower will be subject to certain requirements under the Stamp Duty Ordinance (Cap. 117) of Hong Kong (the "Ordinance"). In such circumstances, Borrower shall, within 30 days after the first Hong Kong stock borrowing and lending transaction is effected, enter into an Overseas Securities Lender's Agreement with Lender (the "OSLA") and Borrower shall not be required to issue a Borrowing Request (as defined in the OSLA) in respect of such Loan of Securities. Borrower shall be responsible for complying with Ordinance requirements, including the requirement, within 30 days after the first Hong Kong stock borrowing and lending transaction is effected, to either provide, or authorize Lender to provide, the Hong Kong Revenue authorities with: (1) an executed copy or a certified true copy of the OSLA; (2) a further certified true copy of the OSLA; (3) such fees as may be specified from time to time by the Financial

Secretary of Hong Kong for these purposes; and (4) such other documents, particulars and information as the Hong Kong Revenue authorities may require.

4. **INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5. **COLLATERAL.**

(a) Lender may from time to time, in its good faith discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion (a "Margin Call"). Borrower shall comply with any such Margin Call as follows: if demand is made by 10:00 a.m. on any business day, by the close of business on the same business day on which the demand is made, or if demand is made after 10:00 a.m. on any business day, by the close of business on the business day immediately following that on which the demand is made (the "Margin Transfer Period"). Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its good faith discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its good faith discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended from trading, or in respect of which there is no price source or a discontinuous price source, shall be determined by Lender in its good faith discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) Margin Dispute.

(i) Provided that no Event of Default has occurred and is continuing, if Borrower elects to dispute the calculation of the aggregate Market Value of any securities (which are not exchange-traded securities or other securities with screen-based pricing), then Borrower will notify Lender in writing of such dispute (a "Margin Dispute Notice") no later than 12:00 p.m. on the business day that the Margin Call is due. The Margin Dispute Notice shall set forth the securities (and the amount of securities) the Market Values of which are in dispute (the "Disputed Securities"). Thereafter, Lender shall solicit from four eligible dealers, which shall include (in descending order of preference) Deutsche Bank AG, Citigroup NA, JPMorgan Chase Bank, N.A., and Bank of America NA, firm bids (or offers, as the case may be) for at least the securities which are identical to the Disputed Securities (and in an identical amount). Firm bids (or offers, as the case may be) must be received by 4:00 p.m. of the same day to be eligible for use in calculating the Market Value ("Eligible Firm Bids").

(ii) With respect to the securities for which Lender obtains such Eligible Firm Bids, Lender shall recalculate the Market Value of the Disputed Securities as follows: as to any Disputed Security for which two or more bids are obtained, Lender shall average the Eligible Firm Bids and the Market Value determined by Lender in good faith (the "Bid Average"). If Lender receives one Eligible Firm Bid (or none), then Lender's original Market Value determination shall prevail. The dispute mechanics of this process shall not affect the obligation of the parties to effect Margin Calls in the timely manner set out

above with respect to the undisputed portion (if any) of the Margin Calls. For the avoidance of doubt, in the event that Borrower is disputing a portion of Lender's initial valuation of the Market Value, Borrower shall be required to post collateral on any undisputed portion in accordance with the Margin Transfer Period.

(c) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(d) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated. Notwithstanding anything to the contrary herein, to the extent Lender does not make any loans to Borrower with respect to the purchase of any security, and such security is fully paid for by Borrower, at Borrower's request, Lender shall move such security to a fully-paid, segregated account (the "Segregated Account"). Once such security is in the Segregated Account, it shall not be considered Collateral under this Agreement and Lender shall not be entitled to the rights afforded to it under subsection (a) hereof with respect to such security.

(e) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(f) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to

satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6.  EVENTS OF DEFAULT. The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) Borrower's failure to maintain collateral as required by Section 5 hereof and such failure remains uncured after one prior business day notice thereof;

(iii) Borrower's failure to make any payment or delivery when required hereunder and such payment or delivery remains uncured after one prior business day notice thereof;

(iv) Borrower's failure to comply with or perform any other material agreement or obligation hereunder and such failure remains uncured after one prior business day notice thereof;

(v) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

(vi) any material representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made and such material misrepresentation remains uncured after one prior business day notice thereof;

(vii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(viii) any portfolio manager that has a title of "Director" or above of the Borrower states that the Borrower is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(ix) there is a material adverse change in the business affairs of Borrower;

(x) any event of default or equivalent event occurs under any other agreement, including for the sake of clarity, any event of default described in Section 4 of the LBI Account Agreement, between Borrower and Lender or Agent or any of their affiliates ,and such an event of default (or similar event) has been declared or occurred thereunder and any applicable grace or cure periods have expired and any and all obligations under such contract have been accelerated and notice has been given to Borrower of such acceleration; provided however, that such an event of default (or similar event) did not result from (1) a failure to deliver securities on (A) the repurchase date under a repurchase or reverse repurchase agreement or (B) the termination date under a securities lending agreement, in both cases where the undersigned continues to meet all applicable margin calls as required under the applicable agreement or (2) a buy-in or similar action where the undersigned pays amounts owed when due; or

(xi) any material document or constitutive document of Borrower is modified in a manner which, in the reasonable discretion of Lender, will have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loan and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its good faith discretion determine. At any such sale or purchase, such valuation to be made by Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself (in such case, such valuation to be made by Lender, Agent or any of Lender or Agent's affiliates in good faith and in accordance with their customary business practices) or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

### 7. MISCELLANEOUS.

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a QPAM Representation Letter.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash delivered by Borrower hereunder will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash.

(e) Adequate Assurances. Intentionally deleted.

(f) Costs and Expenses. Absent Lender's gross negligence or wilful misconduct, Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

**LEHMAN BROTHERS**                                          6

(g) **Securities Events.** Lender shall promptly inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) **Voting Rights.** If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(d), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) **Waiver, Assignment and Notices.** Neither party's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by such party of any of its rights or privileges hereunder. Any purported assignment of a party's rights or obligations hereunder without obtaining the prior written consent of an authorized representative of the other parties shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates with the same or better credit as Lender, with prior notice to Borrower to the extent practicable under the circumstances; provided, however, that as a result of such an assignment (i) no breach of this Agreement would occur; and (ii) it would not become unlawful for either party to perform any obligation under this Agreement. Notices and other communications to a party (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by a party, shall, until the sender has received notice in writing of a different address or number, be deemed to have been personally delivered to such first party. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) **Securities Contract; Margin Payment; Settlement Payment.** Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) **Legally Binding.** Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Absent Lender's gross negligence or willful misconduct, Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) **Amendment.** This Agreement may not be modified absent a written instrument signed by an authorized representative of Lender, Agent and Borrower.

(m) **GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE

LEHMAN BROTHERS                                7

STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

(n) <u>JURISDICTION; WAIVER OF JURY TRIAL</u>. The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("<u>Proceedings</u>"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) <u>NO CONSEQUENTIAL DAMAGES</u>. IN NO EVENT WILL LENDER, AGENT OR BORROWER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

(p) <u>Waiver of Immunities</u>. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) <u>Headings</u>. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) <u>Cumulative Rights; Entire Agreement</u>. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

LEHMAN BROTHERS                         8

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the _____ day of _____, 2007.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

Name:
Title:

> BRUCE RAILTON
> Authorised Signatory

Borrower:

MacKay Shields Credit Strategy Fund Ltd.

By: _____

Name: J. Matthew Philo
Title: Senior Managing Director

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____

Name: John J. Coghlan
Title: M.D.

# EXHIBIT C

Margin Lending Agreement by and between Lehman Brothers International (Europe) and MacKay Shields Credit Strategy Fund Ltd., with MacKay Shields LLC as General Partner, undated but executed in 2007.

# AMENDMENT

AMENDMENT (the "Amendment") dated as of _____, 2007, by and among LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Lender"), LEHMAN BROTHERS INC. ("Agent") and MACKAY SHIELDS CREDIT STRATEGY FUND LTD. ("Borrower")

## WITNESSETH

WHEREAS, Lender and Borrower have entered into a Margin Lending Agreement dated as of _____, 2007 (as the same may be amended from time to time (the "Margin Lending Agreement") and

WHEREAS, Lender and Borrower wish to amend the Margin Lending Agreement in order to address certain changes to the FSA Customer Protection rules;

NOW THEREFORE, in consideration of the mutual agreements herein contained, Lender and Borrower hereby acknowledge and agree as follows:

1.   Clause (d) in Section 7 of the Margin Lending Agreement shall be deleted in its entirety and replaced with the following:

"FSA Customer Protections.  Lender is authorised by the FSA and is regulated by its rules (the "Rules").  Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules.  Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts.  The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England."

2.   Clause (m) in Section 7 of the Margin Lending Agreement shall be amended by adding the following provision to the end of the provision prior to the period:

", save for Clause (d) in this Section 7 which shall be construed in accordance with the laws of England."

3.     Except as specifically amended hereby, all of the terms and conditions of the Margin Lending Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with there respective terms.

4.     Each of the parties hereby represents and warrants that the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.     This amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.     This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

IN WITNESS WHEREOF, the parties have caused this Amendment to executed by their respective officers or authorized representatives as of the day and year first above written.

**LEHMAN BROTHERS**               **MACKAY SHIELDS**
**INTERNATIONAL (EUROPE)**         **CREDIT STRATEGY**
                                   **FUND LTD.**
                                   By: MacKay Shields LLC, its investment adviser

By: _____        By: _____
Name:                              Name: J. Matthew Philo
Title                              Title: Senior Managing Director
Date:                              Date: 11/6/07


**LEHMAN BROTHERS INC.**

By: _____
Name:
Title:
Date:

## AMENDMENT

AMENDMENT (the "Amendment") dated as of _____, 2007, by and among LEHMAN BROTHERS INTERNATIONAL (EUROPE) ("Lender"), LEHMAN BROTHERS INC. ("Agent") and MACKAY SHIELDS CREDIT STRATEGY FUND LTD. ("Borrower")

## WITNESSETH

WHEREAS, Lender and Borrower have entered into a Margin Lending Agreement dated as of _____, 2007 (as the same may be amended from time to time (the "Margin Lending Agreement") and

WHEREAS, Lender and Borrower wish to amend the Margin Lending Agreement in order to address certain changes to the FSA Customer Protection rules;

NOW THEREFORE, in consideration of the mutual agreements herein contained, Lender and Borrower hereby acknowledge and agree as follows:

1.    Clause (d) in Section 7 of the Margin Lending Agreement shall be deleted in its entirety and replaced with the following:

"FSA Customer Protections.  Lender is authorised by the FSA and is regulated by its rules (the "Rules").  Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules.  Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts.  The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England."

2.    Clause (m) in Section 7 of the Margin Lending Agreement shall be amended by adding the following provision to the end of the provision prior to the period:

", save for Clause (d) in this Section 7 which shall be construed in accordance with the laws of England."

3.    Except as specifically amended hereby, all of the terms and conditions of the Margin Lending Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with there respective terms.

4.    Each of the parties hereby represents and warrants that the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.    This amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

    IN WITNESS WHEREOF, the parties have caused this Amendment to executed by their respective officers or authorized representatives as of the day and year first above written.

**LEHMAN BROTHERS**
**INTERNATIONAL (EUROPE)**

By: _____
Name:
Title
Date:

**LEHMAN BROTHERS INC.**

By: _____
Name:
Title:
Date:

**MACKAY SHIELDS**
**CREDIT STRATEGY**
**FUND LTD.**
By: Mackay Shields LLC its investment adviser

By: _____
Name: J. Matthew Philo
Title: Senior Managing Director
Date: 11/6/07

**<u>Exhibit A2</u>**

**Claim Of MacKay Shields Credit Strategy Partners LP**

7



**SiPC**
SECURITIES INVESTOR PROTECTION CORPORATION

Office Use Only:
Claim Number _____

Date Received _____

## CUSTOMER CLAIM FORM

### LEHMAN BROTHERS INC.

Account Name: MacKay Shields Credit Strategy
Partners LP, with MacKay Shields LLC as General
Partner

Daytime Phone: 212-230-3805

Account Number: 05602654

Email: Byron.Spivack@mackayshields.com

Address: 9 West 57th Street, New York, NY 10019

Contact Person: Byron H. Spivack

Taxpayer I.D. Number
(Social Security No.) 13-4357172

## PLEASE NOTE

- **A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.**

- **TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.**

- **THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. <u>NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.</u>**

- **ALL CLAIMS ARE DATED AS OF THE DATE <u>RECEIVED</u> BY THE TRUSTEE.**

- **YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.**

- **IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.**

- **LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.**

This customer claim form must be completed electronically online at www.lehmantrustee.com or mailed promptly, together with supporting documentation, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR  97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR  97005

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

   a. Lehman Brothers, Inc. ("LBI") owes me a credit or cash in
      the amount of:                                          **SEE EXHIBIT A**

   b. I owe LBI a debit or cash in the amount of:                      $0

   c. If you wish to repay the debit balance listed in point b.
      above please insert the amount you wish to repay and
      attach a check payable to "James W. Giddens, Trustee for
      the SIPA Liquidation of Lehman Brothers Inc." If you
      wish to make a payment, **it must be enclosed** with this
      claim form.                                                     N/A


2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

   <u>**Please Do Not Claim Any Securities You Have In Your Possession**</u>

   |   | | <u>YES</u> | <u>NO</u> |
   |---|---|---|---|
   | a. | LBI owes me securities: | <u>X</u> | |

   **SEE EXHIBIT A**

   | b. | I owe LBI securities: | | <u>X</u> |

   c. If yes to either, please list below (or
      in additional pages as necessary):

| Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|---|
| | | | LBI Owes Me (Long) | I Owe LBI (Short) |
| | SEE EXHIBIT A ATTACHED | | | |
| | | | | |

If additional space is needed, attach additional pages providing the information in the exact format

## 3. COMMODITY FUTURES CLAIMS

|  | YES | NO |
|---|---|---|
| Do you have a claim based on a commodity futures account? | | X |

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim:_____

Basis for Claim: _____

_____

_____

_____

_____

## WHEN COMPLETING THE ABOVE PLEASE KEEP IN MIND:

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.

- Proper documentation can speed the review, allowance and satisfaction of your claim.

- Please enclose copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim, and any other documentation or correspondence you believe will be of assistance in processing your claim.

- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.

- If, at anytime, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.**

**NOTE:** IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | <u>YES</u> | <u>NO</u> |
|---|---|---|---|
| 4. | Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | X | |
|  | | **PLEASE SEE EXHIBIT A** | |
| 5. | Has there been any change in your account since September 19, 2008? | | X |
| 6. | Are you or were you a party to a repurchase or reverse repurchase agreement, a director, officer, partner, shareholder, lender to, or capital contributor of LBI? | | X |
| 7. | Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | | X |
| 8. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | | X |
| 9. | Is this claim being filed by or on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | | X |
| 10. | Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | | X |
| 11. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | | X |

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Full name:     Bingham McCutchen LLP, Attention: Joshua Dorchak

Address:       399 Park Avenue, New York, New York 10022

Phone number: <u>(212) 705-7784</u>

Email address: <u>joshua.dorchak@bingham.com.</u>

If more than one person is assisting you, attach additional pages providing the information in the exact format above.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date: 1/27/09                     Signature: _____

MacKay Shields Credit Strategy Partners
LP, by MacKay Shields LLC as General
Partner

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

## EXHIBIT A

Lehman Brothers Inc. ("*LBI*") and MacKay Shields Credit Strategy Partners LP, MacKay Shields LLC as General Partner ("*Claimant*") are parties to a Customer Account Agreement Prime Brokerage (the "*Prime Brokerage Agreement*") dated as of March 30, 2007. LBI served as signatory for itself and the Lehman Brothers affiliates listed therein. The Prime Brokerage Agreement is attached as EXHIBIT B.

Claimant and Lehman Brothers International (Europe) ("*LBIE*") are parties to a Margin Lending Agreement also dated March 30, 2007, executed in connection with the Prime Brokerage Agreement ("*Lending Agreement*" together with the Prime Brokerage Agreement and all documents executed in connection therewith, collectively, the "*Agreements*"). The Lending Agreement is attached as EXHIBIT C.

Claimant believes LBI may be in possession of customer property of Claimant under the Agreements. Claimant is also pursuing recovery from LBIE. Claimant files this Claim as a precaution, in the event that any cash or securities of Claimant were transferred to and are currently held by LBI.

Claimant files this Customer Claim Form, with Exhibits (collectively, the "*Claim*") under compulsion of the deadline for customer claims established by order of the Bankruptcy Court for the Southern District of New York (the "*Court*"), in order to protect the Claimant from forfeiture of claims by reason of such deadline. Claimant reserves its right to amend this Claim for any purpose, including to add claims for interest or reimbursement of legal fees and other expenses, to the extent allowed by law.

In the event this Claim is determined not to constitute a "customer claim" for purposes of LBI's liquidation proceeding under the Securities Investor Protection Act (the "*Proceedings*"), this Claim should constitute a duly and timely filed general unsecured claim against LBI in the Proceedings.

This Claim also encompasses any contingent claims that may arise in connection with any rejection of the Prime Brokerage Agreement by LBI and any other executory contract to which the Claimant may be a party with LBI.

This Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e)

a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

# **EXHIBIT B**

Customer Account Agreement Prime Brokerage by and between Lehman Brothers Inc. and MacKay Shields Credit Strategy Partners LP, with MacKay Shields LLC as General Partner, dated as of March 30, 2007.

# Customer Account Agreement Prime Brokerage

## LEHMAN BROTHERS INC.

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
(212) 526-7000

| Title: | Account (and Group) No.: |
|---|---|
| MacKay Shields Credit Strategy Partners LP | |

### Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby. You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose investment manager or general partner is (and you covenant and agree that any successor investment manager or general partner appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a QPAM representation letter .

**.2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities, commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or

agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

## 4. BREACH, BANKRUPTCY OR DEFAULT. If you shall:

(i) (a) breach, repudiate or default under this Agreement, and such breach, repudiation or default, if capable of remedy, is not remedied within one business day following notice of such event by Lehman Brothers, or (b) breach, repudiate or default under any other Contract between you and any Lehman Brothers Entity and an event of default (or similar event) has been declared or occurred thereunder and any applicable grace or cure periods have expired any and all obligations under such Contract have been accelerated and notice has been given to you of such acceleration; provided however, that such a breach, a repudiation or default did not result from (1) a failure to deliver securities on (A) the repurchase date under a repurchase or reverse repurchase agreement or (B) the termination date under a securities lending agreement, in both cases where the undersigned continues to meet all applicable margin calls as required under the applicable agreement or (2) a buy-in or similar action where the undersigned pays amounts owed when due;

(ii) (a) make or repeat any material misrepresentations in connection with this Agreement and such material misrepresentation remains uncured after one prior business day notice thereof;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity, provided that this section 4(iii) shall apply only to statements made by one of your portfolio managers with a title of "Director" or above;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due;

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement. In the event of any such default (an "Event of Default"), each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, reasonable costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its good faith discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself (in such case, such valuation to be made by Lehman Brothers in good faith and in accordance with its customary business practices) or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** Intentionally deleted.

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby with respect to transactions entered into after your receipt of the relevant notice.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** Absent Lehman Brothers' gross negligence or willful misconduct, you hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein, provided that such investigation, litigation or proceeding is solely related to claims to such property by third parties, (iii) your use of or access to any Lehman Brothers or third-party

system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of a party's rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of the other party shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations relating to equity prime brokerage hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to a party (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by a party, shall, until the sender has received notice in writing of a different address or number, be deemed to have been personally delivered to such first party. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction. Except where an Event of Default has occurred, in which case Section 4 shall apply with respect to termination, this Agreement may be terminated by either you or Lehman Brothers upon giving notice to the other party; provided, however, that this Agreement shall remain in effect as to any transactions, including unsettled

transactions, or obligations under this Agreement that remain outstanding and you shall remain liable for all of your obligations to the Lehman Brothers Entities under this Agreement.

**15. CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16. SHORT AND LONG SALES.** In placing any sell order for a short account, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long account, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being for a long account shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17. MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). You shall comply with any such Margin Call as follows: if demand is made by 10:00 a.m. on any business day, by the close of business on the same business day on which the demand is made, or if demand is made after 10:00 a.m. on any business day, by the close of business on the business day immediately following that on which the demand is made (the "Margin Transfer Period"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

(a) Margin Dispute.

(i) Provided that no Event of Default has occurred and is continuing, if you elect to dispute the calculation of the aggregate Market Value (as defined below) of any securities (which are not exchanged-traded securities or other securities with screen-based pricing), then you will notify Lehman Brothers in writing of such dispute (a "Margin Dispute Notice") no later than 12:00 p.m. on the business day that the Margin Call is due. The Margin Dispute Notice shall set forth the securities (and the amount of securities) the Market Values of which are in dispute (the "Disputed Securities"). Thereafter, Lehman Brothers shall solicit from four eligible dealers, which shall include (in order of descending preference) Deutsche Bank AG, Citigroup, NA, JPMorgan Chase Bank, N.A., and Bank of America, NA, firm bids (or offers, as the case may be) for at least the securities which are identical to the Disputed Securities (and in an identical amount). Firm bids (or offers, as the case may be) must be received by 4:00 p.m. of the same day to be eligible for use in calculating the Market Value ("Eligible Firm Bids").

(ii) With respect to the securities for which Lehman Brothers obtains such Eligible Firm Bids, Lehman Brothers shall recalculate the Market Value of the Disputed Securities as follows: as to any Disputed Security for which two or more bids are obtained, Lehman Brothers shall average the Eligible Firm Bids and the Market Value determined by Lehman Brothers in good faith (the "Bid Average"). If Lehman Brothers receives one Eligible Firm Bid (or none), then Lehman Brothers' original Market Value determination shall prevail. The dispute mechanics of this process shall not affect the obligation of the parties to effect Margin Calls in the timely manner set out above with respect to the undisputed portion (if any) of the Margin Calls. For the avoidance of doubt, in the event that you

5

are disputing a portion of Lehman Brothers' initial valuation of the Market Value, you shall be required to post collateral on any undisputed portion in accordance with the Margin Transfer Period.

(b) Market Value means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lehman Brothers in its good faith discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lehman Brothers in its good faith discretion; and, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended from trading, or in respect of which there is no price source or a discontinuous price source, shall be determined by Lehman Brothers in its good faith discretion. Market Value is determined by Lehman Brothers solely for the purposes of determining margin requirements and should not be relied on by you for any other purposes.

**18. SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19. CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(c) Notwithstanding anything to the contrary herein, to the extent Lehman Brothers does not make any loans to you with respect to the purchase of any security, and such security is fully paid for by you, at your request, Lehman Brothers shall move such security to a fully-paid, segregated account (the "Segregated Account"). Once such security is in the Segregated Account, it shall not be considered collateral under this Agreement and Lehman Brothers shall not be entitled to the rights afforded to it under subsection (a) hereof with respect to such security.

**20. OPTIONS POSITIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You will notify Lehman Brothers of your intention to exercise listed options no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which case Lehman Brothers may, but shall be under no obligation to,

exercise the option. Except as required by the Options Clearing Corporation Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. If it would not be profitable for your account due to commission expenses, it may be permitted to expire or, at Lehman Brother's discretion, sold or acquired by Lehman Brothers for some equitable payment to you based on Lehman Brothers' expenses and risk, without any liability or responsibility on our part to you. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21. PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)   LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)  LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c)  On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing.

(d)  In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e)  You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its good faith discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event.

Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event: (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its good faith discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f)  If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g)  If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h)  You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i)  Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j)  You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder, absent Lehman Brothers' gross negligence or willful misconduct.

(k)  You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)  The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22.  LEGALLY BINDING.**  You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any oral instruction was not in writing as may be required

by any applicable law, rule or regulation. With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time. In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23. AMENDMENT.** You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24. GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25. JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26. WAIVER OF IMMUNITIES.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers or you be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or

member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

*PLEASE COMPLETE THIS INFORMATION <u>AND</u> SIGN THE APPROPRIATE SPACE BELOW:*

**THIS AGREEMENT IS DATED AS OF** <u>March 30</u>, 2007

|  |  |
|---|---|
| MacKay Shields Credit Strategy Partners LP | |
| *Name of Customer* | |
| c/c MacKay Shields LLC, 9 W.57th Street | USA |
| *Address* | *Country* |
| NY, NY | 10019 |
| *City, State* | *Zip Code + 4* |

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

**YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.**

*CUSTOMER NAME:*     MacKay Shields Credit Strategy Partners LP

*Individual or Printed Name of Company*

*SIGNATURE:*     *[signature]*

*Signature of Authorized Person*

*PRINT NAME:*     MacKay Shields LLC

*Printed Name and Title of Signatory <u>or</u> Name of General Partner if Signer is a Partnership*

*BY:*     Lucille Protas, Senior Managing Director and Chief Operating Officer

*Authorized Signatory and Title of General Partner <u>if Above</u> Signer is a Partnership <u>Otherwise Blank</u>*

**ACCEPTED AND AGREED TO:**

*[signature]*

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates named herein

12

## EXHIBIT A
## AUTHORIZED PERSONS

Name                                          Specimen Signature

## EXHIBIT C

Margin Lending Agreement by and between Lehman Brothers International (Europe) and MacKay Shields Credit Strategy Partners LP, with MacKay Shields LLC as General Partner, dated as of March 30, 2007.

# Margin Lending Agreement

## LEHMAN BROTHERS
## INTERNATIONAL (EUROPE)

Lehman Brothers International (Europe)
25 Bank Street,
London E14 5LE
United Kingdom

| Borrower: MacKay Shields Credit Strategy Partners LP | Reference No.: |
|---|---|

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated March 30, 2007 , as amended from time to time (the "LBI Account Agreement").

## 1. AGENT AS AGENT OF LENDER AND BORROWER.

(a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

## 2. PURPOSE OF THE LOANS.
Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

## 3. SECURITIES LOANS.

(a) Borrower and Lender hereby agree that Lender shall use good faith efforts, but is in no event obligated, to extend credit in the form of securities to the Borrower hereunder in connection with the Borrower's purchase, sale (including short selling), lending or borrowing of securities. The term "Securities Loan" means the outstanding number of shares of each Securities Loan, from Lender to the Borrower at any time and from time to time outstanding under this Agreement. Lender shall have no commitment to make, or Borrower to accept, any

## LEHMAN BROTHERS

Loan hereunder. The Borrower hereby agrees to repay any such Loan in accordance with the provisions of this Agreement.

(b)  Fees for securities Loans ("Loan Fees") are computed from the first to the last calendar day of each month, based on the market value of the securities borrowed by Borrower and such rate as Lender shall inform the Borrower from time to time with respect to the Loaned Securities (the "Lending Rate"). The Lending Rate in respect of any security, or all securities, may be changed at any time by Lender on notice to the Borrower.

(c)  Loan Fees shall be due and payable in arrears on the first business day of the month following the month in which the Loan Fee is accrued.

(d)  Lender shall be entitled to receive from Borrower any "Distributions" (as defined below) with respect to securities that are the subject of Securities Loans to Borrower to the full extent as if the securities had not been loaned to Borrower. Any cash Distributions made on or in respect of the securities loaned shall be paid by the transfer of cash to Lender by Borrower on the date any such Distribution is paid in an amount equal to such Distribution. Non cash Distributions to which Lender is entitled shall be added to the Securities Loan on the date of the Distribution and shall be considered part of the Securities Loan for all purposes, except that if the Securities Loan has been terminated, Borrower shall immediately transfer the non cash Distributions to Lender.

(e)  "Distribution" shall mean with respect to any security that is the subject of a Securities Loan at any time, any distribution made on or in respect of such security, including, but not limited to: (i) cash and all other property, (ii) stock dividends, (iii) securities received as a result of split ups of such securities and distributions in respect thereof, (iv) interest payments, (v) all rights to purchase additional securities, and (vi) any cash or other consideration paid or provided by the issuer of such securities in exchange for any vote, consent or the taking of any similar action in respect of such security.

(f)  Immediately upon Lender's demand at any time from time to time and for any reason whatsoever, the Borrower shall repay to Lender the aggregate principal amount of any Loans outstanding, together with accrued interest and Loan Fees. Interest shall accrue on any amounts (including unpaid interest and Loan Fees) not paid immediately upon demand at the interest rate plus 2% per annum.

(g)  Borrower will pledge in respect of the Loans, pursuant to this Agreement, securities, cash and other investment property and assets of such types, in such amounts and at such times as Lender shall from time to time request.

(h)  Notwithstanding the foregoing, the parties agree that any of Lender's or Agent's affiliates may act as agent in accordance with any Loan entered into hereunder. Lender, Agent and any subagent that they may appoint shall have no responsibility or liability to the Borrower or Lender with respect to the performance of either such party under this Agreement, and Lender, Agent and any subagent that they may appoint shall not be deemed to endorse or guarantee any transaction effected hereunder.

(i)  All Loans are demand loans. Upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver equivalent securities under any or all Loans of securities. The inclusion of Section 6 hereof shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

(j)  Borrower acknowledges that if it borrows any Hong Kong securities, Borrower will be subject to certain requirements under the Stamp Duty Ordinance (Cap. 117) of Hong Kong (the "Ordinance"). In such circumstances, Borrower shall, within 30 days after the first Hong Kong stock borrowing and lending transaction is effected, enter into an Overseas Securities Lender's Agreement with Lender (the "OSLA") and Borrower shall not be required to issue a Borrowing Request (as defined in the OSLA) in respect of such Loan of Securities. Borrower shall be responsible for complying with Ordinance requirements, including the requirement, within 30 days after the first Hong Kong stock borrowing and lending transaction is effected, to either provide, or authorize Lender to provide, the Hong Kong Revenue authorities with: (1) an executed copy or a certified true copy of the OSLA; (2) a further certified true copy of the OSLA; (3) such fees as may be specified from time to time by the Financial

Secretary of Hong Kong for these purposes; and (4) such other documents, particulars and information as the Hong Kong Revenue authorities may require.

**4.  INTEREST AND LOAN FEES.**  Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

**5.  COLLATERAL.**

(a)  Lender may from time to time, in its good faith discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion (a "Margin Call"). Borrower shall comply with any such Margin Call as follows:  if demand is made by 10:00 a.m. on any business day, by the close of business on the same business day on which the demand is made, or if demand is made after 10:00 a.m. on any business day, by the close of business on the business day immediately following that on which the demand is made (the "Margin Transfer Period").  Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i)  with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its good faith discretion); and

(ii)  with respect to securities, the price for such securities obtained from a source selected by Lender in its good faith discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended from trading, or in respect of which there is no price source or a discontinuous price source, shall be determined by Lender in its good faith discretion.  Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) Margin Dispute.

(i)  Provided that no Event of Default has occurred and is continuing, if Borrower elects to dispute the calculation of the aggregate Market Value of any securities (which are not exchanged-traded securities or other securities with screen-based pricing), then Borrower will notify Lender in writing of such dispute (a "Margin Dispute Notice") no later than 12:00 p.m. on the business day that the Margin Call is due. The Margin Dispute Notice shall set forth the securities (and the amount of securities) the Market Values of which are in dispute (the "Disputed Securities").  Thereafter, Lender shall solicit from four eligible dealers, which shall include (in descending order of preference) Deutsche Bank AG, Citigroup NA, JPMorgan Chase Bank, N.A., and Bank of America NA, firm bids (or offers, as the case may be) for at least the securities which are identical to the Disputed Securities (and in an identical amount).  Firm bids (or offers, as the case may be) must be received by 4:00 p.m. of the same day to be eligible for use in calculating the Market Value ("Eligible Firm Bids").

(ii)  With respect to the securities for which Lender obtains such Eligible Firm Bids, Lender shall recalculate the Market Value of the Disputed Securities as follows: as to any Disputed Security for which two or more bids are obtained, Lender shall average the Eligible Firm Bids and the Market Value determined by Lender in good faith (the "Bid Average").  If Lender receives one Eligible Firm Bid (or none), then Lender's original Market Value determination shall prevail. The dispute mechanics of this process shall not affect the obligation of the parties to effect Margin Calls in the timely manner set out

**LEHMAN BROTHERS**                                           3

above with respect to the undisputed potion (if any) of the Margin Calls. For the avoidance of doubt, in the event that Borrower is disputing a portion of Lender's initial valuation of the Market Value, Borrower shall be required to post collateral on any undisputed portion in accordance with the Margin Transfer Period.

(c) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(d) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated. Notwithstanding anything to the contrary herein, to the extent Lender does not make any loans to Borrower with respect to the purchase of any security, and such security is fully paid for by Borrower, at Borrower's request, Lender shall move such security to a fully-paid, segregated account (the "Segregated Account"). Once such security is in the Segregated Account, it shall not be considered Collateral under this Agreement and Lender shall not be entitled to the rights afforded to it under subsection (a) hereof with respect to such security.

(e) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(f) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to

satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6. **EVENTS OF DEFAULT.** The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) Borrower's failure to maintain collateral as required by Section 5 hereof and such failure remains uncured after one prior business day notice thereof;

(iii) Borrower's failure to make any payment or delivery when required hereunder and such payment or delivery remains uncured after one prior business day notice thereof;

(iv) Borrower's failure to comply with or perform any other material agreement or obligation hereunder and such failure remains uncured after one prior business day notice thereof;

(v) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

(vi) any material representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made and such material misrepresentation remains uncured after one prior business day notice thereof;

(vii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(viii) any portfolio manager that has a title of "Director" or above of the Borrower states that the Borrower is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(ix) there is a material adverse change in the business affairs of Borrower;

(x) any event of default or equivalent event occurs under any other agreement, including for the sake of clarity, any event of default described in Section 4 of the LBI Account Agreement, between Borrower and Lender or Agent or any of their affiliates ,and such an event of default (or similar event) has been declared or occurred thereunder and any applicable grace or cure periods have expired and any and all obligations under such contract have been accelerated and notice has been given to Borrower of such acceleration; provided however, that such an event of default (or similar event) did not result from (1) a failure to deliver securities on (A) the repurchase date under a repurchase or reverse repurchase agreement or (B) the termination date under a securities lending agreement, in both cases where the undersigned continues to meet all applicable margin calls as required under the applicable agreement or (2) a buy-in or similar action where the undersigned pays amounts owed when due; or

(xi) any material document or constitutive document of Borrower is modified in a manner which, in the reasonable discretion of Lender, will have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loan and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its good faith discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself (in such case, such valuation to be made by Lender, Agent or any of Lender or Agent's affiliates in good faith and in accordance with their customary business practices) or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

### 7. MISCELLANEOUS.

(a) <u>Capacity to Contract</u>. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) <u>ERISA</u>. Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a QPAM Representation Letter.

(c) <u>Compliance with Regulations</u>. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) <u>FSA Customer Protections</u>. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash delivered by Borrower hereunder will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash.

(e) <u>Adequate Assurances</u>. Intentionally deleted.

(f) <u>Costs and Expenses</u>. Absent Lender's gross negligence or wilful misconduct, Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) <u>Securities Events</u>.  Lender shall promptly inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities.  Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes.  Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) <u>Voting Rights</u>.  If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies.  Subject to 5(d), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes.  If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) <u>Waiver, Assignment and Notices</u>.  Neither party's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by such party of any of its rights or privileges hereunder.  Any purported assignment of a party's rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of the other parties shall be null and void.  Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates with the same or better credit as Lender, with prior notice to Borrower to the extent practicable under the circumstances; provided, however, that as a result of such an assignment: (i) no breach of this Agreement would occur; and (ii) it would not become unlawful for either party to perform any obligation under this Agreement.  Notices and other communications to a party (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by a party, shall, until the sender has received notice in writing of a different address or number, be deemed to have been personally delivered to such first party.  Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) <u>Securities Contract; Margin Payment; Settlement Payment</u>.  Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) <u>Legally Binding</u>.  Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns.  Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation.  Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf.  Absent Lender's gross negligence or willful misconduct, Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) <u>Amendment</u>.  This Agreement may not be modified absent a written instrument signed by an authorized representative of Lender, Agent and Borrower.

(m) **GOVERNING LAW.**  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE

STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

(n) **JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) **NO CONSEQUENTIAL DAMAGES.** IN NO EVENT WILL LENDER, AGENT OR BORROWER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

(p) Waiver of Immunities. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 30 day of March , 2007.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
Name:
Title:

Borrower:

MacKay Shields Credit Strategy Partners LP
By: MacKay Shields LLC, its Investment Adviser

By: _____
Name: Lucille Protas
Title: Senior Managing Director and Chief Operating Officer

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

## <u>Exhibit B1</u>

**Determination for Claim Of MacKay Shields Credit Strategy Fund Ltd.**

A/73160677.1

James W. Giddens
Trustee for the SIPA Liquidation of Lehman Brothers Inc.
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

*In re* **Lehman Brothers Inc.**

Case No. 08-01420 (JMP) SIPA

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

September 2, 2009

**VIA UPS OVERNIGHT**

MACKAY SHIELDS CREDIT STRATEGY FUND LTD
BINGHAM MCCUTCHEN LLP
ATTN: JOSHUA DORCHAK
399 PARK AVENUE
NEW YORK, NY 10022

Re: Claim Number(s):   900003957
                               5357 (Amendment of claim 900003957.)
Account Number(s): 05604090

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens, Trustee (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA") pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York. You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding. This Notice is applicable only to the claim(s) and/or accounts identified above. If you filed other claims, additional notices will be issued.

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED. The above-referenced account(s) (the "Account") is with Lehman Brothers International (Europe) ("LBIE"), not LBI. LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

> Clerk of the United States Bankruptcy Court
> Southern District of New York
> One Bowling Green
> New York, New York 10004

**PLEASE TAKE FURTHER NOTICE:** You must serve your opposition upon the Trustee's counsel by mailing a copy to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, NY 10004
> Attn: LBI Hearing Request

> Attorneys for James W. Giddens, Trustee for
> the SIPA Liquidation of Lehman Brothers Inc.

> Very Truly Yours,

> James W. Giddens
> Trustee for the SIPA Liquidation of
> Lehman Brothers Inc.

2

**Exhibit B2**

**Determination for Claim Of MacKay Shields Credit Strategy Partners LP**

9

**James W. Giddens**
**Trustee for the SIPA Liquidation of Lehman Brothers Inc.**
**c/o Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**

*In re* **Lehman Brothers Inc.**

Case No. 08-01420 (JMP) SIPA

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

September 2, 2009

**VIA UPS OVERNIGHT**

MACKAY SHIELDS CREDIT STRATEGY PARTNERS LP
BINGHAM MCCUTCHEN LLP
ATTN: JOSHUA DORCHAK
399 PARK AVENUE
NEW YORK, NY 10022

        Re:  Claim Number(s):    900003968
                                      5355 (Amendment of claim 900003968.)
           Account Number(s):  05602654

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens, Trustee (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA") pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York. You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding. This Notice is applicable only to the claim(s) and/or accounts identified above. If you filed other claims, additional notices will be issued.

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED. The above-referenced account(s) (the "Account") is with Lehman Brothers International (Europe) ("LBIE"), not LBI. LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

> Clerk of the United States Bankruptcy Court
> Southern District of New York
> One Bowling Green
> New York, New York 10004

**PLEASE TAKE FURTHER NOTICE:** You must serve your opposition upon the Trustee's counsel by mailing a copy to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, NY 10004
> Attn: LBI Hearing Request
>
> Attorneys for James W. Giddens, Trustee for
> the SIPA Liquidation of Lehman Brothers Inc.

> Very Truly Yours,

> James W. Giddens
> Trustee for the SIPA Liquidation of
> Lehman Brothers Inc.