Edwin E. Smith
Joshua Dorchak
**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, New York 10022
(212) 705-7000

*Attorneys for Putnam Investment Holdings, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                      :

In re                                 :
                                        :

LEHMAN BROTHERS INC.,         : Case No. 08-01420 (JMP) SIPA
                                        :

          Debtor.                  :
                                        :
-----------------------------------------------------------------x

## <u>OBJECTION OF CLAIMANT PUTNAM</u><br><u>INVESTMENT HOLDINGS, LLC TO DETERMINATION OF CLAIM</u>

Putnam Investment Holdings, LLC (the "Claimant"), on behalf of the sub-accounts listed on Schedule 1 hereto, by and through its undersigned counsel, hereby objects (the "Objection") to the Notice of Determination of James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc. (the "Trustee"), denying Claimant's customer claim against Lehman Brothers Inc. ("LBI") in these proceedings, and respectfully states as follows:

### <u>Background</u>

1.     In 2006, the Claimant entered into a Customer Account Agreement, Prime Brokerage (the "PBA") with LBI.

2.     On information and belief, LBI and Lehman Brothers International (Europe) ("LBIE"), and possibly one or more of their affiliates (collectively with LBI and LBIE, "Lehman") arranged for LBIE to handle the Claimant's prime brokerage account established

pursuant to the PBA (the "Customer Account"), including controlling securities or cash posted as collateral to the Customer Account or otherwise transferred to Lehman by the Claimant (collectively, the "Customer Assets").

3.  The Claimant provided the Customer Assets to Lehman, either directly to LBI or directly to LBIE.

4.  On September 15, 2008, LBIE entered Administration proceedings.

5.  On September 19, 2008 (the "Commencement Date"), the above-captioned SIPA proceedings (the "SIPA Case") were commenced.

6.  On information and belief, as of the Commencement Date, LBI as well as LBIE may have held some or all of the Customer Assets.

7.  The Claimant is entitled to the return of the Customer Assets, net of any obligations of the Claimant to Lehman (the "Net Equity"), from any Lehman entity or entities that hold the Customer Assets, including LBI.

8.  The Net Equity has not been returned to the Claimant by any Lehman entity.

9.  On or before January 30, 2009, the Claimant duly filed a customer claim in the SIPA Case seeking recovery of any Customer Assets in the possession of LBI (the "Claim"). The Trustee assigned the Claim the claim number 900002354.

10.  The Claim included as exhibits the PBA and other agreements entered into by the Claimant and Lehman.  The Claim, which is annexed hereto as Exhibit A, is incorporated herein by reference.

11.  On September 2, 2009, the Trustee served the Claimant with a Notice of Trustee's Determination of Claim (the "Determination").  The Determination, which is annexed hereto as Exhibit B, reads, in relevant part, as follows:

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED. The above-referenced account(s) (the "Account") is with Lehman Brothers International (Europe) ("LBIE"), not LBI. LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers.

12.     The Claimant objects to the Determination for the reasons set forth below.

### Grounds for Objection

13.     There are two independent reasons why the Determination should be overruled and the Claim should be granted as a customer claim in the SIPA Case.

14.     First, there is no dispute that LBI entered into the PBA with the Claimant. Accordingly, LBI is contractually liable to the Claimant as a customer for any of the Customer Assets that LBI holds in connection with the PBA, whether the Customer Assets were provided by the Claimant directly to LBI or to LBIE.

15.     Second, to the extent the Customer Assets were transferred to LBI by LBIE or were held by LBI for the benefit of LBIE, LBI should be liable to the Claimant as a customer under the Securities Investor Protection Act of 1970, as amended ("SIPA"), which provides, in relevant part:

> [N]o advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established to the satisfaction of the trustee, from the books and records of the debtor or from the books and records of a broker or dealer or bank, or otherwise, that **the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer** or bank (which customers are not themselves a broker or dealer or bank or a person described in paragraph (4)), in which event **each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor**.

15 U.S.C. § 78fff-3(a)(5) (emphasis added).

A/73160720.1

16.     If LBIE transferred the Customer Assets to LBI or they were otherwise held by LBI for the benefit of LBIE, LBIE transferred the Customer Assets or was the account holder of the Customer Assets in LBIE's capacity as broker or dealer in connection with transactions for the Claimant as its customer.  The Claimant is not a broker or dealer or bank.  Accordingly, the Claimant is a separate customer of LBI with respect to the Customer Assets held by LBI.  *See id.*

17.     The cursory Determination simply ignores, rather than rebuts, LBI's contractual obligations to the Claimant under the PBA and LBI's statutory obligations to the Claimant under the SIPA.  Accordingly, the Determination should be overruled.

## Reservation of Rights

18.     The Claimant has insufficient information concerning (a) the relationship between LBI and LBIE with respect to the Customer Assets, (b) the disposition of the Customer Assets by LBIE or LBI, and (c) the current location of the Customer Assets.

19.     The Claimant reserves the right to demand discovery on these subjects, in the event the Determination is overruled but the Claim remains subject to any further objection.

20.     The Claimant reserves all rights to supplement or amend this Objection for any reason, including as a result of further information that the Claimant may acquire about the relationship between LBI and LBIE and the disposition of the Claimant's assets by Lehman.

21.     In the event this Court determines that the Claim does not qualify as a customer claim, the Claimant hereby requests that the Claim be reclassified as a noncustomer claim based on, among other things, LBI's contractual liability to the Claimant under the PBA.[1]

## Contact Information

22.     Any replies or correspondence concerning this Objection should be directed to the

---

[1]     On or before June 1, 2009, the Claimant filed a noncustomer claim against LBI asserting LBI's liability for the Customer Assets on several grounds.  The Claimant reserves all rights in connection with this noncustomer claim.

A/73160720.1

undersigned attorneys on behalf of the Claimant.

<u>**Conclusion**</u>

For the reasons set forth above, the Claimant respectfully requests that the Determination be overruled and the Claim be granted as a customer claim under SIPA, and for such further relief as this Court deems just and proper.

Dated: New York, New York
   October 7, 2009

         **BINGHAM MCCUTCHEN LLP**

      By:<u>/s/  Joshua Dorchak</u>
       Edwin E. Smith
       edwin.smitrh@bingham.com
       Joshua Dorchak
       joshua.dorchak@bingham.com
       399 Park Avenue
       New York, New York  10022
       (212) 705-7000

       *Attorneys for Putnam Investment Holdings, LLC*

A/73160720.1

## Schedule 1

### Sub-Accounts

| Sub-Account Name: | Account Number: |
| --- | --- |
| Putnam Investment Holdings, LLC - Putnam Small Cap Growth L/S Market Neutral Strategy | 5602356 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Value L/S Market Neutral Strategy | 5602357 |
| Putnam Investment Holdings, LLC - Small Cap Growth Extended Alpha - Institutional Incubated Fund | 5602358 |
| Putnam Investment Holdings, LLC - Small Cap Value Extended Alpha - Institutional Incubated Fund | 5602359 |
| Putnam Investment Holdings, LLC - Putnam Global Core L/S Market Neutral - Institutional Incubated Fund | 5602360 |
| Putnam Investment Holdings, LLC - Putnam Global Core Extended Alpha 130/30 - Institutional Incubated Fund | 5602361 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Core L/S Market Neutral Strategy | 5602362 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Core Extended Alpha (130/30) | 5602363 |
| Putnam Investment Holdings, LLC - Putnam Domestic Core Long/Short Market Neutral | 5602364 |
| Putnam Investment Holdings, LLC - Putnam Domestic Core Extended Alpha 130/30 | 5602365 |

A/73160720.1

## Exhibit A

### Claim

A/73160720.1

# CUSTOMER CLAIM FORM
## <u>LEHMAN BROTHERS INC.</u>

Account Name:  Putnam Investment Holdings, LLC

Daytime Phone:  (617) 760-1061

Account Number:  See below

Email:  Melissa_LaBarge@putnam.com

Address:  One Post Office Square, Boston, MA 02109

Taxpayer I.D. Number
(Social Security No.) <u>04-3534983</u>

Contact Person:  Melissa LaBarge

| Sub-Account Name: | Account Number: |
|---|---|
| Putnam Investment Holdings, LLC - Putnam Small Cap Growth L/S Market Neutral Strategy | 5602356 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Value L/S Market Neutral Strategy | 5602357 |
| Putnam Investment Holdings, LLC - Small Cap Growth Extended Alpha - Institutional Incubated Fund | 5602358 |
| Putnam Investment Holdings, LLC - Small Cap Value Extended Alpha - Institutional Incubated Fund | 5602359 |
| Putnam Investment Holdings, LLC - Putnam Global Core L/S Market Neutral - Institutional Incubated Fund | 5602360 |
| Putnam Investment Holdings, LLC - Putnam Global Core Extended Alpha 130/30 - Institutional Incubated Fund | 5602361 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Core L/S Market Neutral Strategy | 5602362 |
| Putnam Investment Holdings, LLC - Putnam Small Cap Core Extended Alpha (130/30) | 5602363 |
| Putnam Investment Holdings, LLC - Putnam Domestic Core Long/Short Market Neutral | 5602364 |
| Putnam Investment Holdings, LLC - Putnam Domestic Core Extended Alpha 130/30 | 5602365 |

## PLEASE NOTE

- A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.

- TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.

- THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.

- ALL CLAIMS ARE DATED AS OF THE DATE RECEIVED BY THE TRUSTEE.

- YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.

- IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.

- LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.

This customer claim form must be completed electronically online at www.lehmantrustee.com or mailed promptly, together with supporting documentation, to the following:

| If by first class mail: | If by overnight mail: |
|---|---|
| Lehman Brothers Inc. Claims Processing | Lehman Brothers Inc. Claims Processing |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions, LLC |
| P.O. Box 6389 | 10300 SW Allen Blvd. |
| Portland, OR 97228-6389 | Beaverton, OR 97005 |

A/72825055.1

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

   a. Lehman Brothers, Inc. ("LBI") owes me a credit or cash in the amount of: **SEE EXHIBIT A**

   b. I owe LBI a debit or cash in the amount of: $0

   c. If you wish to repay the debit balance listed in point b. above please insert the amount you wish to repay and attach a check payable to "James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc." If you wish to make a payment, **it must be enclosed** with this claim form.

   N/A

2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

   <u>**Please Do Not Claim Any Securities You Have In Your Possession**</u>

   | | | YES | NO |
   |---|---|---|---|
   | a. | LBI owes me securities: | X | |

   **SEE EXHIBIT A**

   | | | | |
   |---|---|---|---|
   | b. | I owe LBI securities: | | X |

   c. If yes to either, please list below (or in additional pages as necessary):

| Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|---|
| | | | LBI Owes Me (Long) | I Owe LBI (Short) |
| | **SEE EXHIBIT A** | | | |
| _____ | _____ | _____ | _____ | _____ |
| | | | | |
| _____ | _____ | _____ | _____ | _____ |

If additional space is needed, attach additional pages providing the information in the exact format

## 3. COMMODITY FUTURES CLAIMS

|  | YES | NO |
|---|---|---|
| Do you have a claim based on a commodity futures account? | | X |

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim:_____
Basis for Claim: _____
_____
_____
_____
_____

## WHEN COMPLETING THE ABOVE PLEASE KEEP IN MIND:

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.

- Proper documentation can speed the review, allowance and satisfaction of your claim.

- Please enclose: copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim; and any other documentation or correspondence you believe will be of assistance in processing your claim.

- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.

- If, at anytime, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.**

**NOTE:** IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | <u>YES</u> | <u>NO</u> |
|---|---|---|---|
| 4. | Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | X | |
| | | **SEE EXHIBIT A** | |
| 5. | Has there been any change in your account since September 19, 2008? | X | |
| | | **SEE EXHIBIT B** | |
| 6. | Are you or were you a party to a repurchase or reverse repurchase agreement, a director, officer, partner, shareholder, lender to, or capital contributor of LBI? | | X |
| 7. | Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | | X |
| 8. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | | X |
| 9. | Is this claim being filed by or on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | | X |
| 10. | Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | | X |
| 11. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | | X |

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Full name: Bingham McCutchen LLP, Attention: Joshua Dorchak

Address: 399 Park Avenue, New York, New York 10022

Phone number: (212) 705-7784

Email address: joshua.dorchak@bingham.com.

If more than one person is assisting you, attach additional pages providing the information in the exact format above.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date: January 26, 2009　　　　　　　Signature: _Melissa LaBarge_
　　　　　　　　　　　　　　　　　　Melissa LaBarge
　　　　　　　　　　　　　　　　　　Assistant Secretary
　　　　　　　　　　　　　　　　　　Putnam Investment Holdings,
　　　　　　　　　　　　　　　　　　LLC

Date: _____　　Signature: _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

# EXHIBIT A

Lehman Brothers Inc. ("*LBI*") and Putnam Investments ("*Claimant*") are parties to a Customer Account Agreement Prime Brokerage (the "*Prime Brokerage Agreement*") dated as of October 26, 2006. LBI served as signatory for itself and the Lehman Brothers affiliates listed therein. The Prime Brokerage Agreement is attached as EXHIBIT C.

Claimant and Lehman Brothers International (Europe) ("*LBIE*") are parties to a Margin Lending Agreement dated October 26, 2006, executed in connection with the Prime Brokerage Agreement (the "*Lending Agreement*") and a Global Master Securities Lending Agreement, dated October 26, 2006, also executed in connection with the Prime Brokerage Agreement ("*Global Agreement*" together with the Prime Brokerage Agreement, the Lending Agreement and all documents executed in connection therewith, collectively, the "*Agreements*"). The Lending Agreement is attached as EXHIBIT D. The Global Agreement is attached as EXHIBIT E.

Claimant believes LBI may be in possession of customer property of Claimant under the Agreements. Claimant is also pursuing recovery from LBIE. Claimant files this Claim as a precaution, in the event that any cash or securities of Claimant were transferred to and are currently held by LBI.

Claimant files this Customer Claim Form, with Exhibits (collectively, the "*Claim*") under compulsion of the deadline for customer claims established by order of the Bankruptcy Court for the Southern District of New York (the "*Court*"), in order to protect the Claimant from forfeiture of claims by reason of such deadline. Claimant reserves its right to amend this Claim for any purpose, including to add claims for interest or reimbursement of legal fees and other expenses, to the extent allowed by the Agreements and law.

In the event this Claim is determined not to constitute a "customer claim" for purposes of LBI's liquidation proceeding under the Securities Investor Protection Act (the "*Proceedings*"), this Claim should constitute a duly and timely filed general unsecured claim against LBI in the Proceedings.

This Claim also encompasses any contingent claims that may arise in connection with any rejection of the Prime Brokerage Agreement by LBI and any other executory contract to which the Claimant may be a party with LBI.

This Claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by the Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial

in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

## **EXHIBIT B**

Corporate actions on securities held in the accounts (e.g., dividends) have occurred since September 19, 2008.

# **EXHIBIT C**

Customer Account Agreement Prime Brokerage by and between Lehman Brothers Inc. and Putnam Investments, dated as of October 26, 2006.

# Customer Account Agreement Prime Brokerage

| Title: | Account (and Group) No.: |
|---|---|
| Putnam Investment Holdings, LLC | |

### Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you, Putnam Investments Holdings, LLC, as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby. You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Manager or General Partner appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a QPAM Representation Letter.

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your assets ("Assets"), defined as all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities, commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for

differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf, where such Lehman Brothers Entity is authorized to do so) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing). The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping, provided that this shall not apply to any assets of any client of an affiliate of Putnam Investment Holdings, LLC. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any reasonable orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be reasonably required to realize upon any of Lehman Brothers' rights in the Assets.

**4. BREACH, BANKRUPTCY OR DEFAULT.** If you shall:

(i) (a) breach, repudiate or default under this Agreement and such breach, repudiation or default remains uncured after one prior day notice thereof; or (b) breach, repudiate or default under any Contract with any Lehman Brothers Entity whether heretofore or hereafter entered into, and an event of default (or similar or equivalent event) has been declared or occurred thereunder and the applicable grace or cure period has expired;

(ii) (a) make or repeat any material misrepresentations in connection with this Agreement and such misrepresentation remains uncured after one prior day notice thereof; or (b) make or repeat any material misrepresentations in connection with any Contract with any Lehman Brothers Entity whether heretofore or hereafter entered into, and an event of default (or similar or equivalent event) has been declared or occurred thereunder and the applicable grace or cure period has expired;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property; provided that in the case of any involuntary application or petition, such application or petition is not dismissed within 30 calendar days after filing;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due, as determined by Lehman Brothers in good faith discretion (including, without limitation, dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity or the attachment against your or such other party's account(s) with any Lehman Brothers Entity;);

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency, provided that in the case of any involuntary application or petition, such application or petition is not dismissed within 30 calendar days after filing;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately, with notice to you to the extent reasonably practicable under the circumstances, in such manner as Lehman Brothers may in good faith discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself (in such case, such valuation to be made by Lehman Brothers in good faith and in accordance with its customary business practices) or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Assets held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts). Lehman Brothers agrees to notify you promptly of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no event of default (as defined by the terms of the applicable Contract, taking into account any applicable cure periods) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** [Intentionally deleted.]

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto

which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case, you hereby authorize Lehman Brothers to charge your account(s), with prior notice to you, for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder, without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity with prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, with prompt subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its reasonable discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), to the extent Lehman Brothers deems necessary in its good faith discretion due to due to credit, margin, legal, regulatory or money laundering concerns, and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under this Agreement or any Contract. In the event that Lehman Brothers, in its reasonable discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory or money laundering, Lehman Brothers shall, if reasonably practicable under the circumstances, provide you with prior notice of such restriction.

**15. CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports (for internal use) concerning your credit standing and business conduct. You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16. SHORT AND LONG SALES.** In placing any sell order for a short account, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long account, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being for a long account shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17. MARGIN ACCOUNTS.** All loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its reasonable discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its reasonable discretion, deems it necessary for its protection, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein, with prior notice to you if practicable under the circumstances or promptly following the exercise of such rights and/or remedies. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18. SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19. CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any

consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b)  Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

**20.  OPTIONS POSITIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You will notify Lehman Brothers of your intention to exercise listed options no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which case Lehman Brothers may, but shall be under no obligation to, exercise the option. Except as required by the Options Clearing Corporation Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. If it would not be profitable for your account due to commission expenses, it may be permitted to expire or, at Lehman Brothers' discretion, sold or acquired by Lehman Brothers for some equitable payment to you based on Lehman Brothers' expenses and risk, without any liability or responsibility on our part to you. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21.  PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)    LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)  LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade because orders from you and your executing broker do not match or because there are insufficient funds in your account to settle the trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d)  In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if you request and LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, subject to LBI's gross negligence or willful misconduct, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e)  You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to, which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent, with prior notice to you if reasonably practicable under the circumstances or promptly thereafter. In the event LBI determines in its reasonable discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f)  If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g)  If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h)  You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i)  Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters

pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) Absent Lehman Brothers' gross negligence and willful misconduct, you agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)     The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22.  LEGALLY BINDING.** You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions.  With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time.  In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23.  AMENDMENT.** This Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers and you.

**24.  GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

**25.  JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by the parties.   With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26. WAIVER OF IMMUNITIES.**  [Intentionally deleted.]

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. Absent Lehman Brothers' gross negligence and willful misconduct, you agree to indemnify and hold

Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. Absent Lehman Brothers' gross negligence and willful misconduct, in the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any reasonable action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially

Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

**THIS AGREEMENT IS DATED AS OF**     **October 26, 2006**

Putnam Investment Holdings, LLC
_____
*Name of Customer*

_____     _____
*Address*                                           *Country*

_____     _____
*City, State*                                      *Zip Code + 4*

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

**YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.**

*CUSTOMER NAME:*        Putnam Investment Holdings, LLC
_____
*Individual or Printed Name of Company*

*SIGNATURE:*        _____
*Signature of Authorized Person*

*PRINT NAME:*        _____
*Printed Name and Title of Signatory <u>or</u> Name of General Partner if Signer is a Partnership*

*BY:*        _____
*Authorized Signatory and Title of General Partner <u>if</u> Above Signer is a Partnership <u>Otherwise Blank</u>*

**ACCEPTED AND AGREED TO:**

_____

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates named herein

11

# EXHIBIT A
## AUTHORIZED PERSONS

### Name

Mark Alley
Rowland Bankes
Richard Block
Jonathan Bridges
John Caron
Lisa Emerick
Peter Fleisher
Brian Hickey
George Issa
Olga Keyser
Marc Lindquist
Jeff McClory
David Schiff
Jeffrey Stought
James Thomas
Jeff Weishaar

## **EXHIBIT D**

Margin Lending Agreement by and between Lehman Brothers International (Europe) and Putnam Investments, dated as of October 26, 2006.

# Margin Lending Agreement

| Borrower: Putnam Investment Holdings, LLC | Reference No.: |
|---|---|

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "LBI Account Agreement").

## 1. AGENT AS AGENT OF LENDER AND BORROWER.

(a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

## 2. PURPOSE OF THE LOANS.
Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

## 3. LOAN TERMS.

(a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

**4. INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

**5. COLLATERAL.**

(a) Lender may from time to time, in its good faith discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its good faith discretion. Borrower shall promptly comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its good faith discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its good faith discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its good faith discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its good faith discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its good faith discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6. **EVENTS OF DEFAULT.** The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder and such failure remains uncured after one prior day notice thereof;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder and such failure remains uncured after one prior day notice thereof;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made and such failure remains uncured after one prior day notice thereof;

(viii) Borrower is suspended or expelled from any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the good faith discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loan and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) or any of Lender or Agent's affiliates, publicly or privately without notice or advertisement, provided that in such case valuation of such Collateral shall be made by Lender or Agent or their respective affiliates, in good faith and in accordance with their customary business practices. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

## 7. MISCELLANEOUS.

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or

LEHMAN BROTHERS                    4

General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a QPAM Representation Letter.

(c) <u>Compliance with Regulations</u>. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "<u>FSA</u>"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) <u>FSA Customer Protections</u>. Lender is authorised by the FSA and is regulated by its rules (the "<u>Rules</u>"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash delivered by Borrower hereunder will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash.

(e) <u>Adequate Assurances</u>. [Intentionally deleted.]

(f) <u>Costs and Expenses</u>. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) <u>Securities Events</u>. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) <u>Voting Rights</u>. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) <u>Waiver, Assignment and Notices</u>. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, with prompt subsequent written confirmation.

(j) <u>Securities Contract; Margin Payment; Settlement Payment</u>. Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) <u>Legally Binding</u>. Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) <u>Amendment</u>. This Agreement may not be modified absent a written instrument signed by an authorized representative of Lender, Borrower and Agent.

(m) **<u>GOVERNING LAW</u>.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

(n) **<u>JURISDICTION; WAIVER OF JURY TRIAL</u>.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) **<u>NO CONSEQUENTIAL DAMAGES</u>.** IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

(p) <u>Waiver of Immunities</u>. [Intentionally deleted.]

(q) <u>Headings</u>. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) <u>Cumulative Rights; Entire Agreement</u>. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 26th day of October, 2006.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
      Name:
      Title:


Borrower:

PUTNAM INVESTMENT HOLDINGS, LLC

By: _____
      Name:
      Title:


Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
      Name:
      Title:

# Financing Product Annex
# Lehman Brothers International Europe
# Margin Lending Agreement

The Borrower in determining whether to enter into any transactions confirms that it is not relying upon and will not rely upon the advice of the Lender in so doing but instead has made and will make its own independent judgement from time to time as to the suitability to it of trading strategies using Lehman Brothers PrimePLUS and PrimeVEST ("PrimePLUS" and "PrimeVEST", respectively) based on careful consultation by the Borrower with its own independent legal and tax advisors. The Borrower further acknowledges that the Lender does not act as tax advisor to the Borrower nor does it assume any fiduciary responsibilities in relation to the Borrower with respect to the use of PrimePLUS and PrimeVEST and therefore cannot and does not opine on the suitability of either of these products to the Borrower's investment circumstances, criteria, strategies, or risk profile.

The Borrower represents that it has received all required consents from the underlying beneficial owners of assets under its control in relation to the use of PrimePLUS and PrimeVEST. The Borrower understands and accepts that the Lender is under no obligation to monitor and will not monitor the Borrower's trading strategies or positions and the Lender accepts no responsibility or liability in relation to the conduct or performance thereof. In particular, the Borrower represents that it understands the meaning and effect of "acquisition indebtedness" under applicable law and accepts that the Lender shall not be liable for any losses, expenses, charges or costs whatsoever (including without limitation any tax liability) which may arise in the event that the Borrower's trading strategy results in the generation of acquisition indebtedness.

**IN WITNESS WHEREOF** this Annex to the Margin Lending Agreement dated _____ has been executed on behalf of the Parties hereto:

By: _____

Title: _____

Date: _____

# EXHIBIT E

Global Master Securities Lending Agreement by and between Lehman Brothers International (Europe) and Putnam Investments, dated as of October 26, 2006.



**GLOBAL MASTER SECURITIES LENDING AGREEMENT**

CLIFFORD CHANCE

# CONTENTS

| | | |
|---|---|---|
| 1. | Applicability | 1 |
| 2. | Interpretation | 1 |
| 3. | Loans Of Securities | 5 |
| 4. | Delivery | 5 |
| 5. | Collateral | 7 |
| 6. | Distributions And Corporate Actions | 10 |
| 7. | Rates Applicable To Loaned Securities And Cash Collateral | 11 |
| 8. | Redelivery Of Equivalent Securities | 11 |
| 9. | Failure To Redeliver | 13 |
| 10. | Set-Off Etc | 14 |
| 11. | Transfer Taxes | 17 |
| 12. | Lender's Warranties | 17 |
| 13. | Borrower's Warranties | 18 |
| 14. | Events Of Default | 18 |
| 15. | Interest On Outstanding Payments | 19 |
| 16. | Transactions Entered Into As Agent | 19 |
| 17. | Termination Of This Agreement | 21 |
| 18. | Single Agreement | 21 |
| 19. | Severance | 22 |
| 20. | Specific Performance | 22 |
| 21. | Notices | 22 |
| 22. | Assignment | 22 |
| 23. | Non-Waiver | 23 |
| 24. | Governing Law And Jurisdiction | 23 |
| 25. | Time | 23 |
| 26. | Recording | 23 |
| 27. | Waiver Of Immunity | 23 |
| 28. | Miscellaneous | 23 |
| SCHEDULE | | 26 |

# AGREEMENT

## BETWEEN:

**Lehman Brothers International (Europe)** ("**Party A**") a company incorporated under the laws of England and Wales of 25 Bank Street, London E14 5LE acting through a Designated Office; and **Putnam Investment Holdings, LLC** ( "**Party B**") a company incorporated under the laws of Delaware of One Post Office Square, Boston, MA 02109 acting through a Designated Office.

1. **APPLICABILITY**

1.1 From time to time the parties may enter into transactions in which one party ("**Lender**") will transfer to the other ("**Borrower**") securities and financial instruments ("**Securities**") against the transfer of Collateral (as defined in paragraph 2) with a simultaneous agreement by Borrower to transfer to Lender Securities equivalent to such Securities on a fixed date or on demand against the transfer to Borrower by Lender of assets equivalent to such Collateral.

1.2 Each such transaction shall be referred to in this Agreement as a "**Loan**" and shall be governed by the terms of this Agreement, including the supplemental terms and conditions contained in the Schedule and any Addenda or Annexures attached hereto, unless otherwise agreed in writing.

1.3 Either party may perform its obligations under this Agreement either directly or through a Nominee.

2. **INTERPRETATION**

2.1 In this Agreement:-

"**Act of Insolvency**" means in relation to either Party

(i) its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(ii) its stating in writing that it is unable to pay its debts as they become due; or

(iii) its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

(iv) the presentation or filing of a petition in respect of it (other than by the other Party to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such Party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition not having been stayed or dismissed within 30 days of its filing (except in the case of a petition for

winding-up or any analogous proceeding in respect of which no such 30 day period shall apply); or

(v) the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such Party over all or any material part of such Party's property; or

(vi) the convening of any meeting of its creditors for the purpose of considering a voluntary arrangement as referred to in Section 3 of the Insolvency Act 1986 (or any analogous proceeding);

"**Alternative Collateral**" means Collateral having a Market Value equal to the Collateral delivered pursuant to paragraph 5 and provided by way of substitution in accordance with the provisions of paragraph 5.3;

"**Base Currency**" means the currency indicated in paragraph 2 of the Schedule;

"**Business Day**" means a day other than a Saturday or a Sunday on which banks and securities markets are open for business generally in each place stated in paragraph 3 of the Schedule and, in relation to the delivery or redelivery of any of the following in relation to any Loan, in the place(s) where the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral are to be delivered;

"**Cash Collateral**" means Collateral that takes the form of a transfer of currency;

"**Close of Business**" means the time at which the relevant banks, securities exchanges or depositaries close in the business centre in which payment is to be made or Securities or Collateral is to be delivered;

"**Collateral**" means such securities or financial instruments or transfers of currency as are referred to in the table set out under paragraph 1 of the Schedule as being acceptable or any combination thereof as agreed between the Parties in relation to any particular Loan and which are delivered by Borrower to Lender in accordance with this Agreement and shall include Alternative Collateral;

"**Defaulting Party**" shall have the meaning given in paragraph 14;

"**Designated Office**" means the branch or office of a Party which is specified as such in paragraph 4 of the Schedule or such other branch or office as may be agreed to in writing by the Parties;

"**Equivalent** " or "**equivalent to**" in relation to any Securities or Collateral provided under this Agreement means securities, together with cash or other property(in the case of Collateral) as the case may be, of an identical type, nominal value, description and amount to particular Securities or Collateral, as the case may be, so provided. If and to the extent that such Securities or Collateral, as the case may be, consists of securities that are partly paid or have been converted, subdivided, consolidated, made the subject of a takeover, rights of pre-emption, rights to receive securities or a certificate which may at a future date be exchanged for securities, the expression shall include such securities or other assets to which Lender or Borrower as the case may be, is entitled following the occurrence of the relevant event, and,

if appropriate, the giving of the relevant notice in accordance with paragraph 6.4 and provided that Lender or Borrower, as the case may be, has paid to the other Party all and any sums due in respect thereof. In the event that such Securities or Collateral, as the case may be, have been redeemed, are partly paid, are the subject of a capitalisation issue or are subject to an event similar to any of the foregoing events described in this paragraph, the expression shall have the following meanings:-

(a)     in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(b)     in the case of a call on partly paid securities, securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, provided that Lender shall have paid Borrower, in respect of Loaned Securities, and Borrower shall have paid to Lender, in respect of Collateral, an amount of money equal to the sum due in respect of the call;

(c)     in the case of a capitalisation issue, securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, together with the securities allotted by way of bonus thereon;

(d)     in the case of any event similar to any of the foregoing events described in this paragraph, securities equivalent to the Loaned Securities or the relevant Collateral, as the case may be, together with or replaced by a sum of money or securities or other property equivalent to that received in respect of such Loaned Securities or Collateral, as the case may be, resulting from such event;

**"Income"** means any interest, dividends or other distributions of any kind whatsoever with respect to any Securities or Collateral;

**"Income Payment Date"**, with respect to any Securities or Collateral means the date on which Income is paid in respect of such Securities or Collateral, or, in the case of registered Securities or Collateral, the date by reference to which particular registered holders are identified as being entitled to payment of Income;

**"Letter of Credit"** means an irrevocable, non-negotiable letter of credit in a form, and from a bank, acceptable to Lender;

**"Loaned Securities"** means Securities which are the subject of an outstanding Loan;

**"Margin"** shall have the meaning specified in paragraph 1 of the Schedule with reference to the table set out therein;

**"Market Value"** means:

(a)     in relation to the valuation of Securities, Equivalent Securities, Collateral or Equivalent Collateral (other than Cash Collateral or a Letter of Credit):

(i)     such price as is equal to the market quotation for the bid price of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral as

derived from a reputable pricing information service reasonably chosen in good faith by Lender; or

(ii)     if unavailable the market value thereof as derived from the prices or rates bid by a reputable dealer for the relevant instrument reasonably chosen in good faith by Lender,

in each case at Close of Business on the previous Business Day or, at the option of either Party where in its reasonable opinion there has been an exceptional movement in the price of the asset in question since such time, the latest available price; plus (in each case)

(iii)    the aggregate amount of Income which has accrued but not yet been paid in respect of the Securities, Equivalent Securities, Collateral or Equivalent Collateral concerned to the extent not included in such price,

(provided that the price of Securities, Equivalent Securities, Collateral or Equivalent Collateral that are suspended shall (for the purposes of paragraph 5) be nil unless the Parties otherwise agree and (for all other purposes) shall be the price of such Securities, Equivalent Securities, Collateral or Equivalent Collateral, as the case may be, as of Close of Business on the dealing day in the relevant market last preceding the date of suspension or a commercially reasonable price agreed between the Parties;

(b)     in relation to a Letter of Credit the face or stated amount of such Letter of Credit; and

(c)     in relation to Cash Collateral the amount of the currency concerned;

**"Nominee"** means an agent or a nominee appointed by either Party to accept delivery of, hold or deliver Securities, Equivalent Securities, Collateral and/or Equivalent Collateral or to receive or make payments on its behalf;

**"Non-Defaulting Party"** shall have the meaning given in paragraph 14;

**"Parties"** means Lender and Borrower and **"Party"** shall be construed accordingly;

**"Posted Collateral"** has the meaning given in paragraph 5.4;

**"Required Collateral Value"** shall have the meaning given in paragraph 5.4;

**"Settlement Date"** means the date upon which Securities are transferred to Borrower in accordance with this Agreement.

2.2     **Headings**

All headings appear for convenience only and shall not affect the interpretation of this Agreement.

2.3     **Market terminology**

Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin", "redeliver" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to redeliver Equivalent Securities or Equivalent Collateral as the case may be.

## 2.4 Currency conversions

For the purposes of determining any prices, sums or values (including Market Value, Required Collateral Value, Relevant Value, Bid Value and Offer Value for the purposes of paragraphs 5 and 10 of this Agreement) prices, sums or values stated in currencies other than the Base Currency shall be converted into the Base Currency at the latest available spot rate of exchange quoted by a bank selected by Lender (or if an Event of Default has occurred in relation to Lender, by Borrower) in the London interbank market for the purchase of the Base Currency with the currency concerned on the day on which the calculation is to be made or, if that day is not a Business Day the spot rate of exchange quoted at Close of Business on the immediately preceding Business Day.

2.5 The parties confirm that introduction of and/or substitution (in place of an existing currency) of a new currency as the lawful currency of a country shall not have the effect of altering, or discharging, or excusing performance under, any term of the Agreement or any Loan thereunder, nor give a party the right unilaterally to alter or terminate the Agreement or any Loan thereunder. Securities will for the purposes of this Agreement be regarded as equivalent to other securities notwithstanding that as a result of such introduction and/or substitution those securities have been redenominated into the new currency or the nominal value of the securities has changed in connection with such redenomination.

## 2.6 Modifications etc to legislation

Any reference in this Agreement to an act, regulation or other legislation shall include a reference to any statutory modification or re-enactment thereof for the time being in force.

## 3. LOANS OF SECURITIES

Lender will lend Securities to Borrower, and Borrower will borrow Securities from Lender in accordance with the terms and conditions of this Agreement. The terms of each Loan shall be agreed prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties. Any confirmation produced by a Party shall not supersede or prevail over the prior oral, written or electronic communication (as the case may be).

## 4. DELIVERY

## 4.1 Delivery of Securities on commencement of Loan

Lender shall procure the delivery of Securities to Borrower or deliver such Securities in accordance with this Agreement and the terms of the relevant Loan. Such Securities shall be deemed to have been delivered by Lender to Borrower on delivery to Borrower or as it shall direct of the relevant instruments of transfer, or in the case of Securities held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such Securities being held by the operator of the clearing system for the account of the Borrower or as it shall direct, or by such other means as may be agreed.

4.2 **Requirements to effect delivery**

The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(a) any Securities borrowed pursuant to paragraph 3;

(b) any Equivalent Securities redelivered pursuant to paragraph 8;

(c) any Collateral delivered pursuant to paragraph 5;

(d) any Equivalent Collateral redelivered pursuant to paragraphs 5 or 8;

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, on delivery or redelivery of the same in accordance with this Agreement with full title guarantee, free from all liens, charges and encumbrances. In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a computer based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or redeliver any of the assets so acquired but, in so far as any Securities are borrowed or any Collateral is delivered to such Party, such Party shall be obliged, subject to the terms of this Agreement, to redeliver Equivalent Securities or Equivalent Collateral as appropriate.

4.3 **Deliveries to be simultaneous unless otherwise agreed**

Where under the terms of this Agreement a Party is not obliged to make a delivery unless simultaneously a delivery is made to it, subject to and without prejudice to its rights under paragraph 8.6 such Party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities, Collateral and cash transfers waive its right under this Agreement in respect of simultaneous delivery and/or payment provided that no such waiver (whether by course of conduct or otherwise) in respect of one transaction shall bind it in respect of any other transaction.

4.4 **Deliveries of Income**

In respect of Income being paid in relation to any Loaned Securities or Collateral, Borrower in the case of Income being paid in respect of Loaned Securities and Lender in the case of Income being paid in respect of Collateral shall provide to the other Party, as the case may

be, any endorsements or assignments as shall be customary and appropriate to effect the delivery of money or property equivalent to the type and amount of such Income to Lender, irrespective of whether Borrower received the same in respect of any Loaned Securities or to Borrower, irrespective of whether Lender received the same in respect of any Collateral.

5.    **COLLATERAL**

5.1    **Delivery of Collateral on commencement of Loan**

Subject to the other provisions of this paragraph 5, Borrower undertakes to deliver to or deposit with Lender (or in accordance with Lender's instructions) Collateral simultaneously with delivery of the Securities to which the Loan relates and in any event no later than Close of Business on the Settlement Date. In respect of Collateral comprising securities, such Collateral shall be deemed to have been delivered by Borrower to Lender on delivery to Lender or as it shall direct of the relevant instruments of transfer, or in the case of such securities being held by an agent or within a clearing or settlement system, on the effective instructions to such agent or the operator of such system, which result in such securities being held by the operator of the clearing system for the account of the Lender or as it shall direct, or by such other means as may be agreed.

5.2    **Deliveries through payment systems generating automatic payments**

Unless otherwise agreed between the Parties, where any Securities, Equivalent Securities, Collateral or Equivalent Collateral (in the form of securities) are transferred through a book entry transfer or settlement system which automatically generates a payment or delivery, or obligation to pay or deliver, against the transfer of such securities, then:-

(i)    such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the extent that it is applied to discharge an obligation of the transferee to effect payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a transfer of Collateral or redelivery of Equivalent Collateral, as the case may be, made by the transferee until such time as the Collateral or Equivalent Collateral is substituted with other Collateral or Equivalent Collateral if an obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral; and

(ii)    the party receiving such substituted Collateral or Equivalent Collateral, or if no obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral, the party receiving the deemed transfer of Collateral or redelivery of Equivalent Collateral, as the case may be, shall cause to be made to the other party for value the same day either, where such transfer is a payment, an irrevocable payment in the amount of such transfer or, where such transfer is a delivery, an irrevocable delivery of securities (or other property, as the case may be) equivalent to such property.

5.3    **Substitutions of Collateral**

Borrower may from time to time call for the repayment of Cash Collateral or the redelivery of Collateral equivalent to any Collateral delivered to Lender prior to the date on which the same would otherwise have been repayable or redeliverable provided that at the time of such repayment or redelivery Borrower shall have delivered or delivers Alternative Collateral acceptable to Lender and Borrower is in compliance with paragraph 5.4 or paragraph 5.5, as applicable.

5.4     **Marking to Market of Collateral during the currency of a Loan on aggregated basis**

Unless paragraph 1.3 of the Schedule indicates that paragraph 5.5 shall apply in lieu of this paragraph 5.4, or unless otherwise agreed between the Parties:-

(i)     the aggregate Market Value of the Collateral delivered to or deposited with Lender (excluding any Equivalent Collateral repaid or redelivered under Paragraphs 5.4(ii) or 5.5(ii) (as the case may be)) ("**Posted Collateral**") in respect of all Loans outstanding under this Agreement shall equal the aggregate of the Market Value of the Loaned Securities and the applicable Margin (the "**Required Collateral Value**") in respect of such Loans;

(ii)    if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement exceeds the aggregate of the Required Collateral Values in respect of such Loans, Lender shall (on demand) repay and/or redeliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess;

(iii)   if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement falls below the aggregate of Required Collateral Values in respect of all such Loans, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.5     **Marking to Market of Collateral during the currency of a Loan on a Loan by Loan basis**

If paragraph 1.3 of the Schedule indicates this paragraph 5.5 shall apply in lieu of paragraph 5.4, the Posted Collateral in respect of any Loan shall bear from day to day and at any time the same proportion to the Market Value of the Loaned Securities as the Posted Collateral bore at the commencement of such Loan. Accordingly:

(i)     the Market Value of the Posted Collateral to be delivered or deposited while the Loan continues shall be equal to the Required Collateral Value;

(ii)    if at any time on any Business Day the Market Value of the Posted Collateral in respect of any Loan exceeds the Required Collateral Value in respect of such Loan, Lender shall (on demand) repay and/or redeliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess; and

(iii) if at any time on any Business Day the Market Value of the Posted Collateral falls below the Required Collateral Value, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.6 **Requirements to redeliver excess Collateral**

Where paragraph 5.4 applies, unless paragraph 1.4 of the Schedule indicates that this paragraph 5.6 does not apply, if a Party (the "**first Party**") would, but for this paragraph 5.6, be required under paragraph 5.4 to provide further Collateral or redeliver Equivalent Collateral in circumstances where the other Party (the "**second Party**") would, but for this paragraph 5.6, also be required to or provide Collateral or redeliver Equivalent Collateral under paragraph 5.4, then the Market Value of the Collateral or Equivalent Collateral deliverable by the first Party ("**X**") shall be set-off against the Market Value of the Collateral or Equivalent Collateral deliverable by the second Party ("**Y**") and the only obligation of the Parties under paragraph 5.4 shall be, where X exceeds Y, an obligation of the first Party, or where Y exceeds X, an obligation of the second Party to repay and/or (as the case may be) redeliver Equivalent Collateral or to deliver further Collateral having a Market Value equal to the difference between X and Y.

5.7 Where Equivalent Collateral is repaid or redelivered (as the case may be) or further Collateral is provided by a Party under paragraph 5.6, the Parties shall agree to which Loan or Loans such repayment, redelivery or further provision is to be attributed and failing agreement it shall be attributed, as determined by the Party making such repayment, redelivery or further provision to the earliest outstanding Loan and, in the case of a repayment or redelivery up to the point at which the Market Value of Collateral in respect of such Loan equals the Required Collateral Value in respect of such Loan, and then to the next earliest outstanding Loan up to the similar point and so on.

5.8 **Timing of repayments of excess Collateral or deliveries of further Collateral**

Where any Equivalent Collateral falls to be repaid or redelivered (as the case may be) or further Collateral is to be provided under this paragraph 5, unless otherwise agreed between the Parties, it shall be delivered on the same Business Day as the relevant demand. Equivalent Collateral comprising securities shall be deemed to have been delivered by Lender to Borrower on delivery to Borrower or as it shall direct of the relevant instruments of transfer, or in the case of such securities being held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such securities being held by the operator of the clearing system for the account of the Borrower or as it shall direct or by such other means as may be agreed.

5.9 **Substitutions and extensions of Letters of Credit**

Where Collateral is a Letter of Credit, Lender may by notice to Borrower require that Borrower, on the Business Day following the date of delivery of such notice, substitute Collateral consisting of cash or other Collateral acceptable to Lender for the Letter of Credit. Prior to the expiration of any Letter of Credit supporting Borrower's obligations hereunder, Borrower shall, no later than 10.30a.m. UK time on the second Business Day prior to the

date such Letter of Credit expires, obtain an extension of the expiration of such Letter of Credit or replace such Letter of Credit by providing Lender with a substitute Letter of Credit in an amount at least equal to the amount of the Letter of Credit for which it is substituted.

6.    **DISTRIBUTIONS AND CORPORATE ACTIONS**

6.1   **Manufactured Payments**

Where Income is paid in relation to any Loaned Securities or Collateral (other than Cash Collateral) on or by reference to an Income Payment Date Borrower, in the case of Loaned Securities, and Lender, in the case of Collateral, shall, on the date of the payment of such Income, or on such other date as the Parties may from time to time agree, (the "**Relevant Payment Date**") pay and deliver a sum of money or property equivalent to the type and amount of such Income that, in the case of Loaned Securities, Lender would have been entitled to receive had such Securities not been loaned to Borrower and had been retained by Lender on the Income Payment Date, and, in the case of Collateral, Borrower would have been entitled to receive had such Collateral not been provided to Lender and had been retained by Borrower on the Income Payment Date unless a different sum is agreed between the Parties.

6.2   **Income in the form of Securities**

Where Income, in the form of securities, is paid in relation to any Loaned Securities or Collateral, such securities shall be added to such Loaned Securities or Collateral (and shall constitute Loaned Securities or Collateral, as the case may be, and be part of the relevant Loan) and will not be delivered to Lender, in the case of Loaned Securities, or to Borrower, in the case of Collateral, until the end of the relevant Loan, provided that the Lender or Borrower (as the case may be) fulfils their obligations under paragraph 5.4 or 5.5 (as applicable) with respect to the additional Loaned Securities or Collateral, as the case may be.

6.3   **Exercise of voting rights**

Where any voting rights fall to be exercised in relation to any Loaned Securities or Collateral, neither Borrower, in the case of Equivalent Securities, nor Lender, in the case of Equivalent Collateral, shall have any obligation to arrange for voting rights of that kind to be exercised in accordance with the instructions of the other Party in relation to the Securities borrowed by it or transferred to it by way of Collateral, as the case may be, unless otherwise agreed between the Parties.

6.4   **Corporate actions**

Where, in respect of any Loaned Securities or any Collateral, any rights relating to conversion, sub-division, consolidation, pre-emption, rights arising under a takeover offer, rights to receive securities or a certificate which may at a future date be exchanged for securities or other rights, including those requiring election by the holder for the time being of such Securities or Collateral, become exercisable prior to the redelivery of Equivalent Securities or Equivalent Collateral, then Lender or Borrower, as the case may be, may, within a reasonable time before the latest time for the exercise of the right or option give

written notice to the other Party that on redelivery of Equivalent Securities or Equivalent Collateral, as the case may be, it wishes to receive Equivalent Securities or Equivalent Collateral in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice.

7. **RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL**

7.1 **Rates in respect of Loaned Securities**

In respect of each Loan, Borrower shall pay to Lender, in the manner prescribed in sub-paragraph 7.3, sums calculated by applying such rate as shall be agreed between the Parties from time to time to the daily Market Value of the Loaned Securities.

7.2 **Rates in respect of Cash Collateral**

Where Cash Collateral is deposited with Lender in respect of any Loan, Lender shall pay to Borrower, in the manner prescribed in paragraph 7.3, sums calculated by applying such rates as shall be agreed between the Parties from time to time to the amount of such Cash Collateral. Any such payment due to Borrower may be set-off against any payment due to Lender pursuant to paragraph 7.1.

7.3 **Payment of rates**

In respect of each Loan, the payments referred to in paragraph 7.1 and 7.2 shall accrue daily in respect of the period commencing on and inclusive of the Settlement Date and terminating on and exclusive of the Business Day upon which Equivalent Securities are redelivered or Cash Collateral is repaid. Unless otherwise agreed, the sums so accruing in respect of each calendar month shall be paid in arrears by the relevant Party not later than the Business Day which is one week after the last Business Day of the calendar month to which such payments relate or such other date as the Parties shall from time to time agree.

8. **REDELIVERY OF EQUIVALENT SECURITIES**

8.1 **Delivery of Equivalent Securities on termination of a Loan**

Borrower shall procure the redelivery of Equivalent Securities to Lender or redeliver Equivalent Securities in accordance with this Agreement and the terms of the relevant Loan on termination of the Loan. Such Equivalent Securities shall be deemed to have been delivered by Borrower to Lender on delivery to Lender or as it shall direct of the relevant instruments of transfer, or in the case of Equivalent Securities held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such Equivalent Securities being held by the operator of the clearing system for the account of the Lender or as it shall direct, or by such other means as may be agreed. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (howsoever expressed) to an obligation to redeliver or account for or act in relation to Loaned Securities shall accordingly be construed

as a reference to an obligation to redeliver or account for or act in relation to Equivalent Securities.

8.2     **Lender's right to terminate a Loan**

Subject to paragraph 10 and the terms of the relevant Loan, Lender shall be entitled to terminate a Loan and to call for the redelivery of all or any Equivalent Securities at any time by giving notice on any Business Day of not less than the standard settlement time for such Equivalent Securities on the exchange or in the clearing organisation through which the Loaned Securities were originally delivered. Borrower shall redeliver such Equivalent Securities not later than the expiry of such notice in accordance with Lender's instructions.

8.3     **Borrower's right to terminate a Loan**

Subject to the terms of the relevant Loan, Borrower shall be entitled at any time to terminate a Loan and to redeliver all and any Equivalent Securities due and outstanding to Lender in accordance with Lender's instructions and Lender shall accept such redelivery.

8.4     **Redelivery of Equivalent Collateral on termination of a Loan**

On the date and time that Equivalent Securities are required to be redelivered by Borrower on the termination of a Loan, Lender shall simultaneously (subject to paragraph 5.4 if applicable) repay to Borrower any Cash Collateral or, as the case may be, redeliver Collateral equivalent to the Collateral provided by Borrower pursuant to paragraph 5 in respect of such Loan. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (however expressed) to an obligation to redeliver or account for or act in relation to Collateral shall accordingly be construed as a reference to an obligation to redeliver or account for or act in relation to Equivalent Collateral.

8.5     **Redelivery of Letters of Credit**

Where a Letter of Credit is provided by way of Collateral, the obligation to redeliver Equivalent Collateral is satisfied by Lender redelivering for cancellation the Letter of Credit so provided, or where the Letter of Credit is provided in respect of more than one Loan, by Lender consenting to a reduction in the value of the Letter of Credit.

8.6     **Redelivery obligations to be reciprocal**

Neither Party shall be obliged to make delivery (or make a payment as the case may be) to the other unless it is satisfied that the other Party will make such delivery (or make an appropriate payment as the case may be) to it. If it is not so satisfied (whether because an Event of Default has occurred in respect of the other Party or otherwise) it shall notify the other party and unless that other Party has made arrangements which are sufficient to assure full delivery (or the appropriate payment as the case may be) to the notifying Party, the notifying Party shall (provided it is itself in a position, and willing, to perform its own obligations) be entitled to withhold delivery (or payment, as the case may be) to the other Party.

9.  **FAILURE TO REDELIVER**

9.1  **Borrower's failure to redeliver Equivalent Securities**

(i)  If Borrower does not redeliver Equivalent Securities in accordance with paragraph 8.1 or 8.2, Lender may elect to continue the Loan (which Loan, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable) provided that if Lender does not elect to continue the Loan, Lender may either by written notice to Borrower terminate the Loan forthwith and the Parties' delivery and payment obligations in respect thereof (in which case sub-paragraph (ii) below shall apply) or serve a notice of an Event of Default in accordance with paragraph 14.

(ii)  Upon service of a notice to terminate the relevant Loan pursuant to paragraph 9.1(i):-

(a)  there shall be set-off against the Market Value of the Equivalent Securities concerned such amount of Posted Collateral chosen by Lender (calculated at its Market Value) as is equal thereto;

(b)  the Parties delivery and payment obligations in relation to such assets which are set-off shall terminate;

(c)  in the event that the Market Value of the Posted Collateral set-off is less than the Market Value of the Equivalent Securities concerned Borrower shall account to Lender for the shortfall; and

(d)  Borrower shall account to Lender for the total costs and expenses incurred by Lender as a result thereof as set out in paragraphs 9.3 and 9.4 from the time the notice is effective.

9.2  **Lender's failure to Redeliver Equivalent Collateral**

(i)  If Lender does not redeliver Equivalent Collateral in accordance with paragraph 8.4 or 8.5, Borrower may either by written notice to Lender terminate the Loan forthwith and the Parties' delivery and payment obligations in respect thereof (in which case sub-paragraph (ii) below shall apply) or serve a notice of an Event of Default in accordance with paragraph 14.

(ii)  Upon service of a notice to terminate the relevant Loan pursuant to paragraph 9.2(i):-

(a)  there shall be set-off against the Market Value of the Equivalent Collateral concerned the Market Value of the Loaned Securities;

(b)  the Parties delivery and payment obligations in relation to such assets which are set-off shall terminate;

(c) in the event that the Market Value of the Loaned Securities held by Borrower is less than the Market Value of the Equivalent Collateral concerned Lender shall account to Borrower for the shortfall; and

(d) Lender shall account to Borrower for the total costs and expenses incurred by Borrower as a result thereof as set out in paragraphs 9.3 and 9.4 from the time the notice is effective.

## 9.3 Failure by either Party to redeliver

This provision applies in the event that a Party (the "**Transferor**") fails to meet a redelivery obligation within the standard settlement time for the asset concerned on the exchange or in the clearing organisation through which the asset equivalent to the asset concerned was originally delivered or within such other period as may be agreed between the Parties. In such situation, in addition to the Parties' rights under the general law and this Agreement where the other Party (the "**Transferee**") incurs interest, overdraft or similar costs and expenses the Transferor agrees to pay on demand and hold harmless the Transferee with respect to all such costs and expenses which arise directly from such failure excluding (i) such costs and expenses which arise from the negligence or wilful default of the Transferee and (ii) any indirect or consequential losses. It is agreed by the Parties that any costs reasonably and properly incurred by a Party arising in respect of the failure of a Party to meet its obligations under a transaction to sell or deliver securities resulting from the failure of the Transferor to fulfil its redelivery obligations is to be treated as a direct cost or expense for the purposes of this paragraph.

## 9.4 Exercise of buy-in on failure to redeliver

In the event that as a result of the failure of the Transferor to fulfil its redelivery obligations a "buy-in" is exercised against the Transferee, then the Transferor shall account to the Transferee for the total costs and expenses reasonably incurred by the Transferee as a result of such "buy-in".

## 10. SET-OFF ETC

## 10.1 Definitions for paragraph 10

In this paragraph 10:

"**Bid Price**" in relation to Equivalent Securities or Equivalent Collateral means the best available bid price on the most appropriate market in a standard size;

"**Bid Value**" subject to paragraph 10.5 means:-

(a) in relation to Collateral equivalent to Collateral in the form of a Letter of Credit zero and in relation to Cash Collateral the amount of the currency concerned; and

(b) in relation to Equivalent Securities or Collateral equivalent to all other types of Collateral the amount which would be received on a sale of such Equivalent Securities or Equivalent Collateral at the Bid Price at Close of Business on the

relevant Business Day less all costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out such sale or realisation and adding thereto the amount of any interest, dividends, distributions or other amounts, in the case of Equivalent Securities, paid to Borrower and in respect of which equivalent amounts have not been paid to Lender and in the case of Equivalent Collateral, paid to Lender and in respect of which equivalent amounts have not been paid to Borrower, in accordance with paragraph 6.1 prior to such time in respect of such Equivalent Securities, Equivalent Collateral or the original Securities or Collateral held, gross of all and any tax deducted or paid in respect thereof;

**"Offer Price"** in relation to Equivalent Securities or Equivalent Collateral means the best available offer price on the most appropriate market in a standard size;

**"Offer Value"** subject to paragraph 10.5 means:-

(a)    in relation to Collateral equivalent to Collateral in the form of a Letter of Credit zero and in relation to Cash Collateral the amount of the currency concerned; and

(b)    in relation to Equivalent Securities or Collateral equivalent to all other types of Collateral the amount it would cost to buy such Equivalent Securities or Equivalent Collateral at the Offer Price at Close of Business on the relevant Business Day together with all costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction and adding thereto the amount of any interest, dividends, distributions or other amounts, in the case of Equivalent Securities, paid to Borrower and in respect of which equivalent amounts have not been paid to Lender and in the case of Equivalent Collateral, paid to Lender and in respect of which equivalent amounts have not been paid to Borrower, in accordance with paragraph 6.1 prior to such time in respect of such Equivalent Securities, Equivalent Collateral or the original Securities or Collateral held, gross of all and any tax deducted or paid in respect thereof;

10.2    **Termination of delivery obligations upon Event of Default**

Subject to paragraph 9, if an Event of Default occurs in relation to either Party, the Parties' delivery and payment obligations (and any other obligations they have under this Agreement) shall be accelerated so as to require performance thereof at the time such Event of Default occurs (the date of which shall be the **"Termination Date"** for the purposes of this clause) so that performance of such delivery and payment obligations shall be effected only in accordance with the following provisions:

(i)    the Relevant Value of the securities which would have been required to be delivered but for such termination (or payment to be made, as the case may be) by each Party shall be established in accordance with paragraph 10.3; and

(ii) on the basis of the Relevant Values so established, an account shall be taken (as at the Termination Date) of what is due from each Party to the other and (on the basis that each Party's claim against the other in respect of delivery of Equivalent Securities or Equivalent Collateral or any cash payment equals the Relevant Value thereof) the sums due from one Party shall be set-off against the sums due from the other and only the balance of the account shall be payable (by the Party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be payable on the Termination Date.

If the Bid Value is greater than the Offer Value, and the Non-Defaulting Party had delivered to the Defaulting Party a Letter of Credit, the Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently redeliver for cancellation the Letter of Credit so provided.

If the Offer Value is greater than the Bid Value, and the Defaulting Party had delivered to the Non-Defaulting Party a Letter of Credit, the Non-Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently redeliver for cancellation the Letter of Credit so provided.

In all other circumstances, where a Letter of Credit has been provided to a Party, such Party shall redeliver for cancellation the Letter of Credit so provided.

10.3 **Determination of delivery values upon Event of Default**

For the purposes of paragraph 10.2 the **"Relevant Value"**:-

(i) of any securities to be delivered by the Defaulting Party shall, subject to paragraph 10.5 below, equal the Offer Value of such securities; and

(ii) of any securities to be delivered to the Defaulting Party shall, subject to paragraph 10.5 below, equal the Bid Value of such securities.

10.4 For the purposes of paragraph 10.3, but subject to paragraph 10.5, the Bid Value and Offer Value of any securities shall be calculated for securities of the relevant description (as determined by the Non-Defaulting Party) as of the first Business Day following the Termination Date, or if the relevant Event of Default occurs outside the normal business hours of such market, on the second Business Day following the Termination Date (the **"Default Valuation Time"**);

10.5 Where the Non-Defaulting Party has following the occurrence of an Event of Default but prior to the close of business on the fifth Business Day following the Termination Date purchased securities forming part of the same issue and being of an identical type and description to those to be delivered by the Defaulting Party or sold securities forming part of the same issue and being of an identical type and description to those to be delivered by him to the Defaulting Party, the cost of such purchase or the proceeds of such sale, as the case may be, (taking into account all reasonable costs, fees and expenses that would be incurred in connection therewith) shall (together with any amounts owing pursuant to paragraph 6.1) be treated as the Offer Value or Bid Value, as the case may be, of the amount of securities to

be delivered which is equivalent to the amount of the securities so bought or sold, as the case may be, for the purposes of this paragraph 10, so that where the amount of securities to be delivered is more than the amount so bought or sold as the case may be, the Offer Value or Bid Value as the case may be, of the balance shall be valued in accordance with paragraph 10.4.

10.6 Any reference in this paragraph 10 to securities shall include any asset other than cash provided by way of Collateral.

10.7 **Other costs, expenses and interest payable in consequence of an Event of Default**

The Defaulting Party shall be liable to the Non-Defaulting Party for the amount of all reasonable legal and other professional expenses incurred by the Non-Defaulting Party in connection with or as a consequence of an Event of Default, together with interest thereon at the one-month London Inter Bank Offered Rate as quoted on a reputable financial information service ("**LIBOR**") as of 11.00 am, London Time, on the date on which it is to be determined or, in the case of an expense attributable to a particular transaction and where the parties have previously agreed a rate of interest for the transaction, that rate of interest if it is greater than LIBOR. The rate of LIBOR applicable to each month or part thereof that any sum payable pursuant to this paragraph 10.7 remains outstanding is the rate of LIBOR determined on the first Business Day of any such period of one month or any part thereof. Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed.

11. **TRANSFER TAXES**

Borrower hereby undertakes promptly to pay and account for any transfer or similar duties or taxes chargeable in connection with any transaction effected pursuant to or contemplated by this Agreement, and shall indemnify and keep indemnified Lender against any liability arising as a result of Borrower's failure to do so.

12. **LENDER'S WARRANTIES**

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Lender:

(a) it is duly authorised and empowered to perform its duties and obligations under this Agreement;

(b) it is not restricted under the terms of its constitution or in any other manner from lending Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c) it is absolutely entitled to pass full legal and beneficial ownership of all Securities provided by it hereunder to Borrower free from all liens, charges and encumbrances; and

(d) it is acting as principal in respect of this Agreement or, subject to paragraph 16, as agent and the conditions referred to in paragraph 16.2 will be fulfilled in respect of any Loan which it makes as agent.

13. **BORROWER'S WARRANTIES**

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Borrower:

(a) it has all necessary licenses and approvals, and is duly authorised and empowered, to perform its duties and obligations under this Agreement and will do nothing prejudicial to the continuation of such authorisation, licences or approvals;

(b) it is not restricted under the terms of its constitution or in any other manner from borrowing Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c) it is absolutely entitled to pass full legal and beneficial ownership of all Collateral provided by it hereunder to Lender free from all liens, charges and encumbrances; and

(d) it is acting as principal in respect of this Agreement.

14. **EVENTS OF DEFAULT**

14.1 Each of the following events occurring in relation to either Party (the **"Defaulting Party"**, the other Party being the **"Non-Defaulting Party"**) shall be an Event of Default for the purpose of paragraph 10 but only (subject to sub-paragraph (v) below) where the Non-Defaulting Party serves written notice on the Defaulting Party:-

(i) Borrower or Lender failing to pay or repay Cash Collateral or deliver Collateral or redeliver Equivalent Collateral or Lender failing to deliver Securities upon the due date;

(ii) Lender or Borrower failing to comply with its obligations under paragraph 5;

(iii) Lender or Borrower failing to comply with its obligations under paragraph 6.1;

(iv) Borrower failing to comply with its obligations to deliver Equivalent Securities in accordance with paragraph 8;

(v) an Act of Insolvency occurring with respect to Lender or Borrower, an Act of Insolvency which is the presentation of a petition for winding up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party not requiring the Non-Defaulting Party to serve written notice on the Defaulting Party;

(vi) any representation or warranty made by Lender or Borrower being incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated;

(vii) Lender or Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations under this Agreement and/or in respect of any Loan;

(viii) Lender (if applicable) or Borrower being declared in default or being suspended or expelled from membership of or participation in, any securities exchange or association or suspended or prohibited from dealing in securities by any regulatory authority;

(ix) any of the assets of Lender or Borrower or the assets of investors held by or to the order of Lender or Borrower being transferred or ordered to be transferred to a trustee (or a person exercising similar functions) by a regulatory authority pursuant to any securities regulating legislation, or

(x) Lender or Borrower failing to perform any other of its obligations under this Agreement and not remedying such failure within 30 days after the Non-Defaulting Party serves written notice requiring it to remedy such failure.

14.2 Each Party shall notify the other (in writing) if an Event of Default or an event which, with the passage of time and/or upon the serving of a written notice as referred to above, would be an Event of Default, occurs in relation to it.

14.3 The provisions of this Agreement constitute a complete statement of the remedies available to each Party in respect of any Event of Default.

14.4 Subject to paragraph 9.3 and 10.7, neither Party may claim any sum by way of consequential loss or damage in the event of failure by the other party to perform any of its obligations under this Agreement.

## 15. INTEREST ON OUTSTANDING PAYMENTS

In the event of either Party failing to remit sums in accordance with this Agreement such Party hereby undertakes to pay to the other Party upon demand interest (before as well as after judgment) on the net balance due and outstanding, for the period commencing on and inclusive of the original due date for payment to (but excluding) the date of actual payment, in the same currency as the principal sum and at the rate referred to in paragraph 10.7. Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed.

## 16. TRANSACTIONS ENTERED INTO AS AGENT

### 16.1 Power for Lender to enter into Loans as agent

Subject to the following provisions of this paragraph, Lender may (if so indicated in paragraph 6 of the Schedule) enter into Loans as agent (in such capacity, the **"Agent"**) for a third person (a **"Principal"**), whether as custodian or investment manager or otherwise (a Loan so entered into being referred to in this paragraph as an **"Agency Transaction"**).

### 16.2 Conditions for agency loan

A Lender may enter into an Agency Transaction if, but only if:-

(i) it specifies that Loan as an Agency Transaction at the time when it enters into it;

(ii) it enters into that Loan on behalf of a single Principal whose identity is disclosed to Borrower (whether by name or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) at the time when it enters into the Loan or as otherwise agreed between the Parties; and

(iii) it has at the time when the Loan is entered into actual authority to enter into the Loan and to perform on behalf of that Principal all of that Principal's obligations under the agreement referred to in paragraph 16.4(ii).

16.3 **Notification by Lender of certain events affecting the principal**

Lender undertakes that, if it enters as agent into an Agency Transaction, forthwith upon becoming aware:-

(i) of any event which constitutes an Act of Insolvency with respect to the relevant Principal; or

(ii) of any breach of any of the warranties given in paragraph 16.5 or of any event or circumstance which has the result that any such warranty would be untrue if repeated by reference to the then current facts;

it will inform Borrower of that fact and will, if so required by Borrower, furnish it with such additional information as it may reasonably request.

16.4 **Status of agency transaction**

(i) Each Agency Transaction shall be a transaction between the relevant Principal and Borrower and no person other than the relevant Principal and Borrower shall be a party to or have any rights or obligations under an Agency Transaction. Without limiting the foregoing, Lender shall not be liable as principal for the performance of an Agency Transaction, but this is without prejudice to any liability of Lender under any other provision of this clause; and

(ii) all the provisions of the Agreement shall apply separately as between Borrower and each Principal for whom the Agent has entered into an Agency transaction or Agency Transactions as if each such Principal were a party to a separate agreement with Borrower in all respects identical with this Agreement other than this paragraph and as if the Principal were Lender in respect of that agreement;

PROVIDED THAT

if there occurs in relation to the Agent an Event of Default or an event which would constitute an Event of Default if Borrower served written notice under any sub-clause of paragraph 14, Borrower shall be entitled by giving written notice to the Principal (which notice shall be validly given if given to Lender in accordance with paragraph 21) to declare

that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal. If Borrower gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given; and

if the Principal is neither incorporated in nor has established a place of business in Great Britain, the Principal shall for the purposes of the agreement referred to in paragraph 16.4(ii) be deemed to have appointed as its agent to receive on its behalf service of process in the courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in Great Britain, the person appointed by the Agent for the purposes of this Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other Party.

The foregoing provisions of this paragraph do not affect the operation of the Agreement as between Borrower and Lender in respect of any transactions into which Lender may enter on its own account as principal.

16.5    **Warranty of authority by Lender acting as agent**

Lender warrants to Borrower that it will, on every occasion on which it enters or purports to enter into a transaction as an Agency Transaction, have been duly authorised to enter into that Loan and perform the obligations arising under such transaction on behalf of the person whom it specifies as the Principal in respect of that transaction and to perform on behalf of that person all the obligations of that person under the agreement referred to in paragraph 16.4(ii).

17.    **TERMINATION OF THIS AGREEMENT**

Each Party shall have the right to terminate this Agreement by giving not less than 15 Business Days' notice in writing to the other Party (which notice shall specify the date of termination) subject to an obligation to ensure that all Loans which have been entered into but not discharged at the time such notice is given are duly discharged in accordance with this Agreement.

18.    **SINGLE AGREEMENT**

Each Party acknowledges that, and has entered into this Agreement and will enter into each Loan in consideration of and in reliance upon the fact that, all Loans constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each Party agrees:

(i)    to perform all of its obligations in respect of each Loan, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Loans; and

(ii)    that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan.

19. **SEVERANCE**

If any provision of this Agreement is declared by any judicial or other competent authority to be void or otherwise unenforceable, that provision shall be severed from the Agreement and the remaining provisions of this Agreement shall remain in full force and effect. The Agreement shall, however, thereafter be amended by the Parties in such reasonable manner so as to achieve as far as possible, without illegality, the intention of the Parties with respect to that severed provision.

20. **SPECIFIC PERFORMANCE**

Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver or redeliver Securities, Equivalent Securities, Collateral or Equivalent Collateral but without prejudice to any other rights it may have.

21. **NOTICES**

21.1 Any notice or other communication in respect of this Agreement may be given in any manner set forth below to the address or number or in accordance with the electronic messaging system details set out in paragraph 4 of the Schedule and will be deemed effective as indicated:

   (i)   if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)  if sent by telex, on the date the recipient's answerback is received;

   (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

   (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or the receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the Close of Business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

21.2 Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

22. **ASSIGNMENT**

Neither Party may charge, assign or transfer all or any of its rights or obligations hereunder without the prior consent of the other Party.

23. **NON-WAIVER**

No failure or delay by either Party (whether by course of conduct or otherwise) to exercise any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege as herein provided.

24. **GOVERNING LAW AND JURISDICTION**

24.1 This Agreement is governed by, and shall be construed in accordance with, English law.

24.2 The courts of England have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Agreement (respectively, **"Proceedings"** and **"Disputes"**) and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of England.

24.3 Each party irrevocably waives any objection which it might at any time have to the courts of England being nominated as the forum to hear and decide any Proceedings and to settle any Disputes and agrees not to claim that the courts of England are not a convenient or appropriate forum.

24.4 Each of Party A and Party B hereby respectively appoints the person identified in paragraph 5 of the Schedule pertaining to the relevant Party as its agent to receive on its behalf service of process in the courts of England. If such an agent ceases to be an agent of Party A or party B, as the case may be, the relevant Party shall promptly appoint, and notify the other Party of the identity of its new agent in England.

25. **TIME**

Time shall be of the essence of the Agreement.

26. **RECORDING**

The Parties agree that each may record all telephone conversations between them.

27. **WAIVER OF IMMUNITY**

Each Party hereby waives all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any action or proceeding in the courts of England or of any other country or jurisdiction relating in any way to this Agreement and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

28. **MISCELLANEOUS**

28.1 This Agreement constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

28.2 The Party (the **"Relevant Party"**) who has prepared the text of this Agreement for execution (as indicated in paragraph 7 of the Schedule) warrants and undertakes to the other Party that such text conforms exactly to the text of the standard form Global Master Securities Lending Agreement posted by the International Securities Lenders Association on its website on 7 May 2000 except as notified by the Relevant Party to the other Party in writing prior to the execution of this Agreement.

28.3 No amendment in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the Parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

28.4 The obligations of the Parties under this Agreement will survive the termination of any Loan.

28.5 The warranties contained in paragraphs 12, 13, 16 and 28.2 will survive termination of this Agreement for so long as any obligations of either of the Parties pursuant to this Agreement remain outstanding.

28.6 Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

28.7 This Agreement (and each amendment in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

28.8 A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any terms of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

**EXECUTED** by the **PARTIES**

SIGNED BY                              )
                                       )
DULY AUTHORISED FOR AND                ) **LEHMAN BROTHERS INTERNATIONAL**
ON BEHALF OF                           ) **(EUROPE)**
                                       )


SIGNED BY                              )
                                       )
DULY AUTHORISED FOR AND                ) **PUTNAM INVESTMENT HOLDINGS, LLC**
ON BEHALF OF                           )

1.   **Collateral**

1.1   The collateralization and margin requirements and procedures relating to Loans of Loaned Securities will be governed by the Margin Lending Agreement (the "Margin Lending Agreement"), among Party A, Party B and Lehman Brothers Inc., including the terms and conditions rider (the "TCR") referred to therein, in each case as amended or supplemented from time to time by the parties thereto.

1.2   [Intentionally Deleted]

1.3   Paragraph 5.4 (aggregation) shall apply when determining the amount of outstanding Loans of Loaned Securities to be subject to the collateralization and margin requirements and procedures of the Margin Lending Agreement, including the TCR.

1.4   Paragraph 5.6 (netting of obligations to deliver Collateral and redeliver Equivalent Collateral) shall not apply. The collateralization and margin requirements and procedures relating to Loans of Loaned Securities will be governed by the Margin Lending Agreement, including the TCR.

2.   **Base Currency**

The Base Currency applicable to this Agreement is US Dollars.

3.   **Places of Business**

London

(See definition of Business Day.)

4.   **Designated Office and Address for Notices**

(A)   **Designated office of Party A:**

Address for notices or communications to Party A:

Address: 25 Bank Street, London E14 5LE.

Attention: Equity Finance Department

Facsimile No: +44 (0) 20 7102 3192

Telephone No: +44 (0) 20 7102 2025

Electronic Messaging System Details: May be provided by Party A after execution of this Agreement

(B)   **Designated office of Party B:**

Address for notices or communications to Party B:

Address:

Attention:

Facsimile No:

Telephone No:

Electronic Messaging System Details:

(C)     In addition, any notice or other communication in respect of this Agreement may be given by Party A or Party B in any manner contemplated by and in accordance with the terms and provisions of the Margin Lending Agreement.

5.     **Agent for Service of Process**

(A)     **Agent of Party A for Service of Process**

None.

(B)     **Agent of Party B for Service of Process**

None.

6.     **Agency**

Paragraph 16 will apply to Party A when (i) Party A is lending U.S. Securities and (ii) Party B is a U.S. resident or person for U.S. tax purposes. If Paragraph 16 is applicable to Party A, then (i) the Principal will be a U.S. resident or person for U.S. tax purposes and (ii) the identity of the Principal will be disclosed to Party B upon request.

Paragraph 16 will not apply to Party B.

7.     **Party Preparing this Agreement**

Party A is the party preparing this Agreement.

8.     **Amendment to Paragraph 24**

Paragraph 24 of this Agreement shall be deleted in its entirety and replaced with the following:

"THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

9. **Additional Amendments**  This Agreement is further amended  as follows: (i) the simultaneous delivery obligations set forth in this Agreement (including Paragraph 4.3 hereof) will not apply to Loans of  Loaned Securities; (ii) Paragraph 6 of this Agreement will only apply to Loaned Securities; (iii) Paragraphs 9.2 of this Agreement will not apply to Loans of Loaned Securities; (iv) Paragraphs 9.3 and 9.4 of this Agreement will only apply to the redelivery obligations of Party B; (v) Paragraph 10 of this Agreement will only apply if Party B is the Defaulting Party; and (vi) Paragraph 14.3 and 28.8 of this Agreement is deleted.

10. **Hong Kong Securities**  Party B authorizes and appoints Party A, as appropriate, to register or file this Agreement (under such stock borrowing reference as is assigned) with Hong Kong Revenue authorities in relation to any Securities Lending relating to Hong Kong securities and make such subsequent returns and filings (after consultation with Party B) as may be required to be filed by Party B in relation thereto.

11. **Additional Warranty of Party B.**  Party B represents and warrants to Party A that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and will provide Party A with a QPAM Representation Letter.

12. To the extent a Margin Lending Agreement (a "MLA") is in effect between the parties hereto, the terms thereof shall supercede any conflicting terms of this GMSLA, including without limitation, the collateralization and margin requirements and procedures contained herein.

# **Exhibit B**

## **Determination**

A/73160720.1

**James W. Giddens**
**Trustee for the SIPA Liquidation of Lehman Brothers Inc.**
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

*In re* **Lehman Brothers Inc.**

Case No. 08-01420 (JMP) SIPA

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

September 2, 2009

**VIA UPS OVERNIGHT**

PUTNAM INVESTMENT HOLDINGS, LLC
BINGHAM MCCUTCHEN LLP
ATTN: JOSHUA DORCHAK
399 PARK AVENUE
NEW YORK, NY 10022

> Re:  Claim Number(s):   900002354
> Account Number(s): 5602356, 5602357, 5602358, 5602359, 5602360, 5602361, 5602362, 5602363, 5602364, 5602365

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens, Trustee (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA") pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York. You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding. This Notice is applicable only to the claim(s) and/or accounts identified above. If you filed other claims, additional notices will be issued.

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED. The above-referenced account(s) (the "Account") is with Lehman Brothers International (Europe) ("LBIE"), not LBI. LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

>Clerk of the United States Bankruptcy Court
>Southern District of New York
>One Bowling Green
>New York, New York 10004

**PLEASE TAKE FURTHER NOTICE:** You must serve your opposition upon the Trustee's counsel by mailing a copy to:

>Hughes Hubbard & Reed LLP
>One Battery Park Plaza
>New York, NY 10004
>Attn: LBI Hearing Request
>
>Attorneys for James W. Giddens, Trustee for
>the SIPA Liquidation of Lehman Brothers Inc.

>Very Truly Yours,

>James W. Giddens
>Trustee for the SIPA Liquidation of
>Lehman Brothers Inc.