HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>      LEHMAN BROTHERS INC.,<br><br>                      Debtor. | Case No. 08-01420 (JMP) SIPA |

# TRUSTEE'S SECOND INTERIM REPORT FOR THE PERIOD
# MAY 30, 2009 THROUGH NOVEMBER 11, 2009

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................1

I.      FINANCIAL CONDITION OF THE ESTATE ....................................................5

II.     ADMINISTRATION ............................................................................................5

III.    ACCOUNT TRANSFERS UNDER SIPA §78fff-2(f)...........................................7

IV.     CLAIMS PROCESS ...........................................................................................10

V.      ALLOCATION OF CUSTOMER PROPERTY ...................................................20

VI.     RETURN OF MISDIRECTED FUNDS ..............................................................22

VII.    CUSTOMER AND CREDITOR RELATIONS ...................................................24

VIII.   TRUSTEE'S INVESTIGATION.........................................................................25

IX.     CONTINGENCIES.............................................................................................29

X.      BARCLAYS CAPITAL INC. .............................................................................30

XI.     LEHMAN BROTHERS HOLDINGS INC. .........................................................31

XII.    INTERNATIONAL AFFILIATE CLAIMS AND PROTOCOLS........................32

XIII.   DERIVATIVES, REPOS, FX, AND TBA ISSUES.............................................38

XIV.    GOVERNMENT AND THIRD PARTY INVESTIGATIONS AND
        REGULATORY MATTERS................................................................................39

XV.     ADVERSARY PROCEEDINGS.........................................................................40

XVI.    DATA ACCESS AND TRANSITION SERVICES..............................................41

XVII.   BANKING AND RELATED MATTERS.............................................................44

XVIII.  TAX MATTERS.................................................................................................45

XIX.    EMPLOYEE BENEFITS....................................................................................47

XX.     EXECUTORY CONTRACTS.............................................................................49

XXI.   PROFESSIONAL RETENTION........................................................................49

XXII.  REAL ESTATE ...............................................................................................51

XXIII. INSURANCE.....................................................................................................51

XXIV. CONCLUSION....................................................................................................52

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

To date, the Trustee has administered more than one hundred and ten billion dollars. This makes the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970 ("SIPA") the largest and most complex stock broker liquidation ever attempted, and one of the largest and most complex insolvency proceedings of any kind in history.

The Trustee's primary duty under the law is the return of customer property to customers of LBI as defined under SIPA, while at the same time maximizing the estate for all creditors. In furtherance of the goal of protecting customers, the Trustee has already taken control of and transferred to other broker-dealers more than 110,000 accounts aggregating in excess of $92 billion. The Trustee substantially completed these transfers during the prior report period, thereby preserving to the greatest extent possible both liquidity and market access following Lehman's demise. The Trustee completed these transfers in accordance with the SIPA account transfer process, with the consent of the Securities Investor Protection Corporation ("SIPC") and in keeping with Court Orders and regulatory intent. During the current Report Period, the Trustee's account-by-account, line-by-line reconciliation of the transfers continued. In that connection, the Trustee made additional deliveries as assets continued to be secured from depositories around the world, and, where necessary, the Trustee effected the return of over-deliveries.

The Report Period also saw the passage of the time for filing all claims against the estate, including for claimants seeking to participate in the SIPA customer claims process. As of the June 1 bar date, the Trustee had received more than 12,500

asserted customer claims on behalf of more than 86,000 accounts, along with more than 7,500 general estate claims.  The Trustee has already determined more than 85% of asserted public customer claims, and has made equally substantial progress in the reconciliation of customer claims asserted by, among others, Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers International (Europe) ("LBIE"), and Barclays Capital Inc. ("Barclays") that were filed on an omnibus basis on behalf of many thousands of accounts.

In parallel with the determination of claims, which begins to frame the estate's potential liability to customers and other creditors, during the Report Period the Trustee filed a motion pursuant to SIPA seeking Bankruptcy Court approval of an allocation of the assets available to satisfy such claims.  The allocation motion will help determine how much of the roughly $18 billion currently available to the estate (along with any future recoveries) will be apportioned to the fund of "customer property" – a priority pool of assets available only to allowed customer claims – and to the "general estate" – a pool of assets available to satisfy all other claims, including any potential deficiencies in customer claims.

The Trustee's goal and aspiration remains effecting a 100% distribution to customers if at all possible.  However, regardless of resolution of the allocation motion it is already apparent that, based on circumstances including the transfer of nearly all of LBI's subsidiaries to LBHI prior to the September 19, 2008 filing date (the "Filing Date") and the transfer of substantial assets to Barclays, returns to general estate creditors will be limited at best.

The timing and extent of distributions remain dependent on a number of

contingencies for which the Trustee must continue to reserve.  These contingencies include pending litigation such as the allocation motion and some $6 billion in disputes with Barclays, along with disputes arising from the claims process that have already amounted to several billion dollars.  The Trustee intends to make distributions as soon as there is sufficient clarity on these and other issues so to allow substantial distribution on account of allowed customer claims, but due to the amounts at stake and complexity of the issues such contingencies may take time to resolve to a sufficient degree to make such a distribution prudent.

At the same time, the Trustee continues actively to marshal assets. Among other potential sources of recoveries, the Trustee is pursuing more than 1,700 counterparty unwind and customer receivable positions, which to date have resulted in returns in excess of $700 million.  Similar progress is being made in connection with recovery of assets tied up in foreign depositories, and in the analysis of potential preference and other avoidance claims.

Finally, the Trustee continues to fulfill his duty to investigate the acts, conduct, property, and financial condition of LBI, including the causes of the broker-dealer's demise and lessons that may be learned from a regulatory perspective.  The Trustee has coordinated these efforts in every respect with, among others, the Examiner in the LBHI proceeding, to avoid potential duplication.

This Second Interim Report summarizes these and other matters attendant to the administration and liquidation of the largest broker-dealer ever to fail.  It is important to note that at all points the Trustee and his professionals have acted in close consultation with SIPC, and also in consultation with the Securities and Exchange

Commission (the "SEC"), the Federal Reserve Bank of New York ("FRBNY"), the

Commodities Futures Trading Commission ("CFTC"), and the Financial Industry

Regulatory Authority ("FINRA").  Equally as important, the Trustee and his

professionals interact daily – at times with hundreds of different parties per day – with

LBI's customer and general creditor population, along with other direct and indirect

parties in interest including the Chapter 11 Debtors, their Creditors' Committee and other

ad hoc groups and creditors of those proceedings, and with LBIE and other foreign

affiliates.

1.      James W. Giddens (the "Trustee"), as trustee for the liquidation of LBI, respectfully submits this Second Interim Report (this "Report") in accordance with the terms of the Order of the Court entered on November 6, 2008 (Docket No. 241), and pursuant to §78fff-1(c) of SIPA, 15 U.S.C. §78fff-1(c).

2.      On May 29, 2009, the Trustee filed his First Interim Report for the Period September 19, 2008 Through May 29, 2009 (the "First Interim Report") (Docket No. 1151), and, pursuant to the Order, shall file interim reports at least every six (6) months thereafter.  This Report covers the period from May 30, 2009 through November 11, 2009 (the "Report Period").[1]

## I.      FINANCIAL CONDITION OF THE ESTATE

3.      The Trustee's professionals have continued to perform a detailed and comprehensive analysis of the financial condition of the LBI Estate.  For information relating to LBI Estate finances, including cash flow, assets on hand, and professional fee disbursements, see Exhibit 1.

4.      As part of this ongoing financial analysis, the Trustee's professionals have reconciled the majority of cash positions on LBI's records with approximately 460 accounts at third-party banks with which LBI had banking relationships, and communications continue with certain banks where outstanding items remain to be validated (*see infra* ¶ 10).

## II.      ADMINISTRATION

5.      The Trustee has retained Hughes Hubbard & Reed LLP ("HHR"), Deloitte & Touche LLP ("Deloitte"), Deloitte Tax LLP, tax advisory services ("Deloitte Tax"), claims agent EPIQ Bankruptcy Solutions, LLC, Norton Rose LLP ("Norton Rose"), and certain other specialized professionals and experts to advise and assist the Trustee in the orderly liquidation of the LBI Estate.  The Trustee has also retained special counsel in Japan, Israel, and the United States to assist with various matters (*see infra* ¶¶ 217-221). The roles and responsibilities of the Trustee's professionals continue to evolve as the liquidation progresses and the Trustee and his counsel identify new needs and determine where certain needs have been met.

6.      The Trustee's professionals are housed in a fully operational and staffed New York City office within walking distance of the Bankruptcy Court and HHR to facilitate the review of claims, respond to inquiries from claimants and other parties, and otherwise administer the estate.  Unlike most liquidations in the forty year history of the SIPA statute, the Trustee did not inherit the broker-dealer's premises, which was sold to Barclays.  As a result, the Trustee built from the ground up a fully functioning office from which he could access hundreds of systems containing in excess of 90 billion records of data (*see infra* ¶¶ 168-182).

---

1.   The Trustee's Interim Reports are available on the Trustee's website (www.lehmantrustee.com).

7.     The Trustee employs administrative professionals who oversee the performance of the major efforts and work streams, provide guidance and review functions related to invoices, assist with information and technological needs, provide historical knowledge of LBI's operations, and provide consultative advice on various matters.  The Trustee, in consultation with SIPC, continuously evaluates the administrative needs of the estate.  Thus, as substantial progress has been made in the review of claims, the Trustee anticipates that the services of Financial Industry Technical Services, Inc., which provides expert assistance with the processing and review of potential SIPA customer claims, will no longer be required and thus no longer retained by the end of this month.

8.     The Trustee has hired industry experts to assist with various matters including, but not limited to, regulatory compliance, the Trustee's ongoing investigation of the Depository Trust Clearing Corporation ("DTCC") (*see infra* ¶¶ 105-107), and the evaluation of payment-in-kind notes ("PIK Notes") (*see infra* ¶¶ 122-124).

9.     Deloitte personnel are organized into work streams to support the efforts of the Trustee and his counsel.  (*See* Exhibit 2.)  Deloitte work streams assist with all aspects of the liquidation, including account transfers (*see infra* ¶¶ 14-30), claim processing (*see infra* ¶¶ 31-70), the return of misdirected wires (*see infra* ¶¶ 79-82), the unwind of derivatives and other financial products (*see infra* ¶¶ 154-159), technology and transition services (*see infra* ¶¶ 168-182), and tax matters (*see infra* ¶¶ 191-205).

10.     The Trustee's professionals have established daily processes to support the ongoing processing of LBI's former brokerage business.  These include:

- reconciling cash to approximately 460 bank accounts, including over 16,000 open times, 12,000 of which the Trustee's professionals have reconciled;

- reconciling to depositories on a daily basis over 9,500 unique securities that equate to a share or par amount of over 14.5 billion of equity and debt securities;

- updating more than 3 million journal entries on LBI's books, including transfer or receipt of assets;

- researching approximately 12,000 suspense items, virtually all of which the Trustee's professionals have resolved; and

- processing over 25,000 corporate actions related to securities held at various depositories around the world.

11.     The Trustee's professionals have also established controls for the payment and journaling of all administrative expenses which include recording payment instructions and supporting documentation, reviewing time-entry diaries, and assessing the reasonableness of all rates and bills for services performed.  At the request of and in

consultation with SIPC, nearly every professional firm and consultant retained by the Trustee has agreed to a voluntary "public interest discount" of 10% or more from standard rates and has further agreed not to charge for a number of expenses regularly paid to professionals in large bankruptcy proceedings (*see infra* ¶¶ 217-221).

12.     The Trustee maintains a dedicated research team that investigates inquiries submitted by the Trustee and his counsel relating to asset movement and related issues arising from customer claims or former LBI customer inquiries, and other historic and ongoing activities that affect the LBI Estate from time to time.  To date, this team has completed research related to 250 independent requests in response to over 300 inquiries from the Trustee and his counsel.

13.     The Trustee and his professionals continue to monitor LBI's proprietary assets including, as appropriate, soliciting and or evaluating bids for such assets.

### III.     ACCOUNT TRANSFERS UNDER SIPA §78fff-2(f)

14.     Pursuant to SIPA 78fff-2(f), the Order Commencing Liquidation,[2] the Asset Purchase Agreement of September 16, 2008, as amended ("Purchase Agreement"), and to effectuate the SIPA goals of providing protection to customers, preserving account values and stabilizing markets, the Trustee has substantially completed transferring three sets of customer accounts: (i) Private Investment Management ("PIM") accounts to Barclays; (ii) Private Asset Management ("PAM") accounts to Ridge Clearing and Outsourcing, Inc. ("Ridge") for the benefit of Neuberger Berman, LLC ("Neuberger"); and (iii) prime brokerage accounts ("PBAs") to SIPC member broker-dealers designated by the PBA holders (collectively, the "Account Transfers").

15.     The Account Transfers allowed former LBI account holders to access billions of dollars of assets held in hundreds of thousands of LBI accounts promptly following the largest broker-dealer liquidation filing in history.  To complete the Account Transfers, the Trustee has (i) transferred available securities from LBI's various custodial banks to the affected customers' broker-dealers, (ii) transferred cash from available reserves for the benefit of various customers, or directly to them, and (iii) used cash reserves to purchase missing securities for ultimate delivery to customers' broker-dealers.

16.     During the Report Period, the Trustee's professionals continued to reconcile, evaluate and deliver property as part of the Account Transfers.  While the bulk of the transfers occurred during the prior report period, in addition to reconciling tens of thousands of accounts and billions of positions to the penny during this period, the Trustee also completed 35 separate deliveries and, as necessary, effected the return of over-deliveries.

---

2.    On the Filing Date, The Honorable Gerard E. Lynch, then District Court Judge of the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation pursuant to SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.,* Case No. 08-CIV-8119 (GEL).  By Order of the Court dated November 7, 2008 (Docket No. 240), the case caption changed to *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) SIPA.

17.    In total, as of the filing of this Report, the Trustee has transferred approximately $92 billion in customer assets for the benefit of over 110,000 former LBI customers. Each component of the Account Transfers was undertaken pursuant to SIPA, the Order Commencing Liquidation, the Order authorizing the Trustee to consummate the sale transaction on behalf of LBI pursuant to the Purchase Agreement (Docket No. 3, incorporating by reference LBHI Docket No. 258), and with the advice and consent of SIPC and support of regulators, in order to preserve investor confidence in turbulent markets and protect customer assets.

**Conversion of Private Asset Management Accounts to Ridge Clearing & Outsourcing Solutions, Inc.**

18.    As detailed in the First Interim Report (¶¶ 13-16), prior to the Filing Date, LBI served as Neuberger's clearing broker for the PAM accounts, and following the commencement of the Chapter 11 Cases, Neuberger negotiated to transfer clearing services for LBI's PAM accounts to Ridge. As a result, the PAM accounts were converted from accounts on LBI's books and records to accounts on Ridge's books and records, creating mirror accounts for the holder(s) of each such PAM account on Ridge's systems (the "PAM Conversion"; each former PAM account holder that became a Neuberger account holder via Ridge in the PAM Conversion, a "PAM Account Holder").

19.    The PAM conversion has resulted in the full transfer of assets by the Trustee to Ridge for the benefit of Neuberger and the PAM Account Holders, except in limited instances where securities were unavailable to the Trustee for delivery to Ridge. On January 7, 2009, the Trustee, Ridge, and Neuberger agreed to a mechanism under which the Trustee transferred cash from LBI's existing customer reserve account to Neuberger for the purpose of allowing and enabling Neuberger to purchase unavailable securities. These replacement purchases have been completed to the extent possible, and where a replacement purchase could not be undertaken, cash was provided to the affected PAM Account Holders using the cash provided by the Trustee.

20.    The Trustee's obligations to deliver cash and securities to Ridge in connection with the PAM Conversion have been performed, and, to the extent not performed, have been relieved as provided in a second agreement among the Trustee, Ridge, and Neuberger dated as of October 30, 2009. The January 2009 and October 2009 agreements also provided for and confirmed Ridge's return of any excess securities to the Trustee as well as the return of excess cash transfers to Neuberger and Ridge.

21.    With respect to the PAM Conversion, the Trustee has transferred customer cash and securities valued at over $45.5 billion to Ridge and Neuberger for the benefit of 38,000 individual PAM Account Holders. As a result, claims by PAM Account Holders have been determined as "denied as satisfied," and the PAM transfers – which in themselves would be larger than all other stock-broker liquidations in history combined – are now substantially complete.

## Conversion of Private Investment Management Accounts to Barclays Capital Inc.

22.    As detailed in the First Interim Report (¶¶ 17-24), the Trustee effected the transfer of PIM accounts to Barclays.  Specifically, the PIM accounts were converted from accounts on LBI's books and records to accounts on Barclays' books and records, creating mirror accounts for the holder(s) of each such PIM account on Barclays' systems (the "PIM Conversion"; each former PIM account holder that became a Barclays account holder in the PIM Conversion, a "PIM Account Holder").

23.    The Trustee has, beginning on or about September 25, 2008, and continuing from time to time until the date hereof, in nearly two hundred separate transfers, delivered cash and securities to Barclays for the purpose of completing the PIM Conversion pursuant to the Trustee's authority under SIPA and the expectation of all interested parties.  In total, the Trustee has transferred customer cash and securities valued at nearly $43.2 billion to Barclays for the benefit of 85,000 individual PIM Account Holders.  To make such deliveries, the Trustee's professionals have transferred securities from LBI depositories to Barclays to the extent such securities were available.

24.    Notwithstanding cooperation between the Trustee's professionals and Barclays' employees, the transfer of assets to Barclays to complete the PIM Conversion was not instantaneous.  Approximately 1,300 securities – valued at approximately $1.1 billion – needed to complete the PIM Conversion were unavailable for the Trustee's delivery to Barclays for the benefit of the PIM Account Holders.  Many of the securities were not available for delivery due to assertion of liens by custodial banks or other causes.

25.    To complete the PIM Conversion, the Trustee has purchased some of these securities for ultimate transfer to Barclays, subject to Court approval.  The remainder are subject to ongoing joint efforts between Barclays and the Trustee to complete the PIM Conversion.  In that connection, and subject to Court approval, Barclays and the Trustee anticipate seeking assistance from regulators to facilitate the handling of certain undeliverable and irreplaceable securities.[3]

## The Prime Brokerage Account Transfers

26.    As detailed in the First Interim Report (¶¶ 25-33), consistent with Court orders and the Purchase Agreement, which originally contemplated the transfer of PBAs to Barclays, on October 14, 2008, the Trustee promulgated the Protocol Regarding Prime Brokerage Arrangements (the "Prime Brokerage Protocol"), creating a consensual and

---

3.    To maintain market stability while the PIM Conversion was completed, Barclays sold or transferred, at PIM Account Holders' request, securities appearing on their Barclays statements, even though the Trustee had not yet transferred those securities to Barclays.  In some instances, Barclays purchased the security from, or came to a mutually agreed upon close-out price with, the PIM Account Holder.  In other instances, when a customer request required that Barclays deliver an unavailable security to a third party, Barclays would retain an obligation to deliver the security to the third party (i.e. a "fail").  To terminate Barclays' delivery obligation with respect to the security, Barclays has reached a mutually agreed upon close out price with some, but not all, of the third parties.

voluntary process for the orderly transfer of portions of some PBA assets to operating broker-dealers. On January 23, 2009, the Trustee released the Statement Regarding the October 14, 2009 Prime Brokerage Protocol, announcing that transfer requests from PBA holders desiring to avail themselves of the Prime Brokerage Protocol needed to be received by January 30, 2009.

27.     In total, the Trustee effectuated the transfers for approximately 300 PBAs, resulting in the transfer of over $3.4 billion in customer cash and securities. Remaining PBAs, including both those that had been partially satisfied by the Prime Brokerage Protocol and those that had not, subsequently became subject to the SIPA claims process. These claims present some of the most complex and time-consuming issues in claim processing, described in ¶¶ 37-41.

28.     The transfer of PBAs as a part of the Account Transfers resulted in claims by the PBA holders for approximately a quarter of LBI's Filing Date prime brokerage book. For the most part, PBA-related assets that were not transferred were subject to potential negative exposure to other Lehman entities related to possible liens or borrowings with those entities. During the Report Period, the Trustee has collaborated with other Lehman affiliate administrators to resolve potential negative cross entity exposure (*see infra* ¶¶ 38-39).

**Summary**

29.     In an efficient and streamlined manner, the Account Transfers resolved brokerage account issues for over 110,000 LBI account holders that SIPC and the District Court had determined were in need of protection. In both the PIM and PAM Conversions, the Trustee worked primarily with three parties – Barclays, Ridge and Neuberger – with only minimal disruption or even dealings with the thousands of affected customers.

30.     Approximately 2,400 unique claims were filed in the customer claims process by individual PIM Account Holders. Most were prophylactic claims and the remainder were claims for assets not converted due to activity in the week before the Filing Date or for accounts associated with PIM accounts not purchased by Barclays. Only 133 PAM Account Holders filed claims in the SIPA proceeding, and in most instances they were prophylactic claims for issues that had or have been resolved as part of the PAM Conversion. Finally, as noted above, the transfer of PBAs resulted in the filing of claims for less than a quarter of LBI's total prime brokerage related assets as of the Filing Date.

## IV.     CLAIMS PROCESS

31.     After an initial period to allow for implementation of , and to avoid potential claimant confusion with, the Account Transfers discussed above, the Trustee sought Court approval for and implemented without delay the largest SIPA claims process in history. Beginning December 1, 2008, consistent with §78fff-2(a)(1) and the Bankruptcy Court's Order of November 7, 2008 (*see* Docket No. 241), the Trustee,

among other things, provided formal notice of the claims process to more than 905,000 potential customer and general creditor claimants. Pursuant to §78fff-2(a)(3), customer claims received by the Trustee on or before January 30, 2009 are eligible for the maximum protection afforded under SIPA. No claim of any kind was allowed if not received by the Trustee on or before June 1, 2009. (For additional details regarding the customer claims process, see the First Interim Report at ¶¶ 34-48.)

32. During the Report Period, the Trustee's professionals have made substantial progress in reconciling and determining customer claims. The Trustee received over 12,500 customer claims on behalf of over 86,000 account holders, including over 8,000 "public customer" claims – those filed by various institutions and individual investors not related to PIM, PAM or PBA account holders or Lehman affiliates. Public customer claims are reconciled and determined by a dedicated team of professionals in the Trustee's New York City office (*see infra* ¶¶ 34-36). To date, the Trustee's professionals have determined approximately 85% of the public customer claims and are conducting final review of the remaining 15% of public customer claims. (*See* Exhibit 3.)

33. Simultaneously, separate teams of professionals have made extensive progress with respect to the reconciliation of complex and sizeable omnibus claims (*see infra* ¶¶ 42-55). Omnibus claims will be determined once the Trustee's professionals have finalized the reconciliation of that claim, a time-consuming process that often requires extensive cooperation and information sharing with the claimant and that, as a practical matter, generally means that a single letter of determination or batch of such letters will issue at once. The processing of omnibus claims, though not complete, is in an equally well advanced stage as the parallel processing of public customer claims. The chart below summarizes the customer claims population as of November 6, 2009.

| Customer claims | Description | No. of claims | No. of claims determined[4] |
|---|---|---|---|
| Public customers | All public claimants that do not fall into categories below | 8,367 | 7,130 |
| Barclays (PIM), Neuberger (PAM), and related | Includes omnibus claim filed by Barclays on behalf of over 72,000 accounts and individual claims related to PIM and PAM accounts that were transferred to Barclays and Neuberger Berman respectively | 2,534 | 942 |
| Prime brokerage related | Claims filed by LBI PBA holders and LBIE PBA holders. | 1,162 | 265 |

4. A claim is "determined" when a letter of determination has been sent to the claimant.

| Customer claims | Description | No. of claims | No. of claims determined |
|---|---|---|---|
| LBHI and related | Claims filed by LBHI on behalf of LBHI and its affiliates and individual claims filed in connection with LBHI-related accounts | 626 | 3 |
| LBIE and related | Includes omnibus claim filed by LBIE on behalf of over 1,100 LBIE customers, and individual claims of LBIE account holders (not including LBIE Prime Brokerage account holders) | 41 | 28 |
| Other affiliates | Claims of foreign and other LBHI affiliates not filed by LBHI | 52 | - |
| **Total** | **All Customer Claims** | **12,782** | **8,368** |

## **Public Customer Claims**

34.     In the report period, the Trustee's professionals made significant progress in reconciling and determining public customer claims. The Trustee has developed an efficient and thorough claims administration program to determine the validity of claims, the applicability of SIPA coverage, and the net equity (in dollars and/or securities) of claims. A dedicated team of professionals research and determine claims and provide weekly progress reports to the Trustee and SIPC.

35.     The administration of claims involves a three-stage process for the intake, reconciliation, and resolution of each claim. The process is reflected in the custom-designed Claims Administration System ("CAS"), the details of which are available in the First Interim Report at ¶¶ 34-45.

36.     As of November 6, 2009, the Trustee has determined 8,368 claims, allowing 381 claims, denying 4,746 claims, and denying and reclassifying 3,241 customer claims to general creditor claims.[5] All remaining public customer claims are in their final stage of review and are expected to be completed within weeks. As part of the reconciliation process, the Trustee has sent over 1,863 requests for supplemental information to claimants following an initial review of their claim and upon determination by the Trustee's professionals that their claim could not be reconciled without the requested supplemental information. In addition, the Trustee's professionals

---

5.     Once a claim is determined after review by the Trustee's professionals and SIPC examiners, a Letter of Determination ("LOD") is sent to the claimant. The LOD explains the Trustee's determination and any actions required by the claimant in response to the determination. For claims that are reclassified as general creditor claims, no further action is required of the claimant.

have made thousands of follow-up phone calls to claimants regarding requests for additional information and related matters, or to otherwise update the claimant as to the status of claims processing and to respond to any inquiries they may have.

**Prime Brokerage Claims**

37.     Over 1,160 claims were filed by PBA holders for cash, securities, and other transactions that were not transferred through the Prime Brokerage Protocol (*see supra* ¶¶ 26-30).  The Trustee has denied over 250 PBA holder claims related to accounts with LBIE, and has informed such claimants that LBIE has filed claims with the Trustee for funds or property held or believed to be held by LBI for the benefit of LBIE's customers (*see* discussion regarding LBIE's claim against LBI *infra* ¶¶ 48-55).

38.     The Trustee's professionals continue to reconcile all remaining PBA-related claims.  These are generally the most complicated claims due to the trading strategies employed through PBA holders, which in many cases involved financial instruments that are not afforded customer protection under SIPA as well as margin lending with other Lehman affiliates that may result in liens to such affiliates or other complications.  At the Trustee's request, a dedicated team of professionals continue to reconcile PBAs and process related claims.

39.     As noted above, many of the PBA holders were involved in transactions with other Lehman entities either through their PBA or separately.  Typically PBA holders signed certain agreements when opening their accounts granting liens of varying types on assets held in their accounts by the LBI, LBHI, LBIE, and other Lehman entities.  Due to uncertainty surrounding alleged liens on PBA property, the Trustee has not yet determined claims filed by PBA holders where Lehman's systems show exposure, or potential exposure, to other Lehman entities.  For those claims, the Trustee has evaluated each party's claim to the extent possible, and will make a final determination when information is provided by the relevant Lehman entity.  The Trustee has shared information about possible liens and sought assurances from each of LBIE and the Chapter 11 Debtors of its intentions with respect to assertions of liens.

40.     In the normal course of business, Lehman operations maintained internal facilitation accounts to facilitate trading and financing for certain PBA holders.  These accounts acted as a bridge between PBAs' LBI accounts and LBIE accounts.  Normally these facilitation accounts would settle to empty at the end of each business day.  However, in the week preceding the Filing Date and on the Filing Date, certain internal facilitation accounts were used in unconventional ways such that positions in those accounts did not settle as expected.  The Trustee's professionals are analyzing these accounts and working with the LBIE Administrators to effectively settle these positions.

41.     As noted above, certain PBA holders have made claims related to financial instruments which the Trustee believes are not afforded customer protection under SIPA, such as repurchase agreements, TBAs ("to be announced" trades on mortgage related securities), and securities swaps.  To the extent that a PBA holder has such a claim, the Trustee is reclassifying that portion of the claim to a general creditor claim.  If the

termination amount is a loss for the PBA holder, such loss will be a debit in the PBA holder's net equity calculation. To the extent the closeout creates a gain for the PBA holder, the amount of the gain will be reclassified as a general creditor claim.

**Claims Relating to PIM Assets**

42.     The Barclays customer omnibus claim is based on more than 72,000 PIM accounts. In addition, the Trustee received over 2,400 individual claims by PIM Account Holders. Because these accounts were transferred to Barclays as a part of the Account Transfers, most of the claims, though not all, are duplicative of the assets claimed by Barclays in its omnibus claim (*see supra* ¶¶ 22-25). The Trustee's professionals continue to analyze these individual claims in conjunction with the Barclays customer omnibus claim. (*See* discussion regarding Barclays demands, generally, *infra* ¶¶ 115-118.)

**Claims Relating to PAM Assets**

43.     The Trustee received 133 individual claims related to the PAM accounts transferred in bulk to Neuberger, as well as an omnibus claim by Neuberger on behalf of its account holders. Because these accounts transferred to Neuberger, and because the PAM Conversion is complete, the Trustee has denied or will shortly deny these claims as satisfied to the extent they claim only PAM Conversion related amounts (*see supra* ¶¶ 18-21).

**Claims Received From LBHI and the Chapter 11 Debtors**[6]

44.     The Chapter 11 Debtors and their subsidiaries filed 626 claims against LBI on behalf of themselves and their customers or counterparties, with a total estimated value of approximately $18 billion. The Trustee is in the process of analyzing and determining the status of these claims and has made considerable progress towards completing that process. A number of the claims submitted by the Chapter 11 Debtors may be categorized as subordinated claims not entitled to customer status. Perhaps because the information was not available to the Debtors when the claims were submitted, some of the Chapter 11 Debtors' claims lack certain basic information, which complicates the claim determination process. Further, many of LBI's records are not in the Trustee's possession, and access to those records through LBHI or Barclays has proved time-consuming.

45.     In order to expedite the LBHI claim determination process, the Trustee has requested the assistance and cooperation of the Chapter 11 Debtors and their counsel. Specifically, the Trustee has requested that, with respect to certain accounts related to their claims, the Chapter 11 Debtors:

- Identify the beneficial owner of the assets contained in the account;

---

6.  *See* discussion regarding the Trustee's claims against LBHI and the Chapter 11 Debtors *infra* ¶¶ 119-121.

- State the reason that the account was opened or describe how the account was used;

- Identify the affiliate/subsidiary that is making the claim;

- State whether any Debtor/affiliate is asserting a lien with respect to some or all of the assets in the account; and

- State the instructions provided to LBI with respect to the account.

The Chapter 11 Debtors have indicated that they intend to cooperate with the Trustee's requests and that the requested information will be supplied, although much information remains to be delivered. The Trustee believes that continued cooperation with the Chapter 11 Debtors will enhance the efficiency of the claims determination process.

46.     The Trustee has located agreements between various of the Chapter 11 Debtors and LBI that expressly subordinate many claims, and has found other evidence of an intent to subordinate as to many others. As part of the ongoing cooperative nature of the relationship between the Trustee and the Chapter 11 Debtors, the Trustee has proposed engaging in a dialogue with the Chapter 11 Debtors before the end of the year as to the claims determinations. The goal of this dialogue would be to ensure that all relevant facts related to the determination of these claims are given full consideration in arriving at a final determination.

47.     The Trustee is close to reaching a determination as to whether other claims submitted by the Chapter 11 Debtors should be treated as general creditor or customer claims. As with the claims that the Trustee believes should be subordinated, the Trustee anticipates a dialogue with the Chapter 11 Debtors about the classification of these claims in the coming weeks. The Trustee's task in reaching these determinations has been made more complex because of the consolidated fashion in which the Chapter 11 Debtors' claims were received. Further complications have been caused by multiple parties – notably the Chapter 11 Debtors and their clients, customers or counterparties – making duplicate claims for the same property. The Trustee believes that further discussions with the Chapter 11 Debtors will be useful in completing this aspect of the claims determination process over the coming months. These claims, as filed, assert over $18 billion in claims as customers. Determination of these issues with the Chapter 11 Debtors is therefore material to determining the amount of any distribution to customers.

## LBIE's Claim Against LBI[7]

48.     On January 30, 2009, LBIE filed omnibus claims against LBI, which were subsequently amended by LBIE, regarding the following: a securities-related cash balance of up to approximately $4.5 billion for its clients and approximately $5.6 billion for itself; a securities balance of approximately $6.3 billion for its clients and approximately $2.2 billion for itself; a commodities futures balance of approximately

---

7.   *See* discussion regarding the Trustee's claims against LBIE *infra* ¶ 128.

$1.3 billion for its clients; and a securities financing related balance of $2.3 billion for itself.  In addition, LBIE asserted a failed trades claim on behalf of its clients against LBI with respect to over 100,000 "failed to deliver to LBI" trades and over 95,000 "failed to receive from LBI" trades.

49.     The Trustee and his professional advisors have been analyzing the LBIE omnibus claims and reconciling them with LBI's records.  This process has involved continued exchange of information with the LBIE Administrators and their professional advisors.

50.     LBIE's omnibus claim on behalf of LBIE's clients against LBI was based on LBIE's books and records as of Friday, September 12, 2008, the last business day prior to the commencement of the administration of LBIE.  However, LBI did not commence its liquidation proceeding until September 19, 2008, which is the relevant date for determining claims against LBI under SIPA.  The Trustee's and the LBIE Administrators' respective professional advisors have largely completed the reconciliation of LBIE's omnibus claim on behalf of LBIE's clients to LBI's books and records as of September 12, 2008, but it is necessary to adjust the claim for relevant activity on LBI's books and records after September 12, 2008 through September 19, 2008.  Since this week in September 2008 was a period of tremendous turmoil in the world's financial markets and substantial activity at LBI, the process of analyzing LBI's books and records to substantiate such adjustments will require significant additional work.

51.     The reconciliation of LBIE's omnibus claim to September 19 involves a detailed analysis and reconciliation of over 8,400 unique securities.  Of these, over 90% had stock record movements between September 12, 2008 and the Filing Date.  As noted above, there are over 95,000 "failed to receive from LBI" trades across approximately 4,600 unique securities, and an additional 105,000 "failed to deliver to LBI" trades across 5,200 unique securities.  Moreover, the majority of the securities underwent significant stock record activity after September 12 and require a detailed analysis in order to be fully reconciled.

52.     In addition to the reconciliation of LBIE's omnibus claim on behalf of LBIE clients, significant additional analysis is required with respect to LBIE's claim with respect to failed trades.  The Trustee's professional advisors have conducted a preliminary review of these claims and determined that many are not substantiated by LBI's books and records.  The Trustee has requested additional information from LBIE in support of these claims.  The Trustee's professional advisors plan to finish the reconciliation of LBIE's omnibus claim filed on behalf of itself after the LBIE omnibus claim on behalf of LBIE clients has been fully reconciled.

53.     The Trustee's professionals continue to work closely with the LBIE Administrators and professionals at PricewaterhouseCoopers ("PwC").  In an effort to reconcile LBIE's omnibus claim, and as part of the continual exchange of information between the Trustee and LBIE Administrators, the Trustee's professionals have engaged in weekly status calls with PwC, as well as daily e-mail communications, and multiple in-

person meetings often lasting several days at a time. The Trustee's professionals have requested from LBIE additional information concerning over 1,000 unique security positions, and additionally continue to consult with Barclays personnel (i.e. former Lehman staff ) with respect to information technology and operations.

54.     The Trustee, in coordination with SIPC, has drafted and discussed with the LBIE Administrators a protocol regarding the treatment of allowed claims of LBIE customers and subsequent distribution of property. This protocol would clarify procedures and should expedite the return of property sub-custodied in the United States to LBIE customers. The issue is complex because of differences between the British Administration, which does not have a scheme of arrangement in place due to jurisdictional limitations of British courts, and the statutory requirements of SIPA. The Trustee contemplates seeking Bankruptcy Court approval of any agreement or protocol.

55.     The Trustee also received 41 individual claims filed by non-prime brokerage LBIE customers. The Trustee has denied the majority of these claims thus far, as claims to assets held by LBI on behalf of LBIE and its customers are to be resolved through LBIE's omnibus claim. Although certain property may have been sub-custodied by LBI in the United States for LBIE and accounted for through the omnibus account between companies, such claimants are generally customers of LBIE, not LBI, and are therefore not entitled to SIPA customer status.

## Other International Affiliate Claims[8]

56.     In addition to the claims filed by LBIE and LBHI on behalf of various of its affiliates, the following Lehman affiliates filed a total of 52 customer claims: Lehman Brothers Asia Limited ("LBA"), Lehman Brothers Securities Asia Limited ("LBSA"), Lehman Brothers Commercial Corporation Asia Limited ("LBCCA"), Lehman Brothers Asia Capital Company ("LBACC"), Lehman Brothers Securities Private Limited, Lehman Brothers Finance Asia PTE, Lehman Brothers Bank FSB, Lehman Brothers Finance AG, Lehman Brothers Bankhaus AG ("LBBA"), Storm Funding Limited, Lehman Brothers UK Real Estate Holdings Limited, Lehman Brothers Japan ("LBJ"), LBS Fund Derivatives, and Lehman Brothers Luxembourg S.A.("LBLux") (further information regarding certain of these claims is provided below). Some of these affiliates have filed duplicative or additional general creditor claims as well.

57.     In particular, LBCCA filed multiple claims totaling approximately $79 million, primarily related to futures margin balances and commodities related trading receivables. LBACC filed multiple claims totaling approximately $89 million, primarily related to commodities related trading receivables, failed trades, intercompany receivable balances, and securities trading receivables. LBBA filed a $1.3 billion claim with the Trustee related to two securities repurchase transactions. LBJ filed multiple claims totaling approximately $79 million, primarily related to LBJ customer positions sub-custodied by LBI. Finally, LBLux filed a $12 billion claim to cash provided to LBI as

---

8.  *See* discussion regarding the Trustee's claims and dealings with other international affiliates *infra* ¶¶ 133-146.

part of a securities lending transaction. The Trustee believes that the net amount due under securities lending transactions claimed by LBLux is approximately $285 million. The Trustee and his professionals continue to work with other Lehman affiliates to evaluate overall intercompany relationships and reconcile affiliate claims.

### Customer Name Securities

58.     In accordance with SIPA, the Trustee directed that where claims were made for securities that were in customer name, as defined by §78lll(3) and without stock powers, and where there was no indebtedness of the customer to the LBI Estate, those securities should be returned to the customer in accordance with the mandate in SIPA to return such property as promptly as practicable. 15 U.S.C. §78fff-2(c)(2). The Trustee's professionals have searched all known depositories for customer name securities. The total number of unique customers identified was fewer than 200, a significant portion of which were affiliates, and all the customer name securities that were properly returnable have been so returned to customers.

### Claimant Objections

59.     As ordered by the Court on November 7, 2008 (*see* Docket No. 241), if a claimant disagrees with the Trustee's determination, the claimant may object and request a hearing before the Bankruptcy Court within thirty days of the date on the Letter of Determination. Each such request must include a statement of the reasons for the claimant's objection and copies of any documents or other writings upon which the claimant seeks relief. The Trustee shall then ask the Court to set a time and date for a hearing.

60.     As ordered by the Court (*see* Docket No. 241), if a claimant fails to request a hearing within thirty days of the Letter of Determination, or if the claimant fails to appear at the hearing, then the Trustee's determination shall be final and the claim is closed. Any claimant who requests a hearing will have an opportunity to have their dispute adjudicated by the Court.

61.     As of November 6, 2009, 5,951 customer claims have reached final determination and those claimants have been sent Letters of Determination, and 628 objections have been filed relating to 966 customer claims. In addition to these, 31 objections were filed but have been voluntarily withdrawn. The Trustee has also received 192 letters from indirect investors who did not have a direct relationship with LBI, but rather invested in a fund with a customer account at LBI not opened on the claimant's behalf. These indirect investors have not filed objections but are reserving their rights should the law change and entitle them to a recovery.

62.     The Trustee's professionals continue to affirmatively reach out to many of the objecting claimants in order to informally resolve factual objections where possible or to distill agreed facts so that objections may be decided in a procedure similar to summary judgment.

63.     As explained at a status conference on November 5, 2009, the Trustee intends, as appropriate, to aggregate similar claims for determination of potentially dispositive issues and to select test cases or groups of cases for briefing and argument of complex or novel issues of law.  These categories include, but are not limited to, objections relating to customer status, TBA trades, and repurchase agreements.

64.     The chart below indicates categories of objections received as of November 6, 2009.  A similar chart was presented to the Court by the Trustee's counsel and SIPC at the 11/5/09 status conference.  The Trustee and SIPC, at the suggestion of the Court, may schedule multiple dates reserved for customer-related issues in 2010.

| Claim Type/Issue | Number of Pending Objections |
| --- | --- |
| To-Be-Announced ("TBA") Contracts | 360 |
| LBIE Accounts | 135 |
| Empty Accounts | 47 |
| Lack of Information | 39 |
| Other Non-LBI | 28 |
| Repurchase Agreement | 8 |
| Reclassified to General Creditor | 7 |
| Short Positions Valued as of Filing Date | 1 |
| Terms of Release | 1 |
| Allowed Amount | 2 |
| **Total Pending Objections** | **628** |
| *Objections Withdrawn* | *31* |

**Distributions**

65.     The Trustee will proceed with distributions on allowed claims after all claims have been determined and there is sufficient clarity on or resolution of major contingencies and other issues (*see infra* ¶¶ 108-114).  Distributions may occur in stages depending on the extent of allowed claims and available assets (*see infra* ¶¶ 71-78.)

66.     In July 2009, pursuant to §78fff-3(a), the Trustee requested, and SIPC provided, an advance of funds to satisfy approximately 180 claims, each in an amount below SIPA coverage limits ($500,000 with respect to securities and $100,000 with respect to cash, up to an overall total of $500,000).  Pursuant to §78fff-2(d), the Trustee may use such SIPC advances to purchase missing securities necessary to deliver to customers in satisfaction of their claims.

67. The Trustee may seek additional SIPC advances to pay for other claims within the SIPA limits as necessary. Distributions on claims above the SIPA limits will be dependent upon the ruling on the Allocation Motion and resolution of the contingencies as described *infra* ¶¶ 108-114.

68. The Trustee has not issued determinations as to the validity or allowed amount of any claims for amounts, such as interest and dividends, received by the Trustee on customer securities after the Filing Date. The Trustee believes that these amounts should be treated as customer property to be returned to customers, but the exact manner in which distribution will be made will be determined at a later stage when the total amount of all allowed customer claims is known. The Trustee will then file a motion for the Court to approve his proposed method of distributing this property as part of the Trustee's continuing administration of the LBI Estate.

**General Creditor Claims**

69. The Trustee received over 7,500 general creditor claims, which will be reviewed separately after the customer claims process is complete and, in keeping with SIPA and §704(a)(5) of the Bankruptcy Code, at such time that the Trustee has reason to believe that there will be a meaningful distribution to general creditors.

70. Any claim filed as a customer claim but determined to be a general creditor claim is automatically reclassified as such, without requiring the claimant to re-file a claim to this effect. In addition, in keeping with SIPA §78fff-2(c)(1), customer claim deficiencies, if any, become claims against the general estate, and any SIPC advances for customer claims or administration become priority claims against the general estate. While such claims, other contingencies, and the outcome of the general estate claims review are unknowable at this time, the asserted amount of priority and general unsecured claims (without ascribing value to unliquidated amounts) appears to exceed $60 billion.[9]

## V.    ALLOCATION OF CUSTOMER PROPERTY

71. As discussed above, customer claims have been and are being reviewed to determine each customer's "net equity,"[10] as mandated by SIPA, and distributions to pay allowed customer claims on a pro rata basis will depend on the amount and value of

---

9. In keeping with §78fff-2(a)(3), the Trustee reached an agreement with the Internal Revenue Service ("IRS"), so ordered by the Court on May 27, 2009 (Docket No. 1132) which gives the IRS until December 31, 2009 to file any priority tax claims it may have.

10. In a SIPA liquidation, other than the return of customer name securities (discussed below), all other allowable customer claims are determined based on a customer's net equity, i.e., the value of a customer's account less any indebtedness to the broker as of the filing date of the liquidation (in this case, September 19, 2008). Net equity claims then share on a pro rata basis in the fund of "customer property," as defined by SIPA, which includes generally all the customer-related property of the broker-dealer's business. Certain other property is allocated to the general estate against which claims of non-customer general creditors are filed.

property (securities and cash) allocated to the fund of "customer property" as well as the total of all allowed net equity claims. Interim distributions on net equity claims will be made as soon as there is enough clarity for reasonable estimates to be made of both the amount of customer property available for distribution and the total of allowed net equity claims.

72.     In order to determine what distributions can be made to customers with allowed net equity claims, the Trustee must know or be able to estimate with reasonable certainty: (a) the total value of customer property available for distribution; and (b) the total net equity of all allowed customer claims (including reserves for disputed claims). As discussed below, both halves of the equation – the customer property numerator and the net equity claims denominator – are complex in a liquidation of the magnitude of LBI's, and may depend on issues to be decided by the courts.

73.     SIPA requires allocation of property as between the fund of "customer property" and the general estate. On October 5, 2009, the Trustee filed a motion seeking Bankruptcy Court approval for the allocation of LBI assets (the "Allocation Motion") (*see* Docket No. 241). The Allocation Motion seeks to establish principles governing determination of whether particular items and categories of property constitute "customer property" within the meaning of SIPA and are thus available on a priority basis to satisfy customer claims. As stated in the Allocation Motion, the question presented is "what portion and what elements of the roughly $17 billion to $18 billion in cash and securities presently available to the Trustee (and of any additional cash or securities that may be subsequently recovered) may be allocated to the fund of [c]ustomer [p]roperty, and thus be available on a priority basis for satisfaction of customer claims?"

74.     The Allocation Motion describes the federal scheme of customer protection, including SIPA and the complementary regulatory scheme under the Securities Exchange Act of 1934 (the "Exchange Act"), of which SIPA is effectively a part. This body of laws and rules governs treatment of customer property, both during the operation of a broker-dealer and in the event of a liquidation, and seeks to ensure that a broker-dealer liquidation will result in full satisfaction of customer claims. "Customer protection" rules are designed to ensure – and to instill confidence in investors and securities markets – that financial failure of a firm will not result in shortfalls of property available to satisfy customer claims. *See* 17 C.F.R. § 240.15c3-1; 17 C.F.R. § 240.15c3-3 (the "Customer Protection Rule" or "Rule 15c3-3"). As a broker-dealer registered with the SEC, LBI was required to segregate and protect customer property and to maintain segregated reserve deposits sufficient to cover obligations to customers in accordance with Rule 15c3-3 and related provisions.

75.     The Allocation Motion proposes a scheme following the basic definition of "customer property" in SIPA which broadly provides that the components of customer property include at a minimum the following categories of property:

(i)     Securities held for customers pursuant to SEC Rule 15c3-3;

(ii)     Cash segregated for customers in a special reserve account "for the Exclusive Benefit of Customers" pursuant to Rule 15c3-3, also called the "Reserve Account";

(iii)    Assets derived from or traceable to customer property;

(iv)    Resources provided through the use or realization of customer-related debit items; and

(v)    Any other property of LBI's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers.

76.    The majority of the property under the Trustee's control falls into categories (i) through (iv) above. With respect to category (v), SIPA seeks to achieve full customer protection by incorporating the SEC rules and allocating property to customers as necessary where a broker-dealer's noncompliance leads to shortfalls in customer property.

77.    Although the Trustee's investigation of LBI's customer protection compliance is ongoing, the Trustee has already identified lapses in LBI's compliance, particularly during the confused period immediately before and following the chapter 11 filing of LBHI on September 15, 2008. The gaps in compliance, which the Trustee believes require augmentation to Customer Property, are now believed to aggregate not less than $4.9 billion. The specific instances of non-compliance are described in detail in the Allocation Motion. However, as the Trustee's investigation continues, compliance gaps ultimately may exceed this figure significantly and will likely require augmentation with much of the property available to the Trustee in the near term.

78.    An Order approving the Trustee's Allocation Motion is a necessary step in allowing the Trustee to make interim and final distributions of property, with reserves for significant unresolved claims. The Trustee is seeking to have this pivotal issue decided expeditiously. Any objecting party was required to file an objection by no later than October 30, 2009. As of the deadline, nine parties – one of which has since withdrawn – had filed objections to the Allocation Motion while others have engaged in discussions with the Trustee's professionals that have resolved or may soon resolve their inquiries.

## VI.    RETURN OF MISDIRECTED FUNDS

79.    The Trustee continues to receive and investigate a substantial number of requests for the return of misdirected funds alleged to have been sent in error to LBI bank accounts. In April 2009, the Trustee implemented court-authorized procedures (the "Misdirected Wire Procedures") to streamline the investigation and return process for misdirected funds, including implementing a system of processing requests for the return of misdirected funds electronically and returning a substantial number of misdirected wires of $50,000 or less without the need of obtaining further court approval.

80.    The Misdirected Wire Procedures are set forth as follows:

- A party requesting return of misdirected funds must report it to the Trustee by sending the Trustee a completed electronic Request Form for the Return of Misdirected Funds (the "Request Form") available on the Trustee's website.

- The Trustee carefully reviews all information contained in the Request Form and, in conjunction with independent consultants, investigates all funds alleged to be misdirected. As part of the investigation process, the Trustee confirms that such funds were in fact sent in error and are not property of the LBI Estate.

- If after investigation, the information provided by the requesting party is confirmed to be accurate, the Trustee will prepare the required documentation and send it to the requesting party to obtain the relevant parties' signatures.

  - With respect to returns of up to $50,000.00, the Trustee prepares a letter agreement and facilitates obtaining signatures from the beneficiary of the misdirected funds.

  - With respect to returns above $50,000.00, the Trustee seeks authorization from the Court to return the misdirected funds by preparing a stipulation and order, and facilitates obtaining signatures from the party that ordered or authorized the transfer and the beneficiary of the misdirected funds. Thereafter, the Trustee seeks court authorization, through Notice of Presentment, to return those funds.

- Upon receipt of the signed documents or entry of the court stipulation and order, the Trustee will authorize the bank that received the misdirected funds to return the funds according to the wire instructions provided in the Request Form (or pursuant to such other wire instructions provided to the Trustee in writing by the requesting party following the submission of the Request Form.)

81. As of November 6, 2009, the Trustee has returned approximately 566 misdirected fund transfers aggregating approximately $498 million. Of those returns, approximately 297 are for misdirected funds of $50,000 or less, aggregating approximately $2.8 million. Currently, the Trustee has 154 return requests pending, aggregating approximately $52.5 million. (*See* Exhibit 4.)

82. Due to the high number of return requests that the Trustee continues to receive and the time dedicated to the Misdirected Wire Procedures, there are significant costs incurred by the LBI Estate to investigate misdirected funds and authorize returns. It is difficult to understand why, more than one year after Lehman's well-publicized insolvency proceedings began, sophisticated financial institutions cannot correct their records to prevent these mistakes from occurring, and the Trustee does not believe that

the LBI Estate should have to bear the attendant costs. Therefore, the Trustee is considering charging fees in the future for the return of misdirected funds. Further, the Trustee intends to work with industry organizations and related parties to inform the relevant institutions that they need to update their wire instructions to avoid these situations and that, if they do not, they will need to bear some of the cost of correcting them.

## VII.   CUSTOMER AND CREDITOR RELATIONS

83.     The Trustee and his professionals have made extraordinary efforts to keep claimants and other interested parties informed about the ongoing SIPA liquidation of LBI. Throughout the Report Period, the Trustee and his counsel have responded to thousands of claimant inquiries, attended meetings with regulators, government officials, formal and informal groups of creditors in this and the Chapter 11 proceeding, participated in industry panel discussions, and responded to hundreds of phone calls, emails, and letters received each day.

84.     The Trustee and his representatives conduct several conference calls each week with the LBIE Administrators to discuss the ongoing reconciliation of LBIE's omnibus claim (*see supra* ¶¶ 48-55), LBI's claim against LBIE (*see infra* ¶128) and other matters.

85.     During the Report Period, the Trustee's professionals continued discussions and attended independent meetings with LBHI and its creditor constituencies including the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Ad Hoc Group of Lehman Brothers Creditors. In addition to such meetings, the Trustee's professionals regularly have informal discussions with these and other creditors regarding ongoing matters.

86.     During the Report Period, the Trustee and his counsel presented and answered questions from audience members at conferences sponsored by the Managed Funds Association in New York and the Alternative Investment Management Association in London. Additionally, the Trustee's representatives have attended conferences in London and the Netherlands regarding the proposed global close of Lehman's records.

87.     On July 1, 2009, the Trustee's counsel issued a statement, available on the Trustee's website, describing the process by which customer claims will be satisfied. (*See* Exhibit 5.) Additionally, as part of the Trustee's efforts to keep claimants informed about the customer claims process, the Trustee's representatives have continued with affirmative outreach to thousands of claimants to address questions and concerns, notify claimants of any missing information or other deficiencies in claim forms or distributions paperwork.

88.     The Trustee uses his website (www.lehmantrustee.com), which is maintained and updated daily, to provide a centralized source of information relating to a variety of issues such as claim processing, the return of misdirected wires, and tax information. The Trustee's website also contains the reports and other information as

well as a complete and up-to-date docket of all filings in this case and rulings by the Bankruptcy Court. In addition, the Trustee continues to maintain a call center designed to address all general inquiries (US: (866) 841-7868; Non-US: (503) 597-7690).

## VIII.   <u>TRUSTEE'S INVESTIGATION</u>

89.     The Trustee has the specific and important duty to conduct an investigation concerning "the acts, conduct, property, liabilities, and financial condition of [LBI], the operation of its business, and any other matter, to the extent relevant to the liquidation proceeding." 15 U.S.C. §78fff-1(d). To that end, the Trustee obtained permission of the Court by Order dated January 15, 2009 to issue subpoenas in furtherance of this duty (*see* Docket No. 561), and since then has been actively engaged in pursuing numerous avenues of investigation.

90.     The Trustee's report will address the broad topics of, *inter alia*, (i) the causes of LBI's demise and the events and transactions that preceded it, (ii) potential causes of action on behalf of LBI against third parties, (iii) progress of the liquidation, and (iv) lessons learned from the LBI liquidation and legislative, regulatory, and other policy recommendations for the future.

91.     With the active participation of SIPC, the Trustee has continued the approach of first pursuing voluntary cooperation, but resorting to invocation of his subpoena authority where necessary. In this effort, the Trustee has made document requests (both formal and informal) to financial institutions that may have information relating to the events leading to LBI's collapse and obtained thousands of documents in response.

92.     The objective of these third party document requests is to seek to determine and understand the numerous complex financial arrangements and transactions in which LBI engaged, and thereby determine potential claims against third parties and other matters. For example, the Trustee is seeking to ascertain how, in the period leading up to and immediately following the Filing Date, certain entities disposed of collateral belonging to LBI or its customers. To this end, the Trustee's professionals have received and reviewed tens of thousands of pages of documents from these entities and, based on the knowledge gained from those documents, has conducted dozens of interviews of employees of those entities with knowledge of the collateral liquidation process. The Trustee's professionals are also looking at the information that was exchanged with third parties who were interested in purchasing portions of, or investing in, LBI during the summer of 2008.

93.     The Trustee's professionals have also reviewed hundreds of thousands of pages of internal LBI emails, including those of numerous high-level officers during the critical months leading up to the Filing Date, LBI account records, contractual agreements, and other documents from LBI's records, as well as hundreds of gigabytes of electronic data from LBI's information systems.

94.     These and other materials are being studied with an eye toward both investigating currently-known causes of action against third parties as well as uncovering presently-unknown causes of LBI's decline, matters concerning the financial condition of LBI, and events impacting the liquidation process.  These materials fall into several categories and/or subject matter areas, including:  (i) corporate records; (ii) liquidity; (iii) intercompany transactions; (iv) significant client withdrawals; (v) effect of and response to financial market conditions; (vi) internal risk assessments; (vii) relationships with third-party custodians and clearing institutions; (viii) operational difficulties; (ix) fraudulent conveyance/preference claims; and (x) strategic transactions with third parties. The Trustee's professionals are assembling the evidence on each of these areas, developing detailed chronologies for use of counsel, and identifying key witnesses to be interviewed and/or deposed in the coming months.

95.     From this review of LBI's records, one area of focus that has emerged is the many operational and systems difficulties that the filings of LBHI and LBIE occasioned at LBI, which remained in business for four more days.  The Trustee is keen to identify systemic and/or regulatory changes that could be implemented in the future to avoid the informational and operations breakdowns that occurred during the week of September 15, 2009 and that made it difficult for LBI and regulators to evaluate fully LBI's financial condition.  Another focus has been the apparent exodus of clients from LBI to other financial institutions in the summer of 2008 and the corresponding impact on LBI's liquidity and ability to generate business.  The Trustee is examining correspondence with and regarding various clients and trading counterparties to ascertain the causes and effects of these diminishing relationships.

96.     With the assistance of professionals at Deloitte, the Trustee has begun various forensic analyses of LBI's books and records as well as information received from third parties.  For example, one work stream is dedicated to analyzing payments to hundreds of insiders in the one year leading up to the filing date, as well as payments to third parties in the 90 days leading up to the filing date.  To conduct this analysis, the Trustee's professionals are reviewing bank statements, check records, account payable and payroll data, and cash and vendor data from a variety of sources to identify avoidable transfers that may have preferentially or fraudulently transferred property out of the estate.

97.     Another forensic work stream has focused on items related to the allocation of customer property, specifically issues that may have caused a misstatement in LBI's reserve calculation under Rule 15c3-3a.  This effort is aimed at evaluating, *inter alia*: (i) an overdraft in LBI's main operating account at Chase as of the Filing Date; (ii) whether during the period preceding the Filing Date, LBI's Rule 15c3-3 calculation allowed unsecured or under-secured customer debits to be used in the Reserve Formula; (iii) whether customer securities were included in the repurchase transaction entered between Barclays and LBI  to provide temporary liquidity to LBI in its final week of operation; and (iv) assets detained by foreign bank custodians.

98.     Other forensic analyses involve: (i) examining the health of LBI's financial condition at several dates before the Filing Date to assess LBI's decline and

ascertain the point in time when its collapse became inevitable, (ii) reviewing intercompany and affiliate transactions for possible improper pre-petition transfers of property out of the LBI Estate or to avoid regulatory compliance issues, and (iii) unexplained deficits in customers' accounts where amounts may also be owed to the LBI Estate.

99.     At this time the Trustee has conducted scores of interviews of former LBI personnel as well as personnel at third parties with knowledge of information relevant to his investigation.  The Trustee expects an increased number of interviews and depositions to take place throughout the next quarter and into the early part of 2010.

100.    The Trustee has continued to coordinate his investigative efforts with the Examiner appointed in the LBHI case as practicable and appropriate.  In addition to periodic meetings and conference calls, the Trustee and the Examiner have exchanged information about key documents, witnesses and events, and supported each other's efforts to obtain documents from third parties.

**JPMorgan Chase Investigation**

101.    Insofar as JPMC was LBI's primary clearing bank, it has been and remains one of the focuses of the Trustee's investigation, and its actions have also been at issue in connection with various claims made against LBI.  In that regard, the Trustee, with the assistance of his professionals, has been and is investigating the seizure and liquidation of collateral by JPMC, and has otherwise been endeavoring to investigate the pre- and post-petition actions of JPMC to the extent they impact LBI.

102.    This has included, among other things, investigation of JPMC's seizure of: (i) cash and securities contained in certain Fixed Income Division Prime Brokerage Accounts; (ii) certain municipal bonds purchased by Lehman Brothers Commercial Bank on September 12, 2008; and (iii) other property which may constitute fully paid for customer securities.  JPMC has been responding on a rolling basis to requests for documents, and has also been working with Deloitte in attempting to reconcile numerous transactions.  The Trustee is also seeking information regarding the actions of JPMC from additional parties including former employees of LBI and DTCC.

103.    The Trustee's counsel, with the assistance of the Trustee's professionals, has reviewed in excess of 400,000 pages of documents, and over 4,000 spreadsheets and other files produced by JPMC, regarding JPMC's relationship with LBI and its role as LBI's clearing bank.  The Trustee's counsel continues to work with JPMC to obtain additional pertinent documentation, including an accounting of the transactions between JPMC and LBI before and after the Filing Date and a full accounting of JPMC's seizure and liquidation of collateral.  The Trustee has also reviewed LBI documents related to JPMC and has sought documents or other information regarding JPMC from DTCC and Barclays, among others.

104.    The Trustee's counsel has to date conducted nine interviews of former JPMC employees concerning (i) the business relationship between LBI and JPMC, (ii)

the events leading up to the Filing Date, (iii) the winding down of LBI's transactions, and (iv) the liquidation of LBI securities held by JPMC. The Trustee's professionals have also communicated with JPMC with respect to these matters on numerous other occasions. The Trustee's counsel has sought information from former Lehman employees regarding matters related to JPMC and to date has conducted two depositions. The Trustee's counsel has coordinated its investigation with related investigations by the Creditors' Committee.

## DTCC Investigation

105.    The Trustee continues to review the factual details and legal basis for DTCC's activities during the week of September 22, 2008, when DTCC purported to invoke rules governing ceasing to act and/or wind-down with respect to LBI's pending and failed transactions, and his professionals are conducting a review of the liquidation of collateral by DTCC during the ensuing period.[11] Issues have also arisen regarding fees and expenses charged by DTCC in connection with these activities.

106.    LBI had direct relationships with three of the DTCC subsidiaries – Depository Trust Company (DTC), National Securities Clearing Corporation (NSCC), and Fixed Income Clearing Corporation (FICC) – covering custodial, collection and clearance and settlement services with respect to a broad range of securities. The Trustee's professionals have requested and obtained large volumes of information with respect to each of these subsidiaries, including the property they held on the Filing Date or received thereafter and the disposition of such property, whether to Barclays and other brokers receiving account transfers, to the Trustee as return of deposits or turnover of post-petition distributions, to a DTCC subsidiary as a cost or fee associated with the wind-down, or through liquidation to satisfy or close out open commitments of LBI.

107.    As with JPMC, the Trustee seeks a full accounting of DTCC's activities in regard to the liquidation of LBI collateral. Understanding and reconciling this large body of data is an ongoing process between the Trustee's professionals and DTCC personnel, with regular exchange of information. With respect to Government and Mortgage-Backed securities, final reconciliation also requires information from JPMC, as

---

11. DTCC, through the Depository Trust Company, National Securities Clearing Corporation, and Fixed Income Clearing Corporation (the "Clearing Agency Subsidiaries"), provides clearance and settlement services for broker-to-broker transactions in equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and over-the-counter derivatives. LBI relied extensively on DTCC's services to complete, in the ordinary course of its business, the clearance and settlement of transactions effected by LBI prior to the Filing Date, and processed through accounts at the Clearing Agency Subsidiaries. DTCC indicated in its 2008 Annual Report that, as of the Filing Date, more than $500 billion in property, largely held for the benefit of customers and other LBI counterparties, was reflected in the LBI accounts held through the Clearing Agency Subsidiaries.

As noted above, during the week of September 22, 2008, DTCC purported to invoke rules governing ceasing to act and/or wind-down of LBI's pending and failed transactions. This was a complex process potentially involving tens of thousands of transactions, and was further complicated by the transfer of some but not all of LBI's accounts to Barclays pursuant to the Purchase Agreement.

settlements would occur through receipt of funds or delivery of securities at JPMC rather than FICC, the DTCC subsidiary providing services with respect to these types of securities.

## IX.    CONTINGENCIES

108.    The Trustee has made unprecedented progress in determining over 8,300 claims, as well as in returning misdirected wires, transferring customer accounts, recovering substantial funds, and administering the LBI Estate.  Nevertheless, substantial contingencies remain and have emerged during the Report Period, many of which are already subject to litigation.  These contingencies continue to impact the timing and extent of distributions on allowed customer net equity claims as well as the significance, if any, of potential distributions on account of allowed general estate claims.

109.    As discussed *supra* ¶¶ 71-78, the Trustee, in consultation with SIPC, has moved before the Bankruptcy Court for an order allocating estate property between the fund of "customer property" and the "general estate."  Resolution of this motion is important to determining the property available to customers and therefore the extent of distributions.  Nine objections and limited objections were received by the October 30, 2009 response date on the motion, of which one was withdrawn, and the Trustee has and will continue to engage in informal discussions with these objectors and a smaller number of other parties in response to their inquiries.  The Trustee hopes to resolve these objections and have the motion heard as soon as possible.

110.    The Trustee must also continue to reserve for the pending litigation with Barclays, described *infra* ¶¶ 115-118.  The Barclays dispute involves roughly in excess of $6 billion, including claims by Barclays against the estate for approximately $3 billion. The dispute is currently in discovery, oral argument is expected to be heard March 25, 2010, and an evidentiary hearing, if necessary, is expected to commence April 26, 2010.

111.    The Trustee also must reserve for disputed and undetermined claims.  The most significant of these are the LBHI and LBIE affiliate claims.  The LBHI asserted customer claims total more than $18 billion as filed.  Many of the accounts underlying these claims were not reflected on LBI's books and records as potential customer claims. The Trustee disputes some or all of these claims and the assertion that they are all necessarily entitled to treatment on parity with claims of non-affiliated, public customers. There are also many factual questions concerning the calculation and reconciliation of the amount of many claims.  Also, as noted above, despite great progress, final reconciliations must be completed and certain factual issues resolved before the final value of the LBIE claim is known.

112.    Moreover, customer claims have been asserted for financial products across the entire spectrum of derivatives and other instruments offered at LBI, as well as for various methodologies for computing claim value.  The Trustee and SIPC do not believe that all these products or valuations comport with customer status under SIPA. To date, some 628 objections representing nearly 1,000 customer accounts have been filed, and objections will continue to be received by the estate as the claims process

progresses. While some objections have and will be withdrawn, resolution of several issues will likely involve litigation, and it is apparent that disputed claims may amount to several billion dollars in value.

113. Finally, dividends and interest received by the estate post filing and aggregating into the hundreds of millions of dollars are being accounted for separately, and will be the subject of a separate application to the Court prior to their distribution.

114. The Trustee is doing everything in his power to determine claims, narrow disputed issues with third parties, and reduce these contingencies, with the goal of returning 100% of allowed net equity claims for customer property and maximizing value for all stakeholders.

## X. BARCLAYS CAPITAL INC.[12]

115. In addition to the assets Barclays has already received under the Purchase Agreement, Barclays has made formal demands (and filed corresponding claims in the claims process) for an additional $2 billion to 3 billion or more of assets based on its interpretation of the Purchase Agreement and Clarification Letter. These demands involve claims to items in LBI's former Rule 15c3-3 customer reserve account and margin and other property at exchanges or clearing agencies that may be needed to satisfy customer claims. The demands also include property in clearance boxes at DTCC that may also be needed to satisfy customer claims and which Barclays, the Trustee, and DTCC had specifically agreed in a letter agreement were excluded assets under the purchase transaction. The Trustee believes that the transfer of these additional assets, as well as an amount in excess of $3 billion of similar assets that are already in the possession of Barclays, were not approved by the Bankruptcy Court on the Filing Date, and that the transfer of these assets to Barclays would create an unfair windfall for Barclays at the expense of public customers.

116. On June 25, 2009, the Bankruptcy Court entered an Order granting LBHI's motion under Federal Rule of Bankruptcy Procedure ("FRBP") 2004 for permission to seek written discovery and depositions from Barclays into the assets Barclays received and liabilities assumed under the Purchase Agreement ("the June 25 Order"). The June 25 Order specifically permitted the Trustee to participate in the Rule 2004 discovery, and ordered the Trustee to work with LBHI, the Examiner in LBHI's Chapter 11 case, and the Creditors' Committee to develop a protocol to govern the discovery sought from Barclays, and to confer with Barclays regarding the discovery requests. Due to the extraordinarily cooperative efforts of the Trustee and counsel for the other parties, the parties succeeded in coordinating and completing an extremely demanding discovery schedule that included the depositions of more than 30 current and former Barclays and Lehman employees in a period of just over six weeks.

---

12. *See* discussion regarding PIM Conversion *supra* ¶¶ 22-25; *see also* discussion regarding the treatment of claims related to PIM Conversion *supra* ¶ 42.

117.     Based in part on information learned during the Rule 2004 discovery, on September 15, 2009, the Trustee filed a motion for relief pursuant to the Sale Orders or, alternatively, for certain limited relief under Federal Rule of Civil Procedure ("FRCP") 60(b).  If the Trustee were not granted the relief sought in its motion, the Trustee could be denied recovery of about $3 billion or more in cash and other assets transferred to Barclays and might have to pay or release to Barclays $3 billion dollars or more of additional cash and securities, all of which could have a major impact on satisfaction of claims in this proceeding.  LBHI and the Creditors' Committee also filed motions seeking relief under Rule 60(b).

118.     The Trustee has conferred with the other parties to agree upon an efficient and realistic procedure and timetable to resolve this important dispute.  To that end, the parties appeared before Judge Peck on October 15, 2009, and have agreed to a schedule under which further discovery and briefing will be completed by March 18, 2010.  The Court has scheduled oral argument on the Trustee's and the other motions for March 25, 2010, and, if needed, an evidentiary hearing is scheduled to begin on April 26, 2010.

## XI.     LEHMAN BROTHERS HOLDINGS INC.

### Claims Against LBHI and the Chapter 11 Debtors[13]

119.     Pursuant to the Stipulation, Agreement and Order Between the Debtors and the Signatories to the Cross-Border Insolvency Protocol with Respect to the Bar Date Order approved by the Bankruptcy Court on August 25, 2009 (LBHI Docket No. 4928), the deadline for the Trustee to assert LBI's claims against the Chapter 11 Debtors was November 2, 2009.  In addition, and to promote efficiency, the Trustee and the Chapter 11 Debtors have agreed that the Trustee may submit a single consolidated claim against all of the Chapter 11 Debtors.

120.     The Trustee has conducted an extensive investigation and faced several unusual hurdles in preparing the proof of claim.  Notably, because LBI no longer has employees, there was no one with an historic view of the relationship between LBI and the Chapter 11 Debtors to assist in identifying claims against the Chapter 11 Debtors.  In addition, significant portions of LBI's historic records are not in the Trustee's possession, making access to those records more difficult.  Notwithstanding these hurdles, and although the Trustee has reserved all rights, the Trustee prepared as comprehensive a proof of claim as possible under the circumstances totaling approximately $72 billion against the Chapter 11 Debtors.  Any recovery on the more than $72 billion claimed will enhance the Trustee's ability to return assets to LBI's customers and maximize estate value.

121.     In preparing this claim, the Trustee's professionals conducted research that revealed billions of dollars of specific intercompany obligations owed by the Chapter 11 Debtors to LBI.  In addition, the Trustee, building on other aspects of his overall investigation, filed claims based on LBI's central role in the Lehman corporate structure.

---

13. *See* discussion regarding claims filed by LBHI and the Chapter 11 Debtors *supra* ¶¶ 44-47.

Notably, LBI served as the paymaster for Lehman employees, who were generally paid by and received certain employment benefits through LBI, regardless of which Lehman entity was the recipient of their services. LBI also served as a central provider of certain operational expenses and information services. The Trustee also investigated and submitted claims related to the filing of consolidated, combined, or unitary tax returns by the Lehman Brothers group, and for claims such as avoidable transfers, conversion of securities, insurance recoveries, the use of LBI's intellectual property, and part of the Lehman art collection.

**PIK Notes Received From Lehman ALI Inc.**

*Transferred Entities PIK Note*

122. On September 19, 2008, in the hours before the commencement of the SIPA proceeding, LBI, while still under the control of LBHI, transferred stock of twenty-five entities (some of which, in turn, had multiple subsidiaries) to Lehman ALI Inc. in exchange for a payment-in-kind note ("PIK Note"). Under the terms of the PIK Note, its value is to be the "fair market value of the Acquired Stock as of" September 19, 2009. The Trustee has retained the assistance of valuation consultants to assist in determining the value of the PIK Note.

123. The Trustee and the Chapter 11 Debtors are engaged in a dialogue as to the appropriate methodology for determining the value of the PIK Note. As part of this effort, the Trustee has requested, and received, financial information about the transferred PIK Note entities. The Trustee believes that the parties are engaged in a constructive dialogue that could lead to the consensual valuation of the PIK Note.

*Transferred Intellectual Property PIK Note*

124. In addition, concurrent with the transfer of the PIK Note, LBI, while still under the control of LBHI, transferred certain intellectual property (patents and trademarks) (the "Transferred IP") to Lehman ALI, Inc. in exchange for a payment-in-kind note (the "IP PIK Note") with a value to be determined at a later date. The Trustee has been engaged in discussions with the Chapter 11 Debtors and is seeking to determine whether there is any value associated with the Transferred IP. To date, the Trustee's investigation, which remains ongoing, has revealed that some of the Transferred IP may currently be in use by new owners, suggesting that there may be some value in the IP PIK Note as well.

## XII.  INTERNATIONAL AFFILIATE CLAIMS AND PROTOCOLS

125. Since May 2009, the Trustee and his professional advisors have continued to gather information from around the world with respect to insolvency proceedings applicable to Lehman entities outside of the United States, the requirements for making claims in such proceedings and the extent of the claims that the Trustee and such other Lehman entities have against each other. The Trustee has retained Norton Rose as legal counsel to assist in proceedings involving Lehman affiliates in the United Kingdom,

China, Germany, Hong Kong and Singapore, City Yuwa Partners as legal counsel in Japan, and Steinmetz Haring Gurman & Co. as legal counsel in Israel.

126.     The following summarizes the principal issues that the Trustee has addressed since May 2009 relating to LBI's international dealings.

**United Kingdom**

127.     LBIE, based in London, was the principal European broker-dealer within the Lehman group. Prior to the commencement of the liquidation, LBI dealt extensively with LBIE. As a result of the insolvency of LBIE, in September 2008, certain partners of PwC were appointed as the LBIE Administrators.  The Trustee and his professional advisors have continued to work extensively with the LBIE Administrators and their professional advisors in developing and sharing information about LBI and LBIE relevant to the administration of the respective estates and in determining claims that each of LBI and LBIE has against the other.

*LBI's Claim Against LBIE[14]*

128.     Although a bar date has not been set in LBIE's administration, the LBIE Administrators requested that the Trustee submit a claim against LBIE for segregated assets of LBI or LBI customers.  On June 30, 2009, the Trustee submitted a claim against LBIE for 156 security positions with a Filing Date claim value of $413 million and cash balances of $259.5 million.  Reconciliation of this claim is ongoing.  The Trustee expects to submit additional claims against LBIE in the future.

*U.K. Court Proceedings*

129.     As noted in the Trustee's First Interim Report, the High Court of Justice of England and Wales (the "U.K. High Court") granted the Trustee's application for recognition of the SIPA liquidation of LBI as a foreign main proceeding in accordance with the United Nations Model Law on Cross-Border Insolvency (as enacted by the Cross-Border Insolvency Regulations 2006) on March 30, 2009.  This recognition has facilitated the Trustee's appearance in two of the applications made by the LBIE Administrators to the High Court, as described below.

130.     On May 15, 2009, the LBIE Administrators made an application to the U.K. High Court seeking directions concerning LBIE's obligations under applicable U.K. regulations in relation to the handling of client money by LBIE prior to the time of administration.  The questions raised by this application relate to the scope of the protection available to clients of a U.K. regulated firm – in this instance LBIE – when the firm has failed to segregate client money in accordance with the U.K. Financial Services Authority's client money rules, including for the firm's affiliated entities.  The Trustee is the only respondent to the application asserting an entitlement to client money in its own right, as well as on behalf of its underlying clients.  The Trustee intends to assert in this

---

14.  *See* discussion regarding claims filed by LBIE and certain LBIE customers *supra* ¶¶ 48-55.

proceeding, *inter alia*, that LBIE failed to segregate properly money on behalf of LBI and its customers and, as a result, LBIE is now obligated to provide for such segregation from LBIE's unsegregated assets. The hearing commenced on November 9, 2009.

131. On July 16, 2009, the LBIE Administrators made an application to the U.K. High Court seeking directions on the treatment of certain money received by LBIE after the time it entered administration. This application relates to money (for example, redemption proceeds, dividends, or interest) received by LBIE post-administration in respect to securities held by LBIE as custodian under certain versions of the International Prime Brokerage Agreement: Charge Version. The U.K. High Court gave judgment on October 21, 2009, finding that post-administration money, the subject of the application, is held in trust by LBIE for the relevant client and should not be treated as part of LBIE's general estate. At this time, the representative respondent for the LBIE general estate has not sought permission to appeal. The Trustee and his representatives continue to monitor this application.

132. On July 16, 2009, the LBIE Administrators made an application to the U.K. High Court with respect to whether or not Lehman affiliates' interests in securities held by LBIE in the course of the operation of Lehman Brothers' RASCALS (Regulation and Administration of Safe Custody and Local Settlement) system belonged to the affiliates or to LBIE. LBI is a respondent to this application and the hearing is scheduled to commence on March 1, 2010.[15]

## Germany

133. The Trustee continues to monitor the proceedings of two German Lehman entities: Lehman Brothers Bankhaus AG ("LBBA") and Lehman Brothers Capital GmbH ("LBCG"). The Trustee's representatives attended the initial creditors meeting of LBCG on June 10, 2009.

134. On September 7, 2009, the Trustee's representatives learned that the LBI claim filed against LBBA is being fully contested. The Trustee's counsel, Norton Rose, is in contact with the German insolvency administrator regarding this issue and related issues.

135. The Trustee's representatives attended a second meeting of LBBA creditors on October 20, 2009. The primary topic of the meeting was a proposed settlement between LBBA and LBHI, Lehman Brothers Commercial Paper Inc., Lehman Brothers Commercial Corporation and Lehman ALI Inc., related to certain real estate and commercial loans not involving LBI. The next meeting of LBBA creditors is scheduled for March 16, 2010.

---

15. The other respondents to the application are Lehman Brothers Finance S.A ("LBF"), LBCCA, Lehman Brothers Asia Holdings Limited, and Lehman Brothers Special Financing Inc. The parties to the application are in the course of determining evidential issues for the purposes of the hearing.

**Switzerland**

136.    On August 12, 2009, the Trustee's representatives lodged a claim for cash and certain securities against LBF in Switzerland.  On September 15, 2009, the LBF bankruptcy liquidators issued a first report to creditors.  At that time, the liquidators stated that they were unable to forecast any possible bankruptcy dividend.  The LBF bankruptcy liquidators anticipate that the proceedings will last for several years.

**Luxembourg**

137.    In July 2009, the Trustee filed a claim against Lehman Brothers Luxembourg S.A. ("LBLux") for securities related to lending transactions with LBLux.  The Trustee received acknowledgement of his claim by the LBLux Joint Administrators on October 8, 2009.  At this time, the LBLux Joint Administrators have not made a decision whether to admit or reject LBI's claim.

**Japan**

138.    As noted in the Trustee's First Interim Report, due to the early deadline for submitting claims in the LBJ insolvency proceedings, the Trustee sought to preserve rights and claims that the Trustee might later identify.  The Trustee has retained City Yuwa Partners in Tokyo to advise regarding the LBJ proceedings.  On July 30, 2009, the Trustee filed a claim against LBJ with the Tokyo District Court for approximately JPY 16.4 billion (USD approximately 180 million) as well as securities positions sub-custodied by LBJ.  LBJ is in the process of evaluating LBI's claim.

139.    A portion of LBI's claim relates to margin posted on the Tokyo Stock Exchange and the Osaka Stock Exchange related to futures trading.  City Yuwa Partners is working directly with LBJ and appropriate personnel at the exchanges regarding the return of these assets.

**Hong Kong**

140.    The administrators of the Lehman companies in Hong Kong set a bar date in their respective proceedings of August 14, 2009.  On August 13, 2009, the Trustee filed claims against (i) LBA, (ii) LBACC, (iii) LBQ Hong Kong Funding Limited, and (iv) Lehman Brothers Nominees (H.K.) Limited; supplemented previously filed claims against (v) LBCCA and (vi) LBSA; and reserved rights to file claims in the future against (vii) Lehman Brothers Futures Asia Limited and (viii) Lehman Brothers Asia Holdings Limited.

**China**

141.    With the assistance of Norton Rose, the Trustee continues to evaluate his options with respect to the LBI representative office in Beijing, China.

**Singapore**

142.   Norton Rose continues to assist the Trustee with issues related to the LBI Singapore branch office, including responding to inquiries by local creditors.

143.   The Trustee continues to evaluate options related to the assets identified as being held for LBI by Lehman affiliates in Singapore, Lehman Brothers Private Ltd ("LBPL") and Lehman Brothers Singapore Private Ltd. ("LBSPL"), that are not subject to insolvency proceedings.  The Trustee also continues to monitor the situation in Singapore related to structured products purportedly arranged by LBI.

**Cayman Islands**

144.   Lehman Brothers Equity Finance (Cayman) Ltd. appointed Joint Voluntary Liquidators on July 6, 2009.  The Trustee filed a claim against this entity in advance of the September 18, 2009 bar date.  The Trustee's representatives attended the first meeting of creditors on September 20, 2009 and will continue to monitor these proceedings.

**Israel**

145.   On numerous occasions the Trustee instructed Israel Discount Bank Ltd. ("IDB") to deliver assets from LBI's cash and securities accounts at IDB used to custody customer assets.  IDB has not complied with the Trustee's requests and has failed to deliver the assets, all of which were requested for transfer for the benefit of former LBI customers.  Because of IDB's non-compliance, the Trustee, in connection with his duty to return securities under SIPA, has been compelled to take action to protect customers from IDB's refusal to deliver.  In certain instances, the Trustee has purchased securities and has or will deliver them for the benefit of the customers owed those securities.  In instances where a replacement security could not reasonably be purchased, the Trustee has or will provide replacement cash to the customers owed those securities.  IDB also owes LBI over $74 million on the close-out of foreign exchange transactions.

146.   These assets and receivables are also alleged to be the subject of an attachment lien obtained by Bank Leumi Ltd ("Bank Leumi") and consented to by IDB, potentially in violation of the U.S. Bankruptcy Court's Stay Order.  It was issued by an Israeli court in connection with litigation commenced by Bank Leumi against other entities.  The Trustee has retained the law firm of Steinmetz Haring Gurman & Co. as local Israeli counsel to assist in the recovery of assets and to represent the Trustee's interests, if necessary, in the ongoing Israeli litigation.  The Trustee is considering various options to recover damages suffered as a result of the actions of IDB and Bank Leumi, including commencing an adversary proceeding against IDB and Bank Leumi in the Bankruptcy Court in New York.

**International Protocols**

147.    Since early in the LBI liquidation proceeding, the Trustee has advocated cooperation among the administrators of Lehman entities from around the world and formalization of such cooperation through multilateral or bilateral protocols.

148.    In June 2009, the Trustee became a party to the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"), along with LBHI and administrators for Lehman entities in Hong Kong, Australia, Singapore, Germany and the Netherlands.  The Protocol provides for cooperation and sharing of information among the parties.  In addition, pursuant to the Protocol, a Procedures Committee was established with the objective of developing a methodology for resolving intercompany claims among the Lehman entities.  Two of the Trustee's professional advisors are members of the Committee, which has generally met by conference call bi-weekly since July 2009.

149.    A meeting of the signatories to the Protocol was held in London, England, on July 14 and 15, 2009, which the Trustee and representatives of eleven other Lehman entities attended.  The attendees made reports regarding the status of their respective proceedings and discussed intercompany claims.  A principal topic considered at the meeting was the "global close" as of September 12, 2008 of the accounts of a substantial number of Lehman entities, including LBI.  The parties to the Protocol are investigating the extent to which financial information produced as a result of the "global close" may form the basis for settling the amounts of intercompany claims.  In the case of claims against LBI, any account information derived from the "global close" as of September 12, 2008 would need to be adjusted for activity after September 12, 2008, through the Filing Date.

150.    Alvarez & Marsal organized a seminar in New York on September 23 and 24, 2009, regarding the "global close" and how it was implemented, which the Trustee's representatives attended along with other parties to the Protocol.

151.    The signatories to the Protocol met again in Amsterdam, the Netherlands, on October 15-16, 2009.  The Trustee's representatives attended this meeting as well. The meeting participants (except LBI and LBJ) adopted a resolution to the effect that the global close as of September 12, 2008 would be used to determine non-trading intercompany balances, subject to further analysis of any material breaks and to approvals where required of creditors' committees and/or Tribunals.  LBI expressed general comfort with the global close as a starting point, but intends to perform further work to roll forward from September 12, 2008 to the Filing Date.  LBJ stated that it would continue to consider the resolution positively.

152.    Also at the Amsterdam meeting, the participants reviewed proposed guidelines for dealing with intercompany settlements and valuing trading balances.

153.    LBIE is not a party to the Protocol.  The Trustee has proposed to LBIE a bilateral protocol to address primarily the resolution of customer claims and distribution

of customer property between LBI and LBIE.  The Trustee and the LBIE Administrators are currently in the process of negotiating such a bilateral protocol.

## XIII.  DERIVATIVES, REPOS, FX, AND TBA ISSUES

154.    During the Report Period, the Trustee and his professionals continued to work diligently on the recovery of value from the unwind of the financial products that were transacted at LBI with broker-dealers, financial institutions, and other parties. These transactions include foreign exchange derivatives, repurchase agreements, securities lending agreements and TBAs ("to be announced" trades on mortgage related securities).  Most of these transactions were documented using the form of Master Agreement of the International Swaps and Derivatives Association ("ISDA"), the forms of Master Repurchase Agreement and Master Securities Lending Agreement of the Bond Market Association/Securities Industry and Financial Markets Association, and a Master TBA agreement.  The legal steps involved with the termination mechanics are thus well understood in the market and benefit from legal certainty.

155.    To date, the Trustee's efforts have resulted in the recovery of approximately $700 million, which represents the partial or full resolution of financial products transactions with approximately 29 counterparties that owed termination amounts to LBI.  At the time of the Filing Date, amounts related to the closeout of financial products transactions were due from approximately 300 counterparties, comprised largely of financial institutions.  Furthermore, in addition to the 29 counterparties from which such collections have been made, the Trustee and his professionals are currently in active negotiations with approximately 70 additional counterparties.  Approximately 100 counterparties owe the LBI Estate amounts of three million dollars or more.

156.    The Trustee has been working with many counterparties and their counsel who have come forward to settle the closeout value of transactions on a consensual basis. The Trustee has taken affirmative steps to contact counterparties which have not reached out to the Trustee.  Such contact consists of the Trustee writing to and calling such counterparties to initiate a dialogue with the goal of engaging in a consensual discussion. To date, the Trustee and his professionals have contacted nearly all such counterparties that on the books and records of LBI are shown as owing a closeout amount exceeding one million dollars.  In coming weeks, the Trustee's professionals will commence outreach to parties whose closeout amounts are less than one million dollars.

157.    The Trustee has established due diligence procedures for reconciling and collecting the closeout amounts due to the LBI Estate.  These procedures include the following steps: (i) an analysis of LBI books and records for the identification of trade population and a calculation of closeout amounts as of September 19, 2008; (ii) a review of the relevant termination provisions of the agreement governing the transaction; (iii) a review of any applicable notice of termination sent by the counterparty and an evaluation regarding the selection of valuation date; (iv) a review of the pricing and valuation data submitted by the counterparty; (v) in the case of parties that have not offered any data, an analysis of LBI books and records; (vi) an assessment of any legal issues asserted; and

(vii) negotiations over any differences in valuation and/or methodology applied for purposes of valuation. In arriving at the calculations of amounts due, the Trustee and counterparties have taken into account a substantial number of unsettled trades from the week of September 15, 2008, as well as the termination values of amounts that were due after the commencement of the SIPA proceeding.

158.    In addition, the Trustee has investigated and determined that approximately 1,400 other trading counterparties owe amounts to LBI as of the Filing Date. Approximately 20 of these trading counterparties owe the LBI Estate amounts of three million dollars or more. Following procedures similar to those described above, the Trustee is taking affirmative steps to contact these trading counterparties with a goal to recovering, on a consensual basis, these amounts owed.

159.    On October 29, 2009, the Trustee filed a motion with the Court to seek the Court's approval for the procedures that have been adopted to reduce to cash and recover amounts due from financial products and other trading counterparties (Docket No. 2006). The Trustee believes he has the explicit and inherent legal authority under SIPA and the Bankruptcy Code to reduce the assets of the LBI Estate to cash. In the interest of transparency and in order to streamline the process of obtaining Court approval for individual transactions that will be applied henceforth, the Trustee requested that all resolutions of financial products closeouts and other trading counterparty receivables in amounts of three million dollars or more be submitted for approval by the Court in a streamlined court approval process. As part of this application to the Court, the Trustee seeks the Court's approval of his continued exercise of discretion in resolving consensually transactions valued at under three million dollars without the necessity for further Court approval.

## XIV.    GOVERNMENT AND THIRD PARTY INVESTIGATIONS AND REGULATORY MATTERS

### Government and Third Party Investigations

160.    The Trustee has continued to receive requests for historical LBI information from dozens of federal, state, and local government agencies. Cooperation with investigations by these agencies is of paramount importance to the Trustee and SIPC. Accordingly, to date the Trustee has produced in response to these requests hundreds of thousands of pages of documents as well as hundreds of gigabytes of data in electronic form, much of which has been obtained in cooperation with Barclays. In addition, the Trustee has received and is responding in due course to an ever-increasing number of non-party subpoenas issued in connection with various litigations and arbitrations around the United States.

161.    In total, the Trustee has responded to over 200 of these governmental and non-party requests. While the Trustee has been happy to cooperate with such investigations to the extent documents and information have been available, the productions continue to be a significant expense for the LBI Estate. In some cases investigators and third parties are referred to the Trustee by Barclays or LBHI, who also

may be in an equal or better position to supply the information. The Trustee continues to pursue a more coordinated approach to some of these requests.

**Regulatory Matters**

162.    As a result of the complexities of administering LBI's Estate, the Trustee regularly meets and coordinates with the SEC, the FRBNY, the CFTC, FINRA, and the British Financial Services Authority. The Trustee has also undertaken to terminate LBI's former broker-dealer registrations with the 50 states and other regulatory agencies, saving LBI's Estate from the significant costs associated with maintaining its registration status.

## XV.    ADVERSARY PROCEEDINGS

163.    The Trustee has continued to enforce the automatic stay provisions of 11 U.S.C. §362 and the LBI Liquidation Order (together, the "Automatic Stay") with respect to new complaints that name LBI as a defendant but are filed outside the Court in violation of the stay. In certain instances, the Trustee has obtained dismissal of the action against LBI.

164.    Before this Court, the Trustee has defended against ten adversary proceedings, including successfully negotiating the voluntary dismissal of claims in one action, moving to dismiss in two actions, and reaching settlement agreements in two others. To date, the most advanced of the remaining actions is the interpleader action filed by the Options Clearing Corp. ("OCC") against the Trustee, Barclays, Australia & New Zealand Banking Group Ltd. ("ANZ"), Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") and Lloyds TSB Bank plc ("Lloyds") to determine the parties' respective rights and obligations in connection with approximately $80 million in proceeds of certain letters of credit deposited as margin in LBI's options and futures accounts at the OCC, and subsequently drawn down by the OCC. ANZ, BTMU and Lloyds issued the letters of credit, the proceeds of which are subject to reimbursement agreements with the banks. In addition, the OCC, Barclays and the Trustee entered into a Transfer and Assumption Agreement on or about September 20, 2008, governing the transfer of certain OCC-related items from LBI to Barclays. The parties have filed statements of claim to the proceeds, and discovery is ongoing. The Bank defendants have indicated their intent to respond to the recently-filed Rule 60(b) motions (*see supra* ¶117).

165.    Separately, the Trustee has briefed objections to Rule 2004 requests by the Newport Global entities, the Deferred Compensation Parties, Bank of New York Mellon, and Carret and Evansville Insurance Ltd., the last of which the Court denied the Rule 2004 requests on March 31, 2009, after a hearing on the motion on March 25, 2009 (*see* Docket No. 913). Thereafter, the Trustee has continued to work with Newport Global, the Deferred Compensation Parties, the Harbinger Funds, and Carret and Evansville in an attempt to informally resolve their individual information requests without incurring additional significant expense to the LBI Estate.

166.    The Trustee is continuing the process of determining amounts owed to the LBI Estate as a result of over 270 employee loans that were in collection as of the Filing

Date (*see* discussion on employee benefits *infra* ¶¶ 206-212) and is employing cost-effective means to maximize collection of those amounts through a minimum of administrative expense.

167. The Trustee also continues to respond as appropriate to other threatened litigation, both within and outside the jurisdiction of the Court.

## XVI. DATA ACCESS AND TRANSITION SERVICES

168. When it purchased LBI's assets, Barclays took possession of LBI's computer systems and the data stored within those systems. Barclays is providing the Trustee with access to these systems and other assistance on a transitional basis, for which it charges the Trustee according to an agreed-upon costing methodology. The Trustee has been working diligently to migrate off of the Barclays' computer systems and to establish an independent information infrastructure.

169. The Trustee's marshaling of LBI data and migration to Trustee-maintained systems are consistent with the LBI Liquidation Order, which authorized the Trustee to take immediate possession of LBI's books and records. The Trustee requires this data to effectuate the liquidation of LBI and perform his duties under SIPA and the Bankruptcy Code, including completing the Account Transfers, reconciling claims, resolving contingencies, and investigating potential causes of action against third-parties.

170. Since the First Interim Report, the Trustee's professionals have completed a rigorous evaluation of more than 2,700 data systems in order to identify the data that are or may be necessary for the liquidation of LBI.[16] Much of the data needed for the liquidation is stored within a relatively small number of larger systems, and many of the 2,700 systems that were in use as of the Filing Date are no longer needed now that LBI has ceased operations as a going concern. As a result, the Trustee was able to identify approximately 125 systems of interest. (*See* Exhibit 6.)

171. As of the end of September 2009, the Trustee's professionals had completed the migration of data from approximately 95 of these systems. Given the nature and the complexity of the systems, as well as the volume of data involved, this required extensive work. To date, the Trustee has completed the migration of hundreds of millions of transaction records and more than 75 terabytes of data in total. This amount, if printed, would yield a stack of paper nearly 700 miles high, or more than 130 times the height of Mt. Everest. (*See* Exhibit 6.)

172. The migration process itself is a multi-step process. For each system, the Trustee's professionals begin by reviewing the available system documentation and consulting with Barclays information technology ("IT") professionals (many of whom are

---

16. This information constitutes part of the books and records of LBI and is necessary for, among other things, the processing of customer claims, the ongoing operations of LBI, the reconciliation of financial positions, litigation, and ongoing regulatory investigations.

legacy Lehman employees with historical knowledge of the system). Through these efforts, the Trustee's professionals are able to understand how the system works, how the data is organized, and how the data can be extracted. Then, working cooperatively with Barclays IT professionals, the Trustee's professionals design a process to extract the data from the system.

173.    Once extracted, the Trustee's professionals transfer the data to a forensic laboratory, where the data is validated to make sure that the transfer has not corrupted the data, and that key tables, fields, and relationships between data points have remained intact. The data is then classified and archived based on expected future needs. When the Trustee's professionals are satisfied that they have captured the data, they notify Barclays to "decommission" the system, so that it is no longer included in the Trustee's monthly bill. The Trustee has decommissioned all of the approximately 95 systems from which data has been migrated, resulting in reduced fees of approximately $5 million annually.

174.    The Trustee has established dedicated space in a fully operational data center for the storage of the migrated data. The data center is a secure, up-to-date facility maintained by the Trustee's professionals. The data is backed-up regularly, and a copy is stored in a remote disaster recovery site in case of a catastrophe.

175.    Migrating the larger trading systems is expected to be a particular challenge. The Trustee is using three of these systems to manage LBI's inventory of cash and securities: (i) the MTS system, which supports the trade capture and settlement of US-dollar denominated fixed-income products, (ii) the ITS system, which is a multi-currency and multi-entity settlement system for international trading, and (iii) the RISC system, which is a global processing system for the futures and foreign exchange business.

176.    The Trustee and his professionals have been formulating and testing migration plans to transfer the historical data from these trading systems to the Trustee's data center and the current inventory of cash and securities positions to a third-party vendor, Broadridge Securities Processing Solutions Inc. ("Broadridge"). This is time-consuming and complicated work due to the complexity of the systems involved – as well as the smaller feeder systems and operational reconciliation tools that support these systems – and the need to support ongoing claims processing and research activity while the migrations are in progress.

177.    The Trustee is also planning to migrate the general ledger into the Trustee's data center. The Trustee requires ongoing access to the general ledger and underlying supporting data for the overall financial close process. This work requires the Trustee's professionals to replicate the structure of the existing Barclays system to ensure that the account balances accurately represent the financial books and records of LBI. Once in place, the systems at Broadridge will feed data to the general ledger to ensure that it is kept up-to-date.

178. The Trustee also requires access to email and other electronic records created by LBI employees. LBI stored its employees' email and other electronic messages in a third-party email archive provided by Iron Mountain Information Management Inc. ("Iron Mountain"). The Iron Mountain archive houses an estimated 3.2 billion messages, making it one of the largest email archives in the financial services industry. Barclays assumed the Iron Mountain contract and has been charging the Trustee and LBHI a pro rata share of the monthly costs to access the archive. The Trustee is engaged in ongoing discussions with Barclays and LBHI regarding the renewal of the Iron Mountain contract and a new cost-sharing arrangement that is expected to result in significant savings.

179. The Trustee continues to negotiate and implement arrangements relating to transition services required by the LBI Estate, including a transition services agreement with each of Barclays (the "Barclays TSA") and LBHI, in order to obtain these resources at an appropriate cost and for an appropriate period.[17]

180. The Trustee receives invoices from Barclays for services under the parties' Data Access Agreement. As described in the First Report (¶¶ 111-12), after extensive negotiations the Trustee and Barclays entered into that agreement, dated February 24, 2009 and approved by the Court on April 22, 2009 (*see* Docket No. 1018), and a related agreement with LBHI dated February 12, 2009, in order to facilitate timely and effective access to LBI data that, following the closing of the asset sale to Barclays on September 22, 2008, is now maintained in Barclays' data systems.[18]

181. The Data Access Agreement between Barclays and the Trustee accommodates Barclays' professed concerns about commingled data and the expense of services performed. Barclays has charged the Trustee several million dollars a month for its services (including transition services pending negotiation of the Barclays TSA), and the Trustee's professionals review these expenses carefully. In addition, the Trustee negotiated with Barclays that the LBI Estate will not be charged for services related to Barclays' own substantial omnibus claims, and all bills are being reviewed closely in that regard. The Trustee has also disputed and withheld payment for certain other expenses which are being addressed in the context of the negotiations of the Barclays TSA. There have been extensive discussions of these issues and of the terms of a formal TSA with Barclays throughout this and previous reporting periods. The Trustee expects to conclude, and file a motion seeking approval of, the Barclays TSA early in the next reporting period.

---

17. Barclays and LBHI entered into a transition services agreement on September 22, 2008. LBI is not a party to that agreement.

18. This data is required by the Trustee to effect the liquidation of LBI and to perform his obligations under SIPA, including determining and satisfying claims and returning customer property. The Data Access Agreement is consistent with the District Court's Order authorizing the Trustee "to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI . . ." (LBI Liquidation Order, ¶ XIV).

182.    The Trustee is also negotiating a definitive transition services agreement with LBHI for the receipt of services of a more modest scope than those required from Barclays.

## XVII.  BANKING AND RELATED MATTERS

### Collection of LBI and Client Funds

183.    The Trustee has established certain accounts with the trust group of Union Bank, N.A. (f.k.a. Union Bank of California, N.A.) in New York.  These accounts were set up to accumulate funds and securities owned by LBI for its own account or for customers, including amounts owed to LBI by third parties, which are being used to satisfy LBI obligations to former customers and other third parties, as well as payment of ongoing administrative expenses.

184.    The Trustee maintains four accounts at Union Bank, N.A.  The four accounts segregate cash and securities held in connection with (i) previously existing Rule 15c3-3 requirements for the benefit of customers, (ii) post-petition accruals the Trustee believes are specifically associated with customers, (iii) other funds and securities received or collected; and (iv) cash advanced by SIPC to fund distributions to claimants with claims below SIPA's limits.  As of November 6, 2009, the total value of the funds and securities in these accounts exceeded $4 billion.

185.    In connection with the Trustee's efforts to marshal assets from abroad, the Trustee's counsel has sent letters to over 20 banks seeking withdrawal of *de minimis* amounts.  Six banks transferred cash to the Trustee following this correspondence.  The Trustee continues to negotiate with the remaining banks to collect assets and close the accounts.

### DTCC Payments

186.    The Trustee remains engaged in a full accounting of the DTCC wind-down activities.  In the Report Period, DTCC transferred to the LBI Estate additional cash relating to proceeds on securities held in LBI's accounts at DTCC.  All post-petition accruals on securities are directed to a special account at Union Bank titled specifically for that purpose.  (*See* discussion regarding the Trustee's investigation of DTCC *supra* ¶¶ 105-107.)

187.    Since May 30, 2009, the Trustee has received $510 million from DTCC in connection with such payments of post-petition accrued proceeds.

### Other Banking Matters

188.    Significant post-petition principal and interest payments have been made on securities held by LBI at JPMorgan Chase Bank, N.A. ("JPMC").  Since May 30, 2009, the Trustee has collected approximately $250 million from JPMC related to such payments.  JPMC has yet to deliver additional amounts the Trustee believes due to him, and the Trustee continues to explore avenues to recover items seized by JPMC.

189.     Citibank asserted an administrative hold on all of LBI's accounts maintained at Citibank, pending the resolution of Citibank's setoff claims.  The Trustee continues to evaluate Citibank's setoff claims against LBI, including a setoff that Citibank effected (purportedly immediately prior to the commencement of the LBI liquidation proceeding) against a $1 billion deposit of cash collateral provided by LBI to Citibank during the week prior to the Filing Date.

**Corporate-Owned Life Insurance**

190.     The Trustee was unable to locate purchasers for the Corporate-Owned Life Insurance ("COLI") policies discussed in the prior Interim Report, other than a single sale to the family of one beneficiary.  The Trustee surrendered a number of these policies in late July and surrendered the remainder in October.

## XVIII.  TAX MATTERS

191.     The Trustee's professionals continue to monitor or respond to several federal, state, and local tax audits; to respond to requests for tax-related information from international, federal, state, and local authorities; and to coordinate all tax reporting requirements.

**Tax Audits and Refund Claims**

192.     LBI is included in consolidated federal income tax returns filed by LBHI as well as consolidated and combined state income tax returns in a number of states.  Under the tax law, LBHI is entitled to control any audits and refund claims relating to these returns but LBI is jointly and severally liable for any taxes due in most cases (other than California, where LBI is liable for its allocable share).  In order to monitor these proceedings, the Trustee's professionals have maintained ongoing discussions with LBHI's counsel, who is handling substantial federal refund claims for the years 1997 through 2000 and audits for 2001 through 2007 where the IRS is asserting deficiencies.  As a matter of tax law, LBHI is entitled to act as agent for the group in its dealings with the IRS with respect to federal income tax liabilities.

193.     State tax refunds have also been claimed on consolidated and combined returns filed by LBHI.  Again, the Trustee's professionals are monitoring the status of these claims.  With respect to all these refund claims, the Trustee's professionals are evaluating LBI's entitlement to a share of these refunds (the checks generally would be issued to LBHI in the first instance as a matter of tax law).

194.     The Trustee's counsel continues to await or negotiate with federal and state tax authorities for other refunds, including a refund of $9.5 million from the IRS,

attributable to an overpayment of payroll taxes,[19] and a refund of $2.8 million from New York State, attributable to an overpayment of payroll taxes.

195.     In addition to the consolidated and combined tax disputes, there is an ongoing IRS investigation regarding possible tax shelter promotion penalties that began pre-bankruptcy. Outside counsel for the then-consolidated group has been working on this matter for several years; that counsel is now engaged by LBHI. The Trustee's professionals have been coordinating responses to the IRS's requests for information with those attorneys. It remains unclear whether the IRS believes that LBI, LBHI, or both are potentially liable for penalties. The Trustee's professionals are working with the IRS in order to avoid the need for LBI to incur the expenses of duplicating LBHI's document production.

196.     There are also separate company state tax audits. The Trustee's professionals are working with a small firm that historically handled all state tax audits for LBHI and LBI to address these audits.

197.     The IRS completed a federal employment audit of LBI for tax years 2005-2008 and issued a "no-change" letter for all years under audit.

**Ongoing Compliance**

198.     *Federal return.* Deloitte Tax continues to hold bi-weekly calls with LBHI to coordinate preparation of the final 2008 federal income tax return. An estimated consolidated federal return was timely filed by LBHI on September 15, 2009. The return included a lengthy disclosure regarding LBHI's reliance on estimated financial information in preparing the return, and LBHI's intent to prepare and file an amended return once this financial information is finalized. The final return is unlikely to be filed before spring 2010.

199.     *State returns.* The completion of several separate company LBI state income tax returns for 2007 has been delayed due to the discovery that LBHI, which had prepared the returns for Deloitte Tax's review, had not taken certain tax items into account. The Trustee has timely filed twenty 2008 state income tax returns, and anticipates filing approximately four others by their due date of November 15, 2009. The returns were or will be accompanied by disclosures regarding (1) reliance on estimated financials and (2) notice to tax authorities that any taxes due represent claims in bankruptcy, and are subject to the claims process. The Trustee has filed business discontinuance notices in most states where LBI formerly did business. Deloitte Tax will perform analysis to identify the states in which LBI may file final returns for 2008. LBI continues to hold partnership interests in partnerships doing business in certain states. As a result, LBI may be required to file tax returns in such states for tax year 2009.

---

19. Representatives of the IRS have advised in informal conversations that the IRS is holding any refunds to which LBI would otherwise be entitled pending a disposition of all outstanding IRS audits and assessments as to LBI. LBI and LBHI jointly entered into a stipulation in this proceeding extending the claims bar date for the IRS to December 31, 2009. *See supra* note 9.

200.    *State tax and employment issues – other.*  The Trustee and his professionals continue to monitor and respond to requests by various states as to the status of former LBI workers for purposes of entitlement to unemployment compensation, with the assistance of Deloitte Tax and LBHI.

201.    *Forms 1099 and 1042-S.*  The call center that was established to respond to questions from customers who received 2008 Forms 1099-B, 1099-DIV, 1099-INT and 1099-OID is no longer staffed on a full-time basis, but Deloitte Tax representatives continue to monitor and respond to any messages left at the center's toll-free number. The Trustee's professionals do not currently anticipate that LBI or the Trustee will be required to perform this type of tax reporting for tax year 2009.

202.    The Trustee's professionals have finalized the schedule of tax services included in the master services agreement between the Trustee and Broadridge, and continue to respond to comments from LBHI on a similar schedule of tax services to a services agreement between the Trustee and LBHI.

203.    *Foreign information reporting – employees.*  The Trustee has filed information returns with respect to LBI employees who were seconded to certain Hong Kong entities (now in liquidation), as required by Hong Kong tax law, with the assistance of Deloitte Tax Hong Kong.

204.    *Withholding – backup withholding.*  Although LBI timely filed its required Forms 945 for tax year 2008 for backup withholding, it paid over the withheld taxes after the due date.  As a result, the IRS has issued a penalty assessment.  Deloitte Tax has filed a request to have the penalty abated for reasonable cause.

205.    *Other taxes.*  The Trustee's tax professionals continue to work with the Trustee's real estate attorneys and Deloitte Tax to determine any real or personal property tax liability, and possible nexus issues for state income tax liability or reporting obligations for the post-bankruptcy period, for LBI.

## XIX.    EMPLOYEE BENEFITS

### Aceso Holdings Health Care Trust

206.    Prior to the SIPA liquidation, Aceso Holdings, Inc., a wholly-owned subsidiary of LBI, transferred $95 million in connection with its establishment of a health care trust (the "Health Care Trust") to fund the payment of benefits under the Lehman Brothers Holdings Inc. Group Benefits Plan (the "Health Plan").  Until the beginning of April 2009, funds continued to be wired out of the Health Care Trust bank account to pay tail Medco Health and Aetna charges as well as to fund other costs of the Health Plan for employees of all sponsoring employers on a daily basis.  The Trustee has been actively engaged in discussions with LBHI and the Department of Labor regarding the ownership and disposition of the Health Care Trust assets.  The Trustee continues to monitor the situation.

**Bonus Advances & Tuition Payment Programs**

207.    Certain employees of LBI were entitled to participate in advance programs which entitled them to immediate receipt of a cash award in return for executing a promissory note that obligated them to repay the cash award in full with margin rate interest upon certain terminations of employment.  LBHI continues to assert that even though LBI is the named holder of the promissory notes, the loans were transferred to LBHI and any recoveries thereunder belong to LBHI.  Despite the difference in opinion as to the ownership of any proceeds, the Trustee has agreed to enter into a cooperative stipulation with LBHI in order to allow LBHI to pursue amounts owed under the promissory notes pending a final determination as to ownership.  The Trustee is currently negotiating a stipulation agreement with LBHI that generally provides for the party prevailing on ownership to bear the costs of recovery.

**Demand Note in Favor of LBI**

208.    In connection with an Asset Purchase Agreement from 1993 between Shearson Lehman Brothers, Inc. [now LBI] and Smith Barney [now CitiBank Smith Barney], there is a buyer's demand note issued in favor of LBI in connection with certain vested benefits under its deferred compensation plans as of the date of the asset sale (the "Note").  There is currently about $10 million left to be drawn from the Note.  The Trustee has communicated with Citibank concerning its right to demand payment of the Note and the parties are still in discussions with respect to the relevant issues.

**Termination of the LBHI Retirement Plan Issues**

209.    The Trustee continues to monitor the effect of the settlement agreement reached among LBHI, the LBHI Retirement Plan's plan administrator, Neuberger Berman and the PBGC with respect to LBI's liability in connection with the termination of the LBHI Retirement Plan.  The Trustee is currently involved in discussions with LBHI concerning an invoice sent to LBI whereby LBHI requested reimbursement for professional fees incurred by it in connection with services it performed in analyzing the termination of the LBHI Retirement Plan.

**Savings Plan Contributions**

210.    LBHI sponsors a 401(k) savings plan for its eligible employees called the Lehman Brothers Savings Plan (the "Plan").  The Plan also covers eligible employees of any affiliate of LHBI and, prior to the Filing Date, covered employees of LBI.

211.    The Trustee filed a Cash Management/Wage Motion seeking authority to pay pre-petition 401(k) deferrals for the pay period ending September 19, 2008.  As a result of the Trustee's actions, all employee contributions for the September 19, 2008 payroll period have been contributed to the Plan.

212.    The Trustee has responded to Department of Labor inquiries concerning the timing of the transfer of employee contributions to the Plan.  After talks with the Trustee, the Department of Labor concluded that appropriate corrective actions had been

taken with respect to the transfer of employee contributions to the Plan and that it would take no further action against LBI.

## XX.    EXECUTORY CONTRACTS

213.    During the Report Period, the Trustee's professionals nearly completed the task of reviewing over 20,000 Lehman Brothers vendor, consulting, and IT contracts that remained after the sale to Barclays.  The Trustee's professionals determined (i) whether the contracts are LBI or LBHI contracts (a time consuming task because many contracts are merely in the name of Lehman Brothers); and, as to LBI contracts (ii) whether such contracts would be beneficial to the estate and further the purposes of the liquidation or result in consideration to the estate through assignment to third-parties.

214.    To facilitate this review and preserve the rights of the estate in executory contracts and unexpired leases, during the Report Period, the Court granted the Trustee's requests to extend the time within which the Trustee may assume, assign or reject the LBI's executory contracts and certain unexpired leases, as provided in section 365(d)(1) of the Bankruptcy Code, through January 12, 2010.  (*See* Docket Nos. 1241, 1679, together the "Extension Orders.")

215.    In particular, since entry of the Extension Orders, the Trustee has assumed and assigned certain agreements to the Chapter 11 Debtors, to facilitate a potential reorganization effort by certain Chapter 11 Debtors.  The Chapter 11 Debtors have agreed to satisfy any cure costs owed under such agreements, reducing the amount of pre-petition claims against the LBI Estate had the Trustee otherwise rejected such agreements.  (*See* Docket Nos. 1342, 1499, 1604.)  To facilitate future assignments to the Chapter 11 Debtors and their non-debtor affiliates, the Court entered an order (*see* Docket No. 1342) authorizing the Trustee to implement procedures for future assumption and assignments of executory contracts to these parties, upon notice to counterparties, without further order of the Court.

216.    In addition, the Trustee assumed and assigned certain contracts to Neuberger that are essential to that entity's operations.  (*See* Docket Nos. 1549, 1594.)  Finally, to minimize administrative expenses, the Trustee has rejected numerous executory contracts upon notice to the counterparties, eliminating several million dollars of potential administrative expense claims.[20]  (*See* Docket Nos. 1295, 1442, 1501, 1603, 1654, 1921.)

## XXI.   PROFESSIONAL RETENTION

217.    At the request of and in consultation with SIPC, nearly every professional firm and consultant retained by the Trustee has agreed to a voluntary "public interest discount" of 10% or more from standard rates and has further agreed not to charge for a

---

20.  The Trustee's professionals continue to review remaining outstanding executory contracts and unexpired leases and anticipate filing additional notices of rejection shortly.

number of categories of expenses regularly paid to professionals in large bankruptcy proceedings, including overtime meals and after-hour travel services.

218.     During the Report Period, HHR, pursuant to the LBI Liquidation Order and the Order Regarding Disinterestedness of the Trustee and Counsel to the Trustee (Docket No. 243), continued to perform numerous tasks for the LBI Estate, its customers and creditors as the Trustee's primary counsel.[21]

219.     HHR has not, does not and will not represent any current or former client or their respective affiliates in this proceeding, the LBHI Chapter 11 proceedings, any other Lehman insolvency proceeding, or in any other matter adverse to the Trustee or the LBI Estate. On September 17, 2009, the Court entered the Order Authorizing the Trustee to Retain and Employ Menaker & Herrmann LLP as Special Counsel, *Nunc Pro Tunc* to July 30, 2009 (*see* Docket No. 1707). Menaker & Herrmann LLP ("Menaker & Herrmann") has begun advising the Trustee on the treatment of claims by and against counterparties that are clients or entities related to clients for which HHR has rendered services on unrelated matters, is presently rendering such services, or expects to render such services in the future. This added level of review by special counsel and SIPC increases transparency and assures there is no question that the Trustee acts in strictest accord with his fiduciary obligation to the LBI Estate and all parties-in-interest. Menaker & Herrmann has also begun representing the Trustee in all matters relating to Citigroup Inc. and affiliates or syndicates, including Citibank, N.A.[22]

220.     As noted above, given the global nature of the LBI business and that Lehman insolvency proceedings have been commenced in numerous jurisdictions, the Trustee requires additional counsel to attend to certain matters. During the Report Period, Norton Rose LLP continued to advise the Trustee with respect to his and the LBI Estate's rights, duties and powers in connection with the U.K. Administration and assisted the Trustee on the winding down of LBI's representative office in Beijing, China.[23]

221.     In addition, during the Report Period, the Court approved the Trustee's retention of Steinmetz, Haring, and Gurman & Co. (*see* Docket No. 1680) as special

---

21. On August 27, 2009, the Court entered the Order Approving Second Application for Allowance of Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From February 1, 2009 through May 31, 2009 (Docket No. 1602) providing for the allowance of interim compensation of $12,907,843.03 and expenses of $132,764.74.

22. Recently, HHR has been retained on Citibank matters that may generate fees constituting more than one percent of HHR's 2009 revenue. Although HHR does not hold or represent an interest that is adverse to the Trustee or the LBI estate under SIPA in connection to Citibank, out of an abundance of caution, HHR will not continue to perform services for the Trustee in matters relating to these entities. *See* First Supplemental Declaration of James B. Kobak, Jr. on Behalf of Hughes Hubbard & Reed LLP Regarding Disinterestedness of Counsel (Docket No. 1627).

23. On October 16, 2009, the Court entered the Order Approving the Second Interim Fee Application of Norton Rose LLP (Docket No. 1976) providing for the allowance of interim compensation of $299,186.38 and expenses of $9,971.05 for the period of January 30, 2009 through May 31, 2009.

Israeli counsel to represent the Trustee before the District Court for Tel Aviv-Jaffa in the proceedings that have been commenced in Israel regarding other Lehman entities (*see supra* ¶¶ 145-146). The Trustee also retained City Yuwa Partners, pursuant to Order Authorizing Employment of Counsel Utilized in the Ordinary Course (*see* Docket No. 1443 Declaration of Disinterestedness of Masaaki Sawano on Behalf of City Yuwa Partners), to serve as his Japanese counsel for purposes of asserting claims in the LBJ proceeding.

## XXII.  REAL ESTATE

222.    As of May 30, 2009, all leases previously held by LBI had been rejected or assumed and assigned.  While the Trustee maintains that the lease for premises located at 555 California Street in San Francisco, CA was rejected as of April 17, 2009, the adversary proceeding filed by the landlord on April 17, 2009 seeking a declaration that the San Francisco lease had been assumed by LBI on the closing date of the Purchase Agreement has not yet been resolved.  A hearing was held on the Trustee's motion to dismiss the complaint on August 11, 2009, and the Court converted the Trustee's motion to a motion for summary judgment, and ordered reasonable discovery in the case.  The landlord and the Trustee have agreed to postpone the commencement of discovery until November 13, 2009, at the earliest, while the parties attempt to negotiate a settlement.

223.    The Trustee continues to investigate any potential real estate assets that the LBI Estate may own or have an interest in.

## XXIII.  INSURANCE

224.    The Trustee has continued to take steps to secure coverage on behalf of the LBI estate and its customers, including providing updates to representatives of the Customer Asset Protection Company in connection with an excess surety bond issued to LBI that is designed to provide LBI customers, to the extent necessary, with protection in excess of that provided under SIPA.  Additionally, the Trustee is continuing to investigate facts to determine the existence and/or scope of insurable losses and whether notice under additional insurance policies would be appropriate.

## XXIV.  <u>CONCLUSION</u>

The foregoing report represents a summary of the status of this proceeding and the material events that have occurred from May 30, 2009 through November 11, 2009. It will be supplemented and updated with further interim reports.


Dated: New York, New York
      November 11, 2009

Respectfully submitted,

HUGHES HUBBARD & REED LLP


By:   /s/ James B. Kobak, Jr.   
       A member of the firm

One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

# EXHIBIT 1

# Financial Condition of the Estate – Assets on Hand

**Summary of Assets and Customer Property on Hand**
**As of November 6, 2009**

Unaudited (in millions)

| | |
|---|---:|
| Cash and Cash Equivalents | |
| Trustee Established Accounts | $3,970 |
| LBI Legacy Accounts (principally 15c3-3) [a] | 1,138 |
| **Total Cash and Cash Equivalents** | **5,108** |
| | |
| Securities [b], [c] | |
| DTCC [a] | 12,729 |
| Chase [d] | 60 |
| Goldman Sachs | 769 |
| Union Bank | 128 |
| **Total Securities** | **13,686** |
| | |
| **Total Assets Under Trustee Control** [e] | **$18,794** |

(a) See Second Interim Report, Section X, regarding Barclays' claim to certain assets under the Asset Purchase Agreement of September 16, 2008.
(b) Market value of securities obtained from depository statements; excludes value of customer name securities.
(c) See Summary of Securities on Hand on following page.
(d) Represents value of securities as of September 21, 2009.
(e) Does not include assets held in certain foreign depositories, which are not under Trustee control.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Financial Condition of the Estate – Summary of Securities on Hand as of November 6, 2009

|  | Number of Cusips | Number of Shares/Par | Market Value |
|---|---|---|---|
| **DTCC** | | | |
| Corporate Equities | 7,083 | 701,765,788 | $ 7,970,276,157 |
| Corporate Bonds | 1,662 | 13,348,118,649 | 4,633,489,165 |
| Municipal Bonds | 114 | 140,301,180 | 125,596,787 |
| **Chase** [(a)] | | | |
| Treasuries & Agencies | 25 | 57,945,500 | 59,797,499 |
| **Goldman Sachs** | | | |
| Corporate Equities | 378 | 26,302,721 | 737,838,537 |
| Mutual Funds | 33 | 397,732 | 5,664,058 |
| Treasuries & Agencies | 1 | 3,495,000 | 3,814,198 |
| Corporate Bonds | 35 | 6,778,476 | 18,191,411 |
| Municipal Bonds | 17 | 3,695,000 | 3,720,457 |
| **Union Bank** | | | |
| Corporate Equities | 3 | 11,405 | 217,320 |
| Treasuries & Agencies | 106 | 153,518,309 | 127,298,389 |
| Corporate Bonds | 82 | 11,929,178 | 466,283 |
| **TOTAL** | **9,539** | **14,454,258,937** | **$ 13,686,370,261** |

(a) Represents value of securities as of September 21, 2009.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Financial Condition of the Estate – Cash Flow

**Schedule of Cash Receipts and Disbursements** [a]

**September 19, 2008 - November 6, 2009**

Unaudited (in millions)

| Beginning Cash [b] (9/19/08) | Receipts | Disbursements | Ending Cash and Cash Equivalents (11/6/09) |
|---|---|---|---|
| $1,221 | $9,516 | $5,629 | $5,108 |

(a) Represents cash flows for Trustee controlled bank accounts.  Foreign currency amounts are reflected in USD equivalents.

(b) Represents cash in legacy LBI bank accounts under Trustee Control as of September 19, 2008.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# Financial Condition of the Estate – Schedule of Administrative Expenses

| Unaudited (in thousands) | | Disbursed as of November 6, 2009 |
|---|---|---:|
| **Professional Fees** | | |
| Deloitte | Accountants and Consultants | $76,503 |
| EPIQ | Noticing and Claims Agent | 5,895 |
| Financial Industry Technical Services, Inc. | Claims Processing Consultants | 2,916 |
| Hughes Hubbard & Reed LLP | Counsel to the Trustee | 41,116 |
| Norton Rose | Special Counsel | 413 |
| Other Consultants (e.g., technology, valuation services) | | 392 |
| Other Legal Services (e.g., e-Discovery) | | 244 |
| Trustee's Staff | | 2,570 |
| | | |
| **TSA Services** | | |
| Barclays | | 37,487 |
| LBHI | | 101 |
| | | |
| **Other** (ongoing rent of $34k/month, Iron Mountain, Broadridge information technology, office equipment, etc.) [a] | | 6,115 |
| | | |
| **Total** | | **$173,752** |

(a) Includes settlements totaling $1.8 million for former LBI leases that are no longer an ongoing expense to the LBI Estate.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# EXHIBIT 2

# Key Work Streams

## Cash Account Reconciliations

- Reconciling cash to approximately 460 custodial bank accounts, including over 16,000 open items, 12,000 of which the Trustee's professionals have reconciled.
- Analyzing accounts for consolidation and closure where accounts are no longer needed.

## Corporate Actions Reconciliations

- Reconciling payments to account holders and payments received from third parties.
- Tracking and processing over 25,000 corporate actions related to securities held at various depositories around the world.
- Preparing customer money analysis related to DTC payments received.

## Depository Reconciliations

- Reconciling activity at DTCC, JPM Chase, and Citibank from September 19, 2008 to date on a daily basis; over 9,500 unique securities that equate to share or par amount of over 14.4 billion of equity and debt securities.
- Reconciling securities held at various outside depositories (foreign and domestic).
  - Physical securities
  - Book-entry securities

## Omni Reconciliations

- Reconciling cash and securities movements related to conversion of PIM (Barclays) and PAM (Neuberger Berman) customers subsequent to September 19, 2008.
- Reviewing buy-ins of securities for delivery to Barclays and Neuberger Berman.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Operational Suspense Accounts Reconciliations

- Identified historical suspense accounts and suspense accounts set up after September 12, 2008.

- Researching and resolving approximately 12,000 suspense items, virtually all of which the Trustee's professionals have resolved.

- Implemented continuous monitoring of suspense account activity and balances.

- Reviewing and reconciling steps taken by the NSCC related to the close out of outstanding balances.

- Reviewing non CNS ACAT transactions to ascertain appropriate balances.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# Key Work Streams

## Affiliates Reconciliations

- Substantially reconciled LBIE's 9/12/08 settlement date securities claim (approximately 6,600 CUSIPs) to LBI's books and records.

- Identified and categorized differences between LBIE's 9/12/08 and 9/19/08 omnibus account positions on LBI's books and records. Approximately 8,850 CUSIPs are included in the reconciliation framework, including LBIE's settlement date claim and failed trades claim.

- LBIE's failed trades claim includes approximately 200,000 transactions; approximately 105,000 failed to deliver trades and 95,000 failed to receive trades.

- Approximately 90% of LBIE client positions had movements between 9/12/08 and 9/19/08 due to significant settlement activity occurring on LBI's books and records from 9/15/08 through 9/19/08.

- The Trustee and his professional advisors are working closely with the LBIE Administrators in the enormous reconciliation process.

- 25 claims have been filed by other foreign affiliates, the most significant of which were filed by Lehman Brothers Bankhaus, eight Lehman Brothers Hong Kong entities, Lehman Brothers Japan, Lehman Brothers Luxembourg, and Lehman Brothers Finance.

    – The Trustee's professional advisors are in the process of reconciling the claims to LBI's books and records.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Affiliates Reconciliations

- LBHI has filed 598 customer claims on behalf of itself and 19 subsidiaries representing 1,095 accounts. LBHI's claims include claims for customer collateral held by LBI as custodian as well as proprietary accounts of LBHI.

- Several of LBHI's subsidiaries are parties to subordination agreements or other arrangements or understandings with LBI, the effect of which are being evaluated by the Trustee's professional advisors.

- The Trustee's professional advisors have evaluated the 598 claims to categorize the claims as potential customer collateral accounts or LBHI and its subsidiaries proprietary accounts, as well as to categorize as subordinated and potentially subordinated.

- The Trustee's professional advisors are in the process of reconciling LBHI's claims to LBI's books and records and substantially all of the 1,095 accounts have been reconciled or are in the process of being reconciled.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Affiliates – Outbound Claims

- The Trustee has filed claims against LBHI and its 19 subsidiaries in the US Chapter 11 bankruptcy proceedings.

- The Trustee has been monitoring bankruptcy proceedings in foreign jurisdictions and has filed claims in 19 foreign affiliate proceedings.

- The Trustee's professional advisors continue to monitor other foreign proceeding and are in the process of preparing claims to other foreign affiliates whose bar dates have not yet passed or who as of yet have not entered into bankruptcy proceedings.

- The Trustee's professional advisors are also in the process of identifying receivable amounts from other LBHI subsidiaries that have not entered into bankruptcy.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# Key Work Streams

## Prime Brokerage Claims

- Reconcile Prime Broker claims.

- Utilize Lehman systems (i.e., MTS, ITS, ADP) to reconcile remaining balances.

- Monitor and implement processes to track claims status per CAS (Claims Administration System).

- Monitor and reconcile ongoing account activity (i.e., Corporate Actions, TBAs, repos, fails unwind).

## Special Projects (Claims & Research Requests)

- Research requests coming from the Legacy System Research & Reports team, which is a Deloitte team within the Deloitte Claims team.

- Delegate research requests to appropriate Operations teams.

- Research inquiries from the Trustee and his professional advisors.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

| Finance |
|---|
| ▪ Assessment of Customers Receivables.<br>   – Customer receivables are computed based on the net equity of the customer's account(s) at September 19, 2008. These accounts are being reconciled by the Trustee's staff and other research activities are being conducted to compute an adjusted customer receivable balance. For reconciled accounts the Trustee's staff will issue collection letters.<br><br>▪ Asset Realization.<br>   – The Trustee continues to marshal assets of the LBI Estate and realize those assets in the form of cash or other liquid assets. As detailed in other work stream sections, the Trustee is pursuing actions to collect receivables as pertains to Trade Unwind and Customer Receivables. The Trustee's staff has been successful in recovering various other deposits from third parties and sales of certain firm assets, realizing over $200 million. |

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Trade Unwind – Collection of Receivables

- Establishment of due diligence procedures related to the settling of closeout value of transactions:
  - Identification of third-party transactions from the books and records of LBI.
  - Determine appropriate closeout value for the books and records of LBI by establishing valuation date and price based upon, among others, the relevant operating legal agreements and termination notices and valuation statements submitted by counterparties.
  - Establish contact with counterparties and their counsel if they have not already come forward by sending closeout letters.
  - Review the open transactions, pricing and valuation submitted by the counterparties.
  - Negotiate final settlement.

- As of November 6, 2009, the Trustee and his professionals have been in contact with approximately 120 counterparties accounting for more than 90% of the total receivables.

- To date, the Trustee has recovered approximately $700 million.

- The ongoing liquidation of LBI may result in the identification of additional third-party receivables or the identification of amounts that could potentially offset third-party receivables identified to date.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Global Close

- Participate in Procedures Committee calls and meetings to coordinate with affiliate representatives and discuss process.

- Coordinate with LBI affiliate-related claims processing to the extent that the 9/12/08 Global Close is useful for determining claims against LBI, as of 9/19/08.

- Identify intercompany accounts and balances and conduct initial intercompany reconciliations between LBI, LBHI, and other affiliates as of 9/12/08 based on the Global Close information provided by LBHI.

- Coordination with LBHI and affiliates in reconciling trading and non-trading intercompany general ledger account balances.

- Coordinate with unwind process on reconciliation of open trading positions.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Account Transfers

- Consistent with the Court Order instituting this liquidation and the Court-approved Asset Purchase Agreement, the Private Asset Management ("PAM") and the Private Investment Management ("PIM") businesses and their clients were transferred to Neuberger Berman and Barclays Capital, respectively.
  - Final reconciliations, evaluations, and identification and return of over-deliveries are in process.

## Stock Record Analysis

- Support to other work streams in the analysis of stock record positions and movements.
  - Affiliate claims reconciliations.
  - Systems migration and integrity of stock record.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

| Tax Matters |
|---|
| ▪ Income Tax Returns |

- Reviewed all 2007 income tax returns prepared by LBHI for state and local jurisdictions that require separate filings.
- Reviewed and facilitated the filing of separate company state income tax extensions for LBI's 2008 tax year.
- Monitoring LBHI completion of 2008 income tax returns.
- Preparing for 2009 filing requirements.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

## Technology/Systems & Data Management

- Reducing reliance on Barclays for applications and technology infrastructure.
- Have defined the future state Trustee operating environment.
- Have established a technology environment and infrastructure and application support.
- Developed and executing a plan to decommission legacy Lehman systems and move to the future Trustee application environment, independent of Barclays.
- Continuing to collect and secure books and records of LBI.
- Extracting, retrieving, and analyzing data as needed.
- Migration of data to the Trustee's platforms.
- Established databases for use in responding to requests from regulators, and for managing correspondence and inquiries from customers and others.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Key Work Streams

| Administration and Controls |
| --- |
| <ul><li>Reviewing transactions posted to the LBI books and records – more than 3 million journal entries have been posted to LBI's books and records, including transfer or receipts of assets.</li><li>Monitoring stock record breaks with international custodians and  legacy bank accounts.</li><li>Monitoring user access to LBI's books and records.</li><li>Monitor  inventory of safekeeping  items in the vault.</li><li>Reviewing administrative invoices and disbursement expenses.</li><li>Establishing controls for the payment and journaling of administrative expenses, which include recording payment instructions and supporting documentation, reviewing time-entry diaries, and assessing the reasonableness of all rates and bills for services performed.</li></ul> |

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

**EXHIBIT 3**

## Claims Administration – Summary of Customer Claims Processing as of November 6, 2009

| | | |
|---|---|---|
| **Total Customer Claims Filed** | | **12,782** |
| Includes: | Barclays Omnibus Claims (a) | 2,401 |
| | Affiliate Claims (b) | 719 |
| | Post-petition Misdirected Wires | 79 |
| | Aggregated Claims Filed by 40 entities (these claims are being reviewed together in connection with those entities) | 2,742 |
| | Duplicate and Amended Claims | 2,054 |
| **Requests for Supplemental Information Sent (c)** | | **1,863** |
| **Determined Claims** | | **8,368** |
| | Claims Allowed | 381 |
| | Claims Denied | 4,746 |
| | Claims Denied and Reclassified as General Creditor Claims | 3,241 |
| **Determination in Final Process (d)** | | **1,662** |
| **Objections to Claim Determinations (e)** | | **966** |
| **Finally Determined Claims (f)** | | **5,951** |

(a) Represents individual claims received that are also included in the omnibus claim filed by Barclays.

(b) Claims filed by affiliates of LBI or clients of affiliates that are also included in the affiliate claims.

(c) Claims that are deficient on their face; claimants are sent letters pointing out deficiencies and given thirty days to cure deficiencies.

(d) Claims that are in final stages of review; LOD expected shortly.

(e) 628 objections received, representing 966 filed customer claims, including duplicates and amendments.

(f) Claims are finally determined when the 30-day objection period has lapsed.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Claims Administration – Public Customer Claims Determination Status as of November 6, 2009



**Public Customer Claims** (a)

Claims Determined: 7,130 (85%)

Claims In Process: 1,237 (15%)

**Determined Public Customer Claims**

Claims Closed: 4,865 (68%)

Claims Within Thirty-Day Objection Window: 1,511 (21%)

Public Customer Objections Received: 471 relating to 754 claims (11%)

(a) Public customer claims are the 8,367 claims, representing 9,717 accounts, filed by various institutions and individual investors not related to PIM, PAM or PBA account holders or Lehman affiliates.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Claims Administration – Summary of Objections Received as of November 6, 2009

| Claim Type/Issue | Number of Pending Objections |
|---|---|
| To-Be-Announced ("TBA") Contracts | 360 |
| LBIE Accounts | 135 |
| Empty Accounts | 47 |
| Lack of Information | 39 |
| Other Non-LBI | 28 |
| Repurchase Agreement | 8 |
| Reclassified to General Creditor [(a)] | 7 |
| Short Positions Valued as of Filing Date | 1 |
| Terms of Release | 1 |
| Allowed Amount | 2 |
| Total Pending Objections | 628 [(b)] |
| | |
| Total Objections Withdrawn | 31 |

(a)  Objections to determinations involving  TBAs and Repos are identified separately.

(b)  The 628 objections relate to 966 filed customer claims. The Trustee has also received 192 letters from indirect investors who did not have a direct relationship with LBI, but rather invested in a fund with a customer account at LBI not opened on the claimant's behalf.  These indirect investors have not filed objections but are reserving their rights should the law change and entitle them to a recovery.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# EXHIBIT 4

# Return of Misdirected Funds

➢ The Trustee continues to receive requests for the return of misdirected funds alleged to have been sent in error to LBI bank accounts.

➢ The Trustee developed and implemented court-authorized procedures for return of misdirected wires:

  ▪ Protocol Regarding Misdirected Funds is available on the Trustee's website (www.lehmantrustee.com).

  ▪ Standardized electronic request forms for the return of misdirected funds.

  ▪ Court authorization to return misdirected funds of $50k or less without need for further court approval.

➢ The Trustee continues to investigate allegedly misdirected funds to confirm whether funds were in fact sent in error, and to return funds determined to have been sent in error.

➢ For future procedures see Section VI of the Report.

| As of November 6, 2009  (USD in millions) | Number of Wires | Approximate Amount |
|---|---|---|
| **Returned** | | |
| - Up to $50,000 | 297 | $2.8 |
| - Above $50,000 | 269 | $495.3 |
| **Total** | **566** | **$498.1** |
| | | |
| **Pending** | | |
| - Identified for Return - Pending Additional Information | 77 | $21.7 |
| - In Process of Research/With Outstanding Issues | 77 | $30.8 |
| **Total** | **154** | **$52.5** |

| Misdirected Wires Returned (Between First Interim Report and November 6, 2009) | |
|---|---|
| Number of Wires | Amount (USD in millions) |
| 235 | $42 |

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals.  This exhibit is based on the information available at this time.  All amounts are unaudited and subject to revision.

# EXHIBIT 5

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

       LEHMAN BROTHERS INC.,

               Debtor.

Case No. 08-01420 (JMP) SIPA

**STATEMENT REGARDING DETERMINATION**
**OF CUSTOMER CLAIMS AND DISTRIBUTIONS**

       The deadline for filing claims expired June 1, 2009, and the Trustee has largely completed the account transfer process. In accordance with Securities Investor Protection Act ("SIPA"), the Trustee has entered the next phase of the liquidation proceeding in which all customer claims will be reviewed to determine each customer's "net equity" claim, as mandated by SIPA, and distributions to pay allowed customer claims on a pro rata basis will depend on the amount and value of property (securities and cash) allocated to the fund of customer property.

       As described below, the Trustee is continuing to take the steps mandated by SIPA, which are a precondition to determining the property to be made available to pay customers' net equity claims. Interim distributions on net equity claims will be made as soon as there is enough clarity for reasonable estimates to be made of both the amount of customer property available for distribution and the total of allowed net equity claims.

# Background:  Customer Net Equity Claims and Customer Property

In a SIPA liquidation, other than the return of customer name securities – physical securities registered in the name of the customer with no stock powers and where there is no indebtedness of the customer – all other allowable customer claims are determined based on a customer's *net equity, i.e.,* the value of a customer's account and any indebtedness to the broker as of the filing date of the liquidation (in this case, September 19, 2008).  Net equity claims then share on a pro rata basis in the fund of "customer property," as defined by SIPA, which includes generally all the customer-related property of the broker-dealer's business.  Certain other property is allocated to the general estate against which claims of non-customer general creditors are filed.

In order to determine what distributions can prudently be made to customers with allowed net equity claims, a Trustee must know or be able to estimate two things with reasonable certainty:  (1) the total value of customer property available for distribution; and (2) the total net equity of all allowed customer claims (including reserves for disputed claims).  Both halves of the equation – the customer property numerator and the net equity claims denominator – are complex in a liquidation of the magnitude of LBI's, and both depend on issues that must be decided by the Courts.  The steps described below are prerequisites to satisfying customer net equity claims in a customer claim process.

Step 1:

Allocation of Customer Property by the Court.  First, with respect to the *numerator* or amount of customer property available for distribution, the Court must approve an allocation of property between customer property and general estate property.  The Trustee intends promptly to file a motion for an order of allocation with a proposed allocation that he believes is fair and corresponds to the realities of this liquidation.  The Trustee will do everything in his power to have this pivotal issue decided expeditiously, but others have a right to be heard on the question.  In connection with that allocation, the Trustee may have to reserve for significant claims made to certain property under the asset purchase agreement and clarification letter as described in the Trustee's First Interim Report, thereby reducing the assets available for immediate distribution.

Step 2:

Determining Allowable Net Equity Claims and Establishing Reserves.  Second, in order to establish the *denominator*, or amount of allowable net equity claims, the Trustee is continuing efforts that began shortly after the commencement of the claims filing period to review and determine the allowability and amount of all customer claims filed in the liquidation.

The Trustee has received over 12,000 customer claim forms representing over 80,000 accounts.  The Trustee has established teams of professionals who have been working to reconcile and resolve issues.  These include teams working on the multibillion dollar claims submitted on an omnibus or group basis by Barclays, LBIE, and other Lehman entities, claims by prime brokerage account holders and over 7,000 timely filed individual customer claims after identification and elimination of duplicates.  The Trustee has already determined 3,350 of these

claims.  The Trustee has also issued approximately 1,500 deficiency letters and reached out to customers to obtain required information with respect to claims that lack meaningful information or are defective on their face.

The Trustee is reviewing remaining claims and issuing letters of determination as rapidly as possible.  Under SIPA and the procedures approved by the Court, when the Trustee issues a determination denying a customer claim in whole or in part, the claimant has a right to object, and the dispute must be resolved or submitted for Court determination.  Some of these disputes will involve whether certain categories of transactions qualify for customer treatment under SIPA as well as valuation questions.  Some will involve substantial dollar amounts.  It may be a considerable time before some of these disputes can be finally resolved through the Bankruptcy Court and appeals process.  The Trustee will reserve for disputed claims until resolution becomes final.

Dated: New York, New York
     July 1, 2009

Respectfully submitted,

HUGHES HUBBARD & REED LLP


By:  /s/ James B. Kobak, Jr.    
      A member of the firm

One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.



**EXHIBIT 6**

# Summary of Data Migrated by the Trustee as of November 6, 2009

- To date the Trustee has moved and secured a significant amount of information to support the ongoing work. The volume of information moved and stored is illustrated below.

> **Systems Fully Migrated:   95 of 125**

> **Number of Databases:   356**

> **Number of Tables:       89,552**

> **Data Collected (GB):    76,479**

> **Number of Records:      67,643,325,276**

- The amount of information moved to date exceeds 76 Terabytes. This amount, if printed, would yield a stack of paper nearly 700 miles high, or more than 130 times the height of Mt. Everest.

- The Trustee has collected in excess of 67,000,000,000 records documenting historical transactions carried out by LBI. This information is stored in more than 89,000 tables in 356 databases. At the completion of the collection of the data comprising the books and records and other critical information, the Trustee expects to have collected more than 100,000,000,000 records of information.

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.

# Summary of Data Migrated by the Trustee as of November 6, 2009

As part of the Trustee's migration to the future state environment independent of Barclays, the Trustee's professionals are reviewing many thousands of CUSIPs, accounts and positions. The volume of information reviewed for three of these systems is illustrated below.

**ITS**

| | |
|---|---|
| Positions | 263,362 |
| Customer Positions | 112,455 |
| Firm Positions | 38,470 |
| Street Side Positions | 112,437 |
| Fails | 204,209 |
| Balances | 56,517 |

**GEAC - General Ledger – Corporate**

| | |
|---|---|
| Journal Entries | 45,735 |
| Intercompany | 3,311 |
| Balance Sheet | 38,076 |
| P&L | 4,348 |

**MTS**

| | |
|---|---|
| CUSIPs | 11,000 |
| Accounts | 2,000 |
| Positions | 27,460 |
| Box Positions | 6,480 |
| Inventory Positions | 18,879 |
| Finance Positions | 26 |
| Customer Safekeep Positions | 2,075 |
| Fails | 1,600 |

The information and data included in this exhibit are derived from sources available to the Trustee and his professionals. This exhibit is based on the information available at this time. All amounts are unaudited and subject to revision.