ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
Michael J. Canning

*Attorneys for American Capital, Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS, INC.,

Debtor.

Case No. 08-01420 (JMP) SIPA

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

American Capital, Ltd. (f/k/a American Capital Strategies, Ltd., the "Customer"), hereby submits this objection to the denial and reclassification of the Customer's claim number 800000083 (the "Claim") filed against Lehman Brothers Inc. (the "Debtor"), and in support thereof respectfully represent as follows:

## BACKGROUND

1.      Beginning on September 15, 2008, Lehman Brothers Holdings Inc. and certain of its affiliates filed voluntary petitions under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

2.      On September 19, 2008 (the "Commencement Date"), a proceeding was commenced under the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa - 78*lll*, with respect to the Debtor, a securities broker-dealer. James W. Giddens was appointed as trustee (the "Trustee") under SIPA to liquidate the Debtor's assets.

3.      The Customer filed a timely proof of claim, attached hereto as <u>Exhibit A</u>, asserting that the Claim, which arose from pre-Commencement Date transactions, is entitled to "customer" status under SIPA.

4.      On or about December 10, 2009, the Trustee served a notice (the "<u>Determination Notice</u>"), attached hereto as <u>Exhibit B</u>, upon the Customer denying "customer" status and reclassifying the Claim as a general creditor claim.  The Determination Notice does not specify a rationale for denying "customer" status to the Claim.

5.      The Customer objects to the Determination Notice and asserts that the Claim is entitled to "customer" status under SIPA.[1]

## THE CLAIM

6.      The Claim arises from the Customer's financing transactions with the Debtor prior to the Commencement Date in which the Customer agreed to transfer to the Debtor certain securities (the "<u>Securities</u>") against the transfer of funds by the Debtor, with a simultaneous agreement by the Debtor to transfer to the Customer such Securities at a later date (the "<u>Reverse Repos</u>").  The Reverse Repos were documented pursuant to a Master Repurchase Agreement, dated as of April 7, 2008 (as amended, supplemented or modified, the "<u>MRA</u>").

7.      In connection with the Reverse Repos, and pursuant to the MRA, the Customer was from time to time obligated to transfer cash and securities to the Debtor to cover any margin calls made by the Debtor incident to Reverse Repos.  In this regard, during the month of June 2009, the Customer transferred an aggregate amount of $1,514,300 in cash to the Debtor's

---

[1]      The Customer and the Trustee negotiated a consensual extension of time to respond to the Determination Notice.

2

account at JP Morgan Chase (the "Pledged Cash"), and, on or about August 20, 2009, the Customer transferred that certain CMBS bond (CGCMT 2007-C6 J / CUSIP 17311QAL4), with a face value of $1,500,000, to the Debtor at the Debtor's Depositary Trust Company ("DTC"), participant number 636 (the "Pledged Bond," and together with the Pledged Cash, the "Collateral"), all as more specifically set forth in the Customer's proof of claim form attached hereto as Exhibit A.

8.  The Reverse Repos were closed on or about September 12 and 15, 2009, and the Debtor returned to the Customer the Securities subject to such Reverse Repos. However, the Collateral delivered in respect of the margin calls related to the Reverse Repos has not been returned to the Customer. Furthermore, certain coupon payments have been made, and are scheduled to be made, with respect to the Pledged Bond. In that regard, all coupon payments made since September 10, 2009, have gone to the Debtor in error, and instead, should have been remitted to the Customer. The closeout of the Reverse Repos does not affect the Customer's entitlement, as economic owner, to the Collateral and/or to any interest or payments paid or payable on or in respect of the Collateral.

9.  As such, the Customer's Claim seeks the return of the Collateral, along with all coupon payments, interest and/or dividends made or coming due with respect to the Collateral to which the Customer is entitled.

## ARGUMENT

10.  The Customer seeks a determination that it is a "customer" under SIPA and, therefore, the Claim constitutes a "customer" claim under SIPA. *See* 15 U.S.C. § 78*lll*(2). Under SIPA, "customer" claims are entitled to (i) recover against "customer property," *id.*

§ 78*lll*(4) on the basis of their "net equity," *id.* § 78*lll*(11) and (ii) receive advances from a fund maintained by the Securities Investor Protection Corp. (the "SIPC").

11.     With respect to a SIPA debtor, a "customer" is

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.

*Id.* § 78*lll*(2).  Further, this definition "includes any person who has a claim against the debtor arising out of sales or conversions of such securities." *Id.*

12.     The Securities and the Pledged Bond giving rise to the Claim are clearly "securities" under SIPA.[2]  The Debtor's financing with the Customer was clearly within the "ordinary course of its business" as a "broker or dealer." *Id.* § 78*lll*(2).  The Securities and the Pledged Bond have been acquired "from or for the securities account" of the Customer. Moreover, the Debtor received, acquired and held the Securities with a view to their resale back to the Customer and the Pledged Bond was delivered incident thereto.  Therefore, the nature of the relationship created by the MRA fits squarely within the definition of "customer" under SIPA.

13.     We believe that denying the Claim "customer" status is inconsistent with SIPA, the legislative intent embodied by SIPA, and with prior case law.  The primary purpose of SIPA is "to provide protection for investors if the broker-dealer with whom they are doing business

---

[2]     SIPA's definition of "security" includes "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate. . . any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security." 15 U.S.C. § 78*lll*(14).

encounters financial troubles." H.R. Rep. No. 9 1-1613, at 1 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 5254, 5255. The Second Circuit has observed that SIPA's legislative history uses the term "'investors'. . . synonymously with 'customers,' indicating that, in the eyes of Congress, [SIPA] would protect capital markets by instilling confidence" in investors. *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir. 1976).

14.     SIPA's definition of "customer" is strikingly similar to the definition of "customer" in the stockbroker liquidation provisions of the Bankruptcy Code. *Compare* 15 U.S.C. § 78*lll*(2) *with* 11 U.S.C. § 741(2). As such, it is significant, as noted by a bankruptcy court in this District, that "[t]he sole legislative statement addressed to the [Bankruptcy] Code definition of 'customer' reveals that such descriptive term comprehends 'anybody that interacts with the debtor in a capacity that concerns securities transactions.'" *In re SSIW Corp.*, 7 B.R. 735, 738 (Bankr. S.D.N.Y. 1980). Indeed, the Reverse Repos in which the Customer and the Debtor engaged, and which forms the basis of the Claim, were related to trading in the securities market.

15.     The *Bevill, Bresler* court noted that Congress enacted SIPA to "protect individual investors from financial hardship, insulate the economy from the disruption which can follow the failure of major financial institutions, and to maintain public confidence in the capital markets." *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 67 B.R. 557, 602 (D.N.J. 1986). Focusing on "the size and economic importance of the repurchase market," the court determined that "providing investors in this market with the protections afforded 'customers' under SIPA will significantly advance" SIPA's goals. *Id.* As the Customer is clearly a participant of the repurchase market, the result should be no different here.

16.     Several courts have held that parties to repurchase transactions are "customers" under SIPA. *See id.* at 602 (holding that repo and reverse repo participants were "customers" of a debtor broker-dealer under SIPA); *see also City of Elkins v. Davidson (In re Swink & Co.)*, 142 B.R. 874, 878-79 (Bankr. E.D. Ark. 1992) (holding that the parties to a repurchase transaction had contemplated a relationship in which they would trade in securities as broker-dealer and customer and that the broker-dealer had acted in a fiduciary capacity).

17.     In holding that parties to reverse repurchase agreements were "customers" under SIPA, the court in *Bevill, Bresler* noted that (i) reverse repurchase agreements were an integral part of the broker-dealer's ordinary course of business, (ii) the broker-dealer maintained computerized accounts for each reverse repurchase customer in which purchases and sales pursuant to reverse repurchase transactions were duly recorded, and (iii) the securities underlying the reverse repurchase transactions were received and/or acquired by the broker-dealer with a view to their resale back to the reverse repo participants on a predetermined future date. *Bevill, Bresler*, 67 B.R. at 597-98. The Customer's relationship with the Debtor satisfies each of these requirements.

18.     A number of courts have construed a claimant's status as a "customer" or a creditor as dependant on whether the claimant entrusted cash or securities to the broker-dealer debtor. *See, e.g., SIPC v. Executive Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam). In the present situation the Customer is clearly a "customer" of the Debtor, not a creditor. In the *Bevill, Bresler* case, the court reasoned that the reverse repurchase transaction participants were not creditors of the debtor because the risks and potential rewards of the transactions were "unquestionably *market-related* risks and rewards which are entirely distinct from and additional

to any credit risk associated with the solvency of the broker as a financial intermediary." *See Bevill, Bresler*, 67 B.R. at 601.

19. The Customer entrusted the Securities and the Collateral to the Debtor by transacting with the Debtor, as a dealer. Therefore, the Customer's ability to receive the benefits of its investments depended on the Debtor fulfilling its obligations pursuant to the MRA terms and a well-established course of dealing. The Customer is entitled to receive the return of its Collateral, as well as any interest and principal payments that were made, or will be made, on the Collateral. The transactions at issue fall squarely within SIPA's definition of a "customer" claim, and the Claim is therefore a "customer" claim wrongfully denied by the Trustee.

20. Once again, for all of the reasons stated above, the Claim should be allowed as a "customer" claim for purposes of SIPA.

**[Remainder of Page Intentionally Left Blank]**

## **RESERVATION OF RIGHTS**

21.    The Customer reserves all rights with respect to the Claim asserted herein.  The Customer further reserves all rights to amend or supplement this Objection or file a reply to any response to this Objection filed by the Trustee.

Dated: New York, New York
      February 19, 2010

ARNOLD & PORTER LLP

By:  /s/ Michael J. Canning
      Michael J. Canning
      399 Park Avenue
      New York, New York 10022-4690
      Telephone: (212) 715-1000
      Facsimile:  (212) 715-1399
      Michael_Canning@aporter.com

      *Attorneys for American Capital, Ltd.*

# EXHIBIT A

## CUSTOMER CLAIM FORM LEHMAN BROTHERS INC. FILING CONFIRMATION

Your customer claim form in the SIPA liquidation of Lehman Brothers Inc. was successfully filed on 12/3/2008 3:27 PM Please print this page as proof of your filing.

| Claim Number |
|---|
| 800000083 |

| First Name | Middle Initial | Last Name |
|---|---|---|
| | | |

| Business Name | Representative Name |
|---|---|
| American Capital Ltd. | |

| Mailing Address |
|---|
| 2 Bethesda Metro Center 14th Floor |

| City | State | Zip Code |
|---|---|---|
| Bethesda | MD | 20814 |

### Item 1

| LBI owes me a credit or cash in the amount of: |
|---|
| 1536146.4300 |

| I owe LBI a debit or cash in the amount of: |
|---|
| 0.0000 |

| Debit balance to be paid: |
|---|
| 0.0000 |

### Item 2

| LBI owes me securities: Yes | | | | | |
|---|---|---|---|---|---|
| Name of Security | Type of Security | CUSIP | Transaction Date | Amount | Number of Shares |
| CGCMT 2007-C6 J | Bond | 17311QAL4 | 08/20/2008 | $1,500,000.00 | N/A |

| I owe LBI securities: |
|---|
| No |

### Item 3

| claim based on a commodity futures account: |
|---|
| No |

| Amount of Claim: |
|---|
| $0.00 |

| Basis for Claim: |
|---|
| |

| Claim has been estimated: |
|---|
| |

## Item 4 - 11

| | |
|---|---|
| 4. Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | No |
| 5. Has there been any change in your account since September 19, 2008? | No |
| 6. Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI? <br><br> American Capital Ltd. had a reverse repurchase agreement with Lehman Brothers Inc. American Capital Ltd. sent free $1,500,000 original face of CGCMT 2007-C6 J (Cusip: 17311QAL4) and $1,514,300.00 cash to Lehman Brothers Inc. to cover margin calls. | Yes |
| 7. Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | No |
| 8. Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | No |
| 9. Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | No |
| 10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | No |
| 11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | No |

## Preparer and Signature Information

| |
|---|
| Full Name: <br> Craig Gross |
| Address (line 1): <br> 2 Bethesda Metro Center 14th Floor |
| Address (line 2): <br> 14th Floor |
| City: <br> Bethesda |
| State/Province: <br> MD |
| Country: <br> UNITED STATES |
| Postal Code: <br> 20814 |
| Phone Number: <br> 3018411436 |
| Email Address: <br> CashandBanking@AmericanCapital.com |

To Whom It May Concern:

This letter is an explanation of the CMBS bond (CGCMT 2007-C6 J) posted at Lehman Brothers Inc. that needs to be returned to American Capital Ltd along with all of its coupon payments. Below is a detailed schedule of all coupon payments due to American Capital with regards to the $1,500,000 original face of CGCMT 2007-C6 J (17311QAL4). All coupon payments since 9/10/08 have gone to Lehman Brothers Inc. in error and all future coupon payments need to be forwarded to American Capital Ltd.

### CGCMT 2007-C6 J Bond Detail

| Trade Date | Security Name | Cusip | Shares/Amount |
|---|---|---|---|
| 08/20/2008 | CGCMT 2007-C6 J | 17311QAL4 | 1,500,000.00 |

### CGCMT 2007-C6 J Coupon Payment Schedule

| Date | Security Name | Cusip | Coupon Payment |
|---|---|---|---|
| 09/10/08 (Actual) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.70 |
| 10/10/08 (Actual) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.09 |
| 11/10/08 (Actual) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.64 |
| 12/10/08 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 01/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 02/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 03/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 04/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.00 |
| 05/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 06/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.00 |
| 07/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 08/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.00 |
| 09/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.00 |
| 10/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |
| 11/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,360.00 |
| 12/10/09 (Projected) | CGCMT 2007-C6 J | 17311QAL4 | $7,125.00 |

# American Capital Ltd. transactions with Lehman Brothers Inc.

## Table of Contents

Page 1
Summary of transactions made with Lehman Brothers Inc.

Page 2
August 2008 Cash Collateral Statement from Lehman Brothers Inc.

Pages 3-5
August 20, 2008 margin call from Lehman Brothers Inc.

Pages 6-10
Wells Fargo bank statements showing cash wires for margin calls.

Pages 11-13
Wells Fargo CMBS trade confirmation.

Page 14
Email correspondence with Lehman Brothers Inc. on posting CMBS collateral.

## Hughes Hubbard & Reed LLP. Contact Information

Steve McSloy
(212) 837 – 6614
mcsloy@hugheshubbard.com

Jeffrey S. Margolin
(212) 837-6375
margolin@hugheshubbard.com

James Kobak
(212) 837-6757
kobak@hugheshubbard.com

James Pastore
(212) 837-6639
pastore@hugheshubbard.com

## Website Information about Lehman Brothers Trustee

www.lehmantrustee.com

# American Capital Strategies Cash Collateral

| Date | | Exposure | Description | Account | Account Name |
|------|---|----------|-------------|---------|--------------|
| 6/9/2008 | $ | 362,856.00 | Sent Cash Wire | 1487440 | American Capital Strategies A/C American Capital Advisors |
| 6/11/2008 | $ | 298,250.00 | Sent Cash Wire | 1487440 | American Capital Strategies A/C American Capital Advisors |
| 6/26/2008 | $ | 401,376.00 | Sent Cash Wire | 1487440 | American Capital Strategies A/C American Capital Advisors |
| 6/27/2008 | $ | 451,818.00 | Sent Cash Wire | 1487440 | American Capital Strategies A/C American Capital Advisors |
| Total Cash: | $ | 1,514,300.00 | | | |

# American Capital Strategies CMBS Collateral

| Date | | Exposure | Description | Account | Account Name |
|------|---|----------|-------------|---------|--------------|
| 8/20/2008 | $ | 412,494 | Sent CMBS Bond as Collateral | 1487440 | American Capital Strategies A/C American Capital Advisors |

**Collateral Detail**

| Cusip | | Face Amount | Name | DTC#: |
|-------|---|-------------|------|-------|
| 17311QAL4 | $ | 1,500,000.00 | CGCMT 2007-C6 J | 636 |

| | |
|---|---|
| Market Price | 28.125 |
| Market Value | $ 421,875.00 |

Return DTC Instructions
DTC#:      0025
Account#:  13022280

# LEHMAN BROTHERS || Interest Accrual On Cash Collateral

| TO: | AMERICAN CAP STRATEGIES A/C AMERICAN CAP ADVISORS |
|---|---|
| | 1487440 |
| | X X |
| **PHONE:** | |
| **FAX:** | |
| **EMAIL:** | |
| **FROM:** | LEHMAN BROTHERS INC. |
| | ALLISON ZUCCO |
| **PHONE:** | 212-526-1210 |
| **FAX:** | 646-758-3023 |
| **EMAIL:** | allison.zucco@lehman.com |
| **DUE DATE:** | 09/01/2008 |

From  08/01/2008  To  08/31/2008   [inclusive]

| Date | CCY | Principal | Interest Calc Amt | Rate | Accrued Int |
|---|---|---|---|---|---|
| 08/01/2008 | USD | 1,514,300.00 | -90.02 | 2.140 | -90.02 |
| 08/02/2008 | USD | 1,514,300.00 | -90.02 | 2.140 | -90.02 |
| 08/03/2008 | USD | 1,514,300.00 | -90.02 | 2.140 | -90.02 |
| 08/04/2008 | USD | 1,514,300.00 | -87.91 | 2.090 | -87.91 |
| 08/05/2008 | USD | 1,514,300.00 | -83.71 | 1.990 | -83.71 |
| 08/06/2008 | USD | 1,514,300.00 | -81.60 | 1.940 | -81.60 |
| 08/07/2008 | USD | 1,514,300.00 | -81.60 | 1.940 | -81.60 |
| 08/08/2008 | USD | 1,514,300.00 | -81.60 | 1.940 | -81.60 |
| 08/09/2008 | USD | 1,514,300.00 | -81.60 | 1.940 | -81.60 |
| 08/10/2008 | USD | 1,514,300.00 | -81.60 | 1.940 | -81.60 |
| 08/11/2008 | USD | 1,514,300.00 | -83.71 | 1.990 | -83.71 |
| 08/12/2008 | USD | 1,514,300.00 | -83.71 | 1.990 | -83.71 |
| 08/13/2008 | USD | 1,514,300.00 | -84.97 | 2.020 | -84.97 |
| 08/14/2008 | USD | 1,514,300.00 | -88.33 | 2.100 | -88.33 |
| 08/15/2008 | USD | 1,514,300.00 | -90.44 | 2.150 | -90.44 |
| 08/16/2008 | USD | 1,514,300.00 | -90.44 | 2.150 | -90.44 |
| 08/17/2008 | USD | 1,514,300.00 | -90.44 | 2.150 | -90.44 |
| 08/18/2008 | USD | 1,514,300.00 | -88.33 | 2.100 | -88.33 |
| 08/19/2008 | USD | 1,514,300.00 | -82.45 | 1.960 | -82.45 |
| 08/20/2008 | USD | 1,514,300.00 | -80.34 | 1.910 | -80.34 |
| 08/21/2008 | USD | 1,514,300.00 | -83.71 | 1.990 | -83.71 |
| 08/22/2008 | USD | 1,514,300.00 | -84.55 | 2.010 | -84.55 |
| 08/23/2008 | USD | 1,514,300.00 | -84.55 | 2.010 | -84.55 |
| 08/24/2008 | USD | 1,514,300.00 | -84.13 | 2.000 | -84.13 |
| 08/25/2008 | USD | 1,514,300.00 | -85.39 | 2.030 | -85.39 |
| 08/26/2008 | USD | 1,514,300.00 | -84.55 | 2.010 | -84.55 |
| 08/27/2008 | USD | 1,514,300.00 | -85.39 | 2.030 | -85.39 |
| 08/28/2008 | USD | 1,514,300.00 | -84.13 | 2.000 | -84.13 |
| 08/29/2008 | USD | 1,514,300.00 | -84.13 | 2.000 | -84.13 |
| 08/30/2008 | USD | 1,514,300.00 | -84.13 | 2.000 | -84.13 |
| 08/31/2008 | USD | 1,514,300.00 | -84.13 | 2.000 | -84.13 |

Total Interest Due : 2,642.05

Lehman will pay to the following settlement instructions:

| Intermediary | Institution | Beneficiary | Special |
|---|---|---|---|
| | FW121000248 | 4000037507 | /BNF/COLLATERAL |

2

# LEHMAN BROTHERS | Fixed Income Financing Margin Call Statement

| TO: | AMERICAN CAP STRATEGIES A/C AMERICAN CAP ADVISORS INC |
|---|---|
| A/C #: | 1487440 |
| | X X |
| C/P NAME: | AMERICAN CAPITAL STRATEGIES LTD |
| PHONE: | |
| FAX: | |
| EMAIL: | luis.rosado@americancapital.com;chris.morgan@americancapital.com; |

| FROM: | LEHMAN BROTHERS INC. |
|---|---|
| | ALLISON ZUCCO |
| PHONE: | 212-526-1210 |
| FAX: | 646-758-3023 |
| EMAIL: | allison.zucco@lehman.com |

| DATE: | 20-Aug-2008 |
|---|---|
| COB VALUATION DATE: | 19-Aug-2008 |
| DUE DATE: | 20-August-2008 |
| REPORTING CCY: | USD |

*POSITIVE NUMBERS = LEHMAN RECEIVABLE*
*NEGATIVE NUMBERS = LEHMAN PAYABLE*

| Summary | |
|---|---|
| Economic Exposure | (4,158,942) |
| Margin/Haircut Amount | 6,090,000 |
| Margin Exposure | 412,494 |
| Cash Free Collateral | (1,518,564) |
| Security Free Collateral | 0 |
| Portfolio Margin Requirement | 0 |

| Margin Calls Made | 0 |
|---|---|
| TODAY'S CALL AMOUNT | 412,494 |

3

# MARGIN CALL INSTRUCTIONS

Payment Instructions (CASH-USD):

JP Morgan Chase NYC
ABA # 021-000-021
A/C # 066206677
Lehman Brothers Inc.
Attn: Margin

Payment Instructions (TRSY):

JPMChase/Lehman
ABA # 021-000-021

Attn: Margin

## Detail

| ISIN/CUSIP Deal ID | Mat Date Account | Coupon Description | Original Face | Factor | Mkt Price | On Date Off Date | Deal Type Fin Rate | RR Fin Interest | Coupon Interest | Loan | Market Value | Mrgn/ Hrct | Magnfict. Amt | Margin Exposure USD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 52108PAY1 88IFU30 | 7/15/40 1487440 | 6.24 LBUBS 2007-C6 H | 11,236,000 | 1.000000 | 32.0355 | 6/8/08 9/8/08 | 3.460 | 2,098 | (17,333) | 1,819,000.00 | (3,599,834) | 250,000 | 2,728,500 | 932,431 |
| 50180LBF5 7UJN320 | 4/15/41 1487440 | 6.15 LBUBS 2008-C1 K | 6,812,000 | 1.000000 | 21.1421 | 7/25/08 8/25/08 | 3.463 | 1,386 | (10,473) | 986,000.00 | (1,440,200) | 250,000 | 1,029,000 | 285,713 |
| 50180LBD1 7UJN360 | 4/15/41 1487440 | 6.15 LBUBS 2008-C1 J | 12,588,000 | 1.000000 | 24.9295 | 7/30/08 8/29/08 | 3.463 | 3,141 | (19,355) | 1,555,000.00 | (3,138,373) | 250,000 | 2,332,500 | 732,913 |
| RR Total | | | 30,637,000 | | | | | 6,625 | (47,261) | 4,360,000.00 | (8,178,207) | | 6,090,000 | 1,931,057.00 |
| Grand Total | | | 30,637,000 | | | | | 6,625 | (47,261) | 4,360,000.00 | (8,178,207) | | 6,090,000 | 1,931,057.00 |

4

## Free Collateral

| Type | ISIN/CUSIP | Deal Id | On Date | Off Date | Description | Coupon | Maturity Date | Quantity | Price | Market Value (USD) | Margin* Value (USD) |
|------|-----------|---------|---------|----------|-------------|--------|---------------|----------|-------|--------------------|--------------------|
| VAR | CASH COLL | | | | UNITED STATES DOLLARS | 0.0000 | | (1,514,300) | | (1,514,300) | (1,518,564) |
| Totals | | | | | | | | | | (1,514,300) | (1,518,564) |

\* = Denotes Free Collateral Fail

## Disclaimer

The above estimated value[s] are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value[s]. Unless otherwise specified, the above valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). The bid-side is the estimated amount a party would pay to purchase the asset.

Discussions of the trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit. These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes.

As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising therefrom to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information.



Custom
06/10/2008 09:31 AM ET
CUSTOMER ID: AMCAS814
OPERATOR ID: NICH01

Commercial Electronic Office®

AMERICAN CAPITAL STRATEGIES

Intraday Composite Report
As of 06/09/2008

Treasury Information Reporting

| | | | |
|---|---|---|---|
| **BOOK TRANSFER CREDIT Total** | | Credit Amount | 6,481,443.81 |
| Credit Total | | Credit Amount | 22,808,024.57 |

**Debit Transactions**

| 6/9/2008 | 502 / BOND OPERATIONS DEBIT<br>Cust Ref: 12792602<br>IBS MEMO POST EWIB20080609152540440086 | Debit Amount | 5,000,000.00<br>Bank Ref: |
|---|---|---|---|
| 6/9/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 091000015656626<br>COMPANY NAME: WFBS     A<br>ENTRY DESC: INVESTMENT<br>CUSTOMER ID: 12792602 000000<br>CUSTOMER NAME: AMER CAP<br>COMPANY ID: 9000000444<br>ENTRY CLASS CODE: PPD<br>DISCRETIONARY DATA: 00<br>WFBS12792602CR   060609   A          00015656626 | Debit Amount | 5,000,000.00<br>Bank Ref: |
| 6/9/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 091000015003840<br>COMPANY NAME: CLIENT ANALYSIS SRVC CHRG<br>ENTRY DESC: SRVC CHRG<br>CUSTOMER ID: SVC CHGE 0408<br>CUSTOMER NAME: 000004000037507<br>COMPANY ID: DP10700543<br>ENTRY CLASS CODE: PPD<br>DISCRETIONARY DATA: | Debit Amount | 21,707.48<br>Bank Ref: |
| 6/9/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 091000015003838<br>COMPANY NAME: CLIENT ANALYSIS SRVC CHRG<br>ENTRY DESC: SRVC CHRG<br>CUSTOMER ID: SVC CHGE 0308<br>CUSTOMER NAME: 000004000037507<br>COMPANY ID: DP10700543<br>ENTRY CLASS CODE: PPD<br>DISCRETIONARY DATA: | Debit Amount | 20,506.03<br>Bank Ref: |
| | **PREAUTHORIZED ACH DEBIT Total** | Debit Amount | 5,042,213.51 |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06091B7036R000102<br>Wells Ref: 080606027101<br>021001033 DEUTSCHE BANK TRUST CO AMERICAS NEW YORK NY UNITED<br>STATES IN00060606324469 ORG=AMERICAN CAPITAL STRATEGIES Two<br>Bethesda Metro Center 14th Floor Bethesda, MD 20814 US RFB=<br>000015702 OBI=ACFS RLOC Attn: Justine Baggs /FTR/ BBK=DEUTSC<br>HE BANK LUXEMBOURG S.A. 2, BOULEVARD KONRAD AUDENAUER LUXEMB<br>OURG,LU BNF=LU0903601400383850100 EUROPEAN CAPITAL SICAR S.A.<br>IBK=DEUTSCHE BANK LUXEMBOURG S.A. 2 BOULEVARD KONRAD AUDENA<br>UER LUXEMBOURG,LU DEUTLULL S<br>Completed Timestamp 080606000855 (Time Released) | Debit Amount | 7,500,000.00<br>Bank Ref: |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06091B7035R000406<br>Wells Ref: 080609024886<br>021001088 HSBC BANK USA 452 FIFTH AVENUE NEW YORK, NEW YORK<br>IN080605511354360 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd<br>a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001568<br>8 OBI=Hartstrings, LLC Revolver Funding Attn Jean Lewis 610-<br>989-4175 SFR- /FTR/ BBK=HSBC BANK USA BUFFALO NY BNF=6108782<br>98 Harstrings, LLC<br>Completed Timestamp 080609083812 (Time Released) | Debit Amount | 1,000,000.00<br>Bank Ref: |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06091B7035R002256<br>Wells Ref: 080609071165 | Debit Amount | 362,856.00<br>Bank Ref: |

Custom                                                    AMERICAN CAPITAL STRATEGIES
06/10/2008 09:31 AM ET
CUSTOMER ID: AMCAS814                                     Intraday Composite Report
OPERATOR ID: NICH01                                       As of 06/09/2008

 Commercial Electronic Office®         Treasury Information Reporting

| | | | | |
|---|---|---|---|---|
| | 021000021 JPMORGAN CHASE BANK 4 NEW YORK PLAZA NEW YORK, NY IN08060911193972 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001571 9 OBI=REPO Margin Call (Cusips: 52109PAY1 + 50180LBF6) Cusip : 50180LBD1 Attn: ALLISON ZUCCO (212-526-1210) /FTR/ BBK=JP Morgan Chase NYC BNF=066206677 Lehman Brothers Inc. Completed Timestamp 080609144221 (Time Released) | | | |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER Cust Ref: COMPLETE Wires Ref: 060911B7031R000145 Wells Ref: 080606082188 075000022 U.S. BANK,N.A. CINCINNATI, OH IN08060613141547 ORG =AMERICAN CAPITAL STRATEGIES Two Bethesda Metro Center 14th Floor Bethesda, MD 20814 US RFB=000015707 OBI=American Capit al Strategies Revolver Draw SFR- /FTR/ BBK=U.S. BANK,N.A. CI NCINNATI OH BNF=182380318754 Scientific Protein Laboratories LLC Completed Timestamp 080609154059 (Time Released) | Debit Amount: | 300,000.00 Bank Ref: |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER Cust Ref: COMPLETE Wires Ref: 060911B7037R002125 Wells Ref: 080609071023 055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080609 11452888 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro Center 14th Floor Bethesda, MD 20814 RFB=000015721 OBI=Wacho via ACFS Checking account /FTR/ BBK=WACHOVIA BANK NA OF MARY LAND BETHESDA MD BNF=2000013846864 American Capital Financia l Servic Completed Timestamp 080609144121 (Time Released) | Debit Amount: | 190,000.00 Bank Ref: |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER Cust Ref: COMPLETE Wires Ref: 060911B7033R002106 Wells Ref: 080609071013 055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080609 11440861 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro Center 14th Floor Bethesda, MD 20814 RFB=000015720 OBI=Wacho via ACAS Checking account /FTR/ BBK=WACHOVIA BETHESDA MD BNF =2000013846851 American Capital Strategies, Ltd. Completed Timestamp 080609144114 (Time Released) | Debit Amount: | 135,000.00 Bank Ref: |
| 6/9/2008 | 495 / OUTGOING MONEY TRANSFER Cust Ref: COMPLETE Wires Ref: 060911B7039R002176 Wells Ref: 080609071128 021000021 JPMORGAN CHASE BANK 4 NEW YORK PLAZA NEW YORK, NY IN08060909380787 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001571 7 OBI=REPO Pair Off (Cusips: 46631BAS4 + 46631BAU9) Attn: Do rothea Owens (212-834-4183) /FTR/ BBK=JPMORGAN CHASE BANK, N A NEW YORK NY BNF=140093704 JP Morgan Chase Completed Timestamp 080609144159 (Time Released) | Debit Amount: | 5,172.16 Bank Ref: |
| | OUTGOING MONEY TRANSFER Total | Debit Amount | 9,493,028.16 |
| | Debit Total | Debit Amount | 19,535,241.57 |
| | Account Net Amount | | 3,272,782.90 |

Currency: USD                                             WELLS FARGO BANK, N.A.
Bank: 121000248                                           ACS FUNDING TRUST I
Account: 4000037515(MD)


**WELLS FARGO**

Custom
06/12/2008 09:00 AM ET
CUSTOMER ID: AMCAS814
OPERATOR ID: NICH01

**AMERICAN CAPITAL STRATEGIES**

Intraday Composite Report
As of 06/11/2008

Commercial Electronic Office®

Treasury Information Reporting



| | | | |
|---|---|---|---|
| | Credit Total | **Credit Amount** | **281,128,613.40** |

**Debit Transactions**

| 6/11/2008 | 502 / BOND OPERATIONS DEBIT<br>Cust Ref: 12792602<br>IBS MEMO POST EWIB20080611152422400702 | **Debit Amount:** | 91,000,000.00<br>Bank Ref: |
|---|---|---|---|
| 6/11/2008 | 502 / BOND OPERATIONS DEBIT<br>Cust Ref: 12792602<br>IBS MEMO POST EWIB20080611527379000705 | **Debit Amount:** | 91,000,000.00<br>Bank Ref: |
| | **BOND OPERATIONS DEBIT Total** | **Debit Amount** | **182,000,000.00** |
| 6/11/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 091000013725167<br>COMPANY NAME: WFBS    A<br>ENTRY DESC:  INVESTMENT<br>CUSTOMER ID:  12792602 000000<br>CUSTOMER NAME: AMER CAP<br>COMPANY ID:  9000000444<br>ENTRY CLASS CODE:  PPD<br>DISCRETIONARY DATA: 00<br>WFBS12792602CR    080611    A        00013725167 | **Debit Amount:** | 91,000,000.00<br>Bank Ref: |
| 6/11/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 061111B7037R000891<br>Wells Ref: 080611034636<br>055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080611<br>08233097 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro<br>Center 14th Floor Bethesda, MD 20814 RFB=000015745 OBI=Wacho<br>via ACFS Checking account /FTR/ BBK=WACHOVIA BANK NA OF MARY<br>LAND BETHESDA MD BNF=2000013846864 American Capital Financia<br>l Servic<br>Completed Timestamp 080611103340 (Time Released) | **Debit Amount:** | 2,750,000.00<br>Bank Ref: |
| 6/11/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 061111B7034R001313<br>Wells Ref: 080611044194<br>026009593 BANK OF AMERICA, NEW YORK, NY 100, 33 RD STREET WE<br>ST NEW YORK NEW YORK 10001 IN08061011322163 ORG=AMERICAN CAP<br>ITAL STRATEGIES Two Bethesda Metro Center 14th Floor Bethesd<br>a, MD 20814 US RFB=000015734 OBI=New England Confectionery C<br>o Revolver Funding American Capital Strategies SFR- /FTR/ BB<br>K=BANK OF AMERICA, N.A., NY NEW YORK NY BNF=004602296108 New<br>England Confectionery Company<br>Completed Timestamp 080611114702 (Time Released) | **Debit Amount:** | 1,500,000.00<br>Bank Ref: |
| 6/11/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 061111B7032R001265<br>Wells Ref: 080611044064<br>021000021 JPMORGAN CHASE BANK 4 NEW YORK PLAZA NEW YORK, NY<br>IN08061106093831 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd<br>a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001574<br>3 OBI=REPO Margin (Cusips: 52109PAY1 + 50180LBF6) Cusip: 501<br>80LBD1 Attn: RYAN JOHNSON 212-526-1210 /FTR/ BBK=JP Morgan C<br>hase NYC BNF=066206677 Lehman Brothers Inc.<br>Completed Timestamp 080611114634 (Time Released) | **Debit Amount:** | 298,250.00<br>Bank Ref: |
| 6/11/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 061111B7033R000978<br>Wells Ref: 080611034659<br>055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080611<br>08225818 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro<br>Center 14th Floor Bethesda, MD 20814 RFB=000015744 OBI=Wacho<br>via ACAS Checking account /FTR/ BBK=WACHOVIA BETHESDA MD BNF<br>=2000013846851 American Capital Strategies, Ltd.<br>Completed Timestamp 080611103356 (Time Released) | **Debit Amount:** | 50,000.00<br>Bank Ref: |
| | OUTGOING MONEY TRANSFER Total | **Debit Amount** | **4,598,250.00** |

*Note: Intraday information subject to change*



Custom
06/27/2008 09:26 AM ET
CUSTOMER ID: AMCAS814
OPERATOR ID: NICH01

**AMERICAN CAPITAL STRATEGIES**

Intraday Composite Report
As of 06/26/2008

Commercial Electronic Office®

Treasury Information Reporting



|  | Credit Total |  | Credit Amount | 26,198,421.78 |
|---|---|---|---|---|

### Debit Transactions

| Date | Description | | | Amount |
|---|---|---|---|---|
| 6/26/2008 | 502 / BOND OPERATIONS DEBIT<br>Cust Ref: 12792602<br>IBS MEMO POST EWIB20080626152430610099 | | Debit Amount: | 10,000,000.00<br>Bank Ref: |
| 6/26/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 0910000013760023<br>COMPANY NAME: WFBS        A<br>ENTRY DESC:   INVESTMENT<br>CUSTOMER ID:  12792602 000000<br>CUSTOMER NAME: AMER CAP<br>COMPANY ID:   9000000444<br>ENTRY CLASS CODE:  PPD<br>DISCRETIONARY DATA: 00<br>WFBS12792602CR        080626      A                    00013760023 | | Debit Amount: | 10,000,000.00<br>Bank Ref: |
| 6/26/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06261IB7038R001204<br>Wells Ref: 080626039669<br>055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080626<br>08132514 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro<br>Center 14th Floor Bethesda, MD 20814 RFB=000015884 OBI=Wacho<br>via ACFS Checking account /FTR/ BBK=WACHOVIA BANK NA OF MARY<br>LAND BETHESDA MD BNF=2000013846864 American Capital Financia<br>l Servic<br>Completed Timestamp 080626110510 (Time Released) | | Debit Amount: | 1,500,000.00<br>Bank Ref: |
| 6/26/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06261IB7039R001208<br>Wells Ref: 080626040011<br>021000018 BANK OF NEW YORK MELLON CORPORATION ONE WALL STREE<br>T NEW YORK, NY IN08062608173821 ORG=AMERICAN CAPITAL STRATEG<br>IES Two Bethesda Metro Center 14th Floor Bethesda, MD 20814<br>US RFB=000015885 OBI=Order# 53250794 Attn: OTC Settlements B<br>ANK OF NY# 315/765-4207 /FTR/ BBK=BANK OF NEW YORK NEW YORK<br>NY BNF=8900360968 Credit Suisse International<br>Completed Timestamp 080626110634 (Time Released) | | Debit Amount: | 577,834.85<br>Bank Ref: |
| 6/26/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06261IB7038R001208<br>Wells Ref: 080626039939<br>021000021 JPMORGAN CHASE BANK 4 NEW YORK PLAZA NEW YORK, NY<br>IN08062607135150 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd<br>a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001586<br>2 OBI=REPO Margin Call (Cusips: 52109PAY1 + 50180LBF6) Cusip<br>: 50180LBD1 Attn: ALLISON ZUCCO (212-526-1210) /FTR/ BBK=JP<br>Morgan Chase NYC BNF=066206677 Lehman Brothers Inc.<br>Completed Timestamp 080626110606 (Time Released) | | Debit Amount: | 401,376.00<br>Bank Ref: |
| 6/26/2008 | 455 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06261IB7039R000231<br>Wells Ref: 080626055886<br>122000496 UNION BANK OF CALIFORNIA, NA LOS ANGELES, CA IN080<br>62506491701 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Met<br>ro Center 14th Floor Bethesda, MD 20814 US RFB=000015871 OBI<br>=T&L Acquisition Jr. Sub Debt facility American Capital SFO-<br>/FTR/ BBK=UNION BANK OF CALIFORNIA, NA LOS ANGELES CA BNF=6<br>493009638 Rug Doctor<br>Completed Timestamp 080625125356 (Time Released) | | Debit Amount: | 296,612.73<br>Bank Ref: |
| 6/26/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 06261IB7037R001341<br>Wells Ref: 080626039677 | | Debit Amount: | 10,000.00<br>Bank Ref: |

*Note: Intraday information subject to change.*



Custom
06/30/2008 09:14 AM ET
CUSTOMER ID: AMCAS814
OPERATOR ID: NICH01

AMERICAN CAPITAL STRATEGIES

Intraday Composite Report
As of 06/27/2008

Commercial Electronic Office®

Treasury Information Reporting

| 6/27/2008 | 502 / BOND OPERATIONS DEBIT<br>Cust Ref: 12792602<br>IBS MEMO POST EWIB20080627153246300000849 | Debit Amount: | 2,500,000.00<br>Bank Ref: |
| --- | --- | --- | --- |
| 6/27/2008 | 455 / PREAUTHORIZED ACH DEBIT<br>Cust Ref: 091000016208936<br>COMPANY NAME: WFBS    A<br>ENTRY DESC: INVESTMENT<br>CUSTOMER ID: 12792602 000000<br>CUSTOMER NAME: AMER CAP<br>COMPANY ID: 9000000444<br>ENTRY CLASS CODE: PPD<br>DISCRETIONARY DATA: 00<br>WFBS12792602CR   080627   A        00016208936 | Debit Amount: | 2,500,000.00<br>Bank Ref: |
| 6/27/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 0627I1B7033R000111<br>Wells Ref: 080625055925<br>021001033 DEUTSCHE BANK TRUST CO AMERICAS NEW YORK NY UNITED<br>STATES IN0806250701598 1 ORG=AMERICAN CAPITAL STRATEGIES Two<br>Bethesda Metro Center 14th Floor Bethesda, MD 20814 US RFB=<br>000015873 OBI=ACFS RLOC Attn: Justine Baggs /FTR/ BBK=DEUTSC<br>HE BANK LUXEMBOURG S.A. 2, BOULEVARD KONRAD AUDENAUER LUXEMB<br>OURG,LU BNF=LU0903601400068385010 EUROPEAN CAPITAL SICAR S.A.<br>IBK=DEUTSCHE BANK LUXEMBOURG S.A. 2, BOULEVARD KONRAD AUDEN<br>AUER LUXEMBOURG,LU DEUTLULL S<br>Completed Timestamp 080625125421 (Time Released) | Debit Amount: | 4,500,000.00<br>Bank Ref: |
| 6/27/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 0627I1B7038R001765<br>Wells Ref: 080627052368<br>055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080627<br>08311753 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro<br>Center 14th Floor Bethesda, MD 20814 RFB=000015892 OBI=Wacho<br>via ACFS Checking account /FTR/ BBK=WACHOVIA BANK NA OF MARY<br>LAND BETHESDA MD BNF=2000013846864 American Capital Financia<br>l Servic<br>Completed Timestamp 080627114917 (Time Released) | Debit Amount: | 1,500,000.00<br>Bank Ref: |
| 6/27/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 0627I1B7033R002065<br>Wells Ref: 080627062548<br>021000021 JPMORGAN CHASE BANK 4 NEW YORK PLAZA NEW YORK, NY<br>IN080627103020 1 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesd<br>a Metro Center 14th Floor Bethesda, MD 20814 US RFB=00001589<br>6 OBI=REPO Margin Call (Cusips: 52109PAY1 + 50180LBF6) Cusip<br>: 50180LBD1 Attn: ALLISON ZUCCO (212-526-1210) /FTR/ BBK=JP<br>Morgan Chase NYC BNF=066206677 Lehman Brothers Inc.<br>Completed Timestamp 080627125117 (Time Released) | Debit Amount: | 451,818.00<br>Bank Ref: |
| 6/27/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 0627I1B7036R000117<br>Wells Ref: 080625055908<br>122000496 UNION BANK OF CALIFORNIA, NA LOS ANGELES, CA IN080<br>62509633679 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Met<br>ro Center 14th Floor Bethesda, MD 20814 US RFB=000015872 OBI<br>=Sweet Services Jr. Sub Debt facility American Capital Strat<br>egies SFO- /FTR/ BBK=UNION BANK OF CALIFORNIA, NA LOS ANGELE<br>S CA BNF=6493009636 Rug Doctor<br>Completed Timestamp 080625125411 (Time Released) | Debit Amount: | 229,086.82<br>Bank Ref: |
| 6/27/2008 | 495 / OUTGOING MONEY TRANSFER<br>Cust Ref: COMPLETE<br>Wires Ref: 0627I1B7033R001690<br>Wells Ref: 080627052349<br>055003201 WACHOVIA BANK NA OF MARYLAND BETHESDA, MD IN080627<br>08295232 ORG=AMERICAN CAPITAL STRATEGIES Two Bethesda Metro<br>Center 14th Floor Bethesda, MD 20814 RFB=000015891 OBI=Wacho<br>via ACAS Checking account /FTR/ BBK=WACHOVIA BETHESDA MD BNF<br>=2000013846861 American Capital Strategies, Ltd.<br>Completed Timestamp 080627114908 (Time Released) | Debit Amount: | 200,000.00<br>Bank Ref: |

*Note: Intraday information subject to change*

10



Help   Print   Close

**Transaction Details (Trade)**

**Wells Fargo Institutional Brokerage and Sales**
Safekeeping Services
608 Second Avenue South
Minneapolis, MN 55479-0130

American Capital Strategies Ltd
Cmbs SecuritiesAttn Treasury Operations
2 Bethesda Metro Center
Bethesda MD 20814

| | |
|---|---|
| Account Number: | 13022280 |
| Rep Name: | Mark E Thompson |
| Rep Phone: | 612-667-4792 |

**Activity**

| | |
|---|---|
| Par: | 1,500,000.00 |
| CUSIP: | 17311QAL4 |
| Market: | |
| Capacity: | |
| Account Type: | 1 |
| Trade Number: | |
| Trade Date: | 08/21/2008 |
| Settlement Date: | 08/21/2008 |
| Price: | $.00 |
| Principal: | $.00 |
| Interest: | $.00 |
| Misc. Handling Fee: | $.00 |
| Transactions Fee: | $.00 |
| Transaction Fee Code: | |
| Net Amount: | $.00 |
| Security Description: | CITIGROUP COML MTG TR 07-C6 J |
| Symbol: | |
| Coupon: | $.00 |
| Maturity Date: | |
| Issue Date: | |
| Notes: | |

**Legend**

**TYPE – Type of account**
1. Cash
2. Margin
3. Short
4. Collateral
5. Other
6. Repo

**MKT--Market in which the transaction was executed**
1. New York Stock Exchange
2. American Stock Exchange
3. Chicago Stock Exchange
4. Options Exchanges
M. Market Maker
N. NSCC
O. Over the Counter
X. Funding Product

**CAP--Capacity in which WFBS acted**
1. As Agent
2. As Principal
4. Cross Trades
6. Principal Market Maker
9. As Riskless Principal
A. Third Market Maker

**Transaction Fee Codes**
O. Odd-Lot
A. Auction

**Print** **Close**

*Investment Account Reporting is a service provided by Wells Fargo Brokerage Services, LLC and Wells Fargo Institutional Securities, LLC. Institutional Brokerage & Sales includes Wells Fargo Brokerage Services, LLC (WFBS) and Wells Fargo Institutional Securities, LLC (WFIS), brokerage affiliates of Wells Fargo & Company and Members FINRA and SIPC. WFBS provides clearing services for WFIS, and WFIS accounts are carried by WFBS.*

Investments:  NOT FDIC Insured  •  May Lose Value  •  No Bank Guarantee

© 2001-2008 Wells Fargo. All rights reserved.

## Morgan, Chris

**F. :** Mark.E.Thompson@wellsfargo.com
**Sent:** Friday, October 10, 2008 11:17 AM
**To:** Morgan, Chris
**Subject:** FW: 8/20 delivery to dtc 636

:hris, Our DTC desk shows we delivered the piece to DTC 636 on 8/20/08. Below is a screen print from our DTC system. Mark

---

rom: Gordon, David
ent: Friday, October 10, 2008 10:14 AM
o: Thompson, Mark E.
ubject: 8/20 delivery to dtc 636

```
FDT/ART /MD20          THE DEPOSITORY TRUST COMPANY           Date: 10/10/2008
0000025-NA           ** CUSIP in Chronological Order **       Time: 11:11:00
art#: 0025 CUSIP or MMI-BASE: 17311QAL4     Del/Rec/All: A      Status(M,A): A
ELLS BRKG               GCMO144A5.888% BE-#
oll Grp: 0025     Bus-Date: 08 / 20 / 2008                      MA/NA(Y,N): N

1 Time Activity  Source  CUSIP  Reason Contra  Quantity   Dollar Amount Stat
  14:29 Memo Seg  MSEG 17311QAL4  000           1,500,000          .00 Made
  14:29 DO - Delvr DOS  17311QAL4  030    636   1,500,000          .00 Made
```

DTC#

636 Lehman DTC#

13

**Morgan, Chris**

| | | |
|---|---|---|
| F | : | Zucco, Allison K [allison.zucco@lehman.com] |
| Sent: | | Wednesday, August 20, 2008 1:59 PM |
| To: | | Morgan, Chris |
| Cc: | | Gross, Craig; Channyalew, Tigist; Rosado, Luis |

**Subject:** RE: FIN - Margin Call Notice for LBI - AMERICAN CAP STRATEGIES A/C AMERICAN CAP ADVISORS INC

k all booked, thx, dtc  #636

## Allison Zucco

.ehman Brothers
:epo Margin
'h: 212-526-1210
ax: 646-758-3023

---

rom: Morgan, Chris [mailto:Chris.Morgan@americancapital.com]
ent: Wednesday, August 20, 2008 1:56 PM
o: Zucco, Allison K
:c: Gross, Craig; Channyalew, Tigist; Rosado, Luis
ubject: RE: FIN - Margin Call Notice for LBI - AMERICAN CAP STRATEGIES A/C AMERICAN CAP ADVISORS INC

.llison,

vith no hair cut we will send $1,500,000 face with a market value of $421,875.00 at the 28.125 price.  Will that be sufficient to cover
ie margin call?

hanks,

:hris Morgan
:ash and Banking
.merican Capital Strategies, Ltd.
wo Bethesda Metro Ctr, 14th Floor
3ethesda, MD   20814
.01-841-9918 Phone
.01-560-8419 Fax
40-271-2439 Cell
:hris.Morgan@AmericanCapital.com

he information contained in this email is intended for use by the recipient(s) named above.  If the reader of
iis message is not the intended recipient, you are hereby notified that you have received this document in
rror and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you
ave received this communication in error, please notify me immediately by email and delete the original
iessage.

J4



# Master Repurchase Agreement

September 1996 Version

Dated as of **April 7, 2008**

Between: **Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

and **American Capital Strategies Ltd.**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
\*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

American Capital Strategies Ltd.

By: _____

By: _____

Name: Robert E. Guglielmo

Name: Douglas L. Cooper

Title: Senior Vice President

Title: Managing Director

Date: 4/17/08

Date: 4/7/08

This Annex forms a part of the Master Repurchase Agreement dated as of April 7, 2008 (the "Agreement") between **Lehman Brothers Inc., Lehman Commercial Paper Inc.**, (each Party A, as the case may be) and **American Capital Strategies Ltd.** (Party B).

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. In addition to this Annex I, Annex II the following Annexes (and any schedules or exhibits attached thereto) shall be deemed executed by the parties hereto and shall also form a part of the Agreement:

   None

2. With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterpart of the Lehman Brothers entity.

3. <u>Definitions</u>. For purposes of the Agreement, the following terms shall have the following meanings:
   (a) "Margin Notice Deadline", 10:00 am New York City time.

   (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4. <u>Calculation of Market Value</u>: Market Value will be calculated in accordance with market practice prevailing in the principal market for the relevant securities as determined by Party A.

5. <u>Purchase Price Maintenance</u>.
   (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

   (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

6. <u>Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.</u>
   (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

   (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise), such party irrevocably waives such immunity, with respect to itself and its revenues

and assets, from (i) any legal action, suit or proceeding (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

(c)  Insofar as permitted by law, each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

7.  <u>ERISA</u>

(a)  <u>Representation by Party B.</u>  Party B represents that Party B is not an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of ERISA, as amended, or subject to ERISA or Section 4975 of the Code, as amended, or materially similar provisions of any Similar Law.  Party B further represents and warrants that Party B is not a person acting on behalf of an ERISA Plan and that the Party B's assets do not constitute assets of an ERISA Plan.

(b)  <u>ERISA Event of Default</u>. Paragraph 11 is revised by appending the word "or" to the end of sub-section (vii) and adding the following as sub-section (viii) before the parenthetical phrase (each an "Event of Default"):

"(viii) the representation made by Party B in Annex I is incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated."

Lehman Brothers Inc.
Lehman Commercial Paper Inc.

By: _____

Name:  Robert E. Guglielmo

Title:  Senior Vice President

Date: _____4/17/08_____

American Capital Strategies Ltd.

By: _____

Name:  John Hooker

Title:  VP

Date: _____4/30/08_____

ver_01-08

**Annex II**
**Names and Addresses for Communications Between Parties**

**LEHMAN BROTHERS**
1271 Avenue of the Americas, 43rd Floor
New York, New York 10020

Attn.: Robert Guglielmo, Senior Vice President
Capital Markets Contracts - Legal
(212) 526-7121 phone
(212) 526-7672 fax

**AMERICAN CAPITAL STRATEGIES, LTD.**
2 Bethesda Metro Center, 14th Floor
14th Floor
Bethesda, MD 20814

**Contract Issues:**
American Capital Strategies, Ltd.
Attention: John Hooker
2 Bethesda Metro Center, 14th Floor
Bethesda, MD 20814
Telephone: (301) 841-1816

**Operational Issues:**
American Capital Strategies, Ltd.
Attention: Michael Sarner
2 Bethesda Metro Center, 14th Floor
Bethesda, MD 20814
Telephone: (301) 841-1366

# People Assisting in Claim

Joshua Lefkowitz
Email: Joshua.Lefkowitz@AmericanCapital.com
Phone: (301) 841-1835

Craig Gross
Email: Craig.Gross@AmericanCapital.com
Phone: (301) 841-1436

Luis Rosado
Email: Luis.Rosado@AmericanCapital.com
Phone: (301) 841-2027

Chris Morgan
Email: Chris.Morgan@AmericanCapital.com
Phone: (301) 841-9918



**DTC ELIGIBLE SECURITIES should be directed as follows:**

| | |
|---|---|
| Agent Bank# | 12204 |
| DTC#: | 0025 |
| FFC: | American Capital Strategies, Ltd CMBS Securities |
| Account #: | 13022280 |
| Attn: | Treasury Operations |



**Please remit electronic funds due to American Capital Strategies to the following:**

---

*Domestic Wire Transfers*

| | |
|---|---|
| Beneficiary's Bank: | Wells Fargo |
| | San Francisco, CA |
| ABA #: | 121000248 |
| Account Name: | American Capital Strategies |
| | Two Bethesda Metro Center, 14th Floor |
| | Bethesda, MD 20814 |
| Account #: | 4000037507 |

*International Wire Transfers*

| | |
|---|---|
| Beneficiary's Bank: | Wells Fargo |
| | San Francisco, CA |
| SWIFT: | WFBIUS6S |
| Account Name: | American Capital Strategies |
| | Two Bethesda Metro Center, 14th Floor |
| | Bethesda, MD 20814 |
| Account #: | 4000037507 |

# EXHIBIT B

James W. Giddens
Trustee for the SIPA Liquidation of Lehman Brothers Inc.
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

*In re* Lehman Brothers Inc.

Case No. 08-01420 (JMP) SIPA

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

December 10, 2009

**VIA UPS OVERNIGHT**

AMERICAN CAPITAL LTD.
ATTN: CRAIG GROSS
2 BETHESDA METRO CENTER
14TH FLOOR
BETHESDA, MD 20814

   Re: Claim Number(s):  800000083
     Account Number(s): 1487440

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY

   The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens, Trustee (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA") pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York. You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding. This Notice is applicable only to the claim(s) and/or accounts identified above. If you filed other claims, additional notices will be issued.

   The Trustee has made the following determination regarding your Claim:

   Your claim for customer treatment of cash and/or securities under SIPA is DENIED. The cash and/or securities that you claimed are not customer property pursuant to SIPA. As such, your claim is not entitled to treatment as a customer claim eligible to share from the fund of customer property or SIPA cash advances.

Although the Trustee has denied your claim for customer treatment under SIPA, he is converting your claim to a general creditor claim on the Debtor's estate, similar to a claim in an ordinary bankruptcy case. No determination is being made as to the validity or allowed amount of the claim at this time. After the determination of customer claims, the Trustee will address all general creditor claims and you will receive a further notification as to the Trustee's determination of your general creditor claim.

With respect to the determination of your claim as a general creditor claim, you do not need to take any further action at this time. The Trustee will send you a further notification once he has made a determination of your claim as a general creditor claim.

**PLEASE TAKE NOTICE:** If you disagree with the determination that your claim is Denied as a customer claim and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

Clerk of the United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

**PLEASE TAKE FURTHER NOTICE:** You must serve your opposition upon the Trustee's counsel by mailing a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attn: LBI Hearing Request

Attorneys for James W. Giddens, Trustee for
the SIPA Liquidation of Lehman Brothers Inc.

Very Truly Yours,

James W. Giddens
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

3