UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.

Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.

Debtor.

- - - - - - - - - - - - - - - - - - - - - -x

United States Bankruptcy Court

One Bowling Green

New York, New York

May 7, 2010

9:17 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

CONTINUED EVIDENTIARY HEARING re 60(b) Motions

Transcribed by: Lisa Bar-Leib

A P P E A R A N C E S :

JONES DAY

Special Counsel for the Debtors

222 East 41st Street

New York, NY 10017

BY: ROBERT W. GAFFEY, ESQ.

JAYANT W. TAMBE, ESQ.

QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

Special Counsel to the Official Committee of Unsecured Creditors

51 Madison Avenue

22nd Floor

New York, NY 10010

BY: SUSHEEL KIRPALANI, ESQ.

JAMES C. TECCE, ESQ.

RICHARD I. WERDER, JR., ESQ.

HUGHES HUBBARD & REED LLP

Attorneys for the James W. Giddens, SIPC Trustee

One Battery Park Plaza

New York, NY 10004

BY: WILLIAM R. MAGUIRE, ESQ.

SECURITIES INVESTOR PROTECTION CORPORATION

805 15th Street, N.W.

Suite 800

Washington, DC 20005

BY: KENNETH J. CAPUTO, ESQ.

BOIES, SCHILLER & FLEXNER LLP

Attorneys for Barclays Capital, Inc.

333 Main Street

Armonk, NY 10504

BY: DAVID BOIES, ESQ.

BOIES, SCHILLER & FLEXNER LLP

Attorneys for Barclays Capital, Inc.

535 Lexington Avenue

7th Floor

New York, NY 10022

BY: JONATHAN D. SCHILLER, ESQ.

BOIES, SCHILLER & FLEXNER LLP

Attorneys for Barclays Capital, Inc.

5301 Wisconsin Avenue, N.W.

Washington, DC 20015

BY: HAMISH P.M. HUME, ESQ.

JONATHAN M. SHAW, ESQ.

PROSKAUER ROSE LLP

Attorneys for DTCC

1585 Broadway

New York, NY 10036

BY: GREGG M. MASHBERG, ESQ.

P R O C E E D I N G S

THE COURT: Be seated. Good morning. Be seated, please.

MR. BOIES: Good morning, Your Honor.

THE COURT: Good morning, Mr. Boies.

RESUME CROSS-EXAMINATION

BY MR. BOIES:

**Q. Good morning, Mr. Burian.**

**A. Good morning, Mr. Boies.**

**Q. Yesterday you testified about a conversation that you had early Monday morning with Mr. Miller and Mr. Klein and perhaps some other people. Do you recall that?**

**A. I do.**

**Q. How long did that conversation last?**

**A. Seven to eighteen minutes.**

**Q. Say that again.**

**A. Eighteen minutes.**

**Q. Eighteen minutes?**

**A. Around there somewhere.**

**Q. Were you timing it?**

**A. I was giving you a range. I mean, around fifteen minutes.**

**Q. Around eighteen minutes? And who else was present other than Mr. Miller and Mr. Klein?**

**A. Tom Roberts was there, Mr. Miller's partner, Mike Fazio, my partner, Lori Fife, I believe, for a period of the -- for a**

**period of it.**

**Q. Did Mr. Fazio take any notes?**

**A. I don't believe so. We searched for notes. If it wasn't provided to you, then no.**

**Q. Did you take any notes other than writing the little thing on resis that you wrote on the mon --**

**A. No. I was listening and watching Mr. Klein write it out for me.**

**Q. Did you prepare any memo of what you say Mr. Klein told you?**

**A. I did.**

**Q. And to whom did you send that memo?**

**A. It's a memo I discussed earlier which I sent to the committee which was ninety-nine percent from Mr. Klein's conversation.**

**Q. And did you mention that that was based on something that you had heard from Mr. Klein?**

**A. In the memo to the committee?**

**Q. Yes.**

**A. No.**

**Q. Did you prepare any writing in which you ascribed Mr. Klein what you testified to the Court Mr. Klein said?**

**A. I have no writing that said Mr. Klein said.**

**Q. In this memo that you say that you wrote to the committee, did you even mention that you had a conversation with Mr.**

Klein?
A. In the memo I didn't write or the memo I did write?
Q. The memo you did write.
A. Well, you saw the memo. It doesn't mention Mr. Klein by name.
Q. No. And does that memo that you say you wrote to the committee even mention that you had had any conversations with anyone at Barclays?
A. Why don't we go back and look to see -- I think I said discussions or something like that with the parties. I'm not sure if I said Lehman or Barclays. I'm not sure.
Q. And which memo, just so the record is clear, are you talking about? What was the date of the memo?
A. Monday morning when I got back to the office. So it was -- what date was Monday morning again? The 20 --
Q. That would have been the 22nd.
A. The 22nd.
Q. Let me try to , with your counsel's help, find the memos because I want to be sure that we've identified exactly what memo you're talking about. Would you turn to Movants' Exhibit 713?
A. So, Mr. Boies, did you see, I did not mention Lehman or Barclays. I said, "Following participating discussions and explanations regarding the open issues".
Q. And so, there's no mention of Lehman or Barclays, you say,

in this?
A. I do not specifically reference the source of my information in this memo other than --
Q. Well, let's take a look at that, sir. Let's look at paragraph 3, okay?
A. Oh.
Q. How do you begin paragraph 3?
A. Oh. "According to Lehman, there's no five billion dollar issues."
Q. Now, is there anywhere in this memo that you ascribe anything to Barclays?
A. As I mentioned earlier, I don't believe I referenced Barclays specifically anywhere in this memo.
Q. Now, in any of the materials that you ever prepared for the committee, did you ever reference anything that Barclays told you ascribing it to Barclays at the time?
A. I don't specifically recall any such memo.
Q. Okay. Now, you said that during this conversation, Mr. Klein told you, in effect, that Barclays was going to take a two billion dollar loss on this transaction. Do you recall that?
A. No.
Q. Well, do you recall him, according to you, telling you that they were going to get 47.4 in assets?
A. That sounds right, yes.

Q. And much in liabilities did he tell you, according to you, that Barclays was going to assume?

A. The cure, the comp for giving of the Barclays repo. The reason I say no earlier was because the transaction had other elements besides this piece. I was trying to be clear. Buy -- as you know, we thought buying the broker/dealer was a great deal. If we're talking about did he tell me that Barclays was doing worse than expected in respect of the purchase of the broker dealer assets, then my answer will be yes.

A. Let me be sure I understand what you're saying. Do you recall yesterday saying that Mr. Klein told you that they were going to take assets of forty-seven or 47.4 and they were going to assume liabilities that were over forty-nine billion dollars?

A. Forty-five and two is forty-seven and forty-nine -- yes, sir.

Q. Okay. And so that means that what Mr. Klein told you was that they were going -- according to you, was that Barclays was going to take on a couple billion dollars more in liabilities, at least in terms of anything he talked to you about, than they were getting assets, right?

A. In respect of the broker/dealer assets as compared to the change from Wednesday to the closing Monday morning, Mr. Klein said that Barclays was actually going to do almost two billion dollars worse than expected. Keeping in mind --

Q. Two dollars --
A. I'm trying to give you a full answer, Mr. Boies, to make this -- help it go quicker. Keep in mind that some of that --
Q. It'll actually go quicker if you respond to my questions.
A. -- some of this included --
Q. Do you know what question you're responding to?
A. I do.
Q. What is the question?
A. Whether or not Mr. Klein told me that they were expecting to take a two billion dollar loss --
Q. No.
A. -- on the assets --
Q. No.
A. -- being purchased in the broker/dealer.
Q. No. The question was whether, according to you, Mr. Klein, in this conversation, told you that they were taking on approximately two billion dollars more of liabilities than they were getting assets. Did he tell you that? That's a yes or no question, to begin with, or I don't know. And then you can give an explanation if you feel it's necessary. Did he tell you that?
A. Yes, with an explanation.
Q. Okay.
THE COURT: Do you want him to give the explanation?
Q. How long is the explanation?

**A. I think pretty short.**

**Q. Okay. Then please do.**

THE COURT: Let's have a short explanation.

THE WITNESS: 4.25 of those liabilities were estimates of cure and comp. So when you add them up, those may or may not be full liabilities. Some of them were at the discretion of Barclays. So whether or not Barclays was, in fact, taking a loss as opposed to coming out even, that was not explicit. Whether or not, in a purchase of the broker/dealer assets, Barclays was doing two billion dollars, roughly, worse than they expected when we were standing in court by Wednesday and Friday, that was clear.

**Q. Did Mr. Klein tell you in this conversation that the 4.25 billion of cure and comp might or may not be paid?**

**A. That did not come up in the conversation.**

**Q. Was that something that you believed at the time of the conversation?**

**A. Yes, with an explanation.**

**Q. How long is the explanation?**

**A. Short.**

**Q. Please give it to us.**

**A. With respect to the comp, we were understood the comp was being paid in full and was part of the books and records of Lehman unchanged based on how the broker/dealer accrued their compensation. With respect --**

**Q. Who told you that?**

**A. With respect to --**

**Q. Who told you that?**

**A. Can I finish my answer, sir?**

**Q. Can I just ask who told you that?**

**A. I'll remember that and I'll respond to it when I finish my answer.**

**Q. Sir, I'm letting you give an explanation. I think you've given a short explanation. I'd like to know just who told you that.**

THE COURT: Mr. Boies, here's what we're going to do. You can remember that question. He can remember that answer.

MR. BOIES: Okay.

THE COURT: But if the witness is in the midst of an explanation --

MR. BOIES: Okay.

THE COURT: -- he's entitled to finish it without being interrupted.

MR. BOIES: Yes, Your Honor.

**A. With respect to the cure, we knew there was a level of discretion.**

**Q. Who told you that?**

**A. With respect to the comp at the Thursday meeting at Weil Gotshal --**

**Q. Sir, my questions is who told you that.**

A. I am -- Lehman and its counsel.
Q. What?
A. Lehman and its counsel.
Q. Okay. Now, with respect to the comp, who told you what you related?
A. I just answered that.
Q. With respect to the cure, who told you what you related?
A. I read the contract.
Q. Okay. Other than reading the contract, did anybody tell you what you've related?
A. I have no specific recollection.
Q. When you said you read the contract, what contract are you referring to?
A. The asset purchase agreement.
Q. Did you also read the clarification letter?
A. Yes.
Q. When did you read the asset purchase agreement for the first time?
A. If you're talking about the version that was filed with the Court upon the filing or shortly after the filing of the bankruptcy case, I read that, I think, Tuesday night or Wednesday morning.
Q. When did you first read the clarification letter?
A. Do you mean the signed version? Probably sometime on Monday or Tuesday after the closing.

Q. September 22nd or 23rd, is that correct?

A. If that's Monday or Tuesday, yes.

Q. Okay. When did you first become aware that Barclays planned to book a gain on the acquisition of the Lehman assets?

A. I first became aware that Barclays was going to book -- was planning to book an accounting gain, if that's what you mean, on Saturday night after the Friday hearing.

Q. In other words, the 20th of September?

A. Okay.

Q. And how did you become aware of that?

A. I think when I got to Weil Gotshal, someone showed me the press release that Barclays had issued or it could have been the transcript of the analyst report or Q&A from -- I don't remember if it was Thursday or Friday.

Q. Let me ask you to look at tab 1 in your book, which is Barclays' Exhibit 109A. This is a September 17, 2008 press release. Is this the press release that someone showed you on Saturday, September 20?

A. As I mentioned earlier, I don't remember if I saw the press release or the analyst Q&A, but I'll take your word for it that this is the press release that was issued in connection with the Barclays purchase agreement.

(Pause)

A. Reading it quickly, it does look consistent with that.

Q. It does not look consistent with what you saw.

A. It does. It does.
Q. Oh, it does look consistent with what you saw.
A. Yeah.
Q. On Saturday. Is that what you're saying?
A. Either what I saw or was told about or read in the Q&A.
Q. Now, let me ask you to look at tab 2 which is Barclays' Exhibit 110. And did you see this document on Saturday, September 20?
A. I believe I did. This looks much more familiar.
Q. And did you read it?
A. Not the whole thing but, yes, I read portions.
Q. What portions did you read?
A. Mr. Boies, I don't remember exactly. Whichever portion related to the purchase of the broker/dealer securities.
Q. Well, let me direct your attention to some portions. Let me go to the second page, the third paragraph.
A. Are we in the press release or in the Q&A?
Q. Exhibit 110, Barclays' Exhibit 110 that's behind tab 2. Do you have that, sir?
A. Yes, thank you.
Q. And you say you saw this document on Saturday, September 20, correct?
A. Correct.
Q. And directing your attention to second page, third paragraph, second sentence, it says: "We are acquiring trading

assets with a current estimated value of seventy-two billion dollars and trading liabilities with a current estimated value of sixty-eight billion dollars for a cash consideration of 250 million dollars." Did you read that portion on Saturday, September 20?

A. I believe I did.

Q. All right. Going down two paragraphs, again to the second sentence, where Barclays says, "In fact, the transaction is capital/ratio accretive without additional equity issuance. And the source of that accretion is the negative goodwill from the transaction which amounts to about two billion U.S. dollars after tax -- or post tax." Do you see that?

A. I do.

Q. And did you read that portion?

A. I did.

Q. And going on to page 5, at the top there's a question where the questioner says "You have a buffer between the trading assets and liabilities of four billion dollars?" And then the answer from Barclays says: "We absolutely expect to preserve that buffer. And the way that Chris has described, we have marked. And the capital derived from the negative goodwill that arises from the transaction is actually more than is needed to support the fifteen billion dollars of risk-weighted assets. It is just the combination of that part of the transaction gives them an enhancement to the tier one

**capital and equity tier one capital." Did you read that portion on Saturday, September 20?**

**A. I don't have a specific recollection. But I knew this information if that's your point.**

**Q. I'm sorry. Say again.**

**A. I don't have a specific recollection of reading these exact words. But I do remember this information being related to me. I believe I read it. I just can't -- I try to be very clear about what I'm absolutely certain about and what I believe I did.**

**Q. And when you say this information was related to you, you mean it was related to you on Saturday, September 20th?**

**A. Mr. Boies, on Saturday, I knew this information either because I read it or because it was related to me. If I had to guess, I think I read it.**

**Q. Okay. Now, when Barclays said that it was going to have two billion dollars of negative goodwill on day 1 of the transaction, did you have an understanding of where that negative goodwill was going to come from?**

MR. KIRPALANI: Objection, Your Honor. No foundation that this witness understands even accounting concepts.

THE COURT: Did he have an understanding of where this negative goodwill would come from?

MR. KIRPALANI: Correct.

THE COURT: I overrule that objection. I think that

he either has an understanding or doesn't have an understanding. If he has an understanding, Mr. Boies, no doubt, will probe all the background facts as to how he has that understanding. So I think right now, it's a yes or no question.

MR. BOIES: It is, Your Honor.

**A. No, with an explanation. I had a guess but I do not know.**

**Q. How long would it take you to tell me your guess?**

THE COURT: Well, this isn't a timed trial. So it really doesn't matter how long it takes him --

MR. BOIES: Okay. Well, the only thing is, Your Honor --

THE COURT: -- if you want the answer.

MR. BOIES: The only thing is, Your Honor --

**Q. Well, why don't you give us the answer?**

**A. From this Q&A, it was very clear that consistent with what was described to the Court, Barclays was paying -- was buying sixty-eight -- seventy-two billion of assets and paying sixty-eight. And the difference was an assumption of all sorts of liabilities in the estate. I assume that based on some British accounting methodology, that when you book trading assets for a capital accretion, you look at your book. And you look at what you have in your book. And you don't look at compensation and cure and contracts in the same buckets. And therefore, I assumed that there was going to be a capital accretive gain on**

Barclays' trading book as was described. What I couldn't figure out and had no idea of knowing was, why it was two billion, not three billion or four billion.

Q. Did you ever try to find that out?

A. No.

(Pause)

A. Oh --

Q. Did you ever --

A. Excuse me, sir. In what time frame? I want to -- I apologize. I did try to find it out. Not that night.

Q. When did you first try to find out how the -- or why Barclays was booking or said it was booking a gain on acquisition?

A. When your counsel made a big deal of it in my deposition.

Q. And when was that, sir?

A. I don't remember the exact date of my first deposition. But thereafter --

Q. But it was in this case, this proceeding.

A. This case.

Q. It was sometime in 2009, late 2009, is that correct?

A. Whenever my first deposition was. Counsel can help me out here.

Q. Well, if you turn to the book that your counsel gave you, and turn to the tab that is helpfully labeled "Transcript", do you see when your first deposition was?

**A. December 17, 2009.**

**Q. And that was the first time, according to you, that you made any effort to find out what the basis of Barclays' announced gain was, is that correct?**

**A. Yeah, more or less.**

**Q. When you say "more or less", did you make any effort prior to December of 2009 to ascertain what the basis of Barclays' announced gain on acquisition was with respect to this transaction?**

**A. When was the Barclays brief filed in this case? Was that before or after my deposition? Where Barclays provided an explanation of the accounting gain and said there was no gain. When was that? Was that before December or after? It was in paragraph 44 of the brief.**

**Q. I'm sorry. Say again.**

**A. I think it was paragraph 44 of the brief.**

**Q. Paragraph 44 of the brief.**

**A. Was that before or after my deposition?**

THE COURT: That's a shocking display of memory, Mr. Burian. It will ultimately be to your detriment.

THE WITNESS: The only reason I remember, Your Honor, is 44 was my number in high school. Favorite number.

THE COURT: All right.

**A. When was that brief filed? 'Cause if it --**

**Q. Is it your testimony that either at your deposition or**

when this paragraph 44 was filed, that was the first time that you made any effort to figure out what the basis was for Barclays' announced gain on acquisition in connection with this transaction?

A. Yes. It was the first time I made any serious effort.

Q. Now you said "serious effort".

A. Yes. It's the first time I cared -- I thought the issue was relevant enough to focus on seriously.

Q. When you say "focus on seriously", I want to understand when the first time was that you made any effort to find out what the basis was of Barclays' announced gain. And then I'll probe what you did and we'll figure out whether it's serious or not. But I want to know what the first time you made any effort, any effort at all, to figure out what that basis was.

A. The reason I'm being careful is when I got this, if someone said to me, hey, what do you think, where is this from or what's going on, probably -- I don't have any specific recollection of saying I need to investigate or look at this press release and understand Barclays' accounting treatment until it became an issue in this trial. At the time, it was not something that I looked into or took seriously.

Q. Well --

A. That's -- I'm just trying to be complete.

Q. Well, in September of 2008, did somebody come to you and say Barclays is announcing this two billion dollar gain. How

do you think they're doing that?
A. I believe that one or two committee members or other counsel forwarded the press release and said, hey, look, they're booking an accounting gain. As I said to you, they came to my attention and I read the document.
Q. No. I understand -- I understand the gain came to your attention. My question is different. My question is whether anybody from the committee, or anyplace else, came to you during September 2008 and asked you whether you had any explanation for how Barclays was announcing what has been referred to repeatedly as this one day or immediate gain on acquisition.
A. I don't remember any specific conversation where that was a material issue.
Q. Well, I'm not asking whether it was a material issue or not, sir. I'm asking whether there was any conversation at all, whether you thought it was a material issue or not.
A. Mr. Boise, I am sure that whether it was at the October 8th committee meeting or during conversations in the hallway around the closing that there was, hey, look, Barclays is booking a gain. I'm sure that there was -- I knew about it. I read it. It was discussed with committee members from time to time. I'm -- then you're going to ask me what date. I don't know of any particular date. It wasn't an important issue in what I was doing.

**Q. When you say it was discussed among committee members, do you mean discussed among committee members in September of 2008?**

**A. I don't have a specific recollection of exactly when or where this particular press release of Barclays' accounting treatment was discussed. I remember getting e-mails from people forwarding it to me. I remember reading it. I am sure it came up in conversations about, wow, we need to go look at this and get a reconciliation. It just wasn't something important that I recollect specifically trying to figure out how Barclays was dealing with their accounting or particular conversations with people about this press release.**

**Q. When was the first time that you can tell us as the committee's 30(b)(6) witness that anybody in the committee said we need to look at this gain and figure it out?**

**A. There were many conversations in which we said we need to look into whether or not Barclays got a gain. Never was this press release something that was divorced from that process. There was no connection in my mind or anyone else's on Houlihan's side that this gain was specific -- that the accounting gain directly correlated to an economic gain.**

**So you're asking me the first time. I don't want to say there never was or no, 'cause we talked about it. Hey, did Barclays get a gain? Wait, we have to reconcile. We pushed -- wow, we did all that stuff. So later you can come back and I'm**

worried you're going to say, well, wasn't that part of the accounting gain. On the other hand, was there a specific I need an explanation of this press release and this accounting gain? That was never an important issue.

Q. My question, sir, was when. I understand you've testified these conversations happened. My question is when did they happen. When was the first time that anyone from the committee said, in words or in substance, Barclays has announced a two billion dollar after tax accounting gain. We ought to figure out what the basis of that gain is. When did somebody say that, in words or in substance, for the first time?

A. As I said to you, I don't have a specific recollection of the first time.

Q. Approximately?

A. I received this press release from a number of sources and wouldn't be surprised if someone said look into this. I don't have a specific recollection. And I'm not going to make it up to you.

Q. No one's asking you to make up testimony, sir. What I am asking you as the committee's 30(b)(6) witness --

A. I think I'm Houlihan's 30(b)(6) witness.

Q. What?

A. I think I'm Houlihan's witness not the committee's.

Q. Okay. Houlihan is the professionals for the committee, right?

A. A professional for the committee, yes.
Q. And as Houlihan's 30(b)(6) witness, when was the first time -- and if you don't remember specifically, just tell me approximately when the first time was that, to Houlihan's knowledge, anybody from the committee or representing the committee said, in words or in substance, there's this two billion dollar gain that Barclays is announcing. We ought to figure out what the basis of that announcement is.
A. I don't remember.
Q. Approximately?
A. I don't remember.
Q. Was it in 2008?
A. I don't remember.
Q. Was it before June of 2009?
A. I don't remember.
Q. Now, you said that there were discussions about whether Barclays had what you referred to as an economic gain. Recall that?
A. I do.
Q. First, what did you mean by an "economic gain"?
A. As compared to an accounting gain. In a distinction to an accounting gain.
Q. And, sir, what is that distinction?
A. Whether you actually make money. Whether it is something that is real as opposed to bookkeeping.

Q. And when did the committee, insofar as anyone at Houlihan knows, first attempt to determine whether Barclays had what you referred to as an economic gain?

A. On the first second we got involved in the Barclays sale.

Q. Excuse me?

A. On the first second we got retained.

Q. That is, before the closing of this transaction, correct?

A. Yes, sir.

Q. And at the time the transaction closed, had you given any advice to the committee as to whether or not, in your opinion, Barclays would or would not have what you referred to as an economic gain?

A. I did.

Q. And by economic gain, are you taking into account all of the assets that Barclays was getting in this transaction or only what you have referred to as the broker/dealer trading assets?

A. When I gave that advice, I was referring to all of the assets being purchased by Barclays.

Q. Okay. And when did you tell the committee your opinion as to whether or not Barclays was going to get an economic gain from this transaction?

A. Trying to remember if it was -- the first time was Thursday, Friday or Sunday. I could tell you that it was a given that the broker/dealer business, the 250 million dollars

**for the broker/dealer, was viewed by all of us as being incredibly and inexpensively huge gain for that going concern engine. So that was a premise of the deal from the start. So whenever we described the transaction or had discussions with people, we probably said, wow, Barclays is making out like bandits on the broker/dealer business. I don't have a specific recollection of a particular date but it wouldn't surprise me if, in my pitch to the committee on Wednesday when we got retained, we said, wow, 250 million for the premier broker/dealer business. So, at all times.**

**Q. So that at all times during your conversations with the committee, to the extent that you would be talking about whether or not Barclays was going to have an economic gain, you would have been telling the committee that, in your opinion, Barclays was going to have an economic gain, correct?**

**A. Yes.**

**Q. Now, did there ever come a time when anyone at the committee asked you for any estimate or approximation of how much an economic gain Barclays was certain to achieve on this transaction?**

**A. No, with an explanation.**

THE COURT: I think that means that the witness would like to give an explanation. Mr. Burian, why don't you complete your answer?

MR. BOIES: Yes.

A. With respect to whether we thought Barclays was making the most money in the broker/dealer, there was really no way for us to estimate and the committee did not ask for an estimate. When we raised concerns about the trading assets on the Sunday call, we were asked whether we could estimate if, in fact, there was a gain. And that's when I think I testified yesterday that we were very frustrated that we could not provide one because of the number of privates in the transaction and confusion about which assets were going or not going. So the committee asked if we had an estimate with respect to a portion of it but not with respect to other portions.

Q. Let me be sure I understand what you're saying. It was a given, it is your testimony, that Barclays was going to have an economic gain from the transaction, correct? And "the transaction" means the entire purchased transaction.

A. Yes. We assumed from the start that Barclays was going to make money. They were picking up assets in the broker/dealer business inexpensively.

Q. Okay. Now, you've also distinguished what you referred to as the trading assets which were a part of, but only a part of, the total transaction, correct?

A. Correct.

Q. And do I understand that you were asked at some point whether Barclays was going to have a gain just on the trading

assets?
A. Correct.
Q. And just to be clear, when we talk about the trading assets, we're talking about the trading assets and the trading liabilities, correct?
A. Correct.
Q. And is that something that you have sometimes referred to in your testimony as the broker/dealer book?
A. Correct.
Q. Okay. And I'll try to use that language. Did there come a time when the committee asked you whether, in your opinion, Barclays was going to have an economic gain on the acquisition of what you refer to as the broker/dealer book, just those trading assets and liabilities?
A. Oh. In that case, the answer -- when we were talking about the trading book and the balancing as ascribed in the balance sheet and yesterday, we were including the comp and cure as part of liabilities. If you're now narrowly defining the trading assets as merely the broker/dealer book and then the repo transaction that was secured by those assets, then the answer is yes, we always assumed that there would be a gain for Barclays. And we told the committee that there'd be a gain. What balanced it out was the fact that there were the other four and a quarter billion of assumed liabilities. That was always presented to us as a package. The way you're describing

it, I now see you're excluding that, so I apologize.

Q. Okay. I think I understand --

A. If you don't, ask me again.

Q. -- what you're saying. But let me just be sure the record's clear. The --

(Pause)

Q. The transaction as a whole is one thing. The trading assets and liabilities is another. And comp and cure is another component. Is that right?

A. We -- in my testimony yesterday and earlier before I finally understood your distinction, I was focusing on comp and cure as part of the trading assets --

Q. Okay. Then I'll leave it --

A. -- which is why I corrected my answer. Which is why I corrected my answer. You asked me --

Q. I'm happy to have -- excuse me. I'm happy to have how ever you use the term. I just want to get how you used the term. When you were using the term "the broker/dealer book" or "the broker/dealer trading assets", am I understanding you that you were including the trading assets, the trading liabilities, plus comp and cure.

A. I don't remember which question we're referring to anymore, but the answer is we expected a gain if you're only including the repo liabilities against the trading assets. If you were including comp and cure, we're expecting that Barclays

would actually be even or lose a little money.

Q. And by trading assets, are you referring to the repo assets?

A. If we're talking about Sunday evening, then we're talking about the repo assets and the box. If you're talking about Wednesday, Thursday and Friday until someone told me about the repo -- the box, then we're talking about -- I didn't know there was a box. So we're not talking about the box.

Q. Sunday evening and Monday morning, when you were talking about trading assets, you were talking about the repo assets plus the clearance box assets, correct?

A. Correct.

Q. And you understood that those were assets that Barclays was acquiring, correct?

A. Correct.

Q. And when you talk about the repo liability, you're talking about the forty-five billion dollars or approximately forty-five billion dollars that Barclays had paid to satisfy Lehman's repo loan, correct?

A. No, with an explanation.

Q. How much was the repo liability as you understand it, too?

A. We were told it was 45.5 billion --

Q. Okay.

A. -- not forty-five billion.

Q. Okay. 45.5. That's why I said approximately.

A. 500 million off.

Q. So you believed the repo liability was 45.5 billion dollars, correct?

A. That is what I was told and what I believed.

Q. And you believed that the trading assets that Barclays was acquiring including both the Lehman securities that were the repo securities plus the clearance box assets totaled how much?

A. I think it was roughly forty-five billion of repo assets and 1.9 billion of clearance box. Those numbers refer to book value in a manner in which a broker/dealer would ordinarily mark their books.

Q. Now when you say "those numbers", you represent what you say is the book value the way a broker/dealer would normally mark their books, are you referring to the forty-five billion dollars, the 1.9 billion dollars or both?

A. Both.

Q. Both. Now, who told you that the forty-five billion dollar valuation represented book value as a broker/dealer would ordinarily mark their books?

A. I have no specific recollection of anyone using those exact words.

Q. Now, Sunday night and Monday morning -- you believed that if you simply looked at the trading assets that Barclays was acquiring, the repo assets plus the clearance box assets, and compared it to the repo liabilities, Barclays was going to book

a gain, correct?
A. Correct.
Q. You believed that if you then factored in the comp and cure obligations that Barclays was assuming, Barclays would have, just taking those aspects of the transaction, have a loss, correct?
A. No.
Q. Did you believe Sunday night and Monday morning that the amount of comp and cure that Barclays was taking on was going to be more than the difference between what you have described as the trading assets and the trading liabilities.
A. As I said earlier, Mr. Boies, I thought the comp number was a firm number. And these 45.5 plus roughly one billion is 46.5. The asset side was 45 plus 1.9 which is roughly almost 47. I didn't have, at that time, a firm number in my head for the cure. I knew I had a debtor estimate of -- Ms. Fife said at the hearing. But I can tell you that I sat in that room and said that Barclays is going to book a loss. What I said was that depending on -- what I said was that I was told that the transaction was worse for Barclays than what was ascribed to the Court.
Q. My question may not have been clear although I think it was. I was asking what you believed not what you were told.
A. What I believed -- is what I answered the question -- I did not have a firm belief as to the amount of the cure. And

therefore, I did not have a firm belief that Barclays was going to lose money. If the cure was more than half a billion dollars, you would lose money on those elements. If it was less than half a billion dollars, you would have a little bit of a profit on that side. I expected cure to be higher but I didn't have a firm belief. I didn't walk out of that room saying you're going to have a loss.

Q. Okay. I just want to be sure I've got the arithmetic right. The trading assets including both the value of the repo securities Barclays was acquiring and the value of the clearance box assets Barclays was acquiring was approximately, according to you, forty-seven billion dollars, correct?

A. Correct.

Q. Now, the repo liability, according to you, was 45.5 billion dollars, correct?

A. Again, based on what my belief was?

Q. Yes.

A. Not according to me. I was just -- knew what I was talking --

Q. Yes. What you believed.

A. I believed it was 45.5.

Q. And you believed that the comp number was a firm number at two billion dollars, correct.

A. That's a good point. Two -- I may be getting confused, but yes. I -- whatever the comp number, I felt was a firm

number. And you're right. It's two billion not one.
Q. Okay. So the repo liability, 45.5, plus two billion dollars is 47.5, correct?
A. Correct.
Q. And 47.5 is obviously more than what you thought the trading assets were including both repo assets and the clearance box assets, correct?
A. Correct.
Q. So even if Barclays paid nothing in comp --
A. In cure.
Q. In cure, excuse me. Even if Barclays paid nothing in cure, was it your belief that Barclays -- just looking at trading assets, trading liabilities, comp and cure, that Barclays was going to have a loss on the transaction?
A. Yes. Thank you for correcting my arithmetic. I forgot that the comp was two billion not one billion.
Q. Okay. If you look at the entire transaction, though, it was your understanding that Barclays was going to have an economic gain on the transaction, correct?
A. Correct.
Q. So just to move from the specific to the general, if you simply look at trading assets and trading liabilities without anything else, Barclays was going to have a gain. If you looked at trading assets, trading liabilities plus comp and cure, Barclays was going to have a loss. If you looked at the

entire transaction, all of the assets and liabilities involved in the transaction, Barclays was going to have an economic gain. Is that fair?

A. Yes.

Q. Okay. And that's what you understood at the time of the transaction, is that correct?

A. Yes.

Q. And insofar as you believed at the time, is that what the committee understood?

A. Yes.

Q. Okay. Recognizing that the cure number had some discretion in it, was there ever any effort made by you or, insofar as you were aware, the committee to estimate how much of a loss you believed Barclays was going to have if you looked at only trading assets, trading liabilities, comp and cure?

A. Other than to seek their conciliation to see what exactly was transferred and therefore add it up, I mean, if that's what you're referring to, yes. If you're asking for something other than that then no.

Q. Did you ever do anything prior to the closing to try to figure out what you thought the net result of just trading assets, trading liabilities, comp and cure were going to be?

A. I testified yesterday about our efforts on Thursday, Friday, Saturday and Sunday to get to the bottom of the transaction, sir. And that's what we did.

Q. Other than the conversations that you say you had with Mr. Klein early in the morning of September 22nd for eighteen minutes --

A. I didn't say eighteen minutes. I said --

Q. Approximately eighteen minutes.

A. -- say, between seven and eighteen minutes, you know, twenty minutes. Eighteen minutes is an estimate. I'm sorry if it's become an issue.

Q. Okay. Seventeen to twenty minutes, is that what you're saying?

A. There we go.

Q. What?

A. I don't have a specific recollection. I think my first utterance was, you know, five to eighteen minutes and you made a big deal of eighteen minutes.

Q. Oh, five to eighteen minutes.

A. So I backed into it and said maybe ten or twenty. I don't have a specific recollection. It was long enough to have the exchange with Mike Fazio to ask a question that gets shot down by Harvey. I described the substance of the conversation in some quotes. I haven't timed how long that would take. I don't remember exactly how long it took.

Q. I think I simply may have misheard your original answer. When I asked you how long it was, did you say five to eighteen minutes?

A. My first guess was five to eighteen minutes.
Q. Okay. Other than this conversation of five to eighteen minutes --
A. Five seems low now.
Q. Say again?
A. I said five seems low now when I recollect how much was said. I don't --
Q. Okay.
A. I don't have a firm recollection. I'm not going to make it up.
Q. Okay. Other than this one conversation --
A. There you go.
Q. -- with Mr. Klein the morning of September 22nd, did you have any other conversations with any Barclays representatives prior to closing?
A. Nothing specific that I can recall. I'm sure I saw them in the hallways and getting popcorn in the kitchen. I just don't -- nothing substantive.
Q. Let me ask you to look at a document that is behind tab 20. It is Barclays' Exhibit 285. Is this a document you've ever seen before?
(Pause)
A. Am I copied, Mr. Boise?
Q. I don't see you as being copied.
A. Mr. Boies, I don't have a specific recollection. I

remember your colleague showing me e-mails at or around the closing forwarding to me the press release. But I can't tell you I recognize if this is the particular one.

Q. The top e-mail is an e-mail from Edward Gilbert on Sunday, September 21st at 3 p.m. Do you see that?

A. I do.

Q. Do you know who Edward Gilbert is?

A. Yes.

Q. Who is he?

A. He was the committee representative from Shinsei Bank. He was one of the committee members.

Q. And he sends this to a number of people. Are any of the people who he sends it to also committee members?

A. Actually -- David Schamis, Christopher Flowers, Mitten Baj Jacob (ph.), Jay Jorro (ph.), Sally Walker. I don't recognize those names, sir. Could be but I don't recognize those names.

Q. Okay.

A. You recognize, sir, that committee membership is by institution not by individual. So sometimes there'll be a meeting and someone else will show up as an institution announcing or not announcing themselves. So just 'cause I don't recognize the name doesn't mean they're not a committee member. But I don't -- sitting here, I don't recognize these names.

Q. Now, the original message earlier in the day was from a

Jacob Goldfield. Do you see that?
A. I do.
Q. Do you know who he is?
A. I do not.
Q. And the message that goes to Mr. Gilbert and others from Jacob Goldfield is referencing the Barclays investor call that we've marked as Exhibit 110. Do you recognize that?
A. I see that, sir.
Q. And it says, after referencing it, where they describe "how great the Lehman buy is". Do you see that?
A. Yes.
Q. And Mr. Gilbert writes back, "Thanks, Jacob. We will make sure this information is considered in the Lehman proceeding." Do you see that?
A. Yes.
Q. Did the committee insofar as you are aware, ever make sure this information was considered in the Lehman proceeding?
A. Depends what you mean by Lehman proceeding. Yes. We considered in connection with our analysis of the transaction.
Q. Was this information information that, insofar as you were aware of, the committee ever brought to the attention of the Court?
A. Before the closing?
Q. Let's begin with before the closing.
A. No. There were no hearings before the Court between 3

p.m. on Sunday and the closing, sir.

Q. Was this information that the committee ever brought to the attention of the Court after the closing?

A. I'm not familiar with all the filings in connection with this case. So I don't know if it was something that was filed somewhere by -- I have no specific recollection of --

Q. Insofar as you are aware, is this something that the committee ever brought to the attention of the Court at any time in 2008?

A. Mr. Boies, I just don't recall if this is mentioned in our objection to the December settlement. I know it was mentioned somewhere in the complaint, in the 60(b) complaint. I just don't know exactly, sir. I don't recall exactly.

Q. The 60(b) complaint was filed months after the end of 2008, correct?

A. Correct.

Q. Other than possibly mentioning it, and we can check the record, in the December 2008 objection, was this information about the Barclays gain and the statements in the press conference or analyst meeting ever brought to the attention of the Court by the committee insofar as you know.

A. Insofar as I know, the committee in 2008 did not bring to the Court the accounting gain announced by Barclays.

Q. Or anything else that was said in the press release -- or analyst meeting, is that correct?

A. I have to go now and read the whole analyst meeting. But I have no recollection of using -- of that analyst meeting being used in a court proceeding in 2008.

Q. Okay. Insofar as you were aware, was there ever any discussion within Houlihan or with members of the committee about whether the fact that Barclays had announced an accounting gain should be brought to the attention of the Court? That's a yes or no question and you can have an explanation afterwards.

A. Yes with an explanation.

Q. Okay. What's the explanation?

A. We had conversations internally about the reconciliation, the investigation, whether we'd have to sue Barclays. And obviously, the accounting gain was mentioned in that context. We never specifically, as in we need to bring the accounting gain, individually, to the Court's attention. So I'm trying to be over-inclusive, but again, as I said before, this was not viewed as a highly material event that warranted a specific consideration.

Q. When did you first have internal conversations about whether you would have to sue Barclays?

A. Well --

Q. When was the first such time?

A. The first time that it probably ever came up was my memo to the committee Monday morning after the closing when we told

the committee, this is the deals we were represented. And if it is the deal, great; if it's not the deal, Barclays will be hearing from us or from LBI. I guess you can consider that contemplating a suit against Barclays. If you're asking the first time we seriously discussed the need to go actually sue Barclays because we were convinced or concerned that this was really a problem, I'd have to get to the December/January time frame, sir.

Q. Now, in that last answer, you used two words, "convinced" or "concerned". And -- because those might often have different meanings, I'd like to split it up. When did you first become concerned that you might have to sue Barclays, that the committee might have to sue Barclays?

(Pause)

A. Now we're really going to parse words. Obviously, my memo to the committee contemplated that if we're misrepresented to, we may have to pursue a remedy. When I first became concerned that we'd actually have to sue Barclays was following the conference calls with Cleary after the judge's direction to help us get our reconciliation.

Q. Now, when you refer to your memo, you're referring to your September 22 memo to the committee, is that correct?

A. Yeah. The Monday morning memo after the closing.

Q. Now -- and when you refer to the conference calls with Cleary, those were conference calls that took place in December

of 2008 or January of 2009, correct?

A. I'm pretty sure it happened after the new year, in January or February.

Q. Okay. So between your memo on September 22 and January/February of the following year, were there any internal discussions within Houlihan or within the committee that you were aware of about possibly having to sue Barclays?

A. Yes.

Q. When were the first such discussions?

A. I don't have a specific recollection. When Brad -- you want me to help you?

Q. Approximately.

A. I'm trying to --

Q. No. What I want you to do is answer my question. And if you don't remember specifically, I want you to tell me approximately when were those discussions.

A. You know, it's hard to pin it down exactly. I will tell you that in late September or early October certainly after the committee meeting with Alvarez and I being -- we being asked to brief Milbank on all the issues, people in my firm would come to my office and say, you know, do you think we're going to have to sue someone. What's your understanding of what's going on? Are we going to get the reconciliation? And loose talk. I know in my presence when we briefed Milbank -- no. The idea was either there's a logical explanation or we'll get a

reconciliation. Or I can do something about it. I don't remember if the word "law suit: or "sue" was used.

But the backdrop, Mr. Boies, to all the conversations about the reconciliation was if things weren't as they appeared and Barclays took more than they were entitled to, someone would have to do something about it. And, by the way, if you're talking about the committee suing Barclays, that probably was never really discussed. We always thought the debtor would be the plaintiff. I thought the debtor would be the one -- Alvarez & Marsal would do it, not us. So I just want to make sure I'm not missing a nuance in your question.

Q. My question right now is when, as near as you can tell us, were the internal discussions about the possibility of having to sue Barclays. When was the first time after your May (sic) 22 memo?

A. September 22.

Q. Yes. I apologize. When was the first time after your September 22, 2008 memo that there were internal discussions about having to sue Barclays. I understand that you don't remember exactly. What I'm asking you to do is to give the Court your best approximation of when those first internal discussions took place.

A. Whenever we talked about aggressively pursuing a reconciliation. The contemplation that a suit against Barclays was possible was either explicit or implicitly stated. So that

would be in the September/October/November time frame, September/October time frame.

Q. Now, you talked about briefing Milbank. When did you brief Milbank about the possibility of having to sue Barclays.

A. Okay. It's not exactly what I said. The brief was not about the possibility of suing Barclays. What I testified and what happened was that after -- Milbank was more or less up to speed but not really focused on the economics of the transaction. But after the October 8th committee meeting, we were specifically asked to make sure that Milbank understood exactly what the concerns were so they could be more effective in going to Weil Gotshal to press for the reconciliation. So in that time frame, we were briefing Milbank to get a reconciliation. And obviously, the context of that is if the reconciliation came out wrong, it didn't reconcile, it would have to be a law suit. I just don't -- you're turning my words a little bit by saying we briefed them to sue as opposed to we briefed them to be knowledgeable and aggressive in getting a reconciliation.

Q. I think my question was about the possibility of suing them. But my question is when. When did this briefing of Milbank take place?

A. And again, if you define the possibility of a suit to include briefing someone to aggressively pursue a reconciliation, it would be in the October 8th to October

15th -- no. That -- that time period shortly after October 8th when we pushed again to get that reconciliation.

Q. Now, in a prior answer, you talked about Barclays taking more than they were entitled to. Do you recall that?

A. I do, sir.

Q. You were aware from your reading of the APA and the clarification letter that there was no specification in either of those documents as to the valuation of the assets that Barclays was acquiring and the liabilities that it was assuming, correct?

A. No.

Q. You were not aware of that?

A. I was not.

Q. What, as you understood it, was the valuation of the assets that Barclays was acquiring that was in the APA and the clarification letter?

A. I don't have it in front of me, Mr. Boies. But I believe that the asset purchase agreement said that you were -- that Barclays was buying seventy-two billion book value assets and assuming sixty-eight billion of liabilities.

Q. And, sir, those provisions were explicitly taken out by the clarification letter, correct?

A. They were explicitly taken out by the clarification letter. They were modified to reflect the assets that actually were supposed to be transferred. But -- are you asking me a

legal question or a factual question? I'm not sure.

Q. I'm asking you a factual question, sir. You read the clarification letter, right?

A. I did.

Q. And did the clarification letter, according to your reading, excise, take out, nullify the provision that you've just identified about seventy-two and sixty-eight billion dollars of book value assets and liabilities?

A. I have no recollection of whether the clarification letter removed it and removed it in a manner of valuation. I do have a very firm recollection that the clarification -- I guess that will be clarified which assets were being transferred. But I don't have any recollection of it modifying the valuation accounting.

Q. Well, let's look at the clarification letter. That's Exhibit 5. And I've got it up on the screen. And let me go to the portion where it addresses what had been in the -- prior APA. And in the APA -- and let me go -- that's Exhibit 1.

(Pause)

Q. Section (d), 1(d), talked about the purchased assets being government securities, Commercial Paper, corporate debt, corporate equity, exchange-traded derivatives and collateral short term agreements with a book value as of the date hereof of approximately seventy billion dollars (collectively, "the long position"). You see that?

**A. I do.**

MR. BOIES: Give me a copy of it.

**Q. Now, you understood that that --**

MR. BOIES: Clarification letter.

**Q. You understood that that provision had changed in the clarification letter, correct, sir?**

**A. You were pointing it out to me. I didn't have -- what period of time are we talking about?**

**Q. What period of time are we talking about?**

**A. Sunday? Monday? Now?**

**Q. The clarification letter. The final clarification letter. The clarification letter that was signed, filed with the court, given to you, that final clarification letter. You understood that that took out the seventy billion dollar figure, correct?**

**A. As of when, sir? When are you asking me did I understand whether that was true?**

**Q. Oh. Well, you said you read the clarification either on Monday or Tuesday, the 22nd or 23rd of September of 2008, correct?**

**A. Which is why I asked you whether or not this is before or after the closing. If you're asking me did I understand the clarification letter modified this provision, the answer is yes, in the time frame after the closing.**

**Q. Okay. Let me just ask you did you read the draft clarification letter before the closing?**

A. I believe I did.
Q. And in the drafts that you read before the closing, did those drafts change paragraph 1(d)?
A. I don't specifically recall.
Q. You left Weil Gotshal somewhere, what, around 5 in the morning on Monday?
A. It may have been a little earlier, sir. I think I said somewhere between 3 and 5. I'm not sure.
Q. Okay. At the time that you left, the draft of the clarification letter that existed, did that draft include the seventy billion dollar figure?
A. I don't know. When I left, there were still negotiations and discussions. I didn't have a -- I still didn't have a clarification letter that was in final form.
Q. No, no, no. I'm talking about the draft that existed when you left. The draft that existed when you left, did that draft refer to the seventy billion dollar figure?
A. Mr. Boies, as I said to you earlier, we were not part of the discussions. I had a draft either from Saturday night or Sunday. If you're asking me whether some draft that I happened to have on Saturday night or Sunday in its text said seventy billion, of course not. If you're asking me whether it defined "purchased assets", probably it did. If you're asking me what my understanding was, whether I understood that that clarification draft in my hand was radically changing the

**methodology of the valuation of assets, the answer is no. Now, you can point out and tell me the document said what it said or didn't say what it said. But I'm telling you what I knew and what I understood at the time.**

**Q. My question's a little different, sir. In the asset purchase agreement, there is a valuation of certain assets, correct?**

**A. There's a reference to a valuation methodology, yes.**

**Q. There's a reference to a valuation methodology. And the valuation methodology that you're referring to there is the reference to what is called book value, correct?**

**A. Correct.**

**Q. Okay. Now, was there, in the clarification letter or any draft of the clarification letter that you ever saw, any reference to book value?**

**A. I don't recall about any draft I ever saw. I believe that the final version I received on Monday does not have a reference to book value.**

**Q. Okay. Now, let me try to walk you through this. This is Exhibit -- this is the APA exhibit, Exhibit 1. And 1(d) is what refers to government securities, the long position with "the book value as of the date hereof, approximately seventy billion dollars". You see that?**

**A. I do, sir.**

**Q. Now, if you look at the clarification letter, the list of**

purchased assets, 1(a)(i) says "The items set forth in clauses (b), (c), (f) through (o) and (q) through (s)". Do you see that?

A. You're referring to the second 1(a)(i), I assume, not the first 1(a)(i).

Q. Do you see where it says "The items set forth in clauses" --

A. Yes.

Q. Okay.

A. The second 1(a) -- the second 1(a)(i).

Q. And that omits 1(d), correct, sir?

A. "The 'purchased assets means all the assets...and none of the assets associated with LBHI other than the assets of LBI...otherwise specifically provided in the agreement or this letter. Purchased assets shall include items set forth in clauses (b), (c), (f)...(o) and (q) through (s).'" The other paragraph was (d), correct?

Q. Yes, sir.

A. So that's -- why are you showing me 1(a)(i) instead of 1(a)(ii)?

Q. Well, I'm showing it to you to make clear that, first, the definition of "Purchased Assets" skipped 1(d); and, second, explicitly 1(d) was substituted by something else. In other words, in two separate parts of this clarification letter, it made clear that 1(d), the reference to book value and seventy

billion dollars and any valuation of the assets, was taken out. And I'm asking whether you understood that at the time that you read the drafts that did that and the final clarification letter that did that. Did you understand that, sir?

A. Mr. Boies, if you think this clarification letter was clear of any of the things you just said then you're a better reader than I am. I read this paragraph and it says -- there's so many exclusions and inclusions. For instance, "except as otherwise specifically provided in the Agreement", which maybe you can tell me refers to the APA, and then it says or in "this Letter". And then it says "Purchased Assets shall include". Then you go down in (ii), the repo transactions and such stuff in securities, clearance boxes. I will grant you there's no reference to seventy billion book value which would have made no sense. If you're trying to imply that I understood what these words meant and all the complicated writing just by quickly reading this, I did not have a firm understanding of what these changes were.

Q. Did you ever tell anybody prior to closing that you didn't understand what the clarification letter was doing?

A. As I testified yesterday, somewhere between 3 in the morning, or whatever, I got more and more agitated and demanded to know what was going on. What are the changes? Why are they being made and what's the impact on the Lehman estates?

Q. My question's a little different, sir. You had a copy of

the clarification letter. There was a -- in fact, there was a call with the committee, including Houlihan and Milbank Tweed where somebody walked through the clarification letter Sunday night, correct?

A. We discussed the content of the draft we had. I'm not sure we walked -- we didn't -- I don't believe we walked through line by line or paragraph by paragraph.

Q. Prior to this call with the committee, you'd read the clarification letter, correct?

A. I believe I read most of it.

Q. Did you tell the committee on this call that you didn't understand what assets were in and what assets were out under the clarification letter?

A. Yes.

Q. Did you walk the committee through what your best understanding was of the clarification letter at that time?

A. We walked them through what we believed were the three most significant issues impacting the committee arising from the full panoply of circumstances between Saturday and Sunday. The three major and material issues were then summarized in my memo to the committee.

Q. Let me ask you to look at your deposition that is -- this is your second day of deposition. I'm not sure that was in what your counsel what your counsel handed you.

MR. KIRPALANI: It is.

MR. BOIES: It is?

MR. KIRPALANI: It is at the back after the --

MR. BOIES: At the back.

**Q. Sir, at the back, if you look at -- from the back, you'll find -- there's a blue divider of what your counsel gave you. And that blue divider separates your first and second day of deposition. And I'd like you to go to your second day of deposition, page 21, lines 2 through 6.**

**A. There's a blue divider?**

**(Pause)**

**A. I think I'm there, page 21.**

**Q. Okay. And you're being asked about this call.**

**"Q. At the time of the call, had you reviewed a draft clarification letter?**

**"A. I believe we did. I believe that on the call, somebody walked through our best understanding of it at the time."**

**Do you see that, sir?**

**A. I do.**

**Q. And you gave that testimony at the time, did you?**

**A. I did.**

**Q. And it was truthful and accurate at the time you gave it?**

**A. And remains true and accurate.**

**Q. At the time of this call, when somebody walked through your best understanding of the clarification letter at the time, did you understand that there was no valuation of any**

assets contained in the clarification letter?

A. No. I don't believe that came up.

Q. Whether or not it came up in the call, did you understand that that was true?

A. No.

Q. Do you understand today, as you sit here, that in the clarification letter there is no valuation of any of the assets that are being acquired?

A. I could read it through again, sir. I do not -- I don't believe there's a number in the clarification letter that refers to the repo purchased assets or something.

Q. Did you ever suggest to anyone that the clarification letter should include a valuation methodology?

A. I'm sorry for laughing. Just the idea of me suggesting changes to the letter that night is humorous. No. I did not make that suggestion.

Q. And, sir, I take it, it would be true that you never suggested that the clarification letter include a provision that provided a valuation or estimated valuation for any of the assets that were being acquired, correct?

A. Mr. Boies, that night I made no specific recommendations of modifications to the clarification letter.

Q. Did you, without recommending a specific valuation, did you generally recommend that the clarification letter should include some valuation or some valuation methodology for the

assets that were being acquired?

A. I think I answered that already.

Q. And the answer to that is no?

A. I said that night I do not recollect making any specific suggestions of modifications to the clarification letter.

Q. And I want to be sure that there's not some misunderstanding with respect to your use of the word "specific", sir.

A. Okay.

Q. And so, what I'm asking is whether you consider it specific or general, did you make any suggestions or recommendations that the clarification letter should include some valuation, some valuation methodology, whether or not it was a specific number that you had in mind or not.

A. I did not.

Q. Okay. Insofar as you were aware, prior to closing, was there any discussion among anybody as to whether the clarification letter should or should not include any valuation of the assets being acquired or any valuation methodology?

A. I'm not aware of those discussions.

Q. Okay. Let me direct your attention to Movants' Exhibit 709, which is -- it's in my book, tab 34. It's in your counsel's book as well. This is a document that your counsel spent some time with you on yesterday.

A. I recognize the document, sir.

**Q. And if you go to the Houlihan memo that is attached dated October 10, 2008, that says "LBI sale value of assets transferred to Barclays". Do you see that?**

**A. I'll -- Mr. Boies --**

**Q. Yes?**

**A. -- just to make this go quicker, this is not a Houlihan memo. This is an insert to a Milbank memo. Most of this text -- I believe that a lot of this text came from Milbank and Mr. Geer only started writing from the components of value as an insert to walk Milbank through the issue. But I can't be sure. I don't know -- see the footer, Mr. Boies? NY1?**

**Q. Yes.**

**A. That's not a Houlihan footer.**

MR. BOIES: Incidentally, Your Honor, I think last night, counsel produced to us a unredacted version of the first page of 709.

THE COURT: Are we going to substitute pages?

MR. BOIES: And if we could substitute pages.

**Q. Now, this document is marked as Barclays' Exhibit 813B. But I believe it is exactly the same as Movants' Exhibit 709 except that the redacted portion on the first page has been unredacted so that you can see that it is a -- an e-mail from Clayton Bell. And he's at Milbank, correct, sir?**

**A. Yes, sir.**

**Q. -- to Michael Fazio and Brad Greer (sic). And they're**

both at Houlihan, correct?
A. Correct.
Q. -- dated Friday, October 10th, 2008 at 9:14 a.m. And it says "Here are some bullet points. Please add what detail you can and send back to me. I will forward to Luc" --
Q. And that's Luc Despins, correct?
A. You're asking me?
Q. Yes.
A. Yeah. I think so, yeah.
Q. -- "with the transcript." And then Brad Greer (sic) writes back: "I made some additions. Michael may have some additional thoughts. I've also attached a summary version of Schedule A.
Q. Do you see that?
A. I do.
Q. Now, as the Houlihan 30(b)(6) witness, I now want you to focus on the attachment that is headed "LBI Sale Value of Assets Transferred to Barclays." And is it your understanding that this is a memorandum originally prepared by Milbank Tweed to which Houlihan made some additions?
A. Mr. Boies, it is exactly what it is referred to. It's a set of bullet points trying to brief Luc as to what the issues are. If that's a memorandum to you, fine, it's a bunch of bullet points on a page.
Q. If you're uncomfortable with the word memorandum for some

**reason, is document sufficient?**

**A. Yes, sir.**

**Q. Okay. We'll use document. Is this document a document that was prepared by Milbank Tweed to which Houlihan made some additions?**

**A. Correct.**

**Q. And this is dated October 10, 2008, correct?**

**A. Yes.**

**Q. Now, let me go down to the bottom of the first page, where it says the last sentence -- last two sentences, "A majority of the value transferred to Barclays is contained on Schedule A, a summary of which is attached." And that summary is the previous page, correct?**

**A. Yeah. Yes, sir.**

**Q. And the document then goes on to say that Summary A at face value shows approximately forty-three billion dollars of value based on the marks in the Lehman system at the time of the transaction, do you see that?**

**A. I do.**

**Q. And was it your understanding that the marks on the repo securities of forty-three billion dollars, as shown on this document, represented the marks for those securities in the Lehman system at the time of the transaction?**

**A. No, with an explanation.**

MR. BOIES: Your Honor, may I inquire whether the

Court would like to hear the explanation now, or if counsel for the witness is able to do it on redirect. I'm happy to have him do it. In view of the time constraints I'm trying to go through what I need to cover, whichever way the Court would like to do it, I want to do it.

THE COURT: I want to do it the most efficient way. It's probably most efficient for him to explain now while it's fresh, it's also on the screen, and we're thinking about it together.

But I have a broader question of how we manage the morning. Are you able to estimate at this juncture with reasonable accuracy about how much longer you think you'll be on your cross-examination of Mr. Burian?

MR. BOIES: Your Honor, I think it would probably take me about thirty to forty minutes, excluding explanation time.

THE COURT: Well, in that case it's about an hour. I'm just thinking about whether or not it makes sense after Mr. Burian's explanation for us to take our morning break, and then proceed with the remainder of your cross-examination, and then any further examination. And I'm just guessing that's going to get us to lunch.

So, Mr. Burian, we await your explanation before our break.

THE WITNESS: Thank you, Your Honor.

**A. I think what Mr. Geer is referring to is the best marks we**

**had at the time. It's a presumption by him since Jim Seery had promised to give us updates. And because people had said we'd get updates and we never got them, that this is all they had in their system at the time of the transaction. But that's a leap of faith in building the case that it looks like Barclays got a lot more than we thought. It is not what we actually thought at the time, or suspected at the time, nor do we even know if that is true. And the Mr. Klein meeting was at premark and postmark, we didn't know if on Friday the Lehman books were updated, or in light of the tumult going on if that was done less formally and, therefore, the system was updated or not. So that's my explanation, Your Honor.**

THE COURT: Before we take a break, do you want to follow-up on any of that explanation?

MR. BOIES: I can do it after the break, Your Honor.

THE COURT: Fine. We'll take a break and we'll resume at 11:05.

(Recess from 10:53 a.m. until 11:08 a.m.)

THE COURT: Be seated.

MR. KIRPALANI: Apologies, Your Honor. Mr. Burian is just on his way back from the men's room; there was a long line. And he was hopeful to move in front of it.

THE COURT: Oh. I thought when I was told everybody was ready, I assumed we had a witness.

MR. KIRPALANI: He's literally down the hall, on his

way.

THE COURT: Okay. I'm not going to move then.

(Pause)

THE WITNESS: I apologize, Your Honor.

THE COURT: No problem.

THE WITNESS: I had too much water.

THE COURT: We want you to be comfortable.

THE WITNESS: I'm sorry, Your Honor.

RESUME CROSS-EXAMINATION

BY MR. BOIES:

**Q. Mr. Burian, we've been looking at Barclays' Exhibit 813-B, and I understand that this two-page document at the end is a document that you have testified was prepared by Milbank with from input from Houlihan. But do I take it from what you said you did not participate in its preparation?**

**A. Many -- much of the information is derivative of me, but I did not type this information and send it to Milbank.**

**Q. Did you ever review this document after it was prepared?**

**A. I saw it in my deposition, that's for sure. Before the deposition most likely. Yes, it would be my purview to have reviewed it. I don't have a specific recollection.**

**Q. Would you have reviewed this document at or about the time that it was prepared?**

**A. On October 10th, probably not. Probably a little afterwards.**

Q. But you would have reviewed it sometime within a week or so after its preparation?
A. Mr. Boies, I'm not going to give you an exact time. A lot was going on that first two weeks in October, and I can't tell you when I caught up on my e-mail and when I followed up in reading this document. I do believe -- I have a recollection of reviewing it, but I cannot give you a specific time.
Q. Do you have a recollection of reviewing it, roughly contemporaneously, with it's preparation? That is, sometime in October as opposed to weeks later?
A. I don't have a firm recollection of when exactly I reviewed this particular document.
Q. When you got to the point of December and you're talking about this objection, or limited objection that was filed, had you read this document by then?
A. I don't have a specific recollection of when I read this document.
Q. At anytime after you read this document, did you communicate to either Milbank or anyone at Houlihan that you thought something in the document was wrong?
A. I did not think that anything in the document was materially wrong, so I didn't -- no, I did not.
Q. Going back to the document, the first page, you see at the bottom where it is -- there's a reference to a Schedule A haircut of five billion dollars?

A. I do.

Q. And was it your understanding in or about October of 2008 that there had been a five billion dollar haircut taken from the values of the Schedule A assets that were acquired by Barclays?

A. Let's see it. Not the way you described it, no.

Q. Schedule A was a list of the securities acquired by Barclays, you understood that?

A. Yes, Mr. Boies, Schedule A is in quotations. What I understood was that we had "a draft of schedule A" at some indeterminate date had a Lehman mark of forty-three billion, plus seven billion of cash, is fifty billion. We understood that the transaction closed with a valuation that was roughly five billion less than that. So if you're asking whether Mr. Geer is summarizing what we believed at the time, that the assets were five billion less than reflected on the Schedule A we had received with marks, that is self-evident.

If you're asking me whether or not we believed that Barclays got a five billion haircut off the actual Schedule A assets, that were the ones that were transferred in the transaction at the appropriate valuations for those transactions, the answer is no.

Q. When a reference is made here to Schedule A assets and those are the assets that are summarized on the second page of this exhibit, correct? That add up to forty-two billion

dollars?

A. The "Schedule A" assets refers to the schedule here, which refers to the document we got on Sunday, if you remember my testimony, that had the marks on them, with all the testimony I gave on yesterday about our understanding of what that document was.

Q. You got at the end of September the Schedule A that Weil Gotshal had filed with the Court, correct?

A. Yes, we did.

Q. And you understood at the time that Weil Gotshal was representing to the Court that this Schedule A represented the securities that were being transferred to Barclays, correct?

A. No, with an explanation. As you know from the settlement agreement, as you know from the confusion I knew that that was a Schedule A filed by Weil Gotshal to the Court, and it was purported to be a draft of purportedly mostly correct of what was scheduled. But I also knew with my personal experience that it was highly likely to be materially amended in light of all the loan transfers that were being described.

Q. Did anyone tell you that the schedule A that was going -- that was filed with the Court in September of 2008 was going to be in your terms materially amendable?

A. It was in my --

Q. Did anybody tell you that?

A. No.

Q. Did you write anything that indicated that you believed that the Schedule A that was being filed with the Court was going to be materially amended?
A. I don't recollect whether I wrote anything that said I was confused. We were uncertain about which assets were exactly transferred. I believe it may have been one of the letters to Barclays seeking the reconciliation, but I can't be sure.
Q. At anytime within sixty days of the time that Weil Gotshal filed Schedule A with the Court did you or, to your knowledge, anyone write anywhere to anyone that they believed that the Schedule A filed with the Court was going to be materially amended?
A. I have no specific recollection of a specific writing. I do know that there was communications with Weil Gotshal, including a nasty exchange between Luc and Lori about the need to understand what assets were actually transferred, the implication of which was clear that we didn't think that Schedule A was accurate. To say Schedule A is inaccurate or when are you amending the Schedule A, I can't tell you that. I know that we pestered people to the point of their exasperation to get the update which, if you don't draw the conclusion, we thought it was inaccurate, I'm not sure what conclusion one could draw.
Q. Let me be clear. I'm not asking you whether you thought Schedule A was accurate or inaccurate, I'm not asking you

whether people were nasty or exasperated. I'm asking you whether anyone, at anytime, to anyone within thirty -- within sixty days of Weil Gotshal's filing Schedule A, wrote that they believed that that schedule was going to be materially changed or amended?

A. I don't know if there was a specific writing.

Q. Now, let me go back to the bottom of the first page of the two-page Milbank/Houlihan document dated October 10, 2008. And it talks about the forty-three billion dollars in value being based on the marks in the Lehman system at the time of the transaction, do you see that?

A. Yes.

Q. And the transaction that's being referred to there, is the sales transaction that closed September 22, 2008, correct?

A. Correct.

Q. And with respect to the five billion dollar haircut that is referred to immediately above that, would you agree with me that taking a multibillion dollar haircut is not what happens when a broker-dealer ordinarily marks its securities to market in the ordinary course?

A. It depends on what you mean by haircut. And I'm sure you'll get me to the second page of the memo where Mr. Geer describes what the explanation was as to what he meant by haircut. So, again, I want just to go -- I want more than you for this to go faster, I just want to get clear that if you

mean by haircut as a discount off fair market value, that is not typical other than when you do a repo in the ordinary course. If you're asking me -- actually, I'm not sure what you're asking me now.

Q. The term haircut is a term you've heard a number of times, correct?

A. In many contexts.

Q. And you are aware that in repo financing there is ordinarily a haircut, correct?

A. I'm sorry, say it again?

Q. You understand in repo financing there's ordinarily a haircut?

A. Yesterday I testified that in a typical repo there would be some room between the amount borrowed and the assets collateralizing the obligation.

Q. And that is referred to as a haircut, correct, sir?

A. Correct.

Q. And in the course of your work prior to closing did you have an understanding as to what the amount of the haircut had been with respect to the fed repo?

A. I testified about that yesterday that we didn't know what the amount of any particular haircut was on the date that the fed first lent the money. And I don't think the fed did in light of the confusion about what they actually got. But when it comes to Barclays at closing we were pretty comfortable that

there was none.

Q. My question was about the fed repo, did you understand that?

A. I have no knowledge of what the actual or assumed or intended haircut in the fed repo was going to be at the time.

Q. Did you ever hear that when the fed did the repo financing originally that there was a four or five billion dollar haircut built into the transaction?

A. No.

Q. No one ever told you that?

A. No.

Q. And you haven't become aware of that at anytime since, is that your testimony?

A. I don't recall anyone telling me that there was a -- 68 was -- 34 -- yeah, I don't recollect that conversation, sir.

Q. I'm not asking you whether you recollect a particular conversation --

A. I don't recollect that coming up -- someone telling me that.

Q. Or learning it somehow -- other way?

A. Sir, could I see the Thursday balance sheet that I was shown yesterday?

Q. If your counsel will find it I'll be happy to show you whatever you'd like to see.

MR. KIRPALANI: It's Movants' Exhibit 2, it's in the

big book that you have there.

**Q. Just so the record is clear, my question is whether or not you learned in any way that the original fed repo transaction included a haircut of four to five billion dollars?**

**A. I'm just looking at this balance sheet to refresh and make sure I got it right. Yes, we knew that when you balance the transaction of roughly seventy-three billion originally, and you take the liabilities in the book, and you add them to what was told to us was the outstanding amount of -- I think the thirty-four and a half was supposed to be the fed repo at the time, that's there's a differential between the sixty-eight and seventy-two which was four billion, and was then made up by the cure and comp. The reason I -- it never came up in the way you said which was did someone tell me there was a haircut in fed repo.**

**But what I realize sitting here I can figure it out. And, yeah, there looks like there was a differential as of whenever this balance sheet was put together.**

**Q. Let me just be sure I understand what you're saying. You're saying that looking at this balance sheet refreshes your recollection that you knew back in September of 2008 that the original fed repo transaction had a haircut of four or five billion dollars, is that correct?**

**A. I have no recollection of a particular conv -- of any specific knowledge as to whether there was or was not a**

haircut. I do believe that I knew that the fair value of these assets net of the contras was more than the liabilities that Lehman would have to pay off at closing. It just never came up so specifically, sir. So I want to be clear.

Q. Right. There's no mention of the fed repo in Movants' Exhibit 2, correct?

A. You're right. I'm assuming that the thirty-four and a half is it, but I could be wrong.

Q. You're assuming that the thirty-four and a half million dollars is what Lehman got from the fed and owing the fed?

A. Sitting here, that's what I'm assuming.

Q. Has anyone ever told you that Lehman borrowed forty-five billion dollars from the fed?

A. It was never clear to me whether or when -- or this is not as of Friday. I was told that the outstanding balance of the Barclays' repo, which was taken over by from the fed, was forty-five billion at closing. I don't know specifically if the fed drew it up, or someone else drew it up, I don't know.

Q. That's my question. My question is you know that there was a fed repo?

A. I do.

Q. And do you know when the fed repo transaction took place?

A. I don't.

Q. Do you know that it took place approximately Monday, September 15th?

A. I don't know specifically, other than when I walked into the room on Thursday at Weil Gotshal there was such a thing.
Q. Did you ever find out when the fed repo transaction originally took place?
A. You just told me, sir.
Q. Prior to his conversation with me, did you ever find out when the original fed repo transaction took place?
A. I don't have a specific recollection of the date when the money was lent, no.
Q. Did you ever find out what the amount of the original fed repo transaction was?
A. I don't recall.
Q. Did you ever find out what the amount of the haircut in the original fed repo transaction was?
A. No.
Q. Did you ever try to find out?
A. No.
Q. Using haircut in the sense that you use it in describing the fed rep, is the application of such a haircut the kind of thing that a broker-dealer ordinarily uses in marking the broker-dealer's securities to market?
A. It is not in my knowledge typical for a broker dealer to haircut its going concern, market value of its securities, for purposes of marking their books.
Q. Let me turn to the next page of the Milbank/Houlihan

document, that is the last two pages of Barclays Exhibit 18 -- 813-B.

At the top of the page it says, "The night of the close of the transaction," and this would have been Sunday night, correct, sir?

A. Correct.

Q. "The night of the close of the transaction we told Lehman/Weil that the pieces of the transaction that were being described to us added up to fifty-two to fifty-three billion dollars, rather than the approximately forty-seven billion dollars that we would describe in court the Friday before." Correct, sir?

A. Yes. You're accurately reading the document.

Q. And is this a true statement? Did representatives of the committee in fact tell Lehman and Weil Gotshal on Sunday night, September 21st, that the pieces of the transaction that were being described to the committee, added up to fifty-two to fifty-three billion dollars, rather than the approximately forty-seven billion dollars that had been described in Court the Friday before

A. As I testified yesterday, I did.

Q. And when we talk about the forty-seven billion dollars that had been described in Court before, we're talking about the 47.4 billion dollars that had been described by Lori Fife to the Court, correct?

A. Correct.

Q. And the committee understood, and you understood, that that 47.4 billion dollars was what Lehman was indicating the value of the fed portfolio securities were, correct?

A. No.

MR. BOIES: Would you hand out the next binder.

Q. I'd like to direct your attention to Barclays' Exhibit 37, which is at Tab 6. And in particular, page 8. This is what is referred to as the limited objection of the creditors' committee that was filed in December, correct?

A. Yes.

Q. And you've referred to this a number of times, correct?

A. Yes.

Q. And you read this at the time, correct?

A. This document?

Q. Yeah.

A. Yeah, sure. Yes.

Q. And did you participate in its preparation?

A. I did.

Q. Let me direct your attention to page 8, footnote 2. Where it says, "At the sale hearing the Lehman sellers indicated the value of the fed portfolio securities was 47.4 billion dollars," do you see that?

A. I do.

Q. And was that your understanding as of December of 2008,

when this brief was filed?

A. No.

Q. Did you ever tell anybody who was working on this brief that they had it wrong here? That's a yes, no, or I don't know question.

A. Not before it was filed.

Q. Did you tell them afterwards?

A. I think it came up later, I don't remember exactly when.

Q. Do you remember when it came up?

A. Sometime between May and September of last year.

Q. Somewhere between May and September of 2009?

A. Yeah, about the time when discovery was proceeding and you'll be more active in investigating the transaction, I believe. I don't remember exactly.

Q. But you never told anybody back in December that you thought this statement was wrong, did you, sir?

A. Again, I didn't catch the mistake until later. The mistake is minor in the sense of -- the mistake is whether or not this includes the box -- the clearance box assets. If you remember my testimony today, yesterday, the 47. -- I wasn't sure when I heard about the clearance back, what Mr. Seery called the hammers. And as they got I believe to roughly those numbers, and going through this and 47.4 just didn't seem to be a big deal.

Q. Well, --

A. It was forty-five plus the 1.9, it's forty-seven.

Q. First, sir, you knew about Barclays getting 1.9 billion dollars of clearance box assets at the time that you had the conversation that you say you did with Mr. Klein, correct?

A. Yes.

Q. And you worked on this brief, you read it at the time, and the brief here says that you understood -- the committee understood the 47.4 billion dollars was indicating the value of the fed portfolio securities, do you see that?

A. It's citing the hearing transcript. I didn't check the reference, and if I made a mistake, I made a mistake. It was -- I focused on my affidavit and on the bullet points. I don't have any explanation for including the box assets or not including the box assets. I mean, footnote 12 of page 8 of the brief.

Q. But your testimony is that even though you may not have mentioned it to anybody you knew in December of 2008 that the statement was in your testimony wrong?

A. No, I didn't say that. I didn't say I realized in December. I said I had a discussion about it when things became an earnest in connection with the investigation at a 2004 examinations. Or maybe even later when it was pointed out by you in my deposition. By your firm in my deposition. I don't have any firm recollection of exactly when this footnote was discussed.

Q. Well, let's leave the footnote aside just for a second. In December of 2008, did you believe that at the sale hearing, the Lehman sellers had indicated that the value of the fed portfolio securities was 47.4 billion dollars, did you believe that, sir?
A. At the sale hearing, you're asking? Or at the closing?
Q. What I'm asking you, sir, is whether in December of 2008 you believed that at the sale hearing the Lehman sellers indicated the value of the fed portfolio securities was 47.4 billion dollars?
A. I had no firm belief one way or the other.
Q. All right, sir --
A. My belief was that --
Q. I'm sorry, what?
A. I believe -- I believe that the total value of assets transferred was roughly forty-seven billion, I don't remember --
Q. Sir, I'm asking you a specific question.
A. I told you, I have no firm belief about that.
Q. You have no what?
A. I have no firm -- you asked me whether I believed, and I said no, I have no firm belief about that topic.
Q. And the topic that we're talking about is the topic of this sentence in the brief?
A. I have no --

Q. Is that right?

A. -- firm belief, whether in December I thought that the Leman estate had represented in Court whether fed portfolio securities were worth 47.4 billion as opposed to what the total value of assets in the book were being traded for. I don't have a firm belief, sir.

Q. I'm not asking you what you thought the value of the securities were?

A. I understand that. You're asking me whether or not I have a belief of what Lehman represented to the Court were the value of the assets.

Q. In other words, Lehman made a statement to the Court. And I’m just trying to get from you what you and the committee understood that statement to mean, do you understand what I'm asking?

A. Yes.

Q. And in this brief the committee says that it understood that statement to mean that the value of the fed portfolio securities was 47.4 billion dollars, correct?

A. I see that in the brief in footnote 12.

Q. Okay. And now what I'm asking you is did you share that belief as to what Ms. Fife's statement meant?

A. And what I'm saying to you again is I didn't think about it at the time, I don't have a firm recollection of what Ms. Fife's statement meant or didn't mean. I have a firm

recollection of what I thought it was at the time, not the construction of Ms. Fife's statement as summarized in Quinn Emanuel's brief. I don't know what more you want me to say.
Q. Well, sir, let me approach it this way. Let me ask you to look at your deposition.
A. Okay.
Q. And this is your deposition that was taken on December 17th, 2009.
A. So where do I find that, sir?
Q. In the book that your counsel gave you.
A. Oh, the big book.
Q. Behind the tab, hopefully, labeled transcripts.
A. The first deposition or the second deposition?
Q. It is the very first deposition, is the one taken December 17th, 2009.
A. Okay. I'll be there in a minute. What page?
Q. Let's begin on page 40, and line 18. You'll see that the examiner quotes to you the footnote that we've been talking about where the committee stated in December of 2008, "At the sale hearing the Lehman sellers indicated the value of the fed portfolio securities was forty-seven billion dollars." And you're then asked, "As of the time the statement was made to Judge Peck, you did not have any reason to believe, did you, that this was an inaccurate statement of what the Lehman sellers had indicated?"

A. Where are you, sir, what line?
Q. At the bottom of page 40, the top of page 41.
A. Okay.
Q. The questioner tries at line 6 to get a yes or no answer. You respond:
"A. I didn't go back and read the whole trial transcript when this was filed, and, therefore, I didn't have a view as to whether this was a direct quote or not of Ms. Fife."
Then at line 15:
"Q. Did you have any reason to believe this was an inaccurate statement of what she had said?
"A. I think it was an accurate description of what we all thought she said."
Do you see that, sir?
A. I do.
Q. And did you give those answers to those questions under oath in December of 2009?
A. Did I give these answers under oath, oh, sure, yes. My deposition.
Q. And those were truthful and accurate statements at the time, correct, sir?
A. It appears I made a mistake in understanding the question, sir.
Q. You made a mistake in understanding the question?
A. I mean, it looks like --

**Q. The question says, "Did you have any reason to believe this was an inaccurate statement of what she had said?" And you answer, "I think it was an accurate description of what we all thought she said."**
**A. Mr. --**
**Q. And you think you misunderstood the question, is that your testimony?**
**A. Mr. Boies, this is -- sitting here today, I think I made a mistake in my deposition. I have not seen this since December. I'm reading it now. I gave you my best recollection today. You know and I know from my deposition -- my testimony earlier of exactly what I thought, which was actually was on Friday the checklist I went through with Ms. Fife and what I thought she said.**
**Q. Umm --**
**A. I missed the 47.4 was not including the box assets, then I apologize and I made a mistake in December.**
**Q. Now, in December when this deposition was taken you knew you had a right to go through and correct the transcript, correct?**
**A. I’m not sure if I was actually advised that. I think generally I knew that.**
**Q. You're a lawyer, aren't you?**
**A. I am.**
**Q. Okay. And you knew that a deponent has the right to go**

through and review their transcript and make corrections, correct?

A. I think so.

Q. And did you go through this transcript and make corrections?

A. I neither went through the transcript, nor made corrections.

Q. Is it your testimony that in preparation for you testimony here you didn't read your deposition transcript?

A. That is correct, I did not read this transcript since I was deposed. I mean, I've seen snippets of it, but, no. I did not. And to the extent there are differences, that's a mistake. And this one seems fairly innocuous in light of the fact that the numbers were moving around, but, yes.

Q. So your testimony is that the footnote in the committee's brief was a mistake. And your testimony under oath in December 2009, was simply a mistake?

A. I do not know if the footnote was or was not a mistake. Whether it's directly quoting Ms. Fife or not. So I don't know if that references a mistake or not. What I'm telling you is that at that time in December -- at the time of the closing, at the time in December, at the time in May, June, July, August, when this may have been pointed out, at the time of the deposition and at this time my recollection hasn't changed. And if I misspoke I misspoke. Sir, if you let me --

**Q. Let me make sure I understand what you said.**

**A. If you read my affidavit, if you read the bullet point --**

**Q. There's no pending question, sir.**

**A. -- it's clear what my recollection was at the time.**

**Q. Well, when you say it's clear what your recollection was at the time, is there anywhere in your declaration where you state how you interpreted Ms. Fife's --**

**A. Well, instead of making me guess, sir, why don't we open up the affidavit and read it together, and then I'll tell you whether or not I did or did not.**

**Q. Sir --**

**A. Let's turn to the affidavit, sir --**

**Q. Sir, we will do that if your counsel wants to do it.**

THE COURT: Mr. Burian, let me just caution you that you're a witness here. You don't control the examination, Mr. Boies does. And then on redirect counsel for the committee will direct questions to you.

THE WITNESS: Your Honor, he's asking me to guess about a document before us. Actually have a memory test. I remember what was in my affidavit --

THE COURT: Simply answer the questions to the best of your ability.

THE WITNESS: Okay. We'll have a memory test.

**Q. At anytime insofar as you remember as you sit here now --**

**A. Right.**

**Q. -- did you ever give any description of how you interpreted Ms. Fife's representation to the Court, other than the deposition testimony that I've shown you?**

**A. I believe yesterday in my testimony I described at length my understanding at the time that Ms. Fife's description was consistent with, both her quick review prior to the judge taking the bench, and my conversations with Mr. Seery and I think Mr. Shapiro was on the phone at the same time. And which we went through the before and after checklist of what had changed in the transaction.**

**Q. At the time of the sale hearing, and Ms. Fife spoke to the Court, did you have at that point, on September 19th, an estimate of what the value of the fed repo securities were?**

**A. Only in the context of an estimate of the total assets being transferred to Barclays. So not specifically these assets are worth X, this is worth Y. I think -- I don't -- did I have an estimate at the time? Yeah, yeah. I think in the notes -- in fact, in my notes before I had forty-five plus 1.9. So, yeah, it was basically somewhere around forty-five billion dollars.**

**I think as I told you, I believe that on Friday Mr. Seery did tell me about the hammers, the box assets, the clearance box. And, therefore, the only conclusion one could have reached is that the repo assets had deteriorated in value to around forty-five.**

Q. When did you have this conversation with Mr. Seery?

A. As I testified yesterday there were a number of conversations, one long one, one shorter one.

Q. When did you have the conversation with Mr. Seery, in which he told you according to your testimony about the nails and --

A. Hammers. We would have to go back to my notes as to whether it was the first conversation, the second conversation. It was that Friday morning, early afternoon, before the hearing.

Q. And when did you first come to the conclusion that as part of this transaction Barclays was acquiring clearance box assets worth an estimated 1.9 billion dollars?

A. I never came to that conclusion, it's what I was represented and trusted to be verified later.

Q. That's what you were told?

A. Correct.

Q. And did you believe it?

A. Yes.

Q. Did you have any reason to disbelieve?

A. Now, I do.

Q. When did you first have any reason to disbelieve the assertion that Barclays was getting 1.9 billion dollars in clearance box assets?

A. When did I first have a reason to disbelieve? When the

deal closed --
Q. Sir, the question's when?
A. I'm trying my best to recollect. I had no reason to disbelieve in particular the valuation of the clearance box assets, other than in the context of trying to verify the total amount of assets. I, frankly, didn't worry that much about the clearance box assets, I didn't disbelieve that. At the time I was more focused on the repo transaction assets. And I don't know.
Q. I'm not asking what you worried about, sir, okay. What I'm asking you is when was the first time, if ever, you had any reason to disbelieve the assertion that you say was made to you, that Barclays was getting 1.9 billion dollars in clearance box assets?
A. With respect to those particular assets, I do not recall.
Q. Approximately when?
A. With respect to those particular assets, I do not recall.
Q. Do you recall whether it was in 2008?
A. With respect to those particular assets, I do not recall.
Q. Do you recall whether it was in the first half of 2009?
A. With respect to those particular assets, I do not recall.
Q. Let me go back to the Milbank/Houlihan document, dated October 10, 2008. And go to the second page, second paragraph. This is Barclays' Exhibit 18 -- 813-B. And the first paragraph talks about an asset difference of five or six billion dollars

that you had, or Houlihan or the committee had raised with Lehman and Weil Gotshal the night of the close of the transaction. And we've talked about that. And then it goes on to say, "A few hours after we raised the issue Lehman came in and got us and sat down to try to show us how things added up. We were told that some of the marks shown on Schedule A, were 'out of date' and that the parties, Lehman and Barclays, had agreed to a five billion dollar discount, as the appropriate mark-to-market adjustment for the securities." Do you see that?

A. I do.

Q. First, were you present when Lehman came in, got you and sat you down to try to show you how things added up?

A. Mr. Geer is referring to my description of the Michael Klein meeting, which I explained earlier how that happened. So if you're asking me was there a meeting which Lehman came and got us and sat us down, no, there was no such meeting.

Q. Well, sir, you say Mr. Geer was referring to this. To begin with this is something that was written by, both Mr. Geer and by Milbank, and not by you, correct?

A. I do not believe that this paragraph was written by Milbank, sir. It's an internal summary preparing Milbank to push Weil harder to get information in giving a Layman's quick explanation of what -- of Mr. Geer's recollection of what happened.

**Q. Did you ever have any discussions with Mr. Geer or with Milbank about who wrote what portions of this document?**
**A. I did.**
**Q. And when did you do that?**
**A. It must have been when the discovery binders showed up on my desk.**
**Q. What discovery binders?**
**A. The Houlihan e-mails. We got a subpoena or something, we were told to produce e-mails. At my direction a paralegal produced e-mails. There were discussions about parameters and searches, and we spent a lot of time on this. And at some point all sorts of things got dumped on my desk.**
**Q. And this would have been after discovery had started in this proceeding, correct?**
**A. Yes.**
**Q. Okay. And who told you what portions of this were written by Milbank, and what portions were written by Mr. Geer, or Houlihan?**
**A. I don't remember if it was clearly discussed explicitly or it just very, very clear from the context since we were there having these conversations and Milbank wasn't. So -- but it would have only come from a conversation between me and Mr. Geer. Or, again, it's pretty clear from the context that this is not Milbank.**
**Q. Sir, everybody can read the document for themselves. I'm**

simply asking you what you were told. And did anybody ever tell you what portions of this document were written by Milbank and what portions of the document were written by people from Houlihan?

A. I don't specifically recall why the foundation for my belief that these paragraphs describing that evening were by Brad Geer.

Q. Is that a no to my question?

A. It's an I don't know. It's I don't specifically recall how I know this or believe it to be true.

Q. Now, there's no reference in here to Barclays telling you anything, correct?

A. That is correct.

Q. Now, in the second sentence here it says, "We were told that some of the marks shown on Schedule A were out of date. And that the parties, Lehman and Barclays, had agreed to a five billion dollar discount." Do you see that?

A. Well, let's read the rest of it.

Q. I did, before. "As appropriate" --

A. "As the appropriate mark-to-market adjustment for the securities."

Q. And --

A. That is a --

Q. Was Houlihan and the committee told on Sunday night that Lehman and Barclays had agreed to a five billion dollar

discount as the appropriate mark-to-market adjustment for the securities, that Barclays was acquiring? That's yes, no, or I don't know.

A. It depends on how you define the word discount. So it's a yes, with an explanation.

Q. Well, first of all, were Houlihan or the committee told that Lehman and Barclays had agreed to a five billion dollar discount, using the word discount?

A. No.

Q. Was Houlihan and the committee told that Lehman and Barclays had agreed to a five billion dollar reduction as the appropriate mark-to-market adjustment for the securities that Barclays was acquiring?

A. Yes. We were told that market values had dropped, and the appropriate mark-to-market valuation of the securities being transferred, not including the clearance box, but including the resis was forty-four to forty-five billion was being rounded up to forty-five billion. Which -- and this is math we were competent in doing, we understood was five billion less than the fifty billion on the page that we had received Sunday afternoon.

Q. Let me be sure I've got your testimony. You testified that you were not told that Lehman and Barclays had agreed to a five billion dollar discount, using the word discount as the appropriate mark-to-market adjustment for the securities

Barclays was acquiring, correct?
A. Correct.
Q. My question now is were you told that Lehman and Barclays had agreed to a five billion dollar reduction as the appropriate mark-to-market adjustment for the securities?
A. We're having a problem, Mr. Boies, because in common usage when I think of discount, you go to a store you buy a shirt, it's a very nice shirt, it's worth twenty bucks. You get it for eighteen dollars, hey, I got a discount.
Q. Do you understand the question, sir?
A. No. Because I'm trying for you to please be more particular as to what you mean by discount or reduction.
Q. I didn't use the word discount in my last question. I said reduction. Do you understand what reduction means?
A. I'm trying to define it with particularity, but you're not letting me.
Q. Let me try to define reduction as the lowering of the amount, the reducing of the amount.
A. As compared to what, sir?
Q. As compared to a prior amount. Okay. And I'm asking you were you told on Sunday night that Lehman and Barclays had agreed to reduce, bring down, lower, the mark by about five billion dollars?
A. As compared to what? Which mark are you referring to?
Q. As it compared to what it had been?

A. At what date?
Q. Well, let me ask you that question, sir.
A. Well, that's exactly what I've been saying, sir.
Q. No.
A. Yes. It's exactly what I've been saying. Which is --
Q. Mr. Burian, what question are you answering?
A. I'm answering your question as to whether or not I was told there was a reduction in the value of the securities as of a mark of a date that you have not defined. And I am telling you exactly -- you have it exactly right, Mr. Boies.
Q. And my question to you --
A. I'm answering the question.
Q. No, I don't think you are, sir. And with respect --
A. I finally got a question I could answer, now you don't want the answer. I finally got the question right.
Q. Sir --
A. And now I want to answer it
Q. Have you finished?
A. I want to answer the question first.
Q. Okay. Tell me the question you're answering?
A. Whether or not I was told that there was a five billion dollar reduction in the value of the securities as of a mark of a date that you're not sure of.
Q. Okay, now the answer to that question --
A. That one I can answer.

Q. The answer to that question begins yes, no, or I don't know?

A. Yes.

Q. Okay. Now, when were you told that?

A. By Mr. Klein in the meeting early Monday morning.

Q. Okay. Now, we will agree that if you're talking about a reduction or lowering, as you just said, there is a prior amount and then a subsequent amount, correct?

A. Correct.

Q. And the subsequent amount is lower than the prior amount, correct?

A. You said if?

Q. I said it is. That's what you were told. You were told --

A. Correct. Correct.

Q. Okay. So that you had one value and then you had a second lower value, correct?

A. Correct.

Q. And the first higher value was for, you were told, an earlier point in time, correct?

A. Correct.

Q. And the second lower value was for a later point in time, you were told, correct?

A. Correct.

Q. And the difference between the higher value and the lower

value was about five billion dollars, you were told, correct?

A. Correct.

Q. And you were told that the difference between the higher value and the lower value of about five billion dollars was a difference that Lehman and Barclays had agreed to, correct, sir?

A. It wasn't expressed that way. Not exactly right. Close, but not exactly right.

Q. Well, when --

A. It wasn't --

Q. It's written here, sir, that Lehman and Barclays had agreed to a five billion dollar discount as the appropriate mark-to-market adjustment for the securities, and you say, you don't like discount, you don't know what reduction means, but you know what lowering means. And it's lowered down. It's clear that whatever had happened it was something that Lehman and Barclays had agreed to, correct?

A. Barclays and Lehman had agreed the fair market value of the assets on that date was forty-five billion. My recollection is not that they agreed on an amount to the discount. It happened to be that because at one point in time it was embarked at fifty billion and now it was forty-four to forty-five billion, rounded up to forty-five, you are pointing out the difference. But you're implying in your questions that I know what they negotiated a discount. And that is not my

testimony, and not what I believe was told, and not what I believed at the time. So we can go back and forth on words, but I stay very, very clear what I was told and what I believed.

Q. I'm focusing right now on what you were told. And assuming that we changed the word discount to some word that you're more comfortable with that means generically the same thing. Are you saying that this statement in the Milbank Houlihan document is right or wrong?

A. As long as we understand discount not to be a discount to value, but a reduction from a previous higher number, at some indeterminate time, then the answer is of course it's right.

Q. Okay. Now, let me focus on the indeterminate time. It is your testimony that you were told that there was a fifty billion dollar number, and rounded forty-five billion dollar number. And the fifty billion dollar number was from an earlier point in time -- an indeterminate point of time, but outdated, correct?

A. Both, the number and the corpus of securities, were outdated, correct.

Q. Let me focus on that. How much of the reduction from fifty billion dollars to forty-five billion dollars, as you understood it, was a result of the value changing, not the result of securities being taken out, but of the value changing?

A. I didn't know. I did not know at the time.
Q. Did you try to find out?
A. Later we tried to find out. At the time, no.
Q. Okay. And by later -- when you say later we tried to find out, when do you mean later?
A. The whole process of seeking reconciliation, of exactly what went at what marks at what values.
Q. Let me ask you this. When was the first time that you ever asked Barclays how much of the reduction that you say was made from fifty to forty-five billion dollars was due to a change in valuation?
A. I never specifically asked Barclays to parse the difference between the premark and the postmark in categories of securities that did not show up as compared to market deterioration. We figured we could figure that one out on our own when we got the full list of assets and their marks of what was actually transferred.
Q. Just to be clear, what you're saying is the reduction in value, from fifty billion to forty-five billion, was as you understood it, in part do to some securities no longer being there, and in part due to a deterioration of prices, correct?
A. Correct. Mr. Klein said market value of what we're getting --
Q. I'm not asking you what Mr. Klein said, I'm asking what your understanding was?

A. My understanding was it could very well have been a combination of both of those but without any firm knowledge of whether it was the former, latter, or both.
Q. Did you believe that it was in part due to some of the fifty billion dollar assets no longer being there, and in part due to a deterioration in the value of the assets that remained?
A. At the time I suspected as much.
Q. And at the time, before the closing, did you ever make any effort to find out how much of the difference was attributable to assets disappearing and how much was attributable to the prices of the assets that remained declining?
A. Yes.
Q. And did you ask somebody that?
A. We did.
Q. Who did you ask?
A. As I testified yesterday, Mr. Fazio, he immediately jumped in after I clarified the resi issue. He said wait a minute I want to talk about the what went down, government securities, which is the first half of understanding what portion would be market decline, what portion would be assets not showing up. And as I testified yesterday, it was Mr. Miller cut him off and said you got your explanation and ended the meeting.
Q. And did you ever -- prior to this proceeding, did you ever complain to the Court that Mr. Miller was cutting you off and

not giving you information that you thought was important?

A. Just so I understand the question, Mr. Boies --

Q. The question is yes, no, I don't --

A. Are you asking me whether I came running into Judge Peck and asked him whether or not Mr. Miller was being informative or nice to me?

Q. No, I didn't ask that at all, sir. My question was whether at anytime prior to this proceeding you ever complained to the Court that Mr. Miller was cutting you off and not giving you information that you thought was important? That's my question. And I'd like you to begin with yes, no, I don't know.

A. I never came to Court to complain that Mr. Miller had cut off a conversation about the closing.

Q. Did you ever come to Court to complain to the Court or to tell the Court that Mr. Miller was not permitting you to get information that you thought was important?

A. I --

Q. Again, a yes, no, or I don't know.

A. Yes, with an explanation, Mr. Boies. The explanation is --

Q. Wait, wait, wait a minute. I want to be sure I got the question.

A. Whether I ran to Court --

Q. Did you ever come to Court to complain to the Court, or to

tell the Court Mr. Miller was not permitting you to get information that you thought was important? And your answer is yes with an explanation, is that correct?

A. Correct. To the extent you view Mr. Miller as representing a Lehman estate, and to the extent that we came in December to complain very loudly that we were not getting information we need to do our reconciliation, that would be a reflection on Mr. Miller.

Q. And the first time you did that was in December, is that your testimony?

A. The first time we came to Court was in December, yes, sir.

Q. Let me go to the next paragraph. Where it says, "Lehman wasn't able to provide detail as to which securities on Schedule A led to the five billion dollar adjustment." You see that?

A. I do, sir.

Q. And is adjustment a term that you're comfortable using in connection with what happened?

A. Yes, I am.

Q. Okay.

A. It's an adjustment to reflect market value at the time.

Q. Okay. And -- and let me try to use the word adjustment. And you will agree that the five billion dollar adjustment was a five billion dollar downward adjustment, correct?

A. With all the qualifications we've been talking about, yes.

Q. Okay. Now, was it your understanding that Lehman and Barclays had agreed to a five billion dollar downward adjustment from one set of values to a second set of values?
A. At different times, yes.
Q. And by at different times, yes, do you mean that the valuations were at different times?
A. Correct. As of different dates.
Q. So that the fifty billion dollar valuation was at a different time than the forty-five billion dollar valuation?
A. That's what we understood and were told.
Q. Okay. Did you ever prior to closing, have any understanding as to how long the negotiation process between Lehman and Barclays had gone on in order to agree to this five billion dollar downward adjustment?
A. Nope.
Q. This sentence goes on to say that Lehman was also not able to tell you who at Lehman actually agreed to the adjustment, and they simply said various traders. You see that?
A. I do.
Q. Now, were you aware that Barclays' traders and Lehman traders were negotiating over the course of the week of September 15th in order to try to adjust what had been the Lehman marks for securities?
A. I suspected as much, was not specifically told.
Q. And when you say you suspected as much, you mean you

suspected as much during that week prior to closing, is that correct?

A. Yes.

Q. Now, going down to the third paragraph from the bottom, it says, "The marks for the remaining assets in the Lehman estate," and just for context, this is the remaining assets other than government agencies and treasuries, correct, sir?

A. What he means by remaining assets in the Lehman estate is other than the assets taken by Barclays, the assets that we have been in charge of trying to maximize value together with the debtor estates.

Q. All right, that's a helpful clarification.

A. You're welcome.

Q. So the reference here for the marks for remaining assets mean the assets in the Lehman estate that Barclays did not acquire?

A. That's what I just said, sir.

Q. Yeah. And you say that those marks appear to be reasonably good and up to date, do you see that?

A. I do, sir.

Q. And by reasonably good and up to date, do you mean that the marks as of October were approximately the same as the marks had been on September 12th?

A. No.

Q. Do you mean that the marks as of October were

approximately the same as they had been on September 22nd?

A. No.

Q. Were the marks for Lehman's remaining assets, that is the assets that remained in Lehman's estate, as of October 10, materially lower than the marks on those same assets as of September 12th?

A. I don't know.

Q. Same question with respect to September 22nd?

A. I don't know. It's not what this paragraph's referring to.

Q. I'm not asking what the paragraph's referring to, I'm asking for your knowledge.

A. Okay. I don't know.

Q. The next sentence it says, "The story that we were given the night of the close that some of the marks on Schedule A were 'out of date' and needed to be written down five billion dollars is implausible," do you see that?

A. I do.

Q. And as you understand it was the sentence that we're just referring to here a sentence that was written by Milbank or by Houlihan?

A. Houlihan.

Q. And that was part of the additions that was made by Houlihan to what Milbank had originally drafted, is that correct?

A. I believe so.

Q. And then the completed document was according to your understanding sent back to Milbank?

A. That's what this e-mail is I believe, it's an e-mail from Brad Geer sending this crib sheet to Milbank so they could be better prepared to push harder on Weil who had not yet been responsive to our requests.

Q. And this was done on October 10, 2008, correct, sir?

A. The e-mail was sent on October 10th, the document is dated October 10th, sir.

Q. the e-mail was sent first by Milbank to Houlihan on October 10th, changes were made and then the document was sent back by Houlihan to Milbank again on October 10th, correct?

A. That's what the first page says.

Q. And you don't have any reason to doubt that, do you, sir?

A. Nope.

Q. Let me go to the next paragraph. And particularly let me separate that between cure and comp. The first part of this paragraph says, "With respect to the 2.5 billion dollar cure liability that Barclays assumed, and which Lehman gave Barclays securities in the list above to cover the payment of there is still no list summarizing what cure assumptions could lead to anything even close to this type of cure payments. The only potential cure payment that we've seen was a 25.5 million prepetition payable associated with the assumption of a

services contract with the Indian Servicing Operations," do you see that?

A. I do.

Q. And this was written by Houlihan to Milbank Tweed on October 10, 2008, correct?

A. I believe so.

Q. And then the next sentence says, "A similar argument could be made for the two billion employee compensation liability. There's no way it's that high." Do you see that?

A. I do.

Q. And that, too, was written by Houlihan and Milbank Tweed on October 10th, 2008, correct?

A. Yes, sir. The whole paragraph appears to be from Houlihan to Milbank on October 10th, 2008.

Q. And let me go to the very last sentence of this document. It says, "It appears that the assets transferred were significantly greater and liabilities assumed significantly less than the figures represented in Court by at least a few billion dollars in each case," do you see that?

A. I do.

Q. And this, too, was written by Houlihan to Milbank Tweed on October 10th, 2008, correct, sir?

A. Correct.

Q. Let me ask you to turn next to Barclays' Exhibit 814. This is an e-mail and it's Tab 36 in your book.

A. Thank you.
Q. This is an e-mail dated December 21, 2008 from Brad Geer to James Tecce with a copy to Michael Fazio, correct?
A. Yes.
Q. Have you seen this document before?
A. Yes, it was shown to me -- the last time I saw it was at my deposition.
Q. When was the first time you saw it?
A. I don't have any firm recollection.
Q. Had you ever seen it prior to your deposition?
A. Again, I think it may have been in the binder of e-mails collected by paralegals. I don't remember specifically reviewing it.
Q. Did you ever review it before the discovery in this proceeding?
A. I don't think so.
Q. The e-mail begins, "The primary issue that we're trying to get to the bottom of is that we believe the securities that were transferred to BarCap were worth five billion dollars more than both the Lehman and BarCap guys said they were worth when the securities were transferred. It's not so much that we think their value change during the week, that the deal was being done, but the Lehman guys in cahoots with their soon to be bosses, partners in BarCap negotiated a sweetheart deal that camouflaged the amount and value of securities that were to be

transferred. We first uncovered this the Sunday night after the hearing when Weil/Lehman presented draft versions of the clarifying letter Schedules A and B," do you see that, sir?

A. I do.

Q. Now, recognizing that you didn't write that, and you say you'd never saw it prior to your deposition, or at least discovery in this matter, let me merely ask you whether after seeing this you ever wrote Mr. Geer or Mr. Tecce or Mr. Fazio saying that you believed that what Mr. Geer said here was not true?

A. No, I never wrote that what Mr. Geer said was untrue.

Q. Or inaccurate? Did you ever write it was inaccurate?

A. I think it's inarticulate, I don't think it's inaccurate.

Q. Okay. That was going to be my next question, is what you believe. And I take it you believe it's not inaccurate, but it's inarticulate, is that correct?

A. Yes. He's using --

Q. I’m not asking you what he's using, I'm asking just for what you -- your view is of what he has said?

A. I was trying to give you my views of what he said, sir.

Q. And your view of what he has said is that it's not inaccurate, although it's inarticulate, is that what your belief is?

A. To the extent --

Q. Please begin yes, no, or I don't know.

A. Yes, with an explanation that I think he is expressing this in a conclusory matter that in December I would not have been comfortable as a representative of Houlihan. I also think that he's using, you know, layman terms for the events that I described over the last two days. For instance, when he says uncovered, what he's referring to is we got the drafts and we saw the differential and we sought to find out the differences and got an explanation, as you know, we know longer believe.

A. Did you ever have any conversations with Mr. Geer about what he meant by this?

A. Yes.

Q. When was the first such time?

A. I'm trying to remember exactly when.

Q. Approximately when, sir?

A. Yeah. Sometime before my second deposition.

Q. That is after your first deposition?

A. Correct.

Q. Let me ask you to turn to a document that has been marked as Exhibit 838, as behind Tab 33.

A. In your book?

Q. In my book.

A. Okay.

Q. And is this a document you've seen before?

A. I don't recollect seeing this before, no.

Q. Do you recognize either the author or the addressees?

**A. I know who Sam Star and Connor Tully are. I do not know who Jintay Kim is.**

**Q. Well, Samuel Star and Connor Tully are the addressees of this, correct?**

**A. Correct.**

**Q. And who are they?**

**A. They are employees at FTI Consulting.**

**Q. And FTI Consulting is one of the committee's professionals, is that correct?**

**A. Yes.**

**Q. And are you working with FTI, jointly representing the committee?**

**A. Yes. We have different responsibilities, but we are working together to represent the committee.**

**Q. You share information?**

**A. We do.**

**Q. Let me ask you to look at the last sentence of this document. And this is sent to FTI, a representative, on October 9, 2008, correct?**

**A. That's what the e-mail says, I don't know what time zone this person is and whether it's 8th, 9th or 10th.**

**Q. The last paragraph says, and this is a quote attributable -- or attributed here to Barclays chief executive, John Varley, correct?**

**A. Starting on the second page? Oh, there it is. Not the**

last paragraph of the document, the last paragraph of the quote from some article?
Q. Yes, do you see that?
A. I see on the screen now, yes, sir.
Q. And the quote that's attributed to Mr. Varley on October 9, 2008 is, "If you look at the balance sheet that we have acquired, we have acquired net assets of about four billion dollars for 250 million dollars. And included in the growth assets for these liabilities which are netted to get to the four billion dollars is the assumption of a bonus pool for Lehman," do you see that?
A. I do.
Q. Did anyone tell you on or about October 9, 2008 that Barclays had made this statement?
A. It does not look familiar at all to me. And, frankly, I'm not even sure what he's talking about.
Q. That is even if somebody had shown you this, it is your testimony you wouldn't have known what he was talking about, is that correct?
A. If you look at the balance sheet --
Q. That's yes, no, or I don't know.
A. Sir, I'm reading it to make sure I can answer your question accurately.
Q. Okay.
A. Do you want me to close my eyes and answer as if I, you

**know, make up what it says?**

**Q. No.**

**A. So let me read it for a second.**

**Q. And I don't mean this with any sense of disrespect, sir.**

**A. Then don't say it then, because usually that precedes a negative comment.**

**Q. No. It may be interpreted that way, but I don't mean it that way.**

**A. Oh.**

**Q. It's not close your eyes, I do want you to read it. But I want you not to talk except to respond to the question. Do you understand the difference?**

THE COURT: And that's actually the rule of the game for every witness.

THE WITNESS: Okay.

THE COURT: It's not limited to you, Mr. Burian.

THE WITNESS: Yes.

THE COURT: That's how it works here.

(Pause)

**A. I've now read it, sir, if you'd like to ask me a question, I'll try to answer you.**

**Q. Okay. Well, let me go back and ask the preliminary question that I asked before, just to be sure that your answer is the same. Am I correct that you do not recall being aware of this in words or in substance, as of about October 9, 2008?**

**A. That is correct.**

**Q. If you had been aware of this as of October 9, 2008, would you have had some understanding of what Mr. Varley was talking about?**

**A. No.**

**Q. It would simply be confusing to you, is that your testimony?**

**A. I am not familiar with -- yes, I'm not familiar with the accounting treatment of these items, and honestly do not know what this really means.**

**Q. Okay.**

MR. BOIES: Your Honor, we're at our traditional breaking period. I have, I think about another ten minutes. But my predictions of how quickly I go with this witness has not been accurate.

THE COURT: My suggestion is even though we are at a traditional breaking point that we push on and conclude with the cross-examination of the witness, then break for lunch. And I'm thinking it's going to be a short lunch today. Shortened by the length of your examination.

MR. BOIES: Yes. Anything would be, Your Honor.

**Q. Let me ask you to look at Exhibit 144, Tab 27.**

**A. Tab 27?**

**Q. Uh-huh. Are these -- is this a document you've seen before, sir?**

A. No, sir.
Q. You've never seen this?
A. I don't think so, no. Can we make it a little larger, sir?
(Pause)
A. I've never seen this before, sir.
Q. Okay. Let me pass that.
A. Can I see the bottom of it?
Q. It's in your book.
A. I know, but it's small, sir. I mean, if you want to lend me your glasses I'll read it. No, sir, I've never saw this before.
Q. You've never seen that document before, okay?
A. I don't recall ever seeing the document before.
Q. Okay.
A. To be careful.
Q. To the best of your recollection you have never seen that document before, correct?
A. That is correct.
Q. Okay. Let me ask you to look at Barclays' Exhibit 16-A, which is Tab 30.
(Pause)
Q. Have you ever seen this document before?
A. I do not believe -- to the best of my recollection I have never seen this document before.

Q. Are you familiar with a Mary Korycki, and I may be pronouncing her name wrong?
A. A who?
Q. Mary Korycki, K-O-R-Y-C-K-I.
A. No.
Q. All right.
A. Can you help me? Do you know what firm she's with, is she with my firm maybe?
Q. If you don't know her, sir, you don't know here.
A. Mary Korycki?
Q. K-O -- I want to just spell it out because I want to be sure my pronunciation is not giving you some way of avoiding the question. But it's K-O-R-Y-C-K-I. Korycki. My belief is she works with Alvarez & Marsal. But my belief is irrelevant. I say that just to refresh you recollection.
A. Well, you made me less nervous I thought I was being -- I thought it was maybe some analyst that worked for me and I didn't remember their name, I'd be embarrassed when I got back to the office.
Q. My question is not to embarrass you, but just to see if you've ever seen these notes or had any conversations with this person?
A. To the best of my knowledge and recollection, I've never seen these notes and certainly never spoken to Mary about them.

MR. BOIES: Your Honor, I have no more questions.

THE COURT: All right. We'll break until -- let's try to get back, if we can, a little before 2 o'clock today. Because I think we need the extra time. So the lunch will be shortened not only by the examination of Mr. Boies that extended past 12:30, but by our coming back a little bit early. Let's start at say ten to 2.

Do you have --

UNIDENTIFIED SPEAKER: Your Honor, may we approach on a scheduling question before you adjourn?

THE COURT: A sidebar?

UNIDENTIFIED SPEAKER: Yes.

THE COURT: We hardly ever do those here, that's great. Sure.

(Recess from 12:36 p.m. until 1:55 p.m.)

THE COURT: Be seated, please. You may proceed.

MR. KIRPALANI: Thank you, Your Honor. For the record Susheel Kirpalani for the creditors' committee.

REDIRECT EXAMINATION

BY MR. KIRPALANI:

**Q. Mr. Burian, you were asked on cross-examination about certain press releases and Q&A printouts from Barclays, do you recall those questions generally?**

**A. I do.**

**Q. Okay. How reliable and informative did you consider the press releases as to the economic substance of the deal as**

compared with your in person meeting with Mr. Klein and Mr. Miller?

A. Viewed them as being mostly irrelevant. Didn't understand and didn't think the accounting treatment was relevant to true economic gain. And relied directly on the representations of the people that were working on the transaction, explaining the transaction, the context of what it meant to Lehman Brothers, as opposed to U.K. accounting conventions of some sort.

Q. You also testified or you asked questions by Mr. Boies about your belief that Barclays would realize overall economic gain from this transaction, do you recall those questions?

A. I do.

Q. Okay. Did you think the overall gain was associated with buying the Lehman Brothers broker-dealer franchise for 250 million dollars?

A. I did. I --

Q. Did you have any belief that all or part of that gain was attributable to acquiring the trading book, including the associated liabilities for less than fair market value?

A. At the time of the closing my understanding was that they were not going to have a gain in the trading book. Obviously earlier in the week, the 6872 deal, depending on the amount of cure and comp, there might have been some profit in the trading book. By the time that I left Weil Gotshal that morning I did not think that the assets were being purchased for anything

**other than fair market value in the manner that a broker-dealer would mark their books.**

**Q. Is this dispute about Barclays having made overall economic profits from the transaction?**

**A. Not from my perspective.**

**Q. Okay. You were asked a few questions that I need to put -- I'll ask you to look and put on the screen, Movants' Exhibit 3, for us, in context. But you were asked about whether the clarification letter, whether it did or didn't take out all references in the APA to book value, do you remember that line of questions?**

**A. I do.**

MR. KIRPALANI: If we could just highlight the -- I guess it's (ii) on the bottom there, if you can expand that.

**Q. Do you see the language that says, "Instead of the items," in the second line there, after in the original agreement, "Instead of the items referred to in such clauses," and then the next thing -- that it basically refers the parties now to securities owned by LBI and transferred to purchaser or its affiliates under the Barclays repurchase agreement as specified on Schedule A previously delivered by seller, and accepted by purchaser." You see that language?**

**A. I do.**

MR. KIRPALANI: And if we can also put up -- you can take this down. You can put up Movants' Trial Exhibit 394.

Q. This is the e-mail that Weil Gotshal sent to Milbank that we asked you about yesterday that attaches the not necessarily final, but some version of Schedule A. And if you can take a look at the attachment, I believe it's the second page in, do you see any references in this Schedule A to the use of liquidation value as opposed to book value?

A. No, it's consistent with everything we've always seen from Lehman. It's their marking of the book at market value in a way that every single U.S. broker-dealer does.

Q. And putting aside that, we understand your testimony from yesterday that the numbers may not be right, as of a particular date, and you weren't sure what date, all of the reams of paper behind this schedule, which are in the hard copy there, did they reference liquidation value?

A. No.

Q. Did they use the word market value on every single line item and every single page?

A. I would have to go back and check, but I believe so.

Q. Okay. The last topic I wanted to ask you about is, you were asked a series of questions by Mr. Boies about when exactly you first thought of suing Barclays for this transaction, you remember that line of questioning?

A. I do.

Q. Okay. During the period from the closing through December of 2008 did you, meaning Houlihan or the committee, ever

consider suing Barclays under the TSA?

A. We did.

Q. Why did you consider doing that?

A. Well, Mr. Kirpalani, at that point in time we had lost our eyes and ears to all our assets. Barclays was in control of our computer systems, was -- and this is my understanding of the circumstances, was not cooperating, and probably the single most important activity that Mr. Marsal was telling us he was doing on behalf of the estate, was sitting down with Barclays and explaining that, you know, we were at risk of losing billions of dollars in our derivative book, in our loan book, and our other associated assets. And that if this weren't remedied quickly it would have to take aggressive action to ensure compliance. So there were many, many discussions about whether the estate was proceeding quickly enough with Barclays. Whether Barclays was going to cooperate voluntarily, or would need to be compelled. And, in fact, whether ultimately we could hold Barclays responsible for losses in the book for -- losses in the assets that Barclays did not take for the failure to have open eyes and ears to whatever assets were. So the answer is yes, there were many, many conversations about suing Barclays during this time period.

Q. But did you -- you didn't run to court to sue them right away?

A. No. It was viewed as being counterproductive. The idea

**was to ensure -- to try to get a working relationship with them, to try to get -- we have to live with Barclays for years. I don't remember how many more years we have left of shared systems and the rest. And the idea was to find a consensual way to make the relationship work, to maximize value of the remaining estates.**

**Q. Okay.**

MR. KIRPALANI: Nothing further, Your Honor.

THE COURT: Is there anything more from anyone else?

MR. BOIES: Just two questions, Your Honor to follow-up.

RECROSS-EXAMINATION

BY MR. BOIES:

**Q. Mr. Burian, counsel just asked you about Movants' Exhibit 394, and he introduced the line of questioning saying that I talked to you about book value. And he asked you to look at the pages. And he said do you see liquidation value mentioned anywhere, do you recall those questions?**

**A. I do.**

**Q. You don't see book value mentioned on those pages, do you, sir?**

**A. No, it was --**

**Q. Okay.**

**A. -- market value.**

**Q. And he said you considered or you told him that you**

**considered suing under the TA, do you recall that?**

**A. The TSA, sir.**

**Q. TSA. You didn't sue under the TSA, did you?**

**A. Oh, wait. Sue, just 'cause I know you're not a bankruptcy person, when we talk about the time, was coming to court to compel compliance, not, you know, motion practice, not suing someone.**

**Q. Did you do that?**

**A. We -- no, we didn't.**

**Q. Okay. When was the first time you considered Barclays -- when you considered suing Barclays in connection with anything to do with the APA, including the clarification letter, that transaction?**

**A. Are you including -- the TSA was part of the APA, sir. Are you including the TSA in that --**

**Q. I'm not talking about going to court because you thought they weren't cooperating, I'm talking about going to Court because you thought that somehow the transaction was not the transaction that you thought had occurred. The thing that brings us here today?**

**A. Right.**

MR. KIRPALANI: Objection. Objection, Your Honor.

THE COURT: What's the objection?

MR. KIRPALANI: The objection is this is beyond the scope of my redirect and was extensively covered in his cross-

examination.

THE COURT: I think that's true. I think we've been down this road a few times.

MR. BOIES: The only thing I wanted to be clear, and I think counsel has clarified it. I just want to be clear that the testimony he had given before about when he considered suing Barclays wasn't related to this TSA issue, it was related to the substance of what we're talking about here. That was the only point I wanted to bring -- I wanted to clarify. And I think counsel has agreed to that.

THE COURT: So does that end the examination?

MR. BOIES: Yes, Your Honor.

THE COURT: Mr. Burian, you're excused.

THE WITNESS: Thank you very much, Your Honor.

THE COURT: I'm sure you're very pleased to hear those words.

THE WITNESS: Yes, sir.

THE COURT: And we'll call the next witness.

MR. GAFFEY: Your Honor, may I approach the witness?

THE COURT: Yes.

THE WITNESS: Thank you.

THE COURT: Mr. Ricci, I’m going to swear you in once people have settled down.

THE WITNESS: You want me to stand, Your Honor?

THE COURT: You might as well stand, you're going to

be sitting for a long time.

(Pause)

THE COURT: You ready?

MR. GAFFEY: Yes, Your Honor.

(Witness duly sworn)

THE COURT: Be seated, please.

MR. GAFFEY: May I proceed, Your Honor?

THE COURT: Please do.

MR. GAFFEY: Good afternoon, Mr. Ricci.

THE WITNESS: Good afternoon.

MR. GAFFEY: We've not met. My name is Robert Gaffey, I'm from Jones Day. We're counsel to the debtors.

THE WITNESS: How do you do, Mr. Gaffey.

DIRECT EXAMINATION

BY MR. GAFFEY:

**Q. Mr. Ricci, by whom are you employed, sir?**

**A. Barclays Bank.**

**Q. How long have you been employed by Barclays Bank?**

**A. Over fifteen years.**

**Q. And as I understand it, sir, you're currently the chief operating officer of the investment banking and management division of Barclays Capital?**

**A. I got a different title now since we last met. I'm the co-chief executive of the corporate investment bank.**

**Q. You were employed by Barclays Capital in September of**

2008, correct, sir?
A. Yes, that's correct.
Q. What was your title then?
A. I was the COO of the corporate investment bank.
Q. And briefly, sir, what were your responsibilities as COO?
A. As COO my day-to-day responsibilities involved managing all of the infrastructure functions. So risk, legal compliance, technology, human resources, as well as serving on the executive committee of Barclays Capital.
Q. And at that time, sir, you reported to Robert Diamond?
A. That's correct.
Q. And Robert Diamond was at the time, and is, president of Barclays Capital, is that right?
A. That is correct.
Q. Thank you. And were you a direct report to Mr. Diamond?
A. Yes.
Q. And did you work, sir, with a man named Mr. Clackson?
A. Yes.
Q. What was the reporting relationship vis-a-vis Mr. Clackson, was he next to you, a report to you, where did he fit in the organization chart?
A. Mr. Clackson reported to me.
Q. Okay. Now, sir, you understand obviously that what's brought us here today is the sale transaction that took place in September of 2008. I want to ask you first about a brief

period before the filing of the Lehman bankruptcy, when I understand there were discussions between Barclays on the one hand and Lehman on the other about the purchase of the entire Lehman firm, do you recall those few days?

A. Yes.

Q. And were you involved in those negotiations?

A. Yes.

Q. In fact, you were appointed by Mr. Diamond, essentially, as the lead negotiator on those negotiations, is that right?

A. I was appointed by Mr. Diamond as the -- the head of the whole transaction. So part of my responsibilities were those negotiations, yes.

Q. And you were more or less teed up to be the senior person to lead the discussions on the Barclays side, correct?

A. That's correct. I had a large team working with me, but that's correct, I was a senior person.

Q. And those negotiations with regard to a potential purchase of the entire Lehman firm took place for several days beginning on or about September 12th, the Thursday, is that correct?

A. That's correct, I believe. Yes.

Q. And that deal did not come to fruition, as I understand it, is that right?

A. That deal did not happen. That is correct.

Q. And that deal died on the Saturday?

A. On the Sunday.

Q. On the Sunday. And in the course of the work from Thursday the 12th through Sunday the 15th, did you have a team of Barclays' people working with you in connection with the negotiations?

A. We had a team of Barclays' people as well as lawyers and advisors, as well.

Q. And the lawyers and the advisors and the Barclays' people were able to do some degree of due diligence, albeit on a somewhat hurried schedule, is that right?

A. It was a very limited amount of due diligence, yes.

Q. But included in the due diligence that Barclays was able to do, sir, was some review of values of various classes of securities held by Lehman, is that correct?

A. Amongst other assets, yes. Limited, though. I would emphasize on limited.

Q. And in the course of that work -- and, again, I'm in the pre-bankruptcy period, Mr. Ricci, in the course of that due diligence, and other work around those negotiations, did you have occasion to work with a man named Martin Kelly?

A. I don't believe I directly worked with Martin Kelly during that weekend, no.

Q. Who were the main Lehman people you worked with in that pre-bankruptcy period?

A. I would have spent most of my time with Mr. McDade. Mr. Kirk, I spent some time with Mr. Fuld. Really at that level of

the house, top of the house.

Q. And in connection with those pre-bankruptcy discussions between Barclays and Lehman, your team included Jerry Delmessier (ph.), correct?

A. That is correct, yes.

Q. And Mike Keegan, correct?

A. Mike Keegan.

Q. And what was Mike Keegan's role?

A. Mike Keegan was playing a -- a variety of roles. He did work on the asset valuations of some of the securities and some of the other assets.

Q. And did Mr. Keegan report up to you?

A. He reports to Mr. Delmessier directly. On the project we had a whole team of people, but reporting to me.

Q. And Mr. Stephen King was on the team as well?

A. I don't recall if Stephen was on the team that weekend. He --

Q. I could jump ahead a bit, because you know we're going to talk about after the bankruptcy too, but he was involved in the post-bankruptcy negotiations, correct?

A. That is correct, yes.

Q. And what was Mr. Keegan's general area of responsibility?

A. Mr. Keegan?

Q. Yes.

A. Mr. Keegan's general responsibility were valuing assets.

**Q. And I think I just confused myself. Mr. King, who we were talking about. What was his general area of responsibilities?**

**A. Mr. King works in our -- in securitized structured product area, so he had a very specific role in valuing those types of assets.**

**Q. And one of the people -- and, again, I'm in that period before the bankruptcy, sir. One of the people on the Barclays' team was Michael Evans, is that right?**

**A. That’s correct, yes.**

**Q. And Mr. Evans was head of HR, as I understand it?**

**A. That's correct, yes.**

**Q. And also involved were Archie Cox, chairman of the Americas?**

**A. Yes. Mr. Cox was involved.**

**Q. And Michael Klein an outside advisor?**

**A. Michael Klein was also involved, yes.**

**Q. And John Varley had some degree of involvement, is that correct?**

**A. John would have been involved, obviously, as the chief executive of the firm as we were discussing with the board, and with him, whether we could conclude the transaction or not, yes.**

**Q. And had Mr. Varley travelled here to the U.S. or were you reporting back -- to him, back in the U.K.?**

**A. Mr. Varley remained in the U.K.**

Q. And Patrick Clackson, who we've spoken about, was also involved in the pre-bankruptcy negotiations, correct?

A. Yes, that's correct.

Q. Now, you said before that that -- we agreed before, I guess, that that transaction came to an end, it died on Sunday the 14th. As I understand it, sir, and briefly, the reason that deal did not go forward had to do with regulatory issues in the United Kingdom, is that right?

A. Well, specifically, the reason that the deal ultimately didn't conclude was in order to open on the Monday morning there needed to be a guarantee of the Lehman liabilities to the market. And under U.K. listing rules you need shareholder approval for -- or Barclays needed shareholder approval for a commitment of that size. That would have taken several weeks to put a shareholder meeting together, et cetera. And the United Kingdom regulatory and government agency wouldn't waive that rule. And the United States government would not provide that line either.

Q. So for those two -- lacking the necessary commitments from the two respective governments, that deal could not go forward, is that about right?

A. That's correct, yes.

Q. Okay. Now, shortly after that -- the negotiations of that transaction came to an end discussions arose about a different type of transaction with Lehman, is that right?

A. That's correct, yes.
Q. And when did those discussions begin?
A. Those discussions began in earnest on the Monday.
Q. There was, as I understand it, sir, a conversation between Barton McDade and Bob Diamond on Sunday evening, of which you became aware, is that right?
A. Yes, that's correct. Late Sunday evening.
Q. Who called who?
A. I believe Bart called Mr. Diamond. It's what Mr. Diamond told me.
Q. Were you party to the conversation or did you have its contents reported to you by Mr. Diamond after it was over?
A. Mr. Diamond reported the contents to me.
Q. And what, in sum and substance, did Mr. Diamond tell you he had discussed with Mr. McDade?
A. Bob said to me that -- I'm sorry, Bob is Mr. Diamond. Said to me that Bart had suggested there may be an opportunity to purchase some Lehman assets or Lehman out of bankruptcy and would be interested.
Q. And did Mr. Diamond tell you what his response was to Mr. McDade?
A. I believe he said yes, we'd be interested.
Q. And were any plan put in place to continue those discussions?
A. I believe we agreed to meet again on the Monday morning.

Q. Okay. I take it the team that was in the U.S. is still in town, nobody's had time to get back to the U.K. by this point, right?
A. I don't recall that everyone was here. But, certainly, there was -- there's still quite a few on the ground, yes.
Q. Is Mr. Evans still here?
A. I don't recall.
Q. What about Mr. King or Mr. Keegan?
A. Mr. King and Mr. Keegan are both based in the United States, so I think they were here.
Q. And Mr. Clackson?
A. Mr. Clackson I believe was still here, yes.
Q. Okay. Now, in the due diligence prior to the bankruptcy had any -- had you or any members of your team had any opportunity to look at Lehman's accruals for such things as employee costs?
A. I believe we did look at some -- certain type of accruals we would have, yes. We would have looked at the ongoing concern. But, yes.
Q. And in that pre-bankruptcy period you'd also had an opportunity to look at, to some degree anyway, vendor contracts and other such business costs, is that right?
A. I don't believe we looked at in any details at those type of costs. We were concentrating on buying a whole entity. So the real issue was, you know, on the balance sheet side, which

is where most of the attention analysis took place, what were the assets that were of most concern to us that we didn't want to buy. Because, as you may recall in the week prior to that, Lehman had given an investor update and talked about creating something called a spinco, which was going to house some assets that were particularly problematic for Lehman as an ongoing concern. And most of our work that weekend really centered on looking at those assets, because that was a real area of controversy for the institution. And as a matter of fact, in our proposed structure we weren't going to take those assets.

Q. When you say in your proposed structure, we're in the second phase?

A. No, we're in the first phase.

Q. In the first phase.

A. As part of buying the entire Lehman entity, we were not going to purchase those assets.

Q. Okay. So -- and when the second phase came, when the post-bankruptcy negotiations began the discussions essentially focused on identifying particular assets, or classes of assets that Barclays would purchase from Lehman, is that right?

A. Yes. The second transaction is really about buying the people, the buildings, and associated transactions as we chose. Associated assets as we chose, pardon me.

Q. There was -- to your mind there was even consideration during this second phase, sir, of just buying the buildings and

**taking the people and not buying any securities inventory at all, isn't that right?**

**A. There was lots of deliberations around what -- how the structure might look like.**

**Q. You, yourself, gave some thought to buying the buildings, taking the people, and not buying the securities inventory, isn't that right?**

**A. Gave thought to lots of different scenarios, yes.**

**Q. It's a yes?**

**A. I gave thought to lots of different scenarios. And I don't recall particularly whether I thought about not buying any assets.**

**Q. Okay. Now, in the course of these negotiations, beginning the week of --**

MR. GAFFEY: Steve, can we have the calendar up there.

**Q. Beginning Monday -- well, Sunday night that first phone call and then they begin in earnest on Monday morning the 15th, is that right?**

**A. That's what I recall, yes.**

**Q. And, again, as he had done with regard to the pre-bankruptcy transaction Mr. Diamond put you in charge of the negotiations, is that right?**

**A. Again, he put me in charge of the entire transaction, which -- part of which was the negotiations, part of which was getting the businesses ready to be run together. And there was**

a large team of people that supported me, yes.

Q. And in between being in charge of the negotiations and having the businesses run together, you also would be responsible for such things as seeing to it that the deal was properly documented, correct?

A. There would have been people on the team who were responsible for that?

Q. And those people, in turn, were responsible to you as head of the entire effort, correct?

A. Yes, as responsible -- ultimately the senior executive in charge, yes.

Q. And you understood from the nature of the transaction that was being discussed that one thing that would need to happen in between the conclusion of negotiations and running the businesses together, would be to get this Court's approval of the transaction, correct?

A. Yes, we needed the approval of the Court, yes.

Q. So within your area of responsibility as the guy in charge of the Barclays' team, was seeing to it that the necessary steps were taken to property -- to obtain the Court's approval, correct?

A. I certainly relied on lawyers and professionals to help me do that. I was ultimately responsible for the whole transaction, yes.

Q. I don't mean to suggest, sir, that -- you had to write the

brief or come in and argue to the Court. But the point is within the structure, the negotiating structure that you had, the transaction team that you had, there were people who were responsible to see to it that the necessary steps were taken to obtain the Court's approval of the transaction, is that right?

A. Yes.

Q. Okay. Now, you attended by telephone, I believe, a board meeting of the Barclays board on the 15th of September concerning the transaction, is that right?

A. Yes, I did. That's correct.

Q. And at that board meeting the board was given a summary of the transaction that was contemplated, that was going to be negotiated with Lehman. Is that correct?

A. That is correct. As I've said in my testimony, I fell asleep at that board meeting. I'm embarrassed to say, but I'd been up --

Q. We'll seal this part of the transcript, sir.

A. -- for several hours, and I'd fallen asleep, but I -- that was, the point of the board was, yes.

Q. Okay. You were awake enough during the meeting, sir, to understand that the topic was the transaction and that the board approved going ahead with the negotiations, correct?

A. That's correct.

Q. All right. And you came away from the board meeting with a sense of what the parameters were that the board had

established for the transaction. Is that correct?
A. That's correct.
Q. And you also understood from conversations with Mr. Diamond what the parameters or restrictions were on your authority to negotiate a deal. Is that right?
A. Well, the board had approved the transaction and certainly had set some parameters, but I don't recall if I was ever designated authority or to not operate within those parameters or to go back to the board. I was certainly given parameters in which to try to get the deal done, yes.
Q. Well, it's a fair statement, sir, that you weren't given authority to make any deal that you thought, in your individual judgment, made sense, correct?
A. That's correct. I was working within the parameters of the board. That's right.
Q. And you were working within the parameters that the board set and within parameters that Mr. Diamond set when he delegated you to run this, yes?
A. Yes. I agree with that.
Q. And you also had conversations, did you not, with John Varley about the transaction, the contemplated transaction?
A. I had several discussions with Varley throughout the week, yes.
Q. And your conversations with Mr. Varley included receiving from him certain instructions or parameters with respect to the

nature of the transaction to which you were allowed to agree, yes?

A. Can you reword that question --

Q. Yes, let me simplify that. Mr. Varley also told you there were certain requirements for any deal, correct?

A. Certainly. He set parameters, yes, in line with the board's, yes.

Q. And one of the parameters that Mr. Varley set for you was to be sure you protected Barclays' capital in any deal that you made, yes?

A. We were to protect -- are you talking about Barclays' capital as in capital not as in Barclays' capital, the entity?

Q. I mean the capital of Barclays' capital.

A. Okay.

Q. Exactly.

A. -- price.

Q. Yes.

A. Certainly. We were to keep Barclays out of harm's way and make sure that Barclays Bank's capital was intact and protected, yes.

Q. And your instructions from Mr. Varley included to ensure that any risk you were assuming had enough protection in whatever final deal there was to ensure that Barclays' capital was, at least, no worse off, right?

A. To the best we could assess it. That's absolutely

**correct.**

**Q. And in your conversations with Mr. Diamond you were given to understand, were you not, that it was necessary for the deal to be capital accretive to Barclays or you had no authority to enter into that deal. Is that right?**

**A. No. We -- at the time, again, keeping in mind that week, which I'm sure we're all familiar with, where, you know, markets were in turmoil, values were very depressed and going one way, which was downwards. We had just come out of a transaction that didn't conclude, of which there was lots of speculation around, you know, the adequacy of Barclays' capital position, all that type of rhetoric, concern from regulators, and it was on that, amongst other basis, that the board told us we had to protect the capital. If it was capital accretive, great.**

**Q. Well, sir, was it not your understanding it was actually a condition to the deal from the beginning that it be capital accretive?**

**A. I think when we set the board parameters it was certainly it was going to be capital neutral to positive. Accretive certainly was the intent.**

**Q. I'd like to press a little bit on the difference between intent and condition. Is it your testimony, sir, it was not actually a condition to the deal, that you had authority to make a deal that was not capital accretive?**

A. I had authority to make a deal that was within the parameters that the board set, and the board had hoped that it would be accretive.

Q. Let me show you some testimony that Mr. Diamond gave at his deposition, sir, and I want to ask you if you could comment on that.

MR. GAFFEY: Could we put up page 66, lines 13 to 24 of Mr. Diamond's deposition?

Q. And I asked Mr. Diamond, and I want you to focus on his answer, sir, but starting at line 13 I asked Mr. Diamond "Q. Did you ever learn indirectly whether the Bankruptcy Court was told it was a condition to the deal that it be capital accretive to Barclays?"

And this was Mr. Diamond's answer: "The condition to the deal from the beginning was capital accretion. I have explained this many times."

Do you see that testimony, sir?

A. Yes, I see it.

Q. Did Mr. Diamond explain that once or many times to you?

A. Can I read the rest of the --

Q. Sure.

A. -- testimony.

Q. The lines you need to read are 13 through 19 down the side of the page.

A. Can I see the previous page, please?

**Q. Sure.**

**(Pause)**

**A. Next page, please.**

**Q. Okay.**

MR. GAFFEY: Can you turn to page 66?

(Pause)

**A. Can I see the next page, please?**

**(Pause)**

**A. Okay. Thank you.**

**Q. Do you want to just read the last answer on 67 over to 68?**

**A. I think I have been very, very clear.**

**Q. Then turn to 68, please. Okay. That's where Mr. Diamond reminds us that you were the guy in charge. But to go back to page 66, lines 13 to 24, and, in particular, Mr. Diamond's answer to the question at lines 17 to 19. "The condition to the deal from the beginning was capital accretion. I have explained this many times." Did you have that conversation with Mr. Diamond at the time you were negotiating the transaction with Lehman?**

**A. Mr. Diamond certainly wanted the transaction to be capital accretive.**

**Q. Okay. And were you given to understand from Mr. Diamond that it was a board requirement that the deal be capital accretive?**

**A. The board certainly had the intent it would be capital**

**accretive, but if you're asking me if the transaction wasn't capital accretive would the board have gone through with it, I don't know.**

**Q. Were you given to understand by Mr. Diamond that a transaction had to be capital accretive in the sense that there was an asset liability mismatch in Barclays favor? It would take more assets on than liabilities it would assume.**

**A. We never had the specific conversation about how it might become capital accretive, but he certainly wanted it to be capital accretive.**

**Q. Did Mr. Diamond ever tell you, in sum or substance, that if it did not have such an asset liability mismatch you weren't authorized to do the deal?**

**A. I don't recall that.**

**Q. Okay. I'm going to show you another piece of Mr. Diamond's testimony, sir, at page 86, line 25 through 87, line 5.**

MR. GAFFEY: That should start at 86, line 25. I need the question and answer, please. And highlight 25 through 87, line 5.

UNIDENTIFIED SPEAKER: If it's possible, Mr. Gaffey, to provide the witness with a copy of the Diamond deposition, it might be helpful.

MR. GAFFEY: I don't have one, Your Honor. I afraid I'm restricted to the screen here. I mean, if we have one in

the room I'll have it handed up, but I don't have one at the podium.

THE COURT: Let's just wait one moment to see if we have a copy.

MR. GAFFEY: We're having somebody check the workroom, Your Honor.

BY MR. GAFFEY:

**Q. Without regard to the screen, sir, did Mr. Diamond ever tell you that if the deal was not capital accretive you had no authority to make that deal?**

**A. I don't recall whether Mr. Diamond actually told me that. I can tell you, though, certainly Mr. Diamond wanted the deal to be capital accretive.**

**Q. Okay. He was pretty emphatic about the fact that it had to be capital accretive?**

**A. Given the environment and the parameters the board had set, yes, he wanted it to be capital accretive.**

**Q. And did he say that many times?**

**A. I don't know if he said it many times, but I certainly understood that he wanted it to be capital accretive.**

**Q. And you didn't believe you had authority to make a deal that was not capital accretive to Barclays?**

**A. Again, I don't know. We never got to the point where we were absolutely positive it wouldn't be capital accretive. I mean, there was an awful lot of uncertainty, and we were trying**

to make sure we had protection in the event that things continued to go wrong, and protection meant, among other things, you know, positive capital accretion.

Q. Well, let me ask you this. Before you signed off on a final -- before you agreed on a final transaction with Lehman, with the Lehman representatives, did you check in with Mr. Diamond to give him the structure of the deal before you said yes to the other side?

A. I would have been keeping Mr. Diamond posted all day. I'm not sure if I ever had one final check with Mr. Diamond, but certainly he knew the broad parameters of the deal. I recall having conversations with him about this is where we're headed; this is where we're at. Of course the story changed many, many times in terms of the value of the assets, but we had several conversations through the day.

Q. I'd like you to focus in terms of conversations with Mr. Diamond on the period Monday the 15th through Tuesday the 16th. It's a fact, sir, is it not, that early in the morning on the 16th of September an agreement was reached, an agreement in principle was reached? We'll talk about changes to that deal over the week, but on the Tuesday morning a deal was reached. Is that right?

A. We had an agreement in principle on a deal structure, yes.

Q. And did you have a conversation with Mr. Diamond before you agreed, in principle, to that deal structure?

**A. I don't recall. I really don't recall having a conversation with Mr. Diamond. It was, again, lots of moving parts, fast and furious, up all night type of thing.**

**Q. When you described the deal structure to Mr. Diamond did you discuss with him whether or not it was capital accretive?**

**A. Yes, as we were preparing for an investment announcement on the Wednesday to the public, you know, certainly my conversation with Mr. Diamond would have -- would have said look, there's positive accretion here. This is what we need to tell the market, et cetera, et cetera.**

**Q. And did you have discussions with Mr. Diamond or any of the other members of senior management of Barclays as to whether there would be a gain, an economic gain to Barclays on acquisition -- of the deal as contemplated on the 16th?**

**A. Yes. I mean, we announced it publicly on the Wednesday, so, certainly, there was conversations with Mr. Diamond, Mr. Varley, among others.**

**Q. And was it your understanding in the negotiation of that transaction that it was a requirement, a Barclays' precondition, that there be a first day economic gain, a gain on acquisition for Barclays?**

**A. That's what I've said several times. We certainly intended to have one, and we wanted one. As I said to you previously, I don't recall if we didn't have that would we have gone through with the deal or not, I don't know, but,**

certainly, it was our intent to have one.

Q. And was it a fact, in your view, when an agreement in principle was reached on the 16th of September, was there a first day economic gain in the deal?

A. As I recall there was a first day economic gain in the deal, yes.

Q. And the first day economic gain in the deal was derived from the excess of the assets purchased over the liabilities assumed and the cash paid, correct?

A. Yes, I believe that's correct. Yes.

Q. And the basic structure of the deal to which Barclays and Lehman agreed on the 16th of September was one in which Barclays would receive, among other things, securities assets of Lehman, correct?

A. We purchased some securities, yes, and assumed some liabilities.

Q. And that bucket of securities was one of a list of different assets purchased, yes?

A. There's a ton of categories, yes.

Q. And on the consideration side Barclays paid 250 million, correct?

A. 250 million plus the cost of the buildings, yes.

Q. Plus the cost of the buildings. And away from the building, well, plus the cost of the buildings, and it assumed certain liabilities, correct?

A. That -- yes, we assumed certain liabilities.

Q. And those liabilities fell into two broad categories. One was contract cure, correct?

A. Contract cure was one.

Q. And the other was compensation, correct?

A. It was compensation, yes.

Q. And the liability that Barclays agreed to assume -- do you need a moment there, sir?

A. No. It's just a fly.

Q. Okay.

A. Sorry. I hope it's not me.

Q. The compensation liability --

THE COURT: He does seem quite attracted to you.

Q. I've never seen anybody say that literally, sir. The compensation liability that Barclays agreed to assume, sir, was agreed between you and Mr. McDade, the amount. Is that right?

A. That's correct.

Q. You agreed with Mr. McDade that the amount that Barclays would assume would be two billion dollars. Is that right?

A. Two billion dollars.

Q. And when the deal came to be documented you understood that that assumption of liability for comp at a two billion dollar level was properly documented in the deal, correct?

A. My understanding was that it was and that the two billion dollar assumption was to cover all comp and -- compensation,

which included bonuses as well as severance.
Q. Well, I wouldn't actually --
A. There were some concerns around the documentation of a certain clause, if I recall, that I wasn't happy with.
Q. I hadn't, actually, asked you that, sir, although we'll --
A. All right.
Q. -- to it in a while, so, for the moment, let's agree to disagree about what the two billion covered and just talk about the number.
A. Okay.
Q. The number was two billion for the comp related assumption of liability, correct?
A. Yes. Two billion dollars.
Q. And with regard to the assumption of liability for contract cure there had been some work done to create a good estimate of what that contract cure would be. Is that right?
A. There was an estimate. It was, certainly, a, sort of, a maximum exposure number that we could have had under the contract, yes.
Q. And did you, in the course of your work as the man in charge of the deal, did you come over the course of the week to understand what numbers the Court was given with regard to contract cure?
A. The number I have in mind was two and a quarter billion. I'm assuming that's what the Court was told. I can't recall.

Q. I will represent to you, sir, so that we're not confused over the next couple of questions, that there was a two and a quarter billion dollar number, but on the 17th of September the Court was told the exposure would be 1.5 billion. Does that refresh your recollection about that original number dropping?

A. The 1.5 billion, there was estimates for numbers across Lehman all over the place. The 1.5 billion isn't a number that I recall, but there were certainly wide estimates across an awful lot of things that Lehman was representing to you, which were different for the week. So if you're telling me there were different numbers around cure, there was different numbers around lots of things we were talking about, so it wouldn't come as a surprise to me.

Q. And at the same time that these numbers were flying around Barclays was internally calculating what it thought it might wind up paying in contract cure and compensation. Is that right?

A. No, the cure number came from Lehman.

Q. I'm not suggesting the number was calculated.

A. We didn't have time to do a proper analysis of what we might spend, what it might cost us. What we wanted was what was the maximum exposure, again, trying to protect Barclays' interest, not put Barclays in harm's way. Didn't want to get stuck with something that, you know, we hadn't planned on. So we were looking for the maximum exposure, and then we would,

you know, obviously start our due diligence around what we needed to pay as practically as possible. But Lehman had all that information.

Q. My question, sir, went to Barclays internal valuations. I take it with regard to those internal valuations you're also looking for the maximum exposure, because you didn't want to underestimate that amount, right?

A. That's correct.

Q. Okay. So the amount of work that was done inside Barclays with regard to calculating an estimate of contract cure would have been on the conservative side. Make the number bigger, not smaller, so you know what you're looking at.

A. Again --

Q. Yes?

A. Very limited. The number came from Lehman. They were -- we did the limited work we could to get ourselves comfortable to that extent we could, that that was the maximum exposure. There wasn't a lot of work done on what cure might actually be. We didn't have the information, and, again, there was lots of other things going on.

Q. Again, sir, I'm not talking about the numbers that came from Lehman. We seem to be missing each other here. I'm talking about the internal valuations that Barclays was doing. There were calculations done inside Barclays that were not shared with Lehman where Barclays made an effort to estimate

what the contract cure number would be. Isn't that correct?
A. I don't recall, but it's certainly possible.
Q. Would it have surprised you if it wasn't happening, sir, that Barclays just accepted whatever estimate Lehman gave them and figured it all out after the contract was signed?
A. What we would have been focusing on was maximum protection.
Q. So in maximum protection, sir, were there internal valuations? Barclays would have wanted the most conservative approach to that, maximize the possible number.
A. I don't know if it would have wanted -- we wanted maximum protection. I don't think we would have tried to maximize a number. I think there's a difference.
Q. I guess my --
A. One implies, sort of, ill will. I think the other is looking at, you know, the -- maximize the number versus maximizing protection. I think there's an important difference there.
Q. At least, let's, I'll use your phrase. Maximize the protection. The point about maximizing the protection, sir, is when you're estimating what you're likely to pay in contract cures you're going to take extra steps not to come in with too low a number. You don't want any surprises, right?
A. You don't want surprises, correct.
Q. Now, you did expect that on a combination -- well, once

the North American broker-dealer was purchased by Barclays there would be certain synergies that would lead to savings on the vendor side, yes?

A. Potentially.

Q. Well, you wouldn't need, for example, two Bloomberg contracts or two telephone contracts or you could -- these are contracts that Barclays already had in place, yes?

A. You wouldn't need two Bloomberg contracts, but, you know, you would need Bloomberg terminals, and having not a great idea what their contract was versus what our contract was, you would hope there'd be synergy, sure.

Q. So is it your testimony, sir -- well, let me just ask you it. It was not the working assumption inside Barclays that the maximum number, the total number of Lehman contracts, would all be assumed by Barclays, yes? Is that correct?

A. Sir, can you repeat the question?

Q. Barclays did not assume it was going to -- it did not work on the assumption it was going to take over all of the Lehman contracts, correct?

A. We had a maximum exposure that we knew we had. Of course we were going to try and work to try to minimize our exposure. Anybody would.

Q. And one of the reasons you wanted to minimize that exposure is you wanted to create for Barclays a cushion to protect it and to protect its capital after the transaction was

closed, correct?
A. We assumed the number assuming that could be our exposure. If we could underspend it and create a cushion, yes.
Q. And it was your hope to underspend the amounts that were estimated for comp and cure.
A. It was our hope.
Q. And calculations were done inside Barclays to determine the degree to which those amounts could be underspent. Isn't that correct?
A. I don't recall that those were done, if anything was done prior to the close. We certainly were making estimates all the time, and, as you're aware, on the compensation side we spent the full amount.
Q. On the -- well, again, sir, we're going to have to disagree, agree to disagree about that one, too, but with regard to all the work that was being done, were any of Barclays internal valuations shared with the Lehman negotiators?
A. I don't recall.
Q. Do you recall any point where anyone on the Barclays side of the table said to anybody on the Lehman side of the table, in sum or substance, no, the contract cure number is not going to be nearly that high?
A. I don't recall that happened.
Q. Do you recall any conversation between anyone on the

Barclays side of the table and the Lehman side of the table where Barclays allowed as how the comp number might not actually be the agreed two billion dollars?

A. Well, the comp number was constantly being talked about, and we were obviously working with Lehman as to, you know, what the number was going to be, so I don't know if there were conversations about the comp number might be this, the comp number might be that. That's possible.

Q. The comp number was agreed initially at two billion, yes?

A. Two billion dollars, yes.

Q. That's the agreement you made with Mr. McDade, correct?

A. Yes.

Q. And there was no point between the time you made that agreement with Mr. McDade that the comp number would be two billion and the conclusion of the sale hearing on the 19th of September, that that number was ever reduced. Isn't that right? It stayed at two billion all week.

A. It stayed at two billion.

Q. Okay. It stayed at two billion through all the applications to the Court, yes?

A. I think that's correct.

Q. It stayed at two billion all the way through the sale hearing, correct?

A. I believe that's correct.

Q. Did you attend the sale hearing?

A. No. I was not at the sale hearing.
Q. Okay. Did you get reports from people who did?
A. Yes.
Q. And you understood from those reports that the two billion dollar number was given to this Court with regard to the assumption of liability for compensation. Is that right?
A. I don't know if I was specifically briefed on that number, but I'm aware that was the Court -- the number that was presented, yes.
Q. Now, sir, did you -- there came a time when the agreement in principle that was reached on the morning of the 16th was documented in an asset purchase agreement. Is that right?
A. Yes.
Q. Did you ever read the whole thing?
A. I would have read various components of the draft, yes.
Q. I take it that's a no. You never read the whole thing?
A. I would have -- I would have read the -- yes, I would have read it.
Q. Okay. Did you read the whole thing, sir?
A. Yes, I would have read the whole thing.
Q. Did you read the whole thing when it wasn't final? You mentioned a moment ago you looked at it --
A. It don't know if I read it if it wasn't final.
Q. Did you read the copy of it that was submitted to the Court?

A. I don't recall specifically reading it, but I'm sure I did, to be honest. Yes.

Q. And one of the sections you did read was the definition of purchased assets, correct?

A. Yes.

Q. If you would turn in your book, sir, to Exhibit M-1? It should be the first tab in that book in front of you. Do you recognize that to be the asset purchase agreement?

A. Yes.

Q. And would you turn, please, to page 6? And you'll see that on page 6, sir, begins the definition of purchased assets. It's about midway down the page. Do you see that?

A. Yes.

Q. And directing your attention in particular to Subsection D concerning government securities, commercial paper, et cetera. Would you read through that section to yourself? Tell me when you've had a chance to do that.

(Pause)

A. Yes.

Q. Have you read that through? Did Barclays agree to purchase a so-called long position that had a book value as of September 16th of approximately seventy billion dollar?

A. I believe that's correct, yes.

Q. Do you know how the book value was determined?

A. I don't. I don't know if it was Lehman's number or fair

market value. I don't recall how that was determined.

Q. But your understanding is they were Lehman's numbers?

A. As I said, I don't recall whether they were Lehman's number or Barclays' numbers.

Q. Do you think Barclays might have determined what Lehman's book value was, sir?

A. No. Barclays wouldn't have determined anything to do with Lehman's books, but we -- maybe we were looking at a fair value price of the book value as it pertained to Barclays. But it was book value in this context that came from Lehman. I accept that.

Q. Now, I mentioned before, sir, that you had given some consideration -- you and, I guess, members of Barclays' team had given some consideration to just taking the people in the buildings and not taking any securities positions. Is that right?

A. Among other scenarios, yes.

Q. And one of the reasons that scenario was considered is Barclays was in a position to run the broker-dealer without that particular long position. It could buy that type of security on the open market, yes?

A. Theoretically it could have. That wasn't -- I don't remember exactly why we or the scenarios in which we considered these options.

Q. And if it needed securities of that type and that amount

**in order to run the business it could buy them at market values, correct?**

**A. Correct. We were very worried about clients, about reputation, about, you know, making sure we had an ongoing business, and all that factored into what we bought and what we didn't buy.**

**Q. And the fact is, sir, that you only decided to include the securities assets and not just take the people in the buildings because to do otherwise, in Barclays' view, might be looked upon unfavorably by the Bankruptcy Court. Is that correct?**

**A. I don't recall that.**

**Q. You have in that book, sir, your deposition transcript. I'd ask you to turn to that tab and go to page 280.**

**A. What tab is that?**

**Q. I think the tab should just be labeled "Transcript", sir.**

**A. Okay.**

**Q. And when you get to page 280, sir, I would direct your attention to the question that begins at line 16 and the answer that concludes it, line 24. Do you see that question and answer?**

**"Q. Why did Barclays want to buy Lehman assets?"**

MR. GAFFEY: Strike that.

"Q. Why did Barclays want to buy securities positions from Lehman on Monday, September 15th?

"A. My understanding was that there was a view expressed that

just taking the people and the buildings wouldn't be a situation that would be looked upon favorably by the Bankruptcy Court."

Do you recall that question and answer at your deposition, sir?

**A. I do.**

**Q. Okay. So when you say that that wasn't you, does that refresh your recollection that that was --**

**A. Yes. I said I didn't recall. That reflects my recollection, yes.**

**Q. And, so, it refreshes your recollection that as the guy in charge of the negotiations the reason that Barclays purchased the securities position was because it thought it would be looked on unfavorably by the Bankruptcy Court if it did not.**

**A. Among other things, yes.**

**Q. Okay. And you agree with me, sir, that to run -- had it purchased the Lehman North American broker-dealer it didn't need that particular long position that we talked about before. It could have bought a long position out in the open market.**

**A. Theoretically it could have. But in that environment --**

**Q. Well, it's more than theoretical, sir.**

**A. In that environment it was very difficult to replicate those assets.**

**Q. Well, one of the reasons it bought this particular long**

position, sir, was because it got a very good price on them. Isn't that right?

A. These particular assets, the valuations of these assets, was all over the place. At the end of the day these aren't the assets we bought.

Q. Well, you bought the assets you bought after the result of intensive negotiations between traders for Barclays and traders for Lehman about the value of that long position. Isn't that correct, sir?

A. Yes.

Q. And Barclays, obviously, as it would in any negotiation, wanted to pay the lowest possible price. Is that right?

A. We needed to record the prices on our books at fair market value.

Q. And to the extent that you could determine such a value with a buffer in it that would help to cover costs in the transaction, wouldn't it? It would create that cushion we talked about, wouldn't it?

A. We were looking for buffers across the whole transaction phase.

Q. So you were looking for buffers in costs in the price that Barclays paid for the long position and in any savings on the assumed liabilities. Those are the two basic categories to find a buffer. Isn't that right?

A. Well, there was other ones as well. There was the

recording of intangible assets and the value of those and -- among others.

Q. Okay. Can you think of any other than those three, fine cost savings and the assumed liabilities, pay less for securities assets and intangibles?

A. It's confusing on the security assets because on the asset side we were looking to pay the fair value for the asset and we assumed certain liabilities. So theoretically if you -- well, if you assumed assets and you assumed -- if you bought some assets and assumed a few liabilities it could also create a gain.

Q. You would agree with me, sir, if you got -- the more favorable the price you get for the securities assets the bigger the buffer you have, yes?

A. It depends. Potentially yes, but we were looking for the fair value price. As you'll recall, at the end of the day, we were looking at a transaction, you're aware, with the Fed stepped in where we put up forty-five billion dollars of cash --

Q. We're going to come to that, sir.

A. -- and we're looking for value of securities in excess of that with the buffer.

Q. We will come to that, I promise you, sir.

A. Okay.

Q. We're still back in the period, the 15th and the 16th.

A. Sorry. I'm going to trying to give you other scenarios.
Q. I appreciate that but let's talk about the scenario of the asset purchase agreement that was actually filed in the court. Okay. The asset purchase agreement that was filed in the court referred to a seventy billion dollar long position, yes?
A. Yes.
Q. Okay. And that long position, the price that Barclays paid for that was negotiated, yes?
A. Yes.
Q. Now these -- this cushion, this buffer that we've talked about, in the course of the whole week, sir, even as the deal changed, to your knowledge was any notion of a cushion or a buffer for Barclays disclosed to the Court at any point prior to the issuance of the sale order approving the transaction?
A. It was disclosed publicly on Wednesday, I think, September -- whatever that date was in September, publicly by Barclays.
Q. And you're referring to a certain press release, are you sir?
A. To an investor call and press release.
Q. As the man in charge of the transaction to whom the whole team reports, please describe to this Court what steps you took to make sure that whatever was in that press release, or any other announcement, was actually reported from the floor of this court, to this Court, while approval was sought of this

transaction.

A. It wasn't in the courtroom. And again, I was worried about complying with the law and in the U.K. our law was to make public the terms of the transaction at that time, to the best of our knowledge. Relied on lawyers and others to make sure the Court knew what the appropriate representations were, it was a public forum. Lots of people were on the call including, I think, members of this creditors' committee related to this sale and it was a public document in the public domain. I can't speak to --

Q. Do you remember the question I asked you, sir?

A. I can't speak to the lawyers or whatever insuring -- I'm assuming that the lawyers and others representing me made the appropriate representations to the Court. I'm not a lawyer, sir.

Q. I understand that, sir, but you had lawyers, didn't you?

A. I did indeed.

Q. All right. What steps did you take, sir -- as the man in charge of the transaction, what steps did you take to make sure those lawyers made sure that this Court knew about buffers or cushions in the deal for Barclays?

A. I would have asked counsel to ensure that the Court needed to know everything they know. I was assured by counsel that was the case.

Q. All right. And you've told us that you were sure to

comply with U.K. law with the press release and public announcements, yes?

A. Uh-huh.

Q. And I believe you referred to a transcript or to a call. You're talking about an analyst call, is that right?

A. An analyst call, yes.

Q. And the transcript of that analyst call was submitted to the FSA or U.K. regulator, correct?

A. Yes.

Q. What steps, if any, sir, did you take to make sure that the transcript of that analyst call was filed in this court?

A. Again, I relied on my attorneys and asked my attorneys to make sure and assure me that, you know, everything appropriate that needed to be filed with the court was filed with the court and I was given their assurances.

Q. Okay. Did you ever get from anyone, sir, the understanding that the asset purchase agreement prohibited Barclays' representatives from describing the transaction to the Court?

A. No, sir.

Q. Nobody ever told you anything like that, did they?

A. Not that I recall.

Q. And you understood that your lawyers present in this court were responsible to make disclosures as necessary so that full and fair disclosure of the transaction was made to the Court,

is that right?
A. As I said, I was assured by my attorneys that everything that was needed to be disclosed to the Court was disclosed to the Court.
Q. Okay. And with regard to the press release you described to me before, you knew sir, that it had been published as necessary to comply with U.K. regulations, yes?
A. Yes.
Q. Okay. Did you know, sir, one way or the other, during the week of the 15th of September, whether that press release was brought to the attention of this Court or the creditors in this bankruptcy in connection with this sale transaction and the motion to approve it?
A. Sorry. I'll say it again, I asked my lawyers to make sure and assure me that everything appropriate had been represented to the Court and I was assured thereof.
Q. Now to achieve this cushion, sir, it was important to Barclays to take from the deal assets -- more assets than trading liabilities, yes?
A. More assets than liabilities.
Q. Okay. And one way to do that would be to insure that there was a liquidity premium in the value of the assets, yes?
A. It depends how we have -- how we're using that term. When I think of liquidity premium it's in relation to marketing an asset to a market value in an instance where there might not

be, A, you know a really clear view of what market value is but the asset's illiquid. So you're using a liquidity premium as, sort of, a counterintuitive term to, you know, factor that in to determining what a fair value or market price might be.

Q. It's a counterintuitive term because it means lower the price, not raise it. Is that what you mean?

A. Yeah. No. In the sense of -- you might want to say it's an illiquidity premium rather than a liquidity premium. That's what I was referring to.

Q. What it means is you pay less then you otherwise would?

A. You're fair valuing an asset then, you know, because I'm not sure if you're selling it or not but if you're valuing an asset and there's no market for it, there needs to be-- there's on market price for it and it's illiquid and hard to sell, it needs to be a discount from that value to something that reflects its illiquidity.

Q. Would it be fair to say, sir, that as of the time the asset purchase agreement was executed that in your view you would think there would be a discount off the Lehman assets, off Lehman's marks on its assets?

A. I can't speak to Lehman's books but, you know, that whole week we were seeing volatile prices, illiquid markets as we were assessing assets, our assets, assets for looking the market. There was all sorts of issues around illiquidity and liquidity premiums were factored into fair values.

Q. The question I asked you was discount, sir.

A. You can use the word discount but when we're talking about discount it's discount of an asset to market value.

Q. Which, in your view, could constitute a discount off of Lehman's books to whatever your view of market value is, yes?

A. This was the process we were in together with Lehman to determine what the fair value of those assets would be.

Q. And to your knowledge, sir, was there a discount off of Lehman's book value in the price paid for the securities assets in this transaction?

A. I can't speak to their book values but certainly their marks that we started using were very stale and needed to be revised to reflect the market conditions.

Q. I know you want to tell me that, sir, but I'd rather you answer my question. Was there a discount off of Lehman's marks?

A. I can't speak to Lehman's books.

Q. Would you think there would have been a discount off of Lehman's marks?

A. Their marks were very stale. It was a very illiquid environment, sure.

Q. Is that a yes when you say sure?

A. Yes, I would have assumed they would have been.

Q. Okay.

A. Remember, we were using asset values from --

**Q. Sir there's no question for you.**

**A. -- Friday, trying to price assets on Wednesday in the worst market conditions in thirty-five, sixty years.**

**Q. Is there anything else you'd like to say, sir, before I put a question to you?**

**A. I'm sorry.**

**Q. Thank you.**

THE COURT: He's showing off his preparation.

MR. GAFFEY: Pardon me?

THE COURT: I said he's showing off his preparation. I can see what's going on here.

**Q. Now you mentioned before, sir, there was a time -- well actually, we talked a bit before about internal valuations at Barclays concerning the comp and cure liabilities. Do you recall having discussions with Skip -- well first of all, do you know who Skip McGee is?**

**A. Yes.**

**Q. Okay. He works for Barclays now?**

**A. Yes, that's correct.**

**Q. And at the time he was on the other side of the table for Lehman?**

**A. That's correct, yes.**

**Q. And in the negotiations with Lehman you talked to Mr. McGee about establishing that -- a bonus pool, yes?**

**A. A compensation accrual, yes.**

Q. Okay. And the compensation -- this is the compensation accrual we talked about that was agreed with Mr. McDade at two billion dollars?

A. Yes.

Q. All right. And you mentioned before that the deal changed during the week, you told me about the repo and how things looked but that never changed, did it? That two billion stayed there?

A. That two billion -- that number was pretty stable, yes.

Q. Right through the closing, yes?

A. Yes.

Q. Now, did there come a time, sir, where you had communications with another member of the team concerning what he called a 650 million dollar problem with that two billion dollar item?

A. Yes.

Q. Why don't you turn to tab 24 in your book, it's Movants' Trial Exhibit 24. Can you tell me when you've found that document, sir, or it's on the screen, if that's easier.

A. I'm there.

Q. Now this, Movants' Exhibit 24 in evidence, sir, is, at the top, an e-mail from you to Patrick Clackson with a copy to Archie Cox (ph.); do you see that?

A. Yes.

Q. And the title is 650 million dollar problem?

A. Yes.
Q. And in your e-mail to Mr. Clackson, with a copy to Mr. Cox and Michael Evans, the head of HR, you say "Never agreed to it. Archie, this is the problem. We can't have this clause, I don't think." Do you see that?
A. Yes.
Q. And you'd agree with me, sir, that the clause you're referring to is language taken from the final asset purchase agreement regarding annual bonuses?
A. It's a subset of that clause, yes.
Q. Okay. I can take the time -- I can take out the asset purchase agreement, sir, but my guess is you've been through this. Do you understand that that is language from the final?
A. Yes.
Q. No reason to think it's not the actual language from the contract?
A. Yes.
Q. Okay. Now, in the underlying e-mail, Mr. Clackson writes to Mr. Evans and to you and says, "This is a problem. They have two billion in the agreement. I was relying on you guys telling me I needed 1.35 billion, which gave me 650 million of the goodwill. But the para below says we have to pay it to them, can't use. Archie says you have agreed to this. Help." That's the e-mail that Mr. Clackson writes, yes?
A. Yes.

Q. And you understood Mr. Clackson to be telling you that the contract required the expenditure of the whole two billion on bonuses but that he'd only budgeted 1.35 billion, is that right? Hence the title 650 million dollar problem.
A. Yes. I think Mr. Clackson's flagging that issue.
Q. Okay. Mr. Clackson's flagging the fact that in order to calculate goodwill, you understand that to be a reference to negative goodwill?
A. That's right.
Q. To gain, yes?
A. Yes.
Q. Okay. So in order to generate the gain that Barclay is planning, the 650 million dollar problem that Mr. Clackson identifies is the contract says we have to pay two billion but we're only planning on spending 1.35, is that how you understood his e-mail?
A. I think there's a couple of things going on here, if I may?
Q. If I can have a yes or no.
A. Okay.
Q. If I could have a yes or not first, sir, and then I'll let you explain.
A. Okay. Could you repeat the question, please?
Q. I think I've forgotten the question. Isn't it a fact, sir, that the 650 million dollar problem that Mr. Clackson is

identifying here is that he's figured out the contract requires Barclays to pay two billion but Barclays is only planning on spending 1.35 billion, yes or no?

A. Yes.

Q. And did you understand that to be the issue as well?

A. There was a couple of issues going on here. One was that Mr. Clackson had some particular accounting concerns around open accounting books and negative goodwill. And number two, I was very concerned, I think as I testified earlier, about the, sort of, bonus payment that would be going back to employees if a certain number of employees left Lehman, as I didn't think that was fair and that was the -- my reference to the problem to Archie Cox.

Q. Well, as the contract actually reads sir, the bonuses are paid to employees not severed employees, yes?

A. No. Sorry; that was a yes but there's a clause that says if certain employees leave some money reverted to people who were there.

Q. Okay. Regardless of what's best or desirable or fair, the problem that Mr. Clackson is surfacing to you here is the contract actually says Barclays was supposed to pay two billion dollars for bonuses, yes?

A. We have an obligation to pay two billion, yes.

Q. And so that, in turn, leads me to my next question which is this was a problem because Barclays was planning on spending

only 1.35 billion for bonuses, isn't that right?
A. There was numbers throughout the week as to what we were going to spend. At this point in the process Patrick's saying look with only assuming 1.35 billion in my calculations, hoping to save on the two, yes.
Q. Okay. And hoping to save on the two means hoping to draw 650 million dollars gain out of the difference between the two billion in the contract and the 1.35 billion that is that scenario for bonus expenditures, yes?
A. Yes. Whether that was for open accounting periods or whatever was in his mind, but that is correct. Yes.
Q. Okay. And in these various scenarios that were going on during the week, to calculate what bonus would actually be -- what money would actually be spent on bonus, you never saw one above two billion, did you?
A. I can't recall. There was a lot of numbers going on.
Q. Did you ever see one above two billion dollars?
A. Not that I recall.
Q. Okay. And all the calculations you saw were below two billion dollars; isn't that right?
A. Any ones I saw I don't recall if they were above two billion.
Q. And as the man in charge of the transaction, sir, would you tell the Court what steps, if any, you took to ensure that when the Court was told there would be two billion spent on

**compensation, Barclays was actually calculating how it could spend less? Were any steps taken along those lines?**

**A. Again --**

**Q. It's a yes or no question, sir.**

**A. Sorry. Again, I would have relied on --**

**Q. Again, sir, it's a yes or no question. I'll let you explain but you have to answer the question yes or no first.**

**A. Sorry. You asked me what steps I took. Sorry.**

**Q. That's a good point. You win that one.**

**A. Sorry. Sorry. With all due respect. Sorry.**

**Q. I'm trying.**

THE COURT: We're all following the David Boies example of disciplining witnesses.

MR. GAFFEY: Only when the pen is pointing at the screen, Your Honor.

THE WITNESS: So sorry. Again, I would have relied on counsel to represent what was told to the Court. I wasn't here.

**Q. Did you take any steps?**

**A. What about?**

**Q. On that issue, on the difference between what Barclays was internally planning to pay and what the Court told them to pay?**

**A. Again, I would have asked specifically -- not on this specific issue, I would have asked broadly did we tell the Court everything we needed to tell the Court.**

Q. Now you said, sir, that the number moved around during the week?

A. Yes.

Q. That calculation of -- you see that Mr. Clackson's number for -- on the 17th of September is 1.35 billion, yes?

A. Yes.

Q. Okay. Let me ask you to take a look at Exhibit 91 in your book, do you have M-91?

A. Yes.

Q. And you'll see, sir, that Exhibit M-91, in evidence, is from Michael Evans to Mr. Diamond, to Mr. Delmissie (ph.) to Roger Jenkins and to you entitled "Summary of Current Spending". Do you see that?

A. Yes.

Q. Who is Mr. Jenkins? We haven't talked about him?

A. Mr. Jenkins was the head of our structured capital markets biz at this time.

Q. And --

A. Sorry. And a member of the Barclays capital executive committee.

Q. And you see, sir, that Mr. Evans is describing to you on the 23rd of September -- well, do you remember when the deal closed, sir?

A. The deal closed on Monday morning.

Q. That would be the 22nd of September?

A. The 22nd of September.

Q. Okay. So the day after the closing Mr. Evans sends this memo to, among others, you entitled summary of current spend, do you see that?

A. Yes.

Q. I'd ask you to turn to the second page of the document, sir, it's Bates number -- that's the number in the lower right-hand corner, 27191.

A. Yes.

Q. Okay. Are you with me?

A. Yes.

Q. And there's a "Table Summary of Current Spend". Do you see that?

A. Yes.

Q. And you understand that that table outlines planned bonus expenditures?

(Pause)

A. Yes.

Q. And you see that the "Total Pool Funding Available", the last line on that table, puts the pool at 1.4 billion dollars. Do you see that?

A. Yes.

Q. So, in between Mr. Clackson's memo of the 17th, which had the 650 million dollar problem created by 1.35 billion and the day after the closing, that number's only moved by a relatively

small amount. You're still only at 1.4, is that right sir?

A. On this date, yes.

Q. So from the beginning of the week you're at 1.35, at the end of the week you're at 1.4. Did the number really move around that much during the week, sir, or was it always the plan? Was that the original bonus pool, 1.4 billion dollars?

A. It did move around quite a bit during the week because -- may I explain? Because what was happening was, we had 10,000 people that we were trying to hire, some with guarantees, some without. And this was a series, there's a series of these e-mails to Mr. Evans that went on for a while after this, I recall, that would give various updates as to how -- you know, what was going on, what was happening. Everybody that we wanted to stay longer we didn't have in that pool day one and we negotiated, you know, with those 10,000 people long after the close. So there was various approximations of what the number might be. I would call this a snapshot.

Q. And this snapshot is 600 million dollars below the number you agreed with Mr. McDade, correct?

A. Yes. We have a -- I think it's the residual pool available for non-GB purpose. Oh, sorry. Yes, 600 million. Sorry. You're correct. Yes.

Q. So it's also 600 million dollars below the number that was given to this Court, correct?

A. At the snapshot stage, yes.

Q. And that snapshot, as you put it, on the 23rd is actually the amount of the original bonus pool that Barclays planned, isn't that right?

A. Again, the number was moving all over -- a lot during the week and we needed to make sure that we kept people and, you know, we had 10,000 people to try to address.

Q. Take a look further down in Mr. Evan's memorandum under the heading current funding pressure. Do you see that?

A. Uh-huh.

Q. And I'll read you the first sentence there, "Three funding pressures currently exist that are putting pressure on the original bonus pool estimate of 1.4 billion, assumed to exclude funding for deferred cash awards." Do you see that?

A. Yes.

Q. Okay. Does that refresh your recollection or affect your view, sir, that the 1.4 billion dollars wasn't the plan all along?

A. I think what he's suggesting here is that the 1.4 billion is the cash plan.

Q. I think what I'm asking about is the phrase original bonus pool. This was always the plan bonus pool, isn't that right, Mr. Ricci, 1.4 billion dollars. It was always 600 million below what the Court was told?

A. Not that I recall. I think what he's trying to distinguish here is the cash component of the pool versus

deferred cash awards. You'll have to ask Mr. Evans but I don't recall that the 1.4 billion was always the number.

Q. Have you ever seen a number above two billion dollars in a calculation of what bonuses would be paid?

A. Not that I recall.

Q. Okay. You agree with me, sir, that the 600 dollar (sic) difference between 1.4, if that was the pool, and two billion that was agreed would be gained to Barclays, yes? Less money that it spent?

A. Well, again, you have to ask Mr. Evans but I'd be curious as the 1.4 billion plus the 305 million of deferred cash award plus another 111 of second year's could have been the total number versus that two billion.

Q. And that brings you how much closer to two billion, sir?

A. Four hundred million.

Q. Okay. Do you know how much ultimately was spent on bonuses or would I have to ask Mr. Evans that too?

A. I believe it was around two billion dollars, 1.95, two billion.

Q. Cash or all elements?

A. I don't recall if that was cash or everything.

Q. And with regard to the assumed liabilities generally, sir, time and attention was spent during that week toward finding a way to get as much flexibility as Barclays could and spending as little as possible against those estimates, is that right?

A. Are we talking about the cure?
Q. I'm talking about both.
A. Both.
Q. Assumed liabilities as a whole.
MR. GAFFEY: We can take it off the screen.
A. Again, we certainly wanted to be -- have our maximum exposure. And yes, as I said earlier, if we didn't have to spend it we didn't want to spend it.
Q. Okay sir, we're later in the week. We're at the repo; we can talk about that now. There came a time, Mr. Ricci, when Barclays, to use a phrase others have used, stepped into the shoes of a repurchase agreement between the Fed and Lehman Brothers, correct?
A. Yes.
Q. Okay. And what happened in that transaction was that on the 17th of September Barclays did agree to take over the repo because the Fed had insisted that it do so, yes?
A. Sorry; is that the Tuesday?
Q. That's the Wednesday.
MR. GAFFEY: Can you put up the calendar, please.
A. I think the Wednesday -- the conversation started on Tuesday when the Fed called us.
Q. Okay. And on the Wednesday the agreement's made to do it, yes?
A. I think that's correct. Yes.

Q. Okay. And the Fed repo would issue there, sir, constituted an advancement of forty-six billion or so in cash by the Fed to Lehman and the Fed holding 50.6 billion in collateral, is that right?
A. I think it was forty-five billion in cash. That's what I recall.
Q. Do you recall a number in the range of 50.6 billion in collateral?
A. It was forty-nine or fifty in collateral.
Q. And when it took over the repo, Barclays advanced forty-five billion to Lehman, yes?
A. Yes.
Q. And it was supposed to receive back approximately fifty billion in collateral, yes?
A. Yes.
Q. And owing to certain operational difficulties, the entire fifty billion collateral bucket did not make it to Barclays, correct?
A. That's correct.
Q. And the difference between the amount of collateral that made it over and the amount that was supposed to make it over was approximately seven billion dollars, correct?
A. That's correct.
Q. And the agreement was made that at least temporarily Lehman would supply seven billion in cash till certain

securities could be released or loosened up from an account where they were held by JPMorgan, yes?
A. Yes.
Q. And the seven billion in cash was advanced by Lehman to Barclays, correct?
A. Yes.
Q. Bringing the total value given to Barclays in that repo the forty-two billion or so that made it over plus the seven billion in cash, yes?
A. The notional value.
Q. Well, we'll come in a moment to the value, I take your point. The numbers at the time said forty-two billion or so made it over. That was Lehman's value, yes?
A. That was JPMorgan's value, the Fed's value and Lehman did the -- there were several marks on that valuation, yes.
Q. And they were in the range of forty-two billion, yes?
A. Yes.
Q. And -- now JPMorgan valued the repo collateral as the collateral agent in the repo between the Fed and Lehman, correct?
A. Correct.
Q. And you understand that's the job of the collateral agent, is it not, to calculate the value of the assets in the repo?
A. Correct.
Q. And the Fed, itself, valued the -- the Fed valued the

collateral in the repo as well, correct?

A. At one time, yes.

Q. You came to understand that later in the year when there was a certain settlement presented to this Court, yes?

A. Yes.

Q. And you came to understand that the Fed had put a value on the repo collateral?

A. Yes.

Q. Okay. And when the collateral in the Barclays/Lehman repo was transmitted, it was valued by Bank of New York as collateral agent, correct?

A. Correct.

Q. And Barclays had selected Bank of New York as the collateral agent for that tri-party repo, correct?

A. That's correct.

Q. And Bank of New York served as Barclays' agent in that regard to value the collateral for it, correct?

A. Yes.

Q. And you recall that Bank of New York put a value on the repo collateral of about forty-five billion dollars that actually made it over, correct?

A. Yes, I believe that's correct.

Q. Okay. And with the forty-five billion plus the seven billion cash, that would put the value of what Barclays received at roughly fifty-two billion dollars, correct?

A. I don't recall exactly the fifty-two but that --

Q. Okay. Well, even with my meager math skills, sir, we can agree that forty-five plus seven is fifty-two, yes?

A. Yes.

Q. Okay. So if the Bank of New York valuation, Barclays' agent, Bank of New York, values the repo at forty-five, repo collateral at forty-five, and then seven billion cash is advanced, Barclays has fifty-two billion, yes?

A. In notional value.

Q. In notional value. Well, notional value, sir, or the value that's applied to it by your agent Bank of New York?

A. Well, we had issues with those marks and all the other marks given the environment.

Q. On the Bank of New York valuation, sir, that wasn't face value, right? That was a valuation applied by Bank of New York to the collateral, correct?

A. That was Bank of New York's marks, yes.

Q. Yes. Okay. And so it was not -- it wasn't face value? It was a market valuation done by Bank of New York, yes?

A. In their view, yes.

Q. You might agree or disagree with it, sir, but you do agree with me that it was a market value calculated by Bank of New York?

A. It was a market value calculated by Bank of New York.

Q. And it was a market value calculated by Bank of New York

as the collateral agent that Barclays had appointed, correct?

A. Correct.

Q. And if you add the seven billion in cash to that we're at fifty-two billion to Barclays, correct?

A. Correct.

Q. Okay. And you agree sir, that when the Fed put a value on the collateral in its repo, the Fed repo, the Fed had no agenda here, it wasn't acting for Lehman or for Barclays; it was an independent valuation, yes?

A. Yes. But I -- again, I think it's important to add context to that time. In dialogue with the Fed, you know, they would admit that they -- you know, their marks, not sure how fresh they were, et cetera. They were busy with other things.

Q. So I'm told.

A. Sir. Would you take a look at tab 119 in your book? It's Movants' Exhibit 119, in evidence. And it is a motion under 11 U.S.C. Section 105 and 363, et cetera, et cetera. Let me know when you've gotten to that document.

A. Sorry. Does it follow Movant 92?

Q. It's Movant 119.

(Pause)

A. 119.

Q. Sir, you know, I'm told it's in the pocket part of yours.

A. Oh, okay.

Q. Now I mentioned before, sir, a certain settlement

agreement that was brought to this Court and you, I think, told me you remember that, yes?

A. Yes.

Q. Okay. And the dispute that was being settled at the time, sir, was a dispute -- well, broadly speaking, was a dispute between Barclays and JPMorgan over who's entitled to the seven billion, yes?

A. Yes.

Q. And that was resolved, ultimately, by an agreement that this Court approved -- that was submitted to this Court for approval, yes?

A. Yes.

Q. Okay. And you signed the settlement agreement that we're talking about, yes? Take a look through it and I'm sorry, sir, this is not Bates numbered so if you could just leaf through it until you get to the document entitled settlement agreement and then go to the signature page.

(Pause)

A. Yes.

Q. Okay. That is your signature for Barclays Capital?

A. Yes.

Q. All right. So now you recall signing this settlement agreement between JPMorgan, the trustee, SIPA and Barclays, yes?

A. Yes.

Q. All right. And do you recall this motion being submitted at the time?
A. Yes.
Q. All right. And if you'd turn further, sir, to the declaration of Shari Leventhal?
A. Yes.
Q. Let me know when you've gotten there.
A. I'm there.
Q. Okay. And Ms. Leventhal lays out for the Court certain events concerning Barclays stepping into the Fed's shoes on the repo. And she says, if you go to paragraph 9 of her declaration, and again I apologize, sir, that doesn't have page numbers so you'll just have to work with me on the paragraph numbers. Let me know when you're there.
A. I'm there.
Q. And she says overnight on September the 17th and she describes certain exposures. And then she says the following: "In total, the New York Fed had funded 46.22 billion in cash and treasury securities against 50.62 billion in collateral." Do you see that?
A. I do.
Q. And Ms. Leventhal doesn't express doubt or concerns or equivocation about the Fed valuation of the value of the repo collateral, does she?
A. No.

**Q. And you didn't point out to her at the time that they had been expressing equivocation. You read this as the unequivocal statement that it is, isn't that right?**
**A. Excuse me. The 17th is what day?**
**Q. That's the Wednesday, sir.**
**A. The Wednesday. Okay.**
**Q. And my question was, you didn't speak up and say, wait a minute, you've been more equivocal about that value. You took that at face value as it was meant to be taken, right?**
**A. That was the Wednesday night. That was their marks, their books. We transacted this on a Thursday night.**
**Q. I'm sorry. I can't hear.**
**A. We transacted this on a Thursday. So I would have no basis to dispute our marks on the Wednesday.**
**Q. You have no basis to dispute that on those marks the Fed came to an independent valuation of 50.62 of the collateral and the repo, yes?**
**A. On the Wednesday, correct.**
**Q. Excuse me one moment, sir. I'm a little bit lost.**
**(Pause)**

THE COURT: At some point, when you're done with this particular area of questioning, we'll be taking an afternoon break.

MR. GAFFEY: Now would be just fine, Your Honor.

THE COURT: Okay. Let's break for ten minutes.

(Recess from 3:25 p.m. until 3:38 p.m.)

THE COURT: Be seated, please. We're going to be taking another break in approximately one hour so that we can have a substitution of reporters in order to accommodate going past 5:30 this evening.

THE REPORTER: Thank you, Your Honor.

THE COURT: So at approximately an hour from now, we'll take another break for about five minutes.

RESUME DIRECT EXAMINATION

BY MR. GAFFEY:

**Q. And, Mr. Malloy (sic), before the break we were talking a bit about the Bank of New York values that were applied to the repo collateral, the Fed values that were applied to the repo collateral, and you allowed as how you had some level of disagreement with the Bank of New York valuations, did I understand that correctly?**

**A. Yes.**

**Q. The fact of the matter is that at least as of the 19th of September, the day of the sale hearing in this case, Barclays was calculating the value of the repo based on those Bank of New York marks, isn't that correct?**

**A. What were they calculating again? Sorry.**

**Q. The value of the repo --**

**A. On the 19th --**

**Q. -- collateral.**

**A. -- which was the --**

**Q. On the 19th. It was the Friday, sir.**

MR. GAFFEY: Steve, could you put the calendar up?

**Q. We're just going to keep that up there unless there's an exhibit, sir, because I need it occasionally myself. But take a look at Friday the 19th. As of Friday the 19th, sir, Barclays was valuing the collateral in accordance with the values applied to it by its agent, the Bank of New York, correct?**

**A. What were they valuing?**

**Q. The capital structure in the repo.**

**A. In the repo?**

**Q. Yes.**

**A. I think there was various views on the -- that would have been one thing we used. I think we used others as well. Again, the markets were quite uncertain at the time.**

**Q. So I'm told. But the values, sir, that Barclays was using on the 19th of September 2008 with regard to the collateral and the repo were the Bank of New York values, correct?**

**A. For what purposes, sir?**

**Q. Well, to talk, for example, about how much excess collateral there was in the repo. Let me show you Exhibit M-200 in evidence, sir. Would you turn to that in your book? And we'll put that up on the screen. We're going to blow the whole e-mail up, sir, so it's a little easier to see on the**

screen, but -- and I know you're not an addressee or an author of this but you do know who -- Stephen King worked for you, yes?

A. Stephen --

Q. On this project?

A. He worked as part of my team, yes.

Q. All right. And Mr. LaRocca was part of the team, yes?

A. Yes.

Q. And you see that in this e-mail in evidence they are -- it's entitled: "Totals for the Fed facility collateral", yes?

A. Yes.

Q. And Marty Malloy is totaling that up, correct? That's what the e-mail says.

A. Yes.

Q. Okay. And you see that Mr. Malloy has applied -- has concluded that there is 7.19 billion what he calls excess collateral in the repo, do you see that?

A. I see on the page, yes.

Q. And when he calculates the collateral in the repo in the upper section there he adds, "The Fed wire securities, DTC cash, DTC cash". You see all that? That's the collateral that's in there, yes?

A. I don't know what Mr. Malloy was meaning. I haven't seen this e-mail before. I don't know whether this is the actual assets we got or --

Q. Actually, I don't want you to speculate. I don't mean to interrupt, sir, but if you haven't seen it before I don't want you to speculate about its meaning.
A. Okay.
Q. What I would like you to agree with me about, sir, is if there is excess collateral in the repo that's something of a cushion, is it not?
A. Against -- yes, that's correct.
Q. Okay. Now, instead of looking at Mr. Malloy's e-mail, let's look at Exhibit M-362, also in your book, sir. And that's dated September 20th. That would be the Saturday after the sale hearing is over. You see that?
A. Yes.
Q. And it's a series of e-mails. Beginning at the bottom there's one to you and then there's one from Michael Klein. And at the top -- the second from the top actually, it's from you to Michael Klein, entitled "Accruals". Do you see that?
A. Yes.
Q. And you write there, "Pretty convinced resis not in fifty-two after talking to a few people." Do you see that, sir?
A. Yes.
Q. Now, you understood that by the Saturday there was some concern -- there was some issue as to whether or not certain resis were included or not included in the repo collateral,

correct?

A. That's correct.

Q. And that's what you're referring to here in your e-mail to Mr. Klein, another senior member of the team?

A. Yes.

Q. And the fifty-two that you're referring to there, sir, is the total value of the collateral in the repo plus the seven billion dollars, isn't it?

A. It's the -- we're referring to that set of assets, those values I used all week. But yeah, in this e-mail I'm referring to that set of assets, yes.

Q. So on the 20th of September you were putting those assets in the range of fifty-two, yes?

A. Yes, in this note among others.

Q. Now, the fact is, sir, whatever disagreements Barclays may have developed later with the Bank of New York marks, it took the collateral in the repo in at the Bank of New York marks, isn't that right?

A. When you say "we took it in" --

Q. They put it on Barclays' books using the marks its agents had applied to the value of the repo collateral, isn't that right?

A. I don't recall us putting -- or recording on our books that following day. I don't -- I don't know what the values we assigned were.

Q. Okay. Well --
A. I don't recall anyway.
Q. -- let me ask you to take a look, sir, at Exhibit 228, sir, in your book. You see that? Are you there?
A. Yes.
Q. All right. And in Exhibit -- and Exhibit 228 in evidence at the top has an e-mail from you to Patrick Clackson?
A. Yes.
Q. Subject: Long Island draft balance sheet?
A. Yes.
Q. And Long Island was the code for this transaction?
A. That was a reference to Lehman, yes.
Q. You don't know who -- well, in any event, below that is an e-mail change from Mr. Clackson you, and below that from Mr. Romain to you. Do you -- are you following through there with me, sir?
A. Yes.
Q. And you see that attached to this chain of e-mails is a draft balance sheet purporting to -- entitled "Acquisition summary". Do you see that, sir?
A. Yes.
Q. And would you take a look at the acquisition summary, and in particular -- well, do you recall getting this acquisition summary?
A. Yes.

Q. Okay. And you understood that Mr. Clackson, in his e-mail to you, was giving you some idea of where things stand by way of calculating negative good will out of the assets acquired, yes?
A. Yes.
Q. He's talking about how to squeeze a little bit more negative good will out of the assets, yes?
A. Yes.
Q. And you'll see that in the acquisition summary -- well, back on the cover e-mail, sir, there's a reference in Mr. Romain's e-mail to you, Mr. Clackson and a James Walker which says, "The 2.83 billion valuation adjustment is S. King's first cut only." Do you see that?
A. Yes.
Q. And you understood that to be a reference to Stephen King?
A. Correct.
Q. He's one of the valuation people on the team, yes?
A. That's correct.
Q. And Mr. King was spending his time coming up with values for the collateral that by now Barclays has acquired, yes?
A. Yes.
Q. Because the transaction has closed. And you'll see that the valuation adjustment to which Mr. Romain's e-mail refers is at line 16 of the acquisition summary on the next page. Do you see that?

A. Yes.
Q. And do you understand, sir, that the valuation adjustment to which that line refers is an adjustment against the value of the repo collateral?
A. You'll have to ask Mr. King, but by looking at this page it looks like it's a deduction from that, yes.
Q. Okay. It's a deduction from that. And it's, at least according to Mr. Romain, Mr. King's first cut at a reduction, yes?
A. For Mr. Romain, yes.
Q. All right. And you see that that item on the acquisition summary is footnoted to footnote 5? Are you with me, sir?
A. Yes.
Q. I can blow it up on the screen.
A. No, that's okay, I got it.
Q. Okay. And -- it's going to get a little worse, we're going to go to footnote 5.
A. Okay.
Q. And we're going to blow that up on the screen as big as we can. And we're going to highlight line 55. Now, the footnote to which that valuation adjustment refers to, sir, says, "Trades are initially booked at BoNY prices. 2.83 billion is initial estimate of the adjustment Barclays marks". Do you see that?
A. I do.

Q. Does that suggest to you, sir, that the BoNY marks, the Bank of New York marks were the marks that Barclays initially used to value what it acquired, and only after that did it begin to write them down?

A. No, we had -- as I said, we had issues throughout the week with the BoNY marks, and I don't know -- we didn't end up final reconciliation of the day one balance sheet until February of the following year, I think. So we had issues through the week.

I'm not saying that maybe BoNY wasn't an estimate we used, but we had issues with their expertise and some of the products. These were very highly structured geared projects, difficult to price, no market -- really clear market prices to use as an estimate. We had issues with them. I don't think we -- again, you have to ask technical accountants but I don't think we recorded things at BoNY prices. We certainly weren't using it as an estimate. But we had issues with them, certainly.

Q. Where it says, sir, "Trades are initially booked at BoNY prices", don't you understand that to mean that they were taken in at the BoNY mark?

A. I don’t know if they were taken in at the BoNY marks or not.

Q. Do you have any other explanation for footnote 5?

A. He may be referring to "booked" as reflecting on how he's

booked them on his balance sheet -- or on his spreadsheet.

Q. Or how he booked them on the day of the closing?

A. You have to ask Mr. King.

Q. You have no understanding of it, sir?

A. I don't recall this. I know we had issues with BoNY prices --

Q. The phrase "Trades are initially booked at Bank of New York prices" has no meaning to you?

A. I don't know what "booked" means in that sense. Is it booked on this spreadsheet? Is it booked in the accounts? I mean, there was a lot of technical accounting work around this transaction.

Q. To take away all the technical accounting stuff surrounding the transaction, sir, your view -- your view was that it was fifty-two billion dollars worth of collateral. We saw your e-mail before that referred to "in the fifty-two".

A. As I said, that was one of a number of characterizations of the collateral that week. I referred to it as fifty-two. I'm sure in conversations I referred to it as forty-five. I'm referred to it just as collateral. There was varying issues with the marks and the valuation of those securities.

Q. Well, when you referred to it as the forty-five, sir, that's just subtracting the seven billion dollar cash, right?

A. No, not necessarily.

Q. So one moment it'd be forty-five billion worth, the next

minute fifty-two billion worth and we just call it seven billion dollar difference between friends? Sir, on the day you wrote the e-mail, you thought the collateral was worth fifty-two billion dollars, didn't you?

A. The fifty-two billion dollars was a number that was used to describe those assets. We used various numbers through the week. We had issues with market values through that whole week. It was difficult to price the inventory.

Q. As the man in charge of the transaction, sir, can you tell the Court what steps, if any, you or the people working for you took to bring to this Court's attention that the difficulties in valuing the collateral could have resulted in a range from forty-five billion to fifty-two billion?

A. Again, I asked my attorneys and advisors to make sure the Court knew everything they were supposed to know and they assured me that it was.

Q. I've got that, but let's be a little more specific about this one, sir. Did you talk to anyone about making sure the Court got an accurate description of the value of the assets that Barclays was purchasing?

A. Again, I spoke to my attorneys. My attorneys were fully appraised of this. It was an open process. Everyone knew there was issues. Everyone knew the numbers. The attorneys represented us in court what they thought they needed to represent.

MR. GAFFEY: Move to strike to the extent the witness purports to speak on behalf of what everyone knew, Your Honor.

THE WITNESS: Sorry --

THE COURT: I don't think I'm going to --

MR. GAFFEY: Mr. Ricci might --

THE COURT: I don't think I'm going to grant that motion to strike, but I'm just going to disregard the answer. It's in the record, but what this witness says everyone knew obviously is simply his hyperbole. It can't possibly be his knowledge.

MR. GAFFEY: Thank you, Your Honor.

**Q. What steps did you take about this issue, sir -- this issue, the value of the collateral that Barclays purchased. I know you've told us that you've told your lawyers generally to make sure everything got disclosed the way it should have been disclosed. With respect to this particular issue, the value of the collateral that Barclays purchased, what steps, if any, did you take to make sure that value was accurately reported to this Court?**

**A. I didn't take any specific actions other than the ones I described generally.**

**Q. Now, isn't it a fact, sir, that it was only after the assets had been taken in at the Bank of New York values that Barclays began a process of writing those values down through its PCG group?**

**A. We had concerns about those marks from the beginning and analysis was started as early as Thursday to try to figure out what we believed the value of that collateral was that the Fed was holding. Once we found out on Wednesday that we had to put out the forty-five billion dollars, we wanted to understand what the collateral was and we asked our people to try to get a listing from Lehman to try to value it. So I think we had concerns. I mean, when you finally get to the books and records you'll have to ask Mr. Clackson about the role of the product control group and how they finally recorded those activities.**

**Q. Did there come a point on --**

MR. GAFFEY: Can I have the calendar up there, please, Steve?

**Q. Did there come a point, sir, where personnel at Barclays began to look at the value that the Fed had put on the repo collateral, that 50.6 that it has put on the collateral in its repo, and to apply haircuts to it to come to a better view of the value?**

**A. We were doing analysis, yes, to look at the values in terms of what we believe the market value was.**

**Q. And that analysis was done by a Mr. Yang, is that right?**

**A. Mr. Yang, he worked for Mr. King. I recall an e-mail from Mr. Yang.**

**Q. And if you would look in your binder, sir, at tab 45**

you'll find Movants' Trial Exhibit 45 in evidence. Are you with me, sir?

A. Yes, sir.

Q. And you see that that is an e-mail -- the top e-mail is from Patrick Clackson to you on the 19th of September 2008 --

A. Yes.

Q. -- entitled "Haircut summary"?

A. Yes.

Q. Do you have an understanding of what a haircut is, sir, in the context of a repurchase agreement?

A. Yes.

Q. What is it?

A. It's a discount to the values to account for, you know, cushion against delivery of those values or something else might going wrong.

Q. Okay. It's the difference between the amount of cash advanced and the greater amount of collateral deposited, yes?

A. Yes.

Q. Okay. And attached to this -- and Mr. Clackson forwards to you an e-mail from Jason Yang to Mr. Clackson, copying King, John Mahon, and Mike Keegan.

A. John Mahon works in our counterparty management group.

Q. Okay. And does he work with Mr. King and Mr. Keegan.

A. They work together.

Q. Okay.

A. Not for the same -- not in the same area, but yes, they're colleagues.
Q. Okay. And was Mr. Mahon involved in any activities around the transaction?
A. As I recall, he probably was involved in some of the valuation activities.
Q. Do you know if he ever had a conversation with a man named Mr. Seery?
A. I don't know.
Q. In any event, Mr. Yang sends to Clackson this haircut summary. Is this the document you're talking about, the one that Barclays prepared?
A. I don't know if Barclays prepared it, but it came from Mr. Yang.
Q. Do you know one way or the other whether Barclays prepared it?
A. I don't know whether Barclays prepared it, no, but I'm --
Q. Do you know the purpose for which it was prepared? I'm on the second page of the document.
A. I believe, and again, I don't know where it came from, but I believe this was the calculation on the haircuts associated with what was supposed to be delivered from the Fed.
Q. As I understand -- that's a good point, sir. As I understand it, the collateral that was supposed to be delivered once Barclays stepped into the shoes of the Fed was supposed to

be substantially the same collateral, yes?
A. It was supposed to be the same collateral.
Q. As it turned out, it was not entirely the same collateral, but that was the idea at the beginning, yes?
A. That's correct.
Q. Okay. And this, you understand, is a valuation of what was the Fed repo collateral, yes?
A. What was supposed to be received, the Fed repo, yes.
Q. Okay. And the 50.64 billion dollar number you recognize now to be the 50.6 number that the Fed put on the repo when it valued the collateral, yes?
A. Yes.
Q. Okay. And the haircuts to the right are a reduction in that value, yes?
A. Yes.
Q. And you don't know one way or the other whether this document was prepared by before, is that your testimony?
A. I don't know if it was prepared by Barclays or Lehman. I know that -- well, I don't know whether -- it came from Jason Yang but I don't know where the underlying information came from and I don't know whether he prepared it or was just passing it on.
Q. Okay. You know it goes from Yang to Clackson and then Clackson to you, right?
A. Yes.

Q. Okay. And it clearly has something to do with this transaction, yes?
A. Yes.
Q. And what it has to do with this transaction is Barclays is looking at the value of the collateral that it at least expected to receive, yes?
A. Yes.
Q. And it's doing that on the 19th of September, at least according to the date on Mr. Yang's e-mail to Mr. Clackson and Mr. Clackson's e-mail to you, right? One is 9:20 and the other is 9:42 a.m.
A. That would be --
Q. You with me?
A. Yes.
Q. Okay.
A. That's about 5 -- that's a quarter of 5 in the morning New York time.
Q. And the purpose of your reviewing this haircut summary, sir, is it not, is that so you can send it off to Lehman with whom you are negotiating to say -- to show them that in Barclays' view there's not enough value in the repo collateral, yes?
A. As I recall -- again, this would have started earlier in the day on Thursday when we agreed to step into the Fed's shoes, anticipating in the environment where values were,

values are dropping, let's get a hold of the listing of what's on the books at the Fed for this repo and let's see what the value is from our view just to protect ourselves.

Q. Okay. To protect ourselves by coming up with a view on what the haircut should be, yes?

A. Yes.

Q. And the view that Barclays comes up with to protect itself totals out to 6.04 billion dollars once you total up the haircuts taken off those classes of assets, yes?

A. I don't recall if it was Barclays -- if this was Barclays' analysis or someone else's analysis, but there's a 6.4 billion dollar haircut, yes.

Q. And I think, sir, my question went to whether this document was then delivered to you so you could talk to the folks at Lehman about the Barclays view that it needed more assets because it wasn't adequately collateralized in the repo.

A. I would have taken this document and either given it to Mr. Keegan -- certainly would have given it to Mr. Keegan and would've, yes, used it to talk to Lehman about I was very worried about the value of the assets, yes.

Q. Okay. Because that was a topic of great concern to Barclays on the morning of the 19th of September, correct?

A. Yes.

Q. Barclays took the view that it was unhappy, it was uncomfortable with the value of the repo collateral, yes?

A. Of what was supposed to be delivered, yes.
Q. Okay. And the repo had essentially become the center of the transaction, yes? The assets were all in there, correct?
A. Yes, all the other assets were disappearing.
Q. Okay. And your understanding is you would have given this to Mr. Keegan. You knew Mr. Keegan was dealing with counterparts at Lehman about this topic, right, whether or not Barclays was receiving enough value in the deal, correct?
A. Yes, I would have had a conversation with Mr. McDade as well, to be clear.
Q. Well, and you had conversations with Mr. McDade, you had a conversation with Mr. Lowitt about that too, didn't you?
A. I don't recall having with Mr. Lowitt.
Q. Okay. Do you recall having a conversation with Ian Lowitt on the morning of the 19th of September about a project to gather more value to ensure that Barclays could close?
A. I remember having that conversation with Mr. McDade. I don't know -- Mr. Lowitt may have been in the room, yes.
Q. And this document is given go Mr. Keegan so that in his discussion with his counterparts he can engage in a discussion about what needs to be added to make up for a purported inadequacy in the value of the repo collateral?
A. That's what I recall. We were looking to identify additional assets, yes.
Q. And you, in fact, sir, send Michael Klein, Barclays'

advisor, to go in and get more assets, yes? You gave him those instructions?

A. Yes.

Q. And those instructions and Mr. Keegan's involvement all revolve around the Barclays' view that it's not getting enough value, correct?

A. Correct.

Q. So you make it known yourself, and through others working for you, that if Lehman does not add more value to this transaction to Barclays' satisfaction Barclays is not going to close, correct?

A. I said there's a possibility Barclays wouldn't close, yes.

Q. Well, a possibility, sir? What was the possibility? If there was not enough value added Barclays wouldn't close, yes?

A. We couldn't put Barclays in harm's way and if the value was negative it would've -- I mean, we were stuck with the repo at this point, but yes, we would have -- there's a possibility we wouldn't have closed.

Q. Is that how you put it to Mr. McDade, there's a possibility --

A. I don't --

Q. -- we won't close?

A. I don't recall my words.

Q. You understood, sir, that personnel at Lehman scrambled around on Friday morning --

A. Yes.
Q. -- and added approximately three billion dollars more to this deal?
A. Can you refer to what the three billion is? I know we had additional assets, yes.
Q. Okay. What was your understanding of the amount of additional assets that were added?
A. I believe we added the clearance box which was at the time valued at something around 1.9 billion. And I think there was the 15c3 which was -- there was a large range of estimates around that, but three billion may have been a number.
Q. Okay.
A. There's clearly additional assets identified.
Q. All right. Well, on the Friday the 15c3 number is larger than -- let me do that the other way. Over the weekend that 15c3 number crystallizes at 769 million, do you recall that?
A. Yes.
Q. Okay. But on the Friday the number was considered to be larger because at that point there was an issue about whether cash including the 15c3 component would go over, yes?
A. Yes, I think that number was around two billion.
Q. So the number everybody's looking at on Friday morning the 19th was something between three and four billion dollars more?
A. That's correct.
Q. Sir, do you think the personnel at Lehman scrambled around

to find three to four billion dollars more in assets because Barclays might not close or because, I suggest to you, Barclays said it would not close if more value wasn't added to the deal?

A. They certainly scrambled around to ensure that we closed.

Q. And they did that because you and the other Barclays negotiators said you would not close if more assets were not added, isn't that right?

A. I don't remember if I was that definitive, counselor, but they certainly did scramble around to ensure we closed.

Q. Do you know if Mr. Klein ever told that to the Lehman folks, "We're not closing unless there's more value"?

A. I don't recall if Mr. Klein said that, you have to ask him.

Q. Is it your testimony you never had a conversation with Klein where he reported that to you?

A. I don't recall.

Q. In any event, we are agreed that on the Friday morning Barclays demands more assets, yes?

A. Yes, sir.

Q. And the assets that are added to the deal include the clearance box at 1.9 billion dollars, yes?

A. 1.9 billion is my recollection.

Q. If I didn't say that I should have.

A. Right.

Q. The clearance box at 1.9 billion dollars, yes?

A. Yes, yes.
Q. And the 15c3 assets at, as it turns out, 769 million, yes?
A. Yes.
Q. And those assets are added over and above the amount that is repo collateral, yes?
A. Yes.
Q. And to your knowledge, sir, even in your absence, you're not present at the hearing, a total was reported to the Court of assets that were being transferred to Barclays as part of the transaction, is that correct?
A. Sorry, you threw me with --
Q. You know that someone gave the Court a number about the value of the assets that were to be transferred, yes?
A. Yes.
Q. Okay. You know what question's coming, sir. What steps did you take, as the guy in charge of the deal, to make sure that that number was accurately reported to the Court?
A. As I said, I mean, I talked to my attorneys and my advisors to make sure they disclosed everything to the Court.
Q. Now, when this search for additional assets was going on, on Friday morning, it was at Barclays' -- let's pick a verb -- request? Barclays asked for more assets, right?
A. Yes, we wanted to understand if there's any other assets that could be identified as part of the sale --
Q. Okay.

A. -- that were coming with the deal, yes.
Q. And let's bump it up a little from "request", Barclays actually demanded that more assets be added, right?
A. Yes.
Q. Okay. And no actual numerical target was given to the Lehman people as to how much needed to be added, is that right?
A. I don't recall giving a specific number.
Q. Okay. You do recall having discussions with the folks at Lehman about more assets needing to be added to the deal, yes?
A. Yes.
Q. And there was no set number, no target that you or anyone on the Lehman side -- on the Barclays side of the table gave, yes?
A. Not that I recall.
Q. Well, whether you recall the number or not now, sir, do you recall whether or not a number was given?
A. I don't recall if there was a specific number given.
Q. Do you recall a conversation -- well, is it your recollection that you didn't have a specific number?
A. There was real uncertainty. We had real issues with the value of the collateral.
Q. I --
A. I wanted to make sure that we were comfortable. I didn't -- don't recall having a specific number in time. I wanted to make sure that I felt comfortable that we had enough

protection.

Q. And beyond making you comfortable, sir, that Barclays had enough protection, what I'm trying to find out here is if there was anything more precise than that as the standard used on Friday when additional assets were identified. Was the test, sir, keep adding assets till Barclays says to stop?

A. I wanted to make sure that we had enough cushion. I don't -- there was no directive that said keep adding until I say stop or -- I don't recall a specific number.

Q. Did there come a point -- one of the men you were dealing with was Alex Kirk?

A. Yes.

Q. Did there come a point where you said to Mr. Kirk, "We're not going to be pigs and go after every last nickel"?

A. Yes.

Q. And was that the test, sir? Was that the test of how much had to be added in terms of additional value?

A. No, because again, we had all kinds of issues around value. That exchange with Mr. Kirk was around -- he was very worried that we weren't going to close and that he -- I mean, they felt a lot of pressure from their people. And the issue was, you know, we've done the best we can, that's all there is that we can find, you know, we want to close the deal. And I said, "We won't be pigs, fine, let's get on with it."

Q. And all of this was done prior to the commencement of

**the -- it was done in the morning of the 19th, yes?**

**A. The --**

MR. GAFFEY: Let me withdraw that. That might be misleading.

**Q. Do you know when Barclays was satisfied that enough additional assets had been added?**

**A. I believe I had a final conversation with Mr. McDade, Mr. Kirk -- I think Mr. McDade was on his way to court.**

**Q. So I take it then that your understanding is a resolution was reached of this prior to the commencement of the sale hearing?**

**A. Yes.**

**Q. Was that one of the conditions in the morning, we have to get this done before the sale hearing begins?**

**A. I don't recall if we specifically talked about that, but we certainly knew the sale hearing was in the afternoon and we wanted to make sure we had an agreement, yes.**

**(Pause)**

MR. GAFFEY: Your Honor, if I could just take one moment. There's one more document I need to find in my --

THE COURT: Take your time.

MR. GAFFEY: Thank you, Your Honor.

(Pause)

**Q. If you could turn back to M-45, please, sir?**

**A. Yes, sir.**

Q. Okay. It's so, sir, is it not, that the haircut summary that was annexed to that e-mail was used as part of the discussions with the Lehman folks on the morning of the 19th about how much collateral was lacking, how big a whole needed to be filled, yes?

A. I think we used this as part of the discussion, yes.

Q. And it's a fact, is it not, sir, that the position Barclays took with respect to this analysis was the repo was worth no more than 50.64 minus 6.04, putting you in the 44.5 range, yes?

A. The net range.

Q. Okay. And it's also a fact, is it not, sir, that Barclays did not show or share its analysis, how it got to this number with Lehman, it simply said in our view this is how much the repo is undervalued.

A. If I recall correctly, I think we shared with Lehman, based on our analysis -- and again, I don't know if this was our analysis, where this information -- where the underlying information came from, but I think we said "Based on our analysis we think the repo is valued at forty-three, forty-four" -- I don't remember exactly what the number was. And Lehman said, "Well, we'll take a look at it as well", and they went off and did an exercise as well.

Q. Would you take a look at -- they did an exercise off of this?

A. No, I believe they then -- I'm thinking now, remember, because this was based on what we were supposed to receive, and I think what happened then was -- is that Lehman then ran an analysis, I think, of what they actually -- what we did actually receive and valued it.

Q. Would you take a look at Exhibit 147 in your binder, please, Mr. Ricci?

A. Yes.

Q. Now, in your binder, sir, that's going to be a fairly fat set of notes. I just want you to look at the last page. It's Bates number 70. That's the number stamped on the lower right-hand corner.

A. Yes.

Q. Now, you recognize that to be the same form of haircut summary we were looking at a few moments ago?

A. Yes.

Q. And you'll see at the bottom there, you see it's that same 6.04 haircut? You with me?

A. Yes.

Q. Except on this one handwritten is 45.5 and 1.9 billion, do you see that?

A. Yes.

Q. Now, to your knowledge, sir, that's the number that results from this, what you called analysis that took place?

A. I haven't seen this before.

**Q. Did you ever learn what the basis was for the Lehman analysis that you just told us about?**

**A. No, it was done between the traders.**

**Q. Do you know that the traders applied liquidation values?**

**A. I didn't know what the traders did -- done between the traders.**

**Q. Nobody ever told you?**

**A. I don't recall --**

**Q. Do you have any --**

**A. -- if they told me or not.**

**Q. I beg your pardon, sir. Do you have any clue what the 1.9 billion written on there is for?**

**A. No.**

MR. GAFFEY: Your Honor, I have nothing further for Mr. Ricci.

THE COURT: Anything from the other movants' lawyers?

(Pause)

UNIDENTIFIED SPEAKER: Your Honor, if I might approach?

THE COURT: Sure. Thank you. Mr. Maguire?

MR. MAGUIRE: Thank you.

THE COURT: Excuse me. Mr. Maguire, before you begin, do I need to keep this?

MR. MAGUIRE: Yes. You don't need that for right now.

THE COURT: Okay. Thank you.

CROSS-EXAMINATION

BY MR. MAGUIRE:

**Q. Sir, as you know, my name is Bill Maguire and I represent the SIPA trustee. I'd like to start, sir, by asking you to turn to the small binder that I just provided you. And if you would just look at the document on the inside tab, that's a document that was presented to the Court this morning as Barclays' Exhibit 838 by Barclays' counsel.**

MR. MAGUIRE: And Your Honor, I apologize, I do not have on the copy I've circulated the Barclays' exhibit sticker. We only --

THE COURT: That's fine, I recognize this one.

**Q. Sir, if you could take as much time as you need to read this document and then I'll have some questions for you. And if it helps you, sir, my questions will address exclusively the second page of the document, the statement, the quotation of Mr. John Varley towards the end of the first half of that page.**

**(Pause)**

**Q. Just let us know whenever you're ready to proceed, sir.**

**A. I will, thank you.**

**(Pause)**

**A. Yes.**

**Q. Sir, as the senior executive in charge of this transaction, can you tell us whether the statement attributed to Mr. Varley here is consistent with your understanding of the**

transaction?
A. Can I ask you a question? What's the date of this article? I don't see it dated.
Q. Regardless of the date, sir, I'm only asking you of your understanding. Can you tell me whether this statement is consistent with your understanding of the transaction?
A. The date's relevant because what we announced in the market on September 17th is reflective of what Mr. Varley says here.
Q. Is this consistent, sir, with your understanding of the transaction that you understood you had negotiated at the end of that hectic week that ended with Friday, September 19, 2008?
A. Not entirely consistent.
Q. What is Mr. Varley's position?
A. He's the chief executive of the Barclays group.
Q. And it's important that his public statements be truthful and accurate, is it not?
A. Yes.
Q. His public statements can move the market price of Barclays stock, can they not?
A. I guess.
Q. Now, sir, in what respect is this statement not accurate?
A. Again, if I may, the date's important because I don't know if it's not accurate as to the point in time at which he referred to this in the market.

Q. What I'd like you to do is to focus your attention on Friday September 19, 2008, and specifically, to your understanding at that time, can you tell me in what respect this does not accurately describe the transaction as of Friday, September 19, 2008?

A. It doesn't have the buildings in it, for one.

Q. It doesn't have what?

A. The buildings in it. And I'm not sure what he means by net assets either. I didn't understand that. I think he's talking about -- again, I think he's talking about the assets although I believe this was the estimate of what we were talking about that the good will was at the time.

Q. Leaving aside the buildings, sir ,let's just focus on the net assets. If we understand that to be the day one gain, the disparity between the assets and the liabilities, with that understanding, is Mr. Varley's statement accurate? Again, leaving aside the buildings.

A. I'm trying to think back to September 19th because I don't think we had finalized values. Ultimately we recorded a day one gain of about two and a half billion pounds.

Q. It was approximately four billion dollars, correct?

A. Yes.

Q. So again, leaving aside the buildings, with respect to your understanding as of Friday, September 19, 2008, is this consistent with your understanding of this transaction as of

that date?
A. As I would interpret this, it's close.
Q. Well, when you say it's close, in what respect do you --
A. Well, we didn't have any values finalized on that day so --
Q. Well, let me not hold you to the four billion dollars. Let's say --
A. Okay.
Q. -- some number of billions of dollars. We can work on the decimal points or the precise hundreds of millions either way.
A. Fine.
Q. But leaving that aside, is it fair to say that, broadly speaking, this statement by Mr. Varley here is an accurate statement and consistent with your understanding on Friday, September 19, 2008?
A. Yes.
Q. Certainly you understood that Barclays was acquiring the balance sheet, isn't that right?
A. We were acquiring certain assets.
Q. You see Mr. Varley refers to the balance sheet that we have acquired. Is it your testimony that that was not an accurate statement?
A. I don't know what he means by a balance sheet.
Q. And certainly there was a disparity between the assets, between what Barclays was paying and what Barclays was getting,

whether or not that was four billion dollars or estimated at Friday the 19th to be some slightly smaller or larger number we can leave for another day. But certainly there was that disparity, was there not?

A. Assets exceeded liabilities.

Q. And it was by some billions of dollars, was it not?

A. Again, didn't have values on that day but I would acknowledge, yes, it's exceeded liabilities.

Q. And you understood that on Friday, September 19th?

A. Yes.

Q. In fact, you had done everything humanly possible to make sure that there was that disparity and that it was achieved in your negotiations with Lehman, isn't that right?

A. Yes.

Q. You did that job to the best of your ability.

A. Did my best to make sure that we met the goals of the board which was to be capital accretive.

Q. And to be as capital accretive as possible.

A. I wouldn't say as possible.

Q. Didn't you want to get as big a day one gain? Didn't you want this transaction to be as good for Barclays as it could possibly be? Wasn't that your job?

A. My job was to make sure that we didn't put Barclays in harm's way, so it was about preserving capital. Certainly we wanted to be accretive. But I never said we wanted it to be as

big as it possibly could be.

Q. You were certainly here representing the best interests of Barclays' shareholders, isn't that right?

A. Yes.

Q. And responsible to Mr. Diamond and to the board?

A. Correct.

Q. Your job is to make as big a profit for Barclays in the course of its business as management is capable of doing, isn't that correct?

A. In the normal course of business, yes, you want to maximize returns to shareholders.

Q. Now, sir, did you understand that this disparity between what Barclays was paying and what Barclays was getting was going to be an issue that would be considered before this Court?

A. What do you mean by "issue"? Sorry.

Q. That the disparity between what Barclays was paying and what Barclays was getting would be presented for consideration by the Court.

A. Again, I don't know specifically what was going to be -- if that was an issue for the Court. Remember, I've got those attorneys, everyone doing that. I don't know if it was relevant or not to the Court -- relying on my attorneys to do that. Certainly we were very public about what the expected gain was going to be on the previous Wednesday.

Q. You understood, did you not, sir, that the whole point of the hearing here was to determine whether or not the transaction would be approved?
A. Yes.
Q. And you understood that a central consideration in that is whether the transaction was fair?
A. Fair to whom?
Q. Fair to the estate of Lehman.
A. Yes.
Q. You understood that?
A. Yes.
Q. And that obviously involved an inquiry into the economics of the transaction, did it not?
A. I wouldn't speak for the Court as to what is relevant and not relevant. I'm not an attorney. Again, I relied on my attorneys and advisors to present what the Court needed to approve the agreement and the sale. And certainly, from my perspective, you know, I was worried about Barclays' interests and making sure that, you know -- and the Lehman people and all those type of activities. So I was relying on others to represent to the Court what the Court needed to understand.
Q. I will not ask you, sir -- I will not presume to ask you to speak for the Court. I ask you to speak only for you. You understood that the economics of this transaction would be presented to the Court?

A. Relevant economic information, yes.

Q. And you understood that a critical piece of relevant economic information was the disparity between what Barclays was paying and what Barclays was getting? Did you not?

A. I don't know if that was relevant for the Court or not, sir, I'm sorry.

Q. It was relevant to you in assessing the fairness of this transaction to Barclays, was it not?

A. Yes.

Q. It was relevant to Mr. Diamond, was it not?

A. Yes.

Q. It was relevant to Mr. Varley, was it not?

A. Yes.

Q. And it was certainly relevant to your board, was it not?

A. Yes.

Q. Now, sir, you gave some testimony earlier about the scramble for assets on that Friday the 19th, the assets that Barclays demanded. I'd like to start by asking you about one of those assets in particular and that's the 15c3 assets.

A. Okay, yes?

Q. I understand it's your position that Barclays was going to get these assets absolutely and unconditionally, is that correct?

A. Yes.

Q. No one told you that there as any problem or any condition

or sensitivity in Barclays getting any of these 15c3 assets?
A. Not that I recall.
Q. And it's your position that if for any reason Barclays could not get assets from inside the account, then certainly Barclays would be absolutely entitled to an equivalent amount of securities from outside the account. That is your position?
A. My understanding was that if we didn't get the assets, we would get the equivalent value from the estate, yes.
Q. Now, of course, you'd heard from Mr. Kirk who told us just a little while ago that there was nothing left. Nothing left to give to Barclays, isn't that right?
A. At that stage, he said there was nothing; that they couldn't find anything else.
Q. He told you that's all there is. All that we can find, isn't that right?
A. At that point, yes.
Q. So if you couldn't get the assets from inside the account and the estate had to look for assets outside the account and there was nothing left, then that would put the estate either in default or it would have to resort to getting customer property to pay Barclays this value, isn't that right, sir?
A. No, no necessarily. I don't know whether -- if the estate is finally going to settle or where it was going to settle. There was a lot of confusion and uncertainty around what values were and there could have been additional values somewhere else

in the estate.

Q. All kinds of things are possible, sir. I'm asking you to focus your attention on this. It's not possible to get the securities from the account and there's nothing left outside the account. Then that leaves the estate with only two places to go; either default or giving you customer property. Isn't that correct?

A. Well, not necessarily, because Mr. -- I -- Mr. Kirk wasn't speaking for the estate he was speaking -- this is all we could find, you know, I can't find anything else. Their accounts were in complete disarray. Theoretically, you may be right. Theoretically, maybe they could have found additional assets. At the time the conversation was, brief conversation, "We're exhausted. That's it. We can't find anything else. Are we done?"

Q. But other than the aspiration that somebody might find 769 million dollars somewhere, other than that aspiration, there was nowhere for the estate to go other than default or customer property. Isn't that correct?

A. I don't know if that's true or not. Mr. Kirk wasn't speaking for the estate; he was speaking for himself.

Q. Is it your testimony, sir, that Lehman agreed to deliver to Barclays 769 million dollars, even if there was nothing left and even if there as a shortfall in customer property?

A. My understanding was is that we would get 769 million

dollars from the estate.

Q. Sir, let me show you, please, some testimony of Lehman's president, Bart McDade. If we can show you page 599 of his trial testimony. And that is starting at line 9: "Q. Can you please tell the Court whether that deal, what was described to the SEC just hours before the closing, whether that ever changed and specifically whether Lehman ever agreed unconditionally to give Barclays any assets from the 15c3 account?" "A. To the best of my knowledge, the deal did not change and certainly Lehman was in no position, either with other assets or touching a segregated client asset that obviously needed regulatory approval for anything that we did with respect as any consideration in the transaction."

You see that testimony, sir?

A. Yes, sir.

Q. You'll agree with me that Mr. McDade had an understanding that is the exact opposite of yours?

A. That's what he says, yes.

Q. Now let me, sir, please refer you to the trial testimony of Lehman's lawyer, Harvey Miller, at page 998 of the trial transcript. And starting at line 5:

"Q. Did you at any time enter into any commitment on behalf of Lehman that Barclays would get the 769 billion (sic) dollars unconditionally?

"A. I assume when you say me, you are talking about Lehman.

"Q. I am referring to you personally or anyone that you know acting on behalf of Lehman.
"A. Absolutely no commitment.
"Q. Did you or anyone that you know acting on behalf of Lehman undertake or give Michael Klein or anyone at Barclays a commitment that if there was a regulatory problem and the 769 million dollars in securities could not be transferred from inside the 15c3 account, Lehman would be required to substitute and provide 769 million dollars from somewhere outside that account?
"A. Absolutely not."

Sir, you'll agree that Mr. Harvey Miller's testimony reflects an understanding that is also the exact opposite of yours?

A. Yes. I neither spoke to Mr. McDade or Mr. Miller about this.
Q. Did Mr. Michael Klein tell you that he had been admonished by Harvey Miller that the chances of Barclays getting the 769 million were slim to none?
A. I don't recall.
Q. You don't recall that, sir?
A. I don't recall.
Q. Is it your position, sir, that you were never told that this asset was conditional, that there was a contingency, a sensitivity around it?

A. I don't recall. I do recall that we were specific that if there was an issue, we would expect to get the 769 from somewhere else in the estate. But I don't remember -- I'm not saying it didn't happen, I don't recall it happening, That there was a specific conversation, but I do remember saying or agreeing to certain language around if we couldn't get it there, we'd get it from the estate.

Q. Sir, I'd like you please to refer to tab 3 of your binder. And that is Movants' Trial Exhibit 436. Your colleague, Mr. Patrick Clackson visited with us some days ago and we discussed this with him. This is a paper for the board audit committee meeting of Barclays on 21 October, 2008. Do you see that, sir?

A. Yes.

Q. I'd ask you, sir, please, to turn to the last page of the exhibit and to look at the provisional acquisition balance sheet and negative good will calculations. Do you see that, sir?

A. Yes.

Q. Now if you look at the financial assets column and just go down three lines, you'll see a cash deposit, and it's in the amount of 770 million dollars. Do you see that, sir?

A. Yes.

Q. Now please, sir, look at note 2. You'll see there, there is a sensitivity that is reported to the Barclays audit committee and you see that that reports the release of this

deposit is subject to Sec approval. Do you see that, sir?

A. Yes.

Q. Were you aware of this report before it was provided to the audit committee?

A. I don't recall specifically.

Q. Did you tell Bob Diamond that this asset, the 770 million dollars from Lehman, was conditional?

A. I don't recall if I had a specific conversation with Bob that it was conditional but, again, I do remember explaining that we had language that said if we couldn't get it through the -- if for some reason we couldn't get it from whoever, we'd get it from the estate. So, by its nature, it was, I'd say, not conditional -- I don't remember a specific conversation on conditional or anything. But clearly we were trying to say if we couldn't get it, then we'd get it from the estate. So clearly there was some issue, or potential issue.

Q. Is it fair to say that Mr. Diamond does not like surprises?

A. You'd have to ask Mr. Diamond. That is a characterization of Mr. Diamond. That's public.

Q. This 770 million dollars has been recognized as earnings by Barclays, has it not?

A. I don't know if it's been recognized as earnings, actually.

Q. Prior to the release of Barclays' accounts for 2008, did

**you ever tell Mr. Diamond that this 770 million dollars was subject to a contingency?**

**A. We may have had the conversation again because of the nature of the language around -- if we didn't get it from -- if we couldn't get it, we'd get it via the estate from another way. So, I don't remember if we had the specific term around contingency, but clearly there was an issue because I was saying if we didn't get it one way, we'd get it another.**

**Q. You advised Mr. Diamond of the issue, did you, sir?**

**A. I can't recall. I really can't recall.**

**Q. Sir, let me --**

THE COURT: Mr. Maguire --

**A. Well, the language is there --**

THE COURT: Mr. Maguire, let me just break in in terms of scheduling. Mr. Maguire, can you give me an estimate as to how much longer you're going to be? Because if it's going to be brief, we can take the time and not take a break. If you're going to be a while, we'll change reporters.

MR. MAGUIRE: It'll be a little while, Your Honor.

THE COURT: I think we'll take a break then. Five minutes.

(Recess from 4:40 p.m. until 4:51 p.m.)

THE COURT: Be seated, please.

MR. MAGUIRE: If it please the Court.

RESUME CROSS-EXAMINATION

BY MR. MAGUIRE:

**Q. Sir, I'd like to ask you some questions about the 1.9 billion dollar asset that you got on the Friday the 19th. That's the assets at DTC or the depository trust company. Right away, you understood there was an issue with the value of those assets, isn't that right?**

**A. I don't know that there was issue with the value of those assets. I remember, I recall that they were descr -- unencumbered assets. The 1.9 billion.**

**Q. You remember that the Lehman people referred to these assets as the bag of hammers?**

**A. No.**

**Q. You remember that Michael Keegan and Stephen King were involved in looking at these assets?**

**A. I don't recall whether they would have or not. I do not, sorry.**

**Q. Do you recall Mike Keegan telling you on Friday the 19th that these were the most illiquid securities that Lehman had?**

**A. I don't recall that.**

**Q. Do you recall Mr. Keegan telling you that Friday that he didn't know he was going to put a positive value on those assets?**

**A. I don't recall that specifically, either. Mr. Keegan certainly had big concerns about the entire transaction.**

**Q. Do you deny that Michael Keegan on Friday, September 19,**

2008 told you that he would be very nervous about putting a positive value on these assets?

A. I don't recall that.

Q. Through the weekend, Stephen King valued these assets at nil, isn't that right, sir?

A. I don't recall specifically.

Q. Well, you received an e-mail, did you not, from Patrick Clackson shortly after the weekend telling you that Stephen had valued these assets at nil?

A. I may have. I don't recall.

Q. Would you turn, sir, please, to tab 5 of your binder?

A. Yes.

Q. If you look at the top of the exhibit, sir, you'll see that that is an e-mail that your colleague Patrick Clackson sent you on Tuesday, September 23, 2008 in which he said in the first line of the e-mail, "1.9 billion was in but Stephen has valued at nil. So maybe upside." Do you see that, sir?

A. Yes, I do see that. I -- it refreshes my recollection.

Q. So you understand that through the weekend, your colleague Stephen King was valuing these assets at DTC at nil?

A. Well, there was valuations that -- across a variety of numbers. I mean, this was -- you could see from Patrick's note, he said there may be upside. Again, the asset's very, very difficult to value throughout the whole weekend, throughout the previous week and then into the following weeks.

Q. There's always a possibility of upside. My question, sir, is that you understand that Stephen King valued this through the weekend at nil?
A. I don't know if it was through the weekend, but certainly at that point it was, yes.
Q. Now sir, you understood that DTC had serious concerns about its exposure to Lehman?
A. Yes.
Q. Many, many billions of dollars of unsettled Lehman trades were outstanding, were they not?
A. It was a significant number, yes.
Q. And the DTCC wanted an unlimited guaranty from Barclays, did it not?
A. Yes, it did.
Q. And Barclays, given the markets, had no appetite for giving any unlimited guarantee, isn't that correct?
A. We had a lot of conversations around it and as I recall, we bounced back and forth as to what we wanted to do. But we eventually ended up saying no, we'd give no unlimited guarantee.
Q. Barclays had no appetite to give an unlimited guarantee, isn't that correct?
A. Yes.
Q. Of course, the issue with DTC was that if DTC issued a cease to act notice for Lehman, then all trading would stop,

all unsettled trades could be open and there would be no business to buy. You understood that, did you not?

A. That -- there were certain -- I don't understand all the intricacies you describe, but, yes, certainly getting the DTC comfortable was important to getting it open for business, yes.

Q. You certainly understood that the issue with DTC threatened your ability to close this entire transaction?

A. Yes.

Q. If you would turn, sir, to tab 4 of your binder? This is an e-mail that -- Movants' Trial Exhibit 522, that Archie Cox sent to Bob Diamond concerning the closing. You see that, sir?

A. Yes.

Q. And just below that, you'll see there's an exchange of e-mails in which you were involved, right?

A. Yes.

Q. And starting at the bottom, you'll see there's an e-mail from Archie Cox to Bob Diamond in which he notifies him, "You should be aware" -- and the subject here is "Closing" -- "that there are issues around clearing which could be significant and thus affect closing. The issues are being addresses but a resolution is not yet clear." Do you see that, sir?

A. Yes.

Q. And then there was a response from Mr. Diamond in which he said, "This is Rich's responsibility." And you were copied on that, were you not, sir?

A. Yes.
Q. "Please be sure to get his approval on everything. I know you know this, but too much slipping through cracks, as you say." You see that, sir?
A. Yes.
Q. You understood at this time that there were issues, very serious issues, concerning DTC which affected the closing?
A. The potential closing, yes.
Q. And you knew that this was your responsibility?
A. Yes.
Q. And Barclays wanted to close this deal, did it not?
A. Yes.
Q. You certainly did not want to lose this deal over any problem with DTCC, isn't that correct?
A. If we could avoid it, absolutely correct, yes.
Q. And on this Sunday, Mr. Diamond made very clear that this deal was your responsibility? Isn't that right?
A. He made it very clear this responsibility Archie was saying, was mine, yes.
Q. Now the person that you put in charge of dealing with DTCC was Gerard LaRocca, correct?
A. That's correct.
Q. And Mr. LaRocca is a senior executive of Barclays, correct?
A. Yes.

Q. He was also on the board of DTCC, correct?
A. That's correct.
Q. And Mr. LaRocca had authority working with your team and your counsel to enter into whatever agreements he had to to get this deal done, isn't that correct, sir?
A. Not whatever agreement he had to to get this done, because as you said, we certainly weren't prepared to, you know, guarantee all the clearing on an unlimited basis.
Q. Sir, if I could trouble you to turn to your deposition transcript, which may be in that large binder that you have.
A. Yes.
Q. And turn, please, to page 238, starting at line 23:
"Q. Did Mr. LaRocca have authority to say that substantial assets or any assets for that matter could be excluded from the sale?
"A. Mr. LaRocca would have been working with our counsel and our deal team on the specific nature of those trades and what might be included or excluded.
"Q. And to the extent that he was working with counsel in good faith and doing his best to get the best job for Barclays, he had the authority to enter into whatever agreements that he had to enter into, is that correct?
"A. Yes, broadly."

You were asked that question, sir, and you gave those answers, did you not?

A. Yes.

Q. And that testimony was true at the time you gave it --

A. Yes.

Q. -- was it not?

A. Yes.

Q. And that testimony remains true today does it not, sir?

A. Yes.

Q. Now, sir, I'd like to ask you some questions about Lehman's margin. By margin I mean the cash, cash equivalents and government securities that Lehman's posted as collateral with clearing organization. You understand?

A. Yes.

Q. This is a subject on which you were designated by Barclays to be its corporate representative, specifically with respect to the subject of disclosure. Do you recall that, sir?

A. Yes.

Q. In fact at tab 2 of your binder, sir, you will see Movants' Trial Exhibit 454 and that is the notice in which the movants -- I'm sorry -- the debtors notified Barclays of the topics. And specifically, if you turn to the third page of that exhibit, you will see that the subject number 3 is the timing and extent of disclosures to the bankruptcy court, the SIPA trustee, Lehman Brothers Holdings, Inc. and all other parties in interest regarding the actual or proposed transfer to Barclays of any exchange-traded derivatives and any exchange

deposit to which Barclays claims entitlement under the clarification letter, the TAA or otherwise. You see that, sir?

A. Yes.

Q. And that notice was sent to Barclays on or about August 12 of 2009. And in case you don't recall, I'll represent to you that your deposition was on September 15, just over a month later. You recall that you were designated as Barclays' corporate representative on the subject of disclosure?

A. Yes, sir.

Q. And in satisfying Barclays' obligations in discovery, you prepared for that deposition with other people at Barclays, including Barclays' counsel, isn't that correct, sir?

A. Yes, sir.

Q. Now, I understand, sir, your position is that Barclays made three disclosures that it acquired Lehman's cash, cash equivalents and government securities, is that correct? And if it helps you, I'll list them.

A. Please.

Q. The asset purchase agreement, the clarification letter, and Barclays' accounts. Those are the three disclosures that you gave at that deposition, correct?

A. Yes.

Q. And starting last, the accounts that you refer to, those are Barclays' 2008 accounts which it published in the first part of 2009, correct?

A. That's correct.

Q. And the clarification letter, the clarification letter is the letter that was created over the weekend following the sale here in this court, isn't that correct?

A. That's correct, sir.

Q. And you're not aware of any other disclosure other than the accounts, the clarification letter and the asset purchase agreement, isn't that correct, sir?

A. I -- that's correct, sir, yes.

Q. And you say that not only personally, but as Barclays' corporate representative, correct?

A. Correct.

Q. Now, sir, I'd like to turn your attention to the asset purchase agreement and specifically to the disclosure to Barclays' acquisition of Lehman's cash, cash equivalents and government securities. And I believe that is Exhibit 1 and it should be in the large binder that you have before you.

THE COURT: It's also in the small binder that you gave the witness.

MR. MAGUIRE: I appreciate that, Your Honor.

Q. So you have the small one --

A. Thank you. It's easier to deal with.

Q. -- right there. And if you turn, sir, to page 6 --

A. Yes.

Q. If you look about six to seven lines up from the bottom,

you'll see a subsection (d) under "Purchased Assets".

A. Yes.

Q. And right in the middle of that you'll see the words, "Exchange-traded Derivatives". Do you see that, sir?

A. Yes.

Q. And that is the disclosure that you identified that Barclays had made, disclosing that it was acquiring Lehman's cash, cash equivalents and government securities. Isn't that correct?

A. Yes.

Q. And there is no other disclosure that Barclays made in the asset purchase agreement other than those three words, isn't that correct?

A. I believe that's correct, yes.

Q. Now, sir, you understand, do you not, the difference between exchange-traded derivatives and the cash, cash equivalents or government securities that are used as collateral to support exchange-traded derivatives?

A. Yes, is that it -- yes.

Q. Can you explain that difference for us?

A. Well, the collateral is posted and is associated with those positions, the exchange-traded derivatives. And when we --

Q. Sorry.

A. Yep.

Q. And if I understand your position, sir, it's your understand that these three words constitute a disclosure that Barclays was acquiring Lehman's cash, cash equivalents and government securities used as collateral because it's your understanding that if Barclays took the derivatives without the collateral, it would have to post its own cash?

A. Correct.

Q. And you have no other basis for saying that this is such a disclosure other than that understanding?

A. Well, certainly there -- we didn't know what was in the accounts at the time. No one would ever take the derivatives without taking the collateral.

Q. You --

A. Sorry. No. I don't mean no one. As a business, we wouldn't take the positions without taking the collateral.

Q. And that is the only basis for your understanding, sir?

A. Yes.

Q. Now, sir, I'd like to show you the testimony at trial of Mr. Bart McDade at page 602 of the trial transcript. And this is starting at line 21: "Sir, I would like to ask you a few questions about Lehman's margin assets. And by margin assets what I am referring to is Lehman's cash, cash equivalents and government securities that it posted as collateral at clearing firms."

And going over to the next page:

"A. Okay.
"Q. Can you please tell the Court whether Lehman's margin assets were included in this sale?
"A. They were not intended to be included in the transaction."
The next question: "Did you ever authorize any agreement with anyone at Barclays to include any Lehman cash margin in the sale?"
"A. No, I did not."
You see that testimony, sir?
A. I do.
Q. You would agree with me that Mr. Bart McDade's understanding is exactly the opposite of yours?
A. Certainly not the same as mine.
Q. And you would agree with me that Mr. McDa -- back to your knowledge, Mr. McDade is a person who spent his entire professional life in investment banking?
A. I don't know Mr. McDade's background, except he was in investment banking for a long time, yes.
Q. At the time you dealt with him, he was the president of Lehman?
A. Yes.
Q. And certainly, sir, you have never discussed the understanding that you've testified about, that margin is necessarily goes along -- let me take that back. The understanding that you said that no one would acquire exchange-

traded derivatives without the collateral and that Barclays would not do so. You have never discussed that understanding with anyone other than your counsel. Isn't that correct?

A. That is correct. I recall, Mr. Maguire, that this -- as I recall, the issue exchange-traded derivatives was settled early in the week and there was no cause to have a further dialog about it. It never came up.

Q. You certainly never discussed including margin in the sale with anyone at Lehman?

A. I didn't personally, no.

Q. And when you say personally, in your corporate capacity as a representative of Barclays, you are not aware of anyone at Barclays who discussed margin being included in the sale to Barclays, isn't that correct?

A. I can only speak personally. I don't know if we had people handling that in the team, but I'm not familiar with any conversations they had.

Q. So if you had any thoughts along the lines that the understanding that you've testified about, you kept them to yourself?

A. I discussed them with counsel, I think, at one point, but we all assumed it was coming. It was, again, it was settled earlier in the week in our minds and it never came back up.

Q. And it was settled, you say, because those three words that were in the asset purchase agreement? Is that your

**testimony, sir?**

**A. Those three words were disclosure, yes.**

**Q. Very good. Thank you, sir.**

MR. MAGUIRE: I have no further questions.

THE WITNESS: Thank you.

THE COURT: Anything from the committee?

MR. KIRPALANI: No, Your Honor.

THE COURT: Mr. Schiller, it's time for cross-examination. And without limiting what you choose to do, I would just express the preference, if it's possible, to make this efficient an examination as possible, that we try to conclude by 7 p.m. if we can. If that's not possible, we'll stay later. But at some point, there is a point of diminishing returns, especially as it relates to my ability to get your point or not be irritated that you still keep making your points.

MR. SCHILLER: Thank you, Judge. Well, I know you said at the beginning f this trial, you expected to hear some things over and over again and expected to see some of the same documents over and over again. I will not take that much time tonight.

CROSS-EXAMINATION

BY MR. SCHILLER:

**Q. Mr. Ricci, I appreciate your patience. As the Court's indicated, he wants your examination finished and you well on**

your way home tonight.

A. Thank you very much.

Q. You were asked in your direct examination about the APA and specifically the first lawyer who examined you made reference in the APA to the "book value" of approximately seventy billion of long positions. Do you recall that part of the earlier examination?

A. Yes.

Q. All references in the APA to book value were removed by the clarification letter later that week, isn't that true?

A. That's correct.

Q. In fact, all references to the value or the estimated value of assets and liabilities was removed by the clarification letter, correct?

A. That's correct.

Q. And was that in part because by the time of the clarification letter, no on e believed that book value was relevant or at least you didn't believe that?

A. As I said earlier, the market was so difficult and it was such trouble valuing assets, book values were irrelevant.

Q. Is it also in part -- was it also in part an issue of what assets were actually there and an effort to determine that following the repo?

A. Yes, because the assets referred to in the APA and the short positions for that matter by the end of the week were

gone and essentially replaced by the repo.

Q. Thank you. You were shown a page of Mr. Diamond's deposition. Do you recall that? I think it was page 66, lines 13 through 19, but you weren't given a copy. And while you were looking at those lines, 13 through 19, that question and that answer, as to capital accretion and Mr. Diamond's answer, "I have explained that many times" -- let -- you answered only as to that particular page. Let me address your attention to page 60 of Mr. Diamond's deposition and you see at lines 7, beginning at line 7 in his answer at page 60 he states, "So doing a transaction that was accretive to capital was very, very important to our board and was a strong instruction to me. Notwithstanding that, it was very difficult to value the group of assets and the group of liabilities that we agreed on. And more than telling you that we agreed on a group of assets or discussed a group of assets and a group of liabilities, any -- that is how -- that is how we managed this. With clarity around the fact that, again, with all the risks, nothing could be guarantied, being capital accretive was important."

Do you see that?

A. Yes.

Q. And do you agree with that?

A. Yes.

Q. Let me also show you page 63, which you did not see in your earlier examination. And let me address your attention

there to lines 2 through 9, Mr. Ricci. And Mr. Diamond says again here, "There was a group of assets and a group of liabilities and there was the condition that notwithstanding the risk in the markets and the difficult valuation sin the markets, that at the end of this, we had a commitment to do the best of our ability. Again, nothing could be guaranteed that it would be capital accretive."

Do you agree with Mr. Diamond's testimony there?

A. Yes. As I said, there were parameters that were set by the board and that was our intent. But yes, there's nothing guaranteed given the environment.

Q. And let me finally turn your attention to page 89 of Mr. Diamond's deposition, which you also didn't see. Let me begin actually on page 88 at line 9. Mr. Diamond testifies there, "I think clearly the mismatch is what creates the capital accretion, and you know, listen, fair enough, I've said it before in other situations and I'll try to say it again. It's not that there as certainty in valuations. Not that there was certainty in the information. And it is clear that the volatility of the market, even if there was certainty in valuation that day and certainty in information, of which there was neither, when the equity market is swinging around 500 points a day, you can imagine the volatility. So this was a very stressful situation for me, as a main board member to be able to say to my board that you have the highest certainty

possible of capital accretion as we are showing it to you, notwithstanding the uncertainty, the lack of valuations, the lack of information and the volatility in the market. And I was. To be fair, we could only do the best we could. There were no guarantees."

Do you agree with Mr. Diamond's testimony?

A. Yes. It's consistent with the parameters I described that the board laid out.

Q. A portion of Bart McDade's testimony here before His Honor at trial was also put up on the screen. Let me put another page up on the screen for you. Beginning at page 97, there's a question at the very bottom that continues to the next page, 98. And the question to Mr. McDade at trial from Mr. Boies was, "And there were a number of assets that might be of little or no value to Lehman as a nonoperating company that might have substantial value to Barclays as an operating company?" McDade answers, "Yes. I would agree." And Mr. Boies asks him, "And if that difference resulted in a first day gain for Barclays, that was in no way inconsistent with your understanding of the deal, correct?" And Mr. McDade answers, "Correct."

Do you agree with Mr. McDade's testimony?

A. Yes, I do.

Q. Was one way for Barclays to have an economic gain from this transaction to acquire assets that had value to Barclays but that were not valued by Lehman during the negotiation

process?

A. Certainly. The most simple example of that would be -- software is probably the simplest example. Operating platforms. There's others, obviously.

Q. And those are of value to Barclays as a going concern, but not of value to Lehman?

A. That's correct.

Q. I don't know whether you were here while Mr. Burian was still testifying, but he said toward the end, and so you may have been here, that it was a given, and I quote him, that Barclays would have an "economic gain" from the entire transaction. DO you agree with that testimony?

A. Again, you couldn't guarantee anything. But it certainly was our stated intent and open intent to have a gain.

Q. You were asked about Ms. Leventhal's testimony before His Honor and a declaration that Ms. Leventhal submitted to His Honor in December of 2008. DO you recall that?

A. Yes, I do.

Q. And that was a declaration having to do with the settlement of JPMorgan and I'm not going to go into that with you today.

A. Right.

Q. But you were asked about the marks on the federal repo collateral as of Wednesday, September 17th but counsel. Do you remember that?

A. I do.

Q. You may have said this earlier but I'd like you to be clearer with His Honor if you did not. Did Barclays ever receive all of the collateral in the fed repo that Ms. Leventhal referenced in her declaration?

A. No, we didn't. That was the whole issue on Thursday, the nondelivery of the assets that were worked out were supposed to come were significant.

Q. And did the value of what did come decline after Thursday, September 17th?

A. To the best of my recollection, it did, yes.

Q. And did what was actually delivered to Barclays include illiquid securities that were very hard for you and your team to value?

A. Yes.

Q. You were asked some questions about Mr. Clackson's e-mails concerning cure and comp. Do you recall that?

A. Yes, I do.

Q. And Mr. Clackson has testified before His Honor about his accounting. And I know you are not an expert in accounting, but I just want to touch on that subject with regard to documents you were shown concerning a 650 million dollar portion of the two billion dollar value of the -- billion dollars of the comp obligation. Remember that discussion?

A. Yes.

Q. Do you recall whether Mr. Clackson, with regard to that portion of the comp, was considering whether that should move from the acquisition balance sheet and be expensed on the profit and loss statement early in the week?

A. Early in the week, we had various conversations about both the treatment, accounting treatment of the comp accrual as well as the cure accrual and there was some discussion about whether, you know, we would trade in P&L for accounting purposes or balance sheet, it would have made a difference to the opening gain and there were some issues around the technical treatment of that, and what was appropriate.

Q. And did the comp include bonus and severance?

A. Comp included bonus and severance.

Q. So was there a question whether what you were going to spend, depending on how many people remained here and how many people parted ways with Barclays after their initial employment, that spend would move over to profit and loss and not be accounted for on Mr. Clackson's acquisition balance sheet?

A. That was one of the topics we were debating, yes.

Q. And was that the concern about the 700 -- 650 million that is, where it would be accounted for?

A. Mr. Clackson, in that e-mail, I know he was worried about the technical accounting because Gary Romain I think was in the previous e-mail, if I recall correctly, he was our technical

accountant.

Q. And the 2.25 billion for cure, you told His Honor that you were aware of that number early in the week and through the week, right?

A. That's correct.

Q. DO you remember early in the week whether Mr. Clackson intended to move that 2.25 off of the acquisition -- draft acquisition balance sheet over to P&L to incur those charges as they were spent, as the cure money was spent?

A. As I said, that was another accounting treatment we considered. So, yes, Mr. Clackson did discuss that type of treatment for that -- for the sure, yes.

Q. Do you know how long it took to determine what your cure payments ultimately were?

A. I don't recall. We started the work, obviously, as soon as we could and I think we ended up going through to about November time frame to determine the final amount.

Q. You were also asked about representations and the repo. You were asked about a valuation after receiving the repo of fifty-two billion in connection with, I think, the loaning marks and you said you thought there were many valuations. Do you remember that?

A. Yes.

Q. Movants gave you a big book. Do you still have it?

A. I do.

Q. Can I ask you to turn to tab 78 of movants' book?
A. Sorry, yes.
Q. Okay, His Honor has that. This is an e-mail from Stephen King to you on Sunday, September 21st in the evening, the evening before the sale closed. You see that?
A. I do, yes.
Q. And he's saying to you, and he's copying Patrick, "Current best estimate is the portfolio including seven billion cash is 48.5 to 49 billion." Do you see that?
A. Yes, I do.
Q. That's quite below fifty-two, isn't it?
A. Yes. This is my point about there's valuations swinging all over the place.
Q. You were asked about your discussions Friday with Mr. McDade.
A. Yes.
Q. And the representation to you from Mr. McDade or Mr. Kirk as you were asking for more value -- and by the way, you were asking for more value because you were concerned, were you not, about the values of what you had received in the repo, what you had not received in the repo and these illiquid securities that you couldn't value at all?
A. Yes, as I had stated, well, I haven't really stated. The night when the repo was actually being executed, there was a massive shortfall in the delivery of what we were supposed to

get. So we got assets that weren't no the register that the fed had been a party to, there were problems in delivering assets, there were assets that were coming back to us that we had already rejected in other transactions with JPMorgan. It was a real nightmare and of course we had concerns around the value, the environment, where market values were headed; we were very concerned. And what, again, we wanted to make sure we had the appropriate cushion to keep Barclays out of harm's way.

Q. At some point Friday, when you were told by Mr. McDade or Mr. Kirk that there were no more assets, there as nothing more, did you take that to mean there were no more assets of the type that you have said you were not willing to acquire, that --

MR. SCHILLER: Let me rephrase that.

Q. -- that there were no more assets of the kind that you were willing to acquire, as opposed to the kinds of assets Barclays was not willing to acquire, like the RACERS and other kind of illiquid assets?

A. Yes. That was my understanding.

Q. You knew that Barclays had selected the assets it was willing to acquire and that there were aspects of the entire estate that Barclays was not interested in acquiring?

A. Yes, absolutely. I mean, that started the previous weekend when we excluded a large chunk of assets related to real estate and private equity and a lot of other illiquid

**assets. Yes, a large set of assets we didn't want.**

**Q. Like Neuberger, for example?**

**A. Neuberger, yes.**

**Q. Let me know ask you to look again, Your Honor and Mr. Ricci, to Trial Exhibit 580 that movants put in front of you. And I don't know whether it was my friend Mr. Maguire and his book or in the big book and I apologize for that.**

THE COURT: 580 is tab 5 in Mr. Maguire's book.

MR. SCHILLER: Thank you, Judge.

**Q. This is an e-mail, I believe you identified it, from Mr. Clackson to you the day after closing, September 23rd. And Mr. Maguire read to you the first part of the top e-mail from Patrick: "1.9 billion was in, but Stephen has valued at nil, so maybe upside." It goes on to say, "He has his guys working on it." Do you see that?**

**A. Yes.**

**Q. And then Mr. Clackson explains what he's doing, what he is valuing. "I am putting fifty cent value." Does that mean fifty cents on the dollar, sir?**

**A. That's correct, yes. That's what it would imply.**

**Q. "I am putting fifty cents on the dollar on it for the moment." So, to Mr. Clackson, working on his acquisition balance sheet, this was not nil, was it?**

**A. No, that's correct.**

**Q. And this was not the final valuation either as he worked**

on that process?
A. That's correct. There were various considerations.
Q. How long did it take Barclays, do you recall, to definitively value the assets that it had received?
A. I don't believe we definitively valued all the assets until February of 2009.
Q. Finally, you were asked by Mr. Maguire about margin. And you were shown the APA in paragraph 1(d). And you indicated in your testimony that you thought that you didn't go back to it. But let me ask you whether you recall, and I'm going to try to refresh you on this, it's not in your book, that that language in the APA was replaced in the clarification letter? DO you recall that?
A. Yes. Certain language within the APA was replaced, yes.
Q. That is the APA referred to exchange-traded derivatives?
A. Yes.
Q. And you told Mr. Maguire that you understood that included margin, do you recall that?
A. Yes, I do.
Q. And then you said that later in the week it may have come up again, you may have talked to your lawyer about it, but that was the only memory. Do you recall whether in the clarification letter, it was provided in the definition of purchase assets -- and I'm not asking you to look at anything, just see if this refreshes you, that exchange-traded

**derivatives was coming to Barclays and any property that may be held to secure obligations under such derivatives. Do you recall that?**

**A. I do recall that, yes.**

**Q. And do you now recall that that clarification letter language amended the APA?**

**A. Yes.**

**Q. And the clarification letter expressly makes clear that exchange-traded derivatives include all margin and collateral, doesn't it?**

**A. That's the -- yes, in the clarification letter, that's correct.**

**Q. Thank you.**

MR. SCHILLER: I have no -- I have two more questions.

THE COURT: The same thing happened to Mr. Shaw.

MR. SHAW: The old man privilege again, Your Honor.

THE COURT: Okay, it works. Works for me, too.

BY MR. SCHILLER:

**Q. I can tell you a story -- I won't -- about the first time we appeared in court together about twenty years ago. To your knowledge, Mr. Clackson (sic), did anyone from Lehman or anyone else ever suggest or say, prior to closing, that you were not entitled to the 1.9 billion in Lehman's clearance boxes?**

**A. Sorry, just for the record, I'm Mr. Ricci, not Mr. Clackson. And, no, not that I recall.**

**Q. Thank you. Thank you. You were also read some testimony, Mr. Ricci, trial testimony from Harvey Miller and from Bart McDade about the 769 million that was due in connection with the 15c3 accounts. Do you recall that?**

**A. Yes, I do.**

**Q. And you mentioned that the clarification letter expressly says that if you don't get the 769 million from the 15c3 account, you get it from somewhere else. DO you recall that testimony?**

**A. Yes, id o.**

**Q. Did anyone ever suggest to you why this language was in the letter, other than to make that Barclays was to get 769 million from one source, the accounts, or another?**

**A. I don't recall if there's a specific conversation about why we had the language, but we did have the language that we would get it from one source or another.**

**Q. Thank you.**

MR. SCHILLER: Thank you, Your Honor.

THE COURT: Is there any redirect?

MR. GAFFEY: Not from the debtor, Your Honor.

MR. MAGUIRE: Just very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. MAGUIRE:

**Q. Again, Bill Maguire for the SIPA trustee. Mr. Ricci, I believe you just were asked some questions about language that**

made its way into the clarification letter and that language was, "any property that may be held to secure obligations under exchange-traded derivatives."

A. Yes.

Q. Now did you see that language in the clarification letter before the closing? Or is that something that you learned about after the fact?

A. Before the closing, did you mean on Friday?

Q. No, before the closing on Monday morning the 22nd of September?

A. I don't recall if I saw it before or afterwards. I certainly would have read the letter, but I can't remember specifically when I read it.

Q. Do you have any recollection of seeing that language, specifically the language, "any property held to secure obligations under exchange-traded derivatives"? DO you have a recollection of ever seeing that language any time before the closing on Monday morning?

A. I don't recall if I did or not, I'm sorry.

Q. Do you know whether you spoke with your lawyer concerning that any time prior to the closing?

A. I believe I did speak to counsel around the issue of exchange-traded derivatives, but I can't remember the details around it.

Q. Was that before the closing?

**A. I think it was before the closing, but I can't be sure.**

MR. MAGUIRE: No further questions, Your Honor.

THE COURT: Does that prompt any questions?

MR. SCHILLER: No, Your Honor.

THE COURT: Mr. Ricci, you can go home.

THE WITNESS: Thank you. London's looking very good.

THE COURT: You're excused. Thank you for your time.

THE WITNESS: Thank you very much.

THE COURT: Now, there's still a couple of items of unfinished business. One is, and this is really a question to counsel. We had talked about using some time this evening if we had the time, to just talk about what happens next and when it happens and to have what amounts to a chambers conference, but we would do it in place simply clearing the courtroom and going off record.

My question is whether or not, given the intensity of the last two weeks and the hour, you're comfortable doing that now or if you would like me to schedule another time to discuss when next we'll be able to come together for an agreed series of trial days in June. I have some days, incidentally, that I'm going to propose to you in addition to the ones that I mentioned last time we were together.

Candidly, I think it would be useful if we could use maybe ten or fifteen minutes for that purpose before breaking. But I also recognize that people may have other priorities for

the moment. Is it okay to stay? Okay?

MR. SCHILLER: Absolutely, Your Honor.

THE COURT: Fine. Let's do that then. I also wanted to rule on the discovery motion relating to Exhibits 701 and 705. They're admitted.

(Movants' Exhibits 701 and 705 are hereby received into evidence as of this date.)

I have reviewed the May 5 letter brief from Boies Schiller and the May 6 -- excuse me, May 4 memorandum submitted by the movants. I probably tipped my hand during colloquy as well. I don't believe that the Exhibits 701 and 705 truly fall within the ambit of Rule 408 because the dispute there being discussed by e-mail communication between Barclays and the fed was settled is not the dispute which is before the Court and the issues presented do not really fall within either section of 408(a).

I'm also influenced by the opinion of the second circuit in Starter Corp. v. Converse, Inc. 170 F. 3d 286 at 293, a 1999 second circuit decision which provide in the second circuit, "evidence of a settlement agreement and its surrounding circumstances though otherwise barred by Rule 408 can fall outside the rule if it is offered for another purpose i.e. for a purpose other than to prove or disprove the validity of the claims that the agreement was meant to settle."

There's some other authority as well, but I don't need

to burden the record with more authority. Under the circumstances, those documents are in for whatever weight they're to be given.

Now, we're adjourned for the week and we'll have a chamber conference in about ten minutes to discuss when next we get together.

(Whereupon these proceedings were concluded at 5:39 p.m.)

I N D E X

T E S T I M O N Y


| WITNESS | EXAM BY | PAGE | LINE |
|---|---|---|---|
| Saul Burian | Mr. Boies | 6 | 6 |
| Saul Burian | Mr. Kirpalani | 116 | 18 |
| Saul Burian | Mr. Boies | 121 | 13 |
| Rich Ricci | Mr. Gaffey | 124 | 15 |
| Rich Ricci | Mr. Maguire | 218 | 2 |
| Rich Ricci | Mr. Schiller | 246 | 23 |
| Rich Ricci | Mr. Maguire | 260 | 23 |


E X H I B I T S


| NO. | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| M-701 | | | 263 |
| M-705 | | | 263 |

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.

Lisa Bar-Leib Digitally signed by Lisa Bar-Leib
DN: cn=Lisa Bar-Leib, o, ou,
email=digital1@veritext.com,
c=US
Date: 2010.05.11 14:22:33 -04'00'

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date: May 11, 2010