FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) | |
| Plaintiff. | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 08-1420 (JMP) |
| LEHMAN BROTHERS INC., | ) | |
| Defendant. | ) | SIPA Liquidation |
| | ) | |

### MEMORANDUM DECISION GRANTING MOTION TO UPHOLD DETERMINATION OF CLAIM BY SIPA TRUSTEE

HUGHES HUBBARD & REED, LLP
*Attorneys for SIPA Trustee*
One Battery Park Plaza
New York, NY 10004

> James B. Kobak, Jr., Esq.
> Ramsey Chamie, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for SIPC*
805 15th Street, N.W.
Suite 800
Washington, DC 20005

> Kenneth J. Caputo, Esq.

FIFTH THIRD ASSET MANAGEMENT, INC.
*Attorneys for Fifth Third Structured Large Cap Plus Fund*
38 Fountain Square Plaza
Cincinnati, OH 45263

> Matthew A. Swendiman, Esq.

K&L GATES LLP
*Attorneys for Fifth Third Structured Large Cap Plus Fund*
1601 K. Street, N.W.
Washington, DC 20006

> Richard A. Kirby, Esq.
> Stephen G. Topetzes, Esq.

K&L GATES LLP
*Attorneys for Fifth Third Structured Large Cap Plus Fund*
925 Fourth Avenue
Suite 2900
Seattle, WA 98104

      Philip M. Guess, Esq.
      Kymberly K. Evanson, Esq.


JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

James W. Giddens, as Trustee (the "Trustee") for the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, has brought a Motion for an order upholding his determination regarding the claim of Fifth Third Structured Large Cap Plus Fund ("Fifth Third") and expunging Fifth Third's objection to that determination. The Securities Investor Protection Corporation ("SIPC") has filed a memorandum of law in support of the Trustee's Motion[1].

At issue is the proper date for determining the claim against LBI relating to closing out certain short positions in Fifth Third's prime brokerage customer account with LBI. Because of market movements, the amount of the claim changes significantly depending on the date selected. The Trustee argues that the date for calculating the market value of securities to close out such short positions should be the filing date of the LBI liquidation, as mandated by SIPA, and that this is the one bright line date for fixing the amount of all claims against the estate.

---

[1] SIPC is deemed to be a party in interest in all matters arising under a SIPA liquidation proceeding. 15 U.S.C. § 78eee(d).

Despite plain language of the SIPA statute that supports valuing all claims as of the filing date, Fifth Third objects[2] to the Trustee's determination principally on the basis of its specially protected status as a financial participant. Fifth Third contends that securities needed to close out the short positions in its LBI account should be valued as of March 11, 2009, the effective date of a limited settlement agreement between Fifth Third and the Trustee regarding the treatment of its claims. By virtue of certain provisions of the Bankruptcy Code (as defined below) enacted by Congress in 2005, Fifth Third asserts that its SIPA claim must be valued as of the date of termination of its securities contract.

These amendments to the Bankruptcy Code insulate securities contracts of financial participants from the operation of the automatic stay, clarify the rights of financial participants under such contracts and, according to Fifth Third, also provide support for the proposition that financial participants are exempt from the requirement to value their claims against the Trustee as of the filing date. Thus, Fifth Third submits that claims arising out of the closing out its short positions against the LBI estate (i.e., claims calculated on the basis of the then applicable market value of securities needed to cover those positions) are governed by Section 562 of the Bankruptcy Code.

---

[2] On January 6, 2010, Fifth Third also filed a Motion for Summary Judgment and Statement of Material Facts Not in Dispute (the "Summary Judgment Motion") [Docket No. 2471] relating to this contested matter. On January 20, 2010, the Trustee and SIPC filed a Joint Motion for Entry of an Order Striking Fifth Third's January 6, 2010 Motion for Summary Judgment (the "Motion to Strike") [Docket No. 2541]. The Summary Judgment Motion is procedurally improper in the context of the claims resolution process and was filed in violation of (i) the November 5, 2009 Consent Order Regarding Briefing Schedule and (ii) the requirements of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"). For the reasons noted on the record on February 25, 2010, the Court will grant the Motion to Strike and will disregard the Summary Judgment Motion. (Tr. 56:6-58:20.) Moreover, to the extent that Fifth Third's Memorandum in Opposition to the SIPC [sic] Trustee's Motion to Uphold Claim Determination and in Support of Fund Motion for Summary Judgment [Docket No. 2471] or either declaration submitted therewith introduces new facts to those agreed upon by the parties in that certain Stipulation of Facts (the "Stipulation of Facts") [Docket No. 2045] so-ordered by the Court on November 5, 2009, the Court will disregard them. By agreement of the parties, the Court will consider as part of the record the July 2, 2007 Special Custody and Control Agreement by and among State Street Bank and Trust Company, Fifth Third and LBI (the "Special Custody Agreement"), which was submitted to the Court in connection with the Summary Judgment Motion. (Tr. 58:25-59:11.)

Under this authority, Fifth Third urges that the resulting claim should be based on the market value of securities on the date of rejection or termination of applicable securities contracts with LBI and not the filing date. Fifth Third also argues that its claim should not be treated as an ordinary "customer claim" under SIPA, because of the tri-party nature of the agreements relating to the short sale transactions. As structured, these transactions provided for borrowed securities and margin payments to be held not by LBI but by a third party acting as a fiduciary in accordance with a custody agreement.

The parties presented their respective arguments to the Court at a hearing held on February 25, 2010 (the "Hearing")[3]. At the Hearing, the Court reserved decision. For the reasons stated, the Court agrees with the Trustee and SIPC that the filing date of the LBI liquidation is the only correct date for determining claims based on the short positions of Fifth Third. That date is an immutable element of every case under SIPA. This case is no exception, and nothing in the safe harbor provisions of the Bankruptcy Code is inconsistent with that central liquidation premise. Accordingly, the Court grants the Motion and overrules the objection of Fifth Third.

### *Background*

On September 15, 2008, Lehman Brothers Holdings, Inc. commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to a Complaint and Application of SIPC, on September 19, 2008, the United States District Court for the Southern District of New York entered an Order Commencing Liquidation (the "Liquidation Order") [Docket No. 1].

---

[3] On March 1, 2010, the Court received a letter from counsel to Fifth Third purporting to address an issue raised by the Court *sua sponte* during the Hearing but not addressed by any party in its papers. The Trustee did not respond to the letter. The letter raised questions not relevant to the issues in dispute in this matter and, therefore, the Court has not considered the letter in this Memorandum Decision.

The Liquidation Order, *inter alia*, (i) ordered, adjudged and decreed that the customers of LBI were in need of the protection afforded by SIPA, (ii) appointed the Trustee "for the liquidation of the business of LBI with all the duties and powers of a trustee as prescribed in SIPA" and (iii) removed the liquidation proceeding to this Court. (*Liquidation Order* ¶¶ I, II, XIII).  Under the Liquidation Order, the Trustee is obligated to take action to promptly satisfy LBI's obligations to its "customers," as such term is defined in SIPA.  15 U.S.C. § 78lll(2); 78fff-2(b).

Fifth Third, a registered investment company under the Investment Company Act of 1940, and LBI are parties to a Prime Brokerage Customer Agreement, dated as of July 7, 2007.  (SOF[4] ¶¶ 1, 7).  In connection with the Prime Brokerage Customer Agreement, and in accordance with federal securities laws, Fifth Third and LBI entered into a Special Custody Agreement with State Street Bank and Trust Company ("State Street").  (SOF ¶ 8).  Pursuant to the Special Custody Agreement, Fifth Third established a special custody account (the "Special Custody Account") at State Street, and LBI was granted a security interest in that account.  (SOF ¶ 8).

Fifth Third held various short positions in the Special Custody Account.  (SOF ¶ 9).  Transactions covered by these agreements involved borrowing securities from LBI, selling these securities through a third-party broker, and depositing the proceeds in the Special Custody Account.  (SOF ¶ 9).  Pursuant to federal regulations, and by agreement of the parties, Fifth Third was obligated to post margin based on the current value of each short position in the Special Custody Account equal to twice the value of the borrowed securities.  (SOF ¶¶ 6, 9, 11).

---

[4] Unless noted otherwise, all facts upon which the Court relies in this matter are set forth in the Stipulation of Facts (the "SOF").

The margin account for each of Fifth Third's short positions was marked to market daily, and the required margin was either increased or reduced based on the adjusted value of the securities. (SOF ¶¶ 6, 9). In accordance with industry custom and practice, margin was determined on a net basis across multiple securities positions and a single margin debit or credit adjustment was made to the Special Custody Account each day. (SOF ¶¶ 6, 9, 11). This practice constituted a "master netting agreement" as that term is used in the Bankruptcy Code. (SOF ¶ 14). Under the terms of the Special Custody Agreement, LBI had the exclusive right to direct State Street to release the margin in the Special Custody Account. (SOF ¶ 11).

On October 6, 2008, the Trustee issued the Protocol of the LBI Trustee Regarding Prime Brokerage Arrangements (the "Protocol"), setting forth procedures for transferring prime brokerage accounts. (SOF ¶ 20). With respect to short positions, the Protocol stated that "[c]ustomer accounts will be closed out as of September 19, 2008, using the Bloomberg end of day closing price or a commercially reasonable price from alternative sources." (SOF ¶ 20). On October 14, 2008, the Trustee issued a superseding Protocol of the LBI Trustee Regarding Prime Brokerage Arrangements (the "Superseding Protocol") (SOF ¶ 21). The Superseding Protocol emphasized that "the protocols envision a consensual process and discussion of individual accounts may permit some variation where the estate is not put at risk," and reiterated that, with respect to short positions, "accounts will be closed out as of September 19, 2008 … ." (SOF ¶ 21).

Subsequent to the issuance of the Superseding Protocol, Fifth Third made efforts to transfer its short positions to another prime broker, but the Trustee would not approve any transfer that did not comport with the terms of the Superseding Protocol. (SOF ¶ 24).

6

Fifth Third filed a "customer" claim with SIPC on January 30, 2009 (the "Claim") in

which Fifth Third demanded that the Trustee "(a) accept tender in cash equivalent to the

market value of [its] short positions; (b) close-out [its] short positions at market values as

of the tender date; and (c) authorize [State Street] to release to [Fifth Third the excess

margin in the Special Custody Account]." *Objection to Trustee's Determination of*

*Claim* [Docket No. 1301] at Ex. 4.

On March 12, 2009, the Trustee and Fifth Third entered into a limited settlement

agreement (the "Limited Settlement Agreement"), whereby the parties agreed to place in

escrow the difference between the value needed to close out the short positions in the

Special Custody Account as calculated on each of two dates deemed relevant to the

current dispute – September 19, 2008, the SIPA "filing date" and March 11, 2009, the

"tender date" relied upon by Fifth Third.  15 U.S.C. § 78lll(7); (SOF ¶ 26).  The

difference between the values ascribed to closing out the positions calculated on these

two dates (the "Disputed Amount") is $18,179,102.19.  (SOF ¶ 31).  Pursuant to the

Limited Settlement Agreement, the Disputed Amount is being held in escrow pending

resolution of the dispute now before the Court, the value of the short positions as

calculated as of March 11, 2009 has been transferred to the Trustee, and the remaining

assets in the Special Custody Account have been released to Fifth Third.  (SOF ¶¶ 32-34).

By notice dated June 23, 2009, the Trustee informed Fifth Third of his

determination that the Claim was (i) allowed and satisfied as to the value of the cash and

securities reflected in the Special Custody Account as of September 19, 2008, the

calculation of which reflected the close out of the short positions as of September 19,

2008; and (ii) denied as to the Disputed Amount.  (SOF ¶ 35).  Fifth Third filed its

Objection to Trustee's Determination of Claim on July 21, 2009.

### *Discussion*

In order to resolve the dispute framed by the Trustee's Determination of Claim,

the Objection and the Stipulation of Facts, the Court must consider and reconcile

seemingly inconsistent provisions of SIPA and the Bankruptcy Code.  In his argument,

the Trustee relies heavily upon the SIPA definition of "net equity" and its requirement

that it be calculated on the filing date.  *Trustee Br. Supp.* at 5-6; 15 U.S.C. § 78lll(11).

Fifth Third focuses attention on Section 562 of the Bankruptcy Code, which provides that

when a debtor rejects a securities contract with a financial participant or when a financial

participant terminates a securities contract with a debtor, the parties shall use the date of

rejection or termination as the reference point to calculate damages.  *Fifth Third Br.*

*Supp.* at 16-17; 11 U.S.C. § 362.  Before analyzing these conflicting provisions, however,

the Court first must address whether the assets in the Special Custody Account are

"customer property," and, as a result, whether the Claim is properly subject to the SIPA

claims process.

Fifth Third argues that a net equity calculation as of the filing date is

inappropriate in this matter because the calculation "is a tool for identifying priority

claims of customers *against the debtor's estate*."   *Fifth Third Br. Supp.* at 27 (emphasis

original).  Fifth Third maintains that the present dispute "involves [its] claim for *its own*

*property* which has always been properly segregated by law and contract from the claims

of other customers of LBI."  *Id.* (emphasis original).  Fifth Third looks to the requirement

of the Investment Company Act of 1940 that its assets be held by a third-party custodian

(here, State Street) to support its assertion that the Disputed Amount has never been "held

by the debtor," and, therefore never "became part of the customer property pool subject

to pro-rata distribution among other customers." *Fifth Third Br. Supp.* at 28.

This is a superficial characterization that disregards the commercial reality of the

agreements among the parties. Notably, Fifth Third itself recognized this reality when it

filed a "customer" claim stating that the assets in the Special Custody Account are

"customer property that must be released to Claimant". *Objection to Trustee's*

*Determination of Claim* at Ex. 4. The Special Custody Agreement cannot be viewed as

an isolated agreement. It formed a necessary part of the prime brokerage services

provided by LBI to Fifth Third that enabled Fifth Third to implement its short selling

market strategies. Securities and margin held by a custodian in connection with such an

interconnected tri-party relationship are not to be excluded from the definition of

customer property simply because assets are in the hands of a custodian, especially when

the assets in question are so closely related to trading activities in Fifth Third's LBI

account.

SIPA defines "customer property" to include "cash and securities … held by or

for the account of a debtor from or for the securities accounts of a customer … ." 15

U.S.C. § 78lll(4). Moreover, pursuant to the Special Custody Agreement, the assets in

the Special Custody Account were under the dominion and control of LBI. *See, e.g.,*

Special Custody Agreement at ¶ 4 ("[Fifth Third] and [LBI] desire to establish

procedures for the compliance by [LBI] with the provisions of Regulation T … including

without limitation [State Street's] acting as agent of [LBI] to effect the security interest

contemplated hereby and to effect [LBI's] dominion and control over the Collateral"); *Id.*

at ¶ 6 ("[Fifth Third], [LBI] and [State Street] are entering into this Agreement to provide

for perfection of [LBI's] security interest in the Collateral by establishing that [LBI] has

'control' of the Collateral"); at ¶ 2(a) ("[Fifth Third], in its capacity as securities

intermediary … shall open and maintain on its books and records a securities account for

[LBI] entitled 'Lehman Brothers Inc. as Pledgee of Fifth Third … Special Custody

Securities Account'").  Given the foregoing, the Court finds that the Disputed Amount

constitutes "customer property," as such term is defined by SIPA.

Having found that the Claim should be resolved in accordance with the SIPA

claims process, the Court next examines the question of the relevant date for calculating

the market value of securities to close out the short positions in Fifth Third's customer

account.  Under SIPA, the Trustee is required to determine a "customer"[5] claim based on

the "net equity" of the customer as shown on the books and records of the debtor.  15

U.S.C. § 78fff-2(b); *see also In re Adler, Coleman Clearing Corp.*, 211 B.R. 486, 489

(Bankr. S.D.N.Y. 1997) (explaining that the "value of a customer's account, or its 'net

equity', is the measure of its preferred SIPA customer claim").  Net equity is

> the dollar amount of the account or accounts of a customer, to be determined by
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer … ; minus (B) any indebtedness of such
> customer to the debtor on the filing date; plus (C) any payment by such customer

---

[5] SIPA defines "customer" as

> any person (including any person with whom the debtor deals as principal or agent) who has a
> claim on account of securities received, acquired, or held by the debtor in the ordinary course of
> its business as a broker or dealer from or for the securities accounts of such person for
> safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral
> security, or for purposes of effecting transfer … .

15 U.S.C. § 78lll(2).  Given that (i) Fifth Third is party to a Prime Brokerage Customer Agreement with
LBI, (ii) Fifth Third filed a "customer" claim, and (iii) the Court has found that the Disputed Amount
constitutes customer property, Fifth Third is most definitely a customer of LBI with respect to the Disputed
Amount.

of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).

15 U.S.C. § 78lll(11).  As is clear from the definition, net equity is calculated as of the filing date.  *See also In re Adler, Coleman Clearing Corp.,* 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996) (explaining that "[a] customer's account is valued as of the date the SIPA liquidation is commenced").

In contending that it is entitled to the Disputed Amount and that March 11, 2009 is the proper date for determining the value to be ascribed to closing out its short positions, Fifth Third relies on certain changes to the Bankruptcy Code that were adopted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and a corresponding change to SIPA (the "2005 Amendments") that allow financial participants to net-out positions under securities contracts without violating the automatic stay.

Fifth Third asserts that it is impossible to apply and give meaning to these so-called safe harbor provisions if net equity value is determined on the filing date in the same manner as ordinary customer accounts.  *Fifth Third Br. Opp'n* at 19.  In particular, Section 562 of the Bankruptcy Code provides that, where (i) a debtor rejects a securities contract or (ii) a financial participant terminates such a contract, damages "shall be measured as of the earlier of … the date of such rejection … or the date or dates of such … termination."  11 U.S.C. § 562.  In addition, because the parties' practice of offsetting or netting their respective obligations across multiple securities contracts constituted a "master netting agreement," Section 561 of the Bankruptcy Code provides "yet  another level of protection to [Fifth Third's] exercise of its rights under its securities contracts,

11

which cannot be disrupted by LBI's SIPA liquidation." *Fifth Third Br. Opp'n* at 18.

Fifth Third states that exercising its rights of offset and netting out of its positions under

section 561 "means valuing [Fifth Third's] net positions as of the date they were finally

closed, March 11, 2009." *Id.* at 19.

However, this March 11, 2009 closing date only becomes relevant to this dispute

because of the timing of the Limited Settlement Agreement under which the Trustee gave

his consent and authorized State Street as custodian to close out the then open short

positions of Fifth Third.  If such consent had not been given by the Trustee, Fifth Third

would lack the capacity acting on its own to unilaterally direct State Street as custodian to

take the necessary steps to close out the short positions in its LBI account.  Thus, the

prime brokerage arrangements as structured prior to commencement of the case under

SIPA did not authorize Fifth Third to take any action without first obtaining the consent

of LBI, and this restrained Fifth Third from taking action under the authority of sections

561 and 562.

Under the circumstances, Fifth Third's reliance on these so-called safe harbor

provisions as authority for the right to terminate the securities contracts in question is a

bit mystifying.  Fifth Third argues that it is a specially protected financial participant, but

it could not take action under the very provisions on which it now relies without first

entering into the Limited Settlement Agreement with the Trustee.  Because the

termination rights available to Fifth Third under the safe harbor provisions of the

Bankruptcy Code were not rights that could be freely exercised and were always subject

to contractual restrictions, these provisions turn out to be of only limited value to Fifth

Third in its current attempt to claim the Disputed Amount and separate itself from the

ranks of other customers of LBI.

In part for this reason, Fifth Third's arguments with respect to sections 561 and

562 are simply unavailing.  Although Congress amended SIPA in conjunction with

BAPCPA, importantly it did not change the definition of net equity.  *See* 15 U.S.C. §

78eee(b)(2)(C) (providing, in relevant part, that "[n]otwithstanding section 362 of title 11

… neither the filing of an application nor any order or decree obtained by SIPC from the

court shall operate as a stay of any contractual rights of a creditor to liquidate, terminate

or accelerate a securities contract …").  A financial participant is not stayed in a SIPA

proceeding from liquidating, terminating or accelerating its securities contracts or master

netting agreements, but these rights to liquidate, terminate or accelerate are distinct from

the core determination of net equity.

The 2005 Amendments have not changed the requirement under SIPA that

customer "net equity" claims must be valued as of the filing date.  Financial participants

are entitled to exercise their safe harbored rights, but the 2005 Amendments did not

establish a separate regime for calculating amounts owed to or by the Trustee nor did

these amendments create a separate class of specially-protected parties in a SIPA

proceeding.

Of particular significance in finding in favor of the Trustee with respect to the

Disputed Amount is the deference to be given by the Court to the mandates of SIPA

when applying any language of the Bankruptcy Code that may be inconsistent with the

provisions of SIPA.  SIPA plainly provides that "[t]o the extent consistent with [SIPA], a

liquidation proceeding shall be conducted in accordance with, and as though it were

being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title

11." 15 U.S.C. § 78fff(b).  The key words to emphasize here are *to the extent consistent*.

Thus, to the extent that Fifth Third relies on provisions of the Bankruptcy Code that may

be read to imply a valuation date for the short positions other than the SIPA filing date,

such provisions are inconsistent with SIPA and become inapplicable to this proceeding.

*See SIPC v. Charisma Sec. Corp.*, 506 F.2d 1191, 1195 (2d Cir. 1974) (a provision is not

consistent with SIPA if it "conflicts with an explicit provision" of SIPA).

### *Conclusion*

For the reasons stated, the Objection of Fifth Third to the Trustee's Determination

of Claim is overruled, and the Motion is granted.  Notwithstanding anything contained in

sections 561 and 562 that may be inconsistent, the safe harbor provisions of these

sections of the Bankruptcy Code do not alter the basic principles of SIPA declaring that

customer net equity claims are to be determined as of the filing date.  Thus, the operative

date for purposes of resolving competing claims to the Disputed Amount is September

19, 2008.  The Trustee shall submit an order consistent with this Memorandum Decision

for the Court's consideration.


SO ORDERED:

Dated: New York, New York
       June 1, 2010

                                  *s/ James M. Peck*
                                  Honorable James M. Peck
                                  United States Bankruptcy Judge