| | |
|---|---|
| **JONES DAY** | **HUGHES HUBBARD & REED LLP** |
| Robert W. Gaffey | William R. Maguire |
| 222 East 41st Street | One Battery Park Plaza |
| New York, New York  10017 | New York, New York 10004 |
| | |
| Attorneys for Debtors | Attorneys for James W. Giddens, as Trustee for the |
| and Debtors in Possession | SIPA Liquidation of Lehman Brothers Inc. |

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

James C. Tecce
51 Madison Avenue
22nd Floor
New York, New York  10010

Attorneys for Official Committee
of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :   Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al*.,                       :   Case No. 08-13555 (JMP)
                                                               :
                    Debtors.                                   :   (Jointly Administered)
                                                               :
---------------------------------------------------------------x
                                                               :
In re:                                                         :   SIPA Proceeding
                                                               :
LEHMAN BROTHERS INC.,                                          :   Case No. 08-01420 (JMP)
                                                               :
                    Debtor.                                    :
                                                               :
---------------------------------------------------------------x

**REPLY MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* FOR AN ORDER
EXCLUDING THE EXPERT TESTIMONY OF PROFESSOR PAUL PFLEIDERER**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. and its affiliated debtors and debtors-in-possession (the "Committee," collectively, the "Movants") respectfully submit this reply brief in further support of their motion *in limine* for an order excluding the expert testimony of Professor Paul Pfleiderer.

## INTRODUCTION

1.  Barclays attempts to distract the Court with immaterial issues. The key questions this motion presents are (1) whether Professor Pfleiderer is qualified as an expert with respect to *the actual opinions he is offering in this case*, regardless of whether he might be qualified to give different opinions in any other case; (2) whether Professor Pfleiderer's opinions resulted from an analysis that is "reliable at every step," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), so that there is "a sufficiently rigorous analytical connection" between his "methodology and [his] conclusions," *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); and (3) whether Professor Pfleiderer's opinions "fit" with the issues before the Court and are indeed grounded in appropriate expertise.

2.  Barclays tries to make Professor Pfleiderer's opinions relevant and admissible by re-casting the issue on the Rule 60 motions as whether Barclays adequately recounted on its post-Sale Transaction Acquisition Balance Sheet the value of the Lehman assets Barclays received in the Sale Transaction. But this Balance Sheet was, of course, never submitted to the Court in connection with the Sale Order, and whether Barclays may have violated any SEC regulations or securities laws with this regulatory disclosure is decidedly not the issue before the Court on the Rule 60 motions. A central issue on the Rule 60 motions is the value of the Lehman assets transferred at the Closing Date, whether Barclays offered "reasonably equivalent

2

value" for the assets it purchased, and, fundamentally, whether that was consistent with the transaction that was disclosed to the Court. Professor Pfleiderer does not have the requisite expertise to opine on this issue. In any event, the "methodology" he used is not reliable; it consisted primarily of a cursory review of Barclays' self-conducted valuation and procedures that either did not apply or were not applied by Barclays, and then opining, second hand, that Barclays' valuation seemed "reasonable" to him.

3. Barclays also tries to vouch for Professor Pfleiderer simply because he has testified before this Court in another case. But it does not matter that the Court deemed Professor Pfleiderer's testimony about a different issue to be admissible in a different case. For the actual opinions Professor Pfleiderer is offering in *this case*, his qualifications, methodology, and conclusions fail to meet the standards for admitting expert testimony pursuant to Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and his testimony should therefore be excluded.

**ARGUMENT**

**I. PROFESSOR PFLEIDERER'S OPINION CONCERNING THE EXISTENCE OF A $5 BILLION DISCOUNT THROUGH THE REPO COLLATERAL IS INADMISSIBLE**

4. As Movants showed in their opening brief, Professor Pfleiderer's opinion concerning whether Barclays received a $5 billion discount when acquiring the Repo Collateral is inadmissible. It is based on a methodology that, at bottom, cannot be replicated or tested. Professor Pfleiderer also lacks the requisite expertise to independently value the Repo Collateral and admits that he made no attempt to do so. *See* Motion ¶¶ 9, 32-38.

5. In opposition, Barclays contends that, although Professor Pfleiderer conducted no valuation of his own, he properly opined on the reliability of Barclays' own valuation. *See* Barclays Opp. at 5-9. But Professor Pfleiderer's testimony shows that he is deeply unfamiliar

3

with Barclays' processes. Further, many of those processes did not even apply to the securities at issue on the Repo Collateral. And, further still, Professor Pfleiderer's opinions are ultimately untestable because they are based on private, unrecorded conversations with Barclays' employees who do not even recall having spoken to Professor Pfleiderer, or other steps that Professor Pfleider says that he took but for which he did not create any record. And, although Barclays tries to shore up Professor Pfeiderer's opinion by focusing on his purported "expertise" to validate Barclays' work, *see* Barclays Opp. at 5-7, the fact is that he does not have the requisite expertise to render this opinion.

### A. Professor Pfleiderer's Unfamiliarity With the Details of Barclays' Valuation Makes His Opinion About the Repo Collateral's Value Unreliable

6.  Professor Pfleiderer's opinion that the Repo Collateral was worth "*at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary," Pfleiderer Report (attached to Opening Brief as Exhibit A) ¶ 5(a) (emphasis in original), is based on an unreliable methodology. Professor Pfleiderer did no independent valuation of *any* of the securities comprising the Repo Collateral. He simply opined that, to him, Barclays' valuation seemed "reasonable" in the aggregate based upon his review of Barclays' procedures. *See* Pfleiderer Report ¶¶ 49-54. Barclays responds to this basis for excluding Professor Pfleiderer's opinion by arguing that he properly "examines the correctness of the methodology used" by Barclays and by submitting a declaration in which Professor Pfleiderer asserts that he interviewed Barclays employees to evaluate the process Barclays used. *See* Barclays Opp. at 13; Barclays Opp. Ex. A ¶ 8. Discovery has only further shown, however, that the "methodology" Professor Pfleiderer asserts he used here is neither reliable nor capable of being replicated.

### 1. Professor Pfleiderer's Analysis of Barclays' Procedures Is Not a Reliable Basis for Validating Barclays' Valuation

7.  As a threshold matter, most of the Barclays pricing policies that Professor Pfleiderer purportedly reviewed were not even in effect at the time of the Sale Transaction. Almost all of the Barclays policies and procedures included in Professor Pfleiderer's reliance materials are dated *after* the Sale Transaction.[1] The testimony of Barclays' valuation professionals also corroborates that Barclays did not even *have* existing policies and procedures to value many of the securities in the portfolio it acquired from Lehman. *See, e.g.*, Washtell Dep. Tr. (attached to Geremia Declaration as Exhibit 5) at 41:19-24 ("[W]e did not have a policy document for a cash equity business."). Indeed, Barclays had never carried some of these securities on its books before. *See* Landreman Dep. Tr. (attached to Geremia Declaration as Exhibit 4) at 47:2-9, 58:11-24; Washtell Dep. Tr. at 33:22-34:22, 41:8-24.

8.  Further, discovery has shown that many policies and procedures Barclays did have were ignored and, instead, Barclays came up with *ad hoc* methods. For example, Barclays' valuation professionals would ordinarily price test trader marks, not create valuations from scratch. *See* Landreman Dep. Tr. at 9:15-10:8, 19:3-18, 75:5-8, 155:16-18, 159:4-8; Washtell Dep. Tr. at 39:18-40:10, 61:6-14, 154:6-12; Teague Dep. Tr. (attached to Geremia Declaration as Exhibit 6) at 37:10-38:11. Yet, in valuing the Repo Collateral, Barclays did not review existing

---

[1] Professor Pfleiderer's reliance materials include very few policies for Barclays' Independent Valuation Group, and most of those produced are dated after the Sale Transaction and thus would not have governed the valuation of the Repo Collateral. *See* Dep. Ex. 802B (attached to Geremia Declaration as Exhibit 1), Dep. Ex. 803B (attached to Geremia Declaration as Exhibit 2), and Dep. Ex. 806B (attached to Geremia Declaration as Exhibit 3). Professor Pfleiderer's reliance materials also do not include any front office policies, nor has Barclays produced any. And, though Professor Pfleiderer claims he reviewed PricewaterhouseCoopers' audit records, the most probative of PwC's papers were not among his reliance materials; they were produced by PwC (not Barclays) and only after Professor Pfleiderer submitted his report.

5

marks by Lehman's traders, even though many of those traders were employed by Barclays when the valuations were underway. *See* Landreman Dep. Tr. at 28:3-9; Washtell Dep. Tr. at 154:19-155:5; Teague Dep. Tr. at 70:17-71:8. Indeed, Barclays' valuation professionals not only failed to consider the Lehman marks, but they did not speak to any of these former Lehman traders to gather information about the securities. *See* Landreman Dep. Tr. at 22:24-23:6; Washtell Dep. Tr. at 61:6-23, 154:19-155:5 ("We did not discuss with ex-Lehman traders, and I do not recall that we looked at prices in the Lehman system."); Teague Dep. Tr. at 70:3-8, 140:18-141:6.

9. Barclays also failed to analyze whether it marked the securities it received from the Repo Collateral at the same price at which it held the same or similar positions. *See* Washtell Dep. Tr. at 32:9-33:8, 38:16-18; Teague Dep. Tr. at 89:21-94:14. Barclays further applied adjustments to securities for purposes of its acquisition accounting where it did not make such adjustments for other positions of the *same* asset class already on its books. *See* Landreman Dep. Tr. at 156:15-157:14; Washtell Dep. Tr. at 67:18-68:12, 73:3-17, 74:20-75:10; Teague Dep. Tr. at 89:21-90:20, 95:3-96:8. Similarly, Barclays did not normally value securities based on an internal sales price, used in transferring securities from one Barclays unit to another. *See, e.g.*, Excerpt of Dep. Ex. 813B (attached to Geremia Declaration as Exhibit 7). Here, however, Barclays did use such internal "prices" in its acquisition accounting for a significant portion of the so-called PMTG assets in the Repo Collateral. *See* Landreman Dep. Tr. at 51:8-52:6, 138:9-18, 138:25-140:3; Teague Dep. Tr. at 147:2-25, 150:21-151:14.

10. That Barclays did not follow or, for some securities, did not have its own policies and procedures in valuing the Repo Collateral may not, on its own, make Barclays' valuation unreasonable. But it does make Professor Pfleiderer's conclusions unreliable, because his

6

"methodology" amounts to examining a Barclays valuation in which he had no involvement and assessing that valuation against Barclays' procedures that either did not exist at the pertinent time or were not followed.

### 2. Discovery Has Shown That Professor Pfleiderer Cannot Rely on Barclays' Valuation Professionals

11. Professor Pfleiderer's inadequate knowledge of Barclays' valuation process is not surprising. He spent little or no time speaking with Barclays employees about the work they did. Professor Pfleiderer testified that he interviewed only five Barclays employees, for only a few hours in total, and he did not even bother to keep notes of his conversations. *See* Pfleiderer Dep. Tr. (attached to Opening Brief as Exhibit B) at 74:2-88:25. And, though Barclays claims—with no record support—that Professor Pfleiderer "ask[ed] probing questions of the Barclays staff who prepared the exit marks" at issue, *see* Barclays Opp. at 12, the Barclays staff in question have testified otherwise.[2]

12. As Barclays itself has acknowledged, Richard Landreman and Sean Teague played key roles in Barclays' valuation process. *See* Barclays Opp. Ex. C. Professor Pfleiderer asserts that he spoke with Landreman and Teague about what they did in Barclays' valuation process. Pfleiderer Dep. Tr. 74:12-75:8, 82:4-85:9. But Landreman and Teague have no recollection of ever communicating with Professor Pfleiderer. *See* Landreman Dep. Tr. at

---

[2] Barclays has identified three members of the Independent Valuation Group with primary responsibility for valuing the securities acquired from Lehman in the Sale Transaction (Barclays Opp. Ex. C; Barclays Witness List (attached to Geremia Declaration as Exhibit 8)), whom Movants have deposed since Barclays submitted its opposition to this motion: Sean Teague, who had primary responsibility for valuing Rates, Corporates (including the Giants Stadium Bonds), Municipal Bonds, and the Pine CLO (*see* Teague Dep. Tr. at 6:15-24, 7:7-14, 25:4-13); Richard Landreman, who had primary responsibility for valuing Agency RMBS, Non-Agency RMBS, CDOs, and CMBS (*see* Landreman Dep. Tr. at 6:18-7:4, 15:16-16:5, 16:21-17:4); and Mark Washtell, who had primary responsibility for valuing the Equities (*see* Washtell Dep, Tr. at 5:23-6:14, 21:16-22:8).

7

187:19-188:5; Teague Dep. Tr. at 104:22-105:6. Professor Pfleiderer also did not speak to Mark Washtell, who testified that he had primary responsibility for valuing the equities transferred in the transaction (Washtell Dep. Tr. at 5:23-6:14, 21:16-22:8), yet is somehow missing from Barclays' list of personnel involved in its valuation. *See* Barclays Opp. Ex. C. Like Landremann and Teague, Washtell testified that he could not recall ever having spoken to Professor Pfleiderer. *See* Washtell Dep. Tr. at 188:15-18.[3] Professor Pfleiderer also never spoke with anyone at Barclays' auditor, PricewaterhouseCoopers, in preparing his report. *See* Pfleiderer Dep. Tr. at 124:24-125:14.

13. Accordingly, despite Barclays' claim that Professor Pfleiderer asked "probing questions of the Barclays staff who prepared the exit marks," key members of that staff recall no such questions or even a conversation.[4] Professor Pfleiderer's records of conversations he says he had are also of no help in testing his assertions, either, because there are none. Thus, Professor Pfleiderer's purported reliance on Barclays professionals, and the so-called "probing" questions he supposedly asked, is not a ground on which the reliability of his opinions can properly be defended.

---

[3] Additionally, after Professor Pfleiderer submitted his report, and also after the expert discovery cutoff, Professor Pfleiderer submitted a declaration purporting to summarize reports from a "GFS" system that Barclays' produced after the fact discovery cut-off. *See* Dep. Ex. 791 (attached to Geremia Declaration as Exhibit 9). Uma Krishnan, whom Barclays designated to testify about this system, testified that she had never spoken to Professor Pfleiderer and that she did not even recognize his name. *See* Krishnan Tr. (attached to Geremia Declaration as Exhibit 10) at 119:7-20.

[4] Insofar as these individuals recall conversations with counsel, on calls that staffers for the Finance Scholars Group may or may not have been on, Barclays blocked examination by Movants by asserting a blanket privilege over the contents of those conversations. *See, e.g.*, Washtell Dep. Tr. at 190:21-193:20. This is yet another example of Barclays' unwillingness to provide transparency into its valuation of the Repo Collateral, and, of course, precludes Barclays from relying on such conversations to support the introduction of Professor Pfleiderer's opinions into evidence.

### 3. Professor Pfleiderer Is Unfamiliar With the Work of Staffers from the Finance Scholars Group

14. Professor Pfleiderer's unfamiliarity with the work done by staffers from the Finance Scholars Group ("FSG") is a separate reason why Professor Pfleiderer's valuation opinions are unreliable. *See* Motion ¶¶ 22-24. Barclays argues that, as a general matter, an expert's reliance on staff does not disqualify him as an expert. *See* Barclays Opp. at 17-19. But the problem with Professor Pfleiderer's proffered expert testimony is not just that he relied heavily upon staffers and, ultimately, simply blessed Barclays' own analysis. Professor Pfleiderer is also deeply unfamiliar with the details of the work upon which he relied, and so his opinions are, in critical respects, untestable and conclusory.

15. For example, Barclays has not disclosed to Movants, and Professor Pfleiderer could not testify about, the detailed analysis underlying the Barclays data with which Professor Pfleiderer worked.[5] Although Barclays produced the spreadsheets that Professor Pfleiderer used, he could not explain how their contents were calculated. *See* Pfleiderer Tr. at 33:6-16, 40:3-41:24, 321:21-323:14. Professor Pfleiderer has also been unable to provide any details on what Barclays did to actually value the Repo Collateral on a per-CUSIP basis, even though the core of his analysis is a review of Barclays' valuations. *See id.* at 40:3-46:15, 261:8-262:10; *see also id.* at 33:6-16, 107:6-14, 109:3-7, 122:16-124:14, 213:21-215:6. Professor Pfleiderer's troubling unfamiliarity with Barclays' valuation has accordingly insulated the basis of his opinion from any meaningful testing or review.

---

[5] Indeed, Barclays has continuously stonewalled Movants' efforts to obtain the information necessary to test Barclays' valuations. For instance, Barclays has provided only the *results* from its valuation model; but, without the model's inputs, it is impossible to assess whether Barclays' valuations are reasonable. *See, e.g.*, Dep. Ex. 637A (attached to Opening Brief as Exhibit D).

9

\* \* \*

16. Professor Pfleiderer's lack of knowledge about what Barclays did, and what the FSG staffers did, show that his valuation opinion lacks the requisite "rigorous analytical connection" to be admissible. *Nimely*, 414 F.3d at 396. Expert testimony must be "reliable at every step" to be admissible. *Amorgianos*, 303 F.3d at 267. Here, Professor Pfleiderer is barely able to explain the underlying work from which his analysis was derived, and many of the internal Barclays procedures on which he purports to rely either did not exist at the pertinent time or were not applied to Barclays' valuation of the Repo Collateral.

17. If Professor Pfleiderer cannot explain the work that was purportedly done, and Movants cannot test it, the Court cannot rely on his opinion. On this ground alone, Professor Pfleiderer's opinion endorsing Barclays' valuation of the Repo Collateral is inadmissible. *See, e.g.*, *Colon v. Abbott Labs.*, 397 F. Supp. 2d 405, 415 (E.D.N.Y. 2005) ("It is well established that in analyzing the reliability of an expert's testimony, the key question is whether it can be (and has been) tested." (internal quotation marks omitted)); *MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 292 (S.D.N.Y. 2001) (rejecting an expert opinion because it was based on information "neither verified nor submitted in a way that permits meaningful review"); *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, No. 98 Civ. 8272, 2003 WL 22124991, at \*6 (S.D.N.Y. Sept. 15, 2003) (explaining an opinion to be inadmissible in part because the expert's "technique for reaching such a conclusion cannot be tested"); *Faryniarz v. Nike, Inc.*, No. 00 Civ. 2623, 2002 WL 1968351, at \*3 (S.D.N.Y. Aug. 23, 2002) ("According to Williams' own statements, his conclusions regarding causation are incapable of being tested or challenged. This is precisely the type of evidence Rule 702 was intended to exclude.").

**B.     Professor Pfleiderer's Opinion Lacks the Requisite Connection to His Expertise**

18.     Professor Pfleiderer's valuation opinion should also be excluded because he lacks the requisite expertise to give it.

19.     Apparently relying on a notion that once an expert has been qualified in one case, he can opine about anything in any case, Barclays enthusiastically recites that this Court once found Professor Pfleiderer to be "an especially credible witness" in *In re Iridium Operating LLC*, 373 B.R. 283, 337 (Bankr. S.D.N.Y. 2007) (Peck, J.). *See* Barclays Opp. at 6. This case is, of course, not *Iridium*, and the testimony that Professor Pfleiderer is offering is fundamentally different from his testimony in that case. In *Iridium*, Professor Pfleiderer analyzed a single company's debt and equity over a four-year period. *See* 373 B.R. at 337. He reviewed all available market data and offered an expert opinion that the company in question was solvent and adequately capitalized. *See id.* Professor Pfleiderer's opinion in *Iridium* called for a full economic valuation that fit squarely within his academic background.

20.     Unlike in *Iridium*, the valuation issue in this case demands more than just an academic background. Valuing the Repo Collateral is a task fundamentally different from and far more complex than analyzing a single company's solvency. Four issues primarily drive the $5 billion difference between Movants' valuation of the Repo Collateral and Barclays' valuation: (i) the valuation date used, which accounts for at least $2.35 billion of the $5 billion difference;[6]

---

[6]   The valuation date issue includes (a) Barclays' use of September 22 closing prices instead of September 19, 2008 closing prices for the Equities (*see* Declaration of Mark E. Zmijewski, dated July 15, 2010 (attached to Geremia Declaration as Exhibit 12) ¶ 22 ($290 million for equities); (b) Barclays' use of sales prices for post-closing transactions between September 22 and September 30, most of which were internal sales within Barclays (*see* Declaration of Mark E. Slattery, dated July 15, 2010 (attached to Geremia Declaration as Exhibit 13) ¶¶ 26-27 ($389 million for post-closing internal sales)); and (c) Barclays' use of a December 22

11

(ii) the liquidity discount applied, or the "mid-to-bid" adjustment percentage, which accounts for at least $800 million of the difference;[7] (iii) pricing of the Pine CLO, which accounts for $389 million of the difference;[8] and (iv) pricing of the Giants Stadium Bonds, which accounts for approximately $349 million of the difference.[9] Professor Pfleiderer is not qualified to opine about any of these issues.[10]

21. As a threshold matter, Professor Pfleiderer skips the step of picking the proper proxy for assessing the value of the Repo Collateral as of the contractually defined Closing Date of 12:01 a.m., September 22. Instead, Professor Pfleiderer simply blesses Barclays' post-Sale-

---

(continued…)
date, three months after the Sale Transaction, to value the JPM Inventory (*see* Zmijeski Decl. ¶ 25 n.54 ($1.657 billion for JPM inventory)).

[7] Fair value accounting rules under U.S. Generally Accepted Accounting Principles allow the practice of marking securities from the "mid" (the mid point between a bid and an offer price) to a bid price to approximate an "exit price." *See* Garvey Report (attached to the Geremia Declaration as Exhibit 11) ¶ 35. Movants' expert Professor Zmijewski opined that Barclays overstated its mid-to-bid adjustment (or liquidity adjustment) by $251 million for equities. *See* Zmijeski Decl. ¶ 38. Movants' expert Mark Slattery opined that Barclays overstated its liquidity adjustment by $377 million for U.S. Agencies and $181 million for Agency CMOs. *See* Slattery Decl. ¶ 6. Movants' expert Joseph Schwaba opined that Barclays overstated its liquidity adjustment for municipal securities by $38 million. *See* Declaration of Joseph Schwaba, dated July 15, 2010 (attached to Geremia Declaration as 14) ¶¶ 10-11 ($38 million for municipal securities)).

[8] Movants' expert Mark Slattery opined that Barclays undervalued the Pine CLO by at least $389 million. *See* Expert Report of Mark E. Slattery, dated March 15, 2010 (attached to Geremia Declaration as Exhibit 15) ¶¶ 54-65.

[9] Movants' expert John Olvany opined that Barclays undervalued the Giant Stadium Bonds by at least $349 million. *See* Expert Report of John J. Olvany, dated March 15, 2010 (attached to Geremia Declaration as Exhibit 16) ¶¶ 9-29.

[10] Nor is Professor Pfleiderer qualified to summarily dismiss as unreliable the valuation of the Repo Collateral the Bank of New York conducted as Barclays' collateral agent, or the marks provided by JP Morgan as collateral agent for the Fed Repo. Professor Pfleiderer has no expertise related to the valuation processes and methods employed by tri-party repo agents. The Bank of New York and JPM, on the other hand, value over $1 trillion in securities in the repo market on a daily basis.

12

Transaction acquisition accounting, which may or may not reflect the value as of the Closing Date. *See* Pfleiderer Report ¶¶ 26-33, 47-64. Professor Pfleiderer is also not qualified to opine on what a proper proxy is for 12:01 a.m., September 22, because he does not have the familiarity with the relevant financial markets needed to opine on what prices would be available and how each market may have moved over the weekend, if at all.

22. For the second issue—the liquidity discount—Professor Pfleiderer likewise is not qualified. Analyzing Barclays' "mid-to-bid" adjustment for a given asset class requires specialized knowledge about that asset class, but Professor Pfleiderer does not have experience with many of the asset classes at issue. Knowledge of valuation techniques alone is not sufficient for determining or validating a liquidity discount. One must also understand market nuances and the specific financial products to apply a proper liquidity discount. For example, Barclays applied a 10% liquidity discount to Agency CMOs. *See* Pfleiderer Report at 110. Professor Pfleiderer was repeatedly asked at his deposition what he did to satisfy himself that this discount was appropriate. *See* Pfleiderer Tr. at 246:17-247:2, 253:11-255:5, 257:5-17, 259:4-262:16. His response boiled down to nothing more than a laying on of hands: he declared that Barclays and its auditors thought this discount was appropriate and that was good enough for him. *See id*. But Professor Pfleiderer could not recall how this liquidity discount was calculated; he did not try to replicate Barclays' methodology; and, given his lack of familiarity with the asset class, he could not and did not opine on whether the sample portfolio Barclays used to calculate the bid-offer spread is actually representative of the Agency CMOs. *See id*. at 246:17-25, 251:19-263:14. Because the liquidity discount is so central to Barclays' undervaluation, Professor Pfleiderer's complete lack of practical experience renders him unqualified to opine upon the value of the Repo Collateral.

13

23. With respect to the third issue that drives the difference between Movants' and Barclays' valuation—pricing of the Pine CLO—even though there was a difference of more than $400 million between BoNY's mark and Barclays' mark, Professor Pfleiderer could not recall conducting *any* analysis other than conducting a "Google" search, speaking to some individuals at Barclays about the Pine CLO, and electing to prefer Barclays' post-Sale-Transaction number over the number generated by Barclays' collateral agent at the time. *See id*. at 44:4-45:3, 84:7-85:2, 87:23-88:11, 194:21-197:12, 204:14-206:23, 208:6-210:3, 212:13-216:25, 219:5-220:22.

24. Finally, for the fourth issue—pricing of the Giants Stadium Bonds—Professor Pfleiderer did not do any independent analysis, at least none that the Movants have seen. Nor is he qualified to opine on the value of a complex corporate auction rate security like the Giants Stadium Bonds, even if he had. Professor Pfleiderer also could not recall what, if any, due diligence his staff performed to validate Barclays' valuation of the Giants Stadium Bonds. *See id*. at 315:3-316:4.

25. Barclays cites cases for the general proposition that an expert does not need practical experience to be qualified. And, to be sure, "lack of extensive practical experience directly on point does not *necessarily* preclude [an] expert from testifying." *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (emphasis added, alteration in original, and internal quotation marks omitted). But Barclays ignores a crucial element: whether an expert must have practical experience to be qualified requires "compar[ing] the expert's area of expertise *with the particular opinion the expert seeks to offer*." *Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998) (emphasis added). Barclays also cites several cases in which courts allowed individuals with general expertise to testify about topics for which they lacked specific

14

experience. But in each case practical experience was not necessary to render a reliable opinion on the particular issue at hand and, in any event, many of the experts did in fact have experience related to the issue.[11]

26.  Here, by contrast, the opinion that Professor Pfleiderer gives cannot reasonably be deemed reliable due to his lack of expertise on the critical issues driving the proper valuation of the Repo Collateral. On this separate ground, the Court should exclude Professor Pfleiderer's valuation opinion. *See Smith v. Herman Miller, Inc.*, No. CV-03-5358, 2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005) (finding a purported expert unqualified to opine that furniture had a defective design when he had only "general engineering expertise"); *Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475 (ILG), 2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005) (finding a purported expert unqualified to opine upon on whether an alleged design flaw caused an accident when he lacked any design experience).

---

[11]  *See Cary*, 2003 WL 1878246, at *3 (finding an academic, who had experience on a company's board of directors and as a consultant to several suppliers and marketers, to be qualified to offer a "relatively straightforward analysis" of the potential effects of certain contracts on a specific business); *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (finding an academic to be qualified to testify about "broad economic principles and market forces"); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 141 (S.D.N.Y. 2003) (finding a forensic account who was "a Certified Public Accountant with 17 years of experience reviewing financial documents" to be qualified to testify about a health care company's "solvency" and "methods for accounting for accounts receivable"); *McCullock v. H.B. Fuller & Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (finding "an experienced medical doctor" who had "practiced in the specialty of ears, nose and throat since 1966" to be qualified to testify about "a throat ailment and its causes"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, No. 05 Civ. 9016(SAS), 2010 WL 648369, at *15 (S.D.N.Y. Feb. 22, 2010) (finding a CPA who had "substantial auditing experience" over a forty-year career, but no "specific experience with hedge fund audits," to be qualified to testify about a hedge fund audit when "there is no indication that [auditing] requirements substantially differ when the audited entity is a hedge fund").

15

      **C.    Purported Problems With Movants' Experts Are Irrelevant To the Admissibility of Professor Pfleiderer's Testimony**

      27.    Finally, Barclays repeatedly defends against the defects in Professor Pfleiderer's valuation opinions and methodology by arguing that Movants' expert opinions purportedly suffer similar flaws. *See, e.g.*, Barclays Opp. at 13. Movants emphatically disagree, for reasons set forth in their opposition to Barclays' motion to exclude Movants' experts' testimony. But putative shortcomings with Movants' experts obviously have no bearing on the admissibility of Professor Pfleiderer's testimony. Barclays' insinuations to the contrary are an unnecessary and inappropriate distraction from the actual issues before the Court on this motion.[12]

**II.    PROFESSOR PFLEIDERER'S OTHER OPINIONS ARE NOT BASED ON ANY PERTINENT EXPERTISE**

      28.    For all of the reasons stated above and in the opening brief on this motion, Professor Pfleiderer's opinions concerning the value of the Repo Collateral are not admissible. His remaining opinions on (1) whether the parties negotiated a $5 billion discount at the inception of the Sale Transaction, (2) the nature of the risks associated with the Repo Collateral, (3) Barclays' accounting gain on acquisition of the assets transferred through the Sale Transaction, and (4) the reasonableness of the Court's findings concerning the benefits of the Sale Transaction, are also inadmissible. *See* Motion ¶¶ 1, 3-4, 39-49. For the reasons stated in the opening brief, it is not Professor Pfleiderer's role to weigh conflicting evidence in giving an

---

[12] Barclays also suggests that Movants' experts have taken inconsistent positions with respect to BoNY's valuations of the Repo Collateral CUSIPs. *See* Barclays Opp. at 20 n.20. But, again, Movants' experts' positions cannot carry Barclays' burden to prove the admissibility of *Professor Pfleiderer's* testimony. Also, to be clear, Barclays is bound by the BoNY valuation as a matter of law. BoNY acted as Barclays' agent when it performed that valuation. *See, e.g.*, LBHI's Rule 60 (LBHI Docket No. 5148) ¶ 93. Accordingly, the Court need not reach the question of how to verify BoNY's valuation of the Repo Collateral. But, if the Court does reach that question, BoNY's valuations should be examined independently, something that Professor Pfleiderer did not do.

16

"opinion" on whether the parties negotiated an undisclosed $5 billion discount. *Id.* ¶¶ 40-43. That is the Court's province. And the other issues on which Professor Pfleiderer offers opinions—issues (2) through (4) above—are simply not germane to the Rule 60 Motions, which raise the question of whether Barclays received more assets than were disclosed to Court or paid less for those assets than was disclosed to the Court. *Id.* ¶¶ 44-49.

29.     Barclays disputes that Professor Pfleiderer is weighing the evidence and argues that his opinions on these issues are all relevant. *See* Barclays Opp. at 21-24. But even if Barclays were correct—and it is not, for all of the reasons stated in the opening brief on this motion—it has failed to show that Professor Pfleiderer's opinions are based on any sort of expertise in reviewing asset purchase agreements; assessing risks; financial accounting; or, most egregiously, making findings on a motion to approve an asset sale transaction pursuant to 11 U.S.C. § 363. On this basis, too, Professor Pfleiderer's opinions on these four issues are inadmissible.

## CONCLUSION

Movants respectfully request that the Court (a) enter an order substantially in the form attached as Exhibit E to the Motion, granting the relief requested therein; and (b) grant such other and further relief to the Movants as the Court may deem proper.

Dated: New York, New York
       July 16, 2010

                              Respectfully submitted,

\_\_\_/s/ Robert W. Gaffey_____       \_\_/s/ William R. Maguire_____
JONES DAY                                  HUGHES HUBBARD & REED LLP
Robert W. Gaffey                           William R. Maguire
Jayant W. Tambe                            Seth D. Rothman
William J. Hine                            Neil J. Oxford
Todd R. Geremia                            One Battery Park Plaza
Kelly A. Carrero                           New York, New York 10004
222 East 41st Street                       (212) 837-6000 (telephone)
New York, New York  10017                  (212) 422-4726 (facsimile)
(212) 326-3939 (telephone)                 maguire@hugheshubbard.com
(212) 755-7306 (facsimile)
rwgaffey@jonesday.com

*Attorneys for Debtors*                    *Attorneys for James W. Giddens, as Trustee*
*and Debtors in Possession*                *for the SIPA Liquidation of Lehman*
                                           *Brothers Inc.*

\_\_\_/s/ James C. Tecce_____
QUINN EMANUEL URQUHART &
SULLIVAN LLP
Susheel Kirpalani
James C. Tecce
51 Madison Ave 22nd Floor
New York, New York 10010
212 849-7000 (telephone)
212 849-7100 (facsimile)
jamestecce@quinnemanuel.com

Erica P. Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

*Attorneys for Official Committee of Unsecured*
*Creditors*