Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  LEHMAN BROTHERS HOLDINGS INC., et al.

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12

13  LEHMAN BROTHERS INC.

14           Debtor.

15  - - - - - - - - - - - - - - - - - - - - - -x

16           United States Bankruptcy Court

17           One Bowling Green

18           New York, New York

19

20           October 21, 2010

21           9:33 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for Movant, James W. Giddens, SIPC Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16        NEIL J. OXFORD, ESQ.

17

18

19

20

21

22

23

24

25

Page 4

```
 1

 2    QUINN EMANUEL URQUHART & SULLIVAN LLP

 3         Attorneys for the Official Committee of Unsecured

 4          Creditors

 5         51 Madison Avenue

 6         22nd Floor

 7         New York, NY 10010

 8

 9    BY:   SUSHEEL KIRPALANI, ESQ.

10         JAMES C. TECCE

11

12    QUINN EMANUEL URQUHART & SULLIVAN LLP

13         Attorneys for the Official Committee of Unsecured

14          Creditors

15         865 S. Figueroa St.

16         10th Floor

17         Los Angeles, CA 90017

18

19    BY:   ERICA P. TAGGART, ESQ.

20         (TELEPHONICALLY)

21

22

23

24

25
```

Page 5

1

2   BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         575 Lexington Avenue

5         7th Floor

6         New York, NY 10022

7

8   BY:   JONATHAN D. SCHILLER, ESQ.

9

10   BOIES, SCHILLER & FLEXNER LLP

11         Attorneys for Barclays Capital, Inc.

12         333 Main Street

13         Armonk, NY 10504

14

15   BY:   DAVID BOIES, ESQ.

16

17   DEWEY & LEBOEUF LLP

18         Attorneys for CAPCO

19         1301 Avenue of the Americas

20         New York, NY 10019

21

22   BY:   ELIZABETH P. SMITH, ESQ.

23         (TELEPHONICALLY)

24

25

Page 6

1

2    COVINGTON & BURLING LLP

3        Attorneys for Interested Party, Susan Johnston

4        The New York Times Building

5        620 Eighth Avenue

6        New York, NY 10018

7

8    BY:   SUSAN P. JOHNSTON, ESQ.

9        (TELEPHONICALLY)

10

11   STUTMAN TREISTER & GLATT

12       Attorneys for Elliot Management

13       1901 Avenue of the Stars

14       12th Floor

15       Los Angeles, CA 90067

16

17   BY:   MICHAEL NEUMEISTER, ESQ.

18       REBECCA S. REVICH, ESQ.

19       (TELEPHONICALLY)

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Be seated.  Good morning.

4            MR. GAFFEY:  Good morning, Your Honor.

5            THE COURT:  Let's proceed.  I assume everybody got

6    through security who needs to be here.

7            MR. GAFFEY:  It appears at our table anyway, Your

8    Honor.

9            THE COURT:  Okay.  Fine.  It was a busy morning out

10   there.

11           MR. GAFFEY:  I was towed to the end of the line but I

12   fought my way in.  Good morning, Your Honor.  The way we

13   propose to proceed this morning is we divided the time up

14   amongst the movants and I think my presentation will go about

15   an hour and a half;  Mr. Tecce, perhaps around forty minutes;

16   Mr. Maguire, thirty to forty minutes.  And there's some time

17   built in there for rebuttal if we need it.  We'll see.  And I'd

18   be remiss this morning if I didn't start this morning by on

19   behalf of the movants thanking the Court and its staff for this

20   significant investment of time in helping the parties to

21   resolve their dispute.  And we truly appreciate it.

22           As you know, Your Honor, we've had thirty days of

23   evidence in this case and the case has been heavily briefed.

24   And it all boils down at the end of the day to some main

25   points.  As we showed in our motion papers, we explained that

Page 8

1   our Rule 60 motion, the movants' Rule 60 motions, and the

2   concomitant claims under the Bankruptcy Code that the movants

3   are asserting here as well are supported essentially because

4   the Court was never told about billions of dollars in

5   unauthorized and undisclosed transactions that were concluded

6   but never told to the Court as part of the process for

7   approving the sale.

8          Respectfully, we submit that the movants have proven

9   each and every one of those claims, both the Rule 60(b) based

10  claims and the concomitant claims under the Bankruptcy Code.

11         I thought it'd make sense at the outset to review

12  somewhat the 60(b) framework in which we're approaching this

13  case.  Rule 60(b) provides for relief under a variety of

14  circumstances.  It may include mistake, inadvertence or

15  surprise; newly discovered evidence; fraud or misrepresentation

16  whether that misrepresentation be intentional or an innocent

17  misrepresentation -- there are two prongs for that portion of

18  the rule in 60(b)(3); fraud on the Court under 60(d); and any

19  other reason that justifies relief.  And we would submit that

20  the evidence that has been introduced at this trial supports

21  the 60(b)(relief) that we seek on any one of those bases.

22         Now, the remedy that we ask for is, under our

23  bankruptcy claims, the turnover under our Code claims, our 549,

24  our 550 claims and the other similar claims that the other

25  movants have asserted.  It's the turnover of all assets that

1   were delivered to Barclays over and above the balance of

2   transaction that we assert was the basis of the Court's

3   approval, that was described to the Court that was the basis of

4   the agreement.  And our experts have quantified that in the

5   range of thirteen billion dollars.  I'm not going to spend a

6   lot of time today on valuation because that is a part of the

7   case that's been very recently tried and was thoroughly

8   discussed at the in limine motion.  But the disclosure issues

9   are something I'm going to address in some detail.

10       We believe that in this trial there was pervasive

11  evidence that, in essence, one deal was disclosed to the Court

12  while another deal was actually closed.  The deal that was

13  disclosed to the Court was a balance deal, a deal in which

14  there was an equivalent exchange of assets and liabilities and

15  ultimately, as described by Mr. Miller to the Court, would have

16  resulted in a net benefit to the estates of approximately 1.8

17  billion dollars.

18       The deal that was actually closed, as opposed to

19  disclosed, was the deal that Your Honor heard about from Mr.

20  Diamond and from Mr. Varley.  That was the deal that

21  incorporated as a precondition without which Barclays would not

22  have closed, an asset/liability mismatch where the assets

23  exceeded the liabilities so that Barclays would have an

24  embedded first day gain, a buffer.

25       Now there has been a lot of testimony to Barclays'

Page 10

```
 1    side of the case concerning the amounts of assets that were

 2    transferred over.  And I think an underlying theme of that

 3    defense was essentially to suggest there or to argue that there

 4    was a wide range of possible assets that could have been

 5    transferred over, that reasonable people could say it was

 6    forty-five billion.  Other reasonable people could say it was

 7    fifty-five billion and that there was no degree of precision

 8    possible with regard to the assets that Barclays received.

 9              On the disclosure front, which is what this case is

10    really about, nobody ever said that to the Court.  The Court

11    was given figures in response to its own questions about what

12    the deal was worth.  The Court was given values and a basis for

13    those values.  The value was book value; that's the value that

14    was in the asset purchase agreement.  And at the end of the

15    day, however, Barclays approaches this on the grounds that

16    there's some sort of economic value which translation is

17    liquidation value.  It's a bulk purchase with a discount taking

18    into account their own concerns, subjective concerns about the

19    value of the collateral.  That is not the deal that was

20    described to the Court.  It is not the deal that was disclosed.

21    By the time the deal actually closed, it bore new or no

22    relation to what the Court had been told.

23              The deal started out on a -- this is what the Court

24    was not told in sum.  The deal started out on a false premise.

25    The Court was told in the asset purchase agreement that what
```

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 260

Page 11

1   was being transferred to Barclays was approximately seventy

2   billion dollars book value as of the date hereof.  Your Honor

3   has seen page 6 of the asset purchase agreement maybe a hundred

4   times during this trial.  There's no doubt that that was meant

5   to be Lehman book value and there's no doubt now, I believe,

6   after the proof that Your Honor has seen in this trial, that

7   was simply false; that was not true.  It was not Lehman's book

8   value.  It was a lower negotiated value.  It was a discounted

9   from Lehman's book value.  That's established.

10        The Court was told that Barclays would assume 1.5

11   billion dollars in liability for cure amounts.  That was not

12   true.  The proof at this trial has demonstrated that Barclays

13   never intended to pay anything close to 1.5 billion.  Its

14   internal calculations put that in the 200 million dollar range.

15   The Court was told through Section 9.1(c) of the asset purchase

16   agreement that Barclays would pay two billion dollars in

17   bonuses to transfer any Lehman employees as part of the assumed

18   liabilities, as part of the consideration in the transaction.

19   That was not true.  Barclays' own internal valuation showed

20   they never intended to pay more than 1.5 billion dollars in

21   bonuses.  And in the event, that's about what they paid.

22        While the Court was told about a balance deal, the one

23   that would generate a net benefit to the estate, in fact, it

24   was a deal structured to give Barclays an immediate undisclosed

25   multi-billion dollar windfall gain.  The Court was not that by

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 12 of 260

Page 12

1    Thursday of the week, of the week of September 15th, the APA

2    had essentially been abandoned and the deal was now centered on

3    the repurchase agreement, the Lehman/Barclays repurchase

4    agreement, when Lehman -- when Barclays "stepped into the

5    shoes" of the Fed.  The Court was never told anything about the

6    valuation of the collateral of the repo and, in particular, the

7    Court was never told that the repo collateral was valued at

8    liquidation values.  In fact, what the Court was told was that

9    the deal on the table was meant to avoid that very thing, the

10   sale of assets by Lehman at liquidation values.  In fact,

11   that's exactly what happened and nobody ever said a word to the

12   Court about that.  The Court was never told about the addition

13   of billions of dollars of assets in what we call the Friday

14   asset scramble.  Not a word about that was mentioned later that

15   same day at the sale hearing.

16        The Court was not told that the clarification letter,

17   when it reached its final form, accomplished that transfer of

18   additional billions of assets, amended the asset purchase

19   agreement that had been in front of the Court and, through

20   maneuver in paragraph 13, retroactively terminated the

21   termination of the repo which led to the evasion of Section 559

22   of the Code.  One of the reasons we believe the Court was not

23   told that is if the haircut had to be paid back into the estate

24   under Section 559, that would have required the parties to come

25   back and make disclosure and seek the Court's approval and they

1   never did.  The Court never saw the clarification letter before

2   it was signed.  The Court never saw the clarification letter

3   before the sale order was issued.  The terms of the

4   clarification letter were never disclosed to the Court.

5           The Court was never told about the Fed take-out

6   agreement.  The Court was never told that from the very

7   beginning of the week, before the asset purchase agreement was

8   even submitted to the Court before the sale motion was even

9   made before a scrap of proof had been put into his Court as

10  part of the 363 approval process.  The Fed had already reached

11  an agreement with Barclays which, among its other features,

12  gave Barclays an option to purchase the repo collateral in the

13  Fed repo for the amount the Fed had advanced.  In other words,

14  the haircut was already baked in for Barclays.  The Court was

15  never told that, in essence, the Fed traded its support of the

16  transaction in a quid pro quo in return for Barclays' agreement

17  to take the Fed out.  The Court was told in this hearing over

18  and over again by Barclays' executives that this process of

19  Barclays stepping into the shoes of the Fed was the result of

20  Fed pressure, the Fed made us do it.  You heard that from

21  executive after executive of Barclays.  But when Shari

22  Leventhal took the stand from the Fed, the Court asked exactly

23  the right question and asked if the Fed had pressure to

24  encourage Barclays to do that and her answer was a stark no.

25          There's no disclosure of any of these things and one

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 14 of 260

Page 14

1    fundamental reason there was no disclosure of any of these

2    things is the lawyers who were making disclosure to the Court

3    were not clued into them.  The Court heard testimony over and

4    over from Mr. Miller, from Mr. Lewkow, the lawyers were not

5    involved in the valuation of assets.  None of the lawyers even

6    knew about the role of the repo until the Saturday after the

7    closing.  The lawyers were kept in the dark about these

8    material undisclosed issues.  And hence, they were disabled

9    from making disclosure.  We do not -- no movant points at any

10   of the lawyers who sat at these two tables and says they made a

11   deliberate misrepresentation to the Court.  You can be the best

12   bankruptcy lawyer in the United States.  But if your client

13   doesn't tell you the facts, he cannot disclose them to the

14   Court.  You can be the best M&A lawyer Cleary Gottlieb has to

15   offer, but if you're negotiating a deal and nobody tells you

16   the economics, you're not in a position to cause disclosure.

17   It was not the lawyers; it was the businesspeople who caused

18   these fundamental lacks of disclosure to the Court.

19        Now, another theme that has pervaded Barclays'

20   presentation arises from the fact that it was the only bidder,

21   a phrase Your Honor has heard a lot, and the volatility of the

22   markets and the extreme circumstances in September of 2008

23   under which this transaction was addressed and approved.  We

24   all know what that was like.  Even now, after thirty days of

25   trial, I don't think I have a -- I could have a perfect sense

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 15 of 260

Page 15

1    of what it was like in the hearing.  I was not there.  But

2    having reviewed all of the record here, I have a good sense of

3    how urgent it was.  And Barclays' opposition to these motions

4    is based in part on the suggestion that when times are that

5    hard, when the numbers are that big, when the stakes are that

6    high and when the pressure is on to do things quickly as all

7    parties asked the Court to do, that for some reason, the

8    disclosure obligations under Section 363 -- and this is a court

9    of disclosure -- the disclosure obligations under Section 363

10   should somehow have been relaxed, that a failure to make

11   disclosures should retroactively be forgiven, that a failure to

12   tell the Court the real numbers should not be the basis of

13   60(b) relief because, at the end of the day, Barclays wants to

14   say no harm no foul.  They just won't phrase it that way.

15         I would suggest exactly the opposite is true, Your

16   Honor.  This is a court of disclosure.  When the stakes are

17   high, when the circumstances are important, when the Court is

18   asked to consider a transaction this large and this critical

19   and this complicated on a schedule that short, that's where the

20   rubber hits the road and that's where the disclosure

21   obligations are enhanced not diminished.  It's critical -- it

22   is critical for a proper application of Section 363 and to

23   protect the integrity of the process before the Court both for

24   the Court, for the interested parties and for the public that

25   under those circumstances, everyone has to step up their game

1    and everyone has to make sure that the Court is told everything

2    it needs to be told to make an informed decision.  That's not

3    the time for slippage.

4         Now, a topic like that actually came up at the hearing

5    on the 17th; that's the sale motion hearing, the first time the

6    parties came to the Court with the sale motion.  And Your Honor

7    may recall when Mr. Despins, who was counsel for the creditors'

8    committee at the time, in the context of asking for a short

9    adjournment or asking for some sort of relief as to the process

10   regarding the DIP financing, said well, if anything goes, Your

11   Honor.  And the Court stopped him right there.  And the Court

12   told every party how this was going to proceed.  And this is

13   what the Court said:  "I totally disagree with that assertion.

14   We are not in an anything-goes environment.  We are in an

15   environment in which we're seeking to fit the exceptional case

16   within the standard framework that we're all familiar with of

17   due process, Bankruptcy Code, bankruptcy rules, the local rules

18   and accepted practice in this court."  So lest anybody needed

19   warning that that was the standard, the Court gave that

20   warning.  Unfortunately, the involved parties disregarded the

21   warning.  And unfortunately, in fundamental aspects, there was

22   serious failures of disclosure in support of the 363 relief

23   that the parties sought here.

24         Barclays is not entitled and was not entitled at the

25   time to sit back and watch the deal being mis-described and

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 17 of 260

Page 17

```
 1    later claim the finality of 363 protection.  There is a price

 2    to be paid for that.  The price to be paid for 363 protection

 3    is full disclosure.  Barclays conceded at the trial -- Your

 4    Honor may remember during the opening, Mr. Boies suggested that

 5    Barclays did not have a speaking role in this play.  They most

 6    certainly did.  They spoke.  They participated in the drafting

 7    of the sale order.  And they knew the facts that were not

 8    disclosed to the Court.  They can't enjoy finality under 363.

 9    And equity says they can't enjoy the loophole fruits of those

10    failures of disclosure.

11         Now I mentioned one of the disclosures and I want to

12    address some of the particular failures now.  And one of them

13    is the disclosure to the Court and the description to the

14    Lehman board of this deal as a wash.  In fact, we believe it

15    was told to the Court there would be a net benefit to Lehman.

16    But the board -- the board of Lehman was told this would be a

17    wash as to the assets of LBI.  Your Honor will recall these

18    minutes.  This is Exhibit M-9 in evidence.  It's the final

19    minutes of the meeting of the Lehman boards on the morning of

20    September 16th before the asset purchase agreement was

21    finalized, before it was agreed, before it was brought to the

22    Court.  And the board was told the deal was described as a

23    wash, a wash, with Barclays assuming liabilities, including

24    employee liabilities and contract cure amounts, basically the

25    equivalent to the assets.  That's the deal that was described
```

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 260

Page 18

1   to the Lehman boards.  That's the deal the Lehman boards

2   approved.  We put Michael Ainslie, the chairman of LBHI's board

3   and member of the board at the time, on the stand and he

4   confirmed this.  Mr. Ainslie was asked to describe his

5   understanding and his understanding was "It was a transaction

6   where the assets and the liabilities were equal."

7          Your Honor will also recall, on a review of M-9, on a

8   review of the board minutes that another attendee of that board

9   meeting was Barry Ridings from Lazard.  Mr. Ridings laid out

10  the standard that Lehman had to meet for the Court to approve a

11  363 sale.  And he told the board that it had to be better than

12  liquidation -- better than liquidation.  And that's a theme

13  that Mr. Ridings took up later in his deposition which was

14  played to Your Honor.  It had to be better than liquidation.

15         So what does the Lehman board think?  The Lehman board

16  approves a wash, an equal exchange of assets and liabilities

17  with values that are better than liquidation.  The financial

18  schedule on which the deal was originally based -- and Your

19  Honor is familiar with the famous M-2 as well.  It's a balanced

20  financial schedule.  It's a balance sheet.  It balances the

21  assets and the liabilities.  And it does that with the numbers

22  for assumed liabilities at cure and comp for 4.25 billion

23  dollars.  That brings it into balance.  Now the evidence at the

24  trial showed that those numbers were, in reality, plug numbers

25  from Barclays' perspective but had no intention of paying

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 19 of 260

Page 19

1    anything resembling that amount.  But that is the document upon

2    which the deal was based.  Mr. McDade told us that.  We asked

3    Mr. McDade at the trial about that document.  And this is

4    what -- when I asked if it's fair to say these are the numbers

5    upon which the deal was based, he said yes.  And he described

6    it as the guidance document used for the first hearing in the

7    courtroom.  And elsewhere in his testimony, he described it as

8    the guidance document for the lawyers and the advisors and

9    everyone else involved in the deal.  Participants, advisors and

10   lawyers were to be guided by this document.

11           Now, Mr. McDade, Lehman's chief negotiator -- and I

12   would submit a credible witness, one of the few witnesses not

13   aligned with the party anymore -- could not have been clearer

14   in his testimony that the sale transaction overall was to be an

15   equivalent exchange of assets and liabilities.  I asked him

16   that:  "On the 16th when the agreement was signed, did you

17   consider the transaction an equivalent exchange of assets and

18   liabilities?"  His answer:  "Including all of the value that

19   was contemplated, yes, approximately."  That remained Mr.

20   McDade's view all week.  That's not just his description at the

21   beginning.  That was Mr. McDade's view at the sale hearing

22   where he was a witness.  He told us his view never changed over

23   the course of the week.  In his mind, this deal was always an

24   equal exchange of assets and liabilities.  He told us the

25   assumption of liabilities was integral to that balance.  He

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 260

Page 20

 1   told us when he took the stand to testify about this, as

 2   Lehman's witness when he sat in that chair, he made that

 3   representation to the Court.  Your Honor may recall that

 4   interplay where there was an objection over the use of the term

 5   "representation" to the Court.  And we all affirmed that was

 6   Mr. McDade's view of what he represented to the Court.  It was

 7   a balanced deal.

 8          Now, Barclays has, from time to time, said it's not a

 9   balance sheet deal relying on what I would respectfully call a

10   little bit of word play from Mr. Miller's deposition.  It's

11   actually in the question not in the answer.  Mr. Miller was

12   asked, could you do this deal irrespective of the value of

13   liabilities and he said essentially yes.  That was never his

14   client's view.  His client said to us you can't do it that way.

15   You can't do it irrespective of values.  I asked him that.

16          Following on his testimony about the equivalent

17   exchange, I asked, "So the deal couldn't be done irrespective

18   of the value of those liabilities, correct?"  "That's correct."

19   " So the deal that you agreed couldn't have been done

20   irrespective of what the value of the assets was, is that

21   correct?"  "That's correct."  Mr. McDade's testimony

22   resoundingly refutes any suggestion that this deal was supposed

23   to be irrespective of what the values were.  Simply to state

24   the proposition in a bankruptcy court is to show how ludicrous

25   it is.  If the deal was irrespective of values, if it didn't

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 260

Page 21

1   matter what Barclays was going to get, why have the hearing at

2   all?  And if it was a deal irrespective of the values Barclays

3   was going to get, when the Court asked how do I value -- how do

4   I value this transaction, you would have thought that is the

5   answer the Court would have been given.  But nobody said

6   anything like that to this Court at any point during that week.

7   It would have been easy to say and nobody ever said it.  And

8   the reason nobody ever said it is it wasn't the deal.

9          Mr. McDade also told us he was never told anything --

10   anything to indicate it was a precondition for Barclays that it

11   have a first day gain.  And he rejected any notion that

12   Barclays would have such gain.  I asked him, was it

13   contemplated that there was a gain to Barclays and he said no,

14   it was not.  I asked him again, the all-in deal, was there an

15   embedded gain from Barclays on day 1.  He said no, it is not.

16          Your Honor, I'm going to ask Mr. Kirpalani to move his

17   head away from my page numbers, if that's okay.

18          Your Honor will recall, I showed Mr. McDade a balance

19   sheet, an opening day balance sheet that was prepared by Martin

20   Kelly that showed 3.38 billion dollars in equity for Barclays

21   on day 1.  And I asked him if that was consistent with the deal

22   he made and he said no, it was not.  Mr. McDade resoundingly

23   rejected the notion that a first day gain for Barclays was

24   disclosed or was part of the deal.  It was a balance deal.

25   There should have been no such gain for Barclays.

Page 22

1        When the Court asked Mr. Miller how to value the

2   overall transaction, and this is the section of the September

3   17th transcript with which we're all very familiar, Mr. Miller

4   gave these numbers.  Mr. Miller talked about, among other

5   things, the assumption of liabilities of approximately four

6   billion dollars and 250 million in cash.  And that, coupled

7   with the APA, gave the Court the impression this was a balance

8   deal or one that would generate a net benefit for Barclays

9   (sic).  Not a word about it being a precondition for Barclays

10  there was a first day gain.  Not a word that this was

11  irrespective of values.

12        Now, I guess the term "precondition" -- that's not my

13  term.  That's the term of Jonathan Hughes.  Jonathan Hughes was

14  at the time the general counsel of Barclays.  He was the man

15  responsible for marshalling their legal forces to bring this

16  deal to court.  He was in on the negotiations from start to

17  finish.  And he described a first day gain as essentially a

18  precondition.  Essentially a precondition.  Mr. Hughes conceded

19  nobody ever specifically mentioned that.  Mr. Hughes conceded

20  nobody told it to Lehman.  And Mr. Hughes conceded that nobody

21  told it to the Court.  Mr. Hughes conceded, when I asked him if

22  anyone had told that to the Court in any way, shape or form

23  that he didn't think it was said.  Any way, shape or form.  The

24  general counsel of Barclays conceded.

25        The general counsel of Barclays also gave us the

1    formulation for Barclays' idea of disclosure.  This is what Mr.

2    Hughes said:  "There were other pieces of information from

3    which one might have been able to deduce a first day gain for

4    Barclays" -- "other pieces of information from which one might

5    have been able to deduce a first day gain for Barclays".  Most

6    respectfully, Your Honor, I suggest that that standard of

7    disclosure is anathema to a 363 sale.  It is just not enough to

8    argue that there were clues left around to solve the mystery,

9    that there was a trail of bread crumbs that had the Court been

10   inclined could have led it to the conclusion there was a

11   windfall gain for Barclays.  It is just not enough to say the

12   Court could have figured it out, it could have deduced it.

13   That is not disclosure.  That's standing silently while this

14   mis-disclosure is made, comfortable somehow that a record is

15   being made that you can argue later that there were pieces of

16   information from which one might have been able to deduce

17   something.

18          I asked Mr. Diamond about capital accretion about this

19   first day gain.  And Your Honor will recall Mr. Diamond's

20   testimony.  It was a difficult couple of days.  Mr. Diamond was

21   hardly a forthcoming witness.  When I showed him his deposition

22   testimony in which he had said that "an asset/liability

23   mismatch was necessary or we weren't authorized to do the

24   deal" -- those were his words -- "we weren't authorized to do

25   the deal", Robert Diamond, the president of Barclays, an

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 260

Page 24

1    articulate man, who deals with boards all the time and is a

2    member of the Barclays board, had this to say:  " I think I

3    probably misused the phrase 'authorized'".  When I asked him

4    about it again, Mr. Diamond wanted to add a couple of caveats

5    to his deposition testimony.

6         The fact of the matter is when you cut through it and

7    you cut through what Mr. Diamond had to say and when you cut

8    through what Mr. Varley and Mr. Hughes had to say, there's no

9    doubt Barclays knew it would have a first day gain, Barclays

10   considered it a condition of the deal, Barclays would have

11   walked away from this deal if they didn't have it.  And there's

12   no doubt, because the record speaks for itself, nobody ever

13   said that to this Court, not one time.

14        The idea of capital accretion from Mr. Diamond stayed

15   in the deal from beginning to end.  That's what he said.

16        Now, Mr. Varley testified -- Diamond's boss, John

17   Varley, testified, Mr. Varley being chief group executive of

18   Barclays.  And he was fixated on this asset/liability mismatch.

19   That's the term that he used.  And one thing about Varley's

20   testimony that I think is very important is his discussion

21   about the so-called buffer.  Your Honor will recall because

22   we've seen it time after time -- so many times, I don't even

23   have it on a slide -- the analyst call.  The analyst call which

24   talks about a spread between the long and the short position of

25   seventy-two billion and sixty-eight billion.  And Barclays

Page 25

```
 1   tried to make this Court think in this trial that that's where

 2   the asset liability mismatch solely resided and that apparently

 3   is one of the pieces of information from which the Court might

 4   have been able to deduce Barclays' first day gain.  Well, Mr.

 5   Varley conceded that that's only half the buffer.  That's only

 6   half the buffer.  Mr. Varley conceded that the seventy-two they

 7   started out with was a result of the marking process.  The

 8   marking process is the process Your Honor heard about time and

 9   again through the trial of the traders for Barclays and the

10   traders for Lehman sitting in a room and negotiating what the

11   price should be, what the value should be, what led to the

12   discount, what led to the valuation below Lehman's book value.

13   And they got to a range of seventy-two.  So when you start with

14   the seventy-two/sixty-eight that Barclays puts most of this

15   disclosure to -- it's the basket which Barclays puts most of

16   its disclosure eggs.  It has to be taken with Mr. Varley that

17   it started out already cut.  It started out cut from Lehman's

18   book value to the seventy-two at which that spread between the

19   long and short position started.

20         Mr. Varley made clear it was his obligation to deliver

21   that form of capital accretion to the board.  So where are we?

22   The Lehman board approves a wash.  The Court is told there's a

23   net benefit to Lehman.  The Barclays board insists on capital

24   accretion.  Diamond at least admits it's a priority.  At his

25   deposition, at least, he admitted he didn't have authority to
```

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 260

Page 26

 1    do a deal without it.  And Varley tells us there was already a

 2    mark-down baked in to the spread that they say was disclosed to

 3    the Court.  The parties made two different deals apparently.

 4    Lehman made a balance deal.  McDade negotiated a balance deal.

 5    McDade says that's what this Court was told.  That is what this

 6    Court was told.  And below the disclosure, below the line of

 7    disclosure, a deal with a built-in gain for Barclays is

 8    actually being negotiated from the very outset.  And what that

 9    deal contemplated from the outset was the five billion dollar

10    discount.  The five billion dollar discount.  That was agreed

11    from the very beginning.

12          Now, the use of the term "book value" in the APA was a

13    deliberate choice.  Your Honor will recall it was written in by

14    hand in the last draft.  If the Court were to take a look at

15    the first exhibit of both parties, BCI-1 and M-1, you'll see

16    that typed in.  But this is where it came in.  This page is

17    taken from the copy of the asset purchase agreement that was

18    annexed to the sale motion.  It was added in as a deliberate

19    choice.  And we know now from the trial how it was added in;

20    Barclays chose that term.  Barclays chose that term.  Mr.

21    Lewkow told us that Barclays chose that term.  On direct, when

22    Mr. Schiller was questioning him, Mr. Lewkow said that the term

23    "marks" which was at one point in the draft was considered not

24    precise enough.  Book value was going to be substituted

25    instead.  And when I asked him at the trial where that came

Page 27

1    from, he said, I think it was me.  I think it was me who

2    decided we should use the term "book value".

3            The use of that phrase "book value" is just not true.

4    Barclays can't decide in this case with regard to the discount

5    from book value whether it wants to embrace it or shoot it.

6    They put witnesses on the stand who will admit, who say,

7    Lehman's marks were stale.  They needed to be remarked.

8    Lehman's marks were old and too high.  We had to negotiate a

9    different lower value for them to be realistic, to use Mr.

10   Varley's words.

11           And then they put Mr. Pfleiderer on the stand to try

12   to make it disappear entirely through a review of the GFS

13   reports.  The fact of the matter is every witness involved,

14   every witness who was there at the time, admits there was a

15   discount from Lehman's book value.  We're all too familiar with

16   Mr. Kelly's memo where he talks about the five billion dollar

17   all-in economic loss versus our marks.  And Mr. Kelly writes

18   this memo at 5:10 a.m. before the board meeting, before the APA

19   had been drafted and certainly before the sale motion.  It was

20   baked in and built into the deal from the very beginning.

21   Barclays has admitted -- Barclays has admitted the discount.

22   These papers in this case.  In its opposition motion, Barclays

23   attempts to explain it here saying the Lehman marks were stale

24   and overstated.  Barclays didn't agree with them.  And it

25   didn't want to accept those marks and then have to take an

1    immediate write-down after the sale.  Thus, the discount

2    described throughout the movants' Rule 60 motions is not a

3    discount from fair market value but rather an attempt to adjust

4    from stale Lehman marks to fair market value.  Well, that, to

5    me, admits that it wasn't book value.  It wasn't book value as

6    the APA said it would be.  It was not book value as Mr. Lewkow

7    had chosen to say in the APA.

8            Barclays admits the discount.  And let's go back to

9    the disclosure point.  If in fact, as Barclays seems to say and

10   as the witnesses have asserted at the trial, Lehman's marks

11   were stale, Lehman's marks were too high and what the -- the

12   others that were actually being given to the Court were a

13   negotiated amount, whatever the reason, to exceed to Barclays'

14   view that this was a more realistic assessment of market value

15   because it was the deal at which Barclays would transact.

16   Whatever the reason, that needed to be told to the Court.  But

17   the Court was never told that.  Instead, the Court was told it

18   was book value which any Barclays witness will tell you was

19   viewed by the world to be too high.  Well, if that's true, when

20   the Court and the public was told this deal was being done at

21   book value, the information given to the Court was that Lehman

22   was getting, in essence, the benefit of its higher values even

23   if they were stale, even if they were high.  The point is the

24   price really wasn't disclosed.  One deal was disclosed; another

25   deal was actually transacted from the very beginning.  From the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 260

Page 29

1   beginning, the idea was to deliver the securities assets to

2   Barclays at five billion below Lehman's marks.

3           The notes of John Varley, in his own deal file reflect

4   this.  Your Honor will recall this page from Exhibit M-12.

5   That's what Mr. Varley called his hand files, the file he kept

6   in his office on important issues about the deal.  He records

7   the negotiated discount.  Barclays' minutes talk about assets

8   of forty-five billion liquid, thirty billion less liquid.

9   Seventy-five billion not seventy.  Barclays' internal documents

10  at the time, even for tax planning -- and here, I'm looking at

11  Exhibit M-31 -- talk about the valuation calculations that the

12  discount between the value of the assets acquired and the

13  purchase price not be subject to a marginal tax rate.  Mr.

14  McDade testified this was a negotiated number.  Mr. McDade

15  testified that the negotiated number was five billion off of

16  Lehman's marks.  It was in the range of five billion dollars.

17          Now Mr. McDade also conceded and Mr. Lowitt, the CFO,

18  conceded that a negotiated price for both assets with a single

19  purchaser just was not the way any regulated broker-dealer

20  would keep marking market books.  This could not have been

21  Lehman's book value.  Here's Mr. Lowitt on the topic.  I asked,

22  "You've never seen that type of process used to truthfully

23  describe, to correctly describe this book value at all, have

24  you?"  His answer, "Yeah.  I'm not aware of a comparable

25  situation to this."  He said it again when I followed up, "I

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 260

Page 30

1    would not have thought that going to one outside party and

2    saying what do you think these assets are like would be the

3    normal process of how we would establish our books and records

4    for marking."  The CFO of Lehman agreed -- who now works for

5    Barclays -- agreed that that wasn't book value.  It couldn't

6    have been book value.  It was the result of negotiation with a

7    single purchaser.

8           Mr. McDade plainly testified that the price to

9    transact was not Lehman's book value as of the 16th of

10   September.  "Is that right?"  Answer:  "To the best of my

11   understanding."  And that question and answer follows obviously

12   the Q and A above it where I'm asking him about this process,

13   this negotiation process between the traders.  Whatever it was,

14   it wasn't book value as of September 16th.  Whatever it was, it

15   wasn't book value as of the date hereof as the asset purchase

16   agreement said.

17          Now the testimony was also clear there was a plan at

18   the beginning of the week to mark down the books.  Kelly and

19   Lowitt both told us that.  Kelly, of course, confirms his

20   calculation of the loss against the books here in his

21   handwritten notes.  He put it at five and a quarter billion

22   dollars.  He, too, told us about the five billion dollar

23   difference:  "Lower than their most recent book values on the

24   books of Lehman."  And his notes confirmed that it was the plan

25   to mark the books down, to mark the books down to reflect that

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 260

Page 31

1    lower negotiated price.  Your Honor is going to remember this

2    from the trial.  Mr. Kelly was shown these notes where his

3    handwriting says "Marking book down".  Mr. Kelly was shown his

4    deposition testimony where he described why he wrote the phrase

5    "Marking book down".  And Mr. Kelly simply lied.  Mr. Kelly

6    took that stand, took the oath and made false statements to the

7    Court about what his handwriting said.  The plan was marking

8    the book down.  Martin Kelly was involved in that plan.  But we

9    don't have to just rely on him.

10         Mr. Lowitt also made notes about a markdown.

11         Let me get the bigger one of that.

12         This is our merely draft of the 9/16/08 balance sheet.

13   And that's in Lowitt's handwriting, "Markdown", just below

14   77.4.  And Your Honor will recall that both Mr. Kelly and Mr.

15   Lowitt each in their separate appearances on the stand had

16   something of an epiphany about this.  Both of them suddenly

17   remembered for no apparent reason that it was the books of

18   September 12th they were talking about.  Kelly was particularly

19   memorable about that because he told us it had nothing to do

20   with the fact that he was going to testify.  And he was pretty

21   clear it had nothing to do with his preparations to testify.

22   And Lowitt also told us that it had always been his view he was

23   just trying to be a bit more precise than he had been at his

24   deposition.  They bought into the theory and they came in and

25   they sculpted their testimony to say it as if the difference

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 260

Page 32

1    between marking down the 12th or marking down the 15th makes

2    any difference at all.  Mr. Lowitt -- Mr. Lowitt himself

3    conceded that no matter how you look at it it's lower than

4    Lehman's book value, no matter how you look at it.  And Mr.

5    Lowitt also conceded the plan was from the outset to mark the

6    books down.  I understand there was going to be an exercise to

7    mark the books to reflect the agreements between Barclays and

8    Lehman.  They were going to mark the books down.  Now, we know,

9    later, whether they actually took pen to paper and marked them

10   down on that day, turns out to be either unnecessary or

11   irrelevant because the repo presents the opportunity to achieve

12   the same thing by a different method.  But that was the plan at

13   the beginning of the week and it was a negotiated price because

14   Barclays had insisted on it.

15          And what's Barclays' disclosure here?  Again, we turn

16   to Mr. Hughes.  Mr. Hughes tells us despite the testimony of

17   Mr. Lewkow, his lawyer, that the term "book value" "wasn't of

18   great consequence at the time as far as I recall".  It wasn't

19   of great consequence to Barclays."

20          Well, perhaps that explains why Barclays sat silently

21   their lawyer having put the term "book value" in the agreement,

22   the agreement having been submitted to the Court and let the

23   Court think that Lehman was getting the benefit of its

24   allegedly overstated and stale marks.  But one more time, this

25   is indicative of Barclays' disdain for the disclosure

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 260

Page 33

1    obligations in a 363 sale.  It just didn't matter to them.  It

2    didn't matter to them because they got the deal they wanted.

3    They insisted on lower values in the marks showed they got it.

4    And they really didn't care if the Court was told about it.

5    They just wanted to rush to approve it.  The fact remains,

6    that's what the APA said.  Barclays chose that term.  That term

7    was false.  The price was not Lehman's book value.  It was a

8    negotiated lower price.

9          Now, that's how the value to Barclays was understated.

10   The consideration Barclays was going to pay was also

11   overstated.  And that fell in two categories.  And again, I'm

12   at the beginning of the week, the assumption of liabilities for

13   cure and the assumption of liabilities for comp.  The original

14   calculation for cure, Your Honor will remember from our friend,

15   Exhibit M-2, is 2.25.  That number dropped.  We all agree that

16   number dropped as -- sometime between the 16th when this was

17   prepared and the 17th when Mr. Miller came to the court.  But

18   we know where that number and numbers like it came from.  They

19   came from transaction adjustments that Martin Kelly and his

20   staff made in which they were writing up Lehman's accruals.

21   Here's some examples.  Your Honor will recall these transaction

22   adjustment sheets.  There's M-32.  That's them on September

23   18th, the day before the sale hearing.  There's Exhibit M-17.

24   That's done on the 17th, two days before the sale hearing.  Now

25   Barclays had one copy of this and I'm sure they'll show it to

Page 34

1    you where a copy of a transaction adjustment page went to Weil

2    Gotshal.  There's not a scrap of evidence in this record --

3    there's not a scrap of evidence in this record that anybody

4    explained it to Barclays -- I'm sorry -- to Weil Gotshal.

5    There's not a scrap of evidence in this record that anybody

6    ever took one of the disclosing lawyers aside and said look,

7    Harvey, before you tell the judge what an assumption is for

8    cure, for contract, you should know these numbers are just

9    estimates.  These are just the range.  We're actually writing

10   them up to agree with the value sheet.  We're writing them up

11   to agree with the purchase agreement.  They are not real.

12   Nobody ever told Mr. Miller or anybody else either that it was

13   never Barclays' plan to pay those amounts.  This is, in fact,

14   what the Court was told about the assumed liabilities.  That

15   page is page 6.  It's Exhibit M-18 of the sale motion.  This is

16   the first time the Court is asked to consider approving the 363

17   deal.  The parties estimate that the cure costs associated with

18   such assumptions and assignments will be approximately 1.5

19   billion.  No qualification.  No suggestion, as Barclays has

20   made in this trial, that it was a range that could have been

21   from zero to infinity.  Nobody really knew what the number was.

22   That's what the Court is told.  And Mr. Miller also said it.

23   When the Court asked what the value of the transaction was,

24   this is what Mr. Miller said about cure.  "[T]he cure amounts

25   and other payments in connection with the contracts, are

Page 35

1   estimated to be a billion five hundred million dollars."  No

2   qualification.  No suggestion that anybody had told him these

3   were written up.  No suggestion anybody had told him these

4   could be a broad range.  They could be zero; they could be 200

5   million; they could be 1.5.  Nothing like that.  Over and over,

6   the lawyers told us they weren't privy to these numbers.

7         And throughout this trial, we saw proof that that was

8   never Barclays' plan.  It was never Barclays' plan to pay

9   anything near 1.5 billion dollars.  They were thinking more in

10  the range of 200 million dollars.  These are -- in Exhibit M-

11  11, these are Mr. Cox's handwritten notes where he refers to

12  200 million for 2000 contracts that are mission critical.  And

13  where does he get this information?  It says it on his notes:

14  Martin Kelly.  And Mr. Cox didn't remember on the stand where

15  he got that.  But that's what his note said at the time.  His

16  contemporaneous note suggests that it was Martin Kelly who told

17  him we'll only have to pay 200 million.  And in any event,

18  those were Barclays' internal calculations.  200 million for

19  external funding.

20        This document, M-41, puts the total underestimate, the

21  difference between what the Court was told -- what the balance

22  sheet that the deal was based on required and what Barclays

23  actually intended to pay at 2.7 billion dollars.  That's

24  Exhibit M-41.  They put the difference at 1.3.  The total

25  negative goodwill generated by this practice is 2.7 billion

Page 36

1    dollars into Barclays.  No doubt Barclays was always planning

2    to pay something in the range of 200 million dollars for cure

3    in the event they paid 238 which itself is a telling fact.

4    Court's told 1.5 billion; Barclays is in the 200 million dollar

5    range.

6           Same problem with bonuses.  Two billion dollars for

7    bonuses.  It says it right there in 9.1(c).  Barclays has from

8    time to time taken a stab at saying, well, the financial

9    schedule is not the one referred to in Section 9.1(c) because

10   it's only assigned by Mr. Berkenfeld.  Well, Mr. Lewkow

11   dispelled that motion and told us that's the one that's

12   referred to in the agreement.  And Barclays did not pay two

13   billion dollars.  Your Honor will recall the testimony of Mr.

14   Exall, Michael (sic) Exall.  And Mr. Exall generated during

15   discovery in this case a chart that, by a remarkable

16   coincidence, purports to show Barclays paid 1.999 billion.  My

17   partner, Mr. Hine, asked him, well, did you say to yourself,

18   holy cow, I came in within one-tenth of one percent.  And he

19   said that wasn't -- that wasn't result oriented.  But the

20   internal documents show it most certainly was.  Barclays

21   knew -- it always planned a bonus pool in this kind of range.

22   And here, I'm at Exhibit M-130.  There we have a bonus pool of

23   1.3.  That's on the 16th.  As late as the 23rd, Barclays still

24   has a bonus pool in the range of 1.4 billion dollars.  But they

25   knew the contract required a two billion dollar payment.  There

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 260

Page 37

1    are internal memoranda at Barclays about that very fact.

2    Clackson to Ricci:  "So it looks like we have to pay them two

3    billion in bonuses."  And look at the attachment slide.  That's

4    the balance sheet upon which the deal was based.  That's the

5    9/16/08 balance  sheet.

6         We all remember this e-mail, the one entitled "650

7    million dollar profit".  Here we have Clackson, the CFO,

8    writing to Evans.  And he's complaining, "It says two billion

9    9.1(c) and you guys told me it was 1.35."  And in the end, what

10   do they do?  They paid -- and I won't burden the Court with all

11   the documents that support it.  It's virtually undisputed.

12   Barclays says in its papers they paid 1.55 billion dollars for

13   bonuses.

14        Now Barclays says it's not two billion.  Barclays has

15   suggested that 9.1(c) and its obligations of the 9.1(c) somehow

16   also cover other types of comps:  severance, other bonuses.

17   And the schedule that Mr. Exall relied on, both his original

18   and his adjusted one, do include things for social taxes, for

19   Barclays prices.  9.1(c) deals only with bonuses.  The contract

20   itself says it.  9.1(b) deals expressly with severance.  91.(c)

21   deals with bonuses.  9.1(c) is the only one of the two of them

22   that refers to that schedule.  And in the record then -- I

23   won't to put it up on the screen.  It's the testimony of Alvin

24   Brown, a partner at Simpson Thacher who represented Lehman and

25   drafted that clause -- and his deposition testimony is in the

1    record.  And it's clear that's exactly what that what that was

2    meant to say, two billion for bonuses.  Barclays paid only 1.5

3    and never planned to pay anything near two billion dollars.

4           I've mentioned a couple of times Barclays' idea of

5    disclosure.  And I wanted to turn to that just very briefly.  I

6    put out there Mr. Hughes' formula of pieces of information

7    making it capable of deduction being the Barclays standard for

8    disclosure.  I'd like to briefly address the analyst call and

9    just reaffirm some of the things that I think the testimony in

10   this case shows.  First of all, and most self-evidently,

11   whatever it is the analyst call said nobody showed it to the

12   Court.  I asked Mr. Hughes, you may recall, was the Court

13   invited to the analyst call.  And he said, and I think he meant

14   this as a jocular answer, I certainly didn't invite him.  But

15   the fact of the matter is, we know.  The analyst call was not

16   put in the court record.  The press release that they also show

17   us, also not put in the court record.  Mr. Hughes conceded.

18   He's general counsel of Barclays.  He's the one who tells us

19   that's a disclosure document.  He didn't see it until he

20   prepared for his deposition in this case.  So, so much for the

21   analyst call being disclosure.  Even if it was a form of

22   disclosure, it doesn't mention the assumption of liabilities

23   for comp.  It doesn't mention the assumption of liabilities for

24   cure.  It doesn't mention the initial discount.  It discloses,

25   at best, that one mismatch between seventy-two and sixty-eight,

Page 39

1   seventy-two being the markdown book value against the sixty-

2   eight.  That's assumed.  That is not disclosure.  Disclosure is

3   when your lawyer sits at this table and stands up and tells the

4   Court something, when papers are filed with the Court.  It is

5   not a retroactive look at a press release that the Court might

6   have seen or an analyst call the Court might have heard about.

7   That's not even a poor excuse for disclosure.  It's not

8   disclosure at all.

9          So the repo -- let me move on to the repo, Your Honor.

10  We know from all the testimony in this case that Barclays --

11  here's the phrase everybody uses -- stepped into the shoes of

12  the debtor.  Barclays will tell you it did that because the Fed

13  made it do it.  The Fed has told us that's not true.  Barclays

14  will tell you that stepping into the shoes of the Fed created

15  terrible, terrible risk for Barclays.  The take-out agreement

16  between the Fed and Barclays shows that's not true.  Barclays

17  had an option.  Other evidence demonstrates to us that the Fed

18  was ready to step in, and in fact did, to finance the repo

19  collateral for Barclays the very next day.  Barclays could come

20  right back to the PDCF window and put that collateral back to

21  the Fed and receive overnight financing for it for a period

22  they talked of about a month till Barclays could find private

23  funding support.  So the risk that Barclays says it took on is

24  really not the risk that they did take on.

25          And all of that again is begs the disclosure point.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 260

Page 40

1   If what Barclays is trying to prove here is it had such serious

2   risk because it stepped into the shoes of the Fed and the repo,

3   what's their argument?  Therefore, we should be forgiven for

4   the lack of disclosure to the Court?  It was such a risky deal

5   for us, the standards should be lower?  That doesn't make any

6   sense.  And that doesn't work as a matter of law.

7           It also doesn't work as a matter of testimony.  Your

8   Honor will recall I asked Mr. Varley if on the issue of a

9   single bidder he felt that reduced Barclays' disclosure

10  obligations.  He was actually a little agitated at that point.

11  He said, you know that's not my view.  I asked that of Mr.

12  Hughes.  He said it was not.  I asked it of Mr. Diamond.  He

13  said it was not.  They'd have to say that.  I also have to say

14  it because it's true.  The fact that Barclays may have had some

15  risk because of the repo doesn't retroactively forgive a

16  failure to tell the Court about the repo.  The repo was the

17  deal -- was the deal by Thursday and certainly, by Friday.  We

18  know this.  We know that the Friday asset scramble was the

19  result of Barclays complaining that the collateral and repo was

20  too low.  We know that the repo was the main topic of

21  conversation between the parties.  That can't reasonably be

22  disputed.

23          And here's what we also know.  Let me show you on a

24  slide we collected here -- make sure I have the right one.

25  Just so I'm clear on this, Your Honor, these are two extracts

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 260

Page 41

1    from the -- and I'm at slide 120.  These are two extracts from

2    the September 17th transcript.  One is from -- the first one at

3    the top is from page 71.  And the second one at the bottom is

4    from page 24.  Let me read them in page order.  This is what

5    Mr. Miller said:  "And then, Your Honor, in the interim, LBI

6    has entered into an arrangement with the prospective purchaser

7    where there's a repo agreement in which they are backing up and

8    allowing these repos to be settled and to be financed."  And

9    Mr. Miller said a little while later:  "We have a company,

10   Barclays, which is supporting the operations of LBI right now

11   with a repo credit agreement so they can settle the

12   transaction."

13            Your Honor, that -- those two sentences are the sum

14   total of what this Court was told about the repo before it

15   approved the sale order.  That's it.  That's all.  Nothing in

16   the sale motion.  Nothing from the witness on the stand.

17   That's it.  Now how could that possibly tell the Court that the

18   repo had become a central piece of the transaction.  How could

19   that possibly tell the Court that the values they were applying

20   to the repo were going to be what was transferred to Barclays?

21   The answer is it couldn't.

22            And just to reemphasize.  On that -- there's nothing

23   on the 19th.  There's no mention of it.  There's no witness put

24   on the stand to talk about it.  The Fed, which is here, gets up

25   and says we support the agreement.  Nobody sees fit to mention

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 260

Page 42

 1    that that's a trade for taking the Fed out of its repo

 2    liability.  Nobody mentions that there were negotiations that

 3    very morning about the value of the repo collateral.  Nobody

 4    says a word about that.  Nobody says anything about the repo.

 5    Why?  The lawyers don't know.  No one has told the lawyers.

 6    Mr. Miller, Mr. Lewkow for both Weil Gotshal and Cleary

 7    Gottlieb, both were clear and unequivocal and unrefuted in

 8    their testimony that they weren't involved in the repo, they

 9    weren't involved in the valuation of the repo collateral.  They

10    knew nothing about this.

11         And there is a point later on the 19th where Your

12    Honor asks Mr. Novikoff from Wachtell rises and he has a

13    question about safe harbors.  And one of the safe harbors, of

14    course, is Section 559.  And Your Honor inquires of Ms.

15    Granfield from Cleary whether the safe harbors were affected by

16    the transaction.  I'm paraphrasing obviously.  And she says no.

17    The reason I raise that is I want to emphasize the point I just

18    made.  We do not intend that Ms. Granfield misled the Court

19    when she gave that answer.  She did not.  She doesn't know

20    either what's going on with the repo.  The lawyers only find

21    out the next day that the repo's been terminated.  And it's not

22    until the weekend that any lawyer sees any of the implications

23    of Section 559.  I have no doubt Ms. Granfield's answer was

24    truthful.  But I also have no doubt it was completely

25    uninformed because the clients never clued the lawyers in.  And

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 260

Page 43

1   the repo, as we know from the proof in this trial, was the

2   mechanism by which the original discount was delivered.

3           At the sale hearing, Ms. Fife gave the Court a report

4   about changes in the deal since the Wednesday, since the 17th.

5   And this is what she said.  We've seen this a number of times

6   in the trial, too, Your Honor.  Ms. Fife says to the Court:

7   "In terms of the economic changes, they result largely because

8   of the markets, unfortunately.  And from the time that the

9   transaction was actually entered into till now, the markets

10  dropped and the value of the securities dropped as well.

11          "So, originally, we were selling assets that had a

12  value of seventy -- approximately seventy billion dollars."

13  And that's a reference to the long position.  Mr. Shapiro, who

14  testified, said he viewed it as a corollary.  "And today, Your

15  Honor, we're only selling assets that have a value of 47.4

16  billion dollars."

17          So Ms. Fife comes to the Court and says the market's

18  dropped.  This is worth less.  There's no other way to

19  interpret that, especially balanced against the book value

20  clause or the APA, than to say we use mark-to-market book value

21  has caused this to reduce from seventy to 47.44 because of

22  market value.

23          Now, Mr. Miller confirmed, as if it needed to be

24  confirmed, that the lawyers had no information about how that

25  47.4 number was derived.  He said it was given by

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 44 of 260

Page 44

1   businesspeople at Lehman.  So on the public record, the APA is

2   still the operative agreement although it's not; now it's the

3   repo.  And the 47.4 given to the Court is a corollary to the

4   seventy billion dollar long position but, in fact, it's a

5   number that relates to the repo collateral.  And I'm going to

6   move on to how that calculated.

7           But before I do that, I want to take note of the fact

8   that Mr. McDade took the stand at the sale hearing and was

9   asked on cross how the assets being transferred were valued.

10  And he told the Court there was an individual line item detail,

11  an individual line item detail processed through all of our

12  individual list business units and coordination with the normal

13  finance professionals who are incorporating into the valuation

14  process.  And he told Mr. Qureshi who was cross-examining him

15  that that took place as recently as the prior evening.  That

16  was not true.  That was not true because there was no line by

17  line valuation of the collateral being transferred to Barclays.

18  At best, it was done on an asset class basis.  It was also not

19  true because the suggestion of Mr. McDade's testimony was that

20  this was done in Lehman's normal course the way it normally

21  marked its books and record and that was not true.  We know --

22  and I'm going to address this in some detail -- there was an

23  exercise led by Jim Seery to apply liquidation values to the

24  repo collateral.  This was no true.  Now I don't want to stand

25  here and suggest Mr. McDade knew it wasn't true.  I think he

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 45 of 260

Page 45

1    didn't.  Mr. McDade is locked in a room getting prepped with

2    Mr. Miller who doesn't know his numbers.  Mr. McDade is not

3    involved in the nuts and bolts of this.  I think Mr. McDade is

4    testifying to what should have happened, to what normally

5    happens.  But whatever else needs to be said, it did not

6    happen.  There was no line by line valuation.

7              The Court was also told that what needed to be avoided

8    here was liquidation values.  In the sale motion, the parties

9    said this:  "It is urgent to sell the purchased assets now or

10   face material disruption of their value.  I asked Mr. Shapiro,

11   who had reviewed this, what that meant, and he explained, it

12   was to be sure -- because the absence of a sale would have led

13   to a hear term liquidation.  Mr. Ridings, whose deposition was

14   played here by Barclays, said numerous times that the purpose

15   of his proffer and testimony was to demonstrate it's better

16   than liquidation.  "It's the highest and best and only

17   alternative we have."  He said it more than once.  It's better

18   than liquidation because it was the only alternative was the

19   deal on the table.

20             So the suggestion from Ms. Fife's statement to the

21   Court about 47.4 because the drop in the markets coupled with

22   urging of the Court to avoid liquidation price not only does

23   not disclose to the Court that liquidation values were being

24   used -- suggest to the Court that market values are being used,

25   it never disclosed to the Court and lures the Court away from

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 260

Page 46

1    the truth of the matter which emerged at this trial.  The repo

2    collateral that was transferred was valued at liquidation

3    values.

4         Now we know that from the testimony of Jim Seery.  We

5    know the lawyers weren't involved in it.  And I can keep

6    harping on that but I don't think anybody's really going to

7    dispute me on that.  It was all done by the businesspeople.

8    Now Jim Seery was the global head of fixed income at Lehman.

9    That week, Mr. Seery was working on the assumption that he

10   would move over to Barclays.  Mr. Seery told us at the trial

11   that when he got to Barclays, he received a bonus and a

12   retention payment.  He wasn't able to remember the amount but

13   he was able to quantify it into the millions of dollars.  Mr.

14   Seery gathered traders together to look at the value of the

15   collateral and the repo.  He said on the first day of his

16   testimony the purpose -- the primary purpose was to prepare

17   Barry Ridings to get on the stand and show the liquidation

18   value was the worst alternative to the sale transaction.

19        Just a quick word about the repo values.  We know that

20   the values of collateral held in the repo were valued by the

21   custodial agent.  The Fed repo, the one into which Barclays

22   stepped, as it were -- the Fed repo, the repo collateral agent

23   was JPMorgan Chase.  They valued the Fed repo at 50.6 billion.

24   The Lehman/Barclays repo -- that's the one that emerges on the

25   18th when Barclays steps into the shoes -- is valued by

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 47 of 260

Page 47

1   Barclays' agent, Bank of New York.  We know they're Barclays'

2   agent because Mr. Ricci told us that.  And they valued the repo

3   collateral in the neighborhood of fifty billion.  High bid,

4   49.9, forty-nine and change.  Those are not liquidation values.

5   Those are the values the custodial agent puts on repo

6   collateral through its normal processes of checking available

7   market data, third party sources.  You heard Mr. Schneider

8   testify about this in -- one of our experts who explained that

9   between them, JPM and Bank of New York valued one and a half

10  trillion dollars a day of repo collateral and they do it

11  overnight.  Now, Mr. Pfleiderer's report -- Professor

12  Pfleiderer's report allows us how that couldn't possibly be

13  right because they only had a day or two to do it.  But that's

14  what they do every day.  And the only expert on that matter who

15  came to the stand was Mr. Schneider and I suggest his unrefuted

16  analysis suggests he's just right as a matter of common sense.

17  That's why you use collateral agents.

18        Now Seery told us that Lehman carried the 50.6 --

19  carried the Fed repo on its books at 50.6.  That's the 50.6

20  that JPM had put on the Fed repo.  And Seery testified that

21  Lehman took the position when it dealt with Barclays, that

22  these marks were accurate.  This also, by the way, shows that

23  Lehman is marking the books by the end of the week.  So, so

24  much for it's all about whether there was GFS data on the 12th

25  or the 11th or the 13th.  They're marking the books by the end

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 260

Page 48

1   of the week and they're carrying the Fed repo collateral at

2   50.6 billion.

3          When Barclays gets the repo collateral, it decides it

4   wants to be unhappy with the values.  It decides it wants to

5   not accept the amount of Lehman's book value, that is, the

6   amount that the Fed put on it.  And it announced that the value

7   is much lower.  And we know that because we have Exhibit

8   M-45 -- which that is not.  There we go.

9          Now, Exhibit M-45 is a haircut summary prepared by

10  Jasen Yang and delivered ultimately to Clackson and Ricci.  And

11  what it does is it takes the Lehman market value of 50.6

12  billion and applies a haircut of six billion dollars more.  And

13  that summary shows -- that summary was put together on

14  September 18th when Barclays decided it wanted to demand more

15  from Lehman.  Now Barclays has contended in this case that when

16  the repo collateral went from the Fed repo to the

17  Lehman/Barclays repo, a lot of the collateral was different.

18  It was much worse collateral.  It was terrible collateral on

19  Thursday when it was just dandy collateral on Wednesday.  The

20  fact of the matter is, our experts have showed without

21  reputation that the five billion dollar write-down we're

22  complaining about is in primarily the overlapping collateral,

23  the collateral that makes it over.  Four billion of the five

24  billion dollar write-down is in there.  It's not nearly the

25  disconnect that Barclays would have the Court believe.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 260

Page 49

1          So enter Mr. Seery.  Why is this relevant to Mr.

2     Seery?  This is relevant to Mr. Seery, who testified that he

3     knew by Friday morning that the deal had completely changed,

4     that the deal under consideration was to turn the repo into an

5     asset sale.  And Seery admitted that the 50.6 was Lehman's

6     loss.  And Seery said that in his dealings with Barclays over

7     the shortfall of the repo, Lehman said the marks on the Fed

8     collateral were accurate.  Mr. Seery also testified he had

9     confidence in that process.

10          Nonetheless, on Friday morning, Seery says he called

11     together a group of traders and he told them to determine

12     liquidation values for the classes of assets in the repo.  Now

13     initially, he told us that the primary purpose here was to prep

14     Barry Ridings to testify gathering information from Mr.

15     Ridings' testimony.  Mr. Shapiro also gave us testimony to the

16     effect that Ridings was going to be prepared to testify that

17     liquidation was the worst alternative.  That's Mr. Shapiro's

18     testimony on August 23rd at page 115 in the transcript.

19          Now, prepping Ridings with liquidation values would

20     have made sense if Ridings, in fact, was going to take the

21     stand and say the deal on the table is better than liquidation

22     value which is what he told the board because then he would

23     have been able to say these are the liquidation values.  So

24     that's where Seery starts out when he takes the stand.  We were

25     prepping Barry Ridings to testify about liquidation values.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 260

Page 50

 1          In fact, the liquidation value that Seery oversaw was

 2     used to set a lower negotiated price -- a familiar phrase

 3     now -- a lower negotiated price between Lehman and Barclays for

 4     the assets.  Seery told the traders take a look at categories

 5     of assets.  That's not line by line -- and find out whether

 6     they, if the market was very liquid, they could sell it this

 7     afternoon.  If it wasn't so liquid, it would take a couple of

 8     days.  Now Seery was well aware that Barclays had no intention

 9     of doing a fast liquidation.  Barclays had no intention of

10     turning around.  He said that to us.  They didn't tell him that

11     and in his deposition he had said -- not in the highlighted

12     portion.  Down on line 12 -- they wouldn't do that.  But still

13     he asked the traders to form an opinion what kind of discount

14     would you be forced to take if you were to liquidate these

15     assets in a relatively short period of time.  And he also told

16     them to make that consideration at full size.  Seery tells the

17     traders come up with a value that reflects liquidation of the

18     entire portfolio.  That's a liquidation value.  That is not a

19     market value.  And that number came to 45.5.  And the reason we

20     know that number came to 45.5 is Exhibit 147.

21          Now, Exhibit 147 is Yang's haircut summary nabbed up

22     by Seery after the liquidation exercise that he instructed the

23     traders to do.  He told us the 45.5 billion was the total of

24     liquidation for the repo collateral that that traders exercise

25     had come up with.  So the question, obviously, is what's the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 260

Page 51

1    1.9.  The 1.9 is the contents of the unencumbered box that are

2    added as part of the Friday asset grab.  And in total, what

3    those numbers give you is 47.4.  That's the basis of Ms. Fife's

4    number.  47.4.  That's the basis.

5        So Ms. Fife is sent into court to tell the judge the

6    markets have dropped and the values are only 47.4.  And in

7    fact, 45.5 billion of those value are not market values.  They

8    are lower liquidation values which Mr. Seery conceded was the

9    basis of a lower negotiated price.  He said these are the

10   numbers they're reporting back if we had to do a fast

11   liquidation -- that's how he described it.  If we had to do a

12   fast liquidation.  But he also admitted that these numbers were

13   used.  They were a negotiated amount, a negotiated settlement

14   number.  That's what he agreed they were.  And that negotiated

15   lower settlement number became the basis for 47.4 back in front

16   of the bar at the sale hearing.  He sat right behind Mr. Miller

17   and Ms. Fife.  He could have poked them in the back that's not

18   a market value; that's a liquidation value.  But he chose to

19   say nothing.  No one corrected the lawyers at the hearing.  Mr.

20   Seery told us it never even occurred to him.  He was asked, did

21   it occur to you perhaps the Court ought to be advised that that

22   was a negotiated settlement value rather than a number arrived

23   at pursuant to Lehman's normal mark-to-market practices.  "No,

24   it did not."  He allowed this, however, if it had occurred to

25   him, he would have said something.  "If it occurred to me, I

 1    would have advised the Court."  But we all know he didn't.  We

 2    all know no one ever told the Court these were liquidation

 3    based values and they were the basis of a lower negotiated

 4    amount, lower than the Court was told was market value.

 5         Mr. Seery also went on to say having heard Mr.

 6    McDade's testimony because he said when he was sitting here he

 7    was next to Mr. McDade and certainly sitting here would have

 8    heard Mr. McDade testify.  But Mr. McDade's line by line

 9    valuation must have been wrong because it wouldn't achieve 7 --

10    it would get us to forty-nine and change if there had been a

11    line by line valuation.

12         So Mr. McDade gives wrong testimony.  Ms. Fife gives

13    the wrong number.  The man who put the liquidation number is

14    sitting in the court.  Barclays knows it's a negotiated

15    settlement amount because they're the other half of the

16    negotiations.  Barclays doesn't tell its lawyers and the Court

17    is not told.

18         Let's go back to 60(b).  Whether that is a mistake,

19    and it -- that's one explanation and it certainly is a mistake.

20    Whether it's intentional, whether it's facilitating the

21    innocent misrepresentation or whether it's some other basis for

22    relief, that warrants 60(b) relief.  The Court is given the

23    wrong number for the deal at the sale hearing where it's asked

24    to approve it.  Now, Barclays, looking at that 45.5 billion

25    number knows it has a problem and here's their explanation for

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 53 of 260

Page 53

1  why that 45.5 just happens to be the same as the 45.5 its own

2  internal valuators, it's PCG group came up months and months

3  later.  Bear in mind we can't test this because we haven't seen

4  a single person from PCG take that stand.  Barclays has not put

5  one person involved in its internal valuations on the stand to

6  be crossed examined to tell the Court about it.  Instead, they

7  bring an expert who says their methods look okay to me.  So

8  they get my Good Housekeeping seal of approval and PwC looked

9  at, too, so that's two seals of approval.  But no valuators.

10  No Langerman (ph.), no Wachtell, no Teade (ph.), nobody.

11  Here's Barclays' explanation.  It's a coincidence, they say.

12  It is a coincidence.

13          This is a footnote on the last page of Barclays'

14  papers in the in limine motions, Your Honor.  There is a

15  numerical coincidence between the 45.5 billion estimated by

16  some witnesses as the value of the repo and the 45.5 billion

17  ultimate calculated by Barclays.  I'm going to leave it to the

18  Court to determine how likely that coincidence is to be true.

19  Seery sat down and calculated that number.  He wrote it on

20  M-147.  Someone fed it to Lori Fife.  She mis-described it to

21  the Court as a market value and it wasn't.  That's a

22  fundamental failure of disclosure and Barclays knew it.

23  Barclays knew it because when they valued at the time what they

24  took in, they were putting in in the range of fifty-two billion

25  dollars.  Not 47.4.  Fifty-two billion dollars.  I had Mr.

Page 54

1   Ricci agreed with me that Bank of New York was Barclays' agent.

2   And Barclays' agent put the amount of collateral that made it

3   over -- remember all the collateral doesn't make it over -- at

4   forty-five.  And we add the seven billion in cash that was

5   added to make up the difference.  Barclays is calculating its

6   take at fifty-two billion dollars.

7           It's not just Mr. Ricci's testimony.  Your Honor will

8   recall this document, Exhibit M-147.  This is Marty Malloy

9   writing to LaRocca and Stephen King where he puts it at 52.19

10  on the 19th, the day of the sale hearing.  That's the forty-

11  five billion in cash that makes -- let me explain what I mean

12  by makes it over, Your Honor.  Your Honor, so this is only one

13  place in the transcript, you'll recall that there were

14  operational difficulties.  All the collateral doesn't make it

15  over.  That adds to forty-five.  And then the difference is

16  made up in cash.  Later, there's a dispute with JPM over who

17  gets to keep the cash.  But at the time, on the day of the sale

18  hearing, Barclays is putting its take at fifty-two billion.

19  Another person who put it there was our friend, Martin Kelly.

20  While he's preparing the opening balance sheet, he's got 44.8

21  as inventory value, seven billion cash, so he's in the 52.9

22  range.  And when he completes that opening balance sheet, he's

23  got 52.880 as the value of the inventory received.  Barclays

24  knew 47.4 billion dollars was too low.  They're calculating the

25  number of billions and billions higher at the time.

Page 55

1          Romain and others put the number at fifty-two.  Mr.

2    Romain testified -- I have the wrong slide.  Excuse me, Your

3    Honor.  There we go.  9/20, that's the Saturday.  There's

4    Barclays analysis that puts the financial assets at 52.19.  Mr.

5    Yang who did the haircut summary puts the collateral that made

6    it over at forty-five.  Add seven billion.  You're at fifty-

7    two.  So Barclays knew the number was too low.  Actually, as

8    late as October 3rd, Barclays is still at fifty-two.

9          There's a memo that includes Mr. Romain that puts the

10   current acquisition balance sheet at fifty-two billion dollars.

11   Now, this raises the obvious disclosure issue.  Why isn't

12   anybody telling the Court you're being told 47.4, Your Honor.

13   But, you know, internally, at Barclays, we've got this roughly

14   in the range of fifty-two.  The reason is, as I averred to in

15   the morning -- before, nobody ever told the Court there might

16   be a range.  Even if you accept the Barclays view that because

17   a lot of this was Level 3 securities and Level 2 securities and

18   this stuff was really complicated to value, nobody ever told

19   that to the Court.  They just said it's due to a drop in the

20   markets.

21          I would point out, Your Honor, and I said I wouldn't

22   deal with the valuation case, and I'm not, but it took

23   Professor Pfleiderer two days on the stand to describe to this

24   Court in excruciating detail just how complicated it is to come

25   to any kind of value with Level 2 and Level 3 securities.  It

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 260

Page 56

1    took Ms. Fife about five seconds to pick 47.44 and nobody put a

2    disclaimer on that number.  Nobody said it could be fifty-two.

3    It might not be 47.4.  Nobody said anything like that.

4            I asked Mr. Ricci who was in the charge of the deal

5    for Barclays, what did you do about disclosure.  Your Honor

6    will recall each time I asked him that, I got a ritual

7    incantation.  I assume my lawyers would make the disclosures

8    that they were supposed to make.  I just -- well he must have

9    said that six times.  He told us he took no special steps.  The

10   problem again is if you don't tell your lawyers, you can depend

11   them all you want.  But if they don't know the numbers, they

12   can't make disclosure to the Court.

13           Now very briefly, Your Honor -- and very briefly, I'm

14   going to address the Friday asset scramble.  I think the

15   testimony about that has been deep and extensive but only to

16   point out that the end result is this.  Barclays, on -- based

17   on Exhibit M-45, based on Yang's haircut summary, which is sent

18   to Keegan, Barclays demands more.  Using -- Ricci told us this.

19   I asked him about M-45.  I asked him about the Yang haircut

20   summary.  And he said he would have given it to Keegan.  And

21   Keegan was in New York dealing with Barclays -- dealing with

22   Lehman on Friday morning.  And we know that Ricci, Michael

23   Klein and Keegan met with McDade Lowitt and Kirk on Friday

24   morning to come in and say we need more value.  If we don't get

25   more value, this deal is not going to close.  Barclays said, in

 1   its own words, it was uncomfortable with the repo collateral.

 2          Now, according to Mr. McDade, Barclays never said this

 3   is how much we need.  According to Mr. Ricci, there was a

 4   target of about three to four billion dollars.  He told us

 5   that.  But even Mr. Ricci believed that that target wasn't

 6   given to Lehman.  Barclays never shared its calculation of how

 7   it got to that number with Lehman.  And Barclays was clear

 8   about one thing.  If it didn't get additional assets, it wasn't

 9   going to close.  That's what they told Mr. McDade.  I asked him

10   how explicit was Barclays about saying it would not close if

11   this gap could not be filled.  His answer:  they used those

12   words.  Mr. Klein, Barclays' senior advisor and a member of its

13   negotiating team also had said that in his deposition which we

14   talked about at the trial.  This is the trial transcript where

15   we're reading his testimony:  "I made it known to the parties

16   that were involved that there needed to be more assets because

17   if there weren't more assets, the transaction couldn't take

18   place.  But no target, no measure, no analysis.  Nobody says,

19   well, you know, our repo haircut brings us 6.04.  This is a

20   holdup.  This is the morning of the sale hearing.  Lehman's got

21   no negotiating leverage at this point.  Barclays knows it's the

22   only buyer in town as it's fond of reminding us.  And it comes

23   in and says based on our valuation which we're not going to

24   share with you, you need more assets.  And what happens then?

25   McDade puts Lowitt in charge along with some others to go find

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 260

Page 58

1    more assets to give to Barclays so that they can close the

2    deal.  And what follows is the Friday asset scramble.  One of

3    the people involved in that was also Alex Kirk.  And Mr. Kirk

4    wrote an e-mail, which Your Honor may remember from the

5    opening, in which he identifies what appears to be Barclays'

6    standard.  "Rich Ricci just told me he won't blow off this

7    trade by being a pig."  This is simply Barclays saying we want

8    more.  We want more.  You need to add more to the pile or we're

9    not going to close.  Now what makes that worse is putting

10   Lowitt in charge of the Friday asset search.  That basically

11   sends -- that puts the fox right in the middle of the henhouse.

12   Let's review Ian Lowitt a little bit.

13           Ian Lowitt is the chief financial officer of Lehman.

14   By the 18th of September, before the Friday asset scramble even

15   begins, he's under contract to Barclays.  He has signed his

16   employment agreement with Barclays.  That employment agreement

17   provides that Ian Lowitt will get a bonus of six million

18   dollars.  I asked Mr. Lowitt on the stand if that bonus was in

19   respect of services to Lehman and he said no.  It was for

20   services to Barclays.  He knows he's not going to get that

21   contract, he's not going to have that job unless the deal

22   closes.  We talked about that when he was on the stand.  "If

23   the transaction doesn't close, you don't have a job at Barclays

24   that following morning, correct?"  "Correct."  Now we can talk

25   all we want about how Ian Lowitt may have wound up somewhere

Page 59

1    else or Barclays may argue that the amount that they paid him

2    was similar to the amount that he was paid at Lehman.  I think

3    everybody in this room can agree a job is better than no job.

4    Six million guaranteed on Monday is better than I'm going to

5    try and get six million somewhere else.  Lowitt's got every

6    financial incentive to satisfy Barclays when it demands more

7    assets on the strength of a threat to refuse to close.  And

8    here we are again, back to disclosure.  Only a few hours after

9    the asset scramble is completed, the parties are in court.

10   Barclays apparently has enough.  It's decided not to blow off

11   the deal by being a pig.  And nobody tells the Court anything

12   about this exercise.  Nobody says we added 1.9 billion dollars

13   in clearance box assets.  Nobody says we added what turned out

14   to be 769 million in 15c3-3 assets.  Nobody says we added cash,

15   we added margin derivatives.  In fact, the Court is told there

16   is no cash in the deal.  Nobody talks about the Friday asset

17   scramble.

18          Now, Barclays has responded to the proof about this

19   exercise by suggesting -- and it was interesting to me that

20   every single one of their witnesses -- perhaps this is another

21   circumstances -- chose the word "identified" when they talked

22   about the assets that were added by the Friday asset scramble.

23   Every single one of them decided "identified" was the right

24   verb.  Well, they weren't just identified, they were added.

25   They were added.  If, as Barclays suggests, all that really

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 260

Page 60

1    happened here is Barclays got some comfort that the overall

2    value it was getting since it was getting everything included

3    1.9 billion  and 769 million, those negotiations wouldn't have

4    been necessary and, most certainly, the clarification letter

5    wouldn't have been necessary.  What would there have been to

6    clarify.

7            The clarification letter adds these assets to the

8    deal.  They're not just identified, they're added.  And again,

9    let's look at the contemporaneous documents.  First, I want to

10   put a document that indicates Mr. Lowitt's mindset about

11   getting it.  This is Lowitt's e-mail to Tonucci.  After they

12   gathered up these assets, he urges Tonucci, "You need to be

13   close to it.  If we don't succeed, you and I are toast despite

14   all heroics."  He writes this on Saturday the 20th, two days

15   before the closing.

16           Now, I asked Mr. Lowitt about that and he gave an

17   answer along the lines about how he was concerned about the

18   well being of all folks who had worked at Lehman.  I would

19   respectfully suggest that the phrase, "you and I are toast",

20   means nothing of the kind.  This is Ian Lowitt expressing to

21   Paolo Tonucci who's working with him on the Friday asset

22   scramble, you got to get this done.  Add those assets or you

23   and I are not going to have jobs.  And maybe that explains why

24   nobody took a lawyer aside and told them look, you should know

25   about the addition of all these assets.  Maybe that explains

Page 61

1    it.  But it's right there for everybody to see.  Self

2    interested future Barclays employees added billions to the pile

3    that Barclays took away.  And what Barclays was writing at the

4    time didn't suggest, as Barclays would have it now, that all

5    that really happened here were additional assets were

6    identified.  This is what Michael Klein, who had gone and

7    delivered the threat not to close in return for the demand for

8    more assets, wrote to Bob Diamond.  On the 20th on Saturday

9    after the asset grab was held and Mr. Diamond -- Mr. Klein

10   wrote, "We clawed back three billion more of value in the

11   transaction."  We clawed back.  That's not a man who's writing

12   to his client saying don't worry.  The deal is worth what we

13   thought it was worth.  We've identified existing assets that

14   were already on their way over.  That's a man who says, I've

15   gotten them three billion dollars more.  That's the man who's

16   paid ten million dollars by Barclays for a week's worth.

17   That's a man who's reporting he's worth the money.  That's a

18   man who says I got you three billion more to add to this deal.

19   Not one word to the Court about any of this.  No one tells any

20   of the lawyers and therefore no one tells the Court.

21           Now again, that could be a mistake.  It was a deal

22   fraught with tension.  It was a deal with communications

23   problems.  Mr. Miller used an invocative phrase about the week.

24   He called it organized chaos.  And in the organized chaos, this

25   might be attributable to mistake.  I would suggest it goes

Page 62

1    further but I would also say the Court doesn't need to reach

2    that issue if it's not inclined to make that finding.  Mistake

3    is enough under 60(b).  Innocent misrepresentations is enough.

4    But the failure to tell the Court about this is a

5    misrepresentation indeed.

6           And that, Judge, brings us to the clarification

7    letter, the next piece in the sequence.  Now, Ms. Fife

8    describes the clarification letter to the Court.  And she did

9    that not in the part of the sale hearing where she was

10   describing the changes in the economic terms that I put up on

11   the screen.  In a different segment when she's describing what

12   in a normal deal might be considered big issues but in this

13   deal they're relatively insignificant.  That is, whether a

14   certain or sub or two are included.  She says there was some

15   conclusion as to which subsidiaries, if any, are being sold.

16   And she says "And we clarified in a clarification letter which

17   we're hoping to finalize and actually present to Your Honor

18   whenever it comes down to it."  But in that letter, we're going

19   to clarify -- and she goes on to describe what's going to be

20   clarified about these subsidiaries.  That's everything the

21   Court is told about the clarification letter before the sale

22   order is submitted and signed.  That's everything.

23          So what the Court is told is that there's a relatively

24   minor issue regarding risking some subsidiaries that's going to

25   be dealt with in something with a benign name "clarification

Page 63

1   letter" and we're hoping to finalize and get it down.  It's

2   undisputed that the clarification letter did not make it down.

3   It's undisputed the clarification letter was never ever given

4   to the Court under a request that it be approved.  It was

5   merely filed on the 22nd after the closing as an exhibit to

6   other closing papers.  The letter never made it down here.  And

7   the letter did much, much, much more than deal with this

8   subsidiary issue about subsidiaries.  What the letter did is

9   incorporated the billions that had been made on Friday to add

10  billions more in assets to the deal and make other substantial

11  changes.

12          Now I want to go through for a few minutes the

13  sequence that led to that because the timing, I think, is

14  instructive.  At about 12:34 p.m. -- let me put this up on the

15  screen -- at about 12:34 p.m., a draft of the clarification

16  letter is circulated on the day of the sale hearing.  And it's

17  this draft -- and this is before the sale hearing even begins.

18  It's this draft that adds the phrase "amended" to the

19  clarification.  There have been and they are in evidence as a

20  variety of movants' exhibits and Barclays' exhibits other

21  earlier drafts of the clarification letter.  They started

22  working on this as early as the 17th.  No surprise there's

23  going to be some kind of clarification document given the

24  organized chaos in which they're dealing but it's just a

25  clarification letter until here.  Now, the phrase "shall amend"

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 64 of 260

Page 64

1   is added.  And Mr. Lewkow testified about that.  And what Mr.

2   Lewkow is justifiably -- he's a good lawyer.  He's a good firm.

3   All the lawyers involved in this  were at good firms.  Nobody

4   chooses the word "amend" accidentally.  This was a deliberate

5   choice to bump this clarification letter up from a supplement,

6   from a clarification which is how it's described in the sale

7   order to an amendment of the asset purchase agreement.  Nobody

8   tells the Court that's what it's going to be.  Nobody shows the

9   Court that draft.  Now later in the day, at about 5:15 p.m.,

10   another draft is surfaced.  And I'm going to put that up on the

11   screen.  And that's Exhibit M-137.

12        Now this is circulated about 5:15 on the 19th, the day

13   of the sale hearing.  And the reason I chose this one to put

14   up, and there are multiple drafts of the clarification letter,

15   is because this is -- if you look at the transcript and judging

16   from the start time at -- there's an adjournment in the

17   beginning and folks started actually addressing the Court in

18   the late afternoon.  I think this draft is just about the time

19   that Ms. Fife is describing the economic changes in the deal.

20   Someone in the drafting process is attempting to get that into

21   the clarification letter where it says the purchased assets do

22   not have a book value of approximately seventy million (sic).

23   But they obviously do.  So what this indicates s that as the

24   sale hearing is continuing, someone in the drafting process is

25   recognizing -- they're changing the seventy billion dollar book

Page 65

1   value clause -- and you have to recognize it's no longer worth

2   seventy million (sic) dollars.  Now Ms. Fife said when she

3   talked to the Court we're hoping to get it down here.  Mr.

4   Miller, when we asked him about that -- about the clarification

5   letter on the stand described to us that there was a draft.  It

6   may have made its way into the court by e-mail.  Lawyers may

7   have had access to it but that's no way to review the document

8   like this.  And he was told that the letter was wrong so it

9   needed to be redone.  Those were all various explanations

10  perhaps for why it was not shown.  But this draft was never

11  brought to the Court's attention, the clarification letter

12  which recognizes the dropping book value.  It also indicates

13  that the lawyers, and that would, of course, include Ms. Fife,

14  who's talking about 47.4, are still talking in terms of book

15  value.  As late as 5:15 on the 19th, nobody's got a clue that

16  the Lehman's book value.  Lehman's book value, according to Mr.

17  Seery, is about 50.6 if you use the Fed repo as the measure.

18  So the lawyers are still talking in terms of book value.  This

19  is not shown.

20          Now the next draft is Exhibit BCI-466 -- and when I

21  say the next draft, Your Honor, again, there may interim

22  drafts.  This went through a lot.  But this one is one I think

23  is instructive.  Now it's -- the draft slide at the top of this

24  puts the document itself at 12 a.m. on the 20th.  So we've

25  annotated it as midnight the 19th or the 20th.  Your Honor will

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 260

Page 66

1    recall better than anybody in this room that at that point,

2    you're twenty minutes away from the end of the sale hearing.

3    And here, this draft, even twenty minutes before the sale

4    hearing is over, now has changed that clause a little bit, do

5    not have a book value of approximately seventy billion but

6    rather have a book value of approximately 45.5 billion.  So the

7    lawyers who are involved in the clarification letter, even at

8    this point, as the sale hearing draws to a close, apparently

9    still had not been including that that 45.5 which is a

10   component of the 47.4 that Ms. Fife gave, is not book value.

11   It's a deliberately chosen negotiated settlement value based on

12   a liquidation analysis that Jim Seery headed up.  Nobody has

13   even told the lawyers that.  So how could anyone have told the

14   Court?

15          Now that's the last draft at least that I've been able

16   to find.  There may be one or two.  I may -- I don't want to

17   misspeak.  But that puts us near the end of sale hearing in my

18   view.  So what happens next?  The sale hearing ends at twenty

19   minutes after midnight.  The Court says it will approve the

20   sale order and the parties say -- the sale and the parties say

21   they will submit a form of sale order to reflect the changes.

22   But the Court is never given a clarification letter.  The

23   clarification letter, though, continues to be the source of a

24   lot of activity in the ensuing weekend.  And the next draft I

25   want to put up here is Exhibit M-53.  Now this is a draft -- M-

LEHMAN BROTHERS HOLDINGS INC., et al.

1    53 is a draft of the clarification letter circulated by a

2    lawyer at Weil Gotshal whose name is escaping me at the moment.

3    I think it may be Mr. Murgio -- at 2:39 p.m.  And the cover e-

4    mail reflects that it's -- it discusses the changes we talked

5    about last night.  This is the first draft that we see

6    generated after everybody's gotten a little sleep on Saturday.

7    And they're reconvening to look at the clarification letter.

8              And what do they do here?  Here, they change the

9    definition of "purchased assets" in an asset purchase

10   agreement.  They change the definition of "purchased assets" in

11   an asset purchase agreement and Barclays would have the Court

12   find that that's an immaterial change.  It changes the whole

13   deal.  It changes the deal from the seventy billion dollar long

14   value -- the long position of seventy billion dollar book value

15   as of the date hereof.  It changes the deal from Ms. Fife's

16   modification of that at the Friday sale hearing when she says

17   it's dropped.  It was seventy and it's dropped to 47.4.  And

18   what it adds are the assets transferred in the repurchase

19   agreement, something the Court has never had described to it,

20   something nobody ever substantially mentioned to the Court.

21   The contents of the clearance box, something that's never been

22   enumerated to or disclosed to the Court -- and what it does is

23   it strikes out the agreement that's been there all week.  It

24   strikes out in the strikeout in the middle of the page the

25   reference to the long position.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 68 of 260

Page 68

1           So the clarification letter at least is accurate to

2      the extent that even before the sale hearing began amends the

3      asset purchase agreement and no one brings it to the Court.  No

4      one asked the Court to approve this.  No one explains the

5      impact of these changes.

6           Now the last change I want to focus on in the

7      clarification letter emanates from an e-mail that was sent over

8      the weekend on the 21st.  Now we're on the Sunday.  And this e-

9      mail comes from Sullivan -- comes from Cleary Gottlieb.  And

10     circulates language generated by Sullivan & Cromwell who also

11     represented Barclays.  And what this does is proposed language

12     for unwinding the repurchase agreement.  Let me stop at that

13     point for a minute and remind Your Honor what the movants'

14     position is with regard to the unwinding of the repo.

15          The repo is terminated by Barclays through a notice of

16     termination -- and that's in evidence -- on Friday afternoon

17     after LBI files.  Under Section 559 of the Bankruptcy Code,

18     that would allow the party that advanced funds in the repo to

19     be paid the amount in advance.  But the excess, the haircut, in

20     that repo needs to be paid back into the estate.  The safe

21     harbor only extends to the amount advanced by the lender in the

22     repo transaction.  What this language purports to do is to

23     retroactively rescind the notice of termination.  And the only

24     purpose it can really have is to avoid Section 559.  Make it

25     not be a terminated repo anymore.  And what does that achieve

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 260

Page 69

1    over this weekend?  It means we won't have to go back to court.

2    That's why that paragraph was put in the agreement.  Now here's

3    the proof about that paragraph.  That paragraph emanates from

4    the Barclays side of the negotiating table.  And both Mr.

5    Lewkow and Mr. Miller and all the deponents whose testimony is

6    in the record about this have testified there were no

7    discussions between the Lehman side of the table and the

8    Barclays side of the table -- the lawyers -- about the

9    Bankruptcy Code implication of that paragraph, about the 559

10   implication.

11         Now that is relevant to the disclosure point.  If the

12   lawyers didn't even talk about the 559 implication, then how

13   could they have made a knowledgeable decision about whether

14   that, even if it's just that, should be brought back to the

15   Court for approval or for a review.  That's a five billion

16   dollar item right there.

17         Now I'll leave the Court to draw its conclusions -- I

18   have my own -- about the fact that this comes only from the

19   Barclays side of the table.  There's other evidence in the

20   record that Barclays is at least, through Cleary Gottlieb, is

21   at least talking to others about 559.  There's some

22   correspondence between Mr. Rosen and the SEC given the safe

23   harbors.  That's not about this paragraph.  I'm going to

24   overstate that point.  But I do want to suggest that the only

25   people who seem to focus the Section 559 implications were the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 260

Page 70

1    Barclays side of the table.

2         Now lawyers who are unaware of the economics -- and

3    all the lawyers told us they didn't know about the repo on

4    Friday.  They didn't know about the termination of the repo on

5    Friday.  It wasn't until Saturday they found out it had been

6    terminated -- that it existed as a part of a transaction as

7    opposed to merely interim financing, that it was terminated and

8    that they had to deal with this issue.  So they're long gone

9    from court.  In any event, they don't talk about it.

10        Let's go back to 60(b).  At the very least, the

11   failure to bring to the Court's attention a clarification

12   letter that amends the asset purchase agreement, that changes

13   the definition of "purchased asset" in an asset purchase

14   agreement, and that it makes a five billion dollar maneuver

15   with regard to a repurchased agreement which was at the center

16   of the deal but about which the Court had never been told --

17   the failure to bring that back to the Court is at the very

18   least a serious mistake.  It's a serious mistake made by

19   lawyers who had not been informed by their clients of the

20   information they need to have to make a considered decision.

21   They don't know the numbers.  They don't know the role that the

22   repo plays.  They don't know about the termination until the

23   weekend.  They don't know any of those things.  And in an

24   organized chaos, they put together what has continued to have

25   the misnomer clarification letter but more accurately would be

Page 71

1   called amendment to the asset purchase agreement.  That's what

2   this did.  How could anyone contend that reasonable disclosure

3   was made, that necessary disclosure was made in a 363 sale when

4   an amendment to the agreement the Court was asked to approve

5   was never brought to the Court's attention?  It never was.  And

6   it was never brought to the Court's attention because the

7   lawyers involved were disabled from making the necessary

8   disclosures.

9        Now, in connection with this, I want to draw the

10  Court's attention to some testimony -- I believe it was from

11  Mr. Lewkow -- about the hallway dispute, the hallway

12  conversation, at the offices of Weil Gotshal over the weekend

13  concerning 15c3.  Mr. Lewkow described it and I think Mr. Klein

14  may have also but I'm not entirely certain of that.  And he

15  described how there was a billion dollar issue.  Was it 769 or

16  was it 1.8 billion and nobody was able to get a transcript over

17  the weekend to see what the Court had actually been told about

18  the cash fees.  And the resolution, according to Mr. Lewkow,

19  was that Barclays left a billion dollars on the table.  He said

20  he would take the 769.  He left a billion dollars on the table.

21  That tells us two things.  That tells us that Barclays was so

22  comfortable with the buffer it had built into this deal it was

23  happy to leave a billion dollars on the table to get it closed

24  and not have to go back to the court.  It also tells us that

25  Barclays was so anxious not to come back to the court it was

Page 72

1    willing to leave a billion dollars on the table.

2           How could a decision be made to do that when the

3    choice was simply on Monday, over the weekend, be in touch with

4    the Court to say there's been a big development.  That

5    clarification letter that we mentioned, it actually amends the

6    deal.  We made a five billion dollar adjustment.  We need to

7    know a bit about this repo.  We need to talk about what we're

8    doing under 559.  What bankruptcy lawyer wouldn't conclude, as

9    a matter of basic instinct or intuition, that needs to be

10   disclosed to the judge?  Now I'm a little presumptuous speaking

11   as a bankruptcy lawyer, Your Honor.  I'm just a litigator.  I'm

12   becoming one, though, as we speak.  And I know I have a sense

13   of what a bankruptcy lawyer would say.  Bring it to the Court.

14   The Court on Friday at the hearing expressly made the parties

15   aware it will be available on Saturday.  Now I don't know the

16   Court's availability on Sunday.  We don't have proof of that.

17   What we do know, this was a huge deal.  This was a big

18   transaction.  It was an extraordinary transaction.  Can anyone

19   have thought there was no way to reach the Court to disclose

20   this?

21          What drove that decision?  What drove that decision,

22   Barclays' insistence that the deal had to close on Monday

23   before the markets opened.  Remember, Barclays' e-mail on

24   Friday saying you don't add more to this deal, we're not going

25   to close.  Now the asset purchase agreement provided that the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 73 of 260

Page 73

1    closing would take place, I think, on the Tuesday, but in any

2    event, allowing the parties to adjourn it.  There has been no

3    proof in the record at all that that closing absolutely had to

4    happen before the open.  There is deposition to opening of the

5    market.  Good idea but not critical.  And what's the balance

6    here?  Is this one other episode when Barclays will argue,

7    well, it was important.  It was -- the numbers were big.  It

8    was complicated.  This is when we relax the requirements of

9    363?  This is where we relax the disclosure requirements?

10   Again, I'd argue the answer to that has got to be a resounding

11   rejection.  This is the point where the rubber hits the road.

12   This is the point where disclosure is critical.  This is the

13   point where steps need to be taken to tell the Court what's

14   happening.  And no one did.  This is mistake.  This warrants

15   60(b) relief.

16          Now the parties have one other opportunity in December

17   to come in and talk about the numbers.  I'm just going to spend

18   thirty seconds or so on that just to point out that in all of

19   the proceedings in December, Barclays will say, well, you know

20   that affidavit did go in and it said 50.6 billion dollars.  No

21   one stood up and said, Judge, you need to know what happened.

22   We had three months, four months to figure this out.  And

23   before you approve the settlement, we want to explain those

24   numbers again.

25          And what surrounds the December 22nd settlement is my

1   next point which is timeliness.  Every single party in that

2   room at the time -- at the December 22nd hearing made clear to

3   the Court there were still questions surrounding this

4   transaction that needed to be addressed.  The Court itself knew

5   that it won cooperation between the creditors' committee and

6   Barclays to turn over necessary information to make sure

7   questions about the deal were answered.  Mr. Miller said there

8   were questions.  Mr. Schiller himself agreed that the

9   settlement didn't bind anybody and recognized there were things

10  to be had on a go forward basis.

11          Then seven months later, Barclays announced a 4.2

12  billion dollar gain in its February results.  And that gets the

13  world a little agitated, at least the lawyers on my side of the

14  table.  And people started asking Barclays even more fervently

15  for information.  That doesn't work.  We had to come to court

16  in May and get a compulsory order, a June 2004 order, making

17  Barclays turn over information that nobody could get out of

18  Barclays before.  We take several dozen depositions.  We review

19  hundreds of thousands of pages of documents.  We make a Rule 60

20  motion three days after the last deposition is taken.  And

21  Barclays says it wasn't timely.  Well, the argument is, quite

22  frankly, ridiculous.

23          Your Honor heard the testimony of Mr. Marsal.  Your

24  Honor heard the testimony of Mr. Burian.  Barclays itself

25  played the video of Mssrs. Fogarty and Coles.  And all of them

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1   were consistent in their testimony.  Barclays just didn't

2   respond when information was requested.  Mr. Marsal told us the

3   estate had to threaten to sue Barclays under the transition

4   services agreement as late as December of 2008 to get

5   reasonable information to figure out a lot of things about the

6   estate which would have included what happened here.  There was

7   no sitting on any hands.  When the information became

8   available, the movants moved with alacrity.  I think timeliness

9   is a red herring.  I think it should be treated as a red

10  herring.

11          Now I just want to return to where I started, Your

12  Honor, and that is with regard to what these proceedings were

13  about and what Rule 60(b) is about.  A 363 sale is about

14  disclosure.  This is a court of disclosure.  The standards

15  don't relax because it's hard.  Those standards are more

16  important than ever when the deal is hard.  Barclays would take

17  the position that it should be forgiven all sorts of lapses in

18  disclosure to the Court.  It's okay that the Court wasn't told

19  the range could 45.5 to fifty-two as we were saying inside of

20  Barclays.  It's okay that the Court was told 1.5 billion when

21  we, Barclays, were calculating only 200 million dollars.  It's

22  okay that the Court's told two billion dollars when we're

23  planning to pay only 1.4.  Even on that, even on a 500 million

24  dollar difference, the Court expressly allowed, expressly said

25  at the September 17th hearing, I still consider 500 million

1   dollars to be material.  I think we all do.  Barclays would

2   contend it's okay to bring an expert on the stand to say it's

3   just so complicated.  Level 2 and Level 3 are just so difficult

4   to value with precision that I'm going to tell you reasonable

5   people could come to a very wide range.  Why didn't anyone tell

6   that to the Court, to the creditors, to the interested parties,

7   to the public at the September 19th hearing?  The answer is

8   nobody told the lawyers.  If you don't tell the lawyers, the

9   lawyers can't tell the Court.

10       I said in the opening that one essential problem with

11  this transaction is the people who knew didn't speak and the

12  people who spoke to the Court didn't know.  And I think the

13  proof in the trial bore that out in spades.  I think the

14  testimony in this case demonstrates Barclays' idea of

15  disclosure is best personified in Mr. Hughes' mystery novel,

16  pieces of information from which the truth could have been

17  deduced.  It's seen in Jim Seery, on his way to Barclays, not

18  even correcting the lawyer who's three feet away from him when

19  fundamentally wrong numbers are given to the Court.  It's seen

20  in Barclays' decision that it wasn't necessary to disclose to

21  the Court a precondition of the deal that it make a windfall

22  gain.

23       We know the numbers are large.  That makes disclosure

24  important not less important.  We know the deal is important.

25  That makes disclosure critical not less critical.  Those

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 77 of 260

Page 77

 1   disclosure obligations were not met here.  Because they were

 2   not met here, the Court issued a sale order on a skewed record.

 3   We ask that the Court enforce the sale order on the record that

 4   was actually before it.  The public, the parties are entitled

 5   to have a sale order that reflects the record upon which it is

 6   based.  That sale order was based on a record that showed a

 7   1.85 billion net benefit to Lehman.  The proof in this case

 8   shows that not only did Lehman not get that net benefit,

 9   Barclays walked away with eleven billion dollars more that this

10   Court was never told about.  That's inequitable.  It violates

11   the principles and underpinnings of 362.  It's offensive to the

12   disclosure qualities that are critical in this court.  And it

13   cries out for relief under 60(b).

14         So respectfully, Your Honor, I'll conclude at this

15   point unless in the unlikely event you have questions.  And

16   other than that, I'll defer to Mr. Tecce.

17         THE COURT:  Thank you very much, Mr. Gaffey.  I just

18   want to explore the need for a break.  I don't have a need for

19   a break.  But we have a very full courtroom.  And my

20   inclination is to simply proceed.  I don't want this to be a

21   forum for cruel and unusual punishment either.

22         MR. TECCE:  Your Honor, I'm happy to proceed.

23         THE COURT:  Let's go.

24         MR. TECCE:  I may just need a minute to get set up.

25   But --

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 78 of 260

Page 78

1        THE COURT:  And for those people who are standing, I'm

2   just wondering if it's possible for people to push over a

3   little bit and give them a place to sit down if they want to

4   sit.

5        (Pause)

6        MR. TECCE:  Your Honor, we have some slides.  If I may

7   approach?

8        THE COURT:  Sure.

9        MR. TECCE:  Thank you.

10       (Pause)

11       MR. TECCE:  Good morning, Your Honor.  For the record,

12   James Tecce of Quinn Emanuel Urquhart & Sullivan on behalf of

13   the official committee.  Your Honor, committee's Rule 60 motion

14   starts by reciting a simple phrase coined by Supreme Court

15   Justice Louis Brandeis.  "Sunshine is the most powerful of all

16   disinfectants."  Transparency is a concept that lies at the

17   core of bankruptcy practice and procedure in this country.

18   Full and fair disclosure is not just relevant in the context of

19   363 sales where it is a precondition to 363(m) protections but

20   it dictates the method and manner of administering any

21   bankruptcy case.  And while a protracted proceeding that closes

22   today has gone far to eliminate the facts and circumstances

23   surrounding the sale transaction, absent relief from the sale

24   order requested by the committee and the other Rule 60 movants,

25   a sale process will remain forever infected because the balance

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 79 of 260

Page 79

1     going concern transaction presented to and approved by the

2     Court bears no resemblance to the consummated transaction where

3     assets were liquidated to Barclays at breakneck speed.

4          In the committee's view, the speed of the transaction

5     did not mandate reduced or relaxed disclosure requirements;

6     rather, it heightened disclosure and the need for disclosure.

7          At all times, the transaction is advertised as a going

8     concern sale.  When the transaction was first introduced, the

9     committee was advised that the transaction was emergent, that

10    the committee would have little time to diligence the

11    transaction but that the sacrifice attendant to expediency was

12    necessary in furtherance of the greater good of selling the

13    assets on a going concern basis.  Unbeknownst to the Court and

14    the committee, the consummated transaction was, in point of

15    fact, a liquidation, the very consequence the transaction was

16    advertised to avoid.

17         With respect to the committee, the centerpiece of

18    Barclays' defense is that the committee was aware of all

19    material aspects of the consummated transaction or that the

20    committee should have been smart enough to figure it out.

21    Barclays argues the committee filed to take timely action to

22    bring any discrepancies to the Court's attention within the

23    applicable limitations periods.  It also argues the committee

24    consented to all post-hearing modifications irrespective of

25    their materiality.

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 260

Page 80

 1          For that reason, Your Honor, this morning the

 2    committee will set the record straight by answering the simple

 3    question of what did the committee know and when did the

 4    committee know it with reference to testimonial documentary

 5    evidence at various points in time from its appointment to the

 6    commencement of these proceedings.  And that examination will

 7    confirm that the committee was not aware of any negotiated

 8    block discount off of Lehman's book value or the attribution of

 9    liquidation valuations to the trading book assets.  It also

10    leads to the inescapable conclusion that the committee's

11    conduct can only be described as a persistent pattern and

12    practice of prodding for reconciling information from and after

13    the moment the transaction closed through and including the

14    filing of the instant motions.

15          Now answering the question of what did the committee

16    know and when did it know it is best accomplished by reviewing

17    a chronology of the transaction from the committee's

18    perspective during three time periods in this proceeding.  We

19    define the first time period as drinking from a fire hose.  And

20    that's the period from September 17th, which is the committee's

21    appointment, through September 22nd which is the closing date

22    of the sale transaction.

23          The committee refers to the second phase as trust but

24    verified.  And this is the phase from the closing of the sale

25    transaction through the December settlement in December of 2008

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 260

Page 81

1    among Barclays, LBI and JPM.  And that encompasses the

2    committee's attempts to reconcile representations made

3    concerning the transaction during the sale hearing and to the

4    committee's representatives over the closing weekend.

5            The committee's styles the third period as attempts at

6    cooperation devolved to litigation.  This examines attempts by

7    the committee to cooperatively attain information and

8    ultimately the initiation of this proceeding.

9            Starting with the first phase, drinking from a fire

10   hose, the committee is appointed on the 17th of September.  It

11   retains its professionals on the same day.  Indeed, committee's

12   counsel is retained forty minutes -- forty minutes before the

13   bid procedures hearing commences on Wednesday, September 17th.

14   On the 18th of September, Thursday, the estate's professionals

15   introduce the committee's professionals formally to the sale

16   transaction where representatives of Milbank, Houlihan Lokey

17   arrive at Weil Gotshal for a meeting with Lehman principals and

18   advisors.  And during that meeting, Movants' Exhibit 2 is

19   distributed.  And consistent with Movants' Exhibit 2, the

20   transaction is described to the committee as one in balance.

21   So while a buffer exists between attorney assets of 72.65

22   billion and the liabilities of 68.4, that buffer is balanced

23   out by curing compensation liabilities of 2.25 and two billion

24   dollars.

25           As Mr. Burian testified in this trial, we were told

Page 82

1    these numbers are right off the books and records of Lehman,

2    but they were also taking roughly four and a quarter billion of

3    liabilities for cure and comp and therefore, you know, based on

4    the mark to value a book, based on the value of the assets, of

5    the liabilities being picked up, it was, you know, a balanced

6    exchange of exactly seventy-two spot sixty-five against

7    seventy-two spot sixty-five.

8         Now, at that September 18th meeting, the transaction

9    is described as emergent and the committee there is little that

10   it can do to diligence the transaction given the time

11   constraints that the estates are operating under.  And

12   importantly, the transaction is described as a going concern

13   sale, not a liquidation.  And that's squared with the plain

14   text of the asset purchase agreement which stated the values

15   attributable to a trading book assets and liabilities were

16   valued based on Lehman's book.  Again, as Mr. Burian testified,

17   "[I]t was made very clear to us that we were benefitting,

18   because we were selling assets and liabilities in a balanced

19   transaction in respect of these assets.  These were the more

20   liquid broker-dealer assets, and that in lieu of a wholesale

21   liquidation in which we'd have to take a liquidation value for

22   these assets..."

23        And that's squared with the testimony in this trial of

24   another Lehman representative, Mr. Shapiro, who is the self-

25   styled architect of this transaction, that "the absence of the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 83 of 260

Page 83

 1    sale would have led to, you know, a near term liquidation,

 2    whatever you want to call that."

 3         Now, moving to Friday, September 19th.  The

 4    committee's professionals continue in their best efforts to

 5    diligence the transaction.  And that morning, Mr. Burian has a

 6    call with Mr. Seery and Mr. Shapiro.  And Mr. Burian takes

 7    notes during that conference call and they appear and have been

 8    admitted as Exhibit M-380 in this case.  And importantly,

 9    during the course of this conversation between Mr. Seery and/or

10    Mr. Shapiro and Mr. Burian, Mr. Burian receives three separate

11    descriptions of the sale transaction, each of which is

12    reflected in his notes.

13         The first description appears on page 38189.  And Mr.

14    Burian is told that the deal is changing, that the deal now

15    consists of 50.6 billion in assets.  Mr. Burian is told about

16    the Fed repo, that Barclays stepped into the shoes of the

17    Federal Reserve.  He is also told about the difference between

18    the advanced amount under the Fed repo of 45.5 billion and the

19    value of the asset securing that facility at 50.6 billion.  And

20    in point of fact, Mr. Burian's notes reflect the five billion

21    dollar difference between the amount advanced under the repo

22    and the repo collateral.  But most importantly, Mr. Burian is

23    told after receiving this description to "Scratch that.  That's

24    all wrong.  Let me give it to you again."  And consistent with

25    Mr. Seery's instruction, Mr. Burian does, in point of fact,

Page 84

1    scratch out his notes.  And he then proceeds to receive the

2    second description of the sale transaction which appears on

3    page 38190 of his notes.  And here, Mr. Burian is told that

4    there are 45.5 billion of long positions left, that all the

5    shorts are closed out and that the loan is 45.5 billion

6    dollars.

7            But when giving the second description, Mr. Seery

8    shifts gears again on Mr. Burian.  As Mr. Burian testified, "He

9    then said to me, hey, we're now 47.4 billion of assets against

10   45.5 billion of liabilities plus the cure and the employee is

11   roughly four billion.  So, you know, the estate is two billion

12   dollars ahead."  Mr. Burian says to him, "You know something?

13   You're talking to me, you know, as if I know what's going on in

14   your head and is what deal you thought was happening this

15   morning and how it changed from last night.  I know what you

16   told us last night.  I know what the deal was Wednesday and

17   where we were Thursday.  Can you just give it to me simple?"

18   And Mr. Burian turned the page and proceeded to receive the

19   third description of the sale transaction from Mr. Seery.  And

20   that description appears on page 38191 of Mr. Burian's notes.

21   And there he's told that they had seventy-two billion dollars

22   of assets and sixty-eight billion dollars of liabilities under

23   the contract.  And that's no longer true.  The transaction now

24   has 47.4 billion dollars of assets and 45.5 billion dollars of

25   liabilities and the cure and the comp are 2.25 and two billion,

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 260

Page 85

1    respectively."

2          The bottom line, Your Honor, from these three

3    descriptions is that this is the last conversation that Mr.

4    Burian has with an estate of Barclays representative before he

5    goes to court for the sale hearing on the 19th of September.

6    Now, Mr. Seery has his own version of the discussion.  And

7    importantly, Your Honor, when Mr. Burian was asked:  "Did

8    anyone tell you during that conversation that the methodology

9    had changed since they had reported to the Court or filed the

10   APA with the Court?

11   "A.  No.

12   "Q.  Did anyone tell you during that conversation that they

13   were ascribing liquidation values to arrive at that either 45.5

14   or 47.4 number?

15   "A.  At no time did anyone ever tell me that the deal had

16   changed and that we weren't getting going-concern value, but

17   there was a liquidation discount or liquidation methodology

18   being realized."

19          Mr. Burian says:  "[I]t was very clear to me they were

20   being provided to me in a manner consistent with every

21   conversation we'd had about the topic, which is, as a going

22   concern, mark-to-market, in a manner in which any reasonable

23   broker-dealer would do at the close of business of every single

24   day."

25          Now, Mr. Seery has his own version of this discussion.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 260

Page 86

1   And according to Mr. Seery, he advised Mr. Burian that the 45.5

2   billion dollar figure ascribed to the trading assets reflected

3   a negotiated discount.  The forty-five billion dollar number

4   was not a mark-to-market number.  It was a negotiated number.

5           And the issue of how these assets are valued is very

6   important because Barclays is relying on Mr. Seery's testimony

7   to say that the committee was aware of all material aspects of

8   this transaction.  However, Mr. Seery's testimony lacks the

9   clarity and consistency and corroboration of Mr. Burian's.  I

10  make three brief points here.

11          First, Mr. Seery's testimony has evolved throughout

12  this case.  Mr. Seery submitted a declaration in this case

13  after he had been deposed in which he purports to speak to the

14  conversation that he had with Mr. Burian and he purports to

15  speak to Mr. Burian's notes of that conversation.  And in that

16  declaration, Mr. Seery states:  "My recollection is that the

17  part -- primary information that had changed was that Lehman's

18  short positions had been closed out and that the estimated

19  actual value of the Fed repo securities, as opposed to their

20  marked value, had shrunk to approximately 45.5 billion.

21  However, I consistently stressed to committee representatives

22  that the five billion dollar difference between the advanced

23  amount and the marked amount of the securities remained and

24  that was the primary reason for my conversation with them at

25  the time."

Page 87

1          Now, notwithstanding this declaration, Mr. Seery

2     admitted that he never enunciated those words, "estimated

3     actual values", to Mr. Burian.  When he was asked, "Well, sir,

4     the words 'estimated actual value' appear in the declaration

5     that you signed.  Is it now your testimony that these were not

6     the words that you spoke to Mr. Burian in describing the 45.5

7     billion?"

8     "A.  I don't believe I used those words and I don't believe in

9     this declaration that I said I actually used those words.  So

10    those are a rough approximation of the type of words that we

11    talked about value.  Estimated actual value is what the

12    declaration says."

13         Mr. Seery also submits that he told Mr. Burian that the

14    45.5 billion dollar figure was "negotiated".  Now, on the first

15    day of his testimony at the trial when he was examined by the

16    committee, Mr. Seery makes no mention of the phrase "negotiated

17    amount" or the word "negotiated".  On the second day of

18    testifying, when examined by Barclays, for the very first time

19    he refers to the 45.5 billion dollar figure as a negotiated

20    value.  And when cross-examined by the committee that day, he

21    admitted, as he must, that he never referred to a negotiated

22    figure in two depositions in this case before the trial.  He

23    never referred to it in his declaration.  He never said it on

24    direct examination.  It appears for the first time when Mr.

25    Seery is questioned by Barclays' attorneys.  And Mr. Seery also

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 260

Page 88

1    admits that he never used the term "negotiated settlement

2    value" when talking to the committee's representative.  When

3    asked, "And there's nothing in your notes of that meeting on

4    Sunday, is there, sir, that indicates that the assets were

5    being valued based on a negotiated settlement between Barclays

6    and Lehman, right?

7    "A.  I don't believe I had ever used those words in my notes.

8    "Q.  Okay.  You never used those words in connection with the

9    deal until your testimony here this morning, correct, sir?

10   "A.  I think I told Saul that we cut a deal.  So I probably

11   never used negotiated settlement amount."

12        The second point I would make about Mr. Seery's

13   testimony is that he concedes he never told Mr. Burian or the

14   committee representatives that the assignment undertaken by the

15   Lehman traders was to arrive at a liquidation value for the

16   trading assets.  What he told them is that it was to give their

17   view as to market value.  When asked, "[T]here isn't any

18   reference here, and there wasn't any reference in the

19   communication you made to Mr. Burian to an instruction to the

20   traders to develop liquidation bids, correct, sir?

21   "A.  I don't recollect specifically if I said what we did.  I

22   did tell him that we had our traders give us a view as to the

23   market value at that time."

24        And when asked:  "[W]hen you described the input that

25   the traders had given, did you talk to Mr. Burian about the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 89 of 260

Page 89

1    fact that the traders had given that input that morning in

2    response to your request that they give you liquidation bids

3    for the collateral?"  His answer:  "I don't believe that I went

4    into -- I would have -- I don't recollect the specific words

5    but I don't believe I would have gone into that level of

6    detail, no."

7            The third and last point I would make about Mr.

8    Seery's testimony is that whatever Mr. Seery says was the sum

9    and substance of his conversations with Mr. Burian, Mr. Seery

10   is not the final word when it comes to the creditors'

11   committee.  The final conversation, which I'll get to in a

12   minute, takes place between Mr. Klein and Mr. Burian.  It's Mr.

13   Klein who gives the final answer and it's in response to many

14   of the conversations that were had between Mr. Seery and the

15   information that had been provided to the committee over the

16   closing repo.

17           Now after this call between Mr. Burian and Mr. Seery

18   on Friday, September 19th, the sale hearing commences later

19   that afternoon.  And at that hearing, the valuation attributed

20   to the assets is 47.4 billion dollars.  And the marks,

21   according to Mr. McDade, were updated through the date of the

22   sale hearing.  And notably, Mr. Burian testified that the

23   remarks that were made in court on September 19th squared with

24   Mr. Seery's conversation that he had had hours earlier.  They

25   also matched Mr. Burian's notes which appear at 38191 of 47.4

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 260

Page 90

1    billion and 45.5.  After the sale hearing, on September 20th,

2    the Saturday, the parties assemble at Weil Gotshal to close the

3    transaction.  The committee advisors make their way to Weil on

4    that Saturday to attend the closing.  And Mr. Despins, before

5    the day gets underway fully, sends Mr. Miller an e-mail

6    insisting that he "be kind enough to make sure that your

7    corporate team involves my corporate partners including Crayton

8    Bell in all discussions and meetings with respect to the

9    documentation and the closing of the Barclays transaction".

10         And Mr. Burian testified that when the committee

11   advisors arrive on Saturday, they have the mantra of saying,

12   "Tell us what's going on.  We're asking for as much information

13   and detail as possible about the assets that were transferred."

14         But unfortunately, Mr. Burian also testified that for

15   the most part the committee representatives were ignored and

16   excluded from substantive meetings and discussions.  And at the

17   time, no one could describe the transaction to him.

18         And the closing continues on the Sunday morning.  And

19   on Sunday morning, Houlihan representatives approach Mr. Seery

20   demanding a list of assets that were being transferred.  And on

21   Sunday morning at 11:30, this document is distributed.  And

22   this is less than twenty-four hours before the transaction

23   closes.  The U.S. schedules were approximately 12,000 CUSIPs.

24   And this is Exhibit M-381.  And as soon as Houlihan gets the

25   schedules and asks Mr. Seery to explain why these numbers are

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 260

Page 91

1    inconsistent with what was said in court on Friday -- the

2    schedule lists a market value of 49.9 billion.  We were told

3    that the assets during court were 47.4 billion.  And Mr.

4    Seery's response is that these schedules are out of date.  He

5    was not even sure if these were the assets that were being

6    transferred.  But he would refer back to us with updated

7    information.  And that's at 11:30 on Sunday morning.

8         And, Your Honor, notwithstanding the enormity of the

9    task, Houlihan actually tried to diligence this schedule by

10   undertaking a CUSIP by CUSIP analysis.  Mr. Burian put out an

11   all-points bulletin for every analyst he could get his hands on

12   and it was at his disposal.  But even Barclays' expert and Mr.

13   Seery conclude that the committee professionals did not have

14   the ability to diligence these schedules prior to the closing.

15   As Professor Pfleiderer says:

16   "Q.  And in the time that was available the week of September

17   15th through the closing on 22nd, your view is that no line by

18   line CUSIP valuation could have been done with any great

19   precision, is that right?

20   "A.  I think that's definitely true."

21        Mr. Seery conceded:  "And you would agree, would you

22   not, sir, that the committee didn't have any ability to value

23   this portfolio independently on Sunday, September 21, correct?

24   "A.  I don't think they could have valued this portfolio, no."

25        Simply put, diligencing these schedules that weekend

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 92 of 260

Page 92

1    was impossible.

2         Now, as of 11 p.m. on Sunday night, the 21st, the

3    committee professionals had still not heard back from Mr. Seery

4    or gotten any updates with respect to the schedules that they

5    had received at 11:00 that morning.  And a committee call is

6    convened at 11 p.m. on Sunday.  The concerns with respect to

7    the schedules are discussed.  Concerns about the differences

8    between the value appearing on the schedules and the

9    representations made in court are discussed.  And the committee

10   advisors indicate that they are awaiting an explanation.  And

11   during the course of this call, committee's instruction to its

12   financial advisor is clear.  In response to the question of

13   whether Mr. Burian was "able to get any instruction or

14   authority from the committee to consent to the transaction as

15   he understood it at that point", he answered, "Very direct and

16   significant conversations.  We were informed directly and

17   bluntly that we were to observe.  We were to participate.  We

18   were not to consent."

19        And at this time, Your Honor, the uncertainty about

20   the schedules, the uncertainty about the marks, the uncertainty

21   about the assets being transferred, this creates a level of

22   agitation in Mr. Burian that compels him to corner Mr. Miller

23   and insist on a meeting to provide them with an explanation as

24   to what is happening in the transaction.  And Mr. Burian

25   testified -- he said to Mr. Miller, "This is ridiculous.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 260

Page 93

1   You're telling me you're about to close the largest transaction

2   ever and you don't even know what you're transferring and that

3   you're too busy to tell the committee what you're doing?  Don't

4   you think at least you should get an explanation and I can

5   listen and hear it?"  And that was critical to Mr. Burian

6   'cause he was trying to reconcile information they received on

7   the schedules with representations that were made to the Court

8   thirty-six hours earlier.  And in response to this request, a

9   meeting ensues among Mr. Klein, Ms. Fife, Mr. Roberts, Mr.

10  Miller, Mr. Burian and Mr. Michael Fazio of Houlihan.  And that

11  meeting is arranged by Mr. Miller.  And during the course of

12  that meeting, Mr. Klein engages in a conversation.  He explains

13  the transaction to the committee representatives that are

14  present and writing its components on a manila folder.

15          And during this meeting, there is no discussion of a

16  block discount.  There is no discussion of liquidation values.

17  What Mr. Klein says is that because of declines in the market,

18  the marked value of the securities declined from 49.9 to

19  somewhere between forty-four and forty-five billion and that

20  Barclays was receiving the 1.9 billion dollar unencumbered box

21  and this brought the number up to forty-seven billion.  And Mr.

22  Burian testified "Pre-mark, it was clear in the room, was old

23  value.  Post-mark, we're sitting here today.  Post-mark, they

24  are now worth forty-four to forty-five billion dollars...The

25  meaning was obvious in the room.  I mean, he said pre-mark.

Page 94

1    We're talking about Lehman's books and records.  The 49 point

2    whatever billion was pre-mark, post-mark...You know, going

3    concern, mark to market in a manner in which every other

4    broker/dealer might mark a book."

5              And interestingly, Your Honor, the number that appears

6    in the upper left-hand corner of the manila folder of 49.9

7    squares with the number that appeared on the schedule at 49.9

8    that we received twelve hours and that we were told to ignore

9    as being out of date.

10             Now, Mr. Klein testified to say that he described the

11   values as notational values.  But that doesn't appear anywhere

12   on that folder.  What does appear on the folder is pre-mark and

13   post-mark.  And during the course of this conversation, Your

14   Honor, Mr. Burian and Mr. Fazio did their homework.  Mr. Burian

15   testified in this court for two days.  That examination should

16   have revealed clearly that he is not a shrinking violet.  The

17   committee advisors asked during this conversation about the

18   basis for concluding that the market value for these assets had

19   declined by five billion dollars.  And they simply did not get

20   an answer.  As Mr. Burian testified, "I mean,  Mike" -- and

21   that's Mike Fazio of Houlihan -- "jumped in and said, wait a

22   minute.  What's going on here?  Some of these government

23   security issues have gone up in value.  Like, what do you mean

24   pre-mark and post-mark, you know, the market has dropped?...Mr.

25   Klein sort of made a face, you know, as if do we not understand

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 95 of 260

Page 95

1   what's going on in the world, you know.  But I don't know what

2   he was really thinking...But we raised the issue and I'm

3   positive that Mr. Klein several times during that meeting used

4   the word 'market value'."

5           And also on this slide, Your Honor, when asked the

6   question of whether there was any mention during the meeting of

7   Lehman or Barclays using liquidation value or a hypothetical

8   liquidation value to arrive at the post-mark number, Mr.

9   Burian's answer is unequivocally clear, "Absolutely not."

10          And it should be clear because Mr. Klein corroborated

11  that version of that meeting.  When Mr. Klein was asked the

12  question, "Isn't it true that you never told them the forty-

13  four to forty-five was a liquidation valuation?" he answered,

14  "I don't believe I would have said that.  And I don't believe,

15  per se, that it implied a liquidation.  The numbers that were

16  given to me related to Barclays' estimates of the value at the

17  moment in time in that market condition."  Interestingly, Mr.

18  Klein refers to those values as "Barclays' estimates" not

19  Lehman's estimates.

20          Now, speaking to the upper right-hand corner of the

21  folder, Mr. Klein advises that the liabilities assumed in the

22  transaction will total approximately forty-nine billion

23  dollars.  And Mr. Burian testifies that Mr. Klein told him,

24  "[Y]ou guys are doing two plus billion better than you ever

25  thought and you should be thanking us and not causing trouble."

Page 96

1    He was comparing the forty-nine to the forty-seven on the left-

2    hand side of the folder.

3              This meeting among Mr. Klein, Mr. Burian, Ms. Fife,

4    Mr. Miller, it ends at approximately 3 a.m. on Monday morning,

5    September 22nd shortly before the transaction closes.  And just

6    a few hours later, Mr. Burian sends the committee a memo.  And

7    that memo corresponds directly with Mr. Klein's notes on the

8    folder and Mr. Burian's testimony concerning that conversation.

9    And this memo is Mr. Burian's most contemporaneous and

10   comprehensive set of notes about these events.  In that memo,

11   he tells the creditors' committee in recounting the Klein

12   conversation, "The bottom line netting appears to the

13   following:  the total purchased assets were booked at

14   approximately 49.4 billion but dropped in value to about forty-

15   five -- forty-four to forty-five billion.  Barclays was then

16   given additional assets of 1.9 billion to be included in the

17   deal prior to the Friday hearing.  All-in, approximate value of

18   forty-seven billion.  They are forgiving the Fed loan of 45.5

19   billion and assumed liabilities of 4.25 billion for a total of

20   forty-nine plus billion.  Depending on how they do liquidate in

21   the book, they will make or lose money."  Those are Mr.

22   Burian's notes, a memorandum to his clients hours after the

23   Klein meeting.

24             And when Mr. Klein was shown this memorandum, he

25   confirmed the symmetry between the substance of his

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 97 of 260

Page 97

1    conversation with Mr. Burian and with Mr. Burian's description.

2    And when he was asked if there was anything in Mr. Burian's

3    recollection of his discussions and explanations that was

4    inconsistent with Mr. Klein's recollection of that meeting, Mr.

5    Klein said, "There was some phrasing that might be different"

6    but he acknowledged that it was a reasonable summary.

7            The bottom line, Your Honor, when Mr. Burian leaves

8    Weil Gotshal in the early morning hours of September 22nd, his

9    view is that "Essentially this is very, very similar to what

10   Jim Seery told me before the court hearing, very similar to

11   what Lori briefed people in a little scrub before the hearing

12   started and very similar to what Weil Gotshal represented to

13   the Court would be the transaction.  This is pretty close or

14   dead on to what I was expecting to hear."

15           Now, one of the arguments that Barclays raises is that

16   the committee consented to post-hearing modifications to the

17   transaction.  And the evidence doesn't support that conclusion

18   at all.  In fact, again, Mr. Burian's contemporaneous

19   memorandum that was sent to his clients hours after the Klein

20   conversation is clear that he acted in accordance with his

21   client's instruction.  "We did not consent.  We said we

22   understand what they are telling us and expect to see computer

23   runs of all transfers at some point in connection with the

24   closing documentation.  If this is the deal, it sounds

25   consistent with the court proceeding.  If this is not what

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 98 of 260

Page 98

1    actually happened, they will be hearing from us or from the LBI

2    estates."

3           And similarly, committee counsel, Mr. Luc Despins,

4    when asked the question, "Now, the transaction itself closed

5    sometime in the early morning of London, correct?

6    "A.   That's what I understand.

7    "Q.   Were you and other committee professionals present when

8    the deal officially closed?

9    "A.   No."

10          And then proceeds to explain:  "We didn't want to be

11    deemed to have acquiesced or consented to this in any way being

12    there at the closing."

13    "Q.   Did you ever indicate to anyone after the closing that the

14    committee had consented to the transaction?

15    "A.   No."

16          At this point, Your Honor, I would turn to the second

17    period that we've identified, the trust but verified period

18    which takes place after the closing concludes on September 22nd

19    through the December settlement.  And immediately after the

20    Klein meeting, the committee professionals set out to obtain

21    the reconciliation with respect to the representations that

22    were made to them over the closing weekend and to the Court.

23    And the committee's expectation was that it would receive a

24    line by line set of marks showing the CUSIP, the mark ascribed,

25    the date of the mark and the method and manner of marking and

1   that that reconciliation would be consistent with everything

2   the advisors had been told at the hearing and over the closing

3   weekend.

4         And one of the things the committee did was

5   immediately request a copy of the final schedules.  And Mr.

6   Despins e-mailed Mr. Miller on Thursday, September 25th,

7   shortly after the closing, and told him that his partners had

8   made several requests for the asset schedules referred to in

9   the asset purchase agreement and had received no response.  Mr.

10  Miller assured him that the schedules would be furnished ASAP.

11  And in fact, a copy of the schedules was transmitted that day

12  on September 25th.

13        Now, two points about this schedule.  First, it's

14  caveated in a cover e-mail.  It says, "These are not

15  necessarily the final reconciled lists of what was sent over to

16  Barclays.  We are told, however, that they're very close."

17        The second point is, the value, the market value, that

18  appears on these schedules is the exact same -- well, extremely

19  close -- 49.9 billion dollar market value that was on the

20  schedules we had received the weekend before and were told were

21  out of date schedules and incomplete schedules.

22        Now during this period of September and October, the

23  committee continued to set out to get a reconciliation to try

24  to reconcile the differences in the amounts that they had been

25  told with what was said to them in the Klein meeting and what

Page 100

1    was said during court.  On October 8th, the committee met with

2    Alvarez & Marsal and the debtors' other professionals as part

3    of a regularly scheduled meeting.  And the transaction was

4    discussed at this meeting.  And the committees advisors who had

5    been asking for a reconciliation since the closing, raised

6    again the issue of the need to get that reconciliation.  And

7    following this meeting, they also briefed committee counsel on

8    the issue for purposes of allowing committee counsel to try and

9    obtain diligence through LBHI's counsel.  And consistent with

10   that approach, in early October, committee counsel reached out

11   to LBHI's counsel to schedule a meeting to discuss these issues

12   and they met some resistance.  LBHI's counsel said, "I'm really

13   at a loss to figure out why you and the other committee

14   professionals are spending so much time on the Barclays sale.

15   What could you or anyone for that matter do even if it turned

16   out that the assets turned out to be greater?"

17          Another problem that's impeding the ability of the

18   committee to get a reconciliation during this period of time is

19   a significant issue facing the estate, the inability to access

20   information because after the Barclays sale systems and the

21   institutional knowledge were transferred to Barclays as well as

22   the knowledge of the sale transaction.  And while there was a

23   transition services agreement that was in effect, disputes over

24   compliance with that agreement unfolded and that ultimately

25   almost led to litigation.  But at the time, the estates and A&M

Page 101

1   had indicated to the committee during the October 8th meeting

2   that they agreed a reconciliation should be pursued.  But at

3   the time, the estates in and of themselves were hamstrung by

4   the inability to access information.

5           And it's against this backdrop that the December

6   settlement motion is filed.  And the papers that are submitted

7   in connection with that settlement, specifically Ms.

8   Leventhal's declaration, describe a transaction different than

9   the one described to the Court and to the committee.  Ms.

10  Leventhal's declaration states that LBI was to provide Barclays

11  with approximately 49.7 billion in securities in return for

12  forty-five billion in cash.  And that representation didn't

13  square with the 47.4 told to the Court and the committee or the

14  45.5 billion number ascribed to the repo securities.  And in

15  response, the committee filed a limited objection arguing its

16  investigation of the transaction was ongoing.  And the

17  committee also asked that information be provided to the

18  committee so to continue with that investigation.  And the

19  committee's limited objection advised clearly of its five

20  billion dollar issue.  The question that it had about the five

21  billion dollars between the 49.9 it was told and the forty-five

22  in the Klein conversation and how the committee advisors were

23  told that issue was resolved the night of the closing and how

24  that explanation contradicted Ms. Leventhal's declaration which

25  listed the value of the assets at 49.7.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 102 of 260

Page 102

1           And the committee's objection was not well received,

2    Your Honor.  In point of fact, in an e-mail from Barclays'

3    counsel, Barclays' counsel states, "As to the creditors'

4    committee, we think that the e-mail should go on to say that

5    the settlement parties are not willing to agree to other

6    demands of the creditors' committee re an order requiring

7    delivery by January 15 of a vast amount of information

8    relating, in general, to the details of a sale or assets to

9    Barclays Capital.  Nevertheless, the settlement parties are

10   willing on an informal basis to discuss with the creditors'

11   committee after the first of the year reasonable requests for

12   information concerning the sale that it has sought from LBHI

13   and been unable to obtain from LBHI."

14           Now, one of the positions that Barclays asserts in

15   this litigation is that the creditors' committee's rights were

16   released in the December settlement.  And interestingly,

17   Barclays' counsel stated on the record during the hearing of

18   the December settlement, "With regard to the creditors'

19   committee objection, Your Honor, we regard the creditor

20   committee objection as not germane to your decision whether to

21   accept this motion and approve the settlement.  They want to

22   exhume information related back to the sale that is not

23   pertinent, does not bear upon the question before you today."

24   And in point of fact, they confirmed on the record the

25   reservation of rights that the committee had obtained in the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 103 of 260

Page 103

1   order.  When counsel for JPMorgan Chase advised the Court,

2   people would remain free to pursue claims if they feel there is

3   something in the overall sales transaction which gives rise to

4   a claim, Barclays' counsel confirmed, "the order that the

5   trustee has put before you and which we've reviewed and to

6   which Mr. Miller referred preserves rights as Mr. Novikoff just

7   explained."

8          At no point did Barclays advise the Court that the

9   committee's rights would be released if the settlement was

10  approved.  At no point did Barclays advise the Court that the

11  committee could not assert any claims because it failed to

12  appeal from the sale order, because it had waived its claims or

13  that the committee was otherwise estopped from asserting claims

14  with respect to the sale order.

15         Now, turning to the final chapter in our timeline,

16  attempts at cooperation develop into litigation.  At the

17  December hearing, the Court suggested that the parties work

18  cooperatively to obtain information about the sale transaction,

19  the committee and Barclays.  And we pursued on that -- we

20  embarked on that effort by sending a letter to Barclays'

21  counsel four days after the December 22nd hearing on December

22  26th that contained a list of information requests.  And in

23  February, Barclays' principals and counsel and the committee's

24  financial advisors and attorneys had a meeting.  And this was

25  an informational meeting.  This was not a meeting to exchange

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 104 of 260

Page 104

1   litigation positions.  And early, Barclays didn't exchange its

2   litigation position with the committee.  And the committee's

3   position was not a mystery to anyone 'cause it had been stated

4   on the record at the December hearing a month before.  But at

5   the conclusion of this meeting in February, no reconciliation

6   is provided and, in point of fact, the committee's

7   professionals emerge with additional questions.  And that's

8   reflected in a February 10th letter that we sent after the

9   meeting outlining conditional and refined information requests.

10  Now, ultimately, there's some disagreement between Barclays and

11  the committee about the method and manner of producing

12  documents that the Court should respond to these requests.

13  They're initially produced in March and through April and May

14  and the parties negotiate changes to the format and the

15  production.

16         But at the same time, the estates themselves, LBHI,

17  were gearing up.  They initiated Rule 2004 discovery in which

18  the committee joined in May.  And after the committee joined in

19  LBHI's motion, Barclays objected to that joinder and tried to

20  block the committee accessing Rule 2004 discovery which the

21  Court did not sustain.  But thereafter, discovery commenced

22  over the summer and these motions were filed in September.

23         Barclays asserts in this case that the committee did

24  not timely seek Rule 60 relief.  Starting with the closing

25  weekend, going to the Klein conversation, the committee did not

Page 105

1   come to court on Monday morning to halt the sale transaction.

2   As far as there was concern at that point in time, it was

3   advised of a going concern sale.  It was never advised that

4   securities were being transferred to Barclays at liquidation

5   valuations.  In point of fact, Mr. Burian testified that the

6   representations made to him by Mr. Klein during that meeting

7   squared with what was said in court and he had no way to verify

8   those representations but he did set out to do so immediately.

9   And in the September and October months that followed, the

10  committee was pursuing their reconciliation.  It was meeting

11  some resistance in doing so and it was hampered by the estate's

12  inability to access its own information systems.  I think Mr.

13  Despins during the trial testifies quite clearly to the

14  committee's posture during this period of time.

15  "Q.   [D]id you ever consider going back to the Court and

16  saying, in substance, Your Honor, you told him not to make any

17  changes without our consent.  They went ahead and did it

18  anyway.  We objected.  Did you ever consider doing that?"

19       Mr. Despins describes the committee's posture:

20       "Well, I knew that I could read the document and say

21  we're changing that and we're changing that section, et cetera.

22  But what we don't know is the impact of those changes on the

23  value received by the estate.  So I don't want to run to court

24  on a half-baked theory that there are some changes but,

25  frankly, Judge, I don't understand what the impact of those

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 106 of 260

Page 106

1    changes are.  [W]hat I'm telling you is that we wanted to have

2    the schedules.  We wanted to understand what happened to those

3    schedules and the marks.  And obviously, the game plan was --

4    after I gained a full understanding of that and briefing the

5    committee, if warranted, that we would be eventually going back

6    to the Court."

7          Similarly, Your Honor, the committee is not timing the

8    market with this motion.  We did not await a market move to

9    file the Rule 60 motion.  Mr. Burian testified clearly, "I just

10   don't know what to say anymore.  I mean, nothing could be

11   further from the truth.  It's completely and absolutely not

12   true.  I can tell you I can tell you categorically that we were

13   pushing for discussion, investigation, reconciliation of this

14   transaction long before the markets recovered.  I could tell

15   you that I've been a primary person at Houlihan Lokey dealing

16   with these issues, and I have never, not once, with anyone, on

17   my side or on the company's side...ever had a conversation

18   regarding ha-ha, market's been up, now is the time to pounce."

19         Your Honor, the committee did not bring this action

20   lightly.  When does a statutory fiduciary for unsecured

21   creditors bring a claim against the public reporting back

22   alleging misstatements and misrepresentations were made in

23   connection with the largest bankruptcy sale on record?  The

24   short answer is when it has an awareness and an understanding

25   of the issue, when it reaches a conclusion about the issue and

Page 107

1    when it has facts necessary to support that conclusion and not

2    a moment before.  And if you look at the landscape, over time,

3    that shows that that is exactly what the committee did in this

4    case.

5             As of the 18th of September, we knew about a balance

6    going concern transaction, we knew about the emergent nature of

7    the transaction and we knew that the assets were value based on

8    book value.  On the 19th, we were told that there was a decline

9    in the market value of the securities to 47.4.  On the 21st of

10   September, we received schedules at 49.9 and were told they

11   were out of date.  And on the 22nd of September, we received an

12   explanation that the liabilities were 45.5 plus cure and comp

13   and the value of the assets was forty-seven.  And that

14   explanation squared with what was said to the Court.  And

15   thereafter, Your Honor, at that point in time, we did not come

16   back to court to stop the sale.  What we were told was

17   consistent with what the Court was told.  Thereafter, on the

18   25th of September, we received schedules that were the same

19   schedules distributed the weekend before that we were told to

20   ignore.  On the 8th of October, we had a meeting with the

21   debtors and we reiterated the need to focus on a

22   reconciliation.  On the 10th of October, we went to Weil

23   Gotshal requesting a meeting to discuss the issue.  Was not

24   well received.  And in October through December, the estates

25   were unable to access information to a point where it

1    threatened a lawsuit.  At this point, we're still not prepared

2    to go to court.  We're still seeking a reconciliation.  That's

3    the posture.  Thereafter, we received the December settlement

4    in cooperation to obtain information as suggested by the Court.

5    And we proceed down that path.  We do, in good faith, meet with

6    Barclays in February.  In March, we deal with document

7    production issues.  And then in June of 2009, Rule 2004

8    discovery is underway.

9         And at that point, the estates had come to court and

10   we joined in their request to come to court and reseek

11   discovery.  But we still don't assert claims because it's not

12   until 2004 discovery that critical features of the sale

13   transaction that were never disclosed emerged.  The existence

14   of a five billion dollar discount; attribution of liquidation

15   values not mark-to-market values on trading assets; an insisted

16   of -- on a day 1 acquisition gain as an imperative and a

17   precondition to the sale; and the overstatement of cure and

18   compensation liabilities.  At that point, Your Honor, we

19   returned to court and assert the claims and filed the instant

20   motion.

21        We were not aware of this information that was

22   revealed in discovery.  That information was newly discovered

23   by us and we were justifiably ignorant of that information.  We

24   didn't discover it fortuitously or by happenstance.  We

25   discovered it by pursuing a reconciliation persistently from

Page 109

1    the time of the closing to the time that we filed the motion.

2         The committee did everything it possibly could under

3    the circumstances.  It believed in the representations that

4    were made to the Court.  And while it trusted what it had been

5    told into the closing weekend, it saw promptly to verify those

6    representations.  It was incumbent on Barclays, not the

7    committee, to return to court and advise of the material

8    aspects of the sale transaction and the extent to which it

9    differed from what the Court was told at the sale hearing.

10   Barclays had every opportunity.  The Court made itself

11   available on an unlimited basis irrespective of the hour that

12   weekend and for that exercise.  And why did the Court do this?

13   Because the Court knows that the sanctity of a sale order is

14   critical to the purchaser.  But to get that security blanket, a

15   purchaser needs to ensure that it tells the Court what is going

16   on.  You cannot demand integrity of a sale order if you don't

17   have integrity in attaining it.  Barclays declined the Court's

18   invitation to come back to court that weekend.  The committee

19   submits the consequences of Barclays' inaction should be borne

20   by Barclays not by the estates.  The failure to adequately

21   disclose material aspects of the transaction militates strongly

22   in favor of a warning Rule 60 relief from the sale order

23   especially against a purchaser that expressly assumed the risk

24   of its own recalcitrance.

25         Your Honor, in conclusion, the Court has a difficult

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 110 of 260

Page 110

1  decision to make.  One is to revisit a sale order approving a

2  most historic transaction.  And there's an important policy of

3  finality with 363 sale orders.  That's Barclays' whole case.

4  But there's another policy at issue.  And this is the case that

5  should stand as a symbol for all to follow.  The policy is that

6  no matter how critically a debtor needs to sell assets, no

7  matter how many good reasons there may be, this Court must be

8  given full disclosure.  This Court is not a rubber stamp.  It's

9  not a theater of entertainment or mere ceremony.  This is a

10  federal court.  And those who come before the Court owe the

11  Court a duty of disclosure of integrity.  That they failed to

12  comply with that obligation, they face the consequences not

13  innocent creditors.

14      Ruling this way will actually advance both policies at

15  issue.  The sanctity of sale orders will be defended and upheld

16  but only if disclosure is properly made.  Let this case show

17  how serious these issues are and let us all learn from it and

18  be guided in how to behave when we come to bankruptcy court.

19  Let it be cited often.

20      And unless Your Honor has any questions, that

21  concludes my presentation.  Thank you.

22      THE COURT:  Thank you.  Are we ready to go with Mr.

23  Maguire's close?

24      MR. MAGUIRE:  We are, Your Honor.  The parties had

25  suggested we had reserved, I believe forty minutes for the

Page 111

1    trustee's presentation and with an additional twenty minutes

2    for rebuttal at the end of the day.  We had suggested this

3    might be a good time to break for lunch.  But as the Court

4    pleases, we can either take that break now or I'll proceed.

5         THE COURT:  All right.  Well, let's get a sense of

6    Barclays' time for close as well.  I just want to see how this

7    all fits.  Mr. Boies, can you give me an estimate if your

8    closing will be equal in length to the aggregate of all of the

9    closes that I will have heard by the time you start?

10        MR. BOIES:  It will be, Your Honor.

11        THE COURT:  I've already expected that.  My suggestion

12   is that we break for lunch but that we come back a little bit

13   earlier and that we start at 1:45.  That will give us our

14   typical hour and a half but we'll also have a little bit more

15   time in the afternoon during the early hours of the afternoon.

16   That works for the better.  We're adjourned till 1.

17        MR. TECCE:  Thank you, Your Honor.

18        (Recess from 12:15 p.m. until 1:48 p.m.)

19        THE COURT:  Be seated, please.  Good afternoon.

20        MR. MAGUIRE:  If it please the Court, Bill Maguire for

21   the SIPA trustee.  Your Honor, we've taken to using the

22   shorthand for these proceedings as 60(b).  The trustee's claims

23   with respect to the disputed assets, however, are first and

24   foremost, to enforce the parties' contract and to enforce this

25   Court's sale order.  In short, what the trustee is seeking to

Page 112

1    enforce is the transaction that was presented by the parties to

2    the Court and was approved by the Court at the sale hearing.

3         On those disputes assets, I'd like to start with the

4    15c3-3 assets.  And I've taken the liberty of distributing

5    binders of tabs that we made --

6         THE COURT:  I'm not surprised.

7         MR. MAGUIRE:  The 15c3 account takes its name from the

8    SEC Rule, 15c3-3, and that's the rule that requires a broker-

9    dealer to calculate what it needs to pay customers their

10   property, to set that property aside, to keep it segregated in

11   a restricted account.  It can't be used for any other purpose,

12   not subject to any liens.  And all of this is subject to the

13   oversight of the SEC.

14        The parties were clearly aware of the regulated nature

15   of this account.  And the correspondence that the Court has

16   seen with the SEC that week shows that the Lehman participants,

17   in particular, were sensitive to the fact that the SEC was all

18   over this account.

19        Now, in tab 2 of the binder that we've provided Your

20   Honor, you'll see the words of the clarification letter.  This

21   -- the history of this was that the 15c3 account was added late

22   in the deal.  It's not in the asset purchase agreement, as Mr.

23   Gaffey mentioned.  It is added at the Friday asset scramble

24   that he discussed.  And it's not disclosed to the Court.  When

25   Harvey Miller finds out about it, there is a discussion in the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 113

1    hallway at his offices.  That account at the time had 1.7

2    billion dollars in it.  Harvey Miller testified and explained

3    to Your Honor that of that one billion dollars was cash and

4    there was no way that could go to Barclays because of the

5    representation that had been made to the Court at the sale

6    hearing.

7          With respect to the 769 million dollars of securities,

8    the resolution of the hallway discussion, that argument or

9    debate that he testified about, was that Barclays would get the

10   769 million dollars of securities that were in the account but

11   only if it were lawful.  What Barclays got was a contingent

12   right.  And following that hallway conversation, Weil Gotshal

13   provided Barclays with a draft that reflected that.  And what

14   we have on the screen here is the draft which reflects, in

15   black, the writing of the clarification letter prior to the

16   hallway conversation and, in green, the language that Weil

17   Gotshal added after the hallway conversation.  The two words in

18   red were subsequently added by Barclays.

19         The draft that Weil Gotshal provided explained that

20   this was a contingent right.  It said, this was -- Barclays got

21   this "to the extent permitted by applicable law".  And it

22   describes what the asset was:  769 million dollars of

23   securities held in the 15c3 account on the date hereof, the

24   closing date.  Of course, Lehman could not possibly transfer

25   anything from this account on the closing date.  It would take

Page 114

1    time to determine whether, in fact, there was an excess and to

2    run that by the SEC.  And that would take time.  So the

3    delivery of this is made as soon as practicable after closing.

4    Now that gave rise to another subsidiary issue.  If by the time

5    the account can be accessed the particular securities are no

6    longer there, they've been replaced if they'd matured, they

7    rolled over, then Lehman needs the ability to provide

8    substitute securities from within the account.  And that's why

9    the draftsmen added the words "securities of substantially the

10   same nature".  That's the draft that Weil Gotshal provided to

11   Barclays.

12          Now Barclays deposed Robert Messineo who is Harvey

13   Miller's law partner who assisted him in drafting the

14   clarification letter, specifically about this language,

15   "securities of substantially the same nature".  And his

16   testimony we've provided in tab 3.  We also have it -- it's

17   about one minute long by way of video which we can show Your

18   Honor:

19          (Begin playing videotaped excerpt)

20   Q.   So do I understand your testimony to be that you believe

21   that the provision was necessary because there may have only

22   been 769 million dollars in securities in that customer reserve

23   account on the date of the agreement?

24          UNIDENTIFIED SPEAKER:  Objection to form.

25   A.   I wouldn't say it that way.  What was described was that

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 115 of 260

Page 115

1    Barclays was to get 769 million of particular securities that

2    existed in particular accounts on a particular day.  And then

3    it went on as it needed to in order to make sense to say that

4    substantially the same securities since those particular

5    securities over there on that day may not be there on the day

6    when you talked about the account being accessed which is going

7    to be in sometime in the future when favorable conditions are

8    satisfied.

9         (End playing of videotaped excerpt)

10        MR. MAGUIRE:  Now Barclays claims that the contract

11   should be read very differently from what Mr. Messineo

12   intended.  Barclays asserts that the contract gives Barclays an

13   absolute unconditional right to the 769 million dollars.  And

14   they say that that right, that unconditional right, was given

15   to them by Harvey Miller in the hallway argument or debate.

16   The problem with that is that the evidentiary support for it is

17   given more than wishful thinking.

18        The next tab, tab 4 in the binder, collates that

19   evidence and we have the particular pieces of testimony behind

20   the cover slide in that tab.  We asked Harvey Miller at trial,

21   did he give such an unconditional absolute commitment to

22   Barclays?  He said "Absolutely no commitment.  Absolutely not."

23   On the other hand, Barclays' witnesses, Victor Lewkow, said

24   that such a commitment was given to Michael Klein, his client.

25   But he couldn't recall who it was who gave the commitment and

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 116 of 260

Page 116

1    he couldn't recall what they said.  His partner, Mr. Rosen,

2    admitted that his conclusion was based on little more than an

3    inference from some kind of facial gesture, some grunt or not

4    that had been made maybe by Harvey Miller, maybe by one of his

5    partners.  And he, too, did not recall what was said.  And

6    Michael Klein was the supposed recipient of Harvey Miller's

7    largesse and he had admitted that he just didn't consider

8    whether there was any unconditional commitment during the

9    hallway conversation.

10           If we go back to tab 2, and that's the language of the

11   clarification letter, the draft as it was provided back to

12   Barclays by Weil Gotshal, the Barclays witnesses admit that

13   when they got the draft, it didn't work.  They admit that they

14   expected an absolute unconditional right and in their words,

15   "This didn't work."  They admit, they didn't understand it.

16   But they also admit they didn't go back to talk to anyone, Mr.

17   Messineo, Harvey Miller, anyone at Weil Gotshal to ask what was

18   intended by all of these words.  Instead, what they did was

19   they added two words which we have here in red, "and value".

20   The problem with that is that adding those words doesn't change

21   the meaning at all.  It's entirely consistent with what Mr.

22   Messineo was saying.  If you have to replace the securities

23   then you're going to replace them with similar securities of

24   equal value.  So it doesn't in any way change the contingent

25   nature of this right.  The Barclays witnesses all say they

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 117

1    believed they had an absolute right to 769 million dollars of

2    securities.  But apparently, they never asked themselves or

3    anyone else, if that's what the parties intended, why don't

4    they just say so.  Why do we have all these extra words?

5        If we turn to tab 5, we see that in addition to the

6    problems that Barclays has with the words of the contract and

7    with the lack of disclosure to this Court and with the

8    testimony of Harvey Miller, we also have Barclays' admissions

9    consistently in the months after the closing.  Barclays

10   reported to its tough management that this was an asset that

11   was contingent.  It was subject to regulatory issues.

12       Of particular significance here is the October 14

13   report that was made to Barclays' board of directors.  And in

14   your tab, just past the cover page, we have that report to

15   Barclays' old committee of imported directors, Movants' Trial

16   Exhibit 436.  You may recall the chief financial officer,

17   Patrick Clackson testifying about how management vetted that

18   report to make sure that management was providing the most

19   reliable to the Court.  Now when Barclays consistently reported

20   internally to its own top management and to its board that this

21   was subject to regulatory approval, they were clearly

22   acknowledging the fact that this was an -- this was a

23   contingent right, it was a conditional right and it was not an

24   absolute right.

25       Your Honor, that brings me to the disputed asset,

Page 118

```
 1    Lehman's margin assets which we start at tab 6 of our binder.
 2    What we've put up here are what we believe are three
 3    fundamental and dispositive facts with respect to the margin
 4    assets.  They weren't in the deal.  There was no disclosure
 5    that any margin assets were going to Barclays.  And there was
 6    no approval of any such transfer.  We start in the next tab
 7    with the fundamental fact that these margin assets were simply
 8    not in the deal.  Lehman's president, Bart McDade, testified
 9    they were not in the deal.  And the parties' contract, the
10    asset purchase agreement, expressly excluded Lehman's cash and
11    cash equivalents.  The parties' contract also excluded all
12    Lehman assets primarily related to its derivatives contract.
13            Now, in the next tab, we have the testimony of Bart
14    McDade.  He testified that Lehman's margin assets were not
15    intended to be included in the transaction and that he never
16    authorized any agreement with anyone at Barclays to include any
17    Lehman cash margin in the sale.  That was on direct
18    examination.  On cross-examination, he confirmed that that
19    testimony was accurate.  And he actually went a little bit
20    further.  And he said, he wouldn't abuse those assets because
21    he wasn't confident we had those assets to give.  And when you
22    consider Lehman's obligations to the exchanges and its
23    obligations to its customers, that's entirely understandable.
24            Barclays has suggested, well, Mr. McDade just wasn't
25    involved in negotiations about margins.  And I think that's
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 119

1    true.  Mr. McDade was not involved in any negotiations about

2    margin because there weren't any.  The notion that, as a

3    general matter, Mr. McDade was above it all was scotched on

4    Barclays' own case, the very first witness they presented, Mr.

5    Shapiro.  In the next slide, we have Mr. Shapiro's testimony on

6    direct being questioned by Barclays when he specifically

7    testified to how deeply involved in the negotiations Bart

8    McDade was.

9         Mr. McDade was not involved in any negotiations about

10   margin because there weren't any.  And in the next slide, we

11   confirmed that with Barclays' negotiators.  We asked Mr. Ricci,

12   and he confirmed, that he certainly never discussed including

13   margin in the sale.  And he answered, "Personally."  We tried

14   to push him a little bit more because he was, after all,

15   Barclays' 30(b)(6) witness.  And he didn't want to go beyond

16   "Personally" but he was admitted he wasn't aware of any other

17   discussions that anybody else had on the subject.

18        Jonathan Hughes, Barclays' general counsel, suggested

19   at one point that there might have been some kind of oral

20   agreement on the subject of margin.  But when pressed, he

21   acknowledged he had no knowledge of that whatever.

22        Archie Cox admitted he certainly didn't remember any

23   discussions about Lehman margin during the week.  The same can

24   be said of all of the other Barclays witnesses.  Barclays

25   failed to present any witness who could say there was any

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 120 of 260

Page 120

1   negotiation about putting Lehman's margin assets in the asset

2   purchase agreement.

3           And the contract reflects that.  The next tab is the

4   contract, the asset purchase agreement.  At the top, we have

5   the definition of "purchased assets".  And, of course,

6   Barclays' witnesses loved to say that Barclays was acquiring

7   all of the assets of the business.  What they all left out was

8   that that was subject to a very important exception:  excluding

9   the excluded assets.  And there are two critical exclusions

10  here.  The first exclusion is Exclusion B and it excluded all

11  of Lehman's cash, cash equivalents, bank deposits or similar

12  cash items.

13          Now we had various Barclays witnesses who testified

14  about the representations that were made to the Court about no

15  cash going to Barclays and how they thought that was fine and

16  consistent with the deal.  But at the same time, they thought

17  there was some kind of cash that could be going to Barclays.

18  The contract cuts through all that.  It doesn't talk about one

19  kind of cash, another kind of cash, this cash, that cash or the

20  other cash.  It excludes all cash.  All Lehman cash and cash

21  equivalents.

22          The other critical exclusion is Exclusion (m).

23  There's no real issue here concerning all assets primarily

24  related to the I&B business.  There very much is an issue here

25  concerning all assets primarily related to Lehman's derivative

Page 121

1    contracts.  And in the next tab, we have Barclays' take on

2    that.  At the very top, we quote directly from Barclays' reply

3    brief at paragraph 53.  Barclays says "Subsection (m)" --

4    that's what they're calling this Exclusion (m) -- excludes all

5    assets primarily related to derivatives contracts.  That's a

6    direct quote from Barclays' reply brief.  Even the three little

7    ellipses is direct from their reply brief.  Now what is the

8    significance of this?  The significance of this is that

9    Barclays' expert on derivatives, their outside lawyer admits

10   that exchange traded derivates are derivates contracts.  He

11   admits that Lehman's margin at the Options Clearing Corporation

12   was primarily related to the exchange traded derivates.  And

13   the same with respect to all the other clearinghouses.

14          So the disputed margin here is an asset that is

15   primarily related to Lehman's derivates contracts.  That's

16   exactly what Exclusion (m) says.

17          Now, in the next tab, 13, we have where Mr. Rosen

18   suggested that he reads Exclusion (m).  Even though it's an

19   unqualified exclusion, he reads it as if it were limited,

20   limited to over-the-counter derivatives as if the limiting

21   words, "over-the-counter", were somehow inserted into Exclusion

22   (m) right before the words "derivatives contracts".  And the

23   problem with that, the contract doesn't contain any such

24   limitation, as Mr. Rosen admitted.  He acknowledged he could

25   not argue with us about that.  Those words are not there.  And

Page 122

1    he acknowledged -- he said, "This was done" -- this Exclusion

2    (m) was done -- "before I ever saw it."  In fact, Barclays

3    presented no witness on this Exclusion (m).  And we

4    respectfully submit that the exclusion, as written, is entirely

5    consistent with the testimony of Bart McDade that Lehman margin

6    assets were never intended to be part of the deal.  They were

7    excluded.

8            As against the testimony of Bart McDade and the words

9    of the exclusions for all cash and all Lehman margin assets, we

10   have the testimony of Barclays.  We served a 30(b)6 notice on

11   Barclays.  Barclays designated Mr. Ricci as its corporate

12   designee on the subject of disclosure of where it was disclosed

13   that Barclays was acquiring Lehman's margin assets.  As Mr.

14   Ricci acknowledged here, he got the notice, he met with his

15   counsel, he met with other Barclays executives.  And a month or

16   so after we served the notice, he testified at his deposition

17   and he repeated it here.  He said there were three disclosures:

18   one was the accounts that were published in 2009; another was a

19   clarification letter over the weekend; and the third, and the

20   only one that existed at the time of the sale hearing, he said

21   was the asset purchase agreement.  So we asked him, where in

22   the asset purchase agreement is there a disclosure that

23   Barclays is getting Lehman's margin.  And he pointed us to

24   "Purchased Assets", to the definition and to subparagraph (d),

25   the definition of the long positions.  And within that, to

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 123 of 260

Page 123

1    three words:  "exchange traded derivatives".  And he testified

2    that that was the disclosure that Barclays had made that it was

3    acquiring Lehman's cash, cash equivalents and government

4    securities.  And he confirmed that there is no other disclosure

5    that Barclays made in the asset purchase agreement other than

6    those three words.

7           Of course there is a difference between telling people

8    Barclays is taking exchange traded derivatives and telling

9    people Barclays is taking billions of dollars of Lehman's cash,

10   in cash equivalents, Lehman's margin assets.  And that's a

11   difference that Mr. Ricci, to his credit, Acknowledged.  He

12   acknowledged he understood the difference between exchange

13   traded derivatives, on the one hand, and Lehman's margin assets

14   on the other.

15          Now, of course, there was no disclosure of Lehman's

16   margin assets at the sale hearing on Friday night.  On the

17   contrary, the Court was repeatedly told that there was no

18   Lehman cash going to Barclays.  That's what the Court was told;

19   that's what the trustee was told.  That's what the world was

20   told.  After the sale hearing, we have this chronology where on

21   the Saturday, Barclays learned that Lehman had billions of

22   dollars in cash and cash equivalents at the OCC.  Within hours,

23   Barclays proposed adding Lehman cash and cash equivalents to

24   the deal.  Weil Gotshal rejected that proposal.  Barclays

25   appeared to accept Weil's deletion.  And then right before the

Page 124

1    closing, Barclays provided the famous parenthetical.  And after

2    confirming how much cash it was going to get from the OCC,

3    signed the transfer and assumption agreement.

4         The next couple of tabs, we walk through that

5    chronology.  We start in tab 16 with Barclays' proposal to add

6    margin.  What Mr. Rosen did was propose a carve-out to the

7    exclusion for cash.  So after the exclusion for cash, cash

8    equivalents, bank deposits or similar cash items, he put in

9    language that would have kept in the deal all of Lehman's cash

10   and cash equivalents at clearing agencies and clearing

11   organizations.  It specifically mentioned margin.  It

12   specifically mentioned guaranty funds deposit.  That's the

13   proposal that Weil Gotshal rejected.  And in the next slide, we

14   show Weil Gotshal's deletion.  Weil kept the exclusion for

15   cash, cash equivalents, bank deposits and so on.  It deleted

16   everything to do with clearing agency, clearing organization,

17   everything to do with margin and guaranty funds deposit.

18        In the next slide, we show the e-mail that Ed Rosen's

19   partner, Michael Mazzuchi, circulated just after 6 a.m. on

20   Monday morning, right before the closing.  And behind this

21   slide, we have the draft, that draft.  He says "The current

22   form of the clarification letter is attached.  The significance

23   of this draft is that it was a clean draft that reflected the

24   Weil Gotshal deletion."  And the draft contained no

25   parenthetical concerning exchange traded derivatives.  So it

Page 125

1   looked, as of 6:03 a.m. as though everybody was on board.

2   There was no Lehman cash or cash equivalents in the deal.

3          Mr. Rosen, however, was not on board.  And in the next

4   slide, we have his testimony where he admitted he was

5   specifically concerned about negative inferences that could

6   arise from Weil's deletion of his carve-out.  And so, he

7   proposed the famous parenthetical.  We have that in the next

8   slide.

9          Now, a question here is what does this obscure

10  parenthetical mean?  And in opening, we suggested that that

11  could be read simply as a reference to customer property.

12  Barclays, of course, says we're completely wrong about that.

13  And in the next slide, we put forward Barclays' position

14  pre-trial.  Pre-trial, they said, the parenthetical cannot

15  logically be read to apply at all let alone solely the customer

16  property.  Cannot be read to apply at all to customer property.

17  Well, we never heard that during trial.  There's not a single

18  witness who said that.  In fact, when Barclays put its witness,

19  Mr. Rosen, on the stand, Barclays conceded on direct

20  examination in its own questioning of Mr. Rosen that the

21  parenthetical could indeed be read to apply to customer

22  property.  And all they ask Mr. Rosen to say was that it's not

23  limited to customer property, to customer accounts, to customer

24  margin.  Barclays had to make that concession.  And the reason

25  they had to make that concession was because Mr. Rosen was

Page 126

1  already on record.  His deposition transcript is in the trial

2  record and it's in our next tab.  And I asked him at his

3  deposition, what did he think his parenthetical was picking up.

4  And the first thing he told me was customer property.

5       So we don't believe there's any genuine dispute that

6  this parenthetical can be read and should be read to apply to

7  customer property.  The only dispute is whether, as Barclays

8  claims, it should also be read to apply to Lehman's cash and

9  Lehman's cash equivalents and Lehman's margin and Lehman's

10  clearing fund deposits, all the terms that were in the original

11  Barclays proposal and which Barclays cut out of the

12  parenthetical all of the terms that Weil Gotshal rejected.

13       Now we say that having taken out all of those terms,

14  and we show them in the next tab, and having admitted that it

15  took out those terms expressly -- and those were Mr. Rosen's

16  words -- "to avoid becoming embroiled in extensive

17  negotiations".  Having taken all of those terms out, what

18  Barclays is left with, at best, is an ambiguous parenthetical

19  that it drafted.  If Barclays wanted this parenthetical to mean

20  more, if it wanted it to mean Lehman's cash and cash

21  equivalents and margin and bank deposit and guaranty fund

22  deposit, then it should have said so.  It should have made that

23  clear.  And as I think is evident from the fact that Barclays

24  can't keep its own story straight between its own reply brief

25  when it said this parenthetical cannot apply at all to customer

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 127 of 260

Page 127

1    brief and its own testimony at trial which concedes that it

2    absolutely can be, I think it is abundantly established that

3    there was nothing clear about this parenthetical.

4         The final point I would make, Your Honor, on the

5    subject of Lehman's margin concerns the subsidiary agreement

6    between Barclays, the trustee and the Options Clearing

7    Corporation.  And that is the so-called transfer and assumption

8    agreement.  It's the agreement that the trustee's

9    representative, Jim Kobak, signed while he was here at the sale

10   hearing after being told that there was Lehman cash going to

11   Barclays.

12        Barclays maintains in its briefing that "our

13   contention that the transfer and assumption agreement was not

14   approved by the Court is incorrect."  They say that paragraph 3

15   of the sale order explicitly approved "any additional

16   instruments or documents that may be reasonably necessary or

17   appropriate to implement the purchase agreement."  What

18   Barclays omits from that are the following, we submit,

19   important words:  "provided that such additional documents do

20   not materially change its terms".  We respectfully submit that

21   to the extent that Barclays relies on the transfer and

22   assumption agreement to claim 2.3 billion dollars of estate

23   cash and cash equivalents, that agreement materially changes

24   the purchase agreement and was never approved by this Court.

25        That brings me to the Lehman assets at the Depository

1   Trust Clearing Corporation.  In our next tab and behind the

2   slide, we include the evidentiary record that covers how the

3   clearing corporation was concerned about its massive exposure

4   to Lehman; how it rejected a 250 million guaranty unless

5   Barclays put up additional collateral; how the clearing

6   corporation threatened to cease to act when additional

7   collateral became unavailable; how the clearing corporation

8   never released its rights in the clearance box assets; and how

9   its representative, Isaac Montal, testified to the discussions

10  that the clearing corporation had with Barclays on Sunday

11  concerning what assets Barclays was taking and what collateral

12  it was providing; and finally, and most importantly, how the

13  clearing corporation documented Barclays' agreement that it was

14  not going to take any of the clearance box assets.

15       The record also shows, and we have a slide in tab 26,

16  how Barclays' Stephen King valued these assets at nil; how

17  Barclays did not want to lose the sail over a problem with the

18  clearing corporation.  In fact, you may recall that Bob Diamond

19  specifically warned Rich Ricci not to let anything fall through

20  the cracks.  And Mr. Ricci said that he put Gerard LaRocca in

21  charge of getting a deal with the clearing corporation.

22  Barclays ultimately broker the impasse with the clearing

23  corporation by agreeing not to take any assets.

24       Now, in our next slide, we cover the testimony of the

25  clearing corporation's witness, Isaac Montal.  He testified

Page 129

1    about he and his colleagues, including their general counsel

2    and their outside counsel, Shelly Hirshon, were involved with

3    discussions with Barclays on the Sunday including with DTC's

4    own board member, the Barclays executive, Gerard LaRocca, about

5    how the clearing corporation never agreed to release its rights

6    and how they continually pressed Barclays to explain what

7    assets Barclays wanted to take and what collateral Barclays

8    proposed to provide.

9            Ultimately, the discussions resulted in the critical

10   call in which, Mr. Montal testified, they were assured by

11   Barclays that they weren't taking anything.  And he explained

12   why that was so important to the clearing corporation.  It

13   ensured that the assets would be available in the Lehman

14   accounts to settle the open obligations that existed.  So the

15   clearing corporation was looking to those assets as a source of

16   protection.

17           Mr. Montal testified how the clearing corporation

18   documented the deal.  And we have that in the next slide.  The

19   contract -- and this is in tab 28 -- yeah.  The contract

20   specifically provided that these assets were excluded assets

21   within the meaning of the asset purchase agreement.  Barclays

22   maintains that these were just liabilities.  They were simply

23   excluded liabilities.  Well, not so.  The parties expressly use

24   the term "excluded assets" within the meaning of the asset

25   purchase agreement.  Barclays claims, no, this is just a

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 130 of 260

Page 130

1    reference to the accounts.  It deals only with accounts not

2    with the contents of the accounts.  Well, the contract directly

3    refutes that.

4         As we show in the second excerpt here, the contract

5    expressly provided that the trustee authorized DTC to deliver

6    securities.  Securities not accounts.  We're talking now about

7    the contents of the accounts, the specific  assets in the

8    accounts are the securities to which DTC is looking to for

9    protection.  How could the trustee authorize the delivery of

10   those securities if they all belonged to Barclays?

11        Now, in the next slide, we deal with a gap in the

12   trial record.  Barclays has Mr. LaRocca on its witness list but

13   it never called him live to respond to Mr. Montal's testimony.

14   So all we have is Mr. LaRocca's deposition.  At his deposition,

15   Mr. LaRocca confirmed that he was Barclays' global head of

16   operations, that he was a member of the board of DTC.  He

17   admitted that he signed the DTC letter agreement.  And that's

18   about all.  He didn't recall signing it.  When we showed him

19   the critical sentence that designated these as excluded assets

20   within the meaning of the asset purchase agreement, he couldn't

21   recall that language and he couldn't tell us what it meant.

22        The final point I would make on this asset, Your

23   Honor, is that in opening, I suggested that the record -- the

24   evidence would show that Weil Gotshal did not conform the draft

25   clarification letter to the DTCC letter because Weil was

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 131 of 260

Page 131

1   effectively a stranger to the DTCC letter.  You may recall that

2   Barclays objected to that.  They said that wasn't true.  They

3   said that Weil Gotshal was all over the DTCC letter.  So we

4   asked Mr. Miller.  We asked Harvey Miller, "Does the

5   clarification letter reflect any conscious effort to conform

6   that agreement with Barclays' separate letter agreement with

7   the DTCC?"  And Mr. Miller testified he didn't believe Weil

8   Gotshal saw the DTC letter.  We confirmed.  We asked him, "Are

9   you aware of any effort on the part of Weil Gotshal to conform

10  the clarification letter to the DTCC letter?"  And he answered,

11  "Since we did not have the letter, I don't believe there were

12  any efforts to do that."

13        Weil Gotshal was excluded from the DTCC negotiations.

14  You may recall Jonathan Hughes, Barclays' general counsel,

15  saying it was perfectly appropriate for Barclays to exclude

16  Weil Gotshal from those negotiations.  But having excluded Weil

17  Gotshal from those negotiations, Barclays cannot now argue that

18  Weil Gotshal was all over the DTCC letter agreement.

19        Your Honor, if you don't have any questions, I'll

20  reserve the rest of my time for rebuttal later.

21        THE COURT:  Okay.  By my math, the movants have used

22  three hours and twenty minutes of time.  Do I understand that

23  you are collectively reserving forty minutes?

24        MR. GAFFEY:  I believe that's right, Your Honor.

25        THE COURT:  And that you will allocate that in

Page 132

1    whatever way you deem appropriate at the time of using the

2    rebuttal should you choose to use the rebuttal?

3              MR. GAFFEY:  Yes, we will, Your Honor.

4              THE COURT:  Okay.  Mr. Boies, you're up.

5              MR. BOIES:  Thank you, Your Honor.  We, too, have

6    books which I also apologize for not being as efficient as last

7    counsel in having such a nice slim book.

8         (Pause)

9              MR. BOIES:  And I have a separate book for Rule 60(b)

10   motions and a separate book for our disputed assets enforcement

11   motion.  And then I have a very thin book that have some charts

12   that we did over the luncheon recess.

13             THE COURT:  You can distribute whatever you want to

14   distribute in any order you choose.

15             MR. BOIES:  Thank you very much, Your Honor.

16        (Pause)

17             MR. BOIES:  Movant's counsel have been very direct in

18   their arguments and I will try to be so as well.  And in that

19   connection, I want to note at the outset our view that as a

20   threshold matter, it is very important for the Court to

21   understand that the merits of movants 60(b) motion is based on

22   two false premises about what the record before this Court at

23   the sale order hearing shows.

24             THE COURT:  It's a computer disk.  I can't use it now

25   anyway.  It's on the floor.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 133 of 260

Page 133

1          MR. BOIES:  First, movants' counsel says to this Court

2     that this Court was not told information that the written

3     record shows that the Court was told.  Second, movants say to

4     this Court today that this Court was told assertions that the

5     written record shows this Court was not.  Fortunately, what

6     this Court was told, orally and in writing, is recorded.

7     Counsels' call for arguments cannot change the black and white

8     reality of what this Court was told.  One of the most important

9     things that movants' counsel want this Court to believe somehow

10    is that it was not told about the clarification letter.  And

11    counsel made a statement that I actually wrote down and then

12    went back and checked it on the live transcript.  At transcript

13    page 9, lines 21 to 23, counsel said, "The terms of the

14    clarification letter were never disclosed to the Court."

15          Your Honor, let me begin with my chart 73 which I was

16    going to get to a little bit later of which in view of

17    counsel's argument I think it's appropriate to start with.  And

18    that has to do with the sale order that this Court entered.

19    And as the Court will recall, the sale order expressly

20    referenced the clarification letter and defined it as part of

21    the purchase agreement.  And the sale order expressly

22    recognized that that clarification letter was in the process of

23    being modified or amended or clarified.  Those are the words

24    from the sale order.  And the sale order then went on to

25    expressly approve the purchase agreement including the

Page 134

1    clarification letter that the Court had specifically

2    identified.  That clarification letter was then filed with the

3    Court.  It was signed by the movants.  It was, in fact,

4    negotiated with them or in their presence.  There is simply no

5    basis, I suggest to the Court, to say to this Court today that

6    this Court did not have the terms of the clarification letter.

7    And this argument is an argument that arose not a week after

8    the sale hearing, not a month after the sale hearing, but many

9    months after the sale hearing during which time the

10   clarification letter was repeatedly cited not just by Barclays

11   but by the movants.

12          For example, let me go to my chart 214.  The movants

13   knew that the clarification letter was being revised throughout

14   that closing weekend.  And when it was finalized and executed

15   on the morning of September 22nd, they made the decision not to

16   object to it.  Representatives of the debtor and the trustee

17   executed the clarification letter.  And Weil Gotshal then filed

18   it with the court as part of the purchase agreement approved by

19   this Court's sale order.

20          The committee, for example, going to number 215, knew

21   and admitted that the changes to the transaction through the

22   clarification letter would be documented after the sale

23   hearing.  For example, Mr. O'Donnell testified:

24   "Q.  Did Milbank understand there was a provision to the sale

25   order concerning committee consent to possible changes in the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 135 of 260

Page 135

1    purchase agreement?

2    "A.  Yes."

3          Again, a recognition that the sale order itself

4    approved the clarification letter.

5    "Q.  Is that a provision that Milbank negotiated with Weil?

6    "A.  Yes.

7    "Q.  Tell me about Milbank's negotiations with Weil concerning

8    that provision of the sale order."

9          He goes on to say, after the first sentence:

10         "It was anticipated that changes might be made.  The

11    debtors have represented that to the Court and the committee

12    wanted to ensure that it had the ability to consent to any such

13    changes."

14         Mr. Despins, on the next set of transcripts, one of

15    the committee's lead lawyers, admitted at trial that he knew

16    that the clarification letter modified the transaction and he

17    did nothing.

18    "Q.  And so, is it fair to say in September of 2008 you were

19    aware that the clarification letter made certain changes to the

20    transaction?

21    "A.  That's a logical inference, yeah.

22    "Q.  And you testified that you had asked the Court that no

23    changes be made without your consent, correct?

24    "A.  Correct.

25    "Q.  And you had told Mr. Miller that he needed your consent,

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
Pg 136 of 260
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 136

1    correct?

2    "A.  Um-hmm.

3    "Q.  You have to answer audibly.

4    "A.  Yes.  I'm sorry.  Yes.

5    "Q.  And you didn't give your consent, did you?

6    "A.  No, we did not.

7    "Q.  Now, in fact, you believe that the clarification letter

8    did change the transaction presented to the Court, correct?

9    "A.  I think that a fair reading of that letter is that it did

10   modify the transaction, yes.

11   "Q.  And under those circumstances, you believed your consent

12   was required?

13   "A.  Correct.  That's correct.

14   "Q.  And it was never given.

15   "A.  That's correct."

16         There was no dispute about the existence of the

17   clarification letter or the terms or that this Court had

18   approved it.  They had -- and this Court was extremely clear

19   about this.  You told them, "If you got a problem, come back to

20   me.  I'm here.  I'll be here late.  I'll be here.  You can

21   reach me.  If you've got a problem, come back to me."

22         THE COURT:  Let me clear about something, Mr. Boies.

23   I never approved the clarification letter.  You're making a

24   circular argument about what the sale order says.  But I never

25   approved the clarification letter.  I said that at the opening

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 137 of 260

Page 137

1    and I'm saying it again at the closing.

2            MR. BOIES:  Your Honor, I appreciate that and I would

3    never --

4            THE COURT:  It was filed -- it was filed in the docket

5    of this case.  There are now well over 12,000 docket entries.

6    I do not know everything that is contained in every docket

7    entry.  No proceedings took place before this Court to approve

8    the clarification letter per se.

9            MR. BOIES:  Your Honor, I won't address that part of

10   it anymore if the Court wishes me not to.  But I think that --

11           THE COURT:  I'm just letting you know that that's an

12   aspect of your argument that I reject.

13           MR. BOIES:  Okay.  I understand that and I think I've

14   got an obligation to at least pursue it a little bit further so

15   that I have given this Court the benefit of my argument.

16           THE COURT:  Absolutely.

17           MR. BOIES:  And I do that out of the sense of fairness

18   to this Court because I don't want to make an argument on

19   appeal that I have not made to this Court.  And that is that,

20   with all due respect, Your Honor, I think that when the Court

21   enters an order, that order belongs not to the Court alone but

22   to all of the parties.  Barclays took action in reliance on

23   that sale order.  Whatever the Court's subjective

24   interpretation is, I respectfully suggest that what the Court

25   has to do is look at the written words, the black and white,

Page 138

```
 1    and interpret that as though it was not your order because I

 2    believe if you do not, then the kind of reliance the parties,

 3    such as Barclays, must have in order to make enormous

 4    commitments can't really be made.  I respect what the Court

 5    says and I won't go into this in detail.  But I felt I did need

 6    to say to the Court that I believe that the standard that the

 7    Court needs to apply is a question of law and not a subjective

 8    interpretation.

 9            Even if --

10            THE COURT:  I totally agree.  We're on the same page.

11            MR. BOIES:  Okay.

12            THE COURT:  The problem is that you're making an

13    argument about Court approval of the clarification letter and a

14    very critical feature of the current dispute.  And it is

15    absolutely clear, based upon the evidence, that the parties who

16    prepared the clarification letter during the weekend

17    immediately following the sale hearing were aware that one of

18    the options available to them was to come back to court and to

19    express approval of that document which everyone recognizes

20    effected so many substantial changes in the transaction.  In

21    lieu of doing that, the parties, including Barclays, determined

22    that no such approval was required and instead, the letter was

23    lodged in the docket.  Thereafter, it was referenced in various

24    pleadings.  But at not time did anyone ever seek formal

25    approval of that document.  That's the only point I'm making.
```

Page 139

1   You're certainly free to make whatever arguments you wish to

2   make as to the fair interpretation of the order.

3        MR. BOIES:  And that is really all I'm doing, Your

4   Honor, which is all I can do and all Mr. Miller could do, and

5   you heard his testimony, is look at the Court's order and look

6   at what the Court said in open court.  Look at the portion of

7   the sale order that expressly recognizes that it's going to be

8   in that clarification order.  It's part of the purchase

9   agreement.  It is expressly approved in that sale order.  And

10  the sale order recognizes that it is going to be changed.

11       Now one thing I think we can agree on, Your Honor, is

12  that this clarification letter was fully known by each of the

13  movants in September.  Whatever any of the people in this

14  courtroom did or did not do with this Court, they fully knew

15  that.  And for all of the reasons that we have cited, all of

16  the law that we have cited, in this circuit and from other

17  circuits, in terms of an inability of a party to know something

18  or even have the reasonable ability to know something and to

19  sit on it while that order is appealed and indeed while they

20  support the affirmance of that order in the district court and

21  then come back into this court and try to attack that order

22  based on changes that they allege that are clear from the face

23  of the clarification letter is something that the law does not

24  countenance.  And I would respectfully urge this Court not to

25  countenance.  And that has nothing to do with whether this

Page 140

1    Court approved it or not.  We can be in agreement that the

2    Court didn't approve it.  And that still would not have

3    affected their responsibility to act in a timely way before

4    this order was approved and before they support it on appeal

5    the affirmance of that order.

6          And to give you a sense, Your Honor, and I note these

7    not so much on my first point but on my second point.  On

8    September 29th, 2008, the debtor, LBI, not Barclays, the

9    debtor, filed a motion with Barclays to file the schedules to

10   the clarification letter under seal leaving entirely aside the

11   question of this Court's involvement.  This certainly further

12   evidences not only that they signed it, that they knew about

13   it, but they knew that it was being implemented.  They were

14   filing the schedules under the seal.  We're giving them a copy.

15   But were filing them under seal and that required a motion.

16   And that was at slide 76.

17         Let me turn to slide 77.  On October 2nd, 2008, the

18   trustee successfully opposed a TRO by arguing that the

19   clarification letter provided for all repo collateral to be

20   transferred to Barclays.  The Court may recall that on

21   September 26th, 2008, the party filed a complaint emergency

22   motion seeking to compel the trustee to transfer certain

23   securities.  On October 2nd, 2008, the trustee opposed that

24   arguing that the case was "a nonstarter" because the securities

25   were transferred to Barclays Capital -- and this is a quote

Page 141

1    from the trustee -- "in connection with the sale of assets that

2    was the subject of the Court's order dated September 20, 2008."

3    The trustee's representatives explained:  "Paragraph 13 of the

4    clarifying letter states that the securities held by Barclays

5    under the Barclays repurchase agreement as defined are deemed

6    to constitute purchased assets."

7            So not only are they evidencing knowledge of the

8    clarification letter, they're relying on it in the arguments

9    they're making to this Court and they are, of course,

10   acknowledging that it deals with the so-called repo.  Another

11   issue that movants were arguing that the Court had not known

12   about.

13           Let me turn to slide 79.  In December 2008, the

14   movants again invoke the clarification letter in court this

15   time seeking approval for the so-called December settlement.

16   For example, the trustee motion for approval, paragraph 16,

17   says "The clarification letter provided that the replacement

18   transaction was terminated and for securities that have

19   actually been delivered they're deemed to constitute part of

20   the purchased assets under the purchase agreement."

21           Now, the Court also heard argument today that somehow

22   the termination of the replacement transaction was something

23   that raised a problem that the Court wasn't told about.  Again,

24   leaving aside the question of how much this Court believes that

25   these kind of documents are disclosure to the Court, they

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 142

1   clearly reflect that the movants here knew and relied on.  And

2   for them to say that this wasn't disclosed to the Court I think

3   is wrong.  But for them to say months after the fact, we're

4   going to base a Rule 60 motion on matters that are plainly

5   described and set forth on the face of the clarification letter

6   that they signed, knew about and acted upon for months, I think

7   does not begin to approach the kind of burden that they have

8   for attacking an order that has been entered by this Court let

9   alone an order that has been affirmed on appeal let alone an

10  order that has been affirmed on appeal at their instance.

11          So I would say to the Court that when they tell this

12  Court that the clarification letter was this amendment, this

13  enormous change that it added all these additional assets, that

14  it took out a reference to book value, that it took out the

15  estimate or any estimate of the value of the assets, that it

16  changed it in terms of the repo transaction, all of the things

17  that they're complaining about to this Court, all the things

18  that they say this Court didn't know, does not disclose to this

19  Court -- all of those things they knew at the time because, as

20  they now admit, that is plain from the face of the

21  clarification letter.  That is why they argue that this Court

22  didn't approve it.  But I suggest to this Court that whether or

23  not this Court approved the clarification letter they can't sit

24  back in the reeds, wait to see how things develop, see whether

25  the markets recover or not, and then come in and say, we want a

Page 143

1    do-over because the clarification wasn't adequately described

2    to the Court when they knew about it all the time.

3           I guarantee you, Your Honor, that if the markets had

4    crashed, if this transaction had been a failure, if Barclays

5    had lost billions of dollars, they wouldn't be coming back in

6    here and saying let's redo the transaction.  Their argument is

7    that if they see something that they think is not adequately

8    disclosed to the Court they can put it in their pocket, wait

9    until they see if this turns out to be a good deal or bad deal,

10   use the clarification letter as if it were approved by the

11   Court because they certainly treated it, Your Honor, as it

12   being approved by the Court, even if you didn't approve it,

13   they certainly acted as if you did, we acted as if you did, we

14   both argued to you based on its terms.  So all the parties here

15   are acting as if you have approved it.  All of us know about

16   it.  And yet they're saying they can put it in their pocket,

17   they can see what happens and if it turns out that the enormous

18   risk that Barclays takes and took turns out to be successful

19   they can come in and take it out of their pocket and say this

20   is a basis for undoing that sale order and taking another, they

21   say today, thirteen billion dollars from Barclays.  And I

22   suggest there has never been a case that remotely supports

23   that.  I suggest to you there's nothing in the statute.  And I

24   suggest to you that no Court has ever even approached such an

25   interpretation of Rule 60.

Page 144

1          Now there's another premise that underlies movants'

2     argument.  And that is a wholesale attack on the integrity of

3     Lehman's businesspeople apparently with the sole exception of

4     Mr. McDade who I will come to.  Even Mr. Seery, respected

5     Sidley Austin partner, who has no incentive to come in to this

6     court and say anything under oath that was not true, is accused

7     of a great lack of candor.  Now the reason the movants'

8     wholesale attack on the integrity of former Lehman personnel,

9     some of whom are now at Barclays and some of whom are not, like

10    Mr. Seery, is that it is impossible to reconcile movants'

11    claims here with the sworn testimony of those executives about

12    what they were doing and what they knew at the time.  And so

13    what the movants do is they come in and they say we want you to

14    sweep all that away because these people were,-- they implied

15    today and said in their papers, were breaching their fiduciary

16    duties.

17          Now I remind the Court, if I can go to slide 82, that

18    they identified certain individuals who they said breached

19    their fiduciary duty.  Those did not include Mr. McDade.  They

20    did not include Mr. Schaffer, Mr. Berkenfeld, Mr. Shapiro.

21    They did not include Jim Seery until they heard his testimony

22    and didn't like it.  They did not include Robert Azerad.

23          To go to the next chart, they did identify eight

24    people who they said had committed breach of their fiduciary

25    duty.  And yet, there was not a single shred of evidence in

Page 145

1    this trial to support that allegation.  And they don't even

2    really make it explicitly in their argument.  They make it by

3    innuendo.  They talk about bonuses.  They disregard the

4    testimony by Mr. McDade who they admit is their one honest man,

5    that that bonus approach was normal for the industry.  And he

6    didn't believe it affected anybody is the kind of bonuses they

7    would have gotten if they stayed at Lehman or if they had gone

8    someplace else.  It was an attack by innuendo, not by evidence.

9    And yet, based on that innuendo and without evidence, they

10   asked this Court to wholesale ignore the testimony of the

11   Lehman people.  And the reason that's so important, Your Honor,

12   is because it is only that way that they can make any of the

13   arguments that they make to this Court.

14           It was not just Mr. McDade and others from Lehman who

15   testified that they did not believe anybody had committed any

16   breach of fiduciary duty.  Mr. Miller testified to that at

17   slide 86.  I asked him questions about this at his deposition

18   and he was asked questions -- this at his trial:

19   "Q.  Did you believe that the information that you were

20   receiving from Lehman was information that you could rely on in

21   making the representations to Court?

22   "A.  I assumed that the people at Lehman were operating in good

23   faith and I had no reason to doubt them."

24           And this is at the trial, Your Honor.  This is after

25   everything has come out, all the stuff about the bonuses, all

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 146 of 260

Page 146

1    the stuff about what people knew.  Question to Mr. Miller:

2    "Q.  Have you ever had any reason to doubt it, based on

3    anything that you have come across since September of 2008?

4    "A.  No."

5          And then later on:

6    "Q.  And have you found anything since then, since the sale

7    hearing, that has led you to believe that the information that

8    you were given was inaccurate or that the people at Lehman were

9    not operating in good faith?

10   "A.  No."

11         As of this trial, Your Honor, after all the things

12   that the movants have shown him and given him.

13         At slide 87, Lehman's financial advisor, Barry

14   Ridings, testified to the same thing.

15   "Q.  Do you have any reason to believe that those at Lehman who

16   were dealing with Barclays that week were not acting in good

17   faith?

18   "A.  I have no reason to believe that to be the case.

19   "Q.  Let me include in that question Mr. McDade, Mr. Tonucci,

20   Mr. Kirk and Mr. Lowitt.  Do you have any reason to believe any

21   of them did not act in good faith in their dealings with

22   Barclays leading up to September 19th?

23   "A.  I think they all acted in good faith."

24         You remember the chairman of LBHI, Mr. Ainslie,

25   testifying at trial.  We asked him:

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 147 of 260

Page 147

1    "Q.  As you sit here now, based on everything you know, is

2    there any Lehman employee who you believe breached their duty

3    during the Barclays sale process?

4    "A.  No."

5            And this is consistent with all the testimony that

6    this Court heard about how this was an arm's length, highly

7    negotiated transaction.  You had people on either side trying,

8    in very difficult times, to arrive at a solution that both

9    sides thought was fair.  They were trying to negotiate.  They

10   were doing the best they could and they struck a deal and that

11   deal was a deal that was then disclosed to the Court.  It was

12   not a deal that anybody could come in and give you precise

13   numbers on.  There is assertions that this was a deal that was

14   imbalanced and sometimes it says, people say, in rough bounds

15   or approximate bounds and I want to come to what those words

16   means.

17           That this was, as this Court I think notes, a time

18   where everybody has said the assets were extremely volatile,

19   the markets were shut, there was a liquidity crisis the likes

20   of which we haven't seen since the depression and nobody knew

21   what these assets were really worth.

22           And what the Court heard today was a number of

23   selected quotations from documents that use various numbers.

24   What the Court has also seen at trial, and what I'm going to go

25   through, are some documents that use very different numbers.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 148 of 260

Page 148

1        But when it's all said in done, what the Court is going to

2    have in front of it are a whole series of different and

3    inconsistent estimates.  Estimates that varied from person to

4    person, even at the same time.  Estimates by the same person

5    that changed substantially over time, just in those few days of

6    that one week because of the turmoil in the market, because of

7    the uncertainty.  Because o the uncertainty even as to what

8    assets Lehman had at that point.  And that uncertainty led

9    people, both during the process and immediately after the

10   process, to have widely varying estimates.

11        Now what the movants want to do is they want to take

12   all of the high estimates and say well this is what it was

13   really worth and the Court wasn't told that.  And we probably

14   are guilty, to some extent, of taking all of the low estimates

15   and coming to the Court and say, see how reasonable the deal

16   was.

17        The fact of the matter is that all those conflicting

18   estimates do is say to the Court that this was a period of

19   great uncertainty and great difficult in coming up with exactly

20   what the right number was.  And determining what the right

21   number was involved knowing what the assets were, which Lehman

22   didn't, knowing what the value of those assets were, nobody

23   did, particularly for the large number of assets that were

24   liquid, and then deciding what the standard was, what the

25   criteria was.

Page 149

1          We even say this Court was told that the numbers that

2      it was given were book value.  Book value was mentioned in the

3      first version on of the APA.  It is nowhere in the

4      clarification letter and it was nowhere in the sale hearing.

5          They say, well if it wasn't book value it was market

6      value.  The term market value is nowhere in the sale hearing

7      except in one place where they're talking about the customer

8      accounts.  They knew how to use market value when they wanted

9      to, they didn't use market value.

10         Now they didn't use liquidation value either.  And as

11     you know, probably a lot better than I do, and as Mr. Seery

12     knows a lot better than I do, liquidation value is used in a

13     lot of different ways.  And he testified about how there was a

14     bankruptcy meaning of liquidation value and then there's a way

15     that traders and investment bankers use the term liquidating

16     value, simply meaning the value that you can get if you sell

17     it.

18         Now none of those terms were defined.  None of those

19     terms were presented in court.  Anybody could have done that.

20     Very possibly with more time and if this had not been something

21     that had been going on for a few days but it had been going on

22     like this case has been, literally for months, or even if it

23     had been a case in which conditions permitted an exposition

24     that went over several weeks or even a few weeks, there would

25     have been greater precision and greater detail.

1          But as this Court knows, that's not the standard.  I'm

2    not a bankruptcy expert.  Mr. Gaffey probably knows more about

3    bankruptcy than I do.

4          THE COURT:  I wouldn't go that far.

5          MR. BOIES:  But I do know enough that under 363 and

6    under the Bankruptcy Code what is at issue is does this make

7    business sense for the debtor.  And what I'm going to try to do

8    today is to show you that even if this was not a Rule 60(b)

9    motion with all the hurdles that I think exist, that even if

10   this were not 2010 in October, it was twenty-five months ago in

11   September of 2008, and this Court had available to it all of

12   the information that has taken us months or years to find,

13   collate, marshal and present it should still be the Court's

14   decision that this was the right transaction, that it was fair

15   to the estate, it was fair to the creditors, it was the best

16   transaction available.

17         And one of movants' counsel suggested that among the

18   argument is the finality of bankruptcy orders.  It will come as

19   no surprise that we do think that's a very important argument.

20   But this is not our only argument, it's not even the argument

21   that I really want to start with.  Because I want to start and

22   I want to address what I know is at the heart of this Court's

23   concern, which is if you had known everything that you possibly

24   could have known then, if everything that could possibly have

25   been disclosed was disclosed, if you had had not a few hours or

Page 151

1    a few days but weeks or even months to look at this, would you

2    have done the same thing.  And I want to address that issue and

3    I want to address that issue with respect to each of the claims

4    that they raise.

5           And I want to begin by addressing it with respect to a

6    claim that counsel said he wasn't going to address but then

7    did, which was the line in the original APA that talked about

8    the seventy billion dollars of wrong book value.  And he

9    suggested that that number had somehow been manipulated.

10          Now, as introductory to that I want to emphasize some

11   of the evidence that exists about how this deal was never

12   intended, could never have been but was certainly never

13   intended to be what has sometimes been referred to in this

14   trial as awash.  And let me begin by going to chart 13, which

15   is Mr. Miller's testimony.

16   "Q.  Did you ever represent to the Court that this deal was

17   going to be 'a wash'?

18   "A.  I did not.

19   "Q.  Did you say in words or in substance to the Court on the

20   17th or the 19th that assets and liabilities 'in balance'?

21   "A.  Since I didn't view the deal as that kind of transaction

22   I'm sure I never said that."

23          Now the Court is aware, as we indicate on slide 11,

24   that the APA included no representation or warranty regarding

25   the value of the purchased assets and assumed liabilities.  No

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 152 of 260

Page 152

1    requirement of any definite relationship between purchase

2    assets and assumed liabilities.  No requirement, obviously, no

3    provision of any kind regarding the ultimate impact on the

4    Barclays or Lehman balance sheet.  No requirement for any

5    appraisal of final valuation of financial inventory or any

6    other purchased asset other than for real estate.  And never

7    contained a true-up that would require a final valuation or

8    accounting for all the financial inventory.  All the kinds of

9    things that would ordinarily be required, ordinarily be written

10   if you were going to have a transaction that was in balance or

11   awash.

12        Now significantly, although there was never a complete

13   true-up drafted, as we indicate on slide 12, there was a

14   provision that the Court was told about at the hearing for some

15   limited upside sharing.  And as this Court was told at the

16   hearing "There was an upside sharing in the original

17   transaction.  There was going to be a true-up twelve months

18   later on and that has been eliminated from this transaction."

19        Well, not only was the Court not told that there was

20   going to be awash or that everything was going to be in

21   balance, the Court at the hearing was told that there had been

22   a true-up provision but that true-up provision had been

23   eliminated.

24        Now, Mr. McDade testified in a portion of his

25   testimony that movants' counsel directed your attention to,

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 153 of 260

Page 153

1    that he thought there was going to be a rough balance between

2    certain assets and certain liabilities.

3         Now, I hope the Court remembers that on my cross

4    examination he testified what he meant by that and I'm going to

5    come to that.  But significantly for my present purpose, he was

6    asked whether, and this is at slide 14, he'd ever had any

7    conversations with anyone from Barclays about the deal being

8    awash or any requirement that assets and liabilities match or

9    balance and he said "No, I did not".

10        A theme that I said in my opening that I would return

11   to is the theme that under the law subjective, unexpressed

12   intent is irrelevant to interpreting a contract.  Almost

13   everything this Court heard this morning was subject,

14   unexpressed intent.

15        The Court will recall that when their witnesses came

16   to the stand and they testified about what they thought things

17   meant, I or one of my colleagues would ask them, did you ever

18   tell anybody from Barclays that?  And the answer was no.  Did

19   you ever communicate that, in any way, to anybody at Barclays?

20   The answer was no.

21        I respectfully suggest to the Court that the clear

22   legal standard is first if the plain language is unambiguous

23   you must stop there.  But if you find an ambiguity, you must

24   then look only at extrinsic evidence of what the parties

25   exchanged.  It's an objective test, not a subjective test.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 154 of 260

Page 154

1   Subjective, unexpressed intent is irrelevant and I may even

2   have a slide on that and somebody will help me find, in my

3   book, where that is.

4           It is in, and I apologize for this Your Honor, it's

5   the in second book.

6           THE COURT:  Which you have to hand up.

7           MR. BOIES:  Did we not hand up the second.  Oh, I

8   apologize, we haven't handed up our second book.

9           THE COURT:  Is this a good time to hand it up?

10          MR. BOIES:  It would be, Your Honor.

11      (Pause)

12          THE COURT:  Is your live notes working?

13          MR. BOIES:  None of our live notes are working.  Mr.

14  Gaffey and I have been suffering in silence.

15          THE COURT:  Well, I'm glad it wasn't just me.

16          MR. BOIES:  No.

17          This is in the book that's headed disputed assets and

18  it's slide 304.  And it's a series of citations to materials

19  that repeat, probably more than is necessary, a whole series of

20  Second Circuit cases that make clear that the subject intent of

21  the parties of the irrelevant.  That only objective

22  manifestations of intent are relevant for interpreting the

23  contract.

24          And while we're on the subject of law, if you turn to

25  slide 301, we cite the Allegiance Telecom case and the Metro

Page 155

1   Life Insurance cases for the, probably, black letter of

2   opposition that a Court should not look beyond the confines of

3   the contract to extrinsic evidence that's relevant provisions

4   are plain and unambiguous.  And then from Metro Life, "Language

5   whose meaning is otherwise plain and not ambiguous merely

6   because the parties urge different interpretations in

7   litigation."  Those interpretations are for the Court as a

8   matter of law.  If you find ambiguity then we go to extrinsic

9   evidence.  If we go to only objectively manifested extrinsic

10  evidence that has been communicated.  Subjective or unexpressed

11  evidence is irrelevant.

12         I said I would also talk about what the so-called wash

13  concept meant.  And counsel directed your attention to the

14  Lehman board minutes for the meeting that they approved the

15  sale.  And it talked about the concept of a wash, if you recall

16  that.

17         I think what's important, if you turn to, and I'm now

18  back in my big book and I apologize Your Honor, this is slide

19  15, maybe we can put it up on the screen, when you go to the

20  draft minutes, remember the meeting approving this had been in

21  the middle of September, still at the end of October 2008 the

22  draft Lehman Board minutes, after several drafts, show that the

23  wash concept that they were talking about involved assets of

24  seventy billion and liabilities of sixty-four billion, a six

25  billion dollar difference.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 156 of 260

Page 156

1          Now, it is true that that's plus or minus ten percent.

2    And if you take Mr. Bart McDade's testimony about rough balance

3    or rough equivalents a variation of ten percent might fall

4    within that definition.  And obviously the Lehman board

5    believed that they could properly characterize this as a wash

6    even with a six billion dollar differential.

7          So I think that the thing that you maybe take away

8    from this is that even if you thought that this was a wash, and

9    I would urge you that that was never said to the Court and

10   never represented to the Court and the record is quite clear on

11   that, but even if you're talking about what's in people's

12   subjective minds, which I also say ought not to be relevant.

13         You've got to take into account the size of the

14   transaction.  And a buffer, in counsel's words and in the words

15   of some of the documents in this case, of four billion dollars

16   sounds like.  It is a relatively small percentage of the total

17   transaction that is involved.  And I note that the size of the

18   transaction went down from seventy to forty-five or forty-six

19   and a half, I think the cash payment from Barclays was.  And a

20   four billion dollar buffer is still in approximately the same

21   somewhat less than ten percent range as the number that the

22   Lehman board was talking about.

23         So I think that you have to take into account, when

24   you are thinking about these concepts, if you're going to think

25   about the subjective intent at all, what is being meant by

Page 157

1    that.

2          I think you also have to take into account that

3    everybody understood, if you think subjective intent is

4    relevant, everybody understood that without warranties and a

5    post-closing reconciliation and true up provisions there could

6    not be a wash, there could not be a transaction in balance or

7    roughly in balance.  For example, if you go to our slide 17

8    Lehman Board member Michael Ainslie testified at trial and I

9    asked him during his deposition whether the could figure any

10   way to accomplish and equivalence of assets to liabilities or a

11   wash without the use of a true-up provision.  Answer, "No I

12   can't."  And then I asked him "Do you believe today, given

13   everything that you know, that it was a mistake on Lehman's

14   part not to have a true-up clause of the kind you describe?"

15   Answer, "In my opinion, yes.  That kind of mistake, a

16   negotiating mistake if it was one, and I don't really suggest

17   that it was, but even if you credit this testimony that it was

18   a negotiating mistake not to have a true-up provision, that is

19   not a grounds for reopening the sale order, particularly since

20   this Court, in open court with all the movants' representatives

21   present, was told that there had been a true-up provision and

22   that true-up provision had been removed.

23          So if anybody wanted to say to this Court, no we need

24   a true-up provision because we want a wash, we want a

25   transaction that's roughly in balance, they could have said to

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 158 of 260

Page 158

1    the Court no don't approve this without a true-up provision,

2    but nobody did because nobody thought, Your Honor, that that's

3    what was going on and nobody could have thought that given the

4    volatility of the markets.

5         Lehman's CEO, Bryan Marsal, who testified here, I

6    asked him:

7    "Q.  Given the uncertainty that existed with respect to the

8    valuation of these assets, the fact that the valuations were

9    changing, am I correct that it really would not have been

10   possible to have a transaction with actual wash unless you have

11   some kind of true-up provision?

12   "A.  Yes."

13        And everybody recognized, I would suggest to the

14   Court, that at the time.  Everybody recognized that you

15   couldn't have a wash or a transaction that was even roughly in

16   balance without a true-up provision.  Everybody knew the true-

17   up provision had been taken out.  Nobody objected to that

18   because nobody thought that that was the nature of the

19   transaction that was being done.

20        It's also, I think, important because of the emphasis

21   that movants' counsel place on market value and book value,

22   terms that were not used at the September 19th sale hearing

23   except for market value with respect to certain customer

24   accounts and do not appear anywhere in the clarification

25   letter.

Page 159

1           But given that argument I think it's useful to look at

2    Lehman board's approval, which counsel for the movants also

3    gave to the Court this morning and that's slide 20.  And again,

4    at trial I asked Lehman's representative and board member

5    Michael Ainslie:

6    "Q.  Now when you expected and liabilities to be in the words

7    of the Lehman minutes, basically equivalent, was that based on

8    liquidation value?

9    "A.  Again, management was to put the deal together.  We

10   approved the outlines of the deal, the framework of the deal,

11   and the way in which they value the assets was to be

12   implemented by management.

13   "Q.  Did you, as a director, have any understanding, one way or

14   the other, as to whether Lehman's assets, for purposes of the

15   Barclays transaction, were being valued on a liquidation value

16   basis?

17   "A.  No.

18   "Q.  Now did you or the board give any consideration as to

19   whether management should be instructed to try to use fair

20   market value as opposed to liquidation value or vice versa?

21   "A.  No, we did not.

22           Now there's no dispute, obviously, that all the

23   numbers given to the Court were far above liquidation value.

24   I'm not suggesting the liquidation value was the value that

25   people picked.  What I'm saying is that this was not a

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 160 of 260

Page 160

1    transaction in which there is any evidence that anybody

2    believed, or that anybody represented to the Court or

3    represented to each other, that this was a deal that was going

4    to be based on a rough equivalence of market value to market

5    value or book value to book value.

6          Let me cover, very quickly, this question about the

7    seventy billion dollars in the APA, because counsel keeps

8    coming back to it and even though, obviously, that didn't end

9    up in the final transaction, I don't want the Court to think

10   that there was some game being played at that time.  And in

11   that connection I'd ask the Court to look at tab 22, begin at

12   tab 22.  And there's something of a bake and switch going on

13   here in the sense that the APA's definition of purchase assets

14   includes seventy billion dollars, approximately, of what are

15   referred to as long positions.  Separate from that is fifty

16   percent of the residential real estate mortgage securities.

17   The first in subparagraph D, the second in subparagraph E as

18   the Court can see.

19          The evidence shows that the collateralized short term

20   agreements, the residential real estate mortgage securities

21   being transferred to Barclays were received from Lehman loans

22   were worth approximate ten billion dollars and had not been

23   subject to any write downs.

24          You've got to -- when you look at the charts that they

25   give you, you've got to look at where they got these

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 161 of 260

Page 161

1    residential mortgages.  Because if they've got the residential

2    mortgages in a column that adds up with the long positions

3    you'd get to seventy-five million dollars -- seventy-five

4    billion dollars and that is one of the confusions, I think, in

5    some of the papers.

6          But if you just look at what's being added up and you

7    take out the residential mortgage securities or the mortgage

8    securities, what you do is you get back down to seventy billion

9    dollars.

10          Now in addition, if you look at our tab 23, and this

11    was one of our expert's demonstrative exhibits, if you look at

12    the GFS data, which witnesses repeatedly said you've got to

13    look at this if you're going to know what the Lehman marks are,

14    you see for each day from December 12th to the 19th it shows

15    the long positions, that is what's covered in subparagraph D of

16    less than seventy billion dollars.

17          And if you go to tab 24 what you see is a calculation

18    that takes it down by GAAP asset type for the balance sheet of

19    Lehman Brothers as of September 12th, 2008, to sixty-five

20    billion dollars.  And then if look at slide 25 you see what I'm

21    talking about in terms of how you add up the various securities

22    that are here.  And if you take them apples to apples, it comes

23    up to be actually less than the seventy billion dollars that

24    was estimated there.

25          As I say, I don't think that that's directly relevant

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 162 of 260

Page 162

1    to what is before the Court, but I think it's important that

2    the Court understand that that seventy billion dollars was a

3    good faith estimate at the time of the long positions, not of

4    long positions plus the residential mortgages, which were

5    separately stated in the APA.

6        Now we've got a lot of exhibits in here on that issue

7    but I'm going to skip those because I think there are more

8    important things to focus on.

9        Let me focus on what is at issue here in terms of

10    valuation, which is the so-called repo collateral.  Now first,

11    movants again told the Court that the Court was not told at the

12    sale hearing that there had been a repo.  That's not accurate.

13        Can we put on page 63; I've memorized the page it's

14    on.  At page 63, this is, I guess maybe this actually is a

15    slide that we have, it's got a number 270, but this is a quote

16    from Mr. Miller's presentation to you on September 19th and he

17    says, "Barclays, Your Honor, has extended the sale to enable

18    this extraordinary transaction and hopefully to be

19    consummated."

20        Yesterday, as Your Honor has heard, Barclays basically

21    stepped into the shoes of the Federal Reserve in connection

22    with a primary dealer credit facility, that's the repo, as to

23    the 45.5 billion dollars Lehman borrowed last money and

24    received the collateral that Lehman had posted in connection

25    therewith.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 163 of 260

Page 163

1          So there's no doubt that that's being referenced to

2     the Court.  There's no doubt that the Court's being told that

3     what's now happening is Barclays has paid out 45.5 billion

4     dollars and, as it says here, Mr. Miller said to you received

5     the collateral that Lehman had posted in connection therewith.

6          Now there was disagreement about what the value of

7     that collateral was, what the value of the repo collateral was.

8     And I want to go to Mr. McDade at this point because he's, sort

9     of, the one honest man that the movants identify from Lehman.

10    And so that you have some context for what Mr. McDade told the

11    Court, I'm going to take you through a series of statements

12    that Mr. McDade made, several of them deal directly with the

13    point I'm now addressing.  I think they're broader but I think

14    the Court may find it useful to see some of Mr. McDade's

15    testimony in context.

16         Let me begin -- we have helpfully cut off all of the

17    references to page numbers -- what's the first page number?

18    Nineteen, this is at page 19 of the trial transcript.

19    "Q.  I'd like to direct your attention now to the circumstances

20    of the week of September 15th, 2008.  The markets at that

21    point, during that week -- throughout that week were, I think

22    you've described them, tumultuous and volatile, correct?

23    "A.  That's correct.

24    "Q.  And the market had changed dramatically from Friday to

25    Saturday and then again from Saturday to Sunday, again from

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC, et al.
Pg 164 of 260

Page 164

1    Sunday to Monday and changed again from Monday at 9 a.m. to

2    Monday at 11 a.m. and continued to change, correct?

3    "A.  Yes, they did.

4    "Q.  And the prices were changing dramatically, correct?

5    "A.  That's correct.

6    "Q.  Now at your deposition you said that all the markets had

7    shut down, can you explain what you mean by that?

8    "A.  What I meant by markets shutting down, normal trading

9    volumes had shrunk to small percentages of their norm in all

10   asset classes, from liquid asset classes like government

11   securities all the way through to the lesser liquid asset

12   classes.

13       There was a tremendous amount of uncertainty and really a

14   shrinkage of capital that was being used by market makers

15   across the world.

16           And I think it is useful to keep in mind the context

17   in which this was happening, not because it changes the

18   standard that the Court applies.  Not because it changes, in

19   any way, people's obligation to be candid and fulsome in their

20   descriptions to the Court but because it shows why this

21   transaction was necessary and appropriate and why the kind of

22   transaction that the movants now argue for simply could not and

23   would not ever have been done under those circumstances.

24           Let me go to page 21:

25   "Q.  And you recognize that Barclays, in the deal that was

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 165 of 260

Page 165

1    ultimately done, was taking on a tremendous risk, correct?

2    "A.  Yes they were.

3    "Q.  And that had to do with the size of the transaction, the

4    volatility of markets, the illiquidity of some of the assets

5    and many other considerations, correct?

6    "A.  Yes."

7            And again, I emphasize this because we agree with

8    movants that Mr. McDade is somebody to be listened to and

9    relied on by the Court.

10           Now let me turn to asset valuations, which was the

11   point that I started with.  This is at page 152.

12   "Q.  Now did the valuation that was achieved with regard to the

13   assets contain any delta between the book value at which Lehman

14   carried those assets and the price that Barclays would pay?

15   "A.  To the best of my understanding we would not mark the

16   books since Friday evening close because we have so many

17   operational challenges given the bankruptcy announcement on

18   Sunday with just employees, loss of employees.  So yes, my

19   understanding is that marking process, the valuing process,

20   that dialogue amongst the different risk groups would have

21   delivered a different outcome than the marks on Friday given

22   everything that happened to Lehman in the marketplace."

23           Now I want to jump to another subject within Mr.

24   McDade and that's the so-called five billion dollar

25   differential and this is at page 31.

Page 166

1    "Q.  Now this five billion dollar differential or approximate

2    five billion dollar differential you would not describe as a

3    discount, correct?

4    "A.  I would not describe it as a discount, that's correct.

5    "Q.  You would describe it as a change in the valuation of the

6    assets, correct?

7    "A.  That's correct."

8          And then, page 250, this is --

9    Q.   Is it your understanding that Barclays had wanted to

10   ascribe even lower value to these assets then is reflected on

11   that Exhibit 19?

12   A.   Very much so.

13         And I direct the Court's attention to that just to

14   show that this was not a situation where Barclays was dictating

15   the values.  This was a situation in which you had two people,

16   at arm's length, trying to arrive at what the values were.  And

17   movants' counsel make a big thing of whether Mr. Seery

18   described this as negotiating or cutting a deal on valuation.

19   But whether you call it cutting a deal or negotiating what you

20   had was you had two parties at arm's length, very aggressively,

21   trying to protect their rights and arriving at this ultimate

22   conclusion.

23         I want to go back to 252, and this is in the context

24   of the five billion dollar figure that I talked about earlier:

25   "Q.  When you say 'we have marked our books appropriately,'

Page 167

1    what are you referring to?

2    "A.  You asked me about the five billion dollar figure, I

3    think, in your question?

4    "Q.  Right.  Yes.

5    "A.  I'm just saying that our responsibility was to mark our

6    books to market each evening.

7    "Q.  Right.

8    "A.  On Friday September 12 we had done that.  You then pointed

9    out that the price on Exhibit 19 happens to be a five billion

10   dollar difference.  I'm suggesting that we went through a

11   thorough process in terms of getting to the place on September

12   16 where this reflected the fair market value.  So therefore I

13   viewed it to be fair on Friday, fair and Tuesday and so that

14   would reflect the five billion dollar change in terms of

15   process."

16           He went on and talked a lot about this.  I'm going to

17   skip to page 187.

18   "Q.  Did you have enough knowledge at the time to know the

19   amount of money that Barclays advanced under the repurchase

20   agreement?

21   "A.  Approximately.

22   "Q.  How much was it?

23   "A.  Forty-five billion.

24   "Q.  And did you have enough knowledge at the time to have an

25   understanding of who much collateral Lehman gave to Barclays in

Page 168

1   connection with the repo agreement?

2   "A.   Approximately.

3   "Q.   Who much was that?

4   "A.   Fifty billion."

5           Now let me skip to page 224, line 7.

6   "Q.   I want to know about the forty-five, putting aside the

7   15(c)(3), the unencumbered box, isn't it right that you're deal

8   team and Barclays' deal team went through a process to value

9   the assets that went to Barclays as part of the fed repo and

10  concluded out of that process the value is forty-five billion

11  dollars.

12  "A.   To the best of my knowledge, yes.

13  "Q.   Okay.   And that is when you heard it, it was your

14  understanding that that was the market value of that

15  collateral, is that right?

16  "A.   That's correct.

17  "Q.   And your understanding of market value is the ability to

18  transact securities of a normal lot size in the marketplace, is

19  that right?

20  "A.   That's right.

21          Now, the significance of this is not whether that is

22  the right standard or not because this is, like much of the

23  other evidence that the Court has heard, unexpressed subjective

24  intent.   And so I'm not saying that this controls.

25          I offer it, though, so that the Court understand what

Page 169

1    Mr. McDade, whose integrity both sides have vouched for, had in

2    his mind when you're thinking about what some of the people had

3    in their minds.  I think what any of these people had in their

4    minds, if it wasn't written down, if it wasn't exchanged as

5    part of the negotiating process, is irrelevant as a matter of

6    law.  But I'm conscious of the kind of attacks that are being

7    made on my client and some of the people associated with it.

8    And so what I want the Court to understand is what people of

9    unquestioned integrity are saying about this very same subject.

10          I now want to turn to a different subject that Mr.

11   McDade addressed and that was you'll recall that movants'

12   counsel read you some testimony about how it wasn't usual to

13   have book value determined by negotiations and let me read, for

14   context, what Mr. McDade testified to at page 99.

15   "Q.  Counsel also asked you whether it was unusual to have the

16   value on a company's books be determined by negotiations with a

17   single buyer, do you recall that?

18   "A.  Yes, I do.

19   "Q.  And you said it was unusual, correct?

20   "A.  Yes.

21   "Q.  Was this an unusual situation?

22   "A.  Extraordinary.

23   "Q.  Was it unusual to have a situation in which the only

24   alternative to selling these assets was liquidation in

25   bankruptcy?

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 170 of 260

Page 170

1    "A.  Very unusual.

2    "Q.  And was it unusual to have only one buyer or potential

3    buyer for these assets at that time?

4    "A.  Yes."

5            Another subject that's relevant to this proceeding or

6    at least the movants' counsel has raised that Mr. McDade

7    addressed.  This is at page 37.

8    "Q.  Now you were aware that there were a number of other

9    Lehman personnel that were involved in this process that did

10   not have either employment discussions or employment agreements

11   with -- or potential employment agreements with Barclays,

12   correct?

13   "A.  Yes, I was."

14           I'm not sure I read that question correctly, let me

15   reread it just to be sure.

16   "Q.  Now you were aware that there were a number of other

17   Lehman personnel that were involved in this process that did

18   have either employment discussions or employment agreements

19   with -- or potential employment agreements with Barclays,

20   correct?

21   "A.  Yes, I was.

22   "Q.  Did you believe that that somehow compromised their

23   ability to represent Lehman in these circumstances?

24   "A.  No, I did not."

25           I'm turning Mr. McDade into my primary witness just

Page 171

1    because of the nice things that counsel said about him this

2    morning.  And so I'm actually going to read some portion where

3    he's talking about something I'm going to get to later this

4    afternoon, and that is the cure payments.

5              THE COURT:  You're again using Mr. McDade for that

6    purpose?

7              MR. BOIES:  I am.  And this is Mr. McDade's testimony

8    again at page 52, line 17, carrying over to the next page.

9    "Q.  Did you recognize that whatever estimate Mr. Kelly came up

10   with represented a ceiling or maximum exposure?

11   "A.  It was described as a potential exposure.

12   "Q.  A potential exposure.  And you recognize that that

13   exposure might or might not actually result in payments by

14   Barclays, correct?

15   "A.  Yes.  Yes, I did.

16   "Q.  And you understood that Barclays had sixty days under the

17   agreement to determine which contracts to assume, correct?

18   "A.  Yes, I did.

19   "Q.  And which contract Barclays assumed would determine what

20   its cure payments were, correct?

21   "A.  That's correct.

22   "Q.  And the process of determining what contract Barclays was

23   going to assume was not going to start until after the closing,

24   correct?

25   "A.  That's correct.

1    "Q.  And the process of determining what contract Barclays was

2    going to assume was not going to start until after the closing,

3    correct?

4    "A.  It couldn't start until after the closing given all the

5    significant integration issues that had to take place.

6    "Q.  And you understood that Barclays had complete discretion

7    as to what contracts to accept and what contracts to object to?

8    A".  Yes."

9         Counsel for the movants referred to some testimony

10   about Mr. McDade not expecting a first day gain, the Court will

11   remember that from this morning.  And I want to show you some

12   testimony that movants' counsel did not show you at that time,

13   from Mr. McDade, first at page 96, line 17.

14   "Q.  What is an embedded first day gain as you understand that

15   term?

16   "A.  My understanding, it's an accounting gain for assets minus

17   liabilities, balance sheet assets and liabilities.

18   "Q.  And was there anything inconsistent with your

19   understanding of the transaction or the description of the

20   transaction to the Court, whether being an accounting gain for

21   Barclays on the first day?

22   "A.  No."

23        I want to emphasize that in light of the portion that

24   movants' counsel had directed your attention.

25   "Q.  And was there anything inconsistent with your

Page 173

1   understanding of the transaction or the description of the

2   transaction of the Court, with there being an accounting gain

3   for Barclays on the first day?

4   "A.  No."

5           And then let me ask to go to the next page, line 3.

6   "Q.  And when you answered counsel's question about a gain and

7   you said, 'as described in the total valuation', I want to

8   follow up on that.

9       "Am I correct that what you were referring to is that to

10  the extent that the deal ended up being in the rough balance,

11  it was rough balance with respect to assets and liabilities

12  that had actually been valued in the process?

13  "A.  Assets and liabilities valued and assumed payments for

14  cure and comp.

15  "Q.  Yes.  And it did not include assets that were not valued,

16  like intangibles, perhaps furniture and furnishings, whatever

17  the assets were that were not valued, that was not included in

18  what you called the rough balance, correct?

19  "A.  That was not included with a view that those assets, to a

20  non-operating going concern, Lehman, would have been of little

21  value.

22  "Q.  All right.  And I just want to emphasize that.  When you

23  talk about assets and liabilities being or ending up being in

24  rough balance you are talking about the assets and liabilities

25  valued from Lehman's perspective not from Barclays'

Page 174

1    perspective, correct?

2    "A.  That's correct.  I have no ability to understand how

3    Barclays would value that.

4    "Q.  And there were a number of assets that might have little

5    or no value to Lehman as an operating company that might have

6    substantial value to Barclays as an operating company, correct?

7    "A.  Yes, I would agree.

8    "Q.  And if that difference resulted in a first day gain for

9    Barclays that was in no way inconsistent with the understanding

10    of the deal, correct?

11    "A.  Correct.

12        And I submit to the Court that if you're thinking

13    about subjective interpretations, that is particularly

14    important because what it says is that you have to look at how

15    Barclays got the gain in order to evaluate how it fits in even

16    with Mr. McDade's view of the transaction.

17        And I want to close with just one more quote from Mr.

18    McDade.  This comes from page 242.

19    Q.  At the time that the transaction was presented to the

20    Court, based on everything you know now at time of trial, do

21    you believe the transaction was presented to the Court in a

22    fair and balanced way?

23    A.  Yes, I do.

24        And you'll recall the implication that somehow Mr.

25    McDade was kept in the dark along with the lawyers.  Somehow he

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 175 of 260

Page 175

1   didn't, maybe, understand everything.  Well, after he has

2   understood everything, after he has been shown everything,

3   after he's been asked all the questions, he's asked based on

4   everything you know now, do you still believe the transaction

5   was presented to the Court in a fair and balanced way and he

6   says yes, I do.

7        There are a couple other things that I just want to

8   emphasize for the Court.  I think the Court probably has it in

9   mind from all the testimony that we went through but I just

10  want to emphasize it.

11       First, as we indicated on slide 35, the 47.4 billion

12  dollar number was not a valuation cap, it was provided for

13  guidance as to what had become of the long positions.  And over

14  half of the assets in the repo or collateral by value were

15  illiquid assets, very difficult to value.  The fact that there

16  are different valuations of this, some below and some above,

17  that 47.4 figure ought not to be surprising.

18       On September -- this is on slide 36 -- on September 19

19  Lehman had concluded independently that the repo or collateral

20  likely had a market value far below Lehman's last marks.

21       The Court will remember some of these e-mails, for

22  example the Alex Kirk e-mail to James Seery at 5:55 p.m. on

23  September 19th, "I believe the value is 45.5.  I don't know the

24  marked value."  You'll remember Mr. Kirk's testimony that

25  generally the response was the markets are too volatile,

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 176 of 260

Page 176

1   there's too many line items, it's not possible to get this done

2   in any pinpoint fashion in this timeframe.  And that the Lehman

3   traders concluded "Many of these positions were so illiquid

4   that if we were to try to sell them, given our circumstances

5   the bids might be down twenty percent."

6          We can skip our slide 37 because that simply repeats

7   some of Mr. McDade's testimony that I've already read and I

8   don't think we need to do that again.  It is useful, I think,

9   to look at slide 38 in light of movants' assertion that Mr.

10  Yang's fed facility haircut analysis was particularly relevant.

11  This, as I think the evidence is absolutely clear, applied to a

12  different portfolio then that which was delivered to Barclays.

13  This applied to something with a realizable value of 44.6 not a

14  "fire sale" value of 45.5.  And I think the record is clear

15  that this was a different analysis of a different portfolio

16  then what was involved.

17         At slide 39 you also have the unrebutted testimony of

18  Stephen King, the Barclays trader, who testified that in making

19  the assessment they tried to be as objective as possible.  It

20  was not a fire sale, it was based on as orderly a runoff as one

21  can contemplate in the months following the bankruptcy.

22         As indicated on slide 40, Mr. Seery repeatedly

23  testified that the fed facility haircut analysis was not, as

24  movants claim, a fire sale liquidation valuation.  There simply

25  is not contemporary evidence of that.  Everybody involved in

Page 177

1   the process, not just Mr. Seery and the others, have testified

2   to the contrary.  And the reason that its necessary for movants

3   to mount this wholesale attack on the integrity of Mr. Seery

4   and all of the other people who've testified, not just one or

5   two but a wholesale attack, is because they all have a

6   consistent set of testimony that is contrary to what they need

7   to establish in order to have a prayer of establishing their

8   60(b) motion.

9        Now, let me turn to the subject that movants' counsel

10  described, I think, quite aptly as what did they know and when

11  did they know it, because this is, obviously important for

12  their Rule 60 motion.

13       And let me just skip into tab 80 as a starting point,

14  which is where I -- which is something that I'd already talked

15  about in terms of knowledge of the clarification letter.  That

16  on February 9, 2009 the trustee specifically acknowledged that

17  the clarification letter was in full force and effect.  And as

18  I've said, that by itself makes it impossible for them to

19  maintain this motion.  Because whatever else they knew, they

20  knew then that there was no -- there was an absolute, to put it

21  in an affirmative way, they absolutely knew that there was

22  nothing in the final clarification letter that provided for

23  estimate of values.  They absolutely knew there was nothing in

24  the final clarification letter that provided for a true-up.

25  They absolutely knew there was nothing in the clarification

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 178 of 260

Page 178

 1   letter that provided for a wash or things being in balance.

 2   And they absolutely knew, from other sources, that there were

 3   documents from which they could make the same arguments that

 4   they are making now.

 5          The thing that I think is remarkable about this

 6   presentation by movants is that most of the critical points are

 7   drawn from materials that they had at the time.  For example,

 8   they talk about the first day gain and they talk about the

 9   question of the mismatch between assets and liabilities.  They

10   knew all about that in September of 2008.  They knew everything

11   they needed to know to bring this motion at that time.  They

12   certainly knew everything they needed to know to seek discovery

13   at that time.

14          Now we have not had, as the Court knows, an

15   opportunity to take discovery of the LBHI and the trustee's

16   professionals.  The Court did grant us that right, to take

17   discovery of the professionals for the committee. That

18   discovery has demonstrated that they knew back in September of

19   2008 the same arguments, they had the same arguments that

20   they're making today.  And we also know, just from the

21   committee professionals' discovery, that all that was known by

22   the trustee and LBHI as well.

23          Now we believe that if we had discovery and if the

24   Court had the benefit of the documents from this period -- from

25   the professionals from LBHI and the trustee, they would show

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 179 of 260

Page 179

1    exactly what the discovery from the committee's professionals

2    have shown and indeed showed even more so because they had

3    greater knowledge and greater involvement than the committee.

4    But I'm going to be referring, primarily, to the materials that

5    we have from the committee because that's the only

6    professionals that we've had discovery from.

7         I want to begin with something that the movants

8    alluded to, which is a September 17th, 2008 Barclays press

9    announcement followed by an analyst report

10        Now, movants would have you believe that this was

11   somehow a secret conspiracy on the part of a large number of

12   people at Barclays and at Lehman.  Not only to conceal an

13   understatement of assets and overstatement of liabilities from

14   the committee and trustee and LBHI but from their own lawyers.

15   And if you credit what you've been told this morning about Mr.

16   McDade, from their own president and lead negotiator.

17        Now this supposed secret conspiracy was something that

18   Barclays announced in the press and had a press conference and

19   an analyst's report about.  Now, I'm not suggesting that this

20   is disclosure to the Court.  Disclosure to the Court is what

21   the Court gets.  And while I may disagree with the Court about

22   the clarification letter, I am not suggesting that these press

23   announcements are disclosures to the Court.  That's why I bring

24   them up in the part of my argument about the standards for

25   60(b), because they are most certainly something that

Page 180

1    demonstrates what the movants knew and should have known at the

2    time.  And that's critical because they can't sit on their

3    rights, turn a blind eye to what's publicly available and then

4    try to come in and say, months or years after the fact, we're

5    moving to undo this court order.

6           And slide 128 shows the very mismatch of assets and

7    liabilities about which the movants complain.  Not only was

8    this not a secret conspiracy but it was something that Barclays

9    put out for immediate release.

10          Going to the next slide, in addition to having a press

11   announcement Barclays put out another announcement in

12   anticipation of an investor teleconference.  What did they say?

13   They said, "We are acquiring trading assets with a current

14   estimated value of seventy-two billion dollars and trading

15   liabilities with a current estimated value of sixty-eight

16   billion dollars for a cash consideration of 250 million

17   dollars."

18          And in the analyst's call they talked about a four

19   billion dollar buffer, and this is at slide 130, which they

20   said they absolutely expected to preserve.  That was their

21   announcement.  That was their intention.

22          Now, I will show you that not only should they have

23   known about this but they actually did know about it.  I will

24   show actual knowledge as well in a moment.  But as might be

25   expected, the financial press, this goes to slide 131, widely

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 181 of 260

Page 181

1    reported that Barclays was acquiring a business with this asset

2    liability mismatch, Exhibits 796, 111, 797, 798, 115, The New

3    York Times, The Wall Street Journal, USA Today, The Financial

4    Times.  You'd have to have been hiding in Bin Laden's cave not

5    to understand what was going on here.

6            Two days before the sale was approved Barclays

7    publicly announced its expectation.  Remember it had already

8    talked about the asset liability mismatch, now it's publicly

9    announcing its expectation that it would record a post-tax

10   accounting gain of approximately two billion dollars on the

11   acquisition.  Not a wash.  Not a transaction that's roughly in

12   balance but a transaction with a post-tax accounting gain on

13   acquisition of approximately two billion dollars and that's at

14   slide 132.

15           And it's repeated again later in that announcement,

16   that's at 133.  And if you go to 134 you see that the fact that

17   Barclays publicly announced its expectation, that it would

18   record a post-tax gain of two billion dollars was shared with

19   Mr. McDade and other Lehman employees.  No effort here to try

20   to keep Mr. McDade in the dark.  He was sent this announcement

21   about the expected post-tax two billion dollar gain.

22           Now just like the financial press jumped all over the

23   asset liability mismatch that Barclays expected to get, it

24   jumped all over the substantial gain.  Slide 135 refers to

25   Barclays Exhibits 382 and 381, Reuters and The Financial Times

Page 182

1    talking about how it's going to be two billion dollars after

2    tax and almost four billion dollars pre-tax.

3            Now it wasn't just Mr. McDade and the Lehman people

4    who got this.  Before the sale hearing, and I'm now going to

5    Barclays' Exhibit 198 and slide 136, before the sale hearing

6    the committee itself got this.  On Monday, September 17th the

7    financial advisor to the creditors' committee was sent this

8    report, that the transaction was going to result in a two

9    billion dollar after tax gain for Barclays going to the

10   creditors.

11           Now what does the creditors' committee say in response

12   to that?  If we go to the next slide, which represents

13   Barclays' Exhibit 285 and it's slide 137, you see Mr. Gilbert,

14   a member of the creditors' committee, responding to the notice

15   that he had received about how Barclays was going to have this

16   two billion dollar gain, after tax, from the transaction.  What

17   does he say, "We will make sure this information is considered

18   in the Lehman proceeding."

19           And before the closing, if we go to the next slide,

20   which is Barclays' Exhibit 261, you see Mr. Gilbert sending it

21   around to all the committee members and advisors; Mr.

22   O'Donnell, Mr. Despins, all of the other people.  And he's

23   sending around the transcript of a Barclays/Lehman agreement

24   announcement.  And he sends around that announcement which is

25   publicly declaring that there's going to be a two billion

1    dollar, U.S. dollars, post-tax gain as a result of the

2    acquisition.

3              THE COURT:  Mr. Boies, I think we need an afternoon

4    break.

5              MR. BOIES:  Thank you, Your Honor.  I appreciate that.

6              THE COURT:  I think it's a crowded and warm courtroom

7    and we've been at this for a long time.  So rather than make

8    this an endurance contest, I think we should take a ten minute

9    break.

10             MR. BOIES:  Thank you, Your Honor.

11        (Recess from 4:11 p.m. until 4:29 p.m.)

12             THE COURT:  Please be seated.

13             During the break we tried to make it a little cooler

14   in here, I'm not sure if we succeeded but I think we all needed

15   the break given the heat.

16             MR. BOIES:  What I was addressing before the break was

17   the extent to which the movants were aware, in September of

18   2008 and shortly thereafter, of the arguments that they make

19   today.  And I was directing your attention to Barclays' Exhibit

20   219, which is at our slide 139.  And this is an e-mail that

21   went to the committee that included an attachment where Goldman

22   Sachs, who was the financial advisor to the bondholders and who

23   objected to the sale at the sale hearing to what they called a

24   discount and a fire sale deal, said "The proposed sale involved

25   a windfall discount to fair market value of at least several

Page 184

1   billion dollars."  That's what Goldman Sachs was saying on

2   September 19th, 2008.  That's what the committee was being told

3   then.

4           And not only was the committee being told these

5   things, but the committee's advisors admitted that they knew at

6   the time that Barclays was going to have an economic gain on

7   the transaction.  If you look at slide 140, this is trial

8   testimony from the committee's financial advisor, Mr. Burian.

9   "Q.  If you look at the entire transaction, though, it was your

10  understanding that Barclays was going to have an economic gain

11  on the transaction, correct?

12  "A.  Correct."

13          And they explain that, just as Mr. McDade had, is that

14  there were a number of assets that would have little or no

15  value to Lehman Brothers but substantial value to Barclays.

16  There were liabilities that Barclays might be able to work off

17  that Lehman couldn't and that those things, in combination,

18  would be expected to give a gain to Barclays.  And in addition

19  to the testimony I just elicited, at the next slide, 141, I

20  asked Mr. Burian when did he first tell the committee his

21  opinion as to whether or not Barclays was going to have an

22  economic gain from the transaction.  And he said, the first

23  couple of day, the week that they were first employed.

24          He says, "We probably said wow, Barclays is making out

25  like bandits on the broker/dealer business."  And he said it

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 185 of 260

Page 185

1    was viewed by all of us as being "incredibly an inexpensively

2    huge gain for that going concern engine."

3            And then I asked him:

4    "Q.  Sir, that all times during your conversations with the

5    committee, to the extent that you would be talking about

6    whether or not Barclays was going to have an economic gain, you

7    would have been telling the committee that in your opinion

8    Barclays was going to have an economic gain, correct?

9    A.    Yes.

10           Now the movants now come in and say we were first

11   alerted to this when we saw they were going to have an economic

12   gain.  Remember the movants' counsel telling you that this

13   morning?  They said we were trying to figure out what was

14   happening and then Mr. Gaffey says everybody on my side of the

15   table got really excited when we saw an announcement that

16   Barclays was going to have a gain.

17           Here is the committee people saying they knew it all

18   along.  You have Barclays publicly announcing it all along and

19   you have the Lehman advisors saying that they knew it was going

20   to be a gain for Barclays all the way along, unless of course

21   it didn't work out.  So that was a tremendous risk if it didn't

22   work out but if the thing didn't clear there was going to be an

23   automatic gain just because they were getting lots of assets

24   that had value to Barclays that didn't have value to Lehman

25   Brothers.  They also were going to get -- they were taking on

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 186 of 260

Page 186

1    liabilities that they could work off in various ways that

2    Lehman Brothers couldn't.

3         Now it turned out that some of the ways they expected

4    to work off those liabilities, like not putting them

5    immediately on the balance sheet, didn't work out from an

6    accounting standpoint but they didn't know that at the time.

7    And so they were announcing this economic gain publicly,

8    talking to analysts about it, newspapers were full of it, the

9    committee representatives got that, the committee

10   representatives made their own analysis of why they would have

11   an economic gain.  And they knew going in that this was the

12   case.  And so when the movants come to you and say we just

13   discovered this when Barclays finally announced their final

14   accounting, I suggest to the Court that that simply is not

15   credible because they had known it all the way along.

16        Now you also heard a lot of evidence about where the

17   actual acquisition gain came from.  And you'll recall that

18   Barclays' acquisition balance sheet showed a total post-tax

19   gain of 4.1 billion dollars.  If you go to chart 149 what you

20   see is that that gain would not have been reported without the

21   1.98 billion dollars for intangibles, fixtures, fittings and

22   software, assets that are valuable only in the operation of the

23   business and not in liquidation.  These were exactly the kind

24   of assets that Mr. McDade said we don't care that Barclays has

25   got a gain if they make their gain from these kinds of things

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 187 of 260

Page 187

1   because these kinds of things don't have any value to us.  And

2   you'll notice that the 1.98 billion dollars is very close to

3   the two billion dollar gain that was being predicted.

4        Now in addition there was a 2.4 billion dollars in net

5   value for exchange traded derivatives, something that could not

6   have been predicted at the time.  It was not just Mr. McDade

7   that got the information about the issues that the movants

8   raise.  Lazard, who was the debtors' independent financial

9   advisor, received e-mail after e-mail, document after document

10  that detailed exactly what was going on, exactly the kind of

11  possibilities that existed and exactly the kind of documents

12  and data that existed upon which movants rely right now.

13       For example, if you go to tab 150, this is an e-mail,

14  September 15th, it goes to Barry Ridings among other people and

15  it says that it's going to -- the purchase is going to be a

16  fixed discount on the assets that remain to reflect the bulk

17  size of the purchase.

18       Now in fact that didn't happen but the issue that the

19  movants relied on was something that everybody knew about.  If

20  you go to the next one, which is 151 that reflects Barclays'

21  Exhibit 196, again you're talking about the so-called buyer

22  "discount" that Mr. McDade also talked about.  Now Mr. McDade

23  explained that really wasn't a discount, that was something

24  that was related to a more appropriate valuation but the word

25  discount, which is the word that movants seize on, was

Page 188

```
 1   something that was widely known and widely known by the movants

 2   themselves.

 3         Barclays' Exhibit 237, which is displayed on slide

 4   153, shows that Lehman's lawyers knew before the closing that

 5   the repo collateral was marked in excess of forty-nine billion

 6   dollars, five billion dollars more than the repo loan and more

 7   than the 47.4 billion dollar guidance of the so-called long

 8   assets that were remaining that was given to the Court.

 9         And if you turn to the next slide, which is 154, this

10   is Barclays' Exhibit 830, this shows that the committee got the

11   same information.  So here's the same information going to the

12   committee.  And if you turn to the next slide, 155, Barclays'

13   Exhibit 739, here's the same information going to the

14   committee's lawyers.

15         What they have come in, Your Honor, is they've said

16   look, this collateral is really worth forty-nine, fifty billion

17   dollars you got it for five billion dollars less.  This is

18   exactly the kind of allegation that could be made from these

19   documents themselves.  In fact, this is the same kind of

20   document from which they do make the argument now.  So this is

21   not something that they didn't have access to before.

22         Now if you go to 157, you see the testimony from Mr.

23   Seery explaining how he explained to Mr. Burian the transaction

24   and how the forty-five billion dollars had come about, because

25   there was a five billion dollar difference between the amount
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 189

1   they advanced and the marked amount of those securities.  And

2   he goes on to say that the transaction would close and Barclays

3   would take the securities versus the forty-five billion dollars

4   that they had advanced and that Barclays believed the five

5   billion dollars wasn't fair because the securities were worth

6   less than the marked value, something which turned out to be

7   true.

8            It has been suggested to me that it might be more

9   interesting to the Court if I mix this up with a little bit of

10  video or audio, depending on whether it's from the trial or

11  from the deposition.

12           THE COURT:  It depends entirely on what you plan to

13  play.

14           MR. BOIES:  So we'll play this.  I tend to take a more

15  old fashioned approach but --

16       (Begin playing of videotape excerpt)

17  Q.   -- to the committee about the transfer of repo assets and

18  Barclays' concerns upon receiving them?

19  A.   I believed I generally explained to Mr. Gary the substance

20  of the transaction, the way that the long positions had

21  changed, that Barclays had actually received different

22  securities, that they had concerns about the value, that the

23  face amount of the securities that we had marked was about

24  fifty million and that they thought that it was worth a lot

25  lower number.  I explained that they had advanced forty-five

1   billion dollars against that and there was a five billion

2   dollar difference between the amount they advanced and the

3   marked amount of those securities.  And that the transaction

4   would close and that Barclays would take the securities versus

5   the forty-five billion dollars they advance.  And the five

6   billion dollars they believe, Barclays believed, wasn't there

7   because the securities were worth less than the marked value

8   and that there was some legitimate dispute about that but we

9   pushed back, I didn't concede, again, that they were worth less

10  than fifty billion dollars but certainly told them that our own

11  traders had taken a look at these values and there was a

12  question.

13  Q.   Do you recall whether Mr. Burian questioned you about this

14  five billion dollar difference that you say you told him would

15  go to Barclays if there were a gain?

16  A.   We certainly discussed the five billion dollar difference

17  and we certainly discussed the potential value of those

18  securities and the risk.  The risk was, to Barclays, if they

19  weren't worth forty-five billion dollars that was Barclays'

20  problem.  If they were worth more than forty-five billion

21  dollars there was no up side to the estate.

22  Q.   Did you discuss with Mr. Burian and Mr. Fazio, again,

23  whether Lehman and Barclays' assessment of the actual values

24  was different than the market value of the collateral received

25  by Barclays?

1    A.    Yes.    This was a basis of the discussions.    That is Mr.

2    Fazio and Mr. Burian continued the call that they had had on

3    Friday were quoting the difference between the forty-five

4    billion advanced and the fifty, roughly, face value of those

5    assets.    And their concern was that five billion dollar

6    difference.    But that was the basis of the conversation.    If

7    there had not been that difference there wouldn't be any reason

8    to have a conversation.

9    Q.    So you explained to them that if these securities were

10    sold, they may be sold for more than the negotiated values the

11    parties estimated?

12    A.    The risk -- the risk was Barclays' and the benefit was

13    Barclays'.    If Barclays sold them for more, there was more

14    upside in the portfolio it would go to Barclays.    If Barclays

15    sold them for less, they would suffer the consequences.

16    Remember, this is before the markets recovered.    The markets

17    were in a downfall, significant downfall.

18    Q.    Please tell Judge Peck, were you clear with them about

19    this five billion negotiated value, the difference between what

20    the collateral was in the repo and what the parties believed

21    its value was in the market that day.

22    A.    I was absolutely clear, and again if there wasn't a

23    difference between the amount of money that Barclays advanced

24    and what the committee believed the securities to be worth, we

25    wouldn't have any discussions.    Why would be having a debate

Page 192

1    right after the big meeting and then subsequently several into

2    the night to review these items if there was no disagreement on

3    the value versus the amount advanced.  We went through this a

4    number of times and frankly that's what has maybe been

5    discussed about this litigation, the idea that this is a great

6    secret.  It wasn't a secret; they knew exactly what this was.

7         (End playing of videotaped excerpt)

8         MR. BOIES:  And that, of course, is exactly what we're

9    saying, Your Honor.  Is that they did know exactly what this

10   was at the time and chose not to come to court, not to seek any

11   relief and on the contrary, to continue to rely on this,

12   support it and seek its afferents on appeal.

13        I also want to direct your attention to Mr. Seery's

14   testimony at slide 158, because there was a suggestion by one

15   of the movants' counsel that somehow Mr. Klein is the last word

16   that they have.  As the Court can see from pages 68 to 69 of

17   the May 4th trial transcript, Mr. Seery testified that after

18   Mr. Klein left, and Mr. Klein was just there very briefly, when

19   he left the meeting Mr. Seery stayed and answered all their

20   questions.  If you recall, there was some complaint from the

21   committee that Mr. Klein didn't answer all their questions, Mr.

22   Miller wouldn't answer all their questions but Mr. Seery stayed

23   and answered all their -- every question they put to me, he

24   says.  So the last information they had was exactly the

25   information that you just heard Mr. Seery testify to.

Page 193

1          Now if we go to slide 162 the Court will recall that

2    on December 11th, 2009 LBHI's special counsel told this Court

3    that LBHI "remained unaware of the five billion dollar discount

4    which was not revealed until August of this year," meaning

5    August of 2009.

6          Now what we've just shown you is document after

7    document after document talking about the five billion dollar

8    discount.  And if you look at Barclays' Exhibit 437 you'll see

9    LBHI administrator, Alvarez & Marsal, discussing with the

10   committee whether they should "Get 5.5 billion dollars back".

11   They didn't find out about this in August of 2009, they're

12   talking about on October 1, 2008.

13          On October 8th of 2008 Alvarez & Marsal, and this is

14   Barclays' Exhibit 131 at page 28, gave a presentation that

15   stated that Barclays "Negotiated a five billion dollar

16   reduction from Lehman stale marks".

17          Now on October 6, 2008 Alvarez & Marsal described the

18   deal as involving "A negotiated mark haircut" of five billion

19   dollars.  That's Barclays' Exhibit 332.

20          It simply is not the case that LBHI found out about

21   this on August of 2009.  It's simply not the case that LBHI, as

22   Your Honor was told, "Remained unaware of the five billion

23   dollar discount which was not revealed until August of this

24   year."

25          Now, if you look at slide 164 you will see notes of a

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 194 of 260

Page 194

1    meeting at the end of September in which two of the alleged

2    fiduciary breachers, Kirk and Tonucci described the deal in

3    detail to Alvarez, including a five billion dollar difference

4    in valuation.

5            And if you look at slide 165 you'll see, from October

6    6, 2008, where Alvarez & Marsal are documenting for the

7    committee, that is you have LBHI sending the committee's

8    financial advisor a description of how there was a five billion

9    dollar haircut, a five billion dollar mark negotiated haircut

10   from the repo assets.  This is October 6, 2008.

11           Now as I've said, Barclays' Exhibit 131 talks about a

12   negotiated five billion dollar reduction, and that's slide 166,

13   and this was the October 8th, 2008 Alvarez & Marsal

14   presentation.  A presentation that included not only the

15   committee and LBHI but the trustee as well and we asked, and

16   this is at slide 167, we asked Mr. Kruse, who was there and who

17   was the Alvarez & Marsal 30(b)(6) representative, on the topic

18   of the alleged discount.  So this is the person that the movant

19   puts forward as the person with the most knowledge about this

20   subject and asking him about that discount at his deposition.

21   The question was:

22   "Q.  And you recall there being a discount talked about in that

23   motion, the Rule 60(b) motion?

24   "A.  Yes."

25           And this is very significant, Your Honor.

Page 195

1    Q.   Is that the same discount that's referred to on page 28,

2    the five billion dollar reduction?"

3              And that page 28, if you'd just turn back, is

4    Barclays' Exhibit 131, page 28, where on October 8th Alvarez &

5    Marsal is talking about a negotiated five billion dollar

6    reduction.  And he's asked:

7    "Q.   Is that discount that you're relying on in your Rule 60

8    motion, the same as the five billion dollar reduction that you

9    knew about in October 2008?

10   "A.   I believe it applies to the same pool of securities.

11   "Q.   Is it different in any way?

12   "A.   Well, no."

13             Now I suggest to you is that it would have been clear

14   even without that testimony that they knew about it, but with

15   that testimony I respectfully suggest that there is simply no

16   way that anyone could conclude that they were not aware of, in

17   October of 2008, the first week in October of 2008, of exactly

18   what they finally brought to this Court in 2009, late 2009,

19   saying they only discovered it in August of 2009.

20             Now I mentioned before that we had gotten some

21   discovery from the committee and initially they withheld these

22   documents.  But if we go to slide 168 you see a document,

23   Barclays' Exhibit 813-A in which the committee's advisors are

24   writing, "The night of the close of the transaction we were

25   told Lehman while that the prices of -- that the pieces of

Page 196

1    transaction that were being described to us added up to fifty-

2    two to fifty-three billion dollars rather than the

3    approximately forty-seven billion dollars that had been

4    described in court the Friday before."

5         Later on, "A few hours after we raised the issue

6    Lehman came and got us and sat down to try and show us how

7    things added up.  We were told that some of the marks shown on

8    Schedule A were out of date and that the parties had agreed to

9    a five billion dollar discount."  Again, Your Honor, I would

10   emphasize two things about that.

11        First, in their contemporaneous letter they're not

12   talking about Barclays telling them anything.  They're telling

13   each other that it's coming from Lehman.  The second thing is,

14   whoever it's coming they know the night of the transaction that

15   there was this difference and that there was this argument that

16   the assets and liabilities have a mismatch.

17        If you go to 169, the 30(b)(6) representative of

18   committee law firm Milbank Tweed questioned:

19   "Q.  When is the first point in time that Milbank or Houlihan

20   committed to Weil this concern about a five billion dollar

21   mismatch?

22   "A.  On Sunday, September 22nd.  Sunday or Monday the 21st or

23   22nd."

24        So there simply is not an argument, Your Honor, I

25   think, that they weren't aware of this.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 197 of 260

Page 197

1          Another document that we got, only because the Court

2     overruled their work product objection, is Barclays' Exhibit

3     812 at slide 171, September 28th where they say, "The two sides

4     somehow said that although the detailed Schedule A totals to X

5     it's really only worth Y in the aggregate because the marks in

6     the system are somehow outdated, which seems odd.  The

7     difference between X and Y is several billion dollars."

8          There are a number of other documents that are

9     described in here; I won't go through all of them because I

10    think the issue is pretty clear that this issue was wholly

11    known by the movants in September or early October.  We believe

12    it was known before the close.  But whether it was known before

13    the close or not, it was clearly known in early October or late

14    September.  And Weil, if they'd come in at that point, I think

15    there would have been a question even then but as a practical

16    matter something could have been done at that point  But the

17    fact of the matter is they wouldn't come in then.

18          The reason they wouldn't come in then is because they

19    knew that this was by far the best and only transaction.  They

20    only had an ability to sit back until it was too late to

21    unscramble the transaction and then come in and ask this Court

22    to rejigger the pieces, to change the contract, to rewrite the

23    contract to make it more attractive for them.

24          So they put these issues in their pocket.  They knew

25    these issues couldn't help them.  They put them in their pocket

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 198 of 260

Page 198

1    and just waited and sat in the weeds to see if whether they

2    could come forward later.  And I suggest to the Court that

3    whatever signal that the Court wants to give, it is not a good

4    signal to say that that's permissible conduct.  Because if they

5    believed, as they say they now believe, that these documents

6    created a problem, they had an obligation to come in and tell

7    the Court about it at that time.

8         Even if, as I say, they had come in at that point, we

9    would still have been arguing to the Court that this is an

10   appropriate transaction to approve.  And I want to turn, now,

11   to sort of, each of the elements that if we were back twenty-

12   five months ago we'd be talking about.  That is if they had not

13   sat on their rights, if they had not supported this order, sale

14   order, on appeal, if it had not been affirmed, if we'd not gone

15   through the integration process, if we were back twenty-five

16   months ago and they came in and they said stop this

17   transaction, we think it's a bad transaction, what would we

18   have said?  And that's what I want to -- that's what I want to

19   address now.  Because, as I said earlier, I know one of the

20   things the Court is thinking about is regardless of whether

21   anybody's at fault or not would I have approved this back then

22   if I knew everything then that I know now?  And I think the

23   answer is clearly yes and let me go through the items one by

24   one.

25        First, let me deal with the issues of comp and cure.

Page 199

1    I've dealt with the issues of the valuation of the repo and I

2    think we've shown how those valuations were uncertain, changing

3    and the valuation that the estate got was substantially higher

4    than anything that they would have been able to get from any

5    other source.  So from that standpoint I think the Court would

6    still feel that this was an appropriate decision to make, to

7    approve it.  But let me deal with the issues of comp and cure

8    as well.

9         Excuse me just one moment.

10    (Pause)

11         MR. BOIES:  The Court will remember that Harvey Miller

12    told you that there was an exposure for compensation

13    liabilities that was estimated to be two billion dollars.  And

14    counsel for the movants referred to that and if you look at our

15    slide 48 it sets forth what Mr. Miller told you on September

16    19th, 2008.

17         Now, there's no dispute that Barclays spent

18    approximately two billion dollars on compensation.  The dispute

19    is whether this two billion dollars for compensation includes

20    both bonus and severance payments.  The issue is that Barclays

21    spent about a billion and a half for bonus and about a half a

22    billion dollars, in rough numbers, for severance.  And what the

23    movants say is that you knew you weren't going to spend two

24    billion dollars for bonuses and to count severance in there is

25    not appropriate because the two billion dollars that was given

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 200 of 260

Page 200

1   to the Court was not for severance, it was only for bonus.

2        There is nothing in what was said to the Court at that

3   sale hearing that supports that, Your Honor.  Mr. Miller

4   testified, going to our slide 49, that the compensation

5   obligation "Was supposed to cover both, severance pay and

6   bonuses".  That's what he testified to at the trial.

7        Mr. Shapiro -- and Mr. Miller's testimony is at April

8   28th, page 32, lines 23 to 24.  Mr. Shapiro testified on August

9   23rd that the term comp encompassed "A combination of the

10  bonuses that they would pay and if and to the extent that they

11  weren't paying someone a bonus because they were terminating

12  that person's bonus, it would include severance for that

13  person."  That's at 120, lines 20 to 24.

14       Mr. McDade testified at trial, April 26th, page 61,

15  lines 1 to 3, "Barclays also assumed a two billion dollar

16  compensation liability with respect to the combination of the

17  employees' bonus process and the severance process."

18       Exhibit 131, if you could go to page 28, I don't know

19  if we can pull up page 28 or not, but this is the Alvarez &

20  Marsal October presentation.  And my recollection is that they

21  talk about the liabilities assumed and they talk about an

22  assumed cure liability and an assumed severance liability.

23       Now movants' argument here is there was no severance

24  liability assumed, there was just -- it was just the bonus

25  liability.  Here they're encompassing the bonus with the

Page 201

1    assumed severance.  So everybody understood that the severance

2    liability was part of this two billion dollars.  And so I think

3    if we were standing here twenty-five months ago saying is this

4    a fair deal and we were telling you what's going to happen is

5    Barclays is going to pay about two billion dollars for

6    severance and bonus for these employees and that's something

7    for you to take into account, I think you would be saying, yes,

8    I think that's something to take into account.  And

9    compensation -- and Mr. Miller says, and Mr. Shapiro says, as

10   our one honest man Bart McDade says includes severance as well

11   as bonuses.  And that's what Alvarez & Marsal thought too

12   before this litigation started.

13          Now, there are some documents that talk about whether

14   the compensation liability is going to be as high as it turned

15   out to be.  In part, because it was thought that some of it

16   could be simply expensed as a matter of normal payroll, it

17   would not have to be listed as a balance sheet obligation.  It

18   turns out that the accountant said no you have to list it as a

19   balance sheet obligation.

20          So when you look at some of the documents there that

21   had different estimates from this, remember you've got to

22   figure out how much is going on the balance sheet and how much

23   is going through the profit and loss statement, because you've

24   got to add those two up because those are, together, the total

25   compensation that's being assumed.  And I think there's no

Page 202

1    dispute now that if you include severance, along with bonus, it

2    would be approximately the two billion dollars.

3         Now let me turn to the second liability issue that the

4    Court was told about and that is cure, and that is at slide 53.

5    And Harvey Miller told this Court, on April 19th, that Lehman

6    had a cure estimate of 1.5 billion dollars, this is less than

7    some of the charts that were shown you by movants' counsel

8    because those charts were earlier in the week when the estimate

9    was higher, 1.5 billion dollars.  And he told you that that was

10   a potential exposure.  And the sale motion itself made clear

11   that Barclays had "The right but not the obligation to take

12   assignments of contracts and leases that are designated for

13   assumption and assignment."  And that's Barclays' Exhibit 11

14   (ph.) at paragraph 14, that this was all potential.

15        Now, if you go to slide 54 you see, among other

16   things, Saul Burian's testimony "I understood that Barclays had

17   the right to cherry pick those contracts necessary for the

18   operation of the Business."  So there was never any doubt that

19   this exposure was a maximum and that the actual amount paid

20   would be less and considerably less.

21        And if you go to page 56, slide 56, you will see that

22   Mr. Shapiro and Mr. Berkenfeld and honest Bart McDade all

23   testified that these cure estimates were done in good faith,

24   tried to get the most accurate information possible in

25   difficult times and remembering always that they were doing an

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 203 of 260

Page 203

1    estimate of what was described as potential exposure.

2            There's also, if you go to slide 57, uncontradicted

3    evidence that the cure estimate was provided by Lehman and

4    Barclays was not involved in the calculation.  Mr. Clarkson

5    testified to that on April 30th at page 71, line 25 to 72 line

6    11.

7            He also testified that it took until about November to

8    figure out what the actual cure amount was going to be, that's

9    found at April 30th at page 71, line 25 to 72, line 11.  And

10   that various drafts of Barclays' acquisition balance sheet

11   contain different numbers for cure because there was

12   uncertainty over how much, if any, needed to be recorded as a

13   liability.  And again, you will see high estimates and you will

14   see low estimates.  But the uncontradicted testimony is that

15   the amount of potential exposure given to the court came from

16   Lehman without Barclays' participation.

17           Now there's a difference between the mission critical

18   contracts and the remaining contracts.  The mission critical

19   contracts were the ones that had to be accepted and those

20   obviously would have much lower cure payments than the total

21   maximum for all of the contracts.

22           So when you look at some of the numbers some of them

23   are just for the mission critical contracts and the 200 million

24   dollar estimates.  But no estimate that is contrary to the

25   estimate given to this Court of the maximum exposure.  And the

Page 204

1    fact that Barclays, because it had an ongoing relationship with

2    some of these people and also had alternative suppliers, would

3    be able to negotiate with potential cure recipients and get

4    that number down.  That was a benefit to Barclays but not a

5    detriment to Lehman.

6         And so again, if you went back twenty-five months ago,

7    I think you would be saying, and I think Mr. Miller would be

8    saying and he has told you that he would be saying this, he

9    told you that if we were back twenty-five months ago knowing

10   everything that he knows now, he would still be in here

11   supporting this transaction and Lazard, the independent

12   financial people would still be in here knowing everything they

13   know now supporting the transaction.  And I think we would be

14   saying to you that this transaction is right with respect to

15   the comp and cure estimates.  These are reasonable estimates

16   and the fact that Barclays may, in the cure area not in the

17   comp area, but in the cure area may get an advantage is

18   something that is an advantage to it but not a disadvantage to

19   Lehman.

20        Now in addition there has been a suggestion that

21   somehow the Lehman estimate of the potential cure was not in

22   good faith.  And they show a transaction adjustment document

23   that indicates an increase in the cure and comp amounts.  Now,

24   they both went up and then came down and the final comp number

25   was one that was actually almost exactly what was paid.

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 205 of 260

Page 205

1        With respect to the cure number, what Barclays ended

2    up paying was significantly less.  Now they knew that.  They

3    knew it was a possibility, indeed they knew it was a

4    probability it would be less, they didn't know how much less,

5    but they knew it was almost an inevitability it would be less

6    at the time of the hearing.  They knew how much less in

7    November when we put it up on the web site.

8        So there was no dispute from then on as to what the

9    actual cure amount was, no complaint on that at that time, no

10   complaint for a long time after that in terms of the cure

11   amount or of the comp amount.

12       And counsel said this morning, and I'm going to try to

13   find the slide that we have that deals with this transaction

14   adjustment issue, because counsel said this morning now we're

15   going to be able to point to a document that went to Weil

16   Gotshal that showed this transaction adjustment but nobody at

17   Weil Gotshal understood it or figured it out.

18       First of all, that's counsel's testimony, that's not

19   Weil Gotshal's testimony.  Secondly, the -- that document, that

20   transaction adjustment document didn't just go to Weil Gotshal.

21   And if you begin this, at slide 182, this is the transaction

22   adjustments as of September 18th, 2008 that movants' counsel,

23   in their argument, suggests without, I believe, any evidentiary

24   basis, that this can be some indication of some kind of bad

25   faith marking up comp and cure amounts.  If it is, and I don't

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 206 of 260

Page 206

1  think it is, if it is first this was shared by Lehman, it's a

2  Lehman document not a Barclays' document, and it was shared by

3  Lehman with Weil Gotshal contemporaneously, sent to them on

4  September 18th.

5        Now counsel testifies that Weil Gotshal didn't

6  understand this and didn't know what to do with it, again

7  that's his testimony.  But in addition and more important, if

8  you look at 183, Barclays' Exhibit 212, it shows that Lehman

9  had it but it also shows that Alvarez & Marsal had it on

10  September 18th, before the closing.

11        If you go on you'll see that Barry Ridings and Lazard,

12  this is Barclays' Exhibit 209 and 184, they had it as well.

13  And as for noticing it or not noticing it, if you go to page

14  185 of our slides, you'll see that Mr. Coles, a managing

15  director at Alvarez & Marsal, testified that he understood that

16  the cure liabilities would be a "maximum exposure" and that

17  "you typically see a purchaser use its existing business

18  relationships with vendors to negotiate lesser amounts".  And

19  he admitted that he got the transaction adjustment documents

20  and probably would have noted those adjustments but he had more

21  important things to concern himself with.

22        So all of the information that existed to justify this

23  motion they had in 2008.  And we believe that if they had come

24  with all this information to court in 2008, the Court would

25  have said that you still thought this was by far the best

Page 207

1    transaction that could be done for the estate.

2           Now let me turn to the so-called additional assets.

3    The categories of assets that were identified on the weekend

4    before the closing.  Now counsel for the movants takes issue

5    with our use of the word identified because they say they were

6    added.  And as the Court knows, the reason we say identified,

7    and I think the reason that the people who were involved say

8    identified, and you see this in the contemporaneous

9    discussions, is that all of the assets in the business, except

10   the excluded assets, were being transferred.  And these assets

11   were all assets that were used in the business.  They weren't

12   assets that had been identified, this was going very fast and

13   the assets that had essentially been identified were those that

14   were listed in the APA, but these were assets that once it

15   became clear that a lot of the APA listed assets weren't there

16   or didn't have the value that they were supposed to have, that

17   Lehman had to go back and identify additional assets.

18          And there's no dispute between us on this one issue,

19   which is that Barclays was very concerned about the overall

20   value that they were getting and they insisted that they be

21   satisfied that the overall value of what they were getting was

22   going to be what they expected or they didn't want to close.

23   No dispute that Barclays was saying we want you to identify

24   additional assets, and if there are not additional assets we're

25   going to have a hard time getting to there on these terms.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 208 of 260

Page 208

1          So it was important to identify these additional

2     assets and so there was a "scramble" to do so.  But the fact

3     that there was a scramble to identify these assets doesn't say

4     anything about the character of those assets, that is whether

5     those assets were already included in the APA because they were

6     assets that were used primarily in the business, and I think

7     the Court has heard the testimony, from both sides, that those

8     assets were primarily used in the business.  And the only

9     question is whether they are an excluded asset.

10         Now, two of the assets, the -- are not, I think in any

11    sense, excluded assets because there's no exclusion of them.

12    One of them on exchange traded derivatives there is an issue as

13    to whether derivatives and exchange traded derivatives are the

14    same thing or they're different things.  We think it's a matter

15    of contractual construction.  It is clear that the specific

16    controls the general and when they say that you're getting

17    something with respect to exchange traded derivatives even if,

18    contrary to, I think, what all the testimony has been.  All the

19    testimony has been the derivatives are not the exchange traded

20    derivatives.  But even if you assume that derivatives was the

21    larger category, when they say something specific about

22    exchange traded derivatives, that specific has got to control

23    over the general.

24         So with respect to each of those categories of so-

25    called additional assets, I want to walk you through what the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 209 of 260

Page 209

1   evidence -- what the evidence is.  Before doing that, though, I

2   want to just remind the Court that while I am addressing this

3   as if it were back in 2008, the Court does still need to think

4   about the Rule 60 context that we have here.  And you've got to

5   think about it, I think, in three major areas.

6           One is the fact that I've already probably spent more

7   time on than I needed to, that they knew all this stuff back in

8   '08 and they can't commune after the fact and use Rule 60 to

9   undo something that they supported at the time, supported on

10  appeal, was affirmed on appeal based on information that they

11  either knew or should have known at the time.

12          Second issue, though, is that what they tried to do is

13  to impose a new contract on Barclays.  They are trying to

14  rewrite this contract.  There is a contract.  The APA,

15  including whatever it is the Court concludes is part of that,

16  and that contract needs to be interpreted pursuant to

17  traditional contractual provisions.  And Rule 60 does not give

18  a court the right, in a Rule 60 proceeding, we submit, to

19  rewrite the contract and impose additional changes that

20  Barclays didn't agree to at the time and would not have agreed

21  to at the time.

22          I think there is no doubt, and I don't think there can

23  be any doubt in anybody's mind in this courtroom, that if back

24  in 2008 the proposal had been made to Barclays you can have

25  this agreement the way it's drafted as long as you agree to

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 210 of 260

Page 210

1   give back eleven, twelve, thirteen billion dollars more that

2   this transaction would not have been done.  I think if you

3   conclude that, and I think you must, then I think as a matter

4   of law Rule 60 does not provide a basis for modifying a

5   contract.

6           If you look at our slide 234, the movants have said

7   today that they are not seeking to rescind the sale order in

8   its entirety, nor could they at this late date, nor do they

9   want to even void the clarification letter in its entirety,

10  again nor probably could they at this late date.  Rather,

11  movants wants this Court to construct an entirely new contract

12  by taking certain provisions that they like and disregarding

13  those that they don't like and rewriting other provisions.

14  Barclays did not agree to that contract.  Rule 60 does not

15  allow that type of affirmative relief.

16          And if you go to slide 235, you will see case after

17  case that provide that, for example, "Courts may not use Rule

18  60(b) to grant affirmative relief in addition to the relief

19  contained in the prior order or judgment."  Or "Numerous

20  circuit courts, including our own, have held that Rule 60,

21  aptly titled relief from judgment or order, may only be used to

22  set aside the judgment or order, not to grant affirmative

23  relief."

24          And yet, in this case, that's exactly what movants are

25  asking this Court to do.  They want you to modify the sale

08-01420-scc Doc 3836 Filed 10/25/10 Entered 10/25/10 15:48:56 Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 211 of 260

Page 211

1  order to direct Barclays to pay more money than they agreed to.

2  And if we go to slide 236, again, there's case after case that

3  holds, for example -- the Andrulonis case from the Second

4  Circuit in 1994 -- a party's "dissatisfaction and hindsight"

5  where the effects of the bargain are not grounds for Rule 60

6  relief.  Or North Broadway Funding Corp. from the Bankruptcy

7  Court in the Eastern District:  "Rule 60, and by reference Rule

8  924 does not permit relief from a final order, when the effect

9  of such relief would be to free the moving party from

10 calculated and deliberate choices and decisions.  It is

11 insufficient," the Court says, "to set aside a court-approved

12 agreement just because a subsequent investigation reveals 'the

13 bargain is more beneficial to one side than to the other.'"

14       And there are additional Second Circuit cases

15 including the Coffin case from 1989, that make clear that you

16 can't use Rule 60 for this kind of relief.

17       Slide 237 contains additional cases.  For example, a

18 Seventh Circuit Case, Lucille v. City of Chicago, holding that

19 as Rule 60(b) does not allow a Court to "tinker" with the

20 parties' agreement, a motion seeking "to add terms" to a court-

21 approved agreement, must be denied.  And also, the Terry

22 Oilfield Supply Company against American Security Bank, a

23 bankruptcy case that's cited there.

24       I mean, the fact of the matter is that in a Rule 60

25 case, because of its unusual character, coming the timing that

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 212 of 260

Page 212

1    it does, the law is clear that if somebody commits fraud, you

2    can sanction them; if somebody -- there can be a lawsuit for

3    damages for fraud.  It's not to say that if somebody does

4    something that's fraudulent, there's not relief.  I don't think

5    there's any fraud here, and I don't think any of those claims

6    would work.  But I'm not saying that there are not potential

7    forms of relief.  But you can't go in and, after the fact,

8    rework, rewrite a party's contract using Rule 60.

9          As I say, my primary argument is to convince the Court

10    that it would not want to even if it had the power.  But I

11    think that it is important for the Court to keep in mind that

12    you cannot modify -- you cannot use Rule 60 to modify that kind

13    of contract.

14          Now, turning to the three so-called additional sets of

15    assets.  And let me begin -- because this really does implicate

16    the clarification letter and the interpretation of it -- with

17    just a brief reprise of a couple of the legal principles I

18    mentioned before.  And I'm now going to turn to the book that's

19    headed "Disputed Assets".

20          And first, slide 301.  It is clear that in the Second

21    Circuit, as in every circuit, a court cannot look beyond the

22    confines of a contract to extrinsic evidence if its relevant

23    provisions are plain and unambiguous; language whose plain

24    meaning is otherwise plain, is not ambiguous merely because the

25    parties urge different interpretations in the litigation.  And

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 213 of 260

Page 213

1    those are a decision from this bankruptcy court and from the

2    Second Circuit in Metropolitan Life Insurance Company against

3    RJR.

4            The Second Circuit has also held, as indicated on

5    slide 302, that any ambiguity in a contract must emanate from

6    the language used in the contract, rather than from one party's

7    subjective perception of the terms.  That is, they can't come

8    in and create an ambiguity through their testimony.  The

9    Court's got to first conclude that on the four corners of the

10   document, the language is ambiguous.  We believe the language

11   is plain.

12           Even if, in the ordinary course, you could look to

13   extrinsic evidence, as indicated on slide 303, the purchase

14   agreement's merger clause further precludes consideration of

15   extrinsic evidence.  Section 13.5 of the APA says this is the

16   entire understanding and agreement.  It can be amended or

17   supplemented or changed only by written instrument.  As the

18   Second Circuit holds, when you have a -- the purpose of the

19   merger clause is to require the full application of the parol

20   evidence rule in order to bar the introduction of extrinsic

21   evidence to alter, vary or contradict the terms of the writing.

22           Those are all basic contractual provisions, as is, on

23   page 304, where it says, "Unexpressed subjective intent is

24   irrelevant."  And at slide 305, if the purchase agreement is

25   ambiguous, what is relevant is first the parties' performance

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 214 of 260

Page 214

1    of their obligations.  Look to what the parties did.  And

2    second, look at the extrinsic written evidence that they

3    exchanged.  As the cases set forth at 306 make clear, a party's

4    failure to understand the contract it signed is no basis for

5    refusing to enforce it.  Ignorance of the terms and conditions

6    of a contract is no defense for a party that has already

7    executed the contract.

8         And that is exactly what you have here; people saying

9    we didn't understand what we were signing; we didn't know -- we

10   didn't see this; it went in at the last minute.  Now, they

11   don't say that when it went in at the last minute it took them

12   years to raise it.  That might have been a reason why maybe

13   they signed it my mistake and then when they read it the next

14   day or even the next week they would come forward.  So their

15   explanation doesn't really fit the facts.  But even if it did,

16   ignorance of those terms is not an excuse.

17        As the cases at 307 make clear, a contract should not

18   be interpreted to render some of its provisions meaningless.

19   When they don't like some provisions, like the provision with

20   express to exchange-traded derivatives and that parenthetical,

21   they say let's just ignore it; let's make it go away; let's

22   interpret the contract as if it didn't exist.  That's not

23   permissible.

24        Now, as I said, the plain text of the purchase

25   agreement defines purchased assets as "all assets used in

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 215 of 260

Page 215

1   connection with the business."  And as you can see from our

2   slide 308, that includes the assets that are involved here.

3   Because as shown at slide 309, there is no and can be no

4   dispute that the clearance box assets at DTC, the margin held

5   to secure exchange-traded derivatives, and the 15-3c3 (sic)

6   securities, were all LBI assets used in the business, as Mr.

7   Greery (ph.) would say, "capital B".

8           Now, in addition to being included in the definition

9   of purchased assets, each of the disputed assets was expressly

10  listed in the clarification letter.  Now, I understand that

11  with respect to the Rule 60(b) motion, I need to address the

12  appropriateness of that.  But with respect to the motion to

13  enforce the contract that one of the movants has made, the fact

14  that this is specifically mentioned and specifically identified

15  here should erase any doubt that might otherwise have existed,

16  based on the general provision of the APA.

17          None of the assets were excluded.  And I want to put a

18  caveat with respect to the issue, with respect to the derivates

19  and exchange-traded derivatives that I've already alluded to

20  and come back to that.  But other than that, I think there is

21  and can be no dispute that none of these assets were excluded

22  assets, since they are not excluded and they are included under

23  the terms, either of the APA itself or of the clarification

24  letter, and indeed we believe under both of them, those are

25  assets that belong to Barclays.

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 216 of 260

Page 216

1          Now, let's turn to the performance of the parties,

2    because the Court will recall that that's one of the -- if you

3    get to the point of extrinsic evidence, our slide 314 begins

4    the discussion of the performance of the parties.  And the

5    trustee and his representatives knowingly approved post-closing

6    transfers of nearly two billion dollars in proprietary margin

7    and DTC clearance box assets.

8          And as you can see from Barclays' Exhibits 517 and

9    470, among many others, in September and early October, the

10   trustee approved the transfer to Barclays of assets that we say

11   belong to us, and which they now dispute.  We think that

12   performance of the contract by the parties is very relevant to

13   an interpretation of what that contract meant.

14         Now, in addition to that, the trustee's lead counsel,

15   and 30(b)(6) designee, Mr. Kobak, admitted in testimony that

16   the plain language of the clarification letter provides that

17   Barclays is to receive LBI's clearance box assets at the DTC.

18   And that's at page 319.  And question:  "In that Schedule B

19   which is listing those clearing box assets, that was made

20   according to this provision to list the purchased assets

21   including Lehman proprietary assets that were in the clearance

22   boxes, correct?

23   "A.  That's correct.

24   "Q.  And what you're saying is that the APA, including the

25   clarification letter, provides that Schedule B lists securities

Page 217

```
 1    and trading positions transferred under the purchase agreement

 2    to Barclays, correct?

 3    "A.  Yes."

 4          And one more time:

 5    Q.   "You understood that the Schedule B listed LBI's

 6    securities that you considered to be proprietary and not

 7    customer securities, correct?

 8    A.   "That's correct."

 9          Now, the trustee's lead counsel and 30(b)(6)

10    designee -- this is their 30(b)(6) representative, Mr. Kobak --

11    further admitted that the trustee's proposed reading of the

12    clarification letter's clearance box provision, as including

13    only customer assets, would render that provision superfluous.

14          Slide 320 deals with this.  And remember -- I think it

15    was common ground, that you are supposed to interpret a

16    contract so as not to make any of its provisions meaningless.

17    And yet Mr. Kobak testified that:

18    "Q.  Paragraph 8 would have transferred all the customer assets

19    in the clearance boxes to Barclays without any reference to

20    clearance boxes in paragraph 1, correct sir?

21    "A.  I believe so.

22    "Q.  Okay.  So if we interpret paragraph 1 which says that

23    Barclays gets such securities and other assets held in LBI's

24    clearance boxes as being limited to customer assets, this

25    provision is simply redundant to paragraph 8, correct?
```

Page 218

1    "A.  There'd be no need for it."

2          Now that is not only rendering that provision

3    meaningless, but what it's saying is all of the effort to list

4    clearance box assets was just meaningless, irrelevant.  All of

5    the scramble to identify this additional asset, all of the

6    extent to which it was considered in terms of calculation of

7    what the value was that was going to Barclays, all of that was

8    just meaningless because it's just redundant.

9          Continuing on at 321.  The version of Schedule B

10   delivered to Barclays before the closing listed 1.9 billion

11   dollars, the overwhelming majority of which were LBI's DTC

12   accounts.  1.9 billion dollars.  This is what Barclays is being

13   told it's getting as part of the deal.  And yet, what the

14   movants say is that was not intended to be included.

15         The debtor -- and this is at 322 -- acting through

16   Weil Gotshal on September 30, 2008, filed the final version of

17   Schedule B.  And there was a joint motion by the debtor and

18   Barclays to file the schedule under C as assets -- under seal,

19   as assets "transferred under the purchase agreement."  No doubt

20   that these are identified as assets transferred under the

21   purchase agreement.  They didn't object.  They got it.  This is

22   part of the course of conduct, the performance, and it is part

23   of Barclays' reliance on what is being done.  No one ever

24   complained that this was inconsistent with anybody's

25   understanding, for the very simple reason that it was not.  It

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 219 of 260

Page 219

1    was not inconsistent with people's understanding.  This is

2    exactly what everybody's understanding was.  That's what the

3    scramble was about over the weekend.  That's why they listed

4    it.  They didn't list it to be meaningless.  That's why they

5    included it in calculations of the value of what Barclays was

6    getting.

7            The movants' motion would require you to undo all

8    those documents, all of that history, ignore all of that,

9    because they now say they have a disagreement with it.  They

10   didn't read it, they didn't understand it, it happened too

11   fast, or some other explanation.  But I respectfully suggest to

12   the Court that we can't just ignore all that history.  We can't

13   ignore all that documentation.  We can't ignore that

14   performance of the parties.  We can't ignore the fact that the

15   argument that they put forward would require significant

16   portions of the letter and APA to be just rendered meaningless,

17   and as Mr. Kobak says, redundant.

18           Now, there's no doubt that everybody got a copy of

19   Schedule B on the day it was filed.  The argument that says

20   that somehow the DTCC letter to which the movants were not

21   intended to be a benefited party, somehow changes this,

22   respectfully, I think makes no sense, Your Honor.  For one

23   thing, as we discuss at slide 327, there's no conflict between

24   the clarification letter and the DTCC letter.  Every witness

25   that's testified has talked about the difference between

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 220 of 260

Page 220

1    accounts and the content of the accounts.  Movants' counsel

2    points to a portion where it talks about the trustee giving

3    permission for certain securities to be transferred.  That is

4    separate from the discussion of what is and is not an excluded

5    asset.  And in fact, it shows that the parties knew how to

6    distinguish between the accounts and their contents.  They did

7    so on some occasions.  But when they talked about what was

8    included and what was excluded, they excluded the accounts and

9    included as a purchased asset, the securities in those

10   accounts.  And I don't see how that could have been any

11   clearer.

12          At 328 we set out Mr. Rosen's testimony about the

13   distinction between accounts and the assets held in the

14   accounts and how this is a well-recognized distinction.  The

15   DTCC's own representative acknowledged -- and this is at slide

16   330 -- that there's a fundamental distinction between owning a

17   DTC account and owning securities held in the account.  And the

18   DTCC letter agreement specifically lists the accounts as the

19   excluded assets, not the securities in those accounts.

20          Even if you had to reconcile the clarification letter

21   with the DTC's agreement, the principle that the specific

22   governs the general, again, would support our interpretation of

23   the clarification letter, because the clarification letter is

24   more specific than the DTCC letter on the disposition of the

25   LBI assets in its clearance box -- in the clearance boxes.  And

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 221 of 260

Page 221

1    if you go through that language which is at slide 331, you will

2    see exactly the detail with which the clarification letter

3    provides that the purchased assets include "such securities and

4    other assets held in LBI's clearance boxes as of the time of

5    the closing."

6        Now, you can't read that language, I respectfully

7    suggest, in an ambiguous way.  It says "such securities and

8    other assets held in LBI's clearance boxes."  That's a

9    purchased asset.  And I understand the issue about whether the

10   clarification letter is enforceable or not, but if it's

11   enforceable, it clearly provides that.

12       And if we were arguing back twenty-five months ago as

13   to whether that was a sensible provision, I think everybody

14   would be here telling you that these were part of the assets

15   that were identified in that scramble.  These were part of the

16   assets that were identified because the assets that Lehman was

17   supposed to give Barclays didn't exist anymore.  Many of them

18   had disappeared entirely.  A lot of those that had remained

19   were reduced in value; they were continuing to decline in

20   value.  Barclays made very clear, we're not prepared to go

21   forward unless we can identify additional assets.  And so these

22   assets were identified.

23       And if we were back twenty-five months ago, I think

24   everybody would be saying that this ought to go forward.

25   Because if it didn't go forward, the alternative was a disaster

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 222

```
 1    for the estate, for its employees, for LBHI, who had guaranty

 2    obligations, for everybody involved.  And this was a good-faith

 3    effort undertaken over that weekend to identify additional

 4    assets that could give Barclays that comfort.  And I think

 5    everybody would be telling you, if we were back twenty-five

 6    months ago, that that would make sense -- it'd make sense to do

 7    that.

 8          Now, counsel for the movants said that Weil Gotshal

 9    was not involved in the negotiations with DTC, and they implied

10    that that meant that because Weil Gotshal was doing the

11    clarification letter, the clarification letter could not have

12    been drafted to account for the DTC letter.  That, of course,

13    is not true.  Because first, if you go to slide 334, as Mr.

14    Rosen testified, the Weil Gotshal lawyers were fully briefed on

15    the DTCC letter and then changed the clarification letter.

16          There's no dispute that the clarification letter was

17    changed as a result of this.  And in fact, while the

18    clarification letter was still being drafted -- this is slide

19    335 -- the trustee sent Weil Gotshal the final DTCC letter.

20    True, Weil Gotshal was not involved in negotiating it, but that

21    didn't mean they didn't have it, weren't briefed on it, and

22    didn't include and indeed change the clarification letter to

23    include references to it.

24          Slide 336 shows how Weil Gotshal's 4:36 a.m. draft of

25    the clarification letter was changed to expressly recognize the
```

1    DTC letter and provide that Barclays was to receive the

2    clearance box assets.  So at the same time they were revising

3    it to take into account the DTC letter, they are making clear

4    that the clearance box assets are purchased assets.  Doing

5    those two things together would make no sense, Your Honor, if

6    the DTC letter invalidated the very provision they're putting

7    in.

8           The next draft, which is at 337, the 5:22 a.m. draft,

9    revised the description of the DTC letter, refined it and

10   corrected it, and broadened Barclays' right to receive the

11   assets in all of LBI's clearance boxes.  Now, if you've got a

12   DTC letter that's taking away what you're drafting, it makes no

13   sense to continue to draft this way.  You've got provisions

14   that would be just rendered meaningless if you took the

15   movants' argument at its word.

16          The drafting history would just make no sense, as

17   Cleary Gottlieb lawyer, Mr. Rosen testified in his testimony,

18   and it's in slide 338, the drafting history would have made no

19   sense at all if Barclays was giving up the right to any of the

20   clearance box assets.

21   "A.  It would make no sense to anyone who had heard the

22   resolution of the DTC situation.  Would never have drafted

23   these provisions as they were drafted."

24          Now, on the Friday before the sale hearing and during

25   the weekend before the closing, lawyers for LBHI and LBI

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 224 of 260

Page 224

1    understood and intended that the assets in the clearance boxes

2    at DTC were purchased assets.  This is after the DTC issue has

3    been raised.  It says, "This is the additional collateral that

4    we would deliver."

5            Now, what they want you to believe is that when the

6    DTC letter was finalized, that that took away all of this asset

7    that was supposed to be delivered.  This was part of the asset

8    scramble.  This was part of what Lehman was promising Barclays.

9    This was part of what was necessary to get the deal done.  And

10   yet what they're saying is that somehow this was all nullified

11   by a DTC letter that was done contemporaneously and indeed

12   before the clarification letter was finally finalized.  And

13   indeed the clarification letter was modified and changed to

14   adapt to the DTC letter.

15           Now, after the closing, what happened?  You've had the

16   DTC letter; you've had the modification of the clarification

17   letter; they've been signed.  It's after the closing now.

18   After the closing -- this is number 340 -- lawyers for LBHI and

19   LBI continued to confirm to Barclays that the assets held in

20   LBI's clearance boxes, listed on Schedule B, were purchased

21   assets.

22           This is performance.  This is an admission.  This is

23   clear, uncontradictable evidence that this is what the parties

24   intended.  This is -- they meant the normal meaning of the

25   words.  The plain meaning of the words was Barclays got the

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 225 of 260

Page 225

1   clearance box assets.  And here they're saying it.  A few days

2   later, a final version of Schedule B is prepared, after

3   closing, by lawyers representing LBHI and LBI, and it listed

4   several categories of assets totaling approximately 1.9

5   billion, the overwhelming majority of which were LBI's DTC

6   accounts.

7           If you look at Barclays' Exhibit 757, which is on

8   slide 341, you will see the large amount of assets, all but 36

9   million of the 1.9 billion listed, were securities in Lehman

10  DTC clearance boxes.  And this is what they're saying, the week

11  after the closing, is part of the purchased assets.  This is

12  what Barclays is relying on.

13          If you look at Barclays' Exhibit 807, slide 342,

14  again, after the closing, lawyers representing LBHI and LBI

15  prepared another summary of the transaction that again admitted

16  that the securities set forth on Schedule B to the

17  clarification letter, i.e., the unencumbered box, were

18  purchased assets.  They're listing purchased assets on

19  Barclays' Exhibit 807.  That's the parties' performance.

20  That's the parties' objectively manifested interpretation.

21  That's the contemporaneous documentation; not people's after-

22  the-fact testimony; the contemporaneous documentation.

23          Another example of that, Barclays' Exhibit 742, slide

24  343.  September 26, 2008, Weil Gotshal sends an e-mail to

25  Barclays' lawyers at Cleary, again, purporting to list the DTC

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 226 of 260

Page 226

1    clearance box assets as securities that Barclays is actually

2    getting.  There's no suggestion here that somehow that's been

3    trumped by the DTC letter.  Nobody thought it had been.

4         Again, Barclays' Exhibit 320, slide 344.  Weil Gotshal

5    sends out to a lot of people, including Alvarez & Marsal, a

6    list that is an attempt to identify what it is Barclays got and

7    didn't get.  What does it say about securities and other assets

8    held in Lehman Brothers' clearance boxes at the time of the

9    closing?  In purchased assets, that's what Alvarez & Marsal was

10   told.  That's what everybody believed.

11        Alvarez & Marsal prepared a presentation to the

12   committee.  This is Exhibit 131, slide 345.  It listed the

13   assets purchased:  1.9 billion dollars of the unencumbered box,

14   which, as the Court has seen, is the DTC accounts.

15        Phillip Kruse was the 30(b)(6) witness -- this is

16   slide 346.  And I want to take a moment on this testimony,

17   because he was a 30(b)(6) witness for both LBHI and Alvarez &

18   Marsal.  And the movants' counsel have made a big point about

19   how when somebody's a 30(b)(6) witness the party is tied to

20   that testimony, can't get away from that testimony, is bound by

21   that testimony.  Well, this is what Mr. Kruse testified:

22   "Q.  Sir, I mean as of the time of the presentation, Alvarez's

23   understanding was that the sale transaction, specifically the

24   clarification letter, did convey the unencumbered box to

25   Barclays and that was worth approximately 1.9 billion dollars?

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 227 of 260

Page 227

1    "A.  Our understanding at the time was being conveyed here,

2    yes.  That was transferred."

3            Another example, Barclays' Exhibit 756 at slide 347,

4    September 25, 2008, to the committee's counsel, again showing

5    the DTC assets as purchased assets.

6            Now, in contradiction to all of that, what they say is

7    that the DTC letter somehow trumped all that, even though it

8    was drafted separately, drafted before the clarification letter

9    was signed, the clarification letter was more specific, the

10   clarification letter was modified to take into account the DTC

11   letter, all of the performance after both letters had been

12   signed and put to bed, was that the clearance box assets went

13   to Barclays.  They now say, based on the testimony of a witness

14   who was not at all involved -- admittedly not at all involved

15   in drafting the clarification letter, that somehow that all

16   ought to be done.

17           That is exactly the kind of unexpressed, subjective

18   intent that's contrary to the plain language of the agreement

19   and contrary to all of the documentary extrinsic evidence that

20   is simply inadmissible, and if it were admissible, we think

21   would be wholly unreliable.  There's no evidence at all that

22   Barclays ever believed that it was giving up the clearance box

23   assets or that anyone ever told them they were giving up the

24   clearance box assets.

25           If you're going to have an expressed intent, it's got

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 228 of 260

Page 228

1    to be expressed to the parties doing the agreement.  That -- no

2    one has ever testified that that intent was expressed to the

3    people that were drafting the clarification letter.  Indeed the

4    drafters of the clarification letter denied it.

5         If you look at slide 352, you see Mr. McDade, Mr.

6    Miller, Mr. Rosen, Mr. Ricci, all testified that no one ever

7    told them, they never came to believe, that anything between

8    DTC and Barclays changed in any way the deal that Barclays was

9    doing with Lehman.  These are the people that were involved.

10   These are the people whose objective manifested intent might be

11   relevant if you found ambiguity.

12        And at slide 353:  "Mr. Rosen, as you understand it,

13   did Barclays' DTC letter agreement affect at all the purchase

14   of Barclays of assets held in the clearance box accounts?

15   "A.  No, not at all."

16        And then the question:  "Did anyone ever suggest that?

17   "A.  I did not hear that in any of the conversations."

18        Moreover, the new theory that Barclays gave up the

19   clearance box assets is directly contrary to movants' other

20   argument that Lehman had agreed to give the clearance box

21   assets to Barclays in order to get Barclays to close.  Remember

22   counsel for the movants talking to you about how there was a

23   holdup over the weekend and Barclays was insisting on more

24   assets and so they came up with the clearance box assets and

25   exchange-trade derivatives and 15c3?  Now, it makes no sense,

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 229 of 260

Page 229

 1    on the one hand, to say Barclays made us come up with these

 2    assets in order to close, and yet say, except we didn't really

 3    come up with the assets.  You can't reconcile those positions,

 4    Your Honor, and you can't reconcile movants' position that the

 5    clearance box assets were not part of the purchased assets with

 6    any of the testimony of the people who were involved

 7    negotiating the APA or the clarification letter or with any of

 8    the contemporaneous documents that went back and forth or with

 9    the parties' performance afterwards, in which they all acted as

10    if these were Barclays' assets.

11         Now let me turn to the exchange-traded derivatives.

12    As we show on slide 361, because the exchange-traded derivative

13    margin was an asset used in the business and was a deposit

14    associated with the business, the plain text of the APA

15    includes that ETD margin as a purchased asset.  It was not an

16    asset that had been identified or quantified until the weekend

17    before closing, but it was something that was included in the

18    APA.  And so again, if we were back twenty-five months ago, and

19    we were saying -- we brought the clarification letter to the

20    Court and we said we want you to expressly approve this, and

21    we've gone through comp and cure, and we've gone through the

22    clearance boxes, and we've shown how those were already

23    included, we'd now be saying this is just an identification of

24    something that was already included.  It's something that

25    a) was part of the APA to start with, and b) the identification

Page 230

1    of it was necessary in order to get Barclays back to the table

2    after the deterioration of the value of the assets that

3    Barclays had originally been promised.

4          And so I think what we would be saying to the Court is

5    that this is a provision of the clarification letter that is

6    entirely consistent with what went on before and is essential

7    to get this deal done.  And I don't see how anybody back then,

8    given the alternative that the Court was faced with, and given

9    the fact that this was clearly an asset that was used in the

10   business, would have had an objection.  And I think that if the

11   Court thought about it back then, even if these questions had

12   been explicitly raised to the Court, the Court would have

13   concluded, just as Weil Gotshal concluded, and just as the

14   movants themselves concluded back then, that this made sense.

15   Because back then, when they knew what was happening, they

16   didn't object; and they didn't object because they knew it was

17   included as part of the business, and they knew it was

18   essential to get the deal done.

19          Now the clarification letter, as the Court knows, had

20   lots of drafts.  And it is true that the parenthetical that

21   says "and any property that may be held to secure obligations

22   under such derivatives" was added late.  And I think the reason

23   it was added late was quite clear.  And that is because first

24   Barclays had tried to put in a broad provision; Weil Gotshal

25   had objected to the broad provision.  And so what Barclays

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 231

1    proposed was a narrow provision that dealt with exchange-traded

2    derivatives.

3           And everybody understood back then that all of the

4    exchange traded derivative margin was a purchased asset.

5    Again, trustee's 30(b)(6) designee, in this case, Mr. Kobak:

6    "You understood that what was in these OCC accounts," the

7    exchange-traded derivatives accounts, "what are referred to as

8    exchange-traded derivatives?"

9    "A.  Yes.

10   "Q.  And you understood that they exchange-traded derivative

11   discussion in the APA did not limit the collateral to customer

12   collateral, correct?

13   "A.  It just referred, I think, to margin or collateral.  I

14   think in the final version of the clarification, it's that

15   language we saw.  It wasn't limited in any way, no."

16   "Q.  It said 'any property', it wasn't limited to customer

17   property, correct?

18   "A.  It said 'any property', yes."

19          The trustee then went on -- and this is slide 364, to

20   sign three separate agreements approving the transfer of

21   exchange-traded derivative margin to Barclays, including cash

22   margin -- including cash margin.  Because everybody understood

23   that nobody would take on the liability for exchange-traded

24   derivatives in that volatile period without getting all of the

25   margin, all of the property securing those derivatives.  And it

Page 232

1    didn't make any difference whether that property was securities

2    or cash or other property.  What mattered is that this was what

3    had been put up to secure those obligations.

4         And the Court heard testimony from several people,

5    some from Barclays some not.  All of them testified there was

6    no practical way anybody, particularly in that volatile

7    environment, would take on exchange-traded derivatives without

8    taking on all the margin for it.  And the trustee understood

9    that back then and signed three agreements.  There was the

10   transfer and assumption agreement, Barclays' Exhibit 3A at

11   paragraph 1(a), in which it said that "Lehman hereby sells,

12   signs, transfers and sets over, among other things, all margin

13   deposits held by OCC."

14        The collateral account agreement.  It says, "LBI has

15   assigned to Barclays all rights in securities, cash and other

16   property, the collateral pledged by LBI to the OCC and held for

17   OCC's benefit at JPMorgan Chase."  And then of course the

18   clarification letter itself, which provided it got the

19   exchange-traded derivatives and any property that may be held

20   to secure obligations under such derivatives.

21        At trial, Mr. Kobak testified that he understood when

22   he signed the TAA that all of LBI's OCC margin deposits were

23   being transferred to Barclays, slide 365:  "When you signed

24   this, you understood that LBI was transferring all of its OCC

25   accounts to Barclays, correct?

Page 233

1    "A.  Yes.

2    "Q.  And you understood that that transfer included all of the

3    margin deposits held by OCC with respect to those accounts,

4    correct?

5    "A.  Yes."

6          Again, the parties' performance of their contract --

7    they knew what it meant and they were performing it.

8          And slide 366, Mr. Kobak admitted that he knew that

9    these OCC accounts that were being transferred to Barclays

10   included LBI proprietary stuff.  He had to know that.  But he

11   admits it.

12         Now, the parties involved in the transaction talked

13   about this too.  You've got the Elizabeth James testimony

14   that's displayed at slide 367 where she testified that there

15   was an actual discussion in which it was expressly discussed

16   that the margin for the exchange-traded derivatives would be

17   transferred.  And the Court heard, as I said, uncontradicted

18   evidence that nobody would buy this stuff without the margin

19   associated with it.

20         That's not just James' testimony.  If you look at

21   Barclays' Exhibit 217 and slide 368, you see contemporaneous

22   evidence of where that was being discussed on Friday, September

23   19th.  And if you go to Barclays' Exhibit 220 at slide 369, you

24   see the beginning of three or four really critical documents.

25   First the parties inserted a provision in the sale order that

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 234 of 260

Page 234

1   specifically addresses the transfer of LBI's OCC margin to

2   Barclays.  And you see that this includes -- and we've put it

3   in red -- all securities, cash, collateral and other property

4   transferred to accounts of the purchaser at OCC.

5         And this was put in so that OCC could be sure that

6   when this was transferred, they would continue to have their

7   rights to it.  There would be no purpose for this provision if

8   all of this was not being transferred to Barclays.  Again, you

9   can only support the movants' argument here by ignoring the

10   clear language of the contract and ignoring the documented

11   performance of the parties under that contract.

12         Now, going to Barclays' Exhibit 233 and slide 370, the

13   OCC repeatedly confirmed with all the parties that it was

14   transferring all of the EDT margin to Barclays.  For example,

15   on September 20th, Saturday, OCC is seeking to confirm its

16   understanding that the LBI accounts and all positions, cash and

17   securities collateral, that are held by OCC in respect of those

18   accounts, are intended to be transferred to Barclays.  And OCC

19   goes on to note that it's holding nearly a billion dollars in

20   cash.

21         Barclays' Exhibit 262, slide 371, the next day, OCC

22   says, "Having heard nothing from you with respect to cash held

23   by OCC, in respect of the LBI accounts, and in accordance with

24   the terms of the transfer and purchase agreement, all such cash

25   in the accounts will be transferred to Barclays, assuming that

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 235 of 260

Page 235

1    the transaction closes."  And of course, the transaction closed

2    and it was transferred, because that's what the parties

3    intended.  And at trial, Mr. Kobak, the trustee's

4    representative, testified that he read and understood this at

5    the time.  That's at the May 5 transcript at page 112, lines 12

6    to 21.

7            Now, why would the debtor agree to this?  Why does

8    this make sense?  Three reasons.  First, it's already part of

9    the purchased assets, because it's all assets used in the

10   business.  Second, they're going to lose it all anyway.  Even

11   Mr. McDade testified that he thought they were going to lose

12   it.  All of this stuff -- they just lost -- the Chicago Board

13   of Trade or one of those organizations, had already closed them

14   out and taken all their assets.  They knew they were about --

15   this was about to happen.  The evidence is uncontradicted that

16   these margin requirements were not going to be given back to

17   them, because they were going to get closed out; they were

18   going to lose it.  So they're given the sleeves of the vest.

19   They're given something that is helpful to Lehman perhaps --

20   helpful to Barclays, perhaps, but not hurtful to Lehman.  And

21   the third reason is that people aren't going to start taking

22   bits and pieces without getting the whole.

23           So they had -- it was already given.  It didn't have

24   much value to them.  They needed to do it to get the deal done.

25   All of those reasons, if we were back twenty-five months ago, I

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 236 of 260

Page 236

1   would be saying to you -- or somebody who was more

2   knowledgeable about bankruptcy law would be saying to you that

3   this is a deal that needs to be approved.

4          Now, let me turn to the 15c3 account.  Again, the 15c3

5   account was within the broad definition of purchased assets in

6   the original APA, because it is clearly assets that are used in

7   the business -- primarily used in the business -- capital B.

8   It was also specifically included in the clarification letter.

9   And it was also one of the three so-called additional assets

10  that Lehman came forward with and identified in order to

11  convince Barclays to close.

12         So again, to exclude the 15c3 assets, the 769 million

13  dollars, you've got to ignore not only the plain language of

14  the clarification letter, you've got to ignore the reason it

15  was put into the clarification letter.  It was put into the

16  clarification letter to assure Barclays that it was going to

17  get this additional asset.  This was part of convincing

18  Barclays to close.  And so if we were back twenty-five months

19  ago, I would be saying this is an essential part of the deal.

20  Not only was it already a part of the deal when it was signed,

21  and it's been subsequently identified, but you can't take it

22  out now, because if you do, you're taking away part of what was

23  bargained for.

24         And the drafting of this is, of course, what has been

25  noted by movants' counsel.  And that is that at some point

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 237 of 260

Page 237

1    somebody raised an objection and raised a question as to

2    whether the draft that had, up until then, simply provided that

3    Barclays got it, was consistent with regulatory provisions.

4    Now, we think we're entitled to this because we think we've

5    established that there's no regulatory inhibition.  And we've

6    made the point to the Court that regardless of how you read

7    this language, we're entitled to it because there's no

8    regulatory inhibition on our getting it.

9         But if there is a regulatory inhibition on our getting

10   it, then what was specifically done was to write into the

11   clarification letter language that made clear that we were

12   going to get equivalent securities.  There is not any evidence

13   at all that anyone ever said to Barclays that there was any

14   chance that we would not get the 769 million dollars.  I want

15   to repeat that, Your Honor, because that's dispositive.

16   There's not any evidence that anyone said to Barclays that

17   there was any chance we're not going to get the 769 million

18   dollars, one way or the other.

19        They talked about the regulatory inhibitions, but

20   nobody came and said this means that you may not get anything

21   out of 15c3, and that, of course, would have been quite

22   inconsistent with the economic deal that had been agreed to.

23        Now, counsel for the movants said that we gave up a

24   billion dollars of cash, which is true, we did.  And he said

25   that somehow that indicated that we must have thought our

Page 238

1    position was weak.  When we get more we're being a pig, and

2    when we give up things we're being weak.  So it seems that

3    there was probably no way that Barclays could have won under

4    those circumstances.  But the fact of the matter is, that

5    regardless of why they gave up the claim for a billion dollars

6    of cash there, there was nothing that was said that took away

7    our right to get 769 million dollars of securities one way or

8    the other.

9         Now, there is one particular document that I would

10   like to -- yes, 378.  This is a timeline.  And if you will see

11   that between 3 and 4 a.m., Barclays and Lehman lawyers

12   discussed the 15c3-3 cash and agreed to remove it from the

13   deal.  Now, what they did then was to make clear that we would

14   get at least the securities or equivalent value.  And they say

15   the "or value" is just redundant.  Again, they're trying to

16   write out of the agreement part of the language.  In fact, that

17   was put in expressly to try to give Barclays the assurance that

18   if there was a regulatory problem -- which they didn't think

19   there would be -- that they would be able to get those assets.

20        Now, as I've said, we have said that we don't think

21   that there was a regulatory problem.  We've set that forth on

22   slides 412, 413 about why the trustee was legally authorized to

23   transfer the property.  And we think that that's right.  But

24   regardless of that issue, the fact that we were entitled to

25   this because we bargained for it, and it was part of what we

Page 239

1  were entitled to get and part of what we relied on in closing,

2  is the primary argument that I want to make to the Court.

3        Now, if you turn to screen 411, which has the actual

4  language in the clarification letter, it says at the end, "or

5  securities of substantially the same nature and value."  That

6  language would be meaningless if the trustee's and other

7  movants' position is accepted.  And it would have been

8  inconsistent with what all of them said at the end of the

9  negotiations, because they all thought, at that time, that

10  they'd gotten the billion dollars, but they were giving up 760

11  million dollars -- -69 million dollars, which was a good deal

12  for them.

13        And the fact that this was unconditional is shown by

14  the continuation of the timeline, which is at 420.  Remember I

15  pointed out the earlier draft, and at 4:36 a.m., you have the

16  phrase "or securities of substantially the same nature," and

17  then they add "or value."  And there's no point in adding the

18  words "or value" unless you are making sure that we're going to

19  get equivalent value.

20        There's an argument that I want to come to that they

21  make that says the "or" clause was added because you might have

22  to shift things around.  If you're just shifting things around,

23  you wouldn't need the "or value" part.  In addition, I want to

24  go directly to this after-the-fact argument that the "or"

25  clause was intended merely to allow them to shift around the

Page 240

1    securities if there was no regulatory problem.  That comes, as

2    counsel for the movants say, from a Weil Gotshal attorney,

3    Robert Messineo.  He's the only person who has raised this.

4    And if you go to our screen 425, he was not part of the hallway

5    conversation where this was all agreed to.  More important, he

6    did not communicate his understanding of the phrase to anyone

7    at Barclays.  He didn't even communicate his understanding to

8    his own partner, Harvey Miller.  This is unexpressed subjective

9    intent taken to the tenth power.  This is the unexpressed

10   subjective intent of somebody who wasn't even participating in

11   the negotiations.

12          It was never conveyed to Barclays.  It was never even

13   conveyed to his partner who was doing the negotiations.  And if

14   you look at screen 425, this is Harvey Miller:

15   "Q.  Was it your understanding that if LBI or the estate was no

16   longer in a position of transferring the specific security

17   because it had matured, it would have the ability to transfer

18   an alternative similar security of the same value?

19   "A.  I don't think that was contemplated at the time this was

20   drafted."

21          This was the person who was doing the drafting for the

22   estate.  He doesn't even think that this argument that the

23   movants have come up with was even contemplated, let alone told

24   to Barclays.  Even if he had thought it was contemplated, it

25   wouldn't be relevant unless he expressed it to Barclays, which

Page 241

1  he clearly didn't do, because he didn't even know about it.

2  But this just shows you how far afield they are to try to find

3  an interpretation of that "or" clause that doesn't render the

4  entire clause meaningless.

5          Their argument is that you've simply got to ignore

6  that clause that was put in, obviously, late, for the benefit

7  of Barclays.  And you've got to ignore what they wrote; you've

8  got to ignore why they wrote it, which was in order to identify

9  additional assets for Barclays; and you've got to ignore what

10  they did after it was all signed.  Because after closing --

11  this is screen 426, Barclays' Exhibit 287 -- the movants'

12  counsel continued to admit and continued to say to the

13  committee counsel, that Barclays "gets securities, 263 million

14  dollars."  No mention that there's any contingency or

15  conditionality to this.  They say this was a contingent

16  promise.  There's nothing here that indicates it was

17  contingent.  And there's nothing on September 22, BCI Exhibit

18  288, screen 427, from Mr. Miller to the committee advisors in

19  which they say that Barclays is getting the 763 million

20  dollars.  Nothing contingent or conditional there.

21          There was nothing contingent or conditional in October

22  of 2008 -- on October 16, when Mr. Miller, in a state of the

23  estate presentation said -- and this is at screen 428,

24  Barclays' Exhibit 485 at page 58:  "As part of the closing,

25  because Barclays was taking the customer accounts, they got the

Page 242

1   700-odd million dollars in securities."  They got the

2   securities.  Again, Barclays' Exhibit 839, screen 429.  This is

3   the committee now.  And the committee's congratulating

4   themselves.  They're congratulating that they only gave

5   Barclays the 763 of securities, and they got the rest.  So what

6   they are saying is, not only is Barclays entitled to the 763

7   million dollars in securities, but this was a good deal for

8   them.  They're happy with the deal.  They're not trying to undo

9   the deal then.  Because they knew if they tried to undo the

10   deal then, they would open up the billion dollars or the

11   billion and a half dollars that they were getting.

12        Again, Barclays' Exhibit 847, screen 430.  We won the

13   issue, the committee advisors say.  Barclays is only getting

14   the securities.  We won.  We got more than we expected.  And

15   Barclays' Exhibit 811, screen 431, they're again congratulating

16   themselves.  They're saying because they refused to consent,

17   the company got more aggressive and ultimately cut a deal with

18   Barclays in which Barclays only gets 763 million dollars of the

19   securities in these deposit regulatory accounts.

20        I respectfully suggest, Your Honor, that you cannot --

21   could not even, back in October or September of 2008, reconcile

22   the movants' position that somehow this was contingent with,

23   1) the fact that it was part of the definition of purchased

24   assets in the original APA; 2) the express language of the

25   clarification letter, that they have to render meaningless to

08-01420-scc    Doc 3836    Filed 10/25/10    Entered 10/25/10 15:48:56    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 243 of 260

Page 243

1    support their argument; 3) this was part of what was bargained

2    for by Barclays and relied on in Barclays in agreeing to close

3    the deal; and 4) the post-closing performance and conduct of

4    the parties is all consistent with our interpretation and

5    inconsistent with their interpretation.

6         Let me ask you just to look quickly at Barclays'

7    Exhibit 332, which is screen 432.  And I will show you another

8    version of this.  But the important point I want to emphasize

9    is this is the committee recognizing that this is part of what

10   Barclays bargained for and needed to get.  And the same point

11   is made in Barclays' Exhibit 814B, which is screen 433 and

12   Barclays' Exhibit 382, which is screen 434.

13        To summarize, if we were back twenty-five months ago,

14   I would be saying that if the clarification letter had been

15   brought to you, the letter ought to be approved for three

16   reasons:  one, it basically reflects the original deal that was

17   done, because the so-called additional assets were all included

18   originally; and second, it's essential that they be given now,

19   because otherwise Barclays is not going to do the deal.

20   Everybody knew that then.  Everybody knew that because of the

21   deterioration of values, these things had to be identified, and

22   they could not have given them with one hand and take them back

23   with the other.  Third, I'd be emphasizing what I know the

24   Court already knows and what everybody has said, which is that

25   this deal was a far better deal for everybody than the

Page 244

1    alternative.  There was no other practical alternative.  And

2    what Barclays agreed to was, in some cases to give up more than

3    it could have gotten, maybe that billion dollars.  But the deal

4    was done and certainly everybody knew, on that Monday morning,

5    that Barclays was not going to part with what was in those

6    clarification letter paragraphs.  Everybody knew that Barclays

7    was not going to renegotiate the deal then.  And everybody knew

8    that if Barclays closed, they were closing in reliance on those

9    provisions, which is exactly what happened.  So I think that if

10   we were back then and if everybody in this courtroom is honest

11   about it, they would have to tell you that they know that if it

12   had been raised, everybody would have urged the Court to

13   approve it.

14          The second thing I would say is that we're not back

15   there.  We are now in a situation in which Barclays has made

16   the commitment; it has been integrated; and what they're coming

17   in and asking you to do is to rewrite the parties' contract

18   after the fact.  And that simply is impermissible as a matter

19   of law.  They cannot ask this Court to do that.  This Court

20   can't give them that relief.  That doesn't mean that if they

21   could make out an argument that somehow they were defrauded or

22   the like, they wouldn't have a remedy.  It's just not this

23   remedy.

24          Third point.  They knew all of this back then.  And

25   I've spent maybe more time than I should have in a hot

Page 245

1   courtroom going through some of this stuff.  There's a lot more

2   here that I could have gone through.  There's a lot more that

3   we've gone through at trial.  But each of the movants knew each

4   of these things back then.  And they put it in their pocket,

5   and they've brought it out only after the markets have

6   recovered and Barclays' risk is over with.  And that's not

7   something that 60(b), or insofar as I'm aware any principle of

8   law, allows or should allow.

9        The fourth thing that I would say -- and I've alluded

10  to this before -- and that is that Barclays did what it did in

11  reliance on what was written, signed, filed with the Court.

12  That reliance is something that cannot now be undone.  Having

13  relied on what they signed, what they had, what they knew, what

14  they with us filed, that -- it is simply neither just nor, I

15  think, consistent with the law, to revise this transaction at

16  this date.

17        This is not just a question of the finality of

18  bankruptcy law and the finality of bankruptcy proceedings,

19  although I think that is important.  This raises a much more

20  fundamental issue as to whether a party who makes an enormously

21  risky investment, pursuant to a contract that is signed,

22  executed, filed with the Court and then performed for months,

23  has a right to rely on that written, executed, court-filed,

24  performed contract, or whether some parties to that agreement,

25  even if they could identify a problem -- let's say they

1   identified a problem here.  Let's say they said, aha, this

2   clarification letter was never formally approved by the Court,

3   but let's not do anything now.  Let's put it in our pocket and

4   see how things turn out.  And then let's go to the Court --

5   which they did -- and cited it to you.  They cited the

6   clarification letter to you.  We did too.  But so did they.  In

7   the weeks after the closing, both of us came into court and

8   wrote motions and papers in which we cited and relied on the

9   clarification letter.  This Court made decisions based on the

10  existence of the clarification letter.  They took the benefits

11  of the deal that the clarification letter made possible.

12        And when that purchase agreement, including the

13  clarification letter, was attacked on appeal, they went into

14  the appellate court and argued for affirmance of the sale

15  order.  Not just affirmance of the APA, but affirmance of the

16  entire purchase agreement, including expressly the

17  clarification letter, whether this Court approved it or not.

18        At the appellate level, the clarification letter was

19  presented to the appellate court, not just by us -- although it

20  was by us -- but by the movants as well, as part of what this

21  Court had done.  And it was affirmed by the appellate court as

22  part of what this Court had done.  And we've cited law, we've

23  cited the mandate rule, we've cited a variety of legal

24  principles that talk about the importance of that.  But I'm

25  speaking now, not in terms of those legal principles; I'm

Page 247

1  speaking now about the fundamental fairness of what's gone on

2  here; the fundamental fairness of the fact that Barclays

3  stepped up, when nobody else would, took an enormous risk, did

4  so in reliance on a written, executed document that the

5  movants' signed, that was filed with the court, and that they

6  performed.

7         And whether they had a problem or not, whether there

8  was a defect or not, back in 2008, they had no right, it is not

9  fair, there's no legal principle that justifies, them putting

10  it in their pocket and then waiting to come back into court

11  after they've seen how the market has turned, and say to this

12  Court, rewrite that contract.

13         Thank you very much, Your Honor.

14         THE COURT:  Thank you.  Is there any desire on the

15  part of the movants to further argue?  If so, as you may be

16  able to observe, I'm suffering a little bit from a head cold

17  and would just like a five-minute break to blow my nose and

18  take a decongestant.

19         MR. GAFFEY:  Your Honor, I can say, if we take a five-

20  minute break, I can cut what rebuttal I have down to under ten

21  minutes and get it closer to five.

22         THE COURT:  I'm not trying to shut anybody down.

23         MR. GAFFEY:  I think it would be a useful exercise for

24  me.

25         THE COURT:  Let's take five minutes.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 248 of 260

Page 248

1          MR. GAFFEY:  Thank you, Your Honor.

2          (Recess from 6:51 p.m. to 7:01 p.m.)

3          THE COURT:  Be seated, please.  I want to confirm that

4     it is much warmer in here than it is in my chambers.  And I

5     recognize that we've been here for a long day.

6          I wanted to make a brief comment before hearing from

7     the movants again, because there's a theme in Mr. Boies'

8     argument which I think is true insofar as it relates to my

9     state of mind, but may be a debatable point as it relates to

10    the standard under 60(b) that I should be applying.

11         A lot of his argument related to what would I do as of

12    twenty-five months ago if I knew all the facts that were in the

13    record today.  And in effect, that is how I had been thinking

14    about this case from the onset.  But I'm not sure if that's the

15    right way to think about the case.  And so I want to give the

16    parties an opportunity to reflect on that relative to the 60(b)

17    standard, and in particular -- and I realize this isn't a lot

18    of notice -- but you've been hearing the same argument I've

19    been hearing -- in particular in reference to any further

20    comments that the movants wish to make.

21         MR. GAFFEY:  Your Honor, on that particular issue,

22    which obviously we had made note of, it's generally my view

23    that we obviously will deal with this at some point in the

24    post-trial briefs, because it goes to the legal issues, but let

25    me address it very briefly now.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 249 of 260

Page 249

1          I think that the formulation, what would have been

2     done, what would the Court do twenty-five months ago if it knew

3     then what it knows now, is an argument where the barn door

4     closed a long time ago.  I think that Rule 60(b), and

5     particularly in this context, Rule 60(b) requires the Court to

6     look at whether there was a mistake made to the order, a

7     mistake made in connection with or fraud or misrepresentation

8     in connection with the order that was actually issued on the

9     record that was actually developed.  And I think that makes

10    complete sense.  Because I think any other formulation would

11    require the hypotheticals, which is what Mr. Boies' question is

12    close to being:  what would the Court have done if a different

13    record had been made?

14         It's not enough to say -- to me, it's a variation on

15    no harm no foul.  It's -- to be able to say now, well, look, we

16    were the only game in town; Barclays was the only bidder; at

17    the end of the day it was a good deal because Barclays was the

18    only bidder.  I think that the danger of going down the road of

19    what would the Court have done if it knew then what it knows

20    now, is we don't know everything it would have known; and I'll

21    give you one example.

22         I think if the hidden benefits to Barclays in the

23    deal -- and let's everybody assume for the moment I'm right

24    about the hidden benefits, the five billion dollar discount and

25    the understated cure liabilities and the understated bonus

Page 250

1   liability and the fact that the deal was built for Barclays to

2   take an immediate embedded gain of what our experts call eleven

3   billion dollars.  Well, on the state of the play at the time,

4   against the disclosures that actually were made inter se and to

5   the Court, there was one bidder.  There's no way to tell now,

6   twenty-five months later, whether if there was an eleven

7   billion dollar embedded gain in the deal, there might have been

8   another one.

9        Now, Your Honor will recall Mr. Ridings' testimony at

10  the sale hearing.  He was asked -- and I don't recall by

11  whom -- but he was asked on cross-examination about the process

12  that he had followed or not followed with regard to shopping

13  the company around.  And Mr. Ridings' testimony -- and again,

14  I'm paraphrasing and I'm uncharacteristically without a slide

15  on the point --

16        THE COURT:  I think that's even better at this point.

17        MR. GAFFEY:  -- I think you'd make you happier.  Mr.

18  Ridings' testimony essentially was well, everybody's known this

19  company's for sale and my phone hasn't been ringing.  It was

20  not -- and I took note of this the first time I ever read that

21  transcript -- it was not, well, we're calling a lot of

22  potential buyers and nobody wants it.

23        And I think the problem with the formulation Mr. Boies

24  has put forward from a 60(b) perspective is what we are

25  revisiting here, what we are looking at here, is the order that

Page 251

1    was actually issued on the record that was actually developed.

2    And the possibility of making assumptions as to what would have

3    been had history been different, is an endless possibility.

4          To that end, I would note -- and I think I can

5    properly address this, because it's in the record in the motion

6    papers.  In the motion papers you will see that Barclays had

7    put into that record a report by a Professor Saunders.  And

8    Professor Saunders was going to testify, I think, to exactly

9    that -- what I would think is a let's say formulation.  If

10   history had been different, the future would have been

11   different in a way that apparently Professor Saunders thought

12   he could predict.

13         In other words, Professor Saunders put in an opinion

14   that said if the record had been different, Your Honor would

15   have done this, would have done that and would have been right

16   to do so.  Now, that testimony wasn't adduced at trial.  But

17   the reason I am addressing it here is I think it needs to be

18   addressed on the motion papers.  But I also think the logical

19   fallacy in Professor Saunders' approach is epitomized by Mr.

20   Boies' formulation:  if things had been different, would things

21   have been different?  Well, that's hypothesis, not fact.

22         THE COURT:  Well, I think he's actually saying

23   something different.  I think he's not formulating the

24   question:  if things had been different, well then history

25   would have been different.  He's saying, if I had been aware of

Page 252

1    everything that has been now developed in this record,

2    including the clarification letter -- let's just play the tape

3    forward only a couple of days.  Let's say that instead of

4    having had that historical sale hearing that went into the

5    evening, Friday evening into Saturday morning and then led to

6    the weekend of intense activity, that the hearing had taken

7    place instead on Monday, and at that Monday hearing, people

8    would have come into Court with the completed versions of the

9    clarification letter.  The lawyers who had participated in the

10   negotiations would have said whatever it is that they could say

11   after several nights without sleep, and they would say, please

12   approve this transaction as it has been modified to reflect

13   discussions that took place over the weekend.  And here's a

14   black-line version of the documents.  Here are the changes that

15   have taken place.

16          Virtually every single omnibus hearing in the Lehman

17   bankruptcy case that involves transactional activity -- and

18   there are quite a few such motions that get presented for

19   approval on a monthly basis, involves somebody coming up and

20   saying may I approach; and a black-line version of some

21   document that had been previously in the record is presented to

22   reflect the changes made that morning.

23          So I can imagine that happening.  And the question

24   that's being presented, I think, is a little less of a

25   conundrum than what you're now articulating.

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 253 of 260

Page 253

1           MR. GAFFEY:  I see --

2           THE COURT:  I see it more as, if you knew more or less

3    at the same time, everything that had been going on, because we

4    could have a little time shift for about seventy two hours, and

5    it's now the beginning of the week of September 22, and

6    everything that went on could be presented to you, including

7    discussions relating to meetings that took place at Lehman

8    Brothers to mark the book, and it was all presented.  I think

9    what Mr. Boies is saying, well of course you would have

10   approved that.

11          MR. GAFFEY:  I hear Mr. Boies saying that.  I'm just

12   not sure if there's a logical way to get there.  And again,

13   I'll respond by way of example, Your Honor.  I take Your

14   Honor's point about possibly the difference between my

15   formulation and your understanding of Mr. Boies' formulation.

16          But let's take Your Honor's hypothetical.  The parties

17   come in on Monday and say, well, we've changed the deal.  We

18   have a clarification letter.  It's black-lined.  Well, first of

19   all, I think the difference between that and what's routinely

20   seen in the Court and at an omnibus hearing, although there's

21   very little that's routine about a Lehman omnibus hearing, is

22   the deadline.  The parties came in in the beginning and said we

23   have to get this done.  This has got to get done.  That's why

24   we have to have that sale hearing on these incredibly truncated

25   timetables.  And party after party stood up at the initial

Page 254

1    hearing, the sale procedures hearing on the 17th, asking for

2    some relief that -- which the Court determined to go ahead on

3    the schedule the parties proposed.

4         Well, let's take this to the Monday now.  Now, on the

5    Monday -- and now we're in the world of hypothesis -- they come

6    in on Monday and say, well we changed the deal.  We've

7    identified -- if you take Mr. Boies' verb -- or added if you

8    take Mr. Gaffey's verb -- these assets through a clarification

9    letter, and we've changed it.  Well, does the Court hold

10   another hearing now?  This place was crawling with interested

11   parties on the Friday night till after midnight.  Does the

12   Court reconvene that?  If it does, does it do it on notice?  If

13   it does it on notice, how much notice does it give?  If it

14   gives only a little bit of notice, are we back to a whole week

15   from Monday?

16        Now, I raise that as an example, not of whether or not

17   a hearing would -- an additional hearing would have made sense,

18   but to demonstrate that when the order is entered, history is

19   made there.  And it is frozen.  It's an exercise in

20   hypothesizing what would have happened if, no matter how you

21   look at it.

22        Would the creditors' committee, having three more

23   days, been able to say, well, wait a minute, what's that 1.9

24   billion dollars?  What's that 769?  Why did you change the

25   definition of purchased assets?  We need a complete do-over,

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 255 of 260

Page 255

1   because Friday's hearing had nothing to do with the deal that's

2   there now.  How much time would that take?  And again, I do

3   this by way of example of what I think is the fallacy of -- the

4   logical fallacy of approaching it that way.

5            I think when a Court is asked to address an order it

6   issued -- when it's asked under Rule 60(b) to address an order

7   that it's issued, it addresses the order that it issued on the

8   record that was made.

9            One unspoken premise of Mr. Boies' formulation, I

10  think, is the suggestion that somehow it's awkward or it's

11  different for a judge to be asked to revisit his own order.

12  That's what Rule 60(b) is all the time.  You don't go back to a

13  new judge and say, Judge Smith entered an order, but because he

14  entered the order and what he had in mind might feature, we're

15  going to go to Judge Jones.  You go back to the court that

16  issued the 60(b) order.  That's uncontroversial.  That's not at

17  all unreasonable.  That's what 60(b) is.  But 60(b) addresses

18  the record that was made, and there's no do-overs here.

19  There's no, well, let's hypothesize as to the record that would

20  have been made or could have been made and comfort ourselves

21  that it's no harm no foul, it would have come to the same

22  thing.

23           The logical extension is, and I won't -- the logical

24  extension could be, the Court would have approved anything.  I

25  don't think that's so.  But the perception and the logical

08-01420-scc   Doc 3836   Filed 10/25/10   Entered 10/25/10 15:48:56   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 256 of 260

Page 256

1   extension of that, and you're not many steps away is, if I'm

2   going to hypothesize as to what could have happened, you can

3   always hypothesize your way to, well, it would have been the

4   same, the deal -- whatever the new deal is -- would have been

5   done.

6          THE COURT:  I think what distinguishes this proceeding

7   from what may be a more conventional 60(b) setting, and I don't

8   think I'm walking out on a limb in saying that this is perhaps

9   the most unusual 60(b) proceeding in the history of 60(b)

10  proceedings.  I doubt that anybody would --

11         MR. GAFFEY:  I think it's just vanilla, lay down your

12  hands, Your Honor.

13         THE COURT:  So we're all navigating some uncharted

14  territory here.  And it's something that I've given quite a lot

15  of thought to, including some chambers conferences with

16  counsel, about my role in this in that I'm the witness that

17  nobody called.  I was here that entire week and into the

18  evening.  And so the circumstances that surround the revisiting

19  of what happened Lehman week create, I think, some unique

20  burdens and responsibilities for the Court.

21         And without stating too much at this juncture, I think

22  it is publicly known that in the week immediately following

23  that Lehman hearing, I was moderator of a panel at the National

24  Conference of Bankruptcy Judges that took place, I think, on

25  the Thursday after the sale approval hearing.  And my panel was

Page 257

 1   systemic risk.  I had been preparing for that panel since

 2   January of 2008.  And so one of the wildcards in any case

 3   assignment is that I happened to be extremely conversant with

 4   systemic risk at the time that I received the assignment that

 5   week to be what I now am, the Lehman judge.

 6        So would another judge have seen it the same way?

 7   Maybe yes, maybe no.  The point I make is this:  I don't know

 8   how you revisit something like this in a thoughtful way other

 9   than the proceeding we just had.  But it raises some incredibly

10   profound philosophical as well as legal questions.  One, for

11   example, is that it is not possible, under any real-world

12   setting, for the information that I have learned in this

13   proceeding to have ever been presented to me in the context of

14   a 363 setting, even if it weren't being presented in the

15   context of the week that was, because such proceedings are

16   necessarily summary and expedited proceedings.  And even if

17   they are contested, there's a limit to how much time a

18   transaction can stand in court before the transaction breaks.

19        So the reality is that you never could have had a

20   thirty-plus day trial to explore every facet of what was going

21   on that week.  And so from my perspective, this has been one of

22   the most incredibly fascinating experiences I've ever had as a

23   professional.  And without stating anything that you'll view as

24   unduly complimentary to counsel, I think it has been a

25   beautifully tried case and it's been a privilege to be in court

1    with all of you.

2            That said, I have a big job in front of me.  And I

3    know you're going to help, both in any further remarks made

4    tonight and in the submissions which I will get some time in

5    November -- which, by the way, remind me, what date is that?

6            MR. GAFFEY:  I think -- I don't have the immediate

7    date to mind, Your Honor but --

8            UNIDENTIFIED ATTORNEY:  November 21st is a Sunday so

9    it should be 22nd.

10           MR. GAFFEY:  22nd of November.

11           THE COURT:  Okay.

12           MR. GAFFEY:  Your Honor --

13           THE COURT:  With that colloquy, we can then finish

14   with what anybody wants to say, and we can then close for the

15   night.

16           MR. GAFFEY:  I had been prepared to rise to report the

17   happy news that none of us had rebuttal, Your Honor.  So other

18   than to respond to Your Honor's question, I have nothing to

19   add.

20           THE COURT:  Okay.  So I've kept us late.

21           MR. GAFFEY:  Better you than me, Your Honor.  Thank

22   you.

23           THE COURT:  Okay.  Is there anything more?

24           MR. BOIES:  No, Your Honor.

25           MR. GAFFEY:  No, Your Honor.

Page 259

1            ALL:  Thank you, Your Honor.

2            THE COURT:  We're adjourned.

3        (Whereupon these proceedings were concluded at 7:19 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 260

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12    Veritext

13    200 Old Country Road

14    Suite 580

15    Mineola, NY 11501

16

17    Date:  October 25, 2010

18

19

20

21

22

23

24

25