**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani
James C. Tecce
Eric M. Kay
Robert K. Dakis
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
| | |
|---|---|
| **In re:** | **:  Chapter 11** |
| | **:  Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **:  Jointly Administered** |
| | **:** |
| Debtors. | **:** |

-----------------------------------------------------------------------x
| | |
|---|---|
| **In re:** | **:  SIPA Proceeding** |
| | **:  Case No. 08-01420 (JMP)** |
| **LEHMAN BROTHERS INC.,** | **:** |
| | **:** |
| Debtor. | **:** |

-----------------------------------------------------------------------x

**POST-TRIAL MEMORANDUM OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.,
(I) IN SUPPORT OF (A) COMMITTEE'S MOTION, PURSUANT TO 11 U.S.C. § 105(a),
FED. R. CIV. P. 60(b), AND FED. R. BANKR. P. 9024, FOR RELIEF FROM
SEPTEMBER 19 SALE ORDERS, (B) RELIEF ON COUNT I THROUGH COUNT III
OF COMMITTEE'S ADVERSARY COMPLAINT, AND (C) COMMITTEE'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND (II) IN
OPPOSITION TO MOTION OF BARCLAYS' CAPITAL INC. TO ENFORCE SALE
ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

## TABLE OF CONTENTS

**Page**

**I. PRELIMINARY STATEMENT** ................................................................................1

**II. FACTUAL BACKGROUND SUPPORTING COMMITTEE'S PROPOSED FINDINGS OF FACT** ................................................................................18

    A.    DRINKING FROM A FIRE HOSE:  INITIAL ATTEMPTS AT DUE DILIGENCE (SEPTEMBER 17 THROUGH SEPTEMBER 22) ............................................19

        1.    OBTAINING BOARD OF DIRECTORS' APPROVALS (SEPTEMBER 16) ........19

        2.    EXECUTED APA ASCRIBES BOOK VALUES (SEPTEMBER 16) ..................21

        3.    APPOINTMENT OF COMMITTEE AND RETENTION OF PROFESSIONALS (SEPTEMBER 17) ................................................22

        4.    BARCLAYS' PRESS RELEASE AND ANALYST CALL (SEPTEMBER 17) ................................................................................22

        5.    BID PROCEDURES HEARING (SEPTEMBER 17) ........................................25

        6.    INITIAL MEETING AT WEIL:  LEHMAN ADVISES COMMITTEE OF GOING-CONCERN, BALANCED TRANSACTION (SEPTEMBER 18) ............26

        7.    COMMITTEE UNDERSTOOD THAT BARCLAYS' ACQUISITION OF A PREEMINENT BROKER-DEALER FOR RELATIVELY LITTLE CONSIDERATION ULTIMATELY WOULD PROVE PROFITABLE.................29

        8.    SEERY DIRECTS LEHMAN TRADERS TO ASCERTAIN LIQUIDATION VALUES FOR REPO COLLATERAL (SEPTEMBER 19) ...............................30

        9.    BURIAN-SEERY TELEPHONE CALLS CONFIRM GOING-CONCERN, EVEN EXCHANGE (SEPTEMBER 19) ........................................................33

        10.    SEERY' S EVOLVING TESTIMONY CONTRASTS SHARPLY WITH BURIAN'S CONSISTENT, CORROBORATED TESTIMONY ...........................38

    B.    DRINKING FROM A FIRE HOSE:  SALE HEARING ...................................46

        1.    WHAT WAS DISCLOSED TO COURT ........................................................46

        2.    WHAT WAS *NOT* DISCLOSED TO COURT ...............................................49

            (A)    IMPERATIVE TO BARCLAYS TO REALIZE A DAY-ONE GAIN .................................................................................50

(B)    EMBEDDED $5 BILLION DISCOUNT NEITHER DISCLOSED TO COURT NOR IDENTIFIED IN TRANSACTION DOCUMENTS ...................................................................52

(C)    $47.4 BILLION VALUE WAS NOT MARK-TO-MARKET VALUE OR BOOK VALUE -- BUT INSTEAD WAS SUM OF LIQUIDATION VALUE AND CLEARANCE BOX ASSETS ................55

(D)    BOOK, OR MARK-TO-MARKET VALUE OF REPO COLLATERAL TRANSFERRED TO BARCLAYS WAS APPROXIMATELY $50 billion -- A FACT KNOWN TO BARCLAYS PRIOR TO SALE HEARING ..........................55

(E)    USE OF BARCLAYS REPURCHASE AGREEMENT TO TRANSFER EMBEDDED, $5 billion DISCOUNT ...........................57

(F)    ELEVENTH HOUR DEMANDS THAT LEHMAN SELLERS LOCATE AND TRANSFER ADDITIONAL ASSETS...........................58

(G)    OVERSTATED CURE AND COMPENSATION LIABILITIES ..............60

(H)    CLARIFICATION LETTER DID FAR MORE THAN SIMPLY "CLARIFY" APA -- IT MATERIALLY AMENDED IT......................62

C.    DRINKING FROM A FIRE HOSE: CLOSING WEEKEND .........................................68

   1.    COMMITTEE INSISTS ON ACCESS TO INFORMATION, INCLUDING A DETAILED SCHEDULE OF ASSETS TRANSFERRED .................................68

   2.    DISCREPANCIES IN SEPTEMBER 21 SCHEDULES AND OTHER CLOSING WEEKEND EVENTS ADD TO CONFUSION; ELEVENTH-HOUR COMMITTEE CALL .........................................................................70

   3.    KLEIN CONVERSATION: BARCLAYS GIVES COMMITTEE FINAL WORD ON SALIENT TERMS OF SALE TRANSACTION BEFORE CLOSING ........................................................................................72

     (A)    MARKET DETERIORATION PURPORTEDLY CAUSED SECURITIES' VALUES TO DROP .....................................................74

     (B)    CONSIDERING ASSUMED LIABILITIES, CREDITORS ARE AHEAD BY $2-PLUS BILLION .........................................................76

     (C)    KLEIN EXPLANATION SQUARES WITH SEERY DISCUSSIONS, REPRESENTATIONS MADE AT SALE HEARING.................................................................................................77

(D)    COMMITTEE REPRESENTATIVES ADVISE LEHMAN
SELLERS: "GET US A RECONCILIATION" ...................................77

4.    COMMITTEE REPRESENTATIVES IMMEDIATELY RECOUNT SUM
AND SUBSTANCE OF KLEIN CONVERSATION TO COMMITTEE ...............78

5.    COMMITTEE REPRESENTATIVES STATED UNEQUIVOCALLY THAT
COMMITTEE DOES NOT CONSENT TO POST-HEARING
MODIFICATIONS .......................................................................81

D.    TRUST -- BUT VERIFY: PURSUIT OF RECONCILIATION VERIFYING
LEHMAN SELLERS AND BARCLAYS' REPRESENTATIONS (SEPTEMBER
2008 THROUGH DECEMBER 2008).........................................................84

1.    SEPTEMBER 25 SCHEDULES CONTAIN SOME OUTDATED MARKS,
RESERVATIONS OF RIGHTS ON FINALITY ...............................85

2.    OCTOBER AND NOVEMBER 2008 MEETINGS AMONG COMMITTEE
REPRESENTATIVES AND LBHI REPRESENTATIVES .................................88

3.    COMMITTEE'S REACTIONS TO OCTOBER 8 PRESENTATION;
LEHMAN SELLERS' INITIAL REACTIONS TO RECONCILIATION
REQUESTS .................................................................................92

4.    EMAILS AMONG COMMITTEE FINANCIAL ADVISORS AND
ATTORNEYS DEMONSTRATE COMMITTEE'S PERSISTENCE; BOTH
COMMITTEE AND LBHI COUNSEL ADVISE BARCLAYS' COUNSEL
OF COMMITTEE'S CONCERNS IN OCTOBER 2008 ...................................94

5.    COMMITTEE DID NOT AWAIT A MARKET MOVE BEFORE
RETURNING TO COURT TO CHALLENGE TRANSACTION.......................100

6.    DECEMBER SETTLEMENT MOTION: PATTERN OF INADEQUATE
DISCLOSURE CONTINUES AS BARCLAYS SITS SILENTLY ......................102

E.    ATTEMPTS AT COOPERATION DEVOLVE INTO LITIGATION (DECEMBER
2008 THROUGH MARCH 2009)...........................................................108

1.    INFORMAL LETTER REQUESTS AND MEETINGS LEAD NOWHERE
(JANUARY 2009 THROUGH MARCH 2009)................................108

2.    INITIAL DOCUMENT PRODUCTION AND RELATED DISPUTES................111

3.    ABSENCE OF COOPERATION LEADS TO RULE 2004 DISCOVERY ..........112

III. LEGAL ARGUMENT SUPPORTING COMMITTEE'S PROPOSED
CONCLUSIONS OF LAW ........................................................114

A.    RULE 60 RELIEF IS WARRANTED WHEN SIGNIFICANT TRANSACTION
TERMS WERE NOT DISCLOSED TO BANKRUPTCY COURT ................................114

B.    BARCLAYS' FAILURE TO MAKE ADEQUATE DISCLOSURE OF SALIENT
TERMS OF SALE TRANSACTION FORFEITED ITS ENTITLEMENT TO
363(M) AND FINALITY PROTECTIONS ....................................................116

1.    TRANSPARENCY AND DISCLOSURE ARE SINE QUA NON OF
363(M) AND FINALITY PROTECTIONS; SANCTITY OF SALE
ORDER REQUIRES INTEGRITY IN BANKRUPTCY PROCESS ...................116

2.    BARCLAYS ASSUMED RISK OF NOT RETURNING TO COURT ...............120

3.    WHILE BARCLAYS COMPLAINS CHRONICALLY THAT IT
ASSUMED TREMENDOUS RISK, IT ADVERTISED THE
TRANSACTION TO ITS BOARD, MANAGERS AND INVESTORS AS A
RARE OPPORTUNITY AND A "DE-RISKED" TRANSACTION ..................121

4.    SECTION 363(M) OF BANKRUPTCY CODE DOES NOT APPLY TO
MOTIONS FILED PURSUANT TO RULE 60(B) ...........................................122

5.    COMMITTEE CONSENT CANNOT CLEANSE INADEQUATE
DISCLOSURE AND BARCLAYS' FAILURE TO OBTAIN COURT
APPROVAL OF MATERIAL MODIFICATIONS TO SALE
TRANSACTION ..........................................................................................124

C.    COMMITTEE HAS SATISFIED STANDARDS APPLICABLE TO RULE 60
MOTIONS ..........................................................................................126

1.    COMMITTEE IS ENTITLED TO RULE 60(B)(1) RELIEF AS A
RESULT OF MULTIPLE MISTAKES OF FACT ...........................................128

2.    NEWLY DISCOVERED EVIDENCE PROVIDES A BASIS FOR RULE
60(B)(2) RELIEF ..........................................................................................132

(A)    EVIDENCE WAS NEWLY DISCOVERED ...........................................133

(B)    COMMITTEE WAS JUSTIFIABLY IGNORANT OF NEW
EVIDENCE ..........................................................................................138

(C)    NEWLY DISCOVERED EVIDENCE WOULD PRODUCE
DIFFERENT RESULT ..........................................................................139

3.      RULE 60(B)(3) AND RULE 60(B)(6) RELIEF ARE AVAILABLE
        ALTERNATIVELY AS RESULT OF MISREPRESENTATIONS MADE
        TO COURT...................................................................................141

4.      COMMITTEE REQUESTED RULE 60 RELIEF ON TIMELY BASIS
        (RULE 60(C))..............................................................................144

5.      COMMITTEE AND LBHI ESTATE ARE ENTITLED TO
        AFFIRMATIVE RELIEF  UNDER RULE 60 AND UNDER SECTIONS
        549 AND 559 OF BANKRUPTCY CODE ....................................152

D.      EVEN IF RULE 60 DOES NOT PROVIDE A BASIS FOR RELIEF, COURT
        RETAINS POWER TO MODIFY ITS PRIOR ORDER WITHOUT RULE 60 .............158

E.      RELIEF SHOULD BE GRANTED WITH RESPECT TO COUNTS I-III OF
        COMMITTEE'S ADVERSARY COMPLAINT BECAUSE COURT DID NOT
        APPROVE CLARIFICATION LETTER TO EXTENT IT MATERIALLY
        AMENDED APA.........................................................................................159

F.      NEITHER MANDATE RULE NOR ESTOPPEL OR WAIVER DOCTRINES
        PROVIDE BARCLAYS WITH VALID DEFENSES TO COMMITTEE'S RULE
        60(B) MOTION AND ADVERSARY COMPLAINT ...................................160

        1.      MANDATE RULE DOES NOT APPLY WHEN COMMITTEE WAS
                NOT PARTY TO BAY HARBOUR APPEAL, ISSUE DECIDED HAD NO
                BEARING ON RELIEF REQUESTED, AND NEW EVIDENCE
                EXCEPTION APPLIES ................................................................160

        2.      JUDICIAL ESTOPPEL HAS NO APPLICATION WHEN COMMITTEE
                HAS TAKEN CONSISTENT POSITIONS ....................................165

        3.      NEITHER EQUITABLE ESTOPPEL NOR WAIVER PROVIDES A
                SUSTAINABLE DEFENSE WHEN THE COMMITTEE WAS NOT
                AWARE OF MATERIAL DISCREPANCIES AND DID NOT STAY
                SILENT WITH RESPECT TO ITS RECONCILIATION REQUESTS .............167

IV. CONCLUSION ........................................................................................171

# TABLE OF AUTHORITIES

**Page**

## Cases

Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988)............................................................ 141

Aramony v. United Way of America, 28 F.Supp. 2d 147 (S.D.N.Y. 1998), rev'd on other grounds, 191 F.3d 140 (2d Cir. 1999).............................................................................. 169

Atkinson v. Prudential Prop. Co., Inc., 43 F.3d 367 (8th Cir. 1994) ......................................... 141

Bank of China v. Huang (In re Huang), 275 F.3d 1173 (9th Cir. 2002)..................................... 155

Bankers Mortgage Co. v. United States, 423 F.2d 73 (5th Cir. 1970), cert. denied, 399 U.S. 927 (1970).................................................................................................................. 127

Caraway v. Sain, 23 F.R.D. 657 (N.D. Fla. 1959) ..................................................................... 145

Colony Hill Associates v. Kabro Associates of West Islip, LLC (In re Colony Hill Associates), 111 F.3d 269 (2nd Cir. 1997) ..................................................................... 116, 118

Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97 (2d Cir. 1981)...................... 150

Cumberland Farms Dairy, Inc. v. National Farmers' Organization, Inc. (In re Abbotts Dairies of Pennsylvania, Inc.), 788 F.2d 143 (3rd Cir. 1986)................................. 116, 118, 120

Davis v. Musler, 713 F.2d 907 (2d Cir. 1983) ........................................................................... 152

Feliciano v. Reliant Tooling Co., Ltd., 691 F.2d 653 (3d Cir. 1982) ......................................... 152

Ferrell v. Trailmobile, Inc., 223 F.2d 697 (5th Cir. 1955).......................................................... 139

Fogel v. Chestnutt, 668 F.2d 100 (2d Cir. 1981) ....................................................................... 164

Gey Associates General Partnership v. 310 Associates, L.P., 2002 WL 31426344 (S.D.N.Y. October 29, 2002) ...................................................................................... 127, 128

Griggs v. Marion Hospital Corp., 2005 WL 1802249 (S.D. Ill. Jul. 28, 2005) .......................... 167

Hawknet, Ltd. v. Overseas Shipping Agencies, 590 F.3d 87 (2d Cir. 2009)............................. 167

Highland Financial Corp., 216 B.R. 109 (Bankr. S.D.N.Y. 1997) .............................................. 164

In re Alan Gable Oil Development Co., 978 F.2d 1254 (4th Cir. 1992) ..................................... 123

In re BCD Corp., 119 F. 3d 852 (10th Cir. 1997)....................................................................... 128

In re Bel Air Assocs., 706 F.2d 301 (10th Cir. 1983)................................................................. 116

In re Blutrich Herman & Miller, 227 B.R. 53 (Bankr. S.D.N.Y. 1998) ...................................... 158

In re Centennial Textiles, Inc., 220 B.R. 165 (Bankr. S.D.N.Y. 1998) ...................................... 154

In re Charles & Lillian Brown's Hotel, Inc., 93 B.R. 49 (Bankr. S.D.N.Y. 1988).................... 150

In re Chung King Inc., 753 F.2d 547 (7th Cir. 1985) ................................................ 126

In re Colarusso, 280 B.R. 548 (Bankr. D. Mass 2002) ............................................... 168

In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001)............................................. 125

In re Contr. Tech., Ltd., 343 B.R. 573 (Bankr. S.D. Tex. 2006) ................................. 154

In re Cremidas' Estate, 14 F.R.D. 15 (D. Alaska 1953) ............................................. 145

In re Crystal Apparel, Inc., 220 B.R. 816 (Bankr. S.D.N.Y. 1998)............................... 125

In re Engineering Products Co.,121 B.R. 246 (Bankr. E.D. Wash. 1990)........................ 117, 118

In re Frankel, 191 B.R. 564 (Bankr. S.D.N.Y. 1995) ................................................ 126

In re G.A.D., Inc., 340 F.3d 331 (6th Cir. 2003) ..................................................... 144

In re General Insecticide Co., 403 F.2d 629 (2d Cir. 1968) ...................................... 126

In re Gucci, 126 F.3d 80 (2d Cir. 1997)........................................................... 120, 123

In re International Fibercom, Inc., 503 F.3d 933 (9th Cir. 2007) ............................... 151

In re KDI Holdings, Inc., 277 B.R. 493 (Bankr. S.D.N.Y. 1999)................................. 125

In re Kirwan, 164 F.3d 1175 (8th Cir. 1999) ...................................................... 127

In re Lawrence, 293 F.3d 615 (2d Cir. 2002) ..................................................... 141, 143

In re LWD, Inc., 2009 WL 5198060 (W.D.Ky. 2009) ............................................. 115

In re M Capital Corp., 290 B.R. 743 (9th Cir., 2003)............................................ 123

In re Marlar, 288 B.R. 823 (Bankr. W.D. Ark. 2003)........................................... 162

In re McLean Industries, Inc., 76 B.R. 291 (Bankr. S.D.N.Y. 1987) ......................... 150

In re Metaldyne, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) ........................................ 125

In re Momentum Mfg. Corp., 25 F.3d 1132 (2d Cir. 1994)........................................... 2

In re New England Mut. Life Ins. Co. Sales Practices Litigation, 204 F.R.D. 6 (D. Mass.
    2001) ........................................................................................ 145

In re Newport Offshore, Ltd., 86 B.R. 325 (Bankr. D.R.I. 1988)................................................ 168

In re O'Brien Envtl. Energy, Inc., 188 F.3d 116 (3d Cir. 1999).................................................. 152

In re Old Carco LLC, 2010 WL 31430 (Bankr. S.D.N.Y. Feb. 05, 2010) ................................ 158

In re Polycel Liquidation, Inc., 2007 WL 77336 (D.N.J. Jan. 8, 2007)..................................... 153

In re Refco, Inc., 336 B.R. 187 (Bankr. S.D.N.Y. 2006)............................................................ 124

In re Rock Indust. Machinery Corp., 572 F.2d 1195 (7th Cir. 1978) ........................................ 116

In re Rockefeller Ctr. Props., 266 B.R. 52 (S.D.N.Y. 2001) ..................................................... 169

In re Rome Family Corp., 2010 WL 1381093 (Bankr. D. Vt. March 31, 2010) ........................ 119

In re Rome Family Corporation, 407 B.R. 65 (Bankr. D. Vt. 2009) .......................................... 144

In re Roundabout Theatre Co., 131 B.R. 14 (S.D.N.Y. 1991)................................................... 167

In re Summit Ventures, 161 B.R. 9 (Bankr. D. Vt. 1992) .......................................................... 123

In re Tri-Cran, Inc., 98 B.R. 609 (Bankr. D. Mass. 1989)................................. 116, 118, 120, 123

In re TWA, 261 B.R. 103 (Bankr. D. Del. 2001)....................................................................... 155

In re Varat Enterprises, Inc., 81 F.3d 1310 (4th Cir. 1996) ...................................................... 168

In re W.T. Grant Co., 20 B.R. 186 (S.D.N.Y. 1982) .......................................................... 161, 162

In re Woods, 173 F.3d 770 (10th Cir. 1999).............................................................................. 144

J.D. Pharmaceutical Distrib., Inc. v. Save-On Drugs & Cosmetics Corp., 893 F.2d 1201
    (11th Cir. 1990)..................................................................................................................... 145

Jacobs v. New York Founding Hosp., 577 F.3d 93 (2d Cir. 2009) ............................................ 122

Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112 (S.D.N.Y. 2001).................................. 133

Kosakaw v. New Rochelle Radiology Assocs., 274 F.3d 706 (2d Cir. 2001) ............................ 167

Kurzweil v. Philip Morris Cos., 1997 U.S. Dist. LEXIS 4451, *13-19 (S.D.N.Y. 1997).......... 135

Lamont v. Grass (In re Lamont), 453 F. Supp. 608 (N.D.N.Y. 1978)........................................ 127

Lasky v. Cont'l Prods. Corp., 804 F.2d 250 (3d Cir. 1986) ...................................................... 127

Londsdorf v. Seefeldt, 47 F.3d 893 (7th Cir. 1995).................................................................... 141

Lone Star Indus., Inc. v. Compania Naviera Perez Compac (In re New York Trap Rock Corp.), 42 F.3d 747 (2d Cir. 1994) ....................................................................... 115

Marquette Corp. v. Priester, 234 F .Supp. 799 (D.C.S.C. 1964) ................................. 145

Marshall v. Monroe & Sons, Inc., 615 F.2d 1156 (6th Cir. 1980)............................... 127

MDFC Loan Corp. v. First Shopping Center Partnership, 1996 WL 99909 (N.D. Ill. Mar. 1, 1996) .................................................................................................................. 167

Midkiff v. Stewart (In re Midkiff), 342 F.3d, 1194 (10th Cir. 2003) ......................... 121

Myers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996) ...................................... 115

Negron v. Weiss, 2006 WL 2792769 (E.D.N.Y. Sept. 27, 2006)................................ 167

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986) ......................................................... 127

New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599 (2d Cir. 2003) ................................................................................................................... 161

New York Times Co. v. Sullivan, 376 U.S. 254 (1964) ................................................. 2

Nichols v. Alker, 235 F.2d 246 (2d Cir. 1956)........................................................... 138

Official Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983) ................................................................................ 117, 118

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1998)...................... 167

Ope Shipping, Ltd. v. Underwriters at Lloyds, 100 F.R.D. 428 (S.D.N.Y. 1983) ..................... 139

Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.), 596 F.2d 1092 (2d Cir. 1979) .................................................................................................................... 158

Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438 (S.D.N.Y. 1994)...................... 124

Peirre v. Bernuth, 20 F.R.D. 116 (S.D.N.Y. 1956).................................................... 127

Pence v. Langdon, 99 U.S. 578 (1878) ...................................................................... 168

Peyser v. Searle Blatt & Co., Ltd., 2000 U.S. Dist. LEXIS 18432 (S.D.N.Y. Dec. 22, 2000) .................................................................................................................... 138

Pierce Assocs., Inc. v. Nemours Found., 865 F.2d 530 (3d Cir. 1989) ...................... 144

Pratt v. Philbrook, 109 F.3d 18 (1st Cir. 1997).......................................................... 152

PRC Harris, Inc. v. Boeing Co., 700 F.2d 894 (2d Cir. 1983).................................... 144

R.N. v. Suffield Bd. of Educ., 194 F.R.D. 49 (D. Conn. 2000)................................................... 144

Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538 (2d Cir. 1963), cert. denied, 423 U.S. 1079 (1979) ....................................................................................... 153

Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C., 1998 WL 372356 (E.D.N.Y. July 2, 1998) ........................................................................................................................... 144

Richstone v. Chubb Colonial Life Ins., 988 F.Supp. 401 (S.D.N.Y. 1997)............................... 169

Roadrunner Freight Sys. v. Am. Freight Sys. (In re Am. Freight Sys.), 126 B.R. 800 (D. Kan. 1991) ......................................................................................................... 2, 119

Rodal v. Anasthesia Group of Onondaga, PC., 369 F.3d 113 (2d Cir. 2004).................... 165, 166

Ryan v. United States Lines Co., 303 F.2d 430 (2d Cir. 1962) ................................................. 133

Scherer v. City of New York, 2007 WL 2710100 (S.D.N.Y. Sept. 7, 2007) ............................. 144

Seese v. Volkswagenwerk, 679 F.2d 336 (3d Cir. 1982) ......................................................... 164

Smith v. Widman Trucking & Excavating, Inc., 627 F.2d 792 (7th Cir. 1980) ........................ 152

State Bank of Southern Utah v. Gledhill (In re Gledhill), 76 F.3d 1070 (10th Cir. 1996) ......... 153

State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158 (2d Cir. 2004) ................................................................................................................................. 141

Thompson v. County of Franklin, 180 F.R.D. 216 (N.D.N.Y. 1998)................................. 134, 135

U.S. v. 710 Main Street, Peekskill, 753. F. Supp. 121 (S.D.N.Y 1990) .................................... 138

U.S. v. Argentina, 2008 WL 510556, at *1 (2d Cir. Feb. 26, 2008)........................................... 164

U.S. v. Baus, 834 F.2d 1114 (1st Cir. 1987).............................................................................. 151

U.S. v. Bell, 5 F.3d 64 (4th Cir. 1993)....................................................................................... 163

U.S. v. Cirami, 563 F.2d 26 (2d Cir. 1977) ....................................................................... 161, 164

U.S. v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars, 705 F.2d 909 (7th Cir. 1983) ............................................................................................................................. 145

U.S. v. Minicone, 994 F.2d 86 (2d Cir. 1993) ........................................................................... 164

U.S. v. Quinones, 511 F.3d 289 (2d Cir. 2007) ......................................................................... 167

U.S. v. Stanley, 54 F.3d 103 (2d Cir. 1995) .............................................................................. 163

U.S. v. Vidal, 136 Fed. Appx. 438 (2d Cir. 2005) ........................................................ 163

U.S. v. Zvi, 25 Fed. Appx. 34 (2d. Cir. 1995) ............................................................ 163

United States v. Espinosa, 130 S.Ct 1367 (2010) ...................................................... 115

United States v. Holtzman, 762 F.2d 720 (9th Cir. 1985) ........................................... 145

United States v. Int'l Bhd. of Teamsters, 247 F.3d 370 (2d Cir. 2001) ...................... 132

Walker v. Dep't of Veterans Affairs, 1995 WL 625689, at *1 (S.D.N.Y. Oct. 25, 1995) ......... 133

Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112 (E.D.N.Y. 1993) ...... 132, 135

Whitaker v. Assoc. Credit Servs., Inc., 946 F.2d 1222 (6th Cir. 1991) ...................... 127

Wisser Co. v. Mobil Oil Corp., 730 F.2d 54 (2d Cir. 1984) ...................................... 169

Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art, 324 Fed. Appx. 117 (2d Cir. 2009) ............. 165

## Statutes

11 U.S.C. § 559 ........................................................................................................ 156

11 U.S.C. § 363(m) .................................................................................................. 122

11 U.S.C. § 562 ........................................................................................................ 157

Fed. R. Civ. P. 60(b)(2) ............................................................................................ 132

Fed. R. Civ. P. 60(c)(1) ............................................................................................ 144

## Other Authorities

11 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2859 (2d ed. 1995) ........................ 138

3 Collier On Bankruptcy ¶ 363.11 (15th ed. 2009) .................................................... 122

Louis D. Brandeis, 'What Publicity Can Do,' Other People's Money, 92 ........................ 2

The Committee submits this post-trial memorandum (a) in further support of (i) the

Committee Rule 60 Motion,[1] (ii) relief on Counts I-III of its Adversary Complaint,[2] and (iii) the

Proposed Findings of Fact and Conclusions of Law annexed hereto as <u>Exhibit A</u> (the

"<u>Committee's Proposed Findings</u>") and (b) in opposition to the Barclays Enforcement Motion.

## I.    <u>PRELIMINARY STATEMENT</u>

1.    ***Lack Of Candor Forfeits Finality Protections.***  The Committee appreciates the

difficulty of the decision facing the Court.  It must resolve the Movants' requests to revisit a sale

order that approved a historic transaction within monumental chapter 11 cases in the face of

Barclays' mechanically chanting the mantra of finality.  Finality, however, cannot supersede the

overarching predicate for obtaining it, <u>i.e.</u>, full and complete candor before the Court --

irrespective of the myriad reasons that may justify a sale's approval.  Barclays' failure to disclose

fully the material aspects of the consummated transaction, and the barriers to discovering that

information it erected when asked about the particulars by the Committee and LBHI, render

complaints about finality meaningless platitudes, underscore the paramount importance of

disclosure, and tip the scales decidedly in favor of granting Rule 60 relief against a purchaser

that expressly assumed the risk of its own recalcitrance.

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Committee's March 18, 2009 Memorandum Of Law (I) In Opposition To Motion Of Barclays Capital Inc. To Enforce Sale Order And Secure Delivery Of All Undelivered Assets And (II) In Further Support Of Its Motion, Pursuant To 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption And Assignment Of Executory Contracts And Unexpired Leases, Dated September 20, 2008 (And Related SIPA Sale Order) And Joinder in Debtors' And SIPA Trustee's Motions For an Order Under Rule 60(b) to Modify Sale Order, which is incorporated herein along with the Committee Rule 60 Motion.

[2]    Pursuant to the January 6, 2010 Stipulation And Order Concerning Certain Claims Made In Adversary Complaints Filed By LBHI, SIPA Trustee And Creditors Committee, certain claims asserted in the Adversary Complaints filed by Movants will be resolved in connection with the Rule 60 Motions, including Counts I-III of the Committee's Adversary Complaint.

2.    An alternative result enables Barclays to make a mockery of the bankruptcy sale process and encourages future purchasers of assets in bankruptcy cases to conceal actively windfall gains both before and after the transaction is approved in the hope that the passage of time will nullify challenges to their improper conduct.  Slavish adherence to finality would dictate that those purchasers receive blanket immunity from the consequences of their conduct once a court enters a final sale order.

3.    For that reason, candor is the sine qua non of finality.  Indeed, full and fair disclosure is not just relevant in the context of section 363 sales (where it is a precondition to section 363(m) protections), but it dictates the method and manner of administering any bankruptcy case.[3]  As a precondition to receiving finality protections, the sale process must be marked by transparency.  Purchasers arguing for the integrity of a sale order must have displayed integrity when obtaining the order.  Otherwise, their lack of respect for the bankruptcy process and disregard for bankruptcy safeguards forfeit finality and section 363(m) protections.

---

[3]    See, e.g., Roadrunner Freight Sys. v. Am. Freight Sys. (In re Am. Freight Sys.), 126 B.R. 800, 805 (D. Kan. 1991) (setting aside sale order when, among other things, value of assets sold was misstated; rejecting argument that decision undermined public policy interests:  *"[a]s the debtor/appellee points out, the purpose of the finality rule is to obtain the highest price for the debtor's assets, for the benefit of the debtor's estate and ultimately, the creditors.  If defects in notice result in debtor's assets being sold for an inadequate price, strict adherence to the finality rule would require a result contrary to the rule's underlying purpose of achieving the highest possible price"*).  Cf. In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) (*"Full and fair disclosure is required during the entire reorganization process; it begins on day one with the filing of the chapter 11 petition*;" denying motion to amend schedules to delete amounts allocated to employee severance claim so objections to proofs of claim could be lodged when disclosure statement already advertised that claims would be paid) (emphasis added; internal citations omitted); New York Times Co. v. Sullivan, 376 U.S. 254, 305 (1964) (*"As Mr. Justice Brandeis correctly observed, 'sunlight is the most powerful of all disinfectants'"*); LOUIS D. BRANDEIS, "What Publicity Can Do," OTHER PEOPLE'S MONEY, Chapter 5, p. 92 (1932)  ("Publicity is justly commenced as a remedy for social and industrial diseases.  Sunlight is said to be the best of disinfectants; electric light the most efficient policeman").

4.      Barclays and the Lehman Sellers advertised the Sale Transaction to the Court and
the Committee as a going-concern, balanced transaction that would avoid the catastrophic losses
ensuing from a liquidation.  As presented, Barclays would acquire the North American broker-
dealer business for $250 million, certain real estate assets valued at approximately $1.4 billion,
and the Lehman Sellers' "matched book," i.e., Barclays would acquire assets consisting of "long
positions" and assume liabilities for the "short positions."  With respect to that "book," the
Lehman Sellers described the transaction as an even exchange (a "wash" in its Board
presentation), where assumed liabilities (including the Cure and Compensation Liabilities)
equaled transferred assets based on the **book value** of those assets (which the Lehman Sellers
marked-to-market on a daily basis).

5.      The Lehman Sellers presented the transaction to the Court in those terms during
the Sale Hearing.  The need to avoid the deleterious consequences of a liquidation and
consummate a going-concern sale purported to justify a truncated and unprecedented timeline.
The Lehman Sellers and Barclays pushed every party in interest -- especially the Court -- to
endure the sacrifices attendant to expediency in favor of the purportedly greater good of avoiding
a liquidation.

6.      As the trial record in the Rule 60 litigation conclusively demonstrated, the
purported exigency was a subterfuge to liquidate assets to Barclays at breakneck speed and
depressed valuations.  Material aspects of the transaction were concealed from the
documentation (where Barclays agreed expressly to pay book value) and presentations to the
Court.  Based on the presentation, everyone in the courtroom understood that the assets were
being valued on a going-concern, book value basis -- and were not being ascribed liquidation
values.  To the extent Barclays points to the Clarification Letter's modification of the "Purchased
Assets" definition to delete references to book value, that material change was not disclosed to
the Court by Barclays during the Sale Hearing or thereafter.  Also absent from the documents

3

and Court presentations was any mention of a $5 billion, block discount off the Purchased

Assets' book value, use of the Barclays Repurchase Agreement to funnel the discount to

Barclays, and grossly inflated liabilities.  Concealment of these material aspects of the Sale

Transaction incurably infected the sale process, forfeited Barclays' entitlement to section 363(m)

protections, defeats claims of finality, and justifies Rule 60 relief and the recovery of

unauthorized transfers under sections 549 and 559 of the Bankruptcy Code.

7.      ***Appropriate Disclosure Would Have Yielded A Different Result.***  The

Committee sets forth in greater detail below the reasons it has satisfied all elements required to

establish entitlement to Rule 60 relief, but notes here specifically that the unearthed evidence

would have compelled a different result than entry of the Sale Order:

- ***First***, the Rule 60 analysis does not entail consideration of hypothetical facts, such as what would have occurred if the Sale Transaction had not been approved.  Instead, the only relevant facts are the facts in existence at the time of the challenged order's entry.

- ***Second***, if all relevant facts were known at the time the transaction was presented -- including the insistence on a day-one gain and the liquidation of assets to Barclays -- the factual underpinnings of the Sale Order would have been eliminated, necessitating a different result.  At the Sale Hearing, objectors argued Barclays stood to realize a windfall gain.  Those objections were overruled because they were unsubstantiated. The newly discovered evidence supports those objections and may have impacted requests for reconsideration or appeals.  Objectors asserting substantiated objections to the liquidation of estate assets to Barclays would have changed significantly the landscape at the Sale Hearing and militated against approval of the Sale Transaction. Similarly, the Committee professionals testified that if the Committee had known this was not a going-concern sale and instead that the assets were being liquidated to Barclays at a steep discount, it would have mattered enormously and those facts would have provided a basis for an objection to the Sale Transaction.

- ***Third***, while Barclays argues no other purchasers appeared to bid on the assets, the purchasers were neither aware of, nor competing against Barclays' liquidation bid. Alternative bidders were operating under the erroneous assumption that the assets were priced at book value and without a discount.  The proposition that if other purchasers had known about the embedded, day-one gain then they may have submitted competing bids to Barclays' cannot be disproven.  Moreover, it cannot be disproven that the estates would have benefitted in selling the assets for their own account rather than selling them to Barclays at depressed valuations.

4

- **Fourth**, it is an actual fact that material aspects of the Sale Transaction were concealed actively from the Court. At the Sale Hearing, representatives from Barclays and the Lehman Sellers knew that the values ascribed to the assets were not market values and that the President of Lehman Brothers (Bart McDade) was wrong when he testified, on cross examination by an objecting creditor, that the assets had been marked to market that morning. Evidence of concealment is an actual fact unearthed during the litigation. If it were revealed during the Sale Hearing that material facts were concealed, there would have been no alternative but to deny requests to approve the Sale Transaction -- no finding of "good faith" under section 363(m) or reasonably equivalent value could have been made. Instead, the Sale Order (and the 363(m) finding) were issued on erroneous facts that were knowingly incorrect to certain participants at the Sale Hearing.

- **Fifth**, examining the numbers, the consummated liquidation differs materially from its advertised and approved, going-concern sibling by virtue of, among other things, a $5 billion discount off the book value of the Purchased Assets and the overstatement of liabilities by no less than $1.8 billion. Here, the estates would have been incentivised to improve on the wholesale liquidation to Barclays regardless of whether other purchasers appeared if the estates had liquidated the assets over a longer period of time. The estates were denied that opportunity.

- **Sixth**, the fact that the quantum of information unearthed in the Rule 60 litigation may not have been unearthed if the sale were conducted under more controlled circumstances (i.e., over a longer time frame more consistent with the Bankruptcy Rules' time requirements applicable to section 363 sales) does not alter the result. Admittedly, this litigation has involved more than a year of discovery and trial. The hidden features of the transaction, however, relate only to a few simple facts that should have been disclosed from its inception, subject to the rights of parties in interest to object, i.e., that Barclays was receiving a steep discount, that the mark-to-market value of the repo collateral was more than $50 billion and that the liabilities were materially and intentionally overstated. Concealment of these basic facts, and a pattern of impeding access to them transformed what otherwise should have been simple disclosure into protracted and costly litigation. A purchaser that respected the bankruptcy process would have revealed these material aspects of the transaction without making the Committee and the estates plow through months of discovery and trial to identify and understand them.

- **Lastly**, at the Sale Hearing, it was argued that consummation of the transaction would alleviate systematic risk. That was a laudable goal, but it does not authorize Barclays to flout bedrock rules cavalierly. Barclays pursued the sale to advance its economic interests -- not for the greater good of protecting the stability of the world's financial markets. Barclays had every right to do so, but no right to allow the Sale Order to be entered on an inaccurate record. Backroom, insider financial engineering that subverted one of the purported goals of the transaction should be not countenanced.

8.      ***Barclays' Tendentious Defenses Fail.***  Barclays does not dispute the accuracy of the newly discovered evidence.  Instead, the centerpiece of Barclays' defense is the unsubstantiated assertion that both the Court and the Committee were aware of the significant gain Barclays would realize.  Barclays argues ***inconsistently*** that (a) the parties did not agree to any discount but instead to a valuation that purported to reflect the assets' true market value (i.e., that the ***market*** value of the Barclays Repurchase Agreement collateral was $45.5 billion) and (b) assuming such a discount did exist, the Court and Committee were well aware of it.  To that end, Barclays maintains the Committee did not seek Rule 60 relief on a timely basis, its motion does not rely on new evidence, and the Committee consented to post-hearing modifications in any event, irrespective of their materiality.  Barclays is wrong.

9.      The Sale Transaction and the Committee's post-closing efforts to obtain reconciling information fall into three distinct periods, each of which is detailed in the Factual Background In Support Of Proposed Findings Of Fact, which follows, with citations to testimonial and documentary evidence.  Review of these facts confirms the Committee was not aware of any $5 billion block discount off of the book value of the Purchased Assets or the attribution of liquidation valuations to the trading assets.  Instead, it leads to the inescapable conclusion that the Committee's conduct reflected a persistent pattern and practice of prodding for a reconciliation from and after the closing through the filing of the Rule 60 Motions:

- ***Drinking From A Fire Hose:  Pre-Hearing Diligence***.  Barclays' and the Lehman Sellers' respective Boards of Directors approved the Sale Transaction on Tuesday, September 16.  Even though Barclays complains chronically about the risks it undertook, Barclays packaged the transaction to its Senior Leaders as a rare opportunity to expand U.S. investment banking operations and sold it to its Board of Directors as one where risks could be mitigated.  The Lehman Sellers described the transaction to their Boards as a going-concern transaction that presented a better alternative to a liquidation.  With respect to LBI, the transaction was described as a wash, with Barclays assuming liabilities that equaled assets.

6

o   The APA ascribed book values of $70 billion to the Lehman Sellers' long
    positions and $69 billion to their short positions.  Undisclosed to anyone apart
    from a handful of negotiators, however, Barclays and the Lehman Sellers had
    agreed to a $5 billion "discount" off the assets' book value -- which was
    neither reflected in the transaction documents.

o   On Wednesday, September 17, the Committee met for the first time, having
    been appointed that same day, and selected its professionals.  Facing a host of
    difficult and unprecedented issues, it worked diligently to familiarize itself
    with the terms of the Sale Transaction.  The Committee immediately
    dispatched its newly-selected counsel to the Bid Procedures Hearing,
    scheduled for 4:00 p.m. that day, to request (albeit unsuccessfully) an
    adjournment.  On the same day, Barclays advised analysts that Barclays had
    confidently marked the assets it stood to acquire in the Sale Transaction.

o   On Thursday, September 18, the Lehman Sellers formally introduced the Sale
    Transaction to the Committee's professionals at a meeting in Weil's offices.
    The Lehman Sellers described a ***going-concern sale*** that had to be
    consummated quickly to avoid a wholesale liquidation in which the estates
    would have no choice but to accept distressed values for the assets.
    Distributing copies of the Sept. 16 Balance Sheet, the Lehman Sellers also
    explained that the transaction ***was an even exchange*** -- where the assets' book
    value ($72 billion) equaled liabilities ($72 billion).

o   The Committee understood that Barclays' acquisition and operation of a
    preeminent broker-dealer for relatively little consideration ($250 million)
    ultimately would prove profitable.  What the Committee did not know,
    however, was that an embedded, first-day gain was guaranteed to Barclays by
    marking down the trading book.  Instead, the Committee labored under the
    misinformation that the Cure and Compensation Liabilities together with the
    other liabilities relating to the trading book equaled or slightly exceeded the
    book value of the trading assets.  Indeed, receipt of going-concern
    consideration for the assets was of critical importance to the Committee.  Had
    the Committee known the Lehman Sellers were discounting and liquidating
    the assets to Barclays, it would have opposed the Sale Transaction at the Sale
    Hearing.

o   On Friday morning, September 19, James Seery directed the Lehman Sellers'
    traders to ascertain ***liquidation values*** for the repo collateral.  That exercise
    resulted in values of approximately $45.5 billion, a figure that nearly matched
    the figure Barclays arrived at that morning when it marked down the value of
    the Fed Repurchase Agreement collateral from $50.64 billion (the book value
    of those assets and a figure in which Seery had confidence) by a total of $6.04
    billion.  The $45.5 billion figure also matched the figure that Barclays
    ascribed to the assets in its acquisition balance sheet prepared months later.

7

○ On Friday, September 19, continuing to work as efficiently as possible to diligence the transaction, representatives of Houlihan Lokey including Saul Burian, spoke with Seery and/or Mark Shapiro to gather additional information. During that call, Burian received three different descriptions of the Sale Transaction. The first description consisted of a transfer of repo collateral of $50.64 billion against a repo loan of $45.5 billion and Cure and Compensation Liabilities totaling $4.25 billion. Immediately after receiving that description, Seery told Burian to "forget" and "scratch" that description because it was all wrong (an instruction reflected clearly in Burian's notes of the conversation). In the second and third descriptions, Seery ultimately advised Burian the value of the assets being transferred to Barclays totaled $47.4 billion against liabilities Barclays would assume of $49.75 billion.

○ Notably, Seery did not explain the exercise he commissioned that morning to ascertain liquidation values for those assets or that the $45.5 billion figure in the trading assets total of $47.4 billion (i.e., $45.5 billion of repo collateral plus the Clearance Box Assets of $1.9 billion) was a liquidation value.

○ The Seery conversation was the last one Burian had with any representative of Barclays or the Lehman Sellers before heading to Court. At the conclusion of the conversation, Burian understandably assumed that the valuations of the assets he received were provided in a manner consistent with that APA and every conversation the Committee professionals had about the topic, which is, as a going concern, mark-to-market valuation, consistent with the way in which a broker-dealer would mark its books.

- **_Drinking From A Fire Hose: Sale Hearing._** During the Sale Hearing, the Lehman Sellers proffered Ridings' testimony that, among other things, the assets had substantially greater value if sold on a going-concern basis. The Lehman Sellers also advised the Court they had marked their assets on **_a line-by-line basis that day_** -- and that market deterioration had resulted in a decline in the market value of the assets being transferred to Barclays to $47.4 billion. The Lehman Sellers still presented a balanced, going-concern transaction where assumed (or extinguished) liabilities equaled or exceeded assets, and Ridings stressed directly to Burian during the hearing the need to avoid a liquidation. Lastly, the Lehman Sellers advised the Court that the Clarification Letter (which was described as purportedly clarifying which subsidiaries would fall within the "Purchased Assets" definition) was nearly complete and on its way to Court. Yet, the letter was neither presented to, nor reviewed by the Court before the Sale Order was entered or at any time thereafter. The Sale Order only approves the Clarification Letter to the extent it clarifies and supplements the APA. The Clarification Letter goes far beyond that by materially amending the APA and therefore falls outside the confines of the Sale Order.

o   At the hearing, the Committee advised that it did not object to or support the sale.  It reached that position because it was concerned that a more aggressive one might jeopardize the estate's ability to receive going-concern value on the trading assets and avoid their wholesale liquidation.

o   Notably, significant aspects of the Sale Transaction were ***not*** disclosed to the Court during the Sale Hearing, including (without limitation), (a) Barclays' insistence that it receive a day-one gain on the transaction; (b) the previously negotiated $5 billion discount off of the book value of the Lehman Sellers' assets; (c) the $47.4 billion figure, styled as a mark-to-market value arrived at that day, reflected the sum of the ***liquidation values*** (not book value) of the repo collateral ($45.5 billion) together with the Clearance Box Assets ($1.9 billion); (d) the book, or mark-to-market value of the repo collateral was at least $50 billion; (e) the use of the Barclays Repurchase Agreement to funnel the $5 billion discount to Barclays (justified by attributing liquidation values to those assets and terminating the agreement); (f) the retroactive nullification of a prior termination of the Barclays Repurchase Agreement to avoid the effects of section 559 of the Bankruptcy Code; (g) the overstatement of the Cure and Compensation Liabilities by billions of dollars; (h) Barclays' 11th hour demands for billions in additional assets as a precondition to closing the transaction; and (i) the Clarification Letter would do far more than simply clarify and supplement the APA, it would materially amend the APA.  Taken together, the undisclosed aspects of the Sale Transaction resulted in Barclays receiving (or claiming entitlement to) billions of dollars of estate assets beyond the transaction described to or approved by the Court at the Sale Hearing.

•   ***Drinking From A Fire Hose:  Closing Weekend.***  After the Sale Hearing, on Saturday morning (September 20), the Committee professionals proceeded to Weil's office to attend the closing.  That morning, Committee counsel specifically insisted to the Lehman Sellers' counsel that the Committee's professionals be given access to information, discussions and meetings.  But when the Committee's professionals arrived, they were excluded from almost every substantive conversation.  On Sunday morning, September 21, less than 24 hours before the closing and after repeated demands for a list of the assets being transferred (and their marks), the Lehman Sellers furnished the September 21 Schedules at approximately 11:30 a.m.  Those schedules indicated the marked value of the cash and securities that would be transferred to Barclays (i.e., the financial assets) was $49.9 billion.

o   That begged additional questions, e.g., why that amount differed from the $45.5 billion figure provided during the Seery conversations (which, when added to the Clearance Box Assets, supposedly equaled the $47.4 billion figure given to the Court).  When the Committee representatives cornered Seery for an explanation, they were told to ignore those schedules as inaccurate, but that the Lehman Sellers would get them updated information.

o   As of 11:00 p.m. on Sunday night, an updated schedule was not forthcoming.
    At that point, the Committee convened a call, during which the Committee
    instructed its financial advisors that they were to observe, but they were not to
    consent to the transaction.  Uncertainty over the schedules (and their
    inconsistency with representations made to the Court) created a level of
    agitation in the Committee professionals that prompted them to demand an
    immediate explanation.  At that point, the Lehman Sellers' counsel arranged a
    meeting with, among others, Barclays' representative, Michael Klein.

o   Klein explained the substantive elements of the transaction by writing its
    components on the Manila Folder.  ***First***, he confirmed the marked value of
    the trading assets of $49.9 billion was not accurate and elaborated that the
    market value of the securities had declined to between $44 billion and $45
    billion -- but the Clearance Box Assets ($1.9 billion) would be added to bring
    the asset number back to the approximately $47 billion figure provided to the
    Court.  ***Second***, Cure and Compensation Liabilities remained fixed at $4.25
    billion and would be assumed by Barclays in addition to $45.5 billion relating
    to the Barclays Repurchase Agreement.  ***Third***, because the liabilities assumed
    ($49.75 billion) exceeded the securities transferred ($47 billion), the creditors
    supposedly were doing $2 billion better than under the original balanced, 72-
    72 transaction reflected in the APA.

o   Even though Klein's representations squared with the transaction described to
    Burian by Seery and described to the Court on Friday, at the conclusion of the
    meeting, the Committee representatives indicated that they were not accepting
    their veracity.  The Committee professionals instead advised that they had no
    choice (given the Committee's inability to diligence the figures) but to trust
    their accuracy and verify them through a detailed reconciliation.  A few hours
    later, early Monday morning (September 22), the transaction closed.  At
    approximately 12:00 noon that day, Burian recounted the sum and substance
    of the Klein conversation in a memorandum to the Committee.

o   The alleged "decline" in the market value of the assets transferred to which
    Seery and Klein referred (from $49.9 billion to between $44 and $45 billion),
    was ***not*** the result of the Lehman Sellers' mark-to-market valuations or
    anything taking place outside the parties' negotiations.  ***Instead, they were
    liquidation values***, arrived at on Friday by the Lehman Sellers' traders at
    Seery's direction.  These values purported to reduce the "book" or "mark-to-
    market" valuations by approximately $5 billion -- coincidentally (or
    conveniently) the same amount of the negotiated discount.  Whether this was
    to facilitate funneling the previously-negotiated $5 billion discount to
    Barclays through the Barclays Repurchase Agreement -- by terminating it and
    eliminating the excess collateral that would have reverted to the Lehman
    Sellers under section 559 of the Bankruptcy Code -- or part of a new effort to
    transfer additional assets by claiming (baselessly) that the transaction should
    be valued under liquidation standards, it was neither reflected in the APA,
    disclosed to the Committee, nor disclosed to and approved by the Court.

o    The trial testimony revealed that the market value of these assets (i.e., the "Schedule A" assets), was nearly $50 billion as of September 19.  The September 21 Schedules (which Seery and Klein told the Committee professionals to ignore) in point of fact accurately reflected this value.  This was known to Barclays, whose Chief Administrative Officer was advised Friday, September 19, of a significantly higher value ($52 billion) based on the marks ascribed by Barclays' own custodian under the Barclays Repurchase Agreement (BoNY).

o    The Committee professionals never "consented" to these modifications from the transaction represented to the Court.  Because they had no ability to diligence Klein's 11th hour representations, the Committee professionals advised the Lehman Sellers' counsel that they were relying on their representations (and Barclays') with respect to the market value deterioration (which they questioned), ***but*** they insisted on a post-closing reconciliation to confirm those representations.  After the Klein meeting, the Committee professionals left the closing to avoid confusion over whether their continued presence might be misconstrued as consent.

- ***Trust -- But Verify:  Post-Closing Efforts To Obtain Reconciliation***.  Immediately after the closing, the Committee professionals pursued confirmation of the Lehman Sellers' and Barclays' explanations of changes to the transaction.  Among other things, they requested a detailed reconciliation of the assets transferred, their marked values (as of the closing dates) and the supporting documentation for the method used for arriving at those marks.

o    On September 25, following several requests from the Committee for Schedules A and B to the Clarification Letter, the Lehman Sellers finally transmitted copies.  Those Schedules contained the same marks ($49.9 billion) appearing on the September 21 Schedules -- which Seery and Klein told the Committee professionals to ignore as stale and outdated three days before.

o    On September 29, Weil and A&M had a rushed meeting with former Lehman executives Alex Kirk and Paolo Tonucci to discuss the Sale Transaction.  Kirk and Tonucci reiterated the alleged explanation about stale marks and market deterioration resulting in lower marked values (to between $44 and $45 billion).  James Fogarty of A&M, who attended the meeting, emerged "befuddled" by their explanation.  Houlihan also met with A&M during that week and discussed its concerns about the value of the assets transferred and its pursuit of a final reconciliation.

o    On October 8, LBHI and its advisors (including A&M) hosted their regularly-scheduled meeting with the Committee and its professionals.  The 92-page A&M October 8 Presentation distributed to the Committee for the meeting referred to the Sale Transaction on two slides and recounted the discussion that A&M had with Kirk and Tonucci on September 29 concerning the

supposedly "stale" Lehman marks and an alleged "negotiated reduction." Thereafter, Houlihan against stressed to A&M the importance of reaching a final understanding of the assets transferred and their values. While A&M agreed, at the time, the estates' ability to reconstruct the Sale Transaction was hamstrung by Barclays' lack of cooperation under the TSA. The estates had no choice but to make resolution of TSA disputes and data preservation their first priority after having lost their information systems and institutional knowledge in the Sale Transaction to Barclays.

o   From and after the closing through the October 8 Presentation, the Committee professionals had been asking for a reconciliation of the transaction. Following that meeting, those efforts continued by, among other things, preparing Committee counsel to intensify its efforts directly with the Lehman Sellers' counsel. On October 13, Committee counsel requested a meeting with LBHI's counsel to review these issues. After repeated requests, a meeting to discuss these issues took place on November 21. In addition, at or about this time, both counsel for the Committee and the Lehman Sellers advised counsel for Barclays of the Committee's concerns and ongoing investigation.

- **_Trust -- But Verify:  December Settlement_**.  In December 2008, the Committee's investigation into the Sale Transaction intensified when the SIPA Trustee submitted the settlement of an internecine dispute between Barclays and JPMC for the Court's approval. The Committee's Limited Objection (supported by a declaration under penalty of perjury) clearly enunciated the Committee's position that the Leventhal Declaration directly contradicted representations made during the Klein meeting, i.e., the Leventhal Declaration averred that the cash and securities transferred had a market value of $49.7 billion, directly contradicting the $44 to $45 billion figures recounted by Barclays and the Lehman Sellers to the Committee professionals.

  o   Barclays resisted the Committee's attempts to secure an agreement to provide the reconciliation that the Committee had been seeking since the transaction closed on or before a date certain, i.e., by January 15, 2009. At the hearing to consider the Limited Objection, Barclays opposed the Committee's request (arguing it was not "pertinent") -- but never asserted that the Committee failed to seek timely reconsideration of, or failed to timely appeal from, the Sale Order.

  o   Nor did Barclays dispute the $49.7 billion valuation contained in the Leventhal Declaration. Barclays ultimately stated specifically on the record (and agreed to an order decreeing) that approval of the settlement would have no binding effect on the Committee's investigation or any party in interest's ability to pursue claims relating to the Sale Transaction.

- ***Attempts At Cooperation Devolve Into Litigation***.  Heeding the Court's direction at the hearing approving the December Settlement, the Committee promptly forwarded an informal document request to Barclays, attended two meetings to discuss the requests, and sent a supplemental request (because, among other things, its questions remained unanswered).

  o Barclays' pattern of obfuscation first exhibited at the Sale Hearing continued unabated.  Barclays did not produce any documents to the Committee until the end of March 2009.  As produced, a majority of the documents were unintelligible, and Barclays refused to produce the documents in an electronic format until May 28, 2009.  In any event, the documents it produced were not directly responsive to the Committee's primary request:  a straightforward (but detailed) reconciliation showing the marks on the transferred assets, the date of those marks, and documentation supporting those marks.

  o In early 2009, following the Committee's initiative, LBHI began its own investigation.  LBHI notified Barclays in early February 2009 of its own concerns about whether the Cure and Compensation Liabilities had been inflated.  That inquiry met a curt response from Barclays, which maintained those figures were nothing more than unenforceable estimates.

  o At this point, as the Committee's attempts to obtain answers to its questions concerning the Sale Transaction continued to prove unsuccessful, the Committee and LBHI began to coordinate their investigative efforts.  In April 2009, LBHI served its own document demands on Barclays, to which Barclays refused to respond, prompting a Rule 2004 motion (joined by the Committee).  Further stonewalling access to information, Barclays objected to the LBHI Rule 2004 motion (and the Committee's joinder), arguing for the first time that investigations into the Sale Transaction were moot and could not lead to any sustainable causes of action.  Overruling Barclays' objections, the Court authorized discovery, and the Rule 60 Motions from each estate fiduciary, the Committee, LBHI and the SIPA Trustee were timely filed on September 15, 2009.

10.    Barclays' timeliness defense heaps on the Court and the Committee a smattering of attenuated and irrelevant information circulating in the market-place and purportedly appearing in the inaccurately-styled Clarification Letter (but not disclosed to the Court). Barclays' efforts to tag both the Court and the Committee with knowledge of the material differences between the transaction described to the Court and the one consummated should not be countenanced.  The Committee neither knew of, nor consented to, the secret discounts, inflated liabilities, and 11th hour asset grabs by Barclays.

13

11.     With respect to valuation of the repo assets transferred, the Lehman Sellers' mark-to-market valuations on September 19 (which the parties agreed in the APA would govern the transaction) reflected a value of nearly $50 billion.  BoNY, Barclays' collateral custodian, ascribed a $52 billion valuation (a figure known to Barclays' Chief Administrative Officer before the Sale Hearing).  Barclays' valuation of $45.5 billion for the Schedule A assets in its acquisition balance sheet mirrors the liquidation valuation that the Lehman Sellers' traders prepared at Seery's request and the discount to the Fed Portfolio Collateral that Jason Yeng of Barclays prepared, both on the morning of Friday, September 19.  Barclays' claim that this is sheer coincidence stretches credulity.

12.     Every time these values were described to the Committee professionals, they were described in terms of **market** values -- **not liquidation values**.  Seery told Burian the $45.5 billion was a **market** value, not a liquidation value.  Klein told the Committee advisors, in the presence of the Lehman Sellers' counsel, that declines in the **market value** of the repo collateral warranted transferring additional assets (i.e., the Clearance Box Assets), but that the estates had pulled ahead by $2 billion when considering the liabilities assumed.  As the Committee representatives communicated clearly, these representations could not be verified on a single Sunday in September, prompting them to demand a reconciliation to subsequently substantiate Klein's statements.  This is hardly "knowledge and consent of a $5 billion negotiated, block discount off the assets' book value."

13.     The Clarification Letter did not reveal all aspects of the consummated transaction. If the Clarification Letter provided the transparency concerning transaction modifications that Barclays claims, Barclays surely should have submitted the Clarification Letter to the Court for review and approval.  While the Committee professionals finally received a draft of the Clarification Letter during the closing weekend, reviewing the document did not afford a clear picture of the material modifications to the transaction represented to the Court.  The letter made

14

no mention of the $5 billion negotiated discount and neither the Committee nor its professionals were told of the radical change in valuing the assets using a liquidation methodology. Indeed, the litigation among the signatories to the Clarification Letter best demonstrates the opacity in that document.

14.     The Committee professionals were advised hours before the closing that the market value of the assets had declined to between $44 billion and $45 billion because of market factors -- not because of an arrangement to change valuation methods to effectuate a $5 billion discount. That alleged decline eliminated the prospect that excess collateral under the Barclays Repurchase Agreement (i.e., the haircut) would be returned to the estates. Both Seery (directly) and Klein (indirectly) told the Committee professionals that there was no haircut because the value of the collateral had fallen to point where it equaled the amount advanced under the Barclays Repurchase Agreement. Accordingly, language in the Clarification Letter revealing that the Barclays Repurchase Agreement would be terminated and that Barclays would retain the collateral shed no light on Barclays' undisclosed plans to retain the $5 billion in excess collateral. The Clarification Letter's retroactive nullification of a prior termination confirms this fact.

15.     With respect to its estoppel and waiver defenses, Barclays simply cannot explain away the Committee's persistent efforts, commenced prior to the closing and spanning months, to obtain a transaction reconciliation. The Committee's actions hardly can be characterized as "staying silent." Since the transaction closed, the Committee's position has been consistent -- it demanded a reconciliation confirming that the consummated transaction squared with the transaction represented to the Court and the Committee. What did change over time was the Committee's **_posture_**, in response to developing facts and circumstances that suggested a need to intensify efforts and adopt an adversarial position. When LBI, JPMC and Barclays attempted to establish a factual record in connection with the December Settlement concerning the Sale Transaction that was inconsistent with representations made to the Court and the Committee, the

15

Committee appeared in Court and openly expressed its concern.  When Barclays withheld its cooperation in providing information, the Committee reappeared in Court seeking Rule 2004 discovery with LBHI.  When that discovery revealed billions in undisclosed discounts and overstated liabilities, the Committee returned again to Court to file the Rule 60 Motion.

16.    A statutory fiduciary for unsecured creditors does not bring haphazardly or lightly a claim against a public reporting bank alleging that misstatements and misrepresentations cost the estates billions of dollars in the largest bankruptcy sale on record.  An estate fiduciary appropriately discharging its duties only would commence that action when it had an awareness and understanding of the issue, when it reached a conclusion about that issue, and when it had the facts necessary to support that conclusion -- and not a moment before.  Those factors converged on September 15, 2009, when the Committee filed the Rule 60 Motion.

17.    Barclays similarly cannot invoke the mandate rule with respect to the Bay Harbour Appeal of the Sale Order.  That appeal -- to which the Committee was not a party -- examined a narrow issue unrelated to the issues underlying the Rule 60 Motion and did not result in a mandate precluding the Committee's requests for relief from the Sale Order.

18.    From its inception, the Lehman Sellers and Barclays touted the Sale Transaction's benefits to the estates as a going-concern transaction that avoided a hurried and chaotic liquidation and the attendant loss in value.  The Committee does not seek to rewrite the terms of the Sale Transaction but to conform the consummated transaction to the one represented to the Court and the Committee.  It always understood Barclays would realize the economic benefits of purchasing a profitable engine (the broker-dealer business) for relatively little consideration ($250 million).  The Committee does not take issue with Barclays' profitably operating the broker-dealer business but rather with the failure to disclose Barclays' embedded day-one gain realized through significant and concealed discounts, attribution of liquidation valuations, and overstated liabilities.  To that end, the relief the Committee requests -- either in the Rule 60

16

Motion or in the Adversary Complaint seeking a declaration that the Court never approved the Clarification Letter to the extent it materially modified the APA, aims only to re-establish the benefits that originally justified the Court's approval of the Sale Transaction.[4]

19.      As the purchaser seeking the benefits of a Court order under section 363 of the Bankruptcy Code, it was incumbent on Barclays, not the Committee, to make appropriate disclosures and advise the Court of the extent to which the consummated transaction differed from the one represented to the Court.  The central issue for the Court's consideration is not whether and when the Committee became aware of material modifications, but instead whether Barclays satisfied the disclosure requirements of section 363 of the Bankruptcy Code.  Indeed, the Court already had made itself available into the early morning hours of Saturday, September 20, and surely would have made itself available to review and consider any material changes before the markets opened on Monday, September 22.  The Court understood that the sanctity of a sale order is critical to purchasers of assets in bankruptcy.  But Barclays simply chose not to avail itself of that option in the hope of reaping a windfall under cover of darkness.  The consequences of Barclays' inaction should be borne by Barclays, not the estates.

---

[4]      Count I of the Committee's Adversary Complaint seeks declaratory relief that the Court never approved the Clarification Letter.  That finding does not "unwind" the transaction.  It merely requires Barclays to abide by the representations made to the Court.  Instead of receiving all the Schedule A and Schedule B Assets, the Clearance Box Assets, a conditional right to the 15c3 Accounts and the Margin Assets, Barclays only receives what was disclosed:  financial assets with a fair value as of the closing date of the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other discounts.

## II.    FACTUAL BACKGROUND SUPPORTING COMMITTEE'S PROPOSED FINDINGS OF FACT

20.    The following supplemental statement of facts describes salient events preceding the filing of the Committee's Rule 60 Motion and Adversary Complaint.[5]  The Committee submits the Factual Background and Legal Argument sections that follow support entry of its Committee's Proposed Findings annexed hereto as <u>Exhibit A</u>.  The Committee's Proposed Findings also incorporate by reference as if set forth fully therein LBHI's Post-Trial Brief And Proposed Findings Of Fact.    The recitation of the factual background is divided into three phases:



---

[5]    Unless otherwise noted, all exhibits referenced herein (cited as either "M. __" or "BCI __") have been admitted into evidence.  Citations to the trial transcript of the evidentiary hearings held in connection with Movants' Adversary Complaints and Rule 60 Motions are presented here as "Date of testimony [Witness] page:lines" (<u>e.g.</u>, 5/6/10 [Burian] ___.).  All designated deposition testimony has been admitted into evidence as BCI 1108.  Designated deposition transcripts are cited as "[Deponent] Dep. Tr. page:lines" (<u>e.g.</u>, Burian Dep. Tr. __.).

A.    DRINKING FROM A FIRE HOSE:  INITIAL ATTEMPTS AT DUE DILIGENCE
(SEPTEMBER 17 THROUGH SEPTEMBER 22)

21.    On the eve of LBHI's bankruptcy filing, specifically during the weekend of
September 13-14, 2008, Barclays sought to purchase nearly all the assets and assume nearly all
the liabilities of LBHI by acquiring 100% of LBHI's equity.[6]  At the eleventh hour, however,
Barclays abandoned that transaction, and LBHI promptly filed for bankruptcy protection early
the next day (Monday, September 15).  On Tuesday, September 16, Barclays advised its Senior
Leaders that:  "Lehmans' [sic] shift into administration means *we now have the opportunity to
purchase what we regard as the good parts of the investment bank (including people,
infrastructure and licenses), without having to take on any exposure to the bad parts*.  This
remains *a rare opportunity* to accelerate execution of our strategy by expanding our US
investment banking operations."[7]

1.    OBTAINING BOARD OF DIRECTORS' APPROVALS (SEPTEMBER 16)

22.    At 6:00 a.m. on Tuesday, September 16, the LBHI Board of Directors met to
consider approval of the Sale Transaction.  During that meeting, Barry Ridings from Lazard
Freres, LBHI's investment banker, advised the Board of Directors "that the applicable standards

---

[6]    See M. 365 [Witness Statement of Clive Adamson dated 1/19/2010] at 5 ¶ 14 ("In the first,
unsuccessful transaction, Barclays was to buy the shares of . . . [LBHI,] the group's parent
company"); 5/3/10 [Hughes] 25:16-21 ("Lehman 1 was a transaction which involved the vast
proportion, if not the whole of the Lehman business.  And therefore, a size of balance sheet which
was substantially greater than one that we were looking at, that involved substantially greater
numbers of assets and liabilities."); 6/22/10 [Varley] 79:3-15 ("And we can agree, can we not, sir,
that Lehman I is the transaction that was -- you were looking at in the few days before the
Lehman bankruptcy, is that right?  [A] Yes, you're right.  [Q] And in sum or substance without
regard to its particular detail, that was essentially a transaction whereby Barclays would have
acquired Lehman's globally.  [A] Yes.  [Q] All right.  There were some assets that were a matter
of discussion as to whether they could be ring fenced or tossed out of the boat.  But essentially,
what was under discussion in Lehman I was a global purchase of Lehman.  [A] Yes").

[7]    M. 377 [email from SENIOR LEADER COMMUNICATIONS to Senior Leaders
Communications, re: Message from John Varley: Lehmans Update, dated September 16, 2008]
(emphasis added).

for this sale (under section 363 of the Bankruptcy Code) are to obtain the highest and best price *and a price greater than liquidation value* .... [and that] he believes these tests can be met…"[8]

23.     The consideration was described as follows:  "For LBI, the transaction was described as a wash -- with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets."[9]  At that meeting, the LBHI Board of Directors authorized execution of the APA.

24.     The Board of Directors of Barclays PLC, Barclays' parent company, convened a meeting the same day to consider (and approve) the Sale Transaction.  It was advised "[*t*]*he assets being acquired were good quality …. The assets acquired had been marked to market by Barclays Capital to confirm the valuation*."[10]  The Barclays' Board Presentation assured that "[t]his transaction structure *mitigates some of the risks that we previously identified*:  It significantly reduces the amount of assets we acquire ...."[11]  The presentation identified three "primary risks," none of which included market volatility or an inability to accurately mark the assets.[12]

---

[8]     M. 9 [Meeting minutes of the combined boards of Lehman Brothers Holdings Inc. and Lehman Brothers Inc. September 16, 2008] ("LBHI Board Minutes") at 4 (emphasis added).

[9]     See id. (listing attendees).

        Barclays relies extensively on the testimony of Ridings, specifically that he did not understand this transaction to be a "wash."  See Ridings Dep. Tr. at 22:23-23:7 ("[Q] Did you in fact believe on September 19th that this transaction was going to be a wash?  [A] Again, just to be clear what you mean by a wash . . . everything sold equals everything purchased.  [Q] That's right.  [A] No").  Yet, Ridings was present at the LBHI Board of Directors meeting where the transaction was, for LBI, *"described as a wash."*  M. 9 LBHI Board Minutes at 4 (emphasis added).  The Board minutes contain no mention that Ridings or any other attendee corrected this description.

[10]    See M. 144 [September 16, 2008 Barclays PLC Minutes of a Meeting of the Board of Directors] at 1-2 (emphasis added).

[11]    M. 604 ["Project Long Island: Board Discussion Materials 16 September 2008" with cover email] at 2.

[12]    Id. (listing risks:  "[1] If we do not get a fixed price from the major investors . . . before announcement, we take the risk that the share issuance raises less than the $3.4bn current market value of these shares.  [2] We have performed accelerated due diligence and there will be a number of loose ends upon separation from Long Island (e.g., continuation of Group Services).

## 2.    EXECUTED APA ASCRIBES BOOK VALUES (SEPTEMBER 16)

25.    The APA defined "Purchased Assets" to include "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements *with a book value as of the date hereof of approximately $70 billion*."[13] The APA further provided for assumption of liabilities *"with a book value as of the date hereof of approximately $69 billion."*[14] The use of the term "book value" meant "marked" or "mark-to-market" value, in the manner in which broker-dealers typically kept their books.[15] The APA also required Barclays to assume certain liabilities for contract cure payments and accrued employee bonus compensation, i.e., the Cure and Compensation Liabilities.[16]

26.    In connection with the APA, a balance sheet was prepared listing the assets to be transferred to and liabilities to be assumed by Barclays (the "Sept. 16 Balance Sheet"), which listed "Adj. Total Assets" of $72.65 billion, "Liabilities" of $68.4 billion, *plus* the "Cure pmt" liability of $2.25 billion and the "Comp" liability of $2.0 billion.  Thus, the Sept. 16 Balance Sheet reflected a transaction that was in complete balance.

---

[3] We will be subject to a US legal process which is unpredictable").  See also id. at 10 ("Remaining issues/Risks and mitigants").

[13]    M. 1 [Asset Purchase Agreement Among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital Inc., Dated as of September 16, 2008] ("APA") § 1.1 (definition of "Purchased Assets") (emphasis added).

[14]    M. 1 APA § 2.3(i) (emphasis added).  See also M.1 APA § 3.3 (requiring Purchaser to determine "with respect to each Position (long or short, including repos), that was part of the Purchased Assets ... the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof).").

[15]    See 8/31/10 [Lewkow] 129:5-13 ("[Q] I believe you said in your testimony with Mr. Schiller that the word 'book value' was chosen because 'marks' was a complex term or a complicated term? …. [A] [I]t struck me at the time, I think it was me, that we should use the term 'book value' instead of marks . . . ."), 130:4-12 ("[Q] [Y]ou knew and intended that the term 'book value' was to be understood as Lehman's book value?  [A] That's correct …. [Q] And you knew that regulated broker-dealers keep their books on a mark-to-market basis, correct?  [A] Well, yes . . .").

[16]    M. 1 APA §§ 2.5, 9.1(c).

### 3. APPOINTMENT OF COMMITTEE AND RETENTION OF PROFESSIONALS (SEPTEMBER 17)

27.     On Wednesday, September 17, the newly-formed Committee conducted its first meeting to begin the process of selecting its professionals, including its counsel (Milbank) and financial advisors (Houlihan and FTI).[17]  In addition to the Sale Transaction, the Committee faced a mountain of tasks and began reviewing and considering urgent issues for the first time immediately after the selection of its professionals.[18]

### 4. BARCLAYS' PRESS RELEASE AND ANALYST CALL (SEPTEMBER 17)

28.     The Wednesday, September 17 Press Release touted the recently executed APA and indicated "Barclays will acquire trading assets with a current estimated value of £40bn (US$72bn) and trading liabilities with a current estimated value of £38bn (US$68bn) for a cash consideration of £0.14bn (US$0.25bn) value."[19]  On the September 17 Analyst Call that Barclays hosted that day, it:

- announced "the transaction is capital ratio accretive …. And the source of that accretion is the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax;"[20]

---

[17]     Tr., Purcell Dep. Tr. 6:17-19 ("The Committee was formed on September 17, 2008, with our first meeting that morning to begin to select the professionals"); 5/6/10 [Burian] 77:6-8 ([Q] "Turning your attention to the Lehman case, when did the creditors' committee select Houlihan as a financial advisor?  [A] Sometime Wednesday night after the filing").

[18]     Purcell Tr. at 7:17-8:4 ("Late that evening [September 17], there was a discussion . . . about some of the urgent natures within Lehman Brothers' estate.  That included a number of different aspects of the estate, funding issues, liquidity issues, and that included things like sale of certain assets").

        5/6/10 [Burian] 93:17-94:4 ("[A] "Well, it's like drinking from a fire hose . . . . Barclays is only one of many, many issues that were of great concern . . . .  And more broadly, we're talking about the largest, most complicated bankruptcy ever, when we're dropped into this cold turkey, and we needed to figure out where we could add value, what was going on, how do we preserve, protect and maximize value").

[19]     M. 703 ["Barclays announces agreement to acquire Lehman Brothers North American investment banking and capital markets business" press release dated September 17, 2008, with cover email].

[20]     BCI 261 ["Transcript_Barclays-Lehman_Agreement_Announcement_-_17_Sept_08.pdf" with cover email].

- touted  "[t]he acquisition of these businesses and assets significantly enhances BarCap's position in the United States by a transaction that is de-risked by excluding the overwhelming majority of Lehman risk assets;"[21] and

- advised it had just completed its own *mark-to-market valuation* of the securities just 72 hours before, which left it very comfortable that it was acquiring "high quality, tradable" assets.[22]

29.    Barclays submits the September 17 Press Release and Analyst Call apprised interested parties, including the Court and the Committee, that Barclays stood to realize a significant gain on the Sale Transaction.  Barclays is wrong.

30.    *First,* Barclays never advised the Court of the September 17 Press Release, the September 17 Analyst Call, or the accounting gain mentioned during that call.  While Barclays felt compelled to distribute the September 17 Press Release to its regulators in the United Kingdom, the Financial Services Authority, neither the September 17 Press Release nor the transcript from the September 17 Analyst Call were presented or mentioned to the Court in connection with its approval of the Sale Transaction.[23]

31.    *Second*, the September 17 Analyst Call cryptically described an irrelevant United Kingdom purchase accounting convention and was no substitute for the direct representations being made to the Court and the Committee professionals by the Lehman Sellers and Barclays.

---

[21]    Id. (emphasis added).  See also id. at 7 ("What we have taken is a portfolio of trading assets and liabilities *that are first of all de-risked* and secondly those that need to support the ongoing *parts of the business that we have acquired*.  And therefore they are predominantly market making assets and liabilities and very tradable") (emphasis added).

[22]    Id. at 4 ("[W]e had just completed 72 hours of due diligence on every position . . . and were able to establish the marks"), 5 ("[Q] Or is that very much, *this is mark to market as of last night, all the toxic stuff is outside of this portfolio* . . . ?  [A] The 'or is it' piece of your analysis … is the right way of looking at it")(emphasis added), 13-14 ("If we look at the portfolio of assets that we have acquired, it is less than 5% that you would regard as mortgage related.  *Those are marked down and then marked again through the due diligence process . . . . [T]he vast majority of the book is very high quality, easily tradable assets and liabilities . . . . [H]aving gone through the due diligence on the weekend, again all our comments around risk is not generic proof true.  I think we have come out of the process very comfortable and if anything confirmed our marks*") (emphasis added).

[23]    M. 703 [email from John Varley to Hector Sants re: re: Press Release, with attachment, dated September 17, 2008] (attaching September 17 Press Release).

Burian confirmed that he "viewed [the press releases] as being mostly irrelevant.  Didn't understand and didn't think the accounting treatment was relevant to true economic gain.  And relied directly on the representations of the people that were working on the transaction, explaining the transaction, the context of what it meant to Lehman Brothers, as opposed to U.K. accounting conventions of some sort."[24]  Mr. Miller and Ridings also considered the information irrelevant.[25]

32.    ***Third***, the information contained in the September 17 Press Release and Analyst Call became outdated and inaccurate by the time it was circulated to the Committee and its representatives, i.e., Saturday, September 20, after the Sale Hearing.[26]  At that point, the transaction had changed, and, understandably, Milbank recognized the September 17 Press Release and Analyst Call examined a different transaction.[27]  Nonetheless, it provided the basis for further questions and investigation -- which Houlihan put to Barclays and the Lehman Sellers after reading the press release.[28]

---

[24]    5/7/10 [Burian] 117:22-118:2.

[25]    See 4/28/10 [Miller] 105:1-106:2 ("We live in an era of financial engineering.  And an accounting gain, which is not, at least in my terms, in real money, would not have made any difference . . . an accounting gain really did not go to the substance of the transaction"); Ridings Dep. Tr. 25:2-16 ("[Q] As the Reuters article reports, Barclays made an announcement of this … anticipated gain, two days before the hearing . . . . [A] It's not a surprise to me, but it's Barclays' accounting [gain], so . . . I'm not going to put a lot of relevance on the U.K. accounting for this").

[26]    See BCI 291 [email chain including email Edward Gilbert to Julie Becker, et al., re: Re: LEHMAN (URGENT--POSSIBLE EMERGENCY COMMITTEE CALL TODAY) dated September 22, 2008]; BCI 285 [email chain including email from Jacob Goldfield to Edward Gilbert, et al., dated September 21, 2008) (forwarding message concerning Investor Call at 6:53 a.m. on Monday, September 22, 2008).  See Burian Dep. Tr. (12/17/09) 196:13-197:11 (stating he received press release Saturday night (September 20)), 298:20-21 (stating he received transcript of investor call Sunday (September 21)).

[27]    See 6/25/10 [Despins] 95:11-13 ("Well, that statement was made on September 17th.  That deal fell by the wayside -- well it fell -- was changed at the hearing").

[28]    5/7/10 [Burian] 24:3-25 ("I don't have a specific recollection of exactly when or where this particular press release of Barclays' accounting treatment was discussed.  I remember getting e-mails from people forwarding it to me.  I remember reading it.  I am sure it came up in conversations about, wow, we need to go look at this and get a reconciliation.  It just wasn't something important that I recollect specifically trying to figure out how Barclays was dealing

24

33.    *Lastly,* the September 17 Press Release made no mention of any gain Barclays would realize from the Sale Transaction.  According to Barclays, the gain easily could be calculated by subtracting the liabilities assumed from the assets acquired (i.e., $72 billion less $68 billion).  The September 17 Press Release, however, did not mention the Cure and Compensation Liabilities listed on the Sept. 16 Balance Sheet of $4.25 billion (which, if added to the liabilities listed in the press release, would have balanced assets and liabilities).[29]

### 5.    BID PROCEDURES HEARING (SEPTEMBER 17)

34.    On Wednesday, September 17, less than one hour after Milbank's selection as proposed Committee counsel, the Lehman Sellers and Barclays proceeded to Court seeking approval of the bid procedures for the Sale Transaction.[30]  Newly-selected (and proposed) Committee counsel first asked counsel for LBHI to adjourn the Bid Procedures Hearing.[31]  LBHI's counsel refused.  When Committee counsel arrived at Court, it requested (albeit unsuccessfully) that the Court adjourn the Bid Procedures Hearing given the pace with which the Sale Transaction was proceeding and the limited time afforded to the Committee to review it.[32]

---

with their accounting . . . . [W]e talked about it.  Hey, did Barclays get a gain?  Wait, we have to reconcile.  We pushed -- Wow, we did all that stuff").

[29]    M. 703 ["Barclays announces agreement to acquire Lehman Brothers North American investment banking and capital markets business" press release dated September 17, 2008, with cover email].

[30]    6/25/10 [Despins] 10:5-7 ("[Q] And how much time had elapsed between your being retained and that court hearing taking place?  [A] I'd say less than [an] hour").

[31]    6/25/10 [Despins] 10:14-16 ("I remember calling Mr. Miller, counsel for the debtor, prior to the hearing.  I think he was on his way down here – to ask him to consent to an adjournment of the hearing").

[32]    M. 260 [Tr., Hearing, September 17, 2008] ("Sale Procedures Tr.") at 27:21-28:3 ("Clearly, we're not going to have a prolonged argument over this but . . . the committee wanted us to request, a short adjournment until tomorrow morning so that we can actually get up to speed and have an informed discussion . . . . [W]e want a short adjournment until tomorrow morning").

### 6. INITIAL MEETING AT WEIL:  LEHMAN ADVISES COMMITTEE OF GOING-CONCERN, BALANCED TRANSACTION (SEPTEMBER 18)

35.    On Thursday, September 18, the Committee professionals attended their first in-person meeting with the Debtors in Weil's offices, where LBHI formally introduced the transaction.[33]  At the meeting, the Committee's advisors received a copy of the Sept. 16 Balance Sheet:



---

[33]    See O'Donnell Dep. Tr. 9:24-11:15; 5/6/10 [Burian] 81:20-24 ("This was very clearly a confidential meeting of committee professionals to sit down with us and make – and explain to us … notwithstanding newspaper articles and rumors . . . where are they going, and what is the deal"), 89:11-15 ("But the context and the clear understanding in the room was, we're moving along on Friday and there's very little diligence you're going to be able to do.  You're going to have to trust us on this"); 6/25/10 [Despins] 10:20-12:22 (explaining purpose of September 18 Weil meeting, attendees, etc.).

36.    As reflected in the balance sheet, the transaction described to the Committee's professionals was "in balance."  While a buffer existed between the trading assets ($72.5 billion) and the liabilities ($68.4 billion), the Committee professionals properly considered the Cure and Compensation Liabilities a "package" that balanced out the buffer.[34]  Inspection of the Sept. 16 Balance Sheet, however, did not reveal the existence of the negotiated discount (which was embedded in those numbers).[35]

37.    LBHI's principals described the transaction as critical and emergent.  The Committee professionals also were told that little could be done to diligence the transaction.[36]

38.    Most importantly, LBHI's principals advised the Committee's professionals that the Sale Transaction was a ***going concern*** sale, requiring prompt action to avoid a liquidation. As Mr. Burian testified:

---

[34]    See 5/6/10 [Burian] 88:11-17 ("And then right off . . . we were told, these numbers were right off the books and records of Lehman, but they were also taking roughly four and a quarter billion of liabilities for cure and comp, and therefore . . . based on the mark to value of the book, based on the value of the assets, of the liabilities being picked up, it was a . . . balanced exchange of exactly 72.65 against 72.65"); 5/7/10 at 30:16-31:1 ("[W]hen we were talking about the trading book and the balancing as ascribed in the balance sheet from yesterday, we were including the comp and cure as part of the liabilities.  If you're now narrowly defining the trading assets as merely the broker/dealer book and then the repo transaction that was secured by those assets, then . . . we always assumed there would be a gain for Barclays . . . .  ***What balanced it out was the fact that there were the other four and a quarter billion of assumed liabilities.  That was always presented to us as a package***") (emphasis added).

[35]    See M. 15 [Lowitt] 174:12-15 (testifying, with respect to Sept. 16 Balance Sheet (M.2), that "if that was the seventy-two billion dollars … my understanding was that was less than what was on Lehman's books, and that difference was five billion"); 6/22/10 [Varley] 131:19-16.

[36]    See 5/6/10 [Burian] 82:6-11 ("[Q] And how was the sale transaction described to you?  [A] The sale transaction was described as something that was . . . critical and necessary, emergent, you know, no apology for the timeframe.  They recognized that there was very little that we could do with respect to . . . diligencing the transaction"); 6/25/10 [Despins] 13:11-20 ("[Q] Did you feel that every question that the committee had was sufficiently addressed?  [A] No, obviously not . . . . So did they address our issues fully with respect to, for example, to the marketing process?  Yes, as far as we know.  But in terms of . . . what assets were being transferred precisely, the securities that were transferred, et cetera . . . there were no complete answers").

[I]t was made very clear to us that we were benefitting, because we were selling assets and liabilities in a balanced transaction in respect of these assets. These were the more liquid broker-dealer assets, and *that [they were being sold] in lieu of a wholesale liquidation in which we'd have to take a liquidation value for these assets*.[37]

39.    The description of the transaction as a "going concern" sale designed to avoid a liquidation comported with the APA's use of book values. It also squared with the descriptions of the transaction provided by Lehman representatives, including Mark Shapiro (the self-styled "architect" of the transaction).[38] Similarly, the Sale Motion advised parties in interest that "it is urgent to sell the Purchased Assets now or face material disruption of their value."[39]

40.    Later that evening (Thursday, September 18), Houlihan participated in a conference call with James Seery, at the time Lehman Brothers' Global Head of Fixed Income, at which point Seery provided the same high-level of information recounted at the meeting earlier that day.[40]

---

[37]    5/6/10 [Burian] 85:14-19 (emphasis added). See also id. [Burian] 85:24-86:2 ("[I]t was a fair, balanced transaction, and we were avoiding unwinding, selling, dumping these assets, and getting a liquidation value for these assets, as opposed to a going concern"), 89:2-3 ("[W]ith respect to these assets, we were avoiding liquidation and getting the benefit of a matched exchange").

[38]    8/23/10 [Shapiro] 53:19-21 ("The absence of a sale would have led to … a near term liquidation, whatever you want to call that"), 66:19-20 ("I think I may have called myself an architect in that I had the original idea for it"). See also 10/6/10 [Pfleiderer] 85:6-12 ("So as I understand it, there were basically . . . three alternatives; complete the transaction, sell it [to] someone else for a higher price . . . and the third alternative was not to complete the sale and basically go into a liquidation or whatever would ensue if a sale didn't occur"), 85:16-21, 208:3-17, 210:18-24.

[39]    M. 118 [Debtors' Motion to (A) Schedule Sale Hearing; (B) Establish Sales Procedures; (C) Approve Break Up Fee; And (D) Approve The Sale Of The Purchased Assets And The Assumption And Assignment Of Contracts Relating To The Purchase Assets, dated September 17, 2008] at ¶ 11.

[40]    See M. 378 [typed notes re: Lehman Call With Jim Seery], M. 379 [handwritten notes re: Leh call]; 5/6/10 [Burian] 95:13-24 ("[Q] So again, staying on Thursday, did Houlihan actually have a follow-up diligence-type call to understand where the Barclays transaction stood by that night? [A] Yeah. Both of those things were set up. I met with Mr. Berkenfeld . . . . And the rest of my team . . . had a diligence call led by Jim Seery on the Lehman side . . . . For the most part, it was an update with respect to what was said earlier in the other Thursday meeting").

### 7.    COMMITTEE UNDERSTOOD THAT BARCLAYS' ACQUISITION OF A PREEMINENT BROKER-DEALER FOR RELATIVELY LITTLE CONSIDERATION ULTIMATELY WOULD PROVE PROFITABLE

41.    Barclays argues the Committee was aware Barclays would realize a "gain" on the transaction.  Barclays mischaracterizes the Committee's testimony:  it was aware that Barclays' operating the broker-dealer business would prove profitable.  It was not aware, however, that Barclays demanded a first-day gain and to that end negotiated a $5 billion discount.

42.    As Burian testified, "it was a given that … the 250 million dollars for the broker/dealer, was viewed by all of us as being [an] incredibly and inexpensively huge gain from the start.  So whenever we described the transaction or had discussions with people, we probably said, wow, Barclays is making out like bandits on the broker/dealer business."[41]   But importantly, Burian explained his understanding that the potential operating gain bore no relationship to the trading book:

> [Q] Did you think the overall gain was associated with buying the Lehman Brothers broker-dealer franchise for 250 million dollars.  [A] I did.  I-- [Q] Did you have any belief that all or part of that gain was attributable to acquiring the trading book, including the associated liabilities for less than fair market value?  [A] At the time of the closing my understanding was that they were not going to have a gain in the trading book…  By the time that I left Weil Gotshal on that morning I did not think that the assets were being purchased for anything other than fair market value in the manner that a broker dealer would mark their books.[42]

---

[41]    5/7/10 [Burian] 27:25-28:7.  See id. [Burian] 29:18-20 ("We assumed from the start that Barclays was going to make money.  They were picking up assets in the broker/dealer business inexpensively").

[42]    5/7/10 [Burian] 118:8-22.  See also 6/25/2010 [Despins] 118:7-13 ("[Q]  Okay.  If you had learned, following the closing, that  Barclays had made a tremendous economic gain, because it acquired the broker-dealer of Lehman Brothers for 250 million dollars, and as it turns out, that valuable engine of a business was worth much more than 250 million dollars, would you have come to court and cried foul?  [A]  No.  That's the deal we signed up for"); 5/7/2010 [Burian] 118:23-25 ("[Q] Is this dispute about Barclays having made overall economic profits from the transaction? [A]  Not from my perspective").

## 8. SEERY DIRECTS LEHMAN TRADERS TO ASCERTAIN LIQUIDATION VALUES FOR REPO COLLATERAL (SEPTEMBER 19)

43.    Early in the week of September 15, the Fed financed LBI through the Fed Repurchase Agreement, providing $45.0 billion in cash to LBI collateralized by the Fed Portfolio.  Later in the week of September 15, 2008, Barclays assumed the Fed's financing of LBI through its own repurchase agreement, extending loans of approximately the same amount as the Federal Reserve had extended (the "Barclays Repurchase Agreement").[43]

44.    As a registered broker-dealer, the Lehman Sellers marked their books daily. Seery had confidence in Lehman's marking process and believed the marks on the collateral covered by the Federal Repurchase Agreement were accurate.  Seery also admitted that as of September 19, the book or mark-to-market value of the substantially similar pool of securities being transferred to Barclays that collateralized the Barclays Repurchase Agreement (i.e., the "Barclays Repo Collateral") was approximately $50 billion.[44]

---

[43]    See 8/23/10 [Shapiro] 108:9-12 ("[Q] You understood that Barclays would wind up taking over from the Fed a certain repurchase agreement the Fed had with Lehman, yes?  [A] Yes").

While Barclays extended $45.0 billion in cash, the Lehman Sellers advised the Court and the Committee that Barclays extended $45.5 billion in cash (a $500 million discrepancy).  Compare M. 261 [Tr. Hearing September 19, 2008] ("Sale Hearing Tr.") at 47:5-6 (stating Barclays is assuming liabilities of $45.5 billion in connection with trading assets), with, BCI 341 [Expert Report of Professor Paul Pfleiderer, dated January 8, 2010] (the "Pfleiderer Report") at 9 (¶ 15) (maintaining there is no dispute with respect to Barclays transfer of *$45* billion) (emphasis added).

[44]    See 5/3/10 [Seery] 135:24-136:7 ("[Q] And I think that you mentioned earlier the $50.6 billion number, and it's true, is it not, that based upon Lehman's marks, the aggregate value of the collateral that went to Barclays was about 50 billion dollars, correct?  [A] Lehman's marks for the Fed facility were 50.6.  I don't recollect exactly . . . when the securities went to Barclays, exactly what they were off the top of my head, or whether that aggregated exactly 50.6, but it's in that neighborhood"), 136:12-17 ("All right.  And were you familiar with the process that Lehman used to mark securities as of the time period September 2008?  [A] Generally, yes.  [Q] And you had confidence in that process; did you not, sir?  [Q] I did"), 138:16-23 ("[Q] And as a general proposition in its dealings with Barclays on -- in the week of September 15th, it was Lehman's position that the marks on the Fed collateral were accurate marks, correct?  [A]  Yes.  [Q] And that the value of the securities was consistent with the marks on the securities, correct?  [A] That was our position, yes").  See also id. [Seery] 176:5-17 (identifying amount of $50.64 billion on M. 147 as "the amounts that Lehman had marked on their books and what Lehman's books showed as the market value"), at 183:4-6 (noting $50.64 billion was on chart).

45.     In the morning on Friday, September 19, acting at Seery's direction, the Lehman

Sellers' traders determined the ***liquidation values*** for the repo collateral.  Seery directed the

Lehman traders that "we need a view as to … what kind of discount you would be forced to take

if you were to liquidate these assets in a relatively short period of time."[45]  As reflected in Seery's

instructions, this was an attempt to arrive at a liquidation valuation for the full portfolio even

though (a) Seery knew Barclays had no intention of liquidating the assets[46] and (b) Seery was

preparing Ridings to testify at the Sale Hearing on the issue of why the Sale Transaction

presented a better alternative to a liquidation -- a fact that Shapiro confirmed.[47]

46.     At the conclusion of the exercise, the traders returned with a liquidation value for

the repo collateral of ***$45.5 billion***.  Seery admitted that his notes (Movants Exhibit 147) (a)

contained the information that Seery said he "sought from the Lehman traders," (b) the $45.5

---

[45]    5/3/10 [Seery] 152:7-9.  See also id. [Seery] 144:6-10 ("[Q] And so it's your testimony that the work that you were doing was not intended to come up with a liquidation bid for the collateral? [A] ***No, it was a liquidation bid***.  It was to sell the assets . . . over a relatively swift period of time") (emphasis added), 146:25-147:12 (same), 154:20-23 ("If you had to sell the full size in a short period of time, what kind of discount would you need to give the buyers in order to move [the] assets"), 159:25-160:2 (conceding traders were determining what "would be a liquidation bid if you were to sell the full size of the position in relatively short order . . ."); 5/4/10 [Seery] 24:1-6 ("As I explained, it was a fast, quick liquidation of those securities.  If they could do it in a day, that would be great.  If it took a couple days, that was fine, too.  We wanted to know how they could get out of the securities in the best way possible over that short period of time").

[46]    See 5/3/10 [Seery] 160:12-16 ("[Q] So Barclays did not tell you that they intended . . . some sort of quick liquidation, a fast liquidation of these assets, correct?  [A] They did not, no"), 160:5-11 (same).

[47]    See 5/3/10 [Seery] 141:22-142:9 (acknowledging he pulled traders together to gather information for Ridings' testimony), 143:17-21 (noting Ridings would testify to alternatives), 155:21-156:1 (acknowledging Ridings might be required to testify that sale was better than liquidation), 155:10-14 (same), 158:2-6 (same).  See also 8/23/10 [Shapiro] 114:25-115:7 (noting Ridings might "testify about liquidation values"), 115:8-16 (noting Ridings was "comparing the deal that was on the table from Barclays with a possible liquidation scenario and what that could mean for evaluation purposes of the assets that were being transferred"), 116:21-117:3 (same); 117:12-19 (same).

billion figure was "in the ballpark . . . of these numbers," and (c) these numbers were from the

traders "***reporting back if we had to do a fast liquidation***."[48]



---

[48]   5/3/10 [Seery] 172:13-23, 183:20-23, 187:12-19 (emphasis added).  See id. [Seery] 172:24-173:8
(admitting document relates to "information that you received from Lehman traders" on morning
of September 19), 173:23-174:10 (same), 185:3-13 (same), 183:13-23 ("[Q] [W]as the 45.5 when
you wrote it on that page, intended to reflect the view after the Lehman traders exercise of the
liquidation of the assets in the fed repo?  [A] …. I just don't know when I put the 45.5 there.
That's in the ballpark though of these numbers for sure"), 183:24-184:2 (admitting he wrote 45.5
on sheet in timeframe of morning of Friday September 19), 187:24-188:3 (admitting numbers
traders came back to Seery with appear on Movants Exhibit 147).

47.    The $45.5 billion figure nearly matched the figure Barclays arrived at when, that morning (Friday, September 19), it marked down the Fed Repurchase Agreement collateral value of $50.64 billion by at total of $6.04 billion.[49]   Quite conveniently, this reduction from the book or mark-to-market valuations also approximates the $5 billion negotiated discount which had been agreed upon days before and which was intended to be funneled to Barclays through the termination of the Barclays Repurchase Agreement.  The downward adjustment to liquidation value ensured that any excess value owing to the estates after the termination of the Barclays Repurchase Agreement (e.g., under section 559 of the Bankruptcy Code) would be extinguished.

48.    The $45.5 billion figure also ends up being the same figure that Barclays ascribes to the Barclays Repo Collateral in its acquisition balance sheet (i.e., $45.7 billion) prepared months later.  Barclays chalks this up to "sheer coincidence."[50]

### 9.    BURIAN-SEERY TELEPHONE CALLS CONFIRM GOING-CONCERN, EVEN EXCHANGE (SEPTEMBER 19)

49.    On Friday, September 19, 2008, the Committee professionals continued their best efforts to diligence the Sale Transaction.  Before the Sale Hearing, representatives from Houlihan attended a telephone call (or calls) with Seery and Shapiro to discuss the Sale Transaction.  During the course of that conversation, Burian received **three** different descriptions

---

[49]    See Compare M. 45 [email from Jasen Yang to Patrick Clackson, et al., re: Haircut Summary, dated September 19, 2008 at 9:20 a.m.] (attaching Barclays "haircuts" for Fed Repurchase Agreement collateral of $6.04 billion from $50.64 billion), and, 4/30/10 [Clackson] 19:23-20:12 (admitting haircut analysis was prepared on September 19), with M. 147 [Handwritten notes and markup] ("Seery Notes") at JS-LB-BANKR 000070 (Seery notes marking up Barclays' chart prepared by Jasen Yang to total $45.5 billion and listing unencumbered box of $1.9 billion underneath (which totals $47.4 billion)).  See also 5/3/10 [Seery] 184:14-16 ("[Q] The numbers are pretty close, are they not, sir, 45.5 versus . . . 44.6?  [A] I believe they are very close, yes").

[50]    9/2/10 [Romain] 129:10-17.  See also M. 105 [Barclays Acquisition Balance Sheet] at BCI-EX-00115845 (showing value of trading inventory at $45.79 billion).

of the Sale Transaction, each of which Burian memorialized in the notes that he prepared

contemporaneously with that discussion (i.e., Movants Exhibit 380).[51]

50.    ***First Description.***    In the first description, Burian was told that the transaction is

changing, that Barclays is stepping into the shoes of the Fed under the Fed Repo Agreement, that

$50.64 billion in assets will be transferred (against a $45.5 billion loan), that there may be a $5

billion difference between the loan amount and the collateral amount (i.e., a $5 billion haircut),

and that the Cure and Compensation Liabilities remain the same.[52]  At the conclusion of that

description, however, Seery told Burian "***you know something scratch that.  That's all***

***wrong***."[53]  At that point, Burian crossed out his notes of that description and turned the page:

---

[51]    5/6/10 [Burian] 100:13-24 (identifying call among Seery, Shapiro), 99:16-100:15 (identifying
Movants Exhibit 380 as his notes of that conversation).

[52]    See 5/6/10 [Burian] 101:7-25.

[53]    5/6/10 [Burian] 103:9-10 (emphasis added).  See also id. [Burian] 103:12-22 (same).



51.   ***Second Description.***  Seery then told Burian "let me give it to you straight ….

***This is what we're going to the judge with,***"[54] after which Burian received the second

description of the Sale Transaction.  This description indicated that $45.5 billion of long

positions remain, all shorts were closed out, and the loan totaled $45.5 billion.[55]  Burian recalls

that during this conversation, it became clear to him that the "haircut" -- that is the difference

between the value of the loan advanced and the value of the repo securities collateralizing that

loan -- had disappeared.[56]

---

[54]   Id. [Burian] 104:2-4 (emphasis added).

[55]   See id. [Burian] 104:9-21 (describing second rendition); M. 380 [handwritten notes of Saul
Burian] at HLHZ0038190 (memorializing second rendition).

[56]   See 5/6/10 [Burian] 111:8-112:1 ("[Q] [Y]ou understand . . . that typically repos have some
cushion built into them?  [A] I understand that when you lend money, you don't lend at a hundred
percent of value, you take what's called a haircut or a cushion or a reserve on the assets being

52.    In giving this second description, however, Seery switched gears again, telling Burian for the first time that "we have $47.4 billion of assets against $45.5 billion of liabilities, plus the cure and the employees is roughly 4 billion.  So, you know, the estate is 2 billion dollars ahead."[57]  At this point, Burian became thoroughly confused, unaware of, among other things how the $47.4 billion matched with the $45.5 billion in long positions; he told Seery to repeat the description simply, comparing it to the description provided earlier that week in the APA. Burian flipped the page of his notes again and proceeded to record the third description.[58]

53.    ***Third Description.***  Seery told Burian that while the Court was told the transaction consisted of $72 billion in assets and $68 billion in liabilities, the estates now would transfer $47.4 billion in assets, and Barclays would assume $45.5 billion in liabilities in taking over the repo agreement.[59]  Barclays also would assume Cure and Compensation Liabilities of

---

borrowed against or lent against.  [Q] Did it raise any issue with you at that time that the long positions were valued by Lehman at exactly the amount of the extended financing through the repo?  [A] . . . [N]o, the idea … that what the fed government lent and which Barclays stepped into the shoes of, didn't match what actually showed up at Lehman . . . did not surprise me in the least.  Usually haircuts are relatively modest, and frankly, with all of the -- what I was told -- deterioration in the marketplace and loss of assets that were included or not included, I would have been shocked, frankly, if the loan did not exceed the assets").

See also 5/7/10 [Burian] 70:24-71:7 ("[Q] And in the course of your work prior to closing did you have an understanding as to what the amount of the haircut had been with respect to the Fed repo? [A] . . . [W]e didn't know what the amount of any particular haircut was on the date that the Fed first lent the money . . . . ***But when it comes to Barclays at closing we were pretty comfortable that there was none***") (emphasis added).

[57]    5/6/10 [Burian] 107:10-12.

[58]    Id. [Burian] 107:13-108:1 ("I frankly, at this point, was thoroughly confused in a sense of I wasn't sure . . . how the 47 just matched up with the 45.5 longs . . . .  And I did say to him . . . I know what you told us last night.  I know what the deal was Wednesday and where we were Thursday. Can you just give it to me simple.  And I turned the page and a little aggressively, he might say – obnoxiously said, just start from the beginning and go to the end").

[59]    5/6/10 [Burian] 108:10-23 (recounting third rendition).  While it is unclear if the Clearance Box Assets were mentioned specifically during the third description, the $1.9 billion value ascribed to the Clearance Box Assets would explain the references to the $45.5 billion and the $47.4 billion of assets being transferred to Barclays.  Those two figures ($45.5 billion and $1.9 billion) also appear on Seery's notes following the traders' exercise to ascribe liquidation valuations.  See M. 147 Seery Notes at 70.

$4.25 billion.  Burian's notes reflected the comparison between the APA transaction and the third description provided by Seery:



54.      This conversation was Burian's last substantive discussion about the Sale

Transaction with anyone from the Lehman Sellers or Barclays before going to the Sale Hearing.

Critically, *at no point during the call, did Seery advise Burian that liquidation values were*

*being ascribed to the collateral instead of book (or mark-to-market) valuations*:

> [Q] During the conversation, what did you understand the basis of the valuation when the number was 47.4 versus 72 …. [A] [A]t all times, it was very clear to me they were being provided to me in a manner consistent with every conversation we'd had about the topic, which is, as a going concern, mark-to-market, in a manner in which any reasonable broker-dealer would do at the close of business every single day.  [Q] Did anyone tell me during that conversation that the methodology had changed since they had reported to the Court or filed the APA with the Court?  [A] No.  [Q] Did anyone tell you during that conversation that they were ascribing liquidation values to arrive at that either 45.5 or 47.4 number?  [A] At no time did anyone ever tell me that the deal had changed and that

we weren't getting going-concern value, but there was a liquidation discount or liquidation methodology being realized.[60]

55.     Similarly, neither Seery nor Shapiro advised Burian of the $5 billion block discount from the book value of these assets or about Barclays' imperative that it receive a day-one gain on acquisition.[61]

56.     Also, at the time of the call (immediately before Burian went to the Sale Hearing), Burian did not have a schedule of the assets that comprised the $47.4 billion.  Accordingly, Burian "had no way of diligencing or confirming.  I was a scrivener.  I was trusting Jim and the rest of the team that it is what it was."[62]

### 10.    SEERY'S EVOLVING TESTIMONY CONTRASTS SHARPLY WITH BURIAN'S CONSISTENT, CORROBORATED TESTIMONY

57.     Seery provides a different rendition of the sum and substance of his call with Burian prior to the Sale Hearing, maintaining he told Burian that the $45.5 billion figure ascribed to the trading assets reflected a negotiated $5 billion block discount (and not a mark-to-market or book valuation for those assets).  Seery's evolving testimony stands in stark contrast to Burian's consistent testimony, corroborated fully by Burian's notes and the documentary and testimonial evidence.  For no less than five reasons, Seery's testimony is not supportive of Barclays' failing argument that the Committee was aware of all material aspects of the Sale Transaction.

58.     *First,* Seery's testimony has been a moving target throughout this litigation. Movants first deposed Seery in September 2009 as part of the Rule 2004 discovery.  Thereafter, in January 2010, Seery submitted a declaration (prepared by Barclays' counsel) purporting to

---

[60]     5/6/10 [Burian] 112:2-21.

[61]     See 5/6/10 [Burian] 114:10-18 ("[Q] [D]id anyone [tell you] during that call . . . that even when the number had been seventy-two billion dollars, there had always been some pre-negotiated five billion dollar discount for Barclays?  [A] No.  [Q] Did anyone tell you during that call that Barclays had insisted on getting an immediate actual gain in the value of the book?  [A] No").

[62]     5/6/10 [Burian] 116:23-25.

clarify and supplement his first deposition testimony concerning his September 19, pre-Sale

Hearing conversation with Burian (and specifically Burian's notes):

> [m]y recollection is that the primary information that had changed was that Lehman's short positions had been closed out and that the ***estimated actual value of the Fed repo securities (as opposed to their marked value) had shrunk to approximately $45.5 billion***.  However, I consistently stressed to Committee representatives that the $5 billion difference between the advanced amount and the marked amount of the securities remained.[63]

59.    Even though the Seery Declaration recounts a conversation with Burian about

"estimated actual values," when asked about this ambiguous phrase during trial, Seery admitted

that he never uttered these words to Burian when discussing the $45.5 billion figure:  "I don't

believe I used those words and I don't believe in [the Seery Declaration] that I said that I actually

used those words."[64]

60.    When examined by counsel to his former employer (Barclays) -- with whom he

met before he testified at trial -- Seery for the first time testified that the $45.5 billion figure was

a "negotiated settlement figure" and that he advised Burian of this fact.  Seery admitted, as he

must, that he did not describe the $45.5 billion figure as a negotiated settlement figure either (a)

in his first deposition in September 2009, (b) in the Seery Declaration, (c) in his second

deposition in March 2010 or (d) during his direct examination by Committee counsel on the first

day of his trial testimony.[65]  Seery asserted this fact for the first time when examined by

Barclays' counsel on the second day of his testimony during the trial.

---

[63]    M. 568 [Declaration Of James Seery, dated January 28, 2010] (the "Seery Declaration") at ¶ 6 (emphasis added).

[64]    5/4/10 [Seery] 111:18-19.

[65]    5/4/10 [Seery] 94:4-7 ([Direct Examination] "[Q] [Y]ou don't recall testifying yesterday that the 45.5 billion dollar number was a negotiated number or a negotiated settlement,  correct?  [A] I don't recall specifically, no"), 99:6-9 ([First Deposition] "[Q] [A]t no point in your deposition in September of 2009 do you recall testifying that the 45.5 billion number was a negotiated settlement number, do you sir?  [A] I don't recall the specifics"), 101:1-7 ([Second Deposition] "[Q] [A]s you're sitting here right now, do you recall, sir, in your March 2010 deposition ever mentioning that the $45.5 billion number represented a negotiated settlement value? . . . [A] I

61.    Moreover, Seery admitted that *he never described the $45.5 billion figure to Burian as a negotiated settlement figure*:  "[Q] …. [W]ould you agree with me that on Friday, the 19th, you did not advise the committee that the 45.5 billion dollar value number was a number that had been achieved through negotiations between Barclays and Lehman and that it represented a negotiated settlement value?  [A] *I certainly didn't use the words negotiated settlement value*.  I believe I told them we had arrived at the 45.5 but I don't recollect the exact circumstances."[66]  He also admitted (again, as he must) that those words do not appear either in his notes relating to the Sale Transaction or Burian's.[67]

62.    *Third*, Seery conceded during the trial that he never advised Burian or the Committee representatives about the real purpose of the assignment undertaken by the Lehman Sellers' traders at Seery's direction, i.e., to ascribe liquidation values to the trading assets.  *In fact, Seery told Burian the Lehman traders were tasked with giving their view as to market value -- not liquidation value*:  "[Q] …. [T]here wasn't any reference in the communication you made to Mr. Burian to an instruction to the traders to develop liquidation bids, correct, sir?  [A] I don't recollect specifically if I said what we did.  *I did tell him that we had our traders give us a view as to the market value at that time.*"[68]

---

don't recall the specifics"), 111:25-112:2 ([Declaration] "[Q] The [Seery Declaration] doesn't say anything about negotiated settlement value, does it, sir?  [A] No, it does not").

[66]    5/4/10 [Seery] 115:2-10.  See id. [Seery] 123:21-24 ("[Q] You never used those words in connection with the deal until your testimony here this morning, correct, sir?  [A] I think I told Saul that we cut a deal.  So I probably never used negotiated settlement amount").

[67]    See 5/4/10 [Seery] 103:16-20 (conceding phrase "negotiated settlement amount" does not appear anywhere in Burian's notes), 123:16-20 (same, with respect to Seery notes).

[68]    5/3/10 [Seery] 191:12-18 (emphasis added).  See also 5/4/10 [Seery] 113:23-114:4 ("[Q] And when you described the input that the traders had given, did you talk to Mr. Burian about the fact that the traders had given that input that morning in response to your request that they give you liquidation bids for the collateral?  [A] I don't believe that I went into -- I would have -- I don't recollect the specific words but I don't believe I would have gone into that level of detail, no."), 114:8-17 (same).

Seery testified that liquidation values and market values were converging at this time.  5/3/10 [Seery] 153:4-5 ("The liquidation bids I was receiving was coextensive with the market value of

63.    **Fourth**, Seery's testimony conflates two separate and unrelated concepts concerning a "$5 billion issue" with the hopes that the confusion will suggest facts to which he cannot testify directly, i.e., that he advised the Committee of a negotiated $5 billion, block discount off of Lehman's book value.  The first "$5 billion issue" relates to the difference between the funds advanced under the Fed Repurchase Agreement and the collateral securing that loan, or the "haircut."  The second "$5 billion issue" relates to the purported decline in the marked value of repo collateral from $49.9 billion to $45.5 billion (and the misrepresentations made to the Committee about the reasons for that decline).

64.    As Burian testified, the Committee's concerns related to the second issue, i.e., the purported decline in the marked value of the trading assets represented to the Committee and the explanation of the decline.  At trial, Barclays' counsel asked Seery if Seery clearly explained to Burian the alleged $5 billion decline in the marked value of the securities.  Seery did not respond to the question asked.  Instead, Seery proceeded to discuss the difference between the amount of the repo loan ($45 billion) and the value of the repo collateral ($50 billion, i.e., the $5 billion haircut) -- perhaps hoping the confusion between these two "$5 billion issues" somehow would show he told the Committee about the negotiated, block discount:

---

those assets, yes").  Burian disagreed.  See 5/6/10 [Burian] 115:16-21 ("[Q] There's been some testimony in this trial, Mr. Burian, that given the tumultuous state of the markets, that market value as of that period was actually converging with liquidation value.  Was that your understanding of that period, you having lived through it as well?  [A] No").

| | |
|---|---|
| ***Seery Is Asked Whether He Told Committee About Second $5 Billion Issue, i.e., Justification For Alleged Decline In Market Value of Securities From $49.9 to $45.5 Billion*** | [Q] Please tell Judge Peck, were you clear with them about this five billion negotiated value, the difference between what the collateral was in the repo and what the parties believed its value was in the market that day? |
| ***Seery Responds By Referring To Unrelated Issue: The Difference Between Amounts Advanced Under Repurchase Agreement ($45 Billion) And Securities' Value ($50 Billion), i.e., Repo Haircut*** | [A] We were -- I was absolutely clear.  And again, if there wasn't a ***difference between the amount of money that Barclays advanced*** and what the Committee believed the securities to be worth, we wouldn't have had any discussions.  Why would we be having a debate right after the big meeting and then subsequently several into the night to review these items if there was no ***disagreement on the value versus the amount advanced***?[69] |

65.    Seery provides these conveniently evasive answers no less than ***six times*** when

questioned by Barclays' counsel at trial.[70]  The difference between the funds advanced under the

---

[69]    See 5/4/10 [Seery] 67:20-68:6 (emphasis added).

In his response, Seery used the phrase "what the [C]ommittee believed."  The Committee submits he clearly misspoke, meaning instead to say the value of what the "***Company***" believed the securities to be.  That is consistent with his testimony throughout the trial, which refers to the marks ascribed by the Lehman Sellers (i.e., the "Company").  See, e.g., 5/3/10 [Seery] 138:16-139:6 (referring to "Lehman's" position as to the marks on the collateral); 5/4/10 [Seery] 33:6-34:14 (discussing repo securities marked by "Lehman"), 60:1-17 (discussing Lehman's "view" as to the value of the repo securities).

The Committee had no belief as to what the value of the securities was (and, as Seery concedes (noted below), no ability to obtain that information).  Indeed, that is why Committee representatives were asking questions.

[70]    5/4/10 [Seery] 33:18-34:3 ("I explained [to them] that they had advanced forty-five billion dollars against that, and there was a five billion dollar difference between the amount they advanced and the marked amount of those securities, and that the transaction would close and Barclays would take the securities versus the forty-five billion dollars they advanced and the five billion dollars they believed -- Barclays believed wasn't there . . . .  I didn't concede, again, that they were worth less than fifty billion dollars"), 38:20-39:1 ("Again, in the 45.5, which has shown up a few times this morning . . . this reflects my discussion with him regarding the amount advanced, the forty-five billion advanced by Barclays versus the fifty face and the five billion"), 41:23-42:1 ("[Q] Did you tell him to ignore the [five billion] difference between the . . . marked value and the repo loan amount?  [A] No, that would have been pretty hard to ignore"), 62:1-6 ("[W]e further discussed the transaction and the difference between the amount that Barclays had advanced and the marked value of those repos as opposed to the market value of those securities"), 66:18-20 ("We talked about the difference between the amount, the forty-five billion dollars that Barclays had advanced versus the face amount"), 91:15-23 ("[O]n Friday, we had discussions about the difference between the forty-five billion they advanced and the face amount of those securities . . . .  But they knew the difference between the amount advanced and the face amount of those securities.  We didn't know what the market value was").

repo agreement and the value of the collateral securing it has nothing to do with the misrepresentations made to the Committee concerning the alleged decline in the marked value of the collateral and the purported reason for that decline.

66.    With respect to the issue about which Seery did speak, i.e., the $5 billion haircut, he did advise Burian about the $5 billion difference between the advanced amount under the repo agreement and the value of the securities.  Critically, Seery told the Committee *to forget* that description -- including the $50.6 billion valuation and $5 billion haircut -- after he gave it and proceeded to describe a different transaction where the haircut had been eliminated.  (See supra Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)")).  While Seery denies telling Burian this, Burian memorialized Seery's instructions to disregard (or "scratch") the description of the haircut in Burian's contemporaneous notes, which cross-out the "$5 billion issue" to which Seery testifies repeatedly:



67.    *Fifth*, irrespective of what Seery claims he told Burian or other Committee

representatives, Seery did not have the last word.  Klein provided Barclays' "final answer" to

Committee representatives during a meeting held in the early morning hours of Monday,

September 22, shortly before the transaction closed.  Committee representatives insisted on that

meeting to address the confusion that followed conversations with Seery and receipt of schedules

that did not square with Sale Hearing representations.[71]

---

[71]    See infra Part II.C.2 ("Discrepancies In September 21 Schedules And Other Closing Weekend
Events Add to Confusion; Eleventh-Hour Committee Call")

68.     During the trial's closing argument, Barclays maintained that Seery had
substantive conversations with Committee representatives after the Klein meeting.  While
Barclays' counsel purported to describe the substance of those post-Klein conversations, the
record does not contain a shred of evidence to support counsel's description.[72]  To the contrary,
the record shows that any conversations Seery had with Committee representatives after the
Klein meeting were not substantive (or relevant to the representations Klein and others made to
the Committee representatives during that final meeting).  Seery's description of any such post-
Klein conversations does not coherently identify what (if anything) was discussed -- instead
speculating as to what Committee representatives **would have** asked Seery after speaking with
Klein.[73]

69.     Indeed, Seery did not testify that he told Committee representatives to disregard
Klein's comments or that he provided any alternative explanations.  The significance of the Klein
conversation is best demonstrated in Burian keeping the Manila Folder, which contained Klein's
description of the substance of the Sale Transaction.  The evidence shows that the Klein
conversation was Barclays' final word and the last substantive conversation among Committee
representatives and Barclays (and the estates) before the Committee representatives left Weil and
the transaction closed.[74]

---

[72]     See 10/21/10 192:13-20 (Barclay's counsel maintaining Seery stayed after Klein conversation and
answered questions), 192:20-25 (Barclay's counsel purporting to describe substance of post-Klein
conversations among Committee representatives and Seery).

[73]     Tr., 5/4/10 [Seery] 69:16-70:2 ("[Q] Is there any question you didn't answer that night as best you
can recall for Mr. Fazio or Mr. Burian?  [A] There's no question that I didn't answer if I didn't
have the answer.  For example, they certainly would have asked for more detailed line by line --
we didn't have a line by line reevaluation of the book.  So if I couldn't answer the question, I told
them I couldn't answer the question.  But every question they put to me I answered.  [Q] Was this
meeting rushed or did you take your time to satisfy their questions?  [A] Frankly, everything was
rushed.  But this was a number of different meetings where they could -- they kept coming
back . . .").

[74]     5/6/10 [Burian] 162:1-12 (describing last words with Mr. Miller after Klein conversation and
immediately prior to leaving Weil).  See infra Part II.C.3 ("Klein Conversation: Barclays Gives
Committee Final Word On Salient Terms Of Sale Transaction Before Closing"), Part II.C.5

## B.    DRINKING FROM A FIRE HOSE:  SALE HEARING

### 1.    WHAT WAS DISCLOSED TO COURT

70.     During the Sale Hearing, the Lehman Sellers indicated changes had taken place to the transaction outlined in the APA and stated the values of the assets transferred had declined from $70 billion to $47.4 billion because of *market fluctuations*.[75]  With respect to the method used to arrive at those values, McDade testified that a *line-by-line* valuation had been performed the night before and that day to update the marks.[76]  Notably, the proffer of Ridings' testimony stated "[h]e would testify that these assets have substantially greater value *if they are sold as a going concern …. Without Barclays, Lehman would be forced to sell discrete assets for a fraction of the value that will be realized from this transaction*."[77]

71.     This was not surprising to the Committee.  The Lehman Sellers' presentation to the Court (including the statements regarding market deterioration) squared with the third description of the transaction provided to Burian by Seery and Shapiro hours before.[78]  It also tied to descriptions provided by the Lehman Seller's counsel during a side-bar discussion at the Sale Hearing.  No mention was made during that side-bar discussion (or the hearing) of

---

("Committee Representatives Stated Unequivocally That Committee Does Not Consent To Post-Hearing Modifications").  See also Burian Dep. Tr. (12/17/09) 142:21-143:2 ("[A] And that led to what we still believe is the single most important conversation, the one with the principals right before we left. [Q] That was the conversation with Harvey Miller? [A] Harvey Miller, Michael Klein, et cetera"), 262:24-263:10; M. 359 at ¶ 10.

[75]    M. 261 Sale Hearing Tr. at 46:20-47:15.

[76]    Id. at 109:6-110:3, 126:21-127:1.

[77]    Id. at 144:18-24 (emphasis added).

[78]    5/6/10 [Burian] 123:20-124:1 ("And was that presentation to the Court consistent with your discussions with the Lehman representatives, Mr. Seery and Mr. Shapiro?  [A] Again, reading the transcript [from the Sale Hearing], I now see the differential between the cure estimate.  But other than that, it was essentially the same.  You know, market deterioration, etcetera, etcetera").

substantial disagreements between the Lehman Sellers and Barclays over how aggressively

Lehman had been marking its book.[79]

72.    Committee representatives also participated in discussions about why the going-

concern sale was necessary to avoid a liquidation.  In a conversation during the Sale Hearing,

Ridings stressed to Burian the need to avoid a liquidation.[80]

73.    The Committee neither objected to nor affirmatively supported the Sale

Transaction.[81]  Both Burian and Despins testified to the weighty considerations that resulted in

that position, most importantly that the risks attendant to disrupting a going concern sale, i.e.,

causing a liquidation, did not justify an unsubstantiated objection.  As Despins succinctly stated:

"I think the lead point would be no other viable alternative -- well, no apparent viable alternative

at the time …. I think the belief was that the Barclays transaction was better than a liquidation.  I

mean, that assumption was that this was a going concern bid and therefore, it was better than

liquidation."[82]

---

[79]    See 5/6/10 [Burian] 121:4-7 ("[Q] And did Ms. Fife's comments to the audience seem to you to
be consistent with your conversation with Mr. Seery and Mr. Shapiro?  [A] Yeah"), 122:2-11 (no
mention of disagreements); M. 380 at HLHZ0038191 (memorializing third Seery transaction
description).

[80]    5/6/10 [Burian] 122:17-123:5 ("There was a conversation about … if you don't do this, something
else might happen, and the idea that a going-concern sale is better than a disaster or liquidation . .
. . [Q] Did you have any discussions with Mr. Ridings in the courtroom?  [A] . . . He did pull me
aside and during that and say . . . the committee's got to get on board or it's going to be a disaster.
I'm telling you, there's no one else out there who's going to buy these assets.  You don't even want
to look at what a liquidation looks like.  I'm not exactly quoting.  I'm trying to give the nature of
the conversation").

[81]    Id. [Burian] 167:23-168:5.

[82]    6/25/10 [Despins] 61:5-17.  See also 5/6/10 [Burian] 118:6-24 ("We do believe the Company that
there is no viable alternative to buy as a going concern . . . .  [O]n the securities, like it or not, our
choices were:  try to blow this thing up and take the risk of liquidation . . . .  [I]f we blew this
thing up and there was no transaction, Barclays could try to grab those securities and then try to
monetize their loan, which is exactly the liquidation we were trying to avoid").

74.    Receipt of going-concern consideration for the assets was of considerable importance to the Committee.  Had the Committee known that Lehman was liquidating assets to Barclays (as opposed to preserving going concern value), then it would have provided a basis to object to the Sale.[83]

75.    Certain objectors appeared and argued against approval of the Sale Transaction arguing, among other things, that Barclays stood to receive a windfall gain.  In overruling those objections, however, the Court noted, among other things, that the objections were not substantiated.[84]

76.    At the Sale Hearing, the Court also was advised the Clarification Letter would clarify which subsidiaries (if any) were being sold.[85]  But neither Barclays nor the Lehman Sellers presented the Clarification Letter to the Court during the Sale Hearing or any time thereafter -- even though the Court specifically asked for documents reflecting the transaction modifications and advised they were important to its understanding of the transaction.[86]

---

[83]    5/6/10 [Burian] 113:2-114:9 ("So if Mr. Seery had told you that they were ascribing liquidation values to the long positions, is that something that would have mattered to you, or in your experience, to your client?  . . . [A] The main essence that we were getting was the ability . . . to sell these assets . . . in a manner that would allow us to avoid a liquidation and dumping those on the market . . . .  The decision was, was it better or worse to risk liquidation or to get the benefit of a going-concern sale . . . .  [Y]our question was, would it have mattered?  It would have mattered enormously"), 114:19-116:25.  See also Burian Dep Tr. (12/17/09) 301:19-25 ("[I]f someone said to me . . . Barclays is taking the book for 2 billion less than what it's worth, it certainly would have been a basis for objection . . .").

[84]    See M. 261 Sale Hearing Tr. at 170:15-16 ("Mr. Golden, in effect, you're asking me to weigh your speculation against their speculation").

[85]    Id. at 48:5-10.

[86]    Id. at 55:12-23.

77.     The Court entered the Sale Order in the early morning hours of Saturday,

September 20.  Notably, the Sale Order defined the Clarification Letter as the "letter agreement

***clarifying and supplementing*** the Asset Purchase Agreement" and prohibited material

modifications to the Sale Transaction.[87]

### 2.     WHAT WAS *NOT* DISCLOSED TO COURT

78.     Neither the Lehman Sellers nor Barclays disclosed certain features of the Sale

Transaction to the Court, including modifications that had been agreed upon before the Sale

Hearing concluded.  The Court was not advised about Barclays' insistence on receiving a day-

one gain in connection with the transaction, the $5 billion negotiated block discount off the

Lehman Seller's book values, and the change in the method of marking assets from book value to

liquidation value.  ***Similarly, the undisputed trial testimony shows the Committee and its***

***representatives were not aware of these features.***[88]

---

[87]     See M. 257 Sale Order at ¶ 25 ("The Purchase Agreement and any related agreements, documents
or other instruments may be modified, amended or supplemented by the parties thereto, in a
writing signed by such parties, and in accordance with the terms thereof, without further order of
the Court, provided that any such modification, amendment or supplement does not have a
material adverse effect on the Debtors' estates and has been agreed to between the Committee, the
Debtors and the Purchaser").

The Sale Order also expressly reserved each of the Lehman Seller's rights with respect to
allocation of the proceeds realized for the Purchased Assets.  See Id. at ¶ 30 ("**Allocation.** The
consideration received by Seller pursuant to the Purchase Agreement on account of the … [Real
Estate Assets] shall become property of the LBHI estate.  The rights of all parties in interest in
respect of the proper allocation of proceeds received by the Seller on account of the Purchased
Assets other than the Real Estate Assets are reserved, as among each Seller (and without
impairing or affecting in any way Purchaser's rights under the Purchase Agreement), subject to
the further order of the Court.  The Debtors shall seek an order approving such allocation, on
notice to the SIPA Trustee and the Committee, in the event of any dispute regarding such
allocation").

[88]     See 6/25/10 [Despins] 113:22-114:10 ("[Q] …. [O]ne more question about the five billion dollar
reduction, which you say, if anybody had told you, you would have remembered.  When, if ever,
were you told by anybody that there had been a negotiated five billion dollar reduction?  [ A] I
don't think anybody -- that I knew this until this litigation started.  [Q] No one had made that
assertion to you at any time prior to this litigation?  [A] No.  There was a lot of noise by Houlihan
saying these numbers don't add up, there's an issue, blah, blah, blah.  ***But somebody telling me,***
***oh, they cut a deal where they're going to give a five billion dollar discount.  I didn't know***
***anything about that until this litiga[tion] -- or the examiner's report, maybe.  But way -- you***

### (a)    IMPERATIVE TO BARCLAYS TO REALIZE A DAY-ONE GAIN

79.    From the transaction's inception, Barclays insisted on a day-one gain -- a fact Barclays concealed from the Court.  While Barclays concedes the Court was never told about this precondition, it maintains the Court was well aware of this fact -- but considered it "irrelevant."[89]

80.    Barclays claims the Court and Committee were aware of the gain because (a) the Court authorized the transfer of assets to Barclays *irrespective of their value*; (b) the Court reviewed and overruled objectors to the Sale Transaction who complained Barclays stood to realize a windfall gain; and (c) the September 17 Press Release and Analyst Call, while not disclosed to the Court, did announce a gain.  Barclays' arguments are without merit.

---

*know, many, many months after*"); 5/6/10 [Burian] 114:10-14 ("[Q]  *So did anyone during that call with Mr. Seery and/or Mr. Shapiro tell you that even when the number had been seventy-two billion dollars, there had always been some pre-negotiated five billion dollar discount for Barclays?*  [A] *No*"), 192:6-10 ("[Q] *Did you ever hear or advise the committee that there was a block discount of five billion dollars imbedded in the transaction for Barclays?*  [A] *Never heard it, never advised the committee that there was one*"); 112:18-21 ("*At no time did anyone ever tell me that the deal had changed and that we weren't getting going-concern value, but there was a liquidation discount or liquidation methodology being realized*");  5/7/10 [Burian] 66:8-12 ("[Q] *And was it your understanding in or about October of 2008 that there had been a five billion dollar haircut taken from the values of the Schedule A Assets that were acquired by Barclays?*  [A] *Not the way you described it, no*"), 92:18-21 ("[Q] . . . *[W]ere Houlihan or the committee told that Lehman and Barclays had agreed to a five billion dollar discount, using the word discount?*  [A] *No*"); 5/6/10 [Burian] 156:19-22 ("[Q] Was there any discussion of agreeing to the forty-four or forty-five billion dollar post-mark value in order to facilitate a day one gain to Barclays?  [A] No . . .").

[89]    See 4/26/10 [McDade] 184:18-22 (testifying that Barclays never advised Lehman of "imperative that the deal incorporate a first-day gain for Barclays"), 184:23-185:7 (testifying it was not contemplated by agreement that there would be day-one gain), 205:12-20 (testifying day-one gain was inconsistent with transaction); 4/30/10 [Hughes] 122:21-123:8 (testifying that first-day gain was precondition), at 123:9-124:6 (testifying first-day gain was not mentioned beyond Barclays), 124:7-12 (same), 124:13-17 (same), 125:3-7 (same), 126:8-12 (conceding Court was not informed of precondition), 148:2-149:22 (admitting to Barclays' view that "Court felt that it was not relevant whether or not that windfall profit did or did not exist"); 6/21/10 [Diamond] 154:6-10 (testifying to requirement of capital accretion); 6/22/10 [Varley] 110:12-111:19 (testifying to condition precedents), 115:25-116:10 (same).

50

81.    *First*, the argument that the Court approved the transfer of assets irrespective of their value (and without a cap) finds no support in the Sale Order and specifically does not square with the Court's finding that Barclays provided "reasonably equivalent value" for the assets.[90]  The transfer of limitless amounts of assets cannot be considered reasonably equivalent to any value.

82.    *Second*, Barclays attempts to tag the Committee with the knowledge of the gain, even though the September 17 Press Release (i) is silent regarding a gain; (ii) the gain mentioned on the September 17 Analyst Call cryptically described a United Kingdom accounting convention (causing even the Lehman Sellers' investment bankers (Lazard Freres) to dismiss the statement as irrelevant); and (iii) by Barclays' own admission, became outdated by Saturday, September 20, because it addressed a different transaction.[91]

83.    *Third,* the September 19 email to Milbank from a dissenting creditor alleging Barclays will realize a "windfall" in the transaction (and the creditor's assertion of that argument at the Sale Hearing) fails to support Barclays' argument.  That email contains inaccuracies of its own, and, at the time, that creditor's objection at the Sale Hearing was considered rumor -- and certainly not grounds to disbelieve the direct and unambiguous representations made to the Court and the Committee.[92]

---

[90]    See M. 257 Sale Order at ¶ 19.

[91]    See supra Part II.A.4. ("Barclays' Press Release And Analyst Call (September 17)").

[92]    See BCI 219a [email chain including email from Daniel Golden to Luc Despins re: FW LEHMAN BARCLAYS, dated September 19, 2008]; Burian Dep. Tr. (12/17/09) 273:20-274:11 ("I was aware of chatter, as there is in every bankruptcy sale, about people who are not informed of what's going on, worried that Barclays was getting a good deal in a variety of respects . . . . [T]here are at least two, probably three conversations with . . . Lehman about this topic.  And there are clear mistakes in the email about how the transaction was structured, and typically, while it is interesting to hear the uninformed market, what I rely on is my access, my diligence, and the information I get directly from the horses' mouth and my understanding of the transaction, directly").

84.    **Fourth**, the Court indicated it overruled the objections complaining about Barclays' windfall gain because they were based largely on speculation and not concrete evidence.[93]   That decision confirms the Court was not aware of the existence of such a gain.

85.    **Lastly**, the Committee knew Barclays would likely realize a "gain" on the transaction, i.e., from acquiring relatively inexpensively and operating a preeminent broker-dealer business that would prove profitable.   Undisclosed to the Court and the Committee, however, was the fact that an immediate gain was guaranteed through an undisclosed discount and the attribution of liquidation values to the trading assets.[94]

### (b)    EMBEDDED $5 BILLION DISCOUNT NEITHER DISCLOSED TO COURT NOR IDENTIFIED IN TRANSACTION DOCUMENTS

86.    Certain of the negotiators for the Lehman Sellers and Barclays agreed early in the negotiations that Barclays would receive a $5 billion discount from the transferred assets' book value.   Neither Barclays nor the Lehman Sellers disclosed that transfer to the Court or in the transaction documents (including the APA, the First Amendment, and the Clarification Letter). The testimonial record (much of which was supplied by Barclays' employees) is replete with evidence substantiating the existence of the $5 billion block discount off the Lehman Sellers' assets' book value:

- McDade testified to a $5 billion difference between "the books and the agreed price;"[95]

- Lowitt testified the asset value "was an amount that was less than the amount that we had it on our books for[,] which reflected a bid offer that was consistent with the size of the purchase as well as the volatility in the marketplace;"[96]

---

[93]    See M. 261 Sale Hearing Tr. at 170:15-16.

[94]    See Part II.A.7 ("Committee Understood Barclays' Acquisition Of A Preeminent Broker-Dealer For Relatively Little Consideration Ultimately Would Prove Profitable").

[95]    4/26/10 [McDade] 155:20-22.  See also id. [McDade] 165:22-166:10 (testifying to $5 billion difference between "agreed number and the Lehman books").

[96]    4/29/10 [Lowitt] 80:14-18.  See also id [Lowitt] 81:24-82:2 (conceding price was less than amount shown on Lehman's books).

- Kelly testified that the "transaction included an approximately five billion dollar difference between the values that had been negotiated for the assets that were moving, and their most recent book values on the books of Lehman;"and[97]

- Tonucci testified that the final Sale Transaction included a discount to Barclays off of the Lehman Sellers' marks by about $5 billion.[98]

87.    Similarly, the documentary evidence confirms the existence of a discount:

- Kelly emailed Lowitt after the parties executed the APA, describing the agreement that had been reached:  "*Well, it took all night and lots of back and forth but the deal is done and ready for the Board.  Final price did not change meaningfully - approx* [sic] *a $5b all in economic loss versus our marks and $3.6b of resi assets left behind*;"[99]

- On September 17, Gerard Reilly emailed Ian Lowitt, noting he "went through all docs and did not see reference to the price haircut," to which  Lowitt responded, "Since not in contract, hard to see what to d[o];"[100]

- Kelly's handwritten notes recorded a loss of $5.25 and referred to "marking book down;"[101]

---

[97]    4/28/10 [Kelly] 155:15-18.  See id. [Kelly] 156:17-19 (same).

[98]    Tonucci Dep. Tr. 29:22-30:17 ("[Q] You understood the 5 billion dollars all in economic loss versus our marks to be a reference [in M. 8] to a discount off the marks, correct?  [A] Yes. [Q] *The deal that was ultimately done and closed on September 22, that too included a discount off of Lehman's marks, correct?  [A] That is correct*.  [Q] Okay, and the amount of that discount off of Lehman's marks was about $5 billion, is that right? . . . [A] *[V]ersus the valuations that I recall seeing from our analysis it was about that number*. . . . *About $5 billion.*") (emphasis added).

[99]    M. 7 [email from Martin Kelly to Ian Lowitt, copying Paolo Tonucci, re: [blank], dated September 16, 2008) (emphasis added).

[100]    M. 25 [email chain including email from Gerard Reilly and Ian Lowitt re: Are we all set up to do the marking of the positions? Ian, starting September 17, 2008].

[101]    M. 14 [Handwritten notes] at BCI-EX-00115169; M. 235 [Draft Balance Sheet] at BCI-EX-00115152.

At the trial, Kelly incredulously tried to testify that his handwriting said "matched" rather than "marking" but was impeached on this point.  4/28/10 [Kelly] 176:12-186:7.

- Consistent with his testimony that "there was going to be an exercise to mark the books to reflect the agreements between Barclays and Lehman," Lowitt's notes referred to a "mark down" with respect to an earlier draft of the Sept. 16 Balance Sheet (from $77.2 billion); and[102]

- On September 18, 2008, Beatrice Montaudy of Barclays emailed, among others, Jasen Yang and noted that "during the asset purchase price negotiations, it was essential to the valuation calculation that that the 'discount' between the value of the assets acquired and the purchase price NOT be subject to the 46% marginal US tax rate …."[103]

88.    Barclays cannot point to any pre-closing evidence refuting the $5 billion discount off of the Lehman Sellers' book values or the fact that Barclays concealed it from the Court. Barclays argues that to the extent that the negotiators did agree to a $5 billion discount, it was taken from the Lehman Sellers' marks to reflect the securities' "true" market value, rather than to give Barclays a discount off of the Purchased Assets' book value. Barclays cannot point to any document created before the September 22 closing that substantiates an actual calculation of the market value of the securities at $5 billion less than the mark-to-market valuations on the Lehman Sellers' books. Barclays relies instead on the after-the-fact opinion of its expert witness, Professor Pfleiderer. Irrespective of the flaws in the Pfleiderer Report (which are examined in detail in the Movants' experts' reports and LBHI's Post-Trial Brief And Proposed Findings Of Facts, which are incorporated by reference in the Committee's Proposed Findings),[104] Barclays' post-hoc litigation opinion is not relevant to assessing the purpose of the discount as negotiated between the Lehman Sellers and Barclays.

---

[102]    4/29/10 [Lowitt] 84:7-8. See also M. 15; 4/29/10 [Lowitt] 174:12-15 (testifying, with respect to Sept. 16 Balance Sheet (M. 2), that "if that was the seventy-two billion dollars . . . my understanding was that was less than what was on Lehman's books, and that difference was five billion").

[103]    M. 31 [email from Gary Romain to Caroline Owen, et al., re: Re: Long Island Asset Booking, dated September 18, 2008].

[104]    For example, Professor Pfleiderer states that Barclays' "fair value" valuation does not apply any "fire sale" discount to the transferred positions. See BCI 341 Pfleiderer Report ¶ 63. Seery, however, testified that the $45 billion figure reflects a liquidation value based on a sale of the securities as quickly as possible. See Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo Collateral (September 19)").

     **(c)**    **$47.4 BILLION VALUE WAS NOT MARK-TO-MARKET VALUE OR BOOK VALUE -- BUT INSTEAD WAS SUM OF LIQUIDATION VALUE AND CLEARANCE BOX ASSETS**

89.      The APA clearly ascribed book or mark-to-market valuations.  At the Sale Hearing, the Lehman Sellers advised the Court that the marks for the trading assets were updated *that* morning.  Yet, record evidence confirms that the $47.4 billion number provided to the Court was a combination of the liquidation value arrived at by the traders at Seery's direction prior to the Sale Hearing on Friday, September 19 (that is, $45.5 billion for the repo collateral) plus the Clearance Box Assets of $1.9 billion.  See supra Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo Collateral (September 19)").  Indeed, Seery's notes reflected a replacement of the $50.64 billion mark with "$45.5 … 1.9 bn."[105]

90.      The $47.4 billion figure did not change because of any market deterioration -- as represented to the Court and to the Committee.  Rather, it reflected a negotiated, block discount and the undisclosed attribution of liquidation values.

     **(d)**    **BOOK, OR MARK-TO-MARKET VALUE OF REPO COLLATERAL TRANSFERRED TO BARCLAYS WAS APPROXIMATELY $50 BILLION -- A FACT KNOWN TO BARCLAYS PRIOR TO SALE HEARING**

91.      As of Friday, September 19, 2008, Barclays knew the market value of the securities it stood to receive equaled or exceeded $50 billion.  *First*, Seery explained that the Lehman Sellers' mark-to-market valuations on their books as of September 19, prepared using models in which he had confidence, valued the assets being transferred to Barclays at nearly $50 billion (and the Fed Portfolio at $50.64 billion).  It was only when they assumed a quick *liquidation* that the Lehman Sellers arrived at the range of approximately $45.5 billion.[106]

---

[105]    See M. 147 Seery Notes at JS-LB-BANKR 000070, M. 45.

[106]    See Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo Collateral (September 19)"); II.B.2.C ("What Was *Not* Disclosed To Court, $47.4 Billion Value Was Not Mark-To-Market Value Or Book Value -- But Instead Was Sum Of Liquidation Value And Clearance Box Assets").

92.    *Second,* documents reveal a valuation for the repo collateral as high as $52.19 billion (marked by Barclays' collateral agent, BoNY, and given to Barclays CAO Gerard LaRocca by Marty Malloy on Friday, September 19, 2008 -- before the Sale Hearing).[107]  Indeed, Barclays concluded that "We should book all positions from the Lehman Financing Facility to BCI (~45bn securities ...)[.]  *We should book based on the price within the BoNY file, at least for Day 1*"[108]

93.    *Third*, Barclays never took the position the repo collateral was worth less than $49.7 billion.  Barclays did not deny the $49.7 billion figure identified in the Leventhal Declaration submitted in connection with the December Settlement.[109]  Ricci valued the assets at $52 billion on September 20, 2008.[110]

---

[107]    M. 47 [email from Marty Malloy to Gerard LaRocca re: FW: Totals For the (sic) Fed Facility Collateral, dated September 19, 2008]; M. 45 (showing haircut of $7.17 billion).  See also M. 362 [email from Rich Ricci to Michael Klein re: Accruals, dated September 21, 2008] ("Pretty convinced resis not in 52 after talking to a few people.  Will confirm, but more confident.  Where the resis went more troubling.  Worried about stepping blind into dtcc."); M. 490 [email chain including email from Martin Kelly to James Walker, et al., re: RE: Assets and liabilities acquired, dated September 20, 2008] (valuing securities and cash transferred at $44.8 billion and $7 billion, respectively); M. 74 [Barclays Draft Opening Balance Sheet, with cover email] (showing $52.880 billion in "Total Assets"); M. 72 [email from Irina Veksler to Robert Azerad, et al., re: Opening Balance Sheet v. 2, dated September 21, 2008] (showing same); M. 234 [email from Gary Romain to James Walker, et al., re: balance sheet, dated September 20, 2008] (showing "Financial Assets" valued at $52.19 billion"); M. 64 [email from Jasen Yang to Archie Cox, et al., re: Lehman Financing Facility Assets, dated September 20, 2008] (showing value of securities transferred (without $7 billion in cash) totaling $45 billion)).

[108]    M. 139 [email from Stephen Sell to Dixit Joshi, et al., re: Bookings – Lehman Financing Facility, dated September 21, 2008] (emphasis added).  See also 4/30/10 [Hughes] 185:4-13 (noting BoNY was collateral agent); 5/7/10 [Ricci] 185:12-21 ("[Q] And when the collateral in the Barclays/ Lehman repo was transmitted, it was valued by Bank of New York as collateral agent, correct?  [A] Correct . . . .  [Q] And Bank of New York served as Barclays' agent in that regard to value the collateral for it, correct?  [A] Yes").

[109]    See Part II.D.6 ("December Settlement Motion: Pattern Of Inadequate Disclosure Continues As Barclays Sits Silently").

[110]    5/7/10 [Ricci] 195:18-20 ("[Q] So on the 20th of September you were putting those assets in the range of fifty-two, yes?  [A] Yes, in this note among others").

94.    *Fourth*, Movants' experts discredit Barclays' expert opinions by explaining they are based on flawed valuation methodologies.  Based on an independent valuation, the Lehman Sellers transferred approximately $51 billion in cash and securities (as of September 19) to Barclays as the Barclays Repo Collateral, which was well in excess of the value disclosed to the Court.[111]

(e)    USE OF BARCLAYS REPURCHASE AGREEMENT TO TRANSFER EMBEDDED, $5 BILLION DISCOUNT

95.    On or about Thursday, September 18, the Barclays Repurchase Agreement became the mechanism through which the previously agreed-upon $5 billion discount would be transferred to Barclays.[112]  It was agreed that Barclays would keep the Barclays Repo Collateral instead of the assets identified on the Sept. 16 Balance Sheet.

96.    While certain Committee representatives were aware of the existence of the repurchase agreement and Barclays stepping into the Federal Reserve's position, they did not know that the termination of the repurchase agreement provided the vehicle through which the $5 billion undisclosed discount would pass to Barclays.  The reason they were unaware of this mechanic is because, among other things, they had been told specifically that the value of the

---

[111]    M. 156B [Corrected Expert Report of Mark E. Zmijewski] (the "Zmijewski Report") at 6.  See also id. at 5 (indicating Pfleiderer Report undervalues assets transferred to Barclays ($45.5 billion) by $5.1 billion).  These values ascribe to Barclays the full $7 billion in value notwithstanding its later agreement to compromise its claim to approximately $5 billion in the December Settlement.

[112]    See M. 28 [email chain including email from Gerard Reilly to Ian Lowitt, et al., re: Open issues on deal, dated September 18, 2008] ("*Not clear on the amount of block discount or how we make it happen.  Defaulting on repo could be the best as discount could be taken from haircut. If not that then we need to give business an allocation of block discount so they can mark down the books tonight*") (emphasis added); Tonucci Dep. Tr. 32:4-33:9 ("[Q] How did Barclays get the 5 billion-dollar discount? . . . Was the discount given to Barclays by defaulting on the repo? . . . [A] Yes, I would say that was the way in which the transaction was settled, so that is fair"), 133:15-21 ("[Q] Do you remember discussing with anyone at Lehman defaulting on the repo as a way of providing the discount to Barclays?  [A] Yes …. I think it was with Ian and with Gerry, perhaps Martin Kelly as well").

repo collateral matched the value of the loan.  Seery's description of the Sale Transaction

indicated clearly that the $5 billion haircut had been extinguished.  While Seery told Burian, in

his first description, about the $5 billion haircut, Seery proceeded to tell Burian specifically to

**_forget_** and **_scratch out_** that description (and then described a balanced transaction).[113]  Klein's

explanation also showed the repo loan equaling the market value of the repo collateral.  Milbank

and Houlihan testified consistently that they were never told (nor was the Court for that matter)

that a previously negotiated $5 billion discount off of the assets' book value would be effectuated

by terminating the Barclays Repurchase Agreement and transferring the excess Barclays Repo

Collateral to Barclays (along with other additional assets).

### (f)    ELEVENTH HOUR DEMANDS THAT LEHMAN SELLERS LOCATE AND TRANSFER ADDITIONAL ASSETS

97.    On Friday, September 19, Barclays began a campaign to extort from the Lehman

estates any and all additional, unencumbered assets that could be located for transfer, threatening

not to close if their demands were not met.  The record is replete with evidence of Barclays'

aggressive conduct:

- Ricci testified that the haircut summary appearing in Movants Exhibit 45 (discounting the $50.64 billion valuation by $6.04 billion) was used to argue collateral was lacking and that, while no specific number was given, Barclays was aiming to receive between $3 billion and $4 billion in additional value;[114]  Ricci told Alex Kirk, though, that he would not blow up this trade by being a pig;[115]

- Kirk testified the Lehman Sellers began searching to "find some, some identifiable bucket of value until Barclays said, yeah, that's enough;"[116] and

---

[113]    See 5/6/10 [Burian] 103:6-22, 107:24-110:20; M. 380 at HLHZ0038189-90.  See infra Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)").

[114]    5/7/10 [Ricci] 204:7-25, 205:25-207:4, 208:14-211:17.

[115]    5/7/10 [Ricci] 215:19-20 ("[Q] Did there come a point where you said to Mr. Kirk, '[w]e're not going to be pigs and go after every last nickel'?), 216:4-6 ("And I said, 'we won't be pigs, fine, let's get on with it.'"); M. 51 [email from Alex Kirk to Bart McDade re: Re: Box, dated Friday, September 19, 2008].

[116]    Kirk Dep. Tr. 112:17-24.

- Klein, who admitted the transaction would not close without additional assets, gloated to Diamond in an email sent early Saturday, September 20: "Great Day. *We clawed back 3 billion more value in the transaction* and cut the building prices by $160 million tonight."[117]

98.    The primary source of additional value was the Clearance Box Assets, i.e., a "box of assets which is financed on an unsecured basis" that supposedly became Schedule B to the Clarification Letter and was valued at between $1.9 billion and $2.3 billion.[118]  Another source of additional assets was the excess in the reserves LBI maintained pursuant to Rule 15c3 of the Securities Exchange Act (the "15c3 Accounts"), which contained $769 million in securities and $1 billion in cash.[119]

99.    The Court was never advised that the $47.4 billion figure consisted of a liquidation valuation of the repo collateral or that the Clearance Box Assets were being added in response to Barclays' demands for additional assets.  While Committee representatives may have been aware that the Clearance Box Assets and a conditional right to the 15c3 Accounts were features being added to the transaction, they were operating under the incorrect assumption that these additional features were being added as additional assets because the book, or mark-to-market value of the repo securities had declined to $45.5 billion.

---

[117]    8/27/10 [Klein] 51:21-53:10; M. 52 [email from Michael Klein to Robert Diamond re: Re: Lehman Brothers, dated September 20, 2008].

[118]    See Azerad Dep. Tr. 110:25-111:10 (explaining Clearance Box Assets); 4/29/10 [Lowitt] 125:17-126:2 ("I'm not sure whether they were added to the deal, but certainly the amounts -- you know, my recollection was it was about 1.9 billion dollars of unencumbered collateral"); Tonucci Dep. Tr. 125:11-18 (noting Clearance Box Assets became Schedule B); M. 70 [email from Monty Forrest to Ian Lowitt, et al., re: RE: 1.9 bn 4:45am update, dated September 21, 2008] (identifying nearly $2.3 billion in potentially transferable assets).

[119]    4/29/10 [Lowitt] 126:1-5 ("I'm not sure whether they were added to the deal, but certainly the amounts -- you know, my recollection was it was about 1.9 billion dollars of unencumbered collateral.  And it was about a billion of value in the 15(c)(3) lockup.  Although I know those numbers changed a little").

### (g)    OVERSTATED CURE AND COMPENSATION LIABILITIES

100.    The Sept. 16 Balance Sheet listed Cure and Compensation Liabilities at $2.25 billion and $2 billion, respectively.  During the Sale Hearing, the Lehman Sellers advised the Court that Contract Cure may aggregate $1.5 billion.[120]

101.    The Committee was told the "comp numbers were off the Lehman books."[121] Moreover, the Cure and Compensation Liabilities played a critical role in making the Sale Transaction a balanced exchange.[122]  They also were critical to the Court's determination of an appropriate break-up fee.[123]

102.    Both these amounts were grossly inflated, and the extent to which they were manipulated to give the appearance of a balanced transaction was not disclosed to the Court:

- Prior to the Sale Hearing, Barclays estimated the Cure and Compensation Liabilities at $1.3 billion **combined**, not the $4.25 billion outlined in the Sept. 16 Balance Sheet or the $3.5 billion disclosed to the Court;[124]

- Martin Kelly conceded at trial that the Contract Cure figure was overestimated by approximately $1 billion;[125] and

---

[120]    See M. 261 Sale Hearing Tr. at 99:22-100:4.

[121]    5/6/10 [Burian] 193:8-17.  See also 5/7/10 [Burian] 12:22-13:1.

[122]    5/6/10 [Burian] 88:11-17 ("[W]e were told, these numbers were right off the books and records of Lehman, but they were also taking roughly four and a quarter billion of liabilities for cure and comp, and therefore, you know, based on the mark to value of book, based on the value of the assets, of the liabilities being picked up, it was a, you know, balanced exchange of exactly 72.65 against 72.65").

[123]    See M. 260 Sale Procedures Tr. at 23:5-20.

[124]    See M. 41 [email from James Trevelyan to Patrick Clackson re: Negative Goodwill, dated September 19, 2008] ("[T]he negative goodwill arises because the 2.25 cure payment and 2.0 comp provision won't be valued at that amount but instead c.1.3 . . . ."); Id. [email from Patrick Clackson to Rich Ricci, dated September 19] ("[T]he official line fyi . . . .  Cure payments are optional and tho[ugh] some will be incurred, most will be covered by our ongoing supplier relationships and fall into monthly expenses"); M. 130 [email from Bill Castell to Jonathan Stone, et al., re: Long Island Balance Sheet, dated September 16, 2008] (listing bonus accrual at $1.3 billion and "External Funding" at $200 million -- and that these numbers "were the basis for the $3bn negative goodwill").

[125]    See 4/28/10 [Kelly] 211:15-18 ("[M]y recollection is that the final number, the final estimate for cure, changed from 2.25 billion to 1.0 billion.  I don't recall any other estimates for cure throughout the course of the week"), 206:4-8 ("We then had a conversation with Bart to reflect

- The Contract Cure figure actually totaled only *$238 million*; the negotiated Compensation Liability estimate ($2 billion) similarly exceeded the accrual for cash compensation on the Lehman Sellers' books by $1 billion, and actual bonus payments totaled only $1.5 billion, or $500 million less than was disclosed to the Court.[126]

103.    Barclays asserts the Lehman Sellers filed the Contract Cure payments on the Court's dockets at the time of the Sale Hearing, listing the lower amounts, and therefore a party could have discovered they were significantly less than the $1.5 billion represented to the Court. Of course, this does not explain why the lower amount was not formally presented or disclosed to the Court. In addition, Additional Contract Cure payment schedules could be filed, under the terms of the APA, up to *60 days after closing*, illustrating that the schedules the Lehman Sellers filed originally were neither definitive nor instructive -- a fact Milbank understood.[127] Even if

---

both of those understandings … and to suggest an alternative way of estimating the liability. His – his comment, his reaction to that was we just left a billion dollars on the table"), 206:17-24 ("[Q] And this knowledge that you gained during the week about once you took a closer look at the run rate that the estimation for cure was overstated by as much as a billion dollars, and then the conversation you described . . . with Mr. McDade, did all of that take place before Friday, September 19th? [A] Yeah . . ."). See also id. [Kelly] 207:8-14 (same).

[126]    See, e.g., M. 32 [Spreadsheet dated as of September 17, 2008 (but timed at September 18, 2008 at 5:32 p.m.), with cover email] (listing "Balance Sheet Transferred" amounts of $1.520 billion for compensation and $783 million for cure); M. 34 [Spreadsheet dated as of September 17, 2008 (but timed at September 18, 2008 at 7:33 p.m.), with cover email] (listing $1.7205 billion for compensation and $1 billion for cure); M. 17 [Spreadsheet dated as of September 17, 2008 with handwritten notes] (listing the Cure and Compensation Liabilities at $2.250 billion and $2 billion, respectively); M. 11 [Handwritten notes on 9/16 (11:18 a.m.) financial schedule] (Archie Cox notes listing $200 million for "mission critical" contracts); M. 104 [Barclays spreadsheet] at BCI-EX-00109156 (listing "Cure Payment" of $220 million and "Bonus -- Cash Element $1.7 billion"); M. 107 [Barclays Acquisition Balance Sheet Summary] (showing 2008 bonuses); M. 106 [Letter from Jack Stern (Boies Schiller) to Robert Gaffey (Jones Day) re: In re Lehman Brothers Holding Inc., et al., Case No. 08-13555(JMP), dated July 16, 2009, including spreadsheet] at BCI-EX00077272-286 (covering spreadsheet with "aggregate cure payments").

[127]    Cf. O'Donnell Dep. Tr. 99:12-21 ("[Q] Did Milbank have an understanding that, within 60 days of the closing, there would be a further filing with respect to designated contracts and proposed cure amounts for those contracts? . . . [A] Yes"). Cf. Barclays Br. ¶ 98 ("[T]he amount of any future cure payment would depend upon which contracts Barclays chose to assume within 60 days after the closing . . .").

Anecdotally, it is not unusual for contract cure schedules to take aggressively low estimates that are then negotiated or litigated with the holders of executory contracts. Here, the estimates were inflated by no less than 500% over the actual liability.

the values ascribed to the Cure and Compensation Liabilities did constitute estimates, the degree

to which they differed from the actual amounts (i.e., $4.25 billion (or $3.5 billion disclosed to

Court) versus $1.7 billion) is so extreme that they hardly can be said to have been arrived at in

good faith.

### (h)    CLARIFICATION LETTER DID FAR MORE THAN SIMPLY "CLARIFY" APA -- IT MATERIALLY AMENDED IT

104.    As described to the Court, at the Sale Hearing, the Clarification Letter served

initially to clarify confusion over which subsidiaries would be included in the Sale

Transaction.[128]   The Sale Order only approved the Clarification Letter to the extent it *clarified*

and *supplemented* the APA (i.e., not to the extent it *amended* the APA).[129]

105.    The Clarification Letter, however, played a far more significant role than its title

and description to the Court implied, serving as the vehicle through which the parties purported

to memorialize material amendments to the represented transaction.  Indeed, an examination of

the Clarification Letter's various draft versions reveals its evolution both before and after the

Sale Hearing.  It evolved from a simple agreement that would clarify the APA to one

effectuating wholesale amendments to the APA.[130]

---

[128]    See M. 261 Sale Hearing Tr. at 48:5-10.

[129]    See M. 257 Sale Order at 1.

[130]    See M. 384 [Draft Clarification Letter, dated September 17 at 4:48 p.m., with cover email] (noting agreement "clarifies the meaning of certain provisions of the [APA];" Purchased Assets include equity in subsidiaries); M. 385 [Draft Clarification Letter, dated September 18 at 12:26 a.m., with cover email] ("This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement"); M. 386 [Draft Clarification Letter, dated September 18 at 2:39 p.m. with cover email] (modifying Purchased Assets definition to state, among other things that "It is acknowledged that the values of assets set forth on Exhibit A reflect Seller's marks as of the date and time set forth on Exhibit A and that the face and nominal amount of such assets may be different than such marks"); M. 387 [Draft Clarification Letter, dated September 18 at 11:40 p.m., with cover email] ("Purchased Assets" definition amended to add reference to Sept. 16 Balance Sheet); M. 388 [Draft Clarification Letter, dated September 19 at 3:36 a.m., with cover email] (reference to Sept. 16 Balance Sheet deleted); M. 390 [Draft Clarification Letter, dated September 19 at 5:24 a.m., with cover email] (styling the Clarification Letter as a First Amendment To Asset Purchase Agreement); M. 389 [Draft Clarification Letter, dated September 19 at 9:01 a.m., with cover email] (amending Purchased Assets definition to include assets "used

106.    *First,* the Clarification Letter effectuated the transfer to Barclays of the previously negotiated, undisclosed $5 billion discount off of the Purchased Assets' book value.  Over the closing weekend, Barclays learned it "inadvertently" terminated the Barclays Repurchase Agreement on Thursday, September 18, prior to the undisclosed agreement to mark down the assets to liquidation value.[131]  Legally, that would result in any excess collateral (or haircut) reverting to the Lehman Sellers' estates under section 559 of the Bankruptcy Code.

107.    This issue was within Barclays' contemplation, considering its counsel simultaneously was negotiating with the Securities and Exchange Commission for certain exclusions (or "carve-outs") from the order initiating LBI's SIPA Proceeding, specifically for the

---

primarily" in Business; no mention of Barclays Repo Agreement); M. 728 [Draft Clarification Letter, dated September 19 at 12:09 p.m., with cover email] (word "amend" appears for first time: "[t]his letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements  of the parties stated herein and shall amend the agreement to the extent necessary to be consistent with this letter"); M. 137 [Draft Clarification Letter, dated September 19 at 9:15 p.m., with cover email] (containing first mention of the Barclays Repurchase Agreement -- but securities collateralizing agreement are not listed in "Purchased Assets" definition); M. 391 [email from Robert Messineo to Victor Leukow, et al., re: LEHMAN-Barclays, dated September 20, 2008] (containing 2 drafts of the Clarification Letter (*post-Sale Hearing versions*) from (1) September 20, 2008 at 2:39 p.m. (containing first combination of unwinding the Barclays Repurchase Agreement with both express inclusion of collateral as "purchased assets" and Clearance Box Assets; recognizes Clarification Letter amends APA "in certain respects" to be consistent with letter) and (2) September 21 at 12:35 p.m., adding BoNY as collateral agent); M. 363 [Draft Clarification Letter, dated September 20 at 11:13 p.m., with cover email] (again modifying "amends" and "intention" language and introducing Schedule A and Schedule B concept); M. 138 [email chain including email from Ken Myers to Ann Peterson, et al., re New Paragraph 13, dated September 21, 2008] (forwarding, for first time, operative clause to "rescind" the termination of  Barclays Repurchase Agreement).

[131]    See M. 38 ["Notice of Repurchase Date. Notice of Termination", dated September 19, 2008] (the "Termination Notice").  8/31/10 [Lewkow] 168:15-173:20 ("[Q] And it came to your attention over the weekend when you learned that the repurchase agreement had been terminated that some drafting would need to be done to address the fact that the repo had been terminated in the context of a bankruptcy proceeding, correct?  [A] . . . I learned that there had been a notice of termination of some sort sent out by some back office person at Barclays and that that created complexities and notice requirements . . . .  [I]t was desired to -- to undo that back office letter . . . .  [Q] [Y]ou understood … that the reason the repo was retroactively terminated . . . was because the effect of the termination of the repo was to [implicate] provisions of the Bankruptcy Code that required the excess collateral to be paid back into the estate.  [A] I just don't know the answer to that").

exercise of rights under sections 555 and 559 of the Bankruptcy Code.[132]  The Clarification

Letter was amended late Sunday afternoon (September 21) through language proposed by

Barclays' counsel to simultaneously rescind the Termination Notice, to "terminate" the Barclays

Repurchase Agreement a second time -- but this time, to preclude specifically the application of

section 559 of the Bankruptcy Code.[133]

108.    The agreement to use the Barclays Repurchase Agreement as the vehicle through

which billions in assets (i.e., excess Barclays Repo Collateral) would be transferred to Barclays

was reached **prior to** the Sale Hearing.  The APA provided for a transfer of the long positions

and the assumption of the short positions, each at book value.  The Court was not told the

Barclays Repo Collateral (Schedule A) would be transferred at liquidation valuations that

conveniently extinguished any haircut that would revert to the Lehman estates.  While the

Committee was aware of the existence of the Barclays Repurchase Agreement, it had been told

specifically that the haircut no longer existed (and thus could deduce that termination of the

Barclays Repurchase Agreement would not result in any excess collateral returning to the

estates).  That later proved untrue.[134]

---

[132]    See M. 136 [email from Edward Rosen to Josephine Wang, et al., re: [blank], dated September 17, 2008] (sending message to Securities Investor Protection Corporation and Securities Exchange Commission concerning carve-outs regarding stay of section 559 rights); M. 383 [email from Alistaire Bambach to Ed Rosen re: Here is the language you requested.  Please advise if it's acceptable, dated September 18, 2008] (Securities Exchange Commission response confirming stay of exercise of section 555 and 559 rights would not be implemented).

[133]    M. 3 [Clarification Letter, dated September 20, 2008] at § 13; M. 138 (noting proposed Paragraph 13 to Clarification Letter which provides for rescission of Termination Notice).

[134]    See Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)"); Part II.B.2.E ("What Was *Not* Disclosed To Court, Use Of Barclays Repurchase Agreement To Transfer Embedded $5 Billion Discount"); Part II.C.3 ("Klein Conversation:  Barclays Gives Committee Final Word On Salient Terms Of Sale Transaction Before Closing").

109.    **Second,** the Clarification Letter dramatically altered the definition of Purchased Assets by changing the valuation standard from book value to liquidation value.  The APA refers to assets with a "book" value -- but the Clarification Letter makes no mention of book value. The Lehman Sellers marked their books daily, and the mark-to-market values ascribed to the assets being transferred to Barclays on September 19 was nearly $50 billion.  The September 21 Schedules listed cash and securities collateralizing the Barclays Repurchase Agreement of $49.9 billion.  On Friday, Seery's liquidation assignment resulted in values of $45.5 billion.  That figure, when added to the value of the Clearance Box Assets, resulted in the $47.4 billion figure given to the Bankruptcy Court.  Whether to funnel the discount to Barclays through the Barclays Repurchase Agreement or otherwise, changing the standards on which the assets were valued from mark-to-market methodology to a liquidation methodology, and specifically attributing liquidation values to the collateral, eliminated the excess value that would otherwise revert to the Lehman Sellers under section 559 of the Bankruptcy Code upon termination.

110.    **Third,** as Barclays interprets it, the Clarification Letter provides for the transfer of billions in additional assets to Barclays, including the Clearance Box Assets (valued at between $1.9 billion and $2.3 billion) and a conditional right to the 15c3 Accounts (valued at $769 million).  The Clearance Box Assets and the conditional right to the 15c3 Accounts were referred to in the Clarification Letter in response to Barclays' demands additional assets as a precondition to close the transaction, ***not to compensate for a shortfall*** -- even though Klein told the Committee professionals that Barclays needed the Clearance Box Assets to restore the transferred assets figure to the approximate $47 billion amount provided to the court.  Barclays also asserts entitlement to approximately $4 billion in cash and cash equivalents comprising Lehman's proprietary margin associated with exchange-traded derivatives (the "<u>Margin</u>

Assets").[135]  Barclays asserts entitlement to those assets based on an oblique parenthetical phrase added to the letter immediately prior to its execution.

111.   Barclays submits the Committee cannot now challenge the Clarification Letter because the Committee professionals (a) reviewed versions of the Clarification Letter before the parties signed it, (b) knew these additional assets would be transferred to Barclays prior to the Sale Hearing and raised no objection, and (c) knew that repurchase agreements typically involve "haircuts."  Barclays' arguments are misplaced.

112.   The Committee does not take issue with the use of the Barclays Repurchase Agreement as the mechanical vehicle through which the parties consummated certain elements of the Sale Transaction.  A document that simply provided the "plumbing" for the asset transfers would be consistent with the description of the Clarification Letter provided to the Court (and contained in the Sale Order), i.e., a document that clarified the APA.  Instead, the Committee takes issue with the parties' use of the Clarification Letter to pass a secret, negotiated $5 billion discount through to Barclays without disclosing the discount to the Court (and the Committee).

113.   Moreover, the evidence adduced illustrates that the Committee professionals did not (and could not) understand the *economic impact* of the Clarification Letter at the time they reviewed it.[136]  The letter was delivered to Committee professionals over the closing weekend

---

[135]   M. 48 [email from Ian Lowitt to Bart McDade, dated September 19, 2008] ("We did find 5 bn of exchange listed options which we are investigating."); M. 104 (ascribing $2.3 value to Margin Assets); 4/26/10 [McDade] 235:1-3 ("[Q] Did you ever authorize any agreement with anyone at Barclays to include any Lehman cash margin in this sale?  [A] No, I did not").

[136]   See 5/7/10 [Burian] 51:21-52:2 ("If you're asking me what my understanding was, whether I understood that that clarification draft in my hand was radically changing the methodology of the valuation of assets, the answer is no.  Now, you can point out and tell me the document said what it said or didn't say what it said.  But I'm telling you what I knew and what I understood at the time"); 6/25/10 [Despins] 49:23-50:3 ("[Q] And you knew what the changes were 'cause they were written right there in the clarification letter, right?  [A] Well, I knew that I could read the document and say we're changing that and we're changing that section, et cetera.  But what we don't know is the impact of those changes on the value received by the estate").

with the instructions to "figure it out yourself."[137]  Indeed, the trial testimony makes clear that

Barclays' counsel negotiating the Clarification Letter never met with Committee representatives

during the closing weekend.  During the trial, Barclays' counsel testified to the unremarkable

proposition that the Committee's professionals did not advise him of their concerns about the

marked value of the assets being transferred.  On cross examination, however, Barclays' counsel

admitted (as he must) that he never even met the Committee representatives, which is not

surprising considering the Committee representatives were excluded from most of the meetings

that weekend and not permitted to participate in negotiations over the Clarification Letter.[138]

114.    On its face, the Clarification Letter did not describe the $5 billion discount or

make any mention of the radical change in valuation methodology intended to facilitate the

discount.  The expectation, however, was that the letter had an impact consistent with its title,

i.e., to clarify the transaction, not amend it, and to paper changes to the transaction that were

*described to the Court*.[139]  There was no expectation it would produce material changes, and

without the reconciliation of the transferred securities the Committee representatives demanded,

those changes could not be identified.

115.    Lastly, to the extent the Committee professionals became aware that additional

assets were to be transferred to Barclays during the closing weekend, they were apprised of those

---

[137]    See 5/6/10 [Burian] 127:10-11 (noting during the weekend, the parties were "dropping off a draft
of the clarification letter [to the Committee representatives], you know, go figure it out yourself").

[138]    See 8/31/10 [Lewkow] 231:15-22 ("[Q]  Okay, and Mr. Lewkow, isn't it true that during the
closing weekend, you, sir, did not personally engage in any direct discussions with the committee
or attend any  meetings with the committee during that weekend, is that correct?  [A] That's
correct.  There were people from there who were in rooms where things were being discussed, but
I had -- I don't recall any direct conversation I had with any representative of the committee.
That's correct"); Part II.C.1 ("Committee Insists On Access To Information, Including A Detailed
Schedule Of Assets Transferred"); 5/6/10 [Burian] 131:7-23 (testifying that he was "told no"
when he asked if he could join meetings about Clarification Letter).

[139]    5/6/10 [Burian] 133:11-18 ("So the clarification, by its nature, I assumed, had to do with how to
ultimately achieve *what was described to the Court.  It couldn't make material changes to the
deal*.  My view was, I didn't think the Court cared how Barclays got what it got . . . but that what
it got was important . . . .  But my understanding of the clarification letter was to confirm that").

transfers in the context of Barclays' and the Lehman Sellers' representations that the marked

value of the Barclays Repo Collateral, i.e., the value on the Lehman Sellers' books, **had declined**

**by $5 billion**, thereby extinguishing any haircut.  As far as the Committee professionals were

concerned, these additional assets were styled as truing up market declines (an explanation for

which the Committee professionals demanded verification).[140]

### C.    DRINKING FROM A FIRE HOSE:  CLOSING WEEKEND

#### 1.    COMMITTEE INSISTS ON ACCESS TO INFORMATION, INCLUDING A DETAILED SCHEDULE OF ASSETS TRANSFERRED

116.    On the Saturday following the Sale Hearing, the parties proceeded to Weil's

offices to "close" the Sale Transaction.  Representatives of the Committee also proceeded to

Weil on Saturday.  To insure the Committee representatives would be given access to

information, Committee counsel emailed LBHI's counsel on Saturday morning asking if Weil

"would be kind enough to make sure that your corporate team involves my corporate partners …

in all discussions and meetings with respect to the documentation and closing of the Barclays

transaction?"[141]

117.    Burian described the atmosphere when the Committee advisors arrived:

I can't say exactly when we arrived on Saturday … we asked -- like a broken record …
throughout the weekend, we wanted to get a breakdown of exactly what was going and
how they were marked …. The place was very active.  There must have been … ten,
twenty, thirty, forty Weil Gotshal lawyers, people all over the place.  We were at best an
annoyance, at worst something else.  We had the mantra of what's going on, tell us what's
going on.  I don't ascribe negative … motives, but we were for the most part ignored and

---

[140]    See Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange
(September 19)"); Part II.C.3 ("Klein Conversation:  Barclays Gives Committee Final Word On
Salient Terms Of Sale Transaction Before Closing").

[141]    M. 367 [email from L. Despins to H. Miller re: Barclays Documentation, dated September 20,
2008].

excluded from almost every single substantive conversation to the extent that … it got quite frustrating.[142]

118.    When the Committee representatives arrived at Weil, no one could describe the transaction to them.[143]  Moreover, while they witnessed hallway discussions, the Committee representatives were excluded from substantive meetings.[144]

119.    The closing continued into Sunday, September 21, 2008.   When the Committee representatives returned that morning, they expected to find a schedule of the assets being transferred.  Finding none, representatives from Houlihan spoke to Seery demanding a list of assets.[145]  Thereafter, at 11:30 a.m. on Sunday morning, less than 24 hours before the closing, they received the schedules:  hundreds of pages listing approximately 12,000 CUSIPS supposedly covered by the Barclays Repurchase Agreement with a "Market Value" of $49,902,924,897.20 (the "September 21 Schedules"),[146] the summary page of which appears below:

---

[142]    5/6/10 [Burian] 124:20-23, 126:14-21.  See also id. [Burian] 125:25-126:3 (stating Committee representatives did not participate in negotiations or meetings on Saturday and were "waiting around, hoping to get information").

[143]    5/6/10 [Burian] 127:20-128:1 ("[A]nd it was very frustrating and became frankly less and less believable that they were closing at some period of time, and no one knew what was being transferred.  No one could describe to us what the deal was.  No one could describe to us what the huffing, puffing, yelling and screaming and documents being traded and conference calls were").

[144]    6/25/10 [Despins] 25:7-22 ("[M]ost of what I observed during that day [Sunday, September 21] were – what I participated in were, really, most of the time, hallway discussions with Lehman representatives rather than having a formal meeting where we go to a conference room and go through ten points that are to be discussed . . . .  [Q] And were committee representatives invited to attend all meetings that were going on in all of the rooms?  [A] No").

[145]    5/6/10 [Burian] 133:9-13 ("[Q] What did you expect would happen when you returned on Sunday?  [A] I expected there would be – you know, we figured out what we got.  Here's a, you know, schedule that's going to be attached to a purchase agreement and what they're getting"), 134:8-10 ("The team had a quick conversation with Jim Seery that we really had to get the list of assets").

[146]    See M. 381 [email from B. Kelly to A. McComisky and M. Fazio re: Bar Cap, dated September 21, 2008] (attaching zipped spreadsheet of schedules of securities).



| Collateral | Market Value |
|---|---|
| Fed Collateral | 28,490,469,091.33 |
| DTC 074 | 10,176,792,453.35 |
| DTC 636 | 4,235,663,352.52 |
| TPCASH | 7,000,000,000.00 |
| Total | 49,902,924,897.20 |

M. 381

### 2. DISCREPANCIES IN SEPTEMBER 21 SCHEDULES AND OTHER CLOSING WEEKEND EVENTS ADD TO CONFUSION; ELEVENTH-HOUR COMMITTEE CALL

120.    Noting the discrepancy between the $47.4 billion figure announced in Court (which was supposed to reflect repo assets of $45.5 billion and the Clearance Box Assets of $1.9 billion) and the $49.9 billion figure ascribed to the repo assets on the September 21 Schedules, the Committee representatives cornered Seery for an explanation. Burian testified that Seery told them: "whatever schedule you're looking at, it is what it is. I can't tell you when the marks were. I'm not even sure these assets are going. We're still trying to reconcile the books …. [W]hen we know, you'll know."[147]

---

[147]    5/6/10 [Burian] 135:17-21. See id. [Burian] 135:12-16 ("Well Brad Geer buttonholed Jim Seery and said hey, we just got this through Milbank. It says $49.9 -- it's 50 billion dollars. You had told the Judge 47.4, you know, of that -- if this is supposed to be the repo stuff, that was only supposed to be 45.5 billion . . . . [W]hat's going on?"), 138:16-21 ("No firm conclusion as to what date these were marked as of. It also appeared that the marks didn't correlate to any specific date which, by the way, didn't surprise us, in light of the . . . description in [sic] the document was hey, here's a list that was pulled together. *It may or may not be accurate, you know, we're not*

121.    Notwithstanding the enormity of the task, the Committee representatives
attempted to diligence the September 21 Schedules by undertaking a CUSIP-by-CUSIP analysis,
gathering any analyst at their disposal to undertake this Herculean task.[148]  But even Barclays
admits frankly that "[a]pplying its standard valuation policies, it took Barclays **months** to
determine the correct values of what it received [in the transaction]."[149]  And as Professor
Pfleiderer and Seery testified, it was factually impossible to diligence these schedules in the
timeframe provided.[150]

122.    As of 11:00 p.m. on Sunday night, the Committee's professionals had not received
any updates concerning the September 21 Schedules distributed to them hours earlier.   The
Committee conducted a telephonic meeting at that time, during which the professionals provided

---

*sure what date it's through*") (emphasis added); Fazio Dep. Tr. 19:10-17 ("[Q] And were you ever told who assigned those market values to the collateral?  [A] I was told that it came off of the Lehman system earlier in the week.  [Q] Were you given a date earlier in the week?  [A] I was given Monday, Tuesday time periods").

See also 6/25/10 [Despins] 80:7-10 (recounting that the "*focus of the discussion was on Lehman explaining that the marks they had in their book were stale and that's why they were using other marks*").

[148]   5/6/10 [Burian] 136:15-25 ("Well, here we are … it's 11:30, 12:00 in the afternoon on Sunday. The largest asset purchase agreement in bankruptcy ever is about to close.  We don't know what assets are going.  We're told they've dropped tremendously in value.  So we did -- we didn't know if this was the assets, but under instructions to do the best we can, we basically sent out an APB and pulled in associates and analysts, and while I know it sounds crazy, we basically split this list up and said to our associates and analysts go find out what we can know about the value of these assets . . . go CUSIP by CUSIP").

[149]   10/8/10 41:13-14 (Barclays counsel citing to letter to Hon. James M. Peck from Jonathan Schiller dated September 24, 2009) (emphasis added).  See also 8/25/10 [King] 141:3-8 ("[Q] And [the Committee] could have then embarked on that same multi-month process that it took Barclays three and a half, four and a half, five months to effectively come up with acquisition balance sheet prices, is that what you're saying?  [A] I, yes, I guess that's right.  They could have done the same process").

[150]   10/7/10 [Pfleiderer] 9:3-7 ("[Q] And in the time that was available the week of September the 15th through the closing day on September 22, your view is that no line-by-line CUSIP valuation could have been done with any great precision; is that right?  [A] In think that is definitely true, yes"), 16:16-21 (same); 5/4/10 [Seery] 125:25-126:3 ("[Q] And you would agree . . . that the committee didn't have any ability to value this portfolio independently on Sunday, September 21, correct?  [A] I don't think they could have valued this portfolio, no").

an update, discussed concerns about the discrepancies between the September 21 Schedules and

the statements made during the Sale Hearing, and advised they were awaiting an explanation.  At

that point, the Committee provided specific instructions to its financial advisors with respect to

their authority to consent to the transaction:  "[w]e were informed directly and bluntly that we

were to observe, we were to participate, we were not to consent."[151]

123.    Uncertainty over the schedules of assets being transferred and the marked value of

those securities,  as well as discrepancies between information provided that weekend to

Committee representatives and information provided to the Court during the Sale Hearing,

created a level of agitation that prompted the Committee representatives to insist on a meeting to

obtain an explanation.  Shortly after the Committee call, Burian "pulled" Mr. Miller's elbow and

said:

> This is ridiculous.  You're telling me you're about to close the largest transaction ever and
> you don't even know what you're transferring and that you're too busy to tell the
> Committee what you're doing …. Don't you think at least you should get an explanation
> and I can listen and hear it?[152]

### 3.    KLEIN CONVERSATION:  BARCLAYS GIVES COMMITTEE FINAL WORD ON SALIENT TERMS OF SALE TRANSACTION BEFORE CLOSING

124.    In response to Burian's inquiry, Mr. Miller promptly assembled a meeting with

Klein, Lori Fife, Michael Fazio (Houlihan), and Tom Roberts (Weil) that took place in the early

morning hours of Monday, September 22, before the transaction closed.  Klein proceeded to

---

[151]    5/6/10 [Burian] 146:13-15.

[152]    5/6/10 [Burian] 147:25-148:6.  See also id. [Burian] 146:4-147:21 (describing Sunday night Committee call); 6/25/10 [Despins] 30:4-19 (reviewing September 21 Schedules and testifying "[T]here was this ongoing debate or discussion between Houlihan and Lehman representatives over how this -- what's in the book, the lack of certainty as to what's in the book; and second is how are the securities in the book marked . . . .  [T]hat was a topic that was ongoing the whole evening . . . .  Houlihan was extremely agitated over how that was done or -- and unhappy about the lack of clarity over the issue of how the marks were determined"), 71:3-4 (noting Houlihan "had concerns about the fact that these marks didn't add up to a number that had been given in Court regarding the value of the assets being transferred").

explain the substantive elements of the Sale Transaction by writing its components on the Manila

Folder:[153]



125.    On direct examination, Barclays' counsel carefully circumscribed its questions to

Klein to the **bottom-half** of the folder (i.e., the marks below the double line).  In so doing,

Barclays attempted to undermine the folder's significance by limiting the Klein testimony to the

---

[153]    5/6/10 [Burian] 151:2-10 (identifying participants in Klein meeting), 151:11-16 ("And Mr. Klein basically started talking.  He understood the purpose of the meeting . . . .  And he grabbed from the credenza or from somewhere on the table a manila folder, turned it over with a marker . . . and starts scribbling.  And he said, 'Listen, this is where we are and this is what the transaction is'"); 8/27/10 [Klein] 165:1-9 (acknowledging that all writing on the Manila Folder is his, save the word "RESIs" and the circles around the numbers).  See M. 410 [Manila Folder].

discussion in this meeting of how the "pipes" could not be opened.[154]  But as Burian testified, the

**top-half** of the folder (which Klein and Barclays' counsel carefully avoided on direct

examination) contained Klein's description to the Committee representatives of the substantive

elements of the Sale Transaction.[155]

### (a)    MARKET DETERIORATION PURPORTEDLY CAUSED SECURITIES' VALUES TO DROP

126.    Klein first advised the Committee representatives about the value of the trading

assets.  He made no mention of a block discount or the attribution of liquidation valuations.

Instead, Klein advised that because of declines in the market, the **marked** value of the securities

dropped from $49.9 billion to somewhere between $44 and $45 billion.  He also advised that to

compensate for the decline, Barclays would receive the Clearance Box Assets valued at $1.9

billion.

---

[154]    See 5/6/10 [Burian] 154:6-17 ("Mr. Klein said to me, 'Okay, how are we getting the pre-mark fifty billion dollars of assets? . . . Friday we got forty-one to forty-two billion transferred . . . to BarCap from JPM but eight and a half billion was help up.  We got -- on the 8 and a half billion we got about 7.4 billion of cash.'  If you remember, on this big schedule there's 7 billion of cash listed.  'And what we're going to do is somehow or another we're going to reverse that trade and ultimately the goal is we're going to get those securities back and we're going to give them . . . their cash back' . . . .  The plumbing issues just weren't all that interesting to me"); See 8/27/10 [Klein] 59:21-67:25 (Barclays' counsel asking Klein about bottom-half of Manila Folder).

[155]    5/6/10 [Burian] 153:14-18 ("The top above the double line was viewed as 'Let me tell you the substantive impact of what we're getting and what we're not getting.'  And below the line was, 'Let me explain to you what this whole weekend has been about and the complexity of how we're getting it'").

When asked on cross examination about the **top-half** of the chart, Klein's recollection was not clear.  See 8/27/10 [Klein] 157:19-158:10 ("[Q] Can we put the chart back up, please?  [Q] You don't remember, sir, specifically whether the assumption of liabilities for comp and cure was discussed at the meeting, do you?  [A] Well, there's the reference to extra liabilities specifically on that page that you pointed out.  But I don't recall specifically discussing it, no.  [Q] You have no -- you have no recollection of what, if anything, you said about the assumption of comp or cure liabilities, correct?  [A] I don't recall that --  [Q] And nothing about that chart refreshes your recollection, correct?  [A] No, sir.  Those were numbers that were in my mind throughout the entire week and had been discussed openly throughout the entire week.  But I don't have a specific recollection of that discussion.").

127.    Burian testified to his clear recollection of the meaning behind the "pre-mark" notations on the Manila Folder:

> Pre-mark, it was clear in the room was old value.  Post-mark, we're sitting here today, post-mark they are now worth forty-four to forty-five billion dollars …. The meaning was obvious in the room.  I mean, he said pre-mark.  We're talking about Lehman's books and records.  The 49 point whatever billion was pre-mark, post-mark …. You know, going concern, mark to market in a manner in which every other broker/dealer might mark [sic] their book …. ***I'm positive that Mr. Klein several times during that meeting used the word 'market value.'***[156]

128.    Klein testified the $49.9 figure constituted a "notational" value, but acknowledged that term does not appear anywhere on the Manila Folder.  Instead, the terms "pre-mark" and "post-mark" appear clearly on the Manila Folder.  Moreover, the $49.9 figure tied directly to the market value appearing on the September 21 Schedules that had been given to the Committee representatives at 11:30 a.m. that morning (but which they were told to ignore as inaccurate).[157]

129.    After Klein advised about the drop in value from $49.9 billion to $44-45 billion, the Committee representatives asked specifically for an explanation of the basis for concluding the market value of these assets had declined.  They simply did not get an answer.[158]

---

[156]    5/6/10 [Burian] 151-25-156:14 (emphasis added).  See also 5/7/10 [Burian] 93:1-8 (testifying Committee was told "that market values had dropped and the appropriate mark-to-market valuation of the securities being transferred, not including the clearance box, but including the resis was forty-four to forty-five billion was being rounded up to forty-five billion").

[157]    See 5/6/10 [Burian] 155:10-19, 157:1-9 (noting coincidence between 49.9 figure on Manila Folder and September 21 Schedules; stating that while he suspected they were the same, he had no way of knowing); M. 381; 8/27/10 [Klein] 150:19-151:24 (stating he believed values were "notational" amounts but conceding he wrote "pre-mark" instead).

[158]    See 5/6/10 [Burian] 155:24-156:8 ("Mike [Fazio] jumped in and said, 'Wait a minute, what's going on here?  Some of these government security issues have gone up in value.'  Like, what do you mean pre-mark and post mark, you know, the market has dropped?  . . . Mr. Klein sort of made a face, you know, as if we now understand what's going on in the world, you know.  But I don't know what he was really thinking"), 159:10-14 (recounting "the meeting broke up after Mike Fazio, I'm sure in their view, rudely said something like, 'How could have [the] market value dropped in light of the fact that some of the governments had gone up?,' which they refused to answer and [Mr. Miller] broke up the meeting").  See also 5/7/10 [Burian] 100:5-11 ("Mr. Fazio immediately jumped in after I clarified the resi issue and said wait a minute; I want to talk about the what went down, government securities, which is the first half of understanding what

130.    Critically, Klein admitted (and Burian confirmed) that Klein never told Burian

liquidation valuations had been ascribed to the securities to arrive at the $44 to $45 billion figure:

"I don't believe I would have said that and I don't believe, per se, that it implied a liquidation.

The numbers that were given to me related to Barclays' estimates of the value at that moment in

time in that market condition."[159]  Klein's testimony also reveals that he provided ***Barclays'***

***estimates of value*** -- not necessarily those of the Lehman Sellers (and that the $44 to $45 billion

range Klein articulated squares with Jasen Yang's markdown to $44.6 billion (See M. 45)).

131.    Lastly, Klein advised Burian that the $45 billion figure relating to the repo

securities ***included*** the RESIs, with Barclays getting $2.5 billion and the DTC receiving $3.5

billion, subject to possible reversion to the estates.  Burian noted the explanation by writing those

numbers on the Manila Folder.[160]

### (b)    CONSIDERING ASSUMED LIABILITIES, CREDITORS ARE AHEAD BY $2-PLUS BILLION

132.    Turning to the upper-right hand corner of the Manila Folder, Burian recalled

Klein advising the Committee representatives that the liabilities assumed in connection with the

transaction totaled $49.75 billion, the total of $45.5 billion relating to the repo agreement and

$4.25 billion relating to the Cure and Compensation Liabilities.  Burian recalled Klein telling

---

portion would be market decline, what portion would be assets not showing up . . . .  Mr. Miller
cut him off and said 'you got your explanation' and ended the meeting").

[159]    8/27/10 [Klein] 234:21-24 (emphasis added).  See also 5/6/10 [Burian] 156:15-18 ("Was there
any mention during that meeting of Lehman or Barclays using the liquidation value or a
hypothetical liquidation value to arrive at this post-mark number?  [A] Absolutely not").

[160]    5/6/10 [Burian] 158:1-9 ("[W]hat Mr. Klein said to me is, 'It's very simple.  Barclays is getting
two and a half billion of the resis and that's already in the forty-five billion dollar number.  You
are getting three and a half, but that three and a half is going to DTC.  If they have liabilities
they'll take it from there.  If they don't have liability, you'll get them back.'  And that's why [sic] I
sort of straddled there and put two and a half on the left and three and a half on the right").

them, "you guys are doing two plus billion better than you ever thought and you should be

thanking us and not causing trouble."[161]

### (c)    KLEIN EXPLANATION SQUARES WITH SEERY DISCUSSIONS, REPRESENTATIONS MADE AT SALE HEARING

133.    Klein provided an explanation of the Sale Transaction that mirrored the previous

descriptions the Committee had received.   As Burian testified:  "essentially this is very, very

similar to what Jim Seery told me before the court hearing, very similar to what Lori [Fife]

briefed people … in a little scrum before the hearing started, and you know, very similar to what

Weil Gotshal represented to the Court would be the transaction …. [T]his is ... pretty close or

dead on to what we were -- I was expecting to hear."[162]  This is especially true with respect to the

valuation methodology used to value the assets being transferred to Barclays:  "[b]y the time that

I left Weil Gotshal on that morning, I did not think that the assets were being purchased for

anything other than fair market value in the manner that a broker/dealer would mark their

books."[163]

### (d)    COMMITTEE REPRESENTATIVES ADVISE LEHMAN SELLERS: "GET US A RECONCILIATION"

134.    The Committee representatives clearly indicated to Klein and the Lehman Sellers

that they were not accepting the veracity of Klein's explanation because they were unable to

diligence it.  Nothing happened during the closing weekend that enabled the Committee

professionals to properly diligence the transaction.[164]  Instead, they had little choice but to trust

that they were being told the truth and insist on a reconciliation to verify the explanation:

---

[161]    Id. [Burian] 152:21-23.  See also 5/7/10 [Burian] 10:23-11:1 ("In respect of the broker/dealer assets as compared to the change from Wednesday to the closing Monday morning, Mr. Klein said that Barclays was actually going to do almost two billion dollars worse than expected").

[162]    5/6/10 [Burian] 158:21-159:5.

[163]    5/7/10 [Burian] at 118:19-22.

[164]    6/25/10 [Despins] 33:22-34:5 ("[Q] Was the [C]ommittee able to do the due diligence that its professionals felt was necessary over that weekend to have permitted the professionals to make a

[Q] Okay. And how did the meeting with Mr. Klein end? [A] Well, he walked out and I then made the comment to [Mr. Miller] admittedly somewhat thankful to him ... 'Thank you for doing this, but what am I supposed to do with this information' …. I turned to him and said, 'There's nothing I can do about this. It is what it is, I've got to trust you on this.' [Q] *Did you advise Mr. Miller that you were accepting Mr. Klein's representations or his representations or -- [A] Accepting in the sense of I hear it, I understand it, you're closing on that basis, yes. Accepting in that that's the final word? No, we told them that we'll reconcile afterwards and get printouts to these numbers*.[165]

### 4. COMMITTEE REPRESENTATIVES IMMEDIATELY RECOUNT SUM AND SUBSTANCE OF KLEIN CONVERSATION TO COMMITTEE

135.    The Klein meeting ended, and the Committee representatives left Weil at some point between 3:00 a.m. and 4:30 a.m. on Monday, September 22.[166] With the Klein conversation fresh in his mind, a few hours later Burian sent a memorandum to the Committee summarizing the sum and substance of that conversation (the "Burian Memorandum").

136.    At the time, the Committee's primary concerns were the $5 billion disconnect between the "old and cold" September 21 Schedules and the representations to the Court, the disposition of the residential mortgages (i.e., the RESIs) and the 15c3 Accounts. The Burian Memorandum addressed these issues for the Committee.[167]

---

recommendation to the [C]ommittee? [A] . . . I think our due diligence was limited by the events to statements made by Lehman professionals or Lehman employees to us saying this is what's going on, this is what the transaction is. But checking beyond that, no" ).

[165]    5/6/10 [Burian] 159:6-23 (emphasis added).

[166]    Id. [Burian] 162:14-16 (recounting leaving at between "3 and 4:30 in the morning"). See also 4/28/10 [Miller] 117:19-118:25 (testifying that Committee representatives left at "about 3, 4 a.m. Monday morning" and "[t]hey were not there for the final crisis at 6 a.m.").

[167]    5/6/10 [Burian] 165:2-168:17 ("[Q] [W]hat were the critical open issues and questions that you felt the committee was concerned about? [A] . . . The [C]ommittee wanted to understand what was happening with the . . . 15c3 issues. The [C]ommittee wanted to understand who is getting the residential mortgages . . . . And was there [--] or was there not [--] a five billion dollar issue which was the disconnect between the old and cold schedule we had received, our analysis that some of these assets had gone up, some had gone down, but net/net those we were able to value were worth a hundred million more . . . what Barclays was taking in that . . . . [T]hose were the three critical issues the [C]ommittee wanted an update on").

78

137.    As Burian advised the Committee:  "[t]he total purchased assets were booked at approximately $49.4 billion, but dropped in value to about $44-45B.  Barclays was then given additional assets of $1.9B to be included in the deal (***prior*** to the Friday hearing) …. All in, approximate value of $47B.  They are forgiving the Fed loan of $45.5B and assumed liabilities of $4.25B for a total of $49+B.  Depending on how they do liquidating the book, they will make or lose money.":



138.    In describing the Burian Memorandum's recitation of the Klein discussion, Burian testified at trial that "we laid out to the Committee [as discussed on our last Committee call] … we could not reconcile this draft schedule or this list of assts to any closing, that we were never given any information, that there appears to be a five billion disconnect between the two …. [and

then] I repeated the representations I got from Barclays and from Lehman that in fact there was no five billion dollar issue, that the assets were worth forty-four to forty-five billion ...."[168]

139.    Explaining the phrase "[d]epending on how they do liquidating the book they will make or lose money," Burian testified that "I was pointing out … the benefit of the bargain … we're selling assets … [in] good faith, going concern, marked value, in a way that any other broker/dealer would.  And you may not like the fact that today it has the value that it's got but we're avoiding the liquidation, which is the upside, by doing this transaction ….  I was being defensive a little bit that it is what it is and they'll make money or los[e] money."[169]

140.    The Burian Memorandum constitutes the most contemporaneous and comprehensive notes Burian has of these events other than the Manila Folder.  When shown the Burian Memorandum, Klein confirmed the symmetry between the memorandum and his conversation with Burian.  When asked whether there was anything in Burian's recollection of the discussion that was inconsistent with Klein's recollection, Klein acknowledged that while some phrasing might be different, the Burian Memorandum provided a reasonable summary. [170]

---

[168]    5/6/10 [Burian] 165:25-166:9.  See also 5/7/10 [Burian] 7:12-14 (testifying the Burian Memorandum was "ninety-nine percent from Mr. Klein's conversation").

[169]    5/6/10 [Burian] 167:8-18.

[170]    See 5/6/10 [Burian] 163:5-168:6 (explaining Burian Memorandum); 8/27/10 [Klein] 241:18-242:3 ("[Q] Is there anything in Mr. Burian's recollection of his discussions and explanations that's inconsistent with your recollection of the meeting that you had with the creditors' committee representatives?  [A] . . . Well there's some phrasing, but the general movements -- there's some phrasing that might be different, yes, but there's some general movements I think is a reasonable summary of the general movements"), 243:13-22 ("[Q] [A]re there any numbers referred to in Mr. Burian's description in those two paragraphs that are inconsistent with the numbers on the manila folder.  [A] I'm just reviewing this for the first time and the only numerical point that seems to be different is the 49 plus totaling which isn't -- doesn't appear on the folder anyplace.  But I don't just looking at this and seeing that, that plus the 49.4 number that I don't know where that specifically comes from").

### 5.    COMMITTEE REPRESENTATIVES STATED UNEQUIVOCALLY THAT COMMITTEE DOES NOT CONSENT TO POST-HEARING MODIFICATIONS

141.    Barclays argues the Committee consented to any post-hearing modifications to the Sale Transaction and therefore is estopped from challenging any differences between the transaction presented to the Court and the consummated transaction. As argued below, the issue of Committee consent is irrelevant because, among other things, the consummated transaction differed materially from the approved transaction. To that end, modifications required Court approval, and Committee consent (if any) does not excuse Barclays from seeking further Court approval.[171]

142.    In any event, Barclays distorts statements the Committee professionals made in the final hours before the closing. The undisputed evidence clearly proves the Committee did not consent to post-hearing modifications.

143.    *First*, the Burian Memorandum, prepared hours after the Klein conversation and sent directly to the Committee, makes clear that the Committee representatives acted consistently with the instructions the Committee provided to its financial advisors late Sunday evening, withholding their consent and demanding a reconciliation: "***We did NOT consent. We said we understand what they are telling us and expect to see computer runs of all transfers at some point in connection with the closing documentation. If this is the deal, sounds consistent with the Court proceeding. If this is not what actually happened, they will be hearing from us* ….**"[172] The only contemporaneous documentary evidence on this point (the Burian

---

[171]    <u>See</u> Part III.B.5 ("Committee Consent Cannot Cleanse Inadequate Disclosure And Barclays' Failure To Obtain Court Approval Of Material Modifications To Sale Transaction").

[172]    <u>M. 713</u> [email from Brad Geer to M. Etrikin re: FW: Lehman HLHZ Update Regarding LBI/Barclays Transaction and Dial-in Number, dated September 22, 2008] (containing Houlihan's update regarding the LBI/Barclays transaction and dial-in number) at 2 (emphasis added). <u>See</u> 5/6/10 [Burian] 119:2-12 (describing Committee instruction given during call Sunday night at 11:00 p.m. that Committee representatives were to observe, but not to consent).

Memorandum) shows Burian chose to emphasize the lack of consent and insistence on obtaining

a reconciliation.[173]

144.    *Second*, the Committee's counsel testified clearly that consent was never

provided.  Instead, the Committee representatives left Weil's offices to avoid any confusion

about the Committee's position:

> *[Q] … [D]id you ever indicate to Mr. Miller or anyone else over the weekend at Weil that the committee was consenting to the Sale Transaction?  [A] No ….*  [Q] Now the transaction itself closed sometime in the early morning of Monday, correct?  [A] That's what I understand.  [Q] … Were you and the other committee professionals present when the deal officially closed?  [A] No.  [Q] Was there a reason why you weren't? [A] Yes …. [W]e didn't want to be deemed to have acquiesced or consented to this in any way by being there at the closing.  [Q] *Did you ever indicate to anyone after the closing that the committee had consented to the transaction?*  [A] *No.*[174]

145.    *Third*, Mr. Miller's statement that Burian told him "if it's okay with you guys, it's

okay with us," taken in context, neither evidences nor constitutes consent.[175]  When Burian made

this statement at the conclusion of the Klein meeting, he did so in the context of advising that the

Committee had no alternative but to trust Klein's explanation given the Committee's inability to

confirm it:  "I had no way of diligencing this.  Michael Klein … left the room pretty quickly.

[Mr. Miller] had to go around the table and across to leave the room.  And I stood up and turned

to [Mr. Miller] and said 'There's nothing I can do about this.  There's no diligence … I've got to

trust you on this.'"[176]

---

[173]    See also BCI 811 [email chain including email from S. Burian to M. Fazio, et al., re: Lehman Committee Call . . ., dated September 22, 2008] (forwarding Burian Memorandum and identifying issues to consider in connection with reconciliation requests; Burian responds: "Excellent -- these are all issues to keep in mind in connection with the reconciliation -- *we did not waive any of these rights*") (emphasis added).

[174]    6/25/10 [Despins] 33:1-34:19 (emphasis added).

[175]    See 4/28/10 [Miller] 118:23-24.

[176]    5/6/10 [Burian] 157:3-9.

146.    When Burian explained the context of the statement, he also revealed another

important fact -- that the Committee's consent for post-hearing modifications was never solicited

(let alone provided):

> You know, you're standing in the hallway, you have this feeling of majesty of the
> moment and you're making history, and everyone's running around and there's not much
> for me to do.  And I found myself standing next to Mr. Miller.  It's already late.  We have
> no committee anymore.  I've got this explanation tucked away in the manila envelope in
> my briefcase.  And I turned to Mr. Miller and said, 'Do you need us?  Do you need me?'
> And he, partly in jest, partly seriously said, 'You know, Saul, I never need you.'  And I
> said, 'Okay …. Are you okay with all of this?'  He said, 'Yeah, I'm fine.  We're closing
> before the market opens.'  And I said, 'If that's okay with you it's okay with me.' …. I
> know the context of it, following the meeting which I told them we had to reconcile and
> couldn't express a view, it was like ... I don't even know what's fully going on.  You're
> [Mr. Miller] and I'm not, and if you're comfortable moving forward, if it's okay with you
> it's okay with me …. [T]he last thing I was going to do as the investment banker in the
> deal was tell [Mr. Miller] that he had to get [C]ourt approval about a transaction that we
> weren't even consenting to …. I stood there for a few minutes and I said, 'You know,
> we're going to go.'  And he had no objection to us leaving.[177]

147.    ***Fourth***, Seery's testimony that ***in his mind***, the Committee "assented" to the post-

hearing modifications simply is irrelevant.[178]  That conclusion rests on the unsupportable

syllogism that the Committee's failure to stop consummation of the Sale Transaction that night

constitutes consent.  It also contrasts sharply with Burian's testimony and the

contemporaneously-prepared Burian Memorandum, which illustrate that the Committee

representatives made clear they did not accept the explanations provided that evening and instead

insisted on receiving reconciliations to verify them.  Lastly, the Committee had no reason to

return to Court at the conclusion of the Klein conversation to "block" the sale's closing.  Based

on the representations Klein made to Committee professionals, the balanced, going concern-

transaction of assets (valued using a mark-to-market methodology, and not liquidation valuation)

---

[177]    Id. [Burian] 160:22-162:12.

[178]    See 5/4/10 [Seery] 64:10-13, 66:5-12.

described to the Court at the Sale Hearing was being consummated. The Committee did not

learn until discovery was compelled in this case that those explanations were inaccurate.

148.    Barclays also may point to testimony from Mr. Miller that Matt Barr of Milbank

asked at the November 21, 2008 meeting among LBHI's counsel and Committee counsel if LBHI

believed that no material modifications had been made to the represented transaction. Mr. Miller

testified that Barr accepted Mr. Miller's explanation that no material modifications had been

made to the represented transaction.[179] The trial evidence, however, precludes a finding of

Committee consent. Indeed, a few weeks after this meeting, the SIPA Trustee filed the

December Settlement Motion. In response, the Committee filed the Limited Objection, in which

it outlined in detail its concerns regarding the Sale Transaction and ongoing investigation. At no

point during that hearing or in response to the Limited Objection did any participant (Barclays,

LBI, LBHI or JPMorgan) question why the Committee was raising concerns about the Sale

Transaction by arguing that the Committee already had consented to it. Indeed, Mr. Miller

informed the Court at that hearing that "there is still a great deal of work being done by the

unsecured creditors committee in looking to the transfer of assets from all of the Chapter 11

debtors and LBI to Barclays."[180]

### D.    TRUST -- BUT VERIFY:  PURSUIT OF RECONCILIATION VERIFYING LEHMAN SELLERS AND BARCLAYS' REPRESENTATIONS (SEPTEMBER 2008 THROUGH DECEMBER 2008)

149.    Immediately after the closing, the Committee professionals requested verification

of the information provided by the Lehman Sellers and Barclays. They sought -- and fully

expected to receive -- a detailed reconciliation showing the value of the assets transferred, the

marks on those assets, and the dates and methods of those marks.[181] Houlihan's Mike Fazio

---

[179]    4/28/10 [Miller] 117:17-118:6.

[180]    M. 262 [Tr., Hearing December 22, 2008] ("December Settlement Hearing") 34:12-15.

[181]    See 5/6/10 [Burian] 172:17-25 ("[Q] Turning your attention now to the clearly post-closing period from and after the closing, during the months of September up through early October, did

explained that during the two-week period after the closing, Houlihan "attempt[ed] to get a detailed listing of the securities [that had been] transferred associated with the transaction, as well as the market values as of the closing date."[182]

### 1.    SEPTEMBER 25 SCHEDULES CONTAIN SOME OUTDATED MARKS, RESERVATIONS OF RIGHTS ON FINALITY

150.    Immediately after the closing, Committee counsel tried to obtain copies of the schedules attached to the Clarification Letter, i.e., Schedule A (supposedly the Barclays Repo Collateral) and Schedule B (supposedly the Clearance Box Assets) because they had not been shared with the Committee; instead, the Committee's requests for the schedules had gone unanswered.[183] Committee counsel was advised the schedules were being finalized and would be provided.[184] But as of September 25, the schedules had **not** been finalized because the Lehman Sellers and Barclays still were reconciling them and negotiating their final form.[185]

---

Houlihan attempt to obtain a reconciliation from Lehman?  [A] During the periods of time we attempted to follow up to reconcile the closing and get . . . a closing statement . . . balance sheet . . . what happened and what didn't happen and made that request, for the most part, through Milbank"); 6/25/10 [Despins] 35:22-25 ("[Q] So your understanding was you expected to see a line by line, item by item set of marks that when you added it all up, it dovetails with the number? [A] That -- I think so, yes").

[182]    Fazio Dep. Tr. 38:12-15.  See also 5/6/10 [Burian] 177:12-14 ("Again, during -- after the closing through this -- getting this [October 8 Presentation] we never stopped the asking for the reconciliation").

[183]    M. 369 [email from L. Despins to H. Miller, et al., re: RE: Schedules to Barclays APA, dated September 25, 2008) (noting Committee counsel "has made several requests for the asset schedules … and has received NO response.") at 10:09 a.m.

[184]    Id. ("Luc, I am sure that the schedules will be furnished asap.  I don't believe it is helpful to suggest that th[e] schedules may have been manipulated post closing.  You were invited to stay Monday AM as the schedules were reviewed and finalized") at 10:28 a.m.

[185]    See, e.g., M. 392 [Email chain including email from Rod Miller to Lindsee Granfield, et al., re: Re: Fw: Financing Facility Collateral List, dated September 25, 2008) (explaining "The original schedule on the closing table was prepared by LBI, but was replaced by a schedule prepared by BarCap as the one prepared by LBI did not perfectly track what BarCap had received in the Fed transaction, which was the purpose of Schedule A.  Schedule B was prepared by LBI as to what its records indicated as of Sunday, September 21st as to what was in the unencumbered 'box' and should have matched what BarCap received Monday morning, *although there may have been deviations between the time the information was prepared and the trade.*") (emphasis added); M. 393 [email chain including email from Duane McLaughlin to David Murgio, et al., re: Re:

151.    When the schedules were finally provided on September 25, 2008 (the

"September 25 Schedules"), they contained the same figure of $49.9 billion (listed as "market

value") set forth in the September 21 Schedules.  The Committee professionals noted "[w]e were

surprised to see that it was identical in every respect  to what we had been given on Sunday

which was told old and cold and wrong and all that stuff.  And we were told by Milbank that

Weil had said it was still being updated and reconciled and we put it aside:"[186]

---

Fw: Financing Facility Collateral List, dated September 26, 2008 ("Can you send us the agreed [S]chedule B?" asked September 26, 1:07 p.m.), id. (subsequent email in chain from David Murgio to Duane McLaughlin dated September 26, 2008, 1:34 p.m., noting that "[t]here will be a third part of Schedule B that is still being reconciled and that Lehman expects to move on Monday . . . . *Our guys are still running their reconciliation to confirm that there are no errors in the Barclays list.*") (emphasis added); M. 396 [email chain including email from Duane McLaughlin to David Murgio, et al., re: Schedules A and B for Filing, dated September 28, 2008] ("Attached please find two files which include what Barclays believes should be included on Schedules A and B.  *These reflect conversation[s] with Paolo over the weekend, and we believe are agreed between Barclays and Lehman.  Please note that Barclays is not indicating that the listed securities have been delivered …. In addition, Barclays notes that there may be additional securities in the LBI clearance boxes that Barclays would also be entitled to receive under the APA.*") (emphasis added).

[186]    5/6/10 [Burian] 172:3-7.  See id. [Burian] 172:10-12 ("[W]hat we expected to see was a simple list of all the assets that Barclays was getting with the marks at which they were transferred").  Compare M. 381 (September 21 Schedules:  49,902,924,897.20), with BCI 756 [Schedules with cover email] (Purportedly Final Schedules listing value of securities on Schedule A at $49,902,924,897.20).



152.    Both the Lehman Sellers and Barclays repeatedly disclaimed the September 25

Schedules' finality.  The cover email accompanying the September 25 Schedules advises "[t]hese

are not necessarily the final, reconciled lists of exactly what went over to Barclays.  We are told,

however, that they are very close …"[187]  When the Lehman Sellers and Barclays submitted a

joint motion to file the schedules "under seal," Barclays' counsel insisted that any copy of the

schedules distributed to any party contain cover letters clarifying specifically that the schedules

*were not final*.[188]  On October 15, 2008, the Lehman Sellers and Barclays filed summary pages

---

[187]    M. 394 [email from David Murgio to Robert Moore re: Schedules, dated September 25, 2008] .

[188]    M. 395 [email chain including email from Seth Kleinman to Lori Fife re: Schedules with
Attachments, dated September 29, 2008) (regarding Joint Motion to File Schedules Under Seal
and attaching draft documents regarding same) ("These covers need to be attached any time the
Schedules are sent out . . . ."  The covers disclaimed that "[t]he listing of any security on any

containing *par amounts* of the securities supposedly appearing on the schedules. Again, those pages specifically disclaimed that the filed schedules were final.[189]

### 2.    OCTOBER AND NOVEMBER 2008 MEETINGS AMONG COMMITTEE REPRESENTATIVES AND LBHI REPRESENTATIVES

153.    During this period, A&M, who, upon its retention, was instructed to have no involvement in the Sale Transaction, was working diligently to gain an understanding of the assets that had been transferred.[190] A week after the Sale Transaction closed, Paolo Tonucci and Alex Kirk (both of whom went to work for Barclays after the Sale Transaction) met with the Lehman Sellers' advisors (Weil and A&M) to discuss the Sale Transaction. During a rushed September 29, 2008, meeting, they appeared to continue the same storyline Klein had initiated in his discussion with Houlihan, i.e., that the market value of the Barclays Repo Collateral had declined abruptly during the week of the Sale Transaction by $5 billion.[191] James Fogarty of

---

schedules does not indicate that such security has been delivered to Barclays or the value of such security . . . . [T]he par amounts set forth … are provided for informational purposes only and are not indicative of the value of the securities"). See, e.g., BCI 19 [Joint Motion Of Debtors And Barclays Capital Inc. For Entry Of An Order Authorizing To File Under Seal Certain Schedules To The Asset Purchase Agreement, dated September 29, 2008].

[189]    See BCI 411 [Schedule A, with Cover Sheet]; BCI 20 [Schedule B, with Cover Sheet].

[190]    6/21/10 [Marsal] 8:9-17 ("[T]he first day on the job, I was told by the chief administrative officer, Steven Berkenfeld, that my responsibility would be as the CRO immediately after two transactions had taken place. One was the Barclays -- proposed Barclays transaction. And second was the proposed Neuberger Berman transaction. I was specifically told that these transactions were underway. They were being addressed by the two management teams at Lehman and that it was not an area [for] my focus"), 9:16-10:1 (A&M had no involvement in the sale negotiations, valuation of the transferred securities or documentation of the sale transaction).

[191]    Korycki Dep. Tr. at 43:5-9 (explaining purpose of September 29 meeting was "to get an understanding of the Barclays transaction from Alex and Paolo."); M. 382 [Mary Korycki handwritten meeting notes] (referring to (a) "Collateral JPM $45 B … Barclays $38 B Collateral $7 B Cash"; and (c) "Pd $38 cash to buy $42.9 asset Lehman Value Differentiation $5.1 … $38 valued assets"). See also Korycki Dep. Tr. at 53:15-19, 55:3-56:4, 88:14-89:2, 100:18-25 (examining notes).

A&M, who attended the meeting, stated that he did not gain a clear understanding of the

transaction after the meeting and instead emerged befuddled."[192]

154.    Around this time, Fazio impressed on A&M the need to resolve these issues.[193]

On October 1, 2008, Houlihan met with A&M to discuss the Sale Transaction, including the

value of the assets transferred and liabilities assumed, the alleged decline in value of the

Schedule A securities by $5 billion and the estimated cure amounts of $2.25 billion (where

Houlihan asked for backup).[194]

155.    On October 8, 2008, the Committee and its advisors met with LBHI and its

advisors (including A&M) as part of their routine, monthly meetings to discuss a wide array of

issues affecting the estates.  In connection with the meeting, A&M prepared the 92-page October

8 Presentation, which provided discussion materials relating to an ambitious agenda of no less

than 9 different aspects of the chapter 11 cases, including the Sale Transaction.[195]

---

[192]    9/28/10 [Fogarty] 35:22-36:5.

[193]    Fazio Dep. Tr. 35:6-12, 40:20-41:2, 37:21-39:4 (noting discussions with A&M during week of
September 22 or September 29 to raise concerns of "not having a detailed list of the securities or
the market values associated with that transaction"), Kruse Dep. Tr. 157:23-159:16 ("My
recollection during the first quarter of our administration of the estate, . . . Mike Fazio . . . was
expressing some concerns about the economics of the deal . . . .  I remember Mike telling us that
they . . . had asked Barclays and Lehman people for the details behind the difference between the
marked values and what was determined to be the negotiated value as depicted on that [Manila
Folder] . . . .  They were promised the details at the time and never got them.  And I think that
was part of what was underlying their concerns over the economics of the deal").

[194]    See Fazio Dep. Tr. 40:8-12 ("We had numerous conversations with the Alvarez & Marsal people
with respect to the value of the securities and the identification of those securities that were being
transferred as part of the transaction."), 77:3-10 ("We would have talked with Fogarty [A&M]
and the estate about this many times; that these were stale marks and the actual marks as
represented to us, the actual marks as represented by Mr. Seery and Mr. Klein, the actual marks
had declined significantly between the time of the last run and the Friday the 19th.").  See
Korycki Dep. Tr. 19:2-3, 148:10-149:20 (discussing meetings, topics, including request for
backup concerning cure payments).

[195]    BCI 131 ["Lehman Brothers Holdings Inc. Report To Unsecured Creditors Committee, October
8, 2008"].

156.    Notwithstanding Barclays' assertions to the contrary, the October 8 Presentation does not reveal that the Committee and A&M were aware of the $5 billion discount (or that the Committee had sufficient information at the time to challenge it).  At that time, A&M had not developed a view as to whether the marks had declined because of market factors or whether the parties negotiated a $5 billion discount.[196]  The October 8 Presentation simply rehashed the rushed September 29 meeting that A&M had with Tonucci and Kirk, where they repeated Klein's explanation, i.e., that the market value of the securities had declined and that the marks had become "stale."[197]

157.    Moreover, the environment in early October 2008, after the Sale Transaction closed, did not suggest a need for the Committee to assume an adversarial posture.  Instead, Committee professionals had every expectation of cooperation and were receiving cooperation from LBHI in connection with other equally significant projects.  At this point, Houlihan was in its "trust-and-verify mode where … naively, in retrospect, [it] assumed the transaction was as described and no assets were taken in excess of the values we were told.  So in that time frame … Houlihan's focus was to get a reconciliation."[198]

---

[196]    See Marsal Dep. Tr. at 170:17-171:10 ("My understanding was . . . that the parties had negotiated based on an updated assessment, their assessment of the value of the securities, and that that's what this had represented, that there had been a deterioration in the securities during this period of time, during the market chaos . . . .  As of October 8th that's what I believed . . . .  [Q] [W]hat do you believe differently now.  [A] I don't believe that's what happened.  I believe that there was a built-in gain in this transaction.").

[197]    See Kruse Dep. Tr. 122:23-123:3 ("I take this as Jim [Fogarty (A&M)] was relaying information that we had come to understand through others at that point.  I don't think we were making a qualitative judgment at that point that it's right, wrong, or otherwise").  See also Coles Dep. Tr. 70:21-71:9 ("[Q] The 5 billion that's referred to in the notes of the meeting with Weil and former Lehman employees, Kirk and Tonucci, on or about September 29, . . . do you have any recollection of whether that was explained to you, the $5 billion, at the time and what was said about that?  . . . [A] I remember certainly 'marks' was used.  I'm seeing 'stale marks' here [on October 8 Presentation].  I think that's Jim [Fogarty] quoting from that meeting, and it's 'stale' in inverted commas").

[198]    Burian Dep. Tr. (12/17/09) 335:4-10.  See also id. at 179:23-180:10, 181:14-183:12 ("We also were dealing with an estate that was beleaguered by a number of issues that we had never seen before in a restructuring . . . .  [T]o take what we hoped was merely going to be a reconciliation of

158.    Lastly, at this time, the estates faced a wide range of pressing challenges, including a resolution of disputes with Barclays under the TSA that obstructed the estates' access to information concerning the transferred assets.  The TSA was supposed to ensure post-closing access to critical employees, institutional knowledge and infrastructure.  At that time, however, disputes arose between the Lehman Sellers and Barclays over access to information needed to administer the bankruptcy cases, including information regarding the Sale Transaction, to the point where the estates contemplated litigation against Barclays over the TSA.[199]  To that end, the estates' fiduciaries' ability to obtain Sale Transaction information was handicapped by an inability to access legacy Lehman systems and personnel, because they were under Barclays' control.[200]

---

what happened in a manner consistent with the court order [and] the level of running to a judge to say it has got to be dealt with today seemed disproportionate and unnecessary . . . . [O]ur expectation was we were not owed, that no one had taken improperly 5 billion dollars . . . .  At that time, I had the expectation of cooperation.  There was no reason to go to Judge Peck").

[199]    See, e.g., M. 397 [letter from Thomas Roberts to Jonathan Hughes re: Data Access and TSA Issues, dated December 24, 2008) (admitted into evidence for limited purpose of showing LBHI's intention to bring a lawsuit against Barclays)] ("LBHI believes that there are a number of problems with BarCap's performance under the TSA that require an immediate action plan and clear timetable for resolution . . . .  As you know, [Mr. Marsal] believes that the ***delays they have experienced in receiving data to which they are entitled under the letter and spirit of the TSA is materially and adversely hampering (and in some instances preventing) the proper management of the LBHI estate***.  The delays in resolving the data issues are impacting value realization by the estate as the continued failure to receive data belonging to LBHI on a timely basis makes responsible, informed decision making impossible.  ***It also prevents effective dialogue with the various constituencies to whom he is responsible, including the Creditor's*** [sic] ***Committee***") (emphasis added).

[200]    See 9/28/10 [Fogarty] 47:15-48:14 ("[Q] was there ever at any point in time where anyone at Lehman or Weil or anyone else refused to give you information that you thought was important to understanding what assets and liabilities were transferred and what weren't?  [A] Yes.  [Q] When was that?  [A] During this time, we had a very difficult time getting an understanding.  We would get documents, but getting understanding was very difficult.  And that was not my -- that was through my team -- our team had a difficult time getting an understanding of the transaction.  [Q] Let me ask you a more specific question.  Was there any point in time when Lehman refused to provide you any specific information or specific documents?  [A] I don't recall specifically, but I know folks that were working on the project had a difficult time getting time with people to understand the transaction, yes.  [Q]  Is that because it was a very busy time frame, short on time? [A] . . . I don't know why there wasn't more time made. The estate took a backseat to the interests of Barclays in general."); 5/6/10 [Burian] 173:10-17 ("[Between the closing and December 2008],

91

### 3.   COMMITTEE'S REACTIONS TO OCTOBER 8 PRESENTATION; LEHMAN SELLERS' INITIAL REACTIONS TO RECONCILIATION REQUESTS

159.   The October 8 Presentation heightened the concerns of both the Committee professionals and A&M.  Fogarty, who gave the presentation with respect to the Sale Transaction, testified that he recalls "framing in my presentation … a general concern for not understanding the five billion dollar reduction."[201]  Similarly, the Committee professionals' reaction to the presentation's mention of a negotiated reduction was "[c]onfusion and concern …. I didn't know what negotiated meant in that context, other than people reasonably should be discussing how to properly mark a book consistent with the way a broker dealer would."[202]

160.   Thereafter, the Committee intensified existing efforts to obtain a reconciliation: "[w]hen we got this [October 8 Presentation] we raised the issue again to Bryan [Marsal] and his

---

it became clear that Lehman's eyes were shut by Barclays' control of all their systems and there were significant issues and squabbles regarding the TSA and . . . major issues concerning the ability to access systems, get information, and operate the remaining Lehman business and we made the request . . . but ultimately were not able to get [Lehman records]"); Kruse Dep. Tr. 103:11-104:8 (noting effort to get reconciliation "was not really feasible based on the information available to us in that first quarter of the administration of the estate.") 9/29/10 [Coles] 33:1-14 ("[Q] The people you were interacting with at Lehman, whether they stayed at Lehman or went over to BarCap -- Barclays, were they cooperative in providing you information?  [A] Four out of ten.  [Q] Is that good or bad in your experiences?  [A]  It was pretty bad, but we all recognized that they had probably put in some really long days in the -- right up to the filing and right after the filing and that their employer had changed.  For those people that had moved across to BarCap they were now employed by BarCap, and although they were obligated, or BarCap was obligated, to provide transitional services, we were probably going to be deemphasized as a priority.  So it was necessary for us to continue to chase things so that we got some attention").

[201]   9/28/10 [Fogarty] 61:19-21.

[202]   5/6/10 [Burian] 176:11-177:6.  See also 9/28/10 [Fogarty] 61:21-62:10 ("I recall either in that meeting that day or the day before, somewhere around that period of time, a conversation with Mike Fazio of Houlihan Lokey . . . where they were concerned about that five billion dollar reduction on behalf of their committee . . . .  Mike expressed concern that it -- that there wasn't a fair reduction in the value . . . but was struggling to have a complete understanding of what transpired").

Barclays ascribes self-serving significance to the October 8 Presentation, conveniently ignoring the slide's mention of "Lehman 'stale' marks."  During the closing weekend, the Committee professionals were advised that the Lehman marks ($49.9 billion) were "stale" because the market value of the securities had declined by $5 billion to between $44 and $45 billion.  To that end, the October 8 Presentation was consistent with that explanation.

team that we needed to get a reconciliation …. [W]e reminded the [C]ommittee that this had to be an issue to be looked into, and the [C]ommittee reminded us they were expecting us to write a report and move on and get the reconciliation.  And then a flurry of activity was set off because … Milbank was doing a lot of things at the time.  They asked us to make sure they were fully educated and exactly what they were supposed to ask for again."[203]

161.    Consistent with that approach, on October 13, 2008, Committee counsel asked LBHI's counsel for "a low key preliminary meeting/call during which we would explain our concern about the schedules."[204]  The "concern" related to the inability to reconcile the schedules with the $47.4 billion figure announced in Court:  "Houlihan has reviewed them and can not even come close to the amount which was announced in [C]ourt ….  There may very well be a logical explanation for all of this, which is why the first meeting is just to explore the issues."[205] As Committee counsel testified, "there were gaps in … terms of [Houlihan's] understanding of the transaction …. [T]his was in the nature of exploratory due diligence.  It was not in the nature of taking that position with these folks.  We just wanted to understand whether it's possible there's an explanation for what Houlihan sees as an issue."[206]

---

[203]    5/6/10 [Burian] 177:14-25.  See also Fazio Dep. Tr. 77:13-23 ("[Q] Going back in time to this meeting … did you say anything at this meeting specifically concerning this line [in the October 8 Presentation]? . . . [A] I would have commented . . . on the entire line and the fact that the stale marks and the securities detail that we did not have associated with the transaction or they didn't have associated with coming up with a detail[ed] mark-to-market of all the securities transferred and their market values on the 19th").

[204]    M. 148 [email chain including email from Luc Despins to Lori Fife, re: Lehman/Barclays Transaction, dated October 13, 2008] at MTHM0012870.

[205]    Id. at MTHM0012869.

[206]    6/25/10 [Despins] 41:19-42:3.

162.    The request was not well received,  Specifically, the need for such a meeting was questioned, given that the transaction had been consummated.[207]  Nonetheless, Milbank persisted, through follow-up emails in late October and early November 2008, in requesting a meeting.[208]  Ultimately, an initial meeting among counsel to explore these issues took place on November 21, 2008.

### 4.    EMAILS AMONG COMMITTEE FINANCIAL ADVISORS AND ATTORNEYS DEMONSTRATE COMMITTEE'S PERSISTENCE; BOTH COMMITTEE AND LBHI COUNSEL ADVISE BARCLAYS' COUNSEL OF COMMITTEE'S CONCERNS IN OCTOBER 2008

163.    Barclays relies heavily on four emails prepared by the Committee's financial advisors in an attempt to prove the Committee was aware, in late September and early October 2008, of the $5 billion negotiated, block discount off the Lehman Sellers' book value.[209] Barclays grossly overstates their significance.

164.    The Committee initially withheld production of these documents because they were protected by the attorney-client or work product privileges.  On the eve of trial, Barclays renewed its motion, previously denied, to compel production of documents to which the

---

[207]    M. 148 at MTHM0012869 ([LBHI Counsel:]  "I really am at a loss to figure out why you and the other committee professionals are spending so much time on the Barclays sale.  What could you or anyone for that matter do even if it turned out that the assets turned out to be greater?  As you know, the sale has been consummated which effectively moots out any relief you might be seeking.  I would really appreciate it if you would enlighten me as to the potential actions vis a vis Barclays other than in connection with the TSA.  In any event, I will try to set up a call . . . ."); O'Donnell Dep. Tr. 153:13-154:14 (noting that Lehman Sellers' counsel "was not initially receptive to our concerns, and what ensued was a process to convince Weil that these concerns appear to have some basis and that they needed to be investigated further[;]" noting initial reaction was that "it was [not] a productive use of the Committee or the Debtors' time to investigate these issues further.")

[208]    M. 370 [email chain including email from Lori Fife to Matt Barr re: Re: Lehman, dated October 27, 2008] (LBHI counsel noting, among other things, "it is not a high priority").

[209]    BCI 812 [email from Brad Geer to Luc Despins, et al., re: Barclays Schedules, dated September 28, 2008); BCI 813b [email from Brad Geer to Crayton Bell, et al., re: Issues re Value of Assets to Barclays, dated October 10, 2008]; BCI 814 [email from Brad Geer to James Tecce, et al., re: Schedules, dated December 21, 2008], BCI 332 [email from Conor Tully to Daniel Fleming, et al., re: Lehman – JPM Chase Transactions, dated October 6, 2008.

Committee (and the other movants) had claimed privilege. The Court granted the motion, noting

that while the documents were privileged, Barclays nonetheless had a substantial need for them.

Barclays attaches great weight to the fact that the Committee did not voluntarily produce the

documents, implying that the Committee intentionally concealed them from Barclays. But the

Committee rightly withheld their production because they were privileged – a fact the Court

recognized – ***not*** to hide their content.

165.    If anything, the documents fully support the Committee's position that it

vigorously and openly pursued a reconciliation. The emails also confirm that the Committee had

no knowledge of a $5 billion block discount or the use of liquidation values and that

misrepresentations were made to the Committee, <u>i.e.</u>, the Committee was wrongly advised that

the $49.9 billion marks on the September 21 Schedules were out of date and stale.

166.    Barclays points to language from an email sent on September 28 (after the

Committee representatives received the September 25 Schedules) from the Committee's financial

advisor to Committee counsel that references an agreement between the Lehman Sellers and

Barclays about the value of the trading assets, using a phrase "negotiated mark on the deal."

During the trial, the Committee representatives explained this email "is updating [Committee

counsel] and telling him the schedule we'd got is the same schedule and we've -- were told that

there were decreases in value, we couldn't verify it …"[210] They also explained the use of the

terms "agreed to" amount and "negotiated mark," <u>i.e.</u>, it meant a negotiated adjustment to a

***mark-to-market valuation***: "what we thought at the time was someone had to pick a number as

to the appropriate mark to market for broker-dealer . . . . [A]s Mr. Klein said to me it was

somewhere between forty-four and forty-five billion."[211]

---

[210]    5/6/10 [Burian] 179:4-6.

[211]    <u>Id.</u> [Burian] 179:21-24.

167.    Barclays also focuses on language used in an October 10 email to Committee counsel stating that the parties had agreed to a "discount."  What the email said, in describing the events of the closing weekend, was "[w]e were told that some of the marks shown on Schedule A were 'out of date' and that the parties (Lehman and Barclays) had agree to a $5 billion discount *as the appropriate 'mark to market' adjustment for the securities*."[212]  Again, Burian testified clearly that this agreement was not a *block discount off book value* but instead an agreement on a *mark-to-market valuation*:

> Barclays and Lehman had agreed the *fair market value* of the assets on that date was forty-five billion.  My recollection is not that they agreed *on an amount to the discount*. It happened to be that because at one point in time it was marked at fifty-billion and now it was forty-four to forty-five billion, rounded up to forty-five … *But you're implying in your questions that I know that they negotiated a discount.  And that is not my testimony, and not what I believed I was told, and not what I believed at the time*.  So we can go back and forth on words, but I've made very, very clear what I was told and what I believed.[213]

168.    The October 10 email simply notes the parties had agreed to a new *marked* value versus the old *marked* value -- not that the parties agreed to a $5 billion block discount from the book value.  The $5 billion difference between the $49.9 billion appearing on the September 21 Schedules and the $44-45 billion described by Klein was obvious to anyone as a function of simple math:  "[s]o if you're asking me whether Mr. Geer is summarizing what we believed at the time, that the assets were five billion less than reflected on Schedule A we had received with marks, *that is self-evident.*  If you're asking me whether or not we believed that Barclays got a five billion haircut off the actual Schedule A assets that were the ones that were transferred in the transaction at the appropriate valuations for those transactions, the answer is no."[214]

---

[212]    BCI 813b (emphasis added).

[213]    5/7/10 [Burian] 97:6-17 (emphasis added).

[214]    Id. [Burian] 66:20-67:3 (emphasis added).

169.    Even Seery conceded when shown these emails that Geer's statement of a ***mark-to-market adjustment*** is consistent with the information Seery provided the Committee on Sunday night about market value:  "[Q] And then at the end of that paragraph, there's this discussion here about the parties agreeing to the five billion dollar discount, and the phrase that's on the page there is 'the appropriate mark to market adjustment for the securities …. [A] I do, yes [Q] … [W]ithout focusing on the specific language … is that summary consistent with the information that you and your colleagues provided to the [C]ommittee on Sunday night?  [A] I think it's consistent …. [I]f the connotation of that is that we adjusted it as part of that negotiation to get closer to that current ***market***, then that connotation would be correct."[215]

170.    Moreover, as represented to the Committee professionals, negotiation to the appropriate mark-to-market value appeared to proceed in two phases.  The first established the range, i.e., the Committee professionals were told the marked valued dropped from $49.9 billion to "between forty four and forty five" billion.  The second phase established the final figure at $45 billion.[216]

171.    There is no mention in any of these emails of an understanding that the negotiation taking place involved a $5 billion block discount off the Purchased Assets' book value or a departure from market value downward to liquidation value.  This fact was not known to the Committee until it was revealed in discovery.  Nothing in these emails states otherwise.

---

[215]    5/4/10 [Seery] 131:23-132:12 (emphasis added).

[216]    See 5/6/10 [Burian] 155:4-7 (explaining "44-45" on Manila Folder:  "Barclays had an issue between -- it could be between forty-four and forty-five and was giving us the benefit of the doubt and making it forty-five"), 156:22-24 ("[T]he word 'agreement' did come up in the sense that they said, 'we've agreed that we're going to round it up to forty-five'"), 179:19-25 ("I know there's been a whole hullabaloo about what the word negotiated means, but . . . [they] had to pick a number as to the appropriate mark to market for broker-dealer.  And as Mr. Klein said to me it was somewhere between forty-four and forty-five billion, and they agreed to use forty-five billion").

172.    The October 10 email also hypothesizes that the explanation the Committee professionals received about a need to mark down the securities by $5 billion because the marks were out of date "seemed implausible."  But this statement is a hypothesis with respect to which no conclusion had been reached -- either that this presented an issue or that, even if it did present an issue, there was evidence to support it.  At this point in time, the Committee could not reach any firm conclusion because the Committee did not know which assets ultimately were transferred or their values:  "[the author is] referring to the fact that based on the assets we could value, if, in fact, these were the corpus of assets that were transferred you would need a very, very large discount … to value the remaining privates at sixty to sixty-five percent to get to five billion …. I personally didn't share [the author's] conclusion or thoughts it was implausible because I didn't know, nor did he what the privates were or were not …. And what we need to do is figure out what really happened and reconcile."[217]

173.    The four emails also must be considered in context.  Three were prepared after receiving the September 28 Schedules and the October 8 Presentation, serving "to make sure that Milbank understood exactly what the concerns were so they could be more effective in going to Weil Gotshal to press for the reconciliation.  So in that time frame, we were briefing Milbank to get a reconciliation."[218]  The fourth was prepared the day before the hearing to consider approval of the December Settlement (and the Committee's Limited Objection).  It served to prepare counsel to accurately describe the Committee's professionals' concerns.

174.    These emails reveal nothing more than concern, uncertainty and motivation to pursue a reconciliation (which is consistent with the Committee's mindset at the time).  What the Committee representatives could not believe, at the time, was that material terms of a multi-billion dollar transaction had been ***misrepresented to them and to the Court***:

---

[217]      Id. [Burian] 182:19-183:8.

[218]      5/7/10 [Burian] 47:9-13.

You have to understand what was going on at the time …. [N]o one seemed remotely interested in this other than me, Brad Geer, Michael Fazio and committee members … You have this closing, people feel good about themselves. They saved the world. And you have gadfly saying what really happened. It was viewed as being ministerial, it was viewed as being picayune, and we were exercising ourselves to get firm to demand the information. I personally did not believe that I would sit in a room with [Mr. Miller] and others and be represented to as to what a transaction of this nature was. And that it would turn out to be not true. I still have trouble reconciling those misrepresentations by Mr. Klein …. [O]ur job was to keep it on the radar screen, collect evidence if there was any evidence, ultimately have some junior person write a report that would reconcile what Barclays actually got and total it up neatly to 47.4, you know, and move on in life. At this point in time I didn't have, and I did not convey to the committee that I thought there was a -- that we were misrepresented to.[219]

175.    The email sent by Connor Tully of FTI Consulting (the Committee's retained accountants) to LBHI concerning his October 3, 2008, meeting with A&M and Houlihan is equally irrelevant. According to Barclays, this email also evidences the Committee professionals' knowledge of the negotiated $5 billion discount because it attaches an A&M presentation referring to that discount. As discussed previously, at this time, A&M representatives were "befuddled" and did not possess any relevant independent information regarding the Sale Transaction. Moreover, Tully was not part of the team of Committee professionals pursuing a reconciliation of the assets transferred in connection with the Sale Transaction. Instead, he was tasked with reviewing the estates' cash position, focusing on the Sale Transaction with respect to the $7 billion cash issue with JPMC, and contract cure payments.[220]

---

[219]    5/6/10 [Burian] 183:14-184:12.

[220]    See Tully Dep. Tr. 16:17-22 ("[M]y role, a very significant piece . . . was we were doing cash management. So we were trying to -- in any bankruptcy case, cash, understanding your cash position on the day of filing and what it is going to be going forward is imperative."), 18:7-10, 18:23-24 ("We wanted to . . . make sure we were staying on top of the people who were trying, supposed to be monitoring that process . . . . The focus was . . . to insure that claims weren't actually double counted").

176.    Lastly, Barclays' argument that the Committee concealed this concern from Barclays during the September through October 2008 time period is entirely inaccurate.  Both Committee counsel and counsel to LBHI advised Barclays during this period that the Committee was looking into issues in connection with the Sale Transaction.  As Committee counsel testified:  "I remember mentioning to counsel for Barclays that this issue was coming up, sort of giving her a heads up that this issue was coming up …. I don't know precisely when but it would be certainly before October 20th …. And I said something to the effect that the [C]ommittee is looking into these issues …. Sort of a heads up, the [C]ommittee is looking into these issues."[221] See also M. 370 (email from counsel to LBHI advising Committee counsel on October 29, 2008 that "[w]e had a brief discussion today with Cleary about the motions and some of the sale related issues.  We explained that we still need to look into the sale related issues and have discussions with you and your team").

### 5.    COMMITTEE DID NOT AWAIT A MARKET MOVE BEFORE RETURNING TO COURT TO CHALLENGE TRANSACTION

177.    According to Barclays, the Committee should have raised its concerns relating to the Sale Order with the Court within the applicable appeal and reconsideration periods, and its failure to do so renders the Rule 60 Motion untimely.  The facts, however, reveal a consistent pattern and practice of diligence and persistence.

178.    As noted above, Klein's explanation of the Sale Transaction squared with the representations made by the Lehman Sellers to the Committee professionals and the Court.  At the conclusion of the Klein conversation, the Committee professionals assumed (based on the representations that had been made to them and to the Court) that -- subject to the receipt of

---

[221]    6/25/10 [Despins] 44:16-45:3.  See also O'Donnell Dep. Tr. 154:15-156:6 (recounting discussions between Milbank and Cleary regarding Committee concerns about value of securities transferred).

verifying information -- the balanced, going concern transaction would be consummated.  They had no reason to expect that misrepresentations were made, or that discounts were concealed.

179.    In late September and October 2008, the Committee professionals immediately set out to obtain a reconciliation confirming the explanations provided during the closing weekend.  In that time fame, specifically following the October 8 Presentation, Houlihan was bringing Milbank up to speed: "obviously, the context of that is if the reconciliation came out wrong … it didn't reconcile, there'd have to be a lawsuit."[222]

180.    The Committee's posture during this period reflected the position enunciated at the conclusion of the Klein meeting.  The Committee did not necessarily accept the explanations provided, but instead wanted verification.  If the reconciliation showed the consummated transaction mirrored that described to the Court and the Committee in the Klein conversation (and reflected on the Manila Folder), there would not be an issue.[223]

181.    By the end of October 2008, the Committee still had not met with the Debtors "to get their side of the story," even though it persisted in trying to schedule that meeting.[224]  At that time, none of the Committee's professionals had the ability to draw, or had drawn firm conclusions:

> Well, I knew that I could read the document and say we're changing that and we're changing that section, et cetera.  ***But what we don't know is the impact of those changes on the value received by the estate.  So I don't want to run to [C]ourt on a half-baked***

---

[222]    5/7/10 [Burian] 47:13-15.

[223]    See 5/6/10 [Burian] 193:19-194:5 ("[Q] . . . [I]f the deal is ultimately shown to be as was represented to you on that folder, would the committee still be seeking relief?  [A] . . . I can tell you from a big picture perspective as the committee advisor if we sold at a fair mark of going concern value in a manner consistent with the way a broker-dealer as operating as a going concern was marking their books at the time, forty-five billion of assets, plus the 1.9 billion marked the same way, and we were getting an equal or a greater amount of liabilities forgiven or assumed, we wouldn't be here").

[224]    6/25/10 [Despins] 52:22-25 ("Whether they had reached a final conclusion on that, as I said, on my watch, I don't think they did because we never had the meeting with the debtor to get their side of the story").

*theory that there are some changes but, frankly, Judge, I don't understand what the impact of those changes are.* So I -- what I'm telling you is that we wanted to have the schedules. We wanted to understand what happened to those schedules and the marks. And obviously, the game plan was -- after I gained a full understanding of that and briefing the committee, if warranted, that we would be eventually going back to the Court.[225]

182.    According to Barclays, the Committee timed its Rule 60 Motion to take advantage of a market recovery. The undisputed evidence in this case clearly demonstrates this action does not seek the recovery of profits that Barclays may have realized in operating the business. Rather, the dispute concerns Barclays' receipt of an undisclosed, block discount of billions of dollars designed to ensure Barclays' built-in gain on the Sale Transaction. As Burian testified when asked if the Committee was timing the market:

> [N]othing could be further from the truth. It is completely and absolutely not true. I can tell you categorically that we were pushing for discussion, investigation, reconciliation of this transaction long before the markets recovered. I could tell you that I've been a primary person at Houlihan Lokey dealing with these issues, and I have never, not once, with anyone, on my side or on the company's side … ever had a conversation regarding ha-ha, market's been up, now is the time to pounce. We've had discussions about, you know, pursuing this. We had conversations about the timing to pursue. We've had conversations regarding do we have enough evidence to pursue. Never, have I ever had a conversation about we don't want to do this now because the market's down; now's a good time because the market's up.[226]

### 6.    DECEMBER SETTLEMENT MOTION:  PATTERN OF INADEQUATE DISCLOSURE CONTINUES AS BARCLAYS SITS SILENTLY

183.    The December 2008 Settlement Motion purportedly resolved internecine disputes among LBI, Barclays and JPMorgan over the approximately $7 billion in securities and cash that JPMC retained and did not transfer to Barclays in connection with the Barclays Repurchase Agreement over the closing weekend. Indeed, in an October 11, 2008 letter to Barclays regarding the then-ongoing dispute, JPMC asserted (as does the Committee in its Rule 60

---

[225]    Id. [Despins] 49:25-50:11.

[226]    5/6/10 [Burian] 92:9-25 (Burian).

Motion) that Barclays failed to adequately disclose the salient terms of the Sale Transaction to the Court, including that Barclays received $49.7 billion in securities (not $47.4 billion):

> On Friday night, for the first time as far as we know, the Bankruptcy Court was apprised of a different 'deal' between Barclays Capital and Lehman Brothers -- and that Barclays Capital was no longer purchasing $70 billion in assets and assuming $69 billion in related debt. **But the Court was not apprised of the purchase that Barclays Capital now says it agreed to make. Instead of the Court being told that Barclays Capital was purchasing approximately $49.7 billion in securities for $45 billion in cash, the Court was told that Barclays Capital was purchasing $47.4 billion in securities for $45.5 billion in cash. In addition, the Court was told that the reason for the change was a deterioration in market prices, an explanation that we now know to be incorrect**. .... **It is altogether possible that the LBI estate and its creditors gave you more or less value than you were entitled to receive. Moreover, the Bankruptcy Court was told that Barclays Capital was to receive $47.4 billion (not $49.7 billion) in securities and to pay $45.5 billion (not $45 or $45.2 billion) in cash.** We are both duty-bound to ensure that LBI received the value it was supposed to receive in exchange for your $45 billion.[227]

184.    Declarations filed in support the December Settlement Motion set forth facts contradicting Seery's and Klein's representations to the Committee's and the Lehman Sellers' professionals.  The Leventhal Declaration stated the repo collateral totaled $49.7 billion, contradicting representations made to the Committee professionals that these values were between $44 billion and 45 billion.  It similarly put forth a different figure for the cash extended under the Barclays Repurchase Agreement of $45.0 billion (not $45.5 billion)).[228]  In the pleadings, Barclays also acknowledged that between September 19 and September 23, it was unaware that $7 billion in cash was not deposited in its accounts.[229]

---

[227]    M. 360 [Draft Letter from Jamie Dimon to John Varley, dated Oct. 11, 2008, with cover email] (emphasis added).

[228]    M. 398 [Limited Objection OF Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. Et Al., to SIPA Trustee's Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) For Entry of an Order Approving Settlement Agreement, dated December 19, 2008] ("December Settlement Objection") at ¶ 13 ("Pursuant to a [Barclays Repurchase Agreement] . . . LBI was required to provide Barclays with $49.7 billion [in securities] as collateral for the $45.0 billion of cash it funded").

[229]    M. 119C [Declaration Of Gerard LaRocca In Support Of The Trustee's Motion For Entry Of An Order Approving A Settlement Agreement, dated December 5, 2008] ("LaRocca Dec.") ¶¶ 7-12

185.    The December Settlement caused concern:  "I started reading that and I actually

began to get more concerned than I ever was before.  On one hand, it confirmed my suspicion

that there was enormous confusion as to what Barclays got …. I felt concerned that the

reconciliation would fall through the cracks and just wasn't happening.  I was concerned that the

numbers weren't adding up."[230]

186.    Accordingly, the Committee formally opposed the December Settlement Motion,

arguing:

> it seeks the Court's imprimatur of Barclays', the SIPA Trustee's and JPMC's depiction of
> the facts and circumstances surrounding the Sale Transaction without any documentary
> support.  Those purported facts cannot be verified absent the receipt of final
> reconciliations from the Sale Transaction's principal parties, i.e., LBHI, the SIPA Trustee,
> the New York Fed, and Barclays, for each step of the transaction.  Such information to
> date has not been provided to the Committee.  Moreover, the Settlement Motion's factual
> predicate is either incomplete or fails to square with certain representations Barclays and
> LBHI made to the Committee concerning the Sale Transaction prior to, and in connection
> with, the closing.[231]

187.    In an attempt to settle the Limited Objection, the Committee submitted a list of

documents it considered important to its investigation for production from Barclays and the

DTCC, including, inter alia, global reconciliations and supporting schedules, with a proposal that

they be provided on or before January 15, 2009.[232]  Barclays rejected the proposal.  Indeed, the

Limited Objection was not well received by Barclays, whose counsel noted:

---

(noting Barclays did not discover the absence of $7 billion in cash, supposedly deposited on
September 19, until September 23).

[230]    5/6/10 [Burian] 185:4-7, 186:25-187:2.

[231]    M. 398 December Settlement Objection at ¶ 4.

Barclays argues the Committee adopted the factual statements submitted in connection with the
December Settlement Motion because reference is made in footnote 12 of the Limited Objection
to the Fed Portfolio.  As noted above, however, the Committee maintained expressly that none of
the factual underpinnings of the December Settlement -- including facts contained in the papers
submitted -- should apply with respect to the Committee's investigation.

[232]    See M. 647 [email from James Tecce to Hal Novikoff re: Lehman Brothers, Inc., dated December
19, 2008] (outlining proposed settlement requesting (i) incorporation of the language in the order

As to the Creditors' Committee, we think the email should go on to say that the settlement parties are not willing to agree to other demands of the Creditors' Committee re an order requiring delivery by January 15 of a vast amount of information relating in general to the details of sale of assets to Barclays Capital Inc. in September (as that information is irrelevant to the settlement under consideration on Monday and such requests were made for the first time to the settlement parties on the afternoon of December 19). Nevertheless, the settlement parties are willing on an informal basis to discuss with the Creditors' Committee after the first of the year reasonable requests for information concerning the sale that it has sought from LBHI and been unable to obtain from LBHI.

188.    At the hearing on the December Settlement Motion and the Limited Objection, Committee counsel reiterated the Committee's concerns and asked the Court to order Barclays to provide a reconciliation by mid-January 2009. The Committee made its position well known on the record, especially its concern over the representations made to it about the purported decline in the value of the securities by $5 billion:

[T]he question that we had when this has come before the Court … is these new numbers. If they're not footing with the numbers that were told to the [C]reditors' [C]ommittee during the weekend, why is that? And what are the right numbers? …. [A]s of that late Sunday night, early Monday morning, our financial advisors were told that ... ["][T]his is the transaction that has to close. These are the numbers["] -- they're actually given a manila folder, which I photocopied here, that has all of the numbers that Mr. Burian outlined in his declaration. ["]And it's for these reasons we need to go forward. Don't worry. There will be a reconciliation post-closing.["] .... [W]e see declarations that have different numbers, different understandings than what people were told .... [O]ne of the major changes from that weekend was ... that the value from Ms. Fife's comments on that Friday up until Sunday had gotten even worse than the 47.4 and that they have actually decreased now to forty-four or forty-five billion dollars. And Mr. Burian goes through that in his declaration.[233] ….

---

approving the settlement agreement and (ii) adding a provision in the order that provides for delivery of information by January 15, 2009 to the Creditors' Committee and the LBI Estate).

[233]    Burian submitted the declaration under penalty of perjury detailing his recollection of the events that weekend, including the Klein conversation and the explanation he received concerning the $5 billion decline in marked value of the securities. See M. 359 [Declaration of Saul Burian in support of December Settlement Objection, dated December 19, 2008] (admitted into evidence for limited purpose of showing Saul Burian's state of mind).

And so, our request was ... by mid-January, at least, there be a final reconciliation .... It's not that the information doesn't exist.  The declarants are relying on something when they're making statements about assumed liabilities and asset values of particular dates. When people market [sic] [mark] to market securities, we want to make sure they didn't stick their finger in the air and say, hmm, five billion dollars additional assets, please, Lehman Brothers. .... If everything turns out that it was a frenzied time but that, in fact, was the [mark] to market value as of that weekend … then that would be fine.  But there are major discrepancies between what we were told that weekend and what's being put forth here today.[234]

189.    Barclays made a single, short statement at the hearing with respect to the Limited Objection:  "We regard the creditor committee objection … as not germane to your decision whether to accept this motion and approve the settlement.  They want to exhume information related back to the sale.  That is not pertinent and does not bear upon the question before you today."[235]

190.    Notably, Barclays did not deny the $49.7 billion figure in the Leventhal Declaration.  Nor did Barclays contend the Committee had the relevant information such that it knew the value of the assets transferred the extent of Barclays' gain on the transaction.  Barclays also did not challenge the Limited Objection on the grounds that the reconsideration and appeal period with respect to the Sale Order had expired or that the Committee's reconciliation requests were stale or moot.  That silence is especially telling when Barclays had just completed its briefing in the Bay Harbour Appeal of the Sale Order to the District Court.

191.    During the hearing, the Court also received an explicit confirmation from Barclays about the parties' reservation of rights, which also appeared in the Order approving the Settlement:

[JPMorgan Counsel:]  We confirm Your Honor's understanding that what is being done here is we are approving a settlement agreement.  There will not any collateral estoppel or other similar effects.  As to the facts laid out in the declarations or otherwise in the order or the motion, we are approving a transaction.  ***People would remain free to pursue***

---

[234]    M. 262 December Settlement Hearing at 46:11-49:5.

[235]    Id. at 41:7-11.

*claims if they feel that there is something in the overall sales transaction which gives rise to a claim*.  [Barclays' Counsel:] …. *The order that the trustee has put before you and which we've reviewed … preserves rights, as [counsel for JPMorgan] just explained*.[236]

192.    In January 2009, LBI and Barclays returned to Court with the DTCC for a second settlement relating to the Sale Transaction.  The Committee raised the very same issue, that is, to ensure no factual findings made in connection with the January Settlement had any binding impact on the Committee's investigation and requests for reconciliations.[237]  During the hearing to consider approval of the January Settlement, the Committee again stated its position on the record.  Indeed, even LBHI joined in that reservation of rights.[238]  Barclays again made no mention at the hearing of the alleged finality of the Sale Order, the passage of the reconsideration and appeal periods, its belief that the Committee possessed the relevant information, the Committee's (and the Court's) knowledge of the gain it received, and the supposed mootness of

---

[236]    Id. at 39:13-20, 40:9-11 (emphasis added).  See BCI 39 [Order Approving December Settlement] ("[N]othing in this Order shall bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement and such documents as may be necessary or appropriate to effectuate the Settlement Agreement and transfer of the Settlement Securities and Settlement Payment to Barclays").

[237]    See M.411 [Response Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al. To SIPA Trustee's Motion Under Fed. R. Bankr. P. 9019(A) For Approval Of Settlement And Compromise Among Depository Trust And Clearing Corporation And Certain Of Its Subsidiaries And Barclays Capital Inc., dated February 6, 2009].

[238]    See M. 412 [Tr., Hearing February 11, 2009] at 63:21-64:11 ("Our second concern was just that the reservation of rights of the [C]ommittee and the LBHI estates that appeared in the first settlement resolution with Chase back in December, that the same reservation of rights appear in connection with this settlement with the same force and effect.  As the Court knows, we're investigating the sale transaction. We want to make sure that we have the same reservation that we obtained previously . . . .  THE COURT: That's fine. I remember that reservation of rights, and you still have it as far as I'm concerned.  MR. TECCE: Thank you very much.  MR. MILLER:  And the debtor also, Your Honor.  The debtor?  THE COURT:  You have it, too, Mr. Miller").

the Committee's investigation.  The order approving the January Settlement contained the same

reservation of rights.[239]

### E.    ATTEMPTS AT COOPERATION DEVOLVE INTO LITIGATION (DECEMBER 2008 THROUGH MARCH 2009)

193.    Following approval of the December Settlement Motion, the Committee

intensified its efforts to obtain a reconciliation.  When its attempts to retrieve information

cooperatively from Barclays failed, the Committee joined LBHI's request for Rule 2004

discovery in June 2009.

### 1.    INFORMAL LETTER REQUESTS AND MEETINGS LEAD NOWHERE (JANUARY 2009 THROUGH MARCH 2009)

194.    At the December 2008 hearing, the Court suggested that the parties work

cooperatively to provide the Committee with the information it had requested (albeit without

ordering a deadline within which that information should be provided).[240]  Heeding the Court's

admonition, four days later, the Committee prepared and transmitted on December 26, 2008, an

informal document request to Barclays and the DTCC.[241]  The December 26 Request asked for

---

[239]    See M. 413 [Order Approving January Settlement Agreement] at 2 ("[T]he facts alleged in the Motion shall not bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 cases or any related case").

[240]    M. 262 December Settlement Hearing at 50:9-51:6 ("It's not a ruling and I'm not ordering anybody to do anything . . . .  It's obviously in the best interest of orderly case administration that information be shared as promptly as it can be consistent with the other conflicting obligations that the financial advisors and lawyers have in this massive case with enormously complicated issues.  Nonetheless, I consider it to be important for us to get to what I'll call closure with respect to the basics of the transaction that was approved by order entered September 20th.  And this motion with respect to the settlement agreement is a reasonable platform on which to address some of these issues because while this is not fairly to be characterized as a cleanup item, it's a very significant matter.  It does draw all of our attention back to what happened in September.  And I think it important that there be reasonably prompt resolution of outstanding questions that the committee may have on the subject.  I would hope that it's not necessary for the committee to have to file 2004 requests in order to get the information that it seeks which seems to be reasonable and consistent with its mandate").

[241]    M. 371 [Letter from James Tecce to Lindsee Granfield, et al., re: In re Lehman Brothers Holdings, Inc. et al., Case No. 08-13555(JMP), dated December 26, 2008, with cover email].

the production of, among other things, detailed schedules showing the securities to be transferred (and actually transferred), with their mark-to-market valuations on a security-by-security basis (and supporting documentation) as of three points in time: September 16, 2008 (the APA), September 19, 2008 (the Sale Hearing), and September 22, 2008 (the closing).

195.    Barclays' counsel and the Committee representatives ultimately scheduled and conducted a "meet and confer" call on January 13, 2009, attended by both Committee counsel and its financial advisors to review the December 26 Requests.  The Committee professionals recounted that the call was "frustrating" because it involved "sparring" among counsel and a litigious stance from Barclays in response to what the Committee professionals perceived to be an information-gathering exercise.[242]

196.    At the conclusion of the January 13, 2009, conference call, the parties agreed an in-person meeting provided a logical next step, which took place on February 3, 2009.  Initially, Barclays tried to *limit the number of attendees* to two people from Houlihan and two attorneys from Quinn Emanuel, expressing concern that "having more people than that strikes us as wasteful and excessive and unnecessarily may concern any witness who is asked to face that many people without a transcriber."[243]  Ultimately, Barclays finally agreed to drop that requirement, and a meeting ensued at Boies Schiller's offices among certain Barclays principals, Barclays' counsel, Houlihan and Committee counsel.

---

[242]    5/6/10 [Burian] 188:19-189:19 ("I think we were asked to put our . . . concerns in writing.  I remember participating in at least two calls about what we were really trying to get, what we weren't trying to get.  I remember being very frustrated on those calls . . . .  It was more your firm sparring . . . .  Clearly . . . I remember being rude at one point and breaking in and saying … 'stop this nonsense, this is not discovery, this is not technical stuff . . . .  Can you just get for me . . . what you got, what it was marked for, what it was done.'  Because there was an enormous amount of back and forth about are we entitled to this?  Should this come from the debtor?  Should this come from Barclays?  Who from Barclays?  We're not going to create documents for you, only going to give you documents that already exist.  I think someone made the comment well, you're a public company you had to book these things at some point.  You know, just give us the work papers that were booked at").

[243]    M. 653 [email chain including email from Jonathan Schiller to Eric Kay, et al., re: Tues., Feb. 3rd, dated January 30, 2009].

197.    This was an ***informational*** meeting, not one to exchange litigation positions.[244]

Indeed, Barclays did not advise the Committee during the February 3 meeting of its litigation

position that the Committee was estopped from challenging the Sale Order.  As for the

Committee's position, it was enunciated clearly on the record in connection with the December

Settlement, and Barclays was fully aware of the Committee's concerns.

198.    Barclays did not provide the Committee with a reconciliation during the February

3 Meeting or documents responsive to the December 26 Request:  "[w]e got some information

that was interesting color, but we still weren't getting the basic item that I wanted to go hand to a

junior person and write a report.  And it was sort of frustrating."[245]  Fazio's recollection comports

squarely with Burian's:  "[W]e had still come out of that meeting requesting significant amounts

of information that we did not get … information that we had requested numerous times, …

[T]he main purpose of the meeting is to get information associated with the detailed schedules

that we had requested numerous times and have not received …. I would contend that they didn't

answer all our questions…."[246]

199.    No greater evidence exists that the Committee's questions were not answered (as

Barclays submits) at the February 3 Meeting than the ***second letter request*** the Committee sent

to Barclays the following week, on February 10, 2009.  It reiterated some of the requests

contained in the December 26 Request (including a request for detailed schedules), albeit refined

---

[244]    See 8/25/10 [King] 88:11-14 ("I remember the discussion at the offices being a relatively …
cordial one in which we provided them as much information as we could in response to their
questions").  See also BCI 761 [sign-in sheet for February 3, 2009 meeting].

[245]    5/6/10 [Burian] 191:1-4.  See also BCI 761.  See also 8/25/10 [King] 211:24-212:5 ("[Q] . . . At
the February 3rd meeting, Barclays did not provide documents that were responsive to the letter
that I just showed you, is that correct?  [A] . . . [A]t the meeting we -- we didn't bring anything to
the meeting.  I think we brought people to the meeting").

[246]    Fazio Dep. Tr. 79:9-22, 80:2-8.

by the February 3 Meeting discussions (e.g., asking for documents showing the receipt of securities by Barclays' collateral agent (BoNY)).[247]

## 2.    INITIAL DOCUMENT PRODUCTION AND RELATED DISPUTES

200.    As of early March 2009, Barclays still had not responded to either the December 26 Request or the February 10 Request, despite the Committee's reminder that those requests had been outstanding for some time.[248]  On March 13, 2009, the United States District Court for the Southern District of New York affirmed a pending appeal from the Sale Order in the Bay Harbour Appeal.  Whether as a result of coincidence or otherwise, a week later, on March 20, 2009, Barclays finally produced documents it maintained were responsive to the December 26 and February 10 Requests.

201.    The production included thousands of pages of undecipherable spreadsheets that were in the manner produced.  Barclays initially denied the Committee's requests that the documents be produced electronically and insisted on producing hard copies of the spreadsheets.  Barclays finally agreed to provide the documents in an electronic format and produced them accordingly on or about May 28, 2009.[249]

---

[247]    M. 372 [letter from James Tecce to Lindsee Granfield, et al., re: In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555(JMP), dated February 10, 2009].

[248]    M. 373 [email from James Tecce to Jack Stern re: Lehman Brothers – Barclays, dated March 3, 2009] ("Thank you for your call earlier today advising Barclays is still searching for responsive documents to our two letters (and anticipates production within the next two weeks).  As you know, the Committee is anxious to receive documents and continue with their investigation.  Please note from their perspective, the requests have been outstanding for some time -- so we ask that you keep us advised of your progress (and whether you anticipate further delays beyond two weeks).  To that end, the Committee's rights to pursue the discovery through other channels (e.g., Rule 2004) are reserved").

[249]    See M. 655 [email chain including email from James Tecce to Luke Barefoot, et al., re: Lehman Brothers -- Barclays Documents, dated April 17, 2009] (asking "would your clients be willing to provide the actual electronic / EXCEL files for the spreadsheets.  As they were 'printed' to PDF on the CD, the spreadsheets don't fit onto a single page.  As a result, when the documents are printed, no single spreadsheet fits on a single sheet of paper; we can't reconstruct the actual spreadsheets because they appear on different pages"); M. 375 [letter from Jack Stern to James Tecce re: In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555(JMP), dated April 23, 2009] (transmitting "color coded sheets" (instead of producing the documents electronically)

202.    Importantly, at no time did Barclays provide a final reconciliation or balance sheet identifying the specific assets transferred, the specific liabilities assumed and their respective mark-to-market valuations on a security-by-security basis for September 19 (with an explanation of the methods used to arrive at those marks).  Indeed, with respect to the December 26 and February 10 Requests, or during the February 3 Meeting, Barclays could simply have provided specific responses to the Committee's questions (e.g., by providing a written explanation of its position with respect to the value of the assets transferred or a written explanation of the illegible schedules it produced).  It chose not to do so.

### 3.    ABSENCE OF COOPERATION LEADS TO RULE 2004 DISCOVERY

203.    On or about February 8, 2009, Barclays PLC issued its Results Announcement for 2008 stating, among other things, that Barclays realized a gain of "£2,262m relating to Lehman Brothers North American Business," i.e., nearly $4.2 billion at the then prevailing exchange rate.[250]

204.    In early 2009, A&M began obtaining relevant information from the Lehman data systems.  In addition, the Committee continued to stress to the estates the need to obtain a reconciliation of the Sale Transaction.  On February 11, 2009, A&M sent a letter to Barclays

---

advising a "sample print-out of selected material" is enclosed; "[i]f this is acceptable, we will print out the entire production for you in this format"); M. 376 [email chain including email from James Tecce to Jack Stern re: [Blank], dated May 12, 2009 ]  (discussing "colored sheets": "we've checked with our FAs.  The problem is that even with the insert sheets, they still can't read the documents as produced because overflow pages (e.g., other than the first page) don't contain the individual column and row headings on each sheet; they're left trying to 'piece' the charts together.  While the color coded sheets show the different charts attached to the different emails, within the charts (some of which are hundreds of pages long) the row and column legend only appears on the first few pages.  Even if they were to cobble the pages together, for massive charts (with thousands of entries), the 'assembled' pages don't even fit on a conference table"); M. 414 [Objection Of Barclays Capital Inc. To Proposed Joinders In Debtors' Motion For An Order Under Rule 2004 Authorizing Discover Of Barclays Capital Inc., dated June 23, 2009] at 5 (¶ 10) ("On May 28, 2009, in response to a Creditors' Committee request, Barclays provided the electronic/EXCEL files for the spreadsheets in the March 20, 2009 production").

[250]    M. 100 [December 31, 2009 Barclays PLC Results Announcement: Figures 2008, dated February 8, 2009] at 3, 7, 29.

advising of the material discrepancies between the Cure and Compensation Liabilities outlined in the transaction documents ($4.25 billion) and the realized amounts (approximately $1.7 billion).[251]  Barclays responded to the February A&M letter by insisting that Barclays was well within its rights under the contracts.

205.    At or around this time, as the estate's investigation escalated, the Committee and LBHI began coordinating their investigative efforts with respect to the Sale Transaction.[252]  On April 13, 2009, LBHI forwarded an informal document request to Barclays following up on the February A&M Letter requesting 20 different categories of Sale Transaction documents, including a catchall request for all documents produced to the Committee.[253]  Barclays, however, refused to produce documents responsive to LBHI's informal requests, prompting LBHI to file its motion, pursuant to Rule 2004 seeking an order compelling that production.  The Committee and the SIPA joined in the Rule 2004 Motion.  The Committee stressed it would avoid duplication of effort and coordinate with the estates' investigation, but requested access to any discovery given to LBHI.

206.    Barclays tried to block both LBHI's and the Committee's access to discovery; it even filed a separate objection to the Committee's joinder.[254]  Barclays asserted, for the first time and despite numerous opportunities to raise these arguments in meetings with the Committee, in response to the Committee's requests and in connection with the December and January

---

[251]    See M. 124A [letter from Bryan Marsal to Jonathan Hughes, dated February 19, 2009].

[252]    5/6/10 [Burian] 191:4-16 (noting that after February 2009 meeting, "we spoke a[t] a Committee level, we spoke to Milbank, we spoke to you, we spoke to Alvarez …. And we said … the [C]ommittee thinks it's important …. You have to sort of move this forward.  It was more exasperation than, you know, conversations.  And I wasn't as active then, I sort of stepped away at this point, and the machinery moved forward.  We were active in recommending that special counsel get retained; Jones Day.  And after that it was in the lawyers' hands, and not mine").

[253]    M. 374 [letter from Robert Gaffey to Lindsee Granfield, et al., re: In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555(JMP), dated April 13, 2009].

[254]    See M. 414.

Settlement hearings, that the discovery related to "factually meritless" claims. Notably, it did not argue the claims were barred by release, waiver or estoppel (or that the Committee had failed to appeal the Sale Order). Barclays argued, among other things, that it already had answered the Committee's questions.

207.    The Court overruled Barclays' objections and authorized discovery on June 24, 2009, after which a wave of document production and depositions started which continued over the summer of 2009. Ultimately, the Movants filed the Rule 60 Motions on September 15, 2009.

### III.    LEGAL ARGUMENT SUPPORTING COMMITTEE'S PROPOSED CONCLUSIONS OF LAW

### A.    RULE 60 RELIEF IS WARRANTED WHEN SIGNIFICANT TRANSACTION TERMS WERE NOT DISCLOSED TO BANKRUPTCY COURT

208.    The transaction represented to the Court bears little resemblance to the transaction consummated. Critical features simply were not disclosed:

- while (a) the Sale Transaction was advertised to the Lehman Sellers' Board of Directors, the Court and the Committee as (1) a balanced, *going-concern* transaction (or one that favored the estates) and (2) a better alternative than a liquidation, and (b) while the APA referred to "book" values, in reality the Lehman Sellers *liquidated* assets to Barclays;[255]

- Barclays had insisted on a day-one-built-in gain from the inception of the transaction;[256]

- a handful of negotiators agreed to a $5 billion block discount off the book value of the Lehman Sellers' assets;[257]

---

[255]    See supra Part II.A.1 ("Obtaining Board of Directors Approvals (September 16)"); Part II.A.6 ("Initial Meeting At Weil: Lehman Advises Committee of Going-Concern, Balanced Transaction (September 18)"); Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)"); Part II.B.1 ("What Was Disclosed To Court"); Part II.B.2(C) ("What Was *Not* Disclosed To Court, $47.4 Billion Value Was Not Mark-To-Market Value Or Book Value -- But Instead Was Sum Of Liquidation Value And Clearance Box Assets").

[256]    See supra Part II.B.2(A) ("What Was *Not* Disclosed To Court, Imperative To Barclays To Realize Day-One Gain").

[257]    See supra Part II.B.2(B) ("What Was *Not* Disclosed To Court, Embedded $5 Billion Discount Neither Disclosed To Court Nor Identified In Transaction Documents").

- the parties facilitated the transfer of the $5 billion discount by valuing the securities at a liquidation valuation and terminating the Barclays Repurchase Agreement;[258]

- the Lehman Sellers, acceding to Barclays' 11th hour demands, added billions in additional assets to the deal, including the Clearance Box Assets and a conditional right to the 15c3 Accounts based on the false premise of market deterioration of the trading assets; and[259]

- the value of the securities transferred was not $47.4 billion, but at least $50 billion (excluding the Clearance Box Assets); the loan under the Barclays Repurchase Agreement was not $45.5 billion but $45.0 billion in liabilities were overstated by at least $1.8 billion.[260]

209. Barclays failed to apprise the Court of material aspects of the Sale Transaction, justifying Rule 60 relief from the Sale Order. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting section 363 serves to subject "a trustee's actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court"); Lone Star Indus., Inc. v. Compania Naviera Perez Compac (In re New York Trap Rock Corp.), 42 F.3d 747, 752 (2d Cir. 1994) (noting general policy against undisclosed agreements in context of a sale order); In re LWD, Inc., 2009 WL 5198060, at *5 (W.D.Ky. Dec. 23, 2009) (affirming lower court's denial of motion to compel performance under sale order: "[r]ather than following the Term Sheet ... Debtors improperly transferred assets to [purchaser] and failed to disclose a major asset that was ultimately purchased ... for insufficient consideration at the 363 Sale"). Cf., United Student Aid Funds, Inc. v. Espinosa, 130 S.Ct. 1367, 1376 (2010) (noting in the context of a motion for relief from an order approving a chapter 13 plan that "Rule 60(b), however,

---

[258]    See supra Part II.B.2(E) ("What Was *Not* Disclosed To Court, Use Of Barclays Repurchase Agreement To Transfer Embedded, $5 Billion Discount").

[259]    See supra Part II.B.2(F) ("What Was *Not* Disclosed To Court, Eleventh Hour Demands That Lehman Sellers Locate And Transfer Additional Assets").

[260]    See supra Part II.B.2(D) ("What Was *Not* Disclosed To Court, Book, Or Mark-To-Market Value Of Repo Collateral Transferred To Barclays Was Approximately $50 Billion -- A Fact Known To Barclays Prior To Sale Hearing"); II.B.2(G) ("What Was *Not* Disclosed To Court, Overstated Cure And Compensation Liabilities").

provides an 'exception to finality' … that 'allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances'") (citation omitted).

**B.    BARCLAYS' FAILURE TO MAKE ADEQUATE DISCLOSURE OF SALIENT TERMS OF SALE TRANSACTION FORFEITED ITS ENTITLEMENT TO 363(M) AND FINALITY PROTECTIONS**

210.    Barclays contends that section 363(m) of the Bankruptcy Code bars the Committee Rule 60 Motion, which protects a good faith purchaser from an appeal of a sale order following the closing of the sale. Barclays is wrong -- in failing to disclose material features of the Sale Transaction to the Court, Barclays forfeited its entitlement to any section 363(m) protections.

**1.    TRANSPARENCY AND DISCLOSURE ARE SINE QUA NON OF 363(M) AND FINALITY PROTECTIONS; SANCTITY OF SALE ORDER REQUIRES INTEGRITY IN BANKRUPTCY PROCESS**

211.    The Bankruptcy Code does not define the term "good faith" as used in section 363(m). In re Tri-Cran, Inc., 98 B.R. 609, 618 (Bankr. D. Mass. 1989); see Cumberland Farms Dairy, Inc. v. National Farmers' Org., Inc. (In re Abbotts Dairies of Pennsylvania, Inc.), 788 F.2d 143, 147 (3d Cir. 1986) (stating that "neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define 'good faith'").

212.    Instead, courts analyzing transactions under Bankruptcy Code section 363(m) have "turned to traditional equitable principles, holding that the phrase [good faith purchaser] encompasses one who purchases in 'good faith' and for 'value.'" Id. (citing In re Bel Air Assocs., 706 F.2d 301, 305 (10th Cir. 1983); In re Rock Indust. Machinery Corp., 572 F.2d 1195, 1197 (7th Cir. 1978)).

213.    The significance of full disclosure in the context of good faith findings in section 363 sales cannot be overemphasized. See Colony Hill Assocs. v. Kabro Assocs. of West Islip, LLC (In re Colony Hill Assocs.), 111 F.3d 269, 277 (2nd Cir. 1997) (Indeed, "[m]any courts ruling on challenges to a purchaser's good faith status have focused on whether the acts about

which the appellant complained were disclosed to the bankruptcy court"); In re Engineering Prods. Co., 121 B.R. 246, 249 (Bankr. E.D. Wisc. 1990) ("Of paramount importance is the existence of good faith -- *of full disclosure* and fair dealing on the part of all interested parties") (emphasis added).

214.    The Lehman Sellers consummated the Sale Transaction pursuant to section 363(b) of the Bankruptcy Code, implicating the standards enunciated in Official Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983). Lionel examined "to what extent Chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." Id. at 1066.  The Lionel creditors' committee insisted that Lionel sell its 82% equity interest in Dale Electronics, Inc. (the "Dale Stock"), an asset accounting for approximately one-third of the value of Lionel's consolidated assets.  The equity holders objected, arguing that such a sale, "prior to approval of a reorganization plan, deprives the equity holders of the Bankruptcy Code's safeguards of disclosure, solicitation and acceptance and divests the debtor of a dominant and profitable asset which could-serve as a cornerstone for a sound plan." Id.  The Second Circuit determined the Dale Stock could not be sold under section 363(b) of the Bankruptcy Code, thereby confirming a longstanding principle that significant assets must be sold pursuant to a chapter 11 plan.

215.    Although courts today are more willing to permit significant asset sales outside the confines of a chapter 11 plan, Lionel and its progeny still support the proposition that sales through section 363(b) of the Bankruptcy Code and sales through a plan process are not equally favored.  In the plan process, a sufficient quantum of creditors can overrule the debtors' "business judgment."  Management must therefore test that judgment against the creditors' will.  That tension requires disclosure through a plan process -- because the Bankruptcy Code enables

creditors to be the arbiter of management's decision on an informed basis brought about by the
disclosure attendant to the chapter 11 plan process.

216.    In the absence of the protections afforded by the plan and disclosure statement
process, however, as a predicate to a sale of a substantial portion of the debtor's assets pursuant
to section 363(b), courts still will require debtors to introduce evidence of "some articulated
business justification" for the sale, Engineering Prods., 121 B.R. at 247 (quoting In re Lionel
Corp., 722 F.2d at 1070) , and to make "a showing that the purchase price is fair and reasonable,
that the sale is in the best interest of the estate, and that the assets will substantially diminish in
value if not immediately sold."  Id. at 248 (quoting Abbotts Dairies, 788 F.2d at 146).

217.    Implicit in the requirement that the sale price must be fair and reasonable is the
requirement that there must be full disclosure of the assets the debtor is conveying and the
consideration the debtor is to receive; in the absence of such disclosure, a court is unable to
assess whether the sale price is "fair and reasonable" and whether the sale is supported by a
sound business justification.  Disclosure of all relevant terms is mandatory.

218.    Here, Barclays' disclosures to the Court were woefully deficient regarding
fundamental provisions of the Sale Transaction relating directly to value and benefit to the
estates.  That failure stripped Barclays of the finality normally afforded sale orders under section
363(m).  A review of relevant case law confirms this conclusion,[261] especially the factually

---

[261]    Compare In re Colony Hill Assocs., 111 F.3d at 274-77 (refusing to vacate sale order on
application of disgruntled bidder when (i) disgruntled bidder's late bid and request to adjourn sale
hearing were rejected; (ii) initial bidder and secured creditor agreed to block disgruntled bidder's
bid; and (iii) on appeal, disgruntled bidder argued initial bidder and secured creditor conspired to
exclude it from bidding process and buy assets at depressed valuation, because "all relevant facts
regarding the parties' bids and positions were disclosed to the bankruptcy court"), with, In re Tri-
Cran, 98 B.R. at 623-24 (in chapter 11 case of cranberry farming corporation, (i) minority
shareholders objected to debtor's motion to sell nearly all assets in a private sale, arguing debtor
failed to identify buyer and disclose its relationships with debtor and third parties and (ii)
subsequently appointed chapter 7 trustee discovered in a subsequent investigation that certain of
debtor's shareholders had arranged sale to undisclosed purchaser at a discount price as part of
secret deal to maintain control of corporation's assets; Rule 60(b) motion granted to set aside sale
in which "[t]hrough their insider dealing, concealment, and misrepresentation, [purchaser and its

analogous case of <u>In re Am. Freight Sys., Inc.</u>, 126 B.R. at 803, which affirmed the bankruptcy

court's decision to vacate a sale order because the court and creditors were misled concerning the

value of the property sold.  They were advised 11 acres of property with an appraised value of

$1,330,000 would be sold at 70% of value, when, in fact, the sale actually involved 24 acres of

property with an appraised value of $1,675,000 to be sold at 55% of value.  The District Court

noted specifically that it was "unpersuaded by appellant's argument that the bankruptcy court's

decision to set aside the sale order undermines public policy interests.  As the debtor/appellee

points out, ***the purpose of the finality rule is to obtain the highest price for the debtor's assets,***

***for the benefit of the debtor's estate and ultimately, the creditors.  If defects in notice result in***

***debtor's assets being sold for an inadequate price, strict adherence to the finality rule would***

***require a result contrary to the rule's underlying purpose of achieving the highest possible***

***price***."  <u>Id.</u> at 805, n.2 (emphasis added).[262]

---

cohorts] short circuited the judicial machinery and prevented it from performing its usual function in an impartial manner" and explaining that had facts about purchaser's "relationship to the Debtor and about the nature of the dealings between them come to light, the Court would not have permitted the sale to go forward").

[262]    Barclays may argue <u>In re Rome Family Corp.</u>, 2010 WL 1381093, at *2-6 (Bankr. D. Vt. March 31, 2010), where the Court refused to grant Rule 60(b) relief from a 363 sale order where a third party claimed an interest in a heating system sold with certain property in the bankruptcy, supports its position.  But in <u>Rome</u> (i) the Court recognized expressly that in addition to an appeal, "[t]he other way to challenge a § 363 sale order is via a motion to vacate the judgment under Rule 60(b);" (ii) the Court also found that the complainant failed to seek a determination prior to the sale of who owned the system (something the Committee's advisors specifically tried to do in this case but could not) -- but did not act in a commercially reasonable manner in seeking to determine ownership; (iii) there was no "newly discovered evidence," only a new determination of who owned the system; (iv) the notice of sale was sufficiently detailed to prompt a reasonable person to verify its understanding of the ownership of the system; (v) the complainant (an unsecured creditor) was bound by the actions of the trustee in moving to sell the asset; and (vi) balancing the equities weighed in favor of keeping the order intact, especially when the complainant was in a position prior to approval of the transaction to make inquiries (which is precisely what the Committee's professionals did here).

219.    Barclays' incessant demand that the Sale Order's integrity be respected rings hollow given Barclays' failure to display integrity in obtaining its entry.  Cf., In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997)  (holding "*[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made*") (emphasis added); Tri-Cran, 98 B.R. at 618 (good faith purchaser requirement "*speaks to the integrity of his conduct in the course of the sale proceedings.*") (quoting Rock Indus., 572 F.2d at 1198; Abbotts Dairy, 788 F.2d at 147; Bel Air Assocs., 706 F.2d at 305 n. 11) (emphasis added).

## 2.    BARCLAYS ASSUMED RISK OF NOT RETURNING TO COURT

220.    At the Sale Hearing, the Court indicated that it was "prepared to stay here for as long as it takes if you're prepared to stay here for as long as it takes."[263]  Given the significance of the transaction and the materiality of the changes that took place over the weekend, the Court surely would have made itself available to review the Clarification Letter and other changes *before the markets opened* on Monday, September 22.  Moreover, Barclays' counsel acknowledged that the transaction did not have to close that Monday.[264]

221.    Barclays cannot seriously dispute that the differences between the Sale Transaction represented to the Court and the transaction consummated were material and that it might have to return to Court for approval.  Barclays audaciously suggests it was the Committee's burden to return to Court to alert the Court of the Committee's concerns regarding the Sale Transaction.  Barclays was the entity seeking repose, and Barclays assumed the risk of not returning to Court.  Indeed, as a purchaser seeking section 363(m) protection, the onus fell on Barclays to take steps to protect its position.

---

[263]    See M. 261 Sale Hearing Tr. at 243:20-22.

[264]    8/31/10 [Lewkow] 177:20-178:4 (acknowledging that while there was a desire to close on Monday, it was not a requirement).

222.    If sustained, Barclays' argument would shift the burden of disclosure under

section 363 of the Bankruptcy Code to a party that neither signed the transaction documents nor

requested their approval.  Nor can Barclays shift the burden of disclosure to the Committee

simply because the Committee used Rule 60(b) as the procedural vehicle to seek relief.  See, e.g.,

Midkiff v. Stewart (In re Midkiff), 342 F.3d, 1194, 1200-01 (10th Cir. 2003) (rejecting debtors

argument that trustee failed to satisfy its burden of showing mistake on rule 60(b) motion

because trustee failed to investigate and holding, instead, that the "party best situated to provide

relevant information usually bears the burden of doing so").

> **3.      WHILE BARCLAYS COMPLAINS CHRONICALLY THAT IT ASSUMED
> TREMENDOUS RISK, IT ADVERTISED THE TRANSACTION TO ITS BOARD,
> MANAGERS AND INVESTORS AS A RARE OPPORTUNITY AND A "DE-
> RISKED" TRANSACTION**

223.    Barclays also complains chronically that it is entitled to special dispensation

because it supposedly assumed extraordinary risk with respect to the Sale Transaction.  But

Barclays eagerly communicated an entirely different message to its Board of Directors, managers

and investors.  In the September 16 Barclays Board Presentation, it noted specifically an ability

to "mitigate" risks.  The risks Barclays identified included "loose ends" upon separation of the

broker-dealer from Lehman Brothers and securing Court approval.  Notably, Barclays did not

consider market volatility or the illiquidity of the assets a risk.  It also touted to its investors in

the September 17 Press Release and during the Analyst Call, that it had "***de-risked the***

***transaction by excluding the overwhelming majority of the Lehman risk assets.***"  Barclays felt

comfortable it was acquiring "high quality, tradable" assets, a conclusion it reached having

completed its own ***mark-to-market*** valuation during the 72 hours before the report.  These are

not the statements of a purchaser that believed it was assuming extraordinary risk.[265]

---

[265]    See Part II.A.1 ("Obtaining Board of Directors' Approvals (September 16)"); II.A.4 ("Barclays'
Press Release And Analyst Call (September 17)").

121

**4.    SECTION 363(M) OF BANKRUPTCY CODE DOES NOT APPLY TO MOTIONS FILED PURSUANT TO RULE 60(B)**

224.    According to Barclays, section 363(m) of the Bankruptcy Code requires that the Committee satisfy a higher standard (e.g., bad faith) to prevail on its Rule 60(b) Motion. Barclays deduces that because section 363(m) applies to appeals from sale orders, it applies to motions seeking relief from sale orders pursuant to Rule 60, and, as a result, the Committee Rule 60 Motion fails absent a showing of bad faith.[266]  Barclays' position finds no support in the law.

225.    *First,* "[s]ection 363(m) provides that a purchase … of property of the estate is protected from the effects of reversal on appeal of the authorization to sell … as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale."  3 Collier On Bankruptcy ¶ 363.11 (15th ed. 2009).  By its terms, the statute only applies in the context of orders reversed or modified on appeal.  See 11 U.S.C. § 363(m) ("***Reversal or modification on appeal*** of an authorization under [this section] ... does not affect the validity of a sale … under such authorization to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale …  were stayed pending appeal) (emphasis added).

226.    In drafting and amending the Bankruptcy Code, Congress was aware of Rule 60(b) and never extended section 363(m) beyond its terms to preclude the application of Rule 60 to sale orders.  Congress's refusal to do so is telling.[267]  Indeed, Federal Rule of Bankruptcy Procedure 9024, which incorporates Rule 60(b) into the Bankruptcy Rules, contains certain exceptions or limitations to the effect of Rule 60(b) for a motion to reopen a case, reconsider a

---

[266]    In arguing the inapplicability of section 363(m) to its Rule 60 Motion, the Committee is not acknowledging that the bad faith standard could not be met.

[267]    Cf. Jacobs v. New York Founding Hosp., 577 F.3d 93, 100 (2d Cir. 2009) ("The ancient maxim expressio unius est exclusio alterius (mention of one impliedly excludes others) cautions us against engrafting an additional exception to what is an already complex [statute]") (citations omitted).

claim, revoke a discharge or revoke a confirmation order.  Rule 9024 does not provide any limitation to the application of Rule 60(b) to sale orders.

227.    *Second*, as Barclays concedes, courts considering the scope of section 363(m) of the Bankruptcy Code have limited its application to appeals and declined to find it precludes Rule 60 applications.  See In re Alan Gable Oil Dev. Co., 1992 WL 329419, *4 (4th Cir. Nov. 12, 1992) (Section 363(m) does not divest the bankruptcy court of the power to upset a sale under Rule 60(b)); In re M Capital Corp., 290 B.R. 743, 750 (9th Cir. BAP 2003) (finding that if bankruptcy court becomes aware of lack of good faith or misconduct, it has ample authority to revisit its order approving sale and may vacate sale, modify order, or grant other appropriate relief).

228.    *Third*, simply because the Sale Order was appealed and affirmed does not mean that Rule 60 relief cannot be obtained post-appeal.  See In re Tri-Cran, Inc., 98 B.R. at 618 (in examining matter remanded to bankruptcy court by district court (after district court entertained an appeal from order under section 363, bankruptcy court found that because matter before it was not an appeal, but instead a motion to set aside a sale pursuant to Rule 60(b), section 363(m) of Bankruptcy Code did not apply)).[268]

---

[268]    The cases Barclays relied upon in Barclays Brief do not support the extension of section 363(m) of the Bankruptcy Code to Rule 60(b) motions.  In re Summit Ventures, 161 B.R. 9 (Bankr. D. Vt. 1992), did not rely on 363(m) in denying Rule 60(b) relief.  Instead, it held that a failure to provide notice to disgruntled bidders did not entitle them to Rule 60 relief.  Summit Ventures did not purport to establish a rule that section 363(m) of the Bankruptcy Code precludes Rule 60(b) relief.  Instead, it simply found that based on the facts of that case, the sales process was fundamentally fair.  Summit Ventures is entirely distinguishable from the instant case, where the failure to disclose material terms of the consummated sale incurably infected the sale process.  Indeed, the Committee is not simply arguing that notice was deficient, but instead that inadequate disclosure numerous factual mistakes and misrepresentations rendered the sale process defective and fundamentally unfair.  Barclays' only other purported authority for the proposition that section 363(m) precludes Rule 60 relief comes from In re Gucci, 126 F. 3d at 387, which discusses section 363(m) of the Bankruptcy Code in the context of an appeal, not a motion under Rule 60 (b).

**5.    COMMITTEE CONSENT CANNOT CLEANSE INADEQUATE DISCLOSURE
AND BARCLAYS' FAILURE TO OBTAIN COURT APPROVAL OF MATERIAL
MODIFICATIONS TO SALE TRANSACTION**

229.    Barclays maintains the Committee consented to post-hearing modifications to the
Sale Transaction.  Stated simply, the Committee never consented to the Sale Transaction.  Before
leaving Weil's offices on Monday morning of the closing weekend, the Committee professionals
clearly stated that the Committee (a) did not accept the representations made to its
representatives, (b) had no choice but to trust the accuracy of the representations being made
because of the Committee's inability to diligence those representations prior to closing and (c)
fully intended to verify those representations through a reconciliation -- which they demanded at
that time and persistently thereafter.  In fact, (a) Committee consent was never solicited (as the
Committee professionals were told specifically their presence was not necessary), and (b) the
Committee professionals left the closing to avoid any confusion as to whether their continued
presence would be misconstrued as consent.[269]

230.    Assuming, arguendo, Committee consent was obtained, it does not excuse
Barclays' disclosure failures.  As this Court has recognized, the active participation of official
creditors' committees is vital to the effective administration of chapter 11 cases.[270]
Notwithstanding that role, the Committee does not perform judicial functions.  Its consent to a
debtor's actions or transactions does not obviate the need for parties to make appropriate

---

[269]    See Part II.C.3(D) ("Klein Conversation:  Barclays Gives Committee Final Word On Salient
Terms Of Sale Transaction Before Closing, Committee Representatives Advise Lehman Sellers:
'Get Us A Reconciliation'"); Part II.C.5 ("Committee Representatives Stated Unequivocally That
Committee Does Not Consent To Post-Hearing Modifications").

[270]    See, e.g., In re Refco, Inc., 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("'An official committee of
creditors plays a pivotal role in the bankruptcy process. The function of an official creditors
committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are
heard and their interests promoted and protected.'") (quoting Pan Am Corp. v. Delta Air Lines,
Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994)).

disclosures to the Court or to obtain court approval for those actions if required by the Bankruptcy Code or applicable law.[271]

231.    The case of In re Metaldyne, 409 B.R. 661 (Bankr. S.D.N.Y. 2009), is instructive on the limits of an estate fiduciary's ability to unilaterally modify a court order and the risks attendant in not seeking separate Court approval for those modifications.  After the debtors' bidding procedures for the sale of assets to the stalking horse bidder, RHJ International S.A. ("RHJI"), were approved, the debtors received another stalking horse bid from HHI Holdings, LLC ("HHI") and determined it was the superior bid.  RHJI argued it had satisfied all due diligence conditions and could block HHI's bid.  The court disagreed, concluding RHJI had not satisfied the due diligence condition under the original bidding procedures order because it had not submitted a satisfaction notice by the deadline.  Id. at 666.  RHJI argued it had timely submitted the notice under the extensions agreed to between it and the debtors.  The court rejected this position, noting that while the parties may have agreed to an extension, "the Court never approved the amendments."  Id. The Court concluded that "[u]nless and until amended *and approved by the Court*, the Bidding Procedures Order only entitled RHJI to the bidder protections if it delivered its notice of satisfaction with due diligence on or before July 2, 2009. It did not do so.  Therefore, the Debtors are not obligated to pay the break-up fee and expense reimbursement to RHJI."  Id.  at 667 (emphasis in original).

232.    Similar to the bidder in In re Metaldyne, Barclays assumed the risk of closing on the Sale Transaction without seeking separate court approval of the Clarification Letter and the other material modifications to the approved transaction.  The fact that LBHI and LBI signed the

---

[271]    See  In re Crystal Apparel, Inc., 220 B.R. 816, 829 n.7 (Bankr. S.D.N.Y. 1998) ("The approval of counsel or even the Committees or Debtor is not a substitute for court approval of any transaction found to require court approval"); cf. In re Commodore Int'l Ltd., 262 F.3d 96, 100 (2d Cir. 2001) (Court approval required for a committee to bring an estate action even if the debtor and committee both consent to the committee bringing the action); In re KDI Holdings, Inc.. 277 B.R. 493, 504-05 (Bankr. S.D.N.Y. 1999) (same).

Clarification Letter (and even if Committee consent had been obtained) does not relieve Barclays from its obligation to disclose and present it to the Court.

233.    Lastly, Barclays "deemed" consent arguments find no support in paragraph 25 of the Sale Order. That paragraph authorizes non-material modifications to the Sale Transaction that do not negatively impact the estates provided the Committee consents. That paragraph is not the savings clause that Barclays desires. The consummated transaction differed materially from the one represented to the Court. Only subsequent Court approval could legitimize them.

### C.    COMMITTEE HAS SATISFIED STANDARDS APPLICABLE TO RULE 60 MOTIONS

234.    Barclays has argued that the Committee's requested relief from the Sale Order is "especially disfavored," and that the Court's discretion to grant the Rule 60(b) Motions is "very limited," because the Rule 60(b) Motions relate to a section 363 sale order.[272] However, nothing in the relevant text of the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules of Civil Procedure or relevant case law imposes a heightened standard for granting Rule 60(b) relief from sale orders.[273]

---

[272]    Barclays Br. ¶ 521

[273]    Indeed, the cases cited in the Barclays Brief do not establish the existence of a heightened standard for granting Rule 60(b) relief from the Sale Order. See, e.g., In re Chung King, Inc., 753 F.2d 547 (7th Cir. 1985) (holding that relief may be granted from sale order either (i) where the sale price was wholly inadequate as to shock conscious or (ii) there is a price discrepancy and some other aggravating factor such as fraud, mistake or imprudence); In re General Insecticide Co., 403 F.2d 629 (2d Cir. 1968) (holding a bankruptcy sale could be overturned when "tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction;" decision did not examine interplay between Rule 60(b) and sale orders); In re Frankel, 191 B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (holding that Rule 60 is appropriate mechanism for challenging sale and that motion to vacate sale order may be granted where "fundamental errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective notice to interested parties of the sale or 'grossly inadequate' sales price, justify setting aside a confirmed sale").

235.    The decision to grant Rule 60(b) relief from an order is left to the sound discretion

of the court, which may draw on its reservoir of equitable powers to grant that relief.[274]  Rule

60(b) "strikes a balance between serving the ends of justice and preserving the finality of

judgments."[275]  Critically, Rule 60(b) relief is available from an order approving a sale

transaction where, as here, there is a fundamental defect in the sales process, including the failure

to adequately disclose transaction terms to the Court.[276]  To that end, "inadequacy of price,

accompanied with other circumstances having a tendency to cause such inadequacy, or

indicating any apparent unfairness or impropriety, will justify setting aside [a] sale."[277]

---

[274]    See, e.g., In re Kirwan, 164 F.3d 1175, 1177-78 (8th Cir. 1999) (noting in Rule 60(b) context, "[g]eneral equitable principles govern the exercise of discretion"); Lasky v. Cont'l Prods. Corp., 804 F.2d 250, 256 (3d Cir. 1986) (60(b)(6) case); Marshall v. Monroe & Sons, Inc., 615 F.2d 1156, 1160 (6th Cir. 1980) (60(b)(1) case); Whitaker v. Assoc. Credit Servs., Inc., 946 F.2d 1222, 1224 (6th Cir. 1991) (60(b)(1) case); Peirre v. Bernuth, 20 F.R.D. 116, 117 (S.D.N.Y. 1956) (describing Rule 60 as "a grand reservoir of equitable power to do justice in a particular case") (60(b)(6) case)) (citation omitted).

[275]    Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).  See also In re Emergency Beacon Corp., 666 F.2d 754, 759 (2d Cir. 1981) (stating Rule 60(b) relief is appropriate "where the judgment may work an extreme and undue hardship"); Bankers Mortgage Co. v. United States, 423 F.2d 73, 77 (5th Cir. 1970), cert. denied, 399 U.S. 927 (1970) (noting Rule 60(b) "preserve[s] the delicate balance between the sanctity of final judgments ... and the incessant command of the court's conscience that justice be done in light of all the facts"); Gey Associates General Partnership v. 310 Associates, L.P., 2002 WL 31426344 (S.D.N.Y. October 29, 2002)) (holding that bankruptcy court did not abuse its discretion in reversing order authorizing breakup fees in sale transaction based on mistake of fact).

[276]    See, e.g., In re Emergency Beacon Corp., 666 F.2d at 761 (vacating a portion of order under Rule 60(b)(6) because full disclosure was not made to court); In re BCD Corp., 119 F.3d 852, 860-62 (10th Cir. 1997) (affirming lower court's decision to set aside original sale when sale order had been entered without a disclosure of sale terms; finding notice and hearing requirements therefore were not met because parties did not have appropriate information to raise informed objections); In re Lawrence, 293 F.3d 615, 624-26 (2d Cir. 2002) (noting bankruptcy court's statement that "[i]f there were misrepresentations at the time of the sale, this Court approved such sale not fully knowing all the salient facts" and remanding to district court to consider Rule 60(b)(3) relief).

[277]    See, e.g., Lamont v. Grass (In re Lamont), 453 F. Supp. 608, 609-10 (N.D.N.Y. 1978) (affirming bankruptcy court's decision to vacate a sale order where it determined a fundamental mistake occurred -- a bidder was not given notice of meeting of creditors where bid was to be considered), aff'd 603 F.2d 213 (2d Cir. 1979).

### 1. COMMITTEE IS ENTITLED TO RULE 60(B)(1) RELIEF AS A RESULT OF MULTIPLE MISTAKES OF FACT

236.    Rule 60(b)(1) permits relief from an order based on mistakes of fact or law that render the sales process defective.  See In re 310 Assocs., 346 F.3d 28, 31 (2d Cir. 2003) (granting relief from sale order where there was a mistake of fact regarding whether party was stalking horse bidder entitled to breakup fees); In re BCD Corp., 119 F. 3d at 860 (setting aside sale where "there was a fundamental defect in the bidding process due to lack of notice to the creditors of the sale").

237.    The circumstances surrounding the Sale Transaction include a number of factual mistakes and fundamental defects that warrant relief from the Sale Order.  The APA ascribed "book values" to the Purchased Assets and documented a balanced transaction, which is consistent with the explanation afforded to the Court.  In point of fact, the transaction contained a $5 billion negotiated discount from book value.[278]

238.    The Court also mistakenly believed it was approving a going concern transaction and averting a liquidation.  The Lehman Sellers described the transaction to their Board, to the Court, and to the Committee as a going-concern transaction where expediency was warranted to avoid a liquidation.  The Sale Motion explained the need to avoid sale of the assets at "*a fraction of the value that will be realized from this transaction*."[279]  On Thursday, Shapiro and the Lehman Sellers had advised the Committee of emergent need to consummate the transaction to avoid a liquidation.  During the Sale Hearing, the Lehman Sellers proffered Ridings' testimony to that effect.  Assets were described in terms of market values, with McDade testifying to an alleged marking that morning of the assets being transferred.  None of these facts were true.

---

[278]    See Part II.A.1 ("Obtaining Board of Directors' Approvals (September 16)"); Part II.A.6 ("Initial Meeting At Weil: Lehman Advises Committee Of Going-Concern, Balanced Transaction (September 18)"); Part II.A.8 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)"); Part II.B.2 ("What Was *Not* Disclosed to Court").

[279]    M. 261 Sale Hearing Tr. at 144:18-24.

239.    Similarly, a mistake with respect to the alleged decline in the market value of the assets underlies the Sale Order.  The Court was under the mistaken impression that the value of the Lehman Sellers' assets (apart from the real estate and data centers) declined from $70 billion to $47.4 billion as a result of market volatility.  However, the Lehman Sellers' marks ($49.9 billion), Barclays' custodian's (BoNY's) marks ($52 billion) and the Movants' expert reports ($51 billion) demonstrate otherwise.  Moreover, unbeknownst to the parties in the courtroom (except for a select group of Barclays and Lehman principals), $47.4 billion was not book value, but instead constituted a combination of liquidation values of the Barclays Repo Collateral (determined by the traders at Seery's direction on Friday) together with the Clearance Box Assets.  The purported market value was not arrived at by using the Lehman Sellers' mark-to-market methods (notwithstanding McDade's testimony to the contrary, Seery's representations to the Committee's professionals, the representations made to the Court, and the text of the APA).[280]

240.    Barclays may maintain the Court authorized the transfer of no less than $50 billion in assets because, in addition to the $47.4 billion, it also authorized the transfer of $3 billion in residential mortgage securities.  Accepting that argument, however, would be authorizing Barclays to "double count" those securities, which also appear on Schedule A (the Barclays Repo Collateral) and/or Schedule B (the Clearance Box Assets) of the Clarification Letter.[281]  Similarly, Klein told Burian the RESIs fell within the $45.5 billion figure, an inclusion reflected on the Manila Folder.[282]  To that end, they fell within the $47.4 billion figure, which

---

[280]    See Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo Collateral (September 19)"), Part II.B.2(C) ("What Was *Not* Disclosed To Court, $47.4 Billion Value Was Not Mark-To-Market Value Or Books Value -- But Instead Was Sum Of Liquidation Value And Clearance Box Assets").

[281]    See M. 156B Zmijewksi Report at ¶ 40.

[282]    See Part II.C.3 ("Klein Conversation:  Barclays Gives Committee Final Word On Salient Terms Of Sale Transaction Before Closing").

reflects the sum of the liquidation value of the Barclays Repo Collateral together with the Clearance Box Assets.[283]

241.    The overstatement of Cure And Compensation Liabilities by approximately $1.8 billion dollars provides another mistake for Rule 60(b) purposes.  The Sept. 16 Balance Sheet ascribed a valuation of $4.25 billion to these liabilities.  The amount initially disclosed to the Court was reduced to $3.5 billion.  During the Sale Hearing, the Court was assured that "Barclays is also agreeing to the same employee compensation agreements."[284]  Even though the Court was reassured this figure was an accurate representation of the compensation liability, Barclays was aware that the $2 billion amount was significantly overstated against the amount accrued on the Lehman Sellers' books.[285]  More egregious mistakes were made with respect to the Cure amounts.  Barclays and the Lehman Sellers represented to the Court that Barclays would assume up to an estimated $1.5 billion in contract cure liabilities.[286]  The Court was never informed, however, that Barclays knew at the time of the Sale Hearing that it was going to pay substantially less.  Indeed, it paid only $238 million.[287]

242.    The impact of the self-styled "Clarification Letter" serves as an additional example of a fundamental mistake of fact regarding the Sale Transaction.  The Clarification Letter was described to the Court as merely clarifying certain provisions of the APA concerning the addition of certain subsidiaries.[288]  It was never disclosed to the Court that the Clarification

[283]    See Part II.B.2(C) ("What Was *Not* Disclosed To Court, $47.4 Billion Value Was Not Mark-To-Market Value Or Books Value -- But Instead Was Sum Of Liquidation Value And Clearance Box Assets").

[284]    M. 261 Sale Hearing Tr. at 47:13-14, 99:22-25.

[285]    See Part II.B.2(G) ("What Was *Not* Disclosed To Court, Overstated Cure And Compensation Liabilities").

[286]    M. 261 Sale Hearing Tr. at 100:1-4.

[287]    See Part II.B.2(G) ("What Was *Not* Disclosed To Court, Overstated Cure and Compensation Liabilities").

[288]    M. 261 Sale Hearing Tr. at 48:5-13.

Letter would materially amend the APA, e.g., by facilitating the transfer of additional value to Barclays through the repurchase transaction, including the $5 billion discount and additional assets that were not required to compensate for a shortfall in the market value of the securities being transferred.[289]

243.    Barclays contends that there is no mistake because the Committee was, in fact, aware of and understood the material terms of the consummated transaction, including the embedded price discount. Barclays is clearly mistaken as to what the Committee knew and understood. In the context of a complex sale transaction, occurring at a rapid pace, Barclays cannot defeat a claim of mutual mistake simply by claiming it understood the transaction. Evidence exists that Barclays did not understand the transaction, including, among other things, losing track of $7 billion in cash in the days after the transaction closed, and the months of delay until Barclays consummated the December and January Settlements.[290] Barclays also admitted during the trial that it took Barclays months to value the assets it received. Moreover, Barclays is mistaken in its belief that it is entitled to receive billions of dollars in value beyond what was disclosed to and approved by the Court.

244.    Barclays next contends that "unilateral" mistakes regarding the "negotiation and comprehension" of transaction documents provide no basis for relief. While Barclays, and perhaps a handful of the Lehman Sellers destined for employment at Barclays, were aware of the $5 billion discount, Barclays cannot point to any evidence showing the Court and the Committee were aware of the discount, given its active concealment from them.

---

[289]    See Part III.E ("Relief Should Be Granted With Respect To Counts I-III Of Committee's Adversary Complaint Because Court Did Not Approve Clarification Letter To Extent It Materially Amended APA").

[290]    See M. 119C LaRocca Dec. ¶¶ 7-12.

245.    Barclays' final argument is that a unilateral mistake is only effective in the context of a Rule 60(b) motion when state law permits reformation of a contact based upon a unilateral mistake -- which relief, Barclays contends, is unavailable under New York law.  The Committee, however, has not asked the Court to reform the Sale Transaction documents.  Instead, it asks the Court to ensure that the consummated transaction mirrors the transaction presented to and approved by the Court.

### 2.    NEWLY DISCOVERED EVIDENCE PROVIDES A BASIS FOR RULE 60(B)(2) RELIEF

246.    Rule 60(b)(2) provides that a court may relieve a party from a final judgment on the basis of newly discovered evidence "which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."  FRCP 60(b)(2).  To vacate a judgment under Rule 60(b)(2), the movant must demonstrate (1) the newly discovered evidence consists of facts that existed at the time of the prior decision; (2) the movant was excusably ignorant of the facts at the time of the original judgment, despite using due diligence to learn of them; (3) the newly discovered evidence is admissible and will likely change the result of the prior ruling; and (4) the newly discovered evidence is not merely cumulative of evidence already offered.  See United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (listing factors); see also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112, 117 (E.D.N.Y. 1993).  The Committee Rule 60 Motion satisfies each of these elements.

247.    As demonstrated above, material facts then in existence were not presented for the Court's consideration at the Sale Hearing prior to the entry of the Sale Order.  In particular, Barclays did not advise the Court of the following facts at the Sale Hearing:

- *Assets Liquidated To Barclays*.  Expedience was not necessary to avoid a liquidation in favor of a balanced, going-concern sale; expedience was used to liquidate assets to Barclays.

- *Immediate Gain for Barclays*.  It was a condition precedent of the Sale Transaction that Barclays realize an immediate, day-one gain.

- ***Five Billion Dollar Discount.*** Barclays and several of the Lehman Sellers' negotiators (who would soon transfer to Barclays) had agreed that the financial assets transferred to Barclays would be "valued" at $5 billion less than the existing book value of those assets.

- ***Use of Barclays Repurchase Agreement To Transfer Discount.*** The APA the Court was approving would not be used to consummate the Sale Transaction. Rather, the transaction would be consummated through termination of the Barclays Repurchase Agreement which would serve as the conduit through which the $5 billion discount would be transferred to Barclays -- a result aided by Barclays unilaterally ignoring the APA and ascribing liquidation values to extinguish the Lehman Sellers' residual interest in the Barclays Repo Collateral.

- ***Transfer of Billions In Additional Assets.*** Additional assets would be transferred to Barclays, ostensibly to fill-in the illusory shortfall in the value of the Purchased Assets, notwithstanding that such transfers had been agreed to prior to the commencement of the Sale Hearing.

- ***Inflated Cure and Compensation Liabilities.*** The Cure and Compensation Liabilities were substantially lower (by approximately $1.8 billion) than the amounts disclosed to the Court. This is true even though the amount of those liabilities played an important role in the Court's approval of the break-up fee and, ultimately, the sale itself.

248.    Moreover, the facts presented fall squarely within the "exceptional circumstances" typically present when Rule 60(b)(2) motions are granted. This is the largest and, arguably, the most complex bankruptcy case in history. The Sale Transaction is of a magnitude never before seen in a bankruptcy case. On top of all these factors, the Sale Transaction was approved and consummated within eight (8) days of the commencement of these cases on an unprecedented and truncated timeline.

### (a)    EVIDENCE WAS NEWLY DISCOVERED

249.    "Evidence is considered 'newly discovered' for purposes of Rule 60(b)(2) if it 'existed at the time of the prior adjudication but … was discovered by the movant only after the entry of judgment.'" Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001) (quoting Walker v. Dep't of Veterans Affairs, 1995 WL 625689, at *1 (S.D.N.Y. Oct. 25, 1995)). See also Ryan v. United States Lines Co., 303 F.2d 430, 434 (2d Cir. 1962) (newly

discovered evidence is in existence at time of earlier disposition but not discovered until after entry of judgment).

250.    Notably, newly discovered evidence includes evidence that, while in existence, was not in the movant's possession prior to the rendering of the judgment.  See Thompson v. County of Franklin, 180 F.R.D. 216, 221 (N.D.N.Y. 1998) (documents in existence prior to the decision, but not actually in movant's possession until after entry of decision, constitute new evidence).

251.    Barclays cannot dispute that the gain imperative (which existed from the inception of the transaction), the negotiated discount, the use of the Barclays Repurchase Agreement to funnel that discount, the attribution of liquidation values to assets instead of a going-concern, book value transaction, the transfers of additional assets and the inflated liabilities, all were in existence at the time of the Sale Hearing.  Instead, Barclays submits they do not constitute new evidence within the parameters of Rule 60(b)(2) because they were known to the Committee.  Specifically, Barclays submits the Committee had enough information at the time of the Sale Hearing to understand the material differences between the consummated transaction and the transaction represented to the Court.  Barclays is wrong.

252.    *First,* Barclays' assertions glaringly ignore its own failure to disclose these material facts to the Court prior to entry of the Sale Order.  Even if the Committee was aware of these facts, that does not excuse Barclays from its obligation as the purchaser (seeking section 363(m) protection) to disclose them to the Court.  Barclays does not deny these facts were not disclosed to the Court.  It merely assumes the Court either was aware of them or considered them irrelevant.

253.    **Second**, to the extent Barclays points to Seery's testimony as supposed support for the proposition that the Committee was aware of all aspects of the consummated transaction (including the $5 billion negotiated discount off the book value of those assets), Seery's trial testimony was repeatedly impeached by his deposition testimony and contrasts sharply with the corroborated and consistent testimony of the Committee representatives.[291]  They testified clearly that the Committee (and its professionals) were not aware of any such discount.[292]

254.    **Third**, the record contains no evidence the Committee knew about any of these facts.  The Committee understood Barclays would realize an economic gain from operating the broker-dealer business -- not that it would realize a day-one gain from an undisclosed discount or the attribution of liquidation valuations to the trading assets, from the September 17 Press Release or otherwise.  Even if the September 17 Press Release was relevant, Kurzweil v. Philip Morris Cos., 1997 U.S. Dist. LEXIS 4451, *13-19 (S.D.N.Y. April 9, 1997), supports the proposition that evidence in the "public record" is not considered automatically to be in the movant's possession -- which is the case here -- when the Committee did not see the Press Release until after the Sale Hearing.[293]

---

[291]    5/3/10 [Seery] 191:19-192:20 (acknowledging that he did not remember what he told the Committee prior to the sale hearing); 5/4/10 [Seery] 115:2-117:9 (acknowledging that he does not remember using the term negotiated settlement value with the Committee), 123:16-25 (same).

[292]    See Part II.A.10 ("Seery's Evolving Testimony Contrasts Sharply With Burian's Consistent, Corroborated Testimony).

[293]    See supra Part II.A.4 ("Barclays' Press Release And Analyst Call"); II.A.7 ("Committee Understood That Barclays' Acquisition Of A Preeminent Broker-Dealer For Relatively Little Consideration Ultimately Would Prove Profitable").

In Kurzweil, the Court found that in light of the large volume of documents to be reviewed and analyzed, Rule 60(b)(2) relief was appropriate even though the new evidence was published in the public record two months before the court's judgment.  The court reasoned that there was a difference between the documents being available versus the movant's actual possession of the documents.  Id.  Accordingly, where the movant did not have actual possession of the evidence, the Rule 60(b)(2) motion should be granted.  Id. at 30.  "[T]he fact that the evidence could have been discovered shortly before the order was entered will not bar plaintiffs from relief pursuant to Rule 60(b)."  Id. at *16.  See also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 836 F. Supp. 112, 119 (E.D.N.Y. 1993) (granting Rule 60(b) motion based on a subsequently acquired affidavit, which the court reasoned was "unusual evidence which a diligent attorney would not expect to be available"); Thompson v. County of Franklin, 180 F.R.D. at 222-23 (granting the

255.    Contrary to Barclays' assertions, a general understanding of haircuts is irrelevant when the Lehman Sellers and Barclays advised the Committee professionals that the values of the financial assets had declined to the point where they were significantly less than the liabilities Barclays would assume (extinguishing any haircut).  The Committee hardly knew the Barclays Repo Collateral had "marks" of over $49 billion (as Barclays argues), when (a) Seery told Burian to "scratch" and "forget" the first description of the Sale Transaction that contained a haircut ($50.64 billion in value against $45.5 billion advanced), (b) Seery and Klein both told the Committee professionals that the $49.9 billion figure on the September 21 Schedules as stale and inaccurate (and should be ignored) and that the marks had declined in value by $5 billion. Moreover, that decline was described to have resulted from market deterioration -- not a negotiated discount or the attribution of liquidation valuations.[294]

256.    Barclays maintains that the Committee was aware of inflated Cure and Compensation Liabilities because of a schedule filed with the Court after the Sale Transaction. That schedule, however, only pertained to Cure Liabilities and was subject to change, especially when the APA afforded *sixty days* to finalize it.[295]  Even A&M, presumably in a better position than the Committee to assess the Cure and Compensation Liabilities, did not begin to realize the fallacy of the $4.25 billion figure under the Sept. Balance Sheet until February 2009 because Barclays had impeded the Lehman Sellers' access to the accounting systems with which it would

---

60(b)(2) motion because movant was not in possession of documents until after entry of decision and concluding movant satisfied the due diligence prong of Rule 60(b)(2) because it was not until after entry of judgment that movant "had any inkling" of existence of new evidence).

[294]    See Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo Collateral (September 19)"); Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)"); Part II.C.2 ("Discrepancies In September 21 Schedules And Other Closing Weekend Events Add To Confusion; Eleventh-Hour Committee Call"); Part II.C.3 ("Klein Conversation:  Barclays Gives Committee Final Word On Salient Terms Of Sale Transaction Before Closing").

[295]    See Part II.B.2(G) ("What Was *Not* Disclosed To Court, Overstated Cure and Compensation Liabilities").

conduct that analysis.  Moreover, the degree to which the estimates ($4.25 billion) and disclosed

amounts ($3.5 billion) differ from the actual amounts (approximately $1.8 billion) is sufficiently

egregious as to confirm their manipulation.

257.    Barclays also contends the Committee became aware of the additional assets (e.g.,

the Clearance Box Assets and the 15c3 Accounts) by reviewing the Clarification Letter.  The

Committee became aware of these additional assets through rushed reviews of drafts of the

Clarification Letter, but, inter alia, (a) no mention of the negotiated $5 billion discount was made

(either to the Committee or in the Clarification Letter), and (b) the Committee professionals were

advised the Clearance Box Assets would be added to compensate for market deterioration -- not

the attribution of liquidation values.[296]

258.    Reading the Clarification Letter provided little insight into the economics of the

Sale Transaction.  When it was given to the Committee professionals, they were told to "figure it

out yourself."[297]  As the Committee professionals testified, simply examining that document shed

no light on the impact of the material changes to the approved transaction.

259.    Moreover, if the Clarification Letter provided the transparency and disclosure

Barclays maintains, then Barclays surely should have disclosed it to the Court for its review and

approval prior to entry of the Sale Order.  It declined to do so.

260.    *Fourth,* the Committee's actions from and after the closing, including, inter alia,

repeated requests for a reconciliation, advising the estates of the need for a final reconciliation

and investigation, and objecting to the December Settlement, clearly confirm the Committee's

lack of understanding.  The Committee did not develop a meaningful understanding of the Sale

---

[296]    See Part II.A.8 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange
(September 19)"); Part II.B.2 ("What Was *Not* Disclosed To Court"); Part II.C.3 ("Klein
Conversation: Barclays Gives Committee Final Word On Salient Terms Of Sale Transaction
Before Closing").

[297]    See supra Part II.B.2(H) ("What Was *Not* Disclosed To Court, Clarification Letter Did Far More
Than Simply "Clarify" APA -- It Materially Amended It").

Transaction until after receiving the Rule 2004 discovery, at which point it filed the Committee Rule 60 Motion. Accordingly, the Committee acted in a timely manner under Rule 60(b).

**(b)**    **COMMITTEE WAS JUSTIFIABLY IGNORANT OF NEW EVIDENCE**

261.    Rule 60(b)(2) relief is available if the movant demonstrates justifiable ignorance of the newly discovered evidence despite due diligence. That showing requires "specific examples of the attempts, if any, undertaken to locate the evidence at an earlier date." Peyser v. Searle Blatt & Co., Ltd., 2000 U.S. Dist. LEXIS 18432, at *8 (S.D.N.Y. Dec. 22, 2000) (citing U.S. v. 710 Main Street, Peekskill, 753. F. Supp. 121, 127 (S.D.N.Y 1990)).[298]

262.    The Committee asked the Debtors and the Court (albeit unsuccessfully) to adjourn the Sale Hearing. Prior to the Sale Hearing, the Committee professionals attended meetings at Weil on September 18 and conferred with the Lehman Sellers on Thursday, September 18, and Friday, September 19.[299]

263.    Following the Sale Hearing, the Committee professionals gathered what information they could given their limited access to the meetings taking place. The conversations that took place that weekend with Barclays and the Lehman Sellers included representations regarding a going-concern, balanced transaction (or one that favored the estates) that comported with representations made to the Court at the Sale Hearing and in prior conversations among the Committee professionals and the Lehman Sellers. The Committee

---

[298]    See Nichols v. Alker, 235 F.2d 246 (2d Cir. 1956) (requiring a showing of "substantial evidence . . . which was not obtainable by due diligence in time to present it . . . in the original . . . proceedings"); see also 11 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2859, at 303-04 (2d ed. 1995) ("The rule speaks of 'due diligence,' and the moving party must show why he did not have the evidence at the time of the trial or in time to move under Rule 59(b)").

[299]    See Part II.A.3 ("Appointment Of Committee And Retention Of Professionals (September 17)"); Part II.A.5 ("Bid Procedures Hearing (September 17)"); Part II.A.6 ("Initial Meeting At Weil: Lehman Advises Committee Of Going-Concern, Balanced Transaction (September 18)"); Part II.A.9 ("Burian-Seery Telephone Calls Confirm Going-Concern, Even Exchange (September 19)").

professionals advised at the conclusion of the closing weekend that the Committee fully expected to receive a full reconciliation substantiating the explanations they received, which it pursued vigorously immediately after the closing.[300]

264.    When that reconciliation was not forthcoming, the Committee promptly intensified its investigative efforts.  Once the Committee became aware of the potential existence of new evidence, it joined in Court-authorized discovery.[301]

265.    Lastly, even if the Court finds the Committee has not satisfied the due diligence rule, the facts presented warrant relief to avoid a miscarriage of justice.[302]  Absent relief, Barclays will retain billions in estate assets even though the Court neither reviewed nor approved those aspects of the Sale Transaction because of inadequate disclosure.

### (c)    NEWLY DISCOVERED EVIDENCE WOULD PRODUCE DIFFERENT RESULT

266.    The disclosure of discounts and liquidation values would have changed the outcome by, among other things, substantiating existing objections, opening the door for purchasers to better Barclays' liquidation bid, or incentivizing the estates to liquidate the assets for their own account over a longer period of time.  Those facts, added to the revelation that Barclays withheld material terms of the Sale Transaction from the Court, would have removed

---

[300]    See Part II.C ("Drinking From A Fire Hose: Closing Weekend").

[301]    See Part II.D ("Trust -- But Verify:  Pursuit Of A Reconciliation Verifying Lehman Sellers And Barclays' Representation (September 2008 Through December 2008"); Part II.E ("Attempts At Cooperation Devolve Into Litigation (December 2008 Through March 2009").

[302]    A narrow exception to the due diligence rule has been recognized to prevent a grave miscarriage of justice even though the "newly discovered evidence" supporting that order would have been available to the moving party at trial had that party exercised proper diligence.  Ferrell v. Trailmobile, Inc., 223 F.2d 697, 698 (5th Cir. 1955).  Courts in this Circuit have recognized the Ferrell doctrine, characterizing it as a "narrow exception." Ope Shipping, Ltd. v. Underwriters at Lloyds, 100 F.R.D. 428, 432 (S.D.N.Y. 1983) ("a new trial may be ordered to prevent a grave miscarriage of justice even though the 'newly discovered evidence' supporting that order would have been available to the moving party at trial had that party exercised proper diligence").  Specifically, this exception has been "restricted to cases in which the evidence is practically conclusive." Id.

any basis to enter the Sale Order or make a section 363(m) finding. This is especially true given

the high quality of a significant portion of the securities in question and the "flight to quality"

those securities experienced in the week when the transaction was negotiated and

consummated.[303]  The trial testimony also confirms the N.Y. Fed was interested in an orderly

wind down for the broker-dealer.  There is no evidence it would not have continued to finance

the broker-dealer while the Lehman Sellers liquidated their assets over a longer period of time.[304]

267.    The evidence adduced during the Rule 60(b) litigation was substantial (e.g., more

than 30 trial days and 2000 exhibits in evidence).  A section 363 proceeding along a timeline

consistent with the applicable rules may not involve the same level of information or inquiry.

But the disclosure of a few simple facts, e.g., the accurate book value of the assets, the attribution

of liquidation values, block discounts, inflated liabilities, and circumvention of section 559 of the

---

[303]    See 5/6/10 [Burian] 115:24-116:20 ("[A]t the time, our understanding was, this was the most
liquid portion of the Lehman book.  These were the cherry-picked assets, the agency, the Fed
securities and other items.  Clearly, if someone turns around and says I'm going to sell fifty
billion dollars of assets in the next X period of time, any market would move and there would be
a discount applied to that market.  But if you're asking me whether or not someone can hold a
portfolio, I think twenty to twenty-five, twenty-seven billion of this were government securities,
agencies and other . . . anyone can say, if I'm going to hold these in the going-concern, sell and
buy, which is what broker-dealers do, over the course of a reasonable period of time, would I
have significant difference between the going-concern value and dumping it in the market?  I
would have expected to see a significant difference . . . . And frankly, you know, at the time we're
conversing, governments and a lot of these securities had gone up in price.  There was a flight to
quality . . . .  But over the five days, Monday through Friday . . . a lot of these assets had . . .
ticked up in value").

[304]    9/7/10 [Leventhal] 7:21-8:23 ("In order to do that [wind down the broker-dealer in an orderly
manner], it was important that the broker-dealer be financed . . . .  In order to do that financing,
we were going to use the primary dealer credit facility, the PDCF, which had been established by
the Federal Reserve . . . back in March of 2008 during the time when Bear Stearns was in distress.
Basically, the plan was that we would continue to finance the broker-dealer, fully secured using
its collateral, to allow for an orderly wind-down.  Obviously, things changed when Barclays
reappeared and was interested in acquiring assets of the broker-dealer and assuming liabilities
because at that point, it didn't make sense for the Fed to sort of be facilitating that transaction by
financing the broker-dealer . . . .  The concept was we were going to finance for an unwind, an
orderly unwind to ensure stability in the markets.  But once there was an acquisition, it became
the purchaser's obligation to ensure that the value of the assets were maintained, pending
closing").

Bankruptcy Code, would have avoided an involved and complex litigation.  Instead, Barclays

and a handful of Lehman Sellers' representatives silently witnessed an inaccurate record and then

blocked access to pertinent information.

### 3.    RULE 60(B)(3) AND RULE 60(B)(6) RELIEF ARE AVAILABLE ALTERNATIVELY AS RESULT OF MISREPRESENTATIONS MADE TO COURT

268.    Misrepresentations, whether intentional or unintentional, provide a basis for Rule

60(b)(3) relief.[305]  Rule 60(b)(3) relief is appropriate where key terms of a sale order are

misrepresented to the bankruptcy court which then approves the sale based on those

misrepresentations.  See, e.g., In re Lawrence, 293 F.3d at 625-26 (after sale of debtor's

securities of biotech company to consortium of undisclosed purchasers, debtors learned

purchasers were insiders with advance knowledge of a lucrative discovery announced thirty days

later; bankruptcy court reopened sale order so information could be presented to the court;

according to Second Circuit, scenario (i.e., purchasers withholding information from sellers and

court that could not have been discovered in diligence process) provided precise situation

warranting Rule 60(b)(3) relief).

269.    Lawrence noted that the fraud alleged by the defendants "prevented the issue of

fairness [of the sale price] from being fully explored during the Sale Order Proceedings."  Id. at

626.  Here, as in Lawrence, the newly discovered evidence together with Barclays'

misrepresentations, both to the Committee and to the Court, prevented the Committee and the

Court from fully exploring the fairness of the Sale Transaction.

---

[305]    See Londsdorf v. Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations").  Relief is appropriate under Rule 60(b)(3) where the misrepresentations "foreclosed full and fair preparation or presentation of [the movant's] case." Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988); State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004); Atkinson v. Prudential Prop. Co., Inc., 43 F.3d 367, 372-73 (8th Cir. 1994) (requiring a showing "that the opposing party engaged in a fraud or misrepresentation that prevented the movant from fully and fairly presenting its case").

270.     Barclays argues that the Committee did not "plead with particularity" any fraud, misrepresentation or misconduct by Barclays.  Assuming _arguendo_ that Barclays appropriately states the applicable standard, the record is replete with misrepresentations concerning the Sale Transaction that warrant Rule 60(b)(3) relief.

271.     Barclays and the Lehman Sellers presented the Sale Transaction to the Court and the Committee as a balanced, going-concern transaction, where the book value of the assets equaled liabilities or favored the estates.  The Court and the Committee also were told that the asset values (marked that morning) had declined because of market deterioration to $47.4 billion and that Cure and Compensation Liabilities totaled not less than $3.5 billion.  Indeed, Committee professionals were told over the closing weekend that they "made $2 billion" from these developments by Seery and Klein, each of whom corroborated these misrepresentations and failed to advise the Committee representatives of the negotiated discount or the actual reason for this decline (_i.e._, a radical change in valuation methodology).

272.     These disclosures disguised both Barclays' insistence on a gain and a $5 billion discount and the fact that represented values were the result of negotiations, not market fluctuations.  Also concealed was Barclays' insistence on a gain from the transaction's inception, its ensuring that gain by receiving a negotiated $5 billion discount off the Purchased Assets' book value, and a modification of the standards for valuing assets from book value to liquidation value.  In light of these misrepresentations and omissions, the Court was not in a position to fully evaluate the Sale Transaction.

273.     Barclays makes no attempt to directly address the myriad misrepresentations, instead arguing against Rule 60(b)(3)'s applicability because Barclays purportedly did not act as an "opposing party."  However, the misrepresentations at issue here justify relief under subsection (b)(3) or (b)(6) of Rule 60, regardless of Barclays' status at the time they were made.  Indeed, cases have granted Rule 60(b)(3) relief even where a debtor, who supported the

transaction, later claimed the transaction terms were misrepresented to it.  See In re Lawrence,

293 F.3d at 625.  From the inception, the Committee questioned the Sale Transaction, and

indeed, at the Sale Hearing, did not expressly support the transaction.  As a result, Barclays

cannot so quickly claim that it is not effectively adverse (i.e., "an opposing party") to the

Committee.

274.    Moreover, more than once, Barclays itself sought relief from the Sale Order under

Rule 60, implicitly acknowledging its status as a party.  Having taken this position when it

proves beneficial, Barclays is now hard-pressed to disclaim its status as a party in the context of

the Movants' Rule 60 Motion.

275.    Notably, in the Rule 60(b)(3) context, "[i]n order to demonstrate that [Barclays]

substantially interfered with [the Committee's] ability to fully and fairly present [its] case, [the

Committee] need not show that the outcome would have been different absent [Barclay's]

conduct." Catskill Dev., L.L.C. v. Park Place Enter. Corp., 286 F. Supp. 2d 309, 316 (S.D.N.Y.

2003).  Instead, it need only show that "misconduct substantially interfered with [the

Committee's] ability to prepare the case and defend against the motion fully and fairly."  Id.

(citations omitted) (granting relief from order denying plaintiff's summary judgment claims for

tortuous interference when additional evidence was discovered that had not been produced in

discovery even though court acknowledged that reopening the judgment "*appears unlikely to*

*alter the result in this case*") (emphasis added).  Here, with the newly discovered information,

the objectors would have been able to fully and fairly present substantiated objections.  Catskill

suggests that movants need not show, under Rule 60(b)(3), that the Court would have sustained

those objections, only that concealment materially interfered with their ability to prosecute them.

276.    Lastly, Rule 60(b)(6) relief is appropriate when relief under clauses (1) through

(5) of Rule 60(b) is not applicable.  The Committee has pleaded its entitlement to Rule 60(b)(6)

relief in the alternative to the extent that Rule 60(b)(3) is not applicable because Barclays is not

an "opposing party."[306]

### 4.    COMMITTEE REQUESTED RULE 60 RELIEF ON TIMELY BASIS (RULE 60(C))

277.    Rule 60(c)(1) requires that motions be filed within a reasonable time from the

entry of the relevant order, but in no event more than one year later under Rule 60(b)(1)-

(b)(3).[307]  Courts look to a variety of factors when determining what constitutes "reasonable,"

including the complexity of the proceedings, length and the circumstances of delay in filing,

prejudice to the opposing party, and equitable considerations.[308]

278.    Courts make "reasonable time" determinations on a case-by-case basis,

considering the particular facts and circumstances of each case.  The Committee's Rule 60

Motion (dated September 15, 2009) satisfies Rule 60(c) since it was filed within a year of the

entry of the Sale Order (September 20, 2008).  See e.g., Pierce Assocs., Inc. v. Nemours Found.,

865 F.2d 530, 548 (3d Cir. 1989) (finding 364 day delay in filing Rule 60(b) motion reasonable

---

[306]    See Scherer v. City of New York, 2007 WL 2710100, *4 (S.D.N.Y. Sept. 7, 2007); Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C., 1998 WL 372356, *2 (E.D.N.Y. July 2, 1998) (noting "grounds asserted for relief pursuant to Rule 60(b)(6) must be other than those recognized in clauses (1) through (5) of the rule….").

[307]    See Fed. R. Civ. P. 60(c)(1) ("A motion under rule 60(b) must be made within a reasonable time -- and for reasons (1), (2) and (3), no more than a year after the entry of the judgment or order or the date of the proceeding").

[308]    See, e.g., In re G.A.D., Inc., 340 F.3d 331, 334 (6th Cir. 2003) (evaluating "length and circumstances of delay in filing, prejudice to opposing party by reason of the delay, and circumstances warranting equitable relief"); In re Rome Family Corp., 407 B.R. 65, 80 (Bankr. D. Vt. 2009) (entertaining rule 60(b)(4) memorandum in light of the unforeseen shift in ownership of the asset, the failure of key parties to fulfill their statutory duties, the amount of time that elapsed between the sale and the determination of ownership, and the overall equities of the case).  See also PRC Harris, Inc. v. Boeing Co., 700 F.2d 894, 897 (2d Cir. 1983); R.N. v. Suffield Bd. of Educ., 194 F.R.D. 49, 51 (D. Conn. 2000) (finding motion was filed in a reasonable time where defendant tried to resolve the issue and filed the motion as soon as it realized its efforts were to no avail); Kirwan, 164 F.3d at 1178 (considering the sequence of relevant events and finding it was not inappropriate for bankruptcy court to reconsider its prior orders); see also In re Woods, 173 F.3d 770, 780-81 (10th Cir. 1999) (finding that inadvertence did not result from lack of diligence because outside forces involved in timing of motion).

in the context of a "particularly complex matter" where the parties acted "with great haste"); In re
New England Mut. Life Ins. Co. Sales Practices Litigation, 204 F.R.D. 6, 11 (D. Mass. 2001)
(finding reasonable time depends on the facts of each case); U.S. v. Forty-Eight Thousand, Five
Hundred Ninety-Five Dollars, 705 F.2d 909, 912-913 (7th Cir. 1983) (finding 49 week delay in
filing motion reasonable where movant was precluded from acting to protect his interests);
Caraway v. Sain, 23 F.R.D. 657, 660 (N.D. Fla. 1959) (finding delay of 58 days after entry of
judgment reasonable); In re Cremidas' Estate, 14 F.R.D. 15, 18 (D. Alaska 1953) (finding that
delay of three years does not bar motion under Federal rule); Marquette Corp. v. Priester, 234 F
.Supp. 799, 802 (D.C.S.C. 1964) (finding delay of 15 months to file 60(b) motion under (b)(4)
and (b)(6) reasonable); see also United States v. Holtzman, 762 F.2d 720, 725 (9th Cir. 1985)
(finding five year delay in filing motion under Rule 60(b) permissible where litigant reasonably
interpreted an injunction to authorize litigant's conduct and timely relief was sought upon receipt
of notice to the contrary); J.D. Pharmaceutical Distrib., Inc. v. Save-On Drugs & Cosmetics
Corp., 893 F.2d 1201, 1207-08 (11th Cir. 1990) (finding seven month delay allowable and
granting relief from judgment because party was never served with requests for admissions or
motion for summary judgment).

279.    Barclays contends the Committee Rule 60 Motion is untimely because each of the
mistakes of fact and misrepresentations were known to the Committee long before the Rule 60(b)
Motions were filed.  Barclays' defense not only mischaracterizes the state of the Committee's
knowledge, but it ignores the history of the Committee's relentless efforts to obtain a
reconciliation of the Sale Transaction that squared with Barclay's and the Lehman Sellers'
representations.  It also ignores the barriers that Barclays imposed to the Committee's discovery
of the actual facts.  As the timeline below illustrates, the Committee requested relief on a timely
basis:



## DRINKING FROM A FIREHOSE

### *Wednesday, September 17 Through Saturday, September 22*

**Wednesday, September 17**
Committee Appointed; Retains Professionals; Bid Procedures Hearing; Request For Adjournment Denied

**Thursday, September 18**
Committee Advised Of Balanced, Going-Concern Transaction And Emergent Nature To Avoid Liquidation; Assets Based on Book Valuation

**Friday, September 19**
Sirey Advises That Assets Are Valued At $47.4 Billion Against $45.5 of Liabilities; Tells Burian to "Forget" About Description Where Assets Are valued At $50.64 Billion Versus $45.5 Billion in Liabilities; Never Mentions Liquidation Valuation or That $45.5 Billion Is Liquidation Bid

**Friday, September 19**
Sirey Meets Traders To Ascertain Liquidation Value of $45.5 Billion

**Friday, September 19**
Sale Hearing; Court Advised that Market Deterioration leads to $47.4 Billion Value, Line-by-Line Marking Was Performed That Morning; "Transaction Is Better Alternative Than A Liquidation

**Sunday, September 21**
Committee Told To Ignore $49.9 Billion Market Value Listed In Schedules As Stale, Out Of Date, Not Accurate

**Monday, September 22**
Klein Explains Market Decline to $45.5 Billion, Addition Of $1.9 Billion Box; Never Mentions Liquidation Valuation; Advises That Creditors Are "Ahead By $2 Plus Billions"; Committee Demands Reconciliation

**Monday, September 22**
Transaction Closes; Burian Immediately Advises Committee Of Klein Conversation

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Post-Trial Memorandum of Law of Official Committee of Unsecured Creditors – November 22, 2010

146



## TRUST -- BUT VERIFY
### September Through December 2008

**Thursday, September 25, 10:28 AM** — Committee Reiterates Request To Lehman Sellers For Asset Schedules

**Monday, September 29** — Weil And A&M Meet With Tonucci And Kirk; Spin of "Stale Marks" Continues

**Wednesday, October 8** — LBHI And Advisors Including A&M Host Routine Meeting With Committee And Professionals; Reiterate Need To Focus Attempts to Educate Committee Counsel To Approach LBHI Counsel To Escalate

**Late October 2008** — Counsel To LBHI And Committee December Counsel Advise Barclays' Counsel That Committee Is Still Investigating Sale Transaction

**December Settlement** — Committee Files Limited Objection To Settlement; Clearly Enunciates Concerns Over $5 Billion, Closing Weekend Conversation With Klein

**Thursday, September 25, 7:07 PM** — Lehman Sellers Transmit Schedules That Contain Same Figures ($49.9 Billion) That Seery And Klein Told Committee To Ignore As Stale; Disclaim Finality

**Wednesday, October 1** — Houlihan Meets With A&M

**Monday, October 13** — Committee Counsel Requests Meeting With LBHI Counsel To Discuss Sale Transaction

**October-December** — Unable To Access Information Because Barclays Controls Data Systems—Lawsuit Threatened

**Friday, November 21** — Meeting among counsel to LBHI and Committee to discuss Sale Transaction

**December Settlement** — New Values Given To Trading Assets ($49.7 Billion) in Leventhal Decl.; Committee Appears And Explains Issues; All Rights Are Reserved (Confirmed By Barclays); Cooperation Suggested



## ATTEMPTS AT COOPERATION DEVOLVE INTO LITIGATION
### December 2008 Through May 2009

**Monday, December 22**
Hearing On December Settlement; Court Indicates Barclays And Committee Should Cooperate On Information Requests

**Friday, December 26**
Committee Sends 1st Informal Document Request To Barclays And DTCC

**Tuesday, January 13, 2009**
"Meet and Confer" (Call) Among Barclays And Committee Regarding Requests For Reconciliation

**Tuesday, February 3**
In-person Meeting Between Barclays And Committee Regarding Requests For Reconciliation

**Tuesday, February 10**
Committee Sends 2nd Letter Requesting Reconciliation Information

**Wednesday, February 11**
Court Approves January Settlement And Reiterates Reservation Of Rights Concerning Committee Investigation

**Friday, March 20**
Barclays Provides Initial Production To Committee (Cannot Review)

**Monday, May 18**
LBHI Files "Rule 2004 Motion" Seeking Order Compelling Discovery

**Thursday, May 28**
Barclays Produces Documents To Committee In Electronic Format

**Friday, June 5**
Committee And LBI Join In LBHI's Rule 2004 Motion

**Friday, June 5**
Barclays Objects To Rule 2004 Motion And Committee's Joinder

**Thursday, June 25**
Court Enters Order Authorizing Discovery

**Tuesday, September 15**
Committee, LBHI And LBI File Rule 60 Motions

In re Lehman Brothers Holdings Inc. – Chapter 11 Case No. 08-13555 (JMP)
Post-Trial Memorandum of Law of Official Committee of Unsecured Creditors – November 22, 2010

148

280.    Barclays argues the Court should ignore the Committee's persistent attempts to obtain a reconciliation and instead deny the Rule 60 Motions because they were not filed immediately after the Sale Transaction closed. At the time the transaction closed, in the early hours of Monday, September 22, the Committee (a) had just received an explanation from Barclays which was accepted by the Lehman Sellers and which squared with the Seery discussion on Friday, September 19 and the representations made to the Court, (b) had no ability (as Barclays and Seery admitted) to diligence that information and (c) demanded a reconciliation. The Committee's posture in the weeks that followed reflected that position; it did not necessarily accept the explanations provided, and instead pursued verification. Even if the Committee professionals developed hypotheses following the closing, they lacked any information to corroborate them.[309]

281.    That position is not surprising considering the complexities inherent in the transaction which were exacerbated by the pace with which it proceeded. Barclays has conceded on numerous occasions that the Sale Transaction was incredibly complex.[310] This fact is corroborated by the confusion expressed by third parties with better access to information than the Committee.[311]

---

[309]    See, e.g., Part II.D.5 ("Committee Did Not Await A Market Move Before Returning To Court To Challenge Transaction").

[310]    See, e.g., M. 119 [Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, dated December 5, 2008] at ¶¶ 3, 5-13; M. 259 [Objection of Barclays Capital Inc. to Debtors' Motion for an Order Under Rule 2004 Authorizing Discovery of Barclays Capital Inc., dated June 5, 2009] at ¶¶ 44-48.

[311]    See M. 403 [email chain including email from Stephanie Heller to Robert Macallister, et al., re: Confidential – Activity on September 18, dated September 29, 2008] ("Obviously this is a lot to sort through . . . I have asked some of our investigators to help go through these transactions . . . . I am somewhat confused by the first chart . . ."); M. 399 [email chain including email from Robert Macallister to Stephanie Heller, et al., re: Re: New File, dated September 30, 2008] ("JPM is not able to tell whether particular securities successfully moved to BONY/BarCap."); M. 401 [email chain including email from Patrick Macardle to Shari Leventhal, et al., re: Triparty Repos, dated October 1, 2008] (internal Fed email noting "there are approximately 12,000 transactions (CUSIP numbers) in this test group I have gotten through almost 6,000 of these numbers and have been able to match less than half. I can not explain why there are transactions on the

282.    Barclays' own actions confirm the state of confusion that existed after the Sale

Transaction's closing.  Between September 19 and September 23, Barclays was unaware that $7

billion in cash was not in its accounts.  It took Barclays and the SIPA Trustee three months to

negotiate a settlement with respect to the missing funds.  It took the SIPA Trustee, Barclays and

the DTCC four months to negotiate the January Settlement concerning undelivered securities.  It

took Barclays and the SIPA Trustee sixteen months (until December 2009) to negotiate their

settlement concerning the transfers of customer accounts.  Barclays admitted during the trial that

it took months to value the assets transferred to it in the Sale Transaction.  Barclays cannot

maintain that a party in interest could gather sufficient information and conduct the appropriate

diligence to mount a lawsuit seeking the recovery of more than $5 billion in that time period, i.e.,

before the end of October 2008.

283.    Moreover, from and after the filing of the Bay Harbour Appeal, had the

Committee requested Rule 60 relief, Barclays likely would have argued (incorrectly, given the

lack of overlap in the appeal and the Rule 60 Motions) that the appeal divested the Court of

jurisdiction.  Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 107 (2d Cir. 1981)

(holding that filing of the notice of appeal divested the district court of jurisdiction to entertain

the 60(b) motion); see also In re Charles & Lillian Brown's Hotel, Inc., 93 B.R. 49, 52 (Bankr.

S.D.N.Y. 1988) ("This divestiture of jurisdiction has been held to apply to motions pursuant to

FRCP 60(b)"); In re McLean Industries, Inc., 76 B.R. 291, 294 (Bankr. S.D.N.Y. 1987) (same).

_____

Barclays/DTC list that can not be found on the Chase/DTC list and why there are transactions on
the Chase/DTC list that are not found on the Barclays/DTC list" and "I think Pat's final paragraph
is so telling about how messed up this is"); M. 400 [email chain including email from Stephanie
Heller to Niki Poulos re: Re: your question, dated October 1, 2008] ("Chase and Barclays are still
fighting about what happened that night . . . . Chase has provided a lot of data and so has
Barclays.  However Chase's data stops at the Lehman DTC account and so there is a bit of a black
hole in the middle of all of this"); M. 402 [email chain including email from Jeffrey Moore to
Shari Leventhal re: Transaction Detail, dated October 6, 2008] ("In comparing the list of
securities that Barclays says it received and the securities that JPMC says it delivered we find
there is little overlap between the two. Consequently, it is not obvious what Barclays has actually
received from JPMC").

284.    Barclays also cannot complain of the Committee's alleged delay, considering its

own role in causing any such delay.  Rule 60(b) relief is warranted when the movant can

"demonstrate 'that circumstances beyond its control prevented timely action to protect its

interests.'"  In re International Fibercom, Inc., 503 F.3d 933, 945 (9th Cir. 2007) (quoting Alpine

Land & Reservoir, 984 F.2d 1047, 1049 (9th Cir. 1993)); U.S. v. Baus, 834 F.2d 1114, 1123 (1st

Cir. 1987) (finding it would "result in manifest unfairness to deny relief ... on account of

[movant's] failure to seek Rule 60(b)(6) relief prior to the government's 1985 collection effort,

when (1) the government lulled guarantors into delaying through its promises, (2) the

government itself delayed two years and (3) the government apparently breached its obligations

under settlement agreement").

285.    Here, it bears noting that Barclays never provided the simple (but detailed)

reconciliation showing the assets transferred, their marked value, and the date and methods for

those marks.  Indeed, Barclays was free *at any time* -- when advised by counsel to the

Committee and counsel to LBHI that the Committee was investigating the transaction in late

October 2008, at the December Settlement Hearing, at the January Settlement Hearing, during

the meetings in January and February 2009, or in response to either the December 26 or February

10 Request -- to advise the Committee (a) of its position concerning the value of the assets

transferred and (b) of its position concerning whether the Committee's investigation was moot

given the passage of the reconsideration and appeal periods.  It did nothing.

286.    Moreover, the Committee and Barclays negotiated for nearly four months (from

December 2008 through March 2009) for the production of documents.  Even after Barclays

finally produced documents, the limited production was mostly unintelligible and did little to

advance the Committee's understanding of the Sale Transaction.  It took Barclays two more

months to agree to produce the documents electronically.  The in-person meetings were equally

ineffective. While the participants provided color on the transaction, they did not provide the

reconciliation the Committee had been demanding for months and specifically requested in the

December 26 Request.  Barclays also objected to LBHI's request for Rule 2004 discovery (and

the Committee's joinder thereto).

287.    Barclays also complains it will be prejudiced if the Court grants the Committee

Rule 60 Motion.  Delay alone, however, does not substantiate an argument based on prejudice.[312]

To the extent that Barclays' claims of prejudice are based on its reliance on a transaction that was

neither disclosed to nor authorized by the Court, they fall flat.

288.    Lastly, Barclays argues the Sale Transaction has closed and cannot be unwound.

The Committee has not asked to unwind the Sale Transaction in its entirety.  Instead, it insists

that the consummated transaction conform to and reflect the transaction reviewed and approved

by the Court.  While Barclays complains it would not have closed on the represented transaction

advocated by Movants, it should not have procured the Sale Order on the record supporting that

transaction.  The Court should decline Barclays' invitation to uphold the Sale Order based on a

phantom record known only to Barclays and a few compromised Lehman executives.

### 5.    COMMITTEE AND LBHI ESTATE ARE ENTITLED TO AFFIRMATIVE RELIEF  UNDER RULE 60 AND UNDER SECTIONS 549 AND 559 OF BANKRUPTCY CODE

289.    Barclays asserts that the Committee Rule 60 Motion fails because Rule 60 does

not authorize "affirmative relief" beyond simply setting aside a judgment.  Once again, Barclays

mischaracterizes the relief the Committee requests and the available scope of Rule 60(b) relief.

---

[312]    See, e.g., Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983) (holding district court abused its discretion in denying Rule 60(b) relief from a default judgment and holding "delay alone is not a sufficient basis for establishing prejudice") (citing Feliciano v. Reliant Tooling Co., Ltd., 691 F.2d 653, 656-57 (3d Cir. 1982)); see also, In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 127-28 (3d Cir. 1999) (holding prejudice must "be something more closely tied to the merits of the issue"); Pratt v. Philbrook, 109 F.3d 18, 22 (1st Cir. 1997) ("it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent's default."); Smith v. Widman Trucking & Excavating, Inc., 627 F.2d 792, 798 (7th Cir. 1980) (holding delay and possibility that party will have to return money received in judgment not sufficient prejudice to deny Rule 60(b) motion).

290.    Rule 60(b) grants the courts broad discretion to fashion appropriate relief, including a "grand reservoir of equitable power to do justice in a particular case." State Bank of Southern Utah v. Gledhill (In re Gledhill), 76 F.3d 1070, 1079-80 (10th Cir. 1996) (court could grant equitable relief and reinstitute automatic stay under Rule 60(b) even though such relief typically requires an adversary proceeding) (citing Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963), cert. denied, 423 U.S. 1079 (1979)). This means courts have "broad authority to relieve a party from a final judgment 'upon such terms as are just.'" Id. (quoting Rule 60(b)(6)).

291.    The Committee is not, as Barclays claims, seeking to rewrite or modify the Sale Order or the APA.  The Committee is simply seeking to enforce the terms of the Sale Transaction as presented to and approved by the Court, which is entirely proper in a Rule 60(b) motion.  Barclays should not receive assets in excess of the value represented ($47.4 billion) or credit for liabilities it never assumed.  Nor should it have the ability to point to the Clarification Letter, which was never reviewed nor approved, as a basis to keep those assets. See, e.g., In re Polycel Liquidation, Inc., No. 00-62780, 2007 WL 77336, at *9 (D.N.J. Jan. 8, 2007) (rejecting argument that 363 sale order contained sufficiently broad language to incorporate certain injection molds in response to third party that requested post-closing relief from order under Rule 60(b) claiming ownership of the molds; ordering molds be returned to the debtors because the Court was not reforming asset purchase agreement but rather was enforcing deal as disclosed to the Court).

292.    Critically, Barclays ignores the Committee's Adversary Complaint requesting declaratory relief that the Court did not approve the Clarification Letter (which purported to document several of these undisclosed, additional transfers).  It also ignores sections 549 and 559 of the Bankruptcy Code, which provide relief for unauthorized transfers and the recovery of the haircut with respect to the Barclays Repurchase Agreement.  To the extent relief from the Sale

153

Order is granted, or the Sale Order otherwise is set aside, the transfers effectuated pursuant to the Sale Order no longer can be considered "authorized" and instead are subject to recovery for the benefit of the estate.

293.    Barclays suggests the Committee (or LBHI) is not entitled to relief under section 549 of the Bankruptcy Code because the mandate rule bars any argument that Barclays' receipt of $5 billion in additional assets was not authorized.  As discussed below, Barclays' suggestion that the Committee, who was a not a party to the Bay Harbour Appeal, is barred by the mandate rule from challenging a portion of the Sale Transaction or pursuing issues that were never pressed before the appellate courts is without merit.[313]

294.    Barclays further argues the Committee cannot seek relief from selective portions of the Clarification Letter.  The Committee, however, seeks enforcement of section 549 of the Bankruptcy Code to recover assets transferred to Barclays through the Clarification Letter -- which the Committee never signed and which the Court never approved.[314]  That result ensures the transaction consummated resembles the one reviewed and approved by the Court -- precisely the type of relief contemplated by section 549.[315]

295.    Barclays also argues that the Movants are not entitled to relief under section 559 of the Bankruptcy Code when (i) the Clarification Letter provides for the transfer of **all** of the Barclays Repo Collateral (and only LBI was party to the Barclays Repurchase Agreement); (ii) there is no excess Barclays Repo Collateral; (iii) the December Settlement bars the section 559

---

[313]    See Part III.F ("Neither Mandate Rule Nor Estoppel Or Waiver Doctrines Provide Barclays With Valid Defenses To Committee's Rule 60(b) Motion And Adversary Complaint").

[314]    See Part III.E ("Relief Should Be Granted With Respect To Counts I-III Of Committee's Adversary Complaint Because Court Did Not Approve Clarification Letter To Extent It Materially Amended APA").

[315]    See In re Contr. Tech., Ltd., 343 B.R. 573, 584 (Bankr. S.D. Tex. 2006) (principal purpose of sections 549 and 550 is to assure creditors "that the estate's fiduciary complies with applicable distribution law and Court orders").  See also In re Centennial Textiles, Inc., 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (holding section 550 permits a trustee to "restore the estate to the financial condition it would have enjoyed if the [unauthorized] transfer had not occurred").

claims; and (iv) the mandate rule, estoppel and waiver doctrines bar the claim. Each of these purported defenses fails.

296. *First*, the Committee vigorously disputes the Clarification Letter's validity, including its provisions incorporating the Barclays Repurchase Agreement into the transaction, voiding its prior termination, terminating it a second time, and waiving the estates' rights to excess collateral. The Court neither reviewed nor approved the Clarification Letter, and Barclays never advised the Court that the Barclays Repurchase Agreement would be involved in the transaction or utilized as the convenient vehicle for transferring the previously agreed to (but undisclosed) $5 billion discount to Barclays. Indeed, Barclays cannot rely on the Clarification Letter to eviscerate fundamental estate protections.[316]

297. The Clarification Letter was designed, among other things, to eliminate the estates' rights under section 559 of the Bankruptcy Code. Barclays had issued the Termination Notice on Friday, September 19, but subsequently rescinded it. The rescission of that notice presumably was unnecessary because the Barclays Repurchase Agreement would terminate on the following Monday, September 22, at the closing. Nonetheless, the Clarification Letter (a) rescinds the Termination Notice (which was issued prior to the markdown of the repo assets); (b) terminates the Barclays Repurchase Agreement; and (c) waives the estates' rights to section 559 excess through releases. That result only could be accomplished within the confines of the Clarification Letter (and its release provisions).[317] Absent the illicit Clarification Letter,

---

[316] Cf. In re TWA, 261 B.R. 103, 113-18 (Bankr. D. Del. 2001) (contractual provision which purports to waive debtor's right to reject contract under the Bankruptcy Code violates public policy and is not enforceable); see also Bank of China v. Huang (In re Huang), 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code.").

[317] See Part II.B.2 ("What Was *Not* Disclosed To Court"); Part III.E ("Relief Should Be Granted With Respect To Counts I-III Of Committee's Adversary Complaint Because Court Did Not Approve Clarification Letter To Extent It Materially Amended APA").

Barclays has no rights to the excess collateral. The reason that the prior Termination Notice had

to be annulled is because it was apparently issued prior to markdown of the repo assets.

298.    **Second**, no less than $4.9 billion of excess value does exist that should be

returned to the estates beyond the financing extended to LBI under the Barclays Repurchase

Agreement ($45.0 billion). Barclays' own custodial agent, BoNY, valued the Barclays Repo

Collateral on a contemporaneous basis (September 19) at approximately $52 billion. The

Lehman Sellers' mark-to-market valuation for the repo collateral was approximately $50 billion

as of September 19, and the September 21 Schedules reflected a value of $49.9 billion. A

number of Barclays' executives (previously Lehman employees), including Lowitt, and Kelly, all

testified to a $5 billion discount being applied to the value of the repo collateral.[318] The only

valuation that supports Barclays' position that the haircut has evaporated is the liquidation

valuation that the Lehman Sellers' traders prepared at Seery's direction (i.e., $45.5 billion), which

was entirely consistent with the same "haircut" summary Jason Yeng (Barclays) prepared that

morning, and Barclays' acquisition balance sheet.[319]

299.    By its own terms, section 559 applies to more than liquidations, by stating

expressly that it applies irrespective "if any such assets are disposed of on the date of

liquidation." 11 U.S.C. § 559. No case cited in the Barclays Brief provides otherwise. Also,

section 562 of the Bankruptcy Code provides that value should be measured by "commercially

reasonable determinants of value" on the liquidation *or termination* date, and if not available on

---

[318]    See Part II.B.2(D) ("What Was *Not* Disclosed To Court, Book, Or Mark-To-Market Value Of
Securities Transferred To Barclays Was Approximately $50 Billion -- A Fact Known To Barclays
Prior To Sale Hearing").

Barclays' own expert, Professor Pfleiderer, acknowledges an excess of at least $500 million,
which increases by an additional approximately $2 billion if the collateral that Barclays received
in the December Settlement is valued properly at approximately $7 billion and not the
approximately $5 billion that Barclays agreed to accept in the December Settlement.

[319]    See Part II.A.8 ("Seery Directs Lehman Traders To Ascertain Liquidation Values For Repo
Collateral (September 19)").

such date, "as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value." 11 U.S.C. § 562. Here, commercially reasonably determinants of value exist, including, among others, Barclays' own collateral agent, BoNY, or the value ascribed by JPMC, as an independent agent for LBI and the Federal Reserve.

300. **Third**, the Order approving the December Settlement specifically provides that it will not "bind, be collateral estoppel or otherwise prejudice any other matter in this case." The Committee pressed its objection at the hearing on the December Settlement, indicated it did not accept the statements made in connection with the settlement, and enjoys the protections of an order that expressly precluded any collateral estoppel effect of those factual statements. Barclays confirmed its acceptance of that reservation of rights on the record, agreed specifically that parties remain free to pursue all claims relating to the overall Sale Transaction, and in so doing waived any argument that the December Settlement released the Committee's rights. Having stated on the record that the Committee's objection was not even "germane" to the settlement, Barclays is hard pressed to argue now that the Committee's rights were waived by it.[320]

301. **Lastly,** the procedural roadblocks that Barclays seeks to erect to prevent the Court from hearing the merits of the Committee's claims are misplaced. As discussed more fully below, the mandate rule and the estoppel and waiver doctrines have no applicability to the Committee Rule 60 Motion, including arguments relating to section 559 of the Bankruptcy Code, especially when the Bay Harbour Appeal did not examine this issue.[321]

---

[320]     See Part II.D.6 ("December Settlement Motion: Pattern Of Inadequate Disclosure Continues As Barclays Sits Silently").

[321]     See Part III.F ("Neither Mandate Rule Nor Estoppel Or Waiver Doctrines Provide Barclays With Valid Defenses To Committee's Rule 60(b) Motion And Adversary Complaint").

### D.    EVEN IF RULE 60 DOES NOT PROVIDE A BASIS FOR RELIEF, COURT RETAINS POWER TO MODIFY ITS PRIOR ORDER WITHOUT RULE 60

302.    The Second Circuit has recognized that a bankruptcy court may reconsider an order as an exercise of its inherent authority -- even after the time for appeals has lapsed for "good reason."  See Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.), 596 F.2d 1092, 1100 (2d Cir. 1979) (affirming bankruptcy court's grant of relief from a financing order based on the bankruptcy court's inherent power:  "a district court sitting in bankruptcy could in its discretion rehear a case even after the expiration of the period allowed for appeal 'if no intervening rights will be prejudiced by its action' and that if the court rehears the petition 'upon the merits', the time to appeal would run from its grant or denial").

303.    Texlon has been interpreted as recognizing "'practical utility' in a rule that allowed for bankruptcy orders to be vacated or modified where 'subsequent events presented during administration' showed the need for such relief."  In re Old Carco LLC, 423 B.R. 40, 49 (Bankr. S.D.N.Y. 2010).[322]  To that end, the "decision whether to reconsider an order, judgment or proceeding under its inherent power is within the court's discretion."  Id. at 49 (citing Texlon, 596 F.2d at 1100).

304.    Ample cause outside of Rule 60 exists to grant the Committee relief from the Sale Order and hold Barclays to the terms of the Sale Transaction described to and approved by the Court.  Grossly inadequate disclosure -- that failed to identify a $5 billion discount, inflated liabilities, unilateral changes to valuation standards (from book to liquidation value), Barclays' insistence on a day-one gain and 11th hour demands for additional assets -- incurably infected the sale process.  Barclays' own recalcitrance in the discovery process, which caused the Committee,

---

[322]    Courts in this Circuit have continued to recognize the validity of the Texlon rule.  See id. (discussing Texlon doctrine, but finding facts did not warrant modification of order); In re Blutrich Herman & Miller, 227 B.R. 53, 60 (Bankr. S.D.N.Y. 1998) (holding that "[n]otwithstanding the usual jurisprudence under Rule 60(b), it is also well established that bankruptcy courts, as courts of equity, have the power to reconsider, modify or vacate previously-entered orders unless intervening rights have vested in the interim in reliance on those orders").

LBHI and the SIPA Trustee months of delay in reconstructing the Sale Transaction, self-servingly hid the considerable gains Barclays realized. Accordingly, to the extent that Rule 60(b) relief is not available, the Committee submits the Court still should use its inherent power to grant the requested relief from the Sale Order.

### E.    RELIEF SHOULD BE GRANTED WITH RESPECT TO COUNTS I-III OF COMMITTEE'S ADVERSARY COMPLAINT BECAUSE COURT DID NOT APPROVE CLARIFICATION LETTER TO EXTENT IT MATERIALLY AMENDED APA

305.    Consistent with the representation made to the Court that the Clarification Letter served only to clarify the Purchased Assets definition to accommodate for the treatment of certain subsidiaries, the Sale Order only approved the Clarification Letter to the extent it clarified and supplemented the APA.[323]  The Clarification Letter, however, materially amended the APA without the Court's approval.  While the last draft in existence prior to the Sale Hearing (M. 137) tracks to some extent the transaction description enunciated to the Court during the Sale Hearing, the next draft (M. 53) differs dramatically and speaks, for the first time, specifically to the issue of amending the APA and transferring some of these assets (e.g., the Clearance Box Assets).[324]

306.    Among other things, the Clarification Letter effectuated the transfer to Barclays of the $5 billion discount as well as the radical change from book to liquidation valuation of the trading assets and transferred billions in additional assets, e.g., the 15c3 Accounts, Clearance Box Assets and the Margin Assets.  Because the Court was not apprised of these modifications and was never shown a copy of the document that purported to reflect them (apart from it being filed on the docket after closing), the Court it never approved the Clarification Letter.

---

[323]    See M. 261 Sale Hearing Tr. at 48:5-10; M. 257 Sale Order at 1.

[324]    See M. 3 Clarification Letter (noting it "*amends* the [APA] in certain respects"); 8/31/10 [Lewkow] 150:4-25 ("[Q] . . . Now did there come a time when a draft of the clarification letter added the term 'amend'?  [A] Yes, there did . . . .  I think at some point there were sufficient changes that we thought it was . . . not all in the nature of a clarification.  And I think we added the words 'amendment,' 'supplement'. . . .  [Q] And there came a point where you chose the word 'amend' to describe what it was the clarification letter was doing, correct?  [A] Well, as one of the three verbs . . . in that clause, yes").

307.    The relief the Committee seeks would not "unwind" the transaction.  It merely requires Barclays to abide by the representations made to the Court.  Instead of receiving all the Schedule A and Schedule B Assets, the Clearance Box Assets, a conditional right to the 15c3 Accounts and the Margin Assets, Barclays only receives what was disclosed in connection with the represented transaction:  financial assets with a fair value as of the closing date of the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other discounts.

### F.    NEITHER MANDATE RULE NOR ESTOPPEL OR WAIVER DOCTRINES PROVIDE BARCLAYS WITH VALID DEFENSES TO COMMITTEE'S RULE 60(B) MOTION AND ADVERSARY COMPLAINT

308.    Barclays argues that the Committee's alleged failure to appeal the Sale Order bars its Rule 60 Motion and Adversary Complaint based on several inapplicable legal doctrines -- the mandate rule and theories of estoppel and waiver.  Barclays cannot legitimately assert any of these defenses.[325]

### 1.    MANDATE RULE DOES NOT APPLY WHEN COMMITTEE WAS NOT PARTY TO BAY HARBOUR APPEAL, ISSUE DECIDED HAD NO BEARING ON RELIEF REQUESTED, AND NEW EVIDENCE EXCEPTION APPLIES

309.    On September 21, 2008, Bay Harbour appealed the Sale Order to the United States District Court for the District of New York, arguing the Court failed to consider whether Barclays was complicit in transfers totaling $8 billion dollars from Lehman Brothers Inc. (Europe) to Lehman entities in North America -- funds Bay Harbour styled the "Defalcated

---

[325]    The Committee notes that Barclays must differentiate among the Committee, LBHI and the SIPA Trustee.  Indeed, circumstances which Barclays argues justify defeating LBHI's and the SIPA Trustee's Rule 60 Motions (which the Committee does not acknowledge) simply do not apply to the Committee.  The Committee neither approved the Sale Transaction, signed the Clarification Letter, joined in the Bay Harbour Appeal (defined below), or joined as a party to the December Settlement Agreement.  Instead, the Committee vigilantly and persistently pursued a reconciliation of the transaction, even bringing these issues to the Court's attention in connection with the Limited Objection to the December Settlement.

Funds."[326]  According to Barclays, the District Court decision affirming the Sale Order (the

"District Court Decision") bars the Committee from "making claims ... that **could have been**

**raised** on appeal but were not (such as the lack of a valuation cap or a 'wash' requirement).

Barclays also submits the mandate rule bars a challenge from the Committee to the value it

received because the Committee could have joined Bay Harbour" in its appeal.  Barclays is

wrong.

310.    *First,* the District Court Decision does not contain an express mandate that

precludes any of the Committee's arguments in the Rule 60 Motion or Adversary Complaint.

Courts are careful to note that "from the proposition that the trial court must adhere to the

decision of the appellate court there is the corollary that upon remand the trial court may

consider matters not expressly or implicitly part of the decision of the court of appeals." U.S. v.

Cirami, 563 F.2d 26, 33 (2d Cir. 1977) (citation omitted); see also New England Ins. Co. v.

Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003) ("Put simply, the law of

the case does not extend to issues an appellate court did not address.") (internal quotations

omitted).  Here, the District Court Decision does not contain an express mandate that precludes

any of the Committee's arguments in its Rule 60(b) Motion or Adversary Complaint.

311.    Even if there were an express, limited mandate, the mandate rule still would not

apply against the Committee, which was not a party to the appeal.  Other than filing a Counter-

Statement and Counter-Designation of Additional Items To Be Included In The Appeal the

Committee did not participate in any manner in the Bay Harbour Appeal.[327]

---

[326]    M. 404 (Appellants' Opening Brief, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings,
Inc., 08-cv-08869-DLC (S.D.N.Y. Nov. 14, 2008)) at pp. 4, 8-10.

[327]    See BCI 398.

312.    The only case Barclays cites that applied the mandate rule to a non-party is In re Marlar, 288 B.R. 823 (Bankr. W.D. Ark. 2003).  In that case, however, the appellate court (Eighth Circuit) had expressly outlined a mandate, i.e., it "direct[ed] the bankruptcy court not to satisfy the bankruptcy claim of [the party against whom the mandate rule was later applied], directly or indirectly."  Id. at 826 (internal citation omitted).  Because it had a direct and specific mandate, Marlar cannot be read to imply that the mandate rule generally applies to third parties who were not parties to the appeal.  Indeed, the Marlar mandate specifically applied to a third party.[328]

313.    *Second*, the District Court Decision focused on a narrow issue, i.e., the allegedly Defalcated Funds and transfers among LBIE and other Lehman entities, which has no bearing on the Committee's Rule 60 Motion.  The District Court Decision found that this Court "carefully considered Appellants' claims about the Defalcated Funds" and considered them "irrelevant to Barclays's good faith status."  Based on that narrow finding, the District Court affirmed and dismissed the appeal.[329]  The District Court's mandate is not so broad as to find that Barclay's status as a good faith purchaser is unassailable for other reasons (apart from the Defalcated Funds), such as a failure to disclose material aspects of the Sale Transaction and receiving an unauthorized windfall.

314.    *Third,* the mandate rule does not apply to arguments that the District Court did not decide either explicitly or necessarily by implication.  Notably absent from the District Court's decision is any discussion of inadequate disclosure, a negotiated $5 billion discount,

---

[328]    The only other case Barclays relies on for this proposition did not apply the mandate rule.  Instead, it applied res judicata to prevent parties from raising "the same claims that were [previously] litigated and lost."  In re W.T. Grant Co., 20 B.R. 186, 189 (S.D.N.Y. 1982).  Barclays does not even attempt to argue that the doctrine of res judicata applies to the Committee's claims.

[329]    M. 409 [District Court Opinion, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., 08-cv-08869-DLC (S.D.N.Y. March 13, 2009)] at 17, 20.

inflated liabilities, or the Clarification Letter (including whether it was approved by the Court).
Nor does the ruling that this Court did not err in decreeing Barclays a good faith purchaser after
considering the issue of the Defalcated Funds necessarily imply that the transaction
consummated is consistent with the transaction represented to and approved by the Court.  The
Committee's Rule 60(b) Motion and Adversary Complaint does not concern the Defalcated
Funds.

315.    **Fourth,** Barclays' attempts, based on inapposite case law, to argue that the
mandate rule extends beyond the issues **actually decided** to any issue that **could have been
decided** by the appellate court, fails.  Barclays may point to U.S. v. Stanley, 54 F.3d 103 (2d Cir.
1995) and two other cases relying on Stanley.  See U.S. v. Vidal, 136 Fed. Appx. 438, 440 (2d
Cir. 2005); U.S. v. Zvi, 25 Fed. Appx. 34, 36 (2d. Cir. 1995).  All three cases denied
reconsideration of a **second** appeal.  They also did not examine a Rule 60(b) motion filed in a
bankruptcy case by an entity not a party to the appeal.

316.    Moreover, Stanley supports the proposition that the mandate rule depends upon
the scope of the mandate.  Stanley recognized it had "identified a narrow issue for remand" and
held that the mandate rule barred the appellants' argument because it went beyond that narrow
mandate.  Stanley, 54 F.3d at 108; see also Zvi, 25 Fed. Appx. at 36-37 ("The authority granted
to the district court under the mandate did not extend to" issue raised on remand and
subsequently appealed).[330]

317.    Here, the Committee did not appeal the Sale Order and does not seek relief on
remand within the confines of an order from the appellate court specifically identifying a narrow
mandate.  Instead, the Committee is litigating claims in an ongoing bankruptcy case following an

---

[330]    Stanley and its progeny are further distinguishable because their reasoning rests on waiver where
the same party "decided on his first appeal to forego" the argument being barred.  Stanley, 54
F.3d at 107 ("[T]he mandate rule forecloses litigation of issues decided by the district court but
foregone on appeal **or otherwise waived**") (quoting U.S. v. Bell, 5 F.3d 64, 66 (4th Cir. 1993))
(emphasis added).  That reasoning has no application to a non-party to the appeal.

unrelated appeal.  Under these circumstances, the mandate rule bars only matters "expressly or implicitly part of the decision of the court of appeals."  Cirami, 563 F.2d at 32 (noting this would be the case "at a later stage in the litigation where the case is again before the trial court not on remand but, for example, on a new motion to vacate the judgment"); see also U.S. v. Minicone, 994 F.2d 86, 89 (2d Cir. 1993) ("Of course, there is a corollary to [the mandate] rule – if an issue was not part of the appellate decision, a trial court may consider the matter.").[331]

318.    *Fifth,* even if the District Court decision did contain a mandate, the instant facts warrant application of the new evidence exception to the mandate rule, i.e., the recognized exception that when the party relies on new evidence not available on appeal, the mandate rule does not apply.  See U.S. v. Argentina, 2008 WL 510556, at *1 (2d Cir. Feb. 26, 2008); Highland Financial Corp., 216 B.R. 109, 114 (Bankr. S.D.N.Y. 1997) (noting an exception given "the availability of substantially different evidence at the trial on remand").[332]

319.    Evidence newly discovered through Rule 2004 discovery is sufficient to invoke this exception.  Here, it would be inequitable to apply the mandate rule against the Committee (and accept the argument that the Committee should have joined in the Bay Harbour appeal) because the Committee had no ability to develop a sufficient record to lodge an appeal during the relevant period.

---

[331]    The other cases Barclays relies on for the proposition that the mandate rule should apply to matters the District Court did not decide have been cited out of context.  For example, in Fogel, the court notes the mandate rule barred an argument because it was "decided by necessary implication" in a prior appeal.  Fogel v. Chestnutt, 668 F.2d 100, 109-10 (2d Cir. 1981) (barring argument that statute had no private cause of action after previously upholding a verdict on very same cause of action).  Seese involved a Rule 60(b) motion filed by a party after appeal and denial of a petition for certiorari to the Supreme Court.  Seese v. Volkswagenwerk, 679 F.2d 336, 337 (3d Cir. 1982).  Seese is distinguishable because "the basis of the rule 60(b) motion was before [that] court and the Supreme Court and thus could not be considered by the district court."  Id. at n. 1.  By contrast, the Committee's claims were never presented to the District Court for review and consideration.

[332]    See Part III.C.2 ("Newly Discovered Evidence Provides A Basis For Rule 60(b)(2) Relief").

320.     It is telling that in the Bay Harbour Appeal, Barclays did not dispute the representations of value given to the Court to which the Committee now seeks to hold Barclays. The LBHI's appellate brief stated "[b]y the time the Sale Hearing was conducted, the value of the securities to be transferred to Barclays declined from $72 billion at the beginning of that week to $47.4 billion and the liabilities to be assumed by Barclays declined from $68 billion to $45.5 billion."[333]  Barclays did not dispute that explanation of the value (as it does now).  In fact, Barclays cited to the same testimony to note that "the Debtors explained changes to the proposed APA, including an hour-long discussion off the record, followed by a re-explanation of the terms to the Bankruptcy Court."[334]

### 2.   JUDICIAL ESTOPPEL HAS NO APPLICATION WHEN COMMITTEE HAS TAKEN CONSISTENT POSITIONS

321.     "A party wishing to invoke judicial estoppel must show that '(1) the party against whom the estoppel is asserted took *an inconsistent position* in a prior proceeding and (2) that position was adopted by the first tribunal in some manner.'" Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art, 324 Fed. Appx. 117, 119 (2d Cir. 2009) (quoting Rodal v. Anasthesia Group of Onondaga, PC., 369 F.3d 113, 118 (2d Cir. 2004)) (emphasis added).

322.     Since the Committee's position on the Sale Transaction has been consistent and unwavering throughout, the doctrine of judicial estoppel cannot defeat the Committee Rule 60 Motion or its Adversary Complaint.  The position the Committee has taken consistently with respect to the Sale Transaction (enunciated at the Sale Hearing) is that it lacked sufficient information.  After the Sale Hearing, the Committee appeared in connection with the December

---

[333]   M. 405 [Answering Brief of Lehman Brothers Holdings Inc., *et al.*, in Opposition to Bay Harbour Appeal, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., 08-cv-08869-DLC (S.D.N.Y. Dec. 12, 2008)] at 12.

[334]   M. 406 [Appellee Barclays Capital Inc.'s Memorandum of Law in Opposition to Bay Harbour *Et Al.*'s Appeal, Bay Harbour Mgmt., L.C. v. Lehman Brothers Holdings, Inc., 08-cv-08869-DLC (S.D.N.Y. Dec. 12, 2008)] at 10.

Settlement, ***opposing its approval*** because it did not want the settlement to have any collateral

estoppel effect on its examination of the Sale Transaction.  Lastly, the Committee appeared in

support of LBHI's Rule 2004 Motion, further stressing the need for information to reach the truth

about assets transferred.

323.    The doctrine of judicial estoppel requires that the Committee take inconsistent

positions ***on the facts*** and ***in court***.  To that end, Barclays cannot bolster its argument by

mischaracterizing or citing to select portions of the trial transcript concerning statements made

by the Committee or its representatives out of court.  See Rodal v. Anesthesia Group of

Onondaga, P.C., 369 at 118 ("The doctrine of judicial estoppel prevents a party from asserting a

factual position in one legal proceeding that is contrary to a position that it successfully advanced

in another proceeding.") (emphasis added).  Throughout these proceedings, the Committee has

consistently taken the position that further investigation of the Sale Transaction was warranted

well after the alleged out-of-court "positions" highlighted by Barclays.

324.    When applying the doctrine of judicial estoppel, "a court must carefully consider

the contexts in which [even] apparently contradictory statements are made to determine if there

is, in fact, direct and irreconcilable contradiction."  Id. at 119.  Because there is no contradiction

between the Committee's prior position that further factual examination of the Sale Transaction

was required (i.e., both at the Sale Hearing, in connection with the December Settlement,  in

connection with the January Settlement and in connection with LBHI's Rule 2004 Motion) and

its current, substantive positions as articulated in the Committee Rule 60 Motion, judicial

estoppel does not apply.

325.    Moreover, Barclays does not identify any applicable authority suggesting the

Committee is estopped from bringing its Rule 60 Motion or Adversary Complaint.  Barclays

Brief cites cases that applied judicial estoppel to prevent a debtor from asserting a claim it failed

to disclose in prior bankruptcy proceedings.  Barclays uses the cases to argue that silence or

inaction can lead to judicial estoppel.  But that argument ignores the fact that courts considered

"silence" tantamount to taking an affirmative position in the context of those cases because a

debtor in bankruptcy is required by law to disclose all claims.[335]

**3.**  **NEITHER EQUITABLE ESTOPPEL NOR WAIVER PROVIDES A SUSTAINABLE DEFENSE WHEN THE COMMITTEE WAS NOT AWARE OF MATERIAL DISCREPANCIES AND DID NOT STAY SILENT WITH RESPECT TO ITS RECONCILIATION REQUESTS**

326.    Estoppel applies when "1) the party to be estopped makes a misrepresentation of

fact to the other party with reason to believe that the other party will rely upon it; 2) and the other

party reasonably relies upon it; 3) to her detriment."  Kosakaw v. New Rochelle Radiology

Assocs., 274 F.3d 706, 725 (2d Cir. 2001) (citations omitted).  "Since equitable estoppel is an

affirmative defense, [the party asserting the defense] has the burden of establishing its elements."

In re Roundabout Theatre Co., 131 B.R. 14, 17 (S.D.N.Y. 1991).  Barclays cannot satisfy any of

these elements.

327.    As the cases relied on by Barclays explain, waiver "requires the intentional

relinquishment of a known right."  U.S. v. Quinones, 511 F.3d 289, 321 n. 21 (2d Cir. 2007)

(internal quotations omitted).  "[T]he doctrine of waiver demands conscientiousness, not

clairvoyance, from parties."  Hawknet, Ltd. v. Overseas Shipping Agencies, 590 F.3d 87, 92 (2d

Cir. 2009).  Similarly, with respect to equitable estoppel, "[o]ne cannot waive or acquiesce in a

wrong while ignorant that it had been committed.  Current suspicion and rumor are not enough.

---

[335]    See Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416-20 (3d Cir. 1998) (describing statutes and case law requiring full disclosure of claims in bankruptcy as supporting application of judicial estoppel); Negron v. Weiss, No. 06 CV 1288, 2006 WL 2792769 at *4 (E.D.N.Y. Sept. 27, 2006) (same); MDFC Loan Corp. v. First Shopping Center Partnership, No. 93 C 4481, 1996 WL 99909 at *7 (N.D. Ill. Mar. 1, 1996) (same); Griggs v. Marion Hospital Corp., No. 2004-CV-4241, 2005 WL 1802249 at *2 (S.D. Ill. Jul. 28, 2005) (same).

As Oneida states, a former debtor's "failure to list its claim against the [opposing party] worked in opposition to the preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect."  Oneida, 848 F.2d at 419.  This narrow application of judicial estoppel to after-asserted claims undisclosed in a prior bankruptcy has no application here, especially when the Committee hardly can be said to have "remained silent" on this issue.

There must be knowledge of facts which will enable the party to take effectual action.  Nothing short of this will do."  Pence v. Langdon, 99 U.S. 578, 581 (1878).

328.    *First,* neither waiver nor equitable estoppel apply when the Committee was not aware of the material facts Barclays failed to disclose in connection with the Sale Transaction until after Rule 2004 discovery commenced.  See, e.g., In re Varat Enters., Inc., 81 F.3d 1310, 1317 (4th Cir. 1996) (noting party will only be estopped where it "knew the relevant facts").  The Committee's words and actions throughout the relevant time period show both that it did ***not*** remain silent and that it did ***not*** have access to the relevant facts.[336]

329.    *Second,* the random information to which Barclays has pointed throughout the trial, e.g., the September 17 Press Release and Analyst Call and the October 8 Presentation, hardly afforded the Committee sufficient knowledge to make its current claims (or reveal that knowledge), especially given the representations made to the Court and the Committee and the blatant failures to make adequate disclosures.  Barclays' extensive reliance on the September and October emails among the Committee's financial advisors and attorneys is misplaced.  The emails do not reveal knowledge of the material terms of the Sale Transaction.  Instead they confirm a motivation to timely pursue a reconciliation.[337]

330.    Barclays is not aided by the fact that the Committee was concerned, but did not have sufficient information to act on these concerns.  Indeed, as the Supreme Court explained in

---

[336]    The other two cases cited in the Barclays Brief for the proposition that silence supports a finding of estoppel are clearly distinguishable.  In re Colarusso, 280 B.R. 548, 560 (Bankr. D. Mass 2002), the estopped party bid to purchase property from the estate -- thereby acknowledging the estate owned that property -- before later attempting to claim part of the property through adverse possession.  In re Newport Offshore, Ltd., 86 B.R. 325, 326 (Bankr. D.R.I. 1988) involved a party's calculated scheme to clandestinely insert a set-off claim by deception so severe it led the bankruptcy court to hold the party in contempt.

[337]    See Part II.D.4 ("Emails Among Committee Financial Advisors And Attorneys Demonstrate Committee's Persistence; Both Committee And LBHI Counsel Advise Barclays' Counsel Of Committee's Concerns In October 2008").

Pence, suspicions and concerns do not amount to sufficient knowledge to support the doctrine of waiver or acquiescence.  99 U.S. at 581.

331.    More recently, Aramony v. United Way of America, 28 F. Supp. 2d 147, 171-72 (S.D.N.Y. 1998), rev'd on other grounds, 191 F.3d 140 (2d Cir. 1999), emphasized the irrelevance of suspicion.  When the United Way withheld benefits from its former CEO who had engaged in fraud, the former CEO argued the organization had waived its right to do so by votes of confidence and its rejection of the CEO's offer to resign.  The court disagreed, even though the United Way knew at the time that the CEO had caused the organization to purchase property for his personal use and had charged the organization for personal expenses:  "[the United Way was] informed at the time that these charges were the result of 'apparently inadvertent procedural admissions.'"  Id.  (citation to record omitted).  The court found no waiver because the organization's suspicions were assuaged by a plausible explanation and it was unaware of all of the facts of the CEO's misconduct.  Id.; see also Wisser Co. v. Mobil Oil Corp., 730 F.2d 54, 59-60 (2d Cir. 1984) (refusing to find waiver where "any delay here was to confirm what [the party] previously merely suspected").

332.    **Third,** the Committee hardly stayed "silent."  After advising the Court it lacked sufficient information to reach an informed position during the Sale Hearing, post-closing, its diligence continued persistently.  Accordingly, this diligence defeats equitable estoppel.  See In re Rockefeller Ctr. Props., 266 B.R. 52, 60 (S.D.N.Y. 2001) (noting that estoppel requires "conduct which amounts to a false representation or concealment of material facts" and refusing to find estoppel where the party against whom estoppel was urged "actually requested further discovery to learn [the] very facts [at issue]").

333.    The defense of waiver similarly is inapplicable.  Cf. Richstone v. Chubb Colonial Life Ins., 988 F.Supp. 401, 403 (S.D.N.Y. 1997) (holding party did not waive right of removal even after filing motion to dismiss in state court where "the grounds raised in [the party's] motion

169

to dismiss in state court do not indicate that [the party] had any reason to know at that point that the action was removable").

334.    The hearing on the December Settlement Motion is especially important in this regard, where the Court, the SIPA Trustee, LBHI and Barclays all agreed that approval of the settlement had no bearing on future claims.  It was within that context that the Committee argued the Limited Objection to the Court, seeking further investigation of the value of the assets transferred to Barclays pursuant to the Sale Transaction.  Notably, Barclays' position was enunciated at that hearing *after* it filed its responsive briefs in the Bay Harbour Appeal, yet it made no mention of its current arguments concerning failure to seek reconsideration and appeal.

## IV.    CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court enter an order:

(A) granting the Committee Rule 60 Motion,

(B) denying the Barclays Enforcement Motion,

(C) awarding judgment in the Committee's favor with respect to Counts I-III of the Committee's Adversary Complaint (i.e., Count I (Declaratory Judgment), Count II (Accounting) and Count III (Attorneys Fees)),

(D) adopting the Committee's Proposed Findings annexed hereto as Exhibit A, and

(E) awarding the Committee such other and further relief as the Court deems appropriate.

Dated:  November 22, 2010
        New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN LLP


/s/ JAMES C. TECCE_____
Susheel Kirpalani
James C. Tecce
Eric M. Kay
Robert K. Dakis

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone No.:  (212) 849-7000

*Special Counsel to Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al.*