**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS INC.,                    Case No. 08-01420 (JMP) (SIPA)

Debtor.

**UBS AG'S MEMORANDUM OF LAW (I) IN OPPOSITION TO SIPA TRUSTEE'S
MOTION FOR AN ORDER ENFORCING THE AUTOMATIC STAY AND
COMPELLING PAYMENT AND (II) IN SUPPORT OF UBS AG'S CROSSMOTION
FOR AN ORDER ENFORCING THE PARTIES' AGREEMENT**

Edwin E. Smith
Joseph L. Kociubes
Joshua Dorchak
**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, New York  10022
(212) 705-7000

Attorneys for UBS AG

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................... 1

PROCEDURAL NOTE ................................................................................... 4

FACTS ........................................................................................................... 5

ARGUMENT .................................................................................................. 8

    I.    THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE AS A
        MATTER OF NEW YORK CONTRACT LAW. .................................. 9

        A.    The ISDA Setoff Clause Is Valid Under New York Contract Law. .......... 9

        B.    The CSA Setoff Clause Does Not Trump the ISDA Setoff Clause. ........ 10

                1.    The ISDA Setoff Clause Is Not Inconsistent with the CSA
                        Setoff Clause. .................................................................... 11

                2.    The Payable Is Not Exempt from Setoff As a "Pledge." ............. 13

    II.    THE ISDA SETOFF CLAUSE IS NOT LIMITED BY THE SETOFF
        STATUTE. ..................................................................................... 15

    III.    THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE
        UNDER THE SETOFF STATUTE. ................................................. 18

        A.    Mutuality Is Not Lacking Due to Different Capacities. .......................... 19

        B.    Mutuality Is Not Lacking Due to the "Triangular" Structure of the
            ISDA Setoff Clause. ................................................................ 21

                1.    UBS and LBI Have Mutual Debts and Claims, as a Matter
                        of New York Law and Bankruptcy Law. ................................. 21

                2.    UBS and LBI Created Mutual Debts and Claims By
                        Contract. ........................................................................... 23

    IV.    THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE
        UNDER THE SAFE HARBOR OF SECTION 561,
        NOTWITHSTANDING THE SETOFF STATUTE AND THE
        AUTOMATIC STAY. ..................................................................... 28

    V.    THE EXERCISE OF THE ISDA SETOFF DID NOT VIOLATE THE
        AUTOMATIC STAY. ..................................................................... 30

    VI.    THE ISDA SETOFF CLAUSE IS NOT CONTRARY TO EQUITY OR
        POLICY CONCERNS. ................................................................... 31

IN SUPPORT OF CROSS-MOTION ............................................................. 33

CONCLUSION ............................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*200 E. 87th St. Assocs. v. MTS, Inc.*,
  793 F. Supp. 1237 (S.D.N.Y. 1992)........................................................................12

*Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*,
  No. 95 Civ. 4856, 1997 WL 53172 (S.D.N.Y. Feb. 10, 1997)............................................9, 10

*Beekman Paper Co. v. St. Theresa Props., Inc. (In re St. Theresa Props., Inc.)*,
  152 B.R. 852 (Bankr. S.D.N.Y. 1993)........................................................................14

*Bloor v. Shapiro*,
  32 B.R. 993 (S.D.N.Y. 1983)........................................................................27

*Bohack Corp. v. Borden, Inc.*,
  599 F.2d 1160 (2d Cir. 1979)........................................................................4, 32

*Boston Ins. Co. v. Nogg (In re Yale Express Sys., Inc.)*,
  362 F.2d 111 (2d Cir. 1966)........................................................................27

*Bromfield v. Trinidad Nat'l Inv. Co.*,
  36 F.2d 646 (10th Cir. 1929) ........................................................................25, 26, 31

*Butner v. United States*,
  440 U.S. 48 (1979)........................................................................15, 18

*Chem. Bank N.Y. Trust Co. v. Kheel (In re Seatrade Corp.)*,
  369 F.2d 845 (2d Cir. 1966)........................................................................4, 33

*Citizens Bank of Md. v. Strumpf*,
  516 U.S. 16 (1995)........................................................................16, 30

*Cole v. Mfrs. Trust Co.*,
  299 N.Y.S. 418 (N.Y. Sup. Ct., Kings Cnty. 1937)........................................................................14

*Commerce Bank, N.A. v. Chrysler Realty Corp.*,
  244 F.3d 777 (10th Cir. 2001) ........................................................................23, 24

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)........................................................................29

*Dep't of Hous. & Urban Dev. v. Rucker*,
  535 U.S. 125 (2002)........................................................................29

*Depositors Trust Co. of Augusta v. Frati Enters., Inc.*,
   590 F.2d 377 (1st Cir. 1979)....................................................................23, 26, 28

*Eckles v. Petco Inc. (In re Balducci Oil Co.)*,
   33 B.R. 847 (Bankr. D. Colo. 1983) ...............................................................24, 25

*Equibank v. Lang Mach. Co. (In re Lang Mach. Corp.)*,
   No. 86-00415, 1988 WL 110429 (Bankr. W.D. Pa. Oct. 19, 1988) ............................24, 25, 26

*Fed. Nat'l Mortgage Ass'n v. County of Orange (In re County of Orange)*,
   183 B.R. 609 (Bankr. C.D. Cal. 1995)....................................................................19

*Fin. One Pub. Co. v. Lehman Bros. Special Fin. Inc.*,
   414 F.3d 325 (2d Cir. 2005)....................................................................................9

*Framingham Winery, Inc. v. J.A.G., Inc. (In re J.A.G., Inc.)*,
   7 B.R. 624 (Bankr. D. Mass. 1980) .......................................................................19

*Frederick v. America's First Credit Union (In re Frederick)*,
   58 B.R. 56 (Bankr. N.D. Ala. 1986) ......................................................................19

*Fuller v. Fasig-Tipton Co.*,
   587 F.2d 103 (2d Cir. 1978)............................................................................10, 26

*In re Dayton Seaside Assocs. #2, L.P.*,
   257 B.R. 123 (Bankr. S.D.N.Y. 2000) ...................................................................17

*In re Flooring Am., Inc.*,
   302 B.R. 403 (Bankr. N.D. Ga. 2003) ...................................................................19

*In re Garden Ridge Corp.*,
   338 B.R. 627 (Bankr. D. Del. 2006) ................................................................ *passim*

*In re Lawrence United Corp.*,
   221 B.R. 661 (Bankr. N.D.N.Y. 1998) ..................................................................17

*In re Lehman Bros. Holdings Inc.*,
   433 B.R. 101 (Bankr. S.D.N.Y. 2010) ...................................................................30

*In re New Haven Foundry, Inc.*,
   285 B.R. 646 (Bankr. E.D. Mich. 2002) ................................................................26

*In re Pottier & Stymus Co.*,
   262 F. 955 (2d Cir. 1919) ....................................................................................32

*In re Progressive Wallpaper Corp.*,
   240 F. 807 (N.D.N.Y. 1917) ................................................................................14

*In re PT-1 Commc'ns, Inc.,*
    403 B.R. 250 (Bankr. E.D.N.Y. 2009)...................................................................17

*In re Ramp Chevrolet, Inc.,*
    No. 09-77513 (reg), 2010 WL 5348717 (Bankr. E.D.N.Y. Dec. 21, 2010) .....................16, 17

*In re Revere Copper & Brass, Inc.,*
    32 B.R. 577 (Bankr. S.D.N.Y. 1983) ...................................................................32

*In re SemCrude, L.P.,*
    399 B.R. 388 (Bankr. D. Del. 2009), *aff'd,* 428 B.R. 590 (D. Del. 2010)...................... *passim*

*In re Whimsy, Inc.,*
    221 B.R. 69 (S.D.N.Y. 1998) (Sweet, J.)...............................................................32

*In re Yonkers Hamilton Sanitarium Inc.,*
    22 B.R. 427 (Bankr. S.D.N.Y. 1982), *aff'd,* 34 B.R. 385 (S.D.N.Y. 1983) .........................17

*Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.),*
    327 F.2d 401 (7th Cir. 1964) ...................................................................24, 25, 26

*Interfirst Bank Abilene, N.A. v. F.D.I.C.,*
    777 F.2d 1092 (5th Cir. 1985) ...........................................................................18

*Kivort Steel, Inc. v. Liberty Leather Corp.,*
    487 N.Y.S.2d 877 (N.Y. App. Div. 1985) .................................................................22

*Kramer v. Lockwood Pension Servs., Inc.,*
    653 F. Supp. 2d 354 (S.D.N.Y. 2009).....................................................................10

*Libby v. Hopkins,*
    104 U.S. 303 (1881)....................................................................................20

*MNC Comm. Corp. v. Joseph T. Ryerson & Son, Inc.,*
    882 F.2d 615 (2d Cir. 1989)............................................................................23

*N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.),*
    576 F.2d 952 (2d Cir. 1978)............................................................................12

*New England Mut. Life Ins. Co. v. Caruso,*
    538 N.Y.S.2d 217 (N.Y. 1989) ..........................................................................10

*Newbery Corp. v. Fireman's Fund Ins. Co.,*
    95 F.3d 1392 (9th Cir. 1996) ..........................................................................19

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett
    Funding Group, Inc.),*
    212 B.R. 206 (2d Cir. BAP 1997).......................................................................14

*Patterson v. Shumate,*
    504 U.S.753 (1992)......................................................................................................29

*Perdido Pass Rest. v. Sunbelt Vacation Travel, Inc. (In re Sunbelt Vacation Travel, Inc.),*
    94 B.R. 715 (Bankr. S.D. Ala. 1988) ...........................................................................27

*Pereira v. United Jersey Bank, N.A.,*
    201 B.R. 644 (S.D.N.Y. 1996)......................................................................................32

*Piedmont Print Works, Inc. v. Receivers of People's State Bank of S.C.,*
    68 F.2d 110 (4th Cir. 1934) .............................................................................25, 26, 27

*Pink v. Am. Sur. Co. of N.Y.,*
    28 N.E.2d 842 (N.Y. 1940)...........................................................................................20

*Raleigh v. Ill. Dep't of Revenue,*
    530 U.S. 15 (2000)..........................................................................................................9

*Schechter v. Acme Screw Co. (In re Assured Fastener Prods. Corp.),*
    773 F.2d 105 (7th Cir. 1985) .......................................................................................26

*Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.),*
    698 F.2d 42 (1st Cir. 1983)............................................................................... *passim*

*Straughair v. Palmieri (In re Palmieri),*
    31 B.R. 111 (Bankr. N.D. Ga. 1983) ...........................................................................19

*U.S. Aeroteam, Inc. v. Delphi Auto. Sys., LLC (In re U.S. Aeroteam, Inc.),*
    327 B.R. 852 (Bankr. S.D. Ohio 2005).........................................................................26

*Va. Block Co. v. Bushong (In re Va. Block Co.),*
    16 B.R. 560 (Bankr. W.D. Va. 1981) ...........................................................................24

*Walter E. Heller & Co. v. Food Mktg. Assocs.*
    *(In re Fasano/Harriss Pie Co*.), 43 B.R. 864 (Bankr. W.D. Mich. 1984) ...............24

*Westinghouse Credit Corp. v. D'Urso,*
    278 F.3d 138 (2d Cir. 2002)...................................................................................18, 20

*Wooten v. Vicksburg Ref., Inc.*
    *(In re Hill Petroleum Co*.), 95 B.R. 404 (Bankr. W.D. La. 1988) ..........................24

*Zullo v. Varley,*
    868 N.Y.S.2d 290 (N.Y. App. Div. 2008) ..................................................................13

**STATUTES**

11 U.S.C.

§ 101(5)(A) ................................................................................................................22
§ 101(12) ...................................................................................................................22
§ 102(2) .....................................................................................................................22
§ 362(b)(17) .....................................................................................................4, 30, 31
§ 553............................................................................................................... *passim*
§ 560................................................................................................................4, 29, 31
§ 561(a) ......................................................................................................... *passim*

Bankruptcy Act

§ 68............................................................................................................................27

N.Y. DEBT. & CRED. LAW

§ 151 (2001) ..............................................................................................................10

N.Y. U.C.C.

§ 9-101, cmt. 1 ..........................................................................................................15
§ 9-109(d)(10) ................................................................................................13, 15, 20
§ 9-207(a) ..................................................................................................................14
§ 9-270 ......................................................................................................................20
§ 9-340(b), cmt. 3.......................................................................................................13
§ 9-615(d)(1) (2001) .............................................................................................13, 20

UBS AG ("UBS"), by its undersigned counsel, Bingham McCutchen LLP, submits this memorandum of law (i) in opposition to the Motion of James W. Giddens (the "Trustee"), Trustee for the SIPA Liquidation of Lehman Brothers Inc. ("LBI"), Pursuant to Sections 105(a) and 362 of the Bankruptcy Code and the Lehman Brothers Inc. Liquidation Order, for an Order Enforcing the Automatic Stay and the Stays in the Liquidation Order and Compelling Payment of Amounts Payable by UBS AG, dated November 23, 2010 (the "Motion"), and (ii) in support of UBS AG's accompanying Crossmotion for an Order Enforcing the Parties' Agreement (the "Crossmotion").

## PRELIMINARY STATEMENT

In 2004, UBS and LBI negotiated and executed a swap agreement, based upon and modifying a standard ISDA Master Agreement, Schedule and Credit Support Annex (collectively, as modified, the "Agreement").  The Agreement, like countless other ISDA-based swap agreements, contains a clause (the "ISDA Setoff Clause") that provides that upon LBI's default, UBS may offset any amount that it owes LBI under the Agreement against any amount that LBI owes UBS or its affiliates under the Agreement or otherwise.  The Agreement, including the ISDA Setoff Clause, is valid and enforceable under New York law.  Neither section 553 nor any other section of the Bankruptcy Code invalidates the ISDA Setoff Clause.  Moreover, the safe harbor of section 561 of the Bankruptcy Code exempts the ISDA Setoff Clause from the effect of section 553.  Any argument that the policy underlying the Bankruptcy Code weighs against the ISDA Setoff Clause is fundamentally flawed.  For these reasons, this Court should deny the Motion and grant the Crossmotion, enforcing the ISDA Setoff Clause as it stands in the Agreement.

UBS's rights in this case are determined in the first instance by nonbankruptcy law -- here, New York contract law.  As a matter of contract law, the Trustee argues that the ISDA

Setoff Clause is "inconsistent with" the clause in the Agreement that provides for the netting of the cash collateral that LBI posted to UBS (the "Collateral") against LBI's obligations to UBS under the Agreement (the "CSA Setoff Clause"). This argument is refuted by the Agreement, which expressly provides that the ISDA Setoff Clause is "in addition to and not in limitation of" the CSA Setoff Clause. The Trustee also argues that, because the Collateral was "pledged" to UBS, the net payable by UBS to LBI under the CSA Setoff Clause (the "Payable") is simply immune to setoff. This argument is refuted by the Agreement and the New York Uniform Commercial Code (the "U.C.C."), both of which establish that the Payable is simply a debt, subject to setoff like any other obligation of UBS to LBI.

The Trustee also argues that the ISDA Setoff Clause is unenforceable under section 553(a) of the Bankruptcy Code (the "Setoff Statute"). The Setoff Statute does not govern the ISDA Setoff Clause at all, because the ISDA Setoff Clause is not a common-law setoff subject to the Setoff Statute, but rather a contractual defense to LBI's demand for payment -- i.e., a right to reduce what UBS owes to LBI. Because the Setoff Statute does not govern the ISDA Setoff Clause, issues of mutuality, capacity, etc. are irrelevant.

Even assuming, however, that the Setoff Statute governs the ISDA Setoff Clause, the Trustee's two arguments that the mutuality required by the Setoff Statute is lacking fail as a matter of nonbankruptcy law, which governs the issue of mutuality.

The Trustee's argument that UBS owes LBI and is owed by LBI in different capacities because the Collateral was held in "trust" by UBS is unsupported by any precedent, and fares no better than the Trustee's "pledge" argument. The Collateral was not held in trust, pursuant to (i) the Agreement, which expressly permits UBS to commingle and otherwise use the Collateral as UBS sees fit, "free of any claim or right of any nature whatsoever of [LBI]," and (ii) Article 9 of the U.C.C., which dictates that the surplus Collateral is merely a debt.

2

The Trustee's argument that the "triangular" structure of the ISDA Setoff Clause destroys mutuality is incorrect for two independent reasons.  First, the ISDA Setoff Clause gives UBS itself (not its affiliates) a valid defense to LBI's demand for turnover of the Payable, so there is necessarily mutuality between UBS and LBI.  In other words, UBS owes the Payable, and UBS (not its affiliates) has a right to a credit against the Payable.  In terms of the Bankruptcy Code as well, UBS has not only a "debt" to LBI, but also a "claim" against LBI, because UBS has a claim against LBI's property -- i.e., the Payable.  Second, UBS and LBI created mutuality by agreeing to treat UBS and its affiliates as a single entity for purposes of the ISDA Setoff Clause.  As the case law makes clear, parties may so agree under nonbankruptcy law, which governs whether mutuality exists or not under the Setoff Statute.  It is beyond dispute that a contract can create mutuality among more than two parties, if the contract is an assignment or guaranty.  A contractual "triangular" setoff simply achieves the same result more efficiently.

Finally, although UBS does not require an exemption from the mutuality requirement of the Setoff Statute, the ISDA Setoff Clause is in any event exempted from the Setoff Statute by section 561 of the Bankruptcy Code (the "Safe Harbor Statute").  The Agreement is a swap agreement.  The Safe Harbor Statute expressly provides that "the exercise of any contractual right . . . to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more . . . swap agreements . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceeding under this title."  11 U.S.C. § 561(a).  The plain text of the Safe Harbor exempts UBS's exercise of the ISDA Setoff from the Setoff Statute.  The Safe Harbor Statute ensures that a swap participant enjoys the benefits of its bargain as to setoff rights, and the Trustee offers no valid reason why the ISDA Setoff Clause should not be enforced pursuant to the Safe Harbor Statute.

The Safe Harbor Statute (as well as the exemptions from the automatic stay in sections 362(b)(17) and 560) also expressly exempts UBS's exercise of the ISDA Setoff Clause from the automatic stay.

The Trustee argues at length that UBS's setoff rights are somehow inimical to the policy of "equality of distribution of assets among creditors" underlying the Bankruptcy Code and SIPA. *See* Motion at 15-16. Debtors' arguments against setoff as "preferential" are familiar -- but no less familiar than judges' admonitions that setoff occupies a "favored position in our history of jurisprudence" and has been blessed by Congress as set forth in the Bankruptcy Code. *E.g., Bohack Corp. v. Borden, Inc.,* 599 F.2d 1160, 1164 (2d Cir. 1979). The issue before this Court is not whether the ISDA Setoff Clause puts UBS in a relatively better position than creditors that lack setoff rights. It does. But there is nothing unfair in that. "Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite." *Chem. Bank N.Y. Trust Co. v. Kheel (In re Seatrade Corp.),* 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J., concurring).

Because the ISDA Setoff Clause is valid and enforceable under New York law and remains valid and enforceable under the Bankruptcy Code, UBS cannot be deprived of the benefit of its bargain. The Motion should be denied and the Crossmotion should be granted.

## PROCEDURAL NOTE

The Trustee's demand for turnover of the purported surplus collateral should have been made by way of a complaint in an adversary proceeding. *See* Fed. R. Bankr. P. 7001(1). There appears to be no material fact dispute underlying the Motion, but rather only a potential dispute about the precise amounts of the Payable and the Receivable (as defined below). Accordingly, UBS is willing to respond to the Motion by way of the accompanying declaration and this brief (i) in opposition to the Motion and (ii) in support of UBS's Crossmotion, filed herewith, which

4

seeks an order enforcing the ISDA Setoff Clause -- i.e., the relief that UBS would have sought by way of counterclaim if the Trustee had commenced an adversary proceeding. In the event this Court finds that material fact issues prohibit granting the Motion and the Crossmotion, UBS respectfully requests that this Court issue an order directing the Trustee to withdraw the Motion, with leave to commence an adversary proceeding, and UBS reserves all of its rights to discovery and otherwise in any such proceeding.

## **FACTS**

On or about July 13, 2004, UBS and LBI (together, the "Parties") entered into the Agreement: a negotiated and modified ISDA Master Agreement (the "Master Agreement") and related documents, which were incorporated into the Master Agreement: (i) a Schedule to the Master Agreement (the "Schedule"), and (ii) a Credit Support Annex to the Schedule (the "CSA"). Declaration of James B. Fuqua in Opposition to the Motion (the "Fuqua Declaration") ¶ 3, Ex. A (Master Agreement, Schedule, CSA).

Under the Agreement, the Parties subsequently entered into numerous foreign exchange swaps and similar transactions (the "Transactions"). *Id.* ¶ 4.

Pursuant to the Agreement, LBI at various times posted collateral to UBS as security for LBI's obligations to UBS under the Agreement (the "Collateral"). *Id.* ¶ 5. The Collateral was, at the time relevant here, entirely in the form of cash. *Id.* UBS had the right to "sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor." *Id.* ¶¶ 6-7, Ex. A (CSA § 6(c)(i)).

On September 16, 2008, in accordance with section 6 of the Agreement, UBS delivered to LBI a notice of termination (the "Termination Notice") of the Transactions under the

5

Agreement (the "Termination"). *Id.* ¶ 8, Ex. B (Termination Notice). In the Termination Notice, UBS designated September 16, 2008 as the "Early Termination Date" under the Agreement. *Id.* ¶ 9, Ex. B.

In the Termination Notice, UBS listed two distinct grounds for the Termination: (i) cross-default from swap agreements between UBS and LBI's affiliates LBSF, LBCC and LBCS; and (ii) downgrading of LBI's credit rating to a level below BBB-. *Id.* ¶ 10, Ex. B; *see id.,* Ex. A (Master Agreement §§ 5(a)(v), 5(b)(v); Schedule § 1(h)). The Trustee has never disputed the validity of the Termination. *Id.* ¶ 10.

As of the Early Termination Date, the amount of the Collateral held by UBS was $170 million. *Id.* ¶ 11.[1]

On August 13, 2009, UBS delivered to LBI a notice of calculation (the "Valuation Notice") of the "Early Termination Amount" owing from LBI to UBS pursuant to section 6(e) of the Agreement, as required by section 6(d)(i) of the Agreement.[2] *Id.* ¶ 12, Ex. C (Valuation Notice). In the Valuation Notice, UBS calculated the Early Termination Amount owing from LBI to UBS as $94 million. *Id.* ¶ 13.

In the Valuation Notice, UBS stated that pursuant to the CSA Setoff Clause, UBS had applied the Collateral to satisfy the Early Termination Amount, such that the amount of the Collateral in excess of the Early Termination Amount was $76 million (the "Initial Payable"). *Id.* ¶ 14. The Trustee has never disputed the validity of this setoff. *Id.*

In the Valuation Notice, UBS also stated that (i) pursuant to the ISDA Setoff Clause, the Payable was subject to be set off against LBI's obligations to UBS and to certain of its affiliates (UBS and such affiliates collectively, the "UBS Group") based on certain contracts and

---

[1]    All dollar amounts herein are approximate and are rounded to the nearest million or tenth of a million dollars.

[2]    The Valuation Notice superseded prior notices of calculation delivered by UBS to LBI on or about May 22, 2009 and June 11, 2009.

transactions otherwise unrelated to the Transactions (collectively, the "Initial Receivable"), and (ii) UBS in good faith estimated that the amount of the Initial Receivable was in excess of the amount of the Initial Payable. *Id.* ¶ 15.

The ISDA Setoff Clause expressly provides that:

> Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set off, counterclaim, or otherwise withhold payment or any recourse to any Credit Support Document) under applicable law the Non-Defaulting Party or Non-affected Party (in either case, "X") [here, UBS] may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent . . .) owed by the Defaulting Party or Affected Party (in either case, "Y") [here, LBI] to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent . . .) owed by X or any Affiliate of X to Y . . . . If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set-off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

*See id.* ¶ 16, Ex. A (Schedule § 5(a)). The ISDA Setoff Clause was and is typically included by UBS in ISDA Master Agreements to which it is a party and, on information and belief, the same or a similar "triangular" setoff clause is commonly included by dealers in ISDA Master Agreements to which they are parties. *Id.*

The Trustee disputed the validity of the ISDA Setoff Clause. *Id.* ¶ 17. The Parties partially resolved this dispute; and on or about July 28, 2010, UBS paid the LBI estate $53 million of the Initial Payable. *Id.* ¶ 17, Ex. D (email from Trustee's counsel to UBS's counsel). The Parties continue to dispute, however, whether the remaining $23 million of the Initial Payable (i.e., the "Payable") may be offset or netted against certain portions of the Initial

7

Receivable still asserted by UBS (collectively, the "Receivable") pursuant to the ISDA Setoff Clause. *Id.* ¶ 18.

The Receivable consists of:  (i) from LBI to UBS, $1.7 million in misdirected wire transfers made in error by UBS to LBI prior to the Commencement Date; and (ii) from LBI to UBS Securities LLC ("UBS LLC"), (a) $4.5 million due under a certain master stock loan agreement, (b) $14.9 million in fees in connection with securities transactions, (c) $1.2 million due in connection with failed securities transactions, and (d) $0.5 million in other receivables. *Id.* ¶ 19.[3]

On September 19, 2008 (the "Commencement Date"), by order of the United States District Court for the Southern District of New York (the "Liquidation Order"), the above-captioned SIPA proceeding was commenced and transferred to this Court.

## ARGUMENT

The ISDA Setoff Clause is valid and enforceable under the Agreement and governing New York law.  The ISDA Setoff Clause is not nullified by the Setoff Statute (or any other statute) in a bankruptcy or SIPA liquidation.  And even if, contrary to fact, the ISDA Setoff Clause were nullified by the Setoff Statute, the ISDA Setoff Clause is valid and enforceable under the Safe Harbor Statute, which restores UBS's nonbankruptcy rights under the ISDA Setoff Clause.  On a careful analysis of the Agreement and the law, there are no statutory, equitable or policy grounds for depriving UBS of the benefit of its bargain.  The Motion should be denied and the Crossmotion should be granted.

---

[3]    UBS LLC is an indirect, wholly owned subsidiary of UBS, Fuqua Decl. ¶ 20, and, as such, qualifies as an "Affiliate" under the ISDA Setoff Clause, *see* Master Agreement § 14.

I.      THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE AS A MATTER OF NEW YORK CONTRACT LAW.

"Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20 (2000).  Thus, the initial issue before this Court is that the ISDA Setoff Clause is valid and enforceable under the law that the Parties chose to govern the Agreement.  The Agreement -- and therefore the ISDA Setoff Clause -- is governed by New York law.  Schedule § 4(h); *cf. Fin. One Pub. Co. v. Lehman Bros. Special Fin. Inc.,* 414 F.3d 325, 336 (2d Cir. 2005) ("if LBSF's setoff right were created by the Master Agreement and Schedule, New York law would govern that right . . . .").  The ISDA Setoff Clause is valid and enforceable under the terms of the Agreement and New York law.

A.      The ISDA Setoff Clause Is Valid Under New York Contract Law.

Under New York law, there are three distinct sources of rights of an obligor to reduce amounts owed by it to an obligee by the amount of debts owed to it by the obligee:  (i) the common law of setoff, which permits a setoff of debts "due to and from the same person in the same capacity," *e.g., Kemper Reins. Co. v. Corcoran (In re Midland Ins.* Co.), 582 N.Y.S.2d 58, 61 (N.Y. 1992); (ii) statute, which permits a setoff of debts and credits between a debtor and a creditor, N.Y. DEBT. & CRED. LAW § 151 (2001); and (iii) a contract that permits such reduction of obligations to the extent stated therein, *see, e.g., Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.,* No. 95 Civ. 4856, 1997 WL 53172, at *2 (S.D.N.Y. Feb. 10, 1997).  Such a contract is often said to create contractual setoff rights that differ from those provided by common law or statute.  *See id.; accord, e.g., Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.),*

698 F.2d 42, 44-45 (1st Cir. 1983) ("the parties are free to modify these common-law setoff rules by contract"). The setoff at issue here arises by contract. Schedule § 5(a).

"Freedom of contract itself is deeply rooted in public policy" in New York. *Kramer v. Lockwood Pension Servs., Inc.,* 653 F. Supp. 2d 354, 378 (S.D.N.Y. 2009) (citing *New England Mut. Life Ins. Co. v. Caruso,* 538 N.Y.S.2d 217, 221 (N.Y. 1989)). Generally, competent parties may agree to whatever they choose by contract, except for what is contrary to law or public policy. *Caruso,* 538 N.Y.S.2d at 221. This freedom of contract includes the freedom to establish by contract rights to offset claims that are more expansive than rights available under New York common law of setoff or under New York statutes. For example, although New York common law and statute do not permit setoff of contingent obligations, the parties to a New York contract may agree that such obligations shall offset each other. *Bank of N.Y.* 1997 WL 53172, at *2-4. This aspect of freedom of contract extends to mutuality. *See Fuller v. Fasig-Tipton Co.,* 587 F.2d 103, 107 (2d Cir. 1978) (although creditor's setoff of its debt to agent's disclosed principal against agent's debt to creditor lacked mutuality under common law and statute, the parties could have validly agreed to such setoff by contract).

In sum, because the ISDA Setoff Clause is based on a contract, it is valid and enforceable according to its terms under New York law.

**B.**     <u>The CSA Setoff Clause Does Not Trump the ISDA Setoff Clause.</u>

The Agreement provides for two distinct rights of setoff. Pursuant to the CSA Setoff Clause, UBS may offset LBI's "Obligations" under the Agreement against the Collateral. CSA § 8(a)(iii). Pursuant to the ISDA Setoff Clause, UBS may offset any obligation that it owes (whether under the Agreement or otherwise) to LBI against any obligation that LBI owes (whether under the Agreement or otherwise) to UBS or its affiliates. Schedule § 5(a). The ISDA

10

Setoff Clause complements the CSA Setoff Clause.  Both are valid.  There is nothing in the terms of the Agreement that would limit the application of the ISDA Setoff Clause.

The Trustee and UBS agree that:  (i) LBI posted the Collateral to secure its obligations to UBS under the Agreement; (ii) UBS duly terminated the Transactions; (iii) UBS duly exercised its right under the CSA Setoff Clause to apply the Collateral to LBI's obligations to UBS under the Agreement; and (iv) as a result of the CSA Setoff, UBS owed the Payable to LBI.  The Trustee argues that UBS has no choice but to pay LBI the Payable, notwithstanding the ISDA Setoff Clause.   This argument is based on a misreading of the Agreement and a misunderstanding of New York law.

### 1.     The ISDA Setoff Clause Is Not Inconsistent with the CSA Setoff Clause.

The Trustee argues that the CSA Setoff Clause is "inconsistent" with the ISDA Setoff Clause and thus the former, being more specific, nullifies the latter with respect to the Payable. Motion at 19-20.  The CSA Setoff Clause is not "inconsistent" with the ISDA Setoff Clause. The ISDA Setoff Clause is, by its very terms, <u>supplemental</u> to the CSA Setoff Clause.  UBS holds its rights under the ISDA Setoff Clause --

> in addition to and not in limitation of any other right or remedy
> (including any right to set off, counterclaim, or otherwise withhold
> payment or any recourse to any Credit Support Document) under
> applicable law . . .

Schedule § 5(a).  Thus, the Parties (i) were aware of the setoff rights provided for in the CSA (a Credit Support Document, Schedule § 4(f)) and (ii) intended for the broader setoff rights in the ISDA Setoff Clause to be "in addition to" the more limited setoff rights in the CSA.  *See id.*

The CSA requires that the "Secured Party [here, UBS] will **Transfer** to the Pledgor [here, LBI] any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the

Pledgor with respect to any Obligations . . . ."  CSA § 8(c) (emphasis added).  The term "Transfer" is defined to mean, "in the case of Cash, **payment or delivery by wire transfer** into one or more bank accounts specified by the recipient."  CSA § 12 at 9 (emphasis added).

Thus, the Payable is a debt, in cash, owed by UBS to LBI, after the CSA Setoff.  Absent additional setoff rights, UBS would be required to pay the Payable to LBI.  Because, however, the Payable is "any sum or obligation . . . owed by [UBS] or any Affiliate of [UBS] to [LBI]," the ISDA Setoff Clause gives UBS the "addition[al]" right to offset the Payable against the Receivable.  Schedule § 5(a).

The CSA does not include any waiver by UBS of this additional setoff right; and under New York law, "intent to waive must be clearly established and cannot be inferred from doubtful or equivocal acts or language."  *200 E. 87th St. Assocs. v. MTS, Inc.*, 793 F. Supp. 1237, 1251 (S.D.N.Y. 1992) (internal citations omitted); *see N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 960 (2d Cir. 1978) (intention to waive setoff right must be clear).

The Trustee makes the related argument that UBS seeks to "expand the scope of what the Posted Collateral is collateralizing."  Motion at 18.  This argument is contradicted, not only by the Agreement, but also by Article 9 of the U.C.C. ("Article 9"), which, of course, governs security interests.  Article 9 provides that a secured party holding cash collateral in an amount greater than the amount of the account debtor's obligation "shall account to and pay a debtor for any surplus."  N.Y. U.C.C. § 9-615(d)(1) (2001).  But Article 9 also clearly provides that a creditor may hold security and a setoff right over the same collateral.  N.Y. U.C.C. § 9-109(d)(10) (Article 9 does not apply to rights of recoupment or setoff); *accord, e.g., Sisk,* 698 F.2d at 45 ("whether or not a creditor is secured, he can defend against a suit for money owed by asserting a setoff defense . . ."); *cf.* N.Y. U.C.C. § 9-340(b), cmt. 3 (bank's security interest in

deposit account does not impair bank's setoff rights).[4]   Article 9 confirms that the Payable is

nothing more than a debt from UBS to LBI, which is in no way immune from setoff.

Thus, the two Setoff Clauses are completely consistent.  The CSA Setoff Clause creates a

debt from UBS to LBI.  That debt is subject to the ISDA Setoff Clause.  It is the Trustee's

interpretation of the Setoff Clauses that "violates the Agreement" (*cf.* Motion at 17), because it

creates inconsistency where there is none.  *See, e.g., Zullo v. Varley,* 868 N.Y.S.2d 290, 291

(N.Y. App. Div. 2008) ("Where possible, a contract should be interpreted to avoid

inconsistencies . . . .") (citations omitted).

## 2.        The Payable Is Not Exempt from Setoff As a "Pledge."

The Trustee also argues that the Payable is exempt from the ISDA Setoff Clause under

New York law simply because the Collateral was "pledged" to UBS.  This argument is also

contradicted by both the Agreement and Article 9.

The Agreement does not impose any trust or fiduciary relationship on the Parties in

connection with the Collateral (or otherwise).  On the contrary, the Agreement expressly limits

the duty of the Party holding collateral to "exercis[ing] reasonable care to assure the safe custody

of all Posted Collateral to the extent required by applicable law," and this duty is expressly

subject to the secured party's rights to "sell, pledge, rehypothecate, assign, invest, use,

commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral that it

holds free from any claim or right of any nature whatsoever of the Pledgor, including any equity

or right of redemption by the Pledgor."  CSA §§ 6(a), 6(c).  Because UBS (i) had no fiduciary

duty to LBI and (ii) had and used the right to commingle the Collateral, there is no *res* to which

---

[4]    *See also id.* §§ 9-340(b), 9-404 (setting forth certain priority rules concerning setoff and security interests in bank deposit accounts).

even a purported constructive trust could apply.  *See Beekman Paper Co. v. St. Theresa Props., Inc., (In re St. Theresa Props., Inc.),* 152 B.R. 852, 857 (Bankr. S.D.N.Y. 1993).[5]

Likewise, Article 9 does not impose any trust or fiduciary duty on a secured party holding collateral.  On the contrary, Article 9 requires only that "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession."  N.Y. U.C.C. § 9-207(a); *cf.* Restatement (Third) of Trusts § 5 (2003) ("The following are not trusts:  . . . (l) mortgages, deeds of trust, pledges, liens, and other security arrangements."); *id.* at cmt. k ("security interests such as pledges and liens, legal or equitable, are not trusts as that term is used in this Restatement").

The Trustee bases his "pledge" argument on a treatise and a 1937 trial court decision.  The treatise acknowledges that a pledgor and pledgee may expressly agree that the pledge may be applied to another debt owed by the pledgor -- which is the effect of the ISDA Setoff Clause and the CSA Setoff Clause in combination.  *See* 19 Samuel Williston & Richard A. Lord, Williston on Contracts § 53:45 (4th ed. 2001).  The trial court decision is off point, because it concerns the preservation of the value of securities upon foreclosure -- a non-issue where, as here, the security is cash.  *See Cole v. Mfrs. Trust Co.,* 299 N.Y.S. 418, 424-25 (N.Y. Sup. Ct., Kings Cnty. 1937).  More importantly, this decision is no longer good law (if it ever was[6]):  it predates the first Article 9 (enacted in 1952), which supersedes prior law concerning security interests, *see* N.Y. U.C.C. § 9-101, cmt. 1, and, again, clearly provides that a creditor may hold

---

[5]    UBS's unfettered right to use the Collateral also eliminates any argument that the Collateral had to be held in a "special purpose account."  *See Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Group, Inc.),* 212 B.R. 206, 212-15 (B.A.P. 2d Cir. 1997) (absence of obligation to segregate funds is "profound demonstration" of intent to treat account as general account, accordingly subject to setoff).  In *Bennett Funding,* the Second Circuit B.A.P. expressly held that even a "failed collateral account" is not necessarily a special purpose account as to any surplus.  *Id.* at 213.

[6]    There are decisions predating Article 9 holding that a claim secured by collateral remains eligible for setoff.  *See, e.g., In re Progressive Wallpaper Corp.,* 240 F. 807, 810-11 (N.D.N.Y. 1917).

security and a setoff right over the same collateral.  *See id.* § 9-109(d)(10); *accord, Sisk,* 698 F.2d at 45.

The ISDA Setoff Clause is valid and enforceable as a matter of New York law.

## II.    THE ISDA SETOFF CLAUSE IS NOT LIMITED BY THE SETOFF STATUTE.

The Trustee presumes that the ISDA Setoff Clause is subject to the Setoff Statute and related case law.  That presumption is incorrect.  The Setoff Statute does not nullify contractually created rights to offset claims (as opposed to common-law setoff rights).  Accordingly, the ISDA Setoff Clause is beyond the reach of the Setoff Statute and thus is enforceable against LBI in its SIPA case.

The Setoff Statute is derived from, and preserves, common-law setoff rights.  The Setoff Statute requires mutuality for a setoff to be valid.  11 U.S.C. § 553(a).  The doctrine of similar treatment of similarly situated creditors could be said to justify the Setoff Statute nullifying purely equitable setoff rights, absent mutuality.  *See, e.g., In re Garden Ridge Corp.,* 338 B.R. 627, 633-34 (Bankr. D. Del. 2006).  But UBS does not rely on the common law:  UBS relies on rights contractually created by the ISDA Setoff Clause in the Agreement.

In particular, the ISDA Setoff Clause memorializes a consensual agreement between UBS and LBI, whereby each obtains a right not to pay the other, to the extent that the other owes it (or its affiliates) a debt.  Although the clause uses the word "setoff," it could have used the word "netting," or no single word at all to describe the right conferred.  This right not to pay, or defense to a claim, is valid under New York law and is valid in bankruptcy, absent an "actual conflict with the system provided by [the Bankruptcy Code]."  *Butner v. United States,* 440 U.S. 48, 54 n.9 (1979) (citations omitted).  In fact, there is no actual conflict between the ISDA Setoff Clause and the Setoff Statute.

A recent decision from the Eastern District Bankruptcy Court makes it clear that a contractual provision that allows the amount owed to a debtor by an obligor to be reduced by the amount of the claims of the obligor or its affiliates against the debtor is not necessarily a "setoff" subject to the Setoff Statute. *See In re Ramp Chevrolet, Inc.,* No. 09-77513 (reg), 2010 WL 5348717 (Bankr. E.D.N.Y. Dec. 21, 2010). The debtor, a GM dealer, argued that the Setoff Statute rendered unenforceable a provision in the parties' wind-down agreements (the "WDAs"), whereby GM had the right to reduce its Termination Payment Amount to the debtor under the WDAs by "any amount owed by Debtor to Old GM, to GM or their Affiliates." *Id.* at *2-6. The court applied the standard for setoff in the Supreme Court's *Strumpf* decision. *Id.* at *8; *see Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 18 (1995). The court held that this right under the WDAs "is not a true setoff right because GM is not setting off what it owes under the WDAs with amounts it claims it is owed by the Debtor under a different transaction. Rather, GM was granted an additional right under the WDAs to fix the Termination Payment Amount. . . . Because this is not a true setoff, GM's calculations do not violate the stay, and GM is not required to satisfy the terms of Bankruptcy Code § 553 in order to take the reduction. It is clear from the WDAs that GM has **a contractual right to fix the Wind-Down Payment Amount, which right is separate and apart from any setoff rights** GM may or may not have." *Id.* at *8 (emphasis added).

Like GM in *Ramp Chevrolet*, UBS has a contractual right to reduce the Payable by the Receivable, which right is independent of UBS's common law setoff rights. *See id;* Schedule § 5(a). Similarly, as in *Ramp Chevrolet*, it is the exercise of rights under the parties' contract -- here, the ISDA Setoff Clause that establishes and measures UBS's obligation to LBI -- that results in the reduced obligation, even though the determination of the reduction under the contract is made by reference to different transactions. *See id.* Accordingly, as in *Ramp*

*Chevrolet*, the ISDA Setoff Clause is not the kind of "setoff" that is subject to the Setoff Statute. *See id.*

The treatment of recoupment in bankruptcy makes it clear that the Setoff Statute does not reach every remedy that is in the nature of a netting of obligations or a credit against an obligation.  Recoupment is inarguably similar to setoff.  *See, e.g., In re Dayton Seaside Assocs. #2, L.P.,* 257 B.R. 123, 133 (Bankr. S.D.N.Y. 2000) (recoupment permits affirmative defense or claim "for offset purposes"); *In re PT-1 Commc'ns, Inc.,* 403 B.R. 250, 271 (Bankr. E.D.N.Y. 2009) (recoupment involves "offsetting claims").  And yet, it is well settled that (i) the Setoff Statute does not govern recoupment rights, and (ii) recoupment does "not involve the concept of mutuality."  *In re Yonkers Hamilton Sanitarium Inc.,* 22 B.R. 427, 432 (Bankr. S.D.N.Y. 1982), *aff'd,* 34 B.R. 385 (S.D.N.Y. 1983); *In re Lawrence United Corp.,* 221 B.R. 661, 669 (Bankr. N.D.N.Y. 1998) (recoupment is defense, not mutual obligation).

Although recoupment arises from a single transaction, whereas the scope of the ISDA Setoff Clause extends beyond the Agreement, UBS's rights under the ISDA Setoff Clause are similar to recoupment rights, in that UBS's rights arise within the context of the parties' agreement.

Because the ISDA Setoff Clause gives UBS a contractual right not to pay LBI the Payable and a contractual defense to LBI's turnover demand, the common-law restrictions of the Setoff Statute, including the mutuality requirement, need not and should not cut off those rights. *See Ramp Chevrolet,* 2010 WL 5348717, at *8.

## III. THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE UNDER THE SETOFF STATUTE.

As demonstrated in sections I and II above, UBS's right to exercise the ISDA Setoff is (i) valid and enforceable under New York law and (ii) not limited by the Setoff Statute. In the event that this Court determines, nonetheless, that the ISDA Setoff Clause is subject to the Setoff Statute, the ISDA Setoff remains valid and enforceable thereunder.

UBS retains its rights under the ISDA Setoff Clause in this proceeding unless those rights are directly contradicted by the Bankruptcy Code (or SIPA). *See Butner,* 440 U.S. at 54 n.9 (creditor's rights under state law may be suspended only in the event of an "actual conflict with the system provided by [the Bankruptcy Code]").[7] The Trustee argues that the ISDA Setoff Clause is rendered unenforceable by the Setoff Statute, which preserves a creditor's nonbankruptcy rights to offset a debt and claim that (i) are mutual and (ii) arise prepetition. *See* 11 U.S.C. § 553(a). The Trustee does not dispute that the Payable and the Receivable are a prepetition debt and claim; the Trustee argues that the Payable and the Receivable lack mutuality. This argument fails under a careful analysis of the applicable law.

"In determining recoupment and setoff rights, we apply nonbankruptcy law." *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 146 (2d Cir. 2002) (citing *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon),* 129 F.3d 93, 96 (2d Cir. 1997)); *see, e.g., Interfirst Bank Abilene, N.A. v. F.D.I.C.,* 777 F.2d 1092, 1094 (5th Cir. 1985) ("The validity of [a creditor's] setoff claim must comport with federal law, although it may be necessary to refer to state law for guiding principles."). In particular, because the Bankruptcy Code does not define mutuality, **"[m]utuality of obligations is determined by state law."** *Garden Ridge,* 338 B.R. at

---

[7]   The Trustee does not argue that any provision of SIPA other than the Setoff Statute, as made applicable in a SIPA proceeding, contradicts the ISDA Setoff Clause.

633 (quoting *In re Czyzk,* 297 B.R. 406, 409 (Bankr. D.N.J. 2003)) (emphasis added).[8]  Because

the Payable and the Receivable are mutual obligations under New York law, UBS's rights under

the ISDA Setoff Clause are valid and enforceable under the Setoff Statute.

The Trustee's arguments against mutuality based on purported trust capacity and on

triangular structure are addressed in turn below.

### A.    Mutuality Is Not Lacking Due to Different Capacities.

The Trustee argues that, since UBS held the Collateral in "trust," UBS did not owe LBI

the Payable in the same capacity as that in which UBS held the right to the Receivable from LBI.

It is true that a claim held in the capacity of a creditor is not mutual with an obligation held in the

capacity of a trustee.  That rule is irrelevant here.  As demonstrated in section I(B) above, the

Agreement and Article 9 establish that UBS did not hold the Collateral in trust, as a matter of

contract and as a matter of law.  CSA § 6(a); N.Y. U.C.C. § 9-270.  Because the Payable is a

mere debt from UBS to LBI and the Receivable is a mere debt from LBI to the UBS Group, there

is no difference in capacity and thus no impairment to mutuality arising from the purported

nature of the Payable.  *See* N.Y. U.C.C. § 9-615(d)(1).

The Trustee cannot contradict Article 9, which governs the Collateral.  And in fact the

Trustee does not cite any decision holding that surplus collateral is held in "trust" or otherwise is

---

[8]    *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398-99, n.9 (9th Cir. 1996) (noting that Arizona law, as applicable nonbankruptcy law, would determine mutuality for setoff purposes); *In re Flooring Am., Inc.*, 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003) ("Whether mutuality exists is an issue of state law."); *Frederick v. America's First Credit Union (In re Frederick)*, 58 B.R. 56, 57 (Bankr. N.D. Ala. 1986) ("Because section 553 does not define 'mutual,' the definition must be determined under state law."); *Straughair v. Palmieri (In re Palmieri)*, 31 B.R. 111, 112 (Bankr. N.D. Ga. 1983) ("Since §553 is silent as to the definition of 'mutuality,' the definition must be determined under the substantive law of the State of Georgia."); *Framingham Winery, Inc. v. J.A.G., Inc. (In re J.A.G., Inc.)*, 7 B.R. 624, 628 (Bankr. D. Mass. 1980) ("Since Section 553 is silent . . . as to the definition of mutuality, it appears that the substantive state law must control unless there is an overriding specific federal statute."); *but see Fed. Nat'l Mortgage Ass'n v. County of Orange (In re County of Orange)*, 183 B.R. 609, 615 (Bankr. C.D. Cal. 1995) ("Mutuality is generally an issue of state law... [But] in practice courts apply federal bankruptcy precedent and rarely refer to state law to determine whether mutuality exists.").

not subject to setoff due to a purported difference of capacity.  *Cf.* N.Y. U.C.C. § 9-109(d)(10);

*Sisk,* 698 F.2d at 45.  The Trustee does not cite any decision that so much as mentions collateral.

In the Trustee's lead precedent, the Supreme Court held that funds entrusted by the debtor to the creditor for the express purpose of paying a third party, "upon the faith and trust that they would be [so] applied," were not owed by the creditor to the debtor in the same capacity as the creditor was owed money by the debtor.  *Libby v. Hopkins,* 104 U.S. 303, 308 (1881).  In the Trustee's only contemporary precedent, the Second Circuit held that a judgment creditor could not offset funds held in escrow by a third party escrow agent for the potential benefit of the creditor and the debtor against the balance due on the judgment, because "escrow monies are held in trust," and a trust beneficiary is in a different capacity than a contractual creditor.  *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 149 (2d Cir. 2002).  These unremarkable decisions have nothing to do with security interests.[9]

The Trustee also borrows from the *Westinghouse* decision a comment to the effect that a person is a "trustee . . as to moneys in its hands belonging to the [beneficiary] or to be applied to a specific purpose," and thus cannot offset such moneys.  *Westinghouse,* 278 F.3d at 149-50 (quoting *Pink v. Am. Sur. Co. of N.Y.,* 28 N.E.2d 842, 844 (N.Y. 1940)); Motion at 22-23.  The source of this quotation is a 1940 (i.e., pre Article 9) decision concerning salvage recovered by an insurer for the benefit of itself and its reinsurer.  *See Pink,* 28 N.E.2d 842 at 844.  The Second Circuit presumably did not mean to extrapolate from the *Pink* decision a rule of law broad enough to encompass collateral; but in any event, the Second Circuit could not have intended to abrogate Article 9.

---

[9]    Moreover, neither *Westinghouse* nor the other cases cited by the Trustee on this point involve a contractual setoff, and in all of these cases third parties' rights and obligations were impacted by the entrusted funds.

UBS did not hold the Collateral in trust, and thus UBS did not owe LBI the Payable in trust, as a matter of New York law. There is no lack of mutuality due to difference in capacity between the Payable and the Receivable under the Setoff Statute.

### B.    Mutuality Is Not Lacking Due to the "Triangular" Structure of the ISDA Setoff Clause.

In its *SemCrude* decision, the Delaware Bankruptcy Court held that (i) contractual triangular setoff does not create mutuality for purposes of the Setoff Statute, and (ii) there is no "contractual exception" to the Setoff Statute. *In re SemCrude, L.P.,* 399 B.R. 388, 398-99 (Bankr. D. Del. 2009), *aff'd,* 428 B.R. 590 (D. Del. 2010). The Trustee, unsurprisingly, agrees with the *SemCrude* court's novel view. Motion at 16. UBS agrees that the Setoff Statute requires mutuality; but the *SemCrude* decision interpreted mutuality too narrowly. Where the parties to a contract agree to treat affiliates "as one entity" (or, put another way, to "aggregate" debts among affiliates), the parties create mutuality of obligations where it might not have existed under the common law of setoff. Where the parties are free to contract in this way under applicable state law -- as were UBS and LBI -- the Setoff Statute does not annul their agreement.

### 1.    UBS and LBI Have Mutual Debts and Claims, as a Matter of New York Law and Bankruptcy Law.

The *SemCrude* court ruled that creditor Chevron could not offset its debt to debtor affiliate A against the debts of debtor affiliates B and C to Chevron, due to lack of mutuality, even if the parties' contracts expressly so provided. 399 B.R. at 397-98. The *SemCrude* court reasoned, among other things, that Chevron's right to reduce the amount it owed debtor affiliate A because of debtor affiliates B's and C's debts to Chevron did not create a "debt" from debtor affiliate A to Chevron (or, in other words, a "claim" of Chevron against debtor affiliate A) that could be offset against Chevron's debt to debtor affiliate A. *Id.* In so reasoning, the *SemCrude* court interpreted the term "claim" too narrowly.

Because mutuality is defined by nonbankruptcy law, this Court should first examine the status of the Parties under New York law. *See, e.g., Garden Ridge,* 338 B.R. at 633. If LBI had sued UBS to recover the Payable on September 17, 2008, UBS would have had a contract-based counterclaim and defense to LBI's claim to the extent of the Receivable, including the debt to UBS LLC. *See, e.g., Kivort Steel, Inc. v. Liberty Leather Corp.,* 487 N.Y.S.2d 877, 878 (N.Y. App. Div. 1985) (setoff may be pled as counterclaim or affirmative defense). UBS would have had a right to be paid a credit against the Payable in the amount of the Receivable. UBS LLC would not have to intervene in the suit for UBS to assert and prevail on its setoff. *See id.* (defendant sued by undisclosed principal may assert setoff against agent). This demonstrates that the debts and claims between UBS and LBI are mutual under New York law.

This mutuality under New York law is, in fact, entirely consistent with the Bankruptcy Code's scheme of debts and claims, for a reason not discussed in *SemCrude*. The Setoff Statute requires mutuality of a debt and claim. It is undisputed that the Payable is a "debt" that UBS owes to LBI, because (absent the setoff) LBI has a claim or right of payment against UBS. *See* 11 U.S.C. §§ 101(12), 101(5)(A). Also, going beyond the analysis performed by the *SemCrude* court, the Receivable is a "claim" that UBS holds against LBI. UBS has a claim, in the sense of a "right to payment" -- i.e., the right to a credit against the Payable. *See* 11 U.S.C. § 101(5)(A). UBS also has a claim against the Payable itself, which the Trustee insists is property of LBI's estate. *See* Motion at 24. The Bankruptcy Code expressly provides that a "claim against property of the debtor" qualifies as a "claim against the debtor." *See* 11 U.S.C. § 102(2). Because UBS has a claim against the Payable, UBS has a claim against LBI. *See id.*

For these reasons, there is mutuality between UBS and LBI, notwithstanding the triangular structure of the ISDA Setoff Clause.

## 2.    UBS and LBI Created Mutual Debts and Claims By Contract.

There is also mutuality between UBS and LBI for the simple reason that they so agreed, as they had the right to do under New York law.  Nor was their agreement to aggregate their own and their affiliates' debts and claims a token gesture.  That agreement reflects the manner in which large financial institutions like Lehman Brothers and UBS Group do business, i.e., through wholly owned subsidiaries that specialize in different kinds of transactions.  *Cf. Depositors Trust Co. of Augusta v. Frati Enters., Inc.,* 590 F.2d 377, 379 (1st Cir. 1979) (as "common sense" matter, affiliate banks were "basically the same bank, [but] we cannot treat them as such, in the absence of an agreement by the bankrupt to treat the two banks as one").  The ISDA Setoff Clause has been negotiated into the schedules to thousands of ISDA Master Agreements worldwide, and the swap participants that are parties thereto presumably intended for their contractual triangular setoffs to be valid and enforceable, including in bankruptcy.  Prior to the *SemCrude* decision, they had no reason to expect otherwise -- as the precedent cited in *SemCrude* itself makes clear.  The *SemCrude* court should have followed the precedent and honored the parties' agreement to establish mutuality under state contract law.

Based on its survey of the precedent on triangular setoff, the *SemCrude* court cites four decisions in which the courts held that triangular setoff lacks mutuality at common law.  399 B.R. at 393.  But common-law setoff was not the issue before the *SemCrude* court, and is not the issue before this Court.  The *SemCrude* court did not cite any decision holding that a contractual triangular setoff is unenforceable in bankruptcy.  *See id.*[10]  To the contrary, the *SemCrude* court did cite several decisions expressing the view that a contractual triangular setoff is valid in

---

[10]    In *MNC Comm. Corp. v. Joseph T. Ryerson & Son, Inc.,* 882 F.2d 615 (2d Cir. 1989), cited in *SemCrude,* the "Second Circuit did not reach the issue of whether a contractual [triangular] right of setoff was created by the [order] forms" exchanged between the parties."  *Commerce Bank, N.A. v. Chrysler Realty Corp.,* 244 F.3d 777, 782 n.4 (10th Cir. 2001).

bankruptcy, if based on a valid contract, *see id.* at 394 n.4, and indirectly cited decisions holding contractual triangular setoffs to be valid under state law, including in receiverships, *see id.* at 395. There are also decisions enforcing contractual triangular setoffs outside the bankruptcy context that are not mentioned in *SemCrude*. *See, e.g., Commerce Bank, N.A. v. Chrysler Realty Corp.,* 244 F.3d 777, 781 (10th Cir. 2001) (reversing district court and enforcing clause in Dealer Agreement whereby Chrysler Corporation had the right to offset its obligations to a dealer against the dealer's obligations "to Chrysler Corporation *or its affiliates*") (emphasis in original).

The *SemCrude* court was too dismissive of the precedent. Among other things, the *SemCrude* court should have credited the numerous decisions -- e.g., *Garden Ridge, Berger Steel, Balducci Oil, Lang Machinery, Virginia Block, Harriss Pie, and Hill Petroleum* -- in which bankruptcy courts did not enforce alleged contractual triangular setoffs only because they found as a factual matter that there was no such contract.[11] The clear implication of these decisions is that those courts would have enforced the setoffs if there had been a requisite agreement. *See, e.g., Eckles v. Petco Inc. (In re Balducci Oil Co.),* 33 BR 847, 853 (Bankr. D.

---

[11]   *Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.),* 327 F.2d 401, 404-05 (7th Cir. 1964) (district court's finding of no agreement providing for triangular setoff was not clearly erroneous); *Equibank v. Lang Mach. Co. (In re Lang Mach. Corp.),* No. 86-00415, 1988 WL 110429, at *5 (Bankr. W.D. Pa. Oct. 19, 1988) ("For a valid 'triangular' setoff to exist, Debtor must have formally agreed to permit LMCI and Charles to aggregate debts."); *Va. Block Co. v. Bushong (In re Va. Block Co.),* 16 B.R. 560, 562 (Bankr. W.D. Va. 1981) (requiring an "agreement clearly establishing the intention of the parties to treat the parent and subsidiary as one entity"); *Eckles v. Petco Inc. (In re Balducci Oil Co.),* 33 B.R. 847, 853 (Bankr. D. Colo. 1983) ("courts have found mutuality between three parties, as a matter of contract law, where there was an express contractual agreement clearly evincing the intent of the parties to treat the parent and subsidiary as one entity"); *Walter E. Heller & Co. v. Food Mktg. Assocs. (In re Fasano/Harriss Pie Co.),* 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984) ("courts have found mutuality between three parties, as a matter of contract law, where there was an express agreement clearly evidencing the intent of the parties to treat the related corporations as a single entity"); *Wooten v. Vicksburg Ref., Inc. (In re Hill Petroleum Co.),* 95 B.R. 404, 411-12 (Bankr. W.D. La. 1988) ("The narrow exception to the rule against three party, 'triangular' setoffs, occurs where there is a formal agreement by the debtor that two entities may aggregate debts owed to and from the debtor").

Colo. 1983) (denying summary judgment due to material -- and presumably dispositive -- fact issue as to whether parties had contracted for triangular setoff).[12]

The *SemCrude* court also should have credited, rather than criticized, the Seventh Circuit in *Berger Steel* for citing to decisions enforcing contractual triangular setoffs under state law -- especially in receivership cases.  *See SemCrude,* 399 B.R. at 394-95 (citing *Berger Steel,* 327 F.2d at 404-05).[13]  Surely the policy of treating similarly situated creditors in a similar fashion underlies state receiverships as well as federal bankruptcy proceedings.  And yet, the courts in the receivership cases did not hesitate to enforce the debtors' contractual triangular setoff rights.

In *Piedmont Print Works, Inc. v. Receivers of People's State Bank of South Carolina*, 68 F.2d 110, 111 (4th Cir. 1934), the Fourth Circuit enforced the parties' agreement to preserve mutuality among the debtor and two creditor affiliates -- reversing the district court, which had denied the setoff in order to avoid giving the creditor a form of "priority."  In *Bromfield v. Trinidad National Investment Co.*, 36 F.2d 646, 647-48 (10th Cir. 1929), the Tenth Circuit affirmed the district court, which had allowed a contractual triangular setoff, explaining that "[i]t would be manifestly unfair to permit [the debtor] to treat the two [bank] institutions as one" in the contract and "as separate corporations" in the receivership.

The courts that contemplate enforcing a contractual triangular setoff reason that there was "an agreement by the bankrupt to treat the two [creditor affiliates] as one," *e.g., Garden Ridge,* 338 B.R. at 636-37 (collecting cases), or that the debtor "formally agreed to permit [the debtor]

---

[12]    The reason why the *SemCrude* court found no decision enforcing a contractual triangular setoff in bankruptcy may be that, prior to the *SemCrude* decision, both debtors and creditors believed such setoffs were fully enforceable, and so, where the contract was not disputed, the setoff issue was not litigated to the point of a published decision.

[13]    The *SemCrude* court did not acknowledge that mutuality is determined by nonbankruptcy law, even though the point is made in *Garden Ridge*, the last decision from the Delaware Bankruptcy Court on triangular setoff before *SemCrude*, which the *SemCrude* court cites several times on other points.  *See Garden Ridge,* 338 B.R. at 633.

and [the creditor] to aggregate debts," *e.g., Lang Machinery,* 1988 WL 110429, at *5.[14]   Such an

agreement to establish mutuality does not offend nonbankruptcy law, which permits the parties

to define their relationship by contract, and accordingly, since mutuality is defined by state law,

such an agreement does not offend the Setoff Statute.  *See, e.g., id.; Berger Steel,* 327 F.2d at

404-05; *Piedmont,* 68 F.2d at 111; *Bromfield,* 36 F.2d at 647-48.   Such an agreement is

enforceable under New York law, which permits parties to create mutuality where it is lacking at

common law or by statute.  *See, e.g., Fuller,* 587 F.2d at 107 (although creditor's setoff of

agent's debt against creditor's debt to agent's disclosed principal lacked mutuality under

common law and statute, the parties were free to agree to such setoff).

There is no question that mutuality can be created for purposes of the Setoff Statute by

contract, if that contract is an assignment.  *See Schechter v. Acme Screw Co. (In re Assured*

*Fastener Prods. Corp.)*, 773 F.2d 105, 106-07 (7th Cir. 1985); *U.S. Aeroteam, Inc. v. Delphi*

*Auto. Sys., LLC (In re U.S. Aeroteam, Inc.)*, 327 B.R. 852, 864-65 (Bankr. S.D. Ohio 2005); *In re*

*New Haven Foundry, Inc.*, 285 B.R. 646, 648 (Bankr. E.D. Mich. 2002).   An assignment is not

inherently more equitable than a triangular setoff clause, as a First Circuit decision demonstrates.

*See Depositors Trust,* 590 F.2d 377.

In *Depositors Trust*, the debtor had dealings with two affiliate banks (Augusta and

Bangor), which were separate legal entities but operated ostensibly as two branches of a single

bank.   Augusta owed the debtor, and the debtor owed Bangor.   *Id.* at 378-79.   Prepetition,

Augusta bought the debtor's note from Bangor, and Bangor bought back a 100 percent

participation in the proceeds of the note.   *Id.*   The court viewed the substance of this transaction

as an assignment of the note, which took place before the preference period and thus legitimately

established mutuality between Augusta and the debtor.   *Id.* at 379-80.   The court noted that there

---

[14]    *See also* the decisions collected in footnote 11 above.

was a "common sense" solution to the problem that was not available as a matter of law: "although Bangor and Augusta are basically the same bank, we cannot treat them as such, in the absence of an agreement by the bankrupt to treat the two banks as one." *Id.* at 379.

In addition, the majority of courts would hold that mutuality can be created for purposes of the Setoff Statute by a guaranty. *See, e.g., Bloor v. Shapiro,* 32 B.R. 993, 1001-02 (S.D.N.Y. 1983) (guaranty establishes mutuality for setoff purposes); *Perdido Pass Rest. v. Sunbelt Vacation Travel, Inc. (In re Sunbelt Vacation Travel, Inc.),* 94 B.R. 715, 720 (Bankr. S.D. Ala. 1988) (guarantor may set off rents due from his company to debtor, which he guarantied, against loan balance due from debtor to him); *Piedmont,* 68 F.2d at 111 (mutuality based on guaranty in substance but not in form); *cf. Boston Ins. Co. v. Nogg (In re Yale Express Sys., Inc.),* 362 F.2d 111, 114-15 (2d Cir. 1966) (insurance company surety has requisite mutuality under Bankruptcy Act section 68 by virtue of subrogation).  In substance, a contractual triangular setoff clause is effectively the same as party A's guaranty of party B's debt to party C, limited to the amount of party A's claim against party C.

If UBS LLC had assigned its rights under its contracts with LBI to UBS ninety-one days prior to the Commencement Date, such a contract would inarguably survive scrutiny under the Setoff Statute, resulting in precisely the same result that UBS seeks here:  that UBS and UBS LLC would have a single aggregated Receivable that was mutual with the Payable.  Likewise, if UBS LLC had guarantied UBS's obligation to LBI, UBS LLC could have offset its debt on the guaranty against the Receivable without offending the Setoff Statute.

The *SemCrude* court overzealously pursued its perceived duty to "constru[e] the generally accepted definition of mutuality narrowly," resulting in the court's rejection of mutuality as created under the contract law of numerous jurisdictions.  *See SemCrude,* 399 B.R. at 396-97.  The nonbankruptcy law should govern the issue.  *See Garden Ridge,* 338 B.R. at 633.

27

It is not equitable, efficient or sensible to interpret the Setoff Statute as cutting off a straightforward contractual path to mutuality -- especially one contained in a well known provision, commonly used by dealers in swap agreements -- but permitting the same result based on contractual contortions. *See Depositors Trust,* 590 F.2d at 379; *cf. SemCrude,* 399 B.R. at 398-99. A contract that provides mutuality, valid and enforceable under nonbankruptcy law, is just as valid and enforceable under the Setoff Statute. *See, e.g., Garden Ridge,* 338 B.R. at 633, 636-37.

**IV.    THE ISDA SETOFF CLAUSE IS VALID AND ENFORCEABLE UNDER THE SAFE HARBOR OF SECTION 561, NOTWITHSTANDING THE SETOFF STATUTE AND THE AUTOMATIC STAY.**

For the reasons given in section II above, the ISDA Setoff is not subject to the Setoff Statute. For the reasons given in section III above, the ISDA Setoff Statute satisfies the requirements of the Setoff Statute, including mutuality. If this Court determines, nonetheless, that the ISDA Setoff Clause is both subject to and contrary to the Setoff Statute, the ISDA Setoff Clause remains valid and enforceable under the Safe Harbor Statute (section 561).

The Safe Harbor Statute is entitled, "Contractual right to terminate, liquidate, accelerate, or **offset** under a master netting agreement **and across contracts** . . ." (emphasis added). 11 U.S.C. § 561. The Safe Harbor Statute provides:

> Subject to subsection (b), the exercise of any contractual right, because of [an ipso facto condition] . . . to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more [defined financial contracts, including swap agreements] **shall not be stayed, avoided, or otherwise limited by operation of any provision of this title** or by any order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 561(a) (emphasis added).

The Safe Harbor Statute clearly provides that if a creditor has a contractual right to offset claims and debts against a debtor under one or more swap agreements, that right is unaffected by any limitations in the Bankruptcy Code -- which necessarily includes the Setoff Statute. Accordingly, such a contractual right may be exercised freely postpetition.

That should be the end of the inquiry.  It is well settled that where, as here, a statute is clear and unambiguous on its face, it must be enforced according to its terms.  *E.g.*, *Patterson v. Shumate*, 504 U.S.753, 761 (1992); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (where the statute is clear, "judicial inquiry is complete.").  Importantly, legislative history cannot be used to create ambiguity in a statute.  *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132-33 (2002).

In any event, the legislative history shows, among other things, that Congress expressly recognized that swap agreements are "vital risk management tools," *see* 136 CONG. REC. H2281-06 (daily ed. May 15, 1990) (statement of Sen. Schumer); H.R. Rep. No. 101-484, at 2-3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224, and that, in enacting the safe harbor exclusively for swap agreements in section 560 of the Bankruptcy Code, Congress expressly intended to "preempt . . . the provisions of the Bankruptcy Code," H.R. Rep. No. 101-484, at *5-6 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 227-28 (1990), so that "contractual rights are not to be interfered with by any court proceeding under the Code," S. Rep. No. 101-285, at 9 (1990), 1990 WL 259288.

Moreover, in the Financial Netting Improvements Act of 2006, Congress amended the safe harbor from the automatic stay for swap agreements (section 362(b)(17)) to replace language exempting a "setoff by a swap participant . . . of a **mutual debt and claim**" from the automatic stay with language exempting "the exercise . . . of any **contractual right** (as defined in Section 560) to offset or net out any term any [payment] arising under or in connection with 1

29

or more [swap agreement]"  Pub. L. No. 109-390, § 5(a)(2), 120 Stat. 2692 (2006) (emphasis

added).  Thus, Congress expressly eliminated any mutuality requirement for setoff in the course

of expanding the protections afforded to swap agreements in 2005-2006.[15]

Because (i) UBS's rights under the ISDA Setoff Clause are valid and enforceable under

New York law, and (ii) the Payable "aris[es] under or in connection with" a swap agreement,

UBS's "contractual right" to offset the Payable against the Receivable under the ISDA Setoff

Clause remains valid and enforceable in LBI's SIPA case, notwithstanding the Setoff Statute (or

any other provision of the Bankruptcy Code).  *See* 11 U.S.C. § 561(a).  The Safe Harbor Statute

expressly so provides.[16]

## V.    THE EXERCISE OF THE ISDA SETOFF DID NOT VIOLATE THE AUTOMATIC STAY.

UBS's "failure" to turn over the Payable to LBI's estate did not violate the automatic stay

or the stay in the Liquidation Order, for two independent reasons.

First, section 542(b) of the Bankruptcy Code expressly exempts from the obligation to

turn over "a debt that is property of the estate" (here, the Payable) "such debt [as] may be offset

under [the Setoff Statute] against a claim against the debtor" (here, the Receivable).  11 U.S.C. §

542(b).  *See Strumpf,* 516 U.S. at 20 (further holding that section 362(a)(7) does not require the

"immediate payment of a debt subject to setoff").

Second, the ISDA Setoff is safe harbored from the effect of the automatic stay.  *See* 11

U.S.C. § 362(b)(17) (exempting from the stay "the exercise by a swap participant . . . of any

---

[15]    UBS acknowledges that this Court has held, in a different context, that the Safe Harbor Statute does not override the mutuality requirement of the Setoff Statute, notwithstanding the FNIA amendments. *See In re Lehman Bros. Holdings Inc.,* 433 B.R. 101, 110-11 (Bankr. S.D.N.Y. 2010) (*Swedbank*).  UBS respectfully disagrees.

[16]    This Court need not reach the question of whether all of the obligations that make up the Receivable arise from protected classes of contracts under the Safe Harbor Statute, because the ISDA Setoff Clause arises in connection with "one" protected contract -- the Agreement.  The requirement in section 561(b) that all affected contracts be within the list of protected classes applies to termination, liquidation and acceleration; but setoff is conspicuously absent from that section, indicating that Congress did not intend to limit the scope of cross-contract setoff to certain categories of contract.

contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements"); *see* 11 U.S.C. §§ 560, 561(a) ("the exercise of any contractual right, because of [an ipso facto condition], . . . to offset [under one or more safe harbored contracts] shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceeding under this title").

For the foregoing reasons, UBS has not violated the automatic stay.

## VI.    THE ISDA SETOFF CLAUSE IS NOT CONTRARY TO EQUITY OR POLICY CONCERNS.

The Trustee's assertions of purported prejudice and unfairness inherent in the ISDA Setoff require a brief response.

It is often said that equity looks to substance, not form. *See Bromfield,* 36 F.2d at 647-48 ("The action of the trial court . . . was right.  It is right because that is the substance of what the [plaintiff debtor] agreed to do.  . . .  It would be manifestly unfair to permit the [plaintiff debtor] to treat the two [counterparty affiliates] as one when it served the purposes of the [plaintiff debtor], and permit it to treat them as separate corporations whenever its interest so indicated."). Here, the substance of the agreement was that UBS and LBI intended to create valid and enforceable triangular setoff rights through the ISDA Setoff Clause.  The clause is valid and enforceable under New York law.  The parties had no reason to fear that the ISDA Setoff Clause would not be enforceable in bankruptcy, since the precedent was in favor of contractual triangular setoff.  If they had had such a reason, they could and likely would have reinforced the

ISDA Setoff Clause with limited assignments and/or guaranties or the like, to preserve the substance of their bargain.

There is no valid reason -- based in contract, statute, or equity -- why the ISDA Setoff Clause should not be honored in a bankruptcy or SIPA case. The Trustee's contract argument is countered in section I above. The Trustee's mutuality arguments are countered in section III above. At bottom, however, the Trustee essentially admits that his legal arguments are different means to attempt to "maximize the value of the estate" by reducing the number of LBI creditors with purportedly preferential setoff rights. *See* Motion at 15-16.

The issue is not whether a given setoff is preferential: they all are. That is why "the argument that setoff should be denied to avoid the inequity of preferential treatment is an argument against the very concept of setoff, not an argument against its application to the facts of this case." *In re Whimsy, Inc.,* 221 B.R. 69, 75 (S.D.N.Y. 1998) (Sweet, J.) (citing *N.Y. County Nat'l Bank v. Massey,* 192 U.S. 138 (1904)). The real issue is whether a given setoff is available under nonbankruptcy law and, if so, whether the Bankruptcy Code expressly nullifies it. *See In re Pottier & Stymus Co.,* 262 F. 955, 956 (2d Cir. 1919) (setoff is equivalent of "lawful preference"); *In re Revere Copper & Brass, Inc.,* 32 B.R. 577, 583 n.3 (Bankr. S.D.N.Y. 1983) ("statutory exception to the law of preference").[17]

If anyone understands the concept of a lawful preference, it should be the Trustee. For he is overseeing a liquidation pursuant to a statute that lawfully prefers one class of claimants (i.e., customers), over all other claimants -- and this lawful preference is so absolute that LBI's

---

[17]    There is no need to trot out the familiar citations from the Second Circuit in favor of setoff. *See, e.g., Bohack Corp. v. Borden, Inc.,* 599 F.2d 1160, 1164-65 (2d Cir. 1979) (setoff "occupie[s] a favored position in our history of jurisprudence," a position with which the courts should interfere only if "compelling circumstances require it"); *Pereira v. United Jersey Bank, N.A.,* 201 B.R. 644, 679 (S.D.N.Y. 1996) (collecting cases).

thousands of nonprivileged (i.e., noncustomer) claimants may receive a nominal recovery or no recovery at all from LBI's estate.

Because the ISDA Setoff Clause is valid and enforceable under New York law and the Bankruptcy Code, it would be unfair for this Court to annul it. "Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite." *Seatrade,* 369 F.2d at 848.

## IN SUPPORT OF CROSS-MOTION

UBS incorporates the preceding paragraphs, as if set forth herein in their entirety.

For the reasons set forth above, UBS respectfully requests that this Court issue an order confirming that the ISDA Setoff Clause in the Agreement is valid and enforceable in LBI's SIPA proceeding.

In the event that this Court determines that material fact issues prohibit granting the Motion and the Crossmotion, UBS respectfully requests that this Court issue an order directing the Trustee to withdraw the Motion, with leave to commence an adversary proceeding concerning the same subject matter as the Motion.

**CONCLUSION**

For the foregoing reasons, UBS respectfully requests that this Court (i) deny the Motion

in its entirety and (ii) grant the Crossmotion, issuing an order confirming that the ISDA Setoff

Clause in the Agreement is valid and enforceable in LBI's SIPA proceeding.

Dated:   January 21, 2011
      New York, New York

                                      **BINGHAM MCCUTCHEN LLP**

                                      /s/ Joshua Dorchak
                                      Edwin E. Smith
                                      edwin.smith@bingham.com
                                      Joseph L. Kociubes
                                      joe.kociubes@bingham.com
                                      Joshua Dorchak
                                      joshua.dorchak@bingham.com
                                      399 Park Avenue
                                      New York, New York 10022
                                      Telephone: (212) 705-7000

                                      Attorneys for UBS AG