Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of*
*Scotland N.V. (Formerly Known as*
*ABN AMRO Bank N.V.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS INC.,<br><br>           Debtor. | Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| THE ROYAL BANK OF SCOTLAND N.V.,<br><br>          Movant,<br><br>          v.<br><br>JAMES W. GIDDENS, AS TRUSTEE FOR SIPA LIQUIDATION OF LEHMAN BROTHERS INC.,<br><br>          Respondent. | |

**NOTICE OF RBS N.V.'S MOTION FOR ORDER DISMISSING, WITHOUT PREJUDICE, THE LBI TRUSTEE'S MOTION, DATED JUNE 29, 2011, OR ALTERNATIVELY, CONVERTING THE LBI TRUSTEE'S MOTION TO AN ADVERSARY PROCEEDING COMPLAINT, REQUIRING APPLICATION OF CERTAIN BANKRUPTCY AND LOCAL RULES, AND STAYING ALL NON-DISCOVERY-RELATED PROCEEDINGS IN RESPECT OF THE LBI TRUSTEE'S MOTION PENDING A DETERMINATION BY THE DISTRICT COURT WITH <u>RESPECT TO RBS N.V.'S MOTION TO WITHDRAW THE REFERENCE</u>**

PLEASE TAKE NOTICE that The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN AMRO Bank N.V., has filed the attached motion (the "Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for an order dismissing, without prejudice, the motion of James W. Giddens, Trustee for the Securities Investors Protection Act Liquidation of Lehman Brothers Inc. (the "LBI Trustee"), for an order enforcing certain stays and compelling payment from RBS N.V., filed in the above-captioned proceeding on June 29, 2011 [Bankr. Ct. Docket No. 4370], for failing to comply with Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or alternatively, (i) converting the LBI Trustee's motion to an adversary proceeding complaint, (ii) requiring that certain Bankruptcy Rules and related local rules apply, and (iii) staying proceedings with respect to the LBI Trustee's motion pending a determination by the United States District Court for the Southern District of New York with respect to RBS N.V.'s motion to withdraw the reference with respect to the LBI Trustee's motion.

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court shall hold a hearing in order to consider the relief requested by RBS N.V. in the Motion on **August 17, 2011 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as the parties may be heard,** before the Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the Bankruptcy Court, One Bowling Green, New York, New York 10004 (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief sought by RBS N.V. in the Motion must (i) be in writing and state with particularity the legal and factual basis for the objection; (ii) conform to the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, and the *Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and*

*Case Management Procedures and Related Relief* [Bankr. Ct. Docket No. 3466] (the "Case Management Order"); and (iii) be filed with the Bankruptcy Court, together with a proof of service, and served upon the following parties so as to be actually received on or before **August 10, 2011 at 4:00 p.m. (prevailing Eastern Time)**: (a) the chambers of the Honorable James M. Peck, United States Bankruptcy Judge, One Bowling Green, Courtroom 601 of the Bankruptcy Court, New York, New York 10004; (b) Dewey & LeBoeuf LLP, Attn: Martin J. Bienenstock and Irena M. Goldstein, 1301 Avenue of the Americas, New York, New York 10019; (c) Menaker & Herrmann LLP, Attn: Richard G. Menaker and Samuel F. Abernethy, 10 East 40th Street, New York, New York 10016; (d) Hughes Hubbard & Reed LLP, Attn: Christopher K. Kiplock and Jeffrey S. Margolin, One Battery Park Plaza, New York, New York, 10004; and (e) any other person or entity entitled to service under the Case Management Order.

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned from time to time by RBS N.V. without further notice other than by such adjournment being announced in the Bankruptcy Court or by a notice of adjournment filed with the Bankruptcy Court and served upon parties entitled to receive notice in the above-captioned proceeding and parties which have filed objections to the Motion.

PLEASE TAKE FURTHER NOTICE that if no objection to the Motion is timely filed and served, the Bankruptcy Court may enter an order granting the relief requested by RBS N.V. in the Motion without further notice or opportunity to be heard afforded to any party.

Dated: August 2, 2011  
       New York, New York

Respectfully Submitted,

/s/ Martin J. Bienenstock

Martin J. Bienenstock  
Irena M. Goldstein  
DEWEY & LeBOEUF LLP  
1301 Avenue of the Americas  
New York, New York 10019  
Tel: (212) 259-8000  
Fax: (212) 259-6333

*Attorneys for The Royal Bank of Scotland N.V. (Formerly Known as ABN AMRO Bank N.V.)*

Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of
Scotland N.V. (Formerly Known as
ABN AMRO Bank N.V.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re:

LEHMAN BROTHERS INC.,

          Debtor.

---

THE ROYAL BANK OF SCOTLAND N.V.,

          Movant,

          v.

JAMES W. GIDDENS, AS TRUSTEE FOR
SIPA LIQUIDATION OF LEHMAN
BROTHERS INC.,

          Respondent.

Bankr. Case No. 08-01420 (JMP)
SIPA

**RBS N.V.'S MOTION FOR ORDER DISMISSING, WITHOUT
PREJUDICE, THE LBI TRUSTEE'S MOTION, DATED JUNE 29, 2011,
OR ALTERNATIVELY, CONVERTING THE LBI TRUSTEE'S MOTION TO
AN ADVERSARY PROCEEDING COMPLAINT, REQUIRING APPLICATION
OF CERTAIN BANKRUPTCY AND LOCAL RULES, AND STAYING ALL NON-
DISCOVERY-RELATED PROCEEDINGS IN RESPECT OF THE LBI TRUSTEE'S
MOTION PENDING A DETERMINATION BY THE DISTRICT COURT WITH
RESPECT TO RBS N.V.'S MOTION TO WITHDRAW THE REFERENCE**

The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN AMRO Bank N.V. ("ABN"), respectfully submits this motion (the "Motion") for an order dismissing, without prejudice, the *Motion of Trustee Pursuant to Bankruptcy Code Sections 105(a) and 362 and the Lehman Brothers Inc. Liquidation Order, for an Order Enforcing the Automatic Stay and the Stays in the Liquidation Order and Compelling Payment of Amounts Payable by RBS N.V. (Acquirer of and Successor to ABN AMRO Bank N.V.)*[1] (the "Motion to Compel"), filed by James W. Giddens (the "LBI Trustee"), Trustee for the Securities Investors Protection Act ("SIPA") Liquidation of Lehman Brothers Inc. ("LBI"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on June 29, 2011 [Bankr. Ct. Docket No. 4370], for failing to comply with Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or alternatively, (i) converting the Motion to Compel to an adversary proceeding complaint, with a separate adversary proceeding case number assigned by the Clerk of the Bankruptcy Court, (ii) requiring application of the Part VII Bankruptcy Rules (and associated local civil and bankruptcy rules) to this proceeding, and (iii) staying this proceeding, other than with respect to discovery, pursuant to Bankruptcy Rule 5011(c), pending the decision by the United States District Court for the Southern District of New York (the "District Court") on the Motion to Withdraw the Reference (as defined below) to be filed by RBS N.V. In support of its Motion, RBS N.V. respectfully represents the following:

---

[1] The LBI Trustee repeatedly mischaracterizes the relationship between RBS N.V. and ABN in his Motion to Compel (each as defined below) by asserting that RBS N.V. acquired ABN. In fact, RBS N.V. and ABN are one and the same: on or about February 6, 2010, ABN changed its name to RBS N.V. A different RBS entity acquired ABN.

## PRELIMINARY STATEMENT

1.      The LBI Trustee's Motion to Compel attempts to obscure the real relief requested, namely, contract damages of over $345 million against RBS N.V. (the "RBS Amount"). This relief must be requested by complaint pursuant to Bankruptcy Rule 7001(1).[2] Aside from the LBI Trustee's use of a contested matter being plain wrong, it has clearly been done to prejudice RBS N.V. by eliminating the applicability of the Part VII Bankruptcy Rules, such as Bankruptcy Rule 7012, and short-circuiting discovery and RBS N.V.'s rights under Article III of the United States Constitution. Notably, the LBI Trustee, who is a fiduciary appointed by the District Court, has proceeded correctly by complaint in at least one other similar matter.

2.      The LBI Trustee attempts to avoid the requirements of the Bankruptcy Rules and Article III by asserting he is merely enforcing the automatic stay under section 362 of title 11 of the United States Code (the "Bankruptcy Code"). According to the LBI Trustee, because the LBI estate owns contract rights in the swap agreement, the failure of RBS N.V. to pay what the LBI Trustee alleges is due is a violation of the automatic stay. *See* Motion to Compel ¶¶51-53. The LBI Trustee is wrong. Even assuming all the allegations made by the LBI Trustee in the Motion to Compel were true (they are not), the LBI Trustee's entire case starts with a dispute over what is owed under a pre-Liquidation Order (as defined below) contract, and alleges nothing to make even a *prima facie* case that RBS N.V. violated the automatic stay by not paying the RBS Amount. Pursuant to section 541 of the Bankruptcy Code, LBI's estate is limited to its legal or equitable interests that existed as of the commencement of LBI's SIPA proceeding,

---

[2] The LBI Trustee's contention that his Motion to Compel is just a motion to enforce the automatic stay is also disproved by viewing the motion without consideration of the underlying swap agreement and defenses thereto. Without a determination of what, if anything, is owed under the swap agreement, there is no stay motion. Indeed, most of the Motion to Compel is devoted to discussing the underlying contracts. *See* Motion to Compel ¶¶13-19, 24-26, 30-33, 35, 39-46.

September 19, 2008, in this case, LBI's contract rights under its ISDA Agreements (as defined below) with RBS N.V. and its affiliate, The Royal Bank of Scotland plc ("RBS plc"). The LBI estate, however, does *not* include any legal or equitable interest in the RBS Amount because, as set forth below, the Supreme Court, in *Citizens Bank of Maryland v. Strumpf*, and numerous other courts, have long recognized the difference between a debtor's right to payment under a contract from a third party and the payment itself: the former is property of the estate, the latter most certainly is not.[3]

3.      In any event, while the LBI Trustee can litigate his stay violation theory, the existence or nonexistence of a stay violation does not relieve the LBI Trustee of the requirement that he proceed by adversary proceeding because the LBI Trustee is seeking to recover money and Bankruptcy Rule 7001(1) provides that the term "adversary proceeding" includes "a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002."

4.      Nonetheless, if the Bankruptcy Court will not dismiss the Motion to Compel, without prejudice, RBS N.V. requests that the Bankruptcy Court order that the Motion to Compel be treated as a complaint in an adversary proceeding, thereby rendering applicable Part VII of the Bankruptcy Rules.

---

[3] The LBI Trustee's position is unprecedented and void of logic. Perhaps this is why the LBI Trustee invokes section 105(a) of the Bankruptcy Code, the statute of last resort. This is not a situation where a third party is withholding the estate's money or bank account, or a third party violated the automatic stay by terminating a contract with the estate to terminate the third party's obligation to pay monies to the estate. Indeed, the LBI Trustee has acknowledged receipt of two termination notices sent by RBS N.V., one sent on September 15, 2008 and the other on September 22, 2008. The first date was before the SIPA proceeding was even commenced. The second date was clearly within the safe harbor in the Bankruptcy Code. The Liquidation Order was not violated for the same reasons.

5.      As set forth below, RBS N.V. intends to file, in short order, a Motion to Withdraw the Reference with respect to the Motion to Compel on the grounds, among others, that this matter must be heard and determined by an Article III court and jury, if a jury demand is made. Pursuant to Bankruptcy Rule 5011(c), the Bankruptcy Court may stay this matter "on such terms and conditions that are proper." The LBI Trustee and the SIPA estate will not be harmed by such a stay, particularly given the current state of the SIPA proceeding, as discussed further below. RBS N.V. requests that the Bankruptcy Court stay this proceeding, other than with respect to discovery, so that RBS N.V.'s rights can be vindicated without slowing down the matter.

6.      Finally, RBS N.V. reserves its right to show that if the LBI Trustee maintains his action as an action for a violation of the automatic stay and the Liquidation Order, and the Bankruptcy Court or District Court, as applicable, rules that the automatic stay and the Liquidation Order were not violated, the doctrine of *res judicata* will bar the LBI Trustee from bringing a separate contract action.

## BACKGROUND

7.      On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") commenced its chapter 11 case. Beginning on September 16, 2008 and periodically thereafter, certain of LBHI's United States affiliates commenced chapter 11 cases. On September 19, 2008, the Honorable Gerard E. Lynch of the District Court entered an *Order Commencing Liquidation* of LBI in *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-cv-8119 (GEL), thereby commencing the above-captioned SIPA proceeding [Bankr. Ct. and District Ct. Docket No. 1] (the "Liquidation Order"). The Liquidation Order acknowledges that the automatic stay under section 362(a) of the Bankruptcy Code is subject to other provisions, *i.e.,*

section 362(b) of the Bankruptcy Code, and carves out of its injunction actions allowed by the safe harbor provisions of the Bankruptcy Code, *i.e.*, 11 U.S.C. §§ 555-61.

8.     The LBI Trustee admits that RBS N.V. delivered termination notices dated September 15 and 22, 2008 under their respective ISDA agreements with LBI or its affiliates (as amended or supplemented, the "ISDA Agreements"). *See* Motion to Compel ¶¶15-16; Exhibits E and F to the Declaration of Samuel F. Abernethy in Support of the Motion to Compel, filed on June 29, 2011 [Bankr. Ct. Docket No. 4371] (the "Abernethy Declaration"). Thus, RBS N.V. terminated its ISDA Agreement with LBI, and RBS N.V.'s debt to LBI was reduced by amounts other Lehman entities owed to RBS N.V. and its affiliates pursuant to standard trade confirmations that documented LBI's transactions with an affiliate of RBS N.V. sent more than 800 times to LBI.

9.     In addition, on May 22, 2009, RBS N.V. filed a proof of claim against LBI. The proof of claim asserted that RBS N.V. was owed $1,562,717.39 for unpaid underwriting fees payable by LBI to RBS N.V. less the amount payable by RBS N.V. to LBI under a Master Securities Loan Agreement and also explained the setoff exercised by RBS N.V.

10.    On June 29, 2011, years after the LBI Trustee was put on notice that RBS N.V.'s liability to LBI was net of amounts LBI or its affiliates owed RBS N.V. or other RBS N.V. affiliates, the LBI Trustee filed the Motion to Compel and the Abernethy Declaration. In the Motion to Compel, the LBI Trustee asserts that LBI is entitled to the RBS Amount for the following reasons:

> (i)     the ISDA Agreement between RBS N.V. and LBI did not authorize the setoff;

(ii)      pre-Liquidation Order agreements separate and apart from such ISDA Agreement, which by their terms authorized the setoff, are unenforceable under New York law because of an integration clause in the ISDA Agreement;[4] and

(iii)     RBS N.V.'s failure to pay the amount payable under its ISDA Agreement to the estate of LBI constitutes a violation of the Liquidation Order and the automatic stay.[5]

11.     Because the Bankruptcy Court lacks jurisdiction to enter a final order granting the contract damages requested by the LBI Trustee and no property of LBI's estate is at issue, RBS N.V. will file a motion to withdraw the reference with respect to the Motion to Compel with the District Court (the "<u>Motion to Withdraw the Reference</u>") in advance of the hearing on this Motion. The Motion to Withdraw the Reference and any documents filed with the District Court in support thereof will also be filed with the Bankruptcy Court in accordance with Rule 5011-1 of the Local Bankruptcy Rules for the Southern District of New York.

---

[4] RBS N.V. will address the merits of the LBI Trustee's arguments concerning the propriety of the netting or setoff at the appropriate time and under the correct procedural posture, but points out, by way of illustration, that the LBI Trustee may want to check his facts before he proceeds. First, LBI was not contractually entitled to any amount from RBS N.V. Section 6(e) of the ISDA Agreement provides that "[t]he amount, if any, payable in respect of an Early Termination Date … shall be subject to any Set-off," with "Set-off" defined as any setoff or similar right "to which the payer of an amount under Section 6 is entitled … whether arising under the Agreement, another contract, applicable law or otherwise … that is exercised by … such payer." RBS N.V. was allowed to exercise its setoff rights, which as a practical matter required no further action by RBS N.V. Second, in the Motion to Compel, the LBI Trustee cites to New York law in support of his contention that RBS N.V. had no valid right of setoff under the applicable ISDA Agreement and that the Terms of Agreement, which granted the right of setoff exercised, could not alter the parties' obligations under the ISDA Agreement. *See* Motion to Compel ¶¶ 41, 43-46. Not only is the LBI Trustee's construction of the ISDA Agreement contradicted by the very terms of such agreement, he applies the wrong law, as English law governs the ISDA Agreement. *See* Exhibit A to the Abernethy Declaration, Part 4(h) ("This Agreement will be governed by and construed in accordance with English law"). The LBI Trustee asserts that he used New York law in his analysis because RBS N.V. used New York law in prior correspondence with the LBI Trustee. Motion to Compel ¶41 n.6. RBS N.V. did use New York law in connection with prior discussions, but that is because the agreement that gives RBS N.V. the right of netting or setoff expressly provides it is governed by New York law, unlike the ISDA Agreement.

[5] The LBI Trustee asserts "RBS's indefinite withholding of property of the LBI Estate constitutes a violation of the automatic stay and the LBI Liquidation Order." Motion to Compel ¶51. As set forth below, that statement could not be more wrong, as RBS N.V.'s funds are not property of the LBI estate. The LBI Trustee gets it right, however, when he states: "Courts have consistently held that contract rights are property of the estate and any contract rights of the debtor are protected by the automatic stay." *Id.* at ¶53 (citations omitted). RBS N.V. has taken no action, however, that affects the LBI estate's contract rights.

12. By this Motion, RBS N.V. respectfully requests entry of an order dismissing the Motion to Compel, without prejudice, on the grounds that its requested relief may only be granted in an adversary proceeding commenced under Bankruptcy Rule 7001(1). Alternatively, RBS N.V. respectfully requests an order (i) converting the Motion to Compel to an adversary proceeding complaint, with a separate adversary proceeding case number assigned by the Clerk of the Bankruptcy Court, (ii) requiring application of the Part VII Bankruptcy Rules (and associated local civil and bankruptcy rules) to this proceeding, and (iii) staying this proceeding, other than with respect to discovery, pursuant to Bankruptcy Rule 5011(c), pending a determination by the District Court with respect to the Motion to Withdraw the Reference.

**ARGUMENT**

**I.    The Motion to Compel Should be Denied, Without Prejudice, Because it Seeks Relief Bankruptcy Rule 7001(1) Reserves for Adversary Proceedings**

13. The LBI Trustee proceeds by motion instead of by complaint on the premise that he does not need to file a complaint if he is merely enforcing the automatic stay and the Liquidation Order. As discussed below, even assuming *arguendo,* that the automatic stay were implicated by RBS N.V.'s actions, the LBI Trustee is not relieved of his obligation to file a complaint to collect contract damages.[6]  Without proving his entitlement under pre-Liquidation

---

[6] Tellingly, in the Lehman chapter 11 bankruptcy cases, Lehman Brothers Commodity Services, Inc. commenced an adversary proceeding by filing a complaint, attached hereto as Exhibit A, to recover amounts setoff by Sempra Energy Trading LLC and Sempra Oil Trading Sárl, former affiliates of RBS N.V., alleging, among other things, violations of the automatic stay. *See Lehman Bros. Commodity Servs., Inc. v. Sempra Energy Trading LLC (In re Lehman Bros. Holdings Inc.)*, Adv. Pro. No. 11-01502 [Bankr. Ct. Docket No. 1] ¶¶73-81. While the facts and circumstances of the setoff at issue in this matter differ sharply from those described in the complaint, and while RBS N.V. (not to mention the Sempra entities) disagrees with the merits of the complaint, the Lehman chapter 11 debtors, unlike the LBI Trustee, followed the correct procedures. Similarly, the LBI Trustee filed a complaint, attached hereto as Exhibit B, seeking payment of amounts alleged owed by Citibank, N.A. and certain of its affiliates, but set off by Citibank. *See Lehman Bros. Inc. v. Citibank, N.A. (In re Lehman Bros. Inc.)*, Adv. Pro. No. 11-01681 [Bankr. Ct. Docket No. 1] ¶¶91-94.

Order contracts, the LBI Trustee has no premise for any stay violation action. There are no grounds for denying RBS N.V. its procedural rights under the Part VII of the Bankruptcy Rules given the nature of the relief requested in the Motion to Compel and the amount at stake in this proceeding.

14. Bankruptcy Rule 7001 provides that "[t]he following are adversary proceedings: (1) *a proceeding to recover money or property*, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002" (emphasis added). None of those exceptions to the requirements under Bankruptcy Rule 7001(1) are applicable.[7] The Motion to Compel clearly constitutes a proceeding to recover money or property, within the meaning of Bankruptcy Rule 7001(1) – indeed, the first paragraph of the Motion to Compel requests entry of an order "compelling payment of outstanding amounts payable to LBI by RBS N.V." *See also* Motion to Compel ¶51 ("RBS must turn over to the LBI estate the sum of $345,938,625 together with interest thereon").

15. If RBS N.V. were required to litigate the Motion to Compel in the context of a contested matter (without the Bankruptcy Court requiring more procedural safeguards), RBS N.V. would be deprived of procedural rights and protections it is entitled to under Part VII of the Bankruptcy Rules, including:

> (i)    Bankruptcy Rules 7008(a) and 7012(b), which would require the LBI
> Trustee and RBS N.V. to specify in their respective complaint and answer

---

[7] The exceptions to the requirement under Bankruptcy Rule 7001(1) that a trustee must commence an adversary proceeding to recover funds are proceedings under (i) section 554(b) of the Bankruptcy Code (abandonment), (ii) section 725 of the Bankruptcy Code (disposal of non-estate assets), (iii) Bankruptcy Rule 2017 (examination of transactions between debtor and its attorney), and (iv) Bankruptcy Rule 6002 (accounting by prior custodian of estate property). "[A] proceeding to compel the debtor to deliver property to the trustee," of necessity, cannot be the same as a "proceeding to recover money or property." Section 542(a) of the Bankruptcy Code shows that property to be delivered refers to property of the estate because section 542(a) provides that property the trustee may use, sell, or lease shall be delivered to the trustee. Pursuant to subsections 363(b) and (c) of the Bankruptcy Code, the trustee is only authorized to use, sell, or lease property of the estate.

whether the proceeding is core or non-core, and, if non-core, whether the parties consent to entry of final orders or judgments by the Bankruptcy Court.[8] If a determination were made that the adversary proceeding is non-core, or alternatively, a core proceeding that requires exercise of the Article III judicial power per *Stern v. Marshall*, 131 S. Ct. 2594, 2615 (2011), any findings of fact and conclusions of law made by the Bankruptcy Court would be subject to *de novo* review by a jury or the District Court, as applicable, pursuant to 28 U.S.C. § 157(c)(1);[9] and

(ii) Bankruptcy Rule 7012(a), which incorporates Rule 12 of the Federal Rules of Civil Procedure and would permit RBS N.V. to file a pre-answer motion to dismiss the LBI Trustee's complaint.

16. Failure to comply with Bankruptcy Rule 7001(1) by requesting relief through a motion constitutes grounds for dismissal or even denial of the motion. *See, e.g.*, *SLW Capital LLC v. Mansaray (In re Mansaray-Ruffin)*, 530 F.3d 230, 236 (3d Cir. 2008) (noting that section 1322(b)(11) of the Bankruptcy Code "does not leave courts free to disregard the Rules" requiring an adversary proceeding); *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) (a matter falling within the scope of the categories set forth in Bankruptcy Rule 7001 "commenced by motion rather than by complaint will be dismissed"); *In re Innovative Commc'n Co., LLC*, No. 07-cv-105, 2008 WL 2354907, at *6 (D.V.I. June 3, 2008) ("By requesting … relief by motion in the underlying contested matter rather than by commencing an adversary proceeding … Prosser has failed to comply with the requirements of Rule 7001 … Accordingly, Prosser's motion … fails

---

[8] Bankruptcy Rule 7008(a) provides that "[i]n an adversary proceeding before a bankruptcy judge, the complaint … shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge." Likewise, Bankruptcy Rule 7012(b) provides that "[a] responsive pleading shall admit or deny an allegation that the proceeding is core or non-core. If the response is that the proceeding is non-core, it shall include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy judge. In non-core proceedings final orders and judgments shall not be entered on the bankruptcy judge's order except with the express consent of other parties."

[9] 28 U.S.C. § 157(c)(1) provides that: "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."

on procedural grounds"); *Gazes v. DeArakie (In re DeArakie)*, 199 B.R. 821, 825 (Bankr. S.D.N.Y. 1996) (denying the debtor's motion to enjoin the trustee from selling property of the estate on the grounds that the motion was "procedurally improper" because the debtor failed to commence an adversary proceeding pursuant to Bankruptcy Rule 7001(7)); *Great Western Bank v. Snow (In re Snow)*, 201 B.R. 968, 977 (Bankr. C.D. Cal. 1996) ("An adversary proceeding is required to assure the protection of the procedural rights of the parties … Absent an adversary proceeding, the injunction requested may not be granted").

17.     Moreover, given that the Motion to Compel requires exercise of Article III judicial power, whether the motion is categorized as core or non-core,[10] the Bankruptcy Court lacks constitutional authority to exercise the essential attributes of judicial power with respect to the Motion to Compel and therefore cannot find facts or enter a final order determining this proceeding.  The Second Circuit has routinely recognized that actions against nondebtors relating to prepetition contracts require Article III judicial power.  *See Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 448 (2d Cir. 2005); *In re Millennium Seacarriers, Inc.*, 419 F.3d 83, 97 (2d Cir. 2005); *In re United States Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999).  Now that the filing of a proof of claim no longer deprives the claimant of its Article III rights in any counterclaim, there is no basis to proceed by motion in the Bankruptcy Court for such relief.  *See Stern v. Marshall*, 131 S. Ct. at 2598 (bankruptcy court lacks constitutional authority to enter final judgment on a state law counterclaim because "this case involves the most prototypical exercise of judicial power [by an Article I court]: the entry of a final, binding judgment by a court with

---

[10] As a contract action commenced against RBS N.V which had filed a proof of claim, 28 U.S.C. § 157(b)(2)(C) labels this a core proceeding.  But, pursuant to *Stern v. Marshall*, Article III judicial power is required to enter a final order in respect of such action.  131 S. Ct. at 2608.  That the LBI Trustee cloaked his contract action as a purported stay violation does not eliminate the underlying contract action.

broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime").

18.     The LBI Trustee will suffer no prejudice if he is required to comply with Bankruptcy Rule 7001(1).   Moreover, he has not even alleged a *prima facie* turnover case that RBS N.V. took any action that implicated estate property, which would explain why the LBI Trustee nowhere cites section 542(a) of the Bankruptcy Code, pursuant to which the Bankruptcy Court may order that third parties turn over property of the estate to the trustee.

19.     Section 541(a)(1) of the Bankruptcy Code provides that subject to certain exceptions, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "Section 541(a) of the Bankruptcy Code "is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case."  *In re Downey Fin. Corp.*, 428 B.R. 595, 607 (Bankr. D. Del. 2010) (citing *In re Bake-Line Group, LLC*, 359 B.R. 566, 570 (Bankr. D. Del. 2007)). *See also Integrated Solutions, inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997) ("the trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy"); *In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010) (same); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995). Moreover, section 541(a) does not expand property rights beyond what they are under state law.[11] That is why the Supreme Court refused to provide a mortgagee a better claim to rents than it had under state law in *Butner v. United States*, 440 U.S. at 57.  Here, LBI had no property interest

---

[11] *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609 [(1961)]").

under state (English) law in RBS N.V.'s money on the date its SIPA proceeding was commenced. Therefore, that money is not property of LBI's estate.

20.     As of the commencement of LBI's SIPA proceeding, the property of LBI's estate at issue here was its right to payment, if any, under its ISDA Agreement with RBS N.V., not the cash of RBS N.V.  The Supreme Court specifically held in *Citizens Bank* that just because a debtor's interest in a contract is property of the estate does not mean that cash payable thereunder is likewise property of the estate.  516 U.S. at 21.   Indeed, in *Citizens Bank*, the Supreme Court ruled the money in a debtor's own bank account was not property of the estate.  In *Citizens Bank*, a debtor alleged that his bank violated the automatic stay when the bank froze the debtor's deposits to preserve the bank's ability to exercise setoff rights.  *Id.*  In holding the bank's refusal to honor the debtor's withdrawal requests following the commencement of the debtor's bankruptcy case did *not* violate the automatic stay, the Supreme Court stated:

> We are unpersuaded by respondent's … concerns that the administrative hold violated §§ 362(a)(3) and 362(a)(6) … Respondent's reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that belonged to respondent.  That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank.  In fact, however, *it consists of nothing more or less than a promise to pay*, from the bank to the depositor … and [*the bank's*] *refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise*.  In any event, we will not give § 362(a)(3) or § 362(a)(6) an interpretation that would proscribe what § 542(b)'s "exception" and § 553(a)'s general rule were plainly intended to permit: the temporary refusal of a creditor to pay a debt that is subject to setoff against a debt owed by the bankrupt.

516 U.S. 16, 21 (1995) (emphasis added and citations omitted).

21.     Numerous other cases have similarly drawn a distinction between a right to payment under a contract and the payment itself for the purpose of determining the scope of

estate property.  *See, e.g.*, *In re Ruiz*, 440 B.R. 197, 201 (Bankr. D. Utah 2010) (citing *Citizens Bank*, 516 U.S. at 21) (debtors' interests in a bank account was not an interest in specific funds, but rather, a promise to pay from the bank, and this latter interest became property of the estate); *In re Sheeran*, 369 B.R. 910, 922 (Bankr. E.D. Va. 2007) ("The court finds most persuasive the very real distinction between the right to payment and the future payment itself"); *In re Kotz*, 146 B.R. 669, 671 (Bankr. E.D. Va. 1992) (same); *Northeast Glass, Inc. v. Alpen, Inc. (In re Northeast Glass, Inc.)*, 112 B.R. 475, 477 n.4 (Bankr. D. Mass. 1990) ("The Court agrees that the Debtor's right to payment from the General Contractor (whatever that right may be) belongs to the estate.  (The estate's interest in the account, however, is not a property interest in specific funds or other assets belonging to the General Contractor")); *In re Harter*, 10 B.R. 272, 275 (Bankr. D. Ind. 1981) ("the right to payment must be distinguished from the payment itself.  Although the statute grants an entitlement, the entitlement is the only interest which the debtor has at the commencement of his bankruptcy case, not the payments themselves").  *See also In re Gagne*, 163 B.R. 819, 821 n.2 (Bankr. D. Minn. 1994), *rev'd on other grounds*, 172 B.R. 50 (D. Minn. 1994) (noting that "the Bankruptcy Code defines 'claim' in terms of a 'right to payment,' not in terms of the payment itself").

22.     This matter is clearer than *Citizens Bank*.  The LBI estate has no bank account with RBS N.V.  It only has a contested contract claim.  Accordingly, the RBS Amount is not property of LBI's estate.  Only LBI's right to payment, if any, under its ISDA Agreement with RBS N.V., is property of LBI's estate.  Indeed, the cases cited by the LBI Trustee in support of the proposition that the RBS Amount, as opposed to LBI's contractual right to payment, is property of LBI's estate stand for the opposite conclusion and demonstrate the LBI Trustee's error.  In *In re Enron Corp.*, the head of trading for Enron Freight Markets terminated his

employment contract with Enron Global Markets LLC, a debtor in possession, without seeking relief from the automatic stay, and further, served a letter demanding a retention bonus, termination payment, and related fees pursuant to his employment contract.  300 B.R. 201, 206 (Bankr. S.D.N.Y. 2003).  The former employee then filed a motion for an order compelling payment of the foregoing as an administrative expense. *Id.*  In holding that termination of the employment contract and delivery of the demand letter constituted violations of the automatic stay, the Bankruptcy Court stated that "*contract rights are property of the estate*, and … therefore those rights are protected by the automatic stay." *Id.* at 212 (quoting *Elder-Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder-Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996)) (emphasis added).  The LBI Trustee neglects to mention that Enron involved a termination of contract rights that violated the automatic stay.  The employee's postpetition termination of an estate contract was a stay violation.  RBS N.V. has not violated the contract the LBI Trustee is attempting to enforce.  RBS N.V. simply contests the amount owing under the contract.

23.      In *In re Lehman Bros. Holdings Inc.*, Metavante Corp. "refused to perform under [its derivative contract] on account of the bankruptcies of LBSF and LBHI," but did not attempt to terminate the derivative contract during the year following the commencement of LBHI's chapter 11 case.  No. 08-13555 (JMP), Hearing Tr. at 106:8-106:14 (Bankr. S.D.N.Y. Sept. 15, 2009) [Bankr. Ct. Docket No. 5261].  The Bankruptcy Court held that by failing to terminate its derivative contract shortly after the commencement of LBHI's and LBSF's bankruptcy cases, Metavante waived its right to do so within its safe harbor.  *Id.* at 11:23-112:2.  Therefore, when it later terminated its derivative contract without first seeking relief from the automatic stay, Metavante Corp. violated the automatic stay.  Having terminated the derivative contract by

committing a stay violation, Metavante Corp. could not legally stop paying under the contract. In this context, the Bankruptcy Court held that Metavante's failure to pay its derivative contract obligations constituted an "attempt to control property of the estate." *Id*. at 112:20-112:22.

24.     In contrast, in the instant case, the Trustee is not contending that RBS N.V. improperly terminated its ISDA Agreements, given that termination notices were sent by RBS N.V. and receipt acknowledged by LBI.  As explained in the Preliminary Statement, if RBS N.V.'s failure to pay a contested amount under a contract were a stay violation, then every counterparty would have to pay on the estate representative's demand, before trial, to avoid committing a stay violation.  Additionally, Congress would not have included in section 542(b) of the Bankruptcy Code a provision requiring payment of matured debts if failure to pay were a stay violation.  That language would have been inserted in section 362(a).

25.     The LBI Trustee's reliance upon the Bankruptcy Court's statement in *Swedbank* that "a creditor's refusal to pay amounts owed to a debtor constitutes a violation of the automatic stay," to be kind, demonstrates clear legal error.   *In re Lehman Bros. Holdings Inc.*, 433 B.R. 101, 108 (Bankr. S.D.N.Y. 2010), *aff'd, Swedbank AB v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 445 B.R. 130 (S.D.N.Y. 2011).  In *Swedbank*, Swedbank set off prepetition amounts payable by it under prepetition ISDA Master Agreements against funds deposited by LBHI *postpetition* into an LBHI account at Swedbank.  *Id*. at 107.  **In other words, the funds on deposit at Swedbank were LBHI's postpetition funds, property of LBHI's estate, to begin with**.[12]  Here, on the other hand, the funds in question did not belong to LBI pre- or

---

[12] As noted above, the LBI Trustee, in contrast to his actions here, filed a complaint against Citibank, N.A. and certain of its affiliates where he demanded pursuant to section 542 of the Bankruptcy Code that Citibank turn over funds LBI had deposited as collateral prior to the commencement of LBI's SIPA proceeding.  The LBI Trustee does not even cite to section 542 of the Bankruptcy Code in the Motion to Compel, which is further proof the LBI Trustee knows RBS N.V. has no property belonging to the LBI estate.

post-Liquidation Order. *Swedbank* has no valid application here. RBS N.V. obtained the benefit of its pre-Liquidation Order contracts, by terminating its ISDA Agreement with LBI and exercising its pre-Liquidation Order netting and setoff rights against the amount otherwise payable under such ISDA Agreement, which notwithstanding the LBI Trustee's characterizations, expressly did not preclude such setoffs.

26.     Therefore, this contested matter cannot go forward in its present posture because allowing it to proceed would deprive RBS N.V. of its procedural rights and constantly lead to clashes of ordinary motion practice with RBS N.V.'s Article III rights, particularly given that no stay violation has even properly been pled. Accordingly, RBS N.V. respectfully requests that the Bankruptcy Court dismiss the Motion to Compel, without prejudice to the LBI Trustee's right to file a complaint.

**II.     Alternatively, the Motion to Compel Should be Converted to an Adversary Proceeding Complaint and the Part VII Bankruptcy Rules and Associated Local Civil and Bankruptcy Rules Should Apply**

27.     RBS N.V. submits there is absolutely no valid reason to allow a fiduciary and officer of the court like the LBI Trustee to violate the Bankruptcy Rules in suing RBS N.V. for over $345 million of contract damages, even if he actually intends to pursue a purported stay violation. Nevertheless, as an alternative to dismissing the Motion to Compel, the Bankruptcy Court may convert the Motion to Compel into an adversary proceeding complaint, either upon the motion of the parties or *sua sponte*. *See*, *e.g.*, *In re Wilborn*, 401 B.R. 872, 892-93 (Bankr. S.D. Tex. 2009) ("this Court has the power to convert a contested matter to an adversary proceeding on its own motion"); *RMM Records & Video Corp. v. Universal Music & Video Distrib. (In re RMM Records & Video Corp.)*, 372 B.R. 603, 606 n.1 (Bankr. S.D.N.Y. 2007) ("Universal objected that because monetary relief was sought, the motion should have been brought as an adversary proceeding. The Court agreed and converted the motion to an adversary

proceeding"); *Johnson v. Stemple (In re Stemple)*, 361 B.R. 778, 784 (Bankr. E.D. Va. 2007) (converting, *sua sponte*, a party's motion to dismiss to a complaint and initiating an adversary proceeding as required under Bankruptcy Rule 7001(5)); *Heubusch v. Novastar Mortg. (In re Heubusch)*, 345 B.R. 49, 52 (Bankr. W.D.N.Y. 2006) ("At the request of Novastar, this court converted the debtor's motion into an adversary proceeding").

28.    Accordingly, in the event the Bankruptcy Court declines to dismiss or deny the Motion to Compel, without prejudice, RBS N.V. respectfully requests that the Bankruptcy Court enter an order converting the Motion to Compel to an adversary proceeding complaint, with a separate adversary proceeding case number assigned by the Clerk of the Bankruptcy Court and subject to the Part VII Bankruptcy Rules (and associated local civil and bankruptcy rules).

**III.    All Non-Discovery Related Proceedings in Respect of the Motion to Compel Should be Stayed Pending a Determination by the District Court With Respect to RBS N.V.'s Motion to Withdraw the Reference**

29.    If the Bankruptcy Court does not, without prejudice, dismiss or deny the Motion to Compel, the Bankruptcy Court should enter an order pursuant to Bankruptcy Rule 5011(c) staying all proceedings, other than with respect to discovery, in respect of this matter until the District Court has made a determination with respect to RBS N.V.'s Motion to Withdraw the Reference.

30.    Bankruptcy Rule 5011(c) authorizes the Bankruptcy Court to stay this matter pending determination of the Motion to Withdraw the Reference "on such terms and conditions as are proper."  Here, the condition is that discovery may proceed so that prosecution of the action need not be delayed.  Courts in this district have held that "[s]ince injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown."  *In re Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 66 n.1 (S.D.N.Y. 1990); *AP Indus., Inc. v. SN Phelps & Co. (In*

*re AP Indus., Inc.)*, 117 B.R. 789 (Bankr. S.D.N.Y. 1990); *In re Chateaugay Corp.*, 118 B.R. 19, 23-24 (Bankr. S.D.N.Y. 1990); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (citing *Henderson v. Burd*, 133 F.2d 515, 517 (2d Cir. 1943)).

31.     Numerous reasons exist why the Bankruptcy Court should grant such a stay of proceedings.  First, as explained above and as RBS N.V. will explain in greater detail in its memorandum of law accompanying the Motion to Withdraw the Reference, the Motion to Compel commenced an action requiring exercise of the Article III judicial power, regardless of whether the action is labeled core or non-core.  In light of this, and given the facts of the instant proceeding, the policy in the Second Circuit in respect of non-core proceedings to afford claimants in the position of RBS N.V. an Article III forum would also apply to core proceedings where Article III power is required.  *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) (in determining whether cause exists under 28 U.S.C. § 157(d) to withdraw the reference, a District Court should consider first, whether the claim is core or non-core, and second, weigh questions of efficient use of judicial resources, delay, and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors).  Similarly, the considerations of efficiencies, delays, and costs are all served by not subjecting the Bankruptcy Court, the LBI Trustee, and RBS N.V. to potential duplications of efforts if only an Article III court and jury can enter dispositive rulings.

32.     Second, RBS N.V. will be significantly prejudiced if it is required to litigate the merits of the Motion to Compel before the Bankruptcy Court and the Motion to Withdraw the Reference before the District Court (likewise, the LBI estate will be harmed by having to fight

simultaneous litigation on two fronts, to the detriment of LBI's customers and creditors). *See*, *e.g.*, *Miller v. Vigilant Ins. Co. (In re Eagle Enters.)*, 259 B.R. 88, 89 (Bankr. E.D. Pa. 2001) (granting a stay of proceedings pending a motion to withdraw the reference when the movant would be prejudiced by having to litigate in two forums simultaneously).

33.    Third, absent a stay of proceedings in respect of the Motion to Compel, there exists a substantial risk that anything the Bankruptcy Court orders will be under a cloud of whether it unconstitutionally constitutes the exercise of the essential attributes of judicial power.

34.    Fourth, the LBI Trustee will not be harmed by a stay of all non-discovery related proceedings.  As noted above, the LBI Trustee has been aware of RBS N.V.'s asserted right of netting and setoff from the outset.  He had access to all the same Terms of Agreement confirming each trade.  Moreover, the LBI Trustee and RBS N.V. engaged in extensive correspondence debating some aspects of the netting and setoff issue early in the LBI SIPA case. Nevertheless, the LBI Trustee waited over two years to file the Motion to Compel.  The LBI Trustee will not be harmed by waiting a short additional time until a determination has been made by the District Court with respect to RBS N.V.'s Motion to Withdraw the Reference.

35.    Moreover, as set forth in the LBI Trustee's Fifth Interim Report, filed on April 22, 2011 [Bankr. Ct. Docket No. 4245], "[t]here remain 3,146 claims with an approximate value of $42.7 *billion* that remain unresolved (*i.e.*, an objection to the Trustee's determination has been filed and has not been resolved, the time to object to a determination has yet to expire, or the claimant has not provided supplemental information as requested by the Trustee)" (emphasis added).  Fifth Interim Report ¶12.  In addition, there exist over 1,200 unresolved pending objections to the LBI Trustee's determination of claims.  *Id*. at ¶41.  Further, the LBI Trustee will not make distributions on allowed customer claims until "major claims determination issues

are solved and there is sufficient clarity on, or resolution of … major contingencies." *Id*. at ¶31. In short, the LBI Trustee is nowhere near a final resolution of the SIPA proceeding and requiring the LBI Trustee to wait to litigate the instant matter until the District Court has had the opportunity to make a determination with respect to the Motion to Withdraw the Reference would not harm the LBI estate.

## RESERVATION OF RIGHTS

36.     By filing this Motion, RBS N.V. does not waive and expressly reserves the right to (i) file an objection to the Motion to Compel on substantive grounds, and (ii) to demonstrate that if the LBI Trustee maintains his action as an action for a violation of the automatic stay and the Liquidation Order and the Bankruptcy Court or District Court, as applicable, rules that the automatic stay and the Liquidation Order were not violated, the doctrine of *res judicata* will bar the LBI Trustee from bringing a separate contract action.

## NOTICE

37.     RBS N.V. is providing notice of this Motion to each party that is entitled to receive notice pursuant to the *Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007, Implementing Certain Notice and Case Management Procedures and Related Relief* entered by the Bankruptcy Court [Bankr. Ct. Docket No. 3466].

## CONCLUSION

WHEREFORE RBS N.V. respectfully requests that the Bankruptcy Court enter an order denying the LBI Trustee's Motion to Compel, without prejudice, or alternatively, (i) converting the Motion to Compel to an adversary proceeding complaint, with a separate adversary proceeding case number assigned by the Clerk of the Bankruptcy Court, (ii) requiring application of the Part VII Bankruptcy Rules (and associated local civil and bankruptcy rules) to this proceeding, and (iii) staying this proceeding, other than with respect to discovery, pursuant to Bankruptcy Rule 5011(c), pending a determination by the District Court with respect to the Motion to Withdraw the Reference, and granting RBS N.V. such other and further relief as is just.

Dated: August 2, 2011
      New York, New York

Respectfully Submitted,

/s/ Martin J. Bienenstock
Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of Scotland N.V. (Formerly Known as ABN AMRO Bank N.V.)*

# EXHIBIT A

**(Sempra Complaint)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph Miller, Esq.
Peter Gruenberger, Esq.
Robert Lemons, Esq.

*Attorneys for Debtor and Plaintiff*
*Lehman Brothers Commodity Services Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS COMMODITY SERVICES INC.,<br><br>Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY TRADING LLC (f/k/a SEMPRA ENERGY TRADING CORP.) and SEMPRA OIL TRADING SÀRL,<br><br>Defendants. | Adv. Proc. No. 11-_____ |

## ADVERSARY COMPLAINT

Plaintiff Lehman Brothers Commodity Services Inc. ("LBCS"), as debtor
in possession, as and for its Adversary Complaint against Defendants Sempra Energy
Trading LLC (f/k/a Sempra Energy Trading Corp.) ("SET") and Sempra Oil Trading Sàrl
("SOT" and together with SET, "Sempra" or "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     This action arises from Defendants' refusal to pay to LBCS the principal amount of more than $104.7 million (the "LBCS Receivable") that SET and SOT admittedly owe to LBCS in order to gain leverage and an improper advantage over LBCS, its estate, and other creditors.  As justification, Defendants have asserted, and continue to assert, unlawful and nonmutual setoff rights (the "Purported Setoffs") against LBCS based on alleged claims of entities *other than* SOT or SET against LBCS and Lehman entities *other than* LBCS.  Specifically, Defendants assert setoff rights on account of obligations that (i) LBCS allegedly owes to Defendants' affiliate, Sempra Energy Solutions LLC (f/k/a Sempra Energy Solutions) ("SES"); (ii) Lehman Brothers Special Financing Inc. ("LBSF") allegedly owes to The Royal Bank of Scotland plc ("RBS"); (iii) Lehman Brothers Inc. ("LBI") allegedly owes to RBS; and (iv) Lehman Brothers International (Europe) ("LBIE") allegedly owes to ABN AMRO Bank N.V. ("ABN AMRO").

2.     The diagram below illustrates that LBCS has claims against SET and SOT totaling over $104.7 million in aggregate (exclusive of interest),[1]  but neither SET nor SOT has a claim against LBCS.

---

[1]  The amounts owed by SET and SOT to LBCS, included in the below diagram, are taken from Defendants' Calculation Statement, as defined *infra*.  The exact amount owed to LBCS will be determined during trial, if any such trial occurs.

## Obligations Owed to LBCS by Defendants



3.      Further, the Purported Setoffs asserted by Defendants, as shown by a second diagram below,[2] are nonmutual, meaning the obligations that Defendants seek to set off are not owed by the same parties in the same capacity.   Thus, such obligations cannot permissibly be set off against Defendants' obligations to LBCS.   Such Purported Setoffs are in express violation of and are impermissible under section 553(a) of title 11 of the United States Code (the "Bankruptcy Code").

### Alleged Obligations of LBCS and Its Affiliates to Entities Other Than Defendants



---

[2] The amounts claimed by SES and RBS, included in this diagram, are taken from Defendants' Calculation Statement, as defined *infra*, and proof of claim number 37431 filed by RBS against the LBSF estate.   Such alleged amounts have not been accepted by the LBCS or LBSF estates.

4.     SET and SOT may not avoid paying their own obligations due and owing to LBCS by using the alleged claims that SES, a separate and distinct entity, may have against LBCS.   Moreover, SET and SOT may not reduce their own obligations to LBCS by using the alleged claims of RBS and ABN AMRO, also separate and distinct entities from Defendants, against entities other than *LBCS*.   Such putative setoffs are unlawful and detrimental to the LBCS estate because, if permitted, they would (a) deprive LBCS of its rightful claims against Defendants and (b) transform SES's, RBS's, and ABN AMRO's alleged unsecured claims against LBCS, LBSF, LBIE, and LBI into allowed secured claims (by virtue of section 506(a)(1) of the Bankruptcy Code).   Moreover, LBIE is currently in administration proceedings in England while LBI is subject to proceedings under the Securities Investor Protection Act of 1970 ("<u>SIPA</u>").   Both of those proceedings are separate and unrelated to the LBCS chapter 11 proceedings—LBCS has no control over them.   Because Defendants have no valid setoff rights that justify withholding the LBCS Receivable, by withholding such sums and by attempting to effectuate an unlawful setoff, Defendants continue to act in direct violation of the Bankruptcy Code.

5.     To date, and despite LBCS's unequivocal demands for payment, Defendants have failed to seek relief from the automatic stay to permit the Purported Setoffs of over $104.7 million that Defendants willfully are withholding from LBCS and its estate.   Instead, in willful disregard of the automatic stay provision in the Bankruptcy Code, Defendants steadfastly have refused to make *any* payment, forcing LBCS to initiate this adversary proceeding to recover LBCS's property for the benefit of its estate.

6.      Defendants have sought to justify their willful violation of the automatic stay by reference to the Bankruptcy Code's safe harbor provisions for swap participants and master netting agreement participants (sections 560 and 561, respectively) (the "Safe Harbor Provisions").   The Safe Harbor Provisions do not permit the exercise of *nonmutual* setoffs in violation of section 553 of the Bankruptcy Code. Rather, they merely permit certain *mutual* setoffs to be exercised in connection with the termination, liquidation, and acceleration of swap transactions despite the automatic stay and the Bankruptcy Code's prohibitions on *ipso facto* clauses.   Defendants' attempt to cloak themselves in the Safe Harbor Provisions runs afoul of the clear language, purpose, and intent of those provisions.   If the Court were to permit such abuse of the Safe Harbor Provisions, it would deprive the LBCS estate and its creditors of over $104.7 million in principal to which the LBCS estate is rightfully entitled to from Defendants.

7.      LBCS brings this action to protect the interests of its estate and the beneficiaries thereof and to obtain:   (a) a declaration that the Purported Setoffs are not permitted under section 553(a) of the Bankruptcy Code; (b) a declaration that no exception to the mutuality requirement in section 553(a) of the Bankruptcy Code exists by virtue of the Safe Harbor Provisions so as to permit the Purported Setoffs; (c) an order under section 542(b) of the Bankruptcy Code requiring Defendants immediately to turn over the principal amount of more than $104.7 million owed, which they admit is owed to LBCS and which is property of the LBCS estate under section 541(a)(1) of the Bankruptcy Code; (d) an order pursuant to section 542 of the Bankruptcy Code requiring Defendants to turn over all Accrued Interest on the LBCS Receivable, as defined herein and in an amount to be determined at trial, if any such trial occurs; (e) a declaration that

Defendants violated the automatic stay and, consequently, Defendants must turn over the LBCS Receivable plus all Accrued Interest, as defined herein and in an amount to be determined at trial, if any such trial occurs; and (f) an award of damages to LBCS, against Defendants, based on their willful violations of the automatic stay, in an amount to be determined at trial, if any such trial occurs.

## JURISDICTION AND VENUE

8.       This is a civil proceeding arising in a case under the Bankruptcy Code, § 11 U.S.C. 101, *et seq.*, within the meaning of 28 U.S.C. § 1334.   It is properly brought as an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.       This Court has jurisdiction to entertain the claims asserted herein pursuant to 28 U.S.C. § 1334(b) (civil cases arising under title 11), 28 U.S.C. § 1334(e)(1) (district court's exclusive jurisdiction over property of the estate), and 28 U.S.C. § 157(b) (core proceedings arising under title 11).

10.      This is a core proceeding under 28 U.S.C. § 157(b).

11.      Venue is proper in this district under 28 U.S.C. § 1409(a).

12.      This Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004(f).

## PARTIES AND RELATED ENTITIES

13.      Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holding, Inc. ("LBHI") and certain of its subsidiaries (collectively with LBCS, the "Debtors") initiated with this Court voluntary cases under chapter 11 of the Bankruptcy Code.   LBCS commenced its

chapter 11 case on October 3, 2008. LBCS's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBCS's principal place of business is located at 1271 Sixth Avenue, New York, New York 10020, and LBCS is authorized to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14. On September 19, 2008, by order of the United States District Court for the Southern District of New York a liquidation proceeding was commenced for LBI pursuant to the provisions of SIPA (the "SIPA Proceedings"). *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL), Order Commencing Liquidation, Docket No. 3 (S.D.N.Y. Sept. 19, 2008).

15. Pursuant to a court order on September 15, 2008, LBIE entered English administration proceedings pursuant to the Insolvency Act of 1986.

16. SET is a limited liability corporation organized and existing under the laws of the State of Delaware with a registered agent at the address of 160 Greentree Drive, Suite 101, Dover, Delaware 19904. SET's principal place of business is 58 Commerce Road, Stamford, Connecticut 06902.

17. SOT is a corporation organized and existing under the laws of Switzerland with a designated agent at the address of 111 Old Broad Street, London, England EC2N 1SE. SOT's principal place of business is 15-17 rue du Cendrier, CH-1211 Geneva, Switzerland. SOT transacted with LBCS through SET in Connecticut.

**FACTUAL ALLEGATIONS**

**A.**    **The Prepetition Transactions and Defendants' Delivery of the Calculation Statement**

18.    Prior to the Commencement Date, LBCS transacted with SET and SOT under two sets of arrangements.  LBCS and SET entered into swap transactions pursuant to a 1992 Multicurrency-Cross Border ISDA Master Agreement, dated as of May 1, 2006 (as amended, supplemented, or modified, and including all schedules, annexes, and exhibits thereto, and all confirmations exchanged pursuant to the Transactions entered into thereunder, the "SET Master Agreement").  LBCS and SET also entered into crude oil purchase and sale transactions as evidenced by transaction confirmations relating thereto (such transactions and all documentation relating thereto, as amended from time to time, the "Oil Agreements").  Both the SET Master Agreement and the Oil Agreements are governed by New York law.

19.    LBCS and SOT entered into swap transactions under a 1992 Multicurrency-Cross Border ISDA Master Agreement, dated as of January 10, 2007 (as amended, supplemented, or modified, and including all schedules, annexes, and exhibits thereto, and all confirmations exchanged pursuant to the Transactions entered into thereunder, the "SOT Master Agreement").  The SOT Master Agreement is governed by English law.

20.    Also, prior to the Commencement Date, LBCS and SES entered into swap transactions under a 1992 Multicurrency-Cross Border ISDA Master Agreement, dated as of August 25, 2006 (as amended, supplemented, or modified, and including all schedules, annexes, and exhibits thereto, and all confirmations exchanged

pursuant to the Transactions entered into thereunder, the "SES Master Agreement" and collectively with the SET Master Agreement and the SOT Master Agreement, the "Master Agreements").

21.     By notices dated September 14, 2008, SET, SOT, and SES notified LBCS they were terminating the Master Agreements and designated September 15, 2008 as the early termination date (the "Early Termination Date") with respect to all transactions under the respective Master Agreements (the "Early Termination Notices"). By notice dated September 14, 2008, SET notified LBCS that it was terminating and liquidating the Oil Agreements and designated September 15, 2008 as the early termination date (the "Oil Agreements Early Termination Notice").

22.     Pursuant to the SET and SOT Master Agreements, Defendants were required to calculate their "Loss" in respect of the transactions under those agreements.   SET and SOT Master Agreements, Schedule Part 1(f).   "Loss" means:

> with respect to [the Master] Agreement[s] or one or more Terminated Transactions, as the case may be, . . . an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this [the Master] Agreement[s] or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).

*Id.* at § 14 (Loss definition).

23.     Defendants were required to make such calculations "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date,"

and provide to LBCS a "statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid." *Id.* § 6(d)(i). On May 15, 2009, LBCS received from SET, SOT, and SES such a statement, pursuant to section 6(d)(i) of their respective Master Agreements, with calculations including Defendants' "Loss" (or "Gain," with respect to SET and SOT) as a result of the early termination of the Master Agreements and the Oil Agreements (the "Calculation Statement").

24. In the Calculation Statement, Defendants conceded that the following amounts were owed to LBCS as early termination payments under the SET Master Agreement, the SOT Master Agreement, and the Oil Agreements:

- $94,852,002 payable by SET to LBCS under the SET Master Agreement (the "SET Early Termination Payment");

- $9,682,544 payable by SOT to LBCS under the SOT Master Agreement (the "SOT Early Termination Payment"); and

- $243,537 payable by SET to LBCS under the Oil Agreements (the "SET Oil Payment" and together with the SET Early Termination Payment and the SOT Early Termination Payment, the "Early Termination Payments").

The total aggregate principal amount of the LBCS Receivable, as stated in Defendants' Calculation Statement, amounts to at least $104,778,083. The exact amount of the LBCS Receivable will be determined at trial, if any such trial occurs.

25. Both the SET and SOT Master Agreements provide that Defendants were required to remit the SET and the SOT Early Termination Payment on the date that the Calculation Statement was delivered. *Id.* §§ 6(d)(ii), 12(a)(i) (noting hand delivery of notice is effective on date of delivery).

26.     The Oil Agreements provide that, upon an event of default by one party (the "Non-Performing Party"), which event of default can include the filing of a petition for relief under the Bankruptcy Code, the other party (the "Performing Party") shall have the right to terminate the parties' transactions and calculate a net settlement payment due to either party under all transactions between the parties.  Oil Agreements, Non-Performance ¶¶ (1)-(4).  "The party with the payment obligation shall pay such amount to the other party within one business day of the liquidation."  *Id.* ¶ (3).

**B.     The Purported Setoffs**

27.     Despite the fact that the Early Termination Payments—which make up the LBCS Receivable—have been due and payable since, at the very latest, the delivery of the Calculation Statement, and despite the fact that Defendants explicitly acknowledged that the Early Termination Payments due to LBCS amount to over $104.7 million in principal, Defendants have willfully refused to make any payment to LBCS.

28.     As purported justification for their intentional violation of the automatic stay, in their Calculation Statement SET and SOT assert first that they may set off the LBCS Receivable against the $253,405 LBCS allegedly owes SES under the SES Master Agreement (the "Alleged SES Receivable").  Defendants contend that such setoff is permissible under two equally meritless grounds: (i) section 6(f) of the SET and SOT Master Agreements, and (ii) the alleged "Non-Performance" provisions of the Oil Agreements.[3]

_____

[3]  Defendants also have asserted without detail or specification that they may deduct any alleged expenses and fees, which deductions LBCS challenges as contrary to the terms of the Master Agreements.

29.     Section 6(f) of the SET and SOT Master Agreements provides, in

relevant part, as follows:

> Any amount payable to one party by the other party under Section 6(e), . . . will be made without set-off or counterclaim except that at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), X may, without prior notice to any person, set-off any sum or obligation (whether or not arising under this Agreement, whether or not matured and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement, whether or not matured and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y; provided that any amount not then due which is included in such setoff shall be discounted to present value as at the time of setoff (to take account of the period between the time of setoff and the date on which such amount would have otherwise been due) at the applicable rate for that period determined by X in any commercially reasonable manner.  X will give notice to the other party of any set-off effected under this Section 6(f).

SET and SOT Master Agreements, § 6(f).

30.     Similarly, the Oil Agreements provide that the "Performing Party

may, . . . set off amounts which the Non-Performing Party owes to it or its affiliates

against any amounts which it owes to the Non-Performing Party (whether hereunder,

under a transaction or otherwise and whether or not then due)."  Oil Agreements, Non-

Performance ¶ (5).

31.     These provisions, however, do not afford Defendants the right to

exercise a nonmutual setoff of the LBCS Receivable against the Alleged SES Receivable,

because the exercise of such right would be in violation of the express requirement of

mutuality in section 553 of the Bankruptcy Code.  Moreover, on their face, these provisions in the SET and SOT Master Agreement, as well as the Oil Agreements, apply *only* to the purported setoff of the LBCS Receivable against the sum LBCS allegedly owes to SES, which is, at most, $253,405.

32.     In an attempt to justify withholding the entire $104.7 million of the LBCS Receivable, Defendants, therefore, concocted, as expressed in their Calculation Statement, a second, and even more implausible argument, asserting that their "Affiliates" possess "additional rights of counterclaim and set-off" that justify Defendants' depriving LBCS of more than $104.7 million of principal.  Specifically, Defendants have asserted that such rights exist in "law, in equity or contained in certain other agreements with you and/or your Affiliates."   On this basis, Defendants contend they may set off the LBCS Receivable against amounts allegedly owed to other entities, RBS and ABN AMRO, from entities other than LBCS (the "Alleged RBS/ABN Receivables").

33.     These Alleged RBS/ABN Receivables purportedly are owed (i) to RBS from LBSF under that certain 1992 form ISDA Master Agreement between RBS and LBSF dated as of September 15, 2003 (the "RBS/LBSF Master Agreement"; (ii) to ABN AMRO from LBIE, under that certain 1992 form ISDA Master Agreement between ABN AMRO and LBIE dated as of January 24, 1997 (the "ABN/LBIE Master Agreement"); and (iii) to RBS from LBI under that certain 1992 form ISDA Master Agreement between RBS and LBI, dated as of November 25, 1996 (the "RBS/LBI Master Agreement") and together with the RBS/LBSF Master Agreement and the ABN/LBIE Master Agreement, the "Affiliate Master Agreements").

34.     As a purported basis for these nonmutual setoffs, Defendants refer to certain terms of agreement ("Terms of Agreement"), which allegedly were "delivered" from RBS Greenwich Capital ("RBS Greenwich Capital") "to certain of [LBCS's] affiliates,"—not between or among either LBCS, SOT, or SET.  LBCS, having never been the recipient of these so-called Terms of Agreement, requested that Defendants provide it with a copy.  After some delay, Defendants did so and, upon inspection, it is clear that the Terms of Agreement are not only unrelated to the Master Agreements between LBCS and either SOT or SET, *but also are wholly unrelated* to the Affiliate Master Agreements, which allegedly give rise to the Alleged RBS/ABN Receivables against which Defendants purport to set off the LBCS Receivable.  Rather, the Terms of Agreement appear to be an extraneous document allegedly attached to quarterly brokerage confirmations which were sent from RBS Greenwich Capital to LBSF.  Importantly, LBCS was neither the recipient of the Terms of Agreement nor a party to the transactions with RBS Greenwich Capital.  Defendants cannot avoid their clear and unequivocal obligations under the terms of the SET Master Agreement, the SOT Master Agreement, and the Bankruptcy Code, by relying upon an entirely unrelated document that was delivered by an entity other than SET or SOT to an entity other than LBCS.

35.     Moreover, the language in the Terms of Agreement (which Defendants apparently rely upon to exercise their meritless "setoff"), even if it were enforceable (which it is not), does not apply to a setoff of obligations owed to LBCS, but

rather, is limited to obligations that RBS Greenwich Capital owes to an entirely different counterparty, LBSF.[4]

36.  Finally, even assuming that the Terms of Agreement could be deemed to apply to the Purported Setoffs, to enforce them would be in a violation of the bedrock principle of bankruptcy law that all setoffs against a debtor be mutual, and thus, impermissible and in violation of section 553 of the Bankruptcy Code.

### C.  LBCS's Demands for Payment

37.  From and after LBCS's receipt of the Calculation Statement, the Defendants and LBCS have communicated numerous times attempting to reconcile their trades, during which communications LBCS consistently has contested the Purported Setoffs.  Having made minimal progress through such discussions, on December 1, 2010, LBCS made a written demand on Defendants contesting the validity of the

---

[4] Specifically, the Terms of Agreement provide:

> If Customer or any of its affiliates (collectively, the "Customer Parties") shall default . . [or] file or be the subject of the filing or entry of a petition or order for relief under Title 11 or [sic] the U.S. Code . . . each RBS Greenwich Capital Party may . . . set off any obligation *owing by it to you* against any obligations owing by you or any other Customer Party to it or any other RBS Greenwich Capital Party.

*Id.* ¶ 14 (emphasis added).  "Customer" is defined in the preamble to the Terms of Agreement as "you," being the recipient of the confirmation.  In the case of the confirmation produced by Defendants, LBSF would have been the "Customer."  Thus, the purported setoff right allegedly contained in Paragraph 14 of the Terms of Agreement is limited in application to setoffs of *obligations of RBS Greenwich Capital Parties to LBSF* against obligations of LBSF or its affiliates to RBS Greenwich Capital and other RBS Greenwich Capital Parties.  *None* of the obligations that Defendants seek to set off is an obligation owing *from RBS Greenwich Capital to LBSF*.  Moreover, it is far from clear that Defendants are "affiliates" of RBS Greenwich Capital within the meaning of the Terms of Agreement.

Purported Setoffs of (i) the LBCS Receivable against the Alleged RBS/ABN Receivables under both the Terms of Agreement and the Bankruptcy Code, and (ii) the LBCS Receivable against the Alleged SES Receivable under the Bankruptcy Code, and demanding immediate payment of the LBCS Receivable plus Accrued Interest, as defined herein.

38.     On December 13, 2010, Defendants responded in writing raising two arguments attempting to create mutuality required for setoff.[5]  First, Defendants asserted that they could collapse into a single entity all the involved Debtor entities, thereby unilaterally effecting substantive consolidation of the Debtors.   Second, Defendants asserted they could combine SET, SOT, SES, RBS, and ABN AMRO so that they could set off the LBCS Receivable against the Alleged SES Receivable under the terms of the Master Agreements.

39.     Although LBCS disagreed with the position Defendants took in their December 13, 2010 letter, based upon the clear and express requirement of mutuality under section 553 of the Bankruptcy Code and both controlling and persuasive jurisprudence on this issue, LBCS agreed to meet with Defendants to discuss their respective positions on these issues and in an attempt to reach a mutual resolution.   The meeting was unproductive and the parties reached an impasse.   Accordingly, LBCS now

---

[5] LBCS's reference to the December 13, 2010 letter in this Complaint does not implicate Federal Rule of Evidence 408(a) because LBCS does not seek to introduce it as evidence to prove the liability for, the invalidity of, or the amount of the claim that is disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction. Fed. R. Evid. 408(a).

initiates this adversary proceeding to recover the LBCS Receivable plus Accrued Interest thereon.

## COUNT I

**(Declaratory Judgment That The Purported Setoffs Are Not Enforceable Under Section 553 Of The Bankruptcy Code)**

40.　　LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 39 as if fully set forth herein.

41.　　To date, Defendants have failed to pay any portion of the LBCS Receivable and have asserted invalid, nonmutual, and unlawful rights of purported setoff.

42.　　The requirement that all setoffs be of mutual debts is a fundamental tenet in bankruptcy law, which tenet was codified in section 553 of the Bankruptcy Code.

43.　　Section 553(a) of the Bankruptcy Code provides, in relevant part, that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case[.]

11 U.S.C. § 553(a).

44.　　By its terms, section 553 of the Bankruptcy Code does not create a right of setoff; it merely preserves any right of setoff that a creditor of a debtor may have under applicable non-bankruptcy law, while imposing the additional requirement that any debt sought to be setoff against a debt owed to a debtor be a "mutual debt"—*i.e.*, a debt owing by the debtor to the creditor seeking to avail itself of the setoff on the other hand.

11 U.S.C. § 553(a).   The law is clear and well settled, mutuality is strictly construed and requires that the debts and claims be owed between the *same* parties acting in the *same* capacity.   Mutuality is a prerequisite to the right of setoff under both (i) New York law, which is the applicable non-bankruptcy law governing the parties' rights and obligations under the SET Master Agreement and the Oil Agreements, and (ii) English law, which is the applicable non-bankruptcy law governing the parties' rights and obligations under the SOT Master Agreement.

45.   The Purported Setoffs do not involve "mutual debts," rather they are attempts by Defendants to set off the debts admittedly owed from SET and SOT *to LBCS* against (a) an obligation allegedly owed by LBCS to *SES* and (b) obligations allegedly owed to entities *other than SET and SOT* by *affiliates* of LBCS.   These Purported Setoffs encompass nonmutual obligations; obligations that are not owed by the same parties in the same capacity.

46.   Section 6(f) of the SET and the SOT Master Agreements is unenforceable (i) to create mutuality for purposes of section 553 or (ii) as an exception to the mutuality requirement under the Bankruptcy Code.

47.   Similarly, subsection 5 of the Non-Performance provisions in the Oil Agreements is unenforceable (i) to create mutuality for purposes of section 553 or (ii) as an exception to the mutuality requirement under the Bankruptcy Code.

48.   There now exists an actual, justiciable controversy between LBCS and Defendants relating to their respective legal rights, duties, and obligations under the Bankruptcy Code, which controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

49. LBCS requests a judgment declaring the rights and obligations of the parties under the Bankruptcy Code, including a declaration that the Purported Setoffs are impermissible and unlawful and constitute a violation of the Bankruptcy Code.

## COUNT II

**(Declaratory Judgment That the Purported Setoffs Are Not Made Permissible by Virtue of Sections 560 or 561 of the Bankruptcy Code)**

50. LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 49 as if fully set forth herein.

51. Section 560 specifies rights that parties to swap agreements have when a swap counterparty files for bankruptcy. Specifically, it provides, as follows:

> The exercise of any contractual right of any swap participant . . . to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560.

52. Section 561(a) confers similar rights to parties to master netting agreements, and permits a party to do the following:

> cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more) . . . (5) swap agreements; or (6) master netting agreements . . .

*Id.* § 561(a).

53. Sections 560 and 561, neither on their face nor by their purpose and intent, provide for an exception to the express mutuality requirement contained in

section 553 of the Bankruptcy Code. Accordingly, Defendants may not exercise their Purported Setoffs under the cloak of the Safe Harbor Provisions.

54.     LBCS, therefore, requests a judgment declaring the rights and obligations of the parties under the Bankruptcy Code, including a declaration that no exception exists under section 560 or 561 (the Safe Harbor Provisions), allowing the exercise of nonmutual setoff rights in violation of section 553 of the Bankruptcy Code.

## COUNT III

### (Turnover Of The Entire LBCS Receivable Pursuant To Section 542(b) Of The Bankruptcy Code)

55.     LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 54 as if fully set forth herein.

56.     As stated above, on September 15, 2008 and October 3, 2008, LBHI and LBCS, respectively, filed petitions for relief under chapter 11 of the Bankruptcy Code. As a consequence of LBHI's filing, Defendants terminated the swap transactions under the Master Agreements, effective as of September 15, 2008 (the Early Termination Date). Thereafter, on May 15, 2009, Defendants delivered to LBCS the Calculation Statement disclosing that SET and SOT owed Defendants in excess of $104.7 million (the LBCS Receivable), excluding interest, as a result of the early termination of the transactions.

57.     The LBCS Receivable is property of the LBCS estate under section 541(a) of the Bankruptcy Code.

58.     Defendants were required pursuant to the SET and the SOT Master Agreements to pay the SET and the SOT Early Termination Payments, no later than May

15, 2009, the date on which the Calculation Statement was delivered. SET and SOT Master Agreements, §§ 6(d)(ii), 12.

59.     Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b) (emphasis added). Accordingly, pursuant to section 542(b) of the Bankruptcy Code, SET and SOT were required to pay the LBCS Receivable to LBCS, and their failure to do so was in express violation of the Bankruptcy Code.

60.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, LBCS requests an order compelling and directing Defendants to turn over the LBCS Receivable, which amounts to at least $104,778,083 in principal, but may be determined to be more at trial, if such a trial occurs, as it constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code.

**COUNT IV**

**(Demand for Payment of All Accrued Interest)**

61.     LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 60 as if fully set forth herein.

62.     As alleged hereinabove, in paragraph 23, Defendants were required to pay the SET and SOT Early Termination Payments on the date that the Calculation Statement was delivered. SET and SOT Master Agreements, §§ 6(d)(ii), 12(a)(i). Additionally, Defendants were required to pay interest to LBCS on the SET and SOT

Early Termination Payments "in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate." *Id.* § 6(d)(ii). The "Applicable Rate" is the Termination Rate for obligations from the Early Termination Date until the date of delivery of the Calculation Statement, and it is the Default Rate for all obligations after the date of delivery of the Calculation Statement until the date payment is received in full. *Id.* § 14 (Applicable Rate definition).

63.     The "Termination Rate" is a blended rate per annum "equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts." *Id.* (Termination Rate definition).

64.     "Default Rate," however, is the "rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum." *Id.* (Default Rate definition).

65.     Interest at the Applicable Rate "will be calculated on the basis of daily compounding and the actual number of days elapsed." *Id.* § 6(d)(ii). Such interest (the "Master Agreement Interest") will continue to accrue, as provided for in the SET and the SOT Master Agreements, until payment is made in full. *Id.* §§ 6(d)(ii), 14.

66.     Defendants were required to deliver the Calculation Statement to LBCS "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date." *Id.* § 6(d)(i). Defendants, however, failed to deliver the Calculation Statement until May 15, 2009. A delay of eight months is not "[o]n or as soon as

reasonably practicable." *Id.* Consequently, Defendants should not benefit from the lower Termination Rate until May 15, 2009. LBCS is entitled to Default Interest from October 16, 2008, thirty days after the Early Termination Date, which is the latest date by which the Calculation Statement should have been received, until the SET and SOT Early Termination Payments are received by LBCS. Accordingly, LBCS is entitled Master Agreement Interest calculated at the Termination Rate from the Early Termination Date to, but not including, October 15, 2008 (the date by which the Calculation Statement should have been received), and calculated at the Default Rate from October 15, 2008 to, but not including, the date LBCS receives payment of the SET and SOT Early Termination Payments in full.

67.    In the alternative, should this Court find that the Calculation Statement was timely delivered, LBCS is entitled to Master Agreement Interest at the Termination Rate from the Early Termination Date to, but not including, May 15, 2009 (the date on which the Calculation Statement was received), and at the Default Rate from May 15, 2009 to, but not including, the date LBCS receives payment of the SET and SOT Early Termination Payments in full.

68.    SET was required under the terms of the Oil Agreements to pay LBCS the SET Oil Payment "within one business day of the liquidation." Oil Agreements, Non-Performance ¶ (3). SET's failure to do so entitles LBCS to interest on the SET Oil Payment ("SET Oil Interest"), and on any damages incurred thereafter, at the New York statutory rate of 9%. N.Y. Civ. Prac. L & R §§ 5001, 5004.

69.    SET terminated the transactions under the Oil Agreements and, upon information and belief, liquidated its positions on September 15, 2008, the Early

Termination Date. Accordingly, interest at the rate of 9% should be applied to the SET Oil Payment commencing on September 16, 2008 through the date that LBCS receives payment of the SET Oil Payment in full.

70.     Alternatively, should this Court find that the liquidation of the Oil Agreements did not occur until May 15, 2009, when the Calculation Statement was delivered, LBCS is entitled to interest at the rate of 9% from May 16, 2009 through the date that LBCS receives payment of the SET Oil Payment in full.

71.     The Master Agreement Interest and the SET Oil Interest (together the "Accrued Interest") constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code. Accordingly, LBCS requests an order pursuant to section 542 of the Bankruptcy Code, compelling Defendants to pay interest as follows: on the SET and the SOT Early Termination payments (1) calculated at the Termination Rate from the Early Termination Date to, but not including October 15, 2008, the date by which the Calculation Statement should have been delivered, and at the Default Rate from October 15, 2008, to, but not including, the date LBCS receives payment of the SET and SOT Early Termination Payments in full, or in the alternative, (2) calculated at the Termination Rate from the Early Termination Date to, but not including May 15, 2009, the date on which the Calculation Statement was delivered, and at the Default Rate from May 15, 2009 to, but not including, the date LBCS receives payment of the SET and SOT Early Termination Payments in full.

72.     Additionally, LBCS seeks an order requesting payment of the SET Oil Interest at the statutory rate of 9% from September 16, 2008 to the date that LBCS receives payment of the SET Oil Payment in full, or, (2) in the alternative, should this

Court determine that liquidation of the Oil Agreements occurred upon delivery of the Calculation Statement, LBCS requests SET Oil Interest on the SET Oil Payment from May 16, 2009 to the date that LBCS receives payment of the SET Oil Payment in full.

### COUNT V

**(Declaratory Judgment That Defendants Violated The Automatic Stay and an Order Requiring Turnover of the LBCS Receivable and Accrued Interest)**

73.     LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 72 as if fully set forth herein.

74.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code likewise operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.   11 U.S.C. § 362(a)(3).

75.     The LBCS Receivable constitutes property of LBCS's estate, and Defendants' withholding therefore constituted, and continues to constitute, an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"   11 U.S.C. § 362(a)(3).

76.     Section 362(a)(6) of the Bankruptcy Code bars any creditor from taking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]"   11 U.S.C. § 362(a)(6).  Defendants' assertion of the Purported Setoffs is an attempt to collect, in full, sums allegedly owed to RBS, ABN AMRO, and SES, by either LBSF, LBI, or LBIE in clear violation of section 362(a)(6).

77.     Moreover, section 362(a)(7) expressly prohibits the exercise of a right of "setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor[.]"   11 U.S.C. § 362(a)(7). Thus, even if Defendants had a valid right of setoff under section 553(a) of the Bankruptcy Code (which they do not), section 362(a)(7) expressly prohibits them from exercising any such right unless they first promptly seek relief from the automatic stay, which Defendants entirely failed to do.

78.     The exception to the automatic stay for swap participants in section 362(b)(17) to "offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such [swap agreements]" does not extend to protect the exercise of nonmutual setoffs, such as the Purported Setoffs described herein.

79.     Similarly, the exception to the automatic stay for master netting agreement participants in section 362(b)(27) to "offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements" does not extend to protect the exercise of nonmutual setoffs, such as the Purported Setoffs described herein.

80.     Defendants' wanton disregard of the Bankruptcy Code and this Court's authority and discretion to permit setoffs is a violation of the automatic stay existing by virtue of sections 362(a)(3), 362(a)(6), and 362(a)(7) of the Bankruptcy Code.

81.     LBCS is entitled to a declaratory judgment that Defendants acted in violation of sections 362(a)(3), 362(a)(6), and 362(a)(7) of the Bankruptcy Code, and

an order requiring SET and SOT to turn over the LBCS Receivable and Accrued Interest, in an amount to be determined at trial, if any such trial occurs, to LBCS.

COUNT VI

**(An Order Pursuant to Section 105(a) Finding Contempt and Awarding Damages to LBCS for Defendants' Willful Violation of the Automatic Stay)**

82.     LBCS repeats and realleges each and every allegation set forth in paragraphs 1 through 81 as if fully set forth herein.

83.     Pursuant to section 105(a) of the Bankruptcy Code, the Bankruptcy Court is authorized to award LBCS monetary damages, including actual and consequential damages, and any applicable interest, for Defendants' willful violation of the automatic stay.

84.     Because Defendants willfully and wantonly violated the automatic stay, by withholding property of the LBCS estate in an attempt to exercise a nonmutual and impermissible Purported Setoff, Defendants should be sanctioned and LBCS awarded monetary damages, in an amount to be determined at trial, if any such trial occurs, and including (but not limited to) LBCS's actual damages, costs, Accrued Interest, any additional applicable interest, and attorneys' fees and expenses.

## PRAYER FOR RELIEF

WHEREFORE LBCS respectfully requests that judgment be entered as follows:

A.      On Count I, a judgment declaring that Defendants' assertion of the Purported Setoffs is unlawful because it is an attempt to set off nonmutual obligations, which is not permitted under, and constitutes a clear violation of, section 553(a) of the Bankruptcy Code;

B.      On Count II, a judgment declaring that no exception to the mutuality requirements in section 553(a) exists in the Safe Harbor Provisions of the Bankruptcy Code to permit the exercise of the Purported Setoffs;

C.      On Count III, a judgment that the LBCS Receivable is property of the LBCS bankruptcy estate under section 541 of the Bankruptcy Code and requiring SET and SOT to turn over, under section 542 of the Bankruptcy Code, the principal amount of the LBCS Receivable, which amounts to no less than $104,778,083, and may amount to greater than $104,778,083, as determined at trial, if any such trial occurs;

D.      On Count IV, a judgment requiring Defendants to turn over Accrued Interest on the LBCS Receivable, under section 542 of the Bankruptcy Code, in an amount to be determined at trial, if any such trial occurs;

D.      On Count V, a judgment finding Defendants violated the automatic stay by withholding the LBCS Receivable and attempting to effectuate the Purported Setoffs, and that, as a result, Defendants are required to turn over the LBCS Receivable plus Accrued Interest, in amounts to be determined at trial, if any such trial occurs;

E.      On Count VI, a judgment sanctioning Defendants and directing them to pay damages to LBCS pursuant to section 105(a) of the Bankruptcy Code, in an amount to be determined at trial, if any such trial should occur, but in all events including actual damages, costs, and all attorneys' fees and expenses incurred by LBCS by reason of Defendants' willful and wanton violation of the automatic stay; and

F.      For such other and further relief, including interest, costs, and attorneys' fees, as is just.


Dated: New York, New York
       February 22, 2011


                                        */s/ Ralph Miller*
                                        Ralph Miller, Esq.
                                        Peter Gruenberger, Esq.
                                        Robert Lemons, Esq.
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, NY 10153-0019
                                        Telephone: (212) 310-8000
                                        Facsimile:   (212) 310-8007

                                        *Attorneys for Debtor and Plaintiff*
                                        *Lehman Brothers Commodity Services Inc.*

# EXHIBIT B

## (Citibank Complaint)

Richard G. Menaker
Rebecca Northey
Stephen D. Houck
MENAKER & HERRMANN LLP
10 East 40th Street
New York, NY 10016
Telephone:   (212) 545-1900
Facsimile:   (212) 545-1656

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>       LEHMAN BROTHERS INC.,<br><br>                Debtor. | Case No. 08-01420 (JMP) SIPA |
| LEHMAN BROTHERS INC.,<br><br>              Plaintiff,<br><br>      -against-<br><br>CITIBANK, N.A., CITIGROUP, INC.,<br>CITIGROUP GLOBAL MARKETS, INC.,<br>CITIBANK JAPAN LTD., CITIBANK<br>EUROPE PLC, CITIBANK INTERNATIONAL<br>PLC, CITIGROUP PTY LIMITED, BANCO DE<br>CHILE, BANCO NACIONAL DE MEXICO<br>SA, CITIBANK DEL PERU SA, BANK<br>HANDLOWY, ZAO KB CITIBANK,<br>CITIBANK AS, CITIBANK MAGHREB and<br>CITIBANK AFFILIATES 1-5,<br><br>            Defendants. | Adv. Proc. No. 11-    (JMP)<br><br>**<u>COMPLAINT</u>** |

Plaintiff, James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of Lehman Brothers Inc. ("Debtor" or "LBI") pursuant to the Securities Investor Protection Act ("SIPA"), by his undersigned attorneys Menaker & Herrmann LLP, for his complaint against Citibank, N.A. ("Citibank"), Citigroup, Inc. and their respective affiliates and subsidiaries as set forth in the caption, (collectively the "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1. In furtherance of his duty to recover LBI's assets for the benefit of its former customers, the Trustee brings this adversary proceeding to recover more than $1.3 billion in cash and other assets of LBI now held by Citibank, N.A., and its affiliates. Unlike its parent Lehman Brothers Holdings, Inc. ("LBHI") which filed for protection under Chapter 11, LBI remained in business during the week of September 15, 2008, to ensure an orderly wind-down of the business in order to facilitate a seamless transfer of customer accounts and thereby to protect its customers. After LBHI's filing, Citibank conditioned continuation of certain foreign exchange settlement services to LBI on LBI's depositing $1 billion (the "$1 billion deposit") in an LBI account at Citibank. Also during the week of September 15, Citibank obtained a $700 million pledge from Barclays Bank PLC ("Barclays") as security for carrying on the same foreign exchange settlement services. On September 19, after the SIPC filing and after LBI requested the return of the $1 billon deposit, Citibank advised LBI that it had set the deposit off against "obligations owed to Citibank." In addition, Citibank and its various affiliates around the world froze over $300 million in additional LBI deposits and asserted a right to setoff against the

alleged remaining balance of the shortfall. In November 2008, Citibank returned the $700 million pledge to Barclays without notification to the Court or to the Trustee.

2.       The Trustee seeks to recover the $1 billion deposit, post-petition deposits in LBI's various accounts at Citibank which total approximately $190 million as of May 31, 2010, approximately $62 million in pre-petition deposits in LBI's accounts at Citibank, and approximately $90 million in deposits and net payables to LBI from Citibank and certain of its affiliates. The Trustee's right to recover these funds derives from simple and straightforward principles of applicable bankruptcy law and SIPA – e.g., the requirement of mutuality with respect to setoffs – together with the clear limitations on the scope of safe harbor insulation. These legal principles are reinforced by the purposes underlying SIPA and a balance of the equities that weighs heavily against Citibank and its affiliates and in favor of the Trustee and those he is charged to protect.

## THE PARTIES

3.       On September 19, 2008, the Honorable Gerard E. Lynch entered the LBI Liquidation Order pursuant to the provisions of SIPA in the case entitled *Securities Investor Protection Corporation v. Lehman Brothers Inc*., Case No. 08-CIV-8110 (GEL) (the "SIPA Proceeding"). The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; (ii) appointed counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (iii) removed the SIPA Proceeding to this Court pursuant to section 78eee(b)(4) of SIPA.

4.       The Trustee is charged with liquidation of the business of LBI pursuant to the provisions of 78eee(b)(3) of SIPA and the orders of this Court and the

District Court. The Trustee is vested by SIPA with the same powers and rights to avoid transfers as a trustee in a case under title 11, 15 U.S.C. § 78fff-1(a), and is also specifically authorized by SIPA to recover property transferred by the debtor that would have been customer property if the transfer were held voidable under the Bankruptcy Code.

5.     Defendant Citibank, N.A. ("Citibank") is a national banking association organized under the laws of the United States with its principal place of business at 388 Greenwich Street, 14th Floor, New York, New York 10013.

6.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 399 Park Avenue, New York, New York 10022.

7.     Defendant Citigroup Global Markets, Inc. ("CGMI") is a corporation organized under the laws of the State of Delaware and, upon information and belief, is a subsidiary of Citigroup.

8.     Upon information and belief, defendant Citibank Japan Ltd. is a Citibank subsidiary incorporated in Japan; defendant Citibank Europe PLC is a Citibank subsidiary incorporated in Ireland; Citibank International PLC is a Citibank subsidiary incorporated in the U.K.; defendant Citigroup Pty Limited is a Citibank subsidiary incorporated in Australia; defendant Banco de Chile is a Citibank subsidiary incorporated in Chile; defendant Banco Nacional De Mexico SA is a Citibank subsidiary incorporated in Mexico; defendant Citibank Del Peru SA is a Citibank subsidiary incorporated in Peru; defendant Bank Handlowy is a Citibank subsidiary incorporated in Poland; defendant

ZAO KB Citibank is a Citibank subsidiary incorporated in Russia; defendant Citibank AS is a Citibank subsidiary incorporated in Turkey; and defendant Citibank Maghreb is a Citibank subsidiary incorporated in Morocco.

9. The unspecified defendants, referred to herein as Citibank Affiliates 1-5, are affiliated entities under the aegis of Citigroup that are or may be holding funds or other property that should be returned to LBI.

## VENUE AND JURISDICTION

10. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and (c). This is a core proceeding within the meaning of 28 U.S.C. §157(b). The claims asserted include proceedings to determine, avoid and recover preferences and fraudulent transfers, obligations and/or conveyances. In addition, resolution of the claims asserted herein will have an effect upon the administration of LBI's SIPA liquidation case, the value of its estate and any distribution to its creditors.

11. Pursuant to 28 U.S.C. §§157(a) and 157(b)(1) and the District Court's reference of proceedings to the bankruptcy court, this Court has subject matter jurisdiction. Venue in this district is proper in accordance with 28 U.S.C. §1409(a).

12. LBI brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seeks relief, *inter alia,* under Sections 105(a), 362, 541, 542, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, 28 U.S.C. §2201 and applicable provisions of state law.

## FACTUAL ALLEGATIONS

**A.     The Business of LBI**

13.     During the relevant period, LBI was a registered broker-dealer in the United States affiliated with LBHI as part of the latter's global financial services network ("Lehman"). The operations of Lehman were organized in three segments: a) Capital Markets, b) Investment Banking and c) Investment Management.

a.     Capital Markets encompassed, among other things, secondary trading, financing, mortgage origination and securitization, prime brokerage and research activities in fixed income and equity products, as well as principal investing and proprietary trading activities.

b.     Investment Banking included, among other things, providing advice to corporate, institutional and government clients on mergers and acquisitions and other financial matters, and raising capital by underwriting public and private offerings of debt and equity instruments.

c.     Investment Management consisted of two major businesses, Asset Management and Private Investment Management ("PIM"). Asset Management provided proprietary asset management products through a variety of distribution channels to individuals and institutions. Private Investment Management provided traditional brokerage services and comprehensive investment, wealth advisory, trust and capital markets execution services to both high-net-worth individuals and small and medium size institutional clients.

14.     LBI's activities were related to all three segments of the business. In the Capital Markets segment, LBI cleared securities transactions for virtually all of the Lehman affiliates, and offered prime brokerage services to hedge funds, pension funds, insurance companies, trading companies, university endowments and asset managers. Lehman Brothers International Europe ("LBIE"), the European broker-dealer counterpart to LBI in the Lehman group of companies, cleared certain transactions for LBI and its customers. As part of the Investment Banking segment of Lehman, LBI was involved in underwriting debt and equity instruments, and in traditional brokerage services and M&A advisory services.

15.     LBI also held securities in connection with transactions involving other Lehman entities and their counterparties and cleared proprietary trades for Lehman Brothers OTC Derivatives, Inc.

16.     LBI engaged in foreign exchange ("FX") trading mainly to facilitate its services to clients. A *de minimis* amount of proprietary FX trading was carried on by LBI's traders on behalf of LBI itself. (The settlement of FX trading is hereinafter referred to as "FX settlement.") While several Lehman affiliates were involved in FX trading, LBI was the affiliate in the United States that carried on the greatest volume of such transactions.

**B.     The Services Provided to LBI by Citibank and Affiliates**

17.     Citibank and its affiliates provided a number of services to LBI and its affiliates in connection with their various activities described above, including maintenance of cash deposits and custodial accounts, FX settlement, agency and trade

services and provision of credit facilities. Citibank and its affiliates also entered into ISDA (International Swap Dealers Association, Inc.) Multicurrency Agreements and securities lending agreements with LBI.

18.     Citibank assisted LBI in FX settlement using two methods: (a) traditional correspondent banking settlement and (b) settlement through the Continuous Linked Settlement system ("<u>CLS</u>") carried out via CLS Bank International ("<u>CLS Bank</u>"), an Edge Act corporation chartered by the Federal Reserve System.

19.     Currency exchange constituted an indispensable element of the worldwide business of LBI and its affiliates; accordingly, FX transactions were critical to serving Lehman customers. Under the traditional correspondent banking method of FX settlement, each counterparty to an FX trade transfers to the other counterparty the currency it is selling, typically using correspondent banks in the currencies concerned. Because the transfer of the sold currency takes place independently of the transfer of the bought currency, this method exposes the parties to principal and liquidity risks equal to the full value of the trade.

## C.     Overview of FX Settlement Services

20.     Under the CLS method of FX settlement, the counterparties settle their trades on the books of a specialized FX settlement institution, CLS Bank, which assures that the bought currency is paid out only if the sold currency is received. CLS Bank acts as a settlement institution but does not act as a counterparty for any FX trader. Each trade remains the obligation of the counterparties themselves. Thus, what is actually

settled are not the trades themselves but the payments arising from the trades as instructed by the parties.

21.    CLS Bank operates a global multi-currency cash settlement system on a payment-versus-payment basis, thereby effecting simultaneous exchange of the two legs of an FX transaction. The system is intended to eliminate the risk associated with FX settlement across time zones by protecting a party to an FX trade from paying away the currency being sold before receiving the currency being bought.

22.    There are three categories of participants who use the CLS settlement system. "Settlement Members" have direct access to the system, have their accounts with CLS Bank, and can submit information about FX trades and payments for such trades directly to CLS Bank. "User Members" have direct access to the settlement system and can submit information about their trades to the system; however, they do not have an account with CLS Bank and cannot make their own payments. Finally, third parties may use the CLS system, but they have neither direct access nor the ability to submit payments. They cannot carry out CLS settlement without using the services of a Settlement Member that they designate to act on their behalf ("Designated Settlement Member"). Thus, both User Members and third parties are totally dependent on Settlement Members for making payments within the CLS system.

23.    The CLS daily process involves matching and funding of FX trades. Direct participants in the system submit information about their own (or their customers') FX trades with other participants (or their customers) specifying their counterparty, currency exchanged, date of trade, settlement date and other relevant data necessary for

matching the two sides of the trades ("Instructions"). The Instructions are matched on the basis of the data included, and each matched Instruction to be settled is placed in a settlement queue maintained on the CLS System. On the settlement date, Settlement Members administer the matched Instructions by paying in one currency and receiving payment in the counterpart currency so that neither party to the match ends up being indebted to the other.

24.     During the period relevant to this proceeding, Citibank was a Settlement Member of the CLS Bank. As such, it settled its own transactions through the CLS system and provided fee-based CLS settlement services to User Members and third parties that designated it to do so.

25.     LBI was a User Member of CLS Bank and in that capacity could directly submit its FX trades for settlement to CLS Bank. However, because LBI did not have an account with CLS Bank, its payments were processed through the account of its Designated Settlement Member, Citibank. Accordingly, LBI had full access to the CLS system only by virtue of its special relationship with Citibank.

26.     Pursuant to the CLS Settlement Services Amended and Restated Agreement for CLS User Members, dated October 28, 2004 (the "CLS Agreement"), Citibank served as the Designated Settlement Member in the CLS system for LBI, as well as LBI's affiliates LBIE, Lehman Brothers Special Financing and Lehman Brothers Commercial Corporation.

27.     As an inducement to enter into the CLS Agreement, Citibank offered more favorable terms if LBI and the above-listed affiliates consolidated the majority of

their foreign currency accounts with Citibank. Accordingly, LBI and the listed affiliates maintained a number of accounts with various Citibank branches and affiliates in twenty-five different currencies. The main such affiliates are the defendants in this action named in paragraphs 7 and 8 above.

28.     As LBI's Designated Settlement Member, Citibank had discretion to authorize or reject LBI's settlement Instructions and, by the express terms of the CLS Agreement, had no obligation to extend credit to support LBI's trades. Citibank was authorized, in the ordinary course of business, to credit LBI's accounts with long balances and debit LBI's accounts for short balances to fund LBI's FX settlements through CLS. In addition, in order to fund CLS payments for LBI, Citibank was authorized under the CLS Agreement to debit accounts of LBI at branches and affiliates of Citibank and at certain other banks throughout the world insofar as those accounts were used by LBI for FX trading.

**D.     The $1 Billion Deposit**

29.     During the weekend of September 13-14, 2008, meetings were held at the Federal Reserve Bank of New York and at the offices of LBHI in connection with the then-current financial crisis, in particular to determine the future of LBHI and its subsidiaries, including LBI. Citibank representatives were active participants in the meetings at the Federal Reserve Bank and were in contact with LBI personnel during this period. Ultimately, it was determined that LBHI and most of its affiliates would file a petition for relief under Chapter 11 of the Bankruptcy Code, which occurred during the early morning hours of September 15, 2008 (the "Petition Date").

30.     It was further determined as of September 14, 2008, that LBI would not file for bankruptcy court relief but would remain in business for the protection of its customers while efforts were undertaken to wind down pending transactions in the ordinary course of business and facilitate a possible sale of the overall broker-dealer operations to an institutional purchaser, thereby minimizing the disruption to customers' securities accounts, while maximizing the assets available to satisfy LBI's obligations to all its creditors.

31.     Citibank knew that LBI could not remain viable as an ongoing concern without continued access to CLS FX settlement services. Citibank also knew that LBI would be unable to find a replacement in a timely manner were it to resign as LBI's Designated Settlement Member. Accordingly, Citibank had considerable leverage – and knew that it had considerable leverage – to extract concessions from LBI for its benefit and to the detriment of LBI's customers and other creditors.

32.     On the morning of September 15, 2008, aware of the events of the previous weekend and notwithstanding its knowledge of the consequences for LBI should LBI's access to CLS FX settlement services be cut off, Citibank notified LBI and CLS Bank that it was resigning as LBI's Designated Settlement Member and unilaterally terminated the CLS Agreement on the ground of LBHI's Chapter 11 filing. Citibank knew that the effect of its action would be to undermine efforts to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors. Citibank, thus, endeavored to use its leverage to gain an advantage over LBI's customers and other creditors.

### E.     Citibank's Limited Restoration of LBI's CLS Access

33.     After urgent requests by LBI's senior management, Citibank agreed later in the day on September 15 that it would, after all, continue providing CLS FX settlement services to LBI, but only under limited conditions that were materially different from those provided for in the CLS Agreement, including receipt of a deposit in the amount of $1 billion as a precondition to providing any CLS settlement services.

34.     Given the indispensable importance of FX settlement through the CLS system for LBI's ability to continue in business, and having neither power nor time to negotiate, LBI had no alternative but to sign a Letter Agreement, dated September 15, 2008 (the "9/15/08 Letter Agreement") drafted by Citibank. The 9/15/08 Letter Agreement provided that Citibank would continue to serve as the Designated Settlement Member for LBI and its subsidiary Lehman Brothers Commercial Corporation in the CLS system for September 16, 2008, if LBI transferred $1 billion in US currency into a newly created deposit account at Citibank to be opened in LBI's name.

35.     The 9/15/08 Letter Agreement further provided that Citibank would "effect payments on CLS only for the account of LBI and its subsidiary Lehman Brothers Commercial Corp, which companies are not in bankruptcy or other insolvency proceedings, and for no other company. The payments will be made by Citibank only in amounts at any time outstanding of up to the aggregate amount of deposits."

36.     On September 16, 2008, Citibank again issued an ultimatum to LBI stating that it intended to terminate FX settlement services for LBI through the CLS system unless LBI signed another letter agreement (the "9/16/08 Letter Agreement"

together with the 9/15/08 Letter Agreement, the "Letter Agreements") extending by one more day Citibank's obligation to serve as LBI's Designated Settlement Member for CLS. The continuation of settlement services was conditioned on Citibank's continuing to hold the deposited amount with the right to setoff against it. LBI again had no alternative but to sign. The 9/16/08 Letter Agreement, like its predecessor, was drafted by Citibank and presented to LBI on a take-it-or-leave-it basis. Lehman Brothers Commercial Corp. was not a party to the 9/16/08 Letter Agreement.

37.     In forcing LBI to make the $1 billion deposit and sign the two Letter Agreements, Citibank was exercising palpable economic leverage created by the fact that continued access to the CLS FX Settlement System was vital to LBI's ability to maintain its ongoing business operations. LBI, at a time of increasing financial distress, found itself in the coerced position of facing a demand for funds that it could not refuse.

38.     The 9/16/08 Letter Agreement modified the language of the original CLS Services agreement by making it subject to six specific terms and conditions enumerated therein. Among other things, it provided, in paragraph 5, that Citibank would effect payments for the account of LBI on CLS "only in amounts at any time outstanding of up to the aggregate amount in effect from time to time of the LBI deposit placed with Citibank" -- i.e., up to a maximum of $1 billion. Moreover, the only setoff rights provided to Citibank under the CLS Agreement as modified by the 9/16/08 Letter Agreement are set forth in paragraph 6 and are limited to the $1 billion deposit.

**F.    Citibank's Mishandling of the $1 Billion Deposit**

39.    On the evening of September 15, LBI transferred $700 million from an account at Chase via the Fedwire into one of its Citibank accounts which already held in excess of $300 million. On information and belief, shortly thereafter, Citibank moved $1 billion to an off-shore account at Citibank Nassau in the Bahamas. One of Citibank's senior risk officers gave internal instructions that the funds were to be held in LBI's name.

40.    On information and belief, contrary to the instructions of one of its own senior risk officers, Citibank did not hold LBI's $1 billion deposit in LBI's own name. Instead, LBI's $1 billion deposit was deposited in a Citibank Treasury account, rather than in a separate time account in LBI's name as contemplated and required by both Letter Agreements.

41.    On September 18, 2008, Citibank transferred the $1 billion deposit to a newly opened Citibank Global Transaction Services demand deposit account at Citibank N.A., New York branch, denominated "Lehman," and commingled it with the balance remaining from a $2 billion deposit previously made by LBHI.

**G.    Citibank's Violation of the Aggregate Settlement Limit**

42.    In addition, in its capacity as LBI's Designated Settlement Member under the CLS Agreement, Citibank withheld and did not credit long positions accumulated from CLS settlements to the LBI accounts although it knew that this action would impair LBI's FX operations.

43.     On Wednesday, September 17, 2008, Citibank personnel observed that a large net shortfall had accumulated during the CLS settlement process, contrary to accepted procedures for carrying out settlements on the CLS system. Citibank's executives asserted that such a large shortfall resulted from internal management weaknesses that led to substantial negative balances being built up when Citibank settled the various FX payments it handled for LBI as LBI's Designated Settlement Member. Never in the prior history of the relationship had there been a failure to establish a net zero balance in the parties' relative positions as of the close of each business day.

44.     Citibank risk management personnel concluded that the additional, uncontemplated CLS shortfall put it at risk, especially given the stress on LBI's financial position. Once again endeavoring to use the leverage it held over LBI, Citibank demanded yet another large influx of cash from LBI to be used as collateral to secure its CLS obligations. LBI, however, could not meet Citibank's new demands.

## H.     The Barclays Pledge

45.     Citibank then turned to Barclays, which was in the final stages of negotiating with LBI for what turned out to be a purchase of LBI's assets. Accordingly, Barclays had a strong interest in maintaining LBI's viability until it could complete the acquisition. On September 17, 2008, Citibank obtained from Barclays a pledge of $700 million, to be held as security in a special cash collateral account, to permit Citibank's continued "CLS services, and daylight overdraft lines and temporary overdraft lines in connection with the provision of CLS Services to LBI." Citibank would not have

continued to provide CLS FX settlement services to LBI without the security provided by the Barclays pledge.

46.     The $700 million deposit arrangement between Barclays and Citibank was documented in a Pledge Agreement, dated September 17, 2008 (the "9/17/08 Barclays Agreement"). The 9/17/08 Barclays Agreement, unlike the Letter Agreements of the previous two days between Citibank and LBI, expressly granted Citibank a security interest in the special cash collateral account. It also granted Citibank a right of setoff against that account. Further, the 9/17/08 Barclays Agreement specifically secured "all obligations of [Barclays] and LBI now or hereafter existing" under the CLS Agreement.

## I.     The Further Build-Up of the CLS Shortfall

47.     Despite the clear commitment by Citibank in the 9/16/08 Letter Agreement that it would settle CLS transactions only up to the aggregate amount of the $1 billion LBI deposit, Citibank continued to further the build-up of LBI's foreign currency positions. Instead of reducing the short and long balances to zero at the end of each day, as was done in the ordinary course of business, Citibank allowed running balances to accumulate throughout the week of September 15, 2008. At the end of the week, there were substantial negative outstanding balances in various currencies, the largest of which was the net balance in US dollars (approximately $16 billion dollars). In an attempt to protect itself, Citibank withheld the long balances and did not pay them out to LBI, which in turn affected payments to third parties. Citibank built up its position for an eventual setoff by refusing to honor LBI's requests for payments to LBI brokerage

customers, including but not limited to LBI's requests to transfer funds in the aggregate amount of approximately $82 million owed to PIM customers prior to September 19, 2008.

48. Eventually, after commencement of the SIPA liquidation, Citibank netted LBI's short positions against its long positions, leaving what it has claimed to be a net shortfall in the amount of $1,260,326,894. Citibank would not have incurred such a large shortfall absent the security provided by the Barclays pledge.

49. Also as of September 19, 2008, in addition to the almost $16 billion deficit, LBI had short positions in CLS in the following currencies – Australian Dollar (AUD), Honk Kong Dollar (HKD), Mexican Peso (MXN), New Zealand Dollar (NZD), Swedish Krona (SEK) and Singapore Dollar (SGD). The long balances, i.e., amounts that Citibank was supposed to pay out to LBI but did not, were in the following currencies – Canadian Dollar (CAD), Swiss Franc (CHF), Danish Krona (DKK), Euro (EUR), British Pound Sterling (GBP), Israel Shekel (ILS), Japanese Yen (JPY), Norwegian Krona (NOK), South African Rand (ZAR).

**J.    Citibank's $1 Billion Setoff and Return of the Barclays Pledge**

50. At 1:13 p.m. EST on September 19, 2008 Citibank moved the $1 billion deposit from the "Lehman" account to a Citibank administrative hold account used to hold funds on a temporary basis pending further instruction. Citibank's contemporaneous records describe the action as a "reversal" of the September 18 transfer. On information and belief, however, these funds were never returned to the Citibank Nassau account from which they had been taken.

51.     On September 19, 2008, settlement of payments on the CLS system for LBI ceased, and LBI's Treasurer requested that Citibank return the $1 billion deposit.

52.     On September 19, 2008, SIPC filed its petition for a protective decree under SIPA with the District Court with respect to LBI, and an Order Commencing Liquidation was entered at 1:23 p.m. EST.

53.     On information and belief, Citibank did not take the requisite action to effectuate a setoff of the $1 billion deposit against the LBI debt prior to the filing. At 2:07 p.m. -- *after* the SIPA liquidation petition had been filed -- Citibank's legal department addressed a notice to "Lehman Brothers International" (not LBI) advising that Citibank had exercised its right of setoff against the $1 billion deposit.  It was not until 3:22 p.m. on September 19, however, that Citibank finally transferred the $1 billion deposit from the administrative hold account to an account denominated "Citibank N.A. New York Branch for Branch and Citibank Affiliates," again describing the action as a "reversal" of the September 18 transfer.

54.      Citibank refused to return the deposit, stating in a second email at 2:28 p.m., this time addressed to Lehman Brothers Incorporated: "This is to notify you that Citibank has exercised its right to set off the $1 billion deposit that you placed with Citibank to satisfy obligations owed to Citibank."

55.     Citibank did not, in fact, effect the seizure of the $1 billion deposit or record a credit to LBI's net shortfall in the CLS system until after the filing of the SIPC petition. Accordingly, the purported setoff was not pre-petition as claimed by

Citibank, but constituted an improper post-petition setoff taken without approval of the Court.

56.     It was not until the end of September, 2008 that Citibank specified the amount of the alleged indebtedness owed to it by LBI for CLS services in the amount of $1,260,326,894. This amount was said to be based upon the net shortfall that Citibank allowed to be built up during the week of September 15 through September 19, together with approximately $25 million in fees based upon the alleged spread between bid and ask that Citibank's FX Desk charged and over $6 million for what Citibank alleges to be its "cost of carry." While there appeared to be a significant shortfall in connection with CLS settlements, Citibank has never alleged or claimed any shortfall arising out of traditional correspondent banking settlement, although it never ceased providing the traditional correspondent banking settlement service.

57.     On November 13, 2008, without notice to the Court or the Trustee, Citibank returned to Barclays the full $700 million deposit which it had received on September 17, 2008, as security to protect against any loss occasioned by Citibank's provision of settlement services to LBI in the CLS system. Thus, rather than using the Barclays pledge to reduce the amount of the CLS shortfall, Citibank unilaterally took it upon itself to return the funds *in toto* to Barclays. Upon information and belief, Citibank's decision to return the $700 million was made to foster its relationship with Barclays and with full knowledge of the adverse consequences it would have on the LBI estate and on LBI's former customers and other creditors. Citibank's return of the $700 million conferred an enormous benefit on Barclays, allowing it to complete its profitable

acquisition of LBI's assets without the necessity of honoring the pledge it had made specifically for the purpose of buying the time necessary to do so.

58.     Citibank represented to the Court in various proofs of claim that it had properly credited the $1 billion deposit to its own account prior to the filing of the SIPA liquidation petition. At the time it made these representations, however, Citibank knew that the $1 billion was in an administrative hold account when the SIPA petition was filed and that it had not taken the legally required steps to effect a valid setoff.

## K.     Funds Held by Citibank and Its Affiliates

59.     Citibank continues wrongfully to retain LBI's $1 billion deposit based on its post-petition setoff in connection with the CLS settlement shortfall. Citibank claims that certain safe harbor provisions in the Bankruptcy Code concerning swap agreements and related credit enhancements insulate it from any recovery of that sum by the Trustee. But those safe harbor provisions do not in fact apply to CLS services of the kind provided by Citibank.

60.     In addition, Citibank affiliates that do not have any claims against LBI are currently holding pre-petition cash deposits in various LBI accounts in the amount of approximately $70,000,000.

61.     Citibank and its affiliates are also currently holding post-petition cash deposits in various LBI accounts in the amount of approximately $190,000,000 as of May 31, 2010.

62.     Citigroup Global Markets, Inc. is currently holding an account payable to LBI in the amount of approximately $11,000,000.

63.　　Citibank owes additional sums to LBI in the latter's representative capacity on behalf of customers or in its proprietary capacity, including but not limited to, approximately $11,000,000, by reason of an agreement relating to the acquisition of Salomon Smith Barney, which the Trustee is entitled to recover.

## COUNT I

### (Violation of the Automatic Stay)

64.　　The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

65.　　On information and belief, Citibank was on notice that the SIPA liquidation of LBI was being commenced on Friday, September 19, 2008. Citibank seized the $1 billion deposit and purported to set it off against the accumulated LBI shortfall after commencement of the SIPA liquidation knowing that the liquidation had been commenced. Citibank did not record the purported setoff on its books, i.e., it did not credit or reduce LBI's obligations, document or otherwise effect the "setoff," until after the commencement of the liquidation proceeding.

66.　　Since the commencement of the SIPA liquidation, Citibank has wrongfully maintained that it effected a pre-petition setoff.

67.　　Citibank willfully violated the automatic stay and Section 362(a)(7) of the Bankruptcy Code when it effected the seizure of the $1 billion deposit.

68.　　The funds that were seized by Citibank are property of the LBI estate under Section 541 of the Bankruptcy Code.

69.    Citibank should be ordered to turn over to the Trustee the funds seized or their equivalent immediately.

## COUNT II

### (Avoidance of Fund Sweep as an Impermissible Post-Petition Transfer under Section 549 of the Bankruptcy Code)

70.    The allegations in paragraphs 1 through 69 are incorporated by reference as if fully set forth herein.

71.    Citibank's seizure of the $1 billion deposit constitutes an invalid setoff, because under Section 553(a)(3) of the Bankruptcy Code, the $1 billion deposit was a debt to LBI incurred by Citibank within ninety days of the commencement of the SIPA liquidation and for the purposes of obtaining a right of setoff against LBI and improperly getting ahead of other creditors.

72.    The seizure of the funds occurred after the commencement of the case without court permission, in violation of the Bankruptcy Code, and is avoidable under Section 549 of the Bankruptcy Code.

## COUNT III

### (Recovery of the Avoided Post-Petition Transfer under Section 550 of the Bankruptcy Code)

73.    The allegations in paragraphs 1 through 72 are incorporated by reference as if fully set forth herein.

74.    Citibank's seizure of the $1 billion deposit is avoidable as a post-petition transfer pursuant to Section 549 of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover

from Citibank the value of the transfer together with interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT IV

### (Avoidance of the $1 Billion Transfer as Preference under Section 547 of the Bankruptcy Code)

75.     The allegations in paragraphs 1 through are incorporated by reference as if fully set forth herein.

76.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, as of September 19, 2008, LBI owed to Citibank an amount in excess of $15 billion accumulated between September 15 and September 19, 2008, and Citibank seized the deposit to reduce LBI's pre-petition obligations. The seizure of the deposit on September 19, 2008 by Citibank constituted a transfer for the benefit of Citibank.

77.     The transfer occurred within ninety days prior to the Petition Date.

78.     As of the time of the transfer, Citibank was a creditor of LBI.

79.     The transfer was made for, or on account of, an antecedent debt (within the scope of Section 547(b) of the Bankruptcy Code) owed by LBI to Citibank.

80.     The transfer was made while LBI was presumed to be insolvent pursuant to Section 547(f) of the Bankruptcy Code.

81.     The transfer enabled Citibank to receive a larger share of LBI's estate than if such transfer had not been made and if Citibank had received payment of such debt in a liquidation of LBI's assets under chapter 7 of the Bankruptcy Code.

82.     The transfer is an avoidable preference under Section 547(b) of the Bankruptcy Code.

## COUNT V

### (Recovery of the Avoided Preferential Transfer under Section 550 of the Bankruptcy Code)

83.     The allegations in paragraphs 1 through 63 and 75 through 82 are incorporated by reference as if fully set forth herein.

84.     The transfer is avoidable as a preferential transfer pursuant to Section 547 of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT VI

### (Avoidance of the $1 Billion Setoff under Section 553(a)(3) of the Bankruptcy Code and State Law)

85.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

86.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, on September 15, 2008, LBI deposited $1 billion with Citibank under an agreement providing that Citibank "shall have the right at all times to set off the amount of the referenced deposit account against any obligations of Lehman Brothers, Inc. and/or Lehman Brothers Commercial Corporation under the CLS Agreement."

87.     LBI deposited $1 billion with Citibank within ninety days prior to the Petition Date.

88.     At the time of the transfer of the $1 billion deposit to Citibank, LBI was presumed to be insolvent for purposes of Section 553(c) of the Bankruptcy Code.

89.     Citibank caused LBI to make the $1 billion preferential deposit for the purpose of obtaining a right of setoff.

90.     The setoff is invalid under Section 553 of the Bankruptcy Code and under state law because through the preferential deposit, Citibank was positioned ahead of the other creditors of LBI.

## COUNT VII

### (Turnover under Section 542 of the Bankruptcy Code of Estate Property Held by Citibank)

91.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

92.     Citibank itself holds approximately $1.3 million in proprietary assets and $246 million in 19 LBI cash deposits, of which approximately $62 million constitute pre-petition deposits, which Citibank failed to distribute to LBI customers and other third parties in accordance with pre-petition instructions, and approximately $184 million post-petition deposits.

93.     Citibank is in possession, custody or control of the above-described assets, which are of substantial value or benefit to LBI's estate and are property belonging to LBI (that may be used by LBI), and may not be used to setoff against any

alleged claims Citi may have against LBI because of the limitations of Section 553 of the Bankruptcy Code.

94.     Citibank should be directed to turn over the above-described assets or the value thereof to LBI immediately.

## COUNT VIII

**(Avoidance of the $1 billion Transfer as Improvement in Position under Section 553(b) of the Bankruptcy Code)**

95.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

96.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, on information and belief, in the ordinary course of business the balances from CLS settlements between LBI and Citibank were zeroed out as of the end of each business day. The first day on which LBI was indebted to Citibank in connection with CLS was Monday, September 15, 2008. Due to the failure of LBI's FX trade counterparties to make required payments, LBI's resulting inability to cover short balances and Citibank's paying out certain (but not all) long balances, LBI owed Citibank approximately $480 million at the end of the day on September 15. On September 19, 2008, after Citibank seized the $1 billion deposit, LBI's debt to Citibank was reduced to $260 million. As a result of the $1 billion deposit, Citibank improved its position by $220 million.

97.     As of ninety days prior to the Petition Date, and at all relevant times prior to and including the Petition Date, Citibank was a creditor of LBI. Citibank has

asserted that at certain times within ninety days of the Petition date it held claims against LBI.

98.    Within ninety days prior to the Petition Date, LBI transferred $1 billion to Citibank.

99.    At the time of the transfer of the $1 billion deposit to Citibank, LBI was insolvent for purposes of Section 553(c) of the Bankruptcy Code.

100.    Citibank improved its position through LBI's transfer because the amount of the insufficiency on the date of the setoff was less than the insufficiency on the later of ninety days prior to the Petition Date and the first date during the ninety  days immediately preceding the Petition Date on which there was an insufficiency. For purposes of this Count, insufficiency means the amount by which any debt owed by LBI to Citibank exceeded any mutual debt owed by Citibank to LBI.

101.    Pursuant to Section 553(b) of the Bankruptcy Code, Citibank is liable for the amount by which the transfer enabled it to improve its credit position with respect to LBI in the ninety days preceding the Petition Date.

## <u>COUNT IX</u>

**(Recovery of an Avoided Transfer as an Impermissible Improvement in Position under Section 550 of the Bankruptcy Code)**

102.    The allegations in paragraphs 1 through 63 and 95 through 101 are incorporated by reference as if fully set forth herein.

103.    The transfer is avoidable as an impermissible improvement in position pursuant to Section 553(b) of the Bankruptcy Code, and accordingly, pursuant to

Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT X

**(Avoidance of Letter Agreements as Actually Fraudulent under
Section 548 of the Bankruptcy Code)**

104.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

105.    Within two years of the Petition Date, LBI entered into the September 15 Letter Agreement and the September 16 Letter Agreement.

106.    Entering into the Letter Agreements was an obligation incurred by LBI to or for the benefit of Citibank.

107.    Entry into the Letter Agreements was made with an actual intent to hinder, delay, and/or defraud LBI's creditors and customers. Such intent can be inferred from the traditional badges of fraud surrounding LBI's entry into the Letter Agreements. Among other things, on September 15, 2008, the global markets were experiencing an unprecedented meltdown/chaos and LBHI and some of its subsidiaries had filed petitions under Chapter 11 of the Bankruptcy Code. In exchange for the $1 billion deposit, LBI received only a reinstatement of an essential bank service previously provided by Citibank under a long-term contract; Citibank hastily terminated the long-term contract unilaterally and agreed to reinstate it within hours after termination only under terms

more favorable to Citibank. Finally, the Letter Agreements were executed on a rushed "take-it-or-leave-it" basis without any meaningful negotiation between LBI and Citibank.

108.    As a result of LBI's entering into the Letter Agreements, LBI and its customers and creditors have been harmed.

109.    The 9/15/08 and 9/16/08 Letter Agreements are avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT XI

**(Avoidance of Transfer as Actually Fraudulent under
Section 548 of the Bankruptcy Code)**

110.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

111.    Within two years of the Petition Date, LBI transferred $1 billion in cash to Citibank, and Citibank retained such funds after the close of business on September 19, 2008, in the absence of the existence of any further CLS settlement exposure.

112.    The $1 billion deposit was a transfer made by LBI to or for the benefit of Citibank.

113.    The transfer was made with an actual intent to hinder, delay and/or defraud LBI's creditors and customers. Such intent can be inferred from the traditional badges of fraud demonstrated by the circumstances surrounding the Letter Agreements. Among other things, on September 15, 2008, the global markets were experiencing an unprecedented disruption, LBHI and some of its subsidiaries had already filed petitions

under Chapter 11 of the Bankruptcy Code, LBI received disproportionately and unreasonably small consideration in exchange for the transfer of the $1 billion deposit, and the Letter Agreements were executed on a rushed basis, under coercion by Citibank and without any meaningful negotiation whatsoever.

114.    As a result of the transfer, LBI and its customers and creditors have been harmed.

115.    The transfer is avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT XII

### (Recovery of Section 548-Avoided Fraudulent Transfers under Section 550 of the Bankruptcy Code)

116.    The allegations in paragraphs 1 through 63 and 104 through 115 are incorporated by reference as if fully set forth herein.

117.    The transfer is avoidable as an actual fraudulent transfer pursuant to 548(a)(1)(A) of the Bankruptcy Code. Accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT XIII

### (Avoidance of the Obligation to Deposit $1 Billion as a Constructive Fraudulent Conveyance under Section 544 of the Bankruptcy Code and State Law)

118.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

119.    Pursuant to Section 544(b) of the Bankruptcy Code, the Trustee has the rights of an existing unsecured creditor of LBI. Section 544(b) permits the Trustee to assert claims and causes of action that such creditor could assert under applicable state law.

120.    Prior to the commencement of the SIPA liquidation, LBI entered into the Letter Agreements pursuant to which LBI had to deposit $1 billion with Citibank and give Citibank a setoff right against the deposit in exchange for resumption of CLS settlement services. By entering into the Letter Agreements, LBI incurred an obligation to or for the benefit of Citibank.

121.    LBI did not receive fair consideration, or fair equivalent, or reasonably equivalent value in exchange for entering into the Letter Agreements.

122.    When LBI entered into the Letter Agreements, it was already insolvent or became insolvent as a result of incurring the obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, as to which the property remaining was capital in an unreasonably small amount; and/or LBI intended to incur, or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

123.    The Letter Agreements are avoidable as a constructive fraudulent conveyance under Section 544 of the Bankruptcy Code and applicable state law.

## COUNT XIV

### (Recovery of an Avoided Constructive Fraudulent Transfer under
### Section 550 of the Bankruptcy Code)

124.    The allegations in paragraphs 1 through 63 and 118 through 123 are incorporated by reference as if fully set forth herein.

125.    The transfer is avoidable as a fraudulent conveyance pursuant to Section 544 of the Bankruptcy Code and applicable state law, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBI is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT XV

### (Turnover under Section 542 of the Bankruptcy Code of Estate
### Property Held by Affiliates)

126.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

127.    Prior to the commencement of LBI's SIPA liquidation,  Citibank Affiliates, with corporate identities separate from Citibank and with no claims against LBI, held funds in LBI deposit accounts totaling approximately $64 million. Thereafter, as of May 31, 2010, Citibank Affiliates had also received and retained additional deposits of approximately $7 million.

128.    Citibank Affiliates owe debts to LBI as a result of failed trades effected through customer accounts at LBI in the amount of approximately $1 million.

129. The above-described assets are property of the estate because LBI has a legal or equitable interest in them.

130. Citibank Affiliates are in possession, custody or control of the above-described assets, which are of substantial value or benefit to LBI's estate and are property belonging to LBI (that may be used by LBI), and may not be used to setoff against any alleged claims Citibank Affiliates may have against LBI because of the limitations of Section 553 of the Bankruptcy Code.

131. Citibank Affiliates should be directed to turn over the above-described assets or the value thereof to LBI immediately.

## COUNT XVI

**(Buyer's Note Related to Smith Barney Acquisition)**

132. The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

133. In connection with a 1993 Asset Purchase Agreement between a Lehman Brothers Inc. predecessor and a predecessor to the entity subsequently known as Citibank Smith Barney, a promissory note was issued in favor of the LBI predecessor (now LBI) covering certain vested benefits that would be due in the future under certain deferred compensation plans (the "Buyer's Note"). As of the date of this complaint, Citibank retains the duty to pay out to LBI on the balance due under the Buyer's Note.

134. The Trustee now stands in the position of LBI with respect to the Buyer's Note in consequence of the present SIPA liquidation proceeding. Upon payment by the LBI estate on account of the relevant deferred compensation plans, there will be

due from Citibank to the LBI estate the sum of approximately $11 million under the Buyer's Note.

135.    Citibank has disavowed its obligation under the Buyer's Note, contending that the conditions and circumstances of the SIPA liquidation create a Catch-22 that prevents the Trustee from enforcing the Buyer's Note. The Trustee disagrees with Citibank's position and submits that upon making the requisite payment the LBI estate will be entitled to receive payment from Citibank of the $11 million balance still due under the Buyer's Note.

136.    Accordingly, the Trustee seeks (a) a declaratory judgment establishing his right to have the balance due under the Buyer's Note paid by Citibank when the requisite payment has been made by the LBI estate, or (b) if the LBI estate in fact makes such payment prior to this Count coming on for determination, a money judgment against Citibank for the amount due under the Buyer's Note.

## COUNT XVII

**(Equitable Subordination under Section 510(c) of the Bankruptcy Code)**

137.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

138.    Citibank engaged in and benefited from inequitable conduct that resulted in injury to LBI's customers and creditors and conferred an unfair advantage to Citibank. This inequitable conduct has resulted in harm to LBI and its customers and other creditors because customers and general unsecured creditors are less likely to recover the full amounts due to them.

139.     Citibank's conduct has been inequitable and has harmed LBI, its customers, employees and creditors. In equity and good conscience, any claim or interest of Citibank in respect of LBI's estate should be equitably subordinated pursuant to Section 510(c) of the Bankruptcy Code and/or disallowed to the fullest extent permitted by law. Equitable subordination as requested herein is consistent with the provisions of the Bankruptcy Code.

## COUNT XVIII

**(Disallowance of Claims under Section 502(d) of the Bankruptcy Code and Avoidance of Liens Securing Such Claims under Section 506(d))**

140.     The allegations in paragraphs 1 through 131 are incorporated by reference as fully set herein.

141.     Claims held by Citibank against LBI are subject to disallowance under Section 502(d) of the Bankruptcy Code unless and until Citibank has turned over all property transferred, or paid LBI the value of such property for which Citibank is liable under Sections 542, 550, or 553 of the Bankruptcy Code.

142.     In the event that (a) the property is recoverable from Citibank under Sections 542, 550 or 553 of the Bankruptcy Code, or (b) any of the transfers made to Citibank are avoided under Sections 544, 547 or 548 of the Bankruptcy Code, then all of the claims of Citibank against LBI should be disallowed unless and until Citibank has turned over to LBI all property transferred or paid LBI the value of such property, for which it is liable under Sections 542, 550 and 553.

143. Based on the foregoing, to the extent a lien secures a claim that is disallowed such liens are void under Section 506(d) of the Bankruptcy Code.

## COUNT XIX

### (Breach of Contract)

144. The allegations in paragraphs 1 through 63 are incorporated by reference as fully set herein.

145. The CLS Agreement was amended and modified by the Letter Agreements, both of which were drafted by Citibank.

146. LBI's $1 billion deposit had no precedent in LBI's relationship with Citibank as its Designated Settlement Member under the CLS Agreement and constituted an extraordinary change in circumstances in that relationship. In return for LBI's $1 billion deposit, Citibank's rights of setoff against LBI's assets, including that deposit, are strictly limited as set forth by the terms of the Letter Agreements.

147. Citibank breached the terms of the Letter Agreements by exceeding the limitations contained therein with respect to the setoffs it purportedly has taken, and claims to be allowed to take, against LBI's assets, including the $1 billion deposit.

## PRAYER FOR RELIEF

WHEREFORE, LBI demands judgment against Defendants as follows: (i) declaring that Citibank willfully violated the automatic stay and ordering it to pay LBI an amount to be determined at trial for such violation of the automatic stay; (ii) declaring that Citibank has no right to retain LBI's $1 billion deposit; (iii) preserving for the benefit of LBI's estate under Section 551 of the Bankruptcy Code all transfers avoided herein;

(iv) ordering Citibank to return to the Trustee the $1 billion deposit; (v) ordering Citibank to return to the Trustee all LBI assets and customer property held by Citibank prior to commencement of LBI's SIPA liquidation; (vi) disallowing the claims and avoiding the liens of Citibank against LBI unless and until Citibank has turned over to LBI the value of such transferred property for which Citibank is liable under Sections 542, 550 and 553 of the Bankruptcy Code; (vii) equitably subordinating and/or disallowing Citibank's claims and interests in respect to LBI's estate; (viii) ordering Citibank and Citibank Affiliates to turn over all post-petition deposits; (ix) declaring the Trustee's right to payment of the balance due under the Buyer's Note; (x) awarding LBI all other damages in an amount commensurate with the value of all LBI assets held by Citibank and Citibank Affiliates as of September 19, 2008, in addition to statutory interest; (xi) awarding LBI damages as a result of Citibank's breach of the Letter Agreements; (xii) awarding LBI costs and disbursements of this action and attorneys' fees; and (xiii) granting such other and further relief as the Court may deem just and proper.

Dated:  March 18, 2011
        New York, New York

MENAKER & HERRMANN LLP


By:/s/ Richard G. Menaker
        Richard G. Menaker

MENAKER & HERRMANN LLP
10 East 40th Street
New York, New York 10016
Telephone:  (212) 545-1900
Facsimile:   (212) 545-1656

Special Counsel for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.