Brad S. Karp
Stephen J. Shimshak
Douglas R. Davis
Claudia L. Hammerman
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Attorneys for Citibank, N.A., Citigroup Global
Markets, Inc., Citibank Japan Ltd., Citigroup Pty Limited,
Banco Nacional de Mexico SA, Citibank International plc,
Bank Handlowy W Warszawie SA, Citibank AS, Citibank
del Peru SA, Citibank Europe plc, Citibank Maghreb, and
ZAO KB Citibank

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>                                Debtor. | Case No. 08-01420 (JMP) SIPA |

**REPLY BRIEF OF CITIBANK, N.A. AND CERTAIN AFFILIATES IN SUPPORT OF
MOTION FOR THE ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 362(b)(6),
362(b)(7), 362(b)(17), 362(o), 555, 559, 560 AND 15 U.S.C. §§ 78eee(b)(2)(C), 78fff(b)
AUTHORIZING EXERCISE OF CERTAIN CONTRACTUAL, COMMON LAW,
AND STATUTORY RIGHTS IN RESPECT OF AMOUNTS CLAIMED BY LBI
<u>AND OTHER RELATED RELIEF</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT.....................................................................................................................2

I.     The Trustee Does Not Oppose (i) Citibank's Request to Reduce LBI's $60,015,440 ISDA Claim Against Citibank By $25,433,409 or (ii) CGMI's Request to Reduce LBI's Aggregate $19,506,721 Claim Against CGMI by $9,055,533 .................................................................................................................2

II.    The Trustee Does Not Effectively Challenge Citibank Japan's Right to Reduce LBI's $14,282,158 Pre-Filing Date Deposit Account Claim Against Citibank Japan by $1,267,668 ..............................................................................................5

III.   This Court Should Permit Citi to Reduce LBI's Claims Against Citibank and the Affiliates by $260,326,894 ................................................................................6

     A.    The Trustee raises no legitimate factual challenge to Citibank's right to reduce LBI's claims against Citibank and the Affiliates by its remaining CLS Claim.............................................................................................7

     B.    The CLS Agreement is a "swap agreement" and the safe harbors protect Citi's exercise of contractual rights under the CLS Agreement.............................10

     C.    The Bankruptcy Code's safe harbors preserve Citibank's proposed exercise of contractual, common law, and statutory rights to reduce the CLS Claim..............................................................................................10

          1.    The Bankruptcy Code preserves Citibank's contractual right to reduce the CLS Claim by LBI's claims against Affiliates. .........................11

          2.    The safe harbors preserve Citi's right to reduce LBI's post-Filing Date deposits by the amount of the CLS Claim.........................................16

IV.   The Trustee's Request for Immediate Turnover of Post-Filing Date Deposits Must Be Denied ...............................................................................................................18

CONCLUSION...............................................................................................................20

**Page(s)**

### CASES

*In re Balducci Oil Co., Inc.*,
    33 B.R. 847 (Bankr. D. Colo. 1983)...............................................................................12

*Butner v. United States*,
    440 U.S. 48 (1979) .........................................................................................................13

*In re Child World, Inc.*,
    145 B.R. 5 (Bankr. S.D.N.Y. 1992) ...............................................................................19

*Citizens Bank of Md. v. Strumpf*,
    516 U.S. 16 (1995) .........................................................................................................19

*Connecticut Nat. Bank v. Germain*,
    503 U.S. 249 (1992) .......................................................................................................18

*In re Czyzk*,
    297 B.R. 406 (Bankr. D.N.J. 2003)................................................................................14

*In re Dillon*,
    148 B.R. 852 (Bankr. E.D. Tenn. 1992) ........................................................................19

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. et al.*,
    -- F.3d --, 2011 WL 2536101 (2d Cir. June 28, 2011) .................................. 10, 13, 14, 16

*In re Garden Ridge Corp.*,
    338 B.R. 627 (Bankr. D. Del. 2006)...............................................................................14

*Heller & Co. v. Food Mktg. Assoc., Ltd. (In re Fasano/Harriss Pie Co.)*,
    43 B.R. 864 (Bankr. W.D. Mich. 1984) .........................................................................12

*Helliwell v. George R. Burrows, Inc. (In re George R. Burrows, Inc.)*,
    156 F.2d 640 (2d Cir. 1946)..............................................................................................3

*Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*,
    327 F.2d 401 (7th Cir. 1964) ..........................................................................................12

*Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*,
    993 F.2d 915 (1st Cir. 1993).............................................................................................3

*In re King*,
    305 B.R. 152 (Bankr. S.D.N.Y. 2004) .............................................................................3

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004) .......................................................................................................18

*In re Lehman Bros. Holdings, Inc.* ("*DnB Nor*"),
    404 B.R. 752 (Bankr. S.D.N.Y. 2009) ........................................................................10

*In re Lehman Bros. Holdings, Inc.* ("*Swedbank*"),
    433 B.R. 101 (Bankr. S.D.N.Y. 2010) ......................................................... 10, 16, 17

*In re Lehman Bros. Holdings, Inc.*,
    445 B.R. 130 (S.D.N.Y. 2011) ......................................................................... 10, 16

*Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*,
    290 B.R. 487 (Bankr. S.D.N.Y. 2003) ........................................................................1

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*,
    936 F.2d 640 (2d Cir. 1991)......................................................................................12

*N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*,
    129 F.3d 93 (2d Cir. 1997) .......................................................................................17

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co.*
    *(In re Bennett Funding Grp., Inc.)*,
    146 F.3d 136 (2d Cir. 1998)........................................................................................9

*In re Perkins*,
    902 F.2d 1254 (7th Cir. 1990)...................................................................................19

*In re Sabre Shipping Corp.*,
    299 F. Supp. 97 (S.D.N.Y. 1969).................................................................................3

*Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*,
    181 B.R. 730 (Bankr. S.D.N.Y. 1995) ......................................................................16

*Second Penn. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*,
    127 B.R. 346 (Bankr. W.D. Pa. 1991) .................................................................16, 17

*In re SemCrude, L.P.*,
    399 B.R. 388 (Bankr. D. Del. 2009).....................................................................12, 14

*In re SemCrude, L.P.*,
    428 B.R. 590 (D. Del. 2010) ...............................................................................12, 14

*Stewart v. Army & Air Force Exch. Serv. (In re Stewart)*,
    253 B.R. 51 (Bankr. E.D. Ark. 2000).........................................................................1

*Szymanski v. Wachovia Bank, N.A. (In re Szymanski)*,
    413 B.R. 232 (Bankr. E.D. Pa. 2009)..........................................................................4

*Things Remembered, Inc. v. Petrarca*,
    516 U.S. 124 (1995) ..................................................................................................18

*United States v. LaPorta*,
    46 F.3d 152 (2d Cir. 1994) ...................................................................17

*Varity v. Howe*,
    516 U.S. 489 (1996) .........................................................................17

*Wood v. United States*,
    41 U.S. 342 (1842) .........................................................................18

## STATUTES

11 U.S.C. § 362(b)(17) ...........................................................................15

11 U.S.C. § 362(o) ..................................................................................18

11 U.S.C. § 506(b) ....................................................................................4

11 U.S.C. § 546(g) ..................................................................................18

11 U.S.C. § 548(d)(2)(D) .........................................................................18

11 U.S.C. § 553 ...................................................................................13-17

11 U.S.C. § 558 ...................................................................................16-17

11 U.S.C. § 560 ...........................................................................11, 13-18

11 U.S.C. § 561(a) ....................................................................................11

## RULES

Fed. R. Bankr. P. 3001(f) ..........................................................................3

Fed. R. Bankr. P. 7001(1) .....................................................................19-20

Fed. R. Bankr. P. 7012(b) ........................................................................20

Fed. R. Civ. P. 12(c) ................................................................................19

## OTHER AUTHORITIES

Eugenio Cerutti *et al.*, *How banks go abroad: Branches or subsidiaries?*,
    31 J. Banking & Fin. 1669 (2007) .....................................................11

Jonathan Fiechter *et al.*, *IMF Staff Discussion Note: Subsidiaries or Branches: Does One Size Fit All?* (Mar. 7, 2011) ..............................................................11

H.R. Rep. No. 101-484 (1990) .................................................................11

H.R. Rep. No. 109-31 (2005) ....................................................................18

H.R. Rep. No. 109-648 (2006) ..................................................................16

Philip R. Wood, *English & Int'l Set-Off* (1989) ........................................9

# PRELIMINARY STATEMENT

The Trustee devotes only eight pages of his 97-page opposition brief to the motion of Citibank, N.A. ("Citibank") and certain of its Affiliates (together with Citibank, "Citi") for authorization to exercise setoffs based on the "swap agreement" safe harbors of the Bankruptcy Code and other statutory and common law rights.[1] After speculating as to Citi's motivation in seeking stay relief, the Trustee urges this Court to reject the requested relief wholesale.[2] A closer reading of the Trustee's opposition, however, reveals that apart from niggling over a few of the numbers, the Trustee does not assert any genuine basis for opposing most of the relief that Citi seeks in Parts I, II, and III of its motion. His objections to the setoffs proposed in Part IV of the motion largely rest on a perceived lack of mutuality. The plain language of the "swap agreement" safe harbors, though, requires enforcement of Citi's contractual rights, whether involving cross-affiliate "setoffs" or setoffs against post-Filing Date deposits, notwithstanding any potentially conflicting provision of the Bankruptcy Code. Finally, the Trustee tries to turn his opposition to Citi's stay relief motion into a motion to compel immediate turnover of the post-Filing Date deposits—relief that, pursuant to Bankruptcy Rule 7001(1), the Trustee is already seeking in his adversary proceeding. The Trustee's duplicative demand is procedurally deficient, and should be denied on that basis alone.

---

[1] Capitalized terms not defined herein have the same meaning here as they did in Citi's stay relief motion dated May 26, 2011 ("Mot.") [D.I. 4306]. Citations to the Trustee's August 5, 2011 opposition [D.I. 4468] are in the form "Opp.__" and the declarations are cited in the form "Shimshak Decl. Ex. __" and "Menaker Decl. Ex. __."

[2] *See* Opp. 4 ("Citibank and its affiliates appear to have filed their separate lift-stay motion to assure that none of their rights are deemed waived."); *id.* at 89 ("The motion should be rejected."). The Trustee also labels Citi's motion "premature," Opp. 3, 95—an odd characterization, given that Citi filed its motion to meet a Trustee-imposed deadline for Citi to assert rights or interests in the cash and securities that are the subject of his adversary proceeding. Further, his demands for cash and securities arguably triggered Citi's obligations to seek stay relief as a matter of law. *See, e.g.*, *Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 493 (Bankr. S.D.N.Y. 2003) (holding that in the face of a turnover demand under section 542(a), a secured creditor can protect itself from loss by timely moving for relief from stay); *Stewart v. Army & Air Force Exch. Serv. (In re Stewart)*, 253 B.R. 51, 54 (Bankr. E.D. Ark. 2000) (holding that relief from stay to set off debt should be made by motion rather than in answer to complaint for turnover).

# ARGUMENT

## I. The Trustee Does Not Oppose (i) Citibank's Request to Reduce LBI's $60,015,440 ISDA Claim Against Citibank By $25,433,409 or (ii) CGMI's Request to Reduce LBI's Aggregate $19,506,721 Claim Against CGMI by $9,055,533

The Trustee offers no basis to deny the setoffs detailed in Parts I and II of Citi's motion (at ¶¶ 12-41) and summarized in the charts below. Citi has demonstrated its right to proceed with these setoffs and, to the extent required, this Court should modify the stay to permit Citi to complete them.[3]

| LBI Claim Against Citibank | Amount | Citibank Claims Against LBI | Amount |
|---|---|---|---|
| LBI ISDA Claim | $60,015,440 | Wire Transfers Claim | $12,795,775 |
| | | Overdraft Claim | $12,199,628 |
| | | Late Settlement Claim | $207,624 |
| | | Account Fees Claim | $156,142 |
| | | Custody Fees Claim | $38,851 |
| | | Check Fraud Claim | $35,389 |
| Total LBI Claims | $60,015,440 | Total Citibank Claims | $25,433,409 |

LBI-Citibank Net ISDA Claim:      $34,582,031

| LBI Claims Against CGMI | Amount | CGMI Claims Against LBI | Amount |
|---|---|---|---|
| Failed Trades Claim | $19,069,781 | Underwriting Claim | $5,409,268 |
| Repurchase Claim | $436,940 | Securities Lending Claim | $2,979,384 |
| | | Brokerage Fees Claim | $666,881 |
| Total LBI Claims | $19,506,721 | Total CGMI Claims | $9,055,533 |

LBI-CGMI Net Failed Trades Claim:      $10,451,188

The Trustee does not dispute that the relevant safe harbor provisions of the Bankruptcy Code (including sections 555, 559, and 560) protect Citibank's and CGMI's rights to reduce LBI's claims against them by the amount of the LBI ISDA Claim, the Failed Trades Claim, and the Repurchase Claim. *See* Mot. ¶¶ 20-25, 33-41. He also does not dispute that section 553 preserves Citi's right to set off these mutual claims. *Id.* ¶¶ 23, 36. Instead, the Trustee insists that it

---

[3]   Count XVII of the Trustee's complaint—in which he seeks "in equity and good conscience" to equitably subordinate all of Citi's claims—cannot defeat Citi's motion for relief from stay. *See* Compl. ¶ 139. As demonstrated in Citi's motion to dismiss and in its reply brief filed contemporaneously herewith, Citi engaged in no inequitable conduct, much less conduct sufficiently egregious to support equitable subordination against a non-insider and non-fiduciary.

would be "premature" to permit these setoffs now due to purported unresolved factual issues regarding the underlying claims. Opp. 3, 93-95. But the Trustee does not identify any such unresolved factual issues and under Bankruptcy Rule 3001(f), Citi's proofs of claim enjoy prima facie validity unless an objecting party provides "substantial evidence" to rebut that presumption. *See* Fed. R. Bankr. P. 3001(f); *Helliwell v. George R. Burrows, Inc. (In re George R. Burrows, Inc.)*, 156 F.2d 640, 641 (2d Cir. 1946); *see also In re Sabre Shipping Corp.*, 299 F. Supp. 97, 99-100 (S.D.N.Y. 1969); *In re King*, 305 B.R. 152, 164 (Bankr. S.D.N.Y. 2004); *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993).[4]

Although the Trustee has not objected to Citi's proofs of claim and has submitted no evidence to rebut their validity, he now asserts that "discrepancies in excess of $18 million in the calculations . . . require further investigation and consultation with Citibank's representatives"— while admitting that "[c]onsensus on many of the claims may be possible." Opp. 95 (citing Menaker Decl. Ex. 21). In fact, there are no material "discrepancies" that should forestall Citi's exercise of its setoff rights as requested in this motion. The Trustee's own "Exhibit 21"—identifying the $18.9 million variance between the claims identified in Citi's stay relief motion and the Trustee's July 10, 2010 "reconciled" amounts for these claims, *see* Menaker Decl. Ex. 21—makes this abundantly clear. The $18.9 million "discrepancy" reflects Citi's determination that it owes a net $18.9 million *more* to the estate than the Trustee had calculated as of July 10, 2010 (largely due to foreign currency exchange rate fluctuation and the receipt of post-Filing Date deposits). The Trustee's position appears to be that setoff should not be permitted at this time because Citi has admitted it may owe more to the estate than the Trustee had calculated. That argument makes no sense. Whether Citi ends up owing the Trustee more or less after its setoffs, the difference is no reason to

---

[4]    Citibank's and CGMI's proofs of claim (timely filed in May 2009 and amended in May 2011) include detailed claim descriptions, copies of the relevant agreements, and where applicable, charts and other backup for the calculations. *See* Shimshak Decl. Exs. 6, 7.

delay the requested setoffs.[5]  A careful review of Exhibit 21 reveals that the individual "discrepancies" relevant to Parts I and II of Citi's stay relief motion present no legitimate ground to oppose these setoffs.

*First*, Exhibit 21 establishes that most of the claim amounts set out in Parts I and II of Citi's stay relief motion exactly match the Trustee's own numbers—namely, the Wire Transfers Claim, Overdraft Claim, Late Settlement Claim, Check Fraud Claim, Repurchase Claim, Underwriting Claim, and Brokerage Fees Claim.

*Second*, while Exhibit 21 identifies certain claims—namely the LBI ISDA Claim, Custody Fees Claim, Failed Trades Claim, and Securities Lending Claim—where the Trustee believes Citi's and LBI's respective claim amounts should be higher, it necessarily follows that there is no dispute with respect to the lesser amount that Citi seeks to set off.

*Third*, in Exhibit 21 the Trustee identifies an $8.3 million "Defaulted LBI-Issued Notes" claim against LBI that does not appear in Citi's stay relief motion.  To LBI's benefit, Citi excluded this claim after determining that the relevant indenture precludes setoff.

*Fourth*, the $156,142 Account Fees Claim is thus the only claim in Part I or II of the motion where Citi arrives at a higher value than the Trustee.  Citi trusts the parties can resolve any discrepancy over this comparatively small amount without judicial intervention.[6]

In sum, this Court should grant Citibank's request to reduce LBI's $60,015,440 ISDA Claim against Citibank by $25,433,409 (less the $156,142 Account Fees Claim) and CGMI's request to reduce LBI's aggregate $19,506,721 claim against CGMI by $9,055,533, and direct the parties to resolve the $156,142 Account Fees Claim.

---

[5]  Indeed, accomplishing the setoffs now will actually benefit the estate because it will stop the accrual of postpetition interest allowed under section 506(b) on Citi's oversecured claims.  *See Szymanski v. Wachovia Bank, N.A. (In re Szymanski)*, 413 B.R. 232, 252 (Bankr. E.D. Pa. 2009) (awarding postpetition interest to bank oversecured by deposit account).

[6]  The remaining "discrepancy" is due to currency fluctuation and other items discussed in Parts II and III, *infra*.

## II.	The Trustee Does Not Effectively Challenge Citibank Japan's Right to Reduce LBI's $14,282,158 Pre-Filing Date Deposit Account Claim Against Citibank Japan by $1,267,668

This Court should also authorize the following setoffs concerning Citibank Japan, as described in Part III of Citi's motion (at ¶¶ 42-52).

| LBI Claims Against Citibank Japan | Amount | Citibank Japan Claims Against LBI | Amount |
|---|---|---|---|
| Citibank Japan Deposit Account | $14,282,158 | Citibank Japan FX Claim | $1,156,390 |
| | | Citibank Japan Account Fees Claim | $111,278 |
| Total LBI Claims | $14,282,158 | Total Citibank Japan Claims | $1,267,668 |
| LBI-Citibank Japan Net Deposit Account Claim: | | | $13,014,490 |

The Trustee offers no cognizable legal or factual challenge to these setoffs. *See* Opp. 93-95; Menaker Decl. Ex. 21. Exhibit 21 reveals that Citi's calculation of the Citibank Japan FX Claim precisely matches the Trustee's "reconciled" number and the Citibank Japan Account Fees Claim against LBI is actually $887 lower than what the Trustee reports. As for LBI's claim against Citibank Japan for pre-Filing Date deposits, Exhibit 21 reflects that Citi believes the current USD equivalent balance of the account is higher than what the Trustee calculated as of 2010. In any case, the precise USD equivalent of the pre-Filing Date balance of the Citibank Japan Deposit Account (whose variation is likely due to the exchange rates used) is immaterial; whether you use Citi's or the Trustee's numbers, the balance substantially exceeds the aggregate amount of Citibank Japan's claims.

Given these uncontested facts, the Trustee attempts to cast doubt generally on Citi's setoff rights against LBI's deposit accounts based on alleged "significant issues as to the capacity in which LBI held deposited funds." Opp. 94. While the Trustee had ample opportunity to articulate the basis for any concerns over LBI's "capacity," he offers virtually no detail and fails to identify any unresolved issues as to "capacity" with respect to the Citibank Japan account. The proposed setoff is thus effectively unopposed. Accordingly, this Court should allow Citibank Japan to reduce LBI's Citibank Japan Deposit Account Claim by $1,267,668.

### III. This Court Should Permit Citi to Reduce LBI's Claims Against Citibank and the Affiliates by $260,326,894

Similarly, Citibank's request in Part IV of this motion (at ¶¶ 53-98) to reduce LBI's claims against Citi by $260,326,894—the amount of Citibank's remaining CLS Claim before post-Filing Date interest—does not require any fact-finding. All it entails is consideration of Citi's rights under the CLS Agreement, section 553, and (in respect of certain claims) the "swap agreement" safe harbors.

| LBI Claims Against Citi | Amount | Citi Claims Against LBI | Amount |
|---|---|---|---|
| LBI-Citibank Net ISDA Claim | $34,582,031 | CLS Claim | $260,326,894 |
| LBI-Citibank Securities Lending Claim | $8,358,995 | | |
| LBI-Citibank Custody Securities Claims | $1,836,427 | | |
| LBI-Citibank Pre-Filing Date Deposits Claim | $66,618,137 | | |
| *Subtotal – Claims Against Citibank* | $111,395,590 | | |
| LBI-CGMI Net Failed Trades Claim | $10,451,188 | | |
| LBI-Affiliates Custody Securities Claim | $3,742,172 | | |
| LBI-Affiliates Pre-Filing Date Deposits Claim | $73,328,455 | | |
| *Subtotal – Claims Against Affiliates* | $87,521,815 | | |
| LBI-Citibank Post-Filing Date Deposits Claim | $192,230,822 | | |
| LBI-Affiliates Post-Filing Date Deposits Claim | $8,467,250 | | |
| *Subtotal – Post-Filing Date Claims* | $200,698,072 | | |
| Total LBI Claims | $399,615,477 | Total CLS Claim | $260,326,894 |
| Net CLS Claim: | | | $0 |

By its terms, the CLS Agreement gives Citibank the contractual right to reduce amounts otherwise payable to LBI by Citibank or its Affiliates as needed to recover on Citibank's claims against LBI arising under the CLS Agreement:

> Upon an occurrence of an Event of Default (as defined below) with respect to a Transaction Party, Citibank may **(in respect of any account of such Transaction Party and whether by combination or unification of accounts, set-off or otherwise) reduce without notice the amount of any payment obligation whether matured or unmatured owed by it or any of Citibank's branches, affiliates or subsidiaries** to the Transaction Party (but excluding obligations with respect to any amounts held by the Citibank in a trustee capacity and any amounts held in customer accounts required by law to be segregated) by the amount of any payment obligation owed to it by the Transaction Party (including but not limited to Citibank's fees and

> other charges for the Citibank® CLS™ Settlement Services for which the Transaction Party is responsible), regardless of the place of payment or currency of either obligation.

Shimshak Decl. Ex. 10 at 3-4 (emphasis provided). The Trustee nowhere denies the enforceability of this contractual right under applicable English law. Instead, he offers three other defenses to the operation of this provision: (i) the relief requested is "premature" because fact issues exist with respect to the claims of Citi and LBI against each other, including the "capacity" in which LBI maintained deposits with Citi; (ii) the safe harbors do not protect Citibank's rights under the CLS Agreement; and (iii) even if the safe harbors apply, they do not preserve Citibank's rights to reduce amounts owed to LBI by Affiliates or to offset post-Filing Date deposits against the pre-Filing Date CLS Claim. This Court should reject each of the Trustee's arguments, and authorize Citi to exercise immediately its contractual rights under the CLS Agreement as set forth in Part IV of the motion.

### A. The Trustee raises no legitimate factual challenge to Citibank's right to reduce LBI's claims against Citibank and the Affiliates by its remaining CLS Claim.

The Trustee has failed to offer any evidence (or even any factual allegation) to rebut the prima facie validity of Citibank's secured CLS claim against LBI.

*First*, the Trustee does not identify any basis to dispute the validity of Citibank's $260,326,824 claim *calculation* ($1,260,326,824, less the $1 billion setoff). To the contrary, Exhibit 21 reflects that the Trustee has "reconciled" the net $260,326,824 CLS Claim against his own records. Menaker Decl. Ex. 21. The Trustee's sole objection to Citibank's $260 million CLS Claim, then, is his legal argument that Citibank cannot claim more than $1 billion of damages under the Letter Agreements. *See* Compl. ¶¶ 146-47; Opp. 81. Citi's reply brief in support of its motion to dismiss disposes of that contention.

*Second*, any factual discrepancies identified in Exhibit 21 with respect to LBI's claims against Citi are either irrelevant or immaterial, and subject to easy reconciliation. Some of

LBI's claims against Citi simply are not part of Citi's motion. These include securities custodied with Citibank Peru and Citibank Chile, cash deposited with Citibank Korea, and the Trustee's alleged claim against Citi for the Smith Barney deferred compensation (omitted because Citi denies liability). While the LBI securities that are subject to the stay relief motion have increased in value since 2010, that increase serves LBI's interests because it reduces more of the CLS Claim. Similarly, Citibank's determination that the LBI-Citibank Securities Lending Claim is $33,532 higher benefits LBI. Additionally, Exhibit 21 reflects that cash deposit balances may have changed in value, likely due to exchange rate fluctuations and the receipt of additional deposits. As with the $156,142 Account Fees Claim against LBI, discussed above, Citi trusts that it will be able to resolve the minor differences over these calculations with the Trustee, without the need for judicial intervention. But this clerical exercise should not delay the grant of relief to exercise the setoffs, subject only to minor adjustment of the numbers.

_Third_, the Trustee attempts to create a fact issue over the "capacity" in which LBI maintained deposits with Citi. While the Trustee refers vaguely to customer and Lehman affiliate claims against "certain LBI accounts," he identifies only two third party claimants in his opposition brief—Nomura Global Financial Products Inc. ("Nomura") and PT Bank Negara ("Negara"). Opp. 94. Nomura and Negara were not LBI customers, but _counterparties_ who entered into over-the-counter foreign currency exchange transactions with Lehman that settled outside the CLS system, pursuant to which they allegedly remitted payments respectively to LBI's EUR (-0409) and GBP (-6427) accounts in London during the week of September 15, 2008. Menaker Decl. Exs. 17, 18. Seeking to recover these payments, Nomura and Negara have each asserted constructive trust

and related claims against LBI's accounts. *Id.*[7] For his part, the Trustee has vigorously denied these claims.[8] Indeed, in his answer to the Negara complaint, the Trustee states:

> [Negara's] claims against LBI for constructive trust and reclamation pursuant to 11 U.S.C. § 546(c) are barred because **the account at Citibank London is an unsegregated account subject to an administrative freeze by Citibank and the purported prior rights of Citibank as a secured party, and therefore is subject neither to a constructive trust nor to claims of reclamation** pursuant to 11 U.S.C. § 546(c).[9]

Precisely. Claims by Negara and Nomura (or any other third party) to the accounts at issue in this motion must fail because these indisputably are general, unsegregated, proprietary accounts of LBI. The Trustee's allegations that Negara and Nomura paid money into these accounts and were owed payments in return does nothing to change this. Because the Trustee does not cite any specific facts showing that the accounts were segregated or of any special nature—much less facts showing Citi's knowledge of the same—Citi's interests trump any competing claim by a third party, whether LBI customer, counterparty, or otherwise. *See* Philip R. Wood, *English & Int'l Set-Off* § 3-28 (1989); *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*, 146 F.3d 136, 139-41 (2d Cir. 1998) (acknowledging presumption that account is general, not special, and rejecting trustee's argument that bankruptcy court should disallow otherwise valid setoff just because the funds on deposit were derived from Ponzi scheme).

---

[7]   *See also* Complaint, *Nomura Global Fin. Prods. Inc. v. Lehman Brothers Special Financing Inc. & Lehman Brothers Inc.*, Adv. Proc. No. 09-01061 (Bankr. S.D.N.Y. Feb. 27, 2009); Amended Complaint, *PT Bank Negara Indonesia (Persero) Tbk v. Lehman Brothers Special Financing Inc. et al.*, Adv. Proc. No. 09-01480 (Bankr. S.D.N.Y. Jan. 11, 2010).

[8]   Trustee's Answer to Complaint of Nomura Global Fin. Prods. Inc. ¶¶ 58-67, *Nomura Global Fin. Prods.*, Adv. Proc. No. 09-10161 (Bankr. S.D.N.Y. Apr. 3, 2009); Trustee's Answer to Amended Complaint of PT Bank Negara Indonesia (Persero) Tbk ¶¶ 82-98, *PT Bank Negara.*, Adv. Proc. No. 09-01480 (Bankr. S.D.N.Y. July 9, 2010).

[9]   Trustee's Answer to Amended Complaint of PT Bank Negara Indonesia (Persero) Tbk ¶ 90, *PT Bank Negara*, Adv. Proc. No. 09-01480 (Bankr. S.D.N.Y. July 9, 2010) (emphasis provided).

Having dispensed with the Trustee's factual objections, we turn to his legal objections to Citi's setoff of the remainder of the CLS Claim.

**B.      The CLS Agreement is a "swap agreement" and the safe harbors protect Citi's exercise of contractual rights under the CLS Agreement.**

Incorporating all of the arguments he makes in connection with the $1 billion deposit, the Trustee denies that the safe harbors protect Citi's right to reduce amounts payable by Citibank or its Affiliates by the amount of the CLS Claim. *See* Opp. 90-91. Citi adopts the same approach and hereby incorporates all of the safe harbor arguments made in its motion to dismiss. Those arguments demonstrate that the "swap agreement" safe harbors protect Citi's CLS Claim. The remaining question is how broadly that protection extends.

**C.      The Bankruptcy Code's safe harbors preserve Citibank's proposed exercise of contractual, common law, and statutory rights to reduce the CLS Claim.**

The Trustee does not question Citibank's ability to rely on the CLS Agreement (and its common law rights) to reduce the $111,395,590 in pre-Filing Date amounts otherwise payable by Citibank to LBI. *See* Mot. ¶¶ 76-84. The Trustee also does not challenge (indeed does not mention) Citibank's right to retain, pursuant to its security interest in the DCA and Deed, Affiliate-held securities of LBI worth $3,742,172 as of May 2011 to further reduce the CLS Claim. *See id.* ¶ 87-88. But based on this Court's *DnB Nor*[10] and *Swedbank*[11] decisions, the Trustee challenges Citi's right to reduce (i) $83,779,643 otherwise payable by the Affiliates to LBI, and (ii) $200,698,072 in post-Filing Date deposits otherwise payable by Citibank and the Affiliates. *See* Opp. 91-93, 95-96. Those decisions, however, were issued before the Second Circuit's recent decision in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. et al.*, -- F.3d --, 2011 WL 2536101 (2d Cir. June

---

[10]   *In re Lehman Bros. Holdings, Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009).

[11]   *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101 (Bankr. S.D.N.Y. 2010), *aff'd* 445 B.R. 130 (S.D.N.Y. 2011).

28, 2011), which compels a literal and straightforward application of the plain language of section 560 and the enforcement of Citibank's clear and unambiguous contractual rights.

The plain language of section 560 mandates that no provision of the Bankruptcy Code or court order can stay, avoid, or otherwise limit the contractual right of a swap participant to offset or net out any termination values or payment amounts arising under or in connection with the termination of one or more swap agreements. 11 U.S.C. § 560.[12] Citibank's CLS Claim of $260,326,894 is precisely that—a payment amount arising under or in connection with the termination of one or more swap agreements. And Citibank's right under the CLS Agreement to offset or net that claim against "any account" of LBI is a "contractual right" that falls squarely within the definition of section 560. *See* Shimshak Decl. Ex. 10 at 3-4.

### 1. The Bankruptcy Code preserves Citibank's contractual right to reduce the CLS Claim by LBI's claims against Affiliates.

Banks like Citibank operate many branches worldwide, and regulatory, tax, macroeconomic, and political concerns sometimes motivate or require them to establish distinct legal entities to service their clients.[13] In conducting its FX business, LBI manifestly obtained a significant benefit from Citi's global reach and ability to function seamlessly across Affiliates.[14] In

---

[12] *See also* H.R. Rep. No. 101-484, at 5-6 (1990) ("Section 560 provides that the exercise of any such right shall not be stayed, avoided, or otherwise limited by operation of the Bankruptcy Code or by order of any court or government agency in any proceeding under the Bankruptcy Code. . . . *This provision is not intended to preempt the statute of frauds or any other provision of law, except for the provisions of the Bankruptcy Code*.") (emphasis provided). Section 561(a) provides substantially similar relief. *See* 11 U.S.C. § 561(a) (providing that exercise of protected contractual right shall not be limited by "any provision of this title . . .").

[13] *See, e.g.*, Jonathan Fiechter *et al.*, *IMF Staff Discussion Note: Subsidiaries or Branches: Does One Size Fit All?*, at 11 (Mar. 7, 2011), *available at* http://www.imf.org/external/pubs/ft/sdn/2011/sdn1104.pdf (last visited Sept. 2, 2011); Eugenio Cerutti *et al.*, *How banks go abroad: Branches or subsidiaries?*, 31 J. Banking & Fin. 1669, 1671 (2007), *available at* http://siteresources.worldbank.org/DEC/Resources/How_banks_go_abroad_Branches _or_subsidiaries.pdf (last visited Sept. 2, 2011).

[14] *Cf.* Fiechter, *supra*, at 7 ("Despite a clear legal distinction between branches and subsidiaries, however, they may in practice sometimes be operated and managed in a similar fashion. In some countries, branches work effectively as independent entities. In others, subsidiaries may function similarly to branches, subject to centralized risk management established at the group level and funding decisions, and are dependent on their parents for funding . . .

exchange for the benefits of Citi's integrated network, LBI agreed that Citi could satisfy any liabilities owing by LBI under the CLS Agreement out of LBI's accounts with Citi worldwide. Shimshak Decl. Ex. 10 at 3-4. Not only does nothing in the Bankruptcy Code suggest that Congress intended to preempt such arrangements, but the safe harbors, including section 560, expressly require their enforcement.

The Trustee cites to numerous cases holding that a creditor generally cannot set off amounts payable by or to its affiliate against amounts payable by or to the debtor or the debtor's affiliates. *See* Opp. 92, 93. Other than *In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd* 428 B.R. 590 (D. Del. 2010), though, none of the cases cited by the Trustee concern *contractual* rights of cross-affiliate setoff.[15] Citi and LBI had a contract, the CLS Agreement, in which LBI agreed that Citibank could use *any* LBI accounts at Citibank or *any* of the Affiliates to reduce LBI's CLS obligation to Citibank. As demonstrated in Citi's motion to dismiss, the CLS Agreement is a "swap agreement," and as such it qualifies for protection under the safe harbors of the Bankruptcy Code.

The relevant "safe harbor" provisions—and, specifically, section 560—expressly mandate that:

> [t]he exercise of **any contractual right** of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition

Practices such as group-wide guarantees and supervisory ring-fencing often blur the distinctions between branches and subsidiaries.").

[15] Indeed, the Second Circuit case cited by the Trustee recognized that "there may be an exception to the strict mutuality rule where an injustice would be caused by disallowing a set-off . . ." *Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, 936 F.2d 640, 648 (2d Cir. 1991). Two other cases cited by the Trustee recognize an exception to the mutuality requirement where the parties contract for triangular setoff rights. *See Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*, 327 F.2d 401, 404-05 (7th Cir. 1964) (declining to permit tri-party setoff in absence of agreement authorizing such a setoff); *Heller & Co. v. Food Mktg. Assoc., Ltd. (In re Fasano/Harriss Pie Co.)*, 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984) ("Courts have carved out an exception to this general rule in the 'triangular tradeoff' situation. The courts have found mutuality between three parties, as a matter of contract law, where there was an express agreement clearly evidencing the intent of the parties to treat the related corporations as a single entity." (citing *In re Balducci Oil Co., Inc.*, 33 B.R. 847 (Bankr. D. Colo. 1983))).

of the kind specified in section 365(e)(1) of this title or to **offset or net out any termination values or payment amounts** arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements **shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.**

11 U.S.C. § 560 (emphasis provided). Nothing in section 560 suggests that a swap counterparty must *also* establish that its setoff or netting right would independently qualify for protection under any other provision of the Bankruptcy Code, including section 553, which preserves mutual prepetition setoff rights. Similarly, the definition of "contractual right" does not refer to any other provision of the Bankruptcy Code; Congress defines the right simply and expansively to include *any* right arising under the rules and bylaws of various clearing organizations, and *any* right arising "under common law, under law merchant, or by reason of normal business practice." 11 U.S.C. § 560.[16] Nonetheless, the Trustee argues that section 560's protection of *any* contractual right does not extend to contractual rights of cross-affiliate netting, because these are not protected under section 553 of the Bankruptcy Code. This argument fails on multiple grounds.

First, as the Second Circuit recently made clear, courts should look at the plain language of the safe harbors and not read into that language exclusions that have no basis in the statutory text. *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, -- F.3d --, 2011 WL 2536101 (2d Cir. June 28, 2011). In *Enron*, the Second Circuit Court of Appeals held that the plain language of the "settlement payment" definition encompassed the redemption of commercial paper and that "nothing in the Bankruptcy Code or the relevant caselaw . . . supports Enron's proposed limitations on the definition of settlement payment in § 741(8)." *Id.* at *9. As in *Enron*, nothing in section 560

---

[16] The definition of "contractual rights" thus accords with the basic proposition that "[p]roperty interests are created and defined by state law" and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979).

supports limiting contractual rights of setoff to those qualifying for protection under section 553; to the contrary, the plain language of section 560—stating that no other provision of the Bankruptcy Code can limit these contractual rights—compels the opposite conclusion. If the Second Circuit in *Enron* enforced the plain language of section 741(8) despite the arguable circularity (and thus, potential ambiguity) in the definition of "settlement payment," the same approach must prevail in interpreting section 560, which is a model of clarity by comparison.

Moreover, nothing in the language of section 553 indicates that Congress intended to prevent parties from contracting for mutuality where applicable non-bankruptcy law permitted them to do so. The term "mutual" in section 553 is defined under applicable non-bankruptcy law. *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) ("Mutuality of obligations is determined by state law." (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J. 2003))). Only a single reported case holds that parties cannot contract to create "mutuality" for purposes of section 553, and the reasoning of that case is flawed. *See In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd* 428 B.R. 590 (D. Del. 2010). In *SemCrude*, Chevron relied on a contractual netting provision to set off the debt it owed debtor SemCrude against the debts owed to Chevron by two of SemCrude's debtor affiliates. *SemCrude*, 399 B.R. at 390, 392. The bankruptcy court recognized that "[n]early a dozen cases decided in the last three decades under the Code, and a smaller number of cases decided under the . . . Bankruptcy Act of 1898, have observed that an exception [to mutuality] along the lines of that espoused by Chevron exists." *Id.* at 394. Despite that, the court declined to follow those cases, choosing instead to create what amounts to a federal law definition of "mutual" in section 553—a definition requiring that debts be due to and from the same persons. *Id.* at 396. But even assuming for argument's sake that section 553(a) did not expressly protect Citibank's contractual cross-affiliate netting rights, it takes a quantum leap to conclude that enforcement of the rights would actually *violate* Congress's intent, given that the preamble to section

14

553(a) is not a self-executing disallowance provision. There is simply no indication in either section 560 or section 553 that Congress intended to prohibit all cross-affiliate "setoffs" or netting arrangements.[17]

Although under *Enron* resort to legislative history is unnecessary given section 560's plain language, the legislative history is nonetheless instructive and contains clear evidence that Congress intended to *remove* any mutuality requirement from the safe harbors. Before 2006, the automatic stay under section 362(b) exempted "setoff by a swap participant … of a *mutual debt and claim* under or in connection with one or more swap agreements . . ." 11 U.S.C. § 362(b)(17) (2005) (emphasis provided). However, in 2006, Congress amended section 362(b)(17) to exempt "the exercise by a swap participant . . . of *any contractual right* (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such [swap] agreements." Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, § 5, 120 Stat. 2692, 2697 (codified at 11 U.S.C. § 362(b)(17)) (emphasis provided). This deletion was not purely stylistic: Congress explained that the technical revisions enacted in 2006 were needed to "strengthen[] and clarify[] the enforceability of early termination and close-out netting provisions and related collateral arrangements in U.S. insolvency proceedings," in order to "help reduce systemic risk in the financial markets." H.R. Rep. No. 109-648, at 1-2 (2006). As a logical matter, if the only contractual rights of setoff or netting that Congress intended to protect involved "mutual" debts or claims as described in section 553(a), then its language change added nothing and served no purpose, for it neither "strengthened" nor "clarified" the enforceability of setoff rights.

Accordingly, this Court should grant Citi's request to reduce Affiliate payables to LBI.

---

[17] The discussion of section 558 in the next section below (at pp. 16-17) reinforces the conclusion that Congress did not mandate a restrictive definition of mutuality for all purposes.

## 2. The safe harbors preserve Citi's right to reduce LBI's post-Filing Date deposits by the amount of the CLS Claim.

Section 560 also protects Citi's contractual right to offset the CLS Claims against LBI's post-Filing Date deposits. Citibank acknowledges this Court's decision in *In re Lehman Brothers Holdings Inc.*, 433 B.R. 101 (Bankr. S.D.N.Y. 2010) (hereinafter, "*Swedbank*"), holding that the safe harbor protections do not extend to bank deposits received after the commencement of a bankruptcy proceeding, as well as the District Court's affirmance of that decision, 445 B.R. 130 (S.D.N.Y. 2011). Citibank respectfully submits that the plain language of the safe harbors, reinforced by the Second Circuit's *Enron* decision, requires a contrary result here.

The Bankruptcy Code has never elevated mutuality to an absolute. Consider section 558, which gives the estate the benefit of any defense available to the debtor as against any entity other than the estate. 11 U.S.C. § 558. The available defenses include a right of setoff. *See Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739-40 (Bankr. S.D.N.Y. 1995) (citing *Second Penn. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, 127 B.R. 346, 349-50 (Bankr. W.D. Pa. 1991)). Bankruptcy courts routinely permit the setoff of an estate's prepetition claim against a creditor's postpetition claim under section 558. Thus, in *Papercraft*, the leading decision under section 558, the Bankruptcy Court allowed the debtor to reduce its postpetition rent payments to a lessor by certain prepetition taxes the debtor had paid, observing:

> Were this a creditor seeking a setoff, that time differential would be fatal to applying setoff principles. However, because section 558 preserves to the Debtor the defenses it would have had prepetition, **the court must examine the transaction as though the bankruptcy has not been filed. Doing so eliminates the prepetition/ postpetition distinction and, in essence, obliterates the requirement that the mutual debts must both be prepetition obligations in a § 558 context.**

*Papercraft*, 127 B.R. at 350 (emphasis provided).[18]  Section 560 by its plain language expressly eliminates the effects of the Bankruptcy Code on *any* contractual right to set off termination payments.  Like section 558, section 560 treats these contractual rights as though the bankruptcy had not been filed.  If anything, it does so more straightforwardly than section 558, in which the "obliteration" of the postpetition/prepetition distinction derives not from the letter of the statute but from the application of the statute under case law interpretation.

In its *Swedbank* decision this Court also reasoned that the inclusion in section 553 of specific exceptions for safe harbored setoffs implies that section 553's mutuality requirement  (as to which 553 provides no specific exception) must apply to the exercise of safe harbored contractual rights, notwithstanding the clear and overarching exemption contained in section 560.  433 B.R. at 109.  The Court cited *United States v. LaPorta*, 46 F.3d 152, 156-57 (2d Cir. 1994), for the proposition that "a general section of a statute must give way to a specific one."  *Id.*  But, as the Supreme Court has explained, this "canon ('the specific governs the general') [is] a warning against applying a general provision when doing so would undermine limitations created by a more specific provision."  *Varity v. Howe*, 516 U.S. 489, 511 (1996).  Nothing in section 560 would undermine limitations in section 553.  Section 560 provides that neither the Bankruptcy Code nor any Court order should limit "contractual rights" to "offset or net out" payment amounts arising in connection with safe harbored contracts, while section 553 affords more limited protection to qualifying mutual "setoff" rights.  Section 553's specific protections for safe harbored contracts do not conflict, but rather reinforce and are directionally consistent with the broad protections of section 560.

But even if the specific protections in section 553 for safe harbored contracts are redundant in view of section 560, the "preference for avoiding surplusage constructions is not

---

[18]  Bankruptcy courts have also recognized that the doctrine of recoupment permits creditors to net prepetition claims against postpetition claims.  *See, e.g.*, *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997).

absolute" and should not deter the Court from applying the plain meaning of section 560 here. *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws . . . a court must give effect to both." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (citing *Wood v. United States*, 41 U.S. 342, 363 (1842)).[19] To conclude that a creditor must satisfy the requirements of section 553 before it can invoke the protection of section 560 does not give effect to both provisions—rather, it is akin to rewriting section 560.[20] Because section 560 is clear and unambiguous, it should be enforced according to its terms. *Lamie*, 540 U.S. at 536 ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."). Accordingly, this Court should grant Citi's request to set off post-Filing Date deposits.

## IV. The Trustee's Request for Immediate Turnover of Post-Filing Date Deposits Must Be Denied

The Trustee's turnover demand in response to Citi's stay relief motion is also procedurally defective under Bankruptcy Rule 7001(1), and this deficiency alone warrants denying his request. The turnover request is a demand to "recover" money the bank purportedly agreed to

---

[19]     Indeed, redundancies appear throughout the Bankruptcy Code, including the safe harbor provisions. *Compare* 11 U.S.C. § 362(o) (providing that safe harbored rights of offset and netting shall not be stayed by any order of a bankruptcy court); *with id.* § 560 (same); *and compare id.* at § 546(g) (insulating transfers to swap participants from avoidance); *with id.* § 548(d)(2)(D) (clarifying that transfers to swap participants are deemed to be made for value to the extent of such transfer). Moreover, the Supreme Court has held that where two provisions of the statute can coexist, effect must be given to both. *See Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 129 (1995) ("There is no express indication in [28 U.S.C.] § 1452 that Congress intended that statute to be the exclusive provision governing removals and remands in bankruptcy . . . There is no reason §§ 1447(d) and 1452 cannot comfortably coexist in the bankruptcy context. We must, therefore, give effect to both."); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (holding that a party may rely on either 28 U.S.C. § 1292 or 28 U.S.C. § 158(d) as a basis to invoke appellate jurisdiction in bankruptcy cases).

[20]     It is also doubtful that Congress intended for its 2005 amendments to section 553(a)—enacted well after section 560 became effective—to impose limitations on section 560, when Congress's stated purpose for the amendments was "to *clarify* that the acquisition by a creditor of setoff rights in connection with swap agreements . . . cannot be avoided as a preference." H.R. Rep. No. 109-31, at 134 (2005) (emphasis provided). The amendment was a clarification, rather than a departure, because section 560 already afforded the same relief.

pay. *See* Opp. 95-96; *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) ("[A] bank account . . . consists of nothing more or less than a promise to pay, from the bank to the depositor."). The Bankruptcy Rules plainly require an adversary proceeding to "recover money or property" of the estate. Fed. R. Bankr. P. 7001(1); *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) (vacating turnover order entered in an action commenced by motion); *see also, e.g.*, *In re Child World, Inc.*, 145 B.R. 5, 9 (Bankr. S.D.N.Y. 1992) (declining to address the merits of debtor's claim to recover money from creditor when asserted in response to creditor's motion for administrative priority rather than by complaint); *In re Dillon*, 148 B.R. 852, 853 (Bankr. E.D. Tenn. 1992) (denying, without prejudice, request initiated by motion that IRS turn over funds to estate).

The Trustee's request for turnover in response to Citi's stay relief motion also violates the terms of an existing scheduling order between the parties. Consistent with Rule 7001(1)'s mandate, the Trustee has already filed an adversary proceeding that seeks in Counts VII and XV to compel turnover of the post-Filing Date deposits. Citi has filed a pre-answer motion to dismiss many of the counts of the complaint, but not Counts VII or XV. The Trustee and Citi agreed, and the Court so-ordered that Citi is not obligated to serve an answer in respect of Counts VII and XV until thirty calendar days after the Court issues an order determining Citi's motion to dismiss.[21] In now demanding turnover, the Trustee is effectively seeking judgment on the pleadings under Federal Rule of Civil Procedure 12(c) (incorporated under Bankruptcy Rule 7012(b)) on his turnover claims in the adversary proceeding months before Citi has filed any responsive pleading and in contravention of the schedule to which the Trustee and Citi agreed.[22]

---

[21]  *See* Second Amended Scheduling Order and Discovery Plan ¶ 1(a), *Lehman Brothers Inc. v. Citibank, N.A. et al.*, Adv. Proc. No. 11-01681 (JMP) (Bankr. S.D.N.Y. June 22, 2011) [D.I. 23].

[22]  *See* Fed. R. Civ. P. 12(c) ("*Motion for Judgment on the Pleadings.* After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.").

## CONCLUSION

While the Trustee labels Citi's request for stay relief "premature" and urges this Court to reject it, the Trustee does not actually oppose most of the relief sought in Parts I and II of Citi's Motion. The Trustee also has not effectively challenged Citibank Japan's right to reduce LBI's deposit account by $1,267,668, as described in Part III of Citi's motion. Similarly, the Trustee offers no real basis to oppose Citibank's request to reduce its residual CLS Claim of $260,326,894 by the $111,395,590 in pre-Filing Date debt owed by Citibank and the $3,742,172 in Affiliate securities, as requested in Part IV of Citi's motion. All of these proposed setoffs should be allowed to proceed immediately. As for the other relief requested in Part IV, for the reasons set forth above and in Citi's motion to dismiss, the "swap agreement" safe harbors protect Citi's right to further reduce its residual CLS Claim by pre-Filing Date debts of Affiliates and by post-Filing Date deposits, and to the extent required, this Court should modify the stay to permit Citi to exercise its rights. Finally, the Trustee's demand for turnover of the post-Filing Date deposits duplicates relief he is already seeking in the adversary proceeding. His demand is procedurally deficient and should be denied.

Dated: New York, New York  
       September 2, 2011

PAUL, WEISS, RIFKIND, WHARTON &  
GARRISON LLP

By:    */s/ Stephen J. Shimshak*             
       Brad S. Karp  
       Stephen J. Shimshak  
       Douglas R. Davis  
       Claudia L. Hammerman  
       1285 Avenue of the Americas  
       New York, New York 10019-6064  
       Telephone: (212) 373-3000  
       Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global Markets, Inc., Citibank Japan Ltd., Citigroup Pty Limited, Banco Nacional de Mexico SA, Citibank International plc, Bank Handlowy W Warszawie SA, Citibank AS, Citibank del Peru SA, Citibank Europe plc, Citibank Maghreb, and ZAO KB Citibank*