FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| LEHMAN BROTHERS INC., | ) | Case No. 08-01420 (JMP) (SIPA) |
| Debtor. | ) | |

**MEMORANDUM DECISION ENFORCING THE AUTOMATIC STAY AND COMPELLING PAYMENT BY UBS AG**

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004

James B. Kobak, Jr., Esq.
James C. Fitzpatrick, Esq.
Meaghan C. Gragg, Esq.
Christopher K. Kiplok, Esq.

BINGHAM MCCUTCHEN LLP
*Attorneys for UBS, AG*
399 Park Avenue
New York, NY 10022

Joshua Dorchak, Esq.
Edwin E. Smith, Esq.
Joseph L. Kociubes, Esq.

JAMES M. PECK
United States Bankruptcy Judge

## ***Introduction***

The question presented in this contested matter is whether an agreement to set off amounts owed to affiliates of a counterparty (a so-called triangular setoff) is enforceable in a case brought under the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa *et seq*.[1] The parties are well aware of the holding of the *SemCrude* case from the District of Delaware finding that such contractual provisions are ineffective in bankruptcy and are testing to see whether the reasoning of that case will be followed by this Court. *See In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010).

By his motion (the "Motion"), James W. Giddens, as Trustee of Lehman Brothers Inc. ("LBI") under SIPA (the "SIPA Trustee") seeks to enforce the automatic stay and stays imposed under the LBI Liquidation Order (defined below) (together, the "Stays") against UBS AG ("UBS") and recover approximately $23 million of excess collateral that has been held by UBS since the date of termination of a swap agreement between the parties in September 2008. UBS opposes the Motion and has filed its own cross-motion for an order enforcing the parties' agreement (the "Cross-Motion"). UBS points to a cross-affiliate setoff provision as support for asserting a right of setoff in connection with amounts owed by LBI to affiliates of UBS that are not parties to the swap agreement.[2]

[1] "To the extent consistent with [SIPA], a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11 … ." 15 U.S.C. § 78fff(b).

[2] Of the $23 million at issue, approximately $1.7 million is the result of a pre-petition misdirected wire transfer from UBS to LBI; the remaining $21.3 million consists of amounts due from LBI to UBS Securities LLC ("UBS Securities"), an indirect, wholly-owned subsidiary of UBS. The parties have not provided enough information about the circumstances of the pre-petition misdirected transfer (both in their papers and at oral argument) for the Court to rule on that dispute at this time. See discussion at page 15 of this decision.

The Court finds that a contractual right of setoff that permits netting by multiple affiliated members of the same corporate family outside of bankruptcy may no longer be enforced after commencement of a case governed by provisions of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). Contractual provisions that purport to create synthetic mutuality are not a substitute for the real thing. So-called triangular setoff that lacks mutuality, therefore, is not authorized under the Bankruptcy Code, and the Court grants the Motion and denies the Cross-Motion on this basis. The Court reserves judgment with respect to the rights of the parties to a certain $1.7 million portion of the Remaining Collateral (defined below).

***Background***

The facts for the most part are undisputed.[3] On July 13, 2004, UBS and LBI entered into a swap agreement, comprised of a 1992 ISDA Master Agreement (the "Agreement"), a schedule (the "Schedule") and a credit support annex (the "Credit Support Annex"). (Fuqua Decl.[4] Ex. A; Douvas Decl.[5] Ex. A.) Pursuant to the terms of the Credit Support Annex, the parties agreed to post collateral (the "Collateral") to secure their respective obligations.[6] (Fuqua Decl. Ex. A; Douvas Decl. Ex. A.) Under the Agreement, the parties subsequently entered into numerous foreign exchange transactions. (Fuqua Decl. ¶ 4.)

[3] In its Cross-Motion, UBS argues that the SIPA Trustee's demand for turnover of excess collateral should have been made by way of a complaint in an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(1). Because "there appears to be no material fact dispute," however, UBS was "willing to respond to the Motion by way of [its] brief in opposition … and in support of [its Cross-Motion] … ." Br. Opp'n at 4. Neither party raised the issue at oral argument. (8/9/11 Tr. 48:3-75:24.) The Court is ruling on the Motion and the Cross-Motion in the interest of expediting resolution of the issues, but does so without finding that this procedural approach is proper.

[4] All references to "Fuqua Decl." are to the Declaration of James B. Fuqua (I) In Opposition to SIPA Trustee's Motion for an Order Enforcing the Automatic Stay and Compelling Payment and (II) In Support of UBS AG's Crossmotion for an Order Enforcing the Parties' Agreement, ECF No. 4056.

[5] All references to "Douvas Decl." are to the Declaration of George S. Douvas in Support of Motion of James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc., Pursuant to Sections 105(a) and 362 of the Bankruptcy Code and the Lehman Brothers Inc. Liquidation Order, for an Order Enforcing the Automatic Stay and the Stays in the Liquidation Order and Compelling Payment of Amounts Payable by UBS AG, ECF No. 3923.

[6] "Obligations" are defined in the Credit Support Annex as a party's "present and future obligations" under the Agreement. (Fuqua Decl. Ex. A; Douvas Decl. Ex. A.)

UBS delivered to LBI a notice of termination (the "Termination Notice") designating September 16, 2008 as the "Early Termination Date." (Fuqua Decl. Ex. B; Douvas Decl. Ex. B.) The grounds for termination were (i) a cross-default traceable to swap agreements between UBS and certain LBI affiliates, and (ii) the downgrading of LBI's credit rating to a level below BBB-. (Fuqua Decl. ¶ 10 and Ex. B; Douvas Decl. Ex. B.) As of the Early Termination Date, UBS was holding approximately $170 million of Collateral. (Fuqua Decl. ¶ 11.)

Following delivery of the Termination Notice, the district court entered an order (the "LBI Liquidation Order"), which, among other things, authorized the SIPA Trustee to take immediate possession of the property of LBI, wherever located, provided notice that the automatic stay applied to "any act to obtain possession of property of the estate or property from the estate," and stayed and enjoined all entities from directly or indirectly retaining or setting off or interfering with any assets or property owned by LBI. ECF No. 1.

Subsequently, UBS provided a notice of calculation (the "Valuation Notice") of the "Early Termination Amount" owing from LBI to UBS. (Fuqua Decl. ¶ 12 and Ex. C; Douvas Decl. ¶ 4 and Ex. C.) In the Valuation Notice, UBS claimed a setoff right pursuant to section 8(a)(iii) of the Credit Support Annex of amounts payable by LBI to UBS – a right not challenged by the SIPA Trustee. (Fuqua Decl. ¶ 14 and Ex. C; Douvas Decl. Ex. C; Mot. at ¶ 27.) After setting off these undisputed amounts, UBS continued to hold approximately $76 million in Collateral (the "Remaining Collateral"). (Fuqua Decl. ¶ 14 and Ex. C; Douvas Decl. Ex. C.)

With respect to the Remaining Collateral, UBS asserted in the Valuation Notice a setoff right pursuant to section 5(a) of the Schedule of amounts allegedly due from LBI to UBS Securities and UBS Financial Services (another UBS affiliate) against the obligation of UBS under sections 8(c) and (d) of the Credit Support Annex to return the excess Collateral to LBI.

(Fuqua Decl. ¶ 15 and Ex. C; Douvas Decl. Ex. C.) The Valuation Notice asserted that these amounts owed to UBS Securities and UBS Financial Services exceeded the amount of the Remaining Collateral. (Fuqua Decl. ¶ 15 and Ex. C; Douvas Decl. Ex. C.)

The SIPA Trustee disputed the validity of any alleged setoff right under section 5(a) of the Schedule. (Fuqua Decl. Ex. D; Douvas Decl. Ex. D.) UBS agreed to turn over a portion of the Remaining Collateral, but has resisted paying the $23 million balance. (Fuqua Decl. ¶ 17 and Ex. D; Douvas Decl. Ex. D.) This disagreement prompted the filing of the Motion and the Cross-Motion.

***Triangular Setoff***

Section 5(a) of the Schedule, the provision that lies at the heart of the dispute, provides, in relevant part, that

> upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy … under applicable law the Non-defaulting Party or Non-affected Party (in either case, "X") may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement … ) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement … ) owed by X or any Affiliate of X to Y … .

(Fuqua Decl. Ex. A; Douvas Decl. Ex. A.)

The SIPA Trustee argues that the triangular setoff scheme created by this language is impermissible under the mutuality requirement prescribed by section 553(a) of the Bankruptcy Code, and that the failure of UBS to move for relief from the Stays for more than two years while asserting its right to effect setoff under section 5(a) constitutes a violation of the Stays. The question of central importance to this argument is whether the extension of the right of setoff to "any Affiliate" is enforceable in bankruptcy.

UBS asserts that section 5(a) is a valid and enforceable provision as a matter of New York contract law. According to UBS, because the right of setoff under section 5(a) is one that was created by contract (and not a right at common law), the mutuality requirement specified in section 553 does not apply. UBS also submits that even if the Court were to conclude that section 5(a) is subject to section 553, the contractual provision should be enforced as written because (i) the agreement to triangular setoff does not violate the Bankruptcy Code and the rights under that agreement are not directly contradicted by the Bankruptcy Code (or SIPA), and (ii) its contractual right of setoff is protected by the so-called "safe harbor" provisions of the Bankruptcy Code.

As a general matter, parties are entitled to agree to whatever they choose, as long as the resulting contract is not contrary to law or public policy. *See New England Mut. Life Ins. Co. v. Caruso*, 535 N.E.2d 270, 273 (N.Y. 1989). Under New York law,[7] parties are free to create contractual setoff rights that differ from those provided by common law or statute. *See Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*, No. 95 Civ. 4856, 1997 U.S. Dist. LEXIS 1322, at *12 (S.D.N.Y. Feb. 10, 1997) (citing *Fenton v. Ives*, 634 N.Y.S.2d 833 (3d Dept. 1995)) (additional citations omitted). Thus, *outside of the bankruptcy context*, section 5(a) without question is a valid and enforceable provision, but that proposition no longer is true once the parties to that contract are subjected to the constraints of the Bankruptcy Code.

As this Court previously has stated, "[t]he Bankruptcy Code does not establish an independent right of setoff, but section 553 does preserve any right of setoff that may exist under applicable non-bankruptcy law." *In re Lehman Brothers Holdings Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) ("*Swedbank*") (citing *Official Comm. of Unsecured Creditors v.*

[7] The parties do not dispute that the Agreement is governed by New York law. *See* Fuqua Decl. Ex. A; Douvas Decl. Ex. A.

*Manufacturers & Traders Trust Co. (In re Bennett Funding Group*), 146 F.3d 136, 138-39 (2d Cir. 1998))**,** *aff'd*, 445 B.R. 130 (S.D.N.Y. 2011); *see also Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (explaining that "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy"). Contrary to the assertion by UBS that section 553 of the Bankruptcy Code "is derived from, and preserves, common-law setoff rights," Br. Opp'n at 15, the text of section 553 is not limited to common-law setoff and by its plain wording applies whenever a creditor seeks to exercise *any* purported setoff right – including one created by contract – in a case under the Bankruptcy Code.

Section 553(a) of the Bankruptcy Code provides, in relevant part, that

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect *any* right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case … .

11 U.S.C. § 553(a) (emphasis added). Section 553, read literally, preserves *any* setoff right regardless of origin, not just those at common law. "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). Accordingly, the purported setoff right claimed by UBS inescapably is governed by the language of section 553(a).

To be eligible for setoff under section 553, "(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the debt owed the creditor must be mutual." *Swedbank*, 433 B.R. at 107 (citations omitted). In *Swedbank*, this Court addressed the mutuality

requirement under section 553(a) as it applies to a creditor attempting to offset post-petition funds deposited in a bank account against pre-petition indebtedness arising under a swap agreement. There the Court specifically referred to "the axiomatic principle of bankruptcy law, codified in section 553, requiring mutuality in order to exercise a right of setoff." *Swedbank*, 433 B.R. at 109. While the mutuality question now before the Court involves the identity of the parties to the proposed setoff rather than the characterization of the funds as pre-petition or post-petition, the principle of mutuality is no less axiomatic here than it was in *Swedbank*.

The Bankruptcy Code does not define mutuality, but courts consistently find debts to be mutual only when they are "in the same right and between the same parties, standing in the same capacity." *Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 743 F. Supp. 176, 183 (S.D.N.Y. 1990) (internal quotation marks and citations omitted); *see also, Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002); *In re Bennett Funding Group*, 146 F.3d at 139; *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n.2 (2d Cir. 1989) (citations omitted) ("under federal bankruptcy law, a subsidiary's debt may not be set off against the credit of a parent"); *Scherling v. Helman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995).

UBS has the burden to prove mutuality. *See Global Cable, Inc. v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns. Corp.)*, 2006 U.S. Dist. LEXIS 37112, at *11 (S.D.N.Y. 2006) (finding that the creditor-movant had the burden of proving mutuality); *Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 U.S. Dist. LEXIS 12576, at *159-60 (S.D.N.Y. 2000) ("[a] creditor bears the burden of proving its right of setoff and must establish . . . [that] the debt and claim [are] mutual") (citations omitted).

According to UBS, the debts between LBI and UBS Securities should be viewed as mutual because of the express provision allowing UBS to offset amounts owed to its affiliate, notwithstanding the fact that this affiliate is not a named party to the Agreement. The theory is that the contract supplies the required mutuality by collecting all affiliates under the same corporate umbrella and treating them as if they were a single counterparty. This attempt to override the independent status of UBS Securities disregards a consistent pattern of authority prescribing that, even where a setoff right exists under applicable state law, the Bankruptcy Code imposes its own strict requirements – namely, that the debtor owes a pre-petition debt to the creditor, the creditor has a pre-petition claim against the debtor, and the debt and claim are mutual. *See, e.g., Shugrue v. Fischer (In re Ionosphere Clubs, Inc.),* 164 B.R. 839, 841 (S.D.N.Y. 1994) (citing *Braniff Airways, Inc. v. Exxon Co., USA*, 814 F.2d 1030, 1034 (5th Cir. 1987); *Swedbank*, 433 B.R. at 107; *see also*, *supra* at 7 (setting forth eligibility requirements for setoff under section 553). The argument advanced by UBS fails because the allegedly mutual debts flunk the test that they must be "in the same right and between the same parties, standing in the same capacity." *Lines*, 743 F. Supp. at 183.

UBS also asserts that because it was free to contract with LBI for triangular setoff rights under New York law and because the parties intended for these rights to be valid and enforceable, even in bankruptcy, the Court should honor the agreement and allow the triangular setoff. Br. Opp'n at 23. This argument is neutralized by the plain language of section 553. *See Duncan v. Walker*, 533 U.S. 167, 172 (2001) (noting that a court's "task is to construe what Congress has enacted"); 11 U.S.C. § 553; *see also, Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted) (explaining that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there"); *Devine v. United*

*States*, 202 F.3d 547, 551 (2d Cir. 2000) (citing *Germain*) (additional citations omitted). Section 553 expressly preserves the "right of a creditor to offset a mutual debt owing by *such creditor* to the debtor … against a claim of *such creditor* against the debtor." 11 U.S.C. § 553(a) (emphasis added). The clarity of this language is conclusive – mutuality quite literally is tied to the identity of a particular creditor that owes an offsetting debt. The right is personal, and there simply is no ability to get around this language. Parties may freely contract for triangular setoff rights, but not in derogation of these mandates of the Bankruptcy Code.

In *SemCrude*, the United States Bankruptcy Court for the District of Delaware addressed arguments similar to the ones now being made by UBS. *SemCrude* held that a right to triangular setoff set forth in a contract does not create mutuality for purposes of section 553, and that there is no contract exception to section 553. UBS insists that *SemCrude* interpreted mutuality too narrowly and failed to credit "the numerous decisions …" where courts "did not enforce alleged contractual triangular setoffs only because they found as a factual matter that there was no such contract." Br. Opp'n at 24. This argument does not withstand careful examination. The Court agrees with the *SemCrude* court – triangular setoff is not (and never was) permitted under the Bankruptcy Code. Despite the pre-petition agreement of the parties, the cross-affiliate netting urged by UBS simply is not available due to lack of mutuality.

The *SemCrude* court first explained the general rule that, due to "the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy." *SemCrude*, 399 B.R. at 393 (citing *In re United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir 1990); *In re Elcona Homes Corp.*, 863 F.2d 483, 486 (7th Cir. 1988). The court then proceeded through an analysis of a line of cases that appears to recognize a contract exception to the mutuality requirement, noting that

> [u]pon closer inspection, however, it becomes clear that not one of these cases has actually upheld or enforced an agreement that allows for a triangular setoff; each and every one of these decisions have simply recognized such an exception in the course of denying the requested setoff or finding mutuality independent of the agreement.

*SemCrude*, 399 B.R. at 394. The court traced the concept of a contract exception to mutuality under section 553 to a 1964 Seventh Circuit decision, *Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*, 327 F.2d 401 (7th Cir. 1964).

In *Berger Steel*, the court "was presented with a party attempting to effect a triangular setoff, and contending that an oral agreement between it and two other parties created sufficient mutuality of amounts owing and owed to make a triangular setoff proper under the Bankruptcy Act." *SemCrude*, 399 B.R. at 395 (citing *Berger Steel*, 327 F.2d at 404). The court rejected the argument, finding that no agreement existed. *Id.* (citing *Berger Steel* at 404-05). The court then proceeded to factually distinguish the matter before it from cases cited by the party seeking to effect a triangular setoff, noting that the cases that had allowed a triangular setoff pursuant to a valid contract were decided either under state law or the common law of equitable receivership – not under the more restrictive provisions of the Bankruptcy Act. *Id.* (citing *Berger Steel* at 405-06) (additional citations omitted).

In fact, the *Berger Steel* court "avoided addressing the broader question of whether a triangular setoff was permissible under the Bankruptcy Act if a contract signed by the parties to the proposed setoff contemplated such a remedy." *Id.* "Nevertheless," the *SemCrude* court observed, "*Berger Steel* was subsequently read as recognizing an exception to the strict mutuality requirement found in the Bankruptcy Act." *Id.* (citations omitted). "Eventually, nearly a dozen cases construing section 553 of the [Bankruptcy] Code joined into this chain, each referencing one of the earlier decisions for the proposition [that there is a contract exception to section 553],

yet none actually permitting a triangular setoff or addressing the merits of this purported exception in a written opinion." *Id.* at 395-96.

An examination of the decisions that are thought to imply that the courts would have enforced a triangular setoff right if there had been such an agreement lends support to the finding in *SemCrude* that the so-called contract exception cited in these cases actually was created by a game of "whisper down the lane" from decision to decision. For example, the court deciding *Va. Block Co. v. Bushong (In re Va. Block Co.)*, 16 B.R. 560 (Bankr. W.D. Va. 1981), cited *Berger Steel* in its statement that the contract exception exists, but found it to be inapplicable. *Va. Block*, 16 B.R. at 562. *See also*, *In re Balducci Oil Co.*, 33 B.R. 847, 853 (Bankr. D. Colo. 1983) (citing, *inter alia*, *Berger Steel* and *Va. Block* for the existence of the exception, but relying on an unrelated Ninth Circuit case for the proposition that a parent corporation may not pierce the veil of its subsidiary for purposes of establishing mutuality); *In re Fasano/Harriss Pie Co.*, 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984) (recognizing *Va. Block* and *Balducci Oil* as carving out a contract exception, but finding that no such agreement existed in the case at bar); *In re Lang Mach. Corp.*, 1988 Bankr. LEXIS 1667, at *13 (Bankr. W.D. Pa. 1988) (citing, *inter alia*, *Va. Block* for existence of contract exception, but finding that no evidence of alleged oral agreement was ever introduced); *Wooten v. Vicksburg Refining, Inc. (In re Hill Petroleum Co.)*, 95 B.R. 404, 412-13 (Bankr. W.D. La. 1988) (citing, *inter alia*, *Va. Block* as recognizing "the narrow exception to the rule against three party 'triangular' setoffs … where there is a formal agreement by the debtor that two entities may aggregate debts owed to and from the debtor," but finding no such agreement existed).

Conceivably, the courts in these cases *might* have mistakenly enforced a triangular setoff right simply on the basis of string citations if presented with an enforceable agreement for

triangular setoff, but that does not establish a legitimate basis for a contractual exception to the requirement of mutuality. These cases assume the existence of a contract exception but fail to engage in any analysis demonstrating that the exception actually fits within the statutory scheme. The careful analysis in *SemCrude* is persuasive. There simply is no contract exception to section 553(a), because the statute itself does not allow for one.

***Safe Harbor***

UBS argues that if the Court were to find that the asserted right to a triangular setoff is both subject to and contrary to the language of section 553, such a right nonetheless should still exist under the authority of the safe harbor protections of the Bankruptcy Code. Br. Opp'n at 28. However, the Court already has considered and rejected this argument in another comparable setting.

The Court addressed the effect of the safe harbors on the concept of mutuality in *Swedbank*. There, Swedbank contended that the mutuality requirement of section 553 was rendered inapplicable for essentially the same reason cited by UBS in its papers. Swedbank claimed that the reference in section 560 permitting a derivative contract counterparty to exercise "any" contractual right notwithstanding the automatic stay should permit Swedbank to exercise a contractual right to setoff notwithstanding an undisputed lack of mutuality. *Swedbank*, 443 B.R. at 108. UBS repeats that argument with reference to section 561 of the Bankruptcy Code and its application to the Agreement.

Section 561 of the Bankruptcy Code provides, in relevant part, that

> [t]he exercise of any contractual right … to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more … (5) swap agreements … shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 561(a). As this Court noted in *Swedbank*, the safe harbors permit the exercise of a contractual right of offset in connection with swap agreements, notwithstanding the operation of any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that right, *but that right must exist in the first place*. *Swedbank*, 433 B.R. at 109. In addition, in its Memorandum and Order affirming *Swedbank*, the District Court found it "significant" that "there is no mention in the legislative history that the Safe Harbor Provisions were intended to eliminate the mutuality requirement." 445 B.R. at 137. Because there is no mutuality, UBS has no right of offset, and nothing in section 561 of the Bankruptcy Code can be read to preserve or protect a right that does not otherwise exist.

***Stay Violation***

The automatic stay provision of the Bankruptcy Code, 11 U.S.C. 362, is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (internal quotation marks and citations omitted). The stay "is crucial for the benefit and protection of creditors and the central bankruptcy objective of equal treatment of creditors." *Delta Air Lines, Inc. v. Bibb (In re Delta Air Lines)*, 359 B.R. 454, 459 (Bankr. S.D.N.Y. 2006). "When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the debtor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988).

The Bankruptcy Code expressly prohibits exercising a setoff without first seeking relief from the automatic stay. 11 U.S.C. § 362(b)(7). Moreover, due to the importance of the automatic stay, the Supreme Court has held that, while a party may temporarily withhold

payment or turnover of estate property, such party must simultaneously seek relief from the stay. *Citizens of Maryland v. Strumpf*, 516 U.S. 16, 19-20 (1995).

UBS has failed to seek stay relief while it has been holding the Remaining Collateral. Because it is undisputed that the debts allegedly owed by LBI to UBS and UBS Securities do not arise under the Agreement, section 362(b)(17) of the Bankruptcy Code, which provides a limited exception to the automatic stay for the exercise of setoffs of termination values, payment amounts or other transfer obligations arising under or in connection with one or more swap agreements does not apply and does not excuse the failure of UBS to seek relief from the Stays. *See* 11 U.S.C. § 362(b)(17). Even though the triangular setoff issue constitutes a good faith legal dispute, UBS is exercising control over property of the estate in violation of the Stays. Under the reasoning of this decision, UBS has no right to retain this property and is directed to return the Remaining Collateral to the SIPA Trustee without further delay.

***The $1.7 Million Issue***

Based on the papers and the parties' positions expressed at oral argument, the Court understands that approximately $1.7 million of the Remaining Collateral is traceable to a pre-petition misdirected wire transfer from UBS to LBI. Thus, the dispute surrounding these funds is unrelated to triangular setoff. The parties gave limited attention to this aspect of their dispute at oral argument, and the Court finds the papers insufficiently clear as to the exact nature of the disagreement. Given the relatively modest dollar amount at stake, the Court strongly encourages the parties to renew their efforts to reach a compromise in relation to this remaining issue. If the parties are unable to do so, the Court will require additional briefing.

***Conclusion***

In their non-bankruptcy, non-SIPA commercial dealings, parties are free to agree to pretty much anything. Triangular setoff is an entirely appropriate subject for such a private understanding that lays out the manner for reconciliation and netting of obligations among parties that are related within the same corporate family but that have legally separate and distinct corporate forms. After all, assuming that the parties are solvent, the contract affects only the parties themselves and the interests of others are in no way implicated.

A contract with provisions declaring that such related parties shall be treated as if they are one and the same for purposes of mutuality ordinarily impacts only the net obligations of the parties to that contract. Bankruptcy changes all that, and for good reason. When a debtor party to such a contract is "in the money" and collects less due to offsets claimed by affiliates of its named counterparty, the creditors necessarily are impacted by the reduction in the amounts to be realized by the estate. The identity of the named counterparty to a contract is an essential aspect of settling mutual accounts, and to disregard this most basic of corporate formalities and treat subsidiaries as if they have the same standing as their parent for purposes of setoff rights is to ignore the separate nature of these entities to the obvious detriment of other creditors. For that reason, mutuality is an essential, definitional element of the right to setoff that must be strictly observed. It is for Congress, not the bankruptcy court, to clearly delineate any exception to strict mutuality in the case of triangular setoff. Congress has not yet done so, and the Bankruptcy Code as presently written does not allow for it.

For the reasons stated, UBS is unable to exercise its pre-petition contractual right of triangular setoff as to the Remaining Collateral. LBI shall submit a proposed form of order granting the Motion and denying the Cross-Motion to the extent set forth in this decision while

reserving decision with respect to the $1.7 million portion of Remaining Collateral still in dispute. The parties are directed (i) to meet and confer in an effort to reach an agreement as to this final open issue and (ii) to arrange a telephone conference with the Court within twenty (20) days from the date of this decision to report on the progress of these discussions and to set a briefing schedule, if one is needed.

IT IS SO ORDERED.

Dated: New York, New York
October 4, 2011

*s/ James M. Peck*
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE