FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LEHMAN BROTHERS INC., | ) | Case No. 08-01420 (JMP) (SIPA) |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MEMORANDUM DECISION CONFIRMING THE TRUSTEE'S DETERMINATION OF CLAIMS RELATING TO TBA CONTRACTS

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004

      James B. Kobak, Jr., Esq.
      David W. Wiltenburg, Esq.
      Robert B. Funkhouser, Esq.
      Anson B. Frelinghuysen, Esq.
      Eleni D. Theodosiou-Pisanelli, Esq.

CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Morgan Stanley Investment Management Inc.*
One World Financial Center
New York, New York 10281

      Howard R. Hawkins, Jr., Esq.
      Ellen M. Halstead, Esq.

– and –

700 6th Street, N.W.
Washington, DC 20001

      Mark C. Ellenberg, Esq.
      John H. Thompson, Esq.

CLIFFORD CHANCE US LLP
*Attorneys for Pacific Investment Management Company LLC*
31 West 52nd Street
New York, New York 10019

      Jennifer C. DeMarco, Esq.
      Anthony M. Candido, Esq.
      Sarah N. Campbell, Esq.

GOULSTON & STORRS, P.C.
*Attorneys for Rogge Global Partners PLC*
*on behalf of its customer GPIF*
400 Atlantic Avenue
Boston, Massachusetts 02110

      Douglas B. Rosner, Esq.
      Gregory O. Kaden, Esq.
      Timothy J. Carter, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, DC 20005

      Josephine Wang, General Counsel
      Kenneth J. Caputo, Senior Associate General Counsel

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

James W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc.

("LBI") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), has brought

a motion (the "Motion," ECF No. 4360) to confirm his determination that certain claims relating

to TBA contracts do not qualify as customer claims against LBI's estate.  The Motion raises a

number of arguments, but, at its most elemental, points out that participants in the market for

agency mortgage-backed securities ("Agency MBS") who invested in these TBA contracts on a

delivery-versus-payment basis or receipt-versus-payment basis did not transfer any securities or

cash to LBI to hold on their behalf.  Accordingly, such parties never formed the sort of custodial relationship with LBI that is essential to customer status under SIPA.

According to the Trustee, LBI's internal account statements and business records are fully consistent with his determination regarding customer status and reveal that at the time of commencement of LBI's SIPA case (the "Filing Date") the TBA claimants had zero balances for both cash and securities.  Principally as a result of the inability of these claimants to show any entrustment of property to LBI, the Trustee has concluded that the TBA claims do not fit the definition of customer claims under SIPA and should be classified as ordinary breach of contract claims and treated as unsecured claims.  The Securities Investor Protection Corporation ("SIPC") agrees wholeheartedly with the position of the Trustee and has submitted independent arguments that strongly support the Motion.[1]

Three asset managers who are typical of the class of TBA claimants (the "Representative Claimants") oppose the Motion and submit that the Trustee's determination fails to take into account both the expectations of LBI's customers who invested in TBA contracts and the commercial realities of a sophisticated and robust TBA marketplace that regards TBA contracts as the functional equivalent of the Agency MBS to which these contracts relate.  They argue that, with assigned CUSIP numbers, these contracts resemble securities in so many material respects that they satisfy the definition of securities: notably, they trade like securities and have characteristics that are hard to distinguish from other instruments that are defined as securities for purposes of SIPA customer protection.

---

[1]    SIPC is deemed to be a party in interest in all matters arising under a SIPA liquidation proceeding. 15 U.S.C. § 78eee(d).

Also, because these contracts are the primary means by which investors gain access to the vitally important Agency MBS market and are an essential portal to investment in that market, the Representative Claimants believe that market participants should enjoy the same protections that would be available to holders of the not-yet-fully ripe "to be announced" Agency MBS securities themselves.  They argue that these TBA contracts "walk and talk" just like securities, and so they must really be securities.

The Representative Claimants are Morgan Stanley Investment Management Inc. ("MSIM"), Rogge Global Partners PLC on behalf of its customer GPIF and Pacific Investment Management Company LLC.  They assert that their clients are entitled to customer claim status under SIPA because, like others who have been granted allowed customer claims against LBI, their claims seek recoveries from the estate for net equity attributable to the trading of TBAs in their LBI accounts.

Following extensive briefing of the issues that included supporting declarations with respect to a factual record that for the most part is not in dispute, a hearing on the Motion took place on November 17, 2011 (the "Hearing").  Thereafter, in response to a request by the Court for clarifying citations to the evidentiary record, the parties submitted post-hearing memoranda to highlight those portions of the record that support their respective positions.  The issues presented call for the Court to decide whether the Trustee correctly determined that claims based on TBA contracts are not properly classified as customer claims for purposes of SIPA.

The procedure here is similar to a motion for summary judgment, although strictly speaking this dispute does not arise in that context.  Instead, as a means to efficiently create a factual record and eliminate the need for live testimony, the parties have agreed that the Court

may consider as evidence all documents, including the opinions of experts and deposition transcripts, attached to the supporting declarations.

An uncommon procedural aspect of the Motion involves the role of the Representative Claimants themselves. They are not formally-anointed class representatives with the authority to act on behalf of all parties with TBA claims against LBI. Rather, this contested matter is a test case based on particular facts believed to be typical of TBA claims in general. The Representative Claimants are, as their name suggests, representative of the holders of such claims, and so this decision may have preclusive effect on other similarly situated claimants under a law of the case standard. However, deciding the Motion will not conclusively bind other parties with TBA claims who may be able to identify distinguishing facts or circumstances applicable to their own claims. Additionally, this decision will not directly impact the treatment of claims of the Representative Claimants (such as the pool claim of MSIM) or other holders of TBA claims that are not based on TBA contracts.[2]

Accordingly, the procedural context for this dispute is not standard: the fact pattern arises out of an idiosyncratic aspect of the Agency MBS market and presents a matter of first impression that needs to be decided to promote the orderly administration of the LBI liquidation. As described more fully in the following sections of this decision, having considered the submissions of the parties and the arguments presented at the Hearing, the Court finds that the Trustee is correct in his determination that claims of the Representative Claimants relating to TBA contracts do not fit the definition of customer claims under SIPA and properly are classified as general unsecured claims against the estate. The Representative Claimants have placed undue reliance on *In re Adler, Coleman Clearing Corp.*, 211 B.R. 486 (Bankr. S.D.N.Y.

---

[2]    *See* Nov. 17, 2011 Hr'g Tr. 98:5-17 (Peck, Wiltenburg), ECF No. 4780.

1997) ("*Adler Coleman*").  That case does not support the proposition that they have a "net equity" claim under SIPA.

This conclusion flows naturally from the undisputed fact that the Representative Claimants never entrusted any property with LBI as their broker-dealer.[3]  Their account statements confirm transactions involving TBA contracts but not the holding of any customer securities or cash.  The accounts were used to facilitate trading activity that, while closely related to the market for Agency MBS securities, did not involve the retention by the broker-dealer of customer property that is a necessary part of the definition of a customer claim. Simplistically and narrowly, without identified property in the hands of LBI, there can be no claim against the estate for the recovery of such property.  The claims necessarily are for contract damages and not for "securities received, acquired or held" by LBI or cash on deposit with LBI "for the purpose of purchasing securities" under SIPA § 78*lll*(2).

This is true despite the fact that the contractual rights associated with "to be announced" securities have notional value and may be traded, hedged and marked to market just like securities.  The Representative Claimants have shown convincingly that TBA contracts are essential to the orderly functioning of the Agency MBS market, that these contracts have a number of features that make them look very much like securities and that they have become the predominant means by which investors gain access to the second-largest securities market in the United States.  However, they have not shown that the trading activity in question – the purchase, sale or "pairing off" of a TBA contract – ever involved the delivery or entrustment of any property to LBI.  This is the key factor that compels granting the Motion.

---

[3]     *See, e.g., In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 236 (2d Cir. 2011) ("the 'critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities'"), quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995) (emphasis omitted).

Although not essential to confirming the Trustee's determination, the Court has also considered whether TBA contracts are securities for purposes of SIPA. As discussed in the following section of this decision, TBA contracts have certain characteristics that give them both the appearance and functionality of securities. The fact that TBAs are listed on LBI's account statements in a manner comparable to the listing of securities transactions is one such characteristic. Another is that these contracts also trade in the market very much like securities, the CUSIP number being a prominent trait suggesting that TBAs belong to the same family as securities.

The TBA contract, in practical terms, functions as a place holder for the future Agency MBS "to be announced." This makes it challenging, from an analytical perspective, to find many meaningful distinctions between a contract right relating to a future Agency MBS security that will have certain specified characteristics and the security itself. However, regardless of the overlap and potential for convergence between the two, the SIPA definition of the term security still needs to be strictly applied to the TBA contract. As explained below, applying that definition to TBAs leads to the conclusion that they are not securities for purposes of SIPA.

In summary, the Court concurs with the arguments of the Trustee and SIPC. The Representative Claimants have failed to show any error in the determination of claims based on TBAs, and the Motion is granted for the reasons stated in this decision.

### *Factual Background Regarding TBAs and the TBA Market*

Any discussion of the issues raised in this contested matter requires some basic facts as to the nature of TBAs and their role in the financial markets. TBAs are bilateral agreements to buy or sell at a future date "to-be-announced" Agency MBS. Agency MBS are mortgage-backed securities issued and/or guaranteed by one of the three government-sponsored agencies that

provide credit support to the United States mortgage market – the Federal National Mortgage Corporation ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae").  *See* McIsaac Aff.[4] ¶ 5; *See also* SEC, Mortgage-Backed Securities, http://www.sec.gov/answers/mortgagesecurities.htm (last visited December 8, 2012).

A TBA is the forward contract that provides for the delayed delivery of Agency MBS. *See id*.  The date of entering into this contract is referred to as the "Trade Date," and the date of performance required under the contract is referred to as the "Settlement Date."  Typically, there is an interval of several weeks between the Trade Date and Settlement Date for a TBA, with a calendar of industry-standard settlement dates fixed by the Securities Industry and Financial Markets Association ("SIFMA").  *See* Frelinghuysen Decl.[5] Ex. B, at B_010-B_011.[6]

One of the defining features of a TBA is that the actual identity of the Agency MBS to be delivered on the Settlement Date, also known as the mortgage "pool," is not specified on the Trade Date.  Thus, the agreement relates to a security that is "to-be-announced."  Frelinghuysen Decl. Ex. B, at B_009.  Parties to a TBA reach agreement on the general parameters of the referenced Agency MBS security, including the date on which performance is due, the applicable agency (Fannie Mae, Freddie Mac, or Ginnie Mae), the coupon or interest rate, the maturity date, the total face dollar amount to be purchased or sold on the Settlement Date, and the price to be paid on the Settlement Date.  McIsaac Aff. ¶ 7.

---

[4]   All references to "McIsaac Aff." are to the Affidavit of Daniel T. McIsaac in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims, ECF No. 4361.

[5]   All references to "Frelinghuysen Decl." are to the Declaration of Anson B. Frelinghuysen in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to TBA Contracts, ECF No. 4364.

[6]   SIFMA sets a single Settlement Date each month for each of several types of Agency MBS.  *See* Frelinghuysen Decl. Ex. B, at B_010-B_011.

Parties to TBA agreements frequently use the Master Securities Forward Transaction Agreement ("MSFTA"), which is an industry-standard agreement promulgated by the Bond Market Association (which is now part of SIFMA). McIsaac Aff. ¶ 12. The Guidance Notes that accompany the MSFTA state that:

> The [MSFTA] applies to all transactions between the parties for the purchase and sale of "Securities" pursuant to delayed delivery transactions. "Securities" is defined as mortgage-backed and other asset-backed securities, as well as any other types of securities the parties specify in Annex I. Delayed delivery transactions include not only forward purchase and sale transactions, but also when-issued, TBA, and dollar roll transactions involving Securities.

Frelinghuysen Decl. Ex. C2, at C_021. The MSFTA further provides that, unless otherwise mutually agreed by the parties to a TBA, a TBA is to be "settled on a delivery-versus-payment basis and payment shall be made in immediately available funds[,]" and that "[n]one of Seller's property interest in the Securities shall pass to Buyer until such delivery and payment are made." Frelinghuysen Decl. Ex. C1, at C_004.

TBA prices are publicly observable. Frelinghuysen Decl. Ex. B, at B_004. However, TBAs are neither registered with the Securities and Exchange Commission, nor are they traded on any securities or commodities exchange. McIsaac Aff. ¶ 11. In addition, the underlying Agency MBS bonds also are not registered with the SEC, due to a statutory exemption. *Id.*

The vast majority of Agency MBS trading occurs in the TBA market. Frelinghuysen Decl. Ex. B, at B_004. The trading volume of the TBA market is second only to the market for United States Treasury securities. Niculescu Decl.[7] ¶ 15. It is a forward or delayed-delivery market that enables mortgage lenders to (i) sell the loans that they intend to fund before the loans

---

[7]    All references to "Niculescu Decl." are to the Declaration of Peter Niculescu, ECF No. 4582.

are closed, and (ii) to lock in an interest rate for the borrower.  *See* Frelinghuysen Decl. Ex. A, at A_019-A_020.

For trading purposes, TBAs having the same general parameters (issuer, maturity, coupon price, par amount and settlement date) are treated as if aggregated into a single CUSIP. Frelinghuysen Decl. Ex. B, at B_07, B_012.  Forty-eight hours before the Settlement Date, the seller specifies or allocates the identity and number of mortgage pools by the specific pool numbers and CUSIPs to be delivered to satisfy the TBA.  Once the trades settle, each security is attached to a CUSIP identifying individual securities.  *Id.*

During the interval between the Trade Date and Settlement Date, a contracting party may enter into one or more offsetting contracts, a practice known as "pairing-off."  McIsaac Aff. ¶¶ 9-10.  In such a "paired-off" transaction, no purchase or sale of securities occurs on the Settlement Date, and a notional gain or loss on the paired contract becomes fixed without any Agency MBS changing hands.  This results in a net payable or receivable that is due on the Settlement Date. McIsaac Aff. ¶ 10.

With respect to the claims of the Representative Claimants, transactions relating to TBAs were recorded in periodic account statements maintained in LBI's information systems.  Each statement had separate sections detailing the investment activity and status of the account for the relevant period.  Smith Aff.[8] ¶ 8.  As described in the explanatory notes to the account statement, sections of an LBI account statement included, among others: (i) "Portfolio Detail," which is a listing of all assets (securities or cash) held by LBI with respect to the account; (ii) "Securities Transfers," which reports securities received in or delivered out of an account; and (iii)

---

[8]    All references to "Smith Aff." are to the Affidavit of Tracy Smith in Support of Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to TBA Contracts, ECF No. 4363.

"Transaction Details," which reports transactions settled during the statement period. *Id.* An empty or missing "Portfolio Detail" section for a given account statement indicates that LBI was not then holding any securities or other assets for a particular client, Smith Aff. ¶ 10, but the absence of entries in the "Portfolio Detail" section did not exclude the potential for transactions to be listed in the "Transaction Details" section. *See* Smith Aff. Exs. B1, B2, B3, B4, C1, C2, C3, C4.

LBI account statements listed settled TBAs, where applicable, under "Transaction Details," and listed open TBAs that had yet to settle under a separate section entitled "Transaction Details - Future Settlements." Smith Aff. ¶ 10, Exs. B1, at B_003-B_005; B2, at B_009-B_014; B3, at B_017-B_018; B4, at B_021-B_035; C1 at C-003-C_004; C2, at C_009-C_013; C3, at C-017-C_021; C4 at C_025-C_039.  For purposes of this decision, it is significant that the account statements for the Representative Claimants included entries for TBA transactions within the sections entitled "Transaction Details" and "Transaction Details-Future Settlements" and that such account statements included no reference to TBAs within the section entitled "Portfolio Detail."  Accordingly, the account statements demonstrate that the Representative Claimants engaged in various transactions with respect to TBAs and that, at relevant times, no TBAs were being held by LBI in the accounts of the Representative Claimants.

### *Discussion*

I.    *The Representative Claimants Did Not Entrust Customer Property to LBI*

Protection under SIPA does not extend to all creditors of an insolvent broker-dealer, only to those creditors that meet SIPA's definition of "customer." *SEC v. Packer, Wilber & Co.*, 498

F.2d 978, 983 (2d Cir. 1974); SIPA § 78*lll*(2).[9]  "An investor is entitled to compensation from

the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if

an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled

to recover from the SIPC trust fund."  *In re Brentwood Secs., Inc.*, 925 F.2d 325, 327 (9th Cir.

1991); *see also In re Stalvey & Assocs., Inc.*, 750 F.2d 464, 471 (5th Cir. 1985) (the "first

requirement is that the broker must have 'received, acquired, or held' the securities").  The

requirement that a creditor has entrusted cash or securities to the broker-dealer is "critical" to the

treatment of such creditor as a "customer" under SIPA.  *See In re Bernard L. Madoff Inv. Secs.*

*LLC*, 654 F.3d at 236.

The Representative Claimants are unable to demonstrate that they entrusted any cash or

securities to LBI in connection with their TBA investments.  As of the Filing Date, their LBI

accounts did not hold any cash or securities.  *See* Smith Aff. ¶¶ 8, 10, Exs. B1, B2, B3, B4, C1,

---

[9]    On the Filing Date, the term "customer" was defined under SIPA as:

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on
> account of securities received, acquired, or held by the debtor in the ordinary course of its business as a
> broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to
> cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.
> The term "customer" includes any person who has a claim against the debtor arising out of sales or
> conversions of such securities, and any person who has deposited cash with the debtor for the purpose of
> purchasing securities, but does not include—

> (A) any person to the extent that the claim of such person arises out of transactions with a foreign
> subsidiary of a member of SIPC; or

> (B) any person to the extent that such person has a claim for cash or securities which by contract,
> agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated
> to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring
> such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

SIPA § 78*lll*(2).  Subsequent to the Filing Date, the definition of "customer" under SIPA was amended by the
Dodd-Frank Wall Street Reform and Consumer Protector Act of 2010, 12 U.S.C. §§ 5301 *et seq.*  The amended
definition adds to the provision "The term 'customer' includes" the phrase "any person who has a claim against the
debtor for cash, securities, futures contracts, or options on futures contracts received, acquired or held in a
portfolio margining account carried as a securities account pursuant to a portfolio margining program approved
by the [Securities and Exchange] Commission."  SIPA § 78*lll*(2).  However, the amended definition of
"customer" was not in effect at the time of LBI's filing for liquidation, and it is the definition of "customer" that
was in effect at the time of LBI's filing for liquidation that applies here.

C2, C3, C4.   This conclusion is easily confirmed by examining the Representative Claimants' client statements, produced by LBI on a monthly or quarterly basis to report account activity during such periods.  *See* Smith Aff. ¶¶ 8, 10.  These statements confirm trading activity with respect to TBA contracts, but they also show that, as of the Filing Date, the accounts for the Representative Claimants had no cash balances and held no securities.  *See* Smith Aff. ¶¶ 8, 10, Exs. B1, B2, B3, B4, C1, C2, C3, C4.

The Representative Claimants rely heavily on *Adler Coleman* in an effort to justify their claim that they should qualify for customer protection under SIPA, despite the fact that their account statements show no holdings of cash or securities on the Filing Date.  They have misread the significance of that case, primarily because of major differences in the content of the underlying account records.  In *Adler Coleman*, the court noted that the "debtor sent written trade confirmations … showing that each customer's account held Abbott Labs stock," and that the "debtor's books and records showed in the aggregate that the [accounts] contained 49,800 shares of Abbott Labs … ." *Adler Coleman*, 211 B.R. at 490.

In contrast, the client statements for the Representative Claimants show that their LBI accounts held no cash, customer securities or other customer property.  These accounts were used to invest in TBA contracts and to engage in trading activity with respect to these contracts, but the account statements disclose that no property was ever entrusted to LBI.  Furthermore, these statements separately classify transactions involving TBAs within the section "Transaction Details" in a manner that distinguishes these contracts from other investments held by LBI that would be listed under the category "Portfolio Detail."

*Adler Coleman*, in contrast with the records applicable to the TBAs, involved an account statement that actually confirmed holdings of Abbott Labs shares.  As such, the case arises out of

a particular record that supported a finding of customer status, and the case does not stand as authority for the broad proposition, urged by the Representative Claimants, that TBAs should be deemed the equivalent of marketable securities held by a broker-dealer.

Contrary to the situation in *Adler Coleman*, the account statements with LBI establish conclusively that the claims at issue here are not claims for the recovery of property held for the customer, but rather claims for breach of the TBAs.  These are contract claims, and such claims are not entitled to protection under SIPA.  *See e.g.*, *SEC v. Howard Lawrence & Co., Inc.*, No. 74 Civ 193 [SIPA], 1975 U.S. Dist. LEXIS 16798, at *7 (Bankr. S.D.N.Y. Feb. 14, 1975) (citation omitted) ("failure to comply with a sell order … gives rise to a cause of action for breach of contract"); *Matter of Oberweis Secs., Inc.*, 135 B.R. 842, 846 (Bankr. N.D. Ill. 1991) (citations omitted) ("failure to execute an order to buy securities gives rise to a breach of contract claim for damages, but is not a customer claim protected by the SIPA").

The Representative Claimants have made claims for contract damages based on termination of their TBA contracts with LBI pursuant to certain protocols issued by SIFMA.  *See* Frelinghuysen Decl. Exs. D1, D2.  The claim forms themselves show that the claims made by the Representative Claimants are for damages and not for the recovery of customer property.  Unlike the claimant in *Adler Coleman* that claimed 49,800 shares of Abbott Labs on its claim form,[10] the claim forms submitted by the Representative Claimants expressly state that the claims are not for the recovery of any securities.  *See* Frelinghuysen Decl. Exs. E6 at E_098, E8 at E_105, F2 at F_005, G3 at G_079 (demonstrating that, in response to Item No. 2 on the claim form, which required claimants to answer yes or no to the phrase "LBI owes me securities," each Representative Claimant answered "no").

---

[10]    *Adler Coleman*, 211 B.R. at 491.

Rather than trying to secure the return of entrusted property, the Representative Claimants are openly claiming damages calculated on the basis of the sum of (i) the pair-off amount of the TBA contracts, and (ii) the difference between the price agreed upon in the TBA contract with LBI on the Trade Date and the price of replacement transactions. *See* Frelinghuysen Decl. Exs. E6, E8, F2, G3.

The Representative Claimants do not really quarrel with the view that they are making a claim for damages. As MSIM has stated in its papers, "LBI ignores that the [Representative Claimants] would be covering at the market price on the filing date, which in this case was higher than the price established on the trade date. This difference between the trade date and filing date prices for the same TBA is precisely what the TBA Clients are seeking to recover." *See* MSIM's Mem. in Resp. at 8 n.4, ECF No. 4693. Thus, they are seeking to recover the loss of the economic benefit of the transaction, and it is the characterization of the resulting claim that is in dispute.

Relying on *Adler Coleman*, the Representative Claimants assert that their damage claims should be treated in the same manner as other net equity claims under SIPA, but they ignore the essential point of *Adler Coleman*. Their claims are missing the most important single ingredient for a "net equity" claim – namely, a determination that property has been entrusted to the broker-dealer. "Net equity" cannot be calculated for an account that is empty and does not have securities positions.

Under SIPA, the trustee has an obligation to "deliver securities to or on behalf of customers to the maximum extent practicable in satisfaction of customer claims … ." *See* SIPA § 78fff-1(b)(1). SIPA then specifies that "the trustee shall promptly discharge … all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the

15

delivery of securities or the making of payments to or for the account of such customer … ." *See* SIPA § 78fff-2(b).  "Net equity" is determined under SIPA by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated … all securities positions of such customer" less any indebtedness such customer might owe to the debtor.  SIPA § 78*lll*(11).

At the most elementary level, the claims made by the Representative Claimants arising out of purchases and sales of TBAs fail to qualify for "net equity" treatment based on securities or cash in their accounts for the simple reason that it is not possible to compute a "net equity" claim for accounts such as these that do not hold any securities or cash.  Because the Representative Claimants did not entrust any customer property to LBI, they are unable to prove any right to customer protection under SIPA.  Consequently, the Trustee is correct in his determination that their TBA claims are not customer claims against LBI.

II.      *TBA Contracts Are Not Securities Under SIPA*

The Representative Claimants attempt to characterize the TBA contracts themselves as securities, but TBA contracts are not mentioned as an example of a security and do not fit within the definition of the term "security" under SIPA.[11]  To qualify as a security under SIPA, a TBA

---

[11]      Security is defined under SIPA as

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, or any security future as that term is defined in section 3(a)(55)(A) of the Securities Exchange Act of 1934 [15 U.S.C. § 78c(a)(55)(A], any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C. §§ 77a et seq.]), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security. Except as specifically provided above, the term

*(cont'd)*

contract would need to match one of the indicated terms listed in the definition. These classifications include a "security future," "investment contracts," a "warrant or right to subscribe to or purchase or sell any of the foregoing," or "any other instrument commonly known as a security." *See* SIPA § 78*lll*(14). Upon examination, however, TBAs do not neatly fit within any of these categories.

First, SIPA's reference to "security future" in the definition of "security" specifically provides "security future as that term is defined in section 78c(a)(55)(A)" of SIPA. SIPA § 78*lll*(14). In turn, SIPA § 78c(a)(55)(A) provides that "[t]he term 'security future' does not include any agreement, contract, or transaction excluded from the Commodity Exchange Act [pursuant to certain sections]." SIPA § 78c(a)(55)(A). The referenced sections of the Commodity Exchange Act specifically exclude any "agreement, contract, or transaction in … (B) government securities … or (G) mortgages or mortgage purchase commitments." 7 U.S.C. § 2(c). As such, the Agency MBS securities that underlie the TBA contracts are specifically excluded from SIPA's definition of "security future."

TBA contracts also do not qualify as "investment contracts" under SIPA. SIPA's definition of "security" specifically refers to any "investment contract … if such investment contract … is the subject of a registration statement with the [Securities and Exchange] Commission pursuant to the provisions of the Securities Act of 1933." SIPA § 78*lll*(14). As SIPC asserts, TBA contracts are not registered with the Securities and Exchange Commission, and no evidence has been presented to the contrary. *See* SIPC Supp. Statement at 5, ECF No. 4740.

_____
*(cont'd from previous page)*
    "security" does not include any currency, or any commodity or related contract or futures contract, or any
    warrant or right to subscribe to or purchase or sell any of the foregoing.

    SIPA § 78*lll*(14).

Likewise, TBA contracts do not constitute a "warrant or right to subscribe to or purchase or sell any of the foregoing." *See* SIPA § 78*lll*(14).  Unlike a "warrant" or a "right" which, like an option, involves only a potential unilateral act, TBAs are executory contracts that set forth bilateral obligations.  *See* 4 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations §1370 (2011) ("'Rights' to subscribe to new shares are nothing but options … .  A warrant is simply an option to purchase the shares of a corporation at a specified price and for a specified time.")

To support their position that this catch-all category should extend to TBAs, the Representative Claimants rely on two cases: *In re SSIW Corp.*, 7 B.R. 735 (Bankr. S.D.N.Y 1980) ("*SSIW*") and *Abrams v. Oppenheimer Gov't Secs., Inc.*, 737 F.2d 582 (7th Cir. 1984) ("*Abrams*").  However, these cases are not persuasive authority that bilateral contracts are equivalent to unilateral rights to purchase a security.  *SSIW* is not helpful because it involved "put" options, which are specifically identified in SIPA's definition of securities, and, unlike TBA contracts, do not create bilateral obligations.  *See SSIW*, 7 B.R. at 738 ("these transactions take the form of 'puts,' whereby SSIW grants an option to one financial institution for a premium, to purchase 'Ginnie Maes' for a given price on a given date in the future").  Furthermore, in *Abrams*, while the court held that anti-fraud provisions of the securities law applied to the Ginnie Mae forward contracts in question, it also agreed "with the generally accepted proposition that [Ginnie Mae] forwards in and of themselves are not securities," and that the securities law registration requirements did not apply to "[Ginnie Mae] forwards (as non-securities)."  *Abrams*, 737 F.2d at 588 (citations omitted).

Finally, the Representative Claimants have not shown that the TBA contracts are "commonly known as a security."  *See* SIPA § 78*lll*(14).  The only evidence in the record on this

point appears in the deposition of Peter S. Niculescu, an expert witness retained by the

Representative Claimants.  While Mr. Niculescu testified at his deposition that from his

experience "it is common for investors to view these [TBA transactions] as securities

transactions," he also testified "I want to make clear from my testimony that TBA transactions

are by some parties commonly referred to as securities.  By some parties they are not."  *See*

Frelinghuysen Supp. Decl.[12] Ex. D (Niculescu Dep. Tr. 132:7-11, 164:3-8).  This candid

clarification by Mr. Niculescu, while indirect and obliquely referencing what others may think,

serves to highlight that TBAs are ambiguous instruments that are hard to classify with any

precision, even for market participants.  The fact that testimony offered by the Representative

Claimants fails to confirm that a TBA contract is commonly known as a security demonstrates

that TBAs do not fall within this final category of the SIPA definition.

What becomes apparent in the process of applying the SIPA definition of a security to the

claims against LBI based on TBAs is that TBAs are specialized creations related to the market

for Agency MBS that are tough to classify with complete confidence or certainty.  They are

hybrids, contracts closely linked to the functioning of this market having various features that

make them look very much like securities.  But similarity is not enough for purposes of statutory

construction.  Even though they display many of the same markings as securities, these contracts

are outside the applicable definition and are not securities as that term is used in SIPA.

The answer to the classification question discussed in this section of the opinion might

have been different if convincing evidence had been presented showing that TBAs were

commonly known securities.  However, a different answer to this question would not change the

---

[12]    All references to "Frelinghuysen Supp. Decl." are to the Supplemental Declaration of Anson B. Frelinghuysen in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims to TBA Contracts, ECF No. 4674.

outcome.   Regardless of how TBAs are characterized for purposes of SIPA, the TBAs that are the subject matter of the claims made by the Representative Claimants never were received, acquired or held by LBI.   For that reason, even if the Representative Claimants had proven that the TBAs are securities, they would not be entitled to assert customer claims based on a net equity calculation.

### *Conclusion*

As reflected in both their account statements with LBI and their claim forms submitted to the Trustee, the Representative Claimants had accounts with LBI that did not hold any customer property on the Filing Date.   Without such entrusted property as the foundation for their customer relationship, they have no grounds for asserting a net equity claim against the LBI estate.   Additionally, they have not established that TBAs are instruments that properly fit within the definition of a security under SIPA.

For the reasons stated, the objections of the Representative Claimants to the Trustee's determination are overruled, and the Motion is granted.   The Trustee shall submit an order consistent with this decision for the Court's consideration.

IT IS SO ORDERED.

Dated: New York, New York
       December 8, 2011

                                        *s/ James M. Peck*
                                        HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE