FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| LEHMAN BROTHERS INC., | ) Case No. 08-01420 (JMP) (SIPA) |
|  | ) |
| Debtor. | ) |

**MEMORANDUM DECISION CONFIRMING THE TRUSTEE'S DETERMINATION OF CLAIMS RELATING TO SOFT DOLLAR COMMISSION CREDITS**

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004

    James B. Kobak, Jr., Esq.
    Christopher K. Kiplock, Esq.
    Michael E. Salzman, Esq.
    Robert B. Funkhouser, Esq.
    Jenny Baker Stapleton, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, DC 20005

    Josephine Wang, General Counsel
    Kenneth J. Caputo, Senior Associate General Counsel

DORSEY & WHITNEY LLP
*Attorneys for Columbia Management Investment Advisors, LLC*
51 W. 52nd Street
New York, New York 10019

    Eric Lopez Schnabel, Esq.
    Jessica Deborah Mikhailevich, Esq.

KLESTADT & WINTERS, LLP
*Attorneys for Fisher Investments*
570 Seventh Avenue, 17th Floor
New York, New York 10018

    John E. Jureller, Jr., Esq.

SHARTSIS FRIESE LLP
*Attorneys for Weintraub Capital Management, L.P.*
One Maritime Plaza, 18th Floor
San Francisco, CA 94111

    Jahan P. Raissi, Esq.

WILKIE FARR & GALLAGHER LLP
*Attorneys for Oppenheimer Value Fund, Oppenheimer Main Street Fund, Oppenheimer Equity Income Fund, Oppenheimer Small & Mid Cap Value Fund, Oppenheimer Capital Income Fund, Oppenheimer Main Street Fund/VA, Oppenheimer Main Street Opportunity Fund, and Oppenheimer Main Street Small Cap Fund*
787 Seventh Avenue
New York, New York 10019

    Brian E. O'Connor, Esq.
    Katharine N. Monin, Esq.

WILKIE FARR & GALLAGHER LLP
*Attorneys for Duquesne Capital Management, L.L.C.*
787 Seventh Avenue
New York, New York 10019

    Brian E. O'Connor, Esq.
    Katharine N. Monin, Esq.

JAMES M. PECK
United States Bankruptcy Judge

*Introduction*

    This is the first time that any court has been asked to decide the question of whether so-called "soft dollar" claims qualify for treatment as customer claims under the Securities Investor Protection Act of 1970, 15 U.S.C. §78*aaa* et seq., as amended ("SIPA"). As explained in this decision, they do not.

James W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. ("LBI") under SIPA, with the support of the Securities Investor Protection Corporation ("SIPC"),[1] has determined that claims against the LBI estate based on credits held for customers in soft dollar accounts are not entitled to protection as customer claims under SIPA. The Court agrees with that determination. These credits do not constitute securities and may be used only for the limited purposes identified in Section 28(e) of the Securities Exchange Act of 1934, 15 U.S.C. §78bb(e) ("Section 28(e)"). Given their character, purpose and constraints on their usage, such soft dollar credits are not cash equivalents. Soft dollars function something like frequent flyer miles: they are a specialized form of currency that may be redeemed solely as a means to pay for research services and other services provided by a broker-dealer to its customers. They are a kind of credit available to a customer, not unrestricted cash that can be spent freely.

Because soft dollar credits are an accepted method to allocate and account for incremental commission expenses charged by a broker-dealer in executing securities trades and because these credits cannot ever be used to purchase securities, credit balances held in soft dollar accounts do not qualify for the enhanced customer protection afforded by SIPA. Customers with claims based on soft dollars instead have claims for breach of contract (on account of the failure to apply the credits as promised to pay for services) and are only able to recover on these claims as unsecured creditors of LBI. This conclusion is fully consistent with the genesis of soft dollars within the securities industry as a means to pay for market research and with both the language of the SIPA statute itself and the distribution objectives of that statute. The reasons for this decision are described below in more detail.

---

[1] SIPC is deemed to be a party in interest in all matters arising under a SIPA liquidation proceeding. 15 U.S.C. § 78eee(d).

3

*Factual Background And Further Detail Regarding Soft Dollar Commission Credits*

Soft dollars are commission credits that may be used to purchase research and brokerage services that fall within the parameters of the "safe harbor" of Section 28(e). The term "soft dollars" is not specifically defined in any rule or statute, but "[g]enerally speaking, a soft dollar arrangement involves an agreement or understanding by which a discretionary money manager receives research or other services from a broker-dealer in addition to transaction execution, and does so in exchange for the brokerage commissions from transactions for discretionary clients' accounts." Stapleton Decl.[2] Ex. M (Thomas P. Lemke & Gerald T. Lins, *Soft Dollars and Other Trading Activities* § 1:1 (West 2011 -2012 ed.)). Stated more simply, "soft dollars" are amounts allocated from brokerage commissions to pay for the research component of a broker-dealer's array of services.[3] *See Inspection Report on the Soft Dollar Practices of Broker-Dealers, Investment Advisors, and Mutual Funds*, SEC Office of Compliance, Inspections and Examinations ("Inspection Report") § I (September 22, 1998), http://sec.gov/news/studies/softdolr.htm.

Exchange rules in existence prior to 1975 authorized broker-dealers to charge commissions to money managers that were fixed at artificially high levels. *See Id.* at § II(B). These fixed commissions prevented broker-dealers from competing for the business of money managers solely based upon the commissions charged for executing orders. *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities

---

[2] Citations to "Stapleton Decl." are to that certain Declaration of Jenny Baker Stapleton in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to Soft Dollar Commission Credits, dated March 20, 2012, ECF No. 4964.

[3] In contrast, when a money manager pays for research or ancillary brokerage services with its own money, it is said to be paying for the research or ancillary brokerage services with "hard dollars." Stapleton Decl. Ex. M (Thomas P. Lemke & Gerald T. Lins, *Soft Dollars and Other Trading Activities* § 1:1 4 (West 2011 – 2012 ed.)).

4

Exchange Act of 1934, Exchange Act Release No. 34,54165, 71 Fed. Reg. 41978, 41980 (July 18, 2006) (citations omitted).

In this regulated environment, soft dollars became an approach that allowed broker-dealers to discount the prevailing artificially high commission rates. *See* Inspection Report § II(B). In order to more effectively compete, brokerage firms developed special research services as a means to attract institutional business, and money managers were able to choose a broker on the basis of superior execution and research services. *See* Use of Commission Payments by Fiduciaries, Exchange Act Release No. 34,12251, 41 Fed. Reg. 13678, 13679 (March 24, 1976).

In 1975, the Securities and Exchange Commission ("SEC") ended fixed commissions and implemented the present system of negotiated rates. *See* Inspection Report § II(C). With the advent of competitive rates, some money managers became concerned about the risk of exposure to claims for breach of fiduciary duty in the event that commissions charged to a beneficiary's account turned out to be greater than the lowest commission available for a particular transaction. *See* Use of Commission Payments by Fiduciaries, Exchange Act Release No. 34,12251, 41 Fed. Reg. 13678, 13679 (March 24, 1976).

This concern arose because money managers, as fiduciaries, must act in the best interest of their clients, an obligation that includes providing their clients with "best execution" -- "execut[ing] securities transactions for clients in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances." Interpretive Release Concerning Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 34,23170, 51 Fed. Reg. 16004, *14 (Apr. 23, 1986) (citations omitted).

5

To address this issue, Congress enacted Section 28(e) in the Securities Acts Amendments of 1975. *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 34,54165, 71 Fed. Reg. 41978, 41980 (July 18, 2006) (citations omitted). Section 28(e) protects the money manager by providing that it is not a breach of fiduciary duties under state or federal law to have paid a higher commission than another broker-dealer would have charged provided that the money manager determines in good faith that the commission paid is "reasonable in relation to the value of the brokerage and research services provided by such broker-dealer." *Id.; see also* 15 U.S.C. § 78bb(e)(1).[4] Section 28(e)(3) states that "brokerage and research services" are provided by a person who:

(A) furnishes advice, either directly or through publications or writings, as to the value of securities, the advisability of investing in, purchasing, or selling securities, and the availability of securities or purchasers or sellers of securities;

(B) furnishes analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy, and the performance of accounts; or

---

[4] 15 U.S.C. § 78bb(e)(1), entitled "Exchange, broker, and dealer commission; brokerage and research services," provides that:

No person using the mails, or any means or instrumentality of interstate commerce, in the exercise of investment discretion with respect to an account shall be deemed to have acted unlawfully or to have breached a fiduciary duty under State or Federal law unless expressly provided to the contrary by a law enacted by the Congress or any State subsequent to the date of enactment of the Securities Acts Amendments of 1975 [enacted June 4, 1975] solely by reason of his having caused the account to pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member, broker, or dealer, viewed in terms of either that particular transaction or his overall responsibilities with respect to the accounts as to which he exercises investment discretion. This subsection is exclusive and plenary insofar as conduct is covered by the foregoing, unless otherwise expressly provided by contract: *Provided, however,* that nothing in this subsection shall be construed to impair or limit the power of the SEC under any other provision of this title [15 USCS §§ 78a et seq.] or otherwise.

6

> (C) effects securities transactions and performs functions incidental thereto (such as clearance, settlement, and custody) or required in connection therewith by rules of the [SEC] or a self-regulatory organization of which such person is a member or person associated with a member or in which such person is a participant.

15 U.S.C. § 78bb(e)(3).

In order for a money manager to be protected by the safe harbor of Section 28(e), soft dollar commission credits for brokerage and research services may only be used in the manner described in this section. The SEC has made this point emphatically by noting that the use of soft dollar commission credits outside of the explicitly defined safe harbor "may constitute a breach of fiduciary duty as well as a violation of specific provisions of the federal securities laws… ." Interpretive Release Concerning Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 34,23170, 51 Fed. Reg. 16004, *2 (April 23, 1986).

Thus, "soft dollars" is a term of art that has a specialized and generally accepted meaning within the securities industry. These credits have become a means for dealing with a unique problem faced by money managers: accounting for the difference between the commission rate actually paid to a broker-dealer for executing a trade and the rate otherwise payable for best execution of that trade. That spread is accumulated and held as a credit for the benefit of the customer that is available only for the express purposes of paying for brokerage and research services.

### *The Trustee's Determination Of The Soft Dollar Claims*

The Trustee has brought a motion (the "Motion") for an order confirming his determination that claims for soft dollar commission credit balances at LBI (the "Soft Dollar

7

Claims") filed by certain claimants (the "Soft Dollar Claimants")[5] do not qualify for treatment as customer claims. *See* Mot., dated March 20, 2012, ECF No. 4963. The Soft Dollar Claimants are money managers that have asserted claims for soft dollar commission credit balances held in their accounts at LBI (the "Soft Dollar Accounts") as of the SIPA liquidation filing date. *See e.g.*, Stapleton Decl. Ex. B (Kenwood Capital Management Broker Consolidation's SIPC Customer Claim Form). Of the hundreds of money managers that have soft dollar accounts with LBI, only 113 filed Soft Dollar Claims as customer claims. Mot. ¶16, n. 4.

After reviewing these claims, the Trustee issued letters of determination denying customer treatment and stating that soft dollar commission credits "are not customer property pursuant to SIPA." Mot. ¶ 15; *see e.g.*, Stapleton Decl. Ex. C (Notice of Trustee's Determination of Claim for Oppenheimer Main Street Small Cap Fund). In accordance with his determination, the Trustee classified the Soft Dollar Claims as general unsecured claims.

The Soft Dollar Claimants are the twenty-four claimants that have objected to the Trustee's determination. Six pleadings in opposition to the Motion were filed on behalf of fifteen Soft Dollar Claimants.[6] Nine Soft Dollar Claimants that originally had objected to the

---

[5] The Soft Dollar Claimants and Soft Dollar Claims that are the subjects of the Motion are identified in Exhibit A to the Stapleton Decl. and on Exhibit A to the Supplement to Trustee's Motion For An Order Confirming the Trustee's Determination of Claims Related to Soft Dollar Commission Credits, ECF No. 4998.

[6] *See* Obj. of Columbia Management Investment Advisers, LLC (f/k/a RiverSource Investments, LLC and as successor-in-interest to Kenwood Capital Management LLC) to Trustee's Motion, dated April 20, 2012, ECF No. 5034 ("Columbia Obj."); Weintraub Capital Management, L.P.'s Opp'n to Trustee's Motion and Joinder, dated April 20, 2012, ECF No. 5036 ("Weintraub Opp'n"); Fisher Investments' Joinder in Objs. of Columbia Management Investment Advisors, LLC and Weintraub Capital Management, L.P. to Trustee's Motion, dated April 20, 2012, ECF No. 5037; Opp'n Individually of Each of Oppenheimer Value Fund, Oppenheimer Main Street Fund, Oppenheimer Equity Income Fund, Oppenheimer Small & Mid Cap Value Fund, Oppenheimer Capital Income Fund, Oppenheimer Main Street Fund/VA, Oppenheimer Main Street Opportunity Fund, and Oppenheimer Main Street Small Cap Fund to Trustee's Motion and Joinder Individually of Each of the Preceding Enumerated Entities in Any Opp'ns, dated April 20, 2012, ECF No. 5038 ("Oppenheimer Opp'n"); Duquesne Capital Management, L.L.C.'s Opp'n to Trustee's Motion and Joinder in any Opp'ns, dated April 20, 2012, ECF No. 5039 ("Duquesne Opp'n") and Decl. of Darren Martian in Supp. Of Duquesne Capital Management, L.L.C.'s Opp'n to Trustee's Motion and Joinder in any Opp'ns, dated April 20, 2012, ECF No. 5040 ("Martian Decl."); and Obj. and Joinder of

(cont'd)

8

Trustee's determination did not oppose the Motion, and Janus Capital Management LLC, one of the objectors, decided to withdraw its opposition one day before the hearing on the Motion. *See* 5/17/12 H'rg Tr. 7:8-13, ECF No. 5095. On April 17, 2012, SIPC filed a memorandum of law in support of the Motion (the "SIPC Memorandum"). *See* SIPC Mem., ECF No. 5030. On May 10, 2012, the Trustee filed a reply in further support of the Motion. *See* Reply, ECF No. 5073. The Court heard oral argument on the Motion on May 17, 2012. *See generally*, 5/17/12 Hr'g Tr.

### *Discussion*

*Customer Status Under SIPA Is Construed Narrowly*

Protection under SIPA does not extend to all creditors of an insolvent broker-dealer, only to those creditors that meet SIPA's definition of "customer." *SEC v. Packer, Wilber & Co.*, 498 F.2d 978, 983 (2d Cir. 1974); SIPA § 78*lll*(2).[7] Whether a creditor will qualify as a "customer"

---

*(cont'd from previous page)*
Janus Capital Management LLC in Obj. of Columbia Management Investment Advisers, LLC to the Trustee's Motion, dated April 20, 2012, ECF No. 5041.

[7] On the Filing Date, the term "customer" was defined under SIPA as:

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—
>
> (A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or
>
> (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

SIPA § 78*lll*(2). Subsequent to the Filing Date, the definition of "customer" under SIPA was amended by the Dodd-Frank Wall Street Reform and Consumer Protector Act of 2010, 12 U.S.C. §§ 5301 *et seq.* The amended definition adds to the provision "The term 'customer' includes" the phrase" any person who has a claim against the debtor for cash, securities, futures contracts, or options on futures contracts received, acquired or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the [Securities and Exchange] Commission." SIPA § 78*lll*(2). However, the amended definition of "customer" was not
*(cont'd)*

9

is construed narrowly. *See In re MV Secs., Inc.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (noting that the Second Circuit has "approved a narrow interpretation of the 'customer' definition in SIPA") (citations omitted). SIPA "contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to others." *SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974); s*ee also Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 130 (2d Cir. 2006) ("customer status in the course of some dealings with a broker will not confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute." (quoting *In re Stalvey & Assoc., Inc.*, 750 F.2d 464, 471 (5th Cir. 1985))). "[I]t is well-established in the Second Circuit that a claimant bears the burden of proving that he or she is a 'customer' under SIPA." *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) (citations omitted).

Accordingly, for purposes of SIPA, the Soft Dollar Claimants must fit within the narrow definition of a customer with respect to the particular type of asset that is at issue – here the soft dollar credits held in their LBI accounts. Even if the same claimants engaged in other transactions with LBI that are entitled to customer treatment, they are still required to establish that they satisfy the standards for protected customer status in relation to their Soft Dollar Claims. Given the defining characteristics of the soft dollar credits, that is not possible.

*The Soft Dollar Claims Do Not Qualify As Customer Claims Under SIPA*

Under SIPA, the definition of "customer" includes a person "who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a

---

*(cont'd from previous page)*
in effect at the time of LBI's filing for liquidation, and it is the definition that was in effect at the time of LBI's filing for liquidation that applies in deciding the Motion.

10

broker or dealer from or for the securities accounts of such person" for specified purposes.  SIPA § 78*lll*(2)(A).  One of the primary purposes of SIPA is to return securities entrusted by investors to a financially troubled broker-dealer.  *See, e.g., SIPC v. Exec. Secs. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977).  SIPA provides that where possible, an investor's actual securities investments, and not the cash equivalents of those investments should be returned to that investor.  *See* SIPA § 78fff-2(b)(2) (a trustee shall satisfy claims by the delivery of the securities of the same class and issue to the maximum extent practicable).  But soft dollars plainly are not securities.

The definition of customer under SIPA also extends to "any person who has deposited cash with the debtor for the purpose of purchasing securities."  SIPA § 78*lll*(2)(B).  Therefore, in order to qualify for standing as a "customer" under this definition, the purpose matters, and cash must have been deposited with the broker-dealer *for the purpose of purchasing securities*, as that term is defined by SIPA.  *See e.g.*, *Ahammed v. SIPC (In re Primeline Secs. Corp.)*, 295 F.3d 1100, 1108, n.7 (10th Cir. 2002) ("Claimants must demonstrate an intent to invest in an investment vehicle included in the SIPA definition of 'security'").  Thus, the investment objective is key to the definition, and  "customer" status will not be found in the absence of intent to purchase "securities" as defined by SIPA.  *See e.g., Primeline*, 295 F.3d at 1108, n. 7; *Focht v. Heebner (In re Old Naples Secs., Inc.)*, 223 F.3d 1296, 1305 (11th Cir. 2000).

Consistent with this approach, commissions held in an account were denied customer status where the claimant "never used [that account] to buy or sell securities."  *See In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724 (Bankr. S.D.N.Y. 1998).  In *Adler, Coleman Clearing Corp.* the debtor credited commissions that it collected on the claimant's behalf into an account maintained by the debtor from which the debtor deducted its fees for the transactions.

11

*Id.* at 722. That account was not customer property because it was not connected to the purchase or sale of securities. The same holds true for the Soft Dollar Accounts at issue in this case.

As set forth in the Section 28(e) safe harbor, the balances in the Soft Dollar Accounts were held exclusively for the purpose of obtaining certain "brokerage and research services." Given these known limitations, the credits were never available to fund the purchase of securities. Such restrictions on the use of the Soft Dollar Accounts have been acknowledged by many of the Soft Dollar Claimants. *See e.g.* Columbia Obj. ¶ 14 (the soft dollar credits "were paid out in cash by Lehman to provide the Claimant with research"); Columbia Obj. ¶ 18 (noting that "[w]hen a commission was paid to Lehman by the Claimant, a portion of the commission was retained by Lehman, and the remainder was held in escrow by Lehman in a separate account to be used to provide research services in compliance with Section 28(e)"); Weintraub Opp'n, Ex. 1 ("[Weintraub Capital Management, L.P.] entrusted the credits to [Lehman] with an understanding that [Lehman] would set aside a portion of the commissions as credits for WCM's use to obtain eligible research and brokerage services …"); Oppenheimer Opp'n Ex. 1 ¶ 7 ("These 'excess' commissions paid, which the manager may direct the broker-dealer to use to purchase research, typically are referred to as 'soft dollars.'"); Duquesne Opp'n ¶ 11 (same).

Importantly, nothing in the Section 28(e) safe harbor permits the soft dollar commission credits to be used to purchase securities and none of the services set forth in Section 28(e) fall within SIPA's definition of a security. The Soft Dollar Accounts were designated for a particular purpose – research – and under no circumstance could these account balances be applied to the purchase of securities. The analysis is a fairly simple one: the credits are not securities and cannot be used to purchase securities. As a result, claims of the Soft Dollar Claimants relating to their Soft Dollar Accounts cannot be treated as customer claims under SIPA.

In an attempt to find a way around their inability to satisfy the SIPA definition of "customer," certain of the Soft Dollar Claimants have suggested that there is a sufficient connection to the purchase of securities because soft dollar commission credits may be used to purchase research that, in turn, provides "guidance as to what securities ultimately ought to be purchased." *See e.g.*, Columbia Obj. ¶ 22. This argument lacks merit and obfuscates the plain meaning of SIPA.

As stated earlier in this decision, the SIPA definition of a customer should be construed narrowly. *See MV Secs. Inc*, 48 B.R. at 160 (explaining that the definition of "customer" under SIPA is to be construed narrowly); *see also Primeline Secs. Corp.*, 295 F.3d at 1108, n.7 (customer status under SIPA requires a claimant to prove intent to invest in a security, as that term is defined by SIPA). Such a narrow reading is further supported by the fact that research "guidance" may be used as a basis not to purchase a security at all or to make an investment that does not qualify for SIPA protection. *See Old Naples Secs.,* 223 F.3d at 1305 ("[A] deposit of funds with only the vaguest instructions to make 'stock market investments' would not qualify as a deposit 'for the purpose of purchasing securities.'") (citation omitted). Credits that only may be applied to cover the costs of market research are too remote, indirect and tangential to satisfy the customer definition in SIPA. The Soft Dollar Accounts simply are not sufficiently tied to the investment decisions of a customer who intends to actually purchase a security.

*The Soft Dollar Claimants' Other Arguments For Customer Status Are Unpersuasive*

The Soft Dollar Claimants also argue that because LBI included soft dollars as a credit item in its Reserve Formula[8] established under SEC Rule 15c3-3, known as the "Customer

---

[8] The Reserve Formula computes the amount of cash, when taken together with the securities segregated under the "Customer Protection Rule" that would be necessary to satisfy the net equity claims of the broker-dealer's customers in the event of the failure of the broker-dealer. *See* 17 C.F.R. §§ 240.15c3-3, 240.15c3-3a.

13

Protection Rule,"[9] the credits should be treated as customer property within the meaning of SIPA. *See* Weintraub Opp'n ¶ 4; Oppenheimer Opp'n ¶ 34; Duquesne Opp'n ¶ 22. That argument misses the point by mixing together the distinct policy objectives of two different regimes established to benefit customers.

The "Customer Protection Rule" is designed to ensure that customer property held by a broker-dealer is available to satisfy the claims of customers. *See* Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34-9856, 37 Fed. Reg. 25224 (Nov. 29, 1972). With this aim, SEC Rule 15c3-3 defines the terms "customer" and "customer funds" broadly. A "customer" includes "any person from whom or on whose behalf a broker or dealer has received or acquired or holds funds … for the account of that person." 17 C.F.R. § 15c3-3(a)(1). "Customer funds" consist of all free credit and other credit balances carried for the account of the customer. 17 C.F.R. § 15c3-3(a)(8), (9) and (10).

Rule 15c3-3 is not as restrictive as SIPA and does not limit customer status only to those account-holders with cash on deposit "for the purpose of purchasing securities." The SEC Rule's more expansive definition of the term customer serves to promote an increase in the pool of assets available for the protection of customers. SIPA's focus is narrower than that of the SEC Rule and includes stricter requirements in order to qualify for customer status. "The SEC Rule ensures segregation by the broker-dealer of property to the broadest extent possible. SIPA then specifies, in its provisions, who is a 'customer' and what, of such segregated property, is 'customer property.'" SIPC Mem. 16 (citing SIPA §§ 78*lll*(2) and (4)).[10] The differences

---

[9] *See* 17 C.F.R. § 240.15c3-3.

[10] *See also Report and Recommendations of the SIPC Modernization Task Force*, 35 (Feb. 2012), http://www.sipc.org/Portals/0/PDF/Final%20Report%202012.pdf (noting that "[a]lthough there are discrepancies between SEC Rule 15c3-3 and provisions of SIPA, the discrepancies may be necessary. Both the Securities Exchange Act of 1934 and SIPA share the goal of customer protection, but in some cases, the regulatory functions

*(cont'd)*

between the SEC Rule and SIPA in relation to the treatment of customers are obvious, but those differences have no direct bearing on the questions before the Court and do not provide any useful interpretive guidance in dealing with the plain language of SIPA.

The Soft Dollar Claimants also attempt to find a way around the SIPA definition of "customer" by arguing that the Soft Dollar Claims meet the definition of "customer property" because they are proceeds from "sales or conversions" of securities. *See* Columbia Obj. ¶ 11. SIPA defines "customer property" as "cash and securities … at any time received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer … ." SIPA § 78*lll*(4). But the Soft Dollar Accounts do not contain "customer property" as defined by SIPA or proceeds resulting from trading securities. Instead, they contain credits associated with commissions charged by the broker-dealer for executing these trades. Given their source and character, these credits are not customer property.

The Soft Dollar Claimants make a number of other unpersuasive points in arguing that their claims should be treated as "customer" claims under SIPA. None of these have merit. They submit that steps were taken by both the Soft Dollar Claimants and LBI to manifest their mutual intent that the soft dollar credits would qualify as customer claims. *See e.g.* Columbia Obj. ¶ 20; Oppenheimer Opp'n ¶ 31; Duquesne Opp'n ¶ 19. Any promise that a creditor's account "would be treated as a restricted 'customer' account," cannot override the SIPA definition of "customer." *See Adler, Coleman Clearing Corp.*, 216 B.R. at 726.

Some of the Soft Dollar Claimants have also cited their expectations that the Soft Dollar Accounts would qualify for customer protection. *See* Weintraub Opp'n ¶ 4; Oppenheimer Opp'n

---

*(cont'd from previous page)*
of the SEC may compel one approach while the limited protection afforded under SIPA may require a different approach.").

¶¶ 29, 31; Duquesne Opp'n ¶¶18-19. Those expectations are meaningless for purposes of proving customer status. *See e.g.*, *In re Omni Mut., Inc.*, 193 B.R. 678, 682 (S.D.N.Y. 1996) (a claimant's subjective belief, "regardless of how reasonable that belief may have been, is not sufficient to find that [a debtor] held his cash or that he had purchased a 'security' as those terms are defined by SIPA") (citation omitted).

Finally, certain Soft Dollar Claimants have pointed to the fact that soft dollar credits may be transferred from one broker-dealer to another, similar to customer securities or cash. *See* Weintraub Opp'n ¶ 4; Duquesne Opp'n ¶¶ 13-14; Martian Decl. ¶¶ 4-5. However, the ability to transfer credits does nothing to change the character of the credits or expand the limitations on their permitted uses. Irrespective of transferability, the tight restrictions on use that define the credits remain the same.

*The Soft Dollar Claims Are Properly Reclassified as General Unsecured Claims*

The objections of the Soft Dollar Claimants to the Trustee's determination support the conclusion that the Soft Dollar Claims are really breach of contract claims. *See e.g.* Fisher Investments Obj. to Trustee's Determination of Claim ¶ 12, ECF No. 2069 ("[t]o deny the Research Balances treatment as customer property under SIPA results in Claimant's clients having paid commissions for research services that were never received … ."); RiverSource Investments LLC's Resp. to Trustee's Determination of Claim ¶ 21, ECF No. 2384 ("Lehman, RiverSource and the research-producing third party routinely signed agreements that put a contractual obligation on Lehman to pay for research."); Kenwood Capital Management LLC's Resp. to Trustee's Determination of Claim ¶ 21, ECF No. 2385 (same).

Breach of contract claims for damages are not customer claims under SIPA. *See e.g.*, *In re MV Secs., Inc.*, 48 B.R. at 160 ("SIPA does not protect customer claims based on fraud or

16

breach of contract.") (citation omitted); *In re Klein, Maus, & Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) ("Because claims for damages do not involve the return of customer property entrusted to the broker, they are not the claims of 'customers' under SIPA."); *In re Adler, Coleman Clearing Corp.*, 195 B.R. 266, 275 (Bankr. S.D.N.Y. 1996) (breach of contract claims are "not customer claims entitled to priority under SIPA.") (citations omitted); *SEC v. Kelly, Andrews & Bradley Inc.*, 385 F. Supp. 948, 952-53 (S.D.N.Y. 1974) ("To require the Trustee to use SIPC funds to pay damages for a breach of contract claim against the debtor would … only serve to give a windfall to those who are general creditors based upon breach of contract claims.").

These authorities support the determination by the Trustee to classify the Soft Dollar Claims as unsecured claims. This determination is correct both because the Soft Dollar Accounts do not hold any customer property and because the Soft Dollar Claims are based on a breach of the contractual obligation of LBI to provide research services to its customers. Accordingly, the Court agrees with the Trustee that the Soft Dollar Claims do not satisfy the definition of customer claims under SIPA and properly should be allowed as unsecured claims against LBI.

### *Conclusion*

For the reasons stated, the objections of the Soft Dollar Claimants to the Trustee's determination are overruled, and the Motion is granted. The Trustee shall submit a proposed

form of order consistent with this decision.

        IT IS SO ORDERED.


Dated: New York, New York
       July 10, 2012

                                                      ___*s/ James M. Peck*_____
                                                      HONORABLE JAMES M. PECK
                                                      UNITED STATES BANKRUPTCY JUDGE