K&L GATES LLP
*Attorneys for FirstBank Puerto Rico*
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile:  (212) 536-3901
Richard S. Miller
Robert T. Honeywell
Brian D. Koosed

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————— :
                                                             :
In re:                                                    :
                                                             :
LEHMAN BROTHERS INC.,              :          Case No. 08-01420 (JMP) SIPA
                                                             :
                            Debtor.              :
—————————————————————— :

**MOTION OF FIRSTBANK PUERTO RICO FOR (1) RECONSIDERATION, PURSUANT TO SECTION 502(j) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9024, OF THE SIPA TRUSTEE'S DENIAL OF FIRSTBANK'S CUSTOMER CLAIM, AND (2) LIMITED INTERVENTION, PURSUANT TO BANKRUPTCY RULE 7024 AND LOCAL BANKRUPTCY RULE 9014-1, IN THE CONTESTED MATTER CONCERNING THE TRUSTEE'S DETERMINATION OF CERTAIN CLAIMS OF LEHMAN BROTHERS HOLDINGS INC. AND CERTAIN OF ITS AFFILIATES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION AND VENUE ............................................................................10

FACTS AND PROCEDURAL HISTORY ............................................................10

ARGUMENT .......................................................................................................23

I.   FirstBank Is Entitled To Reconsideration of the Trustee's Denial of Its Customer
     Claim Under Section 502(j) of the Bankruptcy Code and Bankruptcy Rule 9024............23

     A.   FirstBank is entitled to relief under Rule 60(b)(1), because its failure to
          timely appeal the Trustee's Denial Notice was not willful, FirstBank has
          a meritorious "customer" claim, and the Trustee will not suffer any
          undue prejudice......................................................................................25

     B.   The Trustee's Denial Notice is void under Rule 60(b)(4) .....................................29

     C.   FirstBank is entitled to relief from the Trustee's Denial Notice under
          Rule 60(b)(6) because this case presents exceptional circumstances ...................30

II.  FirstBank Has a Valid Customer Claim Against LBI For Government Securities
     That FirstBank Entrusted to LBI For Safekeeping ..........................................................31

     A.   LBI acted as the collateral custodian in a tri-party custodial arrangement
          among FirstBank, LBI and LBSF ........................................................32

     B.   LBI agreed to serve as a "securities intermediary" for the benefit of
          FirstBank and LBSF, for purposes of Articles 8 and 9 of the New York
          UCC ......................................................................................................34

     C.   FirstBank was a "customer" of LBI....................................................42

III. FirstBank Seeks a Limited Intervention in the Chapter 11 Debtors' Customer
     Claim Objection For the Sole Purpose of Preserving Its Customer Claim........................52

CONCLUSION....................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57 (2nd Cir. 1996) .......... 3, 25, 26, 32

*AmeriCredit Financial Services, Inc. v. Tompkins*, 604 F.3d 753 (2nd Cir. 2010) ...................... 34

*Cohen v. Army Moral Support Fund* (*In re Bevill, Bresler &
    Schulman Asset Mgmt. Corp.*), 67 B.R. 557 (D.N.J. 1986) ....................................... *passim*

*Brien v. Kullman Indus., Inc.*, 71 F.3d 1073 (2nd Cir. 1995) ........................................ 26

*Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ........................................ 34

*Davis v. Musler*, 713 F.2d 907, 916 (2nd Cir. 1983) .................................... 26

*Dynamic Changes Hypnosis Center, Inc. v. PCH Holding, LLC*,
    306 B.R. 800 (E.D. Va. 2004).......................................................................... 29, 30

*Ezrasons, Inc. v. American Credit Indem. Co.*, 257 A.D.2d 447,
    683 N.Y.S.2d 264 (N.Y. App. Div. 1st Dept. 1999)........................................................ 40

*F. Garofalo Electric Co., Inc. v. New York Univ.*, 270 A.D.2d 76,
    705 N.Y.S.2d 327 (N.Y. App. Div. 1st Dept. 2000).................................................... 14, 40

*Grun v. Pneumo Abex Corp.*, 163 F.3d 411 (7th Cir. 1998)................................................. 29, 30

*In re Adler, Coleman Clearing Corp.*, 216 B.R. 719 (Bankr. S.D.N.Y. 1998) ............................ 44

*In Re Enron Corp.*, 352 B.R. 363 (Bankr. S.D.N.Y. 2006) ........................................ 24

*In re Enron Creditors' Recovery Corp.*, 2007 WL 2480531 (Bankr. S.D.N.Y. 2007).......... *passim*

*In re ESM Gov't Sec., Inc.*, 812 F.2d 1374 (11th Cir. 1987) ........................................ 50

*In re Lehman Brothers Inc.*, --- B.R. ---, 2012 WL 2741226
    (Bankr. S.D.N.Y. July 10, 2012).............................................................. 43, 44

*In re Lehman Brothers Inc.*, 462 B.R. 53 (Bankr. S.D.N.Y. 2011) ........................................ 43, 44

*LaManna v. Concord Mortg. Corp.*, 244 F.R.D. 148 (N.D.N.Y. 2007) ....................................... 31

*Nemaizer v. Baker*, 793 F.2d 58 (2nd Cir. 1986)............................................................ 31

*Pecarsky v. Galaxiworld.Com Ltd.*, 249 F.3d 167 (2nd Cir. 2001) ............................................... 26

*Primus Automotive Fin. Servs., Inc. v. Otto-Wal, Inc.*,
284 F. Supp. 2d 845 (N.D. Ohio 2003)............................................................................... 31

*Scher Law Firm v. DB Partners I, LLC, et al.*, 27 Misc.3d 1230(A),
2010 WL 2219610 (N.Y. Sup. 2010)................................................................. 5, 34, 35

*SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438 (2nd Cir. 2004) ..................................... 5, 34

*SEC v. SIPC*, --- F. Supp. 2d ---, 2012 WL 2550485 (D.D.C. July 3, 2012)........................... 6, 45

*SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273 (Bankr. S.D.N.Y. 1999),
*aff'd sub nom. Arford v. Miller*, 239 B.R. 698 (S.D.N.Y. 1999) ................................ 32, 45

*United Student Aid Funds, Inc. v. Espinosa*, --- U.S. ---, 130 S. Ct. 1367 (2010)....................... 29

**State Statutes**

New York UCC § 1-201 ................................................................................................ 35

New York UCC § 1-201(3)......................................................................................... 36, 37

New York UCC § 1-205(1)............................................................................................ 37

New York UCC § 1-205(2)............................................................................................ 37

New York UCC § 1-205(3)............................................................................................ 37

New York UCC § 2-106(1)............................................................................................ 37

New York UCC § 2-208 ............................................................................................... 37

New York UCC § 8-102 ........................................................................................... 35, 36

New York UCC § 8-102(a)(7) ....................................................................................... 35

New York UCC § 8-102(a)(8) ....................................................................................... 36

New York UCC § 8-102(a)(9) ....................................................................................... 35

New York UCC § 8-102(a)(14) ................................................................................. 35, 39

New York UCC § 8-102(a)(17) ..................................................................................... 35

New York UCC § 8-106 ................................................................................................ 34, 36

New York UCC § 8-501 ...................................................................................... 35, 37, 39, 40

New York UCC § 8-501(a) ......................................................................................... 36, 39

New York UCC § 8-503(b) ................................................................................................ 41

New York UCC § 8-507(b) ................................................................................................ 41

New York UCC § 8-509 ................................................................................................ 11, 34

New York UCC § 8-511 ................................................................................................ 35, 40

New York UCC § 9-102 ..................................................................................................... 35

New York UCC § 9-106 ..................................................................................................... 34

## Federal Statutes

11 U.S.C. § 502(j) ......................................................................................... 1, 23, 24, 57

15 U.S.C. § 78aa ............................................................................................................. 10

15 U.S.C. § 78c(a)(42) ...................................................................................................... 5

15 U.S.C. § 78eee(a)(3) ................................................................................................... 10

15 U.S.C. § 78eee(b)(2) ................................................................................................... 10

15 U.S.C. § 78eee(b)(2)(A)(iii) ................................................................................... 24, 35

15 U.S.C. § 78eee(b)(3) ................................................................................................... 10

15 U.S.C. § 78eee(b)(4) ................................................................................................... 10

15 U.S.C. § 78fff(b) ................................................................................................... 24, 35

15 U.S.C. § 78lll(2) .......................................................................................................... 42

15 U.S.C. § 78lll(4) .......................................................................................................... 43

28 U.S.C. § 157(b)(2)(A) .................................................................................................. 10

Pub. L. 99-571, 100 Stat. 3208 ("Government Securities Act of 1986") ........................................ 5

Pub. L. 111-203, 124 Stat. 1376 ("Dodd-Frank Act") ................................................................. 43

**Federal Regulations**

17 C.F.R. § 240.15c3-3(b)(4)(i)(D)……………………………………………………………...6, 48

17 C.F.R. § 400.3 ....................................................................................................................... 5

17 C.F.R. § 403.1 ................................................................................................................... 5, 46

SEC Rule 15c3-3 ................................................................................................................... 5, 45

**Other Authorities**

1-12 Collier on Bankruptcy, P 12.12 ........................................................................................ 45

SEC No-Action Letter to FNMA, 2002 WL 32165826 (July 12, 2002) ........................................ 5

SEC Release No. 19162, 26 SEC Docket 599, 1982 WL 33713 (Oct. 21, 1982) ..........................5

SEC Release No. 7383, 63 SEC Docket 1671 (Jan. 22, 1997) ..................................................... 45

SEC Release No. 34-31511, 57 Fed. Reg. 56973, 56980 (Dec. 2, 1992)...................................... 45

SIPC, "The Dodd-Frank Bill Amends Sections of the Securities Investor Protection Act"
    (July 29, 2010) ..................................................................................................................... 43

**Rules**

Bankruptcy Rule 2018(a)........................................................................................................... 52

Bankruptcy Rule 3001(f) ............................................................................................... 3, 26, 31

Bankruptcy Rule 3008 ............................................................................................................... 24

Bankruptcy Rule 7024 ...................................................................................................... 1, 52, 57

Bankruptcy Rule 9024 .............................................................................................. 1, 23, 24, 57

Fed. R. Civ. P. 24.................................................................................................................... 52

Fed. R. Civ. P. 60(b)(1)........................................................................................ 25, 26, 27, 28, 29

Fed. R. Civ. P. 60(b)(4)........................................................................................ 25, 29, 30

Fed. R. Civ. P. 60(b)(6)........................................................................................ 25, 30, 31

Local Bankruptcy Rule 9014-1 ............................................................................ 1, 52, 57

FirstBank Puerto Rico ("FirstBank"), by and through its undersigned counsel, hereby moves for an Order: (1) pursuant to Section 502(j) of the Bankruptcy Code and Bankruptcy Rule 9024, for reconsideration of the letter determination by James W. Giddens, as trustee in this proceeding (the "Trustee"), dated September 15, 2010 (the "Denial Notice"), denying FirstBank's claim numbered 800003257 (the "Customer Claim") status as a customer claim against Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act ("SIPA"); and (2) confirming FirstBank's right, pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule 9014-1, to intervene in the contested matter initiated by the Objection of Lehman Brothers Holdings Inc. and Certain of Its Affiliates to the Trustee's Determination of Claims, dated September 28, 2011 [Dkt. #4584] (the "Customer Claim Objection"), for the limited purpose of preserving FirstBank's Customer Claim.  In support of the motion, FirstBank respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The purpose of this motion is to remedy a procedural and substantive error by the Trustee that has denied FirstBank its rights as a customer of LBI.  FirstBank has a valid Customer Claim against LBI for approximately $61.5 million, based on government securities that FirstBank entrusted to LBI for safekeeping and for use as collateral for swap transactions with an LBI affiliate, Lehman Brothers Special Financing Inc. ("LBSF") – i.e., in a "tri-party" custodial relationship among FirstBank, LBI and LBSF.  The Trustee incorrectly and summarily denied the Customer Claim, claiming that it was a "duplicate and/or amendment" of claim numbered 900006430, a customer claim filed by the Lehman Chapter 11 Debtors (the "Lehman Customer Claim")[1] – which it is not as a matter of law.  The Trustee then sent its Denial Notice

---

[1] The referenced debtors (the "Chapter 11 Debtors") are the debtors in *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555, before this Court (the "Chapter 11 Case").

to the wrong address, so that FirstBank had no opportunity to object to the Trustee's determination and seek a hearing before this Court.

2.    FirstBank now requests such a hearing, and summarizes its argument as follows:

<u>FirstBank is Entitled to Reconsideration of the Trustee's Denial of Its Customer Claim</u>

3.    FirstBank timely filed its Customer Claim against LBI on January 30, 2009, listing FirstBank as the claimant with the name of its in-house counsel as its representative, its mailing address in San Juan, Puerto Rico, and Clifford Chance US LLP, its outside counsel at the time, as the "preparer" filing the claim. FirstBank formally substituted K&L Gates LLP as its counsel on August 7, 2009, filing a notice in this proceeding and serving it on all parties of record, including the Trustee.

4.    Despite proper notice of FirstBank's contact information and counsel substitution, the Trustee sent its Denial Notice only to the address of FirstBank's former counsel. FirstBank learned of the Denial Notice only by accident on March 19, 2012, when a lawyer representing a third party in another lawsuit provided a copy to FirstBank's counsel in that case. This was the first time either FirstBank or its current counsel learned of the Trustee's Denial Notice. FirstBank promptly alerted the Trustee in writing about the error, and has twice requested the Trustee to reconsider its denial of the Customer Claim. FirstBank also proposed a consensual resolution of this matter to both the Trustee and counsel to the Chapter 11 Debtors, to resolve FirstBank's claim and the Lehman Customer Claim to the extent it purports to assert an interest in FirstBank's securities.

5.    Neither the Trustee nor the Chapter 11 Debtors have responded to FirstBank's communications, prompting this motion.

6.    Under the standard for reconsideration of a claim disallowance in the Second Circuit – (1) whether the failure to respond was willful, (2) whether the movant has a meritorious defense to the claim disallowance, and (3) the amount of prejudice to the non-movant if the motion is granted – FirstBank is entitled to a hearing on the merits of its claim.[2]

(1)    <u>FirstBank Did Not Willfully Fail to Respond to the Trustee's Denial Notice</u>

7.    The failure of FirstBank to respond to the Trustee's Denial Notice was not willful.  To the contrary, FirstBank *could not* respond because it received no notice of the denial of its claim.  It only learned of the denial eighteen (18) months later, and then only by chance in a separate proceeding from opposing counsel.  It promptly contacted the Trustee to resolve this dispute and received no response, and contacted the Trustee again and received no response. FirstBank fulfills the first prong of the Second Circuit's test.

(2)    <u>FirstBank Has a Meritorious "Customer" Claim Against LBI Based on FirstBank's Entrustment of Its Government Securities to LBI for Safekeeping, Which is Distinct from Any Customer Claims Filed by the Chapter 11 Debtors</u>

8.    For purposes of the second prong of the Second Circuit's test, FirstBank need only show that its Customer Claim has prima facie validity under Bankruptcy 3001(f) – *i.e.*, that it properly filed its Customer Claim in compliance with the Bankruptcy Rules and the orders of this Court.  *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at *5.  FirstBank's Customer Claim has prima facie validity, because it was filed in compliance with the Bankruptcy Rules and the Court's orders.

---

[2] *See In re Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at *4 (Bankr. S.D.N.Y. 2007) (citing the 2nd Circuit standard and granting a motion to reconsider a claim disallowance, where the claimant had no notice of the claim objection or the order disallowing the claim, discovered it over two years later, promptly contacted the debtor's counsel to try to resolve the dispute without court intervention, and then filed its motion), *citing American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2nd Cir. 1996).

9.     In an abundance of caution, however, and in order to show the Court that its claim has substantive merit, FirstBank sets forth the merits of its "customer" claim against LBI in Part II of this motion.

10.     In sum, FirstBank has a valid "customer" claim against LBI because FirstBank entrusted over $63 million in government securities (issued by GNMA and FNMA) to LBI for safekeeping and for use as collateral for swap transactions with LBSF.  The governing ISDA swap agreement recognized the securities as FirstBank's property.  Title did *not* transfer from FirstBank to LBSF under the swap agreement.  Any interest of LBSF in the securities was limited to a security interest, to secure any amounts owed to LBSF under the swap agreement.

11.     LBI was bound by the swap agreement because it served as a collateral custodian for the benefit of *both* FirstBank and LBSF – specifically, as the "Custodian" appointed by LBSF under the terms of the swap agreement.  LBI was obligated, by the swap agreement and New York law (expressly incorporated into the agreement), to comply with all provisions of the swap agreement applicable to the "Custodian."

12.     LBI clearly agreed to this "tri-party" custodial relationship, by accepting the transfer of FirstBank's securities and by serving as the custodian, bank account holder and back office for all of LBSF's swap transactions – in effect, as LBSF's "clearing firm."[3]  LBI's

---

[3] Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, dated Aug. 31, 2011 [Dkt. #19629 in the Chapter 11 Case] (the "Chapter 11 Disclosure Statement"), at 20 (LBI "maintained Lehman's customer accounts" and "functioned as a broker/dealer registered with and regulated by the SEC"); *id.* at 67 (LBSF was a subsidiary of LBI prior to the bankruptcy); *id.* at 62 ("Most employees in the United States were employees of LBI, which acted as a paymaster for Lehman"; "The same group of employees was responsible for the accounting of the books and records of all entities"; "The Debtors shared administrative and back-office functions"); *id.* at 63 ("Unregulated entities were thinly capitalized"; "Regulated entities maintained adequate capital levels").

*See also* Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) for Authorization to (i) Continue Using Existing Centralized Cash Management System, as Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing Bank Accounts and Business Forms; (B) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code, and (C) to Schedule a Final Hearing, dated Oct. 3, 2008

- 4 -

actual conduct shows that it agreed to serve as the custodian of FirstBank's securities as part of LBI's ordinary course of business as a regulated broker-dealer.

13.    LBI thus had express custodial duties to FirstBank under the Swap Agreement and under federal and state laws applicable to those holding securities in a custodial capacity. These include Article 8 of the New York Uniform Commercial Code (the "New York UCC" or the "UCC"), under which LBI served as a "securities intermediary" for the benefit of FirstBank as the "entitlement holder" and LBSF as the "secured party" (or "purchaser").[4] The governing legal regime also included the federal securities laws, which impose numerous customer protection rules on broker-dealers holding securities in a custodial capacity (*e.g.*, SEC Rule 15c3-3). Treasury Department regulations also apply the customer protection rules to any registered broker-dealer holding *government securities* as a custodian, as the Securities Investor Protection Corporation ("SIPC") has acknowledged.[5]

---

[Dkt. #669] (the "Cash Management Motion"), at ¶ 15 (LBSF settled its derivatives transactions into bank accounts held by LBI).

[4] *See SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 447 (2nd Cir. 2004) (UCC Article 8 "sets forth rules governing the rights and obligations of parties in connection with the issuance and transfer of stocks, bonds, and other forms of debt commonly traded by investors"); *Scher Law Firm v. DB Partners I, LLC, et al.*, 27 Misc. 3d 1230(A), 2010 WL 2219610 at *6 (N.Y. Sup. 2010) (under UCC Article 8, a broker-dealer holding financial assets pledged by a client to its lender was the "securities intermediary," the client was the "entitlement holder," and the lender the "purchaser" of an interest in the assets).

[5] *See* Department of the Treasury, Regulations Under Section 15C of the Securities Exchange Act of 1934, 17 C.F.R. Ch. IV, Part 403 (the "Treasury Customer Protection Rules"), at § 400.3 (defining "government securities broker" and "government securities dealer," both subject to the Government Securities Act of 1986, Pub. L. 99-571, 100 Stat. 3208 (the "GSA"), as including broker-dealers registered with the SEC); *id.* at § 403.1 ("With respect to their activities in government securities," registered broker-dealers may comply with the custody rules mandated by the GSA by complying with the SEC's customer protection rules). "Government securities" is defined as provided in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(42), *id.* at § 400.3, and includes GNMA and FNMA securities. *See* SEC No-Action Letter to FNMA, 2002 WL 32165826 (July 12, 2002); SEC Release No. 19162, 26 SEC Docket 599, 1982 WL 33713 (Oct. 21, 1982).

*See also* Memorandum of Law of the Securities Investor Protection Corporation In Support of Trustee's Motion for Order Confirming the Trustee's Determination of Claims Related to Repurchase Agreements, dated Apr. 6, 2012 [Dkt. #5006] (the "SIPC Memorandum"), at 16 (customer protection safeguards under the GSA "apply to government securities that are held in custody, in safekeeping accounts, at the broker-dealer").

14.    Custodial relationships with broker-dealers, similar to the tri-party FirstBank-LBI-LBSF relationship, have long been recognized as subject to the customer protection rules and SIPA "customer" status.  The SEC has expressly found that a brokerage client is entitled to a SIPA "customer" claim against the broker-dealer in actual *possession* of the customer's securities (the "clearing firm"), even if the customer also had a contractual relationship with the third party in the arrangement (the "introducing firm").[6]  The SEC, SIPC and courts have also held that a hold-in-custody repurchase agreement (an "HIC repo"), where a broker-dealer holds securities in connection with repo transactions, is entitled to "customer" status even if a non-custodial repo might not be.  The SEC, SIPC and the Trustee have recognized that HIC repos are an exception because of their *custodial* feature.[7]

15.    The tri-party custodial relationship at issue here is entitled to the same protection.  A secured swap that involves the entrustment of government securities to a registered broker-dealer – as the client's own property – clearly is a fiduciary "customer" relationship under federal and state securities laws.

16.    When FirstBank terminated the swap agreement in late September 2008, LBI – as the "Custodian" under the Swap Agreement, a securities intermediary under the New York UCC, and a registered broker-dealer holding government securities in custody – was obligated directly to FirstBank with respect to FirstBank's rights in its securities property.

---

[6] *See SEC v. SIPC*, --- F. Supp. 2d ---, 2012 WL 2550485 (D.D.C. July 3, 2012) ("*Stanford*"), at *7-8 (citing SEC releases).

[7] *See* 17 C.F.R. § 240.15c3-3(b)(4)(i)(D) (the "HIC Repo Custody Rule"); *Cohen v. Army Moral Support Fund* (*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*), 67 B.R. 557, 598-602 (D.N.J. 1986) (securities held by broker-dealer in connection with repurchase agreements were subject to SIPA "customer" protection).

The Trustee and SIPC have distinguished *Bevill* based on the *custodial* feature of the repos at issue in that case.  *See* Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Relating to Repurchase Agreements Between LBI and Hudson City Savings Bank, WesternBank Puerto Rico (Including Its International Division), and Doral Bank and Doral Financial Corporation, dated Apr. 6, 2012 [Dkt. #5007] (the "Trustee's Repo Motion"), at ¶¶ 144-151.  *See also* SIPC Memorandum, at 11-19.

FirstBank's rights included its termination remedy to receive *all* of the securities held by LBI (then valued at approximately $64 million) or, at FirstBank's option, to receive the net balance (approximately $61.5 million) after setting off the amount owed to LBSF under the agreement (approximately $2.5 million).[8]

17.     FirstBank's and LBSF's respective claims on the securities held by LBI are thus different not only in amount, but in their *legal character*: FirstBank's claim is as the owner of the securities, and LBSF's claim is as a secured creditor.  They are not "duplicate" claims.

(3)     <u>Granting the Motion Will Not Prejudice the Trustee, Who Has Not Yet Made a Distribution and Is Still Determining the Available Pool of "Customer Property"</u>

18.     Allowing FirstBank the opportunity to prove the merits of its Customer Claim will not prejudice the Trustee.  The Trustee has not yet made a distribution in this case,[9] and is still determining both the amount of "customer" claims against the LBI estate and the amount of "customer property" available to pay distributions on those claims.[10]  In addition, two claim disputes that implicate the Court's views of "customer" claims with respect to repos and derivatives are still pending: (1) the Cardinal/Oak Hill group of claimants under pre-paid forward

---

[8] These claim amounts were calculated using figures proposed by the Chapter 11 Debtors in discussions with FirstBank, as discussed *infra* at ¶ 49.  FirstBank accepts the Chapter 11 Debtors' figures for purposes of this motion.  The value of the securities as of August 29, 2008 (according to the September 1, 2008 statement sent to FirstBank) was approximately $63 million; their value as of the termination of the swap agreement was approximately $64 million; and the net balance returnable to FirstBank was approximately $61.5 million.  *See infra* at ¶ 49.

[9] Trustee's Statement Regarding Appeal of the Federal Court Ruling On Barclays Litigation, dated June 7, 2012 (the "Trustee's June 7, 2012 Press Release"), available at: dm.epiq11.com/LBI/Project (stating the Trustee's "intention to make a substantial interim distribution as soon as it is possible to do so, with a goal of before the end of the year").

[10] Motion for Order Approving Trustee's Allocation of Property of the Estate, dated Oct. 5, 2009 [Dkt. #1866] (the "First Allocation Motion"); Second Motion for Order Approving the Trustee's Allocation of Property, dated Dec. 1, 2011 [Dkt. #4760] (the "Second Allocation Motion"); Statement in Further Support of the Second Motion for Order Approving the Trustee's Allocation of Property, dated Apr. 30, 2012 [Dkt. #5058] (together, the "Allocation Motions").  The Court granted the First Allocation in part, pursuant to its order dated March 2, 2010 [Dkt. #2743].  The Court held a hearing on the Second Allocation Motion on June 13, 2012 and has not yet ruled, based on a review of the case docket.  *See* Declaration of Robert T. Honeywell, sworn to August 1, 2012 and submitted

ISDA contracts, who have demanded the return of their excess collateral and have filed a motion to intervene in the Customer Claim Objection, now set for hearing on August 15, 2012;[11] and (2) the Hudson City/WesternBank/Doral group of repo participants, who have objected to the Trustee's denial of their customer claims, which is still pending and is currently in discovery, with a final hearing to be set by November 21, 2012.[12]

19.    In the context of what has happened to FirstBank's Customer Claim and the status of other material ongoing litigation, FirstBank submits that its effort to protect its due process right to a hearing on its Customer Claim will neither unduly prejudice nor delay the Trustee's efforts to complete LBI's liquidation.

20.    FirstBank fulfills the three factors for a motion for reconsideration of a claim disallowance in the Second Circuit, and requests a hearing before this Court on the merits of its Customer Claim.

FirstBank Seeks a Limited Intervention in the Trustee's Claim Dispute with the Chapter 11 Debtors, for the Sole Purpose of Preserving FirstBank's Customer Claim

21.    As with the Cardinal/Oak Hill Motion, FirstBank also moves to intervene in the Customer Claim Objection filed by the Chapter 11 Debtors, for the limited purpose of preserving its Customer Claim.  FirstBank's Customer Claim is immediately at risk of being, in effect, converted and assigned to the Chapter 11 Debtors – including all right to distributions on that claim.  In the Trustee's Denial Notice, the Trustee alleged that FirstBank's Customer Claim is a "duplicate and/or amendment" of the Lehman Customer Claim, so the Trustee appears to

---

herewith (the "Honeywell Dec."), ¶ 3.

[11] Motion for Limited Intervention in the Contested Matter Concerning the Trustee's Determination of Certain Claims of Lehman Brothers Holdings Inc. and Certain of Its Affiliates, dated October 13, 2011 [Dkt. #4634] (the "Cardinal/Oak  Motion").  The Cardinal/Oak Hill Motion has been adjourned nine times and is currently scheduled for hearing on August 15, 2012 [Dkt. #5132].

[12] See Trustee's Repo Motion and the related agreed scheduling order, dated July 16, 2012 [Dkt. #5162] (the "Repo

believe that the two claims cover the same securities. If the Trustee's disallowance of FirstBank's Customer Claim is allowed to stand, and the Trustee then allows the Lehman Customer Claim, the Chapter 11 Debtors will have acquired a "customer" claim as to FirstBank's own securities. In other words, the Chapter 11 Debtors, who have only a $2.5 million secured claim against FirstBank's securities collateral, will have acquired a "customer" claim as to an additional $61.5 million in securities in which they have no claim or property interest.

22.     The Trustee has reportedly reached a settlement of all of the Chapter 11 Debtors' customer claims against LBI, totaling approximately $6 billion.[13] The settlement presumably includes the Lehman Customer Claim. FirstBank fears that the Trustee may be preparing to grant "customer" status to the Lehman Customer Claim as part of the settlement, in the erroneous belief that the securities entrusted by FirstBank with LBI were owned by the Chapter 11 Debtors' bankruptcy estates. They were not.

23.     FirstBank is therefore constrained to move to intervene in the Customer Claim Objection for the limited purpose of preserving its right to prove its Customer Claim.

---

Scheduling Order").

[13] The Trustee reported an "agreement in principle" with the Chapter 11 Debtors, that "would resolve all claims among their respective entities," including approximately $6 billion in customer claims against LBI. *See* Trustee's Seventh Interim Report for the Period October 22, 2011 Through April 20, 2012, filed herein on Apr. 20, 2012 [Dkt. #5035] (the "Seventh Interim Report"), at 11.

The Seventh Interim Report stated that the agreement is "subject to documentation and various approvals, including by the Bankruptcy Court." *Id.* As of the date of this Motion, FirstBank has not seen any motion filed with this Court to approve the settlement in either this proceeding or the Chapter 11 Case. *See* Honeywell Dec., ¶ 4.

## JURISDICTION AND VENUE

24.     On September 19, 2008, the Honorable Gerard E. Lynch, United States

District Court, Southern District of New York, entered the Order commencing LBI's liquidation

[Dkt. #1] (the "LBI Liquidation Order"), in the case captioned *SIPC v. Lehman Brothers Inc.*,

Case No. 08-CIV-8119 (GEL).

25.     The LBI Liquidation Order, inter alia, (i) appointed James W. Giddens

trustee for the liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); and (ii)

removed the case to this Court pursuant to SIPA § 78eee(b)(4), in the above-captioned case.

26.     Following removal to this Court, this Court has "all of the jurisdiction,

powers, and duties conferred by [SIPA] upon the court to which the application for the issuance

of the protective decree was made."  SIPA § 78eee(b)(4).

27.     The Court's jurisdiction and powers include the resolution of claims

against the LBI estate, as a core proceeding.  SIPA § 78eee(b)(2); 28 U.S.C. § 157(b)(2)(A), (B)

and (O).

28.     Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and 15

U.S.C. § 78aa.


## FACTS AND PROCEDURAL HISTORY

### The Swap Agreement and Tri-Party Custodial Relationship Among FirstBank, LBI and LBSF

29.     FirstBank is a commercial bank serving depositors and borrowers in the

Commonwealth of Puerto Rico, the Virgin Islands and the State of Florida.  *See* Declaration of

Victor M. Barreras, sworn to August 1, 2012 and submitted herewith ("Barreras Dec."), ¶ 3.

- 10 -

FirstBank is chartered and organized under the laws of Puerto Rico with its principal place of business in San Juan, Puerto Rico. *Id.*

30.    On or about January 16, 1997, FirstBank and LBSF signed an "ISDA" International Swap Dealers Association, Inc. Master Agreement (the 1992 ISDA version for Multicurrency-Cross Border transactions) (the "Master Agreement") that included an attached Schedule (the "Schedule") and Credit Support Annex (the 1994 ISDA version) (the "Credit Support Annex" or "CSA").  They later amended the Master Agreement on June 19, 2008.  *See* Barreras Dec., ¶¶ 4-5, Exh. A-1 (the 1997 agreements), Exh. A-2 (the form of the complete 1992 version of the standard ISDA Master Agreement for Multicurrency-Cross Border transactions),[14] and Exh. B (the 2008 amendment).  For ease of reference, the Master Agreement, Schedule, and Credit Support Annex, as amended, are collectively referred to herein as the "Swap Agreement."

31.    FirstBank entered into the Swap Agreement for purposes of interest rate hedge protection.  All of the transactions entered into under the Swap Agreement were interest rate swaps.  Barreras Dec., ¶ 6.

32.    The Swap Agreement is expressly governed by New York law.  *See* Schedule, Part 4(h).  All provisions related to the indirect holding of securities are governed by Article 8 of the New York UCC, and those related to security interests are governed by Article 9 of the New York UCC.  Federal securities laws and regulations (including applicable Treasury Department regulations) supplement New York law as to the holding of securities and LBI's duties as a registered broker-dealer.[15]

---

[14] Consistent with industry practice, the executed copy of the Master Agreement omitted pages 2 through 17 of the ISDA form, leaving only pages 1 and 18 (the signature page), followed by the Schedule and Credit Support Annex. Barreras Dec. ¶ 4.

[15] *See*, *e.g.*, New York UCC § 8-509 (duties of a securities intermediary under §§ 8-504 through 8-508 are satisfied by compliance with other applicable laws and regulations).

33.    Pursuant to the Credit Support Annex, FirstBank was required to post specified types of collateral ("Eligible Collateral") to secure all of its obligations under the Swap Agreement.  As to any posted collateral ("Posted Collateral"), FirstBank acted as the "Pledgor" and granted a first priority security interest to LBSF, as the "Secured Party."  The "Eligible Collateral" was limited to cash, U.S. Treasury debt and certain federal government agency securities (referred to as "Agency Securities").  All posted collateral was valued twice per month, with LBSF acting as the "Valuation Agent."  *See* Credit Support Annex, ¶ 2 (security interest); ¶ 13(b)-(c) (eligible collateral, valuation).

34.    LBSF, as the secured party, could make margin calls on FirstBank – *i.e.*, demand further collateral from FirstBank based on the valuations twice per month (semi-monthly) of the existing collateral.  *See* Credit Support Annex, ¶ 3(a).  The regular valuations could also result in the *return* of excess collateral to FirstBank, if the market value of all posted credit support (securities and other collateral) exceeded the market value of all open swap transactions if they were then terminated, subject to any agreed minimum collateral balances.  In such event, FirstBank could immediately demand the return of all excess collateral (referred to in the CSA as the "Return Amount").  *Id.* at ¶ 3 (b).  FirstBank could replace the collateral at any time with substitute securities, without LBSF's consent.  *Id.* at ¶¶ 4(d), 13(e).  LBSF was also required to remit any interest payments and other distributions on the securities collateral to FirstBank within one business day after receipt.  Any unremitted distributions were added to the collateral balance.  *Id.* at ¶¶ 6(c)-(d).

35.    LBSF's sole legal relationship to the posted collateral – whether it acted itself or through its agents – was as a secured creditor.  Under the Credit Support Annex, LBSF as the "Secured Party" could either hold posted collateral itself or appoint an agent (a

- 12 -

"Custodian") to hold such collateral "for the Secured Party." Any collateral held by such agent would be deemed held "by the Secured Party." *See* Credit Support Annex, ¶ 6(b). The CSA also provided:

> All references in this Annex to the "Secured Party" will be to either party *when acting in that capacity* and all corresponding references to the "Pledgor" will be to the other party *when acting in that capacity* ….

*Id.*, ¶ 2(b) (emphasis added). Therefore, LBSF or its Custodian could hold any collateral posted by FirstBank solely when they were "acting in the capacity" of a secured party. The Swap Agreement did not authorize LBSF or its Custodian to hold such collateral in any other capacity.

36.     Title to the securities posted by FirstBank as collateral never transferred. The parties never contemplated that while the securities were held as collateral, title would transfer and the securities would become the property of either LBSF or its Custodian.[16]

37.     The Credit Support Annex further provided that LBSF or its Custodian could hold any collateral posted by FirstBank *provided* that LBSF had not defaulted under the Swap Agreement and that any "Custodian" was either a wholly owned subsidiary of Lehman Brothers Holdings Inc. ("LBHI") or a bank or trust in New York with at least $100 million in assets. *See* Credit Support Annex, ¶ 13(g)(i). Similarly, LBSF's right as a secured party to use or rehypothecate any collateral posted by FirstBank immediately ceased if LBSF defaulted under the Swap Agreement. *Id.*, ¶ 6(c); ¶ 13(g)(ii) (stating that CSA ¶ 6(c) applied to LBSF) .

38.     Under the Credit Support Annex, the right of the "Secured Party" – *i.e.*, either LBSF or the Custodian acting on its behalf – to use or rehypothecate the collateral did not affect any remedies of FirstBank under the Swap Agreement. LBSF (or its Custodian) was

---

[16] By comparison, an alternative version of the standard ISDA credit support annex *does* contemplate the transfer of title as credit support. *See* 1995 ISDA Credit Support Annex (Transfer – English Law). FirstBank and LBSF did

deemed to continue to hold *all* of the collateral regardless of whether it had used or rehypothecated any of it prior to termination. *Id.*, ¶ 6(c). One of FirstBank's remedies was that if a later termination was based on an LBSF default, the "Secured Party" (LBSF or the Custodian holding the collateral on LBSF's behalf) was required to immediately return *all* of the collateral to FirstBank. If it did not, FirstBank could, at its option, either set off any amounts it owed LBSF under the Swap Agreement against the collateral or withhold such amounts until all collateral was returned. If FirstBank elected to set off such amounts against the collateral, the "Secured Party" (LBSF or its Custodian) was required to return the *remaining collateral balance* to FirstBank – again, regardless of whether LBSF or its Custodian had previously used or rehypothecated any of it. *See* Credit Support Annex, ¶¶ 6(c), 8(b)-(c).

39.    LBI, as the appointed Custodian, was of course bound by all provisions of the Swap Agreement applicable to LBSF. The Custodian held all collateral solely in its capacity as an agent and custodian for LBSF as the secured party, and *not* as the Custodian's (or LBSF's) own property. *Id.* at ¶ 6(b) (all collateral held by a "Custodian" deemed to be held by the "Secured Party for which the Custodian is acting").[17]

40.    Although the Credit Support Annex stated that "Initially" the Custodian for LBSF was "Not applicable" (*see* CSA ¶ 13(g)(i)), the CSA expressly designated LBI as its agent for receiving any collateral transfers by FirstBank of book-entry securities. The CSA instructed FirstBank to transfer all such securities to:

> Chase for credit to the account of **Lehman Brothers Inc., as agent for Party A** [*i.e.*, LBSF] (in telegraphic abbreviation, CHASE NYC/LEHMAN, ABA #021000021)

not use that version.

[17]  *See also F. Garofalo Electric Co., Inc. v. New York Univ.*, 270 A.D.2d 76, 80, 705 N.Y.S.2d 327, 331 (N.Y. App. 1st Dept. 2000) (agent bound by express terms of principal's contract).

*See* Credit Support Annex, ¶ 13(l)(ii) (emphasis added) (the above-referenced account, the "LBI Collateral Account"). All of the securities which FirstBank posted as collateral under the Swap Agreement were sent to this account.

41.    LBI received any such collateral transfers solely as an agent of LBSF, and was the "Custodian" of LBSF for purposes of the Swap Agreement. *Id.*, ¶ 12 (defining "Custodian" as "having the meaning specified in Paragraphs 6(b)(i) and 13); *id.*, ¶ 6(b)(i) (defining "Custodian" as an agent appointed by a "Secured Party" to hold posted collateral). As noted above, LBI's role as "Custodian" for LBSF was limited to holding securities solely for the purpose of LBSF's security interest – *i.e.*, to act on behalf of LBSF as the "Secured Party" when LBSF was "acting in that capacity." *Id.*, ¶ 2(b).

42.    The Swap Agreement further provided that the address for all notices or communications to LBSF was:

> Lehman Brothers Inc.
> Derivative Finance Department
> 3 World Financial Center, 12th Floor
> New York, New York 10285-1200
>
> <u>Attention</u>:      Documentation Manager

*See* Schedule, Part 4, ¶ (a).[18]

43.    The 2008 amendment to the Swap Agreement was transmitted to FirstBank on letterhead with "LEHMAN BROTHERS" at the top and "LEHMAN BROTHERS INC." at the bottom. *See* Barreras Dec., ¶ 5 & Exh. B (capitalization in original).

44.    Similarly, the regular account statements sent to FirstBank had numerous references to "Lehman Brothers" and treated FirstBank's account as a "trading" account with its

---

[18] As noted above (*supra* n. 3 and accompanying text), LBI controlled LBSF as its subsidiary; apparently provided its own bank accounts and back office for LBSF's transactions; and, according to the Chapter 11 Debtors,

collateral held by "Lehman Brothers."  A sample account statement, dated September 1, 2008, is attached to the Barreras Declaration.  *See* Barreras Dec., Exh. C.  It shows twenty-three (23) Agency Securities issued by FNMA and GNMA, with a market value of approximately $63.2 million, that were held for the account of FirstBank.  The account statement, entitled a "DERIVATIVES–MTM STATEMENT," has "LEHMAN BROTHERS" at the top left of the first page, and a guide that includes the following:

> POSITIVE NUMBERS = DUE TO LEHMAN/COLLATERAL HELD
> BY LEHMAN

The account statement then includes two paragraphs of disclaimers by "Lehman Brothers" about the valuations in the statement – including references to "actual trades," the value of "a given position," "trade values," and "trade prices."  The statement then provides tables with various derivatives positions ("FID Swaps," "Structured," "Deal-Specific Breakdown (Scheduled)"), followed by a table entitled "Collateral Data," which lists the 23 Agency Securities (under columns titled "Coll Type," "Security ID," "Security Description," etc.) and their current market values (under a column titled "Market Value (USD)").  These values were presumably as of August 29, 2008, which is listed as the "COB VALUATION DATE" on the first page of the statement.  *Id.* (capitalization in original).  Although the account statements were nominally "from" LBSF (per the box on the first page), it is apparent based on the nature of LBI's operations that LBI generated and transmitted them to FirstBank.[19]

---

maintained all "customer accounts" for LBSF and other Lehman affiliates.

[19] As the Chapter 11 Debtors have admitted, LBI managed all "customer accounts" and acted as "paymaster," bank account holder and back office for LBSF and other Lehman affiliates, while LBSF and other affiliates were "thinly capitalized."  *See supra* n. 3 and accompanying text.

45.    FirstBank could also monitor its swap transactions and securities collateral online, by accessing a "Lehman Brothers" website that included the same information as its hard copy account statements.  *See* Barreras Dec., ¶ 9.

## FirstBank Terminates The Swap Agreement and Demands the Return of Its Securities

46.    On September 15, 2008, LBSF failed to make five swap transaction payments then due to FirstBank under the Swap Agreement.  *See* Barreras Dec., ¶ 10.  This constituted an "Event of Default" under the Swap Agreement, which gave FirstBank the immediate right to terminate it and declare an "Early Termination Date."  *See* Master Agreement, §§ 5(a)(i), 6(a).  It also terminated the right of LBSF or LBI, as its custodian, to either hold or use any collateral posted by FirstBank.  *See* Credit Support Annex, ¶¶ 6(b)(i), 13(g)(i).

47.    On September 16, 2008, FirstBank advised the derivatives department of Lehman Brothers by email (addressed to derivativessettlementsny@lehman.com and an employee with a "lehman.com" email address) that FirstBank had not received LBSF's swap payments, and demanded that those payments be made.  *See* Barreras Dec., ¶ 11 & Exh. D (September 16, 2008 email).

48.    LBSF never made the referenced swap payments to FirstBank.  *See id.* at ¶ 12.  On September 24, 2008, FirstBank emailed a notice to several Lehman Brothers employees (all with "lehman.com" email addresses) that based on the LBSF default, FirstBank was terminating the Swap Agreement, designating an "Early Termination Date" of September 26, 2008, and demanding the return of all securities pledged by FirstBank as collateral.  FirstBank also sent a hard copy of the termination notice to LBSF by mail on September 25, 2008.  *See* Barreras Dec., ¶ 13 & Exh. E.

49.    In 2009, FirstBank commenced discussions with a representative of the Chapter 11 Debtors on the amounts of the respective claims of FirstBank and LBSF against the securities collateral held by LBI.    They agreed that the Swap Agreement was terminated effective as of September 29, 2008, and that the value of the collateral posted by FirstBank as of that date was $63,911,488.89.    By the summer of 2009, they also narrowed their differences on the amount owed to LBSF to a $430,000 range (between $2,035,510.47 and $2,464,657.90).    For purposes of this Motion, FirstBank accepts the claim amounts proposed by the Lehman Chapter 11 Debtors:  a net balance owed to LBSF of $2,464,657.90 – equal to the value of the terminated swap transactions (owed to LBSF), less past due swap payments (owed to FirstBank) – leaving FirstBank the right to the remaining balance of its securities property, $61,446,830.99.    *See* Barreras Dec., ¶¶ 14-15 & Exh. F.

50.    While it pursued discussions with the Chapter 11 Debtors on their respective claims against the collateral, FirstBank learned that all or part of the collateral may have been transferred out of the LBI Collateral Account.    On July 24, 2009, FirstBank filed a Rule 2004 Motion in the Chapter 11 Case [Dkt. #4485 therein] (the "Rule 2004 Motion"), seeking discovery from LBSF and LBHI on the location of the collateral.    The Trustee was served with a copy of the Rule 2004 Motion [Dkt. #4496 in the Chapter 11 Case].    After further discussions with the Chapter 11 Debtors and counsel to the Trustee, during which counsel to the Trustee provided some of the information sought in the Rule 2004 Motion, the motion was adjourned without date [Dkt. #5085].    *See* Barreras Dec., ¶ 17; Honeywell Dec., Exhs. A-C.[20]

---

[20] FirstBank learned that LBI may have wrongfully transferred all or part of its securities collateral to Barclays Capital Inc. ("Barclays"), and has separately filed suit against Barclays in an effort to recover its property.  *See* FirstBank Puerto Rico v. Barclays Capital Inc., No. 09-civ-10317 (GBD), United States District Court, Southern District of New York, since transferred to this Court as Adv. No. 10-04103 (JMP) (the "Barclays Suit").  FirstBank has separate outside counsel for that pending litigation.  *See* Barreras Dec., ¶ 17.

Separate and apart from the Barclays Suit, and notwithstanding that suit, FirstBank holds a customer claim

- 18 -

**FirstBank Timely Files Its SIPA Customer Claim Against LBI**

51.    On November 7, 2008, this Court granted the Trustee's application for an administrative order governing LBI's SIPA liquidation, which included procedures for the filing of claims against LBI.  *See* Dkt. No. 241 (the "Bar Date Order").  Among other things, the Bar Date Order set January 30, 2009 as the "bar date for receiving the maximum possible protection for customer claims under SIPA."  Bar Date Order, p. 4.

52.    The Bar Date Order also set the following procedure for the "filing, determination, and adjudication of claims" under SIPA:

> (1)    **The Trustee will notify the claimant that the Trustee has determined that the claimant's claim has been disallowed in whole or in part** or has otherwise not been approved for satisfaction as filed. . . .  If a claimant is aggrieved by the determination of the Trustee, **the claimant shall be afforded the opportunity to have the matter heard by the court** as a contested matter under Rule 9014 of the Bankruptcy Rules, consistent with the procedures set forth herein.
>
> (2)    **The claimant shall request a hearing before this court** by filing a request in accordance with the instructions included with the Trustee's determination.  **The claimant shall file the request** . . . **within thirty days of the date on which the Trustee mailed his determination**. . . .

---

against LBI for the reasons set forth herein – namely, that FirstBank entrusted its securities to LBI for safekeeping, and has a direct claim against LBI as a broker-dealer under federal securities law and as a securities intermediary under the New York UCC.  FirstBank may pursue its remedies against LBI and against any other party owing it obligations as to its securities collateral.  *See* Credit Support Annex, ¶ 8(B)(i) (upon termination based on an LBSF default, FirstBank "may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party").

If LBI wrongfully transferred FirstBank's securities, FirstBank is entitled to a claim arising out of the sale or conversion of its securities, an additional basis for "customer" status, and any proceeds LBI received for the securities are "customer property," as discussed below.  *See infra* at ¶¶ 115-116 (citing the definitions of "customer" and "customer property").  FirstBank elected to file its claim directly against LBI, rather than LBSF, based on this history.  FirstBank had terminated the swap prior to LBSF's Chapter 11 petition (Oct. 3, 2008) and the securities were at all times FirstBank's property – held by LBI as a custodian obligated to return them directly to FirstBank – rather than part of LBSF's bankruptcy estate.  FirstBank has at all times reiterated its position that the securities *never* became part of LBSF's bankruptcy estate.  *See* Rule 2004 Motion, at ¶ 28 ("The Swap Collateral is not, and never has been, an asset of LBSF's Chapter 11 estate").

- 19 -

(3)     [regarding hearings and other claims procedures]

(4)     **If a claimant fails to request a hearing within thirty days of the mailing** of the Trustee's determination in accordance with the procedures established by this Court's order, or if the claimant fails to appear at the hearing, **then the Trustee's determination shall be final**.

Bar Date Order, pp. 3-4 (emphasis added).

53.     In accordance with the Bar Date Order, on January 30, 2009, FirstBank filed its Customer Claim against LBI, for the return of all of its securities collateral held at LBI. The filing confirmation for the Customer Claim lists the claim number (800003257), FirstBank as the claimant, its representative (Lawrence Odell, its in-house counsel), and its mailing address in San Juan, Puerto Rico. The confirmation also lists the twenty-three (23) Agency Securities comprising the securities collateral held at LBI. The end of the confirmation lists the "Preparer and Signature Information," with the name and address of FirstBank's then-counsel, Clifford Chance US LLP ("Clifford Chance"). *See* Barreras Dec., ¶ 18 & Exh. G.

**FirstBank Files Its Substitution Of Counsel and Notifies the Trustee**

54.     FirstBank subsequently retained K&L Gates LLP ("K&L Gates") to replace Clifford Chance as FirstBank's counsel in this SIPA proceeding. On August 7, 2009 [Dkt. #1370], FirstBank filed and served a "Notice of Appearance and Substitution of Counsel" in this proceeding, notifying the Court and all parties in interest that K&L Gates had replaced Clifford Chance as FirstBank's counsel of record, and that all notices in the SIPA proceeding and any related proceeding should thereafter be served on FirstBank by delivering copies to K&L Gates at the mailing address specified. *See* Honeywell Dec., ¶ 7 & Exh. D (the "Substitution of Counsel").

55.     The electronic filing receipt for the Substitution of Counsel shows that the Trustee received electronic notices of the filing.  *See* Honeywell Dec., ¶ 8 & Exh. E, pp. 4-5 (showing electronic service on three attorneys at Hughes Hubbard & Reed LLP).

56.     On August 8, 2009, FirstBank also mailed a hard copy of the Substitution of Counsel to the Trustee.  On August 11, 2009, K&L Gates filed an Affidavit of Service confirming such service [Dkt. #1437].  *See* Honeywell Dec., ¶ 9 & Exh. F (Exhibit A, first page of addresses, showing service on Hughes Hubbard & Reed LLP).

57.     FirstBank also electronically filed a substitution of counsel in the Chapter 11 Case in July 2009 (along with the Rule 2004 Motion), replacing Clifford Chance with K&L Gates as its counsel of record in the Chapter 11 Case, and mailed a hard copy of the substitution to the Trustee [Dkt. ## 4588, 4693 in the Chapter 11 Case].  *See id.* at ¶ 10 & Exhs. G-H.

58.     Since the above substitutions of counsel were filed, neither FirstBank nor K&L Gates has received any communication from the Trustee regarding FirstBank's Customer Claim.  *See* Barreras Dec., ¶ 20; Honeywell Dec. ¶ 11.

**In March 2012, FirstBank Learns That The Trustee Summarily Denied Its Customer Claim in September 2010**

59.     On or about March 19, 2012, counsel for Barclays gave counsel representing FirstBank in the Barclays Suit[21] a copy of the Trustee's Denial Notice, dated September 15, 2010.  *See* Barreras Dec., ¶ 21 & Exh. H.  This was the first time that FirstBank, K&L Gates or FirstBank's counsel in the Barclays Suit learned that the Trustee had made a determination on FirstBank's Customer Claim.  *See id.* at ¶ 22.

---

[21] *Supra* n. 20.

60.    The Trustee's Denial Notice was not sent to FirstBank.  Instead, it was addressed to FirstBank care of ("C/O") Clifford Chance, its former counsel, at Clifford Chance's New York address.  *See id.* at Exh. H, p. 1.

61.    The Trustee's Denial Notice merely stated that the Trustee denied the FirstBank Customer Claim (number 800003257) because it was a "duplicate and/or amendment" of the Lehman Customer Claim filed by LBSF (number 900006430).  *See id.* at Exh. H, p. 1. The notice provided no explanation of how FirstBank's claim was a "duplicate and/or amendment" of LBSF's claim.  It only stated that the Lehman Customer Claim had been converted to a general creditor claim, and that FirstBank and LBSF would receive further notice on the treatment of that general creditor claim.  *Id.* at p. 2.[22]

62.    The Trustee has never mailed or otherwise served the Trustee's Denial Notice or any other notices regarding FirstBank's Customer Claim on FirstBank or its counsel of record in this proceeding, the Chapter 11 Case or any other proceeding.  *See* Barreras Dec., ¶ 20; Honeywell Dec., ¶ 13.

63.    On April 9, 2012, FirstBank, through K&L Gates as its counsel, sent the Trustee a letter advising that: (a) FirstBank had never received the Trustee's Denial Notice, until Barclays' outside counsel in the Barclays Suit gave a copy to FirstBank's outside counsel in that proceeding; (b) FirstBank objected to the Trustee's characterization of the FirstBank Customer Claim as a duplicate or amendment of the Lehman Customer Claim; and (c) FirstBank therefore requested that the Trustee withdraw his denial and determine the validity of the FirstBank Customer Claim as a separate claim.  *See* Barreras Dec., ¶ 23 & Exh. I (the "April 9 Letter").

---

[22] The Chapter 11 Debtors have objected to the treatment of the Lehman Customer Claim as a general creditor claim.  *See* Objection of Lehman Brothers Holdings Inc. and Certain of Its Affiliates to the Trustee's Determination of Claims, filed herein on Sept. 28, 2011 [Dkt. # 4584], at Exhibit A (listing over 360 "Disputed Customer Claims," including the Lehman Customer Claim).

64.     To date, the Trustee has not responded to FirstBank's April 9 Letter.  *See* Barreras Dec., ¶ 24; Honeywell Dec., ¶ 14.

65.     On April 20, 2012, the Trustee filed his Seventh Interim Report with the Court.  Among other things, the Seventh Interim Report stated that the Trustee and the bankruptcy estates for the Chapter 11 Debtors had reached an agreement in principle to resolve all claims among them, including $6 billion worth of customer claims filed by the Chapter 11 Debtors against LBI.  *See* Seventh Interim Report, pp. 10-11.  The Chapter 11 Debtors had previously objected to the Trustee's denial of the Lehman Customer Claim.[23]  Upon information and belief, the referenced settlement presumably includes the Lehman Customer Claim.

66.     In light of the Seventh Interim Report and the Trustee's failure to respond to its April 9 Letter, FirstBank, through K&L Gates as its counsel, sent letters to the Trustee and counsel for the Chapter 11 Debtors on June 7, 2012, reiterating the need to correct the Trustee's error and proposing a consensual resolution of this matter.  *See* Barreras Dec., ¶ 24.[24]

67.     To date, the Trustee and the Chapter 11 Debtors have not responded to FirstBank's inquiries and attempts at settlement.  *See* Barreras Dec., ¶ 25; Honeywell Dec., ¶ 14.


## **ARGUMENT**

## I.     **FirstBank Is Entitled To Reconsideration of the Trustee's Denial of Its Customer Claim Under Section 502(j) of the Bankruptcy Code and Bankruptcy Rule 9024**

68.     FirstBank is entitled to relief from the Trustee's summary denial of FirstBank's Customer Claim under Section 502(j) of the Bankruptcy Code and Rule 9024 of the

---

[23] *Id.*

[24] The letters sent to the Trustee and counsel to the Chapter 11 Debtors were marked as privileged settlement discussions.  *See* Barreras Dec., ¶ 24.

Federal Rules of Bankruptcy Procedure.  Section 502(j) provides that a disallowed claim may be reconsidered for cause "according to the equities of the case."  Bankruptcy Rule 9024 applies Section 502(j) to bankruptcy proceedings.  *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at *4.  Bankruptcy Rule 9024 applies to this SIPA proceeding pursuant to the SIPA statute.  *See* 15 U.S.C. §§ 78eee(b)(2)(A)(iii), 78fff(b).[25]

69.    Under Bankruptcy Rule 9024, Rule 60 of the Federal Rules of Civil Procedure applies to cases under the Bankruptcy Code with certain exceptions, including that a motion "for reconsideration of **an order allowing or disallowing a claim against the estate entered without a contest**" is not subject to the one-year limitation period of Rule 60(c) (emphasis added).

70.    The Trustee's Denial Notice is a final "judgment" or "order" subject to relief, because this Court has ordered that the Trustee's determination of a claim "shall be final" if a claimant fails to request a hearing within the 30-day period prescribed by the Bar Date Order.  Bar Date Order, p. 4.  The Trustee's determination, as effected by the Bar Date Order, is thus an "order allowing or disallowing a claim against the estate entered without a contest."  *See* Bankr. R. 9024.[26]

71.    The judgment on FirstBank's claim was "entered without contest" because FirstBank was not provided any notice of the Trustee's Denial Notice and thus had no

---

[25] Alternatively, FirstBank seeks relief under Bankruptcy Rule 3008, which permits a party to "move for reconsideration of an order allowing or disallowing a claim against the estate," after which the court "after a hearing on notice shall enter an appropriate order."  *See* Bankr. R. 3008.  Courts apply this standard in the same manner as under Bankruptcy Rule 9024.  *See In Re Enron Corp.*, 352 B.R. 363, 366-67 (Bankr. S.D.N.Y. 2006) (motions for reconsideration under Bankruptcy Rules 3008 and 9024 are substantively analyzed as if they were either Rule 59 or Rule 60 motions under the Federal Rule of Civil Procedure).

[26] FirstBank is aware that the Court has entered orders "expunging" claims, on the motion of the Trustee based on his prior denial of those claims.  As of the date of this Motion, FirstBank has not been served with any such motion seeking to expunge its Customer Claim.   *See* Barreras Dec., ¶ 20.  Nor has it found any such motion in a review of the docket of this proceeding.  *See* Honeywell Dec., ¶ 12.

opportunity to object. *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at \*4 (order disallowing and expunging a claim was "entered without contest" because the claimant was not provided notice of the related claim objection).

72.     FirstBank seeks relief under three subsections of Rule 60(b):

(i)     Rule 60(b)(1) ("mistake, inadvertence, surprise, or excusable neglect"), because FirstBank's failure to timely appeal the Trustee's Denial Notice was not willful, FirstBank has a meritorious SIPA "customer" claim, and the Trustee would not suffer prejudice from the granting of this motion;

(ii)    Rule 60(b)(4) ("the judgment is void"), because the failure to serve FirstBank with the Trustee's Denial Notice violated FirstBank's due process rights; and

(iii)   Rule 60(b)(6) ("any other reason that justifies relief"), because this case presents extraordinary circumstances in which FirstBank's otherwise valid SIPA customer claim might be eliminated through no fault of its own.

**A.     FirstBank is entitled to relief under Rule 60(b)(1), because its failure to timely appeal the Trustee's Denial Notice was not willful, FirstBank has a meritorious "customer" claim, and the Trustee will not suffer any undue prejudice**

73.     Courts in the Second Circuit review a motion to reconsider a claim disallowance under Rule 60(b)(1) based on three factors: (1) whether the failure to respond was willful; (2) whether the movant has a legally supportable defense to the claim disallowance; and (3) the amount of prejudice to the non-movant if the motion is granted. *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at \*4, *citing American Alliance Ins. Co.,* 92 F.3d at 59.

74.     The <u>first factor</u> involves conduct beyond negligence or carelessness, with bad faith conduct weighing heavily against a movant. *Id.* at \*4. The <u>second factor</u> means a

- 25 -

defense that is "meritorious" – *i.e.*, "good at law so as to give the factfinder some determination to make" – and "need not be ultimately persuasive at this stage." *Id.* at *5, *quoting American Alliance*, 92 F.3d at 61.   In the context of a disallowed bankruptcy claim, this factor means a claim that has prima facie validity under Bankruptcy Rule 3001(f).  *Id.* at *5.[27]  Under the <u>third factor</u>, "mere delay is not sufficient to demonstrate a sufficient level of prejudice."  *Id.* at *6, *citing Davis v. Musler*, 713 F.2d 907, 916 (2nd Cir. 1983).

75.    The Second Circuit's policy is a strong preference for a court to review the underlying dispute on the merits:

> There is, however, a strong preference that courts resolve disputes on their merits. . . .  Indeed, **courts resolve any doubts in favor of the movant in order to increase the likelihood that disputes will be resolved on their merits**.

*Id.* at *4 (citations omitted) (emphasis added), *citing Brien v. Kullman Indus., Inc.*, 71 F.3d 1073, 1077 (2nd Cir. 1995) and *Pecarsky v. Galaxiworld.Com Ltd.*, 249 F.3d 167, 172 (2nd Cir. 2001).

76.    Under the Second Circuit's standard, FirstBank is clearly entitled to relief under Rule 60(b)(1).  FirstBank's failure to timely appeal the denial was not willful; FirstBank has a meritorious SIPA "customer" claim;[28] and the Trustee will not suffer any undue prejudice if FirstBank's motion is granted.  All that FirstBank seeks is an opportunity to present the merits of its Customer Claim to the Court.

77.    On facts in the *Enron* case very similar to the facts here, Judge Gonzalez granted a motion to reconsider a claim disallowance under Rule 60(b)(1), over two years after he had entered an order disallowing and expunging the claim, because: (i) the claimant had not been served with the claim objection, despite having properly filed a notice with the court of its

---

[27] Bankruptcy Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

acquisition of the claim; (ii) the debtor's claims agent instead sent the claim objection to the address of a third party asserting an interest in the claim (the IRS); (iii) upon discovering the claim disallowance, the claimant promptly contacted the debtor's counsel to try to reach a consensual resolution; (iv) the claimant had a prima facie valid claim, based on documentation filed with the claim; and (v) the debtor's estate had not yet made a distribution to the IRS based on its asserted interest in the claim. The *Enron* court took particular notice of the claimant's effort to reach a consensual resolution, which it considered a positive, rather than a negative, factor in its consideration of Rule 60(b)(1) relief:

> BOC's **initial efforts to diligently resolve the dispute without court intervention** should not be counted against it. Therefore, the Court finds that minimal, if any, prejudice will inure to the Debtors upon the granting of BOC's motion for reconsideration.

*Id.* at *6 (emphasis added).

78.     FirstBank's situation is almost identical to the facts in *Enron*: (i) it was not served with the Trustee's Denial Notice, despite having properly provided its mailing address in its filed claim and the address of its new counsel in a Substitution of Counsel filed with the Court and served on the Trustee, *supra*, ¶¶ 53-67; (ii) the Trustee or its claims agent delivered the Trustee's Denial Notice to the wrong address, that of FirstBank's former counsel, *id.* at ¶ 60; (iii) upon discovering the Trustee's denial of its claim, FirstBank promptly contacted both the Trustee and the Chapter 11 Debtors' counsel to try to reach a consensual resolution, *id.* at ¶¶ 63-67; (iv) FirstBank has a meritorious SIPA "customer" claim based on over $63 million in securities that it entrusted to LBI for safekeeping, which it listed in detail in its filed claim, *id.* at ¶ 53, and *infra*, Part II; and (v) the Trustee has yet to make any distributions in this proceeding,[29] including

---

[28] The substantive merits of FirstBank's "customer" claim are addressed *infra* at Part II.

[29] Trustee's June 7, 2012 Press Release (stating the Trustee's "intention to make a substantial interim distribution as

on the Lehman Customer Claim – which apparently asserts an interest in FirstBank's securities, based on the Trustee's assertion that FirstBank's Claim is a "duplicate and/or amendment" of the Lehman Customer Claim.  *See supra*, ¶ 61.

79.     In addition, there are other claim disputes pending before the Court that may impact the Court's views of FirstBank's Customer Claim, so there is no prejudice to the Trustee if the Court considers the merits of FirstBank's Customer Claim as well.  The issue of whether a counterparty to a repo or derivative contract is entitled to "customer" status is at issue in at least two other claim disputes in this proceeding: (1) the Cardinal/Oak Hill claim dispute, where participants in pre-paid forward ISDA contracts have demanded the return of their excess collateral and filed a motion to intervene in the Customer Claim Objection, now set for hearing on August 15, 2012;[30] and (2) the Hudson City/WesternBank/Doral claim dispute, where a group of repo participants has objected to the Trustee's denial of their customer claims and are currently engaged in discovery with the Trustee, with a final hearing to be set by November 21, 2012.[31]

80.     FirstBank submits that its effort to protect its due process right to a hearing on its Customer Claim will neither unduly prejudice nor delay the Trustee's efforts to complete LBI's liquidation.  Even if the Trustee might have to undertake some effort in terms of having to address FirstBank's Customer Claim, this is not sufficient prejudice for purposes of Rule 60(b)(1) – particularly where the Trustee never gave FirstBank a chance to defend itself in the first place.  As the court stated in *Enron*:

---

soon as it is possible to do so, with a goal of before the end of the year").

[30] *See* Cardinal/Oak  Motion [Dkt. #4634] and the most recent notice of adjournment [Dkt. #5132].

[31] *See* Trustee's Repo Motion [Dkt. #5007] and the Repo Scheduling Order [Dkt. #5162].

Any potential prejudice experienced by the Debtors in having to expend time and effort arguing against such a result [*i.e.*, the merits of the claim], is minimized by the fact that BOC never received notice of the 33rd Objection, and thereby, was **not given the opportunity to attempt to protect any right it had to a distribution**.

*Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at *6 (emphasis added).

81.    FirstBank fulfills the three factors for a motion for reconsideration of a claim disallowance under Rule 60(b)(1), and requests a hearing before this Court on the merits of its Customer Claim.

**B.    The Trustee's Denial Notice is void under Rule 60(b)(4)**

82.    The Trustee's Denial Notice is void under Rule 60(b)(4) because the Trustee never notified either FirstBank or its counsel of record of the denial, thus violating FirstBank's due process rights.  As the Supreme Court has recently held, Rule 60(b)(4) applies "where a judgment is premised . . . **on a violation of due process that deprives a party of notice or the opportunity to be heard**."  *United Student Aid Funds, Inc. v. Espinosa*, --- U.S. ---, 130 S. Ct. 1367, 1377 (2010) (emphasis added); *see also Dynamic Changes Hypnosis Center, Inc. v. PCH Holding, LLC*, 306 B.R. 800, 809-10 (E.D. Va. 2004) (Rule 60(b)(4) relief is appropriate where "the circumstances cross over the line from mere error to error that violates the due process clause of the Fifth Amendment").

83.    The Seventh Circuit's decision in *Grun v. Pneumo Abex Corporation* is instructive.  163 F.3d 411 (7th Cir. 1998).  There, Grun sued Pneumo Abex for breach of a severance agreement and the parties engaged in extensive discovery, during which Grun's counsel appeared at all scheduled court conferences and complied with all court orders.  *Id.* at 415, 424.  When the court set a trial date, however, "no one appeared" because "neither side received notice of the trial date" due to a courthouse error.  *Id.* at 417.  Nevertheless, the trial

- 29 -

court dismissed Grun's case for failure to prosecute and adhered to that ruling when, almost three years later, Grun finally learned of the dismissal and sought relief from it under Rule 60(b)(4). *Id.* at 417-18. The Seventh Circuit reversed, reinstating the case and ruling that the dismissal was "void under Rule 60(b)(4) because it denied Grun due process," since "Grun's failure to appear at a trial of which he never had notice [was] due exclusively to courthouse errors," and not his own. *Id.* at 424.

84. Similarly, FirstBank and its counsel complied with all court orders by timely filing its Customer Claim and Substitution of Counsel. *See supra*, ¶¶ 53-57. But its compliance was nullified by the Trustee's error in serving the Trustee's Denial Notice on the wrong address. *Id.* at ¶ 60. As in *Grun*, FirstBank's failure to contest the Trustee's Denial Notice was due exclusively to a service error, which denied FirstBank due process by depriving it of an opportunity to contest the denial of its Customer Claim before this Court.

85. Accordingly, the Trustee's Denial Notice is void under Rule 60(b)(4) and FirstBank is entitled to relief from it in the form of a hearing on the merits of its Customer Claim.

C. **FirstBank is entitled to relief from the Trustee's Denial Notice under Rule 60(b)(6) because this case presents exceptional circumstances**

86. FirstBank is further entitled to relief under Rule 60(b)(6)'s catch-all provision – granting reprieve from a judgment or order for "any other reason that justifies relief" – because the Trustee's failure to notify FirstBank of the denial of its Customer Claim prevented FirstBank from either challenging the denial in this Court or appealing it to the District Court. *See* Fed. R. Civ. P. 60(b)(6); *Dynamic Changes*, 306 B.R. at 811 n.18 (noting that "courts have granted relief [under Rule 60(b)(6)] when the losing party fails to receive notice of the entry of judgment in time to file an appeal") (internal quotation omitted).

87.    Courts may amend a prior order pursuant to Rule 60(b)(6) "only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). But courts have found such "exceptional circumstances" where a party fails to receive proper notice of a lawsuit or the entry of a judgment through no fault of its own. *See, e.g., LaManna v. Concord Mortg. Corp.*, 244 F.R.D. 148, 150 (N.D.N.Y. 2007) (granting Rule 60(b)(6) relief because the defendant "did not ignore the Complaint, but rather had no idea that the Complaint had been filed"); *Primus Automotive Fin. Servs., Inc. v. Otto-Wal, Inc.*, 284 F. Supp. 2d 845, 848 (N.D. Ohio 2003) (granting Rule 60(b)(6) relief because "[n]o fault whatsoever" could be attributed to the cross-defendant who "did not receive notice of the application for judgment or its entry . . . .").

88.    Here, FirstBank timely filed its Customer Claim and promptly notified the Trustee of its Substitution of Counsel, but the Trustee never served the Denial Notice on FirstBank. Instead, FirstBank learned of the denial by accident eighteen (18) months after the Trustee issued the Denial Notice, long after the time to challenge it had passed. *See supra*, ¶¶ 51-53, 59-60. Because FirstBank is without fault and because, as set forth below, it has a valid customer claim for almost $62 million in securities that it entrusted to LBI for safekeeping, this case presents the kind of "exceptional circumstances" justifying Rule 60(b)(6) relief.

## II.    **FirstBank Has a Valid Customer Claim Against LBI For Government Securities That FirstBank Entrusted to LBI For Safekeeping**

89.    For purposes of this motion, FirstBank need only show that its Customer Claim has prima facie validity under Bankruptcy Rule 3001(f) – *i.e.*, that it properly filed its Customer Claim in compliance with the Bankruptcy Rules and the orders of this Court. *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at *5. FirstBank need not at this point provide an "ultimately persuasive" case for its Customer Claim, but need only show that its

- 31 -

Customer Claim is "meritorious," or "good at law so as to give the factfinder some determination to make." *Id.*, quoting *American Alliance*, 92 F.3d at 61.

90.    FirstBank's Customer Claim has prima facie validity, because it was timely filed in compliance with the Bar Date Order.  However, in order to show this Court that its claim has substantive merit, FirstBank sets forth the merits of its "customer" claim against LBI in this Part.

91.    As detailed above, FirstBank entrusted over $63 million of its own securities to LBI, a registered broker-dealer, for safekeeping and for use as collateral for swap transactions with LBSF, LBI's corporate affiliate (an "unregulated" entity, in securities industry terms).  Under the plain terms of the SIPA definition of "customer" – and consistent with the policies underlying the federal and state securities laws – FirstBank was clearly a "customer" entitled to the protection of its securities property.

**A.    LBI acted as the collateral custodian in a tri-party custodial arrangement among FirstBank, LBI and LBSF**

92.    The "tri-party" custodial arrangement used by LBSF and LBI is common in the securities industry, and is analogous to a securities customer working with an "introducing firm" that uses a "clearing firm" to hold the customer's securities and effect the customer's trading instructions.[32]  Moreover, LBI acted as the collateral custodian, bank account holder and back office for LBSF and other Lehman affiliates as part of its business model in the ordinary course of LBI's business as a registered broker-dealer.  The Chapter 11 Debtors have admitted that LBI maintained the "customer accounts" for its Lehman Brothers affiliates and "functioned

---

[32] *See SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 239 B.R. 698 (S.D.N.Y. 1999):

> Introducing firms are usually broker-dealers without the financial resources or expertise to clear their own securities.  Clearing firms are broker-dealers which, by agreement with one or more introducing firms, settle and complete trades.

as a broker/dealer registered with and regulated by the SEC." *See* Chapter 11 Disclosure Statement, at 20. LBI's assets and employees were used to conduct the business transactions of LBSF and other affiliates, for which LBI acted as the "paymaster," and LBI maintained "adequate capital levels" while "unregulated" affiliates were "thinly capitalized." *Id.* at 62-63. LBSF also apparently settled all of its derivatives transactions into bank accounts held by LBI. *See* Cash Management Motion, at ¶ 15. Functionally, LBI served as the "clearing firm" for the securities transactions of the customers of LBSF and other Lehman affiliates.

93.    Tri-party custodial arrangements are also common in swap transactions and reflected in the terms of standard ISDA swap agreements. The Swap Agreement used by FirstBank and LBSF was one of the standard ISDA forms – for "Multicurrency-Cross Border" swap transactions – and attached the standard ISDA credit support annex, which has various provisions for a "Custodian" to hold collateral for either party when such party acts as a "Secured Party" under the agreement. *See supra*, ¶¶ 30-45 and Barreras Dec., Exhs. A-1, A-2.

94.    LBI clearly served as the "Custodian" for LBSF, the "Secured Party" under the Swap Agreement. The Credit Support Annex expressly directed FirstBank to transfer its securities collateral to LBI "as agent for" LBSF. When the agreement was terminated, LBI was holding 23 "Agency Securities" (issued by FNMA and GNMA) worth over $63 million in market value. *See supra*, ¶¶ 30-45, 49.

95.    LBI's sole role in holding such securities was to serve as the collateral custodian for the security interest of LBSF, as the Swap Agreement makes clear. LBI, as the agent and collateral custodian of LBSF, was bound by all provisions of the Swap Agreement, including the obligation to return *all* collateral to FirstBank upon a termination based on an LBSF default – or, at FirstBank's election, to return the net collateral balance to FirstBank after

- 33 -

FirstBank set off any amounts it owed to LBSF. This return obligation applied regardless of whether LBSF, or LBI acting as its agent, had previously used or rehypothecated any of the collateral. *Id.* at ¶¶ 38-39.

### B. **LBI agreed to serve as a "securities intermediary" for the benefit of FirstBank and LBSF, for purposes of Articles 8 and 9 of the New York UCC**

96.    Since the Swap Agreement provided that LBI held FirstBank's securities solely as collateral for LBSF's security interest – and expressly incorporated New York law – the provisions of Articles 8 and 9 of the New York UCC apply.

97.    Article 8 (on indirect securities holding) and Article 9 (on secured transactions) govern all rights and obligations of FirstBank, LBSF and LBI with respect to the securities collateral, as supplemented by any federal securities laws and regulations applicable to securities holdings and to LBI's duties as a registered broker-dealer. *See* New York UCC, §§ 8-106 and 9-106 ("control" of securities); § 8-509 (duties covered by other laws and regulations). *See also SEC v. Credit Bancorp, Ltd.*, 386 F.3d at 447 (UCC Article 8 "sets forth rules governing the rights and obligations of parties in connection with the issuance and transfer of stocks, bonds, and other forms of debt commonly traded by investors"); *Scher Law Firm v. DB Partners I, LLC*, 27 Misc.3d 1230(A), 2010 WL 2219610 at * 6 (N.Y. Sup. 2010) (UCC Article 8 applies where a broker-dealer holds financial assets, such as stocks and bonds, in securities accounts that have been pledged to another entity as collateral).

98.    It is well-established that in federal bankruptcy and SIPA proceedings, the nature and extent of property interests are governed by applicable state law.[33] The securities

---

[33] *See AmeriCredit Financial Services, Inc. v. Tompkins*, 604 F.3d 753, 757 (2nd Cir. 2010), *citing Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979):

> As the Supreme Court has stated, "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such

collateral at issue here is no different: the rights of FirstBank, LBSF and LBI in the securities are governed by the New York UCC.

99.     Under Articles 8 and 9 of the New York UCC, LBI served as the "securities intermediary" holding the collateral for the benefit of both FirstBank and LBSF: FirstBank as the "debtor" and "entitlement holder," and LBSF as a "secured party" and "purchaser." *See* New York UCC, §§ 1-201, 8-102 and 9-102 (definitions). *See also Scher Law Firm*, 2010 WL 2219610 at * 6 (under Article 8, a broker-dealer holding financial assets pledged by a client to its lender was the "securities intermediary," the client was the "entitlement holder," and the lender the "purchaser" of an interest in the assets).

100.    Article 8 defines an "<u>entitlement holder</u>" as

> a person **identified in the records of a securities intermediary** as the person having a security entitlement against the securities intermediary.

New York UCC at § 8-102(a)(7) (emphasis added).  It defines a "<u>security entitlement</u>" as "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5," *id.* at § 8-102(a)(17);[34] and a "<u>financial asset</u>" as including a security.  *Id.* at § 8-102(a)(9).  It defines "<u>securities intermediary</u>" as either a clearing corporation or

> a person, including a bank or **broker, that in the ordinary course of its business maintains securities accounts for others** and is acting in that capacity.

*Id.* at § 8-102(a)(14) (emphasis added).  And it defines a "<u>securities account</u>" as

---

> interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

Federal bankruptcy principles apply to this SIPA proceeding to the extent consistent with the SIPA statute.  *See* 15 U.S.C. §§ 78eee(b)(2)(A)(iii), 78fff(b).  *See also Bevill, Bresler*, 67 B.R. at 585 (applying state law in SIPA proceeding and related Chapter 11 proceeding, to determine "the legal character of repo and reverse repo transactions and [the parties'] respective property rights in the underlying securities").

[34] "Part 5" references UCC §§ 8-501 through 8-511, which specify the duties of a securities intermediary vis-à-vis an entitlement holder.

> an account to which a financial asset is or may be credited in accordance
> with an agreement under which **the person maintaining the account
> undertakes to treat the person for whom the account is maintained as
> entitled to exercise the rights that comprise the financial asset**.

*Id.* at § 8-501(a) (emphasis added).

101.    Under UCC Article 8, FirstBank's status as the owner of the securities

("security entitlements") clearly made it the "entitlement holder," with the power to issue

instructions ("entitlement orders")[35] to LBI and also to give LBSF the right to issue such

instructions in the event of a default.  As the Official Comment to Article 8 makes clear:

> A person may have an interest in a security entitlement, and may even
> have the right to give entitlement orders to the securities intermediary with
> respect to it, even though the person is not the entitlement holder. … [T]he
> control provisions in Section 8-106 and the related provisions in Article 9
> are designed to facilitate transactions in which a person who holds
> securities through a securities account uses them as collateral in an
> arrangement where the securities intermediary has agreed that if the
> secured party so directs the intermediary will dispose of the positions.  In
> such arrangements, **the debtor remains the entitlement holder but has
> agreed that the secured party can initiate entitlement orders**.

*Id.* at § 8-102, Official Comment, ¶ 7 (emphasis added).

102.    The New York UCC further makes clear that the "agreement" of LBI to

act as the securities intermediary, and to hold a "securities account" for FirstBank, need not be in

a signed writing:

> A securities account is a consensual arrangement in which the
> intermediary undertakes to treat the customer as entitled to exercise the
> rights that comprise the financial asset.  The consensual aspect is covered
> by the requirement that the account be established pursuant to agreement.
> The term **agreement is used in the broad sense** defined in Section 1-
> 201(3).  There is **no requirement that a formal or written agreement be
> signed**.

---

[35] Article 8 defines an "entitlement order" as "a notification communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement."  New York UCC § 8-102(a)(8).

*Id.* at § 8-501, Official Comment, ¶ 1 (emphasis added).  Section 1-201(3), in turn, defines

"agreement" as "the bargain of the parties in fact as found in **their language or by implication**

**from other circumstances including course of dealing or usage of trade** or course of

performance as provided in this Act (Sections 1-205 and 2-208)" (emphasis added).

> 103.    UCC Section 1-205 defines "course of dealing" as

> a **sequence of previous conduct** between the parties to a particular transaction which is fairly to be regarded as **establishing a common basis of understanding** for interpreting their expressions and other conduct.

*Id.* at § 1-205(1) (emphasis added).  And it defines "usage of trade" as

> any **practice or method of dealing having such regularity of observance in a place, vocation or trade** as to justify an expectation that it will be observed with respect to the transaction in question.  The existence and scope of such a usage are to be proved as facts.  If it is established that such a usage is embodied in a **written trade code or similar writing** the interpretation of the writing is for the court.

*Id.* at § 1-205(2) (emphasis added).  Section 1-205 further provides:

> A course of dealing between the parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware **give particular meaning to and supplement or qualify terms of an agreement**.

*Id.* at § 1-205(3) (emphasis added).[36]

> 104.    Based on the applicable legal standards, it is obvious that LBI "agreed" to

act as the securities intermediary for FirstBank and as the agent and collateral custodian for

LBSF's security interest, for purposes of Articles 8 and 9 of the New York UCC.  The original

Swap Agreement, executed in January 2007, specified LBI as the "agent" of  LBSF for purposes

of receiving collateral transfers from FirstBank.  Over the course of the agreement until its

---

[36] The language in § 1-201(3) on "course of performance" and its parenthetical reference to § 2-208 do not apply here, since they apply only to "sales" under UCC Article 2.  A "sale" is a passing of title for a price.  *See* New York UCC, § 2-106(1).  The title to the securities collateral for the Swap Agreement never passed from FirstBank, since it was transferred to LBI solely as collateral for the security interest of LBSF, as the Swap Agreement expressly

termination in September 2008, FirstBank sent all collateral transfers to an account apparently owned and controlled by LBI. *See supra*, ¶ 40. The specific instructions to FirstBank were to send all collateral transfers to an account at "Chase for credit to the account of **Lehman Brothers Inc., as agent for Party A** [*i.e.*, LBSF]." *See* Credit Support Annex, ¶ 13(l)(ii) (emphasis added). The Swap Agreement also defined the "Custodian" as an agent appointed by the "Secured Party" to hold all posted collateral, and expressly provided that LBSF's "Custodian" could be an LBHI subsidiary if LBSF was not then in default. *See* Credit Support Annex, ¶¶ 6(b)(i), 13(g)(i).

105.    Taken together, the language in the Swap Agreement and FirstBank's transfers of over $63 million in collateral to LBI – and LBI's continued holding of that collateral over the course of the Swap Agreement – were part of a course of dealing among FirstBank, LBI and LBSF that showed that LBI had agreed to act as an agent and "Custodian" for LBSF under the Swap Agreement.

106.    This course of dealing – *i.e.*, LBI as the collateral custodian in a "tri-party" custodial arrangement – is further shown by LBI's operations generally. Court filings in the Chapter 11 Case make clear that LBI served in this capacity for multiple Lehman affiliates and apparently for hundreds of thousands of derivatives transactions, including swaps. As detailed in court filings by the Chapter 11 Debtors, LBI held the "customer accounts" for the transactions of LBSF and other affiliates, served as the "paymaster" and registered broker-dealer for those transactions, and apparently settled all of LBSF's derivatives transactions into bank accounts held by LBI. *See supra*, ¶ 92 & nn. 3, 19. Given that the Chapter 11 Debtors were parties to

---

acknowledged. *See* Credit Support Annex, ¶¶ 1(b), 2 and 6.

"more than 906,000" derivatives contracts, including swap agreements,[37] it is reasonable to assume that LBI served as collateral custodian for literally thousands of swap agreements executed by LBSF.  It also reasonable to assume that, as with the Swap Agreement with FirstBank, most if not all of those swap agreements used standard industry forms issued by ISDA, which contain extensive provisions on the rights and duties of both the "Secured Party" and the "Custodian" when dealing with "Posted Collateral."

107.    In this context, the language and circumstances of the Swap Agreement – including the course of dealing among FirstBank, LBI and LBSF and the usage of trade in the securities and swaps industry (including standard ISDA forms) – show very clearly the "agreement" of LBI referenced in Section 8-501 of the New York UCC.  Namely, LBI agreed to maintain a "securities account" to hold securities posted by FirstBank as collateral under the Swap Agreement, and is thus a "securities intermediary" with respect to those securities.  *See* New York UCC, § 8-501(a) (definition of "securities account); § 8-102(a)(14) (definition of "securities intermediary").   The commentary to Article 8 makes clear that this usage of "securities account" is to be construed liberally and is based on the actual course of dealing among FirstBank, LBI and LBSF:

> Whether an arrangement between a firm and another person concerning a security or other financial asset is a "securities account" under [Article 8] depends on **whether the firm has undertaken to treat the other person as entitled to exercise the rights that comprise the security or other financial asset**.  Section 1-102, however, states the fundamental principle of interpretation that the Code provisions should be construed and applied to promote their underlying purposes and policies.  Thus, the question whether a given arrangement is a securities account should be decided **not by dictionary analysis of the words of the definition taken out of**

---

[37] Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts, dated Nov. 13, 2008 [Dkt. #2561 in the Chapter 11 Case], at ¶ 8; Debtors' Motion for an Order Approving Consensual Assumption and Assignment of Prepetition Derivative Contracts, dated Jan. 16, 2009 [Dkt. #2561 in the Chapter 11 Case], at ¶ 7.

**context, but by considering whether it promotes the objectives of Article 8** to include the arrangement within the term securities account.

….

In short, the primary factor in deciding whether an arrangement is a securities account is whether application of the Part 5 rules[38] is consistent with **the expectations of the parties to the relationship**.

*See* New York UCC, § 8-501, Official Comment, ¶ 1 (emphasis added).

108.    The facts show that LBI clearly undertook to hold FirstBank's securities solely as collateral under the Swap Agreement, with FirstBank remaining the owner and "Pledgor" and LBSF the secured party.  FirstBank certainly had a reasonable expectation, when it transferred over $63 million in securities to an account in LBI's name pursuant to express instructions in the Swap Agreement, and thereafter received regular account statements listing the same securities, that it had a "securities account" with LBI as to those securities.  *See supra*, ¶¶ 30-45.

109.    LBI also clearly undertook to serve as the "Custodian" under the Swap Agreement, for LBSF as the "Secured Party."  LBI is thus bound by all provisions in the Swap Agreement applicable to the "Custodian," and by extension (and New York agency principles) to all provisions applicable to LBSF as the "Secured Party."  *See F. Garofalo Elec.*, 270 A.D.2d at 80, 705 N.Y.S.2d at 331 (agent bound by express terms of principal's contract), *citing Ezrasons, Inc. v. American Credit Indem. Co.*, 257 A.D.2d 447, 448, 683 N.Y.S.2d 264, 266 (N.Y. App. Div. 1st Dept. 1999).

110.    In its dual role as securities intermediary and collateral custodian, LBI was required to comply with all duties of a securities intermediary under Article 8, including the duty to follow the transfer instructions ("entitlement orders") of FirstBank regarding the securities and

---

[38] The "Part 5 rules" reference UCC §§ 8-501 through 8-511, which specify the duties of a securities intermediary (*i.e.* LBI) with respect to securities it is holding for others, and the rights of an entitlement holder (*i.e.* FirstBank) with respect to such securities.

to make FirstBank whole for any securities improperly transferred. *See* New York UCC § 8-507-(b) (a securities intermediary is required to "reestablish" any securities that it improperly transferred).[39]

111.     The fact that FirstBank was entitled to – and did – assign the right to issue transfer instructions to LBSF as a default remedy to enforce LBSF's security interest did not change the underlying character of the tri-party relationship: (i) FirstBank as the owner ("entitlement holder"); (ii) LBSF as the secured party (and "purchaser"); and (iii) LBI as the securities intermediary holding the collateral the benefit of both of them.

112.     Among the remedies in the Swap Agreement that governed LBI's duties to FirstBank was LBI's obligation, as an agent and custodian for LBSF, to immediately return *all* collateral to FirstBank upon termination based on an LBSF default. *See* Credit Support Annex, ¶ 8(b)(iii).  A termination based on LBSF's default in fact occurred in September 2008, triggering the right of FirstBank to receive *all* of the securities held by LBI or, at FirstBank's option, to set off any amounts it owed LBSF against the securities balance, after which LBI was required to return *all remaining* securities to FirstBank. *Id.* at ¶¶ 8(b)(iv), 8(c).  In either case, LBI was legally obligated, under New York law, to return the securities collateral to FirstBank: either the entire balance (approximately $64 million) or the net amount calculated by FirstBank (approximately $62.5 million) based on the figures proposed by the Chapter 11 Debtors, which FirstBank is willing to accept for purposes of this motion.[40]

---

[39] *Cf.* Credit Support Annex, ¶¶ 6(c), 8(b)-(c) (duty to transfer all collateral to FirstBank upon a termination based on an LBSF default, regardless of any prior use or rehypothecation of the collateral).

[40] Even if the net amount owed to LBSF (approximately $2.5 million) is also deemed a "security entitlement" of LBSF in the securities held by LBI, and makes LBSF an "entitlement holder" with respect to that balance, the New York UCC provides that the respective claims of FirstBank and LBSF in the securities are *pro rata* property interests.  *See* New York UCC, § 8-503(b).  The maximum property interest of LBSF in the securities collateral held by LBI is thus approximately $2.5 million, as a matter of New York law.

This cap on LBSF's claim further confirms that the respective claims of FirstBank and LBSF in the

### C.    FirstBank was a "customer" of LBI

113.    As a matter of New York law, FirstBank had a direct property interest in the securities held by LBI, and LBI owed a duty directly to FirstBank to safeguard those securities.  LBI was obligated to make FirstBank whole for the *entire balance* of the securities, pursuant to the New York UCC and the express terms of the Swap Agreement.

114.    Coupled with the customer protection policies of the federal securities laws, it is inconceivable that FirstBank would not be treated as a "customer" with respect to over $63 million in securities that it entrusted to LBI for safekeeping.  FirstBank's securities at all times remained its *own property* and were delivered to LBI for the sole purpose of serving as *collateral* for FirstBank's swap transactions.

115.    SIPA, as in effect when this proceeding was commenced, defines a "customer" as:

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of **securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping**, with a view to sale, to cover consummated sales, pursuant to purchases, **as collateral security**, or for purposes of effecting transfer.   The term "customer" includes any person who has a claim against the debtor arising out of **sales or conversions of such securities**, and any person who has deposited cash with the debtor for the purpose of purchasing securities ….

15 U.S.C. § 78lll(2) (emphasis added).[41]

---

securities held by LBI are *distinct* property interests, and are not "duplicates" as claimed by the Trustee.  *See supra*, ¶¶ 96-112.  As a matter of New York law, incorporated into this proceeding by bankruptcy law, LBSF has a maximum claim of $2.5 million against LBI with respect to the securities – a claim legally based on its security interest – and FirstBank has a claim for the remaining $61.5 million balance – a claim legally based on its ownership interest.

This allocation and legal characterization was contractually agreed to by LBSF and LBI under the Swap Agreement.  *See* Credit Support Annex, ¶¶ 8(b)-(c).  The Trustee is bound by LBI's agreement to comply with the Swap Agreement, and is estopped from now disavowing the terms of that agreement.

[41] This Court has noted that the definition of "customer" in effect at the time this proceeding was filed applies.  *See*

116.    SIPA, as in effect when this proceeding was commenced, likewise defines "customer property" as

> [C]ash and **securities** (except customer name securities delivered to the customer) **at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer**, and the proceeds of any such property transferred by the debtor, **including property unlawfully converted**.  The term "customer property" includes …. (D) any other property of the debtor which, **upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers**, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

15 U.S.C. § 78lll(4) (emphasis added).[42]

117.    By the plain language of the SIPA statute, FirstBank is a "customer" of LBI.  LBI entrusted its securities to LBI, for "safekeeping" and "as collateral security," and LBI "received" and "held" them "in the ordinary course of its business as a broker or dealer." "Securities account" is not defined in either SIPA or the Bankruptcy Code, but the plain meaning of the term as well as its expansive interpretation under the New York UCC make clear that the well-documented holding by LBI of FirstBank's securities constituted a "securities account." *See supra*, ¶¶ 40-44 (regular account statements sent to FirstBank listed all of its securities transferred to LBI as "COLLATERAL HELD BY LEHMAN").

118.    Moreover, to the extent LBI improperly sold, transferred or converted FirstBank's securities, FirstBank's status as a "customer" is further confirmed since it has a

---

*In re Lehman Brothers Inc.*, --- B.R. ---, 2012 WL 2741226 at *4 n. 7 (Bankr. S.D.N.Y. July 10, 2012) (the "*Soft Dollar Decision*"); *In re Lehman Brothers Inc.*, 462 B.R. 53, 61 (Bankr.S.D.N.Y. 2011) (the "*TBA Decision*").

[   ] The Dodd-Frank Act, enacted July 21, 2010, made no substantive changes to the "customer" definition, except to confirm that account-holders in a portfolio margin program approved by the SEC are included.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, enacted July 21, 2010 (the "Dodd-Frank Act"), at Section 983 (entitled "Portfolio Margining"); SIPC, "The Dodd-Frank Bill Amends Sections of the Securities Investor Protection Act" (July 29, 2010), *available at*: http://www.sipc.org/Media/StatementsHill.aspx (describing the SIPA amendments).

[42] The Dodd-Frank Act also did not substantively change the definition of "customer property" except for a

- 43 -

claim "arising out of sales or conversions" of its securities.  Any proceeds received or to be received by LBI for the securities are likewise "customer property," since such proceeds resulted from the unlawful conversion of FirstBank's property and would have been set aside for customers had LBI complied with applicable laws and regulations, including the New York UCC.  The Trustee has reported extensive failures by LBI to comply with customer protection rules, and has argued for inclusion of any proceeds resulting from such non-compliance to be treated as "customer property."[43]

119.    Court rulings and SEC interpretations of "customer" status under SIPA confirm that FirstBank is entitled to customer protection.  This Court and other courts have emphasized that a fiduciary relationship of *entrustment* of cash or securities to a broker-dealer is the central factor to the determination of "customer" status.  *See, e.g., TBA Decision*, 462 B.R. at 61 ("The requirement that a creditor has entrusted cash or securities to the broker-dealer is 'critical' to the treatment of such creditor as a 'customer' under SIPA"); *Soft Dollar Decision*, 2012 WL 2741226 at *5 ("One of the primary purposes of SIPA is to return securities entrusted by investors to a financially troubled broker-dealer").  *See also In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 725 (Bankr. S.D.N.Y. 1998) ("in determining 'customer' status, we look to whether a particular transaction giving rise to a SIPA claim arose out of the type of fiduciary relationship generally characterizing the relationship between a broker-dealer and its customer").

---

conforming change regarding portfolio margining accounts.  *Id.*

[43] *See* Allocation Motions, *supra* n. 10 (reporting LBI's erroneous coding of customer accounts as non-customer accounts, alleged improper seizure by JPMorgan Chase of fully-paid customer property, and LBI's ongoing litigation with Barclays over which customer assets should have been transferred to Barclays, among other issues, which resulted in undercounting of the required "Reserve Account" and might result in shortfalls in customer property).  As noted above, *supra* n. 20, FirstBank believes that by transferring its securities collateral, LBI unlawfully converted FirstBank's securities property.

120.    Fiduciary entrustment of a client's property is the core consideration for SIPA protection.  Therefore, the entity actually *possessing* such property is the proper locus for SIPA customer claims.  *See also Stanford,* 2012 WL 2550485 at *4 ("customer" status requires showing that the SIPC member actually possessed the claimant's property and that the transaction contained "indicia of a fiduciary relationship between the claimant and the debtor," *quoting* 1-12 Collier on Bankruptcy, P 12.12).  *Cf. SIPC v. Stratton Oakmont, Inc.*, 229 B.R. at 279 (claimants were not "customers" of the debtor broker-dealer, an introducing broker, but would more than likely be "customers" of the clearing broker which held the claimants' securities in a "tripartite" custodial arrangement), *aff'd sub nom. Arford v. Miller*, 239 B.R. 698, 701 (S.D.N.Y. 1999).

121.    The SEC has similarly interpreted a SIPA "customer" claim to lie with the broker-dealer actually holding a customer's securities (the "clearing firm"), and *not* with the firm that introduced the customer to the transaction (the "introducing firm").  *See Stanford*, 2012 WL 2550485 at* 7-8, *citing* SEC Release No. 7383, 63 SEC Docket 1671 (Jan. 22, 1997) ("[A]s a legal matter, for purposes of the Securities Investor Protection Act of 1970 and the Commission's financial responsibility rules, **a customer is the customer of the clearing firm.**") (emphasis added); SEC Release No. 34-31511, 57 Fed. Reg. 56973, 56980 (Dec. 2, 1992) ("The Division [of Market Regulation] has interpreted the net capital rule and Rule 15c3-3 to require that, for the purposes of the [SEC's] financial responsibility rules and SIPC, **the introducing firm's customers should be treated as customers of the clearing firm.**") (emphasis added); Letter from Richard Ketchum, Director of the SEC's Division of Marketing Regulation, dated Jan. 14, 1985, to the New York Stock Exchange, National Association of Securities Dealers (NASD), American Stock Exchange and Chicago Board Options Exchange (same).  The policy

reasons for the SEC's interpretation are clear: to protect clients who entrust their securities to others by giving them a SIPA "customer" claim against the broker-dealer that actually holds them.

122.     Moreover, any regulated broker-dealer holding government securities is expressly subject to the Treasury Department's customer protection rules, which the broker-dealer may comply with by in turn complying with the SEC customer protection rules as to such government securities.[44]

123.     The court in *Bevill, Bresler* applied these customer protections – and SIPA "customer" status – to repurchase agreements that included a broker-dealer's custody of government securities.   The court found that brokerage clients who engaged in repos and reverse repos with the broker-dealer as its counterparty were "customers" under SIPA, due to both their literal coverage by the SIPA "customer" definition and the realities of their participation in the market for government agency securities.   Specifically, the court found that: (1) the clients fell within the "customer" definition, because the broker-dealer received their securities for safekeeping and use in future repo transactions, and they held "securities accounts" with the broker-dealer because it maintained computerized accounts listing all of their repo and reverse repo transactions "in the same manner as outright purchases and sales";[45] and (2) the repos and reverse repos were a form of "investment, trading or participation in the securities market." *Bevill, Bresler*, 67 B.R. at 599-600.   Indeed, the court found that the repos and reverse repos – which included GNMA and FHLB securities and U.S. Treasury bills – were "an integral part of the trading in the government securities market" and "instrumental in making and maintaining

---

[44] *See* Treasury Customer Protection Rules, 17 C.F.R. § 403.1.

[45] The client accounts in *Bevill* were also subject to margin calls based on fluctuations in their market value.  67 B.R. at 572, 585.

the broadest possible primary and secondary markets for government and agency securities." *Id.*

at 600-601.[46]

124.    The *Bevill* court dispensed with the arguments of the liquidating trustee

and SIPC that the repo investors relied solely on the credit of the broker-dealer and were not the

type of investors intended to be protected by SIPA:

> Implicit in their arguments is the assumption that only unsophisticated
> individual investors who have engaged in straight purchase and sale
> transactions in the retail securities market through the bankrupt dealer are
> protected under SIPA.  Such a narrow reading of the statute and its
> legislative history is unsupportable.

*Id.* at 600.  Unlike stock lenders and others who contribute to a broker-dealer's capital and rely

on its "ability . . . to repay a business loan," the repo and reverse repo participants in *Bevill* were

"investing and trading in securities through customer accounts maintained for them" by the

broker-dealer.  *Id.* at 602.[47]

---

[46] *See also* SIPC Memorandum, at 14-17 (describing the goal of the GSA and Treasury Customer Protection Rules,
enacted after *Bevill*, as to encourage participation in the government securities market).  As SIPC stated in a separate
claim dispute in this proceeding, a main objective of the GSA was to protect the liquidity of government securities
by protecting the *custody* of government securities.  SIPC quoted the Senate Report for the GSA, which stated that

> [a]fter the failures of ESM and Bevill Bresler, some investors in government securities
> withdrew from the market.  The loss of participants in the market has a negative effect on
> the liquidity of the market and thereby may adversely affect the Treasury's ability to
> finance the national debt.

*Id.* at 15.  As a result, the safeguards of the GSA and Treasury Customer Protection Rules "**apply to government
securities that are held in custody, in safekeeping accounts, at the broker-dealer**."  *Id.* at 16 (emphasis added).

[47] The *Bevill* court also noted that "safekeeping of securities" in the repo market was sometimes accomplished
through "tripartite repo agreements" among the dealer, the customer and a clearing firm:

> Under such an agreement, the purchased securities are delivered by the dealer to the
> clearing firm which acts as **an agent for both participants** and maintains an account for
> the dealer and an account for the repo participant.

*Bevill*, 67 B.R. at 571.  By comparison, LBI served as collateral custodian for the benefit of both FirstBank and
LBSF, in its dual capacity as a "securities intermediary" under the New York UCC and a "Custodian" under the
Swap Agreement.  *See supra*, ¶¶ 30-45, 96-112.

125.    FirstBank's investment in the Swap Agreement is analogous to the custodial repo accounts in *Bevill*.  As in that case, LBI, as a broker-dealer, received FirstBank's securities for safekeeping, maintained them in a custodial account, and was apparently responsible for generating all account statements.  *See supra*, ¶¶ 40-44.  The account statements sent to FirstBank showed all of its swap transactions, and a listing of all of the securities collateral that it posted to secure them.  *Id.* at ¶ 44 and Barreras Dec., Exh. C.  And LBI, a broker-dealer subject to SIPA, held client securities to secure FirstBank's swap transactions just as it would for a client's reverse repo transactions.  *Bevill*, 67 B.R. at 601.

126.    The custodial feature of the FirstBank-LBI relationship is a key factor entitling FirstBank to "customer" status: it entrusted its securities to LBI for safekeeping and for use as collateral for its swap transactions.  FirstBank relied on the market value of the *securities*, as its own investment property – and on its right to return of its investment property under the Swap Agreement and the securities laws – rather than on the credit of LBI as would a lender or other general creditor of LBI.  Simply put, FirstBank expected to get its securities property back from LBI, as the parties had agreed in the Swap Agreement.

127.    The tri-party custodial relationship among FirstBank, LBI and LBSF was very similar to a "hold-in-custody" repurchase agreement, where a repurchase agreement is combined with a custodial account holding securities used for repo transactions.  For such "HIC repos," the broker-dealer holding the securities is subject to all SEC customer protection rules, and the client entrusting the securities has a SIPA "customer" claim against the broker-dealer.[48]

128.    In fact, FirstBank's custodial account with LBI had numerous features that are typical of securities investment accounts, in which the customer has significant monitoring

---

[48] 17 C.F.R. § 240.15c3-3(b)(4)(i)(D); *Bevill, Bresler*, 67 B.R. at 599-601 (client entrusting securities to a broker-dealer for safekeeping and use in repo transactions was a "customer" under SIPA).

and control rights over its securities. Through regularly generated account statements and online access, FirstBank could monitor the market value of its securities at all times. FirstBank could withdraw part of its securities after each mark-to-market valuation (twice per month), if the market value of all of its securities increased enough, relative to fluctuations in the market value of the swap transactions, to create excess collateral. This excess collateral was in effect a withdrawable "free credit balance" as with any securities investment account. FirstBank also had the right to substitute its securities at any time, and to receive all interest payments and other distributions on its securities. *See supra*, ¶¶ 30-45.

129.   FirstBank's custodial swap account served much like a typical margin trading account, with the only difference being that instead of the margin collateral securing cash loans by the broker, it secured interest rate hedge protection offered by the broker's affiliate. LBI, a registered broker-dealer, and its unregulated subsidiary, LBSF, offered this as a normal brokerage service to FirstBank: *i.e.*, safekeeping of its fully paid securities, with one "investment option" for the securities being to back interest rate hedges. There is no legal, equitable or policy reason why FirstBank should not now be entitled to the full SIPA protection offered to other LBI customers that used LBI to hold and invest their securities.

130.   It is also clear that the Swap Agreement was a means by which FirstBank participated in the market for government agency securities, by acquiring over $63 million of such securities (issued by FNMA and GNMA) and posting them as collateral with LBI. Swaps secured by government agency securities, such as the one here, create a secondary market for such securities and enhance their liquidity. *See Bevill*, 67 B.R. at 601 (government and agency securities "would undoubtedly lose much of their attractiveness as investment securities without the liquidity provided by the repurchase market"); SIPC Memorandum, at 14-17 (GSA and

Treasury Customer Protection Rules were designed to protect the government securities markets by encouraging investor participation through enhanced custody rules).  The offering by LBI and LBSF of secured swap transactions enhanced the secondary market for government agency securities, by allowing thousands of Lehman clients the opportunity to invest in swaps backed by those securities.[49]

131.    FirstBank is aware that both SIPC and the Trustee have contested the validity of the *Bevill* ruling in this proceeding, in connection with another claim dispute before this Court involving a group of repo participants.[50]  However, a careful reading of their pleadings shows that their objection to giving the repo claims "customer" status is based almost exclusively on the claimants not having entrusted any property to LBI.  Indeed, the repo participants, according to the Trustee, had "zero balances for both cash and securities in their accounts" as of the date this proceeding began.  *See* Trustee's Repo Motion, at ¶ 2.  Consequently, both SIPC and the Trustee distinguished *Bevill* from the repo claimants on the basis of *lack of entrustment of securities with the broker-dealer for safekeeping.*  As the Trustee stated in his pleadings:

> [T]he key fact relied upon by the court in *Bevill Bresler*, and which is plainly missing here, was that the securities used in the transactions in the *Bevill Bresler* test cases were **held in safekeeping (or, with respect to one of the test cases, were supposed to be held in safekeeping)** by the broker-dealer, BBS, at the time it entered liquidation.

*Id.* at ¶ 145 (emphasis added), *citing In re ESM Gov't Sec., Inc.*, 812 F.2d 1374, 1377 (11th Cir. 1987) ("the key factor for the court [in *Bevill Bresler*] was that the debtor maintained specific trading accounts in which the securities, while owned by the purchaser, were held for the purchaser by the debtor/seller").  SIPC concurred:

---

[49] *Cf. Bevill*, 67 B.R. at 601 (repos and reverse repos through broker-dealers create a secondary market for government agency securities that functions as a "vital link" in the market for such securities).

[50] *See* Trustee's Repo Motion, and the SIPC Memorandum in support thereof.

> What dispositively sets *Bevill Bresler* apart from the present case is the
> fact that in *Bevill Bresler*, the court considered repurchase agreements that
> involved **securities that were held at the broker-dealer** – so-called
> "hold-in-custody" or "HIC" repos. … This is in direct contrast to the
> current case where none of the securities or cash involved in any of the
> subject transactions were held in Claimant accounts at LBI.

SIPC Memorandum, at 13 (emphasis added).

132.   FirstBank's situation, like that in *Bevill Bresler*, is one that involves

securities that were held at the broker-dealer:   FirstBank entrusted over $63 million in

government securities to LBI for safekeeping, which were reflected in securities accounts

regularly maintained by LBI in its business as a broker-dealer.   FirstBank is entitled to

"customer" status for all of the legal, equitable and policy reasons described above.   Indeed, it

would defy the plain language of the SIPA "customer" definition, the SEC's and Treasury

Department's customer protection policies, and the duties of LBI under both the Swap

Agreement and UCC Article 8, to find that FirstBank was *not* a "customer."   FirstBank chose to

entrust all of those securities to LBI, a registered broker-dealer, and was reasonably entitled to

assume that *all* of them would be returned – particularly since the Swap Agreement provided for

just such a remedy if LBSF defaulted.[51]

133.   LBSF of course *did* default in September 2008, and FirstBank

immediately demanded the return of its securities.   They were not returned, thanks to LBI's

insolvency and liquidation, so FirstBank worked with the Chapter 11 Debtors to calculate their

respective claims under the Swap Agreement, and then FirstBank timely filed its customer claim

against LBI.   For reasons that have yet to be explained, the Trustee decided it was a "duplicate

---

[51] *Cf.* SIPC Memorandum, at 20 (the rights of the repo claimants as to LBI are "circumscribed by their contractual
relationship with LBI").

and/or amendment" of a customer claim by the Chapter 11 Debtors, then failed to serve its determination on FirstBank, denying it due process.

134.    The Trustee, as the successor to LBI, should not be allowed to ignore FirstBank's property rights, escape LBI's duties under the Swap Agreement, and then *also* deny FirstBank a right to be heard in this Court.  FirstBank respectfully requests that the Court grant it such a hearing.

## III.    FirstBank Seeks a Limited Intervention in the Chapter 11 Debtors' Customer Claim Objection For the Sole Purpose of Preserving Its Customer Claim

135.    FirstBank also moves, under Bankruptcy Rule 7024, to intervene in the Customer Claim Objection filed by the Chapter 11 Debtors, which is a contested matter herein. Under Local Bankruptcy Rule 9014-1, Bankruptcy Rule 7024 applies in contested matters.[52]

136.    Bankruptcy Rule 7024 applies Rule 24 of the Federal Rules of Civil Procedure.  Rule 24(a)(2) provides for intervention of right to anyone who

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Alternatively, Rule 24(b) provides for permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact."

137.    FirstBank is entitled to intervention of right, because FirstBank's Customer Claim is immediately at risk of being, in effect, converted and assigned to the Chapter 11 Debtors – including all right to distributions on that claim.  In the Trustee's Denial Notice, the Trustee alleged that FirstBank's Customer Claim is a "duplicate and/or amendment" of the Lehman Customer Claim, without further explanation.  FirstBank does not have a copy of the

---

[52] Alternatively, FirstBank moves for intervention under Bankruptcy Rule 2018(a).

Lehman Customer Claim, but based on the Trustee's Denial Notice it appears that the Trustee believes the two claims cover the same securities. In other words, it appears that the Chapter 11 Debtors are seeking the entire $64 million of securities collateral posted by FirstBank, not merely the $2.5 million which the Chapter 11 Debtors have asserted is the sole amount owed to LBSF under the Swap Agreement (which FirstBank is willing to concede for purposes of this motion).

138.    If the Trustee's disallowance of FirstBank's Customer Claim is allowed to stand, and the Trustee then allows the Lehman Customer Claim as including all $64 million of FirstBank's securities that LBI was holding, the Chapter 11 Debtors will have acquired a "customer" claim as to $61.5 million of FirstBank's securities in which the Chapter 11 Debtors have no claim or property interest.

139.    The Trustee has reportedly reached a settlement of all of the Chapter 11 Debtors' customer claims against LBI, totaling approximately $6 billion.[53]    The settlement presumably includes the Lehman Customer Claim, which was included in the list of "Disputed Customer Claims" in the Customer Claim Objection filed by the Chapter 11 Debtors. FirstBank fears that the Trustee may be preparing to grant "customer" status to the Lehman Customer Claim as part of the settlement – and thus a "customer" claim to the Chapter 11 Debtors with respect to *all* of FirstBank's securities collateral – in the erroneous belief that those securities were owned by the Chapter 11 Debtors' bankruptcy estates.

140.    Those securities are FirstBank's property.    LBSF's sole interest in the securities held by LBI (valued at approximately $64 million) was as a secured creditor, and its security interest was only approximately $2.5 million, based on the Chapter 11 Debtors' own

---

[53] Seventh Interim Report, at 11.    The Seventh Interim Report stated that the agreement is "subject to documentation and various approvals, including by the Bankruptcy Court."    *Id.*

calculation.  FirstBank is thus in a similar position as the Cardinal/Oak Hill group of claimants, who have moved to intervene in the Customer Claim Objection to protect their securities held by LBI and posted as collateral for transactions with another LBI affiliate, Lehman Brothers OTC Derivatives Inc.

141.    FirstBank is sensitive to the complexities of the Trustee's settlement efforts with the Chapter 11 Debtors, and has no interest in interfering with those efforts regarding claims not related to FirstBank's Customer Claim.

142.    FirstBank has attempted to resolve its Customer Claim consensually with the Trustee since April 2012.  FirstBank contacted the Trustee shortly after FirstBank first learned of the Trustee's Denial Notice, requesting that the Trustee withdraw his denial and review the claim on the merits.  FirstBank then learned of the possible settlement of all customer claims filed by the Chapter 11 Debtors, which might very well affect FirstBank's own Customer Claim given the Trustee's stated belief that it is a "duplicate and/or amendment" of the Lehman Customer Claim.  FirstBank contacted both the Trustee and the Chapter 11 Debtors to reiterate its concerns and try to avoid involvement by this Court.

143.    Neither has responded to FirstBank.  Should there be any delay in the resolution of FirstBank's Customer Claim or any other customer claims, it cannot be attributed to FirstBank's attempt to resolve its claim without the involvement of this Court.  *See Enron Creditors' Recovery Corp.*, 2007 WL 2480531 at * 6 (claimant's "initial efforts to diligently resolve the dispute without court intervention should not be counted against it").

144.    FirstBank has monitored the docket in this proceeding and the Chapter 11 Case, and notes that the Trustee has not yet made a distribution on "customer" claims.[54]

---

[54] *See* Trustee's June 7, 2012 Press Release (stating the Trustee's goal to make an interim distribution before the end of the year).

- 54 -

FirstBank further notes that the Trustee's resolution of the pool of allowed "customer" claims and the pool of available "customer property" is both ongoing and subject to a very large range of outcomes, depending upon the results of pending claim disputes and other lawsuits.[55]

145.    Also, two claim disputes that implicate the Court's views of "customer" claims with respect to repos and derivatives are still pending: the Cardinal/Oak Hill Motion to intervene in the Customer Claim Objection, now set for hearing on August 15, 2012 (after multiple adjournments);[56] and the Trustee's Repo Motion, currently in briefing and discovery with a final hearing to be set by November 21, 2012.[57]

146.    In the context of what has happened to FirstBank's Customer Claim and the status of other, material ongoing litigation, FirstBank submits that its effort to protect its due process right to a hearing on its Customer Claim will neither unduly prejudice nor delay the Trustee's efforts to complete LBI's liquidation.  FirstBank seeks only a limited intervention in the Customer Claim Objection for the purpose of protecting its Customer Claim, similar to the Cardinal/Oak Hill Motion.  FirstBank is willing to enter into a reasonable scheduling order, after

---

[55] For example, the Trustee has reported that the pending appeals of the litigation over the asset sale to Barclays could result in billions of assets being either included or omitted from the pool of "customer property."  *See* Second Allocation Motion, at ¶¶ 29-32 (Trustee has established a $3.069 billion reserve for LBI's potential exposure, but might recover up to approximately $2.3 billion in margin assets, keep approximately $1.2 billion in margin assets, and recover additional margin assets from third parties and at least $800 million in "clearance box" assets).

[56] *See* Cardinal/Oak  Motion [Dkt. #4634] and the most recent notice of adjournment [Dkt. #5132].

[57] *See* Trustee's Repo Motion [Dkt. #5007] and the Repo Scheduling Order [Dkt. #5162].

discussions with the Trustee and pursuant to the guidance of the Court, to allow the merits of its

Customer Claim to be considered.

## CONCLUSION

147.    For the reasons stated herein, FirstBank respectfully requests that the Court: (a) enter an order, in accordance with the proposed order attached as Exhibit "A" hereto, (i) granting its motion for reconsideration of the Trustee's Denial Notice pursuant to Section 502(j) of the Bankruptcy Code and Bankruptcy Rules 9024; (ii) setting a hearing date for a determination on the merits of FirstBank's Customer Claim (or a status hearing to set a schedule for briefing, discovery and a final hearing on the merits); and (iii) confirming FirstBank's right, pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule 9014-1, to intervene in the Customer Claim Objection filed by the Chapter 11 Debtors, for the limited purpose of preserving FirstBank's Customer Claim; and (b) grant FirstBank such other and further relief as the Court deems just and proper.

Dated: New York, New York
           August 1, 2012

Respectfully submitted,

K&L GATES LLP

By:   /s/ Richard S. Miller

Richard S. Miller (RM–2428)
(Richard.Miller@klgates.com)
Robert T. Honeywell (RH-7684)
(Robert.Honeywell@klgates.com)
Brian D. Koosed (BK-5067)
(Brian.Koosed@klgates.com)
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 536-3922
Facsimile:  (212) 536-3901

*Attorneys for FirstBank Puerto Rico*