FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| LEHMAN BROTHERS INC., | ) Case No. 08-01420 (JMP) (SIPA) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |

## MEMORANDUM DECISION CONFIRMING THE TRUSTEE'S DETERMINATION OF CLAIMS RELATING TO REPURCHASE AGREEMENTS

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004

    Michael E. Salzman, Esq.

SNR DENTON US LLP
*Attorneys for Hudson City Savings Bank*
1221 Avenue of the Americas
New York, New York 10020

    Hugh M. McDonald, Esq.

– and –

2000 McKinney Avenue
Dallas, Texas 75201

    Kym Rogers, Esq.

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
*Attorneys for the FDIC, as receiver of Westernbank Puerto Rico*
230 Park Avenue
New York, New York 10169

    Peter Feldman, Esq.
    John Bougiamas, Esq.

PAUL HASTINGS LLP
*Attorneys for CarVal Investors UK Limited, as manager of*
*Assignee of Doral Bank and Doral Financial Corporation*
75 East 55th Street
New York, New York 10022

     Luc A. Despins, Esq.
     Jodi A. Kleinick, Esq.
     Bryan R. Kaplan, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, DC 20005

     Josephine Wang, General Counsel
     Kenneth J. Caputo, Senior Associate General Counsel


JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

The contested matter before the Court is the latest in a series of similar proceedings brought by James W. Giddens (the "Trustee") to advance the process of case administration by seeking judicial approval of his determinations that certain categories of claims do not satisfy the definition of customer claims in this case. The Trustee, in his capacity as trustee for the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), has brought a motion (the "Motion") to confirm his determination that claims asserted by counterparties in relation to repurchase agreements do not qualify for treatment as customer claims under SIPA. The Securities Investor Protection Corporation ("SIPC") has submitted its own arguments in support of the Motion.[1]

---

[1] SIPC is deemed to be a party in interest in all matters arising under a SIPA liquidation proceeding. 15 U.S.C. § 78eee(d).

Following extensive briefing and argument by the Trustee and the Representative

Claimants (as defined below), the Court agrees with the Trustee's determination that these claims

are not entitled to customer status and approves that determination based upon the requirement

that cash or securities must be entrusted with a broker-dealer in order to qualify for customer

protection under SIPA.  In this instance, the Representative Claimants do not have customer

claims against LBI because their delivery-versus-payment accounts at LBI did not hold any

securities on September 19, 2008, the date of commencement of this case (the "Commencement

Date"), and they are unable to show that the agreements governing the repurchase transactions in

question contemplated the entrustment to LBI of the securities that were transferred under the

terms of the applicable agreements.

Three banks[2] that are typical of the class of claimants asserting a disputed right to

customer status (the "Representative Claimants")[3] oppose the Motion, relying primarily upon the

decision of the United States District Court for the District of New Jersey in *Cohen v. Army*

*Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 67 B.R. 557 (D.N.J.

1986).  That New Jersey district court decision held that claims made against a broker-dealer in

---

[2] The banks are Hudson City Savings Bank ("Hudson"); the Federal Deposit Insurance Corporation ("FDIC"), as receiver of Westernbank Puerto Rico ("Westernbank"); and CarVal Investors UK Limited ("CarVal"), as manager of CVF Lux Master S.a.r.l., the assignee of Doral Bank and Doral Financial Corporation (collectively, "Doral").
[3] Prior to oral argument on the Motion, the Trustee entered into stipulations (collectively, the "Non-Participant Stipulation") that were "so ordered" by the Court with certain claimants (other than the Representative Claimants) (i) who had submitted one or more customer claims arising out of repurchase and/or reverse repurchase transactions with LBI that were open as of the Commencement Date, (ii) whose claims had been denied customer treatment by the Trustee and (iii) who had objected to the Trustee's determination.  Pursuant to the Non-Participant Stipulation, these so-called Non-Participating Claimants agree, *inter alia*, that any legal rulings made by this Court or any appellate court with respect to the Motion shall also apply in any litigation with respect to their claims, unless any court expressly provides otherwise.  *See* So Ordered Stipulation and Order Regarding the Trustee's Determinations of Claims Arising Out of Repurchase and Reverse Repurchase Transactions Entered Into by Non-Participating Claimants [ECF No. 4623]; So Ordered Stipulation and Order Regarding the Trustee's Determinations of Claims Arising Out of Repurchase and Reverse Repurchase Transactions Entered Into by Non-Participating Claimants [ECF No. 4687]; So Ordered Stipulation and Order Regarding the Trustee's Determinations of Claims Arising Out of Repurchase and Reverse Repurchase Transactions Entered Into by Non-Participating Claimants [ECF No. 4703]; So Ordered Stipulation and Order Regarding the Trustee's Determinations of Claims Arising Out of Repurchase and Reverse Repurchase Transactions Entered Into by Non-Participating Claimants [ECF No. 4735].  Certain other objecting claimants with open repos declined to sign the Non-Participant Stipulation.  Trustee Br. Supp. ¶ 14.

relation to hold-in-custody repurchase agreements were customer claims under SIPA. The Representative Claimants cite to this precedent as persuasive support for their position, but, as explained in the discussion section of this Memorandum Decision, *Bevill, Bresler* involved securities that actually were being held by the SIPC member firm for the claimants.

That is far different from the current situation. Even if the holding could be applied more broadly to other types of repo agreements, *Bevill, Bresler* is not binding precedent and does not control the outcome here. Importantly, the repo transactions before the Court, by their very nature and structure, lead directly to the conclusion that the Representative Claimants are entitled to no more than general creditor claims against the estate. They never entrusted any property with LBI as their broker-dealer, and that is fatal to establishing customer status. Their account statements confirm transactions involving repo contracts, but not the retention and holding of any customer securities or cash. Without the existence of identified property in the hands of LBI, no customer claim can be made against the estate to recover such property.

Thus, the Motion is comparable to an earlier contested matter in which the Trustee and SIPC urged the Court to approve the determination that claims relating to so-called TBA contracts are not customer claims against the LBI estate. *See* ECF No. 4360. The Court agreed with the position advocated by the Trustee and SIPC, finding that "without identified property in the hands of LBI, there can be no claim against the estate for the recovery of such property." *In re Lehman Brothers Inc.*, 462 B.R. 53, 57-58 (Bankr. S.D.N.Y. 2011) (the "TBA Decision").[4]

The analysis in the TBA Decision with respect to customer property applies equally well to the claims made by the Representative Claimants. They try to side step the TBA Decision by

---

[4] The TBA Decision dealt with claims relating to so-called TBA ("to be announced") mortgage-backed securities and found that (i) the contractual right to acquire such securities was not equivalent to the securities themselves, (ii) no property was entrusted to LBI or held in customer accounts at LBI, and (iii) as a result, the holders of such contractual rights did not have customer claims under SIPA.

stressing the fact that the claimants there never delivered any securities to LBI (and indeed the

TBA contracts related to securities that had not yet been issued), but this is a distinction without

a difference.  The simple and unavoidable truth is that the LBI accounts of the Representative

Claimants held no property on the Commencement Date, and that indisputable fact alone is

dispositive.  The Representative Claimants are not entitled to customer claims under SIPA

relating to the repurchase transactions in question.

### *Factual Background*

A repurchase transaction (or "repo") is a single transaction consisting of two related

parts.  The first step of the transaction involves a "Seller" who agrees to transfer securities (the

"Purchased Securities") to a counterparty, the "Buyer," against the transfer of cash by the Buyer.

The second step is the simultaneous agreement by the Buyer to transfer back the securities to the

Seller on the "Repurchase Date" (a specified future date), against the transfer of cash by the

Seller back to the Buyer on the Repurchase Date.  McIsaac Decl.[5] ¶ 8.

The market value of the Purchased Securities transferred to the Buyer in the first step of

the transaction generally is higher than the value of the funds transferred to the Seller, with the

difference in value being referred to as the "haircut."  McIsaac Decl. ¶ 9.  The funds transferred

back to the Buyer in the second step of the transaction include, in addition to the sum originally

transferred to the Seller, an amount representing a financing charge computed using an agreed

interest rate, also known as a "repo rate."  McIsaac Decl. ¶ 10.

Whether a transaction is called a "repo" or a "reverse repo" is a matter of perspective.

When viewed from the Seller's perspective, the transaction is called a repo; when viewed from

the Buyer's perspective, the same transaction is called a reverse repo.  McIsaac Decl. ¶ 13;

---

[5] References to "McIsaac Decl." are to the Declaration of Daniel T. McIsaac in Support of the Trustee's Motion for
an Order Confirming the Trustee's Determination of Claims Related to Repurchase Agreements [ECF No. 5050].

Legotte Decl.[6] ¶ 8.  The Motion involves transactions that were all reverse repos from LBI's perspective, inasmuch as LBI acted as the "Buyer."  Legotte Decl. ¶¶ 8, 15.

The term (i.e., the time period between the date of the initial transfer of securities and the Repurchase Date) of a repo is fixed by the agreement of the parties.  McIsaac Decl. ¶ 12.  A "term" repo has a fixed repurchase date, which may be anywhere from the next day to several years.  An "open" repo has no fixed repurchase date, and either party may terminate the transaction on demand.  McIsaac Decl. ¶ 12; Legotte Decl. ¶ 9.

There are three types of delivery arrangements for repo transactions: (i) bilateral repos, in which the Seller delivers the Purchased Securities to the Buyer or its agent at the outset of the transactions against the transfer of cash; (ii) safekeeping or hold-in-custody ("HIC") repos, in which the Purchased Securities are not delivered to the Buyer, but rather are placed in an internal safekeeping account by the Seller, for the Buyer, throughout the duration of the repo; and (iii) tri-party repos, whereby the Buyer and Seller enter into a contractual arrangement with a third-party agent who acts as an intermediary between the counterparties.  McIsaac Decl. ¶ 16.  The repos at issue in the Motion are bilateral repos.  Legotte Decl. ¶¶ 23-26.

As described in more detail below, each of the repo transactions between LBI and the Representative Claimants was governed by an industry-standard Master Repurchase Agreement ("MRA").[7]  The MRA defines the rights of parties to the transaction and contains provisions relating to the maintenance of margin, substitution of securities, default remedies, required disclosures, and other matters.  McIsaac Decl. ¶ 19.  The details of each particular repo

---

[6] References to "Legotte Decl." are to the Declaration of Leonard J. Legotte in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to Repurchase Agreements [ECF No. 5010].
[7] A Global Master Repurchase Agreement ("GMRA") is a different industry-standard contract that may also be used to document the rights and obligations of counterparties to repo transactions.  It is closely modeled on the MRA, but covers different securities.  McIsaac Decl. ¶ 17 and n.3.  Certain of the objecting claimants (other than the Representative Claimants) had repo transactions governed by a GMRA.  According to the Trustee, the provisions of the GMRA that are relevant to the Motion are substantially similar to corresponding provisions in the MRA.  Trustee Br. Supp. ¶ 26 n.9.

transaction, including the purchase and repurchase prices, margin percentage, term, and repo rate, are set out in separate letter agreements (or "confirmations"). Id. The MRA states that the transactions between the counterparties constitute a "business and contractual relationship," and each party represents and warrants that "it will engage in such transactions as principal." Foukas Decl.[8] Ex. A1 ¶¶ 10, 12.

The MRA includes specific margin provisions designed to protect both parties with respect to changes in the value of the Purchased Securities during the term of the repo. McIsaac Decl. ¶ 20. To ensure that a Buyer is always fully collateralized, the MRA provides that if the market value of the Purchased Securities should fall below the specified margin percentage, a "Margin Deficit" is created, and the Buyer can require the Seller to transfer additional securities (or cash) in order to make up the shortfall. Foukas Decl. Ex. A1 ¶ 4(a). Conversely, to ensure that the Buyer is not unduly over-collateralized, the MRA provides that if the value of the Purchased Securities should increase above the specified margin percentage, a "Margin Excess" is created, and the Seller may then demand the transfer of cash or Purchased Securities to rebalance the respective positions of the parties. Foukas Decl. Ex. A1 ¶ 4(b).

The MRA also provides that the Buyer is free to use the Purchased Securities for its own purposes until the Repurchase Date. Foukas Decl. Ex. A1 ¶ 8. Although the Buyer is obligated to transfer the Purchased Securities back to the Seller on the Repurchase Date, the MRA affords great latitude to the Buyer pending the date of such transfer stating that

> All of Seller's interest in the Purchased Securities shall pass to Buyer [and] nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities.

---

[8] References to "Foukas Decl." are to the Declaration of Savvas A. Foukas in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to Repurchase Agreements [ECF No. 5008].

Foukas Decl. Ex. A1 ¶ 8.  Accordingly, the MRA does not impose any obligation on the Buyer to segregate the Purchased Securities or otherwise hold them for the Seller.

The MRA also sets forth the rights of the parties in the event of a default by either party prior to the Repurchase Date.  An "Act of Insolvency" constitutes an "Event of Default."  Foukas Decl. Ex. A1 ¶ 11(d)(ii).  When an Act of Insolvency occurs in relation to the Buyer, the Seller is deemed to have declared an Event of Default and the Repurchase Date is accelerated to occur immediately.  The Seller, in its discretion, may either purchase replacement securities or be deemed to have purchased replacement securities.  Foukas Decl. Ex. A1 ¶ 11(d)(ii).  The defaulting Buyer is liable to the Seller for any excess of the price paid or deemed paid for replacement securities over the repurchase price for the Purchased Securities that were not delivered to the Seller.  Foukas Decl. Ex. A1 ¶ 11(e).

*Certain Facts Regarding the Hudson Repos*

Hudson had a relationship with LBI dating back to 1983, and was a customer of LBI's Middle Markets Desk.  Kranz Decl.[9] ¶¶ 7-8; Sylvin Decl.[10] ¶¶ 3-4.  LBI served as Hudson's investment banker and broker-dealer.  Kranz Decl. ¶ 8.  LBI, through its Middle Markets Desk, eventually offered Hudson a long-term structured repurchase agreement as a means to finance Hudson's acquisition of a position in highly liquid mortgage-backed securities.  Kranz Decl. ¶¶ 8-9; Sylvan Decl. ¶¶ 3-5.

Hudson, LBI and Lehman Commercial Paper Inc. entered into two repo transactions dated September 7, 1999 and September 13, 1999, each in the amount of $50 million.  Kranz Decl. ¶ 17.  The repos were governed by an industry-standard MRA (the "Hudson MRA") and

---

[9] References to "Kranz Decl." are to the Declaration of James C. Kranz in Support of Hudson City Savings Bank's Response to Trustee's Motion to Confirm Notice of Determination of Claim [ECF No. 5240].
[10] References to "Sylvin Decl." are to the Declaration of Allison Sylvin in Support of Hudson City Savings Bank's Response to Trustee's Motion to Confirm Notice of Determination of Claim [ECF No. 5241].

were memorialized by letter agreements dated September 9, 1999 and September 14, 1999

(collectively, the "Hudson Confirmations"). Id.; Foukas Decl. Exs. A1-A3. On February 7,

2003, LBI and Hudson executed a "Structured Funding Modification" to the Hudson MRA,

which incorporated the Hudson MRA and the Hudson Confirmations and set forth the terms of

two long-term repo transactions, each having a value of $50 million. Foukas Decl. Ex. A4.

Under the terms of the Hudson MRA, Hudson transferred $100 million of securities, plus

additional securities comprising the "Seller's Margin Amount." In turn, LBI transferred $100

million to Hudson and agreed to return the securities on the maturity date or on demand upon the

occurrence of certain events. Kranz Decl. ¶¶ 18-19. LBI could make a call for additional margin

in cash or securities if the market value of the securities transferred by Hudson fell below a

Seller's Margin Amount of 105%. Similarly, if the securities increased in value above the

Seller's Margin Amount, Hudson could demand transfer of any excess margin collateral. Foukas

Decl. Ex. A1, ¶ 4. Hudson entered into the repos with the expectation that it owned the

underlying securities and that they would be returned. Kranz Decl. ¶ 13.

*Certain Facts Regarding the Westernbank Repos*

On February 23, 1998, Westernbank executed an industry-standard Master Repurchase

Agreement with LBI (the "Westernbank MRA"). Foukas Decl. Ex. B-1. In August 2001 and

January 2002, LBI and Westernbank entered into three[11] separate long-term structured repo

transactions, each with a term of 15 years. Each of these transactions was memorialized by a

confirmation letter. Maldonado Decl.[12] ¶ 12, Exs. D, E, F. Westernbank's primary purpose for

investing in agency securities through its repo transactions with LBI was to receive the fixed

coupon income that was paid by the issuer. Maldonado Decl. ¶14.

---

[11] The counterparty for one of these repo transactions was Westernbank's International Division. Maldonado Decl. ¶ 12.

[12] References to "Maldonado Decl." are to the Declaration of Freddy Maldonado [ECF No. 5178].

Pursuant to the Westernbank MRA, the value of the securities purchased by LBI from Westernbank needed to be fixed at a set percentage in excess of the amount due on the repurchase date.  Maldonado Decl. ¶ 15.  If the market value of the securities decreased, then Westernbank was subject to a margin call from LBI, and would be required to deliver additional securities to LBI.  If the market value of the securities increased, LBI would be obligated to deliver securities back to Westernbank.  Id.  At all relevant times, Westernbank had the absolute right to demand that LBI return to Westernbank any security subject to these structured repurchase transactions, in which event Westernbank would have to provide substitute securities to LBI.  Maldonado Decl. ¶18.  Westernbank considered the securities that it transferred to LBI as its own and treated them accordingly.  Maldonado Decl. ¶ 19.

*Certain Facts Regarding the Doral Repos*

Doral had a long-term relationship with LBI as a broker-dealer and regularly purchased and sold securities through LBI.  Torres Decl.[13] ¶ 10.  Between January 2000 and May 2001, LBI and Doral entered into six repo transactions, each governed by an industry-standard Master Repurchase Agreement (collectively, the "Doral MRA") and memorialized by a confirmation.  Foukas Decl. Exs. C1-C4.  The repo transactions governed by the Doral MRA involved the sale of securities by Doral to LBI, with the simultaneous agreement by LBI to resell the securities to Doral at a fixed price on a date to be determined.  Torres Decl. ¶ 5.  Throughout the term of each of its repo transactions with LBI, Doral held the securities transferred to LBI as assets on its balance sheet; the matching obligations to repurchase these securities on their respective repurchase dates were recorded as corresponding liabilities.  Torres Decl. ¶11.

---

[13] References to "Torres Decl." are to the Declaration of Maricarmen Logroño Torres [ECF No. 5179].

*Certain facts regarding LBI's account relationship with the Representative Claimants*

At least one separate account bearing a unique account number was established for each person or entity having dealings with LBI with respect to financial transactions and services. Legotte Decl. ¶ 18.  LBI's system of accounts distinguished between custodial, no-lien ("safekeeping" or "segregated") accounts in which LBI held assets for its customers that were segregated from securities available for use by LBI in its proprietary business, and delivery-versus-payment, or DVP, accounts in which transactions were recorded but no cash or property was held in the account.  Legotte Decl. ¶ 19.

In the case of DVP accounts, on the settlement date for any particular transaction, LBI would transfer any cash, securities or other property due to the client in exchange for a simultaneous cash transfer or delivery of property by the client.  Id.  Holders of DVP accounts designated the destination of any payment or delivery by LBI (usually a third-party financial institution) by means of standing instructions maintained in LBI's records.  Legotte Decl. ¶ 20. No cash or property would be held in DVP accounts.  Legotte Decl. ¶ 19.

Each of the Representative Claimants opened a DVP account.  Legotte Decl. Exs. 7-11 (account opening documents reflecting an "x" or check mark in a box corresponding to "DVP").[14]  In connection with their DVP accounts, each of the Representative Claimants provided LBI with standing instructions designating a clearing agent to receive any transfers of securities or cash –Westernbank designated Citibank as its clearing agent, and each of Doral and Hudson designated the Bank of New York.  Legotte Decl. ¶ 23, Exs. 1-5.

Any payment of cash or delivery of securities to each of the Representative Claimants would be transferred to or from the designated third-party financial institution.  Legotte Decl. ¶

---

[14] Westernbank opened accounts for Westernbank Puerto Rico and Westernbank International.  Legotte Decl. Exs. 8-9.  Doral opened accounts for Doral Bank and Doral Financial Corp.  Legotte Decl. Exs. 10-11.

23, Exs. 1-5.  Accordingly, the transaction activities for the Representative Claimants were all recorded in their respective DVP accounts, but LBI held no property in those accounts.  Each of the Representative Claimants regularly received a client statement from LBI that did not include a "Portfolio Details" section, an indication that LBI did not hold any securities or other assets for them.  Legotte Decl. ¶¶ 40, 44; Exs. 46, 57.

As was expressly permitted under the MRA, LBI did not hold any of the Purchased Securities while the repo transactions were open and routinely used the Purchased Securities underlying the applicable reverse repo transactions for LBI's own purposes, including repo transactions or collateral pledges (in exchange for cash or borrowed securities) involving other counterparties.  Legotte Decl. ¶ 13.  LBI's stock record, maintained in accordance with SEC regulations, reflects that each of the Purchased Securities was transferred by LBI to other counterparties in repo transactions or collateral pledges.  17 C.F.R. § 240.17a-3(a)(5); Legotte Decl. ¶¶ 25, 33-35; Exs. 13-45, 13-A-45-D.  LBI's records also show that none of the Purchased Securities was held in safekeeping on the Commencement Date or at any other time.  Legotte Decl. ¶¶ 33-35.  As of the Commencement Date, the majority of the Purchased Securities was in the possession of third parties.[15]  Legotte Decl. ¶¶ 36-37, Exs. 13-45.

### Background Regarding Determination of Claims by the Trustee

Each of the Representative Claimants filed a timely customer claim.  Kranz Decl. Ex. G (Hudson); Feldman Decl.[16] Exs. 36-37 (Westernbank); Torres Decl. Ex. 1 (Doral).  The Trustee

---

[15] On the Commencement Date, positions in certain CUSIPs underlying LBI's repo transactions with Doral were in LBI's main operating account at Chase.  Legotte Decl. ¶ 36, Exs. 22, 24, 26.  This account contained securities that LBI could use in its proprietary business.  Legotte Decl. ¶ 36.  After the Commencement Date, Chase notified the Trustee that it had seized these securities, along with other securities in the same account, to cover an overdraft in LBI's main operating account at Chase.  Id.

[16] References to "Feldman Decl." are to the Declaration of Peter Feldman in Support of Memorandum of Law of (I) The FDIC, as Receiver of Westernbank Puerto Rico and (II) CarVal Investors UK Limited, as Manager of Assignee of Doral Bank and Doral Financial Corporation, in Opposition to Trustee's Motion for an Order Confirming the

responded by timely serving on each Representative Claimant a Notice of Trustee's

Determination of Claim (i) denying each claim for customer treatment, (ii) stating his intent to

treat each claim as a general unsecured claim and (iii) reserving the right to object to such

general unsecured claim at a later date. Each of the Representative Claimants filed an objection

to the Notice of Trustee's Determination of Claim. [ECF Nos. 1677 (Hudson); 2494

(Westernbank); 2495 (Westernbank); 1709 (Doral); 1710 (Doral)].

The parties have worked together cooperatively in developing a schedule for the

submission of declarations and briefs. These submissions have enabled the Court to resolve the

above objections of the Representative Claimants on the basis of an agreed record.

### *Discussion*

SIPA protection extends only to those persons or entities that can satisfy the definition of

"customer" under SIPA. The term "customer" is a "short-hand designation for those eligible

under SIPA to receive special protection … ." *In re Stalvey & Assocs.*, 750 F.2d 464, 468 (5th

Cir. 1985). This right to special protection in a SIPA proceeding should be construed narrowly

in light of the statutory purpose. *See, e.g., In re Omni Mut., Inc.*, 193 B.R. 678, 680 (S.D.N.Y.

1996) (citations omitted) (noting that "customer" is a "term of art" that "should be construed

narrowly"). The burden is on the claimant to prove entitlement to SIPA protection. *Mishkin v.*

*Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002).

As of the Commencement Date, the applicable definition of the term "customer" as used

in SIPA read as follows:

> any person (including any person with whom the debtor deals as principal or agent) who
> has a claim on account of securities received, acquired, or held by the debtor in the
> ordinary course of its business as a broker or dealer from or for the securities accounts of
> such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to

Trustee's Determination of Claims Relating to Repurchase Agreements Between LBI and Westernbank Puerto Rico
and Doral Bank and Doral Financial Corporation [ECF No. 5176].

purchases, as collateral, security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include —

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

SIPA § 78*lll*(2).[17]

Thus, the definition relates customer securities received, acquired or held "for safekeeping" by the broker-dealer in the ordinary course of business or to cash deposited for the purpose of purchasing securities.  Consistent with this definition, it has been held that "[a]n investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund."  *In re Brentwood Secs., Inc.*, 925 F.2d 325, 327 (9th Cir. 1991).  "[T]he 'critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purpose of trading securities,'" *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 236 (2d Cir. 2011) (emphasis omitted) (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)).

The Representative Claimants point to certain facts that they contend "evince" entrustment – that (i) they delivered the Purchased Securities to LBI with the intention that such securities would be returned on a date certain, and (ii) they retained all benefits of ownership of the Purchased Securities.  Westernbank/Doral Br. Opp'n 29.  These contractual expectations and

---

[17] Subsequent to the Commencement Date, the definition of "customer" under SIPA was amended by the Dodd-Frank Wall Street Reform and Consumer Protector Act of 2010, 12 U.S.C. §§5301 *et seq.*  The amended definition is not applicable to the issues raised by the Motion.

retained interests are insufficient by themselves to establish the key possessory elements that are needed to establish entrustment. There is no substitute for actual possession by the broker-dealer. Entrustment simply requires "receipt, acquisition or holding of the securities by the Debtor in the evident sense required by the Act – that is, an actual possession – so as to ground a protected 'net equity'." *SEC v. Kenneth Bove & Co.*, 378 F. Supp. 697, 700 (S.D.N.Y. 1974).

The Representative Claimants have no good way to fill in this missing possessory requirement of the definition, and the facts are not helpful. LBI did not hold the securities and under the relevant documentation had no obligation to do so. The MRA specifically disclaims any obligation of a broker-dealer as Buyer or Seller to hold property for a counterparty, but expressly permits the Buyer to engage in "selling, transferring, pledging or hypothecating the Purchased Securities … ." Foukas Decl. Ex. A1 ¶ 8. The Representative Claimants recognize that LBI did not (and was not required to) segregate securities it received from them, that LBI subsequently rehypothecated the securities, and that their DVP accounts were empty. Hudson Br. Opp'n 19-25, 33; *see* Westernbank/Doral Br. Opp'n 9, 28, 56; Foukas Reply Decl.[18] Ex. F (Maldonado Tr. 74:5-76:2) (agreeing that "Portfolio Detail" section of LBI Client Statement reflects "assets actually held at Lehman as of the last day of the month").

The Representative Claimants submit that the fact that their accounts at LBI were DVP accounts does not preclude a finding that they entrusted property to LBI. Hudson Br. Opp'n 22-23 ("DVP merely denotes a form of settling a customer's securities account"); Westernbank/Doral Br. Opp'n 46 ("DVP merely describes the *means* by which trades are settled"). While it is true that mere labeling of the account as DVP does not determine "customer" status under SIPA, in this instance the DVP accounts were structured and utilized in

---

[18] References to "Foukas Reply Decl." are to the Reply Declaration of Savvas A. Foukas in Support of the Trustee's Motion for an Order Confirming the Trustee's Determination of Claims Related to Repurchase Agreements [ECF No. 5345].

a manner that enabled institutions other than LBI to hold the securities that were purchased from

the Representative Claimants.  The accounts were not possessory by their very nature, and that

defeats customer status.  "[T]he absence of actual receipt, acquisition or possession of the

property of a claimant by the brokerage firm under liquidation has been held to be dispositive

against a claim to participation in the coverage under the Act extended by SIPC."  *Kenneth Bove*,

378 F. Supp. at 700.

Nonetheless, the Representative Claimants argue that there is more to entrustment than

physical possession in a brokerage account and that the contractual obligation to return the

securities constitutes a kind of deemed entrustment.  They submit that the commercial

relationship of the parties, the terms of the MRA, the electronic linking by LBI of the Purchased

Securities to the Representative Claimants' accounts and industry practice, when considered

together, are sufficient to prove entrustment and give them the rights under SIPA that are

reserved for customers.  *See* Westernbank/Doral Br. Opp'n 29 ("[t]he fact that the same

securities were required to be returned and that the [Representative] Claimants retained all

incidents of investment (including the issuer's payment of coupon interest and principal) evinces

entrustment"); Hudson Br. Opp'n 28 ("[t]he Hudson MRA provides that, regardless of how LBI

utilized LBI's securities, 'no such transaction shall relieve Buyer of its obligations to transfer

Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof'"); Westernbank/Doral Br.

Opp'n 17 ("LBI linked the Purchased Securities to the [Representative] Claimants and their

Accounts on its books"); Hudson Br. Opp'n 28 ("LBI's internal electronic documents always

linked Hudson's Securities to Hudson's account").

The contractual duty of LBI to return in kind the Purchased Securities to the

Representative Claimants is not the same as actual possession by LBI.  It is not plausible to

16

expand the meaning of possession beyond its literal interpretation and to suggest that the

hypothecation of securities to third parties can be disregarded.  Such efforts to elevate the claims

of the Representative Claimants to customer status are unpersuasive and inconsistent with a

narrow reading of the SIPA definition of customer.  A contractual obligation by LBI to return

securities is no substitute for an account statement that includes an inventory of securities

actually held by a broker-dealer for its customer.  The Representative Claimants have no such

account statements, and there is no way to ignore or navigate around this missing possessory

requirement for customer status.

Arguments regarding electronic linkage of the Purchased Securities to the Representative

Claimants are of no value in assessing whether there has been entrustment of the securities to

LBI.  The fact that payments of principal and interest were made to the Representative Claimants

may be indicative of a retained ownership interest in the securities, but such a retained interest

has no significance whatsoever in deciding whether repo counterparties may assert customer

claims.  The right to receive payments in connection with securities that were being held by third

parties as permitted by the terms of the MRA is irrelevant to the question of customer status or

the right to SIPA protection in this case.

The Representative Claimants also make the specious argument that because the

Purchased Securities were received and acquired by LBI at the origination of the repo

transaction, "it is not necessary that they also were 'held'" by LBI on the Commencement Date.

Westernbank/Doral Br. Opp'n 25 n. 20.  That is simply not true, and their assertion turns a blind

eye to the reality of onward movement of the securities.  They argue that hypothecation has no

impact upon entrustment that allegedly vested at the outset of the repo transactions.  *See also*

Hudson Br. Opp'n 46 ("entrustment was not affected by LBI's right to hypothecate Hudson's

17

Securities"). However, the Representative Claimants are not free to disregard the legal

significance of facts that existed on the Commencement Date. As noted earlier in this decision,

it is undisputed that the Purchased Securities were either (i) hypothecated or (ii) held by LBI in

its own operating account for use in its proprietary business, and that no property was being held

for the Representative Claimants on the Commencement Date. The analysis ends there. The

Representative Claimants have no grounds to argue that their claims somehow should relate back

to an earlier date before their securities were hypothecated to third parties or transferred by LBI

into its operating account. *See In re Adler, Coleman*, 195 B.R. at 270 (explaining that "[a]

customer's account is valued as of the date the SIPA liquidation is commenced").

The various arguments made by the Representative Claimants fail at the most

fundamental level: their account statements with LBI confirm transactions but not the

entrustment of any property. The very same analysis appears in the TBA Decision where the

Court considered LBI client statements that listed transactions but reflected that no property was

being held. *See TBA Decision*, 462 B.R. at 57 (noting that claimants' "account statements

confirm transactions involving TBA contracts but not the holding of any customer securities or

cash").

Although the claimants in the TBA Decision never delivered any property to LBI, that

factor does not limit the application of this relevant decision to the current dispute. The TBA

Decision found that the customer accounts at LBI were used to facilitate trading activity but "did

not involve the retention by the broker-dealer of customer property that is a necessary part of the

definition of a customer claim." Id. The Court ultimately concluded that "[s]implistically and

narrowly, without identified property in the hands of LBI, there can be no claim against the

estate for the recovery of such property." Id. at 57-58. That statement applies here with equal

18

force.  Because the accounts of the Representative Claimants held no property, there can be no customer claim for the recovery of any property.

The claims at issue against LBI are transactional in nature and arise out of the contractual right, upon fulfillment of the terms of the MRAs, to reacquire the Purchased Securities that underlie the repo transactions upon repayment of principal, together with interest.  The rights to the Purchased Securities are governed by the contractual relationship that exists between the Representative Claimants and LBI under their respective MRAs.  As a result, their claims against LBI are breach of contract claims, not customer claims to recover their securities.[19]  As noted in the TBA Decision, "such claims are not entitled to protection under SIPA."  *TBA Decision*, 462 B.R. at 62 (citations omitted); *see also In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) ("[b]ecause claims for damages do not involve the return of customer property entrusted to the broker they are not the claims of 'customers' under SIPA"); *In re MV Securities, Inc.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (citation omitted) ("SIPA does not protect customer claims based on fraud or breach of contract").

Notwithstanding the powerful logic of this conclusion, the Representative Claimants place considerable reliance on *Bevill, Bresler* in their effort to show that they qualify for customer protection under SIPA.  In *Bevill, Bresler*, the District Court denied the motion of the SIPA trustee who argued that claimants involved in certain repo transactions were not "customers" under SIPA because the repos and reverse repos at issue were collateralized loans. Although the Court in *Bevill, Bresler* determined that the claimants were customers, the circumstances were materially different from those presented here.  Significantly, the trustee's

---

[19] The Court recently considered a similar question in *FirstBank Puerto Rico v. Barclays Capital Inc.*, Adv. Proc. No. 10-04103(JMP), 2013 Bankr. LEXIS 1938 (Bankr. S.D.N.Y. May 10, 2013).  In that decision, the Court denied the alleged right to recover certain identified securities that were the subject of a repo transaction, and held that the failure to return such securities is a breach of contract claim.  *Id.* at *26-27.

motion in *Bevill, Bresler* related to a group of test cases, all involving HIC repos in which the

SIPC member firm actually was holding property for the claimants.  Therefore, although the case

may be cited for the proposition that a repo counterparty under certain circumstances may have a

customer claim under SIPA, the facts are entirely distinguishable from the contested matter now

before the Court.

In an HIC repo, the securities that are the subject of the transaction are placed in a

safekeeping account.  LBI did not hold any securities or cash for the Representative Claimants,

and the MRAs did not contemplate such a structure.  In *Bevill, Bresler*, the Court focused on the

custodial arrangements that are not present here, commenting that "the securities were placed in

safekeeping where they remained on the filing date."  67 B.R. at 600; *see also* id. at 570

(contrasting "delivery repo transactions," where the dealer transfers the securities to the repo

participant or its agent at the outset of the transaction, with "non-possessory or safekeeping repo

transactions," where the dealer retains the securities for the account of the repo participant).

Because of the obvious structural differences, the ruling in *Bevill, Bresler* is not persuasive

authority with respect to the question presented.

The parties have raised a number of additional points that are not material to the Court's

decision.  The Representative Claimants submit that (i) repo transactions are not secured loans

and, therefore, the Second Circuit's line of cases holding that secured loans are not entitled to

customer status are not applicable and (ii) as customers, they have claims for net equity.  The

Trustee and SIPC argue that to afford the Representative Claimants "customer" protection and

the corresponding right to share in the fund of customer property would significantly dilute, or

reduce, the recovery by customers who actually entrusted cash or securities to LBI.  They assert

such an outcome would be detrimental to "customers," and would not provide the protection envisioned by Congress.

Regardless of their merit, the Court does not need to address these various collateral issues.  The central thesis of this decision is sufficient to resolve the dispute before the Court: in order to satisfy the definition of "customer" under SIPA, the broker-dealer must have received, acquired or held securities or cash for the purpose of purchasing securities.  Actual entrustment of property (securities or cash) is a necessity, and the inability to show such entrustment makes it impossible to prove customer status under SIPA.

### *Conclusion*

Because the Representative Claimants did not entrust any customer property to LBI, they are unable to prove any right to customer protection under SIPA.  Consequently, the Trustee is correct in his determination that the repo claims of the Representative Claimants are not customer claims against LBI.  *Accord TBA Decision*, 462 B.R. at 63.  The Motion is granted, and the Trustee is directed to submit an order consistent with this Memorandum Decision.


SO ORDERED.


Dated: New York, New York                                    /s/ James M. Peck
      June 25, 2013                                        _____
                                           Honorable James M. Peck
                                           United States Bankruptcy Judge