**THIS OBJECTION SEEKS TO (I) DISALLOW IN PART, (II) SUBORDINATE AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE OR REDUCE AND RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM, AND TO ALLOW SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION AS PRIORITY AND/OR UNSECURED GENERAL CREDITOR CLAIMS.  PARTIES RECEIVING THIS NOTICE OF THE TRUSTEE'S TWO HUNDRED THIRD OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT THE TRUSTEE'S COUNSEL, KAREN M. CHAU, ESQ., AT (212) 837-6512.**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (SCC) SIPA |

**NOTICE OF HEARING ON THE TRUSTEE'S TWO HUNDRED THIRD OMNIBUS OBJECTION SEEKING TO (I) DISALLOW IN PART, (II) SUBORDINATE AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE OR REDUCE AND RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM, AND TO ALLOW SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION AND/OR UNSECURED GENERAL CREDITOR CLAIMS (EMPLOYEE CLAIMS)**

    **PLEASE TAKE NOTICE** that on February 7, 2014, James W. Giddens (the

"Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor"

or "LBI"), under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel, filed his two hundred third omnibus objection to general creditor claims (the "Two Hundred Third Omnibus Objection to General Creditor Claims"), and that a hearing to consider the Trustee's Two Hundred Third Omnibus Objection to General Creditor Claims will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 621, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **March 27, 2014 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that responses, if any, to entry of the order must (i) be in writing; (ii) state the name and address of the responding party and nature of the claim or interest of such party; (iii) state with particularity the legal and factual bases of such response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format no later than **February 28, 2014 at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York, 10004, Attn: Meaghan C. Gragg, Esq.; (b) Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP, 767 Seventh Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to

the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 621.

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Trustee's Two Hundred Third Omnibus Objection to General Creditor Claims or any claim set forth thereon, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Trustee's Two Hundred Third Omnibus Objection to General Creditor Claims, which may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
        February 7, 2014

HUGHES HUBBARD & REED LLP

By: /s/ James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Meaghan C. Gragg
Karen M. Chau
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: kobak@hugheshubbard.com

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.
        .

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>       LEHMAN BROTHERS INC.,<br><br>                  Debtor. | Case No. 08-01420 (SCC) |

**THE TRUSTEE'S TWO HUNDRED THIRD OMNIBUS OBJECTION SEEKING TO (I) DISALLOW IN PART, (II) SUBORDINATE AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE OR REDUCE AND RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM, AND TO ALLOW SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION AS PRIORITY AND/OR UNSECURED GENERAL CREDITOR CLAIMS (EMPLOYEE CLAIMS)**

**THIS OBJECTION SEEKS TO (I) DISALLOW IN PART, (II) SUBORDINATE AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE OR REDUCE AND RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM, AND TO ALLOW SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION AS PRIORITY AND/OR UNSECURED GENERAL CREDITOR CLAIMS. PARTIES RECEIVING THIS NOTICE OF THE TRUSTEE'S TWO HUNDRED THIRD OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT THE TRUSTEE'S COUNSEL, KAREN M. CHAU, ESQ., AT (212) 837-6512.**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of

Lehman Brothers Inc. ( "LBI") under the Securities Investor Protection Act of 1970 as amended,

15 U.S.C. §§ 78aaa *et seq*. ("SIPA"),[1] by and through his undersigned counsel, respectfully

represents as follows:

**<u>RELIEF REQUESTED</u>**

1.      The Trustee files this two hundred third omnibus objection to general creditor

claims (the "Two Hundred Third Omnibus Objection to General Creditor Claims") pursuant to

sections 502(b) and 507(a)(4)(A) of title 11 of the United States Code (the "Bankruptcy Code"),

as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, Rule

3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this

Court's order approving procedures for the filing of omnibus objections to general creditor

claims filed in this SIPA proceeding (the "General Creditor Claim Objection Procedures Order,"

ECF No. 5441), seeking to (i) disallow and expunge in part (ii) subordinate and reclassify as

equity in part, (iii) reduce, and where applicable, reclassify, in whole or in part, as unsecured

general creditor claims, and (iv) allow, as modified, the claims listed on Exhibit A and Exhibit B

annexed hereto.  The Trustee's proposed order (the "Proposed Order") is annexed hereto as

Exhibit G.

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

2.      Each of the proofs of claim identified on <u>Exhibit A</u>, and as further identified on <u>Exhibit B</u>, (collectively, the "<u>Employee Claims</u>" or the "<u>Claims</u>") asserts a Severance Claim (as that term is defined herein).  Further, certain of the Employee Claims also assert LBHI Equities Claims, Equity Awards Claims, Accrued Equity Claims, and/or 401(k) Claims (as those terms are defined herein).  The Trustee requests that the Court: (i) disallow and expunge the portions of the Employee Claims that constitute LBHI Equities Claims, Equity Awards Claims, and/or 401(k) Claims; (ii) subordinate and reclassify the portions of the Employee Claims that constitute Accrued Equity Claims; (iii) reduce and, where appropriate, reclassify the portions of the Employee Claims that constitute Severance Claims; and (iv) allow each of the Employee Claims, as modified, in the amounts and priorities listed on <u>Exhibit A</u>.

3.      Each of the Employee Claims asserts a claim by former employees for severance payments based upon pre-Filing Date (as that term is defined herein) severance agreements with LBI (the "<u>Severance Claims</u>").  The Trustee has determined that the amounts claimed in the Severance Claims contradict LBI's books and records, and, therefore, the Severance Claims should be reduced to the amount reflected in LBI's books and records, as listed on <u>Exhibit A</u> under the heading "*Claim as Modified*."[2]  In addition, certain of the Severance Claims should be reclassified, in whole or part, from priority to general unsecured status because these Claims assert priority amounts which do not meet the statutory requirements for priority under Bankruptcy Code section 507(a)(4)(A), or are in excess of the statutory cap under section 507(a)(4)(A).  The Trustee therefore requests that the Court reduce, and, where applicable,

---

2.   As indicated on <u>Exhibit A</u>, certain of the claims also assert allowable claims for other items such as an unpaid check (the "<u>Allowable Portions</u>").  The amounts set forth in the column entitled "*Claim as Modified*" for these claims include the amounts attributable to these Allowable Portions.

reclassify, each Severance Claim listed on <u>Exhibit A</u>  to the amount and priority set forth in the column entitled "*Claim as Modified*," and allow each Severance Claim to the extent of such amount and priority.

4.      In addition, certain of the Employee Claims, as indicated on <u>Exhibit B</u>, assert one or more of the following claims (together, the "<u>Hybrid Components</u>") which, for the reasons described below, the Trustee disputes:

- Claims based on the ownership of common stock in Lehman Brothers Holdings Inc. ("<u>LBHI</u>") (the "<u>LBHI Equities</u>," and claims for such securities, the "<u>LBHI Equities Claims</u>").

  o LBI has no liability for the LBHI Equities Claims, as the holders of the LBHI Equities Claims have submitted claims as shareholders of LBHI. Ownership of LBHI Equities represents an equity interest in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding.

- Claims for equity interests in LBHI purportedly owned by the claimants in the form of ownership of restricted stock units ("<u>RSUs</u>"), contingent stock awards ("<u>CSAs</u>"), contingent equity awards ("<u>CEAs</u>"), stock options, and/or other equity-related compensation (together, the "<u>Equity Awards</u>"), all of which were granted to employees of LBI and other Lehman entities as part of their compensation, and provided employees with the right to shares of LBHI common stock on a future date upon the satisfaction of certain conditions (the "<u>Equity Awards Claims</u>").[3]

  o LBI has no liability for the Equity Awards Claims.  Ownership of Equity Awards represents an equity interest in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding.[4]

---

3. The Trustee specifically reserves the right to object to any of the Equity Awards Claims which are not disallowed and expunged on the basis that the Equity Awards were not earned or awarded pursuant to employment with LBI.

4. Furthermore, as explained more fully below in footnote 9, even if ownership of the Equity Awards were to represent an equity interest in LBI (which it does not), ownership of the Equity Awards would not constitute a "claim" against LBI as that term is defined in section 101 of the Bankruptcy Code, and the Equity Awards Claims would be subject to reclassification as equity interests.

- Claims for the delivery of Equity Awards to which the claimant had accrued a right as a component of their compensation as employees of LBI in 2008, but which had not yet been granted to the claimant as of the Filing Date (as that term is defined herein) (collectively, the "Accrued Equity Claims" and, together with the Equity Awards Claims, the "Employee Equity Claims").

  - The Accrued Equity Claims must be subordinated to the level of equity. The Accrued Equity Claims assert claims against LBI for the delivery of Equity Awards owed to the claimants as a result of their employment with LBI or with other Lehman entities. As each of the Accrued Equity Claims is based on the alleged pre-Filing Date right to receive accrued equity in LBHI, an affiliate of LBI, the Trustee requests that the Accrued Equity Claims be subordinated to allowed LBI general creditor claims pursuant to section 510(b) of the Bankruptcy Code.

- Claims for ownership or the decline in value of the claimant's 401(k) savings plan accounts (the "401(k) Accounts" and claims for such accounts, the "401(k) Claims").

  - LBI has no liability for the 401(k) Claims. The claimed 401(k) Accounts were not held at LBI. Instead, the 401(k) Accounts were held in a separate trust and could be accessed by former employees at any time. LBI has no liability for the value of the claimants' 401(k) Accounts and no liability for any loss in value of the claimants' 401(k) Accounts.

5.    Each of the Employee Claims contains a Severance Claim, which should be reduced or reduced and reclassified, in whole or in part, to general unsecured status. Further, certain of the Employee Claims also assert an LBHI Equities Claim, Equity Awards Claim, and/or 401(k) Claim, for which LBI has no liability. Therefore, the Trustee respectfully requests that the Employee Claims be: (i) disallowed and expunged from LBI's claims register in part; and/or (ii) reduced or reduced and reclassified, in whole or in part, from priority to general unsecured status and allowed, as modified, in the amounts and priorities listed on Exhibit A, all as indicated in Exhibit A and Exhibit B.

## JURISDICTION

6.    Following removal to this Court for all purposes as required for SIPA cases by section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred

5

by [SIPA] upon the court to which application for the issuance of the protective decree was made." 15 U.S.C. § 78eee(b)(4).

7.      Venue is proper in this Court pursuant to SIPA section 78eee(a)(3) and 15 U.S.C. section 78aa.

## BACKGROUND

8.      On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, United States District Court, Southern District of New York, entered the Order Commencing Liquidation of LBI (the "LBI Liquidation Order," ECF. No. 1) pursuant to the provisions of SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL).  The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; and (ii) removed the case to this Court for all purposes as required for SIPA cases by section 78eee(b)(4) of SIPA, in the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (the "SIPA Proceeding").

9.      On November 7, 2008, the Court entered the Order Approving Form and Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Other Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Customer Claims Process Order," ECF No. 241).  Beginning on December 1, 2008, consistent with SIPA section 78fff-2(a)(1), the Trustee mailed more than 905,000 claims packages with filing information to former LBI customers and other potential claimants (the "Claims Process Notice") and posted claims filing information on the Trustee's website (www.lehmantrustee.com) and SIPC's website

(www.sipc.org). The Trustee also published notice of the claims process in The New York Times, The Wall Street Journal and The Financial Times.

10. Pursuant to SIPA section 78fff-2(a)(3) and the Customer Claims Process Order, customer claims seeking maximum protection under SIPA must have been received by the Trustee on or before January 30, 2009. All customer claims and general creditor claims must have been received by the Trustee by June 1, 2009 and no claims of any kind will be allowed unless received by the Trustee on or before June 1, 2009 (the "Pre-Filing Date Bar Date"). In addition to the Pre-Filing Date Bar Date, on September 19, 2013, the Bankruptcy Court entered an order (the "Administrative Bar Date Order") that established October 31, 2013 (the "Administrative Bar Date") as the deadline to file a proof of claim for certain administrative expense claims against the LBI estate, as further described in the Administrative Bar Date Order, with respect to such administrative expenses arising between September 19, 2008 and August 31, 2013. The Administrative Bar Date has now passed. A copy of the Customer Claims Process Order was made publicly available at www.lehmantrustee.com. The Trustee's website allowed claimants filing electronically to upload documents as part of their claim submission and thereby comply with the instructions to include supporting documentation set forth in the Proof of Claim.

11. In accordance with the Customer Claims Process Order, in cases where the Trustee denied a claim for protection as a customer and converted the claim to a general creditor claim, the Trustee notified the claimant consistent with the procedures set forth in the Customer Claims Process Order. The claimant was afforded the opportunity to object and have the matter heard by the Court if the claimant was aggrieved by the Trustee's denial of customer treatment and conversion of the claim to a general creditor claim. If a claimant did not object to the

Trustee's conversion of the claim consistent with the procedures set forth in the Customer Claims Process Order, the Trustee's conversion of the claim to a general creditor claim became final. No determination was made as to the validity or allowed amount of such converted and reclassified claims.

12.     On November 15, 2012, the Court entered the General Creditor Claim Objection Procedures Order, which authorizes the Trustee, among other things, to file omnibus objections to no more than 200 general creditor claims at a time, on various grounds, including the grounds that: (i) the claims subject to the omnibus objection seek recovery of amounts for which LBI is not liable; (ii) the claims subject to the omnibus objection were incorrectly classified; and (iii) the amount claimed in the claims subject to the omnibus objection contradicts LBI's books and records.

## ARGUMENT

13.     A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim. *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000). Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).

14.     Section 502(b) of the Bankruptcy Code provides, in relevant part, that a court should determine the amount of a claim subject to an objection "as of the date of the filing of the

petition, and shall allow such claim in such amount," and that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b). The General Creditor Claim Objection Procedures Order authorizes the Trustee to file omnibus objections "seeking reduction [and/or] reclassification . . . [on the grounds that] the amount claimed contradicts LBI's books and records; provided that the Trustee will include the amount of such General Creditor Claim, if any, reflected in LBI's books and records." General Creditor Claim Objection Procedures Orders at 2.

## I.      The Severance Claims Should Be Reduced And, Where Applicable, Reclassified.

15.      According to Bankruptcy Code section 507(a)(4)(A), claims of former employees of a debtor for "wages, salaries, or commissions, including vacation, *severance*, and sick leave pay" are entitled to priority status, but only up to $10,950,[5] and only if earned within the 180 days leading up to the commencement of the SIPA Proceeding. 11 U.S.C. 507(a)(4)(A) (emphasis added). Claims for severance earned more than 180 days before the commencement of the SIPA Proceeding or in excess of the $10,950 statutory cap must be classified as general unsecured claims, with no priority, administrative, or secured status. *In re LandAmerica Fin. Group, Inc.*, 435 B.R. 343, 352 (Bankr. E.D. Va. 2010) *aff'd sub nom. Matson ex rel. LandAmerica Fin. Group, Inc. v. Alarcon*, 10-2352, 2011 WL 2624437, at *410 (4th Cir. July 6,

_____

5.      The amount of the employee compensation priority has been changed periodically for cases filed subsequent to the change in question. This SIPA Proceeding was commenced on September 19, 2008, and therefore the applicable amount of the employee compensation priority in this proceeding is $10,950. *See* Bankruptcy Code § 104(a); Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code, 75 Fed. Reg. 8,747 (Feb. 25, 2010); Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(A) of the Code, 78 Fed. Reg. 12,089 (Feb. 21, 2013).

2011) (holding that section 507(a)(4) claims earned in excess of the statutory cap are general

unsecured claims); *In re Powermate Holding Corp.*, 394 B.R. 765, 773 (Bankr. D. Del. 2008)

(stating that claims in excess of the section 507(a)(4) statutory cap are general unsecured claims);

*In re Chicago Lutheran Hosp. Ass'n*, 75 B.R. 854, 856 (Bankr. N.D. Ill. 1987) (explaining that

claims in excess of the statutory cap "are nothing more than general unsecured claims, entitled to

no priority whatsoever"); *In re Chateaugay Corp.*, 115 B.R. 760, 784 (Bankr. S.D.N.Y. 1990)

*opinion withdrawn and vacated on other grounds*, 89 CIV. 6012 (KTD), 1993 WL 388809, at

*1-3 (S.D.N.Y. June 16, 1993) (holding that priority claims must be reclassified as general

unsecured claims to the extent that they do not conform to the requirements of section 507(a)(4)).

16.     Based on analysis by the Trustee's counsel of the terms of any severance

agreements filed in connection with each of the general creditor proofs of claim (the "Proofs of

Claim") listed in Exhibit A, and based on analysis by the Trustee's professionals of each of the

Proofs of Claim, certain information from the LBI general claims register as maintained by the

Trustee's claims agent, and certain information from the books and records of the LBI estate, as

further described in the declaration of Timothy Hurley, a Principal of Deloitte Transactions and

Business Analytics LLP, annexed hereto as Exhibit C (the "Hurley Declaration"), the Trustee has

identified the Severance Claims as claims that must be reduced because the Severance Claims

miscalculate the amount of severance owed or fail to account for partial severance payments that

the claimant received from LBI prior to the Filing Date.  In addition, certain of the Severance

Claims must be reclassified, in whole or in part, from priority to general unsecured status

because they claim amounts in excess of the statutory cap or amounts earned more than 180 days

prior to the Filing Date, and therefore are not entitled to priority status under Bankruptcy Code

section 507(a)(4)(A).  *See* 11 U.S.C. § 507(a)(4)(A).

17.     The amounts listed on Exhibit A in the column entitled "*Claim as Modified*" and in the row denoted with the lettered symbol (**T**) are calculated by the Trustee's professionals as described in the Hurley Declaration and in Exhibit A.[6]  Accordingly, pursuant to Bankruptcy Code sections 502 and 507(a)(4)(A), the Trustee requests that the Court reduce, and, where applicable, reclassify, each Severance Claim to the amount and priority listed on Exhibit A in the column entitled "*Claim as Modified*," and allow each Severance Claim to the extent of such amount and priority.

## II.     The Hybrid Components Should Be Disallowed And Expunged And/Or Subordinated And Reclassified.

18.     The liabilities asserted in the Hybrid Components are not valid claims against LBI and should be disallowed and expunged and/or subordinated and reclassified as equity awards as set forth below and in Exhibit A and Exhibit B.  Unless the Hybrid Components are disallowed and expunged and/or subordinated and reclassified as equity awards, parties who do not hold valid claims against the LBI Estate will recover ratably with general unsecured creditors.

### A.     *The LBHI Equities Claims Should Be Disallowed And Expunged.*

19.     Based on analysis by the Trustee's professionals of the general creditor claims filed on the claims register in this case and maintained by the Trustee's claims agent, as described in Hurley Declaration, the Trustee has identified the claims identified as "LBHI Equities Claims" on Exhibit B as claims for which LBI is not liable because the LBHI Equities

---

6.   As discussed in Exhibit A, certain of the Employee Claims also assert claims for additional Allowable Portions. The amounts listed in the column entitled "*Claim as Modified*" thus includes both the amounts due to the claimants for the Severance Claims and the amounts owed for the Allowable Portions, as determined by the Trustee's counsel.

Claims are based on the ownership of LBHI Equities, which represents an equity interest in LBHI, not LBI.

20.     The holders of the LBHI Equities Claims fail to articulate any legal or factual justification for asserting a claim against LBI.  The holders of the LBHI Equities Claims have submitted claims as shareholders of LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding.  The ownership of LBHI Equities does not create a claim against, or interest in, LBI.[7]  If the LBHI Equities Claims remain on the claims register, parties who do not hold valid claims against the LBI Estate will recover.  Therefore, the Trustee requests that the Court enter an order disallowing and expunging in their entirety the portions of the Employee Claims based on LBHI Equities Claims.

---

7.   Even if ownership of LBHI Equities gave claimants an equity interest in LBI (which it does not), the LBHI Equities Claims would be subject to reclassification as interests.  Pursuant to the Bankruptcy Code, holders of claims based on stock of the debtor are equity security holders.  *See* 11 U.S.C. §§ 101(16) and (17).  Thus, if the claimants asserting the LBHI Equities Claims had an equity interest in LBI (which they do not), they would have "interests" in, but not "claims" against, LBI.

Further, even if the holders of the LBHI Equities Claims were to have articulated any legal or factual justification for asserting a claim against LBI based on their ownership of LBHI Equities (which they have not), these claims would be subject to subordination pursuant to section 510(b) of the Bankruptcy Code, which provides that for purposes of distribution, a claim arising from the purchase or sale of a security in the debtor or an affiliate of the debtor shall have the same priority as the security.  11 U.S.C. § 510(b); *see, e.g.*, *Hasson v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, 11 Civ. 8444 (RJS), 2012 WL 1886755, at *3-6 (S.D.N.Y May 21,. 2012) (finding that a claim alleging misconduct on the part of the debtor and seeking to recover losses sustained as a result of ownership of stock of the debtor must be subordinated under section 510(b)); *In re VF Brands, Inc.*, 275 B.R. 725, 726-29 (Bankr. D. Del. 2002) (subordinating claims for damages based on securities of an affiliate of the debtor under section 510(b)).

**B.** ***The Equity Awards Claims Should Be Disallowed And Expunged And The Accrued Equity Claims Should Be Reclassified As Equity Interests And Subordinated.***

    1. <u>The Equity Awards</u>

21. Prior to the Filing Date, employees of LBI and other Lehman entities received a portion of their compensation in the form of Equity Awards. The amount of compensation paid in the form of Equity Awards was determined based on the employee's position/title and total compensation for the year. In the case of bonus-eligible employees, Equity Awards were granted as a component of the year-end bonus. In the case of production-based employees, whose level of compensation was dependent on their level of production, the right to Equity Awards accrued on a monthly basis in amounts in accordance with a projection of each employee's total yearly compensation based on the employee's monthly production. These accrued Equity Awards were then granted concurrently with the grant of year-end bonuses. (*See* 2007 Equity Award Program, attached hereto as <u>Exhibit D</u>; 2008 Equity Award Program, attached hereto as <u>Exhibit E</u>.)

22. The Equity Awards Claims were filed by former employees of LBI or other Lehman entities based on Equity Awards which already had been granted prior to the Filing Date. The Accrued Equity Claims were filed by former employees of LBI or other Lehman entities based on alleged rights to Equity Awards which had accrued pursuant to their employment with LBI or other Lehman entities but which had not yet been granted as of the Filing Date.

2. <u>The Equity Awards Claims Should Be Disallowed And Expunged.</u>

23. Based on analysis by the Trustee's counsel of the Equity Awards Claims listed on Exhibit B and other relevant documents and materials,[8] the Trustee has identified the Equity Awards Claims as claims for which LBI is not liable, as the Equity Awards Claims seek recovery of equity interests (owned in the form of Equity Awards) in LBHI.

24. The holders of the Equity Awards Claims fail to articulate any legal or factual justification for asserting a claim against LBI. The Equity Awards gave claimants the right to acquire stock in LBHI, not LBI, and the Equity Awards Claims do not give rise to a claim against LBI.[9] If the Equity Awards Claims remain on the claims register, parties who do not

---

8. Documents reviewed by the Trustee's counsel include agreements governing the Equity Awards, plans and prospectus governing the use of Equity Awards by LBI and other Lehman entities, and minutes of the committee responsible for approving the grant of and plans governing the Equity Awards.

9. Even if the Equity Awards were to have given claimants an equity interest in LBI (which they do not), the Equity Awards Claims would be subject to reclassification as interests. Section 501(a) of the Bankruptcy Code provides that a creditor may file a proof of claim and that an equity security holder may file a proof of interest. 11 U.S.C. § 501(a). Contracts concerning a variety of stock-based transactions, including the right to acquire stock, qualify as equity securities under the Bankruptcy Code. *See, e.g.*, *In re Enron Corp.*, 341 B.R. 141, 162-63 (Bankr. S.D.N.Y. 2006) (holding that a "phantom" stock purchase program where delivery of shares was deferred for tax purposes qualified as a security for the purpose of distribution under the Bankruptcy Code). The Equity Awards gave claimants the right to acquire stock in LBHI after the satisfaction of certain conditions and thus must be deemed "equity securities" under the Bankruptcy Code.

In addition, even if the holders of the Equity Awards Claims were to have articulated any legal or factual justification for asserting a claim against LBI based on the Equity Awards (which they have not), these claims would be subordinated pursuant to section 510 of the Bankruptcy Code on several grounds. First, certain of the Equity Awards are governed by agreements which provided that, in the event of a bankruptcy of LBHI, all claims arising from, in connection with, or in any way relating to any failure to deliver shares of common stock shall have the same priority as, and no greater priority than, common stock interests in LBHI. Subordination agreements such as these are enforceable in bankruptcy. 11 U.S.C. § 510(a); *see, e.g.*, *In re Leasing Consultants, Inc.*, 2 B.R. 165, 168 (Bankr. E.D.N.Y. 1980), citing *In re Credit Indus. Corp.*, 366 F.2d 402, 407 (2d Cir. 1966). Second, any claim arising from the Equity Awards would be subject to subordination under section 510(b) of the Bankruptcy Code, which provides that for purposes of distribution, a claim for damages arising from the purchase or sale of a security shall have the same priority as the security. 11 U.S.C. § 510(b). Therefore, as discussed further in Section II(B)(3), claims for the payment of damages in connection with

(Footnote continued on next page)

hold valid claims against the LBI Estate will recover.  Thus, the Trustee requests that the Court enter an order disallowing and expunging in their entirety the Equity Awards Claims.

      3.      <u>The Accrued Equity Claims Should Be Reclassified As Equity Interests And Subordinated Under Section 510(b) Of The Bankruptcy Code.</u>

25.      Based on analysis by the Trustee's counsel of the Accrued Equity Claims listed on <u>Exhibit B</u> and other relevant documents and materials,[10] the Trustee has identified the Accrued Equity Claims as claims that should be subordinated pursuant to section 510(b) of the Bankruptcy Code because each of the Accrued Equity Claims is based on the right to equity in LBHI.

26.      Section 510(b), as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, provides that, for the purpose of distribution, a claim for damages arising from the purchase or sale of a security of an affiliate of the debtor must have the same priority as the underlying security.  11 U.S.C. § 510(b).  As discussed above in footnote 9, the Equity Awards constitute securities for the purposes of the Bankruptcy Code.  The grant of securities as part of compensation packages qualifies as "a purchase or sale" of a security for the purposes of section 510(b).  *See, e.g.*, *Spirnak v. Motors Liquidation Co. GUC Trust (In re Motor Liquidation Co.)*, No. 11 Civ. 7893(DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012); *In re WorldCom, Inc.*, No. 02-13533(AJG), 2006 WL 3782712, at *5-6 (Bankr. S.D.N.Y. Dec. 21,

---

(Footnote continued from prior page)

equity-related awards granted to employees as a component of compensation must be subordinated under section 510(b) of the Bankruptcy Code.

10.  Documents reviewed by the Trustee's counsel include agreements governing the Equity Awards, plans and prospectus governing the use of Equity Awards by LBI and other Lehman entities, and minutes of the committee responsible for approving the grant of and plans governing the Equity Awards.

2006).  Here, the Accrued Equity claimants accrued the right to receive Equity Awards as part of their compensation, and therefore the right to receive these accrued Equity Awards constitutes the "purchase or sale" of a security

27.     Likewise, "physical possession of the security is not required for a claim based upon that security to be subordinated."  *Enron*, 341 B.R. at 163 (citing *Am. Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829-30 (9th Cir. 2001)).  A claim premised on the failure to deliver securities under a contract constitutes a claim for damages that must be subordinated under section 510(b).  *See In re Med Diversified Inc.*, 461 F.3d 251, 258-59 (2d Cir. 2006); *see also In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002) (subordinating claims pursuant to section 510(b) where the debtor breached a contractual obligation to use its best efforts to register the claimants' securities); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001) (subordinating claims under section 510(b) where the debtor failed to deliver securities pursuant to a merger agreement).  Therefore, as the Accrued Equity Claims are based on the failure to deliver accrued Equity Awards to the claimants, these claims must be subordinated to claims in the general creditor estate pursuant to section 510(b).

28.     Courts have generally applied section 510(b) liberally, to a wide variety of claims. Indeed, the Second Circuit has instructed that section 510(b) should be "interpret[ed] broadly." *Med Diversified*, 461 F.3d at 259.  In agreeing to accept compensation in the form of Equity Awards, the Accrued Equity Claimants "took on the risk and return expectations of a shareholder, rather than a creditor."  *Med Diversified*, 461 F.3d at 256.  They therefore should not also be allowed to "share with creditors [now that] the enterprise [has been] forced to . . . liquidate."  *Id.* at 256 (internal quotations omitted).  Therefore, the Trustee requests that the

Court enter an order reclassifying and subordinating to general creditor claims under section 510(b) the portions of the Employee Claims based on Accrued Equity Claims.[11]

### C.    *The 401(k) Claims Should Be Disallowed And Expunged.*

29.    Based on analysis by the Trustee's professionals of the general creditor claims filed on the claims register in this case and maintained by the Trustee's claims agent, as described in the Hurley Declaration, the Trustee has identified the claims listed as 401(k) Claims on Exhibit B as claims for which LBI is not liable because the 401(k) Claims are based either on the ownership of 401(k) savings accounts not held at LBI or on losses associated with such 401(k) savings plan accounts.  The 401(k) Accounts were held in a separate trust, which was administered by Fidelity Management Trust Company ("Fidelity") in its role as trustee.  *See* Lehman Brothers Savings Plan Summary Plan Description, attached hereto as Exhibit F, at pp. 2, 22.  This trust is not an asset of the LBI Estate and was not held at LBI on the Filing Date.[12]

30.    The claimants' 401(k) Accounts presently contain or contained a variety of financial products, including stocks and bonds that were issued by companies unrelated to LBI and funds that are not connected to LBI.  Losses associated with 401(k) savings accounts not held at LBI do not give rise to a valid claim against LBI.  Thus, as the 401(k) Claims fail to assert any grounds for liability on the part of LBI, the Trustee requests that the 401(k) Claims be disallowed and expunged in their entirety.

---

11.  The Trustee takes no position as to the validity, value, or level of priority of subordinated and reclassified Accrued Equity Claims at this time and reserves the right to raise arguments as to these issues should the need arise.

12.  The Trustee does not have access to information regarding the 401(k) Accounts after the Filing Date, and therefore does not know where the 401(k) Accounts are currently held, whether the trust still exists, or whether the trust is still managed by Fidelity.

31.     The 401(k) Accounts also may contain common stock in LBHI or funds which invest or invested in LBHI common stock.  As discussed above in Section I, ownership of LBHI common stock represents an equity interest in LBHI, not LBI, the debtor in this separate and distinct proceeding.

32.     The holders of the 401(k) Claims fail to articulate any legal or factual justification for asserting a claim against LBI.  If the 401(k) Claims remain on the claims register, the potential exists for recoveries by parties who do not hold valid claims against the LBI Estate.  Thus, the Trustee requests that the Court enter an order disallowing and expunging in their entirety the portions of the Employee Claims that assert 401(k) Claims.

## RESERVATION OF RIGHTS

33.     The Trustee reserves all rights to object to any Employee Claim or any portion of any Employee Claim for which the Court does not grant the relief requested herein.  The Trustee further reserves all rights to object to the validity and/or value of any Employee Claim which is reclassified and subordinated.

## NOTICE

34.     Notice of this Two Hundred Third Omnibus Objection to General Creditor Claims has been provided to (i) each claimant listed on Exhibit A via overnight mail; and (ii) the list of parties requesting notice of pleadings in accordance with the Court's Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures and Related Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately available for inspection upon filing with the Court at the Trustee's website, www.lehmantrustee.com.  The Trustee submits that no other or further notice need be provided.

18

## NO PRIOR RELIEF REQUESTED

35.    No previous request for the relief requested herein has been made by the Trustee

to this or any other Court.

## CONCLUSION

For the reasons stated herein, the Trustee respectfully requests entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated:    New York, New York
           February 7, 2014

                                    HUGHES HUBBARD & REED LLP

                                    By: /s/ James B. Kobak, Jr.
                                    James B. Kobak, Jr.
                                    Christopher K. Kiplok
                                    Meaghan C. Gragg
                                    Karen M. Chau
                                    One Battery Park Plaza
                                    New York, New York 10004
                                    Telephone:  (212) 837-6000
                                    Facsimile:  (212) 422-4726
                                    Email:  kobak@hugheshubbard.com


                                    Attorneys for James W. Giddens,
                                    Trustee for the SIPA Liquidation of
                                    Lehman Brothers Inc.

**EXHIBIT A**

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|---|
| 1 | BISHOP, DAVID L. | 1494 | 1/23/2009 | - (A) | - (A) |
| | 27 KETCHUM ROAD | | | - (S) | - (S) |
| | WARWICK, NY 10990 | | | - (P) | - (P) |
| | | | | $45,000.00 (U) | $40,000.00 (U) |
| | | | | $45,000.00 (T) | $40,000.00 (T) |
| 2 | BUCHERT, FREDERIC C. | 6077 | 6/15/2009 | - (A) | - (A) |
| | 346 LORIMER STREET | | | - (S) | - (S) |
| | BROOKLYN, NY 11206 | | | $12,863.63 (P) | $10,950.00 (P) |
| | | | | $8,088.47 (U) | $8,088.47 (U) |
| | | | | $20,952.10 (T) | $19,038.47 (T) |
| 3 | COSTELLO, RUSSELL S. | 1246 | 1/21/2009 | - (A) | - (A) |
| | 5445 CARUTH HAVEN | | | - (S) | - (S) |
| | #712 | | | $10,950.00 (P) | $10,950.00 (P) |
| | DALLAS, TX 75225 | | | $39,903.00 (U) | $37,703.85 (U) |
| | | | | $50,853.00 (T) | $48,653.85 (T) |
| 4 | DEMASI, KATHLEEN M. | 1473 | 1/23/2009 | - (A) | - (A) |
| | 146 78TH STREET | | | - (S) | - (S) |
| | BROOKLYN, NY 11209 | | | $175,000.00 (P) | $10,950.00 (P) |
| | | | | - (U) | $141,684.62 (U) |
| | | | | $175,000.00 (T) | $152,634.62 (T) |

1

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|---|
| 5 | FRIEDLAND, JAMES<br>90 GREEN WAY<br>ALLENDALE, NJ 07401 | 3408 | 2/3/2009 | - (A)<br>- (S)<br>$116,000.00 (P)<br>- (U)<br>$116,000.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$23,991.95 (U)<br>$34,941.95 (T) [1] |
| 6 | GEORGIEVA, ANNA<br>IORDANKA GEORGIEVA<br>32A ULITZA STARA PLANINA<br>OBSHTINA DOBRICH<br>SELO STEFAN KARADJA 9371<br>BULGARIA | 7000304 | 1/11/2009 | - (A)<br>- (S)<br>$10,950.00 (P)<br>$16,362.50 (U)<br>$27,312.50 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$10,335.62 (U)<br>$21,285.62 (T) |
| 7 | GONGLE, SHRUTI<br>1533 WATERFORD DRIVE<br>EDISON, NJ 08817 | 8001789 | 1/28/2009 | - (A)<br>- (S)<br>- (P)<br>- (U)<br>UNSPECIFIED* (T) | - (A)<br>- (S)<br>- (P)<br>$12,115.39 (U)<br>$12,115.39 (T) |
| 8 | MAGGIACOMO, ALAN B.<br>5 HAWTHORN DRIVE<br>PLAINSBORO, NJ 08536 | 7000599 | 1/28/2009 | - (A)<br>- (S)<br>$86,125.00 (P)<br>- (U)<br>$86,125.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$74,261.63 (U)<br>$85,211.63 (T) |

---

1. The amount to be allowed for claim number 3408, listed in the column entitled "*Claim as Modified*," reflects: (i) a claim for severance, valued at $25,000.00; and (ii) a claim for an unpaid check, valued at $9,941.95.

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | Asserted Amount | Claim as Modified |
|---|---|---|---|---|---|
| 9 | PIERRE-LOUIS, ALIX<br>10900 E. TAYLOR RD<br>APT 132<br>GULFPORT, MS 39503 | 7000708 | 1/21/2009 | - (A)<br>- (S)<br>- (P)<br>$79,434.20 (U)<br>$79,434.20 (T) | - (A)<br>- (S)<br>- (P)<br>$61,894.15 (U)<br>$61,894.15 (T) |
| 10 | ROBINSON, REYNE L.<br>583 WEBSTER AVE<br>NEW ROCHELLE, NY 10801 | 7000714 | 1/29/2009 | - (A)<br>- (S)<br>$70,000.00 (P)<br>- (U)<br>$70,000.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$58,035.53 (U)<br>$68,985.53 (T) |
| 11 | SPITAL, SAUL H.<br>10 JEANINE COURT<br>MANALAPAN, NJ 07726 | 1739 | 1/26/2009 | - (A)<br>- (S)<br>$80,000.00 (P)<br>$143,500.00 (U)<br>$223,500.00 (T) | - (A)<br>- (S)<br>- (P)<br>$78,461.46 (U)<br>$78,461.46 (T) |
| 12 | STEPHENSON, REBECCA L<br>10272 MOUNTAIN MAPLE DRIVE<br>HIGHLANDS RANCH, CO 80129 | 7000413 | 1/19/2009 | - (A)<br>- (S)<br>$112,547.33 (P)<br>$65,047.73 (U)<br>$112,547.33 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$52,319.20 (U)<br>$63,269.20 (T) [2] |

2. The amount to be allowed for claim number 7000413, listed in the column entitled "*Claim as Modified*," reflects: (i) a claim for severance, valued at $58,524.01; and (ii) a claim for unpaid vacation days, valued at $4,745.19.

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|---|
| 13 | TANNOR PARTNERS CREDIT FUND, LP | 3565 | 2/12/2009 | - (A) | - (A) |
| | TRANSFEROR: KOTCHER, LAURI KIEN | | | - (S) | - (S) |
| | ATTN: ROBERT TANNOR | | | - (P) | - (P) |
| | 150 GRAND STREET, STE 401 | | | $140,000.04 (U) | $136,153.90 (U) |
| | WHITE PLAINS, NY 10601 | | | $140,000.04 (T) | $136,153.90 (T) |
| | | | | - (A) | - (A) |
| | | | | - (S) | - (S) |
| | Total | | | $674,435.96 (P) | $87,600.00 (P) |
| | | | | $537,335.94 (U) | $735,045.77 (U) |
| | | | | $1,146,724.17 (T) | $822,645.77 (T) |

**(A) – ADMINISTRATIVE**

**(S) – SECURED**

**(P) – PRIORITY**

**(U) – UNSECURED**

**(T) – TOTAL CLAIMED**

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

**EXHIBIT B**

**IN RE LEHMAN BROTHERS INC., CASE NO: 08-01420 (SCC) SIPA**
**TWO HUNDRED THIRD OMNIBUS OBJECTION: EXHIBIT B – EMPLOYEE CLAIMS**

| Claim Type | Trustee's Proposed Reason for Disallowance, Subordination and Reclassification as Equity, Reduction, and/or Reduction and Reclassification as General Unsecured Claims |
|---|---|
| LBHI Equities Claims | No legal or factual justification for asserting a claim against LBI.  The claimed stock constitutes an equity interest in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding. |
| Accrued Equity Claims | The Accrued Equity Claims are based on the alleged pre-petition right to receive accrued equity in LBHI, an affiliate of LBI, and therefore must be reclassified as equity interests and subordinated pursuant to section 510(b) of the Bankruptcy Code. |
| Equity Awards Claims | No legal or factual justification for asserting a claim against LBI.  The claimed Equity Awards constitute equity interests in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding. |
| 401(k) Claims | No legal or factual justification for asserting a claim against LBI.  LBI is not liable for the claimed 401(k) account or for losses associated with such account. |
| Severance Claims | The claim amount must be reduced to the accurate amount due under the claimant's severance agreement, as shown in LBI's books and records.  The claim must be reclassified, in whole or in part, to a general unsecured claim in accordance with Bankruptcy Code Section 507(a)(4)(A). |

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | SEVERANCE CLAIM | ACCRUED EQUITY CLAIM | EQUITY AWARDS CLAIM | 401(K) CLAIM | LBHI EQUITIES CLAIM |
|---|---|---|---|---|---|---|---|---|
| 1 | BISHOP, DAVID L. 27 KETCHUM ROAD WARWICK, NY 10990 | 1494 | 1/23/2009 | X | | | | |
| 2 | BUCHERT, FREDERIC C. 346 LORIMER STREET BROOKLYN, NY 11206 | 6077 | 6/15/2009 | X | | X | | |
| 3 | COSTELLO, RUSSELL S. 5445 CARUTH HAVEN #712 DALLAS, TX 75225 | 1246 | 1/21/2009 | X | | | | |
| 4 | DEMASI, KATHLEEN M. 146 78TH STREET BROOKLYN, NY 11209 | 1473 | 1/23/2009 | X | | | | |
| 5 | FRIEDLAND, JAMES 90 GREEN WAY ALLENDALE, NJ 07401 | 3408 | 2/3/2009 | X | X | | | |
| 6 | GEORGIEVA, ANNA IORDANKA GEORGIEVA 32A ULITZA STARA PLANINA OBSHTINA DOBRICH SELO STEFAN KARADJA 9371 BULGARIA | 7000304 | 1/11/2009 | X | | | | |
| 7 | GONGLE, SHRUTI 1533 WATERFORD DRIVE EDISON, NJ 08817 | 8001789 | 1/28/2009 | X | | | | |
| 8 | MAGGIACOMO, ALAN B. 5 HAWTHORN DRIVE PLAINSBORO, NJ 08536 | 7000599 | 1/28/2009 | X | | | | |

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | SEVERANCE CLAIM | ACCRUED EQUITY CLAIM | EQUITY AWARDS CLAIM | 401(K) CLAIM | LBHI EQUITIES CLAIM |
|---|---|---|---|---|---|---|---|---|
| 9 | PIERRE-LOUIS, ALIX<br>10900 E. TAYLOR RD<br>APT 132<br>GULFPORT, MS 39503 | 7000708 | 1/21/2009 | X | | | | |
| 10 | ROBINSON, REYNE L.<br>583 WEBSTER AVE<br>NEW ROCHELLE, NY 10801 | 7000714 | 1/29/2009 | X | | | | |
| 11 | SPITAL, SAUL H.<br>10 JEANINE COURT<br>MANALAPAN, NJ 07726 | 1739 | 1/26/2009 | X | | X | | |
| 12 | STEPHENSON, REBECCA L<br>10272 MOUNTAIN MAPLE DRIVE<br>HIGHLANDS RANCH, CO 80129 | 7000413 | 1/19/2009 | X | | X | X | X |
| 13 | TANNOR PARTNERS CREDIT FUND, LP<br>TRANSFEROR: KOTCHER, LAURI KIEN<br>ATTN: ROBERT TANNOR<br>150 GRAND STREET, STE 401<br>WHITE PLAINS, NY 10601 | 3565 | 2/12/2009 | X | | | | |

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| Debtor. | |

**DECLARATION OF TIMOTHY HURLEY IN SUPPORT OF THE TRUSTEE'S TWO
HUNDRED THIRD OMNIBUS OBJECTION SEEKING TO (I) DISALLOW IN PART,
(II) SUBORDINATE AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE
OR REDUCE AND RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM,
AND TO ALLOW SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION
AS PRIORITY AND/OR UNSECURED GENERAL CREDITOR CLAIMS
<u>(EMPLOYEE CLAIMS)</u>**

Pursuant to 28 U.S.C. § 1746, I, Timothy Hurley, hereby declare as follows:

1.      I am a Principal of Deloitte Transactions and Business Analytics LLP.  James W. Giddens (the "<u>Trustee</u>"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("<u>LBI</u>"), has duly authorized me to make and submit this declaration (the "<u>Declaration</u>") in support of the Trustee's two hundred third omnibus objection to general creditor claims (the "<u>Two Hundred Third Omnibus Objection to General Creditor Claims</u>").[1]

2.      The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief, and/or upon the proofs of claim listed on <u>Exhibit A</u> and <u>Exhibit B</u>, certain information from the LBI general claims register as maintained by the Trustee's claim agent, and certain information from the books and records of the LBI estate (the "<u>Books and</u>

---

1.   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the motion.

Records") analyzed by me or other personnel under my supervision and direction. If called and sworn as a witness, I could and would testify competently to the matters set forth herein.

3.     I understand that the Trustee's counsel has analyzed the terms and legal effect of any severance agreements filed in connection with each of the Proofs of Claim listed on Exhibit A and Exhibit B.

4.     In the context of my services for the Trustee, I am involved in assisting with the Trustee's general creditor claim reconciliation process. Accordingly, I and personnel under my supervision and direction have analyzed the claims asserted against the LBI estate listed on Exhibit A and the claims asserted against the LBI estate listed as "401(k) Claims," "LBHI Equities Claims," and "Severance Claims" on Exhibit B annexed to the Two Hundred Third Omnibus Objection to General Creditor Claims (the "Proofs of Claim"), and the LBI general claims register as maintained by Trustee's claims agent.

5.     Based on our analysis referred to in paragraphs 2 and 4 above, the claims listed on Exhibit B and marked as "401(k) Claims" assert claims based upon 401(k) savings plan accounts (the "401(k) Accounts"). The Books and Records do not show that LBI held securities or cash related to the 401(k) Accounts on behalf of the claimants listed on the Proofs of Claim listed as "401(k) Claims" on the Filing Date.

6.     Based on our analysis referred to in paragraphs 2 and 4 above, the claims listed on Exhibit B and marked as "LBHI Equities Claims" assert claims for LBHI common stock and indicate a CUSIP number and/or ticker symbol that corresponds to LBHI common stock as shown on Bloomberg Finance L.P., or otherwise indicates on its face that the claim is for LBHI common stock.

7.      Based on the analyses discussed in paragraphs 2, 3, and 4 above, and at the direction of the Trustee's counsel in regards to the analysis of the severance agreements included in the Proofs of Claim, I and personnel under my supervision and direction:

a)      analyzed the severance agreements included in the Proofs of Claim to identify the date through which the claimant's base salary continued and the amount of the payments indicated in the severance agreement and other documents included in the Proofs of Claim showing severance payments received by the claimant after the Filing Date;

b)      analyzed certain of LBI's payroll records to identify the gross base annual salary and date of last biweekly base salary or severance payment; and

c)      using the information contained in the severance agreement, documents included in the Proofs of Claim showing severance payments received by the claimant after the Filing Date, and information from certain of LBI's payroll records, then calculated the amount of the severance claim and compared it to the amount asserted in the Proof of Claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2014

                                        By: Timothy Hurley
                                        _____
                                        Timothy Hurley
                                        Principal, Deloitte Transactions and Business
                                        Analytics LLP

**EXHIBIT D**



# 2007 EQUITY AWARD PROGRAM
### LIFE @ LEHMAN
## YOUR BENEFITS AND LIFE BALANCE

For Bonus-Eligible Employees and
Production-Based Employees

# LEHMAN BROTHERS



## Contents

Eligibility.................................................................. 1

How the Equity Award Program Works.................. 1

2007 Equity Award Schedule .................................. 3

Termination Provisions ........................................... 5

Your Conduct with Respect to
Lehman Brothers after You Leave........................... 6

Tax Considerations.................................................. 6

Change in Control ("CIC") Provisions..................... 7

Dividend Equivalents .............................................. 7

Voting Rights ........................................................... 7

Other Information .................................................... 7

This brochure describes significant features of the
Lehman Brothers Equity Award Program for 2007.
It is not intended to replace the award agreement
or other official plan documents. This brochure
should be read in conjunction with the other
award documents.

# ELIGIBILITY

Active employees of the Firm (both bonus-eligible and production-based) hired on or before November 30, 2007, including employees on an approved leave of absence, are eligible to receive an equity award for 2007. Note that eligibility to receive an equity award is subject to a 5-share minimum.

If a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 5.

# HOW THE EQUITY AWARD PROGRAM WORKS

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm over time. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. Your 2007 equity award is awarded to you as a portion of your 2007 compensation.

Employees receive a portion of their total compensation (combined base salary, bonus, production payout, and other applicable forms of compensation) in the form of conditional equity awards. For 2007, the equity award is in the form of restricted stock units ("RSUs") for all employees and will be granted in early December. Each RSU represents the conditional right to receive one share of Lehman Brothers Holdings Inc. common stock five years after the grant date, on or about November 30, 2012. You can consider the RSUs as shares of Lehman Brothers common stock which you will be entitled to receive at that time, provided you meet certain terms and conditions. The 2007 RSUs cannot be sold, traded, or pledged for that five-year period.

## The Size of Your Award

The details of your 2007 equity award are shown on your year-end compensation worksheet and will also be available on the Personal Award Summary section of the Equity Award Program site on LehmanLive, keyword EquityAward, before the end of the first quarter of 2008. The amount of each employee's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title. Under this schedule, the amount of compensation awarded in the form of conditional equity awards (RSUs) increases as total compensation rises.

**Bonus-Eligible Employees:** Your 2007 award will be based on your 2007 total compensation, which includes salary earned in fiscal year 2007 plus any additional compensation with respect to fiscal year 2007, even if some of these payments are deferred or paid in 2008. Such compensation includes 2007 bonus, commissions, and other compensation.

**Production-Based Employees:** Similar to bonus-eligible employees, you receive a year-end 2007 conditional equity award as a portion of your 2007 total compensation. Your 2007 equity award accrues on a monthly basis, as a portion of your total payout on gross production during December 2006 through November 2007 (paid from January through December 2007) after all adjustments. For 2007, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of the 2007 Equity Award Schedule appears on page 3.) The 2007 payout may have included regular production payout, certain special payments, and other production payout. During any period you are paid a draw, equity (in the form of RSUs) may be awarded with respect to the amount of the draw. If the draw ends and you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued). Note that for purposes of this communication, all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of RSUs you receive for the Firm's 2007 fiscal year will be based on the closing price of Lehman Brothers Holdings Inc. common stock on the grant date, less a discount: 30% for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of RSUs awarded results in a total RSU award of $143; for other employees, with a 25 percent discount, every $100 of RSUs awarded results in a total RSU award of $133. The discount really means that the Firm "grosses up" your non-discounted portion at the outset.



## How Will the Grant Price for My 2007 RSUs Be Determined?

The grant price will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on a date in early December as determined by the Compensation and Benefits Committee of the Board of Directors. The grant price, along with the number of RSUs granted to you, will be communicated as part of the employee year-end compensation discussion with your manager. For Production-based employees, please refer to the "Compensation Statement" within the Sales Compensation System or contact the Compensation Department in New York at (212) 526-8346.

## When Will My 2007 RSUs Vest?

The vesting schedule for your 2007 RSUs is consistent with last year's. For vesting purposes, you should consider your 2007 RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2007 total compensation before the discount. The discount portion represents the balance of your RSU award, provided by the Firm. Your 2007 RSUs will vest in accordance with the schedule below provided you remain actively employed with the Firm through the applicable vesting date:

|  | Principal | Discount |
|---|---|---|
| MDs | 35% on November 30, 2010 35% on November 30, 2012 | 30% on November 30, 2012 |
| Up to and including SVPs | 75% on November 30, 2009 | 25% on November 30, 2012 |

If your employment with the Firm terminates prior to November 30, 2012, you generally will forfeit the portion of your 2007 RSUs that are unvested at the time of your termination. In addition, if your employment is terminated by the Firm with Cause, or if you engage in Detrimental Activity, prior to November 30, 2012, all of your outstanding RSUs, whether vested or not, will be forfeited. Please refer to page 6 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions* on page 5 for a detailed explanation of how your RSUs may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your RSUs.

## When Will I Receive Shares of Stock?

In general, the vested portion of your 2007 RSUs will convert to shares of Lehman Brothers Holdings Inc. common stock and will be delivered to you on November 30, 2012, subject to the terms and conditions of the Program. See the sections entitled *Termination Provisions* and *Change In Control ("CIC") Provisions* for further information on share delivery.



# 2007 EQUITY AWARD SCHEDULE

The participation schedule for 2007 is shown below. This schedule reflects the percentage of 2007 total compensation ("TC") that represents the principal portion of your 2007 RSUs. For production-based employees, the participation schedule for 2007 below is the same as the one previously communicated in 2006. An example of the calculations follows.

## 2007 Equity Award Schedule

### Amount of Total Compensation ("TC") in Equity-Based Awards

| Total Compensation Range | Employees Through Vice President Level | Senior Vice Presidents | Managing Directors |
|---|---|---|---|
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

## Award Calculation Example

Using the Equity Award Schedule above, your 2007 equity award will be determined at year end based on your 2007 total compensation. Sample illustrations are shown below.

| | Employees thru VP Level | SVPs | MDs |
|---|---|---|---|
| 2007 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| **Amount of Compensation in RSUs:** | **$2,300** | **$71,875** | **$240,000** |
| Est. FMV on grant date[1]: | $63.49 | $63.49 | $63.49 |
| Discount: | 25% | 25% | 30% |
| Est. Discounted grant price: | $47.62 | $47.62 | $44.44 |
| Est. Total # of RSUs: | 48 | 1,509 | 5,400 |
| Principal Portion: | 36 | 1,132 | 3,780 |
| Discount Portion: | 12 | 377 | 1,620 |
| **Total Grant Value with Discount:** | **$3,067** | **$95,833** | **$342,857** |

[1] Based on closing price of Lehman Brothers common stock on November 13, 2007. Actual grant price will be determined in early December.

Note: The number of RSUs has been rounded to the nearest whole number for illustrative purposes only. The actual grant price for 2007 RSUs will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on a date to be determined in early December.



## 2007 Monthly Equity Accrual for Production-Based Employees

As an example, below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2006 to November 2007 (paid January to December 2007) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| **Step 2** | Calculate projected award from 2007 Equity Award Schedule. | $1,932 | $1,932 |
| **Step 3** | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,932 x 8.33%) – $0 | $161 |
| **Step 4** | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| **Step 5** | Calculate projected award from 2007 Equity Award Schedule. | $2,070 | $2,070 |
| **Step 6** | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($2,070 x 16.67%) – $161 | $184 |
| **Step 7** | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|-----------|--------------------|-----------------|----------------------|----------------------|-------------|-------------------|----------------------|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,932 | 8.33% | $161 | $161 |
| 2 | February | 8,000 | 15,000 | 90,000 | 2,070 | 16.67% | 345 | 184 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,300 | 25.00% | 575 | 230 |
| 4 | April | 7,500 | 32,500 | 97,500 | 2,243 | 33.33% | 748 | 173 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,355 | 41.67% | 981 | 234 |
| 6 | June | 7,000 | 49,000 | 98,000 | 2,254 | 50.00% | 1,127 | 146 |
| 7 | July | 7,500 | 56,500 | 96,857 | 2,228 | 58.33% | 1,300 | 173 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,335 | 66.67% | 1,556 | 257 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,300 | 75.00% | 1,725 | 169 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,314 | 83.33% | 1,928 | 203 |
| 11 | November | 6,500 | 90,000 | 98,182 | 2,258 | 91.67% | 2,070 | 142 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,300 | 100.00% | 2,300 | 230 |
| | **Total** | | | | | | | **$2,300** |

In the example above, $2,300 is the amount of total compensation accrued by the production-based employee toward the year-end RSU award. For the calculation of the number of RSUs (including principal and discount portion), see example on page 3. **Note that if a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 5.**



# TERMINATION PROVISIONS

|  | All Employees |
|---|---|
| **Voluntary Termination** (but not Full Career) | Participants will forfeit all unvested 2007 RSUs. Any vested 2007 RSUs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2012 (the "Share Payment Date") but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** (but not Full Career) | **Involuntary Termination without Cause:** Participants will become entitled to the principal portion of their award, including the unvested principal portion (provided the employee signs a Firm-standard release agreement). The discount portion will be forfeited. Shares for the principal portion will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date. |
|  | **Involuntary Termination with Cause:** Participants will forfeit 100% of the principal and discount portions of RSUs. |
| **Full Career Termination** | **A termination is "Full Career" if:**<br>▪ The participant has at least 20 years of service; or<br>▪ The participant is at least 45 years old and has at least 10 years of service; or<br>▪ The participant is at least 50 years old and has at least 5 years of service.<br>**Voluntary Termination:** Participants will become entitled to 100% of both the 2007 RSU principal and discount portions on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2007 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2012.<br>**Involuntary Termination:** Participants will become entitled to 100% of both the 2007 RSU principal and discount portions on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2007 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2012. |
| **Termination due to Death or Disability** | Entire principal and discount portions will immediately vest, and shares will be delivered 30 days following the termination date. "Disability" means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act. |



# YOUR CONDUCT WITH RESPECT TO LEHMAN BROTHERS AFTER YOU LEAVE

You may forfeit your rights to any 2007 RSUs (and related dividend reinvestment) if you engage in Competitive Activity (for Full Career employees) or Detrimental Activity or if you commit an act constituting Cause prior to your termination of employment.

## Cause

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

## Competitive Activity

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).

**Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.** Asset management companies, mortgage-related companies, private equity firms, and hedge funds, along with investment banks, commercial banks, small boutique-type firms and most other financial services companies, are considered competitors of the Firm for purposes of the Equity Award Program.

While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

## Detrimental Activity

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any of its subsidiaries relating to the business affairs of Holdings or any of its subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).

#  TAX CONSIDERATIONS

## Tax Treatment of Your 2007 RSUs

Under current U.S. Federal tax law, you will not be taxed on the value of your RSUs until shares of common stock are delivered. As a result, your RSUs (including dividend reinvestment RSUs—refer to page 7) appreciate on a pre-tax basis until they



convert to shares of common stock. Provided below is a summary of the taxes related to RSUs that are ultimately due under current law.

**Note**: Pursuant to current tax law, if you work in more than one tax jurisdiction during the 5-year restriction period (from the date of grant through the conversion date for RSUs), you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction. The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.

### Taxation of RSUs

- No taxation on the award date.
- Upon delivery of common stock, the fair market value of the shares will be treated as employment income based on the closing price of Lehman Brothers Holdings Inc. common stock on the delivery date.
- This income will be subject to applicable tax withholding.
- Special provisions dealing with capital gains will not apply upon delivery of common stock.
- If you retain your shares after delivery, the basis for capital gains is the closing price on the delivery date.

Consult your personal tax advisor concerning the application of all US federal/state/local or foreign tax laws on your RSUs.

# CHANGE IN CONTROL ("CIC") PROVISIONS

Following a CIC, except to the extent that they would otherwise vest earlier, vesting of RSUs (both principal and discount portions) will accelerate on the later of: (i) 18 months following the CIC; or (ii) the end of the fiscal year in the year after the CIC occurs (the "CIC Vesting Date"), provided you remain actively employed through that date. Shares of Lehman Brothers common stock will be delivered on the earlier of the CIC Vesting Date or November 30, 2012, provided you do not engage in Detrimental Activity.

If your employment is terminated involuntarily without Cause following the CIC but prior to the CIC Vesting Date, all RSUs (both principal and discount portions) become immediately vested.

If your employment terminates for any reason (other than for Cause) following a CIC, any of your then vested RSUs (including those that may vest by reason of your involuntary termination) will convert to shares and be delivered on the earlier of: (i) the end of the fiscal quarter 1 year following the termination date; (ii) the CIC Vesting Date; or (iii) November 30, 2012, provided you do not engage in Detrimental Activity.

# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs.

# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

This document is intended as a brief summary of the material terms of the 2007 Equity Award Program. This document does not purport to summarize or describe the terms of equity awards from prior years. In the event of any conflict or discrepancy between the plan documents (including, but not limited to, the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus applicable to these awards) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive, keyword EquityAward, or contact the Compensation Department at 212-526-8346 (5-8346) or by e-mail at compensation@lehman.com.



**EXHIBIT E**

# 2008 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

# Lehman Brothers

# TABLE OF CONTENTS

**OVERVIEW OF 2008 CHANGES**

Q1  How will the 2008 equity award differ from last year's award? ........................................4

Q2  When will I be granted my 2008 equity award? .................................................................5

Q3  How will 2008 equity award levels compare to last year? ..................................................5

**JULY AWARD**

Q4  Who is eligible for a July equity award?.............................................................................6

Q5  How was the value of my July equity award calculated?....................................................6

    Bonus-eligible Employees ............................................................................................6

    Production-based Employees ........................................................................................6

Q6  How many July RSUs have I been granted? ......................................................................7

Q7  Why is the July equity award only 20% of last year's award?............................................7

Q8  How were the grant date and grant price for the July award determined?..........................7

Q9  What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

**YEAR-END AWARD**

Q10  Who is eligible for a 2008 Year-end equity award? ..........................................................8

Q11  How will my 2008 Year-end equity award be calculated? ................................................8

    Bonus-eligible Employees ............................................................................................8

    Production-based Employees ........................................................................................9

**2008 VESTING AND TERMINATION PROVISIONS**

Q12  When will my 2008 RSUs vest?.......................................................................................9

Q13  When will my 2008 RSUs convert to shares of common stock?........................................9

Q14  What will happen to my 2008 RSUs if I resign from the Firm?.........................................9

Q15  What will happen to my 2008 RSUs if my employment is terminated?............................10

## GENERAL INFORMATION

Q16  Where can I find details regarding my July award and other equity awards?....................10

Q17  Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18  Whom do I contact if I have further questions regarding the Equity Award Program?.....10

## EXHIBITS

Exhibit A:  2007 Equity Award Schedule..................................................................................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees..................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees...............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees...........................14

Exhibit E:  Termination Provisions ..........................................................................................15

Exhibit F:  Glossary of Select Terms .......................................................................................16

# OVERVIEW OF 2008 CHANGES

**Q1    HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?**

A1    The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program**:  the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**:  the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

    - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**:  as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Restricted Stock Units ("RSUs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount**:  Beginning with the 2008 equity award, employees will **no longer be granted RSUs at a discount** from their fair market value at the time of grant.  However, RSUs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Vesting Schedule**:  Under the 2008 Equity Award Program, the vesting schedule for all employees will be the same, irrespective of corporate title:  **33% per year over 3 years** (1/3 vesting on November 30, 2009, 1/3 vesting on November 30, 2010, and 1/3 vesting on November 30, 2011, respectively).

3. **Holding Period**:  In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that vested 2008 RSUs will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

**Q2    WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?**

A2    Eligible employees' 2008 equity award will comprise two separate grants on **two dates**:  a) a grant on July 1, 2008 (the "July RSUs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award").   You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive.  The July RSUs and any Year-end Award will vest and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price.  Further information on the July award is provided in the "July Award" section below.

**Q3    HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?**

A3    For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[1] regardless of corporate title and based on total compensation levels.  In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[2] and certain other employees, the schedule will be as previously communicated.  See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[1] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 2 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy.   Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[2] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award.  "Production-based" employees typically do not receive any year-end bonus.  Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion.  If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

# July Award

**Q4  WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?**

A4  Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence. Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries. In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

**Q5  HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?**

A5  **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July RSUs was calculated as 20% of the principal portion[3] of the 2007 equity award. In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July RSUs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July RSUs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July RSUs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July RSUs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008). See Exhibit D for examples of how the July equity award was determined.

---

[3] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

**Q6   HOW MANY JULY RSUs HAVE I BEEN GRANTED?**

A6   To determine the number of July RSUs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July RSUs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July RSUs, then no July RSUs will be granted.**

**Q7   WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7   As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses.  Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time.  To maintain sufficient flexibility in the determination of pay for 2008—and to minimize the risk that employee cash bonuses are not adversely impacted—the Firm decided that the July award would be based on 20% of the prior year award for most employees.  Please bear in mind that a July RSU award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8   HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8   All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors.  The July 1 grant date was set by the Committee.  The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July RSUs granted to you.

**Q9   WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9   **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July RSUs.  If you leave the Firm on or after November 30, 2008, your entitlement to any July RSUs, the same as any Year-end Award, will depend on when you leave, the

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

**Q10  WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?**

A10  Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions:  employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries.  Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award.  In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

**Q11  HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?**

A11  **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee.  In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

**Production-based Employees**
Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 VESTING AND TERMINATION PROVISIONS

**Q12  WHEN WILL MY 2008 RSUs VEST?**

A12  The 2008 equity award (including any July RSUs) will vest in 1/3 increments on November 30, 2009, 2010 and 2011.

**Q13  WHEN WILL MY 2008 RSUs CONVERT TO SHARES OF COMMON STOCK?**

A13  Vested 2008 RSUs (including any July RSUs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

**Q14  WHAT WILL HAPPEN TO MY 2008 RSUs IF I RESIGN FROM THE FIRM?**

A14  If you resign, you will forfeit all RSUs that are unvested at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

| | **% of Total Equity Award Retained** | | |
|---|---|---|---|
| | ***If you resign from the Firm after November 30 of:*** | | |
| | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 RSUs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of:  (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.**  See Exhibit E for termination provisions.

**Q15 WHAT WILL HAPPEN TO MY 2008 RSUs IF MY EMPLOYMENT IS TERMINATED?**

A15  As in prior years, if your employment with the Firm is terminated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) unvested 2008 RSUs, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity.  Your 2008 RSUs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011.  (If you do not sign a release agreement, you will be eligible to receive only the vested portion of your award.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason before November 30, 2008 forfeit any July RSUs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding RSUs.  See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16 WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16  Details of your equity awards can be found on the Personal Award Summary of the Equity Award Program section of LehmanLive, which you can access by using keyword **equityaward**. The number of July RSUs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

**Q17 DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17  No.  The changes outlined here apply only to awards granted in 2008.  These changes will not be retroactive to awards granted in prior years.

**Q18 WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18  If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com.

# EXHIBIT A:   2007 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

## EXHIBIT B: 2008 EQUITY AWARD SCHEDULE FOR BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below.   Any Year-end Award will be determined by subtracting any July RSUs from your full-year award, but in no event will your full-year award be less than your July RSUs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[4] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | | 1% of 2008 TC | 1% |
| $75,000 - $99,999 | | 2% of 2008 TC | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[4] Subject to a 5-share minimum.

# EXHIBIT C: 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated. Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July RSUs.

### 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
|---|---|---|---|
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

---

[5] Subject to a 5-share minimum.

# EXHIBIT D: 2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July RSUs, if any. The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| | |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| | |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

# EXHIBIT E:    TERMINATION PROVISIONS

| | **All Employees** |
|---|---|
| **Voluntary Termination** <br><br> *(but not Full Career)* | Participants will forfeit all unvested July RSUs and Year-end RSUs (together, "2008 RSUs"). Any vested 2008 RSUs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** <br><br> *(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs, including the unvested portion (provided the employee signs a Firm-standard release agreement). Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date. <br><br> **Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Full Career Termination** | **Voluntary Termination:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011. <br><br> **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011. <br><br> **Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Termination due to Death or Disability** | All 2008 RSUs will immediately vest, and shares will be delivered 30 days following the termination date. |

**NOTE:** Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July RSUs. In such cases, "Full Career" treatment does not apply.

# EXHIBIT F:   GLOSSARY OF SELECT TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Competitive Activity"** means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

**"Disability"** means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

**"Full Career Termination"** means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

**"Restricted Stock Units (RSUs)"** An RSU represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011.  Generally, RSUs cannot be sold, traded, pledged or transferred during that three-year period.

**"Termination"** means the end of employment with Holdings or a subsidiary.  The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**EXHIBIT F**

# Lehman Brothers Savings Plan

---

*Summary Plan Description*
*January 1, 2008*

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.**

Lehman Brothers Savings Plan Summary Plan Description..................................................... 2
    Plan Document Controlling .......................... 2
Eligibility ............................................................ 3
Joining the Plan ................................................ 3
    Types of Accounts and Contributions ......................... 3
    Participation .................................................. 3
Contributions .................................................... 3
    "Pay" ............................................................ 4
    Limits on Elective Deferrals............................ 4
    Catch-Up Contributions.............................. 4
    Reduction of Elective Deferral Limit - Important for New Employees .......................... 4
Employer Contributions—Basic and Matching ............. 5
    Twelve Month Service Requirement ......................... 5
    Eligibility upon Reemployment................... 5
    Types of Employer Contributions................. 5
    Examples.................................................. 5
    In this example $3,000 of the annual contribution represents money actually contributed by the Participant; the other $3,000 is the Employer Contribution............................................. 6
    Vesting in Employer Contributions............................ 6
    Form of Contribution/Investment.................. 6
Military Service ................................................ 6
Rollover Contributions ....................................... 6
Your Investments.............................................. 6
    Investing in a Company Stock Fund ......................... 7
    Life Cycle Funds ......................................... 7
    Information Available.................................... 7
    Section 404(c) Plan ..................................... 8
    Investment Performance Summary ......................... 9
    Investment of Current Contributions ......................... 10
    Valuation Date(s) ....................................... 10
Benefit Statements .......................................... 10
Designating a Beneficiary.................................. 10
    Domestic Partners ..................................... 10
    New Designations Required after Plan Mergers...... 11
Changing Your Elections ................................... 11
    Changing Your Contribution Rate ......................... 11
    Suspending Your Contributions .............................. 11
    Changing Investment of Future Contributions ......... 11
    Transferring Existing Account Balances ................. 11
    Limitations on Transfers............................... 12
    Redemption Fees ....................................... 12
    Blackout Periods ........................................ 12
Vesting ........................................................... 12
    Years of Vesting ........................................ 12
    Service with Affiliates ................................. 12
    Additional Vesting Rules .............................. 12
    Breaks in Service ....................................... 12
    Military Leave ............................................ 13
    Forfeiture of Non-vested Employer Basic and Matching Contributions .......................... 13
Withdrawals .................................................... 13
    Withdrawal from your Rollover Accounts ................. 13
    Age 59-1/2 Withdrawals .............................. 13
    Hardship Withdrawals ................................. 13
    Immediate and Significant Financial Need.............. 14
    How to Apply for a Hardship Withdrawal ................. 14

Minimum Required Distributions................................14
Tax Consequences of Withdrawals .........................14
After-Tax Contributions in Accounts Transferred from E.F. Hutton Plans......................................14
Final Distributions...........................................14
    Distribution upon Termination of Employment or Disability...................................................14
    Distribution upon Death ...............................15
    Valuation...................................................15
    Payment Procedures ..................................15
    Restrictions on Resale of Common Stock ...............16
    Incompetent or Missing Payees................16
    Miscellaneous...........................................16
Tax Consequences of Withdrawals/Distributions..........16
    Withdrawal of After-tax Contributions ....................16
    Withdrawal of Roth Contributions ...................16
    Stock Distributions .....................................17
Plan Loans......................................................17
Non-Alienation of Benefits/Qualified Domestic Relations Orders ................................................18
Voting of Common Stock and Other Securities ..........18
Expenses........................................................18
Top-Heavy Plans ............................................18
Special Provisions Applicable to Former Neuberger Berman Plan Participants................................18
    Pension Account ........................................19
    In-service withdrawals from your Profit Sharing Account ...................................................19
    New Beneficiary Designations Required .................19
    Domestic Partners .....................................19
    Spousal rights to Pension Account ....................19
    Additional Forms of Death Benefits Available for Pension and Profit Sharing Accounts .....................19
    Withdrawal of After-tax Contributions .....................19
Benefit Claims and Appeal Procedure .........................20
Plan Amendment or Termination ................................20
Your Rights Under ERISA.....................................20
    Prudent Actions by Plan Fiduciaries.........................21
    Enforce Your Rights....................................21
    Assistance With Your Questions ..............................21
Administrative Facts .........................................21
    Plan Name ...............................................21
    Plan Sponsor ............................................21
    Participating Employers ..............................21
    Employer Identification Number................21
    Plan Number ............................................21
    Plan Type .................................................21
    Plan Administrator......................................21
    Trust Fund ................................................22
    Plan Year .................................................22
    Payment of Benefits...................................22
    Agent for Service of Legal Process .........................22
Securities Act of 1933 ......................................22
Tax Effects of the Plan on the Company .....................22
Information about the Company and the Company's Common Stock...........................................22
Lehman Brothers Retirement Service Center................24
Lehman Brothers Intranet ..............................24

# Lehman Brothers Savings Plan Summary Plan Description

The Lehman Brothers Savings Plan ("Plan") is a 401(k) plan that provides you with an easy and convenient way to save toward your retirement. There have been various changes to the for 2008 including:

- The addition of a new Roth 401(k) contribution feature to the Plan (see the "Contributions" section on page 3)

- The 50% limit on investments in the Lehman Brothers Common Stock Fund has been reduced to 20% (see the "Your Investments" section on page 6)

- Basic and Employer Contributions for the 2007 and later plan years will be invested according to the employee's investment elections (see the "Employer Contributions – Basic and Matching" section on page 5)

- The Plan's default investment option has been changed to the Fidelity Freedom Fund available through the Plan with the target date that "best" corresponds to the participant's 65th birthday.

By participating in the Plan through traditional pre-tax contributions, you receive an immediate tax benefit since you are saving with tax-deferred dollars. In other words, your Plan contributions are automatically deducted from your paycheck before they are taxed.

By participating in the Plan through Roth contributions, you have the potential of withdrawing your contributions, along with the investment experience on these contributions, tax-free. Unlike traditional 401(k) contributions, Roth contributions are automatically deducted from your paycheck on an *after-tax* basis.

You can choose to have both your pre-tax and Roth contributions invested among a variety of investment funds, each with a varying level of risk. Lehman Brothers Holdings Inc. ("Company") and its participating affiliates (together referred to as the "Employers") may also make contributions to the Plan on behalf of Participants who meet certain eligibility requirements.

You will not be taxed on your traditional pre-tax contributions, any Employer contributions or any investment earnings until you receive a distribution from the Plan. A distribution of these amounts when you terminate employment is taxable (and if you terminate before age 55 and take your distribution before age 59-1/2, may be subject to an additional 10% tax) unless "rolled over." You may generally continue the tax-deferred status of these funds by rolling over your distribution to an individual retirement account (IRA) or to a new employer's eligible retirement plan.

Roth 401(k) contributions, including any investment performance on these contributions, can be withdrawn tax-free as long as the withdrawal is a qualified distribution (at least 5 tax years from your first Roth 401(k) contribution and you have attained age 59 ½ , become disabled, or are deceased).

The Employee Benefit Plans Committee ("Committee"), which is the Plan administrator, has designated Fidelity Investments ("Fidelity") as the recordkeeper for the Plan and as its representative to discharge a number of its responsibilities under the Plan. Fidelity has established the Lehman Brothers Retirement Service Center ("Plan's Service Center") for you to obtain information regarding the Plan and to assist in the processing of the transactions outlined in this Summary Plan Description. To access the Plan's Service Center, log on to Fidelity's NetBenefits™ web site at netbenefits.fidelity.com, or call 1-866-Lehman6 (1-866-534-6266).

In addition to enrolling in the Plan, you may make and change elections to your investment fund options, access information about the Plan, and access your account through the Plan's Service Center.

## Plan Document Controlling

This booklet is the summary plan description for the Plan, as amended through December 31, 2007. The booklet summarizes the most important provisions of the Plan, but it does not provide all the details of the Plan. These can be found in the official Plan document. The Plan document is always used in cases requiring a legal interpretation of the Plan. If there is any difference between the Plan document (as in effect at the relevant time) and this booklet, your rights will be based on the provisions of the Plan document. However, your rights under the Plan document may be modified as required or permitted under applicable law to take account of changes in Plan operation that are made to reflect changes in applicable law even if these changes have not yet been formally reflected in the Plan document. You may obtain a copy of the Plan document from the Plan's Service Center.

If you have any questions about any information in this booklet, contact the Plan's Service Center.

The Company reserves the right to amend the Plan, in whole or in part, at any time, or to terminate it at any time with or without prior notice.

Nothing in the Plan or in this Summary Plan Description constitutes or reflects any contract of continuing employment or alters in any way the "at-will" nature of

each employee's employment with the Employers. Nothing in the Plan or in this Summary Plan Description affects your Employer's ability to treat you without regard to its effect on your benefits under the Plan.

# Eligibility

You are eligible to participate in the Plan on your first day of employment by an Employer if you are paid on an hourly, salaried or commission basis, except if (1) you are employed outside of the United States, unless you are paid through a U.S. based payroll in U.S. dollars, (2) you are employed in a special purpose program (such as student intern), (3) you do not have a valid Social Security Number, or (4) you are a leased employee, or you perform services for an Employer under an arrangement in which you are treated as a consultant, an independent contractor or an employee of another entity.

# Joining the Plan

## Types of Accounts and Contributions

Most participants will have multiple accounts under the Plan (collectively, the "accounts"), each containing a specific type of contribution that is separated for recordkeeping purposes:

- Before-Tax Account and Catch-up Contributions Account ("Before-Tax Accounts")
- Roth 401(k) Account and Roth Catch-up Contributions Account ("Roth Accounts")
- Employer Contributions Account
- Rollover Account
- After-Tax Rollover Account

These accounts hold, as applicable, the following respective types of contributions (and any investment gains or losses you may have had on these contributions):

- Before-Tax Contributions and Catch-Up Contributions (collectively, "Before-Tax Contributions");
- Roth Contributions and Roth Catch-Up Contributions (collectively, "Roth Contributions");
- Employer Basic Contributions and Employer Matching Contributions (collectively, "Employer Contributions"); and
- Before-Tax Rollover Contributions and After-Tax Rollover Contributions (collectively, "Rollover Contributions").

## Participation

If you are eligible to participate in the Plan, you may begin making Before-Tax or Roth Contributions by enrolling through the Plan's Service Center by contacting Fidelity NetBenefits™ at netbenefits.fidelity.com or by calling Fidelity at 1-866-Lehman6 . By enrolling in the Plan you authorize your payroll deductions to begin and you become a Plan Participant. Your contributions will continue until you change your election through the Plan's Service Center at netbenefits.fidelity.com or the phone number above, or they are suspended (such as when a limitation on the amount you may contribute becomes applicable). If you do not make Before-Tax or Roth Contributions to the Plan but you are eligible to receive an Employer Basic Contribution, you will become a Plan Participant as of the date the first Employer Basic Contribution is credited to your Employer Contributions account under the Plan.

You may rollover a qualifying distribution you receive from another plan, as either a participant, a surviving spouse, or an alternate payee ("Rollover Contribution"), as described in the section entitled "Rollover Contributions" on page 6. Your Rollover Contributions are tracked separately within your Plan account(s), and you will be asked to specify the investment fund(s) in which you want your Rollover Contribution initially invested. If you are not already a Plan Participant, you will become a Plan Participant as of the date the Plan receives your Rollover Contribution.

When you become a Participant, you will be asked to make your investment elections and name a beneficiary to receive your account balance if you should die (see the section entitled "Designating a Beneficiary" on page 9).

Your right to make contributions to the Plan will cease when you are no longer employed by an Employer or are transferred to an ineligible employment status.

# Contributions

You can contribute between 1% and 50% (in 1% increments) of your Pay to the Plan as Before-Tax or as Roth Contributions. You must select the percentage of your Pay you wish to contribute in each payroll period, whether the contributions will be Before-Tax Contributions or Roth Contributions, and specify the investment fund(s) in which you want your contributions invested. Payroll deductions of your contributions will begin as soon as administratively practicable after your enrollment process is completed, which is usually two to three weeks after your instructions are received. Contributions are only made through payroll deduction subject to the percentage limits outlined above.

By making Before-Tax Contributions, you defer paying federal (and in most states, state and local) income taxes on the portion of your Pay that is reduced by your Before-Tax Contributions. However, your Before-Tax Contributions do not reduce your Social Security taxes or benefits, or any other pay-related benefits such as life insurance and disability coverage, or pension plan benefits.

By making Roth Contributions, you will not have the benefit of tax deferral now but you will have the potential to receive a tax free withdrawal from the Plan in the future. Roth Contributions do not affect your taxable income.

## "Pay"

"Pay" means the total cash earnings you receive from an Employer in a Plan Year, determined before taxes and before giving effect to any salary reduction agreement. "Pay" does not include any compensation deferred or credited during the calendar year under any non-tax-qualified deferred compensation program, severance, other post-termination payments, any foreign currency earnings, or earnings that are paid in stock. In accordance with Internal Revenue Service ("IRS") regulations, the Pay taken into consideration under the Plan is subject to an annual maximum limit ($230,000 for 2008, subject to subsequent cost of living adjustments).

Contributions are subject to the availability of Pay after other required deductions are taken, such as your contribution to the Lehman Brothers Group Insurance Plan and other welfare plans, and any withholding from Pay required by law.

## Limits on Elective Deferrals

The total amount of Before-Tax and Roth Contributions are subject by law to an annual maximum dollar amount ("Elective Deferral Limit"). The Elective Deferral Limit for calendar year 2008 is $15,500. The elective deferral limit may be increased in future years by the IRS.

The Elective Deferral Limit applies to all Before-Tax and Roth Contributions and similar contributions you make to any other employer-sponsored savings or profit-sharing plan in a calendar year. Once you reach the Elective Deferral Limit under this Plan, your contributions under this Plan will be suspended automatically for the rest of the year (but will resume with the first payroll period of the following year, unless you elect to continue to suspend your contributions as described in the section "Changing Your Elections" on page 10).

The Internal Revenue Code may further limit the contributions made on behalf of individuals who are deemed "highly compensated employees." If you are affected by these limitations, the Plan's Service Center will notify you.

## Catch-Up Contributions

If you will be age 50 or older by the end of a Plan Year and wish to contribute more than the Elective Deferral Limit for that Plan Year (discussed above) or more than 50% of your Pay, you may make additional "Catch-Up Contributions" to the Plan. You may make a Catch-Up Contribution each pay period of between 1% and 25% of your eligible compensation by making a separate election through the Plan's Service Center by contacting Fidelity NetBenefits™ at netbenefits.fidelity.com or by calling Fidelity at 1-866-Lehman6. The maximum annual Catch-Up Contribution for calendar years 2008 is $5,000. The annual Catch-up Contribution limit may be increased in future years by the IRS.

When electing to make Catch-up contributions, you must select the percentage of your Pay you wish to contribute in each payroll period and whether the contributions will be Before-Tax Contributions or Roth Contributions, Note that you Before-Tax/Roth election may be different than your election for your regular contributions towards the Elective Deferral Limit.

You may make Catch-Up Contributions before or after you have already reached one of the otherwise applicable contribution limits.

## Reduction of Elective Deferral Limit - Important for New Employees

You are responsible for monitoring compliance with the Elective Deferral Limit and Catch-up Contribution limit in any year in which you are participating in another employer's plan. For example, if you start contributing under the Plan in a year during which you made before-tax or roth contributions to a prior employer's 401(k) plan, your Elective Deferral Limit and/or Catch-up Contribution limit under this Plan will be reduced by the contributions you made to that other plan in the same year.

If you exceed the Elective Deferral Limit or Catch-up Contribution limit because you made contributions to another employer's plan, you may request a return of Before-Tax or Roth Contributions you made during the year that exceed the limit. Your request must be made to the Plan's Service Center no later than February 15 of the year following the year in which the excess Before-Tax or Roth Contributions were contributed to the Plan. Your request must include a statement that the Elective Deferral Limit will be exceeded unless the excess Before-Tax or Roth Contributions are returned and your agreement to forfeit any Employer Matching

Contributions credited to your account in the Plan and attributable to such excess contributions. Any excess Before-Tax or Roth Contributions that may be returned to you will be returned by April 15 of the year following the year in which such contributions were made to this Plan. Excess contributions not distributed to you under this procedure will be included in your current taxable income, will remain in the Plan and will also be taxable upon later distribution from the Plan.

# Employer Contributions—Basic and Matching

The Employer will make an Employer Contribution for Basic and Matching Participants as described below. A "Basic Participant" for a Plan Year in which an Employer Contribution is made is a Participant who (1) was originally hired prior to January 1 of the Plan Year, (2) has at least one year of service as of the end of that Plan Year, (3) is on the Employer's payroll on the last day of that Plan Year, and (4) is not:

- an hourly, salaried or commissioned employee whose "Compensation" exceeds $50,000; or

- in any position excluded by the Employer as described in the Employer's job classifications.

A "Matching Participant" for a Plan Year in which an Employer Contribution is made is a Participant who (1) was originally hired prior to January 1 of that Plan Year, (2) has at least one year of service as of the end of that Plan Year, (3) was a U.S. benefits eligible employee at some point during that Plan Year, (4) is employed by Lehman Brothers Holdings Inc. or certain of its affiliates which it treats as within its "control group" for these purposes on the last day of that Plan Year, (5) has Compensation of $200,000 or less, and (6) is not a Basic Participant.

The "Compensation" used to determine your eligibility for Employer Contributions is "W-2 earnings" (i.e., the amounts that are reportable on your IRS Form W-2 as earnings) plus any contributions made to the Plan.

## Twelve Month Service Requirement

A "year of service" generally means a 12-month period, beginning with the month you start work for an Employer, during which you remain employed by an Employer or an affiliate. A break in service of less than a year will count toward the required 12-month period, but not toward meeting the requirement of employment at year-end. Service with an 80% or more owned subsidiary of the Company generally counts for the purpose, whether or not the subsidiary participates in the Plan. For special rules that may apply to service with

certain prior employers or before the affiliate was acquired, please contact the Plan's Service Center.

## Eligibility upon Reemployment

If you leave the Employer and are later reemployed as an employee eligible to participate in the Plan, you will be eligible for Employer Contributions in the year you are rehired if all of other Employer Contribution requirements are met, and (i) you previously made contributions to the Plan or were otherwise vested in any amounts under the Plan, or (ii) your break in service was less than five years. Otherwise, you will generally be required to meet the 12 months of service requirement again in the same manner as a new employee. Please contact the Lehman Brothers HR Service Center at 212-526-2363 for any questions you have regarding your individual situation.

## Types of Employer Contributions

There are two types of Employer Contributions — Employer Basic Contributions and Employer Matching Contributions. Participants may be eligible to receive Employer Contributions as follows.

| Type of Participant | Type of Contribution |
|---|---|
| Basic Participant | Basic Contribution of $500 |
| | Matching Contribution equal to the Participant's Before-Tax and Roth Contributions for the Plan Year to a maximum of $3,500 |
| Matching Participant | No Basic Contribution |
| | Matching Contribution equal to the Participant's Before-Tax and Roth Contributions for the Plan Year to a maximum of $4,000 |

A Plan Participant who is neither a Basic Participant nor a Matching Participant is not eligible to receive either Employer Basic or Matching Contributions.

## Examples

**Example One:** The following is an illustration of Employer Contributions made to the account of a Basic Participant whose Pay is $30,000 and who has contributed 5% of Pay as Before-Tax Contributions.

| | |
|---|---|
| Before-Tax Contributions | $1,500 |
| Employer Matching Contribution (up to first $3,500 of Before-Tax Contributions) | $1,500 |

| Employer Basic Contribution | $500 |

| Total of Before-Tax and Employer Contributions | $3,500 |

In this example only $1,500 of the annual contribution represents money actually contributed by the Participant; the other $2,000 is the Employer Contribution.

**Example Two:** The following is an illustration of Employer Contributions made to the account of a Matching Participant whose Pay is $60,000 and who contributed 5% of Pay as Roth Contributions.

| Roth Contributions | $3,000 |

| Employer Matching Contribution (up to first $4,000 of Roth Contributions) | $3,000 |

| Total of Roth and Employer Contributions | $6,000 |

In this example $3,000 of the annual contribution represents money actually contributed by the Participant; the other $3,000 is the Employer Contribution.

**Vesting in Employer Contributions**

You will become fully vested (have a nonforfeitable right) to Employer Contributions made on your behalf for Plan Years beginning on and after January 1, 2005 once you have 3 years of vesting service. (Employer Contributions for years prior to 2005 are fully vested regardless of your years of service.) If you leave before you have 3 years of vesting service, you will forfeit all non-vested Employer Contributions once you take distribution of your account or your break in service is five years or greater. (see the section entitled "Vesting" on page 11)

**Form of Contribution/Investment**

The Employer Contributions allocated to your account are invested in accordance with your investment elections for your Before-Tax/Roth Contribution accounts..

## Military Service

If you terminate employment to enter eligible military service, credit for vesting will be given for that service if you return to the Company in the period your reemployment rights are protected by law. Upon your return, you will be entitled to make Before-Tax or Roth Contributions for the period of military service and receive related Employer Contributions, up to the amount permitted had you continued in employment. For more information, please contact the Plan's Service Center.

## Rollover Contributions

If you are a Plan Participant or you are eligible to become a Plan Participant, you may make a contribution to the Plan of certain qualifying rollover distributions. Rollover Contributions may include eligible rollover distributions from qualified plans, IRAs, 403(b) tax-sheltered annuities, 457 deferred compensation plans sponsored by governmental entities, and direct transfers of after-tax contributions from another such plan. Rollover Contributions to your Roth 401(k) account may come from another Roth 401(k) or Roth 403(b) account. Roth IRA rollovers are not permitted. If you are your spouse's beneficiary under any such plan (or are entitled to a portion of your spouse's benefits under such a plan pursuant to a qualified domestic relations order), an eligible rollover distribution you receive from such plan (but not from an IRA) upon the death of your spouse (or as an alternate payee under such order) may be similarly rolled over to the Plan.

To make a Rollover Contribution, you must comply with the Plan procedures (which can be obtained through the Plan's Service Center). You must provide written certification to the Plan's Service Center (that is satisfactory to the Plan's Service Center) that such contribution is eligible for rollover to this Plan. In addition, you must elect how your rollover contribution is to be invested. This election is separate from the investment election you make for your Before-Tax or Roth Contributions. You may not elect to invest more than 20% of your Rollover Contribution in the Lehman Brothers Common Stock Fund. Any elections you later make to transfer amounts between investment funds will apply to all contributions credited to your Plan account(s), including Rollover Contributions.

## Your Investments

The Plan is based on the premise that individual Participants (or their beneficiaries) have many differing financial situations, retirement goals, and risk tolerances, and are consequently best able to determine the investments most appropriate to their own situation. Accordingly, each Participant or beneficiary has the responsibility to make his or her own decisions as to the investment of the assets in his or her own account(s).

The Plan offers you the opportunity to consider a broad range of different investment funds for the investment of your account balances — all with varying degrees of risk. You elect your initial investment fund choices through the Plan's Service Center when you begin participating in the Plan and/or when you make a Rollover Contribution to the Plan. You may then change your selections as described in the section entitled "Changing Your Elections."

Please note that your investment elections for your contributions will apply to your Before-Tax Contributions, Roth Contributions, Catch-Up Contributions, Roth Catch-Up Contributions and any loan repayments you make to the plan (as described in the section "Plan Loans" on page 16).

In choosing any investment fund for your account(s) under the Plan, you should realize that you may be investing in securities whose market values will change — down as well as up. Therefore, there is no guarantee that the money you put into the funds will retain its original value or that your account(s) will grow while in these funds.

Presently, you may invest your account balances in any of the funds listed under the heading "Investment Performance Summary", subject to any restrictions imposed by a particular fund as described in the information provided for the fund and the restrictions described below on investments in the Company Stock funds. You may invest your entire account(s) in one fund, or divide your investments among several funds subject to the limitations described under the heading "Transferring Existing Account Balances." Except for the Lehman Brothers Common Stock Fund, which is created by the express terms of the Plan, the Committee may add or eliminate funds or investment alternatives at any time.

Certain investment funds have restrictions on transfers into and out of such funds and may charge a fee for transfers made prior to a minimum holding period. For further information regarding the restrictions or fees, contact the Plan's Service Center.

### Investing in a Company Stock Fund

For your long-term retirement security, you should give careful consideration to the importance of a well-balanced and diversified investment portfolio, taking into account all your assets, income and investments. The Lehman Brothers Common Stock Fund is invested exclusively in the common stock of a single company.[1] Each of the other investment funds is invested in a number of securities (such as stocks, bonds, fixed rate contracts, etc. depending on the fund's investment objective), not just the stocks or bonds of one company. There is a risk to holding substantial portions of your assets in the securities of any one company, as individual securities tend to have wider price swings, up and down, than investments in diversified funds.

---

[1] The Lehman Brothers Common Stock Fund maintains a small reserve invested in short-term fixed income investments for liquidity purposes.

### Life Cycle Funds

The available investment funds include "Life Cycle Funds" -- a series of Fidelity Freedom Funds which invest in other Fidelity mutual funds to produce different mixes of equity and fixed income investments, depending on the "target retirement date" adopted by the Fund. Each Fund moves gradually to a more conservative asset allocation over time. If you wish to use this approach to investing, please note that the "target retirement date" you use in selecting among the various Freedom Funds need not be your planned retirement date. For example, if you expect to keep your funds invested in the Plan while you take partial distributions over an extended period following retirement, you should consider whether or not to select in whole or in part a Fund or Funds that have a target retirement date at some time after your retirement.

### Information Available

Fund prospectuses and historical performance for each of the investment options are available from the Plan's Service Center at netbenefits.fidelity.com or 1-866-Lehman6 (1-866-534-6266). You should obtain and read this information carefully before you invest.

On request, the Plan's Service Center will provide you with: the latest information available regarding annual operating expenses of each investment option (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return and the aggregate amount of such expenses expressed as a percentage of average net assets of the investment options; copies of any prospectuses, financial statements and reports, and of any other materials relating to the investment options to the extent such information is provided to the Plan; information concerning the past and current investment performance of each investment option, determined, net of expenses, on a reasonable and consistent basis; a list of the assets comprising the portfolio of each option other than mutual funds, the value of each such asset (or the proportion of the investment option which it comprises), and, with respect to each such asset which is a fixed rate investment contract issued by a bank, savings and loan association or insurance company, the name of the issuer of the contract, the term of the contract and the rate of return on the contract; and information concerning the value of units in each investment option credited to your account.

In providing you with information about the investment funds, through the Plan's Service Center or otherwise, neither the Committee nor the Company is acting in an advisory capacity with regard to your investment in any particular fund, nor guaranteeing that any fund will meet

its investment objective. You should consider your own investment goals and, if necessary, consult your own investment adviser for advice on the selection of any particular fund.

**Section 404(c) Plan**

This Plan is intended to constitute a plan described in Section 404(c) of the Employee Retirement Security Act of 1974, as amended (ERISA) and the regulations promulgated thereunder. Section 404(c) applies to plans, (such as this Plan), under which participants (or beneficiaries) exercise investment control over the assets in their individual accounts. In an ERISA 404(c) plan, the Plan fiduciaries are generally relieved of liability under Part 4 of Title I of ERISA for losses that are the direct and necessary result of a participant's (or beneficiary's) own investment decisions.

The following table presents investment performance information for each of the funds presented as the percentage increase or decrease in the asset value of the fund. The rates reflect the reinvestment of dividends and interest. Please remember that past performance is neither a guarantee nor necessarily an indication of future returns.

## Investment Performance Summary

| | 1/1/2007-12/31/2007 | 1/1/2006-12/31/2006 | 1/1/2005-12/31/2005 |
|---|---|---|---|
| Allianz CCM Emerging Companies Fund – Institutional Class | 2.57% | 6.01% | 7.23% |
| American Funds Capital World Growth and Income | 17.43% | 22.23% | 14.62% |
| Calamos Growth Fund A | 23.26% | 1.45% | 6.47% |
| Century Sm Cap Sel I | 2.85% | 9.58% | 4.04% |
| Fidelity Asset Manager | 6.33% | 9.19% | 4.03% |
| Fidelity Capital & Income Fund | 3.82% | 13.04% | 5.04% |
| Fidelity Diversified International | 16.03% | 22.52% | 17.23% |
| Fidelity Freedom 2010 Fund® | 7.43% | 9.46% | 5.92% |
| Fidelity Freedom 2015 Fund® | 7.82% | 10.36% | 7.01% |
| Fidelity Freedom 2020 Fund® | 8.54% | 11.61% | 7.75% |
| Fidelity Freedom 2025 Fund® | 8.64% | 11.84% | 8.19% |
| Fidelity Freedom 2030 Fund® | 9.27% | 12.90% | 8.62% |
| Fidelity Freedom 2035 Fund® | 9.27% | 12.94% | 9.04% |
| Fidelity Freedom 2040 Fund® | 9.31% | 13.49% | 9.06% |
| Fidelity Freedom 2045 Fund®* | 9.50% | 9.00% | N/A |
| Fidelity Freedom 2050 Fund®* | 9.77% | 9.00% | N/A |
| Fidelity Large Cap Stock Fund | 13.09% | 12.96% | 7.48% |
| Fidelity Low-Priced Stock Fund | 3.16% | 17.76 | 8.85 |
| Fidelity Select Portfolio: Biotechnology Portfolio | 2.65% | 3.60% | 8.78% |
| Fidelity Select Portfolio: Health Care Portfolio | 12.45% | 4.98 | 16.88 |
| Fidelity Select Portfolio: Technology Portfolio | 19.78% | 7.51% | 4.92% |
| Fidelity Select Portfolio: Telecommunications Portfolio | 8.20% | 26.78% | 5.15% |

| | 1/1/2007-12/31/2007 | 1/1/2006-12/31/2006 | 1/1/2005-12/31/2005 |
|---|---|---|---|
| Fidelity U.S. Bond Index Fund | 5.40% | 4.33% | 2.26% |
| Hartford Capital Appreciation Fund Class A | 16.83% | 16.61% | 15.55% |
| Lehman Brothers High Income Bond Fund | 1.61% | 8.00% | 1.62% |
| Lehman Brothers Common Stock Fund | -15.27% | 22.60% | 46.70% |
| MFS Value Fund | 7.61% | 20.67% | 6.22% |
| Neuberger Berman Genesis Fund – Investor Class | 21.89% | 7.31% | 16.37% |
| Neuberger Berman International Fund | 2.92% | 25.18% | 23.96% |
| Neuberger Berman Partners Fund - Investor Class | 10.10% | 13.19% | 17.99% |
| Neuberger Berman Socially Responsive Fund | 7.48% | 14.44% | 7.58% |
| Neuberger Berman Value Equity Fund | 9.36% | 8.80% | 20.49% |
| PIMCO Total Return Fund - Administrative Class | 8.81% | 3.74% | 2.63% |
| Stable Value Fund | 4.87% | 4.73% | 4.38% |
| Templeton Developing Markets Trust - Class A | 28.77% | 28.29% | 28.20% |
| T. Rowe Price Mid Cap Value Fund | 0.60% | 20.24% | 7.73% |
| Vanguard Total Stock Market Index | 5.55% | 15.63% | 6.09% |
| Vanguard Institutional Index Fund | 5.47% | 15.78% | 4.91% |

* The Fidelity Freedom 2045 and 2050 Funds have an inception date of June 1, 2006.

The returns shown in this Investment Performance Summary reflect expenses the investment fund managers charged during the respective periods (which can be found in the prospectus for each fund), but do not reflect the Plan administrative expenses (discussed on page 17) that may have been chargeable against each account for the same periods. Generally, such expenses could range from as little as 0% to as much as 0.2% per year. The actual return you experience may differ based on the timing of contributions, transfers, and withdrawals.

**Investment of Current Contributions**

You may invest your Rollover Contributions, Before-Tax Contributions, or Roth Contributions in any one or more of the Funds available in 1% increments. However, no more than 20% of your contributions may be directed to the Lehman Brothers Common Stock Fund. If you fail to designate where you would like your contributions invested, they will be invested in the default fund as designated by the Committee, which currently is the Fidelity Freedom Fund with the target date that "best" corresponds to your 65th birthday.

**Valuation Date(s)**

Your interest in any investment fund is based on your proportionate share of all of the Plan's investments in that fund, determined on a daily basis by the Plan's recordkeeper using a unit accounting method. As of the end of each day the New York Stock Exchange ("NYSE") is open (i.e., each "Valuation Date"), your account will be adjusted by (1) contributions made to or withdrawals made from your account(s), if any, and (2) your share of any increase or decrease in asset values and any interest, dividends and other earnings earned by each investment fund in which your account(s) is invested.

It should be noted that events may occur that could disrupt the daily valuation of accounts, and that there is no guarantee that the adjustments described above will take place within the intended time frame.

The earnings on each investment fund are reinvested in that fund.

# Benefit Statements

A statement of your account is always available to you. This statement includes detailed information on your account balance including your account balance and recent account activity.

You can create your own statement online through Fidelity's NetBenefits™ web site at www.netbenefits.fidelity.com. You can also request a statement by speaking to a Fidelity representative who can create and mail you a statement of your account. You can reach a Fidelity representative via telephone at 1-866-Lehman6 (1-866-534-6266).

# Designating a Beneficiary

If you should die while you have an undistributed balance under the Plan, your beneficiary will receive the value of your account under the Plan. If you are married, your spouse is your beneficiary unless you designate a different beneficiary with your spouse's notarized consent. You may change your designated beneficiary at any time, subject to your spouse's consent if you are married. If you fail to designate a beneficiary and you have no surviving spouse, payment will be made to your estate.

If you are single and later marry, your spouse will become your beneficiary automatically, and you must file a new designation of beneficiary form with your spouse's consent if you wish to continue any prior designation in effect (or designate any new beneficiary other than your spouse). To name or change a beneficiary, contact the Plan's Service Center for the necessary forms.

**Domestic Partners**

To the extent permitted by law, your domestic partner has the same rights as a spouse under the Plan. For example, if you enter into a domestic partnership as described below, your partner will become your beneficiary unless, after he or she becomes your partner, you designate a different beneficiary and obtain your partner's notarized consent to that designation.

Under the applicable tax laws, however, your domestic partner does not have the same right as a spouse to rollover a distribution from the Plan to another employer's plan and you may not rollover into the Plan any amounts you receive as the beneficiary of your domestic partner. For the same reason, minimum required distributions discussed on page 13 may be calculated differently for participants with domestic partners rather than spouses.

A domestic partner is an individual who is not related to you, but who is living with you on a continuous basis and who has a close and committed personal relationship with you. Domestic partnerships include civil unions and same-sex marriages that are legally valid in the jurisdiction in which entered into. In order for a domestic partnership to be valid, neither you nor your domestic partner can be married to another person (even if legally separated), or have a domestic partnership with another person.

For the Plan to recognize your domestic partnership, you must do one of the following:

- If your domestic partnership is a civil union or same-sex marriage, you may (but are not required to) provide a copy of your certificate of civil union or marriage to the Lehman Brothers HR Service Center.

- If you have registered your domestic partnership with a governmental body pursuant to state or local law authorizing such registration, you may (but are not required to) provide a copy of your valid domestic partnership registration to the Lehman Brothers HR Service Center.

- If you do not have a certificate of civil union or marriage or registration of domestic partnership with a governmental body, you must register your domestic partnership with the Lehman Brothers HR Service Center by completing a Lehman Brothers Declaration of Domestic Partnership form and filing it with the Lehman Brothers HR Service Center. The Declaration of Domestic Partnership form is available on the Lehman Brothers intranet site or by contacting the Lehman Brothers HR Service Center at (212) 526-2363.

- A domestic partnership ends upon filing a Termination of Domestic Partnership form with the HR Service Center. You can obtain a Termination of Domestic Partnership form from the Life @ Lehman page on LehmanLive under 'Frequently Requested Forms' or from the Lehman Brothers HR Service Center.

A domestic partnership ends when the civil union, marriage, or domestic partnership is terminated according to the provisions of the governing body that established the domestic partnership. If the domestic partnership was registered through the Lehman Brothers HR Service Center, it will continue to be recognized by the Plan until a Termination of Domestic Partnership form is filed with the HR Service Center. You can obtain a Termination of Domestic Partnership form from the Life @ Lehman page on LehmanLive under 'Frequently Requested Forms' or from the Lehman Brothers HR Service Center.

### New Designations Required after Plan Mergers

In general, beneficiary designations filed by a Participant under predecessor plans will no longer apply after a merger of those plans into this Plan. If your account under a prior plan was transferred to this Plan, you must therefore file new beneficiary designations under this Plan, which will apply both to your accounts transferred from the prior plan and your accounts for contributions under this Plan. If you are married or have a domestic

partner, your spouse or domestic partner must provide a written notarized consent to designation of any different beneficiary, as described above.

## Changing Your Elections

### Changing Your Contribution Rate

You may want to increase or decrease the amount of your future contributions to the Plan. You may change your Before-Tax, Roth, Catch-Up, and/or Roth Catch-Up Contribution rates at any time through the Plan's Service Center. Your request will be processed as soon as administratively possible.

### Suspending Your Contributions

You may suspend your Before-Tax, Roth, Catch-Up, and/or Roth Catch-Up Contribution at any time through the Plan's Service Center. Your request will be processed as soon as administratively possible.

If you voluntarily suspend your contributions to the Plan, you may later resume contributing to the Plan at any time. You must make a request to resume through the Plan's Service Center. Your request will be processed as soon as administratively possible.

### Changing Investment of Future Contributions

Over time, you may want to change the investment direction of your future contributions. At any time, you may change the investment options in which your future contributions will be invested. You must request such change through the Plan's Service Center. Your request will be processed as soon as administratively possible.

### Transferring Existing Account Balances

You may transfer all or part of your existing account balance(s) (which includes any Before-Tax Contributions, Roth Contributions, Catch-Up Contributions, Roth Catch-Up Contributions, Employer Contributions and Rollover Contributions) from one investment fund to any of the other investment funds, subject to any restrictions applicable to a particular investment fund.

Transfers may be made in 1% increments of your total account balance or in fixed dollar amounts, as prescribed by the Committee.

Asset transfers into the Lehman Brothers Common Stock Fund are not allowed if, once the asset transfer is processed, your balance in this fund would exceed 20% of your total account balance.

You may transfer amounts between investment funds through the Plan's Service Center. Normally, if your request is made on a day in which the NYSE is open,

and the request is made prior to close of trading for that day, the amount to be transferred from a fund will be based on the value of your account(s) under the Plan as of the close of the NYSE on that day. Otherwise, the amount to be transferred from a fund will be based on the value of your account(s) under the Plan as of the close of the NYSE on the next day the NYSE is open for trading.

However, it is possible that a systems failure or other unexpected event may prevent the processing of investment transfers, in which case every effort will be made to process investment elections as soon as possible after the problem is resolved, but the Plan will have no obligation to reconstruct what would have occurred had the problem not arisen.

Keep in mind that this type of transfer does not affect the investment direction of your future contributions.

**Limitations on Transfers**

Although you may normally make transfers on any day the NYSE is open, the sponsor of an Investment Fund or the Committee may impose restrictions on transfers in or out of any given Investment Fund. Restrictions may also be needed to comply with applicable law. You will be notified if any such restriction applies to your account.

**Redemption Fees**

Certain investment funds impose redemption fees on shares not held for at least a minimum period. These are referenced in the summary of investment fund options provided to participants (and their beneficiaries) through the Plan's Service Center at www.netbenefits.fidelity.com or 1-866-Lehman6 (1-866-534-6266) and explained more fully in the prospectus for the investment fund.

**Blackout Periods**

Blackout Periods are imposed when the Company holds undisclosed material information that it has not disseminated to the public. The period prior to and surrounding an earnings announcement is the most recurrent Blackout Period. Blackout Periods may be imposed prior to other corporate announcements if they are deemed to be material.

During a Blackout Period you may not transfer any part of your existing account balance(s) into or out of the Lehman Brothers Common Stock Fund.

# Vesting

Vesting is your non-forfeitable right to receive the value of your Plan account(s) when you terminate employment. You are immediately 100% vested in your

Before-Tax and Roth Contributions and in your Employer Contributions for all plan years up to 2004. All Employer Contributions made for the 2005 and later Plan Years will be subject to a three-year vesting requirement. Once you have three years of service, you will be 100% vested in your Employer Contributions. If you have three years of service on the date the Employer Contribution is made, you will be immediately 100% vested in that Employer Contribution.

**Years of Vesting**

Years of vesting service are made up of 12-month periods, generally beginning with the month you are hired and ending with the month you terminate employment. For any month in which you work at least one hour, you will be credited with a full month of service. Once you complete the three year vesting requirement, you are 100% vested in your Employer Contributions.

**Example:** If your hire date was October 6, 2005, and you continue to be actively employed by the Firm through September 1, 2008, you will have 36 months – or 3 years – of vesting service on September 1, 2008 and become 100% vested on that date.

**Service with Affiliates**

Generally, your service with 80% or more directly or indirectly owned subsidiaries of the Company will count toward vesting whether or not the subsidiary participates in the Plan. For special rules that may apply to service with certain prior employers or before the affiliate was acquired, please contact the Plan's Service Center.

**Additional Vesting Rules**

Vesting service may also include certain periods when you are not actively employed by the Firm. For example, if you terminate employment and return within a twelve month period, you will be credited with vesting service for the period you were not with the Firm. In addition, you will generally continue to earn vesting service during a paid or unpaid leave of absence.

**Breaks in Service**

If you leave the Employer and are later employed by an Employer or an Affiliate, you will retain credit for your prior vesting service if (i) you previously made contributions to the Plan or were otherwise vested in any amounts under the Plan, or (ii) your break in service was less than five years. Otherwise, your vesting service on rehire may be determined in the same manner as for a new employee. Please contact the Lehman Brothers HR Service Center at 212-526-2363 for any questions you have regarding your individual situation.

## Military Leave

If you incur a break in service because of qualified military leave, you will receive credit for vesting purposes for your time of qualified leave. Please call the Lehman Brothers HR Service Center for additional information.

### Forfeiture of Non-vested Employer Basic and Matching Contributions

If you leave the Firm before you have three years of vesting service, you will not be entitled to receive any Employer Contributions you received for the 2005 and later Plan years. This non-vested portion of your account balance will be forfeited when you receive a distribution of the remainder of your account balance (whether made directly to you or as a direct rollover to an IRA or another employer plan).

If you do not receive such a distribution within five years of your date of termination, the non-vested portion of your Account will be forfeited irrevocably on the fifth anniversary of your termination.

If you should forfeit the non-vested portion of your Employer Contributions Account and are then rehired by an Employer or Affiliate within five years of termination, the forfeited amount will be restored (i.e., credited to your Employer Contributions Account) if you repay the amount of the prior distribution within five years of the date or rehire.

Upon such rehire, you will be credited for your prior years of vesting service to determine when you are fully vested in your restored (or otherwise remaining) Employer Contributions Account if you had made contributions or were previously at least partially vested in your Account.

All forfeitures will be used to pay plan expenses or applied to reduce future Employer Contributions.

# Withdrawals

You may make the following types of withdrawals from the Plan while you are employed by an Employer or an affiliate:

- The balances of either or both of your Rollover Account and After-Tax Rollover Account;

- If you are age 59-1/2 or older, the vested balance of all your Plan accounts; or

- If you have a financial "hardship," an amount from your Before-Tax and Roth Accounts needed to satisfy such hardship.

These withdrawals are subject to certain limitations, as described below.

If you wish to make a withdrawal, you should contact the Plan's Service Center. Withdrawals will be paid in a single lump sum cash payment as soon as administratively practicable. However, if a portion of the account from which the withdrawal is made is invested in Company stock, you may elect to receive such stock in lieu of cash (except in the case of hardship withdrawals). Procedures for electing to receive stock in lieu of cash can be obtained from the Plan's Service Center.

### Withdrawal from your Rollover Accounts

You may withdraw all or a part of the balance of either or both your Rollover Account and After-Tax Rollover Account, for any reason, while you are employed by an Employer or an affiliate. The withdrawal will be taken pro rata from the investment funds in which the account is invested.

### Age 59-1/2 Withdrawals

If you are age 59-1/2 or older, you can withdraw all or part of the vested balance of your Plan account(s), for any reason, while you are employed by an Employer or an affiliate.

Withdrawals will be made from your accounts in the following order: Rollover Account, After-Tax Rollover Account, Regular Before-Tax Account, Catch-Up Contributions Account, Employer Contributions Account, Roth After-Tax Account, and Roth Catch-Up Account. Unless otherwise elected, withdrawals will be made pro rata from the investment funds in which these accounts are invested.

### Hardship Withdrawals

You may withdraw your Before-Tax Contributions and Roth Contributions, as well as your pre-1989 investment earnings on such Contributions, and, to the extent needed, your Catch-Up and Roth Catch-Up Contributions, while you are employed by an Employer or an affiliate if you meet certain IRS requirements for a "hardship withdrawal." You may make a hardship withdrawal from your account(s) under the Plan if:

- The Committee determines that you have an "immediate and heavy financial need" (as described below).

- Your withdrawal amount is at least $1,000 (or 100% of the available amount, if less).

- The following conditions apply to hardship withdrawals:

    o You cannot withdraw any post-1988 earnings attributable to your Before-Tax Accounts. You also cannot withdraw any Employer Contributions.

- o You must first take all withdrawals and loans available to you under the Plan and all other plans of your Employer and its affiliates.

- o Only the minimum amount required to satisfy the financial need (plus taxes where applicable) will be distributed.

**Immediate and Significant Financial Need**

A qualifying "immediate and heavy financial need" is limited to the needs as set forth in the safe harbor provisions of the IRS code. The following is a summary of those provisions:

- Costs associated with the purchase of your principal residence (other than mortgage payments).

- Unreimbursed medical expenses for you, your spouse, or your dependents. (Note that hardship withdrawals are not available for expenses of a type that are not tax-deductible, such as cosmetic surgery.)

- Payment of the next 12 months' tuition and related educational fees (including room and board, but not books) for college or post-graduate education for you, your spouse, or your dependents.

- Payment to prevent eviction from or foreclosure of a mortgage on your principal residence.

- Payments for funeral or burial expenses for a Participant's deceased parent, spouse, child or dependent.

- Expenses to repair casualty loss damage to the Participant's principal residence.

The amount withdrawn may include amounts necessary to pay federal, state, or local income taxes or penalties reasonably anticipated to result from your withdrawal.

If the Committee approves your hardship withdrawal request:

- your participation in the Plan will be suspended for six months (at the end of that period you will have to re-enroll to participate in the Plan), and

- your contributions to any deferred compensation plans, stock option or stock purchase arrangements, will be similarly suspended.

Note: Suspension could affect your ability to receive all or a portion of any Employer Contributions made under this Plan.

Your approved hardship withdrawal will be taken pro rata from the investment funds in which your Before-Tax Accounts are invested.

**How to Apply for a Hardship Withdrawal**

Any requests for a hardship withdrawal must be accompanied by the necessary forms, plus any necessary documentation to support the financial hardship. The forms can be obtained from the Plan's Service Center.

If you apply for a hardship withdrawal, you should contact the Plan's Service Center well in advance of the date you need the funds to allow ample time for processing. For purchase of a primary residence, application must be made prior to closing.

**Minimum Required Distributions**

Federal law prescribes a "required beginning date" for distributions, which is generally April 1 after the calendar year in which the Participant attains age 70-1/2 (or, for Participants remaining employed beyond that year, April 1 after the year the Participant terminates employment).

A minimum distribution is required for that and all subsequent calendar years, in the amount of the Participant's account balance at the start of the year divided by a number representing the joint life and last survivor expectancy of the Participant and a hypothetical beneficiary ten years younger.

Minimum distributions to active employees that began when required under prior law are now optional so long as the Participant continues employment.

**Tax Consequences of Withdrawals**

Withdrawals have potentially adverse tax consequences (see section entitled "Certain Tax Consequences of Withdrawals/Distributions" on page 15) which you should consider before you elect a withdrawal.

**After-Tax Contributions in Accounts Transferred from E.F. Hutton Plans**

Withdrawals of after-tax amounts transferred from an E.F. Hutton Plan are not taxable. Contact the Plan's Service Center for more information.

# Final Distributions

**Distribution upon Termination of Employment or Disability**

Upon your termination of employment with all Employers and affiliates or upon your permanent disability (as determined under the terms of your Employer's long-term disability plan), you are entitled to a distribution of the vested amount credited to your account(s) under the Plan. If the total value of your account(s) does not exceed $1,000, distribution will be made as soon as practicable after you elect whether you want your

distribution made directly to you, or in whole or in part as a direct rollover to an IRA or another employer's plan. The distribution will be based on the value of your account(s) as of the Valuation Date on which your request is processed. (If your election is not received by the date prescribed by the Committee, distribution will be made to you in cash less applicable withholding, based on the Valuation Date prescribed by the Committee.)

If your accounts exceed the $1,000 limit, distribution will be made only if and when you elect to receive distribution. If you are not fully vested, distribution may be made of your entire vested account(s). If you are fully vested, you may elect full distribution of your account or you may choose to receive partial distributions until your account(s) is fully distributed. Each distribution must be requested separately through the Plan's Service Center. However, after April 1 following the year you reach age 70-1/2 or retire (if later) -- i.e., the required beginning date described under Minimum Required Distributions above -- your distribution each year cannot be less than the minimum required as described under that heading. Distribution will be based on the value of your account(s) as of the Valuation Date on which your request is processed, and made as soon as administratively practicable following that date.

If your account(s) are invested in the Lehman Common Stock Fund, you may elect to receive the corresponding portion of your distribution in stock in lieu of cash. To receive distribution in stock, your request must be received by the Plan's Service Center prior to the Valuation Date on which your distribution is processed. If elected on a timely basis, distribution of whole shares of stock (and cash for partial shares) will be made as soon as administratively possible following the date on which your request is processed.

If you leave an Employer by reason of a transfer to an affiliate that is not participating in the Plan, contributions to your account(s) will be suspended but you may continue to vest in Employer Contributions previously made. No distribution will be made, and your account(s) will continue to participate in the investment performance of the investment funds in which they are invested. You may change investment funds in the same manner, and subject to the same rules, as active Participants.

### Distribution upon Death

Your accounts will be fully vested should you die while employed by an Employer or an Affiliate.

In the event of your death prior to the distribution of your account(s) under the Plan, your beneficiary will be entitled to receive the vested amount credited to your account(s). Distribution will be made as soon as practicable after the Plan's Service Center receives all information and elections necessary to make the distribution, or, if required elections are not timely made as of the date determined by the Committee as administratively practicable.

If your account balance exceeds $1,000, your beneficiary may elect to receive a distribution as a single lump sum or, if your accounts are fully vested, in partial distributions, the last of which shall be made no later than 5 years after your death.

If your account(s) are invested in the Lehman Common Stock Fund, your beneficiary may elect to receive the corresponding portion of the distribution in common stock in lieu of cash. To receive payment in stock, your beneficiary's request must be received by the Plan's Service Center prior to the Valuation Date on which their request for distribution is processed. If elected on a timely basis, distribution of whole shares of stock (and cash for partial shares) will be made as soon as administratively possible following the Valuation Date in which their request is processed.

### Valuation

Amounts payable are based on the value of your account(s) under the Plan on the Valuation Date as of which the distribution is processed. No interest, earnings or losses are credited or paid with respect to the period between the Valuation Date and the actual date of payment. A "Valuation Date" occurs on any business day the NYSE is open.

You should be aware that daily valuation and the processing of transactions based on daily valuation is dependent on the availability of complete and accurate information, which may come from different sources. Since events may occur that could disrupt the daily valuation process, there is no guarantee that transactions will be processed or valuations adjusted at any given day or time.

### Payment Procedures

No payment or distribution will be made until all distribution procedures and requirements have been complied with. Distribution procedures and requirements, including any required forms, may be obtained from the Plan's Service Center. All payments and distributions are subject to processing procedures of the Committee and, where applicable, various parties including the transfer agent for the shares of common stock payable under the Plan. Except as required by law (such as tax withholding requirements), no charges or deductions will be made upon the distribution or

withdrawal of all or part of your interest in the Plan, unless authorized by you.

**Restrictions on Resale of Common Stock**

A Plan Participant who is an affiliate (as defined under the federal securities laws) of the Company may not resell any Company common stock issued to him under the Plan except pursuant to an effective registration statement, pursuant to Rule 144 under the Securities Act of 1933, as amended, or otherwise pursuant to an applicable exemption. There are no such restrictions applicable to the resale of common stock by Plan Participants who are not affiliates of the Company. In addition, certain officers and directors may be subject to Section 16 of the Securities Exchange Act of 1934 and the applicable rules in connection with the reporting of Company common stock held under the Plan and their disposition.

**Incompetent or Missing Payees**

If the Committee determines that any Participant or beneficiary entitled to payment under the Plan is unable to care for his or her affairs, because of illness or accident or any other reason, it may direct payment to the spouse, legal representative of such person or any other person as so designated by the Committee. Any payment so made will constitute a complete discharge of the liabilities of the Plan to said Participant or beneficiary.

Your Plan benefits are payable only from the Plan's trust fund. If the Committee cannot locate any person to whom a benefit is due under the Plan, the benefit will be forfeited unless that person later makes a valid claim for such benefit before the Plan is terminated. **Until distribution of your account(s) is completed, it is important that you continue to notify the Company of all changes of address.**

**Miscellaneous**

The Plan may rely on the statements and representations of Participants and their beneficiaries and will not be liable for any loss resulting from such reliance.

The Plan does not confer any legal rights to continuation of employment, and the Employer may discharge a Participant without regard to the effect of such discharge under the Plan.

# Tax Consequences of Withdrawals/Distributions

A withdrawal or distribution from the Plan is generally subject to immediate 20% federal tax withholding and

ordinary income taxes for the year of receipt, if such payment is not directly rolled over to an IRA or another employer's eligible retirement plan. If you choose to have the withdrawal or distribution paid to you directly, you will therefore receive only 80% of the payment; however, you may still rollover all or part of the entire amount to an IRA or another employer's eligible retirement plan within 60 days of receiving payment. If you choose to rollover 100% of the withdrawal or distribution amount, you must find other money within the 60-day period to replace the 20% that was withheld. If you rollover only the 80% that you received, you will be taxed on the 20% that was withheld.

In addition, payments prior to age 59-1/2 which are not rolled over to an IRA or another employer's eligible retirement plan are generally subject to a 10% additional tax, unless made following termination of employment at age 55 or later.

A hardship withdrawal cannot be rolled over and will be subject to 10% federal income tax withholding, unless you elect not to have such withholding apply. However, such an election will not avoid your income tax obligation, or the additional 10% tax on withdrawals prior to age 59-1/2, on the amount withdrawn. You should consider what (if any) withholding from your hardship withdrawal is desirable in order to avoid possible penalties for not paying estimated tax on your income.

Withdrawals and distributions subject to Federal income tax (e.g., not rolled over) are also generally subject to state and local income taxes where applicable.

The applicable tax laws, which include a special rule for stock distributions, as discussed below, are complex. You should consult a tax specialist to make sure you fully understand the consequences of different choices available to you and your tax liability upon any withdrawal or distribution.

**Withdrawal of After-tax Contributions**

Withdrawals from your Pension Account or Profit Sharing Account attributable to your after-tax contributions will be tax-free up to the amount of your total such contributions through December 31, 1986 (less any tax-free withdrawals made prior to the merger into the Plan). Additional withdrawals with respect to your after-tax contributions will include associated investment earnings and be taxable to the extent of such earnings (unless rolled over).

**Withdrawal of Roth Contributions**

Withdrawals from your Roth 401(k) Account will be tax-free as long as the withdrawal is considered a qualified distribution. A qualified distribution is one that is taken at

least 5 tax years from the year of your first Roth 401(k) contribution and after you have attained age 59-1/2, become disabled, or are deceased.

If you elect to take a "non-qualified" distribution from your Roth Contribution Account you will be taxed on the full distribution, including the value of the Roth contributions that were originally contributed to the Plan on an after-tax basis.

**Stock Distributions**

If you receive a lump sum distribution on termination of employment that includes shares of Company common stock, the value of the stock at distribution will be taxed to you to the extent it does not exceed the value when acquired for your account (unless you rollover the stock, or sale proceeds, within 60 days). If tax applies because you do not rollover, you will still not be taxed on the "Net Unrealized Appreciation" in the value of the stock until you sell or otherwise exchange the distributed stock, at which time the unrealized appreciation will be taxed as a long-term capital gain. Subsequent appreciation will be long-term or short-term capital gain, depending on the period for which the stock is held after distribution. The Net Unrealized Appreciation is the increase in the fair market value of the distributed stock over the value of the stock when acquired for your account. (This amount will appear on a tax form, Form 1099-R, which will be provided to you at the year-end following your distribution.) If you receive a distribution of after-tax contributions that includes shares of Company stock, the Net Unrealized Appreciation in that stock will similarly not be taxed at the time of distribution but only on subsequent disposition.

# Plan Loans

The Plan permits certain Plan Participants to obtain loans against their Plan account balances. To be eligible, you must be a Participant who is (1) an active employee of an Employer or affiliate and (2) paid on a U.S. payroll. You may borrow up to 50% of the balance of your account, subject to the following:

- You must borrow at least $1,000.

- Outstanding loan amounts may not exceed 50% of your total account balances or $50,000, whichever is less.

- You may not have more than two loans outstanding at any time.

- If you had a prior loan outstanding at any time in the last 12 months, a new loan cannot exceed $50,000 less the highest aggregate loan amount outstanding in the preceding 12 months.

- You will be charged a $35 processing fee for each loan, which will be automatically deducted from your account.

- You will be charged a $15 annual administration fee for each loan. This fee will be charged on a quarterly basis ($3.75 per calendar quarter) and will be automatically deducted from your account.

Interest rates for new loans are determined periodically. You will pay interest to your account on each loan at the rate of prime plus one percent. The interest rate on your loan will remain fixed for the life of the loan.

Generally, all loans must be repaid over 12 to 60 months in whole-month increments. The only exception is for loans for the purchase of a primary residence ("Primary Residence Loan"), which will be granted for up to 120 months if required supporting documentation (e.g., contract of sale) is provided.

You have the right to prepay your loans in full at any time without penalty but you cannot reamortize them.

When you request a loan, a loan package will be sent to you, which will include an Amortization Schedule that will detail the amount of each loan repayment and the total number of repayments required to pay your loan in full. Your loan repayment will be deducted from each regular paycheck on an after-tax basis and will continue until either your loan is paid in full or your employment status with the Employer or affiliate changes. You may not suspend your loan repayments for any reason while employed by an Employer or affiliate, unless you make an acceptable alternate arrangement for a period of unpaid leave of absence.

Your endorsement of your loan check will constitute your agreement to the terms of the loan, including the promissory note for the loan. If you request a loan with a repayment period of 12 to 60 months, no other documentation is required and you will receive your check approximately 5-7 business days after you request your loan. If you requested a Primary Residence Loan with a repayment period of 61 to 120 months, you need to submit required supporting documentation. You should receive your check approximately 5-7 business days after the receipt of the necessary documentation.

If you are no longer employed by an Employer or an affiliate for any reason prior to your loan being repaid, your entire outstanding balance must be repaid within 90 days following termination. You will be notified of this requirement and be given a definite date by which your loan must be repaid. If you do not repay your outstanding loan balance within 90 days of such notification or by the Valuation Date on which a final distribution of your account balance is processed, the

outstanding balance will become a taxable distribution at that time and will be reported to the IRS.

Please note that if your loan includes money from your Roth Accounts and your default does not satisfy the Roth qualified distribution requirements, the Roth portion of the default will also be considered a taxable distribution.

If you default on a loan repayment and the default is not cured within any applicable grace period, you will not be eligible for any further loans from the Plan.

To apply for a Plan loan, contact the Plan's Service Center.

## Non-Alienation of Benefits/Qualified Domestic Relations Orders

Your benefits and rights under the Plan are not subject to assignment, hypothecation, garnishment, appropriation, or any other type of alienation in any manner, except to the extent required by applicable federal law. Any attempt to do so will not be given any effect by the Plan. Generally, the only exceptions to this rule of non-alienation are benefits payable pursuant to a qualified domestic relations order ("QDRO") (as defined in Section 414(p)(1) of the Internal Revenue Code) and amounts payable pursuant to the enforcement of a federal tax levy or judgment for unpaid taxes (or other federal law).

Attorneys for parties to a divorce or similar proceeding who wish to affect your interest in the Plan should contact the Plan's Service Center to make certain that the appropriate documents are filed and that the court order in question is actually a QDRO that complies with governing legislation and applicable Plan provisions. A copy of the Plan procedures for determining whether a court-ordered assignment of your rights under the Plan to a spouse (or child or similar dependent) is a QDRO may be obtained from the Plan's Service Center.

## Voting of Common Stock and Other Securities

You will have the opportunity to vote on the shares of common stock of the Company and Investment Fund interests attributable to amounts credited to you under the Plan. In advance of a vote, the Company stock transfer agent will deliver proxy solicitation materials and voting instruction forms to you. Your voting instructions to the Company stock transfer agent as to how to vote the shares representing your proportionate interest in common stock of the Company held by the Plan will go directly to the Company stock transfer agent, who is independent of the Company. Your voting instructions

with respect to common stock of the Company will remain confidential. Only the Company stock transfer agent will know whether and how any participant votes.

Shares of common stock of the Company for which the Company stock transfer agent receives no voting instructions will be voted in the same proportion as shares for which the transfer agent receives instructions. Other Investment Fund interests for which the Trustee receives no instructions will not be voted.

In the event of a tender or exchange offer for common stock of the Company, the Company stock transfer agent will deliver to you tender materials and tender instruction forms. You may tender or not tender the shares representing your proportionate interest in the stock held by the Plan by submitting instructions directly to the Company stock transfer agent. If you have chosen to tender shares, you are free until the tender offer is withdrawn to change or modify your decision by giving new instructions to the Company stock transfer agent. Your decision to tender or not to tender shares of Company stock will remain confidential information that the transfer agent will not share with the Company.

## Expenses

Except to the extent paid by the Employer, all expenses of administration of the Plan, including service provider fees where appropriate (such as trustee, recordkeeping, consulting, and legal fees) will be charged against the trust fund and will be debited against Participants' accounts.

## Top-Heavy Plans

A plan that primarily favors certain owners and officers may become a "top-heavy" plan, which requires special minimum benefits. In the unlikely event that this Plan becomes top-heavy, you will be notified.

## Special Provisions Applicable to Former Neuberger Berman Plan Participants

On June 14, 2004, the Neuberger Berman, LLC Pension Plan ("Pension Plan") and the Neuberger Berman, LLC Profit Sharing Plan ("Profit Sharing Plan") merged into the Lehman Brothers Savings Plan. As a result, your accounts in the Neuberger Plans were transferred to this Plan and held in a separate Pension Account or Profit Sharing Account, as applicable. Your Pension and Profit Sharing Accounts are fully vested and nonforfeitable.

In general, the rules set forth in the Plan and summarized above, relating to investments, loans, withdrawals and distributions from your Plan Accounts

and the like apply to your Pension and Profit Sharing Accounts. However, certain special rules apply to those accounts, as follows:

## Pension Account

In-service withdrawals from your Pension Account cannot be taken until you reach age 65.

Distributions after termination of employment (or in-service after you reach age 65) can be taken in the form of a lump sum distribution or as partial distributions. However, you must, if married, obtain the notarized written consent of your spouse to that distribution form. Otherwise, your Pension Account distribution will be made in the form of a "Qualified Joint and Survivor Annuity" (QJSA). A QJSA provides monthly payments for your life and, if you die survived by the spouse to whom you were married when payments began, a continuing annuity of one-half your monthly benefit for the life of your spouse. If you are single, or you are married and your spouse consents, you may also elect to receive distribution in the form of a monthly annuity for your life only. Please call the Plan Service Center at 1-866-Lehman6 (1-866-534-6266) to obtain the forms you and your spouse will need to complete.

If you are eligible to take a distribution from your Pension Account and any other account, your distribution will first come from your Pension Account, and then your Profit Sharing Account. Your other Plan accounts will be used to fund distributions after these two accounts have been fully paid to you.

## In-service withdrawals from your Profit Sharing Account

During employment, you may withdraw any amount from your after-tax contribution and rollover portions of your Profit Sharing Account. In addition, withdrawals after age 59½ of elective deferrals, profit sharing, and matching contributions held in your Profit Sharing Account may be taken at any time in whole or in part.

## New Beneficiary Designations Required

In general, beneficiary designations filed under the Pension Plan or Profit Sharing Plan no longer apply after the merger of those plans into this Plan. You must therefore file new beneficiary designations under this Plan, which will apply both to your Pension and Profit Sharing Accounts and your accounts for contributions under this Plan. If you are married, your spouse must provide a written notarized consent to designation of any different beneficiary, as described under "Designation a Beneficiary" on page 9.

## Domestic Partners

If you have a domestic partner, he or she is treated as your spouse for Plan purposes and as such automatically become the beneficiary of your Pension and Profit Sharing Accounts on the merger into the Plan, as well as the beneficiary of the balance of your Plan accounts, unless you obtain his or her consent to your designation of a different beneficiary (see "Domestic Partners" on page 9).

## Spousal rights to Pension Account

Prior to the year you reach age 35, your spouse is automatically the beneficiary of one-half of your Pension Account ("QPSA Portion"), in case you die while still employed with the Company; and the rules allowing you to designate a beneficiary for your Plan accounts with spousal consent only apply to the other one-half of your Pension Account. Starting with the year you reach age 35 (or when you terminate employment), you may, with your spouse's written consent, designate a different beneficiary for your QPSA Portion as well. See "Designating a Beneficiary" on page 9 for more information.

If your spouse is your designated beneficiary for any part of your Pension Account, he or she will receive payments in the form of a monthly life annuity, unless he or she elects a lump sum or partial payment or other special benefit form described below.

## Additional Forms of Death Benefits Available for Pension and Profit Sharing Accounts

In addition to the payment forms otherwise available under the Plan on death, your beneficiary may elect to receive benefits based on your Pension and Profit Sharing Accounts in the form of an annuity, which may have a guaranteed minimum number of payments, or in annual installments. Alternatively, annual installments may be paid to your beneficiary for up to 15 years, or for your beneficiary's life expectancy, whichever is less. If your beneficiary is your spouse, payments may extend for his or her life expectancy. Installments not paid to an individual may generally only be paid for 5 years or less.

## Withdrawal of After-tax Contributions

Withdrawals from your Pension Account or Profit Sharing Account attributable to your after-tax contributions will be tax-free up to the amount of your total such contributions through December 31, 1986 (less any tax-free withdrawals made prior to the merger into the Plan). Additional withdrawals with respect to your after-tax contributions will include associated investment earnings and be taxable to the extent of such earnings (unless rolled over).

# Benefit Claims and Appeal Procedure

If you believe you should have been paid more or different benefits or that you have not been treated properly under the Plan, you (or your authorized representative) can file a claim in writing. Your claim should be mailed to:

Employee Benefit Plans Committee
Lehman Brothers Holdings Inc.
Attention: 401(k) Claims
1301 Avenue of the Americas, 6th Floor
New York, NY 10019

If your claim is wholly or partially denied, you will receive a decision with reasons for the denial within 90 days. If special circumstances warrant, the Committee may extend the 90-day period for up to an additional 90 days (and will first advise you in writing of the extension and why it is needed).

If you believe that your benefit payment, denial, or other treatment is incorrect, you or your representative may appeal the decision in writing within 60 days after it is received by you. Written request for review of the decision should be sent to the Employee Benefit Plans Committee at the address listed above. If you file an appeal you have the right to:

1. Review all documents and records relevant to your claim, and

2. Send to the Committee written comments, documents, records and other information in support of your claim.

The Committee will conduct a review and notify you of its determination within 60 days of its receipt of your written request for review. If special circumstances warrant, the Committee may extend the 60-day period for up to an additional 60 days (and will first advise you in writing of the extension, why it is needed, and the date a decision is expected). The Committee has the discretion and authority to determine all questions of fact under the Plan and to interpret the Plan and to make all other interpretations and determinations necessary for the administration of the Plan.

You must complete all the above stages of review before you may sue for benefits in a civil court. If you wish to bring legal action in court to challenge an adverse determination on appeal you must file your suit within three years from the earlier of the date of the denial, or the date your cause of action first arose. Instead of bringing legal action in court, you and the Committee may agree to have your claim submitted to binding arbitration, subject to the same time limits that govern bringing an action in court.

# Plan Amendment or Termination

The Company, acting through the Committee (with respect to amendments) and the Compensation and Benefits Committee of the Board of Directors (with respect to either amendment or termination), reserves the right to amend, modify, suspend, or terminate the Plan at any time. The Company cannot by amendment or termination of the Plan reduce benefits previously credited to your account(s). However, the Company may act to reduce Employer Basic or Matching Contributions for any year prior to the time such contributions are actually paid into the Plan. If any such action results in a complete discontinuance of contributions under the Plan, Participants at the time of such action will be fully vested in their accounts (as will accounts of Participants affected by any partial termination of the Plan within the meaning of the Internal Revenue Code).

# Your Rights Under ERISA

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all plan participants shall be entitled to:

Receive Information About Your Plan and Benefits

1. Examine, without charge, at the HR Service Center, Lehman Brothers Holdings Inc., 1301 Avenue of the Americas, 6th Floor, New York, New York 10019 and at other specified locations, all documents governing the Plan, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration;

2. Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies;

3. Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report; and

4. Obtain free of charge a statement of his or her account(s) under the Plan, showing the vested portion. Although this statement is not required to be given on request more than once every twelve (12) months, the Committee makes these statements accessible daily.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate this Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way for the purpose of preventing you from obtaining a benefit or exercising your rights under ERISA.

## Enforce Your Rights

If your claim for a benefit under the plan is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. (see the section entitled "Benefit Claims and Appeal Procedure").

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such cases, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## Assistance With Your Questions

If you have any questions about your plan, you should contact the plan administrator at the address listed below in the section entitled "Administrative Facts". If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

# Administrative Facts

This section includes information about the administration of the Plan. If you file a claim or request for information, you may need the information listed below.

## Plan Name

Lehman Brothers Savings Plan

## Plan Sponsor

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019

## Participating Employers

A list may be obtained from the Plan's Service Center.

## Employer Identification Number

13-3216325

## Plan Number

003

## Plan Type

The Plan is a profit-sharing plan that is intended to satisfy the applicable provisions of Code sections 401(a) and 401(k). The Plan is not insured by the Pension Benefit Guaranty Corporation (PBGC) because the PBGC only insures defined benefit-type pension plans and this Plan is a defined contribution-type pension plan.

## Plan Administrator

The Plan is administered by the Employee Benefit Plans Committee (called the "Committee" in this booklet) which is appointed by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings Inc. The Committee is responsible for the operation and administration of the Plan. It has full discretion and authority to make all decisions in connection with the administration of the Plan, including but not limited to decisions concerning eligibility to participate in the Plan and concerning benefits to which any Participant or beneficiary is entitled, as well as with regard to Plan interpretation and determination of any fact under the Plan. You can contact the Plan Administrator by writing to:

Employee Benefit Plans Committee
c/o Lehman Brothers Holdings Inc.
1301 Avenue of the Americas, 6th Floor
New York, NY 10019

**Trust Fund**

All Employee and Employer contributions under the Plan are held in the Lehman Brothers Savings Plans Trust. The Trustee is Fidelity Management Trust Company, whose address is:

Fidelity Management Trust Company
82 Devonshire St.
Boston, MA 02109

**Plan Year**

The Plan year is the calendar year.

**Payment of Benefits**

The Trustee pays benefits as directed by:

Fidelity Investments Institutional Services Company, Inc.
82 Devonshire St.
Boston, MA 02109

**Agent for Service of Legal Process**

A legal action against the Plan may be started by serving the Plan Administrator at the address given above. Legal process may also be served on the Trustee.

# Securities Act of 1933

The Company has registered under the Securities Act of 1933 an indeterminate amount of interests in the Plan and 5,000,000 shares of Company common stock that may be purchased with Plan contributions.

# Tax Effects of the Plan on the Company

Before-Tax Contributions, Roth Contributions and Employer Contributions made on behalf of Participants may be deducted from the income of the Employer for tax purposes.

# Information about the Company and the Company's Common Stock

The following documents, previously filed by the Company with the Securities and Exchange Commission ("Commission") pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") contain important information about the Company and the Company's common stock, and are incorporated by reference into this prospectus:

The Company's Annual Report on Form 10-K for the fiscal year ended November 30, 2006, filed with the Commission on February 13, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2006, filed with the Commission on October 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended May 31, 2006, filed with the Commission on July 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2006, filed with the Commission on April 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act, the Company's Current Report on Form 8-K, filed with the Commission on February 9, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 2, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 31, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 19, 2007 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 21 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 14, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 7, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on December 1, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission

on November 22, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on November 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 27, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on October 2, 2006 pursuant to Section 13 or 15(d) of the Exchange Act;

the Company's Current Report on Form 8-K, filed with the Commission on September 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on September 13, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on August 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on July 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 30, 2004 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 29, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on June 12, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 30, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form

8-K, filed with the Commission on May 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on May 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 25, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on April 4, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 31, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act ; the Company's Current Report on Form 8-K, filed with the Commission on March 24, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 16, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 15, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on March 3, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 28, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 21, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on February 10, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 26, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 23, 2006 pursuant to Section 13 or 15(d) of the Exchange Act; the Company's Current Report on Form 8-K, filed with the Commission on January 17, 2006 pursuant to Section 13 or 15(d) of the Exchange Act.

In addition, each other document filed by the Company or by the Plan pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this booklet and prior to the termination of the Company's offering of Plan interests and common stock in connection with the

Plan shall be automatically incorporated by reference into this booklet and constitute part of the aforementioned prospectus from the date of filing of such document. In the event of any inconsistency between any information in this booklet and any document incorporated by reference, the latest information shall prevail and shall be deemed to replace any prior inconsistent information.

## Lehman Brothers Retirement Service Center

Any questions you have may be directed to the Plan's Service Center. In addition, any information you need about the Plan, Plan procedures, your accounts, eligible investments, loans and withdrawals and other matters may be obtained from the Plan's Service Center.

The Plan's Service Center can be reached through the Fidelity's NetBenefits™ website netbenefits.fidelity.com or by calling 1-866-Lehman6 (1-866-534-6266).

You may obtain the following documents from the Plan's Service Center without charge:

1. Any document which has been incorporated by reference into this booklet and prospectus (other than exhibits to such documents, unless such exhibits are specifically incorporated by reference into such documents);

2. All reports, proxy statements and other communications distributed by the Company to its stockholders generally;

3. Any other documents which the Company is required to deliver to you pursuant to Rule 428(b) under the Securities Act of 1933;

4. The Plan document;

5. This booklet; and

6. Fund prospectuses and other Fund information.

## Lehman Brothers Intranet

Lehman Brothers employees with access may be notified about updates and changes to the foregoing documents through the Lehman Brothers e-mail system.

**EXHIBIT G**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　　　Debtor. | Case No. 08-01420 (SCC) SIPA |

**[PROPOSED] ORDER GRANTING THE TRUSTEE'S TWO HUNDRED THIRD
OMNIBUS OBJECTION SEEKING TO (I) DISALLOW IN PART, (II) SUBORDINATE
AND RECLASSIFY AS EQUITY IN PART, AND/OR (III) REDUCE OR REDUCE AND
RECLASSIFY IN PART CERTAIN FILED PROOFS OF CLAIM, AND TO ALLOW
SUCH CLAIMS, AS MODIFIED, WITH PROPER CLASSIFICATION AS PRIORITY
AND/OR UNSECURED GENERAL CREDITOR CLAIMS (EMPLOYEE CLAIMS)**

Upon the two hundred third omnibus objection to claims, dated February 7, 2013

(the "Two Hundred Third Omnibus Objection to General Creditor Claims"),[1] of James W.

Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. ( "LBI") under

the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),

seeking entry of an order, pursuant to section 502(b) of title 11 of the United States Code (the

"Bankruptcy Code"), as made applicable to this proceeding pursuant to sections 78fff(b) and

78fff-1(a) of SIPA, and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (i) disallowing and expunging the claims listed on Exhibit 1 annexed

hereto (together, the "Employee Claims" or the "Claims") in part on the grounds that LBI does

not have any liability, (ii) reclassifying and subordinating in part the Employee Claims to claims

of general creditors, and/or (iii) reducing and allowing the Employee Claims in part on the basis

---

1. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the motion.

that the amounts listed on the proofs of claim contradict the books and records of the LBI estate, and, with respect to certain of the Claims, reclassifying the Claims to general unsecured status pursuant to Bankruptcy Code section 507(a)(4)(A), all as more fully described in the Two Hundred Third Omnibus Objection to General Creditor Claims; and due and proper notice of the Two Hundred Third Omnibus Objection to General Creditor Claims having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Two Hundred Third Omnibus Objection to General Creditor Claims is in the best interests of LBI, its estate, its customers and creditors, and all parties in interest and that the legal and factual bases set forth in the Two Hundred Third Omnibus Objection to General Creditor Claims establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the relief requested in the Two Hundred Third Omnibus Objection to General Creditor Claims is granted; and it is further

**ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the portions of the claims listed on Exhibit 2 annexed hereto that constitute LBHI Equities Claims, Equity Awards Claims, and 401(k) Claims, as those terms are defined in the Two Hundred Third Omnibus Objection to General Creditor Claims, are disallowed and expunged; and it is further

**ORDERED** that the portions of the Employee Claims listed on Exhibit 2 annexed hereto under the heading "Accrued Equity Claim" are reclassified as equity interests, in an amount and with a level of priority to be determined, as indicated on Exhibit 2 attached hereto; and it is further

**ORDERED** that, pursuant to sections 502(b) and 507(a)(4)(A) of the Bankruptcy Code, the claims listed on Exhibit 1 are reduced and, where applicable, reclassified, as set forth

on Exhibit 1 in the column entitled "*Claim as Modified*," and allowed to the extent of such

amounts and priorities; and it is further

        **ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and interpretation of this Order.

Dated: New York, New York
      March __, 2014

_____
HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|---|
| 1 | BISHOP, DAVID L. | 1494 | 1/23/2009 | - (A) | - (A) |
| | 27 KETCHUM ROAD | | | - (S) | - (S) |
| | WARWICK, NY 10990 | | | - (P) | - (P) |
| | | | | $45,000.00 (U) | $40,000.00 (U) |
| | | | | $45,000.00 (T) | $40,000.00 (T) |
| 2 | BUCHERT, FREDERIC C. | 6077 | 6/15/2009 | - (A) | - (A) |
| | 346 LORIMER STREET | | | - (S) | - (S) |
| | BROOKLYN, NY 11206 | | | $12,863.63 (P) | $10,950.00 (P) |
| | | | | $8,088.47 (U) | $8,088.47 (U) |
| | | | | $20,952.10 (T) | $19,038.47 (T) |
| 3 | COSTELLO, RUSSELL S. | 1246 | 1/21/2009 | - (A) | - (A) |
| | 5445 CARUTH HAVEN | | | - (S) | - (S) |
| | #712 | | | $10,950.00 (P) | $10,950.00 (P) |
| | DALLAS, TX 75225 | | | $39,903.00 (U) | $37,703.85 (U) |
| | | | | $50,853.00 (T) | $48,653.85 (T) |

\* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00\*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|---|
| 4 | DEMASI, KATHLEEN M.<br>146 78TH STREET<br>BROOKLYN, NY 11209 | 1473 | 1/23/2009 | - (A)<br>- (S)<br>$175,000.00 (P)<br>- (U)<br>$175,000.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$141,684.62 (U)<br>$152,634.62 (T) |
| 5 | FRIEDLAND, JAMES<br>90 GREEN WAY<br>ALLENDALE, NJ 07401 | 3408 | 2/3/2009 | - (A)<br>- (S)<br>$116,000.00 (P)<br>- (U)<br>$116,000.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$23,991.95 (U)<br>$34,941.95 (T) [1] |
| 6 | GEORGIEVA, ANNA<br>IORDANKA GEORGIEVA<br>32A ULITZA STARA PLANINA<br>OBSHTINA DOBRICH<br>SELO STEFAN KARADJA 9371<br>BULGARIA | 7000304 | 1/11/2009 | - (A)<br>- (S)<br>$10,950.00 (P)<br>$16,362.50 (U)<br>$27,312.50 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$10,335.62 (U)<br>$21,285.62 (T) |
| 7 | GONGLE, SHRUTI<br>1533 WATERFORD DRIVE<br>EDISON, NJ 08817 | 8001789 | 1/28/2009 | - (A)<br>- (S)<br>- (P)<br>- (U)<br>UNSPECIFIED* (T) | - (A)<br>- (S)<br>- (P)<br>$12,115.39 (U)<br>$12,115.39 (T) |
| 8 | MAGGIACOMO, ALAN B.<br>5 HAWTHORN DRIVE<br>PLAINSBORO, NJ 08536 | 7000599 | 1/28/2009 | - (A)<br>- (S)<br>$86,125.00 (P)<br>- (U)<br>$86,125.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$74,261.63 (U)<br>$85,211.63 (T) |

1. The amount to be allowed for claim number 3408, listed in the column entitled "*Claim as Modified*," reflects: (i) a claim for severance, valued at $25,000.00; and (ii) a claim for an unpaid check, valued at $9,941.95.

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|
| 9  PIERRE-LOUIS, ALIX<br>10900 E. TAYLOR RD<br>APT 132<br>GULFPORT, MS  39503 | 7000708 | 1/21/2009 | - (A)<br>- (S)<br>- (P)<br>$79,434.20 (U)<br>$79,434.20 (T) | - (A)<br>- (S)<br>- (P)<br>$61,894.15 (U)<br>$61,894.15 (T) |
| 10  ROBINSON, REYNE L.<br>583 WEBSTER AVE<br>NEW ROCHELLE, NY  10801 | 7000714 | 1/29/2009 | - (A)<br>- (S)<br>$70,000.00 (P)<br>- (U)<br>$70,000.00 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$58,035.53 (U)<br>$68,985.53 (T) |
| 11  SPITAL, SAUL H.<br>10 JEANINE COURT<br>MANALAPAN, NJ  07726 | 1739 | 1/26/2009 | - (A)<br>- (S)<br>$80,000.00 (P)<br>$143,500.00 (U)<br>$223,500.00 (T) | - (A)<br>- (S)<br>- (P)<br>$78,461.46 (U)<br>$78,461.46 (T) |
| 12  STEPHENSON, REBECCA L.<br>10272 MOUNTAIN MAPLE DRIVE<br>HIGHLANDS RANCH, CO  80129 | 7000413 | 1/19/2009 | - (A)<br>- (S)<br>$112,547.33 (P)<br>$65,047.73 (U)<br>$112,547.33 (T) | - (A)<br>- (S)<br>$10,950.00 (P)<br>$52,319.20 (U)<br>$63,269.20 (T) [2] |
| 13  TANNOR PARTNERS CREDIT FUND, LP<br>TRANSFEROR: KOTCHER, LAURI KIEN<br>ATTN: ROBERT TANNOR<br>150 GRAND STREET, STE 401<br>WHITE PLAINS, NY  10601 | 3565 | 2/12/2009 | - (A)<br>- (S)<br>- (P)<br>$140,000.04 (U)<br>$140,000.04 (T) | - (A)<br>- (S)<br>- (P)<br>$136,153.90 (U)<br>$136,153.90 (T) |

---

2.  The amount to be allowed for claim number 7000413, listed in the column entitled "*Claim as Modified*," reflects: (i) a claim for severance, valued at $58,524.01; and (ii) a claim for unpaid vacation days, valued at $4,745.19.

\* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00\*", "unascertainable", "undetermined," or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | ASSERTED AMOUNT | CLAIM AS MODIFIED |
|---|---|---|---|---|
| | | | - (A) | - (A) |
| | | | - (S) | - (S) |
| Total | | | $674,435.96 (P) | $87,600.00 (P) |
| | | | $537,335.94 (U) | $735,045.77 (U) |
| | | | $1,146,724.17 (T) | $822,645.77 (T) |

**(A) – ADMINISTRATIVE**
**(S) – SECURED**
**(P) – PRIORITY**
**(U) – UNSECURED**
**(T) – TOTAL CLAIMED**

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

# EXHIBIT 2

| Claim Type | Trustee's Proposed Reason for Disallowance, Subordination and Reclassification as Equity, Reduction, and/or Reduction and Reclassification as General Unsecured Claims |
|---|---|
| LBHI Equities Claims | No legal or factual justification for asserting a claim against LBI. The claimed stock constitutes an equity interest in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding. |
| Accrued Equity Claims | The Accrued Equity Claims are based on the alleged pre-petition right to receive accrued equity in LBHI, an affiliate of LBI, and therefore must be reclassified as equity interests and subordinated pursuant to section 510(b) of the Bankruptcy Code. |
| Equity Awards Claims | No legal or factual justification for asserting a claim against LBI. The claimed Equity Awards constitute equity interests in LBHI, not LBI, the debtor in this separate and distinct SIPA Proceeding. |
| 401(k) Claims | No legal or factual justification for asserting a claim against LBI. LBI is not liable for the claimed 401(k) account or for losses associated with such account. |
| Severance Claims | The claim amount must be reduced to the accurate amount due under the claimant's severance agreement, as shown in LBI's books and records. The claim must be reclassified, in whole or in part, to a general unsecured claim in accordance with Bankruptcy Code Section 507(a)(4)(A). |

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | SEVERANCE CLAIM | ACCRUED EQUITY CLAIM | EQUITY AWARDS CLAIM | 401(K) CLAIM | LBHI EQUITIES CLAIM |
|---|---|---|---|---|---|---|---|---|
| 1 | BISHOP, DAVID L.<br>27 KETCHUM ROAD<br>WARWICK, NY 10990 | 1494 | 1/23/2009 | X | | | | |
| 2 | BUCHERT, FREDERIC C.<br>346 LORIMER STREET<br>BROOKLYN, NY 11206 | 6077 | 6/15/2009 | X | | X | | |
| 3 | COSTELLO, RUSSELL S.<br>5445 CARUTH HAVEN<br>#712<br>DALLAS, TX 75225 | 1246 | 1/21/2009 | X | | | | |
| 4 | DEMASI, KATHLEEN M.<br>146 78TH STREET<br>BROOKLYN, NY 11209 | 1473 | 1/23/2009 | X | | | | |
| 5 | FRIEDLAND, JAMES<br>90 GREEN WAY<br>ALLENDALE, NJ 07401 | 3408 | 2/3/2009 | X | X | | | |
| 6 | GEORGIEVA, ANNA<br>IORDANKA GEORGIEVA<br>32A ULITZA STARA PLANINA<br>OBSHTINA DOBRICH<br>SELO STEFAN KARADJA 9371<br>BULGARIA | 7000304 | 1/11/2009 | X | | | | |
| 7 | GONGLE, SHRUTI<br>1533 WATERFORD DRIVE<br>EDISON, NJ 08817 | 8001789 | 1/28/2009 | X | | | | |
| 8 | MAGGIACOMO, ALAN B.<br>5 HAWTHORN DRIVE<br>PLAINSBORO, NJ 08536 | 7000599 | 1/28/2009 | X | | | | |
| 9 | PIERRE-LOUIS, ALIX<br>10900 E. TAYLOR RD<br>APT 132<br>GULFPORT, MS 39503 | 7000708 | 1/21/2009 | X | | | | |

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | SEVERANCE CLAIM | ACCRUED EQUITY CLAIM | EQUITY AWARDS CLAIM | 401(K) CLAIM | LBHI EQUITIES CLAIM |
|---|---|---|---|---|---|---|---|---|
| 10 | ROBINSON, REYNE L.<br>583 WEBSTER AVE<br>NEW ROCHELLE, NY 10801 | 7000714 | 1/29/2009 | X | | | | |
| 11 | SPITAL, SAUL H.<br>10 JEANINE COURT<br>MANALAPAN, NJ 07726 | 1739 | 1/26/2009 | X | | X | | |
| 12 | STEPHENSON, REBECCA L<br>10272 MOUNTAIN MAPLE DRIVE<br>HIGHLANDS RANCH, CO 80129 | 7000413 | 1/19/2009 | X | | X | X | X |
| 13 | TANNOR PARTNERS CREDIT FUND, LP<br>TRANSFEROR: KOTCHER, LAURI KIEN<br>ATTN: ROBERT TANNOR<br>150 GRAND STREET, STE 401<br>WHITE PLAINS, NY 10601 | 3565 | 2/12/2009 | X | | | | |