# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

**Hearing Date and Time:  March 27, 2014 at 10::a.m. (Prevailing Eastern Time)**
**Response Date and Time:  February 13, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (SCC) SIPA |

---

# MGIC'S RESPONSE TO TRUSTEE'S OBJECTION TO MGIC'S GENERAL CREDITOR CLAIM

---

**BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP**
54 West Hubbard Street, 3rd Floor
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

## TABLE OF CONTENTS

Introduction ........................................................................................................................1

Background .........................................................................................................................1

Argument ...........................................................................................................................4

I.  Trustee's Arguments for Disallowing MGIC's Claim Are Meritless.................................4

      A.  MGIC'S Proof of Claim Is Not Subject to the Heightened Pleading
          Requirements of Federal Rule of Civil Procedure 9(b) ......................................4

      B.  No Contractual Provision Limits MGIC's Claims or Remedies .........................7

      C.  MGIC's Insurance Policies and Terms Letters Do Not Prevent it from
          Pursuing Fraud Claims Against LBI.................................................................9

II.  Substantial Evidence Supports MGIC's Proof of Claim Against LBI ...............................12

      A.  LBI Made Misrepresentations and Breached its Contractual
          Representations and Warranties for Thousands of Loans Insured by
          MGIC ...........................................................................................................13

      B.  LBI Acted with Knowledge of its Misrepresentations or, at the Very
          Least, with a Reckless Disregard .......................................................................16

      C.  LBI's Misrepresentations Give Rise to MGIC's Claims for Fraud and
          Breaches of Contractual Representations and Warranties.................................22

          1.  Fraud (Fraudulent Inducement)...................................................... 22

          2.  LBI's Breach of Contractual Representations.................................. 23

          3.  LBI's Breach of Contractual Warranties......................................... 23

Conclusion .........................................................................................................................24

i

# TABLE OF AUTHORITIES

## Cases

*DynCorp v. GTE Corp.*,
    215 F. Supp. 2d 308 (S.D.N.Y. 2002) ....................................................................... 11, 12, 13

*Filmline Techs., Inc. v. Roberts*,
    1993 U.S. Dist. LEXIS 10696 (D. Conn. July 21, 1993) .......................................... 4

*First Bank of Ams. v. Motor Car Funding*,
    257 A.D.2d 287 (1999) ............................................................................................ 13

*Highland Holdings & Zito I, L.P. v. Century/ML Cable Venture*,
    2007 WL 2405689 (S.D.N.Y. August 24, 2007) ....................................................... 7

*In re Alper Holdings USA Inc.*,
    398 B.R. 736 (S.D.N.Y. 2008) .................................................................................. 7

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ..................................................................... 11

*In re DJK Residential LLC*,
    416 B.R. 100 (Bankr. S.D.N.Y. 2009) ............................................................... 5, 6, 7

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 21, 2004) .......................................... 4

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    87 A.D.3d 287 (N.Y. App. Div. 2011) ...................................................... 10, 11, 13

## Other Authorities

Michael Hudson, *How Wall Street Stoked the Mortgage Meltdown*,
    Wall St. J., June 27, 2007 ...................................................................................... 19

Michael W. Hudson, *The Monster*,
    264-267 (St. Martin's Griffin 2011) ....................................................................... 19

## Rules

Federal Rules of Bankruptcy Procedure 3001 ............................................................... 4, 5

Federal Rules of Bankruptcy Procedure 3007 ................................................................... 6

Federal Rules of Bankruptcy Procedure 7009 ................................................................ 6, 7

Federal Rules of Bankruptcy Procedure 9014 ................................................................................ 7

Federal Rules of Civil Procedure 12(b)(6)..................................................................................... 6

Federal Rules of Civil Procedure 9(b) .......................................................................................... 4

**Introduction**

Prior to Lehman Brothers Inc.'s ("LBI") collapse, it repeatedly asked Mortgage Guaranty Insurance Corp. ("MGIC") to extend insurance coverage to mortgage loans that LBI had placed or planned to place into securitization vehicles. MGIC agreed to provide insurance, relying on LBI's representations as to the loan characteristics and credit quality of the mortgages at issue. MGIC has since learned that for thousands of loans, LBI's representations were false—causing hundreds of millions of dollars in damage to MGIC. LBI's fraudulent statements, and related breaches of representations and warranties, form the basis of MGIC's proof of claim. The Trustee's arguments notwithstanding, there is no basis on which to disallow MGIC's claim.

**Background**

MGIC is one the nation's largest private mortgage insurance providers. Between 2005 and 2007, MGIC agreed to insure mortgage loans in 40 securitization vehicles organized by LBI.[1] In order to induce MGIC to extend coverage, LBI provided computer files to MGIC representing the characteristics of the mortgage loans that LBI wanted MGIC to insure, which comprised LBI's application for insurance.

LBI also made a "request for insurance" to MGIC, which LBI agreed was reflected in correspondence provided by MGIC to LBI called "Terms Letters." (*See* Terms Letter example attached hereto as Exhibit A, § 19 ("…please acknowledge this letter as your request for insurance…").)[2] LBI's requests for insurance included various representations and warranties that each mortgage loan that LBI asked MGIC to insure met certain criteria (called "Eligibility

---

[1] MGIC's proof of claim listed all securitizations organized by LBI since 2001. But for the purposes of this motion, MGIC focuses on the 2005-2007 deals.

[2] Although the section numbering varies, the contractual provisions discussed in this response are materially the same across the Terms Letters at issue unless otherwise noted.

Criteria") and that LBI's "Application" for coverage to MGIC was "materially true, correct and accurate." (*Id.* §§ 10, 12.)

LBI's Application included, among other items, representations to MGIC for each loan included in the Application as to the loan balance as of the effective date of the coverage (the "Certificate Effective Date"), the property value, and the borrower's debt-to-income ratio ("DTI"). (*Id.* § 12.) LBI also agreed (and represented) that each loan at issue would meet the following Eligibility Criteria as of the Certificate Effective Date: (1) the borrower must have made from the borrower's own funds the first regular periodic payment; (2) the borrower must have made from the borrower's own funds all subsequent periodic payments up to a specified cut-off date; and (3) all persons involved in the underwriting, processing, originating, or servicing of each loan must have complied in all material respects with all applicable laws and regulations. (*Id.* § 10.)

As part of its requests for insurance as reflected in the Terms Letters, LBI acknowledged and agreed that "(a) the mortgage loan information for each Insurable Loan included in the Application . . . is material to MGIC's decision as to whether to issue such Coverage on such Insurable Loan, and (b) MGIC is relying on such information in issuing such Coverage on such Insurable Loan." (*Id.* § 17.) LBI also acknowledged that "in extending this offer to insure, ***MGIC is relying on the truth and accuracy of the information in the Application*** and Lehman's representation as to compliance with the Eligibility Criteria relating to the Insured Loans." (*Id.* (emphasis added).)

Once a Terms Letter was signed by MGIC, LBI, and the trustee for the securitization vehicle, the letter became binding. (*Id.* § 19.) Thereafter, MGIC issued a certificate of coverage

evidencing that the subject mortgage loans were covered under MGIC's master insurance policy. (*Id.* § 7.)[3]

The master policies at issue provide that MGIC may rescind insurance coverage for loans that are tainted by fraud or misrepresentation.  (Ex. B, Rescission Cap Policy, § 2.)  When MGIC rescinds coverage, it returns the premiums paid for a given loan but does not pay any resulting insurance claim.  The insurance coverage procured by LBI and at issue in MGIC's proof of claim, however, was subject to rescission caps that provided that once a specific amount of insured claims had been rescinded, no more rescissions could be made.  For this reason, the master policies at issue are referred to in this brief and in MGIC's proof of claim as "Rescission Cap Policies."  Section 2.13 of the Rescission Cap Policies permitted MGIC to establish limitations on its right to rescind coverage on a loan or deny a claim.[4]  Section 13 of the Terms Letters then established the rescission cap for a given deal.

After LBI collapsed, it became apparent that LBI had fraudulently induced MGIC to provide insurance coverage by misrepresenting the characteristics of the mortgage loans in its Applications and requests for insurance, and that LBI breached its contractual representations and warranties in the executed Terms Letters.  As a result, MGIC has suffered well in excess of $100 million in damages.  Those damages are the subject of MGIC's properly and timely filed proof of claim against LBI.

---

[3] The "insured" under the master policy was the trustee for the securitization vehicle, not LBI.  (*Id.* § 6.)
[4] Section 2.13 provides:  "Limitation on the Company's Rescission or Cancellation of Coverage or Denial of Claim – Notwithstanding any provision in this Policy to the contrary, the Company may establish limitations . . . on the Company's right to cancel or rescind coverage on a Loan or to deny in whole or in part a Claim on a Loan on the basis of Sections 2.3, 2.12, 4.2, 4.3, 4.11, 5.5(c) or 5.8(b) of this Policy." (Rescission Cap Policy.)

**Argument**

Trustee James W. Giddens makes three arguments why MGIC's claim should be expunged: (1) MGIC's proof of claim does not meet the pleading requirements of Federal Rules of Civil Procedure 9(b); (2) MGIC agreed to limit its remedy for contractual misrepresentations in a way that precludes its claim; and (3) MGIC is improperly disguising its claim for breach of contractual representations as a fraud claim.[5]  As detailed below, these arguments are without merit.

**I.    Trustee's Arguments for Disallowing MGIC's Claim Are Meritless**

**A.    MGIC'S Proof of Claim Is Not Subject to the Heightened Pleading Requirements of Federal Rule of Civil Procedure 9(b)**

Trustee argues that MGIC's proof of claim does not adequately plead a cause of action for fraud.[6]  (Tr. Br. ¶¶ 31, 39-41.)  But Trustee's argument is based on the false premise that the pleading standard set forth in Federal Rules of Civil Procedure 9 ("Rule 9(b)") applies to proofs of claims in bankruptcy proceedings.  (Tr. Br. ¶¶ 27-31.)  That is not the case.  MGIC provided all the detail that was required when it submitted its claim.

Federal Rules of Bankruptcy Procedure ("FRBP") 3001 states that "[a] proof of claim shall conform substantially to the appropriate Official Form."  The requirements of Official Form 10 thus govern the format for submitting a proof of claim.  Nothing in Official Form 10 or FRBP 3001 says that Rule 9(b)'s specificity requirements must be met in submitting a proof of claim.  Instead, the instructions to Form 10 provide that claimant must simply "state the type of debt or

---

[5] MGIC withdraws the portion of its proof of claim dealing with RICO violations.

[6] Trustee does not and cannot argue that Rule 9 is applicable to MGIC's causes of action for breach of contractual representations and warranties.  *See, e.g., Liberty Media Corp. v. Vivendi Universal, S.A.*, 2004 U.S. Dist. LEXIS 7015, at *7 (S.D.N.Y. April 21, 2004) (allegations of breach of contract and breach of warranty need not meet the standards of Rule 9(b)); *Filmline Techs., Inc. v. Roberts*, 1993 U.S. Dist. LEXIS 10696, *6-7 (D. Conn. July 21, 1993) (Rule 9(b) inapplicable to cause of action for breach of contractual representations and warranties that did not sound in fraud).  Thus even if Trustee's Rule 9(b) argument was correct—and it is not—there would still be no basis for expunging MGIC's entire claim.

4

how it was incurred." B10 (Official Form 10.)  MGIC did just that, attaching a three-page

description of its allegations against LBI to MGIC's proof of claim along with various

supporting documents.  (*See* Ex. 1 to Tr. Br.)  Under FRBP 3001(f), MGIC's properly executed

proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim."

      Trustee's argument that MGIC was required to provide even more detail in its proof of

claim relies almost entirely on a single case, *In re DJK Residential LLC*, 416 B.R. 100 (Bankr.

S.D.N.Y. 2009).  But *DJK* does not support Trustee's argument.  While the Court in *DJK* noted

that "bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules

of Civil Procedure" in evaluating disputed claims, *id.* at 106, it simply did not hold—as the

Trustee suggests—that a claimant is required to meet Rule 9(b)'s specificity requirements when

submitting an initial proof of claim.

      A description of the procedural posture in *DJK* reveals why it has little relevance here.

The debtor in *DJK* had already emerged from bankruptcy and an order closing the bankruptcy

cases had been entered.  The claimants filed a claim that incorporated and was "equivalent in all

material respects" to a complaint that the claimants had previously filed against a debtor in the

Northern District of Illinois.  *Id*. at 101-102.  Far from the routine claims administration process

applicable to MGIC's timely filed proof of claim, "the issues presented by the [claim filed in

*DJK*], the Objection and the Response no longer have any significance to the administration of

the chapter 11 cases." *Id*. at 102.  The court disallowed the claim at issue after finding that the

claimants had not offered any support for their commercial bribery allegations, despite repeated

opportunities to do so, including the filing of three different complaints in the parallel district

court proceedings. *Id*. at 103-07 (noting that as to the debtor's co-defendants, the first amended

complaint was dismissed by the district court for failing to meet the pleading requirements of the

Federal Rules of Civil Procedure and the second amended complaint was voluntarily dismissed with prejudice). The court acknowledged the unusual procedural posture of the disputed claim, noting that it was "resolving here what amounts to a procedural anomaly, a strenuous claim objection presented at the tail end of fully administered chapter 11 cases that also happen to overlap with and touch directly on the subject matter of other pending but currently inactive federal litigation." *Id.* at 108.

In contrast to the claimants in *DJK*—who had at least four opportunities to set forth the basis for their claims before they were disallowed—MGIC was not even asked to provide the court with additional support for its claims until now. There is no "procedural anomaly" and no ongoing adversarial proceeding that justifies the application, even before an objection has been raised, of Rule 9(b) to MGIC's proof of claim. MGIC did not sue LBI in a separate district court action and did not make its proof of claim "equivalent in all material respects" to a complaint filed against LBI in a parallel adversarial proceeding. No order closing this bankruptcy case has been entered. *DJK* is thus inapplicable.[7]

Trustee also relies on FRBP 7009 in arguing that MGIC's initial proof of claim must satisfy Rule 9(b)'s pleading requirements. But FRBP 7009 applies only to adversary proceedings. The mere filing of a proof of claim in and of itself does not commence either an adversary proceeding or a contested matter; it is only when and if an objection is filed that a contested matter arises. *See* Fed. R. Bankr. P. 3007, Advisory Committee Note (1983) (an

---

[7] The two other cases Trustee cites in support of its argument that Rule 9(b) applies to a proof of claim are likewise inapplicable. The parties in both cases agreed to treat debtor's objection to claimant's proof of claim as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), which made sense as the issues in both cases had already been the subject of related litigation. *See In re Alper Holdings USA Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008); *Highland Holdings & Zito I, L.P. v. Century/ML Cable Venture*, 2007 WL 2405689, *1, *2 (S.D.N.Y. August 24, 2007).

objection to a proof of claim creates a contested matter); Fed. R. Bankr. P. 9014 (noting that

FRBP 7009 applies in contested matters "unless the court directs otherwise").

More fundamentally, nothing in FRBP 7009 or FRBP 9014 indicates that the initial proof

of claim itself must satisfy Rule 9(b). Indeed, if an objection to a proof of claim creates a

contested matter and the application of Rule 9(b), it cannot be that Rule 9(b) is applicable to the

original proof of claim itself. Even the court in *DJK* provided the opportunity for claimants to

substantiate their claims in response to debtor's objection and at oral argument. *See* 416 B.R. at

107 ("In their Response and at oral argument, Claimants failed to show by a preponderance of

the evidence that the Claim was facially plausible.").

Since Trustee has now challenged MGIC's claim, Part II of this response provides

additional details supporting the proof of claim, including details that satisfy Rule 9(b) for

MGIC's fraudulent inducement claim. This information shows that LBI made widespread

misrepresentations to MGIC and that LBI was at least recklessly indifferent to whether its

representations to MGIC were true.[8]  In light of this substantial evidence, there is no basis for

disallowing MGIC's claims.

> **B.      No Contractual Provision Limits MGIC's Claims or Remedies
> Against LBI**

Trustee next argues that Section 2.13 of the Rescission Cap Policies and Section 13 of the

Terms Letters preclude MGIC from seeking damages for LBI's contractual misrepresentations

above the aggregate amounts of the rescission caps. (Tr. Br. ¶¶ 50-51.) Trustee's argument,

however, ignores the clear statement in Section 7.8(c) that there is no limitation on, or exclusion

of, the rights or remedies of MGIC: "***No right or remedy of the Company provided for by this***

***Policy will be exclusive of***, or limit, any other rights or remedies set forth in this Policy or

---

[8] As the Trustee acknowledges, Rule 9(b) permits intent to be alleged generally.

otherwise available to the Company at law or equity." (Rescission Cap Policy, § 7.8(c) (emphasis added).) MGIC's claim does seek to rescind coverage. Rather, MGIC seeks damages for misrepresentation, which is a "remed[y] . . . otherwise available to [MGIC] at law or equity . . . ." Hence, Section 7.8(c) alone is sufficient to defeat Trustee's argument. However, even if the Rescission Cap Policies did not contain Section 7.8(c), Trustee's argument still fails because it ignores the plain language of the agreements.

Trustee's argument begins with the construction of a straw man that contractual provisions limiting a party's remedies are enforceable even in the face of fraud allegations. But Trustee never explains—and cannot explain—how the rescission caps limit MGIC's remedies for fraud and breaches of representations and warranties more generally.

The rescission caps are just that: limits on the dollar value of claims submitted by the Insured that MGIC may rescind based on the misrepresentations under Section 2.2 of the Rescission Cap Policies. Section 2.3 of the policies, on which LBI relies, does nothing more than establish MGIC's right to rescind coverage based on a misrepresentation under Section 2.2. Nothing in Sections 2.2 or 2.3—or the provisions implementing the rescission caps, Section 2.13 of the policies and Section 13 of the Terms Letters—states that rescission under Section 2.3 is MGIC's exclusive remedy or that the damages that MGIC may seek against LBI are capped. In effect, Trustee's argument improperly conflates two separate issues—(1) whether MGIC can, as to the Insured, deny a claim or rescind coverage of a loan and (2) whether MGIC's damages claim against LBI for misrepresentation and fraud is limited in any manner.

Trustee also relies on Section 2.4 of the Rescission Cap Policies to argue that MGIC somehow knew that it was agreeing to forego damages against LBI in the event of fraud or

misrepresentation.  But Section 2.4 says only that MGIC cannot rescind coverage of a loan based

on misrepresentations in the Application if the Insured can meet certain criteria.[9]

Section 2.4 does not say that claim denials or coverage rescissions are the sole remedies

available to MGIC or that MGIC's damages against LBI are capped.  It does not say that MGIC

cannot bring fraud, breach of contractual representation, and breach of contractual warranty

claims against LBI.  In fact, Section 2.4(c) says that MGIC's payment of a claim "will not limit

any rights which the Company has against the Borrower or any other Person (other than the

Insured) for any misrepresentation."  LBI is not the "Insured"—but it is a "Person" as defined in

the Rescission Cap Policies.  (*See* Terms Letter § 6 (naming trustee of securitization vehicle as

Insured); Rescission Cap Policy, § 1.25 (defining "Person" as "any individual, corporation,

association or other entity").)  Section 2.4(c) thus evidences exactly the opposite conclusion from

what Trustee advocates and expressly preserves MGIC's right to bring damages claims for

misrepresentation against LBI.  Even setting aside the clear preservation of MGIC's rights and

remedies under Section 7.8—which is alone fatal to Trustee's argument—the Trustee's reading

of Section 2 of the polices is simply incorrect.

### C.   MGIC's Insurance Policies and Terms Letters Do Not Prevent it from Pursuing Fraud Claims Against LBI

Finally, Trustee argues that MGIC is "disguising a claim for breach of contractual

representations as a fraud claim." (Tr. Br. ¶¶ 56-57.)  This is not so.

A fraud claim in the insurance context will survive where the plaintiff alleges

misrepresentations of present facts, rather than future intent, made with the intent to induce it to

issue insurance coverage. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d

287, 294 (N.Y. App. Div. 1st Dept. 2011).  It does not matter that some of the false

---

[9] In general, Section 2.4 limits MGIC's rescission rights where the Insured can demonstrate that no person involved in the origination of the loan was aware of a misrepresentation in the Application.

representations are also contained in the agreements as representations and warranties and form

the basis of a breach of contract claim. *Id.* "It simply cannot be the case that any statement, no

matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by

incorporating it verbatim into the language of a contract." *In re CINAR Corp. Sec. Litig.*, 186 F.

Supp. 2d 279, 303 (E.D.N.Y. 2002).

MGIC bases its fraud claim on LBI's pre-contractual misrepresentations. These

misrepresentations are contained in LBI's Applications and in LBI's "requests for insurance" as

reflected in the Terms Letters. (Terms Letter, § 19) Each of LBI's misrepresentations concerned

past or present facts and was made with the intent to induce MGIC to provide insurance

coverage, thus satisfying the requirements set forth in *MBIA* to maintain causes of action for

fraud where at least some of the pre-contractual representations have been incorporated into a

contract as representations and warranties. *See MBIA Ins. Corp,.* 87 A.D.3d at 294.

The *MBIA* case is squarely on point. It concerns a bond insurer that alleges the defendant

committed fraud and breached certain contracts in connection with the securitization of pools of

residential mortgages. *See id.* at 290-291. Trustee tries to downplay the significance of *MBIA*

by relegating it to a footnote. (Tr. Br. ¶ 57.) Instead, Trustee relies upon *DynCorp v. GTE

Corp.*, 215 F. Supp. 2d 308, 324 (S.D.N.Y. 2002). But *DynCorp* is clearly distinguishable from

this case.

The plaintiff in *DynCorp* was pursuing two claims for fraud, which Trustee confuses in

its brief. First, as with MGIC, the *DynCorp* plaintiff was pursuing a fraudulent inducement

claim. But the court dismissed that claim on the basis that the plaintiff had expressly disclaimed

reliance on any representations, including those that formed the basis of plaintiff's fraudulent

inducement claim, and therefore could not prove justifiable reliance on the representations. *See*

10

*DynCorp*, 215 F. Supp. 2d at 319.  In contrast, MGIC did not disclaim reliance on LBI's representations.  Rather, LBI acknowledged that the Terms Letters were a "request for insurance" and agreed that "(a) the mortgage loan information for each Insurable Loan included in the Application and provided to MGIC prior to issuance of Coverage is material to MGIC's decision as to whether to issue such Coverage on such Insurable Loan, and (b) MGIC is relying on such information in issuing such Coverage on such Insurable Loan."  (Terms Letters, § 17.)  LBI also acknowledged that "MGIC is relying on the truth and accuracy of the information in the Application and Lehman's representation as to compliance with the Eligibility Criteria relating to the Insured Loans."  (*Id.*)  And, as discussed above, Sections 2.4 and 7.8(c) of the policies provided MGIC would have rights against LBI.

The second fraud claim brought by plaintiffs in *DynCorp* asserted that defendant's breaches of contractual representations and warranties in a Purchase Agreement were willful and fraudulent, and that plaintiff should therefore be able to sue defendant for fraud based upon those contractual representations and warranties, as well as breach of contract.  *See DynCorp*, 215 F. Supp. 2d at 323.  The court stated with respect to this second fraud claim that "under New York law, a claim of fraud for breaching representations and warranties provided by a contract is not legally sufficient unless the complaining party can '(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate fraudulent misrepresentation or breach collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and breaches and are unrecoverable as contract damages.'" *Id.* at 324.  It was this second fraud claim that the court in *DynCorp* found could not satisfy any of these criteria sufficiently to allow the claim to go forward.  *Id.* at 324-326.  MGIC's fraud claim, by contrast, is based upon (a) misrepresentations by LBI in its Applications to MGIC, and

(b) misrepresentations by LBI in its requests for insurance to MGIC, all of which occurred *before* insurance coverage was issued, not on breaches of contractual representations and warranties. Therefore, the standard set forth in  *DynCorp* is inapplicable to MGIC's fraud claim, and Trustee's arguments based on that standard are misplaced.

Even if *DynCorp* did apply, it still would not bar MGIC's fraud claim since that claim is collateral to the Terms Letters.  As *MBIA* makes clear "[a] fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because the defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim."  87 A.D.3d at 293 (citing *First Bank of Ams. v. Motor Car Funding,* 257 A.D.2d 287, 291-292 (1999).)  "Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract . . . and therefore involves a separate breach of duty."  *MBIA Ins. Corp.* 87 A.D.3d at 293 (quoting *First Bank of Ams.*, 257 A.D.2d at 292).[10]

## II.        Substantial Evidence Supports MGIC's Proof of Claim Against LBI

MGIC's proof of claim provided LBI with notice of three bases for its claim: (1) fraud (fraudulent inducement), (2) breach of contractual representations in the Terms Letters, and (3) breach of contractual warranties in the Terms Letters.  MGIC's proof of claim identified the relevant LBI securitizations and provided a representative example of the Terms Letters and the Rescission Cap Policies at issue.[11]  (Proof of Claim, §§ 2, 7, Attachments 2-3.)  MGIC explained that LBI made various representations about the securitized mortgage loans.  (Proof of Claim,

---

[10] For purposes of responding to the issues raised in Trustee's motion, and in the interest of limiting the issues the Court needs to address at this time, MGIC will not dispute Trustee's implicit position that New York law governs.  However, MGIC does not acknowledge the applicability of New York law for any other purpose and reserves the right to argue that New York law does not apply to other issues relating to MGIC's claim.

[11] Counsel for MGIC has provided Trustee's counsel with a copy of each Terms Letter at issue.

§ 2.)  And it stated that that MGIC had various damages claims against LBI, including, without limitation, common law fraud.  (*Id.*)[12]

MGIC now provides additional detail for the bases of its claim.  Should the Court decide that MGIC's proof of claim should be supplemented formally with these details, MGIC respectfully requests the Court's leave to supplement.

### A.    LBI Made Misrepresentations and Breached its Contractual Representations and Warranties for Thousands of Loans Insured by MGIC

The misrepresentations that LBI used to fraudulently induce MGIC to issue insurance are found in (a) the Applications for insurance that LBI submitted to MGIC prior to MGIC's issuance of coverage and (b) in the LBI's "requests for insurance" reflected in the Terms Letters. The contractual representations and warranties that LBI breached are found in Sections 10 and 12 of the Terms Letters.  Exhibits C and D provide loan-by-loan detail of the misrepresentations and breaches that MGIC has found so far.  The vast majority of those misrepresentations and breaches fall into the following general categories.

#### *Misrepresentations in LBI's Applications*

To induce MGIC to extend insurance coverage, LBI submitted Applications to MGIC in the form of loan schedules.  LBI's Applications continuously misrepresented the balances of the loans it was asking MGIC to cover.  Rather than provide the actual balances of the loans as required, LBI provided scheduled balances.  Scheduled balances show the balance of a loan assuming that the borrower has made all scheduled payments.  Exhibit D shows that in 6451

---

[12] Trustee's motion leaves no question that it had notice as to the basis for MGIC's proof of claim.  For example, Trustee acknowledges MGIC's claims for fraud by arguing that MGIC has not pled them with sufficient particularity.  Similarly, Trustee acknowledges MGIC's claims for breach of contractual representations by asserting MGIC is trying to disguise a claim for breach of contractual representations as a fraud action.  (Tr. Br. ¶¶ 32-34, 50-51, 56-57.)  As already explained, these arguments are without merit, but at the very least they eliminate any issue as to whether MGIC adequately alerted Trustee as to the nature of MGIC's claims.

instances, LBI materially misrepresented the actual balance of a loan by providing instead the scheduled balance when in fact the borrower had not made all payments, meaning the scheduled balance did not equal the actual balance.  The impact of these misrepresentations was significant since a borrower that falls behind on payments immediately presents a much greater credit risk to MGIC than a borrower that is current on his or her mortgage.  Exhibit D shows when each misrepresentation was made, who from LBI made the misrepresentation, and who at MGIC received the misrepresentation.

LBI's Applications also continuously materially misrepresented borrowers' debt-to-income ratios ("DTI").  Exhibit C shows that LBI misrepresented borrowers' DTIs no fewer than 434 times.  The borrower's DTI was a critical factor that MGIC relied on when deciding whether to insure a given loan since DTI provides a reliable indicator of the borrower's ability to make monthly mortgage payments.  Exhibit C shows when each misrepresentation was made, who from LBI made the misrepresentation, and who at MGIC received the misrepresentation.

### *Misrepresentations in LBI's "Requests for Insurance" and LBI's Breaches of Contractual Representations and Warranties*

Prior to MGIC extending the coverage requested by LBI, LBI also made "requests for insurance" to MGIC through the Terms Letters.  (Terms Letter, § 19.)  Once a Terms Letter was signed by MGIC, LBI, and the trustee for the securitization vehicle, the Terms Letter became a binding contract.  (*Id.*)  So the representations and warranties in Sections 10 and 12 of the Terms Letters reflected both (1) pre-contractual representations that LBI made as part of its requests for insurance to MGIC prior to MGIC issuing insurance and (2) contractual representations and warranties.[13]

---

[13] The breaches of contractual representations and warranties discussed in this brief and identified in Exhibits C and D are also breaches of Section 2.2 of the Rescission Cap Policies.

The following four representations and warranties in Sections 10 and 12 of the Terms Letters[14] repeatedly turned out to be false.

> Section 10(b): "For an Insured Loan, the originator, any lender or subsequent owner, any servicer, and any other Persons involved in the underwriting, processing, originating, or servicing of such Insured Loan, must have complied in all material respects with all applicable federal, state or other laws and regulations . . . "[15]

> Section 10(c)(a): ". . . as of the Certificate Effective Date . . . for an Insured Loan, the Borrower must have made from the Borrower's Own Funds (a) the first regular periodic payment . . . "

> Section 12(f): the "Loan balance as of Certificate Effective Date" set forth "in the Application is materially true, correct, and accurate."

> Section 12(h): the "Borrower's debt-to-income ratio . . . " set forth "in the Application is materially true, correct, and accurate."

As set forth in Exhibit C, MGIC's investigations to date have uncovered 470 instances of fraud committed in the origination of mortgage loans. These range from falsification of borrower income to forging tax returns, bank statements, and signatures. And each violates at least one federal, state, or local law or regulation. Of these instances, each of 225 are material breaches of LBI's contractual representation and warranty under Section 10(b) of the Terms Letter. And each is also a material misrepresentation LBI made as part of its pre-contractual request for insurance and for the purpose of inducing MGIC to provide insurance. As MGIC continues its investigation, it expects these numbers will increase substantially.

Exhibit D shows that in 9948 instances, LBI represented that a borrower had made the first regular periodic payment on a loan by the Certificate Effective Date when in fact the

---

[14] The numbering of these representations and warranties is not constant, though most of the Terms Letters have the numbering set forth in this brief. Exhibits C and D provide the correct reference numbering and detail all of LBI's misrepresentations and breaches of contractual representations and warranties.

[15] This representation and warranty is not included in the Terms Letters for 2005. Breaches of other representations concerning compliance with underwriting standards, laws and regulations, and accuracy and truthfulness of information provided by LBI are noted in Exhibit C when applicable.

borrower had failed to do so. As noted above, the borrower's failure to make the first scheduled

payment on time is an obvious red flag from MGIC's perspective. Each misstatement by LBI on

this issue is a material breach of LBI's contractual representation and warranty under Section

10(c)(a) of the Terms Letter. And each is also a material misrepresentation LBI made as part of

its pre-contractual request for insurance and for the purpose of inducing MGIC to provide

insurance.

In addition, for 6451 loans LBI represented the scheduled balance of a loan as the actual

balance of a loan when in fact the scheduled balance was not equal to the actual balance. (Ex.

D.) These material misstatements—which served to obscure the fact that the borrower was not

current on the loan—are breaches of LBI's contractual representation and warranty under

Section 12(f) of the Terms Letter as well as misrepresentations LBI made as part of its pre-

contractual request for insurance that induced MGIC to provide insurance.

Finally, LBI's requests for insurance, like the Applications discussed above, included at

least 434 loans for which LBI represented that the borrower's debt-to-income ratio was lower

than it was in reality. (Ex. C.) Each of these misrepresentations support MGIC's fraudulent

inducement claim and also constitute material breaches of LBI's contractual representation and

warranty under Section 12(h) of the Terms Letter.

### B.    LBI Acted with Knowledge of its Misrepresentations or, at the Very Least, with a Reckless Disregard

LBI made each misrepresentation detailed above either with the knowledge that the facts

were other than it represented or with a reckless disregard as to whether the facts it presented

were true or false. In addition, LBI intended MGIC to rely upon LBI's misrepresentations and

upon the contractual representations and warranties that LBI breached.

16

Prior to its collapse, LBI was a leading global investment bank and a leading underwriter of and market maker in residential mortgages and asset-backed securities.  LBI was a wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("Holdings").  LBI, Holdings, and their subsidiaries were collectively referred to in securities filings made by LBI as "Lehman Brothers."  LBI referred to itself as "Lehman Brothers" in presentations made to MGIC and to securities ratings agencies such as Standard & Poor's.

LBI was a key part of Lehman's mortgage-backed securities machine.  Lehman Brothers owned mortgage loan originators Aurora Loan Services ("Aurora"), BNC Mortgage ("BNC"), and Finance America.  Holdings acquired mortgage loans from Aurora and BNC, and also from third-party originators such as Countrywide Home Loans.  Structured Asset Securities Corporation, another subsidiary of Holdings and part of Lehman Brothers, served as "Depositor," acquiring the loans from Holdings and conveying them to trusts (the "securitization vehicles") that had been set up by Lehman Brothers.  The securitization vehicles then securitized the cash-flows from the mortgage loans into certificates.  LBI was the underwriter for all of the certificate offerings by the securitization vehicles containing the insured loans at issue in MGIC's proof of claim.  Lehman Brothers promoted itself as a "fully vertically integrated mortgage business" that was "involved in every step of the financial process," including "the origination, structuring and underwriting of asset-backed securities."[16]

One of LBI's responsibilities as underwriter was ensuring that the certificates issued by the securitization vehicles sold at the highest possible price.  In order to do so, LBI tried to obtain the best ratings on the certificates from ratings agencies like Standard & Poors.  As part of its efforts to boost the ratings on the certificates, LBI sought insurance from MGIC.  The insurance

---

[16] *See* Presentation to Standard and Poor's, Lehman Brothers Securitized Products Business, Oct. 7, 2005, at p. 2 (LBEX-DOCID 095356).

issued by MGIC under the Rescission Cap Policies insured the securitization vehicles, not LBI, against the risk of borrowers defaulting on the home mortgage loans underlying the certificates sold by the securitization vehicles.

As underwriter, LBI was also responsible for performing due diligence on the loans that were being conveyed to the securitization vehicles. And as part of Lehman Brothers's vaunted "fully vertically integrated mortgage business," LBI had first-hand access to the lenders who originated the mortgage loans, in particular the lenders owned by Lehman Brothers—BNC, Aurora, and Finance America. In fact, LBI often touted its supposed due diligence of the loans at issue. For example, in September 2006, LBI and MGIC met at LBI's offices to discuss LBI's due diligence on the loans MGIC insured. At the meeting, LBI explained its due diligence including reviewing the operations of loan originators like BNC, Aurora, and First America. At the same time Lehman Brothers kept detailed metrics on loan performance across the loan populations originated by Aurora, BNC, and Finance America. Unbeknownst to MGIC, those metrics showed a continued deterioration in performance and skyrocketing delinquencies, payment defaults, loans with misrepresentations and fraud, and loan repurchase demands.[17]

In addition, originations by Lehman owned originators, BNC and Finance America were riddled with fraud and wrongdoing. For instance, in June 2007, The Wall Street Journal reported some scathing accusations:

---

[17]*See* Risk Review of BNC, December 2006 (LBEX-DOCID 251077); Risk Review of Aurora and BNC February 2007—PowerPoint Presentation (LBEX-DOCID 188325); Lehman, Materials Prepared for Office of Thrift Supervision Safety and Soundness/Compliance Examination 2007, Aug. 13, 2007, at pp. 13-15 (LBEX-DOCID 538654); Lehman Email to Aurora, Feb. 2, 2007 (LBEX-DOCID 566140); Lehman, Securitized Products, MBS: Non-Investment Grade Retained Interests, Jan. 16, 2007, at pp. 1, 3 (LBEX-DOCID 839039), attached to email from James Guarino, Lehman, to Richard McKinney, Lehman, *et al.*, Jan. 16, 2007 (LBEX-DOCID 865925) and Complaints filed in *In re Lehman Bros. Secs. & ERISA Lit.,* 09-MD-2017 (LAK) (Feb. 23, 2009, S.D.N.Y.); *Operative Plasterers & Cement Masons Int'l Assoc. Local 262 Ann. Fund v. Richard S. Fuld, Jr., et al.*, No. 08-CV-5523 (LAK) (Oct. 27, 2008, S.D.N.Y.).

"Twenty-five former [BNC] employees said in interviews that front-line workers and managers exaggerated borrowers' creditworthiness by falsifying tax forms, pay stubs and other information, or by ignoring inaccurate data submitted by independent mortgage brokers.  In some instances, several ex-employees said, brokers or in-house employees altered documents with the help of scissors, tape and Wite-Out.  'Anything to make the deal work.'"

. . .

"Dena Ivezic, a mortgage underwriter for both companies [BNC and Finance America] in Downers Grove, Ill., in late 2005 and early 2006, says some staffers at her branch used "cut and paste" techniques to fabricate documents they needed to get loans approved."

Michael Hudson, *How Wall Street Stoked the Mortgage Meltdown*, WALL ST. J., June 27, 2007,

http://online.wsj.com/news/articles/SB118288752469648903.

One BNC employee said "the atmosphere was like this giant cocaine party you see on TV," while another related that managers did not care when indicia of fraud on mortgage loans were brought to their attention.  MICHAEL W. HUDSON, THE MONSTER, pp. 264-267 (St. Martin's Griffin 2011).  BNC originated over 17,000 of the loans that MGIC insured in the 40 securitizations at issue in MGIC's proof of claim.  By August 2007, things had gotten so bad that Lehman Brothers was forced to shut down BNC, taking a $52 million charge-off and terminating 1,200 employees.[18]

---

[18] For purposes of this brief, MGIC does not have the space to set forth every factual allegation showing Lehman's knowledge of and reckless disregard for fraud in loan origination at the mortgage originators that Lehman owned or from which it commonly bought mortgages.  Those allegations are set forth in numerous publicly available sources, for example, LBHI Bankruptcy Examiner's Report and cited source material (*see* Risk Review of BNC, December 2006 (LBEX-DOCID 251077); Risk Review of Aurora and BNC February 2007—PowerPoint Presentation (LBEX-DOCID 188325); Lehman, Materials Prepared for Office of Thrift Supervision Safety and Soundness/Compliance Examination 2007, Aug. 13, 2007, at pp. 13-15 (LBEX-DOCID 538654); Lehman Email to Aurora, Feb. 2, 2007 (LBEX-DOCID 566140); Lehman, Securitized Products, MBS: Non-Investment Grade Retained Interests, Jan. 16, 2007, at pp. 1, 3 (LBEX-DOCID 839039), attached to email from James Guarino, Lehman, to Richard McKinney, Lehman, *et al.*, Jan. 16, 2007 (LBEX-DOCID 865925) and Complaints filed in *In re Lehman Bros. Secs. & ERISA Lit.,* 09-MD-2017 (LAK) (Feb. 23, 2009, S.D.N.Y.); *Operative Plasterers & Cement Masons Int'l Assoc. Local 262 Ann. Fund v. Richard S. Fuld, Jr., et al.*, No. 08-CV-5523 (LAK) (Oct. 27, 2008, S.D.N.Y.).

LBI simply cared more about profit maximization than about making sure that the quality of the mortgage loans it was asking MGIC to insure was accurately reflected in the information it was providing to MGIC. Despite being aware of the deteriorating performance of the loans Lehman Brothers was placing into securitizations, and despite knowing or should having known about the fraud and wrongdoing taking place at the mortgage originators, at times LBI had no more than 4-5 individuals working on its diligence team for all of its numerous offerings. And while LBI farmed some diligence out to third parties, these third parties normally reviewed no more than 10% of the loans being securitized in a deal and sometimes reviewed fewer than 5%. LBI failed to perform any meaningful diligence on most of the loans in the securitizations.

The bottom line is that even though LBI knew or should have known of systemic and pervasive fraud and wrongdoing at the origination level and knew of increasing default rates and repurchase demands, it made numerous representations to MGIC with no knowledge as to their truth or with a reckless disregard as to their truth. That is particularly the case with respect to the representations in the requests for insurance and the contractual representations and warranties found in Section 10(b) (compliance with all laws and regulations), Section 10(c)(b) (borrower has made all subsequent regular periodic payments), and Section 12(h) (borrower's DTI ratio) of the Terms Letters.

LBI's misconduct did not end there. LBI needed to maximize its profits by getting as many loans into the securitization as possible. But LBI knew that MGIC did not want to extend insurance coverage to loans where the borrowers were already delinquent, given that MGIC's claims payment obligations are triggered by borrower default. So when LBI ran low on loans that were not delinquent, instead of waiting to build up its inventory of loans that were current, LBI intentionally misled MGIC about the true nature and status of the loans. First, it deliberately

and knowingly misrepresented scheduled loan balances as actual loan balances on its

Applications.  (*See* Ex. D.)  Second, it deliberately and knowingly misrepresented to MGIC in its

requests for insurance that the loan balances on its Applications were materially true, correct, and

accurate, as reflected in Terms Letter, § 12(f).  (*Id.*)  Third, it deliberately and knowingly

misrepresented to MGIC in its requests for insurance that the borrowers, as of the Certificate

Effective Date, had made their first regular periodic payment, as reflected in Terms Letter,

§ 10(c)(a).  (*Id.*)  By simultaneously misrepresenting the actual loan balance and that a borrower

made the first payment, LBI made it appear that a borrower made all required payments by the

Certificate Effective Date, when in fact, the borrower had not made those payments.  In this way,

LBI intentionally hid from MGIC the nature of the loans that it was asking MGIC to insure and

the heightened risk such loans presented.

This deception also helped LBI maximize its profits by allowing LBI to present a lower

overall principal balance to be insured and, thereby, to lower the premiums paid to MGIC.

MGIC's premiums were calculated based on the principal balance of the loans, so the lower the

principal balance LBI presented to MGIC for insurance, the lower the premium paid.

These misrepresentations were pervasive.  For some of the securitizations, LBI made

these misrepresentations with respect to over 50% of the loans insured.  The gravity and

materiality of these misrepresentations is demonstrated by the rate at which loans covered by

these misrepresentations defaulted: to date, 31.5% of loans with both a first payment

misrepresentation (*e.g.*, § 10(c)(a)) and a loan balance misrepresentation (*e.g.*, § 12(f)) have

defaulted, costing MGIC approximately $209,000,000.  MGIC expects this harm will continue

and that more of these loans will be the subject of claims in the near future.

LBI made its misrepresentations with the intent that MGIC would rely upon them.

Indeed, there is no other purpose for submitting Applications for insurance and requests for

insurance than to induce an insurer to provide the coverage sought.  And MGIC reasonably and

justifiably relied on LBI's representations and warranties.  For instance, LBI acknowledged and

agreed that the mortgage loan information provided in the Application was "material to MGIC's

decision" to provide insurance coverage and that MGIC was "relying on the truth and accuracy"

of that information.  (Terms Letter, § 17)

### C.    LBI's Misrepresentations Give Rise to MGIC's Claims for Fraud and Breaches of Contractual Representations and Warranties

#### 1.    Fraud (Fraudulent Inducement)

The misrepresentations LBI made in its Applications and in its pre-contractual requests

for insurance were material.  These misrepresentations were of a past or presently existing fact

concerning characteristics of the loans that LBI was asking MGIC to insure, such as loan

balance, loan payment history, borrower's DTI ratio, and compliance with applicable laws and

regulations.  And LBI made its misrepresentations knowing them to be untrue or with a reckless

disregard as to whether they were true.  LBI intended for MGIC to rely upon these

misrepresentations and in fact MGIC did reasonably and justifiably rely upon them.

As a result of LBI's fraud, MGIC has incurred massive damages.  To date, MGIC has

paid out approximately $400,000,000 for claims on covered loans that were the subject of LBI's

fraudulent misrepresentations.  MGIC expects this number to increase as its ongoing

investigation uncovers more fraud on the part of LBI and as more loans default.  But that is not

the limit of the damage done by LBI.  MGIC would not have insured any of the loans presented

by LBI had LBI told the truth.  MGIC has paid out approximately $675,000,000 more for claims

on other covered loans that MGIC would never have insured but for LBI's misrepresentations.

### 2.    LBI's Breach of Contractual Representations

The Terms Letters, once fully executed, formed a binding contract.  MGIC fully

performed its obligations under the Terms Letters and the Rescission Cap Policies.  LBI, by

contrast, materially breached its contractual representations to MGIC.  These breaches include

repeated misstatements concerning characteristics of the loans that MGIC was bound to insure

once a Terms Letter was fully executed.  Those misrepresented loan characteristics included

important elements such as the loan balance, payment history, borrower's DTI ratio, and whether

the loan was originated in compliance with applicable laws and regulations.

To date, MGIC has paid out approximately $400,000,000 for claims on covered loans

that were the subject of LBI's breaches of contractual representations in the Terms Letters.

MGIC expects this number to increase as its continuing investigations uncover more breaches of

contractual representations on the part of LBI and as more loans default.

### 3.    LBI's Breach of Contractual Warranties

LBI's numerous misrepresentations were also breaches of LBI's contractual warranties to

MGIC.  LBI's warranties covered material facts regarding the characteristics of the loans that

MGIC was bound to insure once the Terms Letter was fully executed.  Given the significance of

the loan characteristics at issue, LBI's warranties were a key component of the parties' bargain

as embodied in the Terms Letters.  LBI made the contractual warranties it breached knowing

them to be untrue or with a reckless disregard as to whether they were true.  And LBI intended

for MGIC to rely upon these warranties and, in fact, MGIC did reasonably and justifiably rely

upon the fact that it was receiving these warranties from LBI.  To date, MGIC has paid out

approximately $400,000,000 for claims on covered loans that were the subject of LBI's breaches

of contractual warranties in the Terms Letters.

**Conclusion**

Trustee's arguments in support of its motion to disallow MGIC's proof of claim are

without merit.  MGIC has provided extensive detail concerning the bases for its proof of claim,

including that LBI set out to deliberately and fraudulently induce MGIC to insure thousands of

loans.  MGIC respectfully requests this Court to deny Trustee's motion to disallow MGIC's

proof of claim.


Dated: February 13, 2014
Denver, Colorado

BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP

By:  /s/ Andrew C. Baak
Andrew C. Baak
1899 Wynkoop St.
Suite 800
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
Email: andrew.baak@bartlit-beck.com

Steven Nachtwey
John Byars
54 West Hubbard Street #300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
Emails:  steven.nachtwey@bartlit-beck.com
               john.byars@bartlit-beck.com