JEFFREY L. LIDDLE, ESQ.

MICHAEL E. GRENERT, ESQ.

LIDDLE & ROBINSON, L.L.P.

*Attorneys for Joseph Stefanik*

800 Third Avenue, 8th Floor

New York, New York 10022

(212) 687-8500

Hearing Date: February 27, 2014
10:00 AM

**Claim No. 6105**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

                         :

In re                        :

                         :

LEHMAN BROTHERS INC.,       :   Case No. 08-01420 (JMP) SIPA

                         :

              Debtor.   :

                         :

------------------------------------------------------------------------ X

## RESPONSE OF JOSEPH STEFANIK TO TRUSTEE'S ONE HUNDRED NINETY-NINTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

**TO THE HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

Joseph Stefanik, by his attorneys, Liddle & Robinson, L.L.P., as and for his

response to Debtors' One Hundred Ninety-Ninth Omnibus Objection to General Creditor Claims

("Objection"), objecting to the proof of claim submitted by Mr. Stefanik (Claim No. 6105) and

seeking its disallowance and expungement, represents to this Court as follows:

### SUMMARY OF ARGUMENT

1.     Prior to Lehman Brothers, Inc. ("LBI") filing its bankruptcy, Mr. Stefanik

filed a Statement of Claim with Financial Industry Regulatory Authority ("FINRA") against LBI

for binding arbitration pursuant to FINRA's rules as approved by the Securities and Exchange

Commission ("SEC").

2.      Mr. Stefanik's claims revolved around his compensation and wrongful termination without just cause from LBI.

3.      LBI wrongfully terminated Mr. Stefanik in order to deprive him of his bonus compensation for fiscal year 2006. LBI further damaged Mr. Stefanik by refusing to provide him with his deferred compensation and by defaming him on the Form U-5 Uniform Termination Notice For Securities Industry Registration (the "Form U-5") it filed for Mr. Stefanik.

4.      Mr. Stefanik has express and implied contract claims for the payment of his bonus and deferred compensation, a wrongful termination claim, and a defamation claim.

5.      Mr. Stefanik sought relief in the FINRA arbitration in the form of both money damages and expungement of his defamatory U-5 filing.

6.      Following LBI filing its bankruptcy petition, the FINRA arbitration was subject to an automatic stay.

7.      Mr. Stefanik filed a timely claim against LBI for the amount of his unpaid bonus.

8.      LBI now objects to the claim on the grounds that it lacks "legal and/or factual justification for a claim against LBI."

9.      For the reasons stated below, Mr. Stefanik requests that LBI's objection be stayed, and that the automatic stay of the FINRA arbitration be lifted, or in the alternative, that an evidentiary hearing be scheduled with time to allow for discovery prior to the hearing.


**FACTS**

10.     Mr. Stefanik joined LBI in April 2004 as the Head of Mortgage Third Party Distribution in the Mortgage Sales Department in the Fixed Income Division, and was

2

responsible for running the firm's Mortgage Dealer Desk in New York City. He worked continuously for the firm until on or around November 13, 2006.

11.    Mr. Stefanik agreed to join LBI pursuant to a two-year employment agreement, which provided that he would be paid total compensation of $1.5 million the first year (fiscal year ending November 30, 2004) (including a $200,000 base salary and a minimum guaranteed bonus of $1.3 million), and a guaranteed minimum of $1 million the second year (fiscal year ending November 30, 2005) (including a $200,000 base salary and a minimum guaranteed bonus of $800,000). It was understood that at the end of the two-year agreement, Mr. Stefanik would continue to be paid a $200,000 base salary and a year-end bonus.

12.    Mr. Stefanik worked diligently while employed at LBI, generating commissions for LBI of approximately $26 million in 2004, $30 million in 2005, and approximately $20 million by October 2006, thereby entitling him to a bonus for 2006 of approximately $800,000, which was on par with his bonus for 2005. Moreover, Mr. Stefanik consistently received high performance marks for his efforts.

13.    On November 4, 2006, Mr. Stefanik's supervisor, Patricia Sullivan, New York Sales Manager for Securitized Products, sent him an e-mail stating that: "I think you are a valuable member of the team, and want to see you **paid**, utilized and re-energized for a productive 2007." (Emphasis added.)

14.    On or about November 13, 2006, Mike Glover, Global Head of Securitized Products, confronted Mr. Stefanik about a purportedly "explicit" email that Mr. Stefanik had sent through his work email account.

15.    LBI had apparently identified this so-called "explicit" email a month earlier on October 12, 2006. This email was, in fact, an email that Mr. Stefanik had received from the

3

*Men's Health* magazine website and which he ultimately forwarded to a friend, Paul Shapiro, who worked at McDonald Securities, which was one of Mr. Stefanik's customers.   The email in question contained numerous links to articles on the *Men's Health* website.   When Mr. Stefanik forwarded the email, he was not aware of the specific content of each linked webpage.   At no point did Mr. Stefanik believe that any of the information associated with the email from *Men's Health* was in any way objectionable.   Additionally, Mr. Shapiro never complained about receiving the email or the links to the articles in *Men's Health* magazine.

16.    When Mr. Glover confronted him with this email, Mr. Stefanik was astounded and shocked, given the fact that *Men's Health* is a general circulation non-pornographic magazine and accessible via LBI's Bloomberg terminals.   Nonetheless, Mr. Glover claimed that these links in the email he had sent to LBI were "explicit" and did not comport with LBI's "zero tolerance" policy.[1]

17.    Despite Mr. Stefanik's performance during the 2006 fiscal year, LBI terminated his employment on or around November 13, 2006.   On the Form U-5 it filed for Mr. Stefanik, LBI stated that Mr. Stefanik was discharged for violating the firm's "Use of Technology Policy," under which it claims to have "zero tolerance," even though the firm did not apply that policy consistently and equally with respect to other employees.

18.    Upon information and belief, LBI terminated Mr. Stefanik just before the November 30 end of the firm's 2006 fiscal year on the pretext of his alleged violation of the firm's technology policy in order to deprive him of his 2006 bonus.

---

[1] Lehman's policy states in relevant part that: "The viewing, downloading, transmitting or accessing of sexual oriented material including but not limited to, pornographic material, or offensive speech is strictly prohibited."   Moreover, "[v]iolations of the Use of Technology policy will result in appropriate disciplinary action, up to and including the termination of an individual's employment."

19.    Mr. Stefanik received no bonus for 2006 despite the fact that the fiscal year ended on November 30, 2013.

20.    Additionally, following his termination, LBI forfeited all of Mr. Stefanik's Discount Units from his 2004 and 2005 compensation awards of common stock. Based on the terms of the Equity Award Program Agreements for 2004 and 2005, however, Mr. Stefanik was entitled to receive 1,143.54 shares of LBI common stock, because his termination was without cause.

21.    Mr. Stefanik submitted a Statement of Claim against LBI to FINRA on August 11, 2008 for binding arbitration. The Statement of Claim is attached as Exhibit A.

22.    In his Statement of Claim, Mr. Stefanik requested:   (1) not less than $800,000, representing his 2006 bonus, plus 9% pre-judgment interest under applicable New York law, (2) 1,143.54 shares of LBI common stock pursuant to the terms of the 2004 and 2005 Equity Award Program's "Agreement Evidencing a Grant of Restricted Stock Units," (3) the expungement of the defamatory language on his U-5 form, (4) damages relating to his wrongful termination, and (5) an award of his attorney's fees and costs in pursuing this matter.

23.    On September 26, 2008, we received a letter from LBI's then-attorney, Kevin Leblang, stating that the arbitration was subject to an automatic stay as a result of the bankruptcy proceeding.  The Leblang letter is attached as Exhibit B.

24.    Mr. Stefanik timely submitted a Proof of Claim in the amount of $800,000 plus interest in the present matter.  It was filed on September 2, 2009.  The Proof of Claim is attached as Exhibit C.[2]

---

[2] Mr. Stefanik had previously filed a Proof of Claim on May 22, 2009; however, it was dismissed because of the September 2, 2009 claim which amended and superseded it.

5

25.    These proceeding should be stayed and the automatic stay on the FINRA arbitration proceeding should be lifted for the reasons stated below.

26.    In the alternative, an evidentiary hearing should be held, complete with discovery, and the Debtor's objections should be denied.

## ARGUMENT

### I.    THESE PROCEEDINGS SHOULD BE STAYED PENDING ARBITRATION

27. The parties in this case are subject to binding arbitration before a FINRA arbitration panel as a result of industry regulation via FINRA's rules as approved by the SEC.  See FINRA Rule 1300; See Also Order Approving Proposed Rule Change and Amendments 1, 2, 3, and 4 To Amend NASD Arbitration Rules for Industry Disputes, 72 Fed. Reg. 4,574 (Jan. 31, 2007).

28.    In the Second Circuit, "an arbitration clause should be enforced unless doing so would seriously jeopardize the objectives of the [Bankruptcy] Code." In re United States Lines, Inc., 197 F.3d 631, 640 (2d Cir. 1999) (internal citations omitted).

29.    Additionally, "bankruptcy courts generally *do not* have discretion to *decline* to stay *non-core* proceeding in favor of arbitration." In re Crysen/Montenay Energy Co., 226 F.3d 160, 166 (2d Cir. 2000).

30.    Although Mr. Stefanik admits that his claim for damages became a core issue when he filed his proof of claim, his other claims, most specifically his request for expungement of the defamatory language on the U-5 Form, are non-core issues.  This claim does not in any way concern the Bankruptcy Code, nor has Mr. Stefanik submitted it to the Bankruptcy Court by filing his Proof of Claim.

31.    Expungement of the Form U-5 can be ordered by a FINRA arbitration panel under FINRA (formerly the NASD) Notices To Members 99-09 and 99-54 based on the "Defamatory Nature Of The Information." See also FINRA Dispute Resolution Arbitrator's Reference  Guide  at  page  101,  http://www.finra.org/web/groups/arbitrationmediation/ @arbmed/@neutrl/documents/arbmed/p009424.pdf.  In order to seek expungement, Mr. Stefanik will be required to pursue the FINRA arbitration after the automatic stay is lifted.

32.    Therefore, in the very least, the automatic stay on the FINRA Arbitration must be lifted to allow Mr. Stefanik to seek expungement of his U-5.

33.    In regards to Mr. Stefanik's claim for money damages, this proceeding should likewise be stayed and the automatic stay of the FINRA Arbitration should be lifted.

34.    As the Second Circuit has stated, "even as to core proceedings, the bankruptcy court will not have discretion to override an arbitration agreement unless it finds the proceedings are based on provisions of the Bankruptcy Code that inherently conflict with the Arbitration Act or that arbitration of the claim would necessarily jeopardize the objectives of the Bankruptcy Code." MBNA America Bank, N.A. v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) (internal citations omitted).

35.    In this case, Mr. Stefanik's claims are not based on the Bankruptcy Code. Rather, they stem from pre-petition employment-related business activities of LBI.

36.    Furthermore, prosecuting Mr. Stefanik's claims in FINRA would in no way jeopardize the objectives of the Bankruptcy Code.

37.    In a similar situation, the Southern District of New York stated that "where the underlying dispute concerns non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities, no such discretion" to assess whether arbitration would actually

conflict with the purposes of the Bankruptcy Code "exists." Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.), 270 B.R. 108, 124 (S.D.N.Y. 2001).

38.    The court in Cibro also stated that, "nor does the policy favoring expeditious administration of the estate present a sufficient conflict to give the Bankruptcy Court discretion to refuse to compel arbitration." Id. at 125.

39.    Under these circumstances, the Bankruptcy Court lacks the discretion to refuse to allow the FINRA arbitration to proceed.

40.    Therefore, LBI's objection must be stayed and the automatic stay on the FINRA arbitration should be lifted.

## II. IN THE ALTERNATIVE, MR. STEFANIK IS ENTITLED TO AN EVIDENTIARY HEARING

41.    In the alternative, even if the stay of the arbitration is not lifted, Mr. Stefanik is entitled to discovery and an evidentiary hearing before LBI's objection should be ruled upon.

42.    Mr. Stefanik has claims against LBI for breach of express and implied agreements concerning his bonus and deferred compensation, as set forth in his arbitration Statement of Claim attached as Exhibit A.

43.    Arbitration awards are regularly rendered on claims for unpaid bonus compensation in the securities industry. See, e.g., Jay Moskowitz v. RBS Securities, Inc., FINRA No. 09-04041 ($850,000.00 awarded Aug. 4, 2011); Douglas E. Bryant et al. v. RBS Greenwich Capital et al., FINRA No. 09-02849 ($2,218,862.20 awarded Dec. 3, 2010); Ketchum v. Banc of America Securities, LLC, FINRA No. 08-01341 ($5,000,000.00 awarded July 2, 2010); Kurt Lichtman v. RBS Greenwich Capital, FINRA No. 08-000732 ($2,925,268.80 awarded June 4, 2009); Ford v. UBS Warburg, LLC, NYSE No. 2005-016305 ($3,300,000.00 awarded July 10,

2007); <u>James Alban-Davies v. Credit Lyonnais Securities (USA) Inc.</u>, NYSE Docket No. 2000-008631 ($650,000 plus interest at 9% awarded Jan, 28, 2002); <u>Kukanza, et al. v. Merrill Lynch Pierce, Fenner & Smith</u>, NASD Case No. 95-01175 ($415,000.00 awarded Oct. 4, 2000); <u>Halpern, Lyons and McCall v. ING Baring US</u>, NYSE Docket No. 1998-007179 ($298,154.76 awarded for bonus claim, $150,000.00 in attorneys' fees and forum fees of $172,000.00 awarded Nov. 11, 1999); <u>Mary Cassella v. Smith Barney, Inc.</u>, NASD Case No. 95-03783 ($135,115.00 awarded Sept. 3, 1999); <u>Balboni, et al. v. C.S. First Boston</u>, NYSE Docket No. 1995-005313 ($500,000.00 awarded June 29, 1998). As these cases demonstrate, bonus claims brought in reliance on express and/or implied agreements are routinely granted by arbitration panels under circumstances similar to those at issue here.

44.    New York courts regularly confirm arbitration awards for securities industry bonus compensation. <u>See</u> <u>Credit Suisse First Boston v. Crisanti</u>, 734 N.Y.S.2d 150, 151 (1st Dep't 2001) (finding "no basis for judicial disturbance of the arbitrators' primarily factual conclusion that the bonus sought by respondent was an essential component of his compensation and that the parties' course of dealing and the securities industry practice gave rise to an implied right to a bonus"); <u>Halikias v. Warburg Dillon Read LLC</u>, 2000 N.Y. Misc. LEXIS 280 (Sup. Ct. N.Y. Co. July 12, 2000) (arbitration award granting bonus confirmed where arbitrators were called on to determine whether practice of bonus payments created an implied contract, notwithstanding a firm policy stating bonuses were "discretionary").

45.    "By exercising its equitable powers, the bankruptcy court may thus 'sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate.'" <u>Musso v. Ostashko</u>, 468 F.3d 99, 109 (2d Cir. 2006) (quoting <u>Kelleran v. Andrijevic</u>, 825 F.2d 692, 697-98 (2d Cir.1987) (quoting <u>Pepper v. Litton</u>, 308 U.S. 295, 307-08 (1939))).

46.    Given that Mr. Stefanik is appearing in front of this court as a result of LBI's bankruptcy, the interest of substantial justice are best served by determining liability according to the same principles applied in arbitration rather than in courts of law.

47.    In addition, Mr. Stefanik has a claim for wrongful termination.

48.    Upon joining LBI, Mr. Stefanik signed a Securities Industry Form U-4 Uniform Application For Securities Industry Registration Or Transfer, thereby agreeing to submit any dispute or claim he might have against LBI to arbitration pursuant to the Rules of FINRA. See FINRA Rule 1300; see also Order Approving Proposed Rule Change and Amendments 1, 2, 3, and 4 To Amend NASD Arbitration Rules for Industry Disputes, 72 Fed. Reg. 4,574 (Jan. 31, 2007).

49.    As a result of this arbitration requirement, LBI could terminate Mr. Stefanik's employment only for "just cause."

50.    As the Seventh Circuit stated in Shearson Hayden Stone, Inc. v. Liang, 653 F.2d 310, 312-13 (7th Cir. 1981), "[i]t has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'" See also PaineWebber v. Agron, 49 F.3d 347, 352 (8th Cir. 1995) (stating that "some standard of discernible cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship"); Truck Drivers, Oil Drivers, Filling Station and Platform Workers' Union Local 705 v. Schneider Tank Lines, Inc., 958 F.2d 171, 175 (7th Cir. 1992) (holding that the existence of an arbitration provision implies a just cause standard); Smith v. Kerrville Bus Co., 709 F.2d 914, 918 (5th Cir. 1983) (observing that "inherent in the body of arbitral common law...is a marked awareness of the harshness of discharge, and an adherence to the principle that...arbitration, and other provisions that reflect the contracting parties' tacit

acceptance of the employees' right to some measure of job security, pretermit discharge without good cause); DeLuca v. Bear Stearns & Co., 175 F.Supp. 2d 102, 109 (D. Mass. 2001) (noting that "at least three circuits have held that an agreement to arbitrate employee termination may vitiate an employee's at-will status."); Kates v. Deutsche Bank, NYSE Docket No. 1998-007498 (NYSE panel on July 13, 2001 awarded $150,000 in damages for claims of defamation and wrongful termination under Agron); Svigos v. Merrill Lynch, Pierce, Fenner, & Smith, NASD Case No. 93-04516 (NASD panel on October 6, 2000 awarded Claimant $2,264,479, including $515,000 as compensatory damages on wrongful termination claim under Agron); Charles V. Marais v. Barclays De Zoete Wedd, Inc. and Barclays Capital, NASD Case No. 00-02520 (NASD panel on September 12, 2002 awarded Claimant $4,200,000, including damages for wrongful termination under Agron); Varga v. Countrywide Securities Corp., JAMS No. 1425001975 (former federal judge, a JAMS arbitrator, on May 26, 2009 awarded $1.89 million plus interest as damages on wrongful termination claim under Agron (award confirmed by the United States District Court for the Central District of California, CV 09-4134 (PAP) on August 19, 2009)); Doug Shaw v. Salomon Smith Barney, Inc., NYSE Docket No. 2007-016780 (NYSE panel on February 16, 2009, awarded Claimant $1,200,000 in damages on defamation and wrongful termination claims under Agron).[3]

51.    Here, LBI terminated Mr. Stefanik's employment without "just cause," entitling Mr. Stefanik to the compensation he would have earned at LBI had his employment not been wrongfully terminated. That compensation includes both his base salary and expected bonus.

---

[3] Although the Second Circuit has not explicitly endorsed the implied "just cause" requirement in arbitration clauses, they have likewise not rejected it. Based on the reasoning provided by the only three federal appellate courts that have addressed this issue, there is no reason to assume they would rule differently.

52. Furthermore, as this is a contested matter, Mr. Stefanik is entitled to discovery from LBI concerning his claims before a hearing on this matter. See Fed. R. Bankr. P. 9014; Bankr. S.D.N.Y.R. 9014-1 & cmt.; Bankr. S.D.N.Y.R. 7005-1 & cmt.

53.    WHEREFORE, for all of the foregoing reasons, Claimant Joseph Stefanik requests that this Court deny Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims, stay this proceeding, and lift the automatic stay on the FINRA arbitration, together with such other and further relief as is just and proper.

Dated:    New York, New York
          February 14, 2014

                                        LIDDLE & ROBINSON, L.L.P.

                                        By: _____
                                            Jeffrey L. Liddle
                                            Michael E. Grenert
                                        800 Third Avenue
                                        New York, New York 10022
                                        (212) 687-8500
                                        *Attorneys for Claimant Joseph Stefanik*

To:

Hughes Hubbard & Reed LLP
*Attorneys for Trustee*
One Battery Park Plaza
New York, New York 10004
Attn:  Meaghan C. Gragg, Esq.

Securities Investor Protection Corporation
805 Fifteenth Street, N.W., Suite 800
Washington, District of Columbia 20005
Attn:  Kenneth J. Caputo, Esq.

Weil, Gotshal & Manges LLP
*Attorneys for the Debtors*
767 Fifth Avenue
New York, New York  10153
<u>Attn</u>:   Maurice Horwitz, Esq.
          Lori R. Fife, Esq.

The Honorable Shelley C. Chapman
One Bowling Green, Courtroom 621
New York, New York 10004
(courtesy copy)

# Exhibit A

# LIDDLE & ROBINSON, L.L.P.

800 THIRD AVENUE
NEW YORK, N.Y. 10022
─────
(212) 687-8500
FACSIMILE: (212) 687-1505
www.liddlerobinson.com

E-mail: jliddle@liddlerobinson.com

MIRIAM M. ROBINSON (RETIRED)
─────
JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

STEPHEN J. STEINLIGHT
ANDREA M. PAPARELLA
REBECCA A. SAENGER
DINA N. WEINBERG
DAVID H. FELDSTEIN
SHERRY M. SHORE
AMY L. STUTIUS
JESSICA H. SAVAGE*

*AWAITING ADMISSION TO THE BAR



August 11, 2008

**BY HAND**
Mr. George Friedman
Director of Arbitration
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway
27th Floor
New York, NY 10006

Re:   Joseph Stefanik v. Lehman Brothers, Inc.

Dear Mr. Friedman:

We represent the Claimant, Joseph Stefanik, and file on his behalf this Statement of Claim pursuant to FINRA Code of Arbitration Procedure Rule 13302(a) against his former employer, Lehman Brothers, Inc. ("Lehman"). Mr. Stefanik seeks: (a) a payment of not less than $800,000, plus interest of 9%, based on Lehman's failure to pay him any bonus for 2006, (b) 1,143.54 shares of Lehman common stock pursuant to the terms of Lehman's 2004 and 2005 Equity Award Programs "Agreement Evidencing a Grant of Restricted Stock Units," (c) the expungement of the defamatory reason Lehman Brothers specified on his U-5 form regarding the reason for his termination, (d) damages relating to his wrongful termination, and (e) an award of his attorney's fees and costs in pursuing the claims in this case.

This case is about Lehman's decision to fire Mr. Stefanik two weeks before the close of its 2006 fiscal year in order to avoid paying him bonus of approximately $800,000 for the year. Lehman recognized that it could not in good faith fire an employee so close to the end of its fiscal year and not pay him an annual bonus, unless it could claim that the firing was for cause. Mr. Stefanik was a productive and well-regarded employee in 2006, and thus Lehman scratched the

LIDDLE & ROBINSON, L.L.P.

Mr. George Friedman                           2                         August 11, 2008

proverbial "bottom of the barrel" to find a reason to justify his termination. About a month before Mr. Stefanik was fired, Lehman's "thought police," a group of employees whose job is dedicated to screening emails,[1] found an email that Mr. Stefanik had received at home and had forwarded to his work account, which he in turn sent to a customer of his. That email was from *Men's Health* magazine, with the subject line "Make Her Hot in Seconds." Lehman decided to hang its decision to fire him on this email and stated on Mr. Stefanik's U-5 form that he was fired due to a "violation of firm's use of technology policy."

Lehman's reliance on this email from *Men's Health,* which Lehman ignored for over a month from the time the "thought police" first flagged the email until Mr. Stefanik's termination, is nothing but a pretext to cover up the fact that the firm fired Mr. Stefanik (at least in part) to avoid paying him a bonus.[2] *Men's Health* magazine is not pornographic or inappropriate in any respect. In fact, the *Men's Health* website has been accessible since 2000 on all Bloomberg terminals including the Bloomberg terminals that Lehman pays for and provides to its employees. *Men's Health* is published by the major publisher Rodale, which also publishes the magazines *Prevention, Runner's World, Bicycling, Mountain Bike, Running Times, Organic Gardening,* and *Woman's Health.* Rodale is also, according to its website, the largest independent book publisher in the United States and some of its recent *New York Times* bestsellers include *An Inconvenient Truth* by former Vice President and Nobel prize winner Al Gore, *The Abs Diet for Women* by *Men's Health* Editor-in-Chief David Zinczenko, *The Intellectual Devotional* by David S. Kidder and Noah D. Oppenheim, *LL Cool J's Platinum Workout* by LL Cool J, *The South Beach Heart Program* by Arthur Agatston, MD, and *Joy Bauer's Food Cures* by Joy Bauer.

On its website, Rodale describes *Men's Health* as

> Men's Health is the largest men's lifestyle magazine brand in the world with 39 editions and a worldwide readership of over 20 million. Published 10 times a year in the U.S. by Rodale, Men's Health is the best-selling men's magazine on newsstands, providing its 11 million readers each month with the latest information on all aspects of a guy's life including health, fitness, fashion, nutrition, relationships, travel, technology and finance. In addition to receiving a National Magazine Award in the personal service category, the magazine has been awarded numerous accolades including the top spot on Adweek's "Brand Leaders Hot List," Adweek's "Hot List," Advertising Age's "A-List," and Capell's Circulation Report's "Best Newsstand Performer of the Decade."

---

[1] Lehman had difficulty in establishing an effective filtering system for emails and needs individual screeners to look for inappropriate emails, at least in part, because of the name of its CEO, Richard S. Fuld Jr. He is often referred to as "Dick" in the financial press and among professionals on Wall Street, and obviously any email screening system looking for potentially offensive words would be unable to differentiate his name with the slang use of the word for the male genitalia. It is also unclear whether Lehman's screening system filters the four-letter word "Fu\*\*".

[2] Mr. Stefanik also has a claim for age discrimination, which he intends to pursue in court.

LIDDLE & ROBINSON, L.L.P.
Mr. George Friedman                        3                        August 11, 2008

Lehman's reliance on the *Men's Health* email is a flimsy and untenable excuse to justify its decision to fire Mr. Stefanik and deny him a bonus, even though he worked for 96% of the firm's 2006 fiscal year ending November 30.

## FACTS

Mr. Stefanik, 47 years old, joined Lehman in April 2004 as the Head of Mortgage Third Party Distribution in the Mortgage Sales Department in the Fixed Income Division, and was responsible for running the firm's Mortgage Dealer Desk in New York City. Mr. Stefanik was recruited away from Greenwich Capital to Lehman by Chal Taylor (New York Sales Manager for the mortgage–backed securities and asset backed securities department, which was renamed Securitized Products) and Robert Cox.

Upon joining Lehman, Mr. Stefanik reported to Mr. Taylor and Mr. Cox. Within a few weeks after Mr. Stefanik began working at Lehman, Mike Glover was hired as the New York Sales Manager, replacing Mr. Taylor.[3] (During the summer of 2006, Patricia Sullivan became the New York Sales Manager for Securitized Products and Mr. Glover was promoted to Global Head of Securitized Products. In 2007, Ms. Sullivan replaced Mr. Glover as Global Head.)

Mr. Stefanik agreed to join Lehman pursuant to a two-year employment agreement, which provided that he would be paid total compensation of $1.5 million the first year (including a $200,000 base salary and a minimum guaranteed bonus of $1.3 million), and a guaranteed minimum of $1 million the second year (including a $200,000 base salary and a minimum guaranteed bonus of $800,000). At the end of the two-year agreement it was understood that Mr. Stefanik would continue to be paid a $200,000 base salary and a year-end bonus.

Additionally, Mr. Stefanik was eligible for annual awards of Lehman common stock as a Managing Director. These shares of common stock consisted of Principal Units and Discount Units pursuant to the terms of the 2004 and 2005 Equity Award Programs "Agreement Evidencing a Grant of Restricted Stock Units." In December 2004, Mr. Stefanik was awarded 12,858.94 shares of common stock, of which 10,554.32 were the Principal Units and 2,314.62 were the Discount Units. In November 2005, Mr. Stefanik was awarded 4,535.14 shares of common stock, of which 3,446.70 were the Principal Units and 1,088.44 were the Discount Units.[4]

---

[3] Mr. Glover proved to be an ineffective manager. In or around the summer of 2005, Mr. Glover hired Ben Lieberman, a close friend of his since childhood, for the position of Vice President of Middle Market Sales. It was apparent to Mr. Stefanik that Mr. Glover was intent on promoting Mr. Lieberman's career at Lehman. Upon information and belief, Mr. Lieberman took over Mr. Stefanik's duties and responsibilities upon his termination.

[4] Pursuant to Lehman's 2004 Equity Award Program "Agreement Evidencing a Grant of Restricted Stock Units," in the event of involuntary termination without cause, Mr. Stefanik would be entitled to receive, in relevant part, "(ii) freely transferable shares of Common Stock

LIDDLE & ROBINSON, L.L.P.
Mr. George Friedman                                     4                                      August 11, 2008

Mr. Stefanik worked diligently while employed at Lehman, generating commissions of approximately $26 million in 2004, $30 million in 2005 and approximately $20 million by October 2006,[5] thereby entitling him to a bonus in 2006 of approximately $800,000, which was on par with his 2005 bonus. Moreover, Mr. Stefanik consistently received high performance marks for his efforts.

Mr. Stefanik devoted a substantial portion of his time in 2006 to securing orders for Lehman to underwrite deals in the asset-backed securities ("ABS") and collateralized debt obligation ("CDO") space.[6] During the fall of 2006, Mr. Stefanik was working on four orders for his customer, Societe Generale ("SocGen"), a French bank. Mr. Stefanik successfully placed the orders for two deals (called Vela and Libra), which were each in excess of $1 billion. MKP Capital Management served as the asset manager for Vela, and Lehman Brothers Asset Management served as the asset manager for Libra. On or around November 2, 2006, SocGen placed its third order, with Putnam serving as its asset manager, but withdrew this order on November 10.

Nevertheless, pleased with the work he had done on securing two of the orders—Lehman's first time underwriting deals in the ABS and CDO space—Ms. Sullivan sent Mr. Stefanik an email on November 4, 2006 stating that: "I think you are a valuable member of the team, and want to see you **paid**, utilized and re-energized for a productive 2007." (Emphasis added.)

On or around November 13, 2006, Mr. Glover asked Mr. Stefanik to meet him in his office. Mr. Stefanik believed that the conversation would relate to the withdrawn SocGen order. However, Mr. Glover instead confronted Mr. Stefanik about a purportedly "explicit" email that Mr. Stefanik had sent through his work email account.

Lehman had apparently identified this so-called "explicit" email a month earlier on October 12, 2006. This email was, in fact, an email that Mr. Stefanik had received from the *Men's Health* website and which he ultimately forwarded to a friend, Paul Shapiro, who worked at McDonald Securities, which was one of Mr. Stefanik's customers. The email in question contained numerous links to articles on the *Men's Health* website. When Mr. Stefanik forwarded the email, he was not aware of the specific content of each linked webpage. At no point did Mr. Stefanik believe that any of the information associated with the email from *Men's Health* was in any way objectionable. Additionally, Mr. Shapiro never complained about receiving the email or

---

equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2004 and before your Termination." The same language is used in Lehman's 2005 Equity Award Program Agreement, and is applicable to the 2005 Discount Units.

[5] Production on the Mortgage Dealer desk remained consistent despite the fact that the desk went from 4 salesmen to 2 salesmen (including Mr. Stefanik) by the end of 2005.

[6] The CDOs were ABS mezzanine CDOs, commonly referred to as "ABSMezz" deals. These were the first deals that Lehman did in the ABSMezz space. Merrill Lynch was the market leader and Lehman to that point was not a participant in the area. The deals thus presented a unique opportunity for the firm to increase its presence in this space.

LIDDLE & ROBINSON, L.L.P.

Mr. George Friedman                              5                              August 11, 2008

the links to the articles in *Men's Health* magazine.

When Mr. Glover confronted him with this email, Mr. Stefanik was astounded and shocked, given the fact that *Men's Health* is a general circulation non-pornographic magazine and accessible via Lehman's Bloomberg terminals. Nonetheless, Mr. Glover claimed that these links in the email he had sent to Lehman were "explicit" and did not comport with Lehman's "zero tolerance" policy.

Following this confrontation with Mr. Glover, Mr. Stefanik met with David Sheer, the Global Head of Lehman's Securitized Products Group. Mr. Sheer told Mr. Stefanik he should meet with Human Resources to discuss this issue, which he did, to no avail. During the meeting with Human Resources, Mr. Stefanik was barraged with allegations of inappropriate e-mails sent from his work email address, including the email containing the link to the *Men's Health* article that he had forwarded, and a cartoon image that he had forwarded to his friend Christy Young, an employee at First Tennessee Bank, another of Mr. Stefanik's accounts.[7]

Despite Mr. Stefanik's performance during the 2006 fiscal year, including his successful placement of the Vela and Libra orders from SocGen, Lehman terminated his employment on or around November 13, 2006. On the U-5 form it filed for Mr. Stefanik, Lehman stated that Mr. Stefanik was terminated for violating the firm's "Use of Technology Policy,"[8] under which it claims to have "zero tolerance," even though the firm did not apply that policy consistently and equally with respect to other employees. In fact, it appears that Lehman terminated Mr. Stefanik just before the end of the firm's 2006 fiscal year on the pretext of his alleged violation of the firm's technology policy in order to deprive him of his 2006 bonus.

Additionally, following his termination, Lehman forfeited all of Mr. Stefanik's Discount Units from his 2004 and 2005 awards of common stock. Based on the terms of the Equity Award Program Agreements for 2004 and 2005, Mr. Stefanik was entitled to receive 1,143.54 shares of Lehman common stock, because his termination was without cause.[9]

---

[7] In or around October 2006, Mr. Stefanik forwarded an email to Ms. Young that included a joke cartoon image. Mr. Stefanik had initially received this email cartoon from Vinny Pahuja, a Lehman employee who worked on the Mortgage Dealer desk. Even though he first sent this email to Mr. Stefanik, Mr. Pahuja did not lose his job over sending this email, and may not have received any kind of discipline at all. Moreover, upon information and belief, in or around November 2006, Jim Im, a trader on Lehman's Commercial Mortgage Backed Securities desk, had an email flagged that contained a racial joke about Asian-Americans and which had been sent to an Asian employee. Mr. Im was not terminated, and in fact, his only punishment came in the form of sensitivity training.

[8] Lehman's policy states in relevant part that: "The viewing, downloading, transmitting or accessing of sexual oriented material including but not limited to, pornographic material, or offensive speech is strictly prohibited." Moreover, "[v]iolations of the Use of Technology policy will result in appropriate disciplinary action, up to and including the termination of an individual's employment."

[9] Because Mr. Stefanik was terminated without cause just two weeks before the end of Lehman's 2006 fiscal year, the shares of common stock he is owed have been calculated assuming a termination date on or after November 30, 2006.

LIDDLE & ROBINSON, L.L.P.

Mr. George Friedman                          6                          August 11, 2008

### CLAIMS AGAINST LEHMAN BROTHERS

Mr. Stefanik requests an award of: (1) not less than $800,000, representing his 2006 bonus, plus 9% pre-judgment interest under applicable New York law, (2) 1,143.54 shares of Lehman common stock pursuant to the terms of the 2004 and 2005 Equity Award Programs "Agreement Evidencing a Grant of Restricted Stock Units," (3) the expungement of the defamatory language on his U-5 form, (4) damages relating to his wrongful termination,[10] and (5) an award of his attorney's fees and costs in pursuing this matter.

Respectfully submitted,

LIDDLE & ROBINSON L.L.P.

By: _____
     Jeffrey L. Liddle

---

[10] Lehman wrongfully terminated Mr. Stefanik's employment when it fired him in November 2006 for allegedly violating the firm's "Use of Technology Policy." Upon joining Lehman, Mr. Stefanik signed a Securities Industry Form U-4. By signing a Form U-4, Mr. Stefanik agreed to submit any dispute or claim against Lehman to arbitration pursuant to the Rules of the NASD or NYSE. Based on this arbitration requirement, Lehman was obligated to terminate Mr. Stefanik's employment only for "just cause." As the Seventh Circuit stated in Shearson Hayden Stone, Inc. v. Liang, 653 F.2d 310, 312-313 (7th Cir. 1981), "It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause'." See also PaineWebber v. Agron, 49 F.3d 347, 352 (8th Cir. 1995) (stating that "some standard of discernible cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship."). Here, Lehman terminated Mr. Stefanik's employment without "just cause," because the reason for his termination is mere pretext, as no reasonable person could find that the email he sent falls within the letter or the spirit of that which the firm's "Use of Technology Policy" seeks to monitor and prevent from transmission. Moreover, Mr. Stefanik's email of links to articles in a general circulation magazine can not reasonably have merited termination, which is listed in the Policy as the most severe repercussion for a violation. Mr. Stefanik is thus entitled to damages stemming from his wrongful termination, including compensation he would have been paid (including his 2006 bonus) but for his termination.

# Exhibit B

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

KEVIN B. LEBLANG
PARTNER
PHONE 212-715-9306
FAX 212-715-8306
KLEBLANG@KRAMERLEVIN.COM

September 26, 2008

**BY FACSIMILE AND U.S. MAIL**
(212) 687-1505

Jeffrey L. Liddle, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, NY 10022

Re: Joseph Stefanik v. Lehman Brothers, Inc.
FINRA Arbitration No. 08-02823

Dear Jeff:

We represent Lehman Brothers Inc. in the above-referenced matter. We write to inform you that on September 19, 2008 the enclosed Order Commencing Liquidation (the "Order") was entered by the United States District Court for the Southern District of New York in the case of Securities Investor Protection Corporation v. Lehman Brothers Inc., bearing Case No. 08 CIV 8119 (GEL).

Your attention is directed to section III (A) of the Order, which states that the automatic stay provisions of 11 U.S.C. § 362(a) of the Bankruptcy Code operate as a stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding."

Accordingly, the above-captioned arbitration is automatically stayed as to Lehman Brothers Inc. All actions taken in violation of the automatic stay are void. Further, pursuant to established case law, parties may be held in contempt of court for violating the automatic stay. See Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47 (2d Cir. 1976), cert. denied, 429 U.S. 1093 (1977).

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Jeffrey L. Liddle, Esq.
September 26, 2008
Page 2

If you have any questions with respect to the foregoing, please do not hesitate to call me at (212) 715-9306.

Very truly yours,

Kevin B. Leblang

Encl.

KL3 2670361 1

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

KEVIN B. LEBLANG
PARTNER
PHONE 212-715-9306
FAX 212-715-8306
KLEBLANG@KRAMERLEVIN.COM

September 26, 2008

**BY E-MAIL AND U.S. MAIL**
neprocessingcenter@finra.org

Mr. Bola Aguda
Case Assistant Manager
FINRA Dispute Resolution
Northeast Processing Center
One Liberty Plaza
165 Broadway – 27th Floor
New York, New York  10006-1404

> Re:    Joseph Stefanik v. Lehman Brothers, Inc.
>        FINRA Arbitration No. 08-02823

Dear Mr. Aguda:

      We represent Lehman Brothers Inc. in the above-referenced matter.  We respectfully write to inform you that on September 19, 2008 the enclosed Order Commencing Liquidation (the "Order") was entered by the United States District Court for the Southern District of New York in the case of Securities Investor Protection Corporation v. Lehman Brothers Inc., bearing Case No. 08 CIV 8119 (GEL).

      Your attention is directed to section III (A) of the Order, which states that the automatic stay provisions of 11 U.S.C. § 362(a) of the Bankruptcy Code operate as a stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding."

      Accordingly, the above-captioned arbitration is automatically stayed as to Lehman Brothers Inc.  All actions taken in violation of the automatic stay are void.

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Mr. Bola Aguda
September 26, 2008
Page 2

       If you have any questions with respect to the foregoing, please do not hesitate to call me at (212) 715-9306.

                       Very truly yours,

                       Kevin B. Leblang

Encl.

cc:    Jeffrey L. Liddle, Esq. (via facsimile)



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



'08 CIV 8119

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,

    v.

LEHMAN BROTHERS INC.

        Defendant.

Civil Action No. 08-__

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/19/08

## ORDER COMMENCING LIQUIDATION[1]

On the Complaint and Application of the Securities Investor Protection Corporation

("SIPC"), it is hereby:

    I.    ORDERED, ADJUDGED and DECREED that the customers of the

defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities

Investor Protection Act of 1970, as amended ("SIPA"). 15 U.S.C. §78aaa et seq.

    II.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is

appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties

and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP

is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the

Court in the amount of $100,000.00.

---

1.  The "LBI Liquidation Order"

60394664_7.DOC

III.    ORDERED that all persons and entities are notified that, subject to the other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate as a stay of:

A.    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding;

B.    the enforcement against LBI or against property of the estate of a judgment obtained before the commencement of this proceeding;

C.    any act to obtain possession of property of the estate or property from the estate;

D.    any act to create, perfect or enforce any lien against property of the estate;

E.    any act to create, perfect or enforce against property of LBI any lien to the extent that such lien secures a claim that arose before the commencement of this proceeding;

F.    any act to collect, assess or recover a claim against LBI that arose before the commencement of this proceeding;

G.    the setoff of any debt owing to LBI that arose before the commencement of this proceeding against any claim against LBI; and

H.    the commencement or continuation of a proceeding before the United States Tax Court concerning LBI's tax liability for a taxable period the Bankruptcy Court may determine.

60394664_7.DOC

3

IV.    ORDERED that all persons and entities are stayed, enjoined and restrained from directly or indirectly removing, transferring, setting off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets or property owned, controlled or in the possession of LBI, including but not limited to the books and records of LBI, and customers' securities and credit balances, except for the purpose of effecting possession and control of said property by the Trustee.

V.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize, conserve or liquidate LBI or its property and any other suit against any receiver, conservator or trustee of LBI or its property, is stayed.

VI.    ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from enforcing liens or pledges against the property of LBI and from exercising any right of setoff, without first receiving the written consent of SIPC and the Trustee.

VII.    ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing of, securities collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

60394664_7.DOC

4

under a securities lending agreement, without first receiving the written consent of SIPC and the

Trustee.

VIII.     ORDERED that the stays set forth in paragraphs three – six shall not apply

to:

A.     any suit, action or proceeding brought or to be brought by the United

States Securities and Exchange Commission ("Commission"), the

Commodity Futures Trading Commission ("CFTC"), or any self-

regulatory organization of which LBI is now a member or was a member

within the past six months; or

B.     the exercise of a contractual right of a creditor to liquidate, terminate, or

accelerate a securities contract, commodity contract, forward contract,

repurchase agreement, swap agreement, or master netting agreement, as

those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net

termination values, payment amounts, or other transfer obligations arising

under or in connection with one or more of such contracts or agreements,

or to foreclose on any cash collateral pledged by LBI, whether or not with

respect to one or more of such contracts or agreements; or

C.     the exercise of a contractual right of any securities clearing agency to

cause the liquidation of a securities contract as defined in 11 U.S.C.

§741(7) and the contractual right of any derivatives clearing organization

to cause the liquidation of a commodity contract as defined in 11 U.S.C.

§761(4); or

60394664_7.DOC

D.    the exercise of a contractual right of any stockbroker or financial

institution, as defined in 11 U.S.C. §101, to use cash or letters of credit

held by it as collateral, to cause the liquidation of its contract for the loan

of a security to LBI or for the pre-release of American Depository

Receipts or the securities underlying such receipts; or

E.    the exercise of a contractual right of any "repo" participant, as defined in

11 U.S.C. §101, to use cash to cause the liquidation of a repurchase

agreement, pursuant to which LBI is a purchaser of securities, whether or

not such repurchase agreement meets the definition set forth in 11 U.S.C.

§101(47); or

F.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

in respect of (i) any extension of credit for the clearance or settlement of

securities transactions or (ii) any margin loan, as each such term is used in

11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a

contractual right as such term is used in 11 U.S.C. §556 in respect of any

extension of credit for the clearance or settlement of commodity contracts

by a commodity broker as defined in 11 U.S.C. §101(6). As used herein,

"securities clearing bank" refers to any financial participant, as defined in

11 U.S.C. §101(22A), that extends credit for the clearance or settlement of

securities transactions to one or more Primary Government Securities

Dealers designated as such by the Federal Reserve Bank of New York

from time to time; or

G.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by a person (or such person's agent) in respect of securities that were sold

to such person by LBI pursuant to a repurchase transaction (as such term

is used in 11 U.S.C. §741(7) and regardless of whether such transaction is

a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with

LBI that is subject to a Custodial Undertaking in Connection With

Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such

person (or such person's agent); or

H.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by the Federal Reserve Bank of New York; or

I.    any setoff or liquidating transaction undertaken pursuant to the rules or

bylaws of any securities clearing agency registered under section 17A(b)

of the Securities Exchange Act of 1934, 15 U.S.C.§78q-1(b), or any

derivatives clearing organization registered under section 5b of the

Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under

instructions from and on behalf of such a securities clearing agency or

derivatives clearing organization; or

J.    any settlement transaction undertaken by such securities clearing agency

using securities either (i) in its custody or control, or (ii) in the custody or

control of another securities agency with which it has a Commission

approved interface procedure for securities transactions settlements,

provided that the entire proceeds thereof, without benefit of any offset, are

promptly turned over to the Trustee; or

60394664_7.DOC

K.  any transfer or delivery to a securities clearing agency or derivatives
clearing organization by a bank or other depository, pursuant to
instructions given by such clearing agency or derivatives clearing
organization, of cash, securities, or other property of LBI held by such
bank or depository subject to the instructions of such clearing agency or
derivatives clearing organization and constituting a margin payment as
defined in 11 U.S.C. §741(5); or

IX.  ORDERED that the stays set forth in paragraphs three – seven above shall
not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17),
362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or
any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including
without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section
78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or
rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the
transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among
Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC
and (ii) September 24, 2008;

X.  ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is
authorized to operate the business of LBI to: (a) conduct business in the ordinary course until
6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of
securities, commodities futures and option transactions, and obtaining credit and incurring debt
in relation thereto; (b) complete settlements of pending transactions, and to take other necessary
and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

60394664_7.DOC

8

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly transfer of customer accounts and related property.

XI.   ORDERED that the Clerk of the Court is directed to immediately open the docket in this proceeding and that this Order be entered on the docket immediately.

XII.   ORDERED that the Clerk of the Court is directed to produce seventy-five (75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto the docket.

XIII.   ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation proceeding is removed to the United States Bankruptcy Court for the Southern District of New York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry on the docket.

XIV.   ORDERED that the Trustee is authorized to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI, and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the Trustee, and the Trustee may designate such of his representatives who shall be authorized to have access to such property.

Date:   September 19, 2008

_____
UNITED STATES DISTRICT JUDGE

60394664_7.DOC

# Exhibit C

**Filed: USBC - Southern District of New York**
**SIPC v. Lehman Brothers Inc.**
**08-01420 (JMP)**

RECEIVED

SEP 0 2 2009

LEGAL SERVICES

**Bankruptcy Claim #**                              **000006105**

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers, Inc. | Case Number:<br>08-01420 (JMP) SIPA |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Joseph Stefanik | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Joseph Stefanik<br>603 Old Forge Lane<br>Franklin Lakes, NJ 07417-1026<br>Telephone number:<br>(201) 651-1856 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| 1. Amount of Claim as of Date Case Filed:         $ 800,000<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete Item 4.<br><br>If all or part of your claim is entitled to priority, complete Item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| 2. Basis for Claim:  Services Performed<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>If any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| | |
|---|---|
| Date: 5/7/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY<br><br>FILED / RECEIVED<br><br>SEP 0 2 2009<br><br>EPIQ BANKRUPTCY SOLUTIONS, LLC |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

JEFFREY L. LIDDLE, ESQ.
MICHAEL E. GRENERT, ESQ.
LIDDLE & ROBINSON, L.L.P.
*Attorneys for Joseph Stefanik*
800 Third Avenue, 8th Floor
New York, New York 10022
(212) 687-8500

Hearing Date: February 27, 2014
10:00 AM

**Claim No. 6105**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

In re                                              :
                                                   :
LEHMAN BROTHERS  INC.,                             :    Case No. 08-01420 (JMP)  SIPA
                                                   :
                              Debtor.              :
                                                   :
------------------------------------------------------------------ X

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK  )

Geoffrey R. Bowser, being duly sworn, affirms and says:

1. I am over 18 years of age and am not a party to the above-captioned proceedings. I am an associate with Liddle & Robinson, L.L.P., having offices at 800 Third Avenue, 8th Floor, New York, New York 10022.

2. On February 14, 2014, I caused to be served, true and correct copies of the Response of Joseph Stefanik to Debtors' One Hundred Ninety-Ninth Omnibus Objection to General Creditor Claims, filed via the Court's ECF system on such date and via Federal Express upon the parties listed on the attached service list.

Geoffrey R. Bowser

Sworn to before me this
14th day of February, 2013

NOTARY PUBLIC

SHERRY M. SHORE
Notary Public, State of New York
Registration #02SH6255573
Qualified In New York County
Commission Expires February 6, 2016

**Service List**

Hughes Hubbard & Reed LLP
*Attorneys for Trustee*
One Battery Park Plaza
New York, New York 10004
<u>Attn</u>:  Meaghan C. Gragg, Esq.

Securities Investor Protection Corporation
805 Fifteenth Street, N.W., Suite 800
Washington, District of Columbia 20005
<u>Attn</u>:  Kenneth J. Caputo, Esq.

Weil, Gotshal & Manges LLP
*Attorneys for the Debtors*
767 Fifth Avenue
New York, New York  10153
<u>Attn</u>:    Maurice Horwitz, Esq.
         Lori R. Fife, Esq.