Hearing Date and Time:  March 27, 2014 at 10:00 a.m. (Prevailing Eastern Time)
Response Date and Time:  March 7, 2014 at 4:00 p.m. (Prevailing Eastern Time)

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE OF THE TRUSTEE'S TWO HUNDRED SEVENTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT THE TRUSTEE'S COUNSEL, STUART MITCHELL, ESQ., AT (212) 837-6809.**

---

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>      LEHMAN BROTHERS INC.,<br><br>                          Debtor. | Case No. 08-01420 (SCC) SIPA |

### NOTICE OF HEARING ON THE TRUSTEE'S TWO HUNDRED SEVENTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

      **PLEASE TAKE NOTICE** that on February 14, 2014, James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor" or "LBI"), under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel, filed his two hundred seventh omnibus objection to general creditor claims (the "Two Hundred Seventh Omnibus Objection to General

Creditor Claims"), and that a hearing to consider the Trustee's Two Hundred Seventh Omnibus

Objection to General Creditor Claims will be held before the Honorable Shelley C. Chapman,

United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton

Customs House, Courtroom 621, One Bowling Green, New York, New York 10004 (the

"Bankruptcy Court"), on **March 27, 2014 at 10:00 a.m. (Prevailing Eastern Time)** (the

"Hearing").

        **PLEASE TAKE FURTHER NOTICE** that responses, if any, to entry of the

order must (i) be in writing; (ii) state the name and address of the responding party and nature of

the claim or interest of such party; (iii) state with particularity the legal and factual bases of such

response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy

Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in

accordance with General Order M-399 by registered users of the Court's Electronic Case Filing

system, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive,

preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word

processing format no later than **March 7, 2014 at 4:00 p.m. (Prevailing Eastern Time)** (the

"Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery

Park Plaza, New York, New York, 10004, Attn: Meaghan C. Gragg, Esq.; (b) Securities Investor

Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn:

Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York,

New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to

the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York

10004, Courtroom 621.

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Trustee's Two Hundred Seventh Omnibus Objection to General Creditor Claims or any claim set forth thereon, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Trustee's Two Hundred Seventh Omnibus Objection to General Creditor Claims, which may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
       February 14, 2014

HUGHES HUBBARD & REED LLP

By: /s/  James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Meaghan C. Gragg
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
Email:  kobak@hugheshubbard.com

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.
.

**Hearing Date and Time:  March 27, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time:  March 7, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>      LEHMAN BROTHERS INC.,<br><br>                  Debtor. | Case No.  08-01420 (SCC) SIPA |

**THE TRUSTEE'S TWO HUNDRED SEVENTH OMNIBUS OBJECTION**
**TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)**

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS TWO HUNDRED SEVENTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT THE TRUSTEE'S COUNSEL, STUART MITCHELL, ESQ., AT (212) 837-6809.**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of

Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of

1970 as amended, 15 U.S.C. §§ 78aaa *et seq*. ("SIPA"),[1] by and through his undersigned counsel,

respectfully represents as follows:

## **RELIEF REQUESTED**

1.      The Trustee files this two hundred seventh omnibus objection to general creditor

claims (the "Two Hundred Seventh Omnibus Objection to General Creditor Claims") pursuant to

section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), as made applicable

to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, Rule 3007(d) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's order

approving procedures for the filing of omnibus objections to general creditor claims filed in this

SIPA proceeding (the "General Creditor Claim Objection Procedures Order," ECF No. 5441),

seeking disallowance and expungement of the claims listed on Exhibit A annexed hereto.  The

Trustee's proposed order (the "Proposed Order") is annexed hereto as Exhibit D.

2.      The proofs of claim identified on Exhibit A (collectively, the "No Liability

Claims" or "Claims") seek to recover alleged losses for warrants initially held in LBI customer

accounts and subsequently returned to the claimants as part of the Customer Account Transfer

(defined below).  The warrants referenced in the Claims were issued by Lehman Brothers

Holdings Inc. ("LBHI"), not LBI, the debtor in this separate and distinct SIPA proceeding.  The

holders of the Claims also purport to assert general and conclusory claims of fraud and market

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

loss, and for funds from purported "hedges" made by LBI or its affiliates, but the holders of the

Claims fail to show any basis for LBI's liability for the alleged losses, and fail to assert any

particular allegations of fraud, much less plead any facts that could establish any plausible claim

against LBI.  One of the Claims, No. 9002371, also seeks preferred stock issued by LBHI.

Under United States Securities and Exchange Commission ("SEC") Rule 15c3-1, the "Net

Capital Rule," LBI, an operating broker-dealer, was prohibited from guaranteeing securities

issued by LBHI, and LBI in fact did not guarantee the preferred stock claimed in Claim No.

9002371.  *See* 17 C.F.R. § 240.15c3-1c.  Claim No. 9001365 also appears to assert a claim for a

limited partnership interest that was not held by LBI and for which LBI has no liability.

3.       As set forth below, the Trustee requests that the No Liability Claims be

disallowed and expunged in their entirety.

### JURISDICTION

4.       Following removal to this Court for all purposes as required for SIPA cases by

section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred

by [SIPA] upon the court to which application for the issuance of the protective decree was

made."  15 U.S.C. § 78eee(b)(4).

5.       Venue is proper in this Court pursuant to SIPA section 78eee(a)(3) and 15 U.S.C.

section 78aa.

### BACKGROUND

6.       On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, of

the United States District Court, Southern District of New York, entered the Order Commencing

Liquidation of LBI (the "LBI Liquidation Order," ECF. No. 1) pursuant to the provisions of

SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*,

Case No. 08-CIV-8119 (GEL).  The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee

3

for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; and (ii)

removed the case to this Court for all purposes as required for SIPA cases by section 78eee(b)(4)

of SIPA, in the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (the "SIPA

Proceeding").

7.      On November 7, 2008, the Court entered the Order Approving Form and Manner

of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for

Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Other

Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Claims Process Order," ECF No.

241).  Beginning on December 1, 2008, consistent with SIPA section 78fff-2(a)(1), the Trustee

mailed more than 905,000 claims packages with filing information to former LBI customers and

other potential claimants (the "Claims Process Notice") and posted claims filing information on

the Trustee's website (www.lehmantrustee.com) and SIPC's website (www.sipc.org).  The

Trustee also published notice of the claims process in The New York Times, The Wall Street

Journal and The Financial Times.

8.      Pursuant to SIPA section 78fff-2(a)(3) and the Customer Claims Process Order,

customer claims seeking maximum protection under SIPA must have been received by the

Trustee on or before January 30, 2009.  All customer claims and general creditor claims must

have been received by the Trustee by June 1, 2009 and no claims of any kind will be allowed

unless received by the Trustee on or before June 1, 2009 (the "Pre-Filing Bar Date").  In addition

to the Pre-Filing Bar Date, on September 19, 2013, the Bankruptcy Court entered an order (the

"Administrative Bar Date Order") that established October 31, 2013 (the "Administrative Bar

Date") as the deadline to file a proof of claim for certain administrative expense claims against

the LBI estate, as further described in the Administrative Bar Date Order, with respect to such

4

administrative expenses arising between September 19, 2008 and August 31, 2013.  The
Administrative Bar Date has now passed.  A copy of the Customer Claims Process Order was
made publicly available at www.lehmantrustee.com.  The Trustee's website allowed claimants
filing electronically to upload documents as part of their claim submission and thereby comply
with the instructions to include supporting documentation set forth in the Proof of Claim.

9.      In accordance with the Claims Process Order, in cases where the Trustee denied a
claim for protection as a customer claim and converted the claim to a general creditor claim, the
Trustee notified the claimant consistent with the procedures set forth in the Claims Process
Order.  The claimant was afforded the opportunity to object and have the matter heard by the
Court if the claimant was aggrieved by the Trustee's denial of customer treatment and
conversion of the claim to a general creditor claim.  If a claimant did not object to the Trustee's
conversion of the claim consistent with the procedures set forth in the Claims Process Order, the
Trustee's conversion of the claim to a general creditor claim became final.  No determination
was made as to the validity or allowed amount of such converted and reclassified claims.

10.     Separate from the claims process, pursuant to section 78fff-2(f) of SIPA, and to
effectuate the SIPA goals of providing protection to customers, avoiding harm to customers,
preserving account values, and stabilizing markets, the Trustee completed the transfer of over
$87 billion in customer cash and securities outside of the net equity claims process for the benefit
of over one hundred thousand individual account holders either as part of (i) the conversion of
Private Asset Management ("PAM") accounts to Ridge Clearing & Outsourcing Solutions, Inc.
("Ridge") as clearing broker for Neuberger Berman LLC ("Neuberger"); or (ii) the transfer of
Private Investment Management ("PIM") accounts to Barclays Capital Inc. ("Barclays" or
"BCI") (together, the "Customer Accounts Transfer").  The Customer Account Transfer Order

5

dated December 14, 2009, approved the Trustee's efforts and confirmed the Customer Accounts

Transfer which enabled investors holding accounts subject to the Customer Accounts Transfer to

promptly resume trading activity. (*See* Trustee's Third Interim Report for the Period November

12, 2009 through May 10, 2010, at ¶¶ 5-10, ECF No. 3244.)

11.     On November 15, 2012, the Court entered the General Creditor Claim Objection

Procedures Order, which authorizes the Trustee, among other things, to file omnibus objections

to no more than 200 general creditor claims at a time, on various grounds, including the grounds

that the claims subject to the omnibus objection seek recovery of amounts for which LBI is not

liable, and the grounds set forth in Bankruptcy Rule 3007(d)(5).

## **THE CLAIMS**

12.     The No Liability Claims initially were filed as customer claims in this SIPA

Proceeding seeking the return of the warrants issued by LBHI allegedly held in the Claimants'

accounts at LBI.

13.     The Trustee issued letters of determination ("LODs") to each of the Claimants

denying their customer claims on the bases that (i) their accounts and the assets contained

therein, including the claimed warrants, were transferred to BCI as part of the Customer Account

Transfer and (ii) the claims were "based on a relationship with another Lehman or non-Lehman

entity." (*See, e.g.*, Notice of Trustee's Determination of Claim, dated Feb. 4, 2010, attached as

Ex. 3 to the Declaration of Benjamin M. Galynker (the "Galynker Decl."), annexed as Exhibit B

hereto, at 2.)

14.     The Claimants objected to the LODs and submitted various documents in

opposition to the Trustee's determination denying customer status (the "Supplemental

Submissions").[2]  In their Supplemental Submissions, the Claimants raised three new assertions: (a) fraudulent inducement or misrepresentation (the "Fraud Claims") (*see* Supplemental Statement ¶¶ 12, 17; LOD Objections ¶ 6); (b) loss of value in the claimed warrants (the "Market Loss Claims") (*see* Claimants' Mot. Objection ¶ 21); and (c) a claim for funds from purported "hedges" related to the claimed warrants (the "Hedge Claims") (*see* Claimants' Mot. Objection ¶ 18).  The parties agreed to treat these Supplemental Submissions as additional documentation in support of the claims.

15.    On October 28, 2010, the Court heard oral argument from the parties regarding the customer claims and issued a bench ruling (Excerpt of Transcript of Proceedings on Oct. 28, 2010, ECF No. 3519, attached as Ex. 7 to the Galynker Decl.), later memorialized in an order dated November 3, 2010, upholding the LODs and converting the customer claims (including the claims raised in the Supplemental Submissions) to general creditor claims "subject to further determination by the Trustee as to validity and amount."  (Order Upholding Determinations Denying Customer Status to Claims Arising from Alleged Fraud, Misrepresentation, Market Loss or Hedging Transactions and Expunging Related Objections Thereto, ECF No. 3871, attached as Ex. 8 to the Galynker Decl.)

**THE CLAIMED SECURITIES**

16.    Each of the No Liability Claims seeks to recover losses based on certain warrants issued by LBHI (the "Warrants Claims").  In addition to claims for warrants, (i) Claim No.

---

2.  The Supplemental Submissions are:  (a) the Claimants' substantively indistinguishable Objection[s] to Trustee's Determination of Claim and Request for Hr'g, dated Feb. 24, 2010, representative example attached as Ex. 4 to the Galynker Decl.; (b) the Supplemental Statement to Customers' Objections to Trustee's Determinations and Statement in Support of Amended Customer Claims of Richard E. Witten, Harold H. Shamah, Isaac Shamah, Shamah 2000 Family Trust, Robert Perl and The Lapidus Trust U/A/D 6/17/02 (ECF No. 3383) (the "Supplemental Statement"), annexed as Ex. 5 to the Galynker Decl.; and (c) the Objection to Trustee's Motion to Uphold Determinations Denying Customer Status to Claims of Richard E. Witten, Harold H. Shamah, Isaac Shamah, Shamah 2000 Family Trust, Robert Perl and The Lapidus Trust U/A/D 6/17/02 (ECF No. 3727) (the "Claimants' Mot. Objection"), annexed as Ex. 6 to the Galynker Decl.

7

9002371 seeks to recover losses in connection with certain preferred stock issued by LBHI (the "LBHI Stock"); and (ii) Claim No. 9001365 appears to assert a claim for an interest in a Lehman Brothers limited partnership (the "LP Interest" and, together with the LBHI Warrants (defined below) and the LBHI Stock, the "Claimed Securities") that was never held by LBI and for which LBI has no liability.

LBHI Warrants

17.    Over a period of several years prior to the commencement of the chapter 11 proceedings of LBHI and its affiliated debtors on or about September 15, 2008, LBHI issued various series of warrants to investors for which the warrants' return at maturity was derived from or linked to the performance of certain hedge funds or indices.[3]  The warrants include:  (i) call warrants linked to Millennium USA LP and bearing CUSIP number 524935111 (the "Millennium Warrants"); and (ii) call warrants linked to D.E. Shaw Oculus Fund L.L.C. and bearing CUSIP number 52520W143 (the "D.E. Shaw Warrants," and, together with the Millennium Warrants, the "LBHI Warrants" or the "Warrants").  LBI did not issue or guarantee the Warrants.[4]  Based on the analysis described in the Declaration of Timothy Hurley, a Principal of Deloitte Transactions and Business Analytics LLP (the "Hurley Declaration"), annexed hereto as Exhibit C, the Trustee has determined that the LBI estate is not liable for the Warrants Claims. Ownership of LBHI Warrants does not give rise to a claim against or interest in LBI.

18.    The offering documents relating to the LBHI Warrants explained that they were offering general unsecured obligations of LBHI, not investments in the referenced hedge funds

---

3.   LBHI has confirmed in its filings with this Court that it issued the LBHI Warrants.  (*See* Two Hundred Eighty-First Omnibus Objection to Claims (Warrant Claims), dated Apr. 17, 2012, LBHI ECF No. 27421, at ¶ 2 & n.2.)

4.   The cover page to Exhibit V attached to the LBHI Warrants' private placement memoranda ("PPMs") incorrectly refers to LBI as the issuer.  The PPMs of the LBHI Warrants, with the exception of the cover page to Exhibit V, show that the LBHI Warrants were issued by LBHI.

themselves.  For example, the private placement memoranda for the Warrants all stated, on their

first page, "The warrants are issued by Lehman Brothers Holdings Inc. . . . Neither the Issuer nor

its affiliates or agents is offering any interest in the Reference Fund."  (Private Placement

Memorandum for the Millennium Warrants (the "Millennium PPM"), attached as Ex. 1 to the

Galynker Decl., at cover page; Private Placement Memorandum for the D.E. Shaw Warrants (the

"D.E. Shaw PPM," and together with the Millennium PPM, the "PPMs"), attached as Ex. 2 to the

Galynker Decl., at cover page.)  The PPMs further stated, in the section entitled Risk Factors,

"Any person who purchases the Warrants is relying upon the creditworthiness of the Issuer and

has no rights against any other person.  The Warrants constitute the general, unsecured and

unsubordinated contractual obligations of the Issuer."  (Millennium PPM at 14; D.E. Shaw PPM

at 13.)

LBHI Stock

19.     In addition to asserting a claim for an interest or interests in the Warrants and as

described in the Hurley Declaration, Claim No. 9002371 also asserts a claim against LBI based

on the ownership of preferred stock issued by LBHI.  Ownership of the LBHI Stock represents

an equity interest in LBHI, not LBI.  The holder of Claim No. 9002371 is claiming as a

shareholder of LBHI and claims an equity interest in LBHI.  LBI did not issue or guarantee the

LBHI Stock.  (*See* Hurley Decl. ¶ 5.)  Ownership of the LBHI Stock does not give rise to a claim

against or equity interest in LBI.

Partnership Interest

20.     In addition to asserting a claim for an interest or interests in the Warrants and as

described in the Hurley Declaration, Claim No. 9001365 asserts "a claim for all my securities"

and makes the note, "see attached statement."  (Proof of Claim No. 9001365 at 2, attached as Ex.

9

9 to the Galynker Decl.)  According to the account statement attached to this claim, the claimant

held an LP Interest, and it is possible that the claimant intended to assert a claim for this LP

Interest in addition to a Warrant Claim.  However, as indicated both by the Claimant's customer

account statements and the books and records of the LBI estate, the LP Interest was not held in

custody on behalf of the Claimant.[5]  Accordingly, LBI has no liability relating to the LP Interest.

### OBJECTION

21.     A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is

asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re DJK*

*Residential LLC*, 416 B.R. 100, 104-05 (Bankr. S.D.N.Y. 2009); *In re Oneida Ltd.*, 400 B.R.

384, 389 (Bankr. S.D.N.Y. 2009); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr.

S.D.N.Y. 2000).  Moreover, section 502(b)(1) of the Bankruptcy Code provides, in relevant part,

that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor

and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

**I.    THE CLAIMS SHOULD BE DISALLOWED AND EXPUNGED
BECAUSE LBI TRANSFERRED THE CLAIMED SECURITIES
TO CLAIMANTS AND DID NOT ISSUE OR GUARANTEE THE SECURITIES.**

22.     The Claims seek to recover the lost value of securities that LBI neither issued nor

guaranteed.  Based on an analysis by the Trustee's professionals of the general creditor claims

filed on the claims register in this case and maintained by the Trustee's claims agent, and certain

private placement memoranda related to the Warrants, as described in the Hurley Declaration,

the Trustee has identified the claims on Exhibit A as claims for which LBI is not liable, as the No

---

5.   (*See* Account Statement, dated Aug. 31, 2008, attached to Proof of Claim No. 9001365, at 8 ("The information
     reflected in this [alternative investments] section [of the account statement] is for informational purposes only . .
     . *These positions are not held in custody by Lehman Brothers Inc. and are not subject to SIPC*.") (emphasis
     added); Hurley Decl. ¶ 6.)

Liability Claims seek to recover losses in connection with securities that (i) were not issued by

LBI and (ii) were not guaranteed by LBI.

23.     The holders of the No Liability Claims seek recovery for the Claimed Securities,

but fail to articulate any legal or factual justification for asserting a claim against LBI.

Moreover, the Claimants have already received their securities and other assets through the

Customer Accounts Transfer, as confirmed by this Court, pursuant to the Account Transfer

Order.  Thus, the Claims have already been satisfied.  LBI has no further legal obligation to the

Claimants because it did not issue or guarantee the Claimed Securities.

24.     If the No Liability Claims remain on the claims register, parties who do not hold

valid claims against the LBI estate will recover.  Thus, the Trustee requests that the Court enter

an order disallowing and expunging in their entirety the No Liability Claims listed on Exhibit A.


**II.     THE CLAIMS SHOULD BE DISALLOWED AND EXPUNGED
         BECAUSE THEY FAIL TO PLEAD ADEQUATELY ANY CAUSE OF ACTION.**

> A.     The Claimants Fail to Plead a Claim for
>        Fraudulent Inducement or Misrepresentation.

25.     In the Supplemental Submissions, the Claimants assert claims of fraud "by reason

of LBI and LBHI's fraudulent actions and omissions of the Debtor[s] and their affiliates and

agents concerning their financial condition and the false statements in connection with the

purchase and sale of the Warrants to [the Claimants]."  (Supplemental Statement ¶ 17.)   These

claims are not viable against LBI.

26.     "In determining whether a party has met their burden in connection with a proof

of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal

Rules of Civil Procedure."  *In re DJK Residential LLC*, 416 B.R. at 106.

27.     Rule 8(a)(2) of the Federal Rules, which the Court may apply to this contested

matter pursuant to Fed. R. Bankr. P. 9014(c), requires "a short and plain statement of the claim

showing that the pleader is entitled to relief."  This standard "requires more than labels and

conclusions"; it requires the claimant to provide "enough facts to state a claim that is plausible

on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  To show facial

plausibility, each claimant must plead "factual content that allows the court to draw the

reasonable inference that the [Debtor] is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).

28.     In order to state a claim for fraud,[6] the claimants must allege facts showing that

"(1) [LBI] made a material false representation, (2) [LBI] intended to defraud the [claimants]

thereby, (3) the [claimants] reasonably relied upon the representation, and (4) the [claimants]

suffered damage as a result of such reliance."  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-6

(2d Cir. 2006) (internal quotation marks and citations omitted).  The same core elements are

required to state a claim for fraudulent inducement.  *See Aetna Cas. & Sur. Co. v. Aniero

Concrete Co., Inc.*, 404 F.3d 566, 580 (2d Cir. 2005) (per curiam) ("To state a claim for

fraudulent inducement under New York law, a plaintiff must show: (1) a representation of

material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless

disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5)

which that other party relied on to its injury.").

29.     Federal Rule of Civil Procedure 9(b) imposes even more demanding pleading

requirements on any party "alleging fraud," and applies to all contested matters, including the

---

6.   New York law applies to the Claims.  New York law governs the Warrants.  (*See* Millennium PPM at 2 ("The
     Warrants will be governed by, and construed in accordance with, the laws of the State of New York."); D.E.
     Shaw PPM at 2 (same).)

instant Claims, pursuant to Bankruptcy Rules 7009 and 9014(c).  A claim that is "premised on

allegations of fraud" implicates these heightened pleading requirements, even if the legal claims

are not expressly denominated as such.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.

2004).

30.     Rule 9(b) requires a party alleging fraud to "'(1) specify the statements that the

[party] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements

were made, and (4) explain why the statements were fraudulent.'"  *Id.* at 170 (citation omitted).

In addition, to plead intent under Rule 9, a party is required to "'allege facts that give rise to a

strong inference of fraudulent intent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.

2006) (citation omitted).  "'The requisite 'strong inference' of fraud may be established either (a)

by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b)

by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.'"  *Id.* at 290-1 (citation omitted).

31.     The No Liability Claims fail to assert sufficient facts to support any plausible

claim against LBI under Rule 9(b) or Rule 8(a)(2).  The Claimants do not assert any facts with

particularity indicating that LBI or its employees made any material and false representation to

any of the Claimants.  Without asserting the existence of such representations, the Claimants

cannot satisfy the elements of fraudulent intent, reliance, and damages caused by any such

misrepresentations.

32.     To support their generalized and conclusory allegations of fraud, the Claimants

rely entirely on the statements in the introduction to the report filed by the Court-appointed

examiner Anton R. Valukas in the LBHI chapter 11 proceeding (the "Examiner's Report")

relating to the use of the accounting device known as Repo 105.  (*See* Claimants' Mot. Objection

¶ 8 (The Examiner's Report "disclos[es] false and fraudulent actions and omissions of

management of LBI and LBHI."); Supplemental Statement ¶ 5 ("The Customers respectfully

submit this Supplemental Statement . . . to incorporate relevant portions of the Examiner's

Report that dramatically demonstrate the responsibility of LBI and its representatives in

fraudulently selling worthless LBHI securities to the Customers and influencing them to hold

those securities in their LBI accounts.").  The Claimants state that, "[h]ad [they] known of the

facts and circumstances described in the Examiner's Report, they would not have purchased or

held the [w]arrants."  (Supplemental Statement ¶ 15.)

33.    The Claimants fail to cite any specific statements made by LBI on which the

Claimants allegedly relied, much less explain why these statements were false or why they were

made with fraudulent intent.

34.    Furthermore, the offering documents for the LBHI Warrants informed all

prospective purchasers of the fact that they were purchasing the equivalent of unsecured

obligations of LBHI and had no rights against any other party.  The PPMs specifically warned

purchasers that the Warrants were "leveraged investments that involve a high degree of risk,"

that they "constitute[d] the general, unsecured and unsubordinated contractual obligations of the

Issuer [i.e., LBHI]," and that "[a]ny person who purchase[d] the Warrants . . . ha[d] no rights

against any other person [besides the Issuer]."  (Millennium PPM at 12, 14, D.E. Shaw PPM at

11, 13.)

35.    The Claimants have not alleged any facts giving rise to a plausible inference of

fraud.  To prevent a recovery by parties not holding valid claims against the LBI estate, the

Trustee requests that the Fraud Claims be expunged in their entirety.

B.    The Claimants Fail to State
Any Cognizable Claim for Market Losses.

36.    LBI is not liable for any alleged losses in the market value of the Warrants after the Filing Date.  The Claimants argue that LBI should have some responsibility for such losses in value of their Warrants[7] because the Warrants "ha[d] significant value on LBI's last customer statements – but no value o[n] Barclays' statements."  (Claimants' Mot. Objection ¶ 15.)  The Claimants further assert, without any legal support, that "[i]f Customers were going to be wiped out on their investments in Warrants, the Trustee should not have transferred the Warrants to BCI."  (*Id.* ¶ 14.)

37.    LBI has no liability for the Claimants' market losses.  The Trustee properly transferred the Warrants to the Claimants' new accounts at BCI with the approval of this Court.  (*See* Customer Account Transfer Order at 3 ("[T]he completion of the PIM Conversion is approved as a necessary step to implement the LBI Liquidation Order and the purposes of this SIPA liquidation").)  The Claimants fail to provide any legal or factual theory connecting their losses to the Trustee's discharge of his duties under SIPA pursuant to this Court's order.

38.    Based on the foregoing, the Trustee has determined that LBI is not liable for the Market Loss Claims.  Therefore, to prevent a recovery by parties without valid claims against the LBI Estate, the Trustee requests that the Market Loss Claims be expunged in their entirety.

C.    The Claims Relating to
Hedging Are Unfounded.

39.    The Claimants also assert claims for "cash and its proceeds" in their LBI accounts related to "hedging transactions."  (Claimants' Mot. Objection ¶ 18.)  The Claimants' argument

---

7.    The Market Loss Claims apparently do not extend to the LBHI Stock.  (Claimants' Mot. Objection ¶¶ 14-16.)  Regardless, the same objections would apply, with the exception of any objection based on the language of the PPMs.

seems to be that if LBHI or its affiliates obtained interests in the referenced funds in order to
hedge LBHI's obligations under the Warrants, as they were permitted to do under the PPMs,
these hedges must have become part of the Claimants' accounts.  (*Id.* ("[T]he Trustee must come
forward and disclose what is in the Customers' accounts, including hedges.").)

      40.     This claim is invalid on its face because it ignores the explicit terms of the
offering pursuant to which the Claimants purchased the Warrants.  The PPMs state that any
hedging transactions are the property of LBHI (or its affiliates) in which the Warrant holders
have no interest:

> • The Issuer and its affiliates, including Lehman Brothers Inc.,
> may from time to time buy or sell Interests in the Reference
> Fund or enter into derivative instruments or other instruments
> which track or are related to the Reference Fund *for their own
> accounts* in connection with their normal business practices or
> *in connection with hedging of the Issuer's obligations under
> the Warrants*, including on the Valuation Date.  (Millennium
> PPM at 22; D.E. Shaw PPM at 19 (emphases added).)

> • Such Interests purchased, if any, will be the *separate property
> of the Issuer, or such affiliate or affiliates of the Issuer*, and do
> not secure or otherwise underlie the Warrants; and ***holders of
> Warrants have no beneficial interest in or claim over such
> assets.*** (Millennium PPM at 33; D.E. Shaw PPM at 29)
> (emphases added).)

Thus, regardless of the fact that the offering documents contain "allusions to hedging" as
Claimants state (Claimant's Objection ¶ 14), these same offering documents refute the
suggestion that the Claimants have any right, claim or other interest in any hedges or any profits
derived therefrom.

      41.     Based on the clear statements in the PPMs, the Trustee has determined that LBI is
not liable for the Hedge Claims.  Thus, to prevent a recovery by parties that do not hold valid

claims against the LBI Estate, the Trustee requests that the Hedge Claims be expunged in their entirety.

42.    In sum, the Claimants fail to state a plausible legal claim for relief of any kind and the No Liability Claims should be disallowed and expunged in their entirety.

## **RESERVATION OF RIGHTS**

43.    The Trustee reserves all rights to object on any other basis to any No Liability Claim or any portion of any No Liability Claim for which the Court does not grant the relief requested herein, including the right to object on the grounds that the Claimants have obtained a recovery from LBHI relating to the Warrants.

## **NOTICE**

44.    Notice of this Two Hundred Seventh Omnibus Objection to General Creditor Claims has been provided to (i) each claimant listed on Exhibit A via overnight mail; and (ii) the list of parties requesting notice of pleadings in accordance with the Court's Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures and Related Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately available for inspection upon filing with the Court at the Trustee's website, www.lehmantrustee.com.  The Trustee submits that no other or further notice need be provided.

## **NO PRIOR RELIEF REQUESTED**

45.    No previous request for the relief requested herein has been made by the Trustee to this or any other Court.

## CONCLUSION

For the reasons stated herein, the Trustee respectfully requests entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated:    New York, New York
          February 14, 2014

HUGHES HUBBARD & REED LLP

By: /s/  James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Meaghan C. Gragg
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
Email:  kobak@hugheshubbard.com


Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**EXHIBIT A**

## IN RE LEHMAN BROTHERS INC., CASE NO: 08-01420 (SCC) SIPA
## TWO HUNDRED SEVENTH OMNIBUS OBJECTION: EXHIBIT A- NO LIABILITY CLAIMS

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 1 | ORING, NANCY, TTEE/ALVIN M LAPIDUS 19333 COLLINS AVE # 1601 SUNNY ISLE BEACH, FL  33160 | 9002371 | 1/28/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMED STOCK CONSTITUTES AN EQUITY INTEREST IN LBHI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 2 | PERL, ROBERT 18 LEROY STREET NEW YORK, NY  10014 | 9001365 | 1/20/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. LBI DID NOT HOLD THE CLAIMED PARTNERSHIP INTEREST IN CUSTODY ON BEHALF OF THE CLAIMANT. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 3 | SHAMAH 200 FAMILY TRUST C/O HAROLD SHAMAH 125 EXETER STREET BROOKLYN, NY  11235 | 8001613 | 1/27/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |

---

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 4 | SHAMAH 2000 FAMILY TRUST HAROLD SHAMAH 125 EXETER STREET BROOKLYN, NY 11235 | 7000556 | 1/27/2009 | $275,392.00 | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 5 | SHAMAH, HAROLD 125 EXETER STREET BROOKLYN, NY 11235 | 8001621 | 1/27/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 6 | SHAMAH, ISAAC 219 N BROADWAY NYACK, NY 10960-1618 | 9005893 | 2/2/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 7 | WITTEN, RICHARD E. ACCT. NO. [REDACTED] CHESTER B. SALOMAN, ESQ. STEVENS & LEE, P.C. 485 MADISON AVENUE, 20TH FLOOR NEW YORK, NY 10022 | 4550 | 1/26/2009 | $1,869,953.80 | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 8 | WITTEN, RICHARD E. 1445 FLAGLER DRIVE MAMARONECK, NY 10543 | 9001912 | 1/26/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| | Total | | | $2,145,345.80 | |

---

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (SCC) SIPA

### DECLARATION OF BENJAMIN M. GALYNKER IN SUPPORT OF
### THE TRUSTEE'S TWO HUNDRED SEVENTH OMNIBUS OBJECTION TO
### GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

Pursuant to 28 U.S.C. § 1746, I, Benjamin M. Galynker, hereby declare as follows:

1.       I am an attorney duly admitted to practice in this Court and an associate at the law

firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens, Trustee for the SIPA

Liquidation of Lehman Brothers Inc.  I submit this declaration in support of the Trustee's two

hundred seventh omnibus objection to general creditor claims.

2.       Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Private Placement

Memorandum for the 4-Year, 2-Month Cash-Settled Call Warrants Linked to the Performance of

Millennium USA LP Issued by Lehman Brothers Holdings Inc., dated May 1, 2008 (exhibits

thereto omitted).

3.       Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Private Placement

Memorandum for the 3 2/3-Year Cash-Settled Call Warrants Linked to the Performance of D.E.

Shaw Oculus Fund Issued by Lehman Brothers Holdings Inc., dated August 1, 2007 (exhibits

thereto omitted).

4.       Attached hereto as <u>Exhibit 3</u> is a true and correct copy of the Notice of Trustee's

Determination of Claim Re: Claim Number 800001621, dated Feb. 4, 2010.

5.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of the Objection to

Trustee's Determination of Claim and Request for Hearing (Claim No. 800001621), dated Feb.

24, 2010 (ECF No. 2718) (exhibits thereto omitted).

6.      Annexed hereto as <u>Exhibit 5</u> is a true and correct copy of the Supplemental

Statement to Customers' Objections to Trustee's Determinations and Statement in Support of

Amended Customer Claims of Richard E.Witten, Harold H. Shamah, Isaac Shamah, Shamah

2000 Family Trust, Robert Perl and The Lapidus Trust U/A/D 6/17/02, dated June 16, 2010

(ECF No. 3383).

7.      Annexed hereto as <u>Exhibit 6</u> is a true and correct copy of the Objection to

Trustee's Motion to Uphold Determinations Denying Customer Status to Claims of Richard E.

Witten, Harold H. Shamah, Isaac Shamah, Shamah 2000 Family Trust, Robert Perl and The

Lapidus Trust U/A/D 6/17/02, dated Sept. 24, 2010 (ECF No. 3727).

8.      Annexed hereto as <u>Exhibit 7</u> is a true and correct copy of pages 1 through 6 and

pages 51 through 72 of the Transcript of Proceedings in this matter held on Oct. 28, 2010 (ECF

No. 3519).

9.      Annexed hereto as <u>Exhibit 8</u> is a true and correct copy of the Order Upholding

Determinations Denying Customer Status to Claims Arising from Alleged Fraud,

Misrepresentation, Market Loss or Hedging Transactions and Expunging Related Objections

Thereto, dated Nov. 3, 2010 (ECF No. 3871).

10.     Annexed hereto as <u>Exhibit 9</u> is a true and correct copy of proof of claim number

9001365 and excerpts of supporting documentation filed by Robert Perl in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2014

By: /s/  Benjamin M. Galynker
Benjamin M. Galynker
Associate, Hughes Hubbard & Reed LLP

**EXHIBIT 1**

100,000

## 4-YEAR, 2-MONTH CASH-SETTLED CALL WARRANTS

### linked to the

### PERFORMANCE OF

### MILLENNIUM USA LP

### ISSUED BY LEHMAN BROTHERS HOLDINGS INC.

### CONFIDENTIAL

### PRIVATE PLACEMENT MEMORANDUM

**This private placement memorandum is not to be shown or given to any person other than the person who directly received it from the Placement Agent (as defined below) and is not to be copied or otherwise reproduced in any manner whatsoever. Failure to comply with this directive can result in a violation of the Securities Act of 1933, as amended (the "Securities Act").**

**The warrants have not been and will not be registered under the Securities Act, or any state securities law. The warrants are exempt from registration under Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. The warrants may be offered, sold and otherwise transferred only to (i) persons who are "accredited investors" as defined in Rule 501 of the Securities Act who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 (the "Investment Company Act") or (ii) non-U.S. Persons in offshore transactions in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act ("Regulation S") who are also qualified purchasers, in each case, who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a warrant.**

**The warrants are being offered by Lehman Brothers Holdings Inc. (the "Issuer") through Lehman Brothers Inc. as placement agent (the "Placement Agent"). The Issuer reserves the right to withdraw, cancel or modify such offers and to reject orders in whole or in part. The Placement Agent will have the right to reject in whole or in part any offer to purchase warrants.**

**For more information about Millennium USA LP (the "Reference Fund"), Millennium Partners, L.P. (the "Master Fund") as well as about Millennium Management LLC (the "General Partner"), which acts as the general partner to the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached as Exhibit V hereto. Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests in the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of the General Partner, the Master Fund, the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.**

**The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund, or the General Partner or affiliates of the foregoing.**

## LEHMAN BROTHERS INC.

Dated as of May 1, 2008

## TABLE OF CONTENTS

Page

SUMMARY OF PRINCIPAL TERMS ..................................................................1
    Issuance ....................................................................................................1
    Exercise and Maturity ..............................................................................2
    Warrant Payment Amount ........................................................................2
    Liquidity ...................................................................................................3
    In-Kind Distributions ...............................................................................4
    Restrictions On "New Issues" ..................................................................4
    Early Termination ....................................................................................4
    Potential Adjustment Event .....................................................................9
    Transfer Agent .........................................................................................9
    Calculation Agent ..................................................................................10
    Calculations ...........................................................................................10
    Form and Transfer ..................................................................................10
    Ratings ...................................................................................................11
RISK FACTORS ...............................................................................................12
    Holders May Lose Their Entire Investment ...........................................12
    Limited Trading History on the Performance of the Reference Fund ......12
    Holders Should Investigate the Reference Fund as if Investing Directly ...13
    Risks Relating to the Reference Fund, the General Partner or the Master Fund ....13
    Lack of Affiliation Among the Issuer and the Reference Fund ...............13
    The Issuer is Not Responsible for Disclosure of Information by the Reference Fund
        and Has No Obligation to Disclose Information About the Reference Fund After
        the Date of this Memorandum .........................................................13
    Value of Warrants Influenced by Many Unpredictable Factors ..............14
    Specific Investment and Trading Risks Relating to the Reference Fund ...15
    Risks Relating to Hedge Funds and the Reference Fund .........................15
    Your Warrants Could Be Terminated Early ............................................18
    Reliance on Millennium Management LLC .............................................19
    Secondary Trading of the Warrants is Limited and They are Subject to Substantial
        Restrictions on Transferability ........................................................19
    Warrants are not Registered ...................................................................20
    Secondary Trading of Warrants Held Less than 24 Months is Subject to a Penalty ...20
    Investors in Warrants will be Exposed to the Issuer's Credit Risk ..........21
    The Warrants do not Confer Beneficial Ownership in the Reference Fund or its
        Affiliates ........................................................................................21
    Your Investment Will Be "New Issues" Restricted .................................22
    ERISA Limitations .................................................................................22
    Hedging Transactions by the Issuer ........................................................22
    Adverse Economic Interests to Holders ..................................................22
    Certain Business Activities May Create Conflicts of Interest with Holders .........23
    Investment Suitability .............................................................................24
    Transfer Restrictions ..............................................................................24

Income Tax Rules Related to the Warrants are Complex ..........................................24
PLAN OF DISTRIBUTION ..................................................................................................25
SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS ............................25
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ...........................................28
Tax Treatment of Warrants ..................................................................................29
Taxation of U.S. Holders .....................................................................................30
Possible Alternative Tax Treatments of an Investment in Warrants .....................31
IRS Revenue Ruling 2008-1 and IRS Notice 2008-2 ...........................................31
Tax Treatment of Non-U.S. Holders .....................................................................32
Backup Withholding and Information Reporting ..................................................32
CERTAIN BENEFIT PLAN CONSIDERATIONS .................................................................32
USE OF PROCEEDS ............................................................................................................33
LEHMAN BROTHERS HOLDINGS INC. ...........................................................................33
THE REFERENCE FUND ....................................................................................................35

EXHIBITS

I:      Form of Investor Representation Letter ..........................................................I-1

II:     Form of Transferee Representation Letter .................................................... II-1

III:    Form of Issuing, Paying and Transfer Agency Agreement .......................... III-1

IV:     Form of Calculation Agency Agreement .....................................................IV-1

V:      Confidential Private Offering Memorandum of Millennium USA LP .......................... V-1

VI:     Form of Market Making Request ................................................................VI-1

This Private Placement Memorandum (the "Memorandum") relates to the offer and sale by Lehman Brothers Holdings Inc. ("LBH" or the "Issuer"), in a transaction not involving a public offering, of 4-Year, 2-Month Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants") as more fully described herein.

The obligations of the parties to the transaction contemplated herein are set forth in and will be governed by certain documents described herein; all of the statements and information contained herein are qualified in their entirety by reference to such documents.    This Memorandum contains summaries of certain of these documents which LBH believes to be accurate, but for a complete description of the rights and obligations of the parties thereto, reference is hereby made to the actual documents, copies of which are attached hereto, and all such summaries are qualified in their entirety by this reference.

LBH will afford to prospective investors the opportunity to ask questions of, and receive answers from, LBH concerning the offering of the Warrants and to obtain additional relevant information which LBH possesses or can acquire without unreasonable effort or expense.

This Memorandum is based on information supplied by LBH and other sources identified herein and is being furnished on a confidential basis solely for the use of prospective investors in connection with the non-public offering of the Warrants.

The Warrants are being offered in negotiated transactions or otherwise and are offered when, as, and if issued, subject to prior sale or withdrawal, cancellation, or modification of any matters by counsel and certain other conditions.  LBH may from time to time offer and sell other, similar Warrants with different terms to purchasers other than the offerees hereunder.

Subject to the provisions contained herein, the Warrants are being sold on behalf of LBH to persons described in the paragraph below by Lehman Brothers Inc. (the "Placement Agent").

The purchase of a Warrant offered hereby is suitable only for, and should be made only by, investors who are (i) "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act ("Accredited Investors") who are also "qualified purchasers," as defined in Section 2(a)(51) of the Investment Company Act ("Qualified Purchasers") or (ii) "non-U.S. Persons" purchasing in "offshore transactions" (each as defined in Regulation S under the Securities Act, "Non-U.S. Persons" and "Offshore Transactions", respectively) who are also Qualified Purchasers, in each case, who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a Warrant.

THE INITIAL INVESTOR AND EACH TRANSFEREE SHALL REPRESENT AND WARRANT THAT IT IS NOT, AND IT IS NOT ACQUIRING WARRANTS WITH THE ASSETS OF, AN EMPLOYEE BENEFIT PLAN SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), A PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL OR OTHER LAW, RULE OR REGULATION WHICH IS SUBSTANTIALLY SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") OR ANY ENTITY DEEMED TO HOLD THE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN FOR PURPOSES OF ERISA, SECTION 4975 OF THE CODE OR SIMILAR LAW.

ANY INVESTOR OR TRANSFEREE SHALL FURTHER BE DEEMED TO REPRESENT AND COVENANT THAT THROUGHOUT THE PERIOD IT HOLDS WARRANTS, THE FOREGOING REPRESENTATIONS AND WARRANTIES SHALL BE TRUE.

AN INVESTMENT IN THE WARRANTS INVOLVES CERTAIN SUBSTANTIAL RISKS, INCLUDING THE RISK THAT INVESTORS MAY LOSE THE ENTIRE VALUE OF THEIR INVESTMENTS IN CERTAIN CIRCUMSTANCES.  See *"Risk Factors"* for a discussion of certain factors that prospective investors should carefully consider before they invest in the Warrants.

The Warrants are being offered to a limited number of (i) Accredited Investors who are also Qualified Purchasers and (ii) Non-U.S. Persons who are also Qualified Purchasers.  The offering of the Warrants will not be registered under the Securities Act in reliance upon an exemption provided in the Securities Act.  There is no market for the Warrants being offered hereby and, as a result, a purchaser of a Warrant must be prepared to hold it for an indefinite period of time. Transfers of the Warrants may be made only in accordance with the transfer restrictions set forth herein.

**IRS CIRCULAR 230 NOTICE**

**THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL, STATE, OR LOCAL TAX PENALTIES.  THIS MEMORANDUM WAS WRITTEN AND PROVIDED BY THE ISSUER IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE ISSUER AND/OR PLACEMENT AGENT OF THE WARRANTS.  EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Notwithstanding anything to the contrary contained herein, all persons may disclose to any and all persons, without limitation of any kind, the federal, state and local tax treatment of the Warrants, any fact relevant to understanding the federal, state and local tax treatment of the Warrants and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and that may be relevant to understanding such tax treatment.  However, no person may disclose the name of or identifying information with respect to any party identified herein or any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal, state or local tax treatment of the Warrants and is not relevant to understanding the purported or claimed federal, state and local tax treatment of the Warrants.

No person has been authorized to give any information or to make any representations other than those contained in this Memorandum and, if given or made, such information or representations must not be relied upon.  This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the Warrants nor does it constitute an offer of the Warrants to any person in any state or other jurisdiction in which such offer would be unlawful.  This Memorandum does not include information relating to events occurring subsequent to its date, except as specifically indicated.  The delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to its date.  The Warrants may not be sold to any person without delivery of this Memorandum and the Exhibits attached hereto.

# WARRANT SALES RESTRICTIONS FOR CERTAIN JURISDICTIONS

## *Mexico*

The Warrants have not and will not be registered in the Mexican National Registry of Securities (Registro Nacional de Valores). The Warrants may not be offered or sold in the United Mexican States ("Mexico") by any means except in circumstances which do not constitute an offer to the public within the meaning of the Mexican Securities Market Law (Ley del Mercado de Valores) and its regulations. No Mexican regulatory authority has approved or disapproved the Warrants. All applicable provisions of the Mexican Securities Market Law must be complied with in respect of any sale, offer or distribution of, or intermediation with, the Warrants in, from or otherwise involving Mexico, and any resale of the Warrants must be made in a manner that will not constitute a public offering in Mexico.

## *The Bahamas*

The Warrants have not been and shall not be offered or sold in or into The Bahamas except in circumstances that do not constitute a "public offering" according to the Securities Industry Act, 1999 and Securities Industry Regulations, 1999. Any private offer of the Warrants, directly or indirectly, in or from within The Bahamas may only be made by an entity or person who is licensed as a Broker Dealer or Securities Investment Advisor by the Securities Commission of The Bahamas. No person deemed "resident" in The Bahamas for exchange control purposes pursuant to the Exchange Control Regulations, 1956 may purchase the Warrants unless the prior written approval of the Central Bank of The Bahamas has been obtained by or on behalf of such person. The Warrants are subject to significant restrictions on transfer.

## *Chile*

NEITHER THE ISSUER NOR THE WARRANTS HAVE BEEN REGISTERED WITH THE SUPERINTENDENCIA DE VALORES Y SEGUROS PURSUANT TO LAW NO. 18.045, THE LEY DE MERCADO DE VALORES, AND REGULATIONS THEREUNDER.  THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OF, OR AN INVITATION TO SUBSCRIBE FOR OR PURCHASE, THE WARRANTS IN THE REPUBLIC OF CHILE, OTHER THAN TO INDIVIDUALLY IDENTIFIED BUYERS PURSUANT TO A PRIVATE OFFERING WITHIN THE MEANING OF ARTICLE 4 OF THE LEY DE MERCADO DE VALORES (AN OFFER THAT IS NOT "ADDRESSED TO THE PUBLIC AT LARGE OR TO A CERTAIN SECTOR OR SPECIFIC GROUP OF THE PUBLIC.")

## *Venezuela*

This offering is made outside of Venezuela, directed exclusively to existing clients of the Issuer and/or Placement Agent and, as such, no registrations or authorizations will be required or obtained from the Comisión Nacional de Valores.

***The Dominican Republic***

The Instruments may not be publicly offered nor placed in the Dominican Republic (as such terms are defined in the Dominican Securities Law No. 19-00, and the regulation promulgated thereunder), and therefore, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party in the Dominican Republic, will be required for the sale, offer, advertisement and/or marketing of the Instruments on a private placement basis. Notwithstanding the foregoing, under the Dominican Securities Law No. 19-00 and Rule 729-04, the Superintendence of Securities shall have a discretional faculty to determine whether or not a particular offering is of public nature.

## SUMMARY OF PRINCIPAL TERMS

*The information set forth below is qualified in its entirety by reference to the Form of Issuing, Paying and Transfer Agency Agreement attached hereto as Exhibit III. Each prospective investor should review Exhibit III, and no purchase of a Warrant should be made until such review is completed.*

### Issuance

The Issuer will issue 100,000 U.S. dollar Warrants for a total cost, including selling compensation, of $252.25 per Warrant (the "Total Cost"). The Total Cost has been priced to include the selling compensation payable to Lehman Brothers Inc. (the "Placement Agent"). For an explanation of the components of the Total Cost and the plan of distribution, see "*Plan of Distribution.*"

The Issuer expects to issue the Warrants on or about May 1, 2008 (the "Issue Date"). The minimum initial investment is 260 Warrants per investor, subject to waiver at the discretion of the Placement Agent, with additional investments permitted in denominations of one Warrant or multiples thereof. The closing and settlement date for the Warrants will be the Issue Date.

Each Warrant is linked to the performance of the Class PP interests (the "Interests") of Millennium USA LP (the "Reference Fund"). Each Warrant will entitle you to receive from the Issuer an amount, if any, on the Warrant Payment Date (as defined below) in U.S. dollars based on the value of the Reference Fund, as determined by the Calculation Agent, on the Valuation Date (as defined below).

The Warrants represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund or its affiliates.

The Reference Fund invests in Millennium Partners, L.P. (the "Master Fund"). For purposes of the discussion herein, any reference to the Reference Fund's assets or investments shall include the assets and investments of the Master Fund that are attributable to interests of the Master Fund held by the Reference Fund.

For more information about the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached hereto as Exhibit V. Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of Millennium Management LLC. (the "General Partner"), which acts as the general partner to the Reference Fund, the Master Fund, the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

The Warrants will be governed by, and construed in accordance with, the laws of the State of New York.

**Exercise and Maturity**

The Warrants will be exercised automatically on the Valuation Date. The Warrants are scheduled to mature on August 3, 2012 (the "Warrant Payment Date"); provided that if the Calculation Agent determines that a Reference Holder (as defined below) would not have received all redemption proceeds by the end of the day on July 30, 2012, assuming a timely request for redemption by such Reference Holder of the Deemed Quantity of Interests (as defined below) effective as of the Valuation Date, the Warrant Payment Date shall be the earlier of (i) five Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) five Business Days after the thirtieth day following the Audit Date. Each Warrant entitles each holder thereof (a "Holder") to payment of the Warrant Payment Amount (as defined below) on the Warrant Payment Date. The Warrants may only be exercised for cash (U.S. dollars) and Holders will not be entitled to receive any Interests of the Reference Fund.

**Warrant Payment Amount**

On the Warrant Payment Date (or if such day is not a Business Day then the immediately succeeding Business Day), Holders will receive, with respect to each Warrant, an amount (the "Warrant Payment Amount") which is the greater of (i) zero and (ii) an amount equal to the Final NAV minus the Strike Price. If the calculation of the Warrant Payment Amount yields an amount less than zero, Holders will not receive a payment from the Issuer, nor will Holders be required to make any payment to the Issuer. A Holder's loss will be limited to the Total Cost paid by such Holder for each Warrant.

"Final NAV" means, as of the Valuation Date, the aggregate redemption proceeds that would be received by a Reference Holder on or prior to the date that is thirty days after the Audit Date, assuming timely submission of a request for redemption of the Deemed Quantity of Interests (as defined below) to be effective as of the Valuation Date, as determined by the Calculation Agent. The Final NAV shall be calculated by deducting from such amount any redemption, management, incentive or administrator fees or other costs (including, without limitation, any applicable withdrawal fee) payable by a Reference Holder in respect of such Deemed Quantity of Interests, to the extent such amounts have not already been deducted by the Reference Fund in calculating the amount of redemption proceeds payable to the Reference Holder, as determined by the Calculation Agent. For the avoidance of doubt, if the Calculation Agent determines that a Reference Holder, assuming timely submission of a request for redemption of the Deemed Quantity of Interests to be effective as of the Valuation Date, would not have received any of the redemption proceeds on or prior to the date that is thirty days after the Audit Date, the Calculation Agent shall determine the Final NAV, which Final NAV may be equal to zero.

"Valuation Date" means June 30, 2012.

"Audit Date" means, with respect to a date of determination, the Business Day on which the audit of the Reference Fund for the fiscal year in which such date of determination occurs is completed by the Reference Fund's independent auditor.

"Reference Holder" means a hypothetical limited partner of the Reference Fund that is deemed to have the benefits and obligations of an investor owning, during the term of the Warrants, Interests in the Reference Fund, as determined by the Calculation Agent.    The Reference Holder will have a tax situs in Delaware.  The Reference Holder does not represent an investment in or an Interest in the Reference Fund.

"Strike Price" means 100% of the Initial NAV.

"Initial NAV" means $1,000.

"Deemed Quantity of Interests" means a hypothetical quantity of Interests of the Reference Fund with an aggregate value as of the Issue Date equal to the Initial NAV.

"Business Day" means a day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions in New York are authorized or obligated by law or executive order to close.

The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

## Liquidity

The Warrants will not be listed on any securities exchange or quotation system and there is no guarantee that a secondary market in the Warrants will develop.  The Issuer, the Placement Agent and their affiliates have no obligation to make a market for the Warrants and may cease or alter market-making activities if commenced at any time.  To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely on the factors set forth under "*Risk Factors— Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability.*"

The Placement Agent intends, but is not obligated, to buy and sell the Warrants.  To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI.  The Market Making Request must be received by the Placement Agent no later than 105 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction.  The Placement Agent and its affiliates are not obligated to create a secondary market or to continue such activity once it has begun.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase.  The Placement Agent may be the only source of price quotes for the Warrants.  Any secondary market price quoted by the Placement Agent would reflect any changes in market

conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

In addition, any secondary market purchase of the Warrants by the Placement Agent or any of its affiliates prior to maturity will be at a price that is net of the commissions paid to the Placement Agent as described under "*Plan of Distribution.*" Also, likely to be excluded from the secondary market price quote are the projected profits included in the cost of hedging the Issuer's obligations under the Warrants.  In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs.  Further, to the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2010 but on or after July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value.  Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time.  As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than Holders' original cost.

**In-Kind Distributions**

If the Reference Fund makes an in-kind payment to its Reference Holders, the Calculation Agent, when it determines the Valuation NAV, will determine the value of such distribution (including, without limitation, illiquidity discounts, the time remaining until the Warrants are unwound early or exercised, fees, transactions costs and other factors), for the purpose of calculating any related cash settlement amounts due to each Holder.

**Restrictions On "New Issues"**

The Warrants are linked to Interests that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

**Early Termination**

The Issuer reserves the right to terminate the Warrants at any time prior to the Warrant Payment Date if at any time before that date, the Calculation Agent determines that an Early Termination Event (as defined below) has occurred.  The occurrence of any of the following events may be deemed an "Early Termination Event" by the Calculation Agent:

(1)    Reference Fund NAV Decrease Event.  The Reference Fund net asset value per share decreases by (i) 10% or more during any month or (ii) 25% or more during any quarter;

(2)    Reference Fund Volatility Event.  As of any date of determination, the annualized standard deviation of the daily percentage returns of the Reference Fund over the most recent 90 days exceeds 15%;

(3)    Reference Fund Net Capital Event.  The net capital of the Reference Fund for any calendar month drops by 15% or more inclusive of all redemptions and subscriptions but exclusive of any other gains or loss;

(4)    Master Fund Strategy Event.  The percentage of the Master Fund's risk capital allocated to a Permitted Strategy exceeds the Percentage Limit for such Permitted Strategy as set forth below:

|    | Permitted Strategy | Percentage Limit |
|----|--------------------|------------------|
| 1  | Relative Value Sector Arbitrage | 55% |
| 2  | Statistical Arbitrage | 45% |
| 3  | Merger Arbitrage | 20% |
| 4  | Fixed Income Arbitrage | 25% |
| 5  | Distressed | 15% |
| 6  | Futures/Currency Arbitrage | 15% |
| 7  | Closed End/Asset Arbitrage | 18% |
| 8  | Convertibles | 10% |
| 9  | Options Arbitrage | 15% |
| 10 | Other | 10% |

(5)    Reference Fund Diversion Event.  Less than 80% of the assets of the Reference Fund is invested (directly or indirectly) in the Master Fund (each a "Reference Fund Diversion Event");

(6)    Master Fund AUM Decrease Event.  At any time the Master Fund's total assets under management (i) are less than USD 5,000,000,000 or (ii) decrease by 50% or more within any calendar year when compared to the Master Fund's total assets under management on January 1st of such calendar year;

(7)    Key Person Event.  Any two of Israel Englander, David Nolan or Terry Feeney cease to be involved in running the day-to-day operations and management of the General Partner (each a "Key Person Event");

(8)    Fund Liquidity Event.  The Reference Fund, with respect to its Class PP shares (i) provides liquidity information less frequently than quarterly, (ii) requires more than 90 days' notice to effect redemptions, (iii) suspends redemptions in whole or in part or (iv) imposes any whole or partial restriction in respect of a redemption or subscription by a Reference Holder (exclusive of the 4% and 2% early withdrawal fee) (each a "Fund Liquidity Event");

(9)    Material Adverse Change Event.  The occurrence of a material adverse change in the business, properties, operations, assets or liabilities (actual or contingent), or condition (financial or otherwise) of the Reference Fund (each a "Material Adverse Change Event");

(10)   Master Fund Concentration Event.  The Master Fund allocates more than 10% of its assets to a single underlying investment (each a "Master Fund Concentration Event");

(11)  General Partner Event.  Millennium Management LLC ceases to act as General Partner of the Reference Fund, or such party otherwise ceases to act for the Reference Fund as General Partner for any reason (each a "General Partner Event");

(12)  Bankruptcy Event.  The Reference Fund or Master Fund (a) is dissolved or has a resolution passed for its dissolution, winding up, or official liquidation; (b) makes a general assignment or arrangement with or for the benefit of its creditors; (c) becomes insolvent or is unable to pay its debts or fails or admits its inability generally to pay its debts as they become due; (d)(i) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (ii) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (i) above and either (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (e) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, or custodian or other similar official for it or for all or substantially all its assets in a proceeding of the type described herein; (f) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (g) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) through (f) above (inclusive); or (h) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts (each a "Bankruptcy Event");

(13)  Reference Fund Restatement Event.  The Reference Fund NAV is restated by more than +/- 2% for any month (each a "Reference Fund Restatement Event");

(14)  Reporting Failure Event.  The Reference Fund or the Master Fund fails to deliver information that it had previously agreed to deliver or that it had been previously delivering to investors in normal practice that the Calculation Agent deems necessary to determine compliance with the investment guidelines, asset allocation methodologies or any other similar policies of the Reference Fund in a timely manner (each a "Reporting Failure Event");

(15)  Misconduct Event.  (a) The Reference Fund, the Master Fund or the General Partner or any of their respective affiliates, employees, officers or agents, breaches any applicable law or regulation, (b) any governmental, legal or regulatory authority or other person brings or threatens to bring an administrative or judicial proceeding, investigation or litigation against any such person (including, in the case of the General Partner, against any other fund managed by the General Partner) or makes or threatens to make any claim, demand, charge or complaint against

such person alleging any misconduct, impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing; or (c) the cancellation, suspension, revocation, termination, limitation or qualification of the registration, authorization, licenses, membership or approval of any such person by any governmental, legal or regulatory entity with authority over such person (each a "Misconduct Event");

(16)    Change in Law Event.    (a) There is a change in any law, regulations, practice or the interpretation of any law, regulations or practice by any court, tribunal or regulatory authority which causes it to become unlawful or inadvisable for the Issuer or any of its affiliates to perform any obligations hereunder or otherwise has material adverse consequences for the Issuer or any of their affiliates including, for greater certainty, with any hedging activity; or (b) there is a change in the legal, tax, accounting or regulatory treatments of the Interests, the Reference Fund or the General Partner that is reasonably likely to have a material adverse consequence for the Reference Fund or the Interests (each a "Change in Law Event");

(17)    Reference Fund Modification Event.    (a) The modification of the Reference Fund (such as, but not limited to, modification of the organizational documents or any prospectus, offering memorandum, information memorandum or other similar offering document related thereto) in a way that could reasonably be expected to have a material adverse effect on the Final NAV or the rights and remedies of a Reference Holder from those prevailing on the Issue Date (including, without limitations rights of liquidation, transfer or redemption of the Interests), or (b) any event or any change affecting the Reference Fund and/or an Interest thereof (such as, but not limited to, interruption, breakdown, suspension or deferral of the calculation or the publication of the level or value of such Interest, or the disappearance of the level or value of such Interest resulting more particularly from, but not limited to, the winding-up or the termination of such Fund or the cancellation of the registration or of the approval by any relevant authority of the Fund) and that, in the opinion of the Calculation Agent, is likely to have a material effect on the Interests of a Reference Holder (each a "Reference Fund Modification Event");

(18)    Merger Event.    The conversion of an Interest of the Reference Fund into another series of interests or securities with materially different benefits, rights or obligations, or the split of the Reference Fund, or its consolidation or its merger with or its sale or its conveyance of all or substantially all of its Interests or assets to a third party (each a "Merger Event");

(19)    Reference Fund Asset Allocation Event.    The announcement or implementation of a material change in the formula for or method of asset allocation or an other material modification, breach or violation of any strategy or investment guidelines of the Reference Fund that is reasonably likely to materially affect any Interests of a Reference Holder, as determined by the Calculation Agent (each a "Reference Fund Asset Allocation Event");

(20)    Hedging Disruption Event.    (1) The Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, or it is deemed inadvisable for the Issuer and/or any of its affiliates, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s), including, without limitation, where such inability or impracticability has arisen by reason of (i) any restrictions imposed by the Reference

Fund on any investor's ability to redeem such Interest, in whole or in part, or any existing or new investor's ability to make new or additional investments in such Interest, or (ii) any mandatory redemption, in whole or in part, of such Interest imposed by the Reference Fund (in each case other than any restriction in existence on the Issue Date) or (2) the Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, to determine the value of any hedging position in the Reference Fund for any reason (each, a "Hedging Disruption Event").

(21)  Increased Cost of Hedging Event.  The Issuer and/or any of its affiliates would incur a materially increased (as compared with circumstances existing as of the Issue Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (1) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (2) realize, recover or remit the proceeds of any such transaction(s) or asset(s) (each, an "Increased Cost of Hedging Event").

(22)  Material Contract Event.  An event of default or a termination event, however defined, occurs with respect to the Reference Fund under any prime brokerage agreement, any ISDA Master Agreement or other similar derivatives agreement or any other agreement for borrowed money (including, without limitation, any loan agreement or repurchase agreement) (each a "Material Contract Event"); or

(23)  Nationalization Event.  All the Interests or substantially all the assets of the Reference Fund are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof (each a "Nationalization Event").

Upon the occurrence of any of the foregoing events, the Calculation Agent shall determine whether the occurrence of such event constitutes an Early Termination Event.  If the Calculation Agent deems the occurrence of such event to be an Early Termination Event and the Issuer determines to terminate the Warrants, the Issuer will notify the Transfer Agent of its intent to terminate the Warrants.  Holders will receive the Early Termination Amount (as defined below) on the Early Termination Date.  The "Early Termination Date" shall be determined by the Calculation Agent and shall be five Business Days following the date on which all redemption proceeds would have been received by a Reference Holder of Interests based on a timely request for redemption by such Reference Holder to be effective as of the Early Termination Valuation Date (as defined below).  Notwithstanding the foregoing, in no event will the Early Termination Date occur more than five Business Days after the thirtieth day following the Audit Date in respect of the Early Termination Valuation Date.  Upon receipt of notice from the Issuer of its intent to terminate the Warrants following the Early Termination Event, the Transfer Agent will notify each Holder of the Issuer's election to terminate the Warrants in accordance with the Issuing, Paying and Transfer Agency Agreement (as defined below).

"Early Termination Amount" means the amount determined by the Calculation Agent equal to the market value of the Warrant as of the Early Termination Valuation Date, reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred under then prevailing circumstances in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event.  The "Early Termination Valuation Date" shall be determined by the Calculation Agent and shall be the date

as of which a Reference Holder, which properly submitted a redemption notice to the Reference Fund promptly after such Early Termination Event, would have been able to redeem its Interests. If the Calculation Agent determines that a Reference Holder would not have received all of the redemption proceeds by the thirtieth day after the relevant Audit Date, the Early Termination Amount may be equal to zero. In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise.

**Potential Adjustment Event**

Upon the occurrence of a Potential Adjustment Event (as defined below), the Calculation Agent shall make such adjustment to the exercise, settlement, payment or any other terms of the Warrants as the Calculation Agent determines appropriate, and determine the effective times thereof, to account for the economic effect on the Warrants of such Potential Adjustment Event. "Potential Adjustment Event" means any of the following:

    (i)   a subdivision, reclassification, reorganization, consolidation, increase, reduction by cancellation of the Interests of a Reference Holder, or, a free distribution or dividend of any such Interests to existing holders by way of bonus, capitalization or similar issue;

    (ii)   a distribution or dividend to existing holders of (a) Interests, or (b) any other interest capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Reference Fund equally or proportionately with such payments to holders of such interests, or (c) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by the Calculation Agent;

    (iii)   an extraordinary dividend;

    (iv)   a call by the Reference Fund of such Interests in respect of Interests that are not fully paid;

    (v)   a repurchase by the Reference Fund of Interests whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

    (vi)   any other similar event.

**Transfer Agent**

Citibank N.A. will act as registrar and Transfer Agent (the "Transfer Agent") for the Warrants pursuant to the terms of an issuing, paying and transfer agency agreement (the "Issuing, Paying and Transfer Agency Agreement"), dated on or about April 30, 2008 by and between the Issuer and the Transfer Agent. The Transfer Agent's corporate offices are located at 111 Wall Street, New York, New York 10043. Pursuant to the terms of the Issuing, Paying and Transfer Agency Agreement, the Transfer Agent has agreed to make payments on behalf of the Issuer and register the transfer or exchange of Warrants. Fees and expenses of the Transfer

Agent will be paid by the Issuer.  The Transfer Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Transfer Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants.  The Transfer Agent may resign at any time upon three months written notice, and the Issuer may remove the Transfer Agent at any time upon 30 days written notice.  Neither resignation nor removal of the Transfer Agent will take effect until a successor Transfer Agent has been appointed.

## Calculation Agent

Lehman Brothers Inc. will initially serve as calculation agent (the "Calculation Agent") for the Warrants pursuant to the terms of a Calculation Agency Agreement (the "Calculation Agency Agreement"), dated on or about April 30, 2008, by and between the Issuer and the Calculation Agent, attached hereto as Exhibit IV.  Except as otherwise provided in the Warrants, all determinations, calculations or valuations made by the Calculation Agent shall be at the sole discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Transfer Agent and each Holder.  The Calculation Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents.  Nothing shall prevent the Calculation Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants.  The Calculation Agent may resign at any time upon written notice to the Issuer, and the Issuer may remove the Calculation Agent at any time upon written notice to the Transfer Agent.  Neither resignation nor removal of the Calculation Agent will take effect until a successor Calculation Agent has been appointed.

## Calculations

Except as otherwise set forth herein, all calculations made with respect to a Warrant by the Calculation Agent will be calculated to the nearest one hundredth (i.e., to the nearest 0.01), with five one thousandths and greater rounded upwards.

## Form and Transfer

The Warrants will at all times be represented by definitive warrant certificates representing each Holder's interest, in denominations of one Warrant or multiples thereof.  All Warrants owned by customers of Lehman Brothers Inc. shall, absent contrary instructions from a customer, initially be evidenced by one or more Warrants held by, and registered in the name of, Lehman Brothers Inc.  Lehman Brothers Inc. will, upon the written request of the beneficial owner of any Warrants so held, deliver to such owner without charge Warrants registered in the

name of the owner.   Transfers of the Warrants, to the extent effected only on the books of the Placement Agent, shall require the consent of the Placement Agent.

The Warrants will not be registered under the Securities Act or under the securities laws of any other jurisdiction.   The Warrants will be offered and sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons, who are also Qualified Purchasers, for purchase in Offshore Transactions.   The minimum transfer amount is 260 Warrants or a smaller number of Warrants if such number represents the entire number of Warrants held by such transferor and no transfers of Warrants will be effected by the Transfer Agent within five Business Days of the Valuation Date.   In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter in the form of Exhibit II attached hereto and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act.

**Ratings**

The Warrants will not be rated by any rating agency.

## RISK FACTORS

*Prior to making an investment decision in respect of the Warrants, prospective purchasers should carefully consider all the information set out in this Memorandum, the Issuing, Paying and Transfer Agency Agreement and the other related documents. The risk factors set out herein are not and do not purport to be exhaustive. There may be other risks that a prospective purchaser should consider that are relevant to an investor's particular circumstances or generally.*

*The Warrant Payment Amount for the Warrants will depend solely on the performance of the Reference Fund. An instrument linked to the Reference Fund carries with it substantial risks including, but not limited to, the risks referred to below. There can be no assurance that at maturity holders will receive at least or more than the Total Cost per Warrant. The Warrant Payment Amount could be zero.*

*The Issuer disclaims any responsibility to advise prospective purchasers of such risks as they exist at the date of this document or as they change from time to time. Prospective purchasers should consult their own financial, tax and legal advisors about risks associated with an investment in the Warrants and the suitability of investing in the Warrants in light of their particular circumstances.*

***Potential investors in the Warrants should review the risks stated in the Confidential Private Offering Memorandum of Millennium USA LP, a copy of which is attached hereto as Exhibit V.***

### Holders May Lose Their Entire Investment

The Warrants are leveraged investments that involve a high degree of risk that may result in the Warrants maturing worthless. A Holder will lose its entire investment if the Final NAV is less than or equal to the Strike Price. A Holder will lose a portion of its investment if the net asset value of the Reference Fund does not increase such that the Final NAV is at least 25.225% greater than the Strike Price. This means that if the net asset value of the Reference Fund increases such that the Final NAV is exactly 25.225% greater than the Strike Price, each Holder will receive an amount equal to the Total Cost in respect of each of its Warrants.

### Limited Trading History on the Performance of the Reference Fund

The Reference Fund has a limited trading history. As a consequence, each prospective investor should understand that very limited historical performance is available, by which it may be able to evaluate the Reference Fund's performance. **You are cautioned that the historical levels of the Reference Fund or any investment fund or account managed by the General Partner are not indicative of and have no bearing on future performance of the Reference Fund. The Reference Fund may outperform or under-perform the historical levels. No assurance can be given that the net asset value of the Reference Fund will increase in value which may result in the Warrants maturing worthless.**

**Holders Should Investigate the Reference Fund as if Investing Directly**

*Holders should conduct their own diligence of the Reference Fund as they would if they were directly investing in the Reference Fund. Holders should not conclude that the sale by the Issuer of the Warrants is any form of investment recommendation by the Issuer or the Placement Agent to invest in the Reference Fund.*

**Risks Relating to the Reference Fund, the General Partner or the Master Fund**

The performance of the Warrants could be adversely affected by the occurrence of negligence, fraud, misconduct or other acts of the Reference Fund, the General Partner or the Master Fund. For example, any such acts may lead to a material modification or breach of the Reference Fund's strategy or investment guidelines and thus an Early Termination Event. As described above, an Early Termination Event will cause the termination of the Warrants and thus a Holder will lose the opportunity to participate further in the performance of the Reference Fund and may receive less than the Total Cost of the Warrants. Investors should further understand that they will have no recourse against the Reference Fund, the General Partner or the Master Fund in connection with their Warrants.

Additionally, Holders will have very limited information regarding the Reference Fund, the General Partner or the Master Fund and will have no information regarding the underlying investments in the Reference Fund.

**Lack of Affiliation Among the Issuer and the Reference Fund**

The Issuer is not affiliated with the Reference Fund. However, the Issuer and its affiliates may be party to various financial contracts with, or provide services to, the Reference Fund. See "–*Certain Business Activities May Create Conflicts of Interest with Holders*" herein for a further discussion. The Issuer has no ability to control or predict the actions of the Reference Fund. This Memorandum does not and is not intended to provide information with respect to an investment in the Reference Fund. Neither the Issuer nor its affiliates make any representation as to the financial condition or creditworthiness of the Reference Fund in connection with the issuance of the Warrants.

**The Issuer is Not Responsible for Disclosure of Information by the Reference Fund and Has No Obligation to Disclose Information About the Reference Fund After the Date of this Memorandum**

Neither the Issuer nor any of its affiliates or agents has participated in the preparation of the Confidential Private Offering Memorandum of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Furthermore, the Issuer cannot give any assurance that all events occurring prior to the date hereof (including events that would affect the accuracy or completeness of the Confidential Private Offering Memorandum of the Reference Fund) have been properly disclosed. Subsequent disclosure of any such events or the disclosure of or failure to disclose material future events concerning the Reference Fund could affect any Warrant Payment Amount received by you with respect to the Warrants.

The Issuer is not affiliated with the Reference Fund, the General Partner or the Reference Fund's asset managers in any way and the Issuer has no ability to control or predict their actions or the public disclosure of any events or circumstance affecting them.  Therefore, the Issuer has no responsibility to monitor, verify, or disseminate current or future public disclosure of information by the Reference Fund in its fund documents or otherwise.  In the course of the Issuer's dealings with the Reference Fund, the Issuer or any of its affiliates may acquire non-public information about the Reference Fund.  If the Issuer or its affiliates do acquire non-public information about the Reference Fund, they are not obligated to disclose such non-public information to you.

Neither the Issuer nor its affiliates or agents makes any representation or warranty to you as to the performance of the Warrants or the Reference Fund.  Historical data or other performance data is not a prediction of future results.

## Value of Warrants Influenced by Many Unpredictable Factors

An investment in the Warrants entails certain risks which are different from those associated with an investment in a conventional debt security issued by the Issuer.  The value of the Warrants may increase and decrease between the Issue Date and the Warrant Payment Date.  Several factors, many of which are beyond the control of the Issuer, will influence the value of the Warrants, including:

- the value of the Reference Fund;

- the volatility (frequency and magnitude of changes) in the value of the Reference Fund;

- interest and yield rates in the market;

- the market price of securities, derivative products or other investment instruments purchased by the Reference Fund;

- economic, financial, political and regulatory or judicial events that affect the financial markets generally and which may affect the level of the Reference Fund and/or the Warrants;

- the time remaining to the maturity of the Warrants;

- the amount of fees or other charges payable to the Issuer or its affiliates in connection with its activities relating to the Warrants, including hedging of the Issuer's obligations under the Warrants; and

- the creditworthiness of the Issuer.  Any person who purchases the Warrants is relying upon the creditworthiness of the Issuer and has no rights against any other person.  The Warrants constitute the general, unsecured and unsubordinated contractual obligations of the Issuer.

Some or all of these factors will influence the price that an investor will receive if an investor sells its Warrants in the secondary market, if any, prior to maturity.  For example, an investor may have to sell its Warrants at a substantial discount from the Total Cost if at the time of sale the value of the Reference Fund is at, below, or not sufficiently above the Initial NAV.

**Specific Investment and Trading Risks Relating to the Reference Fund**

The Warrants are subject to some of the risks of an investment in the Reference Fund. Investors should review the risks set forth in the "Risk Factors" section beginning on page I-12 of the Confidential Memorandum of the Reference Fund, which is attached hereto as Exhibit V. Each of these risks impacts the value of the Interests in the Reference Fund and will, in turn, have a corresponding impact on the value of the Warrants.

**Risks Relating to Hedge Funds and the Reference Fund**

The Warrants are subject to many of the risks of direct investments in hedge funds. Investments in hedge funds can be speculative and involve a high degree of risk. Many hedge funds (including the Reference Fund) are not subject to the same reporting requirements or investment restrictions as funds that are registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The following is a list of some of the significant risks associated with hedge funds and the Reference Fund. Some of these factors are interrelated in complex ways. As a result, the effect of any one factor may be offset or magnified by the effect of another factor. Each of these risks may adversely impact the value of the Interests in the Reference Fund and may, in turn, have a corresponding adverse impact on the value of the Warrants.

- Many hedge funds are not registered or regulated under the Investment Company Act. Investor protections similar to those afforded by the Investment Company Act relating to, among other matters, publication of net asset values, rights of redemption and controls over changes to an investment company's investment advisor, investment policies, and fees payable to an investment company's service providers, may not be available. Furthermore, pursuant to exemptions available under rules of the United States Commodity Futures Trading Commission ("CFTC"), the asset manager for a hedge fund may not be required to comply with certain regulations promulgated by the CFTC.

- The unregulated nature of investments made by the Reference Fund, such as the employment of different types of trading strategies (including leverage) and the investment in certain types of instruments that are typically prohibited for funds registered under the Investment Company Act.

- There is no secondary market for investors' interest in hedge funds (and none is expected to develop), there may be restrictions on transferring interests in hedge funds, and hedge fund may suspend the right of redemption under certain circumstances. Thus, an investment in hedge funds should generally be regarded as illiquid.

- While hedge funds generally may provide periodic performance reports and annual audited financial statements, they are not otherwise required to provide periodic pricing or valuation information to investors.

- Generally, hedge funds are not registered under the Investment Company Act and therefore provide less transparency than those that are registered. For example, investors in unregistered hedge funds may not easily be able to ascertain all the risk characteristics of the investment vehicle or investment strategies employed by the investment managers of unregistered investment vehicles, as a result, investors in unregistered investment vehicles

may have to strictly rely on the portfolio position disclosure to evaluate the investments and risks of the related investment vehicle.

•    The asset manager for a hedge fund, on behalf of such hedge fund, may invest in and trade in a variety of financial instruments using sophisticated investment techniques for hedging and non-hedging purposes.  Such financial instruments and investment techniques include but are not limited to the use of leverage (i.e., borrowing money for investment purposes), transactions that use derivatives such as swaps, options, index options, futures contracts and options on futures. While these investment strategies and financial instruments allow the asset manager the flexibility to generate positive returns for the hedge fund, they also allow for greater volatility and the opportunity for significant losses that may adversely affect the value of the hedge fund and thus the return on the Warrants.

•    The constitutional documents of hedge funds often provide that any securities or investments which are illiquid, not traded on an exchange or in an established market or for which no value can be readily determined, may be assigned such fair value as an investment manager, administrator (or other applicable third party valuation agent) may determine in its judgment based on various factors.  Such valuations may not be indicative of what actual fair market value would be in an active, liquid or established market.

•    Hedge funds may make investments which are subject to legal or other restrictions on transfer or for which no liquid market exists, thereby making the assets concerned difficult to sell or redeem.  The market prices, if any, of such investments tend to be more volatile and it may be impossible to sell such investments when desired or to realize their fair value in the event of a sale.  Furthermore, companies whose securities are not registered or publicly traded are not subject to the disclosure and other investor protection requirements which would be applicable if their securities were registered or publicly traded.  As a result it may take some time for a hedge fund to sell or redeem all or part of these assets when an investor wishes to redeem its investment in the hedge fund.  The hedge fund may delay redemptions or take other action to address this issue.  In a situation where a large number of investors wish to withdraw their investments in a hedge fund (e.g. in a market downturn), the hedge fund may be forced to sell or redeem its investments on unfavorable terms, which will have an adverse effect on the returns to hedge fund investors and, in turn, upon the value of warrants linked to such a hedge fund.

•    Hedge funds may make investments that are similar to investments made by other hedge funds.  In the event that, during the same time period, many hedge funds act to unwind substantial positions in the same or similar investments, the price of the investment and, in turn, the proceeds resulting from such a sale may be adversely impacted, which will in turn have an adverse effect on the returns to hedge fund investors, and the value of warrants linked to such hedge funds.

•    The investment strategies that hedge funds use may involve significant leverage. Hedge funds may use leverage through financial arrangements provided by banks, broker-dealers or others. The amount of leverage a hedge fund may have outstanding at any time may be large in relation to its capital. The use of leverage by a hedge fund in a market that moves adversely to the hedge fund's investments could result in a loss to the hedge fund that would be greater than if leverage were not employed by the hedge fund. In addition, the costs of

leverage (including interest on borrowings and other expenses that may be associated with borrowings) may be substantial and will affect the operating results of such a hedge fund.

•    A hedge fund could be subject to changes in the value that a lender assigns to a given position, the amount of margin required to support such position, the borrowing rate to finance such position and such lender's willingness to continue to provide any such credit to the hedge fund. In the event the hedge fund has no alternative credit facility that could be used to finance its positions in the absence of financing from lenders, it could be forced to liquidate a substantial portion of its portfolio to meet its financing obligations. The forced liquidation of all or a portion of a hedge fund's investments at distressed prices could result in significant losses to the hedge fund, and the value of warrants linked to such hedge fund.

•    In general, a hedge fund's use of short-term margin borrowings will result in certain risks to the hedge fund. For example, if lenders from whom the hedge fund has borrowed increase their maintenance margin requirements (i.e., reduce the percentage of a position that can be financed), the hedge fund could be subject to margin calls, pursuant to which the hedge fund would be required either to deposit additional funds with the lender or to liquidate positions. In the event of a sudden drop in the value of hedge fund assets, the hedge fund might incur losses as a result of mandatory liquidation of positions in a declining market at relatively low prices. Selling positions could cause the price of the positions to decline further, thereby exacerbating the loss.

•    The asset manager for a hedge fund, on behalf of such hedge fund, may invest in securities listed or traded on foreign exchanges.  The execution of transactions on foreign exchanges might involve particular risks including but not limited to higher volatility, government intervention, lack of transparency, lack of regulation, currency risk, political risk and economic social instability.

•    The asset manager for a hedge fund will often receive an incentive fee from the hedge fund (the "Incentive Fee"), based upon the appreciation, if any, in the assets of that hedge fund.  The Incentive Fee may create an incentive for the asset manager to make investments that are riskier or more speculative than would be the case if such arrangement were not in effect.  Such risky investments may increase the opportunity for significant losses.  In addition, because the Incentive Fee is often calculated on a basis that includes unrealized appreciation of the hedge fund's assets, it may be greater than if such compensation were based solely on realized gains.  Certain management fees and administrative fees charged by the asset manager (as well as expenses of the hedge fund) will also reduce the performance of the hedge fund and the value of warrants linked to such a hedge fund.

•    The asset manager for a hedge fund often has total trading authority over such hedge fund.  The use of a single advisor applying generally similar trading programs could mean lack of diversification and, consequently, higher risk.

•    Substantial redemptions of a hedge fund on a particular redemption day could require the asset manager of such hedge fund to liquidate positions more rapidly than would be otherwise desirable, which could have a negative impact on the performance of the hedge fund.

• Certain inherent and potential conflicts of interest may exist with respect to the operation of a hedge fund. The asset manager for a hedge fund may also serve as the trading manager for other clients. In performing its obligations for such other clients, the asset manager may be in possession of certain material non-public information and the asset manager will have no obligation to disclose such information or use such information for the benefit of the hedge fund. The asset manager may not be obligated to devote any specific amount of time to and the management of a particular hedge fund and often there can be no assurance that the performance by the asset manager of services for its other clients may not operate to the detriment of such hedge fund.

• The lack of oversight and regulation associated with hedge funds may increase the likelihood of fraud and negligence by the hedge funds, general partners, asset managers, or administrators of such hedge funds, or their respective brokerage firms or banks.

• The use of the above investment strategies, investment in the above instruments and the general characteristics of hedge funds may cause the hedge funds to be volatile.

• Hedge funds may involve complex tax structures and delays in distributing important tax information.

• Hedge funds may have high fees and expenses that may offset the hedge fund's trading profits.

• Legal, tax and regulatory changes could occur during the term of this Warrant that may adversely affect hedge funds. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by hedge funds. In addition, the securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. The Securities and Exchange Commission, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. The regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on hedge funds could be substantial and adverse and consequently adversely effect the value of an investment in, or linked to, hedge funds.

**Your Warrants Could Be Terminated Early**

If the Calculation Agent determines that an Early Termination Event has occurred during the term of the Warrants, your Warrants will be terminated as of the date selected by the Calculation Agent as the Early Termination Date. Upon termination of the Warrants pursuant to an Early Termination Event, the Calculation Agent will determine the Early Termination Amount, which will be an amount equal to the market value of the Warrants as of the relevant measurement date, and which will be reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event. In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information it deems necessary, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields,

volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise. See *"Summary of Principal Terms - Early Termination."*

**Reliance on Millennium Management LLC**

The Warrant Payment Amount is based on changes in the value of an Interest of the Reference Fund, which fluctuates. Changes in the value of the Reference Fund cannot be predicted, and is dependent on the ability of Millennium Management LLC as the General Partner to choose investments that appreciate in value, as well as other factors not within the General Partner's control. There can be no assurance that the General Partner will succeed in choosing investments that appreciate in value. Furthermore, the General Partner is dependent on the services of its key personnel. If the services of any such person were to become unavailable, the Reference Fund's performance could be negatively affected.

The Issuer and its affiliates are not in a position to protect the Holders against negligence, fraud and misrepresentation by the General Partner. Holders do not have and are not entitled to any beneficial Interests in the Reference Fund or its components and as such, have no recourse against the General Partner, either contractually or statutorily. Furthermore, as a practical matter, it may be difficult to bring an action, or to seek to enforce a judgment obtained in an action, against any of the aforementioned entities.

**Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability**

The Warrants will not be listed on an organized securities exchange in the United States or abroad. There is currently no secondary market for the Warrants. Even if there is a secondary market, it is not likely to provide significant liquidity. Accordingly, it will be difficult to obtain reliable information about the value of the Warrants at any given time as such value will reflect many factors and cannot be predicted.

The Placement Agent intends, but is not obligated, to buy and sell the Warrants. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI. The Market Making Request must be received by the Placement Agent no later than 105 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction. The Placement Agent and its affiliates are not obligated to create a secondary market or to continue such activity once it has begun. If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates. Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge. As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost of the Warrants.

In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs. Further, to the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2010 but on or after July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value. Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time. As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than the Holders' original offering price.

The Warrants are subject to substantial restrictions on transferability. The Warrants will not be registered under the Securities Act or the securities laws of any state or any other jurisdictions and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found. The Warrants may be sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons who are also Qualified Purchasers for purchase in Offshore Transactions. In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter in the form of Exhibit II attached hereto and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act. Investors must thus be prepared to bear the risk of owning Warrants for an extended period of time.

**Warrants are not Registered**

The Warrants are not registered, and the Issuer does not intend to register the Warrants, under the Securities Act or under any state securities laws. Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission or regulatory authority has recommended or approved the Warrants, nor has any such commission or regulatory authority reviewed or passed upon the accuracy or adequacy of this Memorandum.

**Secondary Trading of Warrants Held Less than 24 Months is Subject to a Penalty**

Pursuant to the terms of the Confidential Memorandum of the Reference Fund, withdrawals by Reference Holders of Interests held for less than 12 months may be subject to a withdrawal fee equal to 4% of the amount withdrawn. Withdrawals by Reference Holders of Interests held for less than 24 months, but more than 12 months, may be subject to a withdrawal fee equal to

2% of the amount withdrawn.  To the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request for which the Placement Agent will determine a market making price prior to July 1, 2010 but on or after July 1, 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value.  Such 4% or 2% reduction of the net asset value of the Fund corresponds to a 4% or 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with redemption of its Interests at a similar point in time.

**Investors in Warrants will be Exposed to the Issuer's Credit Risk**

The Warrants will constitute general unsecured obligations of the Issuer, Lehman Brothers Holdings Inc.  If the Issuer is unable to meet its obligations as they come due, a Holder could suffer a complete loss of its investment.  Payment of any amounts due under the Warrants will not be guaranteed by any corporate or governmental entity.  The claims of Holders, if any, will not be secured by Interests in the Reference Fund or otherwise, and no amount will have been placed or will be placed in escrow to satisfy any such claims.  Moreover, in the event the Issuer becomes the subject of voluntary or involuntary bankruptcy proceedings, investors may lose the whole of their investment, whether a cash settlement amount is or becomes due upon maturity or termination, or otherwise, and will not have a claim for any Interests in the Reference Fund.

Actual or anticipated changes in the Issuer's credit ratings, financial condition or results may affect the market value of the Warrants.

**The Warrants do not Confer Beneficial Ownership in the Reference Fund or its Affiliates**

A Warrant represents a notional investment in the Reference Fund.  The term "notional" is used because there is no actual pool of Reference Fund Interests to which the Holder has recourse.  The Reference Fund is merely a reference used to calculate the value of the Warrants.  The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund or the Master Fund.  Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund or the Master Fund.  An investment in the Warrants confers no indicia of ownership in the Reference Fund or the Master Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund, the General Partner or any affiliates of the foregoing.

There are no actual investments in the Reference Fund underlying the Warrants or to which a Holder would have recourse.  The Issuer, or an affiliate, may, in order to hedge its obligations under the Warrants, purchase Interests in the Reference Fund but it is under no obligation to do so.  Such Interests, if any, are the separate property of the Issuer and do not secure or otherwise underlie the Warrants.  For example, in the event of a failure to pay the Warrant Payment Amount by the Issuer under the Warrants, Holders will have no beneficial interest in or claim to any such Interests.  Accordingly, any claims of Holders pursuant to the terms and conditions of such Warrants will be pari passu with all other unsecured, unsubordinated, unconditional creditors of the Issuer.

**Your Investment Will Be "New Issues" Restricted**

Your investment in the Warrants will be "new issues" restricted.  The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.  Rule 2790 prohibits certain persons from receiving the economic benefit of new issues.  Each of the Issuer and any affiliate that may be entering into transactions to hedge the Issuer's exposure under the Warrants is a Restricted Person under Rule 2790 and, accordingly, any investment by any of them in limited partnership interests of the Reference Fund will be treated as though it had been made by a Restricted Person.  A "Restricted Person" includes most associated persons of a U.S. broker-dealer, most owners and affiliates of a broker-dealer and certain other classes of persons.

**ERISA Limitations**

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law.  Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

**Hedging Transactions by the Issuer**

The Issuer and its affiliates, including Lehman Brothers Inc., may from time to time buy or sell Interests in the Reference Fund or enter into derivative instruments or other instruments which track or are related to the Reference Fund for their own accounts in connection with their normal business practices or in connection with hedging of the Issuer's obligations under the Warrants, including on the Valuation Date.  Although the Issuer has no reason to believe that such activities had or will have a material impact on the value of the Reference Fund, the Issuer cannot give any assurance that it did not, or in the future will not, affect such value as a result of such activities.

**Adverse Economic Interests to Holders**

As described herein, the Issuer has appointed Lehman Brothers Inc. as the Calculation Agent for the Warrants.  The Calculation Agent will be solely responsible for the determination and calculation of the Warrant Payment Amount (including the components thereof) or the Early Termination Amount and any other determinations and calculations in connection with the Warrants.  Because the Calculation Agent is an affiliate of the Issuer, the Calculation Agent may have economic interests adverse to those of the Holders, including with respect to certain determinations and judgments that the Calculation Agent must make in determining the Warrant Payment Amount or the Early Termination Amount or whether an Early Termination Event or

Potential Adjustment Event has occurred.  An investor might disagree with such determination and might be adversely affected by such early termination.

## Certain Business Activities May Create Conflicts of Interest with Holders

The Issuer or its affiliates, including Lehman Brothers Inc., (collectively, "Lehman Brothers") will be engaged in businesses related and unrelated to the Reference Fund.  Lehman Brothers is a major participant in the global finance, equity and fixed income markets.  As such, Lehman Brothers may be actively engaged in transactions in the same securities and instruments in which the assets of the Reference Fund may be invested.  While informational barriers among business units at Lehman Brothers have been established, certain business units at Lehman Brothers may purchase or sell the securities of, or otherwise invest in or finance, companies in which the Reference Fund has an interest.  Lehman Brothers may also have proprietary interests in, and may manage or advise, accounts or investment funds (collectively, "LB Accounts") which may engage in transactions in the same types of securities and instruments in which the Reference Fund is transacting.  Lehman Brothers is not under any obligation to share any investment opportunity, idea or strategy with the Reference Fund.  As a result, Lehman Brothers may compete with the Reference Fund for appropriate investment opportunities.

The proprietary trading activities or portfolio strategies of Lehman Brothers, or the activities or strategies used for LB Accounts managed by Lehman Brothers (collectively, "Lehman Discretionary Trading"), could conflict with the transactions and strategies employed on behalf of the Reference Fund and could affect the prices and availability of the securities and instruments in which the Reference Fund seeks to invest.  Lehman Discretionary Trading transactions will be executed independently of the Reference Fund's transactions, and thus at prices or rates that may be more or less favorable.  Companies whose securities are held by the Reference Fund may have publicly or privately traded securities in which Lehman Brothers is an investor or makes a market.  Lehman Discretionary Trading will be carried out without reference to positions held by the Reference Fund and may have an effect on the value of the positions so held, or may result in Lehman Brothers having an interest in securities adverse to that of the Reference Fund (e.g., Lehman Brothers may have a short position in a security held long by the Reference Fund).

Lehman Brothers may also create, write or issue other derivative instruments with respect to which the underlying securities or instruments may be those in which the Reference Fund invests or which may be based on the performance of the Reference Fund.  Certain of such derivative instruments could require Lehman Brothers or Lehman Brothers' derivative counterparty to enter into positions in such securities or instruments that could have a negative effect on the value of the Reference Fund's portfolio.  Lehman Brothers may keep any profits, commissions, and fees accruing to it in connection with such activities.

The Issuer or its affiliates may receive fees in connection with activities relating to the Warrants, including hedging of the Issuer's obligations under the Warrants.

Any of these business activities or relationships may affect the value of the Reference Fund and thus could be adverse to a Holder's return on the Warrants.  Any prospective purchaser of the Warrants should undertake an independent investigation of the Reference Fund as in its

judgment is appropriate to make an informed decision with respect to an investment in the Warrants.

**Investment Suitability**

The Warrants are not typical, straightforward debt securities.  Prospective investors should determine whether an investment in the Warrants is appropriate in their particular circumstances and should consult with their legal, business, and tax advisors to determine the consequences of an investment in the Warrants and to arrive at their own evaluation of the investment.

Investment in the Warrants is only appropriate for investors who:

- Have the requisite knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Warrants;

- Have access to, and knowledge of, appropriate analytical tools to evaluate such merits and risks in the context of their financial situation;

- Are capable of bearing the economic risk of an investment in the Warrants for an indefinite period of time; and

- Recognize that it may not be possible to dispose of the Warrants prior to their maturity.

Prospective investors in the Warrants should not rely on any communication (written or oral) of the Issuer, Placement Agent or the Transfer Agent as investment advice or as a recommendation to invest in the Warrants, it being understood that information and explanations related to the terms and conditions of these Warrants shall not be considered to be investment advice or a recommendation to invest in the Warrants.  No communication (written or oral) received from the Issuer, Placement Agent or the Transfer Agent shall be deemed to be an assurance or guarantee as to the expected results of an investment in the Warrants.

**Transfer Restrictions**

The Warrants are subject to transfer restrictions.  Consequently, the liquidity of the Warrants may be significantly impaired.

**Income Tax Rules Related to the Warrants are Complex**

The income tax rules relevant to the Warrant are quite complex and may result in significant and possibly adverse tax consequences.  An investor should consult with its own tax adviser in order to understand fully the federal, state and local income tax consequences of an investment in this Warrant.

**THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THIS TRANSACTION.  ANY PROSPECTIVE PURCHASER SHOULD CONSULT WITH ITS OWN LEGAL, TAX AND FINANCIAL ADVISERS BEFORE DECIDING TO INVEST IN THIS TRANSACTION.**

## PLAN OF DISTRIBUTION

In order to purchase Warrants, investors will be required to execute and deliver to the Placement Agent a representation letter (available at the offices of Lehman Brothers Inc. at 745 Seventh Avenue, New York, New York, 10019, Attn: Structured Equity Products, the form of which is attached hereto as Exhibit I); the Warrants will be subject to transfer restrictions. Please refer to *"Suitability Requirements and Transfer Restrictions"* below.

The Issuer will issue 100,000 U.S. dollar Warrants for a Total Cost, including selling compensation, of $252.25 per Warrant. The Issuer will receive $232.25 of the Total Cost as compensation for issuing the Warrants. The balance of the Total Cost, or $20.00 per Warrant, is payable to the Placement Agent as selling compensation. The Issuer and its affiliates will earn the standard fees related to risk-management of products of this type.

The Placement Agent and/or certain other placement agents will distribute the Warrants from time to time in one or more transactions at a fixed price or prices, which may be changed, or at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices, subject to withdrawal, cancellation or modification of the offer by the Issuer, the Placement Agent and/or certain other placement agents.

The Warrants will only be sold in accordance with local sale restrictions.

Prior to the offering, there has been no market for the Warrants. No assurance can be given as to the development of any market, or the liquidity of any market that may develop, for the Warrants. The Placement Agent intends to make a market in the Warrants, but it is under no obligation to do so and such market-making could be discontinued at any time without notice, at its sole discretion. If the Warrants are traded, they may trade at a discount from their initial offering prices, depending on prevailing interest rates, the market for similar securities, the Issuer's performance and other factors.

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates. Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge. As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost.

The Issuer and certain of its affiliates currently perform, and will in the future perform, various investment and commercial banking services from time to time for the Reference Fund, the Master Fund, the General Partner and their affiliates. See *"Risk Factors – Certain Business Activities May Create Conflicts of Interest with Holders."*

## SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS

The Warrants have not been registered, and the Issuer has no intention of registering any sales of the Warrants, under the Securities Act or any other applicable securities laws. Thus, the Warrants may not be offered or sold within the United States or to, or for the account or benefit

of, United States persons except in compliance with the registration requirements of the Securities Act and any other applicable securities laws, or pursuant to an exemption from registration under the Securities Act and any other applicable securities laws, or in a transaction not subject to such laws.   Accordingly, the Warrants are being offered and sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons for purchase in Offshore Transactions who are also Qualified Purchasers.

Any sales or transfers of Warrants in violation of the transfer restrictions set forth herein are prohibited and will be treated by the Issuer and the Transfer Agent as having no legal effect.  The Issuer will not honor such sale or transfer and will have the right, at any time, at the expense and risk of the Holder of any Warrants held by or on behalf of a person who is not an Accredited Investor who is also a Qualified Purchaser at the time it purchases such Warrants, to (1) redeem such Warrants, in whole or in part, at the then-current value per Warrant as determined by the Calculation Agent or (2) require such holder to sell such Warrants to a qualifying transferee who satisfies all of the requirements set forth in these transfer restrictions.

Transfers of Warrants may be made by delivery of the relevant certificate or certificates evidencing ownership of the Warrants to the Transfer Agent together with the form of transfer in writing endorsed thereon and the transferee representation letter duly completed and executed by the transferee.

Each initial purchaser and each transferee will represent, warrant and agree as follows:

(i)  It is either (i) an Accredited Investor who is also Qualified Purchasers or (ii) a Non-U.S. Persons purchasing the Warrants in Offshore Transactions who is also Qualified Purchasers.

(ii) If it is a Non-U.S. Person, that prior to the expiration of the distribution compliance period, it will not offer, sell, pledge or otherwise transfer such Warrants except (1) in an Offshore Transaction in accordance with the provisions of Rule 903 or Rule 904 of Regulation S or (2) pursuant to any available exemption from registration under the Securities Act, in each case in accordance with any applicable securities law of any State of the United States or any other jurisdiction.   The term "distribution compliance period" means the 40-day period commencing on the later of the commencement of the offering or the date the Warrants were originally issued.

(iii) It is purchasing at least the minimum initial investment of Warrants specified herein, unless the Placement Agent permits the purchase of a smaller number of Warrants.

(iv) In connection with the purchase of such Warrants:  (A) it has received a copy of this Memorandum, the Confidential Memorandum of the Reference Fund and any other information it deems necessary to make an investment decision; (B) neither the Issuer nor its affiliates make any representations or warranties with respect to the accuracy, validity or completeness of the information contained in the Confidential Memorandum of the Reference Fund, (C) it has such knowledge and experience in financial and business matters so as to be able to evaluate the merits and risks of an investment in the Warrants and have sufficient net worth and/or annual income to hold the Warrants for an indefinite period of time and to bear the risk of losing its entire investment; and (D) it is acquiring the Warrants as principal solely for its own account, or

for the accounts of its discretionary advisory clients, in each case for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.

(v) On each date from the date on which the investor acquires such Warrants through and including the date on which it disposes of its interests in such Warrants that it is not, and it is not acquiring Warrants with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of any such employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law.  Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

(vi) It acknowledges that (A) the Warrants have not been, nor will be, registered under the Securities Act or any state securities or blue sky laws or the laws of any other jurisdiction, and the Warrants will bear a legend to such effect and (B) none of the Warrants nor any interest or rights therein may be transferred in the absence of such registration under the Securities Act or an exemption from the registration requirements thereof or such other applicable laws, and the purchaser has informed itself about and will observe all restrictions on transfer of the Warrants under such laws that may be applicable to it.

(vii)       If it is a Non-U.S. Person, it understands that prior to the expiration of the distribution compliance period, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws.

(viii) The Purchaser agrees to treat the Warrants in accordance with the treatment described in "*Certain U.S. Federal Income Tax Considerations*" section of this Memorandum, unless otherwise required by law, for federal income tax purposes.

Prior to any purchase of Warrants on the Issue Date, each purchaser of Warrants must represent in writing, by completing, signing and delivering to the Placement Agent in the form of investor representation letter attached hereto as Exhibit I, that the Warrants are being acquired for its own account, for investment purposes and not with a view for resale and that such investor otherwise meets the suitability standards referred to above.  In connection with any subsequent sale or transfer of a Warrant, each prospective transferee will be required to complete, sign and deliver to the Placement Agent or the Issuer and the Transfer Agent, as applicable, the form of transferee representation letter attached hereto as Exhibit II. Before any Warrants may be offered, sold, pledged or otherwise transferred, an initial investor or a subsequent transferee may be required to provide the Transfer Agent with a written certification as to compliance with applicable securities laws.

The Issuer has the right to reject a subscription for the purchase of Warrants for any reason or for no reason.

The Warrants are being offered to qualified investors only in such jurisdictions where offers and sales of Warrants are permitted and only in compliance with all applicable laws and regulations.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This disclosure is limited to the U.S. federal income tax issues addressed herein. Additional issues may exist that are not addressed in this disclosure and that could affect the U.S. federal income tax treatment of the Warrants. This tax disclosure was written in connection with the promotion or marketing by the Issuer of the Warrants, and it cannot be used by you for the purpose of avoiding penalties that may be asserted against you under the Internal Revenue Code or any state or local tax laws. You should seek advice based on your particular circumstances from an independent tax adviser.

In the opinion of Cadwalader, Wickersham & Taft LLP, our special tax counsel, the following are the material U.S. federal income tax consequences of the purchase, ownership and disposition of the Warrants. This discussion applies to you only if you are an initial holder of a Warrant and you hold such Warrant as a capital asset within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code").

This summary does not address all aspects of the U.S. federal income taxation of the Warrants that may be relevant to you in light of your particular circumstances, nor does it address all of your tax consequences if you are a taxpayer that is subject to special treatment under the U.S. federal income tax laws, such as:

•   a financial institution;

•   a tax exempt organization;

•   a dealer in securities or foreign currencies;

•   a person that does not write, sell, or grant (directly or indirectly) any put option with respect to the Reference Fund or any interest therein or asset thereof or holds the Warrants as part of a hedging transaction, straddle, synthetic security, conversion transaction, or other integrated transaction, or enters into a "constructive sale" with respect to the Warrants or a "wash sale" with respect to your Warrants or any Reference Fund Interests;

•   a U.S. Holder (as defined below) whose functional currency is not the U.S. dollar;

•   a trader in securities who elects to apply a mark to market method of tax accounting;

•   a partnership or other entity classified as a partnership for United States federal income tax purposes; or

•   a person that is not a U.S. Holder, as defined below.

This summary is based on the Code, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date of this Memorandum, changes to any of which subsequent to the date of this Memorandum may affect the tax consequences

described herein. If you are considering the purchase of a Warrant, you should consult your own tax adviser concerning the application of the United States federal income tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdictions.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds a Warrant, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and upon the activities of the partnership. Partners of partnerships holding Warrants should consult their own tax advisers.

A "U.S. Holder" is a beneficial owner of a Warrant that, for United States federal income tax purposes, is:

- a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any political subdivision thereof;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if a court within the United States is able to exercise primary supervision over its administration, and one or more United States persons have the authority to control all of its substantial decisions.

A "Non-U.S. Holder" is a beneficial owner of the Warrants that is not a U.S. Holder.

An individual may, subject to certain exceptions, be deemed to be a resident of the United States by reason of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year (counting for such purposes all of the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year).

Further, this summary does not address any investor that is related to, employed by, or affiliated with, the Reference Fund, the Master Fund or the General Partner or to any employee of the Issuer or its affiliates that is involved in management of assets of, or in supervising or administrating, the Reference Fund. In addition, this discussion applies only to U.S. Holders that do not have any prearrangement with the Reference Fund regarding the purchase of an interest in the Reference Fund upon lapse, settlement or other termination of the Warrants.

## Tax Treatment of Warrants

Based on certain factual representations provided to Cadwalader, Wickersham & Taft LLP by us, Cadwalader, Wickersham & Taft LLP is of the view that each Warrant should be treated for U.S. federal income tax purposes as a call option with respect to the Reference Fund. While other treatments of the Warrants could be asserted by the Internal Revenue Service (the "IRS") in respect of the Warrants, as discussed below, the Issuer intends and, pursuant to the terms of the Warrants each U.S. Holder agrees, in the absence of an administrative determination or

judicial ruling to the contrary, to characterize the Warrants as call options with respect to the Reference Fund, for U.S. federal income tax purposes and the following discussion assumes that this treatment of the Warrants is respected.

**Taxation of U.S. Holders**

*Tax Treatment Prior to Expiration.* Under existing law, you should not be required to recognize taxable income over the term of your Warrants prior to the sale, exchange, redemption, settlement, lapse, exercise, maturity or other taxable disposition thereof.

*Sale, Exchange, Redemption, Exercise or Lapse of the Warrants.* Upon the sale, exchange, redemption, exercise, lapse or other taxable disposition of a Warrant (including the settlement of a Warrant at maturity), you should recognize gain or loss in an amount equal to the difference between the amount realized and your tax basis in the Warrant, which should equal the amount you paid to acquire the Warrant. In general, subject to the PFIC rules discussed below, such gain or loss should be long term capital gain or loss if you held the Warrant for more than one year at such time. Additionally, the deductibility of capital losses is subject to further limitations under the Code and U.S. Holders are encouraged to consult their own tax advisors regarding their ability to use any capital losses arising from ownership of the Warrants in light of their particular circumstances.

*Possible Treatment of the Warrants as Interests in One or More PFICs.* In general, a U.S. taxpayer that holds an option to acquire stock in a "passive foreign investment company" (a "PFIC") is required to report any gain on the disposition of the option as ordinary income, rather than capital gain, as if the gain had been earned ratably over each day in the taxpayer's holding period (or certain portion thereof), and the taxpayer is subject to tax on such gain at the highest ordinary income tax rate for each taxable year of the taxpayer's holding period for the option, other than the current year, regardless of the rate otherwise applicable to the taxpayer. The taxpayer is also liable for a non-deductible interest charge at the federal underpayment rate as if such tax liabilities had been due with respect to each prior year of the taxpayer's holding period. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of a PFIC option as security for a loan may be treated as a taxable disposition of a PFIC option. In addition, a stepped-up basis in a PFIC option will not be available upon the death of an individual investor.

While the Reference Fund will not be classified as a PFIC, a U.S. Holder may be subject to the PFIC rules with respect to the Warrants to the extent that the Reference Fund directly or indirectly invests in PFICs or any investments of the Reference Fund are treated as PFICs. However, even if the Reference Fund were to acquire an interest in a PFIC, certain elections made by the Reference Fund for U.S. federal income tax purposes may eliminate any PFIC related exposure in respect of the Warrants. More specifically, even if the Reference Fund were to own an interest in a PFIC, such interest should not cause the Warrant to be treated as a PFIC option if the Reference Fund makes a timely "qualified electing fund" election with respect to such PFIC interest or elects to mark to market all of its trading activity under section 475 of the Code. We understand from the Confidential Memorandum of the Reference Fund that the Master Fund has made such an election under section 475, although we have not verified the existence or validity of such election. Nevertheless, if the Reference Fund were to acquire a non-qualified electing fund PFIC interest directly or if the Master Fund were to acquire such an

interest and identify it for U.S. federal income tax purposes as outside of its trading activity (or alternatively the IRS were to treat it as outside of such trading activity or otherwise treat the Master Fund's election under section 475 as invalid), then the application of the PFIC rules to the Warrants would be unclear and the IRS might assert that the Warrants constitute a PFIC option subject to the above described rules.  Prospective U.S. Holders should consult their own tax advisors regarding the potential application of the PFIC rules to their ownership and disposition of the Warrants.

**Possible Alternative Tax Treatments of an Investment in Warrants**

Due to the absence of authorities that directly address the proper treatment of the Warrants, no assurance can be given that the IRS will accept, or that a court will uphold, the treatment of the Warrants described above. If the IRS were successful in asserting an alternative treatment of the Warrants, the amount, timing and character of income, gain or loss on your Warrants could differ materially from our description herein. For example, one alternative U.S. federal income tax treatment of the Warrants might require you to include amounts in income during the term of the Warrants on the theory that you own an equity interest in the Reference Fund, either directly or through a partnership with the Issuer. Other treatments could result in the recharacterization of some or all of any long term capital gain you realize as ordinary income, together with the imposition of an interest charge.  Other tax treatments are also possible. Accordingly, you should consult your tax adviser regarding the existence, probability and consequences of potential IRS recharacterizations of the Warrants.

**IRS Revenue Ruling 2008-1 and IRS Notice 2008-2**

The IRS recently ruled in Revenue Ruling 2008-1 that an exchange-traded note that was linked to foreign currency is debt for U.S. federal income tax purposes, even though the holder's initial investment and repayment are made in US. dollars and the holder might get back fewer dollars that it invested.  Treatment of the exchange-traded notes resulted in current accrual of interest on the notes.  At the same time the IRS announced that it and the Treasury Department are considering whether holders of prepaid forward or financial contracts should be required to accrue income on a current basis over the term of the transaction, regardless of whether any payments are made prior to maturity, even if such contracts are not otherwise treated as indebtedness for U.S. federal income tax purposes.  In addition, the Notice indicates that the IRS and Treasury Department are considering related issues, including, among others, whether gain or loss from such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, whether the tax treatment of such instruments should vary depending on the nature of the underlying asset, and whether such instruments should be subject to special "constructive ownership rules" contained in Section 1260 of the Code.  Legislation has also been proposed that would require holders of certain prepaid forward contracts to accrue income during the term of the transaction.  It is not possible to predict what changes, if any, will be adopted, or when they will take effect.  In the event that any such treatment is adopted and extended to call options such as the Warrants, a U.S. Holder may be required to accrue ordinary income over the term of the Warrants and the amount, timing and character of income, gain or loss with respect to the Warrants may otherwise be affected, possibly with retroactive effect.  Prospective investors in the Warrants are urged to consult with

their tax advisors concerning the impact of Revenue Ruling 2008-1 and the Notice on any investment in the Warrants.

## Tax Treatment of Non-U.S. Holders

Subject to the discussion below of backup withholding, in general, a Non-U.S. Holder will not be subject to U.S. federal withholding tax with respect to amounts received, if any, with respect to a Warrant, assuming that: (i) the Warrant is not held in connection with a U.S. trade or business or, in the case of a resident of a country that has an income tax treaty with the United States, such Warrant is not attributable to a permanent establishment (or in the case of an individual, a fixed place of business) in the United States; (ii) in the case of an individual, the Non-U.S. Holder is not present in the United States for 183 days during the taxable year and certain other conditions are met; and (iii) such Non-U.S. Holder is not subject to the rules applicable to certain former citizens and residents of the United States. However, it is possible that future guidance or legislation, such as discussed above regarding IRS Notice 2008-2, could subject Non-U.S. Holders to U.S. federal withholding tax on any deemed income accrual from the Warrants.

## Backup Withholding and Information Reporting

In general, information returns may be filed with the IRS in connection with payments of proceeds from a sale, exchange or settlement of a Warrant. In addition, a U.S. Holder who is not a corporation may be subject to U.S. backup withholding tax on these payments unless it provides its taxpayer identification number to the paying agent or otherwise establishes an exemption from backup withholding. If you are a Non-U.S. Holder, you will not be subject to backup withholding if you comply with certain certification procedures to establish that you are not a United States person or otherwise establish an exemption. The amount of any backup withholding imposed on a payment to a U.S. Holder may be allowed as a credit against its U.S. federal income tax liability and may entitle it to a refund, provided the required information is furnished to the IRS.

The tax consequences of owning a Warrant are unclear. You should consult your own tax adviser regarding the tax consequences of purchasing, owning and disposing of a Warrant, including the tax consequences under state, local, foreign and other tax laws and the possible effects of changes in United States federal or other tax laws.

## CERTAIN BENEFIT PLAN CONSIDERATIONS

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

## USE OF PROCEEDS

The Issuer estimates that it will receive net proceeds from this offering of approximately $23,225,000, after deducting estimated offering expenses.  The Issuer plans to use some of the net proceeds to effect purchases (in each case through an affiliate or affiliates of the Issuer) of Interests in the Reference Fund in order to hedge its obligations under the Warrants.  However, it is not required to hedge those obligations.

Such Interests purchased, if any, will be the separate property of the Issuer, or such affiliate or affiliates of the Issuer, and do not secure or otherwise underlie the Warrants; and holders of Warrants have no beneficial interest in or claim over such assets.

The remainder of the proceeds will be used for general corporate purposes.

## LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Holdings Inc. (together with its consolidated subsidiaries hereinafter referred to as the "Company" unless the context otherwise requires), an innovator in global finance and one of the leading global investment banks, serves the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide. The Company provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services.  The Company's global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

Through the Company's subsidiaries, it is a global market-maker in all major equity and fixed income products.  To facilitate its market-making activities, the Company is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

The Company's principal business activities are investment banking, capital markets and investment management which, by their nature, are subject to volatility primarily due to changes in interest and foreign exchange rates, valuation of financial instruments and real estate, global economic and political trends and industry competition.  Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, the Company continues to build on its customer flow business model, which is based on its principal focus of facilitating client transactions in all major global capital markets products and services.  The Company generates customer flow revenues from institutional, corporate, government and high-net-worth customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios and diversify risks across different market cycles; (iii) originating loans for distribution to clients in the securitization or principal market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of the Company's customer flow activities, it maintains inventory positions of

varying amounts across a broad range of financial instruments. In addition, it also takes proprietary investment positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. The Company believes its customer flow orientation helps to mitigate overall revenue volatility.

LBH was incorporated in Delaware on December 29, 1983. LBH's principal executive offices are located at 745 Seventh Ave., New York, NY 10019. LBH is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the SEC. Such reports and other information may be inspected and copied at the public reference facilities maintained by the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549, and copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. In addition, information provided to or filed with the SEC electronically can be accessed through a website maintained by the SEC. The address of the SEC's website is http://www.sec.gov. Information provided to or filed with the SEC by LBH pursuant to the Exchange Act can be located by reference to Commission file number 1-9466. Such reports and other information may also be inspected at the Information Center of the New York Stock Exchange Inc., 20 Broad Street, New York, New York 10005 and at the American Stock Exchange, 86 Trinity Place, New York, New York 10006.

The annual report of LBH on Form 10-K for the year ended November 30, 2007, the quarterly reports on Form 10-Q dated October 10, 2007, and the current reports of LBH on Form 8-K dated December 3, 2007, December 4, 2007 (two filings), December 5, 2007, December 6, 2007, December 7, 2007, December 10, 2007, December 11, 2007, December 13, 2007 (three filings), December 17, 2007 (two filings), December 20, 2007, December 21, 2007, December 28, 2007, January 4, 2008 (two filings), January 15, 2008 (two filings), January 16, 2008, January 17, 2008 (two filings), January 23, 2008, January 29, 2008 (two filings), February 4, 2008 (three filings), February 5, 2008, February 6, 2008 (two filings), February 8, 2008, February 11, 2008, February 12, 2008 (three filings), February 13, 2008, February 15, 2008, February 19, 2008 (two filings), February 20, 2008, February 22, 2008 (two filings), February 25, 2008, February 26, 2008, February 27, 2008, February 28, 2008, March 3, 2008, March 4, 2008, March 5, 2008, March 11, 2008 (two filings), March 12, 2008, March 13, 2008, March 18, 2008, March 21, 2008, March 24, 2008, and March 26, 2008 (two filings), which contain financial information concerning LBH and its subsidiaries on a consolidated basis and other information, have been filed with the SEC and otherwise publicly distributed. Such reports of LBH and subsequent reports of LBH filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date hereof are incorporated herein by reference.

The Company operates in three business segments: Investment Banking, Capital Markets and Client Services. Financial information concerning the Company for the fiscal years ended November 30, 2007, November 30, 2006, and November 30, 2005, including the amount of net revenue contributed by each segment in such periods, is set forth in the Company's Consolidated Financial Statements and the Notes thereto in its 2007 annual report on Form 10-K, which is incorporated by reference herein. Information with respect to operations by segment and net revenues by geographic area is set forth under the captions *Management's Discussion and Analysis of Financial Condition and Results of Operation—Business Segments*" and "—

*Geographic Diversification*" and in Note 19 of the Notes to Consolidated Financial Statements contained in the annual report on Form 10-K, which, as noted above, is incorporated by reference herein.

Some of the statements contained in this Memorandum and the documents incorporated herein by reference, including those relating to LBH's strategy and other statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are not historical facts but instead represent only LBH's expectations, estimates and projections regarding future events. These statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include market, credit or counterparty, liquidity, legal and operational risks. Market risks include changes in interest and foreign exchange rates and securities valuations, global economic and political trends and industry competition. LBH's actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements. LBH undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

**Each prospective investor is encouraged to obtain and review the information referred to above, and it is recommended that no prospective investor make a decision to purchase a Warrant until such review is completed.**

## THE REFERENCE FUND

*This Memorandum is not an offer to sell and it is not an offer to buy interests of the Reference Fund. All disclosures contained in this Memorandum regarding the Reference Fund have been provided by Millennium USA LP. Substantially all of the capital of the Reference Fund generally is invested through a "master-feeder" structure in Millennium Partners, L.P., a Cayman Islands exempted limited partnership (the "Master Fund"). None of the Issuer nor any of its affiliates takes any responsibility for the accuracy or completeness of such information.*

*Attached as Exhibit V is the Confidential Memorandum of Millennium USA LP.*

**EXHIBIT 2**

## 140,000

## 3 2/3-YEAR CASH-SETTLED CALL WARRANTS

### linked to the

### PERFORMANCE OF

### D. E. SHAW OCULUS FUND

### ISSUED BY LEHMAN BROTHERS HOLDINGS INC.

### CONFIDENTIAL

### PRIVATE PLACEMENT MEMORANDUM

**This private placement memorandum is not to be shown or given to any person other than the person who directly received it from the Placement Agent (as defined below) and is not to be copied or otherwise reproduced in any manner whatsoever.  Failure to comply with this directive can result in a violation of the Securities Act of 1933, as amended (the "<u>Securities Act</u>").**

**The warrants have not been and will not be registered under the Securities Act, or any state securities law.  The warrants are exempt from registration under Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws.  The warrants may be offered, sold and otherwise transferred only to persons who are "accredited investors" as defined in Rule 501 of the Securities Act who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 (the "<u>Investment Company Act</u>"), who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a warrant.**

**The warrants are being offered by Lehman Brothers Holdings Inc. (the "<u>Issuer</u>") through Lehman Brothers Inc.  as placement agent (the "<u>Placement Agent</u>").  The Issuer reserves the right to withdraw, cancel or modify such offers and to reject orders in whole or in part.  The Placement Agent will have the right to reject in whole or in part any offer to purchase warrants.**

**For more information about D. E. Shaw Oculus Fund, L.L.C. (the "<u>Reference Fund</u>"), D. E. Shaw Oculus Portfolios, L.L.C., and D. E. Shaw Oculus International Fund (collectively with the Reference Fund and subsidiaries of any of the foregoing, "Oculus Fund") as well as about D. E. Shaw & Co., L.P. ("<u>DESCO L.P.</u>"), which acts as the investment adviser to the Reference Fund, and D. E. Shaw & Co., L.L.C. ("<u>DESCO L.L.C.</u>"), which is the managing member of the Reference Fund, prospective investors are encouraged to review the Confidential Private Offering Memorandum of the Reference Fund, attached as Exhibit V to the private placement memorandum.  Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests the Reference Fund.  Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information.  Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund.  None of DESCO L.P., DESCO L.L.C., the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.**

**The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund or Oculus Fund.  Neither the Issuer nor its affiliates or agents is offering any interest in the Reference Fund.  An investment in the Warrants confers no indicia of ownership in the Reference Fund or Oculus Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, Oculus Fund, DESCO L.P., DESCO, L.L.C., or D. E. Shaw Securities, L.L.C. (the placement agent for the Reference Fund) or affiliates of the foregoing.**

# LEHMAN BROTHERS INC.

Dated as of August 1, 2007

# TABLE OF CONTENTS

Page

SUMMARY OF PRINCIPAL TERMS ..................................................................................1
   Issuance .......................................................................................................................1
   Exercise and Maturity ................................................................................................2
   Warrant Payment Amount ..........................................................................................2
   Liquidity .....................................................................................................................3
   In-Kind Distributions .................................................................................................4
   Early Termination .......................................................................................................4
   Potential Adjustment Event ........................................................................................8
   Transfer Agent ............................................................................................................9
   Calculation Agent .......................................................................................................9
   Calculations ...............................................................................................................10
   Form and Transfer .....................................................................................................10
   Ratings .......................................................................................................................10
RISK FACTORS ...............................................................................................................11
   Holders May Lose Their Entire Investment ..............................................................11
   Limited Trading History on the Performance of the Reference Fund ......................11
   Holders Should Investigate the Reference Fund as if Investing Directly ................12
   Risks Relating to the Reference Fund, DESCO L.L.C. or DESCO L.P. ..................12
   Related Ownership of the Issuer and the Reference Fund .........................................12
   The Issuer is Not Responsible for Disclosure of Information by the Reference Fund
      and Has No Obligation to Disclose Information About the Reference Fund After
      the Date of this Memorandum ...............................................................................12
   Value of Warrants Influenced by Many Unpredictable Factors ...............................13
   Specific Investment and Trading Risks Relating to the Reference Fund .................14
   Risks Relating to Hedge Funds and the Reference Fund ..........................................14
   Your Warrants Could Be Terminated Early ..............................................................16
   Reliance on DESCO L.P. ..........................................................................................16
   Secondary Trading of the Warrants is Limited and They are Subject to Substantial
      Restrictions on Transferability .............................................................................17
   Warrants are not Registered ......................................................................................18
   Investors in Warrants will be Exposed to the Issuer's Credit Risk ..........................18
   The Warrants do not Confer Beneficial Ownership in the Reference Fund or its
      Affiliates ...............................................................................................................18
   Your Investment Will Be 'New Issues' Restricted ...................................................19
   ERISA Limitations ....................................................................................................19
   Hedging Transactions by the Issuer ..........................................................................19
   Adverse Economic Interests to Holders ....................................................................20
   Certain Business Activities May Create Conflicts of Interest with Holders ............20
   Investment Suitability ...............................................................................................21
   Transfer Restrictions .................................................................................................22
   Income Tax Rules Related to the Warrants are Complex ..........................................22
PLAN OF DISTRIBUTION ..............................................................................................22

SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS ....................................23
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ...........................................25
    Tax Treatment of Warrants......................................................................................26
    Taxation of U.S. Holders........................................................................................26
    Possible Alternative Tax Treatments of an Investment in Warrants ......................28
    Backup Withholding and Information Reporting ...................................................28
CERTAIN BENEFIT PLAN CONSIDERATIONS..............................................................28
USE OF PROCEEDS ...........................................................................................................29
LEHMAN BROTHERS HOLDINGS INC. .........................................................................29
THE REFERENCE FUND ....................................................................................................31

EXHIBITS

I:      Form of Investor Representation Letter................................................................I-1

II:    Form of Transferee Representation Letter...........................................................II-1

III:   Form of Issuing, Paying and Transfer Agency Agreement ...............................III-1

IV:   Form of Calculation Agency Agreement............................................................IV-1

V:    Confidential Private Offering Memorandum of D. E. Shaw Oculus Fund, L.L.C. ........ V-1

VI:   Form of Market Making Request.......................................................................VI-1

This Private Placement Memorandum (the "Memorandum") relates to the offer and sale by Lehman Brothers Holdings Inc. ("LBH" or the "Issuer"), in a transaction not involving a public offering, of 3 2/3-Year Cash-Settled Call Warrants Linked to the Performance of D.E. Shaw Oculus Fund (the "Warrants") as more fully described herein.

The obligations of the parties to the transaction contemplated herein are set forth in and will be governed by certain documents described herein; all of the statements and information contained herein are qualified in their entirety by reference to such documents. This Memorandum contains summaries of certain of these documents which LBH believes to be accurate, but for a complete description of the rights and obligations of the parties thereto, reference is hereby made to the actual documents, copies of which are attached hereto, and all such summaries are qualified in their entirety by this reference.

LBH will afford to prospective investors the opportunity to ask questions of, and receive answers from, LBH concerning the offering of the Warrants and to obtain additional relevant information which LBH possesses or can acquire without unreasonable effort or expense.

This Memorandum is based on information supplied by LBH and other sources identified herein and is being furnished on a confidential basis solely for the use of prospective investors in connection with the non-public offering of the Warrants.

The Warrants are being offered in negotiated transactions or otherwise and are offered when, as, and if issued, subject to prior sale or withdrawal, cancellation, or modification of any matters by counsel and certain other conditions. LBH may from time to time offer and sell other, similar Warrants with different terms to purchasers other than the offerees hereunder.

Subject to the provisions contained herein, the Warrants are being sold on behalf of LBH to persons described in the paragraph below by Lehman Brothers Inc. (the "Placement Agent").

The purchase of a Warrant offered hereby is suitable only for, and should be made only by, investors who are "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act ("Accredited Investors") who are also "qualified purchasers," as defined in Section 2(a)(51) of the Investment Company Act ("Qualified Purchasers") who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a Warrant.

THE INITIAL INVESTOR AND EACH TRANSFEREE SHALL REPRESENT THAT IT IS NOT, AND IT IS NOT ACQUIRING WARRANTS WITH THE ASSETS OF, AN EMPLOYEE BENEFIT PLAN SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), A PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL OR OTHER LAW, RULE OR REGULATION WHICH IS SUBSTANTIALLY SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") OR ANY ENTITY DEEMED TO HOLD THE ASSETS OF SUCH AN EMPLOYEE BENEFIT PLAN OR PLAN FOR PURPOSES OF ERISA, SECTION 4975 OF THE CODE OR SIMILAR LAW. ANY INVESTOR OR TRANSFEREE SHALL FURTHER BE DEEMED TO REPRESENT AND

COVENANT THAT THROUGHOUT THE PERIOD IT HOLDS WARRANTS, THE FOREGOING REPRESENTATIONS SHALL BE TRUE.

AN INVESTMENT IN THE WARRANTS INVOLVES CERTAIN SUBSTANTIAL RISKS, INCLUDING THE RISK THAT INVESTORS MAY LOSE THE ENTIRE VALUE OF THEIR INVESTMENTS IN CERTAIN CIRCUMSTANCES.  See "Risk Factors" for a discussion of certain factors that prospective investors should carefully consider before they invest in the Warrants.

The Warrants are being offered to a limited number of Accredited Investors who are also Qualified Purchasers.  The offering of the Warrants will not be registered under the Securities Act in reliance upon an exemption provided in the Securities Act.  There is no market for the Warrants being offered hereby and, as a result, a purchaser of a Warrant must be prepared to hold it for an indefinite period of time.  Transfers of the Warrants may be made only in accordance with the transfer restrictions set forth herein.

### IRS CIRCULAR 230 NOTICE

**THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL, STATE, OR LOCAL TAX PENALTIES.  THIS MEMORANDUM WAS WRITTEN AND PROVIDED BY THE ISSUER IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE ISSUER AND/OR PLACEMENT AGENT OF THE WARRANTS.  EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Notwithstanding anything to the contrary contained herein, all persons may disclose to any and all persons, without limitation of any kind, the federal, state and local tax treatment of the Warrants, any fact relevant to understanding the federal, state and local tax treatment of the Warrants and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and that may be relevant to understanding such tax treatment.  However, no person may disclose the name of or identifying information with respect to any party identified herein or any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal, state or local tax treatment of the Warrants and is not relevant to understanding the purported or claimed federal, state and local tax treatment of the Warrants.

No person has been authorized to give any information or to make any representations other than those contained in this Memorandum and, if given or made, such information or representations must not be relied upon.  This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the Warrants nor does it constitute an offer of the Warrants to any person in any state or other jurisdiction in which such offer would be unlawful.  This Memorandum does not include information relating to events occurring subsequent to its date, except as specifically indicated.  The delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to its date.  The Warrants may not be sold to any person without delivery of this Memorandum and the Exhibits attached hereto.

## SUMMARY OF PRINCIPAL TERMS

*The information set forth below is qualified in its entirety by reference to the Form of Issuing, Paying and Transfer Agency Agreement attached hereto as Exhibit III. Each prospective investor should review Exhibit III, and no purchase of a Warrant should be made until such review is completed.*

**Issuance**

The Issuer will issue 140,000 U.S. dollar Warrants for a total cost, including selling compensation, of $260 per Warrant (the "Total Cost"). The Total Cost has been priced to include the selling compensation payable to Lehman Brothers Inc. (the "Placement Agent"). For an explanation of the components of the Total Cost and the plan of distribution, see "*Plan of Distribution*."

The Issuer expects to issue the Warrants on or about August 1, 2007 (the "Issue Date"). The minimum initial investment is 385 Warrants per investor, subject to waiver at the discretion of the Placement Agent, with additional investments permitted in denominations of one Warrant or multiples thereof. The closing and settlement date for the Warrants will be the Issue Date.

Each Warrant is linked to the performance of the regular member interests (the "Interests") D. E. Shaw Oculus Fund (the "Reference Fund"). Each Warrant will entitle you to receive from the Issuer an amount, if any, on the Warrant Payment Date (as defined below) in U.S. dollars based on the value of the Reference Fund, as determined by the Calculation Agent, on the Valuation Date (as defined below).

The Warrants represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund or its affiliates.

The Reference Fund invests in D. E. Shaw Oculus Portfolios, L.L.C. (the "Oculus Master Fund" and collectively with the Reference Fund, D. E. Shaw Oculus International Fund, and subsidiaries of any of the foregoing, the "Oculus Fund"). For purposes of the discussion herein, any reference to the Reference Fund's assets or investments shall include the assets and investments of the Oculus Master Fund that are attributable to interests of the Oculus Master Fund held by the Reference Fund.

For more information about the Reference Fund, prospective investors are encouraged to review the Confidential Private Offering Memorandum of the Reference Fund, attached hereto as Exhibit V. Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of the Reference Fund, D. E. Shaw & Co., L.P. ("DESCO L.P."), which acts as the investment adviser to the Reference Fund, D. E. Shaw & Co., L.L.C. ("DESCO L.L.C."), which is the

managing member of the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

The Warrants will be governed by, and construed in accordance with, the laws of the State of New York.

## Exercise and Maturity

The Warrants will be exercised automatically on the Valuation Date. The Warrants are scheduled to mature on May 5, 2011 (the "Warrant Payment Date"); provided that if the Calculation Agent determines that a Reference Holder (as defined below) would not have received all redemption proceeds by the end of the day on April 30, 2011, assuming a timely request for redemption by such Reference Holder of the Deemed Quantity of Interests (as defined below) effective as of the Valuation Date, the Warrant Payment Date shall be the earlier of (i) five Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) ten Business Days after the Audit Date. Each Warrant entitles each holder thereof (a "Holder") to payment of the Warrant Payment Amount (as defined below) on the Warrant Payment Date. The Warrants may only be exercised for cash (U.S. dollars) and Holders will not be entitled to receive any Interests of the Reference Fund.

## Warrant Payment Amount

On the Warrant Payment Date (or if such day is not a Business Day then the immediately succeeding Business Day), Holders will receive, with respect to each Warrant, an amount (the "Warrant Payment Amount") which is the greater of zero and

$$USD\ 1,000 \times \left( \frac{\text{Final NAV - Strike Price}}{\text{Initial NAV}} \right)$$

If the calculation of the Warrant Payment Amount yields an amount less than zero, Holders will not receive a payment from the Issuer, nor will Holders be required to make any payment to the Issuer. A Holder's loss will be limited to the Total Cost paid by such Holder for each Warrant.

"Final NAV" means, as of the Valuation Date, the aggregate redemption proceeds that would be received by a Reference Holder on or prior to the date that is five Business Days after the Audit Date, assuming timely submission of a request for redemption of the Deemed Quantity of Interests (as defined below) effective as of the Valuation Date, as determined by the Calculation Agent. The Final NAV shall be calculated by deducting from such amount any redemption, management, incentive or administrator fees or other costs (including, without limitation, any applicable withdrawal fee) payable by a Reference Holder in respect of such Deemed Quantity of Interests, to the extent such amounts have not already been deducted by the Reference Fund in calculating the amount of redemption proceeds payable to the Reference Holder, as determined by the Calculation Agent. For the avoidance of doubt, if the Calculation Agent determines that a Reference Holder, assuming timely submission of a request for redemption of the Deemed Quantity of Interests effective as of the Valuation Date, would not have received any of the redemption proceeds on or prior to the date that is five Business Days after the Audit Date, the Calculation Agent shall determine the Final NAV, which Final NAV may be equal to zero.

-2-

"Valuation Date" means March 31, 2011.

"Audit Date" means, with respect to any date of determination, the date on which the Reference Fund's independent auditors have completed their examination of the Reference Fund's financial statements for the period including such date of determination.

"Reference Holder" means a hypothetical Regular Member of the Reference Fund that is deemed to have the benefits and obligations of an investor owning, during the term of the Warrants, Interests in the Reference Fund, as determined by the Calculation Agent. The Reference Holder will have a tax situs in Delaware. The Reference Holder does not represent an investment in or an Interest in the Reference Fund.

"Strike Price" means 100% of the Initial NAV.

"Initial NAV" means $1,000.

"Deemed Quantity of Interests" means a hypothetical quantity of Interests of the Reference Fund with an aggregate value as of the Issue Date equal to the Initial NAV.

"Business Day" means a day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions in New York are authorized or obligated by law or executive order to close.

The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

## Liquidity

The Warrants will not be listed on any securities exchange or quotation system. No secondary market in the Warrants is expected to develop. The only market, if any, for the Warrants will be the repurchase of the Warrants by the Issuer or the purchase of Warrants by the Placement Agent. Neither the Placement Agent nor its affiliates have any obligation to make a market for the Warrants, they do not anticipate making a market for the Warrants, and may cease or alter market-making activities if commenced at any time. To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely, on the factors set forth under *"Risk Factors— Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability."*

The Placement Agent intends, but is not obligated, to provide an opportunity for Holders to sell their Warrants to the Placement Agent. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI. The Market Making Request must be received by the Placement Agent no later than 55 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making

Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

In addition, any secondary market purchase of the Warrants by the Placement Agent or any of its affiliates prior to maturity will be at a price that is net of the commissions paid to the Placement Agent as described under *"Plan of Distribution."* Also, likely to be excluded from the secondary market price quote are the projected profits included in the cost of hedging the Issuer's obligations under the Warrants. In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs (including any applicable withdrawal fee). As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than the Holders' original cost.

**In-Kind Distributions**

The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

If the Reference Fund makes an in-kind payment to its Reference Holders, the Calculation Agent, when it determines the Final NAV, will determine the value of such distribution (including, without limitation, illiquidity discounts, the time remaining until the Warrants are unwound early or exercised, fees, transactions costs and other factors), for the purpose of calculating any related cash settlement amounts due to each Holder.

**Early Termination**

The Issuer reserves the right to terminate the Warrants at any time prior to the Warrant Payment Date if at any time before that date, the Calculation Agent determines that an Early Termination Event (as defined below) has occurred. The occurrence of any of the following events may be deemed an "Early Termination Event" by the Calculation Agent:

(i) The termination, bankruptcy, insolvency, dissolution, removal or withdrawal of DESCO, L.L.C., as managing member of the Reference Fund, or DESCO L.P., as investment adviser of the Reference Fund (DESCO L.P. and DESCO L.L.C., are referred to collectively as the "Key Entities"), or such parties otherwise cease to act for the Reference Fund as managing member or investment adviser, respectively;

(ii) The Reference Fund (1) is dissolved or has a resolution passed for its dissolution, winding up, or official liquidation; (2) makes a general assignment or arrangement with

-4-

or for the benefit of its creditors; (3) becomes insolvent or is unable to pay its debts or fails or admits its inability generally to pay its debts as they become due (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, or custodian or other similar official for it or for all or substantially all its assets in a proceeding of the type described herein; (6) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (7) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) through (6) above (inclusive); or (8) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

   (iii)   DESCO L.L.C. restates the monthly net return of the Reference Fund, as reported in the monthly final performance indication report of the Reference Fund, for any month during the term of the Warrants by more than 2% (measured as a percentage of the total assets of the Reference Fund) from the monthly net return of the Reference Fund as originally reported in the monthly final performance indication report of the Reference Fund for such month;

   (iv)   (1) Any of the Key Entities or any of their affiliates, employees, officers or agents, materially breaches any applicable law or regulation, (2) any governmental, legal or regulatory authority or other person brings or threatens to bring an administrative or judicial proceeding, investigation or litigation against any such person (including, in the case of the Investment Adviser, against any other fund managed by the Investment Adviser) or makes or threatens to make any claim, demand, charge or complaint against such person alleging any misconduct, impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing; or (3) the cancellation, suspension or revocation of the registration or approval of a Key Entity by any governmental, legal or regulatory entity with authority over such Key Entity;

(v)  (1) There is a change in any law, regulations, practice or the interpretation of any law, regulations or practice by any court, tribunal or regulatory authority which causes it to become unlawful or inadvisable for the Issuer or any of its affiliates to perform any obligations hereunder or otherwise has material adverse consequences for the Issuer or any of their affiliates including, for greater certainty, with any hedging activity; or (2) there is a change in the legal, tax, accounting or regulatory treatments of the Interests, the Reference Fund or the Investment Adviser that is reasonably likely to have a material adverse consequence for the Reference Fund or the Interests;

(vi)  (1) The modification of the Reference Fund (such as, but not limited to, modification of the organizational documents or any prospectus, offering memorandum, information memorandum or other similar offering document related thereto) in a way that could reasonably be expected to have a material adverse effect on the Final NAV or the rights and remedies of a Reference Holder from those prevailing on the Issue Date (including, without limitations rights of liquidation, transfer or redemption of the Interests), or (2) any event or any change affecting the Reference Fund and/or an Interest thereof (such as, but not limited to, interruption, breakdown, suspension or deferral of the calculation or the publication of the level or value of such Interest, or the disappearance of the level or value of such Interest resulting more particularly from, but not limited to, the winding-up or the termination of such Fund or the cancellation of the registration or of the approval by any relevant authority of the Fund) and that, in the opinion of the Calculation Agent, is likely to have a material effect on the Interests of a Reference Holder;

(vii)  The conversion of an Interest of the Reference Fund into another series of interests or securities with materially different benefits, rights or obligations, or the split of the Reference Fund, or its consolidation or its merger with or its sale or its conveyance of all or substantially all of its Interests or assets to a third party;

(viii)  The occurrence of a Hedging Disruption Event or an Increased Cost of Hedging Event;

(ix)  An event of default or a termination event, however defined, occurs with respect to the Reference Fund under any prime brokerage agreement, any ISDA Master Agreement or other similar derivatives agreement or any other agreement for borrowed money (including, without limitation, any loan agreement or repurchase agreement);

(x)  The net return of the Reference Fund (i) during any calendar month is less than negative ten percent (-10%) or (ii) during any consecutive three-month period is less than negative twenty five percent (-25%); or

(xi)  All the Interests or substantially all the assets of the Reference Fund are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof.

Upon the occurrence of any of the foregoing events, the Calculation Agent shall determine whether the occurrence of such event constitutes an Early Termination Event. If the Calculation Agent deems the occurrence of such event to be an Early Termination Event and the Issuer

determines to terminate the Warrants, the Issuer will notify the Transfer Agent of its intent to terminate the Warrants and the date selected by the Calculation Agent as the Early Termination Date.  Following the occurrence of an Early Termination Event, Holders will receive the Early Termination Amount (as defined below) on the Early Termination Date.  The "Early Termination Date" shall be determined by the Calculation Agent and shall be five Business Days following the date on which all redemption proceeds would have been received by a Reference Holder of Interests based on a timely request for redemption by such Reference Holder effective as of the Early Termination Valuation Date.  Notwithstanding the foregoing, in no event will the Early Termination Date occur more than ten Business Days after the Audit Date in respect of the date on which the Calculation Agent determines that the relevant Early Termination Event has occurred (such date of determination, the "Event Determination Date"); provided that the last day of the calendar quarter in which the Event Determination Date occurs is at least 50 days following the Event Determination Date.  If the last day of such calendar quarter is less than 50 days following the Event Determination Date, the Early Termination Date shall occur not more than ten Business Days after the Audit Date in respect of the last day of the calendar quarter next succeeding the calendar quarter in which the Event Determination Date occurred.  Upon receipt of notice from the Issuer of its intent to terminate the Warrants following the Early Termination Event, the Transfer Agent will notify each Holder of the Issuer's election to terminate the Warrants in accordance with the Issuing, Paying and Transfer Agency Agreement (as defined below).

The "Early Termination Amount" shall be determined by the Calculation Agent and shall be an amount equal to the market value of the Warrant as of the Early Termination Valuation Date, reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred under then prevailing circumstances in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event.  The "Early Termination Valuation Date" shall be determined by the Calculation Agent and shall be the date as of which a Reference Holder, which properly submitted a redemption notice to the Reference Fund promptly after such Early Termination Event, would have been able to redeem its Interests; provided that if the Calculation Agent determines that a Market Disruption Event has occurred on the Early Termination Valuation Date, the Early Termination Valuation Date shall be the next succeeding day on which no Market Disruption Event occurs.  If the Calculation Agent determines that a Reference Holder would not have received all of the redemption proceeds by the fifth day after the relevant Audit Date, the Early Termination Amount may be equal to zero.  In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise.

"Market Disruption Event" means, on any Business Day, any event that (i) affects any of the Interests of a Reference Holder that, in the judgment of the Calculation Agent, would make it impossible or impracticable to determine the value of such Interests as of that date or (ii) causes a Hedging Disruption Event (as defined below) or (iii) causes an Increased Cost of Hedging Event (as defined below).

"Hedging Disruption Event" means (1) the Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, or it is deemed inadvisable for the Issuer and/or any of its affiliates, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s), including, without limitation, where such inability or impracticability has arisen by reason of (i) any restrictions or increase in charges or fees imposed by the relevant Reference Fund on any investor's ability to redeem such Interest, in whole or in part, or any existing or new investor's ability to make new or additional investments in such Interest, or (ii) any mandatory redemption, in whole or in part, of such Interest imposed by the relevant Reference Fund (in each case other than any restriction in existence on the date on which such Interest was first included in such a Reference Fund derivative transaction), or (2) the Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, to determine the value of any hedging position in the Reference Fund.

"Increased Cost of Hedging Event" means the Issuer and/or any of its affiliates would incur a materially increased (as compared with circumstances existing as of the Issue Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (1) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (2) realize, recover or remit the proceeds of any such transaction(s) or asset(s), provided that any such materially increased amount that is incurred solely due to the deterioration of the creditworthiness of the Issuer and/or any of its affiliates.

## Potential Adjustment Event

Upon the occurrence of a Potential Adjustment Event (as defined below), the Calculation Agent shall make such adjustment to the exercise, settlement, payment or any other terms of the Warrants as the Calculation Agent determines appropriate, and determine the effective times thereof, to account for the economic effect on the Warrants of such Potential Adjustment Event. "Potential Adjustment Event" means any of the following:

(i)    a subdivision, reclassification, reorganization, consolidation, increase, reduction by cancellation of the Interests of a Reference Holder, or, a free distribution or dividend of any such Interests to existing holders by way of bonus, capitalization or similar issue;

(ii)    a distribution or dividend to existing holders of (a) Interests, or (b) any other interest capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Reference Fund equally or proportionately with such payments to holders of such interests, or (c) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by the Calculation Agent;

(iii)    an extraordinary dividend;

(iv)    a call by the Reference Fund of such Interests in respect of Interests that are not fully paid;

(v)   a repurchase by the Reference Fund of Interests whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

(vi)   any other similar event.

**Transfer Agent**

Citibank N.A. will act as registrar and Transfer Agent (the "Transfer Agent") for the Warrants pursuant to the terms of an issuing, paying and transfer agency agreement (the "Issuing, Paying and Transfer Agency Agreement"), dated on or about July 31, 2007 by and between the Issuer and the Transfer Agent.  The Transfer Agent's corporate offices are located at 111 Wall Street, New York, New York 10043.  Pursuant to the terms of the Issuing, Paying and Transfer Agency Agreement, the Transfer Agent has agreed to make payments on behalf of the Issuer and register the transfer or exchange of Warrants.  Fees and expenses of the Transfer Agent will be paid by the Issuer.  The Transfer Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Transfer Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants.  The Transfer Agent may resign at any time upon three months written notice, and the Issuer may remove the Transfer Agent at any time upon 30 days written notice.  Neither resignation or removal of the Transfer Agent will take effect until a successor Transfer Agent has been appointed.

**Calculation Agent**

Lehman Brothers Inc. will initially serve as calculation agent (the "Calculation Agent") for the Warrants pursuant to the terms of a Calculation Agency Agreement (the "Calculation Agency Agreement"), dated on or about July 31, 2007, by and between the Issuer and the Calculation Agent, attached hereto as Exhibit IV.  Except as otherwise provided in the Warrants, all determinations, calculations or valuations made by the Calculation Agent shall be at the sole discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Transfer Agent and each Holder.  The Calculation Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents.  Nothing shall prevent the Calculation Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants.  The Calculation Agent may resign at any time upon written notice to the Issuer, and the Issuer may remove the Calculation Agent at any time upon written notice to the Transfer Agent.  Neither resignation nor removal of the Calculation Agent will take effect until a successor Calculation Agent has been appointed.

**Calculations**

Except as otherwise set forth herein, all calculations made with respect to a Warrant by the Calculation Agent will be calculated to the nearest one hundredth (i.e., to the nearest 0.01), with five one thousandths and greater rounded upwards.

**Form and Transfer**

The Warrants will at all times be represented by definitive warrant certificates representing each Holder's interest, in denominations of one Warrant or multiples thereof. All Warrants owned by customers of Lehman Brothers Inc. shall, absent contrary instructions from a customer, initially be evidenced by one or more Warrants held by, and registered in the name of, Lehman Brothers Inc. Lehman Brothers Inc. will, upon the written request of the beneficial owner of any Warrants so held, deliver to such owner without charge Warrants registered in the name of the owner. Transfers of the Warrants, to the extent effected only on the books of the Placement Agent, shall require the consent of the Placement Agent.

The Warrants will not be registered under the Securities Act or under the securities laws of any other jurisdiction. The Warrants will be offered and sold only to Accredited Investors who are also Qualified Purchasers. The minimum transfer amount is 385 Warrants or a smaller number of Warrants if such number represents the entire number of Warrants held by such transferor and no transfers of Warrants will be effected by the Transfer Agent within five Business Days of the Valuation Date. In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter in the form of Exhibit II attached hereto and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act.

**Ratings**

The Warrants will not be rated by any rating agency.

-10-

## RISK FACTORS

*Prior to making an investment decision in respect to the Warrants, prospective purchasers should carefully consider all the information set out in this Memorandum, the Issuing, Paying and Transfer Agency Agreement and the other related documents. The risk factors set out herein are not and do not purport to be exhaustive. There may be other risks that a prospective purchaser should consider that are relevant to an investor's particular circumstances or generally.*

*The Warrant Payment Amount for the Warrants will depend solely on the performance of the Reference Fund. An instrument linked to the Reference Fund carries with it substantial risks including, but not limited to, the risks referred to below. There can be no assurance that at maturity holders will receive at least or more than the Total Cost per Warrant. The Warrant Payment Amount could be zero.*

*The Issuer disclaims any responsibility to advise prospective purchasers of such risks as they exist at the date of this document or as they change from time to time. Prospective purchasers should consult their own financial, tax and legal advisors about risks associated with an investment in the Warrants and the suitability of investing in the Warrants in light of their particular circumstances.*

***Potential investors in the Warrants should review the risks stated in the Confidential Private Offering Memorandum of D. E. Shaw Oculus Fund, L.L.C., a copy of which is attached hereto as Exhibit V.***

### Holders May Lose Their Entire Investment

The Warrants are leveraged investments that involve a high degree of risk that may result in the Warrants maturing worthless. A Holder will lose its entire investment if the Final NAV is less than or equal to the Strike Price. A Holders will lose a portion of its investment if the net asset value of the Reference Fund does not increase such that the Final NAV is at least 26.0% greater than the Strike Price. This means that if the net asset value of the Reference Fund increases such that the Final NAV is exactly 26.0% greater than the Strike Price, each Holder will receive an amount equal to the Total Cost in respect of each of its Warrants.

### Limited Trading History on the Performance of the Reference Fund

The Reference Fund has a limited trading history. As a consequence, each prospective investor should understand that very limited historical performance is available, by which it may be able to evaluate the Reference Fund's performance. **You are cautioned that the historical levels of the Reference Fund or any investment fund or account managed by DESCO L.P. are not indicative of and have no bearing on future performance of the Reference Fund. The Reference Fund may outperform or under-perform the historical levels. No assurance can be given that the Final NAV will not be less than the Strike Price which may result in the Warrants maturing worthless.**

**Holders Should Investigate the Reference Fund as if Investing Directly**

*Holders should conduct their own diligence of the Reference Fund as they would if they were directly investing in the Reference Fund. Holders should not conclude that the sale by the Issuer of the Warrants is any form of investment recommendation by the Issuer or the Placement Agent to invest in the Reference Fund.*

**Risks Relating to the Reference Fund, DESCO L.L.C. or DESCO L.P.**

The performance of the Warrants could be adversely affected by the occurrence of negligence, fraud, misconduct or other acts of the Reference Fund, DESCO L.L.C. or DESCO L.P. Holders should understand that they could be materially adversely affected by any such acts. For example, any such acts may lead to an Early Termination Event. As described above, an Early Termination Event will cause the termination of the Warrants and thus a Holder will lose the opportunity to participate further in the performance of the Reference Fund and may receive less than the Total Cost of the Warrants. Investors should further understand that they will have no recourse against the Reference Fund, DESCO L.L.C. or DESCO L.P. in connection with their Warrants.

Additionally, Holders will have very limited information regarding the Reference Fund, DESCO L.L.C. or DESCO L.P. and will have no information regarding the underlying investments in the Reference Fund.

**Related Ownership of the Issuer and the Reference Fund**

An affiliate of the Issuer acquired a minority equity investment in each of DESCO L.P. and DESCO L.L.C., effective as of March 1, 2007 which entitles such affiliate to, among other rights, receive a share of the management fees and incentive fees paid by the Reference Fund to DESCO L.P. and/or DESCO L.L.C. In addition, the Issuer and its affiliates may be party to various financial contracts with, or provide services to, the Reference Fund. See "*–Certain Business Activities May Create Conflicts of Interest with Holders*" herein for a further discussion. None of the Issuer nor any of its affiliates has the ability to control the investment decisions of the Reference Fund. This Memorandum does not and is not intended to provide information with respect to the Reference Fund. Neither the Issuer nor its affiliates or agents makes any representation as to the financial condition or creditworthiness of the Reference Fund in connection with the issuance of the Warrants. None of DESCO, L.P., DESCO L.L.C., the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

**The Issuer is Not Responsible for Disclosure of Information by the Reference Fund and Has No Obligation to Disclose Information About the Reference Fund After the Date of this Memorandum**

The Issuer has not participated in the preparation of the Confidential Private Offering Memorandum of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Furthermore, the Issuer cannot give any assurance that all events occurring prior to the date hereof (including events that would affect the accuracy or completeness of the Confidential Private Offering Memorandum of the Reference Fund) have

been properly disclosed.  Subsequent disclosure of any such events or the disclosure of or failure to disclose material future events concerning the Reference Fund could affect any Warrant Payment Amount received by you with respect to the Warrants.

Although an affiliate of the Issuer owns a minority equity investment in both DESCO L.P. and DESCO L.L.C., none of the Issuer nor any of its affiliates has the ability to control the investment decisions of the Reference Fund.  The Issuer has no responsibility to monitor, verify, or disseminate current or future public disclosure of information by the Reference Fund in its fund documents or otherwise.  In the course of the Issuer's dealings with the Reference Fund, the Issuer or any of its affiliates may acquire non-public information about the Reference Fund.  If the Issuer or its affiliates do acquire non-public information about the Reference Fund, they are not obligated to disclose such non-public information to you.

Neither the Issuer nor its affiliates or agents makes any representation or warranty to you as to the performance of the Warrants or the Reference Fund.  Historical data or other performance data is not a prediction of future results**.**

**Value of Warrants Influenced by Many Unpredictable Factors**

An investment in the Warrants entails certain risks which are different from those associated with an investment in a conventional debt security issued by the Issuer.  The value of the Warrants may increase and decrease between the Issue Date and the Warrant Payment Date.  Several factors, many of which are beyond the control of the Issuer, will influence the value of the Warrants, including:

- the value of the Reference Fund;

- the volatility (frequency and magnitude of changes) in the value of the Reference Fund;

- interest and yield rates in the market;

- the market price of securities, derivative products or other investment instruments purchased by the Reference Fund;

- economic, financial, political and regulatory or judicial events that affect the financial markets generally and which may affect the level of the Reference Fund and/or the Warrants;

- the time remaining to the maturity of the Warrants;

- the amount of fees or other charges payable to the Issuer or its affiliates in connection with its activities relating to the Warrants, including hedging of the Issuer's obligations under the Warrants; and

- the creditworthiness of the Issuer.  Any person who purchases the Warrants is relying upon the creditworthiness of the Issuer and has no rights against any other person.  The Warrants constitute the general, unsecured and unsubordinated contractual obligations of the Issuer.

Some or all of these factors will influence the price that an investor will receive if an investor sells its Warrants in the secondary market, if any, prior to maturity.  For example, an investor

may have to sell its Warrants at a substantial discount from the Total Cost if at the time of sale the value of the Reference Fund is at, below, or not sufficiently above the Initial NAV.

**Specific Investment and Trading Risks Relating to the Reference Fund**

The Warrants are subject to some of the risks of an investment in the Reference Fund. Investors should review the risks set forth in the "*Risk Factors*" section beginning on page 54 of the Confidential Private Offering Memorandum of the Reference Fund, which is attached hereto as Exhibit V. Each of these risks impacts the value of the Interests in the Reference Fund and will, in turn, have a corresponding impact on the value of the Warrants. As a result, the Interests in the Reference Fund, and thus the performance of the Warrants, may be adversely affected by such factors.

**Risks Relating to Hedge Funds and the Reference Fund**

The Warrants are subject to many of the risks of investments in hedge funds. Investments in hedge funds can be speculative and involve a high degree of risk. The following is a list of some of the significant risks associated with hedge funds and the performance of the Warrants. Each of these risks may impact the value of the Warrants. The Reference Fund is not subject to the same reporting requirements or investment restrictions as funds that are registered under the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"). As a result, performance of the Warrants may be adversely affected by the following factors:

• The Reference Fund is a limited liability company organized under the laws of the State of Delaware. The Reference Fund is not registered or regulated under the Investment Company Act. Investor protections similar to those afforded by the Investment Company Act relating to, among other matters, publication of net asset values, rights of redemption and controls over changes to an investment company's investment advisor, investment policies, and fees payable to an investment company's service providers, may not be available. Furthermore, pursuant to exemptions available under rules of the United States Commodity Futures Trading Commission ("<u>CFTC</u>"), DESCO L.P. will not register with the CFTC as a commodity pool operator or a commodity trading advisor with respect to the Reference Fund.

• The unregulated nature of investments made by the Reference Fund, such as the employment of different types of trading strategies (including leverage) and the investment in certain types of instruments that are typically prohibited for funds registered under the Investment Company Act.

• There is no secondary market for investors' interest in hedge funds (and none is expected to develop), there may be restrictions on transferring interests in hedge funds, and hedge fund may suspend the right of redemption under certain circumstances. Thus, an investment in hedge funds should generally be regarded as illiquid.

• While hedge funds generally may provide periodic performance reports and annual audited financial statements, they are not otherwise required to provide periodic pricing or valuation information to investors.

• Generally, hedge funds are not registered under the Investment Company Act and therefore provide less transparency than those that are registered. For example, investors in

unregistered hedge funds may not easily be able to ascertain all the risk characteristics of the investment vehicle or investment strategies employed by the investment managers of unregistered investment vehicles, as a result, investors in unregistered investment vehicles may have to strictly rely on the portfolio position disclosure to evaluate the investments and risks of the related investment vehicle.

•   The Reference Fund may invest in and trade in a variety of financial instruments using sophisticated investment techniques for hedging and non-hedging purposes.  Such financial instruments and investment techniques include but are not limited to the use of leverage (i.e., borrowing money for investment purposes), transactions that use derivatives such as swaps, options, index options, futures contracts and options on futures.  While these investment strategies and financial instruments allow the Reference Fund the flexibility to generate positive returns, they also allow for greater volatility and the opportunity for significant losses that may adversely affect the value of the Reference Fund and thus the return on the Warrants.

•   The Reference Fund may invest in securities listed or traded on foreign exchanges.  The execution of transactions on foreign exchanges might involve particular risks including but not limited to higher volatility, government intervention, lack of transparency, lack of regulation, currency risk, political risk and economic social instability.

•   DESCO L.P. and DESCO L.L.C. will receive an incentive fee from the Reference Fund (the "Incentive Fee"), based upon the appreciation, if any, in the assets of the Reference Fund.  The Incentive Fee may create an incentive for DESCO L.P. to make investments that are riskier or more speculative than would be the case if such arrangement were not in effect.  Such risky investments may increase the opportunity for significant losses that would adversely affect the return on the Warrants.  In addition, because the Incentive Fee is calculated on a basis that includes unrealized appreciation of the Reference Fund's assets, it may be greater than if such compensation were based solely on realized gains.  Certain management fees and administrative fees charged by DESCO L.P. (as well as expenses of the Reference Fund) will also reduce the performance of the Reference Fund and the value of the Warrants.

•   DESCO L.P. has total trading authority over the Reference Fund.  The use of a single advisor applying generally similar trading programs could mean lack of diversification and, consequently, higher risk.

•   Substantial redemptions of the Reference Fund on a particular redemption day could require DESCO L.P. to liquidate positions more rapidly than would be otherwise desirable, which could have a negative impact on the performance of the Reference Fund.

•   Certain inherent and potential conflicts of interest may exist with respect to the operation of the Reference Fund. DESCO L.P. may also serve as the investment adviser for other clients.  In performing its obligations for such other clients, DESCO L.P. may be in possession of certain material non-public information and DESCO L.P. will have no obligation to disclose such information or use such information for the benefit of the Reference Fund.  DESCO L.P. is not obligated to devote any specific amount of time to

manage the Reference Fund and there can be no assurance that the performance by DESCO L.P. of services for its other clients may not operate to the detriment of the Reference Fund.

•    The lack of oversight and regulation associated with hedge funds may increase the likelihood of fraud and negligence by the Reference Fund, DESCO L.L.C., DESCO L.P., its brokerage firm or bank.

•    The use of the above investment strategies, investment in the above instruments and the general characteristics of hedge funds may cause the Reference Fund to be volatile.

•    Hedge funds may involve complex tax structures and delays in distributing important tax information.

•    Hedge funds may have high fees and expenses that may offset the hedge fund's trading profits.

•    Legal, tax and regulatory changes could occur during the term of this Warrant that may adversely affect the Reference Fund.  The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Reference Fund.  In addition, the securities and futures markets are subject to comprehensive statutes, regulations and margin requirements.  The Securities and Exchange Commission, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies.  The regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial action.  The effect of any future regulatory change on the Reference Fund could be substantial and adverse and consequently adversely effect the value of this Warrant.

**Your Warrants Could Be Terminated Early**

If the Calculation Agent determines that an Early Termination Event has occurred during the term of the Warrants, your Warrants will be terminated as of the date selected by the Calculation Agent as the Early Termination Date.  Upon termination of the Warrants pursuant to an Early Termination Event, the Calculation Agent will determine the Early Termination Amount, which will be an amount equal to the market value of the Warrants as of the relevant measurement date, and which will be reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event.  In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise. See "Summary of Principal Terms - Early Termination Events."

**Reliance on DESCO L.P.**

The Warrant Payment Amount is based on changes in the value of an Interest of the Reference Fund, which fluctuates.  Changes in the value of the Reference Fund cannot be

predicted, and is dependent on the ability of DESCO L.P. to choose investments that appreciate in value, as well as other factors not within DESCO L.P.'s control.  There can be no assurance that DESCO L.P. will succeed in choosing investments that appreciate in value.  Furthermore, DESCO L.P. is dependent on the services of its key personnel.  If the services of any such person were to become unavailable, the Reference Fund's performance could be negatively affected.

The Issuer and its affiliates are not in a position to protect the Holders against negligence, fraud and misrepresentation by DESCO L.P.  Holders do not have and are not entitled to any beneficial Interests in the Reference Fund or its components and as such, have no recourse against DESCO L.P. either contractually or statutorily.  Furthermore, as a practical matter, it may be difficult to bring an action, or to seek to enforce a judgment obtained in an action, against any of the aforementioned entities.

**Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability**

The Warrants will not be listed on an organized securities exchange in the United States or abroad.  There is currently no secondary market for the Warrants.  Even if there is a secondary market, it is not likely to provide significant liquidity.  Accordingly, it will be difficult to obtain reliable information about the value of the Warrants at any given time as such value will reflect many factors and cannot be predicted.

The Placement Agent intends, but is not obligated, to provide an opportunity for Holders to sell their Warrants to the Placement Agent.  To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI.  The Market Making Request must be received by the Placement Agent no later than 55 calendar days in advance of the last Business Day of a calendar quarter.  The Placement Agent will determine the market making price as of that quarter end.  For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase.  The Placement Agent may be the only source of price quotes for the Warrants.  Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates.  Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge.  As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost of the Warrants.  In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs (including any applicable

withdrawal fee).  As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than the Holders' original cost.

The Warrants are subject to substantial restrictions on transferability.  The Warrants will not be registered under the Securities Act or the securities laws of any states or any other jurisdictions and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found.  The Warrants may be sold only to Accredited Investors who are also Qualified Purchasers.  Investors must thus be prepared to bear the risk of owning Warrants for an extended period of time.

**Warrants are not Registered**

The Warrants are not registered, and the Issuer does not intend to register the Warrants, under the Securities Act or under any state securities laws.  Neither the Securities and Exchange Commission (the "<u>SEC</u>") nor any state securities commission or regulatory authority has recommended or approved the Warrants, nor has any such commission or regulatory authority reviewed or passed upon the accuracy or adequacy of this Memorandum.

**Investors in Warrants will be Exposed to the Issuer's Credit Risk**

The Warrants will constitute general unsecured obligations of the Issuer, Lehman Brothers Holdings Inc.  If the Issuer is unable to meet its obligations as they come due, a Holder could suffer a complete loss of its investment.  Payment of any amounts due under the Warrants will not be guaranteed by any corporate or governmental entity.  The claims of Holders, if any, will not be secured by Interests in the Reference Fund or otherwise, and no amount will have been placed or will be placed in escrow to satisfy any such claims.  Moreover, in the event the Issuer becomes the subject of voluntary or involuntary bankruptcy proceedings, investors may lose the whole of their investment, whether a cash settlement amount is or becomes due upon maturity or termination, or otherwise, and will not have a claim for any Interests in the Reference Fund.

Actual or anticipated changes in the Issuer's credit ratings, financial condition or results may affect the market value of the Warrants.

**The Warrants do not Confer Beneficial Ownership in the Reference Fund or its Affiliates**

The Reference Fund is merely a reference used to calculate the value of the Warrants. The Warrants represent an investment that is separate and distinct from an investment in the Reference Fund or Oculus Fund.  Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund.  An investment in the Warrants confers no indicia of ownership in the Reference Fund or Oculus Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, Oculus Fund, DESCO L.P., DESCO L.L.C., or D. E. Shaw Securities, L.L.C. (the placement agent for the Reference Fund) or affiliates of the foregoing.

There are no actual investments in the Reference Fund underlying the Warrants or to which a Holder would have recourse.  The Issuer, or an affiliate, may, in order to hedge its obligations under the Warrants, purchase Interests in the Reference Fund but it is under no obligation to do so.  Such Interests, if any, are the separate property of the Issuer and do not secure or otherwise underlie the Warrants.  For example, in the event of a failure to pay the Warrant Payment Amount by the Issuer under the Warrants, Holders will have no beneficial interest in or claim to

any such Interests.  Accordingly, any claims of Holders pursuant to the terms and conditions of such Warrants will be pari passu with all other unsecured, unsubordinated, unconditional creditors of the Issuer.

**Your Investment Will Be 'New Issues' Restricted**

Your investment in the Warrants will be 'new issues' restricted.  In calculating the Warrant Payment Amount, returns will exclude any amount (whether positive or negative) attributable to 'new issues,' as defined in Rule 2790 (or any successor rule) of the National Association of Securities Dealers, Inc. (the 'NASD').  Rule 2790 prohibits certain persons from receiving the economic benefit of new issues.  Each of the Issuer and any affiliate that may be entering into transactions to hedge the Issuer's exposure under the Warrants is a Restricted Person under Rule 2790 and, accordingly, any investment by any of them in member interests of the Reference Fund will be treated as though it had been made by a Restricted Person.  A 'Restricted Person' includes most associated persons of a U.S. broker-dealer, most owners and affiliates of a broker-dealer and certain other classes of persons.  The Reference Fund does not currently invest in new issues, but the Reference Fund's operative documents reserve the right for DESCO L.L.C., as the managing member of the Reference Fund, without the approval or consent of the Reference Fund's members to make such amendments as DESCO L.L.C. deems necessary or appropriate in connection with enabling the Reference Fund to trade new issues.  In the event such amendments are adopted, the Warrants would be linked to the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to new issues pursuant to and subject to the terms of the Reference Fund's amended operative documents.

**ERISA Limitations**

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law.  Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

**Hedging Transactions by the Issuer**

The Issuer and its affiliates, including Lehman Brothers Inc., may from time to time buy or sell Interests in the Reference Fund or enter into derivative instruments or other instruments which track or are related to the Reference Fund for their own accounts in connection with their normal business practices or in connection with hedging of the Issuer's obligations under the Warrants, including on the Valuation Date.  Although the Issuer has no reason to believe that such activities had or will have a material impact on the value of the Reference Fund, the Issuer cannot give any assurance that it did not, or in the future will not, affect such value as a result of such activities.

**Adverse Economic Interests to Holders**

As described herein, the Issuer has appointed Lehman Brothers Inc. as the Calculation Agent for the Warrants. The Calculation Agent will be solely responsible for the determination and calculation of the Warrant Payment Amount (including the components thereof) or the Early Termination Amount and any other determinations and calculations in connection with the Warrants. Because the Calculation Agent is an affiliate of the Issuer, the Calculation Agent may have economic interests adverse to those of the Holders, including with respect to certain determinations and judgments that the Calculation Agent must make in determining the Warrant Payment Amount or the Early Termination Amount or whether an Early Termination Event, Market Disruption Event or potential Adjustment Event has occurred. An investor might disagree with such determination and might be adversely affected by such early termination.

**Certain Business Activities May Create Conflicts of Interest with Holders**

*Ownership of Minority Equity Investment in Reference Fund.* An affiliate of the Issuer acquired a minority equity investment in each of DESCO L.P. and DESCO L.L.C., effective as of March 1, 2007 which entitles such affiliate to, among other rights, receive a share of the management fees and incentive fees paid by the Reference Fund to DESCO L.P. and/or DESCO L.L.C. None of the Issuer nor any of its affiliates has the ability to control the investment decisions of the Reference Fund.

*Other Businesses of Lehman Brothers Inc.* The Issuer or its affiliates, including Lehman Brothers Inc., (collectively, "<u>Lehman Brothers</u>") will be engaged in businesses related and unrelated to the Reference Fund. Lehman Brothers is a major participant in the global finance, equity and fixed income markets. As such, Lehman Brothers may be actively engaged in transactions in the same securities and instruments in which the assets of the Reference Fund may be invested. While informational barriers among business units at Lehman Brothers have been established, certain business units at Lehman Brothers may purchase or sell the securities of, or otherwise invest in or finance, companies in which the Reference Fund has an interest. Lehman Brothers may also have proprietary interests in, and may manage or advise, accounts or investment funds (collectively, "<u>LB Accounts</u>") which may engage in transactions in the same types of securities and instruments in which the Reference Fund is transacting. Lehman Brothers is not under any obligation to share any investment opportunity, idea or strategy with the Reference Fund. As a result, Lehman Brothers may compete with the Reference Fund for appropriate investment opportunities.

The proprietary trading activities or portfolio strategies of Lehman Brothers, or the activities or strategies used for LB Accounts managed by Lehman Brothers (collectively, "<u>Lehman Discretionary Trading</u>"), could conflict with the transactions and strategies employed on behalf of the Reference Fund and could affect the prices and availability of the securities and instruments in which the Reference Fund seeks to invest. Lehman Discretionary Trading transactions will be executed independently of the Reference Fund's transactions, and thus at prices or rates that may be more or less favorable. Companies whose securities are held by the Reference Fund may have publicly or privately traded securities in which Lehman Brothers is an investor or makes a market. Lehman Discretionary Trading will be carried out without reference to positions held by the Reference Fund and may have an effect on the value of the positions so held, or may result in Lehman Brothers having an interest in securities adverse to that of the

Reference Fund (e.g., Lehman Brothers may have a short position in a security held long by the Reference Fund).

Lehman Brothers may also create, write or issue other derivative instruments with respect to which the underlying securities or instruments may be those in which the Reference Fund invests or which may be based on the performance of the Reference Fund.  Certain of such derivative instruments could require Lehman Brothers or Lehman Brothers' derivative counterparty to enter into positions in such securities or instruments that could have a negative effect on the value of the Reference Fund's portfolio.  Lehman Brothers may keep any profits, commissions, and fees accruing to it in connection with such activities.

The Issuer or its affiliates may receive fees in connection with activities relating to the Warrants, including hedging of the Issuer's obligations under the Warrants.

Any of these business activities or relationships may affect the value of the Reference Fund and thus could be adverse to a Holder's return on the Warrants.  Any prospective purchaser of the Warrants should undertake an independent investigation of the Reference Fund as in its judgment is appropriate to make an informed decision with respect to an investment in the Warrants.

**Investment Suitability**

The Warrants are not typical, straightforward debt securities.  Prospective investors should determine whether an investment in the Warrants is appropriate in their particular circumstances and should consult with their legal, business, and tax advisors to determine the consequences of an investment in the Warrants and to arrive at their own evaluation of the investment.

Investment in the Warrants is only appropriate for investors who:

• Have the requisite knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Warrants;

• Have access to, and knowledge of, appropriate analytical tools to evaluate such merits and risks in the context of their financial situation;

• Are capable of bearing the economic risk of an investment in the Warrants for an indefinite period of time; and

• Recognize that it may not be possible to dispose of the Warrants prior to their maturity.

Prospective investors in the Warrants should not rely on any communication (written or oral) of the Issuer, Placement Agent or the Transfer Agent as investment advice or as a recommendation to invest in the Warrants, it being understood that information and explanations related to the terms and conditions of these Warrants shall not be considered to be investment advice or a recommendation to invest in the Warrants.  No communication (written or oral) received from the Issuer, Placement Agent or the Transfer Agent shall be deemed to be an assurance or guarantee as to the expected results of an investment in the Warrants.

**Transfer Restrictions**

The Warrants are subject to transfer restrictions. Consequently, the liquidity of the Warrants may be significantly impaired.

**Income Tax Rules Related to the Warrants are Complex**

The income tax rules relevant to the Warrant are quite complex and may result in significant and possibly adverse tax consequences. An investor should consult with its own tax adviser in order to understand fully the federal, state and local income tax consequences of an investment in this Warrant.

**THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THIS TRANSACTION. ANY PROSPECTIVE PURCHASER SHOULD CONSULT WITH ITS OWN LEGAL, TAX AND FINANCIAL ADVISERS BEFORE DECIDING TO INVEST IN THIS TRANSACTION.**

## PLAN OF DISTRIBUTION

In order to purchase Warrants, investors will be required to execute and deliver to the Placement Agent a representation letter (available at the offices of Lehman Brothers Inc. at 745 Seventh Avenue, New York, New York, 10019, Attn: Structured Equity Products, the form of which is attached hereto as Exhibit I); the Warrants will be subject to transfer restrictions. Please refer to *"Suitability Requirements and Transfer Restrictions"* below.

The Issuer will pay to the Placement Agent a sales commission of $2,800,000 of the gross offering proceeds of the Warrants, representing a 2% commission on the notional amount per Warrant of each Warrant sold in the offering. Additionally, the Issuer expects to earn revenue from its hedging activities consistent with products of this type.

The Placement Agent and/or certain other placement agents will distribute the Warrants from time to time in one or more transactions at a fixed price or prices, which may be changed, or at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices, subject to withdrawal, cancellation or modification of the offer by the Issuer, the Placement Agent and/or certain other placement agents.

Prior to the offering, there has been no market for the Warrants. No secondary market in the Warrants is expected to develop. The only market, if any, for the Warrants will be the repurchase of the Warrants by the Issuer or the purchase of Warrants by the Placement Agent. Neither the Placement Agent nor its affiliates have any obligation to make a market for the Warrants, they do not anticipate making a market for the Warrants, and they may cease or alter market-making activities at if commenced at any time. To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely, on the factors set forth herein under *"Risk Factors – Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability."*

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates. Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge. As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost.

An affiliate of the Issuer purchased a minority equity investment in each of DESCO L.P. and DESCO L.L.C., effective as of March 1, 2007. The Issuer and certain of its affiliates currently perform, and will in the future perform, various investment and commercial banking services from time to time for the Reference Fund, DESCO L.P., DESCO L.L.C. and their affiliates. See "*Risk Factors – Certain Business Activities May Create Conflicts of Interest with Holders.*"

## SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS

The Warrants have not been registered, and the Issuer has no intention of registering any sales of the Warrants, under the Securities Act or any other applicable securities laws. Thus, the Warrants may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except in compliance with the registration requirements of the Securities Act and any other applicable securities laws, or pursuant to an exemption from registration under the Securities Act and any other applicable securities laws, or in a transaction not subject to such laws. Accordingly, the Warrants are being offered and sold only to Accredited Investors who are also Qualified Purchasers.

Any sales or transfers of Warrants in violation of the transfer restrictions set forth herein are prohibited and will be treated by the Issuer and the Transfer Agent as having no legal effect. The Issuer will not honor such sale or transfer and will have the right, at any time, at the expense and risk of the Holder of any Warrants held by or on behalf of a person who is not an Accredited Investor who is also a Qualified Purchaser at the time it purchases such Warrants, to (1) redeem such Warrants, in whole or in part, at the then-current value per Warrant as determined by the Calculation Agent or (2) require such holder to sell such Warrants to a qualifying transferee who satisfies all of the requirements set forth in these transfer restrictions.

Transfers of Warrants may be made by delivery of the relevant certificate or certificates evidencing ownership of the Warrants to the Transfer Agent together with the form of transfer in writing endorsed thereon and the transferee representation letter duly completed and executed by the transferee.

Each initial purchaser and each transferee will represent and agree as follows:

(i)        It is an Accredited Investor who is also a Qualified Purchaser;

(ii)       It is purchasing at least 385 Warrants, unless the Placement Agent permits the purchase of a smaller number of Warrants.

(iii)      In connection with the purchase of such Warrants: (A) it has received a copy of this Memorandum, the Confidential Private Offering Memorandum of the Reference Fund and

any other information it deems necessary to make an investment decision; (B) neither the Issuer nor its affiliates make any representations or warranties with respect to the accuracy, validity or completeness of the information contained in the Confidential Private Offering Memorandum of the Reference Fund, (C) it has such knowledge and experience in financial and business matters so as to be able to evaluate the merits and risks of an investment in the Warrants and have sufficient net worth and/or annual income to hold the Warrants for an indefinite period of time and to bear the risk of losing its entire investment; and (D) it is acquiring the Warrants as principal solely for its own account, or for the accounts of its discretionary advisory clients, in each case for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.

(iv)    On each date from the date on which the investor acquires such Warrants through and including the date on which it disposes of its interests in such Warrants, it is not, and it is not acquiring Warrants with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law.  Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

(v)    It acknowledges that (A) the Warrants have not been, nor will be, registered under the Securities Act or any state securities or blue sky laws or the laws of any other jurisdiction, and the Warrants will bear a legend to such effect, (B) the Warrants are being offered only to Accredited Investors who are also Qualified Purchasers and (C) none of the Warrants nor any interest or rights therein may be transferred in the absence of such registration under the Securities Act or an exemption from the registration requirements thereof or such other applicable laws, and the purchaser has informed itself about and will observe all restrictions on transfer of the Warrants under such laws that may be applicable to it.

(vi)    The Purchaser agrees to treat the Warrants in accordance with the treatment described in "*Certain U.S. Federal Income Tax Considerations*" section of this Memorandum, unless otherwise required by law, for federal income tax purposes.

Prior to any purchase of Warrants on the Issue Date, each purchaser of Warrants must represent in writing, by completing, signing and delivering to the Placement Agent in the form of investor representation letter attached hereto as Exhibit I, that the Warrants are being acquired for its own account, for investment purposes and not with a view for resale and that such investor otherwise meets the suitability standards referred to above.  In connection with any subsequent sale or transfer of a Warrant, each prospective transferee will be required to complete, sign and deliver to the Placement Agent or the Issuer and the Transfer Agent, as applicable, the form of transferee representation letter attached hereto as Exhibit II. Before any Warrants may be offered, sold, pledged or otherwise transferred, an initial investor or a subsequent transferee may be required to provide the Transfer Agent with a written certification as to compliance with applicable securities laws.

The Issuer has the right to reject a subscription for the purchase of Warrants for any reason or for no reason.

The Warrants are being offered to qualified investors only in such jurisdictions where offers and sales of Warrants are permitted and only in compliance with all applicable laws and regulations.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This disclosure is limited to the U.S. federal income tax issues addressed herein. Additional issues may exist that are not addressed in this disclosure and that could affect the federal tax treatment of the Warrants. This tax disclosure was written in connection with the promotion or marketing by the Issuer of the Warrants, and it cannot be used by you for the purpose of avoiding penalties that may be asserted against you under the Internal Revenue Code or any state or local tax laws. You should seek advice based on your particular circumstances from an independent tax adviser.

In the opinion of Cadwalader, Wickersham & Taft LLP, our special tax counsel, the following are the material United States federal income tax consequences of the purchase, ownership and disposition of the Warrants. This discussion applies to you only if you are an initial holder of a Warrant and you hold such Warrant as a capital asset within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code").

This summary does not address all aspects of the U.S. federal income taxation of the Warrants that may be relevant to you in light of your particular circumstances, nor does it address all of your tax consequences if you are a taxpayer that is subject to special treatment under the U.S. federal income tax laws, such as:

- a financial institution;

- a tax exempt organization;

- a dealer in securities or foreign currencies;

- a person that does not write, sell, or grant (directly or indirectly) any put option with respect to the Reference Fund or any interest therein or asset thereof or holds the Warrants as part of a hedging transaction, straddle, synthetic security, conversion transaction, or other integrated transaction, or enters into a "constructive sale" with respect to the Warrants or a "wash sale" with respect to your Warrants or any Reference Fund Interests;

- a U.S. Holder (as defined below) whose functional currency is not the U.S. dollar;

- a trader in securities who elects to apply a mark to market method of tax accounting;

- a partnership or other entity classified as a partnership for United States federal income tax purposes; or

- a person that is not a U.S. Holder, as defined below.

This summary is based on the Code, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date of this Memorandum, changes to any of which subsequent to the date of this Memorandum may affect the tax consequences described herein. If you are considering the purchase of a Warrant, you should consult your own tax adviser concerning the application of the United States federal income tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdictions.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds a Warrant, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and upon the activities of the partnership. Partners of partnerships holding Warrants should consult their own tax advisers.

**Tax Treatment of Warrants**

Based on certain factual representations provided to Cadwalader, Wickersham & Taft LLP by us, Cadwalader, Wickersham & Taft LLP is of the view that each Warrant should be treated for U.S. federal income tax purposes as an option with respect to the Reference Fund.  While other treatments of the Warrants could be asserted by the Internal Revenue Service (the "IRS") in respect of the Warrants, as discussed below, the Issuer intends and, pursuant to the terms of the Warrants each U.S. Holder agrees, in the absence of an administrative determination or judicial ruling to the contrary, to characterize the Warrants as call options with respect to the Reference Fund, for U.S. federal income tax purposes and the following discussion assumes that this treatment of the Warrants is respected.

**Taxation of U.S. Holders**

This discussion applies to you only if you are a "U.S. Holder."  A "U.S. Holder" is a beneficial owner of a Warrant that, for United States federal income tax purposes, is:

•   a citizen or resident of the United States;

•   a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any political subdivision thereof;

•   an estate the income of which is subject to United States federal income taxation regardless of its source; or

•   a trust if a court within the United States is able to exercise primary supervision over its administration, and one or more United States persons have the authority to control all of its substantial decisions.

An individual may, subject to certain exceptions, be deemed to be a resident of the United States by reason of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year (counting for such purposes all of the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year).

Further, this summary does not address any investor that is related to, employed by, or affiliated with, the Reference Fund, or DESCO L.L.C. or DESCO L.P. or to any employee of the Issuer or its affiliates that is involved in management of assets of, or in supervising or administrating, the Reference Fund. In addition, this discussion applies only to U.S. Holders that do not have any prearrangement with the Reference Fund regarding the purchase of an interest in the Reference Fund upon lapse, settlement or other termination of the Warrants.

*Tax Treatment Prior to Expiration.* Under existing law, you should not be required to recognize taxable income over the term of your Warrants prior to the sale, exchange, redemption, settlement, lapse, exercise, maturity or other taxable disposition thereof.

*Sale, Exchange, Redemption, Exercise or Lapse of the Warrants.* Upon the sale, exchange, redemption, exercise, lapse or other taxable disposition of a Warrant (including the settlement of a Warrant at maturity), you should recognize gain or loss in an amount equal to the difference between the amount realized and your tax basis in the Warrant, which should equal the amount you paid to acquire the Warrant. In general, subject to the PFIC rules discussed below, such gain or loss should be long term capital gain or loss if you held the Warrant for more than one year at such time. Additionally, the deductibility of capital losses is subject to further limitations under the Code and U.S. Holders are encouraged to consult their own tax advisors regarding their ability to use any capital losses arising from ownership of the Warrants in light of their particular circumstances.

*Possible Treatment of the Warrants as Interests in One or More PFICs.* In general, a U.S. taxpayer that holds an option to acquire stock in a "passive foreign investment company" (a "PFIC") is required to report any gain on the disposition of the option as ordinary income, rather than capital gain, as if the gain had been earned ratably over each day in the taxpayer's holding period (or certain portion thereof), and the taxpayer is subject to tax on such gain at the highest ordinary income tax rate for each taxable year of the taxpayer's holding period for the option, other than the current year, regardless of the rate otherwise applicable to the taxpayer. The taxpayer is also liable for a non-deductible interest charge at the federal underpayment rate as if such tax liabilities had been due with respect to each prior year of the taxpayer's holding period. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of a PFIC option as security for a loan may be treated as a taxable disposition of a PFIC option. In addition, a stepped-up basis in a PFIC option will not be available upon the death of an individual investor.

While the Reference Fund will not be classified as a PFIC, a U.S. Holder may be subject to the PFIC rules with respect to the Warrants to the extent that the Reference Fund directly or indirectly invests in PFICs or any investments of the Reference Fund are treated as PFICs. However, even if the Reference Fund were to acquire an interest in a PFIC, certain elections made by the Reference Fund for U.S. federal income tax purposes may eliminate any PFIC related exposure in respect of the Warrants. More specifically, even if the Reference Fund were to own an interest in a PFIC, such interest should not cause the Warrant to be treated as a PFIC option if the Reference Fund makes a timely "qualified electing fund" election with respect to such PFIC interest or elects to mark to market all of its trading activity under section 475 of the Code. We understand from the Confidential Private Offering Memorandum of the Reference Fund that the Oculus Master Fund has made such an election under section 475, although we have not verified the existence or validity of such election. Nevertheless, if the Reference Fund

were to acquire a non-qualified electing fund PFIC interest directly or if the Oculus Master Fund acquires such an interest and identifies it for U.S. federal income tax purposes as outside of its trading activity (or alternatively the IRS were to treat it as outside of such trading activity or otherwise treat the Oculus Master Fund's election under section 475 as invalid), then the application of the PFIC rules to the Warrants would be unclear and the IRS might assert that the Warrants constitute a PFIC option subject to the above described rules.  Prospective U.S. Holders should consult their own tax advisors regarding the potential application of the PFIC rules to their ownership and disposition of the Warrants.

**Possible Alternative Tax Treatments of an Investment in Warrants**

Due to the absence of authorities that directly address the proper treatment of the Warrants, no assurance can be given that the IRS will accept, or that a court will uphold, the treatment of the Warrants described above. If the IRS were successful in asserting an alternative treatment of the Warrants, the amount, timing and character of income, gain or loss on your Warrants could differ materially from our description herein. For example, one alternative federal income tax treatment of the Warrants might require you to include amounts in income during the term of the Warrants on the theory that you own an equity interest in the Reference Fund, either directly or through a partnership with the Issuer. Other treatments could result in the recharacterization of some or all of any long term capital gain you realize as ordinary income, together with the imposition of an interest charge.  Other tax treatments are also possible. Accordingly, you should consult your tax adviser regarding the existence, probability and consequences of potential IRS recharacterizations of the Warrants.

**Backup Withholding and Information Reporting**

In general, information returns may be filed with the IRS in connection with payments of proceeds from a sale, exchange or settlement of a Warrant.  In addition, a U.S. Holder who is not a corporation may be subject to U.S. backup withholding tax on these payments unless it provides its taxpayer identification number to the paying agent or otherwise establishes an exemption from backup withholding.  The amount of any backup withholding imposed on a payment to a U.S. Holder may be allowed as a credit against its U.S. federal income tax liability and may entitle it to a refund, provided the required information is furnished to the IRS.

The tax consequences of owning a Warrant are unclear. You should consult your own tax adviser regarding the tax consequences of purchasing, owning and disposing of a Warrant, including the tax consequences under state, local, foreign and other tax laws and the possible effects of changes in United States federal or other tax laws.

## CERTAIN BENEFIT PLAN CONSIDERATIONS

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of

ERISA, Section 4975 of the Code or Similar Law.  Each Investor shall be required to provide a representation and warranty with respect to the foregoing.

## USE OF PROCEEDS

The Issuer estimates that it will receive net proceeds from this offering of approximately $33,600,000, after deducting estimated offering expenses.  The Issuer plans to use some of the net proceeds to effect purchases (in each case through an affiliate or affiliates of the Issuer) of Interests in the Reference Fund in order to hedge its obligations under the Warrants.  However, it is not required to hedge those obligations.

Such Interests purchased, if any, will be the separate property of the Issuer, or such affiliate or affiliates of the Issuer, and do not secure or otherwise underlie the Warrants; and holders of Warrants have no beneficial interest in or claim over such assets.

The remainder of the proceeds will be used for general corporate purposes.

## LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Holdings Inc. (together with its consolidated subsidiaries hereinafter referred to as the "Company" unless the context otherwise requires), an innovator in global finance and one of the leading global investment bank, serves the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide.  The Company provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services.  The Company's global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

Through the Company's subsidiaries, it is a global market-maker in all major equity and fixed income products.  To facilitate its market-making activities, the Company is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

The Company's principal business activities are investment banking, capital markets and investment management which, by their nature, are subject to volatility primarily due to changes in interest and foreign exchange rates, valuation of financial instruments and real estate, global economic and political trends and industry competition.  Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, the Company continues to build on its customer flow business model, which is based on its principal focus of facilitating client transactions in all major global capital markets products and services.  The Company generates customer flow revenues from institutional, corporate, government and high-net-worth customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios and diversify risks across different market cycles;

(iii) originating loans for distribution to clients in the securitization or principal market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of the Company's customer flow activities, it maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary investment positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. The Company believes its customer flow orientation helps to mitigate overall revenue volatility.

LBH was incorporated in Delaware on December 29, 1983. LBH's principal executive offices are located at 745 Seventh Ave., New York, NY 10019. LBH is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the SEC. Such reports and other information may be inspected and copied at the public reference facilities maintained by the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549, and copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. In addition, information provided to or filed with the SEC electronically can be accessed through a website maintained by the SEC. The address of the SEC's website is http://www.sec.gov. Information provided to or filed with the SEC by LBH pursuant to the Exchange Act can be located by reference to Commission file number 1-9466. Such reports and other information may also be inspected at the Information Center of the New York Stock Exchange Inc., 20 Broad Street, New York, New York 10005 and at the American Stock Exchange, 86 Trinity Place, New York, New York 10006.

The annual report of LBH on Form 10-K for the year ended November 30, 2006, the quarterly reports on Form 10-Q dated April 9, 2007, and the current reports of LBH on Form 8-K dated February 14, 2007, February 28, 2007, March 1, 2007, March 13, 2007, March 14, 2007, March 21, 2007, March 23, 2007, March 30, 2007, April 6, 2007, April 9, 2007, April 18, 2007, May 1, 2007, May 9, 2007, May 10, 2007, May 14, 2007, May 23, 2007, May 30, 2007, June 5, 2007, June 6, 2007, June 12, 2007, June 15, 2007, June 18, 2007, June 21, 2007 and June 27, 2007 which contain financial information concerning LBH and its subsidiaries on a consolidated basis and other information, have been filed with the SEC and otherwise publicly distributed. Such reports of LBH and subsequent reports of LBH filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date hereof are incorporated herein by reference.

The Company operates in three business segments: Investment Banking, Capital Markets and Client Services. Financial information concerning the Company for the fiscal years ended November 30, 2006, November 30, 2005, and November 30, 2004, including the amount of net revenue contributed by each segment in such periods, is set forth in the Company's Consolidated Financial Statements and the Notes thereto in its 2006 annual report on Form 10-K, which is incorporated by reference herein. Information with respect to operations by segment and net revenues by geographic area is set forth under the captions "*Management's Discussion and Analysis of Financial Condition and Results of Operation—Business Segments*" and "*— Geographic Diversification*" and in Note 19 of the Notes to Consolidated Financial Statements contained in the annual report on Form 10-K, which, as noted above, is incorporated by reference herein.

Some of the statements contained in this Memorandum and the documents incorporated herein by reference, including those relating to LBH's strategy and other statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as ''expects,'' ''anticipates,'' ''intends,'' ''plans,'' ''believes,'' ''estimates'' and similar expressions are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are not historical facts but instead represent only LBH's expectations, estimates and projections regarding future events. These statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include market, credit or counterparty, liquidity, legal and operational risks. Market risks include changes in interest and foreign exchange rates and securities valuations, global economic and political trends and industry competition. LBH's actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements. LBH undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

**Each prospective investor is encouraged to obtain and review the information referred to above, and it is recommended that no prospective investor make a decision to purchase a Warrant until such review is completed.**

## THE REFERENCE FUND

*This Memorandum is not an offer to sell and it is not an offer to buy interests of the Reference Fund. All disclosures contained in this Memorandum regarding the Reference Fund have been provided D. E. Shaw Oculus Fund, L.L.C. The Reference Fund invests in D. E. Shaw Oculus Portfolios, L.L.C. (the "Oculus Master Fund" and collectively with the Reference Fund, D. E. Shaw Oculus International Fund, and subsidiaries of any of the foregoing, the "Oculus Fund"). None of the Issuer, or any of its affiliates take any responsibility for the accuracy or completeness of such information.*

*Attached as Exhibit V is the Confidential Private Offering Memorandum of D. E. Shaw Oculus Fund, L.L.C. By accepting this document, you acknowledge and agree that all of the information contained in this document shall be kept strictly confidential by you.*

**EXHIBIT 3**

**James W. Giddens**
**Trustee for the SIPA Liquidation of Lehman Brothers Inc.**
c/o Epiq Bankruptcy Solutions, LLC
**757 Third Avenue, 3rd Floor**
**New York, NY  10017**

*In re* **Lehman Brothers Inc.**

Case No. 08-01420 (JMP) SIPA

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

February 4, 2010

**VIA UPS OVERNIGHT**

HAROLD H SHAMAH
125 EXETER STREET
BROOKLYN, NY 11235

Re:  Claim Number(s):    800001621
Account Number(s):  █████████

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY

The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York.  You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding.  This Notice is applicable only to the claim(s) and/or accounts identified above.  If you filed other claims, additional notices will be issued.

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED.  LBI records indicate that the above-referenced account(s) (the "Account") and all cash and securities related to the Account have been transferred to Barclays Capital Inc. ("BCI").  To the extent securities related to the Account were unavailable and could not be purchased for replacement, the Trustee has provided BCI with cash instead.  An order approving the transfer of accounts to BCI was entered by the United States Bankruptcy Court, Southern District of New York, on December 14, 2009.

Your Claim for cash in the amount of $734,522.10 as related to Lehman Brothers Holdings Inc. De Shaw Oculus Warrants is DENIED.  This

portion of your Claim is based on a relationship with another Lehman or non-Lehman entity, not a direct relationship with LBI. LBI owes no obligation to you as a potential creditor of another Lehman entity. LBI, the securities brokerage firm, is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. This SIPA liquidation relates only to LBI and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of the Bankruptcy Code.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

Clerk of the United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

**PLEASE TAKE FURTHER NOTICE:**  You must serve your opposition upon the Trustee's counsel by mailing a copy to:

>Hughes Hubbard & Reed LLP
>One Battery Park Plaza
>New York, NY 10004
>Attn:  LBI Hearing Request
>
>Attorneys for James W. Giddens, Trustee for
>the SIPA Liquidation of Lehman Brothers Inc.

>Very Truly Yours,
>
>
>James W. Giddens
>Trustee for the SIPA Liquidation of
>Lehman Brothers Inc.

**EXHIBIT 4**

**BECKER, GLYNN, MELAMED & MUFFLY LLP**
*Attorneys for Harold Shamah*
299 Park Avenue, 16th Floor
New York, New York 10171
Telephone: 212-888-3033
Facsimile: 212-888-0255
Chester B. Salomon (CS-2319)
csalomon@beckerglynn.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X
                                                      :
In re:                                                :    **Case No.  08-01420 (JMP)**
                                                      :
LEHMAN BROTHERS INC.                                  :    SIPA Liquidation
                                                      :
                        Debtor.                       :    **OBJECTION TO TRUSTEE'S**
                                                      :    **DETERMINATION OF CLAIM**
                                                      :    **AND REQUEST FOR HEARING**
                                                      :    (Claim No. 800001621)
                                                      :
------------------------------------------------------X

**TO:    THE HONORABLE JAMES M. PECK,**
        **UNITED STATES BANKRUPTCY JUDGE:**

        Harold Shamah (the "Customer"), by his undersigned attorneys, hereby objects to

the denial of claim in the Trustee's Determination of Claim, dated February 4, 2010,

requests a hearing, and states as follows:

### BACKGROUND

        1.      Beginning on September 15, 2008, Lehman Brothers Holdings Inc.

("LBHI") and certain of its affiliates filed voluntary petitions under Chapter 11 of Title

11 of the United States Code, as amended.

        2.      On September 19, 2008 (the "Commencement Date"), a proceeding was

commenced under the Securities Investor Protection Act of 1970, as amended ("SIPA"),

with respect to the Debtor, Lehman Brothers Inc. ("LBI"), a securities broker-dealer.

James W. Giddens was appointed as trustee (the "Trustee") under SIPA to liquidate the

Debtor's assets.

3.    The Customer filed a timely proof of claim, asserting a claim, which arose

from pre-Commencement Date transactions, is entitled to "customer" status under SIPA.

4.    On or about February 4, 2010, the Trustee served a notice (the

"Determination Notice"), a copy of which is attached hereto as an Exhibit, upon the

Customer denying the Claim as to LBHI warrants relating to calls on Millennium Fund

and/or D.E. Shaw Oculus Funds. The Determination Notice states, *inter alia*, as follows:

> Your Claim is DENIED. LBI records indicate that the above-referenced
> account(s) (the "Account") and all cash and securities related to the Account
> have been transferred to Barclays Capital Inc. ("BCI"). To the extent
> securities related to the Account were unavailable and could not be purchased
> for replacement, the Trustee has provided BCI with cash instead. An order
> approving the transfer of accounts to BCI was entered by the United States
> Bankruptcy Court, Southern District of New York, on December 14, 2009. . .
>
> This portion of your Claim is based on a relationship with another Lehman or
> non-Lehman entity, not a direct relationship with LBI. LBI owes no
> obligation to you as a potential creditor of another Lehman entity. LBI, the
> securities brokerage firm, is the only Lehman entity that is a debtor in this
> SIPA liquidation proceeding. This SIPA liquidation relates only to LBI and
> dos not apply to any other Lehman entity, including any entity in a proceeding
> under chapter 11 of the Bankruptcy Code.

5.    The Customer objects to the Determination Notice, requests a hearing at

the appropriate time, and asserts that the determination of the Claim should be deferred as

described below. The Customer reserves the right to supplement this Objection if the

Court declines to defer consideration to the Claim. The Customer reserves the right to

seek discovery from the Debtor and such other parties as is appropriate.

6.     The Debtor failed to make appropriate disclosures to Customer concerning the subject investments and thereby placed Customer at risk in investing in the warrants.

7.     The Customer incorporates by reference in this Objection the arguments submitted by all other similarly situated customers in this case.

8.     The Customer reserves the right to amend, alter, revise or supplement this Objection; any failure to object on a particular procedural or substantive ground shall not be deemed a waiver of any such rights, all of which are hereby reserved.

9.     In the event that the Court does not allow the Customer's claim as a "customer" claim, it should nevertheless allow the Customer's claim to be reclassified as a general unsecured creditor claim.

WHEREFORE, the Court should overrule the Trustee's Determination Notice, should allow the Customer's SIPC customer claim in full, or, alternatively, as a general unsecured creditor, and grant the Customer such other and further relief as is just.

Dated: New York, New York
       February 24, 2010

                              BECKER, GLYNN, MELAMED & MUFFLY LLP
                              Attorneys for Harold Shamah


                              By:   /s/ Chester B. Salomon
                                    Chester B. Salomon, of counsel (CS-2319)
                              299 Park Avenue
                              New York, NY 10171
                              Tel: (212) 888 - 3033
                              Fax: (212) 888- 0255
                              csalomon@beckerglynn.com

# EXHIBIT

James W. Giddens
Trustee for the SIPA Liquidation of Lehman Brothers Inc.
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY  10017

*In re* Lehman Brothers Inc.

Case No. 08-01420 (JMP) SIPA

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

February 4, 2010

**VIA UPS OVERNIGHT**

HAROLD H SHAMAH
125 EXETER STREET
BROOKLYN, NY 11235

> Re:  Claim Number(s):    800001621
> Account Number(s): 83204895

Dear Claimant:

### PLEASE READ THIS NOTICE CAREFULLY

The liquidation of the business of Lehman Brothers Inc. ("LBI") is being conducted by James W. Giddens (the "Trustee") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), pursuant to an order entered on September 19, 2008 by the United States District Court for the Southern District of New York. You have submitted the above-referenced claim(s) (the "Claim") as a customer claim in this proceeding. This Notice is applicable only to the claim(s) and/or accounts identified above. If you filed other claims, additional notices will be issued.

The Trustee has made the following determination regarding your Claim:

Your Claim is DENIED. LBI records indicate that the above-referenced account(s) (the "Account") and all cash and securities related to the Account have been transferred to Barclays Capital Inc. ("BCI"). To the extent securities related to the Account were unavailable and could not be purchased for replacement, the Trustee has provided BCI with cash instead. An order approving the transfer of accounts to BCI was entered by the United States Bankruptcy Court, Southern District of New York, on December 14, 2009.

Your Claim for cash in the amount of $734,522.10 as related to Lehman Brothers Holdings Inc. De Shaw Oculus Warrants is DENIED. This

portion of your Claim is based on a relationship with another Lehman or non-Lehman entity, not a direct relationship with LBI. LBI owes no obligation to you as a potential creditor of another Lehman entity. LBI, the securities brokerage firm, is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. This SIPA liquidation relates only to LBI and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of the Bankruptcy Code.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge James M. Peck, you MUST file your written opposition, setting forth (i) the claim number; (ii) a detailed statement of the reasons for your objection to the Trustee's determination; (iii) copies of any document or other writing upon which you rely; and (iv) mailing, phone, and email contact information, with the United States Bankruptcy Court and the Trustee within THIRTY DAYS of the date of this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must file your opposition in accordance with the above procedure electronically with the Court on the docket of *In re* Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA in accordance with General Order M-242 (available at www.nysb.uscourts.gov/orders/orders2.html) by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format.

If you do not have means to file your opposition electronically, you may mail your opposition to:

Clerk of the United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

2

**PLEASE TAKE FURTHER NOTICE:** You must serve your opposition upon the Trustee's
counsel by mailing a copy to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, NY 10004
> Attn: LBI Hearing Request
>
> Attorneys for James W. Giddens, Trustee for
> the SIPA Liquidation of Lehman Brothers Inc.

> Very Truly Yours,

> James W. Giddens
> Trustee for the SIPA Liquidation of
> Lehman Brothers Inc.

**EXHIBIT 5**

**BECKER, GLYNN, MELAMED & MUFFLY LLP**
*Attorneys for Richard E. Witten, Harold H. Shamah,*
*Isaac Shamah, Shamah 2000 Family Trust, Robert*
*Perl and The Lapidus Trust U/A/D 6/17/02*
299 Park Avenue, 16th Floor
New York, New York 10171
Telephone: 212-888-3033
Facsimile: 212-888-0255
Chester B. Salomon (CS-2319)
csalomon@beckerglynn.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                                  :
                                                        :        08-01420 (JMP) SIPC
LEHMAN BROTHERS INC.,                                   :
                                                        :
                    Debtor.                             :
-------------------------------------------------------------x

**SUPPLEMENTAL STATEMENT TO CUSTOMERS' OBJECTIONS TO**
**TRUSTEE'S DETERMINATIONS AND STATEMENT IN SUPPORT OF**
**AMENDED CUSTOMER CLAIMS OF RICHARD E. WITTEN, HAROLD H.**
**SHAMAH, ISAAC SHAMAH, SHAMAH 2000 FAMILY TRUST,**
**ROBERT PERL AND THE LAPIDUS TRUST U/A/D 6/17/02**

**TO THE HONORABLE JAMES M. PECK, U. S. BANKRUPTCY JUDGE:**

Richard E. Witten, Harold H. Shamah, Isaac Shamah, Shamah 2000 Family Trust,

Robert Perl and The Lapidus Trust u/a/d 6/17/02 (together the "Customers"), by their

counsel, Becker, Glynn, Melamed & Muffly LLP, as and for their supplemental statement

to their objections to trustee's determinations of their respective customer claims and in

support of their amended claims, respectfully state:

**Introduction**

1.     At all relevant times, the Customers were undisputed "customers" of

Lehman Brothers Inc., Debtor ("LBI") as defined in the Securities Investor Protection

Act of 1970, as amended ("SIPA").  On or before January 31, 2009 the Customers duly and timely filed claims described in the schedule annexed hereto and incorporated herein as Exhibit A.

2.    Thereafter James W. Giddens, LBI's SIPA Trustee, sent Notices of Trustee's Determination of Claim ("Determination") to the Customers on the dates shown in Exhibit A, in which the Trustee denied the Customers' claims.  Most of the Determinations were sent in late January or early February 2010.

3.    In all Determinations the Trustee denied the Customers' claims for Warrants (described below in Para. 12) on the alleged grounds that (a) Customers' accounts were transferred to Barclays Capital Inc. ("Barclays") on or about September 26, 2008 and (b) "the securities claimed did not have a relationship with LBI."

4.    The Customers therefor timely notified the Trustee of their objections to the Determinations (the "Objections").  Except for the Shamah 2000 Family Trust, when the Customers served their respective Objections, they were not aware of the imminent filing of an Examiner's Report (defined below) that supports the Customers' net equity claims irrespective of the transfer of their accounts to Barclays.

5.    The Customers respectfully submit this Supplemental Statement:  (a) to elaborate on their Objections and their customer claims and (b) to incorporate relevant portions of the Examiner's Report that dramatically demonstrate the responsibility of LBI and its representatives in fraudulently selling worthless LBHI securities to the Customers and influencing them to hold those securities in their LBI accounts.  LBI's responsibility is relevant to the Customers' net equity claims and LBI's liability irrespective of the

ceremonial "transfer" of securities to Barclays.  Upon information and belief, the Trustee

will argue that the losses sustained by the Customers were the result of "market risk."

6.    On September 15, 2008 Lehman Brothers Holdings, Inc. ("LBHI") and

certain of its affiliates filed voluntary cases under Chapter 11 and thereafter have

operated as Chapter 11 debtors. On September 19, 2008 this SIPC proceeding was

commenced.  While the Customers timely filed proofs of claim in the LBHI case in or

about September 2009 and believe that they have valid claims against LBHI, they submit

that they also have net equity claims as customers in this SIPC case that have been

ignored by the Trustee.

**The Examiner's Report, dated March 11, 2010**

7.    On January 16, 2009 this Court entered an order in the LBHI case for the

appointment of an examiner under Section 1104(c)(2) of the Bankruptcy Code to conduct

an investigation into certain specified matters and to perform the duties set forth in

Section 1106(a)(3) and (4) of the Bankruptcy Code (collectively the "Examiner

Investigation").  On January 19, 2009, pursuant to an "Examiner Order" the U.S. Trustee

appointed Anton R. Valukas as Examiner.  This Court approved the appointment by order

dated January 20, 2009.

8.    After 14 months of discovery and Examiner Investigation, on March 11,

2010, the Examiner filed a comprehensive Examiner's Report with the Bankruptcy Court.

That Examiner's Report contains dramatic disclosures concerning false and fraudulent

actions and omissions of management and misleading operating and financial statements

that were enabled by senior management of LBI and LBHI in an apparent effort to

conceal LBHI's and LBI's precarious condition.  The Examiner Report strongly suggests

fraudulent and other illegal conduct of LBI in the sale in 2007 and 2008 to the Customers and other similarly situated investors "Warrants" issued by LBHI. Although this Supplemental Statement cites to some preliminary statements and conclusions, the entire Examiner's Report is respectfully incorporated herein by reference. The Customers may need discovery to connect the Examiner's Report with their LBI investments and accounts.

9.    The following excerpt from the Introduction to the Examiner's Report informs of LBI's defrauding the Customers in the sale and retention of their securities in their accounts in 2007 and 2008.

Lehman's business model was not unique; all of the major investment banks that existed at the time followed some variation of a high-risk, high-leverage model that required the confidence of counterparties to sustain. Lehman maintained approximately $700 billion of assets, and corresponding liabilities, on capital of approximately $25 billion. But the assets were predominantly long-term, while the liabilities were largely short-term. Lehman funded itself through the short-term repo markets and had to borrow tens or hundreds of billions of dollars in those markets each day from counterparties to be able to open for business. Confidence was critical. The moment that repo counterparties were to lose confidence in Lehman and decline to roll over its daily funding, Lehman would be unable to fund itself and continue to operate. So too with the other investment banks, had they continued business as usual. It is no coincidence that no major investment bank still exists with that model.

In 2006, Lehman made the deliberate decision to embark upon an aggressive growth strategy, to take on significantly greater risk, and to substantially increase leverage on its capital. In 2007, as the sub-prime residential mortgage business progressed from problem to crisis, Lehman was slow to recognize the developing storm and its spillover effect upon commercial real estate and other business lines. Rather than pull back, Lehman made the conscious decision to "double down," hoping to profit from a counter-cyclical strategy. As it did so, Lehman significantly and repeatedly exceeded its own internal risk limits and controls.

With the implosion and near collapse of Bear Stearns in March 2008, it became clear that Lehman's growth strategy had been flawed, so much so that its very survival was in jeopardy. The markets were shaken by Bear's demise, and Lehman was widely considered to be the next bank that might fail. Confidence was eroding. Lehman pursued a number of strategies to avoid demise.

But to buy itself more time, to maintain that critical confidence, Lehman painted a misleading picture of its financial condition.

Lehman required favorable ratings from the principal rating agencies to maintain investor and counterparty confidence; and while the rating agencies looked at many things in arriving at their conclusions, it was clear – and clear to Lehman – that its net leverage and liquidity numbers were of critical importance. Indeed, Lehman's CEO Richard S. Fuld, Jr., told the Examiner that the rating agencies were particularly focused on net leverage; Lehman knew it had to report favorable net leverage numbers to maintain its ratings and confidence. So at the end of the second quarter of 2008, as Lehman was forced to announce a quarterly loss of $2.8 billion – resulting from a combination of write-downs on assets, sales of assets at losses, decreasing revenues, and losses on hedges – it sought to cushion the bad news by trumpeting that it had significantly reduced its net leverage ratio to less than 12.5, that it had reduced the net assets on its balance sheet by $60 billion, and that it had a strong and robust liquidity pool.

Lehman did not disclose, however, that it had been using an accounting device (known within Lehman as "Repo 105") to manage its balance sheet – by temporarily removing approximately $50 billion of assets from the balance sheet at the end of the first and second quarters of 2008. In an ordinary repo, Lehman raised cash by selling assets with a simultaneous obligation to repurchase them the next day or several days later; such transactions were accounted for as financings, and the assets remained on Lehman's balance sheet. In a Repo 105 transaction, Lehman did exactly the same thing, but because the assets were 105% or more of the cash received, accounting rules permitted the transactions to be treated as sales rather than financings, so that the assets could be removed from the balance sheet. With Repo 105 transactions, Lehman's reported net leverage was 12.1 at the end of the second quarter of 2008; but if Lehman had used ordinary repos, net leverage would have to have been reported at 13.9.

Contemporaneous Lehman e-mails describe the "function called repo 105 whereby you can repo a position for a week and it is regarded as a true sale to get rid of net balance sheet. Lehman used Repo 105 for no articulated business purpose except "to reduce balance sheet at the quarter-end." Rather than sell assets at a loss, "[a] Repo 105 increase would help avoid this without negatively impacting our leverage ratios. Lehman's Global Financial Controller confirmed that "the only purpose or motive for [Repo 105] transactions was reduction in the balance sheet" and that "there was *no substance* to the transactions."

Lehman did not disclose its use – or the significant magnitude of its use – of Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board of Directors. Lehman's auditors, Ernst & Young, were aware of but did not question Lehman's use and nondisclosure of the Repo 105 accounting transactions.

In mid-March 2008, after the Bear Stearns near collapse, teams of Government monitors from the Securities and Exchange Commission ("SEC") and the Federal Reserve Bank of New York ("FRBNY") were dispatched to and took up residence at Lehman, to monitor Lehman's financial condition with particular focus on liquidity. Lehman publicly asserted throughout 2008 that it had a liquidity pool sufficient to weather any foreseeable economic downturn.

But Lehman did not publicly disclose that by June 2008 significant components of its reported liquidity pool had become difficult to monetize. As late as September 10, 2008, Lehman publicly announced that its liquidity pool was approximately $40 billion, but a substantial portion of that total was in fact encumbered or otherwise illiquid. From June on, Lehman continued to include in its reported liquidity substantial amounts of cash and securities it had placed as "comfort" deposits with various clearing banks; Lehman had a technical right to recall those deposits, but its ability to continue its usual clearing business with those banks had it done so was far from clear. By August, substantial amounts of "comfort" deposits had become actual pledges. By September 12, two days after it publicly reported a $41 billion liquidity pool, the pool actually contained less than $2 billion of readily monetizable assets.

Examiner's Report Volume I at pp. 3-10

10.     Apparently the Trustee believes that the mere delivery of worthless Warrants to a third party broker (Barclays) pursuant to court order eliminates all SIPC claims of the Customers and exonerates the Trustee from satisfying the Customers' net equity claims.   The Trustee apparently relies on older, inapposite decisions of lower courts but ignores the analysis in the New Times cases (cited in Para. 16 below).

11.     The mere transfer to Barclays of the Warrants in their accounts – having zero or de minimus value ascribed by Barclays shortly after the transfer, is not payment of the Customers' claims.   Instead, the transfers to Barclays compound the injustice imposed on the Customers by serving as a cover or excuse for not recognizing the Customers for the amount of their net equity claims against LBI.

**Customers' Amended and Supplemental Claims in LBI SIPC Case**

12.     At the commencement of the LBI SIPC case the Customers' accounts at LBI contained "securities" as defined by SIPA that were purchased from LBI.   Among the said securities in their respective accounts were Warrant Funds issued by LBHI in 2007 and 2008 that were sold by and through LBI (the "Warrants").   The relevant LBHI Warrants were the "3-2/3 Year Cash-Settled Call Warrants Linked to the Performance of D.E. Shaw Oculus Fund" and the "4-Year, 2 Month Cash-Settled Call Warrants linked to the Performance of Millennium USA LP."   Though the valuation of such Warrants referred to other funds not affiliated with LBHI or LBI, critical to the initial sale and the continuing value of the Warrants purchased from and through LBI and held by the Customers' respective accounts was the financial condition of LBHI and its affiliates. The Customers were fraudulently induced to invest in the Warrants by brokers employed

by LBI.  LBI and LBHI omitted to state material facts concerning LBHI's and LBI's condition, and motives creditability in the offering memorandum and other solicitations.

13.    The Customers reasonably relied on the representations, actions and omissions made by their brokers, LBI and LBHI in making their investment decisions. Their reliance were in accord with their legitimate expectations as customers of LBI. After their initial purchases, LBI regularly issued confirmations and account statements reflecting the Customers' purchases and securities holdings, including the Warrants.

14.    The Trustee's statement in the Determinations that "the securities claimed [by the respective Customers] did not have a relationship with LBI" could not be further from the truth.  LBHI was LBI's parent company and it pocketed the money invested by the Customers in the Warrants in 2007 and 2008.  As shown in the Examiner's Report, they were struggling to survive and evidently decided to sacrifice their customers in desperate attempts to avoid liquidation.

15.    According to the Examiner's Report, LBI and LBHI were insolvent at or about the times of the Customers' purchases of the Warrants.  The business and affairs of both LBI and LBI were inextricably intertwined prior and after the Customers' purchases of the LBHI Warrant Funds.  Had LBHI's and LBI's financial condition been known publicly or to their regulators, LBI would not have been authorized to sell securities, including the Warrants, to the Customers.  Had the Customers known of the facts and circumstances described in the Examiner's Report, they would not have purchased or held the Warrants.  Nevertheless, the Warrants were bought for the Customers and LBI represented their values as indicated on the last account statements before the SIPC proceeding.  See Exhibit A.

-8-

16.    At the filing of the SIPC case, the Customers had customer net equity claims for existing securities, i.e., the Warrants, under SIPA entitling them to an allowed claim measured by the net equity in their LBI accounts as of August 31, 2008, the date of LBI's last statement before the commencement of the SIPC proceeding, in the amounts reflected in Exhibit A and to cash advances by SIPC up to $500,000 per Customer.  The Customers have net equity claims for either their investments in the Warrants or the amounts indicated in their last LBI statements.  See In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004) and In re New Times Securities Services, Inc., 463 F.3d 125 (2d Cir. 2006).

### Alternative Claim – General Unsecured Claim for Debtor's Fraud

17.    Alternatively, by reason of LBI's and LBHI's fraudulent actions and omissions of the Debtor and their affiliates and agents concerning their financial condition and the false statements in connection with the purchase and sale of the Warrants to them, the Customers submit that their respective claims should be allowed as general unsecured creditor claims.

### Incorporation of Other Customers' Arguments

18.    The Customers reserve their rights with respect to their respective claims. Further reserve their rights to amend or supplement this Supplemental Statement, and incorporate by reference all arguments, statements and submissions made by other similarly situated customers.

Dated: New York, New York
      June 16, 2010

BECKER, GLYNN, MELAMED & MUFFLY LLP
Attorneys for Richard E. Witten, Harold H.
Shamah, Isaac Shamah, Shamah 2000 Family
Trust, Robert Perl and The Lapidus Trust U/A/D
6/17/02

By:   /s/ Chester B. Salomon
        Chester B. Salomon (CS-2319)
299 Park Avenue
 New York, NY 10171
Tel: (212) 888 - 3033
Fax: (212) 888- 0255
csalomon@beckerglynn.com

**EXHIBIT 6**

Hearing Date: October 28, 2010
at 10:00 a.m.

**BECKER, GLYNN, MELAMED & MUFFLY LLP**
*Attorneys for Richard E. Witten, Harold H. Shamah,*
*Isaac Shamah, Shamah 2000 Family Trust, Robert*
*Perl and The Lapidus Trust u/a/d 6/17/02*
299 Park Avenue, 16th Floor
New York, New York 10171
Telephone: 212-888-3033
Facsimile: 212-888-0255
Chester B. Salomon
csalomon@beckerglynn.com
Alec P. Ostrow
aostrow@beckerglynn.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------X
                                                  :
                                                  :
In  re:                                           :    **Case No.  08-01420 (JMP)**
                                                  :
LEHMAN BROTHERS INC.                              :    SIPA Liquidation
                                                  :
                    Debtor.                       :
                                                  :
                                                  :
-----------------------------------------------------X

**OBJECTION TO TRUSTEE'S MOTION TO UPHOLD**
**DETERMINATIONS DENYING CUSTOMER STATUS TO CLAIMS**
**OF RICHARD E. WITTEN, HAROLD H. SHAMAH, ISAAC SHAMAH,**
**SHAMAH 2000 FAMILY TRUST, ROBERT PERL AND**
**THE LAPIDUS TRUST U/A/D 6/17/02 [DOCUMENT NO. 3519]**

**TO:    THE HONORABLE JAMES M. PECK,**
            **UNITED STATES BANKRUPTCY JUDGE:**

        Richard E. Witten, Harold Shamah, Isaac Shamah, Shamah 2000 Family Trust,

Robert  Perl,  and  Lapidus  Trust  U/A/D  6/17/02 (together the "Claimants"  or

"Customers"),  as  and  for  their  objection  to  the  "Trustee's  Motion  to  Uphold

Determinations  Denying  Customer  Status  to  Claims  Arising  from  Alleged  Fraud,

Misrepresentation and Failed Trades and Expunging Related Objections Thereto," dated July 28, 2010 (LBI Docket No. 3519) (the "Trustee's Motion"), by their attorneys, Becker, Glynn, Melamed & Muffly LLP, respectfully state:

## Introduction

1.      The Claimants, all "customers" of Lehman Brothers Inc. ("LBI"), timely filed their respective customer claims claiming Cash-Settled Call Warrants issued by Lehman Brothers Holdings, Inc. ("LBHI"), described further below, using the SIPC claim forms disseminated by the Trustee.  The Trustee apparently acknowledges that on September 19, 2008 the Claimants were customers of LBI but the Trustee alleges that (a) the Debtor's apparent fraud, as identified by the Examiner's Report of March 11, 2010 and the Customers' reference thereto in their Supplemental Statement, dated June 16, 2010, operate to disqualify the Claimants' net equity claims from "customer" recognition and allowance, and (b) the transfer of their LBI customer accounts, among tens of thousands of other accounts, under the Customer Account Transfer Order, dated December 14, 2008, served to "fully satisfy" their claims and whitewash the estate's responsibility.

2.      As shown below, the Trustee's contentions are incorrect.  Notwithstanding fraudulent activity by LBI and its parent, the Customers are entitled to recognition and allowance of their customer claims for the net equity in their accounts as indicated by LBI's last customer account statements before the filing date.  The Trustee's description of the customer transfer process disguises the true nature of what took place – the transfer from one account (LBI) showing securities with millions in value to another account (Barclays Capital, Inc.) immediately showing the same securities with "no indicative

value".  The "full satisfaction" of the claims by the Customer Account Transfer Order is a convenient device to eliminate the Customers' claims.  As the Trustee has not stated how or why other Customers holding Warrants have been treated in the case, the Claimants are entitled to discovery to ascertain the nature and extent of hedging on the Warrants by LBI, LBHI and their affiliates if fair and consistent treatment has been given to all similarly-situated customers.

### Background

3.    The securities in question, purchased and paid for by the Claimants, are Cash-Settled Call Warrants (the "Warrants") linked to the performance of two different historically successful "Reference Funds" unrelated to LBI.  The Warrants were exclusively marketed and sold by LBI, as "Placement Agent" and "Calculation Agent," and LBHI, LBI's parent company and affiliate, as "Issuer".   Under the Warrants, at maturity the cash investments of investors were to be paid by LBHI to the Customers adjusted in an amount depending on the performance of a "Reference Fund" up to maturity.  Until the filing date, the Warrants had been "marked to market" and had shown profits in the Customers' accounts.  The Warrants and Reference Funds were:

(i)    3-2/3 Year Cash-Settled Call Warrants (140,000 @ $260 per Warrant) Linked to the Performance of D.E. Shaw Oculus Fund;

(ii)    4-Year, 2 Month Cash- Settled Call Warrants linked to the performance of Millennium USA LLP.

4.    As indicated in the private placement memoranda issued in connection with the sale of the Warrants for an aggregate in excess of $100 million, LBI and LBHI envisioned and effected extensive and elaborate hedging with respect to the Reference

Funds.  Investors would be exposed to many risks, including LBHI credit risk.  The sale

proceeds of the Warrants could be used for hedging through affiliates of LBI and LBHI.

The Warrants could be terminated <u>by</u> <u>LBI</u> upon a "Hedging Disruption Event,"

representing inability of LBHI "and/or any of its affiliates" . . . to hedge the price risk of

the Issuer issuing and performing its obligations with respect to the Warrants."   The

Customers respectfully refer to and incorporate herein the private placement memoranda,

and all related documents issued by LBI and LBHI in connection with the marketing and

sale of the Warrants.

5.      At the filing date of the LBI SIPC proceeding the Claimants' accounts at

LBI contained "securities," as defined by SIPA, that had been purchased from LBI.

Among those securities were the Warrants issued by LBHI in 2007 and 2008 that were

sold by and through LBI.  The Hedges were tied into the Warrants.  The Customers paid

over $3 million for the Warrants.

6.      In early 2010, the Trustee served upon each of the Claimants a notice (the

"<u>Determination Notice</u>"), denying each Claim for Warrants.  Each Determination Notice

stated, *inter alia*, as follows:

> Your Claim is DENIED.  LBI records indicate that the above-
> referenced account(s) (the "Account") an all cash and securities
> related to the Account have been transferred to Barclays Capital
> Inc. ("BCI").  To the extent securities related to the Account were
> unavailable and could not be purchased for replacement, the
> Trustee has provided BCI with cash instead.  An order approving
> the transfer of accounts to BCI was entered by the United States
> Bankruptcy Court, Southern District of New York, on December
> 14, 2009. . .
>
> This portion of your Claim is based on a relationship with another
> Lehman or non-Lehman entity, not a direct relationship with LBI.
> LBI owes no obligation to you as a potential creditor of another

Lehman entity.  LBI, the securities brokerage firm, is the only Lehman entity that is a debtor in this SIPA liquidation proceeding. This SIPA liquidation relates only to LBI and does not apply to any other Lehman entity, including any entity in a proceeding under chapter 11 of the Bankruptcy Code.

7.      The Claimants timely objected to the Determination Notices, requested a hearing, and asserted that the determination of their Claims should be deferred.  The Claimants reserved the rights to supplement their Objections and to seek discovery from the Debtor and such other parties as appropriate.  All but one of the Claimants filed proofs of claim in the LBHI Chapter 11 case.  The assertion of claims in the LBHI case should not prejudice the Customers' claims in this SIPA case, except in the unlikely event of a recovery of more than the full amount of their respective claims.

8.      On March 11, 2010, Anton Valukus, the Examiner appointed by this court's order dated January 16, 2009, filed a comprehensive Examiner's Report with the Bankruptcy Court disclosing false and fraudulent actions and omissions of management of LBI and LBHI, including misleading operating and financial statements that enabled LBHI and LBI management to conceal their financial condition.

9.      On June 16, 2010 the Claimants filed a Supplemental Statement and Amended Customer Claims to elaborate on their prior objections to Trustee's Determination Notices and to incorporate portions of the Examiner's Report.  In Para. 6 of the Supplemental Statement, the Claimants reiterated their belief that, irrespective of the fraud, they had valid customer claims for the net equity in their respective customer accounts:

"While the Customers timely filed proofs of claim in the LBHI case in or about September 2009, and believe that they have valid claims against LBHI, they submit that they also have net equity claims as customers in this SIPC case that have been ignored by the Trustee."

**Argument**

A.    <u>Customer Claims for Net Equity</u>

10.    To expunge the Claimants' customer claims at issue, the Trustee has mischaracterized them and cited a host of old cases that are not germane.  Despite the submission of LBI account information and documentation with the filed claims, the Trustee alleges that the claims were based on "fraud, misrepresentation and failed trades." The Barclays pending litigation in this Court relating to the sales process suggests that there may have been fraud and misrepresentation at LBI and LBHI.  That fraud and misrepresentation should not be used by the Trustee as a shield in the claims allowance process.

11.    SIPA defines "customer" as

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. . .

> *15 U.S.C. § 78lll(2).*

Thus the Claimants are customers of LBI with respect to the claims for Warrants.

12.    According to this Court's recent decision, it is not disputable that the Customers' accounts showed net equity at the filing.

> "Under SIPA, the Trustee is required to determine a "customer" claim based on the "net equity" of the customer as shown on the books and records o the debtor.  *15 U.S.C. § 78fff-2(b)*; *see also In re Adler Coleman Cleaning Corp., 211 B.R. 486, 489 (Bankr. S.D.N.Y. 1997)* (explaining that the "value of a customer's account, or its 'net equity', is the measure of its preferred SIPA customer claim").  Net equity is

-6-

The dollar amount of the account or accounts of a customer, to be determined by (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer …; minus (B) any indebtedness of such customer to the debtor on the filing date; plus (C) any payment [*16] by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under *section 78fff-2(a)* of this title).

*15 U.S.C. § 78lll(11)*.  As is clear from the definition, net equity is calculated as of the filing date.  *See also In re Adler, Coleman Clearing Corp., 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996)* (explaining that "[a] customer's account is valued as of the date the SIPA liquidation is commenced")."

*SIPC v. Lehman Brothers Inc., 2010 Bankr. Lexis 1623 at P5.*

13.    The Customers' account statements showing Warrants were attached in the Trustee's moving papers.  The hedges would and should have been included in the Customers' securities positions on the filing date.  The Trustee should not divert attention from the indisputable facts that (a) the Claimants' documented customer claims are based on purchases in 2007 and 2008 of the Warrants issued by LBHI in their respective accounts, (b) the purchases were paid for with cash of the Claimants in their accounts at LBI, (c) the Warrants were sold to the Claimants by LBI brokers and LBI issued to the Claimants LBI purchase confirmations showing the purchase of the Warrants, (d) following the purchases of and payment for the Warrants, LBI issued customer statements showing activity of such securities, and (e) hedges were in place.  The most recent pre-filing LBI customer statements issued to the Claimants were dated August 31, 2008.  These statements showed Warrants for each of the Claimants with values indicated in Exhibit "A" hereto.

B.      The Disappearance of Net Equity in the Customer Account Transfer from LBI to
BCI

14.     Despite numerous allusions to hedging in the offering documents and the highly likely hedging by LBI, LBHI and/or their affiliates concerning the Warrants, there was a shocking difference between (i) the August 31, 2008 LBI account statements of the Customers and (ii) the Customers' opening account statements at BCI.  $4 million in net equity disappeared virtually overnight.   Despite the Customers' objections to the Determinations, the Trustee has failed to address the disappearance of value.   If Customers were going to be wiped out on their investments in Warrants, the Trustee should not have transferred the Warrants to BCI.

15.     The Trustee posits the argument that the simple transfer to Barclays of the Claimants' securities - having significant value on LBI's last customer statements - but no value of Barclays' statements - relieved LBI and the SIPC estate of their responsibility. The Account Transfer Order of the Bankruptcy Court and its implementation enabled the LBI trustee and SIPC to eliminate liability of LBI in the customers' accounts.  Thus significant customer net equity claims, such as those of the Claimants, became valueless in the Barclays accounts.  The purpose of the SIPA statute, protection of Customers with valid net equity claims, is thus undermined and this court should not tolerate the practice. Did the Trustee advise the Court that the Customer Accounts Transfer process would entail such a result?  The Claimants were not so advised.

16.     Para. 1 of the Trustee's Motion to Uphold says " ... there is no dispute that all property entrusted to the Debtor was fully returned to Claimants in the Account Transfer process, thus satisfying all customer claims in full..."  But there is a dispute.

Nothing was returned on the claims for Warrants except Barclays' customer statements showing "no indicative value" and no market price for them.

C.   <u>The Customer Claims Should Include The Supporting Hedges</u>

17.   The Trustee likely will argue that he may trim the hedges from the Warrants, claiming that in order to satisfy his duty as promptly as possible, SIPA grants the Trustee authority to "sell or otherwise transfer to another member of SIPC, without consent of any customer, <u>all or any part of the account of a customer of the debtor</u>." SIPA § 78fff-2(f). (emphasis supplied).

18.   After his professionals' research and analysis of the books and records of LBI and its affiliates, the Trustee must come forward and disclose what is in the Customers' accounts, including hedges.  Otherwise the Trustee has not fulfilled his duty under SIPA to discharge all obligations to customers.  Since the offering documents suggest that customer cash was used to engage in hedging transactions, it is inappropriate to ignore that cash and its proceeds in the analysis of the claims.

19.   The Trustee and SIPC cite older cases that generally are not applicable to the facts present in LBI.  In LBI the hedging was extensively covered in the offering documents and very likely utilized in the management of the Customer investments in the Warrants.  The SIPC claims of the Customers pertain to LBI's custodial function and the Customers' fiduciary relationship with LBI.  <u>In re New Times Securities Services, Inc.</u> 463 F. 3d 125 (2d Cir. 2006); <u>In re New Times Securities Services, Inc.</u> (2d Cir. 2004).

D.   <u>The Fact That the Customers May Have Claims Against LBHI Does Not Require Disallowance of Their Claims Against LBI.</u>

20.   In Paragraph 13 of the Trustee's Motion to Uphold, it is suggested that the practical effect the Customers' dual claims against LBHI and LBI "is to make the fund of

LBI customer property into an insurer or guarantor of the LBHI obligations reflected in the Warrants." That suggestion is inapposite. The Customers have claims against both entities.

21.    By its actions and inactions, LBI has stripped value from the Customers' securities claim. On September 15, 2008 LBHI filed a Chapter 11 petition. Four days later, in the middle of a LBHI asset sale effort, LBI's SIPC proceeding was commenced. What did LBI do with the hedges in the four days after LBHI's filing to protect the Customers' investments over which it was a custodian? The Customers submit that the hedges held by LBI could have been closed out to protect the Customers. Instead, LBI apparently sought to separate the hedges from the Customers' naked investment. Thus the irony of claiming the Customers' recourse to be only the naked claims against LBHI.

WHEREFORE, the Customers pray for denial of the Trustee's Motion to Uphold Determinations, determination that the Customers' claims should be allowed as customer claims consistent with their August 31, 2008 statements, prompt payment of the Customers' claims by the Trustee or by SIPC advances, up to SIPA limits, and such other and further relief as is just.

Dated:  New York, New York
        September 24, 2010

BECKER, GLYNN, MELAMED & MUFFLY LLP
*Attorneys for Richard E. Witten, Harold H.*
*Shamah, Isaac Shamah, Shamah 2000 Family*
*Trust, Robert Perl and The Lapidus Trust u/a/d*
*6/17/02*

By:    /s/ Chester B. Salomon
          Chester B. Salomon
          Alec P. Ostrow
299 Park Avenue
 New York, NY 10171
Tel: (212) 888 - 3033
Fax: (212) 888- 0255
csalomon@beckerglynn.com
aostrow@beckerglynn.com

**EXHIBIT 7**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555-jmp

5   Adv. Case No. 08-01420-jmp (SIPA)

6   - - - - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9              Debtors.

10  - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13             Debtor.

14  - - - - - - - - - - - - - - - - - - - - - -x

15

16             U.S. Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             October 28, 2010

21             10:02 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2   STATUS CONFERENCE

3

4   HEARING re: Trustee's Motion to Uphold Determinations Denying

5   Customer Status to Claims Arising From Alleged Fraud

6   Misrepresentation and Failed Trades and Expunging Related

7   Objections Thereto [3519]

8

9   HEARING re: Motion of MainStay High Yield Opportunities Fund

10  for an Order for Relief From the Automatic Stay to Remove

11  Lehman Brothers Inc. as Agent and Granting Related Relief

12  [3614]

13

14  HEARING re: Trustee's Motion for an Order Upholding the

15  Trustee's Determination of Certain Claims Regarding

16  Underwriting Fees and Expunging Objections Thereto [2833]

17

18  HEARING re: Trustee's Second Motion to Uphold Determinations as

19  to Certain Claims Based on Accounts Empty as of the Filing Date

20  and Expunging Related Objections Thereto Motion [3777]

21

22

23

24  Transcribed By:  Sara Davis

25

Page 3

1

2    A P P E A R A N C E S:

3    HUGHES HUBBARD & REED LLP

4          Attorneys for James W. Giddens, SIPA Trustee

5          One Battery Park Plaza

6          New York, New York 10004

7

8    BY:   CHRISTOPHER K. KIPLOK, ESQ.

9          JEFFREY S. MARGOLIN, ESQ.

10         JAMES KOBAK, ESQ.

11         RAMSEY CHAMIE, ESQ.

12

13   MILBANK, TWEED, HADLEY & MCCLOY LLP

14         Attorneys for Official Committee

15         One Chase Manhattan Plaza

16         New York, NY 10005

17

18   BY:   BRADLEY SCOTT FRIEDMAN, ESQ.

19         DENNIS C. O'DONNELL, ESQ.

20

21

22

23

24

25

Page 4

1

2    SECURITIES INVESTOR PROTECTION CORPORATION

3         805 15th Street, N.W.

4         Suite 800

5         Washington, DC 20005

6

7    BY:   KENNETH J. CAPUTO, ESQ.

8

9    DECHERT LLP

10        Attorneys for MainStay Fund

11        1095 Avenue of the Americas

12        New York, NY  10036

13

14   BY:   SHMUEL VASSER, ESQ.

15

16   WEIL, GOTSHAL & MANGES LLP

17        Attorneys for Lehman Chapter II Debtors

18        767 Fifth Avenue

19        New York, NY  10153

20

21   BY:   RICHARD P. KRASNOW, ESQ.

22

23

24

25

Page 5

1

2    BECKER, GLYNN, MELAMED & MUFFLY LLP

3         299 Park Avenue

4         New York, NY  10171

5

6    BY:    CHESTER B. SALOMON, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.

3         MR. KIPLOK:  Good morning, Your Honor.  Christopher

4    Kiplok for the -- Hughes, Hubbard & Reed for the SIPA trustee.

5         We have three items on this morning's calendar, the

6    first of which is the state of the estate.  We'd propose to

7    proceed with the state of the estate, take a brief recess

8    before moving on to the other contested matters.

9         THE COURT:  Okay.  That's fine.

10        MR. KIPLOK:  We'll proceed with very brief remarks

11   from Mr. Giddens, the trustee, followed by a presentation from

12   Mr. Kobak and then some remarks from SIPC through Mr. Caputo.

13        We've posted the slides that will support the

14   presentation on our website and they are publicly available.

15   And if I may approach, I have copies for you and your clerks.

16        THE COURT:  You may approach.

17        MR. KIPLOK:  With that, Your Honor, James Giddens, the

18   trustee.

19        THE COURT:  Good morning, Mr. Giddens.

20        MR. GIDDENS:  Good morning, Your Honor.  I am James

21   Giddens, the trustee for liquidation of the broker dealer

22   Lehman Brothers, Inc.

23        The purpose of our presentation today is to give a

24   comprehensive picture of what has been accomplished and the

25   principal steps we foresee to complete the resolution of

Page 51

1  given the number of litigations that you're talking about

2  bringing within that general time frame.

3         We'll take a ten-minute break and we'll resume with

4  the rest of the morning calendar at 11:30.

5  (Recessed at 11:19 a.m.; reconvened at 11:34 a.m.)

6         THE COURT:  Be seated, please.

7         MR. KIPLOK:  Christopher Kiplok from Hughes Hubbard,

8  Your Honor, on behalf of the trustee.

9         We now move to the contested portion of this morning's

10  calendar.  The first item, agenda number two, is the trustee's

11  motion to uphold determinations denying customer status to

12  claims arising from alleged fraud, misrepresentations and

13  failed trades.  My colleague Mr. Margolin will handle that

14  issue for the estate.

15         THE COURT:  Okay.

16         MR. MARGOLIN:  Good morning, Your Honor, Jeffrey

17  Margolin for the SIPA trustee for Hughes, Hubbard & Reed.

18         This motion, as Mr. Kiplok described, was fully

19  briefed including SIPC's memorandum of law, in support of the

20  trustee's determinations.  One housekeeping item, Your Honor,

21  before we begin.

22         The claim that was contained in the motion relating to

23  Emerson Investment Management, Inc. relating to trades is no

24  longer subject to the motion, it's been withdrawn.  And Mr.

25  Salomon has informally indicated that he is going to withdraw

1   his underlying objection to the trustee's determination as to

2   that claim.

3           MR. SALOMON:  Your Honor, I've been authorized to do

4   so and am awaiting a stipulation to that effect.

5           MR. MARGOLIN:  We hope to get that papered next week.

6           THE COURT:  And what, if any, significance does that

7   have to the pending matter, other than it's just not subject to

8   the motion any longer?

9           MR. MARGOLIN:  We're not going to be covering the

10  issue of failed trades, failure to consummate trades, which was

11  the subject of the Emerson claim against the LBI estate.

12          THE COURT:  Okay.

13          MR. MARGOLIN:  Two general points to begin with this

14  morning, Your Honor.

15          As the Second Circuit just noted earlier this month in

16  issuing an order in the Madoff matter, many affected parties in

17  a SIPA liquidation will be, at best, general unsecured

18  creditors of a SIPA liquidation estate.

19          Second, customer status in a SIPA liquidation is to be

20  narrowly construed and the claim -- it's the burden of the

21  claimants to provide that they're entitled to customer status

22  under SIPA.

23          These claimants at issue in the motion have been fully

24  satisfied pursuant to the account transfer order entered by the

25  Court in December of '09, as well as under SIPA.  The claims

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 154 of 227

Page 53

1    which are before Your Honor this morning, and they've taken

2    several forms for fraud, misrepresentation, alleged market loss

3    or otherwise, under well settled law in this circuit and other

4    circuits fail to meet the burden to establish customer status

5    under SIPA, and again are at best, general unsecured creditor

6    claims of the estate.

7            For background, Your Honor, the claims at issue this

8    morning arise from LBHI debt instruments.  Specifically, it is

9    the purchase and possession of LBHI warrants, which will --

10   I'll be referring to this morning as warrants, relating to

11   calls on Millennium Fund and D.E. Shaw Oculus Funds.

12           The warrants are linked to the respective performance

13   of stock in the Millennium USA and D.E. Shaw Oculus Fund.  Each

14   of the warrants entitle the holder to receive from LBHI an

15   amount, if any, based on the performance of Millennium and D.E.

16   Shaw Oculus.  They were not direct investments in these

17   entities.

18           Again, these are LBHI debt instruments, and the

19   claimants have already filed claims besides the LBI proceeding

20   in the LBHI proceeding relating to these instruments.

21           With the LBHI Chapter 11 proceedings, there has been a

22   significant diminution of value of the warrants.  However,

23   these warrants, along with the other full contents which were

24   in these claimants' accounts, were transferred to Barclays

25   pursuant to the account transfer motion and order that the

08-01420-scc    Doc 8246    Filed 02/14/14    Entered 02/14/14 17:50:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 155 of 227

Page 54

1    Court approved at a hearing on December 9th of last year --

2    excuse me, December 10th, and a subsequent order entered by the

3    Court on December 14th.

4         Notable is the fact that the claimants have no

5    objection to the transfer of the claim, of certain blue chip

6    stocks and other investment vehicles which were in their

7    accounts, and are only claiming again these LBHI debt

8    instruments, all of which that they now enjoy and have full

9    access to at Barclays.

10        Looking at this, Your Honor, again, as I stated

11   before, that these claimants have been satisfied pursuant to

12   the account transfer order and SIPA.  Moreover, under SIPA, as

13   the Second Circuit again just reiterated in this Madoff order,

14   which was issued this month, a critical aspect of a SIPA claim

15   is entrustment of properties to the debtor for investment.

16        That no longer exists with these instruments, all

17   being transferred to Barclays, pursuant to the account transfer

18   order.  For this basis alone, Your Honor, the claimants are not

19   entitled to customer status.

20        However, the claimants initially claimed when the

21   warrants were purchased in 2007 and 2008, LBI failed to make

22   appropriate disclosures regarding LBHI, thereby placing the

23   claimants, and I quote, at risk in investing in the warrants.

24        The claimants' supplemental objection to the trustee's

25   determination filed in June also hinted at potential

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 55

1   misrepresentations or fraud in connection with the sale of

2   these instruments.  As a factual matter, Your Honor, the

3   private placement memoranda issued by LBHI in connection with

4   the sale of these warrants stated, and we attached those

5   private placement memoranda to a supplemental declaration in

6   support of the trustee's position here, cite extensively to the

7   potential risk involved with these warrants.

8          And I quote, the warrant payment amount could be zero,

9   and the warrants are leveraged instruments that involve a high

10  degree of risk that may result in the warrants maturing to be

11  worthless.  With this factual matter in mind, Your Honor, there

12  are many authorities in SIPA in this district, in this circuit,

13  and throughout the country, which are unanimous that the claims

14  for damages resulting from alleged fraud or misrepresentation

15  are not customer claims.  They are at best, general unsecured

16  creditor claims.

17         Moreover, as this is a security or debt instrument of

18  an affiliate of the debtor in this proceeding, LBI, these

19  claims are potentially subject more than just being at best

20  general unsecured claims, but subject to further subordination

21  under Section 510(b) of the Bankruptcy Code.

22         With this in mind as well, is that these claimants

23  again fail under SIPA because they are not property received,

24  acquired, or held by the debtor within the meaning of SIPA

25  Section 78(LLL)(2).

Page 56

1          With this in mind, Your Honor, the claimant's

2    objection filed last month seem to move away from alleged

3    fraud, misrepresentations, which were contained in their

4    earlier filings.

5          As looking at their objection filed last month, they

6    seem to think the trustee's transfers of the warrants to

7    Barclays and the accounts retro process was improper for two

8    reasons.  First, the warrants had declined in value since the

9    claimants' August 31st account statements in 2008, which

10   predated the LBHI bankruptcy filings, and two, they identify

11   for the first time transfers -- that the transfer failed to

12   include unidentified hedges, in which LBHI may have engaged to

13   mitigate its own risk as debtor on the warrants.

14         As to the claims of misrepresentation or of market

15   loss, as Chief Judge Gonzalez stated in the Kloss, Maos and

16   Shire (ph) liquidation, the loss of market value of securities

17   is not entitled to customer protection under SIPA, and is at

18   best general unsecured creditor claims.

19         Moreover, as Your Honor had held in the 5th Circuit

20   decision, it is black letter case law and under the statute of

21   SIPA, the net equity is calculated on the filing date.  We do

22   not look back to the August 31st, 2008 account statements.

23         As a result, Your Honor, the trustee again contends

24   that claims for market loss are again at best, general

25   unsecured creditor claims on the estate.

08-01420-scc    Doc 8246    Filed 02/14/14    Entered 02/14/14 17:50:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 158 of 227

Page 57

1          On the second point in the claimants' objection, Your

2     Honor, the claimants refer to the first time to allege

3     extensive and elaborate hedging by LBHI with respect to or tied

4     into the warrants, and essentially assert customer claims,

5     putting aside whether these claims in this objection are in the

6     right format or timely for any profit relating to such hedges.

7          Two points on this, Your Honor.  First, LBI's -- the

8     starting point for any SIPA liquidation claim for customer

9     status it the LBI's books and records.  The customers' account

10    statements do not contain these hedges.  They attached some of

11    them to their claim forms, and they were contained as exhibits

12    to the trustee's motions.  Nowhere is there a reference to

13    these alleged hedges that occurred by LBHI.

14         The second point, Your Honor, is that the private

15    placement memoranda state unequivocally that any hedging

16    transactions taken by LBHI are property of LBHI.  These are

17    proprietary hedges in which the warrant holders have no

18    interest.

19         Again, Your Honor, given all these factors, however

20    you look at these claims, whether they are fraud,

21    misrepresentation, market loss, the newly found hedges claims,

22    they are not entitled to customer status under SIPA, and are at

23    best general unsecured creditor claims of the LBI estate.

24         Unless Your Honor has any questions that completes my

25    presentation on the trustee's motion.

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 159 of 227

Page 58

1          THE COURT:  All right.  Thank you, Mr. Margolin.  Mr.

2     Salomon, you're being double-teamed.

3          MR. KIPLOK:  He is, Your Honor.  On just a brief

4     comments with regard to the statute.

5          Let me start by saying that it is unfortunate that

6     these claimants lost value in their market investments.  Many

7     investors lost value at that time, but the law is clear, that

8     SIPA is not intended to provide recompense to all victims with

9     all losses in a SIPA liquidation in a firm that fails

10     financially.

11          Quite simply, the losses suffered by the claimants

12     here are not protected under SIPA.  The trustee complied with

13     his obligations to satisfy these claims when he transferred the

14     accounts under SIPA Section 78(FFF-2F).  It provides that the

15     -- in order to provide for the prompt satisfaction of customer

16     claims and the orderly liquidation of a debtor, the trustee may

17     sell or otherwise transfer to another member of SIPC without

18     consent of any customer, all or any part of the account of the

19     customer.  That's exactly what the trustee did in this case

20     with regard to these claimants.

21          And that essentially should be the end of the input.

22     The claimants' accounts were transferred to Barclays, in total,

23     pursuant to SIPA, and the claimants received everything they

24     would have been entitled to under SIPA early on, at the outset

25     of the liquidation proceeding.

Page 59

1        Now, the principles that underlie this legal

2   conclusion are well grounded in SIPA.  That is, even if the

3   accounts had not been transferred, and their claims had to be

4   dealt with individually by the trustee, the conclusion would be

5   the same.

6        Counsel for the claimants bases his argument on a

7   faulty premise that SIPA is intended to protect the value of

8   customers' positions in their accounts, but that premise is

9   simply incorrect as a matter of law.

10       First, there's no dispute that what was in the

11  accounts were securities.  In fact, that's admitted by the

12  claimants when they say at the filing date of the LBI SIPA

13  proceeding and I quote, the claimant's accounts at LBI

14  contained securities, as defined under SIPA, unquote.

15       Second, pursuant to Section 78(FFF-1B) under the

16  heading, trustee's duties, the trustee has the same duties

17  essentially as a Chapter 7 trustee in a case under Title 11.

18  But certain additional duties; one, to deliver securities to or

19  on behalf of customers to the maximum extend practical in

20  satisfaction of customer claims.

21       This particular added duty distinguishes a SIPA

22  liquidation from that of a liquidation under subchapter three

23  of Chapter 7, where a trustee is required to produce the cash

24  all positions and return to cash to customers, not the

25  securities that were actually contained in their account.

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 161 of 227

Page 60

 1          So for our purposes, the claimants' accounts contain

 2     securities, the trustee had a duty to return such securities to

 3     the claimants, and again, he did so.

 4          Under one other section of SIPA, entitled payments to

 5     customers, Section 78(FFF-2B) it provides the trustee shall

 6     discharge all obligations of the debtor to a customer by the

 7     delivery of securities, or the making of payment for that

 8     account.  And if you read down a little further in that

 9     section, there's a sub two, and in that section -- it's

10     subsection it says, with respect to claims relating to or net

11     equities based upon securities of a class and series of an

12     issuer, which are ascertainable from the books and records of

13     the broker dealer, the trustee is authorized to deliver

14     securities of such class and series.

15          So SIPA provides that the trustee can take all of

16     these securities and make prompt satisfaction, as he did in

17     this case through an account transfer; or if he had to go

18     through the claims process, deliver the actual securities

19     claimed.  The claimants claimed securities, they received

20     securities, they have their securities, but unfortunately, they

21     are not of the same value.

22          Finally, without reiterating all of the case law

23     that's contained in SIPC's briefs, and in SIPC's single brief,

24     excuse me, and in the trustee's papers, let me simply close

25     with this.  There is no case in any court, in any jurisdiction

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 162 of 227

Page 61

1    that has ever granted a customer recompense for the type of

2    claims sought here.  The law is clear.  Claims based on fraud,

3    market loss, breach of contract are not protected under SIPA,

4    Your Honor.

5            THE COURT:  Thank you.

6            Seems like a tough case, Mr. Salomon.

7            MR. SALOMON:  It is a tough case, Your Honor.  I

8    realize that I'm swimming upstream, but there are some issues

9    here and some facts and circumstances that the Court should be

10   aware of before it rules.

11           The -- there were sixty million dollars approximately

12   of these Oculus and Millennium warrants that were issued by

13   LBHI and sold by LBI in 2007 and 2008.  My clients only have

14   four million dollars.  Compared to the numbers that I heard in

15   the trustee's report, this is a very small matter, but it's

16   significant to the clients.

17           We want recognition of customer -- of their customer

18   claims for the warrants that they held in the Oculus and -- in

19   Oculus and Millennium, and there's very little information that

20   we are privy to, as to the treatment of other similarly

21   situated customers of Lehman Brothers.

22           As of today, I do not know whether all the other

23   customers of Lehman Brothers were treated in the same way.  I

24   inquired about it, but did not get an answer, as to whether all

25   customer -- customers have been similarly treated, and I'm

08-01420-scc    Doc 8246    Filed 02/14/14    Entered 02/14/14 17:50:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 163 of 227

Page 62

1    worried about discrimination against my clients because my

2    clients had, in effect, Your Honor, a transfer of their warrant

3    claims to BCI.  And BCI immediately said no indicative value,

4    meaning that it had zero value on the books and records of BCI,

5    and therefore, my clients had nothing.

6            And my clients in trying to assert a claim for the

7    return of -- for the loss that they had sustained as customers,

8    have filed -- had filed the claims, specific claims on a timely

9    basis.

10           The trustee's argument, essentially, Your Honor, is he

11   is relieved of any responsibility or -- and the customer is

12   denied any relief in the SIPC proceeding upon the mere transfer

13   of a zero value security.  And that just doesn't sound right to

14   me, Your Honor.

15           In the case of Bernard Madoff, the SIPC trustee has

16   allowed fraud claims, he's measured them in a certain way.

17   They're saying that there's never been an allowed claim for

18   fraud, that's not true.  Because the allowed amount of the

19   claims in the thousands and thousands of -- for the thousands

20   of customers in Madoff, they were all certainly created because

21   of the fraud of Mr. Madoff and his confederates.  Those claims

22   were allowed, they were measured on a net equity calculation.

23           Similarly, in New Times, the Second Circuit decision,

24   Your Honor, there was fraud by Mr. Goran (ph).  Mr. -- and yet,

25   the Court, the Circuit Court said that their claims could be

Page 63

1    allowed, despite the origin of their investment as a fraud.

2    Their claims as customers could be allowed for the amounts of

3    money that they had put in, and in some cases, for the increase

4    in value in their accounts.

5         So I don't think a simple answer, a slick answer of

6    saying that there was a mere transfer of the customer accounts

7    to Barclays is the complete answer or should be, in equity,

8    should be the complete answer here.

9         THE COURT:  Are you making an equitable argument?

10        MR. SALOMON:  Pardon me?

11        THE COURT:  Are you making an equitable argument or a

12   legal argument?

13        MR. SALOMON:  I think I'm making both, Your Honor, and

14   I've discussed New Times, the fraud that I -- that is alleged

15   is something that we found out after the customers initially

16   filed their claims.  This is the fraud that was reported in the

17   examiner's report about the failing financial condition of

18   Lehman Brothers in 2000 -- starting in 2006, and it was

19   certainly during the period that our client -- our clients were

20   making the investments.

21        THE COURT:  Mr. Salomon, I think the distinction here,

22   in my mind, is that there could well be a broker dealer like

23   Bernard L. Madoff Securities that goes into a SIPA liquidation

24   proceeding on account of the fraud associated with the

25   operations that ultimately produced the insolvency.  Or there

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 165 of 227

Page 64

1    can be, as in the case of LBI, simply a fund that fails for a

2    variety of reasons, and thus far, nobody has alleged with the

3    exception of the repo 105 transactions and certain accounting

4    issues, that there's anything comparable between LBI and

5    Madoff, other than they both ended up in bankruptcy proceedings

6    in this Court, rather close in time.

7         Your claim, however, is a claim based upon market

8    loss.  It's really a claim based upon the fact that the

9    warrants that had a notional value in the LBI account lost that

10   value upon transfer to Barclays.  Am I right that that's the

11   essence of your claim?

12        MR. SALOMON:  Yes, Your Honor.

13        THE COURT:  That's different, I think, in kind from

14   allowing claims in the Madoff SIPC proceeding where there's

15   fraud involved that caused the insolvency.  Here you're saying,

16   you're entitled to damages on account of fraud and

17   misrepresentation at the time that these investments were sold

18   to your clients.

19        MR. SALOMON:  That was the origin of their customer

20   claims, Your Honor, that we believe that there may have been

21   fraudulent omissions concerning the financial picture at Lehman

22   Brothers, but it's -- that's not the only aspect of this.  Mr.

23   Margolin referred to this in his argument, and I've referred to

24   it in the papers.  There were hedges that were undertaken.

25        And it's true that there were some parts of the PPM

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 166 of 227

Page 65

1    that said that the -- that there was no requirement to do the

2    hedges, and that the hedges were proprietary.  But sitting here

3    this morning and reading the trustee's interim report, it

4    occurs to me, Your Honor, that it is very possible that there

5    were hedges.  Investments made with cash that had been

6    deposited by the warrant customers, investments that were made

7    in Oculus and Lehman -- I'm sorry, Oculus and Millennium and

8    they were separated.  Those investments, those hedges were

9    separated from LBI, and it's unclear to me where those hedges

10   were -- where they reposed.  They may have been with LBI --

11   LBHI, they may have been with LBI.  But the trustee has ignored

12   the notion of the hedges, which were purchased with customer

13   property or at least are attributable to cash that was put in

14   with customer property, or with customer investments.  And we

15   believe that the hedges should be included in the value of the

16   customers' individual accounts.

17           There's been no discussion about that, and in trying

18   to reconcile it.  It is to me conceivable that the subject of

19   who owns those warrants is currently being -- not the warrants,

20   the hedges, is currently being debated by the SIPC trustee and

21   the Lehman LBHI debtor-in-possession.

22           But everyone has forgotten the interest of the

23   customers, and it seems to me that the customers have some

24   indirect interest in that customer property.  That has been

25   ignored in this discussion, and in this motion.  And I think it

1    should be considered.  And therefore, Your Honor, I think it is

2    premature for the Court to rule on the motion that the trustee

3    has made.

4         One, the claims were not made as fraud claims, as the

5    title of the trustee's papers state.  They were filed by these

6    customers as customer claims under SIPC.  They had -- they were

7    net equity claims, they're in the initial claims that were

8    filed by them.  There was no reference to alleged fraud.  It

9    only -- that only came to light after the filing of the

10   examiner's report.

11        And I think, Your Honor, that there should be some

12   discovery that is provided here, and the discovery would be as

13   follows:  Were all the LBI customers holding warrants treated

14   equally after the filing of the SIPC proceeding?  If there were

15   any entities that received treatment -- received dispositions

16   on their warrant, their claims for warrants, the circumstances

17   of that should be disclosed by the trustee.

18        What happened to the warrants between the filing of

19   LBHI's petition on September 15 and the filing of the SIPC

20   proceeding on September 19?  Were some of those warrants

21   redeemed and were the warrants treated in any particular way?

22   What happened to the hedges during the -- during this case, and

23   what is the status of those hedges today?  And we would like to

24   see documents concerning LBI and LBI -- communications between

25   LBI and LBHI representatives concerning the hedges of these

Page 67

1   warrants.

2        That's -- Your Honor, this is the thrust of these

3   factors that I'm seeking and seeking to resolve, is to

4   understand whether there is disparate treatment for my clients'

5   four million dollars out of sixty million dollars of warrant

6   holders here, and to see whether there, in fact, is some

7   property behind the mere promise of LBHI to pay.

8        THE COURT:  Well, I hear all these discovery requests,

9   but to what extent is that discovery associated with

10  establishing a customer claim, and to what extent is it simply

11  discovery designed to scratch the itch of curiosity that your

12  clients may feel as to whether or not there are others getting

13  better treatment in this case?

14       MR. SALOMON:  Well, they feel the itch, and it's

15  something more than curiosity, Judge.  And I think it does

16  relate to their treatment as customers.  The trustee has

17  proposed a treatment.  The trustee has said the mere transfer

18  of a security that Barclays claims is worthless is satisfaction

19  of the trustee's responsibility to transfer the securities to

20  the customer, and we don't agree with that.

21       THE COURT:  Now, the only warrant issue that you're

22  concerned with is the particular investment that your clients

23  made in the Oculus and Millennium warrants; is that right?

24       MR. SALOMON:  Yes, sir.

25       THE COURT:  To what extent have you requested informal

Page 68

1   discovery up to this point from the trustee in connection with

2   conversations that may have been designed to resolve your

3   objection?

4          MR. SALOMON:  There was initially during the summer a

5   conversation with trustee's counsel, and there was a follow-up

6   conversation that I had yesterday, Your Honor.

7          THE COURT:  Okay.

8          MR. SALOMON:  Thank you.

9          THE COURT:  Is there anything more?

10         MR. MARGOLIN:  Just briefly, Your Honor.  We did have

11  discussions with Mr. Salomon.  At no point did he raise any

12  particular items or any documents that he was looking for,

13  either over the summer or yesterday.  In any case, we feel that

14  discovery is not material to this matter, it's a question of

15  law whether these claims are covered, as customer plans under

16  SIPA, and however -- whatever theory Mr. Salomon is fashioning

17  today, they are not entitled to a customer classification under

18  SIPA; otherwise, we have nothing else and we rest on our

19  papers, Your Honor.

20         THE COURT:  Okay.  I agree with the trustee and with

21  SIPA, and this contested matter is being resolved in their

22  favor and against Mr. Salomon's clients.  In relative terms,

23  this is a fairly simple inquiry.  There has been full and

24  appropriate compliance with the requirements of SIPA in the

25  transfer of the accounts from Lehman Brothers, Inc. to Barclays

Page 69

1   Capital that took place shortly after the SIPA case was

2   commenced on September 19, 2008.  And these particular

3   customers are not entitled to a recovery for the loss in value

4   of the warrants that were contained within those accounts.

5   It's really as simple as that.

6          The discovery mentioned during argument really doesn't

7   go to the question of whether or not these customers have

8   claims that are entitled to be treated as claims as against

9   customer property.  In fact, Mr. Salomon is raising now,

10  without support as far as I can tell, questions as to the

11  integrity of the liquidation process, and whether or not

12  similarly situated customers are being treated equally or

13  disparately.

14         One of the things that I'm very clear on, particularly

15  as a result of this morning's state of the estate report, the

16  trustee and SIPA and SIPC working in cooperation with one

17  another, have been incredibly scrupulous in the handling of

18  customer claims, and no one has ever suggested, nor do I think

19  it appropriate that that suggestion be made without some

20  showing of proof, that there has been anything other than

21  ongoing scrupulous attention to the detailed requirements of

22  the SIPA statute throughout this liquidation.

23         Some of the discovery requested is also, as far as I

24  can tell, in all respects inappropriate.  The SIPA case didn't

25  commence until September 19, 2008.  Prefiling discovery between

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 171 of 227

Page 70

1    the 15th and the 19th appears to be completely out of order.

2          Concerns with respect to the hedges themselves also

3    appear to be misplaced.  Based upon what I have read, the

4    hedging strategy here was not for the benefit of customers, but

5    rather for the benefit of Lehman and its affiliates.  And so to

6    the extent that there were any hedges, that was not for the

7    account of any customer, based upon what I have read.

8          As Mr. Caputo articulated during his remarks, it is

9    unfortunate that these customers, and frankly many other

10   customers not presently represented here in court, suffered

11   significant market losses during the period surrounding the

12   Lehman filings.  They're hardly alone and individuals who had

13   nothing to do with Lehman suffered significant losses in their

14   401(k) accounts; as to that, I can testify personally.

15         My point is a simple one.  Investing in the market

16   necessarily carries with it some degree of risk.  Those clients

17   of Mr. Salomon's who invested in these particular warrants

18   presumably did so with eyes wide open, and must have assumed

19   that these investments were, relative to their overall

20   investment strategy, appropriate.

21         To the extent that they received misrepresentations or

22   sales talk that may have encouraged to make these investments,

23   they may have claims.  But those claims are not customer

24   claims, and they can be pursued elsewhere or in this case.

25         To the extent that there is an interest on the part of

Page 71

1    these particular clients in appealing this determination which

2    will be the subject of an order that I'm asking the trustee to

3    submit, consistent with these remarks, the Court reserves the

4    right to submit a more detailed written ruling, but otherwise

5    relies upon the statements made and on the briefing that was

6    submitted in support of the position of both SIPC and the

7    trustee.

8           Having read the submissions of both these customers

9    and the trustee and SIPC, I'm satisfied that the legal

10   standards as outlined in the briefs of the trustee and SIPC,

11   amply support the ruling that I've just made.

12          MR. SALOMON:  Your Honor, thank you for the decision.

13   I have one request to make.  You had mentioned that they may be

14   able to file claims in this case, as general creditors.  The

15   bar date has passed, but their claims are on file.  I would

16   request that at least their claims --

17          MR. CAPUTO:  They become general --

18          MR. SALOMON:  -- be considered as general claims.

19          MR. CAPUTO:  They become general creditor claims.

20          THE COURT:  Yeah, that's how I under --

21          MR. MARGOLIN:  Yes.

22          MR. CAPUTO:  To the extent he wants to continue to

23   pursue this, yes.

24          MR. SALOMON:  Could you include that in the order,

25   please?

08-01420-scc   Doc 8246   Filed 02/14/14   Entered 02/14/14 17:50:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 173 of 227

Page 72

1          MR. CAPUTO:  Yeah, we'll communicate with the trustee

2     and make sure you --

3          MR. MARGOLIN:  Yes.  We'll send the order.

4          THE COURT:  Fine.  I had always understood that they

5     were general claims that would be recognized to the extent that

6     there is anything for general creditors as the case progresses.

7          MR. MARGOLIN:  Thank you, Your Honor, we'll submit an

8     order.

9          THE COURT:  Thank you.

10          MR. KIPLOK:  Your Honor, that brings us to the third

11     and final matter on the agenda.  It's the motion of the

12     MainStay fund to lift the automatic stay.  My colleague Mr.

13     Chamie will be handling it for the estate, as it's MainStay's

14     motion, I believe Mr. Vasser will be handling it for MainStay.

15          MR. VASSER:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. VASSER:  Shmuel Vasser, Dechert LLP for MainStay

18     High Yield Opportunity Fund.

19          This is a motion to lift the automatic stay to either

20     allow the fund and LBIE or LIBI as it's referred to, to direct

21     State Street to deal with the collateral pursuant to the

22     instruction given by the principals, which I'll define as LIBI

23     or alternatively better, direct LBI to comply with the

24     instructions of the fund in LIBI.

25          In the factual fully briefed, fully presented, I'm not

**EXHIBIT 8**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

          LEHMAN BROTHERS INC.,

                             Debtor.

Case No. 08-01420 (JMP) SIPA

---

### ORDER UPHOLDING DETERMINATIONS DENYING CUSTOMER STATUS TO CLAIMS ARISING FROM ALLEGED FRAUD, MISREPRESENTATION, MARKET LOSS OR HEDGING TRANSACTIONS AND EXPUNGING RELATED OBJECTIONS THERETO

Upon the motion dated July 28, 2010 (the "Motion," Docket No. 3519)[1] of James W. Giddens, as Trustee (the "Trustee") for the liquidation of the business of Lehman Brothers Inc. ("LBI"), seeking entry of an order upholding the Trustee's determinations denying customer status to claims arising from alleged fraud, misrepresentation, market loss or hedging transactions and expunging related objections thereto, as more fully set forth in the Motion and the Objection and Reply Brief (defined below); and pursuant to the LBI Claims Procedures Order; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the (i) Memorandum of Law of the Securities Investor Protection Corporation in support of the Motion (the "SIPC Brief," Docket No. 3534), (ii) the Objection to the Motion filed

---

1. Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion. The Trustee removed the claim of Emerson Investment Management, Inc. from the Motion. As a result, the Motion seeks no determination as to the status of failed trades under SIPA.

by the LBHI Warrant Claimants (the "Objection," Docket No. 3727), (iii) the Trustee's Reply

Brief in Further Support of the Motion (the "Reply Brief," Docket No. 3826), and (iv) the

Trustee's Supplemental Declaration in Further Support of the Motion (Docket No. 3827); and the

relief requested in the Motion is appropriate and in the best interests of the LBI estate, its

customers, its creditors, and all parties in interest; and a hearing (the "Hearing") having been

held to consider the relief requested in the Motion, the SIPC Brief, the Objection and the Reply

Brief on October 28, 2010; and after due deliberation and sufficient cause appearing therefore

and for the reasons stated by the Court at the Hearing, it is

ORDERED that the Motion is GRANTED; and it is further

ORDERED that Trustee's determinations as to the seven claims identified in

Exhibit A hereto (the "Claims") are hereby confirmed and the corresponding objections are

hereby disallowed, expunged and closed; and it is further

ORDERED that Claims are hereby converted to general creditor claims of the

LBI estate subject to further determination by the Trustee as to validity and amount; and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  New York, New York
        November 3, 2010


                                          _s/ James M. Peck_____
                                          HONORABLE JAMES M. PECK
                                          UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

| Claimant Name | Claim No. | LBHI Warrant | Date of Trustee's Determination | Date of Claimant's Objection | Docket No. of Objection |
|---|---|---|---|---|---|
| Richard E. Witten | 900001912 | Oculus, Millenium | 1/25/2010 | 2/24/2010 | 2710 |
| Harold Shamah | 800001621 | Oculus | 2/4/2010 | 2/24/2010 | 2718 |
| Isaac Shamah | 900005893 | Oculus | 1/25/2010 | 2/24/2010 | 2714 |
| Shamah 2000 Family Trust | 800001613 | Oculus | 3/16/2010 | 4/7/2010 | 3017 |
| Robert Perl | 900001365 | Oculus, Millenium | 1/25/2010 | 2/24/2010 | 2712 |
| Lapidus Trust U/A/D 6/17/02 | 900002323 and 900002371 | Oculus | 2/4/2010 | 3/3/2010 | 2763 |

**EXHIBIT 9**

**Filed: USBC - Southern District of New York**
**SIPC v. Lehman Brothers Inc.**
**08-01420 (JMP)**

RECEIVED

JAN 2 0 2009

LEGAL SERVICES

**SIPC Claim #**                    **900001365**



CUSTOMER CLAIM FORM
LEHMAN BROTHERS INC.

Account Name: _Robert Perl_    Daytime Phone: _(212) 673-7333 x301_
Account Number: _832-04711_    Email: _rperl@towerbrokerage.com_
Address: _18 Leroy Street_
_New York, NY 10014_    Taxpayer I.D. Numbe[redacted]
Contact Person: _Robert Perl_    (Social Security No.): [redacted]

# PLEASE NOTE

- A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.
- TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.
- THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.
- ALL CLAIMS ARE DATED AS OF THE DATE RECEIVED BY THE TRUSTEE.
- YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.
- IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.
- LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.

This claim form must be completed electronically online at www.lehmantrustee.com
or mailed promptly, together with supporting documentation, to the following:

If by first class mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 6389
Portland, OR 97228-6389

If by overnight mail:

Lehman Brothers Inc. Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

   a.  LBI owes me a credit or cash in the amount of:            $ *See attached statement*

   b.  I owe LBI a debit or cash in the amount of:               $ _____

   c.  If you wish to repay the debit balance listed in point b. above please
       insert the amount you wish to repay and attach a check payable to
       "James W. Giddens, Trustee for the SIPA Liquidation of Lehman
       Brothers Inc." If you wish to make a payment, **it must be enclosed**
       with this claim form.                                     $ _____

2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

   ### Please Do Not Claim Any Securities You Have In Your Possession

   |   |   | YES | NO |
   |---|---|-----|-----|
   |   |   | (Circle Y or N) | |
   | a. | LBI owes me securities: | (Y) | N |
   | b. | I owe LBI securities: | Y | (N) |

   c.  If yes to either, please list below (or in     *See attached statement*
       additional pages as necessary):

   | Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
   |---|---|---|---|---|
   | | | | LBI Owes Me (Long) | I Owe LBI (Short) |
   | | WTS Lehman Bros Hldgs Inc Call WT LKD MILLENNIUM | | $166,855.00 | |
   | | WTS Lehman Bros Hldge Inc Call WT LKD DE SHAW OCULUS FD ACCD INVS | | $459,130.10 | |
   | | | | *See attached statement* | |
   | | | | | |
   | | | | | |

   If additional space is needed, attach additional pages providing the information in the exact
   format above.

   *I wish to make a claim for all my securities*

3.    **COMMODITY FUTURES CLAIMS**

<u>YES</u>        <u>NO</u>
(Circle Y or N)

Do you have a claim based on a commodity futures account?        Y        (N)

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim: _____

Basis for Claim: _____

_____

_____

_____

_____

**WHEN COMPLETING SECTIONS 1 THROUGH 3 PLEASE KEEP IN MIND:**

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.
- Proper documentation can speed the review, allowance, and satisfaction of your claim.
- Please enclose: copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim; and any other documentation or correspondence you believe will be of assistance in processing your claim.
- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.
- If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CIRCLE THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.**

NOTE:    **IF "Y" IS CIRCLED FOR ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

<u>YES</u>        <u>NO</u>
(Circle Y or N)

4.    Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)?        (Y)        N

5.    Has there been any change in your account since September 19, 2008?        (Y)        N

3

6. Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI?    Y    (N)

7. Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s).    Y    (N)

8. Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI?    Y    (N)

9. Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming.    Y    (N)

10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers.    Y    (N)

11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker.    Y    (N)

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Full name: _____

Address: _____

_____

Phone number: _____

Email address: _____

If more than one person is assisting you, attach additional pages providing the information in the exact format above.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date _____1/16/2009_____    Signature _____

Date _____    Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

4

# LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008

page    1 of    14

**Your investment
representative:**

LEHMAN BROTHERS INC.
399 PARK AVENUE
6TH FLOOR
NEW YORK NY  10022
TEL:  800-392-5000

**Portfolio summary**

| | |
|---|---|
| 3 | Account asset allocation |
| | Change in account value |
| | Tax spotlight |
| | Bulletin board |
| | Anticipated income |
| | Upcoming activity |
| 5 | Equities summary |
| 6 | Holdings |
| 10 | Activity |
| 11 | Cash investment summary |
| 12 | Tax lots |
| 14 | Realized gains and losses |



*All transaction dates
appearing on this statement
are settlement dates, unless
otherwise labeled.*

ROBERT PERL
18 LEROY STREET
NEW YORK  NY  10014-3905

## Bulletin board (continued on pg.4)

(continued on pg.4)

Lehman Brothers is committed to complying with various customer
identification and verification obligations.  We may ask you to provide
documentation or additional information, as necessary, to enable Lehman
Brothers to comply with these requirements. We may also screen your name
against various databases to verify your identity. This verification
applies to both new accounts and when changes are made to existing
accounts. Please be assured that this information and documentation will
be treated with the highest regard to your personal privacy.

Business Continuity at Lehman Brothers: For a summary of how Lehman
Brothers would respond to a significant business disruption,
please go to www.lehman.com/bcp.htm.

Additional information about your investment representative or your
representative's brokerage firm may be available by accessing FINRA's
BrokerCheck program.  Please visit www.nasdbrokercheck.com or
call 1-800-289-9999 for more information.

# LEHMAN BROTHERS

| Premier client account

ROBERT PERL
August 1 - August 31, 2008

## Understanding your portfolio statement

**Client Services Department** Within the U.S. 800-253-4626
International 212-526-5600
Please contact us immediately to report any errors, omissions or discrepancies you find in your statement. Any oral communications should be re-confirmed in writing. Please send written inquiries to:
Lehman Brothers
Compliance Division
399 Park Avenue, 6th Floor
New York, NY 10022-3763
If you have any questions about your statement or you have a material change in your investment objectives or financial situation, please call us. A financial statement of Lehman Brothers Inc. is available for your personal inspection at our offices, or a copy of it will be mailed upon your written request.

**Transaction charges** Details of transaction charges and commissions are displayed on transaction confirmations, which have been mailed separately to you. We will also send you this information upon request.

**Client order policy** We route client orders to the market where we believe clients receive the best execution, taking into account price, reliability, market depth, quality of service, speed and efficiency. Ordinarily, we will route orders only to markets where there is an opportunity for them to be executed at better prices than the quoted bid or offer. Lehman Brothers does not accept hard-dollar payment for directing customer orders to particular broker/dealers or market centers. However, we may receive discounts, rebates, reductions of fees or credits as a result of the overall volume of our trading activity or directing certain orders. But those benefits will generally not be sufficient to offset the cost of directing orders to such broker/dealers or market centers. If your statement indicates that a security was delivered to you or your designated representative, and you have not received it within three weeks, you must notify your branch office immediately. If you do not notify your branch office within 5 months of the statement delivery date, Lehman Brothers Inc. will not be responsible for the cost of posting a replacement bond.

**Pricing and foreign exchange rates** We obtain pricing and foreign exchange rates from various outside sources and do not guarantee the accuracy, reliability, completeness or attainability of this information. The prices of the securities appearing herein have not been adjusted from the closing market prices to reflect any adjustment (such as an illiquidity discount) that may apply or be appropriate to a particular security or position that is a restricted security, a control security or a similar type of security that is not freely tradable in the hands of the client. You or your service providers should make the necessary adjustments that you believe are appropriate for the security, the client is status and the prevailing market conditions. The prices and rates in this statement indicate values as of the close of business on the last business day of the month only.

**Cost basis** The unit cost for securities have been obtained from various outside sources, including, where applicable, supplied by you. We do not guarantee the accuracy, reliability or completeness of this information. Cost basis and associated realized gain and loss information has been provided to you as a courtesy. Such information may not reflect all adjustments necessary for tax

reporting purposes. You should verify cost basis and corresponding gain/loss information against your own records when calculating reportable gain or loss resulting from a sale. You are solely responsible for the accuracy of cost basis and gain/loss information reported to federal, state and other taxing authorities.

**Funds and securities** Clients funds and securities are held at Lehman Brothers. We will pay you a free credit balance in any account, except for regulated commodity accounts, on demand. These funds may be used for our business purposes and are properly accounted for on our record book.

**Guide to Lehman Brothers Equity Research Rating System** Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector ("the sector coverage universe").

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

### Stock Rating

| | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 2 - Equal weight: | The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| RS Rating Suspended: | The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company. |

### Sector View

| | |
|---|---|
| 1 - Pos / Positive: | "sector coverage universe" fundamentals/valuations are improving. |
| 2 - Neu / Neutral: | sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating. |
| 3 - Neg / Negative: | sector coverage universe fundamentals/valuations are deteriorating. |

**Independent Research:** We provide ratings from Independent Research Providers ("IRPs") for certain companies. BNY Jaywalk Inc., an intermediary, maps individual IRP ratings to standard ratings (1-Buy, 2-Hold, 3-Sell) which are referenced on your statement.

**Taxes** For tax reporting purposes, you should rely on the official tax forms we send you after the end of the year.

**Late charges** If you purchase securities in your cash account and do not make payment by the settlement day, you may have to pay a late charge.

**Interest charges** Any interest you are charged is generally calculated from the 21st day of each month through the 20th day of the following month. When the 20th day falls on a weekend or holiday, the interest is calculated through that weekend or holiday, and the next business day is the start of the next interest period.
*To calculate interest charges, we do the following:*
Net average debit balance x interest rate x number of days the debit was outstanding x 1/360
We charge you interest on the debit balance in your account. Interest charges that are not paid will be added to the opening balance debit balance in your account for the next interest period.

**Credit balances** In accordance with New York Stock Exchange Rule 436, it is our understanding that any free credit balances in your account are being maintained for the purpose of investing those amounts through us.

**General information** All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretations of the pertinent exchanges, markets, self-regulatory organizations and clearing houses, as well as the terms and conditions set forth on the reverse side of Lehman's trade confirmation. All balances are subject to verification. Post-settlement and other differences may appear on subsequent statements. We and our affiliates trade for our own accounts, including as odd lot dealers, block positioners or arbitrageurs. At the time of any transaction in your account, we or our affiliates may have a long or short position in the same security and our positions may be completely or partially hedged. This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax return and to verify interest charges that may appear on your next statement.
We are required by law to report to the Internal Revenue Services certain dividends, bond interest and the net proceeds of certain transactions. For tax reporting purposes, you should rely on the 1099 forms that you will receive from us after the end of the year.

**Member of SIPC** Lehman Brothers Inc. is a member of the Securities Investor Protection Corporation (SIPC). Under SIPC regulations, Lehman Brothers Inc. must protect the securities and cash held in client accounts up to $500,000 per client (including up to $100,000 for claims for cash). In addition to the coverage required by SIPC, Lehman Brothers Inc. carries coverage protection from the Customer Asset Protection Company. Thus, the securities and cash held for clients by Lehman Brothers Inc. are protected up to each client's net equity. This coverage does not protect against changes in market value. Securities lending, borrowing transactions (including repurchase and reverse repurchase agreements), and private equity may not be protected by SIPC. Sweep funds in the Lehman Brothers Bank Cash Deposit Account are also not covered by SIPC. You may obtain information about SIPC, including the SIPC brochure, at www.sipc.org or by calling 202-371-8300.

# LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008

page   3 of   14



LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008



# LEHMAN BROTHERS

| **Premier client account**

ROBERT PERL
August 1 - August 31, 2008



LEHMAN BROTHERS

**| Premier client account**

ROBERT PERL
August 1 - August 31, 2008



# LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008

Equities

# LEHMAN BROTHERS

| **Premier client account**

ROBERT PERL
August 1 - August 31, 2008

Equities

page    8 of    14

## Alternative investments

*The information reflected in this section is for informational purposes only and does not replace or supercede your Alternative Investment account statement. These positions may reflect the valuation as of a prior period and are derived from external sources. These positions are not held in custody by Lehman Brothers Inc. and are not subject to SIPC. Please also note that the totals may differ from the sum on individual components due to rounding.*

| Private equity | Total Capital Commitment/ Remaining Commitment | Called Capital[B]/ Recallable Distributions | Total Contributions/ Total Distributions | Estimated Value | Value in Excess of Net Contributions | Pending Cash[E] | Comments |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Mortgage Opportunity Fund (Onshore) L.P. | | | | | | | |
| Product Ref.: MOFO/USD | | | | | | | |
| Closing Date: 21 Apr 2008 | | | | | | | |

2   Estimate based on preliminary activity information and may be revised upon the
    issuance of the next Capital Account Statement.

# LEHMAN BROTHERS

**| Premier client account**

ROBERT PERL
August 1 - August 31, 2008

Alternative investments



LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008

page    10 of    14



LEHMAN BROTHERS

**| Premier client account**

ROBERT PERL
August 1 - August 31, 2008

page    11 of    14

LEHMAN BROTHERS

| Premier client account

ROBERT PERL
August 1 - August 31, 2008



LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008



LEHMAN BROTHERS

**Premier client account**

ROBERT PERL
August 1 - August 31, 2008



# BARCLAYS WEALTH

| Premier client account

ROBERT PERL
November 1 - November 30, 2008

page    1 of    15

**Your investment representative:**

BARCLAYS CAPITAL INC
399 PARK AVENUE
6TH FLOOR
NEW YORK NY 10022
TEL: 800-392-5000

**Portfolio summary**

| | |
|---|---|
| 3 | Account asset allocation |
| | Change in account value |
| 4 | Tax spotlight |
| | Bulletin board |
| 5 | Anticipated income |
| | Upcoming activity |
| 6 | Equities summary |
| 7 | Holdings |
| 12 | Activity |
| 13 | Cash investment summary |
| 14 | Tax lots |

**Valuation summary: USD**



*All transaction dates appearing on this statement are settlement dates, unless otherwise labeled.*

ROBERT PERL
18 LEROY STREET
NEW YORK NY 10014-3905

---

## Bulletin board (continued on pg.4)

Barclays Wealth is the wealth management division of Barclays Bank PLC, including Barclays Capital Inc. in the United States. Barclays Capital Inc., an affiliate of Barclays Bank PLC, is a U.S. registered broker-dealer and regulated by the Securities & Exchange Commission. The registered office of Barclays Capital Inc. is 200 Park Avenue, New York, NY 10166. Barclays Bank PLC is registered in England and Wales (registered no. 1026167) with a registered office at 1 Churchill Place, London, E14 5HP, United Kingdom. Barclays Bank PLC is authorized and regulated by the Financial Services Authority.

Please note that the current market environment is creating the inability to determine a market value for certain products. These products will be reflected as "Not priced" in the market value column and will be referenced in the comment section as "Unpriced security." This will impact your month to month overall account value, and may also result in an unrealized loss equal to the purchase price of that security. This does not necessarily mean that the security has no value, but rather reflects the current inability to provide a price that we believe is accurate.

Member SIPC

The Multi-tone area of this document changes gradually from light to dark. Heat sensitive "BARCLAYS" on front of the document turns from Grey to Clear when heat is applied.    CS-00000000-E


# BARCLAYS WEALTH

**| Premier client account**

ROBERT PERL
November 1 - November 30, 2008

## Understanding your portfolio statement

**Client Services Department** Within the U.S. 800-253-4626
International 212-526-5600
Please contact us immediately to report any errors, omissions or discrepancies you find in your statement. Any oral communications should be re-confirmed in writing. Please send written inquiries to:

Barclays Wealth
Compliance Division
399 Park Avenue, 6th Floor
New York, NY 10022-3763

If you have any questions about your statement or you have a material change in your investment objectives or financial situation, please call us. A financial statement of Barclays Capital Inc. is available for your personal inspection at our offices, or a copy of it will be mailed upon your written request.

**Transaction charges** Details of transaction charges and commissions are displayed on transaction confirmations, which have been mailed separately to you. We will also send you this information upon request.

**Client order policy** We route client orders to the market where we believe clients receive the best execution, taking into account price, reliability, market depth, quality of service, speed and efficiency. Ordinarily, we will route orders only to markets where there is an opportunity for them to be executed at better prices than the quoted bid or offer. Barclays Wealth does not accept hard-dollar payment for directing customer orders to particular broker/dealers or market centers. However, we may receive discounts, rebates, reductions of fees or credits as a result of the overall volume of our trading activity or directing certain orders. But these benefits will generally not be sufficient to offset the cost of directing orders to such broker/dealers or market centers. If your statement indicates that a security was delivered to you or your designated representative, and you have not received it within three weeks, you must notify your branch office immediately. If you do not notify our branch office within 5 months of the statement delivery date, Barclays Wealth will not be responsible for the cost of posting a replacement bond.

**Pricing and foreign exchange rates** We obtain pricing and foreign exchange rates from various outside sources and do not guarantee the accuracy, reliability, completeness or attainability of this information. The prices of the securities appearing herein have not been adjusted from the closing market prices to reflect any adjustment (such as an illiquidity discount) that may apply or be appropriate to a particular security or position that is a restricted security, a control security or a similar type of security that is not freely tradable in the hands of the client. You or your service providers should make the necessary adjustments that you believe are appropriate for the security, the client's status and the prevailing market conditions. The prices and rates in this statement indicate values as of the close of business on the last business day of the month only.

**Cost basis** The unit cost for securities have been obtained from various outside sources, including, where applicable, supplied by you. We do not guarantee the accuracy, reliability or completeness of this information. Cost basis and associated realized gain and loss information has been provided to you as a courtesy. Such information may not reflect all adjustments necessary for tax

reporting purposes. You should verify cost basis and corresponding gain/loss information against your own records when calculating reportable gain or loss resulting from a sale. You are solely responsible for the accuracy of cost basis and gain/loss information reported to federal, state and other taxing authorities.

**Funds and securities** Clients funds and securities are held at Barclays Wealth. We will pay you a free credit balance in any account, except for regulated commodity accounts, on demand. These funds may be used for our business purposes and are properly accounted for on our record book.

**Guide to Barclays Capital Inc. Equity Research Rating System** Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector ("the sector coverage universe").

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

| Stock Rating | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 2 - Equal weight: | The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| RS Rating Suspended: | The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Barclays Capital Inc. is acting in an advisory capacity in a merger or strategic transaction involving the company. |

| Sector View | |
|---|---|
| 1 - Pos / Positive: | "sector coverage universe" fundamentals/valuations are improving. |
| 2 - Neu / Neutral: | sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating. |
| 3 - Neg / Negative: | sector coverage universe fundamentals/valuations are deteriorating. |

**Independent Research:** We provide ratings from Independent Research Providers ("IRPs") for certain companies. BNY Jaywalk Inc., an intermediary, maps individual IRP ratings to standard ratings (1-Buy, 2-Hold, 3-Sell) which are referenced on your statement.

**Taxes** For tax reporting purposes, you should rely on the official tax forms we send you after the end of the year.

**Late charges** If you purchase securities in your cash account and do not make payment by the settlement day, you may have to pay a late charge.

**Interest charges** Any interest you are charged is generally calculated from the 21st day of each month through the 20th day of the following month. When the 20th day falls on a weekend or holiday, the interest is calculated through that weekend or holiday, and the next business day is the start of the next interest period.
*To calculate interest charges, we do the following:*
Net average debit balance x interest rate x number of days the debit was outstanding x 1/360
We charge you interest on the debit balance in your account. Interest charges that are not paid will be added to the opening balance debit balance in your account for the next interest period.

**Credit balances** In accordance w/ Financial Industry Regulatory Authority Rule 438, it is our understanding that any free credit balances in your account are being maintained for the purpose of investing those amounts through us.

**General information** All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretations of the pertinent exchanges, markets, self-regulatory organizations and clearing houses, as well as the terms and conditions set forth on the reverse side of the Barclays Wealth trade confirmation. All balances are subject to verification. Post-settlement and other differences may appear on subsequent statements. We and our affiliates trade for our own accounts, including as odd lot dealers, block positioners or arbitrageurs. At the time of any transaction in your account, we or our affiliates may have a long or short position in the same security and our positions may be completely or partially hedged. This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax return and to verify interest charges that may appear on your next statement.

We are required by law to report to the Internal Revenue Services certain dividends, bond interest and the net proceeds of certain transactions. For tax reporting purpose, you should rely on the 1099 forms that you will receive from us after the end of the year.

**Member of SIPC** Barclays Capital Inc. is a member of the Securities Investor Protection Corporation (SIPC). SIPC provides protection for the securities and cash held in client accounts up to $500,000 per client (including up to $100,000 for claims for cash). In addition to the coverage required by SIPC, Barclays Capital Inc. carries excess coverage protection from Lloyd's of London. Thus, the securities and cash held for clients by Barclays Capital Inc. are protected up to $500 million for any one client loss ($1.2 million for cash) with an aggregate loss limit of $500 million for all claims. This coverage does not protect against changes in market value. Securities lending, borrowing transactions (including repurchase and reverse repurchase agreements), and private equity may not be protected by SIPC. You may obtain information about SIPC, including the SIPC brochure, at www.sipc.org or by calling 202-371-8300.



**| Premier client account**

ROBERT PERL
November 1 - November 30, 2008





# BARCLAYS WEALTH

**Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page    4 of    15



## Bulletin board *(continued from pg. 1)*

As part of the acquisition by Barclays Capital Inc. ("BCI") of assets relating to the Lehman Brothers Private Investment Management business effective on September 22, 2008 your account relationship was transferred to BCI and the assets held in your account have been, or are in the process of being, transferred to BCI by the trustee of the Lehman Brothers Inc. bankruptcy. This transfer of account relationships did not result in the assignment or assumption by BCI of the accompanying Lehman Brothers Client A greement, although we will operate the account under the same terms and conditions as described in your Lehman Brothers Client Agreement for the foreseeable future. We are in the process of updating all client documentation, and will be providing you with new Barclays Wealth Client Agreements and Terms & Conditions to execute in 2009.

Barclays Capital Inc. ("BCI") is committed to complying with various customer identification and verification obligations. We may ask you to provide documentation or additional information, as necessary, to enable BCI to comply with these requirements. We may also screen your name against various databases to verify your identity. This verification applies to both new accounts and when changes are made to existing accounts. Please be assured that this information and documentation will be treated with the highest regard to your personal privacy.

Business Continuity at Barclays Capital Inc. ("BCI"): For information on how BCI would respond to a significant business disruption, please call our information line at 1-866-663-2360.

Additional information about your Investment Representative or your Representative's brokerage firm may be available by accessing FINRA's BrokerCheck program. Please visit www.nasdbrokercheck.com or call 1-800-289-9999 for more information.

Barclays Capital Inc. ("BCI") provides 24 hour online access to your account information. You will have access to your account summary,


**BARCLAYS WEALTH**

| **Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page    5 of    15

## Bulletin board *(continued from pg. 1)*

holdings, activity, statements, trade confirmations and year-end tax
reports. In the coming weeks, you'll also notice a new look, as we
introduce an improved, user-friendly design. Contact your Investment
Representative if you do not currently have online access or need
assistance in accessing your account information at
www.barclayswealthamericas.com.




**BARCLAYS WEALTH**

**Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page    6 of    15





**Premier client account**

ROBERT PERL
November 1 - November 30, 2008




**BARCLAYS WEALTH**

| **Premier client account**

ROBERT PERL
November 1 - November 30, 2008

Equities

page   8 of   15



# BARCLAYS WEALTH

| Premier client account

ROBERT PERL
November 1 - November 30, 2008

**Equities**

page    9 of    15



## Alternative investments

*The information reflected in this section is for informational purposes only and does not replace or supercede your Alternative Investment account statement. These positions may reflect the valuation as of a prior period and are derived from external sources. These positions are not held in custody by Barclays Capital Inc. and are not subject to SIPC. Please also note that the totals may differ from the sum on individual components due to rounding.*


**BARCLAYS WEALTH**

Alternative investments

| Premier client account

ROBERT PERL
November 1 - November 30, 2008

page    10 of    15

| Private equity | Total Capital Commitment/ Remaining Commitment | Called Capital[B]/ Recallable Distributions | Total Contributions/ Total Distributions | Estimated Value | Value in Excess of Net Contributions | Pending Cash[E] | Comments |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Mortgage Opportunity Fund (Onshore) L.P. | | | | | | | |
|     Product Ref.: MOFO/USD | | | | | | | |
|     Closing Date: 21 Apr 2008 | | | | | | | |




**BARCLAYS WEALTH**

**Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page    11 of    15



 **BARCLAYS WEALTH**



November 1 - November 30, 2008





**Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page   13 of   15





**BARCLAYS WEALTH**

| Premier client account

ROBERT PERL
November 1 - November 30, 2008





**Premier client account**

ROBERT PERL
November 1 - November 30, 2008

page    15 of    15



**FedEx** Express®  US Airbill

FedEx Tracking Number: 8682 2078 3917

SPH21

Form No.: 0215    Recipient's Copy

**1 From** *This portion can be removed for Recipient's records.*

Date 1/16/09    FedEx Tracking Number 8682207838917

Sender's Name Robert Perl / Maureen

Company TOWER BROKERAGE

Address 335 E 10TH ST

City NEW YORK    State NY    ZIP 10009

**2 Your Internal Billing Reference** Lehman

**3 To**

Recipient's Name Lehman Bros. Claims Processing    Phone 503 350-5800

Company C/o Epiq Bankruptcy Solutions LLC

Recipient's Address 10300 SW Allen Blvd.
We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address

To request a package be held at a specific FedEx location, print FedEx address here.

City Beaverton    State OR    ZIP 97005

0392646699

8682 2078 3917

**4a Express Package Service** *Packages up to 150 lbs.*

☐ FedEx Priority Overnight
☐ FedEx Standard Overnight
☐ FedEx First Overnight

☐ FedEx 2Day
☑ FedEx Express Saver

**4b Express Freight Service** *Packages over 150 lbs.*

☐ FedEx 1Day Freight
☐ FedEx 2Day Freight
☐ FedEx 3Day Freight

**5 Packaging**

☑ FedEx Envelope
☐ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ Other

**6 Special Handling** *Include FedEx address in Section 3*

☐ SATURDAY Delivery
☐ HOLD Weekday at FedEx Location
☐ HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?

☑ No    ☐ Yes As per attached Shipper's Declaration    ☐ Yes Shipper's Declaration not required    ☐ Dry Ice    ☐ Cargo Aircraft Only

**7 Payment** *Bill to:*

☐ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Total Packages    Total Weight

**8 Residential Delivery Signature Options**

☐ No Signature Required    ☐ Direct Signature    ☐ Indirect Signature

519

Rev. Date 10/08•Part #158770•©1994–2008 FedEx•PRINTED IN U.S.A.•SRF



**DO NOT REMOVE THIS AREA**

## Peel and Stick FedEx US Airbill

1. Complete front page of the Airbill.
2. Retain "Sender's Copy" for your records.
3. Remove label backing.
4. Adhere Airbill to front of package.
   Please DO NOT remove "FedEx Copy."

PEEL FROM THIS CORNER.

Robert Ren
TOWER BROKERAGE
335 E 11TH ST
NEW YORK, NY 10009
Tel: (212) 673 - 7333

Lehman Brothers Inc. Claims Processing
℅ Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| Debtor. | |

**DECLARATION OF TIMOTHY HURLEY IN SUPPORT OF**
**THE TRUSTEE'S TWO HUNDRED SEVENTH OMNIBUS OBJECTION TO**
**GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)**

Pursuant to 28 U.S.C. § 1746, I, Timothy Hurley, hereby declare as follows:

1.     I am a Principal of Deloitte Transactions and Business Analytics LLP.  James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI"), has duly authorized me to make and submit this declaration (the "Declaration") in support of the Trustee's two hundred seventh omnibus objection to general creditor claims (the "Two Hundred Seventh Omnibus Objection to General Creditor Claims").[1]

2.     The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief, and/or upon certain proofs of claim, certain information from the LBI general claims register as maintained by the Trustee's claims agent, documents available to the public filed with the United States Securities and Exchange Commission (the "SEC"), and certain information from the books and records of the LBI estate (the "Books and Records") including certain private placement memoranda related to warrants issued by LBHI and referenced in the proofs of claim listed on Exhibit A (the "Claimed Warrants") analyzed by me

---

1.   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the motion.

or other personnel under my supervision and direction.  If called and sworn as a witness, I could

and would testify competently to the matters set forth herein.

3.      In the context of my services for the Trustee, I am involved in assisting with the

Trustee's general creditor claim reconciliation process.  Accordingly, I and personnel under my

supervision and direction have analyzed the claims asserted against the LBI estate listed in

Exhibit A annexed to the Two Hundred Seventh Omnibus Objection to General Creditor Claims

(the "Proofs of Claim"), certain information from the LBI general claims register as maintained

by the Trustee's claims agent, certain private placement memoranda related to the Claimed

Warrants (the "Offering Documents"), documents available to the public filed with the SEC as

applicable to the preferred securities identified in the Proof of Claim numbered 9002371 (the

"SEC Documents"), and the Books and Records.  For each account referenced in Proof of Claim

numbered 9001365  (a "Referenced Account"), the Books and Records were analyzed to identify

whether LBI held in custody on behalf of the claimant any partnership interests (the "Alternative

Investments") claimed in the Referenced Account.

4.      Based on our analysis referred to in paragraphs 2 and 3 above, the Offering

Documents show no indication that the Claimed Warrants are guaranteed by LBI.  The Offering

Documents show in most instances that the Claimed Warrants were issued by LBHI.[2]

5.      Based on our analysis referred to in paragraphs 2 and 3 above, the Proof of Claim

numbered 9002371 asserts a claim for LBHI preferred stock and indicates a ticker symbol that

---

2.    The Warrant Certificate, Limited Consent to Disclose Certain Information, Issuing Paying and Transfer Agency
      Agreement, Calculation Agency Agreement, Limited Power of Attorney, as available and applicable to the
      Claimed Warrants, state that the Claimed Warrants were issued by LBHI.  The Private Placement Memoranda
      of the Claimed Warrants, with the exception of the cover page of Exhibit V in each case, state that the Claimed
      Warrants were issued by LBHI.  The cover page of Exhibit V to the Private Placement Memoranda of each of
      the Claimed Warrants states that the Claimed Warrants were issued by LBI.

2

corresponds to LBHI preferred stock as shown on Bloomberg Finance L.P. or otherwise

indicates that the claim is for LBHI preferred stock.

      6.      Based on our analysis referred to in paragraphs 2 and 3 above, the Books and

Records do not show that LBI held the claimed Alternative Investments in custody on behalf of

the claimant asserting Proof of Claim numbered 9001365.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 13, 2014

                    By: /s/  Timothy Hurley
                    Timothy Hurley
                    Principal, Deloitte Transactions and Business
                    Analytics LLP

**EXHIBIT D**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

       LEHMAN BROTHERS INC.,

                     Debtor.

Case No. 08-01420 (SCC) SIPA

**[PROPOSED] ORDER GRANTING THE TRUSTEE'S TWO HUNDRED SEVENTH**
**OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS**
**(NO LIABILITY CLAIMS)**

Upon the two hundred seventh omnibus objection to claims, dated February 14, 2014 (the "Two Hundred Seventh Omnibus Objection to General Creditor Claims"),[1] of James W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), seeking entry of an order, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, disallowing and expunging the No Liability Claims on the grounds that LBI does not have any liability for them, in whole or in part, as more fully described in the Two Hundred Seventh Omnibus Objection to General Creditor Claims; and due and proper notice of the Two Hundred Seventh Omnibus Objection to General Creditor Claims having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Two Hundred Seventh Omnibus Objection to General Creditor Claims is in the best interests of LBI, its estate, its customers and creditors, and all parties in interest and

---

1.   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the objection.

that the legal and factual bases set forth in the Two Hundred Seventh Omnibus Objection to

General Creditor Claims establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

        **ORDERED** that the relief requested in the Two Hundred Seventh Omnibus

Objection to General Creditor Claims is granted; and it is further

        **ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the claims

listed on Exhibit 1 are disallowed and expunged in their entirety with prejudice; and it is further

        **ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: New York, New York
       _____, 2014

                _____
                HONORABLE SHELLEY C. CHAPMAN,
                UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

# IN RE LEHMAN BROTHERS INC., CASE NO: 08-01420 (SCC) SIPA
## TWO HUNDRED SEVENTH OMNIBUS OBJECTION: EXHIBIT 1 – NO LIABILITY CLAIMS

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 1 | ORING, NANCY, TTEE/ALVIN M LAPIDUS 19333 COLLINS AVE # 1601 SUNNY ISLE BEACH, FL 33160 | 9002371 | 1/28/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMED STOCK CONSTITUTES AN EQUITY INTEREST IN LBHI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 2 | PERL, ROBERT 18 LEROY STREET NEW YORK, NY 10014 | 9001365 | 1/20/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. LBI DID NOT HOLD THE CLAIMED PARTNERSHIP INTEREST IN CUSTODY ON BEHALF OF THE CLAIMANT. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 3 | SHAMAH 200 FAMILY TRUST C/O HAROLD SHAMAH 125 EXETER STREET BROOKLYN, NY 11235 | 8001613 | 1/27/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |

---

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 4 | SHAMAH 2000 FAMILY TRUST HAROLD SHAMAH 125 EXETER STREET BROOKLYN, NY  11235 | 7000556 | 1/27/2009 | $275,392.00 | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 5 | SHAMAH, HAROLD 125 EXETER STREET BROOKLYN, NY  11235 | 8001621 | 1/27/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 6 | SHAMAH, ISAAC 219 N BROADWAY NYACK, NY  10960-1618 | 9005893 | 2/2/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| 7 | WITTEN, RICHARD E. ACCT. NO. [REDACTED] CHESTER B. SALOMAN, ESQ. STEVENS & LEE, P.C. 485 MADISON AVENUE, 20TH FLOOR NEW YORK, NY  10022 | 4550 | 1/26/2009 | $1,869,953.80 | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI. THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI. THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.

| | NAME / ADDRESS OF CLAIMANT | CLAIM NUMBER | DATE FILED | TOTAL CLAIM DOLLARS | TRUSTEE'S REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|
| 8 | WITTEN, RICHARD E.<br>1445 FLAGLER DRIVE<br>MAMARONECK, NY 10543 | 9001912 | 1/26/2009 | UNSPECIFIED* | NO LEGAL OR FACTUAL JUSTIFICATION FOR ASSERTING A CLAIM AGAINST LBI.<br><br>THE CLAIMED WARRANTS WERE NOT ISSUED OR GUARANTEED BY LBI.<br><br>THE CLAIMS ARE INSUFFICIENT AS A MATTER OF LAW. |
| | Total | | | $2,145,345.80 | |

_____

* Claim includes unspecified amounts (i.e., amounts not specified by the claimant, amounts listed in a foreign currency, unliquidated amounts and/or amounts listed as "unknown", "$0.00*", "unascertainable", "undetermined", or where no dollar amounts were entered in the spaces provided on the proof of claim form), or is a customer claim reclassified to a general creditor claim, which, consistent with the general creditor claims register, is listed as unspecified even where the claimant listed a specific amount on the SIPC customer claim form.