HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

      LEHMAN BROTHERS INC.,

                    Debtor.

Case No. 08-01420 (SCC) SIPA

---

## NOTICE OF TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR PROOF OF CLAIM OF CONNIE & CURTIS GALE (CLAIM NO. 7000142)

**PLEASE TAKE NOTICE** that on February 27, 2014, James W. Giddens (the

"Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor"

or "LBI"), under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa

*et seq.* ("SIPA"), by and through his undersigned counsel, filed an objection to general creditor

claim number 7000142, filed by Connie & Curtis Gale (the "Objection").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will be held, if

necessary, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the

United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 621, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **April 24, 2014 at**

**10:00 a.m. (Prevailing Eastern Time)** or as soon thereafter as counsel may be heard (the

"Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must:

(i) be in writing; (ii) state the name and address of the responding party and nature of the claim

or interest of such party; (iii) state with particularity the legal and factual bases of such response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format no later than **March 20, 2014 at 4:00 p.m. (Prevailing Eastern Time)** (the "<u>Response Deadline</u>"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York 10004, Attn: Meaghan C. Gragg, Esq.; (b) the Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to the chambers of the Honorable Shelley C. Chapman, Courtroom 621, One Bowling Green, New York, New York, 10004.

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Objection, which may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
February 27, 2014

HUGHES HUBBARD & REED LLP

By: /s/ James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Robert B. Funkhouser
Meaghan C. Gragg
Jordan E. Pace
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
E-mail: kobak@hugheshubbard.com

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

**Hearing Date and Time:  April 24, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time:  March 20, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

     LEHMAN BROTHERS INC.,

                    Debtor.

Case No. 08-01420 (SCC) SIPA

**THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR**
**PROOF OF CLAIM OF CONNIE & CURTIS GALE (CLAIM NO. 7000142)**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of

Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of

1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] by and through his undersigned

counsel, respectfully represents as follows:

### RELIEF REQUESTED

1.    The Trustee files this Objection (the "Objection") pursuant to section 502(b) of

title 11 of the United States Code (the "Bankruptcy Code"), as made applicable to this

proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, seeking disallowance and

expungement of the general creditor claim filed by Connie & Curtis Gale (the "Claimants" or the

"Gales"), represented by claim number 7000142 (annexed hereto as Exhibit A) (the "Claim").

The Trustee's proposed order (the "Proposed Order") is annexed hereto as Exhibit C.

2.    The Claim arises out of an account maintained at LBI by the Gale Family LP (the

"Limited Partnership"), a limited partnership in which the Claimants are, as trustees for certain

trusts, general partners.  The Limited Partnership account was opened in June 2000 and invested

in technology stocks.  It allegedly suffered significant losses soon thereafter, coinciding with the

bursting of the so-called "dot-com bubble" beginning in 2000.  Nonetheless, the Limited

Partnership continued to maintain its account at LBI through February 2008.

3.    The Claimants, in their individual capacities, now allege that LBI made unsuitable

and unauthorized trades in the Limited Partnership's account and churned the account for the

purpose of fraudulently generating excessive and unwarranted commissions.  The Claim does not

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

have any merit and LBI is not liable to the Claimants. Accordingly, the Trustee requests that the Claim be disallowed and expunged in its entirety.

## JURISDICTION AND VENUE

4.      Following removal to this Court for all purposes as required for SIPA cases by section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred by [SIPA] upon the court to which application for the issuance of the protective decree was made." SIPA § 78eee(b)(4).

5.      Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa.

## BACKGROUND

6.      On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, United States District Court, Southern District of New York, entered the Order Commencing Liquidation (the "LBI Liquidation Order," ECF No. 1) pursuant to the provisions of SIPA in the case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL). The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; and (ii) removed the case to this Court for all purposes as required in SIPA cases by section 78eee(b)(4) of SIPA, in the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (the "SIPA Proceeding").

7.      On November 7, 2008, the Court entered the Order Approving Form and Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Other Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Claims Process Order," ECF No. 241). Beginning on December 1, 2008, consistent with SIPA section 78fff-2(a)(1), the Trustee

2

mailed more than 905,000 claims packages with filing information to former LBI customers and

other potential claimants (the "Claims Process Notice") and posted claims filing information on

the Trustee's website (www.lehmantrustee.com) and SIPC's website (www.sipc.org).  The

Trustee also published notice of the claims process in *The New York Times*, *The Wall Street*

*Journal*, and *The Financial Times*.

8.      Pursuant to SIPA § 78fff-2(a)(3) and the Customer Claims Process Order,

customer claims seeking maximum protection under SIPA must have been received by the

Trustee on or before January 30, 2009.  All customer claims and general creditor claims must

have been received by the Trustee by June 1, 2009 and no claims of any kind will be allowed

unless received by the Trustee on or before June 1, 2009 (the "Pre-Filing Bar Date").  In addition

to the Pre-Filing Bar Date, on September 19, 2013, the Bankruptcy Court entered an order (the

"Administrative Bar Date Order") that established October 31, 2013 (the "Administrative Bar

Date") as the deadline to file a proof of claim for administrative expense claims against the LBI

estate, as further described in the Administrative Bar Date Order, with respect to such

administrative expenses arising between September 19, 2008 and August 31, 2013.  The

Administrative Bar Date has now passed.  A copy of the Customer Claims Process Order was

made publicly available at www.lehmantrustee.com.  The Trustee's website allowed claimants

filing electronically to upload documents as part of their claim submission and thereby comply

with the instructions to include supporting documentation set forth in the Proof of Claim.

## ARGUMENT

9.      A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is

asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida*

*Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon Co. v. Oneida*

*Ltd.*, No. 09 Civ. 2229 (DC) (S.D.N.Y. 2010); *In re Adelphia Commc'ns Corp.*, Case No. 02-

41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re*

*Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  Moreover, section

502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to

the extent that "such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law."  11 U.S.C. § 502(b)(1).  The Claim should be disallowed for

the following reasons.

10.     **Ratification.**  LBI is not liable to the Claimants because the Claimants ratified the

trades in the Limited Partnership's account.  The Claimants acknowledge receiving monthly

statements showing the level of trading activity and losses in the account, but they never objected

to any individual trade or group of trades.  (*See, e.g.*, Statement of Claim at 7, annexed as

Exhibit 1 to the Declaration of Jordan E. Pace, annexed hereto as Exhibit B (the "Pace Decl.").)

They cannot now complain that the ratified trades were unauthorized or otherwise fraudulent.

*See Richardson Greenshields Sec. Inc. v. Lau*, 819 F. Supp. 1246, 1259 (S.D.N.Y. 1993)

("Ratification occurs when the customer acquiesces in the unauthorized trading. . . . 'A failure to

object over a long period of time is evidence of acquiescence in the unauthorized activity.'"

(quoting *Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 709 F. Supp. 70, 76 (S.D.N.Y.

1989), *aff'd in part and rev'd in part*, 936 F.2d 640 (2d Cir. 1991))).

11.     **Lack of Loss Causation.**  LBI is not liable to the Claimants because they cannot

establish that LBI's conduct caused the Limited Partnership's losses.  Loss causation is a

necessary element of securities fraud, breach of fiduciary duty, negligence, and other causes of

action alleged by the Claimants.  *See, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73

4

(2d Cir. 2005) (loss causation required for securities fraud); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 591 F. Supp. 2d 586, 589–90 (S.D.N.Y. 2008) (granting defendant's motion for summary judgment on fiduciary duty and negligence claims where plaintiffs failed to show loss causation); *Solar Travel Corp. v. Nachtomi*, No. 00 Civ. 3564 (AGS), 2001 U.S. Dist. LEXIS 7549, at*14-20 (S.D.N.Y. June 8, 2001) (dismissing claims for fraud and negligent misrepresentation for failure to show loss causation). There is no cause of action when the alleged losses are caused by market-wide events rather than by the defendant or debtor. *See Lentell*, 396 F.3d at 174 ("'[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 , 772 (2d Cir. 1994))). The Claimants allege that the Limited Partnership was heavily invested in technology stocks and suffered almost all of its losses from June 2000 to September 2002. (Statement of Claim at 12-13; *see* Confidential Account #4840 Turnover and Cost Analysis (the "Account Analysis") at 1, annexed as Exhibit 2 to the Pace Decl.) During that same period, the NASDAQ Composite Index, the leading benchmark for technology stocks, declined approximately 67%. (*See* Yahoo! Finance, NASDAQ Composite Index Chart, annexed as Exhibit 3 to the Pace Decl.) Thus, the Limited Partnership's losses resulted from the bursting of the "dot-com bubble"—that is, from a market-wide event—rather than from any alleged action by LBI. The Claimants cannot, therefore, establish any cause of action because there was no loss causation.

12.     **Statute of Limitations.**  LBI is not liable to the Claimants because the losses in the Limited Partnership account occurred outside of the limitations period for the causes of action underlying the Claim.  Those causes of action are subject to limitations periods of between one and six years.[2]  The Claimants submitted documents alleging that almost all of the losses in the Limited Partnership's account occurred by September 2002.  (*See* Account Analysis at 1.)  Yet, the Claimants did not file their Claim until after the Filing Date, which was more than six years after the alleged losses.  The Claim is therefore unenforceable as time-barred.[3]  *See* 11 U.S.C. § 558 (expressly preserving statutes of limitations defense).

13.     Because LBI is not liable to the Claimants, the Trustee requests that the Claim be disallowed and expunged in its entirety.

## RESERVATION OF RIGHTS

14.     The Claim may be objectionable on a number of additional grounds.  The Trustee reserves all rights to object on any other basis, including standing, to the Claim or any portion of the Claim for which the Court does not grant the relief requested herein.

## NOTICE

15.     Notice of this Objection has been provided to:  (i) the Claimant via first-class mail; and (ii) the list of parties requesting notice of pleadings in accordance with the Court's Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules

---

2.    The Claimants allege the following causes of action under federal law and Michigan law:  (a) violations of Sections 10(b) and 20 of the Securities and Exchange Act of 1934 and Rule 10b-5 (one year from discovery or three years from violation for violations before July 30, 2002, and two/five years thereafter per 28 U.S.C. § 1658(b)); (b) common law fraud (six years per MCLS § 600.5813); (c) negligent misrepresentation, breach of fiduciary duty, failure to supervise, and negligence (three years per MCLS § 600.5805(10)); (d) breach of contract (six years per MCLS § 600.5807(8)); (e) violation of the former Michigan Uniform Securities Act (2 years from discovery or four years from violation per former MCLS § 451.810(e)); and (f) violation of the Michigan Consumer Protection Act (six years per MCLS § 445.911(7)).

3.    To the extent that any portion of the Claim survives, the Court should disallow any claims based on conduct or damages occurring outside of the relevant limitations period.

1015(a) and 9007 Implementing Certain Notice and Case Management Procedures and Related

Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately available

for inspection upon filing with the Court at the Trustee's website, www.lehmantrustee.com. The

Trustee submits that no other or further notice need be provided.

### NO PRIOR RELIEF REQUESTED

16.    No previous request for the relief requested herein has been made by the Trustee

to this or any other Court.

### CONCLUSION

17.    For the reasons stated herein, the Trustee respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.


Dated: New York, New York
       February 27, 2014

                                                    HUGHES HUBBARD & REED LLP


                                                    By: /s/ James B. Kobak, Jr.
                                                        James B. Kobak, Jr.
                                                        Christopher K. Kiplok
                                                        Robert B. Funkhouser
                                                        Meaghan C. Gragg
                                                        Jordan E. Pace
                                                    One Battery Park Plaza
                                                    New York, New York 10004
                                                    Telephone: (212) 837-6000
                                                    Facsimile:  (212) 422-4726
                                                    E-mail: kobak@hugheshubbard.com

                                                    *Attorneys for James W. Giddens,
                                                    Trustee for the SIPA Liquidation of
                                                    Lehman Brothers Inc.*

**EXHIBIT A**

**PROOF OF CLAIM**

**UNITED STATES BANKRUPTCY COURT**

Claim Number:  7000142

| Name Of Debtor: | Case Number: |
|---|---|
| Lehman Brothers, Inc. | 08-01420 (JMP) SIPA |

| Name Of Creditor: | |
|---|---|
| Connie and Curtis Gale | |

<table>
<tr>
<td><b>Name and address where notices should be sent:</b><br><br>Stuart D. Meissner<br>C\O STUART D MEISSNER LLC<br>STUART MEISSNER, ESQ<br>1350 Broadway<br>Suite 1510<br>NEW YORK, NY  10018<br>UNITED STATES<br>Stuart@smeissner.com<br><br><br><b>Telephone number:</b><br><br>212-764-3100</td>
<td>☐  Check this box to indicate that this claim amends a previously filed claim.</td>
</tr>
<tr>
<td><b>Name and address where payment should be sent (if different from above):</b><br><br><br><br><br><br><br><br><br><b>Telephone number:</b></td>
<td>☐  Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br><br>☐  Check this box if you are the debtor or trustee in this case.</td>
</tr>
<tr>
<td><b>1. Amount of Claim as of Date Case Filed:</b><br><br>$ 2,483,797.07<br><br>☐  Unknown    ☐  Undetermined    ☐  Estimated<br><br>☐  Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.</td>
<td rowspan="3"></td>
</tr>
<tr>
<td><b>2. Basis for Claim:</b><br><br>Litigation</td>
</tr>
<tr>
<td><b>3. Last four digits of any number by which creditor identifies debtor:</b><br><br>9618</td>
</tr>
</table>

## 4. Secured Claim

Nature of property or right of setoff:

☐ Real Estate   ☐ Motor Vehicle   ☐ Other

Value of Property:

$ 0.00

Annual Interest Rate:

Amount of arrearage and other charges as of time case filed included in secured claim, if any:

$ 0.00

Basis for perfection:

Amount if Secured Claim:

$ 0.00

Amount if Unsecured Claim:

$ 0.00

**Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary.

If the documents are not available, please explain:

## 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4)

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7)

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8)

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)()

**Amount entitled to priority:**
$0.00

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Name:  stuart d. meissner esq.

Title, if any:  Attorney

Date:  December 18, 2008

**Creditor or Authorized person address:**

**Telephone number:**

☑  By checking this box, I am electronically signing this document. I intend this electronic signature to carry the same force and effect as my physical signature.

☑  I acknowledge that the Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (SCC) SIPA

### DECLARATION OF JORDAN E. PACE IN SUPPORT OF
### THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR
### PROOF OF CLAIM OF CONNIE & CURTIS GALE (CLAIM NO. 7000142)

Pursuant to 28 U.S.C. § 1746, I, Jordan E. Pace, hereby declare as follows:

1.       I am an attorney duly admitted to practice in this Court and an associate at the law firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens, trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI").  I submit this declaration in support of the Trustee's Objection to the General Creditor Proof of Claim of Connie & Curtis Gale (Claim No. 7000142) (the "Objection").

2.       Attached hereto as Exhibit 1 is a true and correct copy of the Statement of Claim, dated July 2, 2008, submitted by Claimants Connie & Curtis Gale (the "Claimants") in support of their claim.  I understand from personnel of the Financial Industry Regulatory Authority Dispute Resolution that the Statement of Claim was never filed.

3.       Attached hereto as Exhibit 2 is a true and correct copy of a Turnover and Cost Analysis, part of a set of analyses that was submitted by the Claimants in support of their claim.

     4.       Attached hereto as <u>Exhibit 3</u> is a true and correct print-out of a chart from Yahoo!

Finance showing the performance of the NASDAQ Composite Index from June 1, 2000, through

September 30, 2002, reflecting a decrease of over 67%.

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2014.

    /s/ Jordan E. Pace        
Jordan E. Pace

**EXHIBIT 1**

**BEFORE FINRA DISPUTE RESOLUTION**
-----------------------------------------------------------------x
In the Matter of the Arbitration Between

Connie and Curtis Gale

                              Claimants,

  Against

Lehman Brothers, Inc.

                              Respondent
-----------------------------------------------------------------x

### Statement of Claim

The Claimants Connie R. Gale ("Mrs. Gale") and Curtis Gale ("Mr. Gale"), collectively

hereby referred to as the "Claimants" by and through their undersigned counsel, Stuart D.

Meissner LLC submit the following Statement of Claim against Lehman Brothers, Inc.

("Lehman") hereby referred to as the "Respondent."


**I.      Parties**

**Claimants**

      Mrs. Connie R. Gale aged 61 and Mr. Curtis Gale aged 62 are Michigan residents

who have retired to a small farm in Somerset Township, Michigan over ten years ago and

have two adult children. Prior to retiring, Mr. Gale was a junior high school teacher and

Mrs. Gale was employed as General Counsel for a telecommunications company. Due to

the sale of Mrs. Gale's employer, with which she held stock options, to another company

the Gales received a substantial sum of money which they wanted conservatively

managed. In June 2000, through Mr. McDonagh's solicitation, the Gales opened with

Lehman an account for the Gale Family LP, an investment vehicle which was to be left

for their children as an inheritance. A substantial amount of the funds Mrs. Gale received

as a result of the sale was provided to the Respondent to properly manage and to provide

an inheritance for their children. Prior to opening the subject account, the Gales

investment experience in the stock market was limited. Further, there were substantial

demands upon their time; jobs, professional activities, family obligations and problems,

and later, continuous problems related to their farm.

### Lehman Brothers, Inc.

Respondent Lehman is a securities broker-dealer with its principal place of

business being 399 Park Avenue, New York, N.Y., is a member of the Financial Industry

Regulatory Authority ("FINRA") and under the law of Respondeat Superior are fully

responsible for the actions and/or inactions of Christopher McDonagh in managing

Claimants' account and in supervising the broker and the account. Mr. McDonagh was/is

a Registered Representative employed by Lehman at all relevant times related to this

proceeding and started his employment with Lehman in May, 2000 according to his

CRD.

McDonagh, located in the New York City branch of Lehman, was the assigned

account executive for the Gale accounts and has been a Registered representative with

Lehman since May 2000, having previously worked at Prudential Equity Group, LLC

from May, 1992 through May, 2000. At all relevant times, from the moment the Gale

Family, LP account was opened in June, 2000 until it was closed in February, 2008, Mr.

McDonagh misled the Gales into believing that he was a close friend whom they could

trust and that at all times he managed their money in their best interest having known him

for over 16 years. His visits from New York to Michigan to the Gale's residence,

friendly phone calls and e-mail, and assurances created a closer than arms-length

relationship resulting in an ever increasing dependency, which he took advantage of in

the form of overcharging in trade commissions and speculating with risky trades in an

account that was supposed to be conservative and properly diversified. McDonagh

abused his fiduciary relationship with the Gales by abusing their close relationship and

their lack of market experience. Over the course of their relationship, Mr. McDonagh

expressed that he had treated the Gale's account just as he did his and his wife's accounts

and thereby providing a false sense of security, all the while he in fact was earning

commissions and fees totaling an incredible $575, 372.51, an amount higher than the

ending equity of the Gale Family, LP account. He disregarded the Gale's requests for

their funds to be placed in secure investments such as bonds or well-managed mutual

funds, instead exposing them to the high risk of being concentrated in speculative stocks

which remained the case throughout the entire time the account was open until it was

closed in February, 2008.

## II.    Preliminary Statement

In June, 2000 Gale's children's inheritance account, the Gale Family LP, was

moved with Mr. McDonagh to Lehman Brothers when he switched employers from

Prudential Equity Group, LLC to Lehman Brothers. The Gales sought professional

management of their Gale Family LP account which they intended to leave for their

children and informed Mr. McDonagh that the funds being provided (2.25 million)

resulted directly from the exercise of Mrs. Gale's employer's stock options and thus, the

account needed to be managed conservatively. Further, Mr. McDonagh was informed by

the Claimants that they wanted this particular account to experience long term growth

due to the fact that this was an inheritance account to be left for their children. At the

same time Mr. McDonagh assured the Claimants that the funds would be managed, with

the aim of protecting their principal which was essential to the Gales.

Although the Claimants do not recall executing written discretionary authority on

their account as clearly required by NASD Conduct Rule 2510(b) for Lehman to have

exercised such discretion, Mr. McDonagh in fact took discretion over the entire account,

and executed the transactions within the account without proper prior authorization from

Mr. or Mrs. Gale and in violation NASD Conduct Rule 2510(b), 2110, 2120, and NYSE

Rule 408. As a result, such account was a de-facto discretionary account, further

increasing the fiduciary duty which was imposed on the Respondent, as per applicable

law.

Rather than properly investing the Gale's funds with their expressed aim of long

term conservative growth while protecting the principal to leave as a legacy for their

children, the Respondent did the complete opposite. The account was characterized by (a)

frequent and excessive commissions totaling over $575,000 in commissions and margin

interest alone, requiring the Claimants to earn on average 8.75 % annually on the funds

provided just to pay for all of the Respondent's fees (b) unsuitable over-concentrated

investments in speculative stocks even though Mrs. Gale expressed concern about the

nature of such investments. Rather than investing in a diverse asset allocation Mr.

McDonagh placed all the Gale's funds in equities, highly concentrated in the technology

sector, along with speculative stocks within such sector. Further, McDonagh sold the

only ten fixed income instruments the Gale account held (amounting to 10% of Gale's

investments) immediately upon entering Lehman, selling nine bonds on June 28, 2000 and the last remaining bond on July 7, 2000 eliminating any notion of asset diversification which remained the case throughout the time the account was open until it was closed in February, 2008 resulting in the losses.

As a result of the above, along with the extensive commissions, far from preserving capital, the account suffered more than $1.5 million in actual net overall losses excluding any statutory interest, while all other market benchmarks increased significantly. A market adjusted damage analysis demonstrates that if 60 % of the Gale's assets were invested in fixed income and 40 % in diversified equities during the same time frame, not only would they have not suffered any of the $1, 536,523.77 of actual losses, but instead they would have earned almost $950,000 from their Gale Family LP investment. A professional analysis of the Gale's account demonstrates that overall the Gale's account was not managed conservatively or even growth oriented, but was clearly managed in a speculative manner having been just under <u>two times as risky</u> than if they had been 100% invested entirely in the S&P 500 index, consisting completely of equities. Finally, the Respondent engaged in the clearly unsuitable and inappropriate use of margin in the Gale's account further adding to the unsuitable nature of the investments in addition to further increasing the risk within the entire account.

### III.     Statement of facts:

**Introduction to McDonagh, Promises/Assurances/
Material Omissions, The Expressed Need to Preserve Capital
and for Inheritance for their children**

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim
Page 5 of 24

Mrs. Gale while still employed, received a cold call at her work from Christopher McDonagh soliciting her to open an account with him. Mr. McDonagh represented himself as an experienced financial planner/ investment advisor in an effort to gain trust and confidence with his prospective client. At that time Mrs. Gale opted to open a small/limited account with him. A few years later in 1996 Mrs. Gale's employer was sold and the Gale's received a substantial sum of proceeds resulting from the exercise of her employment stock options. The Gales had earmarked such funds for various concerns such as; their daily living expenses, purchasing a farm, college expenses, and creating an inheritance fund for their children (which account is the focus of the instant claim). Mr. McDonagh, who was employed with Prudential at the time, was aware of the Gale's financial situation and called Mrs. Gale frequently to establish a personal friendship and trust. McDonagh expressed that he had great plans as to how to manage and invest their funds so as to fulfill the Gales' plans. His persistence was successful and the Gales opened more accounts; specifically, they invested into the Gale Family LP account approximately $2,249,390 over the course of almost eight years the account was open at Lehman. The Gales told Mr. McDonagh that this account was opened for the sole purpose of being an investment vehicle that would experience long term growth and be left to their sons' as inheritance.

In May 2000, Mr. McDonagh decided to leave Prudential to join Lehman Brothers. He represented to the Gales that Lehman is a more prestigious firm and that this was a great opportunity for both himself and the Gales. McDonagh assured the Gales that with the contacts at Lehman he would be in a better position to professionally manage their funds. Relying upon the trust the Gales had for McDonagh and the reputation of

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim
Page 6 of 24

Lehman, they agreed to move their accounts. During and after this transition period, the

Gales stressed to Mr. McDonagh that the preservation of their principal and conservative

growth of the Gale Family LP account was of paramount concern. They inquired whether

the funds in the Gale Family LP account should be invested into mutual funds but

McDonagh again reassured them that "he was their mutual fund", that he would pay daily

personal attention to their account and that their principal would be protected. He assured

them that the experience he would be afforded at Lehman and the information he would

be able to receive about investments translated to the Gales benefit at Lehman. However,

Mr. McDonagh failed to inform the Gales of the excessive commissions which the

Respondent would be charging along with the speculative margin trading that he intended

to utilize and the risks he intended to take in managing their irreplaceable funds.

### Discretion Taken / Unsuitable Investments/ Concentration /Unsuitable Use of Margin, Account Containing almost 200% More Risk Than the S&P 500 Leading to Catastrophic Losses

After the account was opened with Lehman Brother's, Mr. McDonagh treated it

as a discretionary account where Mr. McDonagh would purchase all of the investments

on his own, without consultation with either Mr. Gale or Mrs. Gale. When the account

initially started to lose money, Mrs. Gale repeatedly expressed her concerns and asked for

ideas with which to recoup the losses and preserve the principal. Mr. McDonagh

continuously asserted that the losses were due to market conditions, that this will take

time to work itself out, that there were many others in similar or worse circumstances,

that the Gales were like family to him and that they should trust him. Monthly statements

that reflected heavy losses and increased trading gave them cause for concern and

significant stress. McDonagh explained that their losses were simply reflective of the market conditions and that he was investing in the same investments that they were invested in (notably failing to distinguish between the clearly different suitability requirements, if such were in fact true). He sympathized with the Gales reassuring them that he and his wife were suffering the same market fate as he stated that he almost had lost his vacation home. McDonagh even tried to joke with Mrs. Gale whether she knew of any job opportunities for him as he was not sure where he might end up, due to the struggling economy. In reality the commissions/fees the Respondent earned at the Gales expense were more than the ending equity within the Gale Family LP account itself.

McDonagh, apparently afraid of losing such a wealthy account and the excessive commissions he was earning on his clients' expense went to great lengths to reassure the Gales. He invited himself to visit the Gales at their farm and flew all the way from New York with his family to do so on at least two occasions. Mr. McDonagh always took an interest in their personal issues, asked about the family, and took the Gale's son to a seminar of interest. McDonagh went to great lengths to create a trust between himself and the Gales beyond that of simply a broker and a client which further allowed him to mislead the Gales over the years that their accounts were being handled properly.

It appears that the Respondent knew there were problems with how the Gale's accounts were being handled because they sent correspondence to the Claimant asking her to rubber stamp the trading in the accounts. Instead, Mrs. Gale submitted a detailed letter expressing concerns about the management of the Gale Family LP account. Apparently, McDonagh was improperly made aware of Mrs. Gale's correspondence to Michael Cassano, the Service Manager in Lehman, instead of conducting their own

independent investigation of the trading. McDonagh called the Gales and expressed

concern that Mrs. Gale's letter might jeopardize his job, that the Gales are like family to

him, and expressed that the letter may also hurt them as well. McDonagh warned that

their Gale Family, LP account was too small for Lehman and indicated that their losses

would plummet further if Lehman dropped their account in a down market. Mr.

McDonagh advised the Gale's to write additional assurances to Lehman Brothers,

puportedly so as not to be dropped as a client. As a result, in reliance on what McDonagh

told the Gales, Mrs. Gale executed a second letter dated February 13, 2002, in which she

expressed her high regard for McDonagh's abilities and his integrity, but also made

Lehman aware of her concerns with respect to her Gale Family LP account and inquired

about their funds possibly being placed in some sort of "secure investments" such as

bonds. Lehman, well aware of Mr. McDonagh's abuse of the Gale's account, did not take

the letter with any deference. Lehman looked the other way and continued to allow

McDonagh to manage the Gale Family LP account in their own best interest and watched

as their clients took the financial blow.

Contrary to what the Gales believed, Mr. McDonagh deluded the Gales so as to

keep their account with Lehman and under his personal control. Rather than making

appropriate, secure investments, performing any type of projections regarding the Gales

needs, or creating alternative portfolio asset allocation suggestions and investing the

Gale's funds in a suitable manner, McDonagh did the complete opposite. In contrast to

their expressed objectives of conservative growth, McDonagh sold the only ten bonds the

Gale Family LP account had held (amounting to10% of Gale's investments) immediately

upon transferring to Lehman, selling nine bonds on June 28, 2000 and the last remaining

bond on July 7, 2000. This left the Gale account concentrated solely in equities which remained the case for the life of the account until it was closed in February, 2008. Despite the fact that Gale Family LP was to be managed conservatively, McDonagh concentrated its funds in speculative stocks in the technology sector exposing the Gales to a risk level inappropriate for the account objectives. Further, Mr. McDonagh utilized margin in the Gale Family LP account reassuring the Gales that it was in their interest to do so, when in fact it was another method for Lehman to add to assets so as to trade and earn fees and interest on. The Gales $2,249,390 investment earned merely $39,603.63 in income during the life of the account while Respondent earned an incredible $575,372.51 in fees, margin interest and commissions at the Gales expense. The fees, commissions, and margin interest the Respondent charged, apparently accounted for more than one third of the $1,536,523.77 loss sustained by the Gale Family, LP account.

The Gale's final conversation with McDonagh occurred in February, 2008, when McDonagh commenced the conversation with a joke about having to stand in the unemployment line due to the poor economy. Mrs. Gale expressed her repeated concern to Mr. McDonagh that the account was bereft of most of the original principal; more than $1,500,000 had been lost from the original investment, and she had yet to be told a solid plan for its restoration. Rather than the typical reassurances, Mr. McDonagh callously responded that she had enough money to live on. He then asked how her two sons were doing. Mrs. Gale terminated the conversation, and upon discussion with her husband the Gales sought legal counsel and conducted an expert analysis of the trading within the account. Such analysis conducted on May 7, 2008 demonstrated McDonagh's true intentions of earning commissions at the Gales' expense and managing their account with

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim
Page 10 of 24

Respondent's best interest in mind. The Gales realized that the close relationship

McDonagh crafted between them was an effort to gain their trust so as to keep them with

Lehman and under his control. Feeling deceived and manipulated they terminated their

contacts with McDonagh, then closed their accounts with Lehman.

## Catastrophic Losses While All Benchmarks Increased – Market Adjusted Damages

It must be remembered that at the same time that Mr. McDonagh managed to

cause catastrophic losses in the Gale's account, all benchmarks, such as the S&P 500,

were moving up substantially. In fact, if the Gales had been invested entirely in a 40/60

asset allocation they would have earned $947,273.30 or if invested in a 60/40 asset

allocation they would have earned $690,468.49 rather than losing a "net" $1,536,524 in

the account. In addition, it will be demonstrated that if the account had instead entirely

been invested in the S&P 500 Index, an index made up entirely of diversified equities

with minimal expense, the Gales would have taken almost one half of the risk which they

had taken under the Respondent's management, which not surprisingly only benefitted

McDonagh and Lehman. As a result, the Gales suffered compensatory market adjusted

damages of just under $2,500,000 before interest, attorney fees, costs or punitive

damages.

The rule providing for market adjusted damages in unsuitability, unauthorized

trading and/or churning cases is well settled. This rule of damages allows the investor "…

to recover the difference between what [he] would have had if the account had been

handled  legitimately and what [he] in fact had at the time the violation ended." *Miley v.*

*Oppenheimer & Company*, 637 F.2d 318, 327 (5thCir. 1981); *see also, Rolf v. Blyth,*

*Eastman Dillon & Co., Inc.*, 637 F.2d 77 (2d Cir. 1980); *Medical Associates of*

*Hambury,P.C. v. Advest, Inc.*, No. CIV-85-837E, 1989 WL 75142, at *1 (W.D.N.Y. Jul.

5, 1989). This measure of recovery for the loss of the bargain would be the value of the

account if it had been properly managed. *See, generally, Stevens v. Abbott, Proctor &*

*Paine,* 288 F. Supp. at 849. Although courts have recognized that it is difficult to

specifically determine the exact amount of an investor's loss of value in his portfolio,

they have approved an award of damages based on an estimation of losses sustained by

the investor. In *Miley,* 637 F.2d at 328, the Court held that:

> *This mode of estimation utilizes the average percentage performance and the*
> *value of the Dow Jones Industrials or the Standard and Poor's Index during*
> *the relevant period as the indicia of how a given portfolio would have*
> *performed in the absence of the broker's misconduct.*

### Lack of Asset Diversification
### Unsuitable Over-Concentration in Speculative Technology Stocks and
### Unsuitable Use of Margin

McDonagh, as a fiduciary in a de-facto discretionary account, failed to create any

asset diversification in the Gale Family LP account in order to limit the risk exposure of

the Gale's conservative growth account. McDonagh sold the only 10 bonds the Gale

Family LP account held (amounting to10% of Gale's investments) immediately upon

transferring the account to Lehman causing the portfolio to consist entirely of equities, a

position that remained for the life of the account until it was closed in February, 2008.

Despite the fact that the account was already susceptible of sustaining heavy losses

because it was concentrated solely in equities, McDonagh concentrated a vast majority of

the Gale's total investment holdings in the technology sector. This significantly increased the Gale's exposure to the risk of immense loss if the sector ever experienced a downturn. Furthermore, McDonagh made unsuitable and highly concentrated investments in individual speculative stocks within the technology concentrated portfolio. The portfolio was heavily weighted to speculative stocks with names such as PSINet, Gemstar, BEA Systems, Nortel Networks, America Online, Intel Corp., Motorola, and more. The losses from these seven stocks alone totaled over $690,000. In December of 2002 the account portfolio had a Standard Deviation of 26.20 almost twice as much as the Standard Deviation of 16.86 of the benchmark S&P 500 Index demonstrating a substantial risk of larger than market losses.

To further perpetuate an already bad situation, McDonagh unsuitably utilized margin in managing the Gale's inheritance funds thus adding leverage to their account portfolio. Any losses McDonagh incurred upon the Gale's account were amplified due to margin debit. Although McDonagh and Lehman were well aware of the negative impact of margin use in the Gale's account, the Respondent continued to increase its use as time progressed and as the Gale account continued to plummet. Such lack of planning, lack of asset allocation, overconcentration in risky positions and use of margin by the Respondent was unsuitable.

**Excessive Commissions, Margin Interest and**
**Fees Totaling more than $575,000**

Mr. McDonagh traded the account motivated by his desire for personal gain through commissions and to generate income for Lehman without regard for Gale's best interest. He controlled all the trading in the Gale's account and abused the Gale's trust by

engaging in transactions which were unsuitable considering their investment objectives and character of their conservative account. The unsuitable trading that McDonagh engaged in rendered it impossible to grow the account given the fact that the account was not generating any profit, but rather was sustaining continuous, substantial losses due not only to mismanagement and unsuitable trading, but also due to the substantial unwarranted trading expenses being incurred.

During the life of the Gale Family LP account with Lehman, the **Cost to Equity Ratio** which provides what the Gales needed to earn on the net value of their account just to be able to pay for the Lehman fees in the account ranged from 5.99% in 2002 to an incredible **14.35% for 2007 and averaged 8.75% per year**. The Respondent's failed to inform the Gales of the excessive fees and margin that they continued to utilize in managing their funds or that their account needed to generate an average of 8.75% a year just to cover the Respondent's fees in order to just break even.

Transaction fees being charged on the continuously sinking Gale Family, LP account ranged anywhere from $50,000 to $100,000 per year. Interestingly enough, the fees never decreased as the account lost in net value but in fact increased over time. Between margin interest and commissions Lehman earned more than $575,000 in fees off the Gale's account. The insignificant income of $39,603.63 earned in the grossly mismanaged account which had $2,249,390 invested in comparison to the fees the Lehman charged is astonishing and highlights how the Claimants paid Lehman much more than the income that the same funds were accruing.

08-01420-scc   Doc 8408   Filed 02/27/14   Entered 02/27/14 18:12:43   Main Document
Pg 33 of 51

All these purchases and sales were executed by Mr. McDonagh exercising complete discretion. Whenever Mrs. Gale expressed her concerns to Mr. McDonagh regarding the excessive trading, tax issues, expenses, and losses, he would choke up with emotion, indicate he took such expressions personally, brought up how much they were valued as close friends, that he should "trust him," and other such defensive remarks. He would often insist that he or his wife had invested in the same securities and experienced losses; switch topics; and/or ask about the family or current events in an effort to keep the Gales with Lehman and in the dark about his misguided intentions.

As a result of the intentional fraudulent actions in violation of NASD Rule IM-2310-2)b)(2) by  the Respondent and their utter failure to comply with their responsibility to supervise their broker so as to profit off of his misdeeds, the Gale's inheritance for their children is now uncertain. As a result, they have unnecessarily suffered substantial mental anguish beyond the financial losses.


IV.    **Jurisdiction**

This dispute is subject to agreements containing clauses requiring arbitration. Jurisdiction is provided by those agreements and by the rules of the Financial Industry Regulatory Authority ("FINRA") by which the Respondent is bound. This matter is also subject to the Federal Arbitration Act in that there are alleged violations of the federal securities laws and that, but for the existence of a pre-dispute arbitration agreement, this matter could have been asserted in court.

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim
Page 15 of 24

## V.    Claims

### 1.   Violations of 10b of the Securities and Exchange Act of 1934, Rule 10b-5 thereunder, Omissions and Misstatements, Common Law Fraud and Fraudulent Inducement.

Claimants repeat and re-allege Paragraphs I through IV above. The warranties and representations of the Respondent were false and fraudulent when made, and the manner in which the accounts were handled arises to a course of conduct tantamount to fraud in that: Respondent had effective control over the accounts and traded the Claimant's accounts for the purpose of generating excessive and unwarranted commissions for the Respondent; invested in unsuitable investments on behalf of the Claimant retirees. The Respondent traded Claimant's accounts without authority; utilized unsuitable margin; and failed to inform Claimant of the substantial risks involved in the their actions, including the enormous activity that they continued to execute within the account, along with the varied and excessive commissions charged, all of which were unsuitable for Mr. and Mrs. Gale.

### 2.   Negligent Misrepresentation

Claimants repeat and re-allege Paragraphs I through IV above.

Respondent carelessly made misrepresentations and omissions concerning material facts that Claimants were expected to rely upon, and which Claimants did in fact justifiably rely upon, thus suffering damages.

The representations and warranties provided to the Gales were materially false and misleading. The representations and omissions by the Respondent were directly intended for the Gales to rely upon their assurances and they did in fact so rely. The

Respondent had a duty to the Gales to exercise reasonable and ordinary care exercising

their duties and failed to do so.

### 3. Breach of Fiduciary Duty and Breach of the Covenants of Good Faith and Fair Dealing.

Claimants repeat and re-allege Paragraphs I through IV above.

Under the circumstances detailed in the facts above, Lehman owed a fiduciary

duty to the Gales which they breached. Respondent disregarded Claimants' age,

economic circumstances, employment status, retirement and the nature of the funds being

their legacy for their children. Respondent misrepresented the risk and profit expectations

of their intended trading "strategy" with callous and reckless disregard for the Claimant's

needs and objectives. The Respondent risked the Gale's funds in a trading style which

was unsuitably concentrated not only entirely in stocks but in technology and high risk

concentrations for the life of the account until it was closed in February, 2008 exposing

the account to losses. Respondent executed investments without reasonable grounds to

expect achievement of the Claimant's stated objectives. Rather, Respondent traded the

Claimant's account with the objective and result of earning commissions and fees. Not

only was Respondent aware of the Claimant's limited investment experience as well as

personal issues draining their time and focus, and that the Gales were relying exclusively

on the Respondent for advice thereby controlling the account, but in fact took de-facto

discretion over the subject account by executing trades without proper prior approval as

required under SRO rules in violation of NASD Conduct Rule 2510, SEC Rule 15c3-7

and NYSE Rule 408. These acts constitute a breach of fiduciary duty as the Respondent

exercised discretionary control over the account, as well as a breach of the covenants of good faith and fair dealing.

The NASD, in *NASD Regulations Inc Office of Hearing Officers Department of Enforcement v. Robert Joseph Kernweis, et al.*, Disc. Proc #CO2980024 (Feb 16, 2000), held in sanctioning a brokerage firm that even where a customer sought to be a "speculative investor" (which is not the case here), and is willing to "bet the ranch" on a trading strategy, a firm must still make suitable recommendations to its customer pursuant to NASD Rule 2310 and thus not recommend a strategy that would be unsuitable. The NASD held that even in such case, the concentration of a large position in a single speculative security is unsuitable even for a speculative investor. In the instant matter, the Gales specifically sought conservative/growth management of the funds in the Gale Family LP account at Lehman. In stark contrast to such expressed desires, the Respondent managed their funds in extremely risky and unsuitable manner on an ongoing basis and as such failed to meet their duty to the Gales and violated NASD and NYSE rules. The applicability of such administrative actions in guiding the Courts and arbitration panels as well has been established ever since the US Supreme Court's decision Skidmore v. Swift & Co. 323 U.S. 134 140 (1944) (explaining that the courts and litigants may properly resort to administrative rulings, interpretations, and opinions for guidance). Further, the United States Supreme Court in Bragdon v. Abbott, 524 U.S. 624,642 (1988) quoting the Skidmore decision stated that "the well reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."

By virtue of the above, the Respondent breached their duty to provide competent, professional services according to the rules and regulations of the NYSE, the NASD and industry customs, practices, standards and duties of good faith and fair dealing owed to the Gales.

### 4. Failure to Supervise; Breach of Contract; Section 20 Violations; Negligence

Claimants repeat and re-allege Paragraphs I through IV above.

Respondent is charged with the obligation to ensure that their brokers are in compliance with all regulatory rules and statutes. Respondent is also charged with the obligation to ensure that recommendations and investments for the accounts are suitable and appropriate for the Claimants and to oversee and diligently supervise accounts and brokers under their control in exchange for the fees charged to its customers including the account and margin fees charged to the Claimant.[1]  Further, the Respondent is charged with the responsibility of establishing, maintaining and enforcing written procedures reasonably designed to achieve compliance with the federal securities laws and with the rules of the NASD. Respondent violated their duty to exercise diligence with respect to the accounts of the Claimant and were similarly and otherwise negligent by:

-   failing to learn the essential facts concerning the Claimant prior to opening the accounts or executing any trading.

-   failing to monitor or supervise the transactions within the Claimant's accounts.

---

[1] <u>Marbury Management, Inc. v Kohn</u>, 629 F.2d 705, 716 (2d. Cir.), cert. Denied. 449 U.S. 1011 (1980) Where a transaction is completed through a brokerage house which requires a fee in return, the burden of proving good faith shifts to the brokerage house and requires at the least a showing that it had not been negligent in its supervision and that it maintained and enforced a reasonable and proper system of supervision over its sales representatives.

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim

- failing to establish maintain and/or enforce written procedures in a manner reasonably designed to detect and prevent the conduct complained of herein.

- as will otherwise be established at the hearing in this matter.

The acts and omissions of Respondent violated various Rules of the NASD and NYSE including but not limited to Rules 2110, 2120, 2310 and 3010 of the Conduct Rules of the National Association of Securities Dealers, Inc., NYSE Rule 405, 408 and 342 as well as Section 20 of the 1934 Act, all of which Lehman is contractually obligated to abide by.

As the Securities and Exchange Commission stated in its *Administrative Proceeding v. Painewebber Incorporated* File # 3-8928 and other proceedings, a broker dealer must conduct a reasonable inquiry into accounts so as to detect unsuitable trading by the Registered representative. Similarly here, Lehman failed to conduct an appropriate neutral inquiry despite many red flags as to the nature of the broker-client relationship, and as a result, the Gale's account suffered significant losses.

Respondent's actions were gross, wanton, or willful in callous disregard of their fiduciary duty to their customers, and in violation of the rules of the National Association of Securities Dealers. They failed to supervise the Gale's account and the transactions therein; and such Respondent knew or should have known that fraudulent activity was taking place with respect to the Gale's account but failed to institute appropriate supervisory procedures and internal controls, thereby in effect participating in the fraud.

In addition, as demonstrated herein, numerous SEC, SRO Rules were violated by the Respondent which the Respondent was obligated to comply with and enforce.

Further, by virtue of the above, Respondent has breached an express and/or implied contract with the Claimant in failing to exercise diligence with respect to accounts under their control and recommendations for said accounts and upon information and belief, in failing to abide by industry standards of conduct, express and implied, including but not limited to Lehman's own supervisory procedures and practices or internal compliance manual.

### 5. Violation of the Michigan Uniform Securities Act Article 451.502

McDonagh violated Article 451.502 Section 102 of the Michigan Uniform Securities Act prohibiting an investment adviser to employ a device, scheme, or artifice to defraud a client and engage in an act, practice, or course of business that operates or could operate as a fraud or deceit upon a client. As a result of his actions/inactions McDonagh violated such statute.

### 6. Violation of the Michigan Consumer Protection Act Article 445.903

Respondent violated Article 445.903 Section 3 of the Michigan Consumer Protection Act prohibiting unfair, unconscionable, or deceptive methods, acts or practices in the conduct of any trade or commerce in Michigan State. As a result of the actions/inactions of their employee, acting within the scope and authority of his employment, the Respondent violated such a statute.

**7. Respondeat Superior**

At all relevant times, McDonagh was an agent employed by or registered with Lehman and therefore subject to the control of the Respondent brokerage firm. As a result of individual violations of federal securities laws, common law fraud, negligence, violations of NASD rules, misrepresentations, omissions and pursuant to the doctrine of respondeat superior, the Respondent brokerage firms, as principals are strictly liable for the damage caused by their agent because he was under the firm's employment and supervision.

## VI.    Damages

1.  ***Compensatory Damages*** – Claimants request an award of
    compensatory/economic damages of market adjusted damages utilizing a 40%
    Stock and 60% Bond asset allocation amounting to **$2,483,797.07** of
    compensatory damages against Respondent which includes disgorgement of
    $575,373 in commissions and margin interest charged to the account, subject
    to presentment at the hearing.

2.  ***Punitive Damages*** –In a large multiple of the compensatory damages awarded
    based on the Respondents' gross, wanton, willful conduct in callous disregard
    of their fiduciary duty to the Gales as well as to deter future violative conduct
    by Respondent or others similarly situated. Based on the intentional acts of
    fraud in seeking commissions and as otherwise to be demonstrated at the
    hearing, at the expense of the Claimants, the Claimants request a significant
    award of punitive damages pursuant to Aldrich v. Thomson Mckinnon
    Securities Inc. et. all 589 F. Supp. 68 (S.D.N.Y. 1984)  and  Mastrobuono v.
    Shearson, Lehman, Hutton, Inc. et. al.  514 U.S. 552 (1995).

3.  ***Costs*** – Claimants request that all forum/filing fees be assessed against the
    Respondent as well as reimbursement of expert witness fees and other costs
    associated with this matter. The Claimant will provide an affidavit as to such
    costs upon request of the Panel as such will continue to accumulate through
    the hearing.

4. ***Interest*** - Pursuant to the Michigan Complied Laws of 1970, MCL 600.6013

Claimants request that the Panel apply the State's statutory pre/post judgment

interest rate calculated on all moneys to be paid in this award from the date of

filing the complaint.

5. ***Attorney's Fees*** – Pursuant to Michigan Uniform Securities Act Article

451.502 Section 102 & Article 445.903 Section 3 of the Michigan Consumer

Protection Act the Claimants respectfully request that the Panel award the

Claimants reimbursement of their attorney's fees as specifically permitted

under such statutes, so as to make the Claimants' whole. The Claimants

respectfully requests that the Panel specify that such fees are being awarded

pursuant to such statute.

Dated: New York, New York
July 2, 2008

Respectfully submitted,
**STUART D. MEISSNER LLC**

By:
    Stuart Meissner Esq.
    Attorney for the Claimant
    1350 Broadway, Suite 1510
    New York, N.Y. 10018
    212-764-3100

Gale v. Lehman Brothers Inc. et. al.
Statement of Claim
Page 24 of 24

**EXHIBIT 2**

**Confidential Account #4840**
**Turnover and Cost Analysis**
**June 2000 through February 2008**
**LB████96-18**

| Date | Total Beginning Account Value | Value of Securities Purchased | Value of Securities Sold | Monthly Transaction Costs | Margin Interest Paid | Total Monthly Costs |
|---|---|---|---|---|---|---|
| Jun-00 | 2,228,232.31 | 988,785.95 | 1,159,912.35 | 8,938.27 | - | 8,938.27 |
| Jul-00 | 2,174,912.15 | 608,319.91 | 436,539.03 | 7,001.19 | 29.19 | 7,030.38 |
| Aug-00 | 2,423,927.21 | 329,161.80 | 298,306.35 | 4,606.20 | 46.03 | 4,652.23 |
| Sep-00 | 1,980,556.93 | 270,161.68 | 318,447.55 | 7,750.88 | 20.56 | 7,771.44 |
| Oct-00 | 1,811,242.11 | 319,511.18 | 346,069.74 | 6,222.69 | 91.39 | 6,314.08 |
| Nov-00 | 1,436,960.05 | 140,957.77 | 143,917.21 | 1,290.56 | 16.29 | 1,306.85 |
| Dec-00 | 1,469,276.23 | 366,942.30 | 354,615.45 | 8,386.60 | 21.64 | 8,408.24 |
| **Avg. Net Equity** | **1,932,158.14** | **3,023,840.59** | **3,057,807.68** | **44,196.39** | **225.10** | **44,421.49** |
| Jan-01 | 1,526,719.66 | 402,160.41 | 450,023.48 | 7,243.18 | 28.83 | 7,272.01 |
| Feb-01 | 1,186,458.65 | 196,133.18 | 215,097.11 | 1,799.57 | 26.29 | 1,825.86 |
| Mar-01 | 990,681.50 | 104,135.33 | 98,970.70 | 2,309.63 | - | 2,309.63 |
| Apr-01 | 1,167,821.22 | 283,397.41 | 284,863.79 | 8,579.62 | 30.76 | 8,610.38 |
| May-01 | 1,106,401.56 | 235,909.93 | 79,170.26 | 4,509.67 | 546.64 | 5,056.31 |
| Jun-01 | 1,104,053.21 | 226,034.26 | 146,723.74 | 3,720.52 | 609.50 | 4,330.02 |
| Jul-01 | 1,058,948.97 | 159,995.80 | 329,850.28 | 5,216.44 | 650.40 | 5,866.84 |
| Aug-01 | 941,173.95 | 29,811.75 | 29,694.43 | 957.32 | - | 957.32 |
| Sep-01 | 803,967.05 | 76,336.21 | 78,789.33 | 2,012.36 | - | 2,012.36 |
| Oct-01 | 829,978.59 | 208,996.00 | 216,926.73 | 7,740.74 | - | 7,740.74 |
| Nov-01 | 918,963.79 | 258,836.22 | 244,425.38 | 8,051.24 | - | 8,051.24 |
| Dec-01 | 911,886.68 | 221,565.13 | 220,583.86 | 4,115.27 | - | 4,115.27 |
| **Avg. Net Equity** | **1,045,587.90** | **2,403,311.63** | **2,395,119.09** | **56,255.56** | **1,892.42** | **58,147.98** |
| Jan-02 | 845,314.25 | 181,131.71 | 191,952.71 | 3,281.39 | - | 3,281.39 |
| Feb-02 | 804,060.05 | 76,707.32 | 69,124.86 | 1,843.07 | - | 1,843.07 |
| Mar-02 | 833,689.67 | 21,333.60 | 19,772.56 | 961.04 | - | 961.04 |
| Apr-02 | 791,974.51 | 138,164.19 | 152,083.12 | 4,124.67 | - | 4,124.67 |
| May-02 | 781,583.19 | 79,235.09 | 22,230.54 | 1,319.55 | - | 1,319.55 |
| Jun-02 | 705,351.11 | 79,861.97 | 70,294.18 | 2,508.29 | - | 2,508.29 |
| Jul-02 | 657,066.06 | 109,074.85 | 131,162.41 | 1,108.42 | 11.80 | 1,120.22 |
| Aug-02 | 664,495.46 | 89,710.08 | 84,737.25 | 3,373.09 | - | 3,373.09 |
| Sep-02 | 581,024.75 | - | - | - | - | - |
| Oct-02 | 620,852.34 | 77,475.00 | 81,246.32 | 1,669.68 | - | 1,669.68 |
| Nov-02 | 687,030.73 | 361,950.25 | 352,115.28 | 14,767.57 | 7.67 | 14,775.24 |
| Dec-02 | 616,287.85 | 210,998.79 | 226,203.06 | 7,660.15 | 212.72 | 7,872.87 |
| **Avg. Net Equity** | **715,727.50** | **1,425,642.85** | **1,400,922.29** | **42,616.92** | **232.19** | **42,849.11** |

**Confidential Account #4840**
**Turnover and Cost Analysis**
**June 2000 through February 2008**
**LB██████96-18**

| Date | Total Beginning Account Value | Value of Securities Purchased | Value of Securities Sold | Monthly Transaction Costs | Margin Interest Paid | Total Monthly Costs |
|---|---|---|---|---|---|---|
| Jan-03 | 596,716.44 | 91,799.75 | 83,713.48 | 4,396.27 | - | 4,396.27 |
| Feb-03 | 588,807.03 | - | - | - | 10.29 | 10.29 |
| Mar-03 | 587,425.98 | 83,826.19 | 114,739.89 | 4,786.30 | 13.59 | 4,799.89 |
| Apr-03 | 629,696.58 | 90,734.53 | 63,891.97 | 3,163.56 | 13.34 | 3,176.90 |
| May-03 | 689,401.82 | 145,208.48 | 143,271.52 | 7,059.56 | 0.40 | 7,059.96 |
| Jun-03 | 701,184.69 | 186,655.88 | 191,302.02 | 8,112.86 | 15.82 | 8,128.68 |
| Jul-03 | 745,251.15 | 58,654.55 | 53,116.17 | 2,088.87 | - | 2,088.87 |
| Aug-03 | 771,203.86 | 180,678.10 | 185,132.39 | 7,043.51 | 24.30 | 7,067.81 |
| Sep-03 | 754,680.99 | 246,702.06 | 229,353.22 | 9,452.84 | 181.90 | 9,634.74 |
| Oct-03 | 822,694.98 | 117,930.67 | 79,961.68 | 4,432.99 | 59.39 | 4,492.38 |
| Nov-03 | 828,526.93 | 349,144.32 | 359,246.13 | 11,654.69 | 182.21 | 11,836.90 |
| Dec-03 | 844,547.55 | 198,270.92 | 180,990.73 | 4,921.16 | 196.62 | 5,117.78 |
| **Avg. Net Equity** | **713,344.83** | **1,749,605.45** | **1,684,719.20** | **67,112.61** | **697.86** | **67,810.47** |
| Jan-04 | 900,053.36 | 236,561.58 | 267,691.96 | 10,414.82 | 195.88 | 10,610.70 |
| Feb-04 | 871,699.15 | 206,473.51 | 251,859.81 | 8,123.70 | 195.11 | 8,318.81 |
| Mar-04 | 836,168.10 | 156,267.71 | 56,588.77 | 5,284.94 | 23.35 | 5,308.29 |
| Apr-04 | 767,873.19 | 206,752.06 | 264,715.05 | 8,959.01 | 181.78 | 9,140.79 |
| May-04 | 813,015.33 | 147,225.83 | 115,207.30 | 3,913.53 | 109.46 | 4,022.99 |
| Jun-04 | 839,541.39 | 276,776.33 | 192,729.63 | 7,259.70 | 327.95 | 7,587.65 |
| Jul-04 | 743,291.56 | 106,866.50 | 206,155.14 | 6,573.86 | 445.09 | 7,018.95 |
| Aug-04 | 714,193.42 | 131,873.85 | 140,846.09 | 4,612.26 | 244.98 | 4,857.24 |
| Sep-04 | 742,820.20 | 149,561.58 | 122,582.85 | 6,254.15 | 85.78 | 6,339.93 |
| Oct-04 | 754,206.76 | 198,925.71 | 88,560.30 | 3,766.81 | 500.74 | 4,267.55 |
| Nov-04 | 795,400.82 | 179,335.66 | 322,825.14 | 7,930.52 | 517.92 | 8,448.44 |
| Dec-04 | 828,325.62 | 492,702.74 | 321,999.85 | 8,868.87 | 548.65 | 9,417.52 |
| **Avg. Net Equity** | **800,549.08** | **2,489,323.06** | **2,351,761.89** | **81,962.17** | **3,376.69** | **85,338.86** |
| Jan-05 | 761,372.15 | 317,200.61 | 164,807.72 | 8,262.94 | 621.87 | 8,884.81 |
| Feb-05 | 754,381.29 | 200,200.80 | 323,979.94 | 6,655.86 | 1,563.96 | 8,219.82 |
| Mar-05 | 704,149.45 | 291,647.01 | 342,932.56 | 12,709.55 | 851.01 | 13,560.56 |
| Apr-05 | 616,161.23 | 76,240.03 | 108,579.16 | 4,270.87 | 879.03 | 5,149.90 |
| May-05 | 683,192.48 | 113,287.05 | 71,569.27 | 1,852.78 | 924.85 | 2,777.63 |
| Jun-05 | 656,957.84 | 197,512.17 | 271,043.40 | 7,238.07 | 996.43 | 8,234.50 |
| Jul-05 | 701,304.12 | 165,994.94 | 194,138.72 | 5,368.28 | 787.03 | 6,155.31 |
| Aug-05 | 685,020.71 | 296,468.57 | 360,919.23 | 9,258.34 | 923.07 | 10,181.41 |
| Sep-05 | 694,418.00 | 261,823.29 | 155,343.67 | 4,169.62 | 389.09 | 4,558.71 |
| Oct-05 | 688,416.28 | - | 43,308.31 | 711.69 | 791.03 | 1,502.72 |
| Nov-05 | 715,943.48 | 185,685.86 | 253,929.02 | 5,317.84 | 797.96 | 6,115.80 |
| Dec-05 | 682,047.97 | 200,478.10 | 230,152.46 | 5,715.14 | 586.47 | 6,301.61 |
| **Avg. Net Equity** | **695,280.42** | **2,306,538.43** | **2,520,703.46** | **71,530.98** | **10,111.80** | **81,642.78** |

**Confidential Account #4840**
**Turnover and Cost Analysis**
**June 2000 through February 2008**
**LB███████96-18**

| Date | Total Beginning Account Value | Value of Securities Purchased | Value of Securities Sold | Monthly Transaction Costs | Margin Interest Paid | Total Monthly Costs |
|---|---|---|---|---|---|---|
| Jan-06 | 721,922.16 | 50,771.85 | 51,601.81 | 1,575.04 | 101.24 | 1,676.28 |
| Feb-06 | 727,564.80 | 434,954.94 | 309,170.20 | 10,030.24 | 244.82 | 10,275.06 |
| Mar-06 | 745,544.99 | 289,727.27 | 447,128.65 | 10,523.62 | 689.39 | 11,213.01 |
| Apr-06 | 777,690.40 | 291,971.75 | 300,134.05 | 9,226.20 | 21.29 | 9,247.49 |
| May-06 | 707,885.14 | 408,823.11 | 256,852.08 | 6,718.87 | 183.97 | 6,902.84 |
| Jun-06 | 694,897.25 | 109,059.20 | 211,210.33 | 5,019.87 | 534.02 | 5,553.89 |
| Jul-06 | 648,186.35 | 93,941.47 | 105,610.42 | 2,802.75 | 368.10 | 3,170.85 |
| Aug-06 | 676,138.37 | 140,667.33 | 129,255.98 | 3,859.35 | 301.18 | 4,160.53 |
| Sep-06 | 686,504.10 | 241,170.00 | 145,984.92 | 5,015.08 | 426.69 | 5,441.77 |
| Oct-06 | 681,159.56 | 357,166.76 | 454,745.83 | 10,592.93 | 831.61 | 11,424.54 |
| Nov-06 | 709,574.22 | 377,186.07 | 301,514.51 | 9,702.56 | 449.78 | 10,152.34 |
| Dec-06 | 673,779.50 | 202,905.69 | 213,995.90 | 6,697.79 | 1,043.93 | 7,741.72 |
| **Avg. Net Equity** | **704,237.24** | **2,998,345.44** | **2,927,204.68** | **81,764.30** | **5,196.02** | **86,960.32** |
| Jan-07 | 716,527.25 | 96,073.10 | 144,043.30 | 3,255.80 | 507.45 | 3,763.25 |
| Feb-07 | 730,844.47 | 567,795.39 | 369,241.07 | 12,353.82 | 953.56 | 13,307.38 |
| Mar-07 | 711,268.21 | 266,709.11 | 354,557.42 | 8,285.69 | 1,250.97 | 9,536.66 |
| Apr-07 | 709,246.79 | 288,978.35 | 259,995.03 | 5,628.82 | 1,265.60 | 6,894.42 |
| May-07 | 764,977.20 | 222,509.29 | 204,156.12 | 6,022.67 | 1,558.70 | 7,581.37 |
| Jun-07 | 731,583.06 | 222,958.60 | 309,099.42 | 6,373.98 | 1,768.67 | 8,142.65 |
| Jul-07 | 674,628.17 | 355,104.56 | 396,012.65 | 12,386.41 | 1,483.48 | 13,869.89 |
| Aug-07 | 690,781.32 | 205,555.84 | 249,679.39 | 5,307.45 | 743.90 | 6,051.35 |
| Sep-07 | 704,198.64 | 178,537.96 | 67,112.63 | 3,363.33 | 846.35 | 4,209.68 |
| Oct-07 | 711,370.65 | 473,297.13 | 451,588.95 | 10,681.18 | 1,576.81 | 12,257.99 |
| Nov-07 | 633,592.40 | 190,793.18 | 275,073.52 | 6,111.66 | 1,666.59 | 7,778.25 |
| Dec-07 | 603,061.14 | 314,844.24 | 131,692.03 | 5,022.71 | 1,790.05 | 6,812.76 |
| **Avg. Net Equity** | **698,506.61** | **3,383,156.75** | **3,212,251.53** | **84,793.52** | **15,412.13** | **100,205.65** |
| Jan-08 | 481,371.03 | 85,114.19 | 272,108.59 | 3,903.60 | 1,321.51 | 5,225.11 |
| Feb-08 | 444,957.40 | 103,359.51 | 47,098.16 | 1,785.35 | 985.39 | 2,770.74 |
| **Avg. Net Equity** | **463,164.22** | **188,473.70** | **319,206.75** | **5,688.95** | **2,306.90** | **7,995.85** |

| | | | % | Totals: | | |
|---|---|---|---|---|---|---|
| 2000 Turnover Rate: | | 2.6829 | 268.29% | 535,921.40 | 39,451.11 | 575,372.51 |
| 2001 Turnover Rate: | | 2.2907 | 229.07% | | | |
| 2002 Turnover Rate: | | 1.9573 | 195.73% | | | |
| 2003 Turnover Rate: | | 2.3617 | 236.17% | | | |
| 2004 Turnover Rate: | | 2.9377 | 293.77% | | | |
| 2005 Turnover Rate: | | 3.3174 | 331.74% | | | |
| 2006 Turnover Rate: | | 4.1566 | 415.66% | | | |
| 2007 Turnover Rate: | | 4.5987 | 459.87% | | | |
| 2008 Turnover Rate: | | 4.8831 | 488.31% | | | |

**EXHIBIT 3**



Enter Symbol

Wed, Feb 19, 2014, 08:20AM PDT - US Markets close in 4 hrs and 40 mins

Dow ▲0.36%  Nasdaq ▼0.04%

More On ^IXIC

**QUOTES**

Summary

Components

Options

Historical Prices

**CHARTS**

Interactive

Basic Chart

Basic Tech. Analysis

**NEWS & INFO**

Headlines

**NASDAQ Composite (^IXIC)** - Nasdaq GIDS    ○ Follow

Add to Portfolio

**4,271.03**  ▼1.76 (0.04%)  11:20AM EST

Enter name(s) or symbol(s) | GET CHART | COMPARE | EVENTS ▼ | TECHNICAL INDICATORS ▼ | CHART SETTINGS ▼ | RESET



Basic Chart | Full Screen | Print | Share | Send Feedback

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re |
| |
|   LEHMAN BROTHERS INC., |
| |
|                                        Debtor. |

Case No. 08-01420 (SCC) SIPA

## [PROPOSED] ORDER GRANTING THE TRUSTEE'S OBJECTION TO
## THE PROOF OF CLAIM OF CONNIE & CURTIS GALE (CLAIM NO. 7000142)

Upon the objection dated February 27, 2014 (the "Objection"),[1] of James W. Giddens

(the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI")

under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.*

("SIPA"), seeking entry of an order, pursuant to section 502(b) of title 11 of the United States

Code (the "Bankruptcy Code"), as made applicable to this proceeding pursuant to sections

78fff(b) and 78fff-1(a) of SIPA, seeking to disallow and expunge the general creditor claim

represented by number 7000142 (the "Claim") filed by Connie & Curtis Gale, as more fully

described in the Objection; and due and proper notice of the Objection having been provided,

and it appearing that no other or further notice need be provided; and the Court having found and

determined that the relief sought in the Objection is in the best interests of LBI, its estate, its

customers and creditors, and all parties in interest and that the legal and factual bases set forth in

the Objection establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

**ORDERED** that the relief requested in the Objection is granted; and it is further

---

1.   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

**ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the Claim is disallowed and expunged in its entirety with prejudice; and it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: New York, New York
       _____ __, 2014

                                    _____
                                      HONORABLE SHELLEY C. CHAPMAN
                                      UNITED STATES BANKRUPTCY JUDGE