AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Telephone: (713) 860-1600
Facsimile:  (713) 860-1699

Attorneys for Cornell Companies, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　　　　Debtor. | Case No. 08-01420 (SCC) SIPA<br>Claim No. 4393 |

**CORNELL COMPANIES INC.'S RESPONSE TO TRUSTEE'S OBJECTION TO**
**<u>CORNELL'S GENERAL CREDITOR CLAIM</u>**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................1

ARGUMENT .................................................................................................................5

I.      Cornell's Fraud and Breach of Fiduciary Duty Claims Are Not Barred by the
Statute of Limitations.......................................................................................................5

II.     The Trustee's Arguments For Disallowing Cornell's
Claim Are Meritless .........................................................................................................12

        A.     Cornell's Proof of Claim Is Not Subject to the Heightened Pleading
              Requirements of Federal Rule of Civil Procedure 9(b) ..........................................12

        B.     LBI Owed Cornell a Fiduciary Duty In Connection With the
              MCF Transaction ...................................................................................................20

        C.     Cornell's 2001 10K Did Not Contain Any Admissions Preventing
              Its Recovery ...........................................................................................................20

        D.     LBI Breached the Retainer Agreement..................................................................22

CONCLUSION....................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Abundance Partners, LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 768 (S.D.N.Y. 2012) ..............21

*Atkins v. Crosland,* 417 S.W. 2d 150, 153 (Tex. 1967) ......................................................7,8,10,11

*Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex.  2001)..............................................................15

*Dearing, Inc. v. Spiller,* 824 S.W.2d 728, 733 (Tex. App.-Fort Worth 1992, writ denied)...........15

*Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 217 (Tex. 2011) ................................14

*Hartford Cas. Ins. v. Walker Cty. Agency, Inc.,* 808 S.W.2d 681, 687-88 (Tex. App.-Corpus
    Christi 1991, no writ.)........................................................................................................ 15-16

*Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex. 2000 ..................................16

*In re DJK Residential LLC,* 416 B.R. 100 (Bankr. S.D.N.Y.2009) .........................................13,14

*In re Swift,* 129 F.3d 792, 798 (5th Cir. 1997) ...............................................................................7

*Johnson v. Peckham,* 120 S.W.2d 786, 788 (Tex. 1938)................................................................16

*Kelly v. Gaines,* 181 S.W. 3d 394, 414 (Tex. App. –Waco 2005), *rev'd on other grounds,* 235
    S.W. 3d 179 (Tex. 2007)........................................................................................................16

*Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 512 (Tex. 1942).......................15

*Little v. Smith*, 943 S.W.2d 414 (Tex. 1997)  ................................................................................9

*Marshall v. Kusch,* 84 S.W.3d 781, 786 (Tex. App. —Dallas 2002, pet. denied).........................15

*Murphy v. Campbell,* 964 S.W.2d 265 (Tex. 1997) ...........................................................9,10,11

*Paramount Pipe & Sup. Co. v. Muhr,* 749 S.W.2d 491, 494-95 (Tex. 1988)................................16

*Plotikin v. Joekel,* 304 S.W.3d 455, 479 (Tex. App. –Houston [1[st] Dist.] 2009, pet. denied).......15

*Relational Investors LLC v. Sovereign Banccorp, Inc.*, 417 F. Supp. 2d 438, 448
    (S.D.N.Y. 2006)........................................................................................................................21

*Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 80-81 (Tex. 1989)................................................6

*S.V. v R.V.,* 933 S.W.2d1 (Tex. 1996)  .........................................................................................9

*Transport Ins. v. Faircloth,* 898 S.W.2d 269, 277 (Tex. 1995)....................................................15

*Waxler v. Household Credit Servs., Inc.,* 106 S.W.3d 277
(Tex. App. –Dallas 2003, no pet.) .........................................................................................8

*Welder v. Green,* 985 S.W.2d 170, 175 (Tex. App.-Corpus Christi 1998, pet. denied) ...............15

*Western Reserve Life Assur. Co. v. Graben,* 233 S.W.3d 360, 374 (Tex. App. –Fort Worth 2007,
no pet.) .................................................................................................................................15

*Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290, S.W.3d 554, 556
(Tex.App.—Dallas 2009, no pet.)........................................................................................15

## **Statutes**

Tex. Civ. Prac. & Rem. Code § 16.004(a)(4), (5)...........................................................................6

## **Rules**

Fed. R. Bankr. P. 3001 .............................................................................................................12,16

Fed. R. Bankr. P. 3001(f).............................................................................................................12

Fed. R. Civ. P. 9(b) ..............................................................................................................13,14,16

iv

**TO THE HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

## <u>INTRODUCTION</u>

1.      Well before Lehman Brothers Inc. ("LBI") sought bankruptcy court protection it engineered a complex financing structure for Cornell Companies, Inc. ("Cornell").  Cornell operated correctional facilities and had no experience in arranging creative financing.  It relied on LBI's expertise in sophisticated financing transactions and placed its trust in LBI to design financing which would achieve Cornell's stated goals.  LBI breached the trust reposed in it by Cornell by designing and implementing a financing arrangement which could not accomplish Cornell's goals.  As a result Cornell was forced to restate certain operating results, which led, in turn, to a precipitous drop in its stock price, lawsuits, and an S.E.C. investigation.  Moreover, the failure of the scheme designed by LBI meant that Cornell did not have access to sufficient capital to compete effectively in its industry.

2.      LBI's breach of fiduciary duty, fraudulent misrepresentations, and breach of contract led to Cornell filing suit against LBI in state court in Texas on November 29, 2006  (the "state court action").  LBI did not file for bankruptcy protection until November 19, 2008.  LBI actively litigated this claim in Texas for almost two full years, participating in extensive discovery through document production and witness depositions.  Never during that time did LBI seek to have the case dismissed, either on statute of limitation grounds or on the basis of any alleged legal deficiency in Cornell's claim.  Now, more than 7 years after Cornell sought redress for its damages, and after having spent two years litigating the claims on the merits, the Trustee tardily takes the position that the case need never have been litigated and that Cornell's claims can be summarily dismissed on purely legal grounds.  Cornell's state court lawsuit itself is sufficient to withstand the Trustee's arguments.  More fundamentally, Cornell's proof of claim,

and not its state court lawsuit, is the only proper target for the Trustee's arguments at this point. Cornell's proof of claim satisfies the requirements contained in the Federal Rules of Bankruptcy Procedure ("FRBP").

## BACKGROUND

3.      Cornell's proof of claim, attached as Exhibit A to the Trustee's Objection, contains a detailed explanation of the relationship between Cornell and LBI and a description of the facts which formed the basis of Cornell's state court action.   That history is briefly summarized here.

4.      At the time of the events giving rise to Cornell's state court action Cornell owned and operated juvenile and adult correctional and treatment facilities.  In 2000 and 2001 Cornell sought access to financing in order to expand its business.  Cornell sought LBI's expertise in finance and investment banking in order to devise strategies for increasing Cornell's access to capital.  Cornell hired LBI to act as its financial advisor.  LBI devised a plan based on creating a special purpose entity ("SPE") to acquire facilities from Cornell and lease them back to Cornell. The transaction was designed to raise money, (the proceeds of the sale of assets to the SPE) and to deleverage Cornell's balance sheet by removing the debt associated with asset ownership to the SPE.

5.      LBI devised the plan for the creation of the SPE, and its sale of bonds to raise the income necessary for purchase of Cornell's assets.  Under applicable accounting rules in effect at the time, the SPE could only achieve the desired off-balance sheet treatment for Cornell if an independent third-party investor made, at a minimum, a 3% investment in the SPE assets and such third-party investment was genuinely at risk.

6.      LBI's plan centered around the creation of the SPE. Maintaining the independence of the SPE's investment and insuring that its investment was genuinely at risk, were necessary for the transaction to succeed.  LBI created Municipal Corrections Finance, L.P. ("MCF") to serve as the SPE.  MCF would, with LBI acting as lead underwriter, sell bonds to raise the money needed to purchase the facilities from Cornell.  It would then enter into long-term leases with Cornell so that Cornell would operate, but not own, the facilities.

7.      Pursuant to the structure created by LBI, one of the limited partners of MCF was LBI Group, Inc. ("LBIG").  LBIG paid $8.17 million to MCF to acquire its limited partnership interest in MCF.  LBIG and Municipal Corrections Finance Holdings, LLC ("MCFH"), the General Partner of MCF, were required to maintain a 3% equity interest in MCF in order to maintain its independence from Cornell.  If it was determined that MCF, as the third-party SPE, was not independent of Cornell or if the investment required to reach the 3% threshold was not truly at risk, the sale-leaseback transaction would not qualify for off-balance sheet treatment.

8.      LBI worked on the MCF transaction for the better part of 2000 and 2001.  The transaction closed on August 14, 2001.  On September 5, 2001 Cornell and LBI entered into a letter agreement pursuant to which LBI was engaged to provide financial advisory services to Cornell concerning future financing vehicles and the strategic development of Cornell's business (the "Retainer Agreement," attached as Exhibit 4 to the Declaration of Jordan Pace in Support of the Trustee's Objection).  Even though LBI was obligated to provide such services on a going forward basis, from the date of the agreement, LBI insisted on the payment of an up-front, non-refundable retainer fee of $3.65 million.  The retainer fee was required to be paid no later than November 5, 2001.

9.      In January of 2002 Cornell's independent auditor, Arthur Anderson LLP, questioned whether the retainer fee, although paid to LBI, was actually used to fund LBIG's stake in MCF.  If that were true, LBIG's independent investment in MCF would be less than the required 3%, thus destroying the desired purpose of the transaction to move the assets off Cornell's balance sheet.  Cornell would be required to consolidate the sale-leaseback assets back onto its balance sheet, showing the book value of the leased properties as an asset, and the outstanding debt of MCF as a liability.

10.      On February 6, 2002 Cornell announced that a special committee of its Audit Committee would be formed to review whether the retainer fee paid to LBI reduced the previously established equity of the MCF partners.  Based on the recommendation of the special committee and with the approval of the SEC, on March 6, 2002 Cornell announced that it would restate its earnings and that the debt and assets related to the MCF sale-leaseback transaction would be moved back onto Cornell's books.  As a result of this restatement Cornell's stock price fell precipitously, shareholder lawsuits were filed, and Cornell's ability to access capital was severely curtailed.

11.      Cornell filed its state court action on November 29, 2006. The suit alleged that LBI failed to appreciate, and then disclose, that the payment and acceptance of the retainer fee could result in the destruction of the requisite characteristics of the sale-leaseback transaction, thereby causing Cornell to carry on its balance sheet the book value of the leased properties as assets and the outstanding debt of MCF as a liability.  LBI's failure with respect to the acceptance of the non-refundable retainer and its effect on the transaction, constituted fraud, a breach of fiduciary duty, and a breach of contract.

4

**ARGUMENT**

12.     The Trustee makes two general arguments for disallowing Cornell's claim. First, the Trustee alleges that Cornell's fraud and breach of fiduciary duty causes of action are barred by the statute of limitations. Second, the Trustee argues that LBI is not liable to Cornell as a matter of law for the following reasons: 1) Cornell failed to plead fraud and breach of fiduciary duty with sufficient particularity; 2) Cornell expressly disclaimed any fiduciary duty on the part of LBI; and 3) Cornell did not allege a breach of the Retainer Agreement. As shown below, these arguments are without merit.

## I.     Cornell's  Fraud and Breach of Fiduciary Duty Claims Are Not Barred by the Statute of Limitations

13.     The Trustee correctly acknowledges that the issue of limitations in this case is governed by the operation of a Tolling Letter entered into between Cornell and LBI on December 7, 2005 (the Tolling Letter is attached as Exhibit 5 to the Declaration of Jordan Pace In Support of the Trustee's Objection)  (Objection, ¶ 26, p. 10). The Tolling Letter extended "the time to commence an action arising out of or in any way related to the Agreement dated September 5, 2001, between Cornell Companies, Inc. and Lehman Brothers Inc." to December 1, 2006. The Tolling Letter also provided that LBI would waive and not assert "any defenses of statute of limitations, laches, or other time-related defenses" in any such action brought on or before December 1, 2006, except to the extent that such defenses was already available "before the date of this letter." As the Trustee noted in his Objection, Cornell filed its state court lawsuit on November 29, 2006, before the deadline established by the Tolling Letter. The only way the Tolling Agreement could have failed to extend the limitations period would have been if a statute of limitations defense was already available before December 7, 2005. Thus, the governing question becomes whether Cornell's causes of action for fraud and breach of fiduciary duty

accrued before, or after, December 7, 2001. If such causes of action accrued before December 7,

2001, then the limitations defense would have already been available on the date of the Tolling

Letter and the Tolling Letter would not have foreclosed such defenses for those causes of action.

If, on the other hand, Cornell's fraud and breach of fiduciary duty causes of action did not accrue

until December 7, 2001 or later, then a statute of limitations defense would not have been

available as of the date of the Tolling Letter, and would have been waived by LBI.

14.    As the Trustee notes, in Texas, actions for fraud and breach of fiduciary duty are

governed by a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4), (5).

LBI waived any defenses based on limitations in the Tolling Letter, as long as 1) the claim was

brought on or before December 1, 2006 and 2) no limitations defense was already available

before December 7, 2005, the date of the Tolling Letter. Cornell satisfied the first requirement by

filing its lawsuit on November 29, 2006. The second condition in the Tolling Letter was also

satisfied because there was no limitations defense to Cornell's fraud and breach of fiduciary duty

claims as of December 7, 2005. As explained below, Cornell's causes of action for fraud and

breach of fiduciary duty did not accrue until early 2002, when it learned that LBI's receipt of the

retainer under the Retainer Agreement destroyed the purpose of the MCF sale-leaseback

transaction. Thus, the applicable limitations period would not have run until early 2006, after the

date of the Tolling Letter.

15.    Under Texas law, a defendant moving for summary judgment based on the

affirmative defense of the statute of limitations has the burden of showing as a matter of law that

the suit is barred by limitations. *Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 80-81 (Tex.

1989). The Trustee seeks a summary disallowance of Cornell's claim and as such bears the

burden of proof to show when the causes of action accrued and when the limitations period

6

expired. The Trustee incorrectly argues that this case is governed by the discovery rule. In fact, the relevant inquiry here is when Cornell's causes of action accrued, not when the damage was discovered.

16.     Discovering that a fraud has occurred, or that a breach of fiduciary has occurred, is not the same thing as applying the "discovery rule." In order for a claimant to possess a right to sue, a legal injury is required. *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex. 1967). Under this legal injury rule, discovery of the injury is relevant to determining when the statute of limitations begins to run, but it is not the same thing as fixing the accrual date for a cause of action. *In re Swift,* 129 F.3d 792, 798 (5th Cir. 1997). Regardless of when the legal injury was discovered, in no case can limitations begin running until the injury actually does occur.  In this case, as shown below, Cornell's causes of action for fraud and breach of fiduciary duty did not accrue until the MCF transaction was determined not to be able to achieve its purpose and Cornell was forced to restate its earnings. That did not happen, by the Trustee's own admission, until March 6, 2002 (Objection, ¶ 16, p.7), meaning that the statute of limitations on those causes of action would not have already run before the Tolling Letter was executed on December 7, 2005.

17.     Texas law recognizes two types of legal injury for purposes of fixing the accrual of a cause of action. Where the act which leads to the injury is in itself a completed wrong, such as an invasion of some personal or property right of the plaintiff, the act and the legal injury occur simultaneously. *Atkins,* 417 S.W.2d at 153. In such a case the cause of action accrues when the act is committed, even if there is little or no simultaneous actual damage. *Id.* Conversely, if the act complained of is not itself unlawful and the plaintiff's suit is designed to recover damages that occurred subsequent to the act, the cause of action accrues only when the damages are

sustained. *Id.* In *Atkins* the plaintiff owned and operated automobile service stations. He hired an accountant to prepare his tax returns and the accountant did so, initially using the cash receipts and disbursements method. The accountant later changed to the accrual method of accounting but failed to secure the consent of the IRS to use the new method. As a result, the plaintiff was assessed with a deficiency for the first year for which the accountant used the new method. The trial court granted the accountant's motion for summary judgment on statute of limitations grounds. The Texas Supreme Court reversed, holding that the accountant's use of the accrual method of accounting was not "in itself the type of unlawful act which, upon its commission, would set the statute in motion" *Id.* The "assessment was the factor essential to consummate the wrong—only then was the tort complained of completed." *Id.*

18.    Similarly, in *Waxler v. Household Credit Servs., Inc.,* 106 S.W.3d 277 (Tex. App.—Dallas 2003, no pet.), the plaintiff alleged that she was damaged when she was subsequently denied credit on the basis of an inaccurate credit report issued earlier by her credit card company. The plaintiff did not suffer any damage until she attempted to get credit at a later point in time and was denied. The Court held that the mere issuance of the faulty credit report did not damage the plaintiff and that her cause of action did not accrue until she sustained damages in the form of a denial of credit. *Id.* at 281.

19.    *Atkins* and *Waxler* are factually analogous to this case and compel the conclusion that Cornell's causes of action for fraud and breach of fiduciary duty did not accrue until the MCF transaction was reversed and its desired benefits wiped out. Just as in *Atkins* and *Waxler,* here the injury resulting from the defendant's actions did not manifest until a later point in time, giving the plaintiff a reason to file a lawsuit. LBI acted fraudulently and breached its fiduciary duty to Cornell in designing and implementing a faulty transaction. The injury from such actions

did not occur until, with the help of its outside auditor, Cornell determined that it would be required to reverse the transaction and restate its earnings. Those actions caused Cornell to be sued and to take assets and debt back onto its balance sheet, thus suffering the injuries that completed its causes of action.

20.    The Trustee argues that Cornell's causes of action for fraud and breach of fiduciary duty accrued on or before November 5, 2001, the date of payment of the retainer under the Retainer Agreement, because "Cornell was aware of the facts underlying its alleged injury as soon as it paid LBI the retainer, if not sooner." (Objection, ¶ 27, p.10). Of course, it is expedient for the Trustee to argue that the limitations period began upon payment of the retainer fee because it would mean that limitations expired on November 5, 2005, before the date of the Tolling Letter. But the Trustee never explains how or why the payment of the Retainer Fee was illegal in itself, such that Cornell was immediately injured upon paying it.  The Trustee does not address the legal injury rule at all, preferring to cite inapposite discovery rule cases. *S.V. v R.V.,* 933 S.W.2d 1 (Tex. 1996) involved claims of sexual abuse brought years after the alleged abuse occurred, and the dispositive inquiry there was whether such injuries were inherently undiscoverable and objectively verifiable, tests under the discovery rule which do not apply to the legal injury rule. Likewise, *Little v. Smith*, 943 S.W.2d 414 (Tex. 1997) has no bearing here as it concerned the discovery rule and whether it should be applied to claims arising out of probate proceedings ("Texas courts have refused to apply the discovery rule to claims arising out of probate proceedings….because the claimant has constructive notice of the probate proceedings").

21.    Finally, *Murphy v. Campbell,* 964 S.W.2d 265 (Tex. 1997), relegated by the Trustee to a footnote, actually supports Cornell's position. In *Murphy,* the Texas Supreme Court

affirmed its earlier ruling in *Atkins* and held that a cause of action for accounting malpractice involving bad tax advice accrues when the plaintiff becomes aware that the advice he received was faulty. *Id.* at 271. In *Murphy* the plaintiff had received a deficiency notice and the Court held that in no circumstance could the plaintiff's cause of action accrue after the date of receipt of the deficiency notice. *Id.* However, the Court also noted that the accrual inquiry is fact specific and that it could be possible that "a taxpayer may know his advice was faulty long before he receives a deficiency notice. [F]or example, if a taxpayer sought other opinions upon receipt of an audit notice, or even earlier, the information obtained might put him on notice that the advice he received was wrong." *Id.* Thus, the Court made clear that the plaintiff would have to have some basis for believing that the advice was wrong and could cause harm. The Court listed the deficiency notice and an audit notice as two examples of the types of information that would put a plaintiff on notice that a claim could exist.

22.     Though the Trustee has the burden of proof to show that a limitations defense existed in this case as of the date of the Tolling Letter, he presents no proof that Cornell had any actual knowledge of anything that would have put it on notice that it had a claim against LBI when it entered into the Retainer Agreement and paid the Retainer. Instead, the Trustee simply argues, in conclusory fashion, that Cornell "knew all of the facts underlying its fraud and breach of fiduciary duty causes of action as soon as it paid the Retainer on or before November 5, 2001." (Objection ¶ 29, p. 12). The Trustee attempts to flesh out this assertion by arguing that Cornell "knew it was paying LBI the Retainer, that LBI's subsidiary, LBI Group, was the independent partner in MCF, and that it wanted off-balance sheet accounting for MCF in the Sale/Leaseback." *Id.* Again, the Trustee fails to explain how these bits of knowledge should have alerted Cornell that it had been injured and had a cause of action. As the Trustee admits in his

10

very next sentence, "the lines connecting these dots and forming alleged causes of action are matters of accounting and tax law, not facts." *Id.* This is precisely the context which justifies the rule adopted in *Atkins* and *Murphy*, that accrual may be deferred if the recipient of bad advice is not an expert in the relevant field and requires outside help to discover that a legal injury has occurred. In the words of the *Murphy* Court, "[I]t is most unlikely that a client would know that tax advice was faulty at the time he received it. [I]ndeed, the very reason to seek expert advice is that tax matters are often not within the average person's common knowledge. [W]e thus conclude that accounting malpractice involving tax advice is inherently undiscoverable." *Murphy* at 271.

23.     Cornell's outside expert, Arthur Andersen, did ultimately raise a concern about the treatment of the Retainer Fee as it pertained to the MCF Sale-Leaseback transaction. An investigation did ensue, and LBI participated in the investigation with Arthur Andersen and Cornell. However, this investigation simply did not begin until several months after the Retainer Fee was paid. There is no evidence supporting the payment date of November 5, 2001 as the time by which any of the parties knew that the transaction would be adversely impacted by the payment of the Retainer. In the state court action, Cornell deposed Mr. Gary Killian, who was at the relevant time the Managing Director for LBI's municipal finance business segment. Mr. Killian testified that LBI gathered information in response to inquiries made by Arthur Andersen concerning the treatment of the Retainer, and that LBI did not respond until "somewhere between January 30th and February 5th." (Killian Deposition, 153:20-154:3, attached as Exhibit 3 to the Declaration of Thomas R. Ajamie in Support of Cornell Companies Inc's Response to Trustee's Objection to Cornell's General Creditor Claim ("Ajamie Declaration"), annexed hereto as Exhibit A.) Cornell alleged in its state court suit that in January 2002, Arthur Andersen

11

questioned whether the Retainer Fee was used to fund LBI's interest in MCF, which would have reduced LBI's actual investment below the 3% needed to make the equity independent. The state court suit further alleged that on February 6, 2002 Cornell formed a special committee of its Audit Committee to review the matter further. LBI does not dispute these dates in its Objection and, more fundamentally, certainly does not carry its burden of establishing that Cornell knew it had a claim against LBI prior to this investigation being completed.

## II.    The Trustee's Arguments For Disallowing Cornell's Claim Are Meritless

### A.    Cornell's Proof of Claim Is Not Subject to the Heightened Pleading Requirements of Federal Rule of Civil Procedure 9(b)

24.    The Trustee argues that Cornell's proof of claim does not allege fraud and breach of fiduciary duty with sufficient particularity. (Objection ¶ 31, p. 12) This argument is based on the incorrect premise that the pleading standard set forth in Federal Rule of Civil Procedure ("FRCP") 9(b) applies to proofs of claim in bankruptcy proceedings. It does not. Cornell provided all the detail that was required when it submitted its claim.

25.    Federal Rule of Bankruptcy Procedure ("FRBP") 3001 states that "[a] proof of claim shall conform substantially to the appropriate Official Form." The requirements of Official Form 10 thus govern the format for submitting a proof of claim. Nothing in Official Form 10 or FRBP 3001 says that FRCP 9(b)'s specificity requirements must be met in submitting a proof of claim. Instead, the instructions to Form 10 provide that claimant must simply "state the type of debt or how it was incurred." B10 (Official Form 10.) Under FRBP 3001(f), Cornell's properly executed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim."

26.    The Trustee's argument that Cornell was required to provide even more detail in its proof of claim relies almost entirely on a single case, *In re DJK Residential LLC*, 416 B.R.

100 (Bankr. S.D.N.Y.2009). But *DJK* does not support Trustee's argument. While the Court in *DJK* noted that "bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure" in evaluating disputed claims, *Id.* at 106, it simply did not hold-as the Trustee suggests—that a claimant is required to meet FRCP 9(b)'s specificity requirements when submitting an initial proof of claim.

27.    A description of the procedural posture in *DJK* reveals why it has little relevance here. The debtor in *DJK* had already emerged from bankruptcy and an order closing the bankruptcy cases had been entered. The claimants filed a claim that incorporated and was "equivalent in all material respects" to a complaint that the claimants had previously filed against a debtor in the Northern District of Illinois. *Id.* at 101-102. Far from the routine claims administration process applicable to Cornell's timely filed proof of claim, "the issues presented by the [claim filed in *DJK],* the Objection and the Response no longer have any significance to the administration of the chapter 11 cases." *Id*. at 102. The court disallowed the claim at issue after finding that the claimants had not offered any support for their commercial bribery allegations, despite repeated opportunities to do so, including the filing of three different complaints in the parallel district court proceedings. *Id.* at 103-07 (noting that as to the debtor's co-defendants, the first amended complaint was dismissed by the district court for failing to meet the pleading requirements of the Federal Rules of Civil Procedure and the second amended complaint was voluntarily dismissed with prejudice). The court acknowledged the unusual procedural posture of the disputed claim, noting that it was "resolving here what amounts to a procedural anomaly, a strenuous claim objection presented at the tail end of fully administered chapter 11 cases that also happen to overlap with and touch directly on the subject matter of other pending but currently inactive federal litigation." *ld.* at 108.

13

28.     In contrast to the claimants in *DJK*—who had at least four opportunities to set forth the basis for their claims before they were disallowed—Cornell's claim has never been challenged until now. There is no "procedural anomaly" and no ongoing adversarial proceeding that justifies the application, even before an objection has been raised, of FRCP 9(b) to Cornell's proof of claim. *DJK* is thus inapplicable.

29.     Since the Trustee has now challenged Cornell's claim, this response provides additional details supporting the proof of claim, including details that satisfy FRCP 9(b) for Cornell's fraud claim. This response also provides additional details supporting Cornell's breach of fiduciary duty claim. In light of this substantial evidence, there is no basis for disallowing Cornell's claims.

30.     To state a claim for fraud under Texas law, a plaintiff must plead the following: 1) the defendant made a representation to the plaintiff; 2) the representation was material; 3) the representation was false; 4) when the defendant made the representation, the defendant knew the representation was false, or made the representation recklessly, as a positive assertion and without knowledge of its truth; 5) the defendant made the representation with the intent that the plaintiff act on it; 6) the plaintiff relied on the representation; and 7) the representation caused the plaintiff injury. *Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 217 (Tex. 2011). To state a claim for fraud through non-disclosure a plaintiff must plead the following: 1) the defendant concealed from or failed to disclose certain facts to the plaintiff; 2) the defendant had a duty to disclose the facts to the plaintiff; 3) the facts were material; 4) the defendant knew the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the facts; 5) the defendant was deliberately silent when it had a duty to speak; 6) failing to disclose the facts the defendant intended to induce the plaintiff to take some action or refrain from acting; 7) the

plaintiff relied on the defendant's non-disclosure; and 8) the plaintiff was injured as a result of acting without the knowledge of the undisclosed facts  *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex.  2001); *Marshall v. Kusch*, 84 S.W.3d 781, 786 (Tex. App.—Dallas 2002, pet. denied); *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290 S.W.3d 554, 556 (Tex.App.—Dallas 2009, no pet.)  And, contrary to the Trustee's assertion (Objection ¶ 36, p. 15), expressions of opinion may be actionable where the defendant had special knowledge that plaintiff did not have, and knew or should have known that the plaintiff would be justified in relying on the defendant's special knowledge. *Transport Ins. v. Faircloth,* 898 S.W.2d 269, 277 (Tex. 1995).

31.    To state a cause of action for breach of fiduciary duty a plaintiff must plead the following: 1) plaintiff and defendant had a fiduciary relationship; 2) defendant breached its fiduciary duty to the plaintiff: 3) the defendant's breach resulted in injury to the plaintiff. *Plotkin v. Joekel,* 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A fiduciary relationship arises when the plaintiff relies on the fiduciary for financial support or guidance. *Western Reserve Life Assur. Co. v. Graben,* 233 S.W.3d 360, 374 (Tex. App.—Fort Worth 2007, no pet.) (defendant was a fiduciary when it assumed role of financial adviser). A fiduciary owes the following duties: 1) the duty of loyalty and utmost good faith, *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 512 (Tex. 1942); 2) the duty of candor, *Welder v. Green,* 985 S.W.2d 170, 175 (Tex. App.—Corpus Christi 1998, pet. denied); 3) the duty to refrain from self-dealing, *Dearing, Inc. v. Spiller,* 824 S.W.2d 728, 733 (Tex. App.—Fort Worth 1992, writ denied); 4) the duty to act with the strictest integrity, *Hartford Cas. Ins. v. Walker Cty. Agency, Inc.,* 808 S.W.2d 681, 687-88 (Tex. App.—Corpus Christi 1991, no writ.); 5) the duty of fair and honest dealing, *Kelly v. Gaines,* 181 S.W.3d 394, 414 (Tex. App.—Waco 2005), *rev'd on other*

15

*grounds,* 235 S.W.3d 179 (Tex. 2007); and 6) the duty of full disclosure, *Johnson v. Peckham,* 120 S.W.2d 786, 788 (Tex. 1938).

32.    As noted above, FRBP 3001 requires only that a proof of claim conform substantially to the appropriate Official Form.  Official Form 10 thus governs the format for submitting a proof of claim.  Nothing in Official Form 10 or FRBP 3001 makes FRCP 9(b) applicable to a proof of claim.  Instead, Form 10 requires only that the claimant "state the type of debt or how it was incurred."  B10 (Official Form 10).  Cornell clearly satisfied this requirement when it appended a 5 page summary of its claims against LBI for its proof of clam.

33.    Similarly, Texas follows the "fair notice" standard for pleading, which looks at whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant.  *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000).  The plaintiff is not required to describe the evidence supporting its claims in detail in the petition.  *Paramount Pipe & Sup. Co. v. Muhr*, 749 S.W.2d 491, 494-95 (Tex. 1988).  The proper procedural mechanism for challenging the sufficiency of pleadings in Texas in filing special exceptions *Horizon*, at 897.  When a defendant does not challenge the plaintiffs' pleadings through special exceptions the court should construe them liberally in favor of the plaintiff. *Id.*

34.    Prior to LBI's bankruptcy filing, LBI litigated the Texas state court action from November 29, 2006 to September 25, 2008.  At no point during that span of almost two years did LBI ever challenge the sufficiency of Cornell's pleadings.  LBI clearly understood the essence of the claims it was fighting, as well as what evidence would be pertinent to those claims.  The parties were in the process of developing that evidence when LBI filed bankruptcy.  If the Trustee is to be permitted to challenge the sufficiency of Cornell's allegations at this point in the

history of the dispute between Cornell and LBI, fairness mandates that the parties be allowed to complete discovery.

35.    Even in its unfinished state, the record contains ample evidence to support Cornell's fraud and breach of fiduciary duty clams. David Lavelle was a Senior Vice President at LBI, in public finance, during the time LBI was working for Cornell on the MCF transaction. He was Cornell's primary contact at LBI for the MCF transaction. He was deposed in the state court action and his testimony establishes Cornell's fraud and breach of fiduciary duty claims. Portions of Mr. Lavelle's deposition are attached as Exhibit 1 to the Ajamie Declaration.  Mr. Lavelle testified that he told Cornell that he had sufficient experience to handle the MCF transaction and that it was "not, you know, rocket science." (Lavelle Dep. 41: 6-11).  Mr. Lavelle touted his and LBI's success in a similar transaction for a health care company. (Lavelle Dep. 42: 10-14). He promised that he could improve the efficiency of Cornell's financing and help it grow its business. (Lavelle Dep. 45: 9-21). Mr. Lavelle affirmed that Lehman conceived the idea of serving as the independent investor in the MCF transaction and decided to perform that role due to the complexity of the deal, even though there was interest by other potential investors who would not have put the transaction at risk by earning fees associated with the transaction. (Lavelle Dep. 52: 21-25; 55: 21 - 56: 2). Mr. Lavelle made several presentations to Cornell's board of directors about the MCF transaction. (Lavelle Dep. 74: 1-2).

36.    With respect to the Retainer Agreement, Mr. Lavelle acknowledged that he was aware that the payment of the retainer could have an impact on the 3% equity requirement being invested by LBI's subsidiary LBIG. (Lavelle Dep. 81: 13-19). Notwithstanding his awareness of this risk, he rather blithely admitted that even though one of Cornell's explicit goals for the MCF transaction was to achieve off-balance sheet treatment for the facilities being sold to MCF, LBI

17

didn't have "any interest in the accounting treatment at all." (Lavelle Dep. 115: 17-20).  In keeping with this cavalier attitude, and placing LBI's interests ahead of Cornell's, Mr. Lavelle refused to return the retainer when that idea was suggested by Cornell as a way to solve the equity problem, saying that "I don't think returning the money solves an accounting issue." (Lavelle Dep. 369: 15-16). Mr. Lavelle's testimony revealed his belief that LBI was entitled to keep the retainer at least partly on account of the work it had done in connection with the MCF transaction, and not as a true retainer for work yet to be done, explaining that he did not give the retainer back because "[W]e had successfully done a stand-alone sale/leaseback transaction. [W]e had done a successful equity transaction, and we had provided Steve Logan and Cornell with debt and equity for their Mississippi Federal Bureau of Prisons project." (Lavelle Dep. 368: 25 - 369: 4). Mr. Lavelle conceded, under questioning from LBI's attorney, that while he conceived a plan to ask Cornell to apply a portion of the Retainer to work done at the end of 2001, he just never made that happen because "you know, the- the-the accounting concerns that Cornell and Arthur Andersen were going under sort of redirected our attention." (Lavelle Dep. 417: 23 – 418: 7).

37.     What emerges from Mr. Lavelle's testimony is that LBI represented to Cornell that it had the requisite expertise to achieve Cornell's stated goals through the MCF transaction. It sold itself by emphasizing its experience and success in similar transactions. When the success of the transaction hung in the balance LBI chose to put its interests ahead of Cornell's and keep the Retainer, thereby destroying the desired accounting treatment and causing damage to Cornell. The record as it existed when LBI entered bankruptcy, when the parties were in the middle of discovery in the state court action, supports Cornell's causes of action for fraud and breach of fiduciary duty.

38.    Steve Logan, one of the cofounders of Cornell, and its chief financial officer during the period of the MCF transaction, was also deposed in the state court action.  Portions of his deposition are attached as Exhibit 2 to the Ajamie Declaration.  He testified that Cornell retained LBI because of "their expertise in the corrections industry," (Logan Dep. 90: 17-20) and because Mr. Lavelle represented to him that he had worked on similar financing projects (Logan Dep. 97: 16-20).  Mr. Logan also testified that LBI made significant revisions to the Retainer Agreement, refuting its contention that all accounting details were left to Arthur Andersen. (Logan Dep. 138: 25 – 139: 6).  In fact, Arthur Andersen did not see the Retainer Agreement until it started asking questions about the transaction in early 2002.  Mr. Logan clarified that even though Arthur Andersen was recommending that the Retainer Fee be paid as far as possible after the closing of the MCF transaction, LBI insisted that it be paid within 60 days of execution. (Logan Dep. 182: 23 – 183: 12).  The timing of the payment, insisted upon by LBI, led directly to Arthur Andersen's insistence that the MCF assets be re-consolidated on Cornell's books.

39.    Gary Killian, Mr. Lavelle's superior at LBI, was also deposed in the state court action.  Portions of Mr. Killian's deposition are attached as Exhibit 3 to the Ajamie Declaration. Mr. Killian confirmed that LBI designed the SPE used in the MCF transaction.  (Killian Dep. 107: 20-23).  Mr. Killian also testified that he understood that LBI's investment in the special SPE had to be increased to account for the fact that LBI was paid underwriting fees in connection with the transaction.  (Killian Dep. 113: 13-25).

40.    All this testimony taken together, establishes that LBI misrepresented that it had the requisite expertise to achieve Cornell's goals in the MCF transaction, in order to cause Cornell to retain LBI and pay it substantial fees.  LBI designed the structure of the SPE, and also drafted the final version of the Retainer Agreement.  LBI insisted that the Retainer be paid too

19

close to the closing of the MCF transaction, causing it to fail.  And, when given an opportunity to protect its client by returning the retainer fee, LBI placed its interests above those of Cornell by keeping the money.

**B.      LBI Owed Cornell a Fiduciary Duty In Connection With the MCF Transaction**

41.     The Trustee makes the disingenuous argument that LBI cannot be liable for a breach of fiduciary duty because the Retainer Agreement contains a waiver of such a duty. Cornell's proof of clam, as well as the cause of action for breach of fiduciary duty in its state court action, are clearly directed at all of LBI's actions and omissions during the time it was working on the MCF transaction, from 1999 up to the time of the Retainer Agreement.  As noted above, LBI had a fiduciary duty to Cornell during that time because it had superior knowledge of public financing arrangements, because Cornell placed its trust in LBI for that reason, and because LBI was acting as Cornell's financial advisor.  Cornell's alleged waiver of any fiduciary duty, from the Retainer Agreement forward, is utterly irrelevant to these claims, which are based on LBI's conduct prior to the Retainer Agreement.

**C.      Cornell's 2001 10K Did Not Contain Any Admissions Preventing Its Recovery**

42.     The Trustee argues that because Cornell included a statement explaining its decision to restate its financials on its 2001 10K it is somehow prevented from recovering for the losses it suffered in connection with the MCF transaction.  At the time Cornell filed its 2001 10K it had resigned itself to the restatement because its auditor was insisting on that approach. Cornell was placed in that position because of LBI's refusal to treat the retainer fee differently.

43.     The statement in Cornell's  2001 10K, that reasonable arguments supported its previous accounting treatment of the 2001 sale and leaseback transaction, was what Cornell

believed to be initially true.  Cornell ultimately decided to restate the accounting because LBI would not adjust its treatment of the retainer fee so that the transaction would not violate the 3% equity requirement.   If LBI had either applied the retainer fee to later work, or returned the fee when given the opportunity to do so, the accounting treatment for the MCF transaction would not have had to change.  LBI's fraud and breach of fiduciary duty lay in representing to Cornell that the MCF transaction could be made to succeed, and then sabotaging its success through its subsequent insistence that the retainer fee be paid at the end of 2001, just after the closing of the MCF transaction.  It isn't surprising that Cornell stated in its 2001 10K that the originally reported accounting treatment for the MCF transaction was supported by reasonable arguments: the originally reported accounting treatment was the result intended by Cornell and Arthur Andersen and neither had reason to know that LBI would scuttle the arrangement through its insistence on receiving and booking the retainer fee in 2001.  The statement in the 2001 10K merely references what Cornell believed before LBI's actions caused the transaction to fail.  Cornell was explaining to its shareholders why it had determined to restate its accounting, not admitting that LBI had done nothing wrong.

44.    The cases relied on by the Trustee for this argument are clearly distinguishable. In *Abundance Partners, LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 768 (S.D.N.Y. 2012) a litigant had unambiguously designated certain property as collateral in an SEC filing.  In *Relational Investors LLC v. Sovereign Banccorp, Inc.*, 417 F. Supp. 2d 438, 448 (S.D.N.Y. 2006) the party had stated that its directors could be removed through shareholder vote, without cause.  These were simple statements of fact, not expressions of opinion or explanations of why the accounting treatment of a transaction is being restated.

21

### D.    LBI Breached the Retainer Agreement

45.    The Trustee argues that Cornell's breach of contract claim isn't specific enough to give the Trustee fair notice of the allegations, such that the Trustee cannot investigate the claims. However, the Retainer Agreement specifically mentions raising money for "a potential Alaska adult prison" (Retainer Agreement, ¶1). Jim Lavelle testified that even though LBI worked on that project for at least 2 years, it never closed. (Lavelle Dep. 251: 23 – 252: 20).

46.    More fundamentally, LBI breached the Retainer Agreement by booking the Retainer Fee in 2001 even though the Retainer Agreement called for the fee to "be applied on a mutually agreed upon basis toward future contingent fees…" (Retainer Agreement, ¶2(a)). Mr. Killian confirmed that the entire $3.65 million retainer fee was booked as income in 2001, a clear breach of the Retainer Agreement. (Killian Dep. 53: 21-23).

## CONCLUSION

47.    The Trustee's arguments, in support of its objection to Cornell's proof of claim are with merit. Cornell has provided extensive detail supporting the basis for its proof of claim. Cornell respectfully requests this Court to deny the Trustee's Objection to Cornell's Proof of Claim.

Dated:  Houston, Texas
          February 28, 2014

AJAMIE LLP

By: */s/ Thomas R. Ajamie*
    Thomas R. Ajamie
    David S. Siegel
    Pennzoil Place - South Tower
    711 Louisiana, Suite 2150
    Houston, TX  77002
    Telephone: (713) 860-1600
    Facsimile:  (713) 860-1699
    Email:  tajamie@ajamie.com

ATTORNEYS FOR CORNELL COMPANIES,
INC.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Response, and all exhibits thereto has been furnished to all parties who have requested notice via electronic filing and to via Federal Express to (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York 10004, Attn: Meaghan C. Gragg, Esq.; (b) Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 621 on this 28th day of February, 2014.

Respectfully submitted,

AJAMIE LLP

By: */s/ Thomas R. Ajamie*
Thomas R. Ajamie
David S. Siegel
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX  77002
Telephone: (713) 860-1600
Facsimile:  (713) 860-1699
Email:  tajamie@ajamie.com

ATTORNEYS FOR CORNELL COMPANIES,
INC.

AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699

Attorneys for Cornell Companies, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| | Claim No. 4393 |
| Debtor. | |

**DECLARATION OF THOMAS R. AJAMIE IN SUPPORT**
**OF CORNELL COMPANIES INC.'S RESPONSE TO TRUSTEE'S OBJECTION TO**
**CORNELL'S GENERAL CREDITOR CLAIM**

Pursuant to 28 U.S.C. § 1746, I, Thomas R. Ajamie, hereby declare as follows:

1.      I am an attorney duly admitted to practice in this Court, and a Partner at the law firm of Ajamie LLP, attorneys for Cornell Companies Inc. ("Cornell"). I submit this declaration in support of Cornell Companies Inc.'s Response to Trustee's Objection to Cornell's General Creditor Claim (Claim No. 4393).

2.      Attached hereto as Exhibit 1 is a true and correct copy of portions of the Deposition of David J. Levelle.

3.      Attached hereto as Exhibit 2 is a true and correct copy of portions of the Deposition of Steven Logan.

4.    Attached hereto as Exhibit 3 is a true and correct copy of portions of the

Deposition of Gary Killian.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 28, 2014

/s/ Thomas R. Ajamie
Thomas R. Ajamie

# EXHIBIT 1

1

CAUSE NO. 2006-76142

CORNELL COMPANIES INC.,          °     IN THE DISTRICT COURT
        Plaintiff                °
                                 °     HARRIS COUNTY, TEXAS
vs.                              °
                                 °     164th JUDICIAL DISTRICT
LEHMAN BROTHERS, INC.            °
        Defendant.              °

Videotaped Deposition of David J. Lavelle

Tuesday, August 19, 2008

3043 Fourth Avenue

San Diego, California

Kae F. Gernandt, RPR, CSR No. 5342

```
 1    APPEARANCES

 2

 3    For the Plaintiff:

 4              AJAMIE LLP
                BY:   THOMAS R. AJAMIE
 5              Pennzoil Place - South Tower
                711 Louisiana, Suite 2150
 6              Houston, Texas   77002
                T:  (713) 860-1600
 7              F:  (713) 860-1699
                tajamie@ajamie.com
 8
      For the Witness:
 9
                LUCE, FORWARD, HAMILTON & SCRIPPS
10              BY:   CHRISTOPHER H. FINDLEY
                600 West Broadway, Suite 2600
11              San Diego, California  92101
                T:  (619) 236-1414
12              F:  (619) 232-8311
                cfindley@luce.com
13

14    For the Defendant:

15              JONES DAY
                BY:   MICHAEL P. GRAHAM
16              717 Texas, Suite 3300
                Houston, Texas   77002-2712
17              T:  (832) 239-3939
                F:  (832) 239-3600
18              mpgraham@jonesday.com

19

20    Also in Attendance:

21              Greg Novak, Videographer, AJL Litigation Media

22

23

24

25
```

DAVID J. LAVELLE   8/19/2008

3

```
 1                    I N D E X

 2   WITNESS

 3   DAVID J. LAVELLE

 4

 5

 6   EXAMINATION BY                              PAGE

 7   Mr. Ajamie ..................................18

 8   Mr. Graham .................................415

 9   Mr. Ajamie .................................418

10

11

12

13                  E X H I B I T S

14   EXHIBIT NO.    DESCRIPTION                  PAGE

15   Exhibit 39     Letter Rogatory filed in Cause   25
                    No. 2006-76142
16
     Exhibit 40     Deposition Subpoena directed to  26
17                  David Lavelle

18   Exhibit 41     Transcript of proceedings        80
                    before the SEC dated 5/21/02
19
     Exhibit 42     Document titled "Cornell        100
20                  Companies Summer 1999
                    Sale-Leaseback Roadshow"
21
     Exhibit 43     Document titled "Municipal      101
22                  Corrections Finance LLC Project
                    Financing Acquisition Series
23                  2000" (LEH004534-004536)

24   Exhibit 44     Memorandum dated 1/25/00 from   102
                    David Lavelle re Cornell
25                  Corrections (LEH000131-000136)
```

CLEAVES & ASSOCIATES   (619) 238-1415

DAVID J. LAVELLE    8/19/2008

41

10:24:08  1    accomplish that.

10:24:11  2          Q.    Potential to accomplish --

10:24:12  3          A.    Well, they owned 100 facilities or so.

10:24:14  4    So, they obviously were growing before they met me.

10:24:17  5    So, they were trying to move on to the next step.

10:24:21  6          Q.    Do you recall telling either Mr. Cornell

10:24:24  7    or Mr. Logan that you had more than enough

10:24:28  8    experience so that you could do this MCF financing

10:24:34  9    deal?

10:24:34 10          A.    Yeah.    I mean, the MCF transaction by

10:24:36 11    itself is not, you know, rocket science, and it's --

10:24:46 12    and it's not pure municipal science either.    But

10:24:50 13    I -- I think I told them that it was imminently

10:24:55 14    doable, yes.

10:24:58 15          Q.    Okay.    Now, I saw some mention to a deal

10:25:03 16    you had done before for a company you called

10:25:06 17    Community Health Care.

10:25:08 18          A.    Uh-huh.

10:25:08 19          Q.    Yes?

10:25:09 20          A.    Yes.

10:25:11 21          Q.    And I looked up -- tried to find that

10:25:13 22    company, and I found something called Community

10:25:17 23    Health Systems, and I saw a deal that closed in the

10:25:19 24    mid-90s.    Is it possible it's Community Health

10:25:22 25    Systems?

DAVID J. LAVELLE    8/19/2008

42

| | | |
|---|---|---|
| 10:25:23 | 1 | A.    It's possible. |
| 10:25:24 | 2 | Q.    Okay.  And Lehman was associated with |
| 10:25:26 | 3 | that deal; I think you were too? |
| 10:25:28 | 4 | A.    That's correct. |
| 10:25:28 | 5 | Q.    I just want to call it by what I think |
| 10:25:30 | 6 | is the correct name, Community Health Systems. |
| 10:25:33 | 7 | A.    Correct. |
| 10:25:34 | 8 | Q.    Not a big deal. |
| 10:25:37 | 9 | A.    Not a -- correct. |
| 10:25:37 | 10 | Q.    Okay.  So -- and I think you had related |
| 10:25:39 | 11 | to the Securities and Exchange Commission that you |
| 10:25:42 | 12 | had talked to Mr. Logan about your success in that |
| 10:25:45 | 13 | transaction? |
| 10:25:45 | 14 | A.    I think that that's probably correct. |
| 10:25:47 | 15 | Q.    And do you recall what you said, or |
| 10:25:49 | 16 | would you like me to go through it some -- |
| 10:25:51 | 17 | A.    The -- the MCF deal and the Community |
| 10:25:54 | 18 | Health deal were very similar, just different |
| 10:25:58 | 19 | industries. |
| 10:25:59 | 20 | Q.    And tell us how they were similar. |
| 10:26:02 | 21 | A.    Multiple hospitals versus multiple |
| 10:26:04 | 22 | prisons. |
| 10:26:06 | 23 | Q.    What was Community Health trying to |
| 10:26:09 | 24 | accomplish? |
| 10:26:10 | 25 | A.    Just access to capital. |

DAVID J. LAVELLE   8/19/2008

45

| | | |
|---|---|---|
| 10:28:26 | 1 | A.   Correct. |
| 10:28:26 | 2 | Q.   And you wanted to implement what you |
| 10:28:30 | 3 | call consolidated financing? |
| 10:28:32 | 4 | A.   With Community Health? |
| 10:28:34 | 5 | Q.   Yes. |
| 10:28:35 | 6 | A.   Yeah, we consolidated a number of |
| 10:28:38 | 7 | inefficient financings that they had outstanding |
| 10:28:41 | 8 | into one efficient financing. |
| 10:28:44 | 9 | Q.   Did you foresee doing the same for |
| 10:28:46 | 10 | Cornell? |
| 10:28:48 | 11 | A.   Similar. |
| 10:29:07 | 12 | Q.   At this time -- at this point in time, |
| 10:29:08 | 13 | we're talking about 1999 roughly? |
| 10:29:10 | 14 | A.   Uh-huh. |
| 10:29:11 | 15 | Q.   Say "yes," please. |
| 10:29:12 | 16 | A.   Yes. |
| 10:29:13 | 17 | Q.   Yes.  When you were talking to David |
| 10:29:15 | 18 | Cornell and Steve Logan, right? |
| 10:29:19 | 19 | A.   Correct. |
| 10:29:19 | 20 | Q.   And talking about what you could offer |
| 10:29:21 | 21 | to help the company consolidate financing and grow? |
| 10:29:24 | 22 | A.   Correct. |
| 10:29:25 | 23 | Q.   At this time, was there a concern by |
| 10:29:27 | 24 | Mr. Logan, maybe Mr. Cornell -- you tell me -- about |
| 10:29:32 | 25 | its competitor, CCA? |

DAVID J. LAVELLE    8/19/2008

52

| | | |
|---|---|---|
| 10:36:04 | 1 | Q. Who did you talk to about that? |
| 10:36:08 | 2 | A. Gary and Dan Singer. |
| 10:36:10 | 3 | Q. Who raised it? |
| 10:36:13 | 4 | A. I think that's when Steve was interested |
| 10:36:18 | 5 | in getting accounting treatment within Cornell -- |
| 10:36:22 | 6 | off-balance-sheet accounting treatment with Cornell. |
| 10:36:32 | 7 | Q. So, it's your testimony that Mr. Logan |
| 10:36:34 | 8 | raises the fact that he'd like to try to get |
| 10:36:36 | 9 | off-balance-sheet -- |
| 10:36:38 | 10 | A. Right.. |
| 10:36:38 | 11 | Q. -- treatment? |
| 10:36:40 | 12 | A. Yeah. |
| 10:36:44 | 13 | Q. And when he raises that with you, how do |
| 10:36:46 | 14 | you foresee doing that, or how did you start |
| 10:36:49 | 15 | planning to do that? |
| 10:36:50 | 16 | A. Well, there were -- there's a multitude |
| 10:36:55 | 17 | of ways to raise capital, to raise equity. You can |
| 10:36:58 | 18 | do it internally, or you can do it externally, or |
| 10:37:01 | 19 | you can do it, you know, as I said, an infinite |
| 10:37:06 | 20 | number of ways. |
| 10:37:07 | 21 | So, we discussed all those ways, and one |
| 10:37:10 | 22 | of them -- one of those ways happened to be of |
| 10:37:15 | 23 | interest of Gary and Dan Singer. |
| 10:37:17 | 24 | Q. What way was that? |
| 10:37:19 | 25 | A. You know, to have Lehman provide it. |

DAVID J. LAVELLE    8/19/2008

55

| | | |
|---|---|---|
| 10:39:43 | 1 | A. I don't remember. |
| 10:39:46 | 2 | Q. Why did -- why was the decision made not |
| 10:39:48 | 3 | to go that route? |
| 10:39:50 | 4 | A. Well, we found that -- that we could go |
| 10:39:54 | 5 | that way, and many other ways as -- as it turns out, |
| 10:39:59 | 6 | and -- but in the meantime, we decided that the |
| 10:40:04 | 7 | transaction was complicated enough that -- that |
| 10:40:10 | 8 | Lehman ourselves would do it. |
| 10:40:13 | 9 | Q. Who -- who all was involved in showing |
| 10:40:16 | 10 | the MCF transaction to these other investors? |
| 10:40:19 | 11 | A. Just me. Just myself. |
| 10:40:22 | 12 | Q. Did -- did Killian assist in that? |
| 10:40:25 | 13 | A. No. |
| 10:40:28 | 14 | Q. Do you remember who you showed it to? |
| 10:40:31 | 15 | A. Huh-uh. |
| 10:40:32 | 16 | Q. No? |
| 10:40:32 | 17 | A. (The witness shook his head.) |
| 10:40:33 | 18 | Q. Okay. We'll look at some documents. |
| 10:40:34 | 19 | Maybe they'll help. I don't know. |
| 10:40:37 | 20 | A. Okay. |
| 10:40:37 | 21 | Q. So, you showed it to them. You said |
| 10:40:39 | 22 | there was interest in -- by other investors in being |
| 10:40:41 | 23 | the 3 percent equity contributor? |
| 10:40:45 | 24 | A. There was potential. |
| 10:40:48 | 25 | Q. But because of the complication of the |

DAVID J. LAVELLE   8/19/2008

56

| | | |
|---|---|---|
| 10:40:52 | 1 | transaction, you decided to keep Lehman as the |
| 10:40:54 | 2 | investor -- |
| 10:40:55 | 3 | A.   Correct. |
| 10:40:56 | 4 | Q.   -- or make Lehman the investor? |
| 10:40:57 | 5 | A.   Correct. |
| 10:40:57 | 6 | Q.   Not keep because they weren't, but make |
| 10:41:00 | 7 | them the investor, right? |
| 10:41:01 | 8 | A.   Correct. |
| 10:41:01 | 9 | Q.   Yeah, yeah.  What other types of |
| 10:41:07 | 10 | structuring did you look at in addition to these |
| 10:41:11 | 11 | outside investors as a possibility? |
| 10:41:14 | 12 | A.   Well, Cornell did their own.  So, they |
| 10:41:17 | 13 | went to their own institutional investors to -- to |
| 10:41:23 | 14 | answer the equity source question. |
| 10:41:27 | 15 | Q.   And what was the response that you're |
| 10:41:28 | 16 | aware of? |
| 10:41:29 | 17 | A.   I don't know.  Steve did that. |
| 10:41:30 | 18 | Q.   Did he tell you that there was no |
| 10:41:32 | 19 | interest? |
| 10:41:33 | 20 | A.   No. |
| 10:41:34 | 21 | Q.   Did he tell you there was interest? |
| 10:41:38 | 22 | A.   I -- I think that he wanted Lehman to |
| 10:41:45 | 23 | fulfill that requirement for him, so that's what we |
| 10:41:48 | 24 | did. |
| 10:41:49 | 25 | Q.   Why do you think that? |

DAVID J. LAVELLE    8/19/2008

74

| | | |
|---|---|---|
| 11:00:19 | 1 | A.    We had a presentation and sort of |
| 11:00:23 | 2 | subsequent updates. |
| 11:00:25 | 3 | Q.    Do you remember telling them that the |
| 11:00:28 | 4 | sale/leaseback would make the company debt free? |
| 11:00:32 | 5 | A.    No. |
| 11:00:41 | 6 | Q.    Let me ask you about the |
| 11:00:44 | 7 | 3.65 million-dollar retainer.  Do you know what I'm |
| 11:00:47 | 8 | talking about? |
| 11:00:47 | 9 | A.    Uh-huh. |
| 11:00:48 | 10 | Q.    Yes?  Say "yes." |
| 11:00:49 | 11 | A.    Yes. |
| 11:00:50 | 12 | Q.    Who did you -- when did you first |
| 11:00:52 | 13 | discuss that type of retainer? |
| 11:00:55 | 14 | A.    I think the retainer, as far as I can |
| 11:01:00 | 15 | recollect, had been sort of an ongoing discussion |
| 11:01:04 | 16 | with Steve Logan for, you know, a year, a year |
| 11:01:11 | 17 | before. |
| 11:01:11 | 18 | Q.    A year before when? |
| 11:01:12 | 19 | A.    A year before the transaction closed. |
| 11:01:17 | 20 | Q.    Okay.  So, at least by August 2000, |
| 11:01:20 | 21 | you're talking to Steve had an additional retainer? |
| 11:01:24 | 22 | MR. GRAHAM:  Objection. |
| 11:01:24 | 23 | MR. FINDLEY:  Join. |
| 11:01:25 | 24 | THE WITNESS:  Well, it was -- it was Steve's |
| 11:01:28 | 25 | idea to -- to get Lehman's attention and focus on |

DAVID J. LAVELLE   8/19/2008

81

| | | |
|---|---|---|
| 11:08:18 | 1 | possible impact of a retainer fee on the 3 percent |
| 11:08:21 | 2 | outside the equity was at least an issue that you |
| 11:08:24 | 3 | were conscious of as this deal was -- as the |
| 11:08:28 | 4 | retainer agreement was being negotiated; is that |
| 11:08:30 | 5 | right?" |
| 11:08:30 | 6 | And you said, "I was at least conscious |
| 11:08:33 | 7 | of it." |
| 11:08:34 | 8 | You see that? |
| 11:08:35 | 9 | A.   Uh-huh. |
| 11:08:35 | 10 | Q.   Okay.  Could you say -- you have to say |
| 11:08:36 | 11 | "yes." |
| 11:08:37 | 12 | A.   Yes. |
| 11:08:37 | 13 | Q.   Okay.  So, you were conscious that the |
| 11:08:40 | 14 | $3.65 million could have some possible impact on the |
| 11:08:44 | 15 | 3 percent equity contribution? |
| 11:08:52 | 16 | MR. GRAHAM:  Objection to the form. |
| 11:08:53 | 17 | MR. FINDLEY:  Join. |
| 11:08:59 | 18 | THE WITNESS:  I -- I got to stand by this, I |
| 11:09:01 | 19 | guess.  I was -- I was conscious of it. |
| 11:09:04 | 20 | BY MR. AJAMIE: |
| 11:09:05 | 21 | Q.   And if you'll move down a little bit, |
| 11:09:07 | 22 | you were asked another question on line 16. |
| 11:09:09 | 23 | A.   Uh-huh. |
| 11:09:10 | 24 | Q.   "So if I understand you correctly then, |
| 11:09:12 | 25 | that was more important an issue than the issue |

DAVID J. LAVELLE    8/19/2008

115

| | | |
|---|---|---|
| 11:55:39 | 1 | Lehman.  Are you aware of that? |
| 11:55:40 | 2 | A.    I don't know. |
| 11:55:41 | 3 | Q.    Okay.  And did you discuss these |
| 11:55:44 | 4 | accounting issues, these Arthur Andersen issues, |
| 11:55:46 | 5 | with anyone inside of Lehman? |
| 11:55:51 | 6 | A.    I don't believe so. |
| 11:55:52 | 7 | Q.    The off-balance-sheet issue? |
| 11:55:54 | 8 | A.    I think it was known but not a priority. |
| 11:55:58 | 9 | Q.    Okay.  No, that's not what the -- the |
| 11:55:59 | 10 | question is, though:  Did you discuss it with |
| 11:56:00 | 11 | anyone? |
| 11:56:02 | 12 | Let me start with Corey Long. |
| 11:56:04 | 13 | Obviously, you spoke to him about it? |
| 11:56:05 | 14 | A.    No, I don't believe so. |
| 11:56:08 | 15 | Q.    Okay.  Even though he's on this memo |
| 11:56:09 | 16 | from you?  No? |
| 11:56:11 | 17 | A.    No one in the financing -- trying to |
| 11:56:14 | 18 | accomplish the financing -- that was the principal |
| 11:56:15 | 19 | goal -- had any interest in the accounting treatment |
| 11:56:17 | 20 | at all. |
| 11:56:18 | 21 | Q.    Okay.  So, you're saying that people at |
| 11:56:20 | 22 | Lehman didn't care about this off-balance-sheet |
| 11:56:22 | 23 | issue? |
| 11:56:23 | 24 | A.    Not really. |
| 11:56:23 | 25 | Q.    Even though it was important to the |

DAVID J. LAVELLE   8/19/2008

251

| | | |
|---|---|---|
| 03:36:00 | 1 | decades prior to their role at Provident. |
| 03:36:05 | 2 | Q.   So, certain people who were -- before |
| 03:36:07 | 3 | they came to Provident, Lehman had worked with |
| 03:36:10 | 4 | certain individuals who were at least at the time of |
| 03:36:13 | 5 | 2001 -- |
| 03:36:14 | 6 | A.   Some were bond counsel.  Some were |
| 03:36:17 | 7 | underwriters.  Some were financial advisors, you |
| 03:36:22 | 8 | know, and so on and so forth. |
| 03:36:23 | 9 | Q.   So, Lehman had work with various members |
| 03:36:26 | 10 | of the Provident Foundation -- |
| 03:36:28 | 11 | A.   Right. |
| 03:36:28 | 12 | Q.   -- being all those different categories |
| 03:36:30 | 13 | you just mentioned of people -- |
| 03:36:31 | 14 | A.   Correct. |
| 03:36:32 | 15 | Q.   -- correct? |
| 03:36:36 | 16 | And if you'll look at the second to last |
| 03:36:38 | 17 | sentence of that paragraph, it says, "In addition, |
| 03:36:42 | 18 | Cornell Companies has retained Lehman Brothers for |
| 03:36:44 | 19 | various municipally owned traditionally structured |
| 03:36:47 | 20 | governmental lease appropriation transactions"? |
| 03:36:49 | 21 | A.   Correct. |
| 03:36:50 | 22 | Q.   What was Lehman retained for? |
| 03:36:57 | 23 | A.   The -- the -- the initial Alaska |
| 03:37:00 | 24 | transaction -- |
| 03:37:01 | 25 | Q.   Uh-huh. |

DAVID V. LAVELLE    8/19/2008

252

| 03:37:01 | 1 | A.    -- is a good example.  That was a -- a |
| 03:37:07 | 2 | transaction that Cornell had hired us on. |
| 03:37:10 | 3 | Q.    Okay. |
| 03:37:15 | 4 | A.    And -- and they hired us on it in 1998, |
| 03:37:19 | 5 | and at this point, we were still working on it.  And |
| 03:37:23 | 6 | it was a traditionally structured, municipally owned |
| 03:37:28 | 7 | government lease appropriation. |
| 03:37:30 | 8 | Q.    Is that the one that's referred to, if |
| 03:37:31 | 9 | you look a little bit further down, it says, |
| 03:37:33 | 10 | "Additional Financings"? |
| 03:37:34 | 11 | A.    Yes. |
| 03:37:34 | 12 | Q.    And if you go to the last sentence in |
| 03:37:36 | 13 | there, it says "Lehman Brothers has been |
| 03:37:37 | 14 | retained --" |
| 03:37:38 | 15 | A.    Right. |
| 03:37:38 | 16 | Q.    -- "by Cornell"?  Yes? |
| 03:37:40 | 17 | A.    Right.  So, we had been working on that |
| 03:37:42 | 18 | transaction for two and a half years. |
| 03:37:45 | 19 | Q.    Did that ever close? |
| 03:37:46 | 20 | A.    No. |
| 03:37:48 | 21 | Q.    If you look at the next page, Lehman |
| 03:37:50 | 22 | Confidential 217 -- |
| 03:37:53 | 23 | A.    Right. |
| 03:37:53 | 24 | Q.    -- it talks about "Compensation is |
| 03:37:58 | 25 | expected to be approximately 2 million." |

DAVID J. LAVELLE    8/19/2008

368

```
06:33:51  1    they had, and they sent us the list.

06:33:56  2         Q.   Did you talk to Logan about this issue

06:33:59  3    after the first call?

06:34:00  4         A.   Right.

06:34:01  5         Q.   Did you talk to them anymore about this

06:34:03  6    issue?

06:34:06  7         A.   A couple of times, and I think the --

06:34:10  8    the sense that I got was that there was a

06:34:13  9    disagreement between Arthur Andersen and Steve on

06:34:16  10   conversations that they had historically on

06:34:19  11   accounting treatment.

06:34:21  12        Q.   And did you offer to help clarify that

06:34:24  13   with Arthur Andersen?

06:34:26  14        A.   We would do anything to help him with

06:34:28  15   any problems that he had.

06:34:29  16        Q.   Okay.  Did you offer that to him then?

06:34:31  17        A.   I -- we would help him -- Steve Logan

06:34:35  18   and Cornell with any issues they had with their

06:34:38  19   accountants.

06:34:39  20        Q.   Why did you not give back the

06:34:41  21   3.65 million?

06:34:45  22        A.   Well, I -- I think the greatest

06:34:47  23   limitation that we had is we're not accountants.

06:34:50  24   We're not an accounting firm; we're a banking firm.

06:34:53  25   We had successfully done a stand-alone
```

06:34:57  1   sale/leaseback transaction.  We had done a

06:35:00  2   successful equity transaction, and we had provided

06:35:07  3   Steve Logan and Cornell with debt and equity for

06:35:13  4   their Mississippi Federal Bureau of Prisons project.

06:35:16  5       Q.   While in the sale and leaseback

06:35:19  6   transaction you had done -- the firm was paid

06:35:22  7   $1.9 million, right?

06:35:24  8       A.   Correct.

06:35:25  9       Q.   And on the secondary offering, the firm

06:35:27 10   was paid about $1.8 million?

06:35:30 11       A.   I have no idea.

06:35:31 12       Q.   So, why did you not offer to return the

06:35:33 13   3.65 million once Arthur Andersen raised the

06:35:39 14   accounting issue?

06:35:42 15       A.   Well, I -- I don't think returning the

06:35:45 16   money solves an accounting issue.

06:35:47 17       Q.   Is that what they told you?

06:35:49 18       A.   Arthur --

06:35:49 19       Q.   Yeah.

06:35:49 20       A.   I mean, that's my layman's understanding

06:35:54 21   of accounting.

06:35:54 22       Q.   Uh-huh.  Did Arthur Andersen tell that

06:35:56 23   to you or to someone who conveyed it to you?

06:35:59 24       A.   No, but it was readily apparent that

06:36:02 25   returning the money is not -- did not cure an

07:33:17  1  understand my question?"

07:33:17  2       And then your answer was, "Yes.  In

07:33:20  3  January when we were discussing potential closing

07:33:22  4  dates and I started thinking about my eventual

07:33:25  5  discussions with Cornell about what would be earned,

07:33:30  6  I would have expected somewhere in the million and a

07:33:34  7  half range."

07:33:36  8       A.    Yeah, I would agree with that.

07:33:38  9       Q.    All right.  Can you explain that just a

07:33:40 10  little bit.  What were you saying there?

07:33:45 11       A.    During the months of September, October,

07:33:48 12  November and December, we not only raised an equity

07:33:54 13  contribution for project financing for a Federal

07:33:57 14  Bureau of Prisons project but we also had a -- a

07:34:01 15  significant commitment for the debt side of that

07:34:05 16  project.

07:34:08 17       In addition to that, Cornell had the

07:34:11 18  ability to do it within the MCF structure, which

07:34:15 19  they can really -- you know, the MCF structure was

07:34:20 20  an efficient structure then after this and is still

07:34:26 21  today.  And we -- we got a commitment for the equity

07:34:31 22  contribution and the debt.

07:34:33 23       Q.    And you say you were thinking about

07:34:38 24  having discussions with Cornell about asking them to

07:34:41 25  apply a million and a half of the 3.6 retainer to

07:34:46  1    the work that had been done?

07:34:47  2         A.   That's correct.

07:34:48  3         Q.   And what -- why didn't you do that?

07:34:52  4         A.   I think because this -- you know, the --

07:34:56  5    the -- the accounting concerns that Cornell and

07:35:01  6    Arthur Andersen were going under sort of redirected

07:35:04  7    our attention.

07:35:06  8         MR. GRAHAM:  Okay.  I don't think I have any

07:35:07  9    further questions.

07:35:10 10         MR. AJAMIE:  Let me just follow up with a

07:35:12 11    couple things.

07:35:12 12

07:35:12 13                  FURTHER EXAMINATION

07:35:12 14    BY MR. AJAMIE:

07:35:12 15         Q.   Who did you discuss that with at

07:35:15 16    Cornell?

07:35:15 17         A.   Amortizing the retainer?

07:35:18 18         Q.   Yes.

07:35:19 19         A.   First with Steve Logan, then with Harry

07:35:25 20    Phillips, I think his name was.  And then the CEO

07:35:29 21    after -- after Harry.  So, we discussed it with

07:35:35 22    three CEOs.

07:35:38 23         Q.   Okay.  And they all said "no"?

07:35:42 24         A.   I would classify the response as sort of

07:35:44 25    nonresponding.

DAVID J. LAVELLE  8/19/2008

420

| | |
|---|---|
| 07:36:09 | 1 |
| 07:36:09 | 2 |
| 07:36:09 | 3 |
| 07:36:09 | 4 |
| 07:36:09 | 5 |
| 07:36:09 | 6 |
| 07:36:09 | 7 |
| 07:36:09 | 8 |
| 07:36:09 | 9 |
| 07:36:09 | 10 |
| 07:36:09 | 11 |
| 07:36:09 | 12 |
| 07:36:09 | 13 |
| 07:36:09 | 14 |
| 07:36:09 | 15 |
| 07:36:09 | 16 |
| 07:36:09 | 17 |
| 07:36:09 | 18 |
| 07:36:09 | 19 |
| 07:36:09 | 20 |
| 07:36:09 | 21 |
| 07:36:09 | 22 |
| 07:36:09 | 23 |
| 07:36:09 | 24 |
| 07:36:09 | 25 |

REPORTER'S CERTIFICATE

I, KAE F. GERNANDT, a Certified
Shorthand Reporter for the State of California, do
hereby certify:

That the witness in the foregoing
deposition was by me duly sworn; that the deposition
was then taken before me at the time and place
herein set forth; that the testimony and proceedings
were reported by me stenographically and were
transcribed through computerized transcription under
my direction; and the foregoing is a true and
correct record of the testimony and proceedings
taken at that time.

IN WITNESS WHEREOF, I have subscribed my
name this 5th day of September, 2008.

_____

Kae F. Gernandt, CSR No. 5342

# EXHIBIT 2

1          CAUSE NO. 2006-76142

2   CORNELL COMPANIES, INC.    )  IN THE DISTRICT COURT
                              )
3   vs.                       )  HARRIS COUNTY, TEXAS
                              )
4   LEHMAN BROTHERS, INC.     )  164TH JUDICIAL DISTRICT

5

6

7          **ORAL VIDEOTAPED DEPOSITION**

8              **STEVEN LOGAN**

9             August 13, 2008

10.

11       ORAL VIDEOTAPED DEPOSITION OF STEVEN LOGAN,

12   produced as a witness at the instance of the

13   Defendant and duly sworn, was taken in the

14   above-styled and numbered cause on August 13, 2008,

15   from 9:41 a.m. to 2:16 p.m., before Karen K. Harris,

16   Certified Shorthand Reporter in and for the State of

17   Texas, reported by computerized stenotype machine at

18   the offices of Jones Day, 717 Texas Avenue, Suite

19   3300, Houston, Texas 77002, pursuant to the Texas

20   Rules of Civil Procedure and the provisions stated on

21   the record or attached hereto.

22

23

24

25                                    **NMA**
                                      **COPY**

*Steve Logan - August 13, 2008*
*Examination by Mr. Ajamie*

1      A.      I don't recall his discussions.  I know

2   that this -- they had done transactions of financing

3   projects in the past.

4      Q.      Did you consider talking to anyone else,

5   besides Mr. Lavelle?

6      A.      I was talking to anybody at that time.  I

7   would have liked to have talked to Lehman Brothers.

8   They were one of the reputable firms.

9              We had also worked with Dillon Read.

10  So, we had worked with several.  But we were -- felt

11  fortunate to be able to work with Lehman Brothers.

12     Q.      And based on Lehman's expertise and

13  Mr. Lavelle's expertise, you decided to go with them?

14     A.      Primarily.  Because what we had encountered

15  in the past is an ability to find someone who would

16  buy the bonds.

17     Q.      Let me just ask you again.  Based on their

18  expertise, did you decide to go about them?

19     A.      I would say, based upon their expertise in

20  the corrections industry, yes.

21     Q.      And then you began a relationship with

22  Mr. Lavelle.  And explain to the jury what -- what

23  type of work you were doing with Mr. Lavelle, let's

24  say in 1999 and 2000?

25     A.      It would generally involve trying to put

*Steve Logan - August 13, 2008*
*Examination by Mr. Ajamie*

1   the level of work that Lehman did on that.

2      Q.    Do you recall that you talked to David

3   Lavelle, or David Lavelle mentioned to you a project

4   he had done for a company called Community Health

5   Care?

6      A.    I just don't recall.  The name sounds

7   familiar, but I don't recall anything about it or why

8   it would be familiar.

9      Q.    Do you remember Mr. Lavelle telling you, as

10  Lehman was -- or excuse me.

11           Do you remember Mr. Lavelle telling

12  you, as you were contemplating doing some deals, that

13  Mr. Lavelle had experience in off balance sheet

14  transactions, and had actually done something for a

15  company very similar to Cornell?

16     A.    I don't recall the exact discussions.  But

17  I know that there was similar -- what I would call

18  project financings, which is one of the things that

19  attracted us, and their expertise in corrections

20  foremost -- their analyst, and the fact that there

21  were other project financings done, that this might

22  work with.

23     Q.    Do you recall that it was Mr. Lavelle's

24  idea to structure something like the MCF transaction

25  based on his prior experience?

*Steve Logan – August 13, 2008*
*Examination by Mr. Ajamie*

1      A.    I don't remember the exact date.  I was out

2   of town, in New York when we were trying to finalize

3   this.  And I had sent it to him for his review.  And

4   he had made some marks, and faxed it to me at the

5   hotel.

6      Q.    Do you believe it was before or after

7   September 5th?

8      A.    I believe it's before.

9      Q.    Okay.  If he says it was after

10  September 5th, would you disagree with that?

11              MR. GRAHAM:  Objection.

12              THE WITNESS:  I don't know.  It would

13  depend on -- I think their were likely faxes that

14  would support the date.

15     Q.    (BY MR. AJAMIE) You know that Mr. Lavelle

16  didn't actually sign it until a couple weeks after

17  September 5th; right?

18     A.    I don't recall.

19     Q.    Okay.  Now, you testified to the SEC that

20  you did the first draft, and that you sent it to

21  Lehman, and Lehman sent it to their legal department.

22              Do you remember that?

23     A.    I do remember discussions of where it went

24  from a shorter form to a longer form.

25     Q.    Yeah.  And it became a longer form when the

*Steve Logan - August 13, 2008*
*Examination by Mr. Ajamie*

1    Lehman people got ahold of it; right?

2        A.    It -- it had more -- more legal terminology

3    in it.

4        Q.    It went from one page to four pages after

5    Lehman got it; correct?

6        A.    That sounds correct.

7        Q.    Who -- who did David Lavelle tell -- told

8    you -- excuse me.  Who did David Lavelle tell you

9    reviewed this letter when he sent the draft of it to

10   Lehman?

11       A.    I don't -- I don't recall.

12       Q.    And he sent the draft to Lehman's

13   headquarters in New York, didn't he?

14       A.    I don't recall.

15       Q.    Okay.  But in any event, you do know that

16   when it came back from Lehman, it was a four-page --

17   they had turned it into a four-page agreement, and

18   not a one-page agreement, like you had sent?

19       A.    It was more structured, yes.

20       Q.    It was four pages; right?

21       A.    I believe so.  Yes.

22       Q.    Okay.  And -- and they added three pages or

23   more of language to what you had drafted; correct?

24       A.    I believe so.

25       Q.    Now, on this Exhibit No. 23, you mentioned

Steve Logan - August 13, 2008
Examination by Mr. Ajamie

1              THE WITNESS:  -- Arthur Andersen --

2              MR. BESSETTE:  You'll find it in the

3    record --

4              THE WITNESS:  Arthur Andersen

5    suggested the application of the entire.

6              MR. AJAMIE:  Okay.

7         Q.    (BY MR. AJAMIE) But you first came up with

8    the idea of initiating some of this to the equity?

9         A.    Yes.

10        Q.    Was Mr. Lavelle involved in that decision?

11        A.    I don't recall.

12        Q.    Now, keeping in mind at this time, is it

13   fair to say that the time that you were sending this

14   suggestion -- which is Exhibit 37 -- to Arthur

15   Andersen and to Locke Liddell, Lehman had already

16   been paid $1,837,500 for its work on the equity

17   offering; correct?

18        A.    The equity offering would have been closed,

19   and they would have been paid out of proceeds.

20        Q.    They would have paid $1,837,500?

21        A.    I don't recall the amount.  Whatever the

22   fees would have been.

23        Q.    Okay.  Now, the fee was paid, we saw

24   already, on November 7th.  Do you see that?

25   3.65 million dollar fee?

*Steve Logan – August 13, 2008*
*Examination by Mr. Ajamie*

1      A.    That sounds accurate.

2      Q.    Right.  Whose idea was it to pay it at that

3    time?

4      A.    On the advice of Arthur Andersen, it was

5    paid as far after the closing of MCF as possible.

6    They would prefer that to be end of the following

7    year.

8           Discussions with Lehman is, they want

9    to be paid upon execution, because that's when they

10   started doing the work.

11          It was merely an agreement of how long

12   they would wait, and 60 days was more than enough.

13     Q.    Why didn't you just make the payment in

14   January of 2002?

15     A.    I think that's asking them too long.  I --

16     Q.    Asking who?  I'm sorry.

17     A.    Lehman Brothers.  Considering they were

18   doing work on the retainer agreement well before

19   that.

20     Q.    So, you thought it was waiting too long to

21   wait two more months to pay them in the 2002 time

22   period?

23     A.    And Andersen's view was:  Just do it as far

24   after as you can.  And I had told them it was going

25   to be November.

*Oral Videotaped Deposition - Steven Logan*
*August 13, 2008*

1                        CAUSE NO. 2006-76142

2    CORNELL COMPANIES, INC.    )    IN THE DISTRICT COURT
                                )
3    vs.                   ·    )    HARRIS COUNTY, TEXAS
                                )
4    LEHMAN BROTHERS, INC.      )    164TH JUDICIAL DISTRICT

5

6

7                        **REPORTER'S CERTIFICATE**

8        **ORAL VIDEOTAPED DEPOSITION OF STEVE LOGAN**

9                        August 13, 2008

10        I, Karen K. Harris, Certified Shorthand Reporter

11    in and for the State of Texas, hereby certify to the

12    following:

13        That the witness, STEVE LOGAN, was duly sworn

14    and that the transcript of the deposition is a true

15    record of the testimony given by the witness;

16        That the deposition transcript was duly

17    submitted on _____ to the witness or to

18    the attorney for the witness for examination,

19    signature, and return to me by

20    _____.

21        That pursuant to information given to the

22    deposition officer at the time said testimony was

23    taken, the following includes all parties of record

24    and the amount of time used by each party at the time

25    of the deposition:

*Oral Videotaped Deposition - Steven Logan*
*August 13, 2008*

```
 1        Mr. Graham (1h 49m)
                Attorney for Defendant
 2        Mr. Ajamie  (1 h 38 m)
                Attorney for Plaintiff
 3
 4        That a copy of this certificate was served on

 5   all parties shown herein on _____

 6   and filed with the Clerk.

 7        I further certify that I am neither counsel for,

 8   related to, nor employed by any of the parties in the

 9   action in which this proceeding was taken, and

10   further that I am not financially or otherwise

11   interested in the outcome of this action.

12        Further certification requirements pursuant to

13   Rule 203 of the Texas Code of Civil Procedure will be

14   complied with after they have occurred.

15        Certified to by me on this _____ day of

16   _____, _____.

17

18                    _____

19                    Karen K. Harris, CSR
                       Texas CSR 1225
20                     Expiration:  12/31/09
                       NELL McCALLUM & ASSOC., INC.
21                     Firm Registration 243
                       5300 Memorial Dr., Suite 600
22                     Houston, Texas 77007
                       (713) 861-0203
23

24        FURTHER CERTIFICATION UNDER TRCP RULE 203

25
```

1      The original deposition was/was not returned to

2   the deposition officer on _____.

3      If returned, the attached Changes and Signature

4   page(s) contain(s) any changes and the reasons

5   therefor.

6      If returned, the original deposition was

7   delivered to Mr. Graham, Custodial Attorney.

8      $_____ is the deposition officer's charges to

9   the Defendant for preparing the original deposition

10  and any copies of exhibits;

11     The deposition was delivered in accordance with

12  Rule 203.3, and a copy of this certificate, served on

13  all parties shown herein, was filed with the Clerk.

14     Certified to by me on this _____ day of

15  _____, _____.

16

17

18

19                          _____

20                          Karen K. Harris, CSR
                            Texas CSR 1225
21                          Expiration:  12/31/09
                            NELL McCALLUM & ASSOC., INC.
22                          Firm Registration 243
                            5300 Memorial Dr., Suite 600
23                          Houston, Texas 77007

24

25

# EXHIBIT 3

IN THE DISTRICT COURT

HARRIS COUNTY TEXAS 164TH JUDICIAL DISTRICT

--------------------------------------------X

CORNELL COMPANIES, INC.,

Plaintiff,

-against- Cause No.: 2006-76142

LEHMAN BROTHERS, INC.,

Defendant.

--------------------------------------------X

222 East 41st Street

New York, New York 10017

July 25, 2008

9:40 a.m.

DEPOSITION of LEHMAN BROTHERS, INC., by its representative GARY KILLIAN, a witness called on behalf of the Plaintiff under Rule 199 of the Texas Rules of Civil Procedure, held at the above time and place, and taken before Binita Shrestha, a reporter and Notary Public within and for the State of New York.

```
 1  A P P E A R A N C E S :
 2
 3  AJAMIE, LLP.
        Attorneys for Plaintiff
 4      Pennzoil Place - South Tower
        711 Louisiana, Suite 2150
 5      Houston, Texas, 77002
        BY: ANN RYAN ROBERTSON, ESQ.
 6
 7  JONES DAY, ESQS.
        Attorneys for Defendant
 8      717 Texas Street, Suite 3300
        Houston, Texas, 77002
 9      BY: MICHAEL P. GRAHAM, ESQ.
10
11  Also Present:
12      Carlos Nunez - Videographer
                US Legal Support
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    [Page 2]
```

```
 1      IT IS HEREBY STIPULATED AND AGREED by and
 2  between the attorneys for the respective parties
 3  herein that the sealing, filing and
 4  certification of the within deposition be
 5  waived; that such deposition may be signed and
 6  sworn to before any officer authorized to
 7  administer an oath, with the same force and
 8  effect as if signed and sworn to before whom
 9  said deposition was taken.
10      IT IS FURTHER STIPULATED AND AGREED that
11  all objections, except as to form, are reserved
12  to the time of trial.
13      IT IS FURTHER STIPULATED AND AGREED that
14  counsel for the witnesses appearing herein shall
15  be furnished with a copy of the within
16  deposition without cost.
17
18
19
20
21
22
23
24
25
                                    [Page 3]
```

```
 1               KILLIAN
 2      G A R Y  K I L L I A N ,
 3      the witness herein, having first been duly
 4      sworn by a Notary Public of the State of
 5      New York, was examined and testified as
 6      follows:
 7  EXAMINATION BY
 8  MS. ROBERTSON:
 9      Q.  Could you state your name for the
10  record, please?
11      A.  Gary Killian.
12      Q.  And Mr. Killian, how are you employed?
13      A.  I recently left Lehman Brothers at the
14  end of May after 24 years.
15      Q.  And when was your departure?
16      A.  Officially May 30th.
17      Q.  And is Mr. Graham appearing as your
18  counsel here today?
19      A.  Yes.
20      Q.  Have you had your deposition taken
21  before, Mr. Killian?
22      A.  No.
23      Q.  You have given testimony to the SEC, do
24  you recall that?
25      A.  That's correct, yes.
                                    [Page 4]
```

```
 1               KILLIAN
 2      Q.  On how many occasions have you given
 3  testimony to the SEC?
 4      A.  Just once.
 5      Q.  I actually have two transcripts.  Do
 6  you recall perhaps being in two segments?
 7      A.  It was in two segments, that's correct.
 8      Q.  All right, my question wasn't as clear
 9  as I would like.  I apologize for that.  Did you
10  have an opportunity to visit with Mr. Graham
11  about what was to occur today?
12      A.  I have.
13      Q.  And you understand that I represent
14  Cornell Companies?
15      A.  Understood.
16      Q.  And if I don't articulate a question in
17  a manner in which you understand, can we have an
18  agreement that you will ask me to rephrase it?
19      A.  Certainly.
20      Q.  And the court reporter is extremely
21  talented, but she can't take both of us down at
22  the same time and sometimes in the heat of
23  questioning and answering, we will have a
24  tendency to talk over one another, so let's both
25  try not to let that happen, all right?
                                    [Page 5]
```

[2]  (Pages 2 to 5)

KILLIAN

1      A.   I don't recall having that conversation
2  with Mr. Lavelle directly, but we did discuss it
3  with a variety of people.
4      Q.   Who did you discuss the retainer
5  agreement in the 2002 timeframe?
6      A.   I don't recall specifically, but -- I
7  don't recall specifically.  I'm sure I discussed
8  it with counsel.  Beyond that, I'm not sure.
9      Q.   And you don't recall what counsel it
10 was?
11     A.   I do not.
12     Q.   Could have been Mr. Rosen?
13     A.   Could have been very possibly.
14     Q.   Now, if you look at Killian Exhibit
15 Number 2, in paragraph one it says that, "In
16 particular the company may pursue the following
17 transactions."  It lists some transactions
18 raising approximately $90 million for a
19 potential Alaska adult prison.  Do you know if
20 that was a new project for Lehman?
21     A.   My understanding was those were
22 transactions that they were to hoping to
23 complete in the future and that Mr. Logan was
24 looking for Lehman to continue to help him on

[Page 50]

KILLIAN

1  trying to find ways to either find initial
2  financing -- initial financing or refinancing of
3  these various deals.
4      Q.   So is it your testimony that Lehman had
5  been working on number one, the Alaska adult
6  prison prior to execution of this agreement?
7      A.   I don't know what -- I don't know how
8  to define "had been working on."
9      Q.   Is that a prospect that Lehman had been
10 considering for the client as a means of
11 assisting the client?
12     A.   I can't answer that directly.  I just
13 know that those transactions were on a list of
14 deals that we were hoping to work with Cornell
15 on.
16     Q.   Does an investment banker have to keep
17 notes of any deals they're working on, like time
18 sheets or anything along that line?
19     A.   Generally, no, we don't require call
20 logs.
21     Q.   Call logs.
22     A.   They may themselves, of course, keep
23 themselves organized, but it's not required by
24 us.

[Page 51]

KILLIAN

1      Q.   After Mr. Lavelle left Lehman, was any
2  other investments banker assigned, for lack of a
3  better word, to Cornell?
4      A.   Steve Peters, managing director, with
5  project finance experience and energy banking
6  experience, which is typically more project
7  finance oriented, was assigned to take over
8  David's responsibilities and support Cornell.
9      Q.   And do you know if Mr. Peters called on
10 Cornell?
11     A.   I know he called on them several times,
12 yes.
13     Q.   How do you know that Mr. Peters called
14 on Cornell several times?
15     A.   Well, he and I had conversations that
16 once David left, of course, we had this retainer
17 in place and we were responsible for following
18 through on the terms, which meant we needed to
19 make ourselves available and continue to give,
20 hopefully, good advice to Cornell with regards
21 to whatever future transactions they were
22 working on.
23     Q.   And is Mr. Peters here in New York?
24     A.   He is -- no, he's located outside

[Page 52]

KILLIAN

1  Boston now.
2      Q.   Is he with Lehman still?
3      A.   He still is, yes.
4      Q.   After the execution of this agreement
5  in September of 2001, are you aware of any
6  transactions that were closed for Cornell?
7      A.   I was made aware of an equity offering,
8  secondary equity offering, that Lehman did for
9  Cornell in late 2001.
10     Q.   Was that within your group?
11     A.   No.
12     Q.   And would that work relate to this
13 retainer agreement, Killian Exhibit Number 2?
14     A.   I can't answer that because I didn't
15 know that transaction happened until well after
16 it closed.
17     Q.   Were you aware of any other
18 transactions that closed?
19     A.   No.
20     Q.   Now, it's my understanding that the
21 $3.65 million that was paid was booked income in
22 2001?
23     A.   That's my understanding.
24     Q.   Now, the agreement states that the

[Page 53]

[14]  (Pages 50 to 53)

KILLIAN

A. That's correct.

Q. "Asset valuation purchaser," who is the purchaser in this transaction?

A. I don't recall the role of ING Baring in this transaction.

Q. How about "seller" on the next page, who would have been the seller in this transaction?

A. At this stage I don't recall the role that Cushman and Wakefield had in this transaction.

Q. Do you know -- the next item is "true sale and comfort letter" and has Arthur Anderson. Do you know what the true sale and comfort letter was in this transaction?

A. I believe they gave the letter to establish the fact that the sale of these assets, the leases that were owned by Cornell into the special purpose company, was done with, you know, proper accounting form.

Q. And was that true ale and comfort letter needed in order to close this transaction?

A. I would say so.

[Page 106]

KILLIAN

Q. Now, if you turn, please, to page five under "additional financings."

A. Okay.

Q. It says that "The proposed financing structure is open-ended for additional facilities upon the satisfaction of a confirmation of a BBB investment grade rating and appropriate legal opinions: Two projects with 'take or pay' contracts are potential additions to the financing." Do you know what two contracts are being made reference to here?

A. I don't recall specifically precisely which two.

Q. Now, do you know if in fact, following the closure of the sales leaseback, if there were any additions to the MCF?

A. Not to my recollection. I don't believe so.

Q. The sales leaseback transaction, this formation of the structured vehicle, is that something that Lehman designed for Cornell?

A. As far as I know, yes.

Q. And if you would turn to page six of the same document, please, sir. The "expected

[Page 107]

KILLIAN

compensation to the firm from deal." "Compensation to the firm as underwriter to for the bonds is expected to be $2 million." That's the $2 million that we've been discussing earlier today, correct?

A. Right, approximately one percent the nearly $200 million.

Q. "In addition, in connection with the limited offering, MCF will require debt service reserve fund and debt service agreement reinvestment support providing Lehman with the opportunity to generate additional compensation of several times the initial fee." Can you explain to me what that sentence or sentences means?

A. Those two transactions were to do two things. One was to help invest the debt service reserve fund that was required by the investors in the deal and Lehman, if I recall, was required in the transaction to guarantee a rate of return it would make available for the reinvestment of those assets, and we did that by delivering certain securities at a guaranteed yield.

[Page 108]

KILLIAN

That way that fund would have a guaranteed rate of return over the life of the fund unless it was drawn upon and if it was the drawn upon, that would be an exposure that Lehman would be taking on.

The same thing for the debt service deposit agreement. There were lease payments being generated from the leases into the structure and those cash flows would be coming in periodically and they would need to be reinvested until debt service was due on the bonds.

And during that interim period of time, again, we were guaranteeing a rate of return selling assets to the trust at a guaranteed yield that then would mature on or prior to the debt service date and the cash flows that could be used to pay debt service. So you know, that was an at-risk transaction for Lehman.

Q. All right, but the hoped for result there was that the guaranteed rate that you paid was lower than the amount that you would make on the amount, you, Lehman?

A. That was the hope over a long period of

[Page 109]

[28]  (Pages 106 to 109)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA NEW YORK NY 10119

KILLIAN

1 time.

2 Q. And do you know if in fact that hope

3 materialized?

4 A. I don't know precisely, no.

5 Q. Who would know that?

6 A. The current management within the

7 municipal business would have to do, you know,

8 an accounting of the transaction over the past

9 seven years and assess that.

10 Q. And who is that current management?

11 A. Greg Shlionsky.

12 Q. Would you spell his last name?

13 A. S-H-L-I-O-N-S-K-Y.

14 Q. Now, this is your group that you were

15 with?

16 A. Yes.

17 Q. Why was that not done on a yearly

18 basis?

19 A. Well, because we didn't look at each

20 individual transaction. We have hundreds of

21 these types of transactions and they're all put

22 together, you know, a book of risk, but they are

23 not looked at on each individual basis to see

24 how any one individual contract is performing.

[Page 110]

KILLIAN

1 therefore, we would not have been able to

2 deliver securities that we had contracted for to

3 support the transaction, I would have been

4 informed.

5 Q. So as far as you know, the Cornell

6 sales leaseback transaction has performed in

7 accordance with the original documentation?

8 A. As far as I know, we've been selling

9 them securities as anticipated over the life of

10 the transaction.

11 Q. Selling them. Who is "them"?

12 A. Meaning the trust. Our obligation is

13 to sell securities to the trust at a guaranteed

14 yield and securities ensuring on or before their

15 debt service date and continually doing that.

16 That doesn't mean that the profitability has

17 worked out to our assumptions. I'm just saying

18 that the mechanics of the transaction have

19 continued as anticipated.

20 Q. Thank you, sir. Now, on this June 15th

21 memorandum, which is Exhibit 7 in front of you,

22 you again were CC'd on this particular

23 memorandum.

24 A. I'm sorry, are we still on 7?

[Page 112]

KILLIAN

1 They are looked at as a pool of transactions.

2 They are not hedged separately. They are hedged

3 as a pool.

4 So I couldn't give you a response on

5 any individual transaction unless there was some

6 sort of a credit problem in the deal and the

7 cash flows had to be drawn in advance.

8 Q. What is Mr. Shlionsky's position?

9 A. He's the managing director responsible

10 for municipal derivatives.

11 Q. If a transaction were not performing as

12 had been anticipated, is that something that

13 would have been brought to your attention?

14 MR. GRAHAM: Objection, form.

15 MS. ROBERTSON: You can still

16 answer.

17 MR. GRAHAM: If you understand what

18 she asked.

19 A. If there were -- what would

20 particularly cause this to not be operating as

21 expected is if we weren't receiving the debt

22 service cash flows to then sell them the

23 securities on a timely basis, whether it had

24 been a draw on the reserve fund and that

[Page 111]

KILLIAN

1 Q. Seven, yes, sir. We're still on 7 and

2 you're CC'd on it. Do you recall having

3 participated in any of the discussions relating

4 to this particular transaction on or about

5 June 15th, 2001?

6 A. My focus at that point in time was more

7 along the lines of the pieces where we were

8 taking risk and that was either these two

9 investments that we just spoke about, debt

10 service deposit and reserve fund agreement, and

11 our equity investment in the transaction.

12 Q. What did you understand the equity

13 investment in the transaction, how much was

14 going to be invested?

15 A. My recollection is it was initially

16 approximately $6 million that eventually got

17 raised to about $8 million.

18 Q. Do you recall why it was raised?

19 A. My recollection is that it was raised

20 because there was a decision made that in order

21 to continue to have three percent outside equity

22 in the transaction, we also could not -- we also

23 had to take into account that we were receiving

24 underwriting fee.

[Page 113]

[29]  (Pages 110 to 113)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

KILLIAN

1  A.  Well, he had his office in Houston, but
2  he traveled to various places to do his business
3  and also spent some time in New York.
4  Q.  How about Mr. Stack, where would his
5  office have been?
6  A.  New York.
7  Q.  And your office was in New York?
8  A.  That's correct.
9  Q.  Where was Corey Long?
10  A.  New York.
11  (Whereupon, a document was marked
12  as Exhibit Killian 16 for
13  identification as of this date.)
14  Q.  Let me show you what's been marked as
15  Killian Exhibit Number 16.  First of all, I ask
16  you if you recall receiving this e-mail?
17  A.  No.
18  Q.  It is, however, addressed to you from
19  David Lavelle, correct?  You start at the
20  bottom.  Did I give you the wrong document?
21  A.  This is addressed to Ron Stack from --
22  Q.  I'm sorry, I picked up the wrong one.
23  Let's remark it.
24  (Whereupon, the correct document
25  [Page 150]

KILLIAN

1  referred to as the "contemplation paragraph"?
2  A.  I recall somewhere in the discussions
3  that started in -- whether it was in September
4  or later, David suggested that at one point in
5  time, he had contemplated the idea of a retainer
6  or something like that with Logan and decided
7  that that wasn't the appropriate course of
8  action until after we had proven to Cornell and
9  Mr. Logan that in fact we had an appropriate
10  vehicle that we had shown some value added that
11  we had created a financing technique that was
12  better than what they had previously been able
13  to do, and that David had said, you know, there
14  is no reason to have a conversation like that
15  until we can prove ourselves.  One, to us it's
16  worth continuing the relationship and two, we'll
17  be proving to you we can actually add value.
18  Q.  Do you know when he's referring to when
19  he says "contemplation paragraph"?
20  A.  It may be one of the previous exhibits
21  where we were having to respond or being asked
22  to respond to some questions posed to us by
23  Cornell giving the dates.
24  Q.  In fact E is "Lehman confirms that the
25  [Page 152]

KILLIAN

1  was marked as Exhibit Killian 16
2  for identification as of this
3  date.)
4  Q.  Let's start this one again.  Let me
5  hand you what's been marked as Killian Number 16
6  and ask you if you have seen that document
7  before?
8  A.  Sorry, the question?
9  Q.  Have you seen this document before?
10  A.  I don't recall.
11  Q.  But it is an e-mail addressed to you
12  from David Lavelle, correct?
13  A.  It's an e-mail addressed to me from Ron
14  Stack.
15  Q.  Well, no, sir, if you go down below the
16  bottom one first of all.  E-mails, you got to
17  read backwards.
18  A.  You're right, okay.
19  Q.  Do you recall receiving this from
20  Mr. Lavelle?
21  A.  Not at this point in time, not seven
22  years later, no.
23  Q.  Do you recall asking Mr. Lavelle to
24  provide you with information relating to what is
25  [Page 151]

KILLIAN

1  agreement in the $3.65 million payment received
2  by Lehman Brothers Holding Inc., were not
3  contemplated at the closing of the sales
4  leaseback."  That would be found on Exhibit 11
5  if you would like to check and make certain I'm
6  correct on that.
7  A.  Sorry, which letter?
8  Q.  E.  Does that appear to be
9  Mr. Lavelle --
10  A.  It appears to be Mr. Lavelle's view
11  that in fact it was -- we were not contemplating
12  and not in negotiations with Mr. Logan or
13  Cornell with regards to a retainer until after
14  the closing of the MCF transaction in August of
15  '01.
16  Q.  Now, you forwarded this e-mail on to
17  Mr. Stack; is that correct?
18  A.  His supervisor, yes.
19  Q.  How long did it take you to gather the
20  information to respond to the inquiries of
21  Arthur Anderson as it related to the retainer
22  agreement?
23  A.  I think based on the exhibits and the
24  date, it appears it was sent to -- it took us
25  [Page 153]

[39]  (Pages 150 to 153)

KILLIAN

1 somewhere between January 30th and February 5th
2 to respond.
3     Q.  Did you consider this inquiry to be a
4 serious matter?
5     A.  Absolutely.
6     Q.  Why did you consider it to be a serious
7 matter?
8     A.  If there was any hint of impropriety
9 that would be a serious matter from a
10 reputational perspective, certainly anything
11 that might have any impact whatsoever.  The
12 accounting analysis done, the MCF transaction
13 would be a serious matter to Cornell.
14     Q.  So it was a serious matter both for
15 Lehman and for Cornell; is that what you're
16 saying?
17     A.  Absolutely.
18         (Whereupon, a document was marked
19         as Exhibit Killian 17 for
20         identification as of this date.)
21     Q.  Let me show you what's been marked as
22 Killian Number 17.  This appears to be an e-mail
23 February 5th, from you to Ron Stack.  Correct
24 characterization?

[Page 154]

KILLIAN

1 is "Nothing on Cornell today."  Do you
2 understand what Mr. Stack was referring to?
3     A.  Nothing other than there was no news in
4 the marketplace with regards to Cornell, or no
5 news from legal, or nothing new that he had
6 learned from David Lavelle, or whatever.  I
7 don't know.
8     Q.  After you received the inquiry from
9 Arthur Anderson, did you or Lehman begin
10 monitoring the news relating to Cornell?
11     A.  At some point in that time period, we
12 did.  Exactly when, I don't recall.
13     Q.  And why were you monitoring the news?
14     A.  We were -- I don't remember the exact
15 timeframe of some of the details, but we wanted
16 to monitor what impact, if any, there could be
17 either on the bonds or the equity of Cornell if
18 indeed there was a view that Cornell had not
19 properly accounted for the retainer agreement
20 and whether that would require any kind of a
21 restatement of earnings.
22     Q.  By Cornell?
23     A.  Right, and in addition to the
24 possibility that the transaction, as structured,

[Page 156]

KILLIAN

1     A.  It appears to be an e-mail from me to
2 Ron Stack, yes.
3     Q.  It says, "Can has a comment."  Is that
4 a person's name?
5     A.  I don't know.  I'm not sure what that
6 means.  I don't know what that means.
7     Q.  Does this e-mail refresh your
8 recollection that you did confer with
9 Mr. Lavelle on at least a few matters?
10     A.  I think it's -- that certainly David
11 Lavelle would have been involved in great
12 detail, which I had mentioned, in putting
13 together the response that we ultimately sent to
14 Cornell.  I believe it was February 5th.
15     Q.  The same date as the e-mail?
16     A.  The same date as the e-mail.
17         (Whereupon, a document was marked
18         as Exhibit 18 for identification as
19         of this date.)
20     Q.  Mr. Killian, this is marked as Killian
21 Exhibit Number 18.  Do you recall receiving this
22 e-mail from Mr. Stack on February 8th?
23     A.  No.
24     Q.  The subject is news and the entire body

[Page 155]

KILLIAN

1 would somehow be viewed as no longer off-balance
2 sheet structure.
3     Q.  For Cornell?
4     A.  For Cornell.
5     Q.  Why was it whether or not it was an
6 off-balance sheet structure for Cornell of
7 concern to Lehman?
8     A.  It may have had an impact on how the
9 equity investors viewed the company's financial
10 condition.
11     Q.  And would it be fair to say that if a
12 restatement by Cornell that affected the
13 transaction in turn could affect Lehman's
14 reputation?
15     A.  It's certainly possible.
16         (Whereupon, a document was marked
17         as Exhibit Killian 19 for
18         identification as of this date.)
19     Q.  Let me show you what's been marked as
20 Killian Exhibit 19 and ask you if you recall
21 that document.
22     A.  I have some recollection of the
23 document.
24     Q.  What is your recollection of the

[Page 157]

[40]   (Pages 154 to 157)

KILLIAN

1  should give?  Is that subject to --
2      MR. GRAHAM:  You can tell her who
3  they were.
4      THE WITNESS:  I believe Martha
5  Salinger, Scott Kimmel, Gary Rosen, and
6  I'll also include in the conversations
7  Dan Singer who was, as we talked about,
8  was directly involved in the equity
9  investment.
10     (Continued on next page
11     to include jurat.)

[Page 174]

---

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Mr. Killian | Ms. Robertson | 4 |

EXHIBITS

| KILLIAN | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition duces tecum | 24 |
| 2 | Retainer agreement | 42 |
| 3 | Memo | 75 |
| 4 | Memo | 83 |
| 5 | Memo | 86 |
| 6 | Sales point memo | 95 |
| 7 | Memo | 99 |
| 8 | Memo | 114 |
| 9 | Memo | 117 |
| 10 | Memo | 121 |
| 11 | Letter from Cornell | 126 |
| 12 | Letter from Mr. Killian | 129 |
| 13 | Letter from Mr. Killian | 138 |
| 14 | Memo to Mr. Ganns | 143 |
| 15 | E-mail from Mr. Logan | 148 |
| 16 | E-mail from Mr. Killian | 150 |
| 17 | E-mail from Mr. Killian | 154 |
| 18 | E-mail from Mr. Stack | 155 |
| 19 | E-mail from Mr. Killian | 157 |
| 20 | Lehman Brothers Policies and Procedures | 160 |

[Page 176]

---

KILLIAN

2  Q.  And by equity investment, so there
3  won't be any confusion in the record, we're
4  talking about the bonds?
5  A.  The subordinate --
6  Q.  Bonds.
7  A.  The portion that Lehman bought.
8  Q.  I think that's all I have at the
9  moment, Mr. Killian.  Thank you.
10  A.  My pleasure.  Thank you.
11     (Whereupon, at 3:10 p.m., the
12  examination of this witness was concluded.)

16     _____
              GARY KILLIAN

18  Subscribed and sworn to before me
19  this ____ day of _____, 2008.
20  _____
21  NOTARY PUBLIC

[Page 175]

---

C E R T I F I C A T E

3  STATE OF NEW YORK    )
                        ss.:
4  COUNTY OF NEW YORK   )

7      I, BINITA SHRESTHA, a Notary Public for
8  and within the State of New York, do hereby
9  certify:
10     That the witness whose examination is
11  hereinbefore set forth was duly sworn and that
12  such examination is a true record of the
13  testimony given by that witness.
14     I further certify that I am not related
15  to any of the parties to this action by blood or
16  by marriage and that I am in no way interested
17  in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto set
19  my hand this 25th day of July, 2008.

22     _____
              BINITA SHRESTHA

[Page 177]

[45]  (Pages 174 to 177)