SCAROLA MALONE & ZUBATOV LLP
*Attorneys for the Individuals Identified*
 *in the Notice of Appearance*
 *at Docket No. 8234*
Richard J.J. Scarola
Alexander Zubatov
1700 Broadway
41st Floor
New York, NY  10019
Tel.:  (212) 757-0007


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re<br><br>            LEHMAN BROTHERS INC.,<br><br>                                      Debtor. | Case No. 08-01420 (SCC) SIPA<br><br>ANSWER<br><br>TRIAL BY JURY<br>IS DEMANDED |

The 340 individuals listed in Appendix A (the "Client Group"), by their counsel,

Scarola Malone & Zubatov LLP, submit this Answer in accordance with this Court's Order,

dated and entered April 1, 2014 (Docket No. 8576).

1.    The Client Group states that no answer to the allegations in Paragraph

1 is called for, except denies that (i) the relief the Trustee seeks may be sought by means of

omnibus objections; and that (ii) the relief the Trustee seeks is warranted.  To the extent

Paragraph 1 purports to assert the propriety of this Court's jurisdiction over this proceeding,

the Client Group states that such jurisdiction is contested per defenses as asserted herein

below.

2.    The Client Group denies the allegations in Paragraph 2 and states that

the members of the Client Group were not, at the relevant time, LBI employees and that the

ESEP was not offered to individuals who were LBI employees or executives at the relevant time. The Client Group further states that the attachment referred to in Footnote 2 as "[a] true and correct copy of the ESEP" is not, in fact, the ESEP, as that term is defined in Paragraph 2, but is, rather, an individual employee's deferred compensation agreement, and, further, that the particular deferred compensation agreements of which the attached Exhibit A is an example were, by their terms, *agreements*, and thus, could not be unilaterally "amended" by any entity, much less by LBI, which was not a party to any such agreements.

3.      The Client Group denies the allegations in Paragraph 3 and requests that this Court decline to award the relief the Trustee requests therein.

4.      The Client Group admits the allegations in Paragraph 4, except states that to the extent Paragraph 4 purports to assert the propriety of this Court's jurisdiction over this proceeding, the Client Group states that such jurisdiction is contested per defenses as asserted herein below.

5.      The Client Group admits the allegations in Paragraph 5, except states that to the extent Paragraph 5 purports to assert the propriety of venue in this Court for purposes of this proceeding, the Client Group states that such venue is contested per defenses as asserted herein below.

6.      The Client Group admits the allegations in Paragraph 6, except denies that the individuals described were executives or employees of LBI at the relevant time.

7.      The Client Group denies the allegations in Paragraph 7 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI.

8.      The Client Group denies the allegations in Paragraph 8 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly

2

substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI. The Client Group does not deny the allegations in Footnote 3.

   9. The Client Group denies the allegations in Paragraph 9 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI.

   10. The Client Group denies the allegations in Paragraph 10, except states that the Client Group is without knowledge or information sufficient to form a belief about the extent to which the substantive allegations in that paragraph may or may not be "[b]ased on analysis by the Trustee's counsel of the Deferred Compensation Claims and other relevant documents and materials."

   11. The Client Group admits the allegations in Paragraph 11.

   12. The Client Group denies the allegations in Paragraph 12 and requests that this Court decline to award the relief the Trustee requests therein.

   13. The Client Group states that no answer to the allegations in Paragraph 13 is called for, except denies such allegations to the extent they would purport to assert or revive rights or defenses that have been waived or relinquished or that are otherwise inconsistent with any relevant agreements and/or applicable law.

## DEFENSES

   For its statement of additional defenses to the Trustee's effort to seek subordination of the rights of the Client Group under the contract each of them signed, entitled Executive and Select Employees Deferred Compensation Agreement, a specimen copy of which is at Exhibit A to Docket No. 8576-1 (the "Contract"), the Client Group

3

alleges, in the alternative, the following as a preliminary statement of its members' defenses
(with their affirmative defenses to follow separately):

AS AND FOR A FIRST DEFENSE

14.    The Contract is an executory contract.

15.    The Contract provides, among other things, continuing material duties
for the Debtor, including, without limitation, the duty to pay the members of the Client Group
their deferred compensation pursuant to the terms of the Contract.

16.    The Contract provides, among other things, continuing material duties
for the Client Group, including, without limitation:

> "10.   Investments by Shearson.
>
> "In connection with this agreement, Employee hereby agrees to
> cooperate with Shearson, as may be necessary, to acquire in the
> name of Shearson any life insurance contract, annuity contract
> or other investment in which Shearson in its absolute discretion
> may choose to invest for purposes of meeting its obligations
> under this agreement."

17.    Significantly, this Section of the Contract is entitled "Investments of
Shearson" and addresses, among other things, the need for the Client Group members to
cooperate in being the subject of investments Shearson might make to fund the liabilities
under the Contract, including by way of insurance policies then contemplated at the time the
Contract was made, separate insurance, annuities or other investments Shearson might have
elected to acquire in connection with this plan or its liabilities thereunder, all of which would
require the Client Group members' consent and possible submission of information or
submission to examination, or additional acts necessary to assure the continued validity and
viability of the vehicles then in place (for example, and by way of example only, as laws

4

might change governing plans of this type or the underlying corporate-owned or stranger-originated life insurance policies contemplated at the time the Contract was made).

18.     The Contract contains additional material duties on the part of the members of the Client Group, including, without limitation, duties to pay or repay money to Shearson or, in some instances, to Shearson or its "successors" (*see*, for example, the Contract at § 9(b) (page 10) and § 9(c) (page 11); and also at § 9(e)(iii) (page 15)), and material duties to supply corrected information (at § 5(h) (pages 5-6)).

19.     The Contract, being an executory contract, has been rejected in this case since the filing of the bankruptcy.

20.     As a rejected executory contract, the Contract was materially breached as of the time before the filing of the bankruptcy petition in this case by the Debtor.

21.     By reason of that material breach, neither the Debtor nor the Trustee nor anyone standing in either of their shoes may assert affirmatively any rights they might have had prior to such material breach.

22.     By reason of the foregoing, such material breach vitiates the subordination clause upon which the Trustee relies in now seeking subordination to the extent such clause could be deemed effective notwithstanding the other defenses of the Client Group.

23.     Accordingly, the Trustee's effort to have the acknowledged claims of the members of the Client Group deemed subordinated to the claims of general unsecured creditors must be denied.

## AS AND FOR A SECOND DEFENSE

24.     The Contract does not provide for the subordination the Trustee seeks in the event of the bankruptcy of this particular Debtor.

25.     The Contract entered into by each member of the Client Group was made with Shearson Lehman Brothers Inc. ("Shearson").

26.     As described further below, per the definitions and language of the Contract, the subordination provisions which the Trustee seeks to invoke in this case apply specifically and only to Shearson as that entity was understood and constituted at the time the Contract was entered into and not to this Debtor or any other entities, including any that may purport to be Shearson's successors, as the term "successors" is widely and specifically used in the Contract in other contexts *but not in this context*.

27.     As described further below, the Debtor is a materially new entity and not the same as, or interchangeable with, "Shearson," as referred to and defined in the Contract and as that entity was understood and constituted at the time the Contract was made.

28.     As such, as described further below, the Debtor and the Trustee are not entitled to enforce the subordination provisions of the Contract against the members of the Client Group.

### *The Debtor Is Not the Entity to Which the Client Group*
### *Agreed to Have Its Deferred Compensation Claims Subordinated*

29.     At the time the Contract was made, Shearson was a subsidiary of an enormous financial conglomerate under the overall umbrella of the American Express Company.

6

30.    It was widely understood and explicitly discussed with Shearson management leading up to the entry into the Contract by members of the Client Group that the purpose of the subordination provision in the Contract was to assist Shearson in the reckonings of its capital for purposes of meeting regulatory capital requirements (including those of the New York Stock Exchange).

31.    It was also expressly discussed in the circumstances that a bankruptcy by Shearson was, under any foreseeable circumstances, out of the question, because American Express itself would stand behind any obligations of Shearson and not permit such a bankruptcy.

32.    Consistent with these circumstances, as described further below, the "subordination" language was by its terms limited and written to be limited to pertain only to the virtually inconceivable bankruptcy of Shearson, as that entity was then understood and constituted; and that subordination provision appeared with the limited purposes of satisfying those capital requirements and assisting Shearson in meeting those capital requirements.

33.    For these reasons, among others, the subordination provision, as drafted, was intended to and did by its plain terms apply only to Shearson itself, as that entity was then understood and constituted, and did not apply to any later-existing entity that might or would be a successor to Shearson or a successor to some of Shearson's assets or into which Shearson would change; and most certainly the subordination provision does not apply to this Debtor or the insolvency proceeding of this Debtor.

34.    In the years following the making of the Contract, especially in the late 1980s through the early 1990s, the Shearson business owned by American Express was the subject of numerous additions, subtractions and meaningful changes in corporate structure, composition and form.

35. To begin, in the late 1980s, after the Contract was made, Shearson acquired and merged with another entity in a billion-dollar transaction, and changed its name to reflect the merger (until 1990, when the name change was dropped in large part due to this merger's toxicity and financial damage to the entity).

36. In connection with these transactions, the new business underwent a substantial and material corporate reorganization.

37. By way of further example, also in the early years after the making of the Contract, the entity that had been Shearson was then dismantled in material respects, and sold off in pieces.

38. By way of example of this dismantling, substantial components of the business that had been Shearson at the time the Contract was made, and some that were acquired later, including Shearson's large retail brokerage business and Shearson's large asset management business, were sold to two other entities.

39. The significant changes to what had been Shearson did not end there.

40. In the succeeding years, having dismantled Shearson, as it had existed at the time of the making of the Contract, American Express decided to jettison Shearson itself.

41. Specifically, in a series of transactions completed in 1993 and 1994, Shearson, and its immediate holding company corporate parent, were spun out of the American Express conglomerate of companies by means of a dividend of the stock of the holding company, which theretofore had been owned by American Express, to American Express shareholders, after which the substantially dismantled Shearson, with its holding company parent, became a new, independent company and traded publicly as such,

8

independent of the American Express conglomerate of which Shearson had been a part when the Contract was made.

42.     Following those transactions, among other things, the new entity no longer had the support and assurance of solvency described above by reason of the American Express conglomerate standing behind it and in the way of any potential insolvency.

43.     As part of the same series of transactions, what had been Shearson ceased to exist even in name, further demonstrating the lack of identity between the entity that had been Shearson at the making of the Contract and the entity succeeding to Shearson or certain assets and functions of Shearson in various respects.  What had become of Shearson was renamed "Lehman Brothers Inc." (the same name used by the Debtor in this case).

44.     Still, after this change in name, other changes in this new entity continued.

45.     By way of example, other firms were merged into this new entity over the years and other material changes occurred.

46.     Under New York law, this Debtor is arguably not even a successor to Shearson, much less is it Shearson itself, and it is, in all events, not the party to which the Contract refers in using the term "Shearson."

47.     Accordingly, under New York law, and as described further below, the provisions of the Contract which refer to possible subordination in the event of the insolvency of Shearson itself (or any other Shearson event) do not apply to or include a "successor" of Shearson, do not apply today, do not apply to or include this Debtor, and, indeed, were

9

vitiated long ago, when the "Shearson" entity changed materially from the entity that had

entered into the Contract with each member of the Client Group.

*The Language of the Parties' Contract Makes Clear*
*that Only the Shearson Entity, as then Understood and Constituted,*
*Could Have Invoked the Contract's Subordination Provisions*

48.    Not only the background and history of the subordination provision, but

also the very carefully worded drafting of that provision and of the Contract as a whole —

including the description and definition of Shearson, the numerous other provisions in which

the identity of Shearson for purposes of this Contract in general and of the subordination

provision in particular is made clear and the subordination provision itself — all demonstrate

that this Debtor's insolvency does not trigger subordination of the acknowledged claims of

the Client Group.

49.    To begin, as to the definition and description of Shearson itself in the

Contract, Shearson is described and defined to be Shearson as that entity was then

understood and constituted, and not Shearson and its "successors" (a different formulation

that, as described further below, is used expressly elsewhere in the Contract where

subordination in the event of a bankruptcy is not implicated).  Specifically, Shearson is

described and defined in the Contract's opening paragraph as a party to the Contract as

follows:

> "Shearson Lehman Brothers Inc., (Shearson) for itself and as
> agent for certain of its subsidiaries as provided in paragraph 8,
> which together may be referred to hereinafter as the (Employer)
> and [name] (Employee) agree as follows:"

50.    This definition makes clear that the entity to which the Contract refers

where the term "Shearson" is used is Shearson itself, as it was then understood and

constituted, and not to such possible successors.

10

51.   Similarly, § 8 provides plainly and clearly that the parties to the

Contract are only as follows, again plainly not including Shearson's "successors" in this

statement where, if intended, the term "successors," which is used multiple times elsewhere in

the Contract, would logically appear:

> "8.   <u>Parties to Agreement</u>.
>
> "This agreement is between Employee and Shearson or a
> subsidiary or affiliate of Shearson for which Shearson is acting
> as agent hereunder, whichever is Employee's actual employer as
> of the date hereof.  If Employee's actual employer changes from
> Shearson to a subsidiary or affiliate of Shearson or from a
> subsidiary or affiliate of Shearson to Shearson or another
> subsidiary or affiliate of Shearson, thereafter Employee's
> employer for purposes of this agreement shall be the new
> employer."

This language names as parties Shearson and, to the extent applicable, certain Shearson

affiliates existing at that time, which employed Client Group members for which Shearson

was then acting as an agent "as of the date [t]hereof," but plainly omits mention of

"successors."

52.   Throughout the Contract's provisions addressing possible

subordination, the Contract refers only to Shearson, as it was then understood and

constituted, as the entity whose insolvency or other events would trigger subordination in the

event of a bankruptcy, and not to any possible successor of Shearson, except in certain

particular contexts described further below and inapplicable here.

53.   Specifically in this regard, the Contract states, at § 5(d) (on page 5):

"The payments to be made by Shearson to Employee hereunder are unsecured subordinated

obligations of Employer only, and Employee is only a general subordinated creditor of

Shearson in that respect."  (As noted above, the Contract defines the term "Employer" in its

opening paragraph as referring to Shearson and certain of its subsidiaries but makes no

mention of "successors.")

54.    Similarly, the Contract states at § 9(d) (on pages 13-14), which is the

provision on which the Trustee, in seeking subordination, directly relies and quotes from (at

Paragraphs 7-8, misleadingly substituting "[LBI]" for the Contract's actual references to

"Shearson"):

> "Employee irrevocably agrees that the Obligations of Shearson
> hereunder with respect to the payment of amounts credited to
> his deferred compensation account are and shall be subordinate
> in right of payment and subject to the prior payment or
> provision for payment in full of all claims of all other present
> and future creditors of Shearson whose claims are not similarly
> subordinated (claims under this agreement shall rank pari passu
> with claims similarly subordinated) and to claims which are now
> or hereafter expressly stated in the instruments creating such
> claims to be senior in right of payment to claims arising under
> this agreement, arising out of any matter or event occurring
> prior to the payment date of the amounts credited to Employee's
> deferred compensation account under this agreement.  In the
> event of the appointment of a receiver or trustee of Shearson or
> in the event of its insolvency, liquidation pursuant to the
> Securities Investor Protection Act of 1970 ('SIPA') or otherwise,
> its bankruptcy, assignment for the benefit of creditors,
> reorganization whether or not pursuant to bankruptcy laws, or
> any other marshalling of the assets and liabilities of Shearson,
> the Employee shall not be entitled to participate or share,
> ratably or otherwise, in the distribution of the assets of Shearson
> until all claims of all other present and future creditors of
> Shearson, whose claims are senior to claims arising under this
> agreement, have been fully satisfied or provision has been
> made therefor."

55.    The Contract further discusses at length, at § 9(e) (on pages 14-16),

subordination of indebtedness to Client Group members to other debt, including Senior

Subordinated Debt of Shearson, but again, despite advisedly and precisely using the term

"successors" elsewhere, as described further below, including in other contexts within the

same § 9, this discussion refers only to such debt of "Shearson" (or, in one specific instance

12

on page 16, to debt of Shearson subsidiaries, further demonstrating the specification of "entity" in these examples is purposeful rather than casual or inadvertent), and not to that of Shearson's successors.

56.     These statements as to subordination omit mention of Shearson "successors" precisely where such mention would appear if subordination were intended as to successors.  Indeed, they omit "successors" despite the specific references to successors in the immediately preceding §§ 9(b) and (c), as described further below.

57.     In fact, significantly, by contrast to the definition of "Shearson" and the references to "Shearson" for purposes of subordination, the Contract, in multiple other instances, *does* indicate that certain specific provisions are applicable not only to Shearson, *but also to Shearson's "successors and assigns."*  In other words, Shearson, as the drafter of the agreement, made certain provisions applicable not only to Shearson, but also to Shearson's "successors and assigns" in particular instances where such application to successors was actually intended by the parties.

58.     An example of such use appears at, for example, § 11 (on page 18; this page is apparently missing from the Trustee's submission of this document as Exhibit A to Docket No. 8576-1), where the Contract provides that it:

> "shall be binding upon Employee and Employee's heirs, legal representatives, and upon Shearson and Shearson's successors and assigns.  Employee's rights hereunder, including rights to receive payments, are not assignable."

59.     Thus, notably, this Debtor, while not an entity whose insolvency or status can trigger subordination, can and does succeed to the *obligations* of Shearson to the members of the Client Group, because Shearson's successors are bound by its provisions.

13

60.    However, as the Contract is plainly and carefully written to provide, the Contract contains no corresponding provision that the Employee, as that term is defined (here, the Client Group members), is bound to a subordination provision keyed to a very differently constituted entity it did not know, contract with or have reason to conceive of at the time of the making of the Contract.

61.    As noted above, similarly, and tellingly, in *other, unrelated portions* of § 9, within which the subordination clause the Trustee would rely upon appears (at § 9(d)), the Contract expressly includes Shearson's "successors" in contexts that govern possible repayment to Shearson but *not subordination*.  In particular, the Contract sets forth, at § 9(b) (page 10) and § 9(c) (page 11), certain payment clawback provisions that might require a repayment to Shearson under the Contract, and provides further, specifically, that not only Shearson, but also Shearson's "successors or assigns," would be entitled to such repayment.

62.    Indeed, that the term "successors" is intentionally and advisedly used or, as the case may be, omitted by Shearson as the drafter of the Contract is further clarified by the fact that although it is used in certain of these repayment/clawback provisions within § 9, it is *not* used in another clawback provision within § 9 (at § 9(e)(iii) on page 15) — in addressing the ranking of the debt under the Contract with other debt (in particular, Senior Subordinated Debt, of Shearson):

> "Employee shall promptly return to Shearson, any amounts (whether cash, securities or otherwise) received from Shearson if the payment by Shearson of such amounts constituted a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding)."

63.    Thus, again, the definition of Shearson as alleged above and the selective use of, and failure to use, the term "successors," make clear that the entity to which

14

the Contract refers where the term "Shearson" is used is Shearson itself, as it was then understood and constituted, and not such possible successors.

64.     Plainly, Shearson, as the Contract's drafter, was able to use the term "successors" of Shearson in instances where the Contract was intended to refer to Shearson's successors.  Conversely, Shearson plainly and advisedly did not use the term "successors" where the Contract was not intended to refer to Shearson's successors.

65.     In this regard, the contract interpretation principles of *contra proferentem* and, relatedly, *expressio unius est exclusio alterius*, further make clear that the Contract, in referring to Shearson, refers to Shearson as it was then understood and constituted, and not to Shearson's successors, both in general and in particular as to subordination provisions and the entity whose insolvency or other events would trigger subordination.

66.     Additionally, Shearson was party to other deferred compensation agreements and plans made at or near the same time as the Contract and the deferred compensation plan to which it relates, including in some instances with some of the members of the Client Group, some of which have been the subject of litigation in this Court, and in those other contracts, Shearson clearly and advisedly had defined itself differently — in those other instances, where it was intended, defining the contracting party to be not only Shearson itself, but also to include in all respects under such contracts "successors" of Shearson — including in particular as to subordination provisions and the entity whose insolvency or other events would trigger subordination.

67.     Relatedly, Shearson or its predecessors were party to other deferred compensation agreements and plans in which the contracting party was defined to include its "successors" but in which there was no subordination provision whatsoever.

15

68.   Thus, by contrast with other provisions in this and other similar Shearson agreements where the Contract refers to Shearson and its "successors," Shearson's successors are not included in the relevant provisions that could trigger subordination of the claims of the Client Group members to general unsecured claims in this case involving this Debtor.

69.   All of these facts and features of the Contract and Shearson's own conduct establish that in Shearson's identification of itself as the contracting party, the insolvency of or other events concerning which could lead to subordination, Shearson intended to make clear that the mutual intent of the parties in this Contract, and the intent of Shearson in drafting this Contract, was precisely to ensure that invocation of the subordination provision could occur only as measured by Shearson as it then existed, was understood and constituted — whose capital requirements were being supported by the subordination provision, and whose insolvency was exceedingly remote by reason of its being an American Express subsidiary, as it was then understood and constituted — and not by the insolvency or other events relating to any other entity that emerged from Shearson or succeeded to Shearson's obligations under the Contract.

70.   Significantly, the Contract was never amended to change this identification of Shearson as the entity whose insolvency or other events would trigger subordination.

71.   The Contract could not be amended unilaterally by Shearson or by its successors.

72.   In fact, there were no amendments to the Contract applicable to the members of the Client Group.

16

73.     Were there to have been any such amendment, for it to be applicable to any member of the Client Group, each individual member of the Client Group would have had to, as to himself or herself, have executed a bilateral amendment, and no member of the Client Group did so.

74.     Moreover, Shearson and any of its successors or would-be-successors were well aware of this, and if they sought to obtain such amendments, they understood how to do so.

75.     Had it been the parties' intent to have the Client Group members subject to subordination in connection with insolvency or other events concerning later-arising entities such as this Debtor, these parties knew how to write such language to implement such intent, as demonstrated by their use of such language in other parts of this Contract, as well as in other Contracts between Shearson and some of the Client Group members.

76.     They did not use that language in this Contract, and they did not do so for sound reasons as alleged above — they did not do so deliberately, to implement an intent that, as per this Contract, subordination would not occur in such far-reaching and unanticipated circumstances.

77.     For all these reasons, the provisions the Trustee seeks to invoke here do not apply with regard to the insolvency of this Debtor.

78.     For these reasons, among all others, the Trustee's effort to seek subordination of the acknowledged claims of the members of the Client Group to the claims of other general unsecured creditors fails.

## AS AND FOR A THIRD DEFENSE

79.     The Debtor materially breached the Contract in failing to maintain the

required plan administrative body to discharge certain rights and duties under the Contract

as the Contract required.

80.     Specifically, the Contract provided that such an Administrative

Committee of Shearson be in place to perform various functions, including:

"4.     Termination.

"The Administrative Committee of Shearson has the right
(if the Administrative Committee also terminates those similar
agreements with its other Employees which become effective on
or about the effective date of this agreement) to terminate this
agreement, and Shearson's and Employee's obligations
hereunder, at any time by giving Employee, or Employee's
designated beneficiary or beneficiaries if Employee is deceased,
written notice to that effect."

A footnote at Page 4 of the Contract further defines and describes the "Administrative

Committee" as being the "Administrative Committee of the Board of Directors of Shearson."

81.     Upon the changes made to and in Shearson since the time the Contract

was made, there was not and could not be any such Administrative Committee as required

by the Contract.

82.     Additionally and relatedly, there was not any amendment to the

Contract permitting a substitute administrative body.

83.     The Administrative Committee, as described in the Contract, could only

be the body specifically described and was no longer available or existing as described in the

Contract long before the filing of this insolvency proceeding.

84.     Further, and separately and independently, neither Shearson nor any

successor or other entity having the obligations to the Client Group members under the

Contract, including the Debtor, whether permissibly or impermissibly, had in place for many years prior to the commencement of this insolvency case any plan administration body of the type required by the Contract (without regard to whether such a body, if constituted, would have been a proper body with authority to act under the Contract).

85.    By reason of the foregoing, the Client Group members were deprived of a critical, material right in the Contract — *viz.*, the existence of a body properly constituted with authority to terminate the underlying deferred compensation plan in anticipation of possible insolvency, to terminate the plan for other reasons, both in the interests of Shearson and/or the individual participants in the deferred compensation plan, and to carry out other duties articulated throughout the Contract as belonging to the Administrative Committee.

86.    Indeed, the Administrative Committee's right and duty to terminate the deferred compensation plan in the face of a potential insolvency and thereby cause return of the Client Group members' funds before such insolvency was an intended and critical component of the plan, which was openly discussed with potential participants before they entered into the Contract.

87.    The Debtor's and its predecessors' failure to have in place the required plan administration body as required by the Contract was and is a material breach of the Contract, occurring prior to the filing of this bankruptcy proceeding.

88.    As a consequence, by reason of that material breach of the Contract, the Debtor is precluded, under New York law, from relying upon contractual provisions, such as the subordination provisions, in its favor.

## AS AND FOR A FOURTH DEFENSE

89.     The Debtor materially breached the Contract in taking impermissible tax deductions and/or claiming other impermissible tax benefits in connection with the Contracts and the related deferred compensation plan in the hundreds of millions and possibly billions of dollars..

90.     This conduct resulted in extensive and ongoing audits on those issues by the Internal Revenue Service and possible other governmental authorities.

91.     The Debtor's and its predecessors' abuse of the tax entitlements in connection with the Contract was a material breach of the Contract, occurring prior to the filing of this bankruptcy proceeding.

92.     In particular, this conduct imperiled the viability of the deferred compensation plan to which the Contracts and the entitlements thereunder of the members of the Client Group relate, such that it brought about the meaningful likelihood that the Client Group would have been deprived of benefits under the Contracts by direct result of such conduct and its consequences with the Internal Revenue Service.

93.     As a consequence, by reason of that material breach of the Contract, the Debtor is precluded, under New York law, from relying upon contractual provisions, such as the subordination provisions, in its favor.

## AFFIRMATIVE DEFENSES

For its statement of Affirmative Defense, the Client Group alleges:

20

AS AND FOR A
FIRST AFFIRMATIVE DEFENSE

94.     This proceeding seeking to subordinate the claims of the Client Group

to claims of general unsecured creditors is not brought in accordance with applicable

Bankruptcy Law and rules and, accordingly, cannot result in a valid order resulting in such

subordination.

AS AND FOR A
SECOND AFFIRMATIVE DEFENSE

95.     The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not state a claim for relief pursuant to which the requested relief

may be granted because they misdescribe the entities to which these pleadings and papers,

and the underlying agreements, refer, and a correct description would require that the claim

for relief or subordination be dismissed, with prejudice, in accordance with F.R.C.P. 12(b)(6)

and F.R.B.P. 7012(b).

AS AND FOR A
THIRD AFFIRMATIVE DEFENSE

96.     The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not state a claim for relief pursuant to which the requested relief

may be granted because they misdescribe the documents to which these pleadings and

papers refer, and upon which they rely, and the correct and actual papers, if attached or

accurately described, would require that the claims for relief or subordination be dismissed,

with prejudice, in accordance with F.R.C.P. 12(b)(6) and F.R.B.P. 7012(b).

21

AS AND FOR A
FOURTH AFFIRMATIVE DEFENSE

97.    The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not, taken as a whole, state a claim for relief or subordination

pursuant to which the requested relief may be granted and must be dismissed, with

prejudice, in accordance with F.R.C.P. 12(B)(6) and F.R.B.P. 7012(b).

AS AND FOR A
FIFTH AFFIRMATIVE DEFENSE

98.    The Trustee's efforts to seek subordination in this case are barred,

because of the facts and matters alleged above which are incorporated herein by reference,

by the doctrine of waiver.

AS AND FOR A
SIXTH AFFIRMATIVE DEFENSE

99.    The Trustee's efforts to seek subordination in this case are barred,

because of the facts and matters alleged above, which are incorporated here by reference,

by the doctrine of estoppel.

AS AND FOR A
SEVENTH AFFIRMATIVE DEFENSE

100.    The Trustee has failed to allege that this is a core proceeding.

AS AND FOR AN
EIGHTH AFFIRMATIVE DEFENSE

101.    This is a non-core proceeding, and the Client Group members do not

consent to entry of final orders or judgments by the Bankruptcy Court.

22

AS AND FOR A
NINTH AFFIRMATIVE DEFENSE

102.   The Trustee's effort to seek subordination in this case are subject to a requirement by the parties' Contract that the issue presented be resolved by mandatory arbitration:

> "5. (i) This agreement and all other similar agreements which become effective shall be interpreted and construed by the Administrative Committee and the determination of the Administrative Committee as to any disputed question shall be conclusive, except that any controversy arising out of or relating to the subordination provisions of paragraph 9, shall be, submitted to and settled by arbitration pursuant to the Constitution and Rules of the New York Stock Exchange ('Exchange').  Shearson and Employee shall be conclusively bound by such arbitration."

Accordingly, the issues raised and presented herein by the Trustee must be arbitrated in accordance with the Contract.


Dated:   New York, New York
         April 29, 2014

                              SCAROLA MALONE & ZUBATOV LLP


                              By _____
                                    Richard J.J. Scarola
                              *Attorneys for the Individuals Identified*
                              *in the Notice of Appearance*
                              *at Docket No. 8234 (Appendix A)*
                              1700 Broadway
                              41st Floor
                              New York, NY  10019
                              Tel.:  (212) 757-0007

23

# APPENDIX A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS INC.,

                                        Debtor.

Case No. 08-01420 (SCC) SIPA

NOTICE OF APPEARANCE AND
REQUEST FOR SERVICE OF PAPERS

Pursuant to Fed. R. Bankr. P. 2002, 9007 and 9010(b), the undersigned attorneys respectfully request the Clerk of the Court to enter their appearance in this case on behalf of the creditors listed in Exhibit A hereto for the limited purpose of opposing the efforts of the Trustee to subordinate their certain claims, also listed in Exhibit A, to the claims of general unsecured creditors (the "Issue of Subordination"), and requests all parties in interest to serve copies of all papers served or filed in this case with respect to this issue upon the undersigned, at the office address and telephone number set forth below.

By filing this Notice of Appearance, it is noted in particular but without limitation that the undersigned counsel and their clients (a) do not waive any rights to object to the jurisdiction of this Court with regard to the Issue of Subordination, (b) do not agree or consent to the jurisdiction of this Court to render a final order or other relief pursuant to the doctrine of *Stern v. Marshall* with regard to the Issue of Subordination, and (c) do not agree or consent, and object, to the filing by the Trustee of the various motions (Dkt. Nos. 6847, 6865, 6866, 7264, 7388 & 8196) directed at the clients listed on Exhibit A to subordinate their claims as a contested matter rather than as an adversary proceeding in violation of Fed. R. Bankr. P. 3007 and 7001(8), and object to the Court rendering any relief in connection with such motions other than dismissal with prejudice (and expressly reserve the right to seek

such dismissal with prejudice), and (d) do not agree or consent to the conversion of the

contested matters described above into adversary proceedings or granting any other relief

with respect to such motions other than dismissal with prejudice.

   In entering this Appearance, it is noted that the Trustee's counsel has reviewed

this list of claimants and claim numbers on Exhibit A and identified a limited number of

instances as to which they believe duplicative, amended or superseded claims may have

been filed or noted other clerical errors.  Counsel now appearing will work with the Trustee's

counsel on those issues and will make any amendments to this list as to names or claim

numbers as are warranted by further developments or information.


Dated: New York, New York
   February 13, 2014


               Richard J.J. Scarola
               rjjs@smzllp.com


               Alexander Zubatov
               az@smzllp.com

SCAROLA MALONE & ZUBATOV LLP
*Attorneys for the Claimants Listed on Exhibit A*
1700 Broadway
41st Floor
New York, NY  10019
Tel.: (212) 757-0007

2

# EXHIBIT A

| Last Name | First Name | Claim # **Unless otherwise noted, each claim number listed is preceded by "700" | Notes |
|---|---|---|---|
| Ackerman | Donald | 1433 & 1872 | |
| Ades | Sabah | 1785 | |
| Allesandro | Robert | 1435 &1874 | |
| Ambrecht | Kennth | 1436 & 1875 | |
| Anderson | Brenton | 1438 & 1877 | |
| Anderson | Jeffrey | 1439 & 1878 | |
| Angst | Chuck | 1786 | |
| Ashe | Kathleen | 1440 & 1879 | |
| Asher | Thomas | 1441 & 1880 | |
| Atchison | John | 1442 & 1898 | |
| Ayoub | Anthony | 1443 & 1899 | |
| Baker | John Jr. | 1444 & 1905 | |
| Barrett | Bernard | 1712 | |
| Bary | Roberta | 1714 | |
| Batkin | Alan | 1445 & 1907 | |
| Beckerman | Stanley | 1447 & 1909 | |
| Bellas | Albert | 2001 | |
| Bellinger | Richard | 1448 & 1910 | |
| Bender | Douglas | 1449 & 1912 | |
| Bender | Theodore III | 2053 | |
| Berkley | Henry | 2054 | |
| Besse | Robert | 1450 & 1913 | |
| Best | Alan | 1451 & 1914 | |
| Biggar | Elizabeth | 1455 & 1918 | |
| Blum | Kevin | 1452 & 1915 | |
| Blutinger | Natan | 1834 | |
| Boe | Richard | 2002 | |
| Bohn | Francois | 1453 & 1916 | |
| Borchers | Leon | 1454 & 1917 | |
| Bourne | George | 1823 | |
| Boyd | William Jr. | 1457 & 1920 | |
| Boyles | Kenneth | 1459 & 1922 | |
| Brady | Jane Wilde | 1460 & 1923 | |
| Brager | Stanley | 2004 | |
| Brandt | Coleman | 1716 | |
| Breck | Chris | 1717 | |
| Breck | William Jr. | 1719 & 2543 | |
| Bresnan | John | 2555 | |
| Broadbent | William | 1462 & 1949 | |
| Broda | Kathleen | 1721 | |
| Brown | Melville | 1468 & 1954 | |
| Brown | Robert Mott III | 2055 | |
| Brydson | John | 1464 & 1950 | |

| | | | |
|---|---|---|---|
| Buls | Arthur | 2056 | |
| Burns | Thomas | 1835 | |
| Burns | Perry | 1465 & 1951 | |
| Burton | Mark | 1466 & 1952 | |
| Bussaca | Gary | 1824 | |
| Butters | David | 1836; 1837 | |
| Buttery | Stuart | 1467 & 1953 & 2033 | |
| Cagnina | Robert | 1469 & 1955 | |
| Campbell | Robert | 1471 & 1957 | |
| Capra | James | 2057 | |
| Carbone | Rudolph | 1472 & 1958 | |
| Carbone | James | 1787 | |
| Carns | Lewis | 1473 & 1959 | |
| Caruana | Sal | 1722 | |
| Ceisler | Robert | 1724 | |
| Cerasia | Robert | 1474 & 1960 | |
| Chatley | Bruce | 1475 & 1961 | |
| Chen | Phil | 1477 & 1963 | |
| Childers | John | 1478 & 1964 | |
| Ciemniecki | Stanley | 1479 & 1965 | |
| Clark | James | 1788 | |
| Coghlan | John | 1924 | |
| Cohen | Paul | 1480 & 1966 | |
| Cohen | Leonard | 2005 | |
| Cohen | Sallee | 2007 | |
| Colacurci | Glenn | 1481 & 1967 | |
| Cole | Emried D III | 1925; 1939; 7000877 | POC #7000877 does not have "700" prefix |
| Conway | Michael | 1838 | |
| Cooper | Stanley | 2072 | |
| Cosgrove | Thomas | 1483 & 1969 | |
| Couch | William | 1489 | |
| Cox | Timothy | 1490 | |
| Cronin | William | 1491 | |
| Cunningham | Kevin | 4584 | No 700 prefix to claim number |
| Dapuzzo | Peter | 2008; 2009 | |
| Darsky | Judith | 2010 | |
| Dauman | Stewart | 1493 | |
| De Gaglia | Tom | 1839 | |
| Degennero | Mark | 1840 | |
| Delaney | Steven G. | 4495 | No 700 prefix to claim number |
| DelCampo | Michael | 1841 | |
| Delli Paoli | Robert | 1495 | |
| Deutsch | Harvey | 1725 | |
| Dixon | Barbara | 1496 | |
| Dobin | Michael | 1497 | |

2

| | | | |
|---|---|---|---|
| Doepke | Wiliam | 1498 & 1631 | |
| Dolan | Robert Jr. | 1842 | |
| Dorfman | Richard | 2011 | |
| Doris | Martin | 1499 | |
| Drescher | Dennis | 1501 | |
| Dworsky | David | 2122; 2124 | |
| Edmiston | Robert | 1843 | |
| Edwards | William | 1505 | |
| Edwards | Michael | 1503 | |
| Edwards | Paul | 1504 | |
| Elliott | Frederic S. | 2125; 2126 | |
| Eschert | Erwin | 1507 | |
| Estey | Arthur | 1928 | |
| Evelo | Joseph | 2127 | |
| Evenson | Don | 1508 | |
| Farley | James | 1509 | |
| Feldman | Helga | 8003716 | No 700 prefix to claim number |
| Feldman | Richard | 1511 | |
| Feldman | Alan | 1825 | |
| Fenwick | Larry | 1512 | |
| Finlayson | Roderick | 1513 | |
| Fish | Jason | 1514 | |
| Fishbein | Norman | 1516 | |
| Forshagen | Doug | 1515 | |
| Frank | Fred | 2073 | |
| Frank | Edwin III | 1726 | |
| Frankel | Arnold | 1519 | |
| Friedman | Mark | 2012 | |
| Fry | Edward Jr. | 1520 | |
| Fulton | Thomas | 1814 & 1942; 626; 9000750 | POC #626 and #9000750 do not have "700" prefix |
| Fultz | Thomas | 1521 | |
| Gallatin | Ron | 1727 | |
| Gallea | Anthony | 1869 | |
| Galleher | Richard | 1522 | |
| Ganz | Susan | 1523 | |
| Garber | Alan | 1524 | |
| Gard | Ronald | 1525 | |
| Gartland | Jude | 1526 | |
| Garzarelli | Elaine | 1527 | |
| Gengler | Thomas Jr. | 1845 | |
| Genirs | Robert | 1421 & 1972 | |
| Gioiella | Henry | 1529 | |
| Gladstone | Alan | 1530: 2071 | |
| Glasky | Joel | 1531 | |
| Goode | John | 1534 | |

3

| | | | |
|---|---|---|---|
| Goodspeed | Roger | 1729 | |
| Gott | Stephen | 1539 | |
| Gottmann | Hank | 1827 | |
| Graber | Jerrold | 1540 | |
| Graves | John | 1541 | |
| Gregory | Robert | 1542 | |
| Guernsey | Alan | 1846 | |
| Hadley | Edwin III | 2074 | |
| Hament | Nancy | 1424 & 1974 | |
| Hart | Edward | 1545 & 2029 | |
| Hayes | Brian | 1731 | |
| Hayes | Dennis Lee | 1847 | |
| Herman | Harvey | 4380 | No 700 prefix to claim number |
| Hermann | John A. Jr. | 2533 | |
| Hershberg | David | 1425 & 1975 | |
| Herzer | Charles | 1732 | |
| Hetzel | Charles | 1547 | |
| Higgins | Harrison | 1549 | |
| Hill | Tomlinson | 1733 | |
| Hoffman | Arnold | 1551 | |
| Hoffman | Kenneth | 1552 | |
| Hoopes | Scott | 1553 | |
| Hubbard | Charles | 2058 | |
| Illges | John | 2128 | |
| Isles | Philip | 1555 | |
| Jackson | Michael | 2075 & 2129 | |
| Jacobs | David | 1557 | |
| James | Graeme | 1558 | |
| Kaplan | Jack | 2164; 3367 | POC #3367 does not have "700" prefix |
| Kaplan | Alice | 1564; 6035 | POC #6035 does not have "700" prefix |
| Karol | Herbert | 2238 | |
| Katz | Evan | 1565 | |
| Kaufman | Joel | 1566 | |
| Kearns | William Jr. | 1567 | |
| Kelly | Brian | 1790 | |
| Kilgore | Jonathan | 1569 | |
| Kirby | William | 1570 | |
| Klonsky | Daniel | 1571 | |
| Kobak | Martin | 1 | No 700 prefix to claim number |
| Kopp | Bradford | 1848 | |
| Kowski | George | 1572 | |
| Kozeletz | Stephen | 1849 | |
| Kra | Howard | 1573 | |
| Krantz | Eric | 1574 | |

4

| | | | |
|---|---|---|---|
| Krueger | Harvey | 2059 | |
| Kunigk | Peter | 1575 | |
| Lakefield | Bruce | 1577 | |
| Lancaster | Robert | 1579 | |
| Landau | Arnold | 1580 | |
| Landgraf | Karl | 1581 | |
| Lane | Jeffrey | 1582 | |
| Leetzow | Leonard, Jr. | 1583 | |
| Lehman | Jack | 1585 | |
| Lehr | Seth | 1586 | |
| Lenz | William | 1588 | |
| Lessing | Stephen | 2252; 6131 | POC #6131 has no "700" prefix to claim number |
| Levinson | Andrew | 1590 | |
| Levy | John | 1591 | |
| Lewis | Dorothy | 2060; 2061 | |
| Libman | Spencer | 1593 | |
| Lind | Robert | 1594 | |
| Lindstrom | Ward | 1735 | |
| Lloyd | Marcelle | 2013 | |
| Lord | William | 1737 | |
| Lovett | Nigel | 1596 & 1632 | |
| Lusardi | Robert | 1597 | |
| Madden | Michael | 1598 | |
| Maguire | James | 1599 | |
| Manley | James | 2147 | |
| Marantz | Alan | 1600 | |
| Marino | Thomas | 1602 | |
| Marks | Herb | 1603 & 1630 | |
| Martinez | Roman | 1604 | |
| Martov | Martin | 1605 | |
| Matza | Robert | 1606 | |
| May | Harold H. | 2014; 2166; 654; 3572 | POC #654 and #3572 do not have "700" prefix |
| McCann | John | 1611; 4705 | POC #4705 does not have "700" prefix |
| McCleary | John | 1607 | |
| McCormick | Robert | 1852 | |
| McDaniel | Roger | 1608 | |
| McDonald | Patrick | 245 | No 700 prefix to claim number |
| McDougall | John | 4412 | No 700 prefix to claim number |
| McGlynn | Edward | 2018 | |
| McGuinn | Edwin III | 1419 & 1976 | |
| McHale | Edward | 1609 | |

| | | | |
|---|---|---|---|
| McKeown | William | 1612 | |
| McLendon | Heath | 1738 | |
| Mehaffrey | Stan | 1614 & 1633 | |
| Mejean | Paul | 1615 | |
| Melnik | Ronald | 1616 | |
| Melzer | Richard | 1617 | |
| Messinger | Craig | 1618 | |
| Mickel | Frank | 1739 | |
| Mikulich | Raymond | 1619 | |
| Millard | Robert | 1741 | |
| Miller | Ronald | 1931 | |
| Miller | Jerome | 1620 | |
| Milverstad | Michael | 1634 | |
| Minter | Alan | 2062 | |
| Montalbano | Richard | 1635 | |
| Morgia | Cataldo | 1636 | |
| Mortkowitz | Harry | 1637 | |
| Moschella | Joseph | 1644 | |
| Munro | William | 1638 & 2168 | |
| Murphy | Newell III | 1740 | |
| Murray | Philip | 1640 & 2030 | |
| Nastro | Charles | 1642 | |
| Navrude | Stanley | 1853 | |
| Neill | Frank Jr. | 1643 | |
| Nestor | Thomas | 1932 | |
| Newmark | Paul | 1645 | |
| Odermatt | Robert | 1647 | |
| Orlins | Stephen | 1648 | |
| Owens | John | 1650 | |
| Palatnek | Arnold | 1649 | |
| Passman | Seymour | 2020 | |
| Penrose | James | 1651 | |
| Pettit | MaryAnne | 2149; 2148 | |
| Phyfer | Daniel | 2022 | |
| Plumeri | Joseph | 1652 | |
| Poggi | Anthony | 90001540; 1357; 2945 | These claims do not have a "700" prefix. |
| Poggi | Irene | 1792 | |
| Polhemus | Kenneth | 1653 | |
| Pollack | Howard | 1654 | |
| Pondt | David R. | 655; 1655 | POC #655 does not have "700" prefix |
| Porter | Grant | 1656 & 1710 | |
| Pravato | Frank | 1742 | |
| Pucciarelli | Jim | 1657 | |

| | | | |
|---|---|---|---|
| Pulling | Thomas | 1743; 2058; 2057; 9003379; 9003380 | POC #2058, #2057, #90033379 and #9003380 do not have "700" prefix |
| Quast | Lani | 1658 & 1702 | |
| Raney | Richard | 1659 | |
| Reef | Alan | 1854 | |
| Reitzel | Edward | 1660 & 1664 | |
| Renehan | Dan | 1661 | |
| Renzi | Louis | 1662 | |
| Ring | Carl Jr. | 1665 | |
| Ritz | Norman | 1666 | |
| Robson | Thomas | 1668 | |
| Roosevelt | Theodore IV | 1426 & 1977 | |
| Roper | James | 1933 | |
| Rosenberg | Nanette | 1670 | |
| Sacco | Gregory | 1671 | |
| Samra | Victor, Jr. | 1856 | |
| Savarese | Lawrence Jr. | 1673 | |
| Scanlon | Joseph Jr. | 1744 | |
| Scaraggi | Frank | 1857 | |
| Schaefer | Gary | 1858 | |
| Schiffer | Craig | 1420 & 1979 | |
| Schoenthal | David | 1934 | |
| Schulsinger | Jeffrey | 1674 | |
| Seibels | Robert III | 2066 | |
| Shafiroff | Martin | 1676 | |
| Shaftel | Mel | 1678 | |
| Shapiro | Robert | 1679 | |
| Shean | Anne | 1680 | |
| Sheinberg | George | 1793 | |
| Shelton | Charles | 1681; 2187 | POC #2187 does not have "700" prefix |
| Shepard | Frank | 1682 | |
| Sherman | John | 1746 | |
| Shorr | David | 2068 | |
| Shutzer | William | 1684 | |
| Silverberg | David | 1685 | |
| Simmons | Hardwick | 1686 | |
| Simonetti | Philip | 1687 | |
| Simonini | Julius | 1688 | |
| Sinai | Allen | 2023 | |
| Slifer | Stephen | 1689 | |
| Sobotka | David | 1690 | |
| Spar | Warren | 1691 | |
| Spiegel | Steven | 1859 | |
| Stern | James | 1749; 1750 | |

| | | | | No 700 prefix to claim number |
|---|---|---|---|---|
| Stipo | Michael J. | 4688 | | |
| Stone | Jerry | 1693 | | |
| Strong | Roger | 2136 | | |
| Struble | Raymond | 1695 | | |
| Terrell | Steven | 1822 | | |
| Tilles | Glenn | 1861 | | |
| Tobin | Paul | 1697 | | |
| Topol | Clifford | 1863 | | |
| Troy | Austin | 1699 | | |
| Tucker | Thomas | 1700 | | |
| Urciuoli | Carmine | 1751 | | |
| VandenBossche | Pamela | 1935 | | |
| Viering | Donald | 1864 | | |
| Vincent | Richard | 1752 | | |
| Virany | Steven | 1753 | | |
| Vlach | Roger | 2069 | | |
| Voelker | Edward | 1754 | | |
| Wait | Jarett | 1756 | | |
| Walther | Gary | 1758 | | |
| Washkowitz | Alan | 1759; 1760 | | |
| Weinberg | Richard | 2137 | | |
| Weiss | Eugene | 2152 | | |
| West | Pat | 1761 | | |
| Weston | Gerald | 1762 | | |
| Williams | Paul | 1763 | | |
| Williamson | John Jr. | 1937 | | |
| Wilson | John | 1764 | | |
| Winchester | David | 1938 | | |
| Wolff | William III | 1865 | | |
| Wolitzer | Steven | 1765 | | |
| Wright | John | 1867; 1868 | | |
| Wright | Jeannie | 1766; 1811 | | |
| Wynn | Barry | 1768 | | |
| Yarkin | Allan | 1769 | | |
| Zatulove | Paul | 1770 | | |
| Zipp | Brian | 1771 | | |
| Zook | George | 1772 | | |