**Hearing Date and Time:  July 16, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time:  June 20, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (SCC) SIPA

**NOTICE OF TRUSTEE'S SUPPLEMENTAL OBJECTION TO**
**THE GENERAL CREDITOR PROOF OF CLAIM OF SOFIA FRANKEL**
**(CLAIM NO. 6430 (AMENDING AND SUPERSEDING CLAIM NO. 4909))**

**PLEASE TAKE NOTICE** that on May 30, 2014, James W. Giddens (the "Trustee"), as

trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor" or "LBI"),

under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.*

("SIPA"), by and through his undersigned counsel, filed a supplemental objection to general

creditor claim number 6430, filed by Sofia Frankel (the "Supplemental Objection"),

supplementing the objection to general creditor claim number 4909, filed by Sofia Frankel (the

"Objection," ECF No. 8425).

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection and the

Supplemental Objection will be held, if necessary, before the Honorable Shelley C. Chapman,

United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton

Customs House, Courtroom 623, One Bowling Green, New York, New York 10004 (the

"Bankruptcy Court"), on **July 16, 2014 at 10:00 a.m. (Prevailing Eastern Time)** or as soon

thereafter as counsel may be heard (the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Supplemental

Objection must: (i) be in writing; (ii) state the name and address of the responding party and

nature of the claim or interest of such party; (iii) state with particularity the legal and factual

bases of such response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local

Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service,

electronically, in accordance with General Order M-399 by registered users of the Court's

Electronic Case Filing system, and by all other parties in interest, on a 3.5 inch disk, compact

disk, or flash drive, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format no later than **June 20, 2014 at 4:00 p.m. (Prevailing**

**Eastern Time)** (the "Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed

LLP, One Battery Park Plaza, New York, New York 10004, Attn: Meaghan C. Gragg, Esq.;

(b) the Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800,

Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP,

767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife,

Esq., with a courtesy copy to the chambers of the Honorable Shelley C. Chapman, Courtroom

623, One Bowling Green, New York, New York, 10004.

      **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served

with respect to the Supplemental Objection, the Trustee may, on or after the Response Deadline,

submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed

to the Supplemental Objection, which may be entered with no further notice or opportunity to be

heard offered to any party.

Dated: New York, New York
       May 30, 2014

HUGHES HUBBARD & REED LLP

By: _/s/ James B. Kobak, Jr._____
     James B. Kobak, Jr.
     Christopher K. Kiplok
     Robert B. Funkhouser
     Meaghan C. Gragg
     Jordan E. Pace
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
E-mail: kobak@hugheshubbard.com

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

**Hearing Date and Time:  July 16, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time:  June 20, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

      LEHMAN BROTHERS INC.,

                Debtor.

Case No. 08-01420 (SCC) SIPA

**THE TRUSTEE'S SUPPLEMENTAL OBJECTION TO**
**THE GENERAL CREDITOR PROOF OF CLAIM OF SOFIA FRANKEL**
**(CLAIM NO. 6430 (AMENDING AND SUPERSEDING CLAIM NO. 4909))**

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED.................................................................................................1

PRELIMINARY STATEMENT ....................................................................................2

JURISDICTION AND VENUE .....................................................................................3

BACKGROUND ...........................................................................................................4

BACKGROUND OF THE CLAIM................................................................................5

ARGUMENT ................................................................................................................8

I.    THE CLAIM IS INSUFFICIENT AS A MATTER OF LAW ...............................8

    A.    Ms. Frankel Is Not Entitled to Any Indemnification ...............................9

    B.    Interest on the Award Was Unmatured as of the Filing Date ................10

    C.    Ms. Frankel Is Not Entitled to Indemnification of Attorneys' Fees .....11

        1.    The Amended Claim Lacks Sufficient Documentation ............................11

        2.    LBI Is Not Required to Pay for Ms. Frankel's
             Estate Planning, Fraudulent Conveyance,
             Malpractice Action, or Customer Claim Objection .................................13

        3.    The Fees Are Not Reasonable....................................................................14

    D.    Ms. Frankel Seeks a Double Recovery By
        Claiming the $844,330 Allegedly Paid to Sardis/JAS ...........................15

II.   ALTERNATIVELY, LBI HAS A RIGHT OF
    SETOFF AGAINST MS. FRANKEL'S CLAIM ...........................................16

RESERVATION OF RIGHTS .....................................................................................18

NOTICE.....................................................................................................................18

PRIOR RELIEF REQUESTED...................................................................................18

CONCLUSION...........................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660
(Bankr. S.D.N.Y. Feb. 20, 2007) ...............................................................8

*Andrulonis v. United States*, 26 F.3d 1224 (2d Cir. 1994)...........................................17

*Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R. 222 (B.A.P.
9th Cir. 1995), *aff'd*, 91 F.3d 151 (9th Cir. 1996) ...................................12

*Beecher v. Peter A. Vogt Mfg.*, 227 N.Y. 468 (1920) ...................................................16

*In re Chateaugay*, 109 B.R. 51 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 403 (S.D.N.Y.
1991), *aff'd in part and rev'd in part*, 961 F.2d 378 (2d Cir. 1992).....................10

*City of New York v. Saper*, 336 U.S. 328 (1949) .........................................................10

*Frankel v. McDonough*, No. 10-20979-CIV-HOEVELER, 2010 U.S. Dist. LEXIS 92383
(S.D. Fla. Aug. 13, 2010)..................................................................................7

*Frankel v. McDonough*, No. 10 Civ. 6106 (DAB), 2011 U.S. Dist. LEXIS 123992
(S.D.N.Y. Oct. 24, 2011), *aff'd*, 471 F. App'x 67 (2d Cir. 2012) ....................7, 17

*Frankel v. McDonough*, 471 F. App'x 67 (2d Cir. 2012)...........................................7, 14

*Frankel v. Sardis*, No. 115836/08, 2009 N.Y. Misc. LEXIS 5717 (N.Y. Sup. Ct. June 1,
2009), *aff'd*, 76 A.D.3d 136 (1st Dep't 2010) ......................................6, 17

*Frankel v. Sardis*, 76 A.D.3d 136 (1st Dep't 2010)...................................................6, 17

*In re Gen. Growth Prop., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) .........................10

*Klinger v. Dudley*, 41 N.Y.2d 362 (1977)...................................................................17

*In re MF Global Holdings Ltd.*, No. 11-15059 (MG), 2012 WL 5499847 (Bankr.
S.D.N.Y. Nov. 13, 2012) ................................................................................11

*In re Minbatiwalla*, 424 B.R. 104 (Bankr. S.D.N.Y. 2010)..........................................12

*New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983).........12

*In re Oneida Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon
Co. v. Oneida Ltd.*, No. 09 Civ. 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y.
Jan. 22, 2010)......................................................................................8, 11

*In re Rockefeller Ctr. Props.*, 272 B.R. 524 (Bankr. S.D.N.Y. 2000) ...........................8

ii

*Sardis v. Frankel*, No. 115328/2010, 2012 N.Y. Misc. LEXIS 4871 (N.Y. Sup. Ct. Oct. 12, 2012), *aff'd*, 113 A.D.3d 135 (1st Dep't 2014) ............................................................7, 13

*Sardis v. Frankel*, 113 A.D.3d 135 (1st Dep't 2014)........................................................7, 13, 14

*Sardis v. Lehman Bros. Diversified Equity Fund 2004, L.P.*, No. 113587/2010, slip. op. (N.Y. Sup. Ct. Apr. 7, 2011) ........................................................................................16

*Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730 (Bankr. S.D.N.Y. 1995) ........................................................................................16

*Shepard v. New York*, 216 N.Y. 251 (1915) ........................................................................15

*Spang Indus., Inc. v. Aetna Cas. & Sur. Co.*, 512 F. 2d 365 (2d Cir. 1975).........................15

*Till v. Paul Frederick Fox & Affiliates*, 261 A.D.2d 853 (4th Dep't 1999) ......................11

*In re United States Lines, Inc.*, 199 B.R. 476 (Bankr. S.D.N.Y. 1996) .............................10

*Vanston Bondholders Prot. Comm. v. Green*, 329 U.S. 156 (1946)....................................10

STATUTES AND RULES

11 U.S.C. § 502.....................................................................................................1, 8, 10

11 U.S.C. § 558..........................................................................................................16

15 U.S.C. § 78aa.........................................................................................................3

15 U.S.C. §§ 78aaa *et seq.* ........................................................................................1

15 U.S.C. § 78eee ......................................................................................................3, 4

15 U.S.C. § 78fff .........................................................................................................2

15 U.S.C. § 78fff-1 .....................................................................................................2

15 U.S.C. § 78fff-2 .....................................................................................................4

N.Y. C.P.L.R. § 1401 ................................................................................................16

N.Y. C.P.L.R. § 1402 ................................................................................................17

N.Y. C.P.L.R. § 5004 ................................................................................................11

Del. Code tit. 8, § 145 ...................................................................................9, 13, 14

Fed. R. Bankr. P. 3001 ..............................................................................................12

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of

Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of

1970, as amended, 15 U.S.C. §§ 78aaa *et seq.*,[1] by and through his undersigned counsel,

respectfully represents as follows:

### RELIEF REQUESTED

1.      On March 3, 2014, the Trustee filed his Objection to the General Creditor Proof

of Claim of Sofia Frankel (Claim No. 4909) (the "Objection," ECF No. 8425).[2]  The claim

addressed in the Objection asserted component claims for indemnification and numerous other

items.[3]  Subsequent to the filing of the Objection, Ms. Frankel filed a new claim (claim no. 6430,

the "Amended Claim," annexed hereto as Exhibit A), focusing exclusively on and clarifying her

indemnification claim.  Solely in exchange for Ms. Frankel withdrawing the Original Claim and

its non-indemnification component claims, the Trustee agreed to treat the Amended Claim as

timely, while reserving all rights to object to the Amended Claim on any basis.

2.      The Trustee now files this supplement (the "Supplemental Objection") to the

Objection pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

2.   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

3.   These other items were equity awards, credit card charges, cash held in a brokerage account, and partnership
     interests.  *See* Claim No. 4909 (the "Original Claim"), annexed as Exhibit A to the Objection.

Code"), as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of

SIPA. This Supplemental Objection seeks disallowance and expungement of Amended Claim.[4]

3.      The Trustee's revised proposed order (the "Proposed Order") is annexed hereto as

Exhibit C.

## PRELIMINARY STATEMENT

4.      In 2008, after the commencement of LBI's liquidation, an arbitration panel held

Ms. Frankel and LBI jointly and severally liable to certain former customers (Sardis/JAS) for

$2.5 million.[5]  Ms. Frankel now seeks indemnification of over $5.5 million purportedly based on

that Award.

5.      Ms. Frankel has not paid the Award and, as determined in related litigation, has

employed an "asset protection plan," including a fraudulent conveyance, to avoid paying the

Award.[6]  In the meantime, post-judgment interest has continued to accrue on the unpaid Award,

with only a fractional payment by Ms. Frankel to reduce the outstanding interest.

6.      By her Amended Claim, Ms. Frankel seeks indemnification to which she has no

right.  She would have the estate indemnify her for the full amount of the Award notwithstanding

that she has not actually paid the Award.  She would also have the estate indemnify her for the

post-Filing Date, post-judgment interest on the Award that she has largely not paid and that

results from her failure to pay her due obligation to Sardis/JAS.  And, Ms. Frankel would have

---

4.  This Supplemental Objection incorporates by reference the Objection and addresses the items and amounts
    clarified in the Amended Claim.  It is not intended to address the arguments raised by Ms. Frankel in her
    Response (ECF No. 8597).  The Trustee will file a single reply addressing those and any other arguments raised
    by Ms. Frankel once she has had an opportunity to respond to this Supplemental Objection.

5.  The Trustee consented to modification of the automatic stay to permit entry and distribution of the Award.  (*See*
    Stipulation and Agreed Order Between James W. Giddens, Trustee for the Liquidation of the Business of
    Lehman Brothers Inc. and Jeffrey Sardis, Lauren Sardis and JAS Holdings Corporation Modifying Automatic
    Stay to Permit Entry and Distribution of Arbitration Award, entered Oct. 23, 2008 (ECF No. 170).)

6.  *See* ¶¶ 20, 29, *infra*.

the estate indemnify her for all of the legal fees she incurred in not paying the Award, including

for the asset protection plan, the fraudulent conveyance litigation, and a related malpractice

action.

7.      Ms. Frankel is not entitled to indemnification of any amount.  As demonstrated in

the Objection, her claim is contingent upon a determination of good faith that has not been made

and, given adjudicated facts, can never be made.  Moreover, the Bankruptcy Code's prohibition

on unmatured interest and the limited scope of LBI's duty to indemnify both preclude aspects of

Ms. Frankel Amended Claim.

8.      Finally, even if Ms. Frankel had any valid claim for indemnification, her claim

would be significantly reduced or wholly extinguished by LBI's right of setoff.  Since LBI will

make distributions on allowed claims to Sardis/JAS due to Ms. Frankel's misconduct, LBI has a

right of contribution from Ms. Frankel.

9.      Accordingly, Ms. Frankel's claim should be disallowed and expunged in its

entirety.

## JURISDICTION AND VENUE

10.      Following removal to this Court for all purposes as required for SIPA cases by

section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred

by [SIPA] upon the court to which application for the issuance of the protective decree was

made."  SIPA § 78eee(b)(4).

11.      Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. §

78aa.

**BACKGROUND**

12.     On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch,

United States District Court, Southern District of New York, entered the Order Commencing

Liquidation (the "LBI Liquidation Order," ECF No. 1) pursuant to the provisions of SIPA in the

case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, Case No. 08-

CIV-8119 (GEL).  The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee for the

liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; and (ii) removed the

case to this Court for all purposes as required in SIPA cases by section 78eee(b)(4) of SIPA, in

the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (the "SIPA

Proceeding").

13.     On November 7, 2008, the Court entered the Order Approving Form and Manner

of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for

Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Other

Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Claims Process Order," ECF No.

241).  Beginning on December 1, 2008, consistent with SIPA section 78fff-2(a)(1), the Trustee

mailed more than 905,000 claims packages with filing information to former LBI customers and

other potential claimants (the "Claims Process Notice") and posted claims filing information on

the Trustee's website (www.lehmantrustee.com) and SIPC's website (www.sipc.org).  The

Trustee also published notice of the claims process in *The New York Times*, *The Wall Street

Journal*, and *The Financial Times*.

14.     Pursuant to SIPA § 78fff-2(a)(3) and the Customer Claims Process Order,

customer claims seeking maximum protection under SIPA must have been received by the

Trustee on or before January 30, 2009.  All customer claims and general creditor claims must

have been received by the Trustee by June 1, 2009 and no claims of any kind will be allowed

unless received by the Trustee on or before June 1, 2009 (the "Pre-Filing Bar Date").  In addition

to the Pre-Filing Bar Date, on September 19, 2013, the Bankruptcy Court entered an order (the

"Administrative Bar Date Order") that established October 31, 2013 (the "Administrative Bar

Date") as the deadline to file a proof of claim for administrative expense claims against the LBI

estate, as further described in the Administrative Bar Date Order, with respect to such

administrative expenses arising between September 19, 2008 and August 31, 2013.  The

Administrative Bar Date has now passed.  A copy of the Customer Claims Process Order was

made publicly available at www.lehmantrustee.com.  The Trustee's website allowed claimants

filing electronically to upload documents as part of their claim submission and thereby comply

with the instructions to include supporting documentation set forth in the Proof of Claim.

## BACKGROUND OF THE CLAIM[7]

15.    Claimant Sofia Frankel is a former broker who was employed by Goldman, Sachs

& Co. ("Goldman Sachs") from 1994 to 2000.  (*See* FINRA BrokerCheck Report for Sofia

Frankel (the "BrokerCheck Report") at 1, annexed as Exhibit 1 to the Supplemental Declaration

of Jordan E. Pace (the "Pace Supp. Decl."), annexed hereto as Exhibit B.)  Beginning in 1999,

Jeffrey Sardis, Lauren Sardis, and JAS Holding Corporation (collectively, "Sardis/JAS") opened

accounts at Goldman Sachs and placed them under the discretionary control of Ms. Frankel.

(*See* Statement of Claim in *Sardis v. Goldman, Sachs & Co.*, Case No. 04-03481 (FINRA

Dispute Resolution) (the "Statement of Claim") ¶ 9, annexed as Exhibit 2 to the Pace Supp.

Decl.)  Ms. Frankel transferred to LBI in late 2000 and remained there until September 2008.

---

7.    The facts recited herein are allegations taken from the Original Claim, the Amended Claim, and documents
submitted by the Ms. Frankel, unless otherwise indicated. The Trustee reserves all rights to challenge the
veracity and relevance of any of these facts.

(*See* BrokerCheck Report at 4.)  Sardis/JAS transferred their accounts to LBI, where they

remained under the discretionary control of Ms. Frankel.

16.    In 2004, Sardis/JAS commenced an arbitration (the "Sardis/JAS Arbitration")

before the NASD (later FINRA) against Ms. Frankel, Goldman Sachs, and LBI.  Sardis/JAS

contended in the Sardis/JAS Arbitration that Ms. Frankel committed fraud and that Goldman

Sachs and LBI were responsible for failing to supervise her.  (*See generally* Statement of Claim.)

The panel held sixty-eight hearing sessions over three years.  (*See* Award in *Sardis v. Goldman,*

*Sachs & Co.*, Case No. 04-03481 (FINRA Dispute Resolution) (the "Award") at 5, annexed as

Exhibit 3 to the Pace Supp. Decl.)

17.    Soon after the Filing Date, the panel awarded Sardis/JAS $1 million jointly and

severally from Ms. Frankel and Goldman Sachs and $2.5 million jointly and severally from Ms.

Frankel and LBI.  (Award at 3.)  In accordance with usual practice, the panel did not give any

reasons for the Award.  (*See id.*)  The Award was entered and distributed on October 30, 2008.

(*See* Award at 7-9.)

18.    After the Award was distributed, Ms. Frankel filed an Article 75 action in New

York State Supreme Court, seeking to vacate or modify the Award.  Sardis/JAS cross-moved to

confirm the Award.  The court confirmed the Award and, on Ms. Frankel's subsequent appeal,

the First Department affirmed the confirmation.  *See Frankel v. Sardis*, No. 115836/08, 2009

N.Y. Misc. LEXIS 5717, at *3-5 (N.Y. Sup. Ct. June 1, 2009) (hereinafter "*Frankel I*"), *aff'd*, 76

A.D.3d 136 (1st Dep't 2010) (hereinafter "*Frankel II*").  In July 2009, Ms. Frankel was

suspended by FINRA for failing to comply with the Award or failing to respond to a request for

information regarding her compliance.  (*See* BrokerCheck Report at 7-8.)

6

19.    After Ms. Frankel exhausted her challenges to the Award, she commenced a

malpractice action in the Southern District of Florida against her attorney from the Sardis/JAS

Arbitration and the confirmation litigation.  That action was transferred to the Southern District

of New York.  *See Frankel v. McDonough*, No. 10-20979-CIV-HOEVELER, 2010 U.S. Dist.

LEXIS 92383 (S.D. Fla. Aug. 13, 2010) (hereinafter "*McDonough I*").  Judge Batts ultimately

dismissed the action and the Second Circuit affirmed the dismissal.  *See Frankel v. McDonough*,

No. 10 Civ. 6106 (DAB), 2011 U.S. Dist. LEXIS 123992, at *11, 14-15 (S.D.N.Y. Oct. 24,

2011) (hereinafter "*McDonough II*"), *aff'd*, 471 F. App'x 67 (2d Cir. 2012) (hereinafter

"*McDonough III*").

20.    While challenging the Award and suing her attorney for malpractice, Ms. Frankel

also developed and effected an asset protection plan that included transferring a New York

apartment to her son and liquidating a brokerage account to purchase an apartment in Florida.

*Sardis v. Frankel*, 113 A.D.3d 135, 138-39 (1st Dep't 2014) (hereinafter "*Sardis II*").

Sardis/JAS sued to void both the New York and Florida apartment transactions.  The New York

Supreme Court voided the transfer of the New York apartment as a fraudulent conveyance and

was affirmed by the First Department.  *See Sardis v. Frankel*, No. 115328/2010, 2012 N.Y.

Misc. LEXIS 4871 (N.Y. Sup. Ct. Oct. 12, 2012) (hereinafter "*Sardis I*"), *aff'd by Sardis II*.

Litigation over the Florida apartment is ongoing, in an action captioned *Sardis v. Frankel*, No.

2011-16294-CA (Fla. Cir. Ct. filed May 25, 2011).

21.    The Original Claim sought withheld compensation/equity awards, reimbursement

of credit card charges, indemnification of the Award, indemnification of certain FINRA fees,

indemnification of certain attorneys' fees, and cash and partnership interests once held in a

brokerage account.  The Amended Claim now seeks only indemnification of the Award and of post-judgment interest and attorneys' fees.

## ARGUMENT

22.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon Co. v. Oneida Ltd.*, No. 09 Civ. 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  Moreover, section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).

## I.    THE CLAIM IS INSUFFICIENT AS A MATTER OF LAW

23.    The Amended Claim drops all component claims except those for indemnification.  (*See* Amended Claim Ex. A.)  Ms. Frankel now seeks indemnification for the following items:

- $2,500,000.00 for the Award to Sardis/JAS;

- $1,692,750.28 in interest on the Award running from October 30, 2008;

- $494,650.39 in attorneys' fees allegedly incurred for defense of the Sardis/JAS Arbitration and appeal of the Award in New York state court; and

- $844,330.00 in monies allegedly turned over by Ms. Frankel to Sardis/JAS in partial satisfaction of the Award.

(*Id.*)  These remaining components should be disallowed because, as stated in the Objection, Ms.

Frankel's entire claim for indemnification is a contingent claim for reimbursement and because

her adjudicated fraudulent misconduct precludes indemnification.  Moreover, most of what Ms.

Frankel now claims represents unmatured interest, falls outside of the scope of indemnification,

or both.  Accordingly, the Amended Claim should be disallowed and expunged in its entirety.

### A.  Ms. Frankel Is Not Entitled to Any Indemnification

24.    The Objection sets forth the reasons why Ms. Frankel is not entitled to

indemnification of the $2.5 million Award to Sardis/JAS.  (*See* Objection ¶¶ 12-13.)

Specifically, the claim is contingent on a determination that Ms. Frankel satisfied the applicable,

good faith standard of conduct for indemnification.  (*See id.* ¶ 12.)  While the Objection

mistakenly cited to a later-amended article of LBI's Certificate of Incorporation,[8] the pre-

indemnification determination of good faith is in fact required by Delaware law.  Del. Code.

tit. 8, § 145(d) ("Any indemnification under subsections (a) and (b) of this section (unless

ordered by a court) shall be made by the corporation only as authorized in the specific case upon

a determination that indemnification . . . is proper in the circumstances because the person has

met the applicable standard of conduct . . . .");  *see* Del. Code tit. 8, § 145(a) (requiring that the

indemnitee have "acted in good faith and in a manner the person reasonably believed to be in or

not opposed to the best interests of the corporation");  *see also* LBI Certificate of Incorporation

art. VII (p. 36) (applying Delaware law to indemnification rights).  The claim is also contingent

until actually paid.  (*See* Objection at 5 n.2.)  In addition, prior findings that Ms. Frankel acted

---

8.    A full copy of LBI's Certificate of Incorporation, including the amendments, was submitted with the Objection (*see* Pace Decl. Ex. 1), but the Objection mistakenly referred to an earlier version of Article VII, which incorporated the Delaware good faith determination requirement.  The applicable version simply refers to Delaware law, which in turn requires a determination of good faith for indemnification.  Nothing in LBI's by-laws addresses indemnification of its personnel.  (*See generally* By-Laws of Lehman Brothers Inc., annexed as Exhibit 5 to the Pace Supp. Decl.)

9

fraudulently preclude any determination that she met the standard for indemnification.  (*See*

Objection ¶ 13.)  Because all of the components in the Amended Claim are dependent on the

same underlying claim for indemnification, the foregoing reasons apply to bar the entirety of Ms.

Frankel's claim, including the newly added items.  Accordingly, the Amended Claim should be

disallowed and expunged in its entirety.

### B.    Interest on the Award Was Unmatured as of the Filing Date

25.    The second component of the Amended Claim is a claim for indemnification of

interest accruing on the Award since October 30, 2008.  Ms. Frankel is not entitled to interest on

the Award since the interest was unmatured as of the Filing Date and the claim is therefore

subject to mandatory disallowance under section 502(b)(2) of the Bankruptcy Code.  11 U.S.C.

§ 502(b)(2); *see In re Gen. Growth Prop., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011)

("Section 502(b)(2) of the Bankruptcy Code ordinarily disallows post-petition interest"); *In re*

*Chateaugay*, 109 B.R. 51, 55 (Bankr. S.D.N.Y. 1990) ("Unmatured interest is without question

not an allowed claim under § 502(b)(2) of the Code."), *aff'd*, 130 B.R. 403 (S.D.N.Y. 1991),

*aff'd in part and rev'd in part*, 961 F.2d 378 (2d Cir. 1992); *see also Vanston Bondholders Prot.*

*Comm. v. Green*, 329 U.S. 156, 163 (1946) ("The general rule in bankruptcy . . . has been that

interest on the debtors' obligations ceases to accrue at the beginning of proceedings").  The bar

on claims for unmatured interest applies with full force to claims, like this one, for post-

judgment interest.  *See In re United States Lines, Inc.*, 199 B.R. 476, 480-81, 484 (Bankr.

S.D.N.Y. 1996) (disallowing both pre- and post-judgment interest components of a claim to the

extent they represent post-petition interest); *see also City of New York v. Saper*, 336 U.S. 328,

331 (1949) (noting that section 63(a) of the Bankruptcy Act—the predecessor of section

502(b)—"allow[ed] interest on judgments and written instruments only to date of bankruptcy").

As Ms. Frankel admits, post-judgment interest on the Award only began accruing on October 30,

2008, over a month after the Filing Date.  (Amended Claim Ex. A.)  Since such interest was

therefore unmatured as of the Filing Date, the Amended Claim should be disallowed and

expunged to the extent it seeks post-judgment interest.[9]

## C.    Ms. Frankel Is Not Entitled to Indemnification of Attorneys' Fees

26.    The third component of the Amended Claim is a claim for indemnification of

attorneys' fees purportedly incurred in the defense of the Sardis/JAS Arbitration and the

subsequent appeal of the Award in New York state court.  (*See* Amended Claim Exs. A, 2.)  For

the reasons stated above, Ms. Frankel is not entitled to any indemnification.  Her claim for

attorneys' fees is also insufficient because:  she has failed to provide sufficient documentation;

the fees do not qualify for indemnification; and the fees were not reasonably incurred.

### 1.    The Amended Claim Lacks Sufficient Documentation

27.    Bankruptcy Rule 3001(c)(1) requires that, "when a claim . . . is based on a

writing, a copy of the writing shall be filed with the proof of claim."  Fed. R. Bankr. P.

3001(c)(1).  Claims filed in accordance with the rules "shall constitute prima facie evidence of

the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f); *see In re Oneida*, 400 B.R. at

389; *see also In re MF Global Holdings Ltd.*, No. 11-15059 (MG), 2012 WL 5499847, at *3

(Bankr. S.D.N.Y. Nov. 13, 2012).  If a claim fails to comply with the requirements of

---

9.  Ms. Frankel also significantly overstates the amount of interest that has accrued.  Under New York law, post-judgment interest is simple interest accruing at nine percent per annum.  *See* N.Y. C.P.L.R. § 5004; *Till v. Paul Frederick Fox & Affiliates*, 261 A.D.2d 853, 854 (4th Dep't 1999) (modifying judgment to vacate compound interest calculation and ordering that interest be calculated using a simple annual interest rate).  As of the date of the Amended Claim (April 10, 2014), a maximum of approximately $1,225,479.45 in interest may have accrued.  The amount claimed by Ms. Frankel—$1,692,750.28—represents six years of interest compounded annually.  Fewer than six years have passed since the date of the Award, and post-judgment interest is never compounded.  In addition, if Ms. Frankel did pay Sardis/JAS any amount in the intervening years, that would further reduce the amount of interest that has accrued.

Bankruptcy Rule 3001, it is not entitled to prima facie validity.  *Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R. 222, 226-27 (B.A.P. 9th Cir. 1995) (holding that since the claimants failed to comply with Rule 3001(c), their claim could not constitute *prima facie* evidence of validity under Rule 3001(f)), *aff'd*, 91 F.3d 151 (9th Cir. 1996).  Further, this Court and others in the Second Circuit have held that "claims can be disallowed for failure to support the claim with sufficient evidence . . . because absent adequate documentation, the proof of claim is not sufficient for the objector to concede the validity of a claim."  *In re Minbatiwalla*, 424 B.R. 104, 119 (Bankr. S.D.N.Y. 2010).

28.      Neither the Original Claim nor the Amended Claim contain documentation sufficient for the Court or the Trustee to ascertain the validity of the claim for attorneys' fees. The only relevant invoices attached to either claim are for one of nine law firms (Kraus & Zuchlewski), and even those invoices contain no more detail than an amount.  (*See* Original Claim Ex. E at 4-5.)  There are no contemporaneous time records, detailed invoices, cancelled checks, or any documentation establishing the nature of the work done, the rates charged, the amount of time spent, or payment of the fees.  *Cf. New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983) (holding, in a case under 42 U.S.C. § 1988, that "contemporaneous time records are a prerequisite for attorney's fees in this Circuit.").  Absent such detail, the Amended Claim does not comply with the Bankruptcy Rules and therefore should be disallowed and expunged.  *Cf. id.* at 1154 ("All applications for attorney's fees . . . should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done.").

### 2. LBI Is Not Required to Pay for Ms. Frankel's Estate Planning, Fraudulent Conveyance, Malpractice Action, or Customer Claim Objection

29.     In the absence of sufficient documentation, the Trustee's counsel have examined publicly available information relevant to the claim for attorneys' fees.  That information reveals that Ms. Frankel's assertion in the Amended Claim that the claimed fees are for "defense of arbitration proceedings and appeal of same" (Amended Claim Ex. A) appears to be largely false. The information available to the Trustee shows that the most of the claimed fees relate to her estate planning, fraudulent conveyance of assets, malpractice action, and customer claim objection.  None of these fees qualify for indemnification under LBI's Certificate of Incorporation or Delaware law, both of which require that fees be incurred "in connection with" the arbitration.  *See* LBI Cert. of Incorp. art. VII; Del. Code tit. 8, § 145(a).  Specifically, Ms. Frankel claims the following attorneys' fees:

- Proskauer Rose ($109,491.71).  "Within days after the October 2008 [A]ward was issued," Ms. Frankel and her son met with an attorney at Proskauer Rose LLP to develop an "asset protection plan" including, among other issues, the "'sale/transfer of NY condos,' [and] 'homestead waiver issues.'"  *Sardis II*, 113 A.D.3d at 138 (quoting Proskauer's time records).  Proskauer also provided tax and estate planning, limited liability company formation, and other services.  *Id.* at 143 n.4.

- Michael Paikin PC ($116,814.83).  As part of the asset protection plan, Ms. Frankel transferred a New York apartment to her son.  *Id.* at 138-39.  Sardis/JAS successfully prosecuted a fraudulent conveyance action against Ms. Frankel and her son based on this transfer.  *See generally Sardis I*, 2012 N.Y. Misc. LEXIS 4871; *Sardis II*, 113 A.D.3d 135.  Michael Paikin represented Ms. Frankel in the New York fraudulent conveyance litigation.  *See Sardis II*, 113 A.D.3d at 135.

- Gabriel Del Virginia ($27,500.00).  Gabriel Del Virginia represented Ms. Frankel's son in the New York fraudulent conveyance litigation.  *See id.*  He also briefly represented Ms. Frankel with respect to certain claims filed in this proceeding but, due to insufficient documentation, it is not clear how much, if any, of the claimed fees relate to that as opposed to the fraudulent conveyance litigation.

- <u>Rennert, Vogel, Mandler & Rodriguez ($43,336.60)</u>.  Also as part of the asset protection plan, Ms. Frankel liquidated assets to purchase an apartment in Florida.  *See id.* at 138-39.  Rennert Vogel represented Ms. Frankel in litigation over the Florida apartment.  (*See* Docket Info., *Sardis v. Frankel*, No. 2011-16294-CA (Fla. Cir. Ct.) at 2 (listing an e-mail address for Thomas Ward, an attorney at Rennert Vogel), annexed as <u>Exhibit 4</u> to the Pace Supp. Decl.)

- <u>Kopelowitz Ostrow ($32,802.87)</u>.  Kopelowitz Ostrow represented Ms. Frankel when she sued her attorney from the Sardis/JAS Arbitration for malpractice.  *See, e.g., McDonough III*, 471 F. App'x at 67.  Ms. Frankel's decision to sue her attorney was separate from and unnecessary for the Sardis/JAS Arbitration, so she is not entitled to indemnification.

- <u>Arnstein & Lehr ($34,080.00)</u>.  Arnstein & Lehr filed both a customer claim and the Original Claim on Ms. Frankel's behalf.  They filed an objection to the Trustee's determination of the customer claim but withdrew before the Original Claim became disputed.  (*See* Objection by Creditor Sofia Frankel to the Trustee's Determination of Claim Numbers 800002290 and 5101 (Amendment of Claim 800002290) (filed Feb. 24, 2010) (ECF No. 2720); Notice of Withdrawal of Appearance (filed Dec. 18, 2012) (ECF No. 5564).)  The customer claim objection, which focused on recovery of assets supposedly held in a brokerage account, does not relate at all to the Sardis/JAS Arbitration.

- <u>Furr & Cohen ($7,837.38)</u>.  Furr & Cohen is a Boca Raton, Florida bankruptcy and family law firm.  *See generally* Homepage of Furr & Cohen, P.A., http://www.furrcohen.com (last visited May 29, 2014).  The firm's practice does not appear to cover anything at issue in the Sardis/JAS Arbitration.

30.    All told, Ms. Frankel claims indemnification for several hundred thousand dollars' worth of attorneys' fees that do not have the required nexus and do not fall within the scope of any right to indemnification she may have, even if that right were not contingent and otherwise disallowable.

### 3.    <u>The Fees Are Not Reasonable</u>

31.    LBI's Certificate of Incorporation and Delaware law also require that any attorneys' fees be "reasonably incurred" before there is a right to indemnification.  *See* LBI Cert. of Incorp. art. VII; Del. Code tit. 8, § 145(a).  Absent sufficient documentation, neither the Court nor the Trustee can evaluate the reasonableness of the fees.  Ms. Frankel does not even allege—

14

let alone prove as required—that any of the fees were reasonably incurred.  *See* 5 Collier on

Bankruptcy ¶ 506.04[3][d] (16th ed. 2014) ("The bankruptcy courts will generally require the

party seeking allowance of attorney's fees to carry the burden of demonstrating reasonableness

by providing a detailed description of the services rendered, supporting documentation, or other

evidence prior to making a determination on an application for payment.").

32.    For the reasons detailed above, Ms. Frankel is not entitled to indemnification of

attorneys' fees and the Amended Claim should be disallowed and expunged to the extent it

claims those fees.

### D.    Ms. Frankel Seeks a Double Recovery By Claiming the $844,330 Allegedly Paid to Sardis/JAS

33.    The final component of the Amended Claim seeks indemnification of

$844,330.00 for "monies turned over by [Ms. Frankel] in partial satisfaction of" the Award.  (*See*

Amended Claim Exs. A, 3.)  Since Ms. Frankel already claims indemnification of both the entire

principal amount of that award and the maximum amount of post-judgment interest, this

component represents an attempt at double recovery.[10]  Moreover, this part of the Amended

Claim is subject to the same grounds for disallowance, described in the Objection and above, as

apply to the entire Amended Claim and to the claims for the principal and interest specifically.

34.    The documentation attached to the Amended Claim is also insufficient under the

Bankruptcy Rules to support Ms. Frankel's claim for $844,330.00.  The numbers in the attached

documents do not add up to the amount claimed.  (*See* Amended Claim Ex. 3.)  And, according

to Sardis/JAS, they have received substantially less than the amount claimed by Ms. Frankel—

---

10.  Under New York law, since this amount allegedly paid to Sardis/JAS represents a partial payment, it would be applied to interest first.  *See, e.g., Spang Indus., Inc. v. Aetna Cas. & Sur. Co.*, 512 F. 2d 365, 371-72 (2d Cir. 1975) (partial payments are applied to interest first); *Shepard v. New York*, 216 N.Y. 251, 256 (1915) (default rule is that payments are applied to interest first).

15

only $478,582.49.[11]  (*See* Pace Supp. Decl. ¶ 9.)  Whatever the actual amount, this component of

the claim is legally insufficient and should be disallowed and expunged along with the rest of the

Amended Claim.

## II.    ALTERNATIVELY, LBI HAS A RIGHT OF SETOFF AGAINST MS. FRANKEL'S CLAIM

35.    To the extent Ms. Frankel's claim is not entirely disallowed and expunged, LBI

has a claim for contribution against Ms. Frankel that must be offset against any allowed portion

of Ms. Frankel's claim.  Section 558 of the Bankruptcy Code expressly preserves "any defense

available to the debtor as against any entity other than the estate, including statutes of limitation,

statutes of frauds, usury, and other personal defenses." 11 U.S.C. § 558.  Thus, Section 558

"preserves for the benefit of the estate any right to setoff the debtor may have." *Scherling v.*

*Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739-40 (Bankr. S.D.N.Y.

1995).  State law governs a debtor's right to setoff and equitable setoff under New York requires

only that the debts be mutual, that is, "the debts are to and from the same parties in the same

capacity." *Id.* at 740 (citing *Beecher v. Peter A. Vogt Mfg.*, 227 N.Y. 468, 473 (1920)).

36.    Ms. Frankel owes LBI a debt in the form of contribution for the amount LBI will

distribute to Sardis & JAS Holdings based on the Award.  Under New York law, "two or more

persons who are subject to liability for damages for the same personal injury, injury to property

or wrongful death, may claim contribution among them." N.Y. C.P.L.R. § 1401.  "The amount

of contribution to which a person is entitled shall be the excess paid by him over and above his

---

11. Sardis/JAS and Ms. Frankel have disputed the proper value of the partnership interests Ms. Frankel now claims
     to have turned over to Sardis/JAS.  The New York Supreme Court sided with Sardis/JAS and held that the
     proper value is limited to the amount of cash actually received by Sardis/JAS.  *See Sardis v. Lehman Bros.*
     *Diversified Equity Fund 2004, L.P.*, No. 113587/2010, slip. op. at *4 (N.Y. Sup. Ct. Apr. 7, 2011) (annexed as
     Exhibit 6 to the Pace Supp. Decl.).

equitable share of the judgment . . . . The equitable shares shall be determined in accordance with the relative culpability of each person liable for contribution."[12]  N.Y. C.P.L.R. § 1402.

37.    In this SIPA Proceeding, Sardis and JAS Holdings have aggregate allowed unsecured general creditor claims of $2,036,248.93 based on the Award.  (Pace Supp. Decl. ¶ 8.) Ms. Frankel owes LBI contribution in the full amount of all current and future distributions to Sardis/JAS because LBI's equitable share of the Award is zero.  As Ms. Frankel argued in New York Supreme Court, LBI's liability was merely derivative of her own fraudulent conduct. *Frankel I*, 2009 N.Y. Misc. LEXIS 5717 at *7 ("[Ms. Frankel] is correct in noting that no liability could be assessed against Lehman Brothers unless [Sardis/JAS] established that [Ms. Frankel] committed wrongful acts . . . .").  Judge Batts found likewise, holding, "the damages [Sardis and JAS Holdings] sought against Lehman Brothers flowed from [Ms. Frankel]'s own fraudulent and tortious misconduct" and "Lehman's liability was derivative of [Ms. Frankel]'s liability." *McDonough II*, 2011 U.S. Dist. LEXIS 123992, at *14.  Thus, Ms. Frankel is the only culpable party and owes contribution to LBI for the full amount LBI distributes to Sardis/JAS.

38.    LBI may offset the contribution debt owed by Ms. Frankel against any amount allowed on her Claim because the debts are mutual.  LBI's contribution claim and Ms. Frankel's indemnification claim are owed to and from the same parties in the same capacities. Accordingly, the Trustee requests that the Amended Claim be reduced by all amounts distributed or to be distributed to Sardis/JAS and that the Amended Claim be disallowed and expunged to the extent those distributions exceed any amount allowed to Ms. Frankel.

---

12.  A party may assert a claim for contribution before actually paying the amount for which it seeks contribution. *Klinger v. Dudley*, 41 N.Y.2d 362, 369 (1977).  The right to contribution remains contingent until payment is made.  *Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d Cir. 1994).

## RESERVATION OF RIGHTS

39.     The Amended Claim may be objectionable on a number of additional grounds.

The Trustee reserves all rights to object on any other basis to the Amended Claim or any portion

of the Amended Claim for which the Court does not grant the relief requested herein.

## NOTICE

40.     Notice of this Supplemental Objection has been provided to:  (i) the Claimant via

first-class mail; and (ii) the list of parties requesting notice of pleadings in accordance with the

Court's Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy

Rules 1015(a) and 9007 Implementing Certain Notice and Case Management Procedures and

Related Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately

available for inspection upon filing with the Court  at the Trustee's website,

www.lehmantrustee.com.  The Trustee submits that no other or further notice need be provided.

## PRIOR RELIEF REQUESTED

41.     The Trustee previously filed the Objection seeking disallowance and

expungement of the Original Claim.

## CONCLUSION

42.     For the foregoing reasons and for the reasons stated in the Objection, the Trustee

respectfully requests entry of an order granting the relief requested herein and such other and

further relief as is just.

Dated: New York, New York
      May 30, 2014

HUGHES HUBBARD & REED LLP


By: _/s/ James B. Kobak, Jr._
    James B. Kobak, Jr.
    Christopher K. Kiplok
    Robert B. Funkhouser
    Meaghan C. Gragg
    Jordan E. Pace
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile:  (212) 422-4726
E-mail: kobak@hugheshubbard.com

*Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.*

**EXHIBIT A**

Filed: USBC - Southern District of New York
SIPC v. Lehman Brothers Inc.
08-01420 (JMP)



FILED / RECEIVED

APR 1 8 2014

EPIQ BANKRUPTCY SOLUTIONS, LLC

Bankruptcy Claim #

000006430

# Document Range



0780001

| Begin: | End: | Quantity |
|---|---|---|
|  |  |  |

| Prepped by: | QC: | Stats: | Scanned by: |
|---|---|---|---|
| ID #: |  |  |  |

Route to:
(Circle One)    **Team***    *Route to:_____Tina Wheelon_____

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK ~CUSTOM 13 PLAN | | Proof of Claim - AMENDED |
|---|---|---|
| Name of Debtor:<br>**Lehman Brothers, Inc.** | Case Number:<br>**08-1420 (SCC) SIPA** | |

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**Sofia Frankel** | **COURT USE ONLY** |
|---|---|
| Name and address where notices should be sent:<br>**Shenwick & Associates**<br>**655 3rd Avenue**<br>**Floor 20**<br>**New York, NY 10017**<br>Telephone number: **(212) 541-6224**       email: **jshenwick@gmail.com** | ■ Check this box if this claim amends a previously filed claim.<br><br>**Court Claim Number:  4909**<br>*(If known)*<br><br>Filed on:  **5/28/2009** |
| Name and address where payment should be sent (if different from above):<br><br>Telephone number:       email: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1.  Amount of Claim as of Date Case Filed:**            **$5,531,730.67 ***

If all or part of your claim is secured, complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach a statement that itemizes interest or charges.

**2.  Basis for Claim:     Wages, salaries and compensation**
(See instruction #2)

| 3.  Last four digits of any number by which creditor identifies debtor:<br>_____ | 3a. Debtor may have scheduled account as:<br><br>(See instruction #3a ) | 3b. Uniform Claim Identifier (optional):<br><br>(See instruction #3b) |
|---|---|---|

**4.  Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____

Value of Property: $_____

Annual Interest Rate:  **0**  %  ☐ Fixed or ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim:    $_____

Amount Unsecured:    $_____

**5.  Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

Amount entitled to priority:

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6.  Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

*See attached Exhibits A, 1, 2  and 3.

**Creditor reserves the right to alter or amend this Proof of Claim

Software Copyright (c) 1996-2013 Best Case, LLC - www.bestcase.com                                              Best Case Bankruptcy

B 10 (Official Form 10) (04/13)

7.  Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 9001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. (See instruction #7, and the definition of "redacted".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

8.  Signature:  (See instruction #8)

Check the appropriate box.

■ I am the creditor.          ☐ I am the creditor's authorized agent.          ☐ I am the trustee, or the debtor, or          ☐ I am a guarantor, surety, indorser, or
                                                                                  their authorized agent.                            other codebtor.
                                                                                  (See Bankruptcy Rule 3004.)                        (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   **Sofia Frankel**
Title:
Company:   **c/o Shenwick & Associates**
Address and telephone number (if different from notice address above):
**655 3rd Avenue**
**Floor 20**
**New York, NY 10017**
Telephone number: **(212) 541-6224**          email **jshenwick@gmail.com**

(Signature)          04/10/2014 (Date)

*Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

Software Copyright (c) 1998-2014 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

# EXHIBIT A

## SOFIA FRANKEL AMENDED PROOF OF CLAIM OF $5,531,730.67

1. Arbitration award to Jeffrey and Lauren Sardis and JAS Holding Corporation against Claimant
and Debtor jointly and severally (Exhibit "1")                                    $2,500,000.00

2. Simple interest at 9% per annum since award date of October 30, 2008          $1,692,750.28

3. Attorneys' fees for defense of arbitration proceedings and appeal of same to Supreme Court of
the state of New York as a result of an indemnification agreement with Debtor regarding matters
of Riverside Holdings, L.L.P. f/k/a Riverside Holdings, LLC and Jeffrey and Lauren Sardis and
JAS Holding Corporation (Exhibit "2")                                             $494.650.39

4. Compensation for monies turned over by Claimant in partial satisfaction of award to Jeffrey
and Lauren Sardis and JAS Holding Corporation (Exhibit "3")                       $844,330.00

Total Claim                                                                       **$5,531,730.67**

**EXHIBIT 1**

## Award
## FINRA Dispute Resolution

In the Matter of the Arbitration Between:

Jeffrey Sardis, Lauren Sardis, and JAS Holding Corporation (Claimants) vs. Sofia
Frankel, Goldman Sachs and Company, and Lehman Brothers, Inc. (Respondents)

Case Number: 04-03481                              Hearing Site: New York, New York

Nature of the Dispute: Customers vs. Associated Person and Members.

### REPRESENTATION OF PARTIES

Claimants Jeffrey Sardis ("J. Sardis"), Lauren Sardis ("L. Sardis"), and JAS Holding
Corporation ("JAS Holding"), hereinafter collectively referred to as "Claimants": Dan
Brecher, Esq., Law Offices of Dan Brecher, New York, NY and William F. Dahill, Esq.,
Wollmuth Maher & Deutsch LLP, New York, NY.

Respondent Sofia Frankel ("Frankel"): Michael J. Dell, Esq., Kramer Levin Naftalis &
Frankel, LLP, New York, NY and Brian F. McDonough, Esq., Drinker Biddle & Reath,
LLP, New York, NY. Frankel was represented by Michael J. Dell, Esq., for the period of
time that she was employed by Goldman Sachs and Company. Frankel was
represented by Brian F. McDonough, Esq., for the period of time that she was employed
by Lehman Brothers, Inc.

Respondent Goldman Sachs and Company ("Goldman Sachs"): Michael J. Dell, Esq.,
Kramer Levin Naftalis & Frankel, LLP, New York, NY.

Respondent Lehman Brothers, Inc. ("Lehman Brothers"): Brian F. McDonough, Esq.,
Drinker Biddle & Reath, LLP, New York, NY.

### CASE INFORMATION

Statement of Claim filed on or about: May 12, 2004.
Answer to the Motion to Dismiss filed by all parties on or about: February 7, 2005.
J. Sardis signed the Uniform Submission Agreement: March 7, 2004.
L. Sardis signed the Uniform Submission Agreement: March 7, 2004.
JAS Holding signed the Uniform Submission Agreement: March 7, 2004.

Joint Statement of Answer filed by Goldman Sachs and Frankel on or about: July 30,
2004.
Motion to Dismiss the Statement of Claim filed by Goldman Sachs and Frankel on or
about: December 23, 2004.
Goldman Sachs did not sign the Uniform Submission Agreement.
Frankel did not sign the Uniform Submission Agreement.

Joint Statement of Answer filed by Lehman Brothers and Frankel on or about: July 30,

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 2 of 7

2004.
Motion to Dismiss the Statement of Claim filed by Lehman Brothers and Frankel on or about: January 13, 2005.
Lehman Brothers did not sign the Uniform Submission Agreement.
Frankel did not sign the Uniform Submission Agreement.

## CASE SUMMARY

Claimants asserted the following causes of action: fraud, breach of contract, negligence, failure to supervise, breach of fiduciary duty, breach of supervisory duties, churning, omission of facts, unauthorized trading, forgery, and unauthorized transfers. The causes of action relate to the purchase of securities in Exodus, WorldCom, Global Crossing, AT&T, and other unspecified securities.

Unless specifically admitted in their Answer, Goldman Sachs and Frankel denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in their Answer, Lehman Brothers and Frankel denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimants requested compensatory damages jointly and severally against Goldman Sachs and Frankel in the amount of $7,700,000.00, $2,000,000.00 or more in commissions, margin interest and other charges to Claimants' accounts, $1,500,000.00 or such other amount to be determined by the Panel for lost interest, profits, income, and gain, unspecified punitive damages, interest, attorneys' fees, and the costs of this proceeding.

Claimants requested compensatory damages solely against Lehman Brothers in the amount of $2,200,000.00, $400,000.00 or more in commissions, margin interest and other charges to Claimants' accounts, unspecified punitive damages, interest, attorneys' fees, and the costs of this proceeding.

Goldman Sachs and Frankel requested that all claims be dismissed in their entirety.

Lehman and Frankel requested that all claims be dismissed in their entirety, that costs of this proceeding be assessed against the Claimants, and that this arbitration be expunged from Frankel's CRD record.

## OTHER ISSUES CONSIDERED AND DECIDED

Frankel, Goldman Sachs, and Lehman Brothers did not file with FINRA Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the Code and having answered the claim, appeared and testified at the hearing, are bound by the determination of the Panel on all issues submitted.

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 3 of 7

At the conclusion of Claimants' case, all Respondents moved to dismiss Claimants' claims. After due deliberation, the Panel denied the Motion.

On September 19, 2008, the United States District Court for the Southern District of New York entered an Order granting the application of the Securities Investor Protection Corporation (SIPC) for a protective decree under the Securities Investor Protection Act (SIPA). Pursuant to the court's order, all claims against Lehman Brothers were indefinitely stayed. Pursuant to the stipulation between Claimants and James W. Giddens, trustee for the liquidation of the business of Lehman Brothers, on October 23, 2008, the United States Bankruptcy Court for the Southern District of New York entered an Order modifying the stay provision to permit the entry and distribution of this Award.

The parties agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the majority of the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Goldman Sachs and Frankel are jointly and severally liable for and shall pay to the Claimants $1,000,000.00 as compensatory damages plus interest at the rate of 4% per annum accruing from May 11, 2004 through and including September 13, 2004.

   Goldman Sachs and Frankel shall divide the total awarded amount (as specified above) and pay to each Claimant one-third (1/3) of the total awarded amount.

2. Lehman Brothers and Frankel are jointly and severally liable for and shall pay to JAS Holdings $1,300,000.00 as compensatory damages.

3. Lehman Brothers and Frankel are jointly and severally liable for and shall pay to J. Sardis and L. Sardis $1,200,000.00 as compensatory damages.

   Lehman Brothers and Frankel shall divide the total awarded amount (as specified above) and pay $600,000.00 to J. Sardis and $600,000.00 to L. Sardis.

4. Frankel's request for expungement is denied.

5. Any and all relief not specifically addressed herein, including punitive damages is denied.

## DISSENTING ARBITRATOR REPORT

The Chairperson consents with the Panel's decision concerning numbered paragraphs 2, 3, 4, and 5 of the Award section but dissents from the Panel's finding in numbered paragraph 1. The Chairperson finds that there should be no liability against Goldman Sachs and Frankel should be liable to pay for the awarded amount and the interest.

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 4 of 7

## FEES

Pursuant to the Code, the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $  600.00 |

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated persons at the time of the events giving rise to the dispute. Accordingly, Goldman Sachs and Company and Lehman Brothers, Inc., are parties.

Goldman Sachs and Company

| | |
|---|---|
| Member surcharge | = $ 3,750.00 |
| Pre-Hearing Process Fee | = $   750.00 |
| Hearing Process Fee | = $ 5,500.00 |

Lehman Brothers, Inc.

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-Hearing Process Fee | = $   750.00 |
| Hearing Process Fee | = $ 5,000.00 |

**Adjournment Fees**
The following adjournment fees are assessed:

June 21 and 22, 2005, July 7 and 8, 2005, and August 16 and 17, 2005

| | |
|---|---|
| adjournment requested Goldman Sachs and Frankel | = $ 1,200.00 |
| Goldman Sachs' share | = $   600.00 |
| Frankel's share | = $   600.00 |

| | |
|---|---|
| September 14, 2005 adjournment requested by all parties | = $ 1,200.00 |
| Claimants' share | = $   600.00 |
| Frankel, Goldman Sachs, and Lehman Brothers' share | = $   600.00 |

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | |
|---|---|
| Two (2) Pre-hearing sessions with a single arbitrator @ $450.00 | = $   900.00 |

Pre-hearing conferences: February 28, 2005  1 session
                         November 15, 2006 1 session

| | |
|---|---|
| Three (3) Pre-hearing conference sessions with the Panel @ $1,200.00/session | |
| Pre-hearing conferences:  December 6, 2004  1 session | = $ 3,600.00 |

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 5 of 7

|  | May 11, 2007 | 1 session |  |
|--|--------------|-----------|--|
|  | March 26, 2008 | 1 session |  |

| Sixty Eight (68) Hearing sessions @ $1,200.00 |  |  | = $81,600.00 |
|-----------------------------------------------|--|--|--------------|
| Hearing Dates: | September 13, 2005 | 2 sessions |  |
|  | May 16, 2006 | 2 sessions |  |
|  | May 17, 2006 | 2 sessions |  |
|  | May 18, 2006 | 2 sessions |  |
|  | June 1, 2006 | 2 sessions |  |
|  | June 12, 2006 | 2 sessions |  |
|  | September 6, 2006 | 2 sessions |  |
|  | September 7, 2006 | 2 sessions |  |
|  | November 20, 2006 | 2 sessions |  |
|  | November 21, 2006 | 2 sessions |  |
|  | April 24, 2007 | 2 sessions |  |
|  | April 25, 2007 | 2 sessions |  |
|  | April 26, 2007 | 2 sessions |  |
|  | May 1, 2007 | 2 sessions |  |
|  | May 2, 2007 | 2 sessions |  |
|  | May 3, 2007 | 2 sessions |  |
|  | July 9, 2007 | 2 sessions |  |
|  | July 10, 2007 | 2 sessions |  |
|  | September 5, 2007 | 2 sessions |  |
|  | September 6, 2007 | 2 sessions |  |
|  | January 22, 2008 | 1 session |  |
|  | February 12, 2008 | 2 sessions |  |
|  | February 13, 2008 | 2 sessions |  |
|  | February 26, 2008 | 2 sessions |  |
|  | February 27, 2008 | 2 sessions |  |
|  | March 18, 2008 | 2 sessions |  |
|  | March 19, 2008 | 2 sessions |  |
|  | March 20, 2008 | 2 sessions |  |
|  | April 29, 2008 | 2 sessions |  |
|  | April 30, 2008 | 2 sessions |  |
|  | June 3, 2008 | 2 sessions |  |
|  | July 17, 2008 | 2 sessions |  |
|  | July 23, 2008 | 2 sessions |  |
|  | August 6, 2008 | 2 sessions |  |
|  | August 7, 2008 | 1 session |  |

Total Forum Fees                                                    = $86,100.00

1. The Panel has assessed $28,700.00 of the forum fees, jointly and severally, to the Claimants.
2. The Panel has assessed $28,700.00 of the forum fees to Goldman Sachs.
3. The Panel has assessed $28,700.00 of the forum fees Lehman Brothers.

Administrative Costs
Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but are not limited

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 6 of 7

to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of
documents from archives, interpreters, and security.

1. Claimants requested duplication of two tapes at $15.00 per tape    = $    30.00
2. Goldman Sachs requested duplication of two tapes at $15 per tape   = $    30.00

All balances are due and payable to FINRA Dispute Resolution.

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 7 of 7

## ARBITRATION PANEL

| Martin Siegel | - | Public Arbitrator, Presiding Chairperson |
| Dennis Meyerson | - | Public Arbitrator |
| Michael Perinelli | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

Dennis Meyerson
Public Arbitrator

$9|19|08$
Signature Date

Michael Perinelli
Non-Public Arbitrator

Signature Date

**Dissenting in Part / Concurring in Part Arbitrator's Signature**

Martin Siegel
Public Arbitrator, Presiding Chairperson

Signature Date

October 30, 2008

Date of Service    (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 04-03461
Award Page 7 of 7

## ARBITRATION PANEL

| Martin Siegel | - | Public Arbitrator, Presiding Chairperson |
| Dennis Meyerson | - | Public Arbitrator |
| Michael Perinelli | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

Dennis Meyerson                                          Signature Date
Public Arbitrator

Michael Perinelli                                          Signature Date
Non-Public Arbitrator

### Dissenting in Part / Concurring in Part Arbitrator's Signature

Martin Siegel                                          Signature Date
Public Arbitrator, Presiding Chairperson

October 30, 2008

Date of Service   (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 7 of 7

## ARBITRATION PANEL

| Martin Siegel | - | Public Arbitrator, Presiding Chairperson |
| Dennis Meyerson | - | Public Arbitrator |
| Michael Perinelli | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

Dennis Meyerson                                           Signature Date
Public Arbitrator

Michael Perinelli                                         Signature Date
Non-Public Arbitrator

**Dissenting in Part / Concurring in Part Arbitrator's Signature**

Martin Siegel                                    9/19/08
Public Arbitrator, Presiding Chairperson          Signature Date

October 30, 2008

Date of Service   (For FINRA office use only)

**EXHIBIT 2**

## Legal Fees Paid By Sofia Frankel in Relation to the Sardis Arbitration

| Law Firm | Amount |
|---|---|
| Kraus & Zuchlewski | $87,987.00 |
| Furr & Cohen | $7,837.38 |
| Arnstein Lehr | $34,080.00 |
| FINRA | $11,800.00 |
| Michael Paikin PC | $116,814.83 |
| Proskauer Rose | $109,491.71 |
| Koplowitz Ostrow | $32,802.87 |
| Rennert, Vogel, Mandler, & Rodriguez | $43,336.60 |
| Gabriel Del Virginia PC | $27,500.00 |
| Shenwick & Associates | $23,000.00 |
| **Grand Total** | **$494,650.39** |

**EXHIBIT 3**

## Capital Accounts Turned Over By Sofia Frankel in Relation to the Sardis Arbitration

| Capital Account | Amount |
|---|---|
| Barclay's | $1,750.00 |
| NB Private Funds | $518,308.00 |
| Lehman Private Equity Funds | $324,272.00 |
| Grand Total | $844,330.00 |

# Co-Investment Capital Partners LP and
# Co-Investment Capital Partners Cayman AIV I LP

(Delaware and Cayman Islands Limited Partnerships)
Combined Statement of Changes in Individual Partner's Capital
For the Three Months Ended March 31, 2013
(Unaudited)

### Sofia Frankel

| Changes in Capital Account Balance | | Year-To-Date | |
| | | Limited Partner | Total Partnership |
|---|---|---|---|
| Beginning Balance - December 31, 2012 | $ | 282,750 $ | 31,615,137 |
| Distributions | | (16,678) | (2,010,596) |
| Profit & Loss Allocation | | | |
| Investment Income | | 275 | 31,034 |
| Other Expenses | | (358) | (49,173) |
| Management Fees | | (359) | (40,054) |
| Realized loss on investments | | (1,587) | (179,069) |
| Net change in unrealized appreciation / (depreciation) on investments and | | | |
| translations in foreign currencies | | 3,836 | 432,759 |
| General Partners Carried Interest Allocation | | (113) | - |
| Ending Balance - March 31, 2013 | $ | 267,766 $ | 29,800,038 |

| Summary of Capital Commitments | | Since Inception | |
| | | Limited Partner | Total Partnership |
|---|---|---|---|
| Original Commitment | $ | 500,000 $ | 56,415,315 |
| Less: Allocated Contributions as a result of transfers of Partnership Interest | | - | - |
| Less: History-to-Date Contributions | | (487,423) | (54,996,229) |
| Add: Recallable Distributions (and Allocated Distributions from transfers if applicable) | | 33,221 | 3,748,339 |
| Remaining Commitment | $ | 45,798 $ | 5,167,425 |
| Ending Balance - March 31, 2013 | $ | 267,766 $ | 29,800,038 |
| History-to-Date Distributions | | 392,387 | 45,679,803 |
| Total Value | $ | 660,153 $ | 75,479,841 |

Note: The information contained in this Combined Statement of Changes in Individual Partner's Capital was extracted from the accounting books and records used to compile the March 31, 2013 combined financial statements of the Partnerships. The General Partner confirms that this statement has been calculated in accordance with the terms and provisions of the Partnership Agreement. This Combined Statement of Changes in Individual Partner's Capital has not been audited.

STRICTLY CONFIDENTIAL

NB Alternatives Advisers LLC
605 Third Avenue
New York, NY 10158
Tel. 212.476.9000

NEUBERGER | BERMAN

August 23, 2013

Sophia Frankel
50 South Pointe Drive
Unit 1202/03
Miami Beach, FL 33139

Dear Ms. Frankel,

You have requested that NB Alternatives Advisers LLC provide you with the amount that NB Co-Investment Partners has distributed, pursuant to the Decision and Order entered in the office of the Clerk of the Supreme Court of the State of New York, Count of New York on April 8, 2011 (the "Decision and Order"), to the Petitioners (as defined in the Decision and Order).

Please be advised that to date, NB Co-Investment Partners has distributed:

12.7.11 - $127,146.81
3.21.12 - $6,847.96
5.23.12 - $17,858.10
9.05.12 - $4,570.72
10.17.12 - $24,243.75
11.19.13 - $6,441.76
11.27.12 - $31,268.79
12.14.12 - $3,589.96
1.25.13 - $3,147.33
3.21.13 - $13,530.89
6.27.13 - $11,896.23
Total:    $250,542.27 to the Petitioners

Very truly yours,

NB Alternatives Advisers LLC

# LEHMAN BROTHERS

KRISTEN KOPPENHAVER AULD
VICE PRESIDENT

August 26, 2013

**BY EMAIL & FIRST CLASS MAIL**
Sofia Frankel
50 South Pointe Drive, Apt. 1202
Miami Beach, Florida 33139

> Re:    **Jeffrey Sardis, et al. v. Lehman Brothers Diversified Private
> Equity Fund 2004, L.P., et al; New York State Supreme Court,
> New York County; Index No. 113587/2010**

Dear Ms. Frankel:

Per your request, below are the total amounts that have been paid to date on your behalf to the Sardis plaintiff in connection with the enforcement of the judgment rendered in the above referenced matter.

| | |
|---|---|
| **Lehman Brothers Diversified Private Equity Fund 2004 LP** | **$161,943.31** |
| **Lehman Brothers Partnership Account 2000/2001 LP** | **$15,750.00** |

Additionally, for your reference, below please find the breakdown of the total payments and the dates on which payments were made.

| | |
|---|---|
| **Lehman Brothers Diversified Private Equity Fund 2004 LP:** | **$67,476.38 (12/9/11)** |
| | **$67,476.38 (6/29/12)** |
| | **$26,990.55 (7/31/13)** |
| **Lehman Brothers Partnership Account 2000/2001 LP** | **$15,750.00 (2/13/12)** |

Please let me know if you have any questions or require any further information.

Very truly yours,

Kristin Auld

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 89th Floor New York, NY 10020
Telephone 646-285-9819; Facsimile 646-285-9337

**SHENWICK & ASSOCIATES**
655 THIRD AVENUE, 20ᵀᴴ FLOOR
NEW YORK, NY 10017
TELEPHONE:  (212) 541-6224
AFTER HOURS DIRECT LINE: (212) 584-9746
FAX:  (646) 218-4600
CELL:  (917) 363-3391
Email: jshenwick@gmail.com
Website: http://sites.google.com/site/jshenwick
Blog: http://shenwick.blogspot.com

April 17, 2014

**Via FedEx**
Bankruptcy Solutions
757 Third Avenue
New York, NY 10017

      Re:    In re Lehman Brothers, Inc.
               Case No. 08-1420 (SCC) SIPA

Dear Sir or Madam:

Enclosed please find the following:

( ) Notice of Appearance              ( ) Stipulation of Dismissal
( ) Motion of Relief from Automatic Stay     ( ) Substitution of Attorney
( ) Certificate of Service

                               (X) Return Envelope

( ) Adversary Proceeding Cover Sheet
( ) Order - proposed (O+2)            (X) Amended Proof of Claim

Will you please:
(X)    File
(X)    Return copy marked "File Copy" to this office in enclosed envelope.

                          Very truly yours,

                          James H. Shenwick

1



From: (212) 541-8224
JAMES SHENWICK
SHENWICK & ASSOCIATES
655 THIRD AVENUE FL 20
20TH FL
NEW YORK, NY 10017

Origin ID: OGSA

Ship Date: 17APR14
ActWgt: 0.5 LB
CAD: 3405612/NET3490

Delivery Address Bar Code

SHIP TO: (646) 282-2500          BILL SENDER

**Attn: Lehman Brothers Claims**
**Epiq Bankruptcy Solutions, LLC**
**757 3RD AVE**

**NEW YORK, NY 10017**

Ref #
Invoice #
PPR ED / RECEIVED
Dept #

APR 1 8 2014

EPIQ SYSTEMS

TRK# 7985 8258 2094
0281

**TUE - 22 APR AA**
**EXPRESS SAVER**

**E3 OGSA**

10017
NY-US
**EWR**

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| | |
| Debtor. | |

## SUPPLEMENTAL DECLARATION
## OF JORDAN E. PACE IN SUPPORT OF THE TRUSTEE'S SUPPLEMENTAL
## OBJECTION TO THE GENERAL CREDITOR PROOF OF CLAIM OF SOFIA
## FRANKEL (CLAIM NO. 6430 (AMENDING AND SUPERSEDING CLAIM NO. 4909))

Pursuant to 28 U.S.C. § 1746, I, Jordan E. Pace, hereby declare as follows:

1.      I am an attorney duly admitted to practice in this Court and an associate at the law firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens, trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI").  I previously submitted a declaration in support of the Trustee's Objection to the General Creditor Proof of Claim of Sofia Frankel (Claim No. 4909) (the "Objection," ECF No. 8425).  I submit this supplemental declaration in support of the Trustee's Supplemental Objection to the General Creditor Proof of Claim of Sofia Frankel (Claim No. 6430 (Amending and Superseding Claim No. 4909)) (the "Supplemental Objection").[1]

2.      Attached hereto as Exhibit 1 is a true and correct copy of the BrokerCheck Report for Sofia Frankel that is derived from FINRA's Central Registration Depository and is maintained on FINRA's website.

---

1.    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection and the Supplemental Objection.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Statement of Claim filed in *Sardis v. Goldman, Sachs & Co.*, Case No. 04-03481 (FINRA Dispute Resolution).

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Award entered in *Sardis v. Goldman, Sachs & Co.*, Case No. 04-03481 (FINRA Dispute Resolution).

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Docket Information as of April 18, 2014, maintained by the Clerk of the Courts for Miami-Dade County, Florida, on its website for the action captioned *Sardis v. Frankel*, No. 2011-16294-CA (Fla. Cir. Ct. filed May 25, 2011).

6.      Attached hereto as Exhibit 5 is a true and correct copy of the By-Laws of Lehman Brothers Inc. understood to be in effect as of the Filing Date.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an order dated April 7, 2011, in the action captioned *Sardis v. Lehman Brothers Diversified Private Equity Fund 2004, L.P.*, No. 113587/2010 (N.Y. Sup. Ct.).

8.      Jeffrey Sardis, Lauren Sardis, and JAS Holding Corporation (collectively, "Sardis/JAS") filed proofs of claim in this proceeding based on the Award.  Jeffrey Sardis and Lauren Sardis collectively have an allowed claim for $977,399.49 and JAS Holding Corporation has an allowed claim for $1,058,849.44.

9.      I understand from counsel for Sardis/JAS that Sardis/JAS have collectively received only $478,582.49 from Ms. Frankel related to the Award as of April 1, 2014.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2014.

                                                          /s/ Jordan E. Pace
                                                          Jordan E. Pace

2

**EXHIBIT 1**



**BrokerCheck Report**

# SOFIA  FRANKEL

CRD# 2527188

Report #56259-90291, data current as of Friday, April 11, 2014.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure Events | 5 |

**About BrokerCheck®**



BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck



## SOFIA FRANKEL
CRD# 2527188

This broker is not currently registered with FINRA.

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is not currently registered with FINRA.**

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration History

**This broker was previously registered with the following FINRA firm(s):**

**BARCLAYS CAPITAL INC.**
CRD# 19714
MIAMI, FL
09/2008 - 04/2009

**LEHMAN BROTHERS INC.**
CRD# 7506
MIAMI, FL
01/2001 - 09/2008

**GOLDMAN, SACHS & CO.**
CRD# 361
NEW YORK, NY
08/1994 - 01/2001

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?   **Yes**

**The following types of disclosures have been reported:**

| Type | Count |
|---|---|
| Regulatory Event | 1 |
| Customer Dispute | 3 |

## Investment Adviser Representative Information

The information below represents the individual's record as a broker. For details on this individual's record as an investment adviser representative, visit the SEC's Investment Adviser Public Disclosure website at
http://www.adviserinfo.sec.gov

www.finra.org/brokercheck

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This broker is not currently registered with FINRA.

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

# Broker Qualifications



## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| National Commodity Futures Examination | Series 3 | 08/31/1994 |
| General Securities Representative Examination | Series 7 | 08/24/1994 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 09/09/1994 |
| Uniform Investment Adviser Law Examination | Series 65 | 02/23/2001 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

www.finra.org/brokercheck

## Registration and Employment History



### Registration History

The broker previously was registered with the following FINRA firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 09/2008 - 04/2009 | BARCLAYS CAPITAL INC. | 19714 | MIAMI, FL |
| 01/2001 - 09/2008 | LEHMAN BROTHERS INC. | 7506 | MIAMI, FL |
| 08/1994 - 01/2001 | GOLDMAN, SACHS & CO. | 361 | NEW YORK, NY |

### Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 09/2008 - Present | BARCLAYS CAPITAL INC. | MIAMI, FL |
| 12/2000 - 09/2008 | LEHMAN BROTHERS INC. | NEW YORK, NY |

### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information reported.

www.finra.org/brokercheck

## Disclosure Events



**What you should know about reported disclosure events:**

1. All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   - A law enforcement agency must file formal charges before a broker is required to disclose a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

3. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. **There are different statuses and dispositions for disclosure events:**
   - A disclosure event may have a status of *pending, on appeal,* or *final.*
     - A "pending" event involves allegations that have not been proven or formally adjudicated.
     - An event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" event has been concluded and its resolution is not subject to change.
   - A final event generally has a disposition of *adjudicated, settled* or *otherwise resolved.*
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally involves an agreement by the parties to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually involves no payment to the customer and no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

**For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.**

|  | Pending | Final | On Appeal |
|---|---|---|---|
| Regulatory Event | 0 | 1 | 0 |

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

| Customer Dispute | 0 | 3 | N/A |

©2014 FINRA. All rights reserved.   Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

www.finra.org/brokercheck

User Guidance



## Disclosure Event Details

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The matter may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Regulatory - Final

This type of disclosure event may involves (1) a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, self-regulatory organization, federal regulatory such as the Securities and Exchange Commission, foreign financial regulatory body) for a violation of investment-related rules or regulations; or (2) a revocation or suspension of a broker's authority to act as an attorney, accountant, or federal contractor.

#### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Regulatory Action Initiated By:** | FINRA |
| **Sanction(s) Sought:** | Suspension |
| **Date Initiated:** | 07/29/2009 |
| **Docket/Case Number:** | 04-03481 |
| **Employing firm when activity occurred which led to the regulatory action:** | N/A |
| **Product Type:** | No Product |
| **Allegations:** | FRANKEL FAILED TO COMPLY WITH AN ARBITRATION AWARD OR SETTLEMENT AGREEMENT OR TO SATISFACTORILY RESPOND TO A FINRA REQUEST TO PROVIDE INFORMATION CONCERNING THE STATUS OF COMPLIANCE. |
| **Current Status:** | Final |
| **Resolution:** | LETTER |

www.finra.org/brokercheck




**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?**   No

**Resolution Date:**   07/29/2009

**Sanctions Ordered:**   Suspension

**If the regulator is the SEC, CFTC, or an SRO, did the action result in a finding of a willful violation or failure to supervise?**   No

**(1) willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board, or to have been unable to comply with any provision of such Act, rule or regulation?**

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.




**(2) willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? or**

**(3) failed reasonably to supervise another person subject to your supervision, with a view to preventing the violation by such person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any such Acts, or any of the rules of the Municipal Securities Rulemaking Board?**

**Sanction 1 of 1**

| | |
|---|---|
| **Sanction Type:** | Suspension |
| **Capacities Affected:** | ALL CAPACITIES |
| **Duration:** | N/A |
| **Start Date:** | 07/29/2009 |
| **End Date:** | |



**Regulator Statement**          PURSUANT TO ARTICLE VI, SECTION 3 OF FINRA BY-LAWS, AND FINRA
RULE 9554, FRANKEL'S FINRA REGISTRATION IS SUSPENDED JULY 29,
2009, FOR FAILURE TO COMPLY WITH AN ARBITRATION AWARD OR
SETTLEMENT AGREEMENT OR TO SATISFACTORILY RESPOND TO FINRA
REQUESTS TO PROVIDE INFORMATION CONCERNING THE STATUS OF
COMPLIANCE.

www.finra.org/brokercheck

User Guidance



## Customer Dispute - Award/Judgment

This type of disclosure event involves a final, consumer-initiated, investment-related arbitration or civil suit containing allegations of sales practice violations against the broker that resulted in an arbitration award or civil judgment for the customer.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN SACHS AND COMPANY,/LEHMAN BROTHERS, INC. |
| **Allegations:** | FRAUD; BREACH OF CONTRACT; NEGLIGENCE; BREACH OF FIDUCIARY DUTY; CHURNING; OMISSION OF FACTS; UNAUTHORIZED TRADING; FORGERY; UNAUTHORIZED TRANSFERS |
| **Product Type:** | Other |
| **Other Product Type(s):** | UNKNOWN TYPE OF SECURITIES |
| **Alleged Damages:** | $13,400,000.00 |

### Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD - CASE #04-03481 |
| **Date Notice/Process Served:** | 05/12/2004 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award |
| **Disposition Date:** | 10/30/2008 |
| **Disposition Detail:** | FRANKEL IS JOINTLY AND SEVERALLY LIABLE FOR AND SHALL PAY CLAIMANTS $1,000,000 AS COMPENSATORY DAMAGES, PLUS INTEREST. FRANKEL IS JOINTLY AND SEVERALLY LIABLE WITH ANOTHER RESPONDENT FOR AND SHALL PAY CLAIMANTS $2,500,000 AS COMPENSATORY DAMAGES. |

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN, SACHS & CO. AND LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANTS ALLEGE CLAIMS OF FRAUD, EXCESSIVE TRADING, BREACH OF |

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

www.finra.org/brokercheck

User Guidance



CONTRACT,BREACH OF FIDUCIARY DUTIES, FRAUD AND LOSSES
SUFFERED AS A RESULT OF FIRM RESEARCH BEING IMPROPERLY
INFLUENCED BY INVESTMENT BANKING CONFLICTS IN CONNECTION WITH
SERVICING OF THREE ACCOUNTS BETWEEN 1999 THROUGH 2001.
ALLEGATIONS ARE DENIED.

**Product Type:** Equity Listed (Common & Preferred Stock)

**Alleged Damages:** $11,200,000.00

## Customer Complaint Information

**Date Complaint Received:** 05/20/2004

**Complaint Pending?** No

**Status:** Settled

**Status Date:** 10/30/2008

**Settlement Amount:** $1,013,698.63

**Individual Contribution Amount:** $0.00

## Arbitration Information

**Arbitration/CFTC reparation claim filed with (FINRA, AAA, CFTC, etc.):** FINRA

**Docket/Case #:** 04-03481

**Date Notice/Process Served:** 05/20/2004

**Arbitration Pending?** No

**Disposition:** Award to Customer

**Disposition Date:** 10/30/2008

**Monetary Compensation Amount:** $1,013,698.63

**Individual Contribution Amount:** $0.00

**Firm Statement** THE PANEL DECIDED IN FULL AND FINAL RESOLUTION TO THE ISSUES
SUBMITTED FOR DETERMINATION THAT GOLDMAN SACHS AND SOFIA
FRANKEL ARE JOINTLY AND SEVERALLY LIABLE FOR AND SHALL PAY TO
THE CLAIMANTS $1,000,000.00 AS COMPENSATORY DAMAGES PLUS
INTEREST AT THE RATE OF 4% PER ANNUM ($13,698.63)ACCRUING FROM
MAY 11, 2004 THROUGH AND INCLUDING SEPTEMBER 13, 2004.



| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN, SACHS & CO AND LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANTS ALLEGE CLAIMS OF FRAUD, EXCESSIVE TRADING, BREACH OF CONTRACT,BREACH OF FIDUCIARY DUTIES, FRAUD AND LOSSES SUFFERED AS A RESULT OF FIRM RESEARCH BEING IMPROPERLY INFLUENCED BY INVESTMENT BANKING CONFLICTS IN CONNECTION WITH SERVICING OF THREE ACCOUNTS BETWEEN 1999 THROUGH 2001. ALLEGATIONS ARE DENIED. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $11,200,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/20/2004 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 05/20/2004 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD NO 04-03481 |
| **Date Notice/Process Served:** | 05/20/2004 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award to Customer |
| **Disposition Date:** | 10/30/2008 |
| **Monetary Compensation Amount:** | $2,500,000.00 |
| **Individual Contribution Amount:** | $0.00 |

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

www.finra.org/brokercheck

User Guidance



| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN, SACHS & CO AND LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANTS ALLEGE CLAIMS OF FRAUD, EXCESSIVE TRADING, BREACH OF CONTRACT,BREACH OF FIDUCIARY DUTIES, FRAUD AND LOSSES SUFFERED AS A RESULT OF FIRM RESEARCH BEING IMPROPERLY INFLUENCED BY INVESTMENT BANKING CONFLICTS IN CONNECTION WITH SERVICING OF THREE ACCOUNTS BETWEEN 1999 THROUGH 2001. ALLEGATIONS ARE DENIED. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $11,200,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/20/2004 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 05/20/2004 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD NO 04-03481 |
| **Date Notice/Process Served:** | 05/20/2004 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award to Customer |
| **Disposition Date:** | 10/30/2008 |
| **Monetary Compensation Amount:** | $2,500,000.00 |
| **Individual Contribution Amount:** | $0.00 |

©2014 FINRA. All rights reserved.   Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

www.finra.org/brokercheck




User Guidance

## Customer Dispute - Settled

This type of disclosure event involves a consumer-initiated, investment-related complaint, arbitration proceeding or civil suit containing allegations of sale practice violations against the broker that resulted in a monetary settlement to the customer.

### Disclosure 1 of 2

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Employing firm when activities occurred which led to the complaint:** | LEHMAN BROTHERS, INC, GOLDMAN SACHS |
| **Allegations:** | COMMON LAW FRAUD, STATUTORY FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTIES, NEGLIGENCE, UNAUTHORIZED TRADING. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Other Product Type(s):** | AND VARIOUS UNSPECIFIED SECURITIES |
| **Alleged Damages:** | $2,123,500.00 |

### Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD - CASE #06-05365 |
| **Date Notice/Process Served:** | 12/21/2006 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 03/03/2008 |
| **Disposition Detail:** | THE PORTION OF THE CASE WAS SETTLED BETWEEN THE PARTIES PRIOR TO THE EVIDENTIARY HEARING. |

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN, SACHS & CO. AND LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANT ALLEGES CLAIMS OF COMMON LAW FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTIES. ALLEGATIONS ARE DENIED |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $1,700,000.00 |

www.finra.org/brokercheck



## Customer Complaint Information

**Date Complaint Received:**

**Complaint Pending?**           No

**Status:**                      Settled

**Status Date:**                 10/17/2008

**Settlement Amount:**           $35,000.00

**Individual Contribution
Amount:**                        $0.00

## Arbitration Information

**Arbitration/CFTC reparation
claim filed with (FINRA, AAA,
CFTC, etc.):**                   AAA

**Docket/Case #:**               13-18070238508

**Date Notice/Process Served:**  10/17/2008

**Arbitration Pending?**         No

**Disposition:**                 Settled

**Disposition Date:**            06/07/2010

**Monetary Compensation
Amount:**                        $35,000.00

**Individual Contribution
Amount:**                        $0.00

---

**Reporting Source:**            Broker

**Employing firm when
activities occurred which led
to the complaint:**              LEHMAN BROTHERS INC.

**Allegations:**                 CLAIMANT ALLEGES THAT RESPONDENTS ENGAGED IN ACTIVITIES THAT
                                 CONSITUTE COMMON LAW FRAUD. CLAIMANT FURTHER ALLEGES THAT
                                 RESPONDENTS ENGAGED IN MATERIAL MISREPRESENTATIONS AND
                                 OMMISSIONS AND THAT LEHMAN FAILED TO SUPERVISE.

**Product Type:**                Equity Listed (Common & Preferred Stock)

**Alleged Damages:**             $2,000,000.00

www.finra.org/brokercheck



## Customer Complaint Information

**Date Complaint Received:**     01/05/2007

**Complaint Pending?**     No

**Status:**     Arbitration/Reparation

**Status Date:**     01/05/2007

**Settlement Amount:**

**Individual Contribution Amount:**

## Arbitration Information

**Arbitration/Reparation Claim filed with and Docket/Case No.:**     NASD 06-05365

**Date Notice/Process Served:**     01/05/2007

**Arbitration Pending?**     No

**Disposition:**     Settled

**Disposition Date:**     01/17/2008

**Monetary Compensation Amount:**     $200,000.00

**Individual Contribution Amount:**     $0.00

**Broker Statement**     SOFIA FRANKEL ADAMANTLY DENIES ALL ALLEGATIONS OF WRONGDOING AGAINST HER.  LEHMAN BROTHERS PAID THE SETTLEMENT AMOUNT TO AVOID THE INHERENT RISKS OF LITIGATION AND ANTICIPATED COSTS OF DEFENSE, WHICH WERE EXPECTED TO EXCEED THE SETTLEMENT AMOUNT.  THIS AND ALL OTHER CLAIMS REFLECTED ON MS. FRANKEL'S CRD WERE FILED BY THE SAME LAWFIRM. ON JANUARY 17, 2008 THE ARBITRATION PANEL IN THE [CUSTOMER] ARBITRATION PROCEEDING ISSUED AN AWARD ORDERING AN EXPUNGEMENT OF ALL REFERENCES TO THE [CUSTOMER] CLAIM FROM MS. FRANKEL'S CRD.

---

### Disclosure 2 of 2

**Reporting Source:**     Firm

©2014 FINRA. All rights reserved.    Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

www.finra.org/brokercheck



| | |
|---|---|
| **Employing firm when activities occurred which led to the complaint:** | GOLDMAN, SACHS & CO. AND LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANT ALLEGES CLAIMS OF COMMON LAW FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTIES. ALLEGATIONS ARE DENIED. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $1,700,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 07/19/2005 |
| **Complaint Pending?** | No |
| **Status:** | Settled |
| **Status Date:** | 07/19/2005 |
| **Settlement Amount:** | $90,000.00 |
| **Individual Contribution Amount:** | $0.00 |

## Arbitration Information

| | |
|---|---|
| **Arbitration/CFTC reparation claim filed with (FINRA, AAA, CFTC, etc.):** | FINRA |
| **Docket/Case #:** | 05-03348 |
| **Date Notice/Process Served:** | 07/19/2005 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 12/20/2007 |
| **Monetary Compensation Amount:** | $90,000.00 |
| **Individual Contribution Amount:** | $0.00 |

| | |
|---|---|
| **Reporting Source:** | Broker |

www.finra.org/brokercheck

User Guidance



| | |
|---|---|
| **Employing firm when activities occurred which led to the complaint:** | LEHMAN BROTHERS INC. |
| **Allegations:** | CLAIMANT ALLEGES THAT RESPONDENTS ENGAGED IN ACTIVITIES THAT CONSITUTE COMMON LAW FRAUD. CLAIMANT FURTHER ALLEGES THAT RESPONDENTS ENGAGED IN MATERIAL MISREPRESENTATIONS AND OMMISSIONS AND THAT LEHMAN FAILED TO SUPERVISE. |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $823,500.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 07/18/2005 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 07/18/2005 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD 05-03348 |
| **Date Notice/Process Served:** | 07/18/2005 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 11/16/2007 |
| **Monetary Compensation Amount:** | $275,000.00 |
| **Individual Contribution Amount:** | $0.00 |
| **Broker Statement** | SOFIA FRANKEL ADAMANTLY DENIES ALL ALLEGATIONS OF WRONGDOING AGAINST HER.  LEHMAN BROTHERS PAID THE SETTLEMENT AMOUNT TO AVOID SUBSTANTIAL ANTICIPATED COSTS OF DEFENSE AND THE INHERENT RISKS OF LITIGATION.  THIS AND ALL OTHER CLAIMS REFLECTED ON MS. FRANKEL'S CRD WERE FILED BY THE |



SAME LAWFIRM.



**End of Report**

**This page is intentionally left blank.**

©2014 FINRA. All rights reserved.   Report# 56259-90291 about SOFIA FRANKEL. Data current as of Friday, April 11, 2014.

**EXHIBIT 2**

NASD REGULATION INC.

In the Matter of the Arbitration between

JEFFREY SARDIS, LAUREN SARDIS and JAS
HOLDING CORPORATION,

Claimants,

- against -

GOLDMAN, SACHS & CO., LEHMAN BROTHERS INC.
and SOFIA FRANKEL,

Respondents.

NASD No.

## STATEMENT OF CLAIM

## PRELIMINARY STATEMENT

This Statement of Claim alleges that the Respondents engaged in fraudulent activities that

victimized these Claimants and a number of other customers of Sofia Frankel ("Frankel"), a

broker at Goldman Sachs from 1994 through 2000, who moved to Lehman Brothers at the end of

2000. Frankel received more than $20 million dollars from Goldman Sachs and Lehman

Brothers in just the four years from early 1997 through early 2001. She "earned" this money,

solely in commissions and her share of markups and markdowns in churning her customers'

accounts in high margin in-and-out trading of hundreds of different securities. These Claimants

are among a number of customers Frankel similarly damaged by overtrading, overcharging and

lying to them, as described in this Statement of Claim. Her employers are well aware of what

Frankel did, having reviewed Frankel's actions in response to a number of claims by customers

who reported unauthorized trading by Frankel, or who have made complaints against Frankel

alleging all or part of the same pattern of illegal behavior reported in this Statement of Claim.

1

Frankel used the names and reputations of Goldman Sachs and Lehman Brothers, together with false representations and fraudulent charts purporting to show the outstanding past performance of her customer accounts, to obtain complete discretionary control of her customers' accounts, which she then overtraded on high margin, charging such high commissions, markups/markdowns and other costs that her supervisors had to know she was engaged in improper activity which they failed to properly supervise and curtail.

As a result of Frankel's fraudulent and tortious actions, Claimants suffered out-of-pocket losses totaling $7.7 million, and total losses of approximately $9.6 million while the Respondents charged substantially more than $2 million in commissions and other excessive charges to the Claimants' accounts. Frankel received approximately $22 million from the Respondents in the four year period January 1997 through January 2001. The Claimants should recover all $9.6 million of their losses and all of the charges to their accounts during Frankel's fraudulent treatment of their accounts, in which the brokerage firm Respondents are complicit and should also be held responsible. Claimants also seek punitive damages, based on the extensive, repeated and widespread fraudulent conduct of the Respondents, and also based on the Respondents' improper actions in efforts to cover up the fraudulent acts and to keep Claimants from learning of the fraud Frankel committed upon them. The fraud is documented by exhibits attached to the Statement of Claim, and will be further evidenced by documents and testimony to be presented at the hearings.

## THE DOCUMENTED FRAUD COMMITTED BY FRANKEL

1.    In 1999, Jeffrey and Lauren Sardis turned over $16 million, most of their family's liquid net worth, to the discretionary control of Sofia Frankel, a broker at Goldman Sachs. Frankel then proceeded to churn the accounts, she overcharged commissions, markups

2

and markdowns, she made unauthorized trades, using excessive margin, and then she falsified

records to cover-up her misdeeds. Frankel's illegal activities caused $9.6 million in total losses

to the Sardis family, including out-of-pocket losses of approximately $5.5 million while the

accounts were at Goldman Sachs, and additional out-of-pocket losses of $2.2 million while the

accounts were at Lehman Brothers.

    2.      The Sardis family opened their accounts with Frankel, starting in April 1999, after

Frankel had provided them with customer performance charts prepared by Goldman Sachs that

purported to show that customers' accounts under Frankel's management and control had very

substantially out-performed the market in the prior three years. Frankel made a practice of

showing her clients performance charts that were titled "Composite Historical Equity

Performance" (hereafter, "the Charts"). The Charts that were shown to Claimants were

represented by Respondents Frankel and Goldman Sachs as being accurate and correct to one

one-hundredth of one percent in their calculations of the performance of "the GS Team

portfolio." However, the Charts Frankel used to obtain discretionary control over Claimants

accounts were materially false, misleading and substantially inaccurate. Copies of certain of the

Charts used by Frankel are annexed hereto as Exhibit A. The Charts had been prepared, with

knowledge that they were false, in order to induce customers to turn over their financial assets to

the management and control of Frankel, who then overtraded the accounts while charging much

higher commission rates than other brokers charged their customers; even materially higher

commissions than other brokers at Goldman Sachs charged. One justification Frankel used to

sell her customers on her high commissions was the performance shown on these phony charts.

    3.      Frankel also sought to use phony customer composite performance charts at

Lehman Brothers. Instead of being a gifted, experienced and well-trained financial adviser, as

3

she was promoted by Goldman Sachs, and then by Lehman Brothers, Frankel was a relatively inexperienced, undisciplined and poorly trained speculator riding the tech boom of the late 90's. Frankel was utilizing very risky strategies and false statements, together with Goldman Sachs' reputation, to promote herself and, with the knowledge and approval of her supervisors, to charge excessive commissions. Moving to Lehman Brothers in December 2000, Frankel sought to promote herself with similar disdain for the accuracy of her presentations to customers at Lehman Brothers. At Lehman Brothers, she was quickly found to be a fraud, but, since early 2001, management at Lehman Brothers has sought to keep the knowledge of Frankel's fraudulent behavior hidden from her customers, including the Claimants.

4.    Goldman Sachs specifically knew that Frankel was overcharging her customers and excessively trading customers' accounts while it was happening. Goldman Sachs not only did nothing to stop her, it supported and encouraged Frankel by knowingly permitting Frankel to tell customers, even those who complained about the high charges, that her performance, as shown in the Charts, among other reasons she gave, was justification for the high commissions she charged. Frankel claimed to her customers that it was her right to charge "old rates," that is, extra high commissions, because that was the price of sharing in the success she had created. Frankel used the fraudulent Charts to support her fleecing of customers through churning their accounts while charging excessively high commissions, until Frankel left Goldman Sachs in December 2000. All of this was with the knowledge and support of Frankel's laissez-faire supervisors. In the twenty-one months from April 1999 to December 2000 that Frankel controlled their accounts, Goldman Sachs charged the Claimants substantially more than $2 million in commissions, markups, markdowns and margin interest.

4

5.      Frankel engaged in an average of three transactions in the Sardis accounts each day in that period. She might just as well have taken their money at gunpoint. The unlawfulness of this scheme is all the more shocking for where it occurred: the most respected name on Wall Street - Goldman Sachs & Co. Indeed, the very success of Frankel's fraudulent activities was dependent on the respected nature of the Goldman Sachs name – Frankel was selling Goldman Sachs' brokerage services, with supposed customized and personal investment advice. She was not represented to be a typical Goldman Sachs broker; Goldman Sachs presented Frankel as a "star," allowed her to charge her customers accordingly, and catered to her accordingly. That was the Goldman Sachs justification, at the time, for the unusually high commissions, the "old rates" that her managers permitted Frankel to charge on the unusually high amount of trading they also permitted her to do in these accounts, over which she had discretionary control: Frankel was promoted as a star broker by Goldman Sachs. Frankel demanded discretionary control over the accounts of the customers she sought to seduce with the Charts. The specific acts of Frankel detailed in this Statement of Claim are serious violations of regulations, rules and law, and these acts were repeated on numerous occasions as to a number of Frankel's customers, causing huge losses, while putting about $22 million into Frankel's pockets.

6.      The Claimants lost $604,000 in just three specific stocks listed in the settlement Goldman Sachs made with the United States Securities and Exchange Commission ("SEC") and with the New York Attorney General regarding the false reports issued by Goldman Sachs analysts, and an additional $50,000 on another security similarly listed in Lehman Brothers' settlements with those same regulators. The Respondents are responsible for the fraudulent Charts, the false statements, the excessive commissions, the negligent acts and the resultant substantial losses of the Claimants described below. The Claimants seek recovery of a total of

5

$11.6 million, including $7.7 million in out-of-pocket losses and substantially more than $2

million in commissions, markups, markdowns and margin interest, and they also seek interest,

legal fees and costs. Claimants believe that the exhibits attached hereto and other records related

to Claimants' accounts and to accounts of other customers of Frankel, evidence unlawful

activities directed at the Claimants by the Respondents, causing them to suffer the losses alleged

herein.

      7.    The Panel is referred to the improprieties acknowledged by Goldman Sachs in the

highlighted language in paragraph F4 on page 14, and in paragraphs G7 and 8 on pages 17 and

18, of the NASD Letter of Acceptance, Waiver and Consent ("AWC") signed by Goldman Sachs

on April 21, 2003, annexed hereto as part of Exhibit B, which the NASD subsequently accepted

from Goldman Sachs. The Panel can then compare the AWC with the $308,000 in losses that

the Sardis family suffered in Exodus, which was sold to them by Frankel at the same $18.50

price specifically mentioned in the AWC. The Panel is referred to page 15, in paragraph F7, and

to page 17, in paragraph G4, of Exhibit B, the AWC, as to the improper acts of the analysts at

Goldman Sachs regarding Global Crossing, which caused $189,000 in losses to the Sardis

family; and, the Panel is referred to pages 16 and 17 of the AWC as to the fraudulent acts

relating to WorldCom, causing $107,000 in losses to the Sardis family. Goldman Sachs

consented to the AWC and paid regulators more than $110,000,000 (a mere six tenths of one

percent of Goldman Sachs' revenues in 2000) for violations specifically related to their dealings

with customers, such as these specific Claimants, for specific acts which these Claimants have

alleged in their Statement of Claim at paragraphs 26 and 28 below, causing the specifically

pleaded losses of $654,000 just as to these four securities. For all of these numerous unlawful

acts, in a continuing course of conduct over a period of several years, all contributing to the $16

6

billion dollars in Goldman Sachs' revenues in 2000 alone, punitive damages are merited,

particularly when the already sanctioned and indisputably unlawful acts are coupled with the

contemporaneous pattern of fraud by Frankel and the Respondents' cover-ups of Frankel's

fraudulent acts, all of which were directly targeted at the Claimants, among other customers of

Frankel. These fraudulent acts contributed to the billions of dollars in profits reported by

Goldman Sachs, which became a publicly held company in 1999. The issue of punitive damages

against Goldman Sachs and Frankel is further discussed in paragraph 71 below.

8.      Frankel has reaped substantial benefits from her overtrading and overcharging of

the Claimants and her other customers in her first six years in the securities industry, all at

Goldman Sachs. She not only "earned" about $10 million from Goldman Sachs, she was paid a

$12 million up-front signing bonus by Lehman Brothers in December 2000 just to leave

Goldman Sachs and join Lehman Brothers. Thus, Frankel has received more than $22 million

dollars from these two industry leaders, and she remains employed at Lehman Brothers despite

the fact that both firms are specifically aware of the documented facts establishing that Frankel is

a dishonest broker who should not be allowed to deal with customers, having proven to be a liar

and a cheat. A broker like Frankel, who has a known record of fraud and deceit described and

evidenced below, has no place in the securities industry. Yet Lehman Brothers continues to

allow Frankel to solicit new customers from her multi-million dollar condominium in South

Miami Beach, using her title as an officer of Lehman Brothers. Lehman Brothers continues to

hide from Frankel's past customers, such as these Claimants, from her present customers, and

from potential customers she continues to solicit from an uninformed public, what Lehman

Brothers' supervisors and management knew in early 2001: her fraudulent representations, her

improper preparation and use of customer composite performance charts, her gross overcharging

7

of her customers while at Goldman Sachs, her unauthorized and improper trading in customers'
accounts, her failure to comply with her supervisors' directions, her fraud on Lehman Brothers
and other improper behavior for which she should have been fired. The reasons that Lehman
Brothers continues to employ Frankel appear to be twofold: 1) to keep hidden from her
customers the fact that their losses were the result of fraud; and 2) to recapture, through fees on
her customers' accounts these past four years, the $12 million that Lehman Brothers paid Frankel
to join it, as a result of negligently hiring her; a decision for which the manager who engineered
the hiring of Frankel was removed. The similar consent orders and AWC signed by Lehman
Brothers with respect to the fraudulent activities of the Lehman Brothers analysts and investment
bankers with regard to securities sold to Claimants, such as Real Networks, in which Claimants
lost $50,000, are annexed hereto as Exhibit C.

9.      When they met Frankel, Jeffrey and Lauren Sardis were 34 years old, and their
children, Andrew and Justin, were 8 and 5 years old, respectively. Three accounts were opened
in 1999, with Frankel having discretionary control over all three accounts. The JAS Holding
account was the account holding the children's money. An investment objective for the JAS
Holding account was stated to be safety of principal, yet Frankel clearly churned this account,
with excessive cost-to-equity and turnover ratios described in paragraphs 46 and 48 below,
causing out-of-pocket losses of over $2 million in the JAS accounts alone.

10.      Lehman Brothers allowed Frankel to use an impressive new title and paid Frankel
approximately $12 million as inducements for her to leave Goldman Sachs at the end of 2000
and to join Lehman, where she remains employed. It appears that Lehman Brothers and
Goldman Sachs have never disciplined or taken any action against Frankel in any way, despite
the knowledge of Lehman Brothers' and of Goldman Sachs' management that Frankel defrauded

8

her customers, breached numerous regulatory and internal rules, falsified records, and lied to

management. Of course, if either firm had taken action against Frankel, their customers would

have discovered the fraud sooner; one reason management of both brokerage firms have done

nothing. Both Goldman Sachs and Lehman Brothers made efforts to keep the facts they knew

about Frankel's improper behaviors hidden from her customers. For this, Goldman Sachs and

Lehman Brothers should be sanctioned.

11.    At Goldman Sachs, Frankel was able to induce Claimants and other customers to

turn over their portfolios to her control by showing them falsified performance charts in which

Frankel and Goldman Sachs made highly inaccurate, greatly exaggerated, and materially false

and misleading claims of great success. Her claims were false, and her supervisors knew, or

should have known that she was lying to her customers. For example, the chart on the second

page of the Charts that are annexed hereto as Exhibit A, makes the claim that $10 million

invested at an unidentified point in 1995 in an undefined "GS Team portfolio" was worth

$32,297,891 on 3/31/99. The truth is that the claimed "portfolio" for a "GS Team" was a fiction.

Yet, in the Notes on the bottom of page 2 of Exhibit A, the Charts portray this as an actual "Past

Performance" which "is not indicative of future results." The truth is that there was no such

actual past performance either. Indeed, even the Charts' claimed actual percentage gain of

198.89% in the so-called "portfolio" does not support the growth performance represented to be

$32,297,891 on 3/31/99. Another example of the fraudulent nature of the Charts is on page 3 of

the Charts, in the first paragraph of which the Charts are falsely portrayed as detailing "results

for the equity portion" (which is undefined) "of certain accounts," and then goes on to falsely

claim that the Charts include performance of accounts which "are not discretionary accounts,

however, all or most of the transactions effected therein resulted in [sic] Sophia's

9

recommendations." This representation is also materially false because Frankel did not include the performance of non-discretionary accounts (plural) in compiling the Charts. The number of accounts and the performance figures on this page are also false representations. For these and other reasons that will be presented at the hearings, the Charts are a fraud.

12.     Frankel moved from Goldman Sachs to Lehman Brothers at the end of 2000, receiving an up-front payment of $12 million and a new job title from Lehman Brothers. Frankel lied to her customers, including the Claimants, and to Lehman Brothers and others, about the amount of assets under her management and about the performance of her customers' funds under her management (again using falsified numbers). She claimed credit for the control over, and the performance of, accounts she did not have. She claimed credit for transactions that she had not recommended. She also lied about the amount of money under her management.

13.     By supporting and assisting Frankel in her fraudulent behavior in obtaining discretionary authority and control over her customers' assets and accounts, including the Claimants' accounts, Goldman Sachs created a trail of customers and friends who have suffered tremendous losses at Frankel's hands.

14.     Claimants suffered out-of-pocket losses in excess of $7.7 million, as a result of Respondents' fraudulent activity. In addition, Claimants lost approximately $1.9 million representing the lost interest, income and gain that Claimant would have realized on the accounts, if calculated at only 4% on the out-of-pocket losses, including lost income under the "well managed portfolio" theory of recovery, had the accounts not been improperly administered.

15.     Simply put, Frankel is a cheat and a fraud, and this should have been known to her supervisors when these Claimants were induced to open their accounts, as well as during the

10

periods thereafter when the Claimants' accounts were maintained with the Respondents, causing

losses to Claimants totaling $9.6 million. That Frankel remains an active, licensed broker is a

continuing effort by the Respondent brokerage firms to cover up and hide the facts from the

public and from regulators.

16.    Sofia Frankel is an immigrant from Russia, who came to this country in or about

1987 in pursuit of what she called the "American Dream." In 1994, she joined Goldman Sachs

as a newly registered broker in her first job in the securities industry. By 1999, she was telling

her customers she was living the "American Dream." She also told many of her customers,

including the Claimants, blatant falsehoods. She even claimed that she had a Ph.D. - she doesn't.

Her lack of regard for truth and her lack of obedience to rules, regulations and the obligations she

assumed when she became a broker at Goldman Sachs will be quite evident at the hearings in

this matter. Fortunately for Frankel, she entered the brokerage business in a rising market that

encouraged speculation in technology stocks. Unfortunately for her customers, such as the

Claimants, Frankel worked for the most highly regarded firms in the securities industry, so, at the

time, her false representations seemed believable to the Claimants, and to Frankel's other

customers. Disregarding obligations to customers, this industry leader and respected name,

Goldman Sachs, by 1999, had, at best, become negligent in the supervision of this broker, and in

the supervision of its analysts and investment bankers. In widely reported settlements of

proceedings with the SEC and with the New York Attorney General's office, Goldman Sachs has

already paid hefty fines to settle the well-documented charges that its analysts committed fraud

in complying with the demands of investment bankers at the firm. These are specific frauds as to

specific securities that Respondents sold to these Claimants; securities listed in the settlements of

proceedings brought by the SEC and the New York Attorney General that caused specific losses

11

to the Claimants. These losses are specifically itemized in paragraph 7 above. These Claimants were clearly victimized by Goldman Sachs as to those specific securities sold to them that regulators specifically cited as securities promoted and sold to Goldman Sachs' customers through fraudulent means, and they are securities specifically identified and listed in the settlement and consent orders entered into by Goldman Sachs and by Lehman Brothers with the regulators. Just on the specific securities listed in paragraph 7 above, Claimants' out-of-pocket losses were more than $650,000. In addition to being victims of theft and fraud, the Claimants were also victimized by the grossly negligent catering to Frankel by management and by the Goldman Sachs compliance department. Frankel's supervisors failed to properly supervise Frankel; she received more favorable treatment from her supervisors than some other brokers received from them, enabling her to fleece her customers.

17.    At the hearing of these claims, it will be shown that Frankel utilized the same fraudulent methods in dealing with many of her customers that she used to defraud these Claimants. Frankel showed other customers the fraudulent charts and insisted upon discretionary control over their accounts, gaining the customers' trust and confidence by promising to treat their assets entrusted to her control as if it was her own money, and by encouraging customers to consider her a member of their family – variously, as a sister or some other relative, even as a mother. She used the mother analogy in dealing with Mr. Sardis. She also told him, on a number of occasions: "Every dollar I invest is like my own dollar." What raises such behavior beyond mere puffery to the level of fraud, even at the outset, is that to first induce the Claimants to open the accounts, Frankel presented Mr. Sardis with the Charts, fraudulently portraying her financial acumen as having resulted in customers' accounts she controlled far outperforming even the strong market that was ongoing prior to the April 1999 opening of the Sardis accounts.

12

The Charts, prepared by Goldman Sachs' employees with information provided to them by

Frankel, were demonstrably and materially false. Frankel's supervisors knew of, and should

have forbade, Frankel's use of the Charts. Frankel knew the Charts she showed to Claimants

were materially false. Frankel's supervisors should have known the Charts were materially false.

Frankel continued this fraudulent practice at Lehman Brothers. Claimants relied on the Charts to

their detriment, suffering out-of-pocket losses totaling more than $7.7 million, and total losses of

approximately $9.6 million.

18.     By 1999, through some luck related to the bull market in technology stocks, in

which Frankel promoted herself as a specialist and expert, and because she had been producing

immense commissions from a limited number of accounts, and had made strong and successful

efforts to befriend her supervisors, Frankel was able to bamboozle almost everyone. Yet, there

were co-workers of Frankel who became aware of her excessive commission charges, and did

not want to work with her. Indeed, her excessive charges and the huge commission income she

generated made her behavior particularly notorious at the firm, which should have served as a

red flag to her supervisors, even in 1999.

19.     Frankel's supervisors ignored a number of warning signs, including Frankel's

lack of experience and training, the performance charts that should have been questioned, her

excessive commission charges, the high cost-to-equity ratios of her accounts, her unorthodox and

unsuitable investment strategies, the high turnover ratios in her customers' accounts, and

customer complaints reporting unauthorized transactions by Frankel. By way of comparison to

Frankel's limited experience as a broker, the average Smith Barney Citigroup broker is

advertised as having 15 years of experience in the securities brokerage industry. At the time she

gained discretionary control over the Claimants' accounts, Frankel had been in the industry for

13

less than five years. Yet, Frankel bragged to other personnel at Goldman Sachs that she charged
"old rates." These were all "red flags" which Frankel's supervisors should have seen and acted
upon, which they failed to do.

20.    Instead, Frankel's supervisors at Goldman Sachs promoted Frankel's
performance to other brokers as a model to be imitated. While purporting to be interested in fair
treatment of its customers, Goldman Sachs sought to encourage other brokers to charge their
customers these excessive "old rates." Goldman Sachs' supervisors had Frankel address new
associates to promote charging "old rates" and held her up to new associates as a broker to
emulate. While many brokers were charging their customers with active accounts commissions
of six cents a share, and less, and even after Goldman Sachs had distributed written instructions
to its brokers encouraging lesser commission charges or fixed annual charges, or charging a
maximum of $.125 a share in transactions for discretionary accounts, Goldman Sachs,
nonetheless, encouraged and supported Frankel in charging her customers substantially higher
rates than other brokers were charging their regular customers with active accounts. Frankel
would often charge customers commissions of $.40, $.50, even $1.00 a share or more, based on
whether the customer made money on a transaction; an improper practice. When Frankel's
supervisors asked her questions about customers' positions, the high margin, or the substantial
trading, Frankel lied to her supervisors; lies that could have been discovered by her supervisors
speaking directly to the customers, such as the Claimants, to confirm what Frankel told her
supervisors. The supervisors failed to speak to Claimants and other customers, as they should
have done. In addition to negligence of supervision, one reason for this breakdown in
supervision was that Frankel went out of her way to befriend her supervisors, particularly in the
compliance department, where Frankel was even able to wangle a job at Goldman Sachs for her

14

son. And, when customers, such as these Claimants, did inquire as to arrangements for fixed

annual charges for their accounts, Frankel and her supervisors lied to them, and told these

customers that the fixed annual charges would not be better for them and would not be cheaper

than what was being charged.

21.     Frankel's deceit included lying to her customers, such as these Claimants, about

new issues she sold to them. She lied to her customers about the quality of a number of the

offerings, the reasons and the basis for her recommendations, and, the procedures for indicating

for, obtaining and paying for the securities. Frankel violated internal Goldman Sachs rules as to

communications with customers and with the back office regarding sales of new issues. For

example, Frankel had a practice of purchasing new issues for these customers without first

discussing the details of the purchases with the customers; an improper practice as to new issues,

even for discretionary accounts such as the accounts at issue here. Frankel would indicate to the

Goldman Sachs investment bankers for new issues and then after being informed of the actual

allotments, Frankel would allocate them among her customers, without properly discussing the

transactions first or without communicating with her customers at all, including the Claimants.

And, when her allotment was less than the amount she indicated for, Frankel would change

customers' allocations, but not in proportion to the amount indicated for each customer; this was

in breach of applicable rules and regulations.

22.     When the interest of regulators became known, and an investigation arose, and,

after several customers had complained to management about unauthorized trading by Frankel,

Frankel set about to "correct" her records, in an attempt to falsify evidence and to cover up her

fraudulent behavior toward her customers. Goldman Sachs' supervisors permitted Frankel

access to records for prior periods, providing her with the opportunity to alter the records so as to

15

cover up her fraudulent activities related to her repeated failures to discuss purchases of new

issues with her customers before they were effected. Frankel was thereby allowed to make back-

dated, false entries in her records for prior periods, purporting to reflect discussions with

customers that had not actually taken place; an unlawful practice. Supervisors at Goldman Sachs

did not take proper cautionary steps, and Frankel was permitted not only to ride out the

collapsing market for technology stocks, but, at the end of 2000, having stuck her clients,

including the Claimants, with substantial unrealized losses, Frankel left Goldman Sachs for

Lehman Brothers, and she was paid an eight figure amount and given an impressive title by

Lehman Brothers, serving to further mislead Claimants. In February 2001, when the assets in

Claimants' accounts were transferred out of Goldman Sachs, Claimants' out-of-pocket losses

alone totaled approximately $5.5 million.

23.    But for the fraudulent acts of Frankel and the negligence of her supervisors at

Goldman Sachs, Claimants would not have opened, and then maintained, their accounts with

Frankel at Goldman Sachs and then at Lehman Brothers. Accordingly, all losses in their

accounts stem from Frankel's fraud, and all of their $7.7 million in out-of-pocket losses, and

their lost income of $1.9 million, should be awarded to the Claimants. Because of the fraudulent

acts of Frankel, and of her employers, Claimants should also be awarded the fraudulently

obtained commissions, markups, markdowns, margin interest and other charges to their accounts,

estimated to be substantially more than $2 million, for a total amount claimed of $11.6 million.

Claimants also seek punitive damages, interest, legal fees and costs in this matter.

16

## THE DOCUMENTED FRAUD RELATED TO ANALYSTS'
## RECOMMENDATIONS OF SECURITIES SOLD TO THESE CLAIMANTS

24.    Claimants reasonably and justifiably relied on Respondents' misrepresentations and omissions, and as a result of Respondents' fraud and misrepresentations, Claimants have been damaged.

25.    Respondents' misstatements and omissions of material fact were made in connection with the sales of securities, were made using the mails and other interstate means, were effected with the intent of deceiving Claimants, and constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

26.    Respondents made misrepresentations and/or omissions of material facts concerning the quality of securities recommended and sold to Claimants. Respondents issued fraudulent recommendations, emanating from their analysts, in stocks sold to Claimants, such as Exodus, WorldCom, Global Crossing and AT&T while Claimants' accounts were at Goldman Sachs, and stocks such as RealNetworks, a Lehman Brothers client that Frankel sold to Claimant while at Goldman Sachs, before she arranged to leave Goldman Sachs and join Lehman Brothers. Claimants lost a total of more than $650,000 investing in just these five securities, while Respondents "earned" substantial commissions and markups, at a time when Respondents knew, or should have known, about the fraud, but did nothing to stop it or to correct it. To this day, Respondents have sought to cover-up and keep hidden from customers such as Claimants, Frankel's fraudulent acts described herein. Claimants' realized out-of-pocket losses in these fraudulently recommended securities alone include, but are not limited to, over $308,000 in Exodus Communications, over $189,000 in Global Crossing, over $107,000 in WorldCom, and over $50,000 in RealNetworks.

17

27.    Goldman Sachs issued fraudulent recommendations as part of a scheme by its investment bankers, working with its analysts, to rig public offerings by practices including "laddering" (allocating shares in the offering to the investors only if they agreed to purchase more shares in the aftermarket at a higher price), by pressuring analysts to promote the stocks of the clients of its investment bankers, and by other activities which Goldman Sachs had an obligation to disclose to Claimants, but did not. Lehman Brothers acted in a similar manner. Some of these practices were engaged in by Goldman Sachs and by Lehman Brothers to obtain investment banking fees from numerous "tech" companies amounting to billions of dollars in the periods Claimants' accounts were maintained with Respondents. Frankel recommended and sold substantial amounts of these securities to Claimants and her other customers, sales that were calculated to serve Frankel well when it came to dealing with her supervisors and with management of the Respondent brokerage firms.

28.    There were fraudulent recommendations emanating from Goldman Sachs' analysts as to at least four different securities sold to the Claimants at various times during the two year period cited as the "relevant period" in the SEC Complaint. Fraud as to these securities, Exodus Communications, AT&T, Global Crossing, and Worldcom, was disclosed in the SEC, NYSE and NASD documents implementing the Global Settlement (see Exhibit B annexed hereto). Analysts at Goldman Sachs were issuing glowing reports about these companies at a time when Goldman Sachs knew such companies were not deserving of such reports. Goldman Sachs hid the analysts' true opinions from the public, including Claimants, and instead, issued reports recommending purchase of these securities, including securities Frankel purchased for Claimants' accounts, which resulted in losses of over $604,000 in these four securities alone. RealNetworks was similarly fraudulently promoted by Lehman Brothers,

18

and Frankel sold RealNetworks to Claimants while still at Goldman Sachs, before she joined

Lehman Brothers, causing further losses of $50,000 to Claimants. If either Goldman Sachs or

Lehman Brothers now claims that, in its settlement agreements with the regulators, it neither

admitted nor denied the alleged fraud, the Panel should consider that Claimants need not prove

fraud to prevail, as the negligent nature of the recommendations is manifest. Frankel's fraud has

not yet been investigated by regulators (because the Respondents have sought to cover it up), and

it is respectfully submitted that punitive damages are called for based on the Respondents' cover-

up activities, which included the creation of fraudulent documents both by Frankel and by others

at Goldman Sachs, and the back-dating of records purporting to evidence conversations with

customers which did not occur, supposedly authorizing proposed purchases of new issues. None

of this has previously been revealed to or investigated by the NASD because Respondents

actively hid these acts from regulators. The similar fraudulent behavior of Lehman Brothers

analysts and investment bankers, and the cover-up of Frankel's fraudulent activities by Lehman

Brothers that continues to this day, also merit punitive damages in these proceedings.

## THE NEGLIGENCE OF SUPERVISION

29.    As the brokerage firm that employed Frankel, Goldman Sachs is responsible for

her fraudulent acts. In addition to Goldman Sachs' acknowledged failures as to the behavior of

its investment bankers and analysts, which caused Claimants to suffer losses, Frankel's

supervisors knew or should have known: (1) that Frankel created and used falsified performance

charts in order to induce customers to open accounts with her and to induce them to turn over

those accounts to her discretion and control; (2) that she was overcharging customers; (3) that

she was excessively trading customers' accounts; (4) that she engaged in unsuitable and

19

unauthorized trading; and (5) that she repeatedly and blatantly lied to her supervisors, she

disobeyed her supervisors' directions, and she repeatedly acted in material violation of Goldman

Sachs' compliance policies and procedures for discretionary accounts. It appears that, to cover

up her unauthorized trading, Frankel changed, falsified and back-dated her records. Even for

discretionary accounts, brokers are required to first specifically discuss and obtain specific

authorization for the purchase of a newly issued security. Comparison of phone records alone

should serve to confirm that telephone conversations with customers she claimed occurred, did

not occur, and that Frankel made unauthorized purchases of new issues for her customers.

Frankel's supervisors knew or should have known of these improper acts, and of Frankel's

predilection for such behavior, and should have prevented these acts. Frankel's use of the

fraudulent charts at Goldman Sachs should have been discovered by her supervisors at the times

they were being used to solicit and retain accounts, and these acts should have been halted by her

supervisors; and, the customers, including Claimants, should have been informed of Frankel's

improper acts. Instead, by its inaction, Goldman Sachs assisted Frankel when she sought to

cover-up her unauthorized trading and fraudulent acts. By the negligence of its supervision of

Frankel, Goldman Sachs is complicit in her acts. Goldman Sachs is just as responsible for

Claimants' $7.7 million in out-of-pocket losses, and $9.6 million in total losses, as is Frankel.

Similar claims are asserted herein against Lehman Brothers as to the acts of Frankel that are

alleged to have occurred at Lehman Brothers. her supervisors' failures to act, and the negligence

of Lehman Brothers in failing to promptly inform Claimants when Lehman Brothers learned of

Frankel's fraudulent behavior.

20

## THE CHURNING OF CLAIMANTS'
## ACCOUNTS BY GOLDMAN SACHS AND FRANKEL

30.     The resolution of churning claims turns on a determination of three elements, all of which are clearly and demonstrably present here, just on the documentary evidence: (i) excessive trading, (ii) control of the accounts by the broker, and (iii) the self- interested behavior of the broker.  As to (i) above, the cost-to-equity ratios and the turn-over ratios of Claimants' accounts evidence churning.  As to (ii), the discretionary control Frankel had over Claimants' accounts was stated in writing and cannot be argued against by Respondents in good faith.  And, as to (iii), the excessive cost-to-equity ratios, reflecting charges to Claimants' accounts estimated to total substantially more than $2 million in just 21 months, evidence Frankel's self-interested behavior.  Claimants' Goldman Sachs accounts were churned by Frankel.  Frankel engaged in a pattern of behavior in a number of her Goldman Sachs customers' accounts, including the Claimants' accounts, where she had engendered a sufficient trust relationship, so as to maximize her remuneration in disregard of the interests of her customers.  Documents and testimony that will be introduced at the hearings will definitively show an open, and even notorious, over-charging of commissions, markups and markdowns to astounding proportions, all for the sole purpose of obtaining as much in income as Frankel could extract from the accounts.

31.     The complicity of her supervisors in her outrageous and unlawful behavior is manifest. The relevant literature states that as the turnover rate in an account increases beyond one, the broker should be required by her supervisors to explain the higher than normal rate, that a turnover rate of two indicates churning, and that, once the rate rises to about three, there should be little room for argument that excessive trading has occurred in a discretionary account. The systemic failures of Goldman Sachs' management include:

21

(i)      failure to question Frankel's out of the ordinary turnover ratios that indicate

churning;

(ii)     failure to discuss the high cost-to-equity ratios in accounts under her

management and control; and

(iii)    failure to investigate her use of high margin, over-concentrations and same-

day transactions in the same technology and high risk securities in portfolios

of customers with different ages, different family, health and life situations,

and with different investment needs.

These are reason enough to find management negligent in their supervisory duties.

        32.     But the further failures of her supervisors who accepted Frankel's barefaced

lies and false explanations without interviewing her customers, and their failures to properly

investigate these matters after receiving complaints of unauthorized trading, are easily explained

– Frankel produced tens of millions of dollars in commissions, markups, markdowns and margin

income, and management was willing to close its eyes to her fraudulent charts, her churning of

accounts, and her gross overcharges on transactions.  Frankel was encouraged, let alone

permitted, to arbitrarily determine commissions, markups and markdowns on transactions.  This

served to allow her to share in customers' profits (a prohibited practice), often charging ten to

twenty times the normal rates on customer trades in active accounts, when Frankel determined

the trades were sufficiently profitable to the customer to allow her to gouge the customer on the

transaction costs.  Essentially, she used the overheated market for tech stocks to line her own

pockets at the expense of her customers.

        33.     Despite the outrageous commissions, markup and markdown charges, high

margin, turnover ratios indicating churning, and cost-to-equity ratios that, at the least, called for

22

investigation, management did nothing to stop Frankel from defrauding her customers. Having

created a close friendship with the head of compliance at Goldman Sachs, to the point of

obtaining a position for her son there, Frankel fleeced her customers with the connivance of

Goldman Sachs. The proper procedures of review, normal to the industry, in the presence of all

of the "red flags," should have alerted management to the "theft" going on under their noses. A

relatively inexperienced broker charging the highest rates at the firm and generating from eight

to twelve million dollars in gross commissions a year should have been the subject of increased

levels of supervision. Instead, Frankel was held up to other brokers at Goldman Sachs as an

example to emulate. Other brokers at Goldman Sachs not only refused to emulate her, some

refused to deal with her. Her reputation among the brokers was questionable, yet management

treated her royally, ignoring supervisory responsibilities. Management did not treat other

brokers with such deference, shutting down accounts with lower cost-to-equity ratios than those

they let Frankel get away with maintaining on accounts she was clearly churning. Thus,

management partnered up with Frankel in the excessive trading, excessive commissions,

markups, markdowns and excessive use of margin.

     34.    When Claimants deposited more than $16 million with Goldman Sachs for

Frankel to manage in discretionary accounts over which Frankel had control, she and Goldman

Sachs accepted obligations not to excessively trade the Claimants' accounts, they accepted

obligations not to invest in over-concentrated amounts of unsuitable securities on excessive

margin, and, they also accepted obligations to charge fair and reasonable commissions and

markups/markdowns for transactions that should have been made with the intent to fulfill an

investment plan calculated to provide benefits to the Claimants. Instead, Frankel was

encouraged by Goldman Sachs to purchase securities for Claimants that were fraudulently

23

promoted by Goldman Sachs' investment bankers and analysts, and Frankel was encouraged and empowered by Goldman Sachs to trade excessively and charge outrageously high commissions and markups on purchases and high markdowns on sales. The excessive nature of the trading costs in Claimants' accounts was covered up by Goldman Sachs when the costs of Claimants' accounts were discussed by Claimants with Frankel's supervisors after Frankel had left the firm. Frankel bought many of the same investments for her various customers, usually without first discussing them with the customers, and similarly overcharging them on a regular and continuous basis. The reputation of Goldman Sachs at the time put it at the very top of the list of respected names in the industry. That is precisely why Frankel was able to get away with her fraudulent activities. Claimants, like Frankel's other customers, were given reason by Goldman Sachs to believe that Frankel was a highly respected, brilliant, experienced and successful broker at the most prominent firm in the industry, and that Frankel was managing a portfolio that had been substantially outperforming the market as set forth in the Charts. Goldman Sachs misled the Claimants; Frankel was just a talented con artist who was overtrading and overcharging her customers' accounts.

35.     A tactic that Frankel used to cover up her churning of the accounts was that she had a practice of delaying the taking of losses in customers' accounts, and she took profits far more quickly. This facilitated her taking bigger commissions on the profitable trades, and misinforming customers about her performance, extending the period of her control over the accounts until the inevitable collapse. Claimants' accounts had accumulated a total of more than $5.5 million in unrealized losses by February 2001, when the accounts' assets were transferred out of Goldman Sachs to Lehman Brothers.

24

36.     The Claimants' accounts were not isolated accounts. A review of other customers' accounts will show that Frankel had a practice of making the same purchases and sales for the Claimants as she did in other customers' accounts, whom she similarly fleeced with exorbitant commissions and other charges. These purchases and sales of the same stocks often were made at the same time on the same days in other customers' accounts. Like the Claimants, Frankel's other customers included families that had achieved remarkable success in their business endeavors, having nothing to do with the stock brokerage industry, and they came to Goldman Sachs with little knowledge of the workings of the securities industry. They chose Goldman Sachs because of its illustrious reputation in the industry, and they were then referred to Frankel by Goldman Sachs, which resulted in these smart and successful business people being led like lambs to a financial slaughter at Goldman Sachs – all because management failed to act on the numerous "red flags" presented by Frankel's churning, unauthorized trades, falsified performance charts, and grossly excessive charges and high margin balances in the accounts. Management failed to see what some of Frankel's co-workers saw: a rapacious and unscrupulous broker overcharging her customers in unsuitable and excessive speculative margin trading in their accounts.

37.     Frankel charged Claimants, and other customers, thousands of dollars on trades for which she had the ability to charge them hundreds of dollars, and she charged five figure commissions on transactions for which she had the ability to charge them four figure commissions. Not only did she have the ability to charge such lower commissions, she had an obligation to charge lower commissions than those she charged. Frankel had received written memoranda from Goldman Sachs regarding charging fair commissions, which she, and the supervisors who had issued them, simply ignored. Neither Frankel nor Goldman Sachs

25

permitted Claimants the option to have their investing handled by Frankel at a fixed annual

charge, or at the lower costs other brokers at Goldman Sachs charged their customers, as

described in written memoranda she received, or at the then-common industry standard $.06 per

share that many Goldman Sachs brokers charged their active accounts. Instead of charging

commissions falling within the firm's guidelines for best execution, Frankel unilaterally set

absurd commissions that were often 400% or more higher than customary rates. Frankel bragged

to her co-workers and supervisors that she charged "old rates." Implicit in her bragging was that

she charged much more than the "new rates," and much more than the fixed annual percentage of

assets rates, that became the norm at Goldman Sachs, and which should have been made

available to Claimants and to Frankel's other customers. These were denied to the Claimants, in

breach of Goldman Sachs' published internal rules and in breach of the fiduciary obligations

Goldman Sachs and Frankel had to the Claimants. Effectively, each time she set her high rates

for transactions in the Claimants' accounts, Frankel was taking out the Claimants' checkbook

and writing Goldman Sachs (and herself) a check. Goldman Sachs and Frankel created a

situation where Frankel had the ability to charge commissions within a broad range (and to

receive a substantial portion of the "checks" written to pay the commissions so set). This created

an extraordinary conflict-of-interest that was not explained to the Claimants. Frankel was

presented with a temptation to literally steal from her customers, including these Claimants.

Frankel was unable to resist that temptation. Moreover, this and other behavior by Frankel

clearly and directly violated Goldman Sachs' compliance policies and internal procedures for

discretionary accounts, such as the Claimants' accounts.

26

## LEHMAN BROTHERS' NEGLIGENT HIRING AND RETENTION OF FRANKEL

38.    Lehman Brothers failed to exercise reasonable care to refrain from negligently hiring and then retaining a broker with the propensity to harm customers. Starting at Goldman Sachs, and continuing at Lehman Brothers, Frankel used fraudulent charts to induce potential customers, including Claimants, to turn over their assets to her. She lied to her customers, including Claimants, and to Lehman, about her education, her experience as a broker, who her clients were, what success she had, and the amount of assets under her management. That Frankel was a liar and a fraud could have been discovered by Lehman Brothers if it had used reasonable diligence in investigating Frankel's background and claims before hiring her. But Lehman did not use such due diligence, which would have included talking to the Claimants and other customers Frankel claimed to have. Instead, after no real investigation, Lehman paid Frankel $12 million as an inducement for her to leave Goldman Sachs and join Lehman Brothers. Soon after she joined Lehman Brothers, Lehman Brothers became aware of Frankel's fraud and deceit. Lehman Brothers then took certain actions to curtail Frankel's activities, but hid Frankel's fraudulent acts from her customers, including the Claimants, causing further losses.

39.    The huge commission income Frankel had generated from a small number of accounts should have served as a red flag to Lehman Brothers when it was seeking to employ Frankel. Lehman Brothers failed to talk to Frankel's customers, and ignored a number of warning signs, including the high cost-to-equity ratios of her accounts, her unorthodox and unsuitable investment strategies, her improper use of performance charts, the high turnover ratios in her customers' accounts, and customer complaints against Frankel alleging unauthorized transactions. These red flags, along with Frankel's exaggerated claims and discoverable lies,

27

presented a foreseeable risk of injury to Lehman Brothers' customers, which Lehman Brothers

had a duty to prevent in the exercise of due care.

40.     Both before and after hiring Frankel, Lehman Brothers' supervisors failed to

properly investigate Frankel's representations.  Lehman Brothers' supervisors failed to speak to

Claimants and other customers, as they should have done.  Sofia Frankel is a broker who, to this

day, remains employed by Lehman Brothers despite the knowledge of Lehman Brothers

management that she has defrauded her customers, defrauded Lehman Brothers, breached

regulatory rules and breached Lehman Brothers' own internal rules.  Lehman Brothers has

actively sought to keep knowledge of Frankel's fraudulent acts from its customers to this day.


## THE LAW

41.     Based on the facts, the acts and the circumstances alleged herein, Respondents

Goldman Sachs and Frankel are liable to Claimants for common law and statutory fraud,

churning, breach of contract, negligence, breach of fiduciary duties, and, as to Goldman Sachs,

breach of supervisory duties.  As to Lehman Brothers, a claim of negligent hiring is alleged, in

addition to the covering up of Frankel's fraudulent acts, negligence and breach of contract,

leading to further out-of-pocket losses while Claimants' accounts were at Lehman Brothers.

Discussion of some of the relevant law as to these claims is set forth below.


## FRAUD

42.     Respondents made willful misstatements and omissions of material fact in

communications with Claimants in an effort to deceive Claimants into opening accounts with the

Respondents, and, then, to further deceive Claimants as to the wrongful activities effected by

28

Respondents in the Claimants' accounts. Goldman Sachs issued fraudulent recommendations, emanating from its analysts, in stocks sold to these Claimants. The Respondents committed these acts using the mails and other interstate means. At the very outset, Frankel used materially false and misleading performance charts in her procurement of Claimants' accounts and in obtaining discretionary control over the accounts, which she then overcharged and traded excessively, in order to generate high income for Respondents. Frankel's supervisors at Goldman Sachs knew, or should have known, that she was lying to her customers and to her supervisors. For example, in compiling the Charts, Frankel utilized results that Frankel and Goldman Sachs claimed were those of "certain accounts for the years 1996 and the first quarter of 1999 which are serviced by Sophia Frankel." In the Charts, Frankel and Goldman Sachs claimed a 199.87% cumulative return from January 1996 through March 1999. The Charts purport to show these results for accounts

> ". . . handled on a discretionary basis wherein investment decisions are generally made by Sophia to whom the client has granted discretion. The remainder of the accounts included in the composite are not discretionary accounts, however, all or most of the transactions effected therein resulted in [*sic*] Sophia's recommendations."

43.    Frankel's supervisors knew, or should have known, that these statements, and therefore, the Charts, were materially false. By reason of the excessive number of transactions, the speculative nature of many of the transactions which were solicited and executed in Claimants' accounts through the fraud and fraudulent misrepresentations of Frankel, the excessive commissions and other charges to the accounts, the excessive use of margin, and the similar transactions and improprieties in accounts of other customers of Frankel, which should have served as "red flags" to Frankel's supervisors, and all of the transactions having been approved by the principals and/or managers at Goldman Sachs, and by reason of the fraudulent acts of Goldman Sachs' analysts and investment bankers with regard to the securities of

29

corporations sold to Claimants' on Respondents' recommendations, Goldman Sachs knew of or

should have known of the improper and fraudulent behavior of Frankel and its other employees,

and has, therefore, assisted or participated in the fraud and in these fraudulent

misrepresentations.

44.   Rule 10b-5 makes it unlawful in connection with the purchase or sale of a security

to:  (a) make an untrue statement of material fact; (b) make a statement that is misleading

because of the omission of a material fact; (c) employ any device, scheme, or artifice to defraud;

or (d) engage in any practice that operates as a fraud or deceit. See Section 17 of the Securities

Act of 1933, 15 U.S.C. §77q; Section 10(b) of the Securities Exchange Act of 194, 15 U.S.C.

§77J; and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. §240.10b-5.

45.   Goldman Sachs is responsible as a primary violator pursuant to Section 20(a) of

the Exchange Act.   Section 20(a) states that:

> [e]very person who, directly or indirectly, controls any person liable
> under any provision of this title or of any rule or regulation thereunder
> shall also be liable jointly and severally with, and to the same extent as
> such controlled person to any person to whom such controlled person is
> liable, unless the controlling person acted in good faith and did not
> directly or indirectly induce the act or acts constituting the violation or
> cause of action.

Securities Exchange Act of 1934, 15 U.S.C. §78t.  Goldman Sachs participated in, knew, should

have known, or otherwise was indifferent to and condoned, the scheme to defraud Claimants and

to grossly overcharge commissions in Claimants' accounts.  Therefore, Goldman Sachs is liable

to Claimants pursuant to Section 20(a) of the Exchange Act.  Lehman Brothers is similarly liable

for the fraud of Frankel while in the employ of Lehman Brothers, for the fraud of its analysts and

investment bankers, and for the cover-up by Frankel's supervisors after they learned of Frankel's

fraudulent acts in early 2001.

30

## CHURNING

46.    One measure of churning in a discretionary account that is discussed in
relevant literature in the field is the annual trading costs as a percentage of the asset value of the
account. Trading costs of 5% of the average account equity per year are excessive. The trading
costs in the Claimants' accounts exceeded 5% per year. Frankel's supervisors did nothing to stop
her, even when trading costs of 10% and higher were reached in Frankel's accounts. The reason
for the excessive charges is simple: Frankel was given unfettered freedom to unilaterally choose
whether to charge a then-standard commission of $.06 per share for a transaction in an active
account, the recommended maximum of $.125 per share for a discretionary account, or to choose
to charge $.20, $.60, $1.00, or more, per share for a transaction by the Claimants. Frankel was
permitted to price commissions after she reviewed whether or not the trades had been profitable
to the Claimants and her other customers. Thus, with the combination of her discretionary
authority over the choice of the securities to be bought and sold, her control over the timing of
such purchases and sales, her control over the commission charges, together with management's
startlingly laissez-faire attitude, Frankel obtained the highest degree of control over Claimants'
accounts, and over accounts of her other customers. The unusually high degree of control that
her supervisors allowed Frankel over the accounts was the primary cause of the customers' huge
losses (and of the substantial incomes to Frankel and Goldman Sachs from the accounts of
Frankel's customers).

47.    Cost-to-equity ratios measure the fraction of the average equity in the account that
is consumed by trading costs. Roughly speaking, annualized cost-to-equity ratios yield the
portfolio's breakeven rate of return; the account will show a profit if, and only if, the securities'
gross returns exceed the account's annualized cost-to-equity ratio. The literature in this field

31

evidences that cost-to-equity ratios over 5% are clearly excessive, and, that the chances of

covering any given level of trading costs decline as the number of securities in the portfolio

increases. The literature further evidences that, for a portfolio with just 10 stocks, it is unlikely

that trading costs of 5% can be covered. In just 21 months of trading, Frankel placed Claimants

in more than 100 different stocks, averaging three transactions a day in Claimants' accounts, in

trading that lacked planning and purpose, other than the generation of income for Frankel and

Goldman Sachs.

48.    Another measure of churning in a discretionary account is the turnover ratio,

described in the case law and literature for half a century. Annualized turnover ratios measure

the number of times the equity in an account is traded per year on average. The simplest turnover

ratio divides the total value of the purchase transactions by the average month-end equity

balance, and then annualizes the turnover ratio by dividing it by the number of years covered in

the analysis of the account. According to the literature and decisions in this regard, a turnover

ratio of two indicates churning. Preliminary calculations show that, while under Frankel's

control, the Claimants' accounts suffered turnover ratios of more than two (Account No. 001-

41448 in 1999), (Account No. 001-41448 in 2000), and (Account No. 001-41449 in 2000). The

turnover ratios in the children's JAS account substantially exceeded two in both 1999 and 2000.

There is no excuse for such high turnover ratios in Claimants' discretionary accounts. Since it is

indicated that churning has occurred with a turnover ratio of two, it became incumbent on

Frankel's supervisors to aggressively inquire as to the principles and methods Frankel was using

to determine her selections of transactions for the various accounts over which she had

discretionary control. Upon information and belief, Frankel insisted on discretionary control

over the accounts she opened when she was showing customers any performance charts,

32

including, but not limited to, the Charts. The insistence on discretionary control, the high

turnover ratios, together with the excessive charges to the accounts, are clear and definitive

evidence of the malevolent intent of Frankel, and the grossly lacking supervision by Goldman

Sachs of Frankel's violative behavior. The return of all of Claimants' losses, commissions,

margin interest and other charges to the accounts is appropriate here, an amount in excess of

$11.6 million.

## BREACH OF CONTRACT

49.    A cause of action for breach of contract may be based upon the customer

agreement or new account agreement which the customer signs when the account is opened with

the brokerage firm. Mismanagement of the account may also be included in a breach of contract

claim based upon implied warranties to handle the account with due care and diligence. A

breach of an implied covenant of good faith and fair dealing may also provide the basis of a

cause of action for breach of contract.

50.    In the context of securities brokerage accounts, every account has a customer

account agreement, and this agreement, being drafted by the broker, is to be strictly construed

against the broker and in favor of investors. See, e.g., Mastrobuono v. Shearson Lehman Hutton,

514 U.S. 52, 62 (1995) (construing an ambiguous account agreement against the broker).

Moreover, every broker has an agreement with a Self Regulating Organization ("SRO"), such as

the National Association of Securities Dealers or the New York Stock Exchange. Exchange

rules constitute a contract between members and, as between those members, have the force of

law. See, e.g., Bibb v. Allen, 149 U.S. 481, 489 (1893) (utilizing New York Cotton Exchange

33

rules and regulations). These agreements necessarily are intended to benefit and protect investors by imposing standards of high business ethics.

51.    A breach of industry standards is an actionable breach of contract under either professional malpractice standards or a third-party beneficiary contract analysis. See e.g., Ferritto v. Olde & Co., 577 N.E.2d 101, 104-106 (Ohio App. 1989); Restatement (Second) of Contracts § 304 (1981) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."). Also, when the broker-customer agreement provides that SRO rules govern the relationship, the rules are deemed incorporated into the agreement and a violation of the rules is a breach of contract. See Brumm v. McDonald & Co., 603 N.E.2d 1141 (Ohio 1942).

52.    Here, Respondents failed to live up to their contractual obligations. Claimants relied upon Frankel and Goldman Sachs, who had responsibilities to conduct themselves with good-faith in their interactions with customers. Customers place their trust and reliance in the broker and brokerage firm to treat them in accordance with the high standards imposed upon the securities profession. Respondents totally breached this trust and their contractual obligations by their blatant and documented fraudulent acts, by their unsuitable and fraudulent recommendations of securities to Claimants, by their excessive charges, by the supervisors' failures to discuss margin trading and excessive charges with the Claimants and to discuss whether purchases of new issues were pursuant to contemporaneous discussions with Frankel, and the failure to discuss any of Frankel's improper acts with customers when Goldman Sachs discovered such acts, and this trust was further breached by the analysts' fraudulent acts as to certain securities sold to Claimants. Respondents had contractual obligations to Claimants,

34

which Respondents clearly failed to fulfill, thereby breaching their contractual agreement with Claimants.

53.     In failing to properly supervise Frankel, the Respondent brokerage firms breached contractual duties owed to the Claimants. See, e.g., Shakeri v. Merrill Lynch Pierce Fenner Smith, Inc., No. 94-05242, 1996 WL706704 (NASD Dispute Resolution, Inc. Oct. 21, 1996).

54.     Lehman Brothers similarly breached its contractual obligations to Claimants.

## NEGLIGENCE

55.     All of the foregoing activities, which occurred with respect to Claimants' accounts while the accounts were maintained and improperly administered, constitute negligence by Respondents in the administration and handling of the Claimants' securities accounts. Goldman Sachs failed to use reasonable diligence in supervising the accounts of Frankel's customers, and its supervisors did not act as reasonable and prudent supervisors would have acted toward Claimants, resulting in fraudulent representations, unauthorized transactions, an unsuitable investment strategy, churning, excessive commissions, markups/markdown, and margin charges, and in unsuitable and fraudulent sales of securities to Claimants by Frankel, including stocks fraudulently touted by Goldman Sachs' analysts. Frankel's conduct called for diligent inquiry by Goldman Sachs; particularly, inquiry as to what Frankel was telling her customers to support this enormous amount of high cost, speculative activity. See, e.g., Cass v. Shearson Lehman Hutton, No. 91-01484, 1994 WL1248585 (NASD Dispute Resolution, Inc. Jan. 31, 1994). See also, Aaron v. Paine Webber, Inc., No. 72-136-1146-87 (Am. Arbitration Ass'n. June 28, 1989).

35

56.    There is authority that SRO rules establish a standard or duty of care owed by securities firms to their customers and that violations of these rules may constitute negligence on the part of the firms. See e.g., Csordas, Fed. Sec. L. Rep. ¶ 97,230 (1992-93 Transfer Binder). Customer claims of negligence may be based on conduct that violates an internal firm compliance manual or directives, the rules of the exchange on which the securities are traded, or the applicable NYSE or NASD rules. Frankel repeatedly and systematically violated her employers' written internal rules. So did her supervisors. Failure to maintain a certain level of competence in the supervision of an account may constitute negligence or a form of broker-dealer malpractice. Additionally, a broker may be liable to her client for negligence when the broker breaches the duty of care owed to the client and the client suffers damages as a proximate cause of that breach. While violations of SRO rules are not causes of action in and of themselves, failure to follow clearly defined rules and guidelines are indicia of actionable carelessness and negligence. See e.g., Csordas, Fed. Sec. L. Rep. ¶ 97,230 (1992-93 Transfer Binder).

57.    Courts typically hold firms to their own articulated standards of professionalism. See e.g., Mihara, 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty). The rule of thumb on negligence is to compare the firm's actions against the standards, customs and usages of the industry, which place duties and obligations on the firm. Negligence can also be demonstrated by a failure to follow the rules of the exchange on which the securities were traded, the applicable NYSE and NASD rules, or even the firm's own compliance manual and internal memoranda. In their dealings with these Claimants, the Respondents failed to follow rules, regulations, the manuals and the internal memoranda of Goldman Sachs and, then, of Lehman Brothers.

36

58.    Broker-dealers and their associated persons are held to high standards of honor. A failure by a broker to abide by these industry standards is evidence of carelessness and negligence. The level of care and skill of a stockbroker is high, and, in assessing a claim of negligence, standards in the securities industry can be examined:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise skill and knowledge normally possessed by members of that profession or trade in good standing in similar circumstances.

RESTATEMENT (SECOND) OF TORTS §299A. Respondents represented that they had even greater skill and knowledge than other brokers in the industry, and should be held to such higher standards. See, Cass v. Shearson Lehman Hutton, supra. and Aaron v. Paine Webber, Inc., supra.

59.    Federal securities laws, NYSE rules and NASD rules require brokerage firms to reasonably supervise their brokers for the purpose of preventing violations of the rules and regulations of the securities industry. Section 15 of the Exchange Act requires securities broker-dealer firms to establish adequate systems of supervision and to enforce these internal rules. 15 U.S.C. 78o. Courts have applied these provisions to require that broker dealers maintain proper systems of supervision and internal controls over their registered representatives. This is consistent with Section 15(b)(4)(E) of the Exchange Act which requires the SEC to discipline broker-dealers who fail "to reasonably supervise, with a view to preventing violations . . . ."

60.    The NASD has expanded this to require reasonable investigation and vigorous response to indications of problems with customers. The rules of the NASD and NYSE require brokerage houses to supervise their brokers' handling of accounts. See NASD Conduct Rule 3010 and NYSE Rule 405. NASD Conduct Rule 3010 requires member firms to establish and maintain a system to supervise the activities of each registered representative: "Each member

37

shall establish . . . a system . . . that is reasonably designed to achieve compliance with applicable

securities laws . . . and with the Rules of this Association." NASD Manual, Rule 3010, at 4831.

Every broker-dealer also may use compliance manuals and written internal directives as methods

of transmitting its own higher standards of professional conduct to its agents. Customer claims

may be based on individual broker misconduct that violates an internal firm compliance guide.

See e.g., Mihara, 619 F.2d at 822 (utilizing internal manual to support finding of fiduciary duty).

Here, Frankel violated a number of internal compliance guides published by her employers.

If a firm has not enforced "a proper system of supervision and internal control," it has not acted

in good faith under the applicable statute. Moscarelli v. Stamm, 288 F.Supp. 453, 460 n.5

(E.D.N.Y. 1968). In supervising Frankel, Goldman Sachs was worse than lax in enforcement of

its supervisory and internal control procedures: Goldman Sachs was complicit in encouraging,

and then covering up Frankel's fraudulent acts, and the fraudulent acts of its analysts and

investment bankers.

61.    Here, negligent supervision by Goldman Sachs existed because it failed to

properly supervise Frankel, it failed to enforce its own system and its own internal controls,

which are reasons why it failed to prevent excessive, unsuitable and unauthorized transactions,

excessive commissions and other excessive charges to the Claimants' accounts. Numerous "red

flags" should have alerted Goldman Sachs to the improper transactions, to the excessive charges

occurring in Claimants' accounts and the use by Frankel of materially false performance charts.

If Frankel had been properly supervised, Claimants' accounts would not have been so

mishandled. The negligence of Lehman Brothers is similarly alleged, particularly as to the hiring

of Frankel, and the retention of Frankel as an employed broker, which continues to this day.

38

## NEGLIGENT HIRING

62.    It is well settled that an employer has a duty to exercise reasonable care to refrain from knowingly employing, or retaining in its employ, a person with known dangerous predilections in a position that would present a foreseeable risk of harm to others.[1]  Section 317 of the Second Restatement of Torts provides that an employer is generally under a duty to exercise reasonable care to control employees from potentially harming others on the employer's premises or using the employer's property, even when those employees are not acting within the scope of their employment.

63.    An employer may be held liable for negligence in hiring and retaining an employee whom the employer knew, or in the exercise of reasonable care, should have known, was potentially harmful to others.  Where an employer unreasonably overlooks an employee's history and an employee's propensity to engage in behavior that later causes harm to a complaining party, the employer will be held liable for its own negligence.

64.    That the employer followed its own protocol for hiring will not insulate the employer from liability.[2]  The extent of an employer's duty to look into the backgrounds of those it hires is subject to considerations of public policy.[3]  There is a public policy to protect brokerage firm customers from fraudulent practices of brokers.  This is evidenced by the fact that New York common law supports the imposition of a fiduciary obligation upon brokers, that is, brokers, and the firms that employ them, occupy a position of trust and confidence, owing the highest degree of loyalty and fidelity to the customer.  This position requires that employers

---

[1]  Ray v. Metropolitan Transp. Auth., 221 A.D.2d 613, 634 N.Y.S.2d 160 (2d Dep't 1995); Haddock v. City of New York, 140 A.D.2d 91, 532, N.Y.S.2d 379 (1st Dep't 1988). *See also* Rochlin v. Alamo, 209 A.D.2d 499, 619 N.Y.S.2d 75 (2d Dep't 1994) (no notice of employee's alleged propensity to steal cars).
[2] Mercer v. State of New York, 125 A.D.2d 376, 509 N.Y.S.2d 103 (2d Dep't 1986).
[3]  Stevens v. Lankard, 31 A.D.2d 602, 297 N.Y.S.2d 686, aff'd 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339.

39

diligently investigate the backgrounds of those brokers it seeks to employ. Lehman Brothers

failed to do this, and this failure resulted in harm to Lehman Brothers' customers, such as

Claimants.

## BREACH OF FIDUCIARY DUTIES
## AND BREACH OF SUPERVISORY DUTIES

65.    In addition to the standards set by the industry, Respondents owed certain

fiduciary duties to Claimants, including the duty to use due care, the duty of Goldman Sachs to

properly supervise Frankel, and not to engage in or permit fraud or self-dealing in Claimants'

accounts or by Goldman Sachs' analysts and investment bankers. Unsuitable recommendations

and breach of fiduciary duties owed to customers are common law concepts thematically linked

as manifestations of a broker-dealer's duty to the public under the "shingle theory." Brokers are

fiduciaries in relation to their customers, that is, they occupy a position of trust and confidence,

owing the highest degree of loyalty and fidelity to the customer. New York common law

supports the imposition of a fiduciary obligation upon the Respondents.

66.    Frankel's false statements, her use of materially false charts, her excessive

trading, her excessive commission charges, her fraudulent recommendations and purchases of

unsuitable securities for Claimants' accounts, her falsification of records and her generally self-

serving actions with regard to Claimants' accounts, were clear violations of the high standards of

commercial honor and just and equitable principles of trade required of her. Furthermore, these

actions by Frankel were in clear breach of the heightened degree of loyalty and fidelity Frankel

owed to Claimants by virtue of her discretionary control over their accounts.

67.    Goldman Sachs failed in its affirmative duty to supervise its registered agents and

its affiliates and to reasonably prevent improper and excessive trading activity, excessive

40

charges, unsuitable transactions, the analysts' fraud, Frankel's use of fraudulent Charts, and other

improper recommendations and transactions. Goldman Sachs failed with regard to its

supervisory duties and responsibilities over Frankel and the Claimants' accounts, and Goldman

Sachs is, accordingly, liable for the improper activity and improper administration that occurred

while the accounts were maintained at Goldman Sachs, which also included the fraudulent acts

and omissions by its analysts. See, e.g., Shakeri v. Merrill Lynch Pierce Fenner Smith, supra.

Frankel's supervisors did not curtail the use of fraudulent performance charts, the unauthorized

trading, and the cover-up of such unauthorized trading, the churning of the accounts, the trading

of unsuitable securities in over-concentrated amounts and the excessive commissions,

markups/markdowns and margin charges in Claimants' accounts.

68.     By virtue of the doctrine of respondeat superior, Respondent Goldman Sachs is

liable and responsible for the activities and conduct of its brokers, such as Frankel, its analysts,

its managers, investment bankers, investment advisors, employees, agents, and persons otherwise

under its control, insofar as its brokers, analysts, managers, investment bankers, investment

advisors, employees, agents and persons otherwise under its control have caused or contributed

to the losses and improper charges suffered by Claimants in the accounts while they were

maintained at Goldman Sachs. As a direct and proximate result of Goldman Sachs' failure to

supervise, Claimants lost $9.6 million, while Respondents "earned" substantially more than $2

million from Claimants' accounts.

69.     As shown above, Respondents accepted fiduciary responsibilities for Claimants'

accounts and effected excessive, unsuitable and unauthorized transactions in over-concentrated

amounts of technology stocks, including those fraudulently recommended by Goldman Sachs'

analysts, and in contradiction of investment objectives of Claimants. Goldman Sachs permitted

41

Frankel, a relatively inexperienced and highly unethical broker, to mislead and defraud

Claimants in order to generate substantially more than $2 million in commissions and other

"earned" income for Respondents by churning the accounts, by trading on high margin in

speculative, unsuitable securities, in unsuitably high concentrations, including securities that

were the specific identified basis of the federal court proceedings brought against Goldman

Sachs by the SEC, by the NASD and in state proceedings brought against the firm by the New

York Attorney General's office and others, as to which Goldman Sachs has entered into consent

judgments and other settlements. Accordingly, Respondents are liable to Claimants for common

law fraud, statutory fraud, breach of contract, negligence, breach of fiduciary duties and, as to

Goldman Sachs, for breach of supervisory duties. Lehman Brother is similarly liable, and

Lehman Brothers is also liable for the added claim of the negligent hiring of Frankel by Lehman

Brothers.

70.    Claimants have already documented proofs of these serious charges. Specific

fraudulent behavior, over an extended period by more than just the broker, has been detailed in

this Statement of Claim. Estimates of commissions, markups and markdowns are preliminary

because Respondents do not provide such information in summary form, and, when information

was requested, Goldman Sachs provided misleading summaries of charges to the accounts, and,

misleading statements were made by Goldman Sachs management in this regard. More precise

calculations of these losses and excessive costs await discovery and expert analysis.

71.    It is respectfully submitted that punitive damages are particularly appropriate

here, where the pervasive pattern of fraud and the activities of the Respondents in seeking to

cover-up their misconduct surely merit economic sanctions. Indeed, the fraudulent activity that

occurred with respect to Claimants' accounts is precisely the type of activity that legislative

42

bodies are seeking to prevent, such as by the direct affirmation of the authority of arbitrators to

award punitive and/or treble damages to investor-claimants in securities arbitration. NASD

arbitrators have the power to award appropriate punitive damages in reasoned amounts relative

to the losses and the offensive nature of the acts proven. If the Respondents' unlawful behaviors

detailed above do not result in proportionate sanctions to deter future violations of this type, then

brokers will continue to "borrow" money from their clients by such gross overcharges and

fraudulent recommendations, pocket the billions, and return only a small fraction of what they

"earned" when challenged by the relatively few victims willing to endure the expenses and

inconveniences of proceedings such as these.

## THE DAMAGES

Claimants seek an award as against Goldman Sachs and Frankel, jointly and severally of:

        (i)    $7.7 million for all of Claimants' out-of-pocket losses;

        (ii)   $2 million or more in commissions, margin interest and other charges to Claimants' accounts;

        (iii)  $1.5 million, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimants would have realized on the accounts, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortious acts;

        (iv)  punitive damages; and

        (v)   interest, attorneys' fees and costs of these proceedings.

Claimants seek an award against Lehman Brothers of:

        (i)    $2.2 million for out-of-pocket losses;

        (ii)   $400,000, or such other amount that the Arbitrators determine represents the lost interest, profits, income, and gain that Claimants

43

would have realized on the accounts, including lost income under the "well managed portfolio" theory of recovery, had they not been improperly administered, and, for lost profit as a result of Respondents' negligent and tortious acts;

(iii)   punitive damages; and

(iv)   interest, attorneys' fees and costs of these proceedings.

Dated:   New York, New York
         May 11, 2004

                        Respectfully submitted,

                        LAW OFFICES OF DAN BRECHER

                        By:
                        Dan Brecher
                        Attorneys for Claimants
                        99 Park Avenue, 16th Floor
                        New York, New York 10016
                        (212) 286-0747

44

**EXHIBIT 3**

**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

Jeffrey Sardis, Lauren Sardis, and JAS Holding Corporation (Claimants) vs. Sofia Frankel, Goldman Sachs and Company, and Lehman Brothers, Inc. (Respondents)

Case Number: 04-03481                    Hearing Site: New York, New York

Nature of the Dispute: Customers vs. Associated Person and Members.

## REPRESENTATION OF PARTIES

Claimants Jeffrey Sardis ("J. Sardis"), Lauren Sardis ("L. Sardis"), and JAS Holding Corporation ("JAS Holding"), hereinafter collectively referred to as "Claimants": Dan Brecher, Esq., Law Offices of Dan Brecher, New York, NY and William F. Dahill, Esq., Wollmuth Maher & Deutsch LLP, New York, NY.

Respondent Sofia Frankel ("Frankel"): Michael J. Dell, Esq., Kramer Levin Naftalis & Frankel, LLP, New York, NY and Brian F. McDonough, Esq., Drinker Biddle & Reath, LLP, New York, NY. Frankel was represented by Michael J. Dell, Esq., for the period of time that she was employed by Goldman Sachs and Company. Frankel was represented by Brian F. McDonough, Esq., for the period of time that she was employed by Lehman Brothers, Inc.

Respondent Goldman Sachs and Company ("Goldman Sachs"): Michael J. Dell, Esq., Kramer Levin Naftalis & Frankel, LLP, New York, NY.

Respondent Lehman Brothers, Inc. ("Lehman Brothers"): Brian F. McDonough, Esq., Drinker Biddle & Reath, LLP, New York, NY.

## CASE INFORMATION

Statement of Claim filed on or about: May 12, 2004.
Answer to the Motion to Dismiss filed by all parties on or about: February 7, 2005.
J. Sardis signed the Uniform Submission Agreement: March 7, 2004.
L. Sardis signed the Uniform Submission Agreement: March 7, 2004.
JAS Holding signed the Uniform Submission Agreement: March 7, 2004.

Joint Statement of Answer filed by Goldman Sachs and Frankel on or about: July 30, 2004.
Motion to Dismiss the Statement of Claim filed by Goldman Sachs and Frankel on or about: December 23, 2004.
Goldman Sachs did not sign the Uniform Submission Agreement.
Frankel did not sign the Uniform Submission Agreement.

Joint Statement of Answer filed by Lehman Brothers and Frankel on or about: July 30,

2004.
Motion to Dismiss the Statement of Claim filed by Lehman Brothers and Frankel on or about: January 13, 2005.
Lehman Brothers did not sign the Uniform Submission Agreement.
Frankel did not sign the Uniform Submission Agreement.

## CASE SUMMARY

Claimants asserted the following causes of action: fraud, breach of contract, negligence, failure to supervise, breach of fiduciary duty, breach of supervisory duties, churning, omission of facts, unauthorized trading, forgery, and unauthorized transfers. The causes of action relate to the purchase of securities in Exodus, WorldCom, Global Crossing, AT&T, and other unspecified securities.

Unless specifically admitted in their Answer, Goldman Sachs and Frankel denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in their Answer, Lehman Brothers and Frankel denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimants requested compensatory damages jointly and severally against Goldman Sachs and Frankel in the amount of $7,700,000.00, $2,000,000.00 or more in commissions, margin interest and other charges to Claimants' accounts, $1,500,000.00 or such other amount to be determined by the Panel for lost interest, profits, income, and gain, unspecified punitive damages, interest, attorneys' fees, and the costs of this proceeding.

Claimants requested compensatory damages solely against Lehman Brothers in the amount of $2,200,000.00, $400,000.00 or more in commissions, margin interest and other charges to Claimants' accounts, unspecified punitive damages, interest, attorneys' fees, and the costs of this proceeding.

Goldman Sachs and Frankel requested that all claims be dismissed in their entirety.

Lehman and Frankel requested that all claims be dismissed in their entirety, that costs of this proceeding be assessed against the Claimants, and that this arbitration be expunged from Frankel's CRD record.

## OTHER ISSUES CONSIDERED AND DECIDED

Frankel, Goldman Sachs, and Lehman Brothers did not file with FINRA Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the Code and having answered the claim, appeared and testified at the hearing, are bound by the determination of the Panel on all issues submitted.

At the conclusion of Claimants' case, all Respondents moved to dismiss Claimants' claims. After due deliberation, the Panel denied the Motion.

On September 19, 2008, the United States District Court for the Southern District of New York entered an Order granting the application of the Securities Investor Protection Corporation (SIPC) for a protective decree under the Securities Investor Protection Act (SIPA). Pursuant to the court's order, all claims against Lehman Brothers were indefinitely stayed. Pursuant to the stipulation between Claimants and James W. Giddens, trustee for the liquidation of the business of Lehman Brothers, on October 23, 2008, the United States Bankruptcy Court for the Southern District of New York entered an Order modifying the stay provision to permit the entry and distribution of this Award.

The parties agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the majority of the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Goldman Sachs and Frankel are jointly and severally liable for and shall pay to the Claimants $1,000,000.00 as compensatory damages plus interest at the rate of 4% per annum accruing from May 11, 2004 through and including September 13, 2004.

   Goldman Sachs and Frankel shall divide the total awarded amount (as specified above) and pay to each Claimant one-third (1/3) of the total awarded amount.

2. Lehman Brothers and Frankel are jointly and severally liable for and shall pay to JAS Holdings $1,300,000.00 as compensatory damages.

3. Lehman Brothers and Frankel are jointly and severally liable for and shall pay to J. Sardis and L. Sardis $1,200,000.00 as compensatory damages.

   Lehman Brothers and Frankel shall divide the total awarded amount (as specified above) and pay $600,000.00 to J. Sardis and $600,000.00 to L. Sardis.

4. Frankel's request for expungement is denied.

5. Any and all relief not specifically addressed herein, including punitive damages is denied.

## DISSENTING ARBITRATOR REPORT

The Chairperson consents with the Panel's decision concerning numbered paragraphs 2, 3, 4, and 5 of the Award section but dissents from the Panel's finding in numbered paragraph 1. The Chairperson finds that there should be no liability against Goldman Sachs and Frankel should be liable to pay for the awarded amount and the interest.

## FEES

Pursuant to the Code, the following fees are assessed:

Filing Fees
FINRA Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $   600.00 |

Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated persons at the time of the events giving rise to the dispute. Accordingly, Goldman Sachs and Company and Lehman Brothers, Inc., are parties.

Goldman Sachs and Company

| | |
|---|---|
| Member surcharge | = $ 3,750.00 |
| Pre-Hearing Process Fee | = $   750.00 |
| Hearing Process Fee | = $ 5,500.00 |

Lehman Brothers, Inc.

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-Hearing Process Fee | = $   750.00 |
| Hearing Process Fee | = $ 5,000.00 |

Adjournment Fees
The following adjournment fees are assessed:

June 21 and 22, 2005, July 7 and 8, 2005, and August 16 and 17, 2005

| | |
|---|---|
| adjournment  requested Goldman Sachs and Frankel | = $ 1,200.00 |
| Goldman Sachs' share | = $   600.00 |
| Frankel's share | = $   600.00 |

| | |
|---|---|
| September 14, 2005 adjournment requested by all parties | = $ 1,200.00 |
| Claimants' share | = $   600.00 |
| Frankel, Goldman Sachs, and Lehman Brothers' share | = $   600.00 |

Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | |
|---|---|
| Two (2) Pre-hearing sessions with a single arbitrator @ $450.00 | = $   900.00 |
| Pre-hearing conferences:   February 28, 2005   1 session | |
| November 15, 2006 1 session | |

| | |
|---|---|
| Three (3) Pre-hearing conference sessions with the Panel @ $1,200.00/session | |
| Pre-hearing conferences:   December 6, 2004   1 session | = $ 3,600.00 |

|  | May 11, 2007 | 1 session |  |
|  | March 26, 2008 | 1 session |  |

| Sixty Eight (68) Hearing sessions @ $1,200.00 |  |  | = $81,600.00 |
|---|---|---|---|
| Hearing Dates: | September 13, 2005 | 2 sessions |  |
|  | May 16, 2006 | 2 sessions |  |
|  | May 17, 2006 | 2 sessions |  |
|  | May 18, 2006 | 2 sessions |  |
|  | June 1, 2006 | 2 sessions |  |
|  | June 12, 2006 | 2 sessions |  |
|  | September 6, 2006 | 2 sessions |  |
|  | September 7, 2006 | 2 sessions |  |
|  | November 20, 2006 | 2 sessions |  |
|  | November 21, 2006 | 2 sessions |  |
|  | April 24, 2007 | 2 sessions |  |
|  | April 25, 2007 | 2 sessions |  |
|  | April 26, 2007 | 2 sessions |  |
|  | May 1, 2007 | 2 sessions |  |
|  | May 2, 2007 | 2 sessions |  |
|  | May 3, 2007 | 2 sessions |  |
|  | July 9, 2007 | 2 sessions |  |
|  | July 10, 2007 | 2 sessions |  |
|  | September 5, 2007 | 2 sessions |  |
|  | September 6, 2007 | 2 sessions |  |
|  | January 22, 2008 | 1 session |  |
|  | February 12, 2008 | 2 sessions |  |
|  | February 13, 2008 | 2 sessions |  |
|  | February 26, 2008 | 2 sessions |  |
|  | February 27, 2008 | 2 sessions |  |
|  | March 18, 2008 | 2 sessions |  |
|  | March 19, 2008 | 2 sessions |  |
|  | March 20, 2008 | 2 sessions |  |
|  | April 29, 2008 | 2 sessions |  |
|  | April 30, 2008 | 2 sessions |  |
|  | June 3, 2008 | 2 sessions |  |
|  | July 17, 2008 | 2 sessions |  |
|  | July 23, 2008 | 2 sessions |  |
|  | August 6, 2008 | 2 sessions |  |
|  | August 7, 2008 | 1 session |  |

| Total Forum Fees |  |  | = $86,100.00 |

1. The Panel has assessed $28,700.00 of the forum fees, jointly and severally, to the Claimants.
2. The Panel has assessed $28,700.00 of the forum fees to Goldman Sachs.
3. The Panel has assessed $28,700.00 of the forum fees Lehman Brothers.

Administrative Costs
Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but are not limited

to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

1. Claimants requested duplication of two tapes at $15.00 per tape        = $   30.00
2. Goldman Sachs requested duplication of two tapes at $15 per tape       = $   30.00

All balances are due and payable to FINRA Dispute Resolution.

## ARBITRATION PANEL

| Martin Siegel | - | Public Arbitrator, Presiding Chairperson |
| Dennis Meyerson | - | Public Arbitrator |
| Michael Perinelli | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

Dennis Meyerson
Public Arbitrator

9|19|08
Signature Date

Michael Perinelli
Non-Public Arbitrator

Signature Date

### Dissenting In Part / Concurring In Part Arbitrator's Signature

Martin Siegel
Public Arbitrator, Presiding Chairperson

Signature Date

October 30, 2008

Date of Service   (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 04-03481
Award Page 7 of 7

## ARBITRATION PANEL

Martin Siegel              -      Public Arbitrator, Presiding Chairperson
Dennis Meyerson            -      Public Arbitrator
Michael Perinelli          -      Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article /50/ of the Civil
Practice Law and Rules, that I am the individual described herein and who executed this
instrument which is my award.

### Concurring Arbitrators' Signatures

_____
Dennis Meyerson                                   _____
Public Arbitrator                                 Signature Date

_____                                 _____
Michael Perinelli                                 Signature Date
Non-Public Arbitrator

### Dissenting in Part / Concurring in Part Arbitrator's Signature

_____                                 _____
Martin Siegel                                     Signature Date
Public Arbitrator, Presiding Chairperson

                    October 30, 2008
_____
Date of Service   (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No   04-03461
Award Page 7 of 7

## ARBITRATION PANEL

| | | |
|---|---|---|
| Martin Siegel | - | Public Arbitrator, Presiding Chairperson |
| Dennis Meyerson | - | Public Arbitrator |
| Michael Perinelli | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

## Concurring Arbitrators' Signatures

_____                                    _____
Dennis Meyerson                                             Signature Date
Public Arbitrator

_____                                    _____
Michael Perinelli                                           Signature Date
Non-Public Arbitrator

## Dissenting in Part / Concurring in Part Arbitrator's Signature

_____                                    9/19/08
Martin Siegel                                               Signature Date
Public Arbitrator, Presiding Chairperson

October 30, 2008
_____
Date of Service   (For FINRA office use only)

**EXHIBIT 4**

Miami-Dade County Clerk - Civil / Probate Justice System - Docket Information                    Page 1 of 3

🛒 0 Item(s) in Basket                           Home      Online Services      About us      Contact us

# HARVEY RUVIN
## CLERK of the COURTS
### MIAMI-DADE COUNTY, FLORIDA

## Civil / Probate Justice System - Docket Information

BACK TO SEARCH RESULTS                    ALL PARTIES                    START A NEW SEARCH

### SARDIS, JEFFREY vs FRANKEL, SOFIA
* Click on BOOK/PAGE of a particular docket to see the image if it is available *

**Case Number** 2011-16294-CA-(LOCAL): 01        **Dockets Retrieved:** 77        **Filing Date:** 05/25/2011

**Case Number (STATE):** 13-2011-CA-016294-0000-01                    **Judicial Section:** 04

| Date | Book/Page | Docket Entry | Comments |
|------|-----------|--------------|----------|
| 09/03/2013 | | ORDER ON MOTION TO COMPEL | |
| 09/03/2013 | | CANCELLATION NOTICE | 09/04/2013 09:00 AM |
| 08/19/2013 | | NOTICE OF HEARING- | MOTIONS 09/04/2013 09:00 AM |
| 08/14/2013 | | MOTION TO COMPEL | AND FOR SANCTIONS |
| 07/10/2013 | | NOTICE OF UNAVAILABILITY/ABSENCE | |
| 07/10/2013 | | NOTICE OF UNAVAILABILITY/ABSENCE | |
| 07/09/2013 | | RESPONSE TO REQUEST FOR PRODUCTION | |
| 05/30/2013 | | NOTICE OF INTERROGATORY | |
| 05/30/2013 | | NOTICE OF INTERROGATORY | |
| 05/30/2013 | | NOTICE OF INTERROGATORY | |
| 05/30/2013 | | REQUEST FOR PRODUCTION | |
| 05/29/2013 | | ANSWER AND AFFIRMATIVE DEFENSE | ATTORNEY:00028624 DN01 |
| 05/15/2013 | | NOTICE: | OF HEARING FOR 5/15/13 AT 11:00 AM IS CONCELLED. |
| 05/15/2013 | | ORDER: | FOR LEAVE TO AMEND 2ND AMENDED COMPLAINT |
| 05/14/2013 | | ORDER: | ON MTN FOR LEAVE TO FILE 2ND AMENDED COMPLAINT |
| 05/14/2013 | | CANCELLATION NOTICE | 05/15/2013 11:00 AM |
| 05/10/2013 | | TEXT | OPPOSITION TO MOTION FOR FINAL JUDGMENT |
| 05/09/2013 | | MOTION: | FOR LEAVE TO FILE AMENDED COMPLAINT |
| 04/24/2013 | | NOTICE OF HRG SPECIAL APPT | 05/15/2013 11:00 AM |
| 04/04/2013 | | REQUEST FOR HEARING | |
| 02/06/2013 | | NOTICE OF HRG SPECIAL APPT | 04/22/2013 11:00 AM |
| 02/04/2013 | | AFFIDAVIT OF: | OF DEFENDANT, SOFIA FRANKEL |

Miami-Dade County Clerk - Civil / Probate Justice System - Docket Information          Page 2 of 3

| | | | |
|---|---|---|---|
| 02/04/2013 | | MOTION FOR SUMMARY JUDGMENT | |
| 02/04/2013 | | AFF IN SUPPORT OF MTN FOR FINAL/SUMMARY JUDGMENT | |
| 11/20/2012 | | CANCELLATION NOTICE | 11/15/2012 09:30 AM |
| 11/13/2012 | | MOTION TO STAY | |
| 11/09/2012 | | NOTICE OF HEARING- | MOTIONS 11/15/2012 09:30 AM |
| 11/07/2012 | | NOTICE OF INTERROGATORY | |
| 11/07/2012 | | RESPONSE TO REQUEST FOR PRODUCTION | |
| 11/07/2012 | | OBJECTION: | TO DEFENDANTS 1ST REQUEST FOR PRODUCTION |
| 11/05/2012 | | MOTION TO STAY | |
| 10/11/2012 | | E-MAIL NOTICE | SERVICETHOMASWARD@RVMRLAW.COM |
| 10/09/2012 | | NOTICE OF TAKING DEPOSITION | |
| 10/09/2012 | | NOTICE: | CANCELLATION OF DEF DEPOSITION |
| 10/05/2012 | | ORDER: | MICHAEL P. BURKE TO APPEAR PRO HAC VICE |
| 10/04/2012 | | REQUEST FOR PRODUCTION | |
| 10/04/2012 | | NOTICE OF INTERROGATORY | |
| 10/04/2012 | | NOTICE OF INTERROGATORY | |
| 10/04/2012 | | NOTICE OF INTERROGATORY | |
| 10/03/2012 | | ORDER: | AGREED GRANTING MOT OF MICHAEL P. BURKE, ESQ, ETC |
| 10/01/2012 | | MOTION: | TO APPEAR PRO HAC VICE |
| 10/01/2012 | | NOTICE OF TAKING DEPOSITION | |
| 08/30/2012 | | E-MAIL NOTICE | PN01 PN02 PN03 JSHUBIN@SHUBINBASS.COM |
| 04/24/2012 | | REQUEST: | COPIES OF DOCUMENT PRODUCED BY NON PARTIES |
| 04/12/2012 | | ORDER DENYING PROTECTIVE ORDER | |
| 04/05/2012 | | RESPONSE: | TO MOTION FOR PROTECTIVE ORDER |
| 03/21/2012 | | NOTICE OF HEARING- | MOTIONS 04/10/2012 09:30 AM |
| 03/21/2012 | | MOTION FOR PROTECTIVE ORDER | |
| 03/16/2012 | | NOTICE: | OF OBJECTING TO PLAINTFFS PROPOSED NON PARTY DISCOVERY |
| 03/15/2012 | | TEXT | SUBPOENA RTD,W/O AFFIDAVIT OF SVC |
| 03/15/2012 | | NOTICE OF TAKING DEPOSITION | |
| 03/15/2012 | | NOTICE OF TAKING DEPOSITION | |
| 03/15/2012 | | TEXT | SUBPOENA RTD,W/O AFFIDAVIT OF SVC |
| 03/02/2012 | | NOTICE OF UNAVAILABILITY/ABSENCE | |
| 11/15/2011 | | ANSWER AND AFFIRMATIVE DEFENSE | ATTORNEY:00028624 DN01 |
| 11/08/2011 | | ORDER EXTENDING TIME FOR | ORDER EXTENDING TIME RESP DATE DUE :11/11/2011 |
| 11/07/2011 | | | |

Miami-Dade County Clerk - Civil / Probate Justice System Docket Information                    Page 3 of 3

| | | MOTION FOR EXTENSION OF TIME | |
|---|---|---|---|
| 11/03/2011 | | NOTICE NOT TIMELY FILED | 11/10/2011 10:00 AM |
| 10/13/2011 | | ORDER DENYING MOTION TO DISMISS | |
| 10/05/2011 | | NOTICE NOT TIMELY FILED | 10/13/2011 10:00 AM |
| 09/16/2011 | | NOTICE OF HEARING- | MOTIONS 09/29/2011 10:00 AM |
| 09/12/2011 | | NOTICE NOT TIMELY FILED | 09/20/2011 10:00 AM |
| 09/06/2011 | | NOTICE OF UNAVAILABILITY/ABSENCE | |
| 08/31/2011 | | TEXT | OPPOASITION TO MTN TO DISMISS |
| 08/08/2011 | | MOTION TO STRIKE | |
| 08/08/2011 | | MOTION TO DISMISS | |
| 07/25/2011 | | AMENDED COMPLAINT | |
| 07/22/2011 | | ORDER: | OF REFERRAL TO CIVIL GEN MAGISTRATE SCHWBEDISSEN |
| 06/30/2011 | | MOTION TO STRIKE | |
| 06/30/2011 | | MOTION TO DISMISS | |
| 06/30/2011 | | MOTION TO STRIKE | SHAM PLEDING |
| 06/27/2011 | | NOTICE OF APPEARANCE | ATTORNEY: 00186483 DN01 |
| 06/13/2011 | | SERVICE RETURNED | BADGE # 365 P 06/06/2011 DN01 |
| 05/25/2011 | | SUMMONS ISSUED | DN01 |
| 05/25/2011 | | DEMAND FOR JURY TRIAL | |
| 05/25/2011 | | COMPLAINT | |
| 05/25/2011 | | CIVIL COVER | |

BACK TO SEARCH RESULTS                    ALL PARTIES                    START A NEW SEARCH

Civil Search Home | Civil Court Information | Email | Login
Home | Privacy Statement | Disclaimer | Contact Us | About Us    
2008 Clerk of the Court. All Rights reserved.

S0142977

**EXHIBIT 5**

**Effective as of 1/30/97**

**By-Laws Of**

**Lehman Brothers Inc.**
**(A Delaware Corporation)**

**Article I**
**Meetings of Shareholders**

**Section 1.**                **Annual Meeting.**  The annual meeting of the shareholders of Lehman Brothers Inc. (hereinafter referred to as the "Corporation") for the election of directors  and for the transaction of such other business as may come before the meeting shall be held on the fourth Thursday in September in each year, if not a legal or recognized religious holiday, and if a legal or recognized religious holiday, then on the next succeeding day not a legal or recognized religious holiday, at such time as shall be designated by the Board of Directors (hereinafter referred to as the "Board"), the Chairman of the Board or the President.  The Board may, in its absolute discretion, direct that the annual meeting be held on such day other than the fourth Thursday in September (but within thirty days prior thereto or sixty days subsequent thereto) as shall be designated in the Board resolution calling such meeting.  If the annual meeting shall not be held as hereinabove provided for, the Board shall call a special meeting for the election of directors, which meeting shall be held within two months after said day.

**Section 2.**                **Special Meetings.** Special meetings of the shareholders, unless otherwise prescribed by statute, may be called at any time by the Board, the Chairman of the Board or the President.

**Section 3.**                **Notice of Meetings.**  Notice of the place, date and time of the holding of each annual and special meeting of the shareholders and, in the case of a special meeting, the purpose or purposes thereof, shall be given personally or by mail in a postage prepaid envelope, not less than ten nor more than sixty days before the date of such meeting, to each shareholder entitled to vote at such meeting, and, if mailed, it shall be directed to such shareholder at his address as it appears on the record of shareholders, unless he shall have  filed with the Secretary of the Corporation a written request that notices to him be mailed to some other address.  Any such notice for any meeting other than the annual meeting shall indicate that it is being issued at the direction of the Board or officer who shall have called the meeting.  Notice of any meeting of shareholders shall not be required to be given to any shareholder who shall attend such meeting in person or by proxy and who does not, prior to the conclusion of such meeting, protest the lack of notice thereof, or who shall, either before or after the meeting, submit a signed waiver of notice, in person or by proxy. Unless the Board shall fix after the adjournment a new record date for an adjourned meeting, notice of such adjourned meeting need not be given if the time and place to which the meeting shall be

adjourned were announced at the meeting at which the adjournment is taken. Any action required to be taken at any annual or special meeting of shareholders of this Corporation or any action which may be taken at any such annual or special meeting of such shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing setting forth the action so taken shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those shareholders who have not consented in writing.

**Section 4.**          **Place of Meetings.**  Meetings of the shareholders may be held at such place, within or without the State of New York, as the Board or the officer calling the same shall specify in the notice of such meeting.

**Section 5.**          **Quorum.**  At all meetings of the shareholders the holders of a majority of the shares of stock of the Corporation issued and outstanding and entitled to vote shall be present in person or by proxy to constitute a quorum for the transaction of any business, except as otherwise provided by statute. In the absence of a quorum, the holders of a majority of the shares of stock present in person or by proxy and entitled to vote may adjourn the meeting from time to time. At any such adjourned meeting at which a quorum may be present any business may be transacted which might have been transacted at the meeting as originally called.

**Section 6.**          **Organization.**  At each meeting of the shareholders the Chairman of the Board, or in his absence or inability to act, the Co-Chairman of the Board, or in his absence or inability to act, a Vice Chairman of the Board, or in the absence or inability to act of the Chairman of the Board, the Co-Chairman of the Board and the Vice Chairmen of the Board, the Chief Executive Officer, or in his absence, the Chief Operating Officer, or in the absence of any of the foregoing, the President shall act as chairman of the meeting. The Secretary, or, in his absence or inability to act, any person appointed by the chairman of the meeting, shall act as secretary of the meeting and keep the minutes thereof.

**Section 7.**          **Order of Business.**  The order of business at all meetings of the shareholders shall be as determined by the chairman of the meeting.

**Section 8.**          **Voting.**  Except as otherwise provided by statute or the Certificate of Incorporation, each holder of record of shares of stock of the Corporation having voting power shall be entitled at each meeting of the shareholders to one vote for every share of such stock standing in his name on the record of shareholders of the Corporation:

     a.     on the date fixed pursuant to the provisions of Section 5 of Article VI of these By-Laws as the record date for the determination of the shareholders who shall be entitled to notice of and to vote at such meeting; or

-2-

b.      if such record date should not have been so fixed, then at the close of business on the day next preceding the day on which notice thereof shall be given.

Each shareholder entitled to vote at any meeting of shareholders may authorize another person or persons to act for him by a proxy signed by such shareholder or his attorney-in-fact.  Any such proxy shall be delivered to the secretary of such meeting at or prior to the time designated in the order of business for so delivering such proxies.  A proxy shall not be valid after the expiration of eleven months from the date thereof, unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the shareholder executing it, except in those cases where an irrevocable proxy is permitted by law.  Except as otherwise provided by statute or the Certificate of Incorporation, any corporate action to be taken by vote of the shareholders shall be authorized by a majority of the votes cast at a meeting of shareholders by the holders of shares present in person or represented by proxy and entitled to vote on such action.  Unless required by statute, or determined by the chairman of the meeting to be advisable, the vote on any question need not be by ballot.  On a vote by ballot, each ballot shall be signed by the shareholder voting, or by his proxy, if there be such proxy, and shall state the number of shares voted.

**Section 9.**          **List of Shareholders.**  A list of shareholders as of the record date, certified by the Secretary of the Corporation or by the transfer agent for the Corporation, shall be produced at any meeting of the shareholders upon the request of any shareholder made at or prior to such meeting.

**Section 10.**          **Inspectors.**  The Board may, in advance of any meeting of shareholders, appoint one or more inspectors to act at such meeting or any adjournment thereof.  If the inspectors should not be so appointed or if any of them should fail to appear or act, the chairman of the meeting may, and on the request of any shareholder entitled to vote thereat shall, appoint inspectors.  Each inspector, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of his ability.  The inspectors shall determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders.  On request of the chairman of the meeting or any shareholder entitled to vote thereat, the inspectors shall make a report in writing of any challenge, request or matter determined by them and shall execute a certificate of any fact found by them.  No director or candidate for the office of director shall act as an inspector of an election of directors.  Inspectors need not be shareholders.

## Article II
## Board of Directors

**Section 1.**             **General Powers.**   The business and affairs of the Corporation shall be managed by the Board.  The Board may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by statute, the Constitution of the New York Stock Exchange, Inc., the Rules of the
Board of Directors of the New York Stock Exchange, Inc., or the Certificate of Incorporation directed or required to be exercised or done by the shareholders.

**Section 2.**             **Number, Qualifications, Election and Term of Office.**   The number of directors which this Corporation shall have shall be not less than three and shall consist of such number as may be fixed from time to time by resolution of the Board.  Any decrease in the number of directors shall be effective at the time of the next succeeding annual meeting of the shareholders unless there shall be vacancies in the Board, in which case such decrease may become effective at any time prior to the next succeeding annual meeting to the extent of the number of such vacancies. All the directors shall be of full age.  Directors need not be shareholders.  Except as otherwise provided by statute or these By-Laws, the directors shall be elected at the annual meeting of the shareholders and at each meeting of the shareholders for the election of directors at which a quorum is present the persons receiving a plurality of the votes cast at such election shall be elected.  Each director shall hold office until the next annual meeting of the shareholders and until his successor shall have been duly elected and qualified, or until his death, or until he shall have resigned or have been removed, as hereinafter provided in these By-Laws.

**Section 3.**             **Place of Meetings.**   Meetings of the Board may be held at such place, within or without the State of New York, as the Board may from to time determine or as shall be specified in the notice of such meeting.

**Section 4.**             **First Meeting.**   The Board shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of the shareholders, on the same day and at the same place where such annual meeting shall be held.  Notice of such meeting need not be given.  Such meeting may be held at any other time or place (within or without the State of New York) which shall be specified in a notice thereof given as hereinafter provided in Section 7 of this Article II.

**Section 5.**             **Regular Meetings.**   Regular meetings of the Board shall be held at such time as the Board may fix.  If any day fixed for a regular meeting should be a legal or recognized religious holiday at the place where the meeting is to be held, then the meeting which would otherwise be held on that day shall be held at the same hour on the next succeeding business day. Notice of regular meetings of the Board need not be given except as otherwise required by statute or these By-Laws.

-4-

**Section 6.**            **Special Meetings.**  Special meetings of the Board may be called by two or more directors of the Corporation or by the Chairman of the Board or the President.

**Section 7.**            **Notice of Meetings.**  Notice of each special meeting of the Board (and of each regular meeting for which notice shall be required)  shall be given by the Secretary or the Chairman of the Board as hereinafter provided in this Section 7, in which notice shall be stated the time and place (within or without the State of New York) of the meeting.  Notice of each such meeting shall be delivered to each director either personally or by telephone, telegraph, cable or wireless, at least twenty-four hours before the time at which such meeting is to be held or by first class mail, postage prepaid, addressed to him at his residence or usual place of business, at least two days before the day on which such meeting is to be held.  Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of notice to him.  Except as otherwise specifically required by these By-Laws, a notice or waiver of notice of any regular or special meeting need not state the purposes of such meeting.  Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing, and the writing is filed with the minutes of proceedings of the Board or such committee.

**Section 8.**            **Quorum and Manner of Acting.**  A majority of the entire Board shall be present in person at any meeting of the Board in order to constitute a quorum for the transaction of business at such meeting, and, except as otherwise expressly required by statute or the Certificate of Incorporation, the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board.  In the absence of a quorum at any meeting of the Board, a majority of the directors present thereat may adjourn such meeting to another time and place.  Notice of the time and place of any such adjourned meeting shall be given to the directors who were not present at the time of the adjournment and, unless such time and place were announced at the meeting at which the adjournment was taken, to the other directors.  At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called.  The directors shall act only as a Board and the individual directors shall have no power as such.

**Section 9.**            **Organization.**  At each meeting of the Board, the officer specified in Article IV hereof (or, in the absence or inability to act of all officers designated in Article IV hereof so to act, another director chosen by a majority of the directors present) shall act as chairman of the meeting and preside thereat.  The Secretary (or, in his absence or inability to act, any person appointed by the Chairman) shall act as secretary of the meeting and keep the minutes thereof.

**Section 10.**            **Resignations.**  Any director of the Corporation may resign at any time by giving written notice of his resignation to the Board, the Chairman of the Board or the Secretary.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 11.          Vacancies.**   Any vacancy in the Board, whether arising from death, resignation, removal (with or without cause), an increase in the number of directors or any other cause, may be filled by the vote of a majority of the directors then in office, though less than a quorum, or by the shareholders at the next annual meeting thereof or at a special meeting thereof; and each director so elected shall hold office for the unexpired term of his predecessor.

**Section 12.          Removal of Directors.**  Any director may be removed, either with or without cause, at any time, by the shareholders at a special meeting thereof.  Any director may be removed for cause by the Board at a special meeting thereof.

**Section 13.          Compensation.**  The Board shall have authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity.

**Section 14.          Meetings by Conference Telephone.**  Notwithstanding anything to the contrary contained in these By-Laws, the Board of Directors of this Corporation, and any committee (including but not limited to the Executive Committee) designated by such Board pursuant to Article III hereof, may participate in a meeting of said Board of Directors or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 14 shall constitute presence in person at such meeting.

## Article III
## Executive and Other Committees

**Section 1.          Executive Committee.**  The Board may, by resolution adopted by a majority of the entire Board, designate an Executive Committee consisting of one or more of the directors of the Corporation, which Committee shall have and may exercise all the authority of the Board as permitted pursuant to the Delaware General Corporation Law including but not limited to declaration of dividends, authorization for the issuance of stock, adoption of a certificate of ownership and merger pursuant to Section 253 of the said Delaware Law, except that it shall not have authority with respect to:

a.     the submission to shareholders of any action requiring authorization of shareholders pursuant to statute or the Certificate of Incorporation;

b.     the filling of vacancies on the Board or in any committee of the Board, including the Executive Committee;

c.     the amendment or repeal of these By-Laws or the adoption of new By-Laws; and

d.     the amendment or repeal of any resolution of the Board which by its terms may be amended or repealed only by the Board.

-6-

The Board shall have the power at any time to change the membership of the Executive Committee, to fill all vacancies in it, or to dissolve it.

The Executive Committee shall keep written minutes of its proceedings and shall report such minutes to the Board upon the request of a majority of the members of the Board of Directors. All such proceedings shall be subject to revision or alteration by the Board; provided, however, that third parties shall not be prejudiced by such revision or alteration.

**Section 2.**          **Other Committees.**  The Board may, by resolution adopted by a majority of the entire Board, designate other committees, each consisting of one or more of the directors of the Corporation, which committees, except as otherwise prescribed by statute, shall have and may exercise the authority of the Board to the extent that such authority shall be conferred by the resolutions designating such committees.

**Section 3.**          **General.**  A majority of any committee may determine its action and fix the time and place of its meetings, unless the Board shall otherwise provide.  The Board shall have power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.  Nothing herein shall be deemed to prevent the Board from appointing one or more committees consisting in whole or in part of persons who are not directors of the Corporation; provided, however, that any such committee shall not have nor exercise any authority of the Board.

## Article IV
### Officers

**Section 1.**          **Number and Qualifications.**  The officers of the Corporation shall include the Chairman of the Board of Directors, the Co-Chairman of the Board, one or more Vice Chairmen of the Board, the Chief Executive Officer, the Chief Operating Officer, the Chief Administrative Officer, the Co-Chief Administrative Officers, the Chief Financial Officer, the President, one or more Senior Managing Directors and Managing Directors of the Corporation, one or more Vice Presidents (one or more of whom may be designated by the Board of Directors as Senior Executive Vice Presidents, Executive Vice Presidents, Executive Vice President--Finance, Senior Vice Presidents or First Vice Presidents), the Controller, the Treasurer, the Secretary, and one or more Assistant Treasurers and Assistant Secretaries.  The Board may also from time to time by resolution establish Divisions of the Corporation, and may elect officers of any such Division, including a Chairman, Vice Chairman, President, one or more Senior Managing Directors and one or more Managing Directors, and one or more Senior Vice Presidents, First Vice Presidents and Vice Presidents, who shall be Officers of the Corporation.  Any two or more offices may be held by the same person, except the offices of President and Secretary.  The Chairman of the Board, the Co-Chairman of the Board, the Vice Chairman of the Board, the Chief Executive Officer, the Chief Operating Officer and the President shall be chosen from among the Board of Directors.  All of the officers mentioned hereinbefore in this Article shall be elected from time to time by the Board, each to hold office until the meeting of the Board following the next annual meeting of the shareholders,

or until his successor shall have been duly elected and shall have qualified, or until his death, or until he shall have resigned, or shall have been removed as hereinafter provided in these By-Laws.  The Board may from time to time elect, or delegate to any one or more officers the power to appoint, such other noncorporate titleholders and Davis, Skaggs Divisional Noncorporate Titleholders (including Chief Financial Officer of the Lehman Brothers Division, President of the Private Client Group of the Shearson Lehman Brothers Division, Managing Partner of the Lehman Brothers Division, Chief Administrative Officer of the Lehman Brothers Division, Chief Administrative Officer of the Shearson Lehman Brothers Division, Chief Financial Officer of the Shearson Lehman Brothers Division, Chief Technology and Operations Officer of the Lehman Brothers Division, President of the Asset Management Group of the Shearson Lehman Brothers Division, one or more Advisory Directors, Assistant Vice Presidents, Controllers--Commodities, Senior Vice Presidents--Administration, Vice Presidents--Administration, Second Vice Presidents--Administrative Manager, Senior Vice Presidents--Arbitrage, First Vice Presidents--Arbitrage, Vice Presidents--Arbitrage, Vice Presidents--Assistant Manager, Vice Presidents--Associate Manager, Senior Vice Presidents--Commodities, First Vice Presidents--Commodities, Vice Presidents--Commodities, Assistant Vice Presidents--Commodities, Second Vice Presidents--Commodities, Assistant Vice Presidents--Commodity Meteorologist, First Vice Presidents--Commodity Research, Vice Presidents--Commodity Research, Assistant Vice Presidents--Commodity Research, Vice Presidents--Communications Planning and Technology, Vice Presidents--Control Administrator, Senior Vice Presidents--Convertible Arbitrage, First Vice Presidents--Convertible Arbitrage, Vice Presidents--Convertible Arbitrage, Assistant Vice Presidents--Convertible Arbitrage, Senior Vice Presidents--Corporate Bonds, Vice Presidents--Corporate Bonds, Assistant Vice Presidents--Corporate Bonds, Second Vice Presidents--Corporate Bonds, Assistant Vice Presidents--Corporate Bond Administration, First Vice Presidents--Corporate Bond Liaison, Vice Presidents--Corporate Bond Liaison, Assistant Vice Presidents--Corporate Bond Liaison, Senior Vice Presidents--Corporate Bond Sales, Assistant Vice Presidents--Corporate Planning & Development, Senior Vice Presidents--Derivative Marketing, Senior Vice Presidents--Derivative Products, First Vice Presidents--Derivative Products, Vice Presidents--Direct Marketing, First Vice Presidents--Equity Arbitrage Group, Vice Presidents--Equity Arbitrage Group, Assistant Vice Presidents--Equity Arbitrage Group, President--Shearson Equity Management, Vice Presidents--Shearson Equity Management, Assistant Vice Presidents--Shearson Equity Management, Vice Presidents--Executive Compensation Planning, Managing Directors/Financial Consultant, Executive Vice Presidents/Financial Consultant, Senior Vice Presidents/Financial Consultants, First Vice Presidents/Financial Consultants, Vice Presidents/Financial Consultants, Assistant Vice Presidents/Financial Consultants, Second Vice Presidents/Financial Consultants, Senior Vice Presidents/Financial Consultants--Commodities, First Vice Presidents/Financial Consultants--Commodities, Vice Presidents/Financial Consultants--Commodities, Second Vice Presidents/Financial Consultants--Commodities, Senior Vice Presidents--Financial Futures and Options, First Vice Presidents--Financial Futures and Options, Vice Presidents--Financial Planning, Vice Presidents--Financial Reporting, Senior Vice Presidents--Fixed Income, Vice Presidents--Fixed Income, Assistant Vice Presidents--Fixed Income, Second Vice Presidents--Fixed Income, Vice Presidents--Fixed Income International, Vice Presidents--Fixed Income Research, Assistant Vice Presidents--Fixed Income Research, Second Vice Presidents--Fixed Income Research, Vice Presidents--Fixed Income Systems, Senior Vice Presidents--Foreign Currency Trading and Sales, First Vice Presidents--Foreign Currency Trading

and Sales, Vice Presidents--Foreign Currency Trading and Sales, Assistant Vice Presidents--Foreign Currency Trading and Sales, Vice Presidents--Foreign Exchange, Senior Vice Presidents--Futures, First Vice Presidents--Futures, Vice Presidents--Futures, Assistant Vice Presidents--Futures, Vice Presidents--Government Bonds, Vice Presidents--Government Securities, Second Vice Presidents-- Government Securities, Vice Presidents--High Yield, Vice Presidents--Institutional Administration, Assistant Vice Presidents--Institutional Administration, Senior Vice Presidents-- Institutional Equity Services, First Vice Presidents--Institutional Equity Services, Vice Presidents--Institutional Equity Services, Assistant Vice Presidents--Institutional Equity Services, First Vice Presidents--Institutional Funds, Vice Presidents--Institutional Investor Services, First Vice Presidents--Institutional Options, Vice Presidents--Institutional Options, Assistant Vice Presidents--Institutional Options, Vice Presidents--Institutional Options & Futures, Assistant Vice Presidents--Institutional Options & Futures, Senior Vice Presidents--Institutional Sales, First Vice Presidents--Institutional Sales, Vice Presidents--Institutional Sales, Second Vice Presidents--Institutional Sales, Senior Vice Presidents-- International, First Vice Presidents--International, Vice Presidents--International, Assistant Vice Presidents--International, Second Vice Presidents--International, Vice Presidents--International Operations, Senior Vice Presidents--Investments, First Vice Presidents--Investments, Vice Presidents--Investments, Second Vice Presidents--Investments, Assistant Vice Presidents-- Investment Banking, Vice President--Investment Strategy-Research, Vice Presidents--Latin America, First Vice Presidents--Leasing, First Vice Presidents--Loan Transaction, Vice Presidents-- Loan Transaction, Assistant Vice Presidents--Loan Transaction, Senior Vice Presidents--Metals, Vice Presidents--Metals, Vice Presidents--Money Market, Senior Vice Presidents--Municipals, Vice Presidents--Municipals, Assistant Vice Presidents--Municipals, Second Vice Presidents-- Municipals, Vice Presidents--Mutual Funds, Vice Presidents--OTC Trading, Second Vice Presidents--OTC Trading, First Vice Presidents--Operations, Vice Presidents--Operations, Assistant Vice Presidents--Operations, Second Vice Presidents--Operations, First Vice Presidents--Options Arbitrage, Vice Presidents--Options Arbitrage, Overseas Director, Vice Presidents--Personal Financial Planning, Vice Presidents--Public Finance, Vice Presidents--Real Estate, Assistant Vice Presidents--Regulatory Reporting, Senior Vice Presidents--Research, First Vice Presidents-- Research, Vice Presidents--Research, Assistant Vice Presidents--Research, Second Vice Presidents-- Research, Vice Presidents--Research High Yield, Assistant Vice Presidents--Research Liaison, Senior Vice Presidents--Resident Manager, Vice Presidents--Resident Manager, Senior Vice Presidents--Risk Arbitrage, Vice Presidents--Risk Arbitrage, Assistant Vice Presidents--Risk Arbitrage, Vice Presidents--Securities International, Vice Presidents--Senior Economist, Vice Presidents--Senior Financial Planning, First Vice Presidents--Stock Loan, Vice Presidents--Stock Loan, Assistant Vice Presidents--Taxable Fixed Income Research, Senior Vice Presidents--Trading, First Vice Presidents--Trading, Vice Presidents--Trading, Assistant Vice Presidents--Trading, Second Vice Presidents--Trading, Vice Presidents--Trading Floor Technology, Vice Presidents-- Unit Trust, Second Vice Presidents--Unit Trust) and such agents, as may be necessary or desirable for the business of the Corporation. Such other officers and agents shall have such duties and shall hold their offices for such terms as may be prescribed by the Board or by the appointing authority. However, absent specific affirmative action by the Board of Directors, holders of the noncorporate titles (including Davis, Skaggs Divisional Noncorporate Titles) of Chief Financial Officer of the Lehman Brothers Division, President of the Private Client Group of the Shearson Lehman Brothers Division, Managing Partner of the Lehman Brothers Division, Chief Administrative Officer of the

Lehman Brothers Division, Chief Administrative Officer of the Shearson Lehman Brothers Division, Chief Financial Officer of the Shearson Lehman Brothers Division, Chief Technology and Operations Officer of the Lehman Brothers Division, President of the Asset Management Group of the Shearson Lehman Brothers Division, Advisory Director, Assistant Vice President, Controller--Commodities, Senior Vice President--Administration, Vice President--Administration, Second Vice President--Administrative Manager, Senior Vice President--Arbitrage, First Vice President--Arbitrage, Vice President--Arbitrage, Vice President--Assistant Manager, Vice President--Associate Manager, Senior Vice President--Commodities, First Vice President--Commodities, Vice President--Commodities, Assistant Vice President--Commodities, Second Vice President--Commodities, Assistant Vice President--Commodity Meteorologist, First Vice President--Commodity Research, Vice President--Commodity Research, Assistant Vice President--Commodity Research, Vice President--Communications Planning and Technology, Vice President--Control Administrator, Senior Vice President--Convertible Arbitrage, First Vice President--Convertible Arbitrage, Vice President--Convertible Arbitrage, Assistant Vice President--Convertible Arbitrage, Senior Vice President--Corporate Bonds, Vice President--Corporate Bonds, Assistant Vice President--Corporate Bonds, Second Vice President--Corporate Bonds, Assistant Vice President--Corporate Bond Administration, First Vice President--Corporate Bond Liaison, Vice President--Corporate Bond Liaison, Assistant Vice President--Corporate Bond Liaison, Senior Vice President--Corporate Bond Sales, Assistant Vice President--Corporate Planning & Development, Senior Vice President--Derivative Marketing, Senior Vice President--Derivative Products, First Vice President--Derivative Products, Vice President--Direct Marketing, First Vice President--Equity Arbitrage Group, Vice President--Equity Arbitrage Group, Assistant Vice President--Equity Arbitrage Group, President--Shearson Equity Management, Vice President--Shearson Equity Management, Assistant Vice President--Shearson Equity Management, Vice President--Executive Compensation Planning, Managing Director/Financial Consultant, Executive Vice President/Financial Consultant, Senior Vice President/Financial Consultant, First Vice President/Financial Consultant, Vice President/Financial Consultant, Assistant Vice President/Financial Consultant, Second Vice President Financial/ Consultant, Senior Vice President/Financial Consultant--Commodities, First Vice President/Financial Consultant--Commodities, Vice President/Financial Consultant--Commodities, Second Vice President/Financial Consultant--Commodities, Senior Vice President--Financial Futures and Options, First Vice President--Financial Futures and Options, Vice President--Financial Planning, Vice President--Financial Reporting, Senior Vice President--Fixed Income, Vice President--Fixed Income, Assistant Vice President--Fixed Income, Second Vice President--Fixed Income, Vice President--Fixed Income International, Vice President--Fixed Income Research, Assistant Vice President--Fixed Income Research, Second Vice President--Fixed Income Research, Vice President--Fixed Income Systems, Senior Vice President--Foreign Currency Trading and Sales, First Vice President--Foreign Currency Trading and Sales, Vice President--Foreign Currency Trading and Sales, Assistant Vice President--Foreign Currency Trading and Sales, Vice President--Foreign Exchange, Senior Vice President--Futures, First Vice President--Futures, Vice President--Futures, Assistant Vice President--Futures, Vice President--Government Bonds, Vice President--Government Securities, Second Vice President--Government Securities, Vice President--High Yield, Vice President--Institutional Administration, Assistant Vice President--Institutional Administration, Senior Vice President--Institutional Equity Services, First Vice President--Institutional Equity Services, Vice President--Institutional Equity Services, Assistant Vice President--Institutional

Equity Services, First Vice President--Institutional Funds, Vice President--Institutional Investor Services, First Vice President--Institutional Options, Vice President--Institutional Options, Assistant Vice President--Institutional Options, Vice President--Institutional Options & Futures, Assistant Vice President--Institutional Options & Futures, Senior Vice President--Institutional Sales, First Vice President--Institutional Sales, Vice President--Institutional Sales, Second Vice President--Institutional Sales, Senior Vice President--International, First Vice President--International, Vice President--International, Assistant Vice President--International, Second Vice President--International, Vice President--International Operations, Senior Vice President--Investments, First Vice President--Investments, Vice President--Investments, Second Vice President--Investments, Assistant Vice President-- Investment Banking, Vice President--Investment Strategy-Research, Vice President--Latin America, First Vice President--Leasing, First Vice President--Loan Transaction, Vice President--Loan Transaction, Assistant Vice President--Loan Transaction, Senior Vice President--Metals, Vice President--Metals, Vice President--Money Market, Senior Vice President--Municipals, Vice President--Municipals, Assistant Vice President--Municipals, Second Vice President--Municipals, Vice President--Mutual Funds, Vice President--OTC Trading, Second Vice President--OTC Trading, First Vice President--Operations, Vice President--Operations, Assistant Vice President--Operations, Second Vice President--Operations, First Vice President--Options Arbitrage, Vice President-- Options Arbitrage, Overseas Director, Vice President--Personal Financial Planning, Vice President--Public Finance, Vice President--Real Estate, Assistant Vice President--Regulatory Reporting, Senior Vice President--Research, First Vice President--Research, Vice President--Research, Assistant Vice President--Research, Second Vice President--Research, Vice President--Research High Yield, Assistant Vice President--Research Liaison, Senior Vice President-- Resident Manager, Vice President--Resident Manager, Senior Vice President--Risk Arbitrage, Vice President--Risk Arbitrage, Assistant Vice President--Risk Arbitrage, Vice President--Securities International, Vice President--Senior Economist, Vice President--Senior Financial Planning, First Vice President--Stock Loan, Vice President--Stock Loan, Assistant Vice President--Taxable Fixed Income Research, Senior Vice President--Trading, First Vice President-- Trading, Vice President--Trading, Assistant Vice President--Trading, Second Vice President--Trading, Vice President--Trading Floor Technology, Vice President--Unit Trust, and Second Vice President--Unit Trust shall not be deemed to be corporate officers and shall not have authority to bind the Corporation to substantial obligations, and in the case of holders of departmental titles, shall not have the authority to bind the Corporation to any obligations outside their respective departments. Accordingly, the holders of such noncorporate titles (including Davis, Skaggs Divisional Noncorporate Titles) as Chief Financial Officer of the Lehman Brothers Division, President of the Private Client Group of the Shearson Lehman Brothers Division, Managing Partner of the Lehman Brothers Division, Chief Administrative Officer of the Lehman Brothers Division, Chief Administrative Officer of the Shearson Lehman Brothers Division, Chief Financial Officer of the Shearson Lehman Brothers Division, Chief Technology and Operations Officer of the Lehman Brothers Division, President of the Asset Management Group of the Shearson Lehman Brothers Division, Advisory Director, Assistant Vice President, Controller--Commodities, Senior Vice President--Administration, Vice President--Administration, Second Vice President--Administrative Manager, Senior Vice President--Arbitrage, First Vice President--Arbitrage, Vice President--Arbitrage Vice President--Assistant Manager, Vice President--Associate Manager Senior Vice President--Commodities, First Vice President--Commodities, Vice President--Commodities,

Assistant Vice President--Commodities, Second Vice President--Commodities, Assistant Vice President--Commodity Meteorologist, First Vice President--Commodity Research, Vice President--Commodity Research, Assistant Vice President--Commodity Research, Vice President--Communications Planning and Technology, Vice President--Control Administrator, Senior Vice President--Convertible Arbitrage,  First Vice President--Convertible Arbitrage, Vice President--Convertible Arbitrage, Assistant Vice President--Convertible Arbitrage, Senior Vice President--Corporate Bonds, Vice President--Corporate Bonds, Assistant Vice President--Corporate Bonds, Second Vice President--Corporate Bonds, Assistant Vice President--Corporate Bonds Administration, First Vice President--Corporate Bond Liaison, Vice President--Corporate Bond Liaison, Assistant Vice President--Corporate Bond Liaison, Senior Vice President--Corporate Bond Sales, Assistant Vice President--Corporate Planning & Development, Senior Vice President--Derivative Marketing, Senior Vice President--Derivative Products, First Vice President--Derivative Products, Vice President--Direct Marketing, First Vice President--Equity Arbitrage Group, Vice President--Equity Arbitrage Group, Assistant Vice President--Equity Arbitrage Group, President--Shearson Equity Management, Vice President--Shearson Equity Management, Assistant Vice President--Shearson Equity Management, Vice President--Executive Compensation Planning, Managing Director/Financial Consultant, Executive Vice President/Financial Consultant, Senior Vice President/Financial Consultant, First Vice President/Financial Consultant, Vice President/Financial Consultant, Assistant Vice President/Financial Consultant, Second Vice President/Financial Consultant, Senior Vice President /Financial Consultant--Commodities, First Vice President/Financial Consultant--Commodities, Vice President/Financial Consultant--Commodities, Second Vice President/Financial Consultant--Commodities, Senior Vice President--Financial Futures and Options, First Vice President--Financial Futures and Options, Vice President--Financial Planning, Vice President--Financial Reporting, Senior Vice President--Fixed Income, Vice President--Fixed Income, Assistant Vice President--Fixed Income, Second Vice President--Fixed Income, Vice President--Fixed Income International, Vice President--Fixed Income Research, Assistant Vice President--Fixed Income Research, Second Vice President--Fixed Income Research, Vice President--Fixed Income Systems, Senior Vice President--Foreign Currency Trading and Sales, First Vice President--Foreign Currency Trading and Sales, Vice President--Foreign Currency Trading and Sales, Assistant Vice President--Foreign Currency Trading and Sales, Vice President--Foreign Exchange, Senior Vice President--Futures, First Vice President--Futures, Vice President--Futures, Assistant Vice President--Futures, Vice President--Government Bonds, Vice President--Government Securities, Second Vice President--Government Securities, Vice President--High Yield, Vice President--Institutional Administration, Assistant Vice President--Institutional Administration, Senior Vice President--Institutional Equity Services, First Vice President--Institutional Equity Services, Vice President--Institutional Equity Services, Assistant Vice President--Institutional Equity Services, First Vice President--Institutional Funds, Vice President--Institutional Investor Services, First Vice President--Institutional Options, Vice President--Institutional Options, Assistant Vice President--Institutional Options, Vice President--Institutional Options & Futures, Assistant Vice President--Institutional Options & Futures, Senior Vice President--Institutional Sales, First Vice President--Institutional Sales, Vice President--Institutional Sales, Second Vice President--Institutional Sales, Senior Vice President--International, First Vice President--International, Vice President--International, Assistant Vice President--International, Second Vice President--International, Vice President--International Operations, Senior Vice President--Investments, First

Vice President--Investments, Vice President--Investments, Second Vice President--Investment, Assistant Vice President--Investment Banking, Vice President--Investments Strategy-Research, Vice President--Latin America, First Vice President--Leasing, First Vice President--Loan Transaction, Vice President--Loan Transaction, Assistant Vice President--Loan Transaction, Senior Vice President--Metals, Vice President--Metals, Vice President--Money Market, Senior Vice President--Municipals, Vice President--Municipals, Assistant Vice President--Municipals, Second Vice President--Municipals, Vice President--Mutual Funds, Vice President--OTC Trading, Second Vice President--OTC Trading, First Vice President--Operations, Vice President--Operations, Assistant Vice President--Operations, Second Vice President--Operations, First Vice President--Options Arbitrage, Vice President--Options Arbitrage, Overseas Director, Vice President--Personal Financial Planning, Vice President--Public Finance, Vice President--Real Estate, Assistant Vice President--Regulatory Reporting, Senior Vice  President--Research, First Vice President--Research, Vice President--Research, Assistant Vice President--Research, Second Vice President--Research, Vice President--Research High Yield, Assistant Vice President--Research Liaison, Senior Vice President--Resident Manager, Vice President--Resident Manager, Senior Vice President--Risk Arbitrage, Vice President--Risk Arbitrage, Assistant Vice President--Risk Arbitrage, Vice President--Securities International, Vice President--Senior Economist, Vice President--Senior Financial Planning, First Vice President--Stock Loan, Vice President--Stock Loan, Assistant Vice President--Taxable Fixed Income Research, Senior Vice President--Trading, First Vice President--Trading, Vice President--Trading, Assistant Vice President--Trading, Second Vice President--Trading, Vice President-Trading Floor Technology, Vice President--Unit Trust, and Second Vice President--Unit Trust shall not be reportable as officers of the Corporation to any regulatory or self-regulatory authority, exchange, clearing corporation or the like.

**Section 2.**          **Resignations.**  Any officer of the Corporation may resign at any time by giving written notice of his resignation to the Board, the Chairman of the Board or the Secretary. Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 3.**                **Removal.**  Any officer or agent of the Corporation may be removed, either with or without cause and without prejudice to any rights existing under any contract, at any time, by the Board at any meeting of the Board, or except in the case of an officer or agent elected or appointed by the Board, by any officer to whom the Board shall have delegated the power to appoint such officer being removed.

**Section 4.**                **Vacancies.**  A vacancy in any office, whether arising from death, resignation, removal or any other cause, may be filled for the unexpired portion of the term of the office which shall be vacant, in the manner prescribed in these By-Laws for the regular election or appointment to such office.

**Section 5.**                **The Chairman of the Board.**  The Chairman of the Board shall, if present, preside at each meeting of the shareholders and of the Board.  He shall perform all duties incident to the office of Chairman of the Board and such other duties as may from time to time be assigned to him by the Board.

**Section 6.**                **The Co-Chairman of the Board.**  The Co-Chairman of the Board shall, in the absence of the Chairman of the Board, preside at each meeting of the shareholders and the Board.  He shall perform all duties incident to the office of Co-Chairman of the Board and such other duties as may from time to time be assigned to him by the Board.

**Section 7.**                **The Vice Chairman of the Board.**  One of the Vice Chairmen of the Board shall, in the absence of the Chairman of the Board and the Co-Chairman of the Board, preside at each meeting of the shareholders and the Board.  They shall perform all duties incident to the office of Vice Chairman of the Board and such other duties as may from time to time be assigned to them by the Board.

**Section 8.**                **The Chief Executive Officer.**  The Chief Executive Officer shall be the chief executive officer of the Corporation and shall have the general and active management of and supervision and direction over the business and affairs of the Corporation and over its several officers, subject, however, to the control of the Board.  He shall, in the absence of the Chairman of the Board, the Co-Chairman of the Board and the Vice Chairmen of the Board, preside at each meeting of the shareholders and of the Board and shall be an ex officio member of all committees of the Board.  He shall see that all orders and directions of the shareholders and the Board are carried into effect.  He may sign, execute and deliver, in the name of the Corporation, all certificates, deeds, mortgages, bonds, contracts and other instruments authorized by the Board, except in cases where the signing, execution and delivery thereof shall be expressly delegated by the Board or by these By-Laws to some other officer or agent of the Corporation or except as otherwise provided by statute.  He may affix the seal of the Corporation to any instrument which shall require it.  In general, he shall perform all duties incident to the office of Chief Executive Officer and such other duties as from time to time may be assigned to him by the Board, or by these By-Laws.

**-14-**

**Section 9.**          **The Chief Operating Officer.**  The Chief Operating Officer shall be the chief operating officer of the Corporation, and shall assist the Chief Executive Officer in the active management of and supervision and direction over the business and affairs of the Corporation and over its several officers, subject, however, to the control of the Board. He shall, in the absence of the Chairman of the Board, the Co-Chairman of the Board, the Vice Chairmen of the Board and the Chief Executive Officer, preside at each meeting of the shareholders and of the Board.  He shall see that all orders and directions of the shareholders and the Board are carried into effect.  In general, he shall perform all duties incident to the office of Chief Operating Officer and such other duties as from time to time may be assigned to him by the Board, or by these By-Laws.

**Section 10.**          **President.**  The President shall, in the absence of the Chairman of the Board, the Co-Chairman of the Board, the Vice Chairmen of the Board, the Chief Executive Officer and the Chief Operating Officer, preside at each meeting of the shareholders and of the Board.  He shall perform all duties incident to
the office of President and such other duties as may from time to time be assigned to him by the Board, or by these By-Laws.

**Section 11.**          **The Chief Financial Officer.**  The Chief Financial Officer shall be the chief financial officer of the Corporation, and shall render to the Board, whenever the Board may require, an account of the financial condition of the Corporation; shall make, sign and execute financial, tax and similar reports to any State, Federal or Municipal Government or Department; shall provide for the continuous review of all accounts and reports; and shall perform such other duties as may, from time to time, be assigned to him by the Board or the Chairman of the Board.

**Section 12.**          **The Chief Administrative Officer or Co-Chief Administrative Officers.**  The Chief Administrative Officer or Co-Chief Administrative Officers as the case may be shall be the chief administrative officer(s) of the Corporation, and shall have responsibility for the various operational facilities and personnel and related support services of the Corporation.  In general, they shall perform all duties incident to the office of the Chief Administrative Officer or Co-Chief Administrative Officer and such other duties as from time to time may be assigned to them by the Board or the Chairman of the Board.

**Section 13.**          **Senior Managing Director of the Corporation.**  Each Senior Managing Director of the Corporation shall have such powers and perform such duties as the Board or the Chairman of the Board may from time to time prescribe, and shall perform such other duties as may be prescribed in these By-Laws.  The office of Senior Managing Director of the Corporation described in this section shall be distinguished from the office of Senior Managing Director of a Division described in Section 18 of these By-Laws.

**Section 14.**          **Vice Presidents.**  Each Senior Executive Vice President, Executive Vice President, Senior Vice President, First Vice President and Vice President shall have such powers and perform such duties as the Board or the Chairman of the Board may from time to time prescribe, and shall perform such other duties as may be prescribed in these By-Laws.

-15-

**Section 15.**          **The Controller.**  The Controller shall be the Chief Accounting Officer of the Corporation and shall cause to be maintained adequate records of all assets, liabilities and transactions of the Corporation; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and have control of all the books of account of the Corporation; and shall perform such other duties as may, from time to time, be assigned to him by the Board or the Chairman of the Board.

**Section 16.**          **The Treasurer.**  The Treasurer shall:

    a.          have charge and custody of, and be responsible for, all the funds and securities of the Corporation;

    b.          cause all monies and other valuables to be deposited to the credit of the Corporation in such depositories as may be designated by the Board;

    c.          be responsible for managing the funds of the Corporation and arranging for short term financing to carry out the business of the Corporation; and

    d.          in general, perform all the duties incident to the office of Treasurer and Chief Money Manager of the Corporation and such other duties as may from time to time be assigned to him by the Board or the Chairman of the Board.

**Section 17.**          **The Secretary.**  The Secretary shall:

    a.          keep or cause to be kept, in one or more books provided for the purpose, the minutes of all meetings of the Board, the committees of the Board and the shareholders;

    b.          see that all notices are duly given in accordance with the provisions of these By-Laws and as required by law;

    c.          be custodian of the records and the seal of the Corporation and affix and attest the seal to all stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and affix and attest the seal to all other documents to be executed on behalf of the Corporation under its seal;

    d.          see that the books, reports, statements, certificates and other documents and records required by law to be kept and filed are properly kept and filed; and

    e.          in general, perform all the duties incident to the office of Secretary and such other duties as from time to time may be assigned to him by the Board or the Chairman of the Board.

**Section 18.**          **Divisions and Divisional Officers and Noncorporate Titleholders.**  The Lehman Brothers Division shall carry on the investment banking, merchant banking, capital markets

-16-

and related activities of the Corporation.  The Chairman, Vice Chairman, President, Chief Executive Officer (or Co-Chief Executive Officers as the case may be) each Senior Managing Director and each Managing Director of the Lehman Brothers Division shall for all purposes be corporate Officers of the Corporation with authority at least commensurate with any Senior Vice President of the Corporation to enter into commitments on behalf of the Corporation, and shall have such further duties as may from time to time be assigned to each of them by the Board, the Chairman of the Board, or these By-Laws.

The Shearson Lehman Brothers Division shall carry on the individual investor and asset management and related activities of the Corporation.  The Chairman, Vice Chairman, President and Chief Executive Officer of the Shearson Lehman Brothers Division shall for all purposes be a corporate Officer of the Corporation, and shall have such duties as may from time to time be assigned to him by the Board, the Chairman of the Board, or these By-Laws.

The Davis, Skaggs Division shall carry on business previously carried on by Davis, Skaggs & Co., Inc.  The Davis, Skaggs Division shall initially include the noncorporate title of Vice President/Financial Consultant and shall from time to time include such other noncorporate titles as shall be available at the Corporation generally in accordance with Section 1 of this Article IV.

The Board may also from time to time by resolution establish other Divisions of the Corporation for such purposes as shall be specified in the resolution creating each such respective Division.  The Chairman, each Senior Managing Director and each Managing Director of each such other Division shall likewise be corporate Officers of the Corporation and shall have such duties and such authority as shall from time to time be assigned to each of them by the Board, the Chairman of the Board, or these By-Laws.

The Chairman, the Senior Managing Directors and the Managing Directors of any Division shall not, however, unless otherwise so elected, be members of the Board of Directors of the Corporation.

**Section 19.**             **Officers' Bonds or other Security.**  If required by the Board, any officer of the Corporation shall give a bond or other security for the faithful performance of his duties, in such amount and with such surety or sureties as the Board may require.

**Section 20.**             **Compensation.**  The compensation of the officers of the Corporation for their services as such officers may be fixed from time to time by the Board; provided, however, that the Board may delegate to any officer the power to fix the compensation of officers and agents appointed by such officer.  An officer of the Corporation shall not be prevented from receiving compensation by reason of the fact that he is also a director of the Corporation, but any such officer who shall also be a director shall not have any vote in the determination of the amount of compensation paid to him.

**Section 21.**             **Directors and Officers of Subsidiaries.**  All directors and corporate officers of subsidiaries of the Corporation must be approved by the Board of Directors of this Corporation.

-17-

**Article V**
**Contracts, Checks, Drafts, Bank Accounts, Etc.**

**Section 1.**                    **Execution of Contracts.**    Except as otherwise required by statute, the Certificate of Incorporation or these By-Laws, any contracts or other instruments may be executed and delivered in the name and on behalf of the Corporation by such officer or officers (including any assistant officer or officers) of the Corporation as the Board may from time to time direct.  Such authority may be general or confined to specific instances as the Board may determine.  Unless authorized by the Board or expressly permitted by these By-Laws, an officer or agent or employee shall not have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it pecuniarily liable for any purpose or to any amount.  Notwithstanding the foregoing, any officer of the Corporation of the rank of Executive Vice President or above is authorized upon instruction from the Vice Chairman of the Board of the Corporation to sign on behalf of the Corporation the Memorandum of Agreement, dated May 13, 1982, among McLeod Young Weir Limited, the Corporation and Shearson Loeb Rhoades (Canada) Inc., and any other documents and agreements contemplated thereby which are required to be executed by the Corporation.

**Section 2.**                    **Loans.**    Unless the Board shall otherwise determine, the Chairman of the Board, the Co-Chairman of the Board, the Vice Chairmen of the Board, the Chief Executive Officer, the Chief Operating Officer, the President, any Executive Vice President, the Controller, the Treasurer or the Secretary may effect loans and advances at any time for the Corporation from any bank, trust company or other institution, or from any firm, corporation or individual, and for such loans and advances may make, execute and deliver promissory notes, bonds or other certificates or evidences of indebtedness of the Corporation, but no officer or officers shall mortgage, pledge, hypothecate or transfer any securities or other property of the Corporation, except when authorized by the Board.

**Section 3.**                    **Checks, Drafts, Etc.**    All checks, drafts, bills of exchange or other orders for the payment of money out of the funds of the Corporation, and all notes or other evidences of indebtedness of the Corporation, shall be signed in the name and on behalf of the Corporation by such persons and in such manner as shall from time to time be authorized by the Board or as may be designated by any officer or officers of the Corporation to whom such power of designation may from time to time be delegated by the Board.

**Section 4.**                    **Deposits.**    All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board may from time to time designate or as may be designated by any officer or officers of the Corporation to whom such power of designation may from time to time be delegated by the Board.  For the purpose of deposit and for the purpose of collection for the account of the Corporation, checks, drafts and other orders for the payment of money which are payable to the order of the Corporation may be endorsed, assigned and delivered by any officer or agent of the Corporation.

-18-

**Section 5.**                **General and Special Bank Accounts.**  The Board may from time to time authorize the opening and keeping of general and special bank accounts with such banks, trust companies or other depositories as the Board may designate or as may be designated by any officer or officers of the Corporation to whom such power of designation may from time to time be delegated by the Board.  The Board may make such special rules and regulations with respect to such bank accounts, not inconsistent with the provisions of these By-Laws, as it may deem expedient.

**Article VI**
**Shares, Etc.**

**Section 1.**                **Stock Certificates.**  Each owner of stock of the Corporation shall be entitled to have a certificate, in such form as shall be approved by the Board, certifying the number of shares of stock of the Corporation owned by him.   The certificates representing shares of stock shall be signed in the name of the Corporation by the Chairman or a Vice Chairman of the Board of Directors, or the President or a Vice President, and by the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer and sealed with the seal of the Corporation (which seal may be a facsimile, engraved or printed); provided, however, that where any such certificate is countersigned by a transfer agent, or is countersigned by a transfer clerk acting on behalf of the Corporation and is registered by a registrar (which may be the same entity as the transfer agent) (other than the Corporation or one of its employees), the signatures of the Chairman of the Board, a Vice Chairman of the Board, President, Vice President, Secretary, Assistant Secretary, Treasurer or Assistant Treasurer upon such certificates may be facsimiles, engraved or printed.   If any officer who has signed such certificates shall cease to be such officer before such certificates have been issued, they may nevertheless be issued by the Corporation with the same effect as if such officer were still in office at the date of their issue.

**Section 2.**                **Books of Account and Record of Shareholders.**   There shall be kept correct and complete books and records of account of all the business and transactions of the Corporation.  There shall also be kept, at the office of the Corporation in the State of New York or at the office of its transfer agent within or without said State, a record containing the names and addresses of all shareholders of the Corporation, the number of shares of stock held by each, and the dates when they became the owners of record thereof.

**Section 3.**                **Transfers of Shares.**  Transfers of shares of stock of the Corporation shall be made on the stock records of the Corporation only upon authorization by the registered holder thereof, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Secretary or with a transfer agent or transfer clerk, and on surrender of the certificate or certificates for such shares properly endorsed or accompanied by a duly executed stock transfer power and the payment of all taxes thereon.  Except as otherwise provided by law, the Corporation shall be entitled to recognize the exclusive right of a person in whose name any share or shares stand on the record of shareholders as the owner of such share or shares for all purposes, including, without limitation, the rights to receive dividends or other distributions, and to vote as such owner,

-19-

and the Corporation shall not be bound to recognize any equitable or legal claim to or interest in any such share or shares on the part of any other person.  Whenever any transfers of shares shall be made for collateral security and not absolutely and written notice thereof shall be given to the Secretary or to such transfer agent or transfer clerk, such fact shall be stated in the entry of the transfer.

**Section 4.**            **Regulations.**  The Board may make such additional rules and regulations, not inconsistent with these By-Laws, as it may deem expedient concerning the issue, transfer and registration of certificates for shares of stock of the Corporation.  It may appoint, or authorize any officer or officers to appoint, one or more transfer agents or one or more transfer clerks and one or more registrars and may require all certificates for shares of stock to bear the signature or signatures of any of them.

**Section 5.**            **Fixing of Record Date.**  The Board may fix, in advance, a date not more than sixty nor less than ten days before the date then fixed for the holding of any meeting of the shareholders or before the last day on which the consent or dissent of the shareholders may be effectively expressed for any purpose without a meeting, as the time as of which the shareholders entitled to notice of and to vote at such meetings or whose consent or dissent is required or may be expressed for any purpose, as the case may be, shall be determined, and all persons who were holders of record of voting stock at such time, and no others, shall be entitled to notice of and to vote at such meeting or to express their consent or dissent, as the case may be.  The Board may fix, in advance, a date not more than sixty days preceding the date fixed for the payment of any dividend or the making of any distribution or the allotment of rights to subscribe for securities of the Corporation, or for the delivery of evidences of rights or evidences  of interests arising out of any change, conversion or exchange of capital stock or other securities, as the record date for the determination of the shareholders entitled to receive any such dividend, distribution, allotment, rights or interests and in such case only the
shareholders of record at the time so fixed shall be entitled to receive such dividend, distribution, allotment, rights or interests.

**Section 6.**            **Lost, Destroyed or Mutilated Certificates.**  The holder of any certificate representing shares of stock of the Corporation shall immediately notify the Corporation of any loss, destruction or mutilation of such certificate, and the Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it which the owners thereof shall allege to have been lost or destroyed or which shall have been mutilated, and the Board may, in its discretion, require such owner or his legal representatives to give to the Corporation a bond in such sum, limited or unlimited, and in such form and with such surety or sureties as the Board in its absolute discretion shall determine to indemnify the Corporation against any claim that may be made against it on account of the alleged loss or destruction of any such certificate, or the issuance of such new certificate.  Anything herein to the contrary notwithstanding, the Board, in its absolute discretion, may refuse to issue any such new certificate, except pursuant to legal proceedings under the laws of the State of New York.

**Section 7.**            **Information to Shareholders and Others.**  Any person who shall have been a shareholder of record of the Corporation for at least six months immediately preceding his

-20-

demand, or any person holding, or thereunto authorized by the holders of, at least 5 percent of the outstanding shares of stock of the Corporation,

    a.    shall, upon at least five days' written demand to the Corporation, have the right to examine in person or by agent or attorney, during the usual business hours, its minutes of the  proceedings of its shareholders and its record of shareholders and to make extracts therefrom, subject, however, to compliance by such person with such rules and regulations, not inconsistent with statute, as the Board may prescribe; and

    b.    shall, upon at least five days' written request to the Corporation, be furnished by the Corporation with its balance sheet and profit and loss statement for the Corporation's fiscal year last preceding such request (or, if such balance sheet and profit and loss statement shall not have been prepared at the date of such request, the Corporation shall prepare them within a reasonable time thereafter and shall furnish them to such shareholder), together with the Corporation's most recent interim balance sheet and profit and loss statement, if any, that shall have been distributed to its shareholders or otherwise made available to the public.

Within two business days after written demand to the Corporation by any shareholder (or by any other person entitled to make such demand pursuant to statute) to inspect a current list of the directors and officers of the Corporation and their respective residence addresses, the Corporation shall, within two business days after its receipt of such demand and for a period of one week thereafter, make such a list available for such inspection at its principal office during regular business hours.

## Article VII
### Office

The principal office of the Corporation within the State of New York shall be American Express Tower, World Financial Center, New York, New York, 10285 or at such other address within the State of New York as may be fixed by the Board.

## Article VIII
### Seal

The seal of the Corporation shall be circular in form and shall include the words and numbers "Shearson Lehman Brothers Inc., Delaware, l965."

## Article IX
### Amendments

These By-Laws may be amended or repealed, or new By-Laws may be adopted, at any annual or special meeting of the shareholders, by vote of the shareholders entitled to vote in the election of directors; provided, however, that the notice of such meeting shall have been given as provided in

-21-

these By-Laws, which notice shall mention that amendment or repeal of these By-Laws, or the adoption of new By-Laws, is one of the purposes of such meeting.  These By-Laws may also be amended or repealed, or new By-Laws may be adopted, by the Board at any meeting thereof; provided, however, that notice of such meeting shall have been given as provided in these By-Laws, which notice shall mention that amendment or repeal of the By-Laws, or the adoption of new By-Laws, is one of the purposes of such meeting; and provided, further, that By-Laws adopted by the Board may be amended or repealed  by the shareholders as hereinabove provided.

**Article X**
**Miscellaneous**

No dividend shall be declared or paid which shall impair the capital of the Corporation nor shall any distribution of assets be made to any shareholder unless the value of the assets of the Corporation remaining after such payment or distribution is at least equal to the aggregate of its debts and liabilities, including capital.

#26935

**EXHIBIT 6**

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    **CAROL E. HUFF**                PART _32_
                        *Justice*

| | |
|---|---|
| Index Number : 113587/2010 | INDEX NO.            _____ |
| **SARDIS, JEFFREY** | MOTION DATE        _____ |
| VS. | |
| **LEHMAN BROTHERS DIVERSIFIED** | MOTION SEQ. NO.   _____ |
| SEQUENCE NUMBER : 001 | MOTION CAL. NO.   _____ |
| TURNOVER PROCEEDING | |

, this motion to/for _____

**PAPERS NUMBERED**

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...    _____

Answering Affidavits — Exhibits _____    _____

Replying Affidavits _____    _____

Cross-Motion:    ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this motion

motion is decided in accordance
with accompanying memorandum decision

*FILED*

APR 08 2011

NEW YORK
COUNTY CLERK'S OFFICE

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):**

Dated: _____APR 07 2011_____        _____
                                          **CAROL E. HUFF**    *J.S.C.*

Check one:    ☒ **FINAL DISPOSITION**    ☐ **NON-FINAL DISPOSITION**

Check if appropriate:    ☐ **DO NOT POST**    ☐ **REFERENCE**

☐ **SUBMIT ORDER/ JUDG.**    ☐ **SETTLE ORDER/ JUDG.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 32

------------------------------------------------------------------------x

JEFFREY SARDIS, LAUREN SARDIS, and                :      Index No. 113587/10
JAS HOLDING CORPORATION.,

                                     Petitioners,  :

              - against -                          :

LEHMAN BROTHERS DIVERSIFIED PRIVATE               :
EQUITY FUND 2004, L.P.,
LEHMAN BROTHERS PARTNERSHIP, L.P., and            :
CO-INVESTMENT CAPITAL PARTNERS, L.P., and
LB CCP GP, L.P.,                                  :

                                     Respondents. :

              - and -                              :

SOFIA FRANKEL,                                     :

                          Judgment                 :
                          Debtor/Additional
                          Respondent               :
------------------------------------------------------------------------x

CAROL E. HUFF, J.:

Petitioners are judgment creditors who seek to enforce their judgment against property
held by respondents in the name of the judgment debtor/additional respondent Sofia Frankel.
They seek a turnover order pursuant to CPLR 5225(b) and 5227, or, alternatively, a charging
order pursuant to N.Y. Partnership Law § 121-702 and Del. Code Ann. tit. 6, § 17-703.
Respondents do not oppose the petition. Frankel asserts three counterclaims.

On October 30, 2008, the Financial Industry Regulatory Authority issued an arbitration
award against Frankel and in favor of petitioners in the amount of $2.5 million. In the arbitration,

petitioners had alleged that Frankel, as their broker, engaged in fraud, churning, breaches of

contract, negligence and breaches of fiduciary duty.  The award was confirmed and an appeal to

the First Department was denied (Frankel v Sardis, 76 AD3d 136 [1st Dept 2010]).  An application

to enforce the judgment against Frankel's interests held by Barclays Bank PLC was granted

(Sardis v Barclays Bank PLC, Sup Ct, NY County, Aug. 26, 2010, Solomon, J., index No.

603582/09).  Barclays, however, controlled only a small amount of cash ($1, 715.09), and stated

that the remainder of the assets were in three limited partnerships controlled by the current

respondents.

Petitioners now seek to enforce the judgment against Frankel's interest in the three limited

partnerships.  As of March 2010, the value of Frankel's share in the partnerships was

approximately $507,000.

CPLR 5225(b) provides:

> Upon a special proceeding commenced by the judgment creditor, against a person
> in possession or custody of money or other personal property in which the
> judgment debtor has an interest . . . where it is shown that the judgment debtor is
> entitled to the possession of such property . . . the court shall require such person
> to pay the money, or so much of it as is sufficient to satisfy the judgment to the
> judgment creditor. . . .

"Where property consists of an interest in a partnership, any partner other than the

judgment debtor, on behalf of the partnership, shall be the garnishee." CPLR 5201(c)(3).

Frankel opposes the petition, asserting three counterclaims.  The first contends that her

husband has an interest in the limited partnerships, and that his adverse claims need to be

adjudicated.  However, despite asserting that he "intends" to intervene in this proceeding, he has

not sought to do so, and the Solomon decision, supra, found no such interest.  The second

-2-

contends that, in the event the Court issues a charging order with respect to Frankel's interests, petitioners should be treated as tenants in common of the limited partnership interests with the husband, and be compelled to contribute a prorata share of any capital call by the general partner. Again, however, no interest on the husband's part has been established, and no law is cited to support this contention, which would severely hamper petitioners' rightful recovery. The third contends that a valuation of Frankel's interests in the partnerships must be made prior to awarding petitioners the assets. The valuation would be, however, the cash value that petitioners receive toward satisfying their judgment.

The petition is granted to the extent that it seeks a turnover of Frankel's interests in the three limited partnerships.

Settle judgment.

Dated:
APR 0 7 2011

CAROL E. HUFF
J.S.C.

-3-

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| | |
| Debtor. | |

**[PROPOSED] ORDER GRANTING THE TRUSTEE'S SUPPLEMENTAL**
**OBJECTION TO THE GENERAL CREDITOR PROOF OF CLAIM OF SOFIA**
**FRANKEL (CLAIM NO. 6430 (AMENDING AND SUPERSEDING CLAIM NO. 4909))**

Upon the objection dated March 3, 2014 (the "Objection"),[1] of James W. Giddens

(the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI")

under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.*

("SIPA"), seeking entry of an order, pursuant to section 502(b) of title 11 of the United States

Code (the "Bankruptcy Code"), as made applicable to this proceeding pursuant to sections

78fff(b) and 78fff-1(a) of SIPA, seeking to disallow and expunge the general creditor claim

represented by number 4909 (the "Original Claim") filed by Sofia Frankel, as more fully

described in the Objection, and the supplemental objection dated May 30, 2014 (the

"Supplemental Objection") of the Trustee seeking entry of an order, pursuant to section 502(b)

of title 11 of the Bankruptcy Code, seeking to disallow and expunge the general creditor claim

represented by number 6430 (the "Amended Claim"); and due and proper notice of the Objection

and the Supplemental Objection having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Supplemental Objection is in the best interests of LBI, its estate, its customers and creditors, and

---

1.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

all parties in interest and that the legal and factual bases set forth in the Objection and the

Supplemental Objection establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

        **ORDERED** that the relief requested in the Supplemental Objection is granted;

and it is further

        **ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the

Amended Claim is disallowed and expunged in its entirety with prejudice; and it is further

        **ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.


Dated: New York, New York
      \_\_\_\_\_ \_\_, 2014

                        _____

                        HONORABLE SHELLEY C. CHAPMAN,
                        UNITED STATES BANKRUPTCY JUDGE