UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (SCC) SIPA

DECLARATION OF RICHARD J.J.
SCAROLA IN SUPPORT
OF MOTION TO COMPEL OF THE
INDIVIDUALS IDENTIFIED IN
THE NOTICES OF APPEARANCE
AT ECF DKT. NOS. 8234 AND 8905

RICHARD J.J. SCAROLA declares under penalty of perjury:

1.      I am a member of the Bar of this Court and a member of Scarola
Malone & Zubatov LLP, attorneys for 341 Individuals Identified in the Notices of Appearances
at ECF Docket Nos. 8234 and 8095 (the "Client Group").  I make this Declaration in support
of the Client Group's Motion for entry of an order, pursuant to 9 U.S.C. §2, to compel
arbitration and stay so much of the proceeding initiated by the Trustee's Converted Omnibus
Objections (ECF Dkt. No. 8783) as seeks to subordinate the Client Group's claims.

2.      Attached hereto as Exhibit A is a true and correct copy of the Executive
and Select Employees Deferred Compensation Agreement, entered into by each Client
Group Member with Shearson Lehman Brothers Inc. ("Shearson") in 1985.

3.      Attached hereto as Exhibit B is a true and correct copy of the Trustee's
Converted Omnibus Objections (ECF Dkt. No. 8576).

4.      Attached hereto as Exhibit C is a true and correct copy of the Client
Group's Answer (ECF Dkt. No. 8783) to the Trustee's Converted Omnibus Objections.

5.      I declare under penalty of perjury in accordance with 28 U.S.C. § 1746

that the foregoing is true and correct.

Executed on June 6, 2014

_____
Richard J.J. Scarola

# EXHIBIT A

EXECUTIVE AND SELECT EMPLOYEES
DEFERRED COMPENSATION AGREEMENT

Shearson Lehman Brothers Inc., (Shearson) for itself and as agent for
certain of its subsidiaries as provided in paragraph 8, which together may
be referred to hereinafter as the (Employer) and Clifford M. Topol
(Employee) agree as follows:

1. Deferred Compensation.

Certain compensation, the amount and description of which is set
forth in Exhibit A attached hereto, shall be deferred according to the
terms and conditions of this agreement. All or a portion of such compensa-
tion may have been previously deferred under Shearson's Voluntary Deferred
Compensation Plan (VDCP) and if so, any such previously deferred amounts
shall henceforth be deferred in accordance with the terms and conditions of
this agreement. In consideration of this agreement, Employee relinquishes
all rights under the VDCP with respect to the amount of deferred compensa-
tion, if any, set forth in Exhibit A which is further deferred hereunder.
Any part of the total amount deferred pursuant to Exhibit A which is not
attributable to the VDCP shall be deferred from compensation to which Em-
ployee would otherwise be entitled from the Employer during the balance of
calendar year 1985 and calendar years 1986 through 1988.

Any portion of the total amount to be deferred hereunder which is not
deferred during 1985 and 1986 will be deferred in calendar years 1987 and
1988 and the form of such deferral will be elected by Employee no later
than December 31, 1986.

2. Deferred Compensation Payments.

Subject to the provisions of paragraphs 3, 4, 5(a) and 9, in consid-
eration of the deferrals provided for in paragraph 1 Shearson shall make
the following payments to Employee or Employee's beneficiary or benefi-
ciaries designated according to paragraph 6:

- 1 -

(a)  If Employee is living on the date that payments to Employee pro-
vided for in this subparagraph (a) are to commence, Shearson shall make
fifteen (or fewer number as determined by the Administrative Committee of
the Board of Directors) consecutive equal annual payments to Employee or in
the event of Employee's death after the commencement of payments to Employ-
ee's designated beneficiary or beneficiaries as follows:

   (i)  The first of these payments shall be made on the date that Em-
        ployee reaches age 65 (or, if later, his actual retirement from
        Shearson) or on any earlier date of retirement after Employee
        reaches age 55 and prior to the date Employee reaches age 65
        which date of retirement is specified in a written notice de-
        livered by Employee to Shearson no later than 60 days prior to
        such specified date.

  (ii)  The remaining fourteen payments (or fewer number of payments as
        the case may be) shall be made on the fourteen (or fewer) suc-
        ceeding anniversary dates of the date such payments commence as
        provided in clause (i) above.

 (iii)  If these payments commence when Employee reaches age 65, the
        amount of each payment shall be the amount specified in Exhibit B
        hereto attached.* If these payments commence prior to Employee
        reaching age 65, the amount of each payment shall be an amount
        determined by using the same rate of interest used to determine
        payments commencing at age 65. For purposes of illustration,
        Exhibit B contains examples of estimated amounts payable if com-
        mencement occurs at age 55 or 60 respectively. Payments which
        commence after age 65 shall be determined in a similar manner.

   (b)  If Employee dies prior to the date that payments to Employee
provided for in subparagraph (a) above are to commence (except in the case
of suicide as described below), Shearson shall make fifteen (or fewer as
the case may be) consecutive annual payments to Employee's designated

*     The payments set forth in Exhibit B are estimated figures which are
subject to later adjustment to account for the timing of deferrals and/or a
payment schedule shorter than fifteen years.

- 2 -

beneficiary or beneficiaries in an amount equal to the amount Employee
would have received had he survived, completed his compensation deferral at
the rate of 25% per year for each of the calendar years 1985 through 1988
(unless such Employee elected to defer entirely from the VDCP), and com-
menced receiving payments at age 65. The first of these payments shall be
made as soon as practicable after Shearson receives appropriate notice and
proof of Employee's death, and the remaining payments shall be made on the
fourteen (or fewer as the case may be) succeeding anniversary dates of the
first of such payments. However, in the event Employee dies as a result of
suicide within two years after the effective date of this agreement, Em-
ployee's designated beneficiary or beneficiaries shall be entitled to re-
ceive hereunder, only the amount of compensation deferred by Employee under
this agreement plus interest credited in the same manner as provided in
paragraph 3 below.

(c)  If Employee becomes totally disabled (as defined in Exhibit C
attached hereto) prior to retirement, in addition to any other disability
benefits to which Employee may be entitled, Shearson shall pay Employee
1/12th of the amount set forth in Exhibit C for each full month of dis-
ability from the date Employee ceases to be an employee because of such
total disability until the earlier of Employee's death or the date the
payments to Employee provided for in subparagraph (a) above are to commence
but in no event later than attainment of age 65. If an Employee becomes
totally disabled prior to the completion of his compensation deferrals as
set forth in paragraph 1, such Employee's retirement benefit shall be de-
termined under paragraph 2 as if such Employee completed his compensation
deferrals at the rate of 25% per year for each of the calendar years 1985
through 1988.

3.  Payments Prior to Vesting or Effective Date.

If Employee dies or becomes totally disabled before this agreement
becomes effective as provided in paragraph 7, or if prior to September 25,
1990 Employee ceases to be an employee of the Employer or of an affiliate
for any reason whatsoever (including termination of employment by Shearson

- 3 -

with or without cause) other than death, total disability or retirement*,
(a) subsequent deferrals and withholding of compensation provided for in
paragraph 1 shall cease, and (b) Shearson shall have no obligation of any
kind hereunder except to pay Employee, or Employee's designated beneficiary
or beneficiaries if Employee is deceased, as promptly as practicable an
amount equal to the amount of compensation theretofore deferred and/or
withheld as provided in paragraph 1 plus interest thereon at an annual rate
equal to the lesser of 5% or the weekly 90-day Treasury Bill auction rate
(on a discounted basis) averaged over a 12 month period ending on the date
of payment. Such interest shall be compounded annually on a calendar year
basis and shall be credited with respect to the average daily balance in
the deferred compensation account each calendar year.

4. Termination.

The Administrative Committee of Shearson has the right (if the Admin-
istrative Committee also terminates those similar agreements with its other
Employees which become effective on or about the effective date of this
agreement) to terminate this agreement, and Shearson's and Employee's
obligations hereunder, at any time by giving Employee, or Employee's desig-
nated beneficiary or beneficiaries if Employee is deceased, written notice
to that effect. In that event, Shearson shall pay Employee or Employee's
designated beneficiary or beneficiaries not less than the amount of com-
pensation theretofore deferred and/or withheld as provided in paragraph 1
plus interest thereon at an annual rate equal to the lesser of 5% or the
weekly 90-day Treasury Bill auction rate (on a discounted basis) averaged
over a 12 month period ending on the date of payment elected by Employee
pursuant to Exhibit D. Such interest shall be compounded annually on a
calendar year basis and shall be credited with respect to the average daily
balance in the deferred compensation account each calendar year. However,
if economically feasible upon such termination, Shearson intends to credit

\*    For purposes of this agreement, retirement shall be determined by the
Administrative Committee of the Board of Directors of Shearson (Administra-
tive Committee) and if Employee is over the age of 60 upon the effective
date of this agreement, the Administrative Committee may apply special
rules regarding retirement.

- 4 -

Employee's deferred compensation account with interest on the amount of
compensation theretofore deferred and/or withheld at an annual compounded
rate of 11% up to the date of termination. Notwithstanding the foregoing,
any amounts that become payable as a result of termination may not be paid
before the earlier of one year after the date of termination or some other
date consented to by the New York Stock Exchange.

5. Miscellaneous Provisions.

Employee understands and agrees that:

(a) Notwithstanding any other provisions of this agreement, payments
of compensation deferred hereunder shall not, unless otherwise permitted by
the Administrative Committee commence within one year after the later of
the date of deferral or the date the subordination provisions of paragraph
9 apply with respect to such deferral.

(b) Notwithstanding any other provisions of this agreement, no pay-
ments to Employee pursuant to paragraph 2(a) shall commence prior to
September 25, 1990, unless the Administrative Committee otherwise consents.

(c) For each year that there is a deferral of compensation hereunder
which otherwise would be paid in such year, there may be a reduction in
pension benefits accrued to Employee under Shearson's qualified pension
plan.

(d) The payments to be made by Shearson to Employee hereunder are
unsecured subordinated obligations of Employer only, and Employee is only a
general subordinated creditor of Shearson in that respect.

(e) Shearson shall establish a deferred compensation account to which
will be credited amounts of deferred compensation and any interest thereon.

(f) The deferral and withholding of compensation provided for herein
are irrevocable unless the Administrative Committee otherwise consents.

(g) Shearson is not assuring Employee of continued employment by
Shearson during all or any part of the period covered by this agreement or
otherwise.

(h) Shearson has relied, in entering into this agreement, on informa-
tion supplied by Employee to Shearson and Employee warrants that all infor-
mation supplied is accurate and complete. In the event Employee made any
material misrepresentations or omissions in the information, Shearson's

- 5 -

sole obligation under this agreement shall be to pay Employee (or Employee's beneficiary) an amount equal to the amount of compensation theretofore deferred and/or withheld as provided in paragraph 1 plus interest thereon at an annual rate equal to the lesser of 5% or the weekly 90-day Treasury Bill auction rate (on a discounted basis) averaged over a 12 month period ending on the date of discovery of the material misrepresentation or omission. Such interest shall be compounded annually and shall be credited with respect to the average balance in the deferred compensation account each year based upon the amount in the account at the end of each quarter.

(i) This agreement and all other similar agreements which become effective shall be interpreted and construed by the Administrative Committee and the determination of the Administrative Committee as to any disputed question shall be conclusive, except that any controversy arising out of or relating to the subordination provisions of paragraph 9, shall be submitted to and settled by arbitration pursuant to the Constitution and Rules of the New York Stock Exchange ("Exchange"). Shearson and Employee shall be conclusively bound by such arbitration. All administrative duties arising in connection with this agreement and all other similar agreements shall be performed by a person or persons delegated such duties by the Administrative Committee.

6. Beneficiary Designation.

Employee may designate a beneficiary or beneficiaries entitled to receive any of the payments to be made by Shearson hereunder if Employee dies. This designation, which is attached hereto as Exhibit E may be revoked or changed by Employee at any time. Any such designation, revocation or change shall be in writing, signed by Employee and delivered to Shearson. If Employee does not designate a beneficiary (or contingent beneficiary) to which payments are to be made after the death of Employee, or if any designated beneficiary (or contingent beneficiary) for payments does not survive Employee, payments by Shearson subsequent to the death of Employee shall be made as provided herein to Employee's estate. If a designated beneficiary (or contingent beneficiary) survives Employee but dies prior to the completion of the payments contemplated to be made hereunder to such beneficiary, the unpaid portion of those payments shall be

- 6 -

paid by Shearson to the designated beneficiary's estate or if applicable to the contingent beneficiary's estate.

### 7. Effective Date.

This agreement shall become effective on September 25, 1985, unless Shearson gives Employee written notice otherwise prior to March 31, 1986; however no interest or other earning shall accrue on any amounts to be deferred hereunder until such amounts are actually deferred.

### 8. Parties to Agreement.

This agreement is between Employee and Shearson or a subsidiary or affiliate of Shearson for which Shearson is acting as agent hereunder, whichever is Employee's actual employer as of the date hereof. If Employee's actual employer changes from Shearson to a subsidiary or affiliate of Shearson or from a subsidiary or affiliate of Shearson to Shearson or another subsidiary or affiliate of Shearson, thereafter Employee's employer for purposes of this agreement shall be the new employer.

### 9. Subordination Provisions.

(a) Suspension of Payment Obligation. Shearson's obligation to pay amounts credited to the Employee's deferred compensation account on the date such payment is otherwise due and payable in accordance with the terms of the agreement (the "Fixed Payment Date") shall be suspended and shall not mature for any period of time during which after giving effect to such payment (together with (1) the payment of any other obligation of Shearson payable at or prior to such payment and (2) the return of any Secured Demand Note and the collateral therefor held by Shearson and returnable at or prior to such payment):

(i) if Shearson is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of Rule 15c3-1 of the Securities Exchange Act of 1934 (hereinafter the "Rule"), the aggregate indebtedness of Shearson would exceed 1200 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the Commodity Exchange Act), as those terms are defined in the Rule as in effect at the time payment is to be made or such lesser per centum as may be made

- 7 -

applicable to Shearson from time to time by the New York Stock
Exchange, Inc. ("Exchange") (or other domestic exchange, board of
trade, clearing association or similar organization of which
Shearson is a member) or a domestic governmental agency or body
having appropriate authority plus an amount equal to the guaranty
deposits with clearing organizations, other than the Chicago
Board of Trade, which were included in current assets under
Section 211 of the Chicago Board of Trade Capital Requirements
("Section 211"), to the extent such deposits cannot be used for
margin purposes, plus the amount computed in accordance with
Chicago Board of Trade Regulation 221.05; or

(ii) if Shearson is operating pursuant to the alternative net capital
requirements provided for in paragraph (f) of the Rule, the net
capital of Shearson (or its "adjusted net capital" as defined in
the regulations under the Commodity Exchange Act) would be less
than the greater of: (x) 5 per centum of aggregate debit items
computed in accordance with Exhibit A to Rule 15c3-3 under the
Securities Exchange Act of 1934 (the "Act") or any successor rule
as in effect at the time payment is to be made plus an amount
equal to the guaranty deposits with clearing organizations, other
than the Chicago Board of Trade, which were included in current
assets under Section 211, to the extent such deposits cannot be
used for margin purposes, plus the amount computed in accordance
with Chicago Board of Trade Regulation 221.05, (y) if Shearson is
registered as a futures commission merchant with the Commodities
Futures Trading Commission, 6 per centum of the funds required to
be segregated pursuant to the Commodity Exchange Act ("CEA") and
the regulations promulgated thereunder, less the market value of
commodity options purchased by option customers on or subject to
the rules of a contract market, provided, however, the deduction
for each option customer shall be limited to the amount of cus-
tomer funds in such option customer's account (if greater), plus
an amount equal to the guaranty deposits with clearing organiza-
tions, other than the Chicago Board of Trade, which were included
in current assets under Section 211, to the extent such deposits
cannot be used for margin purposes, plus the amount computed in

- 8 -

accordance with Chicago Board of Trade Regulation 221.05, or (z)
such greater per centum as may be made applicable to Shearson
from time to time by the Exchange (or any other domestic ex-
change, board of trade, clearing association or similar organiz-
ation of which Shearson is a member) or a domestic governmental
agency or body having appropriate authority; or

(iii) Shearson's net capital (or its "adjusted net capital" as defined
in the regulations under the CEA), as defined in the Rule or any
successor rule as in effect at the time payment is to be made,
would be less than 120 per centum of any minimum dollar amount
required by the Rule (or the regulations under the CEA as in
effect at such time), plus an amount equal to the guaranty
deposits with clearing organizations, other than the Chicago
Board of Trade, which were included in current assets under
Section 211, to the extent such deposits cannot be used for
margin purposes, plus the amount computed in accordance with
Chicago Board of Trade Regulation 221.05, or such greater dollar
amount as may be made applicable to Shearson by the Exchange (or
any other domestic exchange, board of trade, clearing association
or similar organization of which Shearson is a member) or a
domestic governmental agency or body having appropriate
authority; or

(iv) if Shearson guarantees, endorses, carries or clears specialist or
market maker transactions in options listed on a national secu-
rities exchange or facility of a national securities association,
the amounts required to be deducted and maintained as required by
the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or
(c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its
net capital (or its "adjusted net capital" as defined in the
regulations under the CEA), as defined in the Rule as in effect
at the time such payment is made or such lesser per centum as may
be made applicable to Shearson by the Exchange (or any other
domestic exchange, board of trade, clearing association or
similar organization of which Shearson is a member) or a domestic
governmental agency or body having appropriate authority.

- 9 -

During any such suspension Shearson shall, as promptly as is con-
sistent with the protection of its customers, reduce its business to a
condition whereby the amounts the payment of which has been suspended could
be paid (together with (1) the payment of any other obligation of Shearson
payable at or prior to the payment of such amounts and (2) the return of
any Secured Demand Note and the collateral therefor held by Shearson and
returnable at or prior to the payment of such amounts) without Shearson's
net capital being below the applicable minimums set forth in subparagraphs
9(a)(i) through (iv) above or its "adjusted net capital" being below the
amount required as aforesaid. at which time Shearson shall pay the amounts
credited to Employee's deferred compensation account the payment of which
has been suspended plus accrued interest on not less than 5 days' prior
written notice to the Exchange. The first day on which under paragraph 2
hereof or under this subparagraph (a) Shearson has an obligation to pay
amounts is hereinafter referred to as the "payment date". If pursuant to
the terms hereof Shearson's obligation to pay amounts credited to the
Employee's deferred compensation account is suspended, Shearson recognizes
and agrees that Shearson may be summarily suspended by the Exchange.
Shearson agrees that, if its obligation to pay amounts credited to the
Employee's deferred compensation account is ever suspended for a period of
six months, it will promptly take whatever steps are necessary to effect a
rapid and orderly complete liquidation of its business.

(b)  Repayment by Employee of Payments Made on Payment Date.

If payment is made of all or any part of the amounts credited to the
Employee's deferred compensation account on the payment date and if imme-
diately after any such payment Shearson's net capital is less than the
applicable minimums set forth in subparagraphs 9(a)(i) through (iv),
Employee agrees irrevocably, for himself, his beneficiaries, heirs and
assigns, (whether or not Employee had any knowledge or notice of such fact
at the time of any such payment) to repay to Shearson, its successors or
assigns, the sum so paid, to be held by Shearson pursuant to the provisions
hereof as if such payment had never been made; provided, however, that any
suit for the recovery of any such payment must be commenced within two
years of the date of such payment.

- 10 -

(c) Limitations on Withdrawals.

No payment of all or any portion of amounts credited to the deferred compensation account shall be made prior to the Fixed Payment Date unless Shearson shall have received the prior written permission of the Exchange after consultation with the Securities and Exchange Commission if the Exchange deems such consultation appropriate. Furthermore, no such payment shall be made if after giving effect thereto (and to all other payments of principal of outstanding subordination agreements of Shearson, including the return of any Secured Demand Note and the collateral therefor held by Shearson, the maturity or accelerated maturity of which are scheduled to occur within six months after the date such payment is to occur, or on or prior to the date on which Employee has elected to receive payment of the amounts credited to his deferred compensation account disregarding such proposed payment, whichever date is earlier) without reference to any projected profit or loss of Shearson:

(i) if Shearson is not operating pursuant to the alternative net capital requirements provided for in paragraph (f) of the Rule, the aggregate indebtedness of Shearson would exceed 1000 per centum of its net capital (or its "adjusted net capital" as defined in the regulations under the CEA), as those terms are defined in the Rule as in effect at the time such payment is to be made; or such lesser per centum as may be made applicable to Shearson from time to time by the Exchange (or any other domestic exchange, board of trade, clearing association or similar organization of which Shearson is a member) or a domestic governmental agency or body having appropriate authority, plus an amount equal to the guaranty deposits with clearing organizations, other than the Chicago Board of Trade, which were included in current assets under Section 211, to the extent such deposits cannot be used for margin purposes, plus the amount computed in accordance with Chicago Board of Trade Regulation 221.05; or

(ii) if Shearson is operating pursuant to such alternative net capital requirement, its net capital (or its "adjusted net capital" as defined in the regulations under the CEA) would be less than the greater of: (x) 5 per centum of aggregate debit items as those

- 11 -

terms are defined in Exhibit A to Rule 15c3-3 of the Securities
Exchange Act or any successor rule as in effect at such time,
plus an amount equal to the guaranty deposits with clearing
organizations, other than the Chicago Board of Trade, which were
included in current assets under Section 211, to the extent such
deposits cannot be used for margin purposes, plus the amount
computed in accordance with Chicago Board of Trade Regulation
221.05, or (y) if Shearson is registered as a futures commission
merchant with the Commodity Futures Trading Commission, 7 per
centum of the funds required to be segregated pursuant to the CEA
and the regulations promulgated thereunder, less the market value
of commodity options purchased by option customers on or subject
to the rules of a contract market, provided, however, the deduc-
tion for each option customer shall be limited to the amount of
customer funds in such option customer's account (if greater),
plus an amount equal to the guaranty deposits with clearing
organizations, other than the Chicago Board of Trade, which were
included in current assets under Section 211, to the extent such
deposits cannot be used for margin purposes, plus the amount
computed in accordance with Chicago Board of Trade Regulation
221.05, or (z) such greater per centum as may be made applicable
to Shearson from time to time by the Exchange (or any other
domestic exchange, board of trade, clearing association or sim-
ilar organization of which Shearson is a member) or a domestic
governmental agency or body having appropriate authority; or

(iii) Shearson's net capital (or its "adjusted net capital" as defined
in the regulations under the CEA), as defined in the Rule or any
successor rule as in effect at the time payment is to be made,
would be less than 120 per centum of any minimum dollar amount
required by the Rule (or the regulations under the CEA as in
effect at such time), plus an amount equal to the guaranty de-
posits with clearing organizations, other than the Chicago Board
of Trade, which were included in current assets under Section
211, to the extent such deposits cannot be used for margin pur-
poses, plus the amount computed in accordance with Chicago Board
of Trade Regulation 221.05, or such greater dollar amount as may

- 12 -

be made applicable to Shearson by the Exchange (or any other
domestic exchange, board of trade, clearing association or sim-
ilar organization of which Shearson is a member) or a domestic
governmental agency or body having appropriate authority; or

(iv)  if Shearson guarantees, endorses, carries or clears specialist or
market maker transactions in options listed on a national sec-
urities exchange or facility of a national securities associa-
tion, the amounts required to be deducted and maintained as
required by the provisions of paragraphs (a)(6)(v), (a)(7)(iv) or
(c)(2)(x)(b)(1) of the Rule would exceed 1000 per centum of its
net capital (or its "adjusted net capital" as defined in the
regulations under the Commodity Exchange Act), as defined in the
Rule as in effect at the time such payment is made or such lesser
per centum as may be made applicable to Shearson by the Exchange
(or any other exchange, board of trade, clearing association or
similar organization of which Shearson is a member) or a domestic
governmental agency or body having appropriate authority; or

If such payment is made of all or any part of the amounts credited to
the Employee's deferred compensation account on or prior to the Fixed
Payment Date and if Shearson's net capital is less than the amount required
to permit such payment pursuant to the previously cited provisions of this
subparagraph (c), Employee agrees irrevocably (whether or not Employee had
any knowledge or notice of such fact at the time of any such payment) to
repay Shearson, its successors or assigns, the sum so paid to be held by
Shearson pursuant to the provisions hereof as if such payment had never
been made; provided, however, that any suit for the recovery of any such
payment must be commenced within two years of the date of such payment.

(d)  General Subordination.

Employee irrevocably agrees that the obligations of Shearson hereunder
with respect to the payment of amounts credited to his deferred compen-
sation account are and shall be subordinate in right of payment and subject
to the prior payment or provision for payment in full of all claims of all
other present and future creditors of Shearson whose claims are not simi-
larly subordinated (claims under this agreement shall rank pari passu with

- 13 -

claims similarly subordinated) and to claims which are now or hereafter expressly stated in the instruments creating such claims to be senior in right of payment to claims arising under this agreement, arising out of any matter or event occuring prior to the payment date of the amounts credited to Employee's deferred compensation account under this agreement. In the event of the appointment of a receiver or trustee of Shearson or in the event of its insolvency, liquidation pursuant to the Securities Investor Protection Act of 1970 ("SIPA") or otherwise, its bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to bankruptcy laws, or any other marshalling of the assets and liabilities of Shearson, the Employee shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of Shearson until all claims of all other present and future creditors of Shearson, whose claims are senior to claims arising under this agreement, have been fully satisfied or provision has been made therefor.

(e) Specific Subordination: Ranking of Obligations Under the Agreement with Other Indebtedness of Shearson. Anything to the contrary in this agreement notwithstanding:

(i) Employee will not be entitled to receive any payment in respect of amounts credited to his deferred compensation account or to participate in the distribution of assets of Shearson in respect thereof if such payment or distribution would constitute a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding);

(ii) the right of Employee to receive any payment in respect of amounts credited to his deferred compensation account will be subordinated to claims of the holders of Senior Subordinated Debt so that, in the case of any distribution of assets of Shearson in complete or partial liquidation, reorganization, arrrangement or other marshalling of assets and liabilities of Shearson, no such distribution or payment will be made with respect to amounts credited to Employee's deferred compensation account unless and until the principal of and interest on the Senior Subordinated Debt are paid in full; and

- 14 -

(iii) Employee shall promptly return to Shearson any amounts (whether cash, securities or otherwise) received from Shearson if the payment by Shearson of such amounts constituted a violation of the express terms of any Senior Subordinated Debt (or any agreement under or pursuant to which the same may be outstanding).

The term "Senior Subordinated Debt" as used herein shall mean and include all indebtedness of Shearson (other than Shearson's obligations under its guarantees of $84,000. aggregate principal amount of the 10% Guaranteed (Junior Subordinated) Convertible Notes due 1986 - 87 of Boston Group Holdings, Inc., Shearson's obligations under its subordinated assumption agreement with respect to certain debts of Lehman Brothers Kuhn Loeb Holdings, Inc. in the aggregate principal amount of $48,000,000., and other than Shearson's Voluntary Deferred Compensation Plan, Financial Consultant's Deferred Compensation Plan, Branch Manager's Deferred Compensation Plan and those similar agreements with other Employees each of which rank pari passu with the obligation of Shearson under this agreement) constituting part of its Net Capital (as defined in the Rule as from time to time in effect), and shall include without limitation thereto the indebtedness represented by Shearson's 10 3/4% Senior Subordinated Debentures, subject to minimum annual redemptions from the original $35,000,000. due, of which $1,750,000. is due from September 1, 1988 through September 1, 2002 with the balance coming due September 1, 2003 and outstanding October 1, 1985 in the aggregate principal amount of $30,821,000., Shearson's 15% Subordinated Note with American Express Company due 1984 - 1994 and outstanding on October 1, 1985 in the aggregate principal amount of $144,243,000., Shearson's 15 1/4% Senior Subordinated Notes due December 1, 1990 and outstanding on October 1, 1985 in the aggregate principal amount of $60,000,000., Shearson's 13 1/8% Senior Subordinated Loan due March 15, 1994 and outstanding on October 1, 1985 in the aggregate principal amount of $97,800,000., Shearson's obligations in respect of the Shearson/American Express N.V.'s 12 1/8% Guaranteed Notes due March 15, 1994, issued in the original aggregate principal amount of $100,000,000., Shearson's 12 1/2% Senior Subordinated Notes due October 15, 1994 and outstanding on October 1, 1985 in the aggregate principal amount of $150,000,000., Shearson's 11 5/8% Senior Subordinated Notes due May 15, 2005 and outstanding on October 1, 1985 in

- 15 -

the aggregate principal amount of $100,000,000., Shearson's Senior Subor-
dinated Notes with various maturity dates between September 30, 1986 and
March 31, 1987 in the aggregate principal amounts of $50,000,000., Shearson's
obligations in respect of the 10 3/4% Subordinated Notes and 15 1/4% Sub-
ordinated Notes held by various subsidiaries of Shearson, unless, in each
case, in the instrument evidencing or creating the same, or in any agree-
ment under or pursuant to which it shall be outstanding, such indebtedness
shall be declared not to be Senior Subordinated Debt. Senior Subordinated
Debt (and any agreement under or pursuant to which the same may be out-
standing) may be amended, the commitment under such agreements may be
increased, provisions thereof may be waived, time of payment of the Senior
Subordinated Debt may be extended and other indulgences granted to Shearson
in respect thereof all from time to time without notice to or further
assent of the Employee under the Agreement.

(f) <u>No Reliance on Exchange.</u> Employee irrevocably agrees and
acknowledges that:
- (i) entrance into this agreement is not being made in reliance upon
  the standing of Shearson as a member organization of the Exchange
  or upon the Exchange's surveillance of Shearson's financial posi-
  tion or its compliance with the constitution, rules and practices
  of the Exchange;
- (ii) Employee is not relying upon the Exchange to provide any infor-
  mation concerning or relating to Shearson and the Exchange has no
  responsibility to disclose to Employee any information concerning
  or relating to Shearson which it may now, or at any future time,
  have; and
- (iii) neither the Exchange, its Special Trust Fund, nor any director,
  officer, trustee or employee of the Exchange or said Trust Fund
  shall be liable to Employee with respect to this Agreement or the
  payment of amounts credited to Employee's deferred compensation
  account.

(g) <u>Examining Authority.</u>

Upon termination of Shearson as a member of the Exchange, the refer-
ences herein to Exchange will be deemed to refer to Examining Authority.

- 16 -

The term Examining Authority shall refer to such regulatory body having responsibility for inspecting or examining Shearson for compliance with financial responsibility requirements under Section 9(c) of SIPA and Section 17(d) of the Act. Reference herein to Exchange or Examining Authority shall also be deemed to refer to the Chicago Board of Trade and to any other exchange, board of trade, clearing association or similar organization of which Shearson is a member and which requires such reference as a condition to inclusion of the amounts credited to the deferred compensation account hereunder in Shearson's net capital as computed for the purposes of such organization.

(h) Commodity Futures Trading Commission ("CFTC") Regulations.

References in this agreement to the Exchange or Examining Authority shall also be deemed to refer to the organization(s) designated as the self-regulatory organization(s) (also known as DSRO) of Shearson pursuant to a plan filed with the CFTC pursuant to Regulation 1.52 under the CEA to the extent such references are required as a condition to inclusion of the amounts credited to a deferrred compensation account hereunder in Shearson's net capital as computed for purposes of such organization(s).

(i) Use of Amounts Deferred.

The amounts credited to the deferred compensation account hereunder shall be dealt with in all respects as capital of Shearson, shall be subject to the risks of the business, and may be deposited in an account or accounts in Shearson's name in any bank or trust company.

10. Investments by Shearson.

In connection with this agreement, Employee hereby agrees to cooperate with Shearson, as may be necessary, to acquire in the name of Shearson any life insurance contract, annuity contract or other investment in which Shearson in its absolute discretion may choose to invest for purposes of meeting its obligations under this agreement.

- 17 -

*007*

11. Binding Effect.

This agreement shall be binding upon Employee and Employee's heirs and
legal representatives and upon Shearson and Shearson's successors and
assigns. Employee's rights hereunder, including rights to receive pay-
ments, are not assignable.

SHEARSON LEHMAN BROTHERS INC.
for itself or as agent

By: Robert E. Dennis

EMPLOYEE

September 25, 1985

- 18 -

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (SCC) SIPA |

**ORDER, PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 7042, TO CONVERT CERTAIN CONTESTED OMNIBUS OBJECTIONS TO A CONSOLIDATED ADVERSARY PROCEEDING AND ESTABLISH RELATED PROCEDURES**

Upon the Motion of James W. Giddens, as trustee for the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), for entry of an Order, pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7042, to Convert Certain Contested Omnibus Objections to a Consolidated Adversary Proceeding and Establish Related Procedures, dated February 6, 2014 (the "Motion"),[1] all as more fully described in the Motion; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBI, its estate, its customers and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY:

ORDERED, that the Motion is granted as provided herein; and it is further

ORDERED, that the Omnibus Objections are hereby converted to the ESEP

---

1.    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Adversary Proceeding, a single, consolidated adversary proceeding, in which the portions of the Omnibus Objections annexed hereto as Exhibit 1 are deemed to be sufficient in lieu of an adversary complaint (the "Converted Complaint") solely as to the Claimants who have responded either formally or informally to indicate their opposition to the Trustee's Omnibus Objections (collectively, the "Respondents").

ORDERED that the following procedures shall apply solely to the ESEP Adversary Proceeding and Converted Complaint:

(a)     The Trustee shall serve this order (the "Procedures Order") on all Respondents via overnight delivery within two business days of issuance of the Procedures Order and such service shall be deemed good and sufficient, in lieu of service of a summons and complaint. No separate summons shall be issued in connection with the ESEP Adversary Proceeding by the Clerk of the Court;

(b)     Respondents shall have thirty days from the date of entry of the Procedures Order to respond to the Converted Complaint or to supplement their respective Omnibus Objection Responses;

(c)     All provisions of the Bankruptcy Rules governing adversary proceedings shall govern the ESEP Adversary Proceeding and Converted Complaint, except as provided herein;

(d)     On or before April 30, 2014, the Trustee and the Respondents are directed to confer with respect to the submission of a jointly-proposed scheduling order and discovery plan. No discovery requests or dispositive motions shall be served through and until the date thereof, and no dispositive motions shall be served without permission of the Court;

(e)     This Court shall hold a status conference regarding discovery and related matters on May 28, 2014 at 10:00 a.m. (Prevailing Eastern Time);

(f)     The provisions of the ADR Order shall not apply as to these Omnibus Objections; and

(g)     The Trustee and Respondents may, upon notice and hearing, seek Court approval to modify these procedures; and it is further

ORDERED that, other than as expressly set forth herein, the rights of the Trustee and the Respondents, including any defenses or grounds for objection, and any other party in interest with respect to the Deferred Compensation Claims are expressly preserved and unaffected by this Procedures Order; and it is further

ORDERED that, other than with respect to the Deferred Compensation Claims filed by the Respondents, this Procedures Order shall have no effect on any other customer or general creditor claims or any pending or future motions or objections (omnibus or otherwise) related thereto; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or related to this Procedures Order.

Dated: April 1, 2014
New York, New York

/s/ Shelley C. Chapman
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

TO THE HONORABLE SHELLY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business

of Lehman Brothers Inc. ("LBI" or the "Debtor") under the Securities Investor Protection Act of

1970 as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel,

respectfully represents as follows:

## RELIEF REQUESTED

1.      The Trustee files this omnibus objection to general creditor claims (the

"Omnibus Objection") pursuant to sections 502(b) and 510(a) of title 11 of the United States

Code (the "Bankruptcy Code"), as made applicable to this proceeding pursuant to sections

78fff(b) and 78fff-1(a) of SIPA, Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and this Court's order approving procedures for the filing of omnibus

objections to general creditor claims filed in this SIPA proceeding (the "General Creditor Claim

Objection Procedures Order," ECF No. 5441), seeking to subordinate the claims of claimants

who have responded either formally or informally to indicate their opposition to six omnibus

objections pending before the Court (collectively, the "Deferred Compensation Claims" or the

"Claims").[1]

---

[1].    The six Omnibus Objections are: (1) the Trustee's one hundred twelfth omnibus objection to general creditor claims (subordinated claims), filed on July 19, 2013 (ECF No. 6847); (2) the Trustee's one hundred thirteenth omnibus objection to general creditor claims (subordinated claims), filed on July 23, 2013 (ECF No. 6865); (3) the Trustee's one hundred fourteenth omnibus objection to general creditor claims (subordinated claims), filed on July 23, 2013 (ECF No. 6866); (4) the Trustee's one hundred thirty-eighth omnibus objection to general creditor claims (subordinated claims), filed on September 16, 2013 (ECF No. 7264); (5) the Trustee's one hundred forty-seventh omnibus objection to general creditor claims (subordinated claims), filed on October 3, 2013 (ECF No. 7388); and (6) the Trustee's one hundred ninety-eighth omnibus objection to general creditor claims (employee claims), filed on January 28, 2014 (ECF No. 8153) to the extent that the one hundred ninety-eighth omnibus objection to general creditor claims which seeks to subordinate the portion of a claim which constitutes an ESEP claim.

2.      The Claims, as filed by, collectively, the "Deferred Compensation Claimants") seek to recover compensation deferred by LBI employees pursuant to the Executive and Select Employees Plan, as amended (the "ESEP"),[2] which was offered to certain executives of LBI and other highly-compensated LBI employees.

3.      Each of the Deferred Compensation Claimants agreed that his or her benefits under the ESEP would be subordinate to payment in full of LBI's unsubordinated obligations, including those owed to LBI's general unsecured creditors. The Trustee respectfully requests that this Court enforce the ESEP and rank LBI's obligations, if any, to the Deferred Compensation Claimants junior to all unsubordinated liabilities of LBI.

## JURISDICTION AND VENUE

4.      Following removal to this Court for all purposes as required for SIPA cases by section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred by [SIPA] upon the court to which application for the issuance of the protective decree was made." 15 U.S.C. § 78eee(b)(4).

5.      Venue is proper in this Court pursuant to SIPA section 78eee(a)(3) and 15 U.S.C. § 78aa.

## THE ESEP

6.      The ESEP was one of several deferred compensation plans offered only to a limited group of LBI executives and other highly-compensated employees. The ESEP became

---

2.   A true and correct copy of the ESEP is attached hereto as Exhibit A. LBI amended the ESEP Agreement on September 1, 1990 to allow beneficiaries to elect one of four distribution schemes: (i) "Retirement Option – 15 Installments"; (ii) "Lump Sum 2000 Option"; (iii) "Ten Annual Installments Option"; or (iv) the distribution schedule provided in the original ESEP.   A true and correct copy of the ESEP Irrevocable Election Form enumerating these amendments is attached hereto as Exhibit B.  None of these amendments substantively altered the governing subordination provisions of the ESEP.

3

effective in 1985 and was funded through employees' voluntary compensation deferrals from

1985 through 1988.

       7.    In a section titled "Subordination Provisions," the Deferred Compensation

Claimants explicitly agreed to subordinate distribution of any accrued benefits to payment in full

of all of LBI's unsubordinated creditors:

> Employee irrevocably agrees that the obligations of [LBI]
> hereunder with respect to the payment of amounts credited to his
> deferred compensation account are and shall be subordinate in
> right of payment and subject to the prior payment or provision for
> payment in full of all claims of all other present and future
> creditors of [LBI] whose claims are not similarly subordinated . . . .

ESEP Agreement § 9(d).

       8.    Section 9(d) further specifically requires subordination of claims arising

under the ESEP to claims of unsubordinated creditors in the event of a SIPA liquidation:

> In the event of . . . liquidation pursuant to [SIPA] . . . , the
> Employee *shall not* be entitled to participate or share, ratably or
> otherwise, in the distribution of the assets of [LBI] *until all claims*
> *of all other present and future creditors of [LBI], whose claims are*
> *senior to claims arising under this agreement, have been fully*
> *satisfied or provision has been made therefor.*

*Id.* (emphases added).[3]

       9.    Each Deferred Compensation Claimant also agreed that "payments to be

made by [LBI] to Employee hereunder are unsecured subordinated obligations of Employer only,

and employee is only a general subordinated creditor of [LBI] in that respect." *Id.* § 5(d).

### THIS COURT SHOULD ENFORCE THE ESEP AND
### SUBORDINATE THE DEFERRED COMPENSATION CLAIMS

       10.    Based on analysis by the Trustee's counsel of the Deferred Compensation

Claims and other relevant documents and materials, the Trustee has identified the Claims as

---

3    The ESEP also sets forth other specific instances of subordination inapplicable here.

4

governed by valid, binding, and enforceable subordination provisions which subordinate the

Deferred Compensation Claims to payment in full of, *inter alia*, all general unsecured creditors

and other unsubordinated liabilities of LBI.

11.    Section 510(a) of the Bankruptcy Code provides that a "subordination

agreement is enforceable in a case under this title to the same extent that such agreement is

enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).  Courts have routinely

held that the "enforcement of lawful subordination agreements by Bankruptcy Courts does not

offend the policy of equal distribution of the bankrupt's estate." *In re Leasing Consultants, Inc.*,

2 B.R. 165, 168 (Bankr. E.D.N.Y. 1980), *citing In re Credit Industrial Corp.*, 366 F.2d 402, 407

(2d Cir. 1966); *see also Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank,*

*N.A.*, No. 08 Civ. 5723 (NRB), 2009 WL 1834596 (S.D.N.Y. June 16, 2009) (enforcing a

contractual subordination agreement governed by New York law in determining the priority of

bankruptcy distributions); *Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, No. 94

Civ. 1187 (LAP), 1995 WL 429494, at *4 (S.D.N.Y. July 20, 1995) (collecting cases and noting

that subordination agreements are generally enforced in bankruptcy).  Under general contract law

principles, when a subordination agreement is unambiguous, the parties' rights are governed

exclusively by that agreement. *In re Leasing Consultants, Inc.*, 2 B.R. at 169; *see also In re*

*Coronet Capital Co.*, 1995 WL 429494, at *4-8.

12.    The Deferred Compensation Claims are based upon the ESEP, which

explicitly and specifically subordinates the Deferred Compensation Claims.  These provisions

alerted each of the Deferred Compensation Claimants that claims to the individual accounts

would be subordinated to, and subject to risk of, senior creditors and satisfaction in full of

those claims.  Accordingly, the Trustee respectfully requests that the Court classify the Deferred

5

Compensation Claims, whether liquidated, unliquidated, or undetermined, as subordinated to payment in full of all of LBI's unsecured general creditor claims.

## RESERVATION OF RIGHTS

13.    The Trustee reserves all rights to object on any other basis to any Deferred Compensation Claim or any portion of any Deferred Compensation Claim. The Trustee further expressly reserves the right to object to the value of the Claims.

## CONCLUSION

For the reasons stated herein, the Trustee respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

# EXHIBIT C

SCAROLA MALONE & ZUBATOV LLP
*Attorneys for the Individuals Identified*
 *in the Notice of Appearance*
 *at Docket No. 8234*
Richard J.J. Scarola
Alexander Zubatov
1700 Broadway
41st Floor
New York, NY 10019
Tel.: (212) 757-0007


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 08-01420 (SCC) SIPA |
| LEHMAN BROTHERS INC., | ANSWER |
| Debtor. | TRIAL BY JURY IS DEMANDED |

The 340 individuals listed in Appendix A (the "Client Group"), by their counsel,

Scarola Malone & Zubatov LLP, submit this Answer in accordance with this Court's Order,

dated and entered April 1, 2014 (Docket No. 8576).

1.     The Client Group states that no answer to the allegations in Paragraph

1 is called for, except denies that (i) the relief the Trustee seeks may be sought by means of

omnibus objections; and that (ii) the relief the Trustee seeks is warranted.  To the extent

Paragraph 1 purports to assert the propriety of this Court's jurisdiction over this proceeding,

the Client Group states that such jurisdiction is contested per defenses as asserted herein

below.

2.     The Client Group denies the allegations in Paragraph 2 and states that

the members of the Client Group were not, at the relevant time, LBI employees and that the

ESEP was not offered to individuals who were LBI employees or executives at the relevant time. The Client Group further states that the attachment referred to in Footnote 2 as "[a] true and correct copy of the ESEP" is not, in fact, the ESEP, as that term is defined in Paragraph 2, but is, rather, an individual employee's deferred compensation agreement, and, further, that the particular deferred compensation agreements of which the attached Exhibit A is an example were, by their terms, *agreements*, and thus, could not be unilaterally "amended" by any entity, much less by LBI, which was not a party to any such agreements.

3.    The Client Group denies the allegations in Paragraph 3 and requests that this Court decline to award the relief the Trustee requests therein.

4.    The Client Group admits the allegations in Paragraph 4, except states that to the extent Paragraph 4 purports to assert the propriety of this Court's jurisdiction over this proceeding, the Client Group states that such jurisdiction is contested per defenses as asserted herein below.

5.    The Client Group admits the allegations in Paragraph 5, except states that to the extent Paragraph 5 purports to assert the propriety of venue in this Court for purposes of this proceeding, the Client Group states that such venue is contested per defenses as asserted herein below.

6.    The Client Group admits the allegations in Paragraph 6, except denies that the individuals described were executives or employees of LBI at the relevant time.

7.    The Client Group denies the allegations in Paragraph 7 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI.

8.    The Client Group denies the allegations in Paragraph 8 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly

2

substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI. The Client Group does not deny the allegations in Footnote 3.

      9.     The Client Group denies the allegations in Paragraph 9 and states further that the Trustee has, in two places in the quoted excerpt from Exhibit A, misleadingly substituted "[LBI]" for "Shearson," a term defined in Exhibit A and not defined to include LBI.

      10.     The Client Group denies the allegations in Paragraph 10, except states that the Client Group is without knowledge or information sufficient to form a belief about the extent to which the substantive allegations in that paragraph may or may not be "[b]ased on analysis by the Trustee's counsel of the Deferred Compensation Claims and other relevant documents and materials."

      11.     The Client Group admits the allegations in Paragraph 11.

      12.     The Client Group denies the allegations in Paragraph 12 and requests that this Court decline to award the relief the Trustee requests therein.

      13.     The Client Group states that no answer to the allegations in Paragraph 13 is called for, except denies such allegations to the extent they would purport to assert or revive rights or defenses that have been waived or relinquished or that are otherwise inconsistent with any relevant agreements and/or applicable law.

## DEFENSES

      For its statement of additional defenses to the Trustee's effort to seek subordination of the rights of the Client Group under the contract each of them signed, entitled Executive and Select Employees Deferred Compensation Agreement, a specimen copy of which is at Exhibit A to Docket No. 8576-1 (the "Contract"), the Client Group

3

alleges, in the alternative, the following as a preliminary statement of its members' defenses

(with their affirmative defenses to follow separately):

## AS AND FOR A FIRST DEFENSE

14.    The Contract is an executory contract.

15.    The Contract provides, among other things, continuing material duties

for the Debtor, including, without limitation, the duty to pay the members of the Client Group

their deferred compensation pursuant to the terms of the Contract.

16.    The Contract provides, among other things, continuing material duties

for the Client Group, including, without limitation:

> "10.    Investments by Shearson.
>
> "In connection with this agreement, Employee hereby agrees to
> cooperate with Shearson, as may be necessary, to acquire in the
> name of Shearson any life insurance contract, annuity contract
> or other investment in which Shearson in its absolute discretion
> may choose to invest for purposes of meeting its obligations
> under this agreement."

17.    Significantly, this Section of the Contract is entitled "Investments of

Shearson" and addresses, among other things, the need for the Client Group members to

cooperate in being the subject of investments Shearson might make to fund the liabilities

under the Contract, including by way of insurance policies then contemplated at the time the

Contract was made, separate insurance, annuities or other investments Shearson might have

elected to acquire in connection with this plan or its liabilities thereunder, all of which would

require the Client Group members' consent and possible submission of information or

submission to examination, or additional acts necessary to assure the continued validity and

viability of the vehicles then in place (for example, and by way of example only, as laws

4

might change governing plans of this type or the underlying corporate-owned or stranger-originated life insurance policies contemplated at the time the Contract was made).

18.    The Contract contains additional material duties on the part of the members of the Client Group, including, without limitation, duties to pay or repay money to Shearson or, in some instances, to Shearson or its "successors" (*see*, for example, the Contract at § 9(b) (page 10) and § 9(c) (page 11); and also at § 9(e)(iii) (page 15)), and material duties to supply corrected information (at § 5(h) (pages 5-6)).

19.    The Contract, being an executory contract, has been rejected in this case since the filing of the bankruptcy.

20.    As a rejected executory contract, the Contract was materially breached as of the time before the filing of the bankruptcy petition in this case by the Debtor.

21.    By reason of that material breach, neither the Debtor nor the Trustee nor anyone standing in either of their shoes may assert affirmatively any rights they might have had prior to such material breach.

22.    By reason of the foregoing, such material breach vitiates the subordination clause upon which the Trustee relies in now seeking subordination to the extent such clause could be deemed effective notwithstanding the other defenses of the Client Group.

23.    Accordingly, the Trustee's effort to have the acknowledged claims of the members of the Client Group deemed subordinated to the claims of general unsecured creditors must be denied.

5

### AS AND FOR A SECOND DEFENSE

24.    The Contract does not provide for the subordination the Trustee seeks in the event of the bankruptcy of this particular Debtor.

25.    The Contract entered into by each member of the Client Group was made with Shearson Lehman Brothers Inc. ("Shearson").

26.    As described further below, per the definitions and language of the Contract, the subordination provisions which the Trustee seeks to invoke in this case apply specifically and only to Shearson as that entity was understood and constituted at the time the Contract was entered into and not to this Debtor or any other entities, including any that may purport to be Shearson's successors, as the term "successors" is widely and specifically used in the Contract in other contexts *but not in this context.*

27.    As described further below, the Debtor is a materially new entity and not the same as, or interchangeable with, "Shearson," as referred to and defined in the Contract and as that entity was understood and constituted at the time the Contract was made.

28.    As such, as described further below, the Debtor and the Trustee are not entitled to enforce the subordination provisions of the Contract against the members of the Client Group.

### *The Debtor Is Not the Entity to Which the Client Group Agreed to Have Its Deferred Compensation Claims Subordinated*

29.    At the time the Contract was made, Shearson was a subsidiary of an enormous financial conglomerate under the overall umbrella of the American Express Company.

6

30.    It was widely understood and explicitly discussed with Shearson management leading up to the entry into the Contract by members of the Client Group that the purpose of the subordination provision in the Contract was to assist Shearson in the reckonings of its capital for purposes of meeting regulatory capital requirements (including those of the New York Stock Exchange).

31.    It was also expressly discussed in the circumstances that a bankruptcy by Shearson was, under any foreseeable circumstances, out of the question, because American Express itself would stand behind any obligations of Shearson and not permit such a bankruptcy.

32.    Consistent with these circumstances, as described further below, the "subordination" language was by its terms limited and written to be limited to pertain only to the virtually inconceivable bankruptcy of Shearson, as that entity was then understood and constituted; and that subordination provision appeared with the limited purposes of satisfying those capital requirements and assisting Shearson in meeting those capital requirements.

33.    For these reasons, among others, the subordination provision, as drafted, was intended to and did by its plain terms apply only to Shearson itself, as that entity was then understood and constituted, and did not apply to any later-existing entity that might or would be a successor to Shearson or a successor to some of Shearson's assets or into which Shearson would change; and most certainly the subordination provision does not apply to this Debtor or the insolvency proceeding of this Debtor.

34.    In the years following the making of the Contract, especially in the late 1980s through the early 1990s, the Shearson business owned by American Express was the subject of numerous additions, subtractions and meaningful changes in corporate structure, composition and form.

7

35.     To begin, in the late 1980s, after the Contract was made, Shearson acquired and merged with another entity in a billion-dollar transaction, and changed its name to reflect the merger (until 1990, when the name change was dropped in large part due to this merger's toxicity and financial damage to the entity).

36.     In connection with these transactions, the new business underwent a substantial and material corporate reorganization.

37.     By way of further example, also in the early years after the making of the Contract, the entity that had been Shearson was then dismantled in material respects, and sold off in pieces.

38.     By way of example of this dismantling, substantial components of the business that had been Shearson at the time the Contract was made, and some that were acquired later, including Shearson's large retail brokerage business and Shearson's large asset management business, were sold to two other entities.

39.     The significant changes to what had been Shearson did not end there.

40.     In the succeeding years, having dismantled Shearson, as it had existed at the time of the making of the Contract, American Express decided to jettison Shearson itself.

41.     Specifically, in a series of transactions completed in 1993 and 1994, Shearson, and its immediate holding company corporate parent, were spun out of the American Express conglomerate of companies by means of a dividend of the stock of the holding company, which theretofore had been owned by American Express, to American Express shareholders, after which the substantially dismantled Shearson, with its holding company parent, became a new, independent company and traded publicly as such,

8

independent of the American Express conglomerate of which Shearson had been a part when the Contract was made.

42.    Following those transactions, among other things, the new entity no longer had the support and assurance of solvency described above by reason of the American Express conglomerate standing behind it and in the way of any potential insolvency.

43.    As part of the same series of transactions, what had been Shearson ceased to exist even in name, further demonstrating the lack of identity between the entity that had been Shearson at the making of the Contract and the entity succeeding to Shearson or certain assets and functions of Shearson in various respects.  What had become of Shearson was renamed "Lehman Brothers Inc." (the same name used by the Debtor in this case).

44.    Still, after this change in name, other changes in this new entity continued.

45.    By way of example, other firms were merged into this new entity over the years and other material changes occurred.

46.    Under New York law, this Debtor is arguably not even a successor to Shearson, much less is it Shearson itself, and it is, in all events, not the party to which the Contract refers in using the term "Shearson."

47.    Accordingly, under New York law, and as described further below, the provisions of the Contract which refer to possible subordination in the event of the insolvency of Shearson itself (or any other Shearson event) do not apply to or include a "successor" of Shearson, do not apply today, do not apply to or include this Debtor, and, indeed, were

9

vitiated long ago, when the "Shearson" entity changed materially from the entity that had

entered into the Contract with each member of the Client Group.

*The Language of the Parties' Contract Makes Clear
that Only the Shearson Entity, as then Understood and Constituted,
Could Have Invoked the Contract's Subordination Provisions*

48.     Not only the background and history of the subordination provision, but

also the very carefully worded drafting of that provision and of the Contract as a whole —

including the description and definition of Shearson, the numerous other provisions in which

the identity of Shearson for purposes of this Contract in general and of the subordination

provision in particular is made clear and the subordination provision itself — all demonstrate

that this Debtor's insolvency does not trigger subordination of the acknowledged claims of

the Client Group.

49.     To begin, as to the definition and description of Shearson itself in the

Contract, Shearson is described and defined to be Shearson as that entity was then

understood and constituted, and not Shearson and its "successors" (a different formulation

that, as described further below, is used expressly elsewhere in the Contract where

subordination in the event of a bankruptcy is not implicated).  Specifically, Shearson is

described and defined in the Contract's opening paragraph as a party to the Contract as

follows:

> "Shearson Lehman Brothers Inc., (Shearson) for itself and as
> agent for certain of its subsidiaries as provided in paragraph 8,
> which together may be referred to hereinafter as the (Employer)
> and [name] (Employee) agree as follows:"

50.     This definition makes clear that the entity to which the Contract refers

where the term "Shearson" is used is Shearson itself, as it was then understood and

constituted, and not to such possible successors.

10

51.    Similarly, § 8 provides plainly and clearly that the parties to the

Contract are only as follows, again plainly not including Shearson's "successors" in this

statement where, if intended, the term "successors," which is used multiple times elsewhere in

the Contract, would logically appear:

"8.    Parties to Agreement.

"This agreement is between Employee and Shearson or a
subsidiary or affiliate of Shearson for which Shearson is acting
as agent hereunder, whichever is Employee's actual employer as
of the date hereof.  If Employee's actual employer changes from
Shearson to a subsidiary or affiliate of Shearson or from a
subsidiary or affiliate of Shearson to Shearson or another
subsidiary or affiliate of Shearson, thereafter Employee's
employer for purposes of this agreement shall be the new
employer."

This language names as parties Shearson and, to the extent applicable, certain Shearson

affiliates existing at that time, which employed Client Group members for which Shearson

was then acting as an agent "as of the date [t]hereof," but plainly omits mention of

"successors."

52.    Throughout the Contract's provisions addressing possible

subordination, the Contract refers only to Shearson, as it was then understood and

constituted, as the entity whose insolvency or other events would trigger subordination in the

event of a bankruptcy, and not to any possible successor of Shearson, except in certain

particular contexts described further below and inapplicable here.

53.    Specifically in this regard, the Contract states, at § 5(d) (on page 5):

"The payments to be made by Shearson to Employee hereunder are unsecured subordinated

obligations of Employer only, and Employee is only a general subordinated creditor of

Shearson in that respect." (As noted above, the Contract defines the term "Employer" in its

11

opening paragraph as referring to Shearson and certain of its subsidiaries but makes no

mention of "successors.")

      54.    Similarly, the Contract states at § 9(d) (on pages 13-14), which is the

provision on which the Trustee, in seeking subordination, directly relies and quotes from (at

Paragraphs 7-8, misleadingly substituting "[LBI]" for the Contract's actual references to

"Shearson"):

> "Employee irrevocably agrees that the Obligations of Shearson
> hereunder with respect to the payment of amounts credited to
> his deferred compensation account are and shall be subordinate
> in right of payment and subject to the prior payment or
> provision for payment in full of all claims of all other present
> and future creditors of Shearson whose claims are not similarly
> subordinated (claims under this agreement shall rank pari passu
> with claims similarly subordinated) and to claims which are now
> or hereafter expressly stated in the instruments creating such
> claims to be senior in right of payment to claims arising under
> this agreement, arising out of any matter or event occurring
> prior to the payment date of the amounts credited to Employee's
> deferred compensation account under this agreement. In the
> event of the appointment of a receiver or trustee of Shearson or
> in the event of its insolvency, liquidation pursuant to the
> Securities Investor Protection Act of 1970 ('SIPA') or otherwise,
> its bankruptcy, assignment for the benefit of creditors,
> reorganization whether or not pursuant to bankruptcy laws, or
> any other marshalling of the assets and liabilities of Shearson,
> the Employee shall not be entitled to participate or share,
> ratably or otherwise, in the distribution of the assets of Shearson
> until all claims of all other present and future creditors of
> Shearson, whose claims are senior to claims arising under this
> agreement, have been fully satisfied or provision has been
> made therefor."

      55.    The Contract further discusses at length, at § 9(e) (on pages 14-16),

subordination of indebtedness to Client Group members to other debt, including Senior

Subordinated Debt of Shearson, but again, despite advisedly and precisely using the term

"successors" elsewhere, as described further below, including in other contexts within the

same § 9, this discussion refers only to such debt of "Shearson" (or, in one specific instance

on page 16, to debt of Shearson subsidiaries, further demonstrating the specification of

"entity" in these examples is purposeful rather than casual or inadvertent), and not to that of

Shearson's successors.

56.    These statements as to subordination omit mention of Shearson

"successors" precisely where such mention would appear if subordination were intended as

to successors.  Indeed, they omit "successors" despite the specific references to successors in

the immediately preceding §§ 9(b) and (c), as described further below.

57.    In fact, significantly, by contrast to the definition of "Shearson" and the

references to "Shearson" for purposes of subordination, the Contract, in multiple other

instances, *does* indicate that certain specific provisions are applicable not only to Shearson,

*but also to Shearson's "successors and assigns."*  In other words, Shearson, as the drafter of

the agreement, made certain provisions applicable not only to Shearson, but also to

Shearson's "successors and assigns" in particular instances where such application to

successors was actually intended by the parties.

58.    An example of such use appears at, for example, § 11 (on page 18;

this page is apparently missing from the Trustee's submission of this document as Exhibit A to

Docket No. 8576-1), where the Contract provides that it:

> "shall be binding upon Employee and Employee's heirs, legal
> representatives, and upon Shearson and Shearson's successors
> and assigns.  Employee's rights hereunder, including rights to
> receive payments, are not assignable."

59.    Thus, notably, this Debtor, while not an entity whose insolvency or

status can trigger subordination, can and does succeed to the *obligations* of Shearson to the

members of the Client Group, because Shearson's successors are bound by its provisions.

13

60.     However, as the Contract is plainly and carefully written to provide, the
Contract contains no corresponding provision that the Employee, as that term is defined
(here, the Client Group members), is bound to a subordination provision keyed to a very
differently constituted entity it did not know, contract with or have reason to conceive of at the
time of the making of the Contract.

61.     As noted above, similarly, and tellingly, in *other, unrelated portions* of §
9, within which the subordination clause the Trustee would rely upon appears (at § 9(d)), the
Contract expressly includes Shearson's "successors" in contexts that govern possible
repayment to Shearson but *not subordination*. In particular, the Contract sets forth, at § 9(b)
(page 10) and § 9(c) (page 11), certain payment clawback provisions that might require a
repayment to Shearson under the Contract, and provides further, specifically, that not only
Shearson, but also Shearson's "successors or assigns," would be entitled to such repayment.

62.     Indeed, that the term "successors" is intentionally and advisedly used
or, as the case may be, omitted by Shearson as the drafter of the Contract is further clarified
by the fact that although it is used in certain of these repayment/clawback provisions within §
9, it is *not* used in another clawback provision within § 9 (at § 9(e)(iii) on page 15) — in
addressing the ranking of the debt under the Contract with other debt (in particular, Senior
Subordinated Debt, of Shearson):

> "Employee shall promptly return to Shearson, any amounts
> (whether cash, securities or otherwise) received from Shearson if
> the payment by Shearson of such amounts constituted a
> violation of the express terms of any Senior Subordinated Debt
> (or any agreement under or pursuant to which the same may be
> outstanding)."

63.     Thus, again, the definition of Shearson as alleged above and the
selective use of, and failure to use, the term "successors," make clear that the entity to which

14

the Contract refers where the term "Shearson" is used is Shearson itself, as it was then understood and constituted, and not such possible successors.

64.    Plainly, Shearson, as the Contract's drafter, was able to use the term "successors" of Shearson in instances where the Contract was intended to refer to Shearson's successors.  Conversely, Shearson plainly and advisedly did not use the term "successors" where the Contract was not intended to refer to Shearson's successors.

65.    In this regard, the contract interpretation principles of *contra proferentem* and, relatedly, *expressio unius est exclusio alterius*, further make clear that the Contract, in referring to Shearson, refers to Shearson as it was then understood and constituted, and not to Shearson's successors, both in general and in particular as to subordination provisions and the entity whose insolvency or other events would trigger subordination.

66.    Additionally, Shearson was party to other deferred compensation agreements and plans made at or near the same time as the Contract and the deferred compensation plan to which it relates, including in some instances with some of the members of the Client Group, some of which have been the subject of litigation in this Court, and in those other contracts, Shearson clearly and advisedly had defined itself differently — in those other instances, where it was intended, defining the contracting party to be not only Shearson itself, but also to include in all respects under such contracts "successors" of Shearson — including in particular as to subordination provisions and the entity whose insolvency or other events would trigger subordination.

67.    Relatedly, Shearson or its predecessors were party to other deferred compensation agreements and plans in which the contracting party was defined to include its "successors" but in which there was no subordination provision whatsoever.

15

68.     Thus, by contrast with other provisions in this and other similar Shearson agreements where the Contract refers to Shearson and its "successors," Shearson's successors are not included in the relevant provisions that could trigger subordination of the claims of the Client Group members to general unsecured claims in this case involving this Debtor.

69.     All of these facts and features of the Contract and Shearson's own conduct establish that in Shearson's identification of itself as the contracting party, the insolvency of or other events concerning which could lead to subordination, Shearson intended to make clear that the mutual intent of the parties in this Contract, and the intent of Shearson in drafting this Contract, was precisely to ensure that invocation of the subordination provision could occur only as measured by Shearson as it then existed, was understood and constituted — whose capital requirements were being supported by the subordination provision, and whose insolvency was exceedingly remote by reason of its being an American Express subsidiary, as it was then understood and constituted — and not by the insolvency or other events relating to any other entity that emerged from Shearson or succeeded to Shearson's obligations under the Contract.

70.     Significantly, the Contract was never amended to change this identification of Shearson as the entity whose insolvency or other events would trigger subordination.

71.     The Contract could not be amended unilaterally by Shearson or by its successors.

72.     In fact, there were no amendments to the Contract applicable to the members of the Client Group.

16

73.    Were there to have been any such amendment, for it to be applicable to any member of the Client Group, each individual member of the Client Group would have had to, as to himself or herself, have executed a bilateral amendment, and no member of the Client Group did so.

74.    Moreover, Shearson and any of its successors or would-be-successors were well aware of this, and if they sought to obtain such amendments, they understood how to do so.

75.    Had it been the parties' intent to have the Client Group members subject to subordination in connection with insolvency or other events concerning later-arising entities such as this Debtor, these parties knew how to write such language to implement such intent, as demonstrated by their use of such language in other parts of this Contract, as well as in other Contracts between Shearson and some of the Client Group members.

76.    They did not use that language in this Contract, and they did not do so for sound reasons as alleged above — they did not do so deliberately, to implement an intent that, as per this Contract, subordination would not occur in such far-reaching and unanticipated circumstances.

77.    For all these reasons, the provisions the Trustee seeks to invoke here do not apply with regard to the insolvency of this Debtor.

78.    For these reasons, among all others, the Trustee's effort to seek subordination of the acknowledged claims of the members of the Client Group to the claims of other general unsecured creditors fails.

17

### AS AND FOR A THIRD DEFENSE

79.     The Debtor materially breached the Contract in failing to maintain the

required plan administrative body to discharge certain rights and duties under the Contract

as the Contract required.

80.     Specifically, the Contract provided that such an Administrative

Committee of Shearson be in place to perform various functions, including:

> "4.     <u>Termination</u>.
>
> "The Administrative Committee of Shearson has the right
> (if the Administrative Committee also terminates those similar
> agreements with its other Employees which become effective on
> or about the effective date of this agreement) to terminate this
> agreement, and Shearson's and Employee's obligations
> hereunder, at any time by giving Employee, or Employee's
> designated beneficiary or beneficiaries if Employee is deceased,
> written notice to that effect."

A footnote at Page 4 of the Contract further defines and describes the "Administrative

Committee" as being the "Administrative Committee of the Board of Directors of Shearson."

81.     Upon the changes made to and in Shearson since the time the Contract

was made, there was not and could not be any such Administrative Committee as required

by the Contract.

82.     Additionally and relatedly, there was not any amendment to the

Contract permitting a substitute administrative body.

83.     The Administrative Committee, as described in the Contract, could only

be the body specifically described and was no longer available or existing as described in the

Contract long before the filing of this insolvency proceeding.

84.     Further, and separately and independently, neither Shearson nor any

successor or other entity having the obligations to the Client Group members under the

18

Contract, including the Debtor, whether permissibly or impermissibly, had in place for many years prior to the commencement of this insolvency case any plan administration body of the type required by the Contract (without regard to whether such a body, if constituted, would have been a proper body with authority to act under the Contract).

85.    By reason of the foregoing, the Client Group members were deprived of a critical, material right in the Contract — *viz.*, the existence of a body properly constituted with authority to terminate the underlying deferred compensation plan in anticipation of possible insolvency, to terminate the plan for other reasons, both in the interests of Shearson and/or the individual participants in the deferred compensation plan, and to carry out other duties articulated throughout the Contract as belonging to the Administrative Committee.

86.    Indeed, the Administrative Committee's right and duty to terminate the deferred compensation plan in the face of a potential insolvency and thereby cause return of the Client Group members' funds before such insolvency was an intended and critical component of the plan, which was openly discussed with potential participants before they entered into the Contract.

87.    The Debtor's and its predecessors' failure to have in place the required plan administration body as required by the Contract was and is a material breach of the Contract, occurring prior to the filing of this bankruptcy proceeding.

88.    As a consequence, by reason of that material breach of the Contract, the Debtor is precluded, under New York law, from relying upon contractual provisions, such as the subordination provisions, in its favor.

## AS AND FOR A FOURTH DEFENSE

89.    The Debtor materially breached the Contract in taking impermissible tax deductions and/or claiming other impermissible tax benefits in connection with the Contracts and the related deferred compensation plan in the hundreds of millions and possibly billions of dollars..

90.    This conduct resulted in extensive and ongoing audits on those issues by the Internal Revenue Service and possible other governmental authorities.

91.    The Debtor's and its predecessors' abuse of the tax entitlements in connection with the Contract was a material breach of the Contract, occurring prior to the filing of this bankruptcy proceeding.

92.    In particular, this conduct imperiled the viability of the deferred compensation plan to which the Contracts and the entitlements thereunder of the members of the Client Group relate, such that it brought about the meaningful likelihood that the Client Group would have been deprived of benefits under the Contracts by direct result of such conduct and its consequences with the Internal Revenue Service.

93.    As a consequence, by reason of that material breach of the Contract, the Debtor is precluded, under New York law, from relying upon contractual provisions, such as the subordination provisions, in its favor.

## AFFIRMATIVE DEFENSES

For its statement of Affirmative Defense, the Client Group alleges:

20

## AS AND FOR A
### FIRST AFFIRMATIVE DEFENSE

94.    This proceeding seeking to subordinate the claims of the Client Group

to claims of general unsecured creditors is not brought in accordance with applicable

Bankruptcy Law and rules and, accordingly, cannot result in a valid order resulting in such

subordination.

## AS AND FOR A
### SECOND AFFIRMATIVE DEFENSE

95.    The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not state a claim for relief pursuant to which the requested relief

may be granted because they misdescribe the entities to which these pleadings and papers,

and the underlying agreements, refer, and a correct description would require that the claim

for relief or subordination be dismissed, with prejudice, in accordance with F.R.C.P. 12(b)(6)

and F.R.B.P. 7012(b).

## AS AND FOR A
### THIRD AFFIRMATIVE DEFENSE

96.    The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not state a claim for relief pursuant to which the requested relief

may be granted because they misdescribe the documents to which these pleadings and

papers refer, and upon which they rely, and the correct and actual papers, if attached or

accurately described, would require that the claims for relief or subordination be dismissed,

with prejudice, in accordance with F.R.C.P. 12(b)(6) and F.R.B.P. 7012(b).

21

AS AND FOR A
FOURTH AFFIRMATIVE DEFENSE

97.    The pleadings and/or papers on which the Trustee relies to seek

subordination in this case do not, taken as a whole, state a claim for relief or subordination

pursuant to which the requested relief may be granted and must be dismissed, with

prejudice, in accordance with F.R.C.P. 12(B)(6) and F.R.B.P. 7012(b).

AS AND FOR A
FIFTH AFFIRMATIVE DEFENSE

98.    The Trustee's efforts to seek subordination in this case are barred,

because of the facts and matters alleged above which are incorporated herein by reference,

by the doctrine of waiver.

AS AND FOR A
SIXTH AFFIRMATIVE DEFENSE

99.    The Trustee's efforts to seek subordination in this case are barred,

because of the facts and matters alleged above, which are incorporated here by reference,

by the doctrine of estoppel.

AS AND FOR A
SEVENTH AFFIRMATIVE DEFENSE

100.    The Trustee has failed to allege that this is a core proceeding.

AS AND FOR AN
EIGHTH AFFIRMATIVE DEFENSE

101.    This is a non-core proceeding, and the Client Group members do not

consent to entry of final orders or judgments by the Bankruptcy Court.

22

AS AND FOR A
NINTH AFFIRMATIVE DEFENSE

102.    The Trustee's effort to seek subordination in this case are subject to a

requirement by the parties' Contract that the issue presented be resolved by mandatory

arbitration:

> "5. (i) This agreement and all other similar agreements which become
> effective shall be interpreted and construed by the Administrative
> Committee and the determination of the Administrative Committee as
> to any disputed question shall be conclusive, except that any
> controversy arising out of or relating to the subordination provisions of
> paragraph 9, shall be, submitted to and settled by arbitration pursuant
> to the Constitution and Rules of the New York Stock Exchange
> ('Exchange').  Shearson and Employee shall be conclusively bound by
> such arbitration."

Accordingly, the issues raised and presented herein by the Trustee must be arbitrated in

accordance with the Contract.

Dated:   New York, New York
         April 29, 2014

                                        SCAROLA MALONE & ZUBATOV LLP

                                        By_____
                                            Richard J.J. Scarola
                                        *Attorneys for the Individuals Identified
                                        in the Notice of Appearance
                                        at Docket No. 8234 (Appendix A)*
                                        1700 Broadway
                                        41st Floor
                                        New York, NY  10019
                                        Tel.:  (212) 757-0007

# APPENDIX A

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 57 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 25 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 1 of 11

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Case No. 08-01420 (SCC) SIPA |
| LEHMAN BROTHERS INC., | |
| | NOTICE OF APPEARANCE AND |
| | REQUEST FOR SERVICE OF PAPERS |
| Debtor. | |

Pursuant to Fed. R. Bankr. P. 2002, 9007 and 9010(b), the undersigned

attorneys respectfully request the Clerk of the Court to enter their appearance in this case on

behalf of the creditors listed in Exhibit A hereto for the limited purpose of opposing the efforts

of the Trustee to subordinate their certain claims, also listed in Exhibit A, to the claims of

general unsecured creditors (the "Issue of Subordination"), and requests all parties in interest

to serve copies of all papers served or filed in this case with respect to this issue upon the

undersigned, at the office address and telephone number set forth below.

By filing this Notice of Appearance, it is noted in particular but without

limitation that the undersigned counsel and their clients (a) do not waive any rights to object

to the jurisdiction of this Court with regard to the Issue of Subordination, (b) do not agree or

consent to the jurisdiction of this Court to render a final order or other relief pursuant to the

doctrine of *Stern v. Marshall* with regard to the Issue of Subordination, and (c) do not agree

or consent, and object, to the filing by the Trustee of the various motions (Dkt. Nos. 6847,

6865, 6866, 7264, 7388 & 8196) directed at the clients listed on Exhibit A to subordinate

their claims as a contested matter rather than as an adversary proceeding in violation of Fed.

R. Bankr. P. 3007 and 7001(8), and object to the Court rendering any relief in connection

with such motions other than dismissal with prejudice (and expressly reserve the right to seek

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 58 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 26 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 2 of 11

such dismissal with prejudice), and (d) do not agree or consent to the conversion of the

contested matters described above into adversary proceedings or granting any other relief

with respect to such motions other than dismissal with prejudice.

In entering this Appearance, it is noted that the Trustee's counsel has reviewed

this list of claimants and claim numbers on Exhibit A and identified a limited number of

instances as to which they believe duplicative, amended or superseded claims may have

been filed or noted other clerical errors.  Counsel now appearing will work with the Trustee's

counsel on those issues and will make any amendments to this list as to names or claim

numbers as are warranted by further developments or information.

Dated: New York, New York
February 13, 2014

_____
Richard J.J. Scarola
rjjs@smzllp.com

_____
Alexander Zubatov
az@smzllp.com

SCAROLA MALONE & ZUBATOV LLP
*Attorneys for the Claimants Listed on Exhibit A*
1700 Broadway
41st Floor
New York, NY 10019
Tel.: (212) 757-0007

2

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 59 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 27 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 3 of 11

# EXHIBIT A

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 60 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 28 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 4 of 11

| Last Name | First Name | Claim # **Unless otherwise noted, each claim number listed is preceded by "700" | Notes |
|---|---|---|---|
| Ackerman | Donald | 1433 & 1872 | |
| Ades | Sabah | 1785 | |
| Allesandro | Robert | 1435 &1874 | |
| Ambrecht | Kennth | 1436 & 1875 | |
| Anderson | Brenton | 1438 & 1877 | |
| Anderson | Jeffrey | 1439 & 1878 | |
| Angst | Chuck | 1786 | |
| Ashe | Kathleen | 1440 & 1879 | |
| Asher | Thomas | 1441 & 1880 | |
| Atchison | John | 1442 & 1898 | |
| Ayoub | Anthony | 1443 & 1899 | |
| Baker | John Jr. | 1444 & 1905 | |
| Barrett | Bernard | 1712 | |
| Bary | Roberta | 1714 | |
| Batkin | Alan | 1445 & 1907 | |
| Beckerman | Stanley | 1447 & 1909 | |
| Bellas | Albert | 2001 | |
| Bellinger | Richard | 1448 & 1910 | |
| Bender | Douglas | 1449 & 1912 | |
| Bender | Theodore III | 2053 | |
| Berkley | Henry | 2054 | |
| Besse | Robert | 1450 & 1913 | |
| Best | Alan | 1451 & 1914 | |
| Biggar | Elizabeth | 1455 & 1918 | |
| Blum | Kevin | 1452 & 1915 | |
| Blutinger | Natan | 1834 | |
| Boe | Richard | 2002 | |
| Bohn | Francois | 1453 & 1916 | |
| Borchers | Leon | 1454 & 1917 | |
| Bourne | George | 1823 | |
| Boyd | William Jr. | 1457 & 1920 | |
| Boyles | Kenneth | 1459 & 1922 | |
| Brady | Jane Wilde | 1460 & 1923 | |
| Brager | Stanley | 2004 | |
| Brandt | Coleman | 1716 | |
| Breck | Chris | 1717 | |
| Breck | William Jr. | 1719 & 2543 | |
| Bresnan | John | 2555 | |
| Broadbent | William | 1462 & 1949 | |
| Broda | Kathleen | 1721 | |
| Brown | Melville | 1468 & 1954 | |
| Brown | Robert Mott III | 2055 | |
| Brydson | John | 1464 & 1950 | |

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 61 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 29 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 5 of 11

| | | | |
|---|---|---|---|
| Buls | Arthur | 2056 | |
| Burns | Thomas | 1835 | |
| Burns | Perry | 1465 & 1951 | |
| Burton | Mark | 1466 & 1952 | |
| Bussaca | Gary | 1824 | |
| Butters | David | 1836; 1837 | |
| Buttery | Stuart | 1487 & 1953 & 2033 | |
| Cagnina | Robert | 1469 & 1955 | |
| Campbell | Robert | 1471 & 1957 | |
| Capra | James | 2057 | |
| Carbone | Rudolph | 1472 & 1958 | |
| Carbone | James | 1787 | |
| Carns | Lewis | 1473 & 1959 | |
| Caruana | Sal | 1722 | |
| Ceisler | Robert | 1724 | |
| Cerasia | Robert | 1474 & 1960 | |
| Chatley | Bruce | 1475 & 1961 | |
| Chen | Phil | 1477 & 1963 | |
| Childers | John | 1478 & 1964 | |
| Ciemniecki | Stanley | 1479 & 1965 | |
| Clark | James | 1788 | |
| Coghlan | John | 1924 | |
| Cohen | Paul | 1480 & 1966 | |
| Cohen | Leonard | 2005 | |
| Cohen | Sallee | 2007 | |
| Colacurci | Glenn | 1481 & 1967 | |
| Cole | Emried D III | 1925; 1939; 7000877 | POC #7000877 does not have "700" prefix |
| Conway | Michael | 1838 | |
| Cooper | Stanley | 2072 | |
| Cosgrove | Thomas | 1483 & 1969 | |
| Couch | William | 1489 | |
| Cox | Timothy | 1490 | |
| Cronin | William | 1491 | |
| Cunningham | Kevin | 4584 | No 700 prefix to claim number |
| Dapuzzo | Peter | 2008; 2009 | |
| Darsky | Judith | 2010 | |
| Dauman | Stewart | 1493 | |
| De Gaglia | Tom | 1839 | |
| Degennero | Mark | 1840 | |
| Delaney | Steven G. | 4495 | No 700 prefix to claim number |
| DelCampo | Michael | 1841 | |
| Delli Paoli | Robert | 1495 | |
| Deutsch | Harvey | 1725 | |
| Dixon | Barbara | 1496 | |
| Dobin | Michael | 1497 | |

2

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 62 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 30 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 6 of 11

| | | | |
|---|---|---|---|
| Doepke | Wiliam | 1498 & 1631 | |
| Dolan | Robert Jr. | 1842 | |
| Dorfman | Richard | 2011 | |
| Doris | Martin | 1499 | |
| Drescher | Dennis | 1501 | |
| Dworsky | David | 2122; 2124 | |
| Edmiston | Robert | 1843 | |
| Edwards | William | 1505 | |
| Edwards | Michael | 1503 | |
| Edwards | Paul | 1504 | |
| Elliott | Frederic S. | 2125; 2126 | |
| Eschert | Erwin | 1507 | |
| Estey | Arthur | 1928 | |
| Evelo | Joseph | 2127 | |
| Evenson | Don | 1508 | |
| Farley | James | 1509 | |
| Feldman | Helga | 8003716 | No 700 prefix to claim number |
| Feldman | Richard | 1511 | |
| Feldman | Alan | 1825 | |
| Fenwick | Larry | 1512 | |
| Finlayson | Roderick | 1513 | |
| Fish | Jason | 1514 | |
| Fishbein | Norman | 1516 | |
| Forshagen | Doug | 1515 | |
| Frank | Fred | 2073 | |
| Frank | Edwin III | 1726 | |
| Frankel | Arnold | 1519 | |
| Friedman | Mark | 2012 | |
| Fry | Edward Jr. | 1520 | |
| Fulton | Thomas | 1814 & 1942; 626; 9000750 | POC #626 and #9000750 do not have "700" prefix |
| Fultz | Thomas | 1521 | |
| Gallatin | Ron | 1727 | |
| Gallea | Anthony | 1869 | |
| Galleher | Richard | 1522 | |
| Ganz | Susan | 1523 | |
| Garber | Alan | 1524 | |
| Gard | Ronald | 1525 | |
| Gartland | Jude | 1526 | |
| Garzarelli | Elaine | 1527 | |
| Gengler | Thomas Jr. | 1845 | |
| Genirs | Robert | 1421 & 1972 | |
| Giciella | Henry | 1529 | |
| Gladstone | Alan | 1530; 2071 | |
| Glasky | Joel | 1531 | |
| Goode | John | 1534 | |

3

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 63 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 31 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 7 of 11

| | | | |
|---|---|---|---|
| Goodspeed | Roger | 1729 | |
| Gott | Stephen | 1539 | |
| Gottmann | Hank | 1827 | |
| Graber | Jerroid | 1540 | |
| Graves | John | 1541 | |
| Gregory | Robert | 1542 | |
| Guernsey | Alan | 1846 | |
| Hadley | Edwin III | 2074 | |
| Hament | Nancy | 1424 & 1974 | |
| Hart | Edward | 1545 & 2029 | |
| Hayes | Brian | 1731 | |
| Hayes | Dennis Lee | 1847 | |
| Herman | Harvey | 4380 | No 700 prefix to claim number |
| Hermann | John A. Jr. | 2533 | |
| Hershberg | David | 1425 & 1975 | |
| Herzer | Charles | 1732 | |
| Hetzel | Charles | 1547 | |
| Higgins | Harrison | 1549 | |
| Hill | Tomlinson | 1733 | |
| Hoffman | Arnold | 1551 | |
| Hoffman | Kenneth | 1552 | |
| Hoopes | Scott | 1553 | |
| Hubbard | Charles | 2058 | |
| Illges | John | 2128 | |
| Isles | Philip | 1555 | |
| Jackson | Michael | 2075 & 2129 | |
| Jacobs | David | 1557 | |
| James | Graeme | 1558 | |
| Kaplan | Jack | 2164; 3367 | POC #3367 does not have "700" prefix |
| Kaplan | Alice | 1564; 6035 | POC #6035 does not have "700" prefix |
| Karol | Herbert | 2238 | |
| Katz | Evan | 1565 | |
| Kaufman | Joel | 1566 | |
| Kearns | William Jr. | 1567 | |
| Kelly | Brian | 1790 | |
| Kilgore | Jonathan | 1569 | |
| Kirby | William | 1570 | |
| Klonsky | Daniel | 1571 | |
| Kobak | Martin | 1 | No 700 prefix to claim number |
| Kopp | Bradford | 1848 | |
| Kowski | George | 1572 | |
| Kozeletz | Stephen | 1849 | |
| Kra | Howard | 1573 | |
| Krantz | Eric | 1574 | |

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 64 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 32 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 8 of 11

| | | | |
|---|---|---|---|
| Krueger | Harvey | 2059 | |
| Kunigk | Peter | 1575 | |
| Lakefield | Bruce | 1577 | |
| Lancaster | Robert | 1579 | |
| Landau | Arnold | 1580 | |
| Landgraf | Karl | 1581 | |
| Lane | Jeffrey | 1582 | |
| Leetzow | Leonard, Jr. | 1583 | |
| Lehman | Jack | 1585 | |
| Lehr | Seth | 1586 | |
| Lenz | William | 1588 | |
| Lessing | Stephen | 2252; 6131 | POC #6131 has no "700" prefix to claim number |
| Levinson | Andrew | 1590 | |
| Levy | John | 1591 | |
| Lewis | Dorothy | 2060; 2061 | |
| Libman | Spencer | 1593 | |
| Lind | Robert | 1594 | |
| Lindstrom | Ward | 1735 | |
| Lloyd | Marcelle | 2013 | |
| Lord | William | 1737 | |
| Lovett | Nigel | 1596 & 1632 | |
| Lusardi | Robert | 1597 | |
| Madden | Michael | 1598 | |
| Maguire | James | 1599 | |
| Manley | James | 2147 | |
| Marantz | Alan | 1600 | |
| Marino | Thomas | 1602 | |
| Marks | Herb | 1603 & 1630 | |
| Martinez | Roman | 1604 | |
| Martov | Martin | 1605 | |
| Matza | Robert | 1606 | |
| May | Harold H. | 2014; 2166; 654; 3572 | POC #654 and #3572 do not have "700" prefix |
| McCann | John | 1611; 4705 | POC #4705 does not have "700" prefix |
| McCleary | John | 1607 | |
| McCormick | Robert | 1852 | |
| McDaniel | Roger | 1608 | |
| McDonald | Patrick | 245 | No 700 prefix to claim number |
| McDougall | John | 4412 | No 700 prefix to claim number |
| McGlynn | Edward | 2018 | |
| McGuinn | Edwin III | 1419 & 1976 | |
| McHale | Edward | 1609 | |

08-01420-scc     Doc 9069     Filed 06/06/14     Entered 06/06/14 17:07:16     Main Document
Pg 65 of 67

08-01420-scc     Doc 8783     Filed 04/29/14     Entered 04/29/14 11:59:51     Main Document
Pg 33 of 35

08-01420-scc     Doc 8234     Filed 02/13/14     Entered 02/13/14 15:58:19     Main Document
Pg 9 of 11

| | | | |
|---|---|---|---|
| McKeown | William | 1612 | |
| McLendon | Heath | 1738 | |
| Mehaffrey | Stan | 1614 & 1633 | |
| Mejean | Paul | 1615 | |
| Melnik | Ronald | 1616 | |
| Melzer | Richard | 1617 | |
| Messinger | Craig | 1618 | |
| Mickel | Frank | 1739 | |
| Mikulich | Raymond | 1619 | |
| Millard | Robert | 1741 | |
| Miller | Ronald | 1931 | |
| Miller | Jerome | 1620 | |
| Milverstad | Michael | 1634 | |
| Minter | Alan | 2062 | |
| Montalbano | Richard | 1635 | |
| Morgia | Cataldo | 1636 | |
| Mortkowitz | Harry | 1637 | |
| Moschella | Joseph | 1644 | |
| Munro | William | 1638 & 2168 | |
| Murphy | Newell III | 1740 | |
| Murray | Philip | 1640 & 2030 | |
| Nastro | Charles | 1642 | |
| Navrude | Stanley | 1853 | |
| Neill | Frank Jr. | 1643 | |
| Nestor | Thomas | 1932 | |
| Newmark | Paul | 1645 | |
| Odermatt | Robert | 1647 | |
| Orlins | Stephen | 1648 | |
| Owens | John | 1650 | |
| Palatnek | Arnold | 1649 | |
| Passman | Seymour | 2020 | |
| Penrose | James | 1651 | |
| Pettit | MaryAnne | 2149; 2148 | |
| Phyfer | Daniel | 2022 | |
| Plumeri | Joseph | 1652 | |
| Poggi | Anthony | 90001540; 1357; 2945 | These claims do not have a "700" prefix. |
| Poggi | Irene | 1792 | |
| Polhemus | Kenneth | 1653 | |
| Pollack | Howard | 1654 | |
| Pondt | David R. | 655; 1655 | POC #655 does not have "700" prefix |
| Porter | Grant | 1656 & 1710 | |
| Pravato | Frank | 1742 | |
| Pucciarelli | Jim | 1657 | |

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 66 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 34 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 10 of 11

| | | | |
|---|---|---|---|
| Pulling | Thomas | 1743; 2058; 2057; 9003379; 9003380 | POC #2058, #2057, #90033379 and #9003380 do not have "700" prefix |
| Quast | Lani | 1658 & 1702 | |
| Raney | Richard | 1659 | |
| Reef | Alan | 1854 | |
| Reitzel | Edward | 1660 & 1664 | |
| Renehan | Dan | 1661 | |
| Renzi | Louis | 1662 | |
| Ring | Carl Jr. | 1665 | |
| Ritz | Norman | 1666 | |
| Robson | Thomas | 1668 | |
| Roosevelt | Theodore IV | 1426 & 1977 | |
| Roper | James | 1933 | |
| Rosenberg | Nanette | 1670 | |
| Sacco | Gregory | 1671 | |
| Samra | Victor, Jr. | 1856 | |
| Savarese | Lawrence Jr. | 1673 | |
| Scanlon | Joseph Jr. | 1744 | |
| Scaraggi | Frank | 1857 | |
| Schaefer | Gary | 1858 | |
| Schiffer | Craig | 1420 & 1979 | |
| Schoenthal | David | 1934 | |
| Schulsinger | Jeffrey | 1674 | |
| Seibels | Robert III | 2066 | |
| Shafiroff | Martin | 1676 | |
| Shaftel | Mel | 1678 | |
| Shapiro | Robert | 1679 | |
| Shean | Anne | 1680 | |
| Sheinberg | George | 1793 | |
| Shelton | Charles | 1681; 2187 | POC #2187 does not have "700" prefix |
| Shepard | Frank | 1682 | |
| Sherman | John | 1746 | |
| Shorr | David | 2068 | |
| Shutzer | William | 1684 | |
| Silverberg | David | 1685 | |
| Simmons | Hardwick | 1686 | |
| Simonetti | Philip | 1687 | |
| Simonini | Julius | 1688 | |
| Sinai | Allen | 2023 | |
| Slifer | Stephen | 1689 | |
| Sobotka | David | 1690 | |
| Spar | Warren | 1691 | |
| Spiegel | Steven | 1859 | |
| Stern | James | 1749; 1750 | |

08-01420-scc    Doc 9069    Filed 06/06/14    Entered 06/06/14 17:07:16    Main Document
Pg 67 of 67

08-01420-scc    Doc 8783    Filed 04/29/14    Entered 04/29/14 11:59:51    Main Document
Pg 35 of 35

08-01420-scc    Doc 8234    Filed 02/13/14    Entered 02/13/14 15:58:19    Main Document
Pg 11 of 11

| | | | | |
|---|---|---|---|---|
| Stipo | Michael J. | 4688 | | No 700 prefix to claim number |
| Stone | Jerry | 1693 | | |
| Strong | Roger | 2136 | | |
| Struble | Raymond | 1695 | | |
| Terrell | Steven | 1822 | | |
| Tilles | Glenn | 1861 | | |
| Tobin | Paul | 1697 | | |
| Topol | Clifford | 1863 | | |
| Troy | Austin | 1699 | | |
| Tucker | Thomas | 1700 | | |
| Urciuoli | Carmine | 1751 | | |
| VandenBossche | Pamela | 1935 | | |
| Viering | Donald | 1864 | | |
| Vincent | Richard | 1752 | | |
| Virany | Steven | 1753 | | |
| Vlach | Roger | 2069 | | |
| Voelker | Edward | 1754 | | |
| Wait | Jarett | 1756 | | |
| Walther | Gary | 1758 | | |
| Washkowitz | Alan | 1759; 1760 | | |
| Weinberg | Richard | 2137 | | |
| Weiss | Eugene | 2152 | | |
| West | Pat | 1761 | | |
| Weston | Gerald | 1762 | | |
| Williams | Paul | 1763 | | |
| Williamson | John Jr. | 1937 | | |
| Wilson | John | 1764 | | |
| Winchester | David | 1938 | | |
| Wolff | William III | 1865 | | |
| Wolitzer | Steven | 1765 | | |
| Wright | John | 1867; 1868 | | |
| Wright | Jeannie | 1766; 1811 | | |
| Wynn | Barry | 1768 | | |
| Yarkin | Allan | 1769 | | |
| Zatulove | Paul | 1770 | | |
| Zipp | Brian | 1771 | | |
| Zook | George | 1772 | | |

8