# PD 1

## Trustee's Investigation Report

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

      LEHMAN BROTHERS INC.,

                    Debtor.

Case No. 08-01420 (JMP) SIPA

**TRUSTEE'S PRELIMINARY INVESTIGATION REPORT**
**<u>AND RECOMMENDATIONS</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.    EXECUTIVE SUMMARY ............................................................................4

II.   Procedural Background.................................................................................10

III.  LBI'S HISTORICAL BACKGROUND.......................................................13

     A.    LBI Pre-1965 .....................................................................................13

     B.    LBI 1965-1994...................................................................................14

     C.    LBI 1994-2008 — A Period Of Record Growth And Profits — And Increasing Risk...................................................................................15

     D.    The Business Of The Modern Broker-Dealer.......................................17

     E.    Regulatory Oversight ..........................................................................18

          1.    The Financial Responsibility Rules ..........................................19

          2.    The CSE program ....................................................................21

IV.  KEY FEATURES OF LBI'S BUSINESS AND WHAT HAPPENED TO THEM BY THE TIME OF THE LIQUIDATION .........................................................25

     A.    What Happened By The Time Of The Liquidation ...............................27

          1.    Inability to obtain financing from third parties and affiliates...................28

          2.    Customer relationships.............................................................30

          3.    Additional collateral requirements and clearing organization actions ...................................................................................34

               (a)    JPMC.........................................................................34

               (b)    Citibank.....................................................................36

               (c)    Clearing organization actions ....................................37

           4.    Increase in failed transactions..................................................37

# TABLE OF CONTENTS

                                                                                          Page

B.  LBI's Business In Relation To Lehman's Corporate Structure And Some
    Of Its Ramifications ........................................................................................39

    1.  Transactions with or involving other Lehman entities ..............................40

        (a)  Repo agreements with affiliates and other entities ........................42

        (b)  Prime brokerage accounts ..............................................................44

        (c)  Certain LBI subsidiaries ................................................................47

    2.  The role of clearing banks and LBHI in financing LBI and its
        subsidiaries ................................................................................................52

    3.  Some relevant aspects of the LBI-LBIE relationship ...............................56

        (a)  Daily operations of the LBI-LBIE relationship ............................56

        (b)  LBIE Acting as Settlement Hub for Transactions in Europe
             and Certain Jurisdictions ................................................................57

V.  SOME CONSEQUENCES OF LBHI'S INSOLVENCY FILING AND THE
    IMMINENCE OF THE SIPA LIQUIDATION ...................................................60

    A.  Immediate Impacts Of Insolvency Filings ............................................60

        1.  CME's reaction to LBHI's insolvency and LBI's impending
            liquidation ................................................................................................64

        2.  OCC's reaction to LBHI's insolvency and LBI's impending
            liquidation ................................................................................................68

        3.  DTCC's reaction to LBHI's insolvency and LBI's impending
            liquidation ................................................................................................70

        4.  The DTCC-ACATS reversals ................................................................71

    B.  The Impact Of The Insolvency Filings On The LBI-LBIE Relationship .............74

    C.  Prime Brokerage Accounts, Reconciliation Status And The Trustee's
        Protocol ................................................................................................75

    D.  Lehman's Communications With Customers About SIPA ................................76

## TABLE OF CONTENTS

Page

VI.  ADDITIONAL INFORMATION ON FOUR ITEMS RELATING TO LBI MENTIONED IN THE EXAMINER'S REPORT ............................................. 80

    A.  Potential Avoidance Actions — Below-Market Trades ........................ 81

    B.  The SEC Never Granted Approval For The Release Of Customer Funds ........... 82

    C.  Repo 105/108 ............................................................ 83

    D.  HSBC Deposit ........................................................... 84

VII.  CERTAIN CHALLENGES OF THE LARGEST BROKER-DEALER LIQUIDATION IN HISTORY ........................................................ 85

    A.  Overview:  Evolving Events Hinder Careful Planning ......................... 86

    B.  Transfer vs. Non-Transfer Of Customer Accounts:  Legal And Practical Implications ............................................................. 89

    C.  Incorrect Assumptions And Unanticipated Impediments ...................... 91

    D.  The Customer Accounts Included In The SIPA Proceeding .................... 94

        1.  Prime brokerage assets .............................................. 95

        2.  The unknown universe of non-PIM, non-PAM accounts ................. 96

        3.  The LBIE clearing and house customer accounts ..................... 97

        4.  The affiliate customer claims ...................................... 98

    E.  The Largest Broker-Dealer Liquidation Ever ............................... 99

    F.  SIPA And The Customer Protection  Rules Scheme Largely Worked Well In Spite Of It All ....................................................... 100

VIII.  SOME LESSONS AND CAUTIONARY TALES ..................................... 101

    A.  SIPA:  More Than An Afterthought ....................................... 102

    B.  The Desirability Of Account Transfers And Costs Of Partial Account Transfer ............................................................... 102

    C.  The Information And Operations Gap ..................................... 105

# TABLE OF CONTENTS

Page

IX. RECOMMENDATIONS FOR FUTURE LIQUIDATIONS WITH CUSTOMER IMPLICATIONS, WHETHER UNDER SIPA OR ANOTHER ORDERLY LIQUIDATION AUTHORITY ...................................................................111

A. The Need For Planning And Early Involvement Of Representatives Of Customers' Interests..........................................................................111

B. A Required Liquidation Plan ...........................................................112

C. Planning Beyond The Broker-Dealer: Third Party Holders Of Margin, Deposits And Collateral...................................................................115

D. Possible Requirement For Additional Court Findings........................122

E. Clearing Bodies, Set Off And Liquidation Rights, Visibility And Access To Information — Balancing Safe Harbors With Quid Pro Quos For The Protection of Customers...................................................................123

F. Must There Be A Single Fund Of Customer Property?.......................127

G. Reasonable Enhancement Of The SIPC Fund And Borrowing Or Guarantee Authority........................................................................134

H. Tailoring Safe Harbors To SIPA: Short Term Stays And Consensual Relief...............................................................................................136

I. Tailoring Safe Harbors To SIPA: Achieving Fairness And Finality For Close-Outs........................................................................................140

## <u>INTRODUCTION</u>

1.      James W. Giddens (the "Trustee"), as Trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI"), respectfully submits this Preliminary Report and Recommendations ("Preliminary Report").  As the Court is aware, the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), mandates that the Trustee investigate and report on, *inter alia*, the financial condition and business affairs of the debtor.  The Trustee's team of professionals is conducting this investigation and the Trustee plans to report on his findings at the conclusion of these liquidation proceedings as is customary.

2.      After any disaster, the post-event discussion is focused on changes that might be made to prevent a similar disaster from occurring again, and how to respond more effectively and efficiently in the face of future disasters.  The Great Chicago Fire of 1871, for example, led the way for modern construction made of brick and stone, rather than wood, and inspired improved building and fire codes.  The disaster that was the collapse of Lehman is no exception.  Since the events of September 2008, experts, politicians and pundits have explored various types of financial reform that might be implemented to prevent another "Lehman" from taking place.  Indeed, at the present time, significant federal financial reform legislation has just been enacted.[1]  And, earlier this year, in Lehman Brothers Holdings Inc.'s ("LBHI") Chapter XI

---

1.   Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 (2010) (the "Dodd-Frank Act").  Although this Preliminary Report addresses certain potential effects of the Dodd-Frank Act on a broker-dealer liquidation, it does not do so in detail or in each circumstance where the Act may have an impact, given that the Act in many respects delegates to regulatory agencies the obligation to conduct studies and the authority to issue the appropriate implementing regulations.

proceeding,[2] the Lehman crisis was fully explored in the extensive report released by the
Examiner appointed by this Court.[3]

      3.      These efforts are more far-reaching and broader than the Trustee's
mandate here, which is to focus solely on LBI, the United States broker-dealer subsidiary of
LBHI.[4]  Indeed, the Examiner's Report, and nearly all of the public commentary and analyses of
events of September 2008 that culminated with LBHI's Chapter XI filing and LBI's SIPA
proceeding, have focused on the collapse of LBI's parent, LBHI.  The Trustee believes,
therefore, that sharing some of the practical lessons learned from the LBI liquidation, along with
his recommendations specific to future liquidations of broker-dealers, will be timely and relevant
to the issues currently under consideration by legislators and regulators.

      4.      The difference in focus of this Preliminary Report as compared to other
efforts is critical.  While some, for example, have sought major reforms to regulatory agencies,
the Trustee believes that, insofar as the supervision of LBI's basic operations as a broker-dealer
is concerned, the regulatory scheme, as well as the regulators themselves and Lehman's internal
compliance function, largely did their jobs.  During periods of normal operation, LBI was
generally in compliance with regulatory requirements and the financial responsibility and
customer segregation rules specific to the operation of the broker-dealer.  The circumstances
within which LBI's liquidation was commenced and has had to be conducted have created a

---

2.    *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. 2008) ("LBHI Docket"), *available at* http://www.lehman-docket.com.

3.    Report of Anton R. Valukas, Examiner (LBHI Docket No. 7532), *available at* http://lehmanreport.jenner.com/ (the "Examiner's Report").

4.    The overall scope of the Examiner's Report, as detailed by the Court with ten specific bulleted topics for the Examiner to investigate, was the failure of LBHI.  *See* Order Directing Appointment of an Examiner Pursuant to § 1104(c)(2), (LBHI Docket No. 2569).

unique set of obstacles.  But, SIPA still worked to facilitate massive account transfers and

otherwise protect LBI's customers, even in the case of an entity as large and complex as LBI and

even in a time of uncertainty and financial turmoil.  This is not to say that circumstances have

permitted a perfect liquidation or that improvements in industry preparedness and liquidation

proceedings themselves cannot be made, and the Trustee sets forth his recommendations on these

and other topics in Section IX.

5.      By the week of September 15, 2008, LBHI and certain affiliated

companies had already commenced insolvency proceedings in the United States and abroad.  It

was the most tumultuous time in our country's financial history since the Great Depression, and

the Lehman collapse became its defining moment.  While it was a foregone conclusion that LBI

would not survive as an independent entity, little else was certain.

6.      LBI's liquidation arose from the chaos of a failed attempt by Lehman

management to save the firm by either raising capital and selling targeted assets, or finding a

buyer that would buy all or most of the enterprise.  When the anticipated sale to Barclays Capital

Inc. ("Barclays" or "BCI") failed, the plan changed to an orderly wind-down orchestrated by the

Federal Reserve Board of New York ("FRBNY").  A degree of disorder nevertheless ensued

because of the loss of confidence in Lehman as a whole following LBHI's Chapter XI filing and

the not fully-anticipated freezing of European transactions with Lehman Brothers International

(Europe) ("LBIE"), the principal European broker-dealer within the Lehman enterprise, after it

was placed in administration in the United Kingdom.  The wind-down was also interrupted by

the re-emergence of Barclays as the acquirer of selected, but not all, broker-dealer assets and

customer accounts.

7.     This Preliminary Report is based on the Trustee's investigative efforts to date, which remain ongoing.  The Trustee is engaged in active litigation and pre-litigation activities, such that a report on certain topics at this time would be inappropriate.  Indeed, this is another difference between the Trustee and the Examiner, who was a neutral outsider with respect to the matters he investigated.  For these reasons, this Preliminary Report does not address all of the matters that have been or will be the subject of the Trustee's investigation and further reporting.  The Trustee anticipates that by the conclusion of what is expected to be a necessarily complex liquidation proceeding, he will submit additional reports that will focus on other investigative areas set forth in SIPA, such as the examination of causes of action.[5]  The Trustee also files detailed narrative interim reports every six months which describe the progress of the liquidation, investigation and principal issues that the Trustee is pursuing.  The most recent of those reports covers the period through May 10, 2010.[6]

## I.     EXECUTIVE SUMMARY

8.     The Trustee has prepared this Preliminary Report as part of his statutory duty to report on the reasons for the debtor's failure and, as is traditional, to identify problems that could be remedied in future liquidations, including some recommended reforms for consideration by the Court, Congress and relevant regulatory bodies.  Such reports are often issued at or near the end of a SIPA liquidation, but the magnitude of Lehman and the fact that many aspects of the recently enacted financial reform legislation are now being worked out

---

5.   Because the Trustee continues to evaluate potential claims resulting from the LBI liquidation, which he will identify at the end of his investigation, certain information and details are omitted from this Preliminary Report to avoid prejudice to the future prosecution of those claims or potential unfairness to other parties involved.

6.   *See* Trustee's Third Interim Report for the Period November 12, 2009 through May 10, 2010, *In re Lehman Brothers Inc.*, No. 08-01420 (JMP) (Bankr. S.D.N.Y. 2008) ("LBI Docket") (LBI Docket No. 3244), *available at* www.lehmantrustee.com (the "Trustee's Third Interim Report").

makes such a report a little less than two years into the LBI liquidation timely and appropriate in the Trustee's view. The authority to conduct the investigation that has led to this report is contained in SIPA § 78fff-1(d)(1)[7] and was confirmed by this Court's order of January 15, 2009.[8]

9.     This Report does not report on all potential causes of action or other matters that are or are likely to be subjects of litigation. They and other matters will be the subjects of future reports. Rather, this Report focuses on an overview of LBI's relationship with some of the other Lehman entities; the dissipation of LBI's assets following the well-publicized Bear Stearns emergency in the Spring of 2008 as affected by LBI's relationships with other Lehman entities; and lessons learned and recommendations for the future based on that history and the course of the liquidation to date. The Report is accompanied by a summary chronology that may be helpful to readers.

10.     The Report does not purport to be an insolvency analysis or an in depth financial review and seeks to avoid comment, insofar as possible, on matters likely to be subject to litigation involving the Trustee.

11.     The Preliminary Report concludes that, at least until relatively late in the day when panic and confusion set in, LBI's compliance with the regulatory requirements designed for the protection of customer property was good, and the requirements largely had the effect they were supposed to have. With a few important exceptions adverted to in the Report

---

7.   15 U.S.C. § 78fff-1(d)(1) (subsequent citations to the SIPA statute exclude "15 U.S.C."); *see also* SIPA §§ 78fff-1(d)(1), (3), (4).

8.   Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons (LBI Docket No. 561) (the "Subpoena Authority Order") (**Exhibit A**).

and now in litigation, most customer property was intact and accessible for satisfaction of customer claims or transfer to other brokers — precisely the purpose of the regulations. This was particularly true of the customer property located in the United States; obtaining that which was or should have been held in foreign depositories has proved more challenging and has met with less immediate success.

12.    For the most part, SIPA also worked well, permitting implementation of the largest account transfers in history. These transfers provided nearly seamless treatment to the vast majority, though regrettably not all, LBI customers, avoiding loss and disruption to them and the market as a whole. The remaining claims, though small in relation to the number and value of accounts transferred, have nevertheless generated a claims process which is by far the largest and most complex in the history of SIPA or broker-dealer liquidations generally. In fact, administration of any of the four remaining groups of claims — accounts not included in the Private Investment Management ("PIM") or Private Asset Management ("PAM") ranges of transferred accounts for a variety of reasons, certain prime brokerage accounts ("PBAs"), claims under the LBIE/LBI omnibus account through which LBI served as U.S. clearing broker for LBIE and its customers, and claims by LBHI and other Lehman affiliates — would each in itself dwarf virtually any previous broker-dealer liquidation.

13.    The lessons learned and a description of the practical issues the Trustee has faced appear primarily in Sections IV, V, VII and VIII of the Report. Specific recommendations for these and other issues or potential improvements in the operation of the SIPA process are set forth in the concluding Section IX. Some of the lessons learned and problems discussed relate to the particular structure of the transaction with Barclays. The transaction agreed to by the holding company left LBI, a defunct broker-dealer, sandwiched

08-01420-cccc Doc 369250 Filed 08/256/14 Entered 08/256/24 51 89:19 Main Appendix Document
Documents 1 Through 919 Pg 13 of 1129

7

between, on the one hand, LBHI, a holding company entering Chapter XI with a desire to shed liabilities and retain businesses and assets, and, on the other, an entity selectively acquiring some customer accounts and buying some assets while seeking to de-risk the transaction. While another major liquidation might differ in detail, Lehman, in the Trustee's view, presents a cautionary tale on the unexpected dangers inherent in this structure. The Lehman experience underscores the need for better information, better planning, and better communication, whether in a stand-alone SIPA liquidation or as part of a liquidation involving a Federal Deposit Insurance Corporation ("FDIC") takeover of some assets under the new financial authority legislation.

14. In general, with some exceptions, the Trustee has been regularly disappointed in the performance and attitudes of many entities with which he has had to interact or which hold LBI property or information. While there have been professions of cooperation, deeds have spoken louder than words. In too many cases the deeds have shown a pattern of delay, incomplete information and creation of obstacles. Similarly — and again with a few exceptions — parties have seemed all too willing to take extreme positions in order to claim a right to what was intended to be customer property, to claim customer status for themselves for ordinary financial or intercompany transactions, or to withhold property clearly belonging to the LBI estate until the last possible moment under threats of litigation. This attitude of hiding and then holding onto the ball until the referee is about to blow the whistle has greatly hindered the Trustee's work and frustrated SIPA's underlying goals.

15. These attitudes contrast sharply with those that prevailed in earlier SIPA liquidations of New York stock exchange firms in which the Trustee and his counsel have been involved. In those earlier liquidations, a paramount concern for protection of customers and

08-01420-scc Doc 360250 Filed 08/26/14 Entered 08/26/24 51 8:39:19 Main Appendix Documents 1 Through 9 Pg 19 Pg 14 of 1129

8

proving that the customer scheme worked when it was needed caused prominent actors largely to forego gamesmanship and strategic behavior. Admittedly, those liquidations were many years ago; their stakes were lower and the complexity much less. But, at bottom, the industry seems to have forgotten that its success or failure still depends to a large extent on the confidence of customers. Even though many accounts at LBI were large and in some cases quite sophisticated, the underlying sense that customers will be protected and dealt with fairly remains a key foundation of the industry, one that it ought not to contribute to eroding through narrow conceptions of self-interest and focus on minor tactical advantages.

16.     To that end, the Report contains eight principal specific recommendations and ideas for further consideration. Most could be implemented by regulation, or in some cases industry agreement; a few would require legislation. The recommendations are primarily practical, rather than theoretical, in focus. If there ever is to be a "second" Lehman, the recommendations are designed to avoid a later trustee having to encounter some of the largely unforeseen impediments encountered by this Trustee.

17.     Principal recommendations include:

- More pre-liquidation disaster planning, both on an individual broker-dealer and industry-wide basis, including what a broker-dealer's "living will" and emergency plan should include to alleviate the type of information gap which has confronted the Trustee in the LBI liquidation.

- Proposals for more robust and earlier pre-liquidation negotiation and focus by liquidators and regulators on the mechanics and consequences of transactions such as partial customer account

transfers. Specifically, attention needs to be paid to provisions for access to assets, information systems and people, including a possible requirement of judicial findings on some of these issues prior to approval of transactions and extending the time for settling transactions after the filing date.

- Balancing clearing banks' and others' safe harbor rights against the needs for transparency and respect for broker-dealers' obligations to segregate customer property in order to prevent denial of access to screens and seizure of that which should be segregated customer property.

- Study of clearing agencies' emergency rules so that the rules function as expected in emergencies, the operation and consequences of the emergency rules are better understood and the results strike the proper balance among competing interests.

- Suggestions for possible reconsideration of the unitary nature of the fund of customer property in favor of funds tailored to different forms of accounts, to correspond to customer expectations and differences in account relationships.

- Increasing SIPC's financial resources and borrowing authority in a prudent way that minimizes taxpayer costs but adds flexibility in the purposes for which such financial resources could be used.

- Recommendations for short term reinstatement of the automatic stay with provision for SIPC and a SIPA trustee to consent to relief

to permit prompt liquidation of collateral and return of excess or
marking to market to cure deficiencies.

- Rational rules for unwinding outstanding non-customer financial
  transactions on terms that protect both the broker-dealer's estate
  and counterparties while providing certainty and reducing costs.

## II. PROCEDURAL BACKGROUND

18. On September 15, 2008, LBHI and certain of its subsidiaries, excluding
LBI, commenced voluntary cases (the "Chapter XI Cases") under Chapter XI of Title XI of the
United States Code (the "Bankruptcy Code").

19. The commencement of the insolvency proceedings of the corporate parent
substantially limited the daily funding sources of those LBHI affiliates and LBI subsidiaries that
remained in operation as of September 15. As a result, LBI was only able to continue its
operations by borrowing approximately $45 billion (backed by collateral valued much greater
than that) from the FRBNY starting on Monday, September 15 (the "FRBNY Repo").

20. On September 19, 2008, on the application of the Securities Investor
Protection Corporation ("SIPC"), the Honorable Gerard E. Lynch, then a United States District
Judge for the Southern District of New York, entered an Order Commencing Liquidation (the
"LBI Liquidation Order") pursuant to the provisions of SIPA.[9]

21. The LBI Liquidation Order, *inter alia*: (i) appointed James W. Giddens as
Trustee for the liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); (ii) appointed

---

9. *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL) (LBI Docket No.
1) (the "LBI Liquidation Order") (**Exhibit B**).

08-01420-sccc Doc 3690450 Filed 08/256/26/14 Entered 08/256/26/24 518:39:19 Main Appendix
Documents 1 Through 9192 Pg 17 of 1129

11

Hughes Hubbard & Reed LLP ("HHR") counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

and (iii) removed the case to this Court pursuant to SIPA § 78eee(b)(4) (the "SIPA Proceeding").

22. This SIPA Proceeding is "by far the largest and most complex" securities

broker-dealer liquidation ever attempted.[10]  As of July 30, the LBI estate contained

approximately $17 billion of cash and securities, but the SIPA Proceeding has involved the

administration or transfer of well over $110 billion of cash and securities.  Working in

cooperation with SIPC, the U.S. Securities and Exchange Commission ("SEC"), the Commodity

Futures Trading Commission ("CFTC"), the FRBNY, the Depository Trust & Clearing

Corporation ("DTCC"), and former LBI personnel, the Trustee has effectuated the transfer of

over 110,000 customer accounts involving customer property with a value in excess of

$92.3 billion.  This Court approved the customer account transfers on December 14, 2009.[11]

Over the course of the SIPA Proceeding, more than 12,500 customer claims, seeking in excess of

$66 billion, were filed.  The Trustee has determined all customer claims other than those of

affiliates that are now in final stages of review or reconciliation.  Over 1,300 objections to the

Trustee's determinations have been filed for court determination.  Approximately one hundred of

these objections have been denied by the Court or have been withdrawn, and more are in the

process of briefing, exchange of information and discussion.

---

10. Memorandum Decision Granting Motion of DCP Parties for Leave to Conduct 2004 Discovery, at 4 (LBI
Docket No. 353).

11. Order Pursuant to SIPA Section 78 fff-2(f), 11 U.S.C. 105(a) and 363(b) and Fed. R. Bank. P. 9019(a)
Approving the Trustee's Implementation of the LBI Liquidation Order to Complete the Account Transfers for
the Benefit of Customers, Including the Related Limited Settlement Agreement Completing the PIM
Conversion for the Benefit of Private Investment Management Customers, and Terminating the Account
Transfer Process (LBI Docket No. 2338).

08-01420-scc Doc 360250 Filed F08/256/26/14 nEantee0n8/256/26/245:38:9:19ain Apenendit Documents 1 Thr Propugh 0192g Pg 18 of 1129

12

23. In furtherance of his investigative obligations, the Trustee obtained permission of the Court by Order dated January 15, 2009 to issue subpoenas,[12] and since then has been actively engaged in pursuing numerous avenues of investigation. The Trustee agrees with the conclusion of the Examiner, set forth in the April 1, 2010 letter to the U.S. Trustee, that having subpoena power is "equally as important [as] not to have to use it."[13] To date, the Trustee's professionals have conducted over 200 interviews of former Lehman employees and third parties, all of which have occurred without having to deploy the Trustee's subpoena power, although recently some subpoenas for testimony have been issued. Further, with a handful of exceptions, the Trustee has proceeded to collect hundreds of thousands of pages of documents from third parties on a voluntary basis. The Trustee has averted to the possibility of using his subpoena power numerous times in discussions with information sources and, in keeping with this Court's instruction that the Trustee issue subpoenas as necessary, will not hesitate to use this power if voluntary cooperation is not forthcoming or meaningful.

24. The Trustee also coordinated his investigative efforts to the extent practicable and appropriate with the Examiner, the various regulatory authorities, and other third parties. This coordination was critically important to the progress of the Trustee's investigation, his findings and conclusions to date, and the Trustee's ability to avoid duplicative efforts to the greatest extent possible. The Trustee deeply appreciates the Examiner's professionalism, thorough work, courtesies and understanding of the need to "stand down" cooperatively on certain issues that are particularly within the Trustee's purview.

---

12. Subpoena Authority Order (**Exhibit A**).

13. Letter from Anton R. Valukas, Examiner, to Diana Adams, U.S. Trustee (Apr. 1, 2010), at 7 (LBHI Docket No. 8626).

25.     Additional and detailed summaries of the Trustee's works and progress of the liquidation are contained in the Trustee's Interim Reports, the most recent of which was filed on May 10, 2010.[14]

## III.     LBI'S HISTORICAL BACKGROUND[15]

### A.     LBI Pre-1965

26.     The history of Lehman Brothers, from its mid-19th century founding by German immigrants as a dry goods merchant, to its ascension to, and ultimate fall from, the ranks of the world's elite investment banks, has been well documented and extensively discussed.[16]  The modern era of LBI as a registered broker-dealer and a wholly-owned subsidiary of LBHI[17] began when LBI was incorporated under Delaware law on January 21, 1965 under the leadership of Robert Lehman.  Robert, the son of one of the founding Lehman brothers, was the last family member to run Lehman, and he brought great changes during the course of his 44-year tenure.[18]

---

14. *See* Trustee's Third Interim Report.

15. Attached as **Exhibit C** hereto is a chronology of Lehman's more recent history, with a particular focus on rapidly evolving developments in the firm's final days.

16. *See, e.g.*, Ken Auletta, Greed and Glory on Wall Street:  The Fall of the House of Lehman (The Overlook Press 2001) (1986); Lawrence G. McDonald & Patrick Robinson, A Colossal Failure of Common Sense:  The Inside Story of the Collapse of Lehman Brothers (2009); Joseph Tibman, The Murder of Lehman Brothers:  An Insider's Look at the Global Meltdown (2009); Andrew Ross Sorkin, Too Big to Fail:  The Inside Story of How Wall Street and Washington Fought to Save the Financial System — and Themselves (2009); Mark T. Williams, Uncontrolled Risk:  The Lessons of Lehman Brothers and How Systemic Risk Can Still Bring Down the World Financial System (2010); Vicky Ward, The Devil's Casino:  Friendship, Betrayal, and the High Stakes Games Played Inside Lehman Brothers (2010); Henry M. Paulson, Jr., On the Brink:  Inside the Race to Stop the Collapse of the Global Financial System (2010).

17. Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 1 (March 31, 1994).

18. Robert Lehman assumed principal responsibility for the Lehman Brothers partnership in 1925 and led the firm through its golden age until his death in 1969.  *See* Steve Fishman, *Burning Down His House*, New York, Dec.

(Footnote continued on next page)

08-01420-sccc  Doc 3690250  Filed 08/256/06/14  Entered 08/256/06/24 518:39:19  Main  Appendix  Documents 1 Thrgough 919  Pg 20 of 1129

14

## B.    LBI 1965-1994

27.     Under Robert Lehman's guidance, and as the result of the Banking Act of 1933 (Glass-Steagall Act), Lehman cut its ties to commercial banking and instead focused on investment banking.[19]  Then, beginning in the 1960s, the firm expanded its traditional investment banking business towards new financial instruments, such as derivatives and asset-backed securities, in order to meet the increasing demands of clients for these new products, and to become a full-service institution that could compete with the top investment banks.[20]  Beginning in the 1970s, deregulation of the financial industry led to the expansion of financial products and financing mechanisms.[21]

28.     By July 1983, Lehman was more profitable than it had ever been, with capital of nearly $250 million and equity of $175 million.[22]  But the firm then underwent a period of decline, with infighting between the firm's trading and investment banking factions causing disruptions.[23]  By the fall of 1983, the firm was undercapitalized and began looking for buyers.  In 1984, Lehman Brothers was acquired by Shearson/American Express ("AmEx") with

---

(Footnote continued from prior page)
8, 2008, at 34; Harvard Business School, History of Lehman Brothers, http://www.library.hbs.edu/hc/lehman/history.html.

19.  AULETTA, *supra* note 16, at 30-1.

20.  A confidential report commissioned by Lehman's Board of Directors in 1973 highlighted Lehman's weaknesses and suggested that in order to meet the competitive demands of the marketplace, the firm would have to expand the financial services that it offered.  *See id.* at 41-4; *see also* General Accounting Office, Risk-Based Capital: Regulatory and Industry Approaches to Capital and Risk, GAO/GGD 98-153, 35-7 (July 1998) (noting that changes in the financial services industry, including an expansion of financial products, also increased competition, which spurred financial firms to diversify and increasingly operate in what were once separate banking, insurance and securities sectors).

21.  SAM Y. CROSS, ALL ABOUT…THE FOREIGN EXCHANGE MARKET IN THE UNITED STATES 3-4 (1998).

22.  AULETTA, *supra* note 16, at 3-4.

23.  Robert J. Cole, *Shearson to Pay $360 Million to Acquire Lehman Brothers*, N.Y. TIMES, Apr. 11, 1984, at A1.

an agreement that the new firm would be called Shearson Lehman/American Express, preserving the 134-year-old Lehman name. After AmEx divested itself of Lehman in 1994, LBI continued to operate as a broker-dealer, initially concentrating on the bond business.[24]

## C.     LBI 1994-2008 — A Period Of Record Growth And Profits — And Increasing Risk

29.     After the AmEx spin off, Lehman's CEO Richard S. Fuld, Jr. became the leader of what was then primarily a fledgling domestic bond firm that focused almost exclusively on fixed income.[25] The years under AmEx had considerably weakened Lehman, and when it emerged as an independent entity in 1994, it had only 9,000 employees and $75 million in earnings.[26] Under Fuld, by 2007, Lehman grew into a diversified global firm with 28,000 employees and over $4 billion in earnings, approximately $22.5 billion in shareholders' equity, and net revenues of $19.3 billion.[27]

30.     Lehman cut costs and expanded its business activities during Fuld's tenure. This expansion included the acquisition of Neuberger Berman in October 2003, giving LBI a brokerage business (called the PAM business), which included high net worth individuals

---

24. See Jay Mathews, *American Express to Spin Off Lehman; Investment Bank to Go to Shareholders, Employees in Tax-Free Deal*, WASH. POST, Jan. 25, 1994, at D2; Leah Nathans Spiro, *Lehman Brothers: Free at Last*, BUS. WK., May 22, 1995, at 112.

25. Fuld came to Lehman as an intern in 1966, and joined the firm full time as a commercial paper trader in 1969 while earning his business degree at night. He became CEO in 1994 after Lehman Brothers separated from AmEx. *Causes and Effects of the Lehman Brothers Bankruptcy: Hearing Before the H. Comm. on Oversight and Government Reform*, 110th Cong. 119-20 (2008) (statement of Richard S. Fuld, Jr., Chairman and Chief Executive Officer, LBHI); *see also* Written Statement of Richard S. Fuld, Jr. Before the H. Comm. on Oversight and Government Reform, 110th Cong. 3 (2008), *available at* http://oversight.house.gov/index.php?option=com_content&view=article&id=4692:committee-holds-hearing-on-the-causes-and-effects-of-the-lehman-brothers-bankruptcy&catid=42:hearings&Itemid=2 ("Fuld Written Statement"); Fishman, *supra* note 18, at 31 (noting that Lehman emerged from the spin-off as "a small bond shop that few thought would survive").

26. Fuld Written Statement, *supra* note 25, at 3.

27. *Lehman Brothers Hearing*, *supra* note 25 (statement of Richard S. Fuld Jr.), at 120; Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 14, 29 (Jan. 29, 2008).

and institutions.  Lehman also expanded by means of fixed income derivative products created

and distributed through LBI's subsidiaries Lehman Brothers Special Financing, Inc. ("LBSF"),

and the separately capitalized Lehman Brothers Financial Products, Inc. ("LBFP"), as well as

through significant real estate investments.[28]  The equity derivatives products business was

conducted through Lehman Brothers Finance S.A. ("LBF").[29]

   31. Lehman Brothers Commercial Paper, Inc. ("LCPI") was an LBI subsidiary

that effectively abandoned its traditional commercial paper business and concentrated instead on

purchasing mortgage loans for securitization and financing acquisitions.[30]  LB I Group, a private

equity subsidiary of LBI, engaged in strategic, non-real estate investments, generally long-term

in nature.  These entities expanded the scope of financial products and transactions from those

previously conducted by Lehman.  This expansion included involvement in interest rate swaps,

interest rate and equity derivatives, mortgage-backed securities, currency derivatives, credit

default swaps, total return swaps, collateralized debt obligations (including structured finance,

collateralized debt obligations and corporate-backed synthetic collateralized debt obligations)

and municipal bonds and derivatives.  Recent history has shown some of these transactions to be

far more risky than the typical bond, securities, and commercial paper transactions that had

historically been the focus of Lehman's business.[31]  Thus, the growth and apparent success of

---

28. *See* Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 36, 45, 47 (Feb. 28, 1996) (noting that the use of derivative financial instruments expanded significantly over the past decade).

29. *See id.* at 47.

30. *See* Lehman Bros. Company Overview:  First Quarter 2008, at 3 [LBI_PIR_000105].

31. *See* WILLIAMS, *supra* note 16,  at 108  (regarding Lehman in the 90s, "Lehman's antiquated financial reporting infrastructure could not measure the more sophisticated risks it was taking.  No longer did Lehman just have plain vanilla U.S. Treasury and corporate bond risk, which was the world Fuld understood.  Lehman was now subject to non-linear risks that behaved in a less predictable fashion.  These less predictable risks took on fancy

(Footnote continued on next page)

Lehman was achieved at the cost of increasing risk, the full extent of which became apparent

with the loss in value of real estate investments and mortgage-backed securities.

### D.   The Business Of The Modern Broker-Dealer

32.     By 2008, Lehman was operating around the world as a major investment

bank.  LBI was a registered broker-dealer in the United States and a wholly-owned subsidiary of

LBHI.  LBI was also a primary dealer in U.S. government securities and bought, sold and

financed government securities directly with the FRBNY.

33.     In the last years of its existence, Lehman's principal activities were to

serve institutional, corporate, government and high net worth individual clients and customers

throughout the world.  Lehman's activities split into five divisions:  Investment Banking, Fixed

Income, Equities, Mortgage Capital and Investment Management.  The Investment Management

Division ("IMD") consisted of the Asset Management, Private Equity and PIM businesses.  The

Asset Management business generated fee-based revenue from products and services for

institutional and individual clients through affiliates Neuberger Berman and Lehman Brothers

Asset Management LLC ("LBAM") and included the PAM range of customer accounts.  The

Private Equity business operated in merchant banking, venture capital, real estate, credit related,

fund of funds, and infrastructure to provide risk-adjusted returns to investors.  PIM worked with

high net worth individuals, middle market institutions and corporations and provided a wide

variety of services including investment advice, capital markets expertise, tax and estate

(Footnote continued from prior page)

names such as *inverse floaters*, *reset options*, and *knock-out options*.  Derivatives entailed the use of leverage
that added to price swings.  Lehman's increased trading of mortgage-based securities (MBS), asset-backed
securities (ABS), and over-the-counter (OTC) derivatives particularly drove the need for greater risk
measurement and reporting sophistication.") (emphasis in original); *see also Regulatory Perspectives on the
Obama Administration's Financial Regulatory Reform Proposals, Part I:  Hearing Before the H. Comm. on
Financial Services*, 111th Cong. 10-11 (2009) (statement of Gary Gensler, Chairman, CFTC) (proposing capital
standards and margin requirements to help lower risk).

planning, and in some cases corporate treasury services ("CTS") as part of a PIM account relationship.

34.    In addition to the PIM and PAM accounts, LBI operated a prime brokerage business for many hedge funds (in some of which other Lehman entities had a minority interest). LBI also cleared transactions for the hedge fund business of its European affiliate, LBIE, a U.K. broker-dealer, as well as for the Neuberger Berman PAM accounts. LBI also custodied securities or held securities as collateral for transactions with counterparties undertaken by other Lehman entities and cleared proprietary trades for Lehman Brothers OTC Derivatives Inc. "(LOTC"), which, as a "broker-dealer light," could report on an adjusted risk basis for capital reporting purposes. LBI also maintained account ranges for affiliates, which were generally subordinated. Other non-PIM and non-PAM account ranges comprised the largely non-actively traded accounts of institutional and corporate clients, which Lehman cultivated for M&A and financing work, and some CTS accounts not considered part of the PIM business. Still other ranges encompassed accounts for non-traditional trading such as "to be announced" trades on mortgage related securities ("TBAs") and Foreign Exchange trades ("F/X"). As described later in this Report, at the time of Trustee's appointment the nature and magnitude of most of the non-PIM, non-PAM accounts were unknown.

## E.    **Regulatory Oversight**

35.    In the ordinary course, a broker-dealer is a fragile entity dependent on its ability to borrow in order to fund its operations; the fully-paid property it holds for customers has to be segregated and not used for proprietary purposes, and it must retain in addition a net capital

08-01420-scc Doc 369-250 Filed 08/25/6/14 Entered 08/25/6/24 51 18:39:19 Main Appendix Document Documents 1 Through 19 Pg 25 of 1129

19

cushion.[32]  Many of its proprietary assets are pledged to third parties to finance its proprietary

transactions and clearing bank collateral requirements, as well as some margin lending.  In 2008,

when funds from a primary source of LBI's funding — the parent company, LBHI — started to

dry up and eventually disappeared, the pressure on LBI's third-party funding sources, already

under strain, only increased and made liquidation inevitable.  However, until that time — and

aside from losses at its subsidiaries — LBI's status as a regulated broker-dealer appeared to

comply with applicable Financial Responsibility Rules, and the customer property it was

required to hold was to a large extent intact.

### 1.    The Financial Responsibility Rules

36.    As a broker-dealer, LBI was regulated by the SEC, individual state

securities authorities, as well as self-regulatory organizations such as the Municipal Securities

Rulemaking Board and the New York Stock Exchange ("NYSE"), later consolidated into the

Financial Industry Regulatory Authority ("FINRA").[33]  In addition, LBI was a member of SIPC[34]

and, as a registered futures commission merchant, was also subject to the regulation of the

CFTC.

37.    A broker-dealer typically operates with two separate pools of money:

clients' money, and its own money that is used for proprietary investments.  The "Financial

Responsibility Rules" of the Securities Exchange Act of 1934, principally among them "SEC

---

32.  *See*  SEC Rules and Regulations under Securities Exchange Act 1934, 17 C.F.R. § 240.15c3-3 (2010) (requiring segregation of fully paid customer securities); 17 C.F.R. § 240.8c-1 (restricting hypothecation of customer securities).

33.  *See* Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 13 (March 31, 1994) (noting that the SEC had designated the NYSE as LBI's primary regulator).  In 2007, the SEC designated FINRA as LBI's primary regulator.  *See* Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 10-11 (Jan. 29, 2008).

34.  SIPA § 78ccc(a)(2) (requiring virtually all registered broker-dealers to become a member of the SIPC).

08-01420-scc   Doc 360   Filed 08/25/26   Entered 08/25/24 18:39:19   Main Document
Documents 1 Through 9   Pg 25 of 91   Pg 26 of 1129

20

Rule 15c3-3" (17 C.F.R. § 240.15c3-3, known as the "Customer Protection Rule"), require

broker-dealers like LBI to segregate and protect customer property.[35]  The intent of the Customer

Protection Rule is that fully paid-for customer property will be largely available if a broker-

dealer is liquidated either through a claims process or an account transfer process.  Accordingly,

in contrast to margin securities, LBI could not use fully-paid customer securities or excess

customer margin to finance its own operational or proprietary activities because these categories

of customer property had to be segregated for customers.[36]

      38.    While SEC Rule 15c3-3 prohibits a broker-dealer from using fully paid

customer securities and excess margin to finance its own activities, customers often borrow

money from brokerages to buy securities in what is known as margin lending.  SEC Rule 15c3-3

requires that the firm maintain possession and control of fully paid-for customer securities and

excess margin, and maintain cash or qualifying securities in an account for the exclusive benefit

of customers.  If a customer borrowed money to purchase securities, then LBI could re-pledge

those margin securities (up to a prescribed amount) because they were not yet considered fully

paid-for.  LBI was able to lend such securities to a third-party and obtain cash in return to

finance trading inventory positions, settle its accounts, or meet customers' needs.

      39.    The net capital rule requires the broker-dealer to maintain a cushion of

capital net of obligations and haircuts on asset valuations to ensure the broker-dealer's viability

and wherewithal to be liquidated or transferred. [37]  In addition, in LBI's case under the

---

35.  *See* Amendments to Financial Responsibility Rules for Broker-Dealers, Exchange Act Release No. 34-55431, 72 Fed. Reg. 12862 (Mar. 19, 2007).

36.  17 C.F.R. § 240.15c3-3; *see* Michael Jamroz, *The Customer Protection Rule*, 57 BUS. LAW. 1069 (2002).

37.  *See* 17 C.F.R. § 240.15c3-1.

08-01420-scc Doc 369450 Filed 08/256/26/14 Entered 08/256/26/24 518:389:19 Main Appendix Document Documents 1 Through 919 Pg 26 of 919 Pg 27 of 1129

21

Consolidated Supervised Entities ("CSE") program described below, its minimum net capital had to be at least $500 million and its tentative net capital at least $1 billion. Generally, LBI's compliance with its net capital, customer segregation and other regulatory requirements was closely monitored not only internally but also by FINRA and the SEC, and appeared to be largely satisfactory, until the last months of its existence when both internal and external operational factors compromised transparency into LBI's actual financial condition.[38]

### 2. The CSE program

40. In addition to the traditional regulation of LBI as a securities broker-dealer under the SEC Financial Responsibility Rules, LBI and LBHI entered the CSE program in December 2005. The SEC had implemented the CSE program in June 2004 as a way for global investment bank conglomerates lacking a supervisor under law to submit voluntarily to U.S. regulation.[39] Under the CSE program, a broker-dealer that maintained "certain minimum levels for net capital and tentative net capital [was eligible to] apply for a conditional exemption from the application of the standard net capital calculation."[40] As a condition to granting the exemption, the broker-dealer's ultimate holding company was also required to consent to group-wide SEC "supervision related to the financial stability of the broker-dealer."[41] Under the alternative capital computation method, the SEC permitted broker-dealers to calculate certain

---

38. *See* Motion for Order Approving Trustee's Allocation of Property of the Estate at 36-53 (LBI Docket No. 1866); Lehman Brothers Holdings Inc., Quarterly Report (Form 10-Q), at 36 (Apr. 9, 2008).

39. Press Release, U.S. Sec. & Exch. Comm'n, Chairman Cox Announces End of Consolidated Supervised Entities Program (Sept. 26, 2008), *available at* http://www.sec.gov/news/press/2008/2008-230.htm.

40. Letter from Kathleen E. Wannisky, Managing Associate General Counsel, United States General Accounting Office, to The Honorable Richard C. Shelby, Chairman, Committee on Banking, Housing, and Urban Affairs, United States Senate, *et al.* (June 25, 2004) (GAO-04-896R) ("Alternative Net Capital Report").

41. *Id.*

market and credit risk capital charges using internal mathematical models.[42] It was anticipated

that broker-dealers enrolling as CSEs would have "lower deductions from net capital for market

and credit risk."[43] As a condition to its use of the alternative method of computing net capital,

the broker-dealer was also required (under the second part of the rule) to provide the SEC with

an undertaking in which the ultimate holding company agrees to consolidated, group-wide

supervision by the SEC.[44] A registered holding company would thereafter permit the SEC to

supervise it and its affiliates on a group-wide basis.

41.     The rules also established separate regulatory requirements for Supervised

Investment Bank Holding Companies ("SIBHCs"). Commission supervision of an SIBHC –

which Lehman was not – included recordkeeping, reporting and examination requirements

pursuant to SEC Rule 15c3-4. Furthermore, the SIBHC was required to comply with rules

regarding its group-wide internal risk management control system and provide the Commission

with consolidated computations of allowable capital and risk allowances or other capital

assessment.

42.     In short, if a broker-dealer wanted to use the alternative method for

computing net capital, its holding company had to consent to increased reporting on both capital

and risk issues. The most obvious penalty was that the SEC could deny the broker-dealer the

ability to use the alternative calculations (which would be more expensive for the firm). LBI,

---

42. *Commission Announcements, Broker-Dealer and Affiliate Supervision on a Consolidated Basis*, SEC News Digest, 2-3 (June 9, 2004), *available at* http://www.sec.gov/news/digest/dig060904.txt.

43. Alternative Net Capital Report at 1.

44. 17 C.F.R. § 240.15c3-1a(7).

through its Legal and Regulatory Control group, regularly communicated with the SEC

regarding the details of calculations made under the alternative method.

43.      If the holding company did not otherwise have a principal regulator, the

CSE rules permitted the SEC to impose additional conditions on the broker-dealer or the holding

company as "necessary or appropriate in the public interest or for the protection of investors."[45]

These conditions might include, for example,

> restricting the broker's or dealer's business on a product-specific, category-specific, or general basis; submitting to the Commission a plan to increase the broker's or dealer's net capital or tentative net capital; filing more frequent reports with the Commission; modifying the broker's or dealer's internal risk management control procedures; or computing the broker-dealer's deductions for market and credit risk in accordance with § 240.15c3–1(c)(2)(vi), (c)(2)(vii), and (c)(2)(iv), as appropriate.[46]

In practice, the SEC chiefly relied on its power to require Lehman to "file more frequent reports

or to modify its group-wide internal risk management control procedures" as a condition to

remain in the CSE program.[47]

44.      Under the CSE program, a small team from the SEC's Division of Trading

and Markets was charged with monitoring Lehman's risk management function.  One team

member was assigned to monitor each of the following areas at Lehman:  market risk, liquidity

risk, and credit risk.  This team reported to an Assistant Director in the Division of Trading and

Markets.  Other teams from FINRA and the CFTC, in conjunction with the SEC, intensified their

monitoring and examination of LBI's and Neuberger Berman's compliance with the SEC

---

45.   SEC Rules and Regulations under Securities Exchange Act 1934, 17 C.F.R. § 240.15c3-1e(a)(1)(ix)(D) (Appendix E) (2010).

46.   17 C.F.R. § 240.15c3-1e(e).

47.   *Id.*

08-01420-scc Doc 369450 Filed 08/256/126/14 Entered 08/256/126/14 51:89:19 Main Appendix Document Documents 1 Through 919 Pg 30 of 1129

24

Financial Responsibility Rules and the brokerage businesses' financial condition generally, insisting on weekly financial and profit and loss statements. Many details of the monitoring of the enterprise as a whole are detailed in the Examiner's Report and need not be repeated here.[48]

45.     As the Trustee's review of the LBI experience shows, once an entity the size and scope of Lehman as a whole has already become highly leveraged and enmeshed in risky transactions, the CSE program gave the SEC seemingly ample but in practice imperfect and unwieldy tools — and limited resources — for effecting immediate change. Publicizing a failure to pass a hypothetical financial stress test would cause the very collapse the program was designed to prevent. Moreover, the SEC was the monitor, not the manager, of the business; as the Examiner's Report and other sources have documented, even when Lehman had risk controls in place, management was allowed to retain the business judgment to override them, as in the Archstone transaction.[49]

46.     Whether earlier adoption of the CSE program accompanied by more resources and more forceful intervention (for example, by requiring compliance with internal risk management guidelines shared with regulators) might have saved Lehman or mitigated the impact that a broader failure had on the broker-dealer is a moot question. Probably only forceful intervention by late 2006 or early 2007, or greater separation of the broker-dealer from entities engaging in risky proprietary transactions, would have prevented a salvage operation for the broker-dealer. Such radical steps would have meant a much-reduced Lehman and would have

---

48. *See* Examiner's Report at 1484-92.

49. As part of a joint venture, on May 29, 2007 Lehman and Tishman Speyer agreed to acquire Archstone, a publicly traded real estate investment trust ("REIT"). The transaction closed in October 2007, with Lehman funding $5.4 billion of the $23.6 billion purchase price, making Archstone Lehman's largest commercial real estate investment. *See* Examiner's Report at 112, 356.

been stoutly resisted by management and the industry as a whole.  In addition, Lehman was victimized in large part by the same systemic crisis of confidence and inability to obtain financing that caused bailouts or buyouts of peer firms to avoid bankruptcy.  Systemic market failure of this magnitude was not contemplated by the CSE tests, which focused primarily on the ability of a firm to survive a severe (but not unprecedented) downturn similar to various other historic downturns.  An internal April 2008 stress test, reported on by the Examiner, showed that the broker-dealers, LBI and LBIE, were predicted to lose immediately over $31 billion of repo financing between them and almost twice that much after four weeks.  Yet, LBI alone incurred a loss equal to or greater than those joint estimates between the end of August and the filing date of September 19, 2008.

## IV.    KEY FEATURES OF LBI'S BUSINESS AND WHAT HAPPENED TO THEM BY THE TIME OF THE LIQUIDATION

47.    During the period that regulators from the FRBNY, SEC, FINRA and the CFTC were present at LBI, there were relatively few overt signs of non-compliance with technical regulatory requirements.  In this section, we try to explain what did happen to the U.S. broker-dealer, LBI, once the crisis of confidence in Lehman as a whole reached its tipping point.

48.    As the Examiner has reported, just months prior to its bankruptcy filing, LBI's parent company, LBHI, recorded record revenues and record earnings in excess of $4 billion for its fiscal year ending November 30, 2007.[50]  During the same period, LBI also reported a seemingly sound financial condition.[51]  This Report describes the nature of some of

---

50.  Examiner's Report at 2.  The Examiner noted that total revenues were $60 billion though the more meaningful numbers were probably the less dramatic net revenue of $19 billion.  Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 29 (Jan. 29, 2008).

51.  This analysis does not purport to be a solvency analysis for purposes of avoidance actions or other legal issues.

LBI's businesses and assets and what happened to them in the weeks and months leading to its

liquidation, using as a reference point, the balance sheet included as part of LBI's May 31, 2008

Financial and Operational Combined Uniform Single ("FOCUS") Report.[52]

49.       Unsurprisingly, the Trustee's analysis of LBI's finances demonstrates that

while LBI itself continued to be in compliance with the regulatory requirements for a US-broker-

dealer.[53]  LBI's overall financial condition deteriorated over the last three and a half months of

its existence.  Much of this decline was attributable to losses at its subsidiaries, which had

engaged in riskier investments.  There were significant and well-published causes for concern

with respect to LBHI during the spring and summer of 2008, and LBI was dependent on LBHI's

viability (and the market's confidence in it).  Whether or not LBI technically could be considered

insolvent at a much earlier time — a question that may be subject to litigation and on which this

Report therefore takes no position — it was not until relatively late in the game that LBI's

financial position deteriorated to the point where liquidation or transfer to another broker was the

only remaining option to protect customers.  Tangible negative effects on LBI from the crisis in

confidence affecting Lehman as a whole rendered LBI unable to obtain adequate financing on an

unsecured or even secured basis, caused the departure of customers, and spurred an increase in

failed transactions and additional demands for collateral by clearing banks and others.

---

52. A FOCUS report is a periodic regulatory report filed by broker-dealers with the SEC that contains detailed
information about a firm's financial and operational status, such as credit and debit balances and computation of
net capital. LBI filed FOCUS reports on a monthly basis, the last of which was filed on August 25, 2008.  *See*
Lehman Brothers Inc., FOCUS Filing (Form X-17A-5) (Aug. 25, 2008); 17 C.F.R. § 240.17a-5
[LBI_PIR_000097].

53. *See*, *e.g.*, Draft of Lehman Brothers Inc., FOCUS Filing (Form X-17A-5)  (Aug. 31, 2008) (on file with the
Trustee).  The draft was never filed with the SEC.  [LBI_PIR_000067].

A.      **What Happened By The Time Of The Liquidation**

50.      May 31, 2008 was the date of the last issued public financial statement that included LBI.  LBI and its subsidiaries also separately issued annual unaudited Statements of Financial Condition in compliance with SEC Rule 17a-5.  Data from these May 31, 2008 reports can be compared to data from the draft August 31, 2008 FOCUS report (which was prepared but not filed with FINRA).[54]  This period was the final three months in which LBI's internal controls and infrastructure operated under a "normal" environment that allowed for the creation of financial statements prepared consistently with historical financial statements.

51.      This analysis shows that the financial condition of LBI deteriorated following May 31, 2008 up to the events of September 2008.  The rumored, and later actual, insolvency filings of LBHI and LBIE had the effect of ending market and counterparty confidence in the viability of LBI and accelerating its deterioration.  Essentially, in this period, a tremendous strain on LBI's cash resources resulted from:

- An inability to obtain financing on either a secured or unsecured basis from third parties, LBHI or Lehman affiliates,

- Transfers of some customer and PBAs,

- Increased demands for collateral or additional deposits from banks, clearing organizations and other parties, including its principal clearing banks, and

- An increase in failed transactions.[55]

---

54. Lehman Brothers Inc., FOCUS Filing (SEC Form X-17A-5) (Aug. 25, 2008) [LBI_PIR_000097].

55. Failed transactions include both fail-to-receive and fail-to-deliver. A fail-to-receive occurs when a broker-dealer purchasing securities does not receive delivery from the selling broker-dealer on the settlement date.  A fail-to-deliver occurs when a broker-dealer selling securities does not deliver them to the purchasing broker-dealer on the settlement date.

08-01420-scc  Doc 360250  Filed 08/25/14  Entered 08/25/24 18:39:19  Main Document Appendix
Documents 1 Through 9  Pg 38 of 919  Pg 34 of 1129

28

52.     Apart from the effect on regulatory capital, the combination of these factors had the spiraling effect of reducing financing capacity and available cash (and assets available to be pledged for cash), so that normal operations could no longer be continued.  By September 16, 2008, the FRBNY had to finance the operations of LBI, as counterparties were unwilling to undertake the risk of financing LBI during the wind down of its activities.  In addition, as discussed elsewhere in detail, certain clearing exchanges took unilateral actions that resulted in hundreds of millions of dollars in reductions of or restrictions on the use of LBI's available assets, further contributing to LBI's liquidity problem.[56]

**1.      Inability to obtain financing from third parties and affiliates**

53.     LBI used secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs.  LBI's inventory positions were primarily liquid assets (as interpolated from LBI's FOCUS filings).  Consistent with its policy, most of LBI's funding was done on a secured basis.  LBI assets at May 31, 2008 and August 31, 2008 primarily were made up of reverse repos, stock borrow agreements and financial instruments owned.  These transactions represented 94.1% of assets at May 31 and 92.4% at August 31.

54.     LBI's repos and stock borrows began to decline in the summer, as set forth in the following chart:

---

56.  *See infra* Section IV.A.3.c.

08-01420-scc Doc 360250 Filed 08/26/12 Entered 08/26/12 51 18:39: 19 Main Append Document
Documents 1 Through 191 Pg 35 of 1129

29

| (in millions) | 5/31/08 | 8/31/08 | 9/19/08 |
|---|---|---|---|
|  |  |  |  |
| Repurchase agreements – affiliates | $ 63,982 | $ 43,427 | $11,132 |
| Repurchase agreements – total | $141,177 | $143,473 | $80,112 |
|  |  |  |  |
| Securities loans – affiliates | $ 81,174 | $ 61,942 | $41,032 |
| Securities loans – total | $ 87,666 | $ 68,162 | $41,777 |
| Total repos and securities loans | $228,843 | $211,635 | $121,889 |
| Affiliate Percentage | 63% | 50% | 43% |

55.     During September 2008, access to the financing markets became even more difficult, both with affiliates and third parties.  As Lehman's condition became more precarious, third parties began decreasing their exposure to the Lehman entities, including LBI.  Repo financing continued to decline significantly to the point that tri-party repo transactions decreased from approximately $80 billion in May 2008 to less than $650 million on September 19, 2008, according to LBI's records.  LBI's access to the bonds borrowed market also decreased, putting additional strains on financing and the quality and variety of collateral LBI could offer to its repo counterparties.  Another result of decreased access to the bonds borrowed market was that LBI, since it could no longer borrow bonds to cover shorts, had to use more of the bonds already in inventory to cover firm short positions.  In order to obtain the collateral, LBI entered into reverse repo transactions which, though largely a wash for accounting and regulatory purposes where collateral values are sufficient, depleted its cash reserves.

56.     Further constraints on LBI's liquidity arose from the volume and dollar amount of failed foreign currency transactions, and the failure of counterparties to return margin posted by LBI as LBI met its performance obligations.  The result of these actions reduced available cash to LBI and its overall liquidity.  On September 19, 2008, there were over

08-01420-scc  Doc 369-250  Filed 08/25/6/14  Entered 08/25/6/24 18:39:19  Main Appendix Documents 1 Through 19  Pg 35 of 19  Pg 36 of 1129

30

2,350 non-receipts as counterparties failed to perform on their legs of foreign currency contracts, and, as reported at the sale hearing, virtually no proprietary cash available to LBI.

57.     The Lehman entities were under enormous market pressure as the press and counterparties demanded more and more evidence of their financial stability.  The rumors about a potential sale of Lehman to Bank of America and then to Barclays would stabilize and then de-stabilize Lehman's position.  As LBHI, LBIE, and the other affiliates approached September 12, 2008, their last business day of operation, the ability to obtain financing was more and more challenging, especially as demands for collateral increased.  Once LBHI and LBIE's insolvency proceedings commenced on September 15, 2008, LBI's financing options ran out.  The FRBNY had to step in with a $45 billion repo facility that was used to finance the operations of LBI as counterparties were unwilling to undertake the risk of financing LBI during the wind down of its activities.

## 2.     Customer relationships

58.     During the period leading up to September 2008, the number, activity and balances of customer relationships indicated volatility in customer transactions with LBI as would be expected given the state of the U.S. markets.[57]  For example, free credit balances[58] at hedge funds in Lehman as a whole declined by about $3 billion between mid-March 2008 and the beginning of May following the Bear Stearns debacle.  This loss of customers did not rival

---

57.  *See*, *e.g.*, Eric Dash, *U.S. Gives Banks Urgent Warning to Solve Crisis*, N.Y. TIMES, Sept. 12, 2008, http://www.nytimes.com/2008/09/13/business/13rescue.html?_r=1&scp=1&sq=eric%20dash%20warning&st=c se ("[Government] [o]fficials detected a rising number of defections by Lehman's institutional customers to other firms, but nothing near the panic that caused Wall Street executives to bombard Mr. [Hank] Paulson with dire warnings about a Bear Stearns collapse in March.").

58.  Free credit balances are liabilities of a broker-dealer to customers, which liabilities are subject to immediate cash payment to customers on demand, whether resulting from sale of securities, dividends, interest, deposits or otherwise, excluding, however, funds in commodity accounts which are segregated in accordance with the Commodity Exchange Act or in a similar manner.  17 C.F.R. § 240.15c3-3(a)(3).

that which had occurred at Bear Stearns. It did, however, continue after the end of May, as reflected in the following metrics, and accelerated in September as many hedge funds began moving assets elsewhere in the wake of LBI's announcement of financial results.

| (in millions) | 5/31/08 | 8/31/08 |
|---|---|---|
|  |  |  |
| Net payable to customers[59] | $14,478 | $ 8,519 |
| Amount required to be segregated for customer transaction under regulations: |  |  |
|    Securities Transactions[60] | $ 4,013 | $ 4,933 |
|    Commodity Transactions | $ 8,603 | $ 7,546 |
| Free Credits in Customer Accounts | $ 3,978 | $ 2,014 |

59.     Legacy LBI regulatory reporting personnel maintained a report of total free credit balances in customer coded accounts across the various LBI clearance and settlement systems.[61] The following charts show the trend in free credit balances and free credit items in LBI's customer-coded accounts.



59. Net payable to customers is computed using the following line items on the FOCUS balance sheet: Payable to Customers plus Payable to Non-Customers minus Receivables from Customers minus Receivables from Non-Customers.

60. The requirement presented is the sum of the SEC Rule 15c3-3 and the Proprietary Accounts of Introducing Brokers (PAIB) Reserve Requirements.

61. From discussion with former LBI employees in Regulatory Reporting and Operations Control, there does not appear to have been a consistent process for determining free credit balances across the different clearance and settlement systems, or the reports/information used to prepare these reports.



60.     The dollar value of LBI customer coded account free credit balances declined 62% between May 31 and September 19, 2008 ($4,356 million to $1,692 million), and the number of items (which generally correlate to accounts) declined 24% (31,538 to 24,124) over the same period.  The decline in balances and accounts with a balance over $1 million is even more pronounced:  the dollar value of LBI customer coded account free credit balances declined 66% between May 31 and September 19, 2008 ($3,941 million to $1,352 million), and the number of items declined 40% (262 to 155) over the same period.





61.    These figures indicate an increasing trend of customers removing their assets and accounts from LBI.  By the filing date, a large number of Automated Customer Account Transfer Service ("ACATS") transfers were being processed or in line to be processed for prime brokerage customers and others by DTCC, although some of these were later reversed as discussed in a later section of this Report.[62]  This trend was more pronounced for customers with larger free credit balances, whose demands for payment reduced LBI's already-tightening liquidity.

62.    Part of this impact related to LBI's relationship with LBIE.  LBIE was the principal European broker-dealer within the Lehman group.  Prior to the commencement of the liquidation, LBI acted as clearing broker for LBIE and on behalf of underlying LBIE customers for transactions conducted in the US.  LBIE's last business day prior to the commencement of the administration of LBIE was September 12, 2008.  LBI, however, did not commence its

---

62.  *See infra* Section III.A.4.

liquidation proceeding until September 19, 2008, which is the relevant date for determining

claims against LBI under SIPA.[63]

      63.    Prior to the commencement of the administration, LBIE's customers,

primarily prime broker customers, entered into significant trading or other activity. This activity

included attempts to move whole accounts to new prime brokers, as well as other buy and sell

transactions. In order to effectuate the transactions, some instructions were initiated multiple

times, and attempts to move assets or accounts were processed in various ways. These last

minute attempts to move the customer accounts not only further clouded the picture between

LBIE and LBI but also indicated the urgency with which sophisticated customers were fleeing

the Lehman enterprise in the last days.

### 3.     Additional collateral requirements and clearing organization actions

      64.    LBI was required to post collateral with its clearing banks to secure risks

the banks assumed in connection with clearing and settling LBI's proprietary and customer

transactions. Through the summer of 2008 several key clearing banks increased their collateral

requirements in response to perceived risks.

      (a)    JPMC

      65.    JPMorgan Chase ("JPMC") was LBI's principal clearing bank. It

financed LBI's operations on a daily basis in amounts sometimes reaching over one hundred

billion dollars. From July until September 2008, JPMC made a number of collateral demands to

Lehman totaling approximately $17 billion in cash and securities. The frequency and size of

---

63. SIPA §§ 78fff(a), 78*lll*(11); *see also* Memorandum Decision Granting Motion to Uphold Determination of
    Claim By SIPA Trustee (Bankr. S.D.N.Y. June 1, 2010) (LBI Docket 3330), *appeal docketed*, No. 10-cv-5740
    (S.D.N.Y. June 28, 2010).

these demands increased during Lehman's final weeks of operations. On September 9, 2008, JPMC requested that Lehman post $5 billion of collateral with JPMC.

66. On September 9th and 10th, Lehman attempted to gather the requested $5 billion of collateral but was only able to locate and deliver approximately $3 billion in unencumbered collateral that was available for pledge to JPMC. JPMC then requested an additional $5 billion of collateral on or around September 12. To satisfy this new demand for collateral, Lehman Treasury reviewed the entirety of the Lehman organization (across many Lehman affiliate entities) for unencumbered assets. On the morning of September 12, Lehman Treasury located $2.7 billion in cash at LBI. This $2.7 billion was sent to LBHI, and LBHI then pledged the cash along with an additional $2.3 billion from other Lehman entities to JPMC. (The Trustee is investigating whether later cash entries from LBHI effectively returned an equivalent amount of cash to LBI.)

67. The overall impact of JPMC's demands on Lehman for additional security was a reduction in available collateral (cash or securities) on an intra-day basis, and further constraints on LBI's intraday liquidity and capital. These liquidity and capital concerns required continual monitoring and management in the daily operations of LBI's business.

68. In addition to demands for collateral, JPMC also tried to reduce its exposure to Lehman by requiring various amendments to the agreement governing the terms of clearance activity for LBI, as well as the supporting security agreements and guaranties. In the final weeks of August 2008, JPMC and Lehman negotiated and executed amendments to the Clearance Agreement between JPMC and LBI dated July 15, 2000, and executed a Security Agreement and Guaranty Agreement between JPMC and LBHI, dated August 26, 2008.

08-01420-scc Doc 360250 Filed 08/25/26/14 Entered 08/25/26/14 18:39:19 Main Appendix
Documents 1 Through 19 Pg 40 of 119 Pg 42 of 1129

36

69.     The August Amendment to the Clearance Agreement was intended to net JPMC's liability to all Lehman affiliates to which it provided clearance advances through LBI. Thus, the August Amendments and related Security Agreement and Guaranty Agreement granted JPMC a lien on assets of LBHI and certain affiliates that cleared trades through LBI at JPMC. In the first week in September 2008, JPMC demanded that LBI execute an additional amendment to the Clearance Agreement.

70.     In contrast to the August 2008 process for negotiating the amendment, the September amendment was executed on an expedited time frame, with virtually no negotiation of terms or concessions by JPMC. LBI was forced to accept this amendment on JPMC's unfavorable terms or face the possibility JPMC would stop providing advances to unwind LBI's tri-party repurchase transactions, which were necessary to the financing and operation of LBI.

71.     The September 9, 2008 Amendment to the Clearance Agreement (and related supporting documents) between LBI and JPMC amended JPMC's security interest in LBI's property so that JPMC's lien on assets in LBI's clearance accounts purported to secure any and all indebtedness that LBI had to JPMC. (Previously JPMC's lien on assets in the clearance accounts only secured lending JPMC made pursuant to the clearance agreement, and not other LBI indebtedness.)

(b)     Citibank

72.     Citibank ("Citi") was Lehman's designated settlement member on the Continuous Linked Settlement ("CLS") system, and LBI was the primary Lehman entity dealing with Citi with respect to CLS transactions. Citi settled transactions sometimes approaching twenty billion dollars a day. LBI deposited $1 billion at Citi late in the day on September 15, 2008 for the continuation of CLS services in accordance with an agreement between Citi and LBI signed that day. Although other Lehman entities were also engaged in CLS activity early in

the week, by Wednesday September 17, Citi was continuing CLS settlements only for LBI. LBI did not make certain payments to Citi that week for CLS activity, and Citi purported to set off the $1 billion deposit against outstanding amounts allegedly owed to Citi for CLS activity and froze certain LBI bank accounts at Citi entities to cover the balance. The transactions with Citi are being investigated by the Trustee's conflicts counsel.

(c)  Clearing organization actions

73.  Other actions by U.S. exchanges reduced LBI's available cash or assets:

- The Options Clearing Corporation ("OCC") invoked its exchange rules as a basis to refuse to release over $400 million of computed excess margin on September 19, 2008.

- The CME Group Inc. ("CME") auctioned LBI and its affiliates' positions and transferred the margin posted by LBI and its affiliates for those positions. Along with LBI's proprietary positions, the CME transferred to the winning auction bidders more than $450 million in equity to offset the net short option value of the positions, as well as more than $1 billion in risk-related "concessions," representing nearly all of the performance bond ("margin") that LBI had posted with the CME's exchanges in connection with these positions.

- As of the filing date, LBI had over $1.8 billion of cash and securities on deposit with DTCC and its subsidiaries in its participant fund, and an estimated $500 billion worth of transactions in the pipeline at DTCC's various subsidiaries. While the deposit requirements fluctuated on a daily basis between May 2008 and September 2008 due to the change in trading volume and pending settlements, there was an overall significant increase in LBI's deposit requirements with DTCC and its subsidiaries, especially during the last two weeks prior to bankruptcy. For example, the requirement at the National Securities Clearing Corporation ("NSCC") increased from $134 million on September 5, 2008 to $709 million on September 19, 2008.

- In Europe and other countries around the world, the filing of LBIE, LBHI and other affiliates also affected LBI's relationships related to deposits and margin, as well as collateral at clearing organizations. For example, certain exchanges in London took action similar to the CME's and auctioned or closed out positions related to Lehman once LBIE filed for bankruptcy. LBI positions and collateral held through LBIE were swept up in this close-out process.

**4.  Increase in failed transactions**

74.  From the period May 31, 2008 through August 31, 2008, LBI's clearance and settlement activities operated within industry norms insofar as failed transactions were

08-01420-scc Doc 369450 Filed 08/26/14 Entered 08/26/24 51 8:89:19 Main Appendix Document
Documents 1 Through 919 Pg 44 of 1129

38

concerned.  The SEC and FINRA were physically present in LBI's regulatory reporting
department to understand major fluctuations that would have a negative impact on LBI's capital
or customer reserve deposit requirement.

75.     In September 2008, the number of failed transactions began to rise
markedly as counterparties became concerned about LBI's continuing operations and Lehman
affiliates started filing for bankruptcy.  These significant increases in failed transactions reduced
LBI's available cash and increased the need for financing positions at the very time when
borrowing capacity was contracting.  As noted, this reduction included the failure of
counterparties to failed foreign currency transactions to return margin LBI had posted.

76.     The impact of the failed transactions insofar as LBIE is concerned was
exacerbated by the difference of a week between LBIE's administration date and LBI's
liquidation date.  During this period, as the settlement period for securities transactions
continued, significant activity occurred related to LBIE's September 12, 2008, pending trades, as
reflected on LBI's books and records.  As a result, the reconciliation of LBIE's omnibus claim
with the Trustee involves a detailed analysis and reconciliation of multiple transactions in each
of over 8,400 unique securities.  Of these, approximately 90% had stock record movements
between September 12, 2008 and September 19, 2008.  There are over 95,000 "failed to receive
from LBI" trades across approximately 4,600 unique securities, and an additional 105,000
"failed to deliver to LBI" trades across 5,200 unique securities.  The majority of the securities
underwent significant LBI stock record activity after September 12 and require detailed analysis
in order to be fully reconciled.  Further adding to the confusion was the fact that certain
customers continued to access and in some cases cancel trades or enter other activity in their
accounts through the Lehman computing system, LehmanLive.

08-01420-sccc Doc 360250 Filed 08/256/14 Entered 08/256/24 518:39:19 Main Appendixnt
Documents 1 Through 919 Pg 45 of 1129

39

77.     A team of, at varying points, between 50 and 90 professionals working on behalf of the Trustee, in cooperation with the LBIE administrators' professionals, has been reconciling these tens of thousands of transactions.  The ramifications of LBIE's cessation in payment for trades as of September 12, 2008, while LBI would still be operating and its systems would continue to process trades, were not fully anticipated at the time of LBHI's Chapter XI filing, and the consequences were not well understood by operations personnel at the time.

**B.     LBI's Business In Relation To Lehman's
Corporate Structure And Some Of Its Ramifications**

78.     Lehman as a whole operated hundreds of separate corporations that engaged in intercompany transactions as well as transactions with third parties.  LBI interacted with a number of these companies, some of which were direct or indirect subsidiaries, and others of which were affiliate or "sister" companies.  For instance, LBI acted domestically as the "paymaster" for many U.S. operations of LBHI and other Lehman entities, meaning that accounts payable flowed through LBI bank accounts.  (LBHI performed this function for many of the non-U.S. Lehman entities.)  LBI also custodied domestic securities for other affiliates or to secure obligations or support transactions by clients of these affiliates and acted as a provider of certain operational and information services related to the brokerage business and custody of securities.  LBI was in many cases the record employer and the source of payroll and employment benefits for Lehman employees who might perform services for the benefit of other Lehman entities.  It also acted as market maker for LBHI's subordinated bonds.

79.     As the Chapter XI Debtors have noted, however, "Lehman in most respects managed the Regulated Subsidiaries [such as LBI] separately from LBHI and the

Unregulated Subsidiaries."[64]  As a regulated broker-dealer, LBI had to operate as a separate entity and in accordance with rules that did not pertain to other Lehman entities.  It could not as a practical matter loan money to subsidiaries and affiliates on an unsecured basis, for example.  In profitable times, LBI did dividend some profits to its parent once or twice a year.  Often some of these dividends derived from LBI profits were returned to LBI by LBHI on a subordinated basis meant to benefit LBI's regulatory capital.

80.    LBI entered into a variety of financial transactions with other broker-dealers, financial institutions, and investors, sometimes in conjunction with other Lehman affiliates.  For example, LBI provided its services as a broker-dealer to Lehman entities seeking to make and clear trades in the U.S.  In this role, LBI served as Neuberger Berman's clearing broker pursuant to a May 2004 agreement.[65]  LBI also acted as a clearing broker for U.S. securities transactions by overseas customers of LBIE (and vice versa) and also cleared proprietary trades for LOTC.

### 1.    Transactions with or involving other Lehman entities

81.    While the relationships between LBI and the other Lehman entities may have functioned well while the parties were financially healthy, LBI felt the adverse effect of them when LBHI and its separate affiliates commenced insolvency proceedings.

---

64. Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (A) for Authorization to (i) Continue Using Existing Centralized Cash Management System, as Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing Bank Accounts and Business Forms; (B) For an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code, and (C) to Schedule a Final Hearing, at ¶ 11 (LBHI Docket No. 669).

65. *See* Trustee's First Interim Report for the Period Sept. 19, 2008 through May 29, 2009 ¶ 13 (LBI Docket No. 1151), *available at* www.lehmantrustee.com (the "Trustee's First Interim Report").  Neuberger Berman Inc., a leading asset management firm whose brand Lehman kept intact, was initially acquired in October 2003.  *See* Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 8-9 (Feb. 26, 2004).

82.     The ramifications of a series of transactions between separate entities when one or more of the parties is financially unstable are reflected in a September 12, 2008, email exchange among Lehman executives who considered the actions of counterparties as increasing the likelihood of default events.  One executive noted the potential for defaults between LBI, LBHI and LBSF (an LBI subsidiary transferred to Lehman ALI as part of the payment-in-kind ("PIK") note transaction on September 19):  "…If we work on the assumption that in a disaster scenario [where banks fail] to fund clearing account[s] at LBI — then at the close of business on Monday [September 15, 2008] LBI will be in default on its overnight repo book and security lending book by failing to repay…"  The executive noted the potential snowball effect as follows:  "…if default by LBI becomes a default on a single material LBHI corporate indebtedness in excess of 100 million — that would cause a cascade into the LBSF swaps business — permitting the LBSF swap counterparties to liquidate immediately at the end of Monday."[66]

83.     As described more fully below, LBI engaged in various transactions with its subsidiaries, though, as a practical matter, it was virtually impossible for it to make unsecured loans to them to cover losses.  These transactions included repos, securities lending agreements, foreign exchange derivatives, and TBAs, some of which were part of LBI hedging strategies.  Many of LBI's subsidiaries and affiliates were organized with specific financial products or services in mind, and provided those products and services to multiple Lehman entities.

---

66. *See* E-mail dated Sept. 12, 2008 [LBI_PIR_000010].

08-01420-scc Doc 360250 Filed 08/26/14 Entered 08/26/24 518:39:19 Main Appendix Document Documents 1 Through 919 Pg 48 of 1129

42

(a)      Repo agreements with affiliates and other entities

84.      LBI, like other broker-dealers, relied on two means of financing its operations.  First, LBI entered into repo agreements, a form of financing transaction through which it transferred securities to counterparties in exchange for cash and simultaneously agreed to reacquire the securities at a later date.[67]  Repos are the principal means by which broker-dealers finance their inventory positions of U.S. Treasury, mortgage-backed, corporate, and money market securities, as well as their high grade sovereign debt.  Repos enable broker-dealers to increase their liquidity by raising short-term cash at better interest rates than they could receive through traditional bank loans.  They are an attractive option for high net worth investors considering short-term investments due to the flexibility of maturities — making repos an ideal place to place funds on a temporary basis (although at the risk which the SEC requires to be disclosed to counterparties for hold-in-custody repos, and which LBI generally disclosed to all repo counterparties, that they will not be considered customer transactions in a SIPA liquidation).  Dealers may also enter into "reverse repos," in which they borrow securities to either cover short positions or because of operational fails.

85.      The second means of financing is by realizing profits from the spreads in repo rates, called a "matched book," in which broker-dealers create liquidity in the repo market by borrowing and lending specific securities for specific periods of time based on their view of interest rate fluctuations.  To profit from matched book repos, brokers create offsetting positions in repos and reverse repos using identical securities.  LBI, and other broker-dealers, did this by executing reverse repos (in which they effectively borrow securities) with maturity dates and

---

67.  Lehman Brothers, Repo Manual, 6 (Nov. 8, 2005) (unpublished internal manual) [LBI_PIR_000120].

08-01420-scc Doc 369 50 Filed 08/25/06/14 Entered 08/25/06/24 18:39:19 Main Document Documents 1 Through 9192 Pg 49 of 1129

43

interest rates which are different from those of the corresponding repos (in which they effectively lend securities) in order to profit from future shifts in interest rates between the mismatched maturities.

86.     For short-term investments, a government securities dealer borrows from an investor using securities as collateral.  These repos may have a fixed maturity date or will be open repos, that is, callable at any time.  Rates are negotiated directly by the parties involved, but are generally lower than rates on collateralized loans made by New York banks.

87.     One specific repo transaction used by LBI was the overnight repo, an arrangement through which securities dealers and banks finance inventories of Treasury bills, notes and bonds.  The dealer or bank in turn transfers securities to an investor with a temporary surplus of cash, agreeing to reacquire them the next day.  These financing transactions are settled with immediately available federal funds (funds held by banks at the Federal Reserve as part of their reserve requirements), usually at a rate below the federal funds rate charged by banks lending funds to each other.  Although these transactions were often structured as "overnight" deals, it was common for broker-dealers to continue the repo for longer periods, with the agreement of the counterparty.  If the collateral gained or lost value, however, the borrower or lender could demand additional cash or collateral to cover that change, or terminate the repo.

88.     LBI allowed sophisticated clients, those with a minimum net worth of $10 million and who were approved by LBI's credit department, to engage in repos.  Rates were determined by the product-specific repo market.  LBI determined the details of these agreements using an internal credit risk management site that provided haircut grids, credit analyst coverage and credit limit information for financial trades.

08-01420-sccc Doc 369450 Filed 08/256/26/14 Entered 08/256/26/24 518:39:19 Main Document
Documents 1 Through 0 19 Pg 50 of 1129

44

89.     Recognizing that repos are largely used as financing vehicles, SIPC has long taken the position that they are secured loans and do not qualify for customer treatment under SIPA.  LBI's sales literature and the agreements governing repo transactions informed repo counterparties that SIPC has taken the position that they would not be protected under SIPA in the event of a liquidation proceeding.[68]  Nevertheless, approximately 38 repo counterparties have objected to the Trustee's denial of their claims for SIPA customer treatment.

90.     The collateral provided for LBI's repos consisted of Treasuries, agencies, and foreign government bonds, and asset-backed securities.  Many of these repos were conducted with the Primary Dealer Credit Facility ("PDCF"), the discount window that the FRBNY had opened as Bear Stearns collapsed.  LBI packaged securities, such as the "Freedom CLO" (Collateralized Loan Obligation), for transactions with the PDCF that it did not market in the general course of business.  This collateral was illiquid and poorly rated.  Because the government was willing to accept these CLOs as collateral (and assumed some risk that it was later eager to shed), LBI was able to obtain needed liquidity by including them in repos.

          (b)     Prime brokerage accounts

91.     LBI's Prime Services — the "prime brokerage" business — worked with hedge funds, acting as the main point of contact at LBI for clearing trades, maintaining custody of securities, providing margin financing, lending stock to cover short sales, and providing cash

---

68.  *See* SEC Rules and Regulations under Securities Exchange Act 1934, 17 CFR § 240.15c3-3(b)(4)(i)(C) (2010) ("a broker or dealer that retains custody of securities that are subject of a repurchase agreement between the broker or dealer and the counterparty shall . . . advise the counterparty in the repurchase agreement that [SIPC] has taken the position that the provisions of [SIPA] do not protect the counterparty with respect to the purchase agreement;"); *see, e.g.*, Client Stmnt. For Gen. Motors Acceptance Corp. (July 2003), at 5 (noting that "securities lending and borrowing transactions and repurchase and reverse repurchase agreements may not be protected by SIPC").

and position reports.[69]  LBI serviced hundreds of PBAs representing billions of dollars in value through its Prime Services unit.[70]  These PBAs — primarily hedge funds, pension funds, institutional investors, university endowments and asset managers — controlled large pools of investment capital held on behalf of many retirees, employees, depositors, and investors.  The business flow of PBAs functioned as follows:

**Prime Brokerage Business Flow**



A) Fund executes trades with multiple brokers and informs its Prime Broker

B) Executing brokers "give up" the trades to Lehman PB

C) Prime Broker can provide financing via Repo or margin lending

D) Prime Broker clears and settles trades between clients and brokers

E) Prime Broker reports back to client (fund) the activity, position, interest, etc...

---

69.  *See* Lehman Brothers, GCS-Prime Brokerage Client Services & Technology Reference Guide 2006 (May, 24, 2006) (unpublished internal manual) [LBI_PIR_000024]; Lehman Brothers, Global Client Services: Pitchbook (2006) [LBI_PIR_000198] (attached to e-mail dated Sept. 1, 2006 [LBI_PIR_000001] (including Prime Services Pitchbook)).

70.  *See* Trustee's Second Interim Report for the Period May 30, 2009 through Nov. 11, 2009 ¶¶ 27-30, 37-41 (LBI Docket. No. 2055), *available at* www.lehmantrustee.com (the "Trustee's Second Interim Report").

08-01420-scc Doc 360250 Filed 08/256/26/14 Entered 08/256/26/24 51:89:19 Main Appendix
Documents 1 Through 19 Pg 52 of 1129

46

92.     LBHI held interests in certain of these entities, among them a 20% equity interest in D.E. Shaw, and interests in Spinnaker Capital Group, Ospraie Management LP, Marble Asset Management, and GLG Partners LP.[71]

93.     LBI maintained distinct equity and fixed income prime brokerage divisions.  In general, PBA holders entered into prime brokerage and related agreements with LBI, LBHI, LBIE, and their subsidiaries and affiliates.   The typical arrangement for equity PBA holders was entry into several agreements:  (i) a Customer Account Agreement ("CAA") which established a prime brokerage account at LBI and included all Lehman entities as parties for certain purposes such as subjecting property in the account to claims and liens;[72] (ii) Margin Lending Agreement ("MLA") with LBIE;[73] and (iii) a Global Master Securities Lending Agreement ("GMSLA"), also with LBIE.[74]  Under these arrangements, PBAs could borrow from LBIE and receive enhanced leveraging of short positions beyond what would be allowable under the requirements of Federal Reserve Board Regulation T, 12 C.F.R. § 220, in the United States. These contractual arrangements also granted the Lehman entities broad rights of re-

---

71.  Yalman Onaran & Jenny Strasburg, *Lehman Brothers Buys Stake in Hedge Fund D.E. Shaw*, (Mar. 13, 2007), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aQdAgw1hmPRo&refer=home.

72.  The CAA "set[] forth the terms and conditions under which Lehman Brothers [defined to include LBI, LBIE, LBF, LBSF, LBHI, and their subsidiaries] will open and maintain prime brokerage account(s) in [the entity's] name and otherwise transact business with [the entity as a] customer."

73.  The MLA between LBIE and the PBA holder "govern[ed] all loans of money or securities" that LBIE made to the PBA holder in connection with transactions pursuant to the CAA.

74.  The GMSLA governed loans involving the exchange of securities or financial instruments for collateral, with either LBIE or the PBA in the position of lender.

08-01420-scc Doc 369450 Filed F08/256/1dentered 08/256/1241:839:1MainAppendix Document
Documents 1 Thr52u9h19 Pg 53 of 1129

47

hypothecation and continuing liens and first priority security interests in PBA holders' assets.[75] The fixed income PBA agreements did not provide for these broad rehypothecation rights.

94.     For those PBAs that received margin financing from LBIE, LBI, acting as LBIE's agent, maintained internal facilitation accounts that allowed for trading of U.S. securities from a PBA holder's LBIE accounts.  These accounts were maintained for bookkeeping convenience and did not alter the LBIE/LBI clearing relationship or the LBIE customer relationship.  In the normal course of business, internal facilitation accounts would settle at the end of each business day, but LBIE's entry into administration disrupted this system and has caused some confusion about the account relationships among LBIE and its customers.[76]  The confusion was compounded when Barclays erroneously issued a set of account statements September 30, 2008 with respect to the internal facilitation accounts even though they were not customer accounts and had not in fact been purchased by or transferred to Barclays.

95.     As part of its prime brokerage business, LBIE maintained with LBI omnibus accounts that included securities for LBIE's clients on an aggregate rather than on a customer-by-customer basis.  LBIE deposited collateral for margin lending with LBI, which was tracked in an omnibus account managed by the Prime Broker Cash Team in Jersey City, New Jersey to satisfy Regulation T and the OCC's margin requirements.

(c)     Certain LBI subsidiaries

i.     LCPI

96.     LCPI was a wholly-owned subsidiary of LBI that originated as a commercial paper dealer but became principally engaged in the origination and trading of

---

75.  Trustee's First Interim Report at ¶ 30, Ex. 7; Trustee's Second Interim Report at  ¶¶ 37-41.

76. Trustee's Second Interim Report  at ¶ 40.

08-01420-scc Doc 360450 Filed 08/26/14 Entered 08/26/24 51 8:39:19 Main Appendix Document
Documents 1 Through 019 Pg 54 of 1129

48

secured and unsecured loans, as well as warehouse loans and other loans backed by mortgage loans and other assets. LCPI derived "investment banking income" from debt underwriting services for clients (including Lehman entities) seeking to raise money in the capital markets.

97.     LCPI's primary focus was mortgage and asset-backed securitizations. LCPI would purchase the assets, such as commercial and residential mortgages, home equity loans, and government and corporate bonds, from LBHI or other Lehman affiliates, and then, through special-purpose entities such as the RACERs described below, package the assets in securitization deals. These activities generated income for LCPI in the form of dividends and interest on the assets in its inventory, investment banking and underwriting fees, and investment trading profits.

98.     LCPI was funded through repos, bank credit facilities, and loans from LBHI. Although much of LCPI's funding came from LBHI, LBI's balance sheet and potentially its capital for regulatory purposes were impacted by losses at LCPI. As LCPI required cash infusions to address capital deficiencies, those transfers were made in the form of transfers from LBHI to LBI, which, in turn, provided cash to effectuate the ultimate paydowns to LCPI.[77]

### ii.     LBSF

99.     LBI conducted its activities in fixed income derivative products through its wholly-owned special purpose subsidiary, LBSF, and LBSF's separately capitalized subsidiary, LBFP.[78] At LBI, "preferred margin lending" was exclusively for fixed income securities and required a $500,000 minimum for the preferred rate. LBSF was the firm's

---

77. LBI actually paid the cash back to LBHI for the benefit of LCPI, which did not have bank accounts in its own name into which it could receive the funds directly.

78. *See* Lehman Brothers Holdings Inc., Annual Report (Form 10-K), at 47 (Feb. 28, 1996).

08-01420-scc Doc 360250 Filed 08/25/16/14 Entered 08/25/16/24 51:8:39:19 Main Appendix Document Documents 1 Through 19 Pg 55 of 1129

49

principal dealer in over-the-counter ("OTC") derivative products, including interest rate, currency, credit, and mortgage derivatives. LBSF's derivative transactions were guaranteed by LBHI. Lehman Brothers Commodity Services Inc. ("LBCS") was established in 2005 as a wholly-owned subsidiary of LBSF. LBCS was engaged in commodities trading worldwide in the oil, natural gas, and power markets and traded in all major financial products including futures, swaps, options, and structured products. LBCS and its entities, including Eagle Energy Partners I, L.P., were regulated by the Federal Energy Regulatory Commission ("FERC"). Thus, LBSF and LBCS represented LBI's fixed income division derivatives and energy business.

100. Once LBHI's Chapter XI filing occurred, LBSF found itself in a dire liquidity crunch, to the point that it essentially did "not have any cash" to pay its counterparties.[79] Faced with the difficulty of generating cash and payments from an insolvent LBHI, LBSF turned to LBI, but LBI could not provide cash directly to LBSF without creating potential regulatory issues. Employees attempted intercompany transactions, such as repos, between LBSF and LBI, as an alternative, but as the week continued and LBI's liquidity position worsened, even this alternative dissipated.

101. LCPI and LBSF had been LBI subsidiaries for many years. LBSF may have been maintained as an LBI subsidiary, rather than as an LBHI subsidiary, because it could do split hedge transactions with LBI. Similarly, LCPI, as a subsidiary of a regulated broker-dealer rather than a holding company, might have attracted more favorable credit terms, although LBI did not guarantee LCPI's losses. Regulators insisted that LBI might have to report any reduction in the value of its investments in LBSF and LCPI for regulatory purposes, and the

---

79. E-mail dated Sept. 16, 2008 [LBI_PIR_000019].

status of these entities as subsidiaries therefore complicated its compliance and financial position

when the markets imploded.  In light of these issues, and the compounding difficulties LBI was

then experiencing in the marketplace, some LBI personnel turned attention over the summer of

2008 to possible ways to "move LBSF and LCPI out of the LBI chain," but were never able to do

so given the turmoil of events.  (This transfer out of the broker to the holding company was

different from the "SpinCo" plan reported on by the Examiner; that plan contemplated a spin-off

of illiquid assets to shareholders.[80])  Eventually, on the eve of LBI's filing, these and

substantially all other LBI subsidiaries were transferred to Lehman ALI in exchange for the PIK

note, which represents the value on a to-be-determined basis of the subsidiaries as of the time of

the transfer.

<div align="center">

iii.    <u>RACERS</u>

</div>

102.    RACERS, or "<u>R</u>estructured <u>A</u>sset se<u>C</u>urities with <u>E</u>nhanced <u>R</u>eturn<u>S</u>,"

were special-purpose vehicles set up to facilitate structured transactions between LBI and other

Lehman affiliates, among them LBI's subsidiaries, LBSF and LCPI.  The RACERS were set up

as trusts pursuant to Trust Agreements between LBI, as purchaser of notes, and U.S. Bank Trust

National Association, as owner trustee.  The principal assets of the trusts were (i) securities in the

form of a variable funding note secured by collateral that might be contributed by LCPI, and (ii)

the rights under a 1992 International Swaps and Derivatives Association Inc. ("ISDA") Master

Agreement (the "Swap Agreement") with LBSF, pursuant to which the trust would exchange all

payments received in respect of the underlying securities for payments from LBSF.  These

payments were then used to pay all amounts due on the variable funding notes issued by the

---

80.  *See* Examiner Report at 640-61.

trusts and secured by the underlying actions. As noted in the RACERS offering materials, LBHI guaranteed the payment obligations of LBSF under the Swap Agreements.

103.  The market value of the collateral securing the variable funding note was required to be either (1) 105% of the outstanding principal amount of the variable funding note; or (2) if LBHI's credit rating fell below a certain level, 120% of the outstanding principal amount of the variable funding note.

104.  To date, the Trustee has identified RACERS trusts from 2004, 2005, 2006, and 2007.[81]

105.  The collateral for the RACERS consisted of "eligible assets," defined to include corporate and commercial loans and commercial real estate collateral. The assets in RACERS trusts were initially rated highly, receiving an A rating from Moody's, but as the trusts grew to $5 billion, they no longer complied with the requirements to maintain that rating. In September 2008, LBI took steps to "upsize" the trusts again, but by that point LBHI's rating as the trusts' guarantor was a limiting factor.

106.  While RACERS were eligible for PDCF trades with FRBNY, other banks would not accept them. Still others, such as JPMC, initially accepted RACERS as collateral, but became concerned with the product and eventually stopped using Lehman's pricing for RACERS.

---

81. For further details regarding the eventual configuration of one of the RACERS, see the Order Pursuant to Section 363 of the Bankruptcy Code Amending The RACERS Transaction Documents and Terminating Certain RACERS Transaction Documents, dated Aug. 19, 2010 (LBHI Docket No. 10943); Motion of Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code to Amend The RACERS Transaction Documents and Terminate Certain RACERS Transaction Documents, dated July 27, 2010 (LBHI Docket No. 10464); and the Statement of the SIPA Trustee Regarding Motion of Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code To Amend the RACERS Transaction Documents and Terminate Certain RACERS Transaction Documents (LBHI Docket No. 10742).

08-13555-scc Doc 360-1 Filed 08/25/06/14 Entered 08/25/06/24 18:39:19 Main Appendix Documents 1 Through 19 Pg 58 of 1129

52

## 2.   The role of clearing banks and LBHI in financing LBI and its subsidiaries

107.    LBHI guaranteed many of the credit default swaps and derivatives entered into by LBI subsidiaries.  Particularly in the last months of its existence, LBI also sought assistance from LBHI in funding its operating obligations, including obligations to LBI's clearing banks on whom LBI relied to carry accounts, clear transactions, and settle accounts with third parties.

108.    LBI's daily operations were supported in part by JPMC, which acted as LBI's principal clearing bank.  In this capacity, JPMC maintained operating, clearing, service, and other accounts to handle large securities, cash, and other transactions on behalf of LBI on a daily basis.  Huge amounts of LBI's proprietary and LBHI's assets were pledged to JPMC to support this necessary activity— but also nevertheless included in LBHI's "liquidity pool."[82]

109.    Citi was LBI's designated settlement member on the CLS system, operated by a consortium of banks for the clearance and settlement of foreign exchange trades. In the process of settling trades for LBI on the CLS system, Citi extended intraday credit to LBI.[83]

110.    As noted, LBHI loaned substantial amounts of cash and securities to LBI on a subordinated basis.  The cash actually originated from LBI profits; these would be transferred in the form of dividends to LBHI, which would in return contribute a portion back to its original source, LBI, in the form of a subordinated loan.  Several LBHI subsidiaries were also parties to "non-conforming subordination agreements" with LBI, meaning that their claims were

---

82.  *See* Examiner's Report at 1083, 1124, 1454-63.

83.  Citi also provided LBI with other financial services, such as maintaining cash deposit and custodial accounts, providing credit facilities, and some custody and clearing services in emerging markets and in the United States.

08-01420-scc Doc 36450 Filed 08/25/26/14 Entered 08/25/26/24 18:39:19 Main Document
Documents 1 Through 919 Pg 59 of 1129

53

subordinated in whole or in part to the prior payment or provision in full of any indebtedness due

to any LBI creditor.[84]  LBI acted as the Lehman designee for the "clearance box" at the

Depository Trust Company ("DTC", a DTCC subsidiary), which contained those securities that

the clearing agency held for the broker-dealer.[85]  Other Lehman entities maintained accounts at

LBI to hold securities for various purposes related to their or their own customers' transactions.

As part of those relationships, those Lehman entities executed subordination agreements with

LBI, which allowed LBI to use securities reflected in the accounts as collateral for financing.

111.    Throughout 2008, LBI received funding from LBHI in the form of "master

notes" to assist with losses at its subsidiaries.  These master notes were distinct from LBI's

requests for capital infusions to subsidiaries and designed to improve LBI's net capital position

as the broker-dealer's financial challenges mounted.  In March 2008, in recognition of the

difficult market environment at the time of Bear Stearns' well-publicized crisis, LBI requested a

"cushion" of $1 billion to address intercompany balances and compensate LBI for unforeseen

losses, and a master note of more than $2 billion to remain open until further notice.  By the end

of August, LBI requested yet another loan from LBHI in the form of a master note of more than

$3 billion.

112.    By the end of 2007, the subprime mortgage crisis had put LBHI into

serious financial trouble.  LBHI's subsidiaries, such as its commercial real estate division, were

---

84.  *See* Trustee's First Interim Report at ¶ 48.

85.  DTCC ("Depository Trust & Clearing Corporation") provides clearance and settlement services for broker-to-broker transactions in equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments, and over-the-counter derivatives.  LBI relied on DTCC's services to complete the clearance and settlement of its transactions and also processed through accounts at DTCC's subsidiaries.  As of September 19, 2008, more than $500 billion in open trading positions, largely for the benefit of customers and other LBI counterparties, were reflected in LBI's accounts at DTCC.  *See* Trustee's First Interim Report at ¶ 79, n.9; The Depository Trust & Clearing Corp., Annual Report, 4, 13-7 (2008), *available at* www.dtcc.com/downloads/annuals/2008/2008_report.pdf.

08-01420-scc Doc 369450 Filed 08/26/14 Entered 08/26/24 18:39:19 Main Appendix document Documents 1 Through 192 Pg 60 of 1129

54

laden with now-toxic assets, and the firm was undercapitalized.[86]  In 2007, LBHI injected funds

into LBI to be provided to LBI's struggling subsidiaries, especially LBSF and LCPI.[87]  As noted

above, in August 2008, some at Lehman recommended that these LBI subsidiaries be transferred

out of LBI, but the regulatory and tax consequences were complicated as long as those entities

remained capital deficient and events overtook formulation and implementation of any such plan.

113.    The capital infusions process generally involved two actions:  first, a

transfer of funds from LBHI to LBI, and second, a simultaneous transfer of funds from LBI

directly to a subsidiary.  Some of LBI's subsidiaries, however, did not maintain their own bank

accounts.  Consequently, LBI would transfer the money back to LBHI, designated for the

specific LBI subsidiary.  Some of these transactions were recorded as straight infusions.

114.    Generally, LBI used paydowns to provide capital infusions of cash to

subsidiaries in which LBI had a negative investment.  Paydowns occurred in 2008, as LBI sought

to shore up its failing subsidiaries, such as LBSF, LCPI, and LB I Group.

115.    For example, in March 2008, LCPI, LB I Group, and Ribco, an LBI

special purpose corporation, required capital infusions totaling $450 million.  LBHI sent a

paydown to LBI, which then sent the cash to the subsidiaries.  LCPI required $200 million, LB I

Group required $200 million, and Ribco required $50 million.  None of these subsidiaries

maintained their own accounts, so LBHI ultimately received the funds on their behalf.  Only two

months later, on May 30, LCPI and LB I Group required additional infusions from LBI.  In July

2008, Lehman's regulators required infusions to address capital deficiencies at Lehman

---

86.  *See*, *e.g.*, Fishman, *supra* note 18, at 28.

87.  For example, in August 2007, LBSF paid a $500 million dividend to LBI, which would be transferred to LCPI
     as an infusion from LBI.  Additionally, in May 2007, LCPI, LB I Group, and LBSF received a capital infusion
     from LBI; LCPI received $150 million, LB I Group $250 million, and LBSF $100 million.

08-01420-scc Doc 360250 Filed 08/256/26/14 Entered 08/256/26/24 5 18:39:19 Main Document Documents 1 Through 91 Pg 61 of 1129

55

subsidiaries. After an evaluation by the regulators, LBI employees concluded that LCPI had a capital deficiency of about $140 million and LB I Group of about $50 million. Also in July 2008, "FINRA expressed grave concern over LBI's funding of the negative equity with it's [sic] own capital. These entities are not guaranteed subsidiaries and future deficits must be funded by Holdings."[88] FINRA then threatened to require LBI to consolidate the assets and risks of these entities on its statement of net capital, potentially resulting in a deduction of capital (rather than having them excluded from the calculation). LBI informed FINRA of a $1 billion capital infusion for LCPI and LB I Group on August 28.

116. Just before LBHI's Chapter XI filing, the motivation for paydown requests changed from seeking to address capital deficiencies to focusing on intercompany balances and avoiding regulatory charges. For example, on September 12, 2008, a request was made for a paydown from LBI to LBIE for $268 million to address intercompany balances. While many of these transfers appeared to be fairly routine, others resulted from errors or miscommunication, which added to the turmoil of the intercompany financing regime at a time when LBI struggled to operate in the wake of LBHI's Chapter XI filing.

117. The manner in which paydowns occurred just prior to the commencement of LBHI and LBIE's insolvency proceedings further complicated the records relating to LBI's financial position, and thereby, the Trustee's ability to facilitate LBI's liquidation. While intercompany transfers, in the ordinary course, would net to an intercompany balance on a daily, weekly, or even monthly basis, this process was interrupted with the commencement of LBHI's and LBIE's insolvency proceedings, leaving in place interim balances that would otherwise have

---

88. *See* E-mail dated July 29, 2008 [LBI_PIR_000003].

settled still not reconciled on both sides of the relationship.  The process of unwinding and

attempting to reconcile these balances has been very labor intensive, as described in earlier

reports.[89]

### 3. Some relevant aspects of the LBI-LBIE relationship

118.    For purposes of this Preliminary Report, the Trustee sets forth some of the

elements of LBI's relationship with LBIE that significantly impacted the ways in which LBI

operated, and subsequently created difficulties when LBIE went into administration.

(a)    Daily operations of the LBI-LBIE relationship

119.    LBIE was Lehman's principal European broker-dealer; consequently, LBI

used LBIE as its clearing and settlement agent for certain LBI trades outside of the U.S., just as

LBIE used LBI to clear trades within the U.S.  As part of this arrangement, LBI and LBIE settled

trades, in both directions, on a daily basis until LBIE filed its own administration proceeding on

September 15.  Among the transactions between the two entities, LBI engaged in a substantial

number of repos with LBIE.  The extent of this relationship understandably created substantial

default risks by tying LBI and LBIE together through numerous transactions.  As LBHI's

financial situation worsened, executives considered whether a default event caused by problems

at LBIE would also amount to a default event on the part of LBI, or vice-versa.  These executives

determined that "typically [a] default or insolvency event by LBHI, LBIE or LBSF would NOT

be a default on LBI['s] Repo Business."[90]

---

89. *See* Trustee's Third Interim Report at ¶¶ 19-30.

90. Lehman Brothers, Back-Up Contingency Plan (Sept. 12, 2008) [LBI_PIR_000118] (Likewise, "…a default or insolvency event by LBHI, LBI or LBSF would NOT be default on the LBIE Repo business (although this could be negotiated on case by case basis)") (attached to e-mail dated Sept. 12, 2008 [LBI_PIR_000009]).

120.    LBI and LBIE also made intercompany paydowns in cash to each other. These payments helped to minimize regulatory charges resulting from intercompany balances. As LBIE approached administration, paydowns from LBIE to LBI were no longer available to settle intercompany balances and avoid regulatory issues.  During this period, trapped liquidity balances increased.  Trapped liquidity occurred when regulatory, rating agency or operational restrictions precluded LBI from using assets such as margin posted to it by non-regulated Lehman entities, which could otherwise be used to support activity outside of LBI.

(b)    LBIE Acting as Settlement Hub for Transactions in Europe and Certain Jurisdictions

121.    Prior to administration, LBIE undertook settlement activities for certain LBI trades transacted in clearing systems and depots in Europe and certain other jurisdictions (as LBIE did for similar trades for other Lehman entities).  LBIE undertook these settlement activities pursuant to a policy within the wider group of Lehman entities which called for securities trades with the Street for the account of any Lehman entity to be settled by the Lehman entity in the same jurisdiction as the relevant depots through which such securities were traded or in which such securities were held.  The Trustee understands that this was known as the "local settlement policy."  LBIE claims to have assumed this role to minimize costs and logistical difficulties that arise when different affiliates hold clearing house or depository accounts for trading of securities.

122.    The Joint Administrators of LBIE have commenced court proceedings in the English High Court to determine the legal effect of an internal process known as RASCALS (Regulation and Administration of Safe Custody and Global Settlement System) on title to securities purchased by LBIE as local settlement agent for affiliates (including LBI) and held by LBIE in its house depots.  LBIE contends that it is the beneficial owner of such securities from

point of purchase.  Various affiliates, including LBI, have entered appearances in that

proceeding.  The Trustee disputes LBIE's assertions and is currently investigating the factual

background to the issues raised by LBIE's application.

      123.    According to evidence and statements of case filed by LBIE in its

application:

> (i) Under the local settlement policy, LBIE settled securities trades for the
> affiliate, and entries were made in the books of LBIE and the affiliate to reflect
> the new inventory positions of the affiliate.[91]  These transactions resulted in an
> unsecured debt owed to LBIE by its affiliates relating to the acquisition cost of
> securities because the economic benefits (or risks) for those trades were attributed
> to the participating affiliate;[92]
>
> (ii) In the mid-1990's, LBIE developed the RASCALS process, intended to
> resolve legal, compliance and regulatory capital issues that arose on inter-
> company accounts resulting from one company settling another's trades.[93]  The
> impetus for creating the RASCALS process was then-pending changes to the
> U.K. European Capital Adequacy Directive.  Under such pending changes, the
> unsecured debt arising as a result of LBIE's purchase of securities for affiliates

---

91. First Witness Statement of Thomas Bolland, submitted in the Matter of Lehman Brothers International Europe
    (in administration) [Nov. 27, 2009] EWHC (Ch), No. 7942 of 2008, ¶ 16.

92. *Id*.

93. *Id*. at ¶ 42.

would have exposed LBIE to regulatory capital charges. [94] These revised capital requirements came into effect in 1996[95]; and

(iii) The RASCALS process involved two financing tools:  (a) entries in the Lehman Group's internal computer systems purportedly recording overnight report (under which affiliates "sold" securities to LBIE and LBIE agreed to transfer equivalent securities back to the affiliate the next day, a process which ran on a daily basis that was eventually automated) or (b) stock loans — under which affiliates "loaned" securities to a borrower in return for a transfer of collateral, usually cash.  At the end of the term of the loan, securities were returned to the lender, the equivalent collateral was returned to the borrower, and the borrower paid a fee to the lender based on the value of the securities.  These overnight financing transactions provided several advantages over the old method for LBIE — they incurred little to no regulatory charges in the U.K. and generated cash balances on the books that could be settled daily.

124.    LBI did not sign any agreement related to the RASCALS process.[96]  As a broker dealer in the U.S., LBI could not make unsecured loans to affiliates except in very limited, stringent circumstances.  Rather, LBI's relationship with LBIE was primarily governed by the 1996 Undisclosed Custody and Brokerage Services Clearing Agreement ("UCCBSCA").  LBIE claims that the UCCBSCA gave effect to the RASCALS process as between LBIE and

---

94.  *Id.* at ¶ 16.

95.  *Id.* at ¶ 33 (citing Brian Nicholson, RASCALS Project, A Solution to Regulatory and Compliance Issues For Cross Company Settlement on ITS (Mar. 1995)).

96.  *Id. at* ¶ 66.

LBI.  The Trustee disputes this based on the clear terms of the UCCBSCA.  The Trustee's

position is that the RASCALS process did not affect securities purchased by LBIE on LBI's

behalf and that LBI — not LBIE — has the prior entitlement to and ownership of such

securities.[97]

## V.  SOME CONSEQUENCES OF LBHI'S INSOLVENCY FILING AND THE IMMINENCE OF THE SIPA LIQUIDATION

125.    Ultimately, LBHI's financial instability led to the largest insolvency filing

ever when LBHI sought Chapter XI protection on September 15, 2008.  Almost simultaneously,

LBIE was placed into administration in the U.K.  Four days later, this SIPA liquidation

proceeding commenced.

126.    In the days leading up to September 19, LBI employees and governmental

agencies, in particular the FRBNY, the SEC, the CFTC and FINRA, worked diligently to wind

down LBI while simultaneously encouraging a sale of the broker-dealer business to another

viable entity in order to enable the orderly transfer of customer accounts and minimize disruption

of the markets.

127.    The reality of the liquidity crisis, however, prevented an orderly wind-

down.  In this section, the Trustee outlines some of the significant events that occurred in the

immediate aftermath of the LBHI, LBIE and LBI filings.

### A.    Immediate Impacts Of Insolvency Filings

128.    By the time of the SIPA filing, if not before, JPMC unilaterally shut off

access to information systems that LBI personnel and later the Trustee used to monitor account

activity.  In doing so, the bank prevented LBI from identifying incoming customer property and

---

97.  Position Paper of Lehman Brothers Inc., in the matter of Lehman Brothers International (Europe) (in
     administration) [May 10, 2010] EWHC (Ch), No 7942 of 2008.

providing segregation instructions to JPMC to ensure that customer property was properly segregated and protected. In addition, JPMC did not return calls from LBI personnel, making any attempts to provide segregation instructions manually unsuccessful. As a result, customer property that could not be identified and manually segregated was deposited in unsegregated accounts and treated by JPMC as collateral for LBI's obligations.

129. As the liquidation began, the Trustee understood that LBI still had a large number of customer as well as proprietary assets in its accounts at JPMC, but had insufficient information or access to the accounts to provide delivery instructions to use the funds to meet customer account transfer requests. In addition, the Trustee understood the need to ensure that the cash proceeds of customer futures positions, which foreign clearing banks had liquidated, were treated as customer property by JPMC and placed into the segregated funds account at JPMC in the U.S.

130. In order to gain visibility and access to the accounts and information necessary to determine LBI's financial position and execute deliveries for the benefit of customer accounts, the Trustee, SIPC, LBHI and Barclays entered a "Services and Settlement Agreement" (the "SSA") on September 22, 2008 with JPMC setting forth terms and conditions under which JPMC would provide continued clearing, settlement and other processing services to LBI post-petition.[98] The SSA provides that JPMC shall continue to provide clearing, settlement and other processing services in the Accounts (a) to facilitate an orderly liquidation of securities positions remaining in the estate of LBI by the Trustee, and (b) process LBI

---

98. Services and Settlement Agreement between JPMorgan Chase Bank, N.A., Barclays Capital, Inc., and James W. Giddens (LBI Trustee) dated Sept. 22, 2008 at ¶¶ 1, 3 [LBI_PIR_000300].

08-01420-scc Doc 360-50 Filed 08/25/14 Entered 08/25/14 18:39:19 Main Document Documents 1 Through 9 Pg 67 of 919 Pg 68 of 1129

62

transactions for which JPMC had received bona fide instructions on or before 6 p.m. ET on September 19, 2008.

131.   In the immediate aftermath of LBI's filing, and in connection with Barclays' refusal to assume certain accounts, the Trustee initiated the prime brokerage account transfers.  Fixed income division ("FID") PBAs were maintained primarily through LBI's clearing relationship with JPMC.  For two weeks the Trustee's professionals (and Barclays employees assisting the Trustee) reconciled the assets transferrable to these fixed income PBAs using the final set of records that JPMC had provided shortly before the filing date.  This information, however, had quickly become stale and inaccurate, as the securities in these accounts matured to cash (with corresponding principal reductions) or paid interest.  To create reconciliations for the accounts prior to transfer, the Trustee's professionals could not rely on information that would have normally been provided by JPMC.  Not only did this create an extra research layer, it impeded "real world" reconciliation because actual payment date was not being provided and the Trustee's professionals were estimating payments based on how these positions should have behaved.

132.   Only after execution of the SSA and various Confidentiality Agreements pursuant to the SSA did JPMC agree to provide the Trustee with some visibility and access to LBI's accounts which permitted the Trustee to make deliveries for the benefit of customers.  However, due to the lack of screen access on September 19, 2008 and thereafter, there were a significant number of breaks and discrepancies between LBI's records and the positions in its accounts at JPMC when the Trustee's professionals regained access.  As a result, the Trustee's professionals first had to reconstruct the securities movements during the days when JPMC was custodian of the accounts without any visibility or access to LBI.  The Trustee's professionals

08-01420-scc Doc 369450 Filed 08/25/6/14 Entered 08/256/06/24518:39:19 Main Appendix Document
Documents 1 Through 919 Pg 69 of 1129

63

then had to reconcile JPMC's records, LBI's account positions, and LBI's records to close of

business on September 19, 2008 and to the time the petition was filed commencing the LBI SIPA

Proceeding at 1:29 p.m. on September 19, 2008.

 133. The lack of full and immediate screen access to the Trustee's professionals

also delayed the Trustee from knowing that JPMC had seized assets related to the fixed income

PBAs for nearly a month.  The Trustee did not learn until on or around Wednesday, October 15,

2008, while in the course of attempting to transfer prime brokerage accounts, that the bank had

seized cash and securities in the FID accounts, despite the existence of "no lien letters" that were

intended to bar such seizure.  Operating on the basis that JPMC would honor segregation

requirements, the Trustee had indicated that securities and cash related to these accounts would

be transferred to fixed income account holders as soon as procedures were in place and approved

and appropriate releases were received.  Discovery of the JPMC-seized FID assets was

concurrent with attempted deliveries of cash and securities to account holders when records for

the filing date and September 22 were finally provided.  Obviously, these transfers could not be

made.  It took a further six weeks for the Trustee to obtain account information from JPMC and

negotiate the cash substitution agreement described below to allow the securities to be

transferred to these account holders.

 134. Upon learning of the seizures, the Trustee immediately demanded the

return of the cash and securities contained in the FID accounts.  JPMC refused.  Based on the

imperative to return customer securities, the Trustee negotiated and entered into a Substitution

Agreement with JPMC on or around December 5, 2008 (the "Substitution Agreement").  Under

the Substitution Agreement, the Trustee delivered $582,215,585.00 in cash to JPMC to secure

the immediate recovery of the customer securities seized by JPMC.  In order to accomplish the

08-01420-scc Doc 369450 Filed 08/256/126/14 Entered 08/256/126/24 51:839:19 Main Appendix Document Documents 1 Through 9190 Pg 70 of 1129

64

delivery of customer securities, the Trustee was required to substitute funds which otherwise could have been used in the interim period to satisfy other customer claims. The Trustee has investigated, is discussing with JPMC, and is prepared to litigate if necessary, the propriety of JPMC's seizure of the securities which had been subject to a "no-lien" letter.

### 1. CME's reaction to LBHI's insolvency and LBI's impending liquidation

135. The implications of LBHI's bankruptcy filing on the "orderly wind-down" of the broker-dealer are evident in the eventual auction of LBI's house portfolio at the CME.[99]

136. The CME's rules provide the CME with broad discretion to act as it sees fit when one of its clearing members is in financial straits and jeopardizes "the integrity of the Exchange, or negatively impacts the financial markets by introducing an unacceptable level of uncertainty, volatility or risk, whether or not the clearing member continues to meet the required minimum financial requirements."[100] The CME's rules permit the CME under such circumstances to order, among other things, the liquidation of a clearing member's positions. Specifically, CME Rule 975 provides:

> If the President of the Exchange or the President of the Clearing House determines that the financial or operational condition of a clearing member or one of its affiliates is such that to allow that clearing member to continue its operation would jeopardize the integrity of the Exchange, or negatively impacts the financial markets by introducing an unacceptable level of uncertainty, volatility or risk, whether or not the clearing member continues to meet the required minimum financial requirements, he may empanel the Chief Executive Officer, the President of the Exchange, Chairman of the Board, the Chairman of the Clearing House Risk Committee and the President of the Clearing House ("Emergency

---

99. CME Group Inc. is composed of four Designated Contract Markets: the CME, the Chicago Board of Trade (CBOT), the New York Mercantile Exchange (NYMEX), and Commodity Exchange, Inc. (COMEX). As of August 2008, the NYMEX was a separate entity from the CME. The two merged into the CME Group on September 30, 2008.

100. CME Rule 975; Emergency Financial Conditions, CME Rulebook, 24-25 (Dec. 2008), *available at* http:www.cmegroup.com/rulebook/CME/I/9/75.html.

Financial Committee"). Such panel shall be duly authorized and, upon a unanimous vote of the panel, be empowered to order (a) an immediate position limitation, (b) an immediate suspension of the clearing member, (c) that all open trades of said clearing member be for liquidation only, (d) the liquidation or transfer of all or a portion of the open positions of the clearing member, (e) additional performance bond to be deposited with the Clearing House and/or (f) any other action necessary to protect the financial integrity of the Clearing House. The clearing member affected by action taken shall be notified and may request a hearing before the Board as provided in Rule 412. In the event of suspension, the Chief Executive Officer shall, promptly after a suspension, set the matter for hearing before the Board for final determination. To the extent that the panel orders that all open trades of a clearing member be for liquidation only, or the panel orders the liquidation or transfer of all of the open positions of a clearing member, Rule 913.B. shall apply and the clearing member shall be treated as a withdrawing clearing member.[101]

137. Pursuant to a meeting of the CME's Emergency Financial Committee on the night of Sunday, September 14, the CME directed LBI on the afternoon of September 15 to limit trading in its house accounts for liquidation only. The CME took this action notwithstanding the fact that LBI had satisfied all financial requirements of a CME clearing member. In fact, LBI continued to meets its financial requirements at the CME throughout the remainder of that week.

138. Although LBI received the CME's liquidation-only message on the afternoon of Monday, September 15, the lines of internal communication and the personnel necessary to execute a liquidation were hampered as a result of the LBHI filing earlier that morning. The participation of approximately 100 traders covering 30-40 different trading ledgers in time zones around the world would have been necessary to effect a liquidation on that scale, but many traders simply did not show up to work, or showed up without any incentive to do the work required once news of LBHI's filing circulated. Even if the necessary traders had

---

101.NYMEX Rule 9.06A is identical to CME Rule 975. *See* NYMEX Rule 9.06A.

been available, they would have encountered little direction from management, which was distracted by the impending transaction with Barclays and other emergencies stemming from LBHI's filing.  Although the sale of a portion of Lehman's energy portfolio was orchestrated within the next few days, it was not until early on the morning of September 17 that certain of LBI's traders were advised that LBI would "start working on unwinding our futures book" that day.[102]

139.    The LBHI filing impacted not only the supervision and execution of a liquidation of the broker-dealer, but also dramatically impacted LBI's potential exposure in the commodities markets and LBI's ability to liquidate those positions to its benefit.  LBI's portfolio at the CME was, in large measure, a mechanism to hedge non-exchange-traded swaps contracts for the energy businesses conducted by LBSF and LBCS.  LBHI was a guarantor of the swap contracts of its subsidiaries and affiliates.  As a result, under the ISDA agreements and schedules governing the swaps, the bankruptcy filing of the guarantor — LBHI — constituted an event of default, thereby freezing those trades.  Among the effects of such a freeze was that the positions in LBI's house portfolio — which had been placed as hedges to offset the risk of the swaps — now stood on their own, exposed to market turbulence at a time of unprecedented market volatility.  While theoretically LBI could liquidate the naked hedges, the inability to offer both sides of the hedge would render any potential liquidation at favorable prices an impossibility: any counterparty would require substantial additional collateral to assume the significant exposures as well as the margin requirements imposed by the exchanges for maintaining such large exposures.

---

102. E-mail dated Sept. 16, 2008 [LBI_PIR_000020].

140.     The first major piece of LBI's house portfolio to be auctioned was its NYMEX natural gas futures and options positions.  This auction was conducted by LBI, which sought bids from three market participants identified by the CME:  Goldman Sachs, JPMC, and Morgan Stanley.  Goldman Sachs ultimately provided the only, and thus the winning, bid.  The parties agreed upon the following terms:  the transfer of the positions to Goldman at the Tuesday September 16 closing prices, along with over $622 million of collateral.[103]  The collateral was in the form of money market funds that LBI pledged to the CME, which the CME liquidated, with LBI's consent, to provide the cash to Goldman.  Due to operational delays in transferring the bulk positions to Goldman, the deal terms changed as the positions did not transfer until Thursday, September 18, at Wednesday's closing prices.  As a result of market movements against LBI's futures positions on September 17, LBI's account at the CME was debited $82,654,310, which amount was deducted from the amount of collateral to be transferred to Goldman.

141.     LBI's ensuing efforts to liquidate the remainder of its futures and options positions were minimal, despite repeated urgings from the CME on Tuesday September 16 and Wednesday September 17.  At some point late Wednesday, the CME learned that Barclays would purchase LBI's customer, but not house, positions.  The CME then agreed to conduct its own auction of LBI's remaining house positions.  Very early on the morning of September 18th, the CME sent requests for bids, due by 8:00 a.m., to Goldman, Citadel, DRW, JPMC, and Barclays.  LBI had no input into or participation in the CME's auction.  Rather, the CME rejected LBI's pleas to halt or delay the auction until LBI had an opportunity to liquidate the

---

103. The collateral breakdown was as follows:  $482,104,458.98, equal to the portfolio net short option value; and $140 million consisting of the Span risk margin for the portfolio (calculated to be approximately $129 million) and "other consideration."

positions on its own, and went so far as to block LBI's ability to trade house positions on the market upon learning that LBI traders were attempting to execute trades Thursday morning.

142.    In the aggregate, along with LBI's proprietary positions, the CME transferred to the winning bidders more than $465 million in equity to offset the net short option value of the positions, as well as more than $1 billion in risk-related "concessions," representing nearly all of the performance bond ("margin") that LBI had posted with the CME's exchanges associated with those positions.[104]  The CME did not advise LBI of the specific bids, and only advised LBI of the amount of collateral transferred with the positions on Thursday afternoon. LBI internal emails reflect surprise by LBI personnel that its money market funds held at the CME would not be returned to LBI.  At the September 19-20, 2008 Bankruptcy Court hearing regarding the sale of LBI's business to Barclays (the "Sale Hearing"), it was disclosed that the CME had wiped out the last available cash at LBI.

### 2.    OCC's reaction to LBHI's insolvency and LBI's impending liquidation

143.    Just as the CME invoked emergency powers to threaten to liquidate and auction LBI's positions, producing a loss to LBI, so too did DTCC and OCC threaten emergency actions that could have had disastrous effects for the account transfer process and, in DTCC's case, might have derailed the entire transaction with Barclays.  The question of how clearing organizations and exchanges will react and what will happen to assets there is one that should be

---

104. LBI's CME/CBOT Equities portfolio was purchased by Goldman Sachs for a concession of $450 million negatively offset by $4,867,513 of net long option value.  The original wire transfer to Goldman on September 18 failed to account for the long option value, but Goldman refunded the $4,867,513 to LBI's CME account on September 19.  LBI's CME/CBOT Rates portfolio was purchased by DRW Trading Corp. for a concession of $240 million plus $93,489,665 net short option value.  LBI's CME FX portfolio was purchased by DRW Trading Corp. for a concession of $6 million negatively offset by $3,710,625 of net long option value.  LBI's CME/CBOT Ags portfolio was purchased by DRW Trading Corp. for a concession of $57 million negatively offset by $4,547,638 of net long option value.  LBI's NYMEX Energy/Other portfolio was purchased by Barclays for a concession of $335 million plus $372,413,215 net short option value.

08-01420-scc Doc 360 Filed 08/26/24 Entered 08/26/24 15:18:39 Main Document
Documents 1 Through 9 Pg 74 of 919 Pg 75 of 1129

69

studied and planned for in any future liquidation, as is discussed in the Recommendations section

of this Rreport. A complicating factor in LBI's case was the fact that September 19 was a triple-

witching day, greatly increasing the volume of transactions to be dealt with and posing concerns

about market-wide effects.[105]

> 144. The OCC threatened to liquidate all the LBI positions unless Barclays

stepped into LBI's shoes at the OCC. The Trustee agreed to the transfer of LBI's accounts at the

OCC to Barclays to preserve the customers' accounts at the OCC. Had Barclays and the Trustee

not agreed to the transfer of accounts, customers would have found their accounts closed out in

many cases at substantial losses with no ability to take any action to protect themselves or retain

control of their positions.

> 145. By Friday morning, September 19, 2008, the OCC had begun taking steps

to ensure that it would be protected against the possibility of losses stemming from LBI's

liabilities to the OCC. Shortly before noon, the OCC's attorneys proposed inserting language

into the Court's Order Authorizing the Sale of Purchased Assets and other Relief in the Lehman

Brothers Holding Inc. Chapter XI Proceedings such that to the extent any LBI property at the

OCC was included in the sale as a "Purchased Asset," Barclays would assume "all obligations to

The Options Clearing Corporation ('OCC') with respect to Purchased Assets that are within the

possession or control of OCC." Approximately two hours later, Barclays' attorneys confirmed

that this language was not objectionable to Barclays, and it was included in the Sale Order.

> 146. A separate transfer and assumption agreement was presented to the

Trustee during a brief recess in the sale hearing but was never approved by this Court. A dispute

---

105. On a "triple-witching day," which occurs four times each year on the third Friday of March, June, September
and December, the contracts for stock index futures, stock index options and stock options all expire on the
same day.

now exists between the Trustee and Barclays over the appropriate disposition of what the Trustee

subsequently discovered to be substantial cash margin with respect to both customer and

proprietary positions maintained at the OCC, much of which proved to be excess, *i.e.*, not

necessary to cover liabilities. Moreover, having Barclays assume all customer positions and

assets at the OCC proved to be an imperfect solution at best because many customers did not

transfer to Barclays and had problems obtaining access to their OCC positions and margin.

Clearly, issues such as these — compounded in LBI's case by the fact that September 19 was a

triple-witching day — need to be considered on an industry-wide basis in advance, not in last-

minute courtroom asides or email exchanges among only some of the parties involved.

### 3. DTCC's reaction to LBHI's insolvency and LBI's impending liquidation

147. DTCC, through its subsidiaries, provides clearance and settlement services

for broker-to-broker transactions in equities, corporate and municipal bonds, government and

mortgage-backed securities, money market instruments and OTC derivatives. LBI relied

extensively on DTCC's services to carry out clearance and settlement activity in the ordinary

course of its business, maintaining accounts at DTCC subsidiaries, including NSCC, the Fixed

Income Clearing Corporation ("FICC") and the DTC.

148. DTCC presented an even more serious issue than the CME or the OCC

because of the vast amount of property it holds or custodies and the industry's reliance on it and

its subsidiaries to settle trades and transfer customer property. For example, as of the closing of

the sale transaction, DTCC estimates that it held over $500 billion in open trades on Lehman's

books. DTCC was so concerned with the potential cost that it indicated an unwillingness to

perform settlement and transfer functions for LBI unless Barclays assumed all potential liability.

When Barclays refused, DTCC insisted on substantial property being available to it to cover any

potential losses it might face. Eventually, it was agreed that all LBI proprietary assets at DTCC

08-01420-scc  Doc 369250  Filed 08/256/1214  Entered 08/256/1214 18:39:19  Main Appendix
Documents 1 Through 9191  Pg 77 of 1129

71

would remain with the Trustee and be available for DTCC's use — actually a much-needed

benefit for the LBI liquidation but the subject of yet another dispute between the Trustee and

Barclays — and that Barclays would additionally deposit the purchase price due to the estate

with DTCC. Accordingly, the only cash to be paid by Barclays for the extensive brokerage

business and over $40 billion of customer accounts — $250 million for LBI's "goodwill" —

became a deposit with DTCC for Barclays' limited guarantee against losses. Thus, when the

Trustee commenced liquidating one of the largest, most venerable brokerage houses in the world,

he had to obtain an advance of one million dollars from SIPC, because otherwise there did not

appear to be a dime of readily available proprietary cash.[106]

149.    DTCC had previously contemplated a total transfer of the LBI 074 box at

DTCC to Barclays along with Barclays' assumption of liabilities; when this approach was

abandoned, DTCC began to unwind LBI's positions as a broker-dealer whose membership was

terminated. Unfortunately, DTCC deemed this to mean that the already commenced ACATS

transfer process should be reversed, as described in the next section.

### 4.    The DTCC-ACATS reversals

150.    Among its services, NSCC operates the Continuous Net Settlement system

("CNS"), which automatically centralizes the settlement of broker-to-broker security transactions

and maintains an orderly flow of security and money balances. Most broker-to-broker equity

and corporate debt transactions settle through the CNS system.

---

106. The Trustee did have available cash in the Rule 15c3-3 account to help with account transfers and did within a
    few weeks manage to locate some funds in a few bank accounts. The Trustee also received some cash in
    transaction unwinds to which SIPC and the Trustee consented as an exception to the automatic stay, as provided
    for in the Liquidation Order. *See infra* Section IX.I.

08-01420-scc Doc 360 Filed 08/25/26/14 Entered 08/25/26/14 13:39:19 Main Document Documents 1 Through 19 Pg Pg 78 of 1129

72

151.     NSCC also provides an ACATS service, which automates and standardizes procedures for the transfer of assets in a customer account from one brokerage firm or bank (the "Delivering Broker") to another brokerage firm or bank (the "Receiving Broker").

152.     Assets in an ACATS transfer that are eligible for CNS processing are transferred from the Delivering Broker to the Receiving Broker through the CNS system.  Assets ineligible for CNS are delivered by the Delivering Broker to the Receiving Broker by other methods.

153.     Prior to the LBI SIPA Proceeding, many LBI customers had initiated (through Receiving Brokers) account transfer requests.  These requests were submitted to LBI through the ACATS process and LBI proceeded to facilitate transfers of the requested accounts. Account transfers were scheduled to settle through ACATS between September 22, 2008 and September 24, 2008.  At the opening of business on Monday, September 22, 2008, Receiving Brokers to which LBI customers desired to move their accounts were awaiting transfer through the ACATS system of certain customers' securities (the "ACATS Securities") that were scheduled to settle on September 22, 2008.  Under the ACATS service, on the scheduled settlement date, the Delivering Broker (here, LBI) is debited for the value of assets to be transferred to the Receiving Broker.[107]  Upon delivery of the assets, the Delivering Broker is credited back with the value of the transferred assets.  While LBI had securities available to complete many of the September 22, 2008 ACATS delivery obligations, as described below, most of the ACATS Securities did not reach the intended Receiving Brokers.

---

107. The debit/credit only takes place if the account transfer is between two broker-dealers.

154.    NSCC's processing of September 22, 2008 LBI transactions (which had begun on the evening of September 19, 2008) went forward on the morning of September 22, 2008.  However, NSCC subsequently began to wind down the LBI account — effectively as if NSCC had as of September 22, 2008 ceased to act for LBI — pursuant to an agreement dated September 22, 2008, between and among DTCC, the Trustee and Barclays regarding the wind-down of the LBI account.  NSCC reversed certain ACATS transfers for LBI customer accounts that had taken place on September 19, 2008 and all ACATS transfers for September 22, 2008 (the "ACATS Reversal").

155.    The result of the ACATS Reversal and other wind-down activity on September 22, 2008 through September 24, 2008 included:  (i) NSCC taking possession of securities valued at approximately $468 million, including a large amount of customer securities that should have been immune from seizure; (ii) securities valued at approximately $374 million were received as long positions in the LBI DTC account; and (iii) securities valued at approximately $221 million as of September 22, 2008 (again including customer securities) were sold or transferred in connection with the wind-down of LBI's account to settle other LBI obligations.  The ACATS Reversal became the subject of a motion by the Trustee, and resulted in the Court's order of February 11, 2009 restoring conditions as nearly as possible to those that would have been obtained had the ACATS Transfers not been reversed.[108]

156.    All of the threatened actions by these three entities — the CME, the OCC and DTCC — took place in a rushed, confused, uncertain and near-panic atmosphere, which was exacerbated by uncertainty about the financial system beyond just Lehman and the fact that the

---

108. *See* Motion Under Fed. R. Bankr. P. 9019(a) for Approval of Settlement and Compromise, Settlement Agreement (among the Trustee, DTCC and Barclays) (LBI Docket No. 586).

date of LBI's liquidation was also a triple-witching day when contracts come due for settlement. All appear to the Trustee to have produced unforeseen, unfortunate consequences. The rules and procedures that might have applied in those circumstances were unclear, to a large degree unknown, and certainly untested. As we note in the Recommendations section, steps should be taken so that this should not be the case next time.

## B.     The Impact Of The Insolvency Filings On The LBI-LBIE Relationship

157.     As LBIE was forced to enter administration in the U.K., the settlement of certain trades at LBIE resulted in the draining of cash from LBI.

158.     Following LBHI's filing, payments could only be made to and from certain Lehman entities — specifically Neuberger Berman, LBI, LBB, LBCB, LOTC and LBCC FX — and all other payments to Lehman entities were blocked. That is, LBI assets that had been traded in overseas markets through LBIE were tied up in the LBIE administration process and only available to LBI with the LBIE administrators' approval. At the same time, LBIE made a demand for payment from LBI for more than $8 billion related to transactions that supposedly closed before LBIE entered administration.

159.     LBIE's administration presented LBI with a variety of default concerns. For example, where LBI financed a client's securities through a repo trade, LBI often did a back to back trade with LBIE. At the time of repurchase, LBI was now unable to unwind the LBIE trade and, as a result, failed on its obligation to deliver the securities back to the client.

160.     By September 17, 2008, LBI executives worried about when LBIE's administrators would allow LBI's positions to transfer out, while LBI acted to address payments on margin accounts of customers whose positions were held at European exchanges.

161.     During this period, LBI personnel were also unsure whether, and how, payable and receivable balances between two companies could be resolved. The relationship

08-01420-scc Doc 369250 Filed 08/26/14 Entered 08/26/24 51 18:39:19 Main Appendix Document
Documents 1 Through 919 Pg 81 of 1129

75

with LBIE caused additional difficulties in unwinding open trades. In the Investment Banking

Division alone, at least 15 million shares were "stuck." This meant that in order to unwind a

trade with a customer where LBIE would not deliver the securities, LBI would have to buy-in the

securities, increasing its exposure and leaving it with only a claim back against LBIE.

C.    **Prime Brokerage Accounts, Reconciliation Status And The Trustee's Protocol**

162.    PBAs are more complicated to administer in liquidation because of the

nature of the accounts and trading, the terms of the agreements, and indebtedness to and liens in

favor of LBI affiliates. Dealings with LBIE in this situation have added to the complexity. As

noted earlier in this Report, many PBAs sought or were in the process of transferring accounts

away from LBI as the insolvency filing of LBHI was rumored and then became an actuality.[109]

It had originally been expected that Barclays would acquire the prime brokerage customers'

accounts as part of the sale transaction as contemplated in the agreements, but, on September 29,

2008, Barclays informed the Trustee of its refusal to acquire them, further complicating the

liquidation.[110]

163.    SIPC and the Trustee developed an innovative protocol (the "Prime

Brokerage Protocol")[111] under the customer account transfer provisions of SIPA that allowed the

majority of LBI prime brokerage account holders to transfer substantial assets to other financial

institutions (approximately 75% of LBI's remaining prime brokerage business) and thereby

---

109. See *supra* Section IV.A.3.

110. Letter dated Sept. 29, 2008 [LBI_PIR_000022].

111. *See* Protocol of the Lehman Brothers Inc. Trustee Regarding Prime Brokerage Arrangements (Oct. 14, 2008),
Trustee's First Interim Report at Ex. 5 (the "Prime Brokerage Protocol").

regain access to those assets.  No other industry regime yielded such a prompt return of

substantial amounts of customer property.

164.    Despite the success of the Prime Brokerage Protocol, which was approved

by the court in December 2009, not all of the PBAs property could be transferred.  As a result,

1,206 PBA-related claims have been filed with respect to account-related transactions and other

issues not covered by the Protocol.[112]  Despite the flexibility afforded by SIPA, it would have

been far more expedient, and would have resulted in more complete protection for the prime

brokerage account customers, had Barclays or some other entity taken this important range of

accounts as contemplated in the sale agreements.

## D.    Lehman's Communications With Customers About SIPA

165.    LBI prepared communications for customers about SIPA and its role in

the event of LBI's collapse which seem, in retrospect, somewhat naïve and superficial.  These

communications also evidence recognition of the possibility of a liquidation more than six

months before the Filing Date, despite the apparent soundness of LBI in a narrow regulatory

sense.  (And, by inference, they show that it would have been possible to begin planning in

earnest for an actual liquidation scenario months before the situation became desperate.)

166.    On March 18, 2008, in the immediate aftermath of Bear Stearns' demise,

the Managing Director and Global Head of Lehman's PIM business drafted a letter to reassure

LBI clients about the financial health of Lehman and the financial markets in general.[113]  The

letter also devoted a paragraph to Lehman's safeguarding of client assets.  He wrote:

---

112. *See* Trustee's Third Interim Report at 19-30.

113. Letter dated Mar. 18, 2008 [LBI_PIR_000197] (attached to e-mail dated Sept. 12, 2008 [LBI_PIR_000007]).

With respect to the safeguarding and custodying of your assets, Federal law imposes structural safeguards and requires that your assets be segregated from Lehman Brothers' own property. As a result, they are not subject to the claims of the Firms' creditors. In addition to these protections, the Firm is also a member of the Securities Investor Protection Corporation ("SIPC"), which provides coverage in the case of a shortfall of the covered assets. The Firm also carries excess SIPC coverage through the Customer Asset Protection Company ("CAPCO").[114]

167.    In addition to this letter, LBI created materials to address client concerns about the safety of their assets held at LBI, including the following: (i) a document containing a list of bullet-points dealing with asset segregation in the event of a SIPC proceeding; (ii) a March 2008 document entitled "Customer Asset Protection Overview"; and (iii) a background memorandum prepared by an outside law firm at LBI's request addressing generally the issue of the safety of assets in brokerage accounts from a regulatory and historical perspective.[115] LBI provided these materials to employees to send to clients expressing concern about their assets at LBI in light of LBHI's financial predicament.[116]

168.    Additionally, on March 27, 2008, LBI created a document titled "FAQ Regarding Safety and Soundness of Client Accounts," which was designed for internal use "for purposes of general discussions with IMD clients in response to frequently asked questions relating to asset protection issues."[117]

---

114. *Id.*

115. Safety of Cash and Securities Held in a Brokerage Account (Apr. 2008) [LBI_PIR_000288] (attached to e-mail dated Sept. 12, 2008 [LBI_PIR_000007]); Safety of Cash and Securities Held in a Brokerage Account (Sept. 2008) [LBI_PIR_000297] (attached to e-mail dated Sept. 9, 2008 [LBI_PIR_000005]).

116. *See* E-mail dated Sept. 12, 2008 [LBI_PIR_000011]; e-mail dated Sept. 12, 2008 [LBI_PIR_000012].

117. Lehman Brothers, FAQ Regarding Safety and Soundness of Client Accounts (Mar. 27, 2008) [LBI_PIR_000099] (attached to e-mail dated Mar. 27, 2008 [LBI_PIR_000002]).

08-01420-scc Doc 369250 Filed 08/256/124 Entered 08/256/124 18:189:19 Main Appendix Document Documents 1 Through 9192 Pg 88 of 9129 Pg 84 of 1129

78

169.     The document addressing asset segregation sought to allay customer concerns about the safety of their assets and the significance of a SIPC proceeding by making positive statements with respect to asset protection, including:

(i) "[i]f Lehman Brothers were to suffer a deficiency in capital, the SEC and FINRA authorities would immediately step in and ensure an orderly transfer of client assets to other financial institutions";

(ii) a discussion of Lehman's membership in CAPCO concluding that "CAPCO provides coverage on customer accounts up to the account's net equity for securities and cash held at the brokerage firm, subject to similar terms and conditions on SIPC";

(iii) "[i]nvestments in Lehman Brothers Cash Deposit Accounts are insured by the FDIC for up to $100,000 for individuals, up to $100,000 per joint owner for joint accounts, and for certain IRA and self directed retirement accounts up to $250,000"; and

(iv) "[i]n the event of a SIPC liquidation, SIPC states on their website that most customers can anticipate receiving their funds and securities in one to three months."[118]

170.     LBI provided the March 2008 document, titled "Customer Asset Protection Overview," to PIM clients.  This document summarized protections available to LBI's customers and highlighted LBI's and LBHI's credit-worthiness, particularly their high credit ratings on long term senior debt from Fitch, Moody's and Standard & Poor's.  While the

---

118. *Id.*

document states that it was not intended to be used as legal advice, it also provides an overview

of Financial Responsibility Rules including a summary of the cash reserve account as well as the

"Rehypothecation Rules" governing when a broker-dealer can comingle client securities with

other customer funds.

171.    The memorandum focused on descriptions of Rule 15c3-3, the uniform net

capital rule (Rule 15c3-1) and customer claims and rights in a SIPA proceeding.  It also

highlighted the historical rarity of large brokerage firms getting into financial trouble:

> In SIPC's first 36 years of operation, in administering the liquidation of about 320
> broker-dealers, the largest net advance in a single liquidation proceeding was
> $42.1 million.  In all of these proceedings SIPC was required to pay out, on a net
> basis, only $322 Million in order to make possible the return of $15.7 billion of
> customer property, satisfying nearly all claims of public customers.  This reflects
> two key facts – first, that SIPC liquidations have all involved small brokerage
> firms, and second, that the operational processes at brokerage firms result in
> substantive compliance with the financial responsibility and recordkeeping rules
> so that customer property is properly identified and customer accounts are
> accurate.  Finally, it reflects the fact that in the rare instances in which a larger
> brokerage firm gets in financial trouble, these rules and the reports given to SEC
> and FINRA (and to senior management of that firm) have given sufficient early
> warning so that the problem can be addressed either by infusion of capital or by
> arranging account transfers before liquidation of the brokerage firm is needed."
> (emphasis added).[119]

172.    In September 2008, as LBHI's financial condition became increasingly

precarious, LBI sent these materials to a number of its clients.  Moreover, LBI employees sent

correspondence to clients to reassure them that their money would be unaffected by what might

happen to LBHI.  For example, in a September 12, 2008 letter, a Lehman employee wrote, "[o]ur

clients investment holdings are 100% segregated from Lehman Brothers holdings."[120]  And a

---

119. Safety of Cash and Securities Held in a Brokerage Account (Apr. 2008) [LBI_PIR_000297] (attached to e-mail
     dated Sept. 12, 2008 [LBI_PIR_000067]).

120. E-mail dated Sept. 12, 2008 [LBI_PIR_000012].

July 22, 2008 email between two Lehman employees that was forwarded to a client on

September 12, 2008 reads in part:

> The securities in the client's account are solely their property. They are not on
> Lehman Brothers balance sheet and cannot be used to operate our business or
> satisfy the claims of creditors. Client assets are separately segregated and held in
> electronic form at Depository Trust Corporation. Even if the firm failed, creditors
> would not be able to take client assets to cover unpaid debts. Our clients, like
> clients of banks/trust companies, have the right to reclaim securities regardless of
> any creditor claims because client assets are not considered assets of the firm.[121]

173. Some communications erroneously suggested that clients could direct

DTCC to send specific securities reflected in their account when in fact, absent an account

transfer, securities not in a customer's name become part of the fund of customer property, and

the client's claim is to a pro rata share of customer property based on the determination of the

client's equity in the customer claim process. Communications such as these may have

contributed to the confusion and misunderstanding of some customers in the early days of the

liquidation.

## VI. ADDITIONAL INFORMATION ON FOUR ITEMS RELATING TO LBI MENTIONED IN THE EXAMINER'S REPORT

174. As previously indicated, the Examiner expressly omitted a detailed

analysis of matters exclusively related to LBI, in deference to the mandate of the Trustee.

However, the Examiner's Report does reach certain conclusions that touch upon LBI and that the

---

121. E-mail dated June 22, 2008 [LBI_PIR_000006]; *see also* e-mail dated Sept. 12, 2008 [LBI_PIR_000014] ("As a
regulated broker-dealer, the firm is subject to various SEC rules and regulations that protect customer assets
held with Lehman Brothers in the unlikely event of insolvency. Most importantly, the rules require that
customer securities and excess margin securities be segregated from the the [sic] securities that the firm owns.
These securities may not be used in any way by a broker-dealer in its business and are not comingled on
Lehman's balance sheet. All client assets are held at a Depository Trust Company in NY and they would send
these securities to another firm or account as directed by the client.").

Trustee's professionals have investigated further from LBI's point of view. Comments based on this investigation are outlined further here.

## A.  Potential Avoidance Actions — Below-Market Trades

175.  The Examiner analyzed various transfers in connection with potential avoidance actions. In the course of that analysis, the Examiner collected trading data seeming to show that Lehman entities received substantially less than market prices for various securities. In particular, the Examiner located 29 trades between LBI and Citi in which LBI apparently received 10 cents on the dollar for FNMA and FHLMC bonds that were trading at or near par. Initially, it appeared that LBI may have executed the trades with Citi for other Lehman entities, including certain of the Chapter XI debtors. Upon further review, the Examiner reached the conclusion that the trades likely involved only LBI and Citi, and not the Chapter XI debtors, and referred the LBI/Citi trading information to the SIPA Trustee.

176.  The value of these trades is approximately $20 million. The Trustee's professionals have reviewed these trades and concluded that the assets at issue were TBAs owned by a hedge fund client and held by LBI as custodian. These transactions were actually transfers from LBI in a custodial capacity to Citi, which also serves as an alternative prime broker for the customer. The customer instructed that the assets be transferred because of LBI's then-tenuous position. In order to record the transfers in LBI's system, LBI had to enter a transaction price even though there was no price involved with these transfers. Therefore, LBI used the lowest price that the system would accept, which was $10 per transaction. These transactions did not clear prior to September 19, 2008, and were cancelled after that date. Even if the transactions had cleared, there would not have been any economic impact to LBI or any of the other parties involved, since there was no intended trade but simply a transfer of custodied property.

B.     **The SEC Never Granted Approval For The Release Of Customer Funds**

177.     The Examiner's Report suggests that, in connection with the Asset Purchase Agreement ("APA") as between LBI and Barclays, the SEC approved a release from LBI's Customer Reserve Accounts to pay Barclays.  The Examiner's Report does not cite any statement made by the SEC, only (i) a September 20, 2008 email from Lehman's Paolo Tonucci, which requests that Mike Macchiaroli of the SEC agree to release excess from the Customer Reserve Accounts, and (ii) the testimony of Daniel Fleming, a former LBI employee, regarding that email.[122]

178.     In fact, the Trustee's necessarily more intense investigation of this particular point demonstrates that the SEC refused to approve the release of any Customer Reserve Account assets.[123]  Barclays' conduct following the closing of the sale transaction indicates that its representatives understood that regulatory approval was a necessary condition of any transfer.  A Barclays' representative has testified that Barclays met with the SEC in an attempt to obtain permission to release supposedly "excess" amounts form the Customer Reserve Accounts, and that the SEC refused to release any assets because of questions regarding the reliability of the computation.

---

122.  *See* Examiner Report at 2182, n.8054 (citing e-mail from Paolo Tonucci, Lehman to Mike Macchiaroli, SEC (Sept. 20, 2008)); n.8055.

123.  *See* Blackwell Tr. 206:21-208:21, BCI Ex. 56; *see also* Declaration of William R. Maguire in Support of the Trustee's Motion for Relief Pursuant to the Sales Order or, Alternatively, For Certain Limited Relief Under Rule 60(b), Ex. 30 (LBI Docket No. 1692) ("[the SEC] want[s] to see the info once the reconciliation break has been resolved, and want to ensure that all customer balances [were] moved cleanly").)  *See also* The Trustee's Memorandum in Further Support of His Motion for Relief Pursuant to the Sale Orders, or, Alternatively, for Certain Limited Relief Under Rule 60(b) and In Opposition to the Motion of Barclays Capital Inc. to Enforce the Sale Orders and Secure Deliver of All Undelivered Assets, 19 n.6 (LBI Docket No. 2847).

C.    **Repo 105/108**

179.    In addition to traditional repo transactions, LBHI engaged in "Repo 105" and "Repo 108" transactions through LBIE, so named for their intended minimum haircuts of 105 and 108 percent for fixed income and equity related collateral, respectively.  These transactions enabled LBHI to manage its balance sheet through netting opportunities.  As discussed at length in the Examiner's Report, LBIE received a "true sale" opinion from a law firm in the U.K., and thereafter accounted for such repos not as financings (as would be the correct treatment for a typical repo transaction), but rather as "true sales" of inventory and forwards to repurchase securities.[124]  As a result, LBIE accounted for the transactions as sales, rather than financings, and thereby shifted the repo'd assets away from its balance sheet.  LBHI benefited from the results of this accounting as LBIE was consolidated with LBHI for accounting purposes.

180.    The Trustee and his professionals have investigated, and continue to investigate, whether LBHI's use of Repo 105 and Repo 108 transactions was intended to or did in fact benefit LBI, and whether such transactions adversely impacted LBI in any manner.  Based upon the investigation to date, it appears that each of these questions can be answered in the negative, with the potential exception that LBI appears to have received the same haircut on these transactions that LBIE ultimately received from third parties.

181.    In the normal course of broker-dealer financing, as discussed above, LBI frequently engaged in repo transactions with Lehman affiliates (including LBIE) as well as third parties, through which LBI tendered securities in exchange for financing.  In certain instances,

---

124. Examiner's Report at Section III.A.4.

LBI engaged in repo transactions of securities with LBIE, which securities LBIE may ultimately have used to engage in Repo 105 transactions. From LBI's perspective, however, LBIE's ultimate use of such securities in a Repo 105 transaction had no impact on LBI from a financial reporting standpoint. The only potential negative impact on LBI was that LBI apparently received the same terms (*i.e.*, haircuts and interest rates) from LBIE that LBIE received from the ultimate counterparty. LBI booked its repo transactions with LBIE no differently from typical repo financings. In fact, because LBI did not have a "true sale" opinion with respect to the accounting treatment for these transactions under U.S. Generally Accepted Accounting Principles, LBI could not benefit from the type of accounting employed by LBIE for these repo transactions. Consequently, LBI could not improve its balance sheet by participating in a Repo 105 transaction, and such transactions did not impact LBI's balance sheet any differently from a typical repo financing for like securities. Furthermore, LBI's regulatory personnel recognized that no benefit would inure to LBI from Repo 105 transactions, and might even be problematic from a regulatory compliance perspective.

**D.    HSBC Deposit**

182.    The Examiner's Report contains a section discussing a $1 billion segregated deposit that LBI maintained at HSBC.[125] Based on an interview with HSBC's Global Relationship Manager for Financial Institutions, the Examiner's Report states that "LBI kept this deposit with HSBC to satisfy the net capitalization requirements of broker-dealers under Rule 15c3."[126] According to the HSBC employee, although HSBC had "expressly waived its right of setoff" with respect to the deposit and the deposit was "technically unencumbered," Lehman was

---

125. Examiner's Report at 1312-14.

126. *Id.* at 1313.

"required to provide notice to HSBC before making a withdrawal."[127]  The HSBC employee is
reported to have further stated that "sometime post-petition in September 2008, Lehman directed
HSBC to deliver the deposit to Barclays and that HSBC complied with the request."[128]  The
Examiner noted that, "[a]ccording to Lehman's internal memoranda, LBHI did not include this
deposit as part of its liquidity pool."[129]

183.    The Trustee's financial professionals have reviewed LBI's books and
records concerning this deposit and determined that those records do not support several aspects
of the HSBC employee's reported description of the deposit.  To the contrary, LBI's records
indicate that the deposit was maintained for customer segregation purposes, but not as part of a
reserve for customers pursuant to SEC Rule 15c3-3.  LBI's records show that the deposit was
withdrawn before the sale to Barclays closed, but do not show that the deposit was transferred to
Barclays.  Furthermore, LBHI was not able to include the deposit as part of its liquidity pool
because, from a regulatory perspective, the deposit was considered an encumbered asset.

## VII.    CERTAIN CHALLENGES OF THE LARGEST BROKER-DEALER LIQUIDATION IN HISTORY

184.    In this section of the Preliminary Report, the Trustee presents lessons
learned and some recommendations for consideration in preparing for and conducting a future
liquidation of any major broker-dealer, whether through a standalone SIPA proceeding before or
after account transfers or as part of a broader effort involving the FDIC and others under the
orderly liquidation authority provided for in the new financial reform legislation.  The problems

---

127. *Id.*

128. *Id.* at 1313-14.

129. *Id.* at 1314.

08-01420-scc Doc 369-50 Filed 08/25/6/26/14 Entered 08/25/6/26/24 51 8:39:19 Main Appendix Document Documents 1 Through 019 Pg 92 of 1129

86

identified here arose from the unprecedented size, scope and international ramifications of the Lehman liquidation, the hurried and tumultuous environment in which the SIPA proceeding had to be commenced, and the absence of a full understanding of, let alone planning for, how the interests of customers that would remain with the soon-to-be-liquidated estate would be affected by the constantly evolving series of transactions actually implemented. When the storm subsided, it emerged that the transactions involved only a partial transfer of accounts, with the interested regulatory authorities and the Trustee struggling to understand and gain control of the customer property and potential customer claims that were left behind.

185.    The situation that resulted led not only to disputes that are still being negotiated or litigated but also to unanticipated difficulties in obtaining access to customer property and records, including customer assets and records located abroad, and records obtained by Barclays in the partial sale transaction. It also created complicated relationships with the Chapter XI Debtors, Barclays and others which have impeded access to information and people knowledgeable about LBI's operations.

## A.    Overview:  Evolving Events Hinder Careful Planning

186.    Originally, Lehman management planned to save the firm without the need for insolvency proceedings by raising capital, selling the IMD business and spinning off some of the more troubled assets. The plan then changed to finding a buyer that would buy all or most of the enterprise. When a sale to Barclays failed for lack of shareholder approval or a guarantee by either industry participants or the government, the plan changed to an orderly wind-down orchestrated by the FRBNY. The wind-down was, in fact, not orderly, in part because of the unanticipated effect LBHI's Chapter XI filing had in cutting off cash flow and forcing LBIE into administration, thereby freezing many transactions with LBIE. Market participants also lost confidence in Lehman as a whole even though LBI, its U.S. broker-dealer, was in much sounder

condition and appears to have been largely in compliance with the customer protection

requirements until near the end.  As the wind-down got underway, Barclays reappeared to

purchase at nominal cost much of the remaining U.S. brokerage business and assume many —

but far from all — of the remaining customers' accounts in a frantically negotiated, much

disputed and less than pellucid set of agreements.

187.    The Trustee is or may become a party to litigations and disputes involving

these transactions and events.  It would therefore not be appropriate and is not the aim of this

Report to cast blame or to comment on the merits of issues to be determined by the courts.  One

thing that subsequent developments have made abundantly clear, however, is the unnecessary

extent of difficulties caused by the fact that the SIPA proceeding was conceived of as something

of an afterthought to a forward-looking transfer of businesses and accounts to Barclays on the

one hand and reorganization of LBHI on the other.  The SIPA liquidation was to be the vehicle

for completing the transfer of Neuberger Berman accounts and transferring what were said to be

the large bulk of remaining accounts to Barclays.  Relatively little advance attention was given,

however, to the scope or conduct of the SIPA proceeding itself.

188.    Originally it was believed that there would be few significant non-

transferred accounts and that the customer aspects of any SIPA proceeding would be concluded

quickly.  There was, however, no real planning or exchange of information about the scope of

the operations to be transferred, nor was there any clear definition of exactly which customers

and what customer property would remain with LBI to be dealt with in the SIPA proceeding.

189.    No advance planning had occurred with respect to how the liquidation of

the shell of the broker and its remaining proprietary and customer assets and accounts would

work in practice:  (i) how effective access would be obtained to books, records and systems

transferred to Barclays' control; (ii) how the informational and operational needs of a Trustee

now faced with tens of thousands accounts to transfer or examine would be integrated with the

needs of the LBI subsidiaries spun off to the holding company on the eve of the SIPA filing; (iii)

how records and facilities would be shared and made available to the Trustee for the parts of the

business that stayed behind as tens of thousands accounts and related records were being

acquired by Neuberger Berman on the one hand and Barclays on the other; or (iv) how the

customers and customer accounts that were located in Europe and cleared though an omnibus

account between LBI and LBIE would be administered with LBIE already in administration

under a different foreign insolvency regime.  A hastily-drafted (and, in retrospect, far from

satisfactory) transition services agreement was executed between LBHI and Barclays when the

Barclays transaction closed on September 22, 2008, but neither LBHI, which had been acting for

LBI prior to the Trustee's appointment, nor Barclays considered the implications for LBI (which

was not even a party to the agreement).

190.    In addition, LBI maintained accounts at banks and depositories around the

world through which it held securities for its customers.  Following the commencement of

LBHI's and LBIE's insolvency proceedings, many of these banks and depositories ceased

providing information on the positions in these accounts.  Though customer claims are

determined using LBI's records of what it was holding on behalf of its customers, sourcing

securities and cash to fund allowed claims is dependent on the access provided by the custodial

banks.  Because this access was either incomplete or denied, the Trustee was unable in the early

periods of the liquidation to determine to what extent securities known to be needed for account

transfer or for inclusion in the fund of customer property were actually available.  After

substantial effort and work with these depositories, the Trustee has been able to gain access to

information about LBI's custody accounts.  The process, however, has resulted in complications

and delay of the account transfer and customer claims resolution efforts, and, in some cases, has

caused problems in obtaining property believed to be safely custodied for customers.

**B.      Transfer vs. Non-Transfer Of Customer**
**Accounts:  Legal And Practical Implications**

191.    The legal and practical consequences of decisions regarding transfer or

non-transfer of accounts in a SIPA proceeding are significant.  As amended in 1978, SIPA

contemplates as the default option the creation of a "Fund of Customer Property" in which

"Customers" (as defined in the statute) share pro rata, based on their "Net Equity" — essentially

the net amount owing by the broker if all positions were liquidated as of the filing date.  SIPA

§ 78*lll*(2), (4), (11).  This approach contemplates a marshalling of assets and a claims

determination process involving two estates or pools of property to liquidate — one consisting of

customer property and claims, and another for non-customer creditors.

192.    A complementary regulatory scheme reflected in the SEC's "Customer

Protection" rules, principally Rule 15c3-3 under the Exchange Act, seeks to assure that the SIPA

trustee will find the property necessary to satisfy customer claims close to hand:  cash

obligations will be covered by deposits in a Reserve Account set aside for the exclusive benefit

of customers, while fully paid customer securities will be securely held in good control locations,

segregated from non-customer property and immune from seizure to pay debts of the broker

dealer.  This regulatory scheme was largely created during the early 1970's, and was reflected in

the 1978 amendments to SIPA.  In addition, the Uniform Net Capital Rule, SEC Rule 15c3-1, is

designed to ensure that the firm has sufficient liquid assets to permit an orderly liquidation.  The

objectives of this scheme are to protect customers both while the broker-dealer is in operation

and as it enters liquidation either with or without an account transfer.

08-01420-scc Doc 360250 Filed 08/256/26/14 Entered 08/256/26/24 518:89:19 Main Appendix Document Documents 1 Through 91 Pg 96 of 1129

90

193. The 1978 Amendments to SIPA also formally introduced a trustee's authority to transfer customer accounts to a solvent SIPC member. The SEC customer protection rule makes this a viable solution as long as the failed broker has complied to a sufficient extent and has maintained accurate books and records. Thus, the 1978 SIPA amendments provided that, "subject to the prior approval of SIPC," the Trustee could, "without the consent of any customer, sell or otherwise transfer all or any part of the account of a customer of the debtor to another member of SIPC." SIPA § 78fff-2(f). The legislative history of this section referred to the advantages of such a process, in contrast to the claims-based approach. The principal advantages are speed and prompt restoration of customer control of their investment accounts, which have always been key goals of SIPA.[130]

194. The Trustee's extensive use of the customer account transfer authority greatly mitigated the impact of Lehman's failure on the vast majority of LBI and Neuberger Berman customers as well as many prime brokers — and indirectly for the market as a whole. As set forth in detail in other sections of this Report, however, the inability to transfer important categories of accounts — the extent of which was never discussed (or, to the Trustee's knowledge, considered in a systematic way) — produced unforeseen consequences in many aspects of the liquidation. These consequences were exacerbated by Barclays' post-liquidation decision to reject the entire PBAs range with property and liabilities to customers well in excess of $5 billion.

---

130. *See Securities Investor Protection Act Amendments of 1975: Hearing on H.R. 8064 Before the Subcomm. On Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce*, 94th Cong. 56 (1975) (SIPC Chairman Hughes remarked to Congress, "One of the principal goals of the proposed [amendment to SIPA] is to make it possible for the trustee to render accounts to customers as they stood when the firm failed. One way to accomplish this in very rapid order is to empower the trustee to transfer accounts in bulk to another broker/dealer.")

## C.    <u>Incorrect Assumptions And Unanticipated Impediments</u>

195.    The Trustee was appointed after LBHI's and LBIE's insolvency proceedings had already been instituted and with agreements already drafted and transactions, such as the sale of virtually all of LBI's subsidiaries, already in place.[131]  The Trustee had no independent access to records or personnel and was provided only rough, high-level estimates both about assets that had already been divided up among other parties and about what was left behind at the broker.  The implicit assumption — which proved to be optimistic at best — was that most customer accounts and related assets would be transferred smoothly and easily and that only a relatively trivial number of customers and limited amount of customer property would need to be dealt with in any SIPA claims process.

196.    These assumptions proved to be incorrect for a number of reasons, many of which have been described in more detail at the beginning of this Report.  Operationally, the transfer of customer assets was anything but smooth because of, among other system limitations, shutdown of account access screens by clearing banks and other organizations, lack of access to records, frozen overseas accounts, the functioning of the DTCC system, including reversal of the ACATS transfers,[132] lack of clarity in the purchase agreement and simple human confusion as employment relationships and job functions changed.

197.    These problems produced frictions and enormous added costs that might have been avoided by advance planning and analysis as well as more time to adjust assumptions

---

131. Contrary to statements by LBHI in its disclosure statements [cite], the Trustee never specifically consented to the transfer of subsidiaries.  The Trustee was informed about them in a telephone conversation with LBHI's counsel but had not even been appointed when this call occurred.  Representatives of LBI advised by others, not the Trustee, voted for and executed the transaction.  Trustee's Third Interim Report at ¶ 109, n.13.

132. *See* Section V.A.4.

to reality.  Fortunately, thanks to the tireless efforts of many professionals and some former LBI

personnel, no obstacle was significant enough to derail the transfers as a whole — though it was

not always clear that this would be so.  The process of transferring property through

intermediaries without being a viable broker-dealer with an ongoing operation took time and

expense to implement and met with hesitancy, uncertainty and sometimes prolonged refusal from

market participants.  At an operational level, the transfer or registration of tens of thousands of

separate securities, mutual funds, money market funds, and other investment products proved to

be filled with unexpected hurdles.  These were time consuming to resolve and ultimately delayed

the actual transfer of property.

198.    One example was the Trustee's lack of full and immediate access to

records and computer screens and systems normally available to a broker-dealer as discussed

above with respect to JPMC.[133]  Similar problems were initially encountered at DTCC, which did

not provide access to screens for the first three weeks of the liquidation.

199.    Another example was the Trustee's lack of medallion authority for

transferring physical securities.  Shortly after September 19, LBI's "medallion guarantee"

expired.  In the securities industry, medallion stamps guarantee signatures on documents

associated with the ownership, registration, and transfer of securities.  The purpose is both to

protect the securities' holders by limiting fraud and also to limit the liability of those acting or

relying on transfer instructions.  Before issuing a medallion stamp, the three programs that

provide medallion stamps require their "members" to post a cash bond, obtain insurance, and/or

---

133. *See supra* Section V.A.4.

provide an indemnity associated with reliance.  These protective measures allow those relying on a medallion guaranteed signature recourse should the guaranteeing party fail to perform.

200.    Historically, LBI had been a member of the New York Stock Exchange's "Medallion Signature Program."  When LBI's medallion expired, the Trustee was unable to obtain renewal of the medallion under reasonable terms.  The NYSE's administrators demanded the posting of a bond equal to the value of the largest security to be transferred (at the time at least $150 million).  Left in the paradoxical position of being charged with the transfer of securities to LBI's former customers but lacking the operational tools to do so, the Trustee relied on third parties or receiving parties to provide the medallion guarantee for his representatives' signature.  In instances where Barclays or Ridge was not the receiver of the transferred accounts and the related assets, DTC required (and still requires) that the Receiving Broker complete and medallion-stamp a form agreement indemnifying DTC with respect to the transfer of the securities for the benefit of a prime brokerage customer.  The result was often that, while the Trustee was prepared to transfer the assets in an account, the customer's new broker-dealer was unable or hesitant to complete required transfer paperwork.  Ultimately the customers were able to convince their new brokers of the need to complete the paperwork, but these operational issues caused delays of days, if not weeks in some cases.

201.    The Trustee's subsequent attempt to join the Securities Transfer Agents Medallion Program ("STAMP") was also unsuccessful.  The Trustee was unable to obtain the insurance sponsorship and policy, or to provide the extent of indemnification, required for participation in STAMP.

202.    Changes within SIPA could readily eliminate some operational hurdles. As one alternative, SIPA could guarantee the trustee's signature with respect to transfer agents,

08-01420-scc Doc 369250 Filed 08/256/26/14 Entered 08/256/26/14 518:39:19 Main Appendix Documents 1 Through 191 Pg 99 of 191 Pg 100 of 1129

94

specifically authorizing their reliance.  When faced with an unwilling transfer agent, the trustee could direct a transfer agent to this provision.  Alternatively, SIPA could directly authorize the trustee to obtain a medallion stamp and provide a guarantee from the SIPC fund as an alternative to the regular insurance demanded by medallion administrators.

203.    These are merely some examples of delays, inefficiencies and adverse impacts to the customers and creditors from the Trustee's lack of the same access to the system information and industry relationships that LBI had as a functioning broker-dealer.  The challenges the Trustee and his professionals faced were largely invisible to the customers whose accounts were treated as intact despite delays in transmissions of property.  As will be noted, this was in itself a signal feature of this liquidation and a testament to the manner in which SIPA serves its key purposes, even in the most strained and unforeseen of circumstances.  But it does not mean that improvements could not be made for future proceedings.

**D.      The Customer Accounts Included In The SIPA Proceeding**

204.    Initially, in addition to the effort to effect the Neuberger Berman and Barclays account transfer, the Trustee was confronted with thousands of major customer accounts that remained with LBI.  These fall into four major categories.  Together they filed claims aggregating over $65 billion, which, even after eliminating obvious duplicates and denials, claims against the wrong entity, and the like, amount to $35 billion to $40 billion of claims.  While allowed amounts will be much less, these claims have had to be analyzed, researched, formally determined, objected to, discussed at length with claimants, and in many cases litigated.  As described below, a liquidation of any one of these categories of accounts, let alone all four, would in itself exceed any previous SIPA or broker-dealer liquidation.

08-01420-scc Doc 360 Filed 08/25/26/14 Entered 08/25/26/24 18:39:19 Main Appendix Document Documents 1 Through 9 Pg 101 of 1129

95

1.    **Prime brokerage assets**

205.    One significant contributing cause to the increased size and complexity of the SIPA liquidation was the decision communicated by Barclays on September 29 — ten days after the liquidation commenced and more than a week after finalization of the clarification letter to the APA — that it would not assume control of the prime brokerage accounts.  This position surprised the Trustee, SIPC and regulators, and surprised even some of the Barclays-employed personnel involved with these accounts.  The rejection of these accounts by Barclays left the Trustee with additional large, complicated accounts to administer, determine and distribute with filing date values far in excess of $5 billion — enough in itself to dwarf any previous SIPA or brokerage liquidation, save perhaps that of MJK Clearing, Inc. ("MJK").  The innovative account transfer protocol which the Trustee implemented with SIPC and regulators, and which was effectuated pursuant to the flexible account transfer provisions of SIPA, allowed for the return of substantial amounts of property to account holders before the claims process began.

206.    This unanticipated prime brokerage account transfer protocol procedure was nevertheless logistically difficult, consumed resources that could have been devoted to other purposes, and was undoubtedly less satisfactory to the account holders involved than a purchaser's outright assumption of accounts would have been.  Many accounts could not be transferred in their entirety because of potential liens in favor of other entities, property that was temporarily unavailable or tied up in the LBIE insolvency proceedings, disputes about legal or factual issues, or because account holders chose not to participate.  Without a single destination broker-dealer for all the accounts, many of the prime broker account transfers were only partial.  As a result, over a thousand claims of prime brokerage account holders have had to be handled through the claims process.  They present in some cases complex legal issues and claims that may not be eligible for SIPA treatment.  They are now the subject of formal claims objections,

amounting to several billion dollars, which will in many cases have to be determined through litigation and appeal. Much of this effort and uncertainty could have been avoided had the accounts been assumed by Barclays as originally expected.

### 2. The unknown universe of non-PIM, non-PAM accounts

207.     Many other LBI accounts remained with the Trustee because they were neither in the PAM range acquired by Neuberger Berman nor the PIM range acquired by Barclays. When the Trustee first took control of LBI, there was no definition of which accounts were left behind. The Trustee's professionals received estimates of a few hundred legacy Shearson Lehman or friends and family accounts as well as many thousand RVP/DVP accounts. The Trustee did not know the size or composition of this miscellany of customer accounts that would remain behind until the claims filing deadline had passed.

208.     The Trustee has in fact received over 8,000 claims from a variety of individuals, companies and institutions. Some of these claims relate to accounts that were not in the PIM or PAM range and were not attractive to Barclays for several possible reasons. Many accounts were maintained in a separate account range for primarily non-trading, custodial accounts for large corporations and institutional clients for which Lehman did underwritings or other types of transactions. Many others were maintained in separate account ranges for clients who wished to trade in non-traditional products such as TBAs (so called "MTS Accounts" because of the system on which they were maintained) and F/X trades (so-called "ITS" Accounts). Although many claims were incorrectly asserted against LBI, duplicated others, or were for empty accounts, nearly 700 claims have so far been determined to be allowable with a value of over $2 billion. None of these accounts was considered a PIM- or PAM-range account, and Barclays did not acquire them. Over 1,300 objections to the Trustee's adverse

determinations have been filed, though approximately one hundred have already been withdrawn or denied by Court order.

209.    To be sure, these claims may seem to be a relatively small part of the LBI customer universe that existed on the filing date.  But in any other context, the perception would be much different.  Administering a claims population of this complexity and with claims of this magnitude is a far from trivial exercise.  No prior SIPA proceeding has involved anything close to the dollar amounts of customer property and customer claims in issue.  The next largest, MJK, involved less than $1 billion of allowed claims and customer name securities returned to customers, in addition to $10 billion in account transfers.

### 3.    The LBIE clearing and house customer accounts

210.    A third source of customer claims, which have not yet been determined, derives from the undisclosed clearing arrangement and corresponding omnibus accounts that LBIE maintained with LBI on behalf of over a thousand large, primarily hedge fund accounts as well as on its own behalf.  LBIE filed a claim totaling over $12 billion on behalf of itself and the underlying clients to this omnibus account.  (Some of the clients filed their own claims as well, and some have contended that they should be considered direct customers of LBI despite the records to the contrary and their treatment for regulatory purposes.)  A substantial reconciliation effort between the professionals at PricewaterhouseCoopers ("PwC"), which serves as LBIE's administrators, and Deloitte, the Trustee's financial professionals, has been underway for many months and is now nearing partial conclusion.  The difficulty of the task is complicated by the fact that LBIE's books closed on or before September 15, after the LBIE insolvency proceeding began, while LBI's SIPA filing date was September 19 and its accounts were open through the

08-01420-scc Doc 360-2 50 Filed 08/26/14 Entered 08/26/24 18:39:19 Main Appendix Document Documents 1 Through 1 Page 103 of 191 Pg 104 of 1129

98

intervening week, when over 100,000 "failed to deliver to LBI" trades and over 95,000 "failed to receive from LBI" trades were booked or settled with counterparties.[134]

211.    The LBIE customer claim exercise alone should be compared to the next largest clearing broker SIPA liquidation, that of Adler Coleman Clearing Corporation.  That liquidation involved a final allocation of $759.5 million to customer property, less than ten percent of what has been claimed by LBIE and a small fraction of what the allowed amount is likely to be.  And the Adler Coleman liquidation did not involve the complicated and unprecedented jurisdictional and other issues attributable to the nature of the agreements and trading strategies of the clients, LBIE's status as a broker-dealer operated and being liquidated under a foreign nation's regulatory and insolvency regimes and the wide array of products at issue in the LBIE account.

### 4.    The affiliate customer claims

212.    Finally, LBI affiliates, principally LBHI and other Chapter XI entities, have asserted over 650 customer claims totaling over $19 billion.  These include claims by some of the subsidiaries that were transferred out of LBI mere hours before the SIPA Proceeding began.  The Trustee believes that many of these accounts are subordinated by agreement, by understanding, or by operation of law or otherwise are not eligible for customer treatment or subject to reduction for an affiliate's indebtedness.  Some, however, may be on behalf of underlying clients and may involve property subject to customer segregation rules, and may therefore be allowable as customer claims.  Indeed, three claims on behalf of one LBHI affiliate

---

134. *See* Trustee's Third Interim Report at ¶ 23.

08-01420-scc Doc 869250 Filed 08/256/26/14 Entered 08/256/26/24 18:39:19 Main Appendix Document Documents 1 Through 94 of 191 Pg 105 of 1129

99

(Woodlands Bank, f/k/a Lehman Brothers Commercial Bank), totaling over $500 million, have already been allowed.

213.    The LBHI and other affiliate customer claims represent yet another unexpectedly significant claims population in terms of amount of property involved and potential complexity.  These claims were explicitly removed from the transaction only in a draft of the so-called clarification letter to the APA circulated a few hours before the closing on Monday, September 22, 2008.

## E.    The Largest Broker-Dealer Liquidation Ever

214.    In short, what may have been conceived of as an incidental customer claims liquidation proceeding has in effect resulted in a liquidation involving four sets of claim groups — the prime brokerage accounts; the miscellaneous non-PIM, non-PAM customers of LBI; the LBIE omnibus account; and the LBHI and other affiliates' accounts — any one of which could qualify by itself as the largest SIPA liquidation ever.  To these substantial claim proceedings must be added general estate claims filed in amounts exceeding $60 billion.  These aspects of the claims process have proceeded in combination with the largest customer account transfer in history, the return of over $520 million in misdirected funds and pursuit of recoveries from counterparties so far totaling over $2.7 billion, as well as efforts to recover or reduce to the Trustee's control billions of dollars of cash and securities.  LBI was also at the center of a web of transactions with other LBHI companies, including its own former subsidiaries, which suddenly came to an end in various stages of execution.  LBI's position in the Lehman enterprise has entailed substantial potential claims among administrators requiring reconciliation and analysis and has led to an average of ten subpoenas and document requests per week from third parties and regulatory authorities.  In addition, as of the filing date, hundreds of counterparty transactions, such as repos, stock loans, foreign exchange, and OTC options, remained open.

F.     **SIPA And The Customer Protection**
       **Rules Scheme Largely Worked Well In Spite Of It All**

215.     Despite these unanticipated developments and other difficulties addressed below, one of the untold stories of the demise of Lehman is the degree to which SIPA worked and protected most customers' accounts.  While the Trustee has identified some issues with LBI's regulatory compliance, largely in the late stages of its existence, to a large degree the Financial Responsibility Rules proved effective.  Most customer property was relatively intact.  Even numerically significant dollar shortfalls in amounts available to customers, should they eventuate, would be a small fraction of the over one hundred billion dollars of customer property that existed on the filing date.  (A significant portion of any such shortfall, should it eventuate, would result from property taken by Barclays or appropriated by secured lenders or depositories as collateral, differences in the manner in which some transactions or accounts may be treated for regulatory as opposed to SIPA purposes, and difficulties in accessing property in overseas locations that were considered "good control" locations for regulatory purposes but in fact became tied up in foreign insolvency proceedings with rules of their own.)

216.     Most importantly, the vast majority of direct LBI unaffiliated, public customer accounts — more than 110,000 accounts encompassing approximately $89 billion in value — have been transferred.  Despite operational difficulties, customers were almost universally able to resume trading in those accounts seamlessly and within days, avoiding loss, eliminating confusion and anxiety and avoiding further disruption of the capital markets beyond that caused by the failure of the rest of Lehman Brothers and the near-failure of other leading financial institutions.  In addition, a substantial majority of property in the PBAs — a type of account never envisioned when SIPA was created or last amended — totaling more than

08-01420-scc Doc 369450 Filed 08/256/16/24 Entered 08/256/16/24 518:39:19 Main Appendix Document
Documents 1 Through 9 Page 106 of 191 g 107 of 1129

101

$3 billion could be returned to clients through other financial institutions using an innovative protocol made possible by the SIPA account transfer provisions.[135]

217.   Even in an environment of a partial takeover of customer accounts, with constant disputes with Barclays and affiliates over access to systems and shared resources and over the meaning of the basic contractual documents, with depositories limiting access to screens, with lack of direct access to LBI personnel familiar with the broker-dealer's business and systems, and with the world in financial turmoil and confused about the nature and interdependency of the Lehman insolvency proceedings around the world in a liquidation begun on a triple-witching day, SIPA worked remarkably well, thanks largely to the cooperative efforts of the Trustee, SIPC, the regulatory authorities, and their many skilled and dedicated professionals.

## VIII.   SOME LESSONS AND CAUTIONARY TALES

218.   That SIPA worked well for so many customers does not mean that it worked perfectly against the limitations imposed by the LBHI-Barclays transaction, the conduct of various parties described in this Report, and the operation or administration of U.K. and other foreign insolvency regimes.  Proper planning and more notice to and involvement of SIPC and any potential trustee in planning and negotiation might have avoided surprises that delayed and in some cases threatened to frustrate the account transfer and claims processes.  More advance planning would have led to clearer demarcations of asset ownership, responsibilities and access to records and systems; focusing on these key details in advance would almost certainly have yielded a sounder plan for correlating available assets with obligations to customers.

---

135. *See* Prime Brokerage Protocol; *see also* Trustee's Third Interim Report at ¶ 16; Trustee's First Interim Report at ¶¶ 25-33.

## A.    SIPA:  More Than An Afterthought

219.    No matter what the parameters of a holding company collapse, the needs of customers and the possibility of a SIPA liquidation should be more than an afterthought.  The broker-dealer was at the heart of Lehman's operations.  Its liquidation and protection of its customers should have been more than a footnote to plans to dispose of its other valuable assets.  Indeed, wherever possible, the emphasis should be on arranging customer account transfers even before commencement of SIPA proceeding.  When that does not happen, dividing assets and liabilities among a holding company, a trustee for a broker-dealer entity with duties to return property to customers, and an entity acquiring some parts of the brokerage business requires forethought and participation in the public interest both by those who know the brokerage operation and those who will administer its liquidation.

220.    What follows are some examples of unnecessary issues and unexpected pitfalls that could be avoided by better planning.  We also offer  policy suggestions for consideration in connection with any current or future review of the workings of the SIPA statute.  Most, if not all, of these suggestions would apply to a liquidation as part of a broader liquidation pursuant to the orderly liquidation authority provided for in the financial reform legislation as well as a SIPA liquidation conducted on a standalone basis or in parallel with Chapter XI proceedings.

## B.    The Desirability Of Account Transfers And Costs Of Partial Account Transfer

221.    One set of problems that has permeated the liquidation has been the partial nature of the Barclays transaction — the sale of some, but far from all, of the customers' accounts together with many other assets and all the books, records and systems associated with

08-01420-scc Doc 360 Filed 08/25/12 Entered 08/25/12 51:18:39:19 Main Appendix Documents 1 Through 9 Pg 109 of 191 Pg 109 of 1129

103

the broker-dealer, only some of whose accounts were transferred.[136] Without commenting on pending disputes regarding the status and interpretation of the APA and other sale documents, it is fair to state that the negotiation of the asset purchase and resulting agreements suffered from a lack of clarity about what assets and even what customer accounts Barclays was obtaining as part of this partial asset and account transfer. A clearer identification at the outset of negotiations of exactly which customers' accounts would go to Barclays and which would remain with the LBI trustee and the nature of the associated assets would undoubtedly have led to more focused negotiations and more focused agreements. Steps should be required to be taken in advance, not after the fact, to confirm in at least in broad terms the location and availability of the cash and securities to be returned to customers and of the systems needed to maintain visibility into them.

222. Whether terms that might have appeared desirable to assure an effective liquidation that maximized protection for all customers would have been acceptable to Barclays or another purchaser is a moot point. In future liquidations regulators and customer representatives might well insist that an acquirer take all or substantially all accounts or insist on other specific protections for remaining accounts and a Trustee's operational and informational needs. They might insist that the holding company proactively explore account transfers to more than one firm so that maximum protection is afforded customers and maximum value is realized for the transfer. In the Lehman situation, Barclays obtained extremely valuable, high worth customer accounts for an insignificant goodwill payment used to limit its liability and left hedge funds and other accounts behind.

---

136. Counting the PAM accounts transferred to Neuberger Berman and the accounts Barclays left behind or rejected, Barclays in fact took on less than two-thirds of the accounts in number and fewer than half in claim amount.

223.     At the very least, parties representing customer interests should, with the

better planning and access to information we recommend, bargain against a clear baseline of

what needs to be transferred and avoid subsequent uncertainty and surprises.  The Trustee also

recommends that a party with potential responsibility for the customers — whether SIPC, a

putative trustee or a regulator, or a combination of all of them — be involved in the negotiations.

As in Lehman's case, the seller's immediate focus is likely to be its own post-transaction

survival; the purchaser's is with the customers and assets it is taking on, not those it is leaving

behind.  The Trustee also recommends that SIPC be granted increased financial resources, and

flexibility to use those resources, so that assistance and protection could be offered to potential

acquirers as necessary.

224.     Assessing the costs and logistical challenges associated with a liquidation

— and particularly one involving a partial account transfer — necessarily involves time and

information.  In the midst of a crisis of Lehman's proportions, with demands for immediate

solutions, it may be difficult for decision-makers to stand against the tide calling for immediate

action in order to inquire into operational and account details.  Therefore, as a complement to an

industry-wide liquidation planning initiative as detailed below, a potentially useful amendment to

SIPA would be a requirement that a minimum set of additional judicial findings be made in the

event of partial account transfer.  These findings would be designed to ensure that, in the rush to

complete a partial transaction, parties pay more attention to the customer population as a whole.

The findings would require some showing of the extent of the customer population not being

transferred and of the degree of protection those customers would be expected to receive, as well

as assurances about available assets, customer property and future access and cooperation.  The

08-01420-scc Doc 369-250 Filed 08/25/26/14 Entered 08/25/26/24 51 18:39:19 Main Appendix Document
Documents 1 Through 19 Pg 110 of 199 111 of 1129

105

parties would be forced to focus before the fact on some of the things that in LBI's case only the Trustee focused on and only after the fact.

225.     In the case of LBI, one thing that the Trustee and SIPC were able to focus on was the timing of the settlement process and its possible impact on account transfers and customer claims.  Although some assumptions about the expected ease of that process turned out to have been hopelessly naïve, the Trustee and SIPC included a provision in the order that SIPC asked the District Court to enter that allowed trades made before the SIPA filing in the early afternoon of September 19th to be settled through that evening and the close of business on the following Wednesday.  In the opinion of the Trustee's professionals, allowing these thousands of trades to settle, even though unexpectedly impeded by the ACATS reversal, allowed a much "cleaner" and, from the customer's viewpoint, intact set of accounts to be transferred and therefore facilitated the account transfer process.  Inclusion of such a provision, as well as mechanics of the account transfer process itself, ought to be considered in any future SIPA liquidation in which a significant account transfer process is contemplated.

## C.     The Information And Operations Gap

226.     A related set of problems arising from the partial nature of the transfer was that Barclays acquired all the systems and records as part of the acquisition of assets, while the Trustee was left with insufficient practical access to the same systems.  These issues were compounded by the massive number of systems involved (over 2,700) and the fact that other Lehman entities also had needs for data intermingled with the same records.

08-01420-scc Doc 360250 Filed 08/26/14 Entered 08/26/24 51 39:19 Main Appendixent
Documents 1 Through 19 Pg 10 of 19 112 of 1129

106

227. The LBI Liquidation Order was drafted to guarantee access to LBI books and records in any form,[137] but Barclays argued that the information itself was separate and distinct from access to the Barclays-acquired systems on which the information was housed and also expressed concerns about protection of "intermingled" and possibly confidential information. On a day to day level, many personnel familiar with LBI financials and operations were hired by Barclays; the Trustee was nevertheless dependent on these people for most basic informational and operational services (including even the processing of checks and wires being received into LBI's own bank accounts).

228. For the first several weeks of the liquidation one person, by then an employee of Barclays, was to be the point of contact for virtually all information requests by the Trustee as well as LBHI. Delegation of authority by this person was limited, the number of urgent competing demands was enormous, and her priorities as a Barclays employee were not always the same as the Trustee's. Eventually, after several months and numerous complaints by the Trustee and SIPC, a group with a leader was assigned to work at least much of their time on Trustee projects. This group, as well as what became a "ring-fenced" team of Barclays back-office workers, were ultimately provided for in the transition services agreement between Barclays and the Trustee, but requests still had to be centralized and prioritized by Barclays personnel to a frustrating extent. Availability and priorities were not always what the Trustee asked, requests were vetted by representatives of a party with whom the Trustee would have

---

[137.] The order provides "that all persons and entities are stayed, enjoined and restrained from directly or indirectly removing, transferring, … changing, … or otherwise disposing of, withdrawing or interfering with any assets or property owned, controlled or in the possession of LBI, including but not limited to the books and records of LBI" and "that the Trustee is authorized to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI. LBI Liquidation Order (**Exhibit B**).

fundamental disputes, and the charges for services provided have been costly, amounting to as much as $5.2 million a month and nearly $60 million to date.[138]

229.    For many months Barclays would not even permit the Trustee's professionals to have direct access to basic systems, until threats of litigation by the Trustee led the parties to agree to an interim data access agreement entered in February 2009 and approved by the Court on April 22, 2009.[139]  The Trustee's professionals were dependent on Barclays personnel to book all entries and bring the books and records up to date.  As they have elsewhere noted, similar problems plagued LBHI and its professionals, even with the protection of the hastily-drafted, pre-filing date transition service agreement.[140]

230.    While the Access Agreement enabled the Trustee's professionals to have direct access to interactive systems, it was not so for non-interactive systems.  Barclays continued to preclude access to the latter on the asserted basis that the non-interactive systems contained co-mingled LBI and post-September 19, 2008 Barclays's data.

231.    Even following the Access Agreement, Barclays continued to preclude direct access by the Trustee's professionals to at least two critical systems:  PeopleSoft HR, which contains all LBI employee information, and eDoc, which was a report archive repository. Each of these systems was critical to the Trustee's work.  Although the Access Agreement provided for access to systems even if they contained co-mingled data, Barclays continued to refuse to provide access to any systems that contained Barclays' data.  The Trustee's

---

138. In recent months these costs have been declining as certain tasks have been completed and the Trustee has ceased to use various systems or migrated them to other sources.

139. Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Approving a Systems Access Agreement between Trustee and Barclays Capital Inc. (LBI Docket No. 1018).

140. See Examiner's Report at 1996.

08-01420-scc   Doc 369   Filed 08/25/11   Entered 08/25/11 18:39:19   Main Document
Documents 1 Through 19   Pg 113 of 191   Pg 114 of 1129

108

professionals formulated a resolution to the problem by (1) creating a copy of the Peoplesoft HR system that contained only data prior to September 19, 2008, and (2) working with Barclays to use the technical features of the eDoc system to limit the Trustee's access to only those archived reports associated with LBI.  Although this resolution was achieved, it was not without significant additional expense and delay to the progress of the liquidation, and serves as an apt example of the unanticipated and complicated data access issues presented in this liquidation.

232.   Preliminary efforts to create closing balance sheets and reconciliations — something Barclays' counsel has professed disbelief had not been done immediately during the Barclays litigation — have had to be delayed for many months and still have not been completed:  originally because Barclays' priority to the extent any work of this nature was performed was to close the books for LBHI, and more recently because of manpower and professed litigation concerns.  The Trustee's efforts to investigate the Barclays repo were impeded because his professionals had no direct access to the MTS and ADP systems to reconcile with DTCC records and no visibility into the transaction.  Instead, those professionals had to rely largely on a spreadsheet from Barclays.  In fact, the Trustee's professionals had to rely on Barclays employees to make entries into the books and records.  Booking what was believed to be part of the Barclays repo on the basis of the collateral in the FRBNY Repo was not completed until late October, more than a month after the liquidation began.  Barclays did not complete booking the actual elements of the collateral used for the FRBNY Repo until more than six months later.  In the meantime, the Trustee had to operate with inaccurate and incomplete information.

233.   In December of 2009 — well over a year after the liquidation began — the Trustee and Barclays agreed on a comprehensive transition services agreement approved by the

08-01420-scc Doc 369250 Filed 08/26/14 Entered 08/26/14 18:39:19 Main Document
Documents 1 Through of 191 Pg 115 of 1129

109

Court on March 22, 2010 (the "TSA").[141]  Extensive time was involved in these after-the-fact

negotiations, and they were conducted at a time when Barclays was already in control of systems

and key personnel, placing the Trustee at a disadvantage.  Barclays was also in control of third-

party vendor relationships necessary to support certain services to the LBI estate, and the Trustee

generally had little or restricted visibility into those relationships — despite the fact that Barclays

was demanding that the Trustee pay LBI's share of the charges.  In the Trustee's view the

resulting TSA is the best that could be bargained for under the circumstances, and not unfair

given the parties' relative position, but the services are still expensive and inevitably leave the

Trustee dependent to some degree on a party with its own priorities and with which the Trustee

is in an adversarial relationship.  Progress on the TSA was slow and painstaking, and at one point

the Trustee drafted and considered filing a motion to have the terms of access to records and

information established by Court order.[142]

234.    The acquirer's *de facto* control and the lack of clear rules and agreements

led to many delays and mistaken assumptions in the hectic early days of the liquidation when

reliable information was needed but often could not be obtained.  Not only can delay,

inefficiency and mistakes result from such a situation, but opportunities are presented for

---

141. Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Approving a Transition Services
Agreement between Trustee and Barclays Capital Inc. (LBI Docket No. 2883).

142. An additional problem associated with Barclays' control of the records was the incorrect generation and mailing
by Barclays of "LBI" account statements after the Filing Date.  These erroneously created account statements
on LBI's signature green letterhead purported to reflect activity through September 30, 2008 — an obvious
impossibility.  In addition to purporting to state account holdings at LBI after the Filing Date, some account
statements referenced Barclays Capital Inc. as the new manager of the accounts, giving the erroneous
impression to those accounts that Barclays had left behind that they were part of the account transfer to
Barclays.  Account statements were also mailed for certain accounts used solely by Lehman operational
personnel to track securities transfers, purchases, and sales.  In most, if not all, instances, account holders had
not been aware of these operational accounts until they received the statements.  In addition to providing
inaccurate and confusing information to account holders, these statements added to uncertainty regarding the
location of these accounts holders' assets between LBIE and LBI, issues that continue to be raised to this day
and are the subject of approximately 70 claims objections.

strategic behavior, some of which have been discussed during the Barclays trial.  Even today

with more experience on both sides and clearer ground rules, the Trustee is sometimes distressed

by a lack of performance on items such as constructing pre- and post- filing date balance sheets,

and the estate continues to pay for many services one might have expected would have been

provided voluntarily, in a spirit of cooperation.

235.    The point is not that the transfer of the PIM accounts did not produce a

substantial benefit or was not a highly desirable transaction.  The Trustee has never disputed that

it did, and was.  But such a transaction may also entail some offsetting and not clearly foreseen

detriments to some customers and to the Trustee's efficient conduct of the liquation.  The

transaction may have benefited thousands of account holders and saved many jobs, at least for a

period of time.  Its implementation did not, however, benefit all customers, and many jobs

eventually were lost.  Account transfers undoubtedly avoided delay and transaction costs to a

significant degree, but the resulting relationship between the Trustee and the transferee broker

also produced other delays and transaction costs.  These tradeoffs should be identified and

carefully considered in advance of any major future liquidation.

236.    If an acquirer is to pick and choose among accounts, there may be limits to

the assets that the acquirer may be permitted to obtain, particularly if assets may be needed for

satisfaction of remaining customer claims.  Certain liabilities may have to be assumed.

Assurances may have to be given that assets will be returned if assumptions prove incorrect and

the assets are needed to satisfy claims of remaining customers.  An acquirer might also be

obligated to assign certain employees to the Trustee or SIPC and make certain critical services

and systems available at no or nominal cost for some period of time.

08-01420-sccc Doc 360-250 Filed 08/25/12 Entered 08/25/12 15:18:39 Main Document
Documents 1 Through of 1Pg 106 of 19g 117 of 1129

111

237.    At a minimum, the costs and benefits of a partial transfer need to be understood and weighed.  If proceeding on such a basis is justified, arrangements need to be clarified in advance — before the acquirer is driving the bus, not after the doors have closed.  Amending SIPA to require judicial findings relevant to these issues would be one way of guaranteeing that they are appropriately focused on and dealt with in the negotiations.

## IX.    RECOMMENDATIONS FOR FUTURE LIQUIDATIONS WITH CUSTOMER IMPLICATIONS, WHETHER UNDER SIPA OR ANOTHER ORDERLY LIQUIDATION AUTHORITY[143]

### A.    The Need For Planning And Early Involvement Of Representatives Of Customers' Interests

238.    These observations underscore the need for a careful advance planning process in any liquidation in which customer assets and interests are at stake.  SIPC, regulatory authorities and other elements of the market such as clearinghouses and clearing banks need to be directly involved in that process.[144]  The Trustee recommends that knowledgeable operational people need to be accessible to those likely to be charged with liquidating the broker-dealer to explain and share information about the brokerage firm's full range of customer accounts and location of customer and related assets.  This includes customer assets financed by the broker-dealer through repos or other transactions that need to be unwound to assure the availability of property for return to the customers or the transferee.  The practicalities of how operations will be conducted need to be understood and agreed upon in advance, particularly if the broker-dealer is a subsidiary or affiliate of another entity.  (In LBI's case, the complexities were multiplied by the vast number of Lehman entities and their interconnectivity.)

---

143. *See* Dodd-Frank Act, §§ 201-217.

144. The recent financial reform legislation does provide for an increased role for SIPC with respect to account transfers.  *See* Dodd-Frank Act § 210(a)(1)(O).

239.    Since the trustee or other liquidator of the broker-dealer, not its holding company, will be conducting the liquidation of assets or analysis and satisfaction of customer claims, the holding company should not be the sole negotiator for the broker-dealer.  Rather, the potential trustee or liquidator should be given a seat at the table early in the negotiation process.  And for that seat to be meaningful, these parties need direct access to key people and information sources.

## B.    A Required Liquidation Plan

240.    The Trustee recognizes, as the Chapter XI debtors and their counsel have, that the LBHI Chapter XI filing was rushed and preceded by scant opportunity for planning.[145] This is in itself a situation that should not be repeated.  But in the case of Lehman, what planning there was largely centered on maximizing protection for the Chapter XI entities and not on the details as to how the separate SIPA proceeding would be conducted.  Lehman prepared a "contingency liquidation plan" document late on September 13, but the plan focused only partly on LBI, comprised only a handful of slides and warned, "An Emergency Liquidation Plan Can Only Take Place in an Orderly Liquidation" and "There will be no Orderly Liquidation in the Event of a Lehman Default".[146]  This document identified a few potential problem areas at a high level of generality, but set forth no concrete plan for dealing with them operationally.  Much more advance planning and attention to detail are clearly required.  Before it happened, the failure of Lehman and liquidation of its broker-dealer were almost unthinkable; once disaster

---

145. *See Too Big to Fail: The Role for Bankruptcy & Antitrust Law in Financial Regulation Reform: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 111th Cong. 9-12 (2009) (statement of Harvey R. Miller, Senior Partner, Weil, Gotshal & Manges LLP); *see also* Jeffrey McCracken, *Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value*, WALL ST. J., Dec. 29, 2008, at A10.

146. Lehman Brothers, Default Scenario: Liquidation Framework (Sept. 2008) [LBI_PIR_000191] (attached to e-mail dated Sept. 13, 2008 [LBI_PIR_000018]).

08-01420-cgm Doc 369250 Filed 08/26/14 Entered 08/26/24 18:39:19 Main Document
Documents 1 Through of 19 Pg 108 of 19 Pg 119 of 1129

113

struck, it was too late for planning.  While it is to be hoped that there will be no next time, such a

failure is no longer unthinkable.  It should be planned for, like any other potential disaster.

241.    One possible step forward would be a regulatory requirement that each

broker-dealer and, where owned by a holding company, its parent, have in place an up-to-date

liquidation plan that could be monitored by regulatory authorities.  The plan would indicate the

categories of customer accounts and associated assets that would need to be protected and set

forth how possible scenarios would be dealt with, ranging from complete liquidation of all

customer accounts to total or partial account transfer solutions, with details of key operational

steps and the core assets that would have to remain to assure effective liquidation of customer

accounts.  Whatever conditions a potential partial acquirer would have to be prepared to agree to

could be spelled out in such a plan.[147]

242.    The Trustee was handicapped in his administration of the liquidation by

the absence of any such plan and the related inability to locate basic documents and information.

This lack of basic information would also make it difficult for potential acquirers of customer

accounts to perform due diligence or understand the nature of the accounts potentially subject to

transfer.  Even something as simple as a mapping of customer accounts explaining and

identifying the account ranges and agreements associated with them, the applicable systems and

box locations, and the collateral associated with them was lacking.  As noted, the Trustee did not

know, and was given contradictory and erroneous answers about, the number of or types of

customer accounts that would remain in the SIPA proceeding.  Not all prime brokerage account

agreements could be readily located, nor did documentation exist describing the relationship of

---

147. *See* Trustee Recommendation: A Required Liquidation Plan (attached hereto as **Exhibit D**).

prime brokerage account customers to the other Lehman entities. Mutual fund relationships were not listed in any single document or location. Up to date, comprehensive files in a single place did not appear to exist for things like no lien letters and subordination agreements.

243.    The type of plan we envision would be designed to prevent a recurrence of this lack of transparency and would require information and documents and comprehensive mapping of customer accounts to be maintained and updated by regulation or statute. It would include schedules of key systems and information sources and human resources and how they would be made available to a SIPA trustee or other liquidator. A SIPC member would be required to maintain an index of key contractual and other documents including lists of clearing banks and bank deposits, major repo and stock loan/stock borrow counterparties, computer systems, system and information provider vendors with continuing relationships, and contracts with each affiliate. Broker-dealers would also be required to maintain in a readily accessible location subordination agreements, clearing agreements, no lien letters, account contract forms, and actual agreements for major customers and for classes such as prime brokerage customers.

244.    Key systems and vendors and summaries of the contractual commitments, termination provisions and costs should be assembled and updated regularly, and attention should be given to assuring continued provisions by vendors of critical services. This assurance of continued access on some reasonable terms is particularly critical for key services that were shared with affiliates prior to the filing date. Record-keeping systems should be reviewed for currency and accuracy. There should be mapping of accounts with common identifiers for locating collateral. The Trustee and his professionals, when researching counterparty transactions, encountered difficulties in identifying or reconciling transactions because names of counterparties were not uniform and transactions themselves were misdescribed (*i.e.*, trades that

are not repos booked as repos).  Template provisions for transition service and account transfer agreements or protocols could ideally be prepared in advance.  In addition, notices should be prepared to send to appropriate organizations, such as the Securities Industry and Financial Markets Association ("SIFMA") and FINRA, to publicize the need for customers of the broker-dealer to change their wire instructions with respect to funds transfers to accounts maintained at the broker-dealer, to avoid having these funds frozen in the liquidation proceeding.

245.    The plan should also consider relationships, transactions and access to records with remaining affiliates, particularly foreign affiliates, and the timing of the initiation of insolvency proceedings in relation to the SIPA or other liquidation proceeding.  In the case of LBI, a decision had been made by LBHI to transfer LBI's subsidiaries to LBHI in exchange for a note for their value as of the times of their transfer.  Other aspects of the relationships among the companies were not discussed in any detail; LBI was not party to any TSA involving affiliates until recently when the Trustee entered a TSA with LBHI.  The effect of LBHI's Chaper XI filing several days before the SIPA filing was not fully understood, especially its effect in accelerating the entry of LBIE into administration; yet LBIE's status froze customer and other transactions between LBI and LBIE and has greatly complicated the liquidations of both entities.

## C.    Planning Beyond The Broker-Dealer:  Third Party Holders Of Margin, Deposits And Collateral

246.    The plan should also address in a specific way relationships with depositories, clearing banks and holders of collateral.  Ideally, representatives of those institutions should be consulted in connection with the plan.  The manner in which accounts would be handled by DTCC or other clearing organizations holding significant property would need to be addressed, preferably with participation by the clearing organizations themselves.  Possible obstacles to prompt recovery of customer property from "good control" locations in

foreign jurisdictions should also be identified. Although obstacles attributable to differing laws or insolvency regimes present formidable challenges, attention should be given to the terms of customer custody and counterparty agreements that at least minimize these obstacles to the extent possible. The manner in which the often untested emergency rules of exchanges and depositories might work in practice should be closely analyzed against the reality of a brokerage failure, and bankruptcy counsel with SIPA and other relevant experience as well as regulators should be consulted.

247. In LBI's case the CME conducted an emergency, secret auction without any participation by LBI, SIPC or the Trustee. This was an unprecedented transaction and the first such auction the CME had ever conducted. The CME credited or debited to LBI any profits or losses from LBI's portfolio based on the prior day's settlement closes. The result was that acquirers stepped into LBI's shoes on September 18 (the date of the transfers), with significant losses to LBI in the form of margin posted at the CME associated with the transferred positions. At the Barclays sale hearing on September 19 it was announced that this action had depleted all the cash left at LBI.[148]

248. Similarly, on the evening following the liquidation filing and during a recess at the hearing itself, the OCC threatened not to transfer any accounts unless Barclays stepped into LBI's shoes at the OCC. Barclays agreed when it realized that this arrangement was likely to produce a substantial windfall for itself. Regulatory authorities and regulated exchanges contend that these actions are necessary to assure against losses and that they and participants are immune from liability. The more fundamental question is whether this is appropriate policy and

---

148. *See supra* Section V.A.1.

08-01420-sccc Doc 369450 Filed 08/26/14 Entered 08/26/24 51 8:39:19 Main Document Documents 1 Through Pg 100 of 191 123 of 1129

117

whether all or at least some portion of margin that proves to be unnecessary to fulfill obligations should be remitted to a Trustee. The OCC's transfer agreement required margin associated with customers to be transferred to Barclays whether or not the customer was transferred to Barclays, with the result that positions in some of the accounts left behind by Barclays might be unprotected. Additionally, LBI had properly included a debit in its SEC Rule 15c3-3 customer reserve calculation for approximately $500 million of the margin deposited at the OCC. The debit reduced LBI's reserve requirement by approximately the same amount. The treatment of the transfer of all or any portion of this component of the margin other than for the account of customers — the subject of a dispute with Barclays — would have placed LBI in violation of Rule 15c3-3 and left a hole in LBI's customer reserve account.

249.    Sales or transfers are attractive to exchanges because they eliminate risk of loss to the exchange and its members as well as other participants. While the question of exactly what Barclays and others should have obtained and other aspects of these transactions are being or may in the future be litigated, it is not clear that a transfer of all positions and all related property and deposits is an optimal solution from the standpoint of overall public interest. The broader policy question is how protection for clearing organizations and their members must be balanced against the interest of a failed broker's customers and creditors in any residual assets or deposits. The emergency solutions of the CME and the OCC protected the exchanges' customers and members but seem to the Trustee to have unnecessarily deprived the LBI estate of hundreds of millions of dollars of residual margin and to have unnecessarily jeopardized the interests of at least some customers. The Trustee recommends an industry-wide study of these

08-01420-scc Doc 360250 Filed 08/25/16/14 Entered 08/25/06/24 51:18:39:19 Main Appendix
Documents 1 Through 19 Pg 108 of 191 124 of 1129

118

issues, with participation by both foreign and domestic securities and commodities regulators.[149]

What will happen to a broker's positions — and particularly what will happen to margin or

deposits that prove to be excess or that are debited/credited in the broker-dealer's Rule 15c3-3

customer reserve calculation — is an issue that should be addressed by the broker, the exchanges

and regulators in a comprehensive planning exercise.

250.    DTCC in particular holds huge quantities of property for broker-dealers

and their customers.  DTCC did not conduct an emergency auction or sell-off but invoked its

rules to complete and guarantee trades and then liquidated positions over time.  DTCC also

cooperated in transferring accounts or other property, although even on that score it took

precious weeks for the Trustee to obtain direct access to screens.  The Trustee had no access to

DTCC screens until October 10, 2008, over three weeks after commencement of the liquidation.

The Trustee is obtaining an accounting of DTCC's disposition of collateral but believes that

DTCC generally facilitated orderly transfers and liquidations.  Most of the over 400 separately

instructed securities and cash transfers in the account transfer process were effected through

DTCC.  Nevertheless, because of the enormous amount of property DTCC controls and the

central role it plays in property transfers, the Trustee recommends that its rules for insolvent

broker-dealers and operations be studied against the Lehman experience.  The rules are complex

and not thoroughly understood by the brokerage community.  Its system also proved less than

equal to the task of transferring billions of dollars immediately on the evening of September 19.

---

149. Other LBI custodians or depositories around the world exhibited varying ranges of acceptances of the Trustee's powers.  In Israel, a depository would not recognize the authority or the Court, and that situation has resulted in litigation.  (*See* LBI Docket No. 2288.)  In other parts of the world, the transfers were often delayed by uncertainty or an unwillingness to cooperate.

08-01420-scc  Doc 369-50  Filed 08/25/26/14  Entered 08/25/26/24 18:39:19  Main Document
Documents 1 Through of 191  Pg 104 of 191  Pg 125 of 1129

119

Finally, access to key screens for determining location or movement of customer and proprietary assets should be effective and immediate.

251.    The fact that Barclays did not fully assume the trading obligations of LBI also influenced DTCC's actions in the immediate aftermath of the SIPA filing, and caused unnecessary risk and disruption in the transfer of customer securities.  The uncertainties that existed on September 19 about the nature of the Barclays transaction, and the realization that Barclays would not stand behind all LBI obligations to deliver cash or securities, engendered concern on the part of DTCC that the deposit it was holding to secure due performance by LBI of its trading obligations would not be sufficient.  In addition, uncertainty regarding whether LBI's settlement bank would fund LBI's settlement obligations caused DTCC to reverse certain ACATS transfers (transfers pursuant to pre-petition customer instructions to send their property to financially sound brokers) resulting in seizure of customer securities.  Although these securities were appropriately designated as customer securities when the ACATS transfer process began and should therefore have been immune from seizure, DTCC took the position that, following the ACATS reversals, its automated systems lost the ability to distinguish customer from non-customer property.[150]  Following the DTCC seizure, it fell to the Trustee to obtain release of the detained customer property through the "ACATS Settlement," which was approved by the Court on February 11, 2009.  The fact that in ACATS transfers, previously segregated customer property is not protected appears to the Trustee to be an aspect of the system that in itself requires further study.

---

150. It should be noted that it is not the ACATS reversal process that causes a "customer security" to lose that identity.  In order to transfer "customer securities" that were segregated at DTC (whether by a deliver order through DTC, a CNS delivery or an ACATS delivery through NSCC), the broker must have the security in its "free account."  When assets move to the "free account," they are fungible with all other assets therein, and thus potentially exposed to inappropriate seizure.

08-01420-scc Doc 360250 Filed 08/256/14 Entered 08/256/2 51 8:39:19 Main Appendix Document Documents 1 Through 19g 125 of 191g 126 of 1129

120

252.    DTCC is a membership organization whose constituents are themselves securities broker dealers.  These entities reap the benefits of the federal scheme of customer protection, which includes SIPA and the complementary SEC Financial Responsibility Rules, and which were designed to restore and maintain investor confidence by assuring the safety of property entrusted to SEC-regulated broker dealers.  As DTCC and its members are aware, a primary goal of the federal scheme is to insulate customer property from seizure by creditors, with the promise to investors that it will never to be used to pay debts of failing broker dealers. The circumstances of Lehman's collapse were so unprecedented that DTCC itself may not have understood the effect of trying to reverse the ACATS transfers automatically.  In examining its rules, the effect of its automated systems must be analyzed and a balance has to be struck between efficiency of operations and protection of DTCC's membership on the one hand and assuring protection of customer property and integrity of the Financial Responsibility Rules on the other.

253.    On June 4, 2010, DTC and NSCC, the DTCC subsidiaries involved in the ACATS reversals on September 19 and 22, 2008, filed proposed rule changes apparently designed to reduce the risk that customer CNS-eligible securities in transit between brokers using the ACATS system would be subjected to seizure to satisfy the debts of a defaulting broker.[151] These changes and related explanatory material in DTC's Settlement Services Guide would "clarify that securities moving through NSCC's ACATS system are not subject to a lien by DTC

---

151. *See* Self-Regulatory Organizations the Depository Trust Company, Exchange Act Release No. 34-62384, 75 Fed. Reg. 47655 (Aug. 6, 2010).

when they are debited from a delivering Participant's DTC account or when they are credited to a receiving Participant's DTC account."[152]

254.   Questions, however, remain under the proposed rules regarding circumstances under which NSCC (as opposed to DTC) could still impose liens on customer property.[153]  The proposed rule changes also do not appear to take account of non-CNS securities, which are entitled under SEC rules to the same protections against assertions of liens by custodians.  The Trustee applauds DTCC for proposing changes to the rules in light of the Lehman experience but believes there should be no circumstance, however theoretical or improbable, in which customer securities are at risk of lien imposition and seizure by any DTCC subsidiary, whether in connection with the CNS system or otherwise, and would welcome endorsement of this principle as well as further clarification of the proposed rule.

255.   The role of foreign law or procedures on depositories that are considered good control locations for purposes of the SEC customer segregation rules has also proved problematical in the LBI liquidation.  In some cases where LBI held accounts at foreign depositories classified as "good control locations" for SEC compliance purposes, the actual result has been seizure or freezing of assets.

256.   LBIE maintained accounts at foreign clearing houses, exchanges and depots, for example, Euroclear, Swedbank, Israel Discount Bank, BNP Paribas, and Royal Bank of Canada, among others, which were intended to hold customer property, some of which was for LBI's customers.  Not all the money and property in these accounts was present at the time

---

152. *Id.* at 2.

153. *See, e.g.*, The Depository Trust Co., Proposed Rule Change (Form 19b-4), at 16 (June 4, 2010) (describing conditions under which customer securities will be "deemed to be released to NSCC by the receiving Participant, in partial satisfaction of its settlement obligations to NSCC").

LBIE was forced into administration.  Under English trust rules, property actually segregated must be returned to owners, but it was unclear how these rules might apply to cash that should have been, but was not, segregated against the backdrop of the Financials Services Authority's client money rules.  The High Court held that those with funds actually segregated could claim to the extent of those funds against the client money pool.  The Court of Appeal recently overruled the High Court in part, deciding that the LBI Trustee and other parties who actively prosecuted the appeal and who had claims for client money that should have been but was not segregated by the date of the administration (i) could share in the client money pool, and (ii) that the pool could be augmented by unsegregated but identifiable funds required to have been segregated.  In any event, as soon as LBIE entered into administration as a result of LBHI's Chapter XI filing, LBI customer property became unavailable, at least on any ready basis, with a potential shortfall in property to be returned to customers.[154]  Similar problems or delays have arisen in other jurisdictions such as Japan.  The SEC might wish to review its rules and require further assurance, (i) that property and cash in depots maintained by affiliates or others that are considered good control locations actually are maintained in segregation in these accounts and (ii) that the property and cash actually are accessible under the laws or procedures of the applicable foreign jurisdiction.  As noted earlier, review of the terms of agreements relevant to foreign custody and deposit accounts in light of the LBI experience would also be in order.

**D.**     **Possible Requirement For Additional Court Findings**

257.    One statutory step that would focus attention on planning and provision of information and would complement the above recommendations would be a requirement for

---

154. *See* Motion for an Order Approving Trustee's Allocation of Property of the Estate, at ¶¶ 95-6 (LBI Docket No. 1866).

08-01420-scc Doc 369250 Filed 08/256/14 Entered 08/256/24 51 8:39:19 Main Appendix Document Documents 1 Through 9 Page 8 of 191 129 of 1129

123

court findings on customer-related matters in connection with transactions such as partial asset sales or account transfers in which the liquidated broker-dealer is asked to participate. The findings in the order approving the sale transaction in the Chapter XI proceeding focused, as required by Chapter XI, on the transaction from the point of view of the Chapter XI debtors and their creditors. Additional findings might be required in SIPA cases as to the approximate number and magnitude of customer accounts and property involved and the extent to which provisions have been made to assure three things: (i) the likelihood of reasonably equal and adequate treatment of all non-affiliate customers, whether their accounts are transferred or left behind; (ii) the SIPA trustee's or other liquidator's effective access to customer property, wherever located, to assure the reasonably fair and adequate treatment of all customers; and (iii) adequate continued access to books, records and personnel, including provisions for cooperation at no or nominal cost. SIPC or any SIPA trustee or other liquidator and the SEC would have to support the adequacy of the showing made by the proponents of a transaction. Circumstances ordinarily would not permit extraordinarily detailed findings to be made, but requiring findings on these matters would force the parties to focus some attention on the interests of the broker-dealer and, most importantly, provide information to, and negotiate certain key parameters with, those primarily concerned with customer protection.

**E.      Clearing Bodies, Set Off And Liquidation Rights,
          Visibility And Access To Information — Balancing Safe
          Harbors With Quid Pro Quos For The Protection of Customers**

258.    As long as the securities industry is dependent on private sources such as the clearing banks and DTCC rather than governmental sources such as the Federal Reserve for clearing operations, these entities will need security and should not be prevented from exercising legitimate rights of secured creditors in future liquidations, provided that they act reasonably in

08-01420-scc Doc 369 250 Filed F08/266/14 Entered 08/266/14 518:39:19 Main Appendocument
Documents 1 Through 9 Pg 130 of 191 Pg 130 of 1129

124

the exercise of those rights. The LBI experience teaches, however, that safeguards are necessary with respect to the manner and visibility in which rights are exercised.

259. Clearing banks held enormous amounts of LBI collateral which they were able to hold or liquidate with little or no visibility or accountability until well into the LBI SIPA proceeding. The Trustee continues to investigate these activities and may assert claims to the extent customer or proprietary property was improperly seized or liquidated. Visibility and accountability should, however, be contemporaneous and complete rather than after the fact and partial.

260. In the early days of the LBI liquidation, the Trustee had no access to data screens at LBI's clearing bank, JPMC, and even when access was obtained in principle it often was impeded in practice by mistakes and bureaucratic obstacles. In the ordinary course of business, these data screens permitted LBI to monitor activity in customers' accounts. JPMC froze screen access before the commencement of the SIPA liquidation, but continued to process transactions in LBI's accounts through and beyond close of business on September 19, 2008. This ultimately resulted in the Trustee and his professionals expending substantial resources to identify the ownership and interest in securities that were part of trades or other transactions that settled during this JPMC-imposed blackout period. The Trustee and his professionals had to reconcile accounts to the last records reflecting positions in LBI's accounts before the blackout period in order to assess claims as of the filing date to account for accruals going forward. Even more significantly, this freezing of access prevented normal processes for accessing account information and giving instructions for segregating customer property from being implemented. The result was that the Trustee had no visibility into whether customer property believed or intended to be segregated was in fact seized.

261.    Issues of information access are intrinsic to any system where the entities on which the broker-dealer is reliant to provide information have an inherent conflict of interest, either as purchasers of assets or as creditors of the estate.  To remedy the conflicts caused by the foreseeably adverse nature of these relationships once the broker-dealer has entered liquidation, the bilateral information systems on which a broker-dealer relies in conducting business with its clearing bank must have the capability to maintain visibility to information, even if electronic trading access to accounts is cut off or activity in the accounts is frozen.  Requiring systems to maintain visibility will also ensure that any actions taken by clearing banks in their capacity as creditors of the broker-dealer's estate are done with complete transparency and accountability.

262.    Ultimately, it took several weeks for the Trustee to finalize a confidentiality agreement with JPMC; even with an agreement in place, access was limited to certain identified people (only after they signed individual confidentiality agreements with JPMC) and sometimes denied because of bureaucratic misunderstandings or confusion.  It was a great surprise for the Trustee's professionals to learn for the first time after the fact, in the midst of account transfers and assessment of assets available to satisfy customer claims, that hundreds of millions of dollars of fixed income securities held for prime broker accounts and believed to be in segregation had in fact been seized by JPMC.  The contractual relationships and course of dealing relevant to JPMC's actions is being investigated by the Trustee and discussed with JPMC.  But, whatever the merits, this is not something a SIPA trustee and his professionals should learn about after the fact because of lack of access to information.  Account transfers and realization of assets were impeded, and the expenses of administration greatly increased, because of this simple lack of immediate access to real-time information.

08-01420-sccc Doc 360250 Filed 08/256/16/14 Entered 08/256/16/24 51 8:39:19 Main Appendix Document Documents 1 Through 0 of 191 Pg 132 of 1129

126

263.     The Trustee recommends that future SIPA trustees or other liquidators be provided with continuous, unimpeded access to systems that monitor broker-dealer activity, and that transmission of information by clearing banks be continued without interruption on the same basis as prior to the SIPA proceeding.  This information flow should include daily reports identifying (a) CUSIP-level detail of securities transactions that will occur post-filing, including trade settlements and unwinds of repurchase transactions, covering both the debtor's outgoing obligations and anticipated receivables and (b) securities that the clearing banks have liquidated.

264.     Further, clearing banks should be required to respect the Financial Responsibility Rules and the broker dealer's duty to comply with SEC Rule 15c3-3 and strictly respect the segregation of all customer property that was or should have been at any time even arguably segregated for customers in compliance with Rule 15c3-3.  In cases of doubt, banks should not assert or implement setoff or foreclosure rights against property in such accounts until such time as the Trustee and SIPC or others charged with the liquidation agree, with notice to regulatory authorities.

265.     The Trustee makes the following additional recommendations with respect to clearing organization relationships:

- To the extent that the clearing banks are aware that any securities in their possession may be treated as customer property, they should be required to notify the trustee and SIPC or other liquidator of the particulars, and to segregate and hold in custody those securities, thereby providing the Trustee the opportunity to recover such customer property.

- To the extent that the liquidator becomes aware and notifies a clearing organization that any particular collateral in its possession may be customer property, the clearing entity should be required to segregate and hold in custody those securities and cooperate in providing information to the trustee that will permit the trustee to determine whether the securities at issue are customer property and how they came to be seized by the clearing bank.

- To the extent the liquidator becomes aware and notifies a clearing bank that any particular collateral in its possession is necessary to satisfy customer claims, the clearing

08-01420-scc Doc 360250 Filed 08/26/14 Entered 08/26/24 51 18:39:19 Main Appendix
Documents 1 Through of 19g 133 of 1129

127

banks should be required to negotiate in good faith with the trustee for substitution of such collateral.

- Banks should not be able to prevent access to systems for allowing the broker-dealer to receive property or to impede the normal processes for designating customer property as segregated or to be deposited into safekeeping accounts.

- Paragraph VII of the order commencing the SIPA liquidation stayed foreclosure against LBI property held as collateral by counterparties to repos and securities lending agreements for twenty-one days but provided an opportunity for relief from the stay if SIPC and the Trustee consented to a third party request. This consent was usually granted but allowed some transparency (as well as providing a source of funding in the early days of the liquidation). Paragraph VIII (F) of the order excluded clearing banks from the stay. Consideration ought to be given to including them in the temporary stay, at least for a limited period of time, in order to increase transparency, subject to allowing a lift of the stay by consent of SIPC, the trustee, or other liquidator, if relief is requested by a clearing bank in order to advance a clearing bank's reasonable efforts at self-protection.

## F.    Must There Be A Single Fund Of Customer Property?

266.    Under SIPA the only customer property actually deemed to be property of a particular customer are customer name securities — physical securities held by the broker-dealer and registered (or in the process of being registered) in the customer's name. SIPA § 78*lll*(3).  All other securities positions, even when held in identifiable accounts or in certain identified account ranges, are considered part of a fund of customer property in which a customer has a claim to a pro rata share based on the customer's net equity in proportion to the total of all net equity claims.[155]

267.    Originally, SIPA had provided for "specifically identifiable" customer property.  *See* SIPA § 78fff(a)(1)(A) (1970).  This definition included securities in book entry

---

[155] *See* Order Approving Trustee's Motion for Allocation of Property of the Estate, In re Lehman Brothers Inc. (LBI Docket No. 2743) ("[P]ursuant to 15 U.S.C. § 78*lll*(4)(D),the amount of any property of LBI which the Trustee determines would, upon compliance with applicable laws, rules, and regulations, have been set aside or held for the benefit of customers to prevent shortfalls in Customer Property, including without limitation those shortfalls identified in the Trustee's motion papers, shall constitute and be allocated as part of "Customer Property.").

form registered in the customer's name and other property that could be identified as held for a particular customer, including some property segregated in bulk for customers. As with the narrower class of customer name securities under the current statute, *see* SIPA § 78*lll*(3), this property could be returned to the customer in kind, if available, without becoming part of the pooled fund of customer property.

268.     The concept that some but not all securities would be "'specifically identifiable' did not adequately reflect the segregation practices that had evolved to meet changes in the marketplace."[156] This concept was abandoned when Congress amended SIPA in 1978 because the definition was hard to apply and led to anomalous, unfair results, as it could be a matter of chance which customers' securities were properly segregated and which were not on the filing date. Under the 1978 SIPA amendments, Congress eliminated the concept of "specifically identifiable" property in favor of the much narrower concept of "customer name securities," which consist of "securities held by the debtor for the account of a customer on the filing date, and which are registered in the name of the customer or are in the process of being so registered at the debtor's instructions."[157] "Excluded from the definition are securities in the name of the customer, but that have been made negotiable by endorsement or otherwise."[158] As such, a customer may now only reclaim securities "if there is a nonnegotiable certificate in [his

---

156. Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers*, 12 CARDOZO L. REV. 509, 529 (1990) (describing progression from "tagging the securities or placing them in envelopes marked with the customers' names," to "bulk segregation process" that earmarked securities for groups of customers, to the "one box" bookkeeping system).

157. *Id.* at 540-41; SIPA § 78*lll*(3).

158. Don & Wang, *supra* note 156, at 541.

08-01420-sccc Doc 360250 Filed 08/25/06/14 Entered 08/25/06/24 518:39:19 Main Appendix Document Documents 1 Through 11 Pg 135 of 191 Pg 135 of 1129

129

or her] name in the debtor's possession or control."[159]  Nevertheless, many customers mistakenly conceive of positions appearing on their account statements as being held in a segregated or designated account for them, much as if there still were a category of specifically identifiable customer property, *i.e.*, property held in a quasi-trust relationship for specific customers.

269.    The Trustee does not believe that it is possible to return to the concept of specifically identifiable property on a widespread basis.  Industry conditions require too much commingling of property and use in financing to ensure consistent treatment of customers.  On the other hand, the concept of a homogeneous base of customers with claims against a homogeneous fund of customer property is one that does not fully comport with many customers' expectations and does not recognize differences between different account relationships.

270.    In LBI's case, the PBAs formed a relatively discrete — but complicated — set of accounts.  The agreements those PBA holders with equity securities signed were different from those signed by PIM, PAM and other customers and provided for greater rights of LBI to hypothecate securities or purport to make property in these accounts available for assertion of liens by other Lehman entities.  At the same time, these accounts may have been touted to customers as being maintained as separately identified accounts or account ranges with customer names in DTCC or Chase boxes.  Some aspects of the relationship such as the freedom provided to the broker-dealer to use securities in the account for its own purposes and to look to them for satisfaction of indebtedness on an enterprise-wide basis seem to point in the direction of less customer protection than that to which the traditional customer is entitled; other aspects such

---

159. *Id*. at 541-42.

as account range designations might point in the direction of greater protection. Industry sources and press reports indicate that as a result of the LBI experience, hedge funds and other participants are seeking additional protections such as special custodial accounts or limitations on the broker-dealer's freedom to use their property.

271.    Consideration should be given to amending SIPA so that accounts with such shared characteristics could be regarded as having the corresponding assets separately held in a sub-fund or pool of prime brokerage property. Distributions to these accounts could then be made in the first instance from that pool, potentially making it easier to determine claims and transfer property. Initial distributions from this pool would not be delayed because of unavailable property or disputes about customer treatment or account contents in other parts of the customer population such as affiliate accounts or depositories used as clearing accounts. The SEC segregation rules for accounts with certain characteristics could be tailored to those accounts and the agreements covering them. (Of course this presupposes that parties on both sides will read and understand the agreements they sign, something that does not seem invariably to have been the case with many customers at LBI, including many PBAs.)

272.    The concept of separate estates or sub-pools of customer property is embodied in the rules of the CFTC dealing with commodities brokerage. These rules actually create five separate estates or pools of property corresponding to the capacity in which a public commodities customer transacted business with the broker (*e.g.*, leverage transaction or commodity options trader), 17 C.F.R. § 190.01(a). Under these rules, non-public customers, whose property is not required to be separated and who include affiliates and insiders, are treated separately and are essentially subordinated to public customers.

08-01420-scc Doc 360250 Filed 08/26/14 Entered 08/26/14 18:39:19 Main Appendix Documents 1 Through 9 Pg 135 of 191 Pg 137 of 1129

131

273.    Under this approach not only pure brokerage accounts but other subsets of accounts could be treated as separate pools.  For example, property attributable to a clearing arrangement such as the LBIE customer undisclosed clearing agreement might be maintained separately from both LBIE proprietary and other customer property and distributed in the first instance as a separate fund available for ultimate distribution to underlying clients of the introducing broker.  This approach could allow much more prompt (even if not necessarily complete) distribution of property than under the present statute; under SIPA as it exists today the LBIE claim (based on a September 12 or September 15 date because of its earlier administration) must be reconciled with LBI's records (as of its filing date of September 19) for a net equity claim; this claim can only be satisfied when the sum of *all* net equity claims against all customer property from *all* LBI customers can be determined.  At one time LBI maintained a separate box at DTCC for the LBIE omnibus account, although eventually this separate box was closed in favor of one account at DTCC.  Maintaining such property in a separate box and treating it by statute as a separate fund for distribution in a SIPA liquidation could reduce much confusion and aid in the administration of these accounts.

274.    Other rules might apply to accounts maintained by affiliates or subsidiaries of the debtor such as the LBIE proprietary account or the hundreds of accounts submitted as customer claims by the Chapter XI Debtors.  To the extent such accounts may qualify for customer treatment at all, it is not apparent why they should necessarily share on a ratable basis with accounts of unaffiliated third party customers when the effect may only be to create or exacerbate a shortfall in available customer property for the customer population as a whole.  (Most of the Chapter XI Debtors' accounts were subordinated, but that was not true of all accounts or of LBIE's house account.)  This is especially true of affiliate accounts where

segregation of property was not required by SEC regulation.  No determination has yet been made with respect to treatment of these accounts, but the statute or SIPC rules might reduce confusion in future liquidations by specifying that these accounts may be treated as a separate class with rights to claim on a party with other customers only for what is set aside for the affiliates' underlying customers.  Otherwise general creditors of affiliates may effectively share in distributions of customers' property in contravention of the most basic purposes of the SIPA statute.

275.    Finally, the current concept of the fund of customer property along with corresponding customer segregation and protection rules might be largely retained but in slightly modified form for the paradigmatic public customer accounts — those which form the great bulk of the broker-dealers' core brokerage business.  (In LBI's case, these accounts comprised over $90 billion of property or at least 85% of all non-proprietary property, although most were transferred either to Neuberger Berman or Barclays.)  This fund would not be diluted by claims of other classes of customers.  In order to achieve clarity and conform more closely to public expectations, an expanded notion of customer-specific property might be incorporated, albeit not as broadly as the former regime of specifically-identifiable property.  Rather, in addition to customer name securities, some other account relationships might give rise to a right of immediate return for property held in a safeguarded, primarily custodial fashion (for which restrictions on use the broker-dealer might well charge custodial fees).

276.    A benefit of differentiating among different categories of accounts in determining rights to distributions could be the account holder's acknowledgement of the broker's custody arrangement for the securities held for it.  Account holders seeking the traditional entrustment service of a brokerage would aptly fall within one custody pool, with

their assets segregated as customer assets. Other investors seeking greater leverage or margin would more directly acknowledge the risk being taken on alternative custody arrangements. Traditional entrustment type clients would not then find themselves backstopping accounts with fundamentally riskier or different investment strategies. Likewise, should an account holder choose to pay for the benefit of a separately designated custody location, customer property designation rules would have to allow for a SIPA trustee or other liquidator to honor the broker's promise to return that property expeditiously.

277. The Trustee recognizes that no solution is likely to be foolproof and that study would be needed to calibrate the rules for allocating and segregating property with the purposes of each kind of account, as well as the logistics of operating a major broker-dealer and processing and financing hundreds of thousands of transactions a week. On the other hand, the concept of sharing in a vast fund of customer property is not one that many customers comprehend. Even sophisticated hedge funds made hundreds if not thousands of phone calls and sent at least as many emails, and some sought to initiate discovery under Rule 2004, in the early days of this liquidation seeking to confirm the location, if not also immediate return, of "their" securities by reference to CUSIP numbers even though securities with the same CUSIP numbers might be held in great quantity for many different claimants. Some of these questions and demands continue to this day despite the Trustee's and SIPC's efforts at education to the contrary through court filings, interim reports, website postings, appearances at public or industry programs and telephone calls and meetings.

278. The agreements governing the relationship and nature of account activity vary greatly as between, for example, a hedge fund with an active prime brokerage account, a person or company with an individual margin trading account, a former subsidiary of LBI, and a

fiduciary or company with treasury stock holding property at LBI in a largely or entirely

custodial fashion.  Consideration ought to be given to creating rights to return of property that

correspond more closely to the terms of specific types of agreements and the nature of the

account.

279.    Treating similarly situated customers in as equal and non-discriminatory a

fashion as possible is a desirable goal, but the concept of a unitary fund to be administered for

customers no longer corresponds closely to the diverse array of customer relationships

maintained by a major modern broker-dealer.  The single fund concept may actually result in

unfairness and delay to some classes of customers.

### G.    Reasonable Enhancement Of The SIPC Fund And Borrowing Or Guarantee Authority

280.    While recent legislative efforts have increased the size of the SIPC Fund

and enlarged SIPC's borrowing authority, the Trustee recommends that consideration be given to

increasing the SIPC Fund even further and expanding the borrowing and guarantee authority

available to SIPC trustees or other liquidators and to permitting more flexibility for use of those

funds.[160]  While the previously-existing SIPC fund had more than sufficed to meet the demands

of all previous SIPA liquidations, the LBI liquidation shows that the failure of a single major

SIPC member broker-dealer could require at least the temporary availability of much more

substantial sums.

281.    Additional enhancement of the availability of funds through a combination

of a larger SIPC fund and increased borrowing authority would not involve a significant effect

---

160. *See* Dodd-Frank Act, §§ 929C (amending SIPA § 78ddd(h) to permit SIPC to borrow up to $2.5 billion);
929(V) (amending SIPA § 78ddd(d)(1)(C) to increase the minimum assessment on SIPC members to "0.02
percent of the gross revenues from the securities business" of the SIPC member ).

08-01420-scc Doc 369250 Filed 08/256/26/14 Entered 08/256/26/24 18:39:19 Main Appendix Document Documents 1 Through 9 Pg 140 of 191 141 of 1129

135

on the Treasury.  Financing by the government would be minimal, as most funding would be provided by the industry, and any temporary call on government funds would be relatively modest in size and in the nature of a last resort.  This increased SIPC Fund will, however, better reflect the size of the marketplace that exists today and the resulting potential customer obligations and should give SIPC, SIPA trustees or other liquidators increased flexibility in structuring and processing orderly liquidations.  The larger fund may also permit guarantee or indemnification authority beyond that in the current statute which could help ensure rapid transfer or access to customer property.

282.    In addition, an enhanced indemnity or guaranty authority might have helped ameliorate some of the issues discussed in the Report.  For example, a SIPC indemnity guarantee might help support a Trustee's or other liquidator's ability to obtain a medallion or some authority akin to it to prevent transfers from being refused or delayed.  It would also increase a liquidator's ability to provide some measure of indemnification for account transfers in order to obtain disputed collateral from clearing banks or others, and therefore enhance the ability either to arrange transfers outside of liquidation or to move a liquidation forward more expeditiously.  Some guarantee authority even for non-securities transactions might reduce demands for emergency liquidation or transfer of all margin for options or commodities positions such as those made by the CME and OCC.

283.    Insofar as the indemnity is concerned, SIPA currently gives a Trustee authority to indemnify a SIPC member against losses in the transfer of customer accounts and permits SIPC to advance funds for that purpose.  SIPA § 78fff-3(b)(2).  The Trustee recommends that consideration be given to expanding this indemnification authority for other defined purposes.

284.    Each of these possibilities would assist an orderly liquidation and transfer of customer accounts, and each would require only a modest expansion of the financial resources available to SIPC.  Additional statutory amendment may be necessary to define additional purposes for which SIPC funds might be used as guaranties or indemnities, accompanied by conforming amendments to the SIPC Charter and Bylaws.

## H.    Tailoring Safe Harbors To SIPA:  Short Term Stays And Consensual Relief

285.    As Professor Thomas H. Jackson of the University of Rochester, among others, has noted, legislators considering financial reform have paid little attention to the extent to which the safe harbor provisions of the Bankruptcy Code were "a major excuse for the now-discredited bailouts of the 2008 financial crisis."[161]  Of course, Lehman did not benefit from any such bailout, but the actions of the Lehman entities' lenders and counterparties provide an apt example of the possibly deleterious impact of self-interested behavior in a liquidation scenario. The commencement of LBHI's insolvency proceedings on September 15 gave the lenders and

---

[161].Thomas Jackson & David Skeel, *Bankruptcy Reform Will Limit Bailouts*, WALL ST. J., Apr. 21, 2010, at A21; *see also* Kenneth Ayotte & David A. Skeel, Jr., *Bankruptcy or Bailouts?*, 35 J. CORP. LAW 469, 472, 493 (2010) ("Although it was hard to distill a consistent policy rule from the government's rescue efforts, one guiding principle was its preference to avoid all possible bankruptcy filings because of the supposedly severe consequences that would follow" due to "[c]ounterparties' ability to jettison their contracts when a debtor files for bankruptcy [] creat[ing] a run on the debtor's assets, as numerous counterparties terminate their contracts and seize any collateral securing the contracts."); Stephen J. Lubben, *Repeal the Safe Harbors*, 18 ABI L. Rev. 319, 329-30 (2010) ("The safe harbors did nothing to protect the derivative markets from AIG's collapse – the U.S. Treasury's largess prevented the systemic collapse . . . Indeed, some of the safe harbors plainly worsen system risk.  For example, with no threat of having the transaction reversed as a preference, derivative counterparties have every incentive to setoff contracts and seize collateral upon the first hint of financial distress.  In short, this particular safe harbor provision encourages a run on the bank."); David A. Skeel Jr., *Bankruptcy Boundary Games*, 4 BROOK. J. CORP. FIN. & COM. L. 1, 6 (Fall 2009) ("The decision to bail out Bear Stearns, rather than to allow it to file for bankruptcy, stemmed at least in part from the perceived consequences of default and termination for the repo and derivatives markets," and, with respect to AIG, "regulators clearly did not trust counterparties' exemption from the bankruptcy stay to neutralize potential systemic effects."); Ji Hun Kim, *The Need to Amend the Bankruptcy Code's Treatment of Derivatives*, 18 J. BANKR. L. & PRAC. 6 Art. 3, 6 (Nov. 2009) ("Under the Code, counterparties have the right to close out contracts when a debtor files for bankruptcy.  This, in turn, can create panic or a run on the debtor's assets.  This is likely to occur when numerous counterparties terminate their contracts and seize any collateral securing the contracts.")

counterparties not only of LBI but also other Lehman entities the opportunity to terminate

financial contracts, demand additional collateral or liquidate what they already had in hand in an

extraordinarily distressed market.  The actions of SIPC and the Trustee in the case of LBI

suggest, however, an alternative that would mitigate that impact in future broker-dealer

liquidations.

      286.    Ordinarily, on the commencement of an insolvency proceeding, the

automatic stay provisions of 11 U.S.C. § 362 preclude contracting parties from taking actions

adverse to the debtor.  Counterparties to derivative and other defined financial instruments,

however, enjoy statutory exemptions from the stay, among other bankruptcy provisions.  11

U.S.C. § 362(b)(6); SIPA § 78eee(b)(2)(C).  The LBI Liquidation Order also provided that

clearing banks and clearing organizations and actions taken pursuant to swap and other

agreements were exempt from the stay.[162]  As a result, these counterparty-creditors were free to

terminate their contracts with the Lehman entities, demand more collateral, or in some cases

liquidate the collateral that they held.

      287.    At the same time, the stay provisions of the Bankruptcy Code and SIPA

prohibit the broker-dealer's repo and securities lending counterparties from enforcing liens,

pledges and setoff rights following the commencement date.  11 U.S.C. §§ 362(b) & 553, 15

U.S.C. §§ 78eee(b)(2)(B)(ii), (iii).  In the case of LBI, SIPC and the Trustee obtained the District

Court's approval of a provision in the Order Commencing Liquidation that put the stay in place

for 21 days to prevent liquidation of collateral under repos or securities lending agreements but

---

162. *See* LBI Liquidation Order at ¶ VIII.B-K (**Exhibit B**).

permitted SIPC and the Trustee to give their consent to allow creditors to exercise their rights

within that period with the approval of SIPC and the Trustee.[163]

      288.    SIPC and the Trustee did in fact receive during the twenty one-day period

some requests from counterparties to exercise their liquidation rights and to remit the excess

immediately to the Trustee.  Given the data access issues described earlier in this Report, SIPC

and the Trustee had incomplete information and therefore made consent conditional on

representations by the requesting parties about the underlying facts – particularly that no

customer property was involved – and agreements that permission was without prejudice to

future assertion of rights.  At least, however, SIPC and the Trustee were aware of who these

parties were and were able to receive proceeds immediately and catalog which items needed to

be investigated once the data access issues had improved; that was not necessarily the case with

exempted counterparties, which, as described above, conducted termination and liquidation

activities that were often totally undisclosed to the Trustee.

      289.    Many other counterparties owing several billion dollars to the estate did

not contact the Trustee, and the Trustee has expended significant resources in identifying the

---

163. Paragraphs VI and VII of the LBI Liquidation Order provided:

    "ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from enforcing liens or pledges against the property of LBI and from exercising any right of setoff, without first receiving the written consent of SIPC and the Trustee.

    ORDERED that, pursuant to 15 U.S.C. § 78eee(b)(2)(C)(ii), and notwithstanding 15 U.S.C. § 78eee(b)(2)(C)(i), all persons and entities are stayed for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing of, securities collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent under a securities lending agreement, without first receiving the written consent of SIPC and the Trustee."

  LBI Liquidation Order at ¶¶ VI-VII (**Exhibit B**).

parties and transactions, reconciling the amounts and negotiating recoveries. The passivity of these counterparties has not only created exposure but delay and uncertainty about the amount of property available for satisfaction of customer or other claims. The Trustee therefore recommends that policy-makers consider modifications to the stay exemption provisions and other rules that would provide greater transparency and thereby minimize the harm to the customers and creditors of the entity being liquidated from counterparties' actions, while at the same time minimizing the possibility of broader market effects in the event of broker-dealer collapse. These modifications would include:

(1)     Extending the operation of the stay to prevent liquidation of collateral to currently exempted counterparties for a reasonable, but brief, period of time, (perhaps less than the twenty-one days in the LBI Order), following the commencement of the liquidation;

(2)     Providing that SIPC or a SIPA trustee or other liquidator could consent to exercise of a counterparty's liquidation or other rights on certain conditions, or keep the stay in effect but provide the counterparty with adequate collateral on a mark-to-market basis or assurance of eventual payment. In exchange the counterparty would (a) supply information in the form of sworn representations to the satisfaction of SIPC and the trustee or other liquidator, (b) return any admitted or agreed excess to the liquidator, and (c) agree to clawback rights by acceptance of consents made without prejudice to future assertion of claims by the liquidator; and

(3)     Providing that counterparties, whether or not they liquidate collateral to derivative or foreign exchange transactions, must provide information and reconciliations to SIPC, the trustee or other liquidator within the six month claims period, after which

any safe harbor protection or relief from the stay for their actions would be forfeited and the liquidator could seek all available remedies as well as enhanced interest, as explained below for unwind transactions generally.

290.     At the very least, drawing the exemptions reflected in safe harbor provisions more narrowly, and clarifying that those adequately-collateralized counterparties will be protected as long as they deal proactively and in good faith will expand the comfort zone in which the Trustee or other liquidator is operating in the early days of the liquidation, and lead to a dialogue and exchange of information with lenders and counterparties, with the aim of assuring fairness and consistency while minimizing the deleterious impact of what is likely to be a distressed market.  As noted above, this concept of keeping the automatic stay in effect but providing for consensual modification might also be extended to clearing banks which would have to at least consult SIPC or a SIPA Trustee or other liquidator before liquidating collateral, apprise them of relevant information, and seek agreement to terms that would increase transparency.

## I.    Tailoring Safe Harbors To SIPA:
   ## Achieving Fairness And Finality For Close-Outs

291.     The Trustee and his professionals are currently in the process of unwinding financial products that were transacted at LBI with broker-dealers, financial institutions, and other parties.  The financial products include foreign exchange derivatives, repos, securities lending agreements and TBAs.  Nearly all the counterparties are highly sophisticated parties that participated in complex transactions worth millions of dollars and as such, are fully aware of (i) their rights and obligations regarding the close-out of transactions with the Trustee following the commencement of the SIPA liquidation and (ii) their financial

08-01420-sccc Doc 369-250 Filed 08/256/14 Entered 08/256/24 51 8:39:19 Main Appendix Document Documents 1 Through 1 Pg 146 of 191 147 of 1129

141

exposure to the Trustee resulting from the close-out, including whether an LBI receivable or payable existed.

292.     During the twenty-one day stay period in the Liquidation Order, a few — but only a few — of these LBI counterparties reached out to the Trustee to close out outstanding transactions.  The Trustee's professionals were required to expend tremendous effort and expense to determine what other counterparties had payables to the estate, send close-out letters to such counterparties and then conduct the reconciliation of the outstanding accounts.  Even then, many of the counterparties were slow to respond to requests for information or support for their close-out calculation.  For example, in the first year of the liquidation while the Trustee and his professionals had many other pressing tasks and were grappling with the informational problems described earlier in this Report, collections from financial product unwinds totaled approximately $500 million, most of which resulted from parties with excess collateral seeking relief from the stay.  In contrast, once the Trustee and his professionals could complete their preliminary review of the books and records of LBI and begin pursuing the counterparties, they succeeded in collecting four times as much — over $2 billion — between August of 2009 and the present with many other collection efforts currently underway.[164]

293.     Delay in receiving funds at a time when they may be needed impedes the prompt and efficient liquidation of property and settlement of claims.  Migration of knowledgeable staff and temporary or permanent loss of access to systems may compound these

---

164. The procedures the Trustee follows with respect to litigating or reaching settlement of close-outs are set forth in the Bankruptcy Court's Order, Pursuant to Section 105(a) of the Bankruptcy Code, Approving and Authorizing Procedures to Unwind, Close-out and Reduce to Cash Receivables Owed By Trading Counterparties (LBI Docket No. 2078) (**Exhibit E**).  As of July 26, 2010, sixty final settlements have been reached, fourteen of which have been of a size to require notice of filing with the Court, and approximately 45 now are being pursued that would required court approval.

08-01420-scc Doc 3650 Filed 08/25/14 Entered 08/25/14 18:39:19 Main Document
Documents 1 Through 7 Pg 147 of 191 Pg 148 of 1129

142

negative consequences. The additional expense to the estate in having to investigate and search for potential receivables due from the unwind of financial products is considerable. The Trustee conservatively estimates that, through June 30, 2010, over 5,000 hours of accounting professional time and a substantial amount of legal as well as administrative staff time had to be expended in locating and researching amounts potentially owed by counterparties, contacting those counterparties, convincing them to share necessary information, and negotiating with them to cause them to pay amounts that they, themselves, sometimes recognized they owed to the estate. These costs have approached $5 million, not including the costs of delay and uncertainty. All could have been avoided through a modicum of prompt cooperation and provision of basic information by these counterparties. The possibility also exists that, if parties in possession of the information and aware of the transactions do not come forward, some receivables will be missed because of the complexity of the broker-dealer's records or erroneous or confusing listings. For example, the books and records of the broker-dealer may indicate a small receivable or even net payable when in fact the counterparty owes substantial funds to the broker-dealer.

       294. To avoid these results, the Trustee recommends that within a period such as the six month period for filing all claims, financial product counterparties be required to provide the Trustee or other liquidator information regarding their transactions with the broker-dealer, together with summaries setting forth: (i) the trade information, the close out date and amount believed to be owed; (ii) any collateral or other property of the estate being held by the counterparty; (iii) the valuation statements and the methodology employed in calculating valuation; and (iv) the nature and amount of any setoff or other deduction or adjustment the

counterparty intends to assert.[165]  The submissions should include a representation by the
counterparty that the submission is a complete list as well as copies of supporting contractual
documents.

295.    In exchange for providing their close-out information and paying what
they believe (in good faith) to be the close-out amount due to the estate within the specified time
frame, these counterparties could be permitted by statute to choose a close out date within 120
days after the Filing Date (unless an earlier close out date is contractually provided in which case
such earlier close out date will be the applicable date), would retain their setoff rights and could
be allowed by the trustee or SIPC to pay interest at a low rate, such as the Fed Funds rate.  Non-
complying counterparties would forfeit setoff rights, have to abide by a designated closeout date
established by statute (such as the filing date or a narrow range of dates close to the filing date at
the trustee's or other liquidator's option) and would pay interest at a higher rate (*i.e.*, the Fed
Funds rate plus a certain fixed percentage).[166]

296.    The Trustee or SIPC or both should in turn provide to financial product
counterparties, if possible, and post on their own and others' such as SIFMA's websites:  (i) the
updated mailing address to which the counterparties should send a copy of their termination
notices, valuation statements, notices of default and other correspondence; (ii) the updated
bank/securities account(s) information to which counterparties should make payments of cash or

---

165. The Trustee does not believe that legitimate setoff rights would include triangular setoff rights which, in LBI's
case, would result in a windfall for counterparties and the LBHI estates at the expense of the LBI estate and
ultimately its customers.  The Trustee believes that the primacy of mutuality of setoff is clear under the present
law.  If litigation proves that belief to be mistaken, Congress should act to remove any doubt.  *See* Notice of
Filing of Motion of James W. Giddens, Trustee for The SIPA Liquidation of Lehman Brothers Inc., and The
Securities Investor Protection Coroporation for Leave to File Brief of *Amici Curiae* in Support of Lehman
Brothers Holdings Inc. (LBI Docket No. 3595).

166. To the extent the counterparty had a net receivable from the broker-dealer, the information required could
constitute its proof of claim.

08-01420-cgm  Doc 360-2  Filed 08/26/14  Entered 08/26/14 18:39:19  Main Appendix
Documents 1 Through 9  Pg 149 of 179  Pg 150 of 1129

144

transfer of securities, as applicable, and (iii) the name and address of the trustee's or other liquidator's legal counsel to whom legal questions should be directed.

297.    A trustee or other liquidator should also (i) implement a standardized format (as determined by the financial/accounting professionals) as to the type of information that should be provided for each financial product, and (ii) require that such reconciliation information, in addition to the hard copies, be provided in a modifiable electronic format, *e.g.*, excel format (no pdfs).  The Trustee and his professionals experienced numerous instances of counterparties sending their reconciliation information in a manner which had to be converted into a more usable format, causing waste of time and resources.

08-01420-sccc Doc 3690 Filed 08/256/26/14 Entered 08/256/26/24 518:39:19 Main Appendix
Documents 1 Through 50 of 191 151 of 1129

145

## <u>CONCLUSION</u>

298.    The Trustee respectfully submits this Preliminary Investigation Report and

Recommendations for the information and consideration of the Court and other interested

parties.

Dated: New York, New York
        August 25, 2010

                                    Respectfully submitted,

                                    HUGHES HUBBARD & REED LLP

                                    By: __/s/ James B. Kobak, Jr._____
                                        A member of the firm
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Telephone:  (212) 837-6000
                                        Facsimile:  (212) 422-4726
                                        Email: kobak@hugheshubbard.com


                                    Attorneys for James W. Giddens,
                                    Trustee for the SIPA Liquidation of the Business of
                                    Lehman Brothers Inc.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS INC.,

           Debtor.

Case No. 08-01420 (JMP) SIPA

**ORDER GRANTING AUTHORITY TO ISSUE SUBPOENAS FOR THE PRODUCTION
OF DOCUMENTS AND THE EXAMINATION OF THE DEBTOR'S CURRENT AND
FORMER OFFICERS, DIRECTORS AND EMPLOYEES, AND OTHER PERSONS**

Upon the motion (the "Motion") of James W. Giddens (the "Trustee"), as Trustee

for the liquidation of the business of Lehman Brothers Inc. ("LBI"), pursuant to Rule 2004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order authorizing the

Trustee to issue subpoenas (each a "Subpoena") for the production of documents and the

examination of the current and former officers, directors, employees, and affiliates of LBI, and

other persons or entities with relevant information including, without limitation, LBI's lenders,

investors, and other financial transaction counterparties to transactions with LBI (collectively,

the "Witnesses"); and the Court finding that adequate notice of the Motion having been given;

and it appearing that no other notice need be given; and after due deliberation and sufficient

cause appearing therefore, it is

ORDERED that the Motion is GRANTED; and it is further

ORDERED, that the Trustee is authorized, pursuant to Bankruptcy Rule 2004, to

issue such Subpoenas as may be necessary to compel the production of documents and the

testimony of Witnesses in connection with his investigation of LBI; and it is further

ORDERED, that the Trustee shall serve each Subpoena and a copy of this Order

on the target of the Subpoena, with copy to (i) the Securities Investor Protection Corporation, (ii)

the Securities and Exchange Commission, (iii) the Internal Revenue Service, and (iv) the United

States Attorney for the Southern District of New York; and it is further

ORDERED, that the Trustee shall cooperate fully with the U.S. Department of

Justice, and any other federal agency designated by them (collectively, the "Government"), in

any matter that the Government is currently or in the future may be investigating regarding LBI,

its management or its financial condition.  The Trustee shall use best efforts to coordinate with

the Government in order to avoid unnecessary interference with any investigation conducted by

the Government.  The Trustee will follow a reasonable protocol to be established jointly with the

Government for the sharing of information and such sharing shall be subject to appropriate

conditions to protect LBI's estate, including but not limited to, the preservation of the attorney-

client privilege and protections of the attorney work product doctrine.  If the Trustee and the

Government disagree as to the appropriateness of a proposed action to be taken pursuant to this

Order, the Trustee reserves the right to seek a determination from the Court; and it is further

ORDERED, that the Trustee shall file with the Court an affidavit or declaration or

service for each Subpoena he serves; and it is further

ORDERED, that Witnesses are directed to produce, on a rolling basis, all

responsive documents described in the Trustee's Subpoena such that all responsive documents

are received by the Trustee within ten (10) days of the service of a Subpoena upon such Witness

(unless otherwise agreed by the Trustee), subject to any documents withheld under a claim of

privilege; and it is further

ORDERED, that if a Witness withholds the production of any documents to the

Trustee based upon a claim of privilege, such Witness is directed to provide counsel for the

Trustee with a privilege log, containing the information required under Bankruptcy Rule 7026,

within ten (10) days of the service of a Subpoena upon the Witnesses (unless otherwise agreed by the Trustee); and it is further

ORDERED, that the Witness is directed to submit to oral examination upon reasonable notice and, absent other agreement with the Trustee, in no event more than fifteen (15) days from the date of the service of a deposition Subpoena upon such Witness; and it is further

ORDERED, that nothing herein shall limit the rights of any Witness or any other party under applicable law to object to or oppose any Subpoena the Trustee may serve upon such Witness; and it is further

ORDERED, that this Court shall retain jurisdiction to resolve any disputes arising or related to this Order including any discovery disputes that may arise between or among the parties and to interpret, implement and enforce the provisions of this Order; and it is further

ORDERED, that in accordance with Bankruptcy Rules 2004 and 9016, the Clerk of this Court shall issue Subpoenas, signed but otherwise in blank, as requested by the Trustee; and it is further

ORDERED, that this Order is without prejudice to the Trustee's right to file further motions seeking additional documents and testimony pursuant to Bankruptcy Rule 2004(a) or any other applicable law.

Dated:    January 15, 2009
          New York, New York

                                    /s/ James M. Peck
                                    HONORABLE JAMES M. PECK
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,

    v.

LEHMAN BROTHERS INC.

        Defendant.

Civil Action No. 08-__

## ORDER COMMENCING LIQUIDATION[1]

On the Complaint and Application of the Securities Investor Protection Corporation ("SIPC"), it is hereby:

    I.    ORDERED, ADJUDGED and DECREED that the customers of the defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities Investor Protection Act of 1970, as amended ("SIPA"). 15 U.S.C. §78aaa et seq.

    II.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the Court in the amount of $100,000.00.

---

1.  The "LBI Liquidation Order"

08-01420-scc Doc 360 250 Filed 08/26/12 Entered 08/26/12 15:18:39 Main Appendix
Documents 1 Through 9 Pg 157 of 191   158 of 1129

2.

III.   ORDERED that all persons and entities are notified that, subject to the other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate as a stay of:

A.   the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding;

B.   the enforcement against LBI or against property of the estate of a judgment obtained before the commencement of this proceeding;

C.   any act to obtain possession of property of the estate or property from the estate;

D.   any act to create, perfect or enforce any lien against property of the estate;

E.   any act to create, perfect or enforce against property of LBI any lien to the extent that such lien secures a claim that arose before the commencement of this proceeding;

F.   any act to collect, assess or recover a claim against LBI that arose before the commencement of this proceeding;

G.   the setoff of any debt owing to LBI that arose before the commencement of this proceeding against any claim against LBI; and

H.   the commencement or continuation of a proceeding before the United States Tax Court concerning LBI's tax liability for a taxable period the Bankruptcy Court may determine.

IV.     ORDERED that all persons and entities are stayed, enjoined and restrained

from directly or indirectly removing, transferring, setting off, receiving, retaining, changing,

selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets

or property owned, controlled or in the possession of LBI, including but not limited to the books

and records of LBI, and customers' securities and credit balances, except for the purpose of

effecting possession and control of said property by the Trustee.

V.      ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending

bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize,

conserve or liquidate LBI or its property and any other suit against any receiver, conservator or

trustee of LBI or its property, is stayed.

VI.     ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and

notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in

this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one

(21) days, or such other time as may subsequently be ordered by this Court or any other court

having competent jurisdiction of this proceeding, from enforcing liens or pledges against the

property of LBI and from exercising any right of setoff, without first receiving the written

consent of SIPC and the Trustee.

VII.    ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and

notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of

twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any

other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing

of, securities collateral pledged by LBI, whether or not with respect to one or more of such

contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

08-01420-scc Doc 369-50 Filed 08/25/26/12 Entered 08/25/26/12 15:18:89:19ain Appendix
Documents 1 Through of 19q Page 160 of 1129

4

under a securities lending agreement, without first receiving the written consent of SIPC and the
Trustee.

      VIII.   ORDERED that the stays set forth in paragraphs three – six shall not apply
to:

A.     any suit, action or proceeding brought or to be brought by the United
States Securities and Exchange Commission ("Commission"), the
Commodity Futures Trading Commission ("CFTC"), or any self-
regulatory organization of which LBI is now a member or was a member
within the past six months; or

B.     the exercise of a contractual right of a creditor to liquidate, terminate, or
accelerate a securities contract, commodity contract, forward contract,
repurchase agreement, swap agreement, or master netting agreement, as
those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net
termination values, payment amounts, or other transfer obligations arising
under or in connection with one or more of such contracts or agreements,
or to foreclose on any cash collateral pledged by LBI, whether or not with
respect to one or more of such contracts or agreements; or

C.     the exercise of a contractual right of any securities clearing agency to
cause the liquidation of a securities contract as defined in 11 U.S.C.
§741(7) and the contractual right of any derivatives clearing organization
to cause the liquidation of a commodity contract as defined in 11 U.S.C.
§761(4); or

08-01420-23cc-scc Doc 3650-250 Filed 08/26/26 Entered 08/26/26 2:518:89:19 Main Appendix
Documents 1 Through 9 Pg 161 of 1129

5

D.    the exercise of a contractual right of any stockbroker or financial

institution, as defined in 11 U.S.C. §101, to use cash or letters of credit

held by it as collateral, to cause the liquidation of its contract for the loan

of a security to LBI or for the pre-release of American Depository

Receipts or the securities underlying such receipts; or

E.    the exercise of a contractual right of any "repo" participant, as defined in

11 U.S.C. §101, to use cash to cause the liquidation of a repurchase

agreement, pursuant to which LBI is a purchaser of securities, whether or

not such repurchase agreement meets the definition set forth in 11 U.S.C.

§101(47); or

F.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

in respect of (i) any extension of credit for the clearance or settlement of

securities transactions or (ii) any margin loan, as each such term is used in

11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a

contractual right as such term is used in 11 U.S.C. §556 in respect of any

extension of credit for the clearance or settlement of commodity contracts

by a commodity broker as defined in 11 U.S.C. §101(6).  As used herein,

"securities clearing bank" refers to any financial participant, as defined in

11 U.S.C. §101(22A), that extends credit for the clearance or settlement of

securities transactions to one or more Primary Government Securities

Dealers designated as such by the Federal Reserve Bank of New York

from time to time; or

G.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555, by a person (or such person's agent) in respect of securities that were sold to such person by LBI pursuant to a repurchase transaction (as such term is used in 11 U.S.C. §741(7) and regardless of whether such transaction is a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with LBI that is subject to a Custodial Undertaking in Connection With Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such person (or such person's agent); or

H.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555, by the Federal Reserve Bank of New York; or

I.    any setoff or liquidating transaction undertaken pursuant to the rules or bylaws of any securities clearing agency registered under section 17A(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78q-1(b), or any derivatives clearing organization registered under section 5b of the Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under instructions from and on behalf of such a securities clearing agency or derivatives clearing organization; or

J.    any settlement transaction undertaken by such securities clearing agency using securities either (i) in its custody or control, or (ii) in the custody or control of another securities agency with which it has a Commission approved interface procedure for securities transactions settlements, provided that the entire proceeds thereof, without benefit of any offset, are promptly turned over to the Trustee; or

08-01420-scc Doc 360450 Filed 08/25/26/12 Entered 08/25/26/24 18:39:19 Main Appendix
Documents 1 Through 19 Pg 163 of 1129

7

K.     any transfer or delivery to a securities clearing agency or derivatives clearing organization by a bank or other depository, pursuant to instructions given by such clearing agency or derivatives clearing organization, of cash, securities, or other property of LBI held by such bank or depository subject to the instructions of such clearing agency or derivatives clearing organization and constituting a margin payment as defined in 11 U.S.C. §741(5); or

IX.     ORDERED that the stays set forth in paragraphs three – seven above shall not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section 78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC and (ii) September 24, 2008;

X.     ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is authorized to operate the business of LBI to: (a) conduct business in the ordinary course until 6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of securities, commodities futures and option transactions, and obtaining credit and incurring debt in relation thereto; (b) complete settlements of pending transactions, and to take other necessary and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly

transfer of customer accounts and related property.

    XI.    ORDERED that the Clerk of the Court is directed to immediately open the

docket in this proceeding and that this Order be entered on the docket immediately.

    XII.    ORDERED that the Clerk of the Court is directed to produce seventy-five

(75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto

the docket.

    XIII.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation

proceeding is removed to the United States Bankruptcy Court for the Southern District of New

York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry

on the docket.

    XIV.    ORDERED that the Trustee is authorized to take immediate possession of

the property of LBI, wherever located, including but not limited to the books and records of LBI,

and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the

Trustee, and the Trustee may designate such of his representatives who shall be authorized to

have access to such property.

Date:   September 19, 2008

 

_____
UNITED STATES DISTRICT JUDGE

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
DEPUTY CLERK

# EXHIBIT C

**Trustee's Preliminary Investigation Report And Recommendations**

**Chronology – 1987 to September 22, 2008**

| | Date/Time | Background |
|---|---|---|
| 1 | 1987 | Shearson Lehman Brothers Holdings Inc. conducts initial public offering of $18 million shares of common stock, generating $628 million in capital. American Express Co. retains 61% interest in SLBHI. |
| 2 | 7/30/1993 | Shearson Lehman Brothers Inc. completes sale of domestic retail brokerage and asset management businesses to Smith Barney, Harris Upham & Co. |
| 3 | 8/02/1993 | Shearson Lehman Brothers Holdings Inc. changes name to Lehman Brothers Holdings Inc., and Shearson Lehman Brothers Inc. changes name to Lehman Brothers Inc. |
| 4 | 5/02/1994 | Shearson spins off Lehman by way of initial public offering. |
| 5 | 1996 | Lehman's "Executive Committee" is created |
| 6 | 6/15/2000 | LBI and Chase execute a Clearance Agreement governing the Chase-LBI clearing relationship. The Clearance Agreement also provides for the extension of credit to LBI by Chase at Chase's sole discretion. |
| 7 | 5/29/2001 | LBI pays a $1.05 billion dividend to LBHI. LBHI approves the $800 million Subordinated Loan Agreement between LBHI and LBI. LBI is to send the net amount of the dividend, $250 billion, as cash to LBHI. |
| 8 | 8/29/2002 | LBI pays a $1 billion dividend to LBHI. LBHI approves the $800 million increase in the Subordinated Loan Agreement between LBHI and LBI. LBI is to send the net amount of the dividend, $200 million, as cash to LBHI. |
| 9 | 2003 | Lehman acquired the fixed income business of Lincoln Capital Mgmt. Co., which became Lehman's fixed income investment management arm, later known as Lehman Brothers Asset Management. |
| 10 | 10/2003 | Lehman acquires Neuberger Berman, a money management firm for wealthy individuals and institutional investors. |
| 11 | 10/03/2003 | First Supplemental Indenture whereby LBHI agrees to act as guarantor for debt securities issued by LBI. |
| 12 | 10/14/2003 | Second Supplemental Indenture whereby LBHI agrees to act as guarantor for debt securities issued by LBI. |
| 13 | 11/20/2003 | Third Amendment to 5/29/2001 Subordinated Loan Agreement - Cash between LBI and LBHI. This amendment increases the loan amount from $2.4 billion to $2.9 billion. |
| 14 | 11/20/2003 | LBI pays a $1 billion dividend to LBHI. LBHI approves a $500 million increase in the Subordinated Loan Agreement between LBHI and LBI. LBI is to send the net amount of the dividend, $500 million, as cash to LBHI. |
| 15 | 2/16/2004 | Effective date of excess SIPC surety bond issued by Capco. LBI's intent is to provide its customers with protection in excess of that afforded by SIPA in the event that a customer's other receipts do not fully satisfy its net equity claim. The surety bond is subsequently renewed as of February 15, 2005, 2006, 2007 and February 16, 2008, with an expiration date of February 16, 2009. |
| 16 | 5/2004 | LBI infuses $200 million into LBSF by way of $150 million cash dividend from LCPI and $50 million cash dividend from RIBCO to LBI, then down to LBSF. |
| 17 | 6/07/2004 | LBHI guarantees the obligations of its subsidiaries or affiliates to Citibank. LBHI defines the guarantee to include only Lehman Brothers Holdings PLC, LB Securities Asia Ltd., LBSF, LBJ, LBIE, LBCC Asia Ltd., and Lehman Brothers Bankhaus AG. LBI was not included. |
| 18 | 11/24/2004 | LBI pays a $1.2 billion dividend to LBHI. LBHI approves the $500 million increase from the 9/30/1996 Cash Subordination Agreement. LBI will send the net amount of the dividend, $700 million, as cash to LBHI. |
| 19 | 10/03/2005 | Chase and LBI enter into the Cash Collateral Agreement that secures LBI's obligations arising from Chase's provision of clearing services to LBI. |

| | Date/Time | CSE PERIOD (POST-2005) |
|---|---|---|
| 20 | 12/01/2005 | SEC authorizes Lehman to begin operating as a consolidated supervised entity ("CSE"), which enables the firm to use a risk-based method of computing net capital while giving the SEC oversight. |
| 21 | 2/2007 | Lehman purchases interests in GLG Partners (at the time Europe's largest hedge fund), Marble Bar Asset Mgmt., Spinnaker Capital, Blue |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | CSE PERIOD (POST-2005) |
|---|---|---|
| | | Bay Asset Mgmt., Grange Securities (one of the largest CDO sellers in Australia), and Ospraie (a U.S. commodity fund). |
| 22 | 3/13/2007 | Audit Committee is informed about Lehman's U.S. mortgage businesses, particularly the subprime mortgage businesses, and the firm's purchase of a 20% interest in DE Shaw. |
| 23 | 8/2007 | Lehman's total capital ratio declines to 10.5% in August 2007, from 18.2% in early 2006. |
| 24 | 8/02/2007 | For the first time, auctions for two LBI-led taxable auction rate securities ("ARS"), issued by Ram Re and Radian, fail. |
| 25 | 8/20/2007 | Corporate taxable ARS market experiences widespread auction failure. |
| 26 | 8/28/2007 | LBI makes a $500 million capital infusion to LCPI, while LBI simultaneously receives a $500 million dividend payment from LBSF. |
| 27 | 9/11/2007 | Finance and Risk Committee is informed about the Firm's risk exposure to the subprime mortgage market, high-yield bonds, leveraged loans, securitized products, commercial paper, and hedge funds.  Committee is updated about Lehman's balance sheet and capital management.  It is noted that Lehman had a record level of liquidity and cash capital surplus at the end of the 3rd quarter of 2007. Committee is informed about Lehman's credit ratings, including the June 2007 ratings upgrade and recent affirmation from Fitch and affirmations of credit ratings by both Standard & Poor's and Moody's in August 2007. |
| 28 | 12/31/2007 | LBI's Form 17a-5 Focus Report reflects that as of 12/31/07, LBI has:<br>• Total Assets of $470 billion, of which $465 billion are "allowable"<br>• Total Liabilities of $465 billion<br>• $1.2 billion Segregated Cash<br>• Excess Net Capital of $2.46 billion<br>• $3.1 billion in Reserve Bank Account pursuant to Rule 15c3-3 |
| 29 | 1/2008 | The SEC begins to inspect the valuation procedures of all CSE firms to ensure that the firms are complying with internal controls, to compare procedures across the firms, and to provide feedback.  The SEC inspection found significant problems at Lehman, including understaffing of their Price Valuation Group and an asset pricing function that was overly "process driven." |
| 30 | 1/22/2008 | Lehman experiences its first, isolated failures in the municipal ARS market.  Although the next auction of these issues functioned successfully, the municipal auction rate market, as well as student loan auction rate products, across the industry, experienced failures over the next three weeks. |
| 31 | 1/29/2008 | Finance and Risk Committee is told that Lehman's net leverage increased to 16.1x at year-end, although this increase was at a lesser rate than Lehman's peers.  Committee is also told that Lehman has maintained compliance with its conservative funding framework despite challenging credit markets, and that Lehman had record liquidity at fiscal year-end. |
| 32 | 1/31/2008 | LBI's Form 17a-5 Focus Report reflects that as of 1/31/08, LBI has:<br>• Total Assets of $484 billion, of which $481.5 billion are "allowable"<br>• Total Liabilities of $480 billion<br>• $1.2 billion Segregated Cash<br>• Excess Net Capital of $2.646 billion<br>• $2.23 billion in Reserve Bank Account pursuant to Rule 15c3-3 |
| 33 | 2/2008 | LBI requests that Chase provide a daily Net Free Equity ("NFE") snapshot report in order to allow LBI to obtain better estimates of its position.  NFE was the market value of securities pledged to Chase plus any unsecured credit line Chase extended to LBI minus cash advanced by Chase to LBI. |
| 34 | 2/01/2008 | Korea Development Bank ("KDB") expresses interest in making a private investment in Lehman similar to the $2 billion deal that Korea Investment Corp. made with Merrill Lynch. |
| 35 | 2/21/2008 | Lehman worries about changes in its credit default swap spreads as a result of rumors that the Firm is going to have writedowns.  Increase |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | CSE PERIOD (POST-2005) |
|---|---|---|
| | | in spreads makes access to capital markets, such as in Asia, more difficult.  Counterparties raise concerns to Lehman about writedowns. |
| 36 | 2/29/2008 | LBI's Form 17a-5 Focus Report reflects that as of 2/29/08, LBI has:<br>• Total Assets of $437 billion, of which $433.6 billion are "allowable"<br>• Total Liabilities of $432 billion<br>• $884 million Segregated Cash<br>• Excess Net Capital of $2.5 billion<br>• $4.75 billion in Reserve Bank Account pursuant to Rule 15c3-3 |

| | Date/Time | THE BEAR STEARNS CRISIS |
|---|---|---|
| 37 | 3/12/2008 | Dealer counterparties are refusing to accept the assignment of Lehman or Bear Stearns trades. |
| 38 | 3/14/2008 | Lehman executives express concerns internally about ability to survive if Bear Stearns collapses. |
| 39 | 3/15/2008 | Government monitors from the SEC and the Federal Reserve take up residence at Lehman to monitor Lehman's financial condition with particular focus on liquidity. |
| 40 | 3/16/2008 | Bear Stearns is sold to JP Morgan for $2 a share pending shareholder approval (price is later adjusted to $10/share).  In order to facilitate the deal, the Fed agrees to give a $30 billion loan on favorable terms to JP Morgan thereby limiting JP Morgan's risk exposure to $1 billion.  Bear Stearns collapse is in part due to having had two of its hedge funds lose $1.6 billion on subprime mortgage bets. |
| 41 | 3/16/2008 | The Federal Reserve Board of Governors grants the FRBNY authority to establish the Primary Dealer Credit Facility ("PDCF") as a means to provide liquidity to investment banks.  The PDCF was designed to allow the FRBNY to provide collateralized loans to broker-dealers such as LBI and was structured as an overnight facility to provide short-term secured financing. |
| 42 | 3/17/2008 | Lehman's stock plummets to around $20 per share before closing at $31.75 – another "near-death experience," a Lehman banker called it – as investors feared that the firm would be the next to fall. |
| 43 | 3/18/2008 | "Dear Client" letter issued to PIM customers commenting on recent market volatility and asserting the strength of the firm's liquidity position.  Customers are told that their assets "are not subject to the claims of the Firm's creditors," and that SIPC coverage exists "in the case of a shortfall of the covered assets." |
| 44 | 3/25/2008 | Finance and Risk Committee is informed about recent market events leading to the sale of Bear Stearns to Chase.  The factors leading to the sale of Bear Stearns are described, and differences between the liquidity and funding practices of Bear Stearns and Lehman are highlighted.  The Committee asked questions about the new Federal Reserve primary dealer credit facility, exposure to monoline insurers, activity levels of the prime brokerage unit, and the intercompany transfer of assets to Lehman Brothers Bankhaus AG. |
| 45 | 3/26/2008 | Lehman officers discuss  potential that secured lines of credit might be pulled, difficulties in making deliveries at an appropriate pace, and problems with counterparty risk and repo.  One officer writes, "I'm not sure we are set up to weather this one."  Another officer expresses concern that the problem lies with Lehman's dependency on repo and the scale of real estate related positions. |
| 46 | 3/26/2008 08:57 AM | Equity and FID business slowing down with clients such as UBS, CS, DB, ING no longer doing business with Lehman and some clients refusing to have Lehman as the calculation agent in trades. |
| 47 | 3/27/2008 01:58 PM | LBI requests a paydown from LBHI of $450 million to provide a capital infusion into various subsidiaries in which LBI has, or will have, a negative investment.  The funds received into LBI are subsequently paid to LCPI, LB I Group, and RIBCO. |
| 48 | 3/27/2008 04:16 PM | Rumors circulate outside the firm that Lehman collateral is not being accepted by the Fed. |
| 49 | 3/31/2008 | LBI's Form 17a-5 Focus Report reflects that as of 3/31/08, LBI has:<br>• Total Assets of $488 billion, of which $485 billion are "allowable" |

**Trustee's Preliminary Investigation Report And Recommendations**
**Chronology -- 1987 to September 22, 2008**

| | Date/Time | THE BEAR STEARNS CRISIS |
|---|---|---|
| | | • Total Liabilities of $483 billion<br>• $1.9 billion Segregated Cash<br>• Excess Net Capital of $3.2 billion<br>• $2.6 billion in Reserve Bank Account pursuant to Rule 15c3-3 |
| 50 | 4/09/2008 03:42 PM | Lehman experiences problems with its credit lines at Chase. Despite having received $950 million in collateral, Chase requests an additional $2 billion from Lehman. |
| 51 | 4/21/2008 | Lehman performs a liquidity stress test, which finds that the liquidity risk for the broker-dealer affiliates is less of a concern because the repo market is more reliable than the unsecured market. |
| 52 | 4/30/2008 | LBI's Form 17a-5 Focus Report reflects that as of 4/30/08, LBI has:<br>• Total Assets of $398 billion, of which $396 billion are "allowable"<br>• Total Liabilities of $394 billion<br>• $2.1 billion Segregated Cash<br>• Excess Net Capital of $3.5 billion<br>• $5.5 billion in Reserve Bank Account pursuant to Rule 15c3-3 |
| 53 | 5/2008 | LCPI receives a cash infusion of $150 million in response to a significant write-down of securities backed by California real estate. LBHI transfers the cash to LBI, which transfers it back to LBHI (for the benefit of LCPI). |
| 54 | 5/2008 | LBSF receives a cash infusion of $100 million. LBHI transfers the cash to LBI, which in turn transfers it to LBSF. |
| 55 | 5/05/2008 04:17 PM | According to a CNBC report, Lehman is planning layoffs in the coming days. |
| 56 | 5/07/2008 08:30 AM | Finance and Risk Committee discusses financing, liquidity, and the financial world's overall market conditions. The prime brokerage business experienced a decline of approximately $3 billion in customer free credits since March 14, primarily caused by hedge funds customers' redemptions and lower leverage. It was discussed that this would have no impact on Lehman's liquidity as Lehman does not include customer free credits in its liquidity pool calculation. |
| 57 | 5/16/2008 05:02 PM | Matthew Lee sends a letter to Lehman executives alleging financial misstatements and accounting improprieties. |
| 58 | 5/20/2008 03:54 PM | Lehman lays off nearly 5% of its workers globally. The latest cuts are in addition to the layoffs of more than 5,000 people since mid-2007. |
| 59 | 5/21/2008 | David Einhorn makes a speech at the Ira W. Sohn Investment Research Conference declaring that his firm had a short position on Lehman, "not only because Lehman had fudged its numbers but because its recklessness had put the financial system as we know it at grave risk." |
| 60 | 5/26/2008 08:54 AM | Lehman officers discuss potential parties interested in buying part of Lehman. One notes that the KDB situation sounds promising but GE or AIG would be preferable. |
| 61 | 5/28/2008 09:46 PM | Lehman officers discuss opportunities for selling a partial ownership stake in LBHI in preparation for a meeting with KDB. |
| 62 | 5/30/2008 03:48 PM | LBI plans to provide a $500 million capital infusion to LCPI, LB I Group, and LBSF "to eliminate any current and/or potential negative investment." |
| 63 | 5/31/2008 | LBI's Form 17a-5 Focus Report reflects that LBI has, as of 5/31/08:<br>• Total Assets of $320 billion, $317 billion of which were "allowable"<br>• Total Liabilities of $316 billion<br>• Over $2 billion segregated cash<br>• Excess net capital of $3.1 billion<br>• Over $3.8 billion in Reserve Bank Accounts Pursuant to Rule 15c3-3 |
| 64 | 6/05/2008 07:19 PM | Lehman officers discuss seeking interest of Entessa, Societe Generale and HSBC in possible Lehman investment. |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

|    | Date/Time | THE BEAR STEARNS CRISIS |
|----|-----------|-------------------------|
| 65 | 6/09/2008 06:48 AM | Lehman announced that continued challenging market conditions will result in an expected net loss of approximately $2.8 billion, or ($5.14) per common share (diluted) for the second quarter 2008 and net revenues (total revenues less interest expense) of ($0.7) billion. |
| 66 | 6/12/2008 | Joseph Gregory and Erin Callan resign. Ian Lowitt, Chief Administrative Officer, becomes CFO. Bart McDade, Global Head of Equities, becomes Chief Operating Officer and President, replacing Joseph Gregory. |
| 67 | 6/12/2008 | Lehman places a $2 billion "comfort deposit" with Citigroup to allay Citigroup's intraday risk concerns. |
| 68 | 6/19/2008 | Executive Committee of the Board of Directors authorizes and approves the issuance of $4 billion of additional common stock and $2 billion of a new series of preferred stock, 8.75% non-cumulative mandatory convertible preferred stock, series Q. This was part of a plan to raise additional capital in light of Lehman's poor 2nd Quarter earnings. |
| 69 | 6/30/2008 | LBI's Form 17a-5 Focus Report reflects that LBI has, as of 6/30/08:<br>• Total Assets of $436 billion, of which $433 billion were "allowable"<br>• Total Liabilities of $431 billion<br>• Segregated cash of $2.5 billion<br>• Excess net capital of $3.2 billion<br>• Over $4.9 billion in Reserve Bank Accounts Pursuant to Rule 15c3-3 |
| 70 | 7/10/2008 09:57 PM | Lehman officers discuss possible mergers/acquisitions by GE and BofA, but describe KDB as the preferred option, offering the greatest chance for Lehman to operate independently but with a reliable source of external funding. |
| 71 | 7/12/2008 09:31 AM | Lehman officers discuss the possibility of LBHI becoming a bank holding company but that this needs to be accompanied by an announcement on 7/14/08 that LBHI will sell its asset management business and mortgage backed securities, thereby recovering several billion dollars in excess of the equity assigned to those assets. Lehman would use those sales to conduct a large scale buy-back of stock to essentially privatize Lehman. Officers consider suggesting that Lehman should first see if HSBC is willing to bid for Lehman at $25 a share. |
| 72 | 7/18/2008 05:08 PM | Lehman targets 8/11/08 as the date to announce SpinCo. SpinCo. was LBHI's plan to spin-off its commercial real estate portfolio to a stand-alone company, which would then be owned by Lehman shareholders but operate independently of LBHI. |
| 73 | 7/22/2008 | Executive Committee of the Board of Directors authorizes the election of H. H. McDade III as President and Chief Operating Officer and the election of I. Lowitt as Chief Financial Officer and Controller. Also elected are: G. Donini, Senior Vice President and Global Head of Equities; M. Gelband, Senior Vice President and Global Head of Capital Markets; D. Goldfarb, Chief Strategy Officer; and A. Kirk, Senior Vice President and Global Head of Principal Investing. |
| 74 | 7/28/2008 11:29 AM | Lehman officers are updated on potential suitors for IMD. Another possibility discussed is the "KKR option" whereby Lehman Private Equity (LBPE) buys IMD. |
| 75 | 7/29/2008 11:54 AM | LBI sustains a pre-tax loss of $350 million as of 7/24. In response, LBHI is considering infusing additional capital into LBI for July depending on the amount and timing of write-downs. |
| 76 | 7/31/2008 | The major investment banks send a letter to T. Geithner updating him on the continued progress that they as a group have made in improving the credit and equity derivative market participant practices and in expanding coordinated efforts to additional asset classes. The letter is signed by senior management of Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Dresdner Kleinwork, Goldman Sachs, HSBC, JP Morgan Chase, Lehman Brothers, and other investment banks. ISDA, MFA and SIFMA are also signatories. |
| 77 | 7/31/2008 | LBI's Form 17a-5 Focus Report reflects that LBI has, as of 7/31/08:<br>• Total Assets of $332 billion, of which $329 billion were "allowable"<br>• Total Liabilities of $328 billion |

**Trustee's Preliminary Investigation Report And Recommendations**
**Chronology -- 1987 to September 22, 2008**

| | Date/Time | THE BEAR STEARNS CRISIS |
|---|---|---|
| | | • Segregated cash of $5 billion |
| | | • Excess net capital of $3.2 billion |
| | | • Nearly $5.2 billion in Reserve Bank Accounts Pursuant to Rule 15c3-3. |
| 78 | 7/31/2008 11:41 AM | LBI requests a paydown from LBHI of $375 million to provide a capital infusion into various subsidiaries in which LBI has a negative investment. The funds received into LBI will be subsequently paid to LCPI and LB I Group. |

| | Date/Time | AUGUST 2008 |
|---|---|---|
| 79 | 8/2008 | The Bank of New York Mellon ("BNYM") requests collateral from Lehman due to BNYM's perception of its intraday credit risk. |
| 80 | 8/08/2008 12:51 PM | Lehman considers corporate reorganization that would move LBSF and LCPI, but not LB I Group, out of LBI. LBSF and LCPI have significant p/l fluctuations, which raises concerns for LBI. |
| 81 | 8/10/2008 12:05 PM | Lehman prepares for a meeting with the SEC about the creation of SpinCo. |
| 82 | 8/14/2008 01:09 PM | Lehman speaks with T. Geithner about a possible exemption for LBCB from regulations under Rule 23A. Lehman stresses that the exemption be granted quickly. Geithner defers to FDIC. |
| 83 | 8/14/2008 01:57 PM | Lehman submits a draft request for $17.5 billion of assets to be transferred under the 23A exemption to LBCB, with final submission occurring after FDIC feedback. The purpose of the request is to accelerate the growth and profitability of the Bank. |
| 84 | 8/14/2008 03:39 PM | Lehman tells Fitch Ratings that the regulators had made a request to do a stress test and found that Lehman had an excess liquidity position of $15 billion as of the end of June. |
| 85 | 8/14/2008 4:57 PM | LBI loses approximately $835 million pre-tax in July. |
| 86 | 8/22/2008 09:20 PM | LBI's internal reorganization efforts to move LBSF and LBI out of LBI are hampered because entities that are capital deficient cannot be moved out of the LBI family without regulatory or tax consequences, and because of the logistics involved. |
| 87 | 8/28/2008 12:57 PM | LBI requests a paydown from LBHI of $1.1 billion to provide a capital infusion into various subsidiaries in which LBI has, or will have, a negative investment. The funds received by LBI will subsequently be paid to LCPI and LB I Group. |
| 88 | 8/28/2008 12:59 PM | The *New York Times* reported that Lehman plans to lay off around 1,500 employees before third-quarter results are announced in mid-September. |
| 89 | 8/29/2008 | Lehman enters into three agreements with Chase providing a guarantee to Chase for its clearing activities for the obligations of LBI, LCPI, LOTC, LBIW and LBJ. Prior to the amendment to the Clearance Agreement, LBHI did not guarantee LBI obligations. |
| 90 | 8/30/2008 | Concerned by rumors that Lehman would either go out of business over the weekend or bring in an investor, the CME seeks further dialogue with Lehman. |
| 91 | 8/31/2008 | According to Draft Form 17a-5 Focus Report, LBI has as of 8/31/08: |
| | | • Total Assets of $302 billion, of which $298.7 billion were "allowable" |
| | | • Total Liabilities of $298 billion |
| | | • Segregated cash of $3 billion |
| | | • Excess net capital of $3.3 billion |
| | | • Nearly $5 billion in Reserve Bank Accounts Pursuant to Rule 15c-3. |

| | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
| 92 | 9/03/2008 04:00 PM | LBHI Board of Directors is updated about market conditions and Lehman's third quarter results. Specific points included: (1) updates on the status of the proposed spin-off of commercial real estate assets; (2) updates on discussions with two potential foreign investors, and the possible re-emergence of a potential domestic investor with whom discussions had been previously held and reported to the Board; (3) |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
| | | updates on other alternatives being considered in the event discussions with potential investors do not result in a transaction, including the exchange of outstanding convertible preferred stock for shares of common stock, a sale of 51% of the IMD, and other potential means to raise equity capital; and (4) Updates concerning a potential management change in Europe and the United States. |
| 93 | 9/08/2008 05:34 PM | Draft A of Lehman's 3Q 2008 Earnings Call Script notes that Lehman plans to spin-off commercial real estate with about $33 billion of debt financing provided by Lehman and plans to reduce residential real estate exposure. The draft also outlines separately the terms of an IPO for 20% stake in the IMD division and a 51% sale of the IMD division. The draft notes net losses of almost $4 billion. The draft adds that Lehman's "liquidity position, which remains very strong," at $42 billion - down from $45 billion on May 31, 2008. |
| 94 | 9/09/2008 | Lehman executes the amendment to the Guaranty with Citigroup, adding LBI. |
| 95 | 9/09/2008 | Lehman pledges $1 billion in cash and approximately $1.7 billion of money market funds to Chase. |
| 96 | 9/09/2008 07:30 AM | Lehman announced a third-quarter loss of $3.9 billion along with its intention to sell 55 percent of its investment management division and to spin off $25 billion to $30 billion of its commercial real estate assets into a separate publicly traded company by the first quarter of 2009. |
| 97 | 9/09/2008 12:00 PM | The Board of Directors' minutes indicate that the Board, on the recommendation of the Finance and Risk Committee, agreed to pay an annual common stock dividend of $0.05 per share, effective for dividends payable on or after September 2008. Board is updated on strategic initiatives, including: a spin-off of commercial real estate assets, a sale of 51% of the Lehman's IMD, possible exchanges of outstanding convertible preferred stock for shares of common stock, and a possible capital raise with potential investors. Reference is made to discussions with two potential domestic partners, one of whom was concerned about the degree of overlap with its business and those of Lehman. Discussion of Lehman's consideration of a pre-announcement of 3Q earnings and strategic initiatives as soon as possible, either that evening or the next day. |
| 98 | 9/09/2008 05:37 PM | Citibank's Polish branch delays payments related to foreign currency swaps between LBSF, LBCC, and counterparties. The delays result in late intercompany payments between the London desk and LBCC. |
| 99 | 9/10/2008 | Rating agencies, including Dominion Bond Rating Service ("DBRS") and A.M. Best, downgrade their ratings for LBHI, and its related entities in light of Lehman's 3Q announcement. While Standard & Poor's, Moody's, and Fitch do not lower their ratings, they place LBHI and its affiliates on "review." These agencies note that they could lower their ratings if LBHI does not quickly reach an arrangement with another entity for either an acquisition or divestiture of its poorly performing assets. DBRS, S&P and Moody's all view LBHI's near-term liquidity as satisfactory. |
| 100 | 9/10/2008 | Lehman pledges an additional $300 million in cash to Chase, totaling $3 billion in two days. |
| 101 | 9/10/2008 | Press release announcing Lehman's preliminary third quarter results and providing detailed financial information. The release notes an estimated net loss of $3.9 billion, reduction in commercial and residential real estate exposures, the proposed spin-off of the commercial real estate division, and plans to sell a majority stake in IMD - albeit without naming a buyer. The release also evaluates results by business segment, showing an increase in losses in capital markets (to $4.1 billion from $2.4 billion in 2Q) and a decrease in revenue in investment banking (by $300 million) and investment management (by $.8 billion). |
| 102 | 9/10/2008 05:22 AM | LBHI continues to experience problems with the willingness of counterparties to settle trades. Specifically, Chase did not roll $385 million of commercial paper and cut LBI's tri-party settlement line from $2 billion to $1 billion. Similarly, Citibank and Bank of America refused to allow trades in light of their exposures to Lehman. Other counterparties requested early terminations, upgraded trades, and increased haircuts. |
| 103 | 9/10/2008 09:52 AM | Lehman experiences difficulties with Chase in calculating margin requirements. Lehman posts $273.3 million with Chase to meet margin call. |
| 104 | 9/10/2008 10:23 AM | Goldman Sachs informs Lehman that many of LBI's Prime Broker clients transferred their accounts from LBI to Goldman Sachs. |
| 105 | 9/10/2008 10:56 AM | Counterparties refusing to engage in foreign currency transactions with Lehman included: Mizuho Corp Bank, Calyon, ANZ, Westpac, |

**Trustee's Preliminary Investigation Report And Recommendations**
## Chronology -- 1987 to September 22, 2008

| | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
| | | BNZ. Additional counterparties were "tight" on Lehman, including ING, BOA, Bank of Nova Scotia, State Street, Stanchart, HSBC, DBS, Chinatrust, Barclays. Lehman seeks to reduce risk by pricing in liquidity when quoting prices to clients. |
| 106 | 9/10/2008 11:09 AM | Lehman continues to track a list of banks that took issue with Lehman's financial condition, payments, and collateral. In its daily funding report, each bank or counterparty listed sought to restrict and/or restructure their credit and collateral arrangements, including HSBC (cut unsecured credit lines), Citibank (requested additional $2 billion collateral and an additional $1 billion that evening), DnB Bank in Norway (cut unsecured credit), and Standard Bank (requested and received $200 million collateral against intraday exposure). |
| 107 | 9/10/2008 03:37 PM | Lehman employees analyze the capital infusions received by LBI subsidiaries LCPI and LBSF. Over the last five years, LCPI received five capital infusions and LBSF received two. The total capital infusions were over $2 billion for LCPI and $300 million for LBSF. |
| 108 | 9/11/2008 | Lehman posts an additional $600 million in cash to Chase and requests the return of $500 million of corporate bonds that it had posted as collateral the night before. Chase releases a portion of the bonds to Lehman. |
| 109 | 9/11/2008 10:00 AM | Reuters reported that Lehman Brothers shares fell as Wall Street questioned whether the investment bank will survive because of its failure to sell assets to cover losses from toxic real estate investments. |
| 110 | 9/11/2008 11:00 AM | LBHI Board of Directors is updated concerning Lehman funding, and told that the Firm had funded that day and that the Firm believes that it has funding for the following day. It is stated that liquidity is forecasted to decrease to $30 billion that day [9/12/08] as a result of providing collateral. Board is also updated on the discussion with Bank of America. The described goal is to announce a transaction Sunday night. It is reported that while Barclays had not directly reached out to Lehman, the Firm's regulators had advised Fuld of their potential interest. Board is updated on discussions with J. Mack, Chairman and CEO for Morgan Stanley, regarding a potential transaction with Lehman, but Mack was concerned about the amount of overlap between the two organizations and the ability to announce a transaction by Sunday night. Further, Board discusses the potential situation if no transaction is completed over the weekend – the funding situation and the rating agency situation would be very difficult. The Board is advised that the Firm is working with the Federal Reserve and the SEC on an orderly liquidation of assets supported by credit from the Federal Reserve if a transaction does not occur. |
| 111 | 9/11/2008 06:00 PM | JP Morgan Chase CEO, Jamie Dimon indicated to D. Fuld Thursday evening September 11, that Lehman needed to announce a sale transaction by market open Monday September 15 or Chase would immediately discontinue doing business with Lehman, effectively putting Lehman out of business. Based on discussions with Citi, Lehman believes Citi would take similar action. |
| 112 | 9/12/2008 | Lehman posts $5 billion in cash in response to Chase's 9/11/08 collateral request. |
| 113 | 9/12/2008 | SEC analyst notes that LBI's liquidity pool is almost totally locked up with clearing banks to cover intraday credit at Chase and Citi. |
| 114 | 9/12/2008 | Bain Capital submits a proposal to acquire a 55% stake in IMD. |
| 115 | 9/12/2008 01:07 PM | Keefe, Bruyette & Woods issues a memo discussing the impact of the S&P revising its "Creditwatch" for Lehman Brothers from "Negative" to "Developing." On a conference call discussing Lehman, S&P analysts stated that "they do not expect Lehman to fail. They think counterparty and systemic risk in the market is 'very very high' because of the skittish market conditions and tight liquidity. However, they think that barring the problem assets owned by Lehman, the underlying business at the company is doing well and its near-term liquidity is satisfactory." |
| 116 | 9/12/2008 01:18 PM | Lehman sends unspecified recipients documents regarding the safety of customer assets, including an explanation of its 15c3-3 reserve account, oversight by the SEC and FINRA as it relates to this account, the procedures these regulatory bodies would undertake in the event Lehman suffered a deficiency in capital, and additional protection of client accounts afforded by SIPC. |
| 117 | 9/12/2008 02:50 PM | Internal discussions concerning the interaction of potential simultaneous LBI, LBHI and LBSF defaults. |
| 118 | 9/12/2008 04:00 PM | Board of Directors is updated on the Firm's discussions with Bank of America and Barclays. Board is updated on the Firm's discussions with the Federal Reserve and the Fed's interest in helping to facilitate an orderly wind-down and avoid bankruptcy. Board is informed that management has consulted with bankruptcy counsel and introduced Weil Gotshal attorney H. Miller, who advised the Board that LBI would |

## Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
| | | not qualify for Chapter 11 under the Bankruptcy Code and would be subject to a SIPA proceeding. |
| 119 | 9/12/2008 06:00 PM | FRBNY senior management summons a group of senior Wall Street executives to FRBNY to achieve an "industry" solution to Lehman's problems. Talks continued through the weekend, but by Sunday afternoon both Bank of America and Barclays had bowed out, and word had circulated that Lehman was preparing to file for bankruptcy. |
| 120 | 9/12/2008 06:01 PM | Lehman asks the FRBNY to pressure Chase to release $5 billion in collateral in order for Lehman to pay the $3.9 billion that they owe. Chase had previously represented that they would return this collateral to Lehman when trades settled. |
| 121 | 9/12/2008 10:45 PM | Lehman begins preliminary planning for a wind-down plan based on assumption on that LBHI would file for Chapter 11 and that the firm would be liquidated. |
| 122 | 9/13/2008 | LBI and the CME discuss moving LBI's futures accounts elsewhere in the event of a bankruptcy filing. |
| 123 | 9/13/2008 09:00 AM | The Fed asks for meeting with Lehman to discuss plan for the "total Armageddon scenario." |
| 124 | 9/13/2008 10:10 AM | Goldman Sachs asks financial institutions to convene at the Fed for an urgent Operations Management Group OTC Derivatives meeting regarding Lehman. It further requests that anyone in the New York area attend the meeting in person. |
| 125 | 9/13/2008 11:14 AM | Lehman is updated on the status of current bids for Lehman. Despite the number of parties initially approached, Bank of America and Barclays are the only two remaining parties. |
| 126 | 9/13/2008 12:00 PM | LBHI Board of Directors is informed that there was no resolution yet with respect to Bank of America, but that it seemed to be a "game of chicken" between Bank of America, on the one hand, and the Federal Reserve and Treasury, on the other hand. Barclays was still pursuing a potential transaction, but noted that it would need shareholder approval of the transaction, would need to raise capital, and has much of the same types of assets as the Firm. Barclays' positions that it would prefer not to assume Lehman's commercial real estate assets. Board is updated on a meeting of financial institutions held the previous evening at the Federal Reserve in order to help facilitate a transaction between Lehman and Bank of America or Barclays, in turn finding a way to eliminate the need for federal money. Russo further reported that the Corporation had established a trust the previous day in order to fund employee health costs for a period of time in the event that Lehman makes a bankruptcy filing. |
| 127 | 9/13/2008 02:05 PM | Lehman receives "block bids" from several banks to hire groups of employees from Lehman's successful divisions, increasing pressure to finalize a transaction as soon as possible. |
| 128 | 9/13/2008 05:00 PM | Board of Directors is informed about the potential structure for a transaction with Barclays, specifically that Barclays would purchase the operating subsidiaries of the Firm for $3 billion and would guaranty the Firm's debt. Lehman would receive the cash proceeds and also would retain the commercial real estate assets, the minority investments in hedge fund managers, and the limited partnership interests in the Firm-sponsored private equity funds. Under this proposed structure, a consortium of financial institutions would provide new debt financing to the Corporation (estimated at $40 billion), with the preferred and common equity remaining in place at the Corporation. Board members expressed frustration about the Firm being "over a barrel" and concerns about obtaining the FSA's approval on a timely basis. |
| 129 | 9/13/2008 06:59 PM | Lehman prepares contingency liquidation plan showing how liquidation would proceed and describes the measures Lehman has in place to deal with this contingency. The presentation acknowledges that if there is funding uncertainty, LBHI would have to file for bankruptcy in a Chapter 11 proceeding, thereby making LBI subject to a SIPA proceeding and LBIE the subject of a receivership or administration. The presentation notes that both LBI and LBIE rely on funding from LBHI, which will not be able to fund either LBI or LBIE in their liquidations, thus the need for government or a third party financing arrangement. |
| 130 | 9/14/2008 | The FRBNY announces that it is expanding the categories of collateral accepted through the PDCF. While the FRBNY had previously accepted only investment-grade securities, it decides to accept any collateral that was acceptable for triparty repos. For LBI, the FRBNY limits the eligible collateral to that in LBI's clearance box at Chase on 9/12/08. It also imposes larger haircuts on LBI than on other investment banks. |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
| 131 | 9/14/2008 | FRBNY will provide up to two weeks of overnight secured funding to allow LBI to accomplish an orderly liquidation. |
| 132 | 9/14/2008 08:09 AM | LBHI makes a presentation regarding its commercial real estate and residential real estate portfolios to large banks, including Goldman, Credit Suisse, Citibank and others. |
| 133 | 9/14/2008 11:53 AM | S&P warns it may lower Lehman's credit rating absent announcement of a takeover agreement. |
| 134 | 9/14/2008 01:05 PM | Lehman considers opening bank accounts out of LBI in 'safe' banks. |
| 135 | 9/14/2008 1:05 PM | Lehman expresses concerns about the safety of LBI bank accounts and alternative banks into which to move funds out of LBI. |
| 136 | 9/14/2008 01:16 PM | ISDA arranges for special unwind trading session for derivatives for 2-4 p.m. on Sept. 14. |
| 137 | 9/14/2008 02:00 PM | Special unwinding trading session begins. |
| 138 | 9/14/2008 02:50 PM | Lehman prepares two preliminary draft press releases describing the sale of LBHI to Barclays ("Brown Acquisition") or Bank of America ("Blue Acquisition"). Both drafts omit key terms such as sale price and allocation of common stock, but include statements in support of the deal from Lehman executives B. McDade, F. Fuld, and the CEO of the acquiring company. |
| 139 | 9/14/2008 04:00 PM | FSA informs FRBNY that the guaranty issue will need to be resolved before any take-over can be approved. FRBNY responds that it has arranged a consortium of Wall Street firms to take Lehman's illiquid assets, but that a Barclays guarantee is still required. Eventually, FRBNY, Barclays, and the FSA discuss that the Barclays Board of Directors and FSA cannot approve any transaction requiring a Barclays guarantee. |
| 140 | 9/14/2008 04:12 PM | LBI prepares a plan for delivering securities to the Fed pursuant to the PDCF. LBHI and LCPI would prepare a schedule of pledged assets and deliver those securities to the Fed, as an amendment to the current documents, through LBI "as Agent to the Fed for LBHI and LCPI." |
| 141 | 9/14/2008 4:20 PM | Reuters reported that the ISDA has extended the emergency trading session between Wall Street dealers with Lehman counterparty risk until 6 p.m. New York time. |
| 142 | 9/14/2008 05:00 PM | Minutes of the LBHI Board of Directors indicate that the Board is updated on the status of discussions between the firm, the government, and potential investors or acquirers of the firm. Management had believed the Firm had reached a deal with Barclays, conditioned upon arranging third-party financing for the spin-off or sale of commercial real estate assets and approval by the U.K. Financial Services Authority. Discussions with Bank of America were not successful and that it appeared they were instead interested in acquiring Merrill Lynch. The Board is informed that the Firm had a liquidity problem, with much of the liquidity tied up at clearing banks, primarily Chase. He further reported the following: (1) the Federal Reserve Bank of New York ("FRBNY") issued an emergency order allowing for non-investment grade securities to be used as collateral at the Fed window. While Lehman stressed the need for the FRBNY to accept a broader range of collateral, the Fed's position was that the expanded window would only apply to tri-party repos of securities; (2) the Federal Reserve communicated to management that it preferred that LBI be wound down in an orderly fashion; (3) a failure to fund LBIE would obligate LBIE directors to initiate administration proceedings under U.K. insolvency laws, which in turn would trigger cross-defaults which represent a massive systematic risk that would potentially require the Corporation and certain subsidiaries to seek protection under Chapter 11; (4) the Firm has a bid for the IMD of the business that would raise cash and realize current value for a potential depreciation in the value of IMD; (5) the meeting of financial institutions assembled at the Federal Reserve had ended without an agreement to provide assistance to the Firm; and (6) the Corporation had hired bankruptcy counsel who were participating in discussions with the Fed. |
| 143 | 9/14/2008 06:00 PM | Special Unwinding trading session ends. |
| 144 | 9/14/2008 07:55 PM | Board of Directors is informed that the Fed had expressed its desire that the Board approve a Chapter 11 filing as soon as possible. It is also reported that LBI did not have the capacity to provide funding to LBIE which, in turn, would make it insolvent and require it to commence U.K. administration proceedings. The following key points were discussed: (1) the Firm's derivatives would be in default once the corporation filed under Chapter 11; (2) the principal subsidiaries that are parties to derivatives rely on the Corporation's guaranty for operations and the guaranty would probably eliminate the possibility of any shareholder recovery; and (3) debt holders, depending on their |

**Trustee's Preliminary Investigation Report And Recommendations**

**Chronology -- 1987 to September 22, 2008**

|  | Date/Time | THE FIRST TWO WEEKS OF SEPTEMBER |
|---|---|---|
|  |  | place in the structure, may not be paid. B. McDade and others at Weil joined the meeting after returning from the meeting at the Federal Reserve and reported on their discussions which pertained to the following matters: (a) the filing of bankruptcy; (b) the Fed's provision of an unwind for the Firm's tri-party agreements, the Fed agreement to take out counterparties against qualified collateral; (c) the need to operate LBI, in respect of which the Fed will provide funding for one month of up to $500 million against qualified collateral; (d) the Fed's desire that the Firm find a DIP lender for the U.S. broker-dealer; (e) market impact; and (f) the Fed's direct and authoritative statements it wanted the Corporation to file under Chapter 11 that evening. Chase is holding approximately $17 billion of collateral and is demanding another $5 billion. C. Cox, Chairman of the SEC, and T. Baxter, General Counsel of the New York Federal Reserve along with their counsel, Cleary Gottlieb, joined the meeting by conference call and in response to the Board's discussions regarding the necessity and implications of a bankruptcy filing. The SEC and Fed representatives emphasized that it was the Board's decision, but the decision to file bankruptcy had to be made quickly because of its impact on the financial markets. LBHI Board authorized the filing of bankruptcy under Chapter 11 of the Bankruptcy Code. |
| 145 | 9/14/2008 10:00 PM | B. McDade and R. Diamond (Barclays) discuss whether Barclays is interested in only purchasing LBI. Shortly after this discussion, Diamond informs McDade that Barclays is interested in the transaction. |
| 146 | 9/14/2008 11:47 PM | LBHI establishes payment release criteria in advance of filing for bankruptcy. Payments from LBI, NB, LBB, LBCB, LOTC and LBCC FX activity can be released. However, these payments can "only be made to each other and out to the street. Payments with any other Lehman entities as beneficiaries must be blocked." |

|  | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| 147 | 9/15/2008 | The CME receives bids for LBI's proprietary positions with the CME. |
| 148 | 9/15/2008 | The CME places LBI on "liquidation only" status for its proprietary positions, and gives the CME Clearing House Division authority to sell or transfer LBI's house positions in bulk. LBI does not liquidate its positions, but instead modestly adds to its positions over the next two days. |
| 149 | 9/15/2008 | Citibank sends letters to Lehman's CLS user members (LBI, LBCC, LBSF, and LBIE) advising them that they are terminating the CLS Settlement Services Amended and Restated Agreement. Agreement is signed requiring Lehman to deposit $1 billion in an account with Citibank in order for Citi to maintain CLS services for LBI and LBCC on 9/16/08. |
| 150 | 9/15/2008 | Citibank sends a letter suspending the earlier termination notice for one day. |
| 151 | 9/15/2008 | LBI borrows $28 billion from FRBNY via the PDCF. The FRBNY also advances $18.5 billion to LBI under the TSLF and $2.8 billion in OMO. |
| 152 | 9/15/2008 | LBI personnel begin setting up an auction for LBI's CME positions to be held on 9/16/08 or 9/17/08. |
| 153 | 9/15/2008 12:39 AM | Lehman restricts access to the INFINITY operating system to permit trading activities against only LBI. INFINITY is part of the MTS system relating to futures transactions. Access to all other Lehman entities is blocked. |
| 154 | 9/15/2008 01:45 AM | LBHI Chapter 11 Filing. LBHI's Form 8-K reports the September 15, 2008 filing of a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the Bankruptcy Code) in the United States Bankruptcy Court for the Southern District of New York and on September 16, 2008, LB 745 LLC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. LBHI will continue to operate its business as a debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Court. In addition, the Directors of certain affiliates of LBHI in the United Kingdom, including Lehman Brothers International (Europe), Lehman Brothers Holdings Plc, Lehman Brothers Limited and LB UK RE Holdings Limited, have concluded that in the absence of ongoing financial support from LBHI, they are or are likely to become unable to pay their debts as they fall due. Accordingly, these companies have been placed into administration. |

## Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| 155 | 9/15/2008 08:03 AM | DTCC sends a memo to its member banks informing them that DTCC will continue to act for LBI, LBB and Newberger Burman. The DTCC further states that despite LBHI's bankruptcy filing, these LBI entities are still in full compliance with their DTC participation requirements. |
| 156 | 9/15/2008 08:03 AM | NSCC sends a memo to its member banks informing them that the NSCC will continue to act for LBI and Newberger Burman. The NSCC further states that despite LBHI's bankruptcy filing, these LBI entities are still in full compliance with their NSCC participation requirements. The memo emphasizes that all transactions with LBI remain fully guaranteed for their settlement. |
| 157 | 9/15/2008 08:06 AM | Internal discussions regarding the trading impact of LBHI's bankruptcy and LBIE's administration. As a result of these proceedings, all cash flows out of and between Lehman entities are frozen. |
| 158 | 9/15/2008 11:25 AM | Chase and Citibank resign as LBI's clearing banks, thereby preventing money from coming into LBI and making it increasingly difficult for LBI to effect an orderly unwind and avoid SIPA liquidation. There is some question as to whether Citibank and Chase must provide LBI 30 days notice of their resignations. |
| 159 | 9/15/2008 12:51 PM | RBC informs LBI that all trades are on hold until further notice. |
| 160 | 9/15/2008 01:24 PM | LBI authorizes the entry of CLS trades that will settle currencies, thus avoiding a major cause of defaults. |
| 161 | 9/15/2008 04:03 PM | LBI informs Chase that it is moving $700 million to an LBI account at Citibank. |
| 162 | 9/15/2008 04:46 PM | DTCC announces that LBIE has been placed into administration in the UK. As a result, all new activity submitted against LBIE is being held in a special queue at Deriv/SERV and will be processed one per day in a special overnight cycle. |
| 163 | 9/15/2008 04:58 PM | LBI discusses its inability to perform any manner of Global FX trading for LBIE and LBSF. Therefore, LBI makes the decision that there should be no settlement in or out of LBIE and LBSF until the administrators say differently. |
| 164 | 9/15/2008 07:29 PM | Clearing broker BMO Nesbitt Burns Ltd. informs the Montreal Exchange clearing house, the Canadian Derivatives Clearing Corporation, that they would no longer accept opening of positions in LBI accounts. As a result, LBI can no longer open any positions for derivatives instruments listed in the Montreal Exchange. LBI is still able to execute transactions to close out current positions or to transfer such positions to another firm. |
| 165 | 9/15/2008 08:14 PM | The SEC tells LBI that it must increase its reserve deposit by 9/16/08 to cover any shortfall resulting from LBI's erroneous withdrawal of $1.1 billion from LBI's reserve account. The SEC "did not authorize the withdrawal," therefore, "the firm will need to increase the reserve deposit tomorrow morning by any shortfall." |
| 166 | 9/15/2008 11:06 PM | LBI's final cash position on 9/15/08: short approx $2.1 billion with around $2.3 billion of US f/x fails to receive and $1.5 billion of fails to pay for margin, overdrawn at Citi $3 billion US and long approx $900 million in currency, and net down $2.1 billion. LBI had to give Citi an extra $1 billion so they would continue to settle CLS. |
| 167 | 9/16/2008 | LBI wires $2.5 billion to its IMD clients relating to customers' sales of many market funds and securities. In some cases where the transfer related to the customer's sale of a money market fund, LBI would wire out the cash to the customer, but not receive the cash in from the money market fund until the next day, creating a cash shortfall. |
| 168 | 9/16/2008 | LBI pledges $23 billion of collateral to the PDCF in exchange for $19.7 billion in cash. |
| 169 | 9/16/2008 | FRBNY requests that Barclays "step into the shoes" of the FRBNY with respect to overnight financing of LBI to facilitate an orderly transition of the broker-dealer assets to Barclays. |
| 170 | 9/16/2008 12:27 AM | Lehman plans to sell its IMD assets. LBHI will need bankruptcy court approval for the sale. |
| 171 | 9/16/2008 06:00 AM | Minutes of the Board of Directors indicate that the Board meeting included both LBHI and LBI Directors because there was a sale consideration for both parties. Discussion of details to be resolved on the sale transaction, but LBHI is hoping to be able to announce the deal before the U.S. markets open. The transaction with Barclays is described as consisting of the following: (1) the purchase of 745 Seventh Avenue for approximately $1 billion; (2) debtor-in-possession ("DIP") financing of $500 million for LBHI, half in the form of a |

**Trustee's Preliminary Investigation Report And Recommendations**

**Chronology -- 1987 to September 22, 2008**

| | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| | | term facility and half in the form of a revolving facility; and (3) the transfer of most assets of the U.S. broker-dealer, along with approximately 10,000 employees, to Barclays. |
| 172 | 9/16/2008 12:41 PM | The CLS intraday trading through Citibank for 9/17/08 "is huge (peaking around $8 billion around 6am)." As a result, Citibank is seeking full collateralization of this amount, which LBI is not able to provide. Therefore, LBI will need to settle those trades bilaterally. LBI asks Citibank to provide LBI with the details of the largest trades that are causing these problems. |
| 173 | 9/16/2008 03:11 PM | LBIE receives permission from the administrator, PwC, to close out LBIE trades to the street (as opposed to intra-company trades). |
| 174 | 9/17/2008 | After it becomes apparent that Barclays would not assume the risk for LBI's proprietary positions, that LBI would make a bankruptcy court filing on 09/19/08, and that the Australian exchange was preparing to suspend Lehman's trading, the CME decides to re-solicit bids for the purchase of LBI's house portfolio and to transfer the positions to the winning bidders on 9/18/08. |
| 175 | 9/17/2008 | LBI pledges $23.3 billion in collateral to the PDCF in exchange for $20.4 billion in cash. |
| 176 | 9/17/2008 | The CME authorizes an auction to take place on 9/18/08 to liquidate Lehman's house portfolio. |
| 177 | 9/17/2008 | Barclays agrees to take the FRBNY's place in providing overnight funding to LBI. |
| 178 | 9/17/2008 | Lehman seeks CFTC oversight of its plan to auction its CME portfolio, citing concern about potential market manipulation. |
| 179 | 9/17/2008 06:26 AM | LBI seeks an indemnification letter from Barclays to prevent a number of buyins from occurring on 9/17/08 and 9/18/08. |
| 180 | 9/17/2008 07:00 AM | During a Barclays conference call announcing its agreement to acquire Lehman assets, B. Diamond (Barclays) states that the opportunity to purchase Lehman has been around for many months and they were just waiting for the deal to be right. Because the deal occurred through bankruptcy, Barclays "got to choose which inventory came with the deal, and primarily [ ] chose things that were important to the underlying business."<br><br>A Barclays executive states that the transaction is a good deal "because we've not taken the entire balance sheet that created that income. What we've taken is a portfolio of trading assets and liabilities that are, first of all, de-risked, and secondly, those that need to support the ongoing parts of the business that we have acquired." |
| 181 | 9/17/2008 10:20 AM | LBI cash has declined by $2 billion in the last two days. |
| 182 | 9/17/2008 11:56 AM | To facilitate an orderly unwind, LBHI plans to seek an exemption from the buy-in requirements for its clients until LBIE's administrator releases the frozen securities. |
| 183 | 9/17/2008 12:13 PM | Internal discussions concerning why customer withdrawals are impacting LBI's broker-dealer cash account. LBI wires cash to a customer when the customer sells a security. If LBI does not properly credit the sale of the securities, this could impact LBI's broker-dealer cash account. |
| 184 | 9/17/2008 04:07 PM | In spite of earlier refusals to do so, LBHI determines that LB I Group needs to be moved out of LBI. LBHI then considers whether other LBI subsidiaries should be moved. |
| 185 | 9/17/2008 04:31 PM | LBF continues to struggle with access to funds in its Citibank account and threatens legal action against LBI. |
| 186 | 9/17/2008 05:05 PM | OCC risk director and general counsel tells LBI that LBI needs a new settlement bank. If LBI does not make a payment due to the OCC by 9AM on 9/18/08, the OCC "could potentially shut down all our OCC positions." |
| 187 | 9/17/2008 10:02 PM | Internal discussions regarding concerns about ability to fund LBI's operations for 9/18/08. |
| 188 | 9/17/2008 10:02 PM | LBF seeks to retrieve approximately $12 million locked up in its Citibank account needed for LBF's payroll. |
| 189 | 9/18/2008 | The CME transfers LBI's house positions (including LBHI affiliate positions cleared through LBI). |
| 190 | 9/18/2008 | Chase advances $46.22 billion in cash to the FRBNY to unwind the FRBNY's financing of LBI. LBI's collateral with the FRBNY is delivered to LBI's clearance box at Chase. |
| 191 | 9/18/2008 | Barclays and LBI enter into a repo transaction under which Barclays is to send $45 billion in cash to Chase for the benefit of LBI, and LBI would pledge securities in excess of that amount to Barclays. |

**Trustee's Preliminary Investigation Report And Recommendations**
**Chronology -- 1987 to September 22, 2008**

| | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| 192 | 9/18/2008 | The CME provides notice to the CFTC that it took emergency action with respect to LBI on 9/17/08. The notice states that the President of the Clearing House "determined that an emergency action was necessary given the financial condition of [LBI] and to ensure the orderly functioning of the market," and that the Clearing House should immediately conduct an auction to secure bidders to purchase LBI's house account positions." |
| 193 | 9/18/2008 | Barclays begins the process of transferring $45 billion in cash to LBI in order to fund LBI overnight. DTCC and the Fedwire Securities Service remain open for several hours past their closing times in an effort to complete the intended transfer of collateral from LBI to Barclays. Not all collateral is successfully transferred, however. |
| 194 | 9/18/2008 12:24 AM | The CME Group says it is "very dissatisfied with the conduct" of LBI. According to the CME, LBI did not comply with CME's instructions to trade only to reduce risk and to liquidate its portfolio. LBI only liquidated its natural gas portfolio, which was just for the value of the original margin.

The CME is specifically concerned because there are deliveries due of treasuries on Friday, but LBI is not in a position to buy treasuries. Therefore, the CME intends to direct an auction of all LBI positions starting the next morning. The CME will include Barclays as a possible bidder. |
| 195 | 9/18/2008 05:07 AM | Bank Leumi files an action against LB Israel, a subsidiary of LBI, and LBIE because a $100 million wire from LBIE to Bank Leumi did not reach Bank Leumi. Bank Leumi also asserted a lien against LB Israel. |
| 196 | 9/18/2008 10:14 AM | The transaction with Barclays will not include any of LBI's subsidiaries. Instead, plan is formulated whereby LBI will transfer ownership of equity in the subsidiaries to LBHI or a wholly owned subsidiary in exchange for a note with a value equal to the fair value of these assets. |
| 197 | 9/18/2008 10:53 AM | Intercompany repo trades face LBI from LCPI, LCHI, Bankhaus, and LBIE. LBI had $4.67 billion in reverse repo (with cash into LCPI) in exchange for $5 billion in RACERS. In total, intercompany trades facing LBI would result in a cash outflow of $5.3 billion. The amount does not include trades with LBIE. |
| 198 | 9/18/2008 AM | The CME completes liquidation of all LBI house positions. |
| 199 | 9/18/2008 11:37 AM | LBI reports that the value of its 15c3-3 account was down ~$2.2 billion on 9/17/08. LBI used securities that it received after the Fed cutoff for PDCF as part of JPMC "box loan." |
| 200 | 9/18/2008 12:15 PM | FINRA requests that LBI provide additional information concerning withdrawal of $2 billion from its customer reserve account. FINRA strongly suggests that "the firm does not allow this Account to be Under Funded for any length of time throughout today with such a large withdrawal that took place last night."

FINRA also requests information about where LBI holds securities in custody for customers both domestically and internationally, asking for information about positions and market value. |
| 201 | 9/18/2008 12:42 PM | LBI investigates why it appears to be losing $300 million in cash with respect to intercompany repo trading with LBSF. |
| 202 | 9/18/2008 12:51 PM | LBI hears rumors that the exchanges are closing out all LBI house positions today. Therefore, LBI instructs its employees to stay in contact with the exchanges throughout the day and for all excess margin positions to be redeemed with cash wired back today. |
| 203 | 9/18/2008 01:41 PM | The Intercontinental Exchange Clear US ("ICE") Board of Directors orders the immediate liquidation of LBI's proprietary positions carried out at the ICE. |
| 204 | 9/18/2008 02:11 PM | LBI is unable to fund $298 million to GSSC and $240 million to NSCC. The wires were supposed to go out from Chase's main cash account, which is now devoid of funds. |
| 205 | 9/18/2008 02:34 PM | Citibank agrees to make payments to allow LBI to fund $298 million to GSSC and $240 million to NSCC. |
| 206 | 9/18/2008 04:33 PM | FINRA requests information regarding the cash side of LBI's 15c3-3 account after Lehman withdrew $225 million earlier in the day. According to FINRA, the P.A.I.B. is currently under funded by ~ $11 million. |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| 207 | 9/18/2008 04:38 PM | Fails in MTS total in the billions of dollars. |
| 208 | 9/18/2008 05:34 PM | The ICE Clear USA orders LBI not to liquidate any new trades that remain open tomorrow. |
| 209 | 9/18/2008 05:47 PM | FINRA expresses concerns with the amount that LBI has put into its 15c3-3 account to replace the $2 billion it withdrew. |
| 210 | 9/18/2008 06:01 PM | Barclays refuses to take the liabilities resulting from any customer fails. In response, LBHI wants to move and settle the trades instead of leaving them with LBI. |
| 211 | 9/18/2008 09:25 PM | The OCC is not releasing LBI client collateral despite LBI meeting its payment obligations via a direct fed funds wire earlier in the morning. |
| 212 | 9/18/2008 09:31 PM | Nasdaq makes a decision to restrict LBI's access to the Nasdaq and the TRF (ACT) beginning on 9/19/08. Nasdaq makes this decision because it received a call from the DTCC informing it that Barclays would not be accepting any open positions. |
| 213 | 9/18/2008 09:43 PM | Chase requests clear instructions from Barclays and SIPC on how to deal with LBI assets that it receives in LBI operating accounts at Chase. On 9/19/08, Chase will continue to provide access to LBI's operating accounts, but "will minimize its risk to overdrafts by requiring that adequate cash be available in an Operating Account before payment and other transfers are made therefrom."<br><br>After the deal with Barclays closes, Chase will need instructions on handling property it receives into LBI's accounts to identify whether it is receiving LBI or Barclays property. Chase also will require satisfactory protection from SIPC and/or Barclays to assure that JPMorgan will be repaid promptly for any overdrafts or liabilities arising from the Operating Accounts during this period. JPMorgan has requested that Barclays provide a guaranty of such overdrafts and liabilities, and to date Barclays has not agreed to provide a guaranty… |
| 214 | 9/18/2008 10:37 PM | LBI cannot perform any trading on 9/19/08, but can accept wires and checks because its trading box #074 has been deactivated. |
| 215 | 9/18/2008 10:39 PM | DTCC sends LBI a Draft FICC notice, scheduled to go in effect 9/19/08, announcing that FICC has suspended all LBI trade input and intends to settle LBI transactions because LBI is being placed into SIPA liquidation. |
| 216 | 9/18/2008 11:27 PM | LBI expresses concern about its ability to transfer positions to Barclays without also transferring the fails. |
| 217 | 9/19/2008 | Chase freezes LBI's clearing accounts and prevents LBI from accessing Chase's dealer securities trading systems because of overdrafts in LBI's accounts. Until this issue is resolved, LBI is unable to access its clearing accounts at Chase, or to settle outstanding trades and collateral movements. This eliminates LBI's visibility in Chase's BDAS system used by LBI, and prevents LBI from reconciling trades and bank accounts. |
| 218 | 9/19/2008 | LBI agrees to transfer $7 billion cash to a Barclays account held at Chase. This transfer does not occur because the SIPA proceeding is initiated. The $7 billion cash that was initially scheduled to be transferred from LBI to Barclays is instead, transferred to an LBI account held at Chase. |
| 219 | 9/19/2008 12:11 AM | Nasdaq decides to restrict LBI's access to Nasdaq and the TRF (ACT) because of a phone call it received from DTCC expressing concern about LBI's trades not being guaranteed. DTCC's concern is based on incorrect information provided by someone at Barclays. To resolve the situation quickly, DTCC's counsel asks for an authoritative written statement from Barclays that it will unconditionally assume all open LBI trades and obligations at the clearing corporations. |
| 220 | 9/19/2008 12:43 AM | Barclays prepares a press release stating that it has agreed to assume all open LBI trades and obligations at the clearing corporations in order to get the situation with Nasdaq restricting LBHI's access resolved. |
| 221 | 9/19/2008 01:29 AM | Counsel for Barclays informs the DTCC that assuming the Barclays/LBHI deal goes through, it is prepared to guaranty LBI's open trades in Box 074 in "an aggregate net amount not to exceed $250 million" and "[t]his agreement is conditioned upon a modification to the Asset Purchase Agreement permitting Barclays Capital Inc. to hold back from the purchase price an amount equal to the amount guaranteed." |
| 222 | 9/19/2008 05:53 AM | Resolution of the Board of Managers of Neuberger Berman authorizing the Assignment and Assumption Agreement between Neuberger Berman and LBI. |
| 223 | 9/19/2008 07:11 AM | Nasdaq issues a notice of access restriction stating that LBI is restricted from Nasdaq access effective immediately. Nasdaq explains that |

# Trustee's Preliminary Investigation Report And Recommendations
## Chronology -- 1987 to September 22, 2008

| | Date/Time | LBI'S LAST DAYS |
|---|---|---|
| | | this action is based on absence of a guarantee of LBI's trades. |
| 224 | 9/19/2008 08:02 AM | SIPC issues a statement that it "will file a proceeding placing LBI in liquidation under the Securities Investor Protection Act (SIPA)." SIPC's action is being taken in connection with the proposed sale of the business to Barclays. "A hearing on approval of that sale is scheduled for September 19, 2008, at 4 p.m., in the Chapter 11 proceeding of the parent company, LBHI." |
| 225 | 9/19/2008 08:05 AM | Lehman discusses Barclays' guarantee of LBI's DTC fails up to $250 million. As a result of the failure to reach an agreement on the guarantee, DTCC and FICC are threatening not to clear LBI trades. |
| 226 | 9/19/2008 09:56 AM | LBI is authorized to do risk reducing trades or trades that bring cash into the firm, but no cash is to go out. Lehman states that all trading must be approved by appropriate management. |
| 227 | 9/19/2008 10:30 AM | At a meeting of LBI's Board of Directors, also attended by Alvarez and Marsal, and outside counsel Dechert and Weil Gotshal, Board consents to SIPC's initiation of the LBI SIPA Proceeding and entry of the protective decree. The LBI Board also approved the transfer to Lehman ALI of certain of LBI's interests in its first tier subsidiaries and intellectual property, in exchange for the PIK Notes. |
| 228 | 9/19/2008 11:12 AM | FINRA requests the collateral reports for both securities and cash held at Chase, Wells Fargo and HSBC after LBI withdrew $1 billion from its 15c3-3 account. FINRA also renews its request for the information with respect to LBI's $225 million withdrawal on 9/18/08. |
| 229 | 9/19/2008 11:12 AM | FINRA struggles to track Lehman's collateral accounts at several banks on 9/19/08, as well as where LBI held securities in custody for customers - domestically and internationally. |
| 230 | 9/19/2008 11:31 AM | LBI tries to resolve an overdraft issue with Chase that has culminated in Chase's freezing of LBI accounts. LBI cannot clear or settle any transactions with clients or provide Barclays with additional collateral. |
| 231 | 9/19/2008 11:38 AM | Drafting of the first amendment to the APA. Correspondence between counsel for the various parties indicates that time is of the essence to get the draft done "to avoid assets going into the SIPC proceeding." |

| | Date/Time | THE SIPA LIQUIDATION |
|---|---|---|
| 232 | 9/19/2008 01:29 PM | Filing by SIPC of SIPA liquidation complaint against LBI in SDNY and entry by District Court of order commencing liquidation, *inter alia* appointing the Trustee, authorizing him to take possession of property and information, and staying certain actions. |
| 233 | 9/19/2008 03:05 PM | LBI requests that the CME release its house excess and additional currency balances of about $8,000,000. |
| 234 | 9/19/2008 03:18 PM | A director of Lehman Brothers ALI, Inc., refuses to sign a consent of the Lehman ALI Board of Directors regarding the transfer of LB I Group, out of LBI and into ALI. Director is only willing to consent if the bankruptcy counsel is able to "get everyone protection." |
| 235 | 9/19/2008 04:36 PM | Sale hearing on the approval of the broker-dealer sale to Barclays begins in United States Bankruptcy Court SDNY |
| 236 | 9/19/2008 05:01 PM | The OCC advises LBI, while the Trustee and his counsel are in court, that despite LBI meeting its obligations, the OCC has locked up LBI account due to a policy decision. |
| 237 | 9/19/2008 05:21 PM | Barclays decides not to purchase all of Lehman's foreign currency business. |
| 238 | 9/19/2008 05:56 PM | LBI and Barclays experience difficulty verifying trade risk as positions were being transferred from LBI to Barclays. |
| 239 | 9/19/2008 07:19 PM | LBI works with the SEC and SIPC to require Chase to release funds to permit the Neuberger Berman client conversion. |
| 240 | 9/20/2008 04:10 PM | Chase informs the Trustee that it must lock down LBI's Chase accounts against all automatic deposits and withdrawals because Barclays does not intend to purchase any securities held by Chase in LBI accounts and that LBI does not intend to assume any of Chase's OTC contracts with LBI (FX, securities lending, etc.). Chase will lock down LBI's accounts as collateral for LBI's obligations to Chase with respect to substantial overdrafts, OTC contract terminations, and other liabilities. Chase deems the lock-down "necessary to prevent commingling or loss of the collateral and the potential for additional overdrafts." |

**Trustee's Preliminary Investigation Report And Recommendations**
**Chronology -- 1987 to September 22, 2008**

| | Date/Time | THE SIPA LIQUIDATION |
|---|---|---|
| 241 | 9/20/2008 05:00 PM | Internally, LBI cannot discern which accounts <u>have</u> actually settled versus what <u>may</u> have settled because Chase still may have been making some settlements even after it decided to lock LBI out on 9/19/08.  Some accounts may need additional funding to settle. |
| 242 | 9/20/2008 07:11 PM | Barclays management tells Lehman employees that it extends offers to join Barclays to all active Lehman employees in Fixed Income and Equities Sales, Trading and Research, Prime Services, Investment Banking, Principal Investing and Private Investment Management in North America, Argentina, and Uruguay, as well as Corporate support staff for those businesses.  Barclays management also discloses that the majority of Lehman senior management has agreed to join Barclays. |
| 243 | 9/20/2008 11:10 PM | LBI determines that the number of stock record breaks in the 15c3-3 reserve account is "overwhelming." |
| 244 | 9/21/2008 09:43 AM | LBIE threatens to cut off services to other Lehman entities as of 9/22/08. |
| 245 | 9/21/2008 12:23 PM | Lehman disables its access to the Faster Payments Service (UK bank transfer method) with Chase in light of the assignment to Barclays, but Lehman does not disable the link to Citibank. |
| 246 | 9/22/2008 | The Barclays Sale Transaction closes. |
| 247 | 9/22/2008 | The OCC, the SIPA Trustee, and Barclays execute the Transfer and Assumption Agreement. |

# EXHIBIT D

# Trustee Recommendation:
# A Required Liquidation Plan

A pre-existing liquidation plan could help avoid rushed last-minute planning and provide essential details for an efficient liquidation[1]

❑ Address range of possibilities from complete liquidation of customer accounts to total or partial account transfers

❑ Provide details of key operational steps and core assets that would have to remain to assure effective liquidation of customer accounts

❑ State conditions to which a potential partial acquirer would have to be prepared to agree

❑ Include "Living Will" *(see next page)*

❑ Maintain and update plan, by regulation or statute

1. For more on this and related issues, see Section IX: Recommendations for Future Liquidations with Customer Implications, Whether Under SIPA or Another Orderly Liquidation Authority.

# Trustee Recommendation:
# A Required Liquidation Plan (continued)

A "**Living Will**" would require key information and documents to be maintained and updated on a regular basis

❑ Schedule of key systems and information sources and related technical support; assurance of continuing access

❑ Identification of key human resources; assurance of continuing access
  - ❑ Back office operations (e.g. settlement and clearance, corporate actions)
  - ❑ IT
  - ❑ Finance
  - ❑ Tax
  - ❑ Legal / Regulatory compliance

❑ Index of key contracts and lists of clearing banks, bank deposits, depositories, major repo and stock loan / stock borrow counterparties

❑ Explanation of chart of accounts, account holder agreements, applicable systems, box locations and associated collateral

# Trustee Recommendation:
# A Required Liquidation Plan (continued)

- ❑ Sample explanatory chart of accounts and associated general ledger
- ❑ Depending on the size and structure of the firm, the general ledger may be a separate system from clearing system. Account ranges typically include:
  - ❑ Clearing sub-ledger accounts:
    - ❑ Street Side Accounts – depositories and clearing banks where positions are maintained (e.g. DTCC, Euroclear)
    - ❑ Suspense Accounts – accounts holding funds and/or positions for which the account holder is not known
    - ❑ Customer Accounts – accounts which house customer positions and money (e.g. retail or institutional)
    - ❑ Proprietary Accounts – accounts which house firm proprietary positions and money
    - ❑ Bank Accounts – accounts where the firm has accounts
    - ❑ Processing Accounts – accounts used for the purpose of processing corporate actions related to security positions
  - ❑ Other firm accounts:
    - ❑ Payroll
    - ❑ Purchasing accounts payables and receivables (e.g. supplies)

## Chart of Accounts – Mapping Example



| Account Type | Account Range |
|---|---|
| Street Side | 099-00100 – 099-00500 |
| Suspense | 015-00001 – 015-9999 |
| Customer | 500-00001 – 899-99999 |
| Proprietary | 900-00001 – 940-99999 |
| Bank | 029-00001 – 029-99999 |
| Processing | 030-00001 – 030-99999 |

Clearing sub-ledger → General Ledger ← Payroll, Purchasing (Other accounts)

# Trustee Recommendation:
# A Required Liquidation Plan (continued)

- ❑ Schedule of vendor relationships and contracts
  - ❑ Transactional (e.g., SWIFT)
  - ❑ Pricing – external sources supplying pricing data to price and value security assets
  - ❑ Mailing services – external sources used for customer mailings (e.g. proxy, corporate actions)
  - ❑ Books and records
    - ❑ Recordkeeping (e.g., Broadridge)
    - ❑ Electronic archives and data warehouses (e.g., Iron Mountain)
    - ❑ Software providers and licensors
    - ❑ Mainframe and system providers and licensors
  - ❑ Operational support
  - ❑ Clearing services
  - ❑ Document management
  - ❑ Securities transaction processing
  - ❑ Data hosting and warehousing
  - ❑ Portfolio management

- ❑ Comprehensive files in single location for key documents including "no lien" letters, affiliate agreements, and subordination agreements

- ❑ Index and explanations of historic filings (*e.g.,* SIPC 17 report)

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

　　　　LEHMAN BROTHERS INC.,

　　　　　　　　　　　　　　Debtor.

Case No. 08-01420 (JMP) SIPA

## ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, APPROVING AND AUTHORIZING PROCEDURES TO UNWIND, CLOSE-OUT AND REDUCE TO CASH RECEIVABLES OWED BY TRADING COUNTERPARTIES

Upon the motion dated October 29, 2009 (the "Motion")[1] of James W. Giddens (the "Trustee"), as Trustee for the SIPA liquidation of the business of Lehman Brothers Inc. (the "Debtor" or "LBI"), seeking entry of an order, pursuant to section 105(a) of title 11, United States Code (the "Bankruptcy Code"), approving and authorizing procedures for the unwind, close-out and reducing to cash of Receivables owed by LBI Counterparties, as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the relief requested in the Motion is appropriate and in the best interests of the LBI Estate, its customers, its creditors, and all parties in interest; and the Court having

---

1.　Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

reviewed the Motion; and the Court having determined that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the following procedures are herby approved and established:

- With respect to any Receivable, the Trustee is authorized and has the full power and authority to resolve, fix and reduce to cash amounts owed by an LBI Counterparty to the LBI Estate (the "Payment Amount"), and the Payment Amount may incorporate setoffs solely to the extent that such setoff is permitted by applicable law.

  – With respect to Payment Amounts below $3,000,000.00, the Trustee may resolve and reduce to cash the Receivables without further Court order. The Trustee's interim reports to the Court, as required by section 78fff-1(c) of SIPA, and order of this Court dated November 7, 2008 (Docket No. 241), will include information regarding those Receivables collected by the LBI Estate in the period covered by such report.

  – With respect to Payment Amounts of $3,000,000.00 and above, the Trustee will henceforth prepare a stipulation and order (a "Court Stipulation") and seek Court approval by Notice of Presentment, in accordance with the Case Management Order entered in this proceeding (Docket No. 240).

- A Court Stipulation may address and permit the collateral, margin, securities or other property held by the LBI Counterparties or by the LBI Estate to be liquidated, returned or setoff with respect to any Receivable.

- With respect to any Receivable, the Trustee is authorized, but not required, to provide a release to the LBI Counterparties to the extent that the Trustee determines that a release is appropriate.

; and it is further

ORDERED that nothing in the Motion shall be deemed to be an admission of fact

by the Debtor or Trustee, for any purposes whatsoever, concerning the Receivables or the

purported resolution of any of the Receivables; and it is further

ORDERED that the Trustee is hereby authorized to execute and deliver all

instruments and documents, and take such other actions, as may be necessary or appropriate to

implement and effectuate consensual resolutions pursuant to the procedures set forth in this

Order; and it is further

ORDERED that entry of this Order is without prejudice to the rights of the

Trustee, including, but not limited to, the right to seek further, other, or different relief regarding

the Receivables pursuant to, among other things, section 365 of the Bankruptcy Code; and it is

further

ORDERED that notice of the Motion as provided therein is deemed to be good

and sufficient notice of such Motion and the requirements of Bankruptcy Rules 6006(a) and 9014

are satisfied; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order and/or

the terms of any agreement consummated pursuant to the procedures set forth in this Order; and

it is further

ORDERED that all objections to the Motion or the relief requested therein that

have not been withdrawn, waived, or settled, and all reservations of rights included therein, are

overruled on the merits; and it is further

ORDERED that any stay of this Order provided by the Bankruptcy Rules

(including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable

to this Order, and this Order shall be effective and enforceable immediately upon entry.


Dated:  New York, New York
       November 19, 2009

                         ___*s/ James M. Peck*_____
                         Honorable James M. Peck
                         United States Bankruptcy Judge

# PD 2

## SEC Lehman CSA & Credit Risk Review

**Lehman Brothers**

**Consolidated Supervised Entity Market and Credit Risk Review**

Securities and Exchange Commission
Division of Market Regulation
Office of Prudential Supervision and Risk Analysis
100 F Street NE
Mail Stop 6628
Washington, DC 20549

Confidential – For SEC Use Only

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

Table of Contents

Acronyms

Scope and Methodology of Review......................................................................... 1

I. Risk Management Infrastructure ....................................................................... 3

    a. Formal Governance Structure ......................................................... 3
    b. Risk Appetite Framework ................................................................ 4
    c. Aggregate Risk Limits..................................................................... 6

II. Market Risk Management ................................................................................ 7

    a. Structure of Market Risk Management............................................ 8
    b. Models and Methodologies for Measuring Risk ........................... 10
        i.  Introduction to VaR ................................................................. 11
        ii.  Revaluation ............................................................................ 11
        iii.  Mapping ................................................................................ 13
        iv.  Historical time series ............................................................ 13
    c. Businesses Generating Significant Market Risk............................ 14
        i.  Interest Rate Products and Liquid Markets Proprietary .............. 14
        ii.  Credit Businesses ................................................................. 16
        iii.  Mortgage trading .................................................................. 18
        iv.  Municipals ............................................................................ 21
        v.  Equity Volatility (Equity Derivatives) ........................................ 23
        vi.  Global Real Estate Group ..................................................... 24
        vii.  Risk Arbitrage ...................................................................... 26
    d. Control Processes ......................................................................... 27
        i.  Price Verification .................................................................... 27
        ii.  Profit and Loss Attribution Process ........................................ 28
        iii.  Model Control ....................................................................... 30

III.  Credit Risk Management.............................................................................. 32

    a. Overview of Businesses Generating Credit Risk .......................... 32
    b.  Tools ............................................................................................ 33
        i. Potential Exposure Modeling ...................................................... 33
            Fixed Income and Foreign Exchange Derivatives .............. 35
            Equity Derivatives ............................................................. 36
            Credit Derivatives ............................................................. 37
            Fixed Income and Equity Financing.................................... 38
            Prime Brokerage ............................................................... 38
            Revaluation Techniques .................................................... 38
            PE Validation .................................................................... 39
        ii.  Internal Credit Ratings ........................................................... 40
    c. Limits and Permissioning............................................................... 41
    d. Technology Systems ..................................................................... 43
        i.  Credit Work Station................................................................. 43

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

            ii.  MPE System ........................................................................ 43
            iii.  Credit Approval System (CAS)..................................................... 44
            iv.  Credit Risk Reporting Applications ............................................ 44
            v.  Risk Rating Scorecard Application ............................................. 44
            vi.  Future Enhancements ........................................................... 44
        e.  Specific Business Areas.............................................................. 45
            i.  Lending Activities .................................................................. 45
                Leveraged Finance ............................................................ 45
                Relationship Lending .......................................................... 49
                Warehouse Lending............................................................. 49
            ii.  OTC Derivatives/Securities Lending/Repos............................. 51
            iii.  Prime Brokerage ................................................................. 55

IV.  Risk Appetite………………………………………………………………… 58

        a.  Risk Appetite Components.......................................................... 58
        b.  Aggregation Process .................................................................. 60
        c.  Risk Appetite Limitations ........................................................... 61

V.  Areas of Focus………………………………………………………………… 62

        a.  Energy Trading…….................................................................... 62
        b.  Risk Appetite……..................................................................... 62
        c.  Scenario Analysis...................................................................... 63
        d.  PE Modeling Changes................................................................ 64
        e.  VaR Backtesting and PE Validation ............................................ 64
        f.  Changes to Credit Limit Structure .............................................. 65
        g.  Internal Facility Ratings ............................................................. 65
        h.  Prime Brokerage…................................................................... 65
        i.  Model Control……..................................................................... 65

VI.  Conclusion……………… ......................................................................... 66

Appendix A:  CSE review work papers

Appendix B:  Lehman staff consulted during CSE review

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Acronyms in Lehman Consolidated Supervised Entity Market and Credit Risk Review

| | |
|---|---|
| ABS | Asset Backed Securities |
| ALS | Aurora Loan Service |
| ARM | Adjustable-Rate Mortgages |
| BMA | Bond Market Association |
| CAO | Chief Administrative Officer |
| CAS | Credit Approval System |
| CDO | Collateralized Debt Obligation |
| CDS | Credit Default Swaps |
| CE | Current Exposure |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CLO | Collateralized Loan Obligations |
| CMBS | Commercial Mortgage Backed Securties |
| CMO | Collateralized Mortgage Obligations |
| CRM | Credit Risk Management |
| CRO | Chief Risk Officer |
| CSA | Collateral Support Agreements |
| CSE | Consolidated Supervised Entity |
| CVA | Credit Valuation Adjustment |
| CWS | Credit Work Station |
| DQCG | Data Quality Control Group |
| EAD | Exposure At Default |
| EE | Expected Exposure |
| ELP | Estimated Loss Potential |
| EMG/HF | Emerging Market Firms And Hedge Funds |
| EPE | Effective Potential Exposure |
| EPPE | Effective Peak Potential Exposure |
| FX | Foreign Exchange |
| GCS | Global Clearing Services |
| GMG | Global Margin Group |
| GREG | Global Real Estate Group |
| HistSim | Historical Simulation |
| HYCC | High Yield Commitment Committee |
| IB | Investment Banking |
| ICR | Internal Credit Rating |
| IO | Interest-Only |
| LBO | Leveraged Buy-Outs |
| LGD | Loss Given Default |
| LTV | Loan-to-Value |
| MACs | Material Adverse Clauses |
| MIS | Capital Markets Technology Group |
| MMD | Municipal Market Data |
| MPE | Maximum Potential Exposure |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

| MRA | Marginal Risk Appetite |
| MRM | Market Risk Management |
| NAV | Net Asset Values |
| NIM | Net Interest Margin |
| NPC | New Products Committee |
| NPE | Net Potential Exposure |
| OAS | Option-Adjusted Spread |
| OEC | Operating Exposures Committee |
| OPSRA | Office Of Prudential Supervision And Risk Analysis |
| P&L | Profit And Loss |
| PC | Product Control |
| PD | Probabilities Of Default |
| PE | Potential Exposure |
| PPE | Peak Potential Exposure |
| PTG | Principal Transaction Group |
| QR | Quantitative Research |
| QRM | Quantitative Risk Management |
| RA | Risk Appetite |
| RMD | Risk Management Department |
| ROTE | Return On Tangible Equity |
| TBA | To-Be-Announced Market |
| TMG | Transaction Management Group |
| VaR | Value-At-Risk |
| VCV | Variance-Covariance |
| VoD | Value-On-Default |
| WLT | Whole Loan Tracking System |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

## Scope and Methodology of Review

Pursuant to Lehman Brothers' (Lehman) application to become a Consolidated Supervised Entity (CSE), staff of the Office of Prudential Supervision and Risk Analysis (OPSRA)[1] reviewed the independent risk management function at Lehman.  We met with members of the Risk Management Department (RMD), trading desk heads, financial controllers, model research heads, and others.[2]  The bulk of the field work and analysis was done during May and June of 2005.[3]

The review consisted of on-site interactions with Lehman staff and off-site review and analysis of reports, documents and presentations submitted pursuant to this review.[4]  The on-site meetings generally covered one or more topics:  (i) business unit risk taking and risk controls; (ii) aggregate risk metrics and the independent risk control function; and/or (iii) control processes supporting risk management.  In total, we spent 23 days on-site meeting with Lehman staff, and participated in several follow-up conference calls.

During the review, we sought to assess the adequacy of the independent risk management function and to establish a supervisory framework by which to monitor and gauge risk management developments in the future.  For market risk, we focused on businesses generating material or difficult to capture exposures, including interest rate trading, credit trading, mortgages, municipals, equity volatility, real estate, and risk arbitrage.  We reviewed processes surrounding the primary market risk component of RA, value-at-risk (VaR), and looked at the calculations behind event risk, another component of RA that will be discussed in greater detail in the following sections.  In addition, we focused on the control processes surrounding these and other market risk metrics (e.g., price verification and profit and loss reconciliation). For credit risk, we focused on the risk management of the business areas with the most material counterparty credit exposure.  These include the leveraged lending business, which provides relatively large unsecured financing packages to non-investment grade counterparties, the OTC derivatives and securities financing areas, which generate "current" (i.e., unsecured) as well as "potential" credit exposures to a variety of counterparty types, prime brokerage, which provides overcollateralized (i.e., secured) financing to hedge funds, and the warehouse lending business, which finances large pools of whole loans for residential mortgage originators.  We examined the Potential Exposure (PE) methodology, a primary tool used to manage and limit counterparty credit risk, and a key input into the credit component of the risk appetite calculation, as well as the overall estimation of the counterparty risk appetite usage.  In addition, we focused on the credit department's processes for assessing counterparty credit quality and permissioning risk taking.

One feature of the risk management function at Lehman should be noted up front: unlike at its peer firms, market and credit risk are managed in an integrated fashion, through their aggregation into a single measure called Risk Appetite (RA).  This

---

[1] The market risk review team consisted of Lori Bettinger, Mike Hsu, and P.C. Venkatesh, with assistance from Matt Comstock in the Net Capital Group. The credit risk review team consisted of Michelle Danis and Steve Spurry.

[2] Our primary contact at Lehman was Madelyn Antoncic, the Chief Risk Officer.  For a list of Lehman staff contacted as part of this review process, see Appendix B.

[3] For the past two years, Lehman's market and credit risk departments have met with OPSRA staff under the auspices of the Derivatives Policy Group to present monthly risk information and commentary.

[4] See Appendix A for a catalogue of work papers related to this review.

[6] These deals are discussed in detail in Section III.e.i.

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

model achieves many of the same goals, such as the efficient allocation of resources, of the economic capital models at its peer firms.  Given the integration of market and credit risk, it is difficult to clearly delineate a discussion of market risk management from a discussion of credit risk management, and for this reason both departments are assessed jointly in one document.

At Lehman, much of the focus of senior risk management is on the pipeline of financing deals that make up a large portion of their risk.  These deals generate market risk, resulting from the process of selling securities into the market, as well as credit risk, resulting from loan positions retained by Lehman.[6]  They also generate significant operational risk (e.g., legal and reputational) and are heavily scrutinized by senior management.  The departments work together closely, and in the case of some businesses (e.g., prime brokerage and warehouse lending) jointly manage the risks.  This high-level aggregation of risks provide some clear benefits, yet also raises issues surrounding the aggregation process and the assumptions underlying it.  Lehman's approach to aggregating and managing risk is discussed in more detail below.

In addition to the standard market and credit risk review topics, we also looked at the integration of market and credit risk management.  Nowhere is this integration more evident than in the Quantitative Risk Management (QRM) group.  QRM is responsible for independently reviewing and approving the pricing models used across the firm.  It is also responsible for the overall architecture of the risk systems, implementation and maintenance of the risk models and generation of risk reports.  Within QRM, the Credit Risk Analytics department shares responsibility with Credit Risk Management (CRM) for the development, maintenance and operation of the risk quantification methodologies for credit risk, including Maximum Potential Exposure (MPE) and credit risk inputs for RA and Risk Equity.  Similarly, the Market Risk Analytics department shares responsibility with Market Risk Management (MRM) for the development, maintenance and operation of the risk quantification methodologies supporting market risk, including VaR, stress tests, scenario analyses, and RA and Risk Equity.

This review did not focus on operational control issues nor conduct any systems or transactions testing.  Rather, OPSRA directed its efforts to gain a broad understanding of Lehman's risk management infrastructure in order to be able to carry out prudential supervision on an ongoing basis.  Overall, the risk management function at Lehman is robust and market and credit risks are adequately measured, monitored and managed given the firm's current overall risk profile.   Lehman's standards for the measurement of market and credit risk exposures comply with the requirements of the Basel Standards and are consistent with the CSE rule.

This report is organized as follows.  The first section provides a discussion of Lehman's risk management infrastructure, highlighting the formal governance structure, the RA framework, and aggregate risk limits.  The second section describes and assesses Lehman's market risk management, models and methodologies for measuring risk, businesses generating significant market risk, and control processes around market risk metrics.  The third section describes and assesses Lehman's credit risk profile and the processes in place for managing and controlling credit risk, including tools for credit risk management, limits and permissioning, technology systems, and businesses generating significant credit risk.  The fourth section looks at RA in detail, including a discussion of its components, the aggregation process, and the framework's limitations.  The final section highlights areas warranting ongoing scrutiny and our conclusions.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

## I. Risk Management Infrastructure

a.  Formal Governance Structure

RMD has approximately 190 employees and is responsible for the risk management function at Lehman.  RMD is independent of Lehman's business units and is headed by a Chief Risk Officer (CRO) who is a member of Lehman's Management Committee[7] and reports directly to the firm's Chief Administrative Officer (CAO), a member of the Executive Committee.[8]  The CAO reports to the Chairman and Chief Executive Officer (CEO) and, ultimately, to the firm's Board of Directors.  RMD consists of five divisions:  MRM, CRM, QRM, Sovereign Risk Management and Operational Risk Management.

Lehman's policies and procedures identify three core functions of RMD.  First, the group must understand risks material to the firm, at both a business unit and aggregate firm level.  Accordingly, the group has developed metrics to measure and aggregate risks across products and businesses.  Second, RMD must ensure that appropriate limits are in place for all transactions and exposures.  For example, RMD uses RA to establish these limits at a business and firmwide level.  Third, RMD risk manages the firm against "catastrophic" loss.  To this end, RMD measures and monitors "tail risk" for trading positions, and deal risk for large transactions.

In addition to RMD, senior management oversight committees have responsibility for ensuring that the firm understands and approves the risks being incurred by various businesses and transactions.  The following section highlights four of those committees.

The Risk Committee meets weekly to review exposures and position concentrations (both market and credit).  The committee consists of the Executive Committee, the CRO and the Chief Financial Officer (CFO).  The committee discusses the firm's top market and credit risks, relying on metrics such as RA; VaR; counterparty credit risk exposures by region, role, product, and top sectors; large exposures and commitments.  The CRO communicates with the Executive Committee regularly and provides reports as necessary.[9]

The Operating Exposures Committee (OEC) was formed in 1996 at the CEO's request.  The Chief Legal Officer chairs the committee and reports directly to the CEO.  Members of OEC are Executive Committee members and senior managers from control functions such as tax and finance, including the CRO.  The committee meets monthly.  OEC's mission is to protect the franchise and ensure that the firm has implemented an appropriate set of internal controls.  OEC examines all activities that expose Lehman to market, credit, operational, technological, documentation and legal risk.  It attempts to identify and anticipate areas and issues that leave the firm most vulnerable to losses and sponsors appropriate measures to address those areas and issues.  To accomplish its mission, OEC may review any group, department or division where there is the potential for the firm to lose money.  Issues that OEC has addressed or continues to address

---

[7] The Management Committee includes all major business unit operating heads and is responsible for the operations of, and coordination among, the global business units, including the establishment of near-term strategic objectives.

[8] The Executive Committee is comprised of the most senior members of Lehman and is ultimately responsible for its leadership and strategic direction.  The Committee generally meets twice weekly, but will meet more frequently, if necessary.  The Committee reviews and approves all major decisions that impact Lehman.

[9] Other risk committees include Investments, Bridge Loan, New Products and Country Risk Committees.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 2125011

include fraud prevention and continuous audit monitoring, derivatives documentation, client account documentation, business continuity planning, mortgage origination business and infrastructure control, and money laundering prevention, among others.  In addition to identifying vulnerabilities, OEC attempts to plays a proactive role by providing a forum for addressing issues before they become problems.

The New Products Committee (NPC) determines if Lehman will commit to market a new product or enter into a new business.  The NPC is intended to provide a forum for the business units to present new products or businesses to relevant areas of the firm to assess potential risks (including legal, regulatory, market, credit, and operational risks); ensure that the appropriate infrastructure is in place to trade the products or engage in the business; and approve, disapprove or recommend enhancements related to managing risks associated with the new products or businesses. The Chief Legal Officer chairs the NPC.  It is comprised of senior managers from control functions, including Compliance, Corporate Audit, Corporate Strategy, Market and Credit Risk Management, Financial Control, Information Technology, Legal, Operations, Product Control (PC), Tax, Transaction Management and Treasury.  The CAOs of various business divisions, such as Equities and Fixed Income, may participate in reviews of products that their respective divisions sponsor.

Lehman also has both a firmwide Commitment Committee and divisional commitment committees that perform a number of functions. Prior to bringing the deal to the Commitment Committee, the appropriate divisional commitment committee (equity, high yield, or high grade) considers the profitability and limit usage of a particular transaction.  These committees have primary responsibility for determining whether a transaction offers an attractive return on equity and whether it fits within cash capital, RA, credit and single transaction limits.    Once a transaction has been approved by a divisional commitment committee, it must then obtain approval from the firmwide Commitment Committee.  The firmwide Commitment Committee seeks to address risks that are incurred as a result of capital markets deals, such as acquisition financing and underwritings, areas in which Lehman has a dominant presence.  These transactions, such as high yield debt underwritings, can expose the firm to significant amounts of risk.  This committee ensures that a particular transaction fits within Lehman's funding and risk frameworks, with particular attention to any reputational risk a deal may incur. The firmwide Commitment Committee determines if due diligence on a transaction has been thorough, the firm is protected on relevant legal issues, the firm is comfortable doing business with the client (i.e., reputational issues) and the syndication strategy is clear.

b.  Risk Appetite Framework

The RA metric embodies the integrated risk management philosophy discussed above.  Unlike its peer firms, Lehman utilizes this firmwide risk metric to capture market, event and credit risk in a single number for purposes of limit setting and senior management reporting.

Lehman's firmwide RA limit is calculated through a process which considers the budget for the firm, projected revenues for a down year, and minimally-acceptable return on tangible (book) equity (ROTE).  In this way, the firm's RA limit is constructed from the bottom up, rather than through high-level discussions of loss tolerance, as is often the case for VaR and PE limits.[10]  The broad objective is to arrive at a number – the RA limit

---

[10] For instance, in setting a firmwide VaR limit, a senior management committee at other firms utilizing a more conventional approach may seek to set the limit directly by considering the dollar amount it is comfortable with losing one out of every 100 trading days, which is what a 99th percentile VaR metric is

4

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

– which reflects Lehman's capacity to take risk, based on a one year horizon and 95th percentile loss assumption.

In practice, the firmwide RA limit is calculated by the controllers in January, after the Board has signed off on the year's budget. Beginning with the firm's baseline revenue, which is a function of the business units' expected revenues in a normal operating environment, the controllers adjust downward to account for a simultaneous slowdown in customer flow, proprietary trading and banking activities (e.g. origination and mergers and acquisition advisory). The resulting figure represents what the firm can expect to make, even under prolonged adverse market conditions. For 2005, the baseline net revenue was $12.7 billion. Of this, $10.4 billion was derived from customer flow and $2.3 billion from principal investments, private equity and real estate. To simulate a downturn in the market, a -10% revenue shortfall was applied to the customer flow revenues and $0.6 billion was deducted from the $2.3 billion.[11] Thus, should the market environment in 2005 turn sour, the firm could be expected to generate at least $11.1 billion of revenue.

These revenues are offset by expense projections. While most expenses can be assumed to decline in rough proportion to a fall in revenues, compensation-related expenses are assumed to be sticky, reflecting the fact that some headcount must be maintained to protect the franchise in the medium to long term. Moreover, the firm assumes that to protect the franchise it must generate earnings sufficient to maintain for shareholders a minimally acceptable ROTE. This return has been set at 10%. Thus, a portion of the firm's revenues essentially cannot be put at risk, in order to maintain the viability of the franchise. For 2005, these combined constraints translated into $8.9 billion. The difference between the $11.1 billion of revenues the firm can expect to receive (even in a bad year) and the $8.9 billion of revenues which the firm cannot put at risk in order to cover projected expenses is $2.1 billion, which represents how much the firm can risk (i.e., lose) without jeopardizing the franchise. In other words, the difference represents the firm's RA limit: $2.1 billion.

Two aspects of this calculation are worth pointing out. First, from a senior management perspective, this figure has great intuitive appeal. It encapsulates, in dollar terms, how much total risk the firm can take. Moreover, it is generated based on business considerations (revenues, expenses, ROTE, etc.), rather than on statistical metrics like VaR, which can be difficult for non-risk managers to link to the business activities of the firm. Second, the limit establishes a binding constraint on risk-taking. At Lehman the aggregate RA limit is, by design, not meant to be exceeded under any conditions, as an excession would indicate that the franchise was at risk.

In contrast to the RA limits, which express the firm's risk capacity, RA exposures reflect the risks being taken by the businesses, i.e., risk *usage*. RA exposures are an amalgamation of three types of risk: market risk, event risk, and credit risk. Each component is calculated separately, largely by transforming existing metrics like VaR

---

designed to capture. This determination of comfort level is, by its nature, subjective. In addition, at times these limits may be set at relatively low levels, in order to act as "speed bumps" that would trigger discussion if they were to be breached. By contrast, under Lehman's approach, the firm's risk tolerance proceeds along more tightly defined criteria, with little apparent subjectivity around the final number itself. Under this latter approach, the number which falls out of the calculation is less a reflection of management's subjective "comfort level" and more a binding constraint.

[11] The 10% adjustment to baseline projected customer flow revenues is based upon the firm's revenue history during its existence as a public company, with a focus on the down years. The firm has never experienced a revenue shortfall of this magnitude, thus the adjustment has been deemed to be sufficiently conservative. The $0.6 billion deduction from the principal investments component reflects what the firm believes it needs to represent the inherent volatility of this revenue stream.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

and PE, and then aggregated according to certain correlation assumptions, described below.  A central idea behind the RA exposure number is that a dollar of risk is equivalent to all other dollars of risk, no matter the source.  To get to a point where this holds true, the existing measures of market, event and credit risk must first be standardized and put on an apples-to-apples basis with each other.  By matching these to the one year, 95th percentile assumption underlying the RA limit, risk usage and risk capacity can be compared meaningfully.[12]

    c.  Aggregate Risk Limits

    Lehman's risk management framework is multi-tiered.  The primary firm limits live within the RA framework.  As mentioned above, the Executive Committee sets the overall RA limit at a firmwide level and at the division level (e.g. fixed income or equities).  RMD, in conjunction with the business heads, sets limits for the businesses.  As mentioned in a prior footnote, many firms have their own limits intended to act as a sort of speed bump that prompts discussion with risk management prior to putting on a risky position.  At Lehman, RA limits are considered to be hard; that is, they are non-negotiable except in extremely limited situations.  If the firmwide RA limit were to be breached, the CRO would immediately notify the CAO and the Risk Committee.  If a business level breach occurred, the market risk manager would discuss this with the traders, the desk head, the head of MRM, and the CRO.  The CRO, in consultation with the division head, may either allow the excess for an agreed period of time in support of a specific strategy (this type of approval is generally granted only ex-ante), agree to revise the limit if such a change is warranted, or instruct the business to reduce its profile so as to be within the original limit.



    Lehman also sets risk limits for the firm on a more granular basis, such as VaR, counterparty credit limits, and country limits.[13]  In addition, Lehman is in the process of developing single transaction limits, which would cap the size of individual deals.[14]  The

---

[12] It is worth noting that at many firms, stress tests are thought of as more extreme, yet less likely, occurrences, for which probabilities cannot be assigned.  At Lehman, however, event risks are deemed probabilistic for RA aggregation purposes, despite the fact that they appear designed to capture these risks in the same manner as peer firms' stress tests.

[13] VaR limits are discussed in more detail in Section xx.  Counterparty credit and country limits are discussed in more detail in Section III.c.

[14] These limits do not apply to large derivative deals.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

purpose of these limits is to minimize headline risk, where Lehman would receive negative press about an outsized loss that might raise questions about its internal risk management processes. A deal will still have to pass through the requisite approval processes, such as formal committee approval.  In addition, a deal may fall within VaR and RA limits, but still be considered too big under the single transaction limits.  These limits have not yet been rolled out in a formal manner, but the business units are currently operating as if the limits are in place.

Single transactions are limited to $200 million in potential quarterly pre-tax losses and to an overall deal size of 15% of tangible equity (equivalent to $1.8 billion). However, with "bells and whistles" such as material adverse clauses (MACs) and pricing flexibility, potential quarterly pre-tax losses and transaction sizes can be larger.  RMD has developed a calculator that determines the maximum loss, looking at factors such as place in the capital structure, volatility, event risk, pricing flexibility, business or market MACs.  In addition, deals that will take longer to close are penalized within the calculation.  Both RMD and the businesses have access to the same calculator, the idea being that it will allow the bankers to proactively structure a deal with the risk mitigants that will ensure the deal is within the limits.  A banker will input the size of a deal's tranches into the calculator, which will give the maximum loss figure.  The calculator inputs, mentioned above, are input into the model by risk management.  The model incorporates both VaR and event risk at a 99.5% confidence level.  As mentioned previously, RMD at Lehman focuses much of its attention on these large deals generating concentrated exposures.

RMD and the affected business units have worked together to develop this framework, leading to acceptance of the limit by the businesses.  For example, the high yield leveraged loan group pointed out that a leveraged buyout which is a total revamping of a company's structure has a lower probability of default in the first year than a comparable company that has just received a cash infusion.  Thus, the probability of default was adjusted in the calculator accordingly.  However, in areas such as syndication market visibility, MRM is unwilling to adjust the parameters.

The various risk limits set at the senior management level cascade down to the business units and, ultimately, to the trading desks.  Both business unit and RMD personnel then monitor usage against those limits.  Limit excessions (of RA, VaR, or counterparty exposures, for example) are reported to appropriate supervisory personnel and escalated to senior management, if necessary. In some cases, desk heads may set their own limits based on alternative risk measures (e.g. gamma or delta), but these limits are entirely owned by the businesses units rather than RMD.

## II. Market Risk Overview

This section will discuss the structure and responsibilities of MRM, as well as the metrics used to capture and convey market risk at Lehman.[15]  It will then describe the businesses generating significant amounts of market risk, and how the department seeks to capture the risks associated with these businesses.   In addition, OPSRA looked at businesses generating significant event risk, which is discussed in further

---

[15] Unless otherwise specified by term "market risk component" in this section of the report, the term "market risk" will be used to refer to risk arising from potential changes to various risk factors, and generally captured by VaR.  It does not refer to the market risk component of RA, although the market risk component of VaR is directly derived from the daily VaR measure used by MRM.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

detail later in this section. Based on these criteria, OPSRA looked at interest rates, credit trading, mortgage trading, municipals, equity volatility, real estate, and risk arbitrage.

a.  Structure of Market Risk Management

MRM is responsible for developing and implementing Lehman's market risk management policies and procedures; determining market risk measurement methodologies in conjunction with QRM; monitoring, reporting and analyzing the aggregate market risk of the firm's trading exposures; and administering market risk limits.  The Global Head of MRM is based in New York and reports to the CRO.  Under the head of MRM, there are risk managers aligned by businesses: a head of real estate, two global heads of interest rate products, a head of equities, and a head of investment management.  The heads of collateralized lending report jointly to the head of market risk and the head of credit risk.  MRM has teams in the firm's regional trading centers of New York, London, and Tokyo.  In addition to the risk managers aligned by business, there are regional heads: a head of European risk management, and a head of Asian risk management.   The heads of Asian and European risk management report to the regional CEOs for administrative purposes.

MRM is governed by the Market Risk Policies & Procedures, which are reviewed annually concurrently with the budgeting process, or more often if necessary.  MRM is responsible for measuring, monitoring, and reporting VaR, VaR backtesting, stress testing, scenario analysis, and event risk.

Market risk managers physically sit on the trading floors which they cover, and meet daily with the appropriate business unit management.[16]  The risk managers are consulted by desk heads prior to large and unusual transactions.  While the daily processes vary depending on the product covered, in general a risk manager's day begins with market monitoring and a prior day recap.  All of the risk managers' responsibilities are geared towards ensuring that there is a coherent and consistent story being reflected in the data, and reporting that story up through the chain of command.  He or she will look at the prior day risk capture through position data, sensitivities, and stress matrices.  VaR and risk reports will be generated at desk and aggregate levels, and managers will usually perform a "sanity check" with product control, the middle office, and the traders. In the morning, each risk manager must sign off on the VaR calculation for their business.  Without these sign-offs, firmwide VaR cannot be calculated.   The risk manager will also provide commentary on major exposures, trades, and market events.  Throughout the day, the risk manager monitors the market and intraday risk, and any large and unusual transactions.  At the end of the day, the risk manager may provide an additional recap.  In addition to these responsibilities which are common to many product areas, some risk managers create daily customized risk reports.  In the equity proprietary business, for example, risk management prepares daily limit transaction reports and daily fund managers name overlap and exposure reports at the behest of the business.

The weekly process involves risk aggregation with regard to major sensitivities, and major trade or exposure details.  On a monthly basis, the risk manager will comment on VaR or RA changes, as well as discuss the risk with the business head.  Lehman stated that informal interaction with business heads occurs on a daily basis.  For example, the risk manager for U.S. rates attends an end of day meeting held by the

---

[16]OPSRA visited with the head market risk managers at their desks on the trading floor, and the risk managers described and demonstrated their specific daily processes.

8

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

business head of interest rates and liquid proprietary trading, where the desk heads give a quick summary on their day's positions, and any notable market movement.[17]

Risk managers prepare daily updates for the head of MRM and the CRO. On a weekly basis, the senior risk managers contribute to a "top line risk report" that is prepared by the head of MRM.  This report is then given to the CRO, who presents it to the Executive Committee during a weekly meeting.  This report discusses changes in RA, changes to material exposures (e.g. interest rate and foreign exchange (FX) positions), and businesses currently having notable risks.  There is also discussion of new trades and positions that have had a material impact on risk, and investment grade and non-investment grade large exposures on a name by name basis.  The report that OPSRA reviewed also had a lengthy discussion of principal transactions within the real estate business. MRM also contributes to the Firmwide Risk Snapshot, a one-page report which shows RA and VaR usage by business. It breaks out the top market risks, and large exposure highlights.

While market risk managers monitor overall RA usage for their respective businesses, on a day-to-day basis, they tend to focus on the specific RA component (market or event risk) driving RA usage.  In the case of the more liquid businesses, such as equity derivatives and interest rates, RA is driven primarily by VaR, or the market risk component.  Therefore, the risk managers for those businesses focus their daily processes on VaR drivers and overall usage.  In areas such as real estate, the majority of RA is driven by the event risk component, and it is monitored accordingly.  This approach seems appropriate in that it allows risk managers to focus on the metric that best captures a particular business' risks.

Market risk managers also have responsibility for reporting limit breaches, both for VaR and RA. The overall VaR limit is a function of the market risk component of RA, and the division level VaR limits are set by MRM in conjunction with the business heads.  While, as mentioned previously, RA limits are considered to be "hard," there tends to be a bit more flexibility around VaR limits, although not at the divisional level.  Within a division, however, MRM may approve an overage within one business as long as the division is within its overall limits.  As mentioned previously, the CRO and senior business management are made aware of limit overages by risk managers via emails throughout the day.  Risk managers include varying degrees of analysis and commentary with the limit breach notification.  This flexibility allows managers to respond in a manner consistent with the materiality of the breach, but risks inconsistency in the overall limit breach process. In some cases, senior business management will engage in a dialogue to seek more detailed explanation for the increase in risk.  While this provides an audit trail of sorts for limit breaches and management follow-up, the manual nature of this activity means that senior business management is informed of limit excessions only to the extent that risk managers affirmatively report them. Many of Lehman's peer firms use limit processes that are more automated, or have plans to migrate to such systems.

At the highest level, risk managers rely on a technology platform called LehmanRisk to measure aggregate risk-taking by the business units, to store and report relevant risk data, and to otherwise assist them in their analyses of the risk profile of the firm.  LehmanRisk calculates RA, VaR, event risk, and aggregate sensitivities and stress matrices for a variety of products and exposures at multiple levels of the firm hierarchy.  This information is accessible to risk managers through a web-based interface.  In

---

[17] OPSRA attended this end-of-day meeting for interest rates, where the business head, his desk heads (e.g. Treasuries, pass-through mortgages, agencies), and the market risk manager for the rates business were in attendance.  OPSRA spoke with the business head after the meeting to understand how he viewed his interactions with his MRM counterpart.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

calculating the aggregate risk exposures, LehmanRisk leverages off of data in the front office trading and aggregation systems – e.g., position greeks, spread sensitivities and stress matrices. Accordingly, as discussed later in this document, the controls around that data, such as PC-led price verification, are critically important to the robustness of the aggregate risk calculations done for VaR, event risk and RA.

Risk managers also may look directly to the various systems built and used by the business units themselves to provide more granular information on changing risk exposures. For instance, the front office trading systems for mortgages feed into and support a system called RAMP, which aggregates exposure sensitivities to various yield and spread curves and provides a host of other information to its users, primarily the trading desk heads.[18] A similar risk aggregation system exists for rates trading, dubbed IRIS. The finer granularity and higher dimensionality of the exposure information available through these systems provides risk managers with the means to investigate in detail the drivers of any higher level risk changes as evidenced through LehmanRisk. It also provides another set of metrics by which to reconcile changes in aggregate measured risk.

Much of the detailed work from a modeling perspective occurs in the front office systems. Recall, LehmanRisk focuses exclusively on risk aggregation. By contrast, the risk sensitivities which LehmanRisk depends upon are calculated in the front office systems such as RAMP and IRIS. Thus, the model validation process discussed later in this report serves an important role in ensuring the robustness of the risk measurement data eventually calculated and reported by LehmanRisk.

Currently, there is no risk tool to conduct real-time "what if" analysis on large transactions, as is the case at several peer firms. Rather, MRM conducts an ad hoc customized risk analysis for large transactions warranting further review.

b.  Models and Methodologies for Measuring Risk

As mentioned previously, MRM relies on various metrics to assess the risk in the business areas. For some businesses, such as equities and interest rates, the risk manager's primary metric is VaR, as the risks tend to be readily captured through the VaR system. In other businesses, such as real estate, the risk managers tend to focus on event risk, which captures the risks not picked up by VaR. Event risk measures the potential loss associated with occurrences which are not captured in market risk. It seeks to measure stress and "gap risks" which go beyond potential market risk losses.

While the exposure characteristics of positions and portfolios can be captured by risk factor-specific sensitivities, such as the Greeks and measures of the incremental impact of a widening of spreads across the curve[19], calculating a meaningful aggregate risk measure requires some means of taking into account the correlations and dependencies between all of the relevant risk factors and aggregating risk across businesses with exposures to different risk factors. VaR is able to address these aggregation needs. Mathematically, VaR corresponds to a percentile loss of the forecast distribution of a portfolio's profit and loss (P&L). Conceptually, VaR attempts to answer the question, "What is the maximum amount that can be expected to be lost with

---

[18] The market risk manager responsible for mortgages demonstrated to OPSRA how he uses RAMP in his process of risk assessment.

[19] These sensitivities to parallel shifts in the yield curves are found in businesses such as interest rates and credit trading. They are referred to by different nomenclatures, from "DV01" in interest rates to "spread01" in credit. Both are measures of sensitivity to a one basis point parallel change in the appropriate underlying metric across the curve. In this report, these types of risk measures will be referred to as curve sensitivities.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

a certain degree of certainty over a given time horizon?"  Lehman calculates VaR for a one-day horizon to a 95th percentile confidence level.

### i. Introduction to VaR

Very broadly, there are three central steps to designing a VaR model.  The first step involves mapping the firm's positions to risk factors.  Examples of risk factors include equity indices, interest rates, corporate spreads, implied volatilities, and option-adjusted spreads.  The mapping expresses positional P&L as a function of movements in these factors.  The second step involves generating the distribution of risk factor movements that will be applied to estimate the portfolio P&L distribution (using the above mappings).  This process must generate simultaneous movements in all risk factors so as to preserve the correlation structure across factors – i.e., a joint risk factor distribution must be generated.  There are three broad approaches to modeling this joint distribution: Historical Simulation (HistSim), Monte Carlo simulation, and a Variance-Covariance (VCV) approach.  The third step involves taking the risk factor distribution generated and applying a revaluation approach to quantify the P&L impact from each joint risk factor realization.

Lehman utilizes a HistSim approach to calculating the 1-day 95th percentile VaR for the firm as a whole, for each division and the business units within the divisions.  The HistSim approach relies directly upon historical data to establish the joint distribution of risk factors and hence correlation among risk factors, which in turn serve as the inputs for estimating the portfolio P&L distribution.[20]  In broad terms, the portfolio is repriced on each historical date, and each day's P&L is saved, weighted with a decay factor to emphasize recent history, and then rank ordered to form a distribution of gains and losses.  The VaR metric then simply reflects a percentile loss from this distribution.  To capture specific risk, Lehman either directly maps to name-specific risk factors, for most equities, or utilizes a Monte Carlo method, for bonds.

In calculating a HistSim VaR, the following are critical:  (a) the revaluations of the positions in the portfolio (based upon the movements in risk factors) must be robust, especially if the portfolio has non-linear positions, e.g., options;  (b) the mapping of positions to risk factors must be robust, especially for securitization-related positions which are backed by customized collateral pools;  and (c) the historical times series data upon which the revaluations are based must be robust and sufficiently granular to permit capture of all of the material risk in the portfolio.

### ii. Revaluation

To calculate the changes in position values and thus portfolio P&L, those positions must be revalued as a function of the changes in risk factors.  The revaluation techniques utilized by Lehman's VaR model attempt to capture:  (1) linear risks; (2) non-linear risks;  and (3) issue-specific risks.

Linear risks are measured by calculating the local sensitivities of positions to certain risk factors, and then multiplying those sensitivities by historical movements in the corresponding risk factors.  This yields the hypothetical P&L effect of risk factor movements on the portfolio.  For instance, if an equity position has a delta of +$100, a

---

[20] In other words, the past is assumed to be an indicator of the future, and no other statistical assumptions are imposed.  By contrast, under the Monte Carlo approach, individual and joint distributions are specified by the VaR modeler, i.e., parameterized, though they may be calibrated using historical data.  Under the VCV approach, all of the distributions are assumed to be a distribution with fat tails, such as a joint normal.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

$2 decrease in the price level of that equity would correspond to a $200 loss.  Similarly, if a cash government bond position has a spread sensitivity of $1,000 per basis point, a 5 basis point rise in rates would correspond to a $5,000 gain.  In short, the magnitude of the P&L is approximated as a linear function of the movement(s) in the underlying risk factor(s).

Of course, many instruments exhibit non-linear price dynamics.  For example, options prices generally do not change linearly with changes in the prices of the underlying assets.  In these cases, using only local sensitivity measures to calculate the P&L distribution for VaR could introduce significant estimation error.  In addition, many derivatives positions are sensitive to the non-linear co-movements of multiple risk factors, so-called cross-partial effects.[21]  Thus, even if one were able to capture the non-linear sensitivity of a position or portfolio to one risk factor, the cross-partial effect exerted by another risk factor could result in further estimation error.  Lehman addresses both the non-linear and the cross-partial effects through the use of stress matrices.  With a stress matrix, a number of stress points for two risk factors are specified and revaluations are done at each intersection.  For instance, for equity options Lehman uses stress matrices consisting of eleven price points and five volatility points.  For interest rate derivatives, the stress matrix has eleven parallel shifts in the yield curve and nine parallel shifts in the volatility curve.  At each intersection the position or portfolio is fully revalued.[22]  Once full revaluations are completed for all of the intersection points of the stress matrix, the matrix serves as a look-up table for the VaR calculation.  When the actual historical moves in the various risk factors fall between the grid points, the non-linear P&L for that day is estimated using an interpolation technique.  This stress matrix approach provides a shortcut to full revaluation for each position for each historical day's movements in risk factors, thus saving consideration computation time presumably without sacrificing too much accuracy.   The number of points on each axis of the grid, as well as their spacing, should be evaluated in light of the portfolio for appropriateness.

Where stress matrices are used, all revaluations are done in the using the front office calculators, which are not owned by MRM.  This makes the VaR calculation in the risk system more manageable and straightforward, since only multiplication and addition are required to interpolate in between grid values during the VaR calculation.  The truly computationally demanding hard work occurs through the revaluations.  With mortgage products, for instance, this calculation is done only once per week because of the computational burden.

Not all convex, or non-linear, exposures get stress matrix treatment.  For instance, in high grade credit, much of the risk is linear.  However, for the products in the book generating non-linear risks (e.g. emerging market positions), full repricing through stress matrices is done only for positions with "significant" convexity.  All other positions use linear approximations.  OPSRA will be following up with MRM to understand how convexity is determined to be "significant" versus determining that the use of linear approximations is sufficient, particularly in books with a higher proportion of non-linear instruments.  In addition, OPSRA will discuss how MRM assesses whether the linear character of a portfolio has changed  over time.

Issue-specific risk is discussed in the next section on mapping.  In basic terms, where positions are mapped to indices for VaR calculation purposes, the risk is that

---

[21] For example, equity options exhibit non-linear sensitivity to both the price of the underlying asset (gamma) and the implied volatility (vega).

[22] For instance, given a -5% shock in the price of the underlier and a +2 point shock in implied volatility, the position under consideration may yield a loss of $30.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 2125011

those positions will only be partially explained by movements in the indices – the unexplained portion of risk is issue-specific risk and is captured through the means described below.

### iii. Mapping

All positions must get mapped to a set of risk factors. Under HistSim, these risk factors must have sufficiently robust and complete histories of observations to be useful. These observations may come from external sources, such as Bloomberg, or from internal marks, such as credit correlations, which are subject to scrutiny and review by product controllers. Alternatively, the risk factors utilized may be synthetically created where the historical risk factor time series are weak or non-existent. For example, in the case of municipal bonds, a special index was created to provide a meaningful time series to which particular positions can be mapped. In the calculation of firmwide VaR, Lehman utilizes approximately 12,000 risk factors in its VaR calculation – 9,000 for equities and 3,000 for fixed income. In general, a high number of risk factors facilitates more granular risk capture, especially where basis exposures may be significant.

Nearly all name-specific equity exposures are mapped directly to name-specific time series. This obviates the need to calculate issue-specific risk for equities since the mappings are on a name-to-name basis, which effectively captures both the systematic and idiosyncratic components of risk.

For high grade and high yield bonds, however, several mapping approximations are utilized. For instance, in the high grade bond space, the risk factors are segmented by industry sector, credit rating, tenor, and currency. A distinct time series corresponds to each combination of those four attributes. Thus, each investment grade corporate bond, for instance, is mapped to an attribute-specific, but not name-specific, time series. To the extent that the mapped time series is unable to explain the risk (variance) of the position, the unexplained variance is considered issue-specific risk. That variance is used to specify a distribution (mean zero, variance X) from which a Monte Carlo simulation draws to estimate the issue-specific risk arising from that position on any given day in the HistSim P&L distribution. This internal creation of issuer-specific risk effectively adds another 10,000 risk factors to the VaR calculation. Because of the high number of unique bond instruments and the limited time series data on each, this method requires that positions' issue-specific risk be proxied by that exhibited in each attribute-specific index. This introduces some approximation error. Other challenges include dealing with ratings migrations, particularly by big names (like General Motors) which may disproportionately affect index levels and estimates of index volatility and issue-specific risk.

### iv. Historical time series

The integrity of Lehman's HistSim VaR calculation relies upon quality time series data for each risk factor. Ensuring and maintaining that quality requires significant resources given the large number and specialized nature of many of them. Lehman has a group within QRM called the Data Quality Control Group (DQCG), which is responsible for the integrity of the historical data. This group has one dedicated full time QRM employee, who has a PhD. He is assisted by market risk managers who are charged with responsibility for specific time series. DQCG is responsible for checking the data and working with MRM when irregularities arise. Given the number of data series used by Lehman, ensuring data quality is a time-intensive task, and QRM is in the process of developing a new set of reports to monitor the historical database. With only one person

13

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

dedicated full time to maintaining the quality of the time series data used in VaR, Lehman sits at the lower end of the spectrum of resources allocated to that important control. OPSRA will continue to discuss the issue of data quality with QRM.

   c. Businesses Generating Significant Market Risk

   The following sections describe businesses which have material and/or complex market risk profiles. OPSRA met with the heads of each business to discuss the range of products and activities that fell within their jurisdiction. Also present at the meetings were members of MRM and product control, who explained the specific control processes around each business. The chart below shows how the businesses discussed are organized at a divisional level.



   *i. Interest Rate Products and Liquid Markets Proprietary*

Business Overview

   This business is one of the largest within the fixed income division, which is the key driver of Lehman's RA usage. There is a client-focused flow business, where risk is incurred while facilitating trades, and a proprietary business. Interest rate products, the flow portion of the business, has a global RA limit of $300 million, and liquid markets proprietary trading has a limit of $100 million. As of 2/28/05, RA usage in rates was $347 million, and in liquid markets proprietary was $121 million.[23] Both businesses are predominantly in the United States, but also have significant presences in Europe and Asia. As both lines of business are run by the same business head, they exhibit similar characteristics and will be discussed in tandem.

   Lehman trades in two product groups within the flow business: governments and derivatives. Trading activity centers on facilitating clients' requests to increase or hedge exposure to interest rates across the globe and related risk factors such as volatility and inflation. Within the liquid market proprietary group, there is foreign exchange as well as interest rate trading.

   One area of note within the flow business is fund derivatives, a topic that occupied a significant amount of time during discussions between Lehman and OPSRA. The notional size of this business is $5.7 billion, with just over 200 trades. Within this line of business, centered mainly in Europe, Lehman creates principal-protected hedge fund

---

[23] All RA usage numbers in the discussion of businesses are as of 2/28/05. As noted in the discussion on limits, excessions are permitted within a division as long as the division is not breaching its overall limit.

14

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

linked structured notes, which allow leveraged investment into hedge funds. The primary risk in this space is gap risk, where the business would find itself unable to rebalance its portfolio quickly enough.  Other risks in this area include systemic event risk, fraud risk, market risk such as rate, equity and volatility risk, legal risk, operational risk, and reputational risk.  The group manages these risk through due diligence at the fund of funds or individual manager level, diversification across underlying funds and products, and gap options.  Gap options, generally sold by insurance companies, protect again a discontinuous market move. The fund derivatives business will be an area of focus for OPSRA following the formal CSE review.

Recently, within the flow business, Lehman executed its largest trade in 11 years – an inflation linked interest rate swap with a sovereign.  As part of the CSE review, OPSRA was walked through the trade approval and execution process.  The trade was developed by Lehman's derivatives solutions group, which then proposed the trade to the sovereign.  The trade was explained to senior management in the firm, as well as at all levels of the fixed income division.  The factors considered were the initial rate risk, the volatility and inflation risk, the planned hedging strategy, the credit risk exposure, and lack of liquidity in the inflation derivatives market.  Once approved at all levels, including by the CEO who had visited the country in person to discuss the trade, the London derivatives desk executed the trade.[24]

Proprietary trading consists of interest rate and foreign exchange strategies. This area tends to have fewer positions than the flow business, and they are unwound once value is captured.  Within rates, Lehman trades basis spreads, swap spreads, calendar spreads, volatility arbitrage, and gamma (relative value between different types of interest rate options).  Within foreign exchange, they trade foreign basis (hedged foreign exchange forward contracts versus local swaps), global curve arbitrage (sovereign yield curves through the foreign exchange markets), and cross-border arbitrage (trading off-shore versus on-shore interest rate markets).  Similar to the flow business, risks within these two areas include rate risk, basis risk, volatility risk, and convexity risk.  They are managed within the business by limiting traders to specific strategies, employing a dedicated risk monitor who reports directly to senior business managers, and using appropriate hedges. In addition, the group is subject to standard MRM oversight.

<div align="center">Risk Management</div>

Within this space, the key drivers for VaR are interest rates (government, agency, swaps, Eurodollar futures, and treasury futures), rates volatility, spot foreign exchange, and foreign exchange volatility.  P&L distributions are calculated for every desk position using a variety of methods.  For instance, the P&L distribution for cash products may be calculated using treasury on-the-run and off-the-run yield or Libor/swap yields, amongst other time series, while distributions for Treasury futures are generated using the Lehman cheapest-to-deliver model.  In the interest rate derivatives space, to capture vega risk the five year into ten year USD swaption implied volatility is utilized as a reference time series for synthetically generating a sufficiently rich set of rate volatility risk factors. Non-linear components of the P&L are calculated using stress matrices, representing 11 parallel shifts of the yield curve from minus 100bp to plus 100bp and nine parallel shifts in the volatility levels form minus two volatility points to plus two volatility points.  As part of Lehman's drive to capture specific risk, mapping is often quite

---

[24] OPSRA has regularly discussed this position during the ongoing monthly risk reviews with senior members of the risk management department.

<div align="center">15</div>

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

detailed.  For example, Lehman maps government bond exposures to a set of fairly granular risk factors – e.g., on-the-run versus first off-the-run Treasuries and agencies, sixteen groupings for Japanese Government Bonds, thirteen yield curve shift scenarios for bond futures, etc.  Inflation risk, traded mainly in the European markets, is not yet in VaR, but including this risk factor is one of MRM's priorities. Lehman's approach allows the capture of first and second order effects (the second order effects are captured through the stress matrices), but third order effects such as volatility skew, are not picked up in the VaR calculation. QRM would prefer to capture this type of third order effect, even if in an imperfect manner, in VaR rather than develop one-off supplementary risk measures.

Specific daily risk reports include spread sensitivities by bucket, currency, and underlying (e.g., treasury or agency).  For agency positions, spread sensitivity by issuer is calculated.  For treasury futures, MRM looks at notional and spread sensitivity by underlying bond, and by maturity.  Vega is measured in terms of caps and swaptions, while foreign exchange is reported by currency spot, rates, vega, and gamma.  For the weekly reports, spread sensitivity is aggregated by business and by currency.

Event risk in interest rates occurs with fund derivatives, in the form of gap risk. Fund derivatives are hedged dynamically, but markets can occasionally gap.  If the desk cannot hedge in time, losses can be significant.  This mainly occurs when net asset values (NAV) of funds gap downwards.  There is very limited data on gaps, as by definition they are rare events. This risk does not yet show up in risk appetite. As mentioned in the earlier discussion of fund derivatives, OPSRA will be following up with Lehman to learn about this business in further detail, including the calculation of event risk charges in this space. [25]

ii. Credit Businesses

Business Overview

Lehman's High Grade and collateralized debt obligation (CDO) business consists of several different desks.  High Grade has a RA limit of $475 million, with actual usage of $251 million.  The CDO business has a limit of $100 million, with a usage of $62 million. Flow trading, the most active of the group, trades and makes markets in cash credit, single name credit default swaps (CDS), and index credit.  The CDO desk structures and trades cash and synthetic CDOs.  The hybrid capital desk trades and makes markets in corporate preferreds.  The proprietary desk takes positions in credit through all of the various instruments.[26]

In the cash CDO space, the desk engages primarily in "primary activity" (i.e., working with top managers to issue new collateralized loan obligations (CLO) and structured finance CDOs).  For example, Lehman might partner with a manager at a pension fund, and enter into an agreement whereby the manager sources assets to be inventoried for eventual distribution through a CDO structure.  The process generally

---

[25] With respect to PC, within interest rate products and liquid markets proprietary, approximately 83% of the balance sheet is considered to be Level 1, or assets with active reference markets.  16% are Level 3, and 1% are Level 4.  Level 3 consists mainly of the derivatives business, where PC gets dealer quote to verify trader marks.  Level 4 consists of the fund derivatives business in Europe, where it is difficult to capture volatility around prices of the underlying funds. For a full discussion of the level definitions, see the section on price verification within Control Processes.

[26] Currently, proprietary trading in credit is relatively small (approximately 5% of revenues), though the business head noted that this may potentially grow to about 20% in the future.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 2125011

takes six to nine months. The underlying assets are generally high yield loans or asset backed securities. Upon distribution, the entire capital structure is sold to investors. In this space, the primary risk for Lehman is inventory risk.

In the synthetic CDO space, the underlying collateral is generally high grade CDS, and the products are generally bespoke or static baskets. Demand is global, with most of Lehman's market share in the U.S. and Europe. Distribution occurs through the structured credit desk. Here, the risk stems primarily from retained residual pieces, since the sourcing process is relatively straightforward. The residuals expose Lehman to various risks, such as spread volatility, liquidity risk, and correlation skew. With regard to correlations, recent stresses to the structured credit market have demonstrated the difficulties associated with risk managing the correlation skew for tranched products, and OPSRA will continue to focus on Lehman's approach to managing this risk factor.[27] Lehman uses a system called Scorpion, which calculates the desk's exposure to these risks through sensitivity metrics like correlation spread sensitivity, curve sensitivity, the gain or loss associated with a default assuming a specific recover rate, also known as value-on-default (VoD), and curve risk.

Interestingly, the exotics desk trades swaptions (mostly on CDX indices, occasionally on single name CDS), bond options and warrants, and recovery locks/fixed recovery CDS (instruments which reflect recovery rate assumptions in default scenarios). Though these exposures are relatively small, they are complex to model with some exposures tracked using spreadsheets.

The hybrid capital desk focuses on "subordinated product" – e.g., preferreds and subordinated debt. It leverages Lehman's origination and structuring businesses both to take relative value proprietary plays such as capital structure arbitrage and to pitch such ideas to clients. The key risks in this space include the shape of the yield curve (flat to inverted hurts demand because of call features), rates convexity, correlation with other parts of the capital structure, and relative illiquidity. The latter two risk factors can be difficult to measure and risk manage in a systematic way. To the extent that activity in this space increases, OPSRA will discuss the capture of these risks with MRM.

The proprietary desk essentially consists of two people: one capital structure arbitrage trader and one fundamental credit trader. Both use fundamental, as opposed to quantitative or statistical, trading strategies. The investment horizons are short to medium term (up to 18 months), with relatively low trading volumes. Both strategies trade across products/asset classes. As such, in addition to the greeks, VaR is one of the primary metrics used to risk manage this book. Value on default (VoD) is used to manage tail risk. Exposure to event risk such as downgrades, leveraged buy-outs (LBO), and leveraged recapitalizations must be carefully tracked. In addition, the risk of correlations coming unglued remains difficult to manage. So far, risk-taking in this space has been relatively small, but may grow in the future.

Risk Management

On a VaR basis, the risk manager estimated that the risk breakdown by desk was approximately as follows: Synthetic CDO (20-30%), Flow (15-25%), Hybrid (20%),Proprietary (10-15%), and Cash CDO (10%).

MRM utilizes a number of metrics to risk manage exposures from the activities described above. In addition to the standard spread sensitivities, the front office

---

[27] During a conversation with OPSRA, the CRO stated that finding increasingly sophisticated ways to deal with correlation skew was amongst the top priorities of MRM. This is a proactive measure, as Lehman did not suffer material losses during recent credit market events referenced above.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 2125011

systems also calculate:  (1) VoD (2) value-on-default-zero (VoD0), the gain or loss should an issuer default with a zero recovery rate assumption;  (3) VoDProb, the default probability adjusted VoD (PD x VoD);  and (4) Credit10%, the change in an instrument's value for a 10% change in credit spread.  These metrics assist the risk managers in identifying low probability/high impact exposures or concentrations of risk that are not readily captured in VaR. Other risks include CDS basis risk, concentration risk, and correlation risk.

Perhaps the key market risk in credit trading is correlation skew.  As mentioned previously, this can be difficult to capture and manage with regards to tranched products, and addressing this issue is a priority of the CRO. OPSRA will be following up with MRM as to the success of this initiative. Within exotics, trades can be one-way, leading to illiquidity in the market.  In addition, single name swaptions are subject to gap risk due to the illiquidity of the market – these risks can be difficult to manage quantitatively, and instead need qualitative solutions (e.g., being selective on names traded for single name swaptions).  Again, within proprietary trading, correlations continue to be a challenge. This is addressed within this area by monitoring each leg of a paired trade to watch for correlated assets beginning to "uncorrelate."

For the event risk component of Risk Appetite, losses due to downgrades for high grade securities and losses due to defaults for high yield securities are calculated. This is discussed in greater detail later in the credit risk section of the report.[28]

### iii.  Mortgage Trading

### Business Overview

Pass-through mortgages and mortgage options are traded through a joint venture with interest rates and the mortgage group.  Most of the traders in these more vanilla products sit within the interest rate group, and positions therefore roll up through Liquid Markets.  This venture is based on the premise that the multi-trillion dollar mortgage industry is intricately tied to the rates markets, and many flow customers take interest rates positions, especially in convexity, through mortgage products. The more complex residential mortgage trading business sits within Securitized Products, which also includes commercial mortgage backed securities (CMBS), asset backed securities (ABS), and CDOs. Securitized Products rolls up into Liquid Markets as well.  Mortgage trading has a RA limit of $350 million, with usage of $364 million.

In the structured residential mortgage space, there are four product divisions: agency collateralized mortgage obligations (CMO), prime mortgages, sub-prime mortgages, and warehouse lending.  In the agency CMO space, Lehman seeks to arrange CMOs supported by selective collateral and leverage, rather than just doing high volume/low margin CMO issuance.  Similarly, in the prime and sub-prime businesses, Lehman focuses on product design (securitizations and whole loan sales), by leveraging off its three mortgage origination platforms.

---

[28] With regards to PC, nearly all of the derivatives inventory is Level 3.  PC for synthetic CDOs, which are in Level 4, must rely on MarkIT Partners for credit spreads, bespoke calibrations, correlation skew adjustments, and recovery rate assumptions.  MarkIT supplies raw data recovery rate and spread data on single name corporates at a number of points on the term structure, by baskets, for 11 CDO portfolios. Participating firms' controllers then use that raw data to generate spread sensitivities and base correlations for the tranches of the 11 CDOs at various maturities.  Each firm sends that data back to MarkIT. MarkIT collates submissions from 23 contributors and then reports the consensus data (means, not variances). Lehman's PC use this consensus data in the price verification process.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

The origination platforms form a core piece of Lehman's mortgage trading franchise.  Last year, the platforms originated a total of $62.7 billion in residential mortgages.  Lehman's fully owned subsidiary Aurora Loan Service (ALS) originates prime mortgages, mostly Alt-A, through a set of correspondent mortgage originators. ALS averages around $4 billion in originations per month and has a significant servicing portfolio of $50 billion.  The risk arising from servicing activity has several dimensions, with operational risk being the most obvious.  Less clear, but often significant, is the market risk associated with this activity.  This is discussed further in the "Risk Management" sub-section. The two other Lehman originators, BNC Mortgage and Finance America, originate subprime mortgages through a wholesale network and utilize third party servicing.

These platforms provide Lehman with a considerable advantage in intermediating between borrowers (mortgagees) and lenders (investors).  Many of Lehman's peer firms source loans for securitization through purchases of large pools of whole loans from third-party originators, often commercial banks.  As such, their primary tool for affecting the characteristics of the underlying collateral is indirectly through contact with the third party originators and eventually through pricing.  At Lehman, the origination platform provides a direct mechanism to adjust the characteristics of the underlying collateral to suit investor demand.  By having an early touch on the mortgage loans, Lehman can source exactly what is needed to support the securitizations and whole loan pools most in demand.  Going the other way, the investor touch stemming from Lehman's strong distribution/capital markets franchise generates efficient loan pricing information for the originators.  From a risk management perspective, this business model facilitates a faster and more efficiently priced pipeline, thus reducing the risk of getting stuck with unwanted loan pools or residuals.  Some of Lehman's peer firms are now moving towards this type of vertically integrated model.

The pipeline nature of the prime and subprime businesses creates exposure to certain key risks.  The primary risk stems from holding inventory.  Changes in interest rates, housing prices, or rating agency methodologies may adversely affect the value of the loans which are being inventoried for eventual securitization or sale.  In the prime space, Lehman seeks to hedge this risk using the to-be-announced (TBA) market where applicable, in an attempt to reduce the basis risk which otherwise would be incurred if Treasuries or swaps were used to hedge interest rate risk. For non-prime product, a mix of non-TBA hedges must be used, thus introducing more basis risk.  In addition, Lehman often retains the risk on residual positions, including interest-only (IO) exposure and net interest margin (NIM) exposure, as well as servicing risk via ALS.  In the subprime space, there is no robust TBA market (especially for ARMs and other hybrid products), thus Lehman must hedge with Treasuries and swaps and incur significant basis risk.  To minimize this, the sales team tries to sell securities forward to the extent possible.  The pipeline is fairly efficient, as the turnaround for a deal is generally less than 90 days.

The desk head emphasized that most of the value from the mortgage franchise resides in the intermediation/pipeline process.  As such, there is not a twin "secondary trading" desk which takes discretionary proprietary bets on certain factors using loan and investor information generated by the pipeline business.  Rather, the business is selective in the loans it sources –owning the originators helps here – which allows it to exploit market inefficiencies by engaging in the pipeline activity itself.

In a way, then, Lehman's model essentially substitutes operational risk for market risk.  Instead of incurring market risk to generate excess returns through bets on rates or prepayments, Lehman incurs significant operational risk through the origination platforms in order to generate excess returns from the pipeline activity itself.  To this

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

end, Lehman has a sizeable Mortgage Capital Division which focuses on managing the operational risk arising from the three originators.

As mentioned previously, an aggregation system called RAMP serves as the centralized infrastructure which supports the monitoring of mortgage trading risk exposures on a highly granular basis. The various front office trading systems feed into RAMP, which captures all desk positions and trades (real-time), computes all sensitivities and aggregates exposures (daily), and calculates the stress matrices used for non-linear risk measurement purposes (weekly). RAMP feeds into the risk systems used to calculate VaR, event risk, and Risk Appetite.

In addition to providing the standard sensitivities, RAMP also captures model risk. It provides "model" versus "trader" calculations for option adjusted durations and 10-year equivalent exposures by trade, by trader, by desk, by product, etc., and calculates the difference between the two. Finally, RAMP is also used to produce customized risk reports, e.g., for the hybrid pipelines.

Risk Management

Within MRM, the VaR calculation sources the curve sensitivities from RAMP by the following risk factors: rate risk across four points on the yield curve, rates volatility, option adjusted spreads, and mortgage current coupon spreads over Treasuries.

Given the size of Lehman's mortgage business, the mapping of mortgage exposures deserves specific discussion. Mortgage positions – e.g., in residential whole loans, mortgage backed securities (passthroughs), CMOs, and mortgage derivatives – expose the firm to various types of risk, most notably to interest rates, rate volatility, and convexity (prepayments). The mapping of interest rate and rate volatility exposures follows fairly standard methods. However, other mapping decisions are not so straightforward. For example, say Lehman senses investor demand for pools of Alt-A hybrids from the Mid-Atlantic region. The inventory which gets built up for eventual securitization exposes Lehman to market risk, and leads to the question of which benchmarks should the exposure get mapped to for VaR purposes. An insufficiently specific benchmark may lead to a misstatement of risk, especially when hedging activities are factored in. Prepayment risks can also pose a dilemma. The primary metric for prepayment risk, option-adjusted spread (OAS), is dependent on extensive modeling and at the desk level is finely calibrated to the underlying collateral. For VaR purposes, of course, the prepayment risk component must be mapped to a time series. This requires an assignment algorithm, conceptually similar in some respects to the bucketing by attributes for corporate bonds, whereby positions are mapped to OAS time series, such as a government agency issuance or home equity loan credit spread benchmarks.[29] Lehman utilizes a wide range of OAS time series, some of which are synthetically created, e.g., convexity-adjusted collateral-specific CMO OAS's and collateral-specific non-agency OAS's. The robustness of the VaR calculations for mortgages relies in part on the granularity, specificity and robustness of these benchmarks. Given that the greatest growth in mortgages has been in non-agency collateral – e.g., Alt-A, Jumbos, and sub-prime – OPSRA will follow-up on the quality control processes surrounding these mapping specifications and the maintenance of these time series.

---

[29] Of course, the assignment of specific corporate bonds to particular buckets requires minimal parameterization, as the attributes such as tenor and rating are fairly obvious. By contrast, in the mortgage context, the assignment procedure is less clear cut and requires more subjective parameterization.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Sub-prime mortgage loans are also subject to default assumptions through the event risk charge. A stress is approximated by assuming a reduction (which can also be thought of as an increased haircut) in market value of the non-rated retained exposures. Lehman will stress any non-securitized residual positions currently on the books, and a portion of any whole loans. With whole loans, Lehman assumes that 4% of the capital structure qualifies as non-rated retained exposure. These residuals, or NIMs, will be subject to a 25%, or 25 basis point, charge. This is considered by MRM to be fairly punitive given the liquidity and high turnover in the market. [30]

iv. Municipals

Business Overview

The municipal group's activities at Lehman are a microcosm of the fixed income division in which it is housed: origination, syndication, high grade debt, high yield debt, derivatives, structured products, funding, mortgages, asset-backed, money market, and taxables. Across current and anticipated CSE firms, Lehman is the number one book runner for municipal debt (and third overall). Within municipals, 25% of revenue is driven by cash trading (high grade, high yield, and short term), 21% of the revenue is derivatives, 19% is structured products, 18% is origination, and 17% is proprietary trading (including client driven special situations). Municipals has a RA limit of $200 million, with a usage of $193 million.

Cash bond trading includes a wide range of products, such as general markets and long bonds (over 20 years). A unique aspect of trading municipals is that they essentially cannot be shorted, and one cannot borrow to buy the bonds, because the interest payments associated with borrowing to finance a tax-exempt position are not tax deductible. In general, each issuance tends to be unique, and therefore relatively illiquid on a stand-alone basis. The business often incurs significant basis risk. While trading the general markets, traders hedge through the use of 5,10, and 30 year Treasury futures as well as Bond Market Association (BMA) swaps and options. In the zero coupon bond space, the market is not as active and positions tend to be smaller. The bonds trade from one to 50 years on the curve, and hedges include government futures along the curve and BMA swaps and options. Long bonds, going out 20 years or more, are all investment grade, tax-exempt, and with a coupon. They are hedged using Treasuries, municipal bond futures, LIBOR swap futures, BMA and LIBOR swaps. This business tends not to run much spread risk. The retail trading desk is relatively small, and seeks to provide liquidity for the high net worth franchise at Lehman. These trades are done in response to specific client inquiries. Lehman is very active in the high yield/ taxable municipal trading sector, and is one of the primary market makers in this space. In the short term market, Lehman specializes in notes. The short term market tends to exhibit seasonality, notably in April when people pull out money to pay taxes, and again in September when corporations do the same. The municipals group also has a proprietary desk, which trades in such strategies as housing bonds and generic bonds.

The municipals derivatives group looks to help municipal issuers with asset and liability management, as well as reduce their borrowing costs. The most common derivatives used by municipal issuers are interest rate swaps, forward starting interest rate swaps, and swaptions. The tax-exempt status of municipalities makes it more efficient for them to issue floating rate debt, as inefficiencies in the market cause the

---

[30] With respect to PC, 35% of the inventory is in Level 1. 64% is in Level 3, and 1% is classified as Level 4.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

actual tax-exempt yield curve to be much higher than the implied tax-exempt yield curve at the long end of the market, making it expensive to issue fixed rate debt.  The municipalities then swap out the floating rate debt in order to pay fixed. With interest rate swaps, the municipalities often receive a floating rate index.  This index is generally the BMA index, a tax-exempt short term rate, or a set percentage of LIBOR.  Terms range up to 40 years.  The business stated that the greeks tend to be relatively low, and do not approach limits set by the businesses to manage risk on a more micro basis. Lehman hedges these swaps in the interdealer market and sells Eurodollar futures to hedge the interest rate risk.  With swaptions, clients often seek to monetize the value of the call option present in issued callable debt.  The client sells a swaption to Lehman, with an exercise date equal to the callable date.  To hedge, Lehman will again use the interdealer market and Eurodollar futures, and will also sell vanilla swaptions to offset the volatility risk produced by this trade.  Lehman will also enter into synthetic floating rate debt swaps, where the issuer pays Lehman a variable rate such as BMA and Lehman pays a constant fixed rate.  The rate risk is generally fully hedged, and these swaps tend to be more a story about counterparty credit risk.

Structured municipal derivative products include the tender option bond program, total return swaps, principal lending, and opportunistic situations.  Total-return swaps are becoming increasingly common in the municipal space.  Bond issuers tend to use them as synthetic refundings for existing bonds, and synthetic variable rate debt for primary market bonds, which allows issuers to achieve the economic equivalent of variable rate tax-exempt financing without many of the requirements of traditional variable rate debt. The risk focus on these tends to be in the counterparty credit space, as Lehman retains all of the credit risk on the issuer's bonds.  Direct lending solutions, such as synthetic variable rate debt, allow issuers to borrow against unique forms of collateral, such as construction products.  Lehman has a joint venture between the Real Estate Principal Transactions Group and the Municipal Structured Products which allows them to create customized structures.

## Risk Management

The drivers of VaR within municipals are interest rates, yield curve, swap spread curve, municipal market data (MMD) scales, BMA ratios, and swaption volatility.  The municipal cash business drives most of the VaR, as it incurs basis risk by hedging municipals with Treasuries (municipals tend to lag Treasuries by a few days). In calculating the P&L vectors behind VaR, the linear components are derived from curve sensitivites, the swap spread, muni and BMA basis, and vega.  The non-linear components depend on a stress matrix including interest rate and volatility moves.  In addition to focusing on VaR, MRM looks at concentrations and various spread sensitivities.  For the cash desk, MRM reports net interest rate risk, muni basis risk (the change in an instrument's present value due to one basis point change in the MMD muni scale), and notional concentrations on a daily basis.  For derivatives, MRM reports net interest rate risk, swap spread risk, BMA basis, and vega on a daily basis.  Municipal derivatives drive the counterparty charge, and the lower-rated municipals drive the event risk charge.  Municipal products are subject to the following event risk: downgrade for A and above, and default for BBB and below.  The municipal cash desk tends to drive the majority of event risk.

For certain positions within municipals, it is necessary to go beyond VaR and take a more qualitative perspective.  A recent transaction that caused a breach of the municipal VaR limit provides an example of this type of trade.  When the government sought to increase military housing stock, the Department of Defense privately placed

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

bonds.[31]  Lehman approached the government about restructuring the trade to lower the cost of financing.  They did this by working with the ratings agencies to develop a tranching structure, and then worked with Congress' appropriations committees to issue bonds publicly according to the results of these discussions.  They were able to increase the proceeds while lowering the yield.  Lehman did this by going to the holders of the older bonds and purchasing the original issuance, and underwriting a new issuance that was approximately 7% larger than the original deal.  The deal took two months to restructure and then exit, during which time Lehman was fully hedged with interest rate swaps but was exposed to spread risk, benchmarked to a taxable index. As this deal caused municipals to breach its VaR limit, MRM ran marginal analysis and discussed the trade with the head of fixed income and the CRO.  The head of fixed income approved the overage within fixed income, and the CRO approved the deal as it would not cause an overall fixed income VaR breach.  This deal was noted on the top line risk report, which is presented weekly to the Executive Committee by the CRO.[32]

v.  Equity Volatility (Equity Derivatives)

Business Overview

While Lehman has a significantly smaller presence in equities than in fixed income, the firm is looking to grow the business consistent with client demands.  The recent decision to appoint Bart McDade, the former head of fixed incomes, as head of equities reflects this approach.  Within equities, OPSRA reviewed the global volatility business.  This business is allotted 50% of the RA allocation for the equity division.  Equities volatility has a RA limit of $225 million, with a usage of $182 million.

The business trades in both listed and OTC products.  Lehman is a major player in the synthetic convertible market, driven by long-only investors interested in gaining exposure to a specific sector or stock.  The synthetic convertible is essentially a bond with a warrant, leaving Lehman with positions that are relatively easy to hedge.

Within equity volatility, customer driven trades contribute over 95% of the group's revenue. These trades fall into either the flow (listed options, vanilla OTCs) or structured (equity linked notes, synthetic convertibles) volatility categories.  The products traded in the structured bucket tend to group around sets of customers.  For example, hedge funds tend to buy synthetic convertibles, while insurance companies look to hedge their equity risk with equity swaps.  While proprietary trading currently generates a small portion of the group's revenues, management hopes to build on this business and eventually have it contribute around 20% of the group's revenue.  Within the proprietary business, Lehman does statistical arbitrage and trades on automated market making electronic options exchanges. Volatility arbitrage, where traders seek to capture pricing differentials between volatility levels of an index and of its component single stocks - so-called dispersion trading – formerly resided within this group but has recently been moved to the proprietary trading group within the equities division.

The equity volatility business heads noted three areas where risk management is the most challenging: capturing correlations, dispersion trades, and capturing the term structure of volatility and volatility skew.  They also stated that they do not have a

---

[31] This deal was also mentioned to OPSRA during a regular monthly risk meeting.

[32] With respect to PC, 51% of municipal's balance sheet is in the Level 1 category, consisting mainly of cash positions.  34% is in Level 3, consisting mainly of the derivatives positions.  The remaining 15% is in Level 3. This consists mainly of interest rate swaps where options are tied to tax events – an option that is difficult to price verify.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

strategic "long gamma" or "long vega" philosophy, an approach that would leave them protected against large movements in either direction.  Instead, the business heads feel that they can successfully delta hedge their positions, and do not feel it necessary to adopt a strategy of paying for insurance, i.e. experiencing theta bleed in order to remain long gamma. Heavy trading in certain structured products may effectively impose a directional view, but that is usually a relatively transient phenomenon, as structured products tend to have a tangible lifespan.

### Risk Management

For MRM, overall risk exposures are measured by delta, gamma, vega, and theta.  Key drivers for volatility VaR are stock prices and volatilities.  Non-linear risks area captured through price/volatility stress matrices, stressing prices up and down 25%, and volatility points up and down 10%. The equity volatility group works with MRM to create a number of bespoke reports to capture less obvious risks.

This business also has an event risk component. Within equity derivatives, event risk tries to capture the discrepancy between the actual dividend and the assumed dividend used in the option pricing model (quantitative front-office programmers will price in dividends increasing at a given growth rate).  The P&L impact of a 75% discrepancy for single-stock options or a 25% discrepancy for basket options in the assumed dividend used in the model is considered to be the event risk.  The event risk charge makes up a significant portion of the business' risk appetite usage.[33]

### vi.  Global Real Estate Group

### Business Overview

The Global Real Estate Group (GREG) generally focuses on commercial real estate, including non-performing loans which are often backed by commercial real estate.  The bulk of the real estate business at Lehman consists of originating and securitizing commercial real estate loans, though there is also sizeable principal investment activity and, more recently, bridge lending.  Because of the absence of prepayment risk and the chunkier nature of the underlying loans, the business is much more credit-oriented than residential mortgages.  The real estate group has an RA of $500 million, with usage of $411 million. The vast majority of risk in this business is event risk.

The pipeline business (i.e., the origination and securitization of commercial real estate loans) is the dominant business within GREG.  On the origination side, this includes direct lending (fixed and floating rate commercial mortgage loans, lines of credit and term loans), conduit financing (for loans less than $75 million), and whole loan purchases.  Lehman then effectively warehouses this risk leading up to an exit, which typically takes the form of a securitization or loan syndication.[34]  For fixed rate loan pools Lehman averages a securitization every six to eight weeks, resulting in seven to eight securitizations per year.  The key risk mitigant is maintaining a short warehousing period.  Lehman accomplishes this, in part, through a Large Loan Floating Rate

---

[33] With respect to price verification, PC uses its own algorithm to determine a volatility surface.  52% of the business is considered to be Level 1, 25% is Level 3 and 23% is Level 34.  Positions that have long-dated vega, with no observable point on the curve, are classified in Level 4.

[34] A large number of GREG staff are dedicated to commercial mortgage loan origination and underwriting. The underwriting criteria are based heavily upon rating agency credit support criteria.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Securitization Program which is a joint venture with UBS. To hedge the warehouse risk, Lehman effectively replicates a securitization with the existing inventory at any given time and hedges both the rate and spread risk. Approximately 20-30% of the spread risk is hedged using total return swaps, which are relatively expensive and short-dated. There are also plans to potentially use a Lehman CMBS default swap index product which is currently under development. OPSRA will follow up on this initiative, as the ability to effectively short CMBS may facilitate greater capacity to for this business, which is structurally long CMBS. Lehman also has a surveillance group which monitors in real time the credit conditions of the underlying collateral (defaults, vacancy rates, etc.).

In addition to the pipeline business, through the Principal Transaction Group (PTG) Lehman makes strategic equity investments in commercial real estate. Lehman has also set up commercial real estate-focused private equity fund structures with co-investors.[35] These equity investments are longer term (two to three years) and are relatively illiquid. For the PTG investments, the primary risk management concern revolves around cash control and recourse in the case of default. For the private equity investments, the primary risk flows from the special servicers who are retained as asset managers. As noted above, more recently Lehman has engaged in bridge equity investing where Lehman's equity investment in a property is taken out by another equity investment or debt.

On the secondary trading side, Lehman trades to facilitate customer flow, but does so primarily to glean market information, not necessarily to make markets and earn a spread or to take proprietary positions. Lehman also engages in a wide range of investment bank-type activities in this space, such as real estate investment trust IPO underwriting.

## Risk Management

Rate and spread risk are the dominant market risks in the pipeline business. Curve sensitivities are bucketed by maturity. For loan inventory, spread sensitivities are estimated and mapped against a composite CMBS time series based on recent securitizations. Concentration risk (i.e., specific or basis risk) can be quite significant given the large size of many exposures, e.g., $500 million to a single property. This concentration risk is not captured in VaR, but is monitored by MRM. The risk manager responsible for real estate cited an example of a $900 million exposure to a single property, and stated that in order to mitigate the concentration risk, the property was being put into three deals. This allowed the business to quickly securitize at least $300 million of the exposure. The risk manager also explained that on average, a securitization occurs every six weeks. He cited this regular turnover as one of the primary risk mitigants for concentrated positions. For secondary CMBS securities, spread sensitivities are estimated and mapped to CMBS spread index curves bucketed by rating, maturity, etc. These metrics are calculated in the front office systems and fed up to the MRM risk systems for VaR calculation purposes as for other businesses.

The event risk for the Real Estate desk is quite high. The measured event risk was $345 million (easily the highest of all of the desks), compared with a $115 million market risk measure. To put these numbers in context, the total measured event risk for the firm as a whole was $449 million. For real estate and related loans, the stress is only applied to principal transactions, and not to collateralized mortgage backed

---

[35] In 2001, Lehman established its first real estate equity fund. The second such fund was expected to close in May 2005 ($2.3 billion). A mezzanine loan fund was expected to closely shortly thereafter ($1 billion).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 2125011

securities.  With non-performing loans, the underlying name will be stressed. The measurement is the capital value loss due to a real estate downturn, and is therefore looking at a very long-term loss.  Lehman uses a "historical simulation" approach to determine the P&L impact, by revaluing each property.  The market value of the property is multiplied by the historical times series of property value changes, then senior debt is subtracted (if applicable), and finally the Lehman Loan mark-to-market basis (which determines the existence of a loss) is subtracted.  This results in a simulated P&L distribution for each loan.  Losses across property types are aggregated within a region, assuming perfect correlation. Losses across regions are then aggregated assuming zero correlation between regions, and a joint probability distribution, similar to the methodology found in high grade credit, is used to determine overall losses at the desired confidence level.  Collateral concentrations, such as malls or hotels, are not specified in the event risk stresses, even though this risk may at times be significant (e.g., with hotels after 9/11).[36]

### vii.  Risk Arbitrage

### Business Overview

While Lehman takes proprietary positions within both its equities and fixed income divisions, there is also a standalone group dedicated to proprietary risk taking. While formally called Risk Arbitrage, this group has a scope beyond what its name might imply.  Risk Arbitrage has been given a risk appetite of $450 million, equivalent to the RA limit for the entire equity business.  Current usage is $278 billion. Balance sheet usage for the group is provided by the firm, i.e., there are no outside investors. The group of 31 employees is housed in a physically isolated area from Lehman's customer businesses.

Risk Arbitrage trades within six strategies, all of which utilize a research fundamentals approach: long/short fundamental equity, merger arbitrage, distressed securities, special situations (investing in companies subject to corporate restructurings, stock buybacks, bond upgrades, and earning surprises for a period of years rather than months), convertible arbitrage, and privately structured transactions (both in public entities and private equity investments).  Their biggest positions are held through high yield instruments (used in more than one strategy), long/short plays, and merger arbitrage. The group moves in and out of areas opportunistically, based on market dynamics.  For example, they briefly entered the credit trading space during the turmoil surrounding the downgrades of General Motors and Ford debt.  This group tends to hold

---

[36] With respect to PC, all of the positions in Real Estate are classified as Level 3 or Level 4 – i.e., there are no direct external price quotes (Level 1) for any of the positions.  As such, the product controllers must interact often with the traders and servicers to verify prices.  For equity investments, PC usually get monthly data (the "tape") from servicers.  They compare that with interpolated spread data, information from the trading desks, etc.  For loans, floating rate loans are priced off a matrix (current spread vs. loan-to-value (LTV) by property type).  For fixed rate loans, prices are based upon a "mock securitization" based on Lehman's models. CMBS securities are valued using a spread matrix and Bloomberg's Yield Table function. Mezzanine and B notes are priced using a theoretical shadow rating based upon LTVs, which serves as a basis for determining the spread.  Real estate investment trust letters of credit and term loans are priced similarly.  Real estate price verification uses a mix of external published data (e.g., CMBS spreads) and pricing tools such as Bloomberg's yield table or internally-generated pricing grids.  For exposures lower in the capital structure, PC use a "shadow rating" based on LTVs to interpolate spreads and then price using an net present value analysis.  A good portion of the pricing for real estate relies upon data supplied by servicers.  PC noted that last year there were 180 deals realized, providing numerous chances to "backtest" the data supplied by servicers.  They feel that servicer-supplied data integrity is fairly high.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

investments over a longer time horizon, leading to lower trading P&L than might be found within a flow business.

Risk Arbitrage monitors their portfolio two to three times a day on a more micro basis and seeks to manage idiosyncratic exposure, as they do not care to have general market exposures. They generally have exposure to 300-350 names at a time, and they also monitor names not yet in the book. The majority of their risk is within the equity space, and they tend to use very liquid hedges. The business heads stated that their use of options is primarily for risk management rather than leverage.

Risk Management

Risk Arbitrage has a dedicated market risk manager who is physically located with the group, in order to facilitate maximum interactions with the business. Market risk, as measured by VaR, arises mostly from market moves in the equity and distressed high-yield spaces. The group also incurs event risk, from security downgrades for high grade, defaults for high yield, and deal break risk for merger arbitrage. To calculate the deal break risk for merger arbitrage, target and acquirer are assumed to experience the reverse of percentage price movements at the time of the deal announcement, i.e. the target price drops and the acquirer price rises. The probability of a deal break is calculated by assuming that the current target price is the expected value of the deal complete value and the deal break value. This methodology is considered by MRM to be more objective than the desk prediction. Events across different merger and arbitrage deals are assumed to be independent, and the portfolio loss distribution is calculated using a binomial probability distribution. Of these three categories, most event risk arises from defaults for high yield positions. Some securities held by Risk Arbitrage have already defaulted, and in these cases MRM looks at the uncertainty in the traded price, and the uncertainty of recovery in determining event risk. It is worth noting that this measure of event risk is biased towards long bond positions, as it does not account for bond upgrades, which would create losses if the group were to be short securities. Risk Arbitrage and MRM stated that the group currently has few short positions, but this is an area warranting further discussion.[37]

    d. Control Processes

       i. Price Verification

PC performs formal price validation on a monthly basis to ensure that the inventory is marked to market and "fair valued". PC verifies market or fair value for cash instruments and listed derivatives by utilizing vendor prices, broker quotes, exchange prices or similar instruments. To the extent that valuation adjustments are required to arrive at fair value, PC is responsible for ensuring that the marking follows Lehman's formal valuation adjustment policies.

In April 2005, Lehman adopted an adapted version of FASB's fair value hierarchy. Level 1 estimates of fair value are obtained from quoted prices in active reference markets of identical assets or liabilities. Where Level 1 cannot be applied, Level 2 applies and fair value is determined by quoted prices for "similar assets or

---

[37] With respect to PC, the employee in charge of Risk Arbitrage does not work with any other capital markets groups, so as to maintain independence. 90% of the portfolio is screen priced, or Level 1, and the rest is verified through external quotes. 1 to 2% of the portfolio consists of private equity, and PC goes to the investment management desk to get marks for these positions.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

liabilities" adjusted for "objectively determinable" differences. Lehman has elected not to price verify using the Level 2 criteria. Where quoted prices on similar assets or liabilities are not available, Level 3 applies, which relies upon quote prices for similar assets or liabilities in active reference markets or model-based valuation techniques. For model-based valuations, the focus for Level 3 pricing is on the "relevance and reliability" of the inputs to the models. Those positions which cannot be valued under the Level 3 criteria then fall into Level 4, which Lehman defines as using "hypothetical market prices replicated using entity inputs as a practical expedient." PC described several examples of products in each level. In general, PC only price verifies positions over a certain value, e.g., cash positions greater than $1 million market value for corporate credit. This results in less than total coverage, although OPSRA was told that coverage is generally greater than 90%. Most of the coverage cut-offs are in market value terms, presumably because they are easy to set and implement. [38]

For each product, there is a variance threshold which serves as a trigger for more detailed and documented investigation. For example, the variance threshold for corporate credit is $250,000 and 5% of market value. Positions which after getting independently priced verified by PC exhibit differences from the traders' marks greater than the threshold variance get highlighted for further review and potential adjustment. Variances are discussed initially by the product controller and the individual trader. Any issues remaining unresolved are brought to the attention of the desk head, and, if necessary, to the head of PC and the head of the business.

In addition to verifying traders' marks, PC verifies the actual positions – i.e., makes sure that the positions in a trader's books, used to generate the risk reports, are the same as the positions in the general ledger. As the aggregate market risk metrics such as VaR are dependent on the position information provided by the front office systems, MRM depends on the accuracy of these numbers.

### ii. Profit and Loss Attribution Process

PC analytically reviews the P&L and positions on a daily basis and provides explanations for large movements. Through this process, they work in partnership with risk management to ensure accurate reporting and analysis of risk. From a market risk control perspective, the P&L explain process provides a way to check the accuracy and robustness of the pricing models and the risk sensitivities which the business units and MRM use to calculate and monitor risk. The central idea behind the P&L explain process is that P&L should be decomposable into discrete components (e.g., commissions versus principal). This permits the desks and risk managers to assess what is driving the P&L. By matching up risk sensitivities with market movements, they can estimate ex-ante the profit or loss for a desk and compare that to the "actual" P&L ex-post. Insofar there are material differences between the two, traders, risk managers, and controllers can focus on this unexplained portion. Unexplained P&L acts as a warning flag to risk managers and trading desk heads, signaling the existence of a problem such as poor capture of data, mismarking of a position by a trader, or model failure.

---

[38] PC walked OPSRA through several examples, including the verification of the TIPS inflation book within interest rate derivatives (a Level 1 product). They also gave an example of a bond option for an emerging market sovereign (Level 3). Within equities, they demonstrated how an option considered to be Level 3 is priced, using a volatility, spot price, and dividend test. For Level 4, PC discussed the price verification of a synthetic CDO, using data from MarkIT partners, and the price verification of a single family unit development housed within the real estate group.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Daily P&L on a position by position basis for the cash businesses is calculated by the middle office. For the derivatives business, PC (rather than the middle office) owns the entire P&L process, as they tend to have employees with a skill set better suited to explaining P&L arising from derivatives.  Data flows from the front-end source systems into three reporting systems (configured for different types of products): GQuest, PALS, and GEDS.  Any adjustments are made in these systems, and the numbers then flow into the general ledger.

The process is divided into three parts: the trade date estimation, the trade date + 1 P&L production which has reconciliation and analysis, and reporting, where results are aggregated and disseminated to senior management.

To perform trade date estimation, traders mark-to-market inventory positions and the front end systems then generate revenue estimates.  PC receives these estimates and reviews them for reasonableness relative to market movements.  Large items are scrutinized more carefully to ensure that the estimations are valid.  Estimates, along with PC commentary, are consolidated and distributed to senior business and finance management.  For a relatively straightforward business such as equity cash trading, the estimate will be ready around 4:15 PM and is not likely to change significantly the next day.

For cash products, the trade date +1 process is primarily owned by the middle office. This is very automated, involving high volumes and heavy reliance on systems. The middle office ensures that trades are booked correctly and trader mark-to-markets are processed correctly.  They will reconcile within GQuest, and PC will then review the output in order to make any necessary adjustments.  Once analysis is completed, PC delivers P&L to the front office, summarizing the results within the Highlights System and distributing them to senior management.  As mentioned above, for derivatives PC owns the entire P&L process.  For fixed income, PC physically delivers the reports from IRIS (the engine feeding LehmanRisk) by 8:15 AM the next day.  Within equities, traders view their risk from the front office systems directly.  PC also uses the risk reports from IRIS to calculate spread P&L for fixed income derivatives.  The middle office is responsible for the actual position reconciliation of front to back office derivatives systems.  When all booking issues have been resolved, PC will make any necessary adjustments.  Upon finalizing adjustments, PC compiles and explains the results using PALS and GEDS. Within both of these systems, PC can provide a risk-based explanation of P&L using the greeks (e.g., delta and gamma).  PC then reconciles the risk-based P&L explain to the accounting P&L to make sure the actual results can be explained through the risk factors.  They resolve any mismatches by speaking with traders, MRM, or quantitative research.  As with cash products, upon completing the explain, PC delivers the final P&L (i.e., the actual accounting numbers with risk-based explanation) to the front office, where upon approval, it is input in to the Highlights System.

In addition to PC, the Capital Markets technology group (MIS) has a role in the daily P&L process.  They occupy a quality control role in regards to the data, ensuring that P&L results (estimates and actual) have been fully populated by PC, checking to ensure that comment fields are populated, and reconciling estimates to actual results and obtaining explanations from PC.  They also aggregate the results (both same-day estimates and trade date +1 final results) from PC and consolidate the information at a division level.[39]

---

[39] Lehman PC went over several examples of P&L verification with OPSRA.  The first involved a trade date equities recap, which highlighted large P&L movements and contained explanatory comments written by the controllers.  PC also walked through a P&L report for municipal cash bonds.  Finally, PC discussed a P&L report covering interest rate products, and then a P&L summary, from the same day, for the entire fixed income division.  This allowed OPSRA to understand how P&L is aggregated up to the division level.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

iii. Model Control

The model control framework is owned by QRM, where the head of Model Control reports directly to the head of QRM. The framework is a recent initiative at Lehman and leverages off of the business units' model developers in implementing the model control framework, requiring them to perform much of the testing and validation that was previously done within QRM.

As currently structured, model control responsibilities rest with three broad groups: Business units (e.g., Quantitative Research (QR), Analytics and front office technology), QRM, and PC.  The business units are central in many respects and bear the most responsibility, as the ultimate "ownership" of a model resides with the business. QR, which reports to a business head but is independent of the trading hierarchy, has the initial responsibilities:  developing, implementing, testing and fully documenting the models.  QR is also charged with populating and maintaining the model inventory/library and tracking model usage and compiling related statistics, functions that at other firms tend to fall under an independent model validation team such as the one in QRM.  QRM stressed the importance of the peer review process, which occurs within QR, in the model control framework.  The head of QR described this process as a weekly phone call within defined product areas (e.g., mortgages and interest rates).  OPSRA was not able to ascertain the depth of this peer review process, and will follow up with both QR and QRM to understand how exactly the peer review fits into the framework.   Most importantly, after its initial responsibilities have been fulfilled, QR has temporary approval authority for both QR-developed models as well as trader-developed bespoke spreadsheet models.  In other words, trades cannot be booked on a model which does not have QR-approval. Analytics and technology (within each business) are responsible for model implementation, i.e., maintenance control of the computer code, implementing regression tests, and providing notification of code changes and releases.

A typical sequence within the Model Control framework is as follows.  Initial approval comes from QR. This is considered to be "temporary" approval.  Along with temporary approval, QR may place restrictions, such as limits on volumes or number of trades to be priced by the model. Additionally, PC may require valuation adjustments on temporarily approved models. A model is considered to be "fully approved" only when they have approvals from the business unit, QRM and PC.  Limits may be placed at this stage as well. OPSRA was told that the time taken for a model to graduate from temporary to full approval varies considerably, according to the model's complexity.  As a general rule of thumb, equity models tended to be modest variations on already approved models and quickly addressed while fixed income models were more complex and took longer.  A standard documentation template is required, so that the documentation for each model must address each of the required elements.

In principle, QRM has a broad range of responsibilities with regards to the framework: model review/validation, providing guidance to PC on model-related matters, and most importantly, ultimate approval authority (along with PC).  In practice, QRM's role is expected to be more limited. OPSRA understands that QRM will diligently monitor the flow and pipeline of new models approved by the businesses, and will review developer-supplied documentation for compliance with standards prescribed by the Model Control framework.  QRM is unlikely to be doing detailed model review/validation, relying instead on the QR peer review process.  QRM does not plan to conduct formal evaluations of each model's theoretical framework or the model assumptions, or the issues arising from the choice of a particular numerical implementation (e.g., stability/error of prices, sensitivities).  Rather, it will focus on issues related to calibration and propriety of inputs.  It is unclear to what extent QRM will be assessing the suitability

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

of a model for its intended usage.  QRM may develop a metric of model risk based on the sensitivity of a model to unobservable inputs.

PC was also presented as being a key participant in the Model Control framework, via their responsibilities of price verification of model input parameters, reviewing model suitability for transactions as per model documentation and risk management guidance; and assessing and approving model valuation adjustments.  PC is well-situated to detect misuses of a model.  For example, if a trader chose to mark a trade using a model not approved for that trade, this may be detected when PC price-verifies the trade using the approved model for that trade.  Likewise, if the trader marks to an unapproved model, and this model's sensitivities are different from that of the approved model, this may show up in the daily P&L explain.

A Model Control Committee has been formed to provide a forum for discussions of issues related to model control.  It does not have approval authority.  It is chaired by the business unit and members include senior representatives from QR, Analytics, QRM, PC and Technology; other guests may be invited as appropriate.  The committee has scheduled meetings every month and may meet on an "extraordinary" basis as well.

During discussions with OPSRA, QRM focused on valuation models, i.e., those used by traders for marking their books and by PC during the price verification process.  Other types of models/methodologies may be subject, in some form or the other, to some components of the Model Control framework. Documentation received by OPSRA indicates that the VaR and MPE methodologies will be reviewed by the model control group.

Currently, the new process is in place only for the equity division.  In this area, models tend to be more compact and formulaic, with many bespoke adjustments to basic pricing models.  Key aspects include of the process include regular monthly Model Control Committee meetings; development of a complete and measurable model inventory and an approval process with automatic notification and full audit trail.  The inventory contains details on the approval status, the volumes/risks of each model (weekly report), daily report on lists of models with temporary approval, and PC-required reserves for models with temporary approval. The Model Control Committee uses this inventory report to prioritize reviews and re-reviews. The framework is not yet formally in place for fixed income. Here, the models tend to be much more complex, especially within credit derivatives, and operate within a broader framework.  Development time is significantly longer than in equities.  The model validation groups are generally involved from the outset when a new fixed income model is developed, and by the time the model is complete QRM should be in a position to readily evaluate the model.  In the interim, there exists a set of "primary controls" and "detection controls."  The framework is meant to apply globally, consistent across legal entities, geographic regions and trading desks.

Based on OPSRA's assessment of the framework, it appears that QRM is taking a risk-based approach to model validation and that much of the independent model control process resides within PC.  The head of QRM observed that the bulk of trades are booked on models that have been extensively time-tested, and associated model risk is quite low.  As an example, he cited the Black-Scholes model used within equity derivatives.  Lehman asserted that the proportion of "exotic" trades, booked on models where model risk might be higher, is quite low.  A risk-based approach would imply that QRM spends the majority of their time on the models generating the greatest amount of calculation risk and linked to the most material exposures, measured either by VaR or RA usage.  That said, it is unclear how models that may be less material in terms of generating high measures of risk, but incur significant amounts of model risk (e.g. by incorporating inputs such as correlation skew that are difficult to capture and subsequently validate), are prioritized for review.  In addition, there is minimal

31

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

documentation formalizing their approach, and there are no measures, such as risk-based model ratings, that would also lend a degree of formality to the process. OPSRA will continue its discussions with QRM about the new model control framework, and its ability to develop a system that ensures models used for pricing products within Equities and Fixed Income are validated in a thorough and timely fashion.

## III.  Credit risk management

### a.  Overview of Businesses Generating Credit Risk

This section of the report discusses the risk infrastructure surrounding CRM. This includes two of the more important tools used by CRM, the MPE metric and the Internal Credit Rating (ICR) scorecards; the limit and permissioning procedures; and credit systems. This section also details businesses with significant credit risk. Lehman's credit-risk generating activities include a large and sometimes chunky leveraged lending business, smaller but significant relationship and warehouse lending businesses, a broad OTC derivatives and financing business, and a growing prime brokerage franchise.

The Leveraged Finance business is a significant source of Lehman's overall credit risk. The group offers clients without ratings or with debt ratings at loan closing of BB+ or below financing solutions including high yield bond, leveraged loan, bridge financing and/or mezzanine debt products. In 2004, Lehman was ranked seventh in the league tables for US leveraged loan book runners with a volume of $13.0 billion on 62 deals. This area commands a significant amount of attention from the CRO and from senior management of the firm due to the large and lumpy nature of the transactions.

More recently, Lehman has moved into the investment grade loan space in response to clients' desires to consolidate investment banking relationships within one firm. They are now a major player in this loan market. One of the products Lehman offers is loans to investment grade clients that are generally unprofitable on a standalone basis in order to perpetuate an existing relationship or to strengthen a growing relationship. These loans typically take the form of commercial paper backstops or general revolvers. Currently, Lehman has 264 loans outstanding to 145 clients with $10.7 billion committed and $1.1 billion drawn.

Lehman's warehouse lending business provides short-term secured financing to residential mortgage banking counterparties to finance originations or acquisitions of residential mortgage loans. Although this business is profitable on a standalone basis, these facilities are generally extended in order to promote other activities, namely to ensure a source of underlying whole loans for the securitization business. Lehman currently has warehouse lending facilities with 14 counterparties representing total commitments of $4.6 billion, with roughly 50-60% of the total commitments funded at any given time.

The OTC Derivatives, Securities Lending, and Repos businesses include a wide breadth of underlying products that generate credit risk. The counterparty current exposure (CE) as of 2/25/05 across products was $24.4 billion. The largest single product category generating CE was Fixed Income Derivatives, with a CE of $7.4 billion.[40] Large current exposures were also generated in Equity Finance[41] with a CE of

---

[40] This includes Plain Vanilla Swaps, Exotic Swaps, Default Swaps, Fixed Income Options, Corporate Bond Options, Total Return Swaps, FX, EMG Options, and CDO trades.

[41] This includes Stock Borrow vs Stock/Cash Lending trades.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                              LBEX-DOCID 2125011

$6.2 billion, and in Fixed Income Finance[42] with a CE of $3.2 billion.  Other products generating current exposure include Foreign Exchange Derivatives (CE $1.0 billion), Equity Derivatives (CE $590 million), and Forward/Outright trades where the underlying can be convertible bonds, corporate bonds, equities, euros, EMG securities, governments, or mortgage backed securities (CE $410 million).[43]  In addition to CE, these products generate significant potential exposure as discussed below.

      The prime brokerage businesses, which provides securities lending services and extends secured financing (via margin loans) to hedge funds, is also a material source of credit risk.  While these activities are fully collateralized on a daily basis, this business does create potential exposure stemming from the possibility that daily market movements will eat through the equity in the counterparty accounts.  The prime brokerage business is currently small relative to other securities firms, but this is an area Lehman plans to grow.  As of May 2005, the aggregate gross market value of counterparties' positions was approximately $83 billion ($48 million long and $35 million short), the total loan amount was $24 billion, and the Net Potential Exposure (defined as VaR minus equity) was $30 million.

    b.  Tools

       i. Potential Exposure Modeling

      As a result of its OTC derivatives trading, financing transactions (e.g., repos) and prime brokerage activity, Lehman bears credit risk arising from the possibility that a counterparty will default at a time when the termination value of outstanding trades is in Lehman's favor, or when the collateral held by Lehman is worth less than the amount lent against that collateral.  CE is used to represent Lehman's loss were such a counterparty to default today, assuming zero recovery of unsecured exposure.  CEs may change substantially over time, not only from new transactions, but purely as a function of movements in markets.  For instance, two parties may enter into an interest rate swap today, at the market (expected present discounted value of the floating leg and fixed leg payments are equal), so that the CE to both is zero.  However, depending on how rates evolve over time, the contract's value could change substantially so that one party is bearing substantial credit risk with respect to the other.  Thus in risk managing derivatives and financing activities, securities firms must concern themselves not only with CE, but with future PE as well.  PE models provide probabilistic estimates of how CE may evolve over time as a function of market movements. At Lehman, PE is the primary tool by which counterparty trading risk is managed and also serves as a critical input into the RA usage calculation.

      The CE with respect to a particular counterparty is simply the MTM value of the portfolio, or portfolio replacement cost, taking into account netting and collateral.  If netting is allowed, positive and negative transaction level MTM values can be added to calculate counterparty level CE.  In the absence of netting, the current exposure comprises the sum of only positive marks.  Thus without netting the fear is that, in the event of default, Lehman might have to make the defaulting counterparty whole for its

---

[42] This includes Bonds Borrow/Lending vs Cash, Dollar Rolls, Bonds Borrow/Lending; Repurchase/Reverse Repurchase Agreements; and Gentan Repo trades.

[43] In addition, deposits to banks or investments in Global Money Market funds generate a CE of $5.6 billion.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

(the counterparty's) positively valued trades while separately seeking compensation for the trades that have positive value from Lehman's perspective.[44]

To model PE is essentially to model the forecast distribution of the value of a counterparty's portfolio, taking into account the applicable collateral terms. A single PE metric serves as an estimate or forecast of what the CE for a portfolio will be in the future. However, for each point in time - e.g., three months or six months from today, there is an entire forecast distribution of possible CE outcomes. For instance, there is a three month expected/mean outcome, a 5th percentile outcome, a 95th percentile outcome, and so on. The primary PE metrics used at Lehman are (in Lehman parlance):

- *Potential Exposure (PE)* – Refers generically to a CE forecast, or to an entire CE forecast distribution, but not to any particular point on the distribution. PE is always modeled to take into account netting terms but not upfront collateral and/or variation margining. Variation margining refers to additional collateral (beyond the upfront collateral) posted in response to decreases in the value of the portfolio, and is discussed further below.
- *Effective Potential Exposure (EPE)* – The PE after accounting for margining.
- *Maximum Potential Exposure (MPE)* – The 95th percentile PE. MPE is a curve over time - i.e., there is three month MPE, six month MPE, and so on.
- *Expected Exposure (EE)* – The mean PE. EE is also a curve over time.
- *Peak Potential Exposure (PPE)* – The peak point on the MPE curve. For instance, the two-year MPE might be the greatest MPE, making it the PPE.
- *Effective Peak Potential Exposure (EPPE)* – The PPE after accounting for margining terms.

A robust PE framework should somehow capture the mitigating impacts of margin agreements. With a margin agreement in place, counterparties are required to post additional collateral if, following market movements, the portfolio replacement cost exceeds a specified unsecured threshold.[45] Thus variation margining requires the modeler to consider the fact that the forecasted CEs will be continually pulled back towards this unsecured threshold amount.[46] In other words, if a CE exceeds the unsecured threshold, the risk horizon for which the CE could continue to grow past that excession is limited, since the portfolio would eventually either be re-collateralized or closed-out.[47] For the vast majority of Lehman counterparties, margin calls can occur daily and delivery is the next business day. However, a cure period of two weeks is allowed to reflect a dispute resolution time. Thus the total risk horizon modeled for counterparties with margin agreements is typically two weeks.

---

[44] With netting: CE = max($V_1 + V_2 + \ldots V_n$),0
  Without netting: CE = max($V_1$,0) + max($V_2$,0) + $\ldots\ldots$,max($V_n$,0)

[45] For example, if Lehman has an in-the-money swap position with counterparty xzy with a value of $1 million (meaning xyz would have to pay Lehman $1 million to walk away from the trade), and xyz has posted $800,000 in cash collateral to Lehman, the unsecured amount is $200,000.

[46] Typically with variation margining a minimum transfer amount is specified, which requires some minimum change in value for collateral to be called (which avoids "nuisance" calls).

[47] In order to take variation margin into account, collateral flows must be modeled as the CE drifts across these unsecured threshold (plus minimum transfer amount) boundaries. This causes EPE to become path dependent - i.e., simply knowing the forecasted CE is not sufficient for modeling collateral flows, but also the path by which CE arrived at its forecasted value.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

In order to estimate PE distributions, future values for the risk factors that determine the values of the portfolio's instruments must be modeled.  This can be accomplished using various broad statistical approaches, and at large banks and securities firms is often achieved through Monte Carlo simulation.  This type of framework involves the modeler using market price and/or historical risk factor data, along with certain statistical assumptions, to specify the joint stochastic process that describes the evolution of risk factor movements over time and then using random number generation technology to generate hypothetical future states of the world.  Other statistical approaches to modeling risk factor distributions include HistSim and VCV.  HistSim involves using actual historical movements in risk factors and applying those movements to the current risk factor values to generate the forecast risk factor and PE distributions.  A VCV approach allows the modeler to identify specific points on the PE distributions (e.g., the 95th percentiles) without estimating the entire distributions.  Such a computationally convenient approach involves reliance on a statistical assumption of the joint normality of the risk factor distributions and thus normality of the PE distribution being modeled.  Under such a normality assumption, only estimates for the risk factor volatilities and correlations are required to obtain these PE distribution point estimates.  Lehman actually utilizes all of the above statistical approaches, with the approach varying by product type.  In addition, for credit derivatives Lehman uses a stress testing approach.  Below we briefly describe and assess the PE approach taken by product type.

*Fixed Income and Foreign Exchange Derivatives*

For over 99% of FX and approximately 90% of fixed income products a Monte Carlo simulation is used for modeling PE.  QRM uses 1,000 simulation paths in estimating the PE distributions.  While this tends towards the lower range of the typical number of paths used for PE purposes, QRM asserts this specification is appropriate given the additional computational costs that would be incurred versus the amount of benefit (in terms of decreased simulation error) that would be reaped by increasing the number of paths.[48]  The PE term structures are modeled out to a 30 year horizon, with all exposures discounted back to current dollars.  While not all firms express PEs in terms of current dollars, QRM argues this is desirable from the credit analysts' perspective since they think in terms of current dollars for permissioning trading levels across the exposure maturity term structure.  Another advantage in expressing PE in current dollars is that within the context of RA, PE is aggregated with VaR and Event Risk, which are both denominated in current dollars.  There are over 100 maturity points modeled with much of the granularity in the first year.  Variation margin is dynamically modeled within the simulation to produce EPE.  Further, the model captures the aging of portfolio - collateral roll-off, trade expirations, option exercises, etc.

Fixed income and FX risk factors/products are modeled within a single simulation.  In doing so, interest and exchange rates are modeled as uncorrelated, where FX rates are assumed to follow a multivariate lognormal distribution (correlated with one another) that is independent from the interest rate generating processes.[49]  For interest rates, an arbitrage-free two factor model calibrated to yield-curve, swaption, and cap volatilities is used.

---

[48] OPSRA staff will further investigate this issue in the future as progress is made towards developing and implementing PE validation techniques, as discussed below.

[49] With the caveat that the drifts applied to the FX distributions are calibrated to the differential of the interest rates (short rates) of the currencies in question, based on a model of uncovered interest rate parity.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

QRM takes a "risk neutral" approach to the parameterization of the risk factor distributions used in the simulation model. In short, this involves applying risk free rates of drifts (or expected values) to the risk factor distributions, rather than calibrating distributions to historical drifts. Such an approach can result in substantially lower exposure estimates, especially for longer maturity transactions in non-margined portfolios, as compared to alternative "econometric" or "real world" modeling approaches. Often risk neutral risk model frameworks involve calibrating additional distributional parameters (namely volatilities) to price curves, such as forward curves and implied volatilities, rather than from historical risk factor data.[50] However, where price data are lacking, historical volatilities, etc. may be used. Furthermore, correlations are typically measured empirically as market implied correlation parameters are not available for most factors.

As there is clearly no consensus amongst practitioners and academics alike as to what the best approach is, OPSRA staff are somewhat agnostic regarding this real world versus risk neutral PE debate. Each approach has its advantages as well as disadvantages. For instance, an argument in favor for the risk neutral approach is that it is more of a forward looking calibration, using the market's view on distributional parameters rather than simply assuming history will repeat itself. In addition, QRM asserts that using risk neutral scenarios is computationally efficient since the re-pricing of instruments in the face of risk factor movements is performed using risk-neutral distributions. Alternatively, empirical evidence suggests certain risk factors, such as equity returns, exhibit expected values above that of the risk free rate of return, particularly over longer horizons. Going forward, we intend to examine the techniques/processes QRM develops internally, discussed further below, to validate empirically with these PE model outputs.

For the 10% of fixed income and 1% of FX transactions not modeled in the simulation, which are the more exotic/complex transactions, proxy instrument PEs are used or conservative "risk factor add ons" are applied. The add-ons involve the use of a pre-simulated grid of generic trade PPEs. The non-modeled trade is matched to a generic trade based on notional amount, maturity, currency, etc. The PPE of the non-modeled trade is applied to the portfolio. This is conservative in the sense that the highest peak exposure is used to represent the non-modeled trade's entire MPE curve and add-ons are simply added to other portfolio exposures regardless of potential diversification benefits or long/short offsets.

*Equity Derivatives*

For equity derivatives, approximately 80% of trades are modeled using a modified version of the historical simulation VaR model. Approximately 20% of trades, including exotic options and baskets are modeled using a VCV VaR model. For less than 1% of the trades, add-ons are used. For non-margined portfolios (30% of trades), the MPE profile is estimated by scaling up the 1-day VaR by the square root of time to the various PE term maturities and adding the current portfolio MTM value. For margined portfolios, the VaR is scaled up according to the risk horizon (again, usually two weeks) and added to the unsecured threshold and minimum transfer amount.

---

[50] For instance, if a modeler requires an estimate of the expected volatility of returns for Lehman Brothers common equity, one approach might be to compute and use the historical volatility of returns. Alternatively, one could observe volatilities implied from Lehman equity option prices and use those as the market's consensus of the expected volatility.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 2125011

It is important to note that simply scaling up a 1-day VaR metric ignores the aging of the portfolio examined over time.  For instance, as equity levels evolve over time, the portfolio greeks (e.g., the deltas and gammas) will change without adding any new positions (thus changing the relationships between risk factor movements and changes in portfolio value), which impacts any subsequent CE forecasts.  Further, certain trades may be scheduled to expire or options will likely be exercised under particular scenarios.  This static approach of scaling up the VaR implicitly assumes the risk profile does not change over time and captures none of these effects.  Obviously, the aging impacts not captured are larger for non-margined accounts, where VaR metrics are scaled out to considerably longer maturities.  Consequently, QRM personnel have conveyed a desire to refine the modeling of margin provisions for equity products and possibly move non-margined equity portfolios to a Monte Carlo framework.

The current historical simulation is adopted from the market risk VaR model, and utilizes the same times series and re-pricing technology.  The only notable exception with respect to the market risk specification of the model is that, for PE purposes, equal weighting is applied to all historical risk factor data (versus the exponential weighting used for VaR purposes).  The VCV model uses a delta-vega (i.e., linear) re-pricing approximation and one year of historical data.  The VCV deltas are mapped to single name equity return data and vegas are mapped to historical implied volatility data on one of eight regional indices.  Although less material in the context of PE versus VaR models (given that counterparty level risk profiles tend to be more directional in nature and require aggregation across fewer risk types than desk or business unit level profiles), neither a linear VCV approach nor the use of such a limited number of implied volatility series seems ideal for modeling the non-linear price and volatility risks associated with options.  However, pending certain front office system enhancements, QRM intends to extend the historical simulation method to cover key exotic positions.

*Credit Derivatives*

For the credit derivatives business, QRM is currently using a scenario analysis approach to measuring PE, rather than a typical statistical approach.  The scenario analysis involves calculating potential exposures resulting from large, contemporaneous trade-by-trade credit spread shocks.  These individual transaction level exposures are eventually aggregated by taking the maximum exposure of either all of the long or all of the short positions in a portfolio.  In other words, no credit risk factor correlations are explicitly modeled.  This ad-hoc aggregation results in conservative PE estimates in the case of a balanced long and short portfolio.

The magnitudes of the credit spread shocks are intended to be 95th percentile movements, stressing each position's underlier in the direction that increases Lehman's exposure.  These stresses are calibrated either from 1) internally generated market implied credit transition and default probabilities, and corresponding mark-to-market impact matrices, or 2) from Lehman's historical spread data.  For non-margined accounts, underlying implied ratings are stressed at a 95% confidence level using the front office transition matrices and corresponding spread and price changes are obtained from the MTM matrices.  These transition matrices are annual in periodicity and extend out to 10 year horizons.  Thus a metric is produced for the PE one-year out, two-years out, and so one, through the tenth year.  While the transition probabilities are initially based on historical data, they are calibrated to market implied survival curves/default probabilities.  For margined accounts, a spread risk factor, reflecting a 95th percentile

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

two-week spread move and estimated from the firm's historical data, is used. These risk factors are estimated by rating[51].

The PE results produced from this scenario analyses are completely insensitive to the existence of legal netting, and the aging of portfolios over time is not captured. Furthermore, this ad-hoc process of adding up the risk from all the longs versus all the shorts and taking the greater of the two resonates as a fair approximation to actual exposure. In other words, using this approach, PEs will not necessarily increase or decrease with increases and decreases in actual risk. Consequently, QRM is planning to implement a Monte Carlo simulation model for credit products in the near future. In the meantime, QRM asserts some comfort with the fact that the current aggregation bears on the side of caution in ignoring diversification effects[52].

### Fixed Income and Equity Financing

For securities financing transactions, a spreadsheet implemented Monte Carlo simulation model based on a VCV matrix is used for measuring PE. For these businesses, all securities are mapped to one of 52 indices/benchmarks. This includes, for example, ten US equity indices by sector. The use of a VCV based simulation and associated normality assumptions does not seem particularly worrisome given the relatively linear nature of the instruments covered by these businesses. However, OPSRA staff note the relatively non-granular benchmark mapping scheme used. While QRM does attempt to compensate for potential concentrated and basis risks not captured by increasing volatilities for concentrated positions, the concern remains that such mappings could result in the inaccurate offset of exposures. However, QRM again notes the relatively directional nature of most counterparty portfolios. Furthermore, QRM plans on transitioning the financing businesses to the historical simulation VaR based methodology by the end of this year.

### Prime Brokerage

For prime brokerage clients Net Potential Exposure (NPE), defined as the VaR minus the equity in the account, is the PE metric used. The VaR statistic, like with much of the equities derivatives business, is estimated from the market risk group's historical simulation VaR model. Again, the PE version of the VaR model uses the same specification as used for computing the firm's VaR except for the equal weighting of historical risk factor data. All prime broker accounts are fully collateralized and subject to daily margining.

### Revaluation Techniques

As discussed in the VaR section of this report, there are three central steps to constructing a probabilistic risk aggregation model. The above discussion focuses much

---

[51] One of these two approaches is taken for the vast majority of Lehman credit derivative transactions, which are mostly single name CDS and CDOs. Some of the more exotic trades, such as credit default swaptions, are not captured since QRM has not developed the re-pricing calculators to quantify the MPEs resulting from the stress shocks. QRM is currently in the process of developing notional based add-ons to capture risk for such transactions.

[52] While one could imagine hypothetical portfolios, such as a concentrated portfolio consisting of several longs and shorts, for which this approach might underestimate risk, OPSRA staff are told that when QRM moves the credit business to a simulation model PEs are expected to fall for essentially all counterparties.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

on the modeling of risk factor movements for PE purposes.  In terms quantifying the P&L impacts of those movements, QRM uses a combination of front office pricing models, including risk sensitivities and stress matrices, and its own models and calculators which may utilize full revaluation or various re-pricing approximations.  While industry standard seems to be to use front office re-pricing technology for VaR models, firms often build their own calculators for PE purposes due to the higher computational demands of these methods, especially when using Monte Carlo techniques.  Furthermore, PE models require additional counterparty level information to that stored in front office systems (and more than is needed for VaR), such as collateral terms.  However, while OPSRA is open to the use of QRM developed re-pricing calculators (versus front office models), we intend to examine in the future QRM's validation efforts with respect to such models, as discussed below.

*PE Validation*

Due to the relatively longer time horizon across which PE models are used to project potential risks, as compared to VaR models, empirically validating PE calculations poses additional challenges.  Consequently, techniques in addition to pure statistical comparisons of model predictions against actual CE realizations should be considered.  Some institutions appear to be moving in the direction of developing techniques that emphasize intuition and risk management practices in assessing model adequacy, as opposed to focusing on a particular statistical test.  Further, in addition to empirically validating model outputs, some firms gain comfort in assessing the various components of the overall PE methodology from a sort of bottom-up approach.  For instance, separate processes can be established for evaluating the formulas used for repricing instruments (as with front office pricing models) versus the stochastic models used for describing risk factor evolutions over time.

QRM intends to implement a two-stage PE model validation process.  The first stage is to validate the re-pricing techniques and calculators one-by-one.  OPSRA staff are told this process will be much akin to the model review process for vetting front office pricing models, and will also be carried out by the model validation group in QRM.  In addition, various ad-hoc analyses will be performed to evaluate the risk factor forecasts produced by the models.  These sorts of processes entail reconciling the risk factor movements leading to large exposures (i.e., drilling down into the MPE simulation path) with intuition as well as with directly observable historical movements in factors.  The second stage of the validation effort involves performing a form of backtesting of hypothetical portfolios.  The idea is to walk back through time and calculate what the CE history looks for a hypothetical portfolio, were it to have been created at various historical dates, and compare that distribution of CEs to the actual (current) estimated MPE.  In other words, suppose one has estimated a two-week MPE of $1 million for some hypothetical transaction today.  The modeler calculates what the realized CE would have been, two weeks after initiation, had that transaction been put on various days in the past.  The QRM plan is to implement such tests, starting with more simple portfolios, and to expand it to portfolios with perhaps more complex correlation structures and instruments.  The proposed PE validation plan appears reasonable and is consistent with approaches used elsewhere in the industry.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

ii. Internal Credit Ratings

A major component of CRM's function is the analysis of counterparties leading to the assignment of ICRs.[53]  Credit analysis begins with a comprehensive review of counterparty information.  Included in the review is an analysis of counterparty-specific information such as audited financial statements, prospectuses, external credit rating agency reports, external news reports and company press releases.  Credit also relies on due diligence including on-site client visits, particularly for hedge funds.  Industry analysis is also performed, including peer analysis and benchmarking particularly for banks and hedge funds.  Finally, market data, including credit spreads associated with the counterparty's debt or credit default spreads, are utilized.

ICRs are assigned to all counterparties, except for short dated cash trading and counterparties with an MPE less than $1 million, by credit analysts within CRM.  Lehman uses a scale of eight bands ranging from iAAA to iD.  Bands from iA to iB are further defined by the addition of a plus or minus to show relative standing within each rating band.

Lehman has developed a series of industry-based scorecards that are used by analysts to assign ICRs.[54]  Each scorecard contains a number of quantitative and qualitative factors germane to the particular industry.  Analysts input each quantitative factor and score each qualitative factor from 0 (weak) to 5 (excellent).  Each factor is given a predetermined risk weight that cannot be modified by the analyst.  Each factors' score and risk weight is combined ($\sum$value x weights), leading to a final score which is compared to a pre-calibrated industry specific scale to get the final ICR.  Analysts may override the scorecard produced ICR, but must provide a justification for doing so.  Ratings are subject to a sovereign cap, and hedge funds are capped at BBB+.

Analysts are required to refresh counterparty ratings at least annually.  When new information about a counterparty becomes available, analysts may refresh the ICR more frequently.  Analysts are encouraged to downgrade counterparties as soon as negative information is received, whereas they are encouraged only to upgrade counterparties when positive information is backed by evidence of actual improvement.

A comparison of Lehman's ICR with external ratings reflects a conservative bias in Lehman's ICR approach.  Approximately 700 counterparties, representing fewer than 20% of the counterparty population, have Moody's and S&P ratings.  With Moody's, the ICR matches 45% of the ratings and the ICR is lower in 46%, including 8% where they are more than two notches lower.  With S&P, the ICR matches 54% of the ratings and the ICR is lower in 32%, including 4% where they are more than two notches lower.  Sovereign ICRs are broadly consistent with rating agency ratings.

Lehman's method of assigning ICRs through the use of scorecards provides consistency and transparency.  The same scorecards are used globally, increasing consistency.  The scorecards were developed internally by Lehman, not by a third party consultant, and thus there is a sense of "buy-in" among analysts worldwide.  Currently only analysts can access the scorecards on Lehman's internal website, but there are

---

[53] ICRs directly inform a counterparty's maximum available credit limit, as well as documentation and margin terms.

[54] The major industry classes that are covered by the scorecards include:  insurance, banks, hedge funds, sovereigns, corporates, municipals, special purpose vehicles, investment advisors, and broker dealers.  In addition, a scorecard may be treated as "miscellaneous" for counterparties outside of the pre-defined industries.  OPSRA examined the scorecards for insurance companies, banks, sovreigns, and hedge funds in detail.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

plans to allow the businesses to view them once security concerns have been addressed.

###### c.   Limits and Permissioning

There are multiple layers of credit risk limits at Lehman.  The most comprehensive limit is RA, which has a market, credit, and event risk component.  The credit component of RA is a statistical measure of potential credit losses over a one year time horizon.  Lehman also imposes firmwide country risk estimated loss potential (ELP) limits.  The ELP measure is a conservative estimate of the loss Lehman might experience in the event of an instantaneous crisis in a country.  It estimates market risk and counterparty credit risk losses across all products at the country level.  The CRO sets country limits.  In addition to these limits, there are several counterparty credit limits in place at Lehman governing the tenor of exposures in a particular country.

Credit limits are further delimited by family (i.e., all entities within a related group of counterparties) and by counterparty.  These limits are set by Credit Analysts in CRM within their delegated authority.[55]  There are three applicable classes of limits that are monitored by CRM.  First, pre-settlement limits cover pre-settlement credit risk arising from the possibility that Lehman may incur a credit loss if a counterparty defaults at a time when the termination value of outstanding trades is in Lehman's favor and exceeds the proceeds from liquidating any collateral.  These limits apply primarily to the OTC derivatives business.  Second, settlement limits cover the open delivery risk associated with trades in which Lehman, due to market convention, has free delivery and could be at risk for the full value of the trade being delivered due to non-simultaneous settlement.  This is mainly an issue in the FX business.  Third, treasury limits cover the credit risk associated with deposits made for liquidity management purposes.

Family and counterparty limit authorities are set by ICR.  For pre-settlement risk, limits are further defined by trade tenor, are measured in MPE and take into account enforceable netting agreements and collateral.[56]  The family-level authorities for the Global Head of CRM are set forth below, in USD millions.

---

[55] There are five levels of authority (in descending order):  the Global Head of Credit Risk Management (Jeffrey Glibert), Level 0 Approvers (Steve Simonte in New York and David Oman in London), Level 1 Approvers (6 worldwide), Level 2 Approvers (15 worldwide), Level 3 Approvers (10 worldwide), and Level 4 Approvers (19 worldwide).

[56] The PE metric utilized for hedge fund exposures, both OTC and within prime brokerage, is measured as the Net Potential Exposure (NPE), defined as the VaR minus the equity (surplus collateral or initial margin) in the account.  This number is a better metric for dynamic hedge fund portfolios that are subject to daily margining.  See the prime brokerage section of the report below.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

| ICR | Pre-Settlement Risk MPE Limits by Tenor | | | | Settlement Limits | Treasury Limits |
|---|---|---|---|---|---|---|
| | <=1 yr. | <= 5 yrs. | <= 10 yrs. | >10 yrs. | | |
| iAAA | 675 | 375 | 275 | 200 | 1000 | 925 |
| iAA | 675 | 375 | 275 | 200 | 1000 | 925 |
| iA+ | 525 | 375 | 275 | 200 | 425 | 925 |
| iA | 525 | 375 | 275 | 200 | 425 | 925 |
| iA- | 525 | 375 | 275 | 200 | 425 | 925 |
| iBBB+ | 275 | 200 | 175 | 150 | 250 | 425 |
| iBBB | 275 | 200 | 175 | 150 | 250 | 425 |
| iBBB- | 175 | 100 | 100 | 100 | 0 | 225 |
| iBB+ | 125 | 75 | 75 | 75 | 0 | 125 |
| iBB | 125 | 75 | 75 | 75 | 0 | 125 |
| iBB- | 100 | 75 | 55 | 50 | 0 | 100 |
| iB+ | 60 | 60 | 50 | 45 | 0 | 75 |
| iB | 60 | 60 | 50 | 45 | 0 | 75 |
| iB- | 50 | 50 | 40 | 35 | 0 | 55 |
| iCCC | 50 | 50 | 40 | 35 | 0 | 55 |
| iD | 35 | 25 | 25 | 25 | 0 | 35 |

Limits for lower levels of credit authority are correspondingly more restrictive. For example, the pre-settlement risk MPE limit for a iAAA rated counterparty for exposure with less than one year tenor is $600 million for Level 0 approvers, $500 million for Level 1 approvers, $300 million for Level 2 approvers, $150 million for Level 3 approvers, and $15 million for Level 4 approvers.

Limits are further delimited into product limits by Lehman legal entity. These cover specific product areas and are denominated in notional amounts. Limits for repos, FX, and securities lending will be recast product level PE limits in the near future.

Although the credit limit guidelines provide analysts with clear mandates on maximum limits, analysts are still expected to exercise judgment in two ways. First, actual limit recommendations are often less than guidelines. This is primarily due to a lack of business requirements warranting the full amount, and a desire by Lehman not to have "excess credit" to counterparties. Second, the guidelines do not prescribe rules for sub-allocating product-specific limits within a family.

Transactions that are not covered by a credit limit require trade specific review and approval by a credit analyst. Active financial institutions operate under pre-approved limits for all products. Select corporate and insurance clients trade under pre-approved limits for fixed income products, and require trade-by-trade approval for CDS and equity derivatives. All other counterparties, including hedge funds, must have all trades approved individually by credit analysts. Lehman is moving towards having all active counterparties, including hedge funds, operate under pre-approved limits and having infrequent users operate under trade-by-trade approval. From an operational standpoint, this change will alleviate some of workload for the credit analyst.

In addition, the private client business (Private Investment Management) counterparties are provided with pre-approved product lists including notional limits, margin, and haircut requirements and tenors for various client types. This business operates under Reg T and the accounts are all highly margined well in excess of VaR.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

### d. Technology Systems

At Lehman, credit risk staff from all geographic regions use the same global technology platforms containing the same information. The various credit risk reports and applications are accessed from the LehmanRisk CRM Webpage. The primary Credit Risk applications/systems include Credit Work Station (CWS), the MPE System, the Credit Approval System (CAS), Credit Risk Reporting applications, and the Internal Risk Rating Scorecard Application.

#### i. Credit Work Station

CWS is the "downstream" credit system. All important information and tools, from a credit risk management perspective, are brought into CWS. It serves as a repository for counterparty, family hierarchy, credit ratings and trade information, and is used for exposure aggregation and report generation. Within CWS one may view all credit analyst reviews, external credit ratings and various client as well as industry and country data. In addition, all credit lines/limits as well as the current usage of those lines are viewable in CWS. In order to be able to cut data/reports different ways and view exposure at various levels of aggregation, CSW can perform simple MTM (re)calculations. CWS is also used by the analysts to create new credit lines.

#### ii. MPE System

The MPE system calculates counterparty credit exposure for four major purposes: 1) pre-trading analysis and trade approval, 2) reporting of counterparty exposures, 3) calculation of the counterparty risk components of Risk Appetite, and 4) the credit valuation adjustment (CVA). As discussed in the MPE section above, various types of modeling techniques are employed for MPE calculations, varying by product type. However, the same techniques are applied consistently globally within product type. The MPE system produces a standardized set of outputs and reports. For instance, weekly CE and MPE reports showing aggregated exposures to the counterparty level are produced.

In terms of pre-trade analysis, credit analysts and sales personnel can currently estimate the likely portfolio MPE impact of relatively vanilla trades. MPE "risk factor tables" are used to provide conservative estimates of the MPE effects of other new trades on an existing portfolio. The MPE system calculates these impacts for approximately 100 generic proxy trades. However, often, especially for more "sensitive accounts" and more exotic trades, the Credit Risk Analytics team (within QRM) will need to model the impact of a proposed transaction. This may involve either modeling the trade directly, in proxy form, or using an "add-on" (as discussed in the MPE section). In doing so, Credit Risk Analytics has a "generic desktop utility" at its disposal that calculates the effects of adding one or more predefined (generic) trades to portfolios. This calculator offers additional functionality to the risk factor tables – e.g., it allows for variation in margin terms for the marginal simulation. However, QRM is currently developing a "true" MPE calculator that will be available to analyst and business personnel for calculating MPE impacts of actual proposed transactions "on the fly". This tool should enhance the permissioning processes and reduce the number of transactions that require explicit QRM attention for approval purposes.

43

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

### iii. Credit Approval System

The CAS stores pre-approved counterparty credit limits and credit analyst trade approvals. For non-pre-approved counterparts, credit analysts record credit terms for proposed transactions and obtain and assign credit approval numbers for each trade proposal. Transaction management then validates the credit terms in the trade confirmations (front office) with the credit terms in CAS, and a "credit handshake" is performed to ensure the trades that are booked are in fact the trades the credit analysts approve. Within CAS one can view a full history of past trade approvals and can pull up the details on any trade.

### iv. Credit Risk Reporting Applications

The credit risk systems are used to generate a variety of standardized reports, and also provide the capability to generate ad-hoc reports. Types of reports generated include portfolio, country risk, exposure, analyst, and control reports. Again, the CRM webpage is the central depository of risk reports. Daily reports focus on exposure (CE, MPE and settlement). In addition to generating daily current and potential exposure reports, line (limit) utilization and excess reports are created that facilitate limit monitoring. Credit risk managers have the ability to view client activity across all product areas/business lines (e.g., derivatives trading, repos, loans) for a particular counterparty, with the exception of prime brokerage activity. While prime brokerage activity is not currently consolidated with LehmanRisk in an automated matter, OPSRA staff are told this is a project for 2005. In terms of information reviewed by senior management reviews, we are told that every week the Executive Committee receives a package similar to what OPSRA staff review monthly, with an additional cover page highlighting top changes, etc. Furthermore, CRM conveyed an intention to enhance its risk reporting to senior management to provide high level exposure reports with drill down capability and more historical trend analysis.

### v. Risk Rating Scorecard Application

Standardized and automated scorecard applications are used at Lehman to ensure quality control around ICRs. ICRs can only be updated using a scorecard, and when there is an update the changes are stored (each scorecard is date and time stamped). Each counterparty is assigned to an industry and each CWS industry is mapped to a particular Industry Class scorecard (discussed in ICR section). Examples of score card application functionality include automatically applied sovereign ICR caps, mandatory comments in the event of application overrides, definition pop-ups, etc. In the future, Lehman intends to expand the scorecard application to cover internal facility ratings.

### vi. Future Enhancements

Risk management is currently investing resources to enhance credit risk technology in various ways. CRM is continually working to automate processes and integrate systems. For instance, it intends to develop an automated reconciliation between the MPE system and the General Ledger. Furthermore, CRM intends to make improvements to the credit analyst interface, such as by developing a "workflow management tool which will manage the credit review and limit recommendation process, trade approval and reconciliation, and 'push' exception reporting to analyst".

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 2125011

Furthermore, various reporting enhancements, such as improving country risk reporting, are on the CRM agenda.

### e.  Specific Business Areas

#### i.  Lending Activities

*Leveraged Finance*

The high yield business at Lehman includes a leveraged finance group.   This business provides event-driven financing for acquisitions, leveraged buy-outs and refinancings such as dividend recapitalizations.  The financing packages typically include multiple instruments.  There are often longer term financings such as term loans and revolvers, as well as shorter term bridge loans, which are generally taken out by longer term capital sources such as high yield bond offerings.  These pieces can vary in terms of seniority in the capital structure as well as in the probability of being funded.

The approval process for a leveraged loan begins with the deal team conducting due diligence and preparing a detailed transaction memorandum. The deal team is composed of investment bankers, ratings advisory analysts[57], and credit research analysts.  The transaction memo summarizes the transaction, the competitive dynamics and Lehman's role.  Also included is a summary of the diligence conducted, historical financials and projections, business and industry overview, an assessment of management and any significant pending litigation or other issues.  The credit analysis performed by the deal team places a heavy focus on the prospective cash flows.  They consider the robustness of the primary source of repayment, such as cash flows from operations, as well as any secondary sources such as liquidation proceeds.  A final recommendation is made by the deal team.

After the deal team has completed its memo, the findings are presented to the divisional commitment committee, the High Yield Commitment Committee (HYCC).  The analysts present their opinions, and there is a discussion of the proposed commitment terms, pricing, and syndication.  Approval of the proposed terms by the HYCC requires satisfactory diligence, research and ratings opinions, and syndication strategies. Occasionally, the deal team will perform an informal "fly-by."  That is, one month before presenting the formal memo to the HYCC, the deal team will discuss the transaction with the HYCC to figure out what the major issues will be and to get a feel for whether the transaction is potentially viable.  This is more likely to happen for industries with which the HYCC is not familiar and for large sponsor deals.

Deals approved by the HYCC are then elevated to one or more of the firmwide commitment committees.  The two committees relevant to this business are the Investment Banking Commitment Committee and the Bridge Loan Committee.[58]  The former has broader representation across risk management and senior management of the firm.  These firmwide committees ensure that the transaction fits within Lehman's funding and risk frameworks, and ensures that there is proper coordination across the firm.  In addition, they ensure that even in downside scenarios, the transaction will meet minimum return hurdles.  They also make sure that the due diligence has been

---

[57] The rating advisory analysts are former employees of the rating agencies who advise on the projected ratings that transactions will receive from the rating agencies.

[58] The other two firmwide committees are the Fairness Opinion Committee and the Investment Committee, which approves principal transactions such as private equity, real estate and venture capital.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

thorough, that the firm is comfortable doing business with the client, and that the firm is protected from a legal perspective.  Transactions above specified thresholds or those with significant reputational or client risk are elevated to the Executive Committee for final approval.

Lehman engages in a number of measures to mitigate risk post-commitment.  The primary mechanism by which they mitigate risk is by syndicating the commitment to third parties.  They will seek to sell a portion of the loan and bridge commitment through wholesale commitment syndication and general primary syndication.  Factors considered in deciding how much to syndicate include agreements with issuer on hold size and syndication timing, length of commitment, overall risk level, and market conditions.  Syndication is completed prior to closing of the deal except in Europe where syndication must take place post-closing.  Commitment syndications are legally binding and thus constitute risk transference from Lehman to the buyers of syndication pieces.  Post-closing of the transaction, the loan trading desk will generally make markets in the loan and will opportunistically seek to reduce Lehman's remaining exposure in accordance with issuer agreements and market conditions.

Post-syndication of deals, the business is often left with exposure to certain pieces of the capital structure, either client-mandated minimum hold levels or allocation that was not sold.  The goal of the business is to hedge the entire position.  For unfunded positions, they seek to hedge the entire commitment size, recognizing that a counterparty is likely to borrow under the entire revolver prior to default.  They hedge by making two sided markets in loan only deliverable CDS (88%), a product Lehman has engineered that eliminates basis risk by requiring the delivery of loans and not bonds in the event of default, and with unsecured bond referenced CDS (12%).  Customer demand for hedging products is generally present only when it is newly issued or when there is an event surrounding the name.  The business will engage in opportunistic hedging depending on market liquidity to increase the amount of protection.  Also, on occasions when the counterparty pays back their commitment and Lehman ends up net short credit, they will look to unwind their existing hedges.

The business is often not able to hedge the entire hold position due to a lack of demand by third party investors.  There are currently 29 borrowers with exposures greater than $10 million after hedges.  The largest current position is a $45 million revolver, none of which was hedged due to a lack of investor demand.  Ongoing monitoring of these positions is performed by the Loan Portfolio Management Group, a group within the business.

CRM works actively with the business units to keep informed of developments in the pipeline.  For risk analysis purposes, pending transactions are categorized and tracked in five buckets, based on two factors.  First, what is the probability of the deal actually happening?  Second, when does Lehman legally take on exposure?  The five buckets include:

- <u>Syndication Risk Final Documents</u> – Executed final documents.  The transaction may have closed but not finalized the syndication process.  The deal could be either funded or unfunded.
- <u>Syndication Risk Commitment Letter</u> – Issued a Commitment letter which has been accepted by the client.
- <u>Contingent Transaction</u> – Signed letters with limited outs – Issued a commitment letter with conditions.  The letter has not yet been accepted by the client.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

- <u>Conditional</u> – Unsigned letters or signed with material outs – Issued an unsigned letter or a letter with significant conditions such as completion of due diligence and committee approvals.
- <u>Potential Transaction</u> – In the process of analysis and prior to presentation to the Committees.

The following chart represents Lehman's aggregate facility exposure by facility type and by bucket as of 1/25/05.



Source: Lehman Brothers Top Exposure Report, 1/25/05.

     CRM ensures that transactions can be accommodated within all applicable limits, including RA and Single Transaction Limits.[59]  The Marginal Risk Appetite (MRA) is reported on all high yield commitments.  MRA represents the incremental contribution of a deal to the high yield business' total RA usage.  The calculation is done broadly in two parts.  First, the exposure size over the course of a year needs to be determined.  This is complicated by the fact there is uncertainty about whether or not deals in the pipeline actually come to fruition, and by the assumptions necessary to determine what the market conditions will look like in an adverse environment.  Second, the standard RA methodology, with two exceptions noted below, is applied to the predicted exposures calculated in the first step.

     In the first step, MRA is calculated for deals that have firm, conditional or potential commitments.  One hundred percent of the calculated MRA is added in the case of firm commitments, while the conditional or potential commitments are weighted by a deal-specific probability of deal completion assigned by the deal team.  The deal size is calculated as Lehman's share of the total facility.  As RA measures potential annualized losses in extreme market conditions, MRA seeks to measure the potential losses from deals in which the syndication process is disrupted due to adverse market conditions.  Adverse market conditions, such as high default rates, dramatic spread

---

[59] See the discussion of Single Transaction Limits in Section I.c.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

widenings, demand/supply imbalance, and significant fund outflow, could result in Lehman's holding bridge and loan commitments longer than anticipated. Lehman calculates exposures for three different market scenarios and averages the resulting losses to come up with the final exposure. The three scenarios include a closed market (no syndication, hold 100% of the position for the year), a difficult market (bridge taken out with a high yield issuance in six months and loans close in three months at 25% hold level with further syndication to 10% within a year), and a friendly market (bridge taken out in three months and loans syndicated to 5% final hold level at closing). The average of the three scenarios generally approximates the difficult scenario.

In the second step, MRA incorporates both the market risk and the event risk component of RA. The standard methodology applies with two exceptions. The first exception is that pricing flex mitigates market risk on a one-for-one basis, and full flex completely mitigates market risk, leaving only event risk.[60] Event risk captures the possibility of downgrades or defaults of the bridge and loan positions that Lehman is forced to hold in the adverse market conditions. The second exception to the standard methodology is that Lehman assumes defaults are correlated within sectors and independent across sectors.[61] The loss given default is derived from recovery rates published by Moody and S&P, with a downward adjustment for the first year LBO default rate.[62]

To illustrate how MRA captures risk, consider the Intelsat deal. Lehman was the lead bookrunner in this large acquisition financing deal during the fall of 2004. On 8/16/04, the acquisition agreement was signed and announced. Lehman agreed to provide $1.107 billion in financing, made up of an $800 million bridge loan, a $67 million senior revolver, and a $150 million term loan. The resulting MRA number was $106 million. From mid-September through October, the bridge loan was syndicated. Lehman's position was reduced from $850 to $314 million, and MRA went from $46 to $20 million. Lehman expressed comfort that these numbers reasonably reflected the risk of a loss in a stressed environment on these positions. However, CRM focuses on the total size of the deal, which is the maximum loss Lehman would encounter in the event of default, when approving a deal. From CRM's perspective, RA is a good metric to use to aggregate risk across the portfolio, but their focus is on the total size of the transaction.

CRM plays a number of other roles in the leveraged finance business.[63] They analyze key transaction risks, including key business risk, projected financial plans, proposed capital structure and market views on syndication, and reputation risk. They participate in the Investment Banking Commitment Committee and sign off on all

---

[60] "Pricing flex" refers to Lehman's ability to adjust pricing in response to market conditions. For example, 100 bp of flex indicates that Lehman can increase or decrease the spread by up to 100 bps. Full flex allows unmitigated pricing changes.

[61] In other areas of RA where defaults are modeled, Lehman assumes that defaults are uncorrelated. They feed probabilities of default and risk exposures for each counterparty into a "binomial distribution calculator" to obtain the full distribution of credit loss estimates. In the case of correlated defaults within an industry, they utilize the same binomial calculator but treat all counterparties within an industry as one counterparty. This effectively gives the result with perfect correlation. Lehman then interpolates between the uncorrelated and the perfectly correlated results.

[62] The CRO related that the adjustment to the first year LBO default rate was due to conversations between RMD and personnel in the high yield business, illustrating how RA evolved from collaboration between the two groups and thus "buy-in" by the business unit.

[63] Currently, one person responsible for Commitments, Patrick McGarry, reports to Jeff Glibert. Lehman is in the process of hiring one additional person to work in this area.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

transactions approved by the committee.  They engage in ongoing follow up with the respective deal teams as transactions move from approval to closing, final syndication and target hold level.

Senior management is kept well informed of developments in the pipeline through a series of reports.  The Firmwide Risk Snapshot is presented to senior management weekly and, among other items, reports on commitments in each bucket besides Potential Transaction.  The report lists the counterparty, the deal probability, the expected amount of the exposure, and the weekly change in exposure.  The Top Exposure Report contains information on the full pipeline (i.e., all five buckets) and contains detail on the commitment by facility type.  More detail about the deals can be found in the Lehman Expected Commitments reports.  This report contains a series of bullet points about each deal, such as the purpose of the financing, acquisition price, total financing package, any MACs and pricing flex, and the current state of the deal.

### Relationship Lending

Relationship loans, made to investment grade counterparties, are generally unprofitable on a standalone basis but are made in order to perpetuate an existing relationship or to strengthen a growing relationship.  Investment Banking (IB), the business unit responsible for structuring the transactions, performs the risk-reward analysis of the loans.  On an ongoing basis, they perform periodic reviews to determine the profitability of the whole relationship.  The Credit Facilitation Group, a public side group outside of IB within the fixed income franchise, is responsible for determining the mark-to-market cost of the loans and the cost of the hedges.[64]  These costs are then reported to finance, which splits the costs evenly among IB, fixed income, and equities.

Similar to other corporate loan exposures, Lehman seeks to mitigate as much of the committed exposure as possible.  They primarily utilize traditional CDS products to hedge, but also use some loan-only CDS and some equity options.  They also seek to sell off part of the loan facilities.  Hedging is particularly challenging for these investment grade facilities, given that they are generally unfunded.

Before a relationship loan is made, it must first be approved by the Loan Participation Committee.  This committee is composed of IB personnel and considers the revenue versus risk tradeoff of the loan over time in making its decision.  After approval by this committee, the loan must be approved by the High Grade Credit Committee.  This committee is staffed more broadly and considers the credit fundamentals of the counterparty as well as the risk in granting its approval.

Ongoing monitoring of the loans is performed by the High Grade Loan Portfolio Group.  The Credit Facilitation Group is responsible for the ongoing hedging decisions, as well as monitoring the exposures on a portfolio, sector, and single name basis.

The current RA limit for this business is $75 million, broken down geographically in the U.S. and Europe.  The business is also subject to a $4 million VaR limit which is also broken down between the U.S. and Europe.  RMD is responsible for monitoring the utilization of RA and VaR by the business.

### Warehouse Lending

Warehouse lending facilities are generally 364 day facilities and the majority of the collateral is either alt-A or subprime loans. The warehouse lending business, unlike

---

[64] Since financing is provided at rates that are uneconomical from Lehman's perspective, a day one initial markdown/loss is taken on these positions.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

relationship lending, is profitable on a stand-alone basis. However, the primary goal of this business is to generate ancillary business, such as a pipeline for the purchase of whole loans for a Lehman securitization or for the agency securitization business. Lehman has either purchased from or securitized loans for 13 of its 14 warehouse lending counterparties over the past year.

The evaluation and management of the risk associated with these secured lines of credit is primarily done within the business area, in that the business area will determine the advance rates, or haircuts[65] and will conduct the ongoing marking and monitoring of the underlying collateral. However, both the Residential Mortgage Risk Department[66] and RMD[67] will be involved in the upfront due diligence and approval process.

The risk management process around this business starts with the due diligence focused on both the counterparty and the underlying collateral. A Deal Manager within Warehouse Lending is charged with the responsibility of coordinating and running both the upfront due diligence process and the post-close monitoring of the counterparty and collateral. In addition to business personnel within Warehouse Lending, CRM, Residential Mortgage Risk, in-house counsel and a mortgage loan underwriting and compliance specialist third party firm are involved in the upfront due diligence process. The due diligence activities include: (1) Corporate review, (2) Business operations review, (3) Financial review, (4) Litigation/regulatory review, (5) Loan-level due diligence review[68], and (6) Discussion with external auditor of the counterparty. The corporate and business operations reviews are done on-site. CRM[69] is involved in the corporate review, financial review, and auditor discussion.

Once the due diligence has been successfully completed, Warehouse Lending will start the facility structuring process. As with any asset-based lending business, the facilities will be structured to provide protection to the lender on two fronts: (1) covenants[70] with respect to the counterparty and (2) credit terms with respect to advance rates and additional collateral provisions. The facilities are structured so that Lehman has the right to determine the market value of the mortgage loans serving as collateral for the facility at any time and the counterparty is required to cure any deficit in margin

---

[65] Typically, the haircuts range from 2 to 3% and generally the value of the securities upon which the haircuts are based is capped at "par".

[66] This department is headed up by Eric Hibbert and creates the credit policies with respect to the mortgage business. Eric's group does not report into Warehouse Lending, however, it is part of the overall Securitized Products business area.

[67] Jeff Goodman, SVP in MRM reporting to Paul Shotton, sits on the Investment Banking Commitment Committee which approves the warehouse lending facilities as well as debt and equity offering transactions.

[68] Loan level due diligence includes running a sample of mortgage loans through a re-underwriting and compliance analysis to evaluate underwriting guidelines and regulatory compliance. This is done by a third party specialist initially when a counterparty is establishing a facility with Lehman. Typically, additional loan level diligence can be conducted by Lehman if the client either sells loans to Lehman or uses Lehman to securitize loans. If neither of these situations occurs, Lehman will again use the third party specialist to conduct additional periodic loan-level diligence reviews.

[69] Currently, Jeff Goodman is performing the due diligence responsibilities that CRM participates in. Historically, these duties have been performed by a credit analyst reporting to Jeff Glibert, Global Head of CRM. However, this position has been vacant and Jeff Goodman has been performing these duties. CRM is currently interviewing for this opening.

[70] Warehouse Lending focuses on having financial covenants concerning the counterparties' cash position, liquidity in general, and leverage. Each facility arrangement requires the counterparty to report monthly, regarding their compliance with the financial covenants.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

that may occur based on a market value determination or any other collateral margin call within 24 hours of notice.  In addition, the advance rates defined in the facility documents are based upon percentages of the lesser of unpaid principal balance or market value as determined by Lehman in its sole discretion.  Finally, there are additional restrictions on the collateral, such as aging/time-on-line, concentration limits, collateral eligibility criteria, etc.

Once the facility structure is completed, then the proposal will go to the Investment Banking Commitment Committee for approval.  The committee includes representation from the business area, Residential Mortgage Risk, and the independent RMD.  Specifically, Steve Valentino, Eric Hibbert, and Jeff Goodman among others sit on the Committee.

Once a facility commitment has been extended, Warehouse Lending will perform the daily administration and risk management of the warehouse lending facilities.  There will be periodic monitoring of the counterparty and more importantly the daily marking and monitoring of collateral.  As discussed previously, the Deal Manager is responsible for the ongoing monitoring of the facility.  The administration is conducted by the Mortgage Middle Office on a daily basis and includes all fundings, payoffs and interest coming through Lehman's proprietary Whole Loan Tracking System (WLT).  They will get a tape of the collateral positions from the third party custodian and match up the collateral with the warehouse line to the client and then calculate the margin requirements.  On a daily basis, Warehouse Lending and the Mortgage Middle Office will utilize WLT to monitor the collateral based on the collateral restrictions (e.g., aging, eligibility, concentration limits, etc).  If any collateral deficiencies occur, Warehouse Lending will issue a margin call.

Warehouse lending will calculate the collateral market value for each facility on a weekly basis or more frequently if necessary.  Warehouse lending uses the same model used by the whole loan desk to price the whole loan collateral.  Each loan is valued on a discounted cash flow basis, with the cash flows generated based on projections of prepayments, defaults, and losses.  The projections are a function of loan characteristics, forward rates and projected home price appreciation.  In addition, as a reality check, Warehouse Lending will have conversations with the MBS/ABS trading desks as well as with Lehman's own residential home loan origination businesses concerning the portfolio collateral values[71].  Finally, Warehouse Lending will perform ongoing monitoring of financial covenants, loan level due diligence, and an annual on-site corporate due diligence review.

    ii.   OTC Derivatives/Securities Lending/Repos

The size of Lehman's OTC derivatives trading, financing (repo/reverse repo), and securities lending businesses is noteworthy.  With the exception of commodities, Lehman is active in all of the major product areas, including interest rate and FX derivatives, equity derivatives, and credit derivatives, and trade with a variety of counterparty types - e.g., hedge funds, corporates, sovereigns, municipals, financial institutions, etc.  These businesses generate current (unsecured) and well as potential exposures and operate within the firm's counterparty limits framework.  The following chart reflects Lehman's largest 20 Potential Exposures by product area as of 5/13/2005:

---

[71] The business believes that Lehman's vertical integration in the residential mortgage market provides added value in marking the collateral for the warehouse lines since the business has multiple access to trends and data points for valuing collateral.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011



Source: Lehman Top 20 by Product Family, 5/13/05.

Credit analysts are responsible for approving and rating new counterparties, setting counterparty as well as product level limits, approving individual transactions as necessary, determining counterparty and transaction level credit and collateral terms, and monitoring counterparty exposure levels as well as counterparty credit quality and market events.  In risk managing these activities, CRM relies upon and interacts with several other groups that facilitate the mitigation/management of risks.  The Transaction Management Group (TMG) is primarily responsible for drafting and negotiating Lehman's derivatives and funding documentation, and the Global Margin Group (GMG) is responsible for the daily calculation and collection of collateral requirements.

Credit analysts are organized by counterparty industry.  There are distinct groups responsible for covering financial institutions, hedge funds, corporates, investment advisers and mutual funds, insurance companies and municipals, and special purpose investment vehicles (e.g., CDOs)[72].  One analyst covers a single name/counterparty, and monitors and manages risk taking across all product types for that name[73].  Further, the analysts who perform the initial and periodic credit assessments/ratings of counterparties are the same individuals responsible for approving transactions and monitoring counterparty exposures post trade execution.

As described in the Limits section above, Lehman currently specifies counterparty level PE limits and product level notional limits with a plan to migrate to product level PE limits for pre-settlement risk, and notional limits for counterparty level settlement risk.  Credit analysts establish these limits for new and existing counterparties within their delegated authority and, for many counterparties, approve all trades pre-execution.  At both the counterparty and transaction level, analysts are responsible for mitigating risks by ensuring that the appropriate credit and collateral terms are in place (in the ISDA Master Agreements, etc.).  This includes determining acceptable collateral

---

[72] In addition to this industry based organization, groups are further organized by geography.  For instance, there is an Americas as well as a European corporates team.

[73] Although within industry and geographic location there are reporting hierarchies (i.e., there are typically several more junior analysts who report to a more senior analyst).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

types, applicable haircuts, and unsecured threshold amounts, as well as establishing termination events such as ratings and NAV triggers. Often CRM will seek and obtain collateral to reduce the magnitude of the unsecured exposures, even for individual transactions that fall within the firms accepted risk tolerance levels. In addition, prior to approving individual transactions, credit analysts sometimes require risk mitigation via the purchase of CDS protection for investment grade corporate counterparties or through the purchase of options on the transaction underliers for other counterparties.[74]

Credit analysts are also responsible for the ongoing monitoring of existing exposures. CE and PE, including limit excessions, are monitored on a daily basis, and material changes are examined to ensure that the drivers are understood (i.e., new activity versus market movements). For actively traded accounts, which are often hedge fund counterparties, trading activity is reviewed daily. CRM also monitors, in conjunction with the GMG (discussed below), the behavior of counterparties in meeting margin calls. In addition to monitoring exposures, counterparty, industry, and country events are monitored. Credit analysts regularly update their credit views of counterparties based on newly released financial data (including NAV data for hedge funds), press releases, information from industry and investor publications, market data (e.g., credit spreads), etc. Analysts produce for their regional supervisors Daily Credit Summary reports, highlighting major news and events. The Credit Committee, headed by Jeff Glibert, has periodic global credit calls/meetings to discuss trends, exposures, and recent credit reviews. These discussions are often very industry focused. For instance, staff may discuss recent and expected events in the targeted industry, current exposures of big counterparties, credit reviews and scorecard results of those specific counterparties and the resulting limit recommendations.[75]

Obviously, the individual business units take an interest in managing their credit risk as well, given that they are owners of the P&L and thus bear the losses in the event of a default or deterioration in counterparty credit quality. Thus business personnel may pursue hedging should they perceive too much concentrated counterparty risk in their trading book(s). Further, within the Fixed Income Division's derivatives business, a group has been established for dynamically hedging spread risk for corporate counterparties with actively traded CDS and with whom Lehman does not have Collateral Support Agreements (CSA). As credit derivative markets further development, the hedging of counterparty spread and default risk is expected to increase[76].

Limit excessions can occur actively through the addition of a new trade or passively by large market movements affecting exposure from existing trades. The latter cause is difficult to address. Once a trade has been executed, there are a limited number of actions CRM can take to reduce exposure. One available tool is to refrain from executing additional trades. The renegotiation of credits terms (e.g. sign a CSA) ex-post, however, can be difficult.

TMG, a part of the Corporate Advisory Division, is primarily responsible for drafting and negotiating Lehman's derivatives and funding documentation. In doing so, it seeks to mitigate transaction and counterparty-specific legal and "documentation" risk

---

[74] Such transactions are designed to move into-the-money from Lehman's perspective as Lehman's credit exposure grows. However, the premiums paid for such hedges often make transactions unprofitable, thus this is not a common practice.

[75] OPSRA staff attended (via conference call) a Credit Committee meeting on July 14, 2005 during which the U.S. Life Insurance Industry sector was reviewed.

[76] And as counterparty risk becomes more actively hedged, CRM and QRM may feel pressed to incorporate the capture of purchased protection into the firm's PE calculations.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 2125011

through the use of industry-standard master agreements and transaction-level documentation governing OTC transactions.  TMG negotiates and drafts master agreements for the firm's fixed income and equity OTC derivatives, repurchase and securities lending businesses.  In conjunction with the Legal department, TMG is also responsible for legal due diligence for OTC transactions in new jurisdictions[77].

Specific relationship level documentation produced by TMG include ISDA master agreements and CSAs, BMA/ISMA master agreements for OTC repo transactions and related triparty custody agreements, BMA/SIA/ISLA master agreements for securities lending transactions, and local market master agreements.  Prior to sending a draft Master Agreement to a counterparty, TMG incorporates credit terms that are determined by the appropriate credit analyst.  Typical terms that CRM may request include determining events of default (e.g., including cross default terms), adding contract termination events such as downgrade or NAV triggers, and determining collateral terms (e.g., deciding unsecured thresholds, collateral types and haircuts.).  All changes to credit terms must be approved by CRM.  TMG also ensures that all agreements adhere to the firm's Documentation Policy, and have a formal exceptions process in place for addressing deviations.

TMG uses a web-based tool called "Entity Master" to manage the negotiation and execution of ISDA Master Agreements.  Entity Master houses master agreement and credit support level information.  Collateral terms in Entity Master, which are needed for computing and monitoring margin requirements, feed the margin system CAMEO (discussed below).

GMG, which is part of Operations, is responsible for calculating margin requirements, monitoring margin levels and calls, and noticing margin calls (and otherwise interacting with clients regarding when calls will be met, etc.).  Margin requirements are calculated according to government regulations, exchange regulations, and internal requirements, which are defined in the legal documentation governing the transactions.  Transaction and position information is received by Margin from various processing and risk management systems.  All of this information (e.g., master-level margin terms, deal specific requirements, outstanding transactions and collateral holdings) is brought together in CAMEO, the firm's proprietary margin system, to calculate potential margin calls.[78]  Margin calls are tracked and reported using CAMEO.

For derivative counterparties, ISDA documentation, at the master and trade level, govern margin requirements.  Settlement of margin calls can be the same day, next day, or longer depending on the terms negotiated with the counterpart.  For fixed income financing trades and Treasury and mortgage options and forwards, margin calls are calculated using the economic exposure on open trades plus any haircuts.  Settlement of these calls is generally expected the next day.  For secured lending, margin is calculated based on greater of regulatory or house margin requirements.  Clients have three days or longer to meet margin calls, but accounts can be liquidated at Lehman's discretion if exposure grows beyond comfort.  For futures, exchange and house margin requirements dictate the margin calculation, and settlement of margin deficits is same day.  Collateral received by counterparties is booked in CAMEO as well as in one of the firm's books and records systems, which are reconciled with CAMEO daily.  Collateral is priced daily.  Failed collateral is not included in the margin calculations and for securities lending

---

[77] TMG also prepares and executes trade confirmations for certain lower volume businesses (Asia, US Equities) and handles closing for fixed income structured transactions.

[78] For securities lending and futures margin is actually calculated outside of CAMEO (in ADP's Brokerage Processing System and Rolf & Nolan's RISC system respectively), but is viewable in CAMEO.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

collateral is only credited once received.  Differences in margin call calculations with clients are reviewed with Sales, Trading and the Middle Office.  GMG prepares and distributes to Sales, Trading, Credit, and Management a daily exposure report showing outstanding calls by counterparty.

GMG works with CRM in several ways.  The two groups work together to address any client disputes of a margin call.  In the event that a client disagrees with margin requirements, GMG reviews the applicable margin terms with credit.  For new clients and businesses, GMG works with the credit analysts and TMG to put actionable margin terms in place.  In order to calculate margin requirements, GMG has connectivity with credit systems to obtain information such as internal ratings.  And, as mentioned above, GMG provides credit a report detailing margin exposures.

### iii.  Prime Brokerage

Lehman is a relatively new entrant into the equity prime brokerage business, which continues to be dominated by the "Big Three" of Morgan Stanley, Goldman Sachs, and Bear Stearns.  While it currently has approximately 250 clients (advisors), Lehman's business goal is to expand its prime brokerage operations across a variety of services, including execution and financing, service and technology, and business solutions.  Through the prime brokerage platform, Lehman provides leverage to hedge fund counterparties, allowing them to create market exposure in excess of what could be obtained through cash holdings/assets alone.  Leverage is extended through the provision of margin loans and securities lending, which are fully collateralized and margined on a daily basis.  Thus financing provided through this business is asset-backed like in nature, where the only credit exposures are potential exposures.  Consequently, in risk managing this business, the monitoring and analysis of the collateral - i.e., the positions in the prime brokerage accounts - is equally important as the monitoring and evaluation of the credit quality of the counterparties.

Lehman's approach to prime brokerage risk management distinguishes it from its peers.  While at many firms the risk monitoring and management of counterparty portfolios is performed primarily by quasi-independent groups established within the business units, at Lehman this function is performed by RMD.  In particular, a prime brokerage risk management group dubbed Global Clearing Services (GCS) Risk was formed as a joint venture between MRM and CRM to handle the daily monitoring of PB accounts and margin determination process.  In addition, CRM exercises certain responsibilities with respect to prime brokerage counterparties.  The separation of duties between GCS Risk and CRM can broadly be described in that GCS is more focused on the quantitative market risk type analyses of the funds' positions/collateral and in assessing margin, whereas CRM is more focused on evaluating and tracking the funds themselves - e.g., assigning internal credit ratings, tracking headline events, receiving and reviewing performance reports, etc.  However, the two groups work together quite closely in carrying out the primary risk management processes of counterparty credit evaluation, margin determination, and risk measurement, monitoring, and reporting.[79]

All new prime brokerage accounts must be approved by the New Account Committee.  This committee is composed of GCS senior management, sales, financing and client service, and CRM.  As part of this process, the CRM hedge fund team performs a credit evaluation and due diligence of new funds, including background

---

[79] Matt Bowen and Nachi Das are co-heads of GCS Risk, and dually report to Jeff Glibert, head of CRM, and Paul Shotten, head of MRM.  Steve Simonte, head of Hedge Fund Credit, reports to Jeff Glibert and is responsible for the due diligence, etc. on hedge funds completed by credit analysts.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

checks of managers, evaluation of historical performance, strategy review, organizational structure and management experience, financial, operational and risk management controls, and investor base and redemption policy. It also assigns internal credit ratings to new funds using CRM's proprietary hedge fund scorecards. Funds are evaluated based on 14 qualitative and quantitative factors. Fund-specific factors considered include total net asset value, track record (years experience), investment strategy risk profile, etc., and manager related factors include assets under management, track record, quality of risk management framework, etc. Each factor is weighted, with fund-specific factors carrying 40% of overall weightings and manager-related factors carrying 60%. The final weighted score corresponds to an industry-specific rating scale, but credit analysts assign the final rating manually and must rationalize any deviations from the Scorecard output. Ratings are capped at BBB+[80].

When a new account is created, GCS risk managers must determine the applicable margining rates. Margin is generally set on a rules basis and is applied instrument-by-instrument. GCS Risk determines margin for a new fund by considering factors such as internal credit rating, trading strategy, portfolio diversification, leverage diversification, underlying asset volatility and liquidity, and expected P&L volatility. In some cases, a sample portfolio is analyzed. Hedge funds are tiered according to credit worthiness, and the most conservative margins are applied to less credit worthy hedge funds. Margin is set by strategy, country and product type. The margin "rate" generally refers to the percentage of gross market value that is taken as margin on trade-by-trade basis. For instance, for a long-short equity portfolio with concentrated positions, GCS Risk may determine that 15% collateral is taken on each position in the portfolio, long or short. In certain instances, some offset may be awarded for highly correlated positions. For instance, on a particular risk arbitrage trade risk managers may agree with a client to calculate margin for multiple trade legs collectively. Put differently, a smaller per leg margin percentage will be applied for those trades considered jointly. In general, risk management asserts minimal margin benefit is given for risk-reducing exposures. OPSRA staff are told total margin is "almost always" greater than the VaR of the portfolio.[81]

GCS risk managers describe their margining process as completely dynamic, meaning they are constantly evaluating the counterparty's portfolio and re-assessing the adequacy of the margin approach. Typically, Lehman has the right to change margin terms anytime, a powerful risk management tool for responding to market events. Margin lock-up agreements are in place for some accounts that commit Lehman to particular terms, typically for a 90 day horizon.[82] Such agreements are privately negotiated and include covenants and termination events. Lehman includes credit provisions such as minimum NAV and performance decline tests in each of its margin commitments, which give Lehman the right to terminate the lock-up agreement in the

---

[80] As a test of their hedge fund scorecard rating system, CRM investigated how it would have rated Long Term Capital Management in 1997 (prior to its initial distress). The assessment/score card yielded LTCM a BB rating, which CRM feels is appropriate ex post.

[81] GCS risk managers provided an illustrative margin determination example for a "Tier 1 Fund" following an equity statistical arbitrage strategy. The fund had very little single name or industry concentrations and was largely market neutral investing in liquid equities. The historical daily P&L volatility was approximately 50 basis points. Given the fund's leverage requirements, GCS was willing to charge as low as 5 percent margin per trade side (long and short). However, should the fund's strategy shift towards more concentrated, directional positioning, the margin rate would quickly need to be reassessed.

[82] There are currently 16 funds with margin lock agreements, ranging in duration from 30 to 180 calendar days. These funds have a Long Market Value of $14,205 and a Short Market Value of $11,243 million.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.    LBEX-DOCID 2125011

event of a breach.  While the offset of economic exposure for positions/hedges held away from Lehman is not given, and GCS focuses primarily on the positions held at Lehman in assessing and determining margin rates, the overall fund strategy (and thus positions held away from Lehman) does affect margin decisions.  The degree of transparency and level of comfort with the fund relationship affects the extent to which such information is considered.

For certain hedge funds of high credit worthiness and with liquid strategies, Lehman uses portfolio based margining.  Its approach to portfolio margining is to compute margin requirements using VaR along with the P&L impacts of various scenario analyses.  Currently, risk managers are working on developing a full suite of scenarios to cover the various products/fund strategies.  GCS Risk will also consider using portfolio margining for a sub-set of counterparty trades, rather than going to a full blown portfolio approach.  While portfolio based margining is currently used on a limited basis, Lehman expects growth in the future consistent with industry trends.[83]  Clearly one incentive for prime brokers to move in this direction is to attract additional business.  However, there are also credit related arguments in favor of portfolio margining as well, despite the fact that such approaches typically results in margin requirements that are less than requirements yielded by the rules based approaches for a given portfolio.  The argument is made that portfolio margin methodologies capture changes in risk more dynamically, resulting in margin requirements that are more correlated with changes in actual risk taking.  Further, Lehman argues that portfolio based margining provides clients with powerful incentives to maintain more balanced/diversified portfolios by bringing offsetting positions, currently held away from the prime broker relationship, into the prime brokerage accounts.[84]

GSC Risk and CRM monitor current and potential exposures to hedge funds on a regular basis and report to senior management.  For prime brokerage clients NPE, defined as the 95% 1-day VaR minus the equity in the account, is the PE metric used.  Given the more complex nature of hedge fund portfolios relative to other counterparties (e.g., many basis risks stemming from relative value strategies), the rapid pace at which risk profiles may change, and the fact that these accounts are all margined on a daily basis, the use of a scaled-up VaR metric as opposed to the product silo-ed MPE metrics is intuitively appealing.  On a daily basis, GCS risk management is very focused on examining portfolios with positive or near positive NPEs and engage in discussions with senior prime brokerage management regarding the status of those accounts.[85]  If strategy drift has occurred, causing NPE to creep up, margin requirements are re-assessed.  Also, GCS personnel may discuss with clients the possibility of adding hedges to the portfolio to reduce NPE to more comfortable levels.

In addition to NPE, GSC Risk monitors a variety of measures on a daily basis, including gross and net market values, greeks/risk sensitivities (e.g., deltas and credit spread sensitivities), event risk measures, concentration/liquidity measures, and stress

---

[83] The GCS risk managers do not feel portfolio margining is appropriate for all strategies, such as credit strategies that involve significant issuer-specific risk.

[84] The risk managers also note one drawback of portfolio margining: it is less transparent to clients.  In other words, as opposed to a simple percentage based rule, VaR/scenario margin calculations are rather black-box.  Although, counterparties are often willing to forgo such transparency in order to receive the additional diversification benefit provided.

[85] The Equity Risk Management Daily Risk Report lists the top five counterparties sorted by NPE.  As of May 30, 2005, the NPEs for these top counterparties ranged from $21.8 million to $354,000.  The outsized $21.8 million NPE exposure was to fund with short index trades with whom Lehman did not take any initial margin due to a financial guarantee from the fund's Japanese parent.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

and scenario analyses.  It is also monitors market events, evaluates new positions as they are put on, and reviews outstanding margin calls[86].  As mentioned above, risk managers are currently expanding the host of scenarios used to risk manage this business.  OPSRA staff will follow up with GSC Risk as these risk measures are further developed as such techniques are important for assessing collateral adequacy.  While the VaR-based NPE metric is certainly useful from a risk monitoring and management perspective, accounts collateralized roughly to one-day VaR levels should be expected to exhibit current (unsecured) exposure resulting from market movements somewhat frequently.  Thus understanding risks further out into the tails of the counterparties P&L distributions is important.

Hedge funds seeking leverage can obtain financing at securities firms outside of the prime brokerage relationship.  OTC derivatives, such as total return swaps and synthetic CDOs, as well as repurchase agreements, embed financing.  For obvious reasons, securities firm wish to ensure that economically equivalent risks receive equal treatment throughout the firm's various business units.  Lehman risk managers note steps have been and are being taken to ensure that clients can not arbitrage between different Lehman desks/businesses, and that all risks with respect to fund counterparties are transparent and understood by risk management.  As mentioned previously, while prime brokerage activity is not currently consolidated with LehmanRisk in an automated matter, this is a project for 2005.  Further, risk is viewed on a consolidated basis for certain counterparties on a periodic basis.

## IV.  Risk Appetite

### a.  Risk Appetite Components

The event risk component of RA simply reflects the event risk calculations discussed above in the business unit descriptions, e.g., for high yield defaults or equity dividend risk.  By design, these event risk parameters are set under a one year, 95th percentile loss assumption.  For example, the -25% shock applied to principal investments in commercial real estate represents the one year loss likely to occur with a one in twenty probability.[87]  Given the one year time horizon and 95th percentile loss assumption, no transformations are required to find the point of interest in the distribution.

By contrast, Lehman's VaR must be transformed in order to put it on a comparable basis to event risk and the RA limits.  Recall, the firm uses VaR as a risk measure reflecting the 95th percentile *daily* loss.  To transform this metric into the market risk component in RA, it is simply annualized by using a square root of time scaling adjustment.[88]  This puts market risk on equal footing with event risk and the RA limits.

The credit risk component of RA requires a more involved transformation.  The counterparty component of risk appetite usage provides an estimate of the potential

---

[86] The group directly responsible for monitoring margin calls, distributing call notices and monitoring significant changes in client account balances and cash movements reports into the Operations group.  As suggested above, GCS Risk and CRM interact with the Margin group regularly as part of their daily monitoring processes.

[87] Note, for some businesses the specification of event risk parameters appears to be based more on intuition than empirical evidence.  For instance, in the example above, whether the -25% shock truly represents a 95th percentile event is debatable.

[88] In short, market risk equals VaR x sqrt(252), assuming 252 trading days per year.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

losses stemming from defaults of counterparties engaging in derivatives trading as well as financing transactions and prime brokerage activity. As with the rest of the risk appetite components, counterparty risk is a one year statistical measure - i.e., it is a 95th percentile statistic measuring potential credit losses over a one year horizon. Further, it is intended to capture the potential credit losses across all of the firm's counterparties. To truly estimate such a "joint loss distribution" requires much data collection and the capture of the correlation structures between many factors. PE, PD, and recovery rate estimates for each counterparty are required. In addition, in order to properly aggregate risk across counterparties, the correlation structures between counterparty defaults as well as between the risk factors driving PEs must be modeled.[89] Obtaining robust results for and/or effectively modeling all of these parameters is an extremely challenging task due to data availability and computational costs. In estimating this ambitious aggregate metric, Lehman relies upon several simplifying assumptions and uses various proxy techniques, as discussed below.

In order to estimate the potential credit losses associated with a particular counterparty, an exposure at default (EAD) is required. To estimate EAD, the EE and MPE curves discussed in the potential credit exposure section above are used. For emerging market and hedge fund counterparties one-year MPEs are used. For all other counterparties the average of the one year MPEs and EEs are used. However, Lehman does not simply use the MPE and EE from the first one year horizon modeled. Rather, a fairly intricate process is used for identifying the maximum one year exposures considering thirty one year intervals across the PE Curve. In other words, the "peak exposure year" for a counterparty is identified by evaluating the curve evolutions from year 0 to 1, year 1 to 2, .......year 29 to 30 as separate one year intervals.

"Risk exposure" is then calculated by multiplying EAD by loss given default (LGD), which is simply 1- the recovery rate. For a single counterparty, the 95th percentile loss number could next be estimated simply by multiplying risk exposure by the appropriate PD. However, Risk Appetite requires a joint (across all counterparties) loss estimate. Lehman accomplishes this by modeling each counterparty's default as an independent Bernoulli process. That is, each potential default is treated as completely uncorrelated with each of the other potential defaults. Then, the PDs and risk exposures for each counterparty are fed into a "binomial distribution calculator" to obtain the full distribution of credit loss estimates[90]. The procedure involves calculating the probability of each and every possible combination of counterparty defaults, using several numerical approximations to reduce computational cost[91].

Lehman computes these counterparty risk results at various levels of aggregation. Ultimately, results are provided at four different business unit levels: the

---

[89] Further, it can be argued that the correlation between PE and PD should also be somehow modeled to capture the "right way" versus "wrong way" nature of exposures. For instance, a counterparty that has sold put options on its own stock is more likely to default should those options come into-the-money from the option purchaser's perspective.

[90] A binomial distribution results from repeated trials from a Bernoulli distribution. A random variable that follows a Bernoulli distribution may take on two possible outcomes with some probability of success $p$. For instance, the flip of a coin is said to follow a Bernoulli distribution with $p = 0.50$. The binomial distribution provides the probability of obtaining some number of successes ($S$) resulting from $n$ Bernoulli trials. For instance, using the Bernoulli distribution, one could compute the probability of realizing exactly 5 heads outcomes resulting from 5 independent coin flips. Thus, under the Lehman framework, the default of any particular counterparty over a one year horizon is said to follow a Bernoulli distribution. Repeating this experiment for each counterparty yields a binomial distribution.

[91] In short, a full enumeration is performed on the first 13 counterparties. As additional counterparties are added, mass is added to the tail of the distribution through a type of marginal analysis.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

firm level, division level, global business level, and regional business level.  However, exposures must first be computed for the appropriate counterparty, legal agreement, and legal entity combinations and aggregated up.  In doing so, Lehman categorizes counterparties into emerging markets and hedge fund versus all other counterparty types.  This binary categorization becomes important for latter aggregation since different assumptions are made regarding the correlation between counterparty and market and event risks for these broad counterparty types.  Counterparty risk appetite usage numbers are currently computed monthly.  OPSRA staff are told the process is being streamlined to allow for more frequent calculations.

This risk aggregation framework requires PD and recovery rate estimates. Lehman recovery rates are industry based, primarily using Moody's research, and PDs are obtained by mapping ICRs to "modified" historical Moody's PDs.  Given the limited number of default data available, obtaining robust results for a large portfolio of counterparties is challenging.  OPSRA staff intends to examine closer in the future the internal processes used for determining and validating these RA inputs.[92]  In addition, a challenge to aggregating risks across counterparties in this manner lies in capturing all of the appropriate correlations.  For instance, three different counterparties trading interest rate, credit, and equity products are unlikely to reach their maximum potential credit exposures simultaneously, due to the imperfect correlation between risk factors. The Lehman potential exposure framework does not model correlations across these product areas, resulting effectively in the addition of inconsistent MPEs (under an assumption of perfect correlation) across product areas for the risk appetite calculation.[93] It could also be argued that the Lehman assumption of treating all defaults as independent events is unrealistic.  For instance, one might argue there are common factors affecting the PDs of counterparties in the same industry (e.g., the US auto industry).  These assumptions tend to offset one another – the first being conservative and the second aggressive.

b.  Aggregation Process

After transforming each of the risk components into the same "units", one can aggregate them.  To do so requires some specification of the correlation between the component risks:  market risk, event risk and credit risk.  Simply adding them together would implicitly assume complete correlation between the risk types – i.e., that the realized 95th percentile loss due to market factor movements occurs simultaneously with the realized 95th percentile loss due to events, as well as with the 95th percentile loss due to counterparty defaults.  This is unlikely and would overstate the total risk, given that some diversification benefit is achieved across the various businesses.  If the diversification benefit is overestimated, however, then the aggregate risk will be understated.

Lehman errs on the side of caution when considering market risk and credit risk exposure to emerging market firms and hedge funds (EMG/HF) by assuming perfect correlation – i.e., for total RA exposure calculation purposes, market risk and credit risk

---

[92] Further, an alternative approach to using ratings based PDs is to use the PDs implied from traded credit products, an approach risk management has considered.  As Lehman continues to develop and refine its risk aggregation framework, OPSRA staff will of course follow up with regard to any such enhancements.

[93] Although, in addition to performing simple sums across product level exposures, summing such exposures under an assumption of independence or 0 correlation is also feasible.  QRM has expressed interest in moving to this approach, asserting this would produce more meaningful aggregate risk metrics and avoid the large investment required to build a full blown PE simulation across all products areas.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

to EMG/HFs are simply added together.  For the other risk components, however, Lehman assumes "50% correlation".  Technically, QRM takes the average between the RA resulting from a 100% correlation assumption between the remaining components (straight sum) and a 0% correlation assumption (square root of sum of squares).  This computationally simple technique yields a result which reflects the intuition behind the diversification benefit.  The magnitude of this benefit, however, is not guided by any empirical evidence.

These correlation assumptions explain why the component numbers do not sum "horizontally" to the RA exposure usage for each business unit.  Similarly, the component numbers do not sum "vertically" for the market risk and credit risk totals because of the underlying mechanics of VaR and the binomial technique described above.  The event risks by business are assumed to occur independent of each other, thus a sum of squares approach is used to arrive at the event risk total.[94]

Risk Appetite is also monitored on a geographic basis between Americas, Europe and Asia.  No additional correlation assumptions are implied;  rather the data is simply calculated at each regional level and reported accordingly.

c.  Risk Appetite Limitations

The RA framework requires significant amounts of judgment.  For instance, In coming up with the firmwide RA limit, subjective determinations must be made regarding revenues in a down year, compensation adequacy, and minimally-acceptable ROTE.  Similarly, though historical diversification provides a guide for the allocation of RA sub-limits, the business units essentially negotiate these allocations.

From a practical perspective, the RA exposure metric serves as a useful comprehensive risk tool for senior management.  When used in conjunction with the "standard" risk management tools (daily VaR, MPE, etc.), RA may facilitate more active comprehensive risk management than most firms' tools allow.  However, from a statistical and financial theory perspective, the RA metric has some notable limitations.  Whether it makes sense to compare one unit of market risk (from an annualized VaR) with one unit of credit risk (from a statistical aggregation technique) with one unit of event risk (from a set of subjectively specified stresses in some instances), is open to debate.  Also, the degree of subjective parameterization which is required for the calculation to be made raises some questions.  More broadly, while aggregating to a single metric is appealing, the benefits of doing so must be weighed against the risk of having risk measures become less meaningful.

Because of the practical usefulness of RA at the senior decision-making levels, processes and tools to maintain quality control over the metric are important.  In this vein, fuller documentation of the assumptions behind the methodologies and theoretical and empirical bases underlying the specifications in the RA framework could help, particularly with regards to event risk.  In addition, because RA exposures cannot be statistically backtested, a set of meaningful validation techniques may be warranted to alert RA users of potential weaknesses and/or distortions in the measurement.

---

[94] Within each business, e.g., leveraged lending, certain correlation assumptions may be made, as described in the business unit discussions above.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

## V.  Areas of Focus

During the CSE review process at Lehman, OPSRA did not find any areas of immediate concern.  Though our review uncovered no material deficiencies, we note below several areas deserving of ongoing monitoring by senior management and OPSRA.  RMD recognizes the importance of these issues and has plans in place to address these concerns.

### a.  Energy Trading

Lehman has recently stated, both publicly and in conversations with OPSRA, its intent to begin trading energy.  As explained to OPSRA, this decision was not motivated by a desire to take advantage of the strong energy market and place proprietary positions.  Rather, Lehman has a strong energy banking group.  Many of their energy and gas clients have sought to hedge their exposure with Lehman, exposure that Lehman tends to consider right way.[95]  Lehman has done a number of leveraged finance deals in this space, and determined that they would like to offer energy hedging capabilities to their clients.  They have already entered into one relatively small position which was immediately back-to-backed with a larger bank, leaving Lehman exposed only to counterparty credit risk.  They intend to build a team that could hedge this type of position directly in the energy markets.

At a logistical level, the traders will report to the head of Interest Rate trading. Lehman is in the process of building this group.  The CRO indicated that Lehman is looking to hire two market risk managers, and two credit risk managers (possibly more in this area).  They are looking to hire managers with a good deal of expertise, as this is not an area where Lehman has any recent experience.  In addition, the other control functions, such as legal, TMG, and GMG, are looking to hire employees with industry expertise.

OPSRA spoke with members of the NPC about this business, and they explained that they will be reviewing the energy trading infrastructure prior to going live with the business.  Their role will not be to evaluate this from a business perspective, as that decision was made by the Executive Committee when it decided to enter this business. Rather, they have the ability to evaluate the implementation, and slow down the process if necessary (e.g., if a control function is not yet comfortable with actual implementation).

OPSRA will be discussing this new line of business with Lehman in the months going forward, both to understand how the business is developing in terms of its scope and mandate, and to understand how MRM and CRM are getting comfortable with the risks present in the energy business.

### b.  Risk Appetite

Lehman has an integrated approach to risk management that is distinctive among its peer firms.  By closely aligning the market and credit risk functions, the firm is able to leverage personnel, analytics, systems, and information flows.  Reporting to senior management reflects the integrated nature of risk management.  Event risk, market risk, and counterparty credit risks are all presented individually to senior

---

[95] The CRO described positions where the oil companies looked to hedge their production, and would owe Lehman money when oil prices were rising, a situation that represents right way exposure from a credit perspective.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

management, as well as the aggregated RA number.  The CRO stressed the importance of RA, in that it provides a number for senior management that exists within the context of the firm's budget, since the RA limit is derived from the overall firm fiscal year budget. In addition, while the absolute RA numbers may only be estimates, senior management can focus on the relative changes in RA usage, which provides a sense of the firm's current risk-taking activities. As for event risk, the CRO stated that without including the metric in some form of limit, it is difficult to get true buy-in across the firm.  Capturing event risk in the RA calculation circumvents this potential problem.

RA has existed at the firm level for over five years, but was just rolled down to the business level in the current fiscal year.  As Lehman continues to examine and refine the assumptions behind RA, and in particular the calculation of event risk, OPSRA will continue discussions about the both the qualitative and quantitative philosophies underlying this unique approach.  The prior discussion on RA mentioned some of its limitations, and those will be addressed in subsequent meetings with RMD.  In addition, RA is designed for Lehman's current business model: a firm with an overwhelmingly customer-driven business.  At the point in time, Lehman does not have a large proprietary franchise.  That said, at least two business heads (high grade credit and equity volatility) indicated their intention to grow the proprietary group within their jurisdiction.  If Lehman's proprietary positions begin to grow accordingly, it would be prudent to revisit RA and the assumptions underlying the framework.

c.  Scenario Analysis

Stress testing, including historical or hypothetical scenario analysis, is required by Commission rules as well as Basel II.  In the past, RMD has occasionally conducted ad-hoc scenario analysis calculations based on historical events and shared these results with senior management, including the Board of Directors.  However, RMD has not previously conducted (or had the ability to conduct) scenario analysis on a periodic or automated basis.

QRM is currently developing the capability to perform automated scenario analysis.  The plan is to run a fully-automated weekly calculation of various scenarios. Although the firm has not currently "locked down" the complete list of scenarios they plan to run, the eventual list will most likely include both historical market events of significance as well as hypothetical scenarios.  The group expects to have this process completed by the end of the current year.

Once operational, RMD intends to use the automated scenario analysis as another monitoring tool that may help alert the Firm to particular concentrations in risk factors that have proved harmful in the past (i.e., historical scenarios) or alternatively for future concerns (i.e., hypothetical scenarios).   However, unlike other aggregated risk factors, such as VaR, which have a statistical probability associated with them, the specifications of the various scenario analyses are so extreme that RMD does not believe there is a meaningful or credible way to assign probabilities to these events occurring.  As such, they do not plan on using the automated scenarios for either limit-setting or internal capital allocating purposes.[96]   Rather, RMD plans to disclose scenario results to senior management, among others, with the expectation that this will help focus senior management on risk positions, even though no limits are attached to these numbers.[97]

_____

[96] Some of LB's peer firms do have limits based on scenarios in addition to limits based on VaR and other measures as a way to manage the Firm's exposure to extreme events and to capture "fat tail" risk.

[97] In fact, it is anticipated that any outsized scenario results would result in conversations with senior

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

OPSRA will continue to monitor the developments in this area and expects to have further discussions with RMD personnel as the automated scenario analyses become operational.

### d.  PE Modeling Changes

QRM is investing in and planning to implement various enhancements to its PE framework.  A top priority is to increase the coverage of transactions modeled in the fixed income Monte Carlo simulation model to include more exotic products (e.g., Bermudan swaptions).  While QRM feels it will always need to use add-ons for certain trades, the goal is to increase the fixed income coverage to approximately 95% of transactions.  Another top enhancement priority is to build a Monte Carlo simulation for credit derivatives.  The plan is for the simulation to capture rating transitions and defaults as well as portfolio effects and netting and margining agreements, and will be parameterized from transition and default probability data similar to that discussed above.  QRM has expressed that it hopes to have completed both of these projects by the end of 2005.

In addition, QRM is in the process of transitioning its financing simulation and equity derivatives VCV VaR covered products to the historical simulation based VaR approach.  Thus, the long-run goal is to use some combination of Monte Carlo simulation and HistSim with limited add-ons to cover the full product spectrum.  QRM personnel have also conveyed an interest in refining the modeling of margin provisions for equity derivative products and possibly moving non-margined equity portfolios to a Monte Carlo framework.  The projects may be undertaken in 2006.  OPSRA staff will continue to follow-up with regard to progress made towards all of these various planned enhancements, and will examine in some detail new methodologies after these are implemented.

### e.  VaR Backtesting and PE Validation

Currently, Lehman does monthly VaR backtesting on actual P&L provided by the controllers, and they have customized backtesting reports at both a divisional and business unit level. They are in the process of implementing automated daily backtesting at the firmwide and divisional levels, with this process going live in fall 2005. This formal backtesting will be done against "clean" P&L (i.e., P&L that has the fees and commissions removed).  OPSRA will continue to monitor the backtesting initiatives, and ensure that backtesting approaches are within the guidelines specified by CSE.

CSE guidelines specify that PE models must be validated.  OPSRA will continue to work with Lehman and the other CSE firms to develop empirical validation processes for the models.  Lehman currently has plans in place to validate their PE model in two parts.[98]  OPSRA will discuss with QRM on an ongoing basis validation efforts as they continue to develop and refine its approach to establishing comfort with model results in the context of the risk management uses for these metrics.  Further, we intend to examine validation efforts and results on a more granular, product-by-product basis as progress is made.

---

management similar to the discussions RMD has with senior management today concerning the top exposures reported.

[98] See Section III.b.i for a complete description of the validation plans.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

f.  Changes to Credit Limit Structure

Several changes are planned in the counterparty credit limit structure.  First, Lehman is moving towards having all active counterparties, including hedge funds, operate under pre-approved limits and having infrequent users operate under trade-by-trade approval.  In conjunction with this change, an MPE "What-If" analytics tool is being developed for traders and sales personnel.  This tool will allow traders, from their desktops, to analyze the impact on MPE of proposed trades.  Traders will then be able to determine if a trade will fit under the counterparty's pre-approved limit.  Second, counterparty credit limits are delimited into product limits by Lehman legal entity.  These cover specific product areas and are denominated in notional amounts.  Currently, limits for repos, FX, and securities lending are expressed in notional amounts, but they are moving towards an MPE-based structure.  Third, Lehman's firmwide country risk ELP limits are being revised.  The ELP measure is a conservative estimation of the loss the Firm might experience in the event of an instantaneous crisis in a country.  It estimates market risk and counterparty credit risk losses aggregated across all products at the country level.  OPSRA staff will follow up with the changes in limits as they are implemented, and will monitor the impact of limit changes on risk-taking throughout the various businesses in the firm.

g.  Internal Facility Ratings

Lehman currently assigns ICRs on a counterparty basis using the Scorecard application described in Section III.b.ii.  CRM is expanding the scorecard application to assign Internal Facility Ratings.  OPSRA will follow developments in this area, and will monitor how these facility ratings are used by CRM in risk governance.

h.  Prime Brokerage

Given the growing importance of hedge funds as clients to securities firms and large banks, competition in this space is fierce.  Commercial banks are attempting to break into the prime brokerage market by offering aggressive credit terms.  In order for Lehman to grow its market share, it will be competing with these banks as well as Bear Stearns, Morgan Stanley, and Goldman Sachs, experienced players with larger market shares and longer histories in this space.  This raises credit related concerns, given that, in order to expand its market share, Lehman could feel pressure to compete on credit terms.  Thus, while the risk management of prime brokerage counterparties and hedge funds appears sufficient at this time, this is an area that warrants special attention going forward.

i.  Model Control

As mentioned in the discussion on the model control function owned by QRM, it is OPSRA's opinion that Lehman has created a risk-based approach to model validation, implying that QRM spends the majority of their time on the models generating the greatest amount of risk.  However, OPSRA has not heard this approach articulated as such by QRM, and the limited documentation does not clarify the philosophy underlying the newly implemented model control framework.  We view the process as largely reflecting aspirations at this point in time, not surprisingly given that the policy is new.  OPSRA will continue its discussions with QRM to ensure that the firm's models are being validated in a reasonable and timely manner.

65

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

## VI.  Conclusion

Overall, OPSRA finds that the market and credit risk management function at Lehman is robust given their current risk profile.  Taking into account planned enhancements such as VaR backtesting and PE validation, Lehman will meet or exceed the minimum CSE standards.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix A: CSE review work papers

| Date | Title | Format | Team |
|------|-------|--------|------|
| April 21, 2005 | SEC Risk Review for CSE | Presentation | Market |
| April 28, 2005 | SEC Review of Risk Management | Presentation | Market |
| May 10, 2005 | U.S. Leveraged Loans Overview | Presentation | Market |
| May 10, 2005 | Acquisition Finance | Presentation | Market |
| May 12, 2005 | An Overview of the Mortgage Business | Presentation | Market |
| May 17, 2005 | Fixed Income Finance SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Equity Finance SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Investment Management Division SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Securitized Products SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Equities SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Credit and Municipal Business SEC Risk Review for CSE | Presentation | Market |
| May 17, 2005 | Liquid Markets SEC Risk Review for CSE | Presentation | Market |
| May 19, 2005 | Risk Equity and Risk Appetite Models | Document request | Market |
| May 19, 2005 | General Description of VaR Methodology | Document request | Market |
| May 19, 2005 | Prime Brokerage | Presentation | Market |
| May 20, 2005 | An Overview of the Municipal Markets | Presentation | Market |
| May 20, 2005 | Credit Risk Systems | Presentation | Credit |
| May 20, 2005 | Credit Risk Management | Presentation | Credit |
| May 20, 2005 | General ICR Framework Scorecard Document & Appendices | Document request | Credit |
| May 23, 2005 | Credit Risk Measurement | Presentation | Credit |
| May 25, 2005 | An Overview of the High Grade Credit and CDO Businesses | Presentation | Market |
| May 25, 2005 | An Overview of the Interest Rate Products Business and Liquid Markets Proprietary Trading | Presentation | Market |
| May 25, 2005 | SEC Risk Appetite, Risk Equity Review for CSE | Presentation | Market |
| June 2, 2005 | Capital Markets Product Control | Presentation | Market |
| June 2, 2005 | Risk Management - Acquisition Finance | Presentation | Credit |
| June 2, 2005 | Credit Policy Manual | Document request | Credit |
| June 2, 2005 | Credit Risk Management Product Guidelines | Document request | Credit |
| June 2, 2005 | Risk Management - Prime Brokerage | Presentation | Credit |
| June 2, 2005 | Credit Risk Measurement | Document request | Credit |
| June 6, 2005 | Global Volatility CSE Review | Presentation | Market |
| June 6, 2005 | An Overview of the Global Real Estate Business | Presentation | Market |
| June 6, 2005 | Market Risk Management Limit Policy | Document request | Market |
| June 6, 2005 | Market Risk Management Policies & Procedures Manual | Document request | Market |
| June 6, 2005 | Liquid Markets Proprietary: Risk Management Section of Product Binder | Document request | Market |
| June 6, 2005 | Risk Arbitrage: Risk Management Section of Product Binder | Document request | Market |
| June 6, 2005 | Derivatives Volatility: Risk Management Section of Product Binder | Document request | Market |
| June 6, 2005 | Real Estate: Risk Management Section of Product Binder | Document request | Market |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

| | | | |
|---|---|---|---|
| June 7, 2005 | Risk Arbitrage Business Overview | Presentation | Market |
| June 7, 2005 | Credit Risk Management Credit Review Request | Document request | Credit |
| June 7, 2005 | Firmwide Risk Snapshot (2/25/05) | Document request | Credit |
| June 7, 2005 | Daily Risk Appetite Report (2/28/05) | Document request | Credit |
| June 7, 2005 | 95% Daily VaR Usage and Limit (2/28/05) | Document request | Credit |
| June 7, 2005 | Global Current Credit Exposure (CCE) Snapsnot by … (2/25/05) | Document request | Credit |
| June 7, 2005 | NY Credit's CCE Snapshot by … (2/25/05) | Document request | Credit |
| June 7, 2005 | London Credit's CCE Snapshot by … (2/25/05) | Document request | Credit |
| June 7, 2005 | Asia Credit's CCE Snapshot by … (2/25/05) | Document request | Credit |
| June 7, 2005 | Country Risk Report (2/25/05) | Document request | Credit |
| June 10, 2005 | Global Margin | Presentation | Credit |
| June 10, 2005 | Transaction Management | Presentation | Credit |
| June 13, 2005 | Real Estate: Business Overview Section of Product Binder | Document request | Market |
| June 13, 2005 | Warehouse Lending Business | Presentation | Credit |
| June 15, 2005 | SEC Risk Appetite Review | Presentation | Market |
| June 16, 2005 | Muncipals: Daily and Weekly Reports Used by Business | Document request | Market |
| June 16, 2005 | Muncipal Derivative Products: Risk Management Section of Product Binder | Document request | Market |
| June 20, 2005 | New Products Committee Overview | Presentation | Market |
| June 20, 2005 | Global Model Control Process | Presentation | Market |
| June 20, 2005 | Equity Derivatives Model Control list | Document request | Market |
| June 20, 2005 | Fixed Income - Interest Rate and Muni Derivatives Model Control list | Document request | Market |
| June 20, 2005 | Sample E-mails from Large and Unusual Transactions | Document request | Market |
| June 20, 2005 | Sample E-mails from Documenting Limit Monitoring | Document request | Market |
| July 11, 2005 | Market Risk Management: Working List of Stress Scenarios | Document request | Market |
| July 11, 2005 | Summary of Price Testing Results: April 2005 | Document request | Market |
| July 11, 2005 | Firmwide Risk Snapshot (6/24/05) | Document request | Market |
| July 12, 2005 | Bond & Loan Commitment Committee/Bridge Loan Committee Memo re: Intelsat (7/7/04) | Document request | Credit |
| July 12, 2005 | Commitments Reports highlighting Intelsat deal (8/03/04, 8/10/04, 8/17/04, 8/31/04, 9/7/04, 9/22/04, 10/12/04, 1/25/05) | Document request | Credit |
| July 12, 2005 | Firmwide Risk Snapshot Report highlighting Intelsat deal (7/30/04, 8/6/04, 8/13/04, 8/27/04, 9/2/04, 9/17/04, 10/8/04) | Document request | Credit |
| July 12, 2005 | Top Exposure Report highlighting Intelsat deal (8/10/04, 8/17/04, 8/31/04, 9/7/04, 9/22/04, 10/12/04, 1/25/05) | Document request | Credit |
| July 12, 2005 | Intelsat Event Timeline with Marginal Risk Appetite Numbers | Document request | Credit |
| July 12, 2005 | Equity Prime Brokerage description | Document request | Credit |
| July 12, 2005 | Equity Finance Risk Management Daily Risk Report (5/30/05) | Document request | Credit |
| July 12, 2005 | Prime Brokerage sample Margin Requirements agreement | Document request | Credit |
| July 12, 2005 | List of prime broker accounts with lock up agreements for margin terms | Document request | Credit |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix A: CSE review work papers

| July 12, 2005 | Description of the stress testing/scenarios used by risk management in prime broker business | Document request | Credit |
| July 12, 2005 | Statement of risk measures monitored by risk management in prime broker business | Document request | Credit |
| July 12, 2005 | Statement of systems monitoring in prime broker business | Document request | Credit |
| July 14, 2005 | Uses of Pre-Approved Limits in Credit Process (Current State) | Document request | Credit |
| July 14, 2005 | U.S. Life Insurance Industry Sector Review (used in Credit Committee meeting) | Presentation | Credit |
| July 20, 2005 | Historical Market Database - Overview | Document request | Market |
| July 20, 2005 | Large Exposures Summary | Document request | Market |
| July 26, 2005 | VaR Technical Specifications by Product | Document request | Market |
| August 1, 2005 | MPEs by Counterparty, Product Group, Credit Rating, Industry | Document request | Credit |
| August 3, 2005 | Credit Derivatives MPE Model | Document request | Credit |
| August 11, 2005 | Estimated Loan Hedging Costs, Credit Facilitation Group | Document request | Credit |
| August 11, 2005 | Building an Energy Trading Business | Document request | Market |
| August 22, 2005 | Loan Participation Committee Memo (8/22/05) | Document request | Credit |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix B: Lehman staff consulted during CSE review

**Meeting Attendee List (provided by Lehman)**

Tuesday, May 10th, 2005
- Leveraged Lending
  - Alex Kirk
  - Madelyn Antoncic

Thursday, May 12th, 2005
- Mortgages
  - Dave Sher
  - Madelyn Antoncic
  - Jeff Goodman
  - Edward Grieb
  - Gerard Reilly
  - Paul Shotton
  - Robyn Grew
  - Danielle McGraw
  - Lisa Rathgeber
  - Laura Vecchio
  - Anthony Stucchio
  - Louise Ratheram-Browne
  - Scott Simon
  - Scott Kimmel
  - Eduardo Canabarro
  - Beth Rudofker

Tuesday, May 17th, 2005
- Market Risk
  - Madelyn Antoncic
  - Paul Shotton
  - Anthony Stucchio
  - Laura Vecchio
  - Clelia Stegnjajic
  - Madelyn Antoncic

Thursday, May 19th, 2005
- Prime Brokerage Meeting
  - Ed Grieb
  - John Wickham
  - Richard Story
  - John McBryan
  - Marlisa Vinciguerra
  - Gerard Reilly
  - Jeffrey Glibert
  - Matthew Bowen
  - Madelyn Antoncic
  - Anthony Stucchio
  - Paul Shotton
  - Jeff Fernandez
  - Eduardo Canabarro
  - Beth Rudofker

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix B: Lehman staff consulted during CSE review

Friday, May 20th, 2005
- Credit Analysis Meeting
  - Madelyn Antoncic
  - Jeff Glibert
  - Eduardo Canabarro
  - Steven Domenicucci
  - Steve Simonte
  - Eric Spray
  - Scott Burton
  - Anthony Stucchio
  - Robert Lutey
  - Martin Roberts

- Municipals Meeting
  - Paul Shotton
  - Joe Li
  - Madelyn Antoncic
  - Gary Killian
  - James Lister
  - Mike Bade
  - Scott Simon
  - Scott Kimmel
  - Robyn Grew
  - Beth Rudofker
  - Ed Grieb
  - Eduardo Canabarro
  - Anthony Stucchio
  - Gary Rosen
  - Laura Vecchio

Monday, May 23rd, 2005
- Credit Analytics Meeting
  - Jeff Glibert
  - Eduardo Canabarro

Tuesday, May 24th, 2005
- Quantitative Risk Meeting
  - Madelyn Antoncic
  - Eduardo Canabarro
  - Manhua Leng
  - Laura Vecchio
  - Anthony Stucchio
  - Paul Shotton

Wednesday, May 25th, 2005
- Interest Rate Products & Liquid Market Prop Meeting
  - Kaushik Amin
  - Madelyn Antoncic
  - Browning, James;
  - Simon, Scott A;
  - Paul Shotton
  - Melda Elagoz

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

Appendix B: Lehman staff consulted during CSE review

- o   Thomas Hawkins
- o   Gary Rosen
- o   Edward Grieb
- o   Beth Rudofker
- o   Eduardo Canabarro
- o   Anthony Stucchio

- • Credit Products Meeting
  - o   Rick Reider
  - o   Jim Ballentine
  - o   Madelyn Antoncic
  - o   Paul Shotton
  - o   Joe Li
  - o   Shane Flatman
  - o   Gary Rosen
  - o   Ed Grieb
  - o   Beth Rudofker
  - o   Eduardo Canabarro
  - o   Anthony Stucchio
  - o   Laura Vecchio

Thursday, June 2nd, 2005
- • Product Control Meeting
  - o   Gerard Reilly
  - o   Ed Grieb
  - o   Beth Rudofker
  - o   Scott Simon
  - o   Neerag Chopra
  - o   Anthony Stucchio
  - o   Laura Vecchio

Monday, June 6th, 2005
- • Real Estate Meeting
  - o   Madelyn Antoncic
  - o   Mark Walsh
  - o   Kenneth Cohen
  - o   Jeffrey Goodman
  - o   Jonathan Cohen
  - o   Zev Klasewitz
  - o   Paul Shotton
  - o   Eduado Canabarro
  - o   Lynn Gray
  - o   Paul Puskuldjian
  - o   Gary Rosen
  - o   Beth Rudofker
  - o   Ed Grieb
  - o   Laura Vecchio
  - o   Anthony Stucchio
  - o   Robyn Grew

- • Volatility Business Meeting
  - o   Jon Neave

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix B: Lehman staff consulted during CSE review

- o   Jim Throsby
- o   Amit Airen
- o   Paul Shotton
- o   Madelyn Antoncic
- o   Spyros Papadakis
- o   Laura Vecchio
- o   Kenneth MacHarg
- o   Gerald Donini
- o   Anthony Stucchio
- o   Ed Grieb
- o   Jennifer Connors
- o   Robyn Grew

Tuesday, June 7th, 2005
- • Risk Arbitrage Meeting
  - o   Madelyn Antoncic
  - o   Paul Shotton
  - o   Marc Paley
  - o   Manhua Leng
  - o   James Emmert
  - o   Beth Rudofker
  - o   Anthony Stucchio
  - o   Laura Vecchio
  - o   Ed Grieb
  - o   John Crowe
  - o   Robyn Grew

Friday, June 10th, 2005
- • TMG Meeting
  - o   Scott Willoughby
  - o   Zdenka Griswold
  - o   Allyson Carine
  - o   Robert Guglielmo
  - o   Anthony Stucchio
  - o   Laura Vecchio
  - o   Ed Grieb
  - o   Beth Rudofker
  - o   Jeffrey Glibert
  - o   Stephen Vena
  - o   Alex Crepeau
  - o   Stewart Nineham

- • Margin Group Meeting
  - o   Mark Malin
  - o   Stewart Nineham
  - o   Stephen Vena
  - o   Kendall McLaughlin
  - o   Alex Crepeau
  - o   Beth Rufoker
  - o   Ed Grieb
  - o   Anthony Stucchio

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix B: Lehman staff consulted during CSE review

- o  Laura Vecchio
- o  Jeffrey Glibert
- o  Joseph Lodato
- o  Robyn Grew
- o  Scott Willoughby

Monday, June 13th, 2005
- • Warehouse Lending Meeting
  - o  Jeffrey Goodman
  - o  Steve Valentino
  - o  Errington Hibbert
  - o  Fred Madonna
  - o  Gordon Sweely
  - o  David Sherr
  - o  Paul Shotton
  - o  Jeffrey Glibert

Monday, June 20th, 2005
- • Model Validation Meeting
  - o  Eduardo Canabarro
  - o  Jerry Rielly
  - o  Ed Grieb
  - o  Manhua Leng
  - o  Neeraj Chopra
  - o  Anthony Stucchio
  - o  Madelyn Antoncic
  - o  Beth Rudofker
  - o  Laura Vecchio

Thursday, June 23rd, 2005
- • Hedging Discussion - Conference Call
  - o  Alex Kirk
  - o  Ed Grieb
  - o  Gary Rosen
  - o  Peter Chase
  - o  Jeff Glibert
  - o  Scott Kimmel
  - o  James Seery
  - o  Janice Mereglia

Tuesday, July 19th, 2005
- • FRL's and Hedging Discussion Meeting
  - o  Rick Rieder
  - o  Raymond Kahn
  - o  Ed Grieb
  - o  Peter Chase
  - o  Gary Rosen
  - o  Scott Kimmel Peter Chase
  - o  Bari Wolfe
  - o  Jeffrey Glibert
  - o  Patrick McGarry
  - o  Joe Li

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

Appendix B: Lehman staff consulted during CSE review

- o Greg Smith
- o Laura Vecchio

Wednesday, July 20th, 2005
- • Commitment Committee
  - o Steven Berkenfeld
  - o Kevin Genirs
  - o Ed Grieb

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.

LBEX-DOCID 2125011

# PD 3

## SEC Bear Stearns Report



U.S. Securities and Exchange Commission

## Office of Inspector General

Office of Audits

# SEC's Oversight of Bear Stearns and Related Entities:

# The Consolidated Supervised Entity Program



Sections of this report have been redacted to delete information that SEC believes is non-public and confidential

**September 25, 2008**
**Report No. 446-A**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF
INSPECTOR GENERAL

September 25, 2008

**To:**    Chairman Christopher Cox
Erik Sirri, Director, Division of Trading and Markets
Lori Richards, Director, Office of Compliance Inspections and
  Examinations
John White, Director, Division of Corporation Finance
Jonathan Sokobin, Director, Office of Risk Assessment

**From:**    H. David Kotz, Inspector General

**Subject:**    Audit of *SEC's Oversight of Bear Stearns and Related Entities: The
Consolidated Supervised Entity Program*, Report No. 446-A

This memorandum transmits the Securities and Exchange Commission, Office of
Inspector General's (OIG) final report detailing the results of our audit on the
SEC's Oversight of Bear Stearns and Related Entities: The Consolidated
Supervised Entity Program. This audit was conducted pursuant to a
Congressional request from Ranking Member Charles E. Grassley of the United
States Senate Committee on Finance.

The final report consists of 26 recommendations that are addressed primarily to
the Division of Trading and Markets (TM). Recommendations 18 and 25 are also
addressed to the Office of Compliance Inspections and Examinations (OCIE)
and Recommendation 19 is also addressed to the Office of Risk Assessment
(ORA). Recommendations 20 and 21 are addressed to the Division of
Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and
Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21
out of 26 recommendations. TM concurred with 20 of 23 recommendations
addressed to them and disagreed with Recommendations 13, 15, and 16. OCIE
concurred with both recommendations addressed to them. CF concurred with
Recommendation 17, but disagreed with Recommendations 20 and 21.

Your written responses to the draft report, dated September 18, 2008, are
included in their entirety in Appendices VI and VII. In addition, OIG's response
to Chairman Cox's and Management's comments are included in Appendix VIII.

Should you have any questions regarding this report, please do not hesitate to contact me. During this audit we appreciate the courtesy and cooperation that you and your staff extended to our auditors.

Attachment
cc:   Peter Uhlmann, Chief of Staff, Chairman's Office
      Diego Ruiz, Executive Director, Office of the Executive Director
      Brian Cartwright, General Counsel, Office of General Counsel
      Andrew Donohue, Director, Division of Investment Management
      John Nester, Director Office of Public Affairs
      William Schulz, Office of Legislative and Intergovernmental Affairs
      Bob Colby, Deputy Director, TM
      Daniel Gallagher, Deputy Director, TM
      Shelley Parratt, Deputy Director, CF
      Michael Macchiaroli, Associate Director, TM
      Mary Ann Gadziala, Associate Director, OCIE
      Matthew Eichner, Assistant Director, TM
      John Walsh, Chief Counsel, OCIE
      Thomas K. McGowan, Assistant Director, TM
      Herb Brooks, Assistant Director, TM
      William Lenox, Ethics Counsel, Office of General Counsel
      Denise Landers, Legal Counsel, TM
      Juanita Bishop Hamlett, Branch Chief, OCIE
      Darlene L. Pryor, Management Analyst, Office of the Executive Director

      Rick Hillman, Managing Director of Financial Markets and Community
          Investment, GAO

# The CSE Program (Including Reviews Performed on Bear Stearns)

## Executive Summary

**Background.** During the week of March 10, 2008, rumors spread about liquidity problems at The Bear Stearns Companies, Inc. (Bear Stearns).[1] As the rumors spread, Bear Stearns was unable to obtain secured financing from counterparties. This caused severe liquidity problems. As a result, on Friday March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency funding from the Federal Reserve Bank of New York (FRBNY).[2] According to Congressional testimony,[3] after the markets closed on March 14, 2008, it became apparent that the FRBNY's funding could not stop Bear Stearns' downward spiral. As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it. On Sunday March 16, 2008, (before the Asian markets opened), Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY. In May 2008, the sale was completed.

Because Bear Stearns had collapsed, at the time of our fieldwork, there were six holding companies in the Securities and Exchange Commission's (Commission) Consolidated Supervised Entity (CSE) program. In addition to Bear Stearns, these six holding companies include or included Goldman Sachs Group, Inc. (Goldman Sachs), Morgan Stanley, Merrill Lynch & Co. (Merrill Lynch), Lehman Brothers Holdings Inc. (Lehman Brothers), Citigroup Inc. and JP Morgan. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch.[4] Both firms had experienced serious financial difficulties. Finally, on September 21, 2008, the Board of Governors of the Federal Reserve System (Federal Reserve) approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies with the Federal Reserve as their new principal regulator. As a result, the future of the CSE program is uncertain.

---

[1] See Acronyms used in Appendix I.

[2] The funding was from the Federal Reserve Bank of New York (FRBNY) through JP Morgan Chase & Co. (JP Morgan) to The Bear Stearns Companies, Inc. (Bear Stearns) because JP Morgan, unlike Bear Stearns, could borrow money from the FRBNY.

[3] Timothy Geithner (President and Chief Executive Officer, FRBNY) and Alan Schwartz (President and Chief Executive Officer of Bear Stearns) before U.S. Senate Committee on Banking, Housing and Urban Affairs on Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators dated April 3, 2008.

[4] The audit fieldwork was completed prior to these events on September 15, 2008.

Of the seven original CSE firms, the Commission exercised direct oversight over only five firms (Bear Stearns, Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers), which did not have a principal regulator. The Commission does not directly oversee Citigroup Inc. and JP Morgan because these firms have a principal regulator, the Federal Reserve.

The CSE program is a voluntary program that was created in 2004 by the Commission pursuant to rule amendments under the Securities Exchange Act of 1934.[5] This program allows the Commission to supervise these broker-dealer holding companies on a consolidated basis. In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer to the holding company itself. The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from computing capital using the Commission's standard net capital rule, and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision (if it does not already have a principal regulator). By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method. The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies.

Bear Stearns' main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management. Bear Stearns was highly leveraged with a large exposure (*i.e.*, concentration of assets) in mortgage-backed securities. Bear Stearns had less capital and was less diversified than several of the other CSE firms.

The Commission stated that Bear Stearns' unprecedented collapse was due to a liquidity crisis caused by a lack of confidence. Chairman Christopher Cox described Bear Stearns as a well-capitalized and apparently fully liquid major investment bank that experienced a crisis of confidence, denying it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.[6]

---

[5] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Securities and Exchange Commission (Commission). 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.

[6] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before United states (U.S.) Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

**Congressional Request.** On April 2, 2008, the Office of Inspector General (OIG) received a letter from Ranking Member Charles E. Grassley of the United States Senate Committee on Finance, requesting that the OIG analyze the Commission's oversight of CSE firms and broker-dealers subject to the Commission's Risk Assessment Program.[7] This letter noted that the Commission's Division of Trading and Markets (TM) was responsible for regulating the largest broker-dealers, and their associated holding companies. The letter requested a review of TM's oversight of the five CSE firms it directly oversees, with a special emphasis on Bear Stearns. The letter requested that the OIG analyze how the CSE program is run, the adequacy of the Commission's monitoring of Bear Stearns, and make recommendations to improve the Commission's CSE program.

The United States Senate Committee on Finance letter also requested that the OIG provide an update of findings made in its previous audit report on the Commission's Broker-Dealer Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002).[8]

**Audit Objectives.** In response to the April 2, 2008 Congressional Request, the OIG conducted two separate audits with regard to the Commission's oversight of Bear Stearns and related entities. This audit's objectives were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The OIG performed a second audit on the Commission's Broker-Dealer Risk Assessment Program to follow up on the current status of recommendations made in the OIG's prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment program to determine whether improvements are needed. The Commission's Risk-Assessment program tracks the filing status of 146 broker-dealers that are part of a holding company structure and have at least $20 million in capital. The Risk Assessment Program report found that TM is not fulfilling its obligations in accordance with the underlying purpose of the Broker-Dealer Risk Assessment program in several respects. TM has failed to update and finalize the rules governing the program, TM has not enforced the filing requirement incumbent on broker-dealers, resulting in the failure of nearly one-third of the required firms to file 17(h) documents, TM has not yet determined whether the two remaining Bear Stearns' broker-dealers are obligated to file Form 17-H, and TM only

---

[7] A copy of this request letter is attached to this report in full in Appendix II.

[8] The U.S. Senate Committee on Finance letter also requested that the Office of Inspector General (OIG) conduct an investigation into the facts and circumstances surrounding the Commission's decision not to pursue an Enforcement Action against Bear Stearns. This issue will be addressed in an OIG investigative report to be issued on September 30, 2008.

conducts an in-depth review of the filings for six of the 146 filing firms that TM determined are most significant, based on their free credit balances and customer accounts. Audit report number 446-B examining the Commission's Risk Assessment program contains 10 recommendations and was issued on September 25, 2008.

**Retention of an Expert.** Given the complexity of the subject matter, the OIG retained an expert, Albert S. (Pete) Kyle to provide assistance with this audit. Professor Kyle joined the University of Maryland faculty as the Charles E. Smith Chair Professor of Finance at the Robert H. Smith School of Business in August 2006. He earned a Bachelor of Science degree in Mathematics from Davidson College in 1974, studied Philosophy and Economics at Oxford University as a Rhodes Scholar and completed his Ph.D. in Economics at the University of Chicago in 1981. He was a professor at Princeton University's Woodrow Wilson School from 1981-1987, at the University of California's Haas Business School in Berkeley from 1987-1992, and at Duke University from 1992-2006.

Professor Kyle is a renowned expert on many aspects of capital markets, with a particular focus on market microstructure. He has conducted significant research on such topics as informed speculative trading, market manipulation, price volatility, and the information content of market prices, market liquidity, and contagion. His paper "Continuous Auctions and Insider Trading" (Econometrica, 2005) is one of the mostly highly cited papers in theoretical asset pricing.

Professor Kyle was elected a Fellow of the Econometric Society in 2002. He was also a board member of the American Finance Association from 2004-2006. He served as a staff member of the Presidential Task Force on Market Mechanisms (Brady Commission), after the stock market crash of 1987. During his career, he has worked as a consultant on finance topics for several government agencies, in addition to the Commission, including the Department of Justice, the Internal Revenue Service, the Federal Reserve and the Commodity Futures Trading Commission.

Professor Kyle's Curriculum Vitae appears in Appendix III of this report.

In this audit, Professor Kyle analyzed TM's oversight of the CSE firms, with a particular focus on Bear Stearns. Professor Kyle reviewed TM's internal memoranda on the CSE firms, which documented TM's assessment of the CSE firms' operations and reviewed data in the CSE firms' monthly and quarterly CSE program filings.

From this information, Professor Kyle analyzed the firms' financial data, holdings, risk management strategies, tolerance for risk and assessed the adequacy of the firms' filings. In particular, Professor Kyle analyzed Bear Stearns' capital, liquidity, and leverage ratios, access to secured and unsecured financing, and its

compliance with industry and worldwide standards such as the Basel Standards.[9] Professor Kyle analyzed how TM supervised or oversaw Bear Stearns' mortgage-backed securities portfolio, its use of models to measure risk, the adequacy of its models, its model review process, the relationship between its traders and risk management department, and its risk-management scenarios. Professor Kyle also examined how TM supervised Bear Stearns' internal operations, including its funding of two prominent hedge funds that collapsed in the summer of 2007.

**Audit Conclusions and Results.** The CSE program's mission (goal) provides in pertinent part as follows:

> The regime is intended to allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[10] [Emphasis added]

Thus, it is undisputable that the CSE program failed to carry out its mission in its oversight of Bear Stearns because under the Commission and the CSE program's watch, Bear Stearns suffered significant financial weaknesses and the FRBNY needed to intervene during the week of March 10, 2008, to prevent significant harm to the broader financial system.[11]

This audit was not intended to be a complete assessment of the multitude of events that led to Bear Stearns' collapse, and accordingly, does not purport to demonstrate any specific or direct connection between the failure of the CSE Program's oversight of Bear Stearns and Bear Stearns' collapse. However, we have identified serious deficiencies in the CSE program that warrant improvements. Overall, we found that there are significant questions about the adequacy of a number of CSE program requirements, as Bear Stearns was

---

[9] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards. The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States. The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: Government Accountability Office. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[10] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007.
<http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

[11] The Commission established criteria (the link is provided below) for measuring the success of the Consolidated Supervised Entity (CSE) program. While the CSE program may have been successful in achieving its established criteria, none of the criteria standards directly related to the failure of a CSE firm and its effect on the broader financial system (as stated in the CSE program's goal statement). Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007.

compliant with several of these requirements, but nonetheless collapsed. In addition, the audit found that TM became aware of numerous potential red flags prior to Bear Stearns' collapse, regarding its concentration of mortgage securities, high leverage, shortcomings of risk management in mortgage-backed securities and lack of compliance with the spirit of certain Basel II standards, but did not take actions to limit these risk factors.

In addition, the audit found that procedures and processes were not strictly adhered to, as for example, the Commission issued an order approving Bear Stearns to become a CSE prior to the completion of the inspection process. Further, the Division of Corporation Finance (CF) did not conduct Bear Stearns' most recent 10-K filing review in a timely manner.

The audit also identified numerous specific concerns with the Commission's oversight of the CSE program, some of which are summarized as follows:[12]

(a)    Bear Stearns was compliant with the CSE program's capital and liquidity requirements;[13] however, its collapse raises questions about the adequacy of these requirements;

(b)    Although TM was aware, prior to Bear Stearns becoming a CSE firm, that Bear Stearns' concentration of mortgage securities was increasing for several years and was beyond its internal limits, and that a portion of Bear Stearns' mortgage securities (*e.g.,* adjustable rate mortgages) represented a significant concentration of market risk, TM did not make any efforts to limit Bear Stearns' mortgage securities concentration;

(c)    Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

- A debt to-net capital ratio of less than 15 to 1 (after their first year of operation); or

- Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms. Furthermore, despite TM being aware that Bear Stearns' leverage was high, TM made no efforts to require Bear

---

[12] We have no specific evidence indicating whether any of these issues directly contributed to Bear Stearns' collapse since our audit scope did not include a determination of the cause of Bear Stearns' collapse (see Appendix IV).

[13] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

Stearns to reduce its leverage, despite some authoritative sources
describing a linkage between leverage and liquidity risk;

(d) · TM became aware that risk management of mortgages at Bear
Stearns had numerous shortcomings, including lack of expertise by
risk managers in mortgage-backed securities at various times; lack
of timely formal review of mortgage models; persistent    ·
understaffing; a proximity of risk managers to traders suggesting a
lack of independence; turnover of key personnel during times of
crisis; and the inability or unwillingness to update models to reflect
changing circumstances. Notwithstanding this knowledge, TM
missed opportunities to push Bear Stearns aggressively to address
these identified concerns;

(e) There was no documentation of discussions between TM and Bear
Stearns of scenarios involving a meltdown of mortgage market
liquidity, accompanied by a fundamental deterioration of the
mortgages themselves. TM appeared to identify the types of risks
associated with these mortgages that evolved into the subprime
mortgage crisis yet did not require Bear Stearns to reduce its
exposure to subprime loans;

(f) Bear Stearns was not compliant with the spirit of certain Basel II
standards and we did not find sufficient evidence that TM required
Bear Stearns to comply with these standards;

(g) TM took no actions to assess Bear Stearns' Board of Directors' and
senior officials' (e.g., the Chief Executive Officer) tolerance for risk
although we found that this is a prudent and necessary oversight .
procedure;

(h) TM authorized (without an appropriate delegation of authority) the
CSE firms' internal audit staff to perform critical audit work involving
the risk management systems instead of the firms' external
auditors as required by the rule that created the CSE program;

(i) In June 2007, two of Bear Stearns' managed hedge funds
collapsed. Subsequent to this collapse, significant questions were
raised about some of Bear Stearns' senior managements' lack of
involvement in handling the crisis. However, TM did not reassess
the communication strategy component of Bear Stearns'
Contingency Funding Plan (CFP) after the collapse of the hedge
funds, and very significant questions were once again raised about
some of Bear Stearns' managements' handling of the crisis during
the week of March 10, 2008;

(j) The Commission issued four of the five Orders approving firms to
use the alternative capital method, and thus become CSEs
(including Bear Stearns) before the inspection process was
completed; and

SEC's Oversight of Bear Stearns and Related Entities: The CSE Program          September 25, 2008
Report No. 446-A                .

X ·

(k)     CF did not conduct Bear Stearns' most recent 10-K filing review in
        a timely manner. The effect of this untimely review was that CF
        deprived investors of material information that they could have
        used to make well-informed investment decisions (*i.e.*, whether to
        buy/sell Bear Stearns' securities). In addition, the information (*e.g.*,
        Bear Stearns' exposure to subprime mortgages) could have been
        potentially beneficial to dispel the rumors that led to Bear Stearns'
        collapse.

**Recommendations.** We identified 26 recommendations (see Appendix V) that
should significantly improve the Commission's oversight of CSE firms. Chairman
Cox's and Management's comments are attached in Appendix VI and VII,
respectively. Our recommendations include:

(a)     A reassessment of guidelines and rules regarding the CSE firms'
        capital and liquidity levels;

(b)     Taking appropriate measures to ensure that TM adequately
        incorporates a firm's concentration of securities into the CSE
        program's assessment of a firm's risk management systems and
        more aggressively prompts CSE firms to take appropriate actions
        to mitigate such risks;

(c)     A reassessment of the CSE program's policy regarding leverage
        ratio limits;

(d)     Ensuring that: (1) the CSE firms have specific criteria for reviewing
        and approving models used for pricing and risk management, (2)
        the review and approval process conducted by the CSE firms is
        performed in an independent manner by the CSEs' risk
        management staff, (3) each CSE firm's model review and approval
        process takes place in a thorough and timely manner, and (4) limits
        are imposed on risk taking by firms in areas where TM determines
        that risk management is not adequate;

(e)     Being more skeptical of CSE firms' risk models and working with
        regulated firms to help them develop additional stress scenarios
        that have not already been contemplated as part of the prudential
        regulation process;

(f)     Greater involvement on the part of TM in formulating action plans
        for a variety of stress or disaster scenarios, even if the plans are
        informal;

(g)     Taking steps to ensure that mark disputes do not provide an
        occasion for CSE firms to inflate the combined capital of two firms
        by using inconsistent marks;

(h)     Encouraging the CSE firms to present Value at Risk and other risk
        management data in a useful manner, which is consistent with how

the CSE firms use the information internally and allows risk factors to be applied consistently to individual desks;

(i)   Ensuring (in accordance with Basel II) that the Consolidated Supervised Entities take appropriate capital deductions for illiquid assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral;

(j)   Greater discussion of risk tolerance with the CSE firms' Boards of Directors and senior management to better understand whether the actions of CSE firms' staff are consistent with the desires of the Boards of Directors and senior management;

(k)   Requiring compliance with the existing rule that requires external auditors to review the CSE firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act for this deviation from the current rule's requirement;

(l)   Ensuring that reviews of a firm's CFP includes an assessment of a CSE firm's internal and external communication strategies;

(m)   Developing a formal automated process to track material issues identified by the monitoring staff to ensure they are adequately resolved;

(n)   Ensuring that they complete all phases of a firm's inspection process before recommending that the Commission allow any additional CSE firms the authority to use the alternative capital method;

(o)   Improving collaboration efforts among TM, CF, the Office of Compliance Inspections and Examination (OCIE), and the Office of Risk Assessment (ORA);

(p)   The development by CF of internal guidelines for reviewing filings timely and tracking and monitoring compliance with its internal guidelines; and

(q)   The creation of a Task Force led by ORA with staff from TM, the Division of Investment Management, and OCIE to perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis.

The final report consists of 26 recommendations that are addressed primarily to the Division of Trading and Markets (TM). Recommendations 18 and 25 are also addressed to the Office of Compliance Inspections and Examinations (OCIE) and Recommendation 19 is also addressed to the Office of Risk Assessment (ORA). Recommendations 20 and 21 are addressed to the Division of

Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21 out of 26 recommendations.  TM concurred with 20 of 23 recommendations addressed to them and disagreed with Recommendations 13, 15, and 16.  OCIE concurred with both recommendations addressed to them.  CF concurred with Recommendation 17, but disagreed with Recommendations 20 and 21.

# TABLE OF CONTENTS

Executive Summary ..................................................................................... iv

Table of Contents .....................................................................................xiv

Background and Objectives ........................................................................ 1

Findings and Recommendations ............................................................... 10

Finding 1: Bear Stearns Was Compliant With The CSE
Program's Capital Ratio And Liquidity Requirements, But The
Collapse Of Bear Stearns Raises Questions About The
Adequacy Of These Requirements ........................................................... 10
    Capital ................................................................................................ 10
      Adequacy of Capital Levels ...................................................... 10
      Increased Access to Secured Financing ............................... 11
      Recommendation 1 .................................................................... 13

    Liquidity ............................................................................................. 14
    Recommendation 2 ........................................................................... 17

Finding 2: TM Did Not Adequately Address Several Significant
Risks That Impact The Overall Effectiveness Of The CSE
Program ...................................................................................................... 17
    Concentration of Assets .................................................................. 17
    Recommendation 3 ........................................................................... 18

    Leverage ........................................................................................... 19
    Recommendation 4 ........................................................................... 20

Bear Stearns Model Review Process and Risk
Management Staffing Were Inadequate In The Area Of
Mortgage Backed Securities ........................................................... 20
    Recommendation 5 ........................................................................... 24

    Risk Scenarios ................................................................................. 24
    Recommendation 6 ........................................................................... 27
    Recommendation 7 ........................................................................... 27

    Non-compliance With Basel II ........................................................ 27
      Mark Disputes ............................................................................ 27
      Recommendation 8 .................................................................... 29

    Inconsistent VaR Numbers ............................................................. 29
    Recommendation 9 ........................................................................... 29

Bear Stearns' Capital Requirements for Illiquid
Assets and Stressed Repos Require Careful
Oversight ......................................................................29
Recommendation 10................................................33

Tolerance for Risk .......................................................33
Recommendation 11 .................................................33

Finding 3: TM, Without Explicit Authority, Allowed The CSE
Firms' Internal Auditors To Perform Critical Work..............................34
Recommendation 12.........................................................35

Finding 4: TM Did Not Review The Communication Strategy
Component Of Bear Stearns' Contingency Funding Plan After
The Collapse Of Its Managed Hedge Funds ..........................35
Recommendation 13 ......................................................36

Finding 5: TM's Monitoring Staff Do Not Adequately Track
Material Issues ....................................................................... 37
Develop a Formal Automated Tracking Process......................37
Recommendation 14 ......................................................38

Follow-up on Prior OCIE Findings ...............................................38
Recommendation 15 .........................................................40

Finding 6: The Commission's Orders Allowing Firms (Including
Bear Stearns) To Use The Alternative Capital Method Were
Generally Approved Before The Inspection Process Was
Completed .....................................................................40
Recommendation 16 .......................................................41

Finding 7: Collaboration Between TM and Other Commission
Divisions/Offices Should Be Significantly Improved...........................41
Collaboration with CF ......................................................41
Recommendation 17 ......................................................42

Collaboration with OCIE.................................................42
Recommendation 18 .......................................................43

Collaboration with ORA...................................................43
Recommendation 19 .......................................................43

Finding 8: CF's Filing Review Of Bear Stearns' 2006 10-K
Was Not Timely...............................................................44
Review of Bear Stearns' 10-K Filing .............................................44
Recommendation 20 ......................................................45

Bear Stearns' Response to CF's Comment Letter....................45
Recommendation 21 .......................................................................46

Finding 9: Certain Firms May Pose A Systemic Risk
Because They Are Not Supervised On A Consolidated Basis..........46
Recommendation 22 .......................................................................47

Finding 10: TM Should Address Organizational Issues
Involving The Future Of The CSE Program .........................................48
Changes to the CSE Program.........................................................48
Recommendation 23 .......................................................................49

Program Staffing.............................................................................49
Recommendation 24 .......................................................................50

Ethics Manual ................................................................................50
Recommendation 25 .......................................................................50

Coordination with Other Regulators............................................50
Recommendation 26 .......................................................................51

Appendices
Appendix I: Acronyms. ....................................................................52
Appendix II: Congressional Audit Request.......................................54
Appendix III: Curriculum Vitae (OIG expert: Albert "Pete" Kyle)......................56
Appendix IV: Scope and Methodology ..............................................70
Appendix V: List of Recommendations .............................................76
Appendix VI: Chairman Cox's Comments .........................................81
Appendix VII: Management Comments ..............................................83
Appendix VIII: OIG Response to Chairman Cox & Management
Comments..............................................................................116
Appendix IX: Gross Leverage Ratios ..............................................120
Appendix X: Criteria ......................................................................121

# Background and Objectives

## Background

**General Background Information.** The Division of Trading and Markets (TM)[14] is responsible for regulating broker-dealers, which includes administering the Consolidated Supervised Entity (CSE) and Broker-Dealer Risk Assessment programs. The Office of Compliance Inspections and Examinations (OCIE) has responsibility within the Securities and Exchange Commission (Commission) for conducting the inspections[15] of broker-dealers, including broker-dealers that are affiliated with CSE firms[16] (*i.e.,* investment banks).[17] The following TM offices are directly involved in these programs:

- Office of Financial Responsibility: This office is responsible for administering the financial responsibility regulations (*e.g.,* net capital rule[18]

---

[14] See Acronyms used in Appendix I.

[15] The Division of Trading and Markets (TM) uses the term "inspections", however, the Office of Compliance Inspections and Examinations (OCIE) uses the term "examinations". For purposes of this audit report, we use the term "inspections" to refer to both. In addition, for purposes of this audit report, OCIE also includes the Inspection staff in the Commission's regional offices.

[16] During our audit fieldwork, there were four Consolidated Supervised Entity (CSE) firms whose principal regulator (as discussed below) was the Commission: Goldman Sachs Group, Inc., Lehman Brothers Holdings Inc. (Lehman Brothers), Merrill Lynch & Co., Inc., and Morgan Stanley. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co., Inc. On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies. The Bear Stearns Companies, Inc. (Bear Stearns) was also a CSE firm (approved in November 2005) until its collapse. In addition, JP Morgan Chase & Co. (JP Morgan) and Citigroup Inc. have been approved to use the alternative method for their broker-dealer capital requirements, but the Board of Governors of the Federal Reserve System (Federal Reserve) is their principal regulator (*i.e.,* is responsible for the consolidated entity) but the Commission is responsible for the oversight of their broker-dealers. As a result, the Securities and Exchange Commission (Commission) defers oversight (of the consolidated entity) of JP Morgan and Citigroup to the Federal Reserve to avoid duplicative or inconsistent regulation.

[17] In 2007, in response to a Government Accountability Office (GAO) report Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-154, March 15, 2007 (as discussed in the Prior Audit Coverage section of the Scope and Methodology - see Appendix III); the Chairman (in consultation with the other Commissioners) decided to transfer the responsibility for conducting inspections of the consolidated entities from OCIE to TM. The timing of the actual transfer is discussed in more detail later in this report. OCIE retained (within the Commission) responsibility for conducting inspections of the CSEs' broker-dealers. The Self Regulatory Organizations (SRO) have the primary inspection responsibility for the registered broker-dealers. OCIE has oversight responsibility of these broker-dealers and conducts periodic inspections. The Financial Industry Regulatory Authority (FINRA) is the primary regulator of approximately 5,000 broker-dealers registered in the United States (U.S.).

[18] "The net capital rule focuses on liquidity and is designed to protect securities customers, counterparties, and creditors by requiring that broker-dealers have sufficient liquid resources on hand at all times to satisfy claims promptly". Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

SEC's Oversight of Bear Stearns and Related Entities: The CSE Program                    September 25, 2008
Report No. 446-A

and customer protection[19]). These regulations are intended to protect customers and financial institutions. This office also oversees the Securities Investor Protection Corporation and has approximately nine staff.[20]

- <u>Office of Prudential Supervision and Risk Analysis</u>: The staff (referred to as "monitors") in this office work in teams of three to review each CSE firm. They perform their work mainly through periodic meetings and informal discussions with CSE staff. The staff also review CSE required financial filings. The staff have backgrounds in economics, accounting, and finance and expertise in credit, market, or liquidity risk. Approximately 13 individuals comprise the staff.

- <u>Office of CSE Inspections</u>: This office is responsible for conducting the inspections on the CSE firms. They have seven staff who are located in both Washington D.C. and New York.

**CSE Program.** In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934,[21] which created the voluntary CSE program. This program allows the Commission to supervise certain broker-dealer holding companies on a consolidated basis. In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer and the holding company itself. The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States (U.S.) regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from the Commission's standard net capital rule,[22] and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision, if it does not already have a principal regulator. By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method.[23]

---

[19] The customer protection rule "is designed to ensure that customer property (securities and funds) in the custody of broker-dealers is adequately safeguarded."
Source: GAO Report <u>Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk</u>, Report No. GGD-98-153, July 20, 1998.

[20] The Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et. seq.*, as amended, was enacted to protect customers from losses resulting from a broker-dealers' failure, thereby promoting investor confidence in the securities markets. The Securities Investor Protection Corporation was created by the Act to pay investor claims. (See 15 U.S.C. § 78ccc).

[21] Source: <u>Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities</u> (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[22] See 17 C.F.R. § 24015c3-1.

[23] The alternative capital method is based on mathematical models and scenario testing, while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct. (See 17 C.F.R. 240.15c3-1(a)(7)).

The Commission designed the CSE program to be broadly consistent with the Board of Governors of the Federal Reserve System's (Federal Reserve) oversight of bank holding companies. However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting as a critical risk and governance control. Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider." [24]

The CSE application process includes TM reviewing a firm's application[25] (for an exemption from the net capital rule) and makes a recommendation to the Commission. Approval of the firm's application is contingent on the firm agreeing to group-wide Commission supervision of the consolidated entity (including unregulated affiliates), if the firm does not already have a principal regulator. In addition, CSE firms must agree to:

- "Maintain and document an internal risk management control system for the affiliate group;"[26]

- "Calculate a group-wide capital adequacy measure consistent with the international standards adopted by the Basel Committee on Banking Supervision [[27]] ('Basel Standards')."[28] The CSEs are required to maintain an overall Basel capital ratio[29] of not less than the Federal Reserve's 10 percent "well-capitalized" standard for bank holding companies. The CSE must notify the Commission (e.g., file an Early Warning Notice) if the 10 percent capital ratio is or is likely to be violated,[30] or if tentative net capital of the broker-dealer falls below $5 billion;[31]

---

[24] Source: *Examining Regulation and Supervision of Industrial Loan Companies* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

[25] The application process includes inspections whose purpose is to verify the information the firms provides during the application process and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."
Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[26] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[27] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards. The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States. The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[28] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>. [footnote added]

[29] The Basel capital ratio is capital divided by risk weighted assets.

[30] We are aware of one instance where this occurred. In our opinion, TM acted reasonably.

[31] Sources for the information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and

- Maintain "sufficient stand-alone liquidity and sufficient financial resources to meet its expected cash outflows in a stressed liquidity environment where access to unsecured funding is not available for a period of at least one year. Another premise of this liquidity planning is that any assets held in a regulated entity are unavailable for use outside of the entity to deal with weakness elsewhere in the holding company structure, based on the assumption that during the stress event, including a tightening of market liquidity, regulators in the U.S. and relevant foreign jurisdictions would not permit a withdrawal of capital;"[32]

- "Consent to Commission examination [inspection] of the books and records of the ultimate holding company [*i.e.,* the consolidated entity] and its affiliates, where those affiliates do not have principal regulators;"[33]

- "Regularly report on the financial and operational condition of the holding company, and make available to the Commission information about the ultimate holding company or any of its material affiliates that is necessary to evaluate financial and operations risks within the ultimate holding company and its material affiliates;"[34] and

- "Make available [examination] inspection reports of principal regulators for those affiliates that are not subject to Commission [examination] inspection."[35]

The firms agreed to consolidated supervision because of the preferential capital treatment under the alternative method and international requirements. The European Union's (EU) Conglomerates Directive required that affiliates of U.S. registered broker-dealers demonstrate that they were subject to consolidated supervision by a U.S. regulator or face significant restrictions on their European operations.[36]

---

- Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34-428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[32] Source: *Risk Management and Its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission).

[33] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[34] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[35] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[36] According to the CSE final rule, "EU [European Union] 'consolidated supervision' consists of a series of quantitative and qualitative rules, imposed at the level of the ultimate holding company, regarding firms' internal controls, capital adequacy, intra-group transactions, and risk concentration. Without a demonstration of 'equivalent' supervision, U.S. securities firms have expressed concerns that an affiliate institution located in the EU either may be subject to additional capital charges or be required to form a sub-holding company in the EU.' See 'Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002." Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htmP42_10820>.

**Mortgage Loans.** Beginning around late 2004, lenders offered mortgages to individuals who did not meet the normal qualifications (*e.g.*, income or credit history). Many of these loans had teaser rates and/or were interest only. These more risky loans are referred to as "subprime mortgages." The theory behind approving these risky loans was that the homeowner would be able to refinance the loan in a few years because of the increased growth in home values and the individual's improved credit rating. Banks converted these loans into securities and sold the securities to other firms (known as the securitization process).

Once home values began to decrease, mortgage loan defaults started to increase, causing the market value of the mortgage securities to decrease. In the ensuing months, the financial services industry wrote-down billions of dollars in the value of all types of mortgage securities.[37]

**Bear Stearns' Collapse.**[38] The Bear Stearns Companies, Inc. (Bear Stearns) was a holding company that had two registered broker-dealers. Its main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management.[39] Bear Stearns was highly leveraged[40] with a large exposure (*i.e.*, concentration of assets) in mortgage-backed securities.[41] Bear Stearns also had less capital and was less diversified than several of the CSE firms.

In June 2007, two of Bear Stearns' managed hedge funds collapsed because of subprime mortgage losses.[42] Nearly a year later, during the week of March 10, 2008, rumors spread about liquidity problems at Bear Stearns. Due to Bear Stearns' lenders not rolling over secured financing, Bear Stearns faced severe liquidity problems on March 14, 2008.[43] As a result, on March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency

---

[37] In accordance with Generally Accepted Accounting Principles, the securities must be valued at fair market value (*i.e.*, mark to market accounting).

[38] Sources for this information include:
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Timothy Geithner, President and Chief Executive Officer, Federal Reserve Bank of New York (FRBNY);
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Jamie Dimon (Chairman and Chief Executive Officer, JP Morgan); and
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Alan Schwartz (President and Chief Executive Officer, Bear Stearns).

[39] Source: 2006 Bear Stearns' Annual Report (page 32).

[40] There are many definitions of leverage. A simple definition of leverage is assets divided by capital. Bear Stearns' gross leverage ratio was about 33-1. See Appendix IX.

[41] Depending on the definition used to classify a mortgage as "subprime", Bear Stearns' exposure to subprime mortgages varied. However, it clearly had a large exposure to mortgage securities overall.

[42] Bear Stearns' direct exposure to these hedge funds was minimal.

[43] A pledge of collateral supports secured financing.

funding.[44]  According to Congressional testimony,[45] after the markets closed on March 14, 2008, it became apparent that FRBNY's funding could not stop Bear Stearns' downward spiral.  As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it.[46]  On March 16, 2008, Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY.  In May 2008, the sale was completed.

In testimony given before the Senate Committee on Banking, Housing, and Urban Affairs on April 3, 2008, Chairman Christopher Cox stated that Bear Stearns' collapse was due to a liquidity crisis caused by a lack of confidence.[47] Chairman Cox described Bear Stearns' collapse as a "run on the bank"[48] which occurred exceptionally fast and in an already distressed market environment (*i.e.*, the credit crisis).  Specifically, Chairman Cox testified as follows:

> What happened to Bear Stearns during the week of March 10th was likewise unprecedented.  For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.  Counterparties would not provide securities lending services and clearing services.  Prime brokerage clients moved their cash balances elsewhere.  These decisions by counterparties, clients, and lenders to no longer transact with Bear Stearns in turn influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns.[49]

---

[44] The funding was from FRBNY through JP Morgan to Bear Stearns because JP Morgan could borrow money from FRBNY.

[45] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statements of Timothy Geithner, President and Chief Executive Officer, FRBNY) and Alan Schwartz, President and Chief Executive Officer, Bear Stearns).

[46] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[47] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[48] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US.. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[49] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

According to a Commission press release,[50] TM monitored Bear Stearns' capital and liquidity daily since Bear Stearns' hedge funds collapsed. According to data (provided to TM by Bear Stearns), there was adequate capital at the holding company level and at Bear Stearns' two registered broker-dealers prior to and during the week of March 10, 2008. In addition, the Commission stated that Bear Stearns was compliant with the $5 billion liquidity requirement.[51] Furthermore, according to data we reviewed, Bear Stearns had significantly increased its liquidity levels since May 2007.[52]

The Commission stated that neither the CSE program nor any regulatory model (*i.e.,* the Basel Standards)[53] used by commercial or investment banks considered the possibility that secured financing, even when backed by high-quality collateral could become completely unavailable. Instead, the CSE program only considered that a deterioration of secured financing could occur (*e.g.,* that financing terms could become less favorable) and that unsecured funding could be unavailable for at least one year.

**The Commission's Response to Bear Stearns' Collapse.** In the aftermath of Bear Stearns' collapse, the Commission has:

- Supported the work of the Basel Committee on Banking Supervision regarding their planned updated guidance (*i.e.,* strengthening the standards applicable to liquidity risks) on liquidity management;[54]

- Supported legislation to make the CSE program mandatory.[55] At a recent Congressional hearing before the Committee on Financial Services, House of Representatives, July 24, 2008, Chairman Christopher Cox stated:

---

[50] Source: Statement of SEC Division of Trading and Markets Regarding The Bear Stearns Companies. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-44.htm>. The Chairman also made similar statements in his letter to the Basel Committee regarding liquidity management; and testimony (*Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators Before US Senate Committee on Banking, Housing and Urban Affairs*, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission)).

[51] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

[52] According to the Commission, Bear Stearns had a high of $21 billion (in liquidity) in early March 2008, (*i.e.,* before the week of March 10), compared to $7.6 billion in May 2007 according to TM data. Source: Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[53] The CSE firms operate under the Basel II standards.

[54] Source: Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[55] Sources of this information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and
- *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

> The mandatory consolidated supervision regime for
> investment banks should provide the SEC
> [Commission] with several specific authorities.
> Broadly, with respect to the holding company, these
> include authority to: set capital and liquidity
> standards; set recordkeeping and reporting
> standards; set risk management and internal control
> standards; apply progressively more significant
> restrictions on operations if capital or liquidity
> adequacy falls, including requiring divestiture of lines
> of business; conduct examinations and generally
> enforce the rules; and share information with other
> regulators. Any future legislation should also establish
> a process for handling extraordinary problems,
> whether institution-specific or connected with broader
> market events, to provide needed predictability and
> certainty.[56]

- Requested dedicated Congressional funding for the CSE program and increased CSE staffing from about 25 to 40 people;[57]

- Consulted with the CSE firms on their liquidity situation (*e.g.*, funding plans). Specifically, the Commission worked with the firms to:

  o   increase their liquidity levels;[58]

  o   lengthen the terms of their secured and unsecured financing;[59]

  o   review their risk practices and models;[60]

  o   discuss their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets;[61]

  o   increase their public disclosures of their capital and liquidity;[62]

---

[56] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

[57] Source: *Risk Management and Its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Chairman, Commission).

[58] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators,* Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[59] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[60] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[61] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

- Invited FRBNY examiners to review the CSE firms' funding and how the firms are managing their funding;[63] and

- In July 2008, the Commission and the Federal Reserve agreed on a Memorandum of Understanding (MOU) involving coordination and information sharing.[64]

# Objectives

As a result of the collapse of Bear Stearns in March 2008, we received a Congressional request to perform this audit of the Commission's CSE Program, in addition to an audit of the Commission's Broker-Dealer Risk Assessment Program (see Appendix II).

The objectives of this audit were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The objectives of the audit on the Commission's Broker-Dealer Risk Assessment Program were to follow up on recommendations made in the Office of Inspector General's (OIG) prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report No. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment process to determine whether improvements are needed. Audit report number 446-B discusses the Risk Assessment Program in detail and addresses these objectives.

---

[62] Source: Speech by SEC [Commission] Chairman: Address to the Security Traders 12th Annual Washington Conference. Commission. 7 May 2008.
<http://www.sec.gov/news/speech/2008/spch050708cc.htm>.

[63] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[64] SEC [Commission], FRB Sign Agreement to Enhance Collaboration, Coordination and Information Sharing. Commission. 7 July 2008. <http://www.sec.gov/news/press/2008/2008-134.htm>.

# Findings and Recommendations

## Finding 1: Bear Stearns Was Compliant With The CSE Program's Capital Ratio And Liquidity Requirements, But The Collapse Of Bear Stearns Raises Questions About The Adequacy Of These Requirements [65]

Bear Stearns was compliant with the capital and liquidity requirements; however, its collapse raises serious questions about the adequacy of these requirements.

### Capital [66]

Adequacy of Capital Levels

In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934, which created the CSE program and allowed broker-dealers to apply for an exemption from the net capital rule and instead use the alternative capital method.[67] The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies. However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting [[68]] as a critical risk and governance control. Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider." [69]

If approved, a firm must comply with capital requirements at both the holding company and the broker-dealer levels. The CSEs at the holding company level are required to maintain an overall Basel capital ratio of not less than the Federal

---

[65] The capital ratio requirement is stipulated by Basel II, which TM incorporated into the CSE program. TM developed the CSE program's liquidity requirements.

[66] Capital is the difference between a firm's assets and liabilities.
Source: Answers to Frequently Asked Investor Questions Regarding The Bear Stearns Companies, Inc. Commission. 8 March 2008. <http://www.sec.gov/news/press/2008/2008-46.htm>.

[67] The alternative capital method is based on mathematical models and scenario testing while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct.

[68] Mark-to-market accounting refers to a requirement that the securities must be valued at fair market value in accordance with Generally Accepted Accounting Principles.

[69] Source: Examining Regulation and Supervision of Industrial Loan Companies Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

Reserve's 10 percent "well-capitalized" standard for bank holding companies.[70]
In addition, a broker-dealer calculating its capital using the alternative method
must maintain tentative net capital[71] of at least $1 billion and net capital of at
least $500 million. If the tentative net capital of a broker-dealer using alternative
method falls below $5 billion, it must notify the Commission.[72]

According to Bear Stearns' data, it exceeded the required capital amounts at the
holding company and broker-dealer level the entire time it was in the CSE
program, including during the week of March 10, 2008.[73] Although Bear Stearns
was compliant with the capital requirements, there are serious questions about
whether the capital requirement amounts were adequate.[74] For instance, some
individuals have speculated that Bear Stearns would not have collapsed if it had
more capital than was required by the CSE program. In fact, a former Director of
TM has stated:[75]

> The losses incurred by Bear Stearns and other large broker-dealers
> were not caused by 'rumors' or a 'crisis of confidence,' but rather by
> inadequate net capital and the lack of constraints on the incurring
> of debt.

<u>Increased Access to Secured Financing</u>

Notwithstanding the fact that Bear Stearns was compliant with the CSE
program's capital requirements, there are serious questions about whether Bear
Stearns had enough capital to sustain its business model. As the subprime crisis
unfolded, Bear Stearns' cost of unsecured financing tended to increase. For
example, by March 2008, a ten-year bond which had recently been issued at a
spread of 362 basis points over Treasury rates was trading at 460 basis points
over Treasury rates. The high spread indicates that market participants believed
that Bear Stearns' creditworthiness was deteriorating in a manner consistent with
downgrades by ratings agencies. According to the expert retained by the OIG in
connection with this audit,[76] the high cost of financing tended to undermine the

---

[70] Source: SEC [Commission] <u>Holding Company Supervision with Respect to Capital Standards and</u>
<u>Liquidity Planning.</u> Commission. 7 Mar 2007. <http://www.sec.gov/divisions/marketreg/hcliquidity.htm>.
[71] Tentative capital is net capital before deductions for market and credit risk.
[72] Source: <u>Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of</u>
<u>Consolidated Supervised Entities</u> (69 Fed Reg. 34,428). Commission. 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.
[73] Source: <u>Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity</u> Management.
Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.
[74] It is worth noting that prior to the current mortgage crisis, a main concern surrounding the securities
industry was a real/perceived lack of competitiveness with overseas markets. One specific area of
concern was that U.S. firms were potentially at a competitive disadvantage because U.S. regulators were
requiring excessive capital compared to foreign banks. Source: Sustaining New York's and the US'
Global Financial Services Leadership (Recommendation 6, page 24) by McKinsey & Company.
[75] Source: Pickard Lee. "SEC's [Commission] Old Capital Approach Was Tried-and-True." <u>American Banker</u>
August 8, 2008.
[76] Professor Albert S. (Pete) Kyle was retained by the Office of Inspector General (OIG) to provide
assistance with this audit. See Appendix III for Professor Kyle's Curriculum Vitae and the Methodology
section of Appendix IV.

viability of Bear Stearns' business model, which relied heavily on leverage. Therefore, to preserve the viability of its business model, Bear Stearns had a strong incentive to lower its financing costs. One way to lower borrowing costs is to raise new equity capital, thus providing a larger equity cushion to protect unsecured lenders. To the extent that secured financing was cheaper than unsecured financing, another way for Bear Stearns to lower its borrowing costs was to shift its funding model from unsecured to secured financing.

From April 2006 to March 2008, Bear Stearns' Basel capital ratio
[77]                                                                        in March 2008, TM inquired about whether Bear Stearns was contemplating capital infusions, but i    does not suggest that TM exerted influence over Bear Stearns to raise additional capital.[78] The OIG expert was unable to find    that TM had formally required or informally pressured Bear Stearns to raise additional equity capital prior to March 2008. In this sense, TM acted as though it did not believe it had a mandate to compel Bear Stearns to raise additional capital as long as its Basel capital ratio was greater than 10%. In fact, Bear Stearns did not raise additional capital during this time in 2007 or 2008.

, in November 2006, Bear Stearns initiated a plan to increase its availability of secured funding at the holding company level.[79] One component of this plan involved a tri-party repurchase agreement[80] with secured lenders, giving Bear Stearns access to                               Bear Stearns' secured borrowings were initially for terms of         , with the goal of extending the terms to                               By May 2007, Bear Stearns' short-term borrowing was ·          secured and by September 2007, it was secured.[83] Finally, by March 2008, Bear Stearns' short-term borrowing was secured.[84] Nevertheless, Bear Stearns was still unable to obtain adequate secured funding to save the firm in March 2008.

---

[80] In a tri-party repo arrangement, a third party (                          ) acts as a custodian for loans between Bear Stearns and other lenders. The custodian holds Bear Stearns assets as collateral for the loans from the other lenders. Bear Stearns used this tri-party repurchase agreement (repo) facility to finance assets which were otherwise difficult to fund.

---

Bear Stearns' increasing reliance on secured funding indicates that, although it appeared to be compliant with CSE program's capital requirement, the market did not perceive it to be sufficiently capitalized to justify extensive unsecured lending. In this sense, Bear Stearns was not adequately capitalized.

These facts illustrate that although Bear Stearns was compliant with the CSE program's ten percent Basel capital requirement, it was not sufficiently capitalized to attract the funding it needed to support its business model. Although the Commission has maintained that liquidity (not capital) problems caused Bear Stearns' collapse, this audit found that it is entirely possible that Bear Stearns' capital levels could have contributed to its collapse by making lenders unwilling to provide Bear Stearns the funding it needed.

The fact that Bear Stearns collapsed while it was compliant with the CSE program's capital requirements raises serious questions about the adequacy of the CSE program's capital ratio requirements.

The CSE capital requirements are broadly consistent with the Basel II framework. The Basel II framework is based on three pillars: (1) minimum capital requirements, (2) supervisory review, and (3) market discipline in the form of increased public disclosure.[85] CSE firms calculate their capital ratios in a manner consistent with a models-based approach of pillar 1. Under pillar 2, supervisors are required to ensure that banks comply with the minimum capital requirements of pillar 1; address risks not fully captured by pillar 1, including liquidity risk and credit concentration risk; and encourage good risk management practices. Under pillar 2, supervisors should expect banks to operate above the minimum regulatory capital ratios, and should intervene at an early stage to prevent banks from falling below minimum levels required to support the risk characteristics of a particular bank, including requiring banks to raise additional capital immediately.[86] Pillar 3 establishes disclosure requirements that aim to inform market participants about banks' capital adequacy in a consistent framework that enhances comparability.[87] The Basel II framework does not dictate a maximum capital ratio, but instead gives the supervisor the ability to set a high enough capital ratio to be consistent with the characteristics of the banks it regulates.

## Recommendation 1:
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and rules regarding the Consolidated Supervised Entity (CSE)

---

[85] Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, page 20. February 15, 2007.

[86] Source: Basel Committee on Banking Supervision. International Convergence on Capital Measurement and Capital Standards, June 2006, paragraphs 9 and 756-760. < http://www.bis.org/publ/bcbs128.pdf>.

[87] Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, page 91. February 15, 2007.

firms' capital levels; and (2) identify instances (e.g., a firm's credit rating is downgraded, or its unsecured debt trades at high spreads over Treasuries) when firms should be required to raise additional capital, even if the firm otherwise appears to be well capitalized according to CSE program requirements.

## Liquidity [88]

The Commission designed the CSE program to ensure that, in a stressed environment, a firm could withstand the loss of its unsecured financing for up to one year,[89] under the assumption that secured funding for liquid assets would be available. In addition, the liquidity analysis assumes that any assets held in a regulated entity are unavailable for use outside of the entity to deal with liquidity issues elsewhere in the consolidated entity.[90] The CSE program's guidelines on liquidity implement supervisory principles concerning liquidity in a manner that attempts to be consistent with pillar 2 of Basel II.[91]

According to agreements between the Commission and the United Kingdom's Financial Services Authority entered into in April 2006, each CSE is required to maintain a liquidity portfolio of cash or highly liquid debt and equity securities of $10 billion, with the exception of Bear Stearns, which was required to maintain a liquidity portfolio of $5 billion. The liquidity requirement for Bear Stearns was lower because it was the smallest CSE. Bear Stearns was continuously compliant with this requirement.

Bear Stearns initiated a plan in November 2006 to increase its liquidity levels and in fact (according to TM data), it significantly increased its liquidity levels from

---

[88] According to the Commission, "[i]t is important to realize capital is not synonymous with liquidity. A firm can be highly capitalized, that is, can have more assets than liabilities, but can have liquidity problems if the assets cannot quickly be sold for cash or alternative sources of liquidity, including credit, obtained to meet other demands. While the ability of a securities firm to withstand market, credit, and other types of stress events is linked to the amount of capital the firm possesses, the firm also needs sufficient liquid assets, such as cash and U.S. Treasury securities, to meet its financial obligations as they arise.

Accordingly, large securities firms must maintain a minimum level of liquidity in the holding company. This liquidity is intended to address pressing needs for funds across the firm. This liquidity consists of cash and highly liquid securities for the parent company to use without restriction." Source: Answers to Frequently Asked Investor Questions Regarding The Bear Stearns Companies, Inc. Commission. 18 March 2008. <http://www.sec.gov/news/press/2008/2008-46.htm>.

[89] Source: Risk Management and Its Implications for Systemic Risk Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement by Erik Sirri, Director of TM, Commission).

[90] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[91] Sources for this information include:
- Basel Committee on Banking Supervision. International Convergence on Capital Measurement and Capital Standards, June 2006, paragraphs 738 and 741.
  < http://www.bis.org/publ/bcbs128.pdf>; and
- Basel Committee on Banking Supervision. Sound Practices for Managing Liquidity in Banking Organizations. February 2000. <http://www.bis.org/publ/bcbs69.pdf?noframes=1>.

May 2007 until it suddenly collapsed during one week in March 2008.[92]
According to the Commission, Bear Stearns collapsed because it experienced a
liquidity crisis when it lost its secured financing. The collapse of Bear Stearns
thus indicates that the CSE program's liquidity guidelines (implementing the spirit
of pillar 2 of Basel II) are inadequate in two respects. First, the time horizon over
which a liquidity crisis unfolds is likely to be significantly less than the one-year
period. Second, secured lending facilities are not automatically available in
times of stress.

Bear Stearns' liquidity planning indicates that Bear Stearns was well aware of
these impractical aspects of the CSE program's approach to liquidity more than a
year before it failed.                                        :, Bear Stearns
            · it had developed a 60-day cash inflow and outflow analysis that it
could use to track cash flows on a daily basis.[93]                         the
60-day stress test "provides a detailed cash inflows and outflows analysis during
the most critical part of a liquidity crisis."[94] The 60-day analysis, however, did not
assume that secured funding was always available. Instead, the analysis
assumed the availability of existing credit lines.[95] A 60-day period corresponds
more closely than a one-year period to the timeframe over which a liquidity crisis
unfolds. A 60-day period also corresponds to a time period over which a firm
can raise new equity capital in an orderly manner. In this sense, Bear Stearns
realized that the one-year period was not realistic and also recognized that
secured funding might not be available in times of stress.

In November 2006, Bear Stearns also undertook efforts to line up *committed*
secured lending facilities. The fact that Bear Stearns made a special effort to
line up committed secured lending facilities indicates that Bear Stearns did not
think that such facilities would automatically be available in a stressed
environment. .                    ·     the secured funding initiative was
improving the firm's performance in the 60-day stress scenarios, because the 60-
day stress scenarios did not assume that secured funding would always be
available as contemplated by the CSE program's one-year liquidity stress test.
Bear Stearns planned to extend its 60-day stress model to one year and to
modify its analysis to include unused credit lines only to the extent that they were
committed.[96] As part of its secured funding initiative, Bear Stearns planned to
use uncommitted lines of credit on an ongoing basis, thus increasing its access

---

[92] According to the Commission, Bear Stearns had a high liquidity level of $21 billion in early March 2008
(*i.e.*, before the week of March 10) compared to $7.6 billion in May 2007 (according to TM data). Bear
Stearns' required liquidity was $5 billion.

to credit in a stressed environment where uncommitted lines might not be available.[97]

TM believed that the secured funding initiative helped Bear Stearns weather the credit difficulties it faced during the summer of 2007, when two hedge funds sponsored by Bear Stearns' Asset Management (BSAM) failed.

An evergreen facility allows a borrower to lock in funding for a predetermined minimum period of time. For example, in a six-month evergreen facility, the lender must give notice to terminate the facility six months before being entitled to start getting its money back. If Bear Stearns had such facilities, which were terminated, such terminations would have created potential financial stress for Bear Stearns with a known, contractually predetermined time lag. Therefore, it would have been important for TM to know about such terminations, in order for TM to anticipate the potential financial stress. OIG has asked TM for information concerning whether TM knew about terminations of any evergreen facilities providing secured collateralized lending to Bear Stearns, but OIG has been unable to determine what additional information TM had about any such facilities, including terminations.

To summarize, as early as November 2006, Bear Stearns was implementing a more realistic approach to liquidity planning than contemplated by the CSE programs' liquidity stress test. While this more realistic approach may have helped Bear Stearns in the summer of 2007, it was not sufficient to save the firm in March 2008. Bear Stearns' initiative to line up secured funding indicates that the crisis which occurred in March 2008 was not totally unanticipated by Bear Stearns, in that Bear Stearns had been taking specific steps to avoid such a crisis for more than a year before it occurred.

According to the expert retained by OIG in conjunction with this audit, the need for Basel II firms to undertake specific efforts to line up committed secured funding in advance of a stressed environment depends on the extent to which the Basel II firms can rely on secured lending facilities from the central bank

during a liquidity crisis. On the one hand, if it is assumed that secured lending facilities will always be available from the central bank, lining up committed secured lending facilities is not necessary. In this case, a liquidity stress test, which assumes that secured lending facilities will automatically be available is appropriate. On the other hand, if it is assumed that collateralized central bank lending facilities might not be available during a time of market stress, Basel II firms have incentives to line up committed secured lending facilities, in advance, from other sources. In the context of CSE firms which are not banks, the policies of the Federal Reserve towards making collateralized loans to non-banks becomes an important element of their liquidity planning process.

Subsequent to the collapse of Bear Stearns, the Basel Committee released a draft set of updated guidelines concerning supervision of liquidity.[99]

**Recommendation 2:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

# Finding 2: TM Did Not Adequately Address Several Significant Risks That Impact The Overall Effectiveness Of The CSE Program

TM did not adequately address several significant risks, which affected the overall effectiveness of the CSE program.
                                                        indicate that TM often discussed risks, which turned out to be relevant, but the discussions did not prompt TM to exert sufficient influence over Bear Stearns to make changes as a result of the risks identified.

## Concentration of Assets

Bear Stearns had a high concentration of mortgage securities. Prior to Bear Stearns becoming a CSE, TM was aware that its concentration of mortgage securities had been steadily increasing. For instance,

---

[99] Source: Basel Committee on Banking Supervision. Principles for Sound Liquidity Risk Management and Supervision, June 2008 – Draft for Consultation. <http://www.bis.org/publ/bcbs138.pdf?noframes=1>.

TM staff even found that the amount of mortgage securities was occasionally
For instance,


Furthermore, according to TM's own documentation,


> In the course of their activities, supervisors should assess the
> extent of a bank's credit risk concentrations, how they are
> managed, and the extent to which the bank considers them in its
> internal assessment of capital adequacy under Pillar 2. Such
> assessments should include reviews of the results of a bank's
> stress tests. Supervisors should take appropriate actions where the
> risks arising from a bank's credit risk concentrations are not
> adequately addressed by the bank.[102]

Yet, notwithstanding .                                    . and warnings in the
Basel standards, TM did not make any efforts to limit Bear Stearns' mortgage
securities concentration.

### Recommendation 3:

The Division of Trading and Markets should ensure that it adequately
incorporates a firm's concentration of securities into the Consolidated Supervised
Entity (CSE) program's assessment of a firm's risk management systems (*e.g.*,
internal controls, models, etc.) and more aggressively prompts CSE firms to take
appropriate actions to mitigate such risks.

---

[102] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement
and Capital Standards, June 2006, paragraph 777. < http://www.bis.org/publ/bcbs128.pdf>.

## Leverage

Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

- A debt to net capital ratio of less than 15 to 1 (after their first year of operation); or

- Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms. As a result, Bear Stearns was highly leveraged, with a gross leverage ratio of approximately 33 to 1 prior to its collapse.[103] Leverage can affect liquidity risk. For instance:

- The Counterparty Risk Management Policy Group (in June 1999)[104] stated:

  The link between leverage and funding liquidity risk is relatively straightforward: leverage amplifies funding liquidity risk...

- The President's Working Group (PWG) on Financial Markets[105] Report (in April 1999) on Long-Term Capital Management (LTCM) stated:[106]

  In addition, the liquidity risk of a hedge fund interacts with and is magnified by leverage, most clearly in distressed market circumstances.[107]

Although TM has maintained that leverage is not directly related to liquidity, it is clear that if a firm experiences a lack of confidence, its liquidity can be adversely affected and that leverage can influence confidence levels. Thus, it is entirely

---

[103] There are many definitions of leverage. Other firms also had high gross leverage amounts (*i.e.*, assets divided by stockholders' equity). See Appendix VI.

[104] "In January 1999, a group of 12 major, internationally active commercial and investment banks announced the formation of a Counterparty Risk Management Policy Group (CRMPG). The objective of the Policy Group, whose formation was endorsed by Chairman Greenspan [then Federal Reserve Chairman], Chairman Levitt [then Commission Chairman] and Secretary Rubin [then Secretary of the U.S. Department of Treasury], has been to promote enhanced strong practices in counterparty credit and market risk management." *Improving Counterparty Risk Management Policies*, Counterparty Risk Management Policy Group 2 (June 1999).

[105] In 1988, Executive Order 12631 established the President's Working Group (PWG). The PWG's purpose is "...enhancing the integrity, efficiency, orderliness, and competitiveness of our nations financial markets and maintaining investor confidence..." The PWG members are: the Chairmen of the Commission, the Commodities Futures Trading Commission, and the Federal Reserve; and the Secretary of the U.S. Department of Treasury.

[106] Long-Term Capital Management (LTCM) was a very large U.S. hedge fund that collapsed in 1998. However, apparently some counterparties treated LTCM as an investment bank and not a hedge fund.

[107] Although, Bear Stearns was not a hedge fund, we believe that the concept of leverage's relationship to liquidity still applies, especially since apparently some counterparties treated LTCM as an investment bank and not a hedge fund.

possible that Bear Stearns' high leverage contributed to a lack of confidence in the firm (including unsubstantiated rumors) which had an impact on its collapse. In fact, TM believed in early 2006 that Bear Stearns was still managing its balance sheet at quarter end, a practice which suggests that Bear Stearns was aware that its leverage ratios affected market perceptions.[108] Although banking regulators have established a leverage ratio limit, the CSE program has not established a leverage ratio limit.[109] The adoption of leverage limits must be reassessed in light of the circumstances surrounding the Bear Stearns' collapse, especially since some individuals believe that this policy failure directly contributed to the current financial crisis.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

## Bear Stearns' Model Review Process and Risk Management Staffing Were Inadequate in the Area of Mortgage Backed Securities

Prior to Bear Stearns' approval as a CSE in November 2005, OCIE found
[110] nor did it
Further, OCIE found

. It was critically imperative for Bear Stearns' risk managers to review mortgage models because its primary business dealt with buying and selling mortgage-backed securities.

During the initial CSE application, TM staff

---

[109] However, there are some fundamental differences between commercial and investment banks. For instance, unlike investment banks, commercial banks rely on customer deposits.
[110] "Value at Risk (VaR) is the maximum loss not exceeded with a given probability defined as the confidence level, over a given period of time." Source: Wikipedia- The Free Encyclopedia. <http://en.wikipedia.org/wiki/Value_at_risk>.

At a meeting with TM on September 20, 2006, Bear Stearns' risk managers
provided TM with

According to the OIG expert,
this information is consistent with the interpretation that pricing at Bear Stearns
was based more on looking at trading levels in the market than on looking at
models. This information is also consistent with the interpretation that traders
used their own models (perhaps empirically based) for hedging purposes and not
the ones that the risk managers were reviewing.  When markets are liquid and
trading is active, market prices can be used to value assets accurately.  In times
of market stress, trading dries up and reliable price information is difficult to
obtain.  Models therefore become relatively more important than market price in
times of market stress than in times when markets are liquid and trading actively.
Such stressed circumstances force firms to rely more on models and less on
markets for pricing and hedging purposes.

[114] Traders often
combine long and short positions together, using the short positions to hedge out
some of the risks associated with long positions.  For example, a trader might
short a government bond to hedge the interest rate risk associated with a
mortgage-backed security.  To construct an appropriate hedge ratio, traders use
information such as the sensitivity of the value of the assets to interest rate
changes or interest rate spreads.

A VaR model is intrinsically based on more information than a
sensitivity of value to interest rate spread.  A VaR model also incorporates an
assumption about the ratio of spread changes in one asset to spread changes in
another.  A VaR model can therefore tell the trader an appropriate hedge ratio to
use to reduce risks associated with fluctuations in spreads. ;

---

112
113
114

[115] Since VaR measures of risk reported to TM are based on the risk managers' models and not the traders' models, the reported VaR numbers suggested a risk that was different than the risks the traders thought they were bearing. _ _ raises the question of whether VaR risk measures were taken seriously enough by Bear Stearns' traders.

The OIG expert believes that interest rate and spread sensitivities were actively used as part of the discussion between risk managers and traders at Bear Stearns, but the OIG expert did not see evidence                that the additional modeling assumptions incorporated into VaR models added much to these discussions.

[16] Model validation personnel, modelers, and traders all sat together at the same desk.[117] According to the OIG expert, sitting together at the same desk has the potential advantage of facilitating communication among risk managers and traders but has the potential disadvantage of reducing the independence of the risk management function from the trader function, in both fact and appearance.

In 2006, the expertise of Bear Stearns' risk managers was focused on pricing exotic derivatives and validating derivatives models. At the same time, Bear Stearns' business was becoming increasingly concentrated in mortgage securities, an area in which its model review still needed much work. The OIG expert concluded that, at this time, the risk managers at Bear Stearns did not have the skill sets that best matched Bear Stearns' business model.

For instance, TM's discussions with risk managers in 2005 and 2006 indicated that .

_ _ , it would have been difficult for risk managers at Bear Stearns to advocate a bigger focus on default risk in its mortgage models.

There was also turnover of Bear Stearns' risk management personnel at critical times.

[119] At exactly this point in time, Bear Stearns had a tremendous need to rethink its mortgage models and lacked key senior risk

modelers to engage in this process
                                                According to the OIG expert, this
disarray in risk management tended to give trading desks more power over risk
managers. In fact, there are indications

⌐                                                                                              ·r.[121] In
the opinion of the OIG expert, difficulties in communication are a potential red
flag indicating that a risk manager could be telling the traders to take on less risk
than they would otherwise choose to do (*i.e.*, information that the traders would
presumably not want to hear).

                                                                             As a result, the
OIG expert concluded that the reviews of mortgage models that should have
taken place before the subprime crisis erupted in February 2007 appears to have
never occurred, in the sense that it was still a work in progress when Bear
Stearns collapsed in March 2008.

To summarize, TM was aware that risk management of mortgages at Bear
Stearns had numerous shortcomings, including lack of expertise by risk
managers in mortgage-backed securities at various times; lack of timely formal
review of mortgage models; persistent understaffing; a proximity of risk
managers to traders suggesting lack of independence; turnover of key personnel
during times of crisis; and an inability or unwillingness to update models quickly
enough to keep up with changing circumstances. In 2006, TM missed an
opportunity to push Bear Stearns aggressively to add expertise in mortgage
modeling to the risk management staff, to review mortgage models in a timely
manner, to add incorporate default rates into mortgage modeling, and to make
sure that mortgage risk management could function efficiently in a stressed
environment.

**Recommendation 5:**
The Division of Trading and Markets (TM) should ensure that: (1) the
Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing
and approving models used for pricing and risk management, (2) the review and
approval process conducted by the CSE firms is performed in an independent
manner by the CSEs' risk management staff, (3) each CSE firms' model review
and approval process takes place in a thorough and timely manner, and (4)
impose limits on risk taking by firms in areas where TM determines that risk
management is not adequate.

## Risk Scenarios

When Bear Stearns applied to be a CSE, TM reviewed the independent risk
management function at Bear Stearns in 2005.[126] In addition to VaR, Bear
Stearns used stress scenarios to capture risks associated with history-based and
hypothetical scenarios. TM reviewed a sample of a "

Most of these proposed scenarios related to the
market for residential mortgages. For example, the proposed scenarios
contemplated shocking the credit spreads for both high grade and high yield
mortgage-backed securities separately.

Bear Stearns' VaR models did not capture risks associated with credit spread
widening of non-agency mortgages that are prime or near-prime (Alt-A).[128] Thus,
the residential mortgage stress tests were potentially beneficial in that they
quantified potential risks not otherwise captured. The OIG expert did not find
documentary evidence indicating that these scenarios were actually
implemented or subsequently discussed with TM until 2007. Furthermore, the
OIG expert believes that meaningful implementation of high grade and high yield
mortgage credit spread scenarios requires both a measure of sensitivity of
mortgage values to yield spreads as well as a model of how fundamental
mortgage credit risk factors make yield spreads fluctuate. These fundamental
factors include housing price appreciation, consumer credit scores, patterns of
delinquency rates, and potentially other data. These fundamental factors do not
seem to have been incorporated into Bear Stearns' models at the time Bear
Stearns became a CSE.

The presence of the proposed mortgage scenarios in the materials TM reviewed in 2005 indicates that both TM and Bear Stearns knew that incorporating these features into Bear Stearns' risk management was important for effective risk management. The absence of their implementation suggests that Bear Stearns did not have in place in 2005 the risk management technology needed to implement the scenarios in a meaningful manner.

The OIG expert concluded that Bear Stearns' risk managers analyzed these risks carefully. Additionally, TM collected a great deal of information on other aspects of risk management, including the organizational structure of the risk management process, model verification, and price verification.

The OIG expert however, also concluded that the internal TM memoranda provide no discussion of the most serious forward-looking risk scenario that Bear Stearns might face, which was a complete meltdown of mortgage market liquidity accompanied by fundamental deterioration in the mortgages themselves, resulting from falling housing prices.

In April 2006 through June 2006.

[131] In focusing on Bear Stearns' problems with this subsidiary, the OIG expert believes that in 2006, TM identified precisely the types of risks that evolved into the subprime crisis in the U.S. less than one year later. Yet, TM did not exert influence over Bear Stearns to use this experience to add a meltdown of the subprime market to its risk scenarios. Moreover, TM did not use this event to exert influence on Bear Stearns to reduce its exposure to subprime loans, as previously discussed on page 17.

_____

₃ 2006.

In terms of large drops in market prices and large asset write-downs on
mortgage-backed securities, the subprime crisis began to affect the U.S. around
December 2006. The drop in prices tended to hit residuals from mortgage
securitizations first. When mortgages or other assets are securitized, the
tranches, which have the highest certainty of payment, typically receive "AAA"
ratings. The tranches with lowest credit quality are called "residuals," and these
tranches bear credit losses before the higher rated tranches bear credit losses.
In February 2007, Bear Stearns told TM that it had written {

         ₃ down by.                                    , after writing the residuals down
by .                              [12] Additional write-downs the following month
brought total losses on second lien inventory t  ‾ ˙ ˙ ˙  ˮˮ  ˌ and total losses on
residential mortgage backed securities and structured products to .
million.[133] The write-downs during this quarter were mostly on ⌐· ˙˙
by ⌐⌐⌐⌐⌐ ⌐⌐⌐ ⌐⌐⌐⌐⌐⌐,  ˙ ⌐⌐ ⌐⌐ ⌐⌐⌐⌐,  ⌐⌐⌐ ⌐⌐⌐⌐⌐⌐⌐ ⌐⌐⌐⌐⌐⌐⌐⌐⌐⌐. ˙⌐⌐ TM
described the residual write-downs as a meltdown that was worse than what
Bear Stearns could have predicted over a year before Bear Stearns collapsed.[137]

Prior to these write-downs, ⌐ ⌐⌐⌐ ⌐⌐⌐ ⌐⌐ ⌐ ⌐⌐ ⌐⌐, ⌐⌐⌐ ⌐⌐⌐ ⌐⌐⌐⌐⌐⌐ ⌐⌐⌐⌐⌐ risks

The OIG expert believes that the greater risk was that the mortgage market
would deteriorate further, with losses spreading from sub-prime loans to Alt-A
loans and even to higher rated agency securities.[140] In fact, this scenario did
unfold. T⌐⌐
⌐⌐⌐⌐⌐⌐ ⌐⌐                                                        However, TM did
not appear to have sufficiently encouraged Bear Stearns to incorporate into its
risk management forward-looking risk scenarios based on risks identified and
discussed during the regular monthly meetings between TM and Bear Stearns.
Such scenarios could have included the consequences of much higher
delinquencies on subprime and Alt-A mortgages, the consequences of rating

downgrades on mortgage-backed securities, contagion and loss of liquidity from losses on mortgage-backed securities. By July 2007, deterioration of mortgages had spread to highly rated securities such as AAA paper backed by Alt-A mortgages, and Bear Stearns reported $570 million in losses for the month.[142]

Towards the end of 2007, Bear Stearns incorporated measures to reflect house price appreciation or depreciation into its mortgage models. It also developed a housing led recession scenario which it could incorporate into risk management and use for hedging purposes. By this time, Bear Stearns had large inventories of mortgage related assets, which had lost both their value and their liquidity. Since it was difficult for Bear Stearns to reduce its inventory by selling assets, this scenario helped Bear Stearns focus its attention on ways to hedge its mortgage risk by using more liquid instruments.

It is not the purpose of this discussion to claim that Bear Stearns' use of scenario analysis was better or worse than other CSE firms. TM asserts that Bear Stearns' use of scenario analysis was consistent with industry practices and the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

## Non-compliance with Basel II

### Mark Disputes
The subprime mortgage crisis began to affect the U.S. economy around December 2006. As the subprime crisis continued into the summer of 2007, TM learned that mark disputes were becoming more common.[143] A mark dispute can occur when two parties to a derivatives transaction, such as a swap, disagree over the value of the derivative. A mark dispute can also occur in a repurchase agreement (repo) transaction, when the borrower and the lender disagree over the value of the collateral. Mark disputes can lead the two parties

---

[142] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.
[143] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.

to a swap or financing transaction to each make margin calls on the other.

........... TM says that mark disputes are an unavoidable issue faced by all dealers (particularly when markets for underliers become less liquid), and the total disputed numbers at Bear Stearns are much smaller than at other institutions.

This practice allows two traders at different firms to record a gain at the expense of the other, despite the fact that the zero-sum nature of trading requires the net gain to be zero.
................, ............. It is inconsistent with the spirit of Basel II for two firms to use a mark dispute as an occasion to increase their combined capital, as would occur when both parties to a trade book profit at the expense of the other simply because they each mark positions favorably for themselves. ........ ...

.... ............ ....... ......e, the OIG expert found no evidence ·                                          a that TM encouraged the CSE firms to adopt mutually consistent marking practices that avoid the use of collateral disputes to create apparent capital in a manner inconsistent with Basel II. Since mark disputes tend to occur on illiquid positions that are hard to value, conservative valuation adjustments consistent with Basel II[147] should theoretically result in a situation where the long side of a trade is carried at a lower value than the short side; i.e., when netted across two firms with offsetting long and short positions, appropriately conservative valuations should appear to reduce capital, not increase it.

**Recommendation 8**:
The Division of Trading and Markets should take steps to ensure that mark
disputes do not provide an occasion for Consolidated Supervised Entity firms to
inflate the combined capital of two firms by using inconsistent marks.

*Inconsistent VaR Numbers*

. . . . . . . . . . . . . . . . . . . . . . . [9] For example, when markdowns on assets occurred,
Bear Stearns' risk managers had difficulty explaining whether the markdowns
were a delayed response to market moves resulting in changes in VaR risk
factors or updates based on asset specific information (such as delinquency
rates on individual assets).

In some cases, Bear Stearns' risk managers had difficulty explaining how
firmwide VaR numbers were related to desk-specific VaR numbers. The OIG
expert believes that this occurred because each of Bear Stearns' trading desks
evaluated profits and risks individually, as opposed to relying on one overall firm-
wide approach. On some occasions, Bear Stearns' several trading desks had
opposite positions in various instruments (*e.g.*, some desks were long sub-prime
while other desks were short sub-prime), and Bear Stearns used VaR numbers
more for regulatory reporting than for internal risk management. This
inconsistency between use of VaR for internal and regulatory reporting purposes
does not comport with the spirit of Basel II and makes it harder for TM to
understand what is going on inside the firm. TM encouraged Bear Stearns to do
a better job of presenting risks in a manner that made it easier to understand the
relationship between firm-wide desk-level risks. Bear Stearns' risk management
was working on improved reporting, perhaps influenced by TM's encouragement.

**Recommendation 9:**
The Division of Trading and Markets should encourage the Consolidated
Supervised Entity (CSE) firms to present VaR and other risk management data
in a useful manner, which is consistent with how the CSE firms use the
information internally and which allows risk factors to be applied consistently to
individual desks.

*Bear Stearns' Capital Requirements for Illiquid Assets and Stressed Repos
Require Careful Oversight.*
As the subprime crisis worsened in June 2007, the market began to freeze up
and formerly liquid assets lost much of their liquidity.

. TM stated that, in
some instances, TM required a full deduction for certain illiquid assets, such as
mortgage residuals. Since the decline in liquidity of many mortgage-related

assets was so unprecedented, and the decline in liquidity increased the difficulties associated with valuing such illiquid assets, it would have been prudent for TM to consider expanding the list of assets that require a full deduction from capital. The OIG expert was unable to find documentary evidence that TM considered expanding the list of assets that required a 100% capital deduction.

When the Basel Standard is operating correctly, firms take markdowns on the value of trading book assets as the value of the assets decline. When market illiquidity increases and assets become more difficult to value, these markdowns should include valuation adjustments which not only take account of declining market values but also add an element of conservatism based on widening bid-ask spreads and the high costs that would be been incurred by a firm to liquidate its assets in a stressed environment.[149] These markdowns result in a decline in Tier 1 capital.

At times of market stress, when banks often need to take large markdowns, raising additional Tier 1 capital is often very expensive, due to factors such as a bank's falling stock price and negative signaling concerns, which could cause a bank's stock price to fall even further. In such circumstances, banks have a perverse incentive (associated with what is called "moral hazard") to postpone taking markdowns that would require the banks to raise additional capital. As an alternative to taking markdowns while continuing to hold assets whose value is questionable, banks have an incentive to consider selling such assets into the market. When selling an asset, Tier 1 capital is reduced by the amount of losses on the sale, but capital requirements are also reduced by removing the asset from the bank's portfolio. A bank looking to improve its Basel capital ratios by selling assets therefore has a perverse incentive not to sell assets that have modest capital requirements relative to the markdowns the banks should have taken but has not yet taken. This perverse incentive tends to amplify the tendency for markets to freeze up and become illiquid by reducing trading volume that would otherwise occur as banks sell losing positions into the market. On the one hand, these perverse incentives are mitigated to the extent that capital requirements on such assets are high and valuations are appropriately conservative. For assets that face a 100% capital haircut, for example, the bank gains no improvement in its capital ratios by avoiding taking a markdown, and the bank increases its capital by the proceeds of any asset sales. On the other hand, these perverse incentives are worsened to the extent that supervisors allow banks to avoid marking assets down quickly enough, to avoid taking appropriate valuation adjustments in a timely manner, or to understate assets' risks.

As the subprime crisis worsened, numerous Bear Stearns' repo counterparties, such as hedge funds with positions in mortgage related assets, suffered losses

---

[149] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 700. < http://www.bis.org/publ/bcbs128.pdf>.

and demands for redemptions. Some of these hedge funds became financially distressed. T'·' · ·· ···

Consistency with the spirit of Basel II requires that the capital for a stressed repo counterparty (with no assets other than the collateral it has posted) be at least as great as the capital requirement Bear Stearns would face if it purchased the collateral for the amount owed on the repo transaction. The OIG expert believes that                      suggest that Bear Stearns may have been taking a smaller capital charge than Basel II requires. In addition,                     do not indicate that TM pressured Bear Stearns to take more aggressive capital charges on stressed repos.

Lastly, BSAM's "High Grade" hedge fund became a very large, stressed repo counterparty to Bear Stearns during the summer of 2007.[151] As of June 2007, Bear Stearns loaned          .o BSAM's "high grade" fund. The loan was collateralized with assets estimated to be worth '                      3y the end of June 2007, asset sales had reduced the amount loaned to the fund down to
                                                                                    'el

Although the BSAM investors may have benefited to some extent from increases in the value of the collateral, Bear Stearns bore all risks associated with the downside. Since Bear Stearns bore all downside risks, sound risk management (consistent with Basel II) requires that the impact on Bear Stearns' capital associated with these repos should have been at least as great as the impact Bear Stearns would incur if it held the assets in its own trading book at the end of June 2007.

According to the OIG expert, a stressed repo is conceptually similar to a portfolio with a call option written against it, where the portfolio is the repo collateral and the call option is the upside gains to the stressed counterparty. Such a stressed repo is worth less than the portfolio itself, since the call option might have some value. In addition, the value of this stressed repo should have reflected the possibility that Bear Stearns might not benefit fully from potential upside gains in the value of the collateral. Furthermore, to the extent that the collateral was illiquid and would take time to liquidate, Bear Stearns should have valued the collateral conservatively, reflecting appropriate valuation adjustments.

---

[150] Soi

This arrangement is similar to a portfolio with a call option written against it.

The OIG expert did not find any evidence suggesting that TM exerted influence on Bear Stearns to take significantly larger capital charges in conjunction with the BSAM financing than would have been appropriate if the repo were not stressed. For instance, a

TM staff could have used much tougher language to describe (to senior TM management) the very risky situation in which Bear Stearns had put itself and exerted influence over Bear Stearns accordingly. For example, TM staff could have stated that Bear Stearns' financing of the High Grade fund appeared to have allowed Bear Stearns to delay taking a huge hit to its capital, as required by Basel II.

Bear Stearns' financing of the BSAM funds is conceptually similar to implicit support. According to Basel II, "Implicit support arises when a bank provides support to a securitization in excess of its predetermined contractual obligation."[155] Although the BSAM funds are not themselves, literal securitizations, the funds invested in securitizations, and Bear Stearns' financing of the BSAM funds is a form of support in excess of Bear Stearns' contractual obligations to the funds. The repo structure created the potential for Bear Stearns to overstate the amount of risk borne by BSAM and understate its own exposure; as a result, Bear Stearns' capital calculation would understate its true risk.[156] Basel II also requires that "When a bank has been found to provide implicit support to a securitization, it will be required to hold capital against all of the underlying exposures associated with the structure as if they had not been securitized."[157] In the opinion of the OIG expert, it would have been appropriate

for TM to have treated the BSAM financing in a manner parallel to the way in which Basel II mandates that implicit support be treated.

In fact, Bear Stearns eventually acquired much of the remaining portfolio and wrote its value down by :

**Recommendation 10:**
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

## Tolerance for Risk

TM's oversight of the CSE firms did not include assessing the risk tolerance (*e.g.*, concentration of assets) of the CSEs' Boards of Directors and other senior management (*e.g.*, CEO). In fact, TM staff never contacted these individuals about any matters relating to risk tolerance at any of the CSE firms, including Bear Stearns prior to its collapse.

We conclude based on our research that discussing risk management practices and risk tolerance with the CSEs' Boards of Directors is a prudent oversight procedure.[159] This type of assessment would assist TM staff to evaluate governance issues in the CSE firms. For example, in the case of Bear Stearns, an assessment could have been useful when there was evidence that the staff kept increasing the firm's exposure to mortgage securities. TM staff could also assess whether firms are inappropriately increasing leverage to help meet a revenue level that is tied to compensation that is provided to the CSEs' senior officers.[160]

**Recommendation 11:**
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would

---

[159] Sources for this information include:
- *Risk Management and its Implications for Systemic Risk* Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri Director of TM, Commission);
- The Comptroller of the Currency. Liquidity and Funds Management Manual, February 2001, page 27; and
- The Counterparty Risk Management Policy Group. Containing Systemic Risk: The Road to Reform. August 6, 2008, page 18.

enable TM to better assess the effectiveness of the firms' risk management systems.

# Finding 3: TM, Without Explicit Authority, Allowed The CSE Firms' Internal Auditors To Perform Critical Work

> TM, without explicit authority, allowed the firms' internal auditors to perform critical work involving the risk management control systems. As a result, there are significant questions as to whether the work that TM relied upon in fulfilling its oversight role was as thorough or meaningful as the Commission intended in approving the rule amendments.

The CSE firms are required by the rule amendments which created the CSE program (see 17 CFR §240.15c3-1g(b)(1)(iii)(B)) to have their external auditors report[161] on the firms' risk management control systems. This review is critical because TM designed the CSE program to focus on a firm's risk management systems (*e.g.*, internal controls, models) and their financial condition (*e.g.*, compliance with capital and liquidity requirements), which was to be the focus of the external auditors' work. However, after the Commission approved the rule, TM decided that the firms' internal auditors could perform this critical work, instead of the external auditors.

We reviewed the delegations of authority from the Commission to TM and found no explicit authority for TM to approve this change. In addition to the apparent lack of TM's legal authority, there are serious questions about the wisdom of this decision. The rule's requirement that external auditors perform the risk management work helps to ensure the independence and quality of this critical audit work. The external auditors' work is more strictly regulated as the Public Company Accounting Oversight Board (PCAOB) regulates external auditors.[162]

---

[161] The report is referred to in the rule as the "Accountant's Report on Internal Risk Management Control System."

[162] The Sarbanes-Oxley Act of 2002 (SOX), Public Law No. 107-204, was enacted in July 2002 in response to numerous financial statement accounting scandals involving public companies (*e.g.*, Enron and WorldCom) and their auditors (*e.g.*, Arthur Andersen). Among other reforms, SOX established the Public Company Accounting Oversight Board (PCAOB) as a nonprofit corporation. The PCAOB's statutory mission is "to oversee the audits of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors." (Section 101(a) of SOX, 15 U.S.C §7211(a)). SOX requires that accounting firms be registered with the PCAOB, if they "prepare or issue, or participate in the preparation or issuance of, any audit report with respect to any issuer" as defined in Section 3 of the Securities Exchange Act of 1934.

As a result of TM's decision to allow CSE firm's internal auditors to perform the work, there are significant questions as to whether this work that TM relied upon was as thorough or meaningful as the Commission intended in approving the rule.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[164] for this deviation from the current rule's requirement.

# Finding 4:  TM Did Not Review The Communications Strategy Component Of Bear Stearns' Contingency Funding Plan After The Collapse Of Two Of Its Managed Hedge Funds

TM did not review the communications strategy component of Bear Stearns' Contingency Funding Plan (CFP) after two of its managed hedge funds collapsed in June 2007.  Questions regarding Bear Stearns' effectiveness in communicating with its investors and the public were raised after the collapse of its hedge funds and again after the firm collapsed in March 2008.

---

[163] Given the scope of our audit, we have no evidence linking these "significant deficiencies" with the cause of Bear Stearns' collapse.

[164] The Administrative Procedures Act (5 U.S.C. §500 *et. seq.,*) sets forth the basic procedural requirements for agency rulemaking.  It generally requires (1) publication of a notice of proposed rulemaking in the *Federal Register,* (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

TM reviewed Bear Stearns' CFP during its application process. The review included an assessment of its internal and external communications strategies. According to TM:

> The goal of the contingency funding plan is to manage liquidity risk and communicate effectively with creditors, investors, and customers during a funding crisis.[165]

In June 2007, two of Bear Stearns' managed hedge funds collapsed. After the collapse, questions were raised about the lack of involvement by some of Bear Stearns senior management in handling the crisis. For instance, according to media reports, at an August conference call with investors, the conduct of a senior Bear Stearns official (*i.e.*, their lack of involvement in the telephone call) did not apparently help to restore confidence in the firm (which was the purpose of the meeting).

TM did not reassess the communication strategy component of Bear Stearns' CFP after the collapse of its hedge funds. Although there was contact between TM and Bear Stearns (about many issues) after the June 2007 collapse of its hedge funds, at no point did TM discuss Bear Stearns' communication strategy. This proved particularly problematic as questions were once again raised about some of Bear Stearns' management[166] regarding its handling of the crisis during the week of March 10, 2008.

Conversely, some individuals praised Lehman Brothers Holdings Inc. (Lehman Brothers) management for its handling of a crisis it previously experienced (*e.g.*, Lehman Brothers provided talking points to its traders to use with its trading partners). In fact, some of these individuals credited Lehman Brothers' management with helping to save the firm during/around the week of March 10, 2008, when Bear Stearns collapsed.[167]

It is undisputed that a firm's communication strategy can affect confidence levels in the firm. Bear Stearns' collapse illustrated the importance of confidence for an investment bank's survival.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

---

[165] ⌐

[166] We did not asses the performance of Bear Stearns' management during the collapse of the hedge funds or Bear Stearns.

[167] While Bear Stearns collapsed in March 2008, concerns about Lehman Brothers' survival began to circulate and on September 15, 2008, Lehman Brothers announced that it would file for bankruptcy.

# Finding 5: TM's Monitoring Staff Do Not Adequately Track Material Issues

TM's monitoring staff identify numerous issues involving internal risk management systems (*e.g.*, the adequacy of CSE staffing levels in various departments, the functioning of the internal audit office, and the adequacy of documented policies and procedures) which require action by the CSEs and a resolution. However, TM does not adequately track the issues.

## Develop a Formal Automated Tracking Process

TM's monitoring staff does not have a formal process (*e.g.*, automated) to track material issues to ensure that they are adequately resolved. The monitoring staff mainly identify issues through meetings with CSE firm staff. Currently, TM staff document some issues (*e.g.*, the adequacy of the CSE staff levels in various departments, the functioning of the internal audit office and the adequacy of documented policies and procedures) in e-mails and organizes them by firm while other issues are documented in monthly memoranda to senior management (*e.g.*, the Division Director).[168]

However, these current methods are not reliable and do not provide an audit trail. Our review of TM's documentation supports this assertion because we assessed twenty issues[169] that TM and OCIE identified with the CSE firms and we asked TM to explain how the issues were resolved. In some instances, the staff needed to perform detailed research in order to determine how the issues were eventually resolved. For example, OCIE staff found that Bear Stearns' Legal & Compliance group did not have any formal documentation that identified and assessed all of the applicable rules, laws, regulations, requirements and risks pertaining to the entire organization. TM could not readily tell us how and whether this issue was resolved. The follow-up of issues that OCIE identified is further discussed on page 38.

In a somewhat similar recent situation, the Government Accountability Office (GAO) criticized OCIE for its informal method of tracking recommendations regarding its Self Regulatory Organization (SRO) inspections. GAO stated:

> OCIE's informal methods for tracking inspection recommendations contrast with the expectations set by federal internal control standards for ensuring that management has relevant, reliable, and

---

168

169 As discussed in the Scope and Methodology Section (see Appendix III).

timely information regarding key agency activities. These standards state that key information on agency operations should be recorded and communicated to management and others within the entity and within a time frame that enables management to carry out its internal control and other responsibilities. [170]

Given all the facts discussed above, TM cannot provide reasonable assurance (consistent with internal control standards) that issues are adequately resolved. Furthermore, we believe that the risk of an issue being overlooked (*i.e.*, not adequately resolved by a firm) increases if, the CSE program receives additional staff (as requested by Chairman Cox) because presumably more issues will be identified and require resolution.

## Recommendation 14:

The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;
- When the issue was identified;
- Who identified the issue;
- The current status of the issue (*e.g.*, new developments);
- When the issue was resolved; and
- How the issue was resolved.

## Follow-Up on Prior OCIE Findings

In March 2007, Chairman Cox decided to transfer inspection responsibility from OCIE to TM (responsibility was transferred to TM in March 2007 for four of the five firms, and for the last firm (Morgan Stanley) following the completion of the ongoing OCIE exam of that firm in September 2007). Thus consolidating the oversight of the CSEs at the holding company level within TM.[171]  OCIE continues to perform inspections of the CSEs' broker-dealers.

---

[170] Source: GAO. Securities and Exchange Commission: Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, Report 08-33, November 15, 2007.

[171] The transfer was in response to a GAO audit report (Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-

. TM stated that after Chairman Cox
transferred the inspection authority from OCIE to TM,          not to follow-up
on issues that OCIE identified because they did not view the OCIE issues as
material and they assumed that these issues were OCIE's responsibility. OCIE
stated that they did not follow-up (*i.e.,* conduct a new inspection) on the issues
because it was no longer their responsibility once Chairman Cox transferred the
inspections authority to TM.[172] Although TM stated that it had communicated with
Bear Stearns about resolving this issue,
Bear Stearns' assertions that it had addressed this issue. Further, OCIE

As discussed in the Scope and Methodology section in Appendix IV, we
performed testing on TM's tracking of material issues. Our testing found
instances where TM's monitoring staff failed to ensure that issues identified by
OCIE were adequately resolved.

---

154, March 15, 2007) recommendation. In response to the report Chairman Cox told GAO: "To
implement this recommendation, I have carefully considered the question of which organizational
structure will best achieve the goal of the CSE program. I have concluded that the success of the CSE
program will be best ensured if the supervision of the CSE firms is fully integrated with, rather than
merely coordinated with, the detailed onsite testing that is done of the documented controls at CSE
firms. As a result, I have decided to transfer responsibility for on-site testing of the CSE holding
company controls to the Division of Market Regulation [now called TM]. This will better align the testing
and supervision components of the CSE program, will strengthen its prudential character, and will most
efficiently utilize the Commission's resources. With the new structure, ongoing supervision activities will
be more directly informed by the results of focused testing of controls, and field inspections will be more
precisely targeted using information from ongoing supervisory work. In addition, the Commission's
expertise related to the prudential supervision of securities firms will be concentrated in the Division of
Market Regulation, which will foster improved communication and coordination among the staff
responsible for administering various components of the CSE program." The Chairman made his
decision after carefully evaluating proposals from TM and OCIE, and after consulting with the four other
Commissioners, who unanimously supported the decision to consolidate CSE oversight under TM.

[172] After the Orders allowing the firms to use the alternative capital method were issued (from December
2004 to November 2005), OCIE retained the inspection authority until March 2007 for all the firms except
Morgan Stanley, which OCIE retained until September 2007, allowing OCIE to complete its inspection.

[173] These issues were identified in a memorandum from OCIE to TM dated November 4, 2005.

~~~~ ~~~~~~ ~~~ ~~~~~~,                                    The OIG expert found
similar problems with Bear Stearns' VaR models, which raised serious questions
about TM's oversight of Bear Stearns.

As a result, it is possible that other issues identified by OCIE were significant and
were not adequately followed up on by TM.

**Recommendation 15:**
The Division of Trading and Markets should: (1) reassess all the prior Office of
Compliance Inspections and Examinations (OCIE) issues to ensure that no
significant issues are unresolved (given the belief that OCIE followed up); and (2)
follow up on all significant issues.

# Finding 6:  The Commission's Orders Allowing Firms (Including Bear Stearns) To Use The Alternative Capital Method Were Generally Approved Before The Inspection Process Was Completed

> The Commission approved firms to use the alternative capital
> method before OCIE completed its inspection process.

OCIE's and TM's inspections of firms are a significant part of the application
process, and are supposed to be completed prior to a firm's approval as a
CSE.[174]  The purpose of an inspection is to verify the information provided by the
firm and to "assess the adequacy of the implementation of the firm's internal risk
management policies and procedures."[175]  However, four of five Commission
Orders approving the firms (those without principal regulators) to use the
alternative capital method were issued by the Commission before the inspection
process was completed, thereby rendering the application process less
meaningful.[176]  TM acknowledged that they were aware that OCIE did not
complete the inspection process prior to the Commission's approval.  Yet, TM
recommended to the Commission
                              : without first completely verifying the information it was

---

[174] As a result of the organizational change at the Commission, OCIE would no longer be involved in the
   application inspection.
[175] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June
   2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.
[176] Other than the inspection performed during Bear Stearns' application process, neither TM nor OCIE
   performed any additional inspections of Bear Stearns involving firm-wide issues (e.g., risk management)
   prior to its collapse. However, this does not include any inspections (e.g., financial and operational) that
   FINRA performed of Bear Stearns' broker-dealers.

supposed to be relying upon and without ensuring that the firms had adequately implemented internal risk management policies and procedures.

Specifically, we found that:

- In     instances, the Commission approved the Order before OCIE sent the firms a formal letter (*i.e.,* the deficiency letter) describing the issues that were identified during the inspection. Bear Stearns was one of these firms. In fact, as previously discussed in Finding 5, during Bear Stearns' inspection, OCIE identified a significant issue involving Bear Stearns not retaining internal audit workpapers. In fact, according to an internal memorandum, TM and OCIE both agreed that they must reach an agreement with Bear Stearns on this issue prior to the approval of its CSE application. While TM believes that Bear Stearns implemented corrective action, TM never verified Bear Stearns' assertions that it had resolved this issue, as TM did not follow up on many of the OCIE issues.

- In two instances, the Commission approved the Order before the firms responded to the deficiency letter.

TM indicated that they discussed the issues orally with the firms and were comfortable with their responses and, as a result, recommended that the                      . OCIE stated that it was not involved in this decision process at all.

**Recommendation 16:**
The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

# Finding 7: Collaboration Between TM And Other Commission Divisions/Offices Should Be Significantly Improved

> TM should improve its collaboration with the Division of Corporation Finance (CF), OCIE, and the Office of Risk Assessment (ORA) in order to achieve efficiencies and the overall effectiveness of Commission operations.

## Collaboration with CF

The CF staff who review company filings (*e.g.,* Form 10-K) are assigned to Industry Groups within CF. CF assigns firms to a particular group based on their

Standardized Industrial Classification code.[177] Periodically, CF management reassigns firms to adjust the staff's workload. During the past two years, CF twice transferred the CSE firms to different Industry Groups.

CF staff stated that they received a briefing from TM regarding how the CSE program operates. However, according to CF, TM did not provide any specifics regarding the information that the CSE program obtains from the CSE firms.

We believe that the information that TM obtains could substantially improve CF's filing review process. For instance, CF could evaluate whether the information in the filing (e.g., mark to market accounting, VaR models, funding sources) is consistent with TM's information. Furthermore, as a result of Bear Stearns' collapse, CSE firms are now required to disclose additional information regarding capital and liquidity. Also, Basel's Pillar 3 standard (when implemented) will require additional disclosures regarding capital, risk exposures, and risk assessment. TM stated that the CSE firms would incorporate all of these new disclosures mainly into their CF filings. These additional disclosures will, therefore, increase the need for collaboration between TM and CF. .

Our audit found that CF could not opine on the potential usefulness of TM's information on the filing review process since they are not aware of the information that TM receives on the CSE firms. The effectiveness of CF's filing review is potentially diminished because CF is not incorporating TM's information on the CSEs into its review process.

### Recommendation 17:

The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

## Collaboration with OCIE

GAO found that TM and OCIE should improve communication (e.g., information sharing) between their offices.[178] Although TM and OCIE informed GAO during its audit in 2007, that they were working on an agreement to improve communication, they never finalized the agreement.

In March 2007, Chairman Cox decided to transfer inspection responsibility from OCIE to TM (responsibility was transferred to TM in March 2007 for four of the

---

[177] "The Standard Industrial Classification was created by the United States government as a means of classifying industries by the use of a 4-digit coding system to collect economic data on businesses." (Source:

http://www.business.com/directory/management/strategic_planning/business_information/industry_resea ch/classification_systems/standard_industrial_classification_sic/.

[178] Source: GAO. Financial Market Regulation, Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report No. 07-154. March 15, 2007.

five firms, and for the last firm (Morgan Stanley) following the completion of the ongoing OCIE exam of that firm in September 2007). However, despite this organizational change, TM and OCIE could still improve their collaboration involving the broker-dealers of the CSE firms. OCIE stated that TM does not provide it access to information that TM obtains from meetings with CSE staff, filings submitted by the CSE firms, and other sources of information. OCIE stated that all of this information could improve their risk-based broker-dealer inspections. A senior staff official at a CSE firm stated there is no coordination between TM and OCIE and this creates a challenge. OCIE stated that it believes that it would still be useful to finalize the agreement to improve collaboration and TM has not identified any substantive reasons to oppose finalizing the agreement.

### Recommendation 18:

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (e.g., discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

## Collaboration with ORA

The missions of ORA and the CSE programs' have certain similarities. ORA's mission includes identifying emerging issues and market risks[179] while the CSE's program mission states that its purpose is to:

> ... allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[180] [Emphasis added]

We believe that a formal understanding between ORA and TM would increase the likelihood that ORA achieves its mission while potentially minimizing duplicative efforts in identifying and analyzing risks.

### Recommendation 19:

The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These

---

[179] Source: Jonathan Sokobin Named Director of SEC's Office of Risk Assessment. Commission. 28 February 2008. <http://www.sec.gov/news/press/2008/2008-24.htm>.

[180] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007.
<http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

# Finding 8:  CF's Filing Review Of Bear Stearns' 2006 10-K Was Not Timely

CF is responsible for reviewing filings of all public reporting companies, such as Bear Stearns. However, CF's review of Bear Stearns' 2006 10-K was not timely.

## Review of Bear Stearns' 10-K Filing

There are significant issues regarding CF's review of Bear Stearns' 2006 10-K filing dated November 30, 2006. The filing review emphasized Bear Stearns' disclosures involving its exposure to subprime mortgage securities.[181]

Bear Stearns submitted its 2006 10-K filing to the Commission on February 13, 2007. The CF staff accountant completed the initial review of Bear Stearns' 2006 10-K filing on      :            ', approximately       months after Bear Stearns submitted the filing. Another CF staff accountant completed a second level review on September 27, 2007, nearly      months after the initial review.  CF could not provide a specific reason as to why the second reviewer did not perform the review in a timely manner.

CF sent a comment letter[182] to Bear Stearns on September 27, 2007, which, among other things, requested additional information on Bear Stearns' exposure to subprime mortgage securities. Thus, it took CF nearly 7½ months, after Bear Stearns' initial filing, to send a letter to Bear Stearns requesting additional information.

CF's policy is to send a comment letter to a firm prior to the firm's next fiscal year-end. In the case of Bear Stearns, its next fiscal year-end was November 30, 2007 and the Commission received its 2007 10-K on February 13, 2007. According to CF's policy, CF needed to provide Bear Stearns with a comment letter before November 30, 2007.[183] In this way, the firm would have an opportunity to incorporate appropriate changes into its next year's 10-K filing. However, other than this policy, CF does not have any internal guidelines regarding timeframes within which to review filings and issue comment letters.[184]

---

[181] CF staff performed a targeted review that focused on subprime mortgage exposure and revenue recognition.

[182] The staff provide firms with a written memorandum (i.e., a "comment letter") describing the staff's filing review comments.

[183] In this instance, CF met its policy of issuing a comment letter prior to Bear Stearns' fiscal year end.

[184] The Sarbanes Oxley Act of 2002 also requires CF to review each public reporting company at least one

We believe that a five-month timeframe to complete a second review coupled with a total time of 7½ months to send a comment letter to Bear Stearns was simply unacceptable in this particular instance, because this filing review focused on the material issue of subprime mortgage securities (which was adversely affecting the securities industry worldwide).

Bear Stearns' response letter (coupled with CF's comment letter) contained material information that investors could have used to make well-informed investment decisions.[185] For example, Bear Stearns' response letter described its criteria for classifying loans as sub-prime, information about its risk management philosophy, how it defines non-performing loans and a quantification of its investments in securities backed by subprime mortgages. The OIG expert believes that all of these criteria would have been helpful to investors.[186]

We did not perform audit work to determine CF's timeliness in reviewing 10-K filings in general. Despite the lack of information about other filings, based upon CF's review of Bear Stearns' 10-K filing, we believe that the filing review process lacks the appropriate internal controls (i.e., timeframes for conducting second level reviews) to ensure timely reviews.

### Recommendation 20:
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

## Bear Stearns' Response to CF's Comment Letter

Pursuant to CF policy, firms are supposed to reply within 10 business days to CF comment letters. Thus, Bear Stearns' reply was due on October 12, 2007. Prior to this due date, Bear Stearns asked CF (in writing) and received an extension until early November 2007 to file its response. However, Bear Stearns did not respond by this new due date. Bear Stearns then orally asked for and received additional extensions. Bear Stearns finally submitted its comments to CF on January 31, 2008, nearly 3½ months after the initial due date.[187]

---

time every three years.

[185] This information was especially material given that Bear Stearns' stock price went from a one-year closing price high of $158 (April 25, 2007) to a closing price high of $77 the week before March 10, 2008. The final price was $10, the sale price that JP Morgan paid.

[186] CF does not consider its public comment letters and firms' response letters as a means of disseminating (i.e., disclosure) information about public companies. Rather, CF believes that changes to a firm's filings, as a result of CF's comment letters, should be the primary disclosure method. In fact, CF does not post its public comment letters and a firm's response letters to the public site of EDGAR until an issue has been fully resolved.

[187] Two other CSE firms did not respond in a timely manner to comments on their 2006 10-K filings. These filing reviews also emphasized subprime mortgages.

As a result of Bear Stearns' delays, the CF staff accountant did not complete the initial review of Bear Stearns' response until March 4, 2008 and the second reviewer did not complete her review until April 2, 2008, by which time Bear Stearns had already collapsed.

It is our understanding that Bear Stearns' delay in responding to the comment letter was not a unique situation and CF routinely grants extensions to firms to address CF's comment letters. Further, CF informed us that it only requests a firm to contact CF within 10 days of receiving a comment letter and does not require a substantive response to the issues within the 10-day timeframe. Thus, while CF imposes a timeframe for a firm to contact CF, CF does not have a policy prescribing when firms are expected to respond to the issues raised in CF's comment letters.

While there are several consequences that may be imposed on a firm for not responding timely (e.g., the firm may be required to make additional disclosures in future filings regarding the outstanding staff comments or the staff may refer the matter to the Commission's Division of Enforcement for investigation), in the case of Bear Stearns, none of these consequences occurred. Furthermore, by granting repeated extensions, the filing review was rendered less meaningful since the staff completed the filing review after Bear Stearns collapsed. As a result, we believe that investors could have used this material information to make well-informed investment decisions. In addition, the information (e.g., Bear Stearns' exposure to subprime mortgage securities) could have potentially been beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

# Finding 9: Certain Firms May Pose A Systemic Risk Because They Are Not Supervised On A Consolidated Basis

> Certain firms may pose a systemic risk because neither the Commission nor any other regulator currently supervises them on a consolidated basis.

Several large firms, other than the CSEs, have many customer accounts, hold large amounts of customer funds, and have unregulated affiliates. The broker-dealer affiliates of these firms are subject to the Risk Assessment program, but neither the Commission nor any other regulator supervises these firms on a

consolidated basis.[188] In most cases, these firms would be ineligible to apply for group-wide supervision under the CSE program. In some cases, these firms could voluntarily elect to be supervised under the Commission's CSE program or under the statutory supervision regime created by Gramm-Leach-Bliley Act,[189] but these firms are not required to elect this supervision.

Several firms both inside and outside the CSE program collapsed or otherwise experienced serious financial difficulties between March and September 2008.[190] As a result, we believe that if one of these other (non-CSE) firms failed or experienced another significant problem, the broader financial system could be adversely affected, thus impacting the Commission's mission of maintaining fair, orderly, and efficient markets. We did not perform an in-depth assessment of the risks that these firms present or the costs/benefits of supervising these firms on a consolidated basis because of resource constraints. However, we believe that in light of the impact of Bear Stearns collapse, it would behoove the Commission to perform such an analysis.

## Recommendation 22:

Chairman Cox should create a Task Force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

---

[188] Some of the firms are also subject to the Investment Advisers Act of 1940 and the Investment Company Act of 1940. As a result, OCIE is responsible for inspecting these firms and the Division of Investment Management is responsible for the regulations.

[189] "The Gramm-Leach-Bliley Act of 1999 ("Act") will significantly impact the financial services industry. By repealing provisions of the Glass-Steagall Act, the Act facilitates affiliations between banks, securities firms, and insurance companies."
Source: Banking Information: Overview of the Gramm-Leach-Bliley Act. Federal Reserve Bank of San Francisco. < http://www.frbsf.org/publications/banking/gramm/grammpg1.html>.

[190] Between March and September 2008, Bear Stearns, Lehman Brothers, Merrill Lynch, mortgage originators Fannie Mae and Freddie Mac and the American International Group, Inc., all experienced major financial difficulties and collapsed, filed for bankruptcy, or were purchased or taken over by another entity.

# Finding 10: TM Should Address Organizational Issues Involving The Future Of The CSE Program

We identified several organizational issues involving the future of the CSE Program, which could significantly improve the CSE program.

## Changes to the CSE Program

Due to the collapse of Bear Stearns in March 2008, the bankruptcy filing by Lehman Brothers, the purchase of Merrill Lynch by Bank of America, the planned change in status to bank holding companies for Goldman Sachs and Morgan Stanley, [191] and the changing economic environment, the future of the CSE program is uncertain.

Since the collapse of Bear Stearns, several aspects of the CSE program's oversight activities have changed and other changes are being contemplated, as follows:

- The CSE program staff now closely scrutinize the secured funding activities of each CSE firm, with a view to lengthening the average term of secured and unsecured funding arrangements;

- The CSE program staff now obtain more funding and liquidity information for all CSEs;

- TM is in the process of establishing additional scenarios that entail a substantial loss of secured funding. The scenario analyses help TM to determine whether firms could survive in a stressed environment;

- TM is discussing with CSE senior management their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets.

- The Commission plans to request legislative authority to regulate the CSEs at the holding company level as well as the authority to require compliance. Currently, participation in the CSE program is voluntary. TM claims that the voluntary nature of the program does not capture all systemically important broker-dealer holding companies, as companies may not opt for such supervision. Additionally, the ability of a holding company to opt out of supervision creates tension when the Commission wishes to impose more rigorous requirements or mandate CSEs to address specific concerns, according to TM;

---

[191] On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies.

- Chairman Cox has discussed the CSEs programs' need to have systems in place to systematically unwind or liquidate a failing institution at the holding company level. Currently, regulators are only permitted to intervene in the liquidation of a holding company's subsidiaries, such as broker-dealers and banks.

   According to TM, intervention at the holding company level would allow the Commission to operate a failing institution for a limited period of time and would protect the institution's customers and counterparties. Such holding companies typically have substantial activities outside its U.S. bank or broker-dealer. TM believes that the Commission's lack of authority to intervene at the holding company level could lead to massive liquidations of collateral by counterparties to unregulated or non-U.S. regulated affiliates, which in turn, could cause market dislocations and put severe stress on other systemically important financial institutions; and

- The Commission has contemplated ways to improve the efficient and orderly operation of the tri-party repo market. Financial institutions rely on the repo market to finance proprietary and customer positions. If a repo clearing entity is unable to conduct business in an orderly manner, or if a major firm does not have ready access to the repo market, it could have systemic effects on a large number of financial institutions. Bear Stearns was not able to access the repo market on normal business terms, which, according to some accounts, led to its demise.

Changes to the program will require Chairman Cox, Congress, and TM to re-evaluate the needs and priorities of the CSE program.

## Recommendation 23:
The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

## Program Staffing

The CSE program consists of a small number of staff, several of whom have worked in the CSE program since its inception in 2004. The Office of CSE Inspections currently has only two staff in Washington, DC and five staff in the New York regional office. It also does not currently have an Assistant Director (i.e., an office head).

In March 2007, Chairman Cox decided to transfer inspection responsibility from OCIE to TM (responsibility was transferred to TM in March 2007 for four of the five firms, and for the last firm (Morgan Stanley) following the completion of the ongoing OCIE exam of that firm in September 2007). However, as of mid-September 2008, TM staff had not completed any inspections in the 18 months

since the Chairman's decision in March 2007. Three inspections are in varying stages of completion. These inspections act to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures".[192] No milestones are in place to ensure that inspections are completed in a timely manner.

Furthermore, staff at the CSE firms informed the OIG that the inspections information would be useful to them, especially because it would provide the CSEs with information regarding best practices and where the firms stand in relation to each other. It is imperative to receive this information timely to ensure that the information does not become outdated.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward. TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

## Ethics Manual

In 1997, OCIE developed an ethics manual for its Inspection staff because it wanted to formalize standards of behavior and ensure that inspections are conducted in a fair and impartial manner. This manual has been revised and expanded several times since 1997. We believe that a similar manual would be beneficial for TM's monitoring and inspection staff given their close working relationship with the CSE staff.

**Recommendation 25:**
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

## Coordination with Other Regulators

The CSE program staff are increasingly working with the Federal Reserve and other Federal regulators in its administration of the CSE program. Increased coordination with the Federal Reserve is particularly important because the Federal Reserve, unlike the Commission, is in a position to provide emergency funding to distressed firms. Improved communication and information sharing among Federal regulators should also reduce overlaps and alleviate the firms' need to produce duplicative information for each entity. The memorandum of understanding that the Commission and the Federal Reserve entered into in July 2008 is a positive step.

---

[192] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

Additionally, we believe that the CSE program staff will need to further recognize the interconnectedness between securities firms and banks. A general perception, as communicated by a staff member at a CSE firm, is that if a broker-dealer fails, the Commission seems to worry only about customer assets, and if a bank fails, the Federal Reserve seems to worry only about depositors' accounts. Neither regulator appears to focus on systemic risk, nor how the interconnectivity among securities firms and banks affects the overall landscape.

**Recommendation 26:**
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators

# Acronyms

| | |
|---|---|
| BDRA | Broker-Dealer Risk Assessment |
| Bear Stearns | The Bear Stearns Companies, Inc. |
| BSAM | Bear Stearns Asset Management |
| CF | Division of Corporation Finance |
| CFP | Contingency Funding Plan |
| Commission | Securities and Exchange Commission |
| CSE | Consolidated Supervised Entity |
| EU | European Union |
| FINRA | Financial Industry Regulatory Authority |
| Federal Reserve | Board of Governors of the Federal Reserve System |
| FRBNY | Federal Reserve Bank of New York |
| GAO | Government Accountability Office |
| JP Morgan | JP Morgan Chase & Co |
| Lehman Brothers | Lehman Brothers Holdings Inc. |
| LTCM | Long-Term Capital Management |
| Merrill Lynch | Merrill Lynch & Co |
| MOU | Memorandum of Understanding |
| OCIE | Office of Compliance Inspections and Examinations |
| OIG | Office of Inspector General |
| ORA | Office of Risk Assessment |

| OTS | Office of Thrift Supervision |
| PCAOB | Public Company Accounting Oversight Board |
| PWG | President's Working Group |
| Repo | Repurchase Agreements |
| SOX | Sarbanes-Oxley Act of 2002 |
| SRO | Self Regulatory Organizations |
| TM | Division of Trading and Markets |
| U.S. | United States |
| VaR | Value at Risk |

# Congressional Audit Request

## United States Senate
COMMITTEE ON FINANCE
WASHINGTON, DC 20510-6200

April 2, 2008

Via Electronic Transmission

The Honorable David Kotz
Inspector General
US Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-2736

Dear Inspector General Kotz:

According to regulatory filings and a December 2007 *Wall Street Journal* article, the SEC Enforcement Division declined to bring a case against Bear Stearns for improperly valuing mortgage-related investments. Given the later collapse and federally backed bail-out of Bear Stearns, Congress needs to understand more about this case and why the SEC ultimately sought no enforcement action.

Moreover, I am particularly interested in this case in light of the SEC's failed investigation of Pequot Capital Management. As you know, in the final report of the Senate's inquiry into that matter, we found that senior SEC officials showed extraordinary deference to a particular witness because of his "prominence" as the head of Morgan Stanley.

### Request for Investigation

In light of my earlier investigation I need to know whether the same problems identified in the Pequot investigation were repeated in the Bear Stearns case. Accordingly, I request that you conduct a thorough investigation into the facts and circumstances surrounding the decision to not pursue an enforcement action against Bear Stearns. Please provide a final report on whether there was any improper action or misconduct relating to SEC investigation of Bear Stearns and its decision to close the investigation. The report should also describe and assess:

1. the nature, extent, and propriety of communications between Bear Stearns executives or their representatives and senior SEC officials;

2. the decision-making process which led to the SEC's failure to bring an enforcement action following the drafting of a Wells notice;

3. the reasons for declining to proceed with an enforcement action; and

4. the degree to which more aggressive action by the Enforcement Division may have led to an earlier and more complete understanding of the issues that contributed to the collapse of Bear Stearns.

### Request for Audit

In addition to this investigative request, I would also like your office to follow-up on previous audit work relevant to issues surrounding Bear Stearns. The Division of Trading and Markets (Division) is responsible for regulating the largest broker-dealers and the associated holding companies. Offices within the Division are staffed with accountants and economists who are responsible for reviewing the market and credit-risk exposures of the broker dealers. Their review includes assessing broker-dealers' quarterly financial filings, ensuring broker-dealers are meeting net-capital requirements and that other financial ratios, such as liquidity ratios, are adequate. There is a special emphasis in reviewing the five very large broker-dealers, including Bear Stearns, known as the Consolidated Supervised Entity (CSE) Program. The Division staff exercises additional oversight of these firms and examines their risk models.

I understand that the OIG conducted a prior audit of these responsibilities in 2002. Please provide an update of the previous findings, determine whether earlier recommendations were implemented, and analyze the current function of these offices. The review should include a description and assessment of their missions, how the programs are run, their policies and procedures, the adequacy of any reviews conducted regarding Bear Stearns, and recommendations for improvements in the process.

If you have any questions about these requests, please contact Jason Foster or Emilia DiSanto at (202) 225-4515.

Sincerely,

Charles E. Grassley
Ranking Member

# Curriculum Vitae (Albert "Pete" Kyle)

CURRICULUM VITAE
Albert S. "Pete" Kyle

Date: February 25, 2007
Current Position: Charles E. Smith Professor of Finance, Robert H. Smith School of Business
Business Address: University of Maryland, 4433 Van Munching Hall, College Park, MD 20742
Business Phone: 301-405-9684 (UMD voice), 301-314-5828 (UMD fax)
E-Mail: akyle@rhsmith.umd.edu

## EDUCATION

- University of Chicago, 1977-1979, 1980-1981. Ph.D., Economics, 1981.
  Dissertation: "An Equilibrium Model of Speculation and Hedging."
  Advisors: José Scheinkman (chair), Robert E. Lucas, Lester Telser.
- Nuffield College, Oxford University, 1976-1977. Field: Economics. Advisor: James Mirrlees.
  Met all requirements for B.Phil. degree (now called M.Phil.) except two-year residency requirement.
- Merton College, Oxford University, 1974-1976. B.A. Math and Philosophy, 2ⁿᵈ class honors, 1976.
- Davidson College, 1970-1974. B.S. Mathematics, summa cum laude.

## CAREER

- Charles E. Smith Professor of Finance (with tenure), Robert H. Smith School of Business, University of Maryland, August 2006 to Present
- Professor of Finance and Economics (with tenure), Duke University, Fuqua School of Business and Department of Economics, January 2002 - 2006 (appointment predominantly in Fuqua School of Business)
- American Standard Visiting Professor, Said Business School, Oxford University (St. Edmund Hall), June 2004, June 2005, June 2006.
- Visiting Scholar, Princeton University, Department of Economics, Fall 2004 (while on sabbatical leave from Duke University).
- Consultant, Morgan-Stanley and Company, December 1996 - December 1998, full time while on unpaid leave from Duke University, Proprietary trading research.
- Associate Professor of Finance (with tenure), Duke University, Fuqua School of Business, July 1992-July 2002 (on unpaid leave for calendar years 1997,1998).
- Associate Professor of Finance (with tenure), University of California at Berkeley, Haas School of Business, July 1990-June 1992.
- Visiting Scholar, Duke University, Fuqua School of Business, September 1991-June 1992 (on sabbatical leave from UC Berkeley Fall 1991).
- Assistant Prof. of Finance, Univ. of California at Berkeley, Haas School of Business, July 1987-June 1990.
- Assistant Prof. of Economics and Public Affairs, Woodrow Wilson School, Princeton University, 1981-87.
- Visiting Fellow, Yale School of Organization and Management, Spring 1984 (on sabbatical leave from Princeton University).
- Visiting Research Fellow, Centre of Policy Studies, Monash University, Australia, Fall 1983 (on sabbatical leave from Princeton University).
- Pit Trading and Risk Management, Goodman-Manaster and Company, Chicago, 1979-1980.
- Staff Economist, Chicago Board of Trade, part-time, 1978-1979.

1

## PUBLICATIONS IN REFERRED JOURNALS

(In co-authored articles, all authors have equal seniority and approximately equal contribution.)

- Avinash K. Dixit and Albert S. Kyle, "The Use of Protection and Subsidies for Entry Promotion and Deterrence," American Economic Review, Vol. 75, No. 1, 1985, pp. 139-152.
- Albert S. Kyle, "Continuous Auctions and Insider Trading," Econometrica 53, 1985, 1335-1355.
- Albert S. Kyle, "Improving the Performance of the Stock Market," California Management Review, 30:4, Summer 1988, 90-114.
- Peter R. Hartley and Albert S. Kyle, "Equilibrium Investment in an Industry with Moderate Investment Economics of Scale," The Economic Journal, 99:896, June 1989, 392-407,
- Peter R. Hartley and Albert S. Kyle, "Real Rates and Home Goods: A Two Period Model," The Economic Record, 64:186, September 1988, 168-177.
- Albert S. Kyle, "Informed Speculation with Imperfect Competition," Review of Economic Studies 56:3, No. 187, July 1989, 317-356.
- Albert S. Kyle and Jean Luc Vila, "Noise Trading and Takeovers," Rand Journal of Economics, Vol. 22, No. 1, Spring 1991, pp. 54-71.
- John Y. Campbell and Albert S. Kyle, "Smart Money, Noise Trading, and Stock Price Behavior," Review of Economic Studies 1993, 60 pp. 1-34.
- Albert S. Kyle and Albert Wang, "Speculation Duopoly with Agreement to Disagree: Can Overconfidence Survive the Market Test?" Journal of Finance, volume LII, number 5, December 1997, pp. 2073-2090.
- Albert S. Kyle and Wei Xiong, "Contagion as a Wealth Effect," Journal of Finance, volume LVI, No. 4, August 2001, pp. 1401-1440.
- Albert S. Kyle, Hui Ou-yang, and Wei Xiong, "Prospect Theory and Liquidation Decisions," Journal of Economic Theory, Elsevier, vol. 127 (1), July 2006, pp. 273-288.

## CHAPTERS IN BOOKS

- Albert S. Kyle, "Imperfect Competition, Market Dynamics, and Regulatory Issues," in Financial Markets and Incomplete Information: Frontiers of Modern Financial Theory: Vol. 2, edited by Sudipto Bhattacharya and George M. Constantinides, Rowman and Litlefield, 1989, 153-161.
- Albert S. Kyle, "A Theory of Futures Market Manipulations," The Industrial Organization of Futures Markets, edited by Ronald W. Anderson. Lexington, Mass., Lexington Books, 1984, pp. 141-173, also reprinted in Paul Weller (editor), The Theory of Futures Markets, Blackwell, 1992 pp. 272-303.

## PUBLICATIONS IN UNREFEREED CONFERENCE VOLUMES

- Albert S. Kyle, "Trading Halts and Price Limits," The Review of Futures Markets, 7:3, 1988, 426-434.
- Albert S. Kyle, "Market Structure, Information, Futures Markets, and Price Formation," in International Agricultural Trade: Advanced Readings in Price Formation, Market Structure, and Price Instability, edited by Gary G. Storey, Andrew Schmitz, and Alexander H. Sarris, Boulder, Westview, 1984, pp. 45-64.
- Albert S. Kyle, "Discussion of 'The Pricing of Oil and Gas: Some Further Results'," (by Merton Miller and Charles Upton), The Journal of Finance, Papers and Proceedings, Vol. 40, No. 3, July 1985, 1018-1020.
- Peter R. Hartley and Albert S. Kyle, "The Economics of Medical Insurance," in Medical Care and Medical Ethics, edited by C.L. Buchanan and E.W. Prior. Winchester, Mass., Allen & Unwin Inc., 1985, pp. 77-104.

2

MISCELLANEOUS PUBLISHED ARTICLES

- Albert S. Kyle and Terry A. Marsh, 'Computers and the Crash: Is Technology the Problem or the Solution?" Institutional Investor Financial Technology Forum 2, June 1988, pp. 6-7.

UNPUBLISHED PAPERS

- Albert S. Kyle, 'A Rational Expectations Model of Equilibrium in Speculative Markets with Imperfect Liquidity and Costly Information,' Thesis seminar and job-market paper, 1980.
- Albert S. Kyle, 'The Efficient Markets Hypothesis and the Supply of Speculative Services,' manuscript, 1982.
- Albert S. Kyle, 'An Equilibrium Model of Speculation and Hedging,' University of Chicago Ph.D. Dissertation (Economics), 1981.
- Peter R. Hartley and Albert S. Kyle, 'Equilibrium in a Model with Lumpy Investment,' manuscript (now subsumed in 'Equilibrium Investment in an Industry with Moderate Investment Economies,' 1983.
- Avinash K. Dixit and Albert S. Kyle, 'On the Use of Trade Restrictions for Entry Promotion and Deterrence,' Economics Discussion Paper No. 56, Woodrow Wilson School, Princeton University, 1983.
- Albert S. Kyle, 'Equilibrium in a Speculative Market with Strategic Informed Trading," (revised as 'Informed Speculation with Imperfect Competition). 1988.
- Albert S. Kyle, 'Informational Efficiency and Liquidity in a Continuous Auction Futures Market,' Centre for the Study of Futures Markets, Columbia Business School, Working Paper Series #CSFM-75, 1984.
- Albert S. Kyle, 'An Explicit Model of Smart Money and Noise Trading,' manuscript (now subsumed in 'Smart Money, Noise Trading, and Stock Price Behavior), 1985.
- Albert S. Kyle, 'An Intuitive Introduction to Agency Theory with Applications to Money Management,' Q-Group Talk, manuscript, April 1989.
- Albert S. Kyle and Ailsa Roell, Comments on Recent Developments and Proposals Concerning Dealing Practices in the UK Equity Market," manuscript, 1989.
- Albert S. Kyle and Terry A. Marsh, 'On the Economics of Securities of Clearing and Settlement,' manuscript, 1993.
- Albert S. Kyle, 'On Incentives to Acquire Private Information with Continuous Trading,' manuscript, 1985,
- Albert S. Kyle, 'Dealer Competition Against an Organized Exchange,' manuscript, June 1987.
- Albert S. Kyle, 'Market Failures and the Regulation of Financial Markets,' manuscript, 1992.
- Gerard Gennotte and Albert S. Kyle, 'Intertemporal Insider Trading with a Smooth Order Flow,' manuscript, 1993.
- Albert S. Kyle and Tao Lin, 'Continuous Speculation with Overconfident Competitors," manuscript, 2002.
- Albert S. Kyle and Tao Lin, 'An Analysis of Excessive Trading Volume with Different Beliefs,' manuscript, 2002.
- Albert S. Kyle and Rujing Meng, "Strategic Acquisitions and Investment in a Duopoly Patent Race under Uncertainty," manuscript, 2003.
- Ming Guo and Albert S. Kyle, "An Intertemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," manuscript, 2004.
- Albert S. Kyle, "A Two-Factor Model of Value and Growth with Adjustment Costs,' manuscript, 2004.
- Alex Boulatov and Albert S. Kyle, "Uniqueness of Equilibrium in the Single-Period Kyle-85 Model," manuscript, 2005.

3

## RESEARCH CONTRACTS AND GRANTS

- Research Consultant, Bell Laboratories, 1982.
- Research Associate, Center for the Study of Futures Markets, Columbia Business School, two months of summer support, 1983.
- Principal Investigator, NSF Grant (Information Science): 'Organized Exchanges, Dealer Markets, and Anonymous Trading,' Princeton University, Two summers of summer support, 1985, 1986.
- Academic Visitor, Federal Reserve Bank, Washington, D.C., June 6-10, 1992.
- Academic Visitor, Federal Reserve Bank, Atlanta, GA, 5 days, 2003.

## FELLOWSHIPS, PRIZES, AND ACADEMIC AWARDS

- Phi Beta Kappa, Davidson College, 1974.
- Honorary Postmastership, Merton College, 1976-1977.
- George Webb Medley Prize in Economics, Merton College, Oxford University, 1976.
- Rhodes Scholarship (Texas), Davidson College, 1974-1977.
- Schwabacher Fellowship, Haas School of Business, 1988-1989.
- Batterymarch Fellowship, 1990-1991.
- NSF Graduate Fellowship, University of Chicago, 1977-1979, 1980-1981.
- Keynote Speaker, Western Finance Association, Park City, Utah, June 25, 2002, "Market Microstructure."
- Keynote Speaker, Twelfth Annual Conference on The Theories and Practices of Securities Markets, National Sun Yat-sen University, Kaohsiung, Taiwan, "Insider Trading and Corporate Governance," December 17,2004.
- Assurant Lecture, Assurant/Georgia Tech International Finance Conference, "Market Microstructure and Rational Expectations: A Primer," April 8, 2005.
- Fellow, Econometric Society, 2002-present.
- Clarendon Lectures in Finance, Oxford University, June 2006.

## PH.D. DISSERTATION ADVISING
(Initial academic placements are tenure track assistant professors or equivalent, unless otherwise indicated.)

Princeton University:

Steve Kealhofer (Chair, 1983), Columbia University Business School; KMV.
George Mailath (Second Reader, 1984), University of Pennsylvania, Department of Economics.
Loretta Mester (1985), Federal Reserve Board, Philadelphia.
Menachem Sternberg (Second Reader, 1983), Commodities Corporation.
Mark Dudey (Second Reader,1984), Rice University.
Lenny Nakamura (Second Reader,1985), Federal Reserve Board, Philadelphia.
Ian Gale (Chair,1985), University of Wisconsin, Federal Reserve Board, Cleveland.
Julie Nelson (Second Reader,1986), New York University Business School.
Matt Spiegel (Second Reader,1987), Columbia University, UC Berkeley, Yale University.
Jean Luc Vila (Second Reader, 1987), New York University, MIT.
Blaise Allaz (Second Reader, 1987), University of Lausanne.

University of California, Berkeley:

Theodore Sternberg (Chair,1989), Vanderbilt University.
Helena Mullins (Chair,1990), University of Oregon.
Rich Lindsey (Chair,1991), Yale University; Bear Stearns Securities.
Peter Algert (Chair,1991), University of California, Davis; Barclays Global Investor Services.

4

Jim Angel (Chair,1991), Georgetown University.
Lewis Lu (Chair,1992), University of Hong Kong.
Takeshi Yamada, (Chair,1993), Hong Kong Univ. of Science and Technology; National Univ. of Singapore.

Duke University:

John Graham (Chair, Finance, 1994), University of Utah; Duke University.
Susan Monaco (Chair, Finance, 1995), University of Indiana.
Lu Feng (Chair, Finance, 1995), Salomon Brothers; Stark Investments.
Jainlin Zhai (Chair, Economics, 1996), Federal Home Loan Bank, Iowa.
Jennifer Babcock (Accounting, 1997), Sloan School of Business, MIT.
Mary Beth Fisher (Mathematics, 1998), BBT Bank.
Brian Balyeat, (Chair, Finance, 1998), Texas A&M.
Wei Xiong (Chair, Finance, 2001), Bendheim Finance Center, Princeton University.
Jon Wongswan (Tang) (Economics, 2002), Federal Reserve Board, Chicago.
Ben Zhang (Economics, 2002), Moodies KMV; Fitch.
Lin Peng (Chair, Finance, 2002), City University of NY, Baruch College.
Emma Rasiel (Chair, Finance, 2003), Duke University (Lecturer)
Ge Zhang (Finance, 2003), University of New Orleans.
Julia Litvinova (Economics, 2003), The Brattle Group.
Ilia Tsetlin (Decision Sciences, 2003), INSEAD Singapore.
Tao Lin (Chair, Finance, 2003), University of Hong Kong.
Krishna Narisimhan (Finance, 2004), Wharton Business School (visitor).
Rujing Meng (Chair, Finance,2004), University of Hong Kong.
Mohan Gopalan (Finance, 2004), Barclays Global Investors, London.
Lakshman Easwaran (Finance, 2004), Lehmann Brothers.
Haofei Chen (Economics, expected 2005), Goldman Sachs, Hong Kong.
Sandra Lizarazo (Economics, 2005), ITAM, Mexico City.
Oksana Loginova (Economics, 2005), University of Missouri, Columbia.
Will Xu (Chair, Economics, 2005), Hong Kong University.
Ming Guo (Chair, Economics, 2005), Citadel Investment Group.
Florin Dorobantu (Economics, expected 2006).
Bin Wei (Co-chair, Finance, expected 2007).
Fei Ding (Chair, Finance, expected 2007).
Bruce Carlin (Co-chair, Finance, expected 2007).

North Carolina State University:

Lu Na (Decision Sciences, 2004), Medical College of Wisconsin, BioStatistics Consulting Center staff.

University of North Carolina, Chapel Hill:

Albert Wang (Chair, Finance, 1994), Columbia University; Rice University.

TEACHING (Estimated Enrollments)

University of Maryland:

BUFN 758V: Special Topics in Finance: Venture Capital and Private Equity
Fall 2006: 35 students.

BMGT 808J: Doctoral Seminar: Market Microstructure and Industry Equilbirium
Fall 2006: 10 students (including auditors)

5

Duke University: (One daytime MBA course meets for 2 hours 15 minutes twice a week for six weeks, plus exam. Ph.D. courses are one a semester system.)

Finance I – First-year Finance Theory course for Ph.D. students
    Fall 2002: 30 students.
    Fall 2001: 20 students.
    Fall 2000: 20 students.
    Fall 1999: 20 students.
    Fall 1996: 15 students.
    Fall 1995: 15 students.
    Fall 1994: 15 students.
    Fall 1993: 10 students.
    Fall 1992: 10 students.

Finance III – Second-year Finance Elective for Ph.D. students. (Market Microstructure and Derivatives)
    Spring 1998: 15 students.

Venture Capital and Private Equity:
    Summer 2004: Week-end MBA, one section, 50 students.
    Fall 2003: Global Executive MBA One-Day Mini-course, 55 students.
    Fall 2003: Day-time MBA, two sections, with Rebecca Zarutskie, 100 students.
    Fall 2003: Cross-Continent Executive MBA, 50 students, taught as Advanced Corporate Finance.
    Summer 2004: Week-end MBA, one section, 50 students.
    Fall 2002: Global Executive MBA One-Day Mini-course, 50 students.
    Fall 2002: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.
    Fall 2003: Cross-Continent Executive MBA, 50 students, taught as "Advanced Corporate Finance."
    Fall 2001: Global Executive MBA One-Day Mini-course, 50 students.
    Fall 2001: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.
    Fall 2001: Cross-Continent Executive MBA, 25 students, taught as "Advanced Corporate Finance."
    Fall 2000: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.

Advanced Corporate Finance:
    Fall 2000: Day-time MBA, two sections, 70 students.
    Fall 1995: Daytime MBA, two sections, 90 students.
    Fall 1994: Daytime MBA, two sections, 90 students.
    Fall 1993: Daytime MBA, two sections, 90 students.

Corporate Finance:
    Summer 2005: Week-end MBA, one section, 55 students.
    Fall 2005: Daytime MBA, four sections, 210 students.
    Fall 1996: Daytime MBA, two sections, 100 students.
    Fall 1995: Daytime MBA, two sections, 100 students.
    Fall 1994: Daytime MBA, two sections, 100 students.
    Fall 1993: Daytime MBA, one section, 60 students.
    Fall 1992: Daytime MBA, one section, 60 students.

University of California, Berkeley (MBA and Ph.D. courses on semester system)

Finance I – First-year Finance Theory course for Ph.D. students
    Fall 1989: 15 students.
    Fall 1988: 15 students.
    Fall 1987: 15 students.

5

Financial Theory: Gateway Investments elective for MBA students:
Spring 1988: Daytime MBA, two sections, 80 students.
Spring 1989: Daytime MBA, three sections, 130 students.

Corporate Finance: Elective for MBA students:
Fall 1990: Daytime MBA, two sections, 80 students.
Fall 1990: Evening MBA, one section, 40 students.
Fall 1989: Evening MBA, one section, 40 stuents.

Futures and Options: Advance Undergraduate Elective
Spring 1989: With David Modest, 20 students.

Princeton University (Courses on semester system):

Finance I − First-year Finance Theory course for Ph.D. students
Fall 1981: With Raymond Hill, 20 students.
Fall 1982: 15 students.
Fall 1984: 15 students.
Fall 1985: With Sanford Grossman, 15 students.
Fall 1986: 15 students.

Financial Markets − Finance Elective for Woodrow Wilson Masters of Public Affairs students.
Fall 1981: 25 students.
Fall 1982: 25 students.
Fall 1984: 25 students.
Fall 1985: 25 students.
Fall 1986: 25 students.

Topics in Micro-economics − Elective for Woodrow Wilson Masters of Public Affairs students.
Fall 1981: 25 students.
Fall 1982: 25 students.
Fall 1985: 25 students.

## UNIVERSITY SERVICE

University of Maryland:

Business School Ph.D. Oversight Committee, 2006-2007.
Finance Area Ph.D. Committee, 2006-2007.
Finance Area Recruitment Committee, 2006-2007.
Finance Area Strategy Council, 2006-2007.
Business School Financial Lab Committee, 2006-2007.
Mentor to Assistant Professor Georgios Skoulakis

Duke University:

Member, Dean's Advisory Committee, 2002-2003.
Membory, Duke Global Capital Markets Advisory Committee, 2000-2004.
Finance Area Coordinator, Fall 1995.
Finance Ph.D. Program Administrator, 2000-2003. Helped with Ph.D. admissions other years.
Health Sector Management Curriculum Review Committee, 2003.
TeraData Center Research Review Committee, 2002-2004.

7

Faculty Technology Committee, 2000.
Organized Duke-NYSE Conference on Market Microstructure, 1995.
External Ad Hoc Committee Chairman: 1996.
Internal Ad Hoc Committee Chairman: 1992, 1993, 1995.
Internal Ad Hoc Committee Member: 2003, 2004.
Curriculum Committee, 1995-1996.
Elected Academic Council Representative, 1994-1995.
Rhodes Scholarship Advisory Committee, 2001-2004.
Junior and Senior Faculty Recruiting, 1992-2005, including interviewing at ASSA meetings most years.
Carnegie Case Competition Advisor, 1999-2002.

University of California, Berkeley:

Ph.D. Program Administrator, 1988-1991.
Faculty Recruiting, 1987-1991, including interviewing at ASSA meetings.
Elected Academic Council Representative, 1988-1989.
Active Participant in Berkeley Program in Finance, 1987-1991.
Active Participant in Financial Investment Technology (Executive Education) Program, 1989-1991.

Princeton University:

Rhodes Scholarship Advisory Committee, 1984-87.
Finance Faculty Recruiting, 1982-87, including interviewing at ASSA meetings several years.
Woodrow Wilson Qualifying Exam Committee, 1984-87.
Woodrow Wilson Ph.D. Committee, 1985-87.
Economics Department Ph.D. Admissions, 1984-85.

PROFESSIONAL SERVICE

- NBER Research Associate, 1982-1985.
- Institute for the Study of Securities Markets, Member, Board of Directors, 1988-1992.
- Ecole Nationale des Ponts et Chaussees, Visiting Lecturer, two-week finance course, 1991, 1992, 1993.
- CEPR Summer Institute, Gerzensee, Switzerland, Participant, July 11-23, 1993.
- Frankfurt University, Guest Lecturer, Ph.D. lectures on market microstructure, Aug 18-15,1999.
- Rhodes Scholarship Selection Committee, Illinois (1979, 1980), Florida (1998, 1999,2000,2001,2002).
- American Finance Association, Board of Directors, Member, 2004-present.
- NASDAQ, Economic Advisory Board, Member, 2005-present.

REFEREEING AND REVIEWING

- I typically referee 6-10 papers per year.
- I occasionally serve on program committees for conferences.
- Referee Reports and External Reviews, 2004: Journal of Financial Economics (3),Journal of Finance (2),
  Review of Financial Studies, American Economic Review, Econometrica, Journal of Political Economy,
  Journal of Economic Theory, Economic Journal, NSF, several reviews for tenure or promotion.
- Utah Winter Finance Conference Program Committee, 2004, 2005, 2006.

8

## SELECTED CONSULTING

- Goodman-Manaster and Company, 1981. Futures trading, risk management.
- Pepper, Hamilton, and Scheetz, 1984-1986, expert witness. Railroad deregulation. Reports with Robert Willig.
- Consultants in Industry Economics, Inc. 1988-1986, 1988, expert witness. Anti-trust.
- New York Stock Exchange, 1987, 1990, consultant. Market surveillance, insider trading.
- Commodity Futures Trading Commission, 1986-1989, expert witness. Hunt silver market manipulation. Report.
- Staff Member, Presidential Task Force on Market Mechanisms (Brady Commission), 1987-1988. Stock market crash of 1987, stock index futures, index arbitrage, portfolio insurance.
- Options Clearing Corporation, 1989. Clearing and settlement.
- Berkeley Financial Technologies, 1989-1991. Lectures on futures and options.
- Expert witness for Robert Griffin, 1991. Angelo et al vs. CFTC (Treasury Bond Futures tick size). Report and testimony.
- Law and Economics Consulting Group, 1991, manipulation.
- BARRA, 1991, measuring market liquidity.
- The Long Term Credit Bank of Japan, 1991-1996 interest rates and derivatives pricing.
- National Economic Research Associates, 1996, expert witness, securities fraud, damages.
- Salomon Brothers (Wachtell, Lipton, Rosen and Katz), 1991-1992, expert witness. Cocoa futures trading, damages. Deposition.
- Internal Revenue Service, 1996. Expert witness. Treasury Bond Futures trading.
- Justice Department, 1996. Expert witness. NASD market maker competition and tick size.
- Chase Securities, 2000, Foreign Exchange Order Flow
- Expert Witness, Alleged Price Manipulation of NYMEX Electricity Futures Involving Cash-Settled OTC Derivatives, 2003-2004. Report.
- Expert Witness, Barrick Gold Corporation, 2004-2005, price manipulation, damages.

## CURRENT RESEARCH INTERESTS

- Industry Dynamics and Valuation of Firms: An Integration of Corporate Finance and Industrial Organization
- Cash Settlement, Market Manipulation, and the Modigliani-Miller Theorem
- Trading Volume and Overconfidence
- Applications of Numerical Techniques in Finance.
- Settlement Negotiations with Endogenous Discovery
- Financial Contagion.
- Moral Hazard in Continuous Time.
- Trading with Transaction Costs.
- Algorithms for Pricing Interest rates and Derivative Assets.
- Continuous Trading with Many Informed Traders and Risk Aversion.
- Optimal Insider Trading with Smooth Noise Order Flow.
- Applications of complex analysis to finance.

9

<u>CONFERENCE PRESENTATIONS</u>

- USDA Universities International Trade Consortium Meeting, December 1981. "Market Structure, Information, Futures Markets, and Price Formation."
- Center for the Study of Futures Markets, 1982. "A Theory of Futures Market Manipulations."
- NBER-KGSM Conference on Time and Information in Economics, February 1982. "The Efficient Markets Hypothesis and the Supply of Speculative Services."
- Centre of Policy Studies Conference on Distributional Issues in Health Care, 1983. "The Economics of Medical Insurance" (with Peter Hartley).
- Australian Meetings of the Econometrics Society, August 1983. "Equilibrium in a Speculative Market with Strategic Informed Trading."
- Allied Social Science Associations National Convention, December 1984. Session Chairman. Discussant in two sessions.
- Berkeley Program in Finance Seminar, Trading Costs and Trading Strategies, April, 1984. "Trading in Markets Where Buyers May Have Better Information."
- NBER – NYC Conference on Applications of Game Theory to Finance, December 1985. "Informed Speculation with Imperfect Competition."
- ASSA Convention, December 1985. "On Incentives to Acquire Private Information with Continuous Trading."
- Conference on Market Making, June 1987, London School of Economics, "Dealer Markets and Organized Exchanges."
- ASSA Convention, Discussant (three different sessions).
- ASSA Convention, December 1987. "Dealer Markets and Organized Exchanges."
- Discover Cal, Berkeley, February 12, 1988. Discussion of stock market crash.
- Financial Investment Technology Program, Berkeley, February 1988, Lectures on futures markets.
- Institutional Investor Pension Roundatable, Los Angeles, February 25, 1988. Panel discussion on the stock market crash.
- NBER Conference, Cambridge, MA March 10-11, 1988. Panel discussion on the stock market crash.
- Berkeley Program in Finance Seminar: Stock and Futures Markets: Lessons and Prospects, March 28-30, 1989, Santa Barbara, CA. "What Happened During the Week of the Crash" (with Terry Marsh).
- Wells Fargo Investment Advisors Seminar, San Francisco, April 11, 1988. Discussion of the stock market crash.
- CRSP Seminar, Drake Hotel, Chicago. May 1988. Panel discussion. Causes and Consequences of the Stock Market Crash.
- Institute for Fiduciary Education, Carmel Valley, Ranch, CA. May 1988. Panel discussion on the 1987 stock market crash.
- Western Economic Assoc., Meetings, July 1, 1988.
- Berkeley Program in Finance Seminar. On Trading and Fund Management: The Role of Technology. September 23-27, 1988, Silverado, CA. Co-organizer (with Terry Marsh).
- Cal Business Alumni, Meridian Hotel, San Francisco, October 20, 1988, discussion on "The Stock Market Crash: A Year and a Day Later."
- Advanced Financial Technology Seminar of Futures Markets, December 6-10, 1989, Tokyo, lectures with David Modest.
- Chicago Board of Trade Conference on Futures Market Regulation, November 19, 1988, Mayflower Hotel, Washington, D.C., "Trading Halts and Price Limits."
- ASSA Convention, December 1988. Discussant.
- ASSA Convention, December 1988, "Estimating Intraday Price Volatility during the Crash, presented part of "Improving the Performance of the Stock Market."
- Institute for Quantitative Research in Finance (Q-Group), Spring Seminar, Orlando, Florida, April 18, 1989,

10

"An Intuitive Introduction to Agency Theory with Applications to Money Management."

- New York Stock Exchange Academic Seminar, May 5, 1989. Roundtable discussion.
- STEP-CEPR Seminar, Bocconi University, Milan Italy, May 26, 1989. "Smart Money, Noise Trading, and Stock Price Behavior."
- University of Bonn Summer Workshop, Bonn W. Germany, June 28-July 8, 1989, invited guest.
- French Finance Association Conference (AFFI), June 28, 1989, "Smart Money, Noise Trading and Stock Price Behavior."
- New York Stock Exchange/London School of Economics Conference on Market Microstructure, London, England, November 15, 1989. Discussant.
- Washington University, Regional Finance Conference, November 1990, lecture on trading with asymmetric information.
- University of Iowa, Market Microstructure Conference, November 1990. "Dealer Markets and Organized Exchanges."
- Chicago Board of Trade Conference, Vanderbilt University, December 8, 1990. Discussant.
- ASSA Convention, Washington, D.C., December 30, 1990. Session chair.
- Berkeley Program in Finance, April 5-7, 1992. Discussant.
- Atlanta, Federal Reserve Bank, February 20, 1992. Discussant.
- New York Stock Exchange Conference, Los Angeles, California, March, 1992. Discussant.
- Commodity Futures Trading Commission, March 30-31, 1992.
- Konstanz, Germany, April 3-4, 1992. "Intertemporal Insider Trading..."
- Jerusalem, March 11, 1992. "Intertemporal Insider Trading..."
- Western Finance Association, June 22-24, 1992. Discussant.
- Stockholm, Sweden, August 21-22, 1992. "Market Failures and the Regulation of Financial Markets."
- Allied Social Sciences Association, January 5-7, 1993. Discussant.
- Berkeley Program in Finance, Lake Tahoe, California, March 14-16, 1993. Conference Summarizer.
- Allied Social Sciences Association, Boston, January 3-5, 1994. Discussant.
- Western Finance Association, Santa Fe, June 23-26, 1994. Discussant.
- National Bureau of Economic Research Conference, Key Largo, Florida, July 11-12, 1994. Discussant.
- Federal Reserve Bank of Atlanta Conference, Miami, March 3-4, 1995. Discussant.
- Q-Group Conference, November 22-29, 1995. "Active Mismanagement."
- Allied Social Sciences Association, San Francisco, 1996. Session Chair.
- Berkeley Program in Finance, Santa Barbara, September 29-October 1, 1996. Essay in Honor of Fischer Black.
- Western Finance Association Meetings, Los Angeles, June 19, 1999, discussant.
- Duke University Global Capital Markets Center, Conference on Bond Market Microstructure, Washington DC, October 19, 1999, presenter.
- SIR CA Mini-Conference on Insider Trading, Sydney, Australia, November 5, 1999, keynote speaker, "Insider Trading."
- Duke Unversity Global Capital Markets Center, Conference on Hedge Funds, Durham, NC, November 19, 1999, moderator.
- NBER Asset Pricing Conference, Boston, May 5, 2000, discussant.
- Western Finance Association, Sun Valley, Idaho, June 21-24, 2000, discussant.
- Review of Economic Studies Conference, Frankfurt, Germany, June 30, 2000, "Contagion as a Wealth Effect."
- Federal Reserve Bank of Atlanta Conference, Atlanta, September 15, 2000, "Contagion as a Wealth Effect."
- Federal Reserve Bank of Atlanta Conference on E-Finance, October 14, 2000, discussant.
- Berkeley Program in Finance, Squaw Valley, CA, March 17, 2001, program discussant.
- ASSA Meetings, New Orleans, LA, January 6, 2001, "Contagion as a Wealth Effect."

11

- Q-Group, Tampa, FL, April 4, 2001, "Contagion as a Wealth Effect."
- Western Finance Assn., Tucson, AZ, June 22-23, 2001, session chair (Market Microstructure),discussant.
- New York Stock Exchange Conference, Institutional Trading, Palm Beach, FL, Dec. 6, 2001, session chair.
- Utah Winter Finance Conference, Salt Lake City, Utah,February 26-28, discussant.
- RES Conference, Northwestern University, April 26-28, 2002, discussant.
- Federal Reserve Bank of Atlanta Conference on Venture Capital, Sea Island, GA, May 2-4, 2002, discussant.
- Conference in Honor of David Whitcomb, Rutgers University, October 11, 2002, discussant.
- SEC Roundtable Discussion on Market Transparency, November 12, 2002, participant.
- NYSE Roundtable Discussion on Market Quality Statistics, December 6, 2002, participant.
- ASSA Convention, Contagion, January 4, 2003, session chair.
- Utah Winter Finance Conference, February 6, 2003, discussant.
- FRB Atlanta Conference on Business Method Patents, Sea Island, GA, April 3, 2003, discussant.
- NBER Market Microstructure Meeting, Chicago, April 12, 2003, discussant.
- ASSA, San Diego, January 5, 2004, discussant.
- Utah Winter Finance Conference, February 5, 2004, discussant.
- Duke/NYSE Conference on International Cross-Listings, Sarasota, FL, March 11-13, Duke GCMC representative.
- New York Stock Exchange Conference, Market Microstructure, Palm Beach, FL, December 12, 2003, panel on market microstructure.
- FRB Atlanta Conference on Market Transparency, Sea Island, GA, April 15, 2004, discussant.
- 2004 HKUST Finance Symposium, Hong Kong, "A Two-Factor Model of Value and Growth with Adjustment Costs," December 13, 2004.
- Keynote Speaker, Twelfth Annual Conference on The Theories and Practices of Securities Markets, National Sun Yat-sen University, Kaohsiung, Taiwan, "Insider Trading and Corporate Governance," December 17,2004.
- ASSA, Philadelphia, January 8, 2005, discussant.
- Utah Winter Finance Conference, February 10, 2005, discussant.
- Assurant/Georgia Tech International Finance Conference, Assurant Lecture, "Market Microstructure and Rational Expectations: A Primer," April 8, 2005.
- Oxford Finance Summer Symposium, "A Two-Factor Model of Value and Growth with Adjustment Costs," June 15, 2005.
- Conference on Information and Behavioral Biases in Financial Markets, Fundación Ramón Areces, Madrid, "An Intertemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," July 8, 2005.
- Oxford Summer Finance Symposium, "A Two-Factor Model of Value and Growth," June 16, 2005.
- Conference on Information and Behavioral Biases in Financial Markets, Madrid, Spain, "An Intemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," July 7, 2005.
- Alpha Strategies Conference on Quantitative Money Management, commentator, April 10-12,2006.
- Clarendon Lectures in Finance "Stock Price Dynamics and Industry Equilibrium," June 12-14, 2006.
- LSE Conference on New Directions in Asset Pricing and Risk Management, "Dynamic Strategic Informed Trading with Risk-Averse Market Makers," June 16, 2006.
- Western Finance Association, session chair, discussant, June 21-22, 2005.
- European Summer Symposium in Financial Markets, Gerzensee, Switzerland, focus session chair, July 24-28, 2006.

12

INVITED UNIVERSITY RESEARCH SEMINARS

- School of Organization and Management, Yale University, March 1982.
- New York University, April 1983.
- Australian National University, October 1983.
- University of New England, Armidale, NSW, Australia, October 1983.
- Australian Graduate School of Management, University of New South Wales, October 1983.
- Centre of Policy Studies, Monash University, Melbourne, August 1983 and November 1983.
- School of Organization and Management, Yale University, March 1984.
- Columbia University Business School, April 1984.
- University of Rochester, April 1984.
- NBER Trade Group, April 1984.
- NBER Financial Markets Group, November 1984.
- Harvard Business School, May 1985.
- University of Chicago Business School, May 1985.
- Kellogg Graduate School of Management, Northwestern University, May 1985.
- Sloan School, MIT, October 1985.
- Graduate School of Business, Stanford University, March 1986.
- Graduate School of Management, Rutgers University, April 1986.
- Columbia University Business School, September 1986.
- GSIA, Carnegie-Mellon University, September, 1986.
- University of Chicago Business School, October 1986.
- Kellogg Graduate School of Management, Northwestern University, October 1986.
- School of Business, Washington University, St. Louis, February, 1987.
- Graduate School of Management, Rutgers University, February 1987.
- Graduate School of Business, Stanford University, January 1987.
- School of Business, University of California, Berkeley, January 1987.
- School of Management, Rice University, February 1987.
- Business School, University of Michigan, February 1987.
- Business School and Economics, University of Wisconsin, February 1987.
- Economics Department, University of Pittsburgh, February 1987.
- Wharton Business School, University of Pennsylvania, February 1987.
- Economics Department, Brown University, February 1987.
- School of Organization and Management, Yale University, April 1987.
- Economics Department, Virginia Polytechnic Institute, June 1987.
- UCLA Business School, May 20, 1988 "Smart Money, Noise Trading, and Stock Price Behavior."
- University of California, Santa Cruz, Economics Department, October 25, 1988, "Dealer Markets and Organized Exchanges."
- Anderson School of Management, University of New Mexico, November 18, 1988 "Dealer Markets and Organized Exchanges."
- Bocconi University, Milan Italy, "Asymmetric Information and Market Microstructure," May 25, 1989.
- Commodity Futures Trading Commission, November 1989.
- University of British Columbia, Finance Seminar, December 1989, "Noise Trading and Takeovers."
- Vanderbilt University, Finance Seminar November 1989, "Noise Trading and Takeovers."
- University of Utah, Finance Seminar, December 1989. "Intertemporal Insider Trading..."
- University of Indiana, Finance Seminar, September 1990. "Intertemporal Insider Trading..."
- Ecole Nationale des Ponts et Chaussees, Paris Finance Seminar, January 1991. "Intertemporal Insider Trading..."

13

- University of North Carolina, February 18, 1992. "Intertemporal Insider Trading With Smooth Order Flow."
- Northwestern University, Kellogg Graduate School of Management, June 3-4, 1992. "Intertemporal Insider Trading With Smooth Order Flow."
- New York University, September 22, 1993. "Speculation Duopoly..."
- UCLA, November 5, 1993. "Speculation Duopoly..."
- Vanderbilt University, April 14, 1995. "Speculation Duopoly..."
- University of Michigan, December 6, 1996. " Speculation Duopoly with Agreement to Disagree."
- Rice University, October 1, 1999, "Contagion as a Wealth Effect of Financial Intermediaries."
- Sydney University, Sydney, Australia, November 2, 1999, "Contagion as a Wealth Effect of Financial Intermediaries."
- Carnegie-Mellon University, GSIA, February 23, 2001, "Contagion as a Wealth Effect."
- Stanford University, Graduate School of Business, March 14, 2001, "Contagion as a Wealth Effect."
- University of California, Berkeley, Haas School of Business, March 15, 2001, "Contagion as a Wealth Effect."
- University of Indiana, April 27, 2001, "Contagion as a Wealth Effect."
- London School of Economics, May 9, 2001, "Contagion as a Wealth Effect."
- University of Texas, Austin, October 26, 2001, "Continuous Speculation with Overconfident Traders."
- Norwegian School Of Management, Oslo, June 5, 2002, "Continuous Trading with Heterogeneous ...."
- Humboldt University, Berlin, June 7, 2002, "Continuous Trading with Heterogeneous Beliefs ..."
- Oxford Summer Finance Institute, June 11, 2002, "Continuous Trading with Heterogeneous Beliefs and No Noise Trading."
- Oxford Summer Finance Institute, June 12, 2003, "Corporate Finance and Industrial Organization."
- New York University, "Strategic Acquisitions ... ", November 5, 2003.
- University of Virginia, "Prospect Theory ... ", February 14, 2003.
- INSEAD, Paris, "Strategic Acquisition ... ", April 2, 2004.
- HEC, Paris, "Strategic Acquisitions ... ", April 1, 2004.
- University of Amsterdam, "Strategic Acquisitions ... ", March 30, 2004.
- University of Tilburg, "Strategic Acquisitions ... ", March 29, 2004.
- University of Pompeu Fabri, Barcelona, "Strategic Acquisitions ...", March 24, 2004.
- Princeton University, "Strategic Acquisitions ...," March 3, 2004.
- University of Maryland, "Strategic Acquisitions ..." April 23, 2004.
- Federal Reserve Board, Washington, DC, "Strategic Acquisitions ..," August, 17, 2004.
- Baruch College, CUNY, "Strategic Acquisitions and Investments in a Duopoly Patent Race Under Uncertainty" November 17, 2004.
- INSEAD Singapore, "Value and Growth ...," December 7, 2004.
- National University of Singapore, "A Two-Factor Model of Value and Growth with Adjustment Costs," December 9, 2004.
- University of Maryland, "A Two-Factor Model of Value and Growth with Adjustment Costs," May 9, 2005.
- Imperial College, Longon, "A Two-Factor Model of Value and Growth ...," May11, 2006.
- Warwick University, "Strategic Trading with Risk Averse Market Makers," May 31, 2006..

14

# Scope and Methodology

We conducted this performance audit in accordance with Generally Accepted Government Auditing Standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Scope.** We performed our audit from April 2008 to August 2008. Our audit scope included a review of the CSE and Broker-Dealer Risk Assessment program, as requested. Although our audit scope focused on TM's oversight of the CSE firms, we also considered the role of other Commission divisions and offices (for a Commission wide perspective) in the oversight of the CSE firms.

Our scope emphasized the CSE firms (especially Bear Stearns) that do not have a principal regulator because the Commission has much greater oversight responsibility for these firms. Our period of review was from October 2002 until August 2008. However, it varied depending on the nature of the issue. The scope of our review considered when:

- Bear Stearns collapsed;
- The subprime mortgage crisis started to become apparent (based on our audit work, we used December 2006);
- Two of Bear Stearns' managed hedge funds collapsed; and
- The CSE program began and the Commission issued the Order for the particular firm.

Lastly, our scope either did not include or was limited in the following areas:

- We completed our audit fieldwork prior to September 15, 2008 when Lehman Brothers announced it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co. As a result, our fieldwork did not emphasize these firms, unlike Bear Stearns;
- We did not evaluate the effect(s), if any, that mark to market (i.e., "fair value") accounting had on the valuation of mortgage securities and the ensuing write-downs which subsequently caused the firms to raise capital;
- We did not evaluate the role of rating agencies in the securitization process of mortgage loans;

- We did not visit the CSE firms and perform an independent assessment of the firm's risk management systems (e.g., internal controls, models, etc.), or their financial condition (e.g., compliance with capital and liquidity requirements). As a result, we may not have identified certain findings and recommendations (i.e., improvements);

- We did not determine (i.e., recalculate and determine the accuracy) of the capital and liquidity data provided by the CSE firms to TM. OCIE and TM performed some inspection testing on the financial data during the application inspection. Also, the Financial Industry Regulatory Authority (FINRA) routinely performs inspection testing on the registered broker-dealers capital calculation;

- We did not determine the cause of Bear Stearns' collapse. For instance, some individuals have speculated that short sellers may have caused Bear Stearns' collapse by intentionally spreading false rumors. This issue is beyond the scope of this audit;

- The CSE program consists of four interrelated activities: an application process, inspections, the review of required filings, and periodic meetings with CSE staff.[193] We performed limited testing on some of these processes, as discussed below:[194]

    o TM relies mainly on meetings with the CSE staff to administer the CSE program. As a result, we viewed compliance testing in this area to have limited value; instead we (our expert, primarily) focused on the substance of these meetings. Thus, we excluded the meeting process from our compliance testing; and

    o In March 2007, in response to a GAO audit report (as discussed in the Prior Audit Coverage of this Appendix); Chairman Cox decided to transfer inspection responsibility from OCIE to TM (responsibility was transferred to TM in March 2007 for four of the five firms, and for the last firm (Morgan Stanley) following the completion of the ongoing OCIE exam of that firm in September 2007). OCIE retained within the Commission, the responsibility for conducting inspections on the CSE's broker-dealers. TM had not completed any of these inspections as of mid-September 2008. As a result, we only performed limited compliance testing on TM's inspection process. Instead, we emphasized the design of the TM inspection program;

- The Congressional request also asked the OIG to investigate the closing of a Commission enforcement investigation involving Bear Stearns. This

---

[193] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[194] The purpose of our testing was to determine whether the CSE program is compliant with its policies and procedures and the CSE rule.

**APPENDIX IV CONTINUED..**

issue is beyond the scope of this audit, but is the subject of a separate investigative report; and

- The role of federal regulators (*e.g.,* the U.S. Department of Treasury) in the sale of Bear Stearns to JP Morgan is beyond the scope of this audit.

**Methodology.** Our methodology included reviewing required filings, inspection reports, and documentation surrounding periodic meetings between TM and CSE staff. We also reviewed other types of supporting documentation such as TM's policies and procedures, prior GAO audit reports, newspaper articles, etc. We also conducted interviews with staff from the Commission, CSE firms, GAO, and the FRBNY.

Lastly, we hired a contractor (*i.e.,* an expert) to provide us with technical expertise.[195] The expert reviewed the adequacy of TM's review of models, scenario analysis, etc; as well as, the associated internal risk management controls. We have incorporated the expert's opinions, findings, and recommendations into this audit report. The expert focused his review on the Commission's oversight of Bear Stearns.

**Internal/Management Controls.** We did not review management controls because they did not pertain to the audit's objectives. However, we identified several improvements in the CSE program's internal controls (*e.g.,* tracking of issues).

**Use of Computer-Processed Data.** We relied on data from the Commission's Broker-Dealer Risk Assessment (BDRA) computer system. Firms use the BDRA system to electronically transmit filings (and BDRA stores the filing) to TM. The BDRA system does not process any of the data contained in the filings. As a result, we considered the relevant risks to be:

- TM's failure to receive a filing sent by a firm; and
- Whether information in the BDRA system could be compromised (information security risks).

We did not identify any instances where TM failed to receive a filing that a CSE firm transmitted through the system. However, TM told us about situations where firm filings made under the Broker-Dealer Risk Assessment program did not completely transmit to TM through the BDRA system. Given how we used the BDRA data in this audit, if a similar situation occurred with the CSE filings, we would have been aware because the firms transmit the filings at known intervals (*e.g.,* month end).

We considered the risk surrounding information security. The Commission's Office of Information Technology recently certified and accredited the BDRA

---

[195] See Appendix III for our expert's (Albert "Pete" Kyle) Curriculum Vitae.

**APPENDIX IV CONTINUED..**

system, as required by the Federal Information Security Management Act of 2002. Therefore, we believe that we can rely upon the information in the BDRA system as it pertains to information security.

We identified a few issues with the BDRA system, but they do not affect the reliability of the data. We discuss the issues in our related audit report (No. 446-B).

**Judgmental Sample.** We judgmentally selected twenty issues that TM or OCIE staff identified for our testing on TM's tracking of material issues (see Report Finding No. 5). Our sample included issues from all the CSE firms including those with principal regulators, although our audit work emphasized Bear Stearns. We generally selected specific issues such as an internal control weakness, as opposed to more generic issues (*e.g.*, exposure to subprime). We selected samples from:

- The TM action memo recommending that the Commission issue the Order;
- OCIE inspection reports; and[196]
- The monitoring staff's monthly memoranda (which discuss significant issues) to senior TM management.

Although we believe that our sampling methodology is reasonable and representative, our results should not be projected onto the universe of issues.

**Use of Technical Assistance.** We received technical assistance from an expert, as discussed in the Methodology section of this Appendix. His expertise is described in his Curriculum Vitae in Appendix III.

**Prior Audit Coverage.** GAO Report <u>Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration</u>, GAO Report 07-154, dated March 15, 2007 on strengthening performance measurement and collaboration for the agencies (*i.e.*, the Federal Reserve, Commission, and the Office of Thrift Supervision (OTS)) involved in consolidated supervision. They made several recommendations involving the Commission:

GAO Recommendation:     To better assess the Commission's achievements, the Chairman of the Commission should direct his staff to develop program objectives and performance measures that are specific to the CSE program.

---

[196] We did not use TM's inspection reports because they had not completed any inspections (as of when we performed our testing) since the Chairman transferred (from OCIE to TM) the inspection authority for the consolidated entity. Lastly, TM has implemented an automated method to track the inspection issues (*i.e.*, findings).

**APPENDIX IV CONTINUED..**

The Commission has developed program objectives and performance measures. These documents are available on the Commission's website.[197]

GAO Recommendation:    To ensure they are promoting consistency with primary bank and functional supervisors and are avoiding duplicating the efforts of these supervisors, the Chairman of the Federal Reserve, the Director of the OTS, and the Chairman of the Commission should also direct their staffs to identify additional ways to more effectively collaborate with primary bank and functional supervisors. Some of the ways they might consider accomplishing this include:

- Ensuring common understanding of how the respective roles and responsibilities of primary bank and functional supervisors and of consolidated supervisors are being applied and defined in decisions regarding the examination and supervision of institutions; and

- Developing appropriate mechanisms to monitor, evaluate, and report jointly on results.

In response to Bear Stearns' collapse, the Commission and the Federal Reserve have agreed on a MOU involving coordination and information sharing.

GAO Recommendation:    To take advantage of the opportunities to promote better accountability and limit the potential for duplication and regulatory gaps, the Chairman of the Federal Reserve, the Director of OTS, and the Chairman of the Commission should foster more systematic collaboration among their agencies to promote supervisory consistency, particularly for firms that provide similar services. In particular, the Chairman of the Commission and the Director of the OTS should jointly clarify accountability for the supervision of the CSEs that are also thrift holding companies and work to reduce the potential for duplication.

The Chairman and the Director of OTS are still discussing the jurisdictional issues raised by the recommendation. This issue was recently discussed at a Congressional hearing.[198]

---

[197] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[198] Source: Risk Management and Its Implications for Systemic Risk Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment on Banking, Housing, and Urban Affairs, 110th Cong. (June 19,

GAO Recommendation:    The Chairman of the Commission should direct the
                       staff to develop and publicly release explicit written
                       guidance for supervision of CSEs. This guidance
                       should clarify the responsibilities and activities of the
                       OCIE and TM's responsibilities for administering the
                       CSE program.

The Chairman transferred the inspection authority of the consolidated entity from
OCIE to TM. [199] However, as discussed in the audit report, TM and OCIE can
still improve collaboration. Lastly, the Commission developed and publicly
released written guidance describing the CSE program (e.g., TM's roles and
responsibilities).

---

2008) (statement of Erik Sirri, Director of TM, Commission).

[199] The transfer was in response to a GAO audit report (Financial Market Regulation: Agencies Engaged in
Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-
154, March 15, 2007) recommendation. In response to the report Chairman Cox told GAO: "To
implement this recommendation, I have carefully considered the question of which organizational
structure will best achieve the goal of the CSE program. I have concluded that the success of the CSE
program will be best ensured if the supervision of the CSE firms is fully integrated with, rather than
merely coordinated with, the detailed onsite testing that is done of the documented controls at CSE
firms. As a result, I have decided to transfer responsibility for on-site testing of the CSE holding
company controls to the Division of Market Regulation [now called TM]. This will better align the testing
and supervision components of the CSE program, will strengthen its prudential character, and will most
efficiently utilize the Commission's resources. With the new structure, ongoing supervision activities will
be more directly informed by the results of focused testing of controls, and field inspections will be more
precisely targeted using information from ongoing supervisory work. In addition, the Commission's
expertise related to the prudential supervision of securities firms will be concentrated in the Division of
Market Regulation, which will foster improved communication and coordination among the staff
responsible for administering various components of the CSE program." The Chairman made his
decision after carefully evaluating proposals from TM and OCIE, and after consulting with the four other
Commissioners, who unanimously supported the decision to consolidate CSE oversight under TM.

# List of Recommendations

**Recommendation 1:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and rules regarding the Consolidated Supervised Entity (CSE) firms' capital levels; and (2) identify instances (*e.g.,* a firm's credit rating is downgraded, or its unsecured debt trades at high spreads over Treasuries) when firms should be required to raise additional capital, even if the firm otherwise appears to be well capitalized according to CSE program requirements.

**Recommendation 2:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

**Recommendation 3:**
The Division of Trading and Markets should ensure that it adequately incorporates a firm's concentration of securities into the Consolidated Supervised Entity (CSE) program's assessment of a firm's risk management systems (*e.g.,* internal controls, models, etc.) and more aggressively prompts CSE firms to take appropriate actions to mitigate such risks.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

**Recommendation 5:**
The Division of Trading and Markets (TM) should ensure that: (1) the Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firms' model review and approval process takes place in a thorough and timely manner, and (4) impose limits on risk taking by firms in areas where TM determines that risk management is not adequate.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

**Recommendation 8:**
The Division of Trading and Markets should take steps to ensure that mark disputes do not provide an occasion for Consolidated Supervised Entity firms to inflate the combined capital of two firms by using inconsistent marks.

**Recommendation 9:**
The Division of Trading and Markets should encourage the Consolidated Supervised Entity (CSE) firms to present VaR and other risk management data in a useful manner, which is consistent with how the CSE firms use the information internally and which allows risk factors to be applied consistently to individual desks.

**Recommendation 10:**
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

**APPENDIX V CONTINUED..**

**Recommendation 11:**
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would enable TM to better assess the effectiveness of the firms' risk management systems.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[200] for this deviation from the current rule's requirement.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

**Recommendation 14:**
The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;
- When the issue was identified;
- Who identified the issue;
- The current status of the issue (*e.g.*, new developments);
- When the issue was resolved; and
- How the issue was resolved.

---

[200] The Administrative Procedures Act (5 U.S.C. §500 *et. seq.*,) sets forth the basic procedural requirements for agency rulemaking. It generally requires (1) publication of a notice of proposed rulemaking in the *Federal Register*, (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

### Recommendation 15:

The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

### Recommendation 16:

The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

### Recommendation 17:

The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

### Recommendation 18:

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (e.g., discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

### Recommendation 19:

The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

### Recommendation 20:

The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

### Recommendation 21:

The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

## Recommendation 22:

Chairman Cox should create a Task Force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

## Recommendation 23:

The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

## Recommendation 24:

The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward. TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

## Recommendation 25:

The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

## Recommendation 26:

The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators.

**APPENDIX VI**

# Chairman Cox's Comments

September 25, 2008

**MEMORANDUM**

**TO:**      H. David Kotz
             Inspector General

**FROM:**    Christopher Cox
             Chairman

**SUBJECT:** Draft Report on *SEC's Oversight of Bear Stearns and Related
             Entities: The Consolidated Supervised Entities Program*

Thank you for the opportunity to review the Draft Report on *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entities Program*. I welcome your report and recommendations on the CSE program.

There is much value that the agency can take from an independent and arms-length review of its programs, and your report provides an invaluable and fresh perspective for the agency to carefully review and consider. The staff of the Division of Trading and Markets and the Division of Corporation Finance, who as you know have been working around the clock for months in the current market turmoil, have provided detailed comments on specific aspects of the analysis in the report. As head of the agency, I would like to address your major findings and recommendations.

Your report makes 26 specific recommendations to improve the CSE program, all of which are well-considered and worthy of support. Some of these recommendations had already been undertaken and many will have potential applicability beyond the CSE program.

Your report also underscores the fundamental flaw with the CSE program that I have reported to the Congress on several occasions in recent months: voluntary regulation does not work. When Congress passed the Gramm-Leach-Bliley Act, it failed to give the SEC or any agency the authority to regulate certain large investment bank holding companies. Because of the lack of explicit statutory authority for the Commission to regulate the large investment bank holding companies, the Commission in 2004 created a voluntary program, the Consolidated Supervised Entities program, in an effort to fill this regulatory gap.

---

**APPENDIX VI CONTINUED..**

The inherent weakness of the CSE program from the beginning was that investment banks could opt in or out of supervision voluntarily. The program had no explicit statutory authority to require these investment bank holding companies to report their capital, maintain liquidity, or submit to leverage requirements. The fact that investment bank holding companies could withdraw from this voluntary supervision at their discretion diminished the perceived mandate of the CSE program, and weakened its effectiveness in a number of ways.

Lacking a statutory mandate to regulate these investment bank holding companies, the CSE program was patterned after the regulation of commercial bank holding companies. It used the capital and liquidity measurement approaches from the commercial banking world — with unfortunate results.

Thus, as your report confirms, at the time of its near-failure Bear Stearns had a capital cushion well above what was required to meet supervisory standards calculated under the internationally-accepted Basel framework and the Federal Reserve's "well capitalized" standard for bank holding companies.

Your report also highlights the consequences of a critical issue that existed throughout the financial services sector. Prior to the spring of 2008, the bank risk models in use throughout the U.S., including those relied upon by the CSE firms, did not include scenarios premised on a total mortgage meltdown on a scale so devastating that it would cause the failure of Fannie Mae and Freddie Mac. Throughout this year, national and international banking regulators have worked to strengthen and improve the capital and liquidity standards that are used throughout the banking system. The SEC has been a leader in this process through institutions like the Basel Committee on Banking Supervision, the Senior Supervisors Group, the Financial Stability Forum, and the International Organization of Securities Commissions. Those efforts are ongoing and vital.

I am pleased that the SEC has already undertaken several of the actions listed in your recommendations, and look forward to working with you to implement others. Thank you for your role in helping to ensure that the SEC is faithfully executing its mission to protect investors, facilitate capital formation, and maintain fair and orderly markets.

# Management's Comments

## DIVISION OF TRADING AND MARKETS MANAGEMENT COMMENTARY

The Division of Trading and Markets ("Division") appreciates the opportunity to comment on the Office of Inspector General ("OIG") Report "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" ("OIG Report"). This comment process is of critical importance to the Division because previous modes of feedback to OIG have proven ineffective in correcting what the Division believes are factual errors and unsupported conclusions. This OIG Report therefore becomes the mechanism by which the Division can attempt to set the record straight.

We believe the OIG Report is fundamentally flawed in its process, premises, analysis, and key findings. The Division understands the importance of an active and independent OIG, and supports full and fair investigations of matters by the OIG. However, with respect to this OIG Report, the Division's calls to correct mistakes, misunderstandings, and misrepresentations have had limited effect on the final document. It is our view that the resulting OIG Report starts from incorrect assumptions and reaches inaccurate, unrealistic, and impracticable conclusions.

Few would argue that the demise of Bear Stearns was a significant event for the U.S. financial markets. This demise deserves a careful analysis to assess its causes and to prescribe future actions. This OIG Report does not provide such an analysis; rather, it attempts to explain Bear's collapse in nutshell fashion. The Division believes that the OIG Report is flawed in several respects.

As a threshold matter, the Division believes it was not provided with a fair and meaningful process to address the issues raised in the OIG Report. In particular:

- OIG failed to interview the Division's senior management. Senior managers were in a position to address many of the concerns raised in the OIG Report and provide information that OIG could not obtain from staff workpapers.
- OIG did not interview Bear Stearns managers regarding critical aspects of the OIG Report. Firm management constitutes a primary source of information that could serve to meaningfully support or refute a number of the OIG Report's statements about the Division's CSE supervision of the firm. Such a cross-check and verification should be incorporated in such a OIG Report.
- OIG's expert spent only three hours with Division staff before preparing his portions of the OIG Report. The issues associated with supervision of a complex firm such as Bear Stearns cannot be evaluated without developing a context for the information. Without the benefit of conversations with Division staff, such context is missing and the OIG's conclusions are destined to lack proper foundations.

**APPENDIX VII CONTINUED..**

- Large portions of OIG's Report – and in particular the portion prepared by the OIG expert – rely extensively, if not exclusively, on information contained in informal Divison staff memoranda that recorded notes, not final conclusions, and do not represent all the facts or work performed by Division staff. These notes were not a final work product and were not even circulated to the Division's senior management.
- The OIG Report cites staff notes out of context, giving the impression that the Division, at some point, shared such views but failed to act prudently. The OIG Report should have distinguished between its own findings and opinions, and those of Division staff.
- The OIG Report's assessments contain numerous factual and analytical errors, and weakly supported conclusions, perhaps reflective of the process used and the tight time, informational, and resource constraints under which it was prepared. Each error is, in and of itself, understandable. Untangling capital from liquidity, market risk from funding risk, risk weighted assets from less liquid assets, is difficult even for many practitioners and regulators involved in day-to-day consideration of the issues. Unfortunately, the cumulative effect of the errors led to less informed and more assertive conclusions than would have been the case had the process had the luxury of more time and greater resources.

This process has produced findings that are materially in error, including the following:

- As the Division has expressly informed OIG in informal comments, CSE holding companies are not subject to a capital requirement – they are required to report a capital ratio calculated under the Basel II Standard.
- As the Division has expressly informed OIG in informal comments, paragraph 777 of the Basel II Standard, quoted in the OIG Report, describes requirements related to credit risk. Yet the text of the OIG Report cites this paragraph to make an argument that the Standard was applied imprudently with respect to market risk concentrations.
- As the Division has expressly informed OIG in informal comments, the OIG Report improperly criticizes CSE oversight, noting "that pricing at Bear Stearns was based more on looking at trading levels in the market than on looking at models." Marking positions based upon recent trading activity is a higher valuation standard in the accounting literature and should be used above marks produced by models.

This OIG Report considers an isolated set of data about Bear Stearns, yet it makes sweeping statements and comes to broad findings about the CSE program in general. In doing so, it does not consider the events in our markets following the collapse of Bear Stearns. Since that time, we have seen the failure of IndyMac bank, the bankruptcy of Lehman Brothers, the purchase of Merrill Lynch by Bank of America, the Federal government's explicit actions to guarantee Fannie Mae, Freddie Mac, the injection of Federal money into the insurance company AIG, the attempt by the U.S. Treasury to create a $700B purchase facility for distressed

**APPENDIX VII CONTINUED..**

assets from the financial sector, and the conversion of Morgan Stanley and Goldman Sachs to bank holding companies.

[REDACTED PARAGRAPH]

This chain of events raises very significant questions about the supervision of all types of financial institutions, not just investment banks. For our part, the Division has engaged with domestic and international regulators in a concerted effort to answer what are very fundamental questions about how large and complex financial institutions should be supervised, capitalized, and kept liquid. With respect to Bear Stearns, the staff applied the relevant international standards for holding company capital adequacy in a conservative manner, and added a holding company liquidity requirement: and yet they could not withstand a "run-on-the-bank." Where the globally accepted standards required an eight foot high levee, Division staff raised a ten foot levee, which was of course little use in the face of a fifteen foot storm surge. The relevant question now is not whether the levees were high enough, because they clearly were breached. Rather, the central issue is whether levee systems, no matter how high, afford sufficient protection from the financial environment, or are additional measures needed to complement the levees?

In particular, there is widespread recognition that the international standards for holding company capital adequacy, relied upon by both commercial and investment banks, require revision. Also, new standards for liquidity need to be calibrated and applied to large institutions. There are many venues in which relevant discussions are progressing and where guidance will soon be issued. The Commission staff has been active in all of these, including the Senior Supervisors Group, the Basel Committee, the Financial Stability Forum, and the International Organization of Securities Commissions. Rather than wait for this collaborative work to be complete, however, the Division responded quickly to the collapse of Bear Stearns by requiring the remaining CSE firms to increase their liquidity pools, which already were significantly in excess of any applicable international standard.

Given continuing market events, we feel it is not possible to responsibly make the type of statements that were made in this OIG Report about the demise of Bear Stearns, and the role of the CSE program. We expect that after these data are analyzed with proper care and reflection, responsible lessons can be drawn. But the events subsequent to the failure of Bear Stearns strongly suggest that the statements made in this OIG report are premature at best. For our part, we believe that the key conclusions of the OIG Report are inaccurate and without empirical foundation.

OIG Report 446-A: SEC's Oversight of Bear Stearns and Related Entities: The
Consolidated Supervised Entity Program

**Please indicated your concurrence or non-concurrence with each recommendation
that applies to your Division or Office.**

**Recommendation 1:**
The Division of Trading and Markets, in consultation with the Board of Governors of the
Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and
rules regarding the Consolidated Supervised Entity (CSE) firms' capital levels; and (2)
identify instances (e.g., a firm's credit rating is downgraded, or its unsecured debt trades
at high spreads over Treasuries) when firms should be required to raise additional capital,
even if the firm otherwise appears to be well capitalized according to CSE program
requirements.

**Management Response (Concur or Non-concur):**

The Division of Trading and Markets concurs with this recommendation, even though we
believe it is based on a fundamentally flawed understanding of the Bear Stearns crisis.
Nonetheless, we have already undertaken efforts that respond to the recommendation.

Actions: Since Bear Stearns' failure, we have:

- Worked with the Basel Committee on Banking Supervision to amend capital
  adequacy standards for internationally active sophisticated institutions to deal
  explicitly with liquidity risk;
- Supported the work of the Basel Accord Implementation Group on "incremental
  default risk capital," which aims to supplement Value at Risk-based capital to
  ensure that "tail risk exposures" in the trading book are adequately capitalized.
- Developed and entered into a formal Memorandum of Understanding with the
  Federal Reserve to improve sharing of information and provide a mechanism for
  cooperation in supervision of CSEs.
- Jointly with the Federal Reserve, discussed with the senior management at each
  CSE firm its long-term funding plans, including plans for raising new capital by
  accessing the equity and long-term debt markets.
- Required public disclosure of capital adequacy measures computed under the
  Basel Standard.

Flawed Assumptions and Findings: TM believes that the OIG Report's findings are
fundamentally flawed in the following ways:

- The OIG Report's exclusive focus on capital is misplaced. As explained in
  Commission public statements and testimony, Bear Stearns's failure was due to a
  run on liquidity, not capital. The primary reason that Bear failed was concerns by

secured lenders that it would suffer greater losses in the future. These concerns caused secured lenders to stop providing financing, even on a fully-secured basis, despite the firm's compliance with applicable net capital requirements.

- The OIG Report misconstrues the nature of the Basel Standard. The CSE rules incorporate by reference the Basel Standard, the capital adequacy regime applicable to internationally active financial institutions, including commercial banks, on a global basis. The Basel II Standard is a capital ratio, not a capital requirement. However, the CSE program requires reporting of the capital ratio and incorporates the 10% Basel capital ratio threshold as constituting a "well capitalized" institution consistent with the threshold used by banking supervisors. Falling below 10% triggers certain obligations on the firm, but because there is no capital requirement is not necessarily a "violation."

- At the time of its failure, the Bear Stearns holding company actually exceeded the Basel II "well-capitalized" standard, and Bear's primary broker-dealer maintained tentative net capital above $5 billion.

- The OIG Report questions whether Bear's "capital requirement amounts were adequate," but the real issue is whether the international Basel standard that all international banking institutions rely on is sufficient.

- The OIG Report's assumptions regarding leverage based on the Pickard article are inaccurate.

  - The statement of Mr. Pickard, used in the OIG Report, is inapplicable to the relevant capital and liquidity requirements at Bear's holding company. The quotation appears to confuse holding company Basel II capital standards and broker-dealer net capital requirements:

  - Mr. Pickard's statement does not accurately reflect the letter and operation of the SEC's current net capital rule and has numerous analytical errors as a result. For instance, the CSE broker-dealers were not subject to an explicit 12x leverage standard before the CSE amendments, as implied by Mr. Pickard. The article says that broker-dealers were formerly subject to a leverage ratio limit of 12x net capital in computing minimum net capital, and this limit was removed by the net capital requirements applicable to broker-dealer subsidiaries of CSEs. (This limit is in the "aggregate indebtedness" method for calculating net capital.) However, CSE broker-dealers were not subject to this leverage limit even before the CSE net capital standard was created. These broker-dealers used an alternative capital standard that has been in the rule since 1975. Under this requirement, broker-dealers that carry customer accounts maintain minimum net capital equal to no less than two percent of "aggregate debit items", not the aggregate indebtedness standard referred to by Mr. Pickard. This alternative method to compute the minimum net capital requirement is applied by all the CSE broker-dealers and most

2

other large broker-dealers. Under the "aggregate debit items" method for calculating net capital, a broker-dealer's ability to increase leverage is limited through the application of haircuts to proprietary positions rather than through the application of a leverage standard from the aggregate indebtedness standard.

- The OIG Report's conclusion regarding the interaction of capital and secured funding is misguided.

  - In analyzing Bear Stearns's efforts to increase its relative reliance on secured rather than unsecured funding, the OIG Report states that this shift called into question "whether Bear had enough capital to sustain its business model." This statement focuses on capital -- not liquidity -- as the primary issue causing Bear's collapse, and TM believes it is fundamentally incorrect in concluding that such activity points to inadequate capital at Bear.

  - Further, the OIG Report states that even though Bear had increased its reliance on secured funding, it was "unable to obtain" enough to save the firm in March. TM submits that Bear never would have been able to obtain enough funding because the firm was experiencing a run-on-the-bank by counterparties that provide secured funding.

  - A firm's decision as to the form of funding is based on many factors such as term, diversification, collateral, stability of lender, maintaining relationships and cost. It was widely believed that secured funding was more stable and reliable than unsecured funding. Also, the cost of unsecured funding increased substantially for all financial institutions during and after the Summer of 2007. In these circumstances, it is understandable that many financial companies, including Bear, sought cheaper, more stable sources of financing through secured funding. Also important was the collapse of the securitization business. The high cost of funding was an effect of the collapse of securitization rather than its cause.

  - The OIG Report incorrectly states, based on a review of informal staff notes and internal memoranda, that TM did not believe it had a mandate to compel Bear Stearns to raise additional capital if the firm's Basel II capital ratio was greater than 10%.

  - As TM explained in informal comments, the CSE rules expressly and broadly state that the Commission can impose additional conditions on either the broker-dealer or the holding company if the Commission finds it necessary and appropriate in the public interest or for the protection of investors. See Exchange Act Rule 15c3-1e(e)(7). There are also specific conditions that would trigger Commission action. Exchange Act Rule 15c3-1e(e)(1)-(6).

---

3.

• TM has always believed and represented from the beginning of the CSE program that it had broad authority related to financial responsibility to mandate that a broker-dealer and or its ultimate holding company raise capital or achieve the same end by reducing the balance sheet, as well as direct the firm in the sale of assets or customer accounts as the facts and circumstances may warrant.

## Background on the CSE Rules

TM believes that it is useful for the reader to understand certain fundamental features of the CSE rules. The CSE rules incorporate by reference the Basel Standard, the capital adequacy regime applicable to internationally active financial institutions, including commercial banks, on a global basis. The Commission has sought to apply this standard in a conservative manner, in particular with regard to charges for the positions held with trading intent, which are a significant share of those held overall by securities firms. Specifically, firms have been required to augment value-at-risk charges (VaR), computed using internally-developed statistical models, with fixed percentage haircuts. These additional haircuts are, in fact, a multiple of the value-at-risk charges, and so, are more conservative.

Because the Commission recognized that the primary risks to securities firms are those associated with funding, the CSE program imposed a liquidity requirement in addition to the Basel Standard. It is important to note that this requirement, which mandated firms hold significant pools of liquid assets, is not part of the Basel Standard.

In the wake of crises at Bear Stearns, Northern Rock, Countrywide, and a number of other institutions, the Basel Committee on Banking Supervision, which developed and promulgated the Basel Standard, has initiated a number of projects intended to modify the Basel Standard to reflect the lessons of recent events. TM staff has actively engaged in this effort at the behest of Chairman Cox. TM staff co-chair one Basel committee dealing with these issues, and participate in another, which are working to strengthen in a number of areas the capital standards applicable to internationally active institutions. The Basel Committee has expanded its work to include consideration of guidance, and perhaps explicit standards, regarding liquidity risk management for financial institutions. Here again, TM staff has been actively involved. So while the Commission staff believed that capital and liquidity standards applicable to CSEs were conservative relative to international norms prior to the collapse of Bear Stearns, they join other regulators in recognizing that further strengthening and expanding these standards to include liquidity is necessary in the wake of recent events.

## Recommendation 2:

The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should

---

4

describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

**Management Response (Concur or Non-concur):**

We concur with the recommendation, and have either already undertaken or already completed work that responds to the recommendation.

Since Bear's collapse we have:

- Worked with the Basel Committee on Banking Supervision to implement the Chairman's call for amended capital adequacy standards for internationally active sophisticated institutions to deal explicitly with liquidity risk.

- Jointly with the Federal Reserve, established new stress scenarios as a basis for sizing liquidity pool requirements based on the response to shorter, more extreme events entailing a substantial loss of secured funding, more severe liquidity outflows from prime brokerage activities and liquidity drains due to operations frictions such as in derivatives settlements and timing considerations related to margin postings.

- Jointly with the Federal Reserve, strengthened the liquidity requirements for CSE firms relative to their unsecured funding needs, and closely scrutinized the secured funding activities of each CSE firm, with a view to lengthening the average duration and broadening the diversity of all funding arrangements.

Like Recommendation 1, Recommendation 2 is fundamentally flawed, as it based on the same analysis. In addition, as we informed the OIG in our informal comments, the analysis is inaccurate in the following ways:

- The OIG Report's statement that the CSE program liquidity guidelines were inadequate because the time horizon for a liquidity crisis to unfold is likely to be less than the one-year period, and secured lending facilities are not automatically available in times of stress, presupposes that the loss of all secured funding was reasonably predictable. It also ignores the difficulty of providing adequate liquidity for this event.

- TM has stated clearly that its liquidity pool requirements, like those of other international and domestic regulators contemplating similar issues, did not anticipate a complete unwillingness of lenders to provide financing on quality assets (such as Treasuries or agency securities). This would include the availability of committed secured lending facilities.

8

---

- From the standpoint of unsecured funding, applying a one year liquidity requirement to replace unsecured funding was itself a logical approach. The concept underlying the one-year liquidity requirement for unsecured funding was that, should a firm experience a severe event such that unsecured lenders decide on day one to cease lending, the firm would have a liquidity pool sized to allow it to replace the unsecured funding as it matured over a one-year period.

- The 60-day cash flow analysis is a different metric that provides the firm another perspective. It is a short-term cash flow analysis focused on a more acute event.

- Also, given that US and international credit markets have been in crisis for over a year, the one-year unsecured funding liquidity pool requirement remains relevant.

- The OIG Report's suggests that TM staff should have recognized that terminations of Bear's committed secured evergreen facilities were a predictor of a "run-on-the-bank." However, during 2007 availability of longer-term secured funding including evergreen facilities was declining for most investment banks, so that by March, an increasing amount of secured funding was provided on a short-term basis. This was phenomenon visible at many firms and was well understood at the time by TM staff.

- The OIG Report's statement that OIG staff could not determine whether TM staff received information on secured lending facilities, including evergreen is unsupportable. As we explained in informal comments to OIG, since at least August 2007 TM staff periodically received information on the availability of secured evergreen facilities in Fixed Income Inventory Analysis reports compiled by Bear Stearns. Also, TM staff explained that in weekly and daily discussions with Bear's fixed income funding desk and with the Treasury managers, Bear informed TM staff of significant losses of such evergreen facilities.

### Recommendation 3:
The Division of Trading and Markets should ensure that it adequately incorporates a firm's concentration of securities into the Consolidated Supervised Entity (CSE) program's assessment of a firm's risk management systems (e.g., internal controls, models, etc.) and more aggressively prompt CSE firms to take appropriate actions to mitigate such risks.

### Management Response (Concur or Non-concur):

We concur with the recommendation, and either already had in place processes, or have since undertaken efforts that respond to the recommendation.

- The CSE program incorporates an assessment of a firm's concentration of securities into the firm's risk management processes and systems.

---

8

- TM staff have in the past instructed CSEs to reduce outsized, or concentrated exposures related to lending to specific sovereigns, particular instruments or risk factors .

However, the recommendation misapprehends the role of the Commission in overseeing CSEs:

- The OIG Report's conclusion at base is an indictment not of the CSE program's assessment of risk management systems, but of Bear's fundamental business strategy.

- At the time of Bear's CSE approval and thereafter, it was apparent to the Commission and CSE staff, as well as to Bear's equity and debt investors and the market, that Bear Stearns business strategy was focused on US-based fixed income generally and mortgages in particular.

- It is worth noting that a number of other institutions supervised under a variety of regulatory regimes, including Indy Mac, Countrywide and Northern Rock, likewise collapsed because of a business model that relied heavily on mortgage origination or securitization. Moreover, as announced by the US Treasury Department on September 7, 2008, the US Government has placed Fannie Mae and Freddie Mac in conservatorship as a result of the losses they suffered on their mortgage-based holdings.

- The Commission's responsibility was not to dictate business strategies to Bear Stearns. Rather, it was to review whether the exposures taken on by Bear Stearns were properly controlled and measured. The focus of Commission staff on Bear's governance processes was intended to insure that these exposures were reported to senior management in a manner that accurately reflected material risks.

- To discharge this responsibility, Commission staff monitored the risk profile of the firm in the aggregate and at the desk level using a variety of metrics, and discussed with the firm's independent risk management instances where limits were exceeded. These exposures were reported both to Bear's senior business Heads as well as to the Executive Committee regularly.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

---

7.

**Management Response (Concur or Non-concur):**

Given the current public discussions about the utility of leverage ratios for securities firms, we concur with the recommendation and believe it is important to address this issue with fellow regulators. The Recommendation, however, minimizes the problems with imposing limits through leverage ratios.

- Financial institutions are, by their very nature, highly leveraged businesses.

- The Commission has not sought to impose explicit leverage limits on CSE holding companies for several reasons. First, analysts can easily assess leverage from public financial information. Second, a leverage ratio is a crude measure, and implicitly assumes that every dollar of balance sheet involves the same risk, whether due to a treasury bond or an emerging market equity. Further, leverage tests do not at all capture the potential exposures of derivative products that remain off balance sheet. Finally, a leverage limit creates an incentive for firms to move exposures off balance sheet, through instruments ranging from over-the-counter derivatives to the SIV structures that proved highly problematic for other financial institutions (not investment banks) in the last year.

- While a leverage limit may be effective for an institution that does not deal in derivative products, highly complex institutions can easily evade any leverage limit imposed, often with the unintended consequence of increasing the firm's exposure to complex instruments.

**Recommendation 5:**

The Division of Trading and Markets (TM) should ensure that: (1) the Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firms' model review and approval process takes place in a thorough and timely manner, and (4) impose limits on risk taking by firms in areas where TM determines that risk management is not adequate.

**Management Response (Concur or Non-concur):**

TM concurs with the goals of recommendation 5, and the CSE program does ensure that these standards are satisfied.

- However, the OIG Report does not recognize the progress achieved through the review process. While the OIG Report correctly notes that the staff raised concerns with Bear Stearns regarding its coverage and staffing of its Model Review Function, the OIG Report does not reflect the resulting subsequent progress. In fact, the firm did respond to staff concerns, and created and implemented action plans to address them.

---

8

- For example, in September 2006 Bear hired two dedicated model control staff persons for MBS and cash products and three completed model reviews were presented at this time. The MBS and Cash inventory models were reviewed between September 2006 and December 2007.

- With respect to the risk metrics that the firm used in managing its market risk to mortgage products, the OIG Report contains key omissions, and incorrect conclusions.

- The firm in fact made significant progress in improving its VaR infrastructure subsequent to approval in response to Commission staff concerns. For example, the firm followed through on recommendations to enhance control over the VaR system. Inputs to VaR models were regularly updated following application approval.

- Since the beginning of the SEC oversight of Bear as a CSE, Bear regularly improved and expanded its data sources. In some instances where data sources were limited, the instruments were immaterial. For example, mortgage derivatives, which were distinct from CDS and ABS CDO positions, were an immaterial exposure with only de minimis impact on Bear's profit and loss.

- The OIG report assumptions and conclusion regarding Bear's model review staffing are inaccurate. Specifically, while certain model reviewers left Bear in 2006 and the head of model validation resigned in early 2007, TM staff discussed staffing and the model validation process with the head of Bear's Model Review Committee. The model control function for mortgages was shifted to the product line risk managers while a new Head of Model Validation was hired in Sept 2007. Model control work on mortgages was unaffected during the interim period.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Management Response (Concur or Non-concur):**

TM concurs that skepticism is warranted when reviewing firm risk models, but we believe that Recommendation 6 is based on incomplete information.

- Bear Stearns' use of scenario analysis was consistent with industry practices: virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing.

- TM staff did in fact discuss repeatedly with Bear risk officers the firm's Alt-A and option ARMS positions in addition to subprime.

9

- Therefore, the OIG report conclusions, which are based on the OIG expert's review of internal TM memoranda that did not mention forward-looking risk scenarios, such as a complete meltdown of mortgage market liquidity, are based on incomplete information.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

**Management Response (Concur or Non-concur):**

We concur with the recommendation, but believe that it reflects what TM and Bear had already accomplished.

- Contrary to the OIG Report statements, Bear did incorporate into its risk scenarios those risks discussed in meetings with TM staff, such as a housing-led recession scenario.

**Recommendation 8:**
The Division of Trading and Markets should take steps to ensure that mark disputes do not provide an occasion for Consolidated Supervised Entity firms to inflate the combined capital of two firms by using inconsistent marks.

**Management Response (Concur or Non-concur):**

We concur with the recommendation as written, but we believe it reflects a misunderstanding of the marking process and the oversight capabilities of supervisors.

TM did inquire into the mark disputes referenced in the OIG Report.

- TM acknowledges certain, persistent mark disputes indicate illiquid assets and valuation issues that TM should inquire into. However, mediating most or all of any individual firm's disagreements over marks across all its counterparties is not feasible. Additionally, many of the disputed margin calls related to products such as customized structured credit derivatives where price transparency is an issue and variations in marks is conceivable.

- The OIG report does not provide the proper context when discussing certain $100 million mark disputes Bear had with counterparties. Bear had more than 25,000 trades with JPM and, given the nature of the counterparty, a highly-rated financial institution, the capital impact under Basel II would be de minimis.

---

10

- Therefore, TM believes that the OIG report assumption that firms are collaborating to create capital was not properly substantiated.

- The OIG report confounds marking versus price verification processes at investment banks, and does not consider all the information provided to OIG by TM regarding price verification processes.

### Background on Industry Practice:

First, we should point out that margin disputes are unavoidable particularly when markets become less liquid or illiquid. This is an issue that all dealers are facing today and the total disputed numbers at Bear Stearns were much smaller than at other institutions.

With respect to the OIG report assertion about using traders' marks for profit and loss, it is universal industry practice (and endorsed by various descriptions of best practices such as the Group of 30) for traders to mark firm inventory for purposes of books and records. It is then that an independent control group has the role of validating or substantiating those marks via an independent price verification process.

### Recommendation 9:

The Division of Trading and Markets should encourage the Consolidated Supervised Entity (CSE) firms to present VaR and other risk management data in a useful manner, which is consistent with how the CSE firms use the information internally and which allows risk factors to be applied consistently to individual desks.

### Management Response (Concur or Non-concur):

TM concurs with the recommendation, but we believe the findings are inaccurate.

- Contrary to the OIG Report assertion, Bear did not use inconsistent VaR numbers:

- The OIG expert supports this conclusion by noting that Bear's trading desks evaluated profits and risks individually and so assumes VaR was not implemented firmwide.

- As TM already explained in informal comments, Bear's trading desks and businesses used a variety of metrics to measure and manage its risk. VAR, however, was implemented firm-wide.

11

---

**Recommendation 10:**

The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

**Management Response (Concur or Non-concur):**

TM concurs with the recommendation and either already had in place processes, or have since undertaken efforts that respond to the recommendation. However, we believe the findings underlying Recommendation 10 are unsupported.

The report asserts TM should have considered expanding the list of assets that require a full deduction from capital. However, the Report did not present evidence that TM did not follow Basel II or did not apply sufficiently conservative capital treatment in light of the relative illiquidity of assets. The analysis to support this assertion is incomplete or without basis.

As explained in informal comments to the OIG. TM applied Basel II correctly and did employ conservative capital treatment where appropriate.

- Specifically, with respect to illiquid assets, Basel II does not require full deduction of most illiquid assets, many of which attract capital charges of 8%. TM did require full deduction for certain illiquid assets, such as mortgage residuals.

- For assets held in the trading book, Bear took significant mark-downs in mortgage-related assets which resulted in a reduction of Tier 1 capital, as it should.

- With respect to the report's description of Bear's loan to the BSAM High Grade hedge fund, as TM explained in informal comments, the loan was overcollateralized, and Basel II did not require Bear to reduce its capital by the full amount of the loan.

- Specifically, TM explained to the OIG that Bear provided the replacement secured funding to BSAM funds at current marks, that is net of write-downs, and with haircuts. Bear took capital charges for the resulting secured exposures that far exceeded Basel II requirements, and effectively treated the positions as if these had been held on Bear Stearns' balance sheet.

- When the BSAM funds failed to make margin calls in July, the assets were indeed taken onto Bear Stearns' books.

12

### Recommendation 11:

The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would enable TM to better assess the effectiveness of the firms' risk management systems.

### Management Response (Concur or Non-concur):

TM concurs with this recommendation and we have already had in place processes, or have since undertaken efforts, that respond to the recommendation.

* TM acknowledges that SEC senior officials should engage the CSE boards of directors periodically to review risk management issues and assess risk tolerance or discuss particular issues.

### Recommendation 12:

The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[1] for this deviation from the current rule's requirement.

### Management Response (Concur or Non-concur):

TM understands the recommendation and will present to the Commission whether to require compliance with the existing rule or to propose rule amendments that would permit the internal auditor to perform this review.

However, we believe that the finding is incorrect. We raised the following issues with respect to this finding and recommendation:

* TM has specific authority to issue exemptions from the net capital rule of which 15c3-1g is an appendix. See 17 CFR 200.30-3(a)(7)(ii). The functions of the Director of Trading and Markets include responding to no-action requests from CSEs. See 17 CFR 200.19a.

* TM strongly disagrees with the statement that there are serious questions about the wisdom of its decision. The Rule permits the external audit to be based on

---

[1] The Administrative Procedures Act (5 U.S.C. §500 et. seq.) sets forth the basic procedural requirements for agency rulemaking. It generally requires (1) publication of a notice of proposed rulemaking in the *Federal Register*, (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

13

"agreed upon procedures" between the firm and its external auditor. After much negotiation between the Division of Trading and Markets, the CSEs and the external auditors, the external auditors would not agree to perform more than a "check the box" review of the risk management control systems for fear of liability. Thus, it was apparent that the "agreed upon procedures" would be of minimal benefit.

- In contrast, TM believed that a substantive review of procedures by internal audit, which included a determination of whether the procedures used by the firm were sufficient for the purposes intended, would be a more effective check on the firms' risk management process. As a result, the internal audits undertaken by the firm were greater in scope and substance than would have been performed by the external auditors under their agreed upon procedures. The internal audit department's review of internal risk management controls also would be conducted throughout the year rather than as a once a year audit process. The independence, staffing levels, and audit scopes of the internal audit departments were reviewed by OCIE and the Division of Trading and Markets as part of the application process.

- The report's statement that "the external auditor's work is more strictly regulated as the PCAOB regulates external auditors" is misleading due to the lack of substantive auditing standards for reviewing a firm's risk management control systems. It also is not clear that the PCAOB has in place a process for reviewing such auditing work.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

**Management Response (Concur or Non-concur):**

The Division of Trading and Markets does not concur with this recommendation.

- As TM informed OIG in earlier comments, there is no requirement in the CSE rules that CSEs have an internal or external communication policy. Likewise, there are no SEC rules requiring non-CSE broker-dealers to maintain such communication policies, and we are unaware of any such requirement for any other SEC regulated entities. Although TM noted that Bear Stearns had a communications strategy within its Contingency Funding Plan, there was no TM "assessment" of that strategy, as stated by OIG.

- What OIG has failed to appreciate is that the CSEs are part of public holding companies that have securities registered with the SEC and listed and trading on U.S. securities exchanges. As public companies, the CSEs are subject to myriad

---

14

SEC disclosure requirements, including Regulation S-X and Regulation FD.
Corporate disclosures such as those covered in Bear Stearns's CFP
communication strategy are subject to those disclosure requirements, and the
SEC's Divisions of Corporation Finance and Enforcement actively enforce
compliance with these requirements. Accordingly, it would be inappropriate for
TM to opine on, or otherwise influence, the corporate communications of these
public companies.

### Recommendation 14:

The Division of Trading and Markets should develop a formal automated process to track
material issues identified by the monitoring staff to ensure that they are adequately
resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;
- When the issue was identified;
- Who identified the issue;
- The current status of the issue (e.g., new developments);
- When the issue was resolved; and
- How the issue was resolved.

### Management Response (Concur or Non-concur):

TM concurs with the recommendation, and will undertake efforts that fully respond.

However, the analysis underlying the recommendation does not show evidence that the
CSE program failed to adequately resolve issues, or that material issues were not
monitored.

- Rather, the OIG report reaches its conclusion that the program does not adequately
track issues from its criticism of the recordkeeping of those issues. While we
recognize that an automated audit trail is desirable, its absence is not proof that issues
are not adequately tracked, merely that recording of those issues could be improved.

### Recommendation 15:

The Division of Trading and Markets should: (1) reassess all the prior Office of
Compliance Inspections and Examinations (OCIE) issues to ensure that no significant
issues are unresolved (given the belief that OCIE followed up); and (2) follow-up on all
significant issues.

15

**Management Response (Concur or Non-concur):**

We understand the recommendation, but believe that these issues are either moot or long since addressed.

- Moreover, as we explained in our informal comments, the recommendation is predicated on an incorrect understanding of the division of responsibilities, past and present, between the Division of Trading and Markets and OCIE. The report criticizes TM staff that "assumed" issues were the responsibility of OCIE, whereas in fact for eighteen months subsequent to the Bear Stearns application examination, the issues were in fact OCIE's responsibilities.

- In addition, as we informed OIG in our informal comments, TM monitored the material issues to assure that they were resolved. TM and OCIE agreed that one issue mentioned in the report, the issue regarding workpaper retention at Bear Stearns, was material. The firm was required to respond in writing to TM before a recommendation was made that the Commission act upon the application, and firm in fact agreed to retain workpapers. Subsequent oversight by TM personnel relied on access to these workpapers and so verified that corrective action had in fact occurred. With regard to the second issue mentioned in the report, as we explained in our informal comments, there is no basis for the statement about materiality of the VaR model issue. The OIG expert did not directly review the models, related documents, and the firm's books and records. Without a thorough review and reasonable basis for the statement, its materiality finding is conclusory. Appendix III indicates clearly that neither OIG nor the expert conducted an independent analysis of Bear's risk management system.


**Recommendation 16:**

The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

**Management Response (Concur or Non-concur):**

The Division of Trading and Markets does not concur with this recommendation.

- As the Division staff explained in informal comments, the Commission was clearly informed of the examination findings and their status when they approved the CSE applications.

16

---

- In addition, the OIG report's characterization of the application process as "less meaningful" is inaccurate. The Commission was well within its authority to approve such applications, given they were notified of OCIE's findings, of TM's assessment of the materiality of the issues with respect to the application, and of TM's direct follow up with Bear Stearns (or other CSE) regarding the identified issues and resolution.

- The OIG report fails to appreciate that CSE examinations were an ongoing process. As part of its normal business operations, a CSE constantly reviewed its risk management systems to assure that those systems adequately dealt with marketplace changes. Consequently, the staff continually monitored a firm's risk management systems to identify changes a CSE made to its risk management systems and to determine whether those changes appropriately addressed the perceived issues and that they were adequately implemented. For instance, if marketplace changes caused an increase in a CSE's backtesting exceptions, the CSE could amend its models to capture additional data points in an effort to decrease such exceptions. In such cases the staff would review and approve those changes to the CSE's models.

- With respect to Bear in particular, the European Commission's Conglomerates Directive set a fixed deadline by which the firm needed to be supervised on a consolidated basis. Given this timeline and the level of materiality of the issues involved, TM did not believe it necessary to wait for the formal transmittal of a written deficiency letter or the receipt of a written response before recommending the Commission approve the order.

- Finally, the OIG report's statement that TM failed to follow up on issues raised by OCIE during its inspection of Bear is incorrect. As explained to OIG staff in TM's informal comments, TM indeed resolved material issues identified by OCIE and the report has not cited any factual basis for finding otherwise.

**Recommendation 17:**
The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with CF to assess the degree to which additional information and information would be useful.

- However, as the staff explained in its informal comments, TM staff met repeatedly with CF staff during 2007 and 2008 to discuss the issues cited in the

---

17

report around public disclosure of capital information. No acknowledgement of those efforts is made in the formal draft report.

**Recommendation 18:**

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (e.g., discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with OCIE and the Chairman's office to determine how collaboration should be further formalized.

- As we informed OIT in our informal comments, however, and what is not described in the OIG report, is that TM and OCIE issued joint guidance to all staff regarding the division of responsibilities and the sharing of information with respect to the CSE firms on March 19, 2007, shortly after the Commission transferred inspections responsibility from OCIE to TM. TM has complied with all provisions of that guidance.

**Recommendation 19:**

The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with ORA and the Chairman's office to determine how collaboration should be further formalized.

- We note, however, that TM's relationship with ORA is strong, as evidenced by collaboration on a number of issues ranging from credit rating agencies to analysis of Bear Stearns' failure.

- Formalizing an agreement between two offices within the Commission would be relatively unusual, in contrast to concluding a formal MOU with an external agency such as the Federal Reserve.

---

18

**Recommendation 20:**
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

**Management Response (Concur or Non-concur):**

Please see CF letter submitted separately.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

**Management Response (Concur or Non-concur):**

Please see CF letter submitted separately

**Recommendation 22:**

Chairman Cox should create a task force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

**Management Response (Concur or Non-concur):**
TM concurs with this recommendation.

- We note, however, that this issue was previously considered when implementing the rules for Supervised Investment Bank Holding Companies (SIBHCs).

- In Exchange Act Release 49831, the Commission found that its supervision of an investment bank holding company as a SIBHC would be necessary and appropriate only when the IBHC is affiliated with a broker-dealer that has a "substantial presence" in the securities business. The requirement that a firm have a "substantial presence" was to identify broker-dealers and their holding companies whose failure could have a materially adverse impact on other securities market participants, thus reducing systemic risk.

- Under the SIBHC rules, among other things, evidence that an investment bank holding company owns or controls a broker-dealer that maintains $100 million in

---

19

tentative net capital would be sufficient to demonstrate a substantial presence in the securities business. One firm has applied to be supervised as a SIBHC.

**Recommendation 23:**
The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

**Management Response (Concur or Non-concur):**
We understand the recommendation, and are now actively working with the Chairman's Office to consider what changes are appropriate in light of recent developments. In addition, the Chairman has made a number of requests for legislative changes that could require further modifications of the CSE program.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward. TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and we have already undertaken efforts that fully respond to it.

- We have posted a position for an Assistant Director (CSE Inspections) in New York, as well as staff jobs for the CSE inspections units in both New York and Washington.

- It is worth noting, however, that this recommendation arises in part from a misperception of the CSE inspections program.

- As we informed the OIG in our informal comments, three inspections have been conducted and two inspection reports have progressed to the final stages of review in the 13 months since responsibility was transferred from OCIE and in the 9 months since TM's inspections unit became operational.

- In addition, OIG staff was provided with a term sheet document, shared with the Commission in Fall 2007, which set out the specific milestones used to assess progress in each inspections project. While the TM staff would certainly prefer that all three inspections were fully complete at this point, the unprecedented

20

financial market conditions that have prevailed through much of this year have affected the pace of this work, and much else.

### Recommendation 25:
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

### Management Response (Concur or Non-concur):

TM concurs with this recommendation, and we have already undertaken efforts that fully respond to the recommendation.

- As we informed the OIG in our informal comments, the finding is based upon flawed understanding of the current situation. In particular, on March 1, 2005, the Division Director of TM directed the Division staff to follow OCIE's Ethics Guidelines with two minor variations.

- For simplicity's sake, TM management recently concluded that staff should follow the OCIE guidelines. An email has been sent to the staff providing that clarification.

### Recommendation 26:
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators.

### Management Response (Concur or Non-concur):

TM concurs with the recommendation, and we have already undertaken efforts that fully respond to the recommendation. Since inception, TM has collaborated with a large number of other regulators in the context of the CSE program, including the Federal Reserve Board, the New York Federal Reserve Bank, the FDIC, the State of Utah, and others. Efforts continue to expand the range of both bilateral and multilateral activities.

21

# MEMORANDUM

| TO: | David Kotz |
| | Jill Lennox |
| | Office of Inspector General |

**FROM:** Lori Richards, Director
Office of Compliance Inspections and Examinations

**SUBJECT:** OIG Draft Report 446 -A: *"SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program"*

**DATE:** September 24, 2008

The Office of Inspector General provided a draft of its report, OIG Report 446 -A *"SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program"* and has requested that we provide a written response indicating whether or not we concur with each recommendation that refers to the Office of Compliance Inspections and Examinations. This memo outlines our response.

There are three recommendations in the Report that are directed to the Office of Compliance Inspections and Examinations (OCIE) (Recommendations 18, 22, and 25), and one recommendation that references the Office (Recommendation 15). Our response to each is discussed below.

### Recommendation 18:
The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (*e.g.*, discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

OCIE concurs with Recommendation 18. We believe that a collaboration agreement that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity (CSE) program would improve the effectiveness of the oversight by both offices. While the two offices issued a memorandum on March 19, 2007 to all staff involved in CSE oversight that described the allocation of responsibilities and the reallocation of CSE examination oversight from OCIE to TM, a more detailed agreement could enhance the information sharing and corroboration between the two offices.

### Recommendation 22:

Chairman Cox should create a task force led by the Office of Risk
Assessment (ORA) with staff from the Divisions of Trading and
Markets, and Investment Management, and the Office of Compliance
Inspections and Examinations. The Task Force should perform an
analysis of large firms with customer accounts that hold significant
amounts of customer funds and have unregulated entities, to
determine the costs and benefits of supervising these firms on a
consolidated basis. If the Task Force ultimately believes that the
Securities and Exchange Commission (Commission) should supervise
these firms on a consolidated basis, it should make a recommendation
to the Commission that involves seeking the necessary statutory
authority to oversee these firms on a consolidated basis.

OCIE concurs with Recommendation 22. A joint TM, OCIE and IM task force led by
the Office of Risk Assessment to determine the costs and benefits of supervising
firms with significant customer assets and unregulated affiliates could be very
valuable in producing evidence supporting the need for consolidated oversight. At
the current time, the SEC is generally limited in its oversight authority of financial
firms to registered broker-dealers, investment advisers, and transfer agents; the
Consolidated Supervised Entity oversight is a voluntary program. In the current
environment, where firms are highly diversified and deal in very complex products
and businesses, with much of this activity in unregulated material affiliates,
consideration of additional statutory authority would be valuable.

### Recommendation 25:
The Division of Trading and Markets, in consultation with the Office
of Compliance Inspections and Examinations and the Commission's
Ethics office, should develop an ethics manual.

OCIE concurs with Recommendation 25. OCIE has implemented strong written
ethics procedures for the OCIE examination force, with requirements and
prohibitions that are more stringent than the SEC procedures that apply to all SEC
staff. Examiners are entrusted with special responsibilities that require the utmost
integrity, avoidance of even a remote appearance of a conflict of interest, and the
highest level of professional conduct. Because SEC exam staff are evaluating
compliance with the law and effectiveness of risk management controls, their
credibility, judgment, and independence must be above reproach. For this reason,
OCIE believes that the stringent ethics procedures that apply to OCIE examination
staff should apply consistently to all SEC staff that perform examinations, and
would work with TM to develop an ethics manual for the CSE program.

While Recommendation 15 does not require any action by OCIE, it does reference
the Office and therefore we add the comment below.

### Recommendation 15:
The Division of Trading and Markets should: (1) reassess all the prior
Office of Compliance Inspections and Examinations (OCIE) issues to

ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

We note that the OCIE examination process generally involves requesting and receiving documents, reviewing and evaluating those documents and conducting an onsite review, determining if any deficiencies or weaknesses exist, conducting an exit interview with the firm, producing an examination report and detailing deficiencies in a deficiency letter sent to the firm examined. The OCIE staff request that the firm provide a detailed written response to the deficiency letter that describes any corrective action. OCIE evaluates the response and determines whether the firm has responded appropriately. For significant findings that do not appear to be appropriately resolved, OCIE works with the firm on resolution. All responses to findings that required action by the firm are then followed up in the next examination. The most recent CSE examination of Bear Stearns that was conducted by OCIE resulted in an examination report issued by OCIE in December 2005, and Bear Stearns provided its response in January 2006. The results were provided to TM. TM subsequently assumed responsibility for the overall CSE examination program in March 2007, and OCIE ceased CSE examination activities as of that date (OCIE examiners continue to be solely responsible for examinations of broker-dealer firms that are part of CSEs).

*** 

As an additional matter, on page 37 of the report you indicate that in 2007 the Government Accountability Office commented on our method of tracking recommendations regarding Self-Regulatory Organization ("SRO") inspections. Please note that following receipt of that comment, OCIE developed a formal tracking system for recommendations in SRO inspections, and deployed the system for use in SRO inspections in early 2008.

Finally, you requested that OCIE indicate whether there is non-public OCIE information in the report. Any non-general examination-related information would be considered non-public. Examples of this are found on pages 20, 37, and 39 of the report.



DIVISION OF
CORPORATION FINANCE

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

September 24, 2008

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dear Mr. Kotz:

Thank you for the opportunity to respond to the recommendations relating to the Division of Corporation Finance in your August 18, 2008 draft report *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program* (Audit Report No. 446-A).

In 2007, Corporation Finance selected Bear Stearns' 2006 Form 10-K for review. On September 27, 2007, two months prior to its internal guideline for issuance of a comment letter to a company selected for review, Corporation Finance issued its comment letter to Bear Stearns. That letter included a focus on subprime mortgage matters. Soon after receiving this letter, and well before Bear Stearns' collapse in March 2008, Bear Stearns began adding improvements to its disclosures about subprime mortgage securities in its publicly available filings. Those additional disclosures appear in:

- Its Form 10-Q filed on October 10, 2007 (details on net inventory markdowns related to losses in residential mortgages and leveraged finance areas);

- Its Form 8-K filed on November 15, 2007 (updated information on collateralized debt obligations and subprime related exposures);

- Its Form 8-K filed on December 21, 2007 (fourth quarter financial results, including a detailed exhibit of CDO and subprime mortgage asset exposures); and

- Its Form 10-K filed on January 29, 2008 (schedule of subprime exposure).

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 2

**Division of Corporation Finance concerns about Audit Report findings on Bear
Stearns filing review**

In Finding 8 of your audit report, you recommend what could be sweeping
changes to Corporation Finance's full disclosure program based upon conclusions you
draw from a *single* Corporation Finance review – the review of Bear Stearns' 2006 Form
10-K. You include conclusions regarding that review in Finding 8 with which I cannot
agree, the two most significant of which are:

1. That Corporation Finance's "untimely review deprived investors of material
   information that they could have used to make well-informed investment
   decisions," and

2. That Corporation Finance's review of Bear Stearns was "untimely."

*The Division of Corporation Finance review of Bear Stearns resulted in
improved and timely disclosure for investors*

As to the first of these conclusions, you indicate that "Bear Stearns' response
letter (coupled with CF's comment letter) contained material information that investors
could have used to make well-informed investment decisions." You also conclude that
"the information (e.g., Bear Stearns' exposure to subprime mortgage securities) could
have potentially been beneficial to dispel rumors that led to Bear Stearns' collapse."
While you go on to identify information in that letter and state that Albert S. Kyle, the
OIG expert, believes that this information would have been "helpful" to investors, you do
not note the significant redactions of information. I do not understand the basis for your
or Professor Kyle's conclusions.

First, as I indicate above, Bear Stearns began making additional public disclosures
concerning its subprime exposures in its public filings soon after it received our
September 27, 2007 comment letter. In addition, the information that was in Bear
Stearns' response to our comment letter, which we later posted on our website, was
heavily redacted under the confidentiality provisions of Rule 83. I note that in well over
100 places in the letter, Bear Stearns redacted significant information.[1] I have difficulty
agreeing with Professor Kyle that this heavily redacted letter, which would not have

---

[1] Redacted information included: various metrics utilized to determine FICO scores and designation of
loans as subprime; loan to value ratios; subprime production in 2005 and 2006; trend data for loan-to-value
ratios and full-document loans during 2007; percentage of loans with full documentation; size of data
sample upon which risk models are based; table of margin requirements by collateral type; fair value of
subprime loans at various dates; fair value and balance of non-performing subprime loans; fair value of
retained interests in subprime securitizations; reduction of subprime exposure from hedging; fair value of
securitization trusts; amount of subprime loans serviced; amounts securitized through SPEs; amounts
provided to finance subprime collateral to counterparties; fair value of other subprime related instruments;
revenues derived from subprime activity for all periods presented; litigation reserves.

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 3

become available under our posting policy until at least 45 days after we completed our
review and after Bear Stearns had made additional subprime disclosures (which included
actual numeric data and dollar amounts), would have been "helpful" to investors or
would have provided material information that Bear Stearns had not already provided in
the public reports it filed with us. The redacted letter, however, is publicly available and
I urge investors and other readers of this report to review the Bear Stearns response letter,
and reach their own conclusions about the importance of the additional information
appearing in the redacted letter, particularly in light of public disclosures in the Forms 8-
K, 10-Q and 10-K I reference above.[2]

### The Division of Corporation Finance review was timely

As to the second conclusion with which I cannot agree, you conclude that "CF's
filing review of Bear Stearns' 2006 10-K was not timely." This is not correct and the
implication of your conclusion is that we should review Forms 10-K immediately upon
filing and that a failure to do so means that we are "untimely." As background, we have
a selective review program, guided by Section 408 of the Sarbanes-Oxley Act of 2002,
through which we review all public companies on a regular and systematic basis, at least
once in a rolling three-year period. Following this statutory direction, we select for
review between 35% and 40% of public companies each year – which results in
approximately 4,000 to 4,500 company reviews. We do not have a requirement to review
each company each year and there are many companies that we do not select for review
in any given year. Although most Forms 10-K are filed in February and March, we
conduct our reviews of those companies we select for review throughout the year.

As you correctly point out, our long standing internal guideline is that we should
issue our initial comments to a company we select for review before the end of the
company's fiscal year. By following this guideline, we give the companies we select for
review time to reflect our comments, if appropriate, in the disclosure in their next Form
10-K. As you state in your report, we met this internal guideline in our review of Bear
Stearns' 2006 Form 10-K, filed on February 13, 2007, by providing comments on
September 27, 2007 – over two months *prior* to the end of Bear Stearns' fiscal year on
November 30, 2007. Thus, I cannot agree with your statement that the amount of time
we spent to review Bear Stearns' filing is "simply unacceptable."[3]

---

[2] http://www.sec.gov/Archives/edgar/data/777001/000091412108000089/filename1.txt

[3] In fact, in 2006, the Inspector General (Audit 401) recommended that Corporation Finance consider ways
to manage workload peaks resulting from the bunching of Form 10-K filings in February and March. This
recommendation reflected the Inspector General's acknowledgement of the difficulties we face in meeting
our Sarbanes-Oxley mandated and internal review guidelines. The implication of this Inspector General
recommendation in 2006 was actually that we should consider lengthening the timeframe for our filing
reviews, not condensing it closer to the February and March filing peak.

---

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 4

As an aside, I should point out that our comment letters to the other four CSE firms, all of which we selected for review in 2007, were sent out well before their fiscal year ends in November and December. We issued comments to Lehman Brothers Holdings Inc. on August 1, 2007; to Morgan Stanley on August 30, 2007; to Goldman Sachs Group, Inc. on September 20, 2007; to Merrill Lynch & Co., Inc. on September 25, 2007; and to Bear Stearns Companies, Inc. on September 27, 2007.

### Current and periodic reports are the appropriate disclosure mechanism

Separate from any discussion of these two conclusions, I thought it would be useful to provide some background on our review process and its role in prompting good public company disclosure. Our comment letters and company responses are not the mechanism for disclosure of material information to investors envisioned by our full disclosure program. The goal of disclosure of material information to investors, which is paramount in our efforts, is achieved in our program by seeking improvements to a company's public disclosures in its periodic and current reports. Those reports are readily available to all investors. These changes in disclosure are subject to the full liability provisions of the federal securities laws applicable to information appearing in these reports and, when they are included in a periodic report, the safeguards provided by the Sarbanes-Oxley Act of 2002 apply, including senior officer certifications and the disclosure controls and procedures process.

The public posting of comment letters and responses is only a recent development in our full disclosure program and is intended to increase the transparency of our review process and to make this correspondence available to all interested persons at no cost. We believe that companies like to look at the comment letters we send to their competitors to see what comments they might expect, as well as to glean competitive information. To address company concerns about public dissemination of competitively harmful information in their comment response letters, we permit companies to redact such information pursuant to a Rule 83 confidential treatment request. Companies frequently take advantage of this provision, as Bear Stearns did in its response letter in the review of its 2006 10-K.

We intentionally wait until at least 45 days after we complete a filing review before we post correspondence. Our separation of the exchange of views reflected in this correspondence from the disclosure public companies provide in their filings is intentional -- we seek to promote a free give-and-take in the review process and to avoid having conclusions drawn from our questions before a company has an opportunity to respond. Frequently, a company's explanation or analysis of an issue will satisfactorily resolve an issue without any changes to previously filed or future disclosure. When a company improves its disclosure, it makes those improvements in its widely available periodic and current disclosure documents, which is where investors expect to find material disclosures. To my knowledge, investors do not use review correspondence, which may be heavily redacted, and which we do not post until 45 days after we

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 5

complete our review, as a source of disclosure. To revamp our program to make this
back-and-forth correspondence with a company a disclosure vehicle to investors would
require significant, and I believe unwarranted, changes to our program, which would
significantly undermine its effectiveness for investors.

### *The Division of Corporation Finance seeks timely responses to its comments*

You also discuss Corporation Finance's general practice of requesting, but not
requiring, that companies respond to comments within ten business days. While it is true
that we rarely insist that a company respond in that timeframe, it is important to note that
in many cases, companies do respond during that time period. You recommend that we
establish a policy outlining when we expect companies to substantively respond to issues
we raise in our comment letters and monitor compliance with this policy.

Our disclosure review program is built on the common goal we share with
companies – to enhance disclosure and improve compliance with the disclosure
requirements of the federal securities laws. Although the limited consequences of not
responding to our comments can be quite significant – for example, a company is
required to disclose material staff comments that have been outstanding for six months in
its Form 10-K and/or Corporation Finance may refer a non-compliant company or one
with faulty disclosure to the Division of Enforcement for further investigation – they are
rarely the outcome of a staff filing review. While you recommend that we change our
policy in this area, our experience is that most companies do respond to us, in some form,
within the ten business days in which we seek a response. Our experience is also that,
similar to the Bear Stearns review described above, a company may respond to staff
comments in its public disclosure documents. Although we believe that extending the ten
business day request-for-response time period will be counterproductive to our ongoing
efforts to enhance public disclosure, we will consider your recommendation and how it
would impact our program.

### Division of Corporation Finance's role with respect to the CSE program

The Commission's CSE program is the focus of your report. You explain in the
Executive Summary that your objectives in this audit "were to evaluate the Commission's
CSE program, emphasizing the Commission's oversight of Bear Stearns, and to
determine whether improvements are needed in the Commission's monitoring of CSE
firms and its administration of the CSE program." You also summarize the work of
Albert S. Kyle, the expert you obtained to assist you with your audit, and indicate that
Professor Kyle's focus was on "the Division of Trading and Markets' oversight of the
CSE firms, with a particular focus on Bear Stearns."

The Division of Corporation Finance is not directly involved with the CSE
program and, as I understand your report, neither the Division of Corporation Finance,
nor its full disclosure program generally, was the focus of your audit or of Professor

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 6

Kyle's work. However, in connection with your audit of the CSE program, you did review Corporation Finance's review of Bear Stearns' 2006 Form 10-K, filed in February 2007, and, based on that *single* review, you have recommended what could be sweeping changes to Corporation Finance's full disclosure program. In our full disclosure program, we review the filings of more than 4,000 companies each year. I believe it is inappropriate for you to have reached conclusions, and to have made recommendations, about our program based upon your examination of our review of just *one* company's filings.

I believe, based on the scope of your audit work, that your comments and recommendations to Corporation Finance would have more appropriately focused on our full disclosure program as it relates to the CSE program. To the extent your recommendations do focus on Corporation Finance's interaction with the CSE program, I agree fully that we should examine the interaction between our reviews of the CSE firms and Trading and Markets' administration of the CSE program. For example, we will consider whether we should review CSE firms promptly after they make their annual Exchange Act filings and issue comments, if any, within a specific time period. We will discuss our thoughts on this with Trading and Markets. In addition, in Finding 7, you recommend that we should take concrete steps to improve our collaboration efforts with Trading and Markets and that we should determine whether the information Trading and Markets receives from the CSE firms would be helpful in our reviews of the filings these companies make. As you note, we were not able to respond to your questions during the audit about the potential usefulness of this information since we did not know what it was. Furthermore, as we previously conveyed to you, we are concerned about basing our comments to a company, which we will make public, on non-public information that a company provides to another Division or Office for different purposes. That being said, we will take steps to work closely with Trading and Markets to pursue this.

I appreciate your giving me the opportunity to present my views on your report and I very much appreciate your commitment to present this letter as an attachment to it. Doing so will allow readers to draw their own conclusions, and is consistent with the transparent full disclosure review process I and the staff of the Division of Corporation Finance are proud to administer.

Sincerely,

John W. White
Director

# Office of Inspector General Response to Chairman Cox and Management Comments

The Office of Inspector General (OIG) has received responses to its audit report entitled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" from Chairman Christopher Cox, the Division of Trading and Markets (TM), the Office of Compliance Inspections and Examinations (OCIE), the Division of Corporation Finance (CF), and the Office of Risk Assessment (ORA).

In total, the Commission's responsible management officials have concurred with 21 out of the 26 recommendations contained in the report.

Response to the Chairman's Comments

We are particularly pleased that the Chairman has commented that he believes that the 26 specific recommendations are well-considered and worthy of support. We also appreciate his comment that the report provides an invaluable and fresh perspective for the agency to carefully review and consider.

Response to the Comments of the Division of Trading and Markets (TM)

The OIG is pleased that TM concurred with 20 out of the 23 recommendations addressed to them in the OIG audit report. The OIG, however, is, quite disappointed in many of the assertions made in TM's "Management's Commentary."

The OIG made supreme efforts throughout the entire audit process to engage and consult with TM on every aspect of the audit report. Over the five months of fieldwork, OIG auditors had weekly and sometimes daily conversations with TM management, including senior officials, on all issues relating to the audit work. In many cases, TM management did not provide full responses to questions posed and issues raised by the OIG.

It is important to point out that specifically because the OIG recognized that this audit involved numerous issues of a technical and complex nature, the OIG retained a renowned and highly-regarded expert on many aspects of the capital markets, and market microstructure in particular, to assist the OIG's efforts. The expert worked closely with the OIG's auditors, providing technical expertise and guidance. The expert also spent countless hours reviewing detailed notes and memoranda that TM staff had prepared during the time periods pertinent to the audit and conversed in detail with TM management and staff.

Even after having numerous conversations with TM staff throughout the audit field work, immediately prior to finalizing the draft report, the OIG convened a meeting with the Director of TM and several senior management officials to discuss the findings and recommendations in the report. TM officials stated that they were unable to provide any substantive responses without viewing the report in writing in its entirety.

Shortly after this meeting, the OIG also provided TM officials with an initial working draft of the report, complete with findings and recommendations, for their comment. TM management provided in response a red-lined version of the report and an additional memorandum containing substantive comments. OIG staff painstakingly reviewed both TM's redlined version of the report and its memorandum. Thereafter, the OIG incorporated many of TM's suggestions, including making major revisions to one finding, and removing another finding altogether. The OIG then provided TM with a second draft for comment and invited another round of substantive responses. The OIG also posed two separate sets of questions to TM officials regarding some of the assertions they had made in response to the working draft of the report. TM failed to provide any response to these two sets of questions.

Instead of responding to the OIG's questions or providing additional substantive suggestions regarding the OIG report, TM decided to issue its "Management's Commentary," which claims the report is flawed and inaccurate, and asserts that TM was not provided with a fair and meaningful opportunity to address the issues raised in the report. It is worth noting that notwithstanding the rhetoric contained in "Management's Commentary," TM concurred with nearly of the report's recommendations. Moreover, while the commentary asserts that the report in fundamentally flawed in all aspects, it provides only a few examples of actual statements being inaccurate, all of whom are relatively minor, even if true, and have no impact on overall findings and conclusions of the report.

We sincerely hope that the tone adopted in TM's "Management's Commentary" is not indicative of TM's unwillingness to take the OIG report and its findings seriously and responsibly as these matters are of utmost importance to the Commission and the country, particularly as lawmakers consider the administration's proposed unprecedented bailout of the nations' financial markets.

Response to the Comments of the Office of Compliance Inspections and Examinations (OCIE)

The OIG is pleased that OCIE has concurred with all 3 recommendations addressed to it, and commented favorably on an additional recommendation.

Specifically, OCIE concurred that the development of a collaboration agreement that maintains a clear delineation of responsibilities between TM and OCIE

would improve the effectiveness of the oversight by both offices and that a joint TM, OCIE and Division of Investment Management task force led by the ORA to determine the costs and benefits of supervising firms with significant customer assets and unregulated affiliates could be very valuable in producing evidence supporting the need for consolidated oversight. OCIE also concurred with the recommendation that TM develop an ethics manual, agreeing that stringent ethics procedures should apply consistently to all SEC staff that perform examinations, and indicated that it would work with TM to develop an ethics manual for the CSE program.

Response to the Comments of the Division of Corporation Finance (CF)

The OIG is disappointed that CF concurred with only 1 of the 3 recommendations addressed to it. The OIG also disagrees with several of the comments contained in the management response submitted by CF.

First, CF indicates that the OIG recommends what could be "sweeping changes" to its program. The OIG's finding concluded that CF has not established guidelines for the timeliness of second level filing reviews. We recommended that CF establish such guidelines and thereafter monitor compliance with the established guidelines. We do not view these improvements to be "sweeping changes" but rather reasonable and necessary management practices.

Second, CF points out that its current view of timeliness, as it pertains to the entire filing review process, is dictated by the requirements of Section 408 of the Sarbanes-Oxley Act (SOX) of 2002, as well its internal guideline of issuing comments before a company's next fiscal year-end. While these factors may guide the timeliness of filing reviews (and the issuance of comment letters) as a general rule, CF ignores the need to address high-risk filings in an expeditious manner. As evidenced by developments in recent years, a company's stock price can have a dramatic downward swing in a very short period of time. Under the particular circumstances involving Bear Stearns, we simply disagree that CF's review of its 2006 10-K was "timely."

Third, CF questions what value to investors an earlier release of its comment letter on Bear Stearn's 2006 10-K and the company's response would have had because those documents were heavily redacted when publicly disclosed. During our audit, we considered whether the information would still have been useful, even though it was redacted, and we concluded it would have been quite useful. Further, the OIG expert opined on the redacted version and found the information to be beneficial.

Fourth, CF notes that under Section 408 of SOX, it is not required to review every company each year, and there are many companies that are not reviewed at all in a given year. While this may be true, CF is overlooking a critical aspect of Section 408, which contemplates that CF will consider the risks associated

with filings when scheduling its filing reviews. Bear Stearns' 2006 10-K filing was high-risk, in our opinion, given the company's high exposure to subprime mortgages and, accordingly, should have been reviewed in a more timely manner.

Fifth and finally, CF maintains that investors do not use review correspondence, which may be heavily redacted, as a source of information on which to base investment decisions. In addition, CF explains the practice of publicly disclosing the comment letters and the associated responses as a relatively new development intended to increase the transparency of the review process and to make correspondence available to all interested person at no cost. However, according to SEC Insight (now known as Disclosure Insight), an independent and private investment research firm, CF's comment letters and responses can be quite beneficial to investors. In fact, it was stated by SEC Insight as follows:

> The comment letter proposal [to make the comment letters public] provides one important means for _ *investors* to level the playing field with registrants [companies] by enhancing their ability to do what investors do best in transparent markets; that is, assess and discount risks. [Emphasis added].

# Gross Leverage Ratios

Figure 1. CSE Firms- Gross Leverage Ratios



Source: This data was provided by TM. They obtained the information from public filings (*i.e.*, 10-K) and Bloomberg. We verified each firm's year-end gross leverage ratio amount, but did not verify its quarterly ratios.

# Criteria

**Basel II Standards.**

**Final Rule: Alternative Capital Requirements for Broker-Dealers That Are Part Of Consolidated Supervised Entities" (Release No. 34-49830).**[201] In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934 (which created the CSE program) that allowed firms (the broker-dealers) to apply for an exemption from the net capital rule and instead use the alternative capital method.

**TM's Policies and Procedures describing its administration of the CSE program.**

**Publicly Disclosed Information about the CSE Program.**[202] The Commission has posted the following documents on its website about the CSE program:

- Program Overview & Assessment Criteria;

- Program Description; and

- SEC Holding Company Supervision With Respect To Capital Standards And Liquidity Planning.

---

[201] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[202] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

# Audit Request and Ideas

The Office of Inspector General welcomes your input.  If you would like to
request an audit in the future or have an audit idea, please contact us at:

U.S. Securities and Exchange Commission
Office of Inspector General
Attn: Assistant Inspector General, Audits (Audit Request/Idea)
100 F. Street N.E.
Washington D.C. 20549-2736

Tel. #:  202-551-6061
Fax #:  202-772-9265
Email: oig@sec.gov

## Hotline

To report fraud, waste, abuse, and mismanagement at SEC, contact
the Office of Inspector General at:

Phone:  877.442.0854

Web-Based Hotline Complaint Form:  www.reportlineweb.com/sec_oig

# <u>PD 4</u>

## October 6, 2009 McIsaac Affidavit

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (JMP) SIPA

<u>**AFFIDAVIT OF DANIEL MCISAAC**</u>

STATE OF NEW YORK    )
                           :    ss:
COUNTY OF NEW YORK  )

      Daniel McIsaac, being duly sworn, deposes and says:

      1.    I have been retained by Hughes Hubbard & Reed LLP ("Hughes Hubbard"), attorneys for James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc. (the "Trustee" and "LBI," respectively), to provide expert analysis and opinions on various matters related to formulation of principles and methodology for the allocation of the LBI assets under the Trustee's control between the fund of customer property and LBI's general estate.

**I.**    <u>**BACKGROUND AND QUALIFICATIONS**</u>

      2.    For approximately 30 years, I have held executive positions in financial institutions and public accounting firms, specializing in the accounting and regulatory compliance issues facing securities broker-dealers. My <u>curriculum vitae</u> is attached as Exhibit 1.[1]

      3.    Currently, I serve as Chairman of the Capital Committee of the Securities Industry and Financial Markets Association ("SIFMA"), a membership organization comprised

---

1.   All exhibits referenced herein are attached to this affidavit.

of participants in the financial industry, including securities firms, U.S.-registered broker-dealers and asset managers. The Capital Committee is focused on regulatory and legislative issues that impact the regulatory capital and customer protection activities of member firms. From 2004 until early 2006, I served as president of the Financial Management Division of SIFMA, which focuses on matters relating to financial and regulatory issues in the securities industry. I have also served in various capacities on industry committees and task forces responsible for development, interpretation and compliance with regulations promulgated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

4.      I also have many years of private sector experience with regulated broker-dealers, including UBS Securities LLC ("UBS"), Dean Witter Reynolds and Drexel Burnham Lambert, dealing primarily with SEC reporting and compliance. Most recently, from 1994 until June 2009, I served as the regulatory controller for UBS, directing all regulatory calculations and filings, including weekly computations of the firm's reserve requirement under SEC Rule 15c3-3 (the "Customer Protection Rule" or "Rule 15c3-3"), monthly Financial and Operational Combined Uniform Single ("FOCUS") Reports, and daily as well as monthly Commodity Futures Trading Commission ("CFTC") segregation calculations. I was also responsible for managing all regulatory relationships and served as the firm's industry representative in regulatory matters.

5.      Based on my experience in the public and private sectors, I am fully familiar with the SEC rules governing financial responsibility of SEC-registered broker-dealers and the protection of customer property, and with industry practices regarding the handling of customer property and compliance with SEC customer protection rules.

08-01420-scc Doc 189250 Filed 10/06/26/12 Entered 10/06/26 04:22:49 Main Appendix
Documents 1 Through 178 Pg 416 of 1129

3

## II.   INDUSTRY REGULATIONS FOR THE SAFEGUARDING OF CUSTOMER PROPERTY

6.      As a broker-dealer registered with the Securities and Exchange Commission, LBI was subject to SEC Rules designed to insure financial responsibility and to protect the broker-dealer's customers: (a) Rule 15c3-1, commonly referred to as the "Net Capital Rule," establishes minimum net capital requirements in order to operate as a broker-dealer; and (b) Rule 15c3-3 essentially provides that customer property in excess of margin requirements may not be used to support borrowing by the broker-dealer, but must be maintained at all times in good control locations and free of liens, or corresponding amounts segregated and available unconditionally to satisfy customer claims in the event of a liquidation.

### A.      The Net Capital Rule

7.      The SEC's Net Capital Rule requires every broker-dealer to maintain at all times specified minimum levels of liquid assets, or net capital, sufficient to enable a firm to liquidate in an orderly fashion.  In this way, the Net Capital Rule ensures that a broker-dealer is able to compensate customers and creditors fully if it is forced to cease its operations.

8.      Under the Net Capital Rule, a broker-dealer computes its net worth subject to certain exclusions as prescribed by SEC rules  For example, the firm excludes assets not readily convertible into cash such as fixed assets, prepaid items, certain unsecured, partly secured, and other outstanding receivables, and insurance claims.  See 17 C.F.R. § 240.15c3-1(c)(2)(iv).

9.      To compute its "net capital," the broker-dealer computes its equity under Generally Accepted Accounting Principles ("GAAP") and adjusts that amount by making certain additions and subtractions, including percentage reductions ("haircuts") in the market value of its securities and commodities positions.  In theory, a calculation of "net capital" greater than zero

08-01420-scc Doc 18250 Filed 10/06/26/14 Entered 10/06/26 04:23:49 Main Document
Documents 1 Through 9178 Pg 417 of 1129

4

would mean the "liquid assets" owned by a broker-dealer could be sold to repay all its

obligations, even those not then due, other than any qualifying subordinated debt that the Net

Capital Rule treated as regulatory capital.

   10. The Net Capital Rule establishes two methods of compliance.  The

"Aggregate Indebtedness Standard" seeks to ensure a broker-dealer's aggregate indebtedness

does not exceed 1500 percent of its net capital.  In other words, the firm's aggregate

indebtedness could not be more than 15 times the amount of its net capital.  This method

measures "liquid assets" of the broker-dealer against most of its unsecured indebtedness.  The

"liquid assets" serve as the "cushion" to cover full repayment of that unsecured debt.

   11. The "Alternative Standard" uses a percentage of monies owed by

customers to effectuate customer transactions as a baseline for the net capital requirement.

Under this standard, "a broker or dealer shall not permit its net capital to be less than the greater

of $250,000 or 2 percent of aggregate debit items computed in accordance with the Formula for

Determination of Reserve Requirement for Brokers and Dealers (Exhibit A to Rule 15c3-3, §

240.15c3-3a)."  17 C.F.R. § 240.15c3-1.  (See Ex. 2 (Exhibit A to Rule 15c3-3, the "Reserve

Formula").)

   12. Additionally, in 2004, the SEC established the Consolidated Supervised

Entity ("CSE") program, which incorporates certain modifications into the Alternative Standard.

A firm accepted into this program must maintain tentative net capital of not less than $1 billion

and net capital of not less than $500 million, and it must provide same-day notification to the

SEC if its tentative net capital falls below $5 billion.  If a firm is accepted into this program and

therefore undertakes supplemental reporting, recordkeeping, and notification obligations, among

08-01420-scc Doc 180250 Filed 10/06/26/12 Entered 10/06/26/04/22:49:19 Main Document
Documents 1 Through 17 Pg 5 to 917 Pg 418 of 1129

5

other things, it is permitted to use firm designed market and credit risk models in lieu of deductions required in sections (c)(2)(iv), (vi), and (vii) of SEC Rule 15c3-1.

13.     Customers, the investment community and regulators rely on a broker-dealer's compliance with the Net Capital Rule and on the availability of the liquid assets that are counted as part of the regulatory capital.  When a broker-dealer falls out of net capital compliance, it must immediately report the violation to the SEC and cease operations until it resumes compliance.

**B.      The Customer Segregation Rule**

14.     SEC Rule 15c3-3, often referred to in industry terms as the Customer Segregation Rule or the Customer Protection Rule, was established by the SEC to safeguard and restrict the use of customer assets, whether in the form of securities or cash.

15.     The Customer Protection Rule contains two important requirements.  First, it ensures safekeeping of customer securities by requiring that a broker-dealer have physical possession or "good control" of all fully-paid and excess margin securities carried for the accounts of customers, and insure that customer fully paid and excess margin securities are not subject to liens based on the obligations of the broker-dealer.  Second, it requires the broker-dealer to maintain funds in a special bank account for the exclusive benefit of customers (the "Reserve Account") in an amount sufficient to cover the net amounts that the broker-dealer owes to customers.

**1.      Safekeeping of Customer Securities**

16.     The first part of Rule 15c3-3 requires a broker-dealer to have physical possession or "control" of all fully paid and excess margin securities carried for the accounts of customers.  Excess margin securities are securities bought by customers on margin that are in

excess of that amount the broker-dealer may hypothecate (or pledge) to finance the customers'

margin purchases. Where a broker dealer is not in actual possession of a customer's securities,

the broker-dealer remains in compliance with the Rule so long as it maintains effective "control"

over the securities.

17.     Rule 15c3-3 defines the term "control" and specifies circumstances under

which customer securities may be in the physical possession of a person other than the broker-

dealer. A broker-dealer has control over the securities if there is certainty that the broker-dealer

can obtain them promptly, without the payment of money or value. For example, securities at a

domestic bank that are not subject to any right, charge, security interest, lien or claim of any kind

in favor of a bank or any person claiming through the bank are generally deemed to be in good

control locations. Typically, the broker-dealer and bank execute a "no-lien letter," in which the

bank agrees not to assert any lien or right to property held in customer accounts. In industry

terms, a location that meets the requirements is called a "good control location." Conversely,

securities not held free of liens in good control locations might not be readily accessible to a

broker-dealer for a variety of reasons. For example, the securities might be subject to a lien or

the securities might be held by a foreign bank in an account that has not been approved by the

SEC.

18.     If customer securities are not within the broker-dealer's possession or in a

good control location, the broker-dealer must obtain possession or control promptly. 17 C.F.R.

§ 240.15c3-3(d). Paragraph (d) requires the broker-dealer, "[n]ot later than the next business

day" to "determine from his books or records the quantity of fully paid securities and excess

margin securities in his possession or control and the quantity of fully paid securities and excess

margin securities not in his possession or control." Id. If the broker-dealer does not have

possession or control, it must take action to obtain those or similar securities, and may be required to use its own funds to purchase securities or make deposits in the Reserve Account, defined below, in order to cover the deficit. 17 C.F.R. § 240.15c3-3(d)(1)-(3).

### 2. The Reserve Account for the Exclusive Benefit of Customers

19. The second part of Rule 15c3-3 requires the broker-dealer to maintain bank deposits "for the Exclusive Benefit of Customers" (the Reserve Account), in an amount equal to the net amount that the broker-dealer owes to customers and to settle customers' transactions. 17 C.F.R. § 240.15c3-3(e). The broker-dealer is required to obtain written notification from each bank holding its Reserve Account confirming that the amounts are being held for the exclusive benefit of customers and that the amounts are being kept separate from other accounts maintained by the broker-dealer at the bank. 17 C.F.R. § 240.15c3-3(f). Additionally, the broker-dealer is required to obtain a written agreement with the bank holding its Reserve Account providing that the amounts in the Reserve Account will not be used as security for a loan and that the amounts are subject to no right, charge, security interest, lien, or claim of any kind. Id.

20. A computation is made each week as of close of business on Friday (or as required by the SEC) using a "Reserve Formula" to determine what is required to be kept on deposit. See 17 C.F.R. § 240.15c3-3(e)(3); see also Ex. 2.

21. Pursuant to the Reserve Formula, the broker-dealer calculates the total amount of "credit items," essentially monies owed by the broker-dealer to customers and those used to effectuate customer transactions, which include: (i) balances that represent money obligations to customers; (ii) amounts that the broker-dealer has obtained through the use of customer property; and (iii) certain reserves for operational inefficiencies. Subtracted from the

08-01420-scc Doc 1250 Filed 10/06/26/12 Entered 10/06/26/04 12 49 19 Main Appendix Documents 1 Through 178 Pg 421 of 1129

8

total of credit items are "debit items," basically monies owed to the broker-dealer by customers and/or to satisfy customer transactions, consisting of essentially secured receivables from customers or other persons involved with financing transactions on behalf of customers (such debit items are reduced by 3%). See 17 C.F.R. § 240.15c3-3(e)(1); Ex. 2.

22. If the credits exceed the debits, the broker-dealer must deposit the excess in the Reserve Account.[2] If the debits exceed the credits, no deposit is necessary.[3] Required deposits must be made no later than one hour after the opening of banking business on the second following business day, that is, by 10 a.m. the Tuesday following the typical Friday calculation date. 17 C.F.R. § 240.15c3-3(e)(3). Paragraph (g) of the Customer Protection Rule allows the broker-dealer to make withdrawals from the Reserve Account only when a current Reserve Formula computation indicates that excess cash or qualified securities have been deposited. 17 C.F.R. § 240.15c3-3(g).

## III. LBI'S COMPLIANCE WITH CUSTOMER PROTECTION RULES

### A. LBI's Systems for Computing its Reserve Requirements

23. LBI maintained highly specialized and complex information systems to track the location and status of customer securities for purposes of the Rule 15c3-3 segregation requirement, as well as the constant fluctuation of customer credits and debits. In addition, these systems were also used to perform the weekly Reserve Formula allocation and to track the ending customer debit and credit balances for purposes of computing the Reserve Account

---

2. See 17 C.F.R. § 240.15c3-3(e)(1). The broker-dealer may not withdraw these funds unless another Reserve Formula computation is made before withdrawal which shows that no deposit, or a lesser deposit is necessary. 17 C.F.R. § 240.15c3-3(g).

3. This, in effect, would represent a case where customers of the broker-dealer owe the broker-dealer more than the broker-dealer owes the customers.

08-01420-scc Doc 8250 Filed 10/06/26/14 Entered 10/06/26/14 22:39:19 Main Appendix Document Documents 1 Through 178 Pg 422 of 1129

9

requirement. In formulating my opinion, I worked closely with the Trustee's financial advisors to understand LBI's systems.

24. In general, the Reserve Formula computation requires input from many areas of the firm and includes automated reports, manual calculations, reconciliations and analysis of cash and operational accounts, manual adjustments and detailed analysis of amounts and variances from prior computations. The computation utilizes both the general ledger and the stock record to determine the firm's net exposure to customers. When an account is opened it is assigned a "code" or included in a range that designates what "category" of accounts it should be grouped with, for example whether customer or non-customer. These groupings are used to summarize both the cash balances in the accounts as well as the security market values that are included in the computation. Reports are either provided by or generated from the general ledger to provide customer receivable and payable balances as well as contract values for other Reserve Formula items. The specific items required to be included in the Reserve Formula are detailed in a schedule appended as an exhibit to SEC Rule 15(c)3-3 titled "Formula For Determination of Reserve Requirement of Brokers and Dealers under § 240.15c3-3. (See Ex. 2.) System generated reports are used to allocate the stock record positions into includable and excludable buckets based on market value of the securities. Other amounts included in the Formula are calculated either through reconciliations or calculations performed within the group or department of the firm responsible for preparing the computation as well as other areas throughout the firm. In addition, various reconciliations and analyses provide the basis for manual adjustments to system generated reports. The amounts provided from all sources are summarized in Excel spreadsheets that perform various arithmetic calculations that become the source of the summarized computation. Given the complexity of these processes, errors may

08-01420-scc Doc 80250 Filed 10/06/26/14 Entered 10/06/26/04 22 39:19 Main Appendix
Documents 1 Through 178 Pg 423 of 1129

10

occur and broker-dealers usually include a cushion (an amount in excess of the computed Reserve Account requirement) in the Reserve Formula to compensate for such errors.

25.     I have been informed that LBI's automated systems tracked over tens of thousands of accounts, each coded in a way that would allow correct treatment of cash and securities for purposes of Rule 15c3-3 compliance as well as other purposes. The ability of LBI's computer systems to produce accurate accounting for customer property depended on correct "coding" of each of these accounts. On a regular basis, manual adjustments and interpretation of the system generated amounts are required to achieve compliance. As discussed below, errors in coding of accounts significantly impacted LBI's reserve computation.

26.     Further, each "control location" for LBI customer securities must comply with its agreement regarding the safekeeping and status of the securities in their custody, especially regarding whether the securities may or may not be pledged or otherwise serve as collateral for the debts of LBI. As discussed below, errors and disputes in this category appear to be responsible for significant instances of non-compliance and consequent seizure or detention of customer property by custodians to satisfy claimed debts of LBI.

**B.      LBI's Reserve Calculations Immediately Before and After September 19, 2008**

27.     On Friday, September 12, 2008, its last day of "normal" operation prior to Lehman Brothers Holding Inc.'s chapter 11 bankruptcy filing, LBI's calculation for its Reserve Account requirement stood at $5.7 billion. As of the following Friday, September 19, 2008, the day LBI's SIPC liquidation commenced (the "Filing Date"), in the face of large stock record and general ledger breaks as well as the general collapse of LBI's liquidity, LBI employees prepared

a reserve account computation showing that the lock up requirement had declined to about $600 million, an average decrease of over one billion dollars a day.[4]

28.    During the last week of LBI's operation as a broker-dealer and immediately thereafter, its Rule 15c3-3 compliance systems and personnel also confronted technical difficulties caused by bank account freezes, as well as large numbers of general ledger and stock record breaks.  LBI personnel recognized that significant manual effort was needed to resolve various issues surrounding the information provided by the various systems and used for the Reserve Formula.[5]

29.    The reserve computation prepared during the weekend of September 20 and 21 appears to have been further hampered by the lack of access to certain electronic systems. On September 18, 2008, JPMorgan Chase ("Chase"), LBI's primary clearing bank, reportedly discontinued LBI's real-time electronic access to the accounts LBI maintained at Chase.  (See,

---

4.    As shown in Exhibit 3 (Rule 15c3-3 Reserve Computation graph), up until the week before the Filing Date, the lock up requirement was generally in the $3 billion to $6 billion range.

5.    At 9:08 p.m. on September 20, LBI's financial controller noted "many breaks/fails" and that he had "a large team working now and through the night to resolve." (See Ex. 4.)

   The same evening, another LBI employee reported that the reserve formula "gives a net debit of 1.9 billion" without taking account of such potentially significant items as bank overdrafts, unapplied customer cash, stock record breaks or money fund fails.  The same email noted also "around 8 bil worth of breaks" that were "due to the banks being frozen last Friday." (See Ex. 5.)

   Around the same time, LBI's vice-president in charge of customer reserves, reported that "the customer reserve is showing a net debit over 1 billion" although "[t]his number is not final since there are over 6 billion in stock record breaks that must be resolved." (See Ex. 6.)

   During the weekend of September 20-21, LBI employees were under time pressure to complete a reserve calculation as of September 19 and worked around the clock to complete the calculation.  In the process, several drafts of the reserve computation were prepared, and LBI employees appear to have made manual adjustments and assumptions to get the computation done within the time limit, although there was "so little transparency into the way the data is structured it's hugely frustrating on all sides." (See Ex. 7.)

   Several drafts of the reserve computation were circulated during the weekend, each showing different lock-up requirements.  (See, e.g., Exs. 8-21.)  At 12:59 a.m. on September 22, LBI's calculations were still showing a reserve requirement of $3.1 billion.  (See Ex. 22.)  However, by the end of the day on September 22, the reserve requirement was reported to be only $556 million.  (See Ex. 23; see also Ex. 24 (LBI's final calculation as of September 19, 2008, reflecting a reserve requirement of $569 million).)

<u>e.g.</u>, Exs. 25, 26.) Inability to monitor these accounts would have impeded LBI's ability to keep up-to-date records and to process settlements of both customer and firm transactions on a timely and automated basis.

30.     Due to these factors, LBI appears to have relied to a significant extent on manual adjustments, with resulting susceptibility to human error. These manual adjustments are evident from LBI's correspondence during this weekend. (<u>See</u> Exs. 5, 6, 7, 27.) In particular, as evident by internal LBI correspondence during the weekend of September 20 and 21, the processing of trades flowing through the Chase clearance, custody and customer segregated accounts resulted in an unusually large amount of "breaks." (<u>See</u>, <u>e.g.</u>, Ex. 5.) For LBI to prepare its reserve calculation during this weekend, it would have had to resolve these "breaks" through manual processes and adjustments to data produced by LBI's information systems. These manual processes likely contributed to some of the errors in LBI's reserve calculations as of September 19.

31.     Given the foregoing factors and the degree of confusion and market disorder that surrounded the failure of LBI, reconstructing and evaluating the accuracy of the various iterations of the Reserve Formula calculations carried out by LBI personnel would be difficult, and in any event would not be a useful exercise. Based on my investigations and discussions with the Trustee's financial advisors, I have concluded that LBI either omitted entirely or incorrectly reported significant items in the Reserve Formula calculation, resulting in understatement of credits or overstatement of debits. Some of the necessary adjustments are described below.

08-01420-scc Doc 189250 Filed 10/06/26/12 Entered 10/06/26/04 22 49 19 Main Appendix Documents 1 Thru 13 of 17 Pg 426 of 1129

13

## C.    Lapses in LBI's Rule 15c3-3 Compliance

### 1.    Items Omitted or Incorrectly Reported in the Reserve Formula

#### a.    FID Accounts Maintained at Chase

32.    LBI maintained accounts at Chase for certain of its Fixed Income Division prime broker clients (the "FID Accounts"). I have been informed that as of the Filing Date, approximately $630 million in customer securities and approximately $258 million in cash were held by Chase in these accounts.

33.    I have been informed that LBI had obtained a no-lien letter regarding the FID Accounts, but on September 19, Chase seized and liquidated the $630 million in securities associated with the FID Accounts to satisfy LBI's debts to Chase. I understand there is a dispute between the Trustee and Chase regarding Chase's position that it was entitled to seize the securities because the no-lien letter was no longer valid due to a course of dealing between Chase and LBI employees.

34.    The fact of a dispute as to Chase's ability to seize property in the FID Accounts to satisfy debts of LBI means that property in the Chase FID Accounts were at risk, and that the value of the securities should be included as a credit in the Reserve Formula computation.

35.    With respect to the cash contained in the FID Accounts, LBI's Reserve Account computation should have included such customer cash balances as a credit. However, after Chase swept the accounts and terminated LBI's access to its electronic systems, LBI no longer had the ability to view the balances in these Chase accounts. I was informed that the cash received of $258 million was not recorded by LBI as a customer payable because it had been swept by Chase without LBI's knowledge. Thus, when LBI prepared its final reserve

computation over the September 20-21 weekend, the payable was not included as a credit in the Reserve Formula.  Nor did it reflect the $630 million in securities that were seized by Chase. Taking account of both cash and securities, the Reserve Account deficit attributable to these events is not less than $891 million.

**b.**      **Account Coding Errors**

36.      To effectuate the correct allocation to customers for purposes of Rule 15c3-3 segregation and the Reserve Account requirements, LBI's automated systems depended on correct coding of an account as "customer" or "noncustomer" at the time of account creation. Thus, when LBI employees established customer accounts, they would assign account numbers that would instruct LBI's automated systems to include debits and credits and the corresponding securities as customer in the Rule 15c3-3 reserve computation, and otherwise to distinguish them from non-customer accounts.  Included as non-customers were LBI affiliates that had signed subordination agreements,[6] and LBI affiliates that had not (some of which may be customers, depending on the circumstances).

37.      It is already clear that certain customer accounts were improperly classified in LBI's systems as non-customer.  One such account was for Woodlands Bank, a U.S. domiciled Lehman affiliate which I have been informed was not a signatory to a subordination agreement but was coded in the subordinated affiliate account range.  Based on this coding, segregation instructions were not applied to Woodlands' securities.  This resulted in a segregation failure affecting securities that ultimately were seized by Chase to cover a debt of LBI.  Therefore, the failure to properly segregate these securities should require an additional

_____

6.  Under Rule 15c3-3(a)(1), customer does not include a "person to the extent that person has a claim for property or funds which by contract, agreement, or understanding, or by operation of law, is part of the capital of the broker or dealer or is subordinated to the claims of creditors of the broker or dealer."  17 C.F.R. § 240.15c3-3(a)(1).

credit to be added to the Reserve Formula, and a corresponding increase in the Reserve Account
deposit requirement in the amount of the market value of the Woodlands' securities, which I
have been informed is $534 million.[7]

38.     Other coding errors gave "customer" coding to non-customer accounts.
Such errors led to a reserve shortfall to the extent that debits in such mis-coded accounts exceed
credits, thereby reducing the Reserve Account requirement. In addition, errors detected in LBI's
service providers' allocation program used in the calculation of the Reserve Formula caused
additional shortfalls. According to research carried out by former LBI (now Barclays) personnel,
correction of these errors results in the addition of $213 million to the Reserve Account
requirement, with further adjustment possible as further errors are discovered. (See Ex. 28.)

### c.     Assets Subject to LBIE Administration

39.     Lehman Brothers International (Europe) ("LBIE") acted as custodian for
some of LBI's customer business and thus held some of LBI's customers' securities. I
understand that as of September 19, 2008, LBI had no less than $439 million in customer
securities in custody with LBIE. (See Ex. 29.) Because LBIE was considered a "good control
location," LBI did not reflect credits in the Reserve Formula for the value of the securities held at
LBIE, or take other steps to obtain possession of equivalent securities, as would otherwise have
been required.

40.     LBIE's insolvency filing in the United Kingdom was a material change in
its condition, and meant that LBI no longer had prompt access to securities held by LBIE or the
ability to control their transfer. LBIE accordingly ceased to be a good control location, and an

---

7. I have been informed from the Trustee's advisors that LBI also coded other accounts containing a significant
amount of property as accounts for affiliates subject to subordination agreements. The account holders have
nevertheless submitted customer claims. In the event they are determined to be customer accounts, there would
be a significant additional shortfall in segregated customer property.

additional credit of no less than $439 million should have been included in the Reserve Formula as of September 19, 2008.

<p style="text-align:center"><strong>d.    Customer Cash Claimed by LBIE</strong></p>

41.    The Trustee's investigation has further revealed that about $2.3 billion allegedly owed to LBIE's customers was not included as a credit in LBI's reserve computation as of September 19, 2008.  Prior to insolvency, LBIE submitted trades to LBI for execution on behalf of its customers.  On a daily basis, LBI and LBIE reconciled and settled their positions. On September 10, 2008, LBI's position with LBIE showed a payable of approximately $2.3 billion to LBIE in an account used for LBIE customers' transactions. (See Exs. 30, 31, 32.)

42.    LBI personnel identified the issue, investigated it and "[s]uspect[ed] it relate[d] to large client transfers." (See Ex. 31-35.)  The payable appears to have been related to LBIE customer trades. (See Ex. 36.)  LBI's Senior Vice President of Regulatory Reporting observed that resolution of this issue was "critical for the reserve." (See Ex. 35.)  It appears that the balance was still being investigated by LBI when, on September 15, 2008, LBIE went into administration.

43.    Ultimately, for reasons that are unclear, LBI personnel determined that the amount should not be included in the Reserve Formula, and when it performed its September 19, 2008 reserve calculation, the $2.3 billion was not included as a credit.  In fact, based on my discussion with the Trustee's financial advisors and my review of the September 19 calculation, it appears that this amount was manually removed from the Reserve Formula.

44.    I have not seen any document to suggest that this amount was actually transferred or paid out to LBIE or its customers.  Therefore, under SEC rules, LBI should have included this customer obligation as a "credit" in the Reserve Formula.  I also understand that

LBIE has submitted a customer claim for the $2.3 billion corresponding to this amount, thus creating an actual shortfall to the extent this is allowed as a customer claim.

### e. OCC Deposit

45.     LBI also included as a debit in its September 19, 2008 Reserve Formula computation a $507 million deposit LBI made with the Options Clearing Corporation ("OCC") to secure customer-related obligations of LBI.  (See Ex. 24; see also Ex. 37.)  The inclusion of this amount as a debit is in accordance with the rules and had the effect of reducing the Reserve Account requirement in the amount of $507 million (less 3%).  I understand that the Trustee is now involved in a dispute with Barclays over entitlement to the OCC Deposit.  The use of the debit in the Reserve Formula is analogous to a deposit in the reserve bank account, and, if the Trustee is not successful in securing this deposit for the benefit of customers, the Reserve Formula debit should be eliminated.  This would create an additional customer property shortfall.

### f. Customer Property Seizure During Transfer Process

46.     During the period immediately preceding and following the Chapter 11 filing of LBHI, many customers of LBI attempted to withdraw cash and move securities to other brokers.  To the extent that actual delivery of cash was made to customers, this would reduce LBI's Reserve Account requirement.  Actual delivery of securities would also relieve LBI of Rule 15c3-3 custody requirements as to the delivered property.  However, interruptions in the delivery process during the period surrounding the LBI filing had the effect of exposing customer cash and securities to third party seizure.

47.     This situation occurred with cash from liquidation of customers' foreign money market fund positions.  During normal operations, customers holding money market funds denominated in non-US currencies were tracked by LBI on its "ADP" system, which in turn fed information regarding customer holdings into the Rule 15c3-3 calculations.  During the

week of September 15, I have been informed that according to LBI's books and records, customers holding approximately $82 million in such money market fund positions attempted to withdraw, instructing LBI to liquidate and wire transfer the proceeds to their banks. To carry out this instruction, LBI's process included moving the proceeds of the liquidation of money market fund positions from LBI's ADP system, and recording them instead through LBI's "RISC" system, which was designed to handle foreign currency transactions and conversions, but (unlike ADP) did not automatically feed information regarding customer obligations into the Rule 15c3-3 calculation.

48. Following the liquidation of foreign money market fund positions and prior to wire transfer, the proceeds were deposited in an account at Citibank London. This account apparently did not have a "no-lien" letter, and following the September 19 LBI filing, the funds were seized by the bank. Because the foreign money market fund liquidation proceeds and the customer obligations they represented were then being tracked by the RISC system, an appropriate credit in the Rule 15c3-3 calculation was not automatic, but depended on manual intervention to identify them as funds owed to customers. The notification to the preparers of the Reserve Formula computation apparently did not occur, and I have been informed that the resulting credit was not included in the September 19, 2008 Reserve Formula. The result was under-reported Reserve Formula credits in the amount of $82 million, with a corresponding shortfall in the Reserve Account.

49. In my opinion, the incidents identified in (a) through (f) above will result in a shortfall in the customer property of LBI. Had these items been identified prior to the Filing Date, LBI management would have been compelled, pursuant to its customer protection obligations, to devote all free resources of LBI, whether customer or proprietary, to meet its

customer protection obligations. My calculations show that the currently known issues aggregate to approximately $4.9 billion and show a current shortfall in the Reserve Account of approximately $3.7 billion.

### 2.    Items Currently Under Investigation

50.    The items identified below have been identified as having the potential to increase LBI's Reserve Account obligation if further investigation supports the conclusion that they were not correctly accounted for in LBI's Reserve Formula calculation. Similarly, as the liquidation continues, further items arising from custody issues, adjustments to customer and other general ledger balances, and other Reserve Formula errors may be identified.

### a.    Chase Bank Overdraft

51.    LBI's main operating account at Chase, used for both customer and proprietary transactions, developed a large overdraft. (See Exs. 5, 38.) To cover this overdraft, beginning on September 18, Chase seized LBI cash and collateral held at Chase, and it has taken the position that, despite seizing and liquidating billions of dollars in collateral, the bank is still owed billions of dollars on this overdraft. (See Exs. 39, 40.)

52.    Under Rule 15c3-3, overdrafts are "credit" items that are required to be reflected in the reserve computation. (See Ex. 41 (Excerpt of FINRA Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities SEA Rule 15c3-3, at 2656 (2008).) When LBI computed its reserve requirement as of September 19, it was required to reflect the overdrafts at Chase on the credit side of the Reserve Formula, increasing the reserve requirement dollar-for-dollar.

53.    From my review of LBI's internal documents, it appears that LBI personnel computing the reserve requirement as of September 19 during the weekend of

08-01420-sccDoc 18250 Filed 10/06/26/ Entered 10/06/26 10:23:19 Main Appendix Documents 1 Through 17 Pg 20 of 17 Pg 433 of 1129

20

September 20-21 were aware of this issue.  As noted, above, an LBI internal e-mail dated September 20, 2008 circulating a "Rough Estimate for 15c3-3" warned that the estimate had not taken account of "Bank overdrafts" and numerous other items.  (See Ex. 5.)  While one responder stated that, "We cannot possibly solve this," (id.), others decided that the Chase overdraft could be characterized as merely a "secured loan," and thus it was left out of LBI's Rule 15c3-3 Reserve Formula computation (id.).  Others again raised the overdraft on the Chase account the following day, and were advised:  "[w]e should ignore this." (See Ex. 38.)  Despite this instruction, my review of internal emails indicated that the overdraft remained an open item into the following week that required further investigation.

54.    Should further investigation reveal that the account was an under-secured overdraft account, LBI was required to include, at the very least, the amount related to customer activity as a "credit" in the formula, and arguably the entire overdraft amount if the customer component could not be readily ascertained.

**b.    Inclusion of Unsecured Debits in Reserve Formula**

55.    The Reserve Formula permits customer credits to be offset by customer debits, thus reducing the cash lock-up requirement by amounts owed by customers to the broker-dealer.  An important limitation on this rule is that the customer debits so deducted must be fully secured by collateral held by the broker-dealer.  (See Ex. 2; see also Ex. 42 (Excerpt of FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3, at 2721-22 (2008)).)

56.    Investigation is continuing on the question of whether during the period preceding the Filing Date, LBI's Rule 15c3-3 calculation included unsecured or under-secured customer debits to be used in the Reserve Formula.  Should the investigation reveal such use of

unsecured or under-secured customer debits, the Trustee would be required to allocate property as necessary to remedy the shortfall.

### c. Customer Securities Included in the Barclays Repo

57.     I understand that prior to its bankruptcy, LBI and Barclays entered into a repurchase, or repo, transaction (the "Barclays Repo") to provide temporary liquidity to LBI in its final week of operation whereby approximately $49.7 billion in LBI securities were transferred to Barclays in return for a cash loan of $45 billion.

58.     Based on information provided by the Trustee's financial advisors, it appears that customer securities were included in the Barclays Repo transaction. This inclusion was permissible under SEC Rule 15c3-3 so long as LBI included credits in the Reserve Formula to the greater of the market value of the securities included in the repo or the contract value associated with these securities. If the Trustee's investigation reveals that LBI overlooked certain customer securities included in the Barclays Repo when doing its Reserve Formula calculation, there would be a further shortfall in the Reserve Account.

### d. Assets Detained by Foreign Banks

59.     To treat a foreign bank as a good control location for Rule 15c3-3 purposes, a broker-dealer is required to submit an application to the SEC requesting such treatment, and the bank must agree in writing to appropriate custody obligations. LBI treated certain foreign banks as good control locations for purposes of custody of LBI customer securities.

60.     I am informed that certain banks have refused to turn over to the Trustee the customer securities they were holding on behalf of LBI, ostensibly in their capacities as good control locations. Investigation is continuing into whether the foreign banks were correctly

08-01420-scc Doc 18250 Filed 10/06/26/14 Entered 10/06/26 04:02:29:19 Main Document
Documents 1 Through 178 Pg 435 of 1129

22

treated by LBI as good control locations. If they were not, there will be an additional shortfall in property required to be segregated for customers.

###    e.    Other Reserve Computation Errors and Omissions

61.    Also under review are certain other items in LBI's Reserve Formula computation. LBI included many billions in customer debit items for stock borrows and fails to deliver attributable to customer transactions. It is not possible at this time to forecast what portion of these debit items will actually be realized, as there will be litigation and collectability issues to address on a case-by-case basis. In the event that LBI does not realize the full claimed value of the debit items, there will be an additional shortfall in customer property. The full extent of this issue will not be known until the Trustee completes the process of closing-out and recovering on these open transactions.

62.    The Trustee is also investigating whether the reserve computation was performed with appropriate market values of customer securities. In at least one case, the Trustee has identified a discrepancy between what LBI's systems showed as the market value of a customer's securities and what the customer now claims as the market value. As the correct market values are determined, adjustments, whether to increase or decrease the amount that should have been locked up in the Reserve Account, may be required.

_____
Daniel McIsaac

Sworn to and subscribed before
me this 5 th day of ocroBer, 2009

_____
Notary Public State of New York

STEVEN SHEPPARD DiCESARE
Notary Public, State of New York
No. 02DI6110913
Qualified in New York County
Commission Expires June 1, 2012

EXHIBIT 1

# DANIEL MCISAAC, CPA,

## CFO • Controller

A goal-oriented Financial Manager with extensive experience in the financial services industry, specializing in investment banking and securities broker dealers. Demonstrated track record of managing the preparation and analysis of daily and monthly financial results. Filing of all financial regulatory reports with regulatory agencies. Proven expertise in analyzing and interpreting financial and regulatory rules and regulations, establishing processes to meet the reporting requirements, and responding to regulator's inquiries. Continually maintained efficiency and productivity through evaluation of financial management systems and implementation of process improvements. Talented leader specializing in cross business processes, including new business initiatives, review and approval of transactions requiring prior approval, and mergers and acquisitions. Chairman of the SIFMA Capital committee and past president of the SIFMA Financial Management Division. *Core competencies include:*

- Accounting Management
- Financial Analysis
- Capital Management

- Securities Operations
- New product analysis
- Regulatory Rule Interpretation

- Technology Integration
- Regulatory Compliance
- Efficiency Improvements

## CAREER EXPERIENCE

UBS Securities LLC, Stamford Ct, 1994 – Present

**Regulatory Controller - FinOp**

Directed all financial regulatory filings and calculations, including monthly FOCUS Reports, weekly Reserve Formula calculations, daily and monthly CFTC segregation calculations. Responsible for the firm's capital management including daily analysis, monthly and yearly projections, including analysis of daily profit and loss. Manage all regulatory relationships and the firm's industry representative in regulatory matters. Chairman of the SIFMA Capital committee and past president of the SIFMA Financial Management Division. Member of numerous cross business initiatives, responsible for the financial and regulatory aspect of new business initiatives. Senior finance manager on numerous acquisitions, including the coordination and review of financial due diligence process. Work closely with regulators in the development of new regulatory rules and interpretations. Developed skilled team to achieve established objectives. Interact with the Board of Directors and President concerning financial forecasts and reports.

- ➢ Successful management of regulatory relationships.
- ➢ Maintained constant staff levels throughout significant growth of the firm and its products
- ➢ Successfully implemented numerous business acquisitions.
- ➢ Continuous development of alternative solutions to issues
- ➢ Member of industry committees and task forces.

*Continued...*

## DANIEL MCISAAC • Page 2

### CAREER EXPERIENCE CONTINUED

Dean Witter Reynolds, New York, New York, 1989 –1994

**Manager of Regulatory Reporting**

Managed the regulatory reporting department. Responsible for the preparation, analysis and review of all regulatory reports. Worked closely with the business and operations to monitor regulatory compliance and implementation of new rules and regulations. Developed significant process improvements that led to significant overtime reductions. Managed regulatory exams to satisfactory conclusions. *Key Achievements:*

> ➢ Implemented more efficient month end financial closing process, replacing service bureau. Implementation provided significant time savings as well as cost savings.
> ➢ Established distribution broker dealer for the issuance of Investment Company initial shares
> ➢ Worked closely with corporate management on the implementation of a new general ledger system

Drexel Burnham, New York, New York, 1986 – 1989

**Director of Capital Markets Internal Audit**

Responsible for auditing all capital markets areas within the firm. Department was considered a business partner and worked closely with various areas of the firm to develop sound controls and resolve issues. Audit work performed at year end was relied upon by external auditors as part of their certification. Managed the external audit process including the discussion of fees and budgets. Also, coordinated all regulatory exams, including the development and implementation of regulatory recommendations. *Key Achievements:*

> ➢ Uncovered significant reconciliation issues during system conversions.
> ➢ Worked closely with financial accounting and external auditors to develop accounting policies more consistent with the industry.

Deloitte Haskins and Sells, New York, New York, 1978 – 1986

**Audit Manager**

Responsible for the management of certified audits for financial services entities. Managed multi-national audits. Responsible for the development of training programs for industry staff as well as the maintenance of the firm's industry audit guides and programs. Responsible for the supervision of other managers and staff in the audits of over 700 unit investment trust funds. Established the groundwork for the development of an automated approach to these audits *Key Achievement:*

> ➢ Designated firm securities industry expert.
> ➢ Designated firm Mutual Fund industry expert

### EDUCATION

Bachelor of Science, Accounting (1978)

LEHMAN COLLEGE (CUNY), New York, New York

# EXHIBIT 2



17 C.F.R. § 240.15c3-3a                                                                                      Page 1

---

**Effective:[See Text Amendments]**

Securities Exchange Act of 1934
Rules Relating to Over-the-Counter Markets (Refs & Annos)

Code of Federal Regulations Currentness
  Title 17. Commodity and Securities Exchanges
    Chapter II. Securities and Exchange Commission
      Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
        Subpart A. Rules and Regulations Under the

**§ 240.15c3-3a Exhibit A --formula for determination reserve requirement of brokers and dealers under § 240.15c3-3.**

|  |  | Credits | Debits |
|---|---|---|---|
| 1. | Free credit balances and other credit balances in customers' security accounts. (See Note A) | XXX | |
| 2. | Monies borrowed collateralized by securities carried for the accounts of customers (See Note B.) | XXX | |
| 3. | Monies payable against customers' securities loaned (See Note C.) | XXX | |
| 4. | Customers' securities failed to receive (See Note D.) | XXX | |
| 5. | Credit balances in firm accounts which are attributable to principal sales to customers | XXX | |
| 6. | Market value of stock dividends, stock splits and similar distributions receivable outstanding over 30 calendar days | XXX | |
| 7. | Market value of short security count differences over 30 calendar days old | XXX | |
| 8. | Market value of short securities and credits (not to be offset by longs or by debits) in all suspense accounts over 30 calendar days | XXX | |
| 9. | Market value of securities which are in transfer in excess of 40 calendar days and have not been confirmed to be in transfer by the transfer agent or the issuer during the 40 days | | XXX |
| 10. | Debit balances in customers' cash and margin accounts excluding unsecured accounts and accounts doubtful of collection. (See Note E.) | | XXX |
| 11. | Securities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver | | XXX |
| 12. | Failed to deliver of customers' securities not older than 30 calendar days | | XXX |
| 13. | Margin required and on deposit with the Options Clearing Corp. for all option contracts written or purchased in customer accounts. (See Note F.) | | XXX |
| 14. | Margin related to security futures products written, purchased or sold in customer accounts required and on deposit with a clearing agency registered with the Commission under section 17A of the Act (15 U.S.C. 17A) or a derivatives clearing organization registered with the Commodity Futures Trading Commission under sec- | | XXX |

---

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

| | tion 5b of the Commodity Exchange Act (7 U.S.C. 7a-1). (See Note G) | |
|---|---|---|
| | Total credits | |
| | Total debits | |
| 15. | Excess of total credits (sum of items 1-9) over total debits (sum of items 10-14) required to be on deposit in the "Reserve Bank Account" (§ 240.15c3-3(e)). If the computation is made monthly as permitted by this section, the deposit shall be not less than 105 percent of the excess of total credits over total debits | XXX |

Note A. Item 1 shall include all outstanding drafts payable to customers which have been applied against free credit balances or other credit balances and shall also include checks drawn in excess of bank balances per the records of the broker or dealer.

Note B. Item 2 shall include the amount of options-related or security futures product-related Letters of Credit obtained by a member of a registered clearing agency or a derivatives clearing organization which are collateralized by customers' securities, to the extent of the member's margin requirement at the registered clearing agency or derivatives clearing organization.

Note C. Item 3 shall include in addition to monies payable against customer's securities loaned the amount by which the market value of securities loaned exceeds the collateral value received from the lending of such securities.

Note D. Item 4 shall include in addition to customers' securities failed to receive the amount by which the market value of securities failed to receive and outstanding more than thirty (30) calendar days exceeds their contract value.

Note E. (1) Debit balances in margin accounts shall be reduced by the amount by which a specific security (other than an exempted security) which is collateral for margin accounts exceeds in aggregate value 15 percent of the aggregate value of all securities which collateralize all margin accounts receivable; provided, however, the required reduction shall not be in excess of the amount of the debit balance required to be excluded because of this concentration rule. A specified security is deemed to be collateral for a margin account only to the extent it represents in value not more than 140 percent of the customer debit balance in a margin account.

(2) Debit balances in special omnibus accounts, maintained in compliance with the requirements of section 4(b) of Regulation T under the Act (12 CFR 220.4(b) or similar accounts carried on behalf of another broker or dealer, shall be reduced by any deficits in such accounts (or if a credit, such credit shall be increased) less any calls for margin, marks to the market, or other required deposits which are outstanding 5 business days or less.

(3) Debit balances in customers' cash and margin accounts included in the formula under item 10 shall be reduced by an amount equal to 1 percent of their aggregate value.

(4) Debit balances in cash and margin accounts of household members and other persons related to principals of a broker or dealer and debit balances in cash and margin accounts of affiliated persons of a broker or dealer shall be excluded from the Reserve Formula, unless the broker or dealer can demonstrate that such debit balances are directly related to credit items in the formula.

(5) Debit balances in margin accounts (other than omnibus accounts) shall be reduced by the amount by which any single customer's debit balance exceeds 25% (to the extent such amount is greater than $50,000) of the broker-dealer's tentative net capital (i.e., net capital prior to securities haircuts) unless the broker or dealer can demonstrate that the debit balance is directly related to credit items in the Reserve Formula. Related accounts (e.g., the separate accounts of an individual, accounts under common control or subject to cross guarantees) shall be deemed to be a single customer's accounts for purposes of this provision.

If the registered national securities exchange or the registered national securities association having responsibility for examining the broker or dealer ("designated examining authority") is satisfied, after taking into account the circumstances of the concentrated account including the quality, diversity, and marketability of the collateral securing the debit balances or margin accounts subject to this provision, that the concentration of debit balances is appropriate, then such designated examining authority may grant a partial or plenary exception from this provision.

The debit balance may be included in the reserve formula computation for five business days from the day the request is made.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-01420-scc Doc 1850-50 Filed 10/05/12 Entered 10/05/12 23:19:19 Main Document
Documents 1 Thru 29 of 178 Pg 442 of 1129

17 C.F.R. § 240.15c3-3a                                                                                      Page 3

(6) Debit balances of joint accounts, custodian accounts, participations in hedge funds or limited partnerships or similar type accounts or arrangements of a person who would be excluded from the definition of customer ("non-customer") which persons includible in the definition of customer shall be included in the Reserve Formula in the following manner: if the percentage ownership of the non-customer is less than 5 percent then the entire debit balance shall be included in the formula; if such percentage ownership is between 5 percent and 50 percent then the portion of the debit balance attributable to the non-customer shall be excluded from the formula unless the broker or dealer can demonstrate that the debit balance is directly related to credit items in the formula; if such percentage ownership is greater than 50 percent, then the entire debit balance shall be excluded from the formula unless the broker or dealer can demonstrate that the debit balance is directly related to credit items in the formula.

Note F. Item 13 shall include the amount of margin required and on deposit with Options Clearing Corporation to the extent such margin is represented by cash, proprietary qualified securities, and letters of credit collateralized by customers' securities.

Note G. (a) Item 14 shall include the amount of margin required and on deposit with a clearing agency registered with the Commission under section 17A of the Act (15 U.S.C. 78q-1) or a derivatives clearing organization registered with the Commodity Futures Trading Commission under section 5b of the Commodity Exchange Act (7 U.S.C. 7a-1) for customer accounts to the extent that the margin is represented by cash, proprietary qualified securities, and letters of credit collateralized by customers' securities.

(b) Item 14 shall apply only if the broker or dealer has the margin related to security futures products on deposit with:

(1) A registered clearing agency or derivatives clearing organization that:

(i) Maintains the highest investment-grade rating from a nationally recognized statistical rating organization; or

(ii) Maintains security deposits from clearing members in connection with regulated options or futures transactions and assessment power over member firms that equal a combined total of at least $2 billion, at least $500 million of which must be in the form of security deposits. For purposes of this Note G, the term "security deposits" refers to a general fund, other than margin deposits or their equivalent, that consists of cash or securities held by a registered clearing agency or derivative clearing organization; or

(iii) Maintains at least $3 billion in margin deposits; or

(iv) Does not meet the requirements of paragraphs (b)(1)(i) through (b)(1)(iii) of this Note G, if the Commission has determined, upon a written request for exemption by or for the benefit of the broker or dealer, that the broker or dealer may utilize such a registered clearing agency or derivatives clearing organization. The Commission may, in its sole discretion, grant such an exemption subject to such conditions as are appropriate under the circumstances, if the Commission determines that such conditional or unconditional exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors; and

(2) A registered clearing agency or derivatives clearing organization that, if it holds funds or securities deposited as margin for security futures products in a bank, as defined in section 3(a)(6) of the Act (15 U.S.C. 78c(a)(6)), obtains and preserves written notification from the bank at which it holds such funds and securities or at which such funds and securities are held on its behalf. The written notification shall state that all funds and/or securities deposited with the bank as margin (including customer security futures products margin), or held by the bank and pledged to such registered clearing agency or derivatives clearing agency as margin, are being held by the bank for the exclusive benefit of clearing members of the registered clearing agency or derivatives clearing organization (subject to the interest of such registered clearing agency or derivatives clearing organization therein), and are being kept separate from any other accounts maintained by the registered clearing agency or derivatives clearing organization with the bank. The written notification also shall provide that such funds and/or securities shall at no time be used directly or indirectly as security for a loan to the registered clearing agency or derivatives clearing organization by the bank, and shall be subject to no right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank. This provision, however, shall not prohibit a registered clearing agency or derivatives clearing organization from pledging customer funds or securities as collateral to a bank for any purpose that the rules of the Commission or the registered clearing agency or derivatives clearing organization otherwise permit; and

(3) A registered clearing agency or derivatives clearing organization that establishes, documents, and maintains:

(i) Safeguards in the handling, transfer, and delivery of cash and securities;

(ii) Fidelity bond coverage for its employees and agents who handle customer funds or securities. In the case of agents of a registered clearing agency or derivatives clearing organization, the agent may provide the fidelity bond coverage; and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-01420-scc Doc 18750 Filed 10/06/14 Entered 10/06/20 12:39:19 Main Appendix
Documents 1 Through 18 Pg 80 of 178 Pg 443 of 1129

17 C.F.R. § 240.15c3-3a                                                                                   Page 4

(iii) Provisions for periodic examination by independent public accountants; and

 (4) A derivatives clearing organization that, if it is not otherwise registered with the Commission, has provided the Commission with a written undertaking, in a form acceptable to the Commission, executed by a duly authorized person at the derivatives clearing organization, to the effect that, with respect to the clearance and settlement of the customer security futures products of the broker-dealer, the derivatives clearing organization will permit the Commission to examine the books and records of the derivatives clearing organization for compliance with the requirements set forth in § 240.15c3-3a, Note G.(b)(1) through (3).

 (c) Item 14 shall apply only if a broker or dealer determines, at least annually, that the registered clearing agency or derivatives clearing organization with which the broker or dealer has on deposit margin related to securities future products meets the conditions of this Note G.

[42 FR 27224, May 27, 1977; 50 FR 41340, Oct. 10, 1985; 52 FR 30334, Aug. 14, 1987; 69 FR 54190, Sept. 7, 2004]

SOURCE: Sections 240.15c1-1 to 240.15c3-1 appear at 13 FR 8205, Dec. 22, 1948; 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20 , 1987; 52 FR 9 154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, July 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 199 1; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 44709, Oct. 16, 1992; 58 FR 14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997; 63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5 , 2000; 66 FR 21659, May 1 , 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9 , 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28 , 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76 596, Dec. 21 , 200 6; 72 FR 4166, Jan . 29, 2007,

unless otherwise noted.

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s, 78u-5, 78w, 78x, 78ll, 78mm, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, and 7201 et seq.; and 18 U.S.C. 1350, unless otherwise noted.; Sections 240.0-9, 240 .0-11, 240.13e-1, 24 0.13e-100, 2 40.13e-101 and 240.14d-100 also issued under secs. 12, 13 and 14, 15 U.S.C. 78l, 78m and 78n;; Section 240.3a4-1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as am ended;; Section 240.3a12-8 also iss ued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), a nd 23(a), 15 U.S.C. 78w(a) ;; Section 240.3a12-10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12-9 als o issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78c(a)(12), 78g(c), 78k(d)(1);; Sections 240.3a43-1 and 240.3a44-1 also issued under sec. 3; 15 U.S.C. 78c;; Section 240.3b-6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b-9 also issued under secs. 2, 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121, as amended (15 U.S.C. 78b, 78c, 78o);; Section 240.9b-1 is also issued under sec. 2, 7, 10, 19(a), 48 Stat. 74, 78, 81, 85; secs. 201, 205, 209, 120, 48 Stat. 905, 906, 908; secs. 1-4, 8, 68 Stat. 683, 685; sec. 12(a), 73 Stat. 143; sec. 7(a), 74 Stat. 412; sec. 27(a), 84 Stat. 1433; sec. 308(a)(2), 90 Stat. 57; sec. 505, 94 Stat. 2292; secs. 9, 15, 23(a), 48 Stat. 889, 895, 901; sec. 230(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; sec. 2, 52 Stat. 1075; secs. 6, 10, 78 Stat. 570-574, 580; sec. 11(d), 84 Stat. 121; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 77b, 77g, 77j, 77s(a), 78i, 78o, 78w(a);; Section 240.10b-10 is also issued under secs. 2, 3, 9, 10, 11, 11A, 15, 17, 23, 48 Stat. 891, 89 Stat. 97, 121, 137, 156, (15 U.S.C. 78b, 78c, 78i, 78j, 78k, 78k-1, 78o, 78q);; Section 240.12a-7 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), 6, 15 U.S.C. 78f, 11A, 15 U.S.C. 78k, 12, 15 U.S.C. 78(l), and 23(a)(1), 15 U.S.C. 78(w)(a)(1).; Sections 240.12b-1 to 240.12b-36 also issued under secs.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3, 12, 13, 15, 48 Stat. 892, as amended 894, 895, as amended; 15 U .S.C. 78c, 78l, 78m, 78o;; Sectio n 240.12b-15 is also issued under secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Sectio n 240.12b-25 is also issued unde r 15 U.S.C. 80a-8 , 80a-24(a), 80a-29, and 80a-37.; Section 240.12g-3 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240 .12g3-2 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.13a-10 is also issued under secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Sectio n 240.13a-11 is also issued under secs. 3(a) and 306(a), Pub.L. 107-204, 116 Stat. 745.; Section 240 .13a-14 is also issu ed und er secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Section 240.13a-15 is also issued under secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Sections 240.13e-4, 240.14d-7, 240.14d-10 a nd 240.14e-1 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(d) and 14(e), 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(d) and 78n(e) and sec. 23 (c) o f the In vestment Company Act of 1940, 15 U.S.C. 80a-23(c);; Sections 240.13e-4 to 240.13e-101 also issued unde r secs. 3(b) , 9(a)(6), 10(b), 13(e), 14(e), 15(c)(1), 48 Stat. 882, 889, 891, 894, 895, 901, sec. 8, 49 Stat. 1379, sec. 5, 78 Stat. 569, 570, secs. 2, 3, 82 Stat. 454, 455, secs. 1, 2, 3-5, 84 Stat. 1497, secs. 3, 18, 89 Stat. 97, 155; 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(e), 78o(c); sec. 23(c) of the Investment Company Act of 1940; 54 Stat. 825; 15 U.S.C. 80a-23(c);; Section 240.13f-2(T) also iss ued under sec. 13(f)(1) ( 15 U.S.C. 78m(f)(1));; Sections 240.14a-1, 240.14a- 3, 240.14a-13, 240.14b-1, 240.14b-2, 240.14c-1, a nd 240.14c-7 als o issued u nder secs. 12 , 15 U.S.C. 781, and 14, Pub.L. 99-222, 99 Stat. 1737, 15 U.S.C. 78n;; Sectio ns 240.14a-3, 24 0.14a-13, 240.14b-1 and 240.14c-7 also issued under secs. 12, 14 and 17, 15 U.S.C. 781 , 78n and 78g;; Sectio ns 2 40.14c-1 to 240.14c-101 also issued under sec. 14, 48 Stat. 895


15 U.S.C. 78n;; Section 240.14d-1 is also issued under 15 U.S.C. 77g , 77j, 77s(a), 77ttt(a), 79t, 80a-37.; Section 240.14e-2 is also issued under 15 U.S.C. 77g, 77h, 77s(a), 77sss, 79t, 80a-37(a).; Section 240.14e-4 also issued under the Exchange Act, 15 U.S.C. 78a et se q., and particularly sections 3(b), 10(a), 10(b), 14(e), 15(c), and 23(a) of the Exchange Act ( 15 U.S.C. 78 c(b), 78j(a), 78j(b), 78n(e), 78o(c), and 78w(a));; Section 240.15a-6, also issued under secs. 3, 10, 15, and 17, 15 U.S.C. 78c, 78j, 78o, and 78q;; Section 240.15b1-3 als o issued under sec. 15 , 17; 15 U.S.C. 78o 78q;; Sections 240.15b1-3 and 240.15b2-1 also issued under 15 U.S.C. 78o, 78q;; Section 240.15b2-2 also issued unde r secs. 3 , 15; 15 U.S.C. 78c, 78o;; Sections 240.15b10-1 to 240.15b10-9 also issued under secs. 15, 17, 48 Stat. 895, 897, sec. 203, 49 Stat. 704, secs. 4, 8, 49 Stat. 1379, sec. 5, 52 Stat. 1076, sec. 6, 78 Stat. 570; 15 U.S.C.

78o, 78q, 12 U .S.C. 24 1 nt .;; Section 240. 15c2-6, also issued under secs. 3, 10, and 15, 15 U.S.C. 78c, 78j, and 78o.; Section 240.15c2-1 1 also issued under 15 U.S.C. 78j(b), 78o(c), 78q(a), and 78w(a).; Section 240.15c2-12 also issued under 15 U.S.C. 78b, 78c, 78j, 78o, 78o-4 and 78q.; Section 240.15c3-1 is also issued under secs. 15(c)(3), 15 U.S.C. 78o(c)(3).; Section 240.15c3-3 is also issued under 15 U.S.C. 78o(c)(2), 78(c)(3), 78q(a), 78w(a); sec. 6 (c), 84 Stat. 1652; 15 U. S.C. 78fff.; Section 240.15c3-3(o) is also issue d unde r Pub.L. 106-554, 114 Stat. 2763, section 203.; Sect ion 240.15d-5 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.15d-10 is also issued under 15 U.S.C. 80a-20(a) and 80a-37(a), and secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Sec tion 240.15d-11 is also issue d under secs. 3(a) and 306(a), Pub.L. 107-204, 116 Stat. 745.; Section 240.15d-14 is also issued under secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745.; Sectio n 240 .15d-15 is also issued under secs. 3(a) and 302, Pub.L. No. 107-204, 116 Stat. 745. ; Section s 240.15Ca1-1, 240 .15Ca2-1, 240.15Ca2-2, 2 40.15Ca2-3, 2 40.15Ca2-4, 2 40.15Ca2-5, 240.15Cc1-1 also issued under secs. 3, 15C; 15 U.S.C. 78c, 78o-5;; Section 240.17a-4 al so issu ed und er secs. 2 , 17, 23(a), 48 Stat. 897, as am ended; 15 U.S.C. 78a, 78d-1, 78d-2; sec. 14, Pub.L. 94-29, 89 Stat. 137 (15 U.S.C. 78g); sec. 18, Pub.L. 94-29, 89 Stat. 155 (15 U.S.C. 78w);; Sec tion 240.17a-23 also issued under 15 U.S.C. 78b, 78c, 78o, 78q, a nd 78w(a);; Section 240.17f-1 is also aut horized under sections 2 , 17 and 17A, 48 Stat. 891, 89 Stat. 137, 141 (15 U.S.C. 78b, 78q, 78q-1);; Section 240.17h-1T also issued under 15 U.S.C. 78q.; Sections 240.17Ac2-1(c) and 240.17Ac2-2 also issued under secs. 17, 17A and 23(a); 48 Stat. 897, as a mended, 89 Stat. 137, 141 and 48 Stat. 901 (15 U.S.C. 78q , 78q-1, 78w(a));; Section 240.17Ad-1 is also issued under secs. 2, 17, 17A and 23(a); 48 Stat. 841 as amended, 48 Stat. 897, as am ended, 89 Stat. 137, 141, and 48 Stat. 901 (15 U.S.C. 78b, 78q, 78q-1, 78w);; Sec tions 240.17Ad-5 and 240.17Ad-10 are also issued under secs. 3 and 17A; 48 Stat. 882, as amended, and 89 Stat. (15 U.S.C. 78c and 78q-1);; Sec tion 240.17Ad-7 als o iss ued under 15 U.S.C. 78b, 78q, and 78q-1.; Sections 240.19c-4 also issued under secs. 6, 11A, 14, 15A, 19 and 23 of the Securities Exchange Act of 1934 ( 15 U.S.C. 78 o-3, an d 78s);; Section 240.19c-5 al so issued under Sections 6, 11A, and 19 of the Securities Ex change Act of 1934, 48 Stat. 885, as amended, 89 Stat. 111, as amended, and 48 Stat. 898, as amended, (15 U.S.C. 78 f, 78k-1, a nd 78s.; Section 240.31-1 is also issued under sec. 31, 48 Stat. 904, as amended (15 U.S.C. 78ee).


17 C. F. R. § 240.15c3-3a, 17 CFR § 240.15c3-3a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-01420-scc Doc 18-7 Filed 10/06/14 Entered 10/06/20 14:23:19 Main Appendix
Documents 1 Through 178 Pg 82 of 9   Pg 445 of 1129

17 C.F.R. § 240.15c3-3a                                                              Page 6

Current through June 19, 2009; 74 FR 29387

© 2009 Thomson Reuters
END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT 3





EXHIBIT 4

| **To:** | James.Walker@barclayscapital.com[James.Walker@barclayscapital.com] |
|---|---|
| **From:** | Kelly, Martin |
| **Sent:** | Sun 9/21/2008 2:33:07 PM |
| **Subject:** | Re: Assets and liabilities acquired |
| **Categories:** | urn:content-classes:message |

Have been working all night. Trying to clear up 15c3 issue - will be in contact as soon as I can

----------------------------------

----- Original Message -----
From: James.Walker@barclayscapital.com <James.Walker@barclayscapital.com>
To: Kelly, Martin; Gary.Romain@barclayscapital.com <Gary.Romain@barclayscapital.com>
Cc: Reilly, Gerard
Sent: Sun Sep 21 09:42:26 2008
Subject: RE: Assets and liabilities acquired

Martin,

Any update ?

Thks, James

-----Original Message-----
From: Kelly, Martin [mailto:martin.kelly@lehman.com]
Sent: Saturday, September 20, 2008 9:08 PM
To: Walker, James: Finance (NYK); Romain, Gary: Finance (LDN)
Cc: Reilly, Gerard
Subject: RE: Assets and liabilities acquired

James/Gary

Right now the BS is still a work in progress. Will probably take
overnight to resolve. Will keep you updated. Here is what we know and
don't know:

(1) Cash $7b - good number
(2) Inventory $44.8 - treasury guys (who funded this) working on split -
large exercise - will be back when have more
(3) 15c3 receivable $1b - have many breaks/fails here - have a large
team working now and through the night to resolve
(4) Financing $45.2b - believe this to be a good number - will need to
validate with you
(5) Other payables - partly on our books today, partly purchase price
related - $4.25b agrees to PA
(6) Shorts - believe they did not go but still need final confirmation
(7) Subsidiaries - Eagle etc - need more complete information and cannot
access this team - will need to update this on Monday am

We have a large effort around this and will be in touch when we have
more clarity.

KELLY_MARTIN_00003225

Regards - Martin


-----Original Message-----
From: James.Walker@barclayscapital.com
[mailto:James.Walker@barclayscapital.com]
Sent: Saturday, September 20, 2008 7:53 AM
To: Kelly, Martin; Reilly, Gerard
Subject: FW: Assets and liabilities acquired

Martin,

Left you a voicemail re this last night.    Will need your help asap.

Thks, James

-----Original Message-----
From: Clackson, Patrick: Finance (LDN)
Sent: Saturday, September 20, 2008 7:48 AM
To: Walker, James: Finance (NYK)
Cc: King, Stephen: Markets (NYK)
Subject: Assets and liabilities acquired

James

I need a balance sheet today of what the assets and liabilities we
finally acquired

I'm trying to get final deal details from jonathan but stephen will have
all the inventory details

Rgds

Patrick

—————————————————————————

This e-mail may contain information that is confidential, privileged or
otherwise protected from disclosure. If you are not an intended
recipient of this e-mail, do not duplicate or redistribute it by any
means. Please delete it and any attachments and notify the sender that
you have received it in error. Unless specifically indicated, this
e-mail is not an offer to buy or sell or a solicitation to buy or sell
any securities, investment products or other financial product or
service, an official confirmation of any transaction, or an official
statement of Barclays. Any views or opinions presented are solely those
of the author and do not necessarily represent those of Barclays. This
e-mail is subject to terms available at the following link:
www.barcap.com/emaildisclaimer. By messaging with Barclays you consent
to the foregoing.  Barclays Capital is the investment banking division
of Barclays Bank PLC, a company registered in England (number 1026167)
with its registered office at 1 Churchill Place, London, E14 5HP.  This
email may relate to or be sent from other members of the Barclays Group.

—————————————————————————
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -

KELLY_MARTIN_00003225

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

_____

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays Group.

_____

KELLY_MARTIN_00003225

EXHIBIT 5

**To:** Hoban, Samantha[samantha.hoban@lehman.com]
**From:** Crepeau, Alex F
**Sent:** Sun 9/21/2008 12:43:16 AM
**Importance:** High
**Subject:** FW: Rough Estimate for 15c3-3 as of 09/19/08
**Categories:** urn:content-classes:message

-----Original Message-----
From: Crepeau, Alex F
Sent: September 20, 2008 20:43
To: Stucchio, Anthony; Tonucci, Paolo; Blackwell, Alastair
Subject: RE: Rough Estimate for 15c3-3 as of 09/19/08

So good news is that we expect a smaller calc but bad news is the system
needs to be put online and recs have to be done and resolved...

-----Original Message-----
From: Stucchio, Anthony
Sent: September 20, 2008 20:27
To: Tonucci, Paolo; Blackwell, Alastair; Crepeau, Alex F
Subject: RE: Rough Estimate for 15c3-3 as of 09/19/08

Good answer!  Now we have all the breaks to resolve

-----Original Message-----
From: Tonucci, Paolo
Sent: Saturday, September 20, 2008 8:25 PM
To: Stucchio, Anthony; Blackwell, Alastair; Crepeau, Alex F
Subject: RE: Rough Estimate for 15c3-3 as of 09/19/08

No - was a secured loan.

That is how must be treated.

-----Original Message-----
From: Stucchio, Anthony
Sent: 20 September 2008 20:19
To: Blackwell, Alastair; Crepeau, Alex F
Cc: Tonucci, Paolo
Subject: RE: Rough Estimate for 15c3-3 as of 09/19/08


Paolo, help end some confusion,  I am on a conference call with the Ops
guys, did we end Friday with an overdraft at chase (52 billion)?
-----Original Message-----
From: Blackwell, Alastair
Sent: Saturday, September 20, 2008 8:16 PM
To: Stucchio, Anthony; Crepeau, Alex F
Cc: Tonucci, Paolo
Subject: Re: Rough Estimate for 15c3-3 as of 09/19/08

We cannot possibly solve this

SEARCH_RESULTS_00099300

--------------------------------

----- Original Message -----
From: Stucchio, Anthony
To: Blackwell, Alastair; Crepeau, Alex F
Cc: Tonucci, Paolo
Sent: Sat Sep 20 20:03:59 2008
Subject: FW: Rough Estimate for 15c3-3 as of 09/19/08


Fyi
As you can see from Joel's email, these items need to be resolved before
a final number can be given to Paolo.
_____
From:   Potenciano, Joel
Sent:   Saturday, September 20, 2008 7:41 PM
To:     McLaughlin, Kendall J; Sudarsan, Daniram; Burke, William T;
Stucchio, Anthony; Hasan, Mohammad; Kush, Anthony
Subject:        Rough Estimate for 15c3-3 as of 09/19/08
Importance:     High

  <<Daily Net Free Credits.09-2008.xls>>

All,

Attached is the rough estimate for 15c3-3.  The formula gives a net
debit of 1.9 billion.  However, this does not factor the following
areas:

*       Bank overdrafts
*       Unapplied customer cash
*       Stock record breaks
*       Money fund fails

The stock record breaks items has numerous items due to the banks being
frozen last Friday. The following are the ADP breaks and unallocated
that we would require assistance in resolving.  Anthony Kush will
provide his items for MTS which I believe is around 8 bil worth of
breaks.  These items will require more than normall time to investigate
because of the volume.

25. BREAK ACCOUNTS ALLOCATED ITEMS :

--------------------------------------

CUSTOMER LONG VS SUSPENDED               1,944,083,997
STOCK BORROW VS L/C

STOCK BORROW VS PLEDGE Q                  1,474,744

STOCK BORROW VS PLEDGE NQ                 9,777,309

STOCK LOAN   VS PLEDGE           285,023

SEARCH_RESULTS_00099300

REVERSE REPO

REPO                          46,338,008

FIRM  LONG                   642,910,433

FIRM  SHORT                  343,368,464

CUST  LONG                    99,532,808

NON CUST SHORT               354,825,908

STOCK LOAN                    92,534,082

STOCK BORR                    86,690,827

FAIL TO RECEIVE              150,504,920

FAIL TO DELIVER              234,793,227

FAIL TO RECEIVE CNS            5,636,111

FAIL TO DELIVER CNS           26,980,908

PAIB  LONG                    89,372,494

PAIB  SHORT                  125,734,764


26. UNALLOCATED POSITIONS :

---------------------------

FIRM SPEC LONG        17,022,063    FIRM SPEC SHORT
952,204
CUST LONG             448,726,063    CUST SHORT
1,922,230,797
NON CUST LONG         375,777,615    NON CUST  SHORT
98,321,553
STOCK LOAN            73,276    STOCK LOAN PLEDGE
47
STOCK BORROW          20,506,033    STOCK BORROW L/C

STOCK BORROW PLEDGE Q          75    STOCK BORROW PLEDGE NQ
474
FAIL TO RECEIVE       28,303,177    FAIL TO DELIVER
20,366,403
FAIL TO RECEIVE CNS          9    FAIL TO DELIVER CNS
496,268
REVERSE REPO                 REPO
7,602,591

SEARCH_RESULTS_00099300

# EXHIBIT 6

**To:** Kelly, Martin[martin.kelly@lehman.com]
**From:** Reilly, Gerard
**Sent:** Sun 9/21/2008 1:08:44 AM
**Subject:** Re: Opening balance sheet
**Categories:** urn:content-classes:message

We should send a prelim
-----------

----- Original Message -----
From: Kelly, Martin
To: Reilly, Gerard
Sent: Sat Sep 20 20:05:37 2008
Subject: Fw: Opening balance sheet

Sounds like not ready to finalize yet?


----------------------------------

----- Original Message -----
From: Blackwell, Alastair
To: Stucchio, Anthony; Lowitt, Ian T; Crepeau, Alex F; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett; Potenciano, Joel
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J; Ullman, Neal (NY); Crepeau, Alex F
Sent: Sat Sep 20 20:01:37 2008
Subject: Re: Opening balance sheet

Has to be fixed tonight.

Alex Crepeau owns this issue
Thanks,
Alastair


----------------------------------

----- Original Message -----
From: Stucchio, Anthony
To: Lowitt, Ian T; Blackwell, Alastair; Crepeau, Alex F; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett; Potenciano, Joel
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J
Sent: Sat Sep 20 19:57:11 2008
Subject: Re: Opening balance sheet

Right now, the customer reserve is showing a net debit over 1 billion. This number is not final since there are over 6 billion in stock record breaks that must be resolved. Kendall will be in touch with Bill. Will advise as soon as more info is available.

Tony

KELLY_MARTIN_00002913

----- Original Message -----
From: Lowitt, Ian T
To: Stucchio, Anthony; Blackwell, Alastair; Crepeau, Alex F; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J
Sent: Sat Sep 20 18:13:32 2008
Subject: Re: Opening balance sheet

Thanks. Please keep me posted on progress. Ian
------Original Message------
From: Stucchio, Anthony
To: Alastair Blackwell
To: Crepeau, Alex F
To: Tonucci, Paolo
To: Daniel Fleming
To: Robert Azerad
To: Martin Kelly
To: Beldner, Brett
Cc: Stewart, Marie
Cc: Gerry Reilly
Cc: Veksler, Irina
Cc: McLaughlin, Kendall J
Cc: Ian Lowitt
Sent: Sep 20, 2008 6:12 PM
Subject: Re: Opening balance sheet

I know, I have guys working at home


----- Original Message -----
From: Blackwell, Alastair
To: Crepeau, Alex F; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett; Stucchio, Anthony
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J; Lowitt, Ian T
Sent: Sat Sep 20 18:10:15 2008
Subject: Re: Opening balance sheet

Tony,

You need to re calc.
This is deal critical and time sense.

Thanks,

Alastair


---------------------------------
----- Original Message -----
From: Crepeau, Alex F
To: Blackwell, Alastair; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett;

KELLY_MARTIN_00002913

Stucchio, Anthony
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J
Sent: Sat Sep 20 18:01:13 2008
Subject: Re: Opening balance sheet

Tony, apparently we need to do anew reserve calc immediately, Kendall is calling you.

----- Original Message -----
From: Blackwell, Alastair
To: Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; Crepeau, Alex F
Sent: Sat Sep 20 17:26:52 2008
Subject: Re: Opening balance sheet

Alex,
Fyi
Thanks,
Alastair




----------------------------------

----- Original Message -----
From: Tonucci, Paolo
To: Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina
Sent: Sat Sep

------Original Message Truncated------

KELLY_MARTIN_00002913

EXHIBIT 7

**To:**  Kelly, Martin[martin.kelly@lehman.com]
**From:**  Lee, Mark
**Sent:**  Mon 9/22/2008 12:37:06 AM
**Subject:**  RE: Final 15c3-3 Reserve Formula as of 09/17/2008
**Categories:**  urn:content-classes:message

<u>2008 (4.24 KB)</u>

Just spoken to Robert. The numbers are taking too long to move significantly and there is now mis-assumptions re the ADI required to remain (see attached) so Robert is going to take the last Joel file and make some assumptions - the guys are working to bring to 2.3bn down so we have to take some hit for this now.
There is so little transparency into the way the data is structured it's hugely frustrating on all sides.

We have a final call in 20 mins but I think we are about out of time

Mark
-----Original Message-----
From: Kelly, Martin
Sent: Sunday, September 21, 2008 7:33 PM
To: Lee, Mark
Subject: Re: Final 15c3-3 Reserve Formula as of 09/17/2008

We need to get for ourselves and give to barclays comfort that the adp balances will be meaningfully reduced - we put in $3.9b as a placeholder. What's the plan and when do you think we can achieve some meaningful progress? Thx - M

----------------------------------

----- Original Message -----
From: Lee, Mark
To: Kelly, Martin
Sent: Sun Sep 21 19:30:03 2008
Subject: RE: Final 15c3-3 Reserve Formula as of 09/17/2008

Martin - it has taken much longer to get the ADP numbers reallocated and we have a call starting in a minute to review with Ops and Fin. What are your expectations this point this evening, Joel is currently trying to allocate as per COM request?

Mark.

_____
From:  Kelly, Martin
Sent:  Sunday, September 21, 2008 5:21 PM
To:  Azerad, Robert; Potenciano, Joel; 'wburke@si.rr.com'; Stucchio, Anthony; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony

KELLY_MARTIN_00003659

Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008

Who is the "owner" of the spreadsheet in terms of making updates to it?
Received several 9/19 versions already - the most recent at 4.30 via
Mark.

---

From:   Azerad, Robert
Sent:   Sunday, September 21, 2008 5:16 PM
To:     Potenciano, Joel; 'wburke@si.rr.com'; Stucchio, Anthony; Kelly,
Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008

Any estimate for 9/19? This is what is urgently needed.

---

From:   Potenciano, Joel
Sent:   Sunday, September 21, 2008 5:14 PM
To:     'wburke@si.rr.com'; Azerad, Robert; Stucchio, Anthony; Kelly,
Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
Subject:       Final 15c3-3 Reserve Formula as of 09/17/2008

  << File: Book4.xls >>

   Hi All,

   Bill requested me to forward the following schedule to this
   distribution.  Thanks!

   With kind regards,
   Joel K. Potenciano
   LEHMAN BROTHERS
   Telephone  +1 (212) 320-6786
   Fax  +1 (646) 885-9383
   Email  joel.potenciano@lehman.com

KELLY_MARTIN_00003659

EXHIBIT 8

**To:** wburke@si.rr.com[wburke@si.rr.com]
**From:** Potenciano, Joel
**Sent:** Sun 9/21/2008 7:47:40 AM
**Subject:** Res.Driver 091908.xls
**Categories:** urn:content-classes:message

Res.Driver 091908.xls

SEARCH_RESULTS_00101292

*FINAL*

*Lehman Brothers Inc.*
*Customer/PAIB Reserve Analysis*

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | 3 Month Avg | Comments |
|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | 31,115 | |
| SCS Cash | 46,462 | | 46,462 | 46,462 | - | 393,585 | |
| Option Margin | 15,824 | | 15,824 | 15,824 | - | 63,353 | |
| P & I | 22,858 | | 22,858 | 22,858 | - | 22,809 | |
| Aged Fails and Partly Secured Debits | 7,518 | | 7,518 | 7,518 | - | 9,538 | |
| Customer Receivable Versus Box | * | | - | - | | (65) | |
| Stock Record/P&C items | 86,809 | | 86,809 | 86,809 | - | 33,719 | |
| Overdrafts | - | | - | - | | 45,935 | |
| Unapplied Cash / Suspense | 31,677 | | 31,677 | 31,677 | - | 55,468 | Decrease in unapplied |
| 3% ADI | 216,477 | | 216,477 | 216,477 | - | 35,950 | Decrease in fails mainly treasuries |
| Sub-total | 504,841 | - | 504,841 | 504,841 | - | 691,407 | |
| **ADP** | | | | | | | |
| Free Credits / Margin | (15,647,813) | 15,279,345 | (368,468) a | 481,456 | (16,129,270) | 2,858,182 | Decrease in customer free credits/ margin payables mainly 732 Prime Broker branches |
| Net Customer Financing | * 4,019,265 | (4,092,613) | (73,348) | (831,906) | 4,851,171 | (972,434) | Increase in customer financing |
| OMNI Conversion Payable | - | | - | - | | - | |
| O/Drafts | 62,604 | | 62,604 | 62,604 | - | 50,330 | Clean-up of OD |
| Dividends | 5,322 | | 5,322 | 5,322 | - | 15,695 | |
| S/B L O.C. vs. Customer Short | - | | - | - | | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | 14,152 | |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | (79,770) | 149,720 | |
| OCC Proprietary Qualified Collateral | (349,858) | | (349,858) | (349,858) | - | (831,762) | Decrease in treasury collateral with OCC |
| Firm Bank Loan – Firm Not Long | - | | - | - | | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | 14,203 | |
| Unapplied Cash | 10,121 | | 10,121 | 10,121 | - | 9,642 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | | 85,212 | 85,212 | - | 81,066 | |
| Other | 3,992,241 | | 3,992,241 | 82,685 | 3,909,556 | 22,382 | |
| 3% ADI | 569,390 | | 569,390 | 322,692 | 246,698 | 132,964 | |
| Sub-total | (6,665,833) | 11,186,732 | 4,520,899 | 204,052 | (6,869,885) | 1,544,142 | |
| **ITS** | | | | | | | |
| Free Credits (primarily SCS cash) | 160,575 | | 160,575 | 160,575 | - | 1,234,634 | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | 60,336 | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | | 189,086 | 189,086 | - | 133,470 | |
| Other | - | | - | - | | - | |
| 3% ADI | 178,711 | | 178,711 | 178,711 | - | 24,315 | |
| Sub-total | 606,011 | - | 606,011 | 606,011 | - | 1,452,756 | |
| **Commodities** | | | | | | | |
| O/Drafts | 176,487 | | 176,487 | 176,487 | - | 54,728 | |
| Non-Reg Commodity Credits | 52,000 | | 52,000 | 52,000 | - | 106,668 | |
| Sub-total | 228,487 | - | 228,487 | 228,487 | - | 161,396 | |
| Requirement | (5,326,493) | 11,186,732 | 5,860,239 | 1,543,392 | (6,869,885) | 3,849,701 | |
| Cushion (plus 2% deduction) | 225,608 | | 225,608 | 225,608 | - | 332,154 | |
| Amount Segregated | (5,100,885) | 11,186,732 | 6,085,847 | 1,769,000 | (6,869,885) | 4,181,855 | |
| **PAIB:** | | | | | | | |
| Net PAIB Debits/Credits | 642,699 | | 642,699 b | 325,286 | 317,413 | 1,245,733 | |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | 719 | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | 171,674 | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | 1,147 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | 130,203 | |
| Stock Borrow | * (450,967) | | (450,967) | (560,229) | 109,262 | (1,116,764) | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | (2,633) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | 430,079 | |
| Cushion (plus 2% deduction) | 25,880 | | 25,880 | 25,880 | - | 111,079 | |
| Amount Segregated | 337,872 | - | 337,872 | 492,000 | (154,128) | 541,158 | |
| Total Segregated | (4,763,012) | 11,186,732 | 6,423,720 | 2,261,000 | (7,024,012) | 4,723,013 | |

\* Denotes account net debit balances.

| | | |
|---|---|---|
| *a* | Includes: | |
| | BREAK ACCOUNTS ALLOCATED ITEMS: | |
| | Stock Borrow vs L/C | - |
| | Stock Borrow vs. Pledge Q | 1,474,744 |

SEARCH_RESULTS_00101293

|  | 09/19/08 | | 09/17/08 | | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | 8,833,951 | | 7,995,742 | | 838,208 |
| | | | | | |
| *Firm Long vs Cust Short* | (1,759,625) | | (196,453) | | (1,563,172) |
| *Non Cust Long vs. Cust Short* | (11,024,522) | | (4,533,257) | | (6,491,265) |
| *PAIB Long vs Cust Short* | (279,021) | | (15,031) | | (263,990) |
| *Reverse Repo vs Cust Short* | - | | - | | - |
| *Cust Long vs Cust Short* | | | | | |
| *Stock Borrow vs Cust Short* | (8,926,953) | | (1,207,278) | | (7,719,675) |
| *Fail to Deliver vs Cust Short* | (2,491,643) | | (1,562,267) | | (929,376) |
| *sub-total* | (24,481,764) | (24,481,764) | (7,514,286) | (7,514,286) | (16,967,478) |
| **Total** | | (15,647,813) | | 481,456 | (16,129,270) |
| | | | | | |
| **Customer Debits** | 8,027,427 | | 8,121,467 | | (94,040) |
| | | | | | |
| *Money Fund Receivable* | (310,045) | | (310,045) | | - |
| *Unsecured/Partly Secured Receivables/Non-Purpose Loans* | (169,152) | | (169,152) | | - |
| *Security Concentrations* | | | | | |
| *Cust. Long vs.Customer Bank Loan* | (228,557) | | (728,814) | | 500,257 |
| *Stock Loan vs Cust Long* | (2,333,573) | | (1,050,110) | | (1,283,464) |
| *Cust Long vs Cust Short* | - | | - | | - |
| *Fail to Receive vs Cust Long* | (2,853,274) | | (2,210,873) | | (642,401) |
| *Firm Short vs Customer Long* | (6,152,091) | | (2,820,568) | | (3,331,523) |
| *sub-total* | (12,046,692) | (12,046,692) | (7,289,562) | (7,289,562) | (4,757,131) |
| **Total** | | (4,019,265) | | 831,906 | (4,851,171) |
| | | | | | |
| *Plus:* | | | | | |
| *Stock Borrow / SB Q vs. Firm Bank Loan* | | - | | - | - |
| *Stock Borrow vs. Cust Bank Loan* | | - | | - | - |
| **Net Cust Dr./Cr.** | | (11,628,548) | | (350,449) | (11,278,099) |

SEARCH_RESULTS_00101293

COPY PASTE FROM RESERVE FILE

**15c3-3 CUSTOMER RESERVE COMPUTATION**
**BROKER DEALER UNIT**
09/19/08
*(in 000'S)*

| | 09/19/08 |
|---|---|
| **1. CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 524,910 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 62,604 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 2,043,617 |
| FIRM LONG VS. CUSTOMER SHORT | (1,789,625) |
| NONCUST LONG VS. CUSTOMER SHORT | (11,024,522) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (279,021) |
| SHORT & CREDIT INTEREST | 23,658 |
| MONEY FUND SETTLEMENTS 098-00003 & 098-70001 | 477 |
| UNALLOCATED CUSTOMER SHORT | 1,922,231 |
| | |
| TOTAL CUSTOMER CREDITS | 36,397 |
| | |
| **2. CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 228,557 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 228,557 |
| | |
| **3. CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 14,343,512 |
| STOCK LOAN MTM | (3,431,134) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 2,090,952 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (124,856) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (29,015) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (332,410) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,333,573 |

SEARCH_RESULTS_00101293

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (195,358) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (493,487) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (24,458) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (28,925) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (782,561) |
| | FAIL TO RECEIVE VS. PAIB LONG | (33,101) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (5,517) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (1) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (14,899) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (42) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,004) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 2,853,274 |
| | | |
| 5. | FIRM SHORT VS CUSTOMER LONG: | |
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 487,026 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,089,180 |
| | REPO VS. CUSTOMER LONG | 2,662,445 |
| | PAIB SHORT VS. CUSTOMER LONG | 152,397 |
| | REPO VS. UNALLOCATED | 53,941 |
| | FIRM SHORT VS. UNALLOCATED | 344,321 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 362,781 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 6,152,091 |
| | | |
| 6. | CUSTOMER DIVIDEND & INTEREST: | |
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| | | |
| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
| | | |
| 8. | SUSPENSE ACCOUNTS | |
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 10,121 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,212 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 135,230 |
| | | |
| 9. | AGED TRANSFERS & REORGANIZATION: | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| 10. | OTHER: | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 11,744,444 |

SEARCH_RESULTS_00101293

| 12. | CUSTOMER DEBITS: | |
|-----|------------------|---|
| | *CUSTOMER SECURITY ACCOUNTS* | 4,950,169 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| | *CUSTOMER NETTING NB* | (77,250) |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)* | 3,292,639 |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *INV ADVISORY FEES RELATED TO NB MARGIN DEBITS* | - |
| | *MONEY FUND RECEIVABLE* | (310,045) |
| | *MARGIN INTEREST* | 33,784 |
| | *UNSECURED DEBITS* | (3,310) |
| | *PARTLY SECURED DEBITS* | (12) |
| | *NON-PURPOSE LOANS* | (199,614) |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | | |
| | *TOTAL CUSTOMER DEBITS* | **7,548,230** |

| 13. | CUSTOMER STOCK BORROW: | |
|-----|------------------------|---|
| | *STOCK BORROW* | 26,275,972 |
| | *STOCK BORROW MTM* | 5,061,972 |
| | *STOCK BORROW L.O.C.* | - |
| | *STOCK BORROW VS. CUST SHORT ADJ.* | - |
| | *STOCK BORROW FREE OF MONEY* | (2,532,947) |
| | *STOCK BORROW LC VS SECURED BK LOAN* | - |
| | *STOCK BORROW L C VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW NQ VS. CUSTOMER SHORT* | (337,017) |
| | *STOCK BORROW L C VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW NQ VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW VS STOCK LOAN* | (9,344,291) |
| | *STOCK BORROW VS. STOCK LOAN PLEDGE* | (256,503) |
| | *STOCK BORROW PLEDGE Q VS. STOCK LOAN* | (21,386) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN* | (7,499) |
| | *STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE* | (9,644) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE* | (28,422) |
| | *STOCK BORROW L C VS. STOCK LOAN* | - |
| | *STOCK BORROW L C VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L C VS. FIRM SHORT* | - |
| | *STOCK BORROW L C VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. FIRM SHORT* | (3,714,514) |
| | *STOCK BORROW VS. NONCUSTOMER SHORT* | (1,811,035) |
| | *STOCK BORROW PLEDGE Q. VS FIRM SHORT* | (201,992) |
| | *STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT* | (146,553) |
| | *STOCK BORROW PLEDGE NQ VS. FIRM SHORT* | (794,427) |
| | *STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT* | (285,203) |
| | *STOCK BORROW VS. THE BOX* | (251,922) |
| | *STOCK BORROW PLEDGE Q. VS. THE BOX* | (30,770) |
| | *STOCK BORROW PLEDGE NQ VS. THE BOX* | (91,082) |
| | *STOCK BORROW L C VS. THE BOX* | - |
| | *STOCK BORROW VS. FAIL REC CNS* | (14,899) |
| | *STOCK BORROW PLEDGE Q. VS. F-R CNS* | (42) |
| | *STOCK BORROW PLEDGE NQ VS. F-R CNS* | (1) |
| | *STOCK BORROW L C VS. F-R CNS* | - |
| | *STOCK BORROW L C VS. REPO* | - |
| | *STOCK BORROW VS. REPO* | (1,341,239) |
| | *STOCK BORROW PLEDGE Q. VS. REPO* | (46,141) |
| | *STOCK BORROW PLEDGE NQ VS. REPO* | (365,820) |
| | *STOCK BORROW VS. UNALLOCATED* | (107,197) |
| | *STOCK BORROW PLEDGE Q. VS. UNALLOCATED* | (1,475) |
| | *STOCK BORROW PLEDGE NQ VS. UNALLOCATED* | (9,778) |
| | *STOCK BORROW L C VS. UNALLOCATED* | - |
| | *STOCK BORROW VS. PAIB SHORT* | (450,138) |
| | *STOCK BORROW PLEDGE Q. VS. PAIB SHORT* | (829) |
| | *STOCK BORROW PLEDGE NQ VS. PAIB SHORT* | (20,314) |
| | *STOCK BORROW L C VS. PAIB SHORT* | - |
| | *STOCK BORROW L C VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW VS. FAIL TO RECEIVE* | (493,487) |
| | *STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE* | (24,458) |
| | *STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE* | (6,984) |
| | | |
| | *TOTAL CUSTOMER STOCK BORROW* | **8,589,936** |

SEARCH_RESULTS_00101293

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---:|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (195,358) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (2,004) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,886) |
| | FAIL TO DELIVER VS. REPO | (418,827) |
| | FAIL TO DELIVER VS. THE BOX | (1,065,589) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (721,860) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (255,160) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (259,824) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,509) |
| | CNS FAIL TO DELIVER VS. THE BOX | (277,980) |
| | CNS FAIL TO DELIVER VS. REPO | (99,861) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,477) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (28,925) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | **2,491,643** |

| 15. | CUSTOMER MARGIN WITH OCC | |
|---|---|---:|
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 349,858 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 349,858 |

| 16. | OTHER | |
|---|---|---:|
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | AGGREGATE DEBIT ITEMS | 18,979,667 |
|---|---|---:|
| 18. | LESS 3% | (569,390) |
| 19. | TOTAL 15C3-3 DEBITS | 18,410,277 |
| 20. | EXCESS - DEBITS OVER CREDITS | 6,665,833 |
| 21. | DEFICIT - CREDITS OVER DEBITS | **0** |

SEARCH_RESULTS_00101293

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| *CUSTOMER CREDITS:* |  |
| *Customer Accounts* | 3,281,275 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 52,000 |
| *Commodity Overdrafts* | 176,487 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 3,776,488 |
|  |  |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 2,202,479 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 0 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 613,236 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,633 |
| *SUSPENSE CREDITS* | 0 |
|  |  |
| **TOTAL CREDITS** | 6,612,836 |
|  |  |
|  |  |
| *CUSTOMER DEBITS:* |  |
| *Customer Accounts* | 4,258,469 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,258,469 |
|  |  |
| *CUSTOMER MARGIN WITH OCC* | 0 |
|  |  |
| *CUSTOMER STOCK BORROW* | 497,654 |
| *CUSTOMER FAIL TO DELIVER* | 1,200,926 |
| *AGGREGATE DEBITS* | 5,957,049 |
| *Less 3%* | 178,711 |
| *TOTAL DEBITS* | 5,778,338 |
|  |  |
| *EXCESS CREDITS OVER DEBITS* | 834,499 |

SEARCH_RESULTS_00101293

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS          09:19:00

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1") CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #63 | (19) B/R-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F/D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F/D VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY. REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F/D VS TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F/D~30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST. F/D > 30 DAYS VS (18) NON CUST F/R | 35,640 | 37 |
| #150 | (1') CUST LONG F/D ~30 VS (18) NON CUST (F/R) | 0 | 0 |
| #151 | (19) B/R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F/R | 0 | 0 |
| #163 | (1") CUST LONG F VS (28) NET SHORT CLR | 0 | 0 |
| #176 | (1%) NON CUST F/D ~30 VS (22) CUST SHRT(F/R) | 201,017 | 201 |
| #194 | (15) CUST LONG (24) OFER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 0 | 0 |
| #190 | (19) B/R DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #191 | (21) OPERATIONAL VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (23) INACTIVE LONG VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (11) NONCUST F/D VS (24) OPER SHORT | 0 | 0 |
| #197 | (21) OFER ACCTS LONG VS (24) OFER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F/D~30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) B/D LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (34) AFFILIATE LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 0 | 0 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 8,459,024 | 8,459 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28) CUST NET CL | 0 | 0 |
| #297 | (33) BREAK (18) F/R | 43,995 | 44 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 18,222,230 | 18,222 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (3) NET LONG CLE(35) INACTIVE SHORT | 0 | 0 |
| #349 | (1") CUST LONG FREE VS (35) INACTIVE SHRT | 76,586 | 77 |
| #342 | (19) B/R DEALER LONG FREE VS (35) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #344 | (23) CUST LONG (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #346 | (2") NON BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (35) INACTIVE SHRT | 0 | 0 |
| #348 | (33) OPER LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 59,402,245 | 59,402 |
| #337 | (9) NON CUST F/D (35) INACTIVE SHORT | 0 | 0 |
| #356 | (5) BVF VS (46) SPECIAL FINANCE | 0 | 0 |
| #392 | (1")CUST LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #393 | (19)BR DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (0) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L(0)VG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33)BOX BREAKS LAW (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 604,571 | 605 |
| #438 | (35)SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 0 | 0 |
| #443 | (3") FIN. LDGR TR VS (8) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 7,280,026.A | 7,280 |
| | STOCK RECORD BREAK | 0 R | 0 |
| | ACCOUNTS PAYABLE | 77,215.968 R-2 | 77,216 |
| | SCS CASH | 46,462.484 R-2 | 46,462 |
| MONEBANK OVERDRAFTS | | 15,823.784 R-2 | 15,824 |
| | | 0 R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 416,943 R-4 | 417 |
| | OPERATIONAL - UNAPPLIED CASH | 31,260.502 R-3 | 31,261 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857.875 R-5 | 22,858 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 194,037,556 216,477,068 | 216,477 |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F/D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE VS (34) BOX | 0 | 0 |
| #270 | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #537 | (15) CUST F/D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |
| **EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS** | | **504,841,226** | **504,841** |

SEARCH_RESULTS_00101293

1,115

(2,289)
(507)
(73,949)

0

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | 2,235,573 |
| | *BREAK VS. PAIB LONG* | 215,107 |
| | *PAIB CREDIT ADJ* | (8,000) |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| | *PAIB LONG VS CUSTOMER SHORT* | 279,021 |
| | *FIRM LONG vs PAIB SHORT* | (25,932) |
| | *NONCUST LONG VS. PAIB SHORT* | (133,325) |
| | *UNALLOCATED PAIB SHORT* | - |
| | *PAIB SHORT VS CUSTOMER LONG* | (152,397) |
| | | |
| | *P.A.I.B. CREDITS:* | 2,421,706 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | - |
| | *OCC MARGIN DEFECIT* | - |
| | *PAIB LONG VS. FIRM BANK LOAN* | - |
| | *PAIB LONG VS. CUST BANK LOAN* | 6 |
| | *PAIB LONG VS. PAIB BANK LOAN* | - |
| | *PAIB BANK LOAN - PAIB NOT LONG* | - |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | 6 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | - |
| | *STOCK LN PLDG VS. PAIB LONG* | 124,856 |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | 124,856 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | 33,101 |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | 1 |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 33,102 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | 11,615 |
| | *NONCUST SHORT VS. PAIB LONG* | 45,183 |
| | *FIRM SHORT VS PAIB LONG* | 11,893 |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 68,691 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES  > 7 DAYS* | - |

SEARCH_RESULTS_00101293

*TOTAL PAIB DEPOSITS & INTEREST:*

7.  **SECURITY COUNT DIFFERENCE > 7 DAYS:**

8.  *SUSPENSE CREDITS & SMV >7 DAYS:*                    -

9.  *AGED TRANSFERS & REORGANIZATION:*

    *TRANSFER SHORTS OVER 40 DAYS*                       -
    *REORG/REDEMPTION SMV OVER 7 DAYS*    _____  -

    *TOTAL AGED TRANSFERS & REORGANIZATION*              -


10. *OTHER:*

    *OTHER CREDITS*                        _____  -

    *TOTAL OTHER*                                         -

    *TOTAL PAIB CREDITS*                  2,648,361

SEARCH_RESULTS_00101293

| 12. | P.A.I.B. DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |
| | | |
| 13. | PAIB STOCK BORROW: | |
| | | |
| | STOCK BORROW VS PAIB SHORT | 450,138 |
| | STOCK BORROW Q. VS. PAIB SHORT | 829 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 450,967 |
| 14. | PAIB FAIL TO DELIVER: | |
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,886 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,509 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 106,395 |
| 15. | PAIB MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |
| 16. | OTHER | |
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| 17. | TOTAL PAIB DEBITS | 2,336,369 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | 311,992 |

SEARCH_RESULTS_00101293

SEARCH_RESULTS_00101293

EXHIBIT 9

**To:**    Rubin, Jaclyn[Jaclyn.Rubin@lehman.com]
**From:**    Lee, Mark
**Sent:**    Sun 9/21/2008 2:48:58 PM
**Subject:**    FW: Reserve Calc
**Categories:**    urn:content-classes:message

<u>15c3_3a.doc</u>
<u>Res Driver 091908.xls</u>


Would like your help. We have a major issue with the Reserve formula as
BCI think they are taking $1Bn from the reserve account and the calcs
being run show a shortfall. I realise that you will not have been
involved in this on a regular basis. However, I'd like you to look at
the spreadsheet, particularly the ADP page and see whether the
categories make any sense to you and there is anything we can compare to
GFS. The ops guys have used GFS to validate their unencumbered assets
this morning and (whilst I accept that GFS is inventory only) I want to
see if there are any numbers we can tie out as the Reg guys have always
sourced their own data directly.

Working with Alex C to present to O'Meara and McDade / Lowitt on this
later so the more eyes familiar with the data the better.

If in doubt give me a ring on 917 215 0392

Mark


> _____
> From:      Lee, Mark
> Sent: Sunday, September 21, 2008 8:33 AM
> To:   Hoban, Samantha
> Subject:      Reserve Calc
>
> <<15c3_3a.doc>>  <<Res Driver 091908.xls>>
>
> FYI

SEARCH_RESULTS_00101576

## 15c3-3a Reserve Calculation

**Objective:** 15c3-3a is the Formula for determination of Reserve requirement to protect Customers liabilities (monies and securities)

**A BCI assumption was made that the Reserve Account had a cash overage of $1Bn, and a Treasury assumption was made that the Account would cover the current liabilities**

**Issues:**

- ADP Account mingled with LBIE Administration Accounts. Opened to facilitate residual processes balances due to customers. Stock Loan entries were processed in error which generated large balances and position of approximately $16. 6 billion of debits and $6 billion of credits.
- 10,000 Stock Record breaks of which 3,700 relate to the NB Conversion.
- The remaining 6,300 breaks relate to international securities lending contracts that were closed but the Loanet entries were not processed correctly, resulting in additional DTC and stock record breaks
- Additionally there are $1.3 billion of free credit balances. Based on analysis from the Books and Records these appear to be valid,

**Initial Actions:**

| Issue | Action | Owner | Due By |
|---|---|---|---|
| | Adjust for ADP Customer issues and Stock Breaks | Bill Burke | Sun 6am Complete |
| LBIE Accounts allocated as Customer | Reallocation of LBIE accounts to Non-Customer in ADP | Kendall McLaughlin | |
| 10,000 Stock Record Breaks | Break fix in priority order | Ops Control | |
| | Work with ADP to re-run Customer Allocation | Kendall McLaughlin | |
| | | | |

SEARCH_RESULTS_00101577

*FINAL*

**Lehman Brothers Inc.**
*Customer/PAIB Reserve Analysis*

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | 3 Month Avg | Comments |
|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | 31,115 | |
| SCS Cash | 46,462 | | 46,462 | 46,462 | - | 393,585 | |
| Option Margin | 15,824 | | 15,824 | 15,824 | - | 63,353 | |
| P & I | 22,858 | | 22,858 | 22,858 | - | 22,809 | |
| Aged Fails and Partly Secured Debits | 7,518 | | 7,518 | 7,518 | - | 9,538 | |
| Customer Receivable Versus Box * | - | | - | - | - | (65) | |
| Stock Record/P&C items | 86,809 | | 86,809 | 86,809 | - | 33,719 | |
| Overdrafts | - | | | | - | 45,935 | |
| Unapplied Cash / Suspense | 31,677 | | 31,677 | 31,677 | - | 55,468 | |
| 3% ADI | 216,477 | | 216,477 | 216,477 | - | 35,950 | |
| Sub-total | 504,841 | | 504,841 | 504,841 | - | 691,407 | |
| **ADP** | | | | | | | |
| Free Credits / Margin | (15,647,813) | 15,279,345 | (368,468)a | 481,456 | (849,925) | 2,858,182 | |
| Net Customer Financing * | 4,019,265 | (4,092,613) | (73,348) | (831,906) | 758,558 | (972,434) | |
| OMNI Conversion Payable | | | - | | | - | |
| O/Drafts | 62,604 | | 62,604 | 62,604 | - | 50,330 | |
| Dividends | 5,322 | | 5,322 | 5,322 | - | 15,695 | |
| S/B L.O.C. vs. Customer Short | | | - | | | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | 14,152 | |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | (79,770) | 149,720 | |
| OCC Proprietary Qualified Collateral | (349,858) | | (349,858) | (349,858) | | (831,762) | |
| Firm Bank Loan - Firm Not Long | | | | | | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | 14,203 | |
| Unapplied Cash | 10,121 | | 10,121 | 10,121 | - | 9,642 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | | 85,212 | 85,212 | - | 81,066 | |
| Other | 3,992,241 | | 3,992,241 | 82,685 | 3,909,556 | 22,382 | |
| 3% ADI | 569,390 | | 569,390 | 322,692 | 246,698 | 132,964 | |
| Sub-total | (6,665,833) | 11,186,732 | 4,520,899 | 204,052 | 4,316,847 | 1,544,142 | |
| **ITS** | | | | | | | |
| Free Credits (primarily SCS cash) | 160,575 | (259,307) | (98,732) | 160,575 | (259,307) | 1,234,634 | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | 60,336 | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | | 189,086 | 189,086 | - | 133,470 | |
| Other | | | - | | | - | |
| 3% ADI | 178,711 | | 178,711 | 178,711 | - | 24,315 | |
| Sub-total | 606,011 | (259,307) | 346,704 | 606,011 | (259,307) | 1,452,756 | |
| **Commodities** | | | | | | | |
| O/Drafts | 176,487 | | 176,487 | 176,487 | - | 54,728 | |
| Non-Reg Commodity Credits | 52,000 | | 52,000 | 52,000 | - | 106,668 | |
| Sub-total | 228,487 | | 228,487 | 228,487 | - | 161,396 | |
| Requirement | (5,326,493) | 10,927,425 | 5,600,932 | 1,543,392 | 4,057,540 | 3,849,701 | |
| Cushion (plus 2% deduction) | 225,608 | | 225,608 | 225,608 | - | 332,154 | |
| Amount Segregated | (5,100,885) | 10,927,425 | 5,826,540 | 1,769,000 | 4,057,540 | 4,181,855 | |
| **PAIB:** | | | | | | | |
| Net PAIB Debits/Credits | 642,699 | | 642,699b | 325,286 | 317,413 | 1,245,733 | |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | 719 | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | 171,674 | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | 1,147 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | 130,203 | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | 109,262 | (1,116,764) | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | (2,633) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | 430,079 | |
| Cushion (plus 2% deduction) | 25,880 | | 25,880 | 25,880 | - | 111,079 | |
| Amount Segregated | 337,872 | - | 337,872 | 492,000 | (154,128) | 541,158 | |
| Total Segregated | (4,763,012) | 10,927,425 | 6,164,413 | 2,261,000 | 3,903,413 | 4,723,013 | |

*  Denotes account net debit balances.

a  Includes:
BREAK ACCOUNTS ALLOCATED ITEMS:
Stock Borrow vs L/C   -
Stock Borrow vs. Pledge Q   1,474,744

SEARCH_RESULTS_00101578

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** |  | 8,833,951 |  | 7,995,742 | 838,208 |
|  |  |  |  |  |  |
| Firm Long vs Cust Short | (1,759,625) |  | (196,453) |  | (1,563,172) |
| Non Cust Long vs. Cust Short | (11,024,522) |  | (4,533,257) |  | (6,491,265) |
| PAIB Long vs Cust Short | (279,021) |  | (15,031) |  | (263,990) |
| Reverse Repo vs Cust Short | - |  |  |  |  |
| Cust Long vs Cust Short |  |  |  |  |  |
| Stock Borrow vs Cust Short | (8,926,953) |  | (1,207,278) |  | (7,719,675) |
| Fail to Deliver vs Cust Short | (2,491,643) |  | (1,562,267) |  | (929,376) |
| sub-total | (24,481,764) | (24,481,764) | (7,514,286) | (7,514,286) | (16,967,478) |
|  |  |  |  |  |  |
| *Total* |  | (15,647,813) |  | 481,456 | (16,129,270) |
|  |  |  |  |  |  |
| **Customer Debits** |  | 8,027,427 |  | 8,121,467 | (94,040) |
|  |  |  |  |  |  |
| Money Fund Receivable | (310,045) |  | (310,045) |  | - |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (169,152) |  | (169,152) |  | - |
| Security Concentrations | - |  | - |  |  |
| Cust. Long vs.Customer Bank Loan | (228,557) |  | (728,814) |  | 500,257 |
| Stock Loan vs Cust Long | (2,333,573) |  | (1,050,110) |  | (1,283,464) |
| Cust Long vs Cust Short | - |  |  |  |  |
| Fail to Receive vs Cust Long | (2,853,274) |  | (2,210,873) |  | (642,401) |
| Firm Short vs Customer Long | (6,152,091) |  | (2,820,568) |  | (3,331,523) |
| sub-total | (12,046,692) | (12,046,692) | (7,289,562) | (7,289,562) | (4,757,131) |
|  |  |  |  |  |  |
| *Total* |  | (4,019,265) |  | 831,906 | (4,851,171) |
|  |  |  |  |  |  |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - |  |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - |  |
|  |  |  |  |  |  |
| *Net Cust Dr./Cr.* |  | (11,628,548) |  | (350,449) | (11,273,099) |

SEARCH_RESULTS_00101578

COPY PASTE FROM RESERVE FILE

### 15c-3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
09/19/08
*(in 000'S)*

| | 09/19/08 |
|---|---|
| **1.** **CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 524,910 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE  5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 62,604 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 2,043,617 |
| FIRM LONG VS. CUSTOMER SHORT | (1,759,625) |
| NONCUST LONG VS. CUSTOMER SHORT | (11,024,522) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (279,021) |
| SHORT & CREDIT INTEREST | 23,658 |
| MONEY FUND SETTLEMENTS 098-00003  & 098-70001 | 477 |
| UNALLOCATED CUSTOMER SHORT | 1,922,231 |
| | |
| TOTAL CUSTOMER CREDITS | 36,397 |
| | |
| | |
| **2.** **CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 228,557 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 228,557 |
| | |
| | |
| **3.** **CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 14,343,512 |
| STOCK LOAN MTM | (3,431,134) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 2,090,952 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (124,856) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (29,015) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (332,410) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,333,573 |

SEARCH_RESULTS_00101578

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (195,358) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (493,487) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (24,458) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L/C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (28,925) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (782,561) |
| | FAIL TO RECEIVE VS. PAIB LONG | (33,101) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (5,517) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (1) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (14,899) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (42) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L/C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,004) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 2,853,274 |

| 5. | FIRM SHORT VS CUSTOMER LONG: | |
|---|---|---:|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 487,026 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,089,180 |
| | REPO VS. CUSTOMER LONG | 2,662,445 |
| | PAIB SHORT VS. CUSTOMER LONG | 152,397 |
| | REPO VS. UNALLOCATED | 53,941 |
| | FIRM SHORT VS. UNALLOCATED | 344,321 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 362,781 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 6,152,091 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|---|---|---:|
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|---|---|---:|

| 8. | SUSPENSE ACCOUNTS | |
|---|---|---:|
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 10,121 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,212 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 135,230 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|---|---|---:|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|---|---|---:|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 11,744,444 |

| 12. | CUSTOMER DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,292,639 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | (310,045) |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,548,230 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (337,017) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (1,811,035) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (146,553) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (285,203) |
| | STOCK BORROW VS. THE BOX | (251,922) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (30,770) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (91,082) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (14,899) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (42) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | (1) |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (107,197) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,475) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (9,778) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (450,138) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (829) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (20,314) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (493,487) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (24,458) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (6,984) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 8,589,936 |

SEARCH_RESULTS_00101578

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (195,358) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (2,004) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,886) |
| | FAIL TO DELIVER VS. REPO | (418,827) |
| | FAIL TO DELIVER VS. THE BOX | (1,065,589) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (721,860) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (255,160) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (259,824) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,509) |
| | CNS FAIL TO DELIVER VS. THE BOX | (277,980) |
| | CNS FAIL TO DELIVER VS. REPO | (99,861) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,477) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (28,925) |
| | TOTAL CUSTOMER FAIL TO DELIVER | 2,491,643 |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 349,858 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | TOTAL CUSTOMER MARGIN WITH OCC | 349,858 |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | TOTAL OTHER | - |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 18,979,667 |
| 18. | LESS 3% | (569,390) |
| 19. | TOTAL 15C3-3 DEBITS | 18,410,277 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | 6,665,833 |
| 21. | DEFICIT - CREDITS OVER DEBITS | 0 |

SEARCH_RESULTS_00101578

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** |  |
| *Customer Accounts* | 3,281,275 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 52,000 |
| *Commodity Overdrafts* | 176,487 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 3,776,488 |
|  |  |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,202,479 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 613,236 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,633 |
| **SUSPENSE CREDITS** | 0 |
|  |  |
| **TOTAL CREDITS** | 6,612,836 |
|  |  |
| **CUSTOMER DEBITS:** |  |
| *Customer Accounts* | 4,258,469 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,258,469 |
|  |  |
| **CUSTOMER MARGIN WITH OCC** | 0 |
|  |  |
| **CUSTOMER STOCK BORROW** | 497,654 |
| **CUSTOMER FAIL TO DELIVER** | 1,200,926 |
| **AGGREGATE DEBITS** | 5,957,049 |
| *Less 3%* | 178,711 |
| **TOTAL DEBITS** | 5,778,338 |
|  |  |
| **EXCESS CREDITS OVER DEBITS** | 834,499 |

SEARCH_RESULTS_00101578

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS     09:39:00

CREDITS

| | | | |
|---|---|---|---|
| #47 | (1') CUST F-D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B-D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F-D (6) REPO | 0 | 0 |
| #63 | (19) BR-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F-D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG (9) HIC REPO | 0 | 0 |
| #92 | (1') CUST LONG F-D VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY.REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F-D VS (10) TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F-D 30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1') CUST Long Free Vs (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST F-D > 30 DAYS VS (18) NON CUST F/R | 35,640 | 37 |
| #150 | (19) B-R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | |
| #151 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #152 | (23) INACTIVE LONG VS (18) NON CUST F/R | 0 | |
| #163 | (1') CUST LONG F VS (28) NET SHORT CLR | 0 | |
| #176 | (11) NON CUST F-D 30 VS (22) CUST SHRT(F/R) | 201,017 | 201 |
| #194 | (15) CUST LONG (24) OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 0 | 0 |
| #180 | (19) BR-DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F/R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (11) NONCUST F-D VS (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D>30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F-D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1') CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCTS LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 0 | 0 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 8,459,024 | 8,459 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28) CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F/R | 43,995 | 44 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 18,222,230 | 18,222 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (1') NET LONG CLE(35) INACTIVE SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 59,402,245 | 59,402 |
| #337 | (9) NON CUST F-D (35) INACTIVE SHORT | 0 | 0 |
| #336 | (5) B-VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #391 | (1')CUST LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #393 | (19) BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK LONG (46) SPECIAL FIN. | 0 | 0 |
| #439 | (33) BOX BREAKS LAW (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 604,871 | 605 |
| #438 | (35) SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 604,871 | 0 |
| #443 | (3'7) FIN. LDGR TR VS (9) HIC REPOS | 0 | 0 |

| | | |
|---|---|---|
| PARTLY SECURED CHARGE | 7,280,026-A | 7,280 |
| STOCK RECORD BREAK | 0-B | 0 |
| ACCOUNTS PAYABLE | 77,215,968-R-2 | 77,216 |
| SCS CASH | 46,462,484-R-2 | 46,462 |
| OPTION MARGIN | 15,823,784-R-2 | 15,824 |
| MONE BANK OVERDRAFTS | 0-R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | 416,943-R-4 | 417 |
| OPERATIONAL - UNAPPLIED CASH | 31,260,502-R-3 | 31,261 |
| P&I PAYABLES CANADA | 0-R-5 | 0 |
| P&I PAYABLES | 22,857,875-R-5 | 22,858 |
| | 194,037,556 | |
| LESS 3% OF AGGREGATE DEBIT ITEMS | 216,477,068 | 216,477 |

DEBIT

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F-D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F-D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F-D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE  VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F-D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |

EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS    504,841,226    504,841

SEARCH_RESULTS_00101578

1,115

(2,289)
(507)
(73,949)

0

SEARCH_RESULTS_00101578

*15c3-3 PAIB COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  | 09/19/08 |
|---|---|
| **1. P.A.I.B. CREDITS:** | |
| PAIB CREDITS | 2,235,573 |
| BREAK VS. PAIB LONG | 215,107 |
| PAIB CREDIT ADJ | (8,000) |
| PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
| PAIB LONG VS CUSTOMER SHORT | 279,021 |
| FIRM LONG vs PAIB SHORT | (25,932) |
| NONCUST LONG VS. PAIB SHORT | (133,325) |
| UNALLOCATED PAIB SHORT | - |
| PAIB SHORT VS CUSTOMER LONG | (152,397) |
| P.A.I.B. CREDITS: | 2,421,706 |
| **2. PAIB BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFECIT | - |
| PAIB LONG VS. FIRM BANK LOAN | - |
| PAIB LONG VS. CUST BANK LOAN | 6 |
| PAIB LONG VS. PAIB BANK LOAN | - |
| PAIB BANK LOAN - PAIB NOT LONG | - |
| CUST BANK LOAN- CUSTOMER NOT LONG | - |
| FIRM BANK LOAN- CUSTOMER NOT LONG | - |
| TOTAL P.A.I.B. BANK LOAN | 6 |
| **3. PAIB STOCK LOAN:** | |
| STOCK LOAN VS PAIB LONG | - |
| STOCK LN PLDG VS. PAIB LONG | 124,856 |
| TOTAL CUSTOMER STOCK LOAN | 124,856 |
| **4. PAIB FAIL TO RECEIVE:** | |
| FAIL TO RECEIVE VS PAIB LONG | 33,101 |
| CNS FAIL TO RECEIVE VS PAIB LONG | 1 |
| TOTAL P.A.I.B. FAIL TO RECEIVE | 33,102 |
| **5. FIRM SHORT VS PAIB LONG:** | |
| REPO VS PAIB LONG | 11,615 |
| NONCUST SHORT VS. PAIB LONG | 45,183 |
| FIRM SHORT VS PAIB LONG | 11,893 |
| TOTAL FIRM SHORT VS P.A.I.B. LONG | 68,691 |
| **6. PAIB DIVIDEND & INTEREST:** | |
| STOCK DIVIDENDS > 30 DAYS | - |
| MONEY CONTROL ADJUSTMENT | - |
| DIVIDEND & INT PAYABLES > 7 DAYS | - |

SEARCH_RESULTS_00101578

*TOTAL PAIB DEPOSITS & INTEREST*

| | | |
|---|---|---|
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| 10. | *OTHER:* | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL PAIB CREDITS* | 2,648,361 |

SEARCH_RESULTS_00101578

| 12. | *P.A.I.B. DEBITS:* | |
|---|---|---|
| | *CUSTOMER SECURITY ACCOUNTS* | 1,955,103 |
| | *VARIOUS PAIB DEBIT ADJ* | (176,096) |
| | *UNSECURED DEBITS* | - |
| | *PARTLY SECURED DEBITS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *BREAK VS CUSTOMER LONG* | - |
| | | |
| | *P.A.I.B. DEBITS:* | 1,779,007 |
| | | |
| | | |
| 13. | *PAIB STOCK BORROW:* | |
| | | |
| | *STOCK BORROW VS PAIB SHORT* | 450,138 |
| | *STOCK BORROW Q. VS. PAIB SHORT* | 829 |
| | *STOCK BORROW NQ VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS PAIB SHORT* | - |
| | | |
| | *TOTAL P.A.I.B. STOCK BORROW* | 450,967 |
| 14. | *PAIB FAIL TO DELIVER:* | |
| | | |
| | *FAIL TO DELIVER OVER 30 DAYS* | - |
| | *FAIL TO DELIVER VS PAIB SHORT* | 43,886 |
| | *CNS FAIL TO DELIVER VS PAIB SHORT* | 62,509 |
| | *CNS FAIL TO DELIVER VS THE BOX* | - |
| | *CNS FAIL TO DELIVER VS REPO* | - |
| | *CNS FAIL TO DELIVER VS UNALLOC./BREAK* | - |
| | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - |
| | | |
| | *TOTAL P.A.I.B. FAIL TO DELIVER* | 106,395 |
| | | |
| | | |
| 15. | *PAIB MARGIN WITH OCC* | |
| | *OCC MARGIN* | - |
| | *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL P.A.I.B. MARGIN WITH OCC* | - |
| | | |
| | | |
| 16. | *OTHER* | |
| | *OTHER PAIB DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| | | |
| 17. | *TOTAL PAIB DEBITS* | 2,336,369 |
| | | |
| | | |
| 20. | *EXCESS - DEBITS OVER CREDITS* | - |
| | | |
| 21. | *DEFICIT - CREDITS OVER DEBITS* | 311,992 |

SEARCH_RESULTS_00101578

SEARCH_RESULTS_00101578

# Exhibit 10

| | |
|---|---|
| **To:** | Azerad, Robert[RAzerad@lehman.com] |
| **From:** | Lee, Mark |
| **Sent:** | Sun 9/21/2008 5:29:42 PM |
| **Subject:** | Res Driver 091908v3.xls |
| **Categories:** | urn:content-classes:message |

**Res Driver 091908v3.xls**

Robert - I made some comments on the right. Happy to quickly try and
create an adjusted estimated column. Hadn't entered the MTS stuff as had
thought this wasn't going although not the major issues with the numbers

My mobile is 9172150392 or home 9173387103
 <<Res Driver 091908v3.xls>>

SEARCH_RESULTS_00101352

*FINAL*

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | 1,169,170 Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Comments |
|---|---|---|---|---|---|
| **MTS** | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | |
| SCS Cash | 46,462 | | 46,462 | 46,462 | |
| Option Margin | 15,824 | | 15,824 | 15,824 | |
| P & I | 22,858 | | 22,858 | 22,858 | |
| Aged Fails and Partly Secured Debits | 7,518 | | 7,518 | 7,518 | |
| Customer Receivable Versus Box * | - | | - | - | |
| Stock Record/P&C items | 86,809 | | 86,809 | 86,809 | |
| Overdrafts | - | | - | - | |
| Unapplied Cash / Suspense | 31,677 | | 31,677 | 31,677 | |
| 3% ADI | 216,477 | | 216,477 | 216,477 | |
| Sub-total | 504,841 | - | 504,841 | 504,841 | |
| **ADP** | | | | | |
| Free Credits / Margin | (15,647,813) | 15,279,345 | (368,468) a | 481,456 | Move to Barclays - to be paid |
| Net Customer Financing * | 4,019,265 | (4,092,613) | (73,348) | (831,906) | connect |
| OMNI Conversion Payable | - | | - | - | |
| O/Drafts | 62,604 | | 62,604 | 62,604 | to be updated. FX 172m really 772m CAD Citibank error |
| Dividends | 5,322 | | 5,322 | 5,322 | |
| S/B L.O.C. vs. Customer Short | - | | - | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | needs to be cleaned up - Kendall cleaning to reduce to 10m. Know by 2pm |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | now 200. In theory should not be protected therefore 0 |
| OCC Proprietary Qualified Collateral | (349,858) | | (349,858) | (349,858) | Assume Frozen as of Friday - Dan to confirm |
| Firm Bank Loan - Firm Not Long | | | | | |
| Suspense | 39,897 | | 39,897 | 39,897 | |
| Unapplied Cash | 10,121 | | 10,121 | 10,121 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | | 85,212 | 85,212 | |
| Other generally fail to receive, cust long vs sr t | 3,992,241 | | 3,992,241 | 82,685 | High Priority change- allocations against stock record acct. Move to adjustments Clients not wanting to deal with us |
| 3% ADI | 569,390 | | 569,390 | 322,692 | cust long vs triparty thurs 900m |
| Sub-total | (6,665,833) | 11,186,732 | 4,520,899 | 204,052 | |
| **ITS** | | | | | |
| Free Credits (primarily SCS cash) | 160,575 | (259,307) | (98,732) | 160,575 | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | | 189,086 | 189,086 | Should be removed |
| Other | - | | - | - | |
| 3% ADI | 178,711 | | 178,711 | 178,711 | |
| Sub-total | 606,011 | (259,307) | 346,704 | 606,011 | correct - good number |
| **Commodities** | | | | | |
| O/Drafts | 176,487 | | 176,487 | 176,487 | |
| Non-Reg Commodity Credits | 52,000 | | 52,000 | 52,000 | |
| Sub-total | 228,487 | - | 228,487 | 228,487 | Should be 0 |
| Requirement | (5,326,493) | 10,927,425 | 5,600,932 | 1,543,392 | |
| Cushion (plus 2% deduction) | 225,608 | | 225,608 | 225,608 | |
| Amount Segregated | (5,100,885) | 10,927,425 | 5,826,540 | 1,769,000 | |
| **PAIB:** | | | | | |
| Net PAIB Debits/Credits | 642,699 | | 642,699 b | 325,286 | |
| Bank Loan | 6 | | 6 | 3,560 | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | |
| Requirement | 311,992 | | 311,992 | 466,120 | |
| Cushion (plus 2% deduction) | 25,880 | | 25,880 | 25,880 | |
| Amount Segregated | 337,872 | - | 337,872 | 492,000 | LOTZ the majority - will be reduced by 215 or 250? |
| Total Segregated | (4,763,012) | 10,927,425 | 6,164,413 | 2,261,000 | |

\* Denotes account net debit balances.

**a**    Includes:
     BREAK ACCOUNTS ALLOCATED ITEMS:
     Stock Borrow vs L/C      -
     Stock Borrow vs. Pledge Q      1,474,744

SEARCH_RESULTS_00101353

| | 09/19/08 | | 09/17/08 | | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | | 8,833,951 | | 7,995,742 | 838,208 |
| | | | | | |
| Firm Long vs Cust Short | (1,759,625) | | (196,453) | | (1,563,172) |
| Non Cust Long vs. Cust Short | (11,024,522) | | (4,533,257) | | (6,491,265) |
| PAIB Long vs Cust Short | (279,021) | | (15,031) | | (263,990) |
| Reverse Repo vs Cust Short | - | | | | |
| Cust Long vs Cust Short | | | | | |
| Stock Borrow vs Cust Short | (8,926,953) | | (1,207,278) | | (7,719,675) |
| Fail to Deliver vs Cust Short | (2,491,643) | | (1,562,267) | | (929,376) |
| sub-total | (24,481,764) | (24,481,764) | (7,514,286) | (7,514,286) | (16,967,478) |
| | | | | | |
| **Total** | | (15,647,813) | | 481,456 | (16,129,270) |
| | | | | | |
| **Customer Debits** | | 8,027,427 | | 8,121,467 | (94,040) |
| | | | | | |
| Money Fund Receivable | (310,045) | | (310,045) | | - |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (169,152) | | (169,152) | | - |
| Security Concentrations | - | | - | | |
| Cust. Long vs.Customer Bank Loan | (228,557) | | (728,814) | | 500,257 |
| Stock Loan vs Cust Long | (2,333,573) | | (1,050,110) | | (1,283,464) |
| Cust Long vs Cust Short | - | | | | |
| Fail to Receive vs Cust Long | (2,853,274) | | (2,210,873) | | (642,401) |
| Firm Short vs Customer Long | (6,152,091) | | (2,820,568) | | (3,331,523) |
| sub-total | (12,046,692) | (12,046,692) | (7,289,562) | (7,289,562) | (4,757,131) |
| | | | | | |
| **Total** | | (4,019,265) | | 831,906 | (4,851,171) |
| | | | | | |
| Plus: | | | | | |
| Stock Borrow / SB Q vs. Firm Bank Loan | | - | | - | - |
| Stock Borrow vs. Cust Bank Loan | | - | | - | - |
| | | | | | |
| **Net Cust Dr./Cr.** | | (11,628,548) | | (350,449) | (11,673,099) |

SEARCH_RESULTS_00101353

COPY PASTE FROM RESERVE FILE

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
09/19/08
*(in 000'S)*

| | 09/19/08 |
|---|---|
| **1.    CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 524,910 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE  5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 62,604 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 2,043,617 |
| FIRM LONG VS. CUSTOMER SHORT | (1,759,625) |
| NONCUST LONG VS. CUSTOMER SHORT | (11,024,522) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (279,021) |
| SHORT & CREDIT INTEREST | 23,658 |
| MONEY FUND SETTLEMENTS 098-00003  & 098-70001 | 477 |
| UNALLOCATED CUSTOMER SHORT | 1,922,231 |
| | |
| TOTAL CUSTOMER CREDITS | 36,397 |
| | |
| | |
| **2.    CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 228,557 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 228,557 |
| | |
| | |
| **3.    CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 14,343,512 |
| STOCK LOAN MTM | (3,431,134) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 2,090,952 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (124,856) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (29,015) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (332,410) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,333,573 |

SEARCH_RESULTS_00101353

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (195,358) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (493,487) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (24,458) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (28,925) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (782,561) |
| | FAIL TO RECEIVE VS. PAIB LONG | (33,101) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (5,517) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (1) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (14,899) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (42) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,004) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 2,853,274 |
| | | |
| 5. | FIRM SHORT VS CUSTOMER LONG: | |
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 487,026 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,089,180 |
| | REPO VS. CUSTOMER LONG | 2,662,445 |
| | PAIB SHORT VS. CUSTOMER LONG | 152,397 |
| | REPO VS. UNALLOCATED | 53,941 |
| | FIRM SHORT VS. UNALLOCATED | 344,321 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 362,781 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 6,152,091 |
| | | |
| 6. | CUSTOMER DIVIDEND & INTEREST: | |
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| | | |
| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
| | | |
| 8. | SUSPENSE ACCOUNTS | |
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 10,121 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,212 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 135,230 |
| | | |
| 9. | AGED TRANSFERS & REORGANIZATION: | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| 10. | OTHER: | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 11,744,444 |

SEARCH_RESULTS_00101353

| 12. | CUSTOMER DEBITS: | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,292,639 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | (310,045) |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,548,230 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---:|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (337,017) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (1,811,035) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (146,553) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (285,203) |
| | STOCK BORROW VS. THE BOX | (251,922) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (30,770) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (91,082) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (14,899) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (42) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | (1) |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (107,197) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,475) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (9,778) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (450,138) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (829) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (20,314) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (493,487) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (24,458) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (6,984) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 8,589,936 |

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---:|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (195,358) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (2,004) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,886) |
| | FAIL TO DELIVER VS. REPO | (418,827) |
| | FAIL TO DELIVER VS. THE BOX | (1,065,589) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (721,860) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (255,160) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (259,824) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,509) |
| | CNS FAIL TO DELIVER VS. THE BOX | (277,980) |
| | CNS FAIL TO DELIVER VS. REPO | (99,861) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC-BREAK | (27,477) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (28,925) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | **2,491,643** |

| 15. | CUSTOMER MARGIN WITH OCC | |
|---|---|---:|
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 349,858 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | **349,858** |

| 16. | OTHER | |
|---|---|---:|
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | AGGREGATE DEBIT ITEMS | **18,979,667** |
|---|---|---:|
| 18. | LESS 3% | (569,390) |
| 19. | TOTAL 15C3-3 DEBITS | 18,410,277 |

| 20. | EXCESS - DEBITS OVER CREDITS | 6,665,833 |
|---|---|---:|
| 21. | DEFICIT - CREDITS OVER DEBITS | **0** |

SEARCH_RESULTS_00101353

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** | |
| *Customer Accounts* | 3,281,275 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 52,000 |
| *Commodity Overdrafts* | 176,487 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 3,776,488 |
| | |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,202,479 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 613,236 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,633 |
| **SUSPENSE CREDITS** | 0 |
| | |
| **TOTAL CREDITS** | 6,612,836 |
| | |
| | |
| **CUSTOMER DEBITS:** | |
| *Customer Accounts* | 4,258,469 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,258,469 |
| | |
| **CUSTOMER MARGIN WITH OCC** | 0 |
| | |
| **CUSTOMER STOCK BORROW** | 497,654 |
| **CUSTOMER FAIL TO DELIVER** | 1,200,926 |
| **AGGREGATE DEBITS** | 5,957,049 |
| *Less 3%* | 178,711 |
| **TOTAL DEBITS** | 5,778,338 |
| | |
| **EXCESS CREDITS OVER DEBITS** | 834,499 |

SEARCH_RESULTS_00101353

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS          09:19:08

CREDITS

| | | | |
|---|---|---|---|
| #47 | (1°) CUST F-D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B-D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F-D (6) REPO | 0 | 0 |
| #63 | (19) BK-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F-D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1°) CUST LONG F-D VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY. REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F-D VS (10) TRI PARTY REPO | 0 | 0 |
| #93 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F-D- 30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1°) CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST. F-D > 30 DAYS VS (18) NON CUST (F/R) | 35,640 | 37 |
| #150 | (19) B-R DEALER LONG FREE VS (18) NON CUST (F-R) | 0 | 0 |
| #151 | (21) OPER. ACCTS. VS (18) NON CUST (F-R) | 0 | 0 |
| #152 | (23) INACTIVE LONG VS (18) NON CUST F-R | 0 | 0 |
| #163 | (1°) CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F-D- 30 VS (22) CUST SHORT(F-R) | 201,017 | 201 |
| #194 | (15) CUST LONG (24) OFER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F-R) | 0 | 0 |
| #180 | (19) BK-DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F-R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F-R) | 0 | 0 |
| #192 | (11)NONCUST F-D V-S (24) OFER SHORT | 0 | 0 |
| #197 | (21) OFER ACCTS LONG VS (24) OFER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG- VS (24) OFER SHRT | 0 | 0 |
| #208 | (9) NON CUST F-D>30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F-D VS (24) OFER SHORT | 0 | 0 |
| #211 | (1°) CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (3A) AFFILIATE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 0 | 0 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F/R) | 8,459,024 | 8,459 |
| #285C | (33) BOX BREAKS VS (22)CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F/R | 43,995 | 44 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 18,222,230 | 18,222 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (5) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1°) CUST LONG FREE VS (35)INACTIVE SHRT | 76,586 | 77 |
| #342 | (19) BK-DEALER LONG FREE VS (35)INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35)INACTIVE SHRT | 0 | 0 |
| #344 | (23) INACT. LONG VS (35)INACTIVE SHRT | 0 | 0 |
| #346 | (2°) NON-BROKER DEALER (19) VS (35)INACTIVE SHRT | 0 | 0 |
| #347 | (2°) AFFIL LGFREE(19) VS (35)INACTIVE SHRT | 0 | 0 |
| #348 | (3A) OPER.LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35)INACTIVE SHRT | 59,402,245 | 59,402 |
| #357 | (9) NON CUST F-D (35) INACTIVE SHORT | 0 | 0 |
| #356 | (5) B-VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #376 | (1°)CUST LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #393 | (19)BR-DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46)SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L8NG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33)BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 604,871 | 605 |
| #438 | (35)SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 604,871 | 605 |
| #443 | (3°) FIN. LDGR TR VS (8) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 7,280,026-A | 7,280 |
| | STOCK RECORD BREAK | 0-B | 0 |
| | ACCOUNTS PAYABLE | 77,215,968 R-2 | 77,216 |
| MONEY | SCS CASH | 46,462,484 R-2 | 46,462 |
| BANK OVERDRAFTS | | 15,823,784 R-2 | 15,824 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 0 R-3 | 0 |
| | OPERATIONAL - UNAPPLIED CASH | 416,943 R-4 | 417 |
| | P&I PAYABLES CANADA | 31,260,502 R-3 | 31,261 |
| | P&I PAYABLES | 0 R-5 | 0 |
| | | 22,857,875 R-5 | 22,858 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 194,037,556 | 216,477,068 |
| | | 216,477,068 | 216,477 |

DEBIT

| | | | |
|---|---|---|---|
| #225 | (9) NON CUST F-D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F-D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F-D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F-D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F-D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F-D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F-D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE  VS (34) BOX | 0 | 0 |
| #270 | (15) CUST F-D VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F-D VS (34) BOX - LBSI | 0 | 0 |

EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS          504,841,226          504,841

SEARCH_RESULTS_00101353

1,115

(2,289)
(507)
(73,949)

0

**15c3-3 P.A.I.B. COMPUTATION**
**BROKER DEALER UNIT**
*09/19/08*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | PAIB CREDITS | 2,235,573 |
| | BREAK VS. PAIB LONG | 215,107 |
| | PAIB CREDIT ADJ | (8,000) |
| | PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
| | PAIB LONG VS CUSTOMER SHORT | 279,021 |
| | FIRM LONG vs PAIB SHORT | (25,932) |
| | NONCUST LONG VS. PAIB SHORT | (133,325) |
| | UNALLOCATED PAIB SHORT | - |
| | PAIB SHORT VS CUSTOMER LONG | (152,397) |
| | | |
| | P.A.I.B. CREDITS: | 2,421,706 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | OCC MARGIN | - |
| | OCC MARGIN DEFECIT | - |
| | PAIB LONG VS. FIRM BANK LOAN | - |
| | PAIB LONG VS. CUST BANK LOAN | 6 |
| | PAIB LONG VS. PAIB BANK LOAN | - |
| | PAIB BANK LOAN - PAIB NOT LONG | - |
| | CUST BANK LOAN- CUSTOMER NOT LONG | - |
| | FIRM BANK LOAN- CUSTOMER NOT LONG | - |
| | | |
| | TOTAL P.A.I.B. BANK LOAN | 6 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | STOCK LOAN VS PAIB LONG | - |
| | STOCK LN PLDG VS. PAIB LONG | 124,856 |
| | | |
| | TOTAL CUSTOMER STOCK LOAN | 124,856 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | FAIL TO RECEIVE VS PAIB LONG | 33,101 |
| | CNS FAIL TO RECEIVE VS PAIB LONG | 1 |
| | | |
| | TOTAL P.A.I.B. FAIL TO RECEIVE | 33,102 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | REPO VS PAIB LONG | 11,615 |
| | NONCUST SHORT VS. PAIB LONG | 45,183 |
| | FIRM SHORT VS PAIB LONG | 11,893 |
| | | |
| | TOTAL FIRM SHORT VS P.A.I.B. LONG | 68,691 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | STOCK DIVIDENDS > 30 DAYS | - |
| | MONEY CONTROL ADJUSTMENT | - |
| | DIVIDEND & INT PAYABLES > 7 DAYS | - |

SEARCH_RESULTS_00101353

*TOTAL PAIB REQUIREMENTS & INTEREST*

| | | |
|---|---|---|
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| 10. | *OTHER:* | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL PAIB CREDITS* | 2,648,361 |

SEARCH_RESULTS_00101353

| 12. | P.A.I.B. DEBITS: | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |

| 13. | PAIB STOCK BORROW: | |
|---|---|---:|
| | | |
| | STOCK BORROW VS PAIB SHORT | 450,138 |
| | STOCK BORROW Q. VS. PAIB SHORT | 829 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 450,967 |

| 14. | PAIB FAIL TO DELIVER: | |
|---|---|---:|
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,886 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,509 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 106,395 |

| 15. | PAIB MARGIN WITH OCC | |
|---|---|---:|
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |

| 16. | OTHER | |
|---|---|---:|
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | TOTAL PAIB DEBITS | 2,336,369 |
|---|---|---:|

| 20. | EXCESS - DEBITS OVER CREDITS | - |
|---|---|---:|

| 21. | DEFICIT - CREDITS OVER DEBITS | 311,992 |
|---|---|---:|

SEARCH_RESULTS_00101353

SEARCH_RESULTS_00101353

EXHIBIT 11

**Cc:** Azerad, Robert [RAzerad@lehman.com]; Crepeau, Alex F [acrepeau@lehman.com]
**To:** Lee, Mark [mark.lee@lehman.com]; Cody, Stephen [scody@lehman.com]; Curley, Kieran [kcurley@lehman.com]; Stucchio, Anthony [astucchi@lehman.com]; Burke, William T [wburke@lehman.com]; McLaughlin, Kendall J [kmclaugh@lehman.com]; Sudarsan, Daniram [daniram.sudarsan@lehman.com]; Logan, Donahue [dlogan@lehman.com]; Kush, Anthony [anthony.kush@lehman.com]
**From:** Potenciano, Joel [joel.potenciano@lehman.com]
**Sent:** Sun 9/21/2008 6:48:41 PM
**Subject:** RE: Updated: Reserve

**Res.Driver 091908.xls**

<<Res.Driver 091908.xls>>

Hi All,

Please see the updated driver schedule for 15c3-3. We incorporated the changes that was discussed in the noon meeting. Please let us know if you have questions. Thanks!

With kind regards,
Joel K. Potenciano
LEHMAN BROTHERS
Telephone +1 (212) 320-6786
Fax +1 (646) 885-9383
Email joel.potenciano@lehman.com

> _____
> From: Lee, Mark
> Sent: Sunday, September 21, 2008 2:41 PM
> To: Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William
> T; Potenciano, Joel; McLaughlin, Kendall J; Sudarsan, Daniram; Logan,
> Donahue; Kush, Anthony
> Cc: Azerad, Robert; Crepeau, Alex F
> Subject: RE: Updated: Reserve
>
> Have we got confirmation from ADP that the cust alloc has started and
> if not what time it will start, and how long it will take to run
> (action: Kendall)?
>
> Bill - the way the spreadsheet is set-up it is not easy to re-calc the
> ADI / cushion values from first principles. Do we need to go back and
> repopulate the back-up sheets as not everything feeds forward e.g. the
> cushion / 3% ADI numbers
>
> Making some basic assumptions:
>
> We will run the ADP alloc and then repopulate the spreadsheet
> Other adjustments to be made
>
> ITS:
> *       MTS Unsecured short of 77m - who is looking at that as
> highlighted but no solution mentioned on the call
> *       Securities Related IC Payable (Mostly ITS) - to be reduced to

STUCCIO_ANTHONY_00003641

> zero
>
> ADP
> Regardless of the re-allocation I noted the following changes:
> *       Free credits / Margin: Adj for $175m cash to be put back into
> this number
> *       O/Drafts of 62m to be updated with an FX related adj of $172m
> and a CAD error by Citibank of $772m
> *       Assume that the Net Customer Financing and Other will resolve
> the issue with large almost equal and opposite values
> *       S/B NQ v Cust Short: Kendall to clena up with target of approx
> 10m (should already have a correct value)
> *       Non-Broker Affiliates. Currently 200, should be 0 as should not
> be protected by formula
>
>
> MTS
> *       I didn't take notes for MTS as assumed outside the purchase
> agreement, but need for overall break resolution
> *       Not a major discrepancy as per ADP
>
>
> Commodities
> *       Should be 0 overall
>
> PAIB
> *       95% Lotz (sorry for misspelling entity name), reducing by 215m
> _____
> From:          Crepeau, Alex F
> Sent: Sunday, September 21, 2008 11:34 AM
> To:    Cody, Stephen; Curley, Kieran; Stuccio, Anthony; Burke, William
> T; Potenciano, Joel; McLaughlin, Kendall J; Lee, Mark; Sudarsan,
> Daniram; Logan, Donahue; Kush, Anthony; Crepeau, Alex F
> Subject:       Updated: Reserve
> When:          Sunday, September 21, 2008 12:30 PM-1:00 PM (GMT-05:00) Eastern
> Time (US & Canada).
> Where:         My office or 1-866-779-0772 LD 334-309-0261 *5807277856*
>
> When: September 21, 2008 12:30-13:00 (GMT-05:00) Eastern Time (US &
> Canada).
> Where: My office or 1-866-779-0772 LD 334-309-0261 *5807277856*
>
> Note: The GMT offset above does not reflect daylight saving time
> adjustments.
>
> *~*~*~*~*~*~*~*~*
>
>  <<Res.Driver 091908.xls>>  << File: Res.Driver 091908.xls >>

STUCCIO_ANTHONY_00003641

*FINAL*

<center>Lehman Brothers Inc.<br>Customer/PAIB Reserve Analysis</center>

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | | | | | - | |
| Stock Record/P&C items | 160,127 | | 160,127 | 86,809 | 73,318 | |
| Overdrafts | | | | | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | 394,926 | (394,926) | (0) | 216,477 | (216,477) | 394 mil of ADI assumes orderly liquidation of open customer fails |
| Sub-total | 766,060 | (394,926) | 371,134 | 504,841 | (133,708) | |
| **ADP** | | | | | | |
| Free Credits / Margin | (15,647,813) | 15,279,345 | (368,468) *a* | 481,456 | (849,925) | Pending B1 change adjustments related to 941 LBIE admin accounts |
| Net Customer Financing * | 4,019,265 | (4,092,613) | (73,348) | (831,906) | 758,558 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| OMNI Conversion Payable | | | | | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Open customer payments not paid yet from the Bank |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | | | | | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | |
| Non-Broker Dealer Affil. | 210,769 | (210,769) | 0 | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (477,614) | | (477,614) | (349,858) | (127,756) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | | | | | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 3,992,241 | | 3,992,241 | 82,685 | 3,909,557 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| 3% ADI | 573,223 | (573,223) | | 322,692 | (322,692) | 573 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | (6,628,613) | 10,402,740 | 3,774,127 | 204,052 | 3,570,075 | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (125,014) | | (125,014) | 160,575 | (285,589) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | (189,086) | | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | | | | - | |
| 3% ADI | 228,486 | (228,486) | (0) | 178,711 | (178,712) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 370,197 | (417,572) | (47,375) | 606,011 | (653,386) | |
| **Commodities** | | | | | | |
| O/Drafts | 456,716 | (456,716) | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | | | | 52,000 | (52,000) | |
| Sub-total | 456,716 | (456,716) | - | 228,487 | (228,487) | |
| Requirement | (5,035,641) | | 4,097,885 | 1,543,392 | 2,554,493 | |
| Cushion (plus 2% deduction) | 225,608 | (225,608) | | 225,608 | (225,608) | |
| Amount Segregated | (4,810,033) | 8,907,918 | 4,097,885 | 1,769,000 | 2,328,885 | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 642,699 | (215,708) | 426,991 *b* | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | |
| Cushion (plus 2% deduction) | 25,880 | (25,880) | | 25,880 | (25,880) | |
| Amount Segregated | 337,872 | (241,588) | 96,284 | 492,000 | (395,716) | |
| Total Segregated | (4,472,160) | 8,666,330 | 4,194,170 | 2,261,000 | 1,933,170 | |

*\* Denotes account net debit balances.*

*a* Includes:
BREAK ACCOUNTS ALLOCATED ITEMS:
Stock Borrow vs L/C — -
Stock Borrow vs. Pledge Q — 1,474,744

STUCCIO_ANTHONY_00003642

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** |  | 8,833,951 |  | 7,995,742 | 838,208 |
|  |  |  |  |  |  |
| Firm Long vs Cust Short | (1,759,625) |  | (196,453) |  | (1,563,172) |
| Non Cust Long vs. Cust Short | (11,024,522) |  | (4,533,257) |  | (6,491,265) |
| PAIB Long vs Cust Short | (279,021) |  | (15,031) |  | (263,990) |
| Reverse Repo vs Cust Short | - |  | - |  |  |
| Cust Long vs Cust Short |  |  |  |  |  |
| Stock Borrow vs Cust Short | (8,926,953) |  | (1,207,278) |  | (7,719,675) |
| Fail to Deliver vs Cust Short | (2,491,643) |  | (1,562,267) |  | (929,376) |
| sub-total | (24,481,764) | (24,481,764) | (7,514,286) | (7,514,286) | (16,967,478) |
|  |  |  |  |  |  |
| **Total** |  | (15,647,813) |  | 481,456 | (16,129,270) |
|  |  |  |  |  |  |
| **Customer Debits** |  | 8,027,427 |  | 8,121,467 | (94,040) |
|  |  |  |  |  |  |
| Money Fund Receivable | (310,045) |  | (310,045) |  | - |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (169,152) |  | (169,152) |  | - |
| Security Concentrations | - |  | - |  |  |
| Cust. Long vs.Customer Bank Loan | (228,557) |  | (728,814) |  | 500,257 |
| Stock Loan vs Cust Long | (2,333,573) |  | (1,050,110) |  | (1,283,464) |
| Cust Long vs Cust Short | - |  |  |  |  |
| Fail to Receive vs Cust Long | (2,853,274) |  | (2,210,873) |  | (642,401) |
| Firm Short vs Customer Long | (6,152,091) |  | (2,820,568) |  | (3,331,523) |
| sub-total | (12,046,692) | (12,046,692) | (7,289,562) | (7,289,562) | (4,757,131) |
|  |  |  |  |  |  |
| **Total** |  | (4,019,265) |  | 831,906 | (4,851,171) |
|  |  |  |  |  |  |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - | - |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - | - |
|  |  |  |  |  |  |
| **Net Cust Dr./Cr.** |  | (11,628,548) |  | (350,449) | (11,278,099) |

STUCCIO_ANTHONY_00003642

COPY PASTE FROM RESERVE FILE

**15c3-3 CUSTOMER RESERVE COMPUTATION**
**BROKER DEALER UNIT**
*09/19/08*
*(in 000'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **CUSTOMER CREDITS:** |  |
|  | *CUSTOMER SECURITY ACCOUNTS* | 8,523,574 |
|  | *CUSTOMER ADJUSTMENTS* | 524,910 |
|  | *UNMAPPED CUSTOMER PAYABLE* | 80 |
|  | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
|  | *CUSTOMER NETTING NB* | (77,250) |
|  | *MONEY CONTROL ADJUSTMENTS* | - |
|  | *NON-BROKER DEALER AFFILIATES TYPE  5* | 290 |
|  | *BOOKKEEPING ADJUSTMENTS* | - |
|  | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
|  | *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
|  | *BANK OVERDRAFTS* | 222,207 |
|  | *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
|  | *HOUSE ACCOUNTS* | 2,525 |
|  | *TEFRA WITHHOLDING PAYABLE* | 95 |
|  | *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
|  | *BREAK VS. CUSTOMER LONG* | 2,043,617 |
|  | *FIRM LONG VS. CUSTOMER SHORT* | (1,759,625) |
|  | *NONCUST LONG VS. CUSTOMER SHORT* | (11,024,522) |
|  | *REVERSE REPO VS. CUSTOMER SHORT* | - |
|  | *PAIB LONG VS. CUSTOMER SHORT* | (279,021) |
|  | *SHORT & CREDIT INTEREST* | 23,658 |
|  | *MONEY FUND SETTLEMENTS 098-00003  & 098-70001* | 477 |
|  | *UNALLOCATED CUSTOMER SHORT* | 1,922,231 |
|  |  |  |
|  | *TOTAL CUSTOMER CREDITS* | **196,000** |
|  |  |  |
| **2.** | **CUSTOMER BANK LOAN:** |  |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFICIT* | - |
|  | *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
|  | *STOCK BORROW VS. CUST BANK LOAN* | - |
|  | *STOCK BORROW VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW L C VS FIRM BANK LOAN* | - |
|  | *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
|  | *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
|  | *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 228,557 |
|  | *CUST BANK LOAN - CUST NOT LONG* | - |
|  | *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN - FIRM NOT LONG* | - |
|  |  |  |
|  | *TOTAL CUSTOMER BANK LOAN* | **228,557** |
|  |  |  |
| **3.** | **CUSTOMER STOCK LOAN:** |  |
|  | *STOCK LOAN* | 14,343,512 |
|  | *STOCK LOAN MTM* | (3,431,134) |
|  | *STOCK LOAN WITH CLEARING ORG* | - |
|  | *STOCK LOAN FREE OF MONEY* | 2,090,952 |
|  | *STOCK LOAN MTM DEFICIT* | 468 |
|  | *STOCK LOAN BOB ADJUSTMENT* | - |
|  | *UNALLOCATED STOCK LOAN ADJ* | - |
|  | *STOCK LOAN VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN VS. REVERSE REPO* | - |
|  | *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
|  | *STOCK LOAN VS. PAIB LONG* | - |
|  | *STOCK LOAN PLEDGE VS. PAIB LONG* | (124,856) |
|  | *STOCK LOAN VS. STOCK BORROW* | (9,344,291) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE Q* | (21,386) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | (7,499) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW* | (256,503) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q* | (9,644) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | (28,422) |
|  | *STOCK LOAN VS. NONCUSTOMER LONG* | (29,015) |
|  | *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | (332,410) |
|  | *STOCK LOAN VS. FIRM LONG* | (181,875) |
|  | *STOCK LOAN PLEDGE VS. FIRM LONG* | (334,323) |
|  |  |  |
|  | *TOTAL CUSTOMER STOCK LOAN* | **2,333,573** |

STUCCIO_ANTHONY_00003642

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (195,358) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (493,487) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (24,458) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (28,925) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (782,561) |
| | FAIL TO RECEIVE VS. PAIB LONG | (33,101) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (5,517) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (1) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (14,899) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (42) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,004) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 2,853,274 |

| 5. | FIRM SHORT VS CUSTOMER LONG: | |
|---|---|---:|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 487,026 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,089,180 |
| | REPO VS. CUSTOMER LONG | 2,662,445 |
| | PAIB SHORT VS. CUSTOMER LONG | 152,397 |
| | REPO VS. UNALLOCATED | 53,941 |
| | FIRM SHORT VS. UNALLOCATED | 344,321 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 362,781 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 6,152,091 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|---|---|---:|
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|---|---|---:|

| 8. | SUSPENSE ACCOUNTS | |
|---|---|---:|
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 136,769 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|---|---|---:|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|---|---|---:|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 11,905,587 |

STUCCIO_ANTHONY_00003642

| 12. | CUSTOMER DEBITS: | |
|-----|------------------|---|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,292,639 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - |
| | MONEY FUND RECEIVABLE | (310,045) |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,548,230 |

| 13. | CUSTOMER STOCK BORROW: | |
|-----|------------------------|---|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (337,017) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (1,811,035) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (146,553) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (285,203) |
| | STOCK BORROW VS. THE BOX | (251,922) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (30,770) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (91,082) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (14,899) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (42) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | (1) |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (107,197) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,475) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (9,778) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (450,138) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (829) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (20,314) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (493,487) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (24,458) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (6,984) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 8,589,936 |

STUCCIO_ANTHONY_00003642

| | | |
|---|---|---:|
| **14.** | *CUSTOMER FAIL TO DELIVER:* | |
| | *FAIL TO DELIVER* | 4,960,740 |
| | *CNS FAIL TO DELIVER* | 1,900,343 |
| | *MISC FAIL TO DELIVER ADJUSTMENTS* | - |
| | *OMNI FAIL TO DELIVER ADJUSTMENTS* | - |
| | *FAIL TO DELIVER MTM ADJUSTMENT* | - |
| | *FAIL TO DELIVER ADJUSTMENT* | - |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE* | (195,358) |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE CNS* | (2,004) |
| | *FAIL TO DELIVER OVER 30 DAYS* | (826) |
| | *FAIL TO DELIVER VS. FIRM SHORT* | (456,414) |
| | *FAIL TO DELIVER VS. PAIB SHORT* | (43,886) |
| | *FAIL TO DELIVER VS. REPO* | (418,827) |
| | *FAIL TO DELIVER VS. THE BOX* | (1,065,589) |
| | *FAIL TO DELIVER VS. NON-CUSTOMER SHORT* | (721,860) |
| | *FAIL TO DELIVER VS. UNALLOCATED BREAK* | (255,160) |
| | *CNS FAIL TO DELIVER VS. FIRM SHORT* | (452,940) |
| | *CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT* | (259,824) |
| | *CNS FAIL TO DELIVER VS. PAIB SHORT* | (62,509) |
| | *CNS FAIL TO DELIVER VS. THE BOX* | (277,980) |
| | *CNS FAIL TO DELIVER VS. REPO* | (99,861) |
| | *CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN* | - |
| | *CNS FAIL TO DELIVER VS. UNALLOC BREAK* | (27,477) |
| | *CNS FAIL TO DELIVER VS. FAIL TO RECEIVE* | (28,925) |
| | *TOTAL CUSTOMER FAIL TO DELIVER* | **2,491,643** |
| | | |
| **15.** | *CUSTOMER MARGIN WITH OCC* | |
| | *OCC MARGIN* | - |
| | *OCC PROPRIETARY QUALIFIED COLLATERAL* | 477,614 |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | *TOTAL CUSTOMER MARGIN WITH OCC* | **477,614** |
| | | |
| **16.** | *OTHER* | |
| | *OTHER CUSTOMER DEBITS* | - |
| | *TOTAL OTHER* | - |
| | | |
| **17.** | *AGGREGATE DEBIT ITEMS* | 19,107,423 |
| **18.** | *LESS 3%* | (573,223) |
| **19.** | *TOTAL 15C3-3 DEBITS* | 18,534,200 |
| | | |
| **20.** | *EXCESS - DEBITS OVER CREDITS* | 6,628,613 |
| **21.** | *DEFICIT - CREDITS OVER DEBITS* | **0** |

STUCCIO_ANTHONY_00003642

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---:|
| **CUSTOMER CREDITS:** | |
| *Customer Accounts* | 4,390,448 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 456,716 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 5,113,889 |
|  | |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,395,768 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,590 |
| **SUSPENSE CREDITS** | 0 |
|  | |
| **TOTAL CREDITS** | 8,214,622 |
|  | |
|  | |
| **CUSTOMER DEBITS:** | |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
|  | |
| **CUSTOMER MARGIN WITH OCC** | 0 |
|  | |
| **CUSTOMER STOCK BORROW** | 848,446 |
| **CUSTOMER FAIL TO DELIVER** | 1,829,002 |
| **AGGREGATE DEBITS** | 7,616,195 |
| *Less 3%* | 228,486 |
| **TOTAL DEBITS** | 7,387,709 |
|  | |
| **EXCESS CREDITS OVER DEBITS** | 826,913 |

STUCCIO_ANTHONY_00003642

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*  |  09:79:09

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1°) CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #63 | (19) BR-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F/D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1°) CUST LONG F/D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY, REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F/D VS TRI PARTY REPO | 0 | 0 |
| #95 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST/F-30  VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1°) CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| *#147* | *(11) NON CUST  F/D > 30 DAYS VS (18) NON CUST F/R* | *61,169* | *61* |
| #150 | (19) B/R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #153 | (23) INACTIVE VS (18) NON CUST F/R | 0 | 0 |
| #163 | (1°) CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST/F-30 VS (22) CUST SHORT(F/R) | 283,919 | 284 |
| #194 | (15) CUST LONG F (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 22,806,745 | 22,807 |
| #190 | (19) BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #191 | (21) OPERATIONAL VS (22) CUST SHORT(F/R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (11) NONCUST F/D V S (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG  VS (24)  OPER SHRT | 0 | 0 |
| #208 | (9) NON CST F/D>30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1°) CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILLATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,936 | 3,912 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28) CUST NET CL | 0 | 0 |
| #297 | (33) BOX BREAK (15) F/R | 84,304,396 | 84,304 |
| #289C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,717,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (5) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1°) CUST LONG FREE VS (35) INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR-DEALER LONG FREE VS (35) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #344 | (23) CUST LONG F/D VS (35) INACTIVE SHRT | 0 | 0 |
| #346 | (27) NON-BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #347 | (2°) AFFIL LGFREE(19) VS (35) INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 175,849 | 176 |
| #357 | (9) NON CUST F/D (35) INACTIVE SHORT | 0 | 0 |
| #356 | (5) B/VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #396 | (1°) CUST LONG FREE VS (46) SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19) BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (0) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L8NG (46) SPECIAL FIN.. | 0 | 0 |
| #419 | (33) BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #435 | (33) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #438 | (35) SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 603,494 | 603 |
| #443 | (3°) FIN. LDGR TR VS (9) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,936-A | 4,250 |
| | STOCK RECORD BREAK | 0-B | 0 |
| | ACCOUNTS PAYABLE | 77,215,968-R-2 | 77,216 |
| | SCS CASH | 38,194,286-R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651-R-2 | 7,130 |
| MONEBANK OVERDRAFTS | | 0-R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 936,385-R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,997-R-5 | 60,078 |
| | P&I PAYABLES CANADA | 0-R-5 | 0 |
| | P&I PAYABLES | 22,857,875-R-5 | 22,858 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 394,925,368 | 304,926 |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F/D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE    VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F/D VS (34) BOX - LBSI | 0 | 0 |

| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | **766,059,535** | 766,060 |

STUCCIO_ANTHONY_00003642

1,115

(2,289)
(507)
(73,949)

0

STUCCIO_ANTHONY_00003642

Pg 109 of 178

**TSCS-3 P.A.I.B COMPUTATION**
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | 2,235,573 |
| | *BREAK VS. PAIB LONG* | 215,107 |
| | *PAIB CREDIT ADJ* | (8,000) |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| | *PAIB LONG VS CUSTOMER SHORT* | 279,021 |
| | *FIRM LONG vs PAIB SHORT* | (25,932) |
| | *NONCUST LONG VS. PAIB SHORT* | (133,325) |
| | *UNALLOCATED PAIB SHORT* | - |
| | *PAIB SHORT VS CUSTOMER LONG* | (152,397) |
| | | |
| | *P.A.I.B. CREDITS:* | 2,421,706 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | - |
| | *OCC MARGIN DEFECIT* | - |
| | *PAIB LONG VS. FIRM BANK LOAN* | - |
| | *PAIB LONG VS. CUST BANK LOAN* | 6 |
| | *PAIB LONG VS. PAIB BANK LOAN* | - |
| | *PAIB BANK LOAN - PAIB NOT LONG* | - |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | 6 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | - |
| | *STOCK LN PLDG VS. PAIB LONG* | 124,856 |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | 124,856 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | 33,101 |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | 1 |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 33,102 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | 11,615 |
| | *NONCUST SHORT VS. PAIB LONG* | 45,183 |
| | *FIRM SHORT VS PAIB LONG* | 11,893 |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 68,691 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES > 7 DAYS* | - |

STUCCIO_ANTHONY_00003642

| | | |
|---|---|---|
| 7. | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| 8. | **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| | | |
| 9. | **AGED TRANSFERS & REORGANIZATION:** | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| 10. | **OTHER:** | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL PAIB CREDITS* | 2,648,361 |

STUCCIO_ANTHONY_00003642

| 12. | P.A.I.B. DEBITS | |
| --- | --- | --- |
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |

| 13. | PAIB STOCK BORROW: | |
| --- | --- | --- |
| | | |
| | STOCK BORROW VS PAIB SHORT | 450,138 |
| | STOCK BORROW Q. VS. PAIB SHORT | 829 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 450,967 |

| 14. | PAIB FAIL TO DELIVER: | |
| --- | --- | --- |
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,886 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,509 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 106,395 |

| 15. | PAIB MARGIN WITH OCC | |
| --- | --- | --- |
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |

| 16. | OTHER | |
| --- | --- | --- |
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | TOTAL PAIB DEBITS | 2,336,369 |
| --- | --- | --- |

| 20. | EXCESS - DEBITS OVER CREDITS | - |
| --- | --- | --- |

| 21. | DEFICIT - CREDITS OVER DEBITS | 311,992 |
| --- | --- | --- |

STUCCIO_ANTHONY_00003642

STUCCIO_ANTHONY_00003642

EXHIBIT 12

**To:**    rod.miller@weil.com [rod.miller@weil.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; O'Meara, Chris M (NY) [comeara@lehman.com]
**From:**    Azerad, Robert [RAzerad@lehman.com]
**Sent:**    Sun 9/21/2008 9:48:45 PM
**Subject:**    15c3 0919 Preliminary.xls

<u>15c3 0919 Preliminary.xls</u>

To start the discussion...

&lt;&lt;15c3 0919 Preliminary.xls&gt;&gt;

TONUCCI_PAOLO_00011111

**FINAL**

*Lehman Brothers Inc.*
*Customer/PAIB Reserve Analysis*

| Customer: | | Preliminary 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|
| **MTS** | | | | | |
| Free Credits | | 77,216 | 77,216 | - | |
| SCS Cash | | 46,462 | 46,462 | - | |
| Option Margin | | 15,824 | 15,824 | - | |
| P & I | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | | 7,518 | 7,518 | - | |
| Customer Receivable Versus Box | * | - | - | - | |
| Stock Record/P&C items | | 86,809 | 86,809 | - | |
| Overdrafts | | - | - | - | |
| Unapplied Cash / Suspense | | 31,677 | 31,677 | - | |
| 3% ADI | | 216,477 | 216,477 | - | |
| Sub-total | | 504,841 | 504,841 | - | |
| | | | | | |
| **ADP** | | | | | |
| Free Credits / Margin | | 481,456 | 481,456 | - | |
| Net Customer Financing | * | (831,906) | (831,906) | - | |
| OMNI Conversion Payable | | | | | |
| O/Drafts | | 62,604 | 62,604 | - | |
| Dividends | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | | - | - | - | |
| S/B NQ vs. Customer Short | | 5,287 | 5,287 | - | |
| Non-Broker Dealer Affil. | | 290,539 | 290,539 | - | |
| OCC Proprietary Qualified Collateral | | (349,858) | (349,858) | - | |
| Firm Bank Loan - Firm Not Long | | - | - | - | |
| Suspense | | 39,897 | 39,897 | - | |
| Unapplied Cash | | 10,121 | 10,121 | - | |
| Abandoned Property / Soft Dollars ($42 mil) | | 85,212 | 85,212 | - | |
| Other | | 82,685 | 82,685 | - | |
| 3% ADI | | 322,692 | 322,692 | - | 573 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | | 204,052 | 204,052 | | |
| | | | | | |
| **ITS** | | | | | |
| Free Credits (primarily SCS cash) | | | 160,575 | (160,575) | |
| Unsecured Shorts | | | 77,639 | (77,639) | |
| Securities Related IC Payable (Mostly ITS) | | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | - | - | - | |
| 3% ADI | | 100,000 | 178,711 | (78,711) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | | 100,000 | 606,011 | (506,011) | |
| | | | | | |
| **Commodities** | | | | | |
| O/Drafts | | - | 176,487 | (176,487) | *Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts* |
| Non-Reg Commodity Credits | | - | 52,000 | (52,000) | |
| Sub-total | | - | 228,487 | (228,487) | |
| | | | | | |
| Requirement | | 808,893 | 1,543,392 | (734,499) | |
| Cushion (plus 2% deduction) | | 225,608 | 225,608 | - | |
| Amount Segregated | | 1,034,501 | 1,769,000 | (734,499) | |
| | | | | | |
| **PAIB:** | | | | | |
| Net PAIB Debits/Credits | | 426,991 | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | | 6 | 3,560 | (3,554) | |
| Stock Loan | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow | * | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | | (106,395) | (40,281) | (66,114) | |
| Requirement | | 311,992 | 466,120 | (154,128) | |
| Cushion (plus 2% deduction) | | - | 25,880 | (25,880) | |
| Amount Segregated | | 96,284 | 492,000 | (395,716) | |
| | | | | - | |
| Total Segregated | | 1,130,786 | 2,261,000 | (1,130,214) | |

TONUCCI_PAOLO_00011112

EXHIBIT 13

**To:**    Tonucci, Paolo [paolo.tonucci@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; O'Meara, Chris M (NY) [comeara@lehman.com]
**From:**    Azerad, Robert [RAzerad@lehman.com]
**Sent:**    Sun 9/21/2008 10:04:43 PM
**Subject:**    15c3 0919 Preliminary V2.xls

15c3 0919 Preliminary V2.xls

TONUCCI_PAOLO_00011113

*FINAL*

**Lehman Brothers Inc.**
*Customer/PAIB Reserve Analysis*

| Customer: | | Preliminary 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|
| **MTS** | | | | | |
| Free Credits | | 77,216 | 77,216 | - | |
| SCS Cash | | 38,194 | 46,462 | (8,268) | |
| Option Margin | | 7,130 | 15,824 | (8,694) | |
| P & I | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box | * | - | - | - | |
| Stock Record/P&C items | | 160,127 | 86,809 | 73,318 | |
| Overdrafts | | - | - | - | |
| Unapplied Cash / Suspense | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | | - | 216,477 | (216,477) | |
| Sub-total | | 371,134 | 504,841 | (133,708) | |
| **ADP** | | | | | |
| Free Credits / Margin | | (368,468) | 481,456 | (849,925) | |
| Net Customer Financing | * | (73,348) | (831,906) | 758,558 | |
| OMNI Conversion Payable | | - | - | - | |
| O/Drafts | | 222,207 | 62,604 | 159,603 | |
| Dividends | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | | - | - | - | |
| S/B NQ vs. Customer Short | | 337,017 | 5,287 | 331,730 | |
| Non-Broker Dealer Affil. | | 0 | 290,539 | (290,539) | |
| OCC Proprietary Qualified Collateral | | (477,614) | (349,858) | (127,756) | |
| Firm Bank Loan - Firm Not Long | | - | - | - | |
| Suspense | | 39,897 | 39,897 | - | |
| Unapplied Cash | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | | 85,319 | 85,212 | 107 | |
| Other | | 82,685 | 82,685 | - | |
| 3% ADI | | 235,430 | 322,692 | (87,262) | |
| Sub-total | | 100,000 | 204,052 | (104,052) | |
| **ITS** | | | | | |
| Free Credits (primarily SCS cash) | | - | 160,575 | (160,575) | |
| Unsecured Shorts | | - | 77,639 | (77,639) | |
| Securities Related IC Payable (Mostly ITS) | | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | - | - | - | |
| 3% ADI | | 100,000 | 178,711 | (78,711) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | | 100,000 | 606,011 | (506,011) | |
| **Commodities** | | | | | |
| O/Drafts | | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | | - | 52,000 | (52,000) | |
| Sub-total | | - | 228,487 | (228,487) | |
| Requirement | | 571,134 | 1,543,392 | (972,258) | |
| Cushion (plus 2% deduction) | | 225,608 | 225,608 | - | |
| Amount Segregated | | 796,742 | 1,769,000 | (972,258) | |
| **PAIB:** | | | | | |
| Net PAIB Debits/Credits | | 426,991 | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | | 6 | 3,560 | (3,554) | |
| Stock Loan | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow | * | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | | (106,395) | (40,281) | (66,114) | |
| Requirement | | 311,992 | 466,120 | (154,128) | |
| Cushion (plus 2% deduction) | | - | 25,880 | (25,880) | |
| Amount Segregated | | 96,284 | 492,000 | (395,716) | |
| Total Segregated | | 893,026 | 2,261,000 | (1,367,974) | |

TONUCCI_PAOLO_00011114

EXHIBIT 14

**To:**      Sudarsan, Daniram[daniram.sudarsan@lehman.com]; McLaughlin, Kendall J[kmclaugh@lehman.com]; wburke@si.rr.com[wburke@si.rr.com]; Buonocore, Salvatore[salvatore.buonocore@lehman.com]; Stucchio, Anthony[astucchi@lehman.com]
**From:**    Potenciano, Joel
**Sent:**    Sun 9/21/2008 10:18:32 PM
**Subject:** Res.Driver 091908.xls
**Categories:** urn:content-classes:message

Res.Driver 091908.xls


<<Res.Driver 091908.xls>>

See updated numbers with the reallocated amounts.  Please review and let me know if we can send out to the group.  Thanks!

Joel

SEARCH_RESULTS_00101557

**FINAL**

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | - | | - | - | - | |
| Stock Record/P&C items | 75,822 | | 75,822 | 86,809 | (10,987) | |
| Overdrafts | - | | - | - | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | 394,926 | (394,926) | (0) | 216,477 | (216,477) | 394 mil of ADI assumes orderly liquidation of open customer fails |
| Sub-total | 879,837 | (394,926) | 484,911 | 504,841 | (19,930) | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,563) | | (2,952,563) a | 481,456 | (3,434,020) | Pending B1 change adjustments related to 941 LBIE admin accounts |
| Net Customer Financing * | 2,419,863 | | 2,419,863 | (831,906) | 3,251,768 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Open customer payments not paid yet from the Bank |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | |
| Non-Broker Dealer Affil. | 210,769 | (210,769) | 0 | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | - | | - | - | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 2,329,550 | | 2,329,550 | 82,685 | 2,246,865 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| 3% ADI | 392,380 | (573,223) | (180,843) | 322,692 | (503,535) | 573 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 2,267,855 | (783,992) | 1,483,863 | 204,052 | 1,279,811 | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (125,014) | | (125,014) | 160,575 | (285,589) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | (189,086) | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | - | | - | - | - | |
| 3% ADI | 228,486 | (228,486) | (0) | 178,711 | (178,712) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 370,197 | (417,572) | (47,375) | 606,011 | (653,386) | |
| **Commodities** | | | | | | |
| O/Drafts | 456,716 | (456,716) | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | |
| Sub-total | 456,716 | (456,716) | - | 228,487 | (228,487) | |
| Requirement | 3,974,605 | (2,053,206) | 1,921,399 | 1,543,392 | 378,007 | |
| Cushion (plus 2% deduction) | 225,608 | (225,608) | - | 225,608 | (225,608) | |
| Amount Segregated | 4,200,213 | (2,278,814) | 1,921,399 | 1,769,000 | 152,399 | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 642,699 | (215,708) | 426,991 b | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | |
| Cushion (plus 2% deduction) | 25,880 | (25,880) | - | 25,880 | (25,880) | |
| Amount Segregated | 337,872 | (241,588) | 96,284 | 492,000 | (395,716) | |
| Total Segregated | 4,538,086 | (2,520,402) | 2,017,684 | 2,261,000 | (243,316) | |

\* Denotes account net debit balances.

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | 9,032,508 |  | 7,995,742 |  | 1,036,765 |
|  |  |  |  |  |  |
| *Firm Long vs Cust Short* | (281,484) |  | (196,453) |  | (85,031) |
| *Non Cust Long vs. Cust Short* | (6,857,319) |  | (4,533,257) |  | (2,324,062) |
| *PAIB Long vs Cust Short* | (11,596) |  | (15,031) |  | 3,435 |
| *Reverse Repo vs Cust Short* | - |  | - |  |  |
| *Cust Long vs Cust Short* |  |  |  |  |  |
| *Stock Borrow vs Cust Short* | (3,543,186) |  | (1,207,278) |  | (2,335,908) |
| *Fail to Deliver vs Cust Short* | (1,291,486) |  | (1,562,267) |  | 270,781 |
| *sub-total* | (11,985,071) | (11,985,071) | (7,514,286) | (7,514,286) | (4,470,785) |
|  |  |  |  |  |  |
| *Total* |  | (2,952,563) |  | 481,456 | (3,434,020) |
|  |  |  |  |  |  |
| **Customer Debits** | 8,227,423 |  | 8,121,467 |  | 105,955 |
|  |  |  |  |  |  |
| *Money Fund Receivable* | (310,045) |  | (310,045) |  | - |
| *Unsecured/Partly Secured Receivables/Non-Purpose Loans* | (169,152) |  | (169,152) |  | - |
| *Security Concentrations* | - |  | - |  |  |
| *Cust. Long vs.Customer Bank Loan* | (181,854) |  | (728,814) |  | 546,960 |
| *Stock Loan vs Cust Long* | (2,030,953) |  | (1,050,110) |  | (980,844) |
| *Cust Long vs Cust Short* | - |  | - |  |  |
| *Fail to Receive vs Cust Long* | (1,976,062) |  | (2,210,873) |  | 234,811 |
| *Firm Short vs Customer Long* | (5,979,219) |  | (2,820,568) |  | (3,158,651) |
| *sub-total* | (10,647,285) | (10,647,285) | (7,289,562) | (7,289,562) | (3,357,724) |
|  |  |  |  |  |  |
| *Total* |  | (2,419,863) |  | 831,906 | (3,251,768) |
|  |  |  |  |  |  |
| *Plus:* |  |  |  |  |  |
| *Stock Borrow / SB Q vs. Firm Bank Loan* |  | - |  | - | - |
| *Stock Borrow vs. Cust Bank Loan* |  | - |  | - | - |
|  |  |  |  |  |  |
| *Net Cust Dr./Cr.* |  | (532,701) |  | (350,449) | (182,251) |

SEARCH_RESULTS_00101558

COPY PASTE FROM RESERVE FILE

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
09/19/08
(in 000'S)

|  |  | 09/19/08 |
|---|---|---|
| **1.** | **CUSTOMER CREDITS:** | |
|  | *CUSTOMER SECURITY ACCOUNTS* | 8,523,574 |
|  | *CUSTOMER ADJUSTMENTS* | 723,468 |
|  | *UNMAPPED CUSTOMER PAYABLE* | 80 |
|  | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
|  | *CUSTOMER NETTING NB* | (77,250) |
|  | *MONEY CONTROL ADJUSTMENTS* | - |
|  | *NON-BROKER DEALER AFFILIATES TYPE 5* | 290 |
|  | *BOOKKEEPING ADJUSTMENTS* | - |
|  | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
|  | *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
|  | *BANK OVERDRAFTS* | 222,207 |
|  | *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
|  | *HOUSE ACCOUNTS* | 2,525 |
|  | *TEFRA WITHHOLDING PAYABLE* | 95 |
|  | *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
|  | *BREAK VS. CUSTOMER LONG* | 1,470,785 |
|  | *FIRM LONG VS. CUSTOMER SHORT* | (281,484) |
|  | *NONCUST LONG VS. CUSTOMER SHORT* | (6,857,319) |
|  | *REVERSE REPO VS. CUSTOMER SHORT* | - |
|  | *PAIB LONG VS. CUSTOMER SHORT* | (11,596) |
|  | *SHORT & CREDIT INTEREST* | 23,658 |
|  | *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | 477 |
|  | *UNALLOCATED CUSTOMER SHORT* | 832,372 |
|  | | |
|  | *TOTAL CUSTOMER CREDITS* | **4,644,635** |
|  | | |
| **2.** | **CUSTOMER BANK LOAN:** | |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFICIT* | - |
|  | *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
|  | *STOCK BORROW VS. CUST BANK LOAN* | - |
|  | *STOCK BORROW VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW L C VS FIRM BANK LOAN* | - |
|  | *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
|  | *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
|  | *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 181,854 |
|  | *CUST BANK LOAN - CUST NOT LONG* | - |
|  | *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN - FIRM NOT LONG* | - |
|  | | |
|  | *TOTAL CUSTOMER BANK LOAN* | **181,854** |
|  | | |
| **3.** | **CUSTOMER STOCK LOAN:** | |
|  | *STOCK LOAN* | 14,343,512 |
|  | *STOCK LOAN MTM* | (3,431,134) |
|  | *STOCK LOAN WITH CLEARING ORG* | - |
|  | *STOCK LOAN FREE OF MONEY* | 2,090,952 |
|  | *STOCK LOAN MTM DEFICIT* | 468 |
|  | *STOCK LOAN BOB ADJUSTMENT* | - |
|  | *UNALLOCATED STOCK LOAN ADJ* | - |
|  | *STOCK LOAN VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN VS. REVERSE REPO* | - |
|  | *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
|  | *STOCK LOAN VS. PAIB LONG* | - |
|  | *STOCK LOAN PLEDGE VS. PAIB LONG* | (80,009) |
|  | *STOCK LOAN VS. STOCK BORROW* | (9,344,291) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE Q* | (21,386) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | (7,499) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW* | (256,503) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q* | (9,644) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | (28,422) |
|  | *STOCK LOAN VS. NONCUSTOMER LONG* | (247,637) |
|  | *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | (461,255) |
|  | *STOCK LOAN VS. FIRM LONG* | (181,875) |
|  | *STOCK LOAN PLEDGE VS. FIRM LONG* | (334,323) |
|  | | |
|  | *TOTAL CUSTOMER STOCK LOAN* | **2,030,953** |

SEARCH_RESULTS_00101558

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (225,367) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,976,062 |

| 5. | FIRM SHORT VS CUSTOMER LONG: | |
|---|---|---:|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 419,376 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 31,101 |
| | FIRM SHORT VS. UNALLOCATED | 291,784 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 1,530,365 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,979,219 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|---|---|---:|
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|---|---|---|

| 8. | SUSPENSE ACCOUNTS | |
|---|---|---:|
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 136,769 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|---|---|---:|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|---|---|---:|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 14,954,815 |

SEARCH_RESULTS_00101558

| 12. | CUSTOMER DEBITS: | |
|---|---|---|
| | *CUSTOMER SECURITY ACCOUNTS* | 4,950,169 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| | *CUSTOMER NETTING NB* | (77,250) |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)* | 3,492,635 |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *INV ADVISORY FEES RELATED TO NB MARGIN DEBITS* | - |
| | *MONEY FUND RECEIVABLE* | (310,045) |
| | *MARGIN INTEREST* | 33,784 |
| | *UNSECURED DEBITS* | (3,310) |
| | *PARTLY SECURED DEBITS* | (12) |
| | *NON-PURPOSE LOANS* | (199,614) |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | | |
| | *TOTAL CUSTOMER DEBITS* | **7,748,226** |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---|
| | *STOCK BORROW* | 26,275,972 |
| | *STOCK BORROW MTM* | 5,061,972 |
| | *STOCK BORROW L.O.C.* | - |
| | *STOCK BORROW VS. CUST SHORT ADJ.* | - |
| | *STOCK BORROW FREE OF MONEY* | (2,532,947) |
| | *STOCK BORROW LC VS SECURED BK LOAN* | - |
| | *STOCK BORROW L C VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW NQ VS. CUSTOMER SHORT* | (10,976) |
| | *STOCK BORROW L C VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW NQ VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW VS STOCK LOAN* | (9,344,291) |
| | *STOCK BORROW VS. STOCK LOAN PLEDGE* | (256,503) |
| | *STOCK BORROW PLEDGE Q VS. STOCK LOAN* | (21,386) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN* | (7,499) |
| | *STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE* | (9,644) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE* | (28,422) |
| | *STOCK BORROW L C VS. STOCK LOAN* | - |
| | *STOCK BORROW L C VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L C VS. FIRM SHORT* | - |
| | *STOCK BORROW L C VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. FIRM SHORT* | (3,714,514) |
| | *STOCK BORROW VS. NONCUSTOMER SHORT* | (6,670,788) |
| | *STOCK BORROW PLEDGE Q. VS FIRM SHORT* | (201,992) |
| | *STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT* | (340,769) |
| | *STOCK BORROW PLEDGE NQ VS. FIRM SHORT* | (794,427) |
| | *STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT* | (630,382) |
| | *STOCK BORROW VS. THE BOX* | (248,630) |
| | *STOCK BORROW PLEDGE Q. VS. THE BOX* | (38,241) |
| | *STOCK BORROW PLEDGE NQ VS. THE BOX* | (82,771) |
| | *STOCK BORROW L C VS. THE BOX* | - |
| | *STOCK BORROW VS. FAIL REC CNS* | (15,106) |
| | *STOCK BORROW PLEDGE Q. VS. F-R CNS* | (23) |
| | *STOCK BORROW PLEDGE NQ VS. F-R CNS* | - |
| | *STOCK BORROW L C VS. F-R CNS* | - |
| | *STOCK BORROW L C VS. REPO* | - |
| | *STOCK BORROW VS. REPO* | (1,341,239) |
| | *STOCK BORROW PLEDGE Q. VS. REPO* | (46,141) |
| | *STOCK BORROW PLEDGE NQ VS. REPO* | (365,820) |
| | *STOCK BORROW VS. UNALLOCATED* | (120,979) |
| | *STOCK BORROW PLEDGE Q. VS. UNALLOCATED* | (1,704) |
| | *STOCK BORROW PLEDGE NQ VS. UNALLOCATED* | (7,128) |
| | *STOCK BORROW L C VS. UNALLOCATED* | - |
| | *STOCK BORROW VS. PAIB SHORT* | (442,429) |
| | *STOCK BORROW PLEDGE Q. VS. PAIB SHORT* | (215) |
| | *STOCK BORROW PLEDGE NQ VS. PAIB SHORT* | (18,115) |
| | *STOCK BORROW L C VS. PAIB SHORT* | - |
| | *STOCK BORROW L C VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW VS. FAIL TO RECEIVE* | (488,042) |
| | *STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE* | (23,607) |
| | *STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE* | (1,005) |
| | | |
| | *TOTAL CUSTOMER STOCK BORROW* | **3,532,210** |

SEARCH_RESULTS_00101558

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---:|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (225,367) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (1,487) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,487) |
| | FAIL TO DELIVER VS. REPO | (440,321) |
| | FAIL TO DELIVER VS. THE BOX | (1,086,414) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (1,423,845) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (296,830) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (665,286) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,417) |
| | CNS FAIL TO DELIVER VS. THE BOX | (263,511) |
| | CNS FAIL TO DELIVER VS. REPO | (96,672) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,877) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (25,903) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | 1,291,486 |
| | | |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 507,418 |
| | | |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 13,079,340 |
| 18. | LESS 3% | (392,380) |
| 19. | TOTAL 15C3-3 DEBITS | 12,686,960 |
| | | |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | (2,267,855) |

SEARCH_RESULTS_00101558

LEHMAN BROTHERS INC.
RULE 15c3-3 RESERVE FORMULA
(000'S)

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** |  |
| *Customer Accounts* | 4,390,448 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 456,716 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 5,113,889 |
|  |  |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,395,768 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,590 |
| **SUSPENSE CREDITS** | 0 |
|  |  |
| **TOTAL CREDITS** | 8,214,622 |
|  |  |
|  |  |
| **CUSTOMER DEBITS:** |  |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
|  |  |
| **CUSTOMER MARGIN WITH OCC** | 0 |
|  |  |
| **CUSTOMER STOCK BORROW** | 848,446 |
| **CUSTOMER FAIL TO DELIVER** | 1,829,002 |
| **AGGREGATE DEBITS** | 7,616,195 |
| *Less 3%* | 228,486 |
| **TOTAL DEBITS** | 7,387,709 |
|  |  |
| **EXCESS CREDITS OVER DEBITS** | 826,913 |

SEARCH_RESULTS_00101558

SEARCH_RESULTS_00101558

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*                    09:19:00

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1") CUST F-D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B-D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F-D (6) REPO | 0 | 0 |
| #63 | (19) BR-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F-D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F-D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY, REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F-D VS TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F-D~30  VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free Vs (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16)PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG  VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | *(11) NON CUST  F/D > 30 DAYS VS (18) NON CUST  F/R* | *61,160* | *61* |
| #150 | (19) B-R DEALER LONG FREE VS (18) NON CUST (F'R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F'R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F-R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F-D~30  VS (22) CUST SHORT(F-R) | 283,919 | 284 |
| #194 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22)CUST SHORT(F'R) | 22,806,765 | 22,807 |
| #190 | (19) BR- DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22)CUST SHORT(F'R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22)CUST SHORT(F R) | 0 | 0 |
| #192 | (11)NONCUST F-D V S (24)OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG  VS (24)  OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D~30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F-D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26)AFFILATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (34) AFFILIATE LONG VS (34)AFFILATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F'R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22)CUST SHRT(F'R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F-R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG FREE VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 4",71",875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (1) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE VS (38)INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR-DEALER LONG FREE  VS (38)INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #344 | (29) CUST LONG  (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #346 | (2") NON BROKER DEALER (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (38)INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (38) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (38)INACTIVE SHRT | 1"5,819 | 176 |
| #337 | (9) NON CUST F-D (38) INACTIVE SHORT | 0 | 0 |
| #356 | (5) B-VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #392 | (1")CUST LONG FREE VS (46)SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19)BR DEALER LONG FREE  VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46)SPECIAL FIN.. | 0 | 0 |
| #400 | (33) BOX BREAK L0NG (46) SPECIAL FIN.. | 0 | 0 |
| #438 | (33)BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 603,494 | 603 |
| #438 | (35)SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 0 | 0 |
| #443 | (3") FIN. LDGR TR VS (5) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,956 A | 4,250 |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258 R-2 | 275,298 |
| | SCS CASH | 38,194,261 R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651 R-2 | 7,130 |
| MONE | BANK OVERDRAFTS | 0 R-3 | 0 |
| ONLY | SUSPENSE - BANK REC. DIFFERENCES | 936,385 R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,907 R-3 | 60,078 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857,875 R-5 | 22,858 |
| | | 404,494,223 | |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 394,925,363 | 304,926 |

*DEBIT*

| | | | |
|---|---|---|---|
| #225 | (9) NON CUST F-D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F-D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F-D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F D  VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D  VS (34) BOX | 0 | 0 |
| #269 | (1) NET LONG CLE   VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F D VS (36) BOX - LBSI | 0 | 0 |
| | | | 0 |

| | | | |
|---|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | | **879,837,430** | 879,837 |

1,115

(2,289)
(507)
(73,949)

0

SEARCH_RESULTS_00101558

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---|
| 1. | **P.A.I.B. CREDITS:** | |
|  | PAIB CREDITS | 2,235,573 |
|  | BREAK VS. PAIB LONG | 215,107 |
|  | PAIB CREDIT ADJ | (8,000) |
|  | PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
|  | PAIB LONG VS CUSTOMER SHORT | 279,021 |
|  | FIRM LONG vs PAIB SHORT | (25,932) |
|  | NONCUST LONG VS. PAIB SHORT | (133,325) |
|  | UNALLOCATED PAIB SHORT | - |
|  | PAIB SHORT VS CUSTOMER LONG | (152,397) |
|  |  |  |
|  | P.A.I.B. CREDITS: | 2,421,706 |
|  |  |  |
| 2. | **PAIB BANK LOAN:** | |
|  |  |  |
|  | OCC MARGIN | - |
|  | OCC MARGIN DEFECIT | - |
|  | PAIB LONG VS. FIRM BANK LOAN | - |
|  | PAIB LONG VS. CUST BANK LOAN | 6 |
|  | PAIB LONG VS. PAIB BANK LOAN | - |
|  | PAIB BANK LOAN - PAIB NOT LONG | - |
|  | CUST BANK LOAN- CUSTOMER NOT LONG | - |
|  | FIRM BANK LOAN- CUSTOMER NOT LONG | - |
|  |  |  |
|  | TOTAL P.A.I.B. BANK LOAN | 6 |
|  |  |  |
| 3. | **PAIB STOCK LOAN:** | |
|  |  |  |
|  | STOCK LOAN VS PAIB LONG | - |
|  | STOCK LN PLDG VS. PAIB LONG | 124,856 |
|  |  |  |
|  | TOTAL CUSTOMER STOCK LOAN | 124,856 |
| 4. | **PAIB FAIL TO RECEIVE:** | |
|  |  |  |
|  | FAIL TO RECEIVE VS PAIB LONG | 33,101 |
|  | CNS FAIL TO RECEIVE VS PAIB LONG | 1 |
|  |  |  |
|  | TOTAL P.A.I.B. FAIL TO RECEIVE | 33,102 |
|  |  |  |
| 5. | **FIRM SHORT VS PAIB LONG:** | |
|  |  |  |
|  | REPO VS PAIB LONG | 11,615 |
|  | NONCUST SHORT VS. PAIB LONG | 45,183 |
|  | FIRM SHORT VS PAIB LONG | 11,893 |
|  |  |  |
|  | TOTAL FIRM SHORT VS P.A.I.B. LONG | 68,691 |
|  |  |  |
| 6. | **PAIB DIVIDEND & INTEREST:** | |
|  |  |  |
|  | STOCK DIVIDENDS > 30 DAYS | - |
|  | MONEY CONTROL ADJUSTMENT | - |
|  | DIVIDEND & INT PAYABLES > 7 DAYS | - |

SEARCH_RESULTS_00101558

*TOTAL PAIB FAILS/AWRAPS & INTEREST:*

| | | |
|---|---|---|
| **7.** | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| **8.** | **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| | | |
| **9.** | **AGED TRANSFERS & REORGANIZATION:** | |

*TRANSFER SHORTS OVER 40 DAYS*      -
*REORG/REDEMPTION SMV OVER 7 DAYS*      -

*TOTAL AGED TRANSFERS & REORGANIZATION*      -

| | | |
|---|---|---|
| **10.** | **OTHER:** | |

*OTHER CREDITS*      -

*TOTAL OTHER*      -

*TOTAL PAIB CREDITS*      2,648,361

SEARCH_RESULTS_00101558

| 12. | P.A.I.B. DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |

| 13. | PAIB STOCK BORROW: | |
|---|---|---|
| | STOCK BORROW VS PAIB SHORT | 450,138 |
| | STOCK BORROW O. VS. PAIB SHORT | 829 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 450,967 |

| 14. | PAIB FAIL TO DELIVER: | |
|---|---|---|
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,886 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,509 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 106,395 |

| 15. | PAIB MARGIN WITH OCC | |
|---|---|---|
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |

| 16. | OTHER | |
|---|---|---|
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | TOTAL PAIB DEBITS | 2,336,369 |
|---|---|---|

| 20. | EXCESS - DEBITS OVER CREDITS | - |
|---|---|---|

| 21. | DEFICIT - CREDITS OVER DEBITS | 311,992 |
|---|---|---|

SEARCH_RESULTS_00101558

SEARCH_RESULTS_00101558

# EXHIBIT 15

Cc:      O'Meara, Chris M (NY) [comeara@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com];
Stucchio, Anthony [astucchi@lehman.com]; Burke, William T [wburke@lehman.com]
**To:**      Kelly, Martin [martin.kelly@lehman.com]; Gary.Romain@barclayscapital.com
[Gary.Romain@barclayscapital.com]; James.Walker@barclayscapital.com
[James.Walker@barclayscapital.com]; tj.gavenda@barclayscapital.com
[tj.gavenda@barclayscapital.com]; matthew.hughey@barclayscapital.com
[matthew.hughey@barclayscapital.com]; robert.martini@barclayscapital.com
[robert.martini@barclayscapital.com]
**From:**      Azerad, Robert [RAzerad@lehman.com]
**Sent:**      Sun 9/21/2008 10:22:57 PM
**Subject:**      RE: 15c3

<u>15c3 0919 Preliminary V3.xls</u>

Here is the spreadsheet. Numbers are still preliminary.

Robert

——

From: Kelly, Martin
Sent: Sunday, September 21, 2008 6:17 PM
To: 'Gary.Romain@barclayscapital.com';
'James.Walker@barclayscapital.com'; 'tj.gavenda@barclayscapital.com';
'matthew.hughey@barclayscapital.com';
'robert.martini@barclayscapital.com'
Cc: O'Meara, Chris M (NY); Tonucci, Paolo; Azerad, Robert; Stucchio,
Anthony; Burke, William T
Subject: RE: 15c3

Could we do a call in 5 minutes on the 15c3? Call in to the following #:
Robert will circulate a page or 2 which we can talk to.

Thx - M

Int'l 205 354 0155

Dom 866 831 2217

*3743693*

——

From: Kelly, Martin
Sent: Sunday, September 21, 2008 5:33 PM
To: 'Gary.Romain@barclayscapital.com';
'James.Walker@barclayscapital.com'; 'tj.gavenda@barclayscapital.com';
'matthew.hughey@barclayscapital.com';
'robert.martini@barclayscapital.com'
Cc: O'Meara, Chris M (NY); Tonucci, Paolo; Azerad, Robert; Stucchio,
Anthony; Burke, William T
Subject: 15c3

STUCCIO_ANTHONY_00003649

Trying to get a hold of the SEC to ensure they are in agreement with our approach. Thought it made sense to have this discussion first before speaking with you. Will be back as soon as possible.

STUCCIO_ANTHONY_00003649

**FINAL**

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Preliminary 09/19/2008 | Pending Adjustments | Preliminary Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | - | | - | - | - | |
| Stock Record/P&C items | 160,127 | | 160,127 | 86,809 | 73,318 | |
| Overdrafts | - | | - | - | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | - | | - | 216,477 | (216,477) | |
| Sub-total | 371,134 | - | 371,134 | 504,841 | (133,708) | |
| | | | | | | |
| **ADP** | | | | | | |
| Free Credits / Margin | (368,468) | | (368,468) | 481,456 | (849,925) | |
| Net Customer Financing * | (73,348) | | (73,348) | (831,906) | 758,558 | |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | |
| Non-Broker Dealer Affil. | 0 | | 0 | 290,539 | (290,539) | |
| OCC Proprietary Qualified Collateral | (477,614) | | (477,614) | (349,858) | (127,756) | |
| Firm Bank Loan - Firm Not Long | | | | | | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 3,992,241 | (3,900,000) | 92,241 | 82,685 | 9,557 | |
| 3% ADI | 235,430 | | 235,430 | 322,692 | (87,262) | |
| Sub-total | 4,009,557 | (3,900,000) | 109,557 | 204,052 | (94,495) | |
| | | | | | | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | | | - | 160,575 | (160,575) | |
| Unsecured Shorts | | | | 77,639 | (77,639) | |
| Securities Related IC Payable (Mostly ITS) | - | | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| | | | | | | |
| Other | | | | | | |
| 3% ADI | 100,000 | | 100,000 | 178,711 | (78,711) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| | | | | | | |
| Sub-total | 100,000 | | 100,000 | 606,011 | (506,011) | |
| | | | | | | |
| **Commodities** | | | | | | |
| O/Drafts | - | | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| | | | | | | |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | |
| Sub-total | - | | - | 228,487 | (228,487) | |
| | | | | | | |
| Requirement | 4,480,690 | (3,900,000) | 580,690 | 1,543,392 | (962,702) | |
| Cushion (plus 2% deduction) | | | | 225,608 | (225,608) | |
| Amount Segregated | 4,480,690 | (3,900,000) | 580,690 | 1,769,000 | (1,188,310) | |
| | | | | | | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 426,991 | | 426,991 | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| | | | | | | |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | |
| | | | | | | |
| Requirement | 96,284 | - | 96,284 | 466,120 | (369,836) | |
| Cushion (plus 2% deduction) | | - | | 25,880 | (25,880) | |
| Amount Segregated | 96,284 | - | 96,284 | 492,000 | (395,716) | |
| | | | | | | |
| Total Segregated | 4,576,975 | (3,900,000) | 676,975 | 2,261,000 | (1,584,025) | |

STUCCIO_ANTHONY_00003650

EXHIBIT 16

**To:** Crepeau, Alex F[acrepeau@lehman.com]; McLaughlin, Kendall J[kmclaugh@lehman.com];
Stucchio, Anthony[astucchio@lehman.com]; Azerad, Robert[RAzerad@lehman.com]; Lee,
Mark[mark.lee@lehman.com]
**Cc:** Cody, Stephen[scody@lehman.com]; Curley, Kieran[kcurley@lehman.com]; Burke, William
T[wburke@lehman.com]; Sudarsan, Daniram[daniram.sudarsan@lehman.com]; Logan,
Donahue[dlogan@lehman.com]; Kush, Anthony[anthony.kush@lehman.com]
**From:** Potenciano, Joel
**Sent:** Sun 9/21/2008 11:12:03 PM
**Subject:** RE: Updated: Reserve
**Categories:** urn:content-classes:message

_Res.Driver 091908.xls_

All,

Here is the latest and the greatest as of 7:10pm after re running the
allocations. The related customer allocations have decreased
significant to a more reasonable level. We still have significant
breaks that are currently being looked upon by the Ops guys.

Please let me know if you have questions.

Joel

-----Original Message-----
From: Crepeau, Alex F
Sent: Sunday, September 21, 2008 6:08 PM
To: McLaughlin, Kendall J; Billeci, Eugene; Ocreto, Josie
Cc: Azerad, Robert; Lee, Mark; Cody, Stephen; Curley, Kieran; Stucchio,
Anthony; Burke, William T; Potenciano, Joel; Sudarsan, Daniram; Logan,
Donahue; Kush, Anthony
Subject: RE: Updated: Reserve

What's the latest?

-----Original Message-----
From: McLaughlin, Kendall J
Sent: September 21, 2008 15:56
To: Billeci, Eugene; Ocreto, Josie
Cc: Azerad, Robert; McLaughlin, Kendall J; Crepeau, Alex F; Lee, Mark;
Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William T;
Potenciano, Joel; Sudarsan, Daniram; Logan, Donahue; Kush, Anthony
Subject: RE: Updated: Reserve

Gene/Josie,

The jobs have completed running. The three job are ttotals,tsec and
tfails 12. Can you please look for the jobs and advise when they will be
available in infopac so the reg guys can complete the c-3 calc.

Thanks
Kendall

-----Original Message-----
From: McLaughlin, Kendall J

SEARCH_RESULTS_00101507

Sent: Sunday, September 21, 2008 3:15 PM
To: Crepeau, Alex F; Lee, Mark; Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William T; Potenciano, Joel; Sudarsan, Daniram; Logan, Donahue; Kush, Anthony; Billeci, Eugene; Ocreto, Josie
Cc: Azerad, Robert
Subject: RE: Updated: Reserve
Importance: High

The B1`s have been updated and ADP have kicked off the c3 allocation job. I will advise once the job has completed running.

Gene/Josie

Please advise once you see this job in the output que. We are waiting to receive so that we can complete the c3.


Thanks,
Kendall

-----Original Message-----
From: Crepeau, Alex F
Sent: Sunday, September 21, 2008 2:43 PM
To: Lee, Mark; Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William T; Potenciano, Joel; McLaughlin, Kendall J; Sudarsan, Daniram; Logan, Donahue; Kush, Anthony
Cc: Azerad, Robert
Subject: Re: Updated: Reserve

Kendall is trying to get it done. Adp has other converions go and is trying to fit us in.

----- Original Message -----
From: Lee, Mark
To: Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William T; Potenciano, Joel; McLaughlin, Kendall J; Sudarsan, Daniram; Logan, Donahue; Kush, Anthony
Cc: Azerad, Robert; Crepeau, Alex F
Sent: Sun Sep 21 14:40:53 2008
Subject: RE: Updated: Reserve

Have we got confirmation from ADP that the cust alloc has started and if not what time it will start, and how long it will take to run (action: Kendall)?

Bill - the way the spreadsheet is set-up it is not easy to re-calc the ADI / cushion values from first principles. Do we need to go back and repopulate the back-up sheets as not everything feeds forward e.g. the cushion / 3% ADI numbers

Making some basic assumptions:

We will run the ADP alloc and then repopulate the spreadsheet Other adjustments to be made

ITS:

SEARCH_RESULTS_00101507

*     MTS Unsecured short of 77m - who is looking at that as highlighted but no solution mentioned on the call
*     Securities Related IC Payable (Mostly ITS) - to be reduced to zero

ADP
Regardless of the re-allocation I noted the following changes:
*     Free credits / Margin: Adj for $175m cash to be put back into this number
*     O/Drafts of 62m to be updated with an FX related adj of $172m and a CAD error by Citibank of $772m
*     Assume that the Net Customer Financing and Other will resolve the issue with large almost equal and opposite values
*     S/B NQ v Cust Short: Kendall to clena up with target of approx 10m (should already have a correct value)
*     Non-Broker Affiliates. Currently 200, should be 0 as should not be protected by formula


MTS
*     I didn't take notes for MTS as assumed outside the purchase agreement, but need for overall break resolution
*     Not a major discrepancy as per ADP


Commodities
*     Should be 0 overall

PAIB
*     95% Lotz (sorry for misspelling entity name), reducing by 215m
_____

From:   Crepeau, Alex F
Sent:   Sunday, September 21, 2008 11:34 AM
To:     Cody, Stephen; Curley, Kieran; Stucchio, Anthony; Burke, William T; Potenciano, Joel; McLaughlin, Kendall J; Lee, Mark; Sudarsan, Daniram; Logan, Donahue; Kush, Anthony; Crepeau, Alex F
Subject:     Updated: Reserve
When:  Sunday, September 21, 2008 12:30 PM-1:00 PM (GMT-05:00) Eastern Time (US & Canada).
Where: My office or 1-866-779-0772 LD 334-309-0261 *5807277856*

When: September 21, 2008 12:30-13:00 (GMT-05:00) Eastern Time (US & Canada).
Where: My office or 1-866-779-0772 LD 334-309-0261 *5807277856*

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*

  <<Res.Driver 091908.xls>>  << File: Res.Driver 091908.xls >>

SEARCH_RESULTS_00101507

**DRAFT**

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | - | | - | - | - | |
| Stock Record/P&C items | 75,822 | | 75,822 | 86,809 | (10,987) | |
| Overdrafts | - | | - | - | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | 394,926 | (394,926) | (0) | 216,477 | (216,477) | 394 mil of ADI assumes orderly liquidation of open customer fails |
| Sub-total | 879,837 | (394,926) | 484,911 | 504,841 | (19,930) | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,563) | | (2,952,563) a | 481,456 | (3,434,020) | Pending B1 change adjustments related to 941 LBIE admin accounts |
| Net Customer Financing * | 2,419,863 | | 2,419,863 | (831,906) | 3,251,768 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Open customer payments not paid yet from the Bank |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | |
| Non-Broker Dealer Affil. | 210,769 | (210,769) | 0 | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | - | | - | - | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 2,329,550 | | 2,329,550 | 82,685 | 2,246,865 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| 3% ADI | 392,380 | (392,380) | - | 322,692 | (322,692) | 392 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 2,267,855 | (603,149) | 1,664,706 | 204,052 | 1,460,654 | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (125,014) | | (125,014) | 160,575 | (285,589) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | (189,086) | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | - | | - | - | - | |
| 3% ADI | 228,486 | (228,486) | (0) | 178,711 | (178,712) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 370,197 | (417,572) | (47,375) | 606,011 | (653,386) | |
| **Commodities** | | | | | | |
| O/Drafts | 456,716 | (456,716) | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | |
| Sub-total | 456,716 | (456,716) | - | 228,487 | (228,487) | |
| Requirement | 3,974,605 | (1,872,363) | 2,102,242 | 1,543,392 | 558,850 | |
| Cushion (plus 2% deduction) | 225,608 | (225,608) | - | 225,608 | (225,608) | |
| Amount Segregated | 4,200,213 | (2,097,971) | 2,102,242 | 1,769,000 | 333,242 | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 642,699 | (215,708) | 426,991 b | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | |
| Stock Borrow * | (450,967) | | (450,967) | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | |
| Cushion (plus 2% deduction) | 25,880 | (25,880) | - | 25,880 | (25,880) | |
| Amount Segregated | 337,872 | (241,588) | 96,284 | 492,000 | (395,716) | |
| Total Segregated | 4,538,086 | (2,339,559) | 2,198,527 | 2,261,000 | (62,473) | |

* Denotes account net debit balances.

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| *Customer Credits* | 9,032,508 |  | 7,995,742 |  | 1,036,765 |
|  |  |  |  |  |  |
| *Firm Long vs Cust Short* | (281,484) |  | (196,453) |  | (85,031) |
| *Non Cust Long vs. Cust Short* | (6,857,319) |  | (4,533,257) |  | (2,324,062) |
| *PAIB Long vs Cust Short* | (11,596) |  | (15,031) |  | 3,435 |
| *Reverse Repo vs Cust Short* | - |  | - |  |  |
| *Cust Long vs Cust Short* |  |  |  |  |  |
| *Stock Borrow vs Cust Short* | (3,543,186) |  | (1,207,278) |  | (2,335,908) |
| *Fail to Deliver vs Cust Short* | (1,291,486) |  | (1,562,267) |  | 270,781 |
| *sub-total* | (11,985,071) | (11,985,071) | (7,514,286) | (7,514,286) | (4,470,785) |
|  |  |  |  |  |  |
| *Total* |  | (2,952,563) |  | 481,456 | (3,434,020) |
|  |  |  |  |  |  |
| *Customer Debits* | 8,227,423 |  | 8,121,467 |  | 105,955 |
|  |  |  |  |  |  |
| *Money Fund Receivable* | (310,045) |  | (310,045) |  | - |
| *Unsecured/Partly Secured Receivables/Non-Purpose Loans* | (169,152) |  | (169,152) |  | - |
| *Security Concentrations* | - |  | - |  |  |
| *Cust. Long vs.Customer Bank Loan* | (181,854) |  | (728,814) |  | 546,960 |
| *Stock Loan vs Cust Long* | (2,030,953) |  | (1,050,110) |  | (980,844) |
| *Cust Long vs Cust Short* |  |  | - |  |  |
| *Fail to Receive vs Cust Long* | (1,976,062) |  | (2,210,873) |  | 234,811 |
| *Firm Short vs Customer Long* | (5,979,219) |  | (2,820,568) |  | (3,158,651) |
| *sub-total* | (10,647,285) | (10,647,285) | (7,289,562) | (7,289,562) | (3,357,724) |
|  |  |  |  |  |  |
| *Total* |  | (2,419,863) |  | 831,906 | (3,251,768) |
|  |  |  |  |  |  |
| *Plus:* |  |  |  |  |  |
| *Stock Borrow / SB Q vs. Firm Bank Loan* | - |  | - |  | - |
| *Stock Borrow vs. Cust Bank Loan* | - |  | - |  | - |
|  |  |  |  |  |  |
| *Net Cust Dr./Cr.* |  | (532,701) |  | (350,449) | (182,251) |

SEARCH_RESULTS_00101508

COPY PASTE FROM RESERVE FILE

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
09/19/08
(in 000'S)

|  | 09/19/08 |
|---|---:|
| **1. CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 723,468 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 222,207 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 1,470,785 |
| FIRM LONG VS. CUSTOMER SHORT | (281,484) |
| NONCUST LONG VS. CUSTOMER SHORT | (6,857,319) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (11,596) |
| SHORT & CREDIT INTEREST | 23,658 |
| MONEY FUND SETTLEMENTS 098-00003 & 098-70001 | 477 |
| UNALLOCATED CUSTOMER SHORT | 832,372 |
| | |
| TOTAL CUSTOMER CREDITS | 4,644,635 |
| | |
| **2. CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 181,854 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 181,854 |
| | |
| **3. CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 14,343,512 |
| STOCK LOAN MTM | (3,431,134) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 2,090,952 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,009) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (247,637) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,255) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,030,953 |

SEARCH_RESULTS_00101508

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---:|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (225,367) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,976,062 |
| | | |
| | | |
| 5. | FIRM SHORT VS CUSTOMER LONG: | |
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 419,376 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 31,101 |
| | FIRM SHORT VS. UNALLOCATED | 291,784 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 1,530,365 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,979,219 |
| | | |
| | | |
| 6. | CUSTOMER DIVIDEND & INTEREST: | |
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| | | |
| | | |
| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
| | | |
| 8. | SUSPENSE ACCOUNTS | |
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 136,769 |
| | | |
| | | |
| 9. | AGED TRANSFERS & REORGANIZATION: | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| | | |
| 10. | OTHER: | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | | |
| | TOTAL CREDITS | 14,954,815 |

SEARCH_RESULTS_00101508

| 12. | CUSTOMER DEBITS: | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,492,635 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | (310,045) |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,748,226 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---:|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
| | STOCK BORROW VS. THE BOX | (248,630) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (15,106) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (23) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | - |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (120,979) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (442,429) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (18,115) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (1,005) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

SEARCH_RESULTS_00101508

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---:|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (225,367) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (1,487) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,487) |
| | FAIL TO DELIVER VS. REPO | (440,321) |
| | FAIL TO DELIVER VS. THE BOX | (1,086,414) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (1,423,845) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (296,830) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (665,286) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,417) |
| | CNS FAIL TO DELIVER VS. THE BOX | (263,511) |
| | CNS FAIL TO DELIVER VS. REPO | (96,672) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,877) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (25,903) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | 1,291,486 |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 507,418 |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 13,079,340 |
| 18. | LESS 3% | (392,380) |
| 19. | TOTAL 15C3-3 DEBITS | 12,686,960 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | (2,267,855) |

SEARCH_RESULTS_00101508

LEHMAN BROTHERS INC.
RULE 15c3-3 RESERVE FORMULA
(000'S)

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** |  |
| *Customer Accounts* | 4,390,448 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 456,716 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 5,113,889 |
|  |  |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,395,768 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,590 |
| **SUSPENSE CREDITS** | 0 |
|  |  |
| **TOTAL CREDITS** | 8,214,622 |
|  |  |
| **CUSTOMER DEBITS:** |  |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
|  |  |
| **CUSTOMER MARGIN WITH OCC** | 0 |
|  |  |
| **CUSTOMER STOCK BORROW** | 848,446 |
| **CUSTOMER FAIL TO DELIVER** | 1,829,002 |
| **AGGREGATE DEBITS** | 7,616,195 |
| *Less 3%* | 228,486 |
| **TOTAL DEBITS** | 7,387,709 |
|  |  |
| **EXCESS CREDITS OVER DEBITS** | 826,913 |

SEARCH_RESULTS_00101508

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*  |  09:19:03

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1") CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #63 | (19) B/R-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST LONG F/D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F/D VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY, REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F/D VS TRI PARTY REPO | 0 | 0 |
| #95 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST/F-30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED Vs BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | *(11) NON CUST_F/D > 30 DAYS VS (18) NON CUST_F/R* | *61,160* | *61* |
| #150 | (1") CUST LONG F/D VS (18) NON CUST (F/R) | 0 | 0 |
| #151 | (19) B/R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F/R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST/F-30 VS (22) CUST SHRT(F/R) | 283,919 | 284 |
| #194 | (15) CUST LONG F/D VS (24) OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 22,806,705 | 22,807 |
| #180 | BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F/R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (11) NONCUST F/D VS (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG. VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F/D >30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (14) AFFILIATE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20) CUST NET CL | 0 | 0 |
| #287 | (33) BREAK (15) F/R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,717,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (1) NET LONG CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE VS (35) INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR DEALER LONG FREE VS (35) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #344 | (23) CUST LONG VS (35) INACTIVE SHRT | 0 | 0 |
| #346 | (2") NON BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (35) INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 175,819 | 176 |
| #337 | (9) NON CUST F/D (35) INACTIVE SHORT | 0 | 0 |
| #386 | (5) B/VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #388 | (1") CUST LONG FREE VS (46) SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19) BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L(46) (46) SPECIAL FIN.. | 0 | 0 |
| #419 | (33) BOX BREAKS LAW (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 603,494 | 603 |
| #438 | (35) SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 0 | 0 |
| #445 | (3") FIN. LDGR TR VS (5) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,936 A | 4,250 |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258 R-2 | 275,298 |
| | SCS CASH | 38,194,246 R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651 R-2 | 7,130 |
| MONEBANK OVERDRAFTS | | 0 R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 936,385 R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,997 R-3 | 60,078 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857,875 R-5 | 22,858 |
| | | 404,494,223 | 394,925,363 | 304,926 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | | |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F/D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (1") CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F/D VS (34) BOX - LBSI | 0 | 0 |

| | | | |
|---|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | | 879,837,430 | 879,837 |

SEARCH_RESULTS_00101508

1,115

(2,289)
(507)
(73,949)

0

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  | 09/19/08 |
|---|---|
| **1.** **P.A.I.B. CREDITS:** | |
| *PAIB CREDITS* | 2,235,573 |
| *BREAK VS. PAIB LONG* | 215,107 |
| *PAIB CREDIT ADJ* | (8,000) |
| *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| *PAIB LONG VS CUSTOMER SHORT* | 279,021 |
| *FIRM LONG vs PAIB SHORT* | (25,932) |
| *NONCUST LONG VS. PAIB SHORT* | (133,325) |
| *UNALLOCATED PAIB SHORT* | - |
| *PAIB SHORT VS CUSTOMER LONG* | (152,397) |
| | |
| *P.A.I.B. CREDITS:* | 2,421,706 |
| | |
| **2.** **PAIB BANK LOAN:** | |
| | |
| *OCC MARGIN* | - |
| *OCC MARGIN DEFECIT* | - |
| *PAIB LONG VS. FIRM BANK LOAN* | - |
| *PAIB LONG VS. CUST BANK LOAN* | 6 |
| *PAIB LONG VS. PAIB BANK LOAN* | - |
| *PAIB BANK LOAN - PAIB NOT LONG* | - |
| *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | |
| *TOTAL P.A.I.B. BANK LOAN* | 6 |
| | |
| **3.** **PAIB STOCK LOAN:** | |
| | |
| *STOCK LOAN VS PAIB LONG* | - |
| *STOCK LN PLDG VS. PAIB LONG* | 124,856 |
| | |
| *TOTAL CUSTOMER STOCK LOAN* | 124,856 |
| **4.** **PAIB FAIL TO RECEIVE:** | |
| | |
| *FAIL TO RECEIVE VS PAIB LONG* | 33,101 |
| *CNS FAIL TO RECEIVE VS PAIB LONG* | 1 |
| | |
| *TOTAL P.A.I.B. FAIL TO RECEIVE* | 33,102 |
| | |
| **5.** **FIRM SHORT VS PAIB LONG:** | |
| | |
| *REPO VS PAIB LONG* | 11,615 |
| *NONCUST SHORT VS. PAIB LONG* | 45,183 |
| *FIRM SHORT VS PAIB LONG* | 11,893 |
| | |
| *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 68,691 |
| | |
| **6.** **PAIB DIVIDEND & INTEREST:** | |
| | |
| *STOCK DIVIDENDS > 30 DAYS* | - |
| *MONEY CONTROL ADJUSTMENT* | - |
| *DIVIDEND & INT PAYABLES > 7 DAYS* | - |

SEARCH_RESULTS_00101508

*TOTAL PAIB INTERESTS & LIABILITIES:*

| | | |
|---|---|---|
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| 10. | *OTHER:* | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL PAIB CREDITS* | 2,648,361 |

SEARCH_RESULTS_00101508

| | | |
|---|---|---:|
| **12.** | **P.A.I.B. DEBITS** | 1,955,103 |
| | *CUSTOMER SECURITY ACCOUNTS* | |
| | *VARIOUS PAIB DEBIT ADJ* | (176,096) |
| | *UNSECURED DEBITS* | - |
| | *PARTLY SECURED DEBITS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *BREAK VS CUSTOMER LONG* | - |
| | | |
| | *P.A.I.B. DEBITS:* | 1,779,007 |

| | | |
|---|---|---:|
| **13.** | **PAIB STOCK BORROW:** | |
| | | |
| | *STOCK BORROW VS PAIB SHORT* | 450,138 |
| | *STOCK BORROW Q. VS. PAIB SHORT* | 829 |
| | *STOCK BORROW NQ VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS PAIB SHORT* | - |
| | | |
| | *TOTAL P.A.I.B. STOCK BORROW* | 450,967 |

| | | |
|---|---|---:|
| **14.** | **PAIB FAIL TO DELIVER:** | |
| | | |
| | *FAIL TO DELIVER OVER 30 DAYS* | - |
| | *FAIL TO DELIVER VS PAIB SHORT* | 43,886 |
| | *CNS FAIL TO DELIVER VS PAIB SHORT* | 62,509 |
| | *CNS FAIL TO DELIVER VS THE BOX* | - |
| | *CNS FAIL TO DELIVER VS REPO* | - |
| | *CNS FAIL TO DELIVER VS UNALLOC./BREAK* | - |
| | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - |
| | | |
| | *TOTAL P.A.I.B. FAIL TO DELIVER* | 106,395 |

| | | |
|---|---|---:|
| **15.** | **PAIB MARGIN WITH OCC** | |
| | *OCC MARGIN* | - |
| | *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL P.A.I.B. MARGIN WITH OCC* | - |

| | | |
|---|---|---:|
| **16.** | **OTHER** | |
| | *OTHER PAIB DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |

| | | |
|---|---|---:|
| **17.** | **TOTAL PAIB DEBITS** | 2,336,369 |

| | | |
|---|---|---:|
| **20.** | **EXCESS - DEBITS OVER CREDITS** | - |

| | | |
|---|---|---:|
| **21.** | **DEFICIT - CREDITS OVER DEBITS** | 311,992 |

SEARCH_RESULTS_00101508

SEARCH_RESULTS_00101508

EXHIBIT 17

**To:**    Tonucci, Paolo [paolo.tonucci@lehman.com]; O'Meara, Chris M (NY) [comeara@lehman.com]; Lee, Mark [mark.lee@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]
**From:**    Azerad, Robert [RAzerad@lehman.com]
**Sent:**    Mon 9/22/2008 12:42:11 AM
**Subject:**    15c3 0919 Preliminary V5.xls

<u>15c3 0919 Preliminary V5.xls</u>

Does it work for everyone?

Robert

  <<15c3 0919 Preliminary V5.xls>>

TONUCCI_PAOLO_00011123

FINAL

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Preliminary 09/19/2008 | Pending Adjustments | Preliminary Adjusted 09/19/2008 | Client Requirements 09/19/2008 | Cushion 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | | |
| Free Credits | 275,298 | | 275,298 | 275,298 | | 77,216 | 198,082 | Net settlement for DVP (Govies+Agencies) |
| SCS Cash | 38,194 | | 38,194 | 38,194 | | 46,462 | (8,268) | SCS and Prime Broker balances |
| Option Margin | 7,130 | | 7,130 | 7,130 | | 15,824 | (8,694) | Cash that clients would provide re: option margin |
| P & I | 22,858 | | 22,858 | 22,858 | | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 4,595 | | 7,518 | (2,923) | |
| Customer Receivable Versus Box | * | - | | | | | | Items where we have a break (stock records)/customer collateral used to finance the Firm |
| Stock Record/P&C items | 75,822 | | 75,822 | 75,822 | | 86,809 | (10,987) | |
| Overdrafts | - | | - | | | | | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 61,014 | | 31,677 | 29,337 | Client cash that cannot be applied on day 1 |
| 3% ADI | 394,926 | | 394,926 | | 394,926 | 216,477 | 178,449 | |
| Sub-total | 879,837 | - | 879,837 | 484,912 | 394,926 | 504,841 | 374,996 | |
| **ADP** | | | | | | | | Retail client system |
| Free Credits / Margin | (2,952,563) | | (2,952,563) | (2,952,563) | | 481,456 | (3,434,020) | Debits - offset by the next line |
| Net Customer Financing | * | 2,419,863 | 2,419,863 | 2,419,863 | | (831,906) | 3,251,768 | Offsetting the previous line |
| OMNI Conversion Payable | - | | - | | | | | |
| O/Drafts | 222,207 | | 222,207 | 222,207 | | 62,604 | 159,603 | Worst case scenario (overdrafts in accounts to pay customers) |
| Dividends | 5,322 | | 5,322 | 5,322 | | 5,322 | - | Aged dividends |
| S/B L.O.C. vs. Customer Short | - | | - | | | | | Borrow on an equity swap / non-qualified basis; should be $10-20 mln after cleaning up numbers |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 10,976 | | 5,287 | 5,689 | |
| Non-Broker Dealer Affil. | 0 | | 0 | 0 | | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (507,418) | | (349,858) | (157,560) | Firm buys Treasuries for customer margin at OCC |
| Firm Bank Loan - Firm Not Long | - | | - | | | | | |
| Suspense | 39,897 | | 39,897 | 39,897 | | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 11,553 | | 10,121 | 1,432 | See MTS |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,319 | | 85,212 | 107 | End of week situation => should be $80 mln |
| Other | 2,329,550 | (2,200,000) | 129,550 | (2,070,450) | | 82,685 | 46,865 | |
| 3% ADI | 392,380 | | 392,380 | | 392,380 | 322,692 | 69,688 | Standard "penalty" |
| Sub-total | 2,057,086 | (2,200,000) | (142,914) | (2,735,294) | 392,380 | 204,052 | (346,966) | |
| **ITS** | | | | | | | | Prime Broker Business (primarily Europe) |
| Free Credits (primarily SCS cash) | - | | - | | | 160,575 | (160,575) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | | 77,639 | - | Brady warrants; should probably stay behind |
| Securities Related IC Payable (Mostly ITS) | - | | - | | | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | - | | - | | | - | - | |
| 3% ADI | 50,000 | | 50,000 | | 50,000 | 178,711 | (128,711) | |
| Sub-total | 127,639 | - | 127,639 | 77,639 | 50,000 | 606,011 | (478,372) | Should disappear except Brady warrants |
| **Commodities** | | | | | | | | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| O/Drafts | - | | - | | | 176,487 | (176,487) | |
| Non-Reg Commodity Credits | - | | - | | | 52,000 | (52,000) | |
| Sub-total | - | | - | | | 228,487 | (228,487) | Not a security business => SEC is ok with taking out business |
| Requirement | 3,064,563 | (2,200,000) | 864,563 | (2,172,743) | 837,306 | 1,543,392 | (678,829) | |
| Cushion (plus 2% deduction) | | | | | | 225,608 | (225,608) | SEC says that is not required |
| Amount Segregated | 3,064,563 | (2,200,000) | 864,563 | (2,172,743) | 837,306 | 1,769,000 | (904,437) | |
| **PAIB** | | | | | | | | Staying behind; relates to LOTC (trading derivatives; hedging with cash instruments) |
| Net PAIB Debits/Credits | 426,991 | | 426,991 | 426,991 | | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 6 | | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 124,856 | | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 33,102 | | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 68,691 | | 394,506 | (325,815) | |
| Stock Borrow | * | (450,967) | (450,967) | (450,967) | | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (106,395) | | (40,281) | (66,114) | |
| Requirement | 96,284 | - | 96,284 | 96,284 | - | 466,120 | (369,836) | |
| Cushion (plus 2% deduction) | | | | | | 25,880 | (25,880) | |
| Amount Segregated | 96,284 | - | 96,284 | - | - | 492,000 | (395,716) | Reduction driven by reduction in LOTC business |
| Total Segregated | 3,160,847 | (2,200,000) | 960,847 | (2,172,743) | 837,306 | 2,261,000 | (1,300,153) | |

TONUCCI_PAOLO_00011124

# EXHIBIT 18

**To:**    Lee, Mark[mark.lee@lehman.com]; Azerad, Robert[RAzerad@lehman.com]; wburke@si.rr.com[wburke@si.rr.com]; Stuccio, Anthony[astucchi@lehman.com]; Stucchio, Anthony[astucchi@lehman.com]; Crepeau, Alex F[acrepeau@lehman.com]

**From:**    Potenciano, Joel

**Sent:**    Mon 9/22/2008 12:59:54 AM

**Importance:**    Low

**Subject:**    RE: Final 15c3-3 Reserve Formula as of 09/17/2008

**Categories:**    urn:content-classes:message

<u>**DRAFT Customer PAIB Reserve-091708.xls**</u>
<u>**Res.Driver 091908.xls**</u>


<<DRAFT Customer PAIB Reserve-091708.xls>>  <<Res.Driver 091908.xls>>

Mark,

The latest and greatest and in Chris' format. Thanks!

Joel


> _____
> From:    Lee, Mark
> Sent: Sunday, September 21, 2008 8:31 PM
> To:    Potenciano, Joel; Azerad, Robert; 'wburke@si.rr.com'; Stucchio,
> Anthony; Stucchio, Anthony; Crepeau, Alex F
> Subject:    RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Joel
>
> Need to reproduce an equivalent for 19th. Don't assume that the 3%ADI
> will be adjusted to zero as per your last schedule, i.e. MTS will have
> 3% ADI raising from $216 to $395 based on the current breaks although
> the assumption that this will be a balance that will be available for
> Barclays post the clearing of all the fails. The free cash that I see
> available to tfr is for the commodities of $225m only but I had
> expected the ITS ADI to come down.
>
> We need to estimate where we think we will get the $2.3bn down to this
> evening for Martin / Chris / Paolo
>
> Mark
>
> _____
> From:    Potenciano, Joel
> Sent: Sunday, September 21, 2008 6:08 PM
> To:    O'Meara, Chris M (NY); Lee, Mark; Kelly, Martin; Azerad, Robert;
> 'wburke@si.rr.com'; Stucchio, Anthony; Stucchio, Anthony; Tonucci,
> Paolo; Crepeau, Alex F
> Subject:    RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
>
> << File: Customer PAIB Reserve-091708.xls >>
>
> Hi Chris,
>

STUCCIO_ANTHONY_00010697

> Attached is the condensed summary that you requested.  Please advise
> if this works or you have comments.  We are still working on the 09/19
> numbers as we have just received the reallocated amounts for ADP.
> Please let me know if you have questions.
>
>
> Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>
>
> _____
> From:        O'Meara, Chris M (NY)
> Sent: Sunday, September 21, 2008 5:25 PM
> To:    Lee, Mark; Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; Stucchio, Anthony; Tonucci,
> Paolo
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Team - We need to make some changes to this.  It is not easily clear
> which balances are truly customer related vs which are cushions, such
> as the ADI's.  So, I suggest we show one date of info, broken into 5
> columns, as follows: Cust dr's, cust cr's, net customer balances,
> cushions, total balances.  Can someone do this easily?  At min, make 3
> separate columns: net cust, cushions, total.  Thanks, Chris
>
> _____
> From:        Lee, Mark
> Sent: Sunday, September 21, 2008 5:24 PM
> To:    Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; O'Meara, Chris M (NY);
> Stucchio, Anthony
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> This is coming from Bill and Joel. They have to run the numbers in and
> hence will be may extract info from it but they own the source
>
> Mark
>
> _____
> From:        Kelly, Martin
> Sent: Sunday, September 21, 2008 5:21 PM
> To:    Azerad, Robert; Potenciano, Joel; 'wburke@si.rr.com'; Stucchio,
> Anthony; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Who is the "owner" of the spreadsheet in terms of making updates to
> it?  Received several 9/19 versions already - the most recent at 4.30
> via Mark.
>
>

STUCCIO_ANTHONY_00010697

> _____
> From:          Azerad, Robert
> Sent: Sunday, September 21, 2008 5:16 PM
> To:    Potenciano, Joel; 'wburke@si.rr.com'; Stucchio, Anthony; Kelly,
> Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Any estimate for 9/19? This is what is urgently needed.
>
> _____
> From:          Potenciano, Joel
> Sent: Sunday, September 21, 2008 5:14 PM
> To:    'wburke@si.rr.com'; Azerad, Robert; Stucchio, Anthony; Kelly,
> Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:       Final 15c3-3 Reserve Formula as of 09/17/2008
>
>  << File: Book4.xls >>
>
> Hi All,
>
> Bill requested me to forward the following schedule to this
> distribution.  Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>

STUCCIO_ANTHONY_00010697

**LEHMAN BROTHERS INC.**
**CONSOLIDATED 15c3-3 RESERVE FORMULA**
**AS OF SEPTEMBER 19, 2008**
*(in 000's)*

|  | 09/19/2008 TOTAL |
|---|---|
| **TOTAL CUSTOMER CREDITS ITEMS** | 35,961,972 |
| **TOTAL CUSTOMER DEBITS ITEMS** | 33,859,731 |
| **NET CUSTOMER CREDITS** | 2,102,241 |
| **3% OF AGGREGATE DEBIT ITEMS** (717,880) | 1,015,792 |
| **CUSHION** | - |
| **CUSTOMER LOCK-UP** | 3,118,033 |

STUCCIO_ANTHONY_00010698

DRAFT

**Gemini Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | - | | - | - | - | |
| Stock Record/P&C items | 75,822 | | 75,822 | 86,809 | (10,987) | |
| Overdrafts | - | | - | - | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | 394,926 | (394,926) | (0) | 216,477 | (216,477) | 394 mil of ADI assumes orderly liquidation of open customer fails |
| Sub-total | 879,837 | (394,926) | 484,911 | 504,841 | (19,930) | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,563) | | (2,952,563) a | 481,456 | (3,434,020) | Pending B1 change adjustments related to 941 LBIE admin accounts |
| Net Customer Financing * | 2,419,863 | | 2,419,863 | (831,906) | 3,251,768 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Open customer payments not paid yet from the Bank |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | |
| Non-Broker Dealer Affil. | 210,769 | (210,769) | 0 | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | - | | - | - | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 2,329,550 | | 2,329,550 | 82,685 | 2,246,865 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| 3% ADI | 392,380 | (392,380) | - | 322,692 | (322,692) | 392 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 2,267,855 | (603,149) | 1,664,706 | 204,052 | 1,460,654 | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (125,014) | | (125,014) | 160,575 | (285,589) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | (189,086) | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | - | | - | - | - | |
| 3% ADI | 228,486 | (228,486) | (0) | 178,711 | (178,712) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 370,197 | (417,572) | (47,375) | 606,011 | (653,386) | |
| **Commodities** | | | | | | |
| O/Drafts | 456,716 | (456,716) | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | - | - | 52,000 | (52,000) | |
| Sub-total | 456,716 | (456,716) | - | 228,487 | (228,487) | |
| Requirement | 3,974,605 | (1,872,363) | 2,102,242 | 1,543,392 | 558,850 | |
| Cushion (plus 2% deduction) | 225,608 | (225,608) | - | 225,608 | (225,608) | |
| Amount Segregated | 4,200,213 | (2,097,971) | 2,102,242 | 1,769,000 | 333,242 | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 264,417 | (215,708) | 48,709 b | 325,286 | (276,577) | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 114 | | 114 | 3,560 | (3,446) | |
| Stock Loan | 80,009 | | 80,009 | 312,247 | (232,238) | |
| F/R Vs PAIB Long | 4,073 | | 4,073 | 31,031 | (26,958) | |
| Firm Short vs. PAIB Long | 403,853 | | 403,853 | 394,506 | 9,347 | |
| Stock Borrow * | (442,644) | | (442,644) | (560,229) | 117,585 | |
| Fail to Deliver | (105,904) | | (105,904) | (40,281) | (65,623) | |
| Requirement | 203,918 | | 203,918 | 466,120 | (262,202) | |
| Cushion (plus 2% deduction) | 25,880 | (25,880) | - | 25,880 | (25,880) | |
| Amount Segregated | 229,798 | (241,588) | (11,790) | 492,000 | (503,790) | |
| Total Segregated | 4,430,011 | (2,339,559) | 2,090,452 | 2,261,000 | (170,548) | |

* Denotes account net debit balances.

STUCCIO_ANTHONY_00010699

| | 09/19/08 | | 09/17/08 | | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | 9,032,508 | | 7,995,742 | | 1,036,765 |
| Firm Long vs Cust Short | (281,484) | | (196,453) | | (85,031) |
| Non Cust Long vs. Cust Short | (6,857,319) | | (4,533,257) | | (2,324,062) |
| PAIB Long vs Cust Short | (11,596) | | (15,031) | | 3,435 |
| Reverse Repo vs Cust Short | - | | - | | |
| Cust Long vs Cust Short | | | | | |
| Stock Borrow vs Cust Short | (3,543,186) | | (1,207,278) | | (2,335,908) |
| Fail to Deliver vs Cust Short | (1,291,486) | | (1,562,267) | | 270,781 |
| sub-total | (11,985,071) | (11,985,071) | (7,514,286) | (7,514,286) | (4,470,785) |
| **Total** | | (2,952,563) | | 481,456 | (3,434,020) |
| **Customer Debits** | 8,227,423 | | 8,121,467 | | 105,955 |
| Money Fund Receivable | (310,045) | | (310,045) | | |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (169,152) | | (169,152) | | |
| Security Concentrations | - | | - | | |
| Cust. Long vs.Customer Bank Loan | (181,854) | | (728,814) | | 546,960 |
| Stock Loan vs Cust Long | (2,030,953) | | (1,050,110) | | (980,844) |
| Cust Long vs Cust Short | - | | - | | |
| Fail to Receive vs Cust Long | (1,976,062) | | (2,210,873) | | 234,811 |
| Firm Short vs Customer Long | (5,979,219) | | (2,820,568) | | (3,158,651) |
| sub-total | (10,647,285) | (10,647,285) | (7,289,562) | (7,289,562) | (3,357,724) |
| **Total** | | (2,419,863) | | 831,906 | (3,251,768) |
| Plus: | | | | | |
| Stock Borrow / SB Q vs. Firm Bank Loan | - | | - | | - |
| Stock Borrow vs. Cust Bank Loan | - | | - | | - |
| **Net Cust Dr./Cr.** | | (532,701) | | (350,449) | (182,251) |

STUCCIO_ANTHONY_00010699

COPY PASTE FROM RESERVE FILE

**15c3-3 CUSTOMER RESERVE COMPUTATION**
**BROKER DEALER UNIT**
*09/19/08*
*(in 000'S)*

| | 09/19/08 |
|---|---:|
| **1.** **CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 723,468 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 222,207 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 1,470,785 |
| FIRM LONG VS. CUSTOMER SHORT | (281,484) |
| NONCUST LONG VS. CUSTOMER SHORT | (6,857,319) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (11,596) |
| SHORT & CREDIT INTEREST | 23,658 |
| MONEY FUND SETTLEMENTS 098-00003 & 098-70001 | 477 |
| UNALLOCATED CUSTOMER SHORT | 832,372 |
| | |
| TOTAL CUSTOMER CREDITS | 4,644,635 |
| | |
| **2.** **CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 181,854 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 181,854 |
| | |
| **3.** **CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 14,343,512 |
| STOCK LOAN MTM | (3,431,134) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 2,090,952 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L-C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L-C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,009) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (247,637) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,255) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,030,953 |

STUCCIO_ANTHONY_00010699

| | | |
|---|---|---:|
| 4. | **CUSTOMER FAIL TO RECEIVE:** | |
| | *FAIL TO RECEIVE* | 5,318,473 |
| | *CNS FAIL TO RECEIVE* | 99,743 |
| | *MISC FAIL TO RECEIVE ADJUSTMENTS* | - |
| | *OMNI FAIL TO RECEIVE ADJUSTMENTS* | - |
| | *FAIL TO RECEIVE MTM ADJUSTMENT* | - |
| | *FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND* | 117,755 |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER* | (225,367) |
| | *FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *FAIL TO RECEIVE VS. MTM DEFICIT* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW* | (488,042) |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q* | (23,607) |
| | *FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *FAIL TO RECEIVE VS. STOCK BORROW L C* | - |
| | *FAIL TO RECEIVE VS. FAIL TO DELIVER CNS* | (25,903) |
| | *FAIL TO RECEIVE VS. FIRM LONG* | (1,046,635) |
| | *FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (1,661,289) |
| | *FAIL TO RECEIVE VS. PAIB LONG* | (4,066) |
| | *FAIL TO RECEIVE VS. UNALLOCATED / BREAK* | - |
| | *CNS FAIL TO RECEIVE VS. FIRM LONG* | (55,709) |
| | *CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG* | (12,668) |
| | *CNS FAIL TO RECEIVE VS. PAIB LONG* | (7) |
| | *CNS FAIL TO RECEIVE ADJUSTMENT* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW* | (15,106) |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q* | (23) |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ* | - |
| | *CNS FAIL TO RECEIVE VS. STOCK BORROW L C* | - |
| | *CNS FAIL TO RECEIVE VS. REVERSE REPO* | - |
| | *CNS FAIL TO RECEIVE VS. FAIL TO DELIVER* | (1,487) |
| | | |
| | *TOTAL CUSTOMER FAIL TO RECEIVE* | **1,976,062** |
| | | |
| 5. | **FIRM SHORT VS CUSTOMER LONG:** | |
| | *TOTAL FIRM SHORT* | - |
| | *FIRM OMNI SHORT* | - |
| | *FIRM SHORT VS. CUSTOMER LONG* | 137,078 |
| | *NONCUSTOMER SHORT VS. CUSTOMER LONG* | 3,447,193 |
| | *REPO VS. CUSTOMER LONG* | 419,376 |
| | *PAIB SHORT VS. CUSTOMER LONG* | 122,322 |
| | *REPO VS. UNALLOCATED* | 31,101 |
| | *FIRM SHORT VS. UNALLOCATED* | 291,784 |
| | *NONCUSTOMER SHORT VS. UNALLOCATED* | 1,530,365 |
| | | |
| | *TOTAL FIRM SHORT VS. CUSTOMER LONG* | **5,979,219** |
| | | |
| 6. | **CUSTOMER DIVIDEND & INTEREST:** | |
| | *DIVIDEND & INT PAYABLES* | 28,907 |
| | *ADJUSTMENTS FROM DIVIDEND DEPT.* | (23,584) |
| | | |
| | *TOTAL CUSTOMER DIVIDENDS & INTEREST* | **5,322** |
| | | |
| 7. | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| 8. | **SUSPENSE ACCOUNTS** | |
| | *SUSPENSE CREDITS & SMV:* | 39,897 |
| | *CUSTOMER UNAPPLIED 090-01234* | 11,553 |
| | *ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES* | 85,319 |
| | | |
| | *TOTAL SUSPENSE ACCOUNTS* | **136,769** |
| | | |
| 9. | **AGED TRANSFERS & REORGANIZATION:** | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG REDEMPTION SMV OVER 7 DAYS* | - |
| | | |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| 10. | **OTHER:** | |
| | *OTHER CREDITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL CREDITS* | **14,954,815** |

STUCCIO_ANTHONY_00010699

| 12. | CUSTOMER DEBITS: | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,492,635 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | (310,045) |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,748,226 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---:|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
| | STOCK BORROW VS. THE BOX | (248,630) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (15,106) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (23) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | - |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (120,979) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (442,429) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (18,115) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (1,005) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

STUCCIO_ANTHONY_00010699

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (225,367) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (1,487) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,487) |
| | FAIL TO DELIVER VS. REPO | (440,321) |
| | FAIL TO DELIVER VS. THE BOX | (1,086,414) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (1,423,845) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (296,830) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (665,286) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,417) |
| | CNS FAIL TO DELIVER VS. THE BOX | (263,511) |
| | CNS FAIL TO DELIVER VS. REPO | (96,672) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,877) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (25,903) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | 1,291,486 |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 507,418 |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 13,079,340 |
| 18. | LESS 3% | (392,380) |
| 19. | TOTAL 15C3-3 DEBITS | 12,686,960 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | (2,267,855) |

STUCCIO_ANTHONY_00010699

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

| | 09/19/08 |
|---|---|
| *CUSTOMER CREDITS:* | |
| *Customer Accounts* | 4,390,448 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 456,716 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 5,113,889 |
| | |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 2,395,768 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 738 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 683,637 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,590 |
| *SUSPENSE CREDITS* | 0 |
| | |
| **TOTAL CREDITS** | 8,214,622 |
| | |
| *CUSTOMER DEBITS:* | |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
| | |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| | |
| *CUSTOMER STOCK BORROW* | 848,446 |
| *CUSTOMER FAIL TO DELIVER* | 1,829,002 |
| *AGGREGATE DEBITS* | 7,616,195 |
| *Less 3%* | 228,486 |
| *TOTAL DEBITS* | 7,387,709 |
| | |
| *EXCESS CREDITS OVER DEBITS* | 826,913 |

STUCCIO_ANTHONY_00010699

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS                09:19:03

CREDITS

| Code | Description | | |
|---|---|---|---|
| #47 | (1") CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #62 | (19) B/Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F/D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F/D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY. REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST F/D VS (10) TRI PARTY REPO | 0 | 0 |
| #95 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F/D~30  VS (16) PLEDGED VS BOR. | 0 | 0 |
| #157 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG  VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST. F/D > 30 DAYS VS (18) NON CUST. F/R | 61,160 | 61 |
| #150 | (1") CUST LONG F/D  VS (18) NON CUST (F/R) | 0 | |
| #151 | (19) B/R DEALER LONG FREE VS (18) NON CUST (F/R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F/R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F/R | 0 | 0 |
| #163 | (1") CUST LONG F VS (28) NET SHORT CLR | 0 | |
| #176 | (11) NON CUST F/D~30 VS (22) CUST SHRT(F/R) | 283,949 | 284 |
| #194 | (15) CUST. LONG F  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 22,806,745 | 22,807 |
| #180 | (19) B/R DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F/R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F/R) | 0 | 0 |
| #192 | (11) NONCUST F/D V S (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG  VS (24)  OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F/D~30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (34) AFFILIATE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F/R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28) CUST NET CL | 0 | 0 |
| #287 | (33) BREAK (18) F/R | 0 | 0 |
| #289C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,717,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (1") NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE  VS (38) INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) B/R DEALER LONG FREE VS (38) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (38) INACTIVE SHRT | 0 | 0 |
| #344 | (23) CUST LONG VS (38) INACTIVE SHRT | 0 | 0 |
| #346 | (2") NON BROKER DEALER (19) VS (38) INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (38) INACTIVE SHRT | 0 | 0 |
| #348 | (34) OPER.LONG F (38) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (38) INACTIVE SHRT | 175,819 | 176 |
| #337 | (9) NON CUST F/D  VS (38) INACTIVE SHORT | 0 | 0 |
| #586 | (5) BVF VS (46) SPECIAL FINANCE | 0 | 0 |
| #388 | (1") CUST LONG FREE VS (46) SPECIAL FINANCE | 530,685 | 531 |
| #593 | (19) BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #595 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L6NG (46) SPECIAL FIN.. | 0 | 0 |
| #419 | (33) BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #438 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 603,494 | 603 |
| #438 | (35) SPEC FIN CUST SHT VS (38) INACTIVE SHORT | 0 | 0 |
| #443 | (3') FIN. LDGR TR VS (9) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,936 A | 4,250 |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258 R-2 | 275,298 |
| | SCS CASH | 38,194,286 R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651 R-2 | 7,130 |
| MONEY | BANK OVERDRAFTS | 0 R-3 | 0 |
| ONLY | SUSPENSE - BANK REC. DIFFERENCES | 936,385 R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,967 R-3 | 60,078 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857,875 R-5 | 22,858 |
| | | 404,494,223 | 304,926 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 394,925,368 | 304,926 |

DEBIT

| Code | Description | | |
|---|---|---|---|
| #225 | (9) NON CUST F/D  VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (15) NET LONG CLE   VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F/D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |

| EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS | 879,837,430 | 879,837 |

STUCCIO_ANTHONY_00010699

1,115

(2,289)
(507)
(73,949)

0

STUCCIO_ANTHONY_00010699

*T3C3-3 P.A.I.B. COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | 2,235,573 |
| | *BREAK VS. PAIB LONG* | 99,471 |
| | *PAIB CREDIT ADJ* | (8,000) |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| | *PAIB LONG VS CUSTOMER SHORT* | 11,596 |
| | *FIRM LONG vs PAIB SHORT* | (21,967) |
| | *NONCUST LONG VS. PAIB SHORT* | (162,586) |
| | *UNALLOCATED PAIB SHORT* | - |
| | *PAIB SHORT VS CUSTOMER LONG* | (122,322) |
| | | |
| | *P.A.I.B. CREDITS:* | 2,043,423 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | - |
| | *OCC MARGIN DEFECIT* | - |
| | *PAIB LONG VS. FIRM BANK LOAN* | - |
| | *PAIB LONG VS. CUST BANK LOAN* | 114 |
| | *PAIB LONG VS. PAIB BANK LOAN* | - |
| | *PAIB BANK LOAN - PAIB NOT LONG* | - |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | 114 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | - |
| | *STOCK LN PLDG VS. PAIB LONG* | 80,009 |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | 80,009 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | 4,066 |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | 7 |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 4,073 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | 47,883 |
| | *NONCUST SHORT VS. PAIB LONG* | 344,571 |
| | *FIRM SHORT VS PAIB LONG* | 11,399 |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 403,853 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES > 7 DAYS* | - |

STUCCIO_ANTHONY_00010699

*TOTAL DIFFERENCES & INTERBOOK*

| | | |
|---|---|---|
| **7.** | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| **8.** | **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| | | |
| **9.** | **AGED TRANSFERS & REORGANIZATION:** | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| **10.** | **OTHER:** | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL PAIB CREDITS* | 2,531,472 |

STUCCIO_ANTHONY_00010699

| 12. | P.A.I.B. DEBITS | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |

| 13. | PAIB STOCK BORROW: | |
|---|---|---:|
| | | |
| | STOCK BORROW VS PAIB SHORT | 442,429 |
| | STOCK BORROW Q. VS. PAIB SHORT | 215 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 442,644 |

| 14. | PAIB FAIL TO DELIVER: | |
|---|---|---:|
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,487 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,417 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 105,904 |

| 15. | PAIB MARGIN WITH OCC | |
|---|---|---:|
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |

| 16. | OTHER | |
|---|---|---:|
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | TOTAL PAIB DEBITS | 2,327,555 |
|---|---|---:|

| 20. | EXCESS - DEBITS OVER CREDITS | - |
|---|---|---:|

| 21. | DEFICIT - CREDITS OVER DEBITS | 203,918 |
|---|---|---:|

STUCCIO_ANTHONY_00010699

STUCCIO_ANTHONY_00010699

# EXHIBIT 19

| | |
|---|---|
| **To:** | Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **From:** | Azerad, Robert [RAzerad@lehman.com] |
| **Sent:** | Mon 9/22/2008 1:17:39 AM |
| **Subject:** | FW: 15c3 0919 Preliminary V6.xls |

<u>15c3 0919 Preliminary V6.xls</u>

> _____

> From:       Azerad, Robert
> Sent: Sunday, September 21, 2008 9:17 PM
> To:    O'Meara, Chris M (NY); Kelly, Martin
> Subject:       15c3 0919 Preliminary V6.xls
>
>  <<15c3 0919 Preliminary V6.xls>>

FINAL

Lehman Brothers Inc.
Customer/PAIB Reserve Analysis

| Customer: | Preliminary 09/19/2008 | Pending Adjustments | Preliminary Adjusted 09/19/2008 | Client Requirements 09/19/2008 | Cushion 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | | |
| Free Credits | 275,298 | | 275,298 | 275,298 | | 77,216 | 198,082 | Net settlement for DVP (Govies+Agencies) |
| SCS Cash | 38,194 | | 38,194 | 38,194 | | 46,462 | (8,268) | SCS and Prime Broker balances |
| Option Margin | 7,130 | | 7,130 | 7,130 | | 15,824 | (8,694) | Cash that clients would provide re: option margin |
| P & I | 22,858 | | 22,858 | 22,858 | | 22,858 | | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 4,595 | | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | | | | | | | | Items where we have a break (stock records)/customer collateral used to finance the Firm |
| Stock Record/P&C items | 75,822 | | 75,822 | 75,822 | | 86,809 | (10,987) | |
| Overdrafts | | | | | | | | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 61,014 | | 31,677 | 29,337 | Client cash that cannot be applied on day 1 |
| 3% ADI | 394,926 | | 394,926 | | 394,926 | 216,477 | 178,449 | |
| Sub-total | 879,837 | - | 879,837 | 484,912 | 394,926 | 504,841 | 374,996 | |
| **ADP** | | | | | | | | |
| Free Credits / Margin | (2,952,563) | | (2,952,563) | (2,952,563) | | 481,456 | (3,434,020) | Retail client system |
| Net Customer Financing * | 2,419,863 | | 2,419,863 | 2,419,863 | | (831,906) | 3,251,768 | Debits - offset by the next line |
| OMNI Conversion Payable | | | | | | | | Offsetting the previous line |
| O/Drafts | 222,207 | | 222,207 | 222,207 | | 62,604 | 159,603 | Worst case scenario (overdrafts in accounts to pay customers) |
| Dividends | 5,322 | | 5,322 | 5,322 | | 5,322 | | Aged dividends |
| S/B L.O.C. vs. Customer Short | - | | - | - | | | | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 10,976 | | 5,287 | 5,689 | Borrow on an equity swap / non-qualified should be $10-20 mln after cleaning up numbers |
| Non-Broker Dealer Affil. | 0 | | 0 | 0 | | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (507,418) | | (349,858) | (157,560) | Firm buys Treasuries for customer margin at OCC |
| Firm Bank Loan - Firm Not Long | | | | | | | | |
| Suspense | 39,897 | | 39,897 | 39,897 | | 39,897 | | |
| Unapplied Cash | 11,553 | | 11,553 | 11,553 | | 10,121 | 1,432 | See MTS |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,319 | | 85,212 | 107 | |
| Other | 2,329,550 | (2,200,000) | 129,550 | 129,550 | | 82,685 | 46,865 | End of week situation => should be $80 mln |
| 3% ADI | 392,380 | | 392,380 | | 392,380 | 322,692 | 69,688 | Standard "penalty" |
| Sub-total | 2,057,086 | (2,200,000) | (142,914) | (535,294) | 392,380 | 204,052 | (346,966) | |
| **ITS** | | | | | | | | |
| Free Credits (primarily SCS cash) | | | - | | | 160,575 | (160,575) | Prime Broker Business (primarily Europe) |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | | 77,639 | | Brady warrants; should probably stay behind |
| Securities Related IC Payable (Mostly ITS) | - | | - | | | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | | | | | | | |
| 3% ADI | 50,000 | | 50,000 | | 50,000 | 178,711 | (128,711) | |
| Sub-total | 127,639 | - | 127,639 | 77,639 | 50,000 | 606,011 | (478,372) | Should disappear except Brady warrants |
| **Commodities** | | | | | | | | |
| O/Drafts | - | | - | | | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | | | 52,000 | (52,000) | Not a security business => SEC is OK with taking out business |
| Sub-total | - | | - | | | 228,487 | (228,487) | |
| Requirement | 3,064,563 | (2,200,000) | 864,563 | 27,257 | 837,306 | 1,543,392 | (678,829) | |
| Cushion (plus 2% deduction) | 225,608 | | 225,608 | | 225,608 | 225,608 | | SEC says that is not required |
| Amount Segregated | 3,290,171 | (2,200,000) | 1,090,171 | 27,257 | 1,062,914 | 1,769,000 | (678,829) | |
| **PAIB:** | | | | | | | | Staying behind; relates to LOTC (trading derivatives; hedging with cash instruments) |
| Net PAIB Debits/Credits | 426,991 | | 426,991 | 426,991 | | 325,286 | 101,705 | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 6 | | 6 | 6 | | 3,560 | (3,554) | |
| Stock Loan | 124,856 | | 124,856 | 124,856 | | 312,247 | (187,391) | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 33,102 | | 31,031 | 2,071 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 68,691 | | 394,506 | (325,815) | |
| Stock Borrow * | (450,967) | | (450,967) | (450,967) | | (560,229) | 109,262 | |
| Fail to Deliver | (106,395) | | (106,395) | (106,395) | | (40,281) | (66,114) | |
| Requirement | 96,284 | - | 96,284 | 96,284 | | 465,120 | (369,836) | |
| Cushion (plus 2% deduction) | 25,880 | | 25,880 | | 25,880 | 25,880 | | |
| Amount Segregated | 122,164 | - | 122,164 | 96,284 | 25,880 | 492,000 | (369,836) | Reduction driven by reduction in LOTC business |
| Total Segregated | 3,412,335 | (2,200,000) | 1,212,335 | 123,541 | 1,088,794 | 2,261,000 | (1,048,665) | |

EXHIBIT 20

| | |
|---|---|
| **To:** | Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **From:** | Azerad, Robert [RAzerad@lehman.com] |
| **Sent:** | Mon 9/22/2008 11:00:00 PM |
| **Subject:** | 15c3 update |

**Res.Driver 091908.xls**

> _____
> From:        Potenciano, Joel
> Sent: Monday, September 22, 2008 6:07 PM
> To:    Azerad, Robert
> Cc:    Burke, William T; Stucchio, Anthony
> Subject:       Res.Driver 091908.xls
>
>  <<Res.Driver 091908.xls>>
>
> Robert,
>
> Attached is the Schedule as of 5 pm today.  We are still going thru
> the remaining breaks.  Thanks!
>
> Joel

TONUCCI_PAOLO_00011177

DRAFT   as of 4:30 pm

Lehman Brothers Inc.
Customer/PAIB Reserve Analysis

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | Waiting from Stephen Cody's area for clean-ups on the $2 billion AP amounts that is not factored in the $275. |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | ok |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | ok |
| P & I | 22,187 | | 22,187 | 22,858 | (671) | ok |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | ok |
| Customer Receivable Versus Box  * | - | | - | - | - | |
| Stock Record/P&C items | 76,152 | | 76,152 | 86,809 | (10,657) | ok |
| Overdrafts | 3,231 | | 3,231 | - | 3,231 | Waiting for Dan Fleming confirmation regarding $3.5 bil EBOC overdrafts that is secured by a loan |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | ok |
| 3% ADI | 394,926 | | 394,926 | 216,477 | 178,449 | ok |
| Sub-total | 882,727 | - | 882,727 | 504,841 | 377,886 | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,752) | | (2,952,752) a | 481,456 | (3,434,208) | Remaining Breaks and Unallocated of $320 mil still being investigated |
| Net Customer Financing  * | 1,660,152 | | 1,660,152 | (831,906) | 2,492,058 | Remaining Breaks and Unallocated of $320 mil still being investigated |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Waiting for confirmation from Dan Fleming and Craig Jones regarding a book overdraft of $1.9 bil ADP account 011-10042. |
| Dividends | 5,322 | | 5,322 | 5,322 | - | ok |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | ok |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | (79,770) | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | - | | - | - | - | |
| Suspense | 41,638 | | 41,638 | 39,897 | 1,741 | ok |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | ok |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | ok |
| Other | 115,894 | | 115,894 | 82,685 | 33,210 | ok |
| 3% ADI | 399,458 | | 399,458 | 322,692 | 76,766 | ok |
| Sub-total | (696,881) | - | (696,881) | 204,052 | (900,933) | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (124,665) | | (124,665) | 160,575 | (285,240) | ok |
| Unsecured Shorts | 77,049 | | 77,049 | 77,639 | (590) | ok |
| Securities Related IC Payable (Mostly ITS) | 189,227 | | 189,227 | 189,086 | 141 | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| Other | - | | - | - | - | |
| 3% ADI | 228,486 | | 228,486 | 178,711 | 49,774 | |
| Sub-total | 370,097 | - | 370,097 | 606,011 | (235,914) | |
| **Commodities** | | | | | | |
| O/Drafts | - | | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | Pulled out cushion |
| Sub-total | - | | - | 228,487 | (228,487) | |
| Requirement | 555,944 | | 555,944 | 1,543,392 | (987,448) | |
| Cushion (plus 2% deduction) | - | | - | 225,608 | (225,608) | |
| Amount Segregated | 555,944 | - | 555,944 | 1,769,000 | (1,213,056) | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 253,918 | | 253,918 b | 325,286 | (71,368) | Investigating items related PAIB long and PAIB short amounting to $100 mil |
| Bank Loan | 114 | | 114 | 3,560 | (3,446) | |
| Stock Loan | 80,009 | | 80,009 | 312,247 | (232,238) | |
| F/R Vs PAIB Long | 4,073 | | 4,073 | 31,031 | (26,958) | |
| Firm Short vs. PAIB Long | 403,853 | | 403,853 | 394,506 | 9,347 | |
| Stock Borrow  * | (442,644) | | (442,644) | (560,229) | 117,585 | |
| Fail to Deliver | (105,904) | | (105,904) | (40,281) | (65,623) | |
| Requirement | 193,419 | | 193,419 | 466,120 | (272,701) | |
| Cushion (plus 2% deduction) | - | | - | 25,880 | (25,880) | |
| Amount Segregated | 193,419 | - | 193,419 | 492,000 | (298,581) | |
| Total Segregated | 749,362 | - | 749,362 | 2,261,000 | (1,511,638) | |

* Denotes account net debit balances.

TONUCCI_PAOLO_00011178

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | 9,032,320 |  | 7,995,742 |  | 1,036,578 |
|  |  |  |  |  |  |
| Firm Long vs Cust Short | (281,484) |  | (196,453) |  | (85,031) |
| Non Cust Long vs. Cust Short | (6,857,319) |  | (4,533,257) |  | (2,324,062) |
| PAIB Long vs Cust Short | (11,596) |  | (15,031) |  | 3,435 |
| Reverse Repo vs Cust Short | - |  | - |  |  |
| Cust Long vs Cust Short |  |  |  |  |  |
| Stock Borrow vs Cust Short | (3,543,186) |  | (1,207,278) |  | (2,335,908) |
| Fail to Deliver vs Cust Short | (1,291,487) |  | (1,562,267) |  | 270,780 |
| sub-total | (11,985,072) | (11,985,072) | (7,514,286) | (7,514,286) | (4,470,786) |
|  |  |  |  |  |  |
| **Total** |  | (2,952,752) |  | 481,456 | (3,434,208) |
|  |  |  |  |  |  |
| **Customer Debits** | 8,227,423 |  | 8,121,467 |  | 105,955 |
|  |  |  |  |  |  |
| Money Fund Receivable | (81,568) |  | (310,045) |  | 228,477 |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (161,709) |  | (169,152) |  | 7,443 |
| Security Concentrations |  |  |  |  |  |
| Cust. Long vs.Customer Bank Loan | (181,854) |  | (728,814) |  | 546,960 |
| Stock Loan vs Cust Long | (2,030,953) |  | (1,050,110) |  | (980,843) |
| Cust Long vs Cust Short |  |  |  |  |  |
| Fail to Receive vs Cust Long | (1,865,215) |  | (2,210,873) |  | 345,659 |
| Firm Short vs Customer Long | (5,566,276) |  | (2,820,568) |  | (2,745,708) |
| sub-total | (9,887,575) | (9,887,575) | (7,289,562) | (7,289,562) | (2,598,013) |
|  |  |  |  |  |  |
| **Total** |  | (1,660,152) |  | 831,906 | (2,492,058) |
|  |  |  |  |  |  |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - |  |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - |  |
|  |  |  |  |  |  |
| **Net Cust Dr./Cr.** |  | (1,292,600) |  | (350,449) | (942,151) |

TONUCCI_PAOLO_00011178

COPY PASTE FROM RESERVE FILE

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

| | 09/19/08 |
|---|---:|
| 1. *CUSTOMER CREDITS:* | |
| *CUSTOMER SECURITY ACCOUNTS* | 8,523,574 |
| *CUSTOMER ADJUSTMENTS* | 723,468 |
| *UNMAPPED CUSTOMER PAYABLE* | 80 |
| *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| *CUSTOMER NETTING NB* | (77,250) |
| *MONEY CONTROL ADJUSTMENTS* | - |
| *NON-BROKER DEALER AFFILIATES TYPE 5* | 290 |
| *BOOKKEEPING ADJUSTMENTS* | - |
| *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
| *BANK OVERDRAFTS* | 222,207 |
| *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
| *HOUSE ACCOUNTS* | 2,525 |
| *TEFRA WITHHOLDING PAYABLE* | 95 |
| *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
| *BREAK VS. CUSTOMER LONG* | 84,788 |
| *FIRM LONG VS. CUSTOMER SHORT* | (281,484) |
| *NONCUST LONG VS. CUSTOMER SHORT* | (6,857,319) |
| *REVERSE REPO VS. CUSTOMER SHORT* | - |
| *PAIB LONG VS. CUSTOMER SHORT* | (11,596) |
| *SHORT & CREDIT INTEREST* | 28,371 |
| *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | 290 |
| *UNALLOCATED CUSTOMER SHORT* | - |
| | |
| *TOTAL CUSTOMER CREDITS* | 2,430,791 |
| | |
| 2. *CUSTOMER BANK LOAN:* | |
| *OCC MARGIN* | - |
| *OCC MARGIN DEFICIT* | - |
| *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
| *STOCK BORROW VS. CUST BANK LOAN* | - |
| *STOCK BORROW VS. FIRM BANK LOAN* | - |
| *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
| *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
| *STOCK BORROW L C VS FIRM BANK LOAN* | - |
| *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
| *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
| *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 181,854 |
| *CUST BANK LOAN - CUST NOT LONG* | - |
| *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
| *FIRM BANK LOAN - FIRM NOT LONG* | - |
| | |
| *TOTAL CUSTOMER BANK LOAN* | 181,854 |
| | |
| 3. *CUSTOMER STOCK LOAN:* | |
| *STOCK LOAN* | 8,421,983 |
| *STOCK LOAN MTM* | (642,717) |
| *STOCK LOAN WITH CLEARING ORG* | - |
| *STOCK LOAN FREE OF MONEY* | 5,224,063 |
| *STOCK LOAN MTM DEFICIT* | 468 |
| *STOCK LOAN BOB ADJUSTMENT* | - |
| *UNALLOCATED STOCK LOAN ADJ* | - |
| *STOCK LOAN VS. STOCK BORROW L C* | - |
| *STOCK LOAN PLEDGE VS. STOCK BORROW L C* | - |
| *STOCK LOAN VS. REVERSE REPO* | - |
| *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
| *STOCK LOAN VS. PAIB LONG* | - |
| *STOCK LOAN PLEDGE VS. PAIB LONG* | (80,009) |
| *STOCK LOAN VS. STOCK BORROW* | (9,344,291) |
| *STOCK LOAN VS. STOCK BORROW PLEDGE Q* | (21,386) |
| *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | (7,499) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW* | (256,503) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q* | (9,644) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | (28,422) |
| *STOCK LOAN VS. NONCUSTOMER LONG* | (247,637) |
| *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | (461,255) |
| *STOCK LOAN VS. FIRM LONG* | (181,875) |
| *STOCK LOAN PLEDGE VS. FIRM LONG* | (334,323) |
| | |
| *TOTAL CUSTOMER STOCK LOAN* | 2,030,953 |

TONUCCI_PAOLO_00011178

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 6,907 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (225,367) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,865,215 |
| | | |
| 5. | FIRM SHORT VS CUSTOMER LONG | |
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 1,805,374 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 31,101 |
| | FIRM SHORT VS. UNALLOCATED | 5,230 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 17,978 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,566,276 |
| | | |
| 6. | CUSTOMER DIVIDEND & INTEREST: | |
| | DIVIDEND & INT PAYABLES | 26,684 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (21,362) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| | | |
| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
| | | |
| 8. | SUSPENSE ACCOUNTS | |
| | SUSPENSE CREDITS & SMV: | 41,638 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 138,510 |
| | | |
| 9. | AGED TRANSFERS & REORGANIZATION: | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| 10. | OTHER: | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 12,218,921 |

TONUCCI_PAOLO_00011178

| 12. | CUSTOMER DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,492,635 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - |
| | MONEY FUND RECEIVABLE | (81,568) |
| | MARGIN INTEREST | 41,227 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,984,145 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | (5,909,361) |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | 8,438,386 |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
| | STOCK BORROW VS. THE BOX | (269,782) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (15,106) |
| | STOCK BORROW PLEDGE Q. VS. F R CNS | (23) |
| | STOCK BORROW PLEDGE NQ VS. F R CNS | - |
| | STOCK BORROW L C VS. F R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (99,827) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (442,429) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | 18,115 |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (1,005) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

TONUCCI_PAOLO_00011178

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | 1,798,941 |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (225,367) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (1,487) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (742,968) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,487) |
| | FAIL TO DELIVER VS. REPO | (440,321) |
| | FAIL TO DELIVER VS. THE BOX | (1,107,188) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (2,936,233) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (276,055) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (665,286) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,417) |
| | CNS FAIL TO DELIVER VS. THE BOX | (264,016) |
| | CNS FAIL TO DELIVER VS. REPO | (96,672) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,371) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (25,903) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | 1,291,487 |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 507,418 |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 13,315,260 |
| 18. | LESS 3% | (399,458) |
| 19. | TOTAL 15C3-3 DEBITS | 12,915,802 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | 696,881 |
| 21. | DEFICIT - CREDITS OVER DEBITS | 0 |

TONUCCI_PAOLO_00011178

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** | |
| *Customer Accounts* | 4,390,797 |
| *Securities Related Intercompany Payables* | 189,227 |
| *ITS Unsecured Shorts* | 77,049 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 0 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 4,657,073 |
| | |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,395,768 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,590 |
| **SUSPENSE CREDITS** | 0 |
| | |
| **TOTAL CREDITS** | 7,757,806 |
| | |
| | |
| **CUSTOMER DEBITS:** | |
| *Customer Accounts* | 4,938,747 |
| **OMNI Rec Formula** | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
| | |
| **CUSTOMER MARGIN WITH OCC** | 0 |
| | |
| **CUSTOMER STOCK BORROW** | 848,446 |
| **CUSTOMER FAIL TO DELIVER** | 1,829,002 |
| **AGGREGATE DEBITS** | 7,616,195 |
| *Less 3%* | 228,486 |
| **TOTAL DEBITS** | 7,387,709 |
| | |
| **EXCESS CREDITS OVER DEBITS** | 370,097 |

TONUCCI_PAOLO_00011178

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS

CREDIT

| | | | |
|---|---|---|---|
| #47 | (1") CUST F D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (2) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F D (6) REPO | 0 | 0 |
| #63 | (19) BR Dealer Long Free vs (6) Repos | 0 | 0 |
| #64 | (2) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F D VS (6) REPO | 0 | 0 |
| #79 | (2) OPER. ACCTS (6) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (6) HIC REPO | 0 | 0 |
| #91 | (1") CUST LONG F D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (2) OPERATIONAL VS (10) TRI PARTY REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F D VS (10) TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F D- 30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST F/D = 30 DAYS VS (18) NON CUST F/R | 61,169 | 61 |
| #150 | (1") CUST LONG F  VS (18) NON CUST (F R) | 0 | 0 |
| #151 | (19) B R DEALER LONG FREE VS (18) NON CUST (F R) | 0 | 0 |
| #152 | (2) OPER. ACCTS. VS (18) NON CUST (F R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F D- 30 VS (22) CUST SHRT(F R) | 283,919 | 284 |
| #194 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F R) | 22,806,705 | 22,807 |
| #180 | (19) BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (2)CUST SHORT(F R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F R) | 0 | 0 |
| #192 | (11) NONCUST FD V S (24) OPER SHORT | 0 | 0 |
| #197 | (2) OPER ACCTS LNG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG  VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D= 30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #213 | (2) OPER. ACCCTS LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (51) AFFILIATE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS VBOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,718,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (3) NET LONG  CLE(38) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE VS (38)INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR DEALER LONG FREE VS (38)INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #344 | (2)CUST LONG (19) VS (38)INACTIVE SHRT | 330,030 | 330 |
| #346 | (2") NON-BROKER DEALER (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (38)INACTIVE SHRT | 0 | 0 |
| #348 | (51) OPER.LONG F (38) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (38)INACTIVE SHRT | 175,819 | 176 |
| #337 | (9) NON CUST F D (38) INACTIVE SHORT | 0 | 0 |
| #386 | (5) BVF VS (46) SPECIAL FINANCE | 0 | 0 |
| #392 | (1")CUST LONG FREE VS (46)SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19)BR DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (2) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (01)SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L8NG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33)BOX BREAKS LAW (45) FIN LDGR TRF. | 0 | 0 |
| #433 | (5)SPEC FIN CUST LONG VS (26) AFFIL SHORT | 603,494 | 603 |
| #438 | (5)SPEC FIN CUST SHT VS (38) INACTIVE SHORT | 0 | 0 |
| #443 | (3") FIN. LDGR TR VS (5) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,986:A | 4,250 |
| | STOCK RECORD BREAK | 0:B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258:R-2 | 275,298 |
| | SCS CASH | 38,194,246:R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651:R-2 | 7,130 |
| MONEY | BANK OVERDRAFTS | 3,230,828:R-3 | 3,231 |
| ONLY | SUSPENSE - BANK REC. DIFFERENCES | 936,385:R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,90":R-3 | 60,078 |
| | P&I PAYABLES CANADA | 0:E-5 | 0 |
| | P&I PAYABLES | 40",054,152 | 22,186.9":E-5 | 22,187 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 394,925,868 | 394,926 |

DEBIT

| | | | |
|---|---|---|---|
| #225 | (9) NON CUST F D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #269 | (15) NET LONG CLE  VS (34) BOX | 0 | 0 |
| #270C | (15) CUST F D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #357 | (15) CUST F D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |
| | | | 0 |

| EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS | | 882,727,289 | 882,727 |

TONUCCI_PAOLO_00011178

1,115

(2,289)
(507)
(73,949)

0

TONUCCI_PAOLO_00011178

FSCS-3 P.A.I.B COMPUTATION
BROKER DEALER UNIT
09/19/08
(in OOO'S)

|  |  | 09/19/08 |
|---|---|---|
| **1.** | **P.A.I.B. CREDITS:** |  |
|  | *PAIB CREDITS* | 2,235,573 |
|  | *BREAK VS. PAIB LONG* | 99,471 |
|  | *PAIB CREDIT ADJ* | (8,000) |
|  | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
|  | *PAIB LONG VS CUSTOMER SHORT* | 11,596 |
|  | *FIRM LONG vs PAIB SHORT* | (21,967) |
|  | *NONCUST LONG VS. PAIB SHORT* | (173,085) |
|  | *UNALLOCATED PAIB SHORT* | - |
|  | *PAIB SHORT VS CUSTOMER LONG* | (122,322) |
|  |  |  |
|  | *P.A.I.B. CREDITS:* | 2,032,924 |
|  |  |  |
| **2.** | **PAIB BANK LOAN:** |  |
|  |  |  |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFECIT* | - |
|  | *PAIB LONG VS. FIRM BANK LOAN* | - |
|  | *PAIB LONG VS. CUST BANK LOAN* | 114 |
|  | *PAIB LONG VS. PAIB BANK LOAN* | - |
|  | *PAIB BANK LOAN - PAIB NOT LONG* | - |
|  | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
|  |  |  |
|  | *TOTAL P.A.I.B. BANK LOAN* | 114 |
|  |  |  |
| **3.** | **PAIB STOCK LOAN:** |  |
|  |  |  |
|  | *STOCK LOAN VS PAIB LONG* | - |
|  | *STOCK LN PLDG VS. PAIB LONG* | 80,009 |
|  |  |  |
|  | *TOTAL CUSTOMER STOCK LOAN* | 80,009 |
| **4.** | **PAIB FAIL TO RECEIVE:** |  |
|  |  |  |
|  | *FAIL TO RECEIVE VS PAIB LONG* | 4,066 |
|  | *CNS FAIL TO RECEIVE VS PAIB LONG* | 7 |
|  |  |  |
|  | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 4,073 |
|  |  |  |
| **5.** | **FIRM SHORT VS PAIB LONG:** |  |
|  |  |  |
|  | *REPO VS PAIB LONG* | 47,883 |
|  | *NONCUST SHORT VS. PAIB LONG* | 344,571 |
|  | *FIRM SHORT VS PAIB LONG* | 11,399 |
|  |  |  |
|  | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 403,853 |
|  |  |  |
| **6.** | **PAIB DIVIDEND & INTEREST:** |  |
|  |  |  |
|  | *STOCK DIVIDENDS > 30 DAYS* | - |
|  | *MONEY CONTROL ADJUSTMENT* | - |
|  | *DIVIDEND & INT PAYABLES > 7 DAYS* | - |

TONUCCI_PAOLO_00011178

*TOTAL P.A.I.B. DIVIDENDS & INTEREST*

**7.    SECURITY COUNT DIFFERENCE > 7 DAYS:**                    -

**8.    SUSPENSE CREDITS & SMV >7 DAYS:**                        -

**9.    AGED TRANSFERS & REORGANIZATION:**

    *TRANSFER SHORTS OVER 40 DAYS*                              -
    *REORG/REDEMPTION SMV OVER 7 DAYS*                          -

    *TOTAL AGED TRANSFERS & REORGANIZATION*                     -

**10.   OTHER:**

    *OTHER CREDITS*                                             -

    *TOTAL OTHER*                                               -

    *TOTAL PAIB CREDITS*                                2,520,973

TONUCCI_PAOLO_00011178

| 12. | *P.A.I.B. DEBITS:* | | |
|-----|-----|---:|---|
| | *CUSTOMER SECURITY ACCOUNTS* | 1,955,103 | |
| | *VARIOUS PAIB DEBIT ADJ* | (176,096) | |
| | *UNSECURED DEBITS* | - | |
| | *PARTLY SECURED DEBITS* | - | |
| | *RULE 144 UNSECURED DEBITS* | - | |
| | *SECURITY CONCENTRATION* | - | |
| | *BREAK VS CUSTOMER LONG* | - | |
| | | | |
| | *P.A.I.B. DEBITS:* | 1,779,007 | |
| | | | |
| | | | |
| 13. | *PAIB STOCK BORROW:* | | |
| | | | |
| | *STOCK BORROW VS PAIB SHORT* | 442,429 | |
| | *STOCK BORROW Q. VS. PAIB SHORT* | 215 | |
| | *STOCK BORROW NQ VS. PAIB SHORT* | - | |
| | *STOCK BORROW L/C VS PAIB SHORT* | - | |
| | | | |
| | *TOTAL P.A.I.B. STOCK BORROW* | 442,644 | |
| 14. | *PAIB FAIL TO DELIVER:* | | |
| | | | |
| | *FAIL TO DELIVER OVER 30 DAYS* | - | |
| | *FAIL TO DELIVER VS PAIB SHORT* | 43,487 | |
| | *CNS FAIL TO DELIVER VS PAIB SHORT* | 62,417 | |
| | *CNS FAIL TO DELIVER VS THE BOX* | - | |
| | *CNS FAIL TO DELIVER VS REPO* | - | |
| | *CNS FAIL TO DELIVER VS UNALLOC/BREAK* | - | |
| | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - | |
| | | | |
| | *TOTAL P.A.I.B. FAIL TO DELIVER* | 105,904 | |
| | | | |
| | | | |
| 15. | *PAIB MARGIN WITH OCC* | | |
| | *OCC MARGIN* | - | |
| | *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - | |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - | |
| | | | |
| | *TOTAL P.A.I.B. MARGIN WITH OCC* | - | |
| | | | |
| | | | |
| 16. | *OTHER* | | |
| | *OTHER PAIB DEBITS* | - | |
| | | | |
| | *TOTAL OTHER* | - | |
| | | | |
| 17. | *TOTAL PAIB DEBITS* | 2,327,555 | |
| | | | |
| | | | |
| 20. | *EXCESS - DEBITS OVER CREDITS* | - | |
| | | | |
| 21. | *DEFICIT - CREDITS OVER DEBITS* | 193,419 | |

TONUCCI_PAOLO_00011178

TONUCCI_PAOLO_00011178

# EXHIBIT 21

**Cc:**     Potenciano, Joel [joel.potenciano@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; Nazimowitz, Lawrence D [lawrence.nazimowitz@lehman.com]; Kush, Anthony [anthony.kush@lehman.com]; O'Meara, Chris M (NY) [comeara@lehman.com]

**To:**     Stucchio, Anthony [astucchio@lehman.com]; McLaughlin, Kendall J [kmclaugh@lehman.com]; Azerad, Robert [RAzerad@lehman.com]; Lee, Mark [mark.lee@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]

**From:**     Burke, William T [wburke@lehman.com]

**Sent:**     Tue 9/23/2008 1:58:33 AM

**Subject:**     Reserve Formula Calculations

**Res.Driver 091908.xls**

All,

The following are the latest results for our Customer and PAIB Reserve calculations as of Sept. 19th:

Customer Requirement          $ 648 million
$1,121 million possible reduction from Sept. 17th

PAIB Requirement          $ 193 million
$ 299 million possible reduction

Total Requirement          $ 841 million
$ 1,420 million possible reduction


The following assumptions or open issues  are relevant to the above calculations:

1) The MTS computation is not including $42 billion of overdrafts with Chase. While the internal records reflect a book credit and those of Chase are inconclusive,  Dan Fleming and Paolo have represented that these amounts should represent secure financing and are probably not an overdraft with the bank.(overdrafts are a formula credit item)

2) Non Broker Dealer Affiliates balances of $400 million credit have been included in this computation. SEC/ FINRA staff has ruled that this item should be reserved.

3) Commodity bank account balances that were overdrawn for $457 million were not included in the customer calculation. The SEC has deemed Forex transactions with Inter Dealer banks to be exempt from the computation. The assumption would then be that related bank accounts overdrawn could also be excluded.


Senior staff of both the SEC and FINRA have stated that the Firm can not withdraw any funds/securities from the Reserve Accounts without their staff reviewing the calculation and their approval. Other than the three issues outlined above, the continued resolution of immaterial breaks and money differences should mitigate the Reserve Requirements. I'm attaching the Formula as computed and will keep this Group apprised of developments as the calculation is finalized and then reviewed with the Regulators. Please call me with any questions. 3-6787   Regards, Bill

FLEMING_DAN_00008788

<<Res.Driver 091908.xls>>

FLEMING_DAN_00008788

DRAFT   as of 7:00 pm

Lehman Brothers Inc.
Customer/PAIB Reserve Analysis

| Customer: | 09/19/08 | 09/17/08 | Variance | Comments |
|---|---:|---:|---:|---|
| **MTS** | | | | |
| Free Credits | 275,298 | 77,216 | 198,082 | Waiting from Stephen Cody's area for clean-ups on the $2 billion AP amounts that is not factored in the $275 |
| SCS Cash | 38,194 | 46,462 | (8,268) | ok |
| Option Margin | 7,130 | 15,824 | (8,694) | ok |
| P & I | 22,187 | 22,858 | (671) | ok |
| Aged Fails and Partly Secured Debits | 4,595 | 7,518 | (2,923) | ok |
| Customer Receivable Versus Box          * | | | | |
| Stock Record/P&C Items | 76,152 | 86,809 | (10,657) | ok |
| Overdrafts | 3,231 | | 3,231 | Waiting for Dan Fleming/Paolo Tonucci confirmation regarding $6 bil EBOC overdrafts that is secured by a loan |
| Unapplied Cash / Suspense | 61,014 | 31,677 | 29,337 | ok |
| 3% ADI | 394,926 | 216,477 | 178,449 | ok |
| Sub-total | 882,727 | 504,841 | 377,886 | ok |
| **ADP** | | | | |
| Free Credits / Margin | (2,713,654) | 481,456 | (3,195,111) | Remaining Breaks and Unallocated of $84 mil still being investigated |
| Net Customer Financing          * | 1,516,822 | (831,906) | 2,348,728 | ok |
| OMNI Conversion Payable | | | | |
| O/Drafts | 222,207 | 62,604 | 159,603 | ok |
| Dividends | 5,322 | 5,322 | - | ok |
| S/B L.O.C. vs. Customer Short | - | - | - | ok |
| S/B NQ vs. Customer Short | 10,976 | 5,287 | 5,689 | ok |
| Non-Broker Dealer Affil. | 210,769 | 290,539 | (79,770) | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| OCC Proprietary Qualified Collateral | (507,418) | (349,858) | (157,560) | ok |
| Firm Bank Loan - Firm Not Long | - | - | - | |
| Suspense | 35,290 | 39,897 | (4,607) | ok |
| Unapplied Cash | 11,553 | 10,121 | 1,432 | ok |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | 85,212 | 107 | ok |
| Other | 115,894 | 82,685 | 33,209 | ok |
| 3% ADI | 401,769 | 322,692 | 79,077 | ok |
| Sub-total | (605,150) | 204,052 | (809,202) | |
| **ITS** | | | | |
| Free Credits (primarily SCS cash) | (124,665) | 160,575 | (285,240) | ok |
| Unsecured Shorts | 77,049 | 77,639 | (590) | ok |
| Securities Related IC Payable (Mostly ITS) | 189,227 | 189,086 | 141 | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| Other | | | | |
| 3% ADI | 228,486 | 178,711 | 49,774 | |
| Sub-total | 370,097 | 606,011 | (235,914) | |
| **Commodities** | | | | |
| O/Drafts | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding foreign exchange overdrafts amounting to $457 mil of SEK and CAD currencies |
| Non-Reg Commodity Credits | - | 52,000 | (52,000) | Pulled out cushion |
| Sub-total | - | 228,487 | (228,487) | |
| Requirement | 647,674 | 1,543,392 | (895,718) | |
| Cushion (plus 2% deduction) | | 225,608 | (225,608) | |
| Amount Segregated | 647,674 | 1,769,000 | (1,121,326) | |
| **PAIB:** | | | | |
| Net PAIB Debits/Credits | 253,918 | 325,286 | (71,368) | Investigating items related PAIB long and PAIB short amounting to $100 mil |
| Bank Loan | 114 | 3,560 | (3,446) | |
| Stock Loan | 80,009 | 312,247 | (232,238) | |
| F/R Vs PAIB Long | 4,073 | 31,031 | (26,958) | |
| Firm Short vs. PAIB Long | 403,853 | 394,506 | 9,347 | |
| Stock Borrow          * | (442,644) | (560,229) | 117,585 | |
| Fail to Deliver | (105,904) | (40,281) | (65,623) | |
| Requirement | 193,419 | 466,120 | (272,701) | |
| Cushion (plus 2% deduction) | | 25,880 | (25,880) | |
| Amount Segregated | 193,419 | 492,000 | (298,581) | |
| Total Segregated | 841,093 | 2,261,000 | (1,419,907) | |

* Denotes account net debit balances.

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** |  | 9,368,809 |  | 7,995,742 | 1,373,066 |
|  |  |  |  |  |  |
| Firm Long vs Cust Short | (281,484) |  | (196,453) |  | (85,031) |
| Non Cust Long vs. Cust Short | (6,857,319) |  | (4,533,257) |  | (2,324,062) |
| PAIB Long vs Cust Short | (11,596) |  | (15,031) |  | 3,435 |
| Reverse Repo vs Cust Short | - |  | - |  |  |
| Cust Long vs Cust Short |  |  |  |  |  |
| Stock Borrow vs Cust Short | (3,543,186) |  | (1,207,278) |  | (2,335,908) |
| Fail to Deliver vs Cust Short | (1,388,878) |  | (1,562,267) |  | 173,389 |
| sub-total | (12,082,463) | (12,082,463) | (7,514,286) | (7,514,286) | (4,568,177) |
|  |  |  |  |  |  |
| **Total** |  | (2,713,654) |  | 481,456 | (3,195,111) |
|  |  |  |  |  |  |
| **Customer Debits** |  | 8,227,423 |  | 8,121,467 | 105,955 |
|  |  |  |  |  |  |
| Money Fund Receivable | (81,568) |  | (310,045) |  | 228,477 |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (182,067) |  | (169,152) |  | (12,915) |
| Security Concentrations |  | - |  | - |  |
| Cust. Long vs.Customer Bank Loan | (181,854) |  | (728,814) |  | 546,960 |
| Stock Loan vs Cust Long | (2,030,953) |  | (1,050,110) |  | (980,843) |
| Cust Long vs Cust Short |  | - |  | - |  |
| Fail to Receive vs Cust Long | (1,727,333) |  | (2,210,873) |  | 483,541 |
| Firm Short vs Customer Long | (5,540,470) |  | (2,820,568) |  | (2,719,902) |
| sub-total | (9,744,245) | (9,744,245) | (7,289,562) | (7,289,562) | (2,454,683) |
|  |  |  |  |  |  |
| **Total** |  | (1,516,822) |  | 831,906 | (2,348,728) |
|  |  |  |  |  |  |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - |  |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - |  |
|  |  |  |  |  |  |
| **Net Cust Dr./Cr.** |  | (1,196,832) |  | (350,449) | (846,383) |

FLEMING_DAN_00008789

COPY PASTE FROM RESERVE FILE

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*09/19/2008*
*(in 000'S)*

| | 09/19/2008 |
|---|---:|
| **1.    CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 1,059,956 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE  5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 222,207 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 84,788 |
| FIRM LONG VS. CUSTOMER SHORT | (281,484) |
| NONCUST LONG VS. CUSTOMER SHORT | (6,857,319) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (11,596) |
| SHORT & CREDIT INTEREST | 28,371 |
| MONEY FUND SETTLEMENTS 098-00003  & 098-70001 | 290 |
| UNALLOCATED CUSTOMER SHORT | - |
| | |
| TOTAL CUSTOMER CREDITS | 2,767,280 |
| | |
| **2.    CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 181,854 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 181,854 |
| | |
| **3.    CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 8,421,983 |
| STOCK LOAN MTM | (642,717) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 5,224,063 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,009) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (247,637) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,255) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,030,953 |

| | | |
|---|---|---:|
| 4. | **CUSTOMER FAIL TO RECEIVE:** | |
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 6,907 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (363,249) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,727,333 |
| | | |
| 5. | **FIRM SHORT VS CUSTOMER LONG:** | |
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 1,805,374 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 5,295 |
| | FIRM SHORT VS. UNALLOCATED | 5,230 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 17,978 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,540,470 |
| | | |
| 6. | **CUSTOMER DIVIDEND & INTEREST:** | |
| | DIVIDEND & INT PAYABLES | 26,684 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (21,362) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| | | |
| 7. | **SECURITY COUNT DIFFERENCE > 7 DAYS:** | |
| | | |
| 8. | **SUSPENSE ACCOUNTS** | |
| | SUSPENSE CREDITS & SMV: | 35,290 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 132,162 |
| | | |
| 9. | **AGED TRANSFERS & REORGANIZATION:** | |
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| | | |
| 10. | **OTHER:** | |
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 12,385,374 |

FLEMING_DAN_00008789

| 12. | CUSTOMER DEBITS: | |
|-----|------------------|--|
| | *CUSTOMER SECURITY ACCOUNTS* | 4,950,169 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| | *CUSTOMER NETTING NB* | (77,250) |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)* | 3,492,635 |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *INV ADVISORY FEES RELATED TO NB MARGIN DEBITS* | - |
| | *MONEY FUND RECEIVABLE* | (81,568) |
| | *MARGIN INTEREST* | 41,227 |
| | *UNSECURED DEBITS* | (21,935) |
| | *PARTLY SECURED DEBITS* | (1,745) |
| | *NON-PURPOSE LOANS* | (199,614) |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *TOTAL CUSTOMER DEBITS* | **7,963,787** |

| 13. | CUSTOMER STOCK BORROW: | |
|-----|------------------------|--|
| | *STOCK BORROW* | 26,275,972 |
| | *STOCK BORROW MTM* | (5,909,361) |
| | *STOCK BORROW L.O.C.* | - |
| | *STOCK BORROW VS. CUST SHORT ADJ.* | - |
| | *STOCK BORROW FREE OF MONEY* | 8,438,386 |
| | *STOCK BORROW LC VS SECURED BK LOAN* | - |
| | *STOCK BORROW L C VS. CUSTOMER SHORT* | - |
| | *STOCK BORROW NQ VS. CUSTOMER SHORT* | (10,976) |
| | *STOCK BORROW L C VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW NQ VS. FIRM BANK LOAN* | - |
| | *STOCK BORROW VS STOCK LOAN* | (9,344,291) |
| | *STOCK BORROW VS. STOCK LOAN PLEDGE* | (256,503) |
| | *STOCK BORROW PLEDGE Q VS. STOCK LOAN* | (21,386) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN* | (7,499) |
| | *STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE* | (9,644) |
| | *STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE* | (28,422) |
| | *STOCK BORROW L C VS. STOCK LOAN* | - |
| | *STOCK BORROW L C VS. STOCK LOAN PLEDGE* | - |
| | *STOCK BORROW L C VS. FIRM SHORT* | - |
| | *STOCK BORROW L C VS. NONCUSTOMER SHORT* | - |
| | *STOCK BORROW VS. FIRM SHORT* | (3,714,514) |
| | *STOCK BORROW VS. NONCUSTOMER SHORT* | (6,670,788) |
| | *STOCK BORROW PLEDGE Q. VS FIRM SHORT* | (201,992) |
| | *STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT* | (340,769) |
| | *STOCK BORROW PLEDGE NQ VS. FIRM SHORT* | (794,427) |
| | *STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT* | (630,382) |
| | *STOCK BORROW VS. THE BOX* | (269,782) |
| | *STOCK BORROW PLEDGE Q. VS. THE BOX* | (38,241) |
| | *STOCK BORROW PLEDGE NQ VS. THE BOX* | (82,771) |
| | *STOCK BORROW L C VS. THE BOX* | - |
| | *STOCK BORROW VS. FAIL REC CNS* | (15,106) |
| | *STOCK BORROW PLEDGE Q. VS. F-R CNS* | (23) |
| | *STOCK BORROW PLEDGE NQ VS. F-R CNS* | - |
| | *STOCK BORROW L C VS. F-R CNS* | - |
| | *STOCK BORROW L C VS. REPO* | - |
| | *STOCK BORROW VS. REPO* | (1,341,239) |
| | *STOCK BORROW PLEDGE Q. VS. REPO* | (46,141) |
| | *STOCK BORROW PLEDGE NQ VS. REPO* | (365,820) |
| | *STOCK BORROW VS. UNALLOCATED* | (99,827) |
| | *STOCK BORROW PLEDGE Q. VS. UNALLOCATED* | (1,704) |
| | *STOCK BORROW PLEDGE NQ VS. UNALLOCATED* | (7,128) |
| | *STOCK BORROW L C VS. UNALLOCATED* | - |
| | *STOCK BORROW VS. PAIB SHORT* | (442,429) |
| | *STOCK BORROW PLEDGE Q. VS. PAIB SHORT* | (215) |
| | *STOCK BORROW PLEDGE NQ VS. PAIB SHORT* | (18,115) |
| | *STOCK BORROW L C VS. PAIB SHORT* | - |
| | *STOCK BORROW L C VS. FAIL TO RECEIVE* | - |
| | *STOCK BORROW VS. FAIL TO RECEIVE* | (488,042) |
| | *STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE* | (23,607) |
| | *STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE* | (1,005) |
| | *TOTAL CUSTOMER STOCK BORROW* | **3,532,210** |

FLEMING_DAN_00008789

| | | |
|---|---|---:|
| 14. | *CUSTOMER FAIL TO DELIVER:* | |
| | *FAIL TO DELIVER* | 4,960,740 |
| | *CNS FAIL TO DELIVER* | 1,900,343 |
| | *MISC FAIL TO DELIVER ADJUSTMENTS* | 2,060,021 |
| | *OMNI FAIL TO DELIVER ADJUSTMENTS* | - |
| | *FAIL TO DELIVER MTM ADJUSTMENT* | - |
| | *FAIL TO DELIVER ADJUSTMENT* | - |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE* | (363,249) |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE CNS* | (1,487) |
| | *FAIL TO DELIVER OVER 30 DAYS* | (826) |
| | *FAIL TO DELIVER VS. FIRM SHORT* | (742,968) |
| | *FAIL TO DELIVER VS. PAIB SHORT* | (43,487) |
| | *FAIL TO DELIVER VS. REPO* | (466,128) |
| | *FAIL TO DELIVER VS. THE BOX* | (1,107,188) |
| | *FAIL TO DELIVER VS. NON-CUSTOMER SHORT* | (2,936,233) |
| | *FAIL TO DELIVER VS. UNALLOCATED  BREAK* | (276,055) |
| | *CNS FAIL TO DELIVER VS. FIRM SHORT* | (452,940) |
| | *CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT* | (665,286) |
| | *CNS FAIL TO DELIVER VS. PAIB SHORT* | (62,417) |
| | *CNS FAIL TO DELIVER VS. THE BOX* | (264,016) |
| | *CNS FAIL TO DELIVER VS. REPO* | (96,672) |
| | *CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN* | |
| | *CNS FAIL TO DELIVER VS. UNALLOC BREAK* | (27,371) |
| | *CNS FAIL TO DELIVER VS. FAIL TO RECEIVE* | (25,903) |
| | | |
| | *TOTAL CUSTOMER FAIL TO DELIVER* | **1,388,878** |
| | | |
| | | |
| 15. | *CUSTOMER MARGIN WITH OCC* | |
| | *OCC MARGIN* | - |
| | *OCC PROPRIETARY QUALIFIED COLLATERAL* | 507,418 |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL CUSTOMER MARGIN WITH OCC* | **507,418** |
| | | |
| | | |
| 16. | *OTHER* | |
| | *OTHER CUSTOMER DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| 17. | *AGGREGATE DEBIT ITEMS* | 13,392,293 |
| | | |
| 18. | *LESS 3%* | (401,769) |
| | | |
| 19. | *TOTAL 15C3-3 DEBITS* | 12,990,524 |
| | | |
| | | |
| 20. | *EXCESS - DEBITS OVER CREDITS* | 605,150 |
| | | |
| 21. | *DEFICIT - CREDITS OVER DEBITS* | **0** |

FLEMING_DAN_00008789

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** |  |
| *Customer Accounts* | 4,390,797 |
| *Securities Related Intercompany Payables* | 189,227 |
| *ITS Unsecured Shorts* | 77,049 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 0 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 4,657,073 |
|  |  |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 2,395,768 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG** | 20,590 |
| **SUSPENSE CREDITS** | 0 |
|  |  |
| **TOTAL CREDITS** | 7,757,806 |
|  |  |
| **CUSTOMER DEBITS:** |  |
| *Customer Accounts* | 4,938,747 |
| **OMNI Rec Formula** | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
|  |  |
| **CUSTOMER MARGIN WITH OCC** | 0 |
|  |  |
| **CUSTOMER STOCK BORROW** | 848,446 |
| **CUSTOMER FAIL TO DELIVER** | 1,829,002 |
| **AGGREGATE DEBITS** | 7,616,195 |
| *Less 3%* | 228,486 |
| **TOTAL DEBITS** | 7,387,709 |
|  |  |
| **EXCESS CREDITS OVER DEBITS** | 370,097 |

FLEMING_DAN_00008789

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS                  09/19/2008

CREDITS

| | | |
|---|---|---|
| #47 | (1") CUST F/D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B/D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F/D (6) REPO | 0 | 0 |
| #63 | (19) BR Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F/D VS (6) REPO | 0 | 0 |
| #'9 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F/D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY, REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F/D VS TRI PARTY REPO | 0 | 0 |
| #95 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F/ D- 30  VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG  VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | *(11) NON CUST. F/D > 30 DAYS VS (18) NON CUST. F/R* | 61,180 | 61 |
| #150 | (1") CUST LONG (F'R) VS (18) NON CUST (F R) | 0 | 0 |
| #151 | (19) B R DEALER LONG FREE VS (18) NON CUST (F R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUSTF/D  30 VS (22) CUST SHRT(F/R) | 283,919 | 284 |
| #194 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #'79 | (19) Customer Long Free VS (22) CUST SHORT(F/R) | 22,806,745 | 22,807 |
| #180 | (19) BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F R) | 0 | 0 |
| #192 | (11) NONCUST F/D VS (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG VS (24)  OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F/D- 30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F/D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (36) AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS  VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F'R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20) CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REFO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,717,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (1) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE  VS (35) INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR DEALER LONG FREE VS (35) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #344 | (23) INACT LONG (19) VS (35) INACTIVE SHRT | 330,030 | 330 |
| #346 | (2") NON BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (35) INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 175,819 | 176 |
| #337 | (9) NON CUST F/D (35) INACTIVE SHORT | 0 | 0 |
| #356 | (5) B'VF VS (46) SPECIAL FINANCE | 0 | 0 |
| #356 | (1") CUST LONG FREE VS (46) SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19)BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46) SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK L8NG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33) BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #433 | (35) SPEC FIN CUST LONG VS (26)  AFFIL SHORT | 603,494 | 603 |
| #438 | (35) SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 0 | 0 |
| #443 | (3") FIN. LDGR TR VS (6) HIC REPOS | 22,186,9"6 | 22,187 |
| | PARTLY SECURED CHARGE | 4,249,936.A | 4,250 |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 275,299,258 R-2 | 275,298 |
| | SCS CASH | 38,194,216 R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651 R-2 | 7,130 |
| MONEY | BANK OVERDRAFTS | 3,230,928 R-3 | 3,231 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 936,345 R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,0"7.90" R-3 | 60,078 |
| | P&I  PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,186,9"6 R-5 | 22,187 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 407,054,152 / 394,925,368 | 304,926 |

DEBIT

| | | |
|---|---|---|
| #225 | (9) NON CUST F/D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F/D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F/D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F/D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F/D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F/D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE  VS (34) BOX | 0 | 0 |
| #270d | (15) CUST F/D VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F/D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |

| | | |
|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | | **882,727,280** | 882,727 |

FLEMING_DAN_00008789

1,115

(2,289)
(507)
(73,949)

0

**15c3-3 P.A.I.B COMPUTATION**
**BROKER DEALER UNIT**
09/19/08
*(in OOO'S)*

| | 09/19/08 |
|---|---|
| **1.** **P.A.I.B. CREDITS:** | |
| PAIB CREDITS | 2,235,573 |
| BREAK VS. PAIB LONG | 99,471 |
| PAIB CREDIT ADJ | (8,000) |
| PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
| PAIB LONG VS CUSTOMER SHORT | 11,596 |
| FIRM LONG vs PAIB SHORT | (21,967) |
| NONCUST LONG VS. PAIB SHORT | (173,085) |
| UNALLOCATED PAIB SHORT | - |
| PAIB SHORT VS CUSTOMER LONG | (122,322) |
| **P.A.I.B. CREDITS:** | 2,032,924 |
| **2.** **PAIB BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFECIT | - |
| PAIB LONG VS. FIRM BANK LOAN | - |
| PAIB LONG VS. CUST BANK LOAN | 114 |
| PAIB LONG VS. PAIB BANK LOAN | - |
| PAIB BANK LOAN - PAIB NOT LONG | - |
| CUST BANK LOAN- CUSTOMER NOT LONG | - |
| FIRM BANK LOAN- CUSTOMER NOT LONG | - |
| **TOTAL P.A.I.B. BANK LOAN** | 114 |
| **3.** **PAIB STOCK LOAN:** | |
| STOCK LOAN VS PAIB LONG | - |
| STOCK LN PLDG VS. PAIB LONG | 80,009 |
| **TOTAL CUSTOMER STOCK LOAN** | 80,009 |
| **4.** **PAIB FAIL TO RECEIVE:** | |
| FAIL TO RECEIVE VS PAIB LONG | 4,066 |
| CNS FAIL TO RECEIVE VS PAIB LONG | 7 |
| **TOTAL P.A.I.B. FAIL TO RECEIVE** | 4,073 |
| **5.** **FIRM SHORT VS PAIB LONG:** | |
| REPO VS PAIB LONG | 47,883 |
| NONCUST SHORT VS. PAIB LONG | 344,571 |
| FIRM SHORT VS PAIB LONG | 11,399 |
| **TOTAL FIRM SHORT VS P.A.I.B. LONG** | 403,853 |
| **6.** **PAIB DIVIDEND & INTEREST:** | |
| STOCK DIVIDENDS > 30 DAYS | - |
| MONEY CONTROL ADJUSTMENT | - |
| DIVIDEND & INT PAYABLES > 7 DAYS | - |

FLEMING_DAN_00008789

| | | |
|---|---|---|
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| | | |
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| | | |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | | |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| | | |
| 10. | *OTHER:* | |
| | | |
| | *OTHER CREDITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL PAIB CREDITS* | 2,520,973 |

FLEMING_DAN_00008789

| | |
|---|---:|
| 12. **P.A.I.B. DEBITS:** | |
| *CUSTOMER SECURITY ACCOUNTS* | *1,955,103* |
| *VARIOUS PAIB DEBIT ADJ* | (176,096) |
| *UNSECURED DEBITS* | - |
| *PARTLY SECURED DEBITS* | - |
| *RULE 144 UNSECURED DEBITS* | - |
| *SECURITY CONCENTRATION* | - |
| *BREAK VS CUSTOMER LONG* | - |
| | |
| *P.A.I.B. DEBITS:* | 1,779,007 |
| | |
| | |
| 13. **PAIB STOCK BORROW:** | |
| | |
| *STOCK BORROW VS PAIB SHORT* | 442,429 |
| *STOCK BORROW Q. VS. PAIB SHORT* | 215 |
| *STOCK BORROW NQ VS. PAIB SHORT* | - |
| *STOCK BORROW L/C VS PAIB SHORT* | - |
| | |
| *TOTAL P.A.I.B. STOCK BORROW* | 442,644 |
| 14. **PAIB FAIL TO DELIVER:** | |
| | |
| *FAIL TO DELIVER OVER 30 DAYS* | - |
| *FAIL TO DELIVER VS PAIB SHORT* | 43,487 |
| *CNS FAIL TO DELIVER VS PAIB SHORT* | 62,417 |
| *CNS FAIL TO DELIVER VS THE BOX* | - |
| *CNS FAIL TO DELIVER VS REPO* | - |
| *CNS FAIL TO DELIVER VS UNALLOC./BREAK* | - |
| *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - |
| | |
| *TOTAL P.A.I.B. FAIL TO DELIVER* | 105,904 |
| | |
| | |
| 15. **PAIB MARGIN WITH OCC** | |
| *OCC MARGIN* | - |
| *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - |
| *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | |
| *TOTAL P.A.I.B. MARGIN WITH OCC* | - |
| | |
| | |
| 16. **OTHER** | |
| *OTHER PAIB DEBITS* | - |
| | |
| *TOTAL OTHER* | - |
| | |
| | |
| 17. **TOTAL PAIB DEBITS** | 2,327,555 |
| | |
| | |
| 20. **EXCESS - DEBITS OVER CREDITS** | - |
| | |
| 21. **DEFICIT - CREDITS OVER DEBITS** | 193,419 |

FLEMING_DAN_00008789

FLEMING_DAN_00008789

EXHIBIT 22

To:        Lee, Mark[mark.lee@lehman.com]; Azerad, Robert[RAzerad@lehman.com];
wburke@si.rr.com[wburke@si.rr.com]; Stuccio, Anthony[astucchi@lehman.com]; Stuccio,
Anthony[astucchi@lehman.com]; Crepeau, Alex F[acrepeau@lehman.com]
**From:**        Potenciano, Joel
**Sent:**        Mon 9/22/2008 12:59:54 AM
**Importance:**        Low
**Subject:**        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
**Categories:**        urn:content-classes:message

<u>**DRAFT Customer PAIB Reserve-091708.xls**</u>
<u>**Res.Driver 091908.xls**</u>


  <<DRAFT Customer PAIB Reserve-091708.xls>>  <<Res.Driver 091908.xls>>

Mark,

The latest and greatest and in Chris' format. Thanks!

Joel


> _____
> From:        Lee, Mark
> Sent: Sunday, September 21, 2008 8:31 PM
> To:    Potenciano, Joel; Azerad, Robert; 'wburke@si.rr.com'; Stuccio,
> Anthony; Stuccio, Anthony; Crepeau, Alex F
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Joel
>
> Need to reproduce an equivalent for 19th. Don't assume that the 3%ADI
> will be adjusted to zero as per your last schedule, i.e. MTS will have
> 3% ADI raising from $216 to $395 based on the current breaks although
> the assumption that this will be a balance that will be available for
> Barclays post the clearing of all the fails. The free cash that I see
> available to tfr is for the commodities of $225m only but I had
> expected the ITS ADI to come down.
>
> We need to estimate where we think we will get the $2.3bn down to this
> evening for Martin / Chris / Paolo
>
> Mark
>
> _____
> From:        Potenciano, Joel
> Sent: Sunday, September 21, 2008 6:08 PM
> To:    O'Meara, Chris M (NY); Lee, Mark; Kelly, Martin; Azerad, Robert;
> 'wburke@si.rr.com'; Stuccio, Anthony; Stuccio, Anthony; Tonucci,
> Paolo; Crepeau, Alex F
> Subject:        RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
>
>  << File: Customer PAIB Reserve-091708.xls >>
>
> Hi Chris,
>

STUCCIO_ANTHONY_00010697

> Attached is the condensed summary that you requested.  Please advise
> if this works or you have comments.  We are still working on the 09/19
> numbers as we have just received the reallocated amounts for ADP.
> Please let me know if you have questions.
>
>
> Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>
>
> _____
> From:          O'Meara, Chris M (NY)
> Sent: Sunday, September 21, 2008 5:25 PM
> To:   Lee, Mark; Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; Stucchio, Anthony; Tonucci,
> Paolo
> Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Team - We need to make some changes to this.  It is not easily clear
> which balances are truly customer related vs which are cushions, such
> as the ADI's.  So, I suggest we show one date of info, broken into 5
> columns, as follows: Cust dr's, cust cr's, net customer balances,
> cushions, total balances.  Can someone do this easily?  At min, make 3
> separate columns: net cust, cushions, total.  Thanks, Chris
>
> _____
> From:          Lee, Mark
> Sent: Sunday, September 21, 2008 5:24 PM
> To:   Kelly, Martin; Azerad, Robert; Potenciano, Joel;
> 'wburke@si.rr.com'; Stucchio, Anthony; O'Meara, Chris M (NY);
> Stucchio, Anthony
> Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> This is coming from Bill and Joel. They have to run the numbers in and
> hence will be may extract info from it but they own the source
>
> Mark
>
> _____
> From:          Kelly, Martin
> Sent: Sunday, September 21, 2008 5:21 PM
> To:   Azerad, Robert; Potenciano, Joel; 'wburke@si.rr.com'; Stucchio,
> Anthony; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:       RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Who is the "owner" of the spreadsheet in terms of making updates to
> it?  Received several 9/19 versions already - the most recent at 4.30
> via Mark.
>
>

STUCCIO_ANTHONY_00010697

> _____
> From:        Azerad, Robert
> Sent: Sunday, September 21, 2008 5:16 PM
> To:    Potenciano, Joel; 'wburke@si.rr.com'; Stucchio, Anthony; Kelly,
> Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:      RE: Final 15c3-3 Reserve Formula as of 09/17/2008
>
> Any estimate for 9/19? This is what is urgently needed.
>
> _____
> From:        Potenciano, Joel
> Sent: Sunday, September 21, 2008 5:14 PM
> To:      'wburke@si.rr.com'; Azerad, Robert; Stucchio, Anthony; Kelly,
> Martin; Lee, Mark; O'Meara, Chris M (NY); Stucchio, Anthony
> Subject:      Final 15c3-3 Reserve Formula as of 09/17/2008
>
> << File: Book4.xls >>
>
> Hi All,
>
> Bill requested me to forward the following schedule to this
> distribution.  Thanks!
>
> With kind regards,
> Joel K. Potenciano
> LEHMAN BROTHERS
> Telephone  +1 (212) 320-6786
> Fax  +1 (646) 885-9383
> Email  joel.potenciano@lehman.com
>

STUCCIO_ANTHONY_00010697

**LEHMAN BROTHERS INC.**
**CONSOLIDATED 15c3-3 RESERVE FORMULA**
**AS OF SEPTEMBER 19, 2008**
*(in 000's)*

|  | 09/19/2008 TOTAL |
|---|---|
| **TOTAL CUSTOMER CREDITS ITEMS** | 35,961,972 |
| **TOTAL CUSTOMER DEBITS ITEMS** | 33,859,731 |
| **NET CUSTOMER CREDITS** | 2,102,241 |
| **3% OF AGGREGATE DEBIT ITEMS**  (717,880) | 1,015,792 |
| **CUSHION** | - |
| **CUSTOMER LOCK-UP** | 3,118,033 |

STUCCIO_ANTHONY_00010698

*DRAFT*

**Lehman Brothers Inc.**
**Customer/PAIB Reserve Analysis**

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | |
| P & I | 22,858 | | 22,858 | 22,858 | - | |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | |
| Customer Receivable Versus Box * | | | | | - | |
| Stock Record/P&C Items | 75,822 | | 75,822 | 86,809 | (10,987) | |
| Overdrafts | - | | - | - | - | |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | |
| 3% ADI | 394,926 | (394,926) | (0) | 216,477 | (216,477) | 394 mil of ADI assumes orderly liquidation of open customer fails |
| Sub-total | 879,837 | (394,926) | 484,911 | 504,841 | (19,930) | |
| | | | | | | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,563) | | (2,952,563) a | 481,456 | (3,434,020) | Pending B1 change adjustments related to 941 LBIE admin accounts |
| Net Customer Financing * | 2,419,863 | | 2,419,863 | (831,906) | 3,251,768 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Open customer payments not paid yet from the Bank |
| Dividends | 5,322 | | 5,322 | 5,322 | - | |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | |
| Non-Broker Dealer Affil. | 210,769 | (210,769) | 0 | 290,539 | (290,539) | Balances with affiliates that are in liquidation |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | | | | | - | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | |
| Other | 2,329,550 | | 2,329,550 | 82,685 | 2,246,865 | Pending B1 change adjustments related to 941 LBIE admin accounts |
| 3% ADI | 392,380 | (392,380) | - | 322,692 | (322,692) | 392 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 2,267,855 | (603,149) | 1,664,706 | 204,052 | 1,460,654 | |
| | | | | | | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (125,014) | | (125,014) | 160,575 | (285,589) | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | (189,086) | - | 189,086 | (189,086) | Balances with affiliates that are in liquidation |
| Other | | | | | - | |
| 3% ADI | 228,486 | (228,486) | (0) | 178,711 | (178,712) | 228 mil of ADI assumes orderly liquidation of open customer balances |
| Sub-total | 370,197 | (417,572) | (47,375) | 606,011 | (653,386) | |
| | | | | | | |
| **Commodities** | | | | | | |
| O/Drafts | 456,716 | (456,716) | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | |
| Sub-total | 456,716 | (456,716) | - | 228,487 | (228,487) | |
| | | | | | | |
| Requirement | 3,974,605 | (1,872,363) | 2,102,242 | 1,543,392 | 558,850 | |
| Cushion (plus 2% deduction) | 225,608 | (225,608) | - | 225,608 | (225,608) | |
| Amount Segregated | 4,200,213 | (2,097,971) | 2,102,242 | 1,769,000 | 333,242 | |
| | | | | | | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 264,417 | (215,708) | 48,709 b | 325,286 | (276,577) | Adjustment relates to PAIB long and PAIB short |
| Bank Loan | 114 | | 114 | 3,560 | (3,446) | |
| Stock Loan | 80,009 | | 80,009 | 312,247 | (232,238) | |
| F/R Vs PAIB Long | 4,073 | | 4,073 | 31,031 | (26,958) | |
| Firm Short vs. PAIB Long | 403,853 | | 403,853 | 394,506 | 9,347 | |
| Stock Borrow * | (442,644) | | (442,644) | (560,229) | 117,585 | |
| Fail to Deliver | (105,904) | | (105,904) | (40,281) | (65,623) | |
| Requirement | 203,918 | | 203,918 | 466,120 | (262,202) | |
| Cushion (plus 2% deduction) | 25,880 | (25,880) | - | 25,880 | (25,880) | |
| Amount Segregated | 229,798 | (241,588) | (11,790) | 492,000 | (503,790) | |
| | | | | | | |
| Total Segregated | 4,430,011 | (2,339,559) | 2,090,452 | 2,261,000 | (170,548) | |

*\* Denotes account net debit balances.*

STUCCIO_ANTHONY_00010699

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| **Customer Credits** | 9,032,508 |  | 7,995,742 |  | 1,036,765 |
|  |  |  |  |  |  |
| *Firm Long vs Cust Short* | (281,484) |  | (196,453) |  | (85,031) |
| *Non Cust Long vs. Cust Short* | (6,857,319) |  | (4,533,257) |  | (2,324,062) |
| *PAIB Long vs Cust Short* | (11,596) |  | (15,031) |  | 3,435 |
| *Reverse Repo vs Cust Short* | - |  | - |  |  |
| *Cust Long vs Cust Short* |  |  |  |  |  |
| *Stock Borrow vs Cust Short* | (3,543,186) |  | (1,207,278) |  | (2,335,908) |
| *Fail to Deliver vs Cust Short* | (1,291,486) |  | (1,562,267) |  | 270,781 |
| *sub-total* | (11,985,071) | (11,985,071) | (7,514,286) | (7,514,286) | (4,470,785) |
|  |  |  |  |  |  |
| **Total** |  | (2,952,563) |  | 481,456 | (3,434,020) |
|  |  |  |  |  |  |
| **Customer Debits** | 8,227,423 |  | 8,121,467 |  | 105,955 |
|  |  |  |  |  |  |
| *Money Fund Receivable* | (310,045) |  | (310,045) |  | - |
| *Unsecured/Partly Secured Receivables/Non-Purpose Loans* | (169,152) |  | (169,152) |  | - |
| *Security Concentrations* | - |  | - |  |  |
| *Cust. Long vs.Customer Bank Loan* | (181,854) |  | (728,814) |  | 546,960 |
| *Stock Loan vs Cust Long* | (2,030,953) |  | (1,050,110) |  | (980,844) |
| *Cust Long vs Cust Short* | - |  | - |  |  |
| *Fail to Receive vs Cust Long* | (1,976,062) |  | (2,210,873) |  | 234,811 |
| *Firm Short vs Customer Long* | (5,979,219) |  | (2,820,568) |  | (3,158,651) |
| *sub-total* | (10,647,285) | (10,647,285) | (7,289,562) | (7,289,562) | (3,357,724) |
|  |  |  |  |  |  |
| **Total** |  | (2,419,863) |  | 831,906 | (3,251,768) |
|  |  |  |  |  |  |
| *Plus:* |  |  |  |  |  |
| *Stock Borrow / SB Q vs. Firm Bank Loan* |  | - |  | - | - |
| *Stock Borrow vs. Cust Bank Loan* |  | - |  | - | - |
|  |  |  |  |  |  |
| **Net Cust Dr./Cr.** |  | (532,701) |  | (350,449) | (182,251) |

STUCCIO_ANTHONY_00010699

COPY PASTE FROM RESERVE FILE

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
09/19/08
*(in 000'S)*

|  |  | 09/19/08 |
|---|---|---:|
| **1.** | **CUSTOMER CREDITS:** |  |
|  | *CUSTOMER SECURITY ACCOUNTS* | 8,523,574 |
|  | *CUSTOMER ADJUSTMENTS* | 723,468 |
|  | *UNMAPPED CUSTOMER PAYABLE* | 80 |
|  | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
|  | *CUSTOMER NETTING NB* | (77,250) |
|  | *MONEY CONTROL ADJUSTMENTS* | - |
|  | *NON-BROKER DEALER AFFILIATES TYPE 5* | 290 |
|  | *BOOKKEEPING ADJUSTMENTS* | - |
|  | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
|  | *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
|  | *BANK OVERDRAFTS* | 222,207 |
|  | *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
|  | *HOUSE ACCOUNTS* | 2,525 |
|  | *TEFRA WITHHOLDING PAYABLE* | 95 |
|  | *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
|  | *BREAK VS. CUSTOMER LONG* | 1,470,785 |
|  | *FIRM LONG VS. CUSTOMER SHORT* | (281,484) |
|  | *NONCUST LONG VS. CUSTOMER SHORT* | (6,857,319) |
|  | *REVERSE REPO VS. CUSTOMER SHORT* | - |
|  | *PAIB LONG VS. CUSTOMER SHORT* | (11,596) |
|  | *SHORT & CREDIT INTEREST* | 23,658 |
|  | *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | 477 |
|  | *UNALLOCATED CUSTOMER SHORT* | 832,372 |
|  |  |  |
|  | *TOTAL CUSTOMER CREDITS* | 4,644,635 |
|  |  |  |
| **2.** | **CUSTOMER BANK LOAN:** |  |
|  | *OCC MARGIN* | - |
|  | *OCC MARGIN DEFICIT* | - |
|  | *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
|  | *STOCK BORROW VS. CUST BANK LOAN* | - |
|  | *STOCK BORROW VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
|  | *STOCK BORROW L C VS FIRM BANK LOAN* | - |
|  | *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
|  | *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
|  | *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 181,854 |
|  | *CUST BANK LOAN - CUST NOT LONG* | - |
|  | *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
|  | *FIRM BANK LOAN - FIRM NOT LONG* | - |
|  |  |  |
|  | *TOTAL CUSTOMER BANK LOAN* | 181,854 |
|  |  |  |
| **3.** | **CUSTOMER STOCK LOAN:** |  |
|  | *STOCK LOAN* | 14,343,512 |
|  | *STOCK LOAN MTM* | (3,431,134) |
|  | *STOCK LOAN WITH CLEARING ORG* | - |
|  | *STOCK LOAN FREE OF MONEY* | 2,090,952 |
|  | *STOCK LOAN MTM DEFICIT* | 468 |
|  | *STOCK LOAN BOB ADJUSTMENT* | - |
|  | *UNALLOCATED STOCK LOAN ADJ* | - |
|  | *STOCK LOAN VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW L C* | - |
|  | *STOCK LOAN VS. REVERSE REPO* | - |
|  | *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
|  | *STOCK LOAN VS. PAIB LONG* | - |
|  | *STOCK LOAN PLEDGE VS. PAIB LONG* | (80,009) |
|  | *STOCK LOAN VS. STOCK BORROW* | (9,344,291) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE Q* | (21,386) |
|  | *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | (7,499) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW* | (256,503) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q* | (9,644) |
|  | *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | (28,422) |
|  | *STOCK LOAN VS. NONCUSTOMER LONG* | (247,637) |
|  | *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | (461,255) |
|  | *STOCK LOAN VS. FIRM LONG* | (181,875) |
|  | *STOCK LOAN PLEDGE VS. FIRM LONG* | (334,323) |
|  |  |  |
|  | *TOTAL CUSTOMER STOCK LOAN* | 2,030,953 |

STUCCIO_ANTHONY_00010699

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (225,367) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,976,062 |

| 5. | FIRM SHORT VS CUSTOMER LONG: | |
|---|---|---|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 419,376 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 31,101 |
| | FIRM SHORT VS. UNALLOCATED | 291,784 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 1,530,365 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,979,219 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|---|---|---|
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|---|---|---|

| 8. | SUSPENSE ACCOUNTS | |
|---|---|---|
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 136,769 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|---|---|---|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|---|---|---|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 14,954,815 |

STUCCIO_ANTHONY_00010699

| 12. | CUSTOMER DEBITS: | |
|---|---|---:|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,492,635 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - |
| | MONEY FUND RECEIVABLE | (310,045) |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,748,226 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---:|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
| | STOCK BORROW VS. THE BOX | (248,630) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (15,106) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (23) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | - |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (120,979) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (442,429) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (18,115) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (1,005) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

STUCCIO_ANTHONY_00010699

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---:|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (225,367) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (1,487) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,487) |
| | FAIL TO DELIVER VS. REPO | (440,321) |
| | FAIL TO DELIVER VS. THE BOX | (1,086,414) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (1,423,845) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (296,830) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (665,286) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,417) |
| | CNS FAIL TO DELIVER VS. THE BOX | (263,511) |
| | CNS FAIL TO DELIVER VS. REPO | (96,672) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,877) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (25,903) |
| | TOTAL CUSTOMER FAIL TO DELIVER | 1,291,486 |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 507,418 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | TOTAL CUSTOMER MARGIN WITH OCC | 507,418 |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | - |
| | TOTAL OTHER | - |
| 17. | AGGREGATE DEBIT ITEMS | 13,079,340 |
| 18. | LESS 3% | (392,380) |
| 19. | TOTAL 15C3-3 DEBITS | 12,686,960 |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | (2,267,855) |

STUCCIO_ANTHONY_00010699

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|  | 09/19/08 |
|---|---|
| *CUSTOMER CREDITS:* | |
| *Customer Accounts* | 4,390,448 |
| *Securities Related Intercompany Payables* | 189,086 |
| *ITS Unsecured Shorts* | 77,639 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 456,716 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 5,113,889 |
| | |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 2,395,768 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 738 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 683,637 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,590 |
| *SUSPENSE CREDITS* | 0 |
| | |
| **TOTAL CREDITS** | 8,214,622 |
| | |
| *CUSTOMER DEBITS:* | |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
| | |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| | |
| *CUSTOMER STOCK BORROW* | 848,446 |
| *CUSTOMER FAIL TO DELIVER* | 1,829,002 |
| *AGGREGATE DEBITS* | 7,616,195 |
| *Less 3%* | 228,486 |
| *TOTAL DEBITS* | 7,387,709 |
| | |
| *EXCESS CREDITS OVER DEBITS* | 826,913 |

STUCCIO_ANTHONY_00010699

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*                     09:19:00

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1") CUST F D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (19) B D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15') CUST F D (6) REPO | 0 | 0 |
| #63 | (19) BR-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15') CUST. LONG F D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG (9) HIC REPO | 0 | 0 |
| #92 | (1") CUST LONG F D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY. REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15') CUST LONG F D VS TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F D~30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16)PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| *#147* | *(11) NON CUST. F/D > 30 DAYS VS (18) NON CUST. F/R* | *61,100* | *61* |
| #150 | (1") CUST. LONG F D VS (18) NON CUST (F R) | 0 | 0 |
| #151 | (19) B R DEALER LONG FREE VS (18) NON CUST (F R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F D~30 VS (22) CUST SHRT(F R) | 283,919 | 284 |
| #194 | (15') CUST LONG  VS (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22)CUST SHORT(F R) | 22,806,705 | 22,807 |
| #180 | (19) BR-DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22)CUST SHORT(F R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F R) | 0 | 0 |
| #192 | (11)NONCUST F D VS (24)OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG- VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D~30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F D VS (24) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26)AFFILATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (34) AFFILIATE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (19) F R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 47,717,875 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (31) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE  VS (35)INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BR-DEALER LONG FREE VS (35)INACTIVE SHRT | 0 | 0 |
| #345 | (21) OPER. ACCTS (19) VS (35)INACTIVE SHRT | 0 | 0 |
| #344 | (23') CUST LONG F D VS (35)INACTIVE SHRT | 0 | 0 |
| #346 | (27) NON-BROKER DEALER (19) VS (35)INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (35)INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35)INACTIVE SHRT | 175,819 | 176 |
| #337 | (9) NON CUST F D (35) INACTIVE SHORT | 0 | 0 |
| #386 | (5) BVF VS (46) SPECIAL FINANCE | 0 | 0 |
| #358 | (1")CUST LONG FREE VS (46)SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19)BR DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (23) CUST. LONG F VS (46)SPECIAL FIN.- | 0 | 0 |
| #400 | (33) BOX BREAK L(46) (46) SPECIAL FIN.- | 0 | 0 |
| #419 | (33)BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #433 | (35) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #438 | (35)SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 603,494 | 603 |
| #443 | (5") FIN. LDGR TR VS (9) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,936 A | 4,250 |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258 R-2 | 275,298 |
| | SCS CASH | 38,194,286 R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651 R-2 | 7,130 |
| MONEBANK OVERDRAFTS | | 0 R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 936,385 R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60,077,997 R-3 | 60,078 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857,875 R-5 | 22,858 |
| | | 404,494,223 | |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 394,925,368 | 304,926 |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F D VS (28) TRANSFER | 0 | 0 |
| #226 | (15') CUST F D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F D VS (30) TRANSIT | 0 | 0 |
| #242 | (15') CUST F D VS (30) TRANSIT | 0 | 0 |
| #258 | (15') CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #261 | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE   VS (34) BOX | 0 | 0 |
| #270 | (15') CUST F D VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F D VS (34) BOX - LBSI | 0 | 0 |

| | | |
|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | *879,837,430* | 879,837 |

STUCCIO_ANTHONY_00010699

1,115

(2,289)
(507)
(73,949)

0

STUCCIO_ANTHONY_00010699

*15c3-3 P.A.I.B COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

|  | | 09/19/08 |
|---|---|---:|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | 2,235,573 |
| | *BREAK VS. PAIB LONG* | 99,471 |
| | *PAIB CREDIT ADJ* | (8,000) |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| | *PAIB LONG VS CUSTOMER SHORT* | 11,596 |
| | *FIRM LONG vs PAIB SHORT* | (21,967) |
| | *NONCUST LONG VS. PAIB SHORT* | (162,586) |
| | *UNALLOCATED PAIB SHORT* | - |
| | *PAIB SHORT VS CUSTOMER LONG* | (122,322) |
| | | |
| | *P.A.I.B. CREDITS:* | 2,043,423 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | - |
| | *OCC MARGIN DEFECIT* | - |
| | *PAIB LONG VS. FIRM BANK LOAN* | - |
| | *PAIB LONG VS. CUST BANK LOAN* | 114 |
| | *PAIB LONG VS. PAIB BANK LOAN* | - |
| | *PAIB BANK LOAN - PAIB NOT LONG* | - |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | 114 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | - |
| | *STOCK LN PLDG VS. PAIB LONG* | 80,009 |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | 80,009 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | 4,066 |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | 7 |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 4,073 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | 47,883 |
| | *NONCUST SHORT VS. PAIB LONG* | 344,571 |
| | *FIRM SHORT VS PAIB LONG* | 11,399 |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 403,853 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES > 7 DAYS* | - |

STUCCIO_ANTHONY_00010699

| | | |
|---|---|---|
| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | |
| | | |
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| | | |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | | |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| | | |
| | | |
| 10. | *OTHER:* | |
| | | |
| | *OTHER CREDITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| | *TOTAL PAIB CREDITS* | 2,531,472 |

STUCCIO_ANTHONY_00010699

| 12. | P.A.I.B. DEBITS: | |
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |

| 13. | PAIB STOCK BORROW: | |
| | | |
| | STOCK BORROW VS PAIB SHORT | 442,429 |
| | STOCK BORROW Q. VS. PAIB SHORT | 215 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 442,644 |

| 14. | PAIB FAIL TO DELIVER: | |
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,487 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,417 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 105,904 |

| 15. | PAIB MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |

| 16. | OTHER | |
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |

| 17. | TOTAL PAIB DEBITS | 2,327,555 |

| 20. | EXCESS - DEBITS OVER CREDITS | - |

| 21. | DEFICIT - CREDITS OVER DEBITS | 203,918 |

STUCCIO_ANTHONY_00010699

STUCCIO_ANTHONY_00010699

# EXHIBIT 23

**To:**       Tonucci, Paolo [paolo.tonucci@lehman.com]
**From:**     Azerad, Robert [RAzerad@lehman.com]
**Sent:**     Mon 9/22/2008 11:00:00 PM
**Subject:**  15c3 update

Res.Driver 091908.xls

> _____
> From:        Potenciano, Joel
> Sent: Monday, September 22, 2008 6:07 PM
> To:    Azerad, Robert
> Cc:    Burke, William T; Stucchio, Anthony
> Subject:        Res.Driver 091908.xls
>
>  <<Res.Driver 091908.xls>>
>
> Robert,
>
> Attached is the Schedule as of 5 pm today.  We are still going thru
> the remaining breaks.  Thanks!
>
> Joel

TONUCCI_PAOLO_00011177

DRAFT    as of 4:30 pm

Lehman Brothers Inc.
Customer/PAIB Reserve Analysis

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | Comments |
|---|---|---|---|---|---|---|
| **MTS** | | | | | | |
| Free Credits | 275,298 | | 275,298 | 77,216 | 198,082 | Waiting from Stephen Cody's area for clean-ups on the $2 billion AP amounts that is not factored in the $275. |
| SCS Cash | 38,194 | | 38,194 | 46,462 | (8,268) | ok |
| Option Margin | 7,130 | | 7,130 | 15,824 | (8,694) | ok |
| P & I | 22,187 | | 22,187 | 22,858 | (671) | ok |
| Aged Fails and Partly Secured Debits | 4,595 | | 4,595 | 7,518 | (2,923) | ok |
| Customer Receivable Versus Box * | - | | - | - | - | |
| Stock Record/P&C items | 76,152 | | 76,152 | 86,809 | (10,657) | ok |
| Overdrafts | 3,231 | | 3,231 | - | 3,231 | Waiting for Dan Fleming confirmation regarding $3.5 bil EBOC overdrafts that is secured by a loan |
| Unapplied Cash / Suspense | 61,014 | | 61,014 | 31,677 | 29,337 | ok |
| 3% ADI | 394,926 | | 394,926 | 216,477 | 178,449 | ok |
| Sub-total | 882,727 | - | 882,727 | 504,841 | 377,886 | |
| **ADP** | | | | | | |
| Free Credits / Margin | (2,952,752) | | (2,952,752) a | 481,456 | (3,434,208) | Remaining Breaks and Unallocated of $320 mil still being investigated |
| Net Customer Financing * | 1,660,152 | | 1,660,152 | (831,906) | 2,492,058 | Remaining Breaks and Unallocated of $320 mil still being investigated |
| OMNI Conversion Payable | - | | - | - | - | |
| O/Drafts | 222,207 | | 222,207 | 62,604 | 159,603 | Waiting for confirmation from Dan Fleming and Craig Jones regarding a book overdraft of $1.9 bil ADP account 011-10042. |
| Dividends | 5,322 | | 5,322 | 5,322 | - | ok |
| S/B L.O.C. vs. Customer Short | - | | - | - | - | |
| S/B NQ vs. Customer Short | 10,976 | | 10,976 | 5,287 | 5,689 | ok |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | (79,770) | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| OCC Proprietary Qualified Collateral | (507,418) | | (507,418) | (349,858) | (157,560) | Includes 130 mil of cash collateral margin with OCC |
| Firm Bank Loan - Firm Not Long | - | | - | - | - | |
| Suspense | 41,638 | | 41,638 | 39,897 | 1,741 | ok |
| Unapplied Cash | 11,553 | | 11,553 | 10,121 | 1,432 | ok |
| Abandoned Property / Soft Dollars ($42 mil) | 85,319 | | 85,319 | 85,212 | 107 | ok |
| Other | 115,894 | | 115,894 | 82,685 | 33,210 | ok |
| 3% ADI | 399,458 | | 399,458 | 322,692 | 76,766 | ok |
| Sub-total | (696,881) | - | (696,881) | 204,052 | (900,933) | |
| **ITS** | | | | | | |
| Free Credits (primarily SCS cash) | (124,665) | | (124,665) | 160,575 | (285,240) | ok |
| Unsecured Shorts | 77,049 | | 77,049 | 77,639 | (590) | ok |
| Securities Related IC Payable (Mostly ITS) | 189,227 | | 189,227 | 189,086 | 141 | SEC/FINRA interprets that credits related to Non BD affiliates should be kept in the formula |
| Other | - | | - | - | - | |
| 3% ADI | 228,486 | | 228,486 | 178,711 | 49,774 | |
| Sub-total | 370,097 | - | 370,097 | 606,011 | (235,914) | |
| **Commodities** | | | | | | |
| O/Drafts | - | | - | 176,487 | (176,487) | Proposed SEC interpretation relief for FX related balances disregarding 244 mil of SEK and 277 mil of CAD foreign exchange overdrafts |
| Non-Reg Commodity Credits | - | | - | 52,000 | (52,000) | Pulled out cushion |
| Sub-total | - | - | - | 228,487 | (228,487) | |
| Requirement | 555,944 | | 555,944 | 1,543,392 | (987,448) | |
| Cushion (plus 2% deduction) | - | | - | 225,608 | (225,608) | |
| Amount Segregated | 555,944 | - | 555,944 | 1,769,000 | (1,213,056) | |
| **PAIB:** | | | | | | |
| Net PAIB Debits/Credits | 253,918 | | 253,918 b | 325,286 | (71,368) | Investigating items related PAIB long and PAIB short amounting to $100 mil |
| Bank Loan | 114 | | 114 | 3,560 | (3,446) | |
| Stock Loan | 80,009 | | 80,009 | 312,247 | (232,238) | |
| F/R Vs PAIB Long | 4,073 | | 4,073 | 31,031 | (26,958) | |
| Firm Short vs. PAIB Long | 403,853 | | 403,853 | 394,506 | 9,347 | |
| Stock Borrow * | (442,644) | | (442,644) | (560,229) | 117,585 | |
| Fail to Deliver | (105,904) | | (105,904) | (40,281) | (65,623) | |
| Requirement | 193,419 | | 193,419 | 466,120 | (272,701) | |
| Cushion (plus 2% deduction) | - | | - | 25,880 | (25,880) | |
| Amount Segregated | 193,419 | - | 193,419 | 492,000 | (298,581) | |
| Total Segregated | 749,362 | - | 749,362 | 2,261,000 | (1,511,638) | |

* Denotes account net debit balances.

TONUCCI_PAOLO_00011178

|  | 09/19/08 | | 09/17/08 | | VARIANCE |
|---|---|---|---|---|---|
| *Customer Credits* | | 9,032,320 | | 7,995,742 | 1,036,578 |
| | | | | | |
| *Firm Long vs Cust Short* | (281,484) | | (196,453) | | (85,031) |
| *Non Cust Long vs. Cust Short* | (6,857,319) | | (4,533,257) | | (2,324,062) |
| *PAIB Long vs Cust Short* | (11,596) | | (15,031) | | 3,435 |
| *Reverse Repo vs Cust Short* | - | | - | | - |
| *Cust Long vs Cust Short* | | | | | |
| *Stock Borrow vs Cust Short* | (3,543,186) | | (1,207,278) | | (2,335,908) |
| *Fail to Deliver vs Cust Short* | (1,291,487) | | (1,562,267) | | 270,780 |
| *sub-total* | (11,985,072) | (11,985,072) | (7,514,286) | (7,514,286) | (4,470,786) |
| | | | | | |
| *Total* | | (2,952,752) | | 481,456 | (3,434,208) |
| | | | | | |
| *Customer Debits* | | 8,227,423 | | 8,121,467 | 105,955 |
| | | | | | |
| *Money Fund Receivable* | (81,568) | | (310,045) | | 228,477 |
| *Unsecured/Partly Secured Receivables/Non-Purpose Loans* | (161,709) | | (169,152) | | 7,443 |
| *Security Concentrations* | | | | | |
| *Cust. Long vs.Customer Bank Loan* | (181,854) | | (728,814) | | 546,960 |
| *Stock Loan vs Cust Long* | (2,030,953) | | (1,050,110) | | (980,843) |
| *Cust Long vs Cust Short* | | | | | |
| *Fail to Receive vs Cust Long* | (1,865,215) | | (2,210,873) | | 345,659 |
| *Firm Short vs Customer Long* | (5,566,276) | | (2,820,568) | | (2,745,708) |
| *sub-total* | (9,887,575) | (9,887,575) | (7,289,562) | (7,289,562) | (2,598,013) |
| | | | | | |
| *Total* | | (1,660,152) | | 831,906 | (2,492,058) |
| | | | | | |
| *Plus:* | | | | | |
| *Stock Borrow / SB Q vs. Firm Bank Loan* | | - | | - | |
| *Stock Borrow vs. Cust Bank Loan* | | - | | - | |
| | | | | | |
| *Net Cust Dr./Cr.* | | (1,292,600) | | (350,449) | (942,151) |

TONUCCI_PAOLO_00011178

COPY PASTE FROM RESERVE FILE

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in OOO'S)*

| | 09/19/08 |
|---|---:|
| **1.** **CUSTOMER CREDITS:** | |
| CUSTOMER SECURITY ACCOUNTS | 8,523,574 |
| CUSTOMER ADJUSTMENTS | 723,468 |
| UNMAPPED CUSTOMER PAYABLE | 80 |
| CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| CUSTOMER NETTING NB | (77,250) |
| MONEY CONTROL ADJUSTMENTS | - |
| NON-BROKER DEALER AFFILIATES TYPE 5 | 290 |
| BOOKKEEPING ADJUSTMENTS | - |
| CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| NON-NETWORK OFFSHR MUTUAL FUNDS | - |
| BANK OVERDRAFTS | 222,207 |
| NON-BROKER DEALER AFFILIATES - OTHER TYPES | 210,769 |
| HOUSE ACCOUNTS | 2,525 |
| TEFRA WITHHOLDING PAYABLE | 95 |
| LEGAL LEDGER CONTRA ACCOUNTS | 116 |
| BREAK VS. CUSTOMER LONG | 84,788 |
| FIRM LONG VS. CUSTOMER SHORT | (281,484) |
| NONCUST LONG VS. CUSTOMER SHORT | (6,857,319) |
| REVERSE REPO VS. CUSTOMER SHORT | - |
| PAIB LONG VS. CUSTOMER SHORT | (11,596) |
| SHORT & CREDIT INTEREST | 28,371 |
| MONEY FUND SETTLEMENTS 098-00003 & 098-70001 | 290 |
| UNALLOCATED CUSTOMER SHORT | - |
| | |
| TOTAL CUSTOMER CREDITS | 2,430,791 |
| | |
| **2.** **CUSTOMER BANK LOAN:** | |
| OCC MARGIN | - |
| OCC MARGIN DEFICIT | - |
| OCC COMMINGLED MARGIN (NONCUST BANK LOAN) | - |
| STOCK BORROW VS. CUST BANK LOAN | - |
| STOCK BORROW VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN | - |
| STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN | - |
| STOCK BORROW L C VS FIRM BANK LOAN | - |
| FAIL TO DELIVER VS. FIRM BANK LOAN | - |
| CUSTOMER BANK LOAN VS. NON-CUST LONG | - |
| CUSTOMER LONG VS. CUSTOMER BANK LOAN | 181,854 |
| CUST BANK LOAN - CUST NOT LONG | - |
| NONCUST BANK LOAN - NONCUSTOMER NOT LONG | - |
| FIRM BANK LOAN - FIRM NOT LONG | - |
| | |
| TOTAL CUSTOMER BANK LOAN | 181,854 |
| | |
| **3.** **CUSTOMER STOCK LOAN:** | |
| STOCK LOAN | 8,421,983 |
| STOCK LOAN MTM | (642,717) |
| STOCK LOAN WITH CLEARING ORG | - |
| STOCK LOAN FREE OF MONEY | 5,224,063 |
| STOCK LOAN MTM DEFICIT | 468 |
| STOCK LOAN BOB ADJUSTMENT | - |
| UNALLOCATED STOCK LOAN ADJ | - |
| STOCK LOAN VS. STOCK BORROW L C | - |
| STOCK LOAN PLEDGE VS. STOCK BORROW L C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,009) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (247,637) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,255) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,030,953 |

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|---|---|---|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 6,907 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (225,367) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23,607) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |
| | FAIL TO RECEIVE VS. PAIB LONG | (4,066) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (12,668) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (7) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (15,106) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (23) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (1,487) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 1,865,215 |

| 5. | FIRM SHORT VS CUSTOMER LONG | |
|---|---|---|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 137,078 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 3,447,193 |
| | REPO VS. CUSTOMER LONG | 1,805,374 |
| | PAIB SHORT VS. CUSTOMER LONG | 122,322 |
| | REPO VS. UNALLOCATED | 31,101 |
| | FIRM SHORT VS. UNALLOCATED | 5,230 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 17,978 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 5,566,276 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|---|---|---|
| | DIVIDEND & INT PAYABLES | 26,684 |
| | ADJUSTMENTS FROM DIVIDND DEPT. | (21,362) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|---|---|---|

| 8. | SUSPENSE ACCOUNTS: | |
|---|---|---|
| | SUSPENSE CREDITS & SMV: | 41,638 |
| | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,319 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 138,510 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|---|---|---|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|---|---|---|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 12,218,921 |

TONUCCI_PAOLO_00011178

| 12. | CUSTOMER DEBITS: | |
|-----|------------------|---|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,492,635 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | - |
| | MONEY FUND RECEIVABLE | (81,568) |
| | MARGIN INTEREST | 41,227 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | TOTAL CUSTOMER DEBITS | 7,984,145 |

| 13. | CUSTOMER STOCK BORROW: | |
|-----|------------------------|---|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | (5,909,361) |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | 8,438,386 |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
| | STOCK BORROW VS. THE BOX | (269,782) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (15,106) |
| | STOCK BORROW PLEDGE Q. VS. F R CNS | (23) |
| | STOCK BORROW PLEDGE NQ VS. F R CNS | - |
| | STOCK BORROW L C VS. F R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (99,827) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (442,429) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (18,115) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| | STOCK BORROW PLEDGE NQ VS. FAIL TO RECEIVE | (1,005) |
| | TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

TONUCCI_PAOLO_00011178

| | | |
|---|---|---|
| **14.** | *CUSTOMER FAIL TO DELIVER:* | |
| | *FAIL TO DELIVER* | 4,960,740 |
| | *CNS FAIL TO DELIVER* | 1,900,343 |
| | *MISC FAIL TO DELIVER ADJUSTMENTS* | 1,798,941 |
| | *OMNI FAIL TO DELIVER ADJUSTMENTS* | - |
| | *FAIL TO DELIVER MTM ADJUSTMENT* | - |
| | *FAIL TO DELIVER ADJUSTMENT* | - |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE* | (225,367) |
| | *FAIL TO DELIVER VS. FAIL TO RECEIVE CNS* | (1,487) |
| | *FAIL TO DELIVER OVER 30 DAYS* | (826) |
| | *FAIL TO DELIVER VS. FIRM SHORT* | (742,968) |
| | *FAIL TO DELIVER VS. PAIB SHORT* | (43,487) |
| | *FAIL TO DELIVER VS. REPO* | (440,321) |
| | *FAIL TO DELIVER VS. THE BOX* | (1,107,188) |
| | *FAIL TO DELIVER VS. NON-CUSTOMER SHORT* | (2,936,233) |
| | *FAIL TO DELIVER VS. UNALLOCATED  BREAK* | (276,055) |
| | *CNS FAIL TO DELIVER VS. FIRM SHORT* | (452,940) |
| | *CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT* | (665,286) |
| | *CNS FAIL TO DELIVER VS. PAIB SHORT* | (62,417) |
| | *CNS FAIL TO DELIVER VS. THE BOX* | (264,016) |
| | *CNS FAIL TO DELIVER VS. REPO* | (96,672) |
| | *CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN* | - |
| | *CNS FAIL TO DELIVER VS. UNALLOC BREAK* | (27,371) |
| | *CNS FAIL TO DELIVER VS. FAIL TO RECEIVE* | (25,903) |
| | *TOTAL CUSTOMER FAIL TO DELIVER* | **1,291,487** |
| | | |
| **15.** | *CUSTOMER MARGIN WITH OCC* | |
| | *OCC MARGIN* | - |
| | *OCC PROPRIETARY QUALIFIED COLLATERAL* | 507,418 |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | *TOTAL CUSTOMER MARGIN WITH OCC* | **507,418** |
| | | |
| **16.** | *OTHER* | |
| | *OTHER CUSTOMER DEBITS* | - |
| | *TOTAL OTHER* | - |
| | | |
| **17.** | *AGGREGATE DEBIT ITEMS* | 13,315,260 |
| **18.** | *LESS 3%* | (399,458) |
| **19.** | *TOTAL 15C3-3 DEBITS* | 12,915,802 |
| | | |
| **20.** | *EXCESS - DEBITS OVER CREDITS* | 696,881 |
| **21.** | *DEFICIT - CREDITS OVER DEBITS* | 0 |

TONUCCI_PAOLO_00011178

LEHMAN BROTHERS INC.
RULE 15c3-3 RESERVE FORMULA
(000'S)

|  | 09/19/08 |
|---|---|
| *CUSTOMER CREDITS:* |  |
| *Customer Accounts* | 4,390,797 |
| *Securities Related Intercompany Payables* | 189,227 |
| *ITS Unsecured Shorts* | 77,049 |
| *Non Commodity Reg* | 0 |
| *Commodity Overdrafts* | 0 |
| *Bank Overdrafts* | 0 |
| *Tefra Withholdings* | 0 |
| *Aged Checks* | 0 |
| *Subtotal* | 4,657,073 |
|  |  |
| *CUSTOMER STOCK LOAN* | 0 |
| *CUSTOMER FAIL TO RECEIVE* | 2,395,768 |
| *CUSTOMER BANK LOAN (OCC MARGIN)* | 738 |
| *CUSTOMER BANK LOAN (ITS-REPO)* | 683,637 |
| *FIRM SHORT VS. CUSTOMER LONG* | 20,590 |
| *SUSPENSE CREDITS* | 0 |
|  |  |
| *TOTAL CREDITS* | 7,757,806 |
|  |  |
| *CUSTOMER DEBITS:* |  |
| *Customer Accounts* | 4,938,747 |
| *OMNI Rec Formula* | 0 |
| *Philadelphia Options Cust. Receivables* | 0 |
| *Subtotal* | 4,938,747 |
|  |  |
| *CUSTOMER MARGIN WITH OCC* | 0 |
|  |  |
| *CUSTOMER STOCK BORROW* | 848,446 |
| *CUSTOMER FAIL TO DELIVER* | 1,829,002 |
| *AGGREGATE DEBITS* | 7,616,195 |
| *Less 3%* | 228,486 |
| *TOTAL DEBITS* | 7,387,709 |
|  |  |
| *EXCESS CREDITS OVER DEBITS* | 370,097 |

TONUCCI_PAOLO_00011178

*SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS*

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (1") CUST F-D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B-D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (23) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F-D (6) REPO | 0 | 0 |
| #63 | (19) BR Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F-D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (6) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (6) HIC REPO | 0 | 0 |
| #93 | (1") CUST LONG F-D  VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F-D VS (10) TRI PARTY REPO | 0 | 0 |
| #98 | (29) AFFILIATE LONG  VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F-D- 30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (1") CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16)PLEDGED VS BOR. | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST F/D = 30 DAYS VS (18) NON CUST F/R | 61,169 | 61 |
| #150 | (1") CUST LONG F  VS (18) NON CUST (F R) | 0 | 0 |
| #151 | (19) B R DEALER LONG FREE VS (18) NON CUST (F R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F R | 0 | 0 |
| #163 | (1") CUST LONG F VS (20) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F/D-30 VS (22) CUST SHRT(F R) | 283,919 | 284 |
| #194 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F R) | 22,806,705 | 22,807 |
| #180 | (19) BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22)CUST SHORT(F R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22)CUST SHORT(F R) | 0 | 0 |
| #192 | (11)NONCUST FD V S (24)OPER SHORT | 0 | 0 |
| #197 | (23) OPER ACCTS LNG VS (24) OPER SHRT | 0 | 0 |
| #195 | (23) INACT. LONG  VS (24) OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D- 30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #215 | (15) NON-CUST F D VS (26) OPER SHORT | 0 | 0 |
| #211 | (1") CUST. LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #213 | (21) OPER. ACCCTS LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (26)AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26)AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 3,911,836 | 3,912 |
| #285 | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #285C | (33) BOX BREAKS VS (22)CUST SHRT(F R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (20)CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (18) F R | 0 | 0 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 0 | 0 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 4".71".87"5 | 47,718 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04)PROPRIETARY SHORT | 0 | 0 |
| #339 | (31) NET LONG  CLE(38) INACTIVE SHORT | 0 | 0 |
| #341 | (1") CUST LONG FREE VS (38)INACTIVE SHRT | 75,851 | 76 |
| #342 | (19) BE.DEALER LONG FREE VS (38)INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #344 | (23) CUST LONG (19) VS (38)INACTIVE SHRT | 330,030 | 330 |
| #346 | (2") NON-BROKER DEALER (19) VS (38)INACTIVE SHRT | 0 | 0 |
| #347 | (3") AFFIL LGFREE(19) VS (38)INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (38) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (38)INACTIVE SHRT | 1"5,819 | 178 |
| #337 | (9) NON CUST F D (38) INACTIVE SHORT | 0 | 0 |
| #386 | (5) BVF VS (46) SPECIAL FINANCE | 0 | 0 |
| #392 | (1")CUST LONG FREE VS (46)SPECIAL FINANCE | 530,685 | 531 |
| #393 | (19)BR DEALER LONG FREE VS (46)SPECIAL FINANCE | 0 | 0 |
| #395 | (21) OPERATIONAL VS (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (01)SPECIAL FIN. | 0 | 0 |
| #400 | (33) BOX BREAK LNG (46) SPECIAL FIN. | 0 | 0 |
| #419 | (33)BOX BREAKS LAW (45) FIN LDGR TRF. | 0 | 0 |
| #433 | (35)SPEC FIN CUST LONG VS (26) AFFIL SHORT | 603,494 | 603 |
| #438 | (35)SPEC FIN CUST SHT VS (38) INACTIVE SHRT | 0 | 0 |
| #443 | (3") FIN. LDGR TR VS (5) HIC REPOS | 0 | 0 |
| | PARTLY SECURED CHARGE | 4,249,986A | 4,250 |
| | STOCK RECORD BREAK | 0B | 0 |
| | ACCOUNTS PAYABLE | 275,298,258R-2 | 275,298 |
| | SCS CASH | 38,194,246R-2 | 38,194 |
| | OPTION MARGIN | 7,129,651R-2 | 7,130 |
| MONEY | BANK OVERDRAFTS | 3,230,828R-3 | 3,231 |
| ONLY | SUSPENSE - BANK REC. DIFFERENCES | 936,305R-4 | 936 |
| | OPERATIONAL - UNAPPLIED CASH | 60.0"7.90"R-3 | 60,078 |
| | P&I PAYABLES CANADA | 00-5 | 0 |
| | P&I PAYABLES | 22,186,9"6E-5 | 22,187 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 40",054,152     394,925,868 | 394,926 |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F-D VS (28) TRANSFER | 0 | 0 |
| #226 | (15) CUST F-D VS (28) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F-D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F-D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #269 | (15) CUST F VS (34) BOX | 0 | 0 |
| #270 | (15) NET LONG CLE  VS (34) BOX | 0 | 0 |
| #270C | (15) CUST VS (34) BOX | 0 | 0 |
| #557 | (15) CUST F D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |

| | | | |
|---|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | | *882,7"",380* | 882,727 |

TONUCCI_PAOLO_00011178

1,115

(2,289)
(507)
(73,949)

0

TONUCCI_PAOLO_00011178

FSCS-3 P.A.I.B COMPUTATION
BROKER DEALER UNIT
09/19/08
(in OOO'S)

|  |  | 09/19/08 |
|---|---|---|
| **1.** | **P.A.I.B. CREDITS:** | |
| | *PAIB CREDITS* | 2,235,573 |
| | *BREAK VS. PAIB LONG* | 99,471 |
| | *PAIB CREDIT ADJ* | (8,000) |
| | *PAIB DEFERRED COMMISSIONS AND IA FEES* | 11,659 |
| | *PAIB LONG VS CUSTOMER SHORT* | 11,596 |
| | *FIRM LONG vs PAIB SHORT* | (21,967) |
| | *NONCUST LONG VS. PAIB SHORT* | (173,085) |
| | *UNALLOCATED PAIB SHORT* | - |
| | *PAIB SHORT VS CUSTOMER LONG* | (122,322) |
| | | |
| | *P.A.I.B. CREDITS:* | 2,032,924 |
| | | |
| **2.** | **PAIB BANK LOAN:** | |
| | | |
| | *OCC MARGIN* | - |
| | *OCC MARGIN DEFECIT* | - |
| | *PAIB LONG VS. FIRM BANK LOAN* | - |
| | *PAIB LONG VS. CUST BANK LOAN* | 114 |
| | *PAIB LONG VS. PAIB BANK LOAN* | - |
| | *PAIB BANK LOAN - PAIB NOT LONG* | - |
| | *CUST BANK LOAN- CUSTOMER NOT LONG* | - |
| | *FIRM BANK LOAN- CUSTOMER NOT LONG* | - |
| | | |
| | *TOTAL P.A.I.B. BANK LOAN* | 114 |
| | | |
| **3.** | **PAIB STOCK LOAN:** | |
| | | |
| | *STOCK LOAN VS PAIB LONG* | - |
| | *STOCK LN PLDG VS. PAIB LONG* | 80,009 |
| | | |
| | *TOTAL CUSTOMER STOCK LOAN* | 80,009 |
| **4.** | **PAIB FAIL TO RECEIVE:** | |
| | | |
| | *FAIL TO RECEIVE VS PAIB LONG* | 4,066 |
| | *CNS FAIL TO RECEIVE VS PAIB LONG* | 7 |
| | | |
| | *TOTAL P.A.I.B. FAIL TO RECEIVE* | 4,073 |
| | | |
| **5.** | **FIRM SHORT VS PAIB LONG:** | |
| | | |
| | *REPO VS PAIB LONG* | 47,883 |
| | *NONCUST SHORT VS. PAIB LONG* | 344,571 |
| | *FIRM SHORT VS PAIB LONG* | 11,399 |
| | | |
| | *TOTAL FIRM SHORT VS P.A.I.B. LONG* | 403,853 |
| | | |
| **6.** | **PAIB DIVIDEND & INTEREST:** | |
| | | |
| | *STOCK DIVIDENDS > 30 DAYS* | - |
| | *MONEY CONTROL ADJUSTMENT* | - |
| | *DIVIDEND & INT PAYABLES  > 7 DAYS* | - |

TONUCCI_PAOLO_00011178

| 7. | *SECURITY COUNT DIFFERENCE > 7 DAYS:* | - |
|----|----|----|
| 8. | *SUSPENSE CREDITS & SMV >7 DAYS:* | - |
| 9. | *AGED TRANSFERS & REORGANIZATION:* | |
| | *TRANSFER SHORTS OVER 40 DAYS* | - |
| | *REORG/REDEMPTION SMV OVER 7 DAYS* | - |
| | *TOTAL AGED TRANSFERS & REORGANIZATION* | - |
| 10. | *OTHER:* | |
| | *OTHER CREDITS* | - |
| | *TOTAL OTHER* | - |
| | *TOTAL PAIB CREDITS* | 2,520,973 |

TONUCCI_PAOLO_00011178

| | | |
|---|---|---|
| 12. | **P.A.I.B. DEBITS:** | |
| | *CUSTOMER SECURITY ACCOUNTS* | 1,955,103 |
| | *VARIOUS PAIB DEBIT ADJ* | (176,096) |
| | *UNSECURED DEBITS* | - |
| | *PARTLY SECURED DEBITS* | - |
| | *RULE 144 UNSECURED DEBITS* | - |
| | *SECURITY CONCENTRATION* | - |
| | *BREAK VS CUSTOMER LONG* | - |
| | | |
| | *P.A.I.B. DEBITS:* | 1,779,007 |
| | | |
| 13. | **PAIB STOCK BORROW:** | |
| | | |
| | *STOCK BORROW VS PAIB SHORT* | 442,429 |
| | *STOCK BORROW Q. VS. PAIB SHORT* | 215 |
| | *STOCK BORROW NQ VS. PAIB SHORT* | - |
| | *STOCK BORROW L/C VS PAIB SHORT* | - |
| | | |
| | *TOTAL P.A.I.B. STOCK BORROW* | 442,644 |
| 14. | **PAIB FAIL TO DELIVER:** | |
| | | |
| | *FAIL TO DELIVER OVER 30 DAYS* | - |
| | *FAIL TO DELIVER VS PAIB SHORT* | 43,487 |
| | *CNS FAIL TO DELIVER VS PAIB SHORT* | 62,417 |
| | *CNS FAIL TO DELIVER VS THE BOX* | - |
| | *CNS FAIL TO DELIVER VS REPO* | - |
| | *CNS FAIL TO DELIVER VS UNALLOC/BREAK* | - |
| | *CNS FAIL TO DELIVER VS FAIL TO RECEIVE* | - |
| | | |
| | *TOTAL P.A.I.B. FAIL TO DELIVER* | 105,904 |
| | | |
| 15. | **PAIB MARGIN WITH OCC** | |
| | *OCC MARGIN* | - |
| | *CUSTOMER LONG SEG VS. CUST. BANK LOAN* | - |
| | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
| | | |
| | *TOTAL P.A.I.B. MARGIN WITH OCC* | - |
| | | |
| 16. | **OTHER** | |
| | *OTHER PAIB DEBITS* | - |
| | | |
| | *TOTAL OTHER* | - |
| | | |
| 17. | **TOTAL PAIB DEBITS** | 2,327,555 |
| | | |
| 20. | **EXCESS - DEBITS OVER CREDITS** | - |
| 21. | **DEFICIT - CREDITS OVER DEBITS** | 193,419 |

TONUCCI_PAOLO_00011178

TONUCCI_PAOLO_00011178

# EXHIBIT 24

**LEHMAN BROTHERS INC.**

**CONSOLIDATED 15c3-3 RESERVE FORMULA**

*AS OF SEPTEMBER 19, 2008*

*(in 000's)*

| CREDITS: | BD UNIT | GOVT UNIT | TOTAL |
|---|---|---|---|
| CUSTOMER CREDITS | 7,413,270 | 11,513,850 | 18,927,120 |
| CUSTOMER BANK LOAN | 866,229 | - | 866,229 |
| CUSTOMER STOCK LOAN | 2,030,953 | 88,169 | 2,119,122 |
| CUSTOMER FAIL TO RECEIVE | 4,123,101 | 946,595 | 5,069,696 |
| FIRM SHORT VS CUSTOMER LONG | 5,561,060 | 959,293 | 6,520,353 |
| CUSTOMER DIVIDENDS AND INTEREST | 5,322 | - | 5,322 |
| SECURITY COUNT DIFFERENCE | - | - | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | 132,162 | 83,201 | 215,363 |
| AGED TRANSFER AND REORGANIZATION | - | - | - |
| OTHER | - | - | - |
| TOTAL CREDITS | 20,132,097 | 13,591,108 | 33,723,205 |
| DEBITS: | | | |
| CUSTOMER DEBITS | 12,909,569 | 2,784,116 | 15,693,685 |
| CUSTOMER STOCK BORROW | 4,380,656 | 456,993 | 4,837,649 |
| CUSTOMER FAIL TO DELIVER | 3,217,880 | 9,923,087 | 13,140,967 |
| CUSTOMER MARGIN WITH OCC | 507,418 | - | 507,418 |
| OTHER | - | - | - |
| AGGREGATE DEBITS | 21,015,523 | 13,164,196 | 34,179,719 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | (630,466) | (394,926) | (1,025,392) |
| TOTAL DEBITS | 20,385,057 | 12,769,270 | 33,154,327 |
| EXCESS OF CREDITS OVER DEBITS | - | 821,838 | 821,838 |
| EXCESS OF DEBITS OVER CREDITS | 252,960 | - | (252,960) |
| CUSHION | | | - |
| PRELIMINARY AMOUNT SEGREGATED | | | 568,878 |
| RR/SEC. BORROWED - 2% DEDUCTION | | | |
| ADJUSTED REGULATORY LOCK-UP | | | 569,000 |

## LEHMAN BROTHERS INC.
### CONSOLIDATED 15c3-3 PAIB RESERVE FORMULA
#### AS OF SEPTEMBER 19, 2008
##### *(in 000's)*

|  | TOTAL |
|---|---|
| **CREDITS:** | |
| PAIB CREDITS | 2,032,924 |
| PAIB BANK LOAN | 114 |
| PAIB STOCK LOAN | 80,009 |
| PAIB FAIL TO RECEIVE | 4,073 |
| FIRM SHORT VS PAIB LONG | 403,853 |
| PAIB DIVIDENDS AND INTEREST | - |
| SECURITY COUNT DIFFERENCE | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | - |
| AGED TRANSFER AND REORGANIZATION | - |
| OTHER | - |
| | |
| **TOTAL CREDITS** | 2,520,973 |
| **DEBITS:** | |
| PAIB DEBITS | 1,779,007 |
| PAIB STOCK BORROW | 442,644 |
| PAIB FAIL TO DELIVER | 105,904 |
| PAIB MARGIN WITH OCC | - |
| OTHER | - |
| | |
| AGGREGATE DEBITS | 2,327,555 |
| | |
| TOTAL DEBITS | 2,327,555 |
| | |
| EXCESS OF CREDITS OVER DEBITS | 193,419 |
| EXCESS OF DEBITS OVER CREDITS | - |
| CUSHION | - |
| **PRELIMINARY AMOUNT SEGREGATED** | 193,419 |
| RR/SEC. BORROWED - 2% DEDUCTION | - |
| **ADJUSTED REGULATORY LOCK-UP** | 193,419 |

### LEHMAN BROTHERS INC.
### CUSTOMER RESERVE FORMULA
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
#### (in 000's)
##### (ITS ONLY)

|  | 09/19/08 |
|---|---:|
| **CUSTOMER CREDITS:** |  |
| Customer Accts (ITS) | 4,467,846 |
| Customer Accts | 0 |
| Securities Related Intercompany Payables | 189,227 |
| Phlx Options Payables | 0 |
| NonReg Commodity Credits | 0 |
| Bank Overdrafts | 0 |
| Bank Overdrafts(Commodity) | 0 |
| Other | 0 |
| Total | 4,657,073 |
|  |  |
| **CUSTOMER BANK LOAN** | 0 |
| **CUSTOMER STOCK LOAN** | 0 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 2,395,768 |
| **CUSTOMER FAIL TO RECEIVE** | 0 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 20,590 |
| **FIRM SHORT VS. CUSTOMER LONG** | 0 |
| **SUSPENSE CREDITS** | 0 |
|  |  |
| **TOTAL CREDITS** | 7,757,806 |
|  |  |
|  |  |
| **CUSTOMER DEBITS:** |  |
| Customer Accts (ITS) | 4,938,747 |
| Customer Accts | 0 |
| Philadelphia Options Cust. Receivables | 0 |
| Total | 4,938,747 |
|  |  |
| **CUSTOMER MARGIN WITH OCC** | 0 |
| **CUSTOMER STOCK BORROW (ITS)** | 848,446 |
| **CUSTOMER STOCK BORROW** | 0 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 1,829,002 |
| **CUSTOMER FAIL TO DELIVER** | 0 |
|  |  |
| **AGGREGATE DEBITS** | 7,616,195 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 228,486 |
|  |  |
| **TOTAL DEBITS** | 7,387,709 |
|  |  |
| **EXCESS OF CREDITS OVER DEBITS** | 370,097 |

2/2

**LEHMAN BROTHERS INC.**
**CUSTOMER RESERVE FORMULA**
**BROKER DEALER UNIT**
**AS OF SEPTEMBER 19, 2008**
*(in 000's)*
*(ADP ONLY)*

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** | |
| Customer Accts (ITS) | 0 |
| Customer Accts | 2,533,990 |
| OMNI Conv payable Accts | 0 |
| Phlx Options Payables | 0 |
| NonReg Commodity Credits | 0 |
| Bank Overdrafts | 222,207 |
| Other | 0 |
| Total | 2,756,197 |
| | |
| **CUSTOMER BANK LOAN** | 181,854 |
| **CUSTOMER STOCK LOAN** | 2,030,953 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 0 |
| **CUSTOMER FAIL TO RECEIVE** | 1,727,333 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 0 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 0 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 0 |
| **FIRM SHORT VS. CUSTOMER LONG** | 5,540,470 |
| **CUSTOMER DIVIDEND & INTEREST** | 5,322 |
| **SUSPENSE CREDITS** | 132,162 |
| **OTHER** | 0 |
| | |
| **TOTAL CREDITS** | 12,374,291 |
| | |
| | |
| **CUSTOMER DEBITS:** | |
| Customer Accts (ITS) | 0 |
| Customer Accts | 7,970,822 |
| Philadelphia Options Cust. Receivables | 0 |
| Total | 7,970,822 |
| | |
| **CUSTOMER MARGIN WITH OCC** | 507,418 |
| **CUSTOMER STOCK BORROW (ITS)** | 0 |
| **CUSTOMER STOCK BORROW** | 3,532,210 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 0 |
| **CUSTOMER FAIL TO DELIVER** | 1,388,878 |
| | |
| **AGGREGATE DEBITS** | 13,399,328 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 401,980 |
| | |
| **TOTAL DEBITS** | 12,997,348 |
| | |
| **EXCESS OF DEBITS OVER CREDITS** | 623,057 |
| | |
| **EXCESS OF CREDITS OVER DEBITS** | 0 |

*LEHMAN BROTHERS INC.*
*CUSTOMER RESERVE FORMULA*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in 000's)*
*(COMBINED)*

|  | 09/19/08 |
|---|---|
| **CUSTOMER CREDITS:** | |
| Customer Accts (ITS) | 4,467,846 |
| Customer Accts | 2,533,990 |
| Securities Related Intercompany Payables | 189,227 |
| Phlx Options Payables | 0 |
| NonReg Commodity Credits | 0 |
| Bank Overdrafts | 222,207 |
| Bank Overdrafts (Commodity) | 0 |
| Other | 0 |
| Total | 7,413,270 |
| | |
| **CUSTOMER BANK LOAN** | 181,854 |
| **CUSTOMER STOCK LOAN** | 2,030,953 |
| **CUSTOMER FAIL TO RECEIVE (ITS)** | 2,395,768 |
| **CUSTOMER FAIL TO RECEIVE** | 1,727,333 |
| **CUSTOMER BANK LOAN (OCC MARGIN)** | 738 |
| **CUSTOMER BANK LOAN (ITS-REPO)** | 683,637 |
| **FIRM SHORT VS. CUSTOMER LONG (ITS)** | 20,590 |
| **FIRM SHORT VS. CUSTOMER LONG** | 5,540,470 |
| **CUSTOMER DIVIDEND & INTEREST** | 5,322 |
| **SUSPENSE CREDITS** | 132,162 |
| **OTHER** | 0 |
| | |
| **TOTAL CREDITS** | 20,132,097 |
| | |
| **CUSTOMER DEBITS:** | |
| Customer Accts (ITS) | 4,938,747 |
| Customer Accts | 7,970,822 |
| Philadelphia Options Cust. Receivables | 0 |
| Total | 12,909,569 |
| | |
| **CUSTOMER MARGIN WITH OCC** | 507,418 |
| **CUSTOMER STOCK BORROW (ITS)** | 848,446 |
| **CUSTOMER STOCK BORROW** | 3,532,210 |
| **CUSTOMER FAIL TO DELIVER (ITS)** | 1,829,002 |
| **CUSTOMER FAIL TO DELIVER** | 1,388,878 |
| | |
| **AGGREGATE DEBITS** | 21,015,523 |
| **LESS 3% OF AGGREGATE DEBIT ITEMS** | 630,466 |
| | |
| **TOTAL DEBITS** | 20,385,057 |
| | |
| **EXCESS OF CREDITS OVER DEBITS** | 0 |
| | |
| **EXCESS OF DEBITS OVER CREDITS** | 252,960 |

1/1

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

AS OF SEPTEMBER 19, 2008

|  | 09/19/08 |
|---|---|
| *CUSTOMER CREDITS:* | |
| Customer Accounts | 4,390,797 |
| Securities Related Intercompany Payables | 189,227 |
| ITS Unsecured Shorts | 77,049 |
| Non Commodity Reg | 0 |
| Commodity Overdrafts | 0 |
| Bank Overdrafts | 0 |
| Tefra Withholdings | 0 |
| Aged Checks | 0 |
| Subtotal | 4,657,073 |
| | |
| CUSTOMER STOCK LOAN | 0 |
| CUSTOMER FAIL TO RECEIVE | 2,395,768 |
| CUSTOMER BANK LOAN (OCC MARGIN) | 738 |
| CUSTOMER BANK LOAN (ITS-REPO) | 683,637 |
| FIRM SHORT VS. CUSTOMER LONG | 20,590 |
| SUSPENSE CREDITS | 0 |
| | |
| TOTAL CREDITS | 7,757,806 |
| | |
| *CUSTOMER DEBITS:* | |
| Customer Accounts | 4,938,747 |
| OMNI Rec Formula | 0 |
| Philadelphia Options Cust. Receivables | 0 |
| Subtotal | 4,938,747 |
| | |
| CUSTOMER MARGIN WITH OCC | 0 |
| | |
| CUSTOMER STOCK BORROW | 848,446 |
| CUSTOMER FAIL TO DELIVER | 1,829,002 |
| AGGREGATE DEBITS | 7,616,195 |
| Less 3% | 228,486 |
| TOTAL DEBITS | 7,387,709 |
| | |
| EXCESS CREDITS OVER DEBITS | 370,097 |

*15c3-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*AS OF SEPTEMBER 19, 2008*
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---|
| 1. | *CUSTOMER CREDITS:* | |
| | *CUSTOMER SECURITY ACCOUNTS* | 8,512,491 |
| | *CUSTOMER ADJUSTMENTS* | 1,059,956 |
| | *UNMAPPED CUSTOMER PAYABLE* | 80 |
| | *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| | *CUSTOMER NETTING NB* | (77,250) |
| | *MONEY CONTROL ADJUSTMENTS* | - |
| | *NON-BROKER DEALER AFFILIATES TYPE 5* | 290 |
| | *BOOKKEEPING ADJUSTMENTS* | - |
| | *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| | *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
| | *BANK OVERDRAFTS* | 222,207 |
| | *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
| | *HOUSE ACCOUNTS* | 2,525 |
| | *TEFRA WITHHOLDING PAYABLE* | 95 |
| | *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
| | *BREAK VS. CUSTOMER LONG* | 84,788 |
| | *FIRM LONG VS. CUSTOMER SHORT* | (281,484) |
| | *NONCUST LONG VS. CUSTOMER SHORT* | (6,857,319) |
| | *REVERSE REPO VS. CUSTOMER SHORT* | - |
| | *PAIB LONG VS. CUSTOMER SHORT* | (11,596) |
| | *SHORT & CREDIT INTEREST* | 28,371 |
| | *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | 290 |
| | *UNALLOCATED CUSTOMER SHORT* | - |
| | *TOTAL CUSTOMER CREDITS* | 2,756,197 |

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
#### *(in OOO'S)*

|     |                                                      | 09/19/08 |
|-----|------------------------------------------------------|---------:|
| 2.  | *CUSTOMER BANK LOAN:*                                |          |
|     | *OCC MARGIN*                                         | -        |
|     | *OCC MARGIN DEFICIT*                                 | -        |
|     | *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)*          | -        |
|     | *STOCK BORROW VS. CUST BANK LOAN*                    | -        |
|     | *STOCK BORROW VS. FIRM BANK LOAN*                    | -        |
|     | *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN*           | -        |
|     | *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN*          | -        |
|     | *STOCK BORROW L/C VS FIRM BANK LOAN*                 | -        |
|     | *FAIL TO DELIVER VS. FIRM BANK LOAN*                 | -        |
|     | *CUSTOMER BANK LOAN VS. NON-CUST LONG*               | -        |
|     | *CUSTOMER LONG VS. CUSTOMER BANK LOAN*               | 181,854  |
|     | *CUST BANK LOAN - CUST NOT LONG*                     | -        |
|     | *NONCUST BANK LOAN - NONCUSTOMER NOT LONG*           | -        |
|     | *FIRM BANK LOAN - FIRM NOT LONG*                     | -        |
|     | *TOTAL CUSTOMER BANK LOAN*                           | 181,854  |
|     |                                                      |          |
| 3.  | *CUSTOMER STOCK LOAN:*                               |          |
|     | *STOCK LOAN*                                         | 8,421,983 |
|     | *STOCK LOAN MTM*                                     | (642,717) |
|     | *STOCK LOAN WITH CLEARING ORG*                       | -        |
|     | *STOCK LOAN FREE OF MONEY*                           | 5,224,063 |
|     | *STOCK LOAN MTM DEFICIT*                             | 468      |
|     | *STOCK LOAN BOB ADJUSTMENT*                          | -        |
|     | *UNALLOCATED STOCK LOAN ADJ*                         | -        |
|     | *STOCK LOAN VS. STOCK BORROW L/C*                    | -        |

3/10

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
#### (in OOO'S)

| | 09/19/08 |
|---|---:|
| STOCK LOAN PLEDGE VS. STOCK BORROW L/C | - |
| STOCK LOAN VS. REVERSE REPO | - |
| STOCK LOAN PLEDGE VS. REVERSE REPO | - |
| STOCK LOAN VS. PAIB LONG | - |
| STOCK LOAN PLEDGE VS. PAIB LONG | (80,009) |
| STOCK LOAN VS. STOCK BORROW | (9,344,291) |
| STOCK LOAN VS. STOCK BORROW PLEDGE Q. | (21,386) |
| STOCK LOAN VS. STOCK BORROW PLEDGE NQ | (7,499) |
| STOCK LOAN PLEDGE VS. STOCK BORROW | (256,503) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q. | (9,644) |
| STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ | (28,422) |
| STOCK LOAN VS. NONCUSTOMER LONG | (247,637) |
| STOCK LOAN PLEDGE VS. NONCUSTOMER LONG | (461,255) |
| STOCK LOAN VS. FIRM LONG | (181,875) |
| STOCK LOAN PLEDGE VS. FIRM LONG | (334,323) |
| | |
| TOTAL CUSTOMER STOCK LOAN | 2,030,953 |

4.  CUSTOMER FAIL TO RECEIVE:

| | |
|---|---:|
| FAIL TO RECEIVE | 5,318,473 |
| CNS FAIL TO RECEIVE | 99,743 |
| MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| FAIL TO RECEIVE MTM ADJUSTMENT | - |
| FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 6,907 |
| FAIL TO RECEIVE VS. FAIL TO DELIVER | (363,249) |
| FAIL TO RECEIVE VS. REVERSE REPO | - |
| FAIL TO RECEIVE VS. MTM DEFICIT | - |
| FAIL TO RECEIVE VS. STOCK BORROW | (488,042) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q. | (23,607) |
| FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| FAIL TO RECEIVE VS. STOCK BORROW L/C | - |
| FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (25,903) |
| FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| FAIL TO RECEIVE VS. NONCUSTOMER LONG | (1,661,289) |

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
#### *(in OOO'S)*

|                                                    | 09/19/08   |
| -------------------------------------------------- | ---------: |
| *FAIL TO RECEIVE VS. PAIB LONG*                    | (4,066)    |
| *FAIL TO RECEIVE VS. UNALLOCATED / BREAK*          | -          |
| *CNS FAIL TO RECEIVE VS. FIRM LONG*                | (55,709)   |
| *CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG*         | (12,668)   |
| *CNS FAIL TO RECEIVE VS. PAIB LONG*                | (7)        |
| *CNS FAIL TO RECEIVE ADJUSTMENT*                   | -          |
| *CNS FAIL TO RECEIVE VS. STOCK BORROW*             | (15,106)   |
| *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q.*   | (23)       |
| *CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ*   | -          |
| *CNS FAIL TO RECEIVE VS. STOCK BORROW L/C*         | -          |
| *CNS FAIL TO RECEIVE VS. REVERSE REPO*             | -          |
| *CNS FAIL TO RECEIVE VS. FAIL TO DELIVER*          | (1,487)    |
| *TOTAL CUSTOMER FAIL TO RECEIVE*                   | **1,727,333** |

| 5. | *FIRM SHORT VS CUSTOMER LONG:*                      |            |
| -- | -------------------------------------------------- | ---------: |
|    | *TOTAL FIRM SHORT*                                 | -          |
|    | *FIRM OMNI SHORT*                                  | -          |
|    | *FIRM SHORT VS. CUSTOMER LONG*                     | 137,078    |
|    | *NONCUSTOMER SHORT VS. CUSTOMER LONG*             | 3,447,193  |
|    | *REPO VS. CUSTOMER LONG*                           | 1,805,374  |
|    | *PAIB SHORT VS. CUSTOMER LONG*                     | 122,322    |
|    | *REPO VS. UNALLOCATED*                             | 5,295      |
|    | *FIRM SHORT VS. UNALLOCATED*                       | 5,230      |
|    | *NONCUSTOMER SHORT VS. UNALLOCATED*               | 17,978     |
|    | *TOTAL FIRM SHORT VS. CUSTOMER LONG*              | **5,540,470** |

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---|
| 6. | CUSTOMER DIVIDEND & INTEREST: |  |
|  | DIVIDEND & INT PAYABLES | 26,684 |
|  | ADJUSTMENTS FROM DIVIDEND DEPT. | (21,362) |
|  | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |
| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: |  |
| 8. | SUSPENSE ACCOUNTS |  |
|  | SUSPENSE CREDITS & SMV: | 35,290 |
|  | CUSTOMER UNAPPLIED 090-01234 | 11,553 |
|  | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATE | 85,319 |
|  | TOTAL SUSPENSE ACCOUNTS | 132,162 |
| 9. | AGED TRANSFERS & REORGANIZATION: |  |
|  | TRANSFER SHORTS OVER 40 DAYS | - |
|  | REORG/REDEMPTION SMV OVER 7 DAYS | - |
|  | TOTAL AGED TRANSFERS & REORGANIZATION | - |
| 10. | OTHER: |  |
|  | OTHER CREDITS | - |
|  | TOTAL OTHER | - |
|  | TOTAL CREDITS | 12,374,291 |

6/10

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|     |                                                          | 09/19/08    |
|-----|----------------------------------------------------------|-------------|
| 12. | **CUSTOMER DEBITS:**                                     |             |
|     | CUSTOMER SECURITY ACCOUNTS                                | 4,946,070   |
|     | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)       | (138,131)   |
|     | CUSTOMER NETTING NB                                       | (77,250)    |
|     | MONEY CONTROL ADJUSTMENT                                  | -           |
|     | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits)            | 3,492,635   |
|     | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)           | -           |
|     | BOOKKEEPING ADJUSTMENTS                                   | -           |
|     | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS           | -           |
|     | MONEY FUND RECEIVABLE                                     | (81,568)    |
|     | MARGIN INTEREST                                          | 41,227      |
|     | UNSECURED DEBITS                                         | (21,006)    |
|     | PARTLY SECURED DEBITS                                    | (1,745)     |
|     | NON-PURPOSE LOANS                                        | (189,409)   |
|     | RULE 144 UNSECURED DEBITS                               | -           |
|     | SECURITY CONCENTRATION                                   | -           |
|     | **TOTAL CUSTOMER DEBITS**                               | **7,970,822** |

7/10

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| 13. | *CUSTOMER STOCK BORROW:* |  |
|  | STOCK BORROW | 26,275,972 |
|  | STOCK BORROW MTM | (5,909,361) |
|  | STOCK BORROW L.O.C. | - |
|  | STOCK BORROW VS. CUST SHORT ADJ. | - |
|  | STOCK BORROW FREE OF MONEY | 8,438,386 |
|  | STOCK BORROW LC VS SECURED BK LOAN | - |
|  | STOCK BORROW L/C VS. CUSTOMER SHORT | - |
|  | STOCK BORROW NQ VS. CUSTOMER SHORT | (10,976) |
|  | STOCK BORROW L/C VS. FIRM BANK LOAN | - |
|  | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
|  | STOCK BORROW VS STOCK LOAN | (9,344,291) |
|  | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
|  | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
|  | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
|  | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
|  | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
|  | STOCK BORROW L/C VS. STOCK LOAN | - |
|  | STOCK BORROW L/C VS. STOCK LOAN PLEDGE | - |
|  | STOCK BORROW L/C VS. FIRM SHORT | - |
|  | STOCK BORROW L/C VS. NONCUSTOMER SHORT | - |
|  | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
|  | STOCK BORROW VS. NONCUSTOMER SHORT | (6,670,788) |
|  | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
|  | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (340,769) |
|  | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
|  | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (630,382) |
|  | STOCK BORROW VS. THE BOX | (269,782) |
|  | STOCK BORROW PLEDGE Q. VS. THE BOX | (38,241) |
|  | STOCK BORROW PLEDGE NQ VS. THE BOX | (82,771) |
|  | STOCK BORROW L/C VS. THE BOX | - |
|  | STOCK BORROW VS. FAIL REC CNS | (15,106) |
|  | STOCK BORROW PLEDGE Q. VS. F/R CNS | (23) |
|  | STOCK BORROW PLEDGE NQ VS. F/R CNS | - |
|  | STOCK BORROW L/C VS. F/R CNS | - |

### 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|  | 09/19/08 |
|---|---|
| STOCK BORROW L/C VS. REPO | - |
| STOCK BORROW VS. REPO | (1,341,239) |
| STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| STOCK BORROW VS. UNALLOCATED | (99,827) |
| STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,704) |
| STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (7,128) |
| STOCK BORROW L/C VS. UNALLOCATED | - |
| STOCK BORROW VS. PAIB SHORT | (442,429) |
| STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (215) |
| STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (18,115) |
| STOCK BORROW L/C VS. PAIB SHORT | - |
| STOCK BORROW L/C VS. FAIL TO RECEIVE | - |
| STOCK BORROW VS. FAIL TO RECEIVE | (488,042) |
| STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (23,607) |
| STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (1,005) |
| TOTAL CUSTOMER STOCK BORROW | 3,532,210 |

*9/10*

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---|
| 14. | *CUSTOMER FAIL TO DELIVER:* |  |
|  | *FAIL TO DELIVER* | 4,960,740 |
|  | *CNS FAIL TO DELIVER* | 1,900,343 |
|  | *MISC FAIL TO RECEIVE ADJUSTMENTS* | 2,060,021 |
|  | *OMNI FAIL TO RECEIVE ADJUSTMENTS* | - |
|  | *FAIL TO DELIVER MTM ADJUSTMENT* | - |
|  | *FAIL TO DELIVER ADJUSTMENT* | - |
|  | *FAIL TO DELIVER VS. FAIL TO RECEIVE* | (363,249) |
|  | *FAIL TO DELIVER VS. FAIL TO RECEIVE CNS* | (1,487) |
|  | *FAIL TO DELIVER OVER 30 DAYS* | (826) |
|  | *FAIL TO DELIVER VS. FIRM SHORT* | (742,968) |
|  | *FAIL TO DELIVER VS. PAIB SHORT* | (43,487) |
|  | *FAIL TO DELIVER VS. REPO* | (466,128) |
|  | *FAIL TO DELIVER VS. THE BOX* | (1,107,188) |
|  | *FAIL TO DELIVER VS. NON-CUSTOMER SHORT* | (2,936,233) |
|  | *FAIL TO DELIVER VS. UNALLOCATED/ BREAK* | (276,055) |
|  | *CNS FAIL TO DELIVER VS. FIRM SHORT* | (452,940) |
|  | *CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT* | (665,286) |
|  | *CNS FAIL TO DELIVER VS. PAIB SHORT* | (62,417) |
|  | *CNS FAIL TO DELIVER VS. THE BOX* | (264,016) |
|  | *CNS FAIL TO DELIVER VS. REPO* | (96,672) |
|  | *CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN* | - |
|  | *CNS FAIL TO DELIVER VS. UNALLOC/BREAK* | (27,371) |
|  | *CNS FAIL TO DELIVER VS. FAIL TO RECEIVE* | (25,903) |
|  | *TOTAL CUSTOMER FAIL TO DELIVER* | 1,388,878 |
| 15. | *CUSTOMER MARGIN WITH OCC* |  |
|  | *OCC MARGIN* | - |
|  | *OCC PROPRIETARY QUALIFIED COLLATERAL* | 507,418 |
|  | *OCC COMMINGLED MARGIN (CUST. BANK LOAN)* | - |
|  | *TOTAL CUSTOMER MARGIN WITH OCC* | 507,418 |

10/10

## 15c3-3 CUSTOMER RESERVE COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|     |                        | 09/19/08    |
| --- | ---------------------- | ----------- |
| 16. | OTHER                  |             |
|     | OTHER CUSTOMER DEBITS  | -           |
|     | TOTAL OTHER            | -           |
| 17. | AGGREGATE DEBIT ITEMS  | 13,399,328  |
| 18. | LESS 3%                | (401,980)   |
| 19. | TOTAL 15C3-3 DEBITS    | 12,997,348  |
| 20. | EXCESS - DEBITS OVER CREDITS | 623,057 |
| 21. | DEFICIT - CREDITS OVER DEBITS |        |

**LEHMAN BROTHERS INC.**
**CUSTOMER RESERVE FORMULA**
**GOVERNMENT DEALER UNIT (MTS)**
**AS OF SEPTEMBER 19, 2008**
*(in 000's)*

|  | 09/19/08 |
|---|---|
| **CREDITS :** | |
| CUSTOMER CREDITS | 11,513,850 |
| CUSTOMER BANK LOAN | 0 |
| CUSTOMER STOCK LOAN | 88,169 |
| CUSTOMER FAIL TO RECEIVE | 946,595 |
| FIRM SHORT VS CUSTOMER LONG | 959,293 |
| CUSTOMER DIVIDENDS AND INTEREST | 0 |
| SECURITY COUNT DIFFERENCE | 0 |
| SUSPENSE ACCOUNT CREDITS AND SMV | 83,201 |
| AGED TRANSFER AND REORGANIZATION | 0 |
| OTHER | 0 |
| **TOTAL CREDITS** | 13,591,108 |
| **DEBITS:** | |
| CUSTOMER DEBITS | 2,784,116 |
| CUSTOMER STOCK BORROW | 456,993 |

| | |
|---|---:|
| *CUSTOMER FAIL TO DELIVER* | 9,923,087 |
| *CUSTOMER MARGIN WITH OCC* | 0 |
| *OTHER* | 0 |
| | |
| *AGGREGATE DEBITS* | 13,164,196 |
| *LESS 3% OF AGGREGATE DEBIT ITEMS* | 394,926 |
| *TOTAL DEBITS* | 12,769,270 |
| | |
| *EXCESS OF CREDITS OVER DEBITS* | 821,838 |

15c3-3 P.A.I.B COMPUTATION

**BROKER DEALER UNIT**
**AS OF SEPTEMBER 19, 2008**
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---|
| 1. | **P.A.I.B. CREDITS:** | |
|  | PAIB CREDITS | 2,235,573 |
|  | BREAK VS. PAIB LONG | 99,471 |
|  | PAIB CREDIT ADJ | (8,000) |
|  | PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
|  | PAIB LONG VS CUSTOMER SHORT | 11,596 |
|  | FIRM LONG vs PAIB SHORT | (21,967) |
|  | NONCUST LONG VS. PAIB SHORT | (173,085) |
|  | UNALLOCATED PAIB SHORT | - |
|  | PAIB SHORT VS CUSTOMER LONG | (122,322) |
|  |  |  |
|  | **P.A.I.B. CREDITS:** | 2,032,924 |
|  |  |  |
| 2. | **PAIB BANK LOAN:** | |
|  |  |  |
|  | OCC MARGIN | - |
|  | OCC MARGIN DEFECIT | - |
|  | PAIB LONG VS. FIRM BANK LOAN | - |
|  | PAIB LONG VS. CUST BANK LOAN | 114 |
|  | PAIB LONG VS. PAIB BANK LOAN | - |
|  | PAIB BANK LOAN - PAIB NOT LONG | - |
|  | CUST BANK LOAN- CUSTOMER NOT LONG | - |
|  | FIRM BANK LOAN- CUSTOMER NOT LONG | - |
|  |  |  |
|  | **TOTAL P.A.I.B. BANK LOAN** | 114 |
|  |  |  |
| 3. | **PAIB STOCK LOAN:** | |
|  |  |  |
|  | STOCK LOAN VS PAIB LONG | - |
|  | STOCK LN PLDG VS. PAIB LONG | 80,009 |
|  |  |  |
|  | **TOTAL CUSTOMER STOCK LOAN** | 80,009 |
| 4. | **PAIB FAIL TO RECEIVE:** | |
|  |  |  |
|  | FAIL TO RECEIVE VS PAIB LONG | 4,066 |
|  | CNS FAIL TO RECEIVE VS PAIB LONG | 7 |
|  |  |  |
|  | **TOTAL P.A.I.B. FAIL TO RECEIVE** | 4,073 |

2/3

## 15c3-3 P.A.I.B COMPUTATION
## BROKER DEALER UNIT
## AS OF SEPTEMBER 19, 2008
### (in OOO'S)

| | 09/19/08 |
|---|---|
| **5.** **FIRM SHORT VS PAIB LONG:** | |
| REPO VS PAIB LONG | 47,883 |
| NONCUST SHORT VS. PAIB LONG | 344,571 |
| FIRM SHORT VS PAIB LONG | 11,399 |
| TOTAL FIRM SHORT VS P.A.I.B. LONG | 403,853 |
| **6.** **PAIB DIVIDEND & INTEREST:** | |
| STOCK DIVIDENDS > 30 DAYS | - |
| MONEY CONTROL ADJUSTMENT | - |
| DIVIDEND & INT PAYABLES > 7 DAYS | - |
| TOTAL P.A.I.B. DIVIDENDS & INTEREST | - |
| **7.** **SECURITY COUNT DIFFERENCE > 7 DAYS:** | - |
| **8.** **SUSPENSE CREDITS & SMV >7 DAYS:** | - |
| **9.** **AGED TRANSFERS & REORGANIZATION:** | |
| TRANSFER SHORTS OVER 40 DAYS | - |
| REORG/REDEMPTION SMV OVER 7 DAYS | - |
| TOTAL AGED TRANSFERS & REORGANIZATION | - |
| **10.** **OTHER:** | |
| OTHER CREDITS | - |
| TOTAL OTHER | - |
| TOTAL PAIB CREDITS | 2,520,973 |

### 15c3-3 P.A.I.B COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| 12. | **P.A.I.B. DEBITS:** | |
|  | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
|  | VARIOUS PAIB DEBIT ADJ | (176,096) |
|  | UNSECURED DEBITS | - |
|  | PARTLY SECURED DEBITS | - |
|  | RULE 144 UNSECURED DEBITS | - |
|  | SECURITY CONCENTRATION | - |
|  | BREAK VS CUSTOMER LONG | - |
|  | **P.A.I.B. DEBITS:** | 1,779,007 |
| 13. | **PAIB STOCK BORROW:** | |
|  | STOCK BORROW VS PAIB SHORT | 442,429 |
|  | STOCK BORROW Q. VS. PAIB SHORT | 215 |
|  | STOCK BORROW NQ VS. PAIB SHORT | - |
|  | STOCK BORROW L/C VS PAIB SHORT | - |
|  | **TOTAL P.A.I.B. STOCK BORROW** | 442,644 |
| 14. | **PAIB FAIL TO DELIVER:** | |
|  | FAIL TO DELIVER OVER 30 DAYS | - |
|  | FAIL TO DELIVER VS PAIB SHORT | 43,487 |
|  | CNS FAIL TO DELIVER VS PAIB SHORT | 62,417 |
|  | CNS FAIL TO DELIVER VS THE BOX | - |
|  | CNS FAIL TO DELIVER VS REPO | - |
|  | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
|  | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
|  | **TOTAL P.A.I.B. FAIL TO DELIVER** | 105,904 |
| 15. | **PAIB MARGIN WITH OCC** | |
|  | OCC MARGIN | - |
|  | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
|  | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
|  | **TOTAL P.A.I.B. MARGIN WITH OCC** | - |

## 15c3-3 P.A.I.B COMPUTATION
### BROKER DEALER UNIT
### AS OF SEPTEMBER 19, 2008
*(in 000'S)*

|     |                                  | 09/19/08  |
|-----|----------------------------------|-----------|
| 16. | *OTHER*                          |           |
|     | OTHER PAIB DEBITS                | -         |
|     | TOTAL OTHER                      | -         |
| 17. | TOTAL PAIB DEBITS                | 2,327,555 |
| 20. | EXCESS - DEBITS OVER CREDITS     | -         |
| 21. | DEFICIT - CREDITS OVER DEBITS    | 193,419   |

EXHIBIT 25

**Cc:**      Lowitt, Ian T [ilowitt@lehman.com]
**To:**      Tonucci, Paolo [paolo.tonucci@lehman.com]
**From:**      Aronow, David G [daronow@lehman.com]
**Sent:**      Fri 9/19/2008 3:30:52 PM
**Subject:**      Update

Dave Petrie is about to speak to Gerard one last time before he leaves
our building to see if there is going to be any resolution to the Chase
overdraft issue.  If this issue is not resolved, I believe that we will
not be able to clear/settle any remaining activity with the street
including the collateral that Barclays has been waiting for.

> _____
> From:          Servidio, Lawrence P
> Sent: Friday, September 19, 2008 11:26 AM
> To:    Tonucci, Paolo; Blackwell, Alastair; Lowitt, Ian T; Ullman, Neal
> (NY); Aronow, David G; Legotte, Lenny
> Subject:
>
> We are frozen at JPMChase, we have no access to clearing or clearing
> tubes. No trades can take place. I have called the Fed to see if they
> can escalate.

TONUCCI_PAOLO_00014136

EXHIBIT 26

**Cc:**       Rudofker, Beth [brudofke@lehman.com]
**To:**       Blackwell, Alastair [ablackwe@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]
**From:**     Fleming, Dan (TSY) [dfleming@lehman.com]
**Sent:**     Fri 9/19/2008 12:57:45 PM
**Subject:**  RE: **urgent**


Chase will not do anything until we resolve the 15.8bn problem from last
night. On a call with Barclay's and Chase.


> _____
> From:          Blackwell, Alastair
> Sent: Friday, September 19, 2008 8:56 AM
> To:   Tonucci, Paolo
> Cc:   Fleming, Dan (TSY); Rudofker, Beth
> Subject:        **urgent**
>
> Paolo,
>       We need to fund DTC 1.2bn to allow settlement. We need you on a
> call with Chase soon because they have removed our access.
> Thanks,
> Alastair
> _____
> Alastair Blackwell                Tel: +1 212 526
> 7666
>                                   Fax: +1
> 646 758 2940
>                                   Mob: +1 917 622
> 9455
> Lehman Brothers
> Email:ablackwe@lehman.com
>
>
>

TONUCCI_PAOLO_00013987

EXHIBIT 27

| | |
|---|---|
| **To:** | Rubin, Jaclyn[Jaclyn.Rubin@lehman.com] |
| **From:** | Lee, Mark |
| **Sent:** | Sun 9/21/2008 2:48:58 PM |
| **Subject:** | FW: Reserve Calc |
| **Categories:** | urn:content-classes:message |

<u>15c3_3a.doc</u>
<u>Res Driver 091908.xls</u>

Would like your help. We have a major issue with the Reserve formula as
BCI think they are taking $1Bn from the reserve account and the calcs
being run show a shortfall. I realise that you will not have been
involved in this on a regular basis. However, I'd like you to look at
the spreadsheet, particularly the ADP page and see whether the
categories make any sense to you and there is anything we can compare to
GFS. The ops guys have used GFS to validate their unencumbered assets
this morning and (whilst I accept that GFS is inventory only) I want to
see if there are any numbers we can tie out as the Reg guys have always
sourced their own data directly.

Working with Alex C to present to O'Meara and McDade / Lowitt on this
later so the more eyes familiar with the data the better.

If in doubt give me a ring on 917 215 0392

Mark

> _____
> From:      Lee, Mark
> Sent: Sunday, September 21, 2008 8:33 AM
> To:   Hoban, Samantha
> Subject:      Reserve Calc
>
> <<15c3_3a.doc>>  <<Res Driver 091908.xls>>
>
> FYI

SEARCH_RESULTS_00101576

## 15c3-3a Reserve Calculation

**Objective: 15c3-3a is the Formula for determination of Reserve requirement to protect Customers liabilities (monies and securities)**

**A BCI assumption was made that the Reserve Account had a cash overage of $1Bn, and a Treasury assumption was made that the Account would cover the current liabilities**

**Issues:**

- ADP Account mingled with LBIE Administration Accounts. Opened to facilitate residual processes balances due to customers. Stock Loan entries were processed in error which generated large balances and position of approximately $16.6 billion of debits and $6 billion of credits.
- 10,000 Stock Record breaks of which 3,700 relate to the NB Conversion.
- The remaining 6,300 breaks relate to international securities lending contracts that were closed but the Loanet entries were not processed correctly, resulting in additional DTC and stock record breaks
- Additionally there are $1.3 billion of free credit balances. Based on analysis from the Books and Records these appear to be valid,

**Initial Actions:**

| Issue | Action | Owner | Due By |
|-------|--------|-------|--------|
| | Adjust for ADP Customer issues and Stock Breaks | Bill Burke | Sun 6am Complete |
| LBIE Accounts allocated as Customer | Reallocation of LBIE accounts to Non-Customer in ADP | Kendall McLaughlin | |
| 10,000 Stock Record Breaks | Break fix in priority order | Ops Control | |
| | Work with ADP to re-run Customer Allocation | Kendall McLaughlin | |
| | | | |

SEARCH_RESULTS_00101577

FINAL

08-01420-scc   Doc 9267-1   Filed 10/26/09   Entered 10/26/09 18:32:24   Appendix
D Daniel M. Stern (Part 2) Pg 686 of 1129

Lehman Brothers Inc.
Customer/PAIB Reserve Analysis

| Customer: | Prelim 09/19/08 | Adjustments | Adjusted 09/19/2008 | 09/17/08 | Variance | 3 Month Avg | Comments |
|---|---|---|---|---|---|---|---|
| **MTS** | | | | | | | |
| Free Credits | 77,216 | | 77,216 | 77,216 | - | 31,115 | |
| SCS Cash | 46,462 | | 46,462 | 46,462 | - | 393,585 | |
| Option Margin | 15,824 | | 15,824 | 15,824 | - | 63,353 | |
| P & I | 22,858 | | 22,858 | 22,858 | - | 22,809 | |
| Aged Fails and Partly Secured Debits | 7,518 | | 7,518 | 7,518 | - | 9,538 | |
| Customer Receivable Versus Box    * | | | - | - | - | (65) | |
| Stock Record/P&C items | 86,809 | | 86,809 | 86,809 | - | 33,719 | |
| Overdrafts | | | - | - | - | 45,935 | |
| Unapplied Cash / Suspense | 31,677 | | 31,677 | 31,677 | - | 55,468 | |
| 3% ADI | 216,477 | | 216,477 | 216,477 | - | 35,950 | |
| Sub-total | 504,841 | | 504,841 | 504,841 | - | 691,407 | |
| **ADP** | | | | | | | |
| Free Credits / Margin | (15,647,813) | 15,279,345 | (368,468) a | 481,456 | (849,925) | 2,858,182 | |
| Net Customer Financing    * | 4,019,265 | (4,092,613) | (73,348) | (831,906) | 758,558 | (972,434) | |
| OMNI Conversion Payable | | | - | - | - | | |
| O/Drafts | 62,604 | | 62,604 | 62,604 | - | 50,330 | |
| Dividends | 5,322 | | 5,322 | 5,322 | - | 15,695 | |
| S/B L.O.C. vs. Customer Short | | | - | - | - | | |
| S/B NQ vs. Customer Short | 337,017 | | 337,017 | 5,287 | 331,730 | 14,152 | |
| Non-Broker Dealer Affil. | 210,769 | | 210,769 | 290,539 | (79,770) | 149,720 | |
| OCC Proprietary Qualified Collateral | (349,858) | | (349,858) | (349,858) | - | (831,762) | |
| Firm Bank Loan - Firm Not Long | | | - | - | - | | |
| Suspense | 39,897 | | 39,897 | 39,897 | - | 14,203 | |
| Unapplied Cash | 10,121 | | 10,121 | 10,121 | - | 9,642 | |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | | 85,212 | 85,212 | - | 81,066 | |
| Other | 3,992,241 | | 3,992,241 | 82,685 | 3,909,556 | 22,382 | |
| 3% ADI | 569,390 | | 569,390 | 322,692 | 246,698 | 132,964 | |
| Sub-total | (6,665,833) | 11,186,732 | 4,520,899 | 204,052 | 4,316,847 | 1,544,142 | |
| **ITS** | | | | | | | |
| Free Credits (primarily SCS cash) | 160,575 | (259,307) | (98,732) | 160,575 | (259,307) | 1,234,634 | |
| Unsecured Shorts | 77,639 | | 77,639 | 77,639 | - | 60,336 | |
| Securities Related IC Payable (Mostly ITS) | 189,086 | | 189,086 | 189,086 | - | 133,470 | |
| Other | | | - | - | - | | |
| 3% ADI | 178,711 | | 178,711 | 178,711 | - | 24,315 | |
| Sub-total | 606,011 | (259,307) | 346,704 | 606,011 | (259,307) | 1,452,756 | |
| **Commodities** | | | | | | | |
| O/Drafts | 176,487 | | 176,487 | 176,487 | - | 54,728 | |
| Non-Reg Commodity Credits | 52,000 | | 52,000 | 52,000 | - | 106,668 | |
| Sub-total | 228,487 | | 228,487 | 228,487 | - | 161,396 | |
| Requirement | (5,326,493) | 10,927,425 | 5,600,932 | 1,543,392 | 4,057,540 | 3,849,701 | |
| Cushion (plus 2% deduction) | 225,608 | | 225,608 | 225,608 | - | 332,154 | |
| Amount Segregated | (5,100,885) | 10,927,425 | 5,826,540 | 1,769,000 | 4,057,540 | 4,181,855 | |
| **PAIB:** | | | | | | | |
| Net PAIB Debits/Credits | 642,699 | | 642,699 b | 325,286 | 317,413 | 1,245,733 | |
| Bank Loan | 6 | | 6 | 3,560 | (3,554) | 719 | |
| Stock Loan | 124,856 | | 124,856 | 312,247 | (187,391) | 171,674 | |
| F/R Vs PAIB Long | 33,102 | | 33,102 | 31,031 | 2,071 | 1,147 | |
| Firm Short vs. PAIB Long | 68,691 | | 68,691 | 394,506 | (325,815) | 130,203 | |
| Stock Borrow    * | (450,967) | | (450,967) | (560,229) | 109,262 | (1,116,764) | |
| Fail to Deliver | (106,395) | | (106,395) | (40,281) | (66,114) | (2,633) | |
| Requirement | 311,992 | | 311,992 | 466,120 | (154,128) | 430,079 | |
| Cushion (plus 2% deduction) | 25,880 | | 25,880 | 25,880 | - | 111,079 | |
| Amount Segregated | 337,872 | - | 337,872 | 492,000 | (154,128) | 541,158 | |
| Total Segregated | (4,763,012) | 10,927,425 | 6,164,413 | 2,261,000 | 3,903,413 | 4,723,013 | |

* Denotes account net debit balances.

a    Includes:
     BREAK ACCOUNTS ALLOCATED ITEMS:
     Stock Borrow vs L/C                    -
     Stock Borrow vs. Pledge Q        1,474,744

SEARCH_RESULTS_00101578

|  | 09/19/08 |  | 09/17/08 |  | VARIANCE |
|---|---|---|---|---|---|
| *Customer Credits* |  | 8,833,951 |  | 7,995,742 | 838,208 |
|  |  |  |  |  |  |
| Firm Long vs Cust Short | (1,759,625) |  | (196,453) |  | (1,563,172) |
| Non Cust Long vs. Cust Short | (11,024,522) |  | (4,533,257) |  | (6,491,265) |
| PAIB Long vs Cust Short | (279,021) |  | (15,031) |  | (263,990) |
| Reverse Repo vs Cust Short | - |  | - |  |  |
| Cust Long vs Cust Short |  |  |  |  |  |
| Stock Borrow vs Cust Short | (8,926,953) |  | (1,207,278) |  | (7,719,675) |
| Fail to Deliver vs Cust Short | (2,491,643) |  | (1,562,267) |  | (929,376) |
| sub-total | (24,481,764) | (24,481,764) | (7,514,286) | (7,514,286) | (16,967,478) |
|  |  |  |  |  |  |
| *Total* |  | (15,647,813) |  | 481,456 | (16,129,270) |
|  |  |  |  |  |  |
| *Customer Debits* |  | 8,027,427 |  | 8,121,467 | (94,040) |
|  |  |  |  |  |  |
| Money Fund Receivable | (310,045) |  | (310,045) |  |  |
| Unsecured/Partly Secured Receivables/Non-Purpose Loans | (169,152) |  | (169,152) |  |  |
| Security Concentrations | - |  | - |  |  |
| Cust. Long vs.Customer Bank Loan | (228,557) |  | (728,814) |  | 500,257 |
| Stock Loan vs Cust Long | (2,333,573) |  | (1,050,110) |  | (1,283,464) |
| Cust Long vs Cust Short | - |  | - |  |  |
| Fail to Receive vs Cust Long | (2,853,274) |  | (2,210,873) |  | (642,401) |
| Firm Short vs Customer Long | (6,152,091) |  | (2,820,568) |  | (3,331,523) |
| sub-total | (12,046,692) | (12,046,692) | (7,289,562) | (7,289,562) | (4,757,131) |
|  |  |  |  |  |  |
| *Total* |  | (4,019,265) |  | 831,906 | (4,851,171) |
|  |  |  |  |  |  |
| Plus: |  |  |  |  |  |
| Stock Borrow / SB Q vs. Firm Bank Loan |  | - |  | - |  |
| Stock Borrow vs. Cust Bank Loan |  | - |  | - |  |
|  |  |  |  |  |  |
| *Net Cust Dr./Cr.* |  | (11,628,548) |  | (350,449) | (11,263,099) |

SEARCH_RESULTS_00101578

COPY PASTE FROM RESERVE FILE

*15c-3 CUSTOMER RESERVE COMPUTATION*
*BROKER DEALER UNIT*
*09/19/08*
*(in 000'S)*

| | 09/19/08 |
|---|---:|
| **1.** **CUSTOMER CREDITS:** | |
| *CUSTOMER SECURITY ACCOUNTS* | 8,523,574 |
| *CUSTOMER ADJUSTMENTS* | 524,910 |
| *UNMAPPED CUSTOMER PAYABLE* | 80 |
| *CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160)* | (138,131) |
| *CUSTOMER NETTING NB* | (77,250) |
| *MONEY CONTROL ADJUSTMENTS* | - |
| *NON-BROKER DEALER AFFILIATES TYPE 5* | 290 |
| *BOOKKEEPING ADJUSTMENTS* | - |
| *CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084)* | - |
| *NON-NETWORK OFFSHR MUTUAL FUNDS* | - |
| *BANK OVERDRAFTS* | 62,604 |
| *NON-BROKER DEALER AFFILIATES - OTHER TYPES* | 210,769 |
| *HOUSE ACCOUNTS* | 2,525 |
| *TEFRA WITHHOLDING PAYABLE* | 95 |
| *LEGAL LEDGER CONTRA ACCOUNTS* | 116 |
| *BREAK VS. CUSTOMER LONG* | 2,043,617 |
| *FIRM LONG VS. CUSTOMER SHORT* | (1,759,625) |
| *NONCUST LONG VS. CUSTOMER SHORT* | (11,024,522) |
| *REVERSE REPO VS. CUSTOMER SHORT* | - |
| *PAIB LONG VS. CUSTOMER SHORT* | (279,021) |
| *SHORT & CREDIT INTEREST* | 23,658 |
| *MONEY FUND SETTLEMENTS 098-00003 & 098-70001* | 477 |
| *UNALLOCATED CUSTOMER SHORT* | 1,922,231 |
| | |
| *TOTAL CUSTOMER CREDITS* | 36,397 |
| | |
| | |
| **2.** **CUSTOMER BANK LOAN:** | |
| *OCC MARGIN* | - |
| *OCC MARGIN DEFICIT* | - |
| *OCC COMMINGLED MARGIN (NONCUST BANK LOAN)* | - |
| *STOCK BORROW VS. CUST BANK LOAN* | - |
| *STOCK BORROW VS. FIRM BANK LOAN* | - |
| *STOCK BORROW PLEDGE Q VS. FIRM BANK LOAN* | - |
| *STOCK BORROW PLEDGE NQ VS. FIRM BANK LOAN* | - |
| *STOCK BORROW L C VS FIRM BANK LOAN* | - |
| *FAIL TO DELIVER VS. FIRM BANK LOAN* | - |
| *CUSTOMER BANK LOAN VS. NON-CUST LONG* | - |
| *CUSTOMER LONG VS. CUSTOMER BANK LOAN* | 228,557 |
| *CUST BANK LOAN - CUST NOT LONG* | - |
| *NONCUST BANK LOAN - NONCUSTOMER NOT LONG* | - |
| *FIRM BANK LOAN - FIRM NOT LONG* | - |
| | |
| *TOTAL CUSTOMER BANK LOAN* | 228,557 |
| | |
| | |
| **3.** **CUSTOMER STOCK LOAN:** | |
| *STOCK LOAN* | 14,343,512 |
| *STOCK LOAN MTM* | (3,431,134) |
| *STOCK LOAN WITH CLEARING ORG* | - |
| *STOCK LOAN FREE OF MONEY* | 2,090,952 |
| *STOCK LOAN MTM DEFICIT* | 468 |
| *STOCK LOAN BOB ADJUSTMENT* | - |
| *UNALLOCATED STOCK LOAN ADJ* | - |
| *STOCK LOAN VS. STOCK BORROW L C* | - |
| *STOCK LOAN PLEDGE VS. STOCK BORROW L C* | - |
| *STOCK LOAN VS. REVERSE REPO* | - |
| *STOCK LOAN PLEDGE VS. REVERSE REPO* | - |
| *STOCK LOAN VS. PAIB LONG* | - |
| *STOCK LOAN PLEDGE VS. PAIB LONG* | (124,850) |
| *STOCK LOAN VS. STOCK BORROW* | (9,344,291) |
| *STOCK LOAN VS. STOCK BORROW PLEDGE Q* | (21,386) |
| *STOCK LOAN VS. STOCK BORROW PLEDGE NQ* | (7,499) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW* | (256,503) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE Q* | (9,644) |
| *STOCK LOAN PLEDGE VS. STOCK BORROW PLEDGE NQ* | (28,422) |
| *STOCK LOAN VS. NONCUSTOMER LONG* | (29,015) |
| *STOCK LOAN PLEDGE VS. NONCUSTOMER LONG* | (332,410) |
| *STOCK LOAN VS. FIRM LONG* | (181,875) |
| *STOCK LOAN PLEDGE VS. FIRM LONG* | (334,323) |
| | |
| *TOTAL CUSTOMER STOCK LOAN* | 2,333,573 |

SEARCH_RESULTS_00101578

| 4. | CUSTOMER FAIL TO RECEIVE: | |
|----|---------------------------|---|
| | FAIL TO RECEIVE | 5,318,473 |
| | CNS FAIL TO RECEIVE | 99,743 |
| | MISC FAIL TO RECEIVE ADJUSTMENTS | - |
| | OMNI FAIL TO RECEIVE ADJUSTMENTS | - |
| | FAIL TO RECEIVE MTM ADJUSTMENT | - |
| | FAIL TO RECEIVE ADJ. PAM MONEY MARKET FUND | 117,755 |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER | (195,358) |
| | FAIL TO RECEIVE VS. REVERSE REPO | - |
| | FAIL TO RECEIVE VS. MTM DEFICIT | - |
| | FAIL TO RECEIVE VS. STOCK BORROW | (493,487) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (24,458) |
| | FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | FAIL TO RECEIVE VS. STOCK BORROW L/C | - |
| | FAIL TO RECEIVE VS. FAIL TO DELIVER CNS | (28,925) |
| | FAIL TO RECEIVE VS. FIRM LONG | (1,046,635) |
| | FAIL TO RECEIVE VS. NONCUSTOMER LONG | (782,561) |
| | FAIL TO RECEIVE VS. PAIB LONG | (33,101) |
| | FAIL TO RECEIVE VS. UNALLOCATED / BREAK | - |
| | CNS FAIL TO RECEIVE VS. FIRM LONG | (55,709) |
| | CNS FAIL TO RECEIVE VS. NONCUSTOMER LONG | (5,517) |
| | CNS FAIL TO RECEIVE VS. PAIB LONG | (1) |
| | CNS FAIL TO RECEIVE ADJUSTMENT | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW | (14,899) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE Q | (42) |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW PLEDGE NQ | - |
| | CNS FAIL TO RECEIVE VS. STOCK BORROW L/C | - |
| | CNS FAIL TO RECEIVE VS. REVERSE REPO | - |
| | CNS FAIL TO RECEIVE VS. FAIL TO DELIVER | (2,004) |
| | | |
| | TOTAL CUSTOMER FAIL TO RECEIVE | 2,853,274 |

| 5. | FIRM SHORT VS CUSTOMER LONG: | |
|----|------------------------------|---|
| | TOTAL FIRM SHORT | - |
| | FIRM OMNI SHORT | - |
| | FIRM SHORT VS. CUSTOMER LONG | 487,026 |
| | NONCUSTOMER SHORT VS. CUSTOMER LONG | 2,089,180 |
| | REPO VS. CUSTOMER LONG | 2,662,445 |
| | PAIB SHORT VS. CUSTOMER LONG | 152,397 |
| | REPO VS. UNALLOCATED | 53,941 |
| | FIRM SHORT VS. UNALLOCATED | 344,321 |
| | NONCUSTOMER SHORT VS. UNALLOCATED | 362,781 |
| | | |
| | TOTAL FIRM SHORT VS. CUSTOMER LONG | 6,152,091 |

| 6. | CUSTOMER DIVIDEND & INTEREST: | |
|----|-------------------------------|---|
| | DIVIDEND & INT PAYABLES | 28,907 |
| | ADJUSTMENTS FROM DIVIDEND DEPT. | (23,584) |
| | | |
| | TOTAL CUSTOMER DIVIDENDS & INTEREST | 5,322 |

| 7. | SECURITY COUNT DIFFERENCE > 7 DAYS: | |
|----|-------------------------------------|---|

| 8. | SUSPENSE ACCOUNTS | |
|----|-------------------|---|
| | SUSPENSE CREDITS & SMV: | 39,897 |
| | CUSTOMER UNAPPLIED 090-01234 | 10,121 |
| | ABANDONED PROPERTY / SOFT DOLLARS / COMM. REBATES | 85,212 |
| | | |
| | TOTAL SUSPENSE ACCOUNTS | 135,230 |

| 9. | AGED TRANSFERS & REORGANIZATION: | |
|----|----------------------------------|---|
| | TRANSFER SHORTS OVER 40 DAYS | - |
| | REORG REDEMPTION SMV OVER 7 DAYS | - |
| | | |
| | TOTAL AGED TRANSFERS & REORGANIZATION | - |

| 10. | OTHER: | |
|-----|--------|---|
| | OTHER CREDITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| | TOTAL CREDITS | 11,744,444 |

SEARCH_RESULTS_00101578

| 12. | CUSTOMER DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 4,950,169 |
| | CUSTOMER NETTING LBI (incl. 941-20159 & 941-20160) | (138,131) |
| | CUSTOMER NETTING NB | (77,250) |
| | MONEY CONTROL ADJUSTMENT | - |
| | CUSTOMER ADJUSTMENT (VARIOUS and LBHI Debits) | 3,292,639 |
| | CUSTOMER ADJUSTMENTS VS. ADP OMNI (097-00084) | - |
| | BOOKKEEPING ADJUSTMENTS | - |
| | INV ADVISORY FEES RELATED TO NB MARGIN DEBITS | (310,045) |
| | MONEY FUND RECEIVABLE | - |
| | MARGIN INTEREST | 33,784 |
| | UNSECURED DEBITS | (3,310) |
| | PARTLY SECURED DEBITS | (12) |
| | NON-PURPOSE LOANS | (199,614) |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | | |
| | TOTAL CUSTOMER DEBITS | 7,548,230 |

| 13. | CUSTOMER STOCK BORROW: | |
|---|---|---|
| | STOCK BORROW | 26,275,972 |
| | STOCK BORROW MTM | 5,061,972 |
| | STOCK BORROW L.O.C. | - |
| | STOCK BORROW VS. CUST SHORT ADJ. | - |
| | STOCK BORROW FREE OF MONEY | (2,532,947) |
| | STOCK BORROW LC VS SECURED BK LOAN | - |
| | STOCK BORROW L C VS. CUSTOMER SHORT | - |
| | STOCK BORROW NQ VS. CUSTOMER SHORT | (337,017) |
| | STOCK BORROW L C VS. FIRM BANK LOAN | - |
| | STOCK BORROW NQ VS. FIRM BANK LOAN | - |
| | STOCK BORROW VS STOCK LOAN | (9,344,291) |
| | STOCK BORROW VS. STOCK LOAN PLEDGE | (256,503) |
| | STOCK BORROW PLEDGE Q VS. STOCK LOAN | (21,386) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN | (7,499) |
| | STOCK BORROW PLEDGE Q. VS. STOCK LOAN PLEDGE | (9,644) |
| | STOCK BORROW PLEDGE NQ VS. STOCK LOAN PLEDGE | (28,422) |
| | STOCK BORROW L C VS. STOCK LOAN | - |
| | STOCK BORROW L C VS. STOCK LOAN PLEDGE | - |
| | STOCK BORROW L C VS. FIRM SHORT | - |
| | STOCK BORROW L C VS. NONCUSTOMER SHORT | - |
| | STOCK BORROW VS. FIRM SHORT | (3,714,514) |
| | STOCK BORROW VS. NONCUSTOMER SHORT | (1,811,035) |
| | STOCK BORROW PLEDGE Q. VS FIRM SHORT | (201,992) |
| | STOCK BORROW PLEDGE Q. VS. NONCUSTOMER SHORT | (146,553) |
| | STOCK BORROW PLEDGE NQ VS. FIRM SHORT | (794,427) |
| | STOCK BORROW PLEDGE NQ VS. NONCUSTOMER SHORT | (285,203) |
| | STOCK BORROW VS. THE BOX | (251,922) |
| | STOCK BORROW PLEDGE Q. VS. THE BOX | (30,770) |
| | STOCK BORROW PLEDGE NQ VS. THE BOX | (91,082) |
| | STOCK BORROW L C VS. THE BOX | - |
| | STOCK BORROW VS. FAIL REC CNS | (14,899) |
| | STOCK BORROW PLEDGE Q. VS. F-R CNS | (42) |
| | STOCK BORROW PLEDGE NQ VS. F-R CNS | (1) |
| | STOCK BORROW L C VS. F-R CNS | - |
| | STOCK BORROW L C VS. REPO | - |
| | STOCK BORROW VS. REPO | (1,341,239) |
| | STOCK BORROW PLEDGE Q. VS. REPO | (46,141) |
| | STOCK BORROW PLEDGE NQ VS. REPO | (365,820) |
| | STOCK BORROW VS. UNALLOCATED | (107,197) |
| | STOCK BORROW PLEDGE Q. VS. UNALLOCATED | (1,475) |
| | STOCK BORROW PLEDGE NQ VS. UNALLOCATED | (9,778) |
| | STOCK BORROW L C VS. UNALLOCATED | - |
| | STOCK BORROW VS. PAIB SHORT | (450,138) |
| | STOCK BORROW PLEDGE Q. VS. PAIB SHORT | (829) |
| | STOCK BORROW PLEDGE NQ VS. PAIB SHORT | (20,314) |
| | STOCK BORROW L C VS. PAIB SHORT | - |
| | STOCK BORROW L C VS. FAIL TO RECEIVE | - |
| | STOCK BORROW VS. FAIL TO RECEIVE | (493,487) |
| | STOCK BORROW PLEDGE Q. VS. FAIL TO RECEIVE | (24,458) |
| | STOCK BORROW PLEDGE NQ. VS. FAIL TO RECEIVE | (6,984) |
| | | |
| | TOTAL CUSTOMER STOCK BORROW | 8,589,936 |

SEARCH_RESULTS_00101578

| 14. | CUSTOMER FAIL TO DELIVER: | |
|---|---|---|
| | FAIL TO DELIVER | 4,960,740 |
| | CNS FAIL TO DELIVER | 1,900,343 |
| | MISC FAIL TO DELIVER ADJUSTMENTS | - |
| | OMNI FAIL TO DELIVER ADJUSTMENTS | - |
| | FAIL TO DELIVER MTM ADJUSTMENT | - |
| | FAIL TO DELIVER ADJUSTMENT | - |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE | (195,358) |
| | FAIL TO DELIVER VS. FAIL TO RECEIVE CNS | (2,004) |
| | FAIL TO DELIVER OVER 30 DAYS | (826) |
| | FAIL TO DELIVER VS. FIRM SHORT | (456,414) |
| | FAIL TO DELIVER VS. PAIB SHORT | (43,886) |
| | FAIL TO DELIVER VS. REPO | (418,827) |
| | FAIL TO DELIVER VS. THE BOX | (1,065,589) |
| | FAIL TO DELIVER VS. NON-CUSTOMER SHORT | (721,860) |
| | FAIL TO DELIVER VS. UNALLOCATED BREAK | (255,160) |
| | CNS FAIL TO DELIVER VS. FIRM SHORT | (452,940) |
| | CNS FAIL TO DELIVER VS. NONCUSTOMER SHORT | (259,824) |
| | CNS FAIL TO DELIVER VS. PAIB SHORT | (62,509) |
| | CNS FAIL TO DELIVER VS. THE BOX | (277,980) |
| | CNS FAIL TO DELIVER VS. REPO | (99,861) |
| | CNS FAIL TO DELIVER VS. CUSTOMER BANK LOAN | - |
| | CNS FAIL TO DELIVER VS. UNALLOC BREAK | (27,477) |
| | CNS FAIL TO DELIVER VS. FAIL TO RECEIVE | (28,925) |
| | | |
| | TOTAL CUSTOMER FAIL TO DELIVER | 2,491,643 |
| | | |
| 15. | CUSTOMER MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | OCC PROPRIETARY QUALIFIED COLLATERAL | 349,858 |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL CUSTOMER MARGIN WITH OCC | 349,858 |
| | | |
| 16. | OTHER | |
| | OTHER CUSTOMER DEBITS | |
| | | |
| | TOTAL OTHER | - |
| | | |
| 17. | AGGREGATE DEBIT ITEMS | 18,979,667 |
| 18. | LESS 3% | (569,390) |
| 19. | TOTAL 15C3-3 DEBITS | 18,410,277 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | 6,665,833 |
| 21. | DEFICIT - CREDITS OVER DEBITS | 0 |

SEARCH_RESULTS_00101578

**LEHMAN BROTHERS INC.**
**RULE 15c3-3 RESERVE FORMULA**
**(000'S)**

|                                                    | 09/19/08      |
|----------------------------------------------------|---------------|
| **CUSTOMER CREDITS:**                              |               |
| Customer Accounts                                  | 3,281,275     |
| Securities Related Intercompany Payables           | 189,086       |
| ITS Unsecured Shorts                               | 77,639        |
| Non Commodity Reg                                  | 52,000        |
| Commodity Overdrafts                               | 176,487       |
| Bank Overdrafts                                    | 0             |
| Tefra Withholdings                                 | 0             |
| Aged Checks                                        | 0             |
| Subtotal                                           | 3,776,488     |
|                                                    |               |
| **CUSTOMER STOCK LOAN**                            | 0             |
| **CUSTOMER FAIL TO RECEIVE**                       | 2,202,479     |
| **CUSTOMER BANK LOAN (OCC MARGIN)**                | 0             |
| **CUSTOMER BANK LOAN (ITS-REPO)**                  | 613,236       |
| **FIRM SHORT VS. CUSTOMER LONG**                   | 20,633        |
| **SUSPENSE CREDITS**                               | 0             |
|                                                    |               |
| **TOTAL CREDITS**                                  | 6,612,836     |
|                                                    |               |
|                                                    |               |
| **CUSTOMER DEBITS:**                               |               |
| Customer Accounts                                  | 4,258,469     |
| OMNI Rec Formula                                   | 0             |
| Philadelphia Options Cust. Receivables             | 0             |
| Subtotal                                           | 4,258,469     |
|                                                    |               |
| **CUSTOMER MARGIN WITH OCC**                       | 0             |
|                                                    |               |
| **CUSTOMER STOCK BORROW**                          | 497,654       |
| **CUSTOMER FAIL TO DELIVER**                       | 1,200,926     |
| **AGGREGATE DEBITS**                               | 5,957,049     |
| Less 3%                                            | 178,711       |
| **TOTAL DEBITS**                                   | 5,778,338     |
|                                                    |               |
| **EXCESS CREDITS OVER DEBITS**                     | 834,499       |

SEARCH_RESULTS_00101578

SUMMARY: EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS    09:79:00

*CREDITS*

| | | | |
|---|---|---|---|
| #47 | (17) CUST F D VS (04) PROPRIETARY SHORT | 0 | 0 |
| #48 | (19) B D LONG VS (04) PROPRIETARY SHORT | 0 | 0 |
| #49 | (21) OPERATIONAL VS (04) PROPRIETARY SHORT | 0 | 0 |
| #50 | (23) INACT. LONG (04) PROP. SHORT | 0 | 0 |
| #62 | (15) CUST LONG F D (6) REPO | 0 | 0 |
| #63 | (19) BR-Dealer Long Free vs (6) Repos | 0 | 0 |
| #65 | (21) OPER. ACCTS (6) REPOS | 0 | 0 |
| #64 | (15) CUST. LONG F D VS (6) REPO | 0 | 0 |
| #79 | (21) OPER. ACCTS (9) HIC REPO | 0 | 0 |
| #80 | (23) INACT. LONG VS (9) HIC REPO | 0 | 0 |
| #92 | (17) CUST LONG F D VS (10) TRI PARTY REPO | 0 | 0 |
| #94 | (21) OPERATIONAL VS (10) TRI PARTY. REPO | 0 | 0 |
| #95 | (23) INACTIVE LONG (10) TRIPARTY REPO | 0 | 0 |
| #91 | (15) CUST LONG F D VS TRI PARTY REPO | 0 | 0 |
| #95 | (29) AFFILIATE LONG VS (10) TRI PARTY REPO | 0 | 0 |
| #134 | (11) NONCUST F D- 30 VS (16) PLEDGED VS BOR. | 0 | 0 |
| #137 | (17) CUST Long Free VS (16) PLEDGE Vbor | 0 | 0 |
| #139 | (21) OPERATIONAL VS (16) PLEDGED Vbor | 0 | 0 |
| #140 | (23) INACT. LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #147 | (11) NON CUST F/D > 30 DAYS VS (18) NON CUST F/R | 35,640 | 37 |
| #150 | (17) CUST LONG F D VS (18) NON CUST (F R) | 0 | 0 |
| #151 | (19) B R DEALER LONG FREE VS (18) NON CUST (F R) | 0 | 0 |
| #152 | (21) OPER. ACCTS. VS (18) NON CUST (F R) | 0 | 0 |
| #153 | (23) INACTIVE LONG VS (18) NON CUST F R | 0 | 0 |
| #163 | (17) CUST LONG F VS (28) NET SHORT CLR | 0 | 0 |
| #176 | (11) NON CUST F D- 30 VS (22) CUST SHRT(F R) | 201,017 | 201 |
| #184 | (15) CUST LONG  (24)  OPER SHRT | 0 | 0 |
| #179 | (19) Customer Long Free VS (22) CUST SHORT(F R) | 0 | 0 |
| #180 | (19) BR DEALER LONG VS (22) CUST SHORT | 0 | 0 |
| #181 | (21) OPERATIONAL VS (22) CUST SHORT(F R) | 0 | 0 |
| #182 | (23) INACTIVE LONG VS (22) CUST SHORT(F R) | 0 | 0 |
| #192 | (11) NONCUST F D VS (24) OPER SHORT | 0 | 0 |
| #197 | (21) OPER ACCTS LONG VS (24) OPER SHRT | 0 | 0 |
| #198 | (23) INACT. LONG VS (24)  OPER SHRT | 0 | 0 |
| #208 | (9) NON CUST F D>30 VS (26) AFFILIATE SHORT | 0 | 0 |
| #191 | (15) NON-CUST F D VS (24) OPER SHORT | 0 | 0 |
| #211 | (17) CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #212 | (19) BD LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #213 | (21) OPER ACCCTS LONG VS (26) AFFILATE SHORT | 0 | 0 |
| #214 | (23) INACTIVE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #218 | (31) AFFILIATE LONG VS (26) AFFILIATE SHORT | 0 | 0 |
| #283 | (33) BOX BREAKS VS (26) AFFILIATE SHORT | 0 | 0 |
| #284 | (33) BOX BREAKS VS (24) OPERATIONAL SHORT | 0 | 0 |
| #285 | (33) BOX BREAKS VS (22) CUST SHRT(F R) | 8,459,024 | 8,459 |
| #285C | (33) BOX BREAKS VS (22) CUST SHRT(F R) | 0 | 0 |
| #286 | (33) BOX BREAKS VS (28) CUST NET CL | 0 | 0 |
| #287 | (33) BOX BREAK (15) F R | 43,995 | 44 |
| #288C | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #288 | (33) BOX BREAKS LONG VS (16) PLEDGE VS BOR. | 0 | 0 |
| #290 | (33) BOX BREAKS VS (12) BANK LOAN FIRM | 0 | 0 |
| #291 | (33) BOX BREAKS VS (10) TRI PARTY REPO | 18,222,220 | 18,222 |
| #292 | (33) BOX BREAKS VS (06) HIC REPOS | 0 | 0 |
| #293 | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #293C | (33) BOX BREAKS VS (06) REPO | 0 | 0 |
| #294 | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #294C | (33) BOX BREAKS VS (04) PROPRIETARY SHORT | 0 | 0 |
| #339 | (31) NET LONG  CLE(35) INACTIVE SHORT | 0 | 0 |
| #341 | (17) CUST LONG FREE VS (35) INACTIVE SHRT | 76,586 | 77 |
| #342 | (19) BR-DEALER LONG FREE VS (35) INACTIVE SHRT | 0 | 0 |
| #343 | (21) OPER. ACCTS (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #344 | (23) NON BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #346 | (27) NON BROKER DEALER (19) VS (35) INACTIVE SHRT | 0 | 0 |
| #347 | (2") AFFIL LGFREE(19) VS (35) INACTIVE SHRT | 0 | 0 |
| #348 | (31) OPER.LONG F (35) INACT. SHORT | 0 | 0 |
| #349 | (33) BOX BREAKS(19) VS (35) INACTIVE SHRT | 59,402,245 | 59,402 |
| #337 | (9) NON CUST F D (35) INACTIVE SHORT | 0 | 0 |
| #356 | (5) BVP VS (46) SPECIAL FINANCE | 0 | 0 |
| #391 | (17) CUST LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #393 | (19) BR DEALER LONG FREE VS (46) SPECIAL FINANCE | 0 | 0 |
| #395 | (23) INACT. LONG (46) SPEC. FINANCE | 0 | 0 |
| #398 | (29) CUST. LONG F VS (46) SPECIAL FIN.. | 0 | 0 |
| #400 | (33) BOX BREAK L(46) (46) SPECIAL FIN.. | 0 | 0 |
| #419 | (33) BOX BREAKS LAW  (48) FIN LDGR TRF. | 0 | 0 |
| #433 | (15) SPEC FIN CUST LONG VS (26) AFFIL SHORT | 0 | 0 |
| #438 | (35) SPEC FIN CUST SHT VS (35) INACTIVE SHORT | 604,571 | 605 |
| #443 | (3'7) FIN. LDGR TR VS (9) HIC REPOS | 7,280,026 A. | 7,280 |
| | PARTLY SECURED CHARGE | | |
| | STOCK RECORD BREAK | 0 B | 0 |
| | ACCOUNTS PAYABLE | 77,215,968 R-2 | 77,216 |
| | SCS CASH | 46,462,484 R-2 | 46,462 |
| | OPTION MARGIN | 15,823,784 R-2 | 15,824 |
| MONE BANK OVERDRAFTS | | 0 R-3 | 0 |
| ONLY SUSPENSE - BANK REC. DIFFERENCES | | 416,943 R-4 | 417 |
| | OPERATIONAL - UNAPPLIED CASH | 31,260,502 R-3 | 31,261 |
| | P&I PAYABLES CANADA | 0 R-5 | 0 |
| | P&I PAYABLES | 22,857,875 R-5 | 22,858 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | | 216,477,068 | 216,477 |

*DEBIT*

| | | | |
|---|---|---|---|
| #223 | (9) NON CUST F D VS (25) TRANSFER | 0 | 0 |
| #226 | (15) CUST F D VS (25) TRANSFER | 0 | 0 |
| #239 | (9) NON CUST F D VS (30) TRANSIT | 0 | 0 |
| #242 | (15) CUST F D VS (30) TRANSIT | 0 | 0 |
| #258 | (15) CUST F D VS (32) SAFEKEEPING | 0 | 0 |
| #267 | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #267c | (9) NON CUST F D VS (34) BOX | 0 | 0 |
| #269 | (13) NET LONG CLE   VS (34) BOX | 0 | 0 |
| #270 | (15) CUST VS (34) BOX | 0 | 0 |
| #337 | (15) CUST F D VS (34) BOX - LBSI | 0 | 0 |
| | | | 0 |

| | | | |
|---|---|---|---|
| *EXCESS OF TOTAL CREDITS OVER TOTAL DEBITS* | | 504,841,226 | 504,841 |

SEARCH_RESULTS_00101578

1,115

(2,289)
(507)
(73,949)

0

SEARCH_RESULTS_00101578

15c3-3 P.A.I.B COMPUTATION
BROKER DEALER UNIT
09/19/08
*(in OOO'S)*

|  |  | 09/19/08 |
|---|---|---:|
| 1. | **P.A.I.B. CREDITS:** |  |
|  | PAIB CREDITS | 2,235,573 |
|  | BREAK VS. PAIB LONG | 215,107 |
|  | PAIB CREDIT ADJ | (8,000) |
|  | PAIB DEFERRED COMMISSIONS AND IA FEES | 11,659 |
|  | PAIB LONG VS CUSTOMER SHORT | 279,021 |
|  | FIRM LONG vs PAIB SHORT | (25,932) |
|  | NONCUST LONG VS. PAIB SHORT | (133,325) |
|  | UNALLOCATED PAIB SHORT | - |
|  | PAIB SHORT VS CUSTOMER LONG | (152,397) |
|  |  |  |
|  | **P.A.I.B. CREDITS:** | 2,421,706 |
|  |  |  |
| 2. | **PAIB BANK LOAN:** |  |
|  |  |  |
|  | OCC MARGIN | - |
|  | OCC MARGIN DEFECIT | - |
|  | PAIB LONG VS. FIRM BANK LOAN | - |
|  | PAIB LONG VS. CUST BANK LOAN | 6 |
|  | PAIB LONG VS. PAIB BANK LOAN | - |
|  | PAIB BANK LOAN - PAIB NOT LONG | - |
|  | CUST BANK LOAN- CUSTOMER NOT LONG | - |
|  | FIRM BANK LOAN- CUSTOMER NOT LONG | - |
|  |  |  |
|  | TOTAL P.A.I.B. BANK LOAN | 6 |
|  |  |  |
| 3. | **PAIB STOCK LOAN:** |  |
|  |  |  |
|  | STOCK LOAN VS PAIB LONG | - |
|  | STOCK LN PLDG VS. PAIB LONG | 124,856 |
|  |  |  |
|  | TOTAL CUSTOMER STOCK LOAN | 124,856 |
| 4. | **PAIB FAIL TO RECEIVE:** |  |
|  |  |  |
|  | FAIL TO RECEIVE VS PAIB LONG | 33,101 |
|  | CNS FAIL TO RECEIVE VS PAIB LONG | 1 |
|  |  |  |
|  | TOTAL P.A.I.B. FAIL TO RECEIVE | 33,102 |
|  |  |  |
| 5. | **FIRM SHORT VS PAIB LONG:** |  |
|  |  |  |
|  | REPO VS PAIB LONG | 11,615 |
|  | NONCUST SHORT VS. PAIB LONG | 45,183 |
|  | FIRM SHORT VS PAIB LONG | 11,893 |
|  |  |  |
|  | TOTAL FIRM SHORT VS P.A.I.B. LONG | 68,691 |
|  |  |  |
| 6. | **PAIB DIVIDEND & INTEREST:** |  |
|  |  |  |
|  | STOCK DIVIDENDS > 30 DAYS | - |
|  | MONEY CONTROL ADJUSTMENT | - |
|  | DIVIDEND & INT PAYABLES > 7 DAYS | - |

SEARCH_RESULTS_00101578

7.    *SECURITY COUNT DIFFERENCE > 7 DAYS:*

8.    *SUSPENSE CREDITS & SMV >7 DAYS:*    -

9.    *AGED TRANSFERS & REORGANIZATION:*

    *TRANSFER SHORTS OVER 40 DAYS*    -
    *REORG/REDEMPTION SMV OVER 7 DAYS*    -

    *TOTAL AGED TRANSFERS & REORGANIZATION*    -

10.    *OTHER:*

    *OTHER CREDITS*    -

    *TOTAL OTHER*    -

    *TOTAL PAIB CREDITS*    2,648,361

SEARCH_RESULTS_00101578

| 12. | P.A.I.B. DEBITS: | |
|---|---|---|
| | CUSTOMER SECURITY ACCOUNTS | 1,955,103 |
| | VARIOUS PAIB DEBIT ADJ | (176,096) |
| | UNSECURED DEBITS | - |
| | PARTLY SECURED DEBITS | - |
| | RULE 144 UNSECURED DEBITS | - |
| | SECURITY CONCENTRATION | - |
| | BREAK VS CUSTOMER LONG | - |
| | | |
| | P.A.I.B. DEBITS: | 1,779,007 |
| | | |
| 13. | PAIB STOCK BORROW: | |
| | | |
| | STOCK BORROW VS PAIB SHORT | 450,138 |
| | STOCK BORROW Q. VS. PAIB SHORT | 829 |
| | STOCK BORROW NQ VS. PAIB SHORT | - |
| | STOCK BORROW L/C VS PAIB SHORT | - |
| | | |
| | TOTAL P.A.I.B. STOCK BORROW | 450,967 |
| 14. | PAIB FAIL TO DELIVER: | |
| | | |
| | FAIL TO DELIVER OVER 30 DAYS | - |
| | FAIL TO DELIVER VS PAIB SHORT | 43,886 |
| | CNS FAIL TO DELIVER VS PAIB SHORT | 62,509 |
| | CNS FAIL TO DELIVER VS THE BOX | - |
| | CNS FAIL TO DELIVER VS REPO | - |
| | CNS FAIL TO DELIVER VS UNALLOC./BREAK | - |
| | CNS FAIL TO DELIVER VS FAIL TO RECEIVE | - |
| | | |
| | TOTAL P.A.I.B. FAIL TO DELIVER | 106,395 |
| | | |
| 15. | PAIB MARGIN WITH OCC | |
| | OCC MARGIN | - |
| | CUSTOMER LONG SEG VS. CUST. BANK LOAN | - |
| | OCC COMMINGLED MARGIN (CUST. BANK LOAN) | - |
| | | |
| | TOTAL P.A.I.B. MARGIN WITH OCC | - |
| | | |
| 16. | OTHER | |
| | OTHER PAIB DEBITS | - |
| | | |
| | TOTAL OTHER | - |
| | | |
| 17. | TOTAL PAIB DEBITS | 2,336,369 |
| | | |
| 20. | EXCESS - DEBITS OVER CREDITS | - |
| 21. | DEFICIT - CREDITS OVER DEBITS | 311,992 |

SEARCH_RESULTS_00101578

EXHIBIT 28

**From:  Barclays Capital**
         **Daniram Sudarsan/Kendall McLaughlin**

**To :   Broadridge:**
         **Larry Papapietro; Gerrett Bannon; Mark Weiner; Pete Karczewsky; Mort**
         **Meckler; Charles Lichter; Brian Pyluck**

**Subject:  Alternative Box – Streetside Positions allocated twice**

**Date:  December 30, 2008**

We brought to the attention of Broadridge that in our review of certain securities
allocation for Lehman Brothers as of September 19, 2008, we discovered  that customer
long positions were over-allocated to Box/Streetside due to the fact  the Streetside
positions were used in the pre-allocation process and then again in the allocation process**.**

This in-depth analysis on our part was done as part of our research to provide information
to the SEC relating to the Lehman Brothers Reserve Formula calculation as of September
19, 2008 whereby we wanted to demonstrate that Lehman Brothers adequately reserved
for all customers long positions that were not segregated.

At Appendix 1 is an example of the incorrect allocation and our analysis of what it should
be.

We also conducted a similar review for Barclays Capital – 224 reports and found the
same issue**.**

**Finding:**

After reviewing several security allocations, it was found that the double use of the
Streetside positions would only impact the Reserve Formula whenever the security was in
an alternative Streetside location, i.e., other than DTC 000-0007-1-1 Account and the
security was in a deficit condition.

The Reserve Formula impact was that credits  would have been understated since the
related allocations such as  Customer Long versus Bank Loan, Stock Loan, Fails to
Receive, etc. would not have been calculated since the customer long was again allocated
to Streetside.

**Actions Taken**
• We have had several meetings with Broadridge representatives and provided
  additional examples of the above condition.
• Broadridge reviewed and indicated that this may be due to special logic coded on
  Lehman Brothers' instruction several years ago and no documentary support for
  the assumption could be found and that since Barclays Capital Client 224 was
  mirrored from Lehman Brothers client 012, the same result would be obtained.

- We requested a "Test" report be run on Barclays Capitals Stock record as of 12/19 using Broadridge's Standard Allocation rules.
- We reviewed the "Test" Allocation reports and found that the same issue was present and concluded that this may not have been due to Lehman Brothers' special logic but rather a Broadridge problem.

**Corrective Actions:**

We proposed to Broadridge and they agreed to amend their program logic to **NOT** include alternate Streetside positions in the "Before Allocation – Box" quantity from which the pre-allocation process reduces the SB memo quantities before making the determination of "Before Allocation – Customer Long" quantity.

Broadridge ran revised Test Allocation reports as of 12/19 which were reviewed and found to correct for the specific problem. Please see Appendix 2 for examples of Test and Production allocations.

However, a comparison of the Production and Test Allocation Summary (Totals) revealed that there were significant increases in the amount of unallocated Fails to Deliver and CNS Fails to Deliver. (Appendix 3). This was due to the fact that there are quite a number of Fails to deliver allocating to the PIM Omnibus Account and other foreign depositories which are coded as good control locations and therefore considered alternative Streetside positions. For specific examples, please see Appendix 4.

Also, to the extent that SB's quantities exceeded the Box (DTC only) position but there were sufficient quantities in the Streetside Account, this gave an allocation of Customer Long versus Streetside (technically Box) which would indicate that the Firm was self-financing customers' unpaid positions which was not necessarily the case. Instead, the pre-allocation process would deduct the full SB's quantities before allocating the remaining customers' long positions.

**Revised recommendations:**

Having reviewed the reason why there was significant increases in Unallocated fails and Stock Borrows, we think that there may be a need to reconsider how the Streetside positions are factored in the allocation process. Our suggestion is to:

- Revert to the logic where all Box and alternative Streetside positions are combined to produce "Before Allocation – Box" quantity but **DO NOT** generate a "Before Allocation – Streetside" report and **DO NOT** therefore have a Customer Long versus Streetside Allocation. Instead, excess customer long positions (amounts exceeding SB quantities) will allocate 'Customer Long versus Box; or,
- **Alternatively,** keep what you have done thus far **but ALSO** develop and create allocations versus Streetside that follow the allocation hierarchy immediately after Box allocations.

**Benefits of Revised recommendation**

- Fails to deliver and Stock Borrows will now allocate to Box instead of being unallocated as we think the Unallocated are resulting from the fact that Broadridge's Standard Allocation report does not have any other Long side allocations versus Streetside except for Customer Longs.
- Customer long versus Box allocation will truly represent debits self-financed by the Firm.

**Follow up Meeting:**

**We will be scheduling a follow- up meeting to discuss the above test results and additional proposals/recommendations.**

**Appendices:**

    **1. Allocation – Sec # 2801568**

 



wlksr - 091908 sec# 2801568.pd...    Analysis - Allocation of 28015...

    **2. Examples of Production and Test Allocations.**



Dan_Allocation_12 19 08_review...

    **3. Totals Report -Comparison of Production versus Test.**



Allocation Totals Comparison -...

    4. **Specific Examples of Unallocated fails**:

 

Examples of Unallocated FTD's ...    Document.pdf (214 KB)

EXHIBIT 29

Confirmation of Positions and Balances with Lehman Brothers International (Europe) as at 07:56 BST 15th September 08 (Point of Administration of LBIE)

Please complete the following tables as applicable to your account with LBIE. A separate form should be completed for each account.

| Account name: | Special Custody Account For The Exclusive Benefit of Customers of LBI |
| Account number: | 088-00375 |

| Net position with LBIE (USD): | |

Please confirm Equity positions as at 07:56 BST 15th Sept 08: (a)

| Equities | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unique identifier (ITS CUSIP #): | Unique identifier (ISIN #): | Stock Details: | Product | Long or (Short): | Nominal: | Nominal rehypo-thecated: | Currency | Price at 07:56 15th Sept 08: (b) | Market Value (local currency): | FX Rate (USD): (c) | Market Value (USD): (d) | Comments |
| 1CA937427 | CA6445351225 | NEW GOLD INC          WTS,AC K=15.0      28Jun17 P | Equity | 587,550 | | | CAN | 0.70 | 411,285.00 | | 381,561.36 | |
| 1RU679560 | RU0007661625 | GAZPROM OAO        SHR          RUB      5.00USD | Equity | 77,147 | | | USD | 8.10 | 624,890.70 | | 624,890.70 | |
| 004977559 | US34969P1021 | MYPHOTOALBUM INC  SHR          USD      0.01EUR | Equity | 3,000 | | | EUR | 0.14 | 420.00 | | 584.73 | |
| 010085249 | BRTLPPACNPR5 | TELECOMUNICACOES DE  PFD          BRL      0.00BRL | Equity | 11 | | | BRL | 44.50 | 489.50 | | 269.28 | |
| 010085215 | BRVIVOACNPR8 | VIVO PARTICIPACOES S PFD          BRL      0.00BRL | Equity | 4 | | | BRL | 8.50 | 34.00 | | 18.70 | |
| 1HK156109 | XS0321495615 | HONG LONG HOLDINGS L      WTS,AC K=3.36    02Oct12 | Equity | 4,500,000 | | | HKD | 0.30 | 1,350,000.00 | | 173,124.86 | |
| 1HK874313 | CNE1000001Q4 | CHINA CITIC BANK  SHR          CNY      1.00HKD | Equity | 315,000 | | | HKD | 3.82 | 1,203,300.00 | | 154,311.96 | |
| 1LU562785 | LU0363796268 | JULIUS BAER MULTIBONFUND          NPV      USD | Equity | 100,000 | | | USD | 100.00 | 10,000,000.00 | | 10,000,000.00 | |
| 1LU562777 | LU0363795708 | JULIUS BAER MULTIBONFUND          NPV      EUR | Equity | 100,000 | | | EUR | 100.00 | 10,000,000.00 | | 13,922,370.00 | |
| 1NL551057 | NL0000390706 | SNS REAAL          SHR          EUR      1.63EUR | Equity | 5,113 | | | EUR | 10.57 | 54,044.41 | | 75,242.62 | |
| 1MX422753 | MXWEEM080001 | UNITED MEXICAN STATEXXX          NPV          USD | Equity | 5,000 | | | USD | 23.00 | 115,000.00 | | 115,000.00 | |
| 1IT400282 | IT0003826481 | PARMALAT SPA          WTS,AC K=1.0      31Dec15 P | Equity | 650 | | | EUR | 1.07 | 692.25 | | 963.77 | |
| 002014520 | | CEMEX VENEZUELA SACASHR          VEB    100.00VEB | Equity | 47,881 | | | VEB | 350.00 | 35,910,750.00 | | 16,723.67 | |
| 003176336 | | CEMEX VENEZUELA SACASHR          VEB    100.00VEB | Equity | 80,447 | | | VEB | 1,485.00 | 119,463,795.00 | | 55,634.42 | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | Total: | 25,520,696.07 | | |

**FOOTNOTES**

(a)    Note that the data provided is as of close of business date 9/12/2008.
(b)    Prices were obtained from ITS as of close of business date 9/12/2008.
(c)    FX rates were not obtained to translate the currencies to USD, instead USD market values were obtained from ITS as of close of business date 9/12/2008. Refer to column L
(d)    USD market values were obtained from ITS as of close of business date 9/12/2008.

Please state any pending Equity buys/sells due for settlement post 07:56 BST 15th Sept 08

| Equities | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unique identifier (e.g. SEDOL / Cusip): | | Stock Details: | | Buy / sell | Nominal: | Nominal rehypo-thecated: | Currency | Price at 07:56 15th Sept 08 | Market Value (local currency): | FX Rate (USD): | Market Value (USD): | Comments |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | Total: | |

**Please provide details of all contractual agreements with LBIE:**

**Please provide details of any default notices that you have served to LBIE**

**Is there any further information which you wish the Administrators to be aware of in relation to your account with LBIE**

**Please confirm Fixed income positions as at 07:56 BST 15ᵗʰ Sept 08: (a)**

| Fixed Income | A/C: 088-00375 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Unique identifier (ITS CUSIP #): | Unique identifier (ISIN #): | Issue Details: | Product | Par value: | Maturity date: | Coupon rate: | Dirty price at 07:56 15th Sept 08: | Currency | Price (b) | Market Value (Local currency): | FX Rate in USD: (c) | Market Value (USD): (d) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1AR354454 | ARARGE03E147 | ARGENTINA GOVERNMENT INTERNATIONAL BOND VARIABLE RATE BOND 2 | Fixed Income | 1,358,441,645 | | | | USD | 2.80 | 38,036,366.06 | | 38,036,366.06 | |
| 1KY377646 | XS0268402368 | CUBIC ONE LTD FRN 20090425 MTN | Fixed Income | 300,000,000 | | | | JPY | 95.97 | 287,910,000.00 | | 2,702,999.72 | |
| 1DE431359 | XS0341285707 | KREDITANSTALT FUER WIEDERAUFBAU 8.500% 20110118 SERIES# EMTN | Fixed Income | 148,000,000 | | | | NGN | 96.63 | 143,012,400.00 | | 1,216,143.58 | |
| 1GB662793 | XS0263594227 | NOMURA BANK INTERNATIONAL PLC 0.000% 20090807 EMTN | Fixed Income | 87,500,000 | | | | GBP | 96.63 | 0.00 | | 0.00 | (g) |
| 1SG900390 | XS0301437520 | GOME ELECTRICAL APPL CNVBND#GOME ZEROCPN18May14 | Fixed Income | 74,000,000 | | | | CNY | 75.38 | 55,777,500.00 | | 8,146,805.87 | |
| 1IE954656 | XS0309859741 | CORIOLANUS LTD VARIABLE RATE BOND 20140615 SERIES# 65B EMTN | Fixed Income | 31,784,221 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1SG562695 | XS0381715266 | STANDARD CHARTERED BANK/SINGAPORE FRN 20120629 SERIES# EMTN | Fixed Income | 20,500,000 | | | | USD | 35.94 | 7,367,085.00 | | 7,367,085.00 | |
| 1US674773 | XS0266770840 | WASHINGTON MUTUAL BANK/SEATTLE WA FRN 20110908 SERIES# EMTN | Fixed Income | 20,000,000 | | | | EUR | 86.53 | 17,305,000.00 | | 24,092,861.28 | |
| 1DE996575 | DE0001080349 | STATE OF BREMEN GERMANY FRN 20090223 | Fixed Income | 20,000,000 | | | | EUR | 99.94 | 19,988,000.00 | | 27,828,033.15 | |
| 1US291586 | | GOLDEN TREE LOAN OPPORTUNITIES FINANCE I 0.000% 20090430 | Fixed Income | 19,250,000 | | | | USD | 102.26 | 19,685,050.00 | | 19,685,050.00 | |
| 1IE534862 | XS0249603233 | DALI CAPITAL SA FOR JSC VNESHTORGBANK 7.000% 20090413 | Fixed Income | 18,200,000 | | | | RUB | 99.13 | 18,041,660.00 | | 698,943.76 | |
| 1IE717368 | XS0272414508 | EIRLES THREE LTD VARIABLE RATE BOND 20170115 SERIES# EMTN | Fixed Income | 16,642,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 020605275 | XS0206052788 | CHAPEL BV VARIABLE RATE BOND 20641117 | Fixed Income | 16,500,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1KZ526902 | XS0373641009 | KAZMUNAIGAZ NATIONAL CO 9.125% 20180702 SERIES# REGS EMTN | Fixed Income | 15,000,000 | | | | USD | 101.75 | 15,262,500.00 | | 15,262,500.00 | |
| 1RU551116 | XS0376189857 | SEVERSTAL 9.750% 20130729 SERIES# REGS | Fixed Income | 15,000,000 | | | | USD | 98.50 | 14,775,000.00 | | 14,775,000.00 | |
| 1UY679106 | US760942AT98 | URUGUAY GOVERNMENT INTERNATIONAL BOND 5.000% 20180914 | Fixed Income | 14,800,000 | | | | UYU | 5.53 | 956,328.51 | | 47,460.39 | (e) |
| 1KY807014 | XS0208744812 | WHITNEY CLO LTD FRN 20170301 SERIES# 1X | Fixed Income | 14,750,000 | | | | USD | | 0.00 | | 0.00 | (f) |
| 1SG536277 | XS0375067880 | STANDARD CHARTERED BANK/SINGAPORE FRN 20130109 SERIES# EMTN | Fixed Income | 13,000,000 | | | | USD | 29.25 | 3,802,500.00 | | 3,802,500.00 | |
| 1IE845078 | XS0290468163 | EIRLES TWO LTD VARIABLE RATE BOND 20120715 SERIES# CRAf EMTN | Fixed Income | 12,869,108 | | | | USD | | 0.00 | | 0.00 | (f) |
| 1NL475356 | XS0275898806 | AMSTEL CORPORATE LOAN OFFERING BV FRN 20160525 SERIES# 1 | Fixed Income | 11,400,000 | | | | EUR | 74.00 | 8,436,000.00 | | 11,744,911.33 | |
| 1LU161315 | XS0190027051 | LIGHTHOUSE INTERNATIONAL CO SA 8.000% 20140430 SERIES# REGS | Fixed Income | 11,000,000 | | | | EUR | 75.00 | 8,250,000.00 | | 11,485,955.25 | |
| 1NL838082 | XS0289641614 | CLOCK FINANCE BV FRN 20150225 SERIES# 1 | Fixed Income | 10,000,000 | | | | CHF | | 0.00 | | 0.00 | (f) |
| 1KY820231 | XS0286802797 | CRAFT CLO LTD 0.000% 20170415 SERIES# 1X | Fixed Income | 10,000,000 | | | | USD | 80.00 | 8,000,000.00 | | 8,000,000.00 | |
| 1KY538361 | XS0370511288 | START CLO LTD FRN 20130109 SERIES# 5X | Fixed Income | 10,000,000 | | | | USD | 100.00 | 10,000,000.00 | | 10,000,000.00 | |
| 1IE419262 | DE000A0EUEZ7 | IKB DEUTSCHE INDUSTRIEBANK AG FRN 20141215 SERIES# 2 | Fixed Income | 10,000,000 | | | | EUR | 69.03 | 6,487,939.85 | | 9,032,749.89 | (e) |
| 1US253529 | US52517P6W62 | LEHMAN BROTHERS HOLDINGS INC VARIABLE RATE BOND 20131129 SER | Fixed Income | 10,000,000 | | | | USD | | 0.00 | | 0.00 | (f) |
| 1DE405148 | DE000NRW1162 | FEDERAL STATE OF NORTH RHINE WESTPHALIA FRN 20110308 SERIES# | Fixed Income | 10,000,000 | | | | EUR | 100.01 | 10,001,000.00 | | 13,923,762.23 | |
| 1GB432288 | XS0356612985 | ROYAL BANK OF SCOTLAND PLC/THE VARIABLE RATE BOND 20110221 S | Fixed Income | 10,000,000 | | | | USD | 100.00 | 10,000,000.00 | | 10,000,000.00 | |
| 012233987 | XS0122398232 | VINTAGE CAPITAL SA FRN 20101220 SERIES# 1 | Fixed Income | 10,000,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1KY823755 | XS0286681803 | GATE SME CLO FRN 20121115 SERIES# 2A | Fixed Income | 8,625,000 | | | | EUR | | 0.00 | | 0.00 | (g) |
| 1KY510055 | XS0132525725 | BROOKLANDS EURO REFERENCED LINKED NOTES 17.500% 20131220 SER | Fixed Income | 8,500,000 | | | | EUR | 20.00 | 1,700,000.00 | | 2,366,802.90 | |
| 1US697931 | XS0270679722 | LEHMAN BROS TREASURY CO BV 10.900% 20111220 SERIES# REG S | Fixed Income | 8,000,000 | | | | USD | | 0.00 | | 0.00 | (g) |
| 020224408 | XS0202244017 | MONASTERY BV FRN 20370317 SERIES# I | Fixed Income | 7,500,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1LU365601 | XS0226285699 | LYONDELLBASELL INDUSTRIES AF SCA 8.375% 20150815 SERIES# REG | Fixed Income | 7,500,000 | | | | EUR | 59.00 | 4,425,000.00 | | 6,160,648.72 | |
| 9TX002432 | XS0111599154 | STICHTING EUROSTAR I CDO 6.840% 20120610 SERIES# I | Fixed Income | 7,500,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1DE086708 | DE000A0LDYM4 | PROMISE PLC FRN 20170310 SERIES# 1 | Fixed Income | 7,400,000 | | | | EUR | | 0.00 | | 0.00 | (g) |
| 021735261 | | EIRLES FOUR LTD FRN 20120615 EMTN | Fixed Income | 7,070,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1US548347 | XS0373732063 | TMK CAPITAL SA FOR OAO TMK 10.000% 20110729 | Fixed Income | 7,000,000 | | | | USD | 100.75 | 7,052,500.00 | | 7,052,500.00 | |
| 1KY823714 | XS0286681399 | GATE SME CLO FRN 20121115 SERIES# 1A | Fixed Income | 6,750,000 | | | | EUR | | 0.00 | | 0.00 | (g) |
| 012080891 | XS0120808919 | BLUE EAGLE CDO SA 11.475% 20121219 SERIES# IX | Fixed Income | 6,500,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1US253313 | USP7182PAA05 | NEWLAND INTERNATIONAL PROPERTIES CORP 9.500% 20141115 SERIES | Fixed Income | 6,000,000 | | | | USD | | 0.00 | | 0.00 | (f) |
| 1DE446977 | XS0197911141 | BAYERISCHE LANDESBANK FRN 20151112 SERIES# EMTN | Fixed Income | 6,000,000 | | | | EUR | 100.60 | 6,035,994.00 | | 8,403,541.69 | |
| 1DE446951 | DE000NLB0WE3 | NORDDEUTSCHE LANDESBANK GIROZENTRALE AG FRN 20150915 SERIES# | Fixed Income | 6,000,000 | | | | EUR | 100.76 | 6,045,600.00 | | 8,416,908.00 | |
| 1FR553492 | FR0111570471 | FRANCE BTF 0.000% 20080925 | Fixed Income | 5,850,000 | | | | EUR | 99.83 | 5,840,324.10 | | 8,131,115.30 | |
| 1DO858014 | USP2402BAA33 | CERVECERIA NACIONAL DOMINICANA C POR A VARIABLE RATE BOND 20 | Fixed Income | 5,837,000 | | | | USD | 85.00 | 4,961,450.00 | | 4,961,450.00 | |
| 200008076 | XS0115743519 | ECUADOR GOVERNMENT INTERNATIONAL BOND STEPPED CPN 10.000% 20 | Fixed Income | 5,191,000 | | | | USD | 91.80 | 4,765,338.00 | | 4,765,338.00 | |
| 1BR724241 | US105756BM14 | BRAZILIAN GOVERNMENT INTERNATIONAL BOND 6.000% 20170117 | Fixed Income | 5,000,000 | | | | USD | 101.34 | 5,067,000.00 | | 5,067,000.00 | |
| 1BR444303 | US105756BK57 | BRAZILIAN GOVERNMENT INTERNATIONAL BOND 7.125% 20370120 | Fixed Income | 5,000,000 | | | | USD | 109.64 | 5,482,000.00 | | 5,482,000.00 | |
| 1DE446969 | DE000A0EFK33 | LANDESBANK HESSEN-THUERINGEN GIROZENTRAL FRN 20150615 SERIES | Fixed Income | 5,000,000 | | | | EUR | 100.25 | 5,012,500.00 | | 6,978,587.96 | |
| 1GB434490 | XS0239426314 | STANDARD BANK PLC 17.000% 20081218 SERIES# EMtn EMTN | Fixed Income | 5,000,000 | | | | EUR | | 0.00 | | 0.00 | (g) |
| 1KY511319 | XS0366779867 | EARLS EIGHT LTD VARIABLE RATE BOND 20150514 SERIES# EMTn EMT | Fixed Income | 4,800,000 | | | | EUR | 100.00 | 4,800,000.00 | | 6,682,737.60 | |
| 1GB077521 | GB0032785924 | UNITED KINGDOM GILT 4.000% 20090307 | Fixed Income | 4,750,000 | | | | GBP | 99.73 | 4,737,080.00 | | 8,292,764.66 | |
| 500750AA2 | US500750AC80 | KPNQWEST NV CNVBND#144A 10 %15Mar12 DFLT | Fixed Income | 4,722,000 | | | | EUR | 3.00 | 141,660.00 | | 197,224.29 | |
| 018432066 | XS0184326683 | ABAG BV FRN 20431222 SERIES# 1 | Fixed Income | 4,100,000 | | | | EUR | | 0.00 | | 0.00 | (f) |
| 1EG961468 | XS0311624240 | ARAB REPUBLIC OF EGYPT 8.750% 20120718 SERIES# REGS | Fixed Income | 4,100,000 | | | | EGP | 85.01 | 3,485,205.00 | | 640,811.69 | |
| 1NL772950 | XS0277789094 | GRESHAM CAPITAL CO BV VARIABLE RATE BOND 20271213 SERIES# 3 | Fixed Income | 4,000,000 | | | | EUR | 67.50 | 2,700,000.00 | | 3,759,039.90 | |
| 1IQ446015 | XS0240295575 | REPUBLIC OF IRAQ 5.800% 20280115 SERIES# REGS | Fixed Income | 4,000,000 | | | | USD | 65.00 | 2,600,000.00 | | 2,600,000.00 | |
| 1LU365643 | US64016AAA34 | LYONDELLBASELL INDUSTRIES AF SCA 8.375% 20150815 SERIES# 144 | Fixed Income | 4,000,000 | | | | USD | 55.00 | 2,200,000.00 | | 2,200,000.00 | |
| 345397569 | US345397SG93 | FORD MOTOR CREDIT CO LLC 5.800% 20090112 | Fixed Income | 4,000,000 | | | | USD | 96.86 | 3,874,497.60 | | 3,874,497.60 | |
| 1PL068610 | PL0000102836 | POLAND GOVERNMENT BOND 5.000% 20131024 SERIES# 1013 | Fixed Income | 3,650,000 | | | | PLN | 95.71 | 3,493,232.50 | | 1,428,213.82 | |
| 1IE377650 | XS0345947674 | CORIOLANUS LTD VARIABLE RATE BOND 20180429 SERIES# EmtN EMTN | Fixed Income | 3,500,000 | | | | EUR | 108.10 | 3,783,325.00 | | 5,267,306.00 | |
| 1GB915183 | XS0303241615 | CREDIT SUISSE INTERNATIONAL FOR VSEUKRAI 10.125% 20100614 | Fixed Income | 3,500,000 | | | | USD | 83.50 | 2,922,500.00 | | 2,922,500.00 | |
| 1NL559316 | XS0267047230 | MARS BV FRN 20140828 SERIES# 2006 | Fixed Income | 3,100,000 | | | | EUR | 74.00 | 2,294,000.00 | | 3,193,791.67 | |

| 1US4S8599 | US89233PW284 | TOYOTA MOTOR CREDIT CORP VARIABLE RATE FRN 20230507 SERIES# | Fixed Income | | | | USD | 100.00 | 3,000,000.00 | 3,000,000.00 | |
| 1G8914467 | XS0303097157 | IIG FUNDING LTD CNVBND#IIG 6.75 %10Jul12 | Fixed Income | | | | USD | 85.77 | 2,573,061.00 | 2,573,062.50 | |
| 1US353063 | US040114GM64 | ARGENTINA GOVERNMENT INTERNATIONAL BOND VARIABLE RATE BOND 2 | Fixed Income | | | | USD | 9.25 | 250,675.00 | 250,675.00 | |
| 1MX536925 | US9S5571AA29 | METROFINANCIERA SA VARIABLE RATE BOND PERP SERIES# REGS | Fixed Income | | | | USD | 50.00 | 1,237,500.00 | 1,237,500.00 | |
| 1US236425 | USU12673AA44 | CII CARBON LLC 11.125% 20151115 SERIES# REGS | Fixed Income | | | | USD | 99.50 | 2,228,800.00 | 2,228,800.00 | |
| 040114GF1 | US040114GF14 | ARGENTINA GOVERNMENT INTERNATIONAL BOND STEPPED CPN 15.500% | Fixed Income | | | | USD | 27.48 | 577,080.00 | 577,080.00 | |
| 070820006 | XS0115748401 | ECUADOR GOVERNMENT INTERNATIONAL BOND 12.000% 20121115 SERIE | Fixed Income | | | | USD | 94.50 | 798,880.32 | 798,880.32 | (e) |
| 1NL684486 | XS0257943893 | IMPRESS HOLDINGS BV FRN 20130915 SERIES# REGS | Fixed Income | | | | EUR | 90.50 | 1,810,000.00 | 2,519,948.97 | |
| 1NL557716 | XS0289552191 | CLOCK FINANCE BV FRN 20150225 SERIES# 1 | Fixed Income | | | | EUR | 92.00 | 1,840,000.00 | 2,561,716.08 | |
| 1KY717338 | XS0267260346 | BLUE CITY INVESTMENTS 1 LTD FOR BLUE CIT FRN 20131107 SERIES | Fixed Income | | | | USD | 99.00 | 1,980,000.00 | 1,980,000.00 | |
| 1US893100 | US870757AA90 | SWIFT TRANSPORTATION CO INC FRN 20150515 SERIES# 144A | Fixed Income | | | | USD | 34.00 | 680,000.00 | 680,000.00 | |
| 2HK002641 | XS0077592078 | BAKRIE INDONESIA 8V 8.588% 20010718 DFLT | Fixed Income | | | | USD | 20.00 | 400,000.00 | 400,000.00 | |
| 1DK546035 | XS0253470644 | ISS HOLDINGS A/S 8.875% 20160515 SERIES# REGS | Fixed Income | | | | EUR | 90.50 | 1,810,000.00 | 2,519,948.97 | |
| 1DK544915 | XS0252438899 | NORDIC TELEPHONE CO HOLDINGS APS 8.250% 20160501 SERIES# REG | Fixed Income | | | | EUR | 89.00 | 1,780,000.00 | 2,478,181.86 | |
| 1FR899309 | XS0300825246 | CMA CGM SA 5.500% 20120516 SERIES# REGS | Fixed Income | | | | EUR | 84.00 | 1,680,000.00 | 2,338,958.16 | |
| 1US319718 | | SANKATY HIGH YIELD II OFFSHORE LTD 0.000% 20250401 | Fixed Income | | | | USD | 100.00 | 1,930,000.00 | 1,930,000.00 | |
| 70415AB32 | USG70415AB35 | PETROZUATA FINANCE INC 8.220% 20170401 SERIES# REGS | Fixed Income | | | | USD | 100.65 | 1,654,384.51 | 1,654,384.51 | (e) |
| 1NL413357 | XS0223493841 | HARBOURMASTER CLO LTD FRN 20200615 SERIES# 5X | Fixed Income | | | | EUR | 51.50 | 772,500.00 | 1,075,503.08 | |
| 1BM426933 | US5438859D10 | LORAL SPACE & COMMUNICATIONS/OLD 9.500% 20491231 DFLT | Fixed Income | | | | USD | 0.33 | 4,950.00 | 4,950.00 | |
| 1AE284051 | XS0335122106 | NAKHEEL DEVELOPMENT 2 LTD 2.750% 20110116 | Fixed Income | | | | USD | 89.17 | 1,337,550.00 | 1,337,551.35 | |
| 1LU472860 | XS0245836274 | WEATHER CAPITAL FINA CNVBND#ORAS 4.75 %27Feb13 | Fixed Income | | | | EUR | 93.27 | 1,399,041.60 | 1,947,797.48 | |
| 1RU765724 | XS0272197053 | EMERGING MARKETS STRUCTURED PRODUCTS FOR 10.000% 20101103 | Fixed Income | | | | USD | 0.00 | 0.00 | 0.00 | (f) |
| 1LU349803 | XS0223715920 | VTB CAPITAL SA 6.250% 20350630 SERIES# REGS | Fixed Income | | | | USD | 89.50 | 1,297,750.00 | 1,297,750.00 | |
| 922646AS3 | US922646AS37 | VENEZUELA GOVERNMENT INTERNATIONAL BOND 9.250% 20270915 | Fixed Income | | | | USD | 84.51 | 1,098,565.00 | 1,098,565.00 | |
| 1NL937744 | USN54360AC13 | MAJAPAHIT HOLDING BV 7.250% 20170628 SERIES# REGS | Fixed Income | | | | USD | 95.00 | 1,102,000.00 | 1,102,000.00 | |
| 1FR552726 | XS0254144115 | EUROPCAR GROUPE SA 8.125% 20140515 SERIES# REGS | Fixed Income | | | | EUR | 73.00 | 810,300.00 | 1,128,129.64 | |
| 1NL385837 | XS0203061907 | HARBOURMASTER CLO LTD FRN 20191011 SERIES# 4X | Fixed Income | | | | EUR | 55.00 | 550,000.00 | 765,730.35 | |
| 1LU779025 | XS0280259556 | HELLAS TELECOMMUNICATIONS II SCA FRN 20150115 SERIES# REGS | Fixed Income | | | | EUR | 70.00 | 700,000.00 | 974,565.90 | |
| 1KY758449 | US85570RAA95 | START CLO LTD FRN 20110607 SERIES# 3A 144A | Fixed Income | | | | USD | 88.00 | 880,000.00 | 880,000.00 | |
| 1JE399603 | XS0234448289 | WHINSTONE CAPITAL MANAGEMENT LTD FRN 20451025 SERIES# 1X | Fixed Income | | | | GBP | 30.00 | 105,146.85 | 184,070.07 | (e) |
| 1IE196421 | XS0325413218 | DANA GAS SUKUK LTD CNVBND#DANA 7.5 %31Oct12 | Fixed Income | | | | USD | 80.00 | 800,000.00 | 800,000.00 | |
| 1LU413500 | XS0236096730 | WIND ACQUISITION FINANCE SA 9.750% 20151201 SERIES# REGS | Fixed Income | | | | EUR | 101.00 | 1,010,000.00 | 1,406,159.37 | |
| 71676QAA4 | US71676QAA40 | PETROZUATA FINANCE INC 7.630% 20090401 SERIES# 144A | Fixed Income | | | | USD | 100.50 | 205,431.05 | 205,431.04 | (e) |
| 1US727605 | XS0273988393 | BOMBARDIER INC 7.250% 20161115 SERIES# REGS | Fixed Income | | | | EUR | 100.70 | 1,007,000.00 | 1,401,982.65 | |
| 1G8650731 | XS0261696586 | AVIS FINANCE CO PLC FRN 20130731 | Fixed Income | | | | EUR | 69.90 | 698,950.00 | 973,104.05 | |
| 1US431935 | US543868BC00 | LORAL CYBERSTAR INC 10.000% 20491231 | Fixed Income | | | | USD | 0.00 | 1.00 | 1.00 | |
| D13139563 | US93933WAA45 | WASHINGTON MUTUAL BANK/HENDERSON NV 6.875% 20110615 | Fixed Income | | | | USD | 68.00 | 680,000.00 | 680,000.00 | |
| 1KZ240413 | XS0202799580 | HALYK SAVINGS BANK OF KAZAKHSTAN JSC 8.125% 20091007 SERIES# | Fixed Income | | | | USD | 100.75 | 987,350.00 | 987,350.00 | |
| 1LU388942 | XS0231380774 | RUSSIAN STANDARD FINANCE SA FOR RUSSIAN 7.500% 20101007 SERI | Fixed Income | | | | USD | 78.39 | 627,080.00 | 627,080.00 | |
| 1ID324166 | USY207214A56 | REPUBLIC OF INDONESIA 6.875% 20180117 SERIES# REGS | Fixed Income | | | | USD | 102.18 | 817,400.00 | 817,400.00 | |
| 1G8961229 | XS0311816234 | UKRAINE ISSUANCE PLC FOR ALFA BANK CJSC 9.250% 20100726 SERI | Fixed Income | | | | USD | 92.28 | 738,200.00 | 738,200.00 | |
| 1VE091922 | USP9395PAB78 | VENEZUELA GOVERNMENT INTERNATIONAL BOND 5.375% 20100807 SERI | Fixed Income | | | | USD | 93.45 | 747,600.00 | 747,600.00 | |
| 1AR518918 | ARARGE03F243 | ARGENTINA GOVERNMENT INTERNATIONAL BOND 7.000% 20110328 SERI | Fixed Income | | | | USD | 82.10 | 640,380.00 | 640,380.00 | |
| 1NL805537 | XS0284750634 | GTB FINANCE B.V. 8.500% 20120129 | Fixed Income | | | | USD | 92.63 | 713,251.00 | 713,251.00 | |
| 1BR460093 | USG4756WAB66 | INDEPENDENCIA INTERNATIONAL LTD 9.875% 20150515 SERIES# REGS | Fixed Income | | | | USD | 92.00 | 708,400.00 | 708,400.00 | |
| 1SN905292 | XS0297056409 | WORLD 8K-IBRD-INTL BK REC&DEV 9.500% 20090427 SERIES# EMTN | Fixed Income | | | | BRL | 98.07 | 745,294.00 | 409,997.79 | |
| 1ID704136 | USN54360AA56 | MAJAPAHIT HOLDING BV 7.250% 20111017 SERIES# REGS | Fixed Income | | | | USD | 100.00 | 760,000.00 | 760,000.00 | |
| 1IE243456 | XS0326630521 | CLOVERIE PLC FRN 20120920 SERIES# EMTN | Fixed Income | | | | EUR | 97.83 | 733,725.00 | 1,021,519.09 | |
| 1GA286651 | XS0333225000 | GABONESE REPUBLIC 8.200% 20171212 SERIES# REGS | Fixed Income | | | | USD | 86.70 | 624,240.00 | 624,240.00 | |
| 1ID704128 | USN54360AB30 | MAJAPAHIT HOLDING BV 7.750% 20161017 SERIES# REGS | Fixed Income | | | | USD | 98.90 | 702,190.00 | 702,190.00 | |
| 1US562069 | | GENERAL ELECTRIC CAPITAL CORP 9.190% 20081230 SERIES# MTN | Fixed Income | | | | USD | 102.48 | 717,353.00 | 717,353.00 | |
| 1DO375613 | USP3579EAD96 | DOMINICAN REPUBLIC INTERNATIONAL BOND 9.040% 20180123 SERIES | Fixed Income | | | | USD | 103.06 | 743,366.31 | 743,366.31 | (e) |
| 1NL425864 | XS0358156510 | HSBK EUROPE BV 9.250% 20131016 SERIES# REGS | Fixed Income | | | | USD | 97.50 | 633,750.00 | 633,750.00 | |
| 1LU434068 | XS0360055056 | EVRAZ GROUP SA 8.875% 20130424 SERIES# REGS | Fixed Income | | | | USD | 96.00 | 624,000.00 | 624,000.00 | |
| 1LU401505 | XS0234987153 | EVRAZ GROUP SA 8.250% 20151110 SERIES# REGS | Fixed Income | | | | USD | 93.13 | 558,750.00 | 558,750.00 | |
| 1SV338511 | USP01012AN67 | EL SALVADOR GOVERNMENT INTERNATIONAL BON 7.650% 20350615 SER | Fixed Income | | | | USD | 103.25 | 619,500.00 | 619,500.00 | |
| 1US476245 | USG26593AA40 | DASA FINANCE CORP 8.750% 20180529 SERIES# REGS | Fixed Income | | | | USD | 100.00 | 550,000.00 | 550,000.00 | |
| 1RA4GE038 | ARARGE035709 | ARGENTINA BONOS FRN 20130430 SERIES# USD | Fixed Income | | | | USD | 43.00 | 236,500.00 | 236,500.00 | |
| 1US559727 | XS0381439305 | TRANSCAPITALINVEST LTD FOR OJSC AK TRANS 8.700% 20180807 SER | Fixed Income | | | | USD | 98.00 | 529,200.00 | 529,200.00 | |
| 1NL324638 | XS0289552514 | CLOCK FINANCE BV FRN 20150225 SERIES# 1 | Fixed Income | | | | EUR | 80.97 | 404,850.00 | 563,647.14 | |
| 112209AL5 | USU12209AL36 | BUSINESS LOAN EXPRESS FRN 20320125 SERIES# 2X | Fixed Income | | | | USD | 0.00 | 0.00 | 0.00 | (f) |
| 6TK001189 | AU0000XCLWF9 | AUSTRALIA GOVERNMENT BOND 7.500% 20090915 SERIES# 909 | Fixed Income | | | | AUD | 101.56 | 507,800.00 | 403,163.37 | |
| 1VE468179 | USG70415AC18 | PETROZUATA FINANCE INC 8.370% 20221001 SERIES# REGS | Fixed Income | | | | USD | 98.00 | 480,200.00 | 480,200.00 | |
| 1US648710 | | TRANSMERIDIAN EXPLOR    WTS,AC K=1.0    15Dec10 P | Fixed Income | | | | USD | 0.00 | | | 0.00 | (g) |
| 1GH160628 | XS0323760370 | REPUBLIC OF GHANA 8.500% 20171004 SERIES# REGS | Fixed Income | | | | USD | 99.73 | 369,015.80 | 369,015.80 | |
| 1SG544958 | US239191AA76 | DAVOMAS INTERNATIONAL FINANCE COMPANY PT 11.000% 20110509 SE | Fixed Income | | | | USD | 98.00 | 196,000.00 | 196,000.00 | |
| 1UA145732 | XS0187564801 | UKRAINE GOVERNMENT INTERNATIONAL BOND 6.875% 20110304 SERIES | Fixed Income | | | | USD | 95.83 | 172,485.00 | 172,485.00 | |
| 123653495 | US060505AG97 | BANK OF AMERICA CORP 7.400% 20110115 | Fixed Income | | | | USD | 104.64 | 104,635.90 | 104,635.90 | |
| 1US558497 | US66610TAA57 | NORTHERNSTAR NATURAL CNVBND#144A VAR 15May13 | Fixed Income | | | | USD | 92.00 | 91,872.12 | 91,872.12 | |
| 1IE712161 | XS0272770396 | GE CAPITAL EUROPEAN FUNDING 4.125% 20161027 SERIES# EMTN | Fixed Income | | | | EUR | 89.84 | 80,853.07 | 112,566.62 | |
| 1US518087 | US65543AAB08 | NORANDA ALUMINIUM ACQUISITION CORP FRN 20150515 | Fixed Income | | | | USD | 84.75 | 63,562.50 | 63,562.50 | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1GR779046 | XS0280247114 | | HELLAS TELECOMMUNICATIONS FINANCE FRN 20150715 SERIES# REGS | Fixed Income | 47,298 | | | | EUR | 87.50 | 41,385.75 | | 57,618.77 | |
| 1VE149050 | US9226468J29 | | VENEZUELA GOVERNMENT INTERNATIONAL BOND 10.750% 20130919 | Fixed Income | 10,000 | | | | USD | 97.75 | 9,775.00 | | 9,775.00 | |
| 1IE747472 | XS0276106761 | | BCM IRELAND PREFERRED EQUITY LTD FRN 20170215 SERIES# 144A | Fixed Income | 8,179 | | | | EUR | 101.50 | 8,301.69 | | 11,557.90 | |
| 170209MXS | US5930488G58 | | UNITED MEXICAN STATES 10.375% 20090217 SERIES# XW | Fixed Income | 1,000 | | | | USD | 102.95 | 1,029.50 | | 1,029.50 | |
| 1US354129 | XS0209139244 | | ARGENTINA GOVERNMENT INTERNATIONAL BOND VARIABLE RATE BOND 2 | Fixed Income | 181 | | | | EUR | 7.65 | 13.85 | | 19.26 | |
| 1DE994869 | XS0312780231 | | S-CORE GMBH VARIABLE RATE BOND 20160425 SERIES# 1 | Fixed Income | 100 | | | | EUR | 999,999.00 | 999,999.00 | | 1,392,235.60 | |
| 1MX638572 | MX0MGO000078 | | MEXICAN BONOS CNVBND#M 20 10 %05Dec24 | Fixed Income | 70,000 | | | | MXN | 110.49 | 7,734,511.96 | | 726,968.81 | |
| 1MX544754 | MX0MGO0000C0 | | MEXICAN BONOS CNVBND#M 10 7.25 %15Dec16 | Fixed Income | 29,000 | | | | MXN | 89.36 | 2,591,393.29 | | 243,565.73 | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | Fixed income securities listed below were not in the 088 Intercompany account, but were identified as being held by LBIE in the Fixed Income Prime Broker research. | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | 21735261 | | | Fixed Income | 7,070,000 | | | | | | | | | (g) |
| | 1US648710 | | | Fixed Income | 377,689 | | | | | | | | | (g) |
| | DE0001141521 | | | Fixed Income | 1,100,000 | | | | | | | | | (g) |
| | US98375NAA81 | | XM SATELITE RADIO INC | Fixed Income | 700,000 | | | | USD | | | | | (f) |
| | XS0302364673 | | WHISTLEJACKET CAP LTD | Fixed Income | 15,000,000 | | | | EUR | | | | | (f) |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | Total: | | 413,396,081 | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

**FOOTNOTES:**

**(a)**  Note that the data provided is as of close of business date 9/12/2008.
**(b)**  Prices were obtained from ITS as of close of business date 9/12/2008 with the exception of one security highlighted in blue. The price for the security highlighted was obtained from Bloomberg.
**(c)**  FX rates were not obtained to translate the currencies to USD, instead USD market values were obtained from the ITS as of close of business date 9/12/2008. Refer to column N.
**(d)**  USD market values were obtained from ITS as of close of business date 9/12/2008.
**(e)**  These  are Mortgage Backed Securities, therefore applicable pricing factors have been taken into account in calculating the market values as of 9/12/2008.
**(f)**  Historical prices not found on Bloomberg.
**(g)**  Securities not found on Bloomberg.

**Please state any pending Fixed Income buys/sells due for settlement post 07:56 BST 15th Sept 08 that impact on the above positions:**

| Unique identifier (e.g. SEDOL): | | | Issue Details: | | Buy/Sell: | Par value: | Maturity date: | Coupon rate: | Dirty price at 07:56 15th Sept 08: | FX Rate in USD: | | Market Value (Local currency): | Market Value (USD): |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | Total: | |

**Please confirm stock borrow positions as at 07:56 BST 15th Sept 08:**

| Derivatives | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unique identifier of underlying security (e.g. SEDOL/CUSIP): | | Stock Details: | Nominal: | Loan value: | Rate: | Outstanding fees payable to LBIE: | Comments |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | Total: | | | | |

**Please confirm cash balances as at 07:56 BST 15th Sept 08:(a)**

| Cash balance | | | | | |
|---|---|---|---|---|---|
| Account | Currency: | Value (local currency): (b) | FX rate: | Value (USD): | Comments |
| 088-00375 | ARS | 19,428,302.84 | 3.081 | 6,306,866.69 | (c) |
| 088-00375 | BRL | 244,201.94 | 1.785 | 136,830.81 | (c) |
| 088-00375 | CAD | 386,914.34 | 1.063 | 363,846.47 | (c) |
| 088-00375 | CHF | 1,290,215.25 | 1.132 | 1,139,363.52 | (c) |
| 088-00375 | EUR | 94,764,562.67 | 1.418 | 66,853,307.00 | (c) |
| 088-00375 | GBP | 54,673,007.94 | 5.439 | 10,052,402.72 | (c) |
| 088-00375 | HKD | 123,027.42 | 7.798 | 15,777.60 | (c) |
| 088-00375 | HRK | 5,236,875.00 | 4.997 | 1,047,919.92 | (d) |
| 088-00375 | HUF | 69,040,900.00 | 168.383 | 410,022.01 | (c) |
| 088-00375 | JPY | 8,330,547.00 | 107.265 | 77,663.24 | (c) |
| 088-00375 | MXN | 12,951,768.48 | 10.577 | 1,224,510.36 | (c) |
| 088-00375 | NOK | 1,784,697.75 | 5.733 | 311,291.73 | (c) |
| 088-00375 | PLN | 547,500.00 | 2.358 | 232,148.91 | (c) |
| 088-00375 | RUB | 7,727,375.00 | 25.574 | 302,159.83 | (c) |
| 088-00375 | TRY | 382,051.36 | 1.240 | 308,105.94 | (c) |
| 088-00375 | USD | 170,461,034.85 | 1 | 170,461,034.85 | (c) |
| 088-00375 | VEF | 40,094.81 | 2.147 | 18,672.20 | (d) |
| 088-00375 | ZAR | 1,995,771.49 | 8.065 | 247,451.61 | (c) |
| | | | | | |
| | | | Total: | 259,509,375.40 | |

**FOOTNOTES:**

(a)   Data provided is as of close of business date 9/12/2008.

(b)   Value in local currency obtained from ITS as of 9/12/2008.

(C)   Obtained FX rates as of 9/12/2008 from Factiva.

(d)   Obtained FX rates as of 9/12/2008 from Bloomberg.

**Please confirm pending cash payments/receipts as at 07:56 BST 15th Sept 08:**

| Account: | | Description: | Payment / receipt: | Date: | Value (local currency): | Value (USD): | Value date: | Comments |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | Total: | | | | |

**Please provide details of other corporate events that impact on your positions and balances:**

| Coupons, Dividends, Corporate actions, interest and | | | | | |
|---|---|---|---|---|---|
| Event type e.g. coupon, dividend etc: | | Position/asset: | Event details: | USD impact on position: | USD impact on cash balance: |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | Total: | | |

EXHIBIT 30

**To:**       O'Mara, Mick[momara@lehman.com]; McLaughlin, Kendall J[kmclaugh@lehman.com]
**Cc:**       Nazimowitz, Lawrence D[lawrence.nazimowitz@lehman.com]; Ingulli,
Charles[charles.ingulli@lehman.com]; Williamson, Chris[chris.williamson@lehman.com]; Sudarsan,
Daniram[daniram.sudarsan@lehman.com]; Buonocore, Salvatore[salvatore.buonocore@lehman.com];
OCE - Regulatory Control[FirmBalAnalysis@lehman.com]
**From:**     Carter, Paul
**Sent:**     Thur 9/11/2008 12:25:09 PM
**Importance:**   Low
**Subject:**  Trapped Liquidity - COB 10th September 2008
**Categories:**   urn:content-classes:message

<http://my.lehman.com/LL_S/images/trans.gif>

<http://my.lehman.com/LL_S/images/trans.gif>

<http://my.lehman.com/LL_S/images/trans.gif>

<http://my.lehman.com/LL_S/images/trans.gif>

<http://my.lehman.com/LL_S/images/trans.gif>

Trapped Liquidity

Trapped Liquidity MIS

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

NAZIMOWITZ_LAW_00011893

Please find attached today's Trapped Liquidity spreadsheet.


10-Sep-08

09-Sep-08


Suspense A/C

84-34671-0

0.00

0.00


I/Co 0302 (LBIE)

88-01352-0

(2,286,433,467.09)

89,187,216.02


I/Co 0302 (LBIE)

88-01352-2

(0.44)

(2,608,744.89)


I/Co 0302 (LBIE)

88-01352-8

(9,636,762.47)

0.00


Corporate Actions

89-31120-0

0.00

NAZIMOWITZ_LAW_00011893

0.00

Dividends Ben Rec

96-08186-0

5,892,097.18

1,264,989.96

Dividends Ben Rec

96-08186-8

(22,500.00)

(22,500.00)

DTC 079 Nostro

98-35000-0

2,378,563,407.38

84,481.09

I/Co Dividends

39-31012-8

(8,757,974.26)

(9,107,108.56)

DTC Charge 079

84-34661-0

9,549,618.91

9,549,618.91

NAZIMOWITZ_LAW_00011893

Total

89,154,419.21

88,347,952.53

Regards

OCE - Regulatory Control

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

OCE-Regulatory Control

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

This data has been prepared by OCE-Regulatory Control. Please contact
mailgroup OCE-Regulatory Control with any queries.

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/spacer.gif>

NAZIMOWITZ_LAW_00011893

OCE Contact Details


<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>


Global Manager

Michael J. O'Mara  | Profile
<http://my.lehman.com/go/LL/composite?templateCode=DetailedEmployeePage&
id=10014869>
Senior Vice President

Control and Exposure Management

22759


<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>


<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

NAZIMOWITZ_LAW_00011893

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

OCE Regulatory

Chris Williamson  | Profile
<http://my.lehman.com/go/LL/composite?templateCode=DetailedEmployeePage&
id=10261491>
Vice President

Control and Exposure Management

24552

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

NAZIMOWITZ_LAW_00011893

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

<http://my.lehman.com/LL_S/imagelibrary/artwork/spacer.gif>

NAZIMOWITZ_LAW_00011893

# EXHIBIT 31

**Cc:**      Tonucci, Paolo [paolo.tonucci@lehman.com]; Allery, Stephen [stephen.allery@lehman.com]; Feraca, John [joferaca@lehman.com]
**To:**      Pellerani, Carlo [carlo.pellerani@lehman.com]; Coghlan, John F. (Prime Services) [jcoghlan@lehman.com]
**From:**      Maynard, Ian [imaynard@lehman.com]
**Sent:**      Wed 9/10/2008 1:25:39 PM
**Subject:**      RE: Prime Broker User as of 09-09

Understand that UBS is unwound value today.

We will continue to focus on the underlift positions to eat into the shortfall.

We do however continue to see pressure on the overlift side - SAAD being the most immediate example yesterday. SICL have raised the possibility of moving their largely fully paid for portfolio. Olivant have yet to raise the issue.

Regards

> _____
> From:          Pellerani, Carlo
> Sent: Wednesday, September 10, 2008 1:09 PM
> To:    Coghlan, John F. (Prime Services); Maynard, Ian
> Cc:    Tonucci, Paolo
> Subject:       FW: Prime Broker User as of 09-09
>
> John, Ian,
>
> Our numbers indicate PB is a net user of cash in LBIE and caused a
> large negative swing yesterday (which Steve and others don't
> intuitively yet understand). One way or another we need to find way of
> generating cash to mitigate a large shortfall in LBIE (around $2.5bn).
> The below clients are the key users with around $3bn. I understand UBS
> O'Connor might be withdrawing and how can we make these clients flat
> and generate $2bn?
>
> Thanks
>
> _____
> From:          Masaun, Jyoti
> Sent: 10 September 2008 13:04
> To:    Pellerani, Carlo
> Subject:       Prime Broker User as of 09-09
>
>  << OLE Object: Picture (Metafile) >>

TONUCCI_PAOLO_00025853

# EXHIBIT 32

| To: | Ingulli, Charles[charles.ingulli@lehman.com]; Burke, William T[wburke@lehman.com] |
|---|---|
| Cc: | Bowen, Gareth[gbowen@lehman.com]; Smith, Simon [UK][simon.smith@lehman.com]; Hemmings, Clare[clare.hemmings@lehman.com] |
| From: | Lynch, Padraic |
| Sent: | Thur 9/11/2008 1:00:36 PM |
| Subject: | RE: LBIE v LBI receivable |
| Categories: | urn:content-classes:message |

Hi Charlie,

Looking at this position, it appears to be reatively flat ie has created a large receivable between LBIE Frankfurt and LBI, and a like payable between LBIE london and LBI, nets to approx 7m. Also I think the movement is in USD on the trapped liquidity account with a balance of 2,296,070,230 usd. Is this something Paul Carter in Ops would be aware of?

| Sum of Net Amount | DBS Entity | | | | | |
|---|---|---|---|---|---|---|
| DBS Account | 0000 | 0019 | 0059 | 0183 | 0909 | Grand Total |
| 1002000158 | | | - | 942,638,601.90 | - | 0.00 - 942,638,601.90 |
| 1101000200 | - | 37,608,620.40 | - | 4,997,089.94 | - | 219,536,171.68 895,539,152.22 633,397,270.20 |
| 1101500010 | 29,685,748.55 | | - | 3,597,718.62 | | 638,317.94 26,726,347.87 |
| 1171000032 | | | - | | | - |
| 1171000300 | | | - | | | - |
| 1201000040 | | | - | | | - |
| 1209000183 | | 273,075,002.47 | | | | 273,075,002.47 |
| 1221000040 | - | 227,140.35 | | 9,486,789.62 | | 9,259,649.27 |
| 1252000000 | | | -1,866,907,015.62 | 1,858,984,143.77 | - | 7,922,871.85 |
| 1252000183 | 1,866,907,015.62 | | | | 1,866,907,015.62 | |
| 1252000909 | -1,858,984,143.77 | | | | -1,858,984,143.77 | |
| 1262000000 | | | - | | | - |
| 1262000019 | | | - | 4,997,700.52 | - | 4,997,700.52 |
| 1262000059 | | | - | 14,775.63 | 49,828,030.01 | 49,813,254.38 |
| 1262000183 | | 4,997,700.52 | 14,775.63 | | -1,908,812,173.78 | - 1,903,799,697.63 |
| 1262000909 | | - | 49,828,030.01 | 1,908,812,173.78 | | 1,858,984,143.77 |
| 1262200183 | | - | 616.98 | - | | - 616.98 |
| 2501000724 | | | - | | | - |
| 2603508005 | | | - | | | - |
| 2603508008 | | | - | 0.00 | - | - 0.00 |
| 4202500010 | | - | 127,863.90 | | 62,996.18 | - 64,867.72 |
| 4804500080 | 227,140.35 | - | 610.58 | | 623.09 18,663.93 | 245,816.79 |
| Grand Total | - | 0.00 | - | 0.00 | 0.00 | 0.00 0.00 - 0.00 |

Thanks,

Regards,
Padraic
> _____
> From:          Ingulli, Charles
> Sent: 11 September 2008 13:42
> To:    Lynch, Padraic; Burke, William T
> Cc:    Bowen, Gareth; Smith, Simon [UK]; Hemmings, Clare
> Subject:        RE: LBIE v LBI receivable
>
>
> Take a look at Cu1DE412482 in EUR currency.. That may help explain.. Also, I have just begun my Calculation for Today.
>
> Charlie Ingulli
>
> Lehman Brothers / Neuberger Berman
> 1301 Avenue of the Americas - 4th Floor
> New York, NY  10019
> ( 212 ) 320 - 6896 Direct Phone
> ( 646 ) 834 - 2392 Direct Fax
>
>
> _____
> From:          Lynch, Padraic
> Sent: Thursday, September 11, 2008 8:08 AM
> To:    Burke, William T; Ingulli, Charles
> Cc:    Bowen, Gareth; Smith, Simon [UK]; Hemmings, Clare
> Subject:        LBIE v LBI receivable
>
> Hi Bill/Charlie,
>
> We are seeing a massive receivable in LBIE vs LBI today of 2.3bn? Primarily relating to the balance on the trapped liquidity account, 08800169. Any ideas on what has caused this. Liquidity in London also are showing a drain of 2bn in their liquidity today which is probably related, Is this related to a particular PB client?
>
> Thanks,
>
> Padraic Lynch
> Associate Entity Control
>
> LEHMAN BROTHERS
> 25 Bank Street, Canary Wharf, London, E14 5LE
> * Email: padraic.lynch@lehman.com
>

INGULLI_CHA_00007315

# EXHIBIT 33

**To:**  Burkhart, Gunner[gunner.burkhart@lehman.com]
**Cc:**  Barker Goldie, Garth[garth.barkergoldie@lehman.com]; Pellerani, Carlo[carlo.pellerani@lehman.com]; Maynard, Ian[imaynard@lehman.com]; Blackwell, Alastair[ablackwe@lehman.com]
**From:**  Searle, Kate
**Sent:**  Fri 9/12/2008 10:14:18 AM
**Importance:**  Low
**Subject:**  RE: Settlement / Funding / Liquidity
**Categories:**  urn:content-classes:message

Hi Gunner

Cash short fall - LBIE $10bn

*       Treasury providing details of the movements they are unable to explain over the last couple of days for Desk / MO to review and explain
*       Believe it relates primarily to the UBS O'Connor transfer earlier in the week but need to confirm
*       Definitely timing issue long / short vs financing positions, lifts etc part of the issue
*       All European unwinds booked with regular settlement cycle but NY booking for same day. Declan will speak to NY Desk to ensure regular settlement cycle going forward and I will liaise with Monty Forrest

Carlo - fyi I sent a note to your guys early yesterday asking what info they needed on this stuff and have not heard back. As a Firm we don't get much of a heads up when clients are leaving but if we can get something to you in advance we will be in a better position than we are now


Intra day funding

*       Primary concern = JPM Triparty. Intraday line cut to $1.5bn. Eur 250 mil cash injection this morning,
*       Ops following up on all monies owed to the Firm
*       Ops only to pre-advise on receipt of funds that have definitely been confirmed

Follow up meeting booked for 1pm

Thanks
Kate

_____

From: Burkhart, Gunner
Sent: Friday, September 12, 2008 10:10 AM
To: Searle, Kate; Settlements Aged Break Team
Subject: RE: Settlement / Funding / Liquidity


Excellent. Thank you.

BLACKWELL_ALA_00019928

From:      Searle, Kate
Sent:      Friday, September 12, 2008 10:10 AM
To:        Burkhart, Gunner; Settlements Aged Break Team
Subject:       Settlement / Funding / Liquidity


Hi Gunner

Have set up a mandatory meeting for 10.30 this morning ...PB Desk /
Treasury / Settlements / MO
Will coordinate throughout the day and keep you updated

Thanks
Kate

BLACKWELL_ALA_00019928

# EXHIBIT 34

To:        Thearle, Michael[michael.thearle@lehman.com]; Gilchriest, William[bgil@lehman.com]; Laurella,
Giovanna[glaurella@lehman.com]; Price, Jason[jason.price@nb.com]
Cc:        Sakaguchi, Marie[Marie.Sakaguchi@lehman.com]
From:      Gallagher, Bill
Sent:      Fri 9/12/2008 4:46:55 PM
Subject:   RE:
Categories: urn:content-classes:message

**specialseglong.xls**


Mike-
I think you might use 941-99951 to identify securities in hard seg for
prime

   <<specialseglong.xls>>

Questionable longs vs shorts-

| hard seg long | br | acct | prime short | cusip | symbol_12 |
| security_adp_nbr | | | | | |
| 253,532 | 941 | 99950 | -26,953 | 448947309 | IDT | H009987 |
| 10,000 | 941 | 99950 | -10,000 | 74347R503 | SH | P018386 |
| 251,909 | 941 | 99950 | -4,856 | 620076109 | MOT | M655080 |
| 560,453 | 941 | 99950 | -312,182 | 23330X100 | DRS | D001416 |


Thx




> _____
> From:        Thearle, Michael
> Sent: Friday, September 12, 2008 12:28 PM
> To:    Gilchriest, William; Gallagher, Bill; Laurella, Giovanna; Price,
> Jason
> Cc:   Sakaguchi, Marie
> Subject:      RE:
>
> The rep for UBS O'Connor said this was the only one he processed. Bill
> if someone could extract the hard seg positions that we know are
> locked up just for LBIE clients I can run a comparison vs. all type 1
> positions booked in ITS. We already do a reconciliation of client Type
> 1 positions vs. what is in Hard seg at DTC, but since there are more
> positions in Hard seg then what we lockup for LBIE clients the rec
> would not work in reverse.
>
> _____
> From:        Gilchriest, William
> Sent: Friday, September 12, 2008 12:21 PM
> To:    Thearle, Michael; Gallagher, Bill; Laurella, Giovanna; Price,
> Jason
> Cc:   Sakaguchi, Marie

GIOVANNA_LAURE_00024618

> Subject:        RE:
>
> I would bet there are more than just one of these, any shot at
> figuring it out
>
>
> Bill
>
>
> _____
> From:          Thearle, Michael
> Sent: Friday, September 12, 2008 12:20 PM
> To:    Gallagher, Bill; Gilchriest, William; Laurella, Giovanna; Price,
> Jason
> Cc:    Sakaguchi, Marie
> Subject:        RE:
>
> The rep flattened the Type 1 position in the account today with a
> journal rather than submitting a request via QMT which is the normal
> process. We need to release the seg for 560,453 shares. I have already
> told the rep to submit all future requests via QMT.
>
> Jason,
> Can you release the seg today?
>
> _____
> From:          Gallagher, Bill
> Sent: Friday, September 12, 2008 11:58 AM
> To:    Gilchriest, William; Laurella, Giovanna; Thearle, Michael
> Cc:    Sakaguchi, Marie; Price, Jason
> Subject:        RE:
> Importance:    High
>
>
> Mike -
>
> Can you check with someone and determine if prime client special seg
> s/b reduced? They have 560,453 long in special hard for prime clients
> yet they're short 312,182 uncovered-
>
> This further illustrates my concern yesterday regarding special hard
> seg and subsequent client sales.
>
> Thx.
>
>
>
>  << OLE Object: StdOleLink >>
>
>
> _____
> From:          Gilchriest, William
> Sent: Friday, September 12, 2008 11:50 AM
> To:    Gallagher, Bill; Laurella, Giovanna
> Cc:    Sakaguchi, Marie
> Subject:

GIOVANNA_LAURE_00024618

>
> Could you please check on the seg for DRS  cusip 233 30x 100
>
> we  need to get it back to UBS and having problems borrowing, is the
> SEG good
>
> bill
>

GIOVANNA_LAURE_00024618

/////////Nong

| type_account_cd | account_cd | branch_cd | dient_nbr | security_adp_nbr | market_value_am | trade_ct_qty | settlement_ct_qty | cusip |
|---|---|---|---|---|---|---|---|---|
| 2 | 9951 | 941 | 0012 | F012655 | 0.12 | 1 | | 13382L902 |
| 2 | 9951 | 941 | 0012 | T131020 | 288 | 4 | | 487038208 |
| 2 | 9951 | 941 | 0012 | V003598 | 1.33 | 13 | | 139184FR08 |
| 2 | 9951 | 941 | 0012 | N012104 | 1535 | 50 | | 5063077105 |
| 2 | 9951 | 941 | 0012 | A003829 | 55601 | 70 | | 7002135106 |
| 2 | 9951 | 941 | 0012 | J001311 | 0 | 75 | | 754808J104 |
| 2 | 9951 | 941 | 0012 | M413225 | 432 | 100 | | 10059S112103 |
| 2 | 9951 | 941 | 0012 | S016414 | 1818 | 100 | | 1008716316 |
| 2 | 9951 | 941 | 0012 | F020699 | 4369 | 100 | | 10073955404 |
| 2 | 9951 | 941 | 0012 | A603109 | 183192 | 120 | | 12003783100 |
| 2 | 9951 | 941 | 0012 | H017372 | 4501.8 | 183 | | 183G491ET108 |
| 2 | 9951 | 941 | 0012 | E004996 | 0 | 200 | | 20029381405 |
| 2 | 9951 | 941 | 0012 | M409061 | 0.04 | 200 | | 20055357105 |
| 2 | 9951 | 941 | 0012 | E000081 | 840865 | 215 | | 215084670207 |
| 2 | 9951 | 941 | 0012 | A022127 | 31354 | 257 | | 257023111206 |
| 2 | 9951 | 941 | 0012 | F003850 | 67878 | 270 | | 27034415V109 |
| 2 | 9951 | 941 | 0012 | A019352 | 470.25 | 275 | | 27503460L100 |
| 2 | 9951 | 941 | 0012 | H014802 | 1805.7 | 926 | | 9364919F104 |
| 2 | 9951 | 941 | 0012 | G007459 | 433170 | 1000 | | 100038259P508 |
| 2 | 9951 | 941 | 0012 | T006502 | 14232 | 1200 | | 120088023J101 |
| 2 | 9951 | 941 | 0012 | C002028 | 4334499 | 1431 | | 1431368287207 |
| 2 | 9951 | 941 | 0012 | E533168 | 0 | 1500 | | 150023951106 |
| 2 | 9951 | 941 | 0012 | E009999 | 48531 | 1900 | | 1900112463104 |
| 2 | 9951 | 941 | 0012 | L160747 | 9368.4 | 2220 | | 222052408100 |
| 2 | 9951 | 941 | 0012 | N002119 | 2314686 | 5000 | | 500066887E206 |
| 2 | 9951 | 941 | 0012 | N008169 | 139200 | 5000 | | 5000G6359F103 |
| 2 | 9951 | 941 | 0012 | E007814 | 344250 | 5000 | | 500010986104 |
| 2 | 9951 | 941 | 0012 | U001694 | 15881064 | 5234 | | 523491324P102 |
| 2 | 9951 | 941 | 0012 | F018637 | 354365 | 5500 | | 550074947R800 |
| 2 | 9951 | 941 | 0012 | S016586 | 7428602 | 7493 | | 749381236D106 |
| 2 | 9951 | 941 | 0012 | A015719 | 21326684 | 7526 | | 752600049C1107 |
| 2 | 9951 | 941 | 0012 | H007642 | 92880 | 8000 | | 800046486731 |
| 2 | 9951 | 941 | 0012 | F018386 | 696500 | 10000 | | 100074949P803 |
| 2 | 9951 | 941 | 0012 | S017454 | 447535.4 | 11180 | | 111806800C104 |
| 2 | 9951 | 941 | 0012 | G004141 | 12105098 | 11286 | | 11286G38900101 |
| 2 | 9951 | 941 | 0012 | E006887 | 193477 | 11381 | | 11381 30212P105 |
| 2 | 9951 | 941 | 0012 | L323457 | 578966.48 | 13642 | | 1364252738104 |
| 2 | 9951 | 941 | 0012 | U042180 | 4113576 | 13968 | | 1368390329405 |
| 2 | 9951 | 941 | 0012 | S011108 | 108600 | 15000 | | 150008300IP305 |
| 2 | 9951 | 941 | 0012 | S015550 | 384500 | 15000 | | 150008194IQ203 |
| 2 | 9951 | 941 | 0012 | A021711 | 162010 | 17000 | | 1700009411109 |
| 2 | 9951 | 941 | 0012 | D011574 | 47891325 | 17025 | | 170252540M109 |
| 2 | 9951 | 941 | 0012 | M009694 | 30728814 | 18478 | | 18478G62165106 |
| 2 | 9951 | 941 | 0012 | L007734 | 814200 | 20000 | | 2000050183L107 |
| 2 | 9951 | 941 | 0012 | M013811 | 130290 | 20200 | | 20200G8064208 |
| 2 | 9951 | 941 | 0012 | S020457 | 19716366 | 21738 | | 2173868810203 |
| 2 | 9951 | 941 | 0012 | F009638 | 352440 | 23000 | | 2200031354904 |
| 2 | 9951 | 941 | 0012 | E008779 | 75337025 | 26675 | | 266752768806 |
| 2 | 9951 | 941 | 0012 | J001425 | 1124550 | 27000 | | 27004625H100 |

GIOVANNA_LAURE_00024619

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2 | 99951 | 941 | 0012 | V004877 | 484.00 | 30000 | 3000093952102 |
| 2 | 99951 | 941 | 0012 | H532141 | 54680.55 | 30987 | 30987457667103 |
| 2 | 99951 | 941 | 0012 | A002932 | 72513415 | 31135 | 31135N07045102 |
| 2 | 99951 | 941 | 0012 | T51552.5 | 79467.5 | 33250 | 33250893247106 |
| 2 | 99951 | 941 | 0012 | V04636 | 0 | 33351 | 33351M47540138 |
| 2 | 99951 | 941 | 0012 | S018452 | 19596.0 | 34080 | 34080827056300 |
| 2 | 99951 | 941 | 0012 | C018430 | 59485.0 | 35000 | 3500012457202 |
| 2 | 99951 | 941 | 0012 | V001958 | 36639.32 | 35844 | 358449304N102 |
| 2 | 99951 | 941 | 0012 | F006529 | 213480 | 36000 | 3600034568F107 |
| 2 | 99951 | 941 | 0012 | D007615 | 70770.364 | 36398 | 36898247020F401 |
| 2 | 99951 | 941 | 0012 | A018375 | 1282400 | 40000 | 400000020160F102 |
| 2 | 99951 | 941 | 0012 | S013539 | 1726000 | 40000 | 40000786480T100 |
| 2 | 99951 | 941 | 0012 | F020752 | 2049810 | 43000 | 4300073763010103 |
| 2 | 99951 | 941 | 0012 | F008840 | 1984850 | 45000 | 450006936361205 |
| 2 | 99951 | 941 | 0012 | S017390 | 37329571 | 48563 | 48563867652109 |
| 2 | 99951 | 941 | 0012 | S014564 | 15338878 | 49006 | 49006F8698xV104 |
| 2 | 99951 | 941 | 0012 | M457847 | 26508738 | 52082 | 52082557223100 |
| 2 | 99951 | 941 | 0012 | N007486 | 15437125 | 59950 | 59950688074305 |
| 2 | 99951 | 941 | 0012 | GI36114 | 1943040 | 69000 | 69000369604103 |
| 2 | 99951 | 941 | 0012 | E009748 | 1993338181 | 69193 | 6919365752108 |
| 2 | 99951 | 941 | 0012 | T232901 | 43926435 | 70735 | 70735680033GI00 |
| 2 | 99951 | 941 | 0012 | 5EDMQx5 | 6412.5 | 75000 | 750006554344ED |
| 2 | 99951 | 941 | 0012 | E011811 | 13526398 | 75981 | 7598111113T103 |
| 2 | 99951 | 941 | 0012 | C016009 | 43662.0 | 96400 | 9640022704609 |
| 2 | 99951 | 941 | 0012 | 571396 | 9187212 | 99861 | 99861666107A45 |
| 2 | 99951 | 941 | 0012 | 5350881 | 104834 | 100000 | 100000008505A09 |
| 2 | 99951 | 941 | 0012 | E004092 | 533000 | 100000 | 1000003003F108 |
| 2 | 99951 | 941 | 0012 | V000855 | 35875534.5 | 106615 | 1066159191.3Y100 |
| 2 | 99951 | 941 | 0012 | V400333 | 47955708 | 156718 | 156718968199108 |
| 2 | 99951 | 941 | 0012 | V03542 | 6097356 | 162503 | 162503N47601112 |
| 2 | 99951 | 941 | 0012 | M415385 | 43652984.04 | 171497 | 171497594818104 |
| 2 | 99951 | 941 | 0012 | E004757 | 48063415 | 195503 | 1955032766742103 |
| 2 | 99951 | 941 | 0012 | 5667333 | 1960000 | 200000 | 200000239191A47 |
| 2 | 99951 | 941 | 0012 | F008334 | 23386768 | 200748 | 200748311567F400 |
| 2 | 99951 | 941 | 0012 | L001566 | 6423004 | 201978 | 201978522723N100 |
| 2 | 99951 | 941 | 0012 | M055080 | 20404629 | 251909 | 251909620076109 |
| 2 | 99951 | 941 | 0012 | H009887 | 27127924 | 253532 | 2535324484947309 |
| 2 | 99951 | 941 | 0012 | T001307 | 47027763 | 307371 | 307371M48258104 |
| 2 | 99951 | 941 | 0012 | N008685 | 52720 | 329500 | 3295006629415118 |
| 2 | 99951 | 941 | 0012 | 5613086 | 1400000 | 350000 | 35000041362AL41 |
| 2 | 99951 | 941 | 0012 | 554872.5 | 226771.2 | 372000 | 37200052517Px46 |
| 2 | 99951 | 941 | 0012 | 5ECSyH5 | 19031568 | 373168 | 37316879563A45 |
| 2 | 99951 | 941 | 0012 | S641023 | 275772504 | 386236 | 38623685061100 |
| 2 | 99951 | 941 | 0012 | F004629 | 21821478.3 | 446247 | 4462476761118102 |
| 2 | 99951 | 941 | 0012 | L008923 | 7937232 | 481048 | 48104850212406 |
| 2 | 99951 | 941 | 0012 | 5209754 | 79500 | 500000 | 500000247126AC9 |
| 2 | 99951 | 941 | 0012 | 5EELH58 | 450000 | 500000 | 500000527266Av5 |
| 2 | 99951 | 941 | 0012 | D001416 | 444996682 | 560463 | 5604532330x100 |
| 2 | 99951 | 941 | 0012 | C008334 | 5417362.5 | 632500 | 632500385034202 |
| 2 | 99951 | 941 | 0012 | 5521597 | 4514266 | 645352 | 6453620550BRA62 |

GIOVANNA_LAURE_00024619

| 2 | 99951 | 941 | 0012 | C008347 | 5887087.5 | 717500 | 71750035034103 |
| 2 | 99951 | 941 | 0012 | 5356558 | 0 | 750000 | 75000040051941 |
| 2 | 99951 | 941 | 0012 | 5412915 | 476000 | 800000 | 80000053218M4B4 |
| 2 | 99951 | 941 | 0012 | 5630977 | 0 | 1000000 | 10000005436688C0 |
| 2 | 99951 | 941 | 0012 | 5399344 | 600000 | 1000000 | 10000093933VAA4 |
| 2 | 99951 | 941 | 0012 | 5452171 | 627500 | 1000000 | 10000008301F4H2 |
| 2 | 99951 | 941 | 0012 | 5387802 | 660000 | 1000000 | 10000000867449 |
| 2 | 99951 | 941 | 0012 | 5BBKVC2 | 786250 | 1000000 | 10000064071A4F7 |
| 2 | 99951 | 941 | 0012 | 5941594 | 770000 | 1000000 | 10000008957F4AA9 |
| 2 | 99951 | 941 | 0012 | 5761414 | 865000 | 1000000 | 10000081619Q4F2 |
| 2 | 99951 | 941 | 0012 | 5503486 | 870000 | 1000000 | 10000083486D4B7 |
| 2 | 99951 | 941 | 0012 | 5856846 | 905000 | 1000000 | 10000090457A9G6 |
| 2 | 99951 | 941 | 0012 | N007537 | 6684000 | 1200000 | 120000063281208 |
| 2 | 99951 | 941 | 0012 | 5630651 | 4950 | 1500000 | 15000005488 9DI |
| 2 | 99951 | 941 | 0012 | L006172 | 11887435 | 1698205 | 169820553283210 |
| 2 | 99951 | 941 | 0012 | 5405195 | 787500 | 1750000 | 17500004136274N0 |
| 2 | 99951 | 941 | 0012 | 5BBNPV6 | 740000 | 2000000 | 200000870757A4B |
| 2 | 99951 | 941 | 0012 | 5005097 | 1520000 | 2000000 | 20000002071424H-B |
| 2 | 99951 | 941 | 0012 | L008277 | 2378272.87 | 2408377 | 24083775301SY206 |
| 2 | 99951 | 941 | 0012 | 5526758 | 1925000 | 2500000 | 25000005987DNAC6 |
| 2 | 99951 | 941 | 0012 | 5308836 | 5107128 | 2600000 | 28000009891994D0 |
| 2 | 99951 | 941 | 0012 | E000886 | 3105994494 | 2786127 | 27861270962311 05 |
| 2 | 99951 | 941 | 0012 | 5BDKRR4 | 2914236 | 3000000 | 30000008923PV2B |
| 2 | 99951 | 941 | 0012 | S019559 | 333000 | 3330000 | 33000082419711 5 |
| 2 | 99951 | 941 | 0012 | A020780 | 0 | 3363125 | 36631250323 6C103 |
| 2 | 99951 | 941 | 0012 | 5378359 | 2340000 | 4000000 | 40000064016AAA3 |
| 2 | 99951 | 941 | 0012 | 5BBNGJ5 | 3440000 | 4000000 | 40000087322R4G7 |
| 2 | 99951 | 941 | 0012 | 5180285 | 3944228 | 4000000 | 40000034539739 |
| 2 | 99951 | 941 | 0012 | 5359457 | 0 | 4750000 | 47500004006 L9B9 |
| 2 | 99951 | 941 | 0012 | 5491703 | 4579670 | 4812000 | 48120006 3281AC3 |
| 2 | 99951 | 941 | 0012 | 5905692 | 382087005 | 5000000 | 5000000302 33B4E2 |
| 2 | 99951 | 941 | 0012 | 5359829 | 3870000 | 6000000 | 6000031557R4A8 |
| 2 | 99951 | 941 | 0012 | 5535486 | 5257500 | 6000000 | 60000098557A4A3 |
| 2 | 99951 | 941 | 0012 | A022232 | 8591000 | 7100000 | 71000003819M106 |
| 2 | 99951 | 941 | 0012 | 5110367 | 3402000 | 7560000 | 75600008612AAC4 |
| 2 | 99951 | 941 | 0012 | 5142446 | 5682263.6 | 8000000 | 80000005381 1AC7 |
| 2 | 99951 | 941 | 0012 | 5BDLH60 | 7325000 | 10000000 | 1000000030033R4C2 |
| 2 | 99951 | 941 | 0012 | 5BBVAWJ0 | 7562500 | 10000000 | 1000000025664AA1 |
| 2 | 99951 | 941 | 0012 | 5BBJZL5 | 10166600 | 10000000 | 100000013134KLJ0 |
| 2 | 99951 | 941 | 0012 | 5212330 | 2100000 | 15000000 | 15000000251694C7 |
| 2 | 99951 | 941 | 0012 | F007911 | 8182871.55 | 22379633 | 2337963330254-H02 |
| 2 | 99951 | 941 | 0012 | 5BC2NK2 | 1882500 | 25000000 | 25000000131994DD0 |
| 2 | 99951 | 941 | 0012 | 5052700 | 2590636804 | 28236000 | 28236000470956A46 |
| 2 | 99951 | 941 | 0012 | 5BCEE36 | 0 | 34308286 | 3430828602208Q4B4 |

GIOVANNA_LAURE_00024619

symbol_12
FGVAC
TEF
VYTC
NAND
AMZN

MU
SVR
QQQQ
AAPL
NVZ

MUOPQ
EPKB
AMRN
RMCN
ANSV
HYTM
GOOG
TRX
OGPY

EKO
LEH
NG
NBR
ECO
UNH
MXY
SHLD
ALNY
EVAT
SH
STP
GSOL
EXPE
LUK
USG
SXPPB
SNDA
AMCN
DSH
MPH
LDK
MF
JAA
FDML
SATS
JPM

GIOVANNA_LAURE_00024619

VX
INBU
ASMI
TLX
VRAE
SGIC
OES
VCLK
FSMO
DELL
T
SAFT
PCH
FICO
SPWR
SVA
MTSN
NWE
OE
BIDU
THC

ER
CRDX

ESLR
VLO
WAG
VOOL
MSFT
EBAY

FTWR
LXCT
MOT
IDT
TTIL
NTOVS

S
CMEX
ID

DRS
GHNU

GIOVANNA_LAURE_00024619

GHN

NCCC

LENK

LIAU

EXG

SACOW

AEPG

FNPY

GIOVANNA_LAURE_00024619

EXHIBIT 35

**To:**       Stucchio, Anthony[astucchi@lehman.com]
**From:**     McLaughlin, Kendall J
**Sent:**     Sat 9/13/2008 5:26:22 PM
**Importance:** Low
**Subject:**  RE: One Box Customer Significant Credits
**Categories:** urn:content-classes:message

Ok. I will be in touch.

-----Original Message-----
From: Stucchio, Anthony
Sent: Saturday, September 13, 2008 1:19 PM
To: McLaughlin, Kendall J; Fleming, Dan (TSY)
Subject: RE: One Box Customer Significant Credits

I am in already working on other things for Martin -  I am waiting for
Bill and Peter, unfortunately, I can't tell them to turn around.

Talk to you later

Tony

-----Original Message-----
From: McLaughlin, Kendall J
Sent: Saturday, September 13, 2008 12:51 PM
To: Stucchio, Anthony; Fleming, Dan (TSY)
Subject: RE: One Box Customer Significant Credits

Tony,

I just spoke to Cody and the bank rec system GSSR will not be available
until late this evening. He is going to have his team come in tomorrow
morning and produce the bank recs as well as the suspense
reconciliations.

Kendall

-----Original Message-----
From: Stucchio, Anthony
Sent: Saturday, September 13, 2008 11:48 AM
To: McLaughlin, Kendall J; Fleming, Dan (TSY)
Subject: Re: One Box Customer Significant Credits

Dan - thius critical for the reserve, what's your assesment, everyone is
on their way in. I am a few blocks away

----- Original Message -----
From: McLaughlin, Kendall J
To: Stucchio, Anthony
Sent: Sat Sep 13 11:33:30 2008
Subject: RE: One Box Customer Significant Credits

Tony

STUCCIO_ANTHONY_00008793

I spoke to the guys in Ops Control and the bank rec data may not be available until tomorrow. They are checking and will let me know asap.

Kendall

-----Original Message-----
From: Stucchio, Anthony
Sent: Saturday, September 13, 2008 10:25 AM
To: McLaughlin, Kendall J
Subject: Re: One Box Customer Significant Credits

Kendall
Call me asap 718 748 9111
Fleming needs the reserve done


----- Original Message -----
From: McLaughlin, Kendall J
To: Stucchio, Anthony
Sent: Sat Sep 13 10:13:25 2008
Subject: RE: One Box Customer Significant Credits

Working on it.

-----Original Message-----
From: Stucchio, Anthony
Sent: Saturday, September 13, 2008 10:13 AM
To: McLaughlin, Kendall J
Subject: Re: One Box Customer Significant Credits

Kendall- thanks
Any update on the bank recs?
Tony


----- Original Message -----
From: McLaughlin, Kendall J
To: Gallagher, Bill
Cc: Ullman, Neal (NY); Crepeau, Alex F; Stucchio, Anthony; Burke, William T; Potenciano, Joel
Sent: Sat Sep 13 10:10:54 2008
Subject: RE: One Box Customer Significant Credits

Bill,

Can you make this a high priority to resolve? The initial estimated impact is $2.6 billion. We need to understand what created the significant balance in the Omni  and the offsetting accounts and entries needed to flatten.

Thanks
Kendall

STUCCIO_ANTHONY_00008793

---

From: Gallagher, Bill
Sent: Saturday, September 13, 2008 9:18 AM
To: Potenciano, Joel; McLaughlin, Kendall J; McKissick, John J; Logan,
Donahue; Sudarsan, Daniram; Plaisant, Michael
Cc: Stucchio, Anthony; Burke, William T; 'wburke@si.rr.com'
Subject: RE: One Box Customer Significant Credits

We're working on this now-

Suspect it relates to large client transfers

---

From:       Potenciano, Joel
Sent:       Saturday, September 13, 2008 9:10 AM
To:         McLaughlin, Kendall J; McKissick, John J; Logan, Donahue;
Gallagher, Bill; Sudarsan, Daniram; Plaisant, Michael
Cc:         Stucchio, Anthony; Burke, William T; 'wburke@si.rr.com'
Subject:    One Box Customer Significant Credits
Importance: High

Hi All,

Regs is performing a run of 9/12 15c3-3 estimates and we have an item
related to one box that might have a significant impact to the formula.
941-99950 and 941-99951 have increased significant since last week. The
other day we had the same outage and the clean-up was sitting in ITS
098-35000.  However, the 9/12 balances for  the ITS account is flat at
263k.   Please review and advise how the items will clean-up so we can
adjust it accordingly in the reserve formula.  Thanks!

<< OLE Object: Picture (Device Independent Bitmap) >>

<< OLE Object: Picture (Device Independent Bitmap) >>
With kind regards,
Joel K. Potenciano
LEHMAN BROTHERS
Telephone  +1 (212) 320-6786
Fax  +1 (646) 885-9383
Email  joel.potenciano@lehman.com

STUCCIO_ANTHONY_00008793

EXHIBIT 36

## Kruse, Phil

| | |
|---|---|
| **From:** | McKissick, John J |
| **Sent:** | Friday, October 03, 2008 10:32 AM |
| **To:** | Kruse, Phil |
| **Subject:** | FW: Cash on omni (2.3 billion) |

---

| | |
|---|---|
| **From:** | McKissick, John J |
| **Sent:** | Sunday, September 14, 2008 11:27 AM |
| **To:** | Gallagher, Bill |
| **Cc:** | Liebscher, William |
| **Subject:** | Cash on omni (2.3 billion) |

Bill,

   The 2.3 billion out of balance is due to the prime corrections it appears, basically the ITS trades cleared creating a 2.3 billion debit which was moved to the final figure wash account. This cash movement was not made on the ADP side it appears resulting in a credit on the 941-99950. It appears from my perspective cash needs to be wired from the 941-99950 account into the final figure wash account. The exact amount that needs to be moved is 2,322,077,475.54

This will leave approximately 300mm up and down between 941-99950 and 954-09502 which can either be journaled between the accounts or TSY can move the cash.

Thx

John McKissick
Lehman Brothers International
Florham Park, NJ 07932
 73-443-2937
jmckissi@lehman.com

# Jones, Craig L

**From:** Gallagher, Bill
**Sent:** Sunday, September 14, 2008 7:23 PM
**To:** Jones, Craig L; McKissick, John J; CCM Fixed Income; Cash Management LBI/LBHI; Ullman, Neal (NY)
**Cc:** Goel, Shikhir; Burke, William T
**Subject:** Re: Adjustment for 9.15.2008

-I reviewed, agree and approve. Thx

----- Original Message -----
From: Jones, Craig L
To: McKissick, John J; CCM Fixed Income; Cash Management LBI/LBHI; Ullman, Neal (NY)
Cc: Goel, Shikhir; Gallagher, Bill; Burke, William T
Sent: Sun Sep 14 19:20:03 2008
Subject: RE: Adjustment for 9.15.2008

Bill - would you please confirm you approve this movement.
Thanks,
Craig

From:     McKissick, John J
Sent: Sunday, September 14, 2008 6:25 PM
To:    CCM Fixed Income; Cash Management LBI/LBHI; Jones, Craig L
Cc:   Goel, Shikhir; Gallagher, Bill; Burke, William T
Subject:    Adjustment for 9.15.2008

Craig as discussed can you please process the following:

As of 9.11.2008

079 debit of 2,322,077,475.54

Currently 941-99950 (LBI) has a credit on ADP and 9830570 (LBIE) has a debit

thanks

John McKissick
Lehman Brothers International
Florham Park, NJ 07932
973-443-2937
jmckissick@lehman.com

1

25

## Sheridan, Lauren

| | |
|---|---|
| **From:** | Lauren Sheridan (A&M) |
| **Sent:** | Thursday, November 13, 2008 11:33 AM |
| **To:** | Sheridan, Lauren |
| **Subject:** | FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION |

**Attachments:**     09830570_9_12_2008.pdf



09830570_9_12_20
08.pdf (11 KB)...

-----Original Message-----
From: Kruse, Philip
Sent: Wednesday, October 01, 2008 1:46 PM
To: comeara@leahman.com; paul.burleton@barclayscapital.com;
wburke@barclayscapital.com; jmckissi@barclayscapital.com
Cc: ralph.miller@weil.com; Sheridan, Lauren
Subject: FW: Trapped Liquidity - COB 09/10 > $ 2.2 BILLION

Here is the email trail referred to in my earlier email that suggests LBI was prepared to
settle the payable with LBIE at $2.3 billion as of Sunday night.

-----Original Message-----
From: Kruse, Phil [mailto:phil.kruse@lehman.com]
Sent: Wednesday, October 01, 2008 1:42 PM
To: Kruse, Philip
Subject: FW: Trapped Liquidity - COB 09/10 > $ 2.2 BILLION


> _____
> From:     O'Meara, Chris M (NY)
> Sent:     Tuesday, September 30, 2008 9:05 AM
> To: Kruse, Phil
> Subject: FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> FYI.  COM
>
> _____
> From:     O'Meara, Chris M (NY)
> Sent:     Tuesday, September 30, 2008 8:49 AM
> To: Nazimowitz, Lawrence D; Stucchio, Anthony; Burke, William T;
> Burleton, Paul; Forrest, Monty; Hraska, James W
> Cc: Tonucci, Paolo; Azerad, Robert
> Subject: FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Team - FYI.  Pls let me know your thoughts on this asap.  Thanks,
> Chris
>
> _____
> From:     Rushton, Dave
> Sent:     Tuesday, September 30, 2008 8:36 AM
> To: Azerad, Robert
> Cc: Pellerani, Carlo; Tonucci, Paolo; O'Meara, Chris M (NY);
> 'sonia.sharma@uk.pwc.com'
> Subject: FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Hi Robert
>

28

> LBIE are topsiding this entry into the LBIE / LBI intercompany balance
> as an intercompany receivable from LBI in LBIE's books
>
> Do you recognise this cash movement from the US side - is this the
> amount that related to UBS O'Connor ?
>
> Full amount is USD 2,322,077,475.54
>
> Many thanks
> Dave
>
> _____
> From:    Bowen, Gareth
> Sent:    Wednesday, September 24, 2008 3:22 PM
> To: Rushton, Dave; Sidebottom, Mark
> Subject:  FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
>
>
> _____
> From:    Bowen, Gareth
> Sent:    Monday, September 15, 2008 4:43 PM
> To: Parvento, Turo
> Cc: Tidey, Andrew
> Subject:  FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
>
>
> _____
> From:    McKissick, John J
> Sent:    Sunday, September 14, 2008 11:18 PM
> To: Bowen, Gareth; Sudarsan, Daniram; Goel, Shikhir; Smith, Simon
> [UK]; Lynch, Padraic; Carter, Paul
> Cc: Burke, William T; Nazimowitz, Lawrence D; Glen, Jennifer; Tidey,
> Andrew; Sidebottom, Mark; McLaughlin, Kendall J; Williamson, Chris;
> Clarke, Claire; Wilson, Robert; Burton, Jason; Golaszewski, Richard;
> Buonocore, Salvatore; Ingulli, Charles; Lerner, Damon; Hemmings,
> Clare; Jones, Craig L
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Debit is sitting on 09830570 (LBIE) and will be offset by this
> incoming credit.
>
> Thx <<09830570_9_12_2008.pdf>>
>
>
>
> _____
> From:    Bowen, Gareth
> Sent:    Sunday, September 14, 2008 6:17 PM
> To: McKissick, John J; Sudarsan, Daniram; Goel, Shikhir; Smith,
> Simon [UK]; Lynch, Padraic; Carter, Paul
> Cc: Burke, William T; Nazimowitz, Lawrence D; Glen, Jennifer; Tidey,
> Andrew; Sidebottom, Mark; McLaughlin, Kendall J; Williamson, Chris;
> Clarke, Claire; Wilson, Robert; Burton, Jason; Golaszewski, Richard;
> Buonocore, Salvatore; Ingulli, Charles; Lerner, Damon; Hemmings,
> Clare; Jones, Craig L
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> This should come to a LBIE account not a holding company one.
>
> _____
> From:    McKissick, John J
> Sent:    Sunday, September 14, 2008 11:17 PM
> To: Sudarsan, Daniram; Goel, Shikhir; Smith, Simon [UK]; Lynch,
> Padraic; Carter, Paul
> Cc: Burke, William T; Nazimowitz, Lawrence D; Glen, Jennifer; Tidey,

29

```
>
> Thanks
> Simon
>
>
> _____
> From:      Goel, Shikhir
> Sent:      Thursday, September 11, 2008 5:30 PM
> To: Lynch, Padraic; Carter, Paul; Sudarsan, Daniram
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Smith, Simon [UK]; Hemmings, Clare
> Subject:   RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Padraic,
>
> This is not a common occurance. There was a processing issue where the
> client sent a trade file with the wrong broker code.
>
>
> Thanks,
> Shikhir
>
>
> _____
> From:      Lynch, Padraic
> Sent:      Thursday, September 11, 2008 12:27 PM
> To: Carter, Paul; Goel, Shikhir; Sudarsan, Daniram
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Smith, Simon [UK]; Hemmings, Clare
  Subject:   RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Hi Shikhir,
>
> I think that these are automated entries when you pass you journal
> between these two 098 accounts, ie this is the intercompany leg to
> ensure that the journal balances by legal entity. As regards the
> processing issue from yesterday, is this something that is likely to
> occur again as this causes a lot of problems when the balances go
> wrong?
>
> Thanks,
>
> Regards,
> Padraic
>
>
> _____
> From:      Carter, Paul
> Sent:      11 September 2008 17:21
> To: Goel, Shikhir; Sudarsan, Daniram; Lynch, Padraic
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Smith, Simon [UK]; Hemmings, Clare
> Subject:   RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Shikhir,
>
  It's not an entry I would pass no. I only report the balances on the
. account, the only entries I would pass on 88-00169 is from balances on
> type 2 and type 8 against type 0 just to clean up the balances, not
> from this account to another account though.
```

31

> Regards
>
> Paul
>
> _____
> From: Goel, Shikhir
> Sent: 11 September 2008 17:18
> To: Goel, Shikhir; Sudarsan, Daniram; Lynch, Padraic
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J; Glen,
> Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall J;
> Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Carter, Paul; Smith, Simon [UK]; Hemmings,
> Clare
> Subject: RE: Trapped Liquidity - COB 09/10 > $ 2.2 BILLION
>
> Also I do not directly journal anything against the below 088-00169.
> Paul, is this an entry you would pass to offset my entry on the
> 098-35000?
>
>
>
> Thanks,
> Shikhir
>
>
> _____
> From:      Goel, Shikhir
> Sent:      Thursday, September 11, 2008 12:09 PM
> To: Sudarsan, Daniram; Lynch, Padraic
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Carter, Paul; Smith, Simon [UK]; Hemmings,
> Clare
> Subject:   RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Padraic/Daniram,
>
> This balance is not for today, is is a break from COB yesterday. There
> was a trade processing issue yesterday where the trades were
> incorrectly booked to TMS instead of ITS. Our calculation for the
> day's final LBIE figure was $700mm based on the net value of the
> deliveries and receives. However, we learned that they only needed to
> ammend the deliveries not the receives, so our figure was off.
>
> I am going to credit my LBIE cash a/c 098-35000 vs 098-30570 for
> $2,322,077,475.54 to fix the break right now.
>
>
> Thanks,
> Shikhir
>
>
> _____
> From:      Sudarsan, Daniram
> Sent:      Thursday, September 11, 2008 11:17 AM
> To: Lynch, Padraic; Goel, Shikhir
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Buonocore, Salvatore; Ingulli, Charles; Bowen,
> Gareth; Lerner, Damon; Carter, Paul; Smith, Simon [UK]; Hemmings,
> Clare
> Subject: RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
> Importance:    High
>

32

> Does the debit in the DTC Nostro 098-35000 offset the credit in the
> 088-00169 as per Paul's mail below?
>
>
> John McK,

> Can you advise on this as this is a very significant amount to be
> dealing with on a day like today.
>
>
> Dan
>
>
>
>
>
> _____
> From:      Lynch, Padraic
> Sent:      Thursday, September 11, 2008 11:10 AM
> To: Goel, Shikhir
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Sudarsan, Daniram; Buonocore, Salvatore;
> Ingulli, Charles; Bowen, Gareth; Lerner, Damon; Carter, Paul; Smith,
> Simon [UK]; Hemmings, Clare
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Hi Shakir,
>
> Thanks, would appreciate if you could come back on this asap, as we
> need to understand the regulatory and liquidity impact of this.
>
> Thanks,
>
>  Regards,
> Padraic
>
>
> _____
> From:      Goel, Shikhir
> Sent:      11 September 2008 15:49
> To: Lynch, Padraic
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Sudarsan, Daniram; Buonocore, Salvatore;
> Ingulli, Charles; Bowen, Gareth; Lerner, Damon; Carter, Paul; Smith,
> Simon [UK]; Hemmings, Clare
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> I am working to resolve this right now, I will get back to you with
> more details.
>
>
> Thanks
>
>
> _____
> From:      Lynch, Padraic
> Sent:      Thursday, September 11, 2008 10:25 AM
> To: Goel, Shikhir
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Sudarsan, Daniram; Buonocore, Salvatore;
>  Ingulli, Charles; Bowen, Gareth; Lerner, Damon; Carter, Paul; Smith,
> Simon [UK]; Hemmings, Clare
> Subject:  FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
> Importance:    High

33

> Hi Shikhir,
>
> I spoke to Paul Carter in relation to the below balance of 2.2bn on
> trapped liquidity account 088 00169 and he advised this is an area you
> look at. This balance is usually relatively flat. Do you know why it
> has massively increased yesterday? And will it be cleared today
> otherwise we will need to arrange a paydown between LBIE and LBI for
> this 2.2bn balance as it is causing a signficant regulatory issue as
> the balance represents a massive intercompany exposure in LBIE vs LBI,
> which breach our FSA defined limits. Any assistance you could provide
> on this would be much appreciated.
>
> Thanks,
>
> Regards,
> Padraic
>
>
> From:    Lynch, Padraic
> Sent:    11 September 2008 14:19
> To: Carter, Paul
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Burton, Jason;
> Golaszewski, Richard; Sudarsan, Daniram; Buonocore, Salvatore;
> Ingulli, Charles; Bowen, Gareth; Lerner, Damon
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
> Importance:    High
>
> Hi Paul,
>
> On the below, will this be corrected today? This is causing us a reg
> issue as it represent a massive exposure in LBIE vs LBI. Do you know
> why this has occurred as I think it is adversly affecting London
> Liquidity numbers also. As regards cleaning this issue up, what would
> the balance sheet impact of this be?
>
> Thanks,
>
> Regards,
> Padraic
>
>
> From:    Ingulli, Charles
> Sent:    11 September 2008 14:13
> To: Lynch, Padraic
> Subject:  FW: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
>
>
> Charlie Ingulli
>
> Lehman Brothers / Neuberger Berman
> 1301 Avenue of the Americas - 4th Floor
> New York, NY  10019
> ( 212 ) 320 - 6896 Direct Phone
> ( 646 ) 834 - 2392 Direct Fax
>
>
>
> From:    Carter, Paul
> Sent:    Thursday, September 11, 2008 8:22 AM
>   To: Ingulli, Charles
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J;
> Glen, Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall
> J; Williamson, Chris; Clarke, Claire; Wilson, Robert; Wang, Hui;

34

> Burton, Jason; Golaszewski, Richard; Sudarsan, Daniram; Buonocore,
> Salvatore
> Subject:  RE: Trapped Liquidity  - COB 09/10 > $ 2.2 BILLION
>
> Charlie,

> There is an offset of $2.3bn on the DTC Nostro.
>
> IIC0200                        B A L A N C E S
> 09/11/08
> ----------------------------- AS OF 09/10/08
> -----------------------------
> SMA(CURRENT):            LONG OPT VAL:          TOT FED CALL:
>
> SMA(PRIOR):              SHRT OPT VAL:          DAY FED CALL:
>
> SMA(CHANGE):             OPTION LOSS:           TOT HSE CALL:
>
> CASH AVAIL:              OPTION REQ:            DAY HSE CALL:
>
> BUYING PWR:              TECH SHORT:            NYSE CALL:
>
> FED REQ:                        CASH A/C EXC:
>
> HSE REQ:                        NET WORTH:
> -2,378,563,407
> IFA    MSG N UP/   MX Y          % EQUITY:               %
>
> ----------------------------------------------------------------
> ---------
> T LAST ACT              T/D BAL              S/D BAL
> T/D EQUITY
> 0 09/10/08      2,378,563,407.38      2,378,563,407.38
> -2,378,563,407
>   TOTALS USD    2,378,563,407.38      2,378,563,407.38
> -2,378,563,407
>                         *** END OF DATA ***
>
>
>
>
>
> ----------------------------------------------------------------
> ---------
> SELECTION:       ACCT: 098-35000   NY PRIME BROKER DTC CASH
> PIERPONT: N
>
> Regards
>
> Paul
>
>
> _____
> From: Ingulli, Charles
> Sent: 11 September 2008 13:09
> To: Carter, Paul
> Cc: Burke, William T; Nazimowitz, Lawrence D; McKissick, John J; Glen,
> Jennifer; Tidey, Andrew; Sidebottom, Mark; McLaughlin, Kendall J;
> Williamson, Chris; Clarke, Claire; Wilson, Robert; Wang, Hui; Burton,
> Jason; Golaszewski, Richard; Sudarsan, Daniram; Buonocore, Salvatore
> Subject: Trapped Liquidity - COB 09/10 > $ 2.2 BILLION
>
>
>
>                 Hello All -
>
>                 Please note that the Trapped liquidity balance
> is  Over $ 2.2 BILLION COB 09/10

35

```
>
>                      If you could please review to cleanup any
> outstanding amounts.
>
>                      Thank you,
>
>
>
>
>
>                  (2,295,427,986.07)    Current - T/D
>
>                     87,220,715.06    Prior Day - T/D
>
>                  (2,382,648,701.13)    Daily Change
>
>
>
>
>
> CPNY     ACCOUNT     TYPE DBS NUMBER   ACCT NAME    BAL-SD
> BAL-TD    CCY   LAST ACTIVITY     COMM FLAG
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> (18,080.00)              (18,080.00)   AUD  20071105
> FD
> 369 88013529   8    1252000183  0369 I/CO WITH 0302
> (11,000.00)              (11,000.00)   AUD  20071005
> FD
> 369 88013529   8    1252000183  0369 I/CO WITH 0302
> 886.30                    886.30   BRL  20080624
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> (168,079.00)            (168,079.00)   CAD  20080818
> FD
>  369 88013529   8    1252000183  0369 I/CO WITH 0302
> 10,946.25                 10,946.25   CAD  20080815
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> (148,880.00)            (148,880.00)   CHF  20080507
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> 1,175.04                 1,175.04   DKK  20070912
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> 321,536.68               321,536.68   EUR  20080709
> FD
> 369 88013529   8    1252000183  0369 I/CO WITH 0302
> (207,124.90)            (207,124.90)   EUR  20080415
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> 97,179.58                 97,179.58   GBP  20080523
> FD
> 369 88013529   8    1252000183  0369 I/CO WITH 0302
> 59,624.99                 59,624.99   GBP  20080307
> FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> 0.21                        0.21   HKD  20061106      FD
> 369 88013529   0    1252000183  0369 I/CO WITH 0302
> 33.00                       33.00  NOK  20071210
> FD
> 369 88013529   2    1252000183  0369 I/CO WITH 0302
> (33.00)                    (33.00) NOK  20070606
> FD
>  369 88013529   0    1252000183  0369 I/CO WITH 0302
> (327,675.00)            (327,675.00)   RUB  20080228
> FD
> 369 88013529   8    1252000183  0369 I/CO WITH 0302
```

9

36

```
> 327,675.00                327,675.00      RUB   20070808
> FD
> 369 88013529    0   1252000183  0369 I/CO WITH 0302
> 798,000.00                798,000.00      SEK   20080820
> FD
  369 88013529    8   1252000183  0369 I/CO WITH 0302
> (93,941.22)              (93,941.22)      SEK   20080114
> FD
> 369 88013529    0   1252000183  0369 I/CO WITH 0302
> (2,286,433,467.09)     (2,286,433,467.09) USD   20080910
> FD
> 369 88013529    2   1252000183  0369 I/CO WITH 0302
> (0.44)                      (0.44)       USD   20080910
> FD
> 369 88013529    8   1252000183  0369 I/CO WITH 0302
> (9,636,762.47)          (9,636,762.47)   USD   20080910
> FD
>
>
> Charlie Ingulli
>
> Lehman Brothers / Neuberger Berman
> 1301 Avenue of the Americas - 4th Floor
> New York, NY  10019
> ( 212 ) 320 - 6896 Direct Phone
> ( 646 ) 834 - 2392 Direct Fax
>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - -
```

This message is intended only for the personal and confidential use of
the designated recipient(s) named above.  If you are not the intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
 rohibited.  This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Lehman Brothers.  Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such.  All information is
subject to change without notice.

--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained
within this communication (including any attachments) is not intended or
written to be used and cannot be used for the purpose of (i) avoiding
U.S. tax related penalties or (ii) promoting, marketing or recommending
to another party any transaction or matter addressed herein.

*******************************************************************************
This message is intended only for the use of the addressee(s) and may contain information
that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient(s), you are
hereby notified that any dissemination of this communication is strictly prohibited.
If you have received this communication in error, please erase all copies of the
message and its attachments and notify us immediately.

This email has been scanned by the MessageLabs Email Security System.
*******************************************************************************

32

Report Id: GSOIC003
GSSR Open Item Cash Report

# Lehman Brothers INC

Outstanding Open Items for Account  09830570  (USD)
LBIE Dummy Nostro

Since Last Proposal on 9/13/2008 at 17:32:51

9/14/2008
16:53:08

| Ledger Sub-Account Number | Latest Ledger Date/No | Section | Closing Balance | D/C |
|---|---|---|---|---|
| 09830570-USD-0 | 9/12/2008 | ITS RECS | 17,041,218,862.61 | D |
| LBIE vs LBI Bridge acct | 256 | | | |

*if no sub-account listed, the account doesn't have a sub-account

| Statement Sub-Account Number | Latest Statement Date/No | Section | Closing balance | D/C |
|---|---|---|---|---|
| 1001833TBRDK-USD | 9/12/2008 | ITS RECS | 14,719,141,386.67 | C |
| LBIE vs LBI Bridge acct | 257 | | | |

## Ledger Sub Account  09830570-USD-0

| Value Date | Entry Date | gln_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 9/11/2008 | 9/11/2008 | 2275 | NONREF | 00L1XKX2 | STOCK LOAN DUMM | Not queried | 2,322,077,475.54 | D |
| | Item: | 1 | | | | | Total: 2,322,077,475.54 | D |

Total Items: 1

Total: 2322077475.54 D

Net Item Amount: 2,322,077,475.54 D

Net Missing Balance:        0.00

Amount Differences:        0.40 D

Total: 2,322,077,475.94 D

Net Closing Balance: 2,322,077,475.94 D

Trial Differs by:        0.00

08-01420-scc   Doc 9250-1   Filed 06/26/09   Entered 06/26/09 08:32:24   Appendix
Documents Taco (Part 2)   Pg 755 of 1129

```
NAD1          NAME AND ADDRESS SCREEN 1              SPAD       10/24/08  16:06
941-99950 099 15 TC TC TC TC TC TC TC TC TC RR:                   # OF IP 00
LBIE PRIME BROKER NOMINEE      S  ------------- INSTRUCTIONS -------------
(DEPOT 079)                        BUY-INST SEG         SELL-INST HOLD PROCD
LEHMAN BROTHERS                    CONF-NBR    1   STMT-NBR   1  ACCT-CLS   001
  HUDSON STREET                M   LANG        E   CURRENCY 000  STL-BR     941
  SEY CIT NJ  07302-4585       C   DVD-CD HOLD     TYPE-3-CD  0  DVD-CR-NT
                                   DVD-BUY-FR      RE-INVEST  0  CK-REDEMP
                                   CSH-SWP-CD 0    ACMCD         FUND-NBR
TEL1                               ACMPR           ACMCX         ACMTR
SS-TIN-1 2 13-2518466    GEO-CD   933 ACH 1  DDA   YEAR-END      CUSTDL-FLIP
SS-TIN-2                 ADR-LOC  933 NO-RR-POST   NO-RR-PAY     RR-EXMPT
BIRTH-DT                 IRA         DTC-ID        INT-AC-NB
USA-WH-S 1  L      STK-WH-TAX  0.0        BND-WH-TAX  0.0        IRS-1042
W8-S               DB-INT-RT + 00.00000  CR-INT-RT + 00.00000  MONEY-MGR
W8-L   INV-OBJ     OBJ-DISC 2 OLTS     PSR   TLOT   SP-STK-C 3  SP-BND-CM
AGREEMENTS: KYC    CASH      MRGN   LOAN   CORP   TRUST   JOINT   TRADE   Y
       SSF    DISC   LTD-DISC   PWR-ATTRN     PRIME-BKR     ERISA    INV-ADV
OPT: DT            NO-OP-TRD   PUR   SPR   COVWR   NKDWR   NKDPT   PROS
SSF: DT            PUR   COV   NKD
ADTS:  OPT-ACC   CUST-TYP 000 SPC-DOC 000
OPEN-DATE 08/01/2007 ADD-DATE 08/01/2007 CHANGE-DATE 08/01/2008
NEXT: _____ ACCT: 941 99950 TRID: O
                                        PA1 TO VIEW I/P
```

08-01420-scc   Doc 9260-1   Filed 06/26/09   Entered 06/26/09 08:32:24   Appendix
of Daniel McIsaac (Part 2)   Pg 756 of 1129

012 941-99950-099 CC: 001 LBIE PRIME BROKER NO    B-3  S-7  SPAD 16:04 10/24/08
CL D1 B1 TAX 1 C/S 0                               TMV 2,451,015,041
                                                  T/E 5,673,059,839
                            H/EXCE 3,249,072,559  P/V 2,451,015,041
PF13: LINK TO COMBINED ACCOUNT

| L | S | T/D | S/D | EQUITY | SMA/FED | CALL | NYSE EX/CL | LIQ EQ HSE EX/CL |
|---|---|-----|-----|--------|---------|------|-----------|------------------|
| | | | | ***** 09-24-08 ***** | | | | |
| 1 | | 75,513.55 | 75,513.55 | 75,513- | | 0 | 75,513C | 0 |
| 2 | | 3,219,098,506.44- | | 6,999,546,610 | | 4,899,726,850E | | |
| | | | 3,214,502,821.19- | | 2,765,985,090 | | 3,786,742,725E | |
| | | | | ***** 09-23-08 ***** | | | | |
| 2 | | 3,219,070,181.71- | | 7,026,345,515 | | 4,913,249,303E | | |
| | | | 3,214,474,496.46- | | 2,765,956,766 | | 3,794,233,243E | |
| | | | | ***** 09-22-08 ***** | | | | |
| 2 | | 3,222,501,882.85- | | 7,060,990,258 | | 4,921,510,780E | | |
| | | | 3,217,906,197.60- | | 2,768,652,918 | | 3,803,980,078E | |
| | | | | ***** 09-19-08 ***** | | | | |
| 2 | | 3,221,614,006.30- | | 7,234,503,026 | | 5,036,862,187E | | |
| | | | 3,217,018,321.05- A | | 2,767,765,041 | | 3,911,534,777E | |

:  A/C: 941 99950     SPAD ID:
      TYPE   SSC#              PA1-NEXT  PA2-PREV           PAGE    8


_Note_

A- Represents cash amount owed to LBIE for ADP customer acct 941-99950.

EXHIBIT 37

ADP OCC Margin-091908.txt

THE OPTIONS CLEARING CORPORATION                    ACTIVITY DATE: 09/19/2008
CYCLE-ID:                        CMO PAGE 1
 ACCOUNT SUMMARY BY CMO                              SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46            CM  PAGE 1
                                                    REPORT-ID:

O20000000353000740000109192008

CMO:                             LEHMAN BROTHERS INC.
CLEARING MEMBER:                 OCC  00074

TIER ACCOUNT:                    OCC  00074 C
SETTLEMENT TIER ACCOUNT:         OCC  00074 C

              ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
_____
   _____

 COLLATERAL TYPE (ALL IN USD)                            COLLATERAL
TYPE (ALL IN USD)
   CASH:                                                    CASH:
    USD:                              130,256,581.65         USD:
                       130,256,581.65
    FOREIGN:                                   0.00          FOREIGN:
                            0.00
   CASH TOTAL:                        130,256,581.65       CASH
TOTAL:                     130,256,581.65
   GOVERNMENT (GS & GE) TOTAL:        347,356,998.08       GOVERNMENT
(GS & GE) TOTAL:       347,356,998.08
   LETTERS OF CREDIT TOTAL:            28,876,501.00       LETTERS OF
CREDIT TOTAL:       28,876,501.00
   MONEY MARKET FUNDS TOTAL:                   0.00        MONEY
MARKET FUNDS TOTAL:                0.00
   VALUED SECURITIES TOTAL:                    0.00        VALUED
SECURITIES TOTAL:              0.00
   _____

 TOTAL COLLATERAL VALUE (IN USD):      506,490,080.73     TOTAL
COLLATERAL VALUE (IN USD):     506,490,080.73

 TOTAL REQUIREMENT:                    472,520,386.00     TOTAL
REQUIREMENT:               472,520,386.00

 MARGIN CREDIT:                                 0.00      MARGIN
CREDIT:                         0.00

 ROLLED-UP MARGIN DEFICIT:                      0.00      ROLLED-UP
MARGIN DEFICIT:                 0.00

 EXCESS/DEFICIT:                        33,969,694.73 EXC
EXCESS/DEFICIT:                 33,969,694.73 EXC

          NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
   _____

 NET PAY/COLLECT:                       3,548,242.00  COL
CASH CONVERSION
    CASH GAINED FROM CONVERSION:              0.00
    CASH USED FOR CONVERSION:                 0.00
DEFICIT:                                      0.00
NET SETTLEMENT:                         3,548,242.00  COL
=========================================================
                       Page 1

ADP OCC Margin-091908.txt

ENPO450                                    ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 2
    ACCOUNT SUMMARY BY CMO                     SYSTEM DATE:    09/19/2008
SYSTEM TIME: 07:08:46            CM  PAGE 2
                                               REPORT-ID:

02000000035300074000109192008

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00074

SETTLEMENT TIER ACCOUNT:      OCC  00074 C

        PAY/COLLECT TYPE
AMOUNT    PAY/COL

_____
        INDEX POST TRADE PREMIUM
742,000.00    PAY
        EQUITY POST TRADE PREMIUM
230,060.00    COL
        INDEX TRADE PREMIUM
2,900.00    COL
        EQUITY TRADE PREMIUM
4,057,282.00    COL

_____
        NET PAY/COLLECT
3,548,242.00    COL

ADP OCC Margin-091908.txt

ENP0450                                              ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION                 ACTIVITY DATE: 09/19/2008
CYCLE-ID:                      CMO PAGE 3
    ACCOUNT SUMMARY BY CMO                           SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46          CM  PAGE 3
                                                     REPORT-ID:

020000000353000740000109192008

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00074

TIER ACCOUNT:                 OCC  00074 F
SETTLEMENT TIER ACCOUNT:      OCC  00074 F

            ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
_____

_____

  COLLATERAL TYPE (ALL IN USD)                               COLLATERAL
TYPE (ALL IN USD)
    CASH:                                                      CASH:
      USD:                            435,065,593.23             USD:
                     435,065,593.23
      FOREIGN:                                  0.00           FOREIGN:
                      0.00
    CASH TOTAL:                       435,065,593.23          CASH
TOTAL:                   435,065,593.23
    GOVERNMENT (GS & GE) TOTAL:       334,891,780.61          GOVERNMENT
(GS & GE) TOTAL:         334,891,780.61
    LETTERS OF CREDIT TOTAL:              698,500.00          LETTERS OF
CREDIT TOTAL:            698,500.00
    MONEY MARKET FUNDS TOTAL:                   0.00          MONEY
MARKET FUNDS TOTAL:             0.00
    VALUED SECURITIES TOTAL:                    0.00          VALUED
SECURITIES TOTAL:               0.00
_____

  TOTAL COLLATERAL VALUE (IN USD):      770,655,873.84        TOTAL
COLLATERAL VALUE (IN USD):    770,655,873.84

  TOTAL REQUIREMENT:                    547,460,379.00        TOTAL
REQUIREMENT:             547,460,379.00

  MARGIN CREDIT:                                 0.00         MARGIN
CREDIT:                      0.00

  ROLLED-UP MARGIN DEFICIT:                      0.00         ROLLED-UP
MARGIN DEFICIT:               0.00

  EXCESS/DEFICIT:                       223,195,494.84  EXC
EXCESS/DEFICIT:                  223,195,494.84  EXC
                            Page 3

ADP OCC Margin-091908.txt

NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
_____

NET PAY/COLLECT:                      143,424,917.00   COL
CASH CONVERSION
    CASH GAINED FROM CONVERSION:              0.00
    CASH USED FOR CONVERSION:                 0.00
DEFICIT:                                      0.00
NET SETTLEMENT:                       143,424,917.00   COL
========================================================

    ENP0450                         ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION        ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 4
    ACCOUNT SUMMARY BY CMO                  SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46           CM  PAGE 4
                                            REPORT-ID:

0200000003530007400001091092008

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                         LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00074

    SETTLEMENT TIER ACCOUNT:    OCC  00074 F

        PAY/COLLECT TYPE
AMOUNT    PAY/COL
_____

_____MISCELLANEOUS
7,740,699.00    COL
        STOCK LOAN MARK TO MARKET
6,294,700.00    PAY
        EQUITY TRADE PREMIUM
19,152,548.00   COL
        INDEX TRADE PREMIUM
122,826,370.00   COL
_____

_____NET PAY/COLLECT
143,424,917.00   COL

ADP OCC Margin-091908.txt

ENP0450                                    ****CONTINUED ON NEXT
PAGE****
  THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 5
  ACCOUNT SUMMARY BY CMO                    SYSTEM DATE:    09/19/2008
SYSTEM TIME: 07:08:46         CM PAGE 5
                                            REPORT-ID:
0200000000353000740000109192008

  CMO:                       LEHMAN BROTHERS INC.
  CLEARING MEMBER:           OCC  00074

  TIER ACCOUNT:              OCC  00074 M
  SETTLEMENT TIER ACCOUNT:   OCC  00074 M

          ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
  _____
  _____

  COLLATERAL TYPE (ALL IN USD)                        COLLATERAL
TYPE (ALL IN USD)
  CASH:                                                 CASH:
    USD:                           241,499,139.34        USD:
                        241,499,139.34
      FOREIGN:                                  0.00        FOREIGN:
                  0.00
    CASH TOTAL:                    241,499,139.34        CASH
TOTAL:                  241,499,139.34
    GOVERNMENT (GS & GE) TOTAL:     78,917,277.20        GOVERNMENT
(GS & GE) TOTAL:      78,917,277.20
    LETTERS OF CREDIT TOTAL:       218,750,000.00        LETTERS OF
CREDIT TOTAL:          218,750,000.00
    MONEY MARKET FUNDS TOTAL:               0.00        MONEY
MARKET FUNDS TOTAL:              0.00
    VALUED SECURITIES TOTAL:                0.00        VALUED
SECURITIES TOTAL:                0.00
  _____
  _____

  TOTAL COLLATERAL VALUE (IN USD):    539,166,416.54        TOTAL
COLLATERAL VALUE (IN USD):          539,166,416.54
                        Page 5

ADP OCC Margin-091908.txt

TOTAL REQUIREMENT:                               0.00        TOTAL
REQUIREMENT:                        0.00

 MARGIN CREDIT:                                  0.00        MARGIN
CREDIT:                             0.00

 ROLLED-UP MARGIN DEFICIT:                438,971,483.00     ROLLED-UP
MARGIN DEFICIT:            438,971,483.00

 EXCESS/DEFICIT:                      100,194,933.54  EXC
EXCESS/DEFICIT:               100,194,933.54  EXC

    NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
_____

 NET PAY/COLLECT:                         7,220,018.25  COL
CASH CONVERSION
    CASH GAINED FROM CONVERSION:               0.00
    CASH USED FOR CONVERSION:                  0.00
DEFICIT:                                       0.00
NET SETTLEMENT:                           7,220,018.25  COL
===============================================================


 ENPO45O                             ****CONTINUED ON NEXT
PAGE****
   THE OPTIONS CLEARING CORPORATION      ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 6
  ACCOUNT SUMMARY BY CMO                SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46         CM PAGE 6
                                        REPORT-ID:
02000000035300074000010919200 8

 NET PAY/COLLECT TOTALS BY CATEGORY

 CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00074

 SETTLEMENT TIER ACCOUNT:      OCC  00074 M

     PAY/COLLECT TYPE
AMOUNT   PAY/COL

_____
_____
         EQUITY CASH DIFFERENCE
2,652.00   PAY
        EQUITY CASH FIXED
70,179.75    COL
        EQUITY POST TRADE PREMIUM
45,000.00    COL
        INDEX TRADE PREMIUM
3,073,320.00    COL
        EQUITY TRADE PREMIUM
4,034,170.50    COL

ADP OCC Margin-091908.txt

_____

_____
_____NET PAY/COLLECT
7,220,018.25   COL

ENPO450                                    ****CONTINUED ON NEXT
PAGE****
   THE OPTIONS CLEARING CORPORATION         ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 7
   ACCOUNT SUMMARY BY CMO                   SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46      CM  PAGE 7
                                           REPORT-ID:

02000000035300074000010919 2008

   CMO:                        LEHMAN BROTHERS INC.
   CLEARING MEMBER:            OCC  00074

   TIER ACCOUNT:               OCC  00074 M P
   SETTLEMENT TIER ACCOUNT:    OCC  00074 M

                 MARGIN ACCOUNT DETAIL
_____

   COLLATERAL TYPE (ALL IN USD)
      GOVERNMENT (GS & GE) TOTAL:            0.00
      LETTERS OF CREDIT TOTAL:               0.00
      MONEY MARKET FUNDS TOTAL:              0.00
      VALUED SECURITIES TOTAL:               0.00
                                          _____
   TOTAL COLLATERAL VALUE (IN USD):         0.00

   TOTAL REQUIREMENT:                     438,971,483.00

                         Page 7

ADP OCC Margin-091908.txt

MARGIN CREDIT:                          0.00

ROLLED-UP MARGIN DEFICIT:               0.00

EXCESS/DEFICIT:              438,971,483.00  DEF

ENPO450                              ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION    ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 8
    ACCOUNT SUMMARY BY CMO               SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46       CM  PAGE 8
                                         REPORT-ID:

02000000035300074000010919 2008

CMO:                       LEHMAN BROTHERS INC.
CLEARING MEMBER:           OCC  00074

TIER ACCOUNT:              OCC  00074 Z X
SETTLEMENT TIER ACCOUNT:   OCC  00074 Z X

                 CLEARING FUND ACCOUNT DETAIL
_____

COLLATERAL TYPE (ALL IN USD)
  CASH:
    USD:                             0.00
  CASH TOTAL:                        0.00
  GOVERNMENT (GS) TOTAL:     171,571,979.25
_____

TOTAL COLLATERAL VALUE (IN USD):   171,571,979.25

TOTAL REQUIREMENT:                 170,993,187.75

EXCESS/DEFICIT:                        578,791.50  EXC

Page 8

ADP OCC Margin-091908.txt

ENPO450                                          ****END OF DATA****
THE OPTIONS CLEARING CORPORATION         ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 9
  ACCOUNT SUMMARY BY CMO                 SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46        CM  PAGE 1
                                         REPORT-ID:

020000000353000840000109192008

CMO:                         LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00084

TIER ACCOUNT:                OCC  00084 C
SETTLEMENT TIER ACCOUNT:     OCC  00084 C

         ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
_____

_____

 COLLATERAL TYPE (ALL IN USD)                          COLLATERAL
TYPE (ALL IN USD)
   CASH:                                                  CASH:
    USD:                              0.00                 USD:
                              0.00
      FOREIGN:                        0.00               FOREIGN:
                              0.00
   CASH TOTAL:                        0.00               CASH
TOTAL:                      0.00
   GOVERNMENT (GS & GE) TOTAL:        0.00               GOVERNMENT
(GS & GE) TOTAL:            0.00
   LETTERS OF CREDIT TOTAL:    33,622,000.00             LETTERS OF
CREDIT TOTAL:       33,622,000.00
   MONEY MARKET FUNDS TOTAL:          0.00               MONEY
MARKET FUNDS TOTAL:            0.00
   VALUED SECURITIES TOTAL:           0.00               VALUED
SECURITIES TOTAL:              0.00
_____

 TOTAL COLLATERAL VALUE (IN USD):     33,622,000.00      TOTAL
COLLATERAL VALUE (IN USD):    33,622,000.00

 TOTAL REQUIREMENT:                  302,610.00          TOTAL
                        Page 9

ADP OCC Margin-091908.txt
REQUIREMENT:                           302,610.00

 MARGIN CREDIT:                                    0.00              MARGIN
CREDIT:                            0.00

 ROLLED-UP MARGIN DEFICIT:                         0.00              ROLLED-UP
MARGIN DEFICIT:                    0.00

 EXCESS/DEFICIT:                       33,319,390.00  EXC
EXCESS/DEFICIT:                       33,319,390.00  EXC


          NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
    _____

 NET PAY/COLLECT:                      286,960.00  COL
CASH CONVERSION
    CASH GAINED FROM CONVERSION:            0.00
    CASH USED FOR CONVERSION:               0.00
DEFICIT:                                    0.00
NET SETTLEMENT:                        286,960.00  COL
    ===========================================================




 ENPO450                              ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION     ACTIVITY DATE: 09/19/2008
CYCLE-ID:                 CMO PAGE 10
 ACCOUNT SUMMARY BY CMO                  SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46        CM  PAGE 2
                                        REPORT-ID:
020000000353000840000109192008

 NET PAY/COLLECT TOTALS BY CATEGORY

 CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00084

 SETTLEMENT TIER ACCOUNT:    OCC  00084 C

     PAY/COLLECT TYPE
AMOUNT   PAY/COL

_____
_____INDEX FUTURES MARK TO MARKET
286,960.00   COL

_____
_____NET PAY/COLLECT
286,960.00   COL

ADP OCC Margin-091908.txt

ENPO450                                     ****CONTINUED ON NEXT
PAGE****
  THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 11
  ACCOUNT SUMMARY BY CMO                    SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46        CM  PAGE 3
                                            REPORT-ID:
02000000035300084000010919200B

  CMO:                       LEHMAN BROTHERS INC.
  CLEARING MEMBER:           OCC  00084

  TIER ACCOUNT:              OCC  00084 F
  SETTLEMENT TIER ACCOUNT:   OCC  00084 F

          ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
  _____
  _____

  COLLATERAL TYPE (ALL IN USD)                        COLLATERAL
TYPE (ALL IN USD)
    CASH:                                               CASH:
    USD:                        24,003,644.00            USD:
                        24,003,644.00
      FOREIGN:                            0.00           FOREIGN:
                        0.00
    CASH TOTAL:                 24,003,644.00          CASH
TOTAL:                 24,003,644.00
    GOVERNMENT (GS & GE) TOTAL:           0.00          GOVERNMENT
(GS & GE) TOTAL:           0.00
    LETTERS OF CREDIT TOTAL:      47,550,000.00        LETTERS OF
CREDIT TOTAL:         47,550,000.00
    MONEY MARKET FUNDS TOTAL:             0.00          MONEY
                        Page 11

```
                      ADP OCC Margin-091908.txt
MARKET FUNDS TOTAL:                    0.00
    VALUED SECURITIES TOTAL:                      0.00          VALUED
SECURITIES TOTAL:                      0.00
  _____

  TOTAL COLLATERAL VALUE (IN USD):          71,553,644.00       TOTAL
COLLATERAL VALUE (IN USD):     71,553,644.00

  TOTAL REQUIREMENT:                        59,356,802.00       TOTAL
REQUIREMENT:                   59,356,802.00

  MARGIN CREDIT:                                   0.00         MARGIN
CREDIT:                                0.00

  ROLLED-UP MARGIN DEFICIT:                        0.00         ROLLED-UP
MARGIN DEFICIT:                        0.00

  EXCESS/DEFICIT:                           12,196,842.00  EXC
EXCESS/DEFICIT:                          12,196,842.00  EXC


       NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
  _____

  NET PAY/COLLECT:                          14,202,750.00  COL
CASH CONVERSION
    CASH GAINED FROM CONVERSION:                   0.00
    CASH USED FOR CONVERSION:                      0.00
DEFICIT:                                           0.00
NET SETTLEMENT:                             14,202,750.00  COL
  =============================================================
```

```
  ENP0450                                    ****CONTINUED ON NEXT
PAGE****
     THE OPTIONS CLEARING CORPORATION        ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 12
  ACCOUNT SUMMARY BY CMO                     SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46         CM  PAGE 4
                                            REPORT-ID:
020000000353000840000109192008

  NET PAY/COLLECT TOTALS BY CATEGORY

  CMO:                       LEHMAN BROTHERS INC.
  CLEARING MEMBER:           OCC  00084

  SETTLEMENT TIER ACCOUNT:   OCC  00084 F

      PAY/COLLECT TYPE
AMOUNT   PAY/COL

  _____
      EQUITY FUTURES MARK TO MARKET
566,820.00    COL
      INDEX FUTURES MARK TO MARKET
13,635,930.00    COL
```

Page 12

ADP OCC Margin-091908.txt

_____
_____
       NET PAY/COLLECT
14,202,750.00    COL

ENPO450                                        ****CONTINUED ON NEXT
PAGE****
   THE OPTIONS CLEARING CORPORATION              ACTIVITY DATE: 09/19/2008
CYCLE-ID:                        CMO PAGE 13
   ACCOUNT SUMMARY BY CMO                        SYSTEM DATE:    09/19/2008
SYSTEM TIME: 07:08:46            CM  PAGE 5
                                                REPORT-ID:

020000000353000840000109192008

   CMO:                          LEHMAN BROTHERS INC.
   CLEARING MEMBER:              OCC  00084

   TIER ACCOUNT:                 OCC  00084 M
   SETTLEMENT TIER ACCOUNT:      OCC  00084 M

              ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
   _____
   _____

   COLLATERAL TYPE (ALL IN USD)                        COLLATERAL
TYPE (ALL IN USD)
     CASH:                                               CASH:
       USD:                               0.00             USD:
                        Page 13

ADP OCC Margin-091908.txt

```
                                         0.00
         FOREIGN:                                          0.00                    FOREIGN:
                                         0.00
         CASH TOTAL:                                       0.00            CASH
TOTAL:                                       0.00
         GOVERNMENT (GS & GE) TOTAL:                       0.00            GOVERNMENT
(GS & GE) TOTAL:                     0.00
         LETTERS OF CREDIT TOTAL:                          0.00            LETTERS OF
CREDIT TOTAL:                        0.00
         MONEY MARKET FUNDS TOTAL:                         0.00            MONEY
MARKET FUNDS TOTAL:                        0.00
         VALUED SECURITIES TOTAL:                          0.00            VALUED
SECURITIES TOTAL:                        0.00
      _____

      _____
      TOTAL COLLATERAL VALUE (IN USD):                     0.00            TOTAL
COLLATERAL VALUE (IN USD):                 0.00

      TOTAL REQUIREMENT:                                   0.00            TOTAL
REQUIREMENT:                               0.00

      MARGIN CREDIT:                                       0.00            MARGIN
CREDIT:                                    0.00

      ROLLED-UP MARGIN DEFICIT:                            0.00            ROLLED-UP
MARGIN DEFICIT:                      0.00

      EXCESS/DEFICIT:                                      0.00
EXCESS/DEFICIT:                                          0.00
```

          NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
      _____

```
      NET PAY/COLLECT:                                     0.00
CASH CONVERSION
         CASH GAINED FROM CONVERSION:                      0.00
         CASH USED FOR CONVERSION:                         0.00
      DEFICIT:                                             0.00
      NET SETTLEMENT:                                      0.00
      ==============================================================
```

```
      ENP0450                               ****CONTINUED ON NEXT
PAGE****
      THE OPTIONS CLEARING CORPORATION      ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 14
      ACCOUNT SUMMARY BY CMO                SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46      CM  PAGE 6
                                            REPORT-ID:
020000000353000840000109192008

      NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                        LEHMAN BROTHERS INC.
CLEARING MEMBER:            OCC  00084

SETTLEMENT TIER ACCOUNT:    OCC  00084 M
```
                              Page 14

ADP OCC Margin-091908.txt

        PAY/COLLECT TYPE
AMOUNT   PAY/COL

_____

_____

_____

_____ NET PAY/COLLECT
0.00

ENP0450                                    ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 15
    ACCOUNT SUMMARY BY CMO                    SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46          CM  PAGE 7
                                             REPORT-ID:

020000000353000840000109192008

    CMO:                       LEHMAN BROTHERS INC.
    CLEARING MEMBER:           OCC  00084

    TIER ACCOUNT:              OCC  00084 M P
    SETTLEMENT TIER ACCOUNT:   OCC  00084 M

                MARGIN ACCOUNT DETAIL
                     Page 15

ADP OCC Margin-091908.txt

_____

```
COLLATERAL TYPE (ALL IN USD)
  GOVERNMENT (GS & GE) TOTAL:              0.00
  LETTERS OF CREDIT TOTAL:                 0.00
  MONEY MARKET FUNDS TOTAL:                0.00
  VALUED SECURITIES TOTAL:                 0.00
_____
TOTAL COLLATERAL VALUE (IN USD):          0.00

TOTAL REQUIREMENT:                        0.00

MARGIN CREDIT:                            0.00

ROLLED-UP MARGIN DEFICIT:                 0.00

EXCESS/DEFICIT:                           0.00
```

```
ENP0450                                    ****END OF DATA****
  THE OPTIONS CLEARING CORPORATION        ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 16
  ACCOUNT SUMMARY BY CMO                   SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46      CM  PAGE 1
                                           REPORT-ID:
0200000000353002730000109192008

CMO:                       LEHMAN BROTHERS INC.
CLEARING MEMBER:           OCC  00273

TIER ACCOUNT:              OCC  00273 C
SETTLEMENT TIER ACCOUNT:   OCC  00273 C

          ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
```
_____

_____

```
COLLATERAL TYPE (ALL IN USD)                        COLLATERAL
TYPE (ALL IN USD)
  CASH:                                               CASH:
    USD:                           781,891.00           USD:
```

```
                    ADP OCC Margin-091908.txt
                       781,891.00
        FOREIGN:                              0.00                    FOREIGN:
                       0.00
      CASH TOTAL:                     781,891.00                      CASH
TOTAL:                 781,891.00
        GOVERNMENT (GS & GE) TOTAL:           0.00            GOVERNMENT
(GS & GE) TOTAL:       0.00
      LETTERS OF CREDIT TOTAL:        3,500,000.00           LETTERS OF
CREDIT TOTAL:         3,500,000.00
        MONEY MARKET FUNDS TOTAL:             0.00                    MONEY
MARKET FUNDS TOTAL:       0.00
        VALUED SECURITIES TOTAL:              0.00                    VALUED
SECURITIES TOTAL:         0.00
      _____

      _____
      TOTAL COLLATERAL VALUE (IN USD):     4,281,891.00            TOTAL
COLLATERAL VALUE (IN USD):    4,281,891.00

      TOTAL REQUIREMENT:                  3,762,574.00            TOTAL
REQUIREMENT:           3,762,574.00

      MARGIN CREDIT:                            0.00            MARGIN
CREDIT:                  0.00

      ROLLED-UP MARGIN DEFICIT:                 0.00            ROLLED-UP
MARGIN DEFICIT:          0.00

      EXCESS/DEFICIT:                     519,317.00   EXC
EXCESS/DEFICIT:        519,317.00   EXC


            NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
      _____

      NET PAY/COLLECT:                     598,810.00   COL
CASH CONVERSION
        CASH GAINED FROM CONVERSION:           0.00
        CASH USED FOR CONVERSION:              0.00
      DEFICIT:                               0.00
      NET SETTLEMENT:                      598,810.00   COL
      =========================================================
```

```
      ENPO450                              ****CONTINUED ON NEXT
PAGE****
      THE OPTIONS CLEARING CORPORATION     ACTIVITY DATE: 09/19/2008
CYCLE-ID:                CMO PAGE 17
      ACCOUNT SUMMARY BY CMO               SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46    CM  PAGE 2
                                           REPORT-ID:
020000000353002730000109192008

      NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                      LEHMAN BROTHERS INC.
CLEARING MEMBER:          OCC  00273

      SETTLEMENT TIER ACCOUNT:      OCC  00273 C
                              Page 17
```

ADP OCC Margin-091908.txt

PAY/COLLECT TYPE
AMOUNT    PAY/COL
_____

_____
_____EQUITY TRADE PREMIUM
598,810.00    COL

_____

_____
_____NET PAY/COLLECT
598,810.00    COL

ENP0450                                    ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION       ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 18
    ACCOUNT SUMMARY BY CMO                 SYSTEM DATE:    09/19/2008
SYSTEM TIME: 07:08:46           CM  PAGE 3
                                           REPORT-ID:
0200000003530027300000109192008

    CMO:                      LEHMAN BROTHERS INC.
    CLEARING MEMBER:          OCC  00273

    TIER ACCOUNT:             OCC  00273 F
    SETTLEMENT TIER ACCOUNT:  OCC  00273 F

```
                        ADP OCC Margin-091908.txt
              ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
 _____
 _____

  COLLATERAL TYPE (ALL IN USD)                               COLLATERAL
TYPE (ALL IN USD)
    CASH:                                                      CASH:
      USD:                                0.00                   USD:
                              0.00
      FOREIGN:                            0.00                   FOREIGN:
                              0.00
    CASH TOTAL:                           0.00                 CASH
TOTAL:                            0.00
      GOVERNMENT (GS & GE) TOTAL:         0.00                 GOVERNMENT
(GS & GE) TOTAL:        0.00
      LETTERS OF CREDIT TOTAL:            0.00                 LETTERS OF
CREDIT TOTAL:           0.00
      MONEY MARKET FUNDS TOTAL:           0.00                 MONEY
MARKET FUNDS TOTAL:             0.00
      VALUED SECURITIES TOTAL:            0.00                 VALUED
SECURITIES TOTAL:               0.00
 _____

  TOTAL COLLATERAL VALUE (IN USD):       0.00                 TOTAL
COLLATERAL VALUE (IN USD):          0.00

  TOTAL REQUIREMENT:                      0.00                 TOTAL
REQUIREMENT:                      0.00

  MARGIN CREDIT:                          0.00                 MARGIN
CREDIT:                           0.00

  ROLLED-UP MARGIN DEFICIT:               0.00                 ROLLED-UP
MARGIN DEFICIT:                   0.00

  EXCESS/DEFICIT:                         0.00
EXCESS/DEFICIT:                             0.00


           NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
 _____

  NET PAY/COLLECT:                        0.00
CASH CONVERSION
    CASH GAINED FROM CONVERSION:          0.00
    CASH USED FOR CONVERSION:             0.00
  DEFICIT:                                0.00
  NET SETTLEMENT:                         0.00
 =======================================================
```

```
  ENP0450                              ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION     ACTIVITY DATE: 09/19/2008
CYCLE-ID:              CMO PAGE 19
  ACCOUNT SUMMARY BY CMO                 SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46        CM  PAGE 4
                    Page 19
```

ADP OCC Margin-091908.txt

REPORT-ID:

02000000035300273000010919200 8

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  00273

SETTLEMENT TIER ACCOUNT:      OCC  00273 F

     PAY/COLLECT TYPE
AMOUNT   PAY/COL
_____

_____

_____

_____NET PAY/COLLECT
0.00

ENP0450                              ****CONTINUED ON NEXT
PAGE****
   THE OPTIONS CLEARING CORPORATION      ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 20
   ACCOUNT SUMMARY BY CMO              SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46      CM  PAGE 5
                                       REPORT-ID:

ADP OCC Margin-091908.txt

020000000353002730000109192008

```
CMO:                          LEHMAN BROTHERS INC.
CLEARING MEMBER:              OCC  OO273

TIER ACCOUNT:                 OCC  OO273 M
SETTLEMENT TIER ACCOUNT:      OCC  OO273 M

           ACCOUNT SUMMARY PRIOR TO CASH CONVERSION
ACCOUNT SUMMARY AFTER CASH CONVERSION
_____
_____

 COLLATERAL TYPE (ALL IN USD)                              COLLATERAL
TYPE (ALL IN USD)
   CASH:                                                     CASH:
    USD:                              0.00                    USD:
                         0.00
      FOREIGN:                        0.00                      FOREIGN:
                         0.00
   CASH TOTAL:                        0.00                   CASH
TOTAL:                       0.00
   GOVERNMENT (GS & GE) TOTAL:        0.00                   GOVERNMENT
(GS & GE) TOTAL:       0.00
   LETTERS OF CREDIT TOTAL:           0.00                   LETTERS OF
CREDIT TOTAL:        0.00
   MONEY MARKET FUNDS TOTAL:          0.00                   MONEY
MARKET FUNDS TOTAL:            0.00
   VALUED SECURITIES TOTAL:           0.00                   VALUED
SECURITIES TOTAL:              0.00
_____
 TOTAL COLLATERAL VALUE (IN USD):    0.00                   TOTAL
COLLATERAL VALUE (IN USD):       0.00

 TOTAL REQUIREMENT:                   0.00                   TOTAL
REQUIREMENT:                     0.00

 MARGIN CREDIT:                       0.00                   MARGIN
CREDIT:                          0.00

 ROLLED-UP MARGIN DEFICIT:            0.00                   ROLLED-UP
MARGIN DEFICIT:            0.00

 EXCESS/DEFICIT:                      0.00
EXCESS/DEFICIT:                       0.00

        NET PAY/COLLECT AND CASH CONVERSION ACTIVITY
_____

 NET PAY/COLLECT:                     0.00
CASH CONVERSION
   CASH GAINED FROM CONVERSION:       0.00
   CASH USED FOR CONVERSION:          0.00
DEFICIT:                              0.00
NET SETTLEMENT:                       0.00
=======================================================
```

Page  21

ADP OCC Margin-091908.txt

ENP0450                                          ****CONTINUED ON NEXT
PAGE****
    THE OPTIONS CLEARING CORPORATION             ACTIVITY DATE: 09/19/2008
CYCLE-ID:                    CMO PAGE 21
  ACCOUNT SUMMARY BY CMO                         SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46        CM  PAGE 6
                                                 REPORT-ID:
0200000003530027300001091 92008

NET PAY/COLLECT TOTALS BY CATEGORY

CMO:                         LEHMAN BROTHERS INC.
CLEARING MEMBER:             OCC  00273

  SETTLEMENT TIER ACCOUNT:   OCC  00273 M

     PAY/COLLECT TYPE
AMOUNT   PAY/COL

_____
_____

_____
_____NET PAY/COLLECT
0.00

ADP OCC Margin-091908.txt

ENP0450                                    ****CONTINUED ON NEXT
PAGE****
  THE OPTIONS CLEARING CORPORATION          ACTIVITY DATE: 09/19/2008
CYCLE-ID:                  CMO PAGE 22
  ACCOUNT SUMMARY BY CMO                     SYSTEM DATE:   09/19/2008
SYSTEM TIME: 07:08:46         CM  PAGE 7
                                            REPORT-ID:

020000000353002730000109192008

  CMO:                      LEHMAN BROTHERS INC.
  CLEARING MEMBER:          OCC  00273

  TIER ACCOUNT:             OCC  00273 M N
  SETTLEMENT TIER ACCOUNT:  OCC  00273 M

                    MARGIN ACCOUNT DETAIL
_____

COLLATERAL TYPE (ALL IN USD)
   GOVERNMENT (GS & GE) TOTAL:            0.00
   LETTERS OF CREDIT TOTAL:               0.00
   MONEY MARKET FUNDS TOTAL:              0.00
   VALUED SECURITIES TOTAL:               0.00
_____

TOTAL COLLATERAL VALUE (IN USD):         0.00

TOTAL REQUIREMENT:                       0.00

MARGIN CREDIT:                           0.00

ROLLED-UP MARGIN DEFICIT:                0.00

EXCESS/DEFICIT:                          0.00

ENP0450                                    ****END OF DATA****

EXHIBIT 38

**Cc:**     Cody, Stephen [scody@lehman.com]
**To:**     Crepeau, Alex F [acrepeau@lehman.com]; Curley, Kieran [kcurley@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]
**Subject:**     Re: Chase G Bank Rec is 39Billion OD as of 9/19
**Sent:**     Sun 9/21/2008 10:55:51 AM
**From:**     Tonucci, Paolo [paolo.tonucci@lehman.com]

We should ignore this.

--------------------------------

----- Original Message -----
From: Crepeau, Alex F
To: Curley, Kieran; Fleming, Dan (TSY); Tonucci, Paolo
Cc: Cody, Stephen
Sent: Sun Sep 21 00:07:58 2008
Subject: RE: Chase G Bank Rec is 39Billion OD as of 9/19

Adding Paolo

_____

From:   Curley, Kieran
Sent:   September 21, 2008 00:07
To:   Fleming, Dan (TSY)
Cc:   Crepeau, Alex F; Cody, Stephen
Subject:   FW: Chase G Bank Rec is 39Billion OD as of 9/19

Dan
We are reflecting a bank overdraft on Chase G of 39.8 Billion. Bank rec attached.
Please advise if you agree the account is OD as of 9/19.

_____

From:   Curley, Kieran
Sent:   Saturday, September 20, 2008 11:54 PM
To:   Cody, Stephen
Subject:   Chase G Bank Rec is 39Billion OD as of 9/19

  << File: Chase G_091908.pdf >>

Kieran Curley
Operations Control
201-499-8176
kcurley@lehman.com

TONUCCI_PAOLO_00014872

Report Id: GSOIC003
GSSR Open Item Cash Report

9/20/2008
23:53:03

# Lehman Brothers INC
## Outstanding Open Items for Account  10000907/20  (USD)
### CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

**Ledger Sub Account  066206677**

| Ledger Sub-Account Number | Latest Ledger Date/No | Section | Closing Balance | D/C |
|---|---|---|---|---|
| 098104903-USD-0 | 9/12/2008    256 | ITS RECS | 0.00 | C |
| Pick Loan Fed Nostro | | | | |
| 10000907/0020 | 9/18/2008    263 | MTS RECS | 68,500,616,910.94 | C |

| Statement Sub-Account Number | Latest Statement Date/No | Section | Closing balance | D/C |
|---|---|---|---|---|
| 066206677 | 9/19/2008    183 | MTS RECS | 39,893,690,564.90 | D |
| Chase | | | | |

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 12/17/2007 | 12/17/2007 | 1866638 DK 8/25/08 | 70043100000BD | 700431207 COMP FOR USE/OF F | Not queried | Not queried | 3,093.01 | C |
| 2/8/2008 | 2/6/2008 | 1897584 DK 8/25/08 | 85833600000BD | REF RETN CRED FR 2/5/08 INT OVERP/ | Not queried | Not queried | 1,250.00 | C |
| 2/8/2008 | 2/13/2008 | 1903806 027/5230157 | 000887050003552 | DEPOSIT | Not queried | Not queried | 6,507.00 | C |
| 2/8/2008 | 3/4/2008 | 19153981 SDM1XC850 | R-11644000641I | JPMORGAN CHASE BANK NATIONAL ASSOC | Not queried | Not queried | 281.49 | C |
| 3/7/2008 | 3/10/2008 | 1918006 DK 8/25/08 | 97403500000BD | REF A/O 03/07/08 TEXAS TRUST FDS/ | Not queried | Not queried | 49,778.52 | C |
| 3/25/2008 | 3/26/2008 | 1933914 DK 8/25/08 | 03428800000BD | REF PER FDS A/O 3/18/08 A/O 3/25/B | Not queried | Not queried | 4,156.67 | C |
| 3/25/2008 | 3/26/2008 | 1933882 DK 8/25/08 | 03437000000BD | REF A/O 3/25/08 BANK OF NY-MELLON/ | Not queried | Not queried | 6,944.46 | C |
| 4/1/2008 | 4/1/2008 | 1937212 DK 8/25/08 | 05521300000BD | REF A/O DREYFUS OVERPAY/ | Not queried | Not queried | 27,638.89 | C |
| 4/4/2008 | 4/4/2008 | 1939252 DK 8/25/08 | 07086900000BD | REF A/O 0403308 US BANK WISCONSI/ | Not queried | Not queried | 109.17 | C |
| 4/4/2008 | 4/4/2008 | 1939224 DK 8/25/08 | 07097200000BD | REF TO ADJ INT ON LOAN A/O 4/1/08/ | Not queried | Not queried | 2,365.62 | C |
| 5/16/2008 | 5/16/2008 | 1966446 BDM4F90BD | R-36784001138HH | CB FUNDS TRANS PREVIOUS DAY TAMPA | Not queried | Not queried | 163,889.15 | C |
| 5/22/2008 | 5/23/2008 | 1971746 DK 8/25/08 | 24981000000BD | REF A/O 05/22/08 RET AT THE REQ O | Not queried | Not queried | 97,473.96 | C |
| 5/22/2008 | 5/23/2008 | 1971792 DK 8/25/08 | 24981200000BD | REF A/O 05/22/08 RET OF REQ OF LXI | Not queried | Not queried | 33,975.69 | C |
| 6/11/2008 | 6/12/2008 | 1980744 DK 8/25/08 | 31775700000BD | REF FRB SEC ON SEC LOANED/ | Not queried | Not queried | 13,872.02 | C |
| 6/13/2008 | 6/13/2008 | 1985408 X0M5GCXX0 | R-78840001165HH | CB FUNDS TRANS COMPENSATION REC D | Not queried | Not queried | 457.50 | C |
| 6/18/2008 | 6/23/2008 | 1991882 DK 8/25/08 | 35546200000BD | REF CITIBANK A/O 6/18/08/ | Not queried | Not queried | 1,125.00 | C |
| 7/22/2008 | 7/22/2008 | 2010974 HDM5K5VH0 | R-46299002004HH | CARACAS INTL BANKING CORP CIBC SAN | Not queried | Not queried | 3,471.06 | C |
| 7/31/2008 | 7/31/2008 | 2016028 NONREF | 50056000000BD | REF A/O 7/31/08 INCOMING FUNDS FOR | Not queried | Not queried | 533.33 | C |
| 8/20/2008 | 8/21/2008 | 2032762 NONREF | 56832600000BD | REF FDS SENT TO LEHMAN FR BARCLAY/ | Not queried | Not queried | 195.23 | C |
| 9/10/2008 | 9/16/2008 | 2044830 NONREF | 24822400000BD | REF A/O 9/10/08 RETURN OF FUNDS FR | Not queried | Not queried | 41.67 | C |
| 9/12/2008 | 9/16/2008 | 2044652 NONREF | 24822460000BD | REF A/O 9/12/08 RETN OF FDS FR EVE | Not queried | Not queried | 18,145.84 | C |
| 9/12/2008 | 9/16/2008 | 2044744 NONREF | R-46599002259HH | REF A/O 9/12/08 RETURN OF FUNDS FR | Not queried | Not queried | 3,629.19 | C |
| 9/12/2008 | 9/16/2008 | 2043984 LDM9849L0 | R-46599002259HH | ROYAL BANK OF CANADA-PAYMENT CENTE | Not queried | Not queried | 32,500.00 | C |
| 9/15/2008 | 9/16/2008 | 2043956 NONREF | 24669130000BD | REF RECEIPT OF FDS LENT OUT | Not queried | Not queried | 1,000,000.00 | C |
| 9/15/2008 | 9/16/2008 | 2044524 NONREF | 24622100000BD | REF A/O 09/15/08 BB ITEM SENT LATE | Not queried | Not queried | 4,247,671.46 | C |

FLEMING_DAN_00007999

Report Id: GSOIO003
GSSR Open Item Cash Report

**Lehman Brothers INC**
Outstanding Open Items for Account  10000907/20  (USD)
CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008
23.53.03

Page 2 of 8

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 9/15/2008 | 9/19/2008 | 2046074 | 079756 | INTR-C208263AAHA | 426427605.00 STRUCTURED ASSET SECU | Not queried | 7,474.85 | C |
| 9/15/2008 | 9/19/2008 | 2046082 | 079760 | INTR-C208263AAHD | 267707289.00 STRUCTURED ASSET SECU | Not queried | 7,508.92 | C |
| 9/15/2008 | 9/19/2008 | 2046092 | 079763 | PYMT-C208263AAJJ | 247500.00 FEDERAL HOME LOAN MORTGA | Not queried | 159.47 | C |
| 9/15/2008 | 9/19/2008 | 2046094 | 079776 | INTR-C208263AANI | 220000.00 FEDERAL HOME LOAN MORTGA | Not queried | 252.58 | C |
| 9/15/2008 | 9/19/2008 | 2046030 | 079778 | INTR-C208263AANJ | 100 FEDERAL HOME LN MTG CORP MULT | Not queried | 55.75 | C |
| 9/15/2008 | 9/19/2008 | 2046030 | 75181500003 | INTR-A208263AR0D | 1500000.00 HDC-BASS CBO XI LTD / | Not queried | 395,302.05 | C |
| 9/15/2008 | 9/19/2008 | 2046046 | 75216000005 | INTR-A208263ARAA | 400000.00 HDOAKVOOD MTG INV 1996- | Not queried | 1,016.40 | C |
| 9/15/2008 | 9/19/2008 | 2046050 | 75216010006 | INTR-A208263ARAT | 5862999.59 HDOAKVOOD MORTGAGE INVE | Not queried | 34,837.18 | C |
| 8/17/2008 | 9/18/2008 | 2046040 | 75233830000004 | INTR-A208263ARU0 | DEPOSIT | Not queried | 285,343.40 | C |
| 9/16/2008 | 9/16/2008 | 2046042 | 0274930400 | 0006070556613 |  | Not queried | 41,000.00 | C |
| 9/18/2008 | 9/18/2008 | 2046034 | NONREF | 2524130000BD | REF A/O 0918008 STATE STREET RET | Not queried | 658,750.00 | C |
| 9/18/2008 | 9/18/2008 | 2046022 | NONREF | 2524108000BD | REF A/O 0918008 TRIPARTY FDS RET | Not queried | 1,512,461.84 | C |
| 9/19/2008 | 9/19/2008 | 2046040 | NONREF | 2524134000BD | INVESTORS BANK TRUST CO BOSTON MA | Not queried | 2,896,180.58 | C |
| 9/19/2008 | 9/19/2008 | 2046008 | 04009PBP1 | 2524131000BD | REF FDS FROM BARCLAYS | Not queried | 907,699,007.57 | C |
| 9/19/2008 | 9/19/2008 | 2046000 | 0000000002633773 | 2513185000BD | REF FEES FRO TSLF | Not queried | 147,052.93 | C |
| 9/19/2008 | 9/19/2008 | 2045724 | NONREF | 2513260006D | REF SALE FINAL | Not queried | 4,633,337,000.00 | C |
| 9/18/2008 | 9/18/2008 | 2045772 | NONREF | 2510205000BD | REF REPO LOAN IN PROCESS | Not queried | 10,269.77 | C |
| 9/18/2008 | 9/18/2008 | 2045556 | NONREF | 2510123000BD | REF TRI PARTY FUNDS RESENT TO LEHM | Not queried | 136,120.02 | C |
| 9/18/2008 | 9/18/2008 | 2045764 | NONREF | INTR-A208263ARVV | 219390630.00 HOSTRUCTURED ASSET SEC | Not queried | 3,912.79 | C |
| 9/16/2008 | 9/19/2008 | 2046062 | 75224080003 | INTR-A208263ARVC | 1850895.44 HOSTRUCTURED ASSET SE | Not queried | 7,933.36 | C |
| 9/19/2008 | 9/19/2008 | 2046082 | 75224050002 | INTR-A208263ARAT | HOSTRUCTURED ASSET SE | Not queried | 43,399.71 | C |
| 9/19/2008 | 9/19/2008 | 2046048 | 0000000002633773 | 0669301263FF | REF FDS FRO TSLF | Not queried | 967,023.43 | C |
| 9/19/2008 | 9/19/2008 | 2046048 | NONREF | SALE-T308263C-DBE6 | 250000.00 ARES LEVERAGED INVESTM | Not queried | 147.00 | C |
| 9/19/2008 | 9/19/2008 | 2046024 | 04009PBP1 | SALE-T308263C-K9V | 1500000.00 ARES LEVERAGED INVESTME | Not queried | 1,677,373.87 | C |
| 9/19/2008 | 9/19/2008 | 2046012 | 04009PBP1 | SALE-T308263C-DBFE | 960000.00 CHL MORTGAGE PASS-THROUG | Not queried | 580,214.05 | C |
| 9/19/2008 | 9/19/2008 | 2046080 | 0395RAF6 | SALE-T308263C-DBFE | 1000000.00 ARCHIMEDES FUNDING 111. | Not queried | 386,809.37 | C |
| 9/19/2008 | 9/19/2008 | 2046032 | 0395RAF6 | SALE-T308263C-K93 | 170000.00 ARES LEVERAGED INVESTME | Not queried | 5,278.54 | C |
| 9/19/2008 | 9/19/2008 | 2046008 | 0409PBP1 | SALE-T308263C-K88 | 115000000.00 ARES LEVERAGED INVEST | Not queried | 416.47 | C |
| 9/19/2008 | 9/19/2008 | 2046008 | 0409PBP1 | SALE-T308263C-K93 | 110000000.00 ARES LEVERAGED INVEST | Not queried | 475,255.93 | C |
| 9/19/2008 | 9/19/2008 | 2046060 | 079745 | PYMT-C208263AAFE | 212400.00 GNACM MORTGAGE LOAN TRU | Not queried | 9,630.75 | C |
| 9/19/2008 | 9/19/2008 | 2046076 | 079746 | SALE-T308263C-AAFF | 2357000.00 GNACM MORTGAGE LOAN TRU | Not queried | 3,214,966.58 | C |
| 9/19/2008 | 9/19/2008 | 2046076 | 08KBIO05590 | 0033302263FF | STATE STREET BANK TR. CO., BOSTONN | Not queried | 3,019,272.96 | C |
| 9/19/2008 | 9/19/2008 | 2046014 | 304968766 | 0155007263FF | STATE STREET BANK AND TRUST COMPAN | Not queried | 475,255.93 | C |
| 9/19/2008 | 9/19/2008 | 3049T0556 | 0280713263FF | STATE STREET BANK AND TRUST COMPAN | Not queried | 43,399.71 | C |
| 9/19/2008 | 9/19/2008 | 2046052 | JGB201909 | 4522300263FC | ZURICH SPECIALITIES LONDON JERSEY | Not queried | 10,358.75 | C |
| 9/19/2008 | 9/19/2008 | 2046046 | MPP522432 | PPMT-T308263C03A | 189709.05 SUTTER CBO 1998-1 / SUT | Not queried | 6,171.88 | C |
| 9/19/2008 | 9/19/2008 | 2046056 | NONREF | 0511700263J0 | ELEMENT CAPITAL MASTER FUND LIMITE | Not queried | 1,300,000.00 | C |
| 9/19/2008 | 9/19/2008 | 2046066 | NONREF | 2524011000BD | REF RETURN LOAN SHORTAGE | Not queried | 9,300,000.00 | C |
| 9/19/2008 | 9/19/2008 | 2046064 | NONREF | 2524151000BD | REF RETURN OF CASH TO SECURE TRIPA | Not queried | 29,214.86 | C |
| 9/19/2008 | 9/19/2008 | 2046028 | NONREF | 2524155000BD | REF P/OF 38,911,828,503.69 ADJUSTE | Not queried | 1,185,455.00 | C |
|  |  |  |  |  |  | Not queried | 15,000.00 | C |
|  |  |  |  |  |  | Not queried | 3,590,930,000.00 | C |
|  |  |  |  |  |  | Not queried | 10,000.00 | C |
|  |  |  |  |  |  | Not queried | 468,061.65 | C |

2

**Lehman Brothers INC**
Outstanding Open Items for Account   10000907/20   (USD)
CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008
23:53.03

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 9/19/2008 | 9/19/2008 | 2046002 | NONREF | 2526744000BD | REF SALE FINAL | Not queried | 12,460,000.00 | C |
| 9/19/2008 | 9/19/2008 | 2046004 | NONREF | 2528282000BD | REF SALE FINAL | Not queried | 318,524.97 | C |
| 9/19/2008 | 9/19/2008 | 2045998 | NONREF | 2542509263VD | FUNDING | Not queried | 7,000,000,000.00 | C |
| 9/19/2008 | 9/19/2008 | 2046006 | NONREF | 3336190002610 | PHH MORTGAGE SERVICES MT. LAUREL N | Not queried | 4,068,948.00 | C |
| 9/19/2008 | 9/19/2008 | 2045996 | NONREF | 4518707283VD | TO EFFECT ENTRY OF 09/19/08 | Not queried | 36,911,828,503.69 | C |
| 9/19/2008 | 9/19/2008 | 2046008 | OBBROWNBROTHE | 6121300263FC | M/F PMCO CAYMAN U.S. BOND FUND | Not queried | 9,600.00 | C |
| 9/19/2008 | 9/19/2008 | 2046090 | OBBROWNBROTHE | 6150300263FC | M/F PMCO CMN GL MULT RL RTN FD | Not queried | 220.00 | C |
| 9/19/2008 | 9/19/2008 | 2046096 | OBBROWNBROTHE | 6161600263FC | M/F PMCO CM GL AGG X JP YH INC | Not queried | 50.00 | C |
| 9/19/2008 | 9/19/2008 | 2046094 | OBBROWNBROTHE | 6162100263FC | M/F PER BD MKT FD MST NEWPORT BEA | Not queried | 1,650.00 | C |
| 9/19/2008 | 9/19/2008 | 2046078 | OBBROWNBROTHE | 6285400263FC | M/F PMCO CM GL AGG XJPN INC FD | Not queried | 5,710.00 | C |
| 9/19/2008 | 9/19/2008 | 2046038 | OBCITIBANKNYC | 0719903263FF | CITIBANK NEW YORK NY 10043-0001 | Not queried | 300,000.00 | C |
| 9/19/2008 | 9/19/2008 | 2046036 | OBMELLONTRUST | 0066620263FF | MELLON TRUST OF NEW ENGLAND BOSTON | Not queried | 130,687.50 | C |
| 9/19/2008 | 9/19/2008 | 2046040 | OBMELLONTRUST | 0362513263FF | MELLON TRUST OF NEW ENGLAND BOSTON | Not queried | 77,336.08 | C |
| 9/19/2008 | 9/19/2008 | 2046046 P | OBMELLONTRUST | 5929700263FC | THE BANK OF NEW YORK MELLON 1-718- | Not queried | 350,000.00 | C |

Item:   81   Total:   53,276,118,956.08 C

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 1/10/2007 | 1/10/2007 | 1843200 | 7533-255EP07 | | WASH ACCOUNT | Not queried | 965.11 | D |
| 1/10/2008 | 1/10/2008 | 1881346 | SDLCHEBSO | R-1268400312II | BK OF CHINA NYC NEW YORK NY 10017- | Not queried | 200.00 | D |
| 4/3/2008 | 4/3/2008 | 1938488 | 900057904R000 | R-1413000010II | LEHMAN BROS INC | Not queried | 4,731.24 | D |
| 7/14/2008 | 7/14/2008 | 2001370 | VDMKE00V0 | 683510019GFQ | MELLON TRUST OF NE BOSTON MA | Not queried | 9,882.03 | D |
| 7/16/2008 | 7/16/2008 | 2006810 | CASE890491 | R-350430019BHH | REF FAIL TRACK 36295NV68 | Not queried | 1,007.81 | D |
| 9/17/2008 | 9/17/2008 | 2045438 | NONREF | 24661160008D | REF A/O 08/26/08 ACCOUNT NOT CHARG | Not queried | 321.83 | D |
| 9/3/2008 | 9/3/2008 | 2037764 | NONREF | 23432325000BD | REF A/O 08/19/08 ACCOUNT NOT CHARG | Not queried | 1,260.96 | D |
| 9/3/2008 | 9/3/2008 | 2037764 | NONREF | 23432325000BD | REF A/O 08/20/08 ACCOUNT NOT CHARG | Not queried | 1,193.82 | D |
| 9/3/2008 | 9/3/2008 | 2037772 | NONREF | 23432341000BD | REF A/O 08/21/08 ACCOUNT NOT CHARGE | Not queried | 1,202.85 | D |
| 9/3/2008 | 9/3/2008 | 2037770 | NONREF | 23432303000BD | REF A/O 08/22/08 ACCOUNT NOT CHARG | Not queried | 1,252.83 | D |
| 9/3/2008 | 9/3/2008 | 2037768 | NONREF | 23432303000BD | REF A/O 08/26/08 ACCOUNT NOT CHARG | Not queried | 1,148.07 | D |
| 9/2/2008 | 9/2/2008 | 2037762 | NONREF | 23432333000BD | REF A/O 08/26/08 ACCOUNT NOT CHARG | Not queried | 1,404.06 | D |
| 8/25/2008 | 9/3/2008 | 2037762 | NONREF | 23432335000BD | REF A/O 08/26/08 ACCT NOR CHARGED | Not queried | 1,152.75 | D |
| 8/26/2008 | 9/3/2008 | 2038694 | NONREF | 23432338000BD | REF A/O 08/26/08 ACCOUNT NOT CHARG | Not queried | 1,046.85 | D |
| 8/27/2008 | 9/3/2008 | 2038282 | NONREF | 23432330000BD | REF A/O 08/27/08 ACCOUNT NOT CHARG | Not queried | 1,473.54 | D |
| 9/4/2008 | 9/4/2008 | 2038276 | NONREF | 23577880008D | REF A/O 08/27/08 ACCOUNT NOT CHARG | Not queried | 11.48 | D |
| 8/27/2008 | 9/4/2008 | 2038284 | NONREF | 23577900008D | REF A/O 08/28/08 ACCOUNT NOT CHARG | Not queried | 456,667.47 | D |
| 8/29/2008 | 9/4/2008 | 2038278 | NONREF | 23577920008D | REF A/O 08/29/08 ACCOUNT NOT CHARG | Not queried | 781,250.00 | D |
| 9/4/2008 | 9/4/2008 | 2039106 | GDM94AEG0 | 000000037ISL | PREMIUM ON GOVT. DEALER LOANS, PER | Not queried | 71,742.19 | D |
| 9/5/2008 | 9/5/2008 | 2039106 | GDM94AEG0 | 1799300248FQ | | Not queried | 1,404.06 | D |
| 9/11/2008 | 9/12/2008 | 2046192 | NONREF | 4289807263VD | TO REVERSE ENTRY OF 09/11/08 TRN 5 | Not queried | 11,450.40 | D |
| 9/19/2008 | 9/19/2008 | 2046192 | NONREF | 4289807263VD | BANK OF N T BUTTERFIELD SON LTD HA | Not queried | 12,107.50 | D |
| 9/12/2008 | 9/12/2008 | 2047708 | CASE024824 | R-1267300256II | D0010962009 LONDON UK UNITED KINGD | Not queried | 296,250.00 | D |
| 9/12/2008 | 9/12/2008 | 2047702 | CASE024828 | R-1268200256II | LEHMAN BROS INC | Not queried | 3,380.77 | D |
| 9/12/2008 | 9/12/2008 | 2044240 | 90026745R000 | 0067710502DR | REF TO SECURE LEHMAN HOLDING CO PL | Not queried | 76,462.19 | D |
| 9/15/2008 | 9/15/2008 | 2044854 | 90026745R000 | 24622440008D | REF FRB INT ON SEC LOANED | Not queried | 60,963.72 | D |
| 9/16/2008 | 9/15/2008 | 2044380 | NONREF | 24962303000BD | REF FRB INT ON SEC LOANED | Not queried | | |
| 9/17/2008 | 9/16/2008 | 2045946 | NONREF | 25101380008D | REF FRB INT ON SEC LOANED | Not queried | | |
| 9/16/2008 | 9/18/2008 | | | | | | | |

FLEMING_DAN_00007999

Report Id: GSOIC003
GSSR Open Item Cash Report

**Lehman Brothers INC**
Outstanding Open Items for Account   10000907/20 (USD)
CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008
23.53.03

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 9/18/2008 | 9/18/2008 | 2045914 | 1DMMJ0010 | 35161002R2FQ | REF DEBIT WAS NOT PUT IN BDA5 ZFIR | Not queried | 99,490,692.92 | D |
| 9/18/2008 | 9/18/2008 | 2045898 | 3DMMH0130 | 35143002R1FQ | REF ZNVR PLEDGE CASH FOR | Not queried | 950,000,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2045912 | 5DMMJ0050 | 35164002R2FQ | REF PLEDGE CASH FOR ZNVR | Not queried | 188,917,827.36 | D |
| 9/18/2008 | 9/18/2008 | 2045908 | 7DMMH0170 | 35145002R61FQ | | Not queried | 400,000,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2045644 | 7DMMJ0170 | 35220002R2FQ | REF FRB INT ON SEC LOANED | Not queried | 1,369.54 | D |
| 9/18/2008 | 9/18/2008 | 2045574 | 9DMMU0190 | 35221002R2FQ | | Not queried | 1,629,242.26 | D |
| 9/18/2008 | 9/18/2008 | 2045916 | 9DMMU0190 | 35163002R2FQ | | Not queried | 82,751,856.17 | D |
| 9/18/2008 | 9/18/2008 | 2045922 | BDMMJ00B0 | 35167002R2FQ | | Not queried | 11,646,954.15 | D |
| 9/18/2008 | 9/18/2008 | 2045962 | FDMMU00F0 | 25109900RM00 | REF A/O 09/18/08 FAIL TRACK ADJUST | Not queried | 14,513.66 | D |
| 9/18/2008 | 9/19/2008 | 2046182 | 0395RAF6 | PURC-T5082R63C8E5 | 500000000.00 ARCHIMEDES FUNDING 111, | Not queried | 1,934,046.85 | D |
| 9/18/2008 | 9/18/2008 | 2046102 | 90027S922R000 | 00680293R98DR | LEHMAN BROS INC | Not queried | 4,633,337,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2046184 | 90027S922R000 | 00680294R15DR | LEHMAN BROS INC | Not queried | 7,000,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2046214 | ZDMMH00Z0 | 25102000R0BD | REF ZNVR PLEDGE CASH FOR | Not queried | 10,000,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2045900 | ZDMMH00Z0 | 25101800R0BD | REF PLEDGE CASH FOR ZNVR | Not queried | 950,000,000.00 | D |
| 9/18/2008 | 9/18/2008 | 2046188 | NONREF | 35144002R61FQ | | Not queried | 180,002.76 | D |
| 9/19/2008 | 9/19/2008 | 2052072 | NONREF | 25240700R1000BD | REF LBI CLEAR FEES 09/18/08 | Not queried | 2,731.74 | D |
| 9/19/2008 | 9/19/2008 | 2524099000BD | NONREF | 25234520R00BD | REF LBN FRB , CLEAR FEES 09/18/08 | Not queried | 434,375.34 | D |
| 9/19/2008 | 9/19/2008 | 2046196 | NONREF | 25234480R00BD | REF LBI CLEAR FEES 09/18/08 | Not queried | 813.20 | D |
| 9/19/2008 | 9/19/2008 | 2046204 | NONREF | 25234520R00BD | REF LBN FRB , CLEAR FEES 09/18/08 | Not queried | 261.39 | D |
| 9/19/2008 | 9/19/2008 | 2046134 | NONREF | 25234550R00BD | REF LBP CLEAR FEES 09/18/08 | Not queried | 116.30 | D |
| 9/19/2008 | 9/19/2008 | 2046144 | NONREF | 25234830R00BD | REF LFA FRB , CLEAR FEES 09/18/08 | Not queried | 5,796.30 | D |
| 9/19/2008 | 9/19/2008 | 2046132 | NONREF | 25234810R00BD | REF LHK CLEAR FEES 09/18/08 | Not queried | 2,598.85 | D |
| 9/19/2008 | 9/19/2008 | 2046208 | NONREF | 25234670R00BD | REF LHM FRB , CLEAR FEES 09/18/08 | Not queried | 57.75 | D |
| 9/19/2008 | 9/19/2008 | 2046164 | NONREF | 25234860R00BD | REF LHT FRB , CLEAR FEES 09/18/08 | Not queried | 787.74 | D |
| 9/19/2008 | 9/19/2008 | 2046130 | NONREF | 25234800R00BD | REF LHV FRB , CLEAR FEES 09/18/08 | Not queried | 1.50 | D |
| 9/19/2008 | 9/19/2008 | 2046138 | NONREF | 25234920R00BD | REF LHZ FRB , CLEAR FEES 09/18/08 | Not queried | 346.21 | D |
| 9/19/2008 | 9/19/2008 | 2046172 | NONREF | 25234700R00BD | REF LFC FRB , CLEAR FEES 09/18/08 | Not queried | 60.00 | D |
| 9/19/2008 | 9/19/2008 | 2046196 | NONREF | 25234670R00BD | REF LFA FRB , CLEAR FEES 09/18/08 | Not queried | 1,561.07 | D |
| 9/19/2008 | 9/19/2008 | 2046122 | NONREF | 25234730R00BD | REF LFC FRB , CLEAR FEES 09/18/08 | Not queried | 1,475.89 | D |
| 9/19/2008 | 9/19/2008 | 2046134 | NONREF | 25234850R00BD | REF LFN FRB , CLEAR FEES 09/18/08 | Not queried | 2.16 | D |
| 9/19/2008 | 9/19/2008 | 2046206 | NONREF | 25234730R00BD | REF LBT FRB , CLEAR FEES 09/18/08 | Not queried | 5,461.79 | D |
| 9/19/2008 | 9/19/2008 | 2046316 | NONREF | 25234570R00BD | REF LBV CLEAR FEES 09/18/08 | Not queried | 17.95 | D |
| 9/19/2008 | 9/19/2008 | 2046770 | NONREF | 25234600R00BD | REF LBF FRB , CLEAR FEES 09/18/08 | Not queried | 1,340.83 | D |
| 9/19/2008 | 9/19/2008 | 2046316 | NONREF | 25234620R00BD | REF LBZ FRB , CLEAR FEES 09/18/08 | Not queried | 2.50 | D |
| 9/19/2008 | 9/19/2008 | 2046462 | NONREF | 25234650R00BD | REF LCT CLEAR FEES 09/18/08 | Not queried | 7.50 | D |
| 9/19/2008 | 9/19/2008 | 2523497000BD | NONREF | 25234870R00BD | REF LIY CLEAR FEES 09/18/08 | Not queried | 1.50 | D |
| 9/19/2008 | 9/19/2008 | 2523489000BD | NONREF | 25234760R00BD | REF LSB CLEAR FEES 09/18/08 | Not queried | 11.25 | D |
| 9/19/2008 | 9/19/2008 | 2523501000BD | NONREF | 25234790R00BD | REF LSJ CLEAR FEES 09/18/08 | Not queried | 5.02 | D |
| 9/19/2008 | 9/19/2008 | 2046174 | NONREF | 25234810R00BD | REF LTA FRB , CLEAR FEES 09/18/08 | Not queried | 11.82 | D |
| 9/19/2008 | 9/19/2008 | 2046120 | NONREF | 25234990R00BD | REF LSJ CLEAR FEES 09/18/08 | Not queried | 1.50 | D |
| 9/19/2008 | 9/19/2008 | 2523504000BD | NONREF | 25235040R00BD | REF LTF FRB , CLEAR FEES 09/18/08 | Not queried | 68.74 | D |
| 9/19/2008 | 9/19/2008 | 2046176 | NONREF | 25235040R00BD | REF LTF FRB , CLEAR FEES 09/18/08 | Not queried | 1.09 | D |

4

FLEMING_DAN_00007999

Report Id: GSOIC003
GSSR Open Item Cash Report

**Lehman Brothers INC**
Outstanding Open Items for Account   100000907/20 (USD)
CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008
23.53.03

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 9/19/2008 | 9/19/2008 | 20461662 | NONREF | 2523307000BD | REF 1TZ CLEAR FEES 09/18/08 | Not queried | 2.50 | D |
| 9/19/2008 | 9/19/2008 | 20461660 | NONREF | 2523309000BD | REF LV1 CLEAR FEES 09/18/08 | Not queried | 3.00 | D |
| 9/19/2008 | 9/19/2008 | 20461646 | NONREF | 2523311000BD | REF LVB CLEAR FEES 09/18/08 | Not queried | 4.50 | D |
| 9/19/2008 | 9/19/2008 | 20461118 | NONREF | 2523313000BD | REF LVI FRB, CLEAR FEES 09/18/08 | Not queried | 90.32 | D |
| 9/19/2008 | 9/19/2008 | 20461666 | NONREF | 2523315000BD | REF LVI FRB, CLEAR FEES 09/18/08 | Not queried | 2.16 | D |
| 9/19/2008 | 9/19/2008 | 20461642 | NONREF | 2523319000BD | REF LVW CLEAR FEES 09/18/08 | Not queried | 6.00 | D |
| 9/19/2008 | 9/19/2008 | 20461628 | NONREF | 2523521000BD | REF LVA CLEAR FEES 09/18/08 | Not queried | 23.50 | D |
| 9/19/2008 | 9/19/2008 | 20461648 | NONREF | 2523523000BD | REF LWH FRB, CLEAR FEES 09/18/08 | Not queried | 4.32 | D |
| 9/19/2008 | 9/19/2008 | 20461654 | NONREF | 2523525000BD | REF LWR FRB, CLEAR FEES 09/18/08 | Not queried | 6.48 | D |
| 9/19/2008 | 9/19/2008 | 20461656 | NONREF | 2523526000BD | REF LX0 CLEAR FEES 09/18/08 | Not queried | 30.00 | D |
| 9/19/2008 | 9/19/2008 | 20461610 | NONREF | 2523532000BD | REF LZZ FRB, CLEAR FEES 09/18/08 | Not queried | 609.75 | D |
| 9/19/2008 | 9/19/2008 | 20461638 | NONREF | 2523534000BD | REF LXH LOAN FEES 09/18/08 | Not queried | 8.16 | D |
| 9/19/2008 | 9/19/2008 | 20461612 | NONREF | 2523541000BD | REF LSE CLEAR FEES 09/18/08 | Not queried | 980.00 | D |
| 9/19/2008 | 9/19/2008 | 20461674 | NONREF | 2523537000BD | REF LYC FRB, CLEAR FEES 09/18/08 | Not queried | 147,052.96 | D |
| 9/19/2008 | 9/19/2008 | 20461690 | NONREF | 2523967000BD | REF LYF CLEAR FEES 09/18/08 | Not queried | 3.00 | D |
| 9/19/2008 | 9/19/2008 | 20461652 | NONREF | 2523539000BD | REF LYG FRB, CLEAR FEES 09/18/08 | Not queried | 2.16 | D |
| 9/19/2008 | 9/19/2008 | 20461668 | NONREF | 2523541000BD | REF LYG FRB, CLEAR FEES 09/18/08 | Not queried | 2.16 | D |
| 9/19/2008 | 9/19/2008 | 20461154 | NONREF | 2523544000BD | REF LYI CLEAR FEES 09/18/08 | Not queried | 3.00 | D |
| 9/19/2008 | 9/19/2008 | 20461156 | NONREF | 2523546000BD | REF LYV FRB, CLEAR FEES 09/18/08 | Not queried | 2.91 | D |
| 9/19/2008 | 9/19/2008 | 20461136 | NONREF | 2523549000BD | REF LZF FRB, CLEAR FEES 09/18/08 | Not queried | 2.16 | D |
| 9/19/2008 | 9/19/2008 | 20461200 | NONREF | 2524002000BD | REF FOR BILLS UNPAID | Not queried | 3,054.03 | D |
| 9/19/2008 | 9/19/2008 | 20461686 | NONREF | 2524081000BD | REF DIV ON VAR CUSIPS | Not queried | 319,064.98 | D |
| 9/19/2008 | 9/19/2008 | 20461894 | NONREF | 2524121000BD | REF DIV ON VAR CUSIPS | Not queried | 66,094.60 | D |
| 9/19/2008 | 9/19/2008 | 20460698 | NONREF | 2523260000BD | REF REPO ADJ ON VAR CUSIPS | Not queried | 14,500,000,000.00 | D |
| 9/19/2008 | 9/19/2008 | 20461178 | NONREF | 2538677000BD | REF PURCHASE FINAL | Not queried | 149,238,192,111.0 | D |
| 9/19/2008 | 9/19/2008 | 20461704 | NONREF | 2535565000BD | REF LBB R 5,344,037,371.53, D 5.19 | Not queried | 3,234,738,744.24 | D |
| 9/19/2008 | 9/19/2008 | 20461180 | NONREF | 2535569000BD | REF LBF R 3,234,738,744.24, D 0.00 | Not queried | 255,909,207.54 | D |
| 9/19/2008 | 9/19/2008 | 20461800 | NONREF | 2535961000BD | REF LFN R 10,062,264.59, D 0.00 | Not queried | 255,909,207.54 | D |
| 9/19/2008 | 9/19/2008 | 20461561 | NONREF | 2535963000BD | REF LBT R 2,373,965,905.16, D 2.11 | Not queried | 11,319,694,748.87 | D |
| 9/19/2008 | 9/19/2008 | 20461563 | NONREF | 2535965000BD | REF LBN R 27,370,179,088.76, D 16. | Not queried | 11,319,694,748.87 | D |
| 9/19/2008 | 9/19/2008 | 20461106 | NONREF | 2535965000BD | REF LBA R 1,223,781,250.00, D 2.65 | Not queried | 1,221,127,553.23 | D |

**Item:   96**                                                 **Total:   45,013,477,602.08 D**

**Ledger Sub Account   100009907/0020**

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 3/17/2008 | 3/17/2008 | 2621971 | 4059010 | Z-00745 | SUMDEBIT: | Not queried | 2,348.07 |  |

5

FLEMING_DAN_00007999

Report Id: GSOIC003
GSSR Open Item Cash Report

9/20/2008
23.53.04

# Lehman Brothers INC
## Outstanding Open Items for Account   100009O7/20   (USD)
### CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 4/22/2008 | 4/22/2008 | 2658901 6947150 | ERIC CRAIG | SUMDEBIT: 4M9LK00 | | Not queried | 250,000.00 | D |
| 5/1/2008 | 5/1/2008 | 2688911 0474290 | ERIC CRAIG | SUMDEBIT: 519LK00 | | Not queried | 100,000.00 | D |
| 5/12/2008 | 5/12/2008 | 2677637 1418170 | R-0B1BC: BCONLON | SUMDEBIT: M685B80 | | Not queried | 5,231.05 | D |
| 8/14/2008 | 8/14/2008 | 2794095 0202320 | R-09B4B | SUMDEBIT: | | Not queried | 3,105.00 | D |
| 8/14/2008 | 8/14/2008 | 2794093 1147890 | R-08B47 | SUMDEBIT: | | Not queried | 18,261.50 | D |
| 8/15/2008 | 8/15/2008 | 2815591 2280400 | Z-05899 | SUMDEBIT: 9CLFR00 | | Not queried | 1,268,165.27 | D |
| 6/16/2008 | 9/16/2008 | 2817481 0718440 | R-0DEFB | SUMDEBIT: | | Not queried | 213.23 | D |
| 6/16/2008 | 9/16/2008 | 2818213 1437770 | R-0E13D | SUMDEBIT: | | Not queried | 17,471.75 | D |
| 6/16/2008 | 9/16/2008 | 2817643 1823860 | R-0DEA | SUMDEBIT: M9G3U60 | | Not queried | 75,923,000.00 | D |
| 6/16/2008 | 9/16/2008 | 2817485 2086380 | R-0DEFD | SUMDEBIT: | | Not queried | 13,462,394 | D |
| 6/16/2008 | 9/16/2008 | 2817483 3427460 | R-0DEFC | SUMDEBIT: | | Not queried | 64,026.83 | D |
| 6/07/2008 | 9/17/2008 | 2818209 0718440 | R-0DE6 | SUMDEBIT: | | Not queried | 181.56 | D |
| 8/07/2008 | 9/17/2008 | 2818215 1437770 | R-0E143 | SUMDEBIT: | | Not queried | 13,923.80 | D |
| 8/17/2008 | 9/17/2008 | 2818221 2086380 | R-0E153 | SUMDEBIT: | | Not queried | 12,282.88 | D |
| 6/17/2008 | 9/17/2008 | 2818219 3427460 | R-0E152 | SUMDEBIT: | | Not queried | 57,229.95 | D |
| 6/07/2008 | 9/17/2008 | 2818385 9108570 | R-0E149 | SUMDEBIT: M9HGZ90 | | Not queried | 102,053,006.25 | D |
| 6/07/2008 | 9/17/2008 | 2818217 9108570 | R-0E151 | SUMDEBIT: | | Not queried | 526,532.77 | D |
| | Item: | 18 | | | | Total: | 180,328,442.86 | D |

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 3/26/2008 | 3/26/2008 | 2633145 7225430 | R-04007 | SUMCREDIT1-4R3VVI0 | | Not queried | 482.78 | C |
| 6/5/2008 | 6/5/2008 | 2733699 0291790 | R-02DD2 | SUMCREDIT1-M33G240 | | Not queried | 646,000.00 | C |
| 9/12/2008 | 9/12/2008 | 2733379 1897130 | R-02E15 | SUMCREDIT: | | Not queried | 1,112.00 | C |
| 6/30/2008 | 6/30/2008 | 2733401 1897130 | R-02F38 | SUMCREDIT: | | Not queried | 1,230.00 | C |
| 7/1/2008 | 7/1/2008 | 2736989 0419860 | R-03459 | SUMCREDIT-M71DN60 | | Not queried | 93,508.64 | C |
| 6/4/2008 | 7/14/2008 | 2750127 6771430 | R-04082 | SUMCREDIT-M7EBRD0 | | Not queried | 12,000.00 | C |
| 7/7/2008 | 7/17/2008 | 2754441 9031860 | R-05503 | SUMCREDIT-LAH6200 | | Not queried | 97,278.03 | C |
| 8/27/2008 | 8/27/2008 | 2799261 0448680 | R-0AEC4 | SUMCREDIT-M7F6VA0 | | Not queried | 1,200.00 | C |
| 9/3/2008 | 9/3/2008 | 2809927 | X-01020 | SUMCREDIT: | | Not queried | 723.69 | C |
| 9/12/2008 | 9/12/2008 | 2814645 4031600 | R-0D0DB | SUMCREDIT-19901U90 | | Not queried | 20,000,000.00 | C |
| 9/15/2008 | 9/15/2008 | 2815731 | Z-05900 | SUMCREDIT-ADP | | Not queried | 312,309,189.65 | C |
| 9/16/2008 | 9/16/2008 | 2818211 6815580 | R-0E1C4 | SUMCREDIT: | | Not queried | 3,472.22 | C |
| 9/16/2008 | 9/16/2008 | 2818383 9073780 | R-0E1CD | SUMCREDIT-M9GASD0 | | Not queried | 5,237,978.00 | C |
| | Item: | 13 | | | | Total: | 338,403,175.01 | C |

Netted Sub Account

6

FLEMING_DAN_00007999

Report Id: GSOIC003
GSSR Open Item Cash Report

**Lehman Brothers INC**
Outstanding Open Items for Account   10000907/20   (USD)
CHASE LGSI
Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008
23:53:04

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 12/12/2007 | 2/12/2008 | 2580659 0218840 | Z-06499 | SUMDEBIT. | | Not queried | 3,750.00 | D |
| 2/12/2008 | 2/13/2008 | 2584185 0238220 | Z-07321 | SUMDEBIT. | | Not queried | 937.50 | D |
| 7/31/2008 | 8/4/2008 | 27769863 LXT 7/31/08 | Z-01672 | SUMCREDIT7W01520 | | Not queried | 6,459.41 | D |
| 8/1/2008 | 8/4/2008 | 27954973 LXT 8/1/08 | R-07F88 | SUMDEBIT. | | Not queried | 6,459.01 | D |
| 8/14/2008 | 8/25/2008 | 27851611 NO ITS CUSIP | NONREF | STOCK LOAN FED NOSTRO 8/14/2008 | | Not queried | 30,000.00 | D |
| 8/15/2008 | 8/15/2008 | 28090985 T/P 9-4-08 | NET 9-4-08 | SUMDEBIT. M94AQC0 | | Not queried | 2,333.34 | D |
| 9/9/2008 | 9/10/2008 | 2807955 FINAL 9/5/08 | Z-09231 | SUMDEBIT. 951DC90 | | Not queried | 55,118.34 | D |
| 9/11/2008 | 9/11/2008 | 2810305 LXT 9/9/08 | NET T/P | LXT 9/9/08 | | Not queried | 75.86 | D |
| 9/12/2008 | 9/13/2008 | 2815265 FINAL 9/12/08 | Z-04788 | SUMCREDIT9C1DF90 | | Not queried | 1,724,490.00 | D |
| 9/17/2008 | 9/18/2008 | 28179681 LBD | Z-04788 | 2029050 | | Not queried | 67.58 | D |
| 9/18/2008 | 9/18/2008 | 28187151 LBT | Z-09238 | 6213740 | | Not queried | 16.17 | D |
| 8/25/2008 | 9/19/2008 | 28187717 LFR 9/18/08 | Z-09238 | 6213740 | | Not queried | 534,233.31 | D |
| 8/20/2008 | 9/19/2008 | 28187719 LBA 9/18/08 | E-05241 | CHASE TUBE | | Not queried | 398,639.83 | D |
| **Item:** | | **13** | | | | | **Total:** | **2,762,691.26 D** |
| 9/10/2008 | 9/10/2008 | 2040268 LXT 9/5/08 | NET T/P | LXT 9/5/08 | | Not queried | 83,919.79 | D |
| 7/25/2008 | 7/28/2008 | 2045162 LBA 9/16/08 | 248116000BD | DTC 2077 LBA R.5,334,024,534.68, D 12.5 | | Not queried | 3,604,938.77 | D |
| 9/12/2008 | 9/12/2008 | 2045164 LBP 9/16/08 | 2467480000BD | REF SALE FINAL | | Not queried | 165,060.09 | D |
| 9/17/2008 | 9/17/2008 | 2045990 LXT 9/17/08 | NET T/P | LXT 9/17/08 | | Not queried | 1,123,468,871.17 | D |
| 9/17/2008 | 9/19/2008 | 2045976 NONREF | 252309100BD | REF LBB R.5,297,225,792.20, D 6.41 | | Not queried | 0.02 | C |
| 9/19/2008 | 9/19/2008 | 2045978 NONREF | 252311000BD | REF LBZ R 191,204,872.78, D 199.92 | | Not queried | 0.01 | C |
| 9/19/2008 | 9/19/2008 | 2045988 LFC+LFN 9/18/08 | 252312000BD | REF LFC R 11,217,684.53, D 146.961 | | Not queried | 330,665.10 | C |
| **Item:** | | **7** | | | | | **Total:** | **1,127,663,454.95 C** |
| 3/17/2008 | 3/19/2008 | 2625241 D TUNG | Z-00746 | SUMCREDIT3EMRTL0 | | Not queried | 3,091.67 | C |
| 7/25/2008 | 7/28/2008 | 2763297 NO ITS CUSIP | NONREF | STOCK LOAN FED NOSTRO 7/25/2008 | | Not queried | 100.00 | C |
| 9/11/2008 | 9/12/2008 | 2813777 LFC+LFN 9/11/08 | 2-03676 | 4206110 | | Not queried | 171.80 | C |
| 9/17/2008 | 9/17/2008 | 2813719 2280400 | 27X | SUMDEBIT. 9CMJFM0 | | Not queried | 376,265.75 | C |
| 9/16/2008 | 9/16/2008 | 28172951 LXT 9/16/08 | NET T/P | LXT 9/16/08 | | Not queried | 438,721,181.51 | C |
| 9/17/2008 | 9/17/2008 | 2817305 | Q-03116 | 912795H20 340M BARCL | | Not queried | 199.26 | C |
| 9/17/2008 | 9/17/2008 | 28173211 2032380 | TSLF | SUMCREDIT9G01T80 | | Not queried | 117,799,401.83 | C |
| 9/17/2008 | 9/17/2008 | 28187211 5806400 | 24100100 | SUMCREDIT19GLK0R0 | | Not queried | 19,404,513,908.58 | C |
| 9/18/2008 | 9/18/2008 | 28187091 LXT 9/18/08 | NET T/P | LXT 9/18/08 | | Not queried | 368.91 | C |
| 9/18/2008 | 9/18/2008 | 28187111 CLEAR FEES 9/17/ | NET | CLEAR FEES 9/17/08 | | Not queried | 0.01 | C |
| 9/18/2008 | 9/18/2008 | 2818713 LBD | Z-09238 | 6213740 | | Not queried | 0.01 | C |
| **Item:** | | **11** | | | | | **Total:** | **19,961,414,689.33 C** |

7

FLEMING_DAN_00007999

# Lehman Brothers INC

## Outstanding Open Items for Account 10000907/20 (USD)
### CHASE LGSI
### Since Last Proposal on 9/19/2008 at 13:46:29

9/20/2008

23.53.04

| Value Date | Entry Date | gin_dim | Reference 1 | Reference 2 | Reference 3 | Status | Amount | D/C |
|---|---|---|---|---|---|---|---|---|
| 5/8/2008 | 8/1/2008 | 20158872 | ZSLD | NET | ZSLD | Not queried | 107,259.24 | D |
| 9/15/2008 | 8/4/2008 | 20167766 | FINAL 8/1/08 | 50309800000BD | REF PURCHASE FINAL | Not queried | 382,060.89 | D |
| 9/15/2008 | 8/15/2008 | 20455994 | NONREF | 24821340000BD | REF REV CR OF 9/15/08 A/C CR IN ER | Not queried | 0.30 | D |
| 9/16/2008 | 9/17/2008 | 20451158 | 1DMMiG0210 | 3299800026DFQ | | Not queried | 124.89 | D |
| 9/16/2008 | 9/16/2008 | 20455992 | LXT 9/15/08 | NET | LXT 9/15/08 | Not queried | 395,375.566.69 | D |
| 9/16/2008 | 9/16/2008 | 20455984 | LBD 9/17/08 | V/S 11000108 | REF LBD R 1,598,259,487.52, D 104 | Not queried | 0.09 | D |
| 9/17/2008 | 9/18/2008 | 20455974 | NONREF | 25231270000BD | REF LBN R 40,930,206,204.91, D 37 | Not queried | 0.09 | D |
| 8/2008 | 9/19/2008 | 20455986 | FINAL 9/18/08 | 25134480000BD | REF PURCHASE FINAL | Not queried | 504,230,380.36 | D |
| | | | | | | | | |

**Item:** 8

**Total Items: 246**

**Total:** 286069263,46.04 | C

**Total:** 900,095,193.15 | D

**Net Item Amount:** 28,606,926,346.04

**Net Missing Balance:** 0.00

**Amount Differences:** 0.00 C

**Total:** 28,606,926,346. C

**Net Closing Balance:** 28,606,926,346.04

**Trial Differs by:** 0.00

FLEMING_DAN_00007999

EXHIBIT 39

**To:**    Tonucci, Paolo [paolo.tonucci@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com]; Azerad, Robert [RAzerad@lehman.com]
**Subject:**    Re: Confirming our unencumbered box is now the top priority
**Sent:**    Sat 9/20/2008 6:21:27 PM
**From:**    Lowitt, Ian T [ilowitt@lehman.com]


To what extent are these separate and to what extent are they mingled with the rest of the chase collateral. Ian
------Original Message------
From: Tonucci, Paolo
To: Alastair Blackwell
To: Robert Azerad
Cc: Ian Lowitt
Sent: Sep 20, 2008 1:59 PM
Subject: RE: Confirming our unencumbered box is now the top priority

Alastair,

This is the non-actionable box that we had shown to them.  Some of these are physicals, and some are going to be in depots.

We need to first find out what is unencumbered per Thursday, which will need us to know what JPM took. They will have a claim on that.  Not sure what happened with the release of the DTCC collateral yesterday by JPM - I assume that they lose that lien.

Also not sure what they had last night against the overdraft that they would have had when we filed.

These will be questions for the lawyers.  The bottom line is that we will need to start with the Thursday box, and understand where all that resided.


-----Original Message-----
From: Lowitt, Ian T
Sent: 20 September 2008 13:04
To: Blackwell, Alastair
Cc: Tonucci, Paolo
Subject: Confirming our unencumbered box is now the top priority

Please coordinate with paolo to do everything possible to ensure we have the 1.95 bn of collateral identified and ready to move - and address claims from chase that they have claim. Ian

TONUCCI_PAOLO_00014609

# EXHIBIT 40

## TO BE FILED UNDER SEAL

EXHIBIT 41

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES

/01    Customer Credit Balances

Report free credit balances and other credit balances contained in customers' security accounts.  Also include:

- Outstanding drafts payable to customers (SEA Rule 15c3-3(Exhibit A - Note A)).

- Checks drawn in excess of bank balances (interpretation 15c3-3(Exhibit A - Item 1)/20).

- Checks drawn on a credit line account (interpretation 15c3-3(Exhibit A - Item 1)/22).

- Overdrafts in bank account not otherwise excluded by interpretation.

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation (other than at month-end, see interpretation 15c3-3(Exhibit A - General)/01) and that netting results in a credit, see interpretation 15c3-3(Exhibit A - Item 10)/06.

/02    Non-Regulated Commodity Accounts

Include the net balance due to customers in non-regulated commodity accounts, reduced by any deposits of cash or securities with any clearing organization or clearing broker in connection with the open contracts in such accounts.

(SEC Release 34-9922, January 2, 1973)

/021    Netting Customers' Non-Regulated and Regulated Commodity Accounts

The net balances determined in accordance with interpretation 15c3-3(Exhibit A - Item1)/02 may be further reduced by the deficit contained in a customer's regulated commodity account to the extent of the equity contained in the same customer's non-regulated commodity account.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/022    Customer Balances Related to Foreign Futures and Options Transactions

Any customer balances comprehended in the computation required by CFTC Regulation 30.7 need not be included in the formula.

(NYSE Information Memo No. 88-10, April 20, 1988)

SEA Rule 15c3-3(Exhibit A - Item 1)/022

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/03   Partly Secured Accounts

See Item 10 /012 when a partly secured account has a credit balance.

When net capital is computed under the basic method and <u>all</u> customer balances are netted for the weekly formula computation, see Item 10 /06.

<div align="center">(SEC Letter to NYSE, December 9, 1975)</div>

/04   Special Omnibus or Similar Accounts

When a special omnibus account maintained in compliance with the requirements of Section 10 of Regulation T or similar accounts carried on behalf of another broker-dealer is partly secured after applying current calls, i.e., outstanding not more than 5 business days, for margin, marks to the market or other required deposits, include the credit balance contained in such account, increased by the deficit after applying current calls.  (See Note E(2).)

<div align="center">(SEC Release 34-13565, May 18, 1977) (No. 78-1, May 1978)</div>

When net capital is computed under the basic method and all customers' balances are netted for the weekly formula computation, see Item 10 /06.

/05   TEFRA Accounts Payable

Taxes and interest withheld from customers' accounts which are payable to the government under the Tax Equity and Financial Responsibility Act are to be included in the formula until paid over to the Internal Revenue Service.

<div align="center">(SEC Staff to NYSE) (No. 86-8, August 1986)</div>

/06   Customer Payments Prior to Settlement Date

Credit balances received from customers prior to settlement date of purchase must be included as a credit in the formula and this treatment is not negated by segregation of the securities.

<div align="center">(SEC Letter to Gibraltar Securities, Inc., March 5, 1986) (No. 92-10, July 1992)</div>

SEA Rule 15c3-3(Exhibit A - Item 1)/06

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/07    Accrued Interest Payable on Customers' Credit Balance

Interest payable to customers is accrued on a daily basis and periodically credited to each customer's account.  The total of such amounts, if not already credited to the customers' accounts, should be included in Item 1 of the reserve computation.

(SEC Staff to NYSE) (No. 91-5, June 1991)

/08    (Reserved)

/09    Retail Customer's Purchasing Reverse Repurchase Agreements

If a broker-dealer enters into a hold in custody (HIC) repurchase agreement with a "retail" customer who had a pre-existing free credit balance with the broker-dealer, the liability of the broker-dealer will ordinarily be considered to be a free credit balance for purposes of SEA Rule 15c3-3.  Customers that conduct their business with the broker-dealer on a delivery versus payment basis or customers with transactions that exceed $1 million contract value would not be considered "retail" customers for purposes of this interpretation.  Include as a credit the contract value of hold in custody repurchase agreement(s) with "retail" customers who had pre-existing credit balances of less than $1 million prior to purchase.  Open repurchase transactions with same customer, may be aggregated in determining the $1 million limit.

(SEC Staff to NYSE) (NYSE Information Memo 87-38, October 28, 1987)

/10    Hold-In Custody Reverse Repos Purchased By Customers Lacking Proper Documentation

The original contract value plus any marks to market is to be included in customer credit balances when there is no written agreement between the parties or when a written agreement exists but lacks notice to the customer that the provisions of The Securities Investor Protection Act of 1970 do not protect the counterparty to the repurchase agreement.

(SEC Release No. 34-24778) (No. 92-1, January 1992)

SEA Rule 15c3-3(Exhibit A - Item 1)/10

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/11    Customers Purchasing Commercial Paper

Notes payable to customers in connection with the issuance of the broker-dealer's own commercial paper may be excluded as credits in the reserve formula provided that adequate written disclosure is stated in the offering circular and on the confirmation as to the identity of the issuer and that these transactions are not covered by SIPC.

(SEC Staff to NYSE) (No. 92-1, January 1992)

/12    Principal Transactions with Customers

When a broker-dealer purchases securities as principal from its customer and the securities have not been resold, the credit balance due to the customer arising from his sale of securities to the broker-dealer may be excluded from the formula until the securities sold have been delivered by the customer.

(SEC Release 34-11497, June 26, 1975) (No. 92-10, July 1992)

When a broker-dealer receives non-negotiable securities purchased on a principal basis from its customer and the securities have not been resold, the credit balance in the customer account shall be excluded from the formula until the earlier of 30 calendar days after settlement date or the date appropriate papers are received that makes the securities negotiable.

(SEC Letter to Emanuel & Company, February 28, 1986) (No. 92-10, July 1992)

/13    Short Credits in Customers' Accounts

Credit balances due to customers' arising from sales of securities which are offset by debit balances arising from purchases in non-customers' accounts can be excluded from the formula.

(SEC Staff to NYSE)

SEA Rule 15c3-3(Exhibit A - Item 1)/13

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/14    Loans Payable

Amounts representing unsecured or secured loans payable, which are not related to securities transactions of the lender and which are evidenced by written agreements are excluded from the formula.

(SEC Letter to Midwest Stock Exchange, Inc., July 28, 1976) (No. 78-1, May 1978)

/15    Unsecured Payables to Subsidiaries

Unsecured payables to subsidiaries representing loans to the broker-dealer are excluded from the formula when they are not related to securities transactions.

(SEC Staff to NYSE) (No. 78-1, May, 1978)

/16    Unearned Prepaid Investment Advisory Fees

Unearned prepaid investment advisory fees that are taken into income when earned, with the unearned balance being deferred and subject to refund, are excluded from the formula.

(SEC Letter to A. R. Schmeidler & Co. Inc., Dec. 4, 1976) (No. 78-1, May 1978)

/17    Unearned Prepaid Customers' Commissions

Unearned prepaid customers' commissions that are refundable are excluded from the formula.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/18    Requirements for Including the Receipt of Customer Checks

Customer checks received by a broker-dealer for the account of the customer must be included in the firm's computation of reserve requirements on the day that they are received by the broker-dealer, its branch office or its agent (e.g. registered representative). Customer checks, though not yet deposited, are customer funds.

(SEC Letter to Marketing One Securities, Inc., December 9, 1992)
(No. 94-5, May 1994)

SEA Rule 15c3-3(Exhibit A - Item 1)/18

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/20    Checks Drawn In Excess of Bank Balances

Checks drawn in excess of a bank balance per the records of the broker/dealer must be included in the formula; whether or not the amount is used for customer payments. However, certain exceptions, described herein may apply.

/21    Two Or More Accounts Carried By The Same Bank-(Rescinded, No.02-7,  August 2002)

/211    Two Or More Accounts Carried By The Same Bank

Where two or more accounts, carried by a bank, are in reality one account which are separated for purposes that are immaterial to SEA Rule 15c3-3 under the Act, the amount of checks drawn in one account to the extent offset by positive balances in the other accounts need not be taken as a credit to the reserve formula provided the broker-dealer has an agreement with the bank acknowledging that:

1.    except for bookkeeping and statement purposes, all such accounts are considered as one; and

2.    the bank is authorized and agrees to treat all such accounts as a single account and apply the balances in one or more such account to any other debits in any other such account without further advice or instruction.

In addition, an opinion needs to be rendered by outside counsel that the bank agreement is legally binding under banking and other relevant federal and state laws and the opinion should include the effect of bankruptcy law or other equitable distribution principles on the agreement.

(SEC Staff to NYSE) (No. 02-7, August 2002)

/22    Checks Drawn On A Credit Line Account

The proceeds derived from writing checks to customers on credit line accounts (zero balance accounts) are included as a credit in the formula.  However, unsecured firm borrowings from banks are not included in the formula provided they actually represent and are recognized by the banks as unsecured borrowings.

(SEC Letter to Shearson H.S. Inc., June 13, 1977) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - Item 1)/22

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/23    Zero Balance or Overdraft Bank Accounts For Checks Issued to Vendors

Where a separate zero balance or overdraft checking account is maintained for payment of vendors' invoices for proprietary purchases, employee payroll checks and checks paid to suppliers, the overdraft may be excluded from the formula provided:

1.    The checks are drawn on a separate and distinct bank account which is clearly unrelated to any account from which customers' checks are drawn;

2.    Issuance of checks drawn on the account do not act to reduce a credit balance which would otherwise be included in the formula;

3.    It is clearly demonstrated and the bank acknowledges in writing that the bank does not have the right to offset with any other account or customers' assets or collateral it may be holding for the broker-dealer; and

4.    The overdraft is included as Aggregate Indebtedness if the broker-dealer is computing net capital requirements under the AI method.

These accounts are not to be netted with other bank accounts and credit balances must be included in the Reserve Formula if any of the checks or drafts drawn on the account could be:

1.    Payable to customers or broker-dealers;

2.    Paid in connection with a securities transaction; or

3.    Deposited in another account unless only certified checks or wired funds are paid out of the receiving account.

(SEC Staff to NYSE) (No. 91-7, July 1991)

SEA Rule 15c3-3(Exhibit A - Item 1)/23

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/24    Zero Balance or Overdraft Accounts Used in Connection With "Seg-Offset" Accounts

Overdrafts incurred in connection with "Seg-Offset" activities need not be included as credit items in the reserve formula computation under SEA Rule 15c3-3a provided:

1.    No checks or drafts drawn on these accounts are payable to customers or broker-dealers;

2.    No checks or drafts drawn on these accounts are paid in connection with securities transactions;

3.    No checks or drafts drawn on these accounts could be deposited in another bank account (the receiving account) unless only wired funds are paid out of such receiving account;

4.    Written assurance has been obtained from the bank, by the broker-dealer, that there are no cross liens to customer-related assets or collateral or any other accounts with the bank; and

5.    The overdrafts are carried on the books of the broker-dealer and otherwise treated as ordinary liabilities.

(NYSE Letter to SEC Staff, March 29, 1990) (No. 91-7, July 1991)

SEA Rule 15c3-3(Exhibit A - Item 1)/24

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/25   Funds Wired From "Seg-Offset" Accounts

A "Seg-Offset" account is understood to be an account which is used as a cash management technique to obtain federal funds for a fee which is lower than prevailing interest rates, in amounts equivalent to amounts in customers' segregated funds accounts with a bank. For example, through this technique, a broker-dealer leaves funds on deposit in a segregated account or Special Reserve Account with a bank that permits the broker-dealer to withdraw federal funds from another account at the bank (the "Seg-Offset" account) in an amount equal to the segregated account or the Special Reserve Account deposits.

Further, the bank has no cross lien against the segregated account or the Special Reserve account for any overdraft in the "Seg-Offset" account. The broker-dealer covers the federal funds withdrawal with a clearing house check drawn on a zero-balance account at another bank.

Federal funds paid out of a "Seg-Offset" account by federal wire need not be included in the reserve formula computation under SEA Rule 15c3-3a as credit items provided:

1.   It is clearly demonstrated and the bank acknowledges in writing that the bank does not have the right to offset with any other account or customers' assets or collateral it may be holding for the broker-dealer; and

2.   The Special Reserve Bank Account must be free of lien and subject to all the requirements of SEA Rules 15c3-3 (e) and (g). No withdrawal entry may appear on the bank statement unless supported by a reserve computation.

(NYSE Letter to SEC Staff, March 29, 1990) (No. 91-7, July 1991)

/26   The Term "Any Other Accounts" Defined

Where it is required that broker-dealers obtain written assurances from the bank that there are no cross liens to customer-related assets or collateral or any other accounts with the bank, the term "any other accounts" refers to accounts that are used to pay down credits which would normally be included in the reserve computation, such as customer credits, customer-related fails etc. Under these circumstances "any other accounts" would include operating bank accounts and require appropriate "cross lien" documentation. Accounts used to write checks to customers that reduce customer credits are included in "any other accounts." Firm bank loan collateral at the same bank is not considered a customer-related asset.

(SEC Staff to NYSE) (No. 92-1, January 1992)

SEA Rule 15c3-3(Exhibit A - Item 1)/26

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/27   Customer Credit Balances Related to Deposits in a Special Trust or Agency Account

Customer credit balances related to deposits in a special trust or agency account utilized pursuant to SEA Rule 15c2-4(b)(1) are excluded from the Reserve Formula.

(SEC Staff of DMR to NASD, September 1983)

/28   Postdated Customer Checks

A broker-dealer that receives postdated checks from customers for trades that have not settled must book said payments to the customer accounts, and, if a credit balance results, include said credits in Item 1 of the Reserve Formula.

(SEC Staff of DMR to NASD, September 1983)

/29   Credit Balances Arising from Limited Partnership Unit Sale

A broker-dealer selling secondary limited partnership units where the transactions create customer credit balances is not required to include such credits in the Reserve Formula, provided:

1.     The broker-dealer, acting as agent or trustee for the persons who have the beneficial interest in the partnership unit, promptly deposits upon receipt the total purchase price of the transaction and the appropriate instruments of assignment in escrow, without interest, with a qualified bank escrow agent pending receipt of the comment of the general partner to the assignment.

2.     Should consent not be forthcoming within 45 days after confirmation of the transaction, promptly return the escrow deposits to the depositor.

3.     The qualified bank escrow agent holding the deposit must agree in writing to hold the escrow deposits for the persons having beneficial interest therein, and to transmit or return the deposits directly to persons entitled thereto when the appropriate event or contingency has occurred.

(SEC Staff of DMR to NASD, July 1986)

**(NEXT PAGE IS 2671)**

SEA Rule 15c3-3(Exhibit A - Item 1)/29

© 2008 Financial Industry Regulatory Authority, Inc.

EXHIBIT 42

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES

/01   Customer Debit Balances

Determine the total of the net debit balances contained in customer's cash accounts and margin accounts which are fully secured by salable securities, i.e., a ready market exists as stipulated by SEA Rule 15c3-1(c)(11) and there are no statutory, regulatory or contractual arrangements or other restrictions inhibiting the public offer or sale of the securities.

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

/011   Drafts Receivable on Customer Debits

Include the debit in a related draft receivable account when immediate credit has not been received on draft shipments of securities purchased by customers when the debit in the customer's account for the purchase of the securities so drafted has been eliminated.

(SEC Release 34-9922, January 2, 1973)

/012   Partly Secured Accounts

For a margin account which is partly secured after applying current margin calls outstanding and in the case of a margin account where a margin call is outstanding more than 5 business days, the amount which should be included in the Reserve Formula should be the debit balance in such account reduced (or if a credit balance, increased) by:

1.   The deficit in such account after the application of current margin calls outstanding; and

2.   The amount which results from applying the appropriate haircut, set forth in SEA Rule 15c3-1(c)(2)(vi) or (f), to the market value of the securities in the account.

With respect to a partly secured cash account, which has a transaction liquidating to a deficit and which is not current within the meaning of Regulation T of the Board of Governors of the Federal Reserve System or which has more than one extension thereunder, the amount included in the Reserve Formula should be the debit balance in the partly secured cash account reduced (or if a credit balance, increased) by:

SEA Rule 15c3-3(Exhibit A - Item 10)/012

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/012    Partly Secured Accounts (continued)

   1.    The deficit related to the transactions which are causing such deficit; and

   2.    The amount which results from applying the appropriate haircut, set forth in SEA Rule 15c3-1(c)(2)(vi) or (f), to the market value of the securities transactions which are causing the deficit.

When net capital is computed under the basic method and all customers' balances are netted for the weekly formula computation, see Item 10 /06.

(SEC Letter to NYSE, December 9, 1975) (SEC Staff to NYSE)

/0120    Customers' Unsecured/Partly Secured Deficit Offset by Correspondents Deposits

A carrying broker-dealer does not have to reduce customers' debits from the reserve formula arising from an introducing broker-dealer's customers' unsecured or partly secured deficits provided sufficient deposits were received from the introducing broker-dealer which can legally be applied to cover (fully secure) the applicable deficits. However, the amount of the introducing broker-dealer's deposits maintained at the carrying broker-dealer must be included in the PAIB computation of the carrying broker-dealer.

(SEC Staff to NYSE) (No. 02-3, February 2002)

/013    Special Omnibus or Similar Accounts

When a special omnibus account maintained in compliance with the requirements of Section 10 of Regulation T or similar accounts carried on behalf of another broker-dealer is partly secured after applying current calls, i.e., outstanding not more than 5 business days, for margin, marks to the market or other required deposits, include the debit balance contained in such account, reduced by the deficit after applying current calls. (See Note E(2).)

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

(SEC Release 34-13565, May 18, 1977) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - Item 10)/013

© 2008 Financial Industry Regulatory Authority, Inc.

# <u>PD 5</u>

## December 1, 2011 McIsaac Affidavit

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

　　　　　LEHMAN BROTHERS INC.,

　　　　　　　　　　　　　　Debtor.

Case No. 08-01420 (JMP) SIPA

**AFFIDAVIT OF DANIEL T. MCISAAC**
**IN SUPPORT OF SECOND MOTION FOR ORDER APPROVING**
**THE TRUSTEE'S ALLOCATION OF PROPERTY OF THE ESTATE**

STATE OF NEW YORK　　　)
　　　　　　　　　　　　　:　　ss:
COUNTY OF NEW YORK　)

　　　　　Daniel T. McIsaac, being duly sworn, deposes and says:

　　　　1.　　　　I currently serve as a Director in the Financial Services Regulatory Practice of

KPMG LLP ("KPMG").  I submit this Affidavit in support of the Second Motion for Order

Approving Allocation of Property of the Estate, submitted by James W. Giddens (the "Trustee")

as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI").  My background and

experience are set forth in my October 5, 2009 Affidavit in support of the Motion for Order

Approving Trustee's Allocation of Property of the Estate (the "October 5 Affidavit" and the

"First Allocation Motion," respectively).[1]  I also submitted a Supplemental Affidavit on February

18, 2010 in connection with the First Allocation Motion (the "February 18 Affidavit").[2]

---

1.　Docket Nos. 1867 & 1866, respectively.

2.　Docket No. 2677.

Subsequent to these filings, I accepted my current position with KPMG.[3]  My updated curriculum vitae is attached hereto as Exhibit 1.

2.	In my prior affidavits, which are incorporated by reference herein, I described certain provisions of the regulatory framework applicable to LBI as a broker-dealer regulated by the Securities and Exchange Commission ("SEC"), as well as industry practices relating thereto. These provisions include the Customer Protection Rule, 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"), which requires secure custody of customer securities as well as the maintenance of a "Reserve Account for the Exclusive Benefit of Customers" (the "Reserve Account"), to cover cash obligations to customers.

3.	My prior affidavits also describe certain compliance failures, including instances where LBI did not follow securities industry compliance practices and LBI customer property was not protected in the way required by the Customer Protection Rule.[4]  The value of compliance failures and resulting Reserve Account deficiencies identified in my prior affidavits and incorporated in the Court's Order dated March 2, 2010 was $2,144,512,674.

4.	In the period since the filing of the Trustee's First Allocation Motion, the Trustee's professionals, in consultation with me, have continued to analyze LBI's reserve calculation.  As explained below, significant additional compliance failures have been identified, leading to further deficiencies in LBI's Reserve Account.

---

3.	Previous to my employment with KPMG and KPMG's retention, I provided expert services to the Trustee at the request of Hughes Hubbard & Reed LLP in my individual capacity beginning in July 2009.

4.	Oct. 5 Aff. ¶¶ 32-49; Feb. 18 Aff. ¶¶ 2-3.

## I.      REGULATORY FRAMEWORK

5.      As explained in paragraphs 14-22 of my October 5 Affidavit, the Customer

Protection Rule was established to safeguard and restrict the use of customer assets, whether in

the form of securities or cash.  The first part of Rule 15c3-3 requires a broker-dealer to have

physical possession or control of all fully-paid[5] and excess margin[6] securities carried for the

accounts of customers.  If the broker-dealer does not have possession or control, it must take

action to obtain those or similar securities, and may be required to use its own funds to purchase

securities or make deposits in its Reserve Account in order to cover the deficit.[7]

6.      The second part of Rule 15c3-3 requires the broker-dealer to maintain the Reserve

Account, one or more bank accounts designated "for the Exclusive Benefit of Customers," in an

amount equal to the net amount that the broker-dealer owes to customers, after taking account of

allowable deductions or "debits."[8]  A computation is made each week, typically as of the close of

business on Friday (or as required by the SEC), using a "Reserve Formula" to determine the

---

5.   "Fully paid securities" are securities purchased through a cash account – requiring full payment on settlement date – or securities held in other accounts not subject to loans.  (See FINRA, Interpretations of Financial and Operational Rules, Customer Protection – Reserves and Custody of Securities, SEA Rule 15c3-3 ("FINRA Interpretations"), Definitions (3), at 2021 (2008).)  Relevant sections of the FINRA Interpretations are attached hereto as Exhibit 2.

6.   "Excess margin securities" are securities bought by customers on margin that are in excess of that amount the broker-dealer may hypothecate (or pledge) to finance the customers' margin purchases.  (See FINRA Interpretations, Definitions (5), at 2022.)

7.   FINRA Interpretations, Requirement to Reduce Securities to Possession or Control, at 2301-2341; id., Reserve Formula (Ex. A – General)/08, at 2625-28.

8.   FINRA Interpretations, Formula for Determination of Reserve Requirement for Brokers and Dealers under Rule 15c3-3, at 2602.

amount required to be kept on deposit.[9]  Pursuant to the Reserve Formula, the broker-dealer

calculates the total amount of credit items, which are essentially funds owed by the broker-dealer

to customers and those used to effectuate customer transactions.  Subtracted from the total of

credit items are debit items, essentially funds owed to the broker-dealer by customers and/or to

satisfy customer transactions, consisting of secured receivables from customers or others to

effectuate customer transactions.[10]  Such debit items are reduced by 3%.[11]  If the credits exceed

the debits, the broker-dealer must deposit the excess in the Reserve Account.[12]  If the debits

exceed the credits, no deposit is required.[13]

   7.  The value of compliance failures may be quantified and expressed as deficiencies

in the broker-dealer's Reserve Account deposit, whether resulting from failure to include a

Reserve Formula credit for a customer cash obligation or failure to hold customer securities in

secure custody.  If fully paid or excess margin securities are not held in secure custody by the

broker itself or at a good control location, the broker dealer may be required to obtain the

---

9. See id., Special Reserve Account for the Exclusive Benefit of Customers (3), at 2431; id., Formula for
  Determination of Reserve Requirement for Brokers and Dealers under Rule 15c3-3, at 2601 et seq.

10. See FINRA Interpretations, Determination of Reserve Requirement for Brokers and Dealers under Rule 15c3-3,
  at 2601 et seq.

11. See 17 C.F.R. § 240.15c3-1(a)(1)(ii)(A) (attached hereto as Ex. 3).  The purpose of this rule is to account for
  "unanticipated collection problems."  Michael P. Jamroz, The Customer Protection Rule, 57 Bus. Law 1069,
  1105 (2002).  In other words, it provides further protection for customers in the event that a broker-dealer
  cannot fully collect on the debit items.

12. See FINRA Interpretations, Special Reserve Account for the Exclusive Benefit of Customers, at 2401.  The
  broker-dealer may not withdraw these funds unless another Reserve Formula computation is made before the
  withdrawal which shows that no deposit or a lesser deposit is required.  (FINRA Interpretations, Withdrawals
  from Reserve Account, at 2461.)

13. This, in effect, would represent a case where customers of the broker-dealer owe the broker-dealer more than
  the broker-dealer owes the customers.

security and generally must include a credit in the Reserve Formula corresponding to its market

value, thus increasing the Reserve Account deposit.[14]

## II.   LBI'S SYSTEMS, BOOKS AND RECORDS, AND METHODS RELATED TO RULE 15C3-3 COMPLIANCE

### A.   The Rule 17a-3 "Securities Record"

8.      Rules promulgated by the SEC require regulated broker-dealers to keep certain

books and records relating to their securities business.  Among the records required to be kept is

a "securities record" reflecting all securities positions held by the broker-dealer for customers or

for its own account and the locations at which the securities are held.[15]  This record is commonly

referred to in the securities industry as the broker-dealer's "stock record."  The stock record is

updated each day and functions as a comprehensive and authoritative record of all of the broker-

dealer's positions, whether for the benefit of the firm or customers.  This record provides the

foundation for Reserve Formula calculations as well as other compliance-related activities.

9.      The information required to be recorded includes the identity of each security, the

firm or counterparty account in which it is held, and the quantity owned – termed the "long"

position – for each firm or counterparty account.  For every long position, a corresponding

"short" position must be entered to record the quantity in each location account, so that the long

positions reflect ownership and short positions reflect location of each security.  Like a double

entry ledger, the total of long positions must equal the total of short positions by security.

10.      LBI maintained Rule 17a-3 securities records generated by three information

systems:  (1) Automatic Data Processing ("ADP"), used primarily to record trading and positions

---

14.  See Oct. 5 Aff. ¶ 18.

15.  17 C.F.R. 240.17a-3(a)(5) (attached hereto as Ex. 4).

in U.S. equities and bonds; (2) Mainframe Trading System ("MTS"), used primarily for government fixed income securities and asset-backed securities; and (3) International Trading System ("ITS") for non-US securities. Each of these systems produced a securities record having the characteristics described above.

11. Each account referenced on LBI's securities record is coded to identify basic characteristics of the account holder and types of transactions that may be recorded. These codes identify, for example, (i) the classification of the account holder, such as whether the account holder is a customer, non-customer, or the firm; (ii) the payment or financing terms of the account, such as cash account,[16] margin account,[17] short credit account,[18] or receipt-versus-payment/delivery-versus-payment (RVP/DVP) account;[19] and (iii) the type of activity recorded in the account, such as failed transactions or stock lending transactions. In addition, LBI designated certain accounts as "safekeeping," which instructed LBI to hold in "good control" the securities in the account.[20]

12. Information recorded in a broker-dealer's securities record regarding ownership of securities and their location, whether a "good control" or other location, feeds into the information systems that calculate credits and debits in the Reserve Formula. For a large and sophisticated broker-dealer such as LBI, which dealt mainly in securities that are not registered

---

16. Cash accounts require full payment on settlement date.

17. Margin accounts are used for purchases on credit.

18. Short credit accounts are a form of a margin account whereby a sale is made without the account holder owning the security.

19. RVP/DVP accounts require the delivery or receipt of the securities by the counterparty simultaneous with payment.

20. See Oct. 5 Aff. ¶ 17 (providing requirements of a "good control" location).

in the name of a particular customer, the calculation of Reserve Formula debits and credits is carried out with the aid of an SEC-recognized methodology termed "allocation."

### B. Allocation

13.     Rights and obligations with respect to securities positions included on a broker-dealer's stock record may be held (or owed) by customers, non-customers or the firm itself.  The classification of the party that holds rights or owes obligations is of critical importance for calculating credits and debits in the Reserve Formula, which requires special treatment of "customer" obligations (whether payable or receivable by the broker-dealer) and "customer" securities.

14.     Because securities denoted by a particular CUSIP,[21] and held by a broker-dealer in "street name,"[22] are fungible, allocation of the securities between customer and non-customer is necessary in order to achieve correct treatment of the various securities-related debits and credits that may occur.  The SEC and FINRA have promulgated guidance concerning the impact of that allocation on the Reserve Formula, leaving broker-dealers to select and implement particular allocation methodologies and systems, whether obtained from a vendor or developed

---

21.  A CUSIP is a unique alphanumeric code that identifies a particular security.

22.  "When [a customer] buy[s] securities through a brokerage firm, most firms will automatically put [the customer's] securities into 'street name.'  This means [the customer's] brokerage firm will hold [the customer's] securities in its name or another nominee and not in [the customer's], but [the customer's] firm will keep records showing [the customer] as the real or 'beneficial owner.'  [The customer] will not get a certificate, but will receive an account statement from [the customer's] broker on at least a quarterly and annual basis showing [the customer's] holdings."  See SEC, "Street Name," http://www.sec.gov/answers/street.htm (last modified 10/5/05).

in-house.[23]  Whatever system is selected, regulatory guidance requires that the allocation process is to be carried out "on a conservative basis to accomplish maximum protection for customers."[24]

15.  In general, allocation methodologies are based upon defining sub-categories of "long" and "short" positions corresponding to the range of "ownership" and "location" characteristics that may apply to a securities position.  The allocation systems in use by broker-dealers may further subdivide these, or add categories for particular types of transactions.

16.  In the weekly Reserve Formula calculations the allocation program will allocate each classification based on the securities positions identified in the securities record and the classifications of longs and shorts, <u>e.g.</u>, customer long vs. securities loaned short, firm long vs. fail to receive short, <u>etc.</u>  The allocation process is performed by utilizing a hierarchy of steps which includes all possible long versus short classifications.  After allocating the securities, the broker-dealer then determines the Reserve Formula impact based on guidance from the SEC, as contained in a FINRA handbook (<u>i.e.</u>, the FINRA Interpretations).

17.  The Reserve Formula impact of such long-versus-short pairings is illustrated by the following examples:  an allocation of customer long free vs. proprietary bank loan will produce credits in the Reserve Formula because the customer's securities are being used by the broker-dealer to secure its own proprietary loans; an allocation of customer fail to deliver (DVP) vs. box will produce debits in the Reserve Formula because, in this example, the customer has

---

23.  LBI utilized ADP's allocation report for all securities maintained on the ADP securities record and a firm-developed allocation report for the MTS stock record.

24.  FINRA Interpretations, Reserve Formula (Ex. A – General)/03, Allocation, at 2622.  "[T]he broker dealer should be able to demonstrate that the results so obtained regarding designations of customer versus proprietary or non-customer positions would be comparable to those which would be obtained if the respective positions had been developed without the use of an allocation."  (<u>Id.</u>)

08-01420-scc Doc 4750 Filed 12/06/12 Entered 12/06/12 13:48:39 Main Appendix Document Documents 1 Through 259 Pg 817 of 1129

9

not paid for its securities and the broker-dealer has not delivered the securities but holds them in its control at its custodian's securities "box."

18.     The securities record and related allocation systems form the mechanism for broker-dealer calculation of reserve requirements under Rule 15c3-3. These systems identify customer securities in good control locations, as well as securities which require credits in the Reserve Formula to compensate for the absence of good control, and calculate the amount of cash the broker-dealer must deposit in the Reserve Account. The systems also identify items that are debits in the Reserve Formula, primarily in the form of off-setting obligations of customers to the broker-dealer.

19.     LBI's systems used for Reserve Formula calculations provide a means to analyze the extent to which the calculated amounts were in compliance with Rule 15c3-3 as of September 19, 2008 (the "Filing Date"). As set forth below, LBI's compliance systems failed to produce correct calculations under the Reserve Formula, leading to deficiencies in LBI's Reserve Account deposit as of the Filing Date.

## III.     COMPLIANCE FAILURES

### A.     Customer Securities Not In Good Control

20.     As explained in paragraph 33 of my October 5 Affidavit, JPMorgan Chase Bank, N.A. ("Chase"), LBI's primary clearing bank, asserted a lien on all LBI property under its control to secure obligations owed to Chase by LBI. However, as required by the Customer

Protection Rule, Chase's lien did not extend to customer property which was held by Chase in segregated accounts pursuant to "no-lien" arrangements between Chase and LBI.[25]

21.     The October 5 Affidavit also stated that the Chase overdraft was known to LBI personnel but not taken into account in LBI's September 19, 2008 reserve calculation.[26]  Under Rule 15c3-3, bank overdrafts are credit items that are required to be reflected in the Reserve Formula.[27]  Chase has claimed that there was an overdraft of $25,259,405,265 as of September 19, 2008 in LBI's main operating account.[28]  In LBI's books and records, the overdraft was recorded as $5,919,098,861.[29]  No amount was included in the Reserve Formula calculation for this overdraft.[30]

22.     Following a conservative approach under Rule 15c3-3, LBI would have included as a credit in its Reserve Formula calculation at least the amount of the overdraft on its books and records – $5,919,098,861.  This amount represented funds LBI recorded as being paid to other parties (including its customers) in excess of the total funds actually available.  In short, customers were at risk because LBI did not have the cash to cover payment of over $5.9 billion

---

25.  See Oct. 5 Aff. ¶ 17.

26.  See Oct. 5 Aff. ¶¶ 52-53.

27.  See FINRA Interpretations, Reserve Formula (Ex. A – Item 1)/01, Customer Credit Balances, at 2651.

28.  Oct. 5 Aff. Ex. 40.

29.  See Ex. 5.

30.  In my experience in the industry, LBI would have reconciled its books and records with those of Chase.  If a broker-dealer could not reconcile its records, the broker-dealer would address the situation in a conservative manner, i.e., it would include the greater of the bank or book overdraft.

in obligations to be made through Chase. In such circumstances, Rule 15c3-3 requires that the broker-dealer take steps to protect its customers from the risk of loss.[31]

23.     At the time the calculation was being performed, LBI determined to treat this overdraft as a "secured loan."[32] Even if this approach were correct, the reserve calculation was not performed correctly. If LBI was treating the overdraft as a secured loan, it was required to determine whether any customer securities were securing, or "allocating to," this loan.[33] To the extent that they were, credits for the market value of those securities were required to be placed in the Reserve Formula.

24.     The Trustee's professionals analyzed whether customer securities were used to secure LBI's proprietary loan and whether any customer securities were in fact seized to satisfy the loan. The following paragraphs describe the results of this analysis of overdraft-related seizures of property by Chase, and the resulting impacts on customer property and LBI's compliance with the Customer Protection Rule.

### 1.     <u>Inability to Apply Safekeeping Instructions</u>

25.     In my October 5 Affidavit, I discussed Chase's termination of LBI's real-time access to account information.[34] I am informed by Leonard Legotte, the former LBI Vice President of Clearance and Custody for Government & Mortgage Operations,[35] that LBI

---

31.  <u>See</u> FINRA Interpretations, Reserve Formula (Ex. A – Item 1)/01, Customer Credit Balances, at 2651.

32.  <u>See</u> Oct. 5 Aff. ¶ 53.

33.  FINRA Interpretations, Reserve Formula (Ex. A – General)/08, at 2625.

34.  <u>See</u> Oct. 5 Aff. ¶ 29.

35.  Mr. Legotte is now serving as a consultant to the Trustee.

08-01420-scc Doc 4709 Filed 12/06/11 Entered 12/06/11 13:48:39 Main Document
Documents 1 Through 25 Pg 12 of 259 Pg 820 of 1129

12

personnel were unable to access the Chase system in order to enter segregation instructions for customer transactions settling on September 19, 2008. Mr. Legotte's research shows that LBI was accordingly unable to instruct Chase to segregate fourteen securities by moving them from LBI's main operating account (the "<u>Chase Box</u>") into LBI's customer safekeeping account.[36]

26.    The Chase Box was not a "good control" location within the meaning of Rule 15c3-3, as property in this unprotected account could be seized by Chase and applied against LBI's overdraft. The Trustee's professionals have indicated to me that the securities in question were in fact seized by Chase and applied to LBI's overdraft.

27.    In consultation with me, the Trustee's professionals calculated the Reserve Formula impact of LBI's failure to segregate the fourteen affected securities. A summary of the original and corrected accounting for these securities in the Reserve Formula is attached as Exhibit 6. Compliance with Rule 15c3-3 with respect to these fourteen securities would result in both additional credits of $98,503,270 and a reduction of debits of $62,716,578 in LBI's reserve calculation. Taking account of the credit and debit correction of this issue (and adding back the 3% reduction on the debit portion) requires a net increase of $159,338,351 in LBI's reserve requirement.[37]

## 2.    <u>Securities Incorrectly Recorded as Held in Safekeeping Location</u>

28.    As part of the investigation into Chase's seizure of customer property to satisfy LBI's overdraft obligations, the Trustee's professionals cross-referenced the securities

---

36.  <u>See</u> Decl. of Leonard J. Legotte, Nov. 30, 2011 ¶ 8.

37.  As a starting point for further adjustments to LBI's Reserve Formula calculation, I understand that the Trustee's professionals used the September 19, 2008 calculation produced by Barclays (former LBI) personnel in January 2009. This calculation corrected the original calculation produced in September 2008 only for the $213 million coding and program logic errors but not the other errors identified in my October 5 Affidavit.

designated on LBI's stock record as held in safekeeping against lists prepared by Chase of the securities it seized and applied to the LBI overdraft. According to LBI's stock record, ten securities held in an account at Chase were customer securities and treated by LBI as if they were in a Chase safekeeping box. However, Chase did not recognize that account as a safekeeping location. Thus, these securities were not in a good control location. The Trustee's professionals have indicated to me that the securities in question were in fact seized by Chase and applied to LBI's overdraft.

29.     In consultation with me, the Trustee's professionals calculated the Reserve Formula impact of LBI's failure to segregate the ten customer securities. A summary of the original and corrected accounting for these securities in the Reserve Formula is attached as Exhibit 7. Compliance with Rule 15c3-3 with respect to the ten securities would have resulted in additional credits of $155,236,428 in LBI's reserve calculation.

### 3.     Additional Customer Property Seized From Chase Box

30.     To determine if any other customer property was seized by Chase and applied to the overdraft, the Trustee's professionals reviewed any remaining securities in the Chase Box corresponding to customer long positions on LBI's securities record. After taking account of other reserve adjustments addressed in this affidavit with respect to the customer securities held in the Chase Box, the Trustee's professionals determined that 202 securities in the Chase Box required additional reserve adjustments. All of these securities were allocated as "Customer Long Fail to Deliver vs. Box," and no credits or debits were included by LBI in the Reserve Formula for such securities allocations. The securities should have been allocated as "Customer Long Fail to Deliver vs. Proprietary Bank Loan," because they were used to satisfy Chase's advances to LBI. Pursuant to the correct allocation, as calculated by the Trustee's professionals, offsetting credits and debits of $1,328,061,322 for these securities should have been included in

08-01420-scc Doc 7250 Filed 12/06/14 Entered 12/06/14 13:48:39 Main Document
Documents 1 Through 259 Pg 14 of 259 Pg 822 of 1129

14

the Reserve Formula. The debits, however, are subject to a 3% reduction.[38] Taking account of both the credits and debits (less the 3% reduction on the debit portion), the net reserve requirement should have been increased by $39,841,840.

### 4. FID Account Updates

31. As explained in paragraphs 32-35 of my October 5 Affidavit, Chase seized customer property in the FID accounts. The Court approved the compliance failure relating to the FID issue.[39] Three securities with a market value of $1,745,699 as of September 19, 2008, as calculated by the Trustee's professionals, matured after the Filing Date and were inadvertently omitted from the First Allocation Motion. The value of these securities should have been a credit in LBI's Reserve Formula calculation as of September 19, 2008.

### B. Unsecured Debit Items

32. The Reserve Formula permits customer credits to be offset by customer debits, thus reducing the cash lock-up requirement by amounts owed by customers to the broker-dealer. An important limitation on this rule is that a customer's debits must be fully secured by that customer's collateral.[40] As explained below, the Trustee's investigation has revealed that LBI's September 19, 2008 reserve computation included over $12.1 million of unsecured debits from a customer's account, which improperly reduced LBI's reserve requirement.

33. The Trustee's professionals have examined the debits and holdings of the customer's account and they have determined that the customer had a debit of $13,499,690 and

---

38. See 17 C.F.R. § 240.15c3-1(a)(1)(ii)(A) (attached hereto as Ex. 3).

39. Order Approving Trustee's Mot. for Allocation of Property of the Estate, entered Mar. 2, 2010, at 2 [Docket No. 2743].

40. FINRA Interpretations, Reserve Formula (Ex. A – Item 10)/012, Partly Secured Accounts, at 2721-22.

two long positions as of September 19, 2008.[41]  For one of these long positions, no price was

identified.[42]  Based on my experience, in such circumstances the broker-dealer cannot deem the

debit to be secured by a security with no identifiable value.  For the second long position, the

market value was $1,350,609.[43]  Accordingly, the $13,499,690 debit was secured only to the

extent of the second long position, leaving $12,149,081 of the debit unsecured.  Removing the

unsecured debit would have resulted in a net increase to the reserve requirement (after adding

back the 3% reduction) of $11,784,609.

### C.   LBIE Omnibus Customer Accounts

34.    Under Rule 15c3-3, "[t]ransactions recorded in non-proprietary accounts of a

foreign broker-dealer would be treated as a customer . . . ."[44]  The Trustee's professionals have

indicated to me that LBI established customer-coded omnibus accounts for clients of Lehman

Brothers International (Europe) ("LBIE"), and recorded transactions identified by LBIE as for its

underlying customers in those accounts.

35.    LBIE commenced insolvency proceedings before the start of business on

September 15, 2008.  The Trustee's professionals have indicated to me that, due to LBIE's

failure, normal reconciliation activity between LBI and LBIE did not occur during the interval

between September 15, 2008 and the commencement of LBI's liquidation proceeding on

September 19, 2008.  This left many of the approximately 195,000 transactions that had entered

---

41.  See Ex. 8.

42.  See id.

43.  Id.

44.  FINRA Interpretations, (a)(1)/033, Foreign Broker-Dealers/Customer and Non-Customer, at 2007.

the trading pipeline during that interval unsettled or unreconciled. As a result, the omnibus

accounts did not fully reflect the LBIE clients' holdings to the extent trades for those clients

settled during the week of September 15-19, 2008.[45]

36. LBIE filed an "Omnibus Customer" claim for the property held in these omnibus

accounts, including cash of approximately $4.5 billion and securities positions of approximately

$6.3 billion.[46] On September 10, 2010, LBIE sent to the Trustee a purported second amendment

to the Omnibus Customer claim, which increased the claim to $16.4 billion.[47] The Trustee has

allowed cash and securities preliminarily valued at $8.3 billion as of September 19, 2008.[48]

37. Using the amount reported in the Trustee's Sixth Interim Report, the Trustee's

professionals, in consultation with me, performed an analysis to determine the extent to which

the net equity of the allowed claim exceeds the net equity in the LBIE customer accounts on

LBI's books and records as of September 19, 2008. The Trustee's professionals estimated that

LBI failed to segregate or reserve for approximately $1.5 billion of assets for LBIE's underlying

clients that is now subject to the Omnibus Customer claim. Such failure would be a violation of

Rule 15c3-3 because LBI was required to segregate the assets for LBIE clients in compliance

with its obligations under the Customer Protection Rule. I understand that, although the Trustee

has determined the LBIE Omnibus Customer claim, the Trustee's professionals and professionals

of the LBIE estate are continuing to analyze the LBIE claim security-by-security and transaction-

---

45. Trustee's Sixth Interim Rep. for the Period Apr. 23, 2011 through Oct. 21, 2011, filed Oct. 21, 2011 ("Sixth Interim Rep."), ¶¶ 28, 30.

46. Id. ¶ 28.

47. Id.

48. Id. ¶ 29.

by-transaction to resolve remaining factual questions and determine the net equity of the claim either consensually or by litigation. I also understand that the outcome of this effort may result in changes, upward or downward, to the allowed amount reported in the Trustee's Sixth Interim Report. Thus, if the ongoing investigation between the estates confirms this number, or some other number, LBI's reserve calculation should be adjusted by a corresponding amount.

### D. Miscoded Suspense Accounts

38. My October 5 Affidavit identified instances where failure to code as "customer" certain accounts on LBI's books and records containing customer property led to non-compliance with Rule 15c3-3.[49] Non-compliance can also result from applying a customer coding to accounts not related to customers.

39. The Trustee's investigation revealed that such miscoding occurred in connection with certain "suspense" accounts that LBI used to record transactions on a temporary basis. It appears that the effect of miscoding these accounts was magnified by the extraordinary conditions in the markets and at LBI during the week of September 15, 2008, which led to unusually large values in the above-mentioned "suspense" accounts.

40. As of September 19, 2008, securities held in all suspense accounts had a long market value of $2,458,155,082 and short market value of $4,500,615,162. Three accounts held the majority of these large balances. These accounts, ending in 1246, 1261, and 1263, contained securities with a total long market value of $2,405,445,128 and short market value of $4,453,129,244. Based on discussions with the Trustee's professionals, I understand that these

---

49. See Oct. 5 Aff. ¶¶ 36-38.

accounts were used as an intermediate step to close out LBI proprietary securities loan and borrow transactions.

41.    In LBI's reserve calculation as of September 19, 2008, all accounts in the suspense range were treated as "customer" accounts, and the positions in those accounts were treated as customer positions.  As a result, by way of example, when LBI ran its Reserve Formula allocation, (i) the values of long positions allocating to proprietary loans were added as credits in the Reserve Formula; and (ii) the values of short positions allocating to stock borrow were added as debits.[50]  Because these positions were in fact not customer positions, they should not have been allocated as such in the Reserve Formula.

42.    To test the impact of this error on the Reserve Formula, the Trustee's professionals, after consultation with me, recoded the suspense accounts as "firm" accounts, rather than customer accounts.  They then reallocated the long and short positions for the securities in the suspense accounts.  This reallocation showed that the credits in the September 19, 2008 Reserve Formula calculation should be reduced by $1,300,688,109 and the debits should be reduced by $3,208,034,982.  Taking account of the excess of improper debits over improper credits (as well as the 3% reduction on debits), the result is a net increase in credits and a corresponding deficiency in the Reserve Account requirement of $1,811,105,823.[51]

---

50.  See FINRA Interpretations, Reserve Formula (Ex. A – General)/08, at 2625, 2629.

51.  See Ex. 9.  The credit and debit impact to the Reserve Formula do not match the gross long and short position market value because reallocation of the positions in the suspense accounts, after treating the accounts as "firm" rather than "customer" accounts, did not always result in a change to the original debits and credits.  For example, even under the original allocation – where the account was treated as a customer account – a credit for a long position may not have been included in the Reserve Formula such as where the security was in good control.

### E.   **Underreported Customer Credit Due To Failed Wire**

43.    On September 19, 2008, a customer sought to withdraw cash of $15,000,952 that had been credited to the customer's account for a redemption.  LBI attempted to wire the funds to the customer.  This attempted wire triggered an entry reducing customer payables on LBI's books and records.  However, the wire transfer did not occur.  Credits in the Reserve Formula were accordingly underreported in the amount of $15,000,952, with a corresponding shortfall in the Reserve Account.

## IV.   **OCC DEPOSIT**

44.    As set forth in paragraph 21 of my October 5 Affidavit, the Reserve Formula contemplates that the amount required to be deposited may be reduced by debit items permitted in accordance with SEC rules and interpretations.  The function of Reserve Formula debits is to take account of obligations owed by customers to the broker-dealer or to satisfy customer transactions, so that only the broker-dealer's net cash obligation to customers and on customer-related transactions is required to be deposited in the Reserve Account.  LBI's Reserve Formula calculation as of September 19, 2008 included aggregate debits (less 3%) in the amount of approximately $32.6 billion, which had the effect of reducing LBI's calculated deposit requirement by that amount.

45.    In addition to the compliance issues discussed above, the Trustee requested that I identify instances where debit items included in the September 19, 2008 Reserve Formula are linked to resources now available to the Trustee.  One such item concerns the deposits at the Options Clearing Corporation ("OCC").

46.    Prior to the Filing Date, LBI deposited assets of approximately $507 million (including cash, securities, and letters of credit) with the OCC with respect to an LBI account that contained options attributable to customers.  This amount was deposited with the OCC to

cover customer obligations.  In relation to this deposit, LBI included $507 million as a debit in

LBI's Reserve Formula as of September 19, 2008.  The inclusion of this customer-related debit

in the Reserve Formula reduced the reserve requirement by $507 million (less the mandatory 3%

reduction for debits).[52]

47.     I first highlighted this issue in paragraph 45 of my October 5 Affidavit, but in

light of the Trustee's ongoing litigation with Barclays Capital Inc. ("Barclays") concerning this

item, the Trustee removed the item from the Court's consideration.  However, I understand that

the Court has now determined that the Trustee is entitled to the margin assets deposited at the

OCC to secure customer and proprietary transactions.

48.     In 2008, the OCC returned to the LBI estate the securities portion of the $507

million deposit.  In the same year, the OCC also turned over to Barclays the cash component of

the deposit.  I understand that although the Court has resolved this issue in the Trustee's favor,

Barclays continues to hold this cash, pending its appeal of the Court's decision.  To the extent

the Trustee does not ultimately recover the full amount of the $507 million deposit, there will be

a shortfall in the funds segregated pursuant to Rule 15c3-3 to satisfy LBI's obligations to its

customers.

## V.     BUSINESS MIX TEST

49.     Based on my experience in the industry, with certain exceptions, members of

national securities exchanges may not transact business for proprietary purposes on such

exchanges.  One exception is the situation where more than fifty percent of the broker-dealer's

---

52. See FINRA Interpretations, Reserve Formula (Ex. A – General); Margin Required by OCC/01, Margin
    Required by Options Clearing Corporation, at 2771.

gross revenue is derived from customer-related business.[53] This rule is known in industry terms as the "business mix" test. Guidance on how a member may meet the test is provided in SEC Rule 11a1-1(T).

50. Broker-dealers perform annual calculations to confirm compliance with the "business mix" test. LBI performed such a calculation and reported its compliance in its annual audited financial statements for the fiscal year ended November 30, 2007, LBI's last audited financial statements before the SIPA liquidation proceeding commenced.[54] I have examined LBI documents showing that its customer-related business accounted for at least 60 percent of its total business mix.

_____
Daniel T. McIsaac

Sworn to and subscribed before
me this 1st day of December, 2011

_____
Notary Public State of New York

**JORDAN PACE**
Notary Public, State of New York
No. 02PA6196272
Qualified in New York County
Commission Expires November 10, 2013

_____

53. See 17 C.F.R. § 240.11a1-1(T)(b) (attached hereto as Ex. 10.).

54. See Ex. 11 at 31.

# EXHIBIT 1

# DANIEL MCISAAC, CPA,

## CAREER EXPERIENCE

KPMG LLP,  2010 – present

Director - Financial Services Regulatory Practice

Subject Matter Professional, specializing in advising broker dealer and FCM clients on regulatory, financial and operational issues.  Provide clients with regulatory advice and guidance. Manage client engagements with responsibility for analyzing various aspects of client's business, assessing gaps to regulatory rules and industry best practices, and providing recommendations to correct or enhance the process.  Manage a staff of industry regulatory professionals as part of the firm's Financial Audit of Broker Dealer and FCM Financial Statements responsible for assessing compliance with regulatory rules.  Member of the firm's Financial Services Center of Excellence.

## Independent Regulatory and Industry Consultant, 2009-2010

Provide clients with regulatory guidance and financial and operational best practices.

UBS Securities LLC, Stamford Ct, 1994 – 2009

## Regulatory Controller - FinOp

Directed all financial regulatory filings and calculations, including monthly FOCUS Reports, weekly Reserve Formula calculations, daily and monthly CFTC segregation calculations.  Responsible for the firm's capital management including daily analysis, monthly and yearly projections, including analysis of daily profit and loss.  Manage all regulatory relationships and the firm's industry representative in regulatory matters.  Chairman of the SIFMA Capital committee and past president  of the SIFMA Financial Management Division.  Member of numerous cross business initiatives, responsible for the financial and regulatory aspect of new business initiatives.  Senior finance manager on numerous acquisitions, including the coordination and review of financial due diligence process.  Work closely with regulators in the development of new regulatory rules and interpretations.  Developed skilled team to achieve established objectives.  Interact with the Board of Directors and President concerning financial forecasts and reports.

  - ➢ Successful management of regulatory relationships.
  - ➢ Maintained constant staff levels throughout significant growth of the firm and its products
  - ➢ Successfully implemented numerous business acquisitions.
  - ➢ Continuous development of alternative solutions to issues
  - ➢ Member of industry committees and task forces.

*Continued…*

# DANIEL McISAAC, CPA, • Page 2

## CAREER EXPERIENCE CONTINUED

Dean Witter Reynolds, New York, New York, 1989 –1994

**Manager of Regulatory Reporting**

Managed the regulatory reporting department. Responsible for the preparation, analysis and review of all regulatory reports. Worked closely with the business and operations to monitor regulatory compliance and implementation of new rules and regulations. Developed significant process improvements that led to significant overtime reductions. Managed regulatory exams to satisfactory conclusions. *Key Achievements:*

- ➢ Implemented more efficient month end financial closing process, replacing service bureau. Implementation provided significant time savings as well as cost savings.
- ➢ Established distribution broker dealer for the issuance of Investment Company initial shares
- ➢ Worked closely with corporate management on the implementation of a new general ledger system

Drexel Burnham, New York, New York, 1986 – 1989

**Director of Capital Markets Internal Audit**

Responsible for auditing all capital markets areas within the firm. Department was considered a business partner and worked closely with various areas of the firm to develop sound controls and resolve issues. Audit work performed at year end was relied upon by external auditors as part of their certification. Managed the external audit process including the discussion of fees and budgets. Also, coordinated all regulatory exams, including the development and implementation of regulatory recommendations. *Key Achievements:*

- ➢ Uncovered significant reconciliation issues during system conversions.
- ➢ Worked closely with financial accounting and external auditors to develop accounting policies more consistent with the industry.

Deloitte Haskins and Sells, New York, New York, 1978 – 1986

**Audit Manager**

Responsible for the management of certified audits for financial services entities. Managed multinational audits. Responsible for the development of training programs for industry staff as well as the maintenance of the firm's industry audit guides and programs. Responsible for the supervision of other managers and staff in the audits of over 700 unit investment trust funds. Established the groundwork for the development of an automated approach to these audits . *Key Achievement:*

- ➢ Designated firm securities industry expert.
- ➢ Designated firm Mutual Fund industry expert

## EDUCATION

Bachelor of Science, Accounting (1978)
LEHMAN COLLEGE (CUNY), New York, New York

**EXHIBIT 2**

08-01420-scc Doc 470-50 Filed 12/06/12 Entered 12/06/12 13:48:39 Main Document
Documents 1 Through 25 Pg 20 of 259 Pg 834 of 1129

2001

## CUSTOMER PROTECTION – RESERVES AND CUSTODY OF SECURITIES
## SEA Rule 15c3-3

(a)     DEFINITIONS

      For the purpose of this rule:

      (1)     The term "customer" shall mean any person from whom or on whose behalf a broker or dealer has received or acquired or holds funds or securities for the account of that person. The term shall not include a broker or dealer, a municipal securities dealer, or a government securities broker or government securities dealer. The term shall, however, include another broker or dealer to the extent that broker or dealer maintains an omnibus account for the account of customers with the broker or dealer in compliance with Regulation T (12 CFR § 220.1 through § 220.19). The term shall not include a general partner or director or principal officer of the broker or dealer or any other person to the extent that person has a claim for property or funds which by contract, agreement or understanding, or by operation of law, is part of the capital of the broker or dealer or is subordinated to the claims of creditors of the broker or dealer. In addition, the term shall not include a person to the extent that the person has a claim for security futures products held in a futures account, or any security futures product and any futures product held in a "proprietary account" as defined by the Commodity Futures Trading Commission in § 1.3(y) of this chapter. The term also shall not include a counterparty who has delivered collateral to an OTC derivatives dealer pursuant to a transaction in an eligible OTC derivative instrument, or pursuant to the OTC derivatives dealer's cash management securities activities or ancillary portfolio management securities activities, and who has received a prominent written notice from the OTC derivatives dealer that:

      (i)     Except as otherwise agreed in writing by the OTC derivatives dealer and the counterparty, the dealer may repledge or otherwise use the collateral in its business;

      (ii)     In the event of the OTC derivatives dealer's failure, the counterparty will likely be considered an unsecured creditor of the dealer as to that collateral;

      (iii)     The Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.) does not protect the counterparty; and

      (iv)     The collateral will not be subject to the requirements of § 240.8c-1, § 240.15c2-1, § 240.15c3-2, or § 240.15c3-3;

SEA Rule 15c3-3(a)(1)(iv)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4720 Filed 12/06/14 Entered 12/06/14 18:39:19 Main Document
08-01789-cgm Doc 17250 Filed 02/26/18 Entered 02/26/18 14:15:59 Appendix
Documents 1 Through 259 Pg 27 of 59 Pg 835 of 1129

2002

(a)(1)    DEFINITIONS; CUSTOMER (continued)

/01    Customer/Non-Customer

Certain accounts shown on the books of the broker-dealer shall be classified as follows:

Customer

Any person or entity from whom or on whose behalf the reporting broker-dealer has received or acquired or holds funds or securities except those specifically excluded as "non-customers";

Special and limited partners' non-capital and non-subordinated accounts;

Accounts of officers, other than principal officers, or directors. (The president, executive vice president, treasurer, secretary or any person performing a similar function are principal officers.);

Non-subordinated accounts of subordinated lenders, other than general partners', directors' and principal officers' (see interpretation 15c3-3(a)(1)/02);

A broker or dealer that maintains an omnibus account with the reporting broker-dealer for the account of customers in compliance with Regulation T;

A broker-dealer to the extent it maintains an account designated as "Special Custody Account for the Exclusive Benefit of Customers of (name of broker-dealer)" which meets the criteria described in interpretation 15c3-3(c)(7)/01;

A broker-dealer to the extent it maintains an account designated as "Special Custody Account for Accommodation Transfers for the Exclusive Benefit of Customers of (name of broker-dealer)" which meets the criteria described in interpretation 15c3-3(c)(7)/02;

A joint account, custodian account, participation in a hedge fund or limited partnership or similar type accounts or arrangements between a customer and a non-customer;

A non broker-dealer affiliate or subsidiary of the reporting broker-dealer;

The other participant(s)' interest in a joint trading and investment account carried on the books of the reporting broker-dealer, and the other participant(s)' interest in a Joint Foreign and Domestic Arbitrage Account when such other participant(s) is a "customer".

Non-proprietary accounts of a foreign bank; and

Non-proprietary accounts of a foreign broker-dealer.

SEA Rule 15c3-3(a)(1)/01

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(1)    DEFINITIONS; CUSTOMER (continued)

/01    Customer/Non-Customer (continued)

Non-Customer

General partner;

Director or principal officer, i.e., president, executive vice president, treasurer, secretary or any person performing a similar function;

A broker or dealer (other than omnibus accounts);

A non-bank registered municipal securities dealer;

A bank municipal securities dealer that either does or does not transact its municipals securities business through a separately identified department or division, and either does or does not register as an undivided entity is a non-customer only with respect to its transactions effected in the capacity of a municipal securities dealer.  All other transactions shall be treated as customer transactions;

A foreign bank which engages in the business of buying and selling securities for its own account through a broker or otherwise within the meaning of Section 3(a)(5) of the Act (i.e., dealer), provided the foreign bank must not fall within the definition of "bank" set forth in Section 3(a)(6) of the Act (see interpretation 15c3-3(a)(1)/032).  If the foreign bank falls within the definition of a bank, it is to be treated as a customer;

The other participant(s)' interest in a joint trading and investment account carried on the books of the reporting broker-dealer and the other participant(s)' interest in a Joint Foreign and Domestic Arbitrage Account when such other participant(s) is a non-customer;

The Federal Reserve Bank in instances where securities are being borrowed from it for the purpose of cleaning up fails; and

The proprietary account of a foreign broker-dealer would be treated as a non-customer.

(SEC Releases 34-9922, January 2, 1973; 34-10429, October 12, 1973;
34-11854, November 20, 1975; 34-11969, January 2, 1976)
(SEC Letter to NASD, July 15, 1974) (SEC Staff to NYSE) (No. 78-1, May 1978)
(SEC Staff to NYSE) (No. 01-05, August 2001)

SEA Rule 15c3-3(a)(1)/01

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(1)   <u>DEFINITIONS; CUSTOMER (continued)</u>

/011   <u>Introduced Accounts of General Partners, Director or Principal Officers of Another Broker-Dealer</u>

The individual securities accounts of another broker-dealer's general partners directors or principal officers that are introduced on a fully disclosed basis are "customers" of the carrying broker-dealer.

In the event the account is that of an individually registered broker-dealer or of an individual who has a relationship with the carrying broker-dealer other than that of a client-customer, the account is a "non-customer" of the carrying broker-dealer.

(SEC Staff to NYSE) (No. 89-7, June 1989)

/012   <u>Proprietary Accounts of Foreign Broker-Dealer</u>

A proprietary account of a foreign broker-dealer is not included in the PAIB calculation.

(SEC Staff to NYSE) (No. 99-6, May 1999)

/013   <u>Limited Liability Company/Limited Liability Corporation (LLC)</u>

Any participant in a broker-dealer which is organized as a LLC, who performs a function similar to that of a general partner, director, or principal officer of a broker-dealer, such as a member of the board of managers of a LLC, would be considered a non-customer for the purpose of SEA Rule 15c3-3.  Any other participant would be considered a customer.

(SEC Staff to NYSE) (No. 02-3, February 2002)

/02   <u>Non-Conforming Subordination Agreements Covering Securities</u>

The SEC would consider subordinated lenders of securities who enter into subordination agreements which are not recognized for purposes of providing net capital under SEA Rule 15c3-1, as non-customers who would not be subject to the possession or control requirements of the Rule.  Such lenders would have to be informed of the absence of SIPC protection and a no action letter would have to be requested of the SEC on a case by case basis.

(SEC Letter to Arnhold & S. Bleichroeder, Inc., June 28, 1974) (No. 78-1, May 1978)

SEA Rule 15c3-3(a)(1)/02

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/14 Entered 12/06/13 43 39:19 Main Appendix Document
Documents 1 Through 9 Pg 830 of 259 Pg 838 of 1129

2005

(a)(1)   DEFINITIONS; CUSTOMER (continued)

/021   Non-Conforming Subordination Agreements with Non Broker-Dealer Affiliated Entities

Accounts maintained pursuant to Non-Conforming Subordination Agreements that are entered into with a non broker-dealer affiliated entity shall not be considered a customer for purposes of SEA 15c3-3, provided all of the following conditions are met:

1.   A written non-conforming subordination agreement exists;

2.   There is a written acknowledgement by the affiliate that the account is not covered by the provisions of The Securities Investor Protection Act of 1970 and the balances are funds that are not subject to foreign customer protection.  In addition, appropriate disclosure of these two points has been made by the affiliate if the assets being pledged are not proprietary;

3.   There is an opinion of counsel that the affiliated entity executing the agreement is legally authorized to make the subordinated loan of the funds or securities;

4.   There must be written representation that the subordinated assets (funds and securities) are not those of U.S customers; and

5.   The non-conforming subordination must be subject to approval by the broker-dealer's Designated Examining Authority.

Any non-conforming subordination that has been previously approved by the SEC and submitted to the DEA, shall not be subject to the provisions of this interpretation unless the subordination covers assets for a foreign or domestic customer other than the proprietary assets of the non broker-dealer affiliate.

(SEC Staff to NYSE) (No. 96-3, April 1996) (No. 97-6, October 1997)

/03   Customer/Non-Customer Foreign Banks – (Rescinded, August 2001)

/031   Customer/Non-Customer Foreign Banks – (Rescinded, August 2001)

SEA Rule 15c3-3(a)(1)/031

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(1)   DEFINITIONS; CUSTOMER (continued)

/032   Foreign Banks/Customer and Non-Customer

Transactions recorded in non-proprietary accounts of a foreign bank would be treated as a customer for purposes of SEA Rule 15c3-3.

Foreign banks may establish a separate "proprietary" account which may be treated as a broker-dealer if the account is clearly labeled as such and a written agreement is obtained in which the foreign bank acknowledges that all transactions in the account are proprietary transactions of the foreign bank acting in a dealer capacity and that the account is not covered by the provisions of The Securities Investor Protection Act of 1970. This account is treated as a non-customer for purposes of the customer 15c3-3 reserve formula provided that the foreign bank does not fall within the definition of "bank" set forth in Section 3(a)(6) of the '34 Act, which provides as follows:

"The term "bank" means (A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising a fiduciary power similar to those permitted to national banks under Section 11(k) of the Federal Reserve Act, as amended, and which is supervised and examined by State or Federal authority having supervision over banks, and which is not operated for the purpose of evading the provisions of this title, and (D) a receiver, conservator, or other liquidating agent of any institution or firm included in clauses (A), (B) or (C) of this paragraph."

If the foreign bank falls within the above definition of a bank, it is to be treated as a customer for purposes of SEA Rules 15c3-1 and 15c3-3.

There are at least three forms of foreign banking operations that you may be doing business with (1) representative offices, (2) agencies and (3) branches. Agencies and branches are subject to certain reporting requirements of the Federal Reserve Board and some states have specific regulations concerning foreign bank entry and operation, including examination and supervision and may be required to be treated as customers. Representative offices generally do not conduct normal banking operations but merely act as liaison offices between the head office and its customers. Generally speaking, there are no state regulations as to examination and supervision of representative offices other than simple registration with the state in which business is being conducted. Representative offices may be eligible for treatment as a non-customer.

In addition, specific consent to use fully-paid or excess margin securities or free credits of the "proprietary" account must be obtained in writing.

(SEC Letter to UBS-DB Corporation, March 5, 1977)
(SEC Staff to NYSE) (No. 78-2, May 1978) (No. 01-05, August 2001)

SEA Rule 15c3-3(a)(1)/032

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/26/14 Entered 2/006/26/3:84:539: Main Appendix
Documents 1 Through 2nd Pg 82 of 259 840 of 1129

2007

(a)(1)  DEFINITIONS; CUSTOMER (continued)

/033  Foreign Broker-Dealers/Customer and Non-Customer

Transactions recorded in the proprietary account of a foreign broker-dealer would be treated as a non-customer for the customer reserve formula and would be omitted from the PAIB calculation.

Transactions recorded in non-proprietary accounts of a foreign broker-dealer would be treated as a customer for purposes of SEA Rule 15c3-3.

(SEC Staff to NYSE) (No. 01-05, August 2001)

/04  Customer/Non-Customer - Differing Definition at SEA Rules 8c-1 and 15c3-3

SEA Rules 8c-1 and 15c2-1 concerning Hypothecation of Customers' Securities define the term "customer", for purposes of those rules, to be everyone except a general or special partner, a director or officer of the broker-dealer or a participant in a joint, group or syndicate account with the broker-dealer or with any partner, officer or director of the broker-dealer.

Broker-dealers should note the requirements of SEA Rules 8c-1 and 15c2-1; the difference in the definition of "customer" from that shown in SEA Rule 15c3-3, and note in particular the requirement at subparagraph (a)(3) which prohibits securities carried for the account of customers from being hypothecated or subjected to any lien or liens of pledgees for an amount in excess of the aggregate indebtedness (as that term is used in SEA Rules 8c-1 and 15c2-1) of all customers.

Other broker-dealers' accounts are "customer" accounts under SEA Rules 8c-1 and 15c2-1 and are "non-customer" accounts under SEA Rule 15c3-3.

(SEC Release No. 2690, November 15, 1940) (No. 88-1, February 1988)

SEA Rule 15c3-3(a)(1)/04

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(1)   DEFINITIONS; CUSTOMER (continued)

/05   Customer/Non-Customer - Prime Broker

A customer in a prime broker relationship is to be treated as a customer, for SEA Rule 15c3-3 purposes by the prime broker, provided the prime broker does <u>not</u> disaffirm the trade. The executing broker in a prime broker relationship should treat the account as a broker-dealer fail in the name of the prime broker for the benefit of the customer.

However, if the prime broker disaffirms the trade, the executing broker must treat the account as its own customer.

(SEC Letter to SIA, January 24, 1994) (No. 94-5, May 1994)

/06   Parent, Affiliate or Sister Corporation of Broker-Dealer

Security accounts carried by a broker-dealer for a non broker-dealer parent, affiliate or sister corporation are "customers" of the broker-dealer. Credit balances held for these accounts are required to be included in the Reserve Formula and fully-paid excess margin securities are subject to the possession or control requirements of SEA Rule 15c3-3. Debit balances are subject to the restrictions in SEA Rule 15c3-3(Exhibit A - Note E(4)).

Fails to deliver and fails to receive with a parent or affiliate who is also a broker-dealer (may be foreign or domestic) are treated according to interpretation 15c3-3(Exhibit A)/08 (Allocation Chart). These transactions are also subject to paragraph (d) of SEA Rule 15c3-3 and subparagraph (c)(2)(ix) of SEA Rule 15c3-1.

Affiliated entities are not per se a "non-customer" unless the affiliated entity is a broker-dealer or excluded by definition. It is the nature of the account or the transaction as a security account or security transaction which will determine the status of the entity under SEA Rule 15c3-3. Non-securities related transactions should not be recorded in the customer account ledgers.

(SEC Letter to Mesirow Financial Corp., July 13, 1987)
(NYSE Interpretation Memo 88-5) (No. 94-5, May 1994)

In cases where the affiliated entity is a foreign bank or a foreign broker-dealer refer to interpretations 15c3-3(a)(1)/032 (Foreign Banks/Customer and Non-Customer) and 15c3-3(a)(1)/033 (Foreign Broker-Dealers/Customer and Non-Customer).

(SEC Staff to NYSE) (No. 02-7, August 2002)

SEA Rule 15c3-3(a)(1)/06

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(1)    <u>DEFINITIONS; CUSTOMER (continued)</u>

/07    <u>Securities Accounts of Government Sponsored Enterprises</u>

The securities accounts of Government Sponsored Enterprises (such as Freddie Mac and Fannie Mae) should be treated as customer accounts for purposes of SEA Rule 15c3-3.

(SEC Staff to NYSE) (No. 07-4, April 2007)

SEA Rule 15c3-3(a)(1)/07

© 2008 Financial Industry Regulatory Authority, Inc.

**PAGE 2010 IS BLANK**

**(NEXT PAGE IS 2021)**

© 2008 Financial Industry Regulatory Authority, Inc.

(a)     <u>DEFINITIONS (continued)</u>

(2)     The term "securities carried for the account of a customer" (hereinafter also "customer securities") shall mean:

(A)     securities received by or on behalf of a broker or dealer for the account of any customer and securities carried long by a broker or dealer for the account of any customer; and

(B)     securities sold to, or bought for, a customer by a broker or dealer.

(3)     The term "fully-paid securities" shall include all securities carried for the account of a customer in a special cash account as defined in Regulation T promulgated by the Board of Governors of the Federal Reserve System, as well as margin equity securities within the meaning of Regulation T which are carried for the account of a customer in a general account or any special account under Regulation T during any period when Section 8 of Regulation T specifies that margin equity securities shall have no loan value in a general account or special convertible debt security account, and all such margin equity securities in such account if they are fully-paid:  Provided, however, that the term "fully-paid securities" shall not apply to any securities which are purchased in transactions for which the customer has not made full payment.

(4)     The term "margin securities" shall mean those securities carried for the account of a customer in a general account as defined in Regulation T, as well as securities carried in any special account (such general or special accounts hereinafter referred to as "margin accounts") other than the securities referred to in paragraph (a)(3).

SEA Rule 15c3-3(a)(4)

© 2008 Financial Industry Regulatory Authority, Inc.

(a)      DEFINITIONS (continued)

(5)      The term "excess margin securities" shall mean those securities referred to in paragraph (a)(4) carried for the account of a customer having a market value in excess of 140% of the total of the debit balances in the customer's account or accounts encompassed by paragraph (a)(4) which the broker or dealer identifies as not constituting margin securities.

/01      Amount in Excess of 140% of Customer Debit

This term means those securities carried in a customer's security accounts having a market value in excess of 140% of the customer's net debit balance in such accounts.  The net debit balance is determined by combining both debit and credit balances in all of a customer's security accounts exclusive of the credit balance in any bona fide short accounts after marking the short positions contained therein to the market.  For these purposes only, when-issued transactions and unsettled security transactions in cash accounts are ignored. Unsettled security transactions are unpaid for security purchases and security sales where securities sold have not been received by the broker-dealer.

(SEC Release 34-9922, January 2, 1973)

(6)      The term "qualified security" shall mean a security issued by the United States or a security in respect of which the principal and interest are guaranteed by the United States.

/01      GNMA Participation Certificates and Mortgage-Backed Securities

In addition to securities issued by the United States Treasury, Participation Certificates and Mortgage-Backed securities guaranteed by the Government National Mortgage Association (GNMA) have been deemed acceptable for deposit as a "qualified security".

(SEC Staff to NYSE) (No. 88-1, February 1988)

/011      U. S. Governments Obtained Through Repo

U.S. Government securities obtained through repurchase agreements initiated by other brokers or dealers may be deposited into Reserve Bank Accounts.

(SEC Letter to NYSE, July 16, 1974)

SEA Rule 15c3-3(a)(6)/011

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/126/14 Entered 12/006/126/13-84-859:19ain Appendix
Documents 1 Through 25 Pg 88 of 259 Pg 846 of 1129

2023

(a)(6)  DEFINITIONS; QUALIFIED SECURITY (continued)

/012  Certificates of Deposit

Certificates of deposit issued by a U.S. Bank as defined by Section 3(a)(6) of the Act which are subject to withdrawal at any time pursuant to the requirements of Regulation Q of the Federal Reserve System may be deposited into Reserve Bank Accounts for an amount equal to the deposit less any applicable early withdrawal penalties for:

- An amount not in excess of $100,000 issued by any one bank, or

- An amount in excess of $100,000 (Jumbo Certificates) issued by any one bank provided the total certificates held issued by any one bank, including any non-jumbo certificates and all proprietary positions, does not exceed 50% of the broker-dealer's excess net capital nor 10% of the bank's equity capital.

(SEC Staff to NYSE) (No. 83-1, January 1983) (No. 88-1, February 1988)

Certificates of deposit issued by a parent or affiliated bank of the broker-dealer are not qualified for deposit into Reserve Bank Accounts.

(SEC Staff to NYSE) (No. 03-2, March 2003)

/0121  Certificates of Deposit – Aggregate Concentration Calculation

Reserve Bank Accounts maintained at the same bank which contain certificates of deposit (issued by the applicable bank), money market deposits and time deposits must be aggregated in determining "total positions" when computing the concentration calculation pursuant to interpretation 15c3-3(a)(6)/012.

Also, see interpretations 15c3-3(e)(1)/010 (Money Market Deposits – Aggregate Concentration Calculation) and 15c3-3(e)(1)/012 (Time Deposits – Aggregate Concentration Calculation).

(SEC Staff to NYSE) (No. 05-2, January 2005)

SEA Rule 15c3-3(a)(6)/0121

© 2008 Financial Industry Regulatory Authority, Inc.

08-01-02020-cscc Doc 47250 Filed 12/06/24 Entered 12/06/24 18:39:19 Main Document
Documents 1 Through 259 Pg 847 of 1129

2024

(a)(6)    DEFINITIONS; QUALIFIED SECURITY (continued)

/013    Stripped Securities Deposited

Securities which have been stripped by the U.S. Government and are guaranteed by the U.S. Government may be deposited in the Reserve Bank Account.

There should be a reduction to the value of the securities by 6% if the securities mature longer than one year.

The stripped securities may represent principal and/or interest obligations.

(SEC Staff to NYSE) (No. 92-13, December 1992)

Callable interest obligation stripped U.S. Government securities are not qualified for deposit into Reserve Bank Accounts (see interpretation 15c3-3(a)(6)/04).

(SEC Staff to NYSE) (No. 02-7, August 2002)

/014    Ginnie Mae REMIC Trust Securities

Ginnie Mae REMIC Trust Securities that are issued under the Ginnie Mae Multiclass Securities Program which are guaranteed by the Government National Mortgage Association (GNMA) as to the timely payment of principal and interest, pursuant to Section 306(g) of the National Housing Act, have been deemed acceptable for deposit as "qualified securities" into a Reserve Bank Account.

(SEC Staff to NYSE) (No. 03-3, April 2003)

SEA Rule 15c3-3(a)(6)/014

© 2008 Financial Industry Regulatory Authority, Inc.

(a)(6)    DEFINITIONS; QUALIFIED SECURITY (continued)

/02    Non-Qualified Securities

Securities issued by the government-sponsored enterprises and international institutions shown below are not guaranteed by the United States as to the payment of principal and interest and are not qualified for deposit into Reserve bank accounts.

Government-Sponsored Enterprises - Issues

Farm Credit System
          Bank for Cooperatives
          Federal Intermediate Credit Banks
          Federal Land Banks
          Federal Farm Credit Consolidated Systemwide Bonds and Discount Notes

Federal Home Loan Banks
          Consolidated Bonds, Discount Notes and Eurodollar Consolidated Bonds (Foreign Targeted Issue)

Financing Corporation
          Long Term Notes

Federal Home Loan Mortgage Corporation
          All issues except Mortgage-Backed Bonds which are guaranteed indirectly through GNMA

Federal National Mortgage Association (FNMA)
          All issues except Mortgage-Backed Bonds which are guaranteed indirectly through GNMA

Student Loan Marketing Association
          All issues

United States Postal Service
          Bonds

SEA Rule 15c3-3(a)(6)/02

© 2008 Financial Industry Regulatory Authority, Inc.

08-01-02420-scc Doc 470250 Filed 12/00/16/14 Entered 12/00/16/13:44:3 39:19 Main Document
Documents 1 Through of 259 Pg 849 of 1129

2026

(a)(6)    DEFINITIONS; QUALIFIED SECURITY (continued)

/02    Non-Qualified Securities (continued)

   International Institutions - Issues

   African Development Bank
       All issues

   Asian Development Bank
       All issues

   Inter-American Development Bank
       All issues

   International Bank for Reconstruction and Development (World Bank)
       All issues

            (SEC Staff to NYSE) (No. 88-1, February 1988)

/03    Collateralized Mortgage Obligations (CMOs)

   CMOs are not "qualified securities".

   While they may be secured by mortgage-backed securities that are issued or guaranteed by
   the United States, they are separate securities neither issued nor guaranteed by the United
   States.

   (SEC Letter to Marcotte Hume & Associates, Inc., June 29, 1988) (No. 89-7, June 1989)

/04    Callable Interest Obligation Stripped Securities

   Callable interest obligation stripped U.S. Government securities, even though stripped and
   guaranteed by the U.S. Government, are not qualified for deposit into Reserve Bank
   Accounts.

            (SEC Staff to NYSE) (No. 02-7, August 2002)

/05    Certificates of Deposit Issued by a Parent or Affiliated Bank

   Certificates of deposit issued by a parent or affiliated bank of the broker-dealer are not
   qualified for deposit into Reserve Bank Accounts.

            (SEC Staff to NYSE) (No. 03-2, March 2003)

**(NEXT PAGE IS 2041)**

                                    SEA Rule 15c3-3(a)(6)/05

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 47250 Filed 12/06/14 Entered 12/06/13 43:39:19 Main Document
Documents 1 Through 259 Pg 42 of 29 Pg 850 of 1129

2041

(a)     DEFINITIONS (continued)

(7)     The term "bank" shall mean a bank as defined in Section 3(a)(6) of the Act and shall also mean any building and loan, savings and loan or similar banking institution subject to supervision by a Federal banking authority.  With respect to a broker or dealer who maintains his principal place of business in the Dominion of Canada, the term "bank" shall also mean a Canadian bank subject to supervision by an authority of the Dominion of Canada.

(8)     The term "free credit balances" shall mean liabilities of a broker or dealer to customers which are subject to immediate cash payment to customers on demand, whether resulting from sales of securities, dividends, interest, deposits or otherwise, excluding, however, funds in commodity accounts which are segregated in accordance with the Commodity Exchange Act or in a similar manner.

(9)     The term "other credit balances" shall mean cash liabilities of a broker or dealer to customers other than free credit balances and funds in commodities accounts segregated as aforesaid.

(10)    The term "funds carried for the account of any customer" (hereinafter also "customer funds") shall mean all free credit and other credit balances carried for the account of the customer.

(11)    The term "principal officer" shall mean the president, executive vice president, treasurer, secretary or any other person performing a similar function with the broker or dealer.

(12)    The term "household members and other persons related to principals" includes husbands or wives, children, sons-in-law or daughters-in-law and any household relative to whose support a principal contributes directly or indirectly.  For purposes of this paragraph (a)(12), a principal shall be deemed to be a director, general partner, or principal officer of the broker or dealer.

SEA Rule 15c3-3(a)(12)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 14:53:19 Main Appendix Documents 1 Through 5 Pg 43 of 259 Pg 851 of 1129

2042

(a)     DEFINITIONS (continued)

(13)     The term "affiliated person" includes any person who directly or indirectly controls a broker or dealer or any person who is directly or indirectly controlled by or under common control with the broker or dealer.  Ownership of 10% or more of the common stock of the relevant entity will be deemed prima facie control of that entity for purposes of this paragraph.

/01     Securities Accounts With Affiliates

Accounts which except for the affiliation would be classified as securities customers must be carried individually, by affiliate in accordance with SEA Rules 15c3-3 and 15c3-3a subject to Notes E(1) and E(6).

(SEC Staff to NYSE) (No. 91-9, July 1991)

(14)     The term "securities account" shall mean an account that is maintained in accordance with the requirements of section 15(c)(3) of the Act (15 U.S.C. 78o(c)(3)) and §240.15c3-3.

(15)     The term "futures account" (also referred to as "commodity account") shall mean an account that is maintained in accordance with the segregation requirements of section 4d of the Commodity Exchange Act (7 U.S.C. 6d) and the rules thereunder.

**(NEXT PAGE IS 2101)**

SEA Rule 15c3-3(a)(15)

© 2008 Financial Industry Regulatory Authority, Inc.

(d)      REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL

Not later than the next business day, a broker or dealer, as of the close of the preceding business day, shall determine from his books or records the quantity of fully-paid securities and excess margin securities in his possession or control and the quantity of fully-paid securities and excess margin securities not in his possession or control. In making this daily determination inactive margin accounts (accounts having no activity by reason of purchase or sale of securities, receipt or delivery of cash or securities or similar type events) may be computed not less than once weekly. If such books or records indicate, as of such close of the business day, that such broker or dealer has not obtained physical possession or control of all fully-paid and excess margin securities as required by this section and there are securities of the same issue and class in any of the following non-control locations:

(1)      Securities subject to a lien securing moneys borrowed by the broker or dealer or securities loaned to another broker or dealer or a clearing corporation, then the broker or dealer shall, not later than the business day following the day on which such determination is made, issue instructions for the release of such securities from the lien or return of such loaned securities and shall obtain physical possession or control of such securities within two business days following the date of issuance of the instructions in the case of securities subject to lien securing borrowed moneys and within five business days following the date of issuance of instructions in the case of securities loaned: or

/01    Margin Section

The time at which instructions must be issued by the margin section to the cashiering section to acquire possession or control or the time at which such instructions may be released to the cashiering section are as follows:

1.      In the case of purchases of securities by customers; on or before the business day following settlement date or the business day following actual date of receipt of payment whichever is later.

2.      In the case of sales of securities by customers; not earlier than the close of business on the third business day before settlement date, which is deemed to allow adequate time for processing securities for pending deliveries. However, the securities cannot be used for securities loans or bank loans.

3.      In the case of sales of securities by customers an alternative is for the broker-dealer to release the segregation instructions not earlier than the morning of business on settlement date minus one business day, which is deemed to allow adequate time for processing securities for pending deliveries.

SEA Rule 15c3-3(d)(1)/01

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-sccc Doc 470250 Filed 12/006/126/14 Entered 12/006/126/3:343:539:19 Main Appendix Document Documents 1 Through of 259 Pg 45 of 25 Pg 853 of 1129

2302

(d)(1) <u>REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL</u> <u>(continued)</u>

/01     <u>Margin Section (continued)</u>

A deficiency in a given security required for possession or control may be eliminated by revising the selection of securities in margin accounts (market value not in excess of 140% of the total of the debit balance in the customer's account or accounts) representing collateral for customers' indebtedness. In every instance where a determination as to which securities within the permissible limits constitute margin securities and which securities constitute excess margin securities of customers has been made or revised, it should be clearly reflected in the records of the broker-dealer.

(SEC Release 34-9922, January 2, 1973; Amended August 1994)
(SEC Staff to NYSE) (No. 95-3, May 1995)

/011     <u>Early Release of Customers' Foreign Issued Securities From Possession or Control</u>

Customers' foreign issued securities which have been sold for foreign settlement may be released on the day following execution of the sale, solely to facilitate its delivery. The security may not be used for any other purpose prior to settlement date.

(SEC Staff to NYSE) (No. 92-13, December 1992)

SEA Rule 15c3-3(d)(1)/011

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 13:48:39 Main Document
Documents 1 Through 2 Pg 46 of 259 Pg 854 of 1129

2303

(d)(1)  **REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL** (continued)

/02  Cashiering Section

The deficiency or excess of securities required for possession or control must be determined on a daily basis as of the close of business on the preceding day. A separate record or listing must include the status of those securities which have either an excess or a deficit. For securities which are neither in excess or deficit, books and records must be available to verify that status.

For securities in deficit, action must be taken (if required by the rule) no later than the business day following the day on which the deficiency determination is made.

Securities needed for possession or control may be borrowed from another broker-dealer or from others rather than recall a security loaned, withdraw bank loan collateral or buy-in a dividend receivable. Securities may not be borrowed in lieu of other buy-in requirements in the rule such as fails to receive in excess of 30 days, short security differences and short in customer accounts in excess of 10 business days (paragraph (m)). If instructions shall have been issued for the recall of a security loaned or for the withdrawal of collateral securities in a bank loan, deliveries of that security may be made to the extent that completion of such recall would create an excess, provided the security recalled is returned within two business days following the date of issuance of the instructions in the case of collateral securities in a bank loan within five business days following the date of issuance of instructions in the case of securities loaned.

Note that the borrowing of securities for the purpose of their hypothecation in bank loan is not stated as a permissible activity at 220.16 of Regulation T of The Board of Governors of the Federal Reserve System.

(SEC Release No. 34-9922, January 2, 1973)

SEA Rule 15c3-3(d)(1)/02

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4070-50 Filed 12/06/12 Entered 12/06/12 14:35:19 Main Appendix Document Documents 1 Through 25 Pg 47 of 259 Pg 855 of 1129

2304

(d)(1)  **REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL** (continued)

/03  **Requirements For Less Than Full Unit of Trading**

Where less than a full unit of trading is required to be in possession or control, no action pursuant to paragraph (d) of the rule will be required and delivery of trading units will not be precluded if a deficiency of less than a trading unit will result.

However, while broker-dealers may pledge margin securities in units of trading without reference to the requirement to reduce to possession or control quantities of less than a trading unit, where such excess is material or substantial a broker-dealer should take appropriate corrective action.

Note:  SEC Release No. 9922 permits a broker-dealer to revise his selection of securities in margin accounts representing collateral for customers' margin indebtedness.

(SEC letter to NASD, July 16, 1974)

/04  **Specific Identification System**

A broker-dealer that uses a specific identification system to satisfy possession and control requirements, need not take action to obtain securities that are in non-control locations other than the location in which a customer's fully-paid or excess margin securities are specifically located.

Example:

Firm owns securities and pledges them for a bank loan.

The next day a customer buys securities, pays for them and the selling broker fails to deliver.

The broker need not remove the securities from bank loan if he is on a specific identification system, since the customer's securities are in fail to receive (for less than 30 days).

(SEC letter to Sade & Co., March 29, 1973)

SEA 15c3-3(d)(1)/04

© 2008 Financial Industry Regulatory Authority, Inc.

(d)(1)   REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

/041   Allocation System

With reference to the example cited in interpretation 15c3-3(d)(1)/04 above or similar situations, if the broker-dealer is using an allocation system the securities must be recalled from bank loan or stock loan as required under SEA Rule 15c3-3(d)(1). Only the locations described under SEA Rule 15c3-3(c) are good possession or control locations.

The fact that time is allowed before action must be taken when securities are located in failed to receive or elsewhere does not make it a good control location.

(SEC Staff to NYSE)

/05   Omnibus Accounts

Broker-dealers carrying a special omnibus account under 220.10 of Reg. T must reduce securities to possession or control in accordance with the instructions of the introducing broker who makes daily determinations of fully paid and excess margin securities. A special omnibus account is also considered a customer account for purposes of SEA Rule 15c3-3 and the required 140% computation must also be complied with.

(SEC Release 34-9856, November 10, 1972)

/06   Customer Long vs. Customer, Non-Customer or Proprietary Short

When customers' fully paid or excess margin securities (other than those indicated at interpretation 15c3-3(d)(1)/07 below) allocate to bona-fide short positions in customer or non-customer margin accounts or to a proprietary short position which results from a principal sale to the customer it is not necessary to buy-in the short position.

The short market value is includible as a credit in the formula.

In any case a deficit may not be created or increased by delivery on a short sale and prompt steps must be taken to bring the security into possession or control.

(SEC Staff to NYSE) (No. 78-1, May 1978) (No. 88-10, June 1988)

SEA 15c3-3(d)(1)/06

© 2008 Financial Industry Regulatory Authority, Inc.

(d)(1)  <u>REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL</u> (continued)

/07  <u>Securities Held in Special Custody or Accommodation Transfer Accounts</u>

When a broker-dealer is holding securities in a "Special Custody Account for the Exclusive Benefit of Customers" or in a "Special Custody Account for Accommodation Transfer for the Exclusive Benefit of Customers" of another broker-dealer, such securities:

1.  Shall not be allocated against short positions in customer, non-customer or proprietary accounts;

2.  Shall be promptly obtained and maintained in physical possession or control, through borrowing or otherwise (failure results in a violation of SEA Rule 15c3-3(b)(1)); and

3.  The market value of securities not held in possession or control shall be included as a credit in the formula.

In addition, a purchasing broker-dealer cannot designate another broker-dealer who issues a short sale confirmation as a control location unless such seller is committed in a custody agreement to borrow and set aside the securities for the benefit of the purchasing broker-dealer's customers.

(SEC Staff to NYSE) (No. 88-4, March 1988) (No. 88-10, June 1988)

/08  <u>Retention of Excess/Deficit Listing</u>

Excess/deficit listings are to be preserved for a period of three years with the first two years in an easily accessible place.

(SEC Staff to NYSE) (No. 78-1, May 1978)

SEA 15c3-3(d)(1)/08

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4709-50 Filed 12/06/12 Entered 12/06/12 13:48:39 Main Document Documents 1 Thru 5 Pg 50 of 259 Pg 858 of 1129

2307

(d)(1)  <u>REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL</u> (continued)

/09  <u>Excess/Deficit Listing</u>

The records which must be maintained by a broker-dealer to appropriately discharge his responsibilities under SEA Rule 15c3-3 and as set forth in Securities Exchange Act Release No. 9922 to promptly obtain and thereafter maintain possession or control of customers' fully paid and excess margin securities will, of necessity, be reflective of the degree of complexity of the broker-dealer's operations. Accordingly, a uniform recordkeeping format cannot be set forth at this time. In general, however, the records which must be prepared and maintained by a broker-dealer are those which he will utilize on a daily basis to:

1.  Identify fully paid and excess margin securities;

2.  Identify fully paid and excess margin securities which are in his physical possession or control;

3.  Determine any deficiency of fully paid or excess margin securities which are not in his physical possession or control;

4.  Determine the location of fully paid and excess margin securities which are not in physical possession or control; and

5.  Record any action taken to reduce fully paid and excess margin securities to physical possession or control or to locations designated by paragraph (c) of the rule when paragraphs (d) or (m) of the rule requires that specified action be taken.

Thus, a separate record or listing as set forth in Release No. 9922 may not be necessary for some broker-dealers who can comply with the rule's provisions if the records outlined above or those maintained by him readily enable a broker or dealer (a) to issue instructions to acquire physical possession or control of fully paid or excess margin securities within the time frames set forth in SEA Rule 15c3-3 or (b) to determine the amount of any excess or deficiency of fully paid and excess margin securities either in or required to be in physical possession or control and the location of any such securities in deficiency, daily as of the close of business on the preceding day. Where a separate listing must be maintained, such listing must include any deficiency or excess of fully paid for and excess margin securities as determined from records, which should meet criteria (1) through (5) above.

(SEC to Troster, Singer & Co., January 21, 1975) (No. 78-1, May 1978)

SEA 15c3-3(d)(1)/09

© 2008 Financial Industry Regulatory Authority, Inc.

(d)(1)  REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

/091  Agreement to Pledge Loans

Effective February 28, 1986 securities collateralizing bank loans under agreements to pledge must be reflected in the daily securities records, bank loan subsidiary ledger and the excess/deficit listings.

(SEC staff to NYSE) (85-12, December 1985)

/10  Conversion of Securities Loan Recall To Fail To Receive

Securities needed for possession or control which are recalled from securities loaned cannot be converted to failed to receive if not returned within five business days and the required buy-in action must be initiated.

Broker-dealers may want to set up such securities loaned buy-ins in a separate account in order to separate such items from securities loaned locations for which no action is required.

Note: Broker-dealers may, however, borrow securities on day 6 in order to satisfy a deficit condition where securities loaned recall has not been returned within the time frames prescribed by the rule.

(SEC Staff to NYSE) (No. 78-1, May 1978)

SEA 15c3-3(d)(1)/10

© 2008 Financial Industry Regulatory Authority, Inc.

0808-02425-cccDoc#470250Filed 12/06/12 Entered 12/06/12 13:48:39 Main Document Documents 1 Through 259 Pg 52 of 59 Pg 860 of 1129

2309

(d)(1) **REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL** (continued)

/101    Securities Loan Recalls - Elective Procedure

The SEC has issued a no-action letter regarding procedures for recalling stock loans. The letter provides a safe harbor for lenders that are attempting to recall securities loaned, that have not received the loaned securities within five business days of the date of issuance of the recall instructions, so long as the lender adheres to the elective procedures. The procedures require the lender to attempt to borrow the securities every day that the security continues to be needed to meet possession or control requirements. The procedures are as follows:

1.    The lender's records indicate that a deficit exists in a security with an outstanding stock loan (Deficit Determination Day). The lender must attempt to borrow securities to fulfill its possession or control requirement.

2.    No later than 11:30 a.m. NYT on the next business day following the Deficit Determination Day (Notification Day ("N")) the lender, if unsuccessful in its borrow attempt, must send notification to the original borrower that the securities loaned must be returned. The recall notice shall state that, after 2:30 p.m. NYT on the fifth business day after notification of the recall ("N+5"), the lender will execute a buy-in unless they receive the securities or proof of purchase of securities of like kind.

3.    The lender continues to try to borrow securities to cover the deficit (N+1 through N+3).

4.    On N+4, if the deficit still exists, the lender must send the borrower a reaffirmed recall notice that states that if the securities are not received by 2:30 p.m. NYT on N+5, the lender will execute a buy-in. If the lender fails to send a reaffirmed recall notice, the borrower may understand that the deficit has been satisfied and that return of the securities is no longer necessary.

5.    On N+5 securities loaned that are subject to a recall notice must be received by 2:30 p.m. NYT. If the recalled securities are not received by 2:30 p.m. NYT on N+5, the buy-in must be executed for securities of a like kind and quantity to those originally loaned. However, if a lender receives proof of purchase of securities from the borrower, it shall not execute the buy-in on the fifth business day. If the securities remain undelivered at 2:30 p.m. NYT on the first business day after settlement date indicated in the proof of purchase provided by the borrower, the lender may buy-in the securities (without any further notice of intent to the borrower) in accordance with the established procedures of the principal exchange or market in which the securities are traded.

(SEC Letter to NYSE, February 14, 1994) (No. 94-5, May 1994)

SEA 15c3-3(d)(1)/101

© 2008 Financial Industry Regulatory Authority, Inc.

08-01-2020-ccc Doc 4780250 Filed 12/06/14 Entered 12/06/13 34:55:19 Main Appendix
Documents 1 Thru 58 of 259 Pg 861 of 1129

2310

(d)(1)  **REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL** (continued)

/102  Securities Borrowed and Loan "Conduit" Business

The SEC has granted relief from certain possession or control provisions of SEA Rule 15c3-3 to broker-dealers that conduct a securities borrowed and loan "conduit" business. In a "conduit" business, a broker-dealer borrows securities from one party and then lends the same securities to another party. A broker-dealer conducting a "conduit" business is not required to freeze the returned securities in the conduit account or recall securities loaned in the conduit account to eliminate a deficiency in its possession or control requirements (except as to intra-company loans) under the following conditions:

1.  The broker-dealer must establish a separate clearing account at a depository.

2.  The broker-dealer must use separate internal securities borrow and loan account numbers to reflect the "conduit" business.

3.  The broker-dealer may not commingle customer securities with those in the conduit account, except as described below.

4.  Intra-company stock borrows and loans are permissible between the broker-dealer's conduit book and customer book, provided that the stock record reflects the borrows and loans, and related movements between the customer and conduit businesses. No customer excess securities available to be loaned may be loaned to and accumulated in the broker-dealer's conduit accounts for potential securities loans. Intra-company borrows and loans may not be used by the broker-dealer to circumvent its possession or control requirements or reserve formula requirements under SEA Rule 15c3-3. When a deficit arises in a security loaned to the conduit, a recall of the securities loaned is required within the time parameters specified in SEA Rule 15c3-3(d)(1).

5.  Securities loaned from the conduit book to the customer book may not be returned to the conduit book if such return would create or increase a deficit.

6.  After recall by the customer book to the conduit book is made, if a conduit securities loan is returned ("received in") the broker-dealer first must satisfy the customer recall even though the securities returned to the account originally were borrowed from a broker-dealer or institution and reloaned. If there is a prior recall to the conduit box from another stock lender, that recall may be satisfied before the customer book recall.

(SEC Letter to NYSE, December 21, 1991, NYSE Interpretation Memo 92-2)
(No. 94-5, May 1994)

SEA 15c3-3(d)(1)/102

© 2008 Financial Industry Regulatory Authority, Inc.

08-01789-cc-sccDocDoc47250FiledFiled12/06/14Entered12/06/1434855:19 MainAppendixt
Documents 1 ThroughPg 54 of 259 862 of 1129

2311

(d)(1)  <u>REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL</u>
(continued)

/11  <u>Dividend Longs, Suspense Longs and Long Differences</u>

Unclaimed stock dividends payable, suspense longs and long differences are considered customer positions and are subject to possession or control requirements.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/12  <u>Pre-Authorized Delivery Service (PDQ)</u>

Recording movements of the location of securities into a pending delivery box non-control location based on excess securities available for delivery a day prior to actual PDQ deliveries is not a violation of possession or control requirements, since such securities are not considered to be in a control location.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/13  <u>Pre-Authorized Delivery - Other</u>

When securities are held in excess of possession or control requirements, they may be moved to a pending delivery box non-control location a day prior to pledge as collateral to bank loan or to stock loan.

(SEC Staff NYSE) (No. 90-11, December 1990)

SEA 15c3-3(d)(1)/13

© 2008 Financial Industry Regulatory Authority, Inc.

**PAGE 2312 IS BLANK**

**(NEXT PAGE IS 2331)**

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/00/26/14 Entered 12/00/26/3:48:59:19 Main Document Documents 1 Thru 5 of 259 Pg 864 of 1129

2331

(d)     REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

     (2)    Securities included on his books or records as failed to receive more than 30 calendar days, then the broker or dealer shall, not later than the business day following the day on which such determination is made, take prompt steps to obtain physical possession or control of securities so failed to receive through a buy-in procedure or otherwise; or

/01     Foreign Issued, Foreign Settled Securities

Broker-dealers may, in lieu of the buy-in requirement of paragraphs (d)(2) and (m) for foreign issued, foreign settled securities apply the following alternative procedures.

1.    File a written notice with its designated examining authority of its intention to apply this alternative;

2.    Thirty days after settlement date, take a proprietary haircut charge for the securities failed to receive or those due from a customer pursuant to SEA Rule 15c3-1, reduced by the equity (or increased by the deficit) in the transaction on a mark-to-market basis. In those countries where settlement is on a seller's option basis rather than on a customary settlement cycle, the settlement date for the purposes of this alternative will be considered to be a day not more than 30 days from trade date;

3.    Maintain in its records a schedule of the current settlement cycle of each country in which it trades; and

4.    Maintain and preserve separate records, in whatever form appropriate, detailing, by country, the total number of failed to receive contracts, the total number of long sale transactions with customers when possession of the securities has not been obtained pursuant to paragraph (m) and the total contractual value of those contracts and transactions.

All other no-action letters relating to this subject should be considered withdrawn and may no longer be relied upon.

    (SEC Letter to SIA, June 16, 1988) (No. 88-20, November 1988)

/02     Fail to Receive Buy-In

When buy-in procedures are required to obtain securities located in fail to receive, such procedures must be initiated not later than the business day following the 30th calendar day.

    (SEC Letter to J. B. Hanauer, February 22, 1988) (No. 89-7, June 1989)

SEA 15c3-3(d)(2)/02

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470-50 Filed 12/06/12 Entered 12/06/12 13:48:59 Main Document
Documents 1 Through 5 Pg 57 of 259 Pg 865 of 1129

2332

(d)(2)  REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL
(continued)

/021  Fail to Receive Buy-In Accomplishment

When the buy-in of aged fail to receive is necessary to obtain securities require to be held in possession or control, the security must be purchased if the order is executable.

In the event the buy-in order is not executable, other steps must be promptly taken to obtain required possession or control (i.e., borrowing).

(SEC Staff of NYSE) (No. 89-7, June 1989)

/0210  Use of Securities Subject to a Buy-in Procedure

The initiation of a buy-in procedure does not give the broker-dealer the right to use securities needed for possession or control that come into its possession during the period of time between the issuance of the buy-in and its actual execution and/or receipt of the securities that were the subject of the buy-in. Securities that are received physically by the firm during this interim period should be allocated to eliminate the deficiency that triggered the buy-in procedure. Only when that deficiency has been corrected can the firm resume use of securities for other purposes.

(SEC Staff of DMR to NASD, October 1988)

/022  CNS System Fails to Receive - Not Aged

Fails to receive from a registered clearing agency operating under a continuous net settlement system which is marked to market daily need not be aged.  Thus, under ordinary circumstances such fails to receive need not be bought in under this subparagraph unless delivery is request by the customer, or a buy in is required through other rules or circumstances.

(SEC Staff to NYSE) (No. 90-11, December 1990)

SEA Rule 15c3-3(d)(2)/022

© 2008 Financial Industry Regulatory Authority, Inc.

(d)(2)   REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

/03   Failed to Receive Resulting From NYSE Rule 412(e) (ACATS) Customer Securities Accounts Transfers

When customer's accounts transferred under the Automated Customer Account Transfer System (ACATS) of NYSE Rule 412(e) contain fully paid securities, the receiving broker-dealer must designate the securities as required to be held in possession or control even though the security may be failing to receive from the delivering broker-dealer. However, where the customer's long position is identified as related to a NYSE Rule 412(e) (ACATS) fail to receive, the following treatment may apply:

- Where the fail to receive contract has been marked to market the credit balance must be included in Item 4 for the reserve formula computation. The fail to receive, identified as a "412 fail" (as required under NYSE Rule 412 (b)(2)/02), may be treated as if it were a good control location allocating only to the position in the account received for up to the first 10 business days during which the fail is open.

- Fails to receive relating to customer positions which are classified as exempt under NYSE Rule 412(f) (and its interpretations /01 through /05 of the NYSE Interpretation Handbook) for which no cash has been received may be treated as if they are control locations allocating to the customer position in the specific account received for as long as the fail continues to be carried in compliance with NYSE Rule 412 and its interpretations. Where cash or a marked to market contract amount is to be paid upon receipt of the security, such amount must be included as a credit under Item 4 of the reserve formula computation.

Amounts to be received upon delivery of an ACATS failed to deliver item may be included as a debit under Item 12 of the reserve formula computation for 10 business days provided it is carried in compliance with NYSE Rule 412 and the security position does not allocate to a control location.

(SEC Staff to NYSE) (No. 90-1, February 1990)

SEA Rule 15c3-3(d)(2)/03

© 2008 Financial Industry Regulatory Authority, Inc.

08-01-2020-sccDoc 479250Filed 12/06/14 Entered 12/06/13:34:59:19 Main Document
Documents 1 Through 25 Pg 59 of 259 Pg 867 of 1129

2334

(d)(2)   REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

/04   Buy-In of Mortgage Backed Securities

Buy-ins are required for U.S. Government Mortgage Backed Securities that are in fail to receive status for more than 60 calendar days pursuant to the requirements of the Treasury Rule.

(U.S. Treasury Department Release, February 28, 1994)
(SEC Staff to NYSE) (No. 95-3, May 1995)

/05   Extensions of Time

See paragraph (n) of this section for information regarding time periods and processing of extensions of time.

(SEC Staff to NYSE)

/06   Recaps by NSCC

In accordance with an SEC no-action letter dated December 22, 1987 a member organization participating in NSCC's RECAP service may treat the RECAP's settlement date as the date of the fail.

(SEC Staff to NYSE)

**(NEXT PAGE IS 2341)**

SEA Rule 15c3-3(d)(2)/06

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/26/14 Entered 12/06/26/13:48:59:19ain Appendix Documents 1 Through 2 Pg 60 of 25 Pg 868 of 1129

2341

(d)    REQUIREMENT TO REDUCE SECURITIES TO POSSESSION OR CONTROL (continued)

(3)    Securities receivable by the broker or dealer as a security dividend receivable, stock split or similar distribution for more than 45 calendar days, then the broker or dealer shall, not later than the business day following the day on which such determination is made, take prompt steps to obtain physical possession or control of securities so receivable through buy-in procedure or otherwise.

/01    Extensions of Time

See paragraph (n) of this section for information regarding time periods and processing of extensions of time.

(SEC Staff to NYSE)

(4)    A broker or dealer which is subject to the requirements of section 240.15c3-3 with respect to physical possession or control of fully paid and excess margin securities shall prepare and maintain a current and detailed description of the procedures which it utilizes to comply with the possession or control requirements set forth in this section.  The records required herein shall be made available upon request to the Commission and to the designated examining authority for such broker or dealer.

SEA Rule 15c3-3(d)(4)

© 2008 Financial Industry Regulatory Authority, Inc.

(e)     SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS

(1)     Every broker or dealer shall maintain with a bank or banks at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the "Reserve Bank Account"), and it shall be separate from any other bank account of the broker or dealer. Such broker or dealer shall at all times maintain in such Reserve Bank Account, through deposits made therein, cash and/or qualified securities in an amount not less than the amount computed in accordance with the formula attached hereto as Exhibit A.

/01     Money Market Deposit Account (MMDA)

Special reserve bank account deposits required under SEA Rule 15c3-3(e) may be made in Money Market Deposit Accounts as defined under Regulation D of the Federal Reserve System provided that:

1.     The deposit is with a bank as defined by paragraph (a)(7) of this rule in accordance with the requirements of SEA Rule 15c3-3(e) and (f), and

2.     The total deposit with any one bank does not exceed 50% of the broker-dealers' excess net capital and is not greater than 10% of the bank's equity capital.

(SEC Staff to NYSE) (No. 88-1, February 1988)

/010     Money Market Deposits – Aggregate Concentration Calculation

Reserve Bank Accounts maintained at the same bank which contain money market deposits, certificates of deposit (issued by the applicable bank) and time deposits must be aggregated in determining the "total deposit" when computing the concentration calculation pursuant to interpretation 15c3-3(e)(1)/01.

Also, see interpretations 15c3-3(a)(6)/0121 (Certificates of Deposit – Aggregate Concentration Calculation) and 15c3-3(e)(1)/012 (Time Deposits – Aggregate Concentration Calculation).

(SEC Staff to NYSE) (No. 05-2, January 2005)

SEA Rule 15c3-3(e)(1)/010

© 2008 Financial Industry Regulatory Authority, Inc.

(e)(1)   SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)

/011   Time Deposits

Special reserve bank account deposits may include Time Deposits provided the broker-dealer receives the following written confirmation from the bank:

1.   The funds are payable upon demand;

2.   The funds are held free of any restrictions; and

3.   If prematurely withdrawn, the funds are subject only to the forfeiture of interest.

In addition, the bank where the deposit is held must meet the definition of a "bank" pursuant to SEA Rule 15c3-3(a)(7).

(SEC Staff to NYSE) (No. 96-3, April 1996)

The total time deposits with any one bank may not exceed 50% of the broker-dealer's excess net capital or may not be greater than 10% of the bank's equity capital.

(SEC Staff to NYSE) (No. 02-7, August 2002)

Time deposits issued by a parent or an affiliated bank of a broker-dealer are not qualified for deposit into a Reserve Bank Account.

(SEC Staff to NYSE) (No. 07-4, April 2007)

/012   Time Deposits – Aggregate Concentration Calculation

Reserve Bank Accounts maintained at the same bank which contain time deposits, certificates of deposit (issued by the applicable bank) and money market deposits must be aggregated in determining the "total deposit" when computing the concentration calculation pursuant to interpretation 15c3-3(e)(1)/011.

Also, see interpretations 15c3-3(a)(6)/0121 (Certificates of Deposit – Aggregate Concentration Calculation) and 15c3-3(e)(1)/010 (Money Market Deposits – Aggregate Concentration Calculation).

(SEC Staff to NYSE) (No. 05-2, January 2005)

SEA Rule 15c3-3(e)(1)/012

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/26/14 Entered 12/06/26/13 18:39:19 Main Appendix
Documents 1 Through 25 Pg 68 of 259 Pg 871 of 1129

2403

(e)(1)  **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)**

/02     **IRA and ERISA Contribution Account**

A separate Reserve Bank Account may be establish to be used exclusively to deposit IRA and ERISA contributions pending purchase of mutual fund shares or other qualified investment for IRA and other qualifying retirement plans.

(SEC Letter to PaineWebber Incorporated, April 17, 1986) (No. 88-1, February 1988)

/03     **Offshore Deposits**

Offshore deposits (Eurodollars, etc.) whether representing demand deposits, time deposits or certificates of deposit are not good for special reserve bank account deposits under SEA Rule 15c3-3(e).

(SEC Staff to NYSE) (No. 86-8, August 1986)

/04     **Borrowed Treasury Securities**

A "qualified security" as defined by SEA Rule 15c3-3(a)(6), which has been borrowed may be deposited into a Reserve Bank Account provided the broker-dealer is a Primary Dealer. Borrowed qualified securities must be secured by cash or other qualified securities to be acceptable for 15c3-3 deposits.

The value allowed for the deposit is the lesser of the contract or market value of the securities borrowed. In lieu of valuing the securities at the lesser of contract or market broker-dealers can take a 2% reduction to the market value in valuing these securities for reserve formula deposit purposes.

(SEC Staff to NYSE) (No. 92-3, January 1992)

It is acceptable for a broker-dealer that is not a Primary Dealer to borrow qualified securities as defined by SEA Rule 15c3-3(a)(6) for deposit into a Reserve Bank Account.

(SEC Staff to NYSE) (No. 03-2, March 2003)

SEA Rule 15c3-3(e)(1)/04

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/12 Entered 12/06/12 14:53:19 Main Document
Documents 1 Through 25 Pg 64 of 55 Pg 872 of 1129

2404

(e)(1)  SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)

/05  Conditions for Deposit of Qualified Securities

The SEC has prescribed the following conditions for holding "Qualified Securities" on deposit in a Rule 15c3-3 Special Reserve Account for the Exclusive Benefit of Customers:

Physical Certificates:  The bank actually holding the certificates must acknowledge to the broker-dealer in writing that the certificates are identified on the bank's books as being held free of lien in a special account for the exclusive benefit of customers of the broker-dealer.

Uncertificated Securities:  The bank having the direct access to the Federal Reserve Bank book entry system must acknowledge in writing to the broker-dealer that the securities are held free of any lien in a special reserve account for the exclusive benefit of customers of the broker-dealer.

Reverse Repurchase Agreement Securities:  Possession or control must be established as in the appropriate paragraph above.

Identification:  The securities deposited must be clearly identified as to class or series of the issuer, interest rate and maturity.

Clearance Procedure:  Where a purchase or sale involves funds or securities already held in the special reserve account, the values removed must be replaced with equal or greater value. Reductions to the special reserve account may only be made in conformity and compliance with SEA Rule 15c3-3(g) and supported by a reserve formula computation as required.  The payment for the purchase and receipt of the securities or delivery of securities and deposit of proceeds in the special reserve account must take place simultaneously.

Correspondent Banks:  Where purchase of the securities is made through a correspondent bank, the broker-dealer must be notified by the bank holding the qualified securities or having the direct contact with the Federal Reserve book entry system that:

1.  The securities it is carrying for the correspondent bank are identified on its books as being held free of lien in a separate special account for the exclusive benefit of customers of the broker-dealer.

2.  The securities are clearly identified as to class or series of the issuer, interest rate and maturity.

(NYSE Interpretation Memo No. 89-13, November 27, 1989)
(SEC Staff to NYSE) (No. 90-1, February 1990)

SEA Rule 15c3-3(e)(1)/05

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/26/14 Entered 12/006/26/14 3:48:39:19ain Document Documents 1 Through 259 873 of 1129

2405

(e)(1)  **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)**

/051  Valuation of Reserve Deposits

If the market value of securities deposited falls below the reserve requirement an additional deposit should be made to maintain an amount not less than the amount computed in the prior reserve computation.

Qualified securities should be valued at the lesser of contract value or market value when the securities are obtained through reverse repurchase agreements or securities borrowed.

In lieu of valuing the securities at the lesser of contract value or market value, broker-dealers can take a 2% reduction to the market value in valuing these securities for reserve formula deposit purposes.

(SEC Staff to NYSE) (No. 92-3, January 1992)

/06  Reserve Deposit Made From Overdrawn Account

Checks deposited or funds wired to a Reserve Bank Account that create overdrafts or increase existing overdrafts in other bank accounts do not qualify as bona fide deposits. Consequently, a broker-dealer cannot meet its deposit requirements by utilizing such overdrawn funds.

(SEC Staff to NYSE and NASD) (No. 90-10, December 1990)

In order for a deposit to be considered bona-fide, the bank account from which the funds were wired must have had funds on deposit per the books of the broker-dealer in excess of the wired amount at the time the wire was sent.

A deposit made from an overdrawn account can only be considered an unsecured loan if the bank acknowledges in writing that the overdrawn amount is an unsecured loan and the bank agrees to only look toward the overdrawn account for payment (no cross liens).

(SEC Staff to NYSE) (No. 91-5, June 1991)
(SEC Staff to NYSE) (No. 92-3, January 1992)

SEA Rule 15c3-3(e)(1)/06

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/12 34:33:19 Main Document
Documents 1 Through 2 Pg 69 of 259 Pg 874 of 1129

2406

**(e)(1)** **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)**

**/061** **Cash Deposits into Reserve Bank Account**

Cash deposited into a Reserve Bank Account must have originated directly from wire transfers of fed funds or certified checks and be in the account by 10 A.M.

Clearing house checks are not acceptable for direct deposit into the reserve bank account unless the checks are received directly from customers.

(SEC Staff to NYSE) (No. 99-5, May 1999)

Drafts, notes, or ACH deposits are not acceptable for direct deposit into the Reserve Bank Account.

(SEC Staff to NYSE) (No. 03-2, March 2003)

**/062** **Timeliness of Reserve Deposit**

A broker-dealer may utilize a reserve bank account located outside of its normal home office (main headquarter) time zone. Funds and/or securities must be deposited into that account no later than one hour after the opening of its home office (but never later than 10 A.M. local time) provided prior written justification has been given to the DEA regarding using a reserve bank account located outside of the broker-dealer's home office time zone.

(SEC Staff to NYSE) (No. 99-5, May 1999)

**/07** **Foreign Currency Deposits**

A firm may deposit foreign currency in a Special Reserve Bank Account, provided there is an offsetting customer credit balance in the same foreign currency in the Reserve Formula.

In addition, the bank where the deposit is held must meet the definition of a "bank" pursuant to SEA Rule 15c3-3(a)(7), and the account must be established and maintained pursuant to SEA Rule 15c3-3(f).

(SEC Staff to NYSE) (No. 96-3, April 1996)

SEA Rule 15c3-3(e)(1)/07

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4770-50 Filed 12/06/12 Entered 12/06/12 13:48:59 Main Document
Documents 1 Through 25 Pg 67 of 259 Pg 875 of 1129

2407

(e)(1)    **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)**

/08    Tri-Party Repurchase Arrangement for Special Reserve Bank Account Deposits

A broker-dealer that elects to maintain its Special Reserve Bank Account ("the Account") pursuant to a tri-party repurchase agreement arrangement where the bank agrees to act as the broker-dealer's agent for the substitution of securities and funds on deposit, must comply with the following requirements:

1.    The broker-dealer is responsible for any violation of SEA Rule 15c3-3 resulting from this arrangement.

2.    Both the broker-dealer and the counterparty to the transaction must maintain accounts with the same bank.

3.    The bank must have equity capital in excess of $500,000,000.

4.    The bank cannot be the counterparty, or be affiliated with the counterparty, to the transactions.

5.    Daily confirmations must be provided by the bank to the broker-dealer disclosing the specific securities that were deposited into and withdrawn from the broker-dealer's Account. The term "various" or other similar terms, cannot be used to identify the securities on the confirmations.

6.    The bank must prepare monthly statements for the Account disclosing all money movements and securities activity. The specific securities deposited into and withdrawn from the Account must be disclosed and the time stamps for these movements must be made available upon request of the SEC or other SRO.  The term "various" or other similar terms, cannot be used to identify the securities on the statements. In lieu of a separate monthly statement, the bank can provide daily activity reports as long as all activity is shown for each day of the month, and on days where no activity occur a statement is provided that states there were no money or securities movements in the account(s).

7.    In lieu of recording the specific securities deposited into and withdrawn from the Account on its stock record, the broker-dealer may elect to produce a subsidiary listing or record which must clearly identify the specific securities deposited into and withdrawn from the Account. This subsidiary record must be maintained in accordance with the recordkeeping requirements of SEA Rules 17a-3 and 17a-4.

SEA Rule 15c3-3(e)(1)/08

© 2008 Financial Industry Regulatory Authority, Inc.

(e)(1)   SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)

/08   Tri-Party Repurchase Arrangement for Special Reserve Bank Account Deposits (continued)

8.   Accurate pricing of securities must be performed by the bank. In addition, qualified securities used in these tri-party repurchase arrangements for deposit into the Account must have readily available market prices.

9.   The broker-dealer will be responsible for verifying that appropriate qualified securities were deposited into the Account.

10.   The bank must represent that it will at all times maintain funds or securities in the Account at least equivalent to the aggregate amount(s) deposited by the broker-dealer.

11.   The bank must represent that it will not place a lien on funds or securities it moves as part of the tri-party repurchase arrangement prior to their deposit into the Account.

(SEC Staff to NYSE) (No. 97-6, October 1997)

**(NEXT PAGE IS 2421)**

SEA Rule 15c3-3(e)(1)/08

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 18:39:19 Main Document Documents 1 Through 25 Pg 69 of 259 Pg 877 of 1129

2421

(e)     SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS (continued)

(2)    It shall be unlawful for any broker or dealer to accept or use any of the amounts under items comprising Total Credits under the formula referred to in paragraph (e)(1) except for the specified purposes indicated under items comprising Total Debits under the formula, and, to the extent Total Credits exceed Total Debits, at least the net amount thereof shall be maintained in the Reserve Bank account pursuant to paragraph (e)(1).

/01    Substitution of Firm Bank Loans for Customer Bank Loans

The SEC has censured a broker-dealer for violating SEA Rule 15c3-3(e)(2) by substituting proprietary bank loans for customer bank loans prior to making the formula computation and reinstating the customer loans shortly thereafter.

The SEC advised that the intent and objective of SEA Rule 15c3-3, as indicated in SEC Release No. 34-9775 dated September 14, 1972, is…."to perfect the objective of the elimination of the use by broker-dealers of customer funds and securities to finance firm overhead and such firm activities as trading and underwriting through the separation of customer related activities from other broker-dealer operations".

The SEC staff advised that broker-dealers that would otherwise have had a higher reserve deposit requirement should be aware that substitution of proprietary or non-customer bank loans for customer bank loans only for the week-end or on the day of the formula computation may be regarded as an intentional circumvention of the rule if the customer loans are reinstated shortly thereafter.

(NYSE Interpretation Memo No. 89-10, August 23, 1989)
(SEC Staff to NYSE) (No. 89-11, October 1989)

SEA Rule 15c3-3(e)(2)/01

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/14 Entered 12/006/26/13:14:839:19 Main Appendix Document Documents 1 Through of 259 Pg 20 of 259 Pg 878 of 1129

2422

(e)(2)  **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS** (continued)

/02  Circumvention of the Rule's Requirement

The SEC staff advises that the following activities by broker-dealers may be considered as a circumvention of the requirement of SEA Rule 15c3-3(e)(2) and an avoidance of the deposit requirement of SEA Rule 15c3-3(e)(1).

1.  During periods between formula computations funds are obtained by loaning customer securities. Immediately before a formula computation is made, securities are borrowed which are returned after the formula computation date and for purposes of the formula computation a presumption is made, through the application of an allocation system or otherwise, that the securities it borrowed - and not customer securities - were on loan on the formula computation date.

2.  Any other device, window dressing or restructuring of transactions made solely to reduce an excess of credits over debits in the formula computation and not otherwise a normal business transaction.

The staff of the SEC further stated that such techniques may be in violation of the requirements of the rule in that customer derived funds are used during the period between computations "...in areas of the firm's business such as underwriting, trading and overhead" contrary to the purpose of the rule.

(NYSE Interpretation Memo No. 89-10, August 23, 1989)
(SEC Staff to NYSE) (No. 89-11, October 1989)

**(NEXT PAGE IS 2431)**

SEA Rule 15c3-3(e)(2)/02

© 2008 Financial Industry Regulatory Authority, Inc.

(e)     **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS** (continued)

(3)     Computations necessary to determine the amount required to be deposited as specified in paragraph (e)(1) shall be made weekly, as of the close of the last business day of the week, and the deposit so computed shall be made no later than one hour after the opening of banking business on the second following business day; provided, however, a broker or dealer which has aggregate indebtedness not exceeding 800 per centum of net capital (as defined in Rule 15c3-1 or in the capital rules of a national securities exchange of which it is a member and exempt from Rule 15c3-1 or in the capital rules of a national securities exchange of which it is a member and exempt from Rule 15c3-1 by subparagraph (b)(2) thereof) and which carries aggregate customer funds (as defined in paragraph (a)(10)), as computed at the last required computation pursuant to this rule, not exceeding $1,000,000, may in the alternative make the computation monthly, as of the close of the last business day of the month, and, in such event, shall deposit not less than 105 per centum of the amount so computed no later than one hour after the opening of banking business on the second following business day.

If a broker or dealer, computing on a monthly basis, has, at the time of any required computation, aggregate indebtedness in excess of 800 per centum of net capital, such broker or dealer shall thereafter compute weekly as aforesaid until four successive weekly computations are made, none of which were made at a time when his aggregate indebtedness exceeded 800 per centum of his net capital.

Computations in addition to the computations required in this subparagraph (3), may be made as of the close of any other business day, and the deposits so computed shall be made no later than one hour after the opening of banking business on the second following business day.

The broker or dealer shall make and maintain a record of each such computation made pursuant to this subparagraph (3) or otherwise and preserve each such record in accordance with Rule 17a-4.

SEA Rule 15c3-3(e)(3)

08-01420-scc Doc 470250 Filed 12/006/26/14 Entered 12/006/26/13 4:5:39:19 Main Appendix Document
Documents 1 Through 259g Pg 2 of 259 Pg 880 of 1129

2432

(e)(3)   **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS** (continued)

/01   Weekly Computations

If the normal month-ending day is other than that as of which a weekly computation would be made, only one computation will be required during that week, as of the month-ending day. In any case, a complete computation must be made as of the month end date.

See interpretation 15c3-3(Exhibit A)/01 for special rules covering the weekly determination of various Reserve Formula items.

(SEC Release 34-9922, January 2, 1973) (No. 83-2, April 1983)

If the normal month-end closing date is other than the last business day of the calendar month, the next weekly computation is required as of the close of the last business day of the following week.  No computation is required as of the last business day of the calendar month.

(SEC Release 34-9922, January 2, 1973) (No. 89-7, June 1989)

/02   Recomputations

If broker-dealers compute the reserve requirement as of Friday and have a deposit requirement, and recompute on Tuesday as of Monday night and do not have a deposit requirement, they  must make a deposit on Tuesday based on Friday's computation but then can immediately make a withdrawal based on Monday's determination.

(SEC Staff to NYSE)

/021   Reserve Deposits Focusing Around Bank Holidays

Deposits into the reserve bank account can be made on Wednesday in lieu of Tuesday when securities exchanges are open on the preceding Monday but it is considered a bank holiday.

(SEC Staff to NYSE) (No. 99-5, May 1999)

SEA Rule 15c3-3(e)(3)/021

© 2008 Financial Industry Regulatory Authority, Inc.

(e)(3)  **SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS** (continued)

/03  Required Weekly Computations For Monthly Computers

When a broker-dealer who calculates the Reserve Formula on a monthly basis finds that customer credits exceed $1,000,000 or Aggregate Indebtedness exceeds 800 per centum of net capital, the Reserve Formula computation must be made weekly until customer credits (free credit and other credit balances carried for customers) are less than $1,000,000 as reflected in four weekly computations, or aggregate indebtedness does not exceed 800 per centum of net capital whereupon the broker-dealer can return to a monthly calculation.

(SEC Staff to NYSE) (78-1, May 1978)

/04  Reducing Credits to Avoid Deposit - Prohibited

Once a deposit requirement is established, it may not be negated by using the proceeds of an unsecured or firm collateralized borrowing to reduce credit balances contained in the formula. The rule requires a deposit to be made.

(SEC Staff to NYSE) (No. 88-1, February 1988)

/05  Excess Reserve Account Deposits Into Affiliated Banks – Rescinded
(No. 03-3, April 2003)

/051  Reserve Bank Account Cash Deposits with Parent and/or Affiliated Bank

A broker-dealer may maintain a reserve bank account cash deposit(s) with a parent and/or affiliated bank(s) provided that:

1.  The cash deposit(s) is with a bank that meets the definition of a "bank" pursuant to SEA Rule 15c3-3(a)(7), and

2.  The greater of the amount of the excess cash deposit, if any, resulting from the following two calculations, will not be counted towards the 15c3-3 deposit:

    a)  The aggregate cash deposit(s) with the parent and/or affiliated bank(s) in excess of 50% of the broker-dealer's excess net capital based on the most recently filed FOCUS Report, or

    b)  In aggregate, the cash deposit with the parent and/or any affiliated bank(s) in excess of 10% of each respective bank's equity capital.

(SEC Staff to NYSE) (No. 03-3, April 2003)

SEA Rule 15c3-3(e)(3)/051

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4709-20 Filed 12/06/12 Entered 12/06/12 14:35:19 Main Document
Documents 1 Through 2 Pg 4 of 259 Pg 882 of 1129

2461

(g)    WITHDRAWALS FROM THE RESERVE BANK ACCOUNT

A broker or dealer may make withdrawals from his Reserve Bank Account if and to the extent that at the time of the withdrawal the amount remaining in the Reserve Bank Account is not less than the amount then required by paragraph (e).  A bank may presume that any request for withdrawal from a Reserve Bank Account is in conformity and compliance with this paragraph (g). On any business day on which a withdrawal is made, the broker or dealer shall make a record of the computation on the basis of which he makes such withdrawal, and he shall preserve such computation in accordance with Rule 17a-4.

/01    Federal Funds Sale or Loan

The sale or loan of Federal Funds on deposit in a Special Reserve Bank account whether made overnight or for an extended period are considered to be withdrawals without the computation required under SEA Rule 15c3-3(g).

(SEC Letter to Holland & Holland, August 20, 1984) (No. 84-9, November 1984)

/02    Reserve Computation Not Required - Substitution

A Reserve Account computation is not required when qualified securities are withdrawn provided that federal funds or other qualified securities have been deposited prior to or at the same time as the withdrawal.

Market appreciation and/or accrued interest on a deposit cannot be withdrawn without preparing a current reserve computation.

(SEC Letter to Olde & Co., Inc., April 1, 1986) (No. 88-1, February 1988)
(SEC Staff to NYSE) (No. 92-3, January 1992)

/021   Reserve Computation Not Required - Funds Received and Remitted by Mutual Fund Sponsor

No computation is required to withdraw funds from a separate Reserve Bank Account established to be used exclusively to deposit immediately upon receipt from customers for remittance to a specific mutual fund sponsor, provided:

•    The funds are withdrawn only for remittance to the mutual fund sponsor no later than noon of the next business day following deposit; and

•    The amount on deposit shall always equal the credits contained in the formula for the related customers.

(SEC Letter to The Ohio Company, March 21, 1985) (No. 88-1, February 1988)

SEA Rule 15c3-3(g)/021

© 2008 Financial Industry Regulatory Authority, Inc.

(g)     **WITHDRAWALS FROM THE RESERVE BANK ACCOUNT** (continued)

/03     Reserve Computation Not Required - IRA and ERISA Contributions

No computation is required to withdraw funds from a separate Reserve Bank Account established to be used exclusively to deposit immediately upon receipt for customers' IRA and ERISA contributions, provided:

- The amount on deposit is maintained in cash and is withdrawn only to purchase mutual fund shares or other qualified investments for IRA and other qualifying retirement plans for the customers whose funds were deposited into the separate account; and

- The amount on deposit shall always equal the credits contained in the formula for the related customers.

(SEC Letter to PaineWebber Inc., April 17, 1986) (No. 88-1, February 1988)

/04     Timeframe for Withdrawal

Excess funds may be withdrawn from the Reserve Bank Account <u>no later than</u> one hour after the opening of banking business on the second business day following the computation.

(SEC Letter to Wall Street Clearing Co., April 11, 1984) (No. 88-1, February 1988)

/041    Multiple Withdrawals

Multiple withdrawals from the Reserve Bank Account are not specifically prohibited as long as they are done within the permissible time frame from the completion of the reserve computation until no later than one hour after the opening of banking business on the second business day following the computation date. Furthermore, the sum of the withdrawals cannot exceed the amount computed to be in excess of the requirement.

Broker-dealers should not make a practice of multiple withdrawals.

(SEC Staff to NYSE) (No. 03-2, March 2003)

SEA Rule 15c3-3(g)/041

© 2008 Financial Industry Regulatory Authority, Inc.

(g)     **WITHDRAWALS FROM THE RESERVE BANK ACCOUNT (continued)**

/05     <u>Reserve Computation Not Required - Substantial Deposits For Specific Current Purpose</u>

No computation is required to withdraw customer funds from a Reserve Bank Account when received in the following three circumstances and conditions:

- In anticipation of a securities transaction on behalf of that customer;

- In order to satisfy a customer's request in connection with a sale of the customer's securities which generates proceeds; or

- In order to pay an issuer for a customer transaction resulting from a firm contractual commitment.

The following conditions apply to each of the above circumstances:

1.     The customer funds received in connection with a specific securities purchase or sale creating the free credit item are deposited directly into a separate Reserve Bank Account established in conformity with SEA Rule 15c3-3(f) when the funds are received.  This account would be in addition to any other of the broker-dealer's customary Reserve Bank Accounts.  (Each underwriting will be deemed to be a single purchase regardless of the number of the broker-dealer's customers purchasing securities pursuant to the underwriting.)  The receipt and disbursement of the customer funds must be separately identified on a broker-dealer's records. The credit items may not be netted against any debit items;

2.     The amount received per transaction or with respect to a particular customer is equal to at least 25% of the total of the credit items in the most recent Reserve Requirement computation required by SEA Rule 15c3-3(e);

3.     If a broker-dealer is required to segregate customer funds pursuant to more than one transaction at any particular time, the funds of each transaction should not be commingled with those of any other transaction; and

4.     The broker-dealer has net capital equal to at least $250,000 at the time of receipt of the customer monies.

(SEC Letter to NYSE, April 25, 1990) (No. 90-6, September 1990)

SEA Rule 15c3-3(g)/05

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/26/14 Entered 12/06/26/34-3559:19 Main Document
Documents 1 Through 259 Pg 885 of 1129

2601

## FORMULA FOR DETERMINATION OF RESERVE REQUIREMENT
## FOR BROKERS AND DEALERS UNDER RULE 15C3-3

|  |  | CREDITS | DEBITS |
|---|---|---|---|
| 1. | Free credit balances and other credit balances in customers' security accounts. (See Note A) | $ XXX | |
| 2. | Monies borrowed collateralized by securities carried for the accounts of customers. (See Note B) | XXX | |
| 3. | Monies payable against customers' securities loaned. (See Note C) | XXX | |
| 4. | Customers' securities failed to receive. (See Note D) | XXX | |
| 5. | Credit balances in firm accounts which are attributable to principal sales to customers. | XXX | |
| 6. | Market value of stock dividends, stock splits and similar distributions receivable outstanding over 30 calendar days. | XXX | |
| 7. | Market value of short security count differences over 30 calendar days old. | XXX | |
| 8. | Market value of short securities and credits (not to be offset by longs or by debits) in all suspense accounts over 30 calendar days. | XXX | |
| 9. | Market value of securities which are in transfer in excess of 40 calendar days and have not been confirmed to be in transfer by the transfer agent or the issuer during the 40 days. | XXX | |

SEA Rule 15c3-3(Exhibit A)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/12 14:53:19 Main Document
Documents 1 Through of 259 Pg 886 of 1129

2602

## FORMULA FOR DETERMINATION OF RESERVE REQUIREMENT
## FOR BROKERS AND DEALERS UNDER RULE 15C3-3

| | | CREDITS | DEBITS |
|---|---|---|---|
| 10. | Debit balances in customers' cash and margin accounts excluding unsecured accounts and accounts doubtful of collection. (See Note E) | | $ XXX |
| 11. | Securities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver. | | XXX |
| 12. | Failed to deliver of customers' securities not older than 30 calendar days. | | XXX |
| 13. | Margin required and on deposit with the Options Clearing Corporation for all option contracts written or purchased in customer accounts. (See Note F) | | XXX |
| 14. | Margin related to security futures products written, purchased or sold in customer accounts required and on deposit with a clearing agency registered with the Commission under section 17A of the Act (15 U.S.C. 17A) or a derivatives clearing organization registered with the Commodity Futures Trading Commission under section 5b of the Commodity Exchange Act (7 U.S.C. 7a-1). (See Note G) | | XXX |
| | TOTAL CREDITS | $ XXX | |
| | TOTAL DEBITS | | $ XXX |
| 15. | Excess of total credits (sum of items 1-9) over total debits (sum of items 10-14) required to be on deposit in the "Reserve Bank Account" (§ 240.15c3-3(e)). If the computation is made monthly as permitted by this section, the deposit shall be not less than 105 percent of the excess of total credits over total debits. | $ XXX | |

SEA Rule 15c3-3(Exhibit A)

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – NOTES)

Note A

Item 1 shall include all outstanding drafts payable to customers which have been applied against free credit balances or other credit balances and shall also include checks drawn in excess of bank balances per the records of the broker or dealer.

Note B

Item 2 shall include the amount of options-related or security futures product-related Letters of Credit obtained by a member of a registered clearing agency or a derivatives clearing organization which are collateralized by customers' securities, to the extent of the member's margin requirement at the registered clearing agency or derivatives clearing organization.

Note C

Item 3 shall include in addition to monies payable against customers' securities loaned the amount by which the market value of securities loaned exceeds the collateral value received from the lending of such securities.

Note D

Item 4 shall include in addition to customers' securities failed to receive the amount by which the market value of securities failed to receive and outstanding more than thirty (30) calendar days exceeds their contract value.

Note E

(1)     Debit balances in margin accounts shall be reduced by the amount by which a specific security (other than an exempted security) which is collateral for margin accounts exceeds in aggregate value 15 percent of all securities which collateralize all margin accounts receivable; provided, however, the required reduction shall not be in excess of the amounts of the debit balance required to be excluded because of this concentration rule.  A specific security is deemed to be collateral for a margin account only to the extent it represents in value not more than 140 percent of the customer debit balance in a margin account.

(2)     Debit balances in special omnibus accounts, maintained in compliance with the requirements of Section 10 of Regulation T under the Act (12 CFR 220.10) or similar accounts carried on behalf of another broker or dealer, shall be reduced by any deficits in such accounts (or if a credit, such credit shall be increased) less any calls for margin, mark to the market, or other required deposits which are outstanding 5 business days or less.

SEA Rule 15c3-3(Exhibit A - Note E)(2)

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note E (continued)

(3)     Debit balances in customers' cash and margin accounts included in the formula under Item 10 shall be reduced by an amount equal to 1 percent of their aggregate value. *[It should be noted that a 3% reduction in aggregate formula debit items is required (in lieu of the 1% reduction of customer debits) when net capital is computed under the alternative method.   See Rule 15c3-1(f)(5)(i).]*

(4)     Debit balances in cash and margin accounts of household members and other persons related to principals of a broker or dealer and debit balances in cash and margin accounts of affiliated persons of a broker or dealer shall be excluded from the Reserve Formula, unless the broker or dealer can demonstrate that such debit balances are directly related to credit items in the formula.

/01     Determination of the Includible Amount of an Affiliated Account's Debit Balance in the Reserve Formula

A broker-dealer may utilize its reserve formula allocation to determine the includible amount of an affiliated account's debit balance that is related to a credit item in the reserve formula.

The broker-dealer's allocation system must be able to determine any long security position underlying an affiliated account's debit balance that allocates to a short security position underlying the related credit item in the reserve formula.

Credit items that have been included in the reserve formula, which may be considered as relating to an affiliated account's debit balance, are limited to those related to bank loan, securities loan, fail to receive, customer short, proprietary short, PAIB short and non-customer short.

Each credit item identified as relating to an affiliated account's debit balance must have a related credit balance which is included in the reserve formula, in order for the affiliated account's debit balance to be includible in the reserve formula.

For purposes of this interpretation, the term "affiliated account" refers to cash and margin accounts of household members and other persons related to principals of a broker-dealer, as well as cash and margin accounts of affiliated persons of a broker-dealer.

(SEC Staff to NYSE) (No. 07-4, April 2007)

SEA Rule 15c3-3(Exhibit A - Note E)(4)/01

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/00/6/26/14 Entered 12/00/6/26/34:8539:19 Main Appendix Document Documents 1 Through 25 Pg 8th of 259 Pg 889 of 1129

2605

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note E (continued)

     (5)     Debit balances in margin accounts (other than omnibus accounts) shall be reduced by the amount by which any single customer's debit balance exceeds 25% (to the extent such amount is greater than $50,000) of the broker-dealer's tentative net capital (i.e., net capital prior to securities haircuts) unless the broker or dealer can demonstrate that the debit balance is directly related to credit items in the Reserve Formula.  Related accounts (e.g., the separate accounts of an individual, accounts under common control or subject to cross guarantees) shall be deemed to be a single customer's accounts for purposes of this provision.

     If the registered national securities exchange or the registered national securities association having responsibility for examining the broker or dealer ("designated examining authority") is satisfied, after taking into account the circumstances of the concentrated account including the quality, diversity, and marketability of the collateral securing the debit balances of margin accounts subject to this provision, that the concentration of debit balances is appropriate, then such designated examining authority may grant a partial or plenary exception from this provision.  The debit balance may be included in the reserve formula computation for five business days from the day the request is made.

/01     Determination of the Includible Amount of a Customer's Concentrated Margin Debit Balance in the Reserve Formula

     A broker-dealer may utilize its reserve formula allocation to determine the includible amount of a customer's concentrated margin debit balance that is related to a credit item in the reserve formula.

     The broker-dealer's allocation system must be able to determine any long security position underlying a customer's concentrated margin debit balance that allocates to a short security position underlying the related credit item in the reserve formula.

     Credit items that have been included in the reserve formula, which may be considered as relating to a customer's concentrated margin debit balance, are limited to those related to bank loan, securities loan, fail to receive, customer short, proprietary short, PAIB short and non-customer short.

     Each credit item identified as relating to a customer's concentrated margin debit balance must have a related credit balance which is included in the reserve formula, in order for the customer's concentrated margin debit balance to be includible in the reserve formula.

     (SEC Staff to NYSE) (No. 07-4, April 2007)

     SEA Rule 15c3-3(Exhibit A - Note E)(5)/01

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note E (continued)

      (6)    Debit balances of joint accounts, custodian accounts, participation in hedge funds or limited partnerships or similar type accounts or arrangements of a person who would be excluded from the definition of customer ("non-customer") with persons includible in the definition of customer shall be included in the Reserve Formula in the following manner: if the percentage ownership of the non-customer is less than 5 percent then the entire debit balance shall be included in the formula; if such percentage ownership is between 5 percent and 50 percent then the portion of the debit balance attributable to the non-customer shall be excluded from the formula unless the broker or dealer can demonstrate that the debit balances is directly related to credit items in the formula; if such percentage ownership is greater than 50 percent, then the entire debit balance shall be excluded from the formula unless the broker or dealer can demonstrate that the debit balance is directly related to credit items in the formula.

/01    Netting of Same Customer's Balances – Rescinded (No. 04-3, June 2004)

/011    Netting of Same Customer's Balances

      A short sale credit balance, other than a balance resulting from an open short versus the box position, may not be used for netting purposes with a debit balance with the same customer in arriving at the excludable debit balance portion from the reserve formula pursuant to Notes E(4), E(5), and E(6).

      (SEC Staff to NYSE) (No. 04-3, June 2004)

SEA Rule 15c3-3(Exhibit A - Note E)(6)/011

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note E(6) (continued)

/02  Determination of the Includible Amount of a Non-Customer's Debit Balance Portion in a Joint Account with a Customer in the Reserve Formula

A broker-dealer may utilize its reserve formula allocation to determine the includible amount of a non-customer's debit balance portion in a joint account with a customer that is related to a credit item in the reserve formula.

The broker-dealer's allocation system must be able to determine any long security position underlying a non-customer's debit balance portion in a joint account with a customer that allocates to a short security position underlying the related credit item in the reserve formula.

Credit items that have been included in the reserve formula, which may be considered as relating to a non-customer's debit balance portion in a joint account with a customer, are limited to those related to bank loan, securities loan, fail to receive, customer short, proprietary short, PAIB short and non-customer short.

Each credit item identified as relating to a non-customer's debit balance portion in a joint account with a customer must have a related credit balance which is included in the reserve formula, in order for the non-customer's debit balance portion in a joint account with a customer to be includible in the reserve formula.

For purposes of this interpretation, the term "joint account" refers to joint accounts, custodian accounts, participation in hedge funds or limited partnerships or similar type accounts or arrangements between a "non-customer" and a "customer", as defined under SEA Rule 15c3-3(a)(1).

(SEC Staff to NYSE) (No. 07-4, April 2007)

Note F

Item 13 shall include the amount of margin deposited with Options Clearing Corporation to the extent such margin is represented by cash, proprietary qualified securities and letters of credit collateralized by customers' securities.

SEA Rule 15c3-3(Exhibit A - Note F)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/12 Entered 12/06/12 13:48:59 Main Document
Documents 1 Through 25 Pg 84 of 259  Pg 892 of 1129

2608

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note G

(a)     Item 14 shall include the amount of margin required and on deposit with a clearing agency registered with the Commission under section 17A of the Act (15 U.S.C. 78q-1) or a derivatives clearing organization registered with the Commodity Futures Trading Commission under section 5b of the Commodity Exchange Act (7 U.S.C. 7a-1) for customer accounts to the extent that the margin is represented by cash, proprietary qualified securities, and letters of credit collateralized by customers' securities.

/01     Customer Security Accounts Holding Security Futures Products

The provisions of Note G are only applicable to security futures products written, purchased or sold in customer security accounts.

(SEC Staff to NYSE) (No. 05-2, January 2005)

(b)     Item 14 shall apply only if the broker or dealer has the margin related to security futures products on deposit with:

(1)     A registered clearing agency or derivatives clearing organization that:

(i)     Maintains the highest investment-grade rating from a nationally recognized statistical rating organization; or

(ii)     Maintains security deposits from clearing members in connection with regulated options or futures transactions and assessment power over member firms that equal a combined total of at least $2 billion, at least $500 million of which must be in the form of security deposits. For purposes of this Note G, the term "security deposits" refers to a general fund, other than margin deposits or their equivalent, that consists of cash or securities held by a registered clearing agency or derivative clearing organization; or

(iii)     Maintains at least $3 billion in margin deposits; or

(iv)     Does not meet the requirements of paragraphs (b)(1)(i) through (b)(1)(iii) of this Note G, if the Commission has determined, upon a written request for exemption by or for the benefit of the broker or dealer, that the broker or dealer may utilize such a registered clearing agency or derivatives clearing organization. The Commission may, in its sole discretion, grant such an exemption subject to such conditions as are appropriate under the circumstances, if the Commission determines that such conditional or unconditional exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors; and

SEA Rule 15c3-3(Exhibit A - Note G)(b)(1)(iv)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/12 34:53:19 Main Appendix
Documents 1 Through 9 Pg 85 of 259 Pg 893 of 1129

2609

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note G (continued)

(2)     A registered clearing agency or derivatives clearing organization that, if it holds funds or securities deposited as margin for security futures products in a bank, as defined in section 3(a)(6) of the Act (15 U.S.C. 78c(a)(6)), obtains and preserves written notification from the bank at which it holds such funds and securities or at which such funds and securities are held on its behalf. The written notification shall state that all funds and/or securities deposited with the bank as margin (including customer security futures products margin), or held by the bank and pledged to such registered clearing agency or derivatives clearing agency as margin, are being held by the bank for the exclusive benefit of clearing members of the registered clearing agency or derivatives clearing organization (subject to the interest of such registered clearing agency or derivatives clearing organization therein), and are being kept separate from any other accounts maintained by the registered clearing agency or derivatives clearing organization with the bank. The written notification also shall provide that such funds and/or securities shall at no time be used directly or indirectly as security for a loan to the registered clearing agency or derivatives clearing organization by the bank, and shall be subject to no right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank. This provision, however, shall not prohibit a registered clearing agency or derivatives clearing organization from pledging customer funds or securities as collateral to a bank for any purpose that the rules of the Commission or the registered clearing agency or derivatives clearing organization otherwise permit; and

(3)     A registered clearing agency or derivatives clearing organization that establishes, documents, and maintains:

(i)     Safeguards in the handling, transfer, and delivery of cash and securities;

(ii)     Fidelity bond coverage for its employees and agents who handle customer funds or securities. In the case of agents of a registered clearing agency or derivatives clearing organization, the agent may provide the fidelity bond coverage; and

(iii)     Provisions for periodic examination by independent public accountants; and

(4)     A derivatives clearing organization that, if it is not otherwise registered with the Commission, has provided the Commission with a written undertaking, in a form acceptable to the Commission, executed by a duly authorized person at the derivatives clearing organization, to the effect that, with respect to the clearance and settlement of the customer security futures products of the broker-dealer, the derivatives clearing organization will permit the Commission to examine the books and records of the derivatives clearing organization for compliance with the requirements set forth in § 240.15c3-3a, Note G (b)(1) through (3).

SEA Rule 15c3-3(Exhibit A - Note G)(b)(4)

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-sccc Doc 7250 Filed 12/06/14 Entered 12/06/13 34 35:19 Main Appendix Document   Documents 1 Through 259   Pg 86 of   Pg 894 of 1129

2610

RESERVE FORMULA (EXHIBIT A – NOTES) (continued)

Note G (continued)

     (c)     Item 14 shall apply only if a broker or dealer determines, at least annually, that the registered clearing agency or derivatives clearing organization with which the broker or dealer has on deposit margin related to securities future products meets the conditions of this Note G.

**(NEXT PAGE IS 2621)**

SEA Rule 15c3-3(Exhibit A - Note G)(c)

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL)

/01      Weekly Computations

Broker-dealers that make a weekly determination under the Reserve Formula are permitted to net free credit and other credit balances in customers' security accounts (Reserve Formula, Item 1), with the debit balances in customers' cash and margin accounts, excluding unsecured debits and accounts doubtful of collection (Reserve Formula, Item 10), for the computations other than that as of the month-end.

The month-end computation must reflect customers' credit and debit balances separately, permitting, however, the combining of the balances in the several accounts of any one customer. Where customers' credit and debit balances are developed separately on a monthly basis, the amount of customers' unsecured debits and accounts doubtful of collection computed at that time may be used in the weekly computation until the next monthly determination.

If customer balances are netted in weekly computations of the formula, to comply with the 1% reduction in debits requirement outlined in Note E(3) of the Reserve Formula, the weekly computations should use the amount of reduction to such debits which was applied at the previous month-end. In the event the netting of customers' balances on a weekly basis results in a credit, the credit should be increased by the amount of the 1% reduction computed as of the previous month-end.

Note: This does not apply for firms using the alternative net capital computation method.

(SEC Release 34-9922, January 2, 1973)

/011     Netting of Customer Balances

In the event that a negative credit results on line Item #1 when the firm allocates customer shorts versus firm longs or customer shorts versus non-customer long, the customer negative credit must be added to the customer debits on line Item #12 which results in an increase in customer debits.

(SEC Staff to NYSE) (No. 01-3, March 2001)

SEA Rule 15c3-3(Exhibit A - General)/011

© 2008 Financial Industry Regulatory Authority, Inc.

08-01-20250-cccccccDoc 47250 Filed 12/006/26/14 Entered 12/006/26/3:4:559:19ain Appendix Documents 1 Through 259g 896 of 1129

2622

RESERVE FORMULA (EXHIBIT A – GENERAL) (continued)

/02     Annual Audit

Where the audit date may not fall on a date for which a computation would be required, the broker-dealer shall make a computation as of the audit date and shall make any required deposit within the time specified in the rule.  For firms who compute weekly, this audit date computation will be in lieu of the normal computation required for that period.  For firms who compute monthly, the audit date computation will be in lieu of any computation required for the calendar month within which the audit falls; provided, that when the audit date is not a month end date the subsequent computation must not be more than 40 calendar days from the date of the audit.

(SEC Letter to NASD, April 28, 1975)

/03     Allocation

Responses to certain of the items contained in the computation may require the determination of an amount that relates to customer accounts, transactions, or activity undertaken to consummate customer transactions based on an allocation method.  If it is impractical or unduly burdensome to determine which fail to receive contracts and fail to deliver contracts relate to customer accounts and which securities loaned and securities borrowed are for customer accounts, an appropriate allocation may be made on a conservative basis to accomplish maximum protection for customers.  If an allocation is used with regard to the foregoing items, the broker or dealer should be able to demonstrate that the results so obtained regarding designations of customer versus proprietary or non-customer positions would be comparable to those which would be obtained if the respective positions had been developed without the use of an allocation.

(SEC Letter to NYSE, May 3, 1985)

SEA Rule 15c3-3(Exhibit A - General)/03

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL) (continued)

/031    Allocation on Stock Borrow/Stock Loan – (Rescinded, No. 02-7, August 2002)

/032    Allocation on Stock Borrow/Stock Loan

If a market value allocation is used, the general ledger balances (contract value) of stock borrows and stock loans need to be reduced by the excess contract value over market value for only those items excluded from the reserve formula.

(SEC Staff to NYSE) (No. 02-7, August 2002)

/04    Making and Retaining a Record of Allocation

When an allocation is required to determine balances, positions or accounts allocable to customers, the broker-dealer shall make and maintain a record of each such allocation and preserve it in accordance with SEA Rule 17a-4.

(SEC Staff to NYSE)

/05    Repurchase, Reverse Repurchase and Matched Repurchase Agreement Transactions are Proprietary

These transactions shall be treated as proprietary transactions in the formula and allocated as such.

(SEC Staff to NYSE) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - General)/05

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/13 34 8 59 19 Main Appendix Documents 1 Through of 259 Pg 898 of 1129

2624

RESERVE FORMULA (EXHIBIT A – GENERAL) (continued)

/06 Subjecting Customers' Securities to Cross Liens Prohibited

Where a broker pledges customers' securities as well as his own securities or those of non-customers (partners, other broker-dealers, etc.) with a single pledgee to secure several loans, one or more of which are made against the broker's own securities, or those of non-customers, it is necessary that the pledgee does not have a lien upon customers collateral for any loan except other loans also made against securities carried for the account of customers of the same broker. In other words customers' securities and other property should not be available as collateral for proprietary or non-customer loans or obligations.

Such cross lien restrictions would also include but are not limited to obligations arising from:

- Clearing arrangements
- Unsecured loans
- Drafts payable to lender
- Overdrawn bank accounts
- Letters of Credit

Customer loans would include "Agreements to Pledge" loan arrangements. See interpretation 15c3-3(Exhibit A - Item 2)/10 for amounts includible in the Reserve Formula.

Such arrangements which could subject customers' securities or property to "cross liens" may be in violation of SEA Rules 8c-1 and 15c2-1.

(SEC Letter to NYSE, May 3, 1985)

/07 "Remote Checking"

The SEC expressed concern about the practice of the issuance to customers of checks drawn on distant banks for the purpose of prolonging a broker-dealer's use of customer funds. It said this unfairly deprives customers of their immediate use of funds, is inconsistent with an obligation to deal fairly with its customers, is inconsistent with just and equitable principles of trade, and may violate the antifraud provisions of the Federal securities laws.

(NYSE Information Circular No. 79-11 and SEC Release No. 34-15194)
(No. 80-3, February 1980)

SEA Rule 15c3-3(Exhibit A - General)/07

© 2008 Financial Industry Regulatory Authority, Inc.

## RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART

/08    This allocation chart shows the relationship between the various allocable items and may be used in conjunction with the interpretations when an allocation is required to determine the debit and credit values includible in the reserve formula computation.

### A. CREDITS

| Short Location: | Long Allocation | Include Credit | Debit | Notes |
|---|---|---|---|---|
| **Customer Bank Loan vs:** | | | | |
| | Customer long | Yes | Yes | |
| | Proprietary long | Yes | No | Note (1) |
| | Non-Customer long | Yes | No | Notes (1), (2) |
| | Stock Borrowed | Yes | Yes | Note (3) |
| | Fail to Deliver | Yes | Yes | |
| **Non-Customer Bank Loan vs:** | | | | |
| | Customer long, Stock Borrowed or Fail to Deliver | Yes | Yes | |
| | Non-Purpose Loan accounts | Yes | No | Note (5) |
| | Proprietary and Non-Customer accounts | No | No | |
| **Proprietary Bank Loan vs:** | | | | |
| | Customer account long | Yes | Yes | Notes (4), (6), (8) |
| | Fail to Deliver or Stock Borrowed | Yes | Yes | Notes (3),(4),(6),(7) |
| | Proprietary, subordinated, general partners, directors, and principal officers accounts long | No | No | Note (7) |
| | All other long allocations | Yes | No | Note (4), (7) |

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART (continued)

A. CREDITS (continued)

| Short Location: | Long Allocation | Include Credit | Debit | Notes |
|---|---|---|---|---|
| **Any Bank or Custody Location with Cross Lien Provisions vs:** | | | | |
| | Customer account long | Yes | Yes | Note (9) |
| **Collateral to Letter of Credit (LOC) or Collateral Pledged for OCC Customer Margin Requirement vs:** | | | | |
| | Customer accounts long | Yes | Yes | Note (10) |
| | Proprietary Qualified Securities | No | Yes | Note (11) |
| | Non-Customer or Proprietary accounts | No | No | |
| **Collateral Pledged to Letter of Credit for Securities Borrowed vs:** | | | | |
| | Customer accounts long | Yes | Yes | Note (12) |
| | Non-Customer or Non-Purpose Loan accounts | No | No | Note (13) |
| | Proprietary accounts | No | No | |
| **Collateral Pledged for Securities Borrowed vs:** | | | | |
| | Customer accounts long | Yes | Yes | Notes (14), (15) |
| | Non-Customer and Non-Purpose Loan accounts | No | No | Note (15) |
| | Proprietary accounts | No | No | Note (15) |

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-sccc Doc 4730250 Filed 12/06/14 Entered 12/06/13 34:859:19 Main Document Documents 1 Through 259 Pg 98 of 2552 901 of 1129

2627

RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART (continued)

A. CREDITS (continued)

| Short Location: | Long Allocation | Include Credit | Debit | Notes |
|---|---|---|---|---|
| **Securities Loaned vs:** | | | | |
| | Customer accounts long | Yes | Yes | Note (16) |
| | Fails to Deliver | Yes | Yes | |
| | Securities Borrowed | No | No | Note (17) |
| | Non-Customer and Proprietary accounts long | No | No | Note (17) |
| **Fails to Receive vs:** | | | | |
| | Customer accounts long | Yes | Yes | Note (18) |
| | Fails to Deliver | Yes | Yes | Note (19) |
| | Non-Customer accounts long | No | No | Note (20) |
| | Proprietary accounts long | No | No | Note (20) |
| | Securities Borrowed | Yes | Yes | Note (19) |
| **Proprietary and Non-Customer Shorts vs:** | | | | |
| | Customer accounts long | Yes | Yes | Note (21) |
| | Non-Customer accounts long | No | No | |
| **Customer Short Position vs:** | | | | |
| | Customer long | Yes | Yes | Note (22) |
| | Proprietary and Non-Customer accounts long | No | No | Note (23) |

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART (continued)

B. OTHER CREDITS OR VALUES INCLUDIBLE - REGARDLESS OF ALLOCATION

| | Include Credit | Notes |
|---|---|---|
| Securities Borrowed Secured by an Irrevocable Letter of Credit Secured by Customer Margin Securities | Yes | Note (12) |
| Stock Dividends Receivable, Stock Splits and Other Distributions Over 30 Calendar Days Old | Yes | Note (24) |
| Suspense Account Credits and Short Security Count, Unverified Short and Suspense Security Differences: | | |
|    Over 7 business days old | Yes | Note (25) |
|    Over 30 calendar days old | Yes | Note (26) |
| Transfer over 40 calendar days old | Yes | Note (27) |
| Prepaid Fails to Receive | Yes | Note (28) |
| Unclaimed Dividends and Interest Payable | Yes | Note (29) |
| All outstanding drafts payable to customers which have been applied against free or other credit balances and checks drawn in excess of bank balances (per firm records) | Yes | Note (30) |
| TEFRA Accounts Payable | Yes | Note (31) |
| Accrued Interest Payable on Customer Credit Balances | Yes | Note (32) |

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART (continued)

C. DEBITS

| Long Position: | Short Allocation | Include Debit | Credit | Notes |
|---|---|---|---|---|
| Securities Borrowed Collateralized By Cash, U.S. Treasury Bills, Notes, LOCs Secured by Proprietary Qualified Securities, or any other Acceptable Collateral as per (b)(3) vs: | | | | |
| | Customer accounts short | Yes | Yes | Note (33) |
| | Non-customer or Proprietary accounts short | No | No | Note (34) |
| | Fails to Receive | Yes | Yes | Note (35) |
| | Customer Bank Loan | Yes | Yes | |
| | Non-Customer or Proprietary Bank Loan | Yes | Yes | Note (7) |
| | Securities Loan | No | No | Note (34) |
| | Stock Dividend Receivable | No | No | Note (36) |
| | Transfer | No | No | Note (37) |
| | All Other Physical Control Locations | No | No | Note (38) |
| Securities Borrowed Secured by an Unsecured Irrevocable Letter of Credit, Unacceptable Collateral as per (b)(3) or Unsecured Borrows | | No | * | Note (39) |

\*  AS ALLOCATED ABOVE

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A – GENERAL); ALLOCATION CHART (continued)

C. DEBITS (continued)

| Long Position: | Short Allocation | Include | | Notes |
|---|---|---|---|---|
| | | Debit | Credit | |
| Fails to Deliver Not Over 30 *<br>Calendar Days Old vs: | | | | |
| | Customer accounts short | Yes | Yes | Note (40) |
| | Non-Customer and<br>Proprietary accounts short | No | No | |
| | Fails to Receive | Yes | Yes | Note (41) |
| | Customer Bank Loan | Yes | Yes | |
| | Proprietary and<br>Non-Customer Bank Loan | Yes | Yes | Note (7) |
| | Securities Loaned | Yes | Yes | |
| | Transfer | Yes ** | | Note (42) |
| | Other Physical Control<br>Location for Not More<br>Than 3 Business Days | Yes | No | Note (43) |

\*   See interpretations /011, /071, and /09 to Item 12.

\*\*  Credit must be included for unconfirmed items over 40 days.

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

## NOTES TO THE RESERVE FORMULA ALLOCATION

1.     Proprietary and non-customer collateral should be removed.

2.     See interpretation to Item 2 /07.

3.     The pledge of securities borrowed subject to Reg T 220.16 is an inappropriate use.

4.     Include market value of the collateral up to the amount borrowed as a credit.

5.     Separate non-purpose bank loan should be maintained to avoid including a credit in the formula.

6.     Inappropriate collateral should be removed.

7.     See interpretations to Item 2 /05 and /051.

8.     See interpretations to Item 2 /05, /051 and /08.

9.     Include the amount required by interpretation to Item 2 /10.

10.     Include up to the amount of OCC margin requirement. See interpretations to Item 2 /02, /021, /03 and /031.

11.     See interpretation to Item 13 /01.

12.     Include the market value of the borrowed securities as a credit. See interpretations to Item 11 /01 and Item 2 /04.

13.     When they are not commingled with customer securities. Otherwise include the market value of the borrowed securities as a credit.

14.     Include the market value of the pledged securities.

15.     See Reg T and SEA 15c3-3(b)(3)(iii) for types of collateral that can be pledged to secure borrowed securities.  See interpretation to Item 11 /01.

16.     Credit increased by mark to market. See interpretations to Item 3 /01, /011 and /012.

17.     See interpretations to Item 3 /02 and /03.

18.     If the Fail to Receive is over 30 calendar days old, the formula credit is increased by the mark to market.  See interpretations to Item 4 /01 and /03.

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

NOTES TO THE RESERVE FORMULA ALLOCATION (continued)

19. If a Fail to Receive matches a Fail to Deliver (not over 30 calendar days old) or a Securities Borrowed of the same quantity and issue, both the credit and debit may be excluded. See interpretations to Item 4 /01 and /07.

20. See Interpretations to Item 4 /07.

21. Include the market value of short securities. See interpretations to Item 4 /03 and Item 5 /01 and /02.

22. Include the market value of unsecured shorts as a credit in the Formula.

23. See interpretations to Item 10 /033.

24. Include the market value. See interpretation to Item 6 /01.

25. Under the alternative method, see interpretations to Item 7 /01 and Item 8 /01, 8 /02 and 8 /03.

26. Under the basic method, see interpretations to Item 7 /01 and Item 8 /01, 8 /02 and 8 /03.

27. When not confirmed by the transfer agent or issuer. See interpretations to Item 9 /01 and /02.

28. Include the market value of the short securities position. See interpretation to Item 4 /02.

29. To be treated as Suspense Items above. See interpretation to Item 8 /03.

30. See interpretations to Item 1 /20, /21, /22, /23, /24, /25 and /26.

31. See interpretation to Item 1 /05.

32. See interpretation to Item 1 /07.

33. See interpretation to Item 11 /01.

34. See interpretation to Item 11 /03.

35. If a Securities Borrowed matches a Fail to Receive of the same quantity and issue, both the credit and debit may be excluded. 1% of the contract value of Securities Borrowed which were allocated to Fail to Receive contracts and excluded from the Formula is deducted from net capital under the alternative method. See interpretation to Item 11 /03.

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

## NOTES TO THE RESERVE FORMULA ALLOCATION (continued)

36.     See interpretation to Items 11 /03 and 6 /01.

37.     Unless it previously allocated to customer fail to deliver.  See interpretation to Item 11 /03.

38.     Unless in accordance with interpretation to Item 11 /03.

39.     1% of the market value of securities borrowed collateralized by LOCs shall be deducted from net capital. See interpretation to Item 11 /03.

40.     See interpretation to Item 12 /01.

41.      If a Fail to Deliver matches a Fail to Receive of the same quantity and issue, both the credit and debit may be excluded. 1% of the contract value of all Fail to Deliver items which were allocated to Fail to Receive contracts and excluded from the formula is deducted from net capital under the alternative method. See interpretation to Item 12 /07 and /08.

42.     Credit must be included for unconfirmed items over 40 days old. See interpretation to Item 12 /04.

43.     Provided the securities are negotiable and are in excess of possession or control requirements and the fail to deliver previously allocated to a credit item in the formula.  See interpretation to Item 12 /08 and /081.

SEA Rule 15c3-3(Exhibit A - General)/08

© 2008 Financial Industry Regulatory Authority, Inc.

**PAGE 2634 IS BLANK**


**(NEXT PAGE IS 2651)**

© 2008 Financial Industry Regulatory Authority, Inc.

## RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES

/01    Customer Credit Balances

Report free credit balances and other credit balances contained in customers' security accounts. Also include:

- Outstanding drafts payable to customers (SEA Rule 15c3-3(Exhibit A - Note A)).

- Checks drawn in excess of bank balances (interpretation 15c3-3(Exhibit A - Item 1)/20).

- Checks drawn on a credit line account (interpretation 15c3-3(Exhibit A - Item 1)/22).

- Overdrafts in bank account not otherwise excluded by interpretation.

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation (other than at month-end, see interpretation 15c3-3(Exhibit A - General)/01) and that netting results in a credit, see interpretation 15c3-3(Exhibit A - Item 10)/06.

/02    Non-Regulated Commodity Accounts

Include the net balance due to customers in non-regulated commodity accounts, reduced by any deposits of cash or securities with any clearing organization or clearing broker in connection with the open contracts in such accounts.

(SEC Release 34-9922, January 2, 1973)

/021    Netting Customers' Non-Regulated and Regulated Commodity Accounts

The net balances determined in accordance with interpretation 15c3-3(Exhibit A - Item1)/02 may be further reduced by the deficit contained in a customer's regulated commodity account to the extent of the equity contained in the same customer's non-regulated commodity account.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/022    Customer Balances Related to Foreign Futures and Options Transactions

Any customer balances comprehended in the computation required by CFTC Regulation 30.7 need not be included in the formula.

(NYSE Information Memo No. 88-10, April 20, 1988)

SEA Rule 15c3-3(Exhibit A - Item 1)/022

© 2008 Financial Industry Regulatory Authority, Inc.

0808-01020-sccc Doc 470250 Filed 12/006/126/14 Entered 12/006/126/3:48:539:19 Main Document
Documents 1 Through 02 Page 910 of 1129

2652

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/03    Partly Secured Accounts

See Item 10 /012 when a partly secured account has a credit balance.

When net capital is computed under the basic method and <u>all</u> customer balances are netted for the weekly formula computation, see Item 10 /06.

(SEC Letter to NYSE, December 9, 1975)

/04    Special Omnibus or Similar Accounts

When a special omnibus account maintained in compliance with the requirements of Section 10 of Regulation T or similar accounts carried on behalf of another broker-dealer is partly secured after applying current calls, i.e., outstanding not more than 5 business days, for margin, marks to the market or other required deposits, include the credit balance contained in such account, increased by the deficit after applying current calls. (See Note E(2).)

(SEC Release 34-13565, May 18, 1977) (No. 78-1, May 1978)

When net capital is computed under the basic method and all customers' balances are netted for the weekly formula computation, see Item 10 /06.

/05    TEFRA Accounts Payable

Taxes and interest withheld from customers' accounts which are payable to the government under the Tax Equity and Financial Responsibility Act are to be included in the formula until paid over to the Internal Revenue Service.

(SEC Staff to NYSE) (No. 86-8, August 1986)

/06    Customer Payments Prior to Settlement Date

Credit balances received from customers prior to settlement date of purchase must be included as a credit in the formula and this treatment is not negated by segregation of the securities.

(SEC Letter to Gibraltar Securities, Inc., March 5, 1986) (No. 92-10, July 1992)

SEA Rule 15c3-3(Exhibit A - Item 1)/06

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/12 13:48:39 Main Document Documents 1 Through of 259 Pg 911 of 1129

2653

## RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/07     Accrued Interest Payable on Customers' Credit Balance

Interest payable to customers is accrued on a daily basis and periodically credited to each customer's account.  The total of such amounts, if not already credited to the customers' accounts, should be included in Item 1 of the reserve computation.

(SEC Staff to NYSE) (No. 91-5, June 1991)

/08     (Reserved)

/09     Retail Customer's Purchasing Reverse Repurchase Agreements

If a broker-dealer enters into a hold in custody (HIC) repurchase agreement with a "retail" customer who had a pre-existing free credit balance with the broker-dealer, the liability of the broker-dealer will ordinarily be considered to be a free credit balance for purposes of SEA Rule 15c3-3.  Customers that conduct their business with the broker-dealer on a delivery versus payment basis or customers with transactions that exceed $1 million contract value would not be considered "retail" customers for purposes of this interpretation.  Include as a credit the contract value of hold in custody repurchase agreement(s) with "retail" customers who had pre-existing credit balances of less than $1 million prior to purchase.  Open repurchase transactions with same customer, may be aggregated in determining the $1 million limit.

(SEC Staff to NYSE) (NYSE Information Memo 87-38, October 28, 1987)

/10     Hold-In Custody Reverse Repos Purchased By Customers Lacking Proper Documentation

The original contract value plus any marks to market is to be included in customer credit balances when there is no written agreement between the parties or when a written agreement exists but lacks notice to the customer that the provisions of The Securities Investor Protection Act of 1970 do not protect the counterparty to the repurchase agreement.

(SEC Release No. 34-24778) (No. 92-1, January 1992)

SEA Rule 15c3-3(Exhibit A - Item 1)/10

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 479250 Filed 12/06/16/12 Entered 12/06/26/13:43:39:19 Main Appendix document
Documents 1 Through 4 of 259 912 of 1129

2654

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/11    Customers Purchasing Commercial Paper

Notes payable to customers in connection with the issuance of the broker-dealer's own commercial paper may be excluded as credits in the reserve formula provided that adequate written disclosure is stated in the offering circular and on the confirmation as to the identity of the issuer and that these transactions are not covered by SIPC.

(SEC Staff to NYSE) (No. 92-1, January 1992)

/12    Principal Transactions with Customers

When a broker-dealer purchases securities as principal from its customer and the securities have not been resold, the credit balance due to the customer arising from his sale of securities to the broker-dealer may be excluded from the formula until the securities sold have been delivered by the customer.

(SEC Release 34-11497, June 26, 1975) (No. 92-10, July 1992)

When a broker-dealer receives non-negotiable securities purchased on a principal basis from its customer and the securities have not been resold, the credit balance in the customer account shall be excluded from the formula until the earlier of 30 calendar days after settlement date or the date appropriate papers are received that makes the securities negotiable.

(SEC Letter to Emanuel & Company, February 28, 1986) (No. 92-10, July 1992)

/13    Short Credits in Customers' Accounts

Credit balances due to customers' arising from sales of securities which are offset by debit balances arising from purchases in non-customers' accounts can be excluded from the formula.

(SEC Staff to NYSE)

SEA Rule 15c3-3(Exhibit A - Item 1)/13

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4780-50 Filed 12/06/12 Entered 12/06/12 13:43:59 Main Document Documents 1 Through 59 Pg 105 of 259   Pg 913 of 1129

2655

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/14     Loans Payable

Amounts representing unsecured or secured loans payable, which are not related to securities transactions of the lender and which are evidenced by written agreements are excluded from the formula.

(SEC Letter to Midwest Stock Exchange, Inc., July 28, 1976) (No. 78-1, May 1978)

/15     Unsecured Payables to Subsidiaries

Unsecured payables to subsidiaries representing loans to the broker-dealer are excluded from the formula when they are not related to securities transactions.

(SEC Staff to NYSE) (No. 78-1, May, 1978)

/16     Unearned Prepaid Investment Advisory Fees

Unearned prepaid investment advisory fees that are taken into income when earned, with the unearned balance being deferred and subject to refund, are excluded from the formula.

(SEC Letter to A. R. Schmeidler & Co. Inc., Dec. 4, 1976) (No. 78-1, May 1978)

/17     Unearned Prepaid Customers' Commissions

Unearned prepaid customers' commissions that are refundable are excluded from the formula.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/18     Requirements for Including the Receipt of Customer Checks

Customer checks received by a broker-dealer for the account of the customer must be included in the firm's computation of reserve requirements on the day that they are received by the broker-dealer, its branch office or its agent (e.g. registered representative).  Customer checks, though not yet deposited, are customer funds.

(SEC Letter to Marketing One Securities, Inc., December 9, 1992)
(No. 94-5, May 1994)

SEA Rule 15c3-3(Exhibit A - Item 1)/18

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 14:55:19 Main Document
Documents 1 Through 29 Pg 106 of 259 Page 914 of 1129

2656

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/20    Checks Drawn In Excess of Bank Balances

Checks drawn in excess of a bank balance per the records of the broker/dealer must be included in the formula; whether or not the amount is used for customer payments. However, certain exceptions, described herein may apply.

/21    Two Or More Accounts Carried By The Same Bank-(Rescinded, No.02-7, August 2002)

/211   Two Or More Accounts Carried By The Same Bank

Where two or more accounts, carried by a bank, are in reality one account which are separated for purposes that are immaterial to SEA Rule 15c3-3 under the Act, the amount of checks drawn in one account to the extent offset by positive balances in the other accounts need not be taken as a credit to the reserve formula provided the broker-dealer has an agreement with the bank acknowledging that:

1.    except for bookkeeping and statement purposes, all such accounts are considered as one; and

2.    the bank is authorized and agrees to treat all such accounts as a single account and apply the balances in one or more such account to any other debits in any other such account without further advice or instruction.

In addition, an opinion needs to be rendered by outside counsel that the bank agreement is legally binding under banking and other relevant federal and state laws and the opinion should include the effect of bankruptcy law or other equitable distribution principles on the agreement.

(SEC Staff to NYSE) (No. 02-7, August 2002)

/22    Checks Drawn On A Credit Line Account

The proceeds derived from writing checks to customers on credit line accounts (zero balance accounts) are included as a credit in the formula. However, unsecured firm borrowings from banks are not included in the formula provided they actually represent and are recognized by the banks as unsecured borrowings.

(SEC Letter to Shearson H.S. Inc., June 13, 1977) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - Item 1)/22

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 13:48:39 Main Document
Documents 1 Through of Pg 107 of 259 915 of 1129

2657

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/23    Zero Balance or Overdraft Bank Accounts For Checks Issued to Vendors

Where a separate zero balance or overdraft checking account is maintained for payment of vendors' invoices for proprietary purchases, employee payroll checks and checks paid to suppliers, the overdraft may be excluded from the formula provided:

1.    The checks are drawn on a separate and distinct bank account which is clearly unrelated to any account from which customers' checks are drawn;

2.    Issuance of checks drawn on the account do not act to reduce a credit balance which would otherwise be included in the formula;

3.    It is clearly demonstrated and the bank acknowledges in writing that the bank does not have the right to offset with any other account or customers' assets or collateral it may be holding for the broker-dealer; and

4.    The overdraft is included as Aggregate Indebtedness if the broker-dealer is computing net capital requirements under the AI method.

These accounts are not to be netted with other bank accounts and credit balances must be included in the Reserve Formula if any of the checks or drafts drawn on the account could be:

1.    Payable to customers or broker-dealers;

2.    Paid in connection with a securities transaction; or

3.    Deposited in another account unless only certified checks or wired funds are paid out of the receiving account.

(SEC Staff to NYSE) (No. 91-7, July 1991)

SEA Rule 15c3-3(Exhibit A - Item 1)/23

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 4750 Filed 12/06/13 Entered 12/06/13 14:59:19 Main Document
Documents 1 Through 8 Pg 108 of 259 Pg 916 of 1129

2658

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/24    Zero Balance or Overdraft Accounts Used in Connection With "Seg-Offset" Accounts

Overdrafts incurred in connection with "Seg-Offset" activities need not be included as credit items in the reserve formula computation under SEA Rule 15c3-3a provided:

1.    No checks or drafts drawn on these accounts are payable to customers or broker-dealers;

2.    No checks or drafts drawn on these accounts are paid in connection with securities transactions;

3.    No checks or drafts drawn on these accounts could be deposited in another bank account (the receiving account) unless only wired funds are paid out of such receiving account;

4.    Written assurance has been obtained from the bank, by the broker-dealer, that there are no cross liens to customer-related assets or collateral or any other accounts with the bank; and

5.    The overdrafts are carried on the books of the broker-dealer and otherwise treated as ordinary liabilities.

(NYSE Letter to SEC Staff, March 29, 1990) (No. 91-7, July 1991)

SEA Rule 15c3-3(Exhibit A - Item 1)/24

<u>RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)</u>

/25    <u>Funds Wired From "Seg-Offset" Accounts</u>

A "Seg-Offset" account is understood to be an account which is used as a cash management technique to obtain federal funds for a fee which is lower than prevailing interest rates, in amounts equivalent to amounts in customers' segregated funds accounts with a bank. For example, through this technique, a broker-dealer leaves funds on deposit in a segregated account or Special Reserve Bank Account with a bank that permits the broker-dealer to withdraw federal funds from another account at the bank (the "Seg-Offset" account) in an amount equal to the segregated account or the Special Reserve Account deposits.

Further, the bank has no cross lien against the segregated account or the Special Reserve account for any overdraft in the "Seg-Offset" account. The broker-dealer covers the federal funds withdrawal with a clearing house check drawn on a zero-balance account at another bank.

Federal funds paid out of a "Seg-Offset" account by federal wire need not be included in the reserve formula computation under SEA Rule 15c3-3a as credit items provided:

1.    It is clearly demonstrated and the bank acknowledges in writing that the bank does not have the right to offset with any other account or customers' assets or collateral it may be holding for the broker-dealer; and

2.    The Special Reserve Bank Account must be free of lien and subject to all the requirements of SEA Rules 15c3-3 (e) and (g). No withdrawal entry may appear on the bank statement unless supported by a reserve computation.

(NYSE Letter to SEC Staff, March 29, 1990) (No. 91-7, July 1991)

/26    <u>The Term "Any Other Accounts" Defined</u>

Where it is required that broker-dealers obtain written assurances from the bank that there are no cross liens to customer-related assets or collateral or <u>any other accounts</u> with the bank, the term "any other accounts" refers to accounts that <u>are</u> used to pay down credits which would normally be included in the reserve computation, such as customer credits, customer-related fails etc. Under these circumstances "any other accounts" would include operating bank accounts and require appropriate "cross lien" documentation. Accounts used to write checks to customers that reduce customer credits are included in "any other accounts." Firm bank loan collateral at the same bank is not considered a customer-related asset.

(SEC Staff to NYSE) (No. 92-1, January 1992)

SEA Rule 15c3-3(Exhibit A - Item 1)/26

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 1); CUSTOMER CREDIT BALANCES (continued)

/27    Customer Credit Balances Related to Deposits in a Special Trust or Agency Account

Customer credit balances related to deposits in a special trust or agency account utilized pursuant to SEA Rule 15c2-4(b)(1) are excluded from the Reserve Formula.

(SEC Staff of DMR to NASD, September 1983)

/28    Postdated Customer Checks

A broker-dealer that receives postdated checks from customers for trades that have not settled must book said payments to the customer accounts, and, if a credit balance results, include said credits in Item 1 of the Reserve Formula.

(SEC Staff of DMR to NASD, September 1983)

/29    Credit Balances Arising from Limited Partnership Unit Sale

A broker-dealer selling secondary limited partnership units where the transactions create customer credit balances is not required to include such credits in the Reserve Formula, provided:

1.    The broker-dealer, acting as agent or trustee for the persons who have the beneficial interest in the partnership unit, promptly deposits upon receipt the total purchase price of the transaction and the appropriate instruments of assignment in escrow, without interest, with a qualified bank escrow agent pending receipt of the comment of the general partner to the assignment.

2.    Should consent not be forthcoming within 45 days after confirmation of the transaction, promptly return the escrow deposits to the depositor.

3.    The qualified bank escrow agent holding the deposit must agree in writing to hold the escrow deposits for the persons having beneficial interest therein, and to transmit or return the deposits directly to persons entitled thereto when the appropriate event or contingency has occurred.

(SEC Staff of DMR to NASD, July 1986)

**(NEXT PAGE IS 2671)**

SEA Rule 15c3-3(Exhibit A - Item 1)/29

© 2008 Financial Industry Regulatory Authority, Inc.

## RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES

/01    Customer Debit Balances

Determine the total of the net debit balances contained in customer's cash accounts and margin accounts which are fully secured by salable securities, i.e., a ready market exists as stipulated by SEA Rule 15c3-1(c)(11) and there are no statutory, regulatory or contractual arrangements or other restrictions inhibiting the public offer or sale of the securities.

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

/011    Drafts Receivable on Customer Debits

Include the debit in a related draft receivable account when immediate credit has not been received on draft shipments of securities purchased by customers when the debit in the customer's account for the purchase of the securities so drafted has been eliminated.

(SEC Release 34-9922, January 2, 1973)

/012    Partly Secured Accounts

For a margin account which is partly secured after applying current margin calls outstanding and in the case of a margin account where a margin call is outstanding more than 5 business days, the amount which should be included in the Reserve Formula should be the debit balance in such account reduced (or if a credit balance, increased) by:

1.    The deficit in such account after the application of current margin calls outstanding; and

2.    The amount which results from applying the appropriate haircut, set forth in SEA Rule 15c3-1(c)(2)(vi) or (f), to the market value of the securities in the account.

With respect to a partly secured cash account, which has a transaction liquidating to a deficit and which is not current within the meaning of Regulation T of the Board of Governors of the Federal Reserve System or which has more than one extension thereunder, the amount included in the Reserve Formula should be the debit balance in the partly secured cash account reduced (or if a credit balance, increased) by:

SEA Rule 15c3-3(Exhibit A - Item 10)/012

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/12 13:41:59 Main Document Documents 1 Through of 259 Pg 920 of 1129

2722

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/012    Partly Secured Accounts (continued)

      1.      The deficit related to the transactions which are causing such deficit; and

      2.      The amount which results from applying the appropriate haircut, set forth in SEA Rule 15c3-1(c)(2)(vi) or (f), to the market value of the securities transactions which are causing the deficit.

When net capital is computed under the basic method and all customers' balances are netted for the weekly formula computation, see Item 10 /06.

      (SEC Letter to NYSE, December 9, 1975) (SEC Staff to NYSE)

/0120    Customers' Unsecured/Partly Secured Deficit Offset by Correspondents Deposits

A carrying broker-dealer does not have to reduce customers' debits from the reserve formula arising from an introducing broker-dealer's customers' unsecured or partly secured deficits provided sufficient deposits were received from the introducing broker-dealer which can legally be applied to cover (fully secure) the applicable deficits. However, the amount of the introducing broker-dealer's deposits maintained at the carrying broker-dealer must be included in the PAIB computation of the carrying broker-dealer.

      (SEC Staff to NYSE) (No. 02-3, February 2002)

/013    Special Omnibus or Similar Accounts

When a special omnibus account maintained in compliance with the requirements of Section 10 of Regulation T or similar accounts carried on behalf of another broker-dealer is partly secured after applying current calls, i.e., outstanding not more than 5 business days, for margin, marks to the market or other required deposits, include the debit balance contained in such account, reduced by the deficit after applying current calls. (See Note E(2).)

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

      (SEC Release 34-13565, May 18, 1977) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - Item 10)/013

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/26/14 Entered 12/006/26/13:43:59:19 Main Document
Documents 1 Through 18 of 259 Pg 103 of 259 921 of 1129

2723

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/014    Accrued Interest Receivable

Include as a debit accrued interest receivable on customers' fully secured margin account debit balances.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/015    Dividends and Interest Receivable from DTC

Include in Item 10, debit balances due from DTC representing dividends and interest receivable not outstanding for more than 5 business days which are allocable to credits in the formula, resulting from the firm's crediting its customer account for the same dividends and interest.

(SEC Letter to NYSE, March 19, 1984) (No. 84-3, April 1984)

/016    Household Members, Relatives and Affiliated Persons of the B/D

Debit balances contained in the cash and margin accounts of household members and other persons related to principals of the broker-dealer, or contained in the accounts of affiliated persons of the broker-dealer shall be excluded, unless the broker-dealer can demonstrate that such debit balances are directly related to credit items in the formula.  (See Note E(4) and Note E(5).)

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

/017    Debit Balances in Excess of $50,000

In accordance with Note E(5) include in Item 10 the first $50,000 of the debit balance in a margin account that has a debit in excess of $50,000 of a single customer (other than in an omnibus account); in related accounts under common control of a single customer; or subject to cross guarantees, in which case the debit balances shall be aggregated.

The portion of the debit balance remaining shall also be included, provided the total amount included is not in excess of 25% of the broker-dealer's tentative net capital, i.e., the net capital computed in accordance with SEA Rule 15c3-1 prior to the application of securities haircuts; and

If any portion of the debit balance remains, i.e., the portion in excess of 25% of tentative net capital, it shall be excluded, unless the broker-dealer can demonstrate that the debit balance is directly related to credit items contained in the formula.  (See Note E(5).)

(SEC Staff to NYSE)

SEA Rule 15c3-3(Exhibit A - Item 10)/017

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/126/14 Entered 12/006/126/3:84:539:19ain Appendix Documents 1 Through 4 of 259 Pg 104 of 259 922 of 1129

2724

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/018    Customer and Non-Customer Interest in a Single Account

When both a "customer" and a "non-customer" have a participation interest in a single account with a debit balance, in accordance with Note E(6) include the percentage of the debit balance as follows:

| Customer Interest | Amount of Debit Included |
|---|---|
| Greater than 95% | The entire debit |
| Between 50% and 95% | % attributable to customer 1/ |
| Less than 50% | None 1/ |

1/  If the broker-dealer can demonstrate that the debit balance is directly related to credit items in the formula, the entire debit shall be included.  (See Note E(5))

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computation, see Item 10 /06.

/019    Partial Identification of Debits With Credits in The Formula

Debit balances in excess of 25% of the broker-dealer's tentative net capital which are shown to be directly related to credits included in the formula computation may be considered as a reduction of the non-allowable debit amount.  Where this application reduces the remaining debit below 25% of tentative net capital, the balance of the debit may also be included in the computation.

(SEC Staff to NYSE) (No. 91-5, April 1991)

"Debit balances in excess of 25% of tentative net capital, (TNC)" refers to the total debit balance in a single customer's account and not the portion of the debit in excess of 25% of the broker-dealer's TNC.

(SEC Staff to NYSE)

/02    Estate Account Debit Balances

Debit balances in Estate accounts are to be included or excluded in accordance with Note E(6).

(SEC Staff to NYSE) (No. 92-10, July 1992)

SEA Rule 15c3-3(Exhibit A - Item 10)/02

© 2008 Financial Industry Regulatory Authority, Inc.

0808-02020-cccDoc47250Filed 12/06/12 Entered 12/06/26 13:48:39:19 Main Dppendix Documents 1 Through 5 Page 105 of 259 923 of 1129

2725

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/03    Accrued Trade Date Commissions

Commissions receivable accrued on a trade date basis by broker-dealers using settlement date accounting shall not be included in Item 10 in the Reserve Formula.

(SEC Staff to NYSE)

/031    Debit Balances In Customers' Spot Commodity Accounts

Debit balances in fully secured spot commodity accounts of customers shall not be included in Item 10.

However, such debits may be used to reduce a credit balance of the same customer reportable at Item 1. (See Item 1 /02, /021 and /022.)

(SEC Letter to E.F. Hutton & Company, Inc., August 25, 1980) (No. 84-3, April 1984)

/032    Non-Purpose Loans

Non-purpose loan receivables shall not be included.

When a separate bank loan is collateralized by securities held as margin for a non-purpose loan, the bank loan credit is not reportable at Item 2. (See Item 2 /05.)

(SEC Letter to NYSE, April 20, 1983) (No. 84-9, September 1984)

/033    Unsecured Customer Short Positions

For firm longs allocable to unsecured customer shorts, both sides are excluded from the formula.

(SEC Staff to NYSE) (No. 78-1, May 1978)

/034    Accrued Custodial Fees Receivable - IRA Accounts

Accrued custodial fees receivable for IRA custody accounts may be included under Item 10 provided the individual fees are secured by and chargeable to each related IRA custody account.

(SEC Staff to NYSE) (No. 90-11, December 1990)

SEA Rule 15c3-3(Exhibit A - Item 10)/034

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 47250 Filed 12/06/16 Entered 12/06/16 13:48:39 Main Document Documents 1 Through of 259 Page 924 of 1129

2726

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/04    Debit Balances in Margin Accounts - Sample Computation

Debit balances in margin accounts shall be reduced by the amount by which a specific security (other than an exempted security) which is collateral for margin accounts exceeds in aggregate value 15 percent of all securities which collateralize all margin accounts receivable; provided, however, the required reduction shall not be in excess of the amounts of the debit balance required to be excluded because of this concentration rule. A specific security is deemed to be collateral for a margin account only to the extent it represents in value not more than 140 percent of the customer debit balance in a margin account.

Example:

| | |
|---|---|
| Total margin debits | $50,000,000 |
| Margin securities (140%) | 70,000,000 |
| 15% of margin securities | 10,500,000 |
| Total value of stock XYZ included in margin securities | 12,000,000 |
| Excess of value over 15% limit | 1,500,000 |
| Reduction in margin debits ($1,500,000 divided by 140%) | 1,071,429 |

(SEC Staff to NYSE) (No. 78-1, May 1978)

SEA Rule 15c3-3(Exhibit A - Item 10)/04

© 2008 Financial Industry Regulatory Authority, Inc.

0808-01020-cccDoc #70250 Filed 12/006/26/12Entered 12/006/263434539:19 MainAppendix
Documents 1 Through 97 of 259 Page 925 of 1129

2727

## RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/06      Weekly Computation - Netting of Customers' Debit and Credit Balances

When net capital is computed under the basic method and customers' debit and credit balances are netted for the weekly formula computations (other than at month-end, see interpretation 15c3-3(Exhibit A - General)/01), a net debit balance shall be reduced (and a net credit balance at Item 1 of this formula computation shall be increased) by the amount determined at the prior month-end that reflected customers' credit and debit balances separately, for the following:

- The reduction required for customers' unsecured debits, accounts doubtful of collection [see (Exhibit A – General)/01)] and partly secured accounts (see Item 10 /012);

- The reduction required because deficits exist in special omnibus accounts or similar accounts [see Item 10 /013 and (Exhibit A - Note E)(2)];

- The reduction required because an account with a debit balance includes a participation interest of a "non-customer" [see (Exhibit A - Note E)(6)];

- The reduction required for household members and other persons related to principals or affiliated persons of the broker-dealer [see (Exhibit A - Note E)(4)];

- The reduction required because a single customer's debit balance exceeds 25% of the broker-dealer's tentative net capital [see (Exhibit A - Note E)(5)];

- The reduction required because of concentrated collateral for margin debits [see (Exhibit A - Note E)(1)]; and

- The 1% required reduction of aggregate debits [see (Exhibit A - Note E)(3)];

/07      Debits in Customers' Accounts Collateralized by Control or Restricted Stock

Debit balances in customers' accounts collateralized by restricted securities may only be included in the Reserve Formula computation to the extent they are secured by securities that can be publicly sold. Accounts that are partly secured are treated under interpretation 15c3-3 (Exhibit A - Item 10)/02. Broker-dealers will bear the burden of proof in demonstrating that the restricted securities can be publicly sold. The Exchange may require a legal opinion where the value of such securities is a material amount.

(SEC Staff to NYSE) (No. 92-1, January 1992)

SEA Rule 15c3-3(Exhibit A - Item 10)/07

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/06/12 Entered 12/06/13 84:539:19 Main Document Documents 1 Through 8 Page 108 of 259 926 of 1129

2728

RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/08 Customer Redemptions of Money Market Funds

Debit balances in customers' accounts arising from prepayments made by a broker-dealer on behalf of customers which are expected to be covered the next day upon settlement of such customers' redemptions, are treated as receivable from the fund and is not to be included as a debit in the Reserve Formula.  This applies even if the broker-dealer maintains the money market fund position long in the customer's account, and the customer's account is credited for the redemption on settlement date.  However, the debit may serve to reduce certain credit balances.  (See interpretation 15c3-3(Exhibit A - Item 4)/08.)

The term "prepayments" would include the actual payment of funds to or on behalf of customers in the form of a check or wire (e.g., credit card charges or checks written by customers), which are covered by customers' instructions to redeem their money market fund position.

(SEC Staff to NYSE) (No. 92-13, December 1992)

/081 Netting of Money Market Fund Payables by Amounts Receivable from Money Market Funds

Money market fund payables resulting from customer purchases can be reduced by certain receivables from the same or different money market funds.  A broker-dealer can net receivables and payables between the same family of money market funds, but cannot net receivables and payables between unrelated families of money market funds.

(SEC Staff to NYSE) (No. 02-7, August 2002)

SEA Rule 15c3-3(Exhibit A - Item 10)/081

© 2008 Financial Industry Regulatory Authority, Inc.

## RESERVE FORMULA (EXHIBIT A - ITEM 10); CUSTOMER DEBIT BALANCES (continued)

/09     Credit Extended Upon Exercise of Employee Stock Option

When a broker-dealer exercises an employee stock option for a customer, it must have acknowledgement from the issuer that a freely transferable, readily salable and marketable security in negotiable form will be promptly delivered to the broker-dealer within 15 business days after exercise notice is given to the issuer (when acknowledgment is given by telephone, the condition should be restated in the transmittal to the issuer). The exercise shall be subject to the following:

1.     When the security to be received from the exercise has been sold and is not received from the issuer within 15 business days after notice of exercise has been given, the position shall be subject to a cash margin deficiency charge computed without allowing any value for the security not received and is subject to the buy-in provisions under SEA Rule 15c3-3(m) unless an extension of time is requested and approved under SEA Rule 15c3-3 (n);

2.     When the security to be received from the exercise has not been sold and is not received within 15 business days after notice of exercise has been given, any related debit balance shall be treated as an unsecured debit.

(SEC Staff to NYSE) (No. 96-3, April 1996)

SEA Rule 15c3-3(Exhibit A - Item 10)/09

© 2008 Financial Industry Regulatory Authority, Inc.

08-01025-cscc Doc 470250 Filed 12/005/26/12 Entered 12/005/26/12:34:859:19ain Appendix
Documents 1 Through 1 of 259 Page 928 of 1129

2771

## RESERVE FORMULA (EXHIBIT A - ITEM 13); MARGIN REQUIRED BY OCC

/01    Margin Required by Options Clearing Corporation

Include in the formula the amount of margin required and on deposit with the Options Clearing Corporation for all option contracts written or purchased in customer accounts. Note F stipulates that such margin shall be represented by cash, proprietary qualified securities and letters of credit collateralized by customers' securities.

Unsecured letters of credit and proprietary securities not qualified under paragraph (a)(6) of SEA Rule 15c3-3 shall not be included in the reserve formula.

(SEC Release 34-13565, May 18, 1977) (No. 78-1, May 1978)

/011    OCC Margin Requirement Met by Customers Securities

When customer available collateral is deposited with OCC to satisfy margin requirements the actual amount of margin required is included in the Formula as both a debit and a credit. Such deposit of securities is not considered a good control location.

(SEC Staff to NYSE) (No. 83-2, April 1983)

/012    Commingled Collateral As Options Clearing Corp Margin Deposit-(Rescinded, No. 02-7, August 2002)

/013    Commingled Collateral As Options Clearing Corp Margin Deposit

When customer, non-customer and qualified proprietary securities are commingled as margin on deposit with OCC the lesser of the customer margin requirement or the market value of the customers' securities pledged as collateral should be included as a credit in the reserve formula.  In addition, the lesser of the customers' margin requirement or the total market value of the customers' and qualified proprietary securities pledged as collateral should be included as a debit in the reserve formula.

(SEC Staff to NYSE) (No. 02-7, August 2002)

SEA Rule 15c3-3(Exhibit A - Item 13)/013

© 2008 Financial Industry Regulatory Authority, Inc.

08-01420-scc Doc 470250 Filed 12/006/26/14 Entered 12/006/26/31:34:55 39:19 Main Appendix Document Documents 1 Through 0 of 259 929 of 1129

2772

## RESERVE FORMULA (EXHIBIT A - ITEM 13); MARGIN REQUIRED BY OCC (continued)

**/02**   Restricted Letters of Credit Collateralized by Proprietary Securities

Include in the formula restricted letters of credit secured by proprietary "qualified" securities (under SEA Rule 15c3-3(a)(6)) limited, however, to the extent of:

- The net margin required for all options contracts in customers' accounts; and

- The net margin requirement <u>not</u> met by other qualified margin.

(SEC Letter to CBOE, March 14, 1975)

**/03**   Letters of Credit Secured by Customer' Securities

Include in the formula the amount of letters of credit obtained by a member of Options Clearing Corporation which are collateralized by customers' securities not required to be in possession or control, to the extent of the member's customers margin requirement. The collateral securities are not in the possession or control of the broker-dealer.

(SEC Staff to NYSE) (No. 83-2, April 1983)

**/031**   Letters of Credit Secured by Customer and Non-Customer Securities

When a letter of credit collateralized by both customer and non-customer securities is deposited with OCC as margin, only the amount required for customers' margin is included as a debit.

The combined customer and non-customer margin requirement, up to the amount of the letter of credit, must be included as a credit at Item 2.

(SEC Staff to NYSE) (No. 90-11, December 1990)

SEA Rule 15c3-3(Exhibit A - Item 13)/031

© 2008 Financial Industry Regulatory Authority, Inc.

RESERVE FORMULA (EXHIBIT A - ITEM 13); MARGIN REQUIRED BY OCC (continued)

/04   OCC Margin Required From Introducing Firms – Rescinded (No. 05-8, April 2005)

/041   OCC Margin Required for a Broker-Dealer Introducing Options on an Omnibus Basis

A broker-dealer that introduces its customers' option transactions on an omnibus basis should include a debit and an offsetting credit in its reserve formula when customers' securities are deposited as collateral with the carrying/clearing broker-dealer to satisfy the margin requirement from the carrying/clearing broker-dealer.  The amount to be included as a debit and a credit in the reserve formula is the lesser of the customers' margin requirement or the market value of the customers' securities deposited as collateral with the carrying/clearing broker-dealer.

The introducing omnibus broker-dealer should include a debit in its reserve formula (without an offsetting credit) when cash and/or qualified proprietary securities are deposited as collateral with the carrying/clearing broker-dealer to satisfy the margin requirement from the carrying/clearing broker-dealer.  The amount to be included as a debit in the reserve formula is the lesser of the customers' margin requirement or the cash and/or the market value of qualified proprietary securities deposited as collateral with the carrying/clearing broker-dealer.

(SEC Staff to NYSE) (No. 05-8, April 2005)

SEA Rule 15c3-3(Exhibit A - Item 13)/041

© 2008 Financial Industry Regulatory Authority, Inc.

**EXHIBIT 3**

**Securities and Exchange Commission** §240.15c3–1

(iii) Any person who has a customer account with the Participating Underwriter.

(6) The term *preliminary official statement* means an official statement prepared by or for an issuer of municipal securities for dissemination to potential customers prior to the availability of the final official statement.

(7) The term *primary offering* means an offering of municipal securities directly or indirectly by or on behalf of an issuer of such securities, including any remarketing of municipal securities.

(i) That is accompanied by a change in the authorized denomination of such securities from $100,000 or more to less than $100,000, or

(ii) That is accompanied by a change in the period during which such securities may be tendered to an issuer of such securities or its designated agent for redemption or purchase from a period of nine months or less to a period of more than nine months.

(8) The term *underwriter* means any person who has purchased from an issuer of municipal securities with a view to, or offers or sells for an issuer of municipal securities in connection with, the offering of any municipal security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; except, that such term shall not include a person whose interest is limited to a commission, concession, or allowance from an underwriter, broker, dealer, or municipal securities dealer not in excess of the usual and customary distributors' or sellers' commission, concession, or allowance.

(9) The term *annual financial information* means financial information or operating data, provided at least annually, of the type included in the final official statement with respect to an obligated person, or in the case where no financial information or operating data was provided in the final official statement with respect to such obligated person, of the type included in the final official statement with respect to those obligated persons that meet the objective criteria applied to select the persons for which financial information or operating data will be provided on an annual basis. Financial information or operating data may be set forth in the document or set of documents, or may be included by specific reference to documents previously provided to each nationally recognized municipal securities information repository, and to a state information depository, if any, or filed with the Commission. If the document is a final official statement, it must be available from the Municipal Securities Rulemaking Board.

(10) The term *obligated person* means any person, including an issuer of municipal securities, who is either generally or through an enterprise, fund, or account of such person committed by contract or other arrangement to support payment of all, or part of the obligations on the municipal securities to be sold in the Offering (other than providers of municipal bond insurance, letters of credit, or other liquidity facilities).

(g) *Transitional provision.* If on July 28, 1989, a Participating Underwriter was contractually committed to act as underwriter in an Offering of municipal securities originally issued before July 29, 1989, the requirements of paragraphs (b)(3) and (b)(4) shall not apply to the Participating Underwriter in connection with such an Offering. Paragraph (b)(5) of this section shall not apply to a Participating Underwriter that has contractually committed to act as an underwriter in an Offering of municipal securities before July 3, 1995; *except that* paragraph (b)(5)(i)(A) and paragraph (b)(5)(i)(B) shall not apply with respect to fiscal years ending prior to January 1, 1996. Paragraph (c) shall become effective on January 1, 1996. Paragraph (d)(2)(ii) and paragraph (d)(2)(iii) of this section shall not apply to an Offering of municipal securities commencing prior to January 1, 1996.

[54 FR 28813, July 10, 1989, as amended at 59 FR 59609, Nov. 17, 1994]

## §240.15c3–1 Net capital requirements for brokers or dealers.

(a) Every broker or dealer shall at all times have and maintain net capital no less than the greater of the highest minimum requirement applicable to its ratio requirement under paragraph

299

**§ 240.15c3–1**               **17 CFR Ch. II (4–1–08 Edition)**

(a)(1) of this section, or to any of its activities under paragraph (a)(2) of this section. In lieu of applying paragraphs (a)(1) and (a)(2) of this section, an OTC derivatives dealer shall maintain net capital pursuant to paragraph (a)(5) of this section. Each broker or dealer also shall comply with the supplemental requirements of paragraphs (a)(4) and (a)(9) of this section, to the extent either paragraph is applicable to its activities. In addition, a broker or dealer shall maintain net capital of not less than its own net capital requirement plus the sum of each broker's or dealer's subsidiary or affiliate minimum net capital requirements, which is consolidated pursuant to Appendix C, § 240.15c3–1c.

### RATIO REQUIREMENTS

#### *Aggregate Indebtedness Standard*

(1)(i) No broker or dealer, other than one that elects the provisions of paragraph (a)(1)(ii) of this section, shall permit its aggregate indebtedness to all other persons to exceed 1500 percent of its net capital (or 800 percent of its net capital for 12 months after commencing business as a broker or dealer).

#### *Alternative Standard*

(ii) A broker or dealer may elect not to be subject to the Aggregate Indebtedness Standard of paragraph (a)(1)(i) of this section. That broker or dealer shall not permit its net capital to be less than the greater of $250,000 or 2 percent of aggregate debit items computed in accordance with the Formula for Determination of Reserve Requirements for Brokers and Dealers (Exhibit A to Rule 15c3–3, § 240.15c3–3a). Such broker or dealer shall notify its Examining Authority, in writing, of its election to operate under this paragraph (a)(1)(ii). Once a broker or dealer has notified its Examining Authority, it shall continue to operate under this paragraph unless a change is approved upon application to the Commission. A broker or dealer that elects this standard and is not exempt from Rule 15c3–3 shall:

(A) Make the computation required by § 240.15c3–3(e) and set forth in Ex-

hibit A, § 240.15c3–3a, on a weekly basis and, in lieu of the 1 percent reduction of certain debit items required by Note E (3) in the computation of its Exhibit A requirement, reduce aggregate debit items in such computation by 3 percent;

(B) Include in Items 7 and 8 of Exhibit A, § 240.15c3–3a, the market value of items specified therein more than 7 business days old;

(C) Exclude credit balances in accounts representing amounts payable for securities not yet received from the issuer or its agent which securities are specified in paragraphs (c)(2)(vi) (A) and (E) of this section and any related debit items from the Exhibit A requirement for 3 business days; and

(D) Deduct from net worth in computing net capital 1 percent of the contract value of all failed to deliver items or securities borrowed that were allocated to failed to receive contracts of the same issue and which thereby were excluded from Items 11 or 12 of Exhibit A, § 240.15c3–3a.

#### *Futures Commission Merchants*

(iii) No broker or dealer registered as a futures commission merchant shall permit its net capital to be less than the greater of its requirement under paragraph (a)(1) (i) or (ii) of this section, or 4 percent of the funds required to be segregated pursuant to the Commodity Exchange Act and the regulations thereunder (less the market value of commodity options purchased by option customers on or subject to the rules of a contract market, each such deduction not to exceed the amount of funds in the customer's account).

### MINIMUM REQUIREMENTS

See Appendix E (§ 240.15c3–1E) for temporary minimum requirements.

#### *Brokers or Dealers That Carry Customer Accounts*

(2)(i) A broker or dealer (other than one described in paragraphs (a)(2)(ii) or (a)(8) of this section) shall maintain net capital of not less than $250,000 if it carries customer or broker or dealer accounts and receives or holds funds or securities for those persons. A broker or dealer shall be deemed to receive

**Securities and Exchange Commission** §240.15c3–1

funds, or to carry customer or broker or dealer accounts and to receive funds from those persons if, in connection with its activities as a broker or dealer, it receives checks, drafts, or other evidences of indebtedness made payable to itself or persons other than the requisite registered broker or dealer carrying the account of a customer, escrow agent, issuer, underwriter, sponsor, or other distributor of securities. A broker or dealer shall be deemed to hold securities for, or to carry customer or broker or dealer accounts, and hold securities of, those persons if it does not promptly forward or promptly deliver all of the securities of customers or of other brokers or dealers received by the firm in connection with its activities as a broker or dealer. A broker or dealer, without complying with this paragraph (a)(2)(i), may receive securities only if its activities conform with the provisions of paragraphs (a)(2) (iv) or (v) of this section, and may receive funds only in connection with the activities described in paragraph (a)(2)(v) of this section.

(ii) A broker or dealer that is exempt from the provisions of §240.15c3–3 pursuant to paragraph (k)(2)(i) thereof shall maintain net capital of not less than $100,000.

### Dealers

(iii) A dealer shall maintain net capital of not less than $100,000. For the purposes of this section, the term ''dealer'' includes:

(A) Any broker or dealer that endorses or writes options otherwise than on a registered national securities exchange or a facility of a registered national securities association; and

(B) Any broker or dealer that effects more than ten transactions in any one calendar year for its own investment account. This section shall not apply to those persons engaging in activities described in paragraphs (a)(2)(v), (a)(2)(vi) or (a)(8) of this section, or to those persons whose underwriting activities are limited solely to acting as underwriters in best efforts or all or none underwritings in conformity with paragraph (b)(2) of §240.15c2–4, so long as those persons engage in no other dealer activities.

### Brokers or Dealers That Introduce Customer Accounts And Receive Securities

(iv) A broker or dealer shall maintain net capital of not less than $50,000 if it introduces transactions and accounts of customers or other brokers or dealers to another registered broker or dealer that carries such accounts on a fully disclosed basis, and if the broker or dealer receives but does not hold customer or other broker or dealer securities. A broker or dealer operating under this paragraph (a)(2)(iv) of this section may participate in a firm commitment underwriting without being subject to the provisions of paragraph (a)(2)(iii) of this section, but may not enter into a commitment for the purchase of shares related to that underwriting.

### Brokers or Dealers Engaged in the Sale of Redeemable Shares of Registered Investment Companies and Certain Other Share Accounts

(v) A broker or dealer shall maintain net capital of not less than $25,000 if it acts as a broker or dealer with respect to the purchase, sale and redemption of redeemable shares of registered investment companies or of interests or participations in an insurance company separate account directly from or to the issuer on other than a subscription way basis. A broker or dealer operating under this section may sell securities for the account of a customer to obtain funds for the immediate reinvestment in redeemable securities of registered investment companies. A broker or dealer operating under this paragraph (a)(2)(v) must promptly transmit all funds and promptly deliver all securities received in connection with its activities as a broker or dealer, and may not otherwise hold funds or securities for, or owe money or securities to, customers.

### Other Brokers or Dealers

(vi) A broker or dealer that does not receive, directly or indirectly, or hold funds or securities for, or owe funds or securities to, customers and does not carry accounts of, or for, customers and does not engage in any of the activities described in paragraphs (a)(2)(i) through (v) of this section shall

301

maintain net capital of not less than $5,000. A broker or dealer operating under this paragraph may engage in the following dealer activities without being subject to the requirements of paragraph (a)(2)(iii) of this section:

(A) In the case of a buy order, prior to executing such customer's order, it purchases as principal the same number of shares or purchases shares to accumulate the number of shares necessary to complete the order, which shall be cleared through another registered broker or dealer or

(B) In the case of a sell order, prior to executing such customer's order, it sells as principal the same number of shares or a portion thereof, which shall be cleared through another registered broker or dealer.

(3) [Reserved]

### Capital Requirements for Market Makers

(4) A broker or dealer engaged in activities as a market maker as defined in paragraph (c)(8) of this section shall maintain net capital in an amount not less than $2,500 for each security in which it makes a market (unless a security in which it makes a market has a market value of $5 or less, in which event the amount of net capital shall be not less than $1,000 for each such security) based on the average number of such markets made by such broker or dealer during the 30 days immediately preceding the computation date. Under no circumstances shall it have net capital less than that required by the provisions of paragraph (a) of this section, or be required to maintain net capital of more than $1,000,000 unless required by paragraph (a) of this section.

(5) In accordance with Appendix F to this section (§240.15c3–1f), the Commission may grant an application by an OTC derivatives dealer when calculating net capital to use the market risk standards of Appendix F as to some or all of its positions in lieu of the provisions of paragraph (c)(2)(vi) of this section and the credit risk standards of Appendix F to its receivables (including counterparty net exposure) arising from transactions in eligible OTC derivative instruments in lieu of the requirements of paragraph (c)(2)(iv) of this section. An OTC derivatives dealer shall at all times maintain tentative net capital of not less than $100 million and net capital of not less than $20 million.

### Market Makers, Specialists and Certain Other Dealers

(6)(i) A dealer who meets the conditions of paragraph (a)(6)(ii) of this section may elect to operate under this paragraph (a)(6) and thereby not apply, except to the extent required by this paragraph (a)(6), the provisions of paragraphs (c)(2)(vi) or Appendix A (§240.15c3–1a) of this section to market maker and specialist transactions and, in lieu thereof, apply thereto the provisions of paragraph (a)(6)(iii) of this section.

(ii) This paragraph (a)(6) shall be available to a dealer who does not effect transactions with other than brokers or dealers, who does not carry customer accounts, who does not effect transactions in options not listed on a registered national securities exchange or facility of a registered national securities association, and whose market maker or specialist transactions are effected through and carried in a market maker or specialist account cleared by another broker or dealer as provided in paragraph (a)(6)(iv) of this section.

(iii) A dealer who elects to operate pursuant to this paragraph (a)(6) shall at all times maintain a liquidating equity in respect of securities positions in his market maker or specialist account at least equal to:

(A) An amount equal to 25 percent (5 percent in the case of exempted securities) of the market value of the long positions and 30 percent of the market value of the short positions; provided, however, in the case of long or short positions in options and long or short positions in securities other than options which relate to a bona fide hedged position as defined in paragraph (c)(2)(x)(C) of this section, such amount shall equal the deductions in respect of such positions specified by paragraph (c)(2)(x)(A) (*1*) through (*9*) of this section.

(B) Such lesser requirement as may be approved by the Commission under specified terms and conditions upon written application of the dealer and the carrying broker or dealer.

**Securities and Exchange Commission** §240.15c3–1

(C) For purposes of this paragraph (a)(6)(iii), equity in such specialist or market maker account shall be computed by (*1*) marking all securities positions long or short in the account to their respective current market values, (*2*) adding (deducting in the case of a debit balance) the credit balance carried in such specialist or market maker account, and (*3*) adding (deducting in the case of short positions) the market value of positions long in such account.

(iv) The dealer shall obtain from the broker or dealer carrying the market maker or specialist account a written undertaking which shall be designated ''Notice Pursuant to §240.15c3–1(a)(6) of Intention to Carry Specialist or Market Maker Account.'' Said undertaking shall contain the representations required by paragraph (a)(6) of this section and shall be filed with the Commission's Washington, DC, Office, the regional or district office of the Commission for the region or district in which the broker or dealer has its principal place of business and the Designated Examining Authorities of both firms prior to effecting any transactions in said account. The broker or dealer carrying such account:

(A) Shall mark the account to the market not less than daily and shall issue appropriate calls for additional equity which shall be met by noon of the following business day;

(B) Shall notify by telegraph the Commission and the Designated Examining Authorities pursuant to 17 CFR 240.17a–11, if the market maker or specialist fails to deposit any required equity within the time prescribed in paragraph (a)(6)(iv)(A) of this section; said telegraphic notice shall be received by the Commission and the Designated Examining Authorities not later than the close of business on the day said call is not met;

(C) Shall not extend further credit in the account if the equity in the account falls below that prescribed in paragraph (a)(6)(iii) of this section, and

(D) Shall take steps to liquidate promptly existing positions in the account in the event of a failure to meet a call for equity.

(v) No such carrying broker or dealer shall permit the sum of (A) the deductions required by paragraph (c)(2)(x)(A) of this section in respect of all transactions in market maker accounts guaranteed, indorsed or carried by such broker or dealer pursuant to paragraph (c)(2)(x) of this section and (B) the equity required by paragraph (iii) of this paragraph (a)(6) in respect of all transactions in the accounts of specialists of market makers in options carried by such broker or dealer pursuant to this paragraph (a)(6) to exceed 1,000 percent of such broker's or dealer's net capital as defined in paragraph (c)(2) of this section for any period exceeding five business days; *Provided,* That solely for purposes of this paragraph (a)(6)(v), deductions or equity required in a specialist or market maker account in respect of positions in fully paid securities (other than options), which do not underlie options listed on the national securities exchange or facility of a national securities association of which the specialist or market marker is a member, need not be recognized. *Provided further,* That if at any time such sum exceeds 1,000 percent of such broker's or dealer's net capital, then the broker or dealer shall immediately transmit telegraphic notice of such event to the principal office of the Commission in Washington, DC, the regional or district office of the Commission for the region or district in which the broker or dealer maintains its principal place of business, and such broker's or dealer's Designated Examining Authority. *Provided further,* That if at any time such sum exceeds 1,000 percent of such broker's or dealer's net capital, then such broker or dealer shall be subject to the prohibitions against withdrawal of equity capital set forth in paragraph (e) of this section, and to the prohibitions against reduction, prepayment and repayment of subordination agreements set forth in paragraph (b)(11) of §240.15c3–1d, as if such broker or dealer's net capital were below the minimum standards specified by each of the aforementioned paragraphs.

303

ALTERNATIVE NET CAPITAL COMPUTATION FOR BROKER-DEALERS THAT ELECT TO BE SUPERVISED ON A CONSOLIDATED BASIS

(7) In accordance with Appendix E to this section (§ 240.15c3–1e), the Commission may approve, in whole or in part, an application or an amendment to an application by a broker or dealer to calculate net capital using the market risk standards of Appendix E to compute a deduction for market risk on some or all of its positions, instead of the provisions of paragraphs (c)(2)(vi) and (c)(2)(vii) of this section, and using the credit risk standards of Appendix E to compute a deduction for credit risk on certain credit exposures arising from transactions in derivatives instruments, instead of the provisions of paragraph (c)(2)(iv) of this section, subject to any conditions or limitations on the broker or dealer the Commission may require as necessary or appropriate in the public interest or for the protection of investors. A broker or dealer that has been approved to calculate its net capital under Appendix E must:

(i) At all times maintain tentative net capital of not less than $1 billion and net capital of not less than $500 million;

(ii) Provide notice that same day in accordance with § 240.17a–11(g) if the broker's or dealer's tentative net capital is less than $5 billion. The Commission may, upon written application, lower the threshold at which notification is necessary under this paragraph (a)(7)(ii), either unconditionally or on specified terms and conditions, if a broker or dealer satisfies the Commission that notification at the $5 billion threshold is unnecessary because of, among other factors, the special nature of its business, its financial position, its internal risk management system, or its compliance history; and

(iii) Comply with § 240.15c3–4 as though it were an OTC derivatives dealer with respect to all of its business activities, except that paragraphs (c)(5)(xiii), (c)(5)(xiv), (d)(8), and (d)(9) of § 240.15c3–4 shall not apply.

(8) *Municipal securities brokers' brokers.* (i) A municipal securities brokers' brokers, as defined in subsection (ii) of this paragraph (a)(8), may elect not to be subject to the limitations of paragraph (c)(2)(ix) of this section provided that such brokers' broker complies with the requirements set out in paragraphs (a)(8) (iii), (iv) and (v) of this section.

(ii) The term municipal securities *brokers' broker* shall mean a municipal securities broker or dealer who acts exclusively as an undisclosed agent in the purchase or sale of municipal securities for a registered broker or dealer or registered municipal securities dealer, who has no ''customers'' as defined in this rule and who does not have or maintain any municipal securities in its proprietary or other accounts.

(iii) In order to qualify to operate under this paragraph (a)(8), a brokers' broker shall at all times have and maintain net capital of not less than $150,000.

(iv) For purposes of this paragraph (a)(8), a brokers' broker shall deduct from net worth 1% of the contract value of each municipal failed to deliver contract which is outstanding 21 business days or longer. Such deduction shall be increased by any excess of the contract price of the fail to deliver over the market value of the underlying security.

(v) For purposes of this paragraph (a)(8), a brokers' broker may exclude from its aggregate indebtedness computation indebtedness adequately collateralized by municipal securities outstanding for not more than one business day and offset by municipal securities failed to deliver of the same issue and quantity. In no event may a brokers' broker exclude any overnight bank loan attributable to the same municipal securities failed to deliver contract for more than one business day. A brokers' broker need not deduct from net worth the amount by which the market value of securities failed to receive outstanding longer than thirty (30) calendar days exceeds the contract value of those failed to receive as required by Rule 15c3–1(c)(2)(iv)(E).

*Certain Additional Capital Requirements for Brokers or Dealers Engaging in Reverse Repurchase Agreements*

(9) A broker or dealer shall maintain net capital in addition to the amounts required under paragraph (a) of this

**Securities and Exchange Commission** §240.15c3–1

section in an amount equal to 10 percent of:

(i) The excess of the market value of United States Treasury Bills, Bonds and Notes subject to reverse repurchase agreements with any one party over 105 percent of the contract prices (including accrued interest) for reverse repurchase agreements with that party;

(ii) The excess of the market value of securities issued or guaranteed as to principal or interest by an agency of the United States or mortgage related securities as defined in section 3(a)(41) of the Act subject to reverse repurchase agreements with any one party over 110 percent of the contract prices (including accrued interest) for reverse repurchase agreements with that party; and

(iii) The excess of the market value of other securities subject to reverse repurchase agreements with any one party over 120 percent of the contract prices (including accrued interest) for reverse repurchase agreements with that party.

(b) Exemptions:

(1) The provisions of this section shall not apply to any specialist:

(i) Whose securities business, except for an occasional non-specialist related securities transaction for its own account, is limited to that of acting as an options market maker on a national securities exchange;

(ii) That is a member in good standing and subject to the capital requirements of a national securities exchange;

(iii) That does not transact a business in securities with other than a broker or dealer registered with the Commission under section 15 or section 15C of the Act or a member of a national securities exchange; and

(iv) That is not a clearing member of The Options Clearing Corporation and whose securities transactions are effected through and carried in an account cleared by another broker or dealer registered with the Commission under section 15 of the Act.

(2) A member in good standing of a national securities exchange who acts as a floor broker (and whose activities do not require compliance with other provisions of this rule), may elect to

comply, in lieu of the other provisions of this section, with the following financial responsibility standard: The value of the exchange membership of the member (based on the lesser of the most recent sale price or current bid price for an exchange membership) is not less than $15,000, or an amount equal to the excess of $15,000 over the value of the exchange membership is held by an independent agent in escrow: *Provided,* That the rules of such exchange require that the proceeds from the sale of the exchange membership of the member and the amount held in escrow pursuant to this paragraph shall be subject to the prior claims of the exchange and its clearing corporation and those arising directly from the closing out of contracts entered into on the floor of such exchanges.

(3) The Commission may, upon written application, exempt from the provisions of this section, either unconditionally or on specified terms and conditions, any broker or dealer who satisfies the Commission that, because of the special nature of its business, its financial position, and the safeguards it has established for the protection of customers' funds and securities, it is not necessary in the public interest or for the protection of investors to subject the particular broker or dealer to the provisions of this section.

(c) Definitions. For the purpose of this section:

AGGREGATE INDEBTEDNESS

(1) The term *aggregate indebtedness* shall be deemed to mean the total money liabilities of a broker or dealer arising in connection with any transaction whatsoever and includes, among other things, money borrowed, money payable against securities loaned and securities "failed to receive," the market value of securities borrowed to the extent to which no equivalent value is paid or credited (other than the market value of margin securities borrowed from customers in accordance with the provisions of 17 CFR 240.15c3–3 and margin securities borrowed from non-

305

customers), customers' and non-customers' free credit balances, credit balances in customers' and non-customers' accounts having short positions in securities, equities in customers' and non-customers' future commodities accounts and credit balances in customers' and non-customers' commodities accounts, but excluding:

EXCLUSIONS FROM AGGREGATE INDEBTEDNESS

(i) Indebtedness adequately collateralized by securities which are carried long by the broker or dealer and which have not been sold or by securities which collateralize a secured demand note pursuant to Appendix (D) to this section 17 CFR 240.15c3–1d; indebtedness adequately collateralized by spot commodities which are carried long by the broker or dealer and which have not been sold; or, until October 1, 1976, indebtedness adequately collateralized by municipal securities outstanding for not more than one business day and offset by municipal securities failed to deliver of the same issue and quantity, where such indebtedness is incurred by a broker or dealer effecting transactions solely in municipal securities who is either registered with the Commission or temporarily exempt from such registration pursuant to 17 CFR 240.15a–1(T) or 17 CFR 240.15Ba2–3(T);

(ii) Amounts payable against securities loaned, which securities are carried long by the broker or dealer and which have not been sold or which securities collateralize a secured demand note pursuant to Appendix (D) (17 CFR 240.15c)

(iii) Amounts payable against securities failed to receive which securities are carried long by the broker or dealer and which have not been sold or which securities collateralize a secured demand note pursuant to Appendix (D) (17 CFR 240.15c3–1d) or amounts payable against securities failed to receive for which the broker or dealer also has a receivable related to securities of the same issue and quantity thereof which are either fails to deliver or securities borrowed by the broker or dealer;

(iv) Credit balances in accounts representing amounts payable for securities or money market instruments not yet received from the issuer or its agent which securities are specified in paragraph (c)(2)(vi)(E) and which amounts are outstanding in such accounts not more than three (3) business days;

(v) Equities in customers' and non-customers' accounts segregated in accordance with the provisions of the Commodity Exchange Act and the rules and regulations thereunder;

(vi) Liability reserves established and maintained for refunds of charges required by section 27(d) of the Investment Company Act of 1940, but only to the extent of amounts on deposit in a segregated trust account in accordance with 17 CFR 270.27d–1 under the Investment Company Act of 1940;

(vii) Amounts payable to the extent funds and qualified securities are required to be on deposit and are deposited in a "Special Reserve Bank Account for the Exclusive Benefit of Customers" pursuant to 17 CFR 240.15c3–3 under the Securities Exchange Act of 1934;

(viii) Fixed liabilities adequately secured by assets acquired for use in the ordinary course of the trade or business of a broker or dealer but no other fixed liabilities secured by assets of the broker or dealer shall be so excluded unless the sole recourse of the creditor for nonpayment of such liability is to such asset;

(ix) Liabilities on open contractual commitments;

(x) Indebtedness subordinated to the claims of creditors pursuant to a satisfactory subordination agreement, as defined in Appendix (D) (17 CFR 240.15c3–1d);

(xi) Liabilities which are effectively subordinated to the claims of creditors (but which are not subject to a satisfactory subordination agreement as defined in Appendix (D) (17 CFR 240.15c3–1d) by non-customers of the broker or dealer prior to such subordination, except such subordinations by customers as may be approved by the Examining Authority for such broker or dealer;

(xii) Credit balances in accounts of general partners;

(xiii) Deferred tax liabilities;

(xiv) Eighty-five percent of amounts payable to a registered investment

**Securities and Exchange Commission** §240.15c3–1

company related to fail to deliver receivables of the same quantity arising out of purchases of shares of those registered investment companies; and

(xv) Eighty-five percent of amounts payable against securities loaned for which the broker or dealer has receivables related to securities of the same class and issue and quantity that are securities borrowed by the broker or dealer.

NET CAPITAL

(2) The term *net capital* shall be deemed to mean the net worth of a broker or dealer, adjusted by:

(i) *Adjustments to net worth related to unrealized profit or loss and deferred tax provisions.* (A) Adding unrealized profits (or deducting unrealized losses) in the accounts of the broker or dealer;

(B)(*1*) In determining net worth, all long and all short positions in listed options shall be marked to their market value and all long and all short securities and commodities positions shall be marked to their market value.

(*2*) In determining net worth, the value attributed to any unlisted option shall be the difference between the option's exercise value and the market value of the underlying security. In the case of an unlisted call, if the market value of the underlying security is less than the exercise value of such call it shall be given no value and in the case of an unlisted put if the market value of the underlying security is more than the exercise value of the unlisted put it shall be given no value.

(C) Adding to net worth the lesser of any deferred income tax liability related to the items in (*1*), (*2*), and (*3*) below, or the sum of (*1*), (*2*) and (*3*) below:

(*1*) The aggregate amount resulting from applying to the amount of the deductions computed in accordance with paragraph (c)(2)(vi) of this section and Appendices A and B, §240.15c3–1a and 240.15c3–1b, the appropriate Federal and State tax rate(s) applicable to any unrealized gain on the asset on which the deduction was computed;

(*2*) Any deferred tax liability related to income accrued which is directly related to an asset otherwise deducted pursuant to this section;

(*3*) Any deferred tax liability related to unrealized appreciation in value of any asset(s) which has been otherwise deducted from net worth in accordance with the provisions of this section; and,

(D) Adding, in the case of future income tax benefits arising as a result of unrealized losses, the amount of such benefits not to exceed the amount of income tax liabilities accrued on the books and records of the broker or dealer, but only to the extent such benefits could have been applied to reduce accrued tax liabilities on the date of the capital computation, had the related unrealized losses been realized on that date.

(E) Adding to net worth any actual tax liability related to income accrued which is directly related to an asset otherwise deducted pursuant to this section.

(ii) *Subordinated Liabilities.* Excluding liabilities of the broker or dealer which are subordinated to the claims of creditors pursuant to a satisfactory subordination agreement, as defined in Appendix (D) (17 CFR 240.15c3–1d).

(iii) *Sole Proprietors.* Deducting, in the case of a broker or dealer who is a sole proprietor, the excess of liabilities which have not been incurred in the course of business as a broker or dealer over assets not used in the business.

(iv) *Assets Not Readily Convertible Into Cash.* Deducting fixed assets and assets which cannot be readily converted into cash (less any indebtedness excluded in accordance with subdivision (c)(1)(viii) of this section) including, among other things:

(A) *Fixed Assets and Prepaid Items.* Real estate; furniture and fixtures; exchange memberships; prepaid rent, insurance and other expenses; goodwill, organization expenses;

*Certain Unsecured and Partly Secured Receivables*

(B) All unsecured advances and loans; deficits in customers' and non-customers' unsecured and partly secured notes; deficits in special omnibus accounts maintained in compliance with the requirements of 12 CFR 220.10 of Regulation T under the Securities Exchange Act of 1934, or similar accounts carried on behalf of another broker or dealer, after application of calls for

307

margin, marks to the market or other required deposits that are outstanding 5 business days or less; deficits in customers' and non-customers' unsecured and partly secured accounts after application of calls for margin, marks to the market or other required deposits that are outstanding 5 business days or less, except deficits in cash accounts as defined in 12 CFR 220.8 of Regulation T under the Securities Exchange Act of 1934 for which not more than one extension respecting a specified securities transaction has been requested and granted, and deducting for securities carried in any of such accounts the percentages specified in paragraph (c)(2)(vi) of this section or Appendix A (§ 240.15c3–1a); the market value of stock loaned in excess of the value of any collateral received therefor; receivables arising out of free shipments of securities (other than mutual fund redemptions) in excess of $5,000 per shipment and all free shipments (other than mutual fund redemptions) outstanding more than 7 business days, and mutual fund redemptions outstanding more than 16 business days; any collateral deficiencies in secured demand notes as defined in Appendix D (§ 240.15c3–1d);

(C) Interest receivable, floor brokerage receivable, commissions receivable from other brokers or dealers (other than syndicate profits which shall be treated as required in paragraph (c)(2)(iv)(E) of this section), mutual fund concessions receivable and management fees receivable from registered investment companies, all of which receivables are outstanding longer than thirty (30) days from the date they arise; dividends receivable outstanding longer than thirty (30) days from the payable date; good faith deposits arising in connection with a non-municipal securities underwriting, outstanding longer than eleven (11) business days from the settlement of the underwriting with the issuer; receivables due from participation in municipal securities underwriting syndicates and municipal securities joint underwriting accounts which are outstanding longer than sixty (60) days from settlement of the underwriting with the issuer and good faith deposits arising in connection with an under-

writing of municipal securities, outstanding longer than sixty (60) days from settlement of the underwriting with the issuer; and receivables due from participation in municipal securities secondary trading joint accounts, which are outstanding longer than sixty (60) days from the date all securities have been delivered by the account manager to the account members;

(D) *Insurance Claims.* Insurance claims which, after seven (7) business days from the date the loss giving rise to the claim is discovered, are not covered by an opinion of outside counsel that the claim is valid and is covered by insurance policies presently in effect; insurance claims which after twenty (20) business days from the date the loss giving rise to the claim is discovered and which are accompanied by an opinion of outside counsel described above, have not been acknowledged in writing by the insurance carrier as due and payable; and insurance claims acknowledged in writing by the carrier as due and payable outstanding longer than twenty (20) business days from the date they are so acknowledged by the carrier; and,

(E) *Other Deductions.* All other unsecured receivables; all assets doubtful of collection less any reserves established therefor; the amount by which the market value of securities failed to receive outstanding longer than thirty (30) calendar days exceeds the contract value of such fails to receive, and the funds on deposit in a ''segregated trust account'' in accordance with 17 CFR 270.27d–1 under the Investment Company Act of 1940, but only to the extent that the amount on deposit in such segregated trust account exceeds the amount of liability reserves established and maintained for refunds of charges required by sections 27(d) and 27(f) of the Investment Company Act of 1940; *Provided,* That any amount deposited in the ''Special Reserve Bank Account for the Exclusive Benefit of Customers'' established pursuant to 17 CFR 240.15c3–3 and clearing deposits shall not be so deducted.

(F)(*I*) For purposes of this paragraph:

(*i*) The term *reverse repurchase agreement deficit* shall mean the difference between the contract price for resale of

**Securities and Exchange Commission** §240.15c3–1

the securities under a reverse repurchase agreement and the market value of those securities (if less than the contract price).

(*ii*) The term *repurchase agreement deficit* shall mean the difference between the market value of securities subject to the repurchase agreement and the contract price for repurchase of the securities (if less than the market value of the securities).

(*iii*) As used in paragraph (c)(2)(iv)(F)(*1*) of this section, the term *contract price* shall include accrued interest.

(*iv*) Reverse repurchase agreement deficits and the repurchase agreement deficits where the counterparty is the Federal Reserve Bank of New York shall be disregarded.

(*2*)(*i*) In the case of a reverse repurchase agreement, the deduction shall be equal to the reverse repurchase agreement deficit.

(*ii*) In determining the required deductions under paragraph (c)(2)(iv)(F)(*2*)(*i*) of this section, the broker or dealer may reduce the reverse repurchase agreement deficit by:

(*A*) Any margin or other deposits held by the broker or dealer on account of the reverse repurchase agreement;

(*B*) Any excess market value of the securities over the contract price for resale of those securities under any other reverse repurchase agreement with the same party;

(*C*) The difference between the contract price for resale and the market value of securities subject to repurchase agreements with the same party (if the market value of those securities is less than the contract price); and

(*D*) Calls for margin, marks to the market, or other required deposits which are outstanding one business day or less.

(*3*) (*i*) In the case of repurchase agreements, the deduction shall be:

(*A*) The excess of the repurchase agreement deficit over 5 percent of the contract price for resale of United States Treasury Bills, Notes and Bonds, 10 percent of the contract price for the resale of securities issued or guaranteed as to principal or interest by an agency of the United States or mortgage related securities as defined in section 3(a)(41) of the Act and 20 per-

cent of the contract price for the resale of other securities and;

(*B*) The excess of the aggregate repurchase agreement deficits with any one party over 25 percent of the broker or dealer's net capital before the application of paragraph (c)(2)(vi) of this section (less any deduction taken with respect to repurchase agreements with that party under paragraph (c)(2)(iv)(F)(*3*)(*i*)(*A*) of this section) or, if greater;

(*C*) The excess of the aggregate repurchase agreement deficits over 300 percent of the broker's or dealer's net capital before the application of paragraph (c)(2)(vi) of this section.

(*ii*) In determining the required deduction under paragraph (c)(2)(iv)(F)(*3*)(*i*) of this section, the broker or dealer may reduce a repurchase agreement deficit by:

(*A*) Any margin or other deposits held by the broker or dealer on account of a reverse repurchase agreement with the same party to the extent not otherwise used to reduce a reverse repurchase deficit;

(*B*) The difference between the contract price and the market value of securities subject to other repurchase agreements with the same party (if the market value of those securities is less than the contract price) not otherwise used to reduce a reverse repurchase agreement deficit; and

(*C*) Calls for margin, marks to the market, or other required deposits which are outstanding one business day or less to the extent not otherwise used to reduce a reverse repurchase agreement deficit.

(G) *Securities borrowed.* 1 percent of the market value of securities borrowed collateralized by an irrevocable letter of credit.

(H) Any receivable from an affiliate of the broker or dealer (not otherwise deducted from net worth) and the market value of any collateral given to an affiliate (not otherwise deducted from net worth) to secure a liability over the amount of the liability of the broker or dealer unless the books and records of the affiliate are made available for examination when requested by the representatives of the Commission or the Examining Authority for

309

the broker or dealer in order to demonstrate the validity of the receivable or payable. The provisions of this subsection shall not apply where the affiliate is a registered broker or dealer, registered government securities broker or dealer or bank as defined in section 3(a)(6) of the Act or insurance company as defined in section 3(a)(19) of the Act or investment company registered under the Investment Company Act of 1940 or federally insured savings and loan association or futures commission merchant registered pursuant to the Commodity Exchange Act.

(v)(A) Deducting the market value of all short securities differences (which shall include securities positions reflected on the securities record which are not susceptible to either count or confirmation) unresolved after discovery in accordance with the following schedule:

| Differences [1] | Numbers of business days after discovery |
|---|---|
| 25 percent | 7 |
| 50 percent | 14 |
| 75 percent | 21 |
| 100 percent | 28 |

[1] Percentage of market value of short securities differences.

(B) Deducting the market value of any long securities differences, where such securities have been sold by the broker or dealer before they are adequately resolved, less any reserves established therefor;

(C) The designated examining authority for a broker or dealer may extend the periods in (v)(A) of this section for up to 10 business days if it finds that exceptional circumstances warrant an extension.

*Securities Haircuts*

(vi) Deducting the percentages specified in paragraphs (c)(2)(vi) (A) through (M) of this section (or the deductions prescribed for securities positions set forth in Appendix A (§ 240.15c3–1a) of the market value of all securities, money market instruments or options in the proprietary or other accounts of the broker or dealer.

(A)(*I*) In the case of a security issued or guaranteed as to principal or interest by the United States or any agency

thereof, the applicable percentages of the market value of the net long or short position in each of the categories specified below are:

CATEGORY 1

(*i*) Less than 3 months to maturity—0 percent.

(*ii*) 3 months but less than 6 months to maturity—½ of 1 percent.

(*iii*) 6 months but less than 9 months to maturity—¾ of 1 percent.

(*iv*) 9 months but less than 12 months to maturity—1 percent.

CATEGORY 2

(*i*) 1 year but less than 2 years to maturity—1½ percent.

(*ii*) 2 years but less than 3 years to maturity—2 percent.

CATEGORY 3

(*i*) 3 years but less than 5 years to maturity—3%.

(*ii*) 5 years but less than 10 years to maturity—4%.

CATEGORY 4

(*i*) 10 years but less than 15 years to maturity—4½%.

(*ii*) 15 years but less than 20 years to maturity—5%.

(*iii*) 20 years but less than 25 years to maturity—5½%.

(*iv*) 25 years or more to maturity—6%.

Brokers or dealers shall compute a deduction for each category above as follows: Compute the deductions for the net long or short positions in each subcategory above. The deduction for the category shall be the net of the aggregate deductions on the long positions and the aggregate deductions on the short positions in each category plus 50% of the lesser of the aggregate deductions on the long or short positions.

(*2*) A broker or dealer may elect to deduct, in lieu of the computation required under paragraph (c)(2)(vi)(A)(*I*) of this section, the applicable percentages of the market value of the net long or short positions in each of the subcategories specified in paragraph (c)(2)(vi)(A)(*I*) of this section.

(*3*) In computing deductions under paragraph (c)(2)(vi)(A)(*I*) of this section, a broker or dealer may elect to exclude the market value of a long or short security from one category and a security from another category, *Provided,* That:

310

**Securities and Exchange Commission** §240.15c3–1

(*I*) Such securities have maturity dates:

(*A*) Between 9 months and 15 months and within 3 months of one another.

(*B*) Between 2 years and 4 years and within 1 year of one another; or

(*C*) Between 8 years and 12 years and within 2 years of one another.

(*ii*) The net market value of the two excluded securities shall remain in the category of the security with the higher market value.

(*4*) In computing deductions under paragraph (c)(2)(vi)(A)(*I*) of this section, a broker or dealer may include in the categories specified in paragraph (c)(2)(vi)(A)(*I*) of this section, long or short positions in securities issued by the United States or any agency thereof that are deliverable against long or short positions in futures contracts relating to Government securities, traded on a recognized contract market approved by the Commodity Futures Trading Commission, which are held in the proprietary or other accounts of the broker or dealer. The value of the long or short positions included in the categories shall be determined by the contract value of the futures contract held in the account. The provisions of Appendix B to Rule 15c3–1 (17 CFR 240.15c3–1b) will in any event apply to the positions in futures contracts.

(*5*) In the case of a Government securities dealer that reports to the Federal Reserve System, that transacts business directly with the Federal Reserve System, and that maintains at all times a minimum net capital of at least $50,000,000, before application of the deductions provided for in paragraph (c)(2)(vi) of this section, the deduction for a security issued or guaranteed as to principal or interest by the United States or any agency thereof shall be 75 percent of the deduction otherwise computed under paragraph (c)(2)(vi)(A) of this section.

(B)(*I*) In the case of any municipal security which has a scheduled maturity at date of issue of 731 days or less and which is issued at par value and pays interest at maturity, or which is issued at a discount, and which is not traded flat or in default as to principal or interest, the applicable percentages of the market value on the greater of the

long or short position in each of the categories specified below are:

(*I*) Less than 30 days to maturity—0%.

(*ii*) 30 days but less than 91 days to maturity—⅛ of 1%.

(*iii*) 91 days but less than 181 days to maturity—¼ of 1%.

(*iv*) 181 days but less than 271 days to maturity—⅜ of 1%.

(*v*) 271 days but less than 366 days to maturity—½ of 1%.

(*vi*) 366 days but less than 456 days to maturity—¾ of 1%.

(*vii*) 456 days but less than 732 days to maturity—1%.

(*2*) In the case of any municipal security, other than those specified in paragraph (c)(2)(vi)(B)(*I*), which is not traded flat or in default as to principal or interest, the applicable percentages of the market value of the greater of the long or short position in each of the categories specified below are:

(*I*) Less than 1 year to maturity—1%.

(*ii*) 1 year but less than 2 years to maturity—2%.

(*iii*) 2 years but less than 3½ years to maturity—3%.

(*iv*) 3½ years but less than 5 years to maturity—4%.

(*v*) 5 years but less than 7 years to maturity—5%.

(*vi*) 7 years but less than 10 years to maturity—5½%.

(*vii*) 10 years but less than 15 years to maturity—6%.

(*viii*) 15 years but less than 20 years to maturity—6½%.

(*ix*) 20 years or more to maturity—7%.

(C) *Canadian Debt Obligations.* In the case of any security issued or unconditionally guaranteed as to principal and interest by the Government of Canada, the percentages of market value to be deducted shall be the same as in paragraph (A) of this section.

(D)(*I*) In the case of redeemable securities of an investment company registered under the Investment Company Act of 1940, which assets consist of cash or money market instruments and which is generally known as a "money market fund," the deduction shall be 2% of the market value of the greater of the long or short position.

311

(*2*) In the case of redeemable securities of an investment company registered under the Investment Company Act of 1940, which assets are in the form of cash or securities or money market instruments of any maturity which are described in paragraph (c)(2)(vi) (A) through (C) or (E) of this section, the deduction shall be 7% of the market value of the greater of the long or short positions.

(*3*) In the case of redeemable securities of an investment company registered under the Investment Company Act of 1940, which assets are in the form of cash or securities or money market instruments which are described in paragraphs (c)(2)(vi) (A) through (C) or (E) and (F) of this section, the deduction shall be 9% of the market value of the long or short position.

(E) *Commercial paper, bankers acceptances and certificates of deposit.* In the case of any short term promissory note or evidence of indebtedness which has a fixed rate of interest or is sold at a discount, and which has a maturity date at date of issuance not exceeding nine months exclusive of days of grace, or any renewal thereof, the maturity of which is likewise limited and is rated in one of the three highest categories by at least two of the nationally recognized statistical rating organizations (*Provided,* That effective January 1, 1977, and until September 1, 1977, this paragraph shall be deemed to require only one such rating), or in the case of any negotiable certificates of deposit or bankers acceptance or similar type of instrument issued or guaranteed by any bank as defined in section 3(a)(6) of the Securities Exchange Act of 1934, the applicable percentage of the market value of the greater of the long or short position in each of the categories specified below are:

(*1*) Less than 30 days to maturity—0 percent.

(*2*) 30 days but less than 91 days to maturity ⅛ of 1 percent.

(*3*) 91 days but less than 181 days to maturity ¼ of 1 percent.

(*4*) 181 days but less than 271 days to maturity ⅜ of 1 percent.

(*5*) 271 days but less than 1 year to maturity ½ of 1 percent; and

(*6*) With respect to any negotiable certificate of deposit or bankers acceptance or similar type of instrument issued or guaranteed by any bank, as defined above, having 1 year or more to maturity, the deduction shall be on the greater of the long or short position and shall be the same percentage as that prescribed in paragraph (c)(2)(vi)(A) of this section.

(F) (*1*) *Nonconvertible debt securities.* In the case of nonconvertible debt securities having a fixed interest rate and a fixed maturity date and which are not traded flat or in default as to principal or interest and which are rated in one of the four highest rating categories by at least two of the nationally recognized statistical rating organizations, the applicable percentages of the market value of the greater of the long or short position in each of the categories specified below are:

(*i*) Less than 1 year to maturity—2%

(*ii*) 1 year but less than 2 years to maturity—3%

(*iii*) 2 years but less than 3 years to maturity—5%

(*iv*) 3 years but less than 5 years to maturity—6%

(*v*) 5 years but less than 10 years to maturity—7%

(*vi*) 10 years but less than 15 years to maturity—7½%

(*vii*) 15 years but less than 20 years to maturity—8%

(*viii*) 20 years but less than 25 years to maturity—8½%

(*ix*) 25 years or more to maturity—9%

(*2*) A broker or dealer may elect to exclude from the above categories long or short positions that are hedged with short or long positions in securities issued by the United States or any agency thereof or nonconvertible debt securities having a fixed interest rate and a fixed maturity date and which are not traded flat or in default as to principal or interest and which are rated in one of the four highest rating categories by at least two of the nationally recognized statistical rating organizations if such securities have maturity dates:

(*i*) Less than five years and within 6 months of each other;

(*ii*) Between 5 years and 10 years and within 9 months of each other;

(*iii*) Between 10 years and 15 years and within 2 years of each other; or

(*iv*) 15 years or more and within 10 years of each other.

The broker-dealer shall deduct the amounts specified in paragraphs (c)(2)(vi)(F) (*3*) and (*4*) of this section.

(*3*) With respect to those positions described in paragraph (c)(2)(vi)(F)(*2*) of this section that include a long or short position in securities issued by the United States or any agency thereof, the broker or dealer shall exclude the hedging short or long United States or agency securities position from the applicable haircut category under paragraph (c)(2)(vi)(A) of this section. The broker or dealer shall deduct the percentage of the market value of the hedged long or short position in nonconvertible debt securities as specified in each of the categories below:

(*i*) Less than 5 years to maturity—1½%

(*ii*) 5 years but less than 10 years to maturity—2½%

(*iii*) 10 years but less than 15 years to maturity—2¾%

(*iv*) 15 years or more to maturity—3%

(*4*) With respect to those positions described in paragraph (c)(2)(vi)(F)(*2*) of this section that include offsetting long and short positions in nonconvertible debt securities, the broker or dealer shall deduct a percentage of the market value of the hedged long or short position in nonconvertible debt securities as specified in each of the categories below:

(*i*) Less than 5 years to maturity—1¾%

(*ii*) 5 years but less than 10 years to maturity—3%

(*iii*) 10 years but less than 15 years to maturity—3¼%

(*iv*) 15 years or more to maturity—3½%

(*5*) In computing deductions under paragraph (c)(2)(vi)(F)(*3*) of this section, a broker or dealer may include in the categories specified in paragraph (c)(2)(vi)(F)(*3*) of this section, long or short positions in securities issued by the United States or any agency thereof that are deliverable against long or short positions in futures contracts relating to Government securities, traded on a recognized contract market ap-

proved by the Commodity Futures Trading Commission, which are held in the proprietary or other accounts of the broker or dealer. The value of the long or short positions included in the categories shall be determined by the contract value of the futures contract held in the account.

(*6*) The provisions of Appendix B to Rule 15c3–1 (17 CFR 240.15c3–1b) will in any event apply to the positions in futures contracts.

(G) *Convertible Debt Securities.* In the case of a debt security not in default which has a fixed rate of interest and a fixed maturity date and which is convertible into an equity security, the deductions shall be as follows: If the market value is 100 percent or more of the principal amount, the deduction shall be determined as specified in paragraph (c)(2)(vi)(J) of this section; if the market value is less than the principal amount, the deduction shall be determined as specified in paragraph (F) of this section; if such securities are rated as required of paragraph (F) of this section;

(H) In the case of cumulative, nonconvertible preferred stock ranking prior to all other classes of stock of the same issuer, which is rated in one of the four highest rating categories by at least two of the nationally recognized statistical rating organizations and which are not in arrears as to dividends, the deduction shall be 10% of the market value of the greater of the long or short position.

(I) [Reserved]

### All Other Securities

(J) In the case of all securities or evidences of indebtedness, except those described in Appendix A, § 240.15c3–1a, which are not included in any of the percentage categories enumerated in paragraphs (c)(2)(vi) (A) through (H) of this section or paragraph (c)(2)(vi)(K)(ii) of this section, the deduction shall be 15 percent of the market value of the greater of the long or short positions and to the extent the market value of the lesser of the long or short positions exceeds 25 percent of the market value of the greater of the long or short positions, the percentage deduction on such excess shall be 15

313

percent of the market value of such excess. No deduction need be made in the case of:

(*1*) A security that is convertible into or exchangeable for another security within a period of 90 days, subject to no conditions other than the payment of money, and the other securities into which such security is convertible or for which it is exchangeable, are short in the accounts of such broker or dealer; or

(*2*) A security that has been called for redemption and that is redeemable within 90 days.

(K) *Securities with a Limited Market.* In the case of securities (other than exempted securities, nonconvertible debt securities, and cumulative nonconvertible preferred stock) which are not: (*1*) Traded on a national securities exchange; (*2*) designated as ''OTC Margin Stock'' pursuant to Regulation T under the Securities Exchange Act of 1934; (*3*) quoted on ''NASDAQ''; or (*4*) redeemable shares of investment companies registered under the Investment Company Act of 1940, the deduction shall be as follows:

(*i*) In the case where there are regular quotations in an inter-dealer quotations system for the securities by three or more independent market-makers (exclusive of the computing broker or dealer) and where each such quotation represents a bona fide offer to brokers or dealers to both buy and sell in reasonable quantities at stated prices, or where a ready market as defined in paragraph (c)(11) (ii) is deemed to exist, the deduction shall be determined in accordance with paragraph (c)(2)(vi)(J) of this section;

(*ii*) In the case where there are regular quotations in an inter-dealer quotations system for the securities by only one or two independent market-makers (exclusive of the computing broker or dealer) and where each such quotation represents a bona fide offer to brokers or dealers both to buy and sell in reasonable quantities, at stated prices, the deduction on both the long and short position shall be 40 percent.

(L) Where a broker or dealer demonstrates that there is sufficient liquidity for any securities long or short in the proprietary or other accounts of the broker or dealer which are subject to a deduction required by paragraph (c)(2)(vi)(K) of this section, such deduction, upon a proper showing to the Examining Authority for the broker or dealer, may be appropriately decreased, but in no case shall such deduction be less than that prescribed in paragraph (c)(2)(vi)(J) of this section.

*Undue Concentration*

(M)(*1*) In the case of money market instruments, or securities of a single class or series of an issuer, including any option written, endorsed or held to purchase or sell securities of such a single class or series of an issuer (other than ''exempted securities'' and redeemable securities of an investment company registered pursuant to the Investment Company Act of 1940), and securities underwritten (in which case the deduction provided for herein shall be applied after 11 business days), which are long or short in the proprietary or other accounts of a broker or dealer, including securities that are collateral to secured demand notes defined in Appendix D, §240.15c3–1d, and that have a market value of more than 10 percent of the ''net capital'' of a broker or dealer before the application of paragraph (c)(2)(vi) of this section or Appendix A, §240.15c3–1a, there shall be an additional deduction from net worth and/or the Collateral Value for securities collateralizing a secured demand note defined in Appendix D, §240.15c3–1d, equal to 50 percent of the percentage deduction otherwise provided by this paragraph (c)(2)(vi) of this section or Appendix A, §240.15c3–1a, on that portion of the securities position in excess of 10 percent of the ''net capital'' of the broker or dealer before the application of paragraph (c)(2)(vi) of this section and Appendix A, §240.15c3–1a. In the case of securities described in paragraph (c)(2)(vi)(J), the additional deduction required by this paragraph (c)(2)(vi)(M) shall be 15 percent.

(*2*) This paragraph (c)(2)(vi)(M) shall apply notwithstanding any long or short position exemption provided for in paragraph (c)(2)(vi)(J) of this section (except for long or short position exemptions arising out of the first proviso to paragraph (c)(2)(vi)(J)) and the deduction on any such exempted position shall be 15 percent of that portion

**Securities and Exchange Commission**                    **§ 240.15c3–1**

of the securities position in excess of 10 percent of the broker or dealer's net capital before the application of paragraph (c)(2)(vi) of this section and Appendix A, § 240.15c3–1a.

(*3*) This paragraph (c)(2)(vi)(M) shall be applied to an issue of equity securities only on the market value of such securities in excess of $10,000 or the market value of 500 shares, whichever is greater, or $25,000 in the case of a debt security.

(*4*) This paragraph (c)(2)(vi)(M) will be applied to an issue of municipal securities having the same security provisions, date of issue, interest rate, day, month and year of maturity only if such securities have a market value in excess of $500,000 in bonds ($5,000,000 in notes) or 10 percent of tentative net capital, whichever is greater, and are held in position longer than 20 business days from the date the securities are received by the syndicate manager from the issuer.

(*5*) Any specialist that is subject to a deduction required by this paragraph (c)(2)(vi)(M), respecting its specialty stock, that can demonstrate to the satisfaction of the Examining Authority for such broker or dealer that there is sufficient liquidity for such specialist's specialty stock and that such deduction need not be applied in the public interest for the protection of investors, may upon a proper showing to such Examining Authority have such undue concentration deduction appropriately decreased, but in no case shall the deduction prescribed in paragraph (c)(2)(vi)(J) of this section above be reduced. Each such Examining Authority shall make and preserve for a period of not less than 3 years a record of each application granted pursuant to this paragraph (c)(2)(vi)(M)(5), which shall contain a summary of the justification for the granting of the application.

(N) Any specialist that limits its securities business to that of a specialist (except for an occasional non-specialist related securities transaction for its own account), that does not transact a business in securities with other than a broker or dealer registered with the Commission under section 15 or 15C of the Act or a member of a national securities exchange, and that is not a clearing member of The Options Clearing Corporation need not deduct from net worth in computing net capital those deductions, as to its specialty securities, set forth in paragraph (c)(2)(vi) of this section or Appendix A to this section, except for paragraph (e) of this section limiting withdrawals of equity capital and Appendix D to this section relating to satisfactory subordination agreements. As to a specialist that is solely an options specialist, in paragraph (e) the term ''net capital'' shall be deemed to mean ''net capital before the application of paragraph (c)(2)(vi) of this section or Appendix A to this section'' and ''excess net capital'' shall be deemed to be the amount of net capital before the application of paragraph (c)(2)(vi) of this section or Appendix A to this section in excess of the amount of net capital required under paragraph (a) of this section. In reports filed pursuant to § 240.17a–5 and in making the record required by § 240.17a–3(a)(11) each specialists shall include the deductions that would otherwise have been required by paragraph (c)(2)(vi) of this section or Appendix A to this section in the absence of this paragraph (c)(2)(vi)(N).

(vii) *Non-Marketable Securities.* Deducting 100 percent of the carrying value in the case of securities or evidence of indebtedness in the proprietary or other accounts of the broker or dealer, for which there is no ready market, as defined in paragraph (c)(11) of this section, and securities, in the proprietary or other accounts of the broker or dealer, which cannot be publicly offered or sold because of statutory, regulatory or contractual arrangements or other restrictions.

*Open Contractual Commitments*

(viii) Deducting, in the case of a broker or dealer that has open contractual commitments (other than those option positions subject to Appendix A, § 240.15c3–1a), the respective deductions as specified in paragraph (c)(2)(vi) of this section or Appendix B, § 240.15c3–1b, from the value (which shall be the market value whenever there is a market) of each net long and each net short position contemplated by any open contractual commitment in the proprietary or other accounts of the broker or dealer.

315

(A) The deduction for contractual commitments in those securities that are treated in paragraph (c)(2)(vi)(J) of this section shall be 30 percent unless the class and issue of the securities subject to the open contractual commitment deduction are listed for trading on a national securities exchange or are designated as NASDAQ National Market System Securities.

(B) A broker or dealer that maintains in excess of $250,000 of net capital may add back to net worth up to $150,000 of any deduction computed under this paragraph (c)(2)(viii)(B).

(C) The deduction with respect to any single commitment shall be reduced by the unrealized profit in such commitment, in an amount not greater than the deduction provided for by this paragraph (or increased by the unrealized loss), in such commitment, and in no event shall an unrealized profit on any closed transactions operate to increase net capital.

(ix) Deducting from the contract value of each failed to deliver contract that is outstanding five business days or longer (21 business days or longer in the case of municipal securities) the percentages of the market value of the underlying security that would be required by application of the deduction required by paragraph (c)(2)(vi) of this section. Such deduction, however, shall be increased by any excess of the contract price of the failed to deliver contract over the market value of the underlying security or reduced by any excess of the market value of the underlying security over the contract value of the failed to deliver contract, but not to exceed the amount of such deduction. The designated examining authority for the broker or dealer may, upon application of the broker or dealer, extend for a period up to 5 business days, any period herein specified when it is satisfied that the extension is warranted. The designated examining authority upon expiration of the extension may extend for one additional period of up to 5 business days, any period herein specified when it is satisfied that the extension is warranted.

*Brokers or Dealers Carrying Accounts of Listed Options Specialists*

(x)(A) With respect to any transaction of a specialist in listed options, who is either not otherwise subject to the provisions of this section or is described in paragraph (c)(2)(vi)(N) of this section, for whose specialist account a broker or dealer acts as a guarantor, endorser, or carrying broker or dealer, such broker or dealer shall adjust its net worth by deducting as of noon of each business day the amounts computed as of the prior business day pursuant to §240.15c3–1a. The required deductions may be reduced by any liquidating equity that exists in such specialist's market-maker account as of that time and shall be increased to the extent of any liquidating deficit in such account. Noon shall be determined according to the local time where the broker or dealer is headquartered. In no event shall excess equity in the specialist's market-maker account result in an increase of the net capital of any such guarantor, endorser, or carrying broker or dealer.

(B) *Definitions.* (*1*) The term *listed option* shall mean any option traded on a registered national securities exchange or automated facility of a registered national securities association.

(*2*) For purposes of this section, the equity in an individual specialist's market-maker account shall be computed by:

(*i*) Marking all securities positions long or short in the account to their respective current market values;

(*ii*) Adding (deducting in the case of a debit balance) the credit balance carried in such specialist's market-maker account; and

(*iii*) Adding (deducting in the case of short positions) the market value of positions long in such account.

(C) No guarantor, endorser, or carrying broker or dealer shall permit the sum of the deductions required pursuant to §240.15c3–1a in respect of all transactions in specialists' market-maker accounts guaranteed, endorsed, or carried by such broker or dealer to exceed 1,000 percent of such broker's or dealer's net capital as defined in §240.15c3–1(c)(2) for any period exceeding three business days. If at any time such sum exceeds 1,000 percent of such

08-01420-scc Doc 479-50 Filed 12/06/12 Entered 12/06/12 18:39:19 Main Document Documents 1 Through 9 Pg 91 of 259 of 1129

Securities and Exchange Commission §240.15c3–1

broker's or dealer's net capital, then the broker or dealer shall:

(*1*) Immediately transmit telegraphic or facsimile notice of such event to the Division of Market Regulation in the headquarters office of the Commission in Washington, D.C., to the district or regional office of the Commission for the district or region in which the broker or dealer maintains its principal place of business, and to its examining authority designated pursuant to section 17(d) of the Act (15 U.S.C. 78q(d)) (''Designated Examining Authority''); and

(*2*) Be subject to the prohibitions against withdrawal of equity capital set forth in §240.15c3–1(e) and to the prohibitions against reduction, prepayment, and repayment of subordination agreements set forth in paragraph (b)(11) of §240.15c3–1d, as if such broker or dealer's net capital were below the minimum standards specified by each of those paragraphs.

(D) If at any time there is a liquidating deficit in a specialist's market-maker account, then the broker or dealer guaranteeing, endorsing, or carrying listed options transactions in such specialist's market-maker account may not extend any further credit in that account, and shall take steps to liquidate promptly existing positions in the account. This paragraph shall not prevent the broker or dealer from, upon approval by the broker's or dealer's Designated Examining Authority, entering into hedging positions in the specialist's market-maker account. The broker or dealer also shall transmit telegraphic or facsimile notice of the deficit and its amount by the close of business of the following business day to its Designated Examining Authority and the Designated Examining Authority of the specialist, if different from its own.

(E) Upon written application to the Commission by the specialist and the broker or dealer guaranteeing, endorsing, or carrying options transactions in such specialist's market-maker account, the Commission may approve upon specified terms and conditions lesser adjustments to net worth than those specified in §240.15c3–1a.

(xi) *Brokers or Dealers Carrying Specialists or Market Makers Accounts.* With respect to a broker or dealer who carries a market maker or specialist account, or with respect to any transaction in options listed on a registered national securities exchange for which a broker or dealer acts as a guarantor or endorser of options written by a specialist in a specialist account, the broker or dealer shall deduct, for each account carried or for each class or series of options guaranteed or endorsed, any deficiency in collateral required by paragraph (a)(6) of this section.

(xii) *Deduction from net worth for certain undermargined accounts.* Deducting the amount of cash required in each customer's or non-customer's account to meet the maintenance margin requirements of the Examining Authority for the broker or dealer, after application of calls for margin, marks to the market or other required deposits which are outstanding 5 business days or less.

(xiii) *Deduction from net worth for indebtedness collateralized by exempted securities.* Deducting, at the option of the broker or dealer, in lieu of including such amounts in aggregate indebtedness, 4 percent of the amount of any indebtedness secured by exempted securities or municipal securities if such indebtedness would otherwise be includable in aggregate indebtedness.

EXEMPTED SECURITIES

(3) The term *exempted securities* shall mean those securities deemed exempted securities by section 3(a)(12) of the Securities Exchange Act of 1934 and rules thereunder.

CONTRACTUAL COMMITMENTS

(4) The term *contractual commitments* shall include underwriting, when issued, when distributed and delayed delivery contracts, the writing or endorsement of puts and calls and combinations thereof, commitments in foreign currencies, and spot (cash) commodities contracts, but shall not include uncleared regular way purchases and sales of securities and contracts in commodities futures. A series of contracts of purchase or sale of the same security conditioned, if at all, only upon issuance may be treated as an individual commitment.

317

### ADEQUATELY SECURED

(5) Indebtedness shall be deemed to be adequately secured within the meaning of this section when the excess of the market value of the collateral over the amount of the indebtedness is sufficient to make the loan acceptable as a fully secured loan to banks regularly making secured loans to brokers or dealers.

### CUSTOMER

(6) The term *customer* shall mean any person from whom, or on whose behalf, a broker or dealer has received, acquired or holds funds or securities for the account of such person, but shall not include a broker or dealer or a registered municipal securities dealer, or a general, special or limited partner or director or officer of the broker or dealer, or any person to the extent that such person has a claim for property or funds which by contract, agreement, or understanding, or by operation of law, is part of the capital of the broker or dealer. *Provided, however,* That the term "customer" shall also include a broker or dealer, but only insofar as such broker or dealer maintains a special omnibus account carried with another broker or dealer in compliance with 12 CFR 220.4(b) of Regulation T under the Securities Exchange Act of 1934.

### NON-CUSTOMER

(7) The term *non-customer* means a broker or dealer, registered municipal securities dealer, general partner, limited partner, officer, director and persons to the extent their claims are subordinated to the claims of creditors of the broker or dealer.

### MARKET MAKER

(8) The term *market maker* shall mean a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

### PROMPTLY TRANSMIT AND DELIVER

(9) A broker or dealer is deemed to "promptly transmit" all funds and to "promptly deliver" all securities within the meaning of paragraphs (a)(2)(i) and (a)(2)(v) of this section where such transmission or delivery is made no later than noon of the next business day after the receipt of such funds or securities; provided, however, that such prompt transmission or delivery shall not be required to be effected prior to the settlement date for such transaction.

### PROMPTLY FORWARD

(10) A broker or dealer is deemed to "promptly forward" funds or securities within the meaning of paragraph (a)(2)(i) of this section only when such forwarding occurs no later than noon of the next business day following receipt of such funds or securities.

### READY MARKET

(11)(i) The term *ready market* shall include a recognized established securities market in which there exists independent bona fide offers to buy and sell so that a price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined for a particular security almost instantaneously and where payment will be received in settlement of a sale at such price within a relatively short time conforming to trade custom.

(ii) A *ready market* shall also be deemed to exist where securities have been accepted as collateral for a loan by a bank as defined in section 3(a)(6) of the Securities Exchange Act of 1934 and where the broker or dealer demonstrates to its Examining Authority that such securities adequately secure such loans as that term is defined in paragraph (c)(5) of this section.

### EXAMINING AUTHORITY

(12) The term *Examining Authority* of a broker or dealer shall mean for the purposes of 17 CFR 240.15c3–1 and 240.15c3–1a–d the national securities exchange or national securities association of which the broker or dealer is a member or, if the broker or dealer is a

member of more than one such self-regulatory organization, the organization designated by the Commission as the Examining Authority for such broker or dealer, or if the broker or dealer is not a member of any such self-regulatory organization, the Regional or District Office of the Commission where such broker or dealer has its principal place of business.

ENTITIES THAT HAVE A PRINCIPAL
REGULATOR

(13)(i) For purposes of § 240.15c3–1e and § 240.15c3–1g, the term *entity that has a principal regulator* shall mean a person (other than a natural person) that is not a registered broker or dealer (other than a broker or dealer registered under section 15(b)(11) of the Act (15 U.S.C. 78o(b)(11)), provided that the person is:

(A) An insured depository institution as defined in section 3(c)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1813(c)(2));

(B) Registered as a futures commission merchant or an introducing broker with the Commodity Futures Trading Commission;

(C) Registered with or licensed by a State insurance regulator and issues any insurance, endowment, or annuity policy or contract;

(D) A foreign bank as defined in section 1(b)(7) of the International Banking Act of 1978 (12 U.S.C. 3101(7)) that has its headquarters in a jurisdiction for which any foreign bank has been approved by the Board of Governors of the Federal Reserve System to conduct business pursuant to the standards set forth in 12 CFR 211.24(c), provided such foreign bank represents to the Commission that it is subject to the same supervisory regime as the foreign bank previously approved by the Board of Governors of the Federal Reserve System;

(E) Not primarily in the securities business, and the person is:

(*1*) A corporation organized under section 25A of the Federal Reserve Act (12 U.S.C. 611 through 633); or

(*2*) A corporation having an agreement or undertaking with the Board of Governors of the Federal Reserve System under section 25 of the Federal Reserve Act (12 U.S.C. 601 through 604a); or

(F) A person that the Commission finds is another entity that is subject to comprehensive supervision, has in place appropriate arrangements so that information that the person provides to the Commission is sufficiently reliable for the purposes of determining compliance with § 240.15c3–1e and § 240.15c3–1g, and it is appropriate to consider the person to be an entity that has a principal regulator considering all relevant circumstances, including the person's mix of business.

(ii) For purposes of § 240.15c3–1e, § 240.15c3–1g, § 240.17h–1T, and § 240.17h2T, the term *ultimate holding company that has a principal regulator* shall mean a person (other than a natural person) that:

(A) Is a financial holding company or a company that is treated as a financial holding company under the Bank Holding Company Act of 1956 (12 U.S.C. 1840 *et seq.*), or

(B) The Commission determines to be an ultimate holding company that has a principal regulator, if that person is subject to consolidated, comprehensive supervision; there are in place appropriate arrangements so that information that the person provides to the Commission is sufficiently reliable for the purposes of determining compliance with § 240.15c3–1e and § 240.15c3–1g; and it is appropriate to consider the person to be an ultimate holding company that has a principal regulator in view of all relevant circumstances, including the person's mix of business.

(14) The term *municipal securities* shall mean those securities included within the definition of "municipal securities" in section 3(a)(29) of the Securities Exchange Act of 1934.

(15) The term *tentative net capital* shall mean the net capital of a broker or dealer before deducting the securities haircuts computed pursuant to paragraph (c)(2)(vi) of this section and the charges on inventory computed pursuant to Appendix B to this section (§ 240.15c3–1b). However, for purposes of paragraph (a)(5) of this section, the term *tentative net capital* means the net capital of an OTC derivatives dealer before deducting the charges for market and credit risk as computed pursuant

319

to Appendix F to this section (§240.15c3–1f) or paragraph (c)(2)(vi) of this section, if applicable, and increased by the balance sheet value (including counterparty net exposure) resulting from transactions in eligible OTC derivative instruments which would otherwise be deducted by virtue of paragraph (c)(2)(iv) of this section. For purposes of paragraph (a)(7) of this section, the term *tentative net capital* means the net capital of the broker or dealer before deductions for market and credit risk computed pursuant to §240.15c3–1e or paragraph (c)(2)(vi) of this section, if applicable, and increased by the balance sheet value (including counterparty net exposure) resulting from transactions in derivative instruments which would otherwise be deducted by virtue of paragraph (c)(2)(iv) of this section. Tentative net capital shall include securities for which there is no ready market, as defined in paragraph (c)(11) of this section, if the use of mathematical models has been approved for purposes of calculating deductions from net capital for those securities pursuant to §240.15c3–1e.

(d) *Debt-equity requirements.* No broker or dealer shall permit the total of outstanding principal amounts of its satisfactory subordination agreements (other than such agreements which qualify under this paragraph (d) as equity capital) to exceed 70 percent of its debt-equity total, as hereinafter defined, for a period in excess of 90 days or for such longer period which the Commission may, upon application of the broker or dealer, grant in the public interest or for the protection of investors. In the case of a corporation, the debt-equity total shall be the sum of its outstanding principal amounts of satisfactory subordination agreements, par or stated value of capital stock, paid in capital in excess of par, retained earnings, unrealized profit and loss or other capital accounts. In the case of a partnership, the debt-equity total shall be the sum of its outstanding principal amounts of satisfactory subordination agreements, capital accounts of partners (exclusive of such partners' securities accounts) subject to the provisions of paragraph (e) of this section, and unrealized profit and loss. In the case of a sole proprietorship, the debt-equity total shall include the sum of its outstanding principal amounts of satisfactory subordination agreements, capital accounts of the sole proprietorship and unrealized profit and loss. *Provided, however,* That a satisfactory subordination agreement entered into by a partner or stockholder which has an initial term of at least three years and has a remaining term of not less than 12 months shall be considered equity for the purposes of this paragraph (d) if:

(1) It does not have any of the provisions for accelerated maturity provided for by paragraphs (b)(9)(i), (10)(i) or (10)(ii) of Appendix (D) (17 CFR 240.15c3–1d) and is maintained as capital subject to the provisions restricting the withdrawal thereof required by paragraph (e) of this section or

(2) The partnership agreement provides that capital contributed pursuant to a satisfactory subordination agreement as defined in Appendix (D) (17 CFR 240.15c3–1d) shall in all respects be partnership capital subject to the provisions restricting the withdrawal thereof required by paragraph (e) of this section.

(e)(1) *Notice provisions relating to limitations on the withdrawal of equity capital.* No equity capital of the broker or dealer or a subsidiary or affiliate consolidated pursuant to appendix C (17 CFR 240.15c3–1c) may be withdrawn by action of a stockholder or a partner or by redemption or repurchase of shares of stock by any of the consolidated entities or through the payment of dividends or any similar distribution, nor may any unsecured advance or loan be made to a stockholder, partner, sole proprietor, employee or affiliate without written notice given in accordance with paragraph (e)(1)(iv) of this section:

(i) Two business days prior to any withdrawals, advances or loans if those withdrawals, advances or loans on a net basis exceed in the aggregate in any 30 calendar day period, 30 percent of the broker or dealer's excess net capital. A broker or dealer, in an emergency situation, may make withdrawals, advances or loans that on a net basis exceed 30 percent of the broker or dealer's excess net capital in

320

**Securities and Exchange Commission** §240.15c3–1

any 30 calendar day period without giving the advance notice required by this paragraph, with the prior approval of its Examining Authority. Where a broker or dealer makes a withdrawal with the consent of its Examining Authority, it shall in any event comply with paragraph (e)(1)(ii) of this section; or

(ii) Two business days after any withdrawals, advances or loans if those withdrawals, advances or loans on a net basis exceed in the aggregate in any 30 calendar day period, 20 percent of the broker or dealer's excess net capital.

(iii) This paragraph (e)(1) does not apply to:

(A) Securities or commodities transactions in the ordinary course of business between a broker or dealer and an affiliate where the broker or dealer makes payment to or on behalf of such affiliate for such transaction and then receives payment from such affiliate for the securities or commodities transaction within two business days from the date of the transaction; or

(B) Withdrawals, advances or loans which in the aggregate in any thirty calendar day period, on a net basis, equal $500,000 or less.

(iv) Each required notice shall be effective when received by the Commission in Washington, DC, the regional or district office of the Commission for the region or district in which the broker or dealer has its principal place of business, the broker or dealer's Examining Authority and the Commodity Futures Trading Commission if such broker or dealer is registered with that Commission.

(2) *Limitations on Withdrawal of equity capital.* No equity capital of the broker or dealer or a subsidiary or affiliate consolidated pursuant to appendix C (17 CFR 240.15c3–1c) may be withdrawn by action of a stockholder or a partner or by redemption or repurchase of shares of stock by any of the consolidated entities or through the payment of dividends or any similar distribution, nor may any unsecured advance or loan be made to a stockholder, partner, sole proprietor, employee or affiliate, if after giving effect thereto and to any other such withdrawals, advances or loans and any Payments of Payment

Obligations (as defined in appendix D (17 CFR 240.15c3–1d)) under satisfactory subordination agreements which are scheduled to occur within 180 days following such withdrawal, advance or loan if:

(i) The broker or dealer's net capital would be less than 120 percent of the minimum dollar amount required by paragraph (a) of this section;

(ii) The broker-dealer is registered as a futures commission merchant, its net capital would be less than 7 percent of the funds required to be segregated pursuant to the Commodity Exchange Act and the regulations thereunder (less the market value of commodity options purchased by option customers on or subject to the rules of a contract market, each such deduction not to exceed the amount of funds in the option customer's account);

(iii) The broker-dealer's net capital would be less than 25 percent of deductions from net worth in computing net capital required by paragraphs (c)(2)(vi), (f) and appendix A, of this section, unless the broker or dealer has the prior approval of the Commission to make such withdrawal;

(iv) The total outstanding principal amounts of satisfactory subordination agreements of the broker or dealer and any subsidiaries or affiliates consolidated pursuant to appendix C (17 CFR 240.15c3–1c) (other than such agreements which qualify as equity under paragraph (d) of this section) would exceed 70% of the debt-equity total as defined in paragraph (d) of this section;

(v) The broker or dealer is subject to the aggregate indebtedness limitations of paragraph (a) of this section, the aggregate indebtedness of any of the consolidated entities exceeds 1000 percent of its net capital; or

(vi) The broker or dealer is subject to the alternative net capital requirement of paragraph (f) of this section, its net capital would be less than 5 percent of aggregate debit items computed in accordance with 17 CFR 240.15c3–3a.

(3)(i) *Temporary Restrictions on Withdrawal of Net Capital.* The Commission may by order restrict, for a period up to twenty business days, any withdrawal by the broker or dealer of equity capital or unsecured loan or advance to a stockholder, partner, sole

321

proprietor, employee or affiliate if such withdrawal, advance or loan:

(A) When aggregated with all other withdrawals, advances or loans on a net basis during a 30 calendar day period exceeds 30 percent of the broker or dealer's excess net capital; and

(B) The Commission, based on the facts and information available, concludes that the withdrawal, advance or loan may be detrimental to the financial integrity of the broker or dealer, or may unduly jeopardize the broker or dealer's ability to repay its customer claims or other liabilities which may cause a significant impact on the markets or expose the customers or creditors of the broker or dealer to loss without taking into account the application of the Securities Investor Protection Act.

(ii) An order temporarily prohibiting the withdrawal of capital shall be rescinded if the Commission determines that the restriction on capital withdrawal should not remain in effect. The hearing will be held within two business days from the date of the request in writing by the broker or dealer.

(4)(i) *Miscellaneous provisions.* Excess net capital is that amount in excess of the amount required under paragraph (a) of this section. For the purposes of paragraphs (e)(1) and (e)(2) of this section, a broker or dealer may use the amount of excess net capital and deductions required under paragraphs (c)(2)(vi), (f) and appendix A of this section reported in its most recently required filed Form X–17A–5 for the purposes of calculating the effect of a projected withdrawal, advance or loan relative to excess net capital or deductions. The broker or dealer must assure itself that the excess net capital or the deductions reported on the most recently required filed Form X–17A–5 have not materially changed since the time such report was filed.

(ii) The term equity capital includes capital contributions by partners, par or stated value of capital stock, paid-in capital in excess of par, retained earnings or other capital accounts. The term equity capital does not include securities in the securities accounts of partners and balances in limited partners' capital accounts in excess of their stated capital contributions.

(iii) Paragraphs (e)(1) and (e)(2) of this section shall not preclude a broker or dealer from making required tax payments or preclude the payment to partners of reasonable compensation, and such payments shall not be included in the calculation of withdrawals, advances, or loans for purposes of paragraphs (e)(1) and (e)(2) of this section.

(iv) For the purpose of this paragraph (e) of this section, any transaction between a broker or dealer and a stockholder, partner, sole proprietor, employee or affiliate that results in a diminution of the broker or dealer's net capital shall be deemed to be an advance or loan of net capital.

[40 FR 29799, July 16, 1975]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 240.15c3–1, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

**§ 240.15c3–1a  Options (Appendix A to 17 CFR 240.15c3–1).**

(a) *Definitions.* (1) The term *unlisted option* shall mean any option not included in the definition of listed option provided in paragraph (c)(2)(x) of § 240.15c3–1.

(2) The term *option series* refers to listed option contracts of the same type (either a call or a put) and exercise style, covering the same underlying security with the same exercise price, expiration date, and number of underlying units.

(3) The term *related instrument* within an option class or product group refers to futures contracts and options on futures contracts covering the same underlying instrument. In relation to options on foreign currencies a related instrument within an option class also shall include forward contracts on the same underlying currency.

(4) The term *underlying instrument* refers to long and short positions, as appropriate, covering the same foreign currency, the same security, or a security which is exchangeable for or convertible into the underlying security within a period of 90 days. If the exchange or conversion requires the payment of money or results in a loss upon

**EXHIBIT 4**

§ 240.17a–3                                        17 CFR Ch. II (4–1–08 Edition)

receives some benefit from the under-writing that is not shared by other underwriters, or represents any other underwriters in such matters as maintaining the records of the distribution and arranging for allotments of the securities offered.

(2) The term *exempted security* means an exempted security as defined in section 3(a)(12) of the Act, including securities issued, or guaranteed both as to principal and interest, by the International Bank for Reconstruction and Development.

(c) *Records relating to stabilizing, syndicate covering transactions, and penalty bids required to be maintained by manager.* Any person subject to this section who acts as a manager and stabilizes or effects syndicate covering transactions or imposes a penalty bid shall:

(1) Promptly record and maintain the following separately retrievable information, for a period of not less than three years, the first two years in an easily accessible place; *Provided, however,* That if the information is in a record required to be made pursuant to § 240.17a–3 or § 240.17a–4, or otherwise preserved, such information need not be maintained in a separate file if the person can sort promptly and retrieve the information as if it had been kept in a separate file as a record made pursuant to, and preserves the information in accordance with the time periods specified in, this paragraph (c)(1):

(i) The name and class of any security stabilized or any security in which syndicate covering transactions have been effected or a penalty bid has been imposed;

(ii) The price, date, and time at which each stabilizing purchase or syndicate covering transaction was effected by the manager or by any participant in the syndicate or group, and whether any penalties were assessed;

(iii) The names and the addresses of the members of the syndicate or group;

(iv) Their respective commitments, or, in the case of a standby or contingent underwriting, the percentage participation of each member of the syndicate or group therein;

(v) The dates when any penalty bid was in effect.

(2) Promptly furnish to each of the members of the syndicate or group the name and class of any security being stabilized, and the date and time at which the first stabilizing purchase was effected by the manager or by any participant in the syndicate or group; and

(3) Promptly notify each of the members of such syndicate or group of the date and time when stabilizing was terminated.

(d) *Notification to manager.* Any person who has a participation in a syndicate account but who is not a manager of such account, and who effects one or more stabilizing purchases or syndicate covering transactions for its sole account or for the account of a syndicate or group, shall within three business days following such purchase notify the manager of the price, date, and time at which such stabilizing purchase or syndicate covering transaction was effected, and shall in addition notify the manager of the date and time when such stabilizing purchase or syndicate covering transaction was terminated. The manager shall maintain such notifications in a separate file, together with the information required by paragraph (c)(1) of this section, for a period of not less than three years, the first two years in an easily accessible place.

(Secs. 9(a)(6), 10(b), 17(a) and 23(a) of the Act, 15 U.S.C. 78i(a)(6), 78j(b), 78q(a) and 78w(a))

[48 FR 41378, Sept. 15, 1983, as amended at 62 FR 544, Jan. 3, 1997]

§ 240.17a–3  Records to be made by certain exchange members, brokers and dealers.

(a) Every member of a national securities exchange who transacts a business in securities directly with others than members of a national securities exchange, and every broker or dealer who transacts a business in securities through the medium of any such member, and every broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended, (48 Stat. 895, 49 Stat. 1377, 52 Stat. 1075; 15 U.S.C. 78o) shall make and keep current the following books and records relating to its business:

(1) Blotters (or other records of original entry) containing an itemized daily record of all purchases and sales of securities, all receipts and deliveries of

**Securities and Exchange Commission** §240.17a–3

securities (including certificate numbers), all receipts and disbursements of cash and all other debits and credits. Such records shall show the account for which each such transaction was effected, the name and amount of securities, the unit and aggregate purchase or sale price (if any), the trade date, and the name or other designation of the person from whom purchased or received or to whom sold or delivered.

(2) Ledgers (or other records) reflecting all assets and liabilities, income and expense and capital accounts.

(3) Ledger accounts (or other records) itemizing separately as to each cash and margin account of every customer and of such member, broker or dealer and partners thereof, all purchases, sales, receipts and deliveries of securities and commodities for such account and all other debits and credits to such account.

(4) Ledgers (or other records) reflecting the following:

(i) Securities in transfer;

(ii) Dividends and interest received;

(iii) Securities borrowed and securities loaned;

(iv) Moneys borrowed and moneys loaned (together with a record of the collateral therefor and any substitutions in such collateral);

(v) Securities failed to receive and failed to deliver;

(vi) All long and all short securities record differences arising from the examination, count, verification and comparison pursuant to §240.17a–5, §240.17a–12, and §240.17a–13 (by date of examination, count, verification and comparison showing for each security the number of long or short count differences);

(vii) Repurchase and reverse repurchase agreements;

(5) A securities record or ledger reflecting separately for each security as of the clearance dates all ''long'' or ''short'' positions (including securities in safekeeping and securities that are the subjects of repurchase or reverse repurchase agreements) carried by such member, broker or dealer for its account of for the account of its customers or partners or others and showing the location of all securities long and the offsetting position to all securities short, including long security

count differences and short security count differences classified by the date of the physical count and verification in which they were discovered, and in all cases the name or designation of the account in which each position is carried.

(6)(i) A memorandum of each brokerage order, and of any other instruction, given or received for the purchase or sale of securities, whether executed or unexecuted. The memorandum shall show the terms and conditions of the order or instructions and of any modification or cancellation thereof; the account for which entered; the time the order was received; the time of entry; the price at which executed; the identity of each associated person, if any, responsible for the account; the identity of any other person who entered or accepted the order on behalf of the customer or, if a customer entered the order on an electronic system, a notation of that entry; and, to the extent feasible, the time of execution or cancellation. The memorandum need not show the identity of any person, other than the associated person responsible for the account, who may have entered or accepted the order if the order is entered into an electronic system that generates the memorandum and if that system is not capable of receiving an entry of the identity of any person other than the responsible associated person; in that circumstance, the member, broker or dealer shall produce upon request by a representative of a securities regulatory authority a separate record which identifies each other person. An order entered pursuant to the exercise of discretionary authority by the member, broker or dealer, or associated person thereof, shall be so designated. The term *instruction* shall include instructions between partners and employees of a member, broker or dealer. The term *time of entry* shall mean the time when the member, broker or dealer transmits the order or instruction for execution.

(ii) This memorandum need not be made as to a purchase, sale or redemption of a security on a subscription way basis directly from or to the issuer, if the member, broker or dealer maintains a copy of the customer's subscription agreement regarding a

415

purchase, or a copy of any other document required by the issuer regarding a sale or redemption.

(7) A memorandum of each purchase and sale for the account of the member, broker, or dealer showing the price and, to the extent feasible, the time of execution; and, in addition, where the purchase or sale is with a customer other than a broker or dealer, a memorandum of each order received, showing the time of receipt; the terms and conditions of the order and of any modification thereof; the account for which it was entered; the identity of each associated person, if any, responsible for the account; the identity of any other person who entered or accepted the order on behalf of the customer or, if a customer entered the order on an electronic system, a notation of that entry. The memorandum need not show the identity of any person other than the associated person responsible for the account who may have entered the order if the order is entered into an electronic system that generates the memorandum and if that system is not capable of receiving an entry of the identity of any person other than the responsible associated person: in that circumstance, the member, broker or dealer shall produce upon request by a representative of a securities regulatory authority a separate record which identifies each other person. An order with a customer other than a member, broker or dealer entered pursuant to the exercise of discretionary authority by the member, broker or dealer, or associated person thereof, shall be so designated.

(8) Copies of confirmations of all purchases and sales of securities, including all repurchase and reverse repurchase agreements, and copies of notices of all other debits and credits for securities, cash and other items for the account of customers and partners of such member, broker or dealer.

(9) A record in respect of each cash and margin account with such member, broker or dealer indicating (i) the name and address of the beneficial owner of such account, and

(ii) Except with respect to exempt employee benefit plan securities as defined in § 240.14a–1(d), but only to the extent such securities are held by employee benefit plans established by the issuer of the securities, whether or not the beneficial owner of securities registered in the name of such members, brokers or dealers, or a registered clearing agency or its nominee objects to disclosure of his or her identity, address and securities positions to issuers, and (iii) in the case of a margin account, the signature of such owner; *Provided,* That, in the case of a joint account or an account of a corporation, such records are required only in respect of the person or persons authorized to transact business for such account.

(10) A record of all puts, calls, spreads, straddles and other options in which such member, broker or dealer has any direct or indirect interest or which such members, broker or dealer has granted or guaranteed, containing, at least, an identification of the security and the number of units involved. An OTC derivatives dealer shall also keep a record of all eligible OTC derivative instruments as defined in § 240.3b–13 in which the OTC derivatives dealer has any direct or indirect interest or which it has written or guaranteed, containing, at a minimum, an identification of the security or other instrument, the number of units involved, and the identity of the counterparty.

(11) A record of the proof of money balances of all ledger accounts in the form of trial balances, and a record of the computation of aggregate indebtedness and net capital, as of the trial balance date, pursuant to § 240.15c3–1; *Provided, however,* (i) That such computation need not be made by any member, broker or dealer unconditionally exempt from § 240.15c3–1 by paragraph (b)(1) or (b)(3), thereof; and (ii) that any member of an exchange whose members are exempt from § 240.15c3–1 by paragraph (b)(2) thereof shall make a record of the computation of aggregate indebtedness and net capital as of the trial balance date in accordance with the capital rules of at least one of the exchanges therein listed of which it is a member. Such trial balances and computations shall be prepared currently at least once a month.

(12)(i) A questionnaire or application for employment executed by each ''associated person'' (as defined in paragraph (h)(4) of this section) of the member, broker or dealer, which questionnaire or application shall be approved in writing by an authorized representative of the member, broker or dealer and shall contain at least the following information with respect to the associated person:

(A) The associated person's name, address, social security number, and the starting date of the associated person's employment or other association with the member, broker or dealer;

(B) The associated person's date of birth;

(C) A complete, consecutive statement of all the associated person's business connections for at least the preceding ten years, including whether the employment was part-time or full-time;

(D) A record of any denial of membership or registration, and of any disciplinary action taken, or sanction imposed, upon the associated person by any federal or state agency, or by any national securities exchange or national securities association, including any finding that the associated person was a cause of any disciplinary action or had violated any law;

(E) A record of any denial, suspension, expulsion or revocation of membership or registration of any member, broker or dealer with which the associated person was associated in any capacity when such action was taken;

(F) A record of any permanent or temporary injunction entered against the associated person or any member, broker or dealer with which the associated person was associated in any capacity at the time such injunction was entered;

(G) A record of any arrest or indictment for any felony, or any misdemeanor pertaining to securities, commodities, banking, insurance or real estate (including, but not limited to, acting or being associated with a broker-dealer, investment company, investment adviser, futures sponsor, bank, or savings and loan association), fraud, false statements or omissions, wrongful taking of property or bribery,

forgery, counterfeiting or extortion, and the disposition of the foregoing.

(H) A record of any other name or names by which the associated person has been known or which the associated person has used;

*Provided, however,* That if such associated person has been registered as a registered representative of such member, broker or dealer with, or the associated person's employment has been approved by, the Financial Industry Regulatory Authority, Inc., the American Stock Exchange LLC, the Boston Stock Exchange, Inc., the Chicago Stock Exchange, Inc., New York Stock Exchange LLC, NYSE Arca, Inc., the Philadelphia Stock Exchange, Inc., the Chicago Board Options Exchange, Incorporated, the National Stock Exchange, Inc. or the International Securities Exchange, LLC, then retention of a full, correct, and complete copy of any and all applications for such registration or approval shall be deemed to satisfy the requirements of this paragraph.

(ii) A record listing every associated person of the member, broker or dealer which shows, for each associated person, every office of the member, broker or dealer where the associated person regularly conducts the business of handling funds or securities or effecting any transactions in, or inducing or attempting to induce the purchase or sale of any security for the member, broker or dealer, and the Central Registration Depository number, if any, and every internal identification number or code assigned to that person by the member, broker or dealer.

(13) Records required to be maintained pursuant to paragraph (d) of § 240.17f–2.

(14) Copies of all Forms X–17F–1A filed pursuant to § 240.17f–1, all agreements between reporting institutions regarding registration or other aspects of § 240.17f–1, and all confirmations or other information received from the Commission or its designee as a result of inquiry.

(15) Records required to be maintained pursuant to paragraph (e) of § 240.17f–2.

(16)(i) The following records regarding any internal broker-dealer system

417

of which such a broker or dealer is the sponsor:

(A) A record of the broker's or dealer's customers that have access to an internal broker-dealer system sponsored by such broker or dealer (identifying any affiliations between such customers and the broker or dealer);

(B) Daily summaries of trading in the internal broker-dealer system, including:

(*I*) Securities for which transactions have been executed through use of such system; and

(*2*) Transaction volume (separately stated for trading occurring during hours when consolidated trade reporting facilities are and are not in operation):

(*i*) With respect to equity securities, stated in number of trades, number of shares, and total U.S. dollar value;

(*ii*) With respect to debt securities, stated in total settlement value in U.S. dollars; and

(*iii*) With respect to other securities, stated in number of trades, number of units of securities, and in dollar value, or other appropriate commonly used measure of value of such securities; and

(C) Time-sequenced records of each transaction effected through the internal broker-dealer system, including date and time executed, price, size, security traded, counterparty identification information, and method of execution (if internal broker-dealer system allows alternative means or locations for execution, such as routing to another market, matching with limit orders, or executing against the quotations of the broker or dealer sponsoring the system).

(ii) For purposes of paragraph (a) of this section, the term:

(A) *Internal broker-dealer system* shall mean any facility, other than a national securities exchange, an exchange exempt from registration based on limited volume, or an alternative trading system as defined in Regulation ATS, §§ 242.300 through 242.303 of this chapter, that provides a mechanism, automated in full or in part, for collecting, receiving, disseminating, or displaying system orders and facilitating agreement to the basic terms of a purchase or sale of a security between a customer and the sponsor, or between two customers of the sponsor, through use of the internal broker-dealer system or through the broker or dealer sponsor of such system;

(B) *Sponsor* shall mean any broker or dealer that organizes, operates, administers, or otherwise directly controls an internal broker-dealer trading system or, if the operator of the internal broker-dealer system is not a registered broker or dealer, any broker or dealer that, pursuant to contract, affiliation, or other agreement with the system operator, is involved on a regular basis with executing transactions in connection with use of the internal broker-dealer system, other than solely for its own account or as a customer with access to the internal broker-dealer system; and

(C) *System order* means any order or other communication or indication submitted by any customer with access to the internal broker-dealer system for entry into a trading system announcing an interest in purchasing or selling a security. The term "system order" does not include inquiries or indications of interest that are not entered into the internal broker-dealer system.

(17) For each account with a natural person as a customer or owner:

(i)(A) An account record including the customer's or owner's name, tax identification number, address, telephone number, date of birth, employment status (including occupation and whether the customer is an associated person of a member, broker or dealer), annual income, net worth (excluding value of primary residence), and the account's investment objectives. In the case of a joint account, the account record must include personal information for each joint owner who is a natural person; however, financial information for the individual joint owners may be combined. The account record shall indicate whether it has been signed by the associated person responsible for the account, if any, and approved or accepted by a principal of the member, broker or dealer. For accounts in existence on the effective date of this section, the member,

418

broker or dealer must obtain this information within three years of the effective date of the section.

(B) A record indicating that:

(*1*) The member, broker or dealer has furnished to each customer or owner within three years of the effective date of this section, and to each customer or owner who opened an account after the effective date of this section within thirty days of the opening of the account, and thereafter at intervals no greater than thirty-six months, a copy of the account record or an alternate document with all information required by paragraph (a)(17)(i)(A) of this section. The member, broker or dealer may elect to send this notification with the next statement mailed to the customer or owner after the opening of the account. The member, broker or dealer may choose to exclude any tax identification number and date of birth from the account record or alternative document furnished to the customer or owner. The member, broker or dealer shall include with the account record or alternative document provided to each customer or owner an explanation of any terms regarding investment objectives. The account record or alternate document furnished to the customer or owner shall include or be accompanied by prominent statements that the customer or owner should mark any corrections and return the account record or alternate document to the member, broker or dealer, and that the customer or owner should notify the member, broker or dealer of any future changes to information contained in the account record.

(*2*) For each account record updated to reflect a change in the name or address of the customer or owner, the member, broker or dealer furnished a notification of that change to the customer's old address, or to each joint owner, and the associated person, if any, responsible for that account, on or before the 30th day after the date the member, broker or dealer received notice of the change.

(*3*) For each change in the account's investment objectives the member, broker or dealer has furnished to each customer or owner, and the associated person, if any, responsible for that account a copy of the updated customer account record or alternative document with all information required to be furnished by paragraph (a)(17)(i)(B)(*1*) of this section, on or before the 30th day after the date the member, broker or dealer received notice of any change, or, if the account was updated for some reason other than the firm receiving notice of a change, after the date the account record was updated. The member, broker or dealer may elect to send this notification with the next statement scheduled to be mailed to the customer or owner.

(C) For purposes of this paragraph (a)(17), the neglect, refusal, or inability of a customer or owner to provide or update any account record information required under paragraph (a)(17)(i)(A) of this section shall excuse the member, broker or dealer from obtaining that required information.

(D) The account record requirements in paragraph (a)(17)(i)(A) of this section shall only apply to accounts for which the member, broker or dealer is, or has within the past 36 months been, required to make a suitability determination under the federal securities laws or under the requirements of a self-regulatory organization of which it is a member. Additionally, the furnishing requirement in paragraph (a)(17)(i)(B)(*1*) of this section shall not be applicable to an account for which, within the last 36 months, the member, broker or dealer has not been required to make a suitability determination under the federal securities laws or under the requirements of a self-regulatory organization of which it is a member. This paragraph (a)(17)(i)(D) does not relieve a member, broker or dealer from any obligation arising from the rules of a self-regulatory organization of which it is a member regarding the collection of information from a customer or owner.

(ii) If an account is a discretionary account, a record containing the dated signature of each customer or owner granting the authority and the dated signature of each natural person to whom discretionary authority was granted.

(iii) A record for each account indicating that each customer or owner

was furnished with a copy of each written agreement entered into on or after the effective date of this paragraph pertaining to that account and that, if requested by the customer or owner, the customer or owner was furnished with a fully executed copy of each agreement.

(18) A record:

(i) As to each associated person of each written customer complaint received by the member, broker or dealer concerning that associated person. The record shall include the complainant's name, address, and account number; the date the complaint was received; the name of any other associated person identified in the complaint; a description of the nature of the complaint; and the disposition of the complaint. Instead of the record, a member, broker or dealer may maintain a copy of each original complaint in a separate file by the associated person named in the complaint along with a record of the disposition of the complaint.

(ii) Indicating that each customer of the member, broker or dealer has been provided with a notice containing the address and telephone number of the department of the member, broker or dealer to which any complaints as to the account may be directed.

(19) A record:

(i) As to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if nonmonetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.

(ii) Of all agreements pertaining to the relationship between each associated person and the member, broker or dealer including a summary of each associated person's compensation arrangement or plan with the member, broker or dealer, including commission and concession schedules and, to the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation is determined.

(20) A record, which need not be separate from the advertisements, sales literature, or communications, documenting that the member, broker or dealer has complied with, or adopted policies and procedures reasonably designed to establish compliance with, applicable federal requirements and rules of a self-regulatory organization of which the member, broker or dealer is a member which require that advertisements, sales literature, or any other communications with the public by a member, broker or dealer or its associated persons be approved by a principal.

(21) A record for each office listing, by name or title, each person at that office who, without delay, can explain the types of records the firm maintains at that office and the information contained in those records.

(22) A record listing each principal of a member, broker or dealer responsible for establishing policies and procedures that are reasonably designed to ensure compliance with any applicable federal requirements or rules of a self-regulatory organization of which the member, broker or dealer is a member that require acceptance or approval of a record by a principal.

(b)(1) This section shall not be deemed to require a member of a national securities exchange, a broker, or dealer who transacts a business in securities through the medium of any such member, or a broker or dealer registered pursuant to section 15 of the Act, to make or keep such records of transactions cleared for such member, broker, or dealer as are customarily made and kept by a clearing broker or dealer pursuant to the requirements of §§ 240.17a-3 and 240.17a-4: *Provided,* That the clearing broker or dealer has and maintains net capital of not less than $25,000 and is otherwise in compliance with § 240.15c3-1 or the capital rules of the exchange of which such clearing broker or dealer is a member if the members of such exchange are exempt from § 240.15c3-1 by paragraph (b)(2) thereof.

(2) This section shall not be deemed to require a member of a national securities exchange, a broker, or dealer who

420

**Securities and Exchange Commission**                    **§ 240.17a–3**

transacts a business in securities through the medium of any such member, or a broker or dealer registered pursuant to section 15 of the Act, to make or keep such records of transactions cleared for such member, broker or dealer by a bank as are customarily made and kept by a clearing broker or dealer pursuant to the requirements of §§ 240.17a–3 and 240.17a–4: *Provided,* That such member, broker, or dealer obtains from such bank an agreement in writing to the effect that the records made and kept by such bank are the property of the member, broker, or dealer: *And provided further,* That such bank files with the Commission a written undertaking in form acceptable to the Commission and signed by a duly authorized person, that such books and records are available for examination by representatives of the Commission as specified in section 17(a) of the Act, and that it will furnish to the Commission, upon demand, at its principal office in Washington, DC, or at any regional or district office of the Commission designated in such demand, true, correct, complete, and current copies of any or all of such records. Such undertaking shall include the following provisions:

The undersigned hereby undertakes to maintain and preserve on behalf of [*BD*] the books and records required to be maintained and preserved by [*BD*] pursuant to Rules 17a–3 and 17a–4 under the Securities Exchange Act of 1934 and to permit examination of such books and records at any time or from time to time during business hours by examiners or other representatives of the Securities and Exchange Commission, and to furnish to said Commission at its principal office in Washington, DC, or at any regional or district office of said Commission specified in a demand made by or on behalf of said Commission for copies of books and records, true, correct, complete, and current copies of any or all, or any part, of such books and records. This undertaking shall be binding upon the undersigned, and the successors and assigns of the undersigned.

Nothing herein contained shall be deemed to relieve such member, broker, or dealer from the responsibility that such books and records be accurately maintained and preserved as specified in §§ 240.17a–3 and 240.17a–4.

(c) This section shall not be deemed to require a member of a national secu-

rities exchange, or a broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934 (48 Stat. 895, 49 Stat. 1377; 15 U.S.C. 78*o*) as amended, to make or keep such records as are required by paragraph (a) reflecting the sale of United States Tax Savings Notes, United States Defense Savings Stamps, or United States Defense Savings Bonds, Series E, F and G.

(d) The records specified in paragraph (a) of this section shall not be required with respect to any cash transaction of $100 or less involving only subscription rights or warrants which by their terms expire within 90 days after the issuance thereof.

(e) For purposes of transactions in municipal securities by municipal securities brokers and municipal securities dealers, compliance with Rule G–8 of the Municipal Securities Rulemaking Board will be deemed to be in compliance with this section.

(f) *Security futures products.* The provisions of this section shall not apply to security futures product transactions and positions in a futures account (as that term is defined in § 240.15c3–3(a)(15)); *provided,* that the Commodity Futures Trading Commission's recordkeeping rules apply to those transactions and positions.

(g) Every member, broker or dealer shall make and keep current, as to each office, the books and records described in paragraphs (a)(1), (a)(6), (a)(7), (a)(12), (a)(17), (a)(18)(i), (a)(19), (a)(20), (a)(21), and (a)(22) of this section.

(h) When used in this section:

(1) The term *office* means any location where one or more associated persons regularly conduct the business of handling funds or securities or effecting any transactions in, or inducing or attempting to induce the purchase or sale of, any security.

(2) The term *principal* means any individual registered with a registered national securities association as a principal or branch manager of a member, broker or dealer or any other person who has been delegated supervisory responsibility over associated persons by the member, broker or dealer.

(3) The term *securities regulatory authority* means the Commission, any

421

08-01420-scc Doc 4750 Filed 12/06/12 Entered 12/06/12 13:45:39 Main Document Documents 1 Through 5 Pg 157 of 259 Page 965 of 1129

§ 240.17a–4                                                    17 CFR Ch. II (4–1–08 Edition)

self-regulatory organization, or any securities commission (or any agency or office performing like functions) of the States.

(4) The term *associated person* means an ''associated person of a member'' or ''associated person of a broker or dealer'' as defined in sections 3(a)(21) and 3(a)(18) of the Act (15 U.S.C. 78c(a)(21) and (a)(18)) respectively, but shall not include persons whose functions are solely clerical or ministerial.

CROSS REFERENCE: For interpretative release applicable to § 240.17a–3, see No. 3040 in tabulation, part 241 of this chapter.

[13 FR 8212, Dec. 22, 1948]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 240.17a–3, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

§ 240.17a–4  **Records to be preserved by certain exchange members, brokers and dealers.**

(a) Every member, broker and dealer subject to § 240.17a–3 shall preserve for a period of not less than six years, the first two years in an easily accessible place, all records required to be made pursuant to paragraphs § 240.17a–3(a)(1), (a)(2), (a)(3), (a)(5), (a)(21), (a)(22), and analogous records created pursuant to paragraph § 240.17a–3(f).

(b) Every member, broker and dealer subject to § 240.17a–3 shall preserve for a period of not less than three years, the first two years in an easily accessible place:

(1) All records required to be made pursuant to § 240.17a–3(a)(4), (a)(6), (a)(7), (a)(8), (a)(9), (a)(10), (a)(16), (a)(18), (a)(19), (a)(20), and analogous records created pursuant to § 240.17a–3(f).

(2) All check books, bank statements, cancelled checks and cash reconciliations.

(3) All bills receivable or payable (or copies thereof), paid or unpaid, relating to the business of such member, broker or dealer, as such.

(4) Originals of all communications received and copies of all communications sent (and any approvals thereof) by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such, including all communica-

tions which are subject to rules of a self-regulatory organization of which the member, broker or dealer is a member regarding communications with the public. As used in this paragraph (b)(4), the term communications includes sales scripts.

(5) All trial balances, computations of aggregate indebtedness and net capital (and working papers in connection therewith), financial statements, branch office reconciliations, and internal audit working papers, relating to the business of such member, broker or dealer, as such.

(6) All guarantees of accounts and all powers of attorney and other evidence of the granting of any discretionary authority given in respect of any account, and copies of resolutions empowering an agent to act on behalf of a corporation.

(7) All written agreements (or copies thereof) entered into by such member, broker or dealer relating to its business as such, including agreements with respect to any account.

(8) Records which contain the following information in support of amounts included in the report prepared as of the audit date on Form X–17A–5 (§ 249.617 of this chapter) Part II or Part IIA or Part IIB and in annual audited financial statements required by § 240.17a–5(d) and § 240.17a–12(b):

(i) Money balance position, long or short, including description, quantity, price and valuation of each security including contractual commitments in customers' accounts, in cash and fully secured accounts, partly secured accounts, unsecured accounts, and in securities accounts payable to customers;

(ii) Money balance and position, long or short, including description, quantity, price and valuation of each security including contractual commitments in non-customers' accounts, in cash and fully secured accounts, partly secured and unsecured accounts, and in securities accounts payable to non-customers;

(iii) Position, long or short, including description, quantity, price and valuation of each security including contractual commitments included in the Computation of Net Capital as commitments, securities owned, securities

# EXHIBIT 5

## GSSR Account Balances - Balance Data as of August 20, 2010

**Account Name:** CHASE LGSI
**Account Number:** 20
**Sub Account Number:** 0020-RIDGE
**Sub Account Type:** Ledger
**Source Section Code:** MTS RECS

| Statement Date | Opening Balance | Opening D/C | Opening Type | Closing Balance | Closing D/C | Closing Type | Currency | User ID | User Name |
|---|---|---|---|---|---|---|---|---|---|
| 09/19/2008 | 68,500,616,910.94 | | | 5,919,098,861.51 | | Complete | USD | system | system |

# EXHIBIT 6

# Inability to Apply Safekeeping Instructions: Reserve Impact

| CUSIP | Original Allocation — Allocation | Market Values | Debit | Credit | Corrected Allocation — Market Values | Revised Allocation | Debit | Credit | Net Debit Impact | Net Credit Impact |
|---|---|---|---|---|---|---|---|---|---|---|
| 912795G70 | Cust Long (Fail to Deliver) vs Box | $ 3,511,701 | - | - | $ 1,911,920 | Cust Long vs Bank Loan | *Allocation and adjustment addressed elsewhere* | $ 1,911,920 | $ - | $ 1,911,920 |
| | | | | | $ 1,599,781 | Cust Long (Fail to Deliver) vs Box | | | | |
| 912795G88 | Cust Long (Fail to Deliver) vs Box | $ 5,516,412 | - | - | $ 5,136,659 | Delivered out 5,331,000 shares* | | $ 5,136,659 | $ - | $ 5,136,659 |
| | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 5,327,534 | $ 5,327,534 | $ 5,327,534 | $ 5,327,534 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | | | $ (5,327,534) | $ (5,327,534) |
| | Cust Long (Fail to Deliver) vs Non-Cust (Fail to Receive) | $ 2,565,331 | $ 2,565,331 | $ 2,565,331 | $ 2,565,331 | Cust Long Free vs Non-Cust (Fail to Receive) | | $ 2,565,331 | $ (2,565,331) | - |
| | | | | | 379,753 | PAIB vs Box | | | | |
| 912795G96 | Cust Long (Fail to Deliver) vs Box | $ 46,614,555 | - | - | 45,207,026 | Cust Long vs Bank Loan | | $ 45,207,026 | $ - | 45,207,026 |
| | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 19,825,989 | $ 19,825,989 | $ 19,825,989 | 1,462,212 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 1,462,212 | $ 1,462,212 | $ (18,363,777) | (18,363,777) |
| | | | | | 13,485,803 | Cust Long Free vs Cust Short (Fail to Receive) | | $ 13,485,803 | | 13,485,803 |
| | | | | | 4,877,973 | Delivered out 4,879,600 shares* | | | | |
| | | | | | 1,407,531 | PAIB vs Box | | | | |
| 912795H20 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 2,047,863 | $ 2,047,863 | 2,047,863 | $ 2,047,863 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 2,047,863 | $ 2,047,863 | - | - |
| | Cust Long (Fail to Deliver) vs Box | 30,210,224 | | | 748,584 | Cust Long Free vs Bank Loan | | 748,584 | - | 748,584 |
| | | | | | 29,461,640 | Cust Long (Fail to Deliver) vs Box | *Allocation and adjustment addressed elsewhere* | | | |
| 912795H38 | Cust Long (Fail to Deliver) vs Box | $ 31,032,376 | | | $ 28,845,817 | Cust Long Free vs Bank Loan | - | $ 28,845,817 | - | 28,845,817 |
| | | | | | 1,507,318 | Cust Long (Fail to Deliver) vs Box | *Allocation and adjustment addressed elsewhere* | | | |
| | | | | | 679,242 | PAIB vs Box | | | | |
| 912795H61 | Cust Long (Fail to Deliver) vs Box | $ 1,005,336 | | | 782,925 | Cust Long Free vs Bank Loan | - | 782,925 | - | 782,925 |
| | | | | | 222,411 | Cust Long (Fail to Deliver) vs Box | | | | |
| 912795H95 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 50,865 | $ 50,865 | 50,865 | 50,865 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | 50,865 | 50,865 | - | - |
| 912795J28 | Cust Long (Fail to Deliver) vs Box | $ 2,392,248 | | | $ 2,392,248 | Cust Long (Fail to Deliver) vs Box | | $ 2,392,248 | - | 2,392,248 |
| | | $ 20,609,554 | | | 543,643 | Cust Long Free vs Bank Loan | | 543,643 | - | 543,643 |
| | | | | | 20,065,911 | Cust Long (Fail to Deliver) vs Box | *Allocation and adjustment addressed elsewhere* | | | |
| 912795J36 | Cust Long (Fail to Deliver) vs Proprietary Short | $ 3,343,041 | $ 3,343,041 | 3,343,041 | 232,447 | Cust Long (Fail to Deliver) vs Proprietary Short | 232,447 | 232,447 | (3,110,595) | (32,922) |
| | Cust Long (Fail to Deliver) vs Non-Cust (Fail to Receive) | 30,272,931 | 30,272,931 | 30,272,931 | 3,077,673 | Cust Long Free vs Proprietary Short | | 3,077,673 | | |
| | Cust Long Free vs Cust Short (Fail to Receive) | $ 1,835,630 | $ 1,835,630 | 1,835,630 | 30,272,931 | Cust Long Free vs Non-Cust (Fail to Receive) | | 30,272,931 | (30,272,931) | - |
| | | 22,806,705 | | 22,806,705 | 24,642,335 | Cust Long Free vs Cust Short (Fail to Receive) | | 1,835,630 | (1,835,630) | - |
| | | | | | 32,922 | PAIB vs Box | | | | |
| 912795J83 | Cust Long (Fail to Deliver) vs Box | $ 21,468,763 | | | $ 21,468,763 | Cust Long Free vs Bank Loan | | $ 21,468,763 | - | 21,468,763 |
| 912628HH4 | Cust Long (Fail to Deliver) vs Box | $ 295,588 | | | 295,588 | Cust Long Free vs Bank Loan | | 295,588 | - | 295,588 |
| 31384H34 | Cust Long (Fail to Deliver) vs Box | $ 1,558,473 | | | $ 1,558,473 | Cust Long Free vs Bank Loan | | $ 1,558,473 | - | 1,558,473 |
| 31384H86 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 1,090,834 | 1,090,834 | 1,090,834 | 1,090,834 | Cust Long Free vs Cust Short (Fail to Receive) | | 1,090,834 | (1,090,834) | - |
| 31384H28 | Cust Long (Fail to Deliver) vs Cust Short (Fail to Receive) | $ 149,947 | 149,947 | 149,947 | 149,947 | Cust Long Free vs Cust Short (Fail to Receive)** | | 149,947 | (149,947) | (149,947) |
| | | $ 66,509,965 | | $ 89,316,670 | | | $ 3,793,387 | $ 165,013,235 | $ (62,716,578) | 98,503,270 |
| | 3% Impact | $ (1,995,299) | | | | 3% Impact | $ (113,802) | | 1,881,497 | |
| | Total Adjustment | $ 64,514,666 | | $ 89,316,670 | | Total Adjustment | $ 3,679,585 | $ 165,013,235 | $ (60,835,081) | 98,503,270 |
| | | | | | | | | | | $ 159,338,350 |

\* Note that deliveries were made which were not reflected in the reserve formula, thus the market value of these positions are shown to tie to the original allocation

\*\*Note that this position has been netted

**EXHIBIT 7**

Securities Incorrectly Coded as Held in Safekeeping Location Analysis Summary

| CUSIPs | Chase Books and Records | | | | 9-19 MTS Allocation | | Chase Accnt Incorrectly Unsegregated and Allocated as Cust | Calculated Price | Chase Seized MV Allocated as Cust |
| | Correctly Segregated | Incorrectly Unsegregated | Chase Seized Qty | Available Box position seized by Chase | (17) CUST. LONG FREE vs. (32) SAFEKEEPING | (35) SPEC. FIN. CUST. LONG vs. (32) SAFEKEEPING | | | |
|---|---|---|---|---|---|---|---|---|---|
| 31339X2M5 | 100,000 | 7,000,000 | 7,000,000 | - | 7,100,000 | | 7,000,000 | $1.01 | $7,038,415 |
| 3133X7FK5 | 225,000 | 500,000 | 815,000 | 315,000 | 725,000 | | 500,000 | $1.07 | $532,890 |
| 3134A4TZ7 | 100,000 | 50,000,000 | 50,008,000 | 8,000 | 50,100,000 | | 50,000,000 | $1.03 | $51,665,923 |
| 31358M36 | - | 772,000 | 772,000 | - | 772,000 | | 772,000 | $1.00 | $769.953 |
| 912795G70 | 280,320,000 | 74,250,000 | 119,420,000 | 45,130,000 | 290,360,000 | 64,250,000 | 10,040,000 | $1.00 | $10,039.163 |
| 912795H87 | 69,536,000 | 124,000,000 | 191,804,000 | 67,804,000 | 103,036,000 | 90,500,000 | 33,500,000 | $1.00 | $33,383.401 |
| 912795J28 | 319,994,000 | 99,000,000 | 160,852,000 | 61,672,000 | 369,114,000 | 52,145,000 | 46,855,000 | $1.00 | $46,738.331 |
| 912810FR4 | 175,000 | 510,000 | 22,297,000 | 21,787,000 | 685,000 | | 510,000 | $1.19 | $607.073 |
| 912810PV4 | 340,000 | 650,000 | 60,324,000 | 59,674,000 | 990,000 | | 650,000 | $0.97 | $627,564 |
| 912828BH2 | 4,950,000 | 3,620,000 | 6,174,000 | 2,554,000 | 8,570,000 | | 3,620,000 | $1.06 | $3,833,712 |
| | | | | | | | | | $155,236,428 |

<Note 1>     *There was a box break between Chase and 9-19 MTS stock records. Unable to reconcile 9-19 MTS Box and safe keeping positions to Chase Books and Records.*

# EXHIBIT 8

Unsecured Debit Analysis Summary

## CASH SUMMARY

| | USD | EUR | ARS | TOTAL |
|---|---|---|---|---|
| Cash Balance per Currency | (9,219,538.26) | (3,043,084.11) | 294,904.67 | |
| 9/19/08 Fx Conversion Rate | 1.00 | 1.43759 | 0.3206 | |
| USD Equivalent | $ (9,219,538.26) | $ (4,374,710.33) | $ 94,558.59 | $ (13,499,690.00) |

## POSITION SUMMARY

| ISIN | DESCRIPTION | MATURITY DATE | QUANTITY | MARKET VALUE |
|---|---|---|---|---|
| XS0321495615 | HONG LONG HOLDINGS L | 10/2/2012 | 3,706,645.00 | No Price per Bloomberg and IDC |
| XS0208744812 | WHITNEY CLO LTD FRN 20170301 S | 3/1/2017 | 10,369,165.85 | $ 1,350,608.85 |
| | | Total Market Value | | $ 1,350,608.85 |

| | |
|---|---|
| Debit Balance in # 1500 | 13,499,690.00 |
| Long Market Value in Account | 1,350,608.78 |
| **Remaining Unsecured Debit Balance** | **12,149,081.22** |

| | |
|---|---|
| Remaining Unsecured Debit | 12,149,081.22 |
| 3% Impact | 364,472.44 |
| **Debit Balance Impact** | **11,784,608.78** |

**EXHIBIT 9**

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| 5025914 | 25,610,190 | - | - | - | (25,610,190) | - |
| 5152357 | 9,354,985 | - | - | - | (9,354,985) | - |
| 5163126 | 307,982 | - | - | - | (307,982) | - |
| 5218270 | 5,745,000 | - | 6,830,000 | - | 1,085,000 | - |
| 5226191 | 4,557,315 | - | - | - | (4,557,315) | - |
| 5228448 | 20,456,572 | - | - | - | (20,456,572) | - |
| 5249435 | 44,734,678 | - | - | - | (44,734,678) | - |
| 5405311 | 7,961,890 | - | - | - | (7,961,890) | - |
| 5406260 | 59,582,291 | - | - | - | (59,582,291) | - |
| 5409706 | 40,623,520 | - | - | - | (40,623,520) | - |
| 5477354 | 138,099,732 | - | - | - | (138,099,732) | - |
| 5477531 | 99,354,953 | - | - | - | (99,354,953) | - |
| 5503887 | (30,750) | - | - | - | 30,750 | - |
| 5534816 | 1,202,918 | - | - | - | (1,202,918) | - |
| 5536753 | 1,131,133 | - | - | - | (1,131,133) | - |
| 5564550 | 25,133,655 | - | - | - | (25,133,655) | - |
| 5573184 | 43,227,246 | - | - | - | (43,227,246) | - |
| 5584125 | 50,109,703 | - | - | - | (50,109,703) | - |
| 5585588 | - | - | - | - | - | - |
| 5586164 | 4,270,608 | - | - | - | (4,270,608) | - |
| 5587403 | 4,406,237 | - | - | - | (4,406,237) | - |
| 5593953 | 8,018,201 | - | - | - | (8,018,201) | - |
| 5594442 | 66,639,372 | - | - | - | (66,639,372) | - |
| 5595857 | 40,295,172 | - | - | - | (40,295,172) | - |
| 5604414 | 21,649,970 | - | - | - | (21,649,970) | - |
| 5607585 | - | - | - | - | - | - |
| 5607654 | - | - | - | - | - | - |
| 5608127 | 102,230,226 | - | - | - | (102,230,226) | - |
| 5621804 | 2,346,792 | - | - | - | (2,346,792) | - |
| 5624446 | 5,133,969 | - | - | - | (5,133,969) | - |
| 5626485 | 85,773,279 | - | - | - | (85,773,279) | - |
| 5668765 | 15,411,048 | - | - | - | (15,411,048) | - |
| 5674592 | 1,024,321 | - | - | - | (1,024,321) | - |
| 5678914 | 30,933,819 | - | - | - | (30,933,819) | - |
| 5681510 | 21,660,980 | - | - | - | (21,660,980) | - |
| 5682308 | 28,238,425 | - | - | - | (28,238,425) | - |
| 5688458 | 15,332,896 | - | - | - | (15,332,896) | - |
| 5689112 | 68,717,031 | - | - | - | (68,717,031) | - |
| 5693861 | 2,237,127 | - | - | - | (2,237,127) | - |
| 5695872 | 1,930,839 | - | - | - | (1,930,839) | - |
| 5702685 | 16,554,988 | - | - | - | (16,554,988) | - |
| 5702935 | 8,760,420 | - | - | - | (8,760,420) | - |
| 5803136 | 35,972,730 | - | - | - | (35,972,730) | - |
| 5803530 | 26,854,284 | - | - | - | (26,854,284) | - |
| 5803705 | 26,719,433 | - | - | - | (26,719,433) | - |
| 5806134 | 55,100,054 | - | - | - | (55,100,054) | - |
| 5810292 | 9,360,495 | - | - | - | (9,360,495) | - |
| 5810502 | 7,540,474 | - | - | - | (7,540,474) | - |
| 5813961 | 60,702,032 | - | - | - | (60,702,032) | - |
| 5BBGBD2 | 11,860,563 | - | - | - | (11,860,563) | - |
| 5BBGCM3 | 7,235,701 | - | - | - | (7,235,701) | - |
| 5BBGML9 | 909,428 | - | - | - | (909,428) | - |
| 5BBRYY1 | 4,883 | - | 26,359 | - | 21,476 | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| 5BBYNY6 | 52,979,964 | - | - | - | (52,979,964) | - |
| 5BCGYQ0 | - | - | - | - | - | - |
| 5BCHCD9 | - | 18,301,284 | - | - | - | (18,301,284) |
| 5BCNND9 | 8,000,000 | 1,928,800 | 8,000,000 | - | - | (1,928,800) |
| 5BCRPB6 | 1,372,690 | - | - | - | (1,372,690) | - |
| 5BDYYT1 | 22,697,830 | - | - | - | (22,697,830) | - |
| 7140387 | - | - | - | - | - | - |
| 7143014 | 27,876,337 | - | - | - | (27,876,337) | - |
| A001020 | - | 112,220 | - | - | - | (112,220) |
| A001292 | - | 3,722 | - | - | - | (3,722) |
| A001470 | (5,128) | 35,944 | (5,128) | 265,835 | - | 229,891 |
| A001590 | 637,881 | - | 517,212 | - | (120,669) | - |
| A001793 | 3,434,151 | - | 2,208,031 | - | (1,226,120) | - |
| A002177 | 1,075,934 | 1,254 | 169,948 | 231,202 | (905,986) | 229,948 |
| A002205 | - | 139,900 | - | - | - | (139,900) |
| A002515 | - | 230,871 | - | - | - | (230,871) |
| A002858 | - | 82,691 | - | - | - | (82,691) |
| A003139 | - | 10,820,643 | - | - | - | (10,820,643) |
| A003269 | - | 292,175 | - | - | - | (292,175) |
| A003747 | - | 179,912 | - | - | - | (179,912) |
| A003753 | - | 4,613,760 | - | - | - | (4,613,760) |
| A003791 | - | 220,400 | - | - | - | (220,400) |
| A004160 | - | 11,075,857 | - | - | - | (11,075,857) |
| A004167 | - | 618,213 | - | - | - | (618,213) |
| A004295 | 568,511 | 448,108 | 26,711 | 861,819 | (541,800) | 413,711 |
| A004559 | 1,658,700 | - | (440,778) | - | (2,099,478) | - |
| A004692 | - | 61,161 | - | - | - | (61,161) |
| A005808 | - | 5,023,970 | - | - | - | (5,023,970) |
| A006031 | - | 616,050 | - | - | - | (616,050) |
| A006150 | - | 574,531 | - | - | - | (574,531) |
| A006436 | 22 | 464 | 22 | 133,004 | - | 132,540 |
| A006610 | (114,300) | - | (114,300) | - | - | - |
| A006778 | - | 208,082 | - | - | - | (208,082) |
| A006864 | - | 85,093 | - | - | - | (85,093) |
| A007015 | - | 1,103,445 | - | - | - | (1,103,445) |
| A007052 | - | 101,235 | - | - | - | (101,235) |
| A007113 | - | 82,988 | - | - | - | (82,988) |
| A007170 | - | 7,309,012 | - | - | - | (7,309,012) |
| A007295 | - | - | 116,520 | - | 116,520 | - |
| A007474 | - | 548,618 | - | - | - | (548,618) |
| A007633 | 1,131,086 | - | 262,582 | - | (868,504) | - |
| A008081 | - | 2,813,200 | - | - | - | (2,813,200) |
| A008789 | - | 14,810 | - | - | - | (14,810) |
| A009411 | - | 1,320,091 | - | - | - | (1,320,091) |
| A009479 | 1,876,257 | - | 115,839 | - | (1,760,418) | - |
| A009559 | - | 72,646 | - | - | - | (72,646) |
| A009695 | 489,155 | - | - | - | (489,155) | - |
| A009762 | - | 136,380 | - | - | - | (136,380) |
| A009906 | - | 1,110,000 | - | - | - | (1,110,000) |
| A009995 | - | 587,418 | - | - | - | (587,418) |
| A010708 | (686,729) | 1,391,714 | (921,848) | 1,391,714 | (235,119) | - |
| A010772 | - | 70,635 | (206,365) | 70,635 | (206,365) | - |
| A011002 | (3,722,358) | 808,116 | (4,666,985) | 531,454 | (944,627) | (276,662) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| A011237 | 18,889 | - | (1,243,580) | - | (1,262,469) | - |
| A011241 | (178,269) | - | (414,869) | - | (236,600) | - |
| A011291 | - | 7,796 | - | - | - | (7,796) |
| A011428 | 1,160,898 | - | (1,059,143) | - | (2,220,041) | - |
| A011525 | - | 283,262 | - | - | - | (283,262) |
| A011531 | - | 3,440,770 | - | - | - | (3,440,770) |
| A011555 | - | 453,834 | - | 435,914 | - | (17,920) |
| A011607 | (230,509) | 336,898 | - | - | 230,509 | (336,898) |
| A011927 | - | 142,500 | - | - | - | (142,500) |
| A012081 | - | 6,337,615 | - | - | - | (6,337,615) |
| A012344 | - | 281,420 | - | - | - | (281,420) |
| A012502 | 3,244,277 | - | 2,374,248 | - | (870,029) | - |
| A012562 | 2,766,978 | - | 782,900 | - | (1,984,078) | - |
| A012715 | 893,327 | - | - | - | (893,327) | - |
| A013192 | - | 107,548 | - | - | - | (107,548) |
| A013237 | - | 2,311,760 | - | - | - | (2,311,760) |
| A013295 | - | 493,925 | - | - | - | (493,925) |
| A013488 | - | - | - | - | - | - |
| A013661 | - | 306,513 | - | - | - | (306,513) |
| A013911 | - | 605,896 | - | - | - | (605,896) |
| A014056 | 9,581 | - | - | - | (9,581) | - |
| A014095 | 31,060 | - | - | - | (31,060) | - |
| A014598 | - | 150,940 | - | - | - | (150,940) |
| A014661 | - | 73,593 | - | - | - | (73,593) |
| A014847 | (19,398) | 87,256 | (19,398) | 87,256 | - | - |
| A015081 | 221,647 | 140,218 | 21,727 | 140,218 | (199,920) | - |
| A015119 | - | 157,625 | - | - | - | (157,625) |
| A015122 | - | 4,487 | - | - | - | (4,487) |
| A015313 | - | 1,221,000 | - | - | - | (1,221,000) |
| A015709 | 5,318,675 | - | 4,324,855 | - | (993,820) | - |
| A015719 | 5,909,219 | - | 4,312,067 | - | (1,597,152) | - |
| A015747 | - | 1,384,560 | - | - | - | (1,384,560) |
| A015834 | - | 89,115 | - | - | - | (89,115) |
| A016026 | (355,794) | - | (1,612,230) | - | (1,256,435) | - |
| A016032 | - | 18,772,343 | - | - | - | (18,772,343) |
| A016059 | - | 71,890 | - | - | - | (71,890) |
| A016088 | (183,412) | - | (672,326) | - | (488,914) | - |
| A016101 | - | 262,725 | - | - | - | (262,725) |
| A016183 | - | 51,676 | - | - | - | (51,676) |
| A016189 | - | 277,406 | - | - | - | (277,406) |
| A016318 | 674,576 | - | - | - | (674,576) | - |
| A016389 | - | 3,994,560 | - | - | - | (3,994,560) |
| A016397 | 1,232,695 | - | (104,745) | - | (1,337,440) | - |
| A016518 | - | 1,987,173 | - | - | - | (1,987,173) |
| A016622 | - | 296,344 | - | - | - | (296,344) |
| A016649 | - | 1,657,782 | - | - | - | (1,657,782) |
| A016901 | - | 4,596 | - | - | - | (4,596) |
| A016904 | 2,764,769 | - | - | - | (2,764,769) | - |
| A016974 | - | 248,087 | - | - | - | (248,087) |
| A016992 | - | 148,550 | - | - | - | (148,550) |
| A017007 | - | 88,000 | - | - | - | (88,000) |
| A017336 | - | 29,550,306 | 94 | - | 94 | (29,550,306) |
| A017366 | - | 1,861,075 | - | - | - | (1,861,075) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| A017455 | - | 207,506 | - | - | - | (207,506) |
| A017462 | - | 459,780 | - | - | - | (459,780) |
| A017782 | - | 12,569 | - | - | - | (12,569) |
| A017811 | (164,291) | - | (273,603) | - | (109,313) | - |
| A017841 | - | 1,144,500 | - | - | - | (1,144,500) |
| A017997 | - | 70,076 | - | - | - | (70,076) |
| A018146 | - | - | - | - | - | - |
| A018185 | - | 320,533 | - | - | - | (320,533) |
| A018435 | - | 1,792 | - | - | - | (1,792) |
| A018467 | - | - | - | - | - | - |
| A018513 | 212,803 | - | - | - | (212,803) | - |
| A018620 | - | 70,265 | - | - | - | (70,265) |
| A018720 | - | 142,825 | - | - | - | (142,825) |
| A018796 | - | 27,392 | - | - | - | (27,392) |
| A018839 | - | 68,900 | - | - | - | (68,900) |
| A019085 | - | 109,504 | - | - | - | (109,504) |
| A019174 | - | 342,700 | - | - | - | (342,700) |
| A019293 | - | 15,477 | - | - | - | (15,477) |
| A019319 | - | 6,506,320 | - | - | - | (6,506,320) |
| A019386 | - | 574,385 | - | - | - | (574,385) |
| A019523 | - | 8,885 | - | - | - | (8,885) |
| A019650 | - | 412,783 | - | - | - | (412,783) |
| A019812 | 110,173 | 111,322 | 110,173 | 81,164 | - | (30,158) |
| A019868 | (10,653) | - | (145,141) | - | (134,488) | - |
| A020031 | 444,170 | - | - | - | (444,170) | - |
| A020559 | - | 114,205 | - | - | - | (114,205) |
| A020726 | - | 99,251 | - | - | - | (99,251) |
| A020749 | 4,452,385 | - | - | - | (4,452,385) | - |
| A020919 | - | 127,200 | - | - | - | (127,200) |
| A020964 | 25,206 | - | - | - | (25,206) | - |
| A020978 | - | 2,932,230 | - | - | - | (2,932,230) |
| A021028 | 10,368 | - | - | - | (10,368) | - |
| A021120 | (625,289) | - | (709,637) | - | (84,348) | - |
| A021171 | - | 607,417 | - | - | - | (607,417) |
| A021191 | 492,534 | - | 324,747 | - | (167,787) | - |
| A021499 | 70,197 | - | (432,525) | - | (502,722) | - |
| A021532 | - | 43,512 | - | - | - | (43,512) |
| A021675 | - | 2,362,080 | - | 1,433,099 | - | (928,981) |
| A021736 | (6,407,391) | - | (4,055,145) | - | 2,352,246 | - |
| A021770 | - | 8,272,697 | 4,354,785 | - | 4,354,785 | (8,272,697) |
| A021892 | 802,266 | - | 13,987 | - | (788,278) | - |
| A021934 | - | 201,472 | - | - | - | (201,472) |
| A022015 | - | 283,446 | 1,545,900 | - | 1,545,900 | (283,446) |
| A023252 | 3,789,756 | - | 2,914,256 | - | (875,500) | - |
| A023718 | 629,496 | - | 254,208 | - | (375,288) | - |
| A060016 | - | 484,766 | - | - | - | (484,766) |
| A080352 | - | 4,254,972 | - | - | - | (4,254,972) |
| A100776 | - | 901,397 | - | - | - | (901,397) |
| A100795 | - | 194,309 | - | 16,092 | - | (178,217) |
| A100798 | - | 54,887 | - | - | - | (54,887) |
| A100957 | - | 2,939 | - | - | - | (2,939) |
| A102242 | (261,801) | - | - | - | 261,801 | - |
| A103867 | 301,505 | - | (112,724) | - | (414,229) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| A104383 | - | 108,006 | - | - | - | (108,006) |
| A105041 | - | 18,710 | - | - | - | (18,710) |
| A105046 | - | 69,508 | - | - | - | (69,508) |
| A105332 | - | 49,374 | - | - | - | (49,374) |
| A105343 | - | 170,425 | - | - | - | (170,425) |
| A106056 | - | 41,124 | - | - | - | (41,124) |
| A106355 | (7,500) | - | - | - | 7,500 | - |
| A106728 | - | 8,187 | - | - | - | (8,187) |
| A106835 | 55,838 | 10,237 | - | - | (55,838) | (10,237) |
| A107243 | - | 37,842 | - | - | - | (37,842) |
| A107549 | (133,818) | 881,204 | - | - | 133,818 | (881,204) |
| A112602 | 2,508,351 | - | 3,095,386 | - | 587,035 | - |
| A116528 | - | 421,833 | - | - | - | (421,833) |
| A116580 | - | 88,930 | - | - | - | (88,930) |
| A116626 | - | 285,075 | - | - | - | (285,075) |
| A116635 | - | 133,914 | - | - | - | (133,914) |
| A131716 | - | 20,427,710 | - | - | - | (20,427,710) |
| A139406 | - | 1,137,480 | - | - | - | (1,137,480) |
| A142946 | - | 5,107,811 | - | - | - | (5,107,811) |
| A143071 | - | 20,806 | - | - | - | (20,806) |
| A157706 | 293,725 | - | 104,653 | 111,492 | (189,072) | 111,492 |
| A164119 | 418,976 | - | 73,376 | - | (345,600) | - |
| A186186 | 689,716 | - | (85,467) | - | (775,183) | - |
| A191349 | 797,782 | - | (308,002) | - | (1,105,784) | - |
| A205806 | - | 3,646,675 | - | - | - | (3,646,675) |
| A238004 | - | 186,710 | - | 165,338 | - | (21,372) |
| A270842 | - | 985,613 | - | - | - | (985,613) |
| A291391 | - | 489,800 | - | - | - | (489,800) |
| A291419 | 203,340 | 7,740 | (19,908) | 115,104 | (223,248) | 107,364 |
| A386736 | - | 1,631,339 | - | - | - | (1,631,339) |
| A393586 | - | 140,891 | - | - | - | (140,891) |
| A437717 | (103,263,359) | 97,181,597 | 97,712,348 | - | 200,975,707 | (97,181,597) |
| A519629 | (21,167,491) | 991,724 | (21,167,491) | 5,147,645 | - | 4,155,921 |
| A529495 | (12,420) | - | - | - | 12,420 | - |
| A538243 | 479,106 | - | (36,811) | - | (515,917) | - |
| A540711 | 3,204,424 | - | 899,452 | - | (2,304,972) | - |
| A542256 | 1,118,981 | - | (447,150) | - | (1,566,131) | - |
| A542513 | 402,669 | - | (11,072) | - | (413,742) | - |
| A594547 | - | 150,088 | - | - | - | (150,088) |
| A594556 | - | 2,871,346 | - | - | - | (2,871,346) |
| A608248 | - | 157,424 | - | - | - | (157,424) |
| A610510 | - | 181,718 | - | - | - | (181,718) |
| A629920 | 564,809 | - | - | 21,711 | (564,809) | 21,711 |
| A674791 | - | 657,345 | - | - | - | (657,345) |
| A674942 | - | 82,200 | - | - | - | (82,200) |
| A678403 | 262,908 | - | - | - | (262,908) | - |
| A693985 | (1,163,829) | - | (1,272,000) | 16,383 | (108,171) | 16,383 |
| A703518 | - | 503 | - | - | - | (503) |
| A712802 | (69,469) | - | (742,061) | - | (672,592) | - |
| A720438 | - | 79,261 | - | - | - | (79,261) |
| A753544 | 4,384,031 | - | 2,751,215 | - | (1,632,816) | - |
| A753848 | - | 1,622,701 | - | - | - | (1,622,701) |
| A772998 | - | 271,700 | 10,322 | - | 10,322 | (271,700) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| A778527 | - | 587,574 | - | - | - | (587,574) |
| A784422 | - | 28,649 | - | - | - | (28,649) |
| A790692 | - | 59,000 | - | - | - | (59,000) |
| A806667 | - | 4,432 | - | - | - | (4,432) |
| A822701 | 676,710 | - | (476,919) | - | (1,153,629) | - |
| A826146 | - | 495,026 | - | - | - | (495,026) |
| B000028 | 803,139 | - | 1,174 | - | (801,966) | - |
| B000371 | - | 415,610 | - | - | - | (415,610) |
| B000796 | - | 9,983,610 | - | - | - | (9,983,610) |
| B002238 | - | 232,931 | - | - | - | (232,931) |
| B002310 | 200,400 | - | - | - | (200,400) | - |
| B002549 | - | 6,661,200 | - | - | - | (6,661,200) |
| B003474 | - | 18,201,988 | - | - | - | (18,201,988) |
| B003535 | 360,314 | - | - | - | (360,314) | - |
| B003598 | - | 796,025 | - | - | - | (796,025) |
| B003774 | - | 938,400 | - | - | - | (938,400) |
| B003979 | 1,969,187 | - | - | - | (1,969,187) | - |
| B004254 | (306,699) | - | (306,699) | - | - | - |
| B004761 | (203,612) | 10,264,660 | (7,472) | - | 196,140 | (10,264,660) |
| B004805 | (199,186) | 4,839,196 | (199,186) | 599,732 | - | (4,239,464) |
| B004880 | - | 2,244,170 | - | - | - | (2,244,170) |
| B005779 | (184,062) | - | (288,777) | - | (104,715) | - |
| B006386 | - | 8,743,200 | - | - | - | (8,743,200) |
| B006537 | 2,036,837 | - | 1,073,897 | - | (962,940) | - |
| B006549 | 1,301,851 | - | (990,800) | - | (2,292,651) | - |
| B006600 | - | 7,523,880 | - | 3,761,940 | - | (3,761,940) |
| B007387 | - | 3,715,880 | - | - | - | (3,715,880) |
| B007465 | (397,211) | - | (397,211) | - | - | - |
| B007771 | (253,339) | - | (357,964) | - | (104,625) | - |
| B007892 | - | 15,696,922 | - | - | - | (15,696,922) |
| B007985 | - | 203,538 | - | - | - | (203,538) |
| B008432 | - | 340,395 | - | - | - | (340,395) |
| B008478 | - | 131,480 | - | - | - | (131,480) |
| B008572 | 1,527,619 | - | - | - | (1,527,619) | - |
| B008637 | - | 1,912,973 | - | - | - | (1,912,973) |
| B008674 | 1,023,709 | - | (204,353) | - | (1,228,062) | - |
| B008886 | (765,976) | - | (765,976) | - | - | - |
| B008899 | 1,149,886 | - | (86,846) | 23,160 | (1,236,732) | 23,160 |
| B008924 | - | 289,962 | - | - | - | (289,962) |
| B008948 | - | 304,110 | - | - | - | (304,110) |
| B009261 | 171,704 | - | (313,768) | - | (485,472) | - |
| B009313 | 788,096 | 530,004 | (967,730) | 749,857 | (1,755,827) | 219,853 |
| B009415 | - | 187,250 | - | - | - | (187,250) |
| B009634 | - | 63,521,027 | - | - | - | (63,521,027) |
| B009713 | - | 1,321,300 | - | - | - | (1,321,300) |
| B009737 | 693,326 | - | - | - | (693,326) | - |
| B009984 | 49,357 | 18,021,360 | 1,743,816 | - | 1,694,459 | (18,021,360) |
| B010016 | 636,178 | - | 136,760 | 253,662 | (499,418) | 253,662 |
| B010192 | (745,506) | - | (1,335,553) | - | (590,047) | - |
| B010515 | - | 13,487,500 | - | - | - | (13,487,500) |
| B010598 | - | 3,837,395 | - | - | - | (3,837,395) |
| B010853 | - | 1,011,972 | - | 583,830 | - | (428,142) |
| B011123 | (960,182) | 1,287,114 | (1,594,873) | 1,076,143 | (634,691) | (210,971) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|---------------|----------------|---------------|---------------|--------------|
| B011330 | - | 16,960 | - | - | - | (16,960) |
| B011491 | - | 63,614 | - | - | - | (63,614) |
| B011990 | - | 26,072,697 | - | - | - | (26,072,697) |
| B012908 | - | 12,444,689 | - | - | - | (12,444,689) |
| B013350 | 697,740 | - | 231,420 | - | (466,320) | - |
| B013839 | - | 8,533,700 | - | - | - | (8,533,700) |
| B014306 | - | 379,298 | - | - | - | (379,298) |
| B014997 | - | 794,205 | - | - | - | (794,205) |
| B019688 | (67,106) | - | (67,106) | - | - | - |
| B027759 | 365,201 | - | (224,437) | 69,336 | (589,638) | 69,336 |
| B039871 | 844,207 | - | (170,212) | - | (1,014,419) | - |
| B052150 | 3,283,029 | - | 30,459 | - | (3,252,570) | - |
| B052873 | - | 333,915 | - | 327,378 | - | (6,537) |
| B072557 | - | 820,530 | - | - | - | (820,530) |
| B072566 | - | 2,857,200 | - | - | - | (2,857,200) |
| B083340 | - | 841,680 | - | - | - | (841,680) |
| B083420 | - | 135,376 | - | - | - | (135,376) |
| B084606 | (965,780) | 222,569,698 | (433,672) | - | 532,107 | (222,569,698) |
| B086409 | - | 124,409,460 | - | 18,968 | - | (124,390,492) |
| B088158 | (1,156,468) | 2,154,465 | (1,156,468) | 2,154,465 | - | - |
| B090939 | - | 277,170 | - | - | - | (277,170) |
| B093767 | - | 891,900 | - | 630,684 | - | (261,216) |
| B100298 | - | 6,219 | - | - | - | (6,219) |
| B100369 | - | 253,165 | - | - | - | (253,165) |
| B101668 | 1,035,632 | - | - | - | (1,035,632) | - |
| B101860 | - | 175,456 | - | - | - | (175,456) |
| B102353 | - | 832,097 | - | - | - | (832,097) |
| B102505 | (33,137) | 780,603 | - | - | 33,137 | (780,603) |
| B103283 | - | 372,195 | - | - | - | (372,195) |
| B104453 | (2) | - | - | - | 2 | - |
| B129293 | - | 156,335 | - | - | - | (156,335) |
| B131903 | 248,761 | - | (273,926) | - | (522,687) | - |
| B137756 | - | 9,218,305 | - | - | - | (9,218,305) |
| B149440 | (9,834,950) | - | 4,929,620 | - | 14,764,569 | - |
| B182493 | - | 577,225 | - | - | - | (577,225) |
| B199822 | - | 72,470 | - | - | - | (72,470) |
| B255949 | - | 35,010 | - | - | - | (35,010) |
| B256216 | - | 6,340 | - | - | - | (6,340) |
| B280118 | - | 207,378 | - | - | - | (207,378) |
| B292212 | 2,703 | - | - | - | (2,703) | - |
| B315279 | - | 954,368 | - | - | - | (954,368) |
| B333543 | - | 157,289 | - | - | - | (157,289) |
| B333552 | - | 247,050 | - | - | - | (247,050) |
| B361505 | - | - | - | - | - | - |
| B411628 | 1,579,526 | - | 558,461 | - | (1,021,065) | - |
| B413056 | (81,353) | 1,600,227 | 3,809,222 | - | 3,890,575 | (1,600,227) |
| B437209 | - | 14,445 | - | - | - | (14,445) |
| B476979 | - | 30,450 | - | - | - | (30,450) |
| B550111 | (3,539,802) | - | (3,539,802) | - | - | - |
| B570260 | (2,070,081) | - | (2,549,711) | - | (479,630) | - |
| B677841 | 2,952,585 | - | 830,931 | - | (2,121,654) | - |
| B683521 | 934,388 | - | 295,205 | - | (639,183) | - |
| B691264 | 7,603,776 | - | 6,755,155 | - | (848,621) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| C000019 | - | 5,486,329 | 21,319 | - | 21,319 | (5,486,329) |
| C000606 | (4,392,604) | 71,156,055 | (2,216,510) | - | 2,176,094 | (71,156,055) |
| C001205 | - | 282,271 | - | - | - | (282,271) |
| C001489 | 742,970 | - | 330,090 | - | (412,880) | - |
| C001586 | 303,547 | - | (1,402,571) | - | (1,706,118) | - |
| C002134 | - | 213,840 | - | - | - | (213,840) |
| C002403 | 540,626 | - | - | 5,002 | (540,626) | 5,002 |
| C002623 | 2,003,144 | 645,050 | 1,397,528 | 645,050 | (605,616) | 0 |
| C002690 | 1,842,510 | - | 903,121 | - | (939,389) | - |
| C002726 | - | 7,982 | - | - | - | (7,982) |
| C003006 | (731,988) | - | (899,597) | - | (167,610) | - |
| C003097 | - | 16,264,948 | - | - | - | (16,264,948) |
| C003464 | 476,053 | - | - | - | (476,053) | - |
| C003477 | - | 11,100 | - | - | - | (11,100) |
| C003582 | - | 3,083,060 | - | - | - | (3,083,060) |
| C003842 | - | 49,000 | - | - | - | (49,000) |
| C003892 | 2,316,171 | - | 454,024 | - | (1,862,147) | - |
| C003988 | 1,254,027 | - | 7,328 | - | (1,246,699) | - |
| C004281 | - | - | - | - | - | - |
| C004723 | 306,686 | - | (342,826) | - | (649,511) | - |
| C004807 | 2,596,725 | - | (179,499) | - | (2,776,224) | - |
| C004959 | 391,963 | - | (216,791) | - | (608,754) | - |
| C005231 | - | 709,796 | - | - | - | (709,796) |
| C005537 | 1,926,391 | - | 615,627 | - | (1,310,764) | - |
| C005750 | (14,531,120) | 5,468,490 | (14,531,120) | 6,096,996 | 0 | 628,506 |
| C005933 | - | 232,850 | - | - | - | (232,850) |
| C006066 | - | 259,890 | - | - | - | (259,890) |
| C006397 | 303,000 | - | - | - | (303,000) | - |
| C006416 | - | 257,412 | - | - | - | (257,412) |
| C006733 | - | 3,707,140 | - | - | - | (3,707,140) |
| C006826 | 690,611 | - | 248,672 | - | (441,939) | - |
| C006911 | - | 1,481,142 | - | - | - | (1,481,142) |
| C006997 | 78,451 | - | (120) | 9,927 | (78,571) | 9,927 |
| C007284 | (436,491) | - | (1,390,185) | - | (953,694) | - |
| C007587 | - | 21,073,693 | - | 1,472,202 | - | (19,601,491) |
| C007759 | - | 9,409,950 | - | - | - | (9,409,950) |
| C007878 | (17,351,148) | - | (16,853,896) | - | 497,252 | - |
| C008148 | 176,717 | - | (139,287) | - | (316,004) | - |
| C008495 | - | 1,447,375 | - | - | - | (1,447,375) |
| C008552 | 4,514,416 | - | 2,762,080 | - | (1,752,336) | - |
| C008759 | (879,264) | - | (2,388,730) | - | (1,509,466) | - |
| C009027 | - | 481,960 | - | - | - | (481,960) |
| C009134 | 832,944 | - | (332,556) | - | (1,165,500) | - |
| C009145 | 967,830 | - | (243,237) | - | (1,211,067) | - |
| C009195 | - | 3,517,255 | - | - | - | (3,517,255) |
| C009423 | - | 223,534 | - | - | - | (223,534) |
| C009507 | (564,732) | - | (564,732) | - | - | - |
| C009663 | 1,644,555 | - | 54,109 | - | (1,590,446) | - |
| C010006 | - | 577,777 | - | - | - | (577,777) |
| C010383 | (238,730) | - | (528,169) | - | (289,439) | - |
| C010601 | - | 2,192,676 | - | - | - | (2,192,676) |
| C010604 | 449,385 | - | 20,337 | - | (429,048) | - |
| C010713 | - | 8,939 | - | - | - | (8,939) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| C011621 | (1,482,532) | 1,308,702 | (32,351) | - | 1,450,181 | (1,308,702) |
| C011646 | 748,339 | - | 198,360 | 598,421 | (549,979) | 598,421 |
| C012457 | - | 3,591,144 | - | - | - | (3,591,144) |
| C012458 | (164,755) | - | (1,019,655) | - | (854,900) | - |
| C012758 | - | 2,273,651 | - | - | - | (2,273,651) |
| C012800 | - | 155,500 | - | - | - | (155,500) |
| C013745 | - | 184,500 | - | - | - | (184,500) |
| C013798 | - | 14,700,100 | - | - | - | (14,700,100) |
| C013886 | 2,799,382 | - | 1,165,472 | - | (1,633,910) | - |
| C013971 | - | 4,763,400 | - | - | - | (4,763,400) |
| C014059 | 181,028 | 7,552 | 146,790 | 75,447 | (34,238) | 67,895 |
| C014065 | 590,136 | - | 129,198 | - | (460,938) | - |
| C014204 | 84,000 | - | - | - | (84,000) | - |
| C014234 | (65,556) | - | (606,947) | - | (541,390) | - |
| C014403 | (741,343) | 364,791 | (944,804) | 949,039 | (203,461) | 584,248 |
| C014564 | - | 334,125 | - | - | - | (334,125) |
| C014734 | 599,557 | - | - | - | (599,557) | - |
| C015004 | 126,595 | 72,506 | 126,595 | 80,486 | - | 7,980 |
| C015435 | (39,143) | 91,752 | (39,143) | 180,177 | - | 88,425 |
| C015652 | - | 7,964 | - | - | - | (7,964) |
| C015936 | 4,851 | 76,831 | (781) | 107,497 | (5,632) | 30,666 |
| C015990 | - | 4,822,000 | - | - | - | (4,822,000) |
| C016415 | - | 16,677 | - | - | - | (16,677) |
| C016463 | - | 15,000 | - | - | - | (15,000) |
| C016626 | (105,422) | - | (208,726) | - | (103,304) | - |
| C016719 | - | 5,100,702 | - | - | - | (5,100,702) |
| C016731 | - | 287,949 | - | - | - | (287,949) |
| C016873 | - | 138,425 | - | - | - | (138,425) |
| C016909 | 87,150 | - | - | - | (87,150) | - |
| C017044 | - | 29,000 | - | - | - | (29,000) |
| C017055 | - | 979,800 | - | - | - | (979,800) |
| C017057 | - | 141,200 | - | - | - | (141,200) |
| C017130 | - | 134,892 | - | - | - | (134,892) |
| C017136 | (41,520) | - | (101,072) | - | (59,552) | - |
| C017215 | 244,827 | - | (283,677) | - | (528,504) | - |
| C017423 | 1,125,092 | - | 925,508 | - | (199,584) | - |
| C017477 | - | 286,000 | - | - | - | (286,000) |
| C017706 | 10,704 | - | (7,006) | - | (17,710) | - |
| C017781 | (324,117) | - | (578,856) | 232,984 | (254,739) | 232,984 |
| C017815 | - | 14,687 | - | - | - | (14,687) |
| C017817 | (317,843) | - | (494,636) | - | (176,793) | - |
| C017873 | - | 127,400 | - | - | - | (127,400) |
| C017994 | - | 289,027 | - | - | - | (289,027) |
| C018272 | (826,014) | - | (1,514,166) | - | (688,152) | - |
| C018278 | - | 2,190,000 | - | - | - | (2,190,000) |
| C018511 | - | 133 | (1) | 133 | (1) | - |
| C018612 | - | 10,757 | - | - | - | (10,757) |
| C018650 | 6,433,539 | - | 4,224,339 | - | (2,209,200) | - |
| C018678 | - | 10,000 | - | - | - | (10,000) |
| C018691 | - | 1,425,424 | - | - | - | (1,425,424) |
| C019072 | 244,030 | - | (63,549) | 108,721 | (307,579) | 108,721 |
| C019134 | - | 724,000 | - | - | - | (724,000) |
| C019178 | - | 10,199,600 | - | 3,173,143 | - | (7,026,457) |

Miscodes Suspense Accounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| C019242 | - | 849,563 | - | - | - | (849,563) |
| C019540 | - | 157,720 | - | - | - | (157,720) |
| C019597 | - | 189,000 | 31,500 | - | 31,500 | (189,000) |
| C019989 | - | 101,800 | - | - | - | (101,800) |
| C020496 | - | 155,700 | - | - | - | (155,700) |
| C020515 | (197,503) | - | (641,676) | - | (444,172) | - |
| C020575 | (448,833) | - | (493,365) | - | (44,532) | - |
| C020607 | 53,228 | - | - | - | (53,228) | - |
| C020612 | 3,021,099 | - | (2,588,599) | - | (5,609,698) | - |
| C020676 | - | 4,050,000 | (19,116,729) | 4,050,000 | (19,116,729) | - |
| C020816 | - | 1,037,300 | - | - | - | (1,037,300) |
| C021155 | - | 134,907 | - | - | - | (134,907) |
| C021550 | - | 641,500 | - | - | - | (641,500) |
| C022029 | - | 203,352 | - | - | - | (203,352) |
| C022460 | - | 6,478,700 | - | - | - | (6,478,700) |
| C035214 | - | 873,499 | - | - | - | (873,499) |
| C035713 | (5,715,322) | 1,992,489 | (1,255,155) | - | 4,460,166 | (1,992,489) |
| C035820 | - | 29,191 | - | - | - | (29,191) |
| C037436 | 578,801 | - | 183,081 | - | (395,720) | - |
| C056575 | - | 1,928,812 | - | - | - | (1,928,812) |
| C058403 | - | 1,290,200 | - | - | - | (1,290,200) |
| C059723 | (56,470) | - | (83,165) | 37,452 | (26,695) | 37,452 |
| C100365 | - | 688,709 | - | - | - | (688,709) |
| C101081 | - | 89 | - | - | - | (89) |
| C101445 | - | 133,630 | - | - | - | (133,630) |
| C101884 | (1,732) | 6,039,714 | - | 34,649 | 1,732 | (6,005,065) |
| C103706 | (72,286) | 10,967,251 | (72,286) | 542,778 | - | (10,424,473) |
| C104392 | - | 22,966 | - | - | - | (22,966) |
| C104954 | - | 126,795 | - | - | - | (126,795) |
| C105295 | - | 16,697 | - | - | - | (16,697) |
| C105394 | - | 262,024 | - | - | - | (262,024) |
| C105549 | - | 129,111 | - | - | - | (129,111) |
| C105692 | - | 1,208,845 | - | - | - | (1,208,845) |
| C107044 | - | 213,906 | - | - | - | (213,906) |
| C107215 | - | 47,419 | - | - | - | (47,419) |
| C107368 | - | 142,628 | - | - | - | (142,628) |
| C107715 | - | 469,041 | - | - | - | (469,041) |
| C107729 | - | 1,042,111 | - | - | - | (1,042,111) |
| C108326 | - | 12,981 | - | - | - | (12,981) |
| C108342 | - | 47,438 | - | - | - | (47,438) |
| C125493 | 13,370 | - | - | - | (13,370) | - |
| C127062 | - | 15,771,226 | - | - | - | (15,771,226) |
| C128588 | - | 215,290 | - | - | - | (215,290) |
| C146504 | (1,800,046) | 110,234,437 | (1,800,046) | 369,546 | - | (109,864,891) |
| C166000 | - | 10,671,530 | - | - | - | (10,671,530) |
| C168008 | - | 13,115,076 | - | - | - | (13,115,076) |
| C168122 | - | 38,749,155 | - | - | - | (38,749,155) |
| C168311 | - | 1,113,379 | - | - | - | (1,113,379) |
| C177604 | - | 265,469 | - | - | - | (265,469) |
| C178417 | - | 1,331,672 | - | - | - | (1,331,672) |
| C228186 | - | 4,838,024 | - | - | - | (4,838,024) |
| C228257 | 622,511 | - | (368,479) | - | (990,990) | - |
| C228453 | - | 231,000 | - | - | - | (231,000) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| C242473 | - | 511,477 | - | - | - | (511,477) |
| C246530 | 275,336 | - | 70,802 | - | (204,534) | - |
| C251541 | 1,666,782 | - | 221,832 | - | (1,444,950) | - |
| C272270 | - | 100,204 | - | - | - | (100,204) |
| C332189 | 337,414 | - | (172,466) | - | (509,880) | - |
| C339501 | (120,834) | - | (1,162,167) | 70,188 | (1,041,333) | 70,188 |
| C349705 | 1,676,554 | - | (588,008) | - | (2,264,562) | - |
| C357152 | 1,185,380 | - | 86,380 | - | (1,099,000) | - |
| C372983 | - | 168,822 | - | - | - | (168,822) |
| C373517 | - | 375,520 | - | - | - | (375,520) |
| C401837 | - | 295,106 | - | - | - | (295,106) |
| C402399 | - | 80,332 | - | - | - | (80,332) |
| C410086 | - | 367,500 | - | - | - | (367,500) |
| C410102 | - | 8,328,770 | - | - | - | (8,328,770) |
| C410157 | 194,520 | - | - | - | (194,520) | - |
| C410200 | - | 844,067 | - | - | - | (844,067) |
| C411121 | - | 126,289 | - | - | - | (126,289) |
| C421001 | (177,766) | - | (250,288) | - | (72,522) | - |
| C424419 | 387,110 | - | (248,700) | - | (635,810) | - |
| C430000 | 222,925 | - | - | 18,203 | (222,925) | 18,203 |
| C456688 | 3,407,593 | 169,686,539 | 3,407,593 | 13,003,509 | - | (156,683,030) |
| C467051 | - | 346,479 | - | - | - | (346,479) |
| C470742 | - | 318,400 | - | - | - | (318,400) |
| C470760 | 56,280 | - | - | - | (56,280) | - |
| C486067 | - | 6,299 | - | - | - | (6,299) |
| C487155 | 204,647 | 156,843 | 204,647 | 193,843 | - | 37,000 |
| C514027 | (1,240) | 14,064 | (1,240) | 2,800 | - | (11,264) |
| C563321 | 1,196,339 | - | (206,919) | - | (1,403,258) | - |
| C567522 | 1,459,455 | - | 46,935 | - | (1,412,520) | - |
| C588723 | 60,002 | - | 12,192 | - | (47,810) | - |
| C620563 | (2,720) | 543,530 | - | - | 2,720 | (543,530) |
| C621009 | (685) | - | (685) | - | - | - |
| C684138 | (340,751) | - | (392,551) | - | (51,800) | - |
| C702323 | 36,320 | - | - | - | (36,320) | - |
| C703661 | - | 301,320 | - | - | - | (301,320) |
| C707275 | - | 25,990 | - | - | - | (25,990) |
| C710591 | 1,635,797 | - | (788,446) | - | (2,424,243) | - |
| C720205 | 1,607,200 | - | (30,800) | - | (1,638,000) | - |
| C794206 | (172,432) | - | (1,186,670) | - | (1,014,237) | - |
| C802475 | - | 7,232,832 | - | - | - | (7,232,832) |
| D000039 | - | 19,834 | - | - | - | (19,834) |
| D000042 | - | 484,721 | - | - | - | (484,721) |
| D000212 | - | 1,457,147 | - | - | - | (1,457,147) |
| D000361 | - | 850,855 | 202,980 | - | 202,980 | (850,855) |
| D000458 | - | 1,725,390 | - | - | - | (1,725,390) |
| D000809 | - | 111,206 | - | - | - | (111,206) |
| D001416 | 1,202,372 | - | 640,844 | - | (561,528) | - |
| D001524 | 914,342 | - | 259,608 | - | (654,734) | - |
| D001694 | - | 525,837 | - | - | - | (525,837) |
| D001810 | - | 275,221 | - | - | - | (275,221) |
| D002069 | 458,309 | - | (46,989) | 52,963 | (505,297) | 52,963 |
| D003292 | - | 940,010 | - | - | - | (940,010) |
| D004312 | - | 92,254 | - | - | - | (92,254) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| D005169 | - | 2,515,375 | - | - | - | (2,515,375) |
| D005231 | - | 134,534 | - | - | - | (134,534) |
| D005791 | - | 2,630,344 | - | - | - | (2,630,344) |
| D006205 | - | 444,688 | - | - | - | (444,688) |
| D006412 | - | 9,068,400 | - | - | - | (9,068,400) |
| D006445 | - | 3,834,000 | - | - | - | (3,834,000) |
| D006514 | 625,084 | - | - | - | (625,084) | - |
| D006561 | - | 115,220 | - | - | - | (115,220) |
| D006775 | - | 755,207 | - | - | - | (755,207) |
| D006952 | - | 720 | - | - | - | (720) |
| D007088 | - | 598,771 | - | - | - | (598,771) |
| D007250 | - | 31,137 | - | - | - | (31,137) |
| D007257 | - | 714,000 | - | - | - | (714,000) |
| D007493 | - | 110,800 | - | - | - | (110,800) |
| D007549 | - | 168,746 | - | - | - | (168,746) |
| D007881 | - | 143,500 | - | - | - | (143,500) |
| D008032 | - | 396,211 | - | - | - | (396,211) |
| D008146 | (382,970) | - | (497,952) | - | (114,982) | - |
| D008350 | 1,717 | - | - | - | (1,717) | - |
| D008519 | - | 1,365,039 | - | - | - | (1,365,039) |
| D008604 | - | 228,160 | - | - | - | (228,160) |
| D008657 | - | 110,260 | - | - | - | (110,260) |
| D008662 | (115,797) | - | (115,797) | - | - | - |
| D008693 | - | 114,440 | - | - | - | (114,440) |
| D008733 | - | 48,094 | - | - | - | (48,094) |
| D009271 | - | 20,957,687 | - | 3,774,000 | - | (17,183,687) |
| D009688 | - | 1,344,000 | - | - | - | (1,344,000) |
| D009761 | 395,932 | - | - | - | (395,932) | - |
| D009798 | - | 1,142,293 | - | - | - | (1,142,293) |
| D010138 | (221,831) | - | (530,608) | - | (308,777) | - |
| D010204 | - | 498,420 | - | - | - | (498,420) |
| D010346 | - | 441,868 | - | - | - | (441,868) |
| D010379 | - | 272,600 | - | - | - | (272,600) |
| D010443 | - | 475,200 | - | - | - | (475,200) |
| D010449 | - | 1,637,458 | - | - | - | (1,637,458) |
| D010710 | 950,098 | - | 658,171 | - | (291,927) | - |
| D010964 | (95) | - | (140) | - | (45) | - |
| D011105 | - | 245,652 | - | - | - | (245,652) |
| D011232 | 756,648 | - | (83,952) | - | (840,600) | - |
| D011326 | - | 7,854,978 | 187,880 | - | 187,880 | (7,854,978) |
| D011747 | - | 6,487 | - | - | - | (6,487) |
| D017671 | - | 63,333 | - | - | - | (63,333) |
| D019606 | 636,322 | - | (273,028) | 107,984 | (909,350) | 107,984 |
| D020961 | - | 411,080 | - | - | - | (411,080) |
| D020989 | - | 552,838 | - | - | - | (552,838) |
| D022102 | - | 1,695,473 | - | - | - | (1,695,473) |
| D022147 | - | 654,299 | - | - | - | (654,299) |
| D022255 | - | 1,130,352 | - | 126,897 | - | (1,003,455) |
| D022264 | - | 87,810 | - | - | - | (87,810) |
| D022300 | - | 66,124 | - | - | - | (66,124) |
| D022585 | - | 1,887,053 | - | - | - | (1,887,053) |
| D023502 | - | 1,667,924 | - | - | - | (1,667,924) |
| D027857 | - | 117,788 | - | - | - | (117,788) |

Miscodes Suspense Accounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| D027964 | - | 245,344 | - | - | - | (245,344) |
| D028564 | - | - | - | - | - | - |
| D029908 | - | 221,904 | - | - | - | (221,904) |
| D053104 | - | 1,088,638 | - | - | - | (1,088,638) |
| D100102 | - | 37,631 | - | - | - | (37,631) |
| D100603 | - | 2,480,932 | - | - | - | (2,480,932) |
| D102478 | - | 21,533 | - | - | - | (21,533) |
| D103413 | - | 605,688 | - | - | - | (605,688) |
| D103427 | - | 319,852 | - | 3,200 | - | (316,652) |
| D103884 | - | 2,859,529 | - | - | - | (2,859,529) |
| D103893 | 16,536 | - | - | - | (16,536) | - |
| D135650 | - | 72,000 | - | - | - | (72,000) |
| D195005 | 1,196,782 | - | 527,632 | - | (669,150) | - |
| D198413 | - | 2,876 | - | - | - | (2,876) |
| D198422 | - | 71,148 | - | - | - | (71,148) |
| D203611 | - | 1,376,918 | - | - | - | (1,376,918) |
| D213209 | - | 285,200 | - | - | - | (285,200) |
| D310292 | - | 19,317 | - | - | - | (19,317) |
| D311317 | (16,409) | - | (16,409) | - | - | - |
| D327701 | 1,428,564 | - | 330,694 | - | (1,097,870) | - |
| D327952 | 126,683 | - | (50,228) | 106,058 | (176,911) | 106,058 |
| D387691 | 268,642 | - | (56,758) | 22,051 | (325,400) | 22,051 |
| D432357 | - | 14,191 | - | - | - | (14,191) |
| D489082 | (330,780) | - | (402,999) | - | (72,219) | - |
| D491916 | 622,875 | - | - | - | (622,875) | - |
| E000040 | 867,015 | - | 16,845 | - | (850,170) | - |
| E001075 | 814,968 | - | (159,628) | - | (974,596) | - |
| E001150 | 432,843 | - | (1,828) | 54,389 | (434,670) | 54,389 |
| E001157 | - | 9,100 | - | - | - | (9,100) |
| E001444 | - | 135,772 | - | - | - | (135,772) |
| E001851 | 771,006 | - | 1,537,785 | - | 766,779 | - |
| E002015 | 828,766 | - | (292,781) | - | (1,121,547) | - |
| E002194 | - | 1,642 | - | - | - | (1,642) |
| E003534 | (514,495) | 586,995 | (514,495) | 586,995 | - | - |
| E003548 | - | 92,246 | - | - | - | (92,246) |
| E003572 | (247,019) | 33,836,100 | - | - | 247,019 | (33,836,100) |
| E003630 | - | 2,258,733 | - | - | - | (2,258,733) |
| E003710 | (402) | 219,528 | - | 2,476 | 402 | (217,052) |
| E003745 | 500,596 | - | (1,251,308) | - | (1,751,904) | - |
| E003816 | - | 32,142 | - | - | - | (32,142) |
| E004008 | 1,659,996 | - | (167,027) | - | (1,827,023) | - |
| E004129 | - | 7,256,000 | - | - | - | (7,256,000) |
| E004212 | (374,187) | - | (374,187) | - | - | - |
| E004628 | 483,393 | - | (276,216) | - | (759,608) | - |
| E004662 | 903,813 | - | (197,307) | - | (1,101,120) | - |
| E004770 | - | 12,531 | - | - | - | (12,531) |
| E004980 | - | 378,300 | - | - | - | (378,300) |
| E005024 | (12,461,916) | 108,468,552 | 173,251 | - | 12,635,168 | (108,468,552) |
| E005429 | - | 617,220 | - | - | - | (617,220) |
| E005494 | (4,412,075) | - | (8,194,144) | - | (3,782,069) | - |
| E005515 | - | 52,026 | - | - | - | (52,026) |
| E006008 | (266) | 37,428 | 2,190 | 8,719 | 2,456 | (28,708) |
| E006043 | 355,938 | - | - | - | (355,938) | - |

Miscode's Sufficient Amounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| E006096 | - | 6,319,538 | - | - | - | (6,319,538) |
| E006117 | 1,120,786 | 55,129 | (728,031) | 55,129 | (1,848,817) | - |
| E006215 | - | 1,753,249 | - | - | - | (1,753,249) |
| E006382 | - | 5,170,250 | - | - | - | (5,170,250) |
| E006391 | 802 | - | - | - | (802) | - |
| E006495 | 349,363 | - | (760,309) | - | (1,109,672) | - |
| E006503 | 207,995 | - | 118,472 | - | (89,523) | - |
| E006586 | 69,803 | - | (625,461) | 1,049,235 | (695,265) | 1,049,235 |
| E006589 | - | 4,106,467 | - | - | - | (4,106,467) |
| E006833 | 268,700 | - | - | - | (268,700) | - |
| E007468 | 27,660 | - | (101,340) | - | (129,000) | - |
| E007539 | - | 988,432 | - | - | - | (988,432) |
| E007967 | - | 2,932,608 | - | - | - | (2,932,608) |
| E008150 | 227,845 | - | - | - | (227,845) | - |
| E008746 | - | 257,525 | - | - | - | (257,525) |
| E009110 | - | 8,965,935 | - | - | - | (8,965,935) |
| E009410 | - | 1,345,707 | - | - | - | (1,345,707) |
| E009468 | - | 194,956 | - | - | - | (194,956) |
| E009619 | 22 | - | - | - | (22) | - |
| E009622 | - | 63,504 | - | - | - | (63,504) |
| E010058 | - | 63,089 | - | - | - | (63,089) |
| E100102 | (1,942,043) | - | 155,190 | - | 2,097,233 | - |
| E100301 | (558,484) | 48,357,048 | (76,926) | - | 481,558 | (48,357,048) |
| E100487 | - | 106,233 | - | - | - | (106,233) |
| E100651 | 887,823 | 4,191,128 | 887,823 | 7,170 | (0) | (4,183,958) |
| E100669 | - | 13,532,931 | - | - | - | (13,532,931) |
| E100872 | - | 191,353 | - | - | - | (191,353) |
| E101478 | - | 15,277 | - | - | - | (15,277) |
| E101581 | - | 199,157 | - | - | - | (199,157) |
| E101636 | - | 238,089 | - | - | - | (238,089) |
| E101874 | - | 275,447 | - | - | - | (275,447) |
| E101951 | (3,794) | 207,653 | - | - | 3,794 | (207,653) |
| E102721 | - | - | - | - | - | - |
| E125607 | - | 2,706,846 | - | - | - | (2,706,846) |
| E185016 | - | 2,990,391 | - | - | - | (2,990,391) |
| E274009 | (24,773) | - | (24,773) | - | - | - |
| E332526 | - | 2,481 | - | - | - | (2,481) |
| E349885 | 994,493 | - | (106,585) | - | (1,101,078) | - |
| E429423 | 2,146,370 | - | 1,267,970 | - | (878,400) | - |
| E460922 | (116,002) | - | (459,554) | 20,671 | (343,551) | 20,671 |
| E463108 | - | 134,928 | - | - | - | (134,928) |
| E477255 | 1,463,924 | - | 223,544 | - | (1,240,380) | - |
| E517006 | 1,739,814 | - | (3,286,991) | - | (5,026,805) | - |
| E534327 | 254,609 | - | - | 53,767 | (254,609) | 53,767 |
| E572017 | - | 184,220 | - | - | - | (184,220) |
| E591443 | 235,285 | - | (740,990) | - | (976,275) | - |
| E700806 | - | 531,593 | - | - | - | (531,593) |
| F000437 | (145,244) | 92,213 | (208,125) | 92,213 | (62,882) | - |
| F000799 | 91,779 | - | (576,613) | - | (668,392) | - |
| F001554 | - | 42,870,120 | - | - | - | (42,870,120) |
| F002003 | - | 434,265 | - | - | - | (434,265) |
| F002759 | - | 1,299,211 | - | - | - | (1,299,211) |
| F002825 | 278,309 | - | (27,391) | - | (305,700) | - |

Miscodes Suspense Accounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| F002925 | 1,783,284 | - | 387,840 | 57,012 | (1,395,444) | 57,012 |
| F003159 | - | 758,667 | - | - | - | (758,667) |
| F003748 | - | 100,850 | - | - | - | (100,850) |
| F003786 | - | 5,963,699 | - | - | - | (5,963,699) |
| F003873 | - | 321,808 | - | - | - | (321,808) |
| F004002 | - | 30,433 | - | 120 | - | (30,313) |
| F004398 | - | 329,305 | - | - | - | (329,305) |
| F005012 | - | 143,490 | - | - | - | (143,490) |
| F005109 | 67,057 | - | - | - | (67,057) | - |
| F005190 | - | 653,673 | - | - | - | (653,673) |
| F005335 | - | 461,755 | - | - | - | (461,755) |
| F005432 | - | 374,500 | - | - | - | (374,500) |
| F005971 | 1,368,228 | - | 47,118 | - | (1,321,110) | - |
| F006852 | - | 1,811,312 | - | - | - | (1,811,312) |
| F007053 | - | 186,384 | - | - | - | (186,384) |
| F007142 | 5,446,519 | - | 1,131,319 | - | (4,315,200) | - |
| F007400 | - | 108,479 | - | - | - | (108,479) |
| F007457 | - | 181,688 | - | - | - | (181,688) |
| F007582 | 331,753 | - | - | - | (331,753) | - |
| F007628 | - | 397,133 | - | - | - | (397,133) |
| F007687 | - | 174,358 | - | - | - | (174,358) |
| F007769 | 641,679 | - | (55,134) | - | (696,812) | - |
| F007850 | (6,380,400) | 550,898,795 | 985,078 | - | 7,365,478 | (550,898,795) |
| F008155 | 2,341,028 | - | (80,973) | - | (2,422,000) | - |
| F008754 | - | 4,771,528 | - | 724,054 | - | (4,047,474) |
| F008897 | - | 841,492 | - | - | - | (841,492) |
| F008902 | 1,057,121 | - | 324,557 | - | (732,564) | - |
| F008952 | - | 677,748 | - | - | - | (677,748) |
| F009061 | - | 758,046 | - | - | - | (758,046) |
| F009211 | - | 14,667 | - | - | - | (14,667) |
| F009644 | 149,748 | 156,927 | 126,647 | 156,927 | (23,101) | - |
| F009749 | 8,550 | - | - | - | (8,550) | - |
| F009984 | - | - | 949 | - | 949 | - |
| F010213 | - | 54,592 | - | - | - | (54,592) |
| F010538 | 4,875 | - | (672) | 5,461 | (5,546) | 5,461 |
| F031272 | - | 294,580 | - | - | - | (294,580) |
| F032627 | - | 1,459,884 | - | - | - | (1,459,884) |
| F033038 | (688,465) | 149,866 | (876,065) | 149,866 | (187,600) | - |
| F034313 | 266,188 | - | (357,812) | - | (624,000) | - |
| F039527 | (14,375,660) | - | (4,957,420) | - | 9,418,240 | - |
| F100012 | - | 5,491,166 | - | - | - | (5,491,166) |
| F100375 | - | 868,138 | - | - | - | (868,138) |
| F101664 | - | 797,613 | - | 2,500 | - | (795,113) |
| F102062 | - | 620,027 | - | - | - | (620,027) |
| F102291 | - | 972,680 | - | - | - | (972,680) |
| F102991 | (7,548,909) | 82,002 | (14,051) | - | 7,534,858 | (82,002) |
| F104640 | - | 309,829 | - | - | - | (309,829) |
| F105042 | - | 77,315 | - | - | - | (77,315) |
| F106093 | 464,842 | - | - | - | (464,842) | - |
| F106792 | (15,111) | 14,801 | - | - | 15,111 | (14,801) |
| F106990 | - | 234,761 | - | - | - | (234,761) |
| F149832 | 131,209 | - | (38,851) | - | (170,060) | - |
| F155156 | 84,552 | 42,159 | (891,657) | - | (976,209) | (42,159) |

Miscodes Suspense Account
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| F180066 | (231,699) | - | (965,058) | - | (733,359) | - |
| F208797 | 591,958 | - | - | 56,068 | (591,958) | 56,068 |
| F227436 | 1,024,620 | - | (3,030) | - | (1,027,650) | - |
| F228701 | - | 971,753 | - | 93,438 | - | (878,315) |
| F273876 | 563,678 | - | - | 27,906 | (563,678) | 27,906 |
| F277220 | 1,936,714 | - | 434,371 | - | (1,502,343) | - |
| F294390 | 2,982,598 | - | 404,422 | - | (2,578,176) | - |
| F301612 | 2,186,007 | - | (14,193) | - | (2,200,200) | - |
| F316651 | 1,869,548 | - | (33,094) | - | (1,902,642) | - |
| F319391 | 1,242,644 | - | 493,844 | - | (748,800) | - |
| F440570 | 232,400 | 207,173 | 94,584 | 207,173 | (137,816) | - |
| F442854 | 8,684,470 | - | 7,451,290 | 112,660 | (1,233,180) | 112,660 |
| F443808 | 96,600,431 | - | 155,948,938 | - | 59,348,507 | - |
| F497037 | - | 379,252 | - | - | - | (379,252) |
| F497484 | - | 554,220 | - | - | - | (554,220) |
| F530919 | 20,279 | - | - | - | (20,279) | - |
| F538065 | - | 12,071,434 | - | - | - | (12,071,434) |
| F632676 | - | 398,088 | - | - | - | (398,088) |
| F632809 | - | 786,378 | - | - | - | (786,378) |
| F633167 | - | 922,860 | - | - | - | (922,860) |
| F633247 | - | 39,605 | - | - | - | (39,605) |
| F633354 | - | 46,413 | - | - | - | (46,413) |
| F633372 | - | 207,197 | - | - | - | (207,197) |
| F633425 | - | 99,363 | - | - | - | (99,363) |
| F633443 | - | 93,520 | - | - | - | (93,520) |
| F633452 | - | 3,107,021 | - | - | - | (3,107,021) |
| F633513 | - | 323,390 | - | - | - | (323,390) |
| F633559 | - | 212,400 | - | - | - | (212,400) |
| F633598 | - | 135,762 | - | - | - | (135,762) |
| F633739 | 232,290 | - | - | - | (232,290) | - |
| F633844 | - | 81,720 | - | - | - | (81,720) |
| F640024 | (447,506) | - | (449,917) | - | (2,411) | - |
| F657300 | - | 671,360 | - | - | - | (671,360) |
| G000566 | 186,689 | 222,868 | 23,681 | 222,868 | (163,008) | - |
| G001316 | - | 531,923 | - | - | - | (531,923) |
| G001557 | - | 500,965 | - | 1,766 | - | (499,199) |
| G001923 | 1,010,577 | - | (327,347) | - | (1,337,924) | - |
| G002109 | 1,883,700 | - | (240,086) | - | (2,123,786) | - |
| G002227 | - | 29,544 | - | - | - | (29,544) |
| G002459 | - | 1,793,400 | - | - | - | (1,793,400) |
| G002644 | 210,439 | - | (497,326) | - | (707,765) | - |
| G002943 | - | 1,961,167 | - | - | - | (1,961,167) |
| G002966 | 2,915,147 | - | 517,366 | - | (2,397,781) | - |
| G003114 | - | 122,721 | - | - | - | (122,721) |
| G003614 | - | 335,061 | - | - | - | (335,061) |
| G003698 | 5,747 | - | - | - | (5,747) | - |
| G003847 | 179,158 | - | - | - | (179,158) | - |
| G004229 | - | 39,000 | - | - | - | (39,000) |
| G004246 | 1,948,055 | 1,759 | - | - | (1,948,055) | (1,759) |
| G004426 | - | 432,001 | - | - | - | (432,001) |
| G004660 | 241,961 | - | - | - | (241,961) | - |
| G005117 | (88,245) | - | (183,922) | 482,348 | (95,677) | 482,348 |
| G005320 | - | 368,080 | - | - | - | (368,080) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| G005407 | (51,163) | - | (661,123) | - | (609,960) | - |
| G005764 | - | 569,776 | - | - | - | (569,776) |
| G005788 | - | 321,501 | - | - | - | (321,501) |
| G006175 | 1,262,895 | - | (27,113) | - | (1,290,008) | - |
| G006293 | - | 3,191,691 | - | - | - | (3,191,691) |
| G006294 | - | - | (123,300) | - | (123,300) | - |
| G006418 | (199,125) | - | (332,424) | 55,701 | (133,299) | 55,701 |
| G006974 | - | 3,972,503 | - | - | - | (3,972,503) |
| G007090 | 1,062,549 | - | (74,188) | 281,402 | (1,136,738) | 281,402 |
| G007202 | - | 2,961,728 | - | 857,472 | - | (2,104,256) |
| G007313 | 7,536,414 | - | 5,345,414 | - | (2,191,000) | - |
| G007373 | - | 7,033,108 | - | - | - | (7,033,108) |
| G007597 | 16,792 | 5,019 | (68,789) | 5,019 | (85,581) | - |
| G007654 | 2,611,700 | - | - | - | (2,611,700) | - |
| G007730 | - | 39,276 | - | - | - | (39,276) |
| G007834 | - | 379,184 | - | - | - | (379,184) |
| G008066 | 2,668,893 | 282,011 | 2,348,569 | 1,618,186 | (320,324) | 1,336,174 |
| G008124 | 58,201 | 10,769 | 58,201 | 234,619 | - | 223,850 |
| G008197 | 63,821 | - | - | - | (63,821) | - |
| G008319 | - | 674,859 | - | - | - | (674,859) |
| G008335 | - | 2,810,640 | - | - | - | (2,810,640) |
| G008763 | 5,727,741 | - | (5,633,693) | - | (11,361,434) | - |
| G008790 | 945,566 | - | - | - | (945,566) | - |
| G008911 | - | 3,339,575 | - | - | - | (3,339,575) |
| G009094 | - | 197,250 | - | - | - | (197,250) |
| G009388 | - | 873,340 | - | - | - | (873,340) |
| G009407 | (41,798) | 178,686 | - | - | 41,798 | (178,686) |
| G009574 | - | 1,357,800 | - | - | - | (1,357,800) |
| G010122 | - | 474,000 | - | - | - | (474,000) |
| G010737 | - | - | - | - | - | - |
| G015012 | 5,432,419 | - | 3,027,600 | - | (2,404,819) | - |
| G016413 | 4,820,616 | - | 3,547,976 | - | (1,272,640) | - |
| G032057 | - | - | - | - | - | - |
| G033412 | - | 28,961 | - | - | - | (28,961) |
| G071656 | 482,190 | - | (221,073) | - | (703,264) | - |
| G100716 | - | 33,140 | - | - | - | (33,140) |
| G100736 | (316) | 369 | - | - | 316 | (369) |
| G101004 | - | 96,725 | - | - | - | (96,725) |
| G102805 | 2,256,311 | 4,309,969 | 2,256,311 | 4,179,343 | - | (130,626) |
| G102875 | - | 258,160 | - | - | - | (258,160) |
| G103032 | 58,926 | - | - | - | (58,926) | - |
| G103241 | - | 2,303,513 | - | - | - | (2,303,513) |
| G103831 | (169,819) | - | (113,941) | - | 55,878 | - |
| G103884 | - | 426,934 | - | - | - | (426,934) |
| G115244 | 56,566 | 260,004 | 48,726 | 260,004 | (7,840) | - |
| G227999 | 216,263 | - | (864,138) | - | (1,080,400) | - |
| G232858 | - | 84,144 | - | - | - | (84,144) |
| G304664 | - | 547,200 | - | - | - | (547,200) |
| G340107 | 234,610 | - | (297,920) | - | (532,530) | - |
| G414126 | (160,305) | 3,158,838 | 147,689 | - | 307,993 | (3,158,838) |
| G487832 | (774,783) | - | (914,591) | - | (139,808) | - |
| G532409 | 4,369,017 | 632,650 | 3,229,942 | 632,650 | (1,139,075) | - |
| G533685 | - | 240,677 | - | - | - | (240,677) |

Misc. docs Sequence & Bounds
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| G535718 | 471,241 | - | 444,387 | - | (26,854) | - |
| G544879 | 436,133 | - | 129,179 | 28,295 | (306,955) | 28,295 |
| G552976 | - | 93,562,044 | - | - | - | (93,562,044) |
| G690336 | 38,627 | - | (323,743) | - | (362,370) | - |
| G709870 | - | 107,470 | - | - | - | (107,470) |
| G711304 | - | 565,665 | - | - | - | (565,665) |
| G713516 | - | 155,268 | - | - | - | (155,268) |
| G713552 | - | 273,265 | - | - | - | (273,265) |
| H000915 | 457,455 | - | 116,399 | 247,619 | (341,056) | 247,619 |
| H000948 | - | 1,595,866 | - | - | - | (1,595,866) |
| H001546 | - | 6,331 | - | - | - | (6,331) |
| H001864 | 11,441 | - | - | - | (11,441) | - |
| H001995 | - | 151,052 | - | - | - | (151,052) |
| H002294 | - | 208,003 | - | - | - | (208,003) |
| H002621 | - | 479,570 | - | - | - | (479,570) |
| H002664 | - | - | - | - | - | - |
| H003097 | - | 5,758,837 | - | - | - | (5,758,837) |
| H003211 | - | 199,336 | - | - | - | (199,336) |
| H003595 | 1,591,772 | 302,211 | 620,347 | 302,211 | (971,425) | - |
| H003787 | - | 56,100 | - | - | - | (56,100) |
| H003994 | - | 13,777,123 | - | - | - | (13,777,123) |
| H004471 | (372,582) | 1,649,374 | (1,652,753) | 1,649,374 | (1,280,171) | - |
| H005383 | 149,544 | - | (550,119) | - | (699,663) | - |
| H005588 | 2,930,660 | 35,492 | - | - | (2,930,660) | (35,492) |
| H006148 | - | 603,821 | - | - | - | (603,821) |
| H006888 | - | 458,901 | - | 217,902 | - | (240,999) |
| H006997 | 479,489 | - | 142,689 | - | (336,800) | - |
| H007019 | 1,133,697 | - | (976,383) | - | (2,110,080) | - |
| H007578 | 951,243 | 343,267 | (77,365) | 343,267 | (1,028,608) | - |
| H007597 | 20,696,802 | - | 18,802 | - | (20,678,000) | - |
| H007830 | (2,571) | - | (2,571) | - | - | - |
| H007882 | - | 1,059,310 | - | - | - | (1,059,310) |
| H008111 | 611,899 | - | - | - | (611,899) | - |
| H008530 | - | 2,267 | - | - | - | (2,267) |
| H009038 | 4,531,900 | - | - | - | (4,531,900) | - |
| H009439 | 1,034,737 | 3,449 | - | - | (1,034,737) | (3,449) |
| H010515 | - | 14,962 | - | - | - | (14,962) |
| H010675 | 9,083,074 | - | 2,229,669 | - | (6,853,405) | - |
| H010818 | 75,056 | - | (14,472) | - | (89,528) | - |
| H011070 | 181,536 | - | 36,636 | - | (144,900) | - |
| H011914 | 22,094 | - | (550,122) | - | (572,216) | - |
| H012046 | (26,175,335) | 119,093,852 | 221,164 | - | 26,396,499 | (119,093,852) |
| H012657 | - | 198,961 | - | - | - | (198,961) |
| H012746 | - | 2,227,000 | - | - | - | (2,227,000) |
| H012795 | 16,710 | 164,280 | (2,790) | 164,280 | (19,500) | - |
| H012803 | 82,141 | - | - | - | (82,141) | - |
| H012904 | - | 4,152,510 | - | - | - | (4,152,510) |
| H012927 | - | 194,565 | - | - | - | (194,565) |
| H012977 | - | 264,099 | - | - | - | (264,099) |
| H013021 | - | 554,673 | 368,050 | - | 368,050 | (554,673) |
| H013069 | - | 1,206,000 | - | - | - | (1,206,000) |
| H013070 | (89,250) | 987,828 | (284,750) | 2,777,078 | (195,500) | 1,789,250 |
| H013138 | 3,101,632 | - | 85,326 | - | (3,016,305) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| H013440 | 600,545 | - | 191,620 | 350,075 | (408,925) | 350,075 |
| H013594 | 1,290,651 | - | (153,032) | - | (1,443,683) | - |
| H013651 | 1,243,086 | - | 286,316 | - | (956,770) | - |
| H013708 | (96,225) | 28,948 | (191,427) | 28,948 | (95,202) | - |
| H013971 | - | 2,300 | - | - | - | (2,300) |
| H014056 | - | 163,095 | - | - | - | (163,095) |
| H014111 | 290,337 | 13,345 | 99,506 | 521,041 | (190,831) | 507,695 |
| H014349 | 1,025,325 | - | - | - | (1,025,325) | - |
| H014488 | 1,059,444 | - | 204,272 | - | (855,172) | - |
| H014718 | 783,357 | - | (418,595) | - | (1,201,952) | - |
| H014778 | 1,360,331 | - | (248,440) | - | (1,608,772) | - |
| H014903 | 1,035,154 | - | (445,220) | - | (1,480,373) | - |
| H015000 | 305,445 | 337,407 | 101,745 | 337,407 | (203,700) | - |
| H015003 | 1,895,978 | - | (111,069) | - | (2,007,047) | - |
| H015185 | - | 262,496 | - | - | - | (262,496) |
| H015356 | - | 1,640,500 | - | - | - | (1,640,500) |
| H015399 | - | 788,516 | - | - | - | (788,516) |
| H015732 | - | 1,314,495 | - | - | - | (1,314,495) |
| H015889 | 2,938,364 | - | 1,101,460 | - | (1,836,904) | - |
| H016060 | (218,827) | 7,649,593 | (248,132) | 7,649,593 | (29,305) | - |
| H016155 | - | 4,959,500 | - | - | - | (4,959,500) |
| H016162 | - | 23,047 | - | - | - | (23,047) |
| H016382 | 1,825,955 | - | 873,325 | - | (952,630) | - |
| H016478 | - | 125,500 | - | - | - | (125,500) |
| H016554 | 101,392 | 1,647,574 | 28,891 | 1,647,574 | (72,501) | (0) |
| H016713 | 260,130 | - | 11,130 | - | (249,000) | - |
| H017039 | 599,210 | - | (1,238,872) | - | (1,838,082) | - |
| H017280 | - | 235,235 | - | - | - | (235,235) |
| H017525 | - | 546,918 | - | - | - | (546,918) |
| H017570 | (11,175,705) | - | (11,256,455) | - | (80,750) | - |
| H017588 | 1,147,841 | - | 1,109,801 | - | (38,040) | - |
| H017793 | - | 791,179 | - | - | - | (791,179) |
| H017801 | - | 91,216 | - | - | - | (91,216) |
| H018180 | - | 64,950 | - | - | - | (64,950) |
| H018331 | - | 404,625 | - | - | - | (404,625) |
| H018449 | - | 156,076 | - | - | - | (156,076) |
| H018467 | - | 271,523 | - | - | - | (271,523) |
| H028516 | (1,246,250) | - | (2,109,839) | - | (863,589) | - |
| H039951 | 1,987,665 | - | (89,189) | - | (2,076,853) | - |
| H081930 | 859,714 | - | (114,556) | - | (974,270) | - |
| H082118 | - | 802,898 | - | - | - | (802,898) |
| H102070 | 7,162,421 | - | - | - | (7,162,421) | - |
| H102946 | 8,076,951 | - | 6,335,202 | - | (1,741,750) | - |
| H103423 | - | 352,488 | - | 173,430 | - | (179,058) |
| H106264 | 1,944 | - | - | - | (1,944) | - |
| H118848 | - | 441,099 | - | - | - | (441,099) |
| H155913 | 346,913 | - | 173,855 | - | (173,059) | - |
| H162317 | 1,962,835 | - | 419,658 | - | (1,543,177) | - |
| H172324 | - | 1,147,066 | - | - | - | (1,147,066) |
| H192446 | 412,068 | - | 10,204 | - | (401,864) | - |
| H197753 | 407,175 | - | (195,947) | - | (603,122) | - |
| H199001 | 398,465 | - | (265,517) | - | (663,982) | - |
| H248235 | 50,780 | - | 10,022 | - | (40,757) | - |

08-01-02082-cccDoc4730250FiledFiled12/06/12Entered12/06/12/2313:84:539:19 Main Appendix Document Documents 1 Through 2D0f086 of 253 994 of 1129

Miscode5 Suspense Accounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| H257849 | - | 56,423 | - | - | - | (56,423) |
| H257858 | - | 1,930,472 | - | - | - | (1,930,472) |
| H257867 | - | 149,250 | - | - | - | (149,250) |
| H257901 | - | 371,711 | - | - | - | (371,711) |
| H258214 | - | 2,172,356 | - | - | - | (2,172,356) |
| H258287 | - | 2,759,389 | - | - | - | (2,759,389) |
| H258296 | 67,053 | - | - | - | (67,053) | - |
| H258706 | - | 1,513,760 | - | - | - | (1,513,760) |
| H258731 | - | 247,750 | - | - | - | (247,750) |
| H266737 | - | 4,732 | - | - | - | (4,732) |
| H266839 | - | 657,968 | - | - | - | (657,968) |
| H266848 | 49,068 | - | - | - | (49,068) | - |
| H278531 | - | 440,000 | - | - | - | (440,000) |
| H278924 | - | 139,340 | - | - | - | (139,340) |
| H319961 | - | 4,621,595 | - | - | - | (4,621,595) |
| H346717 | - | 28,712 | - | - | - | (28,712) |
| H373562 | 379,924 | - | - | - | (379,924) | - |
| H394718 | 2,103,926 | - | 1,371,781 | - | (732,145) | - |
| H400499 | 3,124,881 | - | (3,986) | 18,781 | (3,128,866) | 18,781 |
| H401443 | - | 3,740 | - | - | - | (3,740) |
| H407045 | - | 2,157,360 | - | - | - | (2,157,360) |
| H415697 | - | 10,882,128 | - | - | - | (10,882,128) |
| H416730 | - | 429,873 | - | - | - | (429,873) |
| H416749 | - | 335,580 | - | - | - | (335,580) |
| H419906 | - | 8,892 | - | - | - | (8,892) |
| H419933 | - | 3,168,806 | - | - | - | (3,168,806) |
| H420011 | 68,324 | - | - | - | (68,324) | - |
| H477530 | (368,987) | - | (387,974) | - | (18,987) | - |
| H532141 | 798,629 | - | 99,741 | - | (698,888) | - |
| H551236 | 53,578 | 40,454 | (178,105) | 40,454 | (231,683) | - |
| H570288 | 556,974 | - | (262,548) | 41,778 | (819,522) | 41,778 |
| H665319 | - | 1,364,274 | - | - | - | (1,364,274) |
| H732719 | - | 4,124,810 | - | - | - | (4,124,810) |
| H740773 | - | 32,699 | - | - | - | (32,699) |
| H740844 | - | 14,724 | - | - | - | (14,724) |
| H757087 | - | 6,571,190 | - | - | - | (6,571,190) |
| H758460 | 543,875 | - | - | - | (543,875) | - |
| H765265 | - | 1,109,920 | (73,600) | 1,109,920 | (73,600) | - |
| H765300 | - | 356,020 | - | - | - | (356,020) |
| J001416 | - | 10,980 | - | - | - | (10,980) |
| J001513 | 18,517 | - | - | - | (18,517) | - |
| J001589 | 1,060,305 | - | - | - | (1,060,305) | - |
| J001657 | 2,306,798 | - | 735,216 | - | (1,571,582) | - |
| J001710 | (214,395) | - | (1,055,210) | - | (840,815) | - |
| J001784 | 4,788 | - | - | - | (4,788) | - |
| J001900 | (66,614) | - | (159,418) | 18,931 | (92,804) | 18,931 |
| J002000 | 105,650 | - | - | - | (105,650) | - |
| J002005 | 61,536 | - | - | - | (61,536) | - |
| J002826 | 414,845 | - | - | - | (414,845) | - |
| J003160 | 144,514 | - | - | - | (144,514) | - |
| J056502 | - | 123,643 | - | - | - | (123,643) |
| J100428 | 17,773 | - | - | - | (17,773) | - |
| J198547 | 9,305 | - | - | - | (9,305) | - |

Miscodes & Suspense Accounts
Impact Calculation

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| J252390 | - | 581,940 | - | - | - | (581,940) |
| K000453 | 84,340 | - | - | - | (84,340) | - |
| K000470 | - | 127,995 | - | - | - | (127,995) |
| K000534 | - | 648,516 | - | - | - | (648,516) |
| K001018 | 487,207 | - | 55,243 | - | (431,964) | - |
| K001084 | - | 3,560,700 | - | - | - | (3,560,700) |
| K001275 | 1,735,164 | - | 718,767 | - | (1,016,398) | - |
| K001790 | 258,619 | - | 131,394 | - | (127,224) | - |
| K001842 | 1,646,128 | - | (1,152) | - | (1,647,280) | - |
| K002907 | - | - | - | - | - | - |
| K003124 | 770,540 | - | - | - | (770,540) | - |
| K003524 | (7,714) | - | (7,714) | - | - | - |
| K003659 | - | 75,150 | - | - | - | (75,150) |
| K004216 | 378,924 | - | - | - | (378,924) | - |
| K014512 | 1,003,284 | - | (99,644) | - | (1,102,928) | - |
| K061319 | 84,042 | - | - | - | (84,042) | - |
| K101025 | 1,470,608 | - | - | - | (1,470,608) | - |
| K138201 | 1,238,838 | - | (825,042) | - | (2,063,880) | - |
| K156707 | 4,057,572 | - | (287,128) | - | (4,344,700) | - |
| K173742 | 395,706 | - | (284,694) | 62,849 | (680,401) | 62,849 |
| K213931 | - | 1,435,118 | - | - | - | (1,435,118) |
| K308009 | 134,859 | 113,104 | 110,619 | 113,104 | (24,240) | - |
| K370048 | - | 223,900 | - | - | - | (223,900) |
| K370084 | - | 581,963 | - | - | - | (581,963) |
| K414723 | 516,350 | - | (1,287,679) | - | (1,804,029) | - |
| K623007 | 2,011,008 | - | - | - | (2,011,008) | - |
| L001450 | - | 8,684,896 | - | - | - | (8,684,896) |
| L001499 | 498,941 | - | (15,109) | - | (514,050) | - |
| L001672 | 252,466 | - | (86,901) | 81,453 | (339,367) | 81,453 |
| L001861 | - | 288,786 | - | - | - | (288,786) |
| L001950 | - | 326,000 | - | - | - | (326,000) |
| L002073 | - | 111,356 | - | - | - | (111,356) |
| L002357 | 2,443,118 | - | 1,012,078 | - | (1,431,040) | - |
| L003132 | 575,266 | - | 314,500 | - | (260,766) | - |
| L003222 | 49,340,165 | - | - | - | (49,340,165) | - |
| L003223 | 1,676,922 | - | - | - | (1,676,922) | - |
| L003322 | 1,416,078 | - | - | - | (1,416,078) | - |
| L003657 | - | 7,331,692 | - | - | - | (7,331,692) |
| L003842 | 355,710 | - | - | - | (355,710) | - |
| L003993 | 376,994 | - | (7,756) | - | (384,750) | - |
| L004667 | 657,562 | - | 65,332 | - | (592,230) | - |
| L005591 | (481,988) | 506,035 | (481,988) | 506,035 | - | - |
| L006224 | 560,394 | - | (36,083) | - | (596,477) | - |
| L006633 | - | 135,097 | - | - | - | (135,097) |
| L006654 | (193,008) | 168,980 | (361,988) | - | (168,980) | (168,980) |
| L006923 | 710,277 | - | (954,023) | - | (1,664,300) | - |
| L013112 | (133,645) | - | (133,645) | - | - | - |
| L041038 | 234,719 | - | - | - | (234,719) | - |
| L100964 | (106,541) | - | (106,541) | - | - | - |
| L101174 | 1,081,486 | - | - | - | (1,081,486) | - |
| L146256 | 350,064 | - | - | - | (350,064) | - |
| L225018 | 206,796 | - | 9,261 | 9,465 | (197,535) | 9,465 |
| L279291 | 395,486 | 13,536,578 | 395,486 | 982,800 | - | (12,553,778) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| L297501 | - | 2,732,076 | - | - | - | (2,732,076) |
| L302504 | 291,526 | - | 184,216 | - | (107,310) | - |
| L439181 | 1,416,425 | - | (209,977) | - | (1,626,402) | - |
| L596947 | 461,700 | - | (1,317,675) | 403,500 | (1,779,375) | 403,500 |
| L623766 | (1,381,798) | - | (3,159,268) | - | (1,777,470) | - |
| L668450 | 691,204 | - | 236,686 | - | (454,518) | - |
| M000051 | 6,216,766 | - | 2,699,206 | - | (3,517,560) | - |
| M002216 | 2,042 | - | - | - | (2,042) | - |
| M002396 | 431,250 | - | 105,975 | 154,725 | (325,275) | 154,725 |
| M003820 | - | 82,000 | - | - | - | (82,000) |
| M005691 | (1,646,642) | - | (1,646,642) | - | - | - |
| M006167 | 196,187 | - | - | - | (196,187) | - |
| M006396 | - | 5,202,953 | - | 363,012 | - | (4,839,941) |
| M006440 | (211,330) | 207,051 | (470,630) | 207,051 | (259,300) | - |
| M006858 | - | 6,145 | - | - | - | (6,145) |
| M006867 | - | 384,750 | - | - | - | (384,750) |
| M007044 | - | 107,000 | - | - | - | (107,000) |
| M007210 | - | 192,840 | - | - | - | (192,840) |
| M007362 | (241,911) | - | (514,887) | - | (272,976) | - |
| M007538 | - | 796,050 | - | - | - | (796,050) |
| M007683 | - | 450,098 | - | - | - | (450,098) |
| M009085 | 261,635 | - | - | 23,377 | (261,635) | 23,377 |
| M009715 | - | 1,992,590 | - | - | - | (1,992,590) |
| M010188 | - | 353,486 | - | - | - | (353,486) |
| M010307 | 290,173 | - | (115,730) | - | (405,903) | - |
| M010336 | 492,100 | - | 12,935 | 93,780 | (479,165) | 93,780 |
| M010779 | 977,522 | - | - | - | (977,522) | - |
| M010904 | - | 454,500 | - | - | - | (454,500) |
| M011258 | 2,433,560 | - | (442,659) | - | (2,876,219) | - |
| M011580 | (103,528) | 628,972 | (103,528) | 667,132 | - | 38,160 |
| M011675 | - | 744,171 | - | - | - | (744,171) |
| M011763 | - | 226,590 | - | - | - | (226,590) |
| M011938 | - | 686,400 | - | - | - | (686,400) |
| M012222 | 740,660 | - | (130,874) | - | (871,534) | - |
| M012756 | - | 190,400 | - | - | - | (190,400) |
| M012794 | 30,120 | - | - | - | (30,120) | - |
| M012867 | 467,804 | - | - | - | (467,804) | - |
| M013025 | 106,304 | - | 10,184 | - | (96,120) | - |
| M013551 | - | 40,250 | - | - | - | (40,250) |
| M013642 | 206,773 | - | - | - | (206,773) | - |
| M013896 | - | 234,962 | - | - | - | (234,962) |
| M013987 | 360,807 | - | - | - | (360,807) | - |
| M014176 | - | 96,078 | - | - | - | (96,078) |
| M014243 | 16,443 | - | - | - | (16,443) | - |
| M014791 | 56,867 | - | (147,325) | - | (204,192) | - |
| M014792 | - | 344,306 | - | - | - | (344,306) |
| M015330 | 3,643,220 | - | - | - | (3,643,220) | - |
| M015624 | 1,911,449 | - | 768,768 | 192,679 | (1,142,681) | 192,679 |
| M015969 | - | 378,860 | - | - | - | (378,860) |
| M016549 | 54,500 | - | - | - | (54,500) | - |
| M017227 | (268,159) | - | (816,923) | 635,146 | (548,764) | 635,146 |
| M018045 | 645,450 | - | - | - | (645,450) | - |
| M018867 | 219,424 | - | (1,694,243) | - | (1,913,667) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| M032976 | (325,607) | 4,012,267 | (819,772) | 5,963,399 | (494,164) | 1,951,132 |
| M105778 | - | - | - | - | - | - |
| M107001 | 2,494 | - | - | - | (2,494) | - |
| M107249 | 440,922 | - | - | - | (440,922) | - |
| M111765 | 1,894,540 | - | 200,109 | - | (1,694,431) | - |
| M134081 | 18,150 | 39,095 | 14,084 | 47,735 | (4,066) | 8,639 |
| M136819 | 477,500 | - | 237,104 | - | (240,396) | - |
| M174714 | 832,448 | - | (199,989) | - | (1,032,437) | - |
| M174803 | 272,796 | - | (1,860,804) | - | (2,133,600) | - |
| M205441 | 3,902,728 | - | 826,800 | - | (3,075,928) | - |
| M228783 | 495,079 | - | 73,489 | - | (421,590) | - |
| M232830 | (35,902) | - | (147,846) | - | (111,944) | - |
| M242507 | 210,640 | 150,738 | 148,080 | 150,738 | (62,560) | - |
| M303451 | 174,278 | - | (273,173) | - | (447,450) | - |
| M303950 | 1,129,758 | - | 864,576 | - | (265,182) | - |
| M347388 | 117,267 | - | (132,984) | - | (250,251) | - |
| M415303 | 2,747,303 | - | 2,625,251 | - | (122,052) | - |
| M415321 | 261,139 | - | 44,177 | - | (216,962) | - |
| M415385 | (121,088,146) | - | (5,719,400) | - | 115,368,746 | - |
| M429842 | 1,479,587 | - | (515,965) | - | (1,995,552) | - |
| M472857 | 1,248,556 | - | (473,645) | - | (1,722,200) | - |
| M473507 | 1,090,738 | - | 136,348 | 182,321 | (954,389) | 182,321 |
| M475783 | - | 592,200 | - | - | - | (592,200) |
| M478209 | 1,261,104 | - | (87,721) | - | (1,348,825) | - |
| M544528 | 114,449 | - | - | - | (114,449) | - |
| M553617 | 177,827 | - | (33,219) | 34,430 | (211,046) | 34,430 |
| M611626 | 958,740 | - | 19,226 | - | (939,514) | - |
| N000301 | - | 153,349 | - | - | - | (153,349) |
| N000518 | 1,337,762 | - | 4,467 | - | (1,333,295) | - |
| N000539 | 632,715 | - | (110,719) | - | (743,434) | - |
| N001377 | - | - | - | - | - | - |
| N001533 | (23,683) | - | (23,683) | - | - | - |
| N003365 | (67,813) | - | (67,813) | - | - | - |
| N003395 | - | 20,500 | - | - | - | (20,500) |
| N004094 | - | 3,820,684 | - | - | - | (3,820,684) |
| N004096 | - | 346,333 | - | - | - | (346,333) |
| N004345 | 3,619 | - | - | - | (3,619) | - |
| N004433 | - | 380,360 | - | - | - | (380,360) |
| N004687 | - | 848,830 | - | - | - | (848,830) |
| N004706 | 2,280,241 | - | - | - | (2,280,241) | - |
| N005672 | - | 486,000 | - | - | - | (486,000) |
| N005872 | - | 4,381,410 | - | - | - | (4,381,410) |
| N006483 | 1,784,882 | - | - | - | (1,784,882) | - |
| N006658 | 966,960 | - | - | - | (966,960) | - |
| N006683 | 226,034 | - | (235,537) | - | (461,571) | - |
| N006764 | 500,042 | - | 124,274 | - | (375,768) | - |
| N006914 | 1,677,188 | - | 231,724 | - | (1,445,464) | - |
| N006974 | - | 68,500 | - | - | - | (68,500) |
| N007158 | 2,967,151 | - | (35,461) | - | (3,002,613) | - |
| N007288 | - | 2,285,037 | - | - | - | (2,285,037) |
| N007350 | 67,755 | - | - | - | (67,755) | - |
| N007415 | - | 1,346,605 | - | - | - | (1,346,605) |
| N007424 | 905,554 | - | 384,754 | - | (520,800) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| N007621 | - | 38,600 | - | - | - | (38,600) |
| N008128 | 2,362,872 | - | (347,125) | - | (2,709,997) | - |
| N009175 | - | 272,356 | - | - | - | (272,356) |
| N009432 | 445,753 | - | 69,468 | 115,780 | (376,285) | 115,780 |
| N009609 | 1,188,000 | - | - | - | (1,188,000) | - |
| N009629 | - | 391,800 | - | - | - | (391,800) |
| N010264 | 4,694 | - | - | - | (4,694) | - |
| N010337 | 59,826 | - | - | - | (59,826) | - |
| N010434 | - | 6,300 | - | - | - | (6,300) |
| N010674 | - | 5,564,160 | - | - | - | (5,564,160) |
| N011568 | 264,528 | - | - | - | (264,528) | - |
| N012239 | 408,600 | - | - | - | (408,600) | - |
| N033733 | (28,613,146) | 335,118 | 92,915,844 | - | 121,528,990 | (335,118) |
| N101418 | 20,877 | - | - | - | (20,877) | - |
| N101684 | 828 | 2,157,753 | (873,659) | 2,153,859 | (874,488) | (3,894) |
| N101860 | 631,680 | 1,880 | 66 | 1,946 | (631,614) | 66 |
| N102056 | 302,871 | - | - | - | (302,871) | - |
| N124421 | 5,503 | - | - | - | (5,503) | - |
| N169007 | 2,071,080 | - | (227,520) | - | (2,298,600) | - |
| N210462 | 342,282 | - | - | - | (342,282) | - |
| N210756 | 104,700 | - | - | - | (104,700) | - |
| N218712 | 20,145 | - | - | - | (20,145) | - |
| N243506 | (10,915) | - | (46,973) | 28,912 | (36,058) | 28,912 |
| N346860 | 1,147,715 | - | - | - | (1,147,715) | - |
| N352709 | 1,769,054 | - | 726,679 | - | (1,042,375) | - |
| N439788 | 788,835 | - | 169,067 | 132,447 | (619,768) | 132,447 |
| N461870 | 344,713 | - | - | - | (344,713) | - |
| N461916 | 26,834 | - | - | - | (26,834) | - |
| N462851 | 126,400 | - | - | - | (126,400) | - |
| N462960 | 114,300 | - | - | - | (114,300) | - |
| N488378 | 551,620 | - | (181,701) | - | (733,321) | - |
| P000030 | 43,440 | - | - | - | (43,440) | - |
| P001051 | - | 735,727 | - | - | - | (735,727) |
| P001067 | 11,999,635 | - | (2,579,265) | - | (14,578,900) | - |
| P001877 | 227,080 | - | (36,860) | - | (263,940) | - |
| P002267 | 2,805,151 | - | 2,627,596 | - | (177,555) | - |
| P002448 | 4,980,748 | - | 555,082 | - | (4,425,665) | - |
| P003081 | - | 96,300 | - | - | - | (96,300) |
| P003648 | 69,620 | - | - | - | (69,620) | - |
| P003735 | 3,363,880 | - | 1,221,205 | - | (2,142,675) | - |
| P004072 | 348,582 | - | (1,019,195) | 239,518 | (1,367,778) | 239,518 |
| P004526 | 515,042 | 770,353 | 378,007 | 1,108,120 | (137,034) | 337,767 |
| P004608 | 567,272 | - | (171,208) | - | (738,480) | - |
| P005156 | (585,099) | - | (686,909) | - | (101,810) | - |
| P005649 | 1,188,650 | - | 92,133 | - | (1,096,517) | - |
| P005743 | 60,193 | - | (886,035) | - | (946,228) | - |
| P007046 | - | 965,350 | - | - | - | (965,350) |
| P007213 | - | 148,150 | - | - | - | (148,150) |
| P008555 | - | 52,238 | - | - | - | (52,238) |
| P008664 | 871,455 | - | (333,645) | - | (1,205,100) | - |
| P008811 | 17,468 | - | 116 | - | (17,353) | - |
| P008840 | (271,363) | 591,086 | (744,414) | 1,052,589 | (473,051) | 461,502 |
| P008889 | 952,675 | - | (484,125) | - | (1,436,800) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| P009027 | - | 706,676 | - | - | - | (706,676) |
| P009624 | - | 8,832 | - | - | - | (8,832) |
| P009686 | 4,038,863 | 957,446 | 1,305,083 | 957,446 | (2,733,780) | - |
| P010246 | - | 218,680 | - | - | - | (218,680) |
| P010343 | - | 831,878 | - | - | - | (831,878) |
| P010391 | - | 96,300 | - | - | - | (96,300) |
| P011159 | - | 810,540 | - | - | - | (810,540) |
| P011488 | - | 2,378,363 | - | - | - | (2,378,363) |
| P011559 | 1,875,990 | - | - | - | (1,875,990) | - |
| P011654 | - | 187,460 | - | - | - | (187,460) |
| P011851 | - | 116,820 | - | - | - | (116,820) |
| P011883 | - | 30,060 | - | - | - | (30,060) |
| P012059 | - | 50,420 | - | - | - | (50,420) |
| P012832 | 18,902 | 96,269 | (55,252) | 336,179 | (74,154) | 239,910 |
| P012850 | 122,456 | - | 66,762 | - | (55,693) | - |
| P013264 | (106,320) | - | (285,270) | - | (178,950) | - |
| P013338 | 27,067 | - | - | - | (27,067) | - |
| P013552 | 153,192 | - | 145,392 | - | (7,800) | - |
| P013736 | - | 4,666,490 | - | 2,127,450 | - | (2,539,040) |
| P013809 | 18,990 | - | - | - | (18,990) | - |
| P014294 | 3,600,109 | - | 201,821 | - | (3,398,287) | - |
| P014527 | 170,748 | - | - | - | (170,748) | - |
| P014548 | (2,058,039) | - | (3,324,339) | - | (1,266,300) | - |
| P014552 | - | 26,938 | - | - | - | (26,938) |
| P015636 | 1,495,067 | - | - | - | (1,495,067) | - |
| P015915 | - | 1,438,485 | - | - | - | (1,438,485) |
| P016405 | (248,924) | - | (248,924) | - | - | - |
| P016597 | 220,290 | - | 115,290 | - | (105,000) | - |
| P016780 | 169,440 | - | - | - | (169,440) | - |
| P016901 | 547 | 5,698 | 547 | 8,208 | - | 2,510 |
| P017326 | 1,195,058 | - | (691,543) | - | (1,886,601) | - |
| P017576 | 1,679,430 | - | - | - | (1,679,430) | - |
| P017771 | - | 76,720 | - | - | - | (76,720) |
| P017902 | 2,161,817 | - | - | - | (2,161,817) | - |
| P018045 | 709,543 | - | 1,932 | - | (707,611) | - |
| P018299 | - | 83,205 | - | - | - | (83,205) |
| P018372 | 830,005 | - | - | - | (830,005) | - |
| P018897 | - | 4,758,854 | - | - | - | (4,758,854) |
| P018918 | - | 13,980 | - | - | - | (13,980) |
| P018987 | 17,917 | - | 3,563 | - | (14,354) | - |
| P019066 | - | 175,337 | - | - | - | (175,337) |
| P019172 | - | 1,152,201 | - | - | - | (1,152,201) |
| P019437 | (2,628,520) | - | (2,628,520) | - | - | - |
| P019571 | 1,859,909 | - | 663,805 | - | (1,196,104) | - |
| P019983 | 316,176 | - | - | - | (316,176) | - |
| P020092 | 64,529 | - | - | - | (64,529) | - |
| P020169 | (14,670) | - | (14,670) | - | - | - |
| P020484 | (293,321,500) | - | (3,321,500) | - | 290,000,000 | - |
| P020752 | (180,538) | 74,269 | (280,698) | 74,269 | (100,160) | - |
| P020808 | 1,296,116 | - | 289,267 | 91,215 | (1,006,848) | 91,215 |
| P020875 | 465,766 | 329,102 | 430,616 | 329,102 | (35,150) | - |
| P021045 | (648,527) | - | (1,004,075) | 416,564 | (355,548) | 416,564 |
| P021174 | - | 814,968 | - | - | - | (814,968) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| P021531 | 121,626 | - | - | - | (121,626) | - |
| P022225 | 263,238 | - | 80,702 | 80,702 | (182,536) | 80,702 |
| P022357 | 2,175 | - | - | - | (2,175) | - |
| P022637 | 26,000 | - | - | - | (26,000) | - |
| P022708 | 1,500,452 | - | (216,224) | - | (1,716,675) | - |
| P022986 | 937,091 | - | - | - | (937,091) | - |
| P023170 | (2,347) | 10,337 | (2,347) | 197 | - | (10,140) |
| P024695 | - | 356,755 | - | - | - | (356,755) |
| P039728 | - | 2,446 | - | - | - | (2,446) |
| P040887 | (65,200) | - | (290,341) | 209,072 | (225,141) | 209,072 |
| P043456 | 1,727,350 | - | (785,150) | - | (2,512,500) | - |
| P088078 | 790,790 | - | - | - | (790,790) | - |
| P098977 | 572,649 | - | - | - | (572,649) | - |
| P100134 | 697,287 | - | (149,676) | - | (846,963) | - |
| P108564 | 913,054 | - | 153,801 | 195,065 | (759,253) | 195,065 |
| P111687 | 636,582 | - | 150,582 | - | (486,000) | - |
| P111986 | 280,623 | - | - | - | (280,623) | - |
| P112613 | 45,861 | - | - | - | (45,861) | - |
| P112674 | 711,597 | - | - | - | (711,597) | - |
| P113190 | (806,798) | - | (806,798) | - | - | - |
| P113591 | 90,576 | - | - | - | (90,576) | - |
| P114359 | 6,537 | - | - | - | (6,537) | - |
| P125064 | 2,010,247 | - | 749,240 | - | (1,261,007) | - |
| P128338 | - | 15,555 | - | - | - | (15,555) |
| P131654 | 225,440 | - | (11,296) | 432,552 | (236,736) | 432,552 |
| P209740 | - | 34,044,204 | - | - | - | (34,044,204) |
| P266116 | (164,780) | 154,294 | (203,300) | 255,944 | (38,520) | 101,650 |
| P278112 | 2,077,433 | - | 749,183 | - | (1,328,250) | - |
| P283259 | (529,329) | - | (750,085) | - | (220,756) | - |
| P290492 | - | 10,162,998 | - | - | - | (10,162,998) |
| P371172 | - | 1,242,214 | - | - | - | (1,242,214) |
| P391720 | 371,272 | - | 107,232 | - | (264,040) | - |
| P400523 | - | 121,680 | - | - | - | (121,680) |
| P415170 | 221,775 | - | - | - | (221,775) | - |
| P415198 | (627,903) | - | (843,419) | - | (215,516) | - |
| P525676 | 2,665,150 | - | (797,959) | 423,212 | (3,463,109) | 423,212 |
| P528129 | 576,361 | - | 461 | - | (575,900) | - |
| P624462 | 14,332,651 | - | 12,669,305 | - | (1,663,346) | - |
| P628397 | 2,745,227 | - | (68,237) | - | (2,813,464) | - |
| P691576 | 1,259,455 | - | - | - | (1,259,455) | - |
| P739650 | 249,117 | - | (249,117) | - | (498,235) | - |
| P761651 | (7,134,774) | 4,404,402 | (7,913,208) | 4,404,402 | (778,434) | - |
| P837802 | 666,190 | - | (381,698) | - | (1,047,888) | - |
| P856540 | - | 959,350 | - | - | - | (959,350) |
| R000556 | 191,952 | - | 70,550 | - | (121,402) | - |
| R000678 | - | 567,378 | - | - | - | (567,378) |
| R000684 | 749,381 | - | (48,905) | - | (798,286) | - |
| R000942 | (1,031,992) | - | (5,001,190) | - | (3,969,198) | - |
| R001144 | - | 3,342,560 | - | - | - | (3,342,560) |
| R001159 | 1,122,549 | - | (404,427) | - | (1,526,976) | - |
| R001553 | (220,292) | - | (293,277) | - | (72,984) | - |
| R001644 | 89,888 | - | (147,463) | - | (237,350) | - |
| R002202 | 86 | - | - | - | (86) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| R002261 | | 558,090 | - | - | - | (558,090) |
| R002898 | 641,921 | - | - | - | (641,921) | - |
| R003061 | - | 368,800 | - | - | - | (368,800) |
| R003071 | - | 40,011 | 8,783 | - | 8,783 | (40,011) |
| R003353 | - | 488,527 | - | - | - | (488,527) |
| R003392 | 454,198 | - | (5,203) | 46,709 | (459,401) | 46,709 |
| R003558 | 72,411 | - | - | - | (72,411) | - |
| R003646 | - | 387,872 | - | - | - | (387,872) |
| R003753 | (1,034,989) | - | (2,667,702) | - | (1,632,714) | - |
| R003863 | 7,063 | - | - | - | (7,063) | - |
| R003908 | 498,582 | - | (14,268) | - | (512,850) | - |
| R004245 | 276,473 | - | (226,375) | - | (502,848) | - |
| R004466 | - | 748,593 | - | - | - | (748,593) |
| R004501 | 4,481,556 | - | 155,788 | - | (4,325,769) | - |
| R004748 | 806,845 | - | - | - | (806,845) | - |
| R004813 | 7,360,019 | - | - | - | (7,360,019) | - |
| R004848 | - | 178,980 | - | - | - | (178,980) |
| R004859 | - | 6,157,350 | - | - | - | (6,157,350) |
| R005005 | 1,269,476 | - | 353,441 | - | (916,035) | - |
| R005077 | 684,430 | - | (1,265) | 86,273 | (685,695) | 86,273 |
| R005320 | - | 62 | - | - | - | (62) |
| R005375 | 315,477 | - | (233,069) | - | (548,545) | - |
| R005652 | 645,792 | - | - | - | (645,792) | - |
| R005654 | 1,824,141 | - | - | - | (1,824,141) | - |
| R005878 | 104,138 | - | (484,792) | - | (588,930) | - |
| R006235 | - | 2,750,572 | - | - | - | (2,750,572) |
| R006365 | - | 607,582 | - | - | - | (607,582) |
| R006959 | 739,772 | - | - | - | (739,772) | - |
| R007372 | - | 1,334,464 | - | - | - | (1,334,464) |
| R007504 | - | 8,740 | - | - | - | (8,740) |
| R007566 | (7,055) | 12,135 | (7,055) | - | - | (12,135) |
| R007567 | (2,857,018) | - | (2,857,018) | - | - | - |
| R101512 | 111,285 | - | - | - | (111,285) | - |
| R113013 | 36,925 | - | - | - | (36,925) | - |
| R162415 | - | 115,000 | - | - | - | (115,000) |
| R219178 | (586,512) | - | (586,512) | - | - | - |
| R219775 | 174,648 | - | - | - | (174,648) | - |
| R221600 | 308,997 | - | 2,606,900 | - | 2,297,903 | - |
| R239708 | - | 202,524 | - | - | - | (202,524) |
| R240787 | 1,165,948 | - | (22,354) | - | (1,188,302) | - |
| R520939 | 1,331,270 | 190,273 | 964,390 | 190,273 | (366,880) | - |
| R648865 | (3,114,768) | - | (3,303,095) | - | (188,327) | - |
| R656070 | 2,461,745 | - | 714,785 | - | (1,746,960) | - |
| R690755 | (20,895) | - | (292,845) | - | (271,950) | - |
| S000020 | 143,437 | - | - | - | (143,437) | - |
| S001327 | 154,456 | 682 | 35,238 | - | (119,218) | (682) |
| S001837 | 66,495 | - | - | - | (66,495) | - |
| S001883 | - | 23,000 | - | - | - | (23,000) |
| S002614 | 890,737 | - | (239,096) | - | (1,129,833) | - |
| S004122 | 280,395 | - | (122,389) | - | (402,784) | - |
| S004873 | - | 70,325 | - | - | - | (70,325) |
| S005035 | 20,250 | - | - | - | (20,250) | - |
| S005492 | 442,158 | - | (249,852) | - | (692,011) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| S006137 | 54,664 | - | (518,096) | - | (572,760) | - |
| S006163 | (79,480) | - | (186,630) | - | (107,149) | - |
| S006791 | - | 538,360 | - | - | - | (538,360) |
| S007137 | 306,279 | - | (240,843) | - | (547,122) | - |
| S007459 | - | 3,020 | - | - | - | (3,020) |
| S007757 | - | 431,610 | - | - | - | (431,610) |
| S007842 | - | 2,356,367 | - | - | - | (2,356,367) |
| S008617 | - | 166,440 | - | - | - | (166,440) |
| S008917 | - | 3,366 | - | - | - | (3,366) |
| S009328 | 317,704 | - | 34,472 | - | (283,232) | - |
| S009443 | - | 2,026,767 | - | - | - | (2,026,767) |
| S009690 | 1,444,343 | - | 257,315 | - | (1,187,028) | - |
| S010129 | - | 12,879 | - | - | - | (12,879) |
| S012376 | 387,134 | - | - | - | (387,134) | - |
| S012634 | 151 | - | (155,530) | - | (155,681) | - |
| S012693 | 789,400 | - | (25,873) | 5,911 | (815,273) | 5,911 |
| S013007 | 93,567 | - | - | - | (93,567) | - |
| S013224 | - | 1,239,097 | - | - | - | (1,239,097) |
| S013392 | 299,063 | - | (224,863) | - | (523,926) | - |
| S013539 | (88,220) | 2,042,920 | (88,220) | 2,099,372 | - | 56,452 |
| S013872 | - | 1,640 | - | - | - | (1,640) |
| S013888 | - | 3,833,275 | - | - | - | (3,833,275) |
| S013907 | - | 16,516 | 631,750 | - | 631,750 | (16,516) |
| S014047 | 1,861 | - | - | - | (1,861) | - |
| S014075 | - | 100,413 | - | - | - | (100,413) |
| S014242 | 736,659 | - | (155,215) | - | (891,873) | - |
| S014614 | 482,697 | - | (68,667) | - | (551,364) | - |
| S014622 | 850,975 | - | (538,017) | - | (1,388,992) | - |
| S014646 | 153,609 | - | - | - | (153,609) | - |
| S014666 | - | 387,642 | - | - | - | (387,642) |
| S014804 | 429,005 | 107,698 | 5,645 | 107,698 | (423,360) | - |
| S015036 | 487,867 | - | - | - | (487,867) | - |
| S015139 | - | 1,487,989 | - | - | - | (1,487,989) |
| S015307 | - | 73,632 | - | - | - | (73,632) |
| S015507 | 3,189 | - | - | - | (3,189) | - |
| S015629 | 1,183,648 | - | (203,431) | - | (1,387,079) | - |
| S015675 | 122,916 | - | (419,904) | - | (542,820) | - |
| S015845 | 36,151 | - | 34,299 | - | (1,852) | - |
| S016404 | 787,577 | - | - | - | (787,577) | - |
| S016584 | 1,266,773 | - | - | - | (1,266,773) | - |
| S016952 | - | 334,157 | - | - | - | (334,157) |
| S017003 | 447,073 | - | - | - | (447,073) | - |
| S017092 | - | 262,600 | - | - | - | (262,600) |
| S017320 | 332,118 | - | - | - | (332,118) | - |
| S017483 | - | 694,691 | - | - | - | (694,691) |
| S017667 | - | 20,141 | - | - | - | (20,141) |
| S017847 | (254,671) | - | (295,371) | - | (40,700) | - |
| S017933 | 559,330 | - | (104,554) | - | (663,884) | - |
| S017991 | - | - | - | - | - | - |
| S018006 | (140,292) | - | (523,570) | 2,853 | (383,277) | 2,853 |
| S018052 | 945,215 | 118,518 | (849,673) | 118,518 | (1,794,888) | - |
| S018055 | 208,104 | - | (100,776) | - | (308,880) | - |
| S018117 | - | 11,230 | - | - | - | (11,230) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| S018140 | 400,000 | - | - | - | (400,000) | - |
| S018142 | - | 250,212 | - | - | - | (250,212) |
| S018464 | 1,427,223 | - | - | - | (1,427,223) | - |
| S018603 | (203,321) | - | (203,321) | - | - | - |
| S018709 | 2,665,080 | - | - | - | (2,665,080) | - |
| S018715 | 2,316,184 | - | - | - | (2,316,184) | - |
| S018913 | - | 16,782 | - | - | - | (16,782) |
| S019186 | - | 680,403 | - | - | - | (680,403) |
| S020278 | 322,400 | - | 1,352,000 | - | 1,029,600 | - |
| S020448 | 353,000 | - | - | - | (353,000) | - |
| S020452 | 99,268 | - | - | - | (99,268) | - |
| S020472 | - | 234,310 | - | - | - | (234,310) |
| S020640 | 54,461 | - | - | - | (54,461) | - |
| S020652 | - | 47,330 | - | - | - | (47,330) |
| S022154 | (31,527) | - | (266,919) | - | (235,392) | - |
| S022317 | - | 9,236 | - | - | - | (9,236) |
| S022490 | - | 1,108 | - | - | - | (1,108) |
| S022914 | 16,911 | - | - | - | (16,911) | - |
| S023201 | (3,026,865) | 75,690,415 | 9,845,153 | - | 12,872,018 | (75,690,415) |
| S043314 | 1,369,797 | 829,069 | 492,966 | 880,165 | (876,831) | 51,096 |
| S047363 | 138,312 | - | - | - | (138,312) | - |
| S053894 | 215,946 | - | (215,946) | - | (431,892) | - |
| S098735 | - | 1,497,086 | - | - | - | (1,497,086) |
| S100256 | 2,023,826 | - | - | - | (2,023,826) | - |
| S100973 | 204,268 | - | - | - | (204,268) | - |
| S101223 | 1,714,650 | - | 1,674,000 | - | (40,650) | - |
| S101736 | 929,683 | - | - | - | (929,683) | - |
| S101900 | 720,765 | - | (105,318) | - | (826,083) | - |
| S102165 | 21,648 | - | - | - | (21,648) | - |
| S104899 | - | 2,285,302 | - | - | - | (2,285,302) |
| S106139 | 1,652,740 | - | (258,859) | - | (1,911,599) | - |
| S106335 | 2 | - | - | - | (2) | - |
| S112060 | 4 | - | - | - | (4) | - |
| S112563 | 610,226 | - | 612,526 | - | 2,300 | - |
| S146602 | 711,048 | - | - | - | (711,048) | - |
| S146933 | 77,006 | 75,202 | (192,010) | 75,202 | (269,016) | - |
| S199056 | 999,154 | - | (67,882) | - | (1,067,036) | - |
| S213085 | 269,228 | - | (29,804) | 277,934 | (299,032) | 277,934 |
| S259901 | 22,159 | - | - | - | (22,159) | - |
| S260023 | 23,340 | - | - | - | (23,340) | - |
| S260309 | 1,063,180 | - | - | - | (1,063,180) | - |
| S277499 | 1,479,885 | - | 823,528 | - | (656,357) | - |
| S305020 | - | 285,077 | - | - | - | (285,077) |
| S317357 | (70,211) | - | (196,401) | - | (126,190) | - |
| S317758 | 395,391 | - | (57,341) | - | (452,732) | - |
| S342016 | 3,276,615 | - | (3,097,565) | - | (6,374,180) | - |
| S362645 | 2,342,880 | - | (21,614) | - | (2,364,495) | - |
| S426284 | 724,321 | - | 36,685 | 113,054 | (687,636) | 113,054 |
| S482025 | 441,454 | - | - | - | (441,454) | - |
| S482631 | 643,168 | - | 212,518 | - | (430,650) | - |
| S520500 | 264,730 | - | 218,650 | - | (46,080) | - |
| S537707 | - | 37,272,144 | - | - | - | (37,272,144) |
| S616809 | 39,830 | - | (103,928) | - | (143,758) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| S617755 | 1,592,368 | - | 22,133 | - | (1,570,235) | - |
| S621205 | 317,985 | - | 164,985 | - | (153,000) | - |
| S664123 | 541,901 | - | (26,015) | - | (567,917) | - |
| S689231 | 381,906 | - | (128,832) | - | (510,738) | - |
| S689464 | 504,211 | - | (244,779) | - | (748,990) | - |
| S690363 | (684,768) | - | (815,822) | - | (131,054) | - |
| S690540 | (400,650,796) | - | (284,422,966) | - | 116,227,830 | - |
| S725102 | (436,869) | - | (3,362,470) | - | (2,925,601) | - |
| S731792 | 334,458 | - | (88,043) | - | (422,500) | - |
| T000102 | 45,613 | - | (1,089,851) | - | (1,135,464) | - |
| T000523 | 11,341,571 | - | - | - | (11,341,571) | - |
| T001149 | 675,416 | - | - | - | (675,416) | - |
| T001734 | (11,625,767) | - | (12,462,006) | - | (836,240) | - |
| T003131 | - | 362,520 | - | - | - | (362,520) |
| T003275 | - | 1,222,500 | - | - | - | (1,222,500) |
| T003475 | - | 45,456 | - | - | - | (45,456) |
| T003682 | (186,124) | - | (622,579) | - | (436,455) | - |
| T003934 | - | 1,000,705 | - | - | - | (1,000,705) |
| T004412 | - | 6,617,400 | - | - | - | (6,617,400) |
| T004489 | - | 152,025 | - | - | - | (152,025) |
| T004496 | - | 95,026 | - | - | - | (95,026) |
| T004841 | 864,244 | - | 126,919 | - | (737,325) | - |
| T005670 | 55,000 | - | - | - | (55,000) | - |
| T005942 | - | 111,440 | - | - | - | (111,440) |
| T005966 | - | 421,870 | - | - | - | (421,870) |
| T005981 | 1,781,273 | - | 631,402 | - | (1,149,871) | - |
| T006481 | - | 121,600 | - | - | - | (121,600) |
| T006502 | 1,201,270 | - | (365,190) | - | (1,566,460) | - |
| T007993 | - | 596,462 | - | - | - | (596,462) |
| T008263 | 38,010 | - | - | - | (38,010) | - |
| T008288 | - | 195,671 | - | - | - | (195,671) |
| T008722 | - | 262,676 | - | - | - | (262,676) |
| T008735 | (167,394) | 18,123,927 | (167,394) | 555,373 | - | (17,568,555) |
| T008823 | 339,602 | - | (121,006) | - | (460,608) | - |
| T008966 | - | 1,586,985 | - | - | - | (1,586,985) |
| T009158 | - | 1,899 | - | - | - | (1,899) |
| T009184 | 2,587,152 | - | - | - | (2,587,152) | - |
| T009282 | - | 154,658 | - | - | - | (154,658) |
| T009968 | - | 1,063,202 | - | - | - | (1,063,202) |
| T010272 | - | 38,552 | - | - | - | (38,552) |
| T010338 | (137,407) | - | (137,407) | - | - | - |
| T010391 | 666,392 | - | 201,965 | - | (464,427) | - |
| T010645 | (256,996) | - | (352,558) | - | (95,562) | - |
| T010796 | - | - | - | - | - | - |
| T010810 | - | 844,518 | - | - | - | (844,518) |
| T010863 | 79,083 | - | (5,858) | 140,592 | (84,941) | 140,592 |
| T010878 | 23,738 | - | - | - | (23,738) | - |
| T011140 | - | 1,266 | - | - | - | (1,266) |
| T011888 | - | 16,271 | - | - | - | (16,271) |
| T020033 | 62,650 | - | - | - | (62,650) | - |
| T045738 | 12,900 | - | - | - | (12,900) | - |
| T048424 | - | 372,184 | - | - | - | (372,184) |
| T048576 | - | 1,881,634 | - | - | - | (1,881,634) |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|---|---|---|---|---|---|---|
| T048718 | 1,473,561 | - | (383,500) | - | (1,857,061) | - |
| T106334 | - | 1,643 | - | - | - | (1,643) |
| T106621 | 309,216 | - | - | - | (309,216) | - |
| T106622 | 45,338 | - | - | - | (45,338) | - |
| T151114 | 14,364 | - | - | - | (14,364) | - |
| T234419 | 572,902 | - | (1,793,747) | - | (2,366,649) | - |
| T332063 | 69,862,170 | - | (766,287) | 11,602 | (70,628,456) | 11,602 |
| T333204 | 1,950,179 | - | 270,626 | - | (1,679,553) | - |
| T386601 | 15,042,563 | - | - | - | (15,042,563) | - |
| T397984 | 1,543 | - | - | - | (1,543) | - |
| T402139 | - | 188,700 | - | - | - | (188,700) |
| T415367 | 385,047 | - | - | - | (385,047) | - |
| T415544 | 284,760 | - | - | - | (284,760) | - |
| T426838 | 27,594 | - | - | - | (27,594) | - |
| T433007 | 285,944 | - | (728,930) | - | (1,014,874) | - |
| T443657 | (118,817) | - | (2,190,390) | - | (2,071,573) | - |
| T511119 | 397,902 | - | - | - | (397,902) | - |
| T511921 | 510,672 | - | (510,672) | - | (1,021,345) | - |
| T601389 | (382,191) | - | (382,191) | - | - | - |
| T649855 | (1,367,291) | 482,181 | (1,589,874) | 1,286,282 | (222,583) | 804,101 |
| T661796 | 67,664 | - | (926,344) | - | (994,008) | - |
| U000536 | 1,497,073 | - | (354,568) | - | (1,851,641) | - |
| U000988 | 4,266,564 | - | 2,127,219 | - | (2,139,346) | - |
| U001159 | 588,494 | - | 42,035 | - | (546,459) | - |
| U001189 | 624,738 | - | (127,487) | - | (752,225) | - |
| U001275 | - | 5,923,608 | - | - | - | (5,923,608) |
| U001363 | 1,636,850 | - | (57,950) | - | (1,694,800) | - |
| U001436 | - | 140,620 | - | - | - | (140,620) |
| U001447 | 163,840 | - | - | - | (163,840) | - |
| U001816 | - | 627,345 | - | - | - | (627,345) |
| U002014 | - | - | - | - | - | - |
| U002179 | 806,583 | - | (1,616) | - | (808,199) | - |
| U002855 | 211,893 | - | - | - | (211,893) | - |
| U003696 | 1,114,213 | - | (424,940) | 282,535 | (1,539,153) | 282,535 |
| U003770 | - | 848,922 | - | - | - | (848,922) |
| U003994 | 946,940 | - | (2,252,494) | - | (3,199,434) | - |
| U004942 | 239,066 | - | 40,616 | - | (198,450) | - |
| U005611 | - | 14,954,579 | - | - | - | (14,954,579) |
| U009591 | (917,851) | - | (1,537,643) | - | (619,792) | - |
| U042509 | (292,248) | - | (430,900) | 278,348 | (138,653) | 278,348 |
| U100810 | 10,819,866 | 1,341,814 | (196,269) | 1,063,195 | (11,016,135) | (278,619) |
| U199207 | 2,229,948 | - | 5,148 | - | (2,224,800) | - |
| U283008 | (238,259) | - | (238,259) | - | - | - |
| U335596 | 3,282,017 | - | 2,157,961 | - | (1,124,056) | - |
| U436816 | (732,248) | - | (732,248) | - | - | - |
| U502851 | - | 640,523 | - | - | - | (640,523) |
| U642503 | 265,895 | - | 8,145 | - | (257,750) | - |
| U727280 | 8,430 | - | - | - | (8,430) | - |
| V000443 | 5,344,158 | 233,536 | 4,475,698 | 837,530 | (868,460) | 603,994 |
| V001575 | 198,341 | - | (124,540) | - | (322,881) | - |
| V001958 | 357,511 | - | (471,889) | - | (829,400) | - |
| V002114 | 239,075 | - | (105,329) | - | (344,404) | - |
| V002127 | (731,952) | 232 | (877,003) | 173 | (145,051) | (59) |

Miscode of Suspense Accounts
Through 09/30/259 1006 of 1129

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|----------------|----------------|----------------|---------------|---------------|--------------|
| V002589 | 362,967 | - | - | - | (362,967) | - |
| V003074 | 4,376,811 | - | 1,313,946 | - | (3,062,865) | - |
| V003094 | - | 184,873 | - | - | - | (184,873) |
| V003217 | - | 627,775 | - | - | - | (627,775) |
| V003267 | - | 4,794 | - | - | - | (4,794) |
| V003448 | - | 24,600 | - | - | - | (24,600) |
| V003882 | 478,208 | - | 102,368 | - | (375,840) | - |
| V100420 | - | 88,580 | - | - | - | (88,580) |
| V500700 | 231,011 | - | 93,874 | - | (137,137) | - |
| V692012 | 361,180 | - | (2,872) | 195,688 | (364,052) | 195,688 |
| V769984 | - | 25,128,765 | - | - | - | (25,128,765) |
| W000081 | - | 408,030 | - | - | - | (408,030) |
| W000131 | 100,605 | - | (565,555) | - | (666,160) | - |
| W001112 | 330,623 | - | (162,261) | - | (492,884) | - |
| W001544 | 97,690 | - | (351,755) | - | (449,444) | - |
| W002135 | 36,012 | - | 1,076 | - | (34,936) | - |
| W002396 | - | 693,012 | - | - | - | (693,012) |
| W003068 | 117,834 | 47,734 | 25,584 | 47,734 | (92,250) | - |
| W003447 | 156,294 | - | - | - | (156,294) | - |
| W003825 | - | 76,476 | - | - | - | (76,476) |
| W004005 | 269,092 | - | - | - | (269,092) | - |
| W004093 | 599,150 | - | (58,401) | - | (657,551) | - |
| W004475 | (39,207) | - | (296,485) | - | (257,278) | - |
| W004611 | 2,802 | - | - | - | (2,802) | - |
| W004759 | 532,125 | - | 75,305 | - | (456,820) | - |
| W004817 | 28,038 | - | - | - | (28,038) | - |
| W005007 | - | 970,592 | - | - | - | (970,592) |
| W005636 | - | 268,399 | - | - | - | (268,399) |
| W005714 | - | 232,050 | - | - | - | (232,050) |
| W006197 | - | 740,950 | - | - | - | (740,950) |
| W006658 | 14,038,824 | - | 13,703,532 | - | (335,292) | - |
| W028598 | 1,669,950 | - | 13,950 | - | (1,656,000) | - |
| W070737 | - | 182,656 | - | - | - | (182,656) |
| W070773 | - | 54,501 | - | - | - | (54,501) |
| W101236 | 277,083 | - | - | - | (277,083) | - |
| W127507 | 2,816,989 | - | - | - | (2,816,989) | - |
| W149226 | - | 405 | - | - | - | (405) |
| W153005 | 1,782,314 | - | 529,341 | - | (1,252,973) | - |
| W178177 | (1,341,004) | - | (1,982,204) | - | (641,200) | - |
| W196503 | 368,905 | - | 257,139 | - | (111,766) | - |
| W233508 | 1,068,329 | - | (1,078,547) | - | (2,146,876) | - |
| W237005 | 863,936 | - | (177,488) | 37,645 | (1,041,425) | 37,645 |
| W291151 | 6,923,222 | - | 4,203,200 | - | (2,720,021) | - |
| W516784 | 2,945,492 | - | (153,708) | - | (3,099,200) | - |
| W605759 | 313,226 | - | 14,759 | 317,845 | (298,466) | 317,845 |
| W696009 | 973,484 | - | (893,233) | - | (1,866,717) | - |
| Y000517 | 267,277 | - | (267,277) | - | (534,554) | - |
| Y000562 | 314,160 | - | - | - | (314,160) | - |
| Y000752 | 23 | - | - | - | (23) | - |
| Y001105 | 267,663 | - | (230,167) | 155,218 | (497,830) | 155,218 |
| Y001281 | 37,186 | - | - | - | (37,186) | - |
| Y001713 | 875,615 | - | 716,071 | - | (159,544) | - |
| Y001895 | 58,011 | - | - | - | (58,011) | - |

| Sec_No | Original_credit | Original_debit | Revised_credit | Revised_debit | Credit_impact | Debit_impact |
|--------|-----------------|----------------|----------------|---------------|---------------|--------------|
| Y001917 | - | 17,690 | - | - | - | (17,690) |
| Y001962 | 3,026,389 | - | 1,583,594 | - | (1,442,795) | - |
| Y002235 | 215,087 | - | (333,154) | - | (548,241) | - |
| Y022022 | 1,134,334 | - | - | - | (1,134,334) | - |
| Y032761 | 134,200 | - | - | - | (134,200) | - |
| Y033314 | 258,313 | - | - | - | (258,313) | - |
| Y100258 | 16,015,564 | - | (942) | - | (16,016,506) | - |
| Y241161 | 807,588 | - | (9,267) | - | (816,855) | - |
| Y272500 | 1,363,404 | - | (71,849) | 84,707 | (1,435,253) | 84,707 |
| 1,705 | $ 1,262,761,996 | $ 3,331,163,750 | $ (37,926,113) | $ 123,128,768 | $ (1,300,688,109) | $ (3,208,034,982) |

# EXHIBIT 10

08-01020-sccc Doc 47250 Filed 12/06/12 Entered 12/06/12 13:45:59 Main Appendix
Documents 1 Through 259 Pg 1019 of 1129 of 1129

Page 1009 of 1129

**Securities and Exchange Commission** §240.11a1–2

Trading Plan of the American Stock Exchange, as amended, have had actual notice thereof, and the Commission finds that notice and procedure pursuant to section 4 of the Administrative Procedure Act (5 U.S.C. section 553) are impracticable and unnecessary and that such Plan, as amended, may be, and is hereby, declared effective on January 31, 1968.

§240.11a1–1(T) **Transactions yielding priority, parity, and precedence.**

(a) A transaction effected on a national securities exchange for the account of a member which meets the requirements of section 11(a)(1)(G)(i) of the Act shall be deemed, in accordance with the requirements of section 11(a)(1)(G)(ii), to be not inconsistent with the maintenance of fair and orderly markets and to yield priority, parity, and precedence in execution to orders for the account of persons who are not members or associated with members of the exchange if such transaction is effected in compliance with each of the following requirements:

(1) A member shall disclose that a bid or offer for its account is for its account to any member with whom such bid or offer is placed or to whom it is communicated, and any such member through whom that bid or offer is communicated shall disclose to others participating in effecting the order that it is for the account of a member.

(2) Immediately before executing the order, a member (other than the specialist in such security) presenting any order for the account of a member on the exchange shall clearly announce or otherwise indicate to the specialist and to other members then present for the trading in such security on the exchange that he is presenting an order for the account of a member.

(3) Notwithstanding rules of priority, parity, and precedence otherwise applicable, any member presenting for execution a bid or offer for its own account or for the account of another member shall grant priority to any bid or offer at the same price for the account of a person who is not, or is not associated with, a member, irrespective of the size of any such bid or offer or the time when entered.

(b) A member shall be deemed to meet the requirements of section 11(a)(1)(G)(i) of the Act if during its preceding fiscal year more than 50 percent of its gross revenues was derived from one or more of the sources specified in that section. In addition to any revenue which independently meets the requirements of section 11(a)(1)(G)(i), revenue derived from any transaction specified in paragraph (A), (B), or (D) of section 11(a)(1) of the Act or specified in 17 CFR 240.11a1–4(T) shall be deemed to be revenue derived from one or more of the sources specified in section 11(a)(1)(G)(i). A member may rely on a list of members which are stated to meet the requirements of section 11(a)(1)(G)(i) if such list is prepared, and updated at least annually, by the exchange. In preparing any such list, an exchange may rely on a report which sets forth a statement of gross revenues of a member if covered by a report of independent accountants for such member to the effect that such report has been prepared in accordance with generally accepted accounting principles.

(Secs. 2, 3, 6, 11, 11A, and 23, 89 Stat. 97, 104, 110, 111, 156 (15 U.S.C. 78b, 78c, 78f, 78k, 78k–1, 78w); secs. 2, 3, 11, 23, 48 Stat. 881, 882, 885, 891, 901, as amended)

[43 FR 11553, Mar. 17, 1978, as amended at 43 FR 18562, May 1, 1978; 44 FR 6093, Jan. 31, 1979]

§240.11a1–2 **Transactions for certain accounts of associated persons of members.**

A transaction effected by a member of a national securities exchange for the account of an associated person thereof shall be deemed to be of a kind which is consistent with the purposes of section 11(a)(1) of the Act, the protection of investors, and the maintenance of fair and orderly markets if the transaction is effected:

(a) For the account of and for the benefit of an associated person, if, assuming such transaction were for the account of a member, or

(b) For the account of an associated person but for the benefit of an account carried by such associated person, if, assuming such account were carried on the same basis by a member.

The member would have been permitted, under section 11(a) of the Act and the other rules thereunder, to effect the transaction: *Provided, however,*

77

# EXHIBIT 11

**Consolidated Financial Statements and Supplemental Information**

**Lehman Brothers Inc. and Subsidiaries**

**Year Ended November 30, 2007**

*(Confidential)*

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

ANNUAL AUDITED REPORT
FORM X-17A-5
PART III

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0123 |
| Expires: | |
| Estimated average burden | |
| hours per response . . . 12.00 | |

FACING PAGE
Information Required of Brokers and Dealers Pursuant to Section 17 of the
Securities Exchange Act of 1934 and Rule 17a-5 Thereunder

| SEC FILE NUMBER |
| --- |
| 8-12324 |

REPORT FOR THE PERIOD BEGINNING ___12/01/06___ AND ENDING ___11/30/07___
                                      MM/DD/YY                    MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER: Lehman Brothers Inc. and Subsidiaries

| OFFICIAL USE ONLY |
| --- |
| FIRM ID. NO. |

ADDRESS OF PRINCIPAL PLACE OF BUSINESS: (Do not use P.O. Box No.)

745 7th Avenue

(No. and Street)

New York               New York                    10019
(City)                  (State)                   (Zip Code)

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT
Martin Kelly                                (212) 526-3606

(Area Code – Telephone No.)

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*
Ernst & Young LLP

(Name – of individual, state last, first, middle name)

5 Times Square          New York          NY          10036
(Address)                (City)           (State)     (Zip Code)

CHECK ONE:
    x  Certified Public Accountant
    ☐  Public Accountant
    ☐  Accountant not resident in United States or any of its possessions.

| FOR OFFICIAL USE ONLY |
| --- |
| |

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant must be supported by a statement of facts and circumstances relied on as the basis for the exemption. See section 240.17a-5(e)(2).

SEC 1410 (7-00)

FAX SERVER          11/26/2008 12:13 PM  PAGE  3/057   Fax Server

08-01420-scc  Doc 470250 Filed 12/00/6/26/12 Entered 12/00/6/26/73:48:539:19ain  Appendix
Documents 1 Through 059 of 259 1013 of 1129

# Lehman Brothers Inc. and Subsidiaries

|  |  |  | Page |
|---|---|---|---|
| This report ** contains (check all applicable boxes): | | | |
| x | (a) | Facing page | Facing page |
| x | (b) | Oath or Affirmation | i |
| x | (c) | Consolidated Statement of Income | 1 |
| x | (d) | Consolidated Statement of Financial Condition | 2 |
| x | (e) | Consolidated Statement of Changes in Stockholder's Equity | 3 |
| x | (f) | Consolidated Statement of Changes in Liabilities Subordinated to Claims of General Creditors | 4 |
| x | (g) | Consolidated Statement of Cash Flows | 5 |
| x | (h) | Computation of Net Capital | S1 |
| x | (i) | Statement of Assets Deemed Non-allowable in Computing Net Capital Under Rule 15c3-1 | S3 |
| x | (j) | Computation for Determination of Reserve Requirements for Broker-Dealers Under Rule 15c3-3 | S4 |
| x | (k) | Information for Possession or Control Requirements Under Rule 15c3-3 | S6 |
| x | (l) | Statement Pursuant to Paragraph (d) (4) of Rule 17a-5 | S7 |
| x | (m) | Statement of Segregation Requirements and Funds in Segregation for Customers Trading on U.S. Commodity Exchanges | S8 |
| x | (n) | Statement of Secured Amounts and Funds Held in Separate Accounts for Foreign Futures and Foreign Options Customers Pursuant to Commission Regulation 30.7.—Foreign Futures and Foreign Options Secured Amounts | S9 |
| x | (o) | Statement of Secured Amounts and Funds Held in Separate Accounts for Foreign Futures and Foreign Options Customers Pursuant to Commission Regulation 30.7.—Funds Deposited in Separate Regulation 30.7 Accounts | S10 |
| x | (p) | Statement Pursuant to Section 1.10 (d) (2) of the Commodity Exchange Act | S11 |
| x | (q) | Reconciliation of Assets, Liabilities and Stockholder's Equity to the Regulatory Report | S12 |
|  | (r) | A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit | n/a |
| x | (s) | Supplemental Report of Independent Auditors on Internal Control Required by Securities and Exchange Commission Rule 17a-5 | S14 |
| x | (t) | Supplemental Report of Independent Auditors on Internal Control Required by Commodity Futures Trading Commission Regulation 1.16 | S16 |

** For conditions or confidential treatment of certain portions of this filing, see Section 240.17a-5(e) (3).

FAX SERVER                11/26/2008 12:13 PM   PAGE   4/057   Fax Server

08-01420-scc Doc 0470250 Filed 11/06/26/14 Entered 12/06/26/3:84:559:19ain Appendix
Documents 1 Thrugh 069 of 259 1014 of 1129

## OATH OR AFFIRMATION

I, Erin Callan, swear that, to the best of my knowledge and belief the accompanying financial statements and supporting schedules pertaining to the firm of Lehman Brothers Inc. and Subsidiaries, as of November 30, 2007 are true and correct. I further swear that neither the Company nor any partner, proprietor, principal officer or director has any proprietary interest in any account classified solely as that of a customer.

The financial statements and supplemental information of the Company are made available to all of the Company's members and allied members of the New York Stock Exchange, Inc.

_____
Signature

Chief Financial Officer, Controller and
Executive Vice President
Title

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK )

Sworn to before me this 25ᵗʰ day of January , 2008.

My commission expires: July 9 , 200 0

_____

**AARON GUTH**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 01GU6042149**
**Qualified in New York County**
**My Commission Expires July 09, 2010**

 **ERNST & YOUNG**

■ Ernst & Young LLP
5 Times Square
New York, New York 10036-6530

■ Phone: (212) 773-3000
www.ey.com

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholder of
Lehman Brothers Inc.

We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Inc., and Subsidiaries (the "Company") as of November 30, 2007 and the related consolidated statements of income, changes in stockholder's equity, changes in liabilities subordinated to claims of general creditors, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Inc., and Subsidiaries at November 30, 2007 and the consolidated results of their operations and their cash flows for the year then ended in conformity with U.S. generally accepted accounting principles.

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The information contained within the section titled Supplemental Information is presented for purposes of additional analysis and is not a required part of the basic financial statements, but is supplementary information required by Rule 17a-5 under the Securities Exchange Act of 1934 and regulations under the Commodity Exchange Act. Such information has been subjected to the auditing procedures applied in our audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Ernst + Young LLP*

January 28, 2008

FAX SERVER          11/26/2008 12:13 PM  PAGE  6/057  Fax Server

08-01-0202s-sccDoc>4702250Filed>12/006/26/EnterEnder12/006/26/3481559:19ainAppenoint
Documents 1 ThrPgu2089of 259 1016 of 1129

Lehman Brothers Inc. and Subsidiaries

Consolidated Statement of Income

| In millions | Year Ended November 30, 2007 |
|---|---|
| **Revenues** | |
| Principal transactions | $ 3,055 |
| Investment banking | 2,633 |
| Commissions | 1,490 |
| Interest and dividends | 33,064 |
| Asset management and other | 185 |
| Total revenues | 40,427 |
| Interest expense | 31,879 |
| Net revenues | 8,548 |
| **Non-Interest Expenses** | |
| Compensation and benefits | 4,225 |
| Technology and communications | 309 |
| Brokerage, clearance and distribution fees | 489 |
| Occupancy | 187 |
| Professional fees | 189 |
| Business development | 139 |
| Management fees, net | 147 |
| Other | 79 |
| Total non-personnel expenses | 1,539 |
| Total non-interest expenses | 5,764 |
| Income before taxes | 2,784 |
| Provision for income taxes | 983 |
| Net income | $ 1,801 |

See Notes to Consolidated Financial Statements.

Lehman Brothers Inc. and Subsidiaries
Consolidated Statement of Financial Condition

| In millions, except share data | At November 30, 2007 |
|---|---|
| **Assets** | |
| Cash and cash equivalents | $    716 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 7,998 |
| Financial instruments and other inventory positions owned | |
| (including $53,201 pledged as collateral) | 173,782 |
| Collateralized agreements: | |
| Securities purchased under agreements to resell | 125,130 |
| Securities borrowed | 156,239 |
| Receivables: | |
| Brokers, dealers and clearing organizations | 9,354 |
| Customers | 8,145 |
| Affiliates | 11,740 |
| Others | 370 |
| Property, equipment and leasehold improvements | |
| (net of accumulated depreciation and amortization of $331) | 238 |
| Other assets | 1,103 |
| Identifiable intangible assets and goodwill (net of accumulated amortization of $151) | 611 |
| Total assets | $ 495,426 |
| | |
| **Liabilities and Stockholder's Equity** | |
| Short-term borrowings and current portion of long-term borrowings | $   1,667 |
| Financial instruments and other inventory positions sold but not yet purchased | 85,023 |
| Collateralized financings: | |
| Securities sold under agreements to repurchase | 186,306 |
| Securities loaned | 115,175 |
| Other secured borrowings | 8,096 |
| Advances from Holdings and other affiliates | 58,230 |
| Payables: | |
| Brokers, dealers and clearing organizations | 3,928 |
| Customers | 22,023 |
| Accrued liabilities and other payables | 5,279 |
| Long-term borrowings | 5,253 |
| Total liabilities | 490,980 |
| Commitments and contingencies | |
| **Stockholder's Equity** | |
| Preferred stock, $0.10 par value; 10,000 shares authorized; none outstanding | — |
| Common stock, $0.10 par value; 10,000 shares authorized; | |
| 1,006 shares issued and outstanding | — |
| Additional paid-in capital | 1,788 |
| Accumulated other comprehensive income (net of tax) | 28 |
| Retained earnings | 2,630 |
| Total stockholders' equity | 4,446 |
| Total liabilities and stockholders' equity | $ 495,426 |

See Notes to Consolidated Financial Statements.

FAX SERVER          11/26/2008 12:13 PM  PAGE  8/057  Fax Server

08-01420-sccsccDoct70250FiledFil2/006/26/12nteEnder2d006/26/13:41339:19ainAppendiant
Documents 1 ThrPugh09 of 259 1018 of 1129

Lehman Brothers Inc. and Subsidiaries

Consolidated Statement of Changes in Stockholder's Equity

| In millions | Year Ended November 30, 2007 |
| --- | --- |
| Additional paid-in capital, beginning and ending balance | $ 1,788 |
| Accumulated other comprehensive income, net of tax: | |
| Beginning balance | $   12 |
| Translation adjustment, net | 16 |
| Ending balance | $   28 |
| Retained earnings: | |
| Beginning balance | $ 2,200 |
| Cumulative effect of accounting change (SFAS No. 157) | 31 |
| Net income | 1,801 |
| Dividends | (1,402) |
| Ending balance | $ 2,630 |
| Total stockholder's equity | $ 4,446 |

See Notes to Consolidated Financial Statements.

FAX SERVER                11/26/2008 12:13 PM   PAGE  9/057   Fax Server

08-01420-scc   Doc 4782-50   Filed 12/06/16   Entered 12/06/16 13:44:59:19   Main Document
Documents 1 Through 259   Pg 1019 of 1129   Page 1019 of 1129

**Lehman Brothers Inc. and Subsidiaries**

**Consolidated Statement of Changes in Liabilities**

**Subordinated to Claims of General Creditors**

| In millions | Year Ended<br>November 30, 2007 |
| --- | --- |
| Subordinated indebtedness, beginning of period | $6,158 |
| Issuance of subordinated indebtedness | 13 |
| Payment of subordinated indebtedness | (332) |
| Other, net | 1 |
| Subordinated indebtedness, end of period | $5,840 |

See Notes to Consolidated Financial Statements.

Lehman Brothers Inc. and Subsidiaries

Consolidated Statement of Cash Flows

| In millions | Year Ended November 30, 2007 |
|---|---|
| **Cash Flows From Operating Activities** | |
| Net income | $ 1,801 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
|     Depreciation and amortization | 86 |
|     Deferred tax benefit | (238) |
| Net change in: | |
|     Cash and securities segregated and on deposit for regulatory and other purposes | (4,741) |
|     Financial instruments and other inventory positions owned | (42,357) |
|     Resale agreements, net of repurchase agreements | 13,258 |
|     Securities borrowed, net of securities loaned | 10,004 |
|     Other secured borrowings | 1,886 |
|     Receivables from brokers, dealers and clearing organizations | (466) |
|     Receivables from customers | (2,007) |
|     Financial instruments and other inventory positions sold but not yet purchased | 4,472 |
|     Payables to brokers, dealers and clearing organizations | (1,460) |
|     Payables to customers | 9,075 |
|     Accrued liabilities and other payables | (590) |
|     Due to/from affiliates, net | 12,992 |
|     Other receivables and assets | (289) |
| Net cash provided by operating activities | 1,426 |
| **Cash Flows From Investing Activities** | |
| Purchases of property, equipment and leasehold improvements, net | (102) |
| Business acquisitions, net of cash acquired | (599) |
| Net cash used in investing activities | (701) |
| **Cash Flows From Financing Activities** | |
| Derivative contracts with a financing element | 7 |
| Issuance of short-term borrowings, net | 110 |
| Issuance of long-term borrowings | 13 |
| Principal payments of long-term borrowings, including the current portion of long term borrowings | (895) |
| Dividends paid | (1,402) |
| Net cash used in financing activities | (2,167) |
| Net change in cash and cash equivalents | (1,442) |
| Cash and cash equivalents, beginning of period | 2,158 |
| Cash and cash equivalents, end of period | $ 716 |

**Supplemental Disclosure of Cash Flow Information (in millions):**

Interest paid totaled $31,852.

Income taxes paid totaled $2,670.

See Notes to Consolidated Financial Statements.

## Lehman Brothers Inc. and Subsidiaries

### Notes to Consolidated Financial Statements

### Contents

|          |                                                        | Page |
|----------|--------------------------------------------------------|------|
| Note 1   | Summary of Significant Accounting Policies             | 7    |
| Note 2   | Business Segments and Geographic Information           | 14   |
| Note 3   | Financial Instruments and Other Inventory Positions    | 16   |
| Note 4   | Fair Value of Financial Instruments                    | 17   |
| Note 5   | Securities Received and Pledged as Collateral          | 20   |
| Note 6   | Securitizations and Special Purpose Entities           | 20   |
| Note 7   | Identifiable Intangible Assets and Goodwill            | 22   |
| Note 8   | Borrowings                                             | 23   |
| Note 9   | Commitments, Contingencies and Guarantees              | 24   |
| Note 10  | Holdings' Incentive Plans                              | 27   |
| Note 11  | Holdings' Employee Benefit Plans                       | 28   |
| Note 12  | Regulatory Requirements                                | 31   |
| Note 13  | Income Taxes                                           | 32   |
| Note 14  | Related Party Transactions                             | 33   |

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

---

**Note 1 Summary of Significant Accounting Policies**

---

**Description of Business**

Lehman Brothers Inc. ("LBI") is a U.S. registered broker-dealer. Together, LBI and its subsidiaries (collectively, the "Company," "we," "us" or "our") is a wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("Holdings").

**Basis of Presentation**

The Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles, and include the accounts of LBI, our subsidiaries, and all other entities in which we have a controlling financial interest or are considered to be the primary beneficiary. All material intercompany accounts and transactions have been eliminated upon consolidation. The presented, consolidated financial information contains certain allocations that are reasonable in management's judgment.

**Consolidation Accounting Policies**

The Consolidated Financial Statements includes the accounts of LBI and the entities in which the Company has a controlling financial interest. We determine whether we have a controlling financial interest in an entity by first determining whether the entity is a voting interest entity (sometimes referred to as a non-VIE), a variable interest entity ("VIE") or a qualified special purpose entity ("QSPE").

*Voting Interest Entity.* Voting interest entities are entities that have (i) total equity investment at risk sufficient to fund expected future operations independently; and (ii) equity holders who have the obligation to absorb losses or receive residual returns and the right to make decisions about the entity's activities. In accordance with Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, and Statement of Financial Accounting Standards ("SFAS") No. 94, *Consolidation of All Majority-Owned Subsidiaries*, voting interest entities are consolidated when the Company has a controlling financial interest, typically more than 50 percent of an entity's voting interests.

*Variable Interest Entity.* VIEs are entities that lack one or more voting interest entity characteristics. The Company consolidates VIEs in which it is the primary beneficiary. In accordance with Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 46-R, *Consolidation of Variable Interest Entities (revised December 2003)—an interpretation of ARB No. 51* ("FIN 46(R)"), we are the primary beneficiary if we have a variable interest, or a combination of variable interests, that will either (i) absorb a majority of the VIEs expected losses; (ii) receive a majority of the VIEs expected residual returns; or (iii) both. To determine if we are the primary beneficiary of a VIE, we review, among other factors, the VIE's design, capital structure, contractual terms, which interests create or absorb variability and related party relationships, if any. Additionally, we may calculate our share of the VIE's expected losses and expected residual returns based upon the VIE's contractual arrangements and/or our position in the VIE's capital structure. This type of analysis is typically performed using expected cash flows allocated to the expected losses and expected residual returns under various probability-weighted scenarios.

*Qualified Special Purpose Entity.* QSPEs are passive entities with limited permitted activities. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-a replacement of FASB Statement No. 125* ("SFAS 140"), establishes the criteria an entity must satisfy to be a QSPE, including types of assets held, limits on asset sales, use of derivatives and financial guarantees, and discretion exercised in servicing activities. In accordance with SFAS 140 and FIN 46(R), we do not consolidate QSPEs.

For a further discussion of our involvement with VIEs, QSPEs and other entities see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

*Equity-Method Investments.* Entities in which we do not have a controlling financial interest (and therefore do not consolidate) but in which we exert significant influence (generally defined as owning a voting interest of 20 percent to 50 percent, or a partnership interest greater than 3 percent) are accounted for either under Accounting Principles Board ("APB") Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock* or SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"). For further discussion of our adoption of SFAS 159, see "Accounting and Regulatory Developments—SFAS 159" below.

*Other.* When we do not consolidate an entity or apply the equity method of accounting, we present our investment in the entity at fair value. We have formed various non-consolidated private equity or other alternative investment funds with third-party investors that are typically organized as limited partnerships. We typically act as general partner for these funds and when third-party investors have rights to either (i) remove the general partner without cause or to liquidate the partnership; or (ii)

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

substantive participation rights we do not consolidate these partnerships in accordance with Emerging Issues Task Force ("EITF") No. 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights* ("EITF 04-5").

A determination of whether we have a controlling financial interest in an entity and therefore our assessment of consolidation of that entity is initially made at the time we become involved with the entity. Certain events may occur which cause us to re-assess our initial determination of whether an entity is a VIE or non-VIE or whether we are the primary beneficiary if the entity is a VIE. Those events generally are:

- the entity's governance structure is changed such that either (i) the characteristics or adequacy of equity at risk are changed; or (ii) expected returns or losses are reallocated amongst the participating parties within the entity.

- the equity investment (or some part thereof) is returned to the equity investors and other interests become exposed to expected returns or losses.

- additional activities are undertaken or assets acquired by the entity that were beyond those anticipated previously.

- participants in the entity acquire or sell interests in the entity.

- the entity receives additional equity at risk or curtails its activities in a way that changes the expected returns or losses.

## Use of Estimates

In preparing our Consolidated Financial Statements and accompanying notes, management makes various estimates that affect reported amounts and disclosures. Those estimates are used in:

- measuring fair value of certain financial instruments;

- accounting for identifiable intangible assets and goodwill;

- establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations; and

- assessing our ability to realize deferred tax assets.

Estimates are based on available information and judgment. Therefore, actual results could differ from our estimates and that difference could have a material effect on our Consolidated Statement of Financial Condition and notes thereto.

## Currency Translation

Assets and liabilities of subsidiaries having non–U.S. dollar functional currencies are translated at exchange rates at the applicable Consolidated Statement of Financial Condition date. Revenues and expenses are translated at average exchange rates during the period. The gains or losses resulting from translating non-U.S. dollar functional currency into U.S. dollars, net of hedging gains or losses, are included in Accumulated other comprehensive income/(loss), net of tax, a component of equity. Gains or losses resulting from non-U.S. dollar currency transactions are included in the Consolidated Statement of Income.

## Revenue Recognition Policies

*Principal transactions.* Realized and unrealized gains and losses from Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased that we measure at fair value are reflected in Principal transactions in the Consolidated Statement of Income as incurred.

*Investment banking.* Underwriting revenues, net of related underwriting expenses, and revenues for merger and acquisition advisory and other investment banking-related services are recognized when services for the transactions are completed. In instances where our Investment Banking segment provides structuring services and/or advice in a capital markets-related transaction, we record a portion of the transaction-related revenue as Investment Banking fee revenues.

*Commissions.* Commissions primarily include fees from executing and clearing client transactions on equities, options and futures markets worldwide. These fees are recognized on a trade-date basis.

*Interest and dividends revenue and interest expense.* We recognize contractual interest on Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased, excluding

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

derivatives, on an accrual basis as a component of Interest and dividends revenue and Interest expense, respectively. We account for our secured financing activities and certain short- and long-term borrowings on an accrual basis with related interest recorded as interest revenue or interest expense, as applicable.

*Asset management and other.* Investment advisory fees are recorded as earned. In certain circumstances, we receive asset management incentive fees when the return on assets under management exceeds specified benchmarks. Incentive fees are generally based on investment performance over a twelve-month period and are not subject to adjustment after the measurement period ends. Accordingly, we recognize incentive fees when the measurement period ends.

We also receive private equity incentive fees when the returns on certain private equity or other alternative investment funds' investments exceed specified thresholds. Private equity incentive fees typically are based on investment results over a period greater than one year, and future investment underperformance could require amounts previously distributed to us to be returned to the funds. Accordingly, we recognize these incentive fees when all material contingencies have been substantially resolved.

### Income Taxes

We account for income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes*. We recognize the current and deferred tax consequences of all transactions that have been recognized in the Consolidated Financial Statements using the provisions of the enacted tax laws. Deferred tax assets are recognized for temporary differences that will result in deductible amounts in future years and for tax loss carry-forwards. We record a valuation allowance to reduce deferred tax assets to an amount that more likely than not will be realized. Deferred tax liabilities are recognized for temporary differences that will result in taxable income in future years. Contingent liabilities related to income taxes are recorded when probable and reasonably estimable in accordance with SFAS No. 5, *Accounting for Contingencies.*

For a further discussion of the impact of FIN 48, *Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109* ("FIN 48"), see "Accounting and Regulatory Developments—FIN 48" below.

### Financial Instruments and Other Inventory Positions

Financial instruments and other inventory positions owned, excluding real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased are carried at fair value. Real estate held for sale is accounted for at the lower of its carrying amount or fair value. less cost to sell. For further discussion of our financial instruments and other inventory positions, see Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

Firm-owned securities pledged to counterparties who have the right, by contract or custom, to sell or repledge the securities are classified as Financial instruments and other inventory positions owned and are disclosed as pledged as collateral. For further discussion of our securities received and pledged as collateral, see Note 5, "Securities Received and Pledged as Collateral," to the Consolidated Financial Statements.

We adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157") effective December 1, 2006. SFAS 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When observable prices are not available, we either use implied pricing from similar instruments or valuation models based on net present value of estimated future cash flows, adjusted as appropriate for liquidity, credit, market and/or other risk factors. Fair value measurements for private equity-related positions reflect selling restrictions, if existing, expected cash flows, earnings multiples and/or comparison to similar market transactions.

Prior to December 1, 2006, we followed the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, *Brokers and Dealers in Securities* (the "Guide") when determining fair value for financial instruments, which permitted the recognition of a discount to the quoted price when determining the fair value for a substantial block of a particular security, when the quoted price was not considered to be readily realizable (*i.e.*, a block discount).

For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

*Derivative financial instruments.* Derivatives are financial instruments whose value is based on an underlying asset (*e.g.*, Treasury bond), index (*e.g.*, S&P 500) or reference rate (*e.g.*, LIBOR), and include futures, forwards, swaps, option contracts, or other financial instruments with similar characteristics. A derivative contract generally represents a future commitment to exchange interest payment streams or currencies based on the contract or notional amount or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Over-the-counter

FAX SERVER          11/26/2008 12:13 PM    PAGE   15/057    Fax Server

08-01-420-20-scccDoc47250Filed12006/26/EnterEdre1r2006/26/3484559:19ainAppendienet
Documents 1 Thru 2017 of 2591025 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

("OTC") derivative products are privately-negotiated contractual agreements that can be tailored to meet individual client needs and include forwards, swaps and certain options including caps, collars and floors. Exchange-traded derivative products are standardized contracts transacted through regulated exchanges and include futures and certain option contracts listed on exchanges.

Derivatives are recorded at fair value and included in either Financial instruments and other inventory positions or Financial instruments and other inventory positions sold but not yet purchased in the Consolidated Statement of Financial Condition. Derivatives are presented on a net-by-counterparty basis when a legal right of offset exists; net across different products or positions when applicable provisions are stated in a master netting agreement; and/or net of cash collateral received or paid on a counterparty basis, provided legal right of offset exists.

We enter into derivative transactions both in a trading capacity and as an end-user. Acting in a trading capacity, we enter into derivative transactions to satisfy the needs of our clients and to manage our own exposure to market and credit risks resulting from our trading activities (collectively, "Trading-Related Derivatives"). For Trading-Related Derivatives, margins on futures contracts are included in receivables and payables from/to brokers, dealers and clearing organizations, as applicable.

As an end-user, we primarily use derivatives to hedge our exposure to market risk (including foreign currency exchange and interest rate risks) and credit risks (collectively, "End-User Derivatives"). When End-User Derivatives are interest rate swaps they are measured at fair value through earnings and the carrying value of the related hedged item is adjusted through earnings for the effect of changes in the risk being hedged. The hedge ineffectiveness in these relationships is recorded in Interest expense in the Consolidated Statement of Income. When End-User Derivatives are used in hedges of net investments in non-U.S. dollar functional currency subsidiaries, the gains or losses are reported within Accumulated other comprehensive income (net of tax) in equity.

Prior to December 1, 2006, we followed EITF Issue No. 02-3, *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* ("EITF 02-3"). Under EITF 02-3, recognition of a trading profit at inception of a derivative transaction was prohibited unless the fair value of that derivative was obtained from a quoted market price supported by comparison to other observable inputs or based on a valuation technique incorporating observable inputs. Subsequent to the inception date ("Day 1"), we recognized trading profits deferred at Day 1 in the period in which the valuation of the instrument became observable. The adoption of SFAS 157 nullified the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs. For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

*Private equity investments.* Our private equity investments are measured at fair value.

*Securitization activities.* In accordance with SFAS 140, we recognize transfers of financial assets as sales, if control has been surrendered. We determine control has been surrendered when the following three criteria have been met:

- The transferred assets have been isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership (i.e., a true sale opinion has been obtained);

- Each transferee (or, if the transferee is a QSPE, each holder of its beneficial interests) has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or holder) from taking advantage of its right to pledge or exchange and provides more than a trivial benefit to the transferor; and

- The transferor does not maintain effective control over the transferred assets through either (i) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity; or (ii) the ability to unilaterally cause the holder to return specific assets.

*Collateralized Lending Agreements and Financings*

Treated as collateralized agreements and financings for financial reporting purposes are the following:

- *Repurchase and resale agreements.* Securities purchased under agreements to resell and securities sold under agreements to repurchase are collateralized primarily by government and government agency securities and are carried net by counterparty, when permitted, at the amounts at which the securities subsequently will be resold or repurchased plus accrued interest. We take possession of securities purchased under agreements to resell.

FAX SERVER                    11/26/2008 12:13 PM  PAGE  16/057   Fax Server

08-01-02020-sccDoc47025Filed-12/06/26/EnteredFiled-12/06/26/13:84:539:Main Appendix
Documents 1 Through 89 of 259 1026 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

The fair value of the underlying positions is compared daily with the related receivable or payable balances, including accrued interest. We require counterparties to deposit additional collateral or return collateral pledged, as necessary, to ensure the fair value of the underlying collateral remains sufficient.

- *Securities borrowed and securities loaned.* Securities borrowed and securities loaned are carried at the amount of cash collateral advanced or received plus accrued interest. We value the securities borrowed and loaned daily and obtain additional cash as necessary to ensure these transactions are adequately collateralized. When we act as the lender of securities in a securities-lending agreement and we receive securities that can be pledged or sold as collateral, we recognize an asset, representing the securities received and a liability, representing the obligation to return those securities.

- *Other secured borrowings.* Other secured borrowings principally includes non-recourse financings of entities that we have consolidated because we are the primary beneficiaries of such entities.

## Long-Lived Assets

Property, equipment and leasehold improvements are recorded at historical cost, net of accumulated depreciation and amortization. Depreciation is recognized using the straight-line method over the estimated useful lives of the assets. Buildings are depreciated up to a maximum of 40 years. Leasehold improvements are amortized over the lesser of their useful lives or the terms of the underlying leases, which range up to 30 years. Equipment, furniture and fixtures are depreciated over periods of up to 10 years. Internal-use software that qualifies for capitalization under AICPA Statement of Position 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*, is capitalized and subsequently amortized over the estimated useful life of the software, generally three years, with a maximum of seven years. We review long-lived assets for impairment periodically and whenever events or changes in circumstances indicate the carrying amounts of the assets may be impaired. If the expected future undiscounted cash flows are less than the carrying amount of the asset, an impairment loss is recognized to the extent the carrying value of the asset exceeds its fair value.

## Identifiable Intangible Assets and Goodwill

Identifiable intangible assets with finite lives are amortized over their expected useful lives, which range up to 15 years. Identifiable intangible assets with indefinite lives and goodwill are not amortized. Instead, these assets are evaluated at least annually for impairment. Goodwill is reduced upon the recognition of certain acquired net operating loss carryforward benefits.

## Cash Equivalents

Cash equivalents include highly liquid investments not held for resale with maturities of three months or less when we acquire them.

## Accounting and Regulatory Developments

*SFAS 157.* In September 2006, the FASB issued SFAS 157. SFAS 157 defines fair value, establishes a framework for measuring fair value, outlines a fair value hierarchy based on inputs used to measure fair value and enhances disclosure requirements for fair value measurements. SFAS 157 does not change existing guidance as to whether or not an instrument is carried at fair value.

SFAS 157 also (i) nullifies the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs; (ii) clarifies that an issuer's credit standing should be considered when measuring liabilities at fair value; (iii) precludes the use of a liquidity or block discount when measuring instruments traded in an active market at fair value; and (iv) requires costs related to acquiring financial instruments carried at fair value to be included in earnings as incurred.

We elected to early adopt SFAS 157 at the beginning of our 2007 fiscal year and we recorded the difference between the carrying amounts and fair values of (i) stand-alone derivatives measured using the guidance in EITF 02-3 on recognition of a trading profit at the inception of a derivative, and (ii) financial instruments that are traded in active markets that were measured at fair value using block discounts, as a cumulative-effect adjustment to opening retained earnings. As a result of adopting SFAS 157, we recognized a $31 million after-tax ($54 million pre-tax) increase to opening retained earnings.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

For additional information regarding our adoption of SFAS 157, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

**SFAS 158.** In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Retirement Plans* ("SFAS 158") which requires an employer to recognize the over- or under-funded status of its defined benefit postretirement plans as an asset or liability in its Consolidated Statement of Financial Condition, measured as the difference between the fair value of the plan assets and the benefit obligation. For pension plans, the benefit obligation is the projected benefit obligation; while for other postretirement plans the benefit obligation is the accumulated postretirement obligation. Upon adoption, SFAS 158 requires an employer to recognize previously unrecognized actuarial gains and losses and prior service costs within Accumulated other comprehensive income (net of tax), a component of equity. The Company's employees participate in Holdings' domestic pension plans. Holdings adopted SFAS 158 for the fiscal year ended November 30, 2007. SFAS 158 had no impact on LBI's consolidated financial statements.

**SFAS 159.** In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"), which permits certain financial assets and financial liabilities to be measured at fair value, using an instrument-by-instrument election. The initial effect of adopting SFAS 159 must be accounted for as a cumulative-effect adjustment to opening retained earnings for the fiscal year in which we apply SFAS 159. Retrospective application of SFAS 159 to fiscal years preceding the effective date is not permitted. We have not elected to fair value any additional financial instruments under the guidance of SFAS 159.

**SFAS 141(R).** In December 2007, the FASB issued SFAS No. 141(R), *Business Combinations* ("SFAS 141(R)"). SFAS 141(R) expands the definition of transactions and events that qualify as business combinations; requires that the acquired assets and liabilities, including contingencies, be recorded at the fair value determined on the acquisition date and changes thereafter reflected in revenue, not goodwill; changes the recognition timing for restructuring costs; and requires acquisition costs to be expensed as incurred. Adoption of SFAS 141(R) is required for combinations after December 15, 2008. Early adoption and retroactive application of SFAS 141(R) to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

**SFAS 160.** In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interest in Consolidated Financial Statements* ("SFAS 160"). SFAS 160 re-characterizes minority interests in consolidated subsidiaries as non-controlling interests and requires the classification of minority interests as a component of equity. Under SFAS 160, a change in control will be measured at fair value, with any gain or loss recognized in earnings. The effective date for SFAS 160 is for annual periods beginning on or after December 15, 2008. Early adoption and retroactive application of SFAS 160 to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

**FIN 48.** In June 2006, the FASB issued FIN 48, which sets out a framework for management to use to determine the appropriate level of tax reserves to maintain for uncertain tax positions. This interpretation of SFAS 109 uses a two-step approach wherein a tax benefit is recognized if a position is more likely than not to be sustained, and the amount of benefit is then measured on a probabilistic approach, as defined in FIN 48. FIN 48 also sets out disclosure requirements to enhance transparency of an entity's tax reserves. We must adopt FIN 48 as of the beginning of our 2008 fiscal year. We estimate that the effect of adopting FIN 48 at the beginning of the first quarter of the 2008 fiscal year to be a decrease to opening retained earnings of approximately $86 million.

**SOP 07-1.** In June 2007, the AICPA issued Statement of Position ("SOP") No. 07-1, *Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies* ("SOP 07-1"). SOP 07-1 addresses when the accounting principles of the AICPA Audit and Accounting Guide Investment Companies must be applied by an entity and whether those accounting principles must be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. SOP 07-1 is effective for our fiscal year beginning December 1, 2008. We are evaluating the effect of adopting SOP 07-1 on our Consolidated Financial Statements.

**EITF Issue No. 04-5.** In June 2005, the FASB ratified the consensus reached in EITF 04-5 which requires general partners (or managing members in the case of limited liability companies) to consolidate their partnerships or to provide limited partners with either (i) rights to remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights. As the general partner of numerous private equity and asset management partnerships, we adopted EITF 04-5 effective June 30, 2005 for partnerships formed or modified after June 29, 2005. For partnerships formed on or before

- 12 -

FAX SERVER          11/26/2008 12:13 PM   PAGE  18/057    Fax Server

08-01420-sccDoc 7250 Filed 12/06/26/Entered 12/06/26/34:39:19 Main Appendix
                Documents 1 Through 259 Pg 209 of 1028 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

June 29, 2005 that had not been modified, we adopted EITF 04-5 as of the beginning of our 2007 fiscal year. The adoption of EITF 04-5 did not have a material effect on our Consolidated Financial Statements.

*FSP FIN 46(R)-6.* In April 2006, the FASB issued FASB Staff Position ("FSP") FIN 46(R)-6, *Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)* ("FSP FIN 46(R)-6"). This FSP addresses how a reporting enterprise should determine the variability to be considered in applying FIN 46(R) by requiring an analysis of the purpose for which an entity was created and the variability that the entity was designed to create. We adopted FSP FIN 46(R)-6 on September 1, 2006 and applied it prospectively to all entities in which we first became involved after that date. Adoption of FSP FIN 46(R)-6 did not have a material effect on our Consolidated Financial Statements.

*FSP FIN 39-1.* In April 2007, the FASB directed the FASB Staff to issue FSP No. FIN 39-1, *Amendment of FASB Interpretation No. 39* ("FSP FIN 39-1"). FSP FIN 39-1 modifies FIN No. 39, *Offsetting of Amounts Related to Certain Contracts*, and permits companies to offset cash collateral receivables or payables with net derivative positions under certain circumstances. FSP FIN 39-1 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted. FSP FIN 39-1 does not affect our Consolidated Financial Statements because it clarified the acceptability of existing market practice, which we use, of netting cash collateral against net derivative assets and liabilities.

*FSP FIN 48-1.* In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 48-1, *Definition of "Settlement" In FASB Interpretation No. 48* ("FSP FIN 48-1"). Under FSP FIN 48-1, a previously unrecognized tax benefit may be subsequently recognized if the tax position is effectively settled and other specified criteria are met. We are evaluating the effect of adopting FSP FIN 48-1 on our Consolidated Financial Statements as part of our evaluation of the effect of adopting FIN 48.

*FSP FIN 46(R)-7.* In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 46(R)-7, *Application of FASB Interpretation No. 46(R) to Investment Companies* ("FSP FIN 46(R)-7"). FSP FIN 46(R)-7 makes permanent the temporary deferral of the application of the provisions of FIN 46(R) to unregistered investment companies, and extends the scope exception from applying FIN 46(R) to include registered investment companies. FSP FIN 46(R)-7 is effective upon adoption of SOP 07-1. We are evaluating the effect of adopting FSP FIN 46(R)-7 on our Consolidated Financial Statements.

*SAB 108.* In September 2006, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin ("SAB") No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 specifies how the carryover or reversal of prior-year unrecorded financial statement misstatements should be considered in quantifying a current-year misstatement. SAB 108 requires an approach that considers the amount by which the current-year statement of income is misstated ("rollover approach") and an approach that considers the cumulative amount by which the current-year statement of financial condition is misstated ("iron-curtain approach"). Prior to the issuance of SAB 108, either the rollover or iron-curtain approach was acceptable for assessing the materiality of financial statement misstatements. SAB 108 became effective for our fiscal year ended November 30, 2006. Upon adoption, SAB 108 allowed a cumulative-effect adjustment to opening retained earnings at December 1, 2005 for prior-year misstatements that were not material under a prior approach but that were material under the SAB 108 approach. Adoption of SAB 108 did not affect our Consolidated Financial Statements.

*SAB 109.* In November 2007, the SEC issued SAB No. 109, *Written Loan Commitments Recorded at Fair Value Through Earnings* ("SAB 109"). SAB 109 supersedes SAB No. 105, *Loan Commitments Accounted for as Derivative Instruments* ("SAB 105"), and expresses the view that, consistent with the guidance in SFAS 156 and SFAS 159, the expected net future cash flows related to the associated servicing of the loan should be included in the measurement of all written loan commitments that are accounted for at fair value through earnings. SAB 105 also expressed the view that internally-developed intangible assets (such as customer relationship intangible assets) should not be recorded as part of the fair value of a derivative loan commitment. SAB 109 retains that view and broadens its application to all written loan commitments that are accounted for at fair value through earnings. Adoption of SAB 109 did not have a material affect on our Consolidated Financial Statements.

*The ASF Framework.* On December 6, 2007, the American Securitization Forum ("ASF"), working with various constituency groups as well as representatives of U.S. federal government agencies, issued the *Streamlined Foreclosure and Loss Avoidance Framework for Securitized Subprime Adjustable Rate Mortgage Loans* (the "ASF Framework"). The ASF Framework provides guidance for servicers to streamline borrower evaluation procedures and to facilitate the use of foreclosure and loss prevention efforts in an attempt to reduce the number of U.S. subprime residential mortgage borrowers who might default in the coming year because the borrowers cannot afford to pay the increased loan interest rate after their U.S. subprime residential mortgage variable loan rate resets. The ASF Framework requires a borrower and its U.S. subprime residential mortgage variable loan to meet specific conditions to qualify for a modification under which the qualifying borrower's U.S. subprime residential mortgage variable loan's interest rate would be kept at the existing rate, generally for five years following an

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

upcoming reset period. The ASF Framework is focused on U.S. subprime first-lien adjustable-rate residential mortgages that have an initial fixed interest rate period of 36 months or less, are included in securitized pools, were originated between January 1, 2005 and July 31, 2007, and have an initial interest rate reset date between January 1, 2008 and July 31, 2010 (defined as "Segment 2 Subprime ARM Loans" within the ASF Framework).

On January 8, 2008, the SEC's Office of Chief Accountant (the "OCA") issued a letter (the "OCA Letter") addressing accounting issues that may be raised by the ASF Framework. Specifically, the OCA Letter expressed the view that if a Segment 2 Subprime ARM Loan is modified pursuant to the ASF Framework and that loan could legally be modified, the OCA will not object to continued status of the transferee as a QSPE under SFAS 140. Concurrent with the issuance of the OCA Letter, the OCA requested the FASB to immediately address the issues that have arisen in the application of the QSPE guidance in SFAS 140. Any loan modifications we make in accordance with the ASF Framework will not have a material affect on our accounting for U.S. subprime residential mortgage loans nor securitizations or retained interests in securitizations of U.S. subprime residential mortgage loans.

---

## Note 2 Business Segments and Geographic Information

### Business Segments

We organize our business operations into three business segments: Capital Markets, Investment Banking and Investment Management.

Our business segment information for the period ended November 30, 2007 is prepared using the following methodologies and generally represents the information that is relied upon by management in its decision-making processes:

- Revenues and expenses directly associated with each business segment are included in determining income before taxes.

- Revenues and expenses not directly associated with specific business segments are allocated based on the most relevant measures applicable, including each segment's revenues, headcount and other factors.

- Net revenues include allocations of interest revenue, interest expense and revaluation of certain long-term and short-term debt measured at fair value to securities and other positions in relation to the cash generated by, or funding requirements of, the underlying positions.

- Business segment assets include an allocation of indirect corporate assets that have been fully allocated to our segments, generally based on each segment's respective headcount figures.

*Capital Markets.* Our Capital Markets segment is divided into two components:

*Fixed Income* – We make markets in and trade municipal and public sector instruments, interest rate and credit products, mortgage-related securities and loan products, currencies and commodities. We also originate mortgages and we structure and enter into a variety of derivative transactions. We also provide research covering economic, quantitative, strategic, credit, relative value, index and portfolio analyses. Additionally, we provide financing, advice and servicing activities to the hedge fund community, known as prime brokerage services. We engage in certain proprietary trading activities and in principal investing in real estate that are managed within this component.

*Equities* – We make markets in and trade equities and equity-related products and enter into a variety of derivative transactions. We also provide equity-related research coverage as well as execution and clearing activities for clients. Through our capital markets prime services, we provide prime brokerage services to the hedge fund community. We also engage in proprietary trading activities and private equity and other related investments.

*Investment Banking.* We take an integrated approach to client coverage, organizing bankers into industry, product and geographic groups within our Investment Banking segment. Business activities provided to corporations and governments worldwide can be separated into:

*Global Finance* – We serve our clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products.

*Advisory Services* – We provide business advisory services with respect to mergers and acquisitions, divestitures, restructurings, and other corporate activities.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

*Investment Management.* The Investment Management business segment consists of:

*Asset Management* – We provide customized investment management services for high net worth clients, mutual funds and other small and middle market institutional investors. Asset Management also serves as general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

*Private Investment Management* – We provide investment, wealth advisory and capital markets execution services to high net worth and middle market institutional clients.

### Business Segments

|  | At and for the Year Ended November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Capital Markets | Investment Banking | Investment Management | Total |
| Gross revenues | $35,963 | $ 3,037 | $1,427 | $40,427 |
| Interest expense | 31,860 | — | 19 | 31,879 |
| Net revenues | 4,103 | 3,037 | 1,408 | 8,548 |
| Depreciation and amortization expense | 58 | 5 | 23 | 86 |
| Other expenses | 2,663 | 2,043 | 972 | 5,678 |
| Income before taxes | $ 1,382 | $ 989 | $ 413 | $ 2,784 |
| Segment assets (in billions) | $ 491.9 | $ 0.5 | $ 3.0 | $ 495.4 |

### Net Revenues by Geographic Region

We organize our operations into three geographic regions:

- Europe and the Middle East, inclusive of our operations in Russia and Turkey;

- Asia-Pacific, inclusive of our operations in Australia and India; and

- the Americas.

Net revenues presented by geographic region are based upon the location of the senior coverage banker or investment advisor in the case of Investment Banking or Asset Management, respectively, or where the position was risk managed within Capital Markets and Private Investment Management. Certain revenues associated with U.S. products and services that result from relationships with international clients have been classified as international revenues using an allocation process. In addition, expenses contain certain internal allocations, such as regional transfer pricing, which are centrally managed. The methodology for allocating the firm's revenue and expense to geographic regions is dependent on the judgment of management.

The following presents, in management's judgment, a reasonable representation of each region's contribution to our net revenues.

### Net Revenues by Geographic Region

| In millions | Year Ended November 30, 2007 |
|---|---|
| Europe and the Middle East | $1,189 |
| Asia-Pacific | 729 |
| Total Non–Americas | 1,918 |
| U.S. | 6,504 |
| Other Americas | 126 |
| Total Americas | 6,630 |
| Net revenues | $8,548 |

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

---

**Note 3 Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased were comprised of the following:

| In millions<br>At November 30, 2007 | Owned | Sold But Not<br>Yet Purchased |
|---|---|---|
| Government and agencies | $ 47,939 | $ 52,698 |
| Corporate debt and other | 29,320 | 3,562 |
| Mortgage and asset-backed securities | 29,627 | 52 |
| Real estate held for sale | 3,563 | — |
| Corporate equities | 30,453 | 6,777 |
| Derivatives and other contractual agreements | 27,849 | 21,934 |
| Commercial paper and other money market instruments | 5,031 | — |
| | $173,782 | $ 85,023 |

Mortgage and asset-backed securities include residential and commercial whole loans and interests in residential and commercial mortgage-backed securitizations. Also included within Mortgage and asset-backed securities are securities whose cash flows are based on pools of assets in bankruptcy-remote entities, or collateralized by cash flows from a specified pool of underlying assets. The pools of assets may include, but are not limited to mortgages, receivables and loans. For further discussion of our securitization activities, see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

Our net investment positions related to Real estate held for sale, excluding the amounts that have been consolidated but for which we do not consider ourselves to have economic exposure, was $1.1 billion at November 30, 2007.

**Derivative and Other Contractual Agreements**

These balances generally represent future commitments to exchange interest payment streams or currencies based on contract or notional amounts or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Both over-the-counter and exchange-traded derivatives are reflected.

The following table presents the fair value of Derivatives and other contractual agreements at November 30, 2007. Assets included in the table represent unrealized gains, net of unrealized losses, for situations in which we have a master netting agreement. Similarly, liabilities represent net amounts owed to counterparties. The fair value of derivative contracts represents our net receivable/payable for derivative financial instruments before consideration of securities collateral, but after consideration of cash collateral. Assets and liabilities are presented below net of cash collateral of approximately $16.3 billion and $12.6 billion, respectively.

**Fair Value of Derivatives and Other Contractual Agreements**

| In millions<br>November 30, 2007 | Assets | Liabilities |
|---|---|---|
| Interest rate, currency and credit default swaps and options | $15,101 | $ 9,409 |
| Equity contracts (including equity swaps, warrants and options) | 6,555 | 6,322 |
| Other fixed income securities contracts (including TBAs and forwards)[1] | 5,176 | 5,170 |
| Foreign exchange forward contracts and options | 1,017 | 1,033 |
| | $ 27,849 | $21,934 |

[1]  Includes $1.5 billion of commodity derivative assets and liabilities at November 30, 2007.

At November 30, 2007, the fair value of derivative assets and liabilities included $900 million and $662 million, respectively, related to exchange-traded option and warrant contracts. With respect to OTC contracts, we view our net credit exposure to be $25.3 billion at November 30, 2007, representing the fair value of OTC contracts in a net receivable position, after consideration of collateral. Counterparties to our OTC derivative products primarily are U.S. and foreign banks, securities firms, corporations, governments and their agencies, finance companies, insurance

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

companies, investment companies and pension funds. Collateral held related to OTC contracts generally includes U.S. government and federal agency securities.

## Concentrations of Credit Risk

A substantial portion of our securities transactions are collateralized and are executed with, and on behalf of, commercial banks and other institutional investors, including other brokers and dealers. Our exposure to credit risk associated with the non-performance of these clients and counterparties in fulfilling their contractual obligations with respect to various types of securities transactions can be directly affected by volatile or illiquid trading markets, which may impair the ability of clients and counterparties to satisfy their obligations to us.

Financial instruments and other inventory positions owned include U.S. government and agency securities, and securities issued by non-U.S. governments, which in the aggregate represented approximately 10% of total assets at November 30, 2007. In addition, collateral held for resale agreements represented approximately 25% of total assets at November 30, 2007, and primarily consisted of securities issued by the U.S. government, federal agencies or non-U.S. governments. Our most significant industry concentration is financial institutions, which include other brokers and dealers, commercial banks and institutional clients. This concentration arises in the normal course of business.

## Note 4 Fair Value of Financial Instruments

Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased, are presented at fair value. Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the Consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value. Hierarchical levels – defined by SFAS 157 and directly related to the amount of subjectivity associated with the inputs to fair valuation of these assets and liabilities – are as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

The types of assets and liabilities carried at Level 1 fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

FAX SERVER        11/26/2008 12:13 PM  PAGE 23/057    Fax Server

08-01420-scc Doc 7250 Filed 12/06/16 Entered 12/06/16 13:48:59 Main Document Documents 1 Through 259 Pg 259 of 259 1033 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

**Fair Value on a Recurring Basis**

Assets and liabilities measured at fair value on a recurring basis are categorized in the tables below based upon the lowest level of significant input to the valuations:

|  | At November 30, 2007 | | | |
| In millions | Level I | Level II | Level III | Total |
| --- | --- | --- | --- | --- |
| Financial instruments and other inventory positions owned: | | | | |
| Government and agencies | $ 33,234 | $ 14,705 | $ — | $ 47,939 |
| Corporate debt and other | 67 | 28,905 | 348 | 29,320 |
| Mortgages and asset-backed securities | 28 | 24,735 | 4,864 | 29,627 |
| Corporate equities | 20,911 | 6,127 | 3,415 | 30,453 |
| Derivative assets[1] | 900 | 24,318 | 2,631 | 27,849 |
| Commercial paper and other money market instruments | 5,031 | — | — | 5,031 |
| Total Financial instruments and other inventory positions owned | $ 60,171 | $ 98,790 | $ 11,258 | $170,219 |
| Financial instruments and other inventory positions sold but not yet purchased: | | | | |
| Government and agencies | $ 50,880 | $ 1,818 | $ — | $ 52,698 |
| Corporate debt and other | 48 | 3,514 | — | 3,562 |
| Mortgages and asset-backed securities | — | 52 | — | 52 |
| Corporate equities | 6,069 | 708 | — | 6,777 |
| Derivative liabilities[1] | 662 | 20,037 | 1,235 | 21,934 |
| Total Financial instruments and other inventory positions sold but not yet purchased | $ 57,659 | $ 26,129 | $ 1,235 | $ 85,023 |

[1]   Derivative assets and liabilities are presented on a net basis by level. Inter- and intra-level cash collateral, cross-product and counterparty netting at November 30, 2007 were approximately $31.8 billion and $28.2 billion, respectively.

**Level III Gains and Losses**

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income. Net realized losses associated with Level III financial instruments were approximately $107 million for the fiscal year ended November 30, 2007. The net unrealized loss on Level III non-derivative financial instruments was approximately $2.1 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

FAX SERVER                11/26/2008 12:13 PM   PAGE 24/057    Fax Server

08-01-02020-sccDoc47250Filed-12/06/26/EnteredEnter12/06/26/33-4-53-9:19Main-Appendix
Documents 1 ThrPg-269of 259 1034 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

The table presented below summarizes the change in balance sheet carrying value associated with Level III financial instruments during the fiscal year ended November 30, 2007. Caution should be utilized when evaluating reported net revenues for Level III Financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions<br>Fiscal year ended<br>November 30, 2007 | Balance<br>December 1,<br>2006 | Periodic<br>Payments,<br>Purchases,<br>Sales, Net | Net<br>Transfers<br>In/(Out) | Gains/(Losses) [1] | | Balance<br>November 30,<br>2007 |
|---|---|---|---|---|---|---|
| | | | | Realized | Unrealized | |
| Corporate debt and other | $   100 | $   (24) | $   320 | $    5 | $    (53) | $    348 |
| Mortgages and asset-backed positions | 897 | 1,424 | 4,690 | (20) | (2,127) | 4,864 |
| Corporate equities | 1,077 | 1,334 | 895 | 16 | 93 | 3,415 |
| Net derivatives | 156 | 225 | 671 | (108) | 452 | 1,396 |
| | $2,230 | $2,959 | $6,576 | $(107) | $ (1,635) | $10,023 |

[1] Realized or unrealized gains/(losses) from changes in values of Level III Financial instruments represent gains/(losses) from changes in values of those Financial instruments only for the period in which the instruments were classified as Level III.

**Fair Value on a Nonrecurring Basis**

We use fair value measurements on a nonrecurring basis in our assessment of assets classified as Goodwill and other inventory positions classified as Real estate held for sale. These assets and inventory positions are recorded at fair value initially and assessed for impairment periodically thereafter. During the fiscal year ended November 30, 2007, the carrying amount of Goodwill assets were compared to their fair value. No change in carrying amount resulted in accordance with the provisions of SFAS No. 142, *Goodwill and Other Intangible Assets*. Additionally and on a nonrecurring basis during the fiscal year ended November 30, 2007, the carrying amount of Real estate held for sale positions were compared to their fair value less cost to sell. No change in carrying amount resulted in accordance with the provisions of SFAS No. 66, *Accounting for Sales of Real Estate*, SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets*, and other relevant accounting guidance. The lowest level of inputs for fair value measurements for Goodwill and Real estate held for sale are Level III.

For additional information regarding Goodwill, see Note 7, "Identifiable Intangible Assets and Goodwill," to the Consolidated Financial Statements. For additional information regarding our inventory of Real estate held for sale, see Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

**Valuation Techniques**

In accordance with SFAS 157, valuation techniques used for assets and liabilities accounted for at fair value are generally categorized into three types:

*Market Approach.* Market approach valuation techniques use prices and other relevant information from market transactions involving identical or comparable assets or liabilities. Valuation techniques consistent with the market approach include comparables and matrix pricing. Comparables use market multiples, which might lie in ranges with a different multiple for each comparable. The selection of where within the range the appropriate multiple falls requires judgment, considering both quantitative and qualitative factors specific to the measurement. Matrix pricing is a mathematical technique used principally to value certain securities without relying exclusively on quoted prices for the specific securities but comparing the securities to benchmark or comparable securities.

*Income Approach.* Income approach valuation techniques convert future amounts, such as cash flows or earnings, to a single present amount, or a discounted amount. These techniques rely on current market expectations of future amounts. Examples of income approach valuation techniques include present value techniques; option-pricing models, binomial or lattice models that incorporate present value techniques; and the multi-period excess earnings method.

*Cost Approach.* Cost approach valuation techniques are based upon the amount that, at present, would be required to replace the service capacity of an asset, or the current replacement cost. That is, from the perspective of a market participant (seller), the price that would be received for the asset is determined based on the cost to a market participant (buyer) to acquire or construct a substitute asset of comparable utility.

The three approaches described within SFAS 157 are consistent with generally accepted valuation methodologies. While all three approaches are not applicable to all assets or liabilities accounted for at fair value, where appropriate and possible, one or

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

more valuation techniques may be used. The selection of the valuation method(s) to apply considers the definition of an exit price and the nature of the asset or liability being valued and significant expertise and judgment is required. For assets and liabilities accounted for at fair value, excluding Goodwill and Real estate held for sale, valuation techniques are generally a combination of the market and income approaches. Goodwill and Real estate held for sale valuation techniques generally combine income and cost approaches. For the fiscal year ended November 30, 2007, the application of valuation techniques applied to similar assets and liabilities has been consistent.

---

### Note 5 Securities Received and Pledged as Collateral

We enter into secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs. We receive collateral in connection with resale agreements, securities borrowed transactions, borrow/pledge transactions, client margin loans and derivative transactions. We generally are permitted to sell or repledge these securities held as collateral and use them to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions.

At November 30, 2007, the fair value of securities received as collateral that we were permitted to sell or repledge was approximately $689 billion. The fair value of securities received as collateral that we sold or repledged was approximately $667 billion at November 30, 2007.

We also pledge our own assets, primarily to collateralize certain financing arrangements. These pledged securities, where the counterparty has the right by contract or custom to sell or repledge the financial instruments were approximately $53 billion at November 30, 2007. The carrying value of Financial instruments and other inventory positions owned that have been pledged or otherwise encumbered to counterparties where those counterparties do not have the right to sell or repledge, was approximately $58 billion at November 30, 2007.

---

### Note 6 Securitizations and Special Purpose Entities

Generally, residential and commercial mortgages, home equity loans, municipal and corporate bonds, and lease and trade receivables are financial assets that we securitize through SPEs. We may continue to hold an interest in the financial assets securitized in the form of the securities created in the transaction, including residual interests ("interests in securitizations") established to facilitate the securitization transaction. Interests in securitizations are presented within Financial instruments and other inventory positions owned (primarily in mortgage and asset-backed securities and government and agencies) in the Consolidated Statement of Financial Condition. For additional information regarding the accounting for securitization transactions, see Note 1, "Summary of Significant Accounting Policies—Consolidation Accounting Policies," to the Consolidated Financial Statements.

For the period ended November 30, 2007, we securitized the following financial assets:

| In millions | |
|---|---|
| Residential mortgages | $ 91,061 |
| Commercial mortgages | 14,059 |
| Municipal and other asset-backed financial instruments | 5,480 |
| Total | $110,600 |

At November 30, 2007, we had approximately $1.3 billion of non-investment grade interests from our securitization activities.

The table below presents the fair value of our interests in securitizations at November 30, 2007, model assumptions of market factors, sensitivity of valuation models to adverse changes in the assumptions, as well as cash flows received on such interests in the securitizations. The sensitivity analysis presented below is hypothetical and should be used with caution since the stresses are performed without considering the effect of hedges, which serve to reduce our actual risk. We mitigate the risks associated with the below interests in securitizations through risk mitigation strategies. These results are calculated by stressing a particular economic assumption independent of changes in any other assumption (as required by U.S. GAAP). In reality, changes in one factor often result in changes in another factor which may counteract or magnify the effect of the changes outlined in the table below. Changes in the fair value based on a 10% or 20% variation in an assumption should not be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

**Securitization Activity**

| Dollars in millions November 30, 2007 | Residential Mortgages | | |
| --- | --- | --- | --- |
| | Investment Grade[1] | Non-Investment Grade | Other[2] |
| Interests in securitizations (in billions) | $ 6.6 | $ 1.3 | $ 2.3 |
| Weighted-average life (years) | 9 | 5 | 6 |
| Average constant prepayment rate | 11.4% | 13.1% | — |
| Effect of 10% adverse change | $ 51 | $ 5 | $ — |
| Effect of 20% adverse change | $ 104 | $ 7 | $ — |
| Weighted-average credit loss assumption | 0.5% | 2.6% | 0.7% |
| Effect of 10% adverse change | $ 108 | $ 98 | $ 6 |
| Effect of 20% adverse change | $ 198 | $ 191 | $ 12 |
| Weighted-average discount rate | 7.8% | 18.9% | 7.3% |
| Effect of 10% adverse change | $ 244 | $ 47 | $ 84 |
| Effect of 20% adverse change | $ 488 | $ 90 | $ 166 |

[1]  The amount of investment-grade interests in securitizations related to agency collateralized mortgage obligations was approximately $2.5 billion at November 30, 2007.

[2]  At November 30, 2007, other interests in securitizations included approximately $2.2 billion of investment grade commercial mortgages, approximately $2.0 million of non-investment grade commercial mortgages and the remainder relates to municipal products.

**Cash flows received on interests in securitizations**

| In millions Year Ended November 30, 2007 | Residential Mortgages | | |
| --- | --- | --- | --- |
| | Investment Grade | Non-Investment Grade | Other |
| | $ 898 | $ 560 | $ 130 |

***Non-QSPE activities.*** We have transactional activity with SPEs that do not meet the QSPE criteria because their permitted activities are not limited sufficiently or the assets are non-qualifying financial instruments (*e.g.*, real estate). These SPEs issue credit-linked notes, invest in real estate or are established for other structured financing transactions designed to meet clients' investing or financing needs.

As a dealer in credit default swaps, we make a market in buying and selling credit protection on single issuers as well as on portfolios of credit exposures. We mitigate our credit risk, in part, by purchasing default protection through credit default swaps with SPEs. We pay a premium to the SPEs for assuming credit risk under the credit default swap. In these transactions, SPEs issue credit-linked notes to investors and use the proceeds to invest in high quality collateral. Our maximum potential loss associated with our involvement with such credit-linked note transactions is measured by the fair value of our credit default swaps with such SPEs. At November 30, 2007, the fair value of these credit default swaps was $3.7 billion. The underlying investment grade collateral held by SPEs where we are the first lien holder was $14.5 billion.

Because the investors assume default risk associated with both the reference portfolio and the SPEs' assets, our expected loss calculations generally demonstrate the investors in the SPEs bear a majority of the entity's expected losses. Accordingly, we generally are not the primary beneficiary and therefore do not consolidate these SPEs. In instances where we are the primary beneficiary of the SPEs, we consolidate the SPEs. At November 30, 2007, we consolidated approximately $170 million of these SPEs. The assets associated with these consolidated SPEs are presented as a component of Financial instruments and other inventory positions owned, and the liabilities are presented as a component of Other secured borrowings.

We also invest in real estate directly through consolidated subsidiaries and through VIEs. We consolidate our investments in real estate VIEs when we are the primary beneficiary. We record the assets of these consolidated real estate VIEs as a component of Financial instruments and other inventory positions owned and the liabilities are presented as a component of Other secured borrowings. At November 30, 2007, we consolidated approximately $884 million of real estate-related

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

investments. After giving effect to non-recourse financing, our net investment position in these consolidated real estate VIEs was $159 million at November 30, 2007.

The following table summarizes our non-QSPE activities at November 30, 2007:

| In millions | |
|---|---|
| Credit default swaps with SPEs | $ 3,657 |
| Value of underlying investment-grade collateral | 14,457 |
| Value of assets consolidated | 170 |
| | |
| Consolidated real estate VIEs | 884 |
| Net investment | 159 |

In addition to the above, we enter into other transactions with SPEs designed to meet clients' investment and/or funding needs. For further discussion of our SPE-related and other commitments, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

### Note 7 Identifiable Intangible Assets and Goodwill

Aggregate amortization expense for the year ended November 30, 2007 was approximately $6 million. Estimated amortization expenses for each of the years ending November 30, 2008 through 2012 are as follows:

| In thousands | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Estimated amortization expense | $6,013 | $5,995 | $5,787 | $5,165 | $5,165 |

#### Identifiable Intangible Assets

| | November 30, 2007 | |
|---|---|---|
| In millions | Gross Carrying Amount | Accumulated Amortization |
| Amortizable intangible assets: | | |
| Customer lists | $97 | $23 |
| | $97 | $23 |

The change in the carrying amount of goodwill for the year ended November 30, 2007 is as follows:

#### Goodwill

| In millions | |
|---|---|
| Balance (net) at November 30, 2006 | $161 |
| Goodwill acquired[1] | 376 |
| Balance (net) at November 30, 2007 | $537 |

[1] We made the final contingent payment under a 2004 deferred transaction agreement for the remaining 50% of Lehman Brothers Alternative Investment Management ("LBAIM"), which manages fund of hedge fund portfolios and investment products for institutional and high-net-worth private clients. LBAIM was previously consolidated in Holdings' results of operations.

FAX SERVER                    11/26/2008 12:13 PM  PAGE  28/057  Fax Server

08-01420-scc Doc 70250 Filed 12/06/26/ Entered 12/06/26/3:48:39:19 Main Appendix
Documents 1 Through 309 of 259 1038 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

---

Note 8 Borrowings

At November 30, 2007, Borrowings consisted of the following:

In millions

| Short-term borrowings | |
|---|---|
| Current portion of long-term borrowings and subordinated notes included | $ 1,038 |
| Other | 629 |
| Total | $ 1,667 |
| Weighted-average contractual interest rate | 5.27% |

| Long-term borrowings | |
|---|---|
| Senior notes | $ 25 |
| Subordinated notes | 5,228 |
| Total | $ 5,253 |
| Weighted-average contractual interest rate | 5.74% |

Maturity Profile

The maturity dates of long-term borrowings are as follows:

| In millions | At November 30, 2007 | | |
|---|---|---|---|
| | Fixed Rate | Floating Rate | Total |
| Maturing in fiscal 2009 | $ — | $4,751 | $4,751 |
| Maturing in fiscal 2010 | 144 | 137 | 281 |
| Maturing in fiscal 2011 | 1 | 3 | 4 |
| Maturing in fiscal 2012 | — | — | — |
| December 1, 2012 and thereafter | 217 | — | 217 |
| | $362 | $4,891 | $5,253 |

End-User Derivative Activities

We use a variety of derivative products, including interest rate and currency swaps as an end-user to modify the interest rate characteristics of our long-term borrowings portfolio. We use interest rate swaps to convert a substantial portion of our fixed-rate debt to floating interest rates to more closely match the terms of assets being funded and to minimize interest rate risk. In addition, we use cross-currency swaps to hedge our exposure to foreign currency risk arising from our non-U.S. dollar debt obligations, after consideration of non-U.S. dollar assets that are funded with long-term debt obligations in the same currency. In certain instances, we may use two or more derivative contracts to manage the interest rate nature and/or currency exposure of an individual long-term borrowings issuance.

Long-Term Borrowings After End-User Derivative Activities

End-user derivative activities resulted in the following mix of fixed and floating rate debt and effective weighted-average interest rate:

In millions
November 30, 2007

| Fixed rate | $ 145 |
|---|---|
| Floating rate | 5,108 |
| Total | $5,253 |
| Weighted-average effective interest rate | 5.70% |

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

---

**Note 9 Commitments, Contingencies and Guarantees**

In the normal course of business, we enter into various commitments and guarantees, including lending commitments to high grade and high yield borrowers, private equity investment commitments, liquidity commitments and other guarantees.

**Lending–Related Commitments**

The following table summarizes the contractual amounts of lending-related commitments at November 30, 2007:

| | Expiration Per Period at November 30, 2007 | | | | | |
|---|---|---|---|---|---|---|
| In millions | 2008 | 2009 | 2010-2011 | 2012-2013 | 2014 and Later | Total Contractual Amount |
| Lending commitments | | | .. | | | |
| High grade | $ 2,164 | $238 | $ 1,536 | $ 3,460 | $   63 | $  7,461 |
| High yield | 3,228 | 255 | 1,407 | 3,227 | 2,341 | 10,458 |
| Contingent acquisition facilities | | | | | | |
| High grade | 10,230 | — | — | — | — | 10,230 |
| High yield | 8,465 | — | — | — | — | 8,465 |
| Mortgage commitments | 44 | 145 | 74 | 21 | 9 | 293 |
| Secured lending transactions | 79,220 | — | 196 | 50 | 1,683 | 81,149 |

We use various hedging and funding strategies to actively manage our market, credit and liquidity exposures on these commitments. We do not believe total commitments necessarily are indicative of actual risk or funding requirements because the commitments may not be drawn or fully used and such amounts are reported before consideration of hedges.

*High grade and high yield.* Through our high grade (investment grade) and high yield (non-investment grade) sales, trading and underwriting activities, we make commitments to extend credit in loan syndication transactions. These commitments and any related drawdowns of these facilities typically have fixed maturity dates and are contingent on certain representations, warranties and contractual conditions applicable to the borrower. We define high yield exposures as securities of or loans to companies rated BB+ or lower or equivalent ratings by recognized credit rating agencies, as well as non-rated securities or loans that, in management's opinion, are non-investment grade.

At November 30 2007, we had commitments to high grade borrowers of $7.5 billion (net credit exposure of $4.4 billion, after consideration of hedges) and to high yield borrowers of $10.5 billion (net credit exposure of $9.7 billion, after consideration of hedges).

*Contingent acquisition facilities.* We provide contingent commitments to investment and non-investment grade counterparties related to acquisition financing. We do not believe contingent acquisition commitments are necessarily indicative of actual risk or funding requirements as funding is dependent both upon a proposed transaction being completed and the acquiror fully utilizing our commitment. Typically, these commitments are made to a potential acquiror in a proposed acquisition, which may or may not be completed depending on whether the potential acquiror to whom we have provided our commitment is successful. A contingent borrower's ability to draw on the commitment is typically subject to there being no material adverse change in the borrower's financial condition, among other factors, and the commitments also generally contain certain flexible pricing features to adjust for changing market conditions prior to closing. In addition, acquirers generally utilize multiple financing sources, including other investment and commercial banks, as well as accessing the general capital markets for completing transactions. Therefore, our contingent acquisition commitments are generally greater than the amounts we ultimately expect to fund. Further, our past practice, consistent with our credit facilitation framework, has been to syndicate acquisition financings to investors. The ultimate timing, amount and pricing of a syndication, however, is influenced by market conditions that may not necessarily be consistent with those at the time the commitment was entered.

At November 30, 2007, we provided contingent commitments to high grade counterparties related to acquisition financing of approximately $10.2 billion and to high yield counterparties related to acquisition financing of approximately $8.5 billion.

---

FAX SERVER                    11/26/2008 12:13 PM  PAGE  30/057     Fax Server

08-01420-scc Doc-7250 Filed 12/06/26/1 Entered 12/06/26/3 18:59:19 Main Appendix Documents 1 Through 25 of 259 Page 1040 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

*Mortgage commitments.* Through our mortgage origination platforms we make commitments to extend mortgage loans. At November 30, 2007, we had outstanding mortgage commitments of approximately $293 million, which were all related to commercial mortgages.

*Secured lending transactions.* In connection with our financing activities, we had outstanding commitments under certain collateralized lending arrangements of approximately $7.2 billion at November 30, 2007. These commitments require borrowers to provide acceptable collateral, as defined in the agreements, when amounts are drawn under the lending facilities. Advances made under these lending arrangements typically are at variable interest rates and generally provide for over-collateralization. In addition, at November 30, 2007, we had commitments to enter into forward starting secured resale and repurchase agreements, primarily secured by government and government agency collateral, of $42.8 billion and $31.1 billion, respectively.

## Other Commitments and Guarantees

The following table summarizes other commitments and guarantees at November 30, 2007:

| | Expiration Per Period at November 30, 2007 | | | | | |
|---|---|---|---|---|---|---|
| In millions | 2008 | 2009 | 2010-2011 | 2012-2013 | 2014 and Later | Total Contractual Amount |
| Derivative contracts[1] | $37,905 | $48,207 | $138,202 | $185,931 | $213,326 | $623,571 |
| Municipal securities-related commitments | 350 | 600 | — | 10 | 161 | 1,121 |
| Other commitments with variable interest entities | — | — | — | — | 1,458 | 1,458 |
| Standby letters of credit | 1,065 | 5 | — | — | — | 1,070 |
| Private equity and other principal investments | 558 | 552 | 710 | 119 | — | 1,939 |

[1] We believe the fair value of these derivative contracts is a more relevant measure of the obligations because we believe the notional amount overstates the expected payout. At November 30, 2007, the fair value of these derivative contracts approximated $27.7 billion.

*Derivative contracts.* Under FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"), derivative contracts are considered to be guarantees if such contracts require us to make payments to counterparties based on changes in an underlying instrument or index (*e.g.,* security prices, interest rates, and currency rates) and include written credit default swaps, written put options, written foreign exchange and interest rate options. Derivative contracts are not considered guarantees if these contracts are cash settled and we cannot determine if the derivative counterparty held the contracts' underlying instruments at inception. We have determined these conditions have been met for certain large financial institutions. Accordingly, when these conditions are met, we have not included these derivatives in our guarantee disclosures.

At November 30, 2007, the maximum payout value of derivative contracts deemed to meet the FIN 45 definition of a guarantee was approximately $623.6 billion. For purposes of determining maximum payout, notional values are used; however, we believe the fair value of these contracts is a more relevant measure of these obligations because we believe the notional amounts greatly overstate our expected payout. At November 30, 2007, the fair value of such derivative contracts approximated $27.7 billion. In addition, all amounts included above are before consideration of hedging transactions. We substantially mitigate our risk on these contracts through hedges, using other derivative contracts and/or cash instruments. We manage risk associated with derivative guarantees consistent with our global risk management policies.

*Municipal-securities-related commitments.* At November 30, 2007, we had municipal securities-related commitments of approximately $1.1 million which are principally comprised of liquidity commitments related to trust certificates backed by high grade municipal securities. We believe our liquidity commitments to these trusts involve a low level of risk because our obligations are supported by high grade securities and generally cease if the underlying assets are downgraded below high grade or upon an issuer's default. In certain instances, we also provide credit default protection to investors, which approximated $468 million at November 30, 2007.

*Other commitments with VIEs.* In addition, we provide limited downside protection guarantees to investors in certain VIEs by guaranteeing return of their initial principal investment. Our maximum exposure to loss under such commitments was

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

approximately $1.5 billion at November 30, 2007. We believe our actual risk to be limited because our obligations are collateralized by the VIEs' assets and contain significant constraints under which downside protection will be available (e.g., the VIE is required to liquidate assets in the event certain loss levels are triggered).

*Standby letters of credit.* At November 30, 2007, we had commitments under letters of credit issued by banks to counterparties for $1.1 billion. We are contingently liable for these letters of credit which are primarily used to provide collateral for securities and commodities borrowed and to satisfy margin deposits at option and commodity exchanges.

*Private equity and other principal investments.* At November 30, 2007, we had private equity and other principal investment commitments of approximately $1.9 billion, comprising commitments to private equity partnerships and other principal investment opportunities. It has been our past practice to distribute and syndicate certain of these commitments to our investing clients.

*Other.* In the normal course of business, we provide guarantees to securities clearinghouses and exchanges. These guarantees generally are required under the standard membership agreements, such that members are required to guarantee the performance of other members. To mitigate these performance risks, the exchanges and clearinghouses often require members to post collateral.

In connection with certain asset sales and securitization transactions, we often make customary representations and warranties about the assets. Violations of these representations and warranties, such as early payment defaults by borrowers, may require us to repurchase loans previously sold, or indemnify the purchaser against any losses. To mitigate these risks, to the extent the assets being securitized may have been originated by third parties, we generally obtain equivalent representations and warranties from these third parties when we acquire the assets. We have established reserves which we believe to be adequate in connection with such representations and warranties.

In the normal course of business, we are exposed to credit and market risk as a result of executing, financing and settling various client security and commodity transactions. These risks arise from the potential that clients or counterparties may fail to satisfy their obligations and the collateral obtained is insufficient. In such instances, we may be required to purchase or sell financial instruments at unfavorable market prices. We seek to control these risks by obtaining margin balances and other collateral in accordance with regulatory and internal guidelines.

Certain of our subsidiaries, as general partners, are contingently liable for the obligations of certain public and private limited partnerships. In our opinion, contingent liabilities, if any, for the obligations of such partnerships will not, in the aggregate, have a material adverse effect on our Consolidated Statement of Financial Condition or Consolidated Statement of Income.

In connection with certain acquisitions and strategic investments, we agreed to pay additional consideration contingent on the acquired entity meeting or exceeding specified income, revenue or other performance thresholds. These payments will be recorded as amounts become determinable. Had the determination date been November 30, 2007, our estimated obligations related to these contingent consideration arrangements would have been $5 million.

### Income Taxes

Our income is included in the consolidated U.S. federal income tax return of Holdings and its subsidiaries. We are under continuous examination by the Internal Revenue Service (the "IRS") and other tax authorities in major operating jurisdictions such as the United Kingdom and Japan and various states in which the Company has significant operations such as New York. The Company regularly assesses the likelihood of additional assessments in each tax jurisdiction and the impact on our Consolidated Financial Statements. Tax reserves have been established, which we believe to be adequate with regards to the potential for additional exposure. Once established, reserves are adjusted only when additional information is obtained or an event requiring a change to the reserve occurs. Management believes the resolution of these uncertain tax positions will not have a material impact on the financial condition of the Company; however, resolution could have an impact on our effective tax rate in any reporting period.

Holdings completed the IRS appeals process with respect to the 1997 through 2000 IRS examination. Although most issues were settled on a basis acceptable to Holdings, two issues remain unresolved and will carry into litigation with the IRS. Based on the strength of its positions, Holdings has not reserved any part of these issues. The aggregate tax benefits previously recorded in Holdings with regard to these two issues is approximately $185 million.

The IRS has recently begun an examination with respect to the 2001 through 2005 tax years. The audit is in its initial stages and no adjustments have been proposed. We believe we are adequately reserved for any issues that may arise from this audit. The

FAX SERVER                    11/26/2008 12:13 PM   PAGE  32/057    Fax Server

08-01420-scc Doc 7250 Filed 12/06/26/12 Entered 12/06/26/12 13:48:39 Main Appendix
Documents 1 Through 39 of 259 1042 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

two issues from the 1997 through 2000 cycle which we plan to litigate also have an impact on the 2001 through 2005 tax years. The aggregate tax benefit previously recorded with regard to these two issues is approximately $500 million.

## Litigation

In the normal course of business, we have been named as a defendant in a number of lawsuits and other legal and regulatory proceedings. Such proceedings include actions brought against us and others with respect to transactions in which we acted as an underwriter or financial advisor, actions arising out of our activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities firms, including us. We provide for potential losses that may arise out of legal and regulatory proceedings to the extent such losses are probable and can be estimated. Although there can be no assurance as to the ultimate outcome, we generally have denied, or believe we have a meritorious defense and will deny, liability in all significant cases pending against us, and we intend to defend vigorously each such case. Based on information currently available, we believe the amount, or range, of reasonably possible losses in excess of established reserves not to be material to the Company's Consolidated Financial Condition or Cash Flows. However, losses may be material to our operating results for any particular future period, depending on the level of income for such period.

## Lease Commitments

We lease office space and equipment primarily in the United States. Total rent expense for 2007 was $84 million. Certain leases on office space contain escalation clauses providing for additional payments based on maintenance, utility and tax increases.

Minimum future rental commitments under non-cancelable operating leases (net of subleases of $47 million) are as follows:

## Minimum Future Rental Commitments Under Operating Lease Agreements

| In millions | |
| --- | --- |
| Fiscal 2008 | $ 105 |
| Fiscal 2009 | 85 |
| Fiscal 2010 | 71 |
| Fiscal 2011 | 67 |
| Fiscal 2012 | 63 |
| December 1, 2012 and thereafter | 261 |
| Total minimum lease payments | $ 652 |

We allocate a portion of the costs associated with the above commitments to affiliates based on headcount.

## Note 10 Holdings' Incentive Plans

Holdings adopted the fair value recognition provisions for share-based awards pursuant to SFAS No. 123 (revised 2004), *Share-Based Payment*, ("SFAS 123(R)") as of the beginning of the 2006 fiscal year.

At November 30, 2007, Holdings' unrecognized compensation cost related to nonvested stock option and RSU awards totaled $2.0 billion. The cost of these non-vested awards is expected to be recognized over the next 9.0 years over a weighted-average period of 3.8 years.

### Holdings' Share-Based Employee Incentive Plans

Our employees participate in various Holdings incentive plans. The total number of shares of Holdings' common stock remaining available for future awards under these plans at November 30, 2007 was 82.3 million (not including shares that may be returned to the Stock Incentive Plan (the "SIP") as described below, but including an additional 0.4 million shares authorized for issuance under the Lehman Brothers Holdings Inc. 1994 Management Ownership Plan (the "1994 Plan") that have been reserved solely for issuance in respect of dividends on outstanding awards under this plan). In connection with awards made under the share-based employee incentive plans, Holdings' is authorized to issue shares of common stock held in treasury or newly issued shares. Holdings' amortization of compensation costs for grants awarded under these plans was approximately $1.3 billion. Holdings' recognized an income tax benefit of $515 million in their Consolidated Statement of Income in the 2007 fiscal year. This amortization expense excluded $514 million of stock awards granted in December 2007, which was accrued as compensation expense by Holdings in the 2007 fiscal year.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

*1994 and 1996 Management Ownership Plans and Employee Incentive Plan.* The 1994 Plan, the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan (the "1996 Plan") and the Lehman Brothers Holdings Inc. Employee Incentive Plan (the "EIP") all expired following the completion of their various terms. These plans provided for the issuance of RSUs, performance stock units, stock options and other share-based awards to eligible employees. At November 30, 2007, awards with respect to 605.6 million shares of common stock have been made under these plans, of which 130.3 million are outstanding and 475.3 million have been converted to freely transferable shares of Holdings' common stock.

*Stock Incentive Plan.* The SIP has a 10-year term ending in May 2015, with provisions similar to the previous plans. The SIP authorized the issuance of up to the total of (i) 95.0 million shares (20.0 million as originally authorized, plus an additional 75.0 million authorized by the stockholders of Holdings at its 2007 Annual Meeting), plus (ii) the 33.5 million shares authorized for issuance under the 1996 Plan and the EIP that remained unawarded upon their expiration, plus (iii) any shares subject to repurchase or forfeiture rights under the 1996 Plan, the EIP or the SIP that are reacquired by Holdings, or the award of which is canceled, terminates, expires or for any other reason is not payable, plus (iv) any shares withheld or delivered pursuant to the terms of the SIP in payment of any applicable exercise price or tax withholding obligation. Awards with respect to 51.1 million shares of Holdings' common stock have been made under the SIP as of November 30, 2007, 50.4 million of which are outstanding.

*1999 Long-Term Incentive Plan.* The 1999 Neuberger Berman Inc. Long-Term Incentive Plan (the "LTIP") provides for the grant of restricted stock, restricted units, incentive stock, incentive units, deferred shares, supplemental units and stock options. The total number of shares of common stock that may be issued under the LTIP is 15.4 million. At November 30, 2007, awards with respect to approximately 13.7 million shares of Holdings' common stock had been made under the LTIP, of which 3.2 million were outstanding.

**Stock Options**

Employees and Directors may receive stock options from Holdings, in lieu of cash, as a portion of their total compensation. Such options generally become exercisable over a one- to five-year period and generally expire five to ten years from the date of grant, subject to accelerated expiration upon termination of employment.

Holdings uses the Black-Scholes option-pricing model to measure the grant date fair value of stock options granted to employees. Stock options granted have exercise prices equal to the market price of Holdings' common stock on the grant date. The principal assumptions utilized in valuing options and Holdings' methodology for estimating such model inputs include: (i) risk-free interest rate - estimate is based on the yield of U.S. zero coupon securities with a maturity equal to the expected life of the option; (ii) expected volatility - estimate is based on the historical volatility of Holdings' common stock for the three years preceding the award date, the implied volatility of market-traded options on our common stock on the grant date and other factors; and (iii) expected option life - estimate is based on internal studies of historical and projected exercise behavior based on different employee groups and specific option characteristics, including the effect of employee terminations. Based on the results of the model, the weighted-average fair value of stock options granted by Holdings' was $24.94 in 2007.

The weighted-average assumptions used for 2007 were as follows:

|  | Year Ended<br>November 30, 2007 |
| --- | --- |
| Risk-free interest rate | 4.72% |
| Expected volatility | 25.12% |
| Dividends per share | $0.60 |
| Expected life | 7.0 years |

The valuation technique takes into account the specific terms and conditions of the stock options granted including vesting period, termination provisions, intrinsic value and time dependent exercise behavior.

**Note 11 Holdings' Employee Benefit Plans**

Holdings provides both funded and unfunded noncontributory defined benefit pension plans for the majority of its employees worldwide. In addition, Holdings provides certain other postretirement benefits, primarily health care and life insurance, to eligible employees. Holdings uses a November 30 measurement date for its plans. Our employees

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

participate in Holdings' domestic pension plans. The following table provides a summary of the changes in Holdings' domestic plan benefit obligations, fair value of plan assets, and funded status in which our employees participate:

**Defined Benefit Plans**

| In millions | November 30, 2007 | |
| --- | --- | --- |
| | Pension Benefits | Other Postretirement Benefits |
| **Change in benefit obligation** | | |
| Benefit obligation at beginning of year | $1,168 | $61 |
| Service cost | 54 | 1 |
| Interest cost | 67 | 3 |
| Plan amendments and curtailments | (3) | — |
| Actuarial loss | (177) | (6) |
| Benefits paid | (32) | (6) |
| Benefit obligation at end of year | $1,077 | $53 |
| **Change in plan assets** | | |
| Fair value of plan assets at beginning of year | $1,147 | $— |
| Actual return on plan assets, net of expenses | 94 | — |
| Employer contribution | — | 6 |
| Benefits paid | (32) | (6) |
| Fair value of plan assets at end of year | $1,209 | $— |
| Funded (underfunded) status[1] | 132 | (53) |
| Unrecognized net actuarial loss/(gain)[1] | | |
| Unrecognized prior service cost/(benefit)[1] | | |
| Prepaid/(accrued) benefit cost[1] | | |
| Accumulated benefit obligation—funded plans | $ 947 | — |
| Accumulated benefit obligation—unfunded plans | 63 | — |
| **Weighted-Average Assumptions Used to Determine Benefit Obligations at November 30, 2007** | | |
| Discount rate | 6.66% | 6.45% |
| Rate of compensation increase | 5.00% | — |

[1]  In accordance with SFAS 158, the funded/(underfunded) status was recognized in Holdings' Consolidated Statement of Financial Condition at November 30, 2007 and Unrecognized actuarial gain/(loss) and Unrecognized Prior service cost/(benefit) was recognized in Holdings' Consolidated Statement of Stockholders' Equity at November 30, 2007.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

**Components of Net Periodic Cost**

| In millions<br>Year Ended November 30, 2007 | Pension<br>Benefits | Postretirement<br>Benefits |
|---|---|---|
| Service cost | $57 | $ 1 |
| Interest cost | 67 | 4 |
| Expected return on plan assets | (86) | — |
| Amortization of net actuarial loss | 26 | — |
| Amortization of prior service cost | 4 | (1) |
| Net periodic cost | $68 | $ 4 |

**Weighted-Average Assumptions Used to Determine Net Periodic Cost for the Year Ended November 30, 2007**

| | | |
|---|---|---|
| Discount rate | 5.73% | 5.70% |
| Expected return on plan assets | 7.50% | — |
| Rate of compensation increase | 5.00% | — |

### Return on Plan Assets

Establishing the expected rate of return on pension assets requires judgment. Holdings considers the following factors in determining these assumptions:

- The types of investment classes in which pension plan assets are invested and the expected compounded return Holdings can reasonably expect the portfolio to earn over appropriate time periods. The expected return reflects forward-looking economic assumptions.

- The investment returns Holdings can reasonably expect from its active investment management program to achieve in excess of the returns expected if investments were made strictly in indexed funds.

- Investment related expenses.

Holdings reviews the expected long-term rate of return annually and revises it as appropriate. Also, Holdings periodically commissions detailed asset/liability studies to be performed by third-party professional investment advisors and actuaries. These studies project stated future returns on plan assets. The studies performed in the past support the reasonableness of Holdings' assumptions based on the targeted allocation investment classes and market conditions at the time the assumptions were established.

### Plan Assets

Pension plan assets are invested with the objective of meeting current and future benefit payment needs, while minimizing future contributions.

Plan assets are invested with several investment managers. Assets are diversified among U.S. and international equity securities, U.S. fixed income securities, real estate and cash. The plan employs a mix of active and passive investment management programs. The strategic target of plan asset allocation is approximately 65% equities and 35% U.S. fixed income. The investment sub-committee of Holdings' pension committee reviews the asset allocation quarterly and, with the approval of the pension committee, determines when and how to rebalance the portfolio. The plan does not have a dedicated allocation to Holdings' common stock, although the plan may hold a minimal investment in Holdings' common stock as a result of investment decisions made by various investment managers.

Weighted-average plan asset allocations were as follows:

| November 30, 2007 | |
|---|---|
| Equity securities | 76% |
| Fixed income securities | 24 |
| | 100% |

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

**Expected Contributions for the Fiscal Year Ending November 30, 2008**

Holdings does not expect it to be necessary to contribute to its U.S. pension plans in the fiscal year ending November 30, 2008.

**Estimated Future Benefit Payments**

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

| In millions | Pension | Postretirement |
|---|---|---|
| Fiscal 2008 | $ 37 | $ 6 |
| Fiscal 2009 | 41 | 5 |
| Fiscal 2010 | 43 | 5 |
| Fiscal 2011 | 46 | 5 |
| Fiscal 2012 | 51 | 5 |
| Fiscal 2013—2017 | 308 | 24 |

**Post Retirement Benefits**

Assumed health care cost trend rates were as follows:

| November 30, 2007 | |
|---|---|
| Health care cost trend rate assumed for next year | 9% |
| Rate to which the cost trend rate is assumed to decline (the ultimate trend rate) | 5% |
| Year the rate reaches the ultimate trend rate | 2012 |

A one-percentage-point change in assumed health care cost trend rates would be immaterial to Holdings' other post-retirement plans.

**Note 12 Regulatory Requirements**

LBI is a registered broker-dealer and futures commission merchant and accordingly, is subject to SEC Rule 15c3-1 and Rule 1.17 of the Commodity Futures Trading Commission ("CFTC"). Under these rules, LBI is required to maintain minimum net capital, as defined, of not less than the greater of 2% of aggregate debit items arising from client transactions, 8% of customer risk maintenance margin requirements plus 4% of non-customer risk maintenance margin requirements, or $500 million. As of November 30, 2007, LBI had net capital of $2.7 billion, which exceeded the minimum net capital requirement by $2.1 billion.

Effective December 1, 2005, the SEC approved LBI's use of Appendix E of the Net Capital Rule which establishes alternative net capital requirements for broker-dealers that are part of consolidated supervised entities. Appendix E allows LBI to calculate net capital charges for market risk and derivatives-related credit risk based on internal risk models provided that LBI holds tentative net capital in excess of $1 billion and net capital in excess of $500 million. Additionally, LBI is required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of November 30, 2007, LBI had tentative net capital in excess of both the minimum and notification requirements.

As a clearing broker-dealer, LBI has elected to compute a reserve requirement for Proprietary Accounts of Introducing Broker-Dealers ("PAIB calculation"), as defined. The PAIB calculation is completed for each correspondent firm that uses us as its clearing broker-dealer to classify its assets held by LBI as allowable assets in the correspondents' net capital calculation. At November 30, 2007, we had a reserve requirement for PAIB of $1.5 billion. Additionally, we had $1.1 billion of qualified securities or cash on deposit in a Special Reserve Bank Account at November 30, 2007.

Repayment of subordinated indebtedness and certain advances and dividend payments by LBI are restricted by the regulations of the SEC and other regulatory agencies. At November 30, 2007, $3.8 billion of our net assets were restricted as to the payment of dividends, principally as a result of regulations of the SEC and other regulatory agencies. In addition, certain covenants governing LBI's indebtedness contractually limit our ability to pay dividends.

For the year ended November 30, 2007, LBI met the criteria set forth under the SEC's Rule 11(a)(1)(G)(i), Trading by Members of Exchanges, Brokers and Dealers, and is therefore in compliance with the business mix requirements.

FAX SERVER                    11/26/2008 12:13 PM   PAGE 37/057   Fax Server

08-01420-scc Doc 67 0250 Filed 12/06/26/ Entered 12/006/26/34:4539:19 Main Appendix
Documents 1 Through 299 of 259 1047 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

Our "AAA" rated derivatives subsidiaries, Lehman Brothers Financial Products Inc. ("LBFP") and Lehman Brothers Derivative Products Inc. ("LBDP"), have established certain capital and operating restrictions that are reviewed by various rating agencies. At November 30, 2007, LBFP and LBDP each had capital that exceeded the requirements of the rating agencies.

### Note 13 Income Taxes

Our income is included in the consolidated U.S. federal income tax return of Holdings and its subsidiaries. Our income tax provision is computed in accordance with the tax sharing agreement between Holdings and its subsidiaries. In accordance with this agreement, the balance due from Holdings at November 30, 2007 was $572 million.

The provision for income taxes consists of the following:

**Provision for Income Taxes**

In millions
Year Ended November 30, 2007

| | |
|---|---:|
| Current: | |
| Federal | $ 824 |
| State | 321 |
| Foreign | 76 |
| | 1,221 |
| Deferred: | |
| Federal | (221) |
| State | (14) |
| Foreign | (3) |
| | (238) |
| Provision for income taxes | $ 983 |

Income before taxes included $394 million that also was subject to income taxes of foreign jurisdictions for the year ended November 30, 2007.

The income tax provision differs from that computed by using the statutory federal income tax rate for the reasons shown below:

**Reconciliation of Provision for Income Taxes to Federal Income Taxes at Statutory Rate**

In millions
Year Ended November 30, 2007

| | |
|---|---:|
| Federal income taxes at statutory rate | $ 974 |
| State and local taxes | 199 |
| Tax-exempt income | (83) |
| Foreign operations | (134) |
| Other, net | 27 |
| Provision for income taxes | $ 983 |

Deferred income taxes are provided for the differences between the tax bases of assets and liabilities and their reported amounts in the Consolidated Financial Statements. These temporary differences will result in future income or deductions for income tax purposes and are measured using the enacted tax rates that will be in effect when such items are expected to reverse. We provide for deferred income taxes on undistributed earnings of foreign subsidiaries.

FAX SERVER                    11/26/2008 12:13 PM   PAGE 38/057    Fax Server

08-01420-scc Doc 7250 Filed 12/06/26 Entered 12/06/26 13:48:39 Main Appendix
Documents 1 Through 409 of 259 1048 of 1129

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

Net deferred tax assets are included in Other assets in the Consolidated Statement of Financial Condition. At November 30, 2007, deferred tax assets and liabilities consisted of the following:

In millions
November 30, 2007

| | |
|---|---:|
| Deferred tax assets: | |
| Liabilities and other accruals not currently deductible | $ 3 |
| Unrealized investment activity | 53 |
| Net operating loss carryforwards | 59 |
| Other | 26 |
| Deferred tax assets | 141 |
| Deferred tax liabilities | — |
| Net deferred tax assets | $141 |

We anticipate the net deferred tax assets will be realized, therefore no valuation allowance has been recorded against deferred tax assets.

We have approximately $169 million of federal net operating loss carryforwards, which are subject to separate company limitations. These net operating loss carryforwards begin to expire between 2023 and 2027.

In accordance with the tax sharing agreement with Holdings, we were reimbursed $268 million for the year ended November 30, 2007 for our net deferred tax assets. The net deferred tax assets transferred in at November 30, 2007 were principally comprised of unrealized investment activity, liabilities and other accruals not currently deductible and deferred compensation.

Holdings is under continuous examination by the IRS, and other tax authorities in major operating jurisdictions such as the United Kingdom and Japan, and in various states in which the Company has significant operations, such as New York. The Company regularly assesses the likelihood of additional assessments in each tax jurisdiction in which it is subject to tax and its potential impact on the Consolidated Financial Statements. We have established tax reserves which we believe to be adequate with regard to the potential of such assessments. Once established, reserves are adjusted only when additional information is obtained or an event requiring a change to the reserve occurs. Management believes the resolution of these uncertain tax positions will not have a material impact on the financial condition of the Company; however, resolution of such positions could have an impact on our effective tax rate in any one particular period.

We have completed the IRS appeals process with respect to the 1997 through 2000 IRS examination. Although most issues were settled on a basis acceptable to Holdings, two issues remain unresolved and will carry into litigation with the IRS. Based on the strength of its positions, Holdings has not reserved any part of these issues. The aggregate tax benefits previously recorded with regard to these two issues is approximately $185 million.

The IRS has recently begun an examination with respect to the 2001 through 2005 tax years. The audit is in its initial stages and no adjustments have been proposed. We believe we are adequately reserved for any issues that may arise from this audit. The two issues from the 1997 through 2000 cycle which we plan to litigate also have an impact on the 2001 through 2005 tax years. The aggregate tax benefit previously recorded with regard to these two issues is approximately $500 million.

## Note 14 Related Party Transactions

In the normal course of business we engage in various securities trading, investment banking and financing activities with Holdings and many of its subsidiaries (the "Related Parties"). Various charges, such as compensation and benefits, occupancy, administration and computer processing are allocated among the Related Parties based on specific identification and other allocation methods.

Lehman Brothers Inc. and Subsidiaries

Notes to Consolidated Financial Statements

Amounts outstanding to and from related parties are reflected in the Consolidated Statement of Financial Condition as set forth below:

In millions

| November 30, 2007 | Assets | Liabilities |
|---|---|---|
| Derivatives and other contractual agreements | $ 5,398 | $ 5,520 |
| Advances to/from Holdings | 890 | 49,628 |
| Advances to/from affiliates other than Holdings | 10,850 | 8,602 |
| Securities purchased/sold under agreements to resell/repurchase | 28,576 | 66,623 |
| Securities borrowed/loaned | 74,719 | 106,381 |
| Receivables from/Payables to brokers, dealers and clearing organizations | 3,761 | 1,875 |
| Receivables from/Payables to customers | 108 | 3,615 |
| Income tax receivable | 572 | |
| Subordinated notes payable | — | 4,750 |

Holdings and subsidiaries of Holdings raise money through short- and long-term funding in the capital markets, which is used to fund the operations of certain of our wholly-owned subsidiaries. Advances from Holdings are generally payable on demand. The average interest rate charged on these advances is primarily based on Holdings' average daily cost of funds, which was 5.25% for the year ended November 30, 2007.

Holdings has allocated to us the cost of certain employees and space in various New York City and surrounding locations.

We believe amounts arising through related party transactions, including those allocated expenses referred to above, are reasonable and approximate the amounts that would have been recorded if we operated as an unaffiliated entity.

For the year ended November 30, 2007, we distributed approximately $1.4 billion to Holdings as dividends.

FAX SERVER                    11/26/2008 12:13 PM   PAGE  40/057    Fax Server

0808-02028-ccc Doc 4728-50 Filed 12/006/14 Entered 12/006/16 31:84 8:59:19 Main Document
Documents 1 Through 29 of 29 Pg 29 of 59 1050 of 1129

Supplemental Information

FAX SERVER          11/26/2008 12:13 PM  PAGE  41/057     Fax Server

08-01-01023-scc  Doc 70250  Filed 11/26/16  Entered 12/06/16 13:34:59  Main Appendix
Documents 1 Thru 2489 of 759  1051 of 1129

FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT

PART II CSE

| BROKER OR DEALER | |
|---|---|
| Lehman Brothers Inc | as of 11/30/07 |

## COMPUTATION OF NET CAPITAL

| | | | |
|---|---|---|---|
| 1 Total ownership equity (from Statement of Financial Condition - Item 1800) | $ | 4,455,449,000 | 3480 |
| 2. Deduct: Ownership equity not allowable for Net Capital | ( | | 3490 |
| 3. Total ownership equity qualified for Net Capital | | 4,455,449,000 | 3500 |
| 4. Add: | | | |
|  A. Liabilities subordinated to claims of general creditors allowable in computation of net capital | | 5,693,368,000 | 3520 |
|  B. Other (deductions) or allowable credits (List) | | | 3525 |
| 5. Total capital and allowable subordinated liabilities | $ | 10,148,817,000 | 3530 |
| 6. Deductions and/or charges: | | | |
|  A. Total non-allowable assets from | | | |
|     Statement of Financial Condition (Notes B and C) $ 3,907,594,000 | 3540 | | |
|     1. Additional charges for customers' and | | | |
|        non-customers' security accounts | 15,545,000 | 3550 | |
|     2. Additional charges for customers' and | | | |
|        non-customers' commodity accounts | 73,409,000 | 3560 | |
|  B. Aged fail-to-deliver: | 89,960,000 | 3570 | |
|     1 number of items    959 | 3450 | | |
|  C. Aged short security differences-less | | | |
|     reserve of $ | 3460 | 70,078,000 | 3580 |
|     number of items    65 | 3470 | | |
|  D. Secured demand note deficiency | | | 3590 |
|  E. Commodity futures contracts and spot commodities - | | | |
|     proprietary capital charges | | | 3600 |
|  F. Other deductions and/or charges | | 459,049,000 | 3610 |
|  G. Deductions for accounts carried under | | | |
|     Rule 15c3-1(a)(6), (a)(7) and (c)(2)(x) | | | 3615 |
|  H. Total deductions and/or charges | ( | 4,615,635,000 | 3620 |
| 7. Other additions and/or allowable credits (List) | | | 3630 |
| 8. Tentative Net Capital | $ | 5,533,182,000 | 3640 |
| 9. Total Market Risk Exposure | $ | 2,534,578,000 | 3635 |
| 10. Total Credit Risk Exposure | $ | 285,878,000 | 3670 |
| 11. Net Capital | $ | 2,712,626,000 | 3750 |

OMIT PENNIES

Page 5

## FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
### PART II CSE

| BROKER OR DEALER | as of | 11/30/07 |
|---|---|---|
| Lehman Brothers Inc | | |

### COMPUTATION OF NET CAPITAL REQUIREMENT

**Part A**

12. 2% of combined aggregate debit items as shown in Formula for Reserve Requirements pursuant to Rule 15c3-3 prepared as of the date of net capital computation including both brokers or dealers and consolidated subsidiaries' debits ............ $ 598,584,000 [3870]

13. Minimum dollar net capital requirement of reporting broker or dealer and minimum net capital requirement of subsidiaries ............ $ 540,012,000 [3880]

14. Net capital requirement (greater of line 12 or 13) ............ $ 598,584,000 [3760]

15. Excess net capital (line 11 less 14) ............ $ 2,114,042,000 [3910]

16. Percentage of Net Capital to Aggregate Debits (line 11 divided by line 18 page 10) ............ % 27.79 [3851]

17. Percentage of Net Capital, after anticipated capital withdrawals, to Aggregate Debits item 11 less item 4880 page 19 divided by line 18 page 10) ............ % 18.61 [3854]

18. Net capital in excess of the greater of
5% of combined aggregate debit items or 120% of minimum net capital requirement ............ $ 2,064,611,600 [3920]

### OTHER RATIOS

**Part B**

19. Percentage of debt to debt-equity total computed in accordance with Rule 15c3-1 (d) ............ % 47.72 [3860]

20. Options deductions/Net Capital ratio (1000% test) total deductions exclusive of liquidating equity under Rule 15c3-1,(a)(6), (a)(7) and (c)(2)(x) divided by Net Capital ............ % [3852]

Page 6

FAX SERVER                11/26/2008  12:13 PM  PAGE  43/057    Fax Server

08-01420-scc Doc 470250 Filed 12/06/26/12 Entered 12/06/26/3:34:539:19 Main Appendix Document
Documents 1 Thru 2459 of 259 1053 of 1129

## Lehman Brothers Inc.

### Statement of Assets Deemed Non-allowable

### In Computing Net Capital Under Rule 15c3-1

| In thousands | November 30, 2007 |
|---|---|
| *Description of Asset:* | |
| Unsecured receivables from brokers or dealers | $   262,536 |
| Unsecured receivables from customers | 240,410 |
| Securities owned not readily marketable | 851,563 |
| Memberships in exchanges | 28,341 |
| Investments in and receivables from affiliates and subsidiaries | 1,968,900 |
| Property, equipment and leasehold improvements, net | 87,336 |
| Receivables and other assets | 332,580 |
| Identifiable intangible assets and goodwill, net | 135,928 |
| | $3,907,594 |

FAX SERVER          11/26/2008  12:13 PM   PAGE  44/057    Fax Server

08-01420-scc  Doc 470  Filed 12/06/12  Entered 12/06/12 13:48:39   Main Document
Documents 1 Through 259   Pg 469 of 259  1054 of 1129

FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | as of | 11/30/07 |
|---|---|---|---|
| Lehman Brothers Inc. | | | |

## COMPUTATION FOR DETERMINATION OF RESERVE REQUIREMENTS
### FOR BROKER-DEALERS UNDER RULE 15c3-3
(See Rule 15c3-3, Exhibit A and Related Notes)

### CREDIT BALANCES

| | | | |
|---|---|---|---|
| 1. Free credit balances and other credit balances in customers' security accounts (see Note A, Exhibit A, Rule 15c3-3) | 9,516,114,000 | 4340 |
| 2. Monies borrowed collateralized by securities carried for the accounts of customers (see Note B) | 342,024,000 | 4350 |
| 3. Monies payable against customers' securities loaned (see Note C) | 824,330,000 | 4360 |
| 4. Customers' securities failed to receive (see Note D) | 758,422,000 | 4370 |
| 5. Credit balances in firm accounts which are attributable to principal sales to customers | 1,744,858,000 | 4380 |
| 6. Market value of stock dividends, stock splits and similar distributions receivable outstanding over 30 calendar days | 6,054,000 | 4390 |
| 7. Market value of short security count differences over 30 calendar days old | | 4400 |
| 8. Market value of short securities and credits (not to be offset by longs or by debits) in all suspense accounts over 30 calendar days | 157,750,000 | 4410 |
| 9. Market value of securities which are in transfer in excess of 40 calendar days and have not been confirmed to be in transfer by the transfer agent or the issuer during the 40 days | | 4420 |
| 10. Other (List) | | 4425 |
| 11. TOTAL CREDITS | 13,349,552,000 | 4430 |

### DEBIT BALANCES

| | | | |
|---|---|---|---|
| 12. Debit balances in customers' cash and margin accounts excluding unsecured accounts and accounts doubtful of collection net of deductions pursuant to Note E, Exhibit A, Rule 15c3-3 | $ 5,711,393,000 | 4440 |
| 13. Securities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver | 1,656,100,000 | 4450 |
| 14. Failed to deliver of customers' securities not older than 30 calendar days | 1,197,693,000 | 4460 |
| 15. Margin required and on deposit with the Options Clearing Corporation for all option contracts written or purchased in customer accounts (see Note F) | 995,190,000 | 4465 |
| 16. Margin related to security futures products written, purchased or sold in customer accounts required and on deposit with a clearing agency or a derivative clearing organization (see note G) | | 4467 |
| 17. Other (List) | | 4469 |
| 18. Aggregate debit items | 9,760,376,000 | 4470 |
| 19. Less 3% (for alternative method only - see Rule 15c3-1(f)(5)(ii)) | ( 292,811,280 ) | 4471 |
| 20. TOTAL 15c3-3 DEBITS | 9,467,564,720 | 4472 |

### RESERVE COMPUTATION

| | | | |
|---|---|---|---|
| 21. Excess of total debits over total credits (line 20 less line 11) | $ | 4480 |
| 22. Excess of total credits over total debits (line 11 less line 20) | 3,881,987,280 | 4490 |
| 23. If computation permitted on a monthly basis, enter 105% of excess of total credits over total debits | | 4500 |
| 24. Amount held on deposit in "Reserve Bank Account(s)", including value of qualified securities, at end of reporting period | 2,265,000,000 | 4510 |
| 25. Amount of deposit (or withdrawal) including $ 1,487,000,000 [4515] value of qualified securities | 2,057,000,000 | 4520 |
| 26. New amount in Reserve Bank Account(s) after adding deposit or subtracting withdrawal including $ 3,122,000,000 [4525] value of qualified securities | $ 4,322,000,000 | 4530 |
| 27. Date of deposit (MMDDYY) | 12/04/07 | 4540 |

OMIT PENNIES

### FREQUENCY OF COMPUTATION

| | | | | | | |
|---|---|---|---|---|---|---|
| 28. Daily | | 4332 | Weekly | X | 4333 | Monthly | | 4334 |

Page 10

FAX SERVER          11/26/2008  12:13 PM   PAGE  45/057   Fax Server

08-01420-scc Doc 7250 Filed 12/06/26 Entered 12/06/26 34:53:19 Main Appendix
Documents 1 Through 9 Pg 479 of 259 1055 of 1129

FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | as of | 11/30/07 |
|---|---|---|---|
| Lehman Brothers Inc | | | |

COMPUTATION FOR DETERMINATION OF PAIB RESERVE REQUIREMENTS
FOR BROKER-DEALERS

### CREDIT BALANCES

| | | |
|---|---:|---|
| 1 Free credit balances and other credit balances in proprietary accounts of introducing brokers (PAIB) | 3,684,560,000 | 2110 |
| 2 Monies borrowed collateralized by securities carried for PAIB | 154,000 | 2120 |
| 3 Monies payable against PAIB securities loaned (see Note 2-PAIB) | 191,783,000 | 2130 |
| 4 PAIB securities failed to receive | 455,000 | 2140 |
| 5 Credit balances in firm accounts which are attributable to principal sales to PAIB | 127,604,000 | 2150 |
| 6 Other (List) | | 2160 |
| 7 TOTAL PAIB CREDITS | 4,004,756,000 | 2170 |

### DEBIT BALANCES

| | | |
|---|---:|---|
| 8 Debit balances in PAIB excluding unsecured accounts and accounts doubtful of collection | 483,942,000 | 2180 |
| 9 Securities borrowed to effectuate short sales by PAIB and securities borrowed to make delivery on PAIB securities failed to deliver | 2,027,005,000 | 2190 |
| 10 Failed to deliver of PAIB securities not older than 30 calendar days | 4,640,000 | 2200 |
| 11 Margin required and on deposit with the Options Clearing Corporation for all option contracts written or purchased in PAIB accounts | | 2210 |
| 12 Margin related to security futures products written purchased or sold in PAIB accounts required and on deposit with a clearing agency or a derivative clearing organization | | 2215 |
| 13 Other (List) | | 2220 |
| 14 TOTAL PAIB DEBITS | 7,515,587,000 | 2230 |

### RESERVE COMPUTATION

| | | | |
|---|---:|---:|---|
| 15 Excess of total PAIB debits over total PAIB credits (line 14 less line 7) | | | 2240 |
| 16 Excess of total PAIB credits over total PAIB debits (line 7 less line 14) | | 1,489,169,000 | 2250 |
| 17 Excess debits in customer reserve formula computation | | | 2260 |
| 18 PAIB Reserve Requirement (line 16 less line 17) | | 1,489,169,000 | 2270 |
| 19 Amount held on deposit in "Reserve Bank Account(s)", including | | | |
| $ 1,143,000,000 | 2275 | value of qualified securities, at end of reporting period | 1,143,000,000 | 2280 |
| 20 Amount of deposit (or withdrawal) including | | | |
| $ 479,000,000 | 2285 | value of qualified securities | 479,000,000 | 2290 |
| 21 New amount in Reserve Bank Account(s) after adding deposit or subtracting | | | |
| $ 1,622,000,000 | 2295 | value of qualified securities | 1,622,000,000 | 2300 |
| 22 Date of deposit (MMDDYY) | | 12/04/07 | 2310 |

### FREQUENCY OF COMPUTATION

OMIT PENNIES

| 23 Daily | 2315 | Weekly | x | 2320 | Monthly | | 2330 |
|---|---|---|---|---|---|---|---|

Page 11

FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | |
|---|---|---|
| Lehman Brothers Inc | as of | 11/30/07 |

## Information for Possession or Control Requirements Under Rule 15c3-3

State the market valuation and the number of items of:

1. Customers' fully paid securities and excess margin securities not in the respondent's possession
   or control as of the report date (for which instructions to reduce to possession or control had
   been issued as of the report date) but for which the required action was not taken by respondent
   within the time frames specified under Rule 15c3-3 Notes A and B . . . $ _____ 12,026,000 [4586]
   A. Number of items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15 [4587]
2. Customers' fully paid securities and excess margin securities for which instructions to reduce
   to possession or control had not been issued as of the report date, excluding items arising
   from "temporary lags which result from normal business operations" as permitted under
   Rule 15c3-3. Notes B,C and D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____ [4588]
   A. Number of items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____ [4589]

                                                                            OMIT PENNIES

3. The system and procedures utilized in complying with the requirement to maintain physical possession or
   control of customers' fully paid and excess margin securities have been tested and are functioning in a
   manner adequate to fulfill the requirements of Rule 15c3-3 . . . Yes _____ x _____ [4584]  No _____ [4585]

NOTES

A--Do not include in item one customers' fully paid and excess margin securities required by Rule 15c 3-3 to be in
   possession or control but for which no action was required by the respondent as of the report date or required action
   was taken by respondent within the time frames specified under Rule 15c3-3.
B--State separately in response to items one and two whether the securities reported in response thereto were
   subsequently reduced to possession or control by the respondent.
C--Be sure to include in item two only items not arising from "temporary lags which result from normal business
   operations" as permitted under Rule 15c3-3
D--Item two must be responded to only with report which is filed as of the date selected for the broker's or dealer's
   annual audit of financial statements, whether or not such date is the end of a calendar quarter. The response to item
   two should be filed within 60 calendar days after such date, rather than with the remainder of this report. This
   information may be required on a more frequent basis by the Commission or the designated examining authority
   in accordance with Rule 17a-5(a)(2)(iv).

FAX SERVER                11/26/2008 12:13 PM   PAGE 47/057    Fax Server

08-01-20230-scc Doc 4750 Filed 12/06/26/14 Entered 12/06/26/34 8:39:19 Main Appendix
Documents 1 Through 25 Pg 499 of 259 1057 of 1129

## Statement Pursuant to Paragraph (d) (4) of Rule 17a-5

There are no material differences between the audited Computation of Net Capital under Rule 15c3-1 and the audited Computation for Determination of the Reserve Requirements under Rule 15c3-3 included in this report and the corresponding schedules included in the Company's unaudited November 30, 2007 Part II FOCUS filing.

SUPPLEMENT TO
FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | |
|---|---|---|
| Lehman Brothers Inc. | as of | 11/30/07 |

STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION
FOR CUSTOMERS TRADING ON U.S. COMMODITY EXCHANGES

SEGREGATION REQUIREMENTS (Section 4d(2) of the CEAct)

| | | | | |
|---|---|---|---|---|
| 1. Net ledger balance | | | | |
| A. Cash | | $ | 2,670,931,000 | 7010 |
| B. Securities (at market) | | | 3,611,861,000 | 7020 |
| 2. Net unrealized profit (loss) in open futures contracts traded on a contract market | | | 109,873,000 | 7030 |
| 3. Exchange traded options | | | | |
| A. Add market value of open option contracts purchased on a contract market | | | 954,288,000 | 7032 |
| B. Deduct market value of open option contracts granted (sold) on a contract market | | ( | 846,152,000) | 7033 |
| 4. Net equity (deficit) (add lines 1, 2, and 3) | | | 6,500,801,000 | 7040 |
| 5. Accounts liquidating to a deficit and accounts with debit balances | | | | |
| - gross amount | 256,022,000 | 7045 | | |
| | | | | |
| Less: amount offset by customer owned securities | ( | 252,168,000 ) | 7047 | 3,854,000 | 7050 |
| 6. Amount required to be segregated (add lines 4 and 5) | | $ | 6,504,655,000 | 7060 |

FUNDS IN SEGREGATED ACCOUNTS

| | | | | |
|---|---|---|---|---|
| 7. Deposited in segregated funds bank accounts | | | | |
| A. Cash | | | 2,455,000 | 7070 |
| B. Securities representing investments of customers' funds (at market) | | | 2,330,180,000 | 7080 |
| C. Securities held for particular customers or option customers in lieu of cash (at market) | | | 1,667,524,000 | 7090 |
| 8. Margins on deposit with derivatives clearing organizations of contract markets | | | | |
| A. Cash | | $ | | 7100 |
| B. Securities representing investments of customers' funds (at market) | | | 539,195,000 | 7110 |
| C. Securities held for particular customers or option customers in lieu of cash (at market) | | | 1,944,337,000 | 7120 |
| 9. Net settlement from (to) derivatives clearing organizations of contract markets | | | 16,884,000 | 7130 |
| 10. Exchange traded options | | | | |
| A. Value of open long option contracts | | | 954,288,000 | 7132 |
| B. Value of open short option contracts | | ( | 846,152,000) | 7133 |
| 11. Net equities with other FCMs | | | | |
| A. Net liquidating equity | | | 10,403,000 | 7140 |
| B. Securities representing investments of customers' funds (at market) | | | | 7160 |
| C. Securities held for particular customers or option customers in lieu of cash (at market) | | | | 7170 |
| 12. Segregated funds on hand (describe: _____ ) | | | | 7150 |
| 13. Total amount in segregation (add lines 7 through 12) | | | 6,719,094,000 | 7180 |
| 14. Excess (deficiency) funds in segregation (subtract line 6 from line 13) | | $ | 214,439,000 | 7190 |

Page 13

SUPPLEMENT TO
FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | as of | 11/30/07 |
|---|---|---|---|
| Lehman Brothers Inc. | | | |

STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7

FOREIGN FUTURES AND FOREIGN OPTIONS SECURED AMOUNTS - SUMMARY

I Check the appropriate box to identify the amount shown on line 1 below

| x | 7300 | Secured amounts in only U.S. - domiciled customers' accounts |
| | 7310 | Secured amounts in U.S. and foreign - domiciled customers' accounts |
| | 7320 | Net liquidating equities in all accounts of customers trading on foreign boards of trade |
| | 7330 | Amount required to be set aside pursuant to law, rule or regulation of a foreign government or a rule of a self-regulatory organization authorized thereunder |

II Has the FCM changed the method of calculating the amount to be set aside in separate accounts since the last financial report it filed ?

| | Yes | 7340 | If yes, explain the change below |
| X | No | 7350 | |

1 Amount to be set aside in separate section
  30.7 accounts                                    $        271,020,000  7360

2 Total funds in separate section 30.7 accounts
  (page 16, line 8)                                          544,805,000  7370

3 Excess (deficiency) - (subtract line 1 from line 2)  $        273,785,000  7380

Page 15

FAX SERVER          11/26/2008  12:13 PM  PAGE  50/057     Fax Server

08-01420-scc Doc 70250 Filed 12/06/12 Entered 12/06/12 34:55:19 Main Appendix
Documents 1 Thru 25 Pg 259 of 259 1060 of 1129

SUPPLEMENT TO
FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
PART II CSE

| BROKER OR DEALER | | | |
|---|---|---|---|
| Lehman Brothers Inc | | as of | 11/30/07 |

STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7

FUNDS DEPOSITED IN SEPARATE REGULATION 30.7 ACCOUNTS

1 Cash in banks
  A. Banks located in the United States $ [7500]
  B. Other banks designated by the Commission
    Name(s)    Lehman Brothers Bank [7510]    20,000 [7520] $    20,000 [7530]
2 Securities
  A. In safekeeping with banks located in the United States $    430,048,000 [7540]
  B. In safekeeping with other banks designated by the Commission
    Name(s) [7550]    [7560]    430,048,000 [7570]
3 Equities with registered futures commission merchants
  A. Cash $ [7580]
  B. Securities [7590]
  C. Unrealized gain (loss) on open futures contracts [7600]
  D. Value of long option contracts [7610]
  E. Value of short option contracts ( ) [7615]    [7620]
4. Amounts held by clearing organizations of foreign boards of trade
  Name(s) [7630]
  A. Cash $ [7640]
  B. Securities [7650]
  C. Amount due to (from) clearing organizations - daily variation [7660]
  D. Value of long option contracts [7670]
  E. Value of short option contracts ( ) [7675]    [7680]
5 Amounts held by members of foreign boards of trade
  Name(s)    Lehman Brothers PTE, Ltd. [7690]
  A. Cash $    61,493,000 [7700]
  B. Securities    57,368,000 [7710]
  C. Unrealized gain (loss) on open futures contracts    (6,551,000) [7720]
  D. Value of long option contracts    3,346,000 [7730]
  E. Value of short option contracts (    (919,000) [7735]    114,737,000 [7740]
6 Amounts with other depositories designated by a foreign board of trade
  Name(s) [7750]    [7760]
7 Segregated funds on hand (describe) [7765]
8 Total funds in separate section 30.7 accounts (to page 15 line 2) $    544,805,000 [7770]

A. If any securities shown are other than the types of securities referred to in CFTC Regulation 1.25, attach
a separate schedule detailing the obligations shown on each such line.

Page 16

FAX SERVER                    11/26/2008 12:13 PM   PAGE 51/057    Fax Server

08-01-02050-sccc Doc 07 0250 Filed 12/006/26/14 Entered 12/006/26/3:34 8:39:19ain Appendix
Documents 1 Through 589 of 259 1061 of 1129

## Statement Pursuant to Section 1.10 (d) (2) of the Commodity Exchange Act

There are no material differences between the audited computation of Segregation Requirements and Funds in Segregation for Customers Trading on U.S. Commodity Exchanges and Secured Amounts and Funds Held in Separate Accounts for Foreign Futures and Foreign Options Customers Pursuant to Regulation 30.7 included in this report and the corresponding schedules included in the Company's unaudited November 30, 2007 Part II FOCUS filing.

### Lehman Brothers Inc. and Subsidiaries

### Reconciliation of Assets, Liabilities and
### Stockholder's Equity to the Regulatory Report

### November 30, 2007

The consolidated financial statements have been prepared on the basis of generally accepted accounting principles and differ in certain respects from accounting practices prescribed by the Securities and Exchange Commission's general instructions to Form X-17A-5. Under the Securities and Exchange Commission's general instructions, certain subsidiaries may not be consolidated.

A reconciliation of amounts reported by the Company at November 30, 2007 on Form X-17A-5 to the consolidated financial statements is as follows:

| In millions November 30, 2007 | Unaudited Form X-17A-5 | Reclassifications | Additional Subsidiaries Consolidated | Consolidated Financial Statements |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 344 | $ 12 | $ 360 | $ 716 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 633 | 7,353 | 12 | 7,998 |
| Financial instruments and other inventory positions owned | 86,587 | (970) | 88,165 | 173,782 |
| Collateralized agreements: | | | | |
| Securities purchased under agreements to resell | 104,297 | — | 20,833 | 125,130 |
| Securities borrowed | 150,251 | 304 | 5,684 | 156,239 |
| Receivables: | | | | |
| Brokers, dealers and clearing organizations | 8,967 | (895) | 1,282 | 9,354 |
| Customers | 6,676 | 6,197 | (4,728) | 8,145 |
| Affiliates | 1,998 | (1,998) | 11,740 | 11,740 |
| Others | — | 640 | (270) | 370 |
| Property, equipment and leasehold improvements, net | 87 | — | 151 | 238 |
| Other assets | 1,076 | 657 | (630) | 1,103 |
| Identifiable intangible assets and goodwill, net | — | 136 | 475 | 611 |
| Derivative receivables | 4,428 | (4,428) | — | — |
| Receivables from non-customers | 6,123 | (6,123) | — | — |
| Securities owned not readily marketable | 852 | (852) | — | — |
| Memberships in exchanges | 28 | (28) | — | — |
| | $372,347 | $ 5 | $ 123,074 | $ 495,426 |
| **Liabilities and Stockholder's Equity** | | | | |
| Short-term borrowings and current portion of long-term borrowings | $ 330 | $ 606 | $ 731 | $ 1,667 |
| Financial instruments and other inventory positions sold but not yet purchased | 48,172 | 4,250 | 32,601 | 85,023 |
| Obligation to return securities received as collateral | 307 | (307) | — | — |
| Collateralized financings: | | | | |
| Securities sold under agreements to repurchase | 171,850 | 1,305 | 13,151 | 186,306 |
| Securities loaned | 105,606 | 307 | 9,262 | 115,175 |
| Other secured borrowings | — | — | 8,096 | 8,096 |
| Advances from Holdings and other affiliates | — | 58,230 | — | 58,230 |
| Payables: | | | | |
| Brokers, dealers and clearing organizations | 3,098 | 3,321 | (2,491) | 3,928 |
| Customers | 15,776 | 4,112 | 2,135 | 22,023 |
| Derivative payables | 4,938 | (4,938) | — | — |
| Accrued liabilities and other payables | 5,172 | (59,458) | 59,565 | 5,279 |
| Long-term borrowings | 5,810 | (581) | 24 | 5,253 |
| Trade date payable | 362 | (362) | — | — |
| Payables to non-customers | 6,471 | (6,471) | — | — |
| Stockholders' equity | 4,455 | (9) | — | 4,446 |
| | $372,347 | $ 5 | $ 123,074 | $ 495,426 |

# SUPPLEMENTAL REPORTS

# OF

# INDEPENDENT AUDITORS


=Ill ERNST & YOUNG

■ Ernst & Young LLP          ■ Phone: (212) 773-3000
5 Times Square                   www.ey.com
New York, New York 10036-6530

**Supplementary Report of Independent Registered Public Accounting Firm on Internal Control**
**Required by Securities and Exchange Commissions Rule 17a-5**

The Board of Directors and Stockholder of
Lehman Brothers Inc.

In planning and performing our audit of the consolidated financial statements of Lehman Brothers Inc. and
Subsidiaries (the "Company"), as of and for the year ended November 30, 2007, in accordance with the
standards of the Public Company Accounting Oversight Board (United States), we considered its internal
control over financial reporting ("internal control") as a basis for designing our auditing procedures for the
purpose of expressing our opinion on the consolidated financial statements, but not for the purpose of
expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we do not
express an opinion on the effectiveness of the Company's internal control.

Also, as required by rule 17a-5(g)(1) of the Securities and Exchange Commission ("SEC"), we have made a
study of the practices and procedures followed by the Company, including consideration of control
activities for safeguarding securities. This study included tests of compliance with such practices and
procedures that we considered relevant to the objectives stated in rule 17a-5(g), in the following:

1. Making the periodic computations of aggregate indebtedness (or aggregate debits) and net capital
   under rule 17a-3(a)(11) and the reserve required by rule 15c3-3(e)

2. Making the quarterly securities examinations, counts, verifications, and comparisons, and the
   recordation of differences required by rule 17a-13

3. Complying with the requirements for prompt payment for securities under Section 8 of Federal
   Reserve Regulation T of the Board of Governors of the Federal Reserve System

4. Obtaining and maintaining physical possession or control of all fully paid and excess margin
   securities of customers as required by rule 15c3-3

The management of the Company is responsible for establishing and maintaining internal control and the
practices and procedures referred to in the preceding paragraph. In fulfilling this responsibility, estimates
and judgments by management are required to assess the expected benefits and related costs of controls,
and of the practices and procedures referred to in the preceding paragraph, and to assess whether those
practices and procedures can be expected to achieve the SEC's above-mentioned objectives. Two of the
objectives of internal control and the practices and procedures are to provide management with reasonable
but not absolute assurance that assets for which the Company has responsibility are safeguarded against loss
from unauthorized use or disposition, and that transactions are executed in accordance with management's
authorization and recorded properly to permit the preparation of financial statements in conformity with
generally accepted accounting principles. Rule 17a-5(g) lists additional objectives of the practices and
procedures listed in the preceding paragraph.

Because of inherent limitations in internal control and the practices and procedures referred to above, error
or fraud may occur and not be detected. Also, projection of any evaluation of them to future periods is
subject to the risk that they may become inadequate because of changes in conditions or that the
effectiveness of their design and operation may deteriorate.

A control deficiency exists when the design or operation of a control does not allow management or
employees, in the normal course of performing their assigned functions, to prevent or detect misstatements
on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal

FAX SERVER          11/26/2008  12:13 PM  PAGE  55/057   Fax Server

08-01-42020-scc Doc 4750 Filed 12/06/26/12 Entered 12/06/26/13:48:39:19 Main Appendix
Documents 1 Through 279 Pg 257 of 259 1065 of 1129



■ Ernst & Young LLP

control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statement will not be prevented or detected on a timely basis.

Our consideration of internal control was for the limited purpose described in the first and second paragraphs and would not necessarily identify all deficiencies in internal control that might be material weaknesses. We did not identify any deficiencies in internal control and control activities for safeguarding securities that we consider to be material weaknesses as defined above.

We understand that practices and procedures that accomplish the objectives referred to in the second paragraph of this report are considered by the SEC to be adequate for its purposes in accordance with the Securities Exchange Act of 1934 and related regulations, and that practices and procedures that do not accomplish such objectives in all material respects indicate a material inadequacy for such purposes. Based on this understanding and on our study, we believe that the Company's practices and procedures, as described in the second paragraph of this report, were adequate at November 30, 2007, to meet the SEC's objectives.

This report is intended solely for the information and use of the Board of Directors, management, the SEC, the New York Stock Exchange, and other regulatory agencies that rely on rule 17a-5(g) under the Securities Exchange Act of 1934 in their regulation of registered brokers and dealers, and is not intended to be and should not be used by anyone other than these specified parties.

*Ernst & Young LLP*

January 28, 2008

 **ERNST & YOUNG**

■ Ernst & Young LLP          ■ Phone: (212) 773-3000
5 Times Square                 www.ey.com
New York, New York 10036-6530

**Supplementary Report of Independent Registered Public Accounting Firm**
**on Internal Controls Required by CFTC Regulation 1.16**

Board of Directors and Stockholder of
Lehman Brothers Inc.

In planning and performing our audit of the consolidated financial statements of Lehman Brothers Inc. and Subsidiaries (the "Company"), as of and for the year ended November 30, 2007, in accordance with the standards of the Public Company Accounting Oversight Board (United States), we considered its internal control over financial reporting ("internal control") as a basis for designing our auditing procedures for the purpose of expressing our opinion on the consolidated financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we do not express an opinion on the effectiveness of the Company's internal control.

Also, as required by Regulation 1.16 of the Commodity Futures Trading Commission ("CFTC"), we have made a study of the practices and procedures followed by the Company, including consideration of control activities for safeguarding customer and firm assets. This study included tests of such practices and procedures that we considered relevant to the objectives stated in Regulation 1.16 in making the following:

1. The periodic computations of minimum financial requirements pursuant to Regulation 1.17

2. The daily computations of the segregation requirements of section 4d(2) of the Commodity Exchange Act and the regulations thereunder, and the segregation of funds based on such computations

3. The daily computations of the foreign futures and foreign options secured amount requirements pursuant to Regulation 30.7 of the CFTC.

The management of the Company is responsible for establishing and maintaining internal control and the practices and procedures referred to in the preceding paragraph. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of controls, and of the practices and procedures referred to in the preceding paragraph, and to assess whether those practices and procedures can be expected to achieve the CFTC's above-mentioned objectives. Two of the objectives of internal control and the practices and procedures are to provide management with reasonable but not absolute assurance that assets for which the Company has responsibility are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of financial statements in conformity with generally accepted accounting principles. Regulation 1.16 lists additional objectives of the practices and procedures listed in the preceding paragraph.

Because of inherent limitations in internal control and the practices and procedures referred to above, error or fraud may occur and not be detected. Also, projection of any evaluation of them to future periods is subject to the risk that they may become inadequate because of changes in conditions or that the effectiveness of their design and operation may deteriorate.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statement will not be prevented or detected on a timely basis.

FAX SERVER          11/26/2008 12:13 PM  PAGE  57/057    Fax Server

08-01-02420-scc Doc 4780-50 Filed 12/06/26/26/4 Entered 12/06/26/34:84:59:19 Main Appendix
Documents 1 Through 2599 of 259 1067 of 1129

**EU ERNST & YOUNG**                          ■ Ernst & Young LLP

Our consideration of internal control was for the limited purpose described in the first, second, and third paragraphs and would not necessarily identify all deficiencies in internal control that might be material weaknesses. We did not identify any deficiencies in internal control and control activities for safeguarding securities and certain regulated commodity customer and firm assets that we consider to be material weaknesses, as defined above. [B]

We understand that practices and procedures that accomplish the objectives referred to in the second paragraph of this report are considered by the CFTC to be adequate for its purposes in accordance with the Commodity Exchange Act and related regulations, and that practices and procedures that do not accomplish such objectives in all material respects indicate a material inadequacy for such purposes. Based on this understanding and on our study, we believe that the Company's practices and procedures as described in the second paragraph of this report, were adequate at November 30, 2007, to meet the CFTC's objectives.

This report is intended solely for the information and use of the Board of Directors, management, the CFTC, and other regulatory agencies that rely on Regulation 1.16 of the CFTC, and is not intended to be and should not be used by anyone other than these specified parties.

*Ernst & Young LLP*

January 28, 2008

# <u>PD 6</u>

## Legotte Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　Debtor. | Case No. 08-01420 (JMP) SIPA |

**DECLARATION OF LEONARD J. LEGOTTE**
**IN SUPPORT OF SECOND MOTION FOR ORDER APPROVING**
**THE TRUSTEE'S ALLOCATION OF PROPERTY OF THE ESTATE**

Leonard J. Legotte declares under penalty of perjury:

1.　　　I currently serve as a consultant to James W. Giddens (the "Trustee"), trustee for the liquidation of Lehman Brothers Inc. ("LBI"). I make this declaration in support of the Second Motion For Order Approving The Trustee's Allocation Of Property Of The Estate.

**I.　　BACKGROUND**

2.　　　I worked for LBI for twenty-two years prior to the commencement of LBI's liquidation under the Securities Investor Protection Act on September 19, 2008. From approximately 1998 to September 2008, I was Vice President of Clearance and Custody for Government and Mortgage Operations. My responsibilities included, among other things, oversight of financial product settlement and safekeeping as well as interfacing with LBI's regulatory department. My responsibilities also included supervision of the Fixed Income Settlement Team for Government and Mortgage Products (the "Settlement Team"), which involved overseeing the application of segregation instructions to certain customer transactions. In the course of my work at LBI, I used and became familiar with LBI's operations systems, including various cash and securities systems.

08-01420-scc Doc 4763-50 Filed 12/06/12 Entered 12/06/12 13:38:39 Main Document
Documents 1 Through 29 Pg 2 of 2 Pg 1070 of 1129

2

3.      Upon the sale of certain operations of LBI to Barclays Capital Inc.

("Barclays") in September 2008, I became an employee of Barclays, and my responsibilities

included providing services to the Trustee.  Thereafter, I became a consultant to the Trustee.  In

this role, I provide historical knowledge of LBI's books and records and operations for matters

related to the areas for which I formerly had responsibility at LBI.  I have also assisted the

Trustee in researching various other aspects of LBI's business and transactions.

4.      I have recently been working with the Trustee's professionals to assist

with the investigations of issues related to LBI's compliance with the Securities and Exchange

Commission Rule 15c3-3.  I describe below one instance identified by me where LBI was unable

to apply segregation instructions to certain customer securities in the custody of LBI's primary

clearing bank, leaving the securities subject to seizure to satisfy obligations owed by LBI.

## II.      LOSS OF SCREEN ACCESS

5.      LBI's primary clearing bank for "Fed-eligible"[1] securities was JPMorgan

Chase N.A. ("Chase").  Significant amounts of customer activity as well as firm activity were

executed through LBI's accounts held at Chase.  In the ordinary course of its business, LBI relied

upon electronic systems maintained by Chase to conduct real-time account management and to

monitor daily activity in its accounts.  The ability to use these electronic systems was referred to

colloquially as having "screen access."  This screen access allowed LBI to maintain up-to-date

records, instruct Chase to segregate customer securities, and to process settlements of both

customer and firm transactions on a timely basis.

---

1.      "Fed-eligible" refers to the Federal Reserve Bank of New York securities system.

08-01420-scc Doc 6250 Filed 12/06/13 Entered 12/06/13 13:38:19 Main Appendix Documents 1 Through 29 Pg 8 of 29 Pg 1071 of 1129

3

6.      One of these systems was the Broker Dealer Automated System ("B-DAS").  LBI used B-DAS to input "segregation instructions" for certain customer transactions.  Where segregation instructions were made with respect to particular customer securities, the securities were moved from LBI's main operating account at Chase to LBI's customer safekeeping account.  The segregated securities were therefore protected from assertion of liens by Chase, and could not be seized or liquidated by Chase to satisfy obligations of LBI.

7.      At the beginning of each business day, LBI personnel under my direction would oversee the application of segregation instructions to customer transactions that were scheduled to settle on that day.  In order to identify the securities that would need to be segregated, my team produced a report using LBI's electronic systems, including the Mainframe Trading System ("MTS").  If an account contained a "safekeeping" instruction, securities coming into the account would be flagged for segregation on the settlement date.  My team used Chase's B-DAS system to enter segregation instructions for the securities identified by LBI's systems for segregation.

8.      On the morning of September 19, 2008, my team attempted to log on to the B-DAS system in order to enter the appropriate segregation instructions for customer transactions settling on September 19, 2008.  However, my team was unable to log on to B-DAS and received a message stating that our system access was denied.  Due to this denial of screen access on the morning of September 19, 2008, LBI was unable to apply segregation instructions to customer securities transactions settling that day.

## III.      IDENTIFICATION OF SECURITIES REQUIRING SEGREGATION

9.      After I alerted the Trustee's professionals to this segregation issue, I was tasked with identifying the securities that LBI was unable to segregate on September 19, 2008

08-01420-scc Doc 47625 Filed 12/06/12 Entered 12/06/12 13:38:39 Main Appendix
Documents 1 Through 4 Pg 4 of 29 Pg 1072 of 1129

4

due to the loss of screen access. From my analysis, I determined that LBI was unable to apply segregation instructions to a total of 14 securities. I identified these securities in the following manner.

        10.     During the ordinary course of business, if the Settlement Team was unable to enter a segregation instruction for a customer trade that was scheduled to settle on a given date, the trade would be recorded on the MTS books and records as a "fail" – meaning it failed to move from LBI's main operating account at Chase to LBI's customer safekeeping account at Chase. To identify the customer securities affected by the screen access cut-off, therefore, I obtained a listing of failed transactions as of September 19, 2008 from MTS. This report listed all of the trades that failed to settle on September 19, 2008, as well as any securities that failed to move into LBI's safekeeping account at Chase. From this report, I created a list of securities that LBI was unable to segregate because of Chase's termination of LBI's screen access. A list of these securities is attached as Exhibit 1.

        I declare under penalty of perjury that the foregoing is true and correct. Executed on November 30, 2011.

                                            Leonard J. Legotte

# EXHIBIT 1

| Screen Access Securities | |
|---|---|
| **CUSIP** | **Quantity** |
| 313384G86 | 600,000.00 |
| 313384G86 | 500,000.00 |
| 313384H28 | 150,000.00 |
| 313384J34 | 1,560,000.00 |
| 912795G70 | 101,000.00 |
| 912795G70 | 77,000.00 |
| 912795G70 | 54,000.00 |
| 912795G70 | 5,000.00 |
| 912795G70 | 3,000.00 |
| 912795G70 | 1,234,000.00 |
| 912795G70 | 46,000.00 |
| 912795G70 | 26,000.00 |
| 912795G70 | 13,000.00 |
| 912795G70 | 113,000.00 |
| 912795G70 | 4,000.00 |
| 912795G70 | 60,000.00 |
| 912795G70 | 62,000.00 |
| 912795G70 | 14,000.00 |
| 912795G70 | 41,000.00 |
| 912795G70 | 59,000.00 |
| 912795G88 | 220,000.00 |
| 912795G88 | 215,000.00 |
| 912795G88 | 90,000.00 |
| 912795G88 | 80,000.00 |
| 912795G88 | 350,000.00 |
| 912795G88 | 72,000.00 |
| 912795G88 | 175,000.00 |
| 912795G88 | 11,695,000.00 |
| 912795G88 | 75,000.00 |
| 912795G88 | 24,000.00 |
| 912795G88 | 42,000.00 |
| 912795G96 | 244,000.00 |
| 912795G96 | 50,000.00 |
| 912795G96 | 50,000.00 |
| 912795G96 | 46,000.00 |
| 912795G96 | 167,000.00 |
| 912795G96 | 572,000.00 |
| 912795G96 | 342,000.00 |
| 912795G96 | 1,210,000.00 |
| 912795G96 | 550,000.00 |
| 912795G96 | 100,000.00 |
| 912795G96 | 50,000.00 |
| 912795G96 | 33,000.00 |
| 912795G96 | 434,000.00 |
| 912795G96 | 386,000.00 |

| 912795G96 | 118,000.00 |
|-----------|-----------|
| 912795G96 | 17,000.00 |
| 912795G96 | 60,000.00 |
| 912795G96 | 205,000.00 |
| 912795G96 | 220,000.00 |
| 912795G96 | 57,000.00 |
| 912795G96 | 49,000.00 |
| 912795G96 | 44,000.00 |
| 912795G96 | 263,000.00 |
| 912795G96 | 62,000.00 |
| 912795G96 | 387,000.00 |
| 912795G96 | 133,000.00 |
| 912795G96 | 141,000.00 |
| 912795G96 | 89,000.00 |
| 912795G96 | 142,000.00 |
| 912795G96 | 39,000.00 |
| 912795G96 | 63,000.00 |
| 912795G96 | 96,000.00 |
| 912795G96 | 20,000.00 |
| 912795G96 | 408,000.00 |
| 912795G96 | 388,000.00 |
| 912795G96 | 271,000.00 |
| 912795G96 | 12,000.00 |
| 912795G96 | 3,000.00 |
| 912795G96 | 32,000.00 |
| 912795G96 | 773,000.00 |
| 912795G96 | 132,000.00 |
| 912795G96 | 208,000.00 |
| 912795G96 | 217,000.00 |
| 912795G96 | 202,000.00 |
| 912795G96 | 374,000.00 |
| 912795G96 | 92,000.00 |
| 912795G96 | 38,000.00 |
| 912795G96 | 370,000.00 |
| 912795G96 | 28,000.00 |
| 912795G96 | 5,000.00 |
| 912795G96 | 63,000.00 |
| 912795G96 | 436,000.00 |
| 912795G96 | 129,000.00 |
| 912795G96 | 426,000.00 |
| 912795G96 | 407,000.00 |
| 912795G96 | 37,000.00 |
| 912795G96 | 8,000.00 |
| 912795G96 | 680,000.00 |
| 912795G96 | 53,000.00 |
| 912795G96 | 175,000.00 |
| 912795G96 | 222,000.00 |

| | |
|---|---|
| 912795G96 | 551,000.00 |
| 912795G96 | 179,000.00 |
| 912795G96 | 98,000.00 |
| 912795G96 | 176,000.00 |
| 912795G96 | 463,000.00 |
| 912795G96 | 7,000.00 |
| 912795G96 | 1,100,000.00 |
| 912795G96 | 27,000.00 |
| 912795G96 | 115,000.00 |
| 912795G96 | 40,000.00 |
| 912795G96 | 58,000.00 |
| 912795G96 | 4,000.00 |
| 912795G96 | 538,000.00 |
| 912795G96 | 118,000.00 |
| 912795G96 | 23,000.00 |
| 912795G96 | 78,000.00 |
| 912795G96 | 255,000.00 |
| 912795G96 | 810,000.00 |
| 912795G96 | 241,000.00 |
| 912795G96 | 856,000.00 |
| 912795G96 | 5,000.00 |
| 912795G96 | 147,000.00 |
| 912795G96 | 415,000.00 |
| 912795G96 | 7,000.00 |
| 912795G96 | 154,000.00 |
| 912795G96 | 116,000.00 |
| 912795G96 | 107,000.00 |
| 912795G96 | 519,000.00 |
| 912795G96 | 491,000.00 |
| 912795G96 | 154,000.00 |
| 912795G96 | 2,000.00 |
| 912795G96 | 91,000.00 |
| 912795G96 | 414,000.00 |
| 912795G96 | 33,000.00 |
| 912795G96 | 94,000.00 |
| 912795G96 | 45,000.00 |
| 912795G96 | 281,000.00 |
| 912795G96 | 165,000.00 |
| 912795G96 | 301,000.00 |
| 912795G96 | 568,000.00 |
| 912795G96 | 583,000.00 |
| 912795G96 | 32,000.00 |
| 912795G96 | 530,000.00 |
| 912795G96 | 43,000.00 |
| 912795G96 | 462,000.00 |
| 912795G96 | 95,000.00 |
| 912795G96 | 496,000.00 |

| | |
|---|---|
| 912795G96 | 34,000.00 |
| 912795G96 | 212,000.00 |
| 912795G96 | 1,000.00 |
| 912795G96 | 79,000.00 |
| 912795G96 | 241,000.00 |
| 912795G96 | 31,000.00 |
| 912795G96 | 22,000.00 |
| 912795G96 | 417,000.00 |
| 912795G96 | 198,000.00 |
| 912795G96 | 2,000.00 |
| 912795G96 | 295,000.00 |
| 912795G96 | 258,000.00 |
| 912795G96 | 260,000.00 |
| 912795G96 | 617,000.00 |
| 912795G96 | 643,000.00 |
| 912795G96 | 37,000.00 |
| 912795G96 | 1,000.00 |
| 912795G96 | 48,000.00 |
| 912795G96 | 396,000.00 |
| 912795G96 | 73,000.00 |
| 912795G96 | 274,000.00 |
| 912795G96 | 375,000.00 |
| 912795G96 | 59,000.00 |
| 912795G96 | 35,000.00 |
| 912795G96 | 92,000.00 |
| 912795G96 | 191,000.00 |
| 912795G96 | 144,000.00 |
| 912795G96 | 277,000.00 |
| 912795G96 | 30,000.00 |
| 912795G96 | 188,000.00 |
| 912795G96 | 348,000.00 |
| 912795G96 | 2,000.00 |
| 912795G96 | 194,000.00 |
| 912795G96 | 391,000.00 |
| 912795G96 | 747,000.00 |
| 912795G96 | 41,000.00 |
| 912795G96 | 12,000.00 |
| 912795G96 | 243,000.00 |
| 912795G96 | 54,000.00 |
| 912795G96 | 238,000.00 |
| 912795G96 | 180,000.00 |
| 912795G96 | 55,000.00 |
| 912795G96 | 53,000.00 |
| 912795G96 | 240,000.00 |
| 912795G96 | 17,000.00 |
| 912795G96 | 297,000.00 |
| 912795G96 | 71,000.00 |

| 912795G96 | 368,000.00 |
|---|---|
| 912795G96 | 261,000.00 |
| 912795G96 | 48,000.00 |
| 912795G96 | 865,000.00 |
| 912795G96 | 193,000.00 |
| 912795G96 | 865,000.00 |
| 912795G96 | 262,000.00 |
| 912795G96 | 168,000.00 |
| 912795G96 | 222,000.00 |
| 912795G96 | 43,000.00 |
| 912795G96 | 55,000.00 |
| 912795G96 | 580,000.00 |
| 912795G96 | 714,000.00 |
| 912795G96 | 135,000.00 |
| 912795G96 | 123,000.00 |
| 912795G96 | 299,000.00 |
| 912795G96 | 223,000.00 |
| 912795G96 | 160,000.00 |
| 912795G96 | 111,000.00 |
| 912795G96 | 148,000.00 |
| 912795G96 | 41,000.00 |
| 912795G96 | 62,000.00 |
| 912795G96 | 318,000.00 |
| 912795G96 | 237,000.00 |
| 912795G96 | 276,000.00 |
| 912795G96 | 269,000.00 |
| 912795G96 | 1,225,000.00 |
| 912795G96 | 1,354,000.00 |
| 912795G96 | 543,000.00 |
| 912795G96 | 73,000.00 |
| 912795G96 | 2,000.00 |
| 912795G96 | 349,000.00 |
| 912795G96 | 74,000.00 |
| 912795G96 | 17,000.00 |
| 912795G96 | 81,000.00 |
| 912795G96 | 112,000.00 |
| 912795G96 | 740,000.00 |
| 912795G96 | 327,000.00 |
| 912795G96 | 193,000.00 |
| 912795G96 | 62,000.00 |
| 912795G96 | 275,000.00 |
| 912795G96 | 362,000.00 |
| 912795G96 | 38,000.00 |
| 912795G96 | 18,000.00 |
| 912795G96 | 338,000.00 |
| 912795G96 | 218,000.00 |
| 912795G96 | 367,000.00 |

| | |
|---|---|
| 912795G96 | 167,000.00 |
| 912795G96 | 45,000.00 |
| 912795G96 | 532,000.00 |
| 912795G96 | 56,000.00 |
| 912795G96 | 943,000.00 |
| 912795G96 | 1,000.00 |
| 912795G96 | 325,000.00 |
| 912795G96 | 39,000.00 |
| 912795G96 | 36,000.00 |
| 912795G96 | 239,000.00 |
| 912795G96 | 700,000.00 |
| 912795G96 | 581,000.00 |
| 912795G96 | 157,000.00 |
| 912795G96 | 1,265,000.00 |
| 912795G96 | 102,000.00 |
| 912795G96 | 22,000.00 |
| 912795G96 | 212,000.00 |
| 912795G96 | 281,000.00 |
| 912795G96 | 58,000.00 |
| 912795G96 | 9,000.00 |
| 912795G96 | 543,000.00 |
| 912795G96 | 6,000.00 |
| 912795G96 | 338,000.00 |
| 912795G96 | 229,000.00 |
| 912795G96 | 152,000.00 |
| 912795G96 | 143,000.00 |
| 912795G96 | 194,000.00 |
| 912795G96 | 63,000.00 |
| 912795G96 | 209,000.00 |
| 912795G96 | 264,000.00 |
| 912795G96 | 192,000.00 |
| 912795G96 | 400,000.00 |
| 912795G96 | 138,000.00 |
| 912795G96 | 208,000.00 |
| 912795G96 | 110,000.00 |
| 912795G96 | 103,000.00 |
| 912795G96 | 44,000.00 |
| 912795G96 | 168,000.00 |
| 912795G96 | 58,000.00 |
| 912795G96 | 60,000.00 |
| 912795G96 | 48,000.00 |
| 912795G96 | 348,000.00 |
| 912795G96 | 89,000.00 |
| 912795G96 | 224,000.00 |
| 912795G96 | 1,077,000.00 |
| 912795G96 | 771,000.00 |
| 912795G96 | 218,000.00 |

| | |
|---|---|
| 912795G96 | 23,000.00 |
| 912795G96 | 491,000.00 |
| 912795G96 | 666,000.00 |
| 912795G96 | 81,000.00 |
| 912795G96 | 800,000.00 |
| 912795G96 | 10,000.00 |
| 912795G96 | 300,000.00 |
| 912795G96 | 57,000.00 |
| 912795G96 | 69,000.00 |
| 912795G96 | 113,000.00 |
| 912795G96 | 31,000.00 |
| 912795G96 | 17,000.00 |
| 912795G96 | 95,000.00 |
| 912795G96 | 540,000.00 |
| 912795G96 | 279,000.00 |
| 912795G96 | 281,000.00 |
| 912795G96 | 274,000.00 |
| 912795G96 | 6,000.00 |
| 912795G96 | 9,000.00 |
| 912795G96 | 12,000.00 |
| 912795G96 | 1,000.00 |
| 912795G96 | 28,000.00 |
| 912795H20 | 250,000.00 |
| 912795H20 | 249,000.00 |
| 912795H38 | 82,000.00 |
| 912795H38 | 86,000.00 |
| 912795H38 | 73,000.00 |
| 912795H38 | 59,000.00 |
| 912795H38 | 259,000.00 |
| 912795H38 | 87,000.00 |
| 912795H38 | 42,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 41,000.00 |
| 912795H38 | 22,000.00 |
| 912795H38 | 82,000.00 |
| 912795H38 | 85,000.00 |
| 912795H38 | 42,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 69,000.00 |
| 912795H38 | 78,000.00 |
| 912795H38 | 91,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 77,000.00 |
| 912795H38 | 75,000.00 |

| | |
|---|---:|
| 912795H38 | 28,000.00 |
| 912795H38 | 80,000.00 |
| 912795H38 | 47,000.00 |
| 912795H38 | 48,000.00 |
| 912795H38 | 93,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 6,000.00 |
| 912795H38 | 36,000.00 |
| 912795H38 | 139,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 103,000.00 |
| 912795H38 | 87,000.00 |
| 912795H38 | 1,000.00 |
| 912795H38 | 83,000.00 |
| 912795H38 | 15,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 80,000.00 |
| 912795H38 | 84,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 33,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 60,000.00 |
| 912795H38 | 87,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 58,000.00 |
| 912795H38 | 135,000.00 |
| 912795H38 | 16,000.00 |
| 912795H38 | 37,000.00 |
| 912795H38 | 80,000.00 |
| 912795H38 | 93,000.00 |
| 912795H38 | 75,000.00 |
| 912795H38 | 69,000.00 |
| 912795H38 | 70,000.00 |
| 912795H38 | 102,000.00 |
| 912795H38 | 95,000.00 |
| 912795H38 | 84,000.00 |
| 912795H38 | 75,000.00 |
| 912795H38 | 11,000.00 |
| 912795H38 | 23,000.00 |
| 912795H38 | 78,000.00 |
| 912795H38 | 85,000.00 |
| 912795H38 | 30,000.00 |
| 912795H38 | 20,000.00 |
| 912795H38 | 107,000.00 |
| 912795H38 | 64,000.00 |
| 912795H38 | 32,000.00 |

| | |
|---|---|
| 912795H38 | 72,000.00 |
| 912795H38 | 257,000.00 |
| 912795H38 | 48,000.00 |
| 912795H38 | 355,000.00 |
| 912795H38 | 17,000.00 |
| 912795H38 | 52,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 56,000.00 |
| 912795H38 | 51,000.00 |
| 912795H38 | 108,000.00 |
| 912795H38 | 40,000.00 |
| 912795H38 | 1,000.00 |
| 912795H38 | 35,000.00 |
| 912795H38 | 70,000.00 |
| 912795H38 | 96,000.00 |
| 912795H38 | 94,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 106,000.00 |
| 912795H38 | 88,000.00 |
| 912795H38 | 91,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 87,000.00 |
| 912795H38 | 58,000.00 |
| 912795H38 | 70,000.00 |
| 912795H38 | 82,000.00 |
| 912795H38 | 90,000.00 |
| 912795H38 | 26,000.00 |
| 912795H38 | 50,000.00 |
| 912795H38 | 55,000.00 |
| 912795H38 | 100,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 74,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 94,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 64,000.00 |
| 912795H38 | 66,000.00 |
| 912795H38 | 64,000.00 |
| 912795H38 | 15,000.00 |
| 912795H38 | 83,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 58,000.00 |
| 912795H38 | 40,000.00 |
| 912795H38 | 66,000.00 |
| 912795H38 | 90,000.00 |
| 912795H38 | 92,000.00 |

| | |
|---|---|
| 912795H38 | 82,000.00 |
| 912795H38 | 90,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 68,000.00 |
| 912795H38 | 83,000.00 |
| 912795H38 | 85,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 92,000.00 |
| 912795H38 | 13,000.00 |
| 912795H38 | 83,000.00 |
| 912795H38 | 295,000.00 |
| 912795H38 | 87,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 6,000.00 |
| 912795H38 | 67,000.00 |
| 912795H38 | 1,000.00 |
| 912795H38 | 450,000.00 |
| 912795H38 | 86,000.00 |
| 912795H38 | 72,000.00 |
| 912795H38 | 33,000.00 |
| 912795H38 | 15,000.00 |
| 912795H38 | 4,000.00 |
| 912795H38 | 67,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 20,000.00 |
| 912795H38 | 39,000.00 |
| 912795H38 | 94,000.00 |
| 912795H38 | 95,000.00 |
| 912795H38 | 96,000.00 |
| 912795H38 | 93,000.00 |
| 912795H38 | 73,000.00 |
| 912795H38 | 55,000.00 |
| 912795H38 | 109,000.00 |
| 912795H38 | 88,000.00 |
| 912795H38 | 2,241,000.00 |
| 912795H38 | 14,000.00 |
| 912795H38 | 78,000.00 |
| 912795H38 | 95,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 75,000.00 |
| 912795H38 | 51,000.00 |
| 912795H38 | 54,000.00 |
| 912795H38 | 20,000.00 |
| 912795H38 | 60,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 44,000.00 |

| | |
|---|---:|
| 912795H38 | 87,000.00 |
| 912795H38 | 69,000.00 |
| 912795H38 | 14,000.00 |
| 912795H38 | 22,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 116,000.00 |
| 912795H38 | 10,000.00 |
| 912795H38 | 38,000.00 |
| 912795H38 | 83,000.00 |
| 912795H38 | 70,000.00 |
| 912795H38 | 4,000.00 |
| 912795H38 | 207,000.00 |
| 912795H38 | 92,000.00 |
| 912795H38 | 95,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 92,000.00 |
| 912795H38 | 252,000.00 |
| 912795H38 | 5,000.00 |
| 912795H38 | 54,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 958,000.00 |
| 912795H38 | 44,000.00 |
| 912795H38 | 7,000.00 |
| 912795H38 | 106,000.00 |
| 912795H38 | 60,000.00 |
| 912795H38 | 47,000.00 |
| 912795H38 | 18,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 23,000.00 |
| 912795H38 | 403,000.00 |
| 912795H38 | 112,000.00 |
| 912795H38 | 56,000.00 |
| 912795H38 | 50,000.00 |
| 912795H38 | 61,000.00 |
| 912795H38 | 2,000.00 |
| 912795H38 | 28,000.00 |
| 912795H38 | 53,000.00 |
| 912795H38 | 30,000.00 |
| 912795H38 | 34,000.00 |
| 912795H38 | 38,000.00 |
| 912795H38 | 59,000.00 |
| 912795H38 | 62,000.00 |
| 912795H38 | 500,000.00 |
| 912795H38 | 600,000.00 |
| 912795H38 | 290,000.00 |
| 912795H38 | 5,000.00 |

| | |
|---|---|
| 912795H38 | 19,000.00 |
| 912795H38 | 4,000.00 |
| 912795H38 | 208,000.00 |
| 912795H38 | 40,000.00 |
| 912795H38 | 94,000.00 |
| 912795H38 | 1,200,000.00 |
| 912795H38 | 1,200,000.00 |
| 912795H38 | 65,000.00 |
| 912795H38 | 75,000.00 |
| 912795H38 | 11,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 29,000.00 |
| 912795H38 | 89,000.00 |
| 912795H38 | 48,000.00 |
| 912795H38 | 93,000.00 |
| 912795H38 | 300,000.00 |
| 912795H38 | 82,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 68,000.00 |
| 912795H38 | 94,000.00 |
| 912795H38 | 80,000.00 |
| 912795H38 | 76,000.00 |
| 912795H38 | 63,000.00 |
| 912795H38 | 47,000.00 |
| 912795H38 | 9,000.00 |
| 912795H38 | 226,000.00 |
| 912795H38 | 16,000.00 |
| 912795H38 | 38,000.00 |
| 912795H38 | 98,000.00 |
| 912795H38 | 16,000.00 |
| 912795H38 | 320,000.00 |
| 912795H38 | 85,000.00 |
| 912795H38 | 96,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 77,000.00 |
| 912795H38 | 81,000.00 |
| 912795H38 | 148,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 57,000.00 |
| 912795H38 | 86,000.00 |
| 912795H38 | 69,000.00 |
| 912795H38 | 78,000.00 |
| 912795H38 | 88,000.00 |
| 912795H38 | 71,000.00 |
| 912795H38 | 106,000.00 |
| 912795H38 | 62,000.00 |
| 912795H38 | 34,000.00 |

| | |
|---|---:|
| 912795H38 | 62,000.00 |
| 912795H38 | 75,000.00 |
| 912795H38 | 100,000.00 |
| 912795H38 | 100,000.00 |
| 912795H38 | 82,000.00 |
| 912795H38 | 195,000.00 |
| 912795H38 | 125,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 28,000.00 |
| 912795H38 | 79,000.00 |
| 912795H38 | 1,000,000.00 |
| 912795H38 | 118,000.00 |
| 912795H38 | 118,000.00 |
| 912795H38 | 1,000.00 |
| 912795H38 | 24,000.00 |
| 912795H38 | 28,000.00 |
| 912795H38 | 99,000.00 |
| 912795H38 | 84,000.00 |
| 912795H38 | 17,000.00 |
| 912795H38 | 25,000.00 |
| 912795H38 | 69,000.00 |
| 912795H38 | 68,000.00 |
| 912795H61 | 20,000.00 |
| 912795H61 | 10,000.00 |
| 912795H61 | 20,000.00 |
| 912795H61 | 25,000.00 |
| 912795H61 | 185,000.00 |
| 912795H61 | 10,000.00 |
| 912795H61 | 435,000.00 |
| 912795H61 | 80,000.00 |
| 912795H95 | 1,200,000.00 |
| 912795H95 | 1,200,000.00 |
| 912795J28 | 100,000.00 |
| 912795J28 | 400,000.00 |
| 912795J36 | 180,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 85,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 79,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 75,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 3,000.00 |

| | |
|---|---|
| 912795J36 | 36,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 30,000.00 |
| 912795J36 | 45,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 27,000.00 |
| 912795J36 | 400,000.00 |
| 912795J36 | 225,000.00 |
| 912795J36 | 150,000.00 |
| 912795J36 | 240,000.00 |
| 912795J36 | 30,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 67,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 40,000.00 |
| 912795J36 | 30,000.00 |
| 912795J36 | 65,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 70,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 35,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 55,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 1,700,000.00 |
| 912795J36 | 2,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 60,000.00 |
| 912795J36 | 55,000.00 |
| 912795J36 | 35,000.00 |
| 912795J36 | 40,000.00 |
| 912795J36 | 1,800,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 90,000.00 |
| 912795J36 | 1,585,000.00 |
| 912795J36 | 4,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 20,000.00 |
| 912795J36 | 300,000.00 |
| 912795J36 | 5,000.00 |

| | |
|---|---|
| 912795J36 | 10,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 9,000.00 |
| 912795J36 | 70,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 60,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 60,000.00 |
| 912795J36 | 9,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 175,000.00 |
| 912795J36 | 240,000.00 |
| 912795J36 | 30,000.00 |
| 912795J36 | 400,000.00 |
| 912795J36 | 1,469,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 35,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 10,000.00 |
| 912795J36 | 500,000.00 |
| 912795J36 | 106,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 108,000.00 |
| 912795J36 | 195,000.00 |
| 912795J36 | 650,000.00 |
| 912795J36 | 600,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 270,000.00 |
| 912795J36 | 360,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 2,350,000.00 |
| 912795J36 | 1,325,000.00 |
| 912795J36 | 900,000.00 |
| 912795J36 | 1,000,000.00 |
| 912795J36 | 557,000.00 |
| 912795J36 | 305,000.00 |
| 912795J36 | 175,000.00 |
| 912795J36 | 15,000.00 |
| 912795J36 | 500,000.00 |
| 912795J36 | 130,000.00 |

| | |
|---|---|
| 912795J36 | 85,000.00 |
| 912795J36 | 95,000.00 |
| 912795J36 | 475,000.00 |
| 912795J36 | 30,000.00 |
| 912795J36 | 520,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 355,000.00 |
| 912795J36 | 400,000.00 |
| 912795J36 | 100,000.00 |
| 912795J36 | 25,000.00 |
| 912795J36 | 485,000.00 |
| 912795J36 | 120,000.00 |
| 912795J36 | 213,000.00 |
| 912795J36 | 180,000.00 |
| 912795J36 | 70,000.00 |
| 912795J36 | 223,000.00 |
| 912795J36 | 276,000.00 |
| 912795J36 | 28,000.00 |
| 912795J36 | 600,000.00 |
| 912795J36 | 330,000.00 |
| 912795J36 | 390,000.00 |
| 912795J36 | 949,000.00 |
| 912795J36 | 270,000.00 |
| 912795J36 | 700,000.00 |
| 912795J36 | 520,000.00 |
| 912795J36 | 700,000.00 |
| 912795J36 | 600,000.00 |
| 912795J36 | 310,000.00 |
| 912795J36 | 50,000.00 |
| 912795J36 | 22,000.00 |
| 912795J36 | 305,000.00 |
| 912795J36 | 372,000.00 |
| 912795J36 | 300,000.00 |
| 912795J36 | 42,000.00 |
| 912795J36 | 22,000.00 |
| 912795J36 | 1,615,000.00 |
| 912795J36 | 440,000.00 |
| 912795J36 | 165,000.00 |
| 912795J36 | 27,000.00 |
| 912795J36 | 330,000.00 |
| 912795J36 | 150,000.00 |
| 912795K83 | 1,200,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 250,000.00 |
| 912795K83 | 200,000.00 |

| | |
|---|---|
| 912795K83 | 100,000.00 |
| 912795K83 | 7,500,000.00 |
| 912795K83 | 85,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 500,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 10,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 400,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 125,000.00 |
| 912795K83 | 125,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 500,000.00 |
| 912795K83 | 150,000.00 |
| 912795K83 | 500,000.00 |
| 912795K83 | 150,000.00 |
| 912795K83 | 250,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 110,000.00 |
| 912795K83 | 20,000.00 |
| 912795K83 | 563,000.00 |
| 912795K83 | 200,000.00 |
| 912795K83 | 38,000.00 |
| 912795K83 | 45,000.00 |
| 912795K83 | 20,000.00 |
| 912795K83 | 150,000.00 |
| 912795K83 | 75,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 25,000.00 |
| 912795K83 | 40,000.00 |
| 912795K83 | 250,000.00 |
| 912795K83 | 1,000,000.00 |
| 912795K83 | 1,000,000.00 |
| 912795K83 | 50,000.00 |
| 912795K83 | 117,000.00 |
| 912795K83 | 100,000.00 |

| | |
|---|---|
| 912795K83 | 800,000.00 |
| 912795K83 | 1,000,000.00 |
| 912795K83 | 500,000.00 |
| 912795K83 | 260,000.00 |
| 912795K83 | 100,000.00 |
| 912795K83 | 500,000.00 |
| 912795K83 | 200,000.00 |
| 912828HR4 | 75,000.00 |
| 912828HR4 | 75,000.00 |
| 912828HR4 | 75,000.00 |
| 912828HR4 | 75,000.00 |
| | |

# PD 7

## Lowitt Affidavit

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                     :

In re                                 :       **Chapter 11 Case No.**
                                       :

**LEHMAN BROTHERS HOLDINGS INC.,**   :       **08-_____ (__)**
                                       :

             **Debtor.**                :
                                       :
-------------------------------------------------------------x

### AFFIDAVIT OF IAN T. LOWITT
### PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY
### RULES FOR THE SOUTHERN DISTRICT OF NEW YORK IN
### SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS

STATE OF NEW YORK      )
                         )   ss:
COUNTY OF NEW YORK    )

          Ian T. Lowitt, being duly sworn, hereby deposes and says:

          1.      I am the Chief Financial Officer, Controller, and Executive Vice President of Lehman Brothers Holdings Inc. (the "Debtor," and together with its non-debtor affiliates, "Lehman Brothers" or the "Company"), the debtor and debtor in possession in this chapter 11 case. In that capacity, I am familiar with the Company's day-to-day operations, businesses, and financial affairs.

          2.      This affidavit is made pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") filed on the date hereof (the "<u>Commencement Date</u>") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the Court.

3.     Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my discussions with other members of the Lehman Brothers' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this affidavit.  I am authorized to submit this affidavit on behalf of the Debtor.

4.     Section I of this affidavit provides an overview of Lehman Brothers' business.  Section II describes the circumstances giving rise to the Debtor's commencement of this chapter 11 case.  Section III describes certain information required by Local Bankruptcy Rule 1007-2, and also explains how exigent circumstances made it impracticable to furnish all of the schedules and lists required by that rule.

## I.

## <u>The Lehman Brothers Business</u>

5.     Lehman Brothers is the fourth largest investment bank in the United States.  For more than 150 years, Lehman Brothers has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.  Through its team of more than 25,000 employees, Lehman Brothers offers a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

6.      The Company has significant assets around the globe.  The Company's worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.  As of May 31, 2008, the Company's consolidated assets totaled approximately $639 billion, and its consolidated liabilities totaled approximately $613 billion.

7.      Lehman Brothers operates in three business segments (each of which is described in greater detail below):  Capital Markets, Investment Banking and Investment Management.  During the Company's 2007 fiscal year, the Capital Markets segment represented 64% of consolidated net revenues.  Investment Banking and Investment Management accounted for 20% and 16% of net revenues, respectively.

*Capital Markets*

8.      The Capital Markets operation provides fixed income and equity investment services.  For customers desiring fixed income services, Lehman Brothers markets and trades public sector bonds and similar instruments, interest rate and credit products, mortgage-related securities and loan products, currencies and commodities.  For customers desiring equity investment services, Lehman Brothers markets and trades equities and equity-related products and enters into a variety of derivative transactions.  To support these core functions, Lehman Brothers also provides related research covering economic, quantitative, strategic, credit, relative value, index and portfolio analyses.  The Capital Markets segment also provides services to the hedge fund community which are known as prime brokerage services.

***Investment Banking***

9.      Lehman Brothers takes an integrated approach to client coverage, organizing investment bankers into industry, product and geographic groups within the Investment Banking segment.  Business services provided to corporations and governments worldwide can be separated into:

*Global Finance* — Lehman Brothers serves clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products; and

*Advisory Services* — Lehman Brothers provides business advisory services with respect to mergers and acquisitions, divestitures, restructurings and other corporate activities.

***Investment Management***

10.      The Investment Management business segment provides customized investment management services for high-net-worth clients, mutual funds and other institutional investors.  This business segment also serves as the general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

***Regulatory Oversight***

11.      Many of Lehman Brothers' operations are subject to regulatory oversight in the various jurisdictions in which the Company does business.  All Lehman Brothers entities are subject to group-wide supervision and examination by the SEC as a Consolidated Supervised Entity.  Several of the Debtor's subsidiaries, including, without limitation, its Lehman Brothers, Inc. subsidiary, are registered with the SEC as broker-

dealers, derivatives dealers, and investment advisers.  As such, those entities are subject

to regulation by the SEC and by self-regulatory organizations, including the Financial

Industry Regulatory Authority ("<u>FINRA</u>"),[1] national securities exchanges such as the

NYSE, and the Municipal Securities Rulemaking Board, among others.  Securities firms

are also subject to regulation by state securities administrators in those states in which

they conduct business.

        12.     Other subsidiaries of the Debtor hold national bank charters and

therefore are subject to regulation by various federal and state authorities, including the

Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the Office

of the Comptroller of the Currency of the United States.  The Debtor's insurance

subsidiaries are subject to state insurance regulation in the states in which they are

domiciled and in the other states in which they are licensed.

***International Operations***

        13.     Lehman Brothers organizes its operations into three geographic

regions:  (i) Europe and the Middle East; (ii) Asia-Pacific, inclusive of operations in

Australia and India, and (iii) the Americas.  Lehman Brothers holds memberships or

associate memberships on several principal international securities and commodities

exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and

Australian stock exchanges.

        14.     During 2007, Lehman Brothers entered or significantly expanded

its presence in several international markets, including Australia, Canada, India, Turkey,

---

[1]     FINRA was formed in 2007 by the consolidation of NASD, Inc. and the member regulation,
enforcement and arbitration functions of the New York Stock Exchange, Inc. ("<u>NYSE</u>").

Russia, Dubai, and Qatar.  As a result of these investments in its global franchise,

Lehman Brothers reported record results in Europe and the Middle East and Asia-Pacific

regions, and 50% of the Company's net revenues for the year came from outside the

Americas.

*Capital Structure*

15.      The Debtor has issued various securities to the public.

Approximately 700 million shares of the Debtor's common stock are publicly traded on

the New York Stock Exchange.  The Debtor has also issued several classes of preferred

stock, warrants, and trust-preferred securities.

16.      The vast majority of the Company's financing for operations arises

from financing provided to the Debtor.  As of May 31, 2008, the Debtor owed

approximately $110.5 billion on account of senior unsecured notes, approximately $12.6

billion on account of subordinated unsecured notes, and approximately $5 billion on

account of junior subordinated notes.

17.      In addition to the cash borrowed to finance the operations of the

Company, various entities within Lehman Brothers also enter into secured borrowing and

lending transactions to finance inventory positions, obtain securities for settlement and

meet clients' needs.  Lehman Brothers receives collateral in connection with resale

agreements, securities borrowed transactions, borrow/pledge transactions, client margin

loans and derivative transactions.  Lehman Brothers is generally permitted to sell or

repledge these securities held as collateral and use them to secure repurchase agreements,

enter into securities lending transactions or deliver to counterparties to cover short

positions in the securities markets.

18.     As a general rule, Lehman Brothers purchases highly liquid securities (*i.e.*, government bonds, U.S. agency securities, corporate bonds, asset-backed securities and equity securities) using secured funding.  Illiquid assets (*e.g.*, fixed assets, intangible assets and margin postings) and less liquid inventory positions (*e.g.*, derivatives, private equity investments, certain corporate loans, certain commercial mortgages and real estate positions) are funded with cash.

19.     Lehman Brothers' secured funding for asset purchases is generally obtained through tri-party repurchase agreements in which a custodian bank or clearing organization acts as an intermediary between Lehman Brothers and its funding counterparties.  The outstanding amount owed under such tri-party repurchase agreements stood at $188 billion as of May 31, 2008.

## II.

## Events Leading to the Chapter 11 Case

20.     As a financial services firm, with interests in investment banking, stock brokerage, and investment management, Lehman Brothers is materially affected by conditions in the global financial markets and worldwide economic conditions.  For most of 2008, Lehman Brothers operated in an extremely unfavorable global business environment.  Conditions were characterized by a continued lack of liquidity in the credit markets, significantly depressed volumes in most equity markets, a widening in certain fixed income credit spreads compared to the end of the 2007 fiscal year, and declining asset values.

21.     These hardships were compounded by slowed growth in major economies as a result of declining business and consumer confidence.  Global inflation

rose amid slowing economic growth.  Commodity prices rose significantly during the

quarter, with oil and gold reaching record levels, raising costs of industrial production.

Consumer spending was challenged by a combination of lower wealth from declining

housing values, higher commodity prices impacting levels of disposable income, and

falling private sector employment growth.  Central banks' concerns about exacerbating

inflationary conditions limited their ability to effect monetary policies intended to

provide liquidity within the markets.

      22.    The combination of low levels of liquidity and the requirement that

financial companies de-leverage their balance sheets resulted in downward pressure on

financial asset prices.  These global economic conditions, in the aggregate, depressed

both the valuations of Lehman Brothers' inventory positions as well as transactional

volumes and market activity levels in which Lehman Brothers' Capital Markets and

Investment Banking business segments operated during recent fiscal quarters.

      23.    Ultimately, the onset of instability in the financial and credit

markets over the past several months created significant liquidity problems for Lehman

Brothers.  Despite infusions of liquidity by central banks into the financial system, broad

asset classes, particularly domestic subprime residential mortgages and structured credit

products, remained thinly traded throughout this period.  As noted above, Lehman

Brothers purchases many of its assets using secured credit obtained under tri-party

repurchase agreements.  When the market value of the pledged assets began to deviate

from the pledged value of those assets, secured lenders imposed "haircuts" (discounts) on

Lehman Brothers.

24.     The devaluation of the Lehman Brothers' pledged assets also had an adverse impact on borrowing availability.  The reduced availability of secured financing forced Lehman Brothers to draw down on its liquidity pool in order to execute transactions.  This loss of liquidity created a chain reaction of adverse economic consequences.  With diminished cash to fund transactions, major credit rating agencies put the Company's credit ratings on negative watch with potential for multiple downgrades.

25.     In response to the Company's deteriorating financial performance, management explored various options to restructure operations, reduce overall cost structure, and improve performance.  In recognition of the concerns caused by the Company's concentration of positions in real estate-related assets, management initiated steps to separate those assets from the rest of its operations.  The Company actively reduced its real estate portfolio in the third quarter of 2008, including a reduction in residential mortgage exposure by 31% to $17.2 billion.  Further, the Company formally engaged BlackRock Financial Management, Inc. to sell approximately $4.0 billion of the Company's residential-mortgage portfolio in the United Kingdom.  The Company also reduced staffing to improve operating efficiency.

26.     In an effort to minimize the effects of  pervasive rumors in the marketplace, on September 10, 2008, Lehman Brothers reported a preliminary net loss of approximately $3.9 billion, or $5.92 per common share (diluted), for the third quarter ended August 31, 2008, compared to a net loss of $2.8 billion, or $5.14 per common share (diluted), for the second quarter of fiscal 2008, and net income of $887 million, or $1.54 per common share (diluted), for the third quarter of fiscal 2007.  The net loss in the

third quarter of 2008 was driven primarily by gross mark-to-market adjustments

stemming from writedowns on commercial and residential mortgage and real estate

assets.

          27.     At the same time, in light of the continuing diminution in the value

of Lehman Brothers' assets, the increasing mark to market obligations, and the Debtor's

plummeting stock price, management announced two major initiatives.  One initiative

involved an effort to sell the Company's Investment Management Division.

Management's view was that the sale of the Company's Investment Management

Division would generate in excess of $4 billion.  Such funds would have enhanced the

capital position of the Company and enabled it to operate the other divisions successfully

through this difficult period in the market.

          28.     The second initiative involved the transfer of the Company's

commercial loan assets to a new company which would be owned by the Debtor's

shareholders.  Management believed that divorcing the real estate assets from the rest of

the Company would relieve the pressure on the Company, while permitting shareholders

to benefit from the full value of such assets when the markets recover.

          29.     Unfortunately, the announcements made on September 10 did little

to quell the rumors in the market and the concerns about the viability of the Company.

The uncertainty, particularly among the banks through which the Company clears

securities trades, ultimately made it impossible for the Company to continue to operate its

business.  The disruption to its business virtually guaranteed that the Company would not

be able to sustain itself long enough to implement either of the initiatives.

30.     The Company's liquidity crisis prompted an emergency meeting on September 12, 2008, between the Debtor's management, officials from the New York branch of the Federal Reserve Bank, the heads of major financial institutions, Treasury Secretary Henry Paulson, and SEC Chairman Christopher Cox.  Government officials later indicated that emergency federal funding would not be forthcoming to stabilize Lehman Brothers and provide the liquidity needed for its operations.

31.     The Debtor filed this chapter 11 case so that it could preserve its assets and maximize value for the benefit of all stakeholders.  While the Company continued to explore a number of strategic alternatives, after the September 12 meeting no viable alternative was available.

### III.

### Information Required by Local Bankruptcy Rule 1007-2

32.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best of my knowledge, information, and belief, no creditors' committees were organized prior to the Commencement Date.

33.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the 30 largest unsecured claims (excluding insiders) against the Debtor.[2]

---

[2]     The list of creditors reflects the thirty largest creditors of the Company on a consolidated basis, including non-debtors.  A list reflecting the thirty largest unsecured creditors of the Debtor will be filed as soon as it is available.

34. Due to the size and complexity of its operations, and the relatively short time that the Debtor had to prepare to file its chapter 11 case, the Debtor is unable to provide the balance of the information required by Local Rules 1007-2(a) and 1007-2(b). The Debtor's business is global in nature with over 25,000 employees and hundreds of legal entities organized under domestic and foreign laws operating in numerous markets. That this case is large and complex is an understatement. Moreover, such information is otherwise publicly available or of little relevance.

35. As described above, the Debtor had only a few days to prepare for this filing. Given the size and complexity of the Debtor's global operations, the preparation of such lists requires weeks, not days. The Debtor requests that the Court waive the obligation for the Debtor to file the additional schedules as provided by Local Bankruptcy Rule 1007-2(d).

36. The foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ Ian T. Lowitt
Ian T. Lowitt

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 14th day of September, 2008.

/s/ John Ellsworth
Notary Public

John Ellsworth
Notary Public, State of New York
No. 01EL4995735
Qualified in New York County
Commission Expires June 6, 2010

# PD 8

## Schwarzmann Declaration

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

In re:

LEHMAN BROTHERS HOLDINGS
INC., et al.,

Debtor.

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

---------------------------------------------------

## DECLARATION OF DAN YORAM SCHWARZMANN

Dan Yoram Schwarzmann, pursuant to 28 U.S.C. § 1746, hereby declares

under penalty of perjury under the laws of the United States of America, as follows:

1.     I make this declaration in support of the Response of the Joint

Administrators of the Lehman European Group Administration Companies (as defined

below) to Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures;

(C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the

Assumption and Assignment of Contracts Relating to the Purchased Assets [D.I. # 60] (the

"Sale Motion"). I am over the age of 18. If called upon, I could competently testify to all

matters set forth herein based on my personal knowledge, or based on reports made by

personnel whom I supervise, Lehman Group staff at the London premises and the books and

records of the Lehman European Group Administration Companies.

2.     On the 15th of September, 2008, the English High Court of Justice made

four orders (the "Administration Orders", attached hereto as Exhibits 1-4) providing for the

appointment of my colleagues Anthony Victor Lomas, Steven Anthony Pearson, and Michael

John Andrew Jervis and I as Joint Administrators of Lehman Brothers Holdings plc, Lehman

Brothers Limited, LB UK RE Holdings Limited, and Lehman Brothers International (Europe)
(together, the "Lehman European Group Administration Companies").

3.     Messrs. Lomas, Pearson, and Jervis and I (collectively, the "Joint
Administrators") are Partners at PricewaterhouseCoopers LLP, Plumtree Court, London
EC4A 4HT.

English Administration Proceedings

4.     The Joint Administrators derive their powers and duties from the
English Insolvency Act 1986, as modified by the English Enterprise Act 2002.
Administration is a proceeding for companies that are, or are likely to become, insolvent. It
is similar in concept to Chapter 11 proceedings in the United States, but very different in
detail.

5.     Administrations under English law have three consecutive objectives:

- to "rescue" the company as a going concern; or,

- to achieve a better result for the company's creditors than would be achieved
  on a liquidation; or,

- if neither of the first two objectives are reasonably practicable and it does not
  unnecessarily harm the interests of the creditors of the company as a whole, to
  realize property to make a distribution to secured or preferential creditors.

6.     After appointment, administrators take over management and control of
the debtor company and have the power, on behalf of the company, to do all things necessary
and expedient for the management of its affairs, business and property. The administrators
may make distributions to creditors, subject in certain cases to court approval, and may make
other payments that are likely to assist in achieving the purposes of the administration. They
may pursue actions to set aside preferences and transactions at an undervalue as well as to

recover assets of the company that were wrongly disposed of. Administrators are agents of the company and officers of the English High Court.

7.      Administrators must act in the interests of the creditors of the company as a whole, and are obligated to make formal proposals and to report regularly to creditors. Creditors have the right to approve the administrators' proposals at creditors' meetings and to appoint a creditors' committee. Creditors may propose and agree upon modifications to the administrators' proposals.

The Lehman European Group

8.      The Lehman Brothers group of companies (the "Lehman Group"), of which the European Group is part, is a global investment bank. The business activities of the Lehman Group were organized in three segments which operate across the Group: capital markets, investment banking, and investment management. Those segments included businesses in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Lehman Group is headquartered in New York, with regional headquarters in London and Tokyo, and other offices around the world. Because the Lehman Group's segments operate globally, the businesses of the different offices are closely intertwined.

9.      Indeed, as part of an international financial group, the Lehman Group's broker-dealer in the United Kingdom and its broker-dealer in the United States both benefited from a guarantee given by Lehman Brothers Holdings Inc. ("LBHI"). Many counterparties of the U.K. and U.S. broker-dealers relied on this guarantee for comfort in transacting business with them.

10.      The Lehman Group's interdependence was both financial and operational. For instance, as part of its global treasury management, the Lehman Group

3

operated a "cash sweep" system. Pursuant to that system, at the end of each trading day, cash in all of the companies within the Lehman Group was transferred to LBHI. During each trading day, LBHI would transfer cash to each of the Lehman Group companies to enable them to meet their cash requirements during that day. The companies within the Lehman Group were therefore reliant upon receipt of that cash from LBHI each day to enable them to make any payments.

11. Lehman Brothers International (Europe) ("LBIE") was the principal trading company, and broker-dealer, within the Lehman Group in Europe. Its business involves the provision of a wide range of financial services, including trading and broking equity and fixed income instruments and financial derivatives. It carried out its business globally. LBIE's headquarters are in London, though it has offices in several other countries in Europe and Asia.

12. LB UK RE Holdings Limited ("LBUKRE") is a holding company for the real estate division of the European Group. Its business consists primarily, both directly and through subsidiaries, of investing in real estate, funds, non-performing loans and sub-performing loans.

13. Lehman Brothers Limited ("LBL") provides administrative services to fellow Group companies in the U.K. and European operations of Lehman, including the provision of property, employees and support services such as IT, clearance and settlement.

14. Lehman Brothers Holdings plc ("LBH") holds fixed asset investments in a range of assets, the majority of which are held through investments in subsidiaries.

15. Following the real estate crisis in the United States, the necessity for the Lehman Group to make a number of provisions and write-downs in its accounts, loss of investor and market confidence, the Chapter 11 filing of the Lehman Group's ultimate

holding company, LBHI, and other factors, the European Group companies listed above were forced to enter English administration proceedings.

<u>The Joint Administrators' Activities To Date</u>

16.    In the few days since the Appointment Orders were entered last Monday, the Joint Administrators have endeavored to investigate and to understand the far-flung operations of the Lehman European Group Administration Companies' businesses, which are by no means confined to Europe.  As described above, the Lehman European Group Administration Companies operated hand in hand with their U.S. counterparts, as well as providing financial services from a variety of offices in Europe, the Middle East, and Asia to clients across the world.

17.    The Joint Administrators have installed a team of approximately 200 PricewaterhouseCoopers LLP employees and 100 lawyers at the offices of the Lehman European Group Administration Companies to manage those companies' business and affairs, including gaining an understanding of the companies' businesses and financial status.  The Joint Administrators, our staff and the Lehman's employees have also had correspondence and notices from a vast number of creditors and counterparties in respect of their claims and other concerns.  The Joint Administrators and our staff must also address continuation of the businesses and employee retention.  Counsel for the Joint Administrators have met and spoken with counsel for the Debtors as well.  Although significant progress had been made, it is obvious that the investigation of the Lehman European Group Administration Companies' business and financial affairs will take a significant time to be completed.

18.    The investigation to date has, however, highlighted certain important considerations relating to the Asset Purchase Agreement dated as of September 16, 2008

("APA"). These issues arise from the intimate interconnection of the Lehman Group's global business segments.

19.    First, there appear to be a number of assets utilized by or in the name of LBI and/or the Debtors that are actually owned by one of the Lehman European Group Administration Companies (and/or their subsidiaries). For example, certain Lehman European Group Administration Companies, predominantly LBL, employed approximately 900 IT staff, and engaged a further 100 or so independent individual IT contractors. That large base of internal IT staff provided support and development for IT applications used not only in Europe, but around the world, including by Debtor LBHI and LBI. Under English law, intellectual property rights ordinarily vest in the employer, and certain inter-company correspondence reviewed by the Joint Administrators' counsel appears to acknowledge ownership, in whole or part, by LBL of a number of software packages used by U.S. Lehman entities. Several of those software packages, such as SUB M and LMX/LOB, are vital to the trading and investment banking activities of the Lehman Group and its constituent businesses. They represent extremely valuable property rights.

20.    In addition, there appear to be some client contracts which were or are jointly performed by LBI and/or the Debtors, on the one hand, and one or more of the Lehman European Group Administration Companies (and/or their subsidiaries), on the other. The Joint Administrators' investigation is still preliminary, and it is too early to know with certainty which U.S. or U.K. entity owns which items of jointly utilized intellectual property. Indeed, it is too early to know with certainty about the ownership of many jointly shared or otherwise utilized assets.

21.    Just as employees of the Lehman European Group Administration Companies (and/or their subsidiaries) created software applications used in the U.S., employees of LBI contributed to applications now used by the Lehman European Group

Administration Companies (and/or their subsidiaries). In the ordinary course of a separation between the U.K. and U.S. entities of the Lehman Group, the Lehman European Group Administration Companies (and/or their subsidiaries) would seek assurances that they could continue to use this software after closing of a sale of a U.S. entity. Without such assurances, the Lehman European Group Administration Companies' (and/or their subsidiaries') businesses cannot operate without infringing intellectual property rights. It appears from the Joint Administrators' preliminary investigation that no express written intra-group IP license was put in place, although it is the Joint Administrators' Counsel's view that an implied license would likely exist. To ensure the orderly continuation of the Lehman European Group Administration Companies' (and/or their subsidiaries') businesses and to prevent potentially serious disruption to the Joint Administrators discharging their functions, an appropriate perpetual and royalty-free license must be negotiated and agreed by the relevant parties.

22.    Second, in order to preserve the continuity and value of the Lehman European Group Administration Companies' businesses, there needs to be an agreement among the parties as to transitional services. LBI currently makes software applications and data storage facilities available to the Lehman European Group Administration Companies (and/or their subsidiaries) on its servers; for example the core Ebanker system used by the global investment banking group. Should the parties agree on a licensing arrangement, the Lehman European Group Administration Companies will require a period of time in which to transfer applications and data to their own servers, as well as the cooperation of the U.S. entities with that effort. Without such a transitional arrangement, the Lehman European Group Administration Companies' businesses and, consequently, the Joint Administrators' ability to deal with those businesses, will be significantly impaired.

## Books and Records

23.    The Joint Administrators require access rights to the books and records to be retained by Seller and Purchaser to the extent reasonably required in the administration of the Lehman European Group Administration Companies. The Joint Administrators must investigate and understand a complex business with a global reach, much of it directed and financed out of the United States headquarters. The daily global cash sweep controlled by LBHI is only one example of funds flows into and out of the United States that the Joint Administrators must understand and reconcile for the benefit of the creditors of the Lehman European Group Administration Companies. Without reasonable access to the books and records to be retained by Seller and Purchaser, the Joint Administrators will be impeded in our duties.

## Confidentiality

24.    The IT systems and databases contain extensive proprietary and confidential information. Given that the IT systems are so integrated and closely linked, as described above, in the absence of appropriate agreement or protection, that information is available to the Sellers, of which they may be able to make unrestricted use. To protect that information and the Lehman European Group Administration Companies' interests in it, appropriate restrictions must be negotiated and agreed among the relevant parties. Consequently, the APA should include protections for the confidential information of the Lehman European Group Administration Companies (and their subsidiaries) as well as for the benefit of the Buyer.

## Transfer of Lehman European Group Administration Companies' Funds

25.    The Joint Administrators' preliminary investigation over the first few days of the Administration has already revealed evidence of substantial transfers of securities

out of LBIE which merit close investigation. LBIE is the Administration Company entity that was the broker-dealer for the Lehman European Group. In its ordinary course of business before entering administration, LBIE held billions of dollars worth of securities. As the market lost confidence in the Lehman Group in recent weeks, many of its clients in the prime brokerage business began to transfer their securities from the Lehman Group to other prime brokers.

26. In such cases, it appears, the securities were typically transferred from LBIE to LBI, the U.S. broker-dealer, then to another Lehman Group entity located in Luxembourg, and from there to the new prime broker. What was supposed to happen next was that the funds to reimburse LBIE in respect of the securities and any margin posted in connection with the client accounts were to flow from the new prime broker back through the chain of Lehman entities to LBIE. But in many cases, it appears, that did not happen. The Joint Administrators' understanding so far is that those funds were transferred from the new prime broker through the Luxembourg entity to LBI. It seems the funds never reached LBIE. In just the past few days, the Joint Administrators have identified more than $8 billion in such funds that are due to LBIE but that LBIE does not hold. As the investigation progresses, it is quite possible that the Joint Administrators will discover further transfers that may require investigation.

27. Depending on the results of the Joint Administrators' investigations, transfers of this magnitude could have a significant effect on the creditors of LBIE, potentially depriving them of billions of dollars in recoveries. It will be our duty as the Joint Administrators to attempt to find and recover those funds. As counsel for the Joint Administrators have been informed by Debtors' counsel that LBI had negligible cash left at the Petition Date, it is likely that the funds referred to above have been disbursed to third parties in the days before these proceedings were commenced. Should the Joint

Administrators need to proceed against those third parties to recover assets, there should be

no impediment to doing so by virtue of the proposed sale, if it is approved.

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws

of the United States of America that the foregoing is true and correct.

Executed on this __19__ day of September, 2008
In London, England

Dan Yoram Schwarzmann

# PD 9

# Lehman Company Overview

# LEHMAN BROTHERS

## Company Overview

*Third Quarter 2007*

# Lehman Brothers

## Summary Corporate Structure
**(Showing Guaranteed Subsidiaries)**

Note:   Interim holding companies may have been omitted.



Key
H- Guaranteed by Lehman Brothers Holdings, Inc. (LBHI)

1

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165165**

## LEHMAN BROTHERS – Company Descriptions

## Summarized Organization Chart

Lehman Brothers is an innovator in global finance, focused on serving the financial needs of corporations, governments and municipalities, institutional clients, and high-net-worth individuals worldwide.  Founded in 1850, Lehman Brothers maintains leadership positions in equity and fixed income sales, trading and research, investment banking, private equity and private client services.  The Firm is headquartered in New York, London and Tokyo and operates in a network of offices around the world.  Lehman Brothers is publicly traded on the NYSE, under the symbol "LEH."

### PRINCIPAL NORTH AMERICAN ENTITIES

**Lehman Brothers Holdings Inc. ("LBHI")**
**Incorporated in Delaware**

LBHI is the ultimate parent company with assets of $659 billion, and long term capital of $142 billion at August 31, 2007.

LBHI was incorporated in December 1983 as a vehicle to source long term funding for the Group and to provide funding for the daily working capital needs for the unregulated subsidiaries within the Lehman Group. In that capacity, LBHI serves as a clearinghouse for internally and externally generated funds.

LBHI funds its activities through a combination of master notes, commercial paper ("CP"), bank credit facilities and other money market related instruments, medium and long-term debt, and a three-year, $2.0 billion committed, unsecured flexible cash capital facility.  LBHI has a medium term note ("MTN") program rated A/A1/AA- by S&P, Moody's, and Fitch respectively.  LBHI and LBI share a $9 billion CP program rated A-1/P1/F1+ for LBHI and LBI, by S&P, Moody's, and Fitch respectively. LBHI also shares a $100 billion multi-currency Euro Medium-Term Note ("EMTN") Program rated A+/A1/AA- by S&P, Moody's, and Fitch respectively and a $3 billion multi-currency Euro CP program with Lehman Brothers Treasury Co. BV (The Netherlands) ("BV"), Lehman Brothers Bankhaus AG (Germany) and Lehman Brothers Holdings Plc. (London).

**Lehman Brothers Inc. ("LBI")**
**Incorporated in Delaware**

LBI is a wholly-owned subsidiary of LBHI.  It is registered as a broker/dealer and is one of the largest full-line securities firms in the world, serving institutions, governments and high-net-worth investors in the U.S., European, and Asian financial markets.  Its primary activities include securities trading as principal and agent, securities underwriting, investment and merchant banking, and financial advisory services.

LBI is also one of the "primary dealers" in United States Government securities.  As a primary dealer, LBI buys, sells and finances government securities directly with the Federal Reserve Bank of New York as part of the Bank's open market activities.  LBI's daily trading inventory positions in United States government and agency securities are financed largely through the use of repurchase agreements.

2

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**    **LBEX-LL 2165166**

| LEHMAN BROTHERS – Company Descriptions (continued) |
| --- |

LBI funds its activities through many of the sources utilized by LBHI, including the $9 billion CP program referred to above. LBI's CP is rated A-1/P1/F1+ by S&P, Moody's, and Fitch respectively.

**Lehman Brothers Bancorp, Inc.**
**Incorporated in Delaware**

Lehman Brothers Bancorp, Inc. is a holding company. It holds the stock of Lehman Brothers Bank, FSB, Lehman Brothers Commercial Bank, Lehman Brothers Trust Company NA (fka NB Trust Company NA) and Lehman Brothers Trust Company (Delaware) (fka NB Trust Company Delaware).

**Lehman Brothers Commercial Bank**
**Incorporated in Utah**

Lehman Brothers Commercial Bank is a state chartered industrial bank, whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"). It primarily originates commercial and industrial loans, commercial real estate loans, warehouse loans, and interest rate products and funds itself through bank deposits. LBCB is wholly owned by Lehman Bancorp, Inc., a Delaware Corporation, which in turn is wholly owned by LBHI.

**Lehman Brothers Commercial Corporation ("LBCC")**
**Incorporated in Delaware**

LBCC is a wholly-owned subsidiary of LBHI. LBCC activities include OTC foreign exchange spot, forward and options trading. LBCC benefits from a full guarantee by LBHI.

**Lehman Commercial Paper Inc. ("LCPI")**
**Incorporated in New York**

LCPI is a wholly-owned subsidiary of LBI and primarily engages in the origination and trading of secured and unsecured loans. As part of these activities, LCPI provides warehouse loans secured by mortgage loans and other assets. LCPI funds itself through repurchase agreements, bank credit facilities and borrowings from LBHI.

**Lehman Brothers Special Financing Inc. ("LBSF")**
**Incorporated in Delaware**

LBSF, a wholly-owned subsidiary of LBI, is Lehman Brothers' principal dealer in a broad range of OTC derivative products including interest rate, currency, credit and mortgage derivatives. LBSF benefits from a full guarantee by LBHI.

**Lehman Brothers Financial Products Inc. ("LBFP")**

| 3 |
| --- |

## LEHMAN BROTHERS – Company Descriptions (continued)

**Incorporated in Delaware**

LBFP is a Triple-A rated special purpose subsidiary that is a stand-alone OTC derivative products company. LBFP has an enhanced continuation structure to ensure that OTC derivative obligations will be fulfilled to maturity.

**Lehman Brothers Derivative Products Inc. ("LBDP")**
**Incorporated in Delaware**

Like LBFP, LBDP is also a Triple-A rated special purpose subsidiary that is a stand-alone OTC derivative products company.  LBDP has a termination structure to ensure that the value of its OTC derivative obligations will be paid promptly following the termination of LBDP.

**Lehman Brothers OTC Derivatives Inc. ("LOTC")**
**Incorporated in Delaware**

LOTC, a wholly-owned and fully guaranteed subsidiary of LBHI, is a limited purpose, regulated broker-dealer.  LOTC operates under special regulations that limit its activities to eligible OTC derivative instruments and risk mitigating transactions in exchange for the ability to calculate its regulatory capital requirement based on Value at Risk models.  Generally, these risk based calculations better align capital requirements with the economic risk associated with trading strategies than traditional haircut based regulatory capital calculations used by fully regulated broker dealers. Due to the unique and relatively new methods of regulatory capital calculation, LOTC is subject to regular regulatory reporting, strict internal control requirements as well as an annual review by its regulator, the Securities and Exchange Commission.

**Lehman Re Ltd.**
**Incorporated in Bermuda**

Lehman Re Ltd. is a wholly-owned subsidiary of LBHI.  It is a unique combination of reinsurance and capital markets technology which provides a comprehensive suite of finite reinsurance and structured financial products.  Lehman Re offers customized products organized around four areas: finite & structured financial solutions, property catastrophe reinsurance, and life annuity reinsurance. Lehman Re has an A+ rating by A.M. Best Co.

**Lehman Brothers Commodity Services**
**Incorporated in Delaware**

Lehman Brothers Commodity Services Inc. is a Delaware corporation with its principal place of business in New York, New York; it is a wholly-owned subsidiary of Lehman Brothers Special Financing Inc. and an indirect subsidiary of Lehman Brothers Holdings Inc. Lehman Brothers

4

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165168**

## LEHMAN BROTHERS – Company Descriptions (continued)

Commodity Services has global trading capability in oil, natural gas and power markets. The business actively trades in all major financial energy products including futures, swaps, options, and structured products tailored to help clients manage exposures to the energy markets.

**Lehman Brothers Bank, FSB**
**Incorporated in USA**

Lehman Brothers Bank, FSB is a federally chartered savings bank, whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"). It primarily originates and purchases residential mortgage loans and funds itself through bank deposits and Federal Home Loan Bank advances. LBB is wholly owned by Lehman Bancorp, Inc., a Delaware Corporation, which in turn is wholly owned by LBHI.

**Neuberger Berman Inc. ("NB")**
**Incorporated in Delaware**

Neuberger Berman Inc., a wholly owned subsidiary of Lehman Brothers Holdings Inc., is, through its subsidiaries, an investment advisory company with $140 billion in assets under management as of August 31$^{st}$, 2007. Since 1939, the firm has provided clients with a broad range of investment products, services and strategies for individuals, families, and taxable and non-taxable institutions. The Company engages in wealth management services, including private asset management, tax and financial planning, and personal and institutional trust services; mutual funds, institutional management and alternative investments.

**Aurora Loan Services LLC ("ALS")**
**Incorporated in Delaware**

Aurora Loan Services LLC is a wholly owned subsidiary of Lehman Brothers Bank, FSB. It is one of the country's leading companies with over 2,000 employees nationally. It specializes in 1$^{st}$ and 2$^{nd}$ mortgages from mortgage bankers on a servicing released basis. It is one of the main sources of real estate loans used for the mortgage securitization business of Lehman Brothers.

**U.K. BASED OPERATIONS**

**Lehman Brothers International (Europe) ("LBIE")**
**Incorporated in the U.K.**

Incorporated in September 1990, LBIE's activities include trading and broking fixed income financial instruments, syndicating and underwriting new security issues, and stockbroking in relation to securities in many major and some emerging markets around the world. LBIE is authorized by the Financial Services Authority, and is a member of the London Stock Exchange and various continental European exchanges. LBIE benefits from a full guarantee from LBHI. The principal sources of funding include repurchase agreements, equity finance, secured bank lines and funding from to

5

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**                    **LBEX-LL 2165169**

## LEHMAN BROTHERS – Company Descriptions (continued)

other Lehman group entities.  LBIE has branches in Amsterdam, Dubai, Frankfurt, Madrid, Milan, Paris, Qatar, Seoul, Stockholm, Tel Aviv, Zurich and a representative office in Geneva.

**Lehman Brothers Europe Ltd. ("LBEL")**
**Incorporated in the U.K.**

Incorporated in March 2000, LBEL engages in investment banking and corporate finance activities as well as arranging derivatives transactions as agent for various other Lehman Brothers group companies.  LBEL is authorized by the Financial Services Authority.  LBEL has a branch in Milan.

**Lehman Brothers Asset Management (Europe) Limited**
**Incorporated in the U.K.**
LBAMEL, based in London, was incorporated in May 2005.  LBAMEL is authorized and regulated by the UK Financial Services Authority and is registered in England and Wales.  LBAMEL offers a broad range of products for institutional and High Net Worth clients.  Capabilities cover the risk/return spectrum in traditional asset classes as well as alternative investment strategies, including quant funds, hedge funds, commodity futures funds, and private equity funds.

**Lehman Brothers Ltd.**
**Incorporated in the U.K.**
This is the U.K. service company whose principal functions are accounting and payroll.

**CONTINENTAL EUROPEAN OPERATIONS**

**Banque Lehman Brothers S.A. ("BLB")**
**Incorporated in France**

BLB is a fully-licensed French bank and finance company.  It is engaged in investment banking activities (mergers & acquisitions and corporate finance).

**Lehman Brothers Finance S.A. ("LBFSA")**
**Incorporated in Switzerland**

LBFSA is a direct and fully guaranteed subsidiary of LBHI.  It is the entity through which the Firm conducts a substantial portion of its equity derivatives business. LBFSA is an unregulated entity whose permitted activities are limited to: a) Execution of OTC derivatives (i.e., options, forwards and swaps) on different underlyings; b) Issuance of warrants and certificates; c) Trading of securities and listed derivatives is only permitted to the

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**                                    **LBEX-LL 2165170**

## LEHMAN BROTHERS – Company Descriptions (continued)

extent this is hedging the risk on the derivative portfolio; d) Securities borrowing/lending or repos are only permitted with other Lehman Brothers' entities and related to settlement or financing of securities hedging positions (Note: borrowing of Swiss securities is forbidden).

**Lehman Brothers Bankhaus AG ("LBBAG")**
**Incorporated in Germany**

LBBAG, is a fully-licensed German bank, engaging in traditional bank lending and financing activities as well as investment banking activities (mergers & acquisitions and corporate finance). It is a licensed commercial bank incorporated under the German Stock Corporation Act and regulated by the German Federal Regulator. As a member of the Association of German Banks it participates in the German Depositors Protection Fund which insures deposits from non-bank customers. The bank finances itself primarily using unsecured and secured money market facilities. LBBAG is wholly owned by Lehman Brothers Verwaltungs- und Beteiligungsgesellschaft mbH, which is wholly owned by LBHI. LBBAG benefits from a full guarantee from LBHI. LBBAG has a $2 billion committed, unsecured flexible cash capital facility provided by a syndicate of relationship banks. The bank has a branch office in London.

**Lehman Brothers Luxembourg S.A. ("LB Lux")**
**Incorporated in Luxembourg**
LB Lux is a wholly-owned subsidiary of Lehman Brothers Holdings Inc. It acts as a conduit for stock loan and repo transactions between Lehman entities or with a counterparty. All such transactions are fully guaranteed by LBHI.

**Lehman Brothers Treasury Co. BV (The Netherlands) ("BV")**
**Incorporated in The Netherlands**

Incorporated in March 1995, BV is a Dutch registered subsidiary of Lehman Brothers UK Holdings (Delaware) Inc. and its Eurodebt issuances are guaranteed by Lehman Brothers Holdings Inc. BV's primary objective is to raise funds for European-based businesses. In addition, BV also acts as a funding vehicle under the Firm's $60 billion EuroMTN program. The firm is a fully guaranteed subsidiary of Lehman Brothers Holdings, Inc.

**Lehman Brothers Equity Finance S.A. (Luxembourg)**
**Incorporated in Luxembourg**

Lehman Brothers (Luxembourg) Equity Finance S.A. was incorporated on the 8th June 2004. Is a subsidiary of Lehman Brothers Holdings Inc. Delaware, USA. Its principal activities are the issuance of certificates which may be of any kind relating to any domestic or foreign securities or similar transactions, hedged by derivatives with other group companies.

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**                    **LBEX-LL 2165171**

## LEHMAN BROTHERS – Company Descriptions (continued)

**Lehman Brothers Securities N.V.**
**Incorporated in Netherlands**

Lehman Brothers Securities N.V. ("LBS") was set up on October 31st, 2003 and is a fully owned subsidiary of Lehman Brothers Asia Holdings Ltd. incorporated as a limited liability company (a Naamloze Vennootschap, or N.V.) under the laws of the Netherlands Antilles. It is also a fully guaranteed subsidiary of LBHI. It is primarily involved with issuing securities, such as warrants, certificates and debt instruments, linked to the performance of equities, funds, indices, foreign exchange, fixed income, commodities, real estate or other assets.


## ASIA/PACIFIC OPERATIONS

**Lehman Brothers Asia Holdings Limited ("LBAH")**
**Incorporated in Hong Kong**

LBAH is a fully guaranteed subsidiary of LBHI. It is also the Firm's principal non-Japan Asian fund raising vehicle, relying on both internal and external funding sources. LBAH is an exempted leveraged foreign exchange trader.

**Lehman Brothers Holdings Japan Inc. ("LBHJ")**
**Incorporated in Japan**

LBHJ is a fully guaranteed subsidiary of LBHI, and is a regional holding company for Lehman Brothers' regulated subsidiaries in Japan.

**Lehman Brothers Japan Inc. ("LBJI")**
**Incorporated in Japan**

LBJI, which was established as a Cayman Islands entity and opened the Tokyo Office in April 1986, has converted into a Japan incorporated company (KK). LBJI is a regulated broker-dealer or securities company and is also a primary dealer in Japanese Government Bonds (JGB). LBJI is a member of the Tokyo Stock Exchange, the Osaka Securities Exchange, the JASDAQ Exchange, the Tokyo Financial Exchange, the Tokyo Commodity Exchange, JASDEC and JGBCC, and benefits from a full guarantee from LBHI.

**Lehman Brothers Securities Asia Limited**
**Incorporated in Hong Kong**

Licensed by the Hong Kong Securities and Future Commission for regulated activity Type 1 to deal in securities, this entity deals in Hong Kong equity agency trading for LB affiliates and is a trading member of the Stock Exchange of Hong Kong. Lehman Brothers Securities Asia Limited is fully guaranteed by LBHI. LBSAL is an exempted leveraged foreign exchange trader

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165172**

## LEHMAN BROTHERS – Company Descriptions (continued)

**Lehman Brothers Asia Capital Company**
**Incorporated in Hong Kong**

Lehman Brothers Asia Capital Company engages in trading Japanese fixed income and equity and related products.  As this entity has a significant deficit in its balance sheet and is not a guaranteed subsidiary, it should not deal with non-LB counterparties.

**Lehman Brothers Asia Limited ("LBAL")**
**Incorporated in Hong Kong**

Lehman Brothers Asia Limited is licensed by the Hong Kong Securities and Futures Commission for various regulated activities namely dealing in securities and futures and advising on securities and corporate finance.  LBAL is also accepted by the Stock Exchange of Hong Kong to act as a sponsor for Hong Kong IPO transactions.  LBAL is a fully guaranteed subsidiary of LBI.  LBAL is an exempted leveraged foreign exchange trader

**Lehman Brothers PTE Ltd. ("PTE Ltd.")**
**Incorporated in Singapore**

PTE Ltd. holds a license for trading in futures contracts issued by the Monetary Authority of Singapore and is a corporate clearing member of the Singapore Exchange Derivatives Trading Limited ("SGX-DT").  PTE Ltd. is a fully guaranteed subsidiary of LBHI.

**Lehman Brothers Futures Asia Limited ("LBFA")**
**Incorporated in Hong Kong**

LBFA is a clearing member of the Hong Kong Futures Exchange and is licensed by the Hong Kong Securities and Futures Commission to deal in futures.

**Lehman Brothers Commercial Corporation Asia Limited ("LBCCA")**
**Incorporated in Hong Kong**

LBCCA principally engages in trading of fixed income and equities, as well as related products on a principal basis.    It has a money lender license in Hong Kong.  LBCCA is a fully guaranteed subsidiary of LBHI.  LBCCA is an exempted leveraged foreign exchange trader

9

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165173**

# LEHMAN BROTHERS – Financial Highlights

## Flagship Facilities

|  |  |  |
|---|---|---|
| LBHI Committed Facility | – | 3 year US$2.0B committed facility extended by a syndicate of 57 banks |
| LBBAG Committed Facility | – | 3 year US$2.5B committed facility extended by a syndicate of 38 banks |

## US Medium Term Note Program

**WKSI Program (Unlimited)**

New York    Lehman Brothers Holdings Inc.

## European Medium Term Note Program

**Shared $100 billion Program**

| London | Lehman Brothers Holdings Inc. |
| Frankfurt | Lehman Brothers Bankhaus AG |
| Netherlands | Lehman Brothers Treasury Co. BV |

## Commercial Paper Programs

**Shared $9 billion Program**

| New York | Lehman Brothers Holdings Inc. |
|  | Lehman Brothers Inc. |

**Shared $3 billion Program**

| Netherlands | Lehman Brothers Treasury Co. BV |
| London | Lehman Brothers Holdings Inc. |
|  | Lehman Brothers Holdings Plc. |

### $119.99 billion of Long-Term Debt Maturing in:[*]

| 2008 | $15.83 billion | 2011 | $11.89 billion |
| 2009 | $18.24 billion | 2011 thereafter | $56.93 billion |
| 2010 | $17.09 billion |  |  |

[*] Long-term debt maturities include $9.6 billion of extendibles, which are shown at their earliest maturity dates.

10

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165174**

## LEHMAN BROTHERS – Personnel

| NEW YORK: | Chris O'Meara | 212 526 9295 | Managing Director, CFO |
|---|---|---|---|
| | Paolo Tonucci | 212-526-3813 | Managing Director, Global Treasurer |
| | Ari Axelrod | 212-320-4486 | SVP, Head of Financial Planning and Analysis |
| | Julie Boyle | 212 320 6323 | SVP, Global Head of Creditor Relations; President & CEO, Lehman Brothers Commercial Bank |
| | Dan Fleming | 201-499-6770 | SVP, Head of Global Cash Management |
| | Nahill Younis | 212-320-4982 | SVP, Global Head of Asset and Liability Management |
| | Emil Cornejo | 212-320-4495 | SVP, Creditor Relations |
| | Steve Engel | 212-528-6236 | SVP, Global Treasury Funding Desk |
| | Janet Birney | 212-320-4489 | SVP, Global Head of Network Management |
| | Amberish Ratanghayra | 212-320-4976 | VP, Senior Relationship Manager, Creditor Relations |
| | Karen von Ruffer | 212-320-4981 | VP, Senior Relationship Manager, Creditor Relations |
| | | | |
| LONDON: | Andrew Wright | 44-20-7102-1175 | Managing Director, European CFO |
| | Carlo Pellerani | 44-20-7102-6309 | Managing Director, International Treasurer |
| | Dave Rushton | 44-20-7102-2091 | SVP, Head of European Asset & Liability Management |
| | Huw Rees | 44-20-7102-2107 | SVP, European Head of Creditor Relations |
| | Geoff Spindler | 44-20-7102-6803 | VP, Head of Network Management Europe |
| | Joseph Igoe | 44 20 710 25489 | VP, Relationship Manager, Creditor Relations |
| | Olga Santos-Canelles | 44 20 7102-9044 | AVP, Relationship Manager, Creditor Relations |
| | | | |
| ASIA: | Enrico Corsalini | 81-3-6440-5260 | Managing Director, Asia CFO |
| | Herbert Moos | 81-3-6440-5060 | SVP, Asia Treasurer |
| | Gregory Ito | 81-3-6440-5062 | SVP, Head of Asset & Liability Management Asia |
| | Nittaya Hongrapipat | 66-2-687-5822 | VP, Thailand Treasurer |
| | Ian Walker | 81-3-6440-5059 | VP, Head of Cash Management Asia |
| | Pierre Mengal | 81-3-6440-5063 | VP, Head Creditor Relations and Network Management Asia |
| | Tatsushi Kishimoto | 81-3-6440-5142 | VP, Senior Relationship Manager, Creditor Relations and Network Management |
| | Nigel Watters | 81-3-6440-5075 | VP, Senior Relationship Manager, Creditor Relations and Network Management |
| | Indranil Ghosh | 91 22 4037 4020 | VP, India Treasurer |

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**                    **LBEX-LL 2165175**

## LEHMAN BROTHERS - Ratings

| | LBHI | LBI | Last Rating Actions | Outlook |
|---|---|---|---|---|
| **Moody's Investor Services** | | | | |
| | | | October 2003 Ratings Upgrade | |
| Short-term | P-1 | P-1 | | |
| Long-term | A1 | Aa3 | | Positive |
| **Standard & Poor's Rating Services** | | | | |
| | | | October 2005 Ratings Upgrade | |
| Short-term | A-1 | A-1+ | | |
| Long-term | A+ | AA- | | Stable |
| **Fitch Ratings** | | | | |
| Short-term | F-1+ | F-1+ | July 2005 Ratings Upgrade | |
| Long-term | AA- | AA- | **June 2007 Ratings Upgrade** | Stable |
| **Dominion Bond Rating Service** | | | | |
| Short-term | R-1 (middle) | R-1 (middle) | | |
| Long-term | A (high) | AA (low) | | Positive |

**Confidential Treatment Requested By Lehman Brothers Holdings, Inc.**

**LBEX-LL 2165176**