# PD 10

# Lehman Repo Manual

# REPO MANUAL

## Contacts:
## Kathy Ashe
## Product Marketer/PIM
## (212) 528-8129

**This book is intended to be a reference guide for sales people engaging in Repurchase Agreements. It provides information on the repo product, ledgers, sales credit schedule, credit risk management and margin issues, booking systems and documentation.**

The table of contents follows. Clicking on a section will link you directly to this point.

*Updated 11/08/05*

**LBEX-LL 1175483**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# REPO MANUAL

## Table of Contents

**I.**   **REPO CONTACTS**

   **Repo Sales, Trading, Support, Clearance Phone Numbers**

**II.**   **INTRODUCTION TO THE FINANCING MARKET**

   **Basics, Terminology, Risks, Legal**

**III.**   **ACCOUNT SUITABILITY**

   **Suitability, Trade Maintenance, Exposure**

**IV.**   **TRADE LEDGERS**

**V.**   **SALES CREDIT SCHEDULE**

**VI.**   **INFINITY QUICK REFERENCE GUIDE**

   **Front-End Repo Trade Booking System**

**VII.**   **MTS VERBS / COMMANDS**

   **Verbs and Commands to Mainframe System**

**VIII.**   **CREDIT RISK MANAGEMENT**

   **Financing Haircuts, Credit Analyst Information, Credit Limits**

**IX.**   **LBIE / LBI TICKETS AND SETTLEMENT INSTRUCTION FOR ITS**

   **Trade and Reprice Tickets**

**X.**   **DOMESTIC SETTLEMENT INSTRUCTION GUIDE**

**XI.**   **CAMEO AND MARGIN EXPOSURE REPORTS**

**LBEX-LL 1175484**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# I.      REPO CONTACTS

**LBEX-LL 1175485**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# REPO CONTACTS

## Repo Sales, Trading, Support, Clearance Phone Numbers

Last update:  11/08/2005

### DOCUMENTATION - MRA & GMRA

| | |
|---|---|
| Robert Guglielmo - Manager | 212-526-7121 |
| Meade Aii - PCS: FI Repo / Tri Party | 212-526-7019 |
| Cheryl Phipps | 212-526-7022 |
| Emily Dallaris | 212-526-7023 |
| Lisa-Lynn Boron - Sec. Loan / Equity Repo | 212-526-7015 |
| Theresa Russo - GMRAs (PCS & Institutional) | 212-526-7021 |
| Guillermo Izabal | 212-526-5607 |

### NEW ACCOUNTS

| | |
|---|---|
| Cathy D'Elena (Supervisor) | 201-499-6444 |
| Group Contact Line (CAS_NY Institutional) | 201-499-4747 |
| Retail Group Contact Line (CAS_NY IMD) | 201-499-3333 |
| Debra Fairbairn/London Cust Acct Srvcs | 44-20710-24068 |
| CASE (London email) | |
| Kirmveer Pandher/London Cust Acct Srvcs | 44-207-102-1887 |

### CORPORATE CREDIT APPROVAL

| | |
|---|---|
| David Sackett - Latin American | 305-789-8734 |
| Hector Kreutz/Scott Quinn - Finl Inst & PCS | 212-526-9760 |
| Julia Nand/Ana Arsov/Amar Patel - Ins. Co/Municipals | 212-526-8271 |
| Jim Glen - Hedge Funds | 212-526-8864 |
| Frank Baldi - Hedge Funds | 212-526-3702 |
| Roger Tennent - Hedge Funds | 212-526-4525 |
| Robert Battoglia - Hedge Funds | 212-526-2939 |
| Daniel Goldhagen - Corporates | 212-526-5046 |
| Vaghn Campos- Invmt. Adv. & Mutual Fds. | 212-526-4133 |
| Mark Patrick - Sovereigns | 212-526-5083 |
| Martin Roberts - Special Purpose Vehicles & CDOs | 212-526-7734 |
| **see also http://my.lehman.com/CRM/** | |

## LBI (MTS)

### CFU SUPPORT

| | PHONE |
|---|---|
| Jim Hraska - Manager | 212-526-6782 |
| Anthony Rivera | 212-526-9950 |
| Michael Thearle | 212-526-9950 |
| Michael Mazzola | 212-526-9950 |
| Andrew Carey | 212-526-9950 |
| Aracelis Lucero | 212-526-9950 |
| Brian Marchellos | 212-526-9950 |
| Pete Woroniecki | 212-528-9950 |
| Matt Linnane | 212-526-9950 |
| **email:  repo trade support** | |

### DATA ENTRY

| | |
|---|---|
| Eleuterio Marcelino (Marcie) | 212-526-3696 |

### INFINITY SYSTEMS SUPPORT

| | |
|---|---|
| Ruth Weinreich | 212 320 6094 |
| Alex Robayo | 201-499-9167 |
| **Hot Line** | **201-499-9250** |

## LBIE (ITS)

### TRADE SUPPORT

| | |
|---|---|
| Pascal Sabattier | 212-526-9950 |
| Thomas Rogers Jr. | 212-526-6875 |
| Laura Purvis | 212-526-6606 |

### Coupons Payments for EMG

| | |
|---|---|
| Paul Carter | 44-20-710-22989 |
| **email:  slprg@lehman.com** | |

LBEX-LL 1175486

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# REPO CONTACTS

**CLEARANCE**
| | |
|---|---|
| Lenny Legotte - Head Supervisor MTG & GOVT | 201-499-8396 |
| **Hot Line** | **201-499-6633** |

**Mortgage Backed Securities  (Fed Wire, PTC)**
| | |
|---|---|
| Anna Garner - Supervisor | 201-499-8393 |

**Governments, Agencies, Disco's (Fed Wire)**
| | |
|---|---|
| Mike Maher - Supervisor | 201-499-8397 |
| John Arancio - Bonds | 201-499-8389 |
| Roger Cabrera - Bills | 201-499-8391 |
| David Hughes - Notes & Redemptions | 201-499-8395 |
| Anthony Collura - Notes | 201-499-8392 |
| Stephen Pisciotti - Agencies, Discount Notes, Strips | 201-499-8398 |
| Tom Wilson - Security Redemptions | 201-499-8512 |
| Terry Flores | 201-499-8402 |

**Clearance Corporates, A/B's, P/L CMO's, Money Mkts (MTS, DTC 636)**
| | |
|---|---|
| Maureen Duffy - Supervisor | 201-499-8296 |
| Tania Mattes - Co G (LBI) | 201-499-8302 |
| Vicent Martemucci | 201 499 8319 |

**Triparty - Allocations**
| | |
|---|---|
| Tom Rogers Sr. - Manager | 201-499-8308 |
| John Palchynsky (J.P.) - Supervisor | 201-499-8306 |
| Rob Rodriquez | 201-499-8307 |
| Albert Abad | 201-499-8294 |
| Brian Wing | 201-499-8321 |

**Cash Management - email Cash Management FI**
| | |
|---|---|
| Jay Chan - Manager | 201-499-6472 |
| Ray Abary | 201-499-4991 |
| Danny Fang | 201-499-6838 |
| Raymond McLennon - Funding | 201-499-6875 |
| Joseph Bellingeri | 201-499-6975 |
| David Tung | 201-499-6912 |
| Lee Gally | 201-499-6655 |
| Ray McLennon | 201-499-6912 |
| Angelo Gabriele | 201-499-6626 |

**Sales Support/Carry Group**
| | |
|---|---|
| Nancy Denig - Manager | 212-526-9770 |
| Carol Schirmacher - Supervisor | 212-526-0669 |
| Jason Friedman | 212-526-0997 |
| Binita Parmar | 212-526-6796 |
| Mike Chiara | 212-526-6837 |
| Vin Chauhan | 212-526-0879 |

**Principal & Interest (Coupon Clips)**
| | |
|---|---|
| Jorge Acevedo - Manager | 201-499-8461 |
| John Venner - Supervisor: Govt's, Agencies | 201-499-8508 |
| Calixto (Lito) Escobar - Physical | 201-499-8473 |
| Chad Lucas | 201-499-8464 |
| Oscar Caiazza | 201-499-8467 |

**Margin Department**
| | |
|---|---|
| Kristin Desario - Manager | 212-526-7065 |
| Carol Dort | 212-526-1210 |
| Rebecca Myers | 212-526-3950 |
| Elena Kondombo | 212-526-5745 |
| Joaquin Escamille | 212-526-3466 |
| Kayvan Parvin | 212-526-4242 |
| Michele Kahne | 212-526-9862 |
| Dala Vongsa | 212-526-4244 |

**CLEARANCE / ITS**
**EMG Securities (DTC 5229 & EUROCLEAR)**
| | |
|---|---|
| John McKissick | 201-499-8304 |
| Bill Liebscher | 201-499-8178 |
| Aida Mendez (physical cage) | 201-499-8305 |
| Nicole Wolleon | 201-499-8431 |
| Maureen Leiner | 201-499-8281 |

**CLEARANCE / ITS  EUROCLEAR 92904**
| | |
|---|---|
| Yvonne Day/London ops | 44-20-710-28461 |
| Shelia McGoldrick | 44-20-710-23042 |
| Lisa Austin | 44-20-710-24252 |
| Rob Chapman - Manger | 44-20-710-22031 |

**FAIL CONTROL**
| | |
|---|---|
| Cesar Serpa | 201-499-8192 |

**Triparty - Cash Balances**
| | |
|---|---|
| Raymond McLennon | 201-499-6875 |
| Lee Gally | 201-499-6655 |
| Danny Fang | 201-499-6838 |

**Pairoffs - Same Day Payable/Receivables**
| | |
|---|---|
| Carol Keith - Supervisor | 201-499-6834 |
| Ray Abary | 201-499-4991 |
| David Tung | 201-499-6912 |
| Ray McLennon | 201-499-6875 |
| Sharon Blake | 201-499-6434 |

**Sales Development**
| | |
|---|---|
| Irena Panda | 212 526 1332 |
| Carla Mantilla | 201-499-8253 |
| Aliana Soto | 201-499-8249 |
| Jennifer Matulewich | 212-526-0529 |
| Julie Ann Catalano | 212-526-3170 |

**Redemptions**
| | |
|---|---|
| Tom Wilson | 201-499-8512 |
| David Hughes | 201-499-8395 |
| Helene Decamp | 201-499-8472 |
| Mike Kahn (TMS) | 201-499-8483 |
| Grace Furia | 201-499-8476 |

**TMS-MTS Bridge Balancing**
| | |
|---|---|
| Larry Zucconi | 201-499-8188 |
| Peter Seok | 201-499-8189 |
| Don Logan | 201-499-8179 |

**Output Management (Infopac)**
| | | |
|---|---|---|
| Hotline | (opt 6 then 4) | 973-533-3000 |
| John McShane | | 973-533-3400 |

**LBEX-LL 1175487**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# II.    INTRODUCTION TO THE FINANCING MARKET

LBEX-LL 1175488

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

# TABLE OF CONTENTS

### I.   LEHMAN BROTHERS AS MARKET LEADER

### II.   INTRODUCTION TO THE FINANCING MARKET

### III.   FINANCE MARKET PARTICIPANTS

A.   Investors

B.   Dealers

C.   Central Banks and Official Institutions

### IV.   CHARACTERISTICS OF FINANCING

A.   Repo Interest Rate

B.   Type of Collateral

C.   Settlement of Transactions

D.   Term of Transactions

E.   Right of Substitution

F.   Margin

G.   Supply and Demand

### V.   RISKS IN THE FINANCE MARKET

A.   Collateral Risk

B.   Counterparty Risk

### VI.   APPENDIX

A.   Legal and Credit Consideration

B.   Checklist for Getting Started

C.   Definitions

**LBEX-LL 1175489**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

## Basics, Terminology, Risks, Legal

### I.    LEHMAN BROTHERS AS MARKET LEADER

The Lehman Brothers Financing team is completely integrated into the rest of the firm to provide clients cost-effective funding solutions.



- ◆  Ranked top three for last two years in *Institutional Investor's* Repo/Reverse Repo ranking.

- ◆  Complete coverage: providing clients with secured financing across all asset classes along the curve.

- ◆  Named the *Euromoney* "Best Site for Securities Lending / Repo" in 2002 & 2003.

- ◆  Lehman Brothers is Market Leader in Repurchase Agreements:

    - –  One of the largest matched-books in industry.

    - –  Ability to finance esoteric collateral type.

    - –  Aggressive specials trading.

### II.    INTRODUCTION TO THE FINANCING MARKET

Repurchase Agreements, or repos, are the primary instruments used by U.S. broker-dealers to finance their inventory positions.  Estimated size of the repo market is $1.6 to $3.8 trillion per day in the U.S. alone.[1]

A repo is an agreement to enter into two simultaneous transactions whereby one counterparty sells securities to another counterparty, and then agrees to repurchase the securities at a later date.

---

[1] As of June 30, 2003, figure covers financing involving U.S. government, federal agency, and federal agency MBS securities.  Source: Federal Reserve Bank of New York

**LBEX-LL 1175490**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

For example:

**Step 1: Sale of securities by a dealer, e.g. Lehman Brothers, to an investor.** In the first leg of this repo, Lehman Brothers would transfer securities to the investor, and the investor would wire cash to Lehman Brothers.



**Step 2: Repurchase by Lehman Brothers of the securities from the investor on the maturity date of the Repo.** In the second leg of the Repo, Lehman Brothers would repay the cash investment to the investor, and the investor would return the securities to Lehman Brothers. In addition, the investor would receive an interest rate from Lehman Brothers on its cash investment for the period of time that the Repo is outstanding. The interest rate would be negotiated and agreed to by Lehman Brothers and the investor before the cash and securities are transferred in Step 1.



*Note: In the Repo market, securities exchanged for cash pursuant to a Repo are called "collateral" because the securities are in effect collateralizing the investor's cash loan to the Repo counterparty, e.g., the dealer. We will follow this convention from here on.*

The term repo is derived from the fact that this short term money market instrument is legally the sale of a security at one price and the simultaneous agreement by the seller to repurchase that security at greater price on a future date. The difference between the two prices is the interest earned on the original investment.

In practice a repo is essentially a loan of cash for a specified period of time against which interest is paid and collateral is pledged. The collateral is often the dealer's inventory of securities either owned outright or "reverse" repos in matched books.

The Repo market works both ways. From time to time dealers need to borrow securities instead of cash. This also enables investors to finance their securities positions.

Similar to a Repo, a reverse repurchase agreement ("Reverse Repo") is an agreement to enter into two simultaneous transactions whereby one counterparty sells collateral to another counterparty, and then agrees to repurchase the collateral at a later date. However, in a Reverse Repo, Lehman Brothers would *buy* collateral from the investor instead of *sell* collateral, and Lehman Brothers would provide cash to the investor instead of *collateral*. Finally, Lehman Brothers would receive interest from the investor instead of *pay* interest.

**LBEX-LL 1175491**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

For example:

**Step 1: Purchase of collateral by Lehman Brothers from the investor.** In this leg of the Reverse, the investor would deliver collateral to Lehman Brothers, and Lehman Brothers would deliver cash to the investor.



**Step 2: Repurchase by the investor of the collateral from Lehman Brothers on the maturity date of the Reverse.** In this leg of the Reverse, Lehman Brothers would return the collateral to the investor, and the investor would repay the cash investment, plus interest to Lehman Brothers.



*Note: One counterparty's Repo is another counterparty's Reverse; both are the same transaction viewed from different perspectives. However, it is common practice to refer to the transaction from the dealer's perspective. For example, if a dealer wishes to borrow money, it enters into a Repo with an investor (the investor would wire cash to the dealer and receive collateral). This transaction would typically be called a Repo by both counterparties.*

## III. FINANCE MARKET PARTICIPANTS

Participants in the Repo market include: individual investors, banks, corporations, mutual funds, investment advisors, central banks and official institutions, insurance companies, pension funds, and, of course, securities dealers. Participants are grouped into three broad categories: investors, dealers, and Central Banks.

### A.    Investors

**Repos**

Repos combine the benefits of a secured, highly liquid and flexible investment with an opportunity to earn a competitive rate of return to create a unique and useful financial tool for investors.

◆    **Security** – Investors may participate in the Finance Market to invest money on a short-term, secured basis at competitive money market rates of return. Repos offer investors a *collateralized* alternative to *unsecured* investments such as bank deposits and money market instruments such as certificates of deposit and commercial paper. In other words, the cash investor is effectively lending money to a broker dealer rather than depositing funds in a bank. The difference is that the investor receives

LBEX-LL 1175492

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

collateral for the total principal amount invested and is thus fully secured in case of a default by the broker dealer. Investors are also provided an additional buffer of security by the dealer providing extra collateral known as margin (for more detailed discussion on margin please see Section IV).

◆ **Flexibility** – Many aspects of a Repo can be negotiated to reflect an investor's unique risk/return parameters, liquidity requirements and operational preferences. Repos can be structured to fit the exact maturity, size, currency, and collateral requirements of the investor. One of the most attractive features of repos is their flexible maturities, or term, including odd periods such as 21 days or 45 days. The term of the repo can be tailored to suit the needs of the investor whose choice may depend both on the timing of the client's cash requirements and on the investor's view of likely interest rate movements. The rate of return can be either set as a fixed rate or a floating rate. In short, a repo is an ideal cash management tool for investors because it enables them to manage their cash positions with a flexible, customized, investment product.

For details, please refer to the section "Risks in the Financing Market".

**Reverse Repos**

The Repo market offers investors the opportunity to maximize returns on securities in their portfolio by repoing out bonds to dealers for which a fee is paid or a positive spread earned when the funds it receives against the loaned securities is reinvested in a higher yielding repo.

**B.    Dealers**

**Repos**

◆ **Financing** – Repos are the principal means by which dealers finance their inventory of U.S. Treasury, mortgage-backed, corporate, and money market securities; and high grade sovereign debt.

◆ **Matched Book** – The term Matched Book is used when a dealer seeks to create liquidity in the Repo market by borrowing and lending specific securities (entering into Reverses and Repos) for specific periods of time based on the dealer's view of interest rates. This is a profit-center vehicle which generates revenue off fluctuations in interest rates.

**Reverses**

There are several factors which influence the dealer's demand to borrow securities, including:

◆ **Cover Short Positions** – Dealers will often sell securities that they do not own. This creates a need to borrow the specific security in order to make the delivery and receive the cash proceeds on the sale.

◆ **Operational Fails** – Often a security is both purchased and sold by the dealer. If the purchased security fails to be delivered to the dealer, the dealer will often borrow this security in order to make delivery on the cash sale and receive the proceeds of the sale.

**C.    Central Banks and Official Institutions**

Central banks and official institutions around the world actively use the Repo market to invest excess reserves, generate liquidity for currency intervention, facilitate the flow of securities in their local markets and generate incremental income.

LBEX-LL 1175493

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

For example, in the United States, the Federal Reserve Bank of New York (the "New York Fed") uses Repos to add reserves to the U.S. banking system and Reverses to drain reserves. The New York Fed can conduct overnight and term repos. Generally, an overnight Repo is viewed by market participants as the tool used by the New York Fed to manage U.S. monetary policy. In addition, the New York Fed executes Repos on behalf of its customers, such as foreign central banks ("Customer Repos"). When the New York Fed executes Customer Repos, the amount is usually announced in advance.

## IV.  CHARACTERISTICS OF FINANCING

As noted earlier, many aspects of a Repo can be negotiated in order to reflect an investor's unique risk-return parameters, liquidity needs and operational preferences. Variables include, but are not limited to: repo rate, collateral, settlement, term, substitution, margin, and supply and demand.

### D.    Repo Interest Rate

In a repo transaction the investor receives interest on the cash investment. The rate used to calculate the interest is a function of many factors including, but not limited to: the supply and demand for the securities used as collateral, the supply and demand for cash, the maturity of the Repo, and the method used to transfer the securities used as collateral from the dealer to the investor.

Please note, the interest bears *no* relation to the interest rate on the securities used as collateral.

---

**CALCULATION OF REPO INTEREST:**

**(Cash Investment) * (Repo Interest Rate) * (# Days Repo Outstanding)/360 = Repo Interest**

---

Repos can be quoted on a fixed rate or floating rate basis. In a floating rate Repo an investor can choose an index as the basis (e.g. LIBOR, U.S. Federal Funds, U.S. Treasury Bills) and receive a specific spread above or below the index, allowing the Repo Interest Rate to reset as the index resets.

Typically, interest is paid at maturity in a Repo. However, for longer-term trades investors may prefer to receive interest at more frequent intervals.

**Repurchase Agreement Example**

Investor C reversing $10 million in U.S. Treasury securities as collateral and receiving cash for a term of 30 days.

| Term of Reverse Repo: | 30 Days |
|---|---|
| Par Amount: | 10 million |
| Reverse Repo Rate: | 1.05% |
| Haircut: | 5% |
| Collateral: | UST 5.25% 11/15/2028 |
| Dirty Price: | 102 |
| Principal Loan: | $9,714,285.72 |

– 10 –

**LBEX-LL 1175494**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

To find the principal loan amount we use the below formula:

> Principal = Par * Dirty Price * 1/HC * 1/100
> Principal = 10,000,000 * 102 * 1/1.05 * 1/100
> Principal = $9,714,285.72

To find the repo interest we use the below calculation:

> Repo Interest = Principal * Rate * (Days Trade is on)/360
> Repo Interest = 9,714,285.72 * 1.05% * (30/360)
> Repo Interest = $8,500

## E.   Type of Collateral

There is a wide range of collateral options available to the Repo investor, reflecting the growing liquidity and importance of Repo markets worldwide.

The Repo Interest Rate is directly related to the quality of the underlying collateral. That is, the more flexible the cash investor is regarding the type of collateral accepted, the higher the return is likely to be on the Repo.

## F.   Settlement of Transactions

Most U.S. Repos settle on the same day they are executed. This is known as cash settlement. Alternatively, Repos can be settled on any future date specified by the investor. Three common methods to transfer collateral are:

◆   Delivery

  –   In a Delivery Repo the collateral is delivered to the investor's bank. This requires the investor to instruct its bank to wire the cash to the dealer's bank and receive collateral from the dealer's bank, and hold the collateral pursuant to the terms of the Repo. In Delivery Repo, the investor will probably incur custody and delivery charges from its bank.

◆   Deliver Tri-Party

  –   Tri-Party is a form of Delivery Repo whereby both counterparties use the same bank, and, collateral and cash are transferred pursuant to a contractual arrangement between the counterparties and the bank.

  –   Under a Tri-Party Repo, a bank stands between the investor and the dealer and physically controls the collateral. The bank performs many administrative tasks such as: marking the collateral to market on a daily basis, ensuring that the collateral in the account is the type of collateral required by the investor, and supervising all substitutions. By eliminating the need to transfer securities between banks, the Tri-Party arrangements avoids the risk of a fail to deliver and provides a secure vehicle for the customer to take delivery of the collateral.

  –   Tri-Party Repos are particularly attractive for corporate treasurers lacking an extensive back office. In addition to the greater convenience offered by the Tri-Party arrangement, the dealer assumes all of the custody and administration costs related to the collateral after the securities have been received by the Tri-Party agent.

**LBEX-LL 1175495**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

**DVP REPO**
**(Delivery vs. Payment)**



Cash to Borrower in direct
Exchange for collateral

(1) Collateral (inclusive of necessary haircut) delivered to
    Lender in direct exchange for cash
(2) Collateral delivered via appropriate delivery system:
      a.  Fed Wire – Treasuries, Agencies, Mortgages
      b.  DTC – Mortgages, Corporates

**TRI-PARTY REPO**



Cash to
Borrower

Confirmation
of allocated
collateral

Pledge
collateral for
possible use
against loans

(1) Allocates appropriate
    quality and value of
    collateral (inclusive of
    necessary haircut)
(2) Segregates collateral on
    Lender's behalf

– 12 –

**LBEX-LL 1175496**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

◆ Safekeep / Hold-in-Custody

  – Safekeep Repos are generally easier for the investor to administer. In a Safekeep Repo the dealer places the collateral in its vault or in its own account at its bank in a segregated sub-account for the exclusive benefit of Repo customers.

  – Also, since the cost of transferring the securities to an outside custodian are not incurred, Safekeep Repos generally yield a higher return than Delivery Repos.

## G.    Term of Transactions

In the U.S. market Repos can be executed on an "open" basis whereby the Repo is "rolled over" from one day to the next until either the investor or the dealer decides to terminate the transaction. Additionally, Repos can be executed for a specific term such as one or three months.

In general, Repos can be negotiated for any term up to one year in order to reflect the investor's cash requirements and expectations of interest rate changes. Presently, the largest concentration of Repos mature within three months.

## H.    Rights of Substitution

Typically, dealers prefer to have the right to change ("substitute") the collateral pledged to the investor while the repo is outstanding. This gives the dealer the flexibility to use the collateral for alternative uses.

## I.    Margin

Please refer to the section "Risks in the Financing Market" for a detailed discussion of margin.

## J.    Supply and Demand

There are several factors which influence the supply and demand in the finance market. These include:

◆ **Matched-book Transactions** – As the volume of repo business continues to increase, matched-book traders will continue to create liquidity in the repo market and seek to both borrow and lend securities.

◆ **Dealer Short Positions** – Dealers will often sell securities which they do not own. This creates a need to borrow the specific security in order to make the delivery, and receive the cash proceeds.

◆ **Operational Fails** – Often a security is purchased, and sold for the same value date. If the purchased security fails to be delivered to the dealer, the dealer will often borrow this security in order to deliver on his cash sale, and receive the proceeds.

◆ **Futures and Options** – The growth of the derivatives market has fueled an increased demand to borrow/lend securities for fixed periods of time. As these markets continue to expand, the repo and securities lending products will also expand to enable efficient pricing of these transactions.

**LBEX-LL 1175497**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

## V.   RISKS IN THE FINANCE MARKET

When evaluating the feasibility of entering the Repo market, investors should be aware of the following potential risks:

## K.   Collateral Risk

Fluctuations in the market value of the collateral relative to the cash invested with the dealer may cause one Repo counterparty to experience credit exposure to the other Repo counterparty. For example, if the market value of the collateral held by the investor falls relative to the cash, the investor would incur unsecured exposure to the dealer in an amount equal to the difference between the current market value of the collateral held by the investor and the cash invested with the dealer.

Conversely, if the market value of the collateral held by the investor increases relative to the cash invested with the dealer, the investor would be over-collateralized in an amount equal to the difference between the current market value of the collateral held by the investor and the cash invested with the dealer.

*Repo market participants address market risk in two ways:*

◆   Margin

 –   Typically, the borrower of cash, i.e. the dealer, provides the investor of cash with margin. Margin is the excess collateral given to the investor to protect the investor against fluctuations in the market value of the collateral. Margin levels reflect a number of variables including: the creditworthiness of the borrower of cash, the liquidity of the collateral, the term and size of the transaction, and the method used to move the collateral from the dealer to the investor.

 –   Below is a chart illustrating the amount of margin that could be provided on various types of securities. Please note that this chart is included in this information package for illustrative purposes only and are determined by Lehman's Credit Risk Management team.

| Collateral Type | Margin |
|---|---|
| U.S. Treasury and Agency Securities | 100 – 105% |
| Money Market Instruments | 102 – 105% |
| Investment Grade Corporate Securities | 100 – 120% |
| Mortgage-Related Securities | 100 – 105% |

◆   Mark-to-Market

 –   Typically, Repo counterparties calculate the value of the collateral each day to make sure that the value of the collateral equals the cash investment, plus the margin, if any. For example, if the value of the securities used as collateral falls below an agreed-upon threshold, the investor usually has the right to request additional collateral from the dealer in order to ensure that the cash investment is appropriately collateralized. Conversely, if the value of the collateral rises above an agreed-upon threshold, the dealer usually has the right to request the investor to return some of the collateral in order to ensure that the cash investment is appropriately collateralized.

– 14 –

**LBEX-LL 1175498**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

### L.   Counterparty Risk

As with other capital market investments, Repos may expose the investor to counterparty credit risk. However, unlike unsecured investments such as commercial paper and certificates of deposit, the collateral provided in a Repo gives the investor an extra layer of protection against counterparty risk.

**Repo Market participants address counterparty risk as follows:**

◆   Deal only with the highest quality counterparties for any repo transaction.

◆   Have a written agreement in place specifically detailing who the counterparty is and the terms under which you will operate.

◆   Mark-to-market your repo and collateral positions daily. This will ensure that you are fully collateralized at all times.

## VI.   APPENDIX

### M.   Legal and Credit Consideration

◆   Execute a standard, industry-wide agreement for Repurchase Agreements.

◆   A thorough credit review of your counterparty should be undertaken prior to entering into any repo/security lending transactions. Be comfortable with the credit of your counterparty since they are your first line of defense.

◆   Understand and get comfortable with the type of collateral you are receiving. Be certain that you can price it accurately, and that you understand the mechanics of settling securities in the particular country of the issue.

◆   Mark-to-market your positions daily. This enables you to request additional collateral if necessary, and remain fully-collateralized at all times.

### Documentation

Two standard agreements have been developed to govern Repo market transactions. These documents are used by many Repo market participants including Lehman Brothers. Participants in the U.S. Repo market generally use the standard Repo agreement developed by the Bond Market Association ("BMA"). Additionally, participants in the global Repo markets generally use the standard Repo agreement developed jointly by the International Securities Market Association and the BMA.

The BMA Master Repurchase Agreement describes the explicit terms agreed by both the buyer and seller of the repo. Such terms include settlement, interest payment, margin maintenance, trade confirmations, collateral substitution and events of default. All participants in the repo market are advised to fully understand this legal contract.

Agreements can be obtained through the appropriate documentation team at Lehman Brothers.

### N.   Checklist for Getting Started

Prior to investing in the repo market it is important to determine the parameters you will work within.

– 15 –

**LBEX-LL 1175499**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

**For the Lender of Securities:**

◆ Decide which currencies you wish to lend.

◆ Decide what percentage of the portfolio you will lend.

◆ Determine the eligible collateral you will accept.

◆ Determine the criteria for selecting counterparties. Consider the creditworthiness of the counterparty, level of service, level of experience, settlement capabilities and revenue expectations.

◆ Address any tax, legal, and regulatory issues, including capital adequacy guidelines for collateral.

◆ Execute the appropriate Repo Agreement.

◆ Set up the operational procedures for delivery/receipt of securities and collateral.

◆ Set up the appropriate reporting system to monitor outstanding positions and their market values.

**For the Investor of Cash:**

◆ Decide upon the currencies and the amount to be invested.

◆ Determine eligible collateral, and level of margin (over-collateralization) required.

◆ Determine the term of the investment (overnight, one-week, one-month, etc.).

◆ Determine criteria for selecting counterparties, as described above.

◆ Address any legal, tax or regulatory issues.

◆ Execute appropriate repo or securities lending agreement.

◆ Set up operational procedures as described above.

**O.   Definitions**

◆ **Collateral** – may consist of cash (in any currency) for repurchase agreements; other securities (U.S. Treasuries, Agencies, Mortgage-backs, Sovereign Debt, etc.) or Letters of Credit for securities lending transactions.

◆ **General Collateral** – ("GC") the universe of securities eligible for repurchase agreements. If a security is not trading as a "special issue" it is considered "general collateral."

◆ **Matched Book** – a major profit center at primary dealers is where a trader reverses in and repos out collateral to the same or different dates. When the maturities of the reverse repos and repos are the same, he or she is said to be running a matched book. But, in reality, most "matched" books are actually "mismatched" in that a trader will reverse in collateral to dates which are different than those maturities on the corresponding repos. A trader does this to profit from future shifts in interest rates that might occur between the unmatched maturities on the reverse repos and repos.

**LBEX-LL 1175500**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## INTRODUCTION TO THE FINANCING MARKET

◆ **Rebate Interest** – in a securities lending transaction the borrower of the securities receives "interest" for the term of the borrow. This rebate interest compensates the borrower of the securities for the loan of the cash collateral.

◆ **Repurchase Agreements** – ("repo") a sale of securities vs. cash with a simultaneous agreement to repurchase the same securities at a future date. The buyer of the securities receives interest on the cash investment.

◆ **Reverse Repurchase Agreements** – ("reverse repo") a purchase of securities vs. cash with a simultaneous agreement to resell the securities at a future date. The purchaser of the securities receives interest on the cash investment.

◆ **Sale/Buy-Back** – a sale of securities and a simultaneous agreement to repurchase the same securities at a future date at an agreed upon price. The future price is calculated to reflect the implied repo (financing) rate for the term of the trade.

◆ **Securities Lending/Borrowing** – a loan/borrow of securities collateralized by either cash, other securities, or Letters of Credit.

◆ **Special Issue** – ("specific issue") any security which is asked for by coupon and maturity. A specific issue is needed in order to cover a short or to facilitate a delivery on a sale transaction. Lending specific issues enables the owner of the bonds to generate cash at below-market rates of interest.

**LBEX-LL 1175501**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INTRODUCTION TO THE FINANCING MARKET

## DISCLAIMER

◆ This presentation is a product of sales and trading and is not a product of research. This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia.

◆ This presentation is furnished on a confidential basis only for the use of the intended recipient and only for discussion purposes. Distribution of this information to any person other than the person to whom this information was originally delivered and such person's advisors is unauthorized and any reproduction of these materials, in whole or in part, or the divulgence of any of its contents, without the prior consent of Lehman Brothers is prohibited.

◆ This information has been prepared solely for informational purposes and is not an offer to buy or sell or solicitation of an offer to buy or sell any security or instrument or to participate in any trading strategy, and is not intended to be complete. These materials may not be relied upon by you in evaluating the merits of investing in any securities or instruments described herein or as to the actual return on an investment in such securities or instruments. No representation or warranty can be given with respect to the accuracy or completeness of the information, or that any future offer of securities or financial instruments will conform to the terms hereof or be made.

◆ This information is not intended to provide and should not be relied upon for accounting, legal or tax advice or investment recommendations. Transactions of the sort described herein may contain complex characteristics and risks. Transactions incorporating derivatives may create additional risks and exposures. You must make an independent review of the economic benefits and risks of a proposed transaction in making your investment decision and should consult your own counsel, accountant, and other advisors as to the legal, tax, business, regulatory, financial, accounting and related aspects of a transaction in relation to your particular circum-stances. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. The value and the income produced by products may fluctuate, so that you may get back less than was invested. Value and income may also be adversely affected by exchange rates, interest rates or other factors. Past performance is not necessarily indicative of future results. When an investment is denominated in a foreign currency, fluctuations in exchange rates may have an adverse effect on the value, price of, or income derived from, the investment. If a product is income producing, part of the capital invested may be used to pay that income. Lehman Brothers enters into transactions on an arms-length basis and does not act as an adviser or fiduciary except where a law, rule or written agreement expressly provides otherwise.

◆ **These materials are subject to change, completion, or amendment from time to time without notice, and Lehman Brothers is under no obligation to keep you advised of such changes. Lehman Brothers disclaims any and all liability relating to this information, including without limitation, any express or implied representations or warranties for, statements contained in, and omissions from, this information.**

◆ Lehman Brothers and/or its affiliated companies may make a market or deal as principal in any securities mentioned in this document or in options, futures, or other derivatives based on any such securities. In addition, Lehman Brothers, its shareholders, directors, officers and/or employees, may from time to time have long or short positions in such securities or in options, futures, or other derivative instruments based on such securities. One or more directors, officers, and/or employees of Lehman Brothers may be a director of the issuer of any securities mentioned in this document. Lehman Brothers may have managed or co-managed a public offering of securities for any issuer mentioned in this document within the last three years, or may, from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this document. Unless otherwise permitted by law, you must contact a Lehman Brothers entity in your home jurisdiction if you want to use our services in effecting a transaction in any security mentioned in this document. This document and its contents are proprietary to Lehman Brothers. Any reference to Lehman Brothers will include Lehman Brothers Inc. and any of its affiliates. © 2004 Lehman Brothers. All rights reserved.

LBEX-LL 1175502

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# III.  ACCOUNT SUITABILITY

**LBEX-LL 1175503**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# ACCOUNT SUITABILITY

## Suitability, Trade Maintenance, Exposure

◆ Broker and Account Suitability

– Do you and your client understand the risks associated with leverage? A person can lose not only the initial money (haircut amount) required to purchase an asset but is responsible up to the total amount of the asset being financed.

– The client must understand that leverage multiplies the amount of risk and therefore increases possible loss.

– Account must understand that Lehman must protect itself and therefore if margin calls are not met timely Lehman will have to liquidate all the financed positions. If a deficit exists in the client's account after liquidation, the client will be expected to supply the additional funds immediately (margin will be covered in the trade flow section in more detail).

### Repo vs. Margin Account

There are two different financing products. Preferred Margin Lending is exclusively for fixed income securities. This account operates as the normal margin accounts but requires a 500,000 minimum balance for the Preferred Rate. The rate floats off the daily average 1 month Libor + a spread and is billed on a monthly cycle. You can commingle UST, Agencies, Municipals and Corporate Bonds and the account will have one rate but different haircuts. It is simple and usually caters to smaller pieces and is done in the TMS system. Accounts must be opened in a specific range in each branch to qualify.

Repo is better suited for the sophisticated client with a minimum net worth of 10mm. The minimum size pieces are 1-5mm depending on the security. Each customer must be approved by Credit and a legal document signed. Rates are based on specific securities. Repo is very manual intensive and a ticket has to be booked for each money or bond movement. Trades are booked in MTS or ITS depending on the type of security. It is best to discuss with the product marketers to determine which product is better suited for your customer.

| Repo | Margin Account |
|---|---|
| ◆ MRA – Long Document. | ◆ Client Agreement – Simple. |
| ◆ Manually intensive; a ticket must be passed for money movements and loan adjustments. | ◆ Not manually intensive; margin account rate is set, the a/c is valued, and the broker requests funds via an online function. |
| ◆ No formal account statements Customer receives confirmation when trade begins and ends. | ◆ Formal client account statements are available listing all activity and month-end balances. |
| ◆ Rates are determined by product-specific repo market. | ◆ Margin rates determined on an overall account and not on a specific security basis. |
| ◆ Minimum transactions usually 5mm in notional. | ◆ Minimum amount of $500,000 debit balance required. |

– 20 –

**LBEX-LL 1175504**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

**TRADE LEDGERS**

# IV.   TRADE LEDGERS

**LBEX-LL 1175505**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-LL 1175506

# TRADE LEDGERS

| ISSUE | RR (BUY) | RE (SELL) | BORR. VS. CASH | DOLLAR ROLL | TRADER |
|---|---|---|---|---|---|
| **FIRM FUNDING** | | | | | |
| | | | | | |
| Treas (TRI) | | 20R | | | Larry Servidio/Andrew Helming |
| Treas (TRI) | | 226 | | | Larry Servidio/Andrew Helming |
| Mortgages (TRI/Del) | | B06 | | | George Van Schaick/Mike Webb/Anish Vasisth |
| PL CMO (TRI/Del) | | B06 | | | George Van Schaick/Mike Webb/Anish Vasisth |
| PLCMO (HIC) | | 2PL | | | George Van Schaick/Mike Webb/Anish Vasisth |
| Agency/Strips | | 20S | | | Kevin Croutier |
| Corp | | 21H | | | Phil Mooney/Tom Conti/Megan Orsen/Geoff Allen |
| Whole Loan HIC - 1RWL | | 27X | | | Andrew Helming/Rob Rieb |
| Commercial Paper | | 21T | | | Andrew Helming/Larry Servidio |
| | | | | | |
| **MATCHBOOK** | | | | | |
| | | | | | |
| UST GC Open or O/N | 123 | 223 | 468 | | Larry Servidio/Andrew Helming |
| On the Run Spec. Open or O/N | 174 | 274 | 4PO | 1DL | Steve Licini |
| On the Run Spec. Term | 174 | 274 | 4PO | 1DL | Dave Lohuis |
| Bills, Coupons < 1yr | 45C | 25C | 490 | 1DE | Jon Wiegand |
| Off the Run Spec. O/N or Term | 40D | 20D | 4ZI | 1DY | Mike Ellsworth/Steve Brown |
| GC Term and TIPS | D6L | B6L | PGL | | Mike Ellsworth/Steve Brown |
| Pass Thrus, Agy CMO, PL CMO, ABS | 422 | 222 | DXZ | | George Van Schaick/Mike Webb/Anish Vasisth |
| Any MBS/ABS trade with Floating rate | 45Q | 25Q | | | George Van Schaick/Mike Webb/Anish Vasisth |
| Agency | 4SK | 2SK | 4V0 | 1CD | Kevin Croutier |
| Agency Specials | 4WK | 2WK | 4U0 | 1CD | Kevin Croutier |
| Strips | 442 | 242 | | | Kevin Croutier |
| Corps | 47A | 27A | 4KK      2KK | | Phil Mooney/Tom Conti/Megan Orsen/Geoff Allen |
| CDO | 4EI | 2EI | | | Phil Mooney/Tom Conti/Megan Orsen/Geoff Allen |
| House Shorts | 12S | | 477 | | |
| Fail | | | 4WZ | | |

# V.    SALES CREDIT SCHEDULE

LBEX-LL 1175507

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-LL 1175508

## GLOBAL FINANCING

| | Overnight/ Open | | Less than 2 weeks | | 2 weeks - 30 days | | 31 - 60 days | | >60 days | |
|---|---|---|---|---|---|---|---|---|---|---|
| | RR | RE | RR | RE | RR | RE | RR | RE | RR | RE |
| **ALL GOVERNMENTS** | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR | $ 100/MM/YR |
| **GOVERNMENT SPECIALS** | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR |
| **AGENCY SPECIALS** | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR | $ 500/MM/YR | $ 200/MM/YR |
| **AGENCY GC** | $ 300/MM/YR | $ 100/MM/YR | $ 300/MM/YR | $ 100/MM/YR | $ 300/MM/YR | $ 100/MM/YR | $ 300/MM/YR | $ 100/MM/YR | $ 300/MM/YR | $ 100/MM/YR |
| **CORPS & ABS** | | | | | | | | | | |
| A or better | $ 500/MM/YR | $ 200/MM/YR | $ 700/MM/YR | $ 300/MM/YR | $ 800/MM/YR | $ 400/MM/YR | $ 1,200/MM/YR | $ 700/MM/YR | TBA | TBA |
| A- to BBB- | $ 800/MM/YR | $ 400/MM/YR | $ 900/MM/YR | $ 500/MM/YR | $ 1,200/MM/YR | $ 600/MM/YR | $ 1,900/MM/YR | $ 1,000/MM/YR | TBA | TBA |
| < Inv Grade | $ 1,250/MM/YR | $ 1,250/MM/YR | $ 1,500/MM/YR | $ 1,500/MM/YR | $ 1,500/MM/YR | $ 1,500/MM/YR | $ 2,500/MM/YR | $ 2,500/MM/YR | $ 3,000/MM/YR | $ 3,000/MM/YR |

| | RR & RE | RR & RE | RR & RE | RR & RE | RR & RE |
|---|---|---|---|---|---|
| **MORTGAGES** | | | | | |
| Agency Pass Throughs | $ 200/MM/YR | $ 200/MM/YR | $ 350/MM/YR | $ 450/MM/YR | $ 600/MM/YR |
| Agency CMO* | $ 400/MM/YR | $ 400/MM/YR | $ 500/MM/YR | $ 750/MM/YR | $ 1,000/MM/YR |
| Private Label CMOs* | | | | | |
| AAA/AA | $ 700/MM/YR | $ 700/MM/YR | $ 750/MM/YR | $ 1,000/MM/YR | $ 1,200/MM/YR |
| A/BBB | $ 1,000/MM/YR | $ 1,000/MM/YR | $ 1,200/MM/YR | $ 1,500/MM/YR | $ 2,000/MM/YR |
| <BBB- | $ 1,250/MM/YR | $ 1,250/MM/YR | $ 1,500/MM/YR | $ 2,500/MM/YR | $ 3,000/MM/YR |
| *New CMO Buyers - 2x sales credits (Min. of 3 months) | | | | | |
| | | | | | |
| **ESOTERICS** | | | | | |
| Whole Loans | $750/MM/YR | $750/MM/YR | $750/MM/YR | $1,500/MM/YR | $2,500/MM/YR |
| Bank Loans | $750/MM/YR | $750/MM/YR | $750/MM/YR | $1,500/MM/YR | $2,500/MM/YR |
| | | | | | |
| **BRADY'S** | $ 500/MM/YR | $ 500/MM/YR | TBA | TBA | TBA |
| | | | | | |
| **MONEY MARKETS** | | | | | |
| A1/P1 | $ 200/MM/YR | $ 200/MM/YR | TBA | TBA | TBA |
| A2/P2 | $ 500/MM/YR | $ 500/MM/YR | TBA | TBA | TBA |
| A3/P3 and Unrated | $ 750/MM/YR | $ 750/MM/YR | TBA | TBA | TBA |
| | | | | | |
| **PROGRAMS** | $ 400/MM/YR | $ 600/MM/YR | TBA | TBA | TBA |

## SALES CREDIT SCHEDULE

| T-Mod | Product |
|-------|---------|
| MKP | AAA/AA Private Label CMO's |
| MCA | ABBB Private Label CMO's |
| MCB | <BBB- Private Label CMO's |
| FC2 | BBB- to A- Corporates |
| FC3 | -Inv Grade Corporates |
| MK2 | A2/P2 Money Markets |
| MK3 | A3/P3 and Unrated Money Markets |
| SR | Specials |
| AGS | Agency Special |

– 25 –

**LBEX-LL 1175509**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# VI.    INFINITY QUICK REFERENCE GUIDE

**LBEX-LL 1175510**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

## Front-End Repo Trade Booking System

### EMAIL:  INFINITY SUPPORT
### PHONE:  (201) 499-9250

## Infinity Features

**Trade Entry**

- ◆ Trade Modification
- ◆ Trade Cancellation

**Position Browse (Traders Only)**

- ◆ Adjustments
- ◆ Substitution
- ◆ Closeouts
- ◆ Hold(All)/Release (All)
- ◆ Price/Modify

**Trade Browse**

- ◆ Pricing
- ◆ Confirmation (Fax, Price, Subs etc.)
- ◆ Filtering
- ◆ Substitution
- ◆ Rollover
- ◆ Closeouts
- ◆ Breakup

**Profiles**

*Customer Account Maintenance*

- ◆ Auto Fax
- ◆ Allocation Parameters

*Broker Maintenance*

- ◆ Ledger Maintenance
- ◆ Sales Team Maintenance

**Product Maintenance**

- ◆ New Product Maintenance
- ◆ Bulk Mark
- ◆ Security Labeling

**Collateral Manager**

- ◆ Position Closeout (Traders Only)
- ◆ Collateral Closeout (Salespeople)
- ◆ Release
- ◆ Undo
- ◆ Approve
- ◆ Instruction Override
- ◆ Exposure Summary
- ◆ All Trades Screen

**LBEX-LL 1175511**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

**The following pages contain some important tips/rules for using *Infinity*:**

**General**

◆ 'Broadcasting' must appear at the top of the Infinity application at all times. If RUN BROWSE appears in red at any time click on it. If 'Broadcasting' does not re-appear immediately call the Infinity hot line at 212-526-2988.

◆ When first accessing *Infinity* as a multi-user (those that enter/process, both Government, Mortgage and Canadian trades) Government appears with an arrow to the right of Broadcasting. If you click on the arrow you may choose Mortgage or Canadian.

Changing from Government to Mortgage or Canadian changes the Trade Browse view allowing a multi-user to see all their Government, Mortgage and Canadian trades on different screens.

◆ Columns on *Trade Browse, Position Browse* or *Collateral Manager* may be sorted by left clicking at the top of the column. Left clicking again reverses the same column. Right clicking on another column makes that the second sort. Left clicking on another column changes that sort to the first etc.

**Trade Entry**

◆ Fields with an arrow can be entered by typing a value (alpha or numeric). *Infinity* will look for the closest match to each character entered. When the desired value has been found press Enter or use the arrow again where the list displayed will begin at the match found.

◆ Entering a Group name results in the pulldown selection of Customers displayed to include only those customers in that Group. Group is assigned at the Customer Profile level. Additionally, entering a Group results in all fields on the contract/collateral maintenance screen other than Amount and Customer to remain on the Trade Entry screen making entry faster. *NOTE:* This includes all override Sales Information.

◆ Selecting the three dots beside the Rate brings you to the Rate Reset Detail for Reset Contracts or Call Schedule information screen for SRRs.

◆ Clicking on the up arrow beside 'Remaining' at the bottom of the Collateral Maintenance screen will automatically update the Contract Amount.

◆ The up and down arrow on the keyboard moves the Start Date/End Date up and down.

◆ 'O' in the End Date field sets it to Open.

◆ Contract margin applies to Repo only implying that margin on the contract can apply to all collateral. Reverse margin however, is applicable on the collateral level only and defaults from the tier set up for the customer shown in the profile (PF) on *Infinity*.

◆ 'Enter' at any field on either the contract or collateral maintenance screen will bring the cursor to Approve if the shell has not been allocated or Released. If it has been allocated. 'Enter' again will either Approve or Release the trade.

**LBEX-LL 1175512**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

◆ Cusip, Pool or Security Description may be entered in the Description field on the collateral maintenance portion of the Trade Entry screen.

◆ All In Price defaults when entering collateral.

◆ Updates to a Products Price and/or Bulk Mark are not Broadcasted (when done via Product Maintenance) to Trade Entry.

◆ The Page Up/Down keys will take you from one tab to the next i.e. Collateral Maintenance to Delivery Instructions to Calculations etc. and vice versa.

◆ MBSFIN for Mortgages is the dummy security that may be used on forward starting contracts only. When a forward Mortgage trade is entered MBSFIN is automatically dropped into the collateral maintenance screen upon selecting Approve or Release.

This is not the case for Governments rather one of the many dummy government securities (speak with Trade Support for the specific cusips) must be manually typed into the Description on the Collateral Maintenance screen.

*NOTE:* On Settlement Date a cancellation of any MBS or the government dummy securities is sent to MTS and the shell is reinstated on *Infinity* to be collateralized that day. If the MBFIN or Govt dummy trades have already been cancelled on MTS Infinity will get naked for the cancellations sent to MTS.

## Profiles

◆ Customer

– The Auto Fax flag on the Customer Profile drives the faxing facility. If a MBS Repo or a GOVT Repo or Reverse Repo is done through a Broker then the trade is faxed to the Broker not the Customer. The fax number must be set up for the Broker account in the Profile function (PF).

◆ Broker

◆ Ledger

◆ Sales Team

## Position Browse *(Traders Only)*

◆ Substitution

– Right click on a Position.

– Choose Substitution.

– Left click on collateral to be substituted or right click and choose Substitution.

◆ Undo Substitution.

– Right click on a Position.

– 29 –

**LBEX-LL 1175513**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

- Choose Activities.

- Right click on the substitution to be undone.

- Select Substitution/Modify Substitution.

- Right click on original piece of collateral and select Undo Substitution.

◆ Adjust to Offset (for last adjustment only).

- To offset an adjustment made incorrectly.

  ◆ Right click on Position.

  ◆ Select Activities.

  ◆ Right click on the Adjustment.

  ◆ Select Adjust to Offset.

  ◆ An offset to the original adjustment will appear. Select Save Changes.

**Trade Browse**

◆ Right click displays functions available for a Contract or piece of Collateral.

- Modify

- Rollover

- Rollover Reprice (allows for entry of one price for all collateral in the new contract).

- Release (for approved contracts only).

- Confirmation

- Print

- Fax

- Substitution/Modify Substitution.

- Closeout/Modify Closeout (function may be performed from Trade Browse or Collateral Manager – See section VI.)

◆ To perform functions on more than one contract/collateral such as releasing, confirming, printing and faxing:

- Select first contract by clicking on it from Trade Browse.

- Select CNTRL and click on every other contract/collateral for which the same function is desired.

**LBEX-LL 1175514**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## INFINITY QUICK REFERENCE GUIDE

◆ Trade Browse displays all of the today's trades for the users default ledgers/salesteams. These ledgers/salesteams will be highlighted in blue on the Trade Browse Filter.

   – In the Trade Browse filter:

      ◆ To see trades for other ledgers (applies to Traders/Support/Systems):

         – Enter the ledger in the ADD box on the Trade Browse Filter screen and tab.

      ◆ To deselect a ledger so as not to see trades in that ledger:

         – Select CNTRL and click on the ledger at the same time.

      ◆ To see trades for other Salesteams (applies to Sales and all other departments):

         – Systems must update these in the database after approval from the Trading force.

      ◆ To view Prior Days trades enter one or more fields in the trade browse filter and select Prior Day's from the Activity selection at the bottom of the screen.

         *NOTE: Do not* select Prior Day's trades when in *Trade Browse Filter* without selecting at least one or more criteria. The system will take a long time because of the size of the search.

      ◆ To see Substitutions/Closeouts done today select Substitutions/Closeouts and Today's Trades from the Trade Browse Filter.

◆ Substitution/Closeout

   – Go to Trade Browse Filter.

   – Enter Settlement Id or Contract Id (format of yyyy/dd/mm-contractId); click on Prior Day (bottom of the screen).

   – Select Apply.

   – Right click on the collateral to be substituted.

   – Select Sub/Modify Sub.

   – Left click on Position Browse or enter Cusip.

   – Select Approve or Release.

◆ Undo Substitution.

   – From Trade Browse right click on the Fully Subbed piece.

   – Select Sub/Modify Sub.

   – Right click ice on top piece which is the Fully Subbed piece.

– 31 –

**LBEX-LL 1175515**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

- Select Undo Sub.

- Select Approve or Release.

**Collateral Manager**

◆ Closeouts

- *Infinity* performs automatic closeouts each day by reviewing certain firm ledgers for collateral that if closed out, would make the firm flat. Traders have the ability to undo closeouts per position if they do not want the collateral to be returned. This action will broadcast to the salespersons closeout screen and upon selecting refresh, all undone closeouts will no longer appear on the screen. Before the refresh however, an undone closeout will be highlighted grey.

- Upon the Traders say so, the Salespeople may release all approved closeouts. *NOTE:* Released closeouts will be highlighted blue.

- To access Collateral Manager Closeout screen:

  ◆ Select CM from the top of the *Infinity* application.

  ◆ From the collateral closeout screen right click on a collateral to:

    – Release

    – Undo

    – Approve (undone closeouts where the screen has not been refreshed may be approved).

    – Override Instructions (upon release these will be sent to MTS).

- A popup per sales team(s) will appear starting at 8:45 AM when there are approved closeouts for that team (s). When all closeouts have either been undone or released the popup will no longer appear.

- A 'Customer Contact' box pops up when releasing a closeout where the user is prompted to enter a contact name. If this is not required uncheck the flag next to Customer Contact at the top left-hand part of the Collateral Closeout screen. Interest may be overridden to another interest amount or to zero for a collateral. All override interest is sent to MTS.

◆ Exposure Summary

- *Infinity* provides a summary (by Sales Team) of Exposure per account. The following columns appear on the summary screen.

- *SOD Exposure* (Start of Day Exposure) – Total Exposure for all active trades as of the completion of the Start of Day. This number includes the exposure on trades that are auto closed out. This number should never change.

- *Current Exposure* (originally Exposure after Returns) – should update during the day with each type of activity that may affect the exposure reflected in the Start of Day for that customer. Activity includes substitution, cancellation and modification. New trades due to sub or trade

– 32 –

**LBEX-LL 1175516**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

entry should not calculate exposure and therefore will not cause a change to this column. Exposure changes due to reprice activity should not be reflected in this column.

- ◆ If a trade is substituted the Current Exposure should be increased/decreased (based on whether buy or sell trade).

- ◆ If a trade is cancelled where the trade had exposure included in the Start of Day Exposure the Current Exposure column should be increased/decreased (based on whether buy or sell trade).

- ◆ Modification of a field that affects the calculation of exposure where there was exposure in the Start of Day number should increase/decrease the Current Exposure column.

    - *End of Day Exposure* – Current Exposure plus or minus Reprice Payable/Receivable.

- ◆ Reprice Detail

    - Double clicking on a summary line will drill down to the trades that make up the summary number. To reprice a trade simply enter the new price and release. If interest only is to be paid simply type P in the Int field. Override interest may also be entered in conjunction with a reprice or to be paid on the contract.

## All Trades Screen

- ◆ The All Trades Screen provides all trades on a per customer basis so that a manual closeout can be initiated.

- ◆ By clicking on the trade and then selecting either Approve or Release Closeout, a trade can be manually closed.

- ◆ To override interest or instructions or to undo an Approved closeout the user must double click on the line in the All Trades screen.

- ◆ To Undo an Approved Closeout the user must double click on the line and then right click on the closed out trade. Select Undo Closeout and then Approve.

    *NOTE:* Release closeouts may not be undone. Additionally, trades that are manually closed out will appear on the Closeout screen mentioned above after the closeout is approved or released.

## Exposure Summary

- ◆ The Exposure Summary screen provides a summary (by Sales Team) of Exposure per account. The following columns appear on the summary screen.

- ◆ *SOD Exposure* (Start of Day Exposure) – Total Exposure for all active trades as of the completion of the Start of Day. This number includes the exposure on trades that are auto closed out. This number should never change.

- ◆ *Pre-Reprice Exposure* (originally Exposure after Returns) – Should update during the day with each type of activity that may affect the exposure reflected in the Start of Day for that customer. Activity includes substitution, cancellation and modification. New trades due to sub or trade entry should not

– 33 –

**LBEX-LL 1175517**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# INFINITY QUICK REFERENCE GUIDE

calculate exposure and therefore will not cause a change to this column. Exposure changes due to reprice activity should not be reflected in this column.

- If a trade is substituted the Current Exposure should be increased/decreased (based on whether buy or sell trade).

- If a trade is cancelled where the trade had exposure included in the Start of Day Exposure the Current Exposure column should be increased/decreased (based on whether buy or sell trade).

- Modification of a field that affects the calculation of exposure where there was exposure in the Start of Day number should increase/decrease the Current Exposure column.

◆ *End of Day Exposure* – Current Exposure plus or minus Reprice Payable/Receivable.

◆ Reprice Detail.

- Double clicking on a summary line will drill down to the trades that make up the summary number. To reprice a trade enter the new price and release. If interest only is to be paid type P in the Int field. Override interest may also be entered in conjunction with a reprice or to be paid on the contract.

**Rate Board**

◆ The Rate Board allows for daily rate updates to variable rate trades. The information is displayed by Customer and groups all trades by Cusip and Ledger. A rate applied to a line in Rate Board is applied to all trades that make up this line. These trades may be seen by drilling down on the line. If the prior day rate for one trade making up a line is different than another the Old Rate field will display.

◆ Multiple cusips can be grouped together for ease of many rate updates by creating a Category in the Customer Profile where trades from specific ledgers or collateral types can be included. Once a Category is created all trades falling into this category will be grouped in one line in the rate board. The Cusip Id, Label, Type and Coupon will show * since the line may be comprised of multiple issues. The Category generated for this customer will appear. Specific trades may be moved out of a category where their rate for a particular day (s) is different. This may be done by right clicking on the trade in Rate Board and selecting Move Category. The Category name may be left blank to move a trade out of a Category.

– 34 –

**LBEX-LL 1175518**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# VII.    MTS VERBS / COMMANDS

LBEX-LL 1175519

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# MTS VERBS / COMMANDS

## Verbs and Commands to Mainframe System

| | |
|---|---|
| **LPCICS** | Initial entry into MTS system at application prompt. |
| **LONT** | Logon to MTS: need userid and password. |
| **LBC** | Browse repo contracts: need either a ledger or cust #. |
| **LBT** | Browse trade: need wither cusip, cust #, or security id (this is for both outright trades as well as repo's). |
| **LVT** | To view details of repo trade: need trade id or cntr id. |
| **LVTR** | Also to view details of repo trade (use '/' to view previous contract. |
| **LVTI** | To view delivery instructions on a trade: need tranni. |
| **LVPO** | To view net receivable / payable for trade (s) that were paired off by clearance or cash mgmt: need one of the trade id's (either buy or sell side). |
| **LBFN** | To browse to see if a cash wire was sent in or if a payable or receivable was created: need amt range. |
| **LVTD** | To view details of a trade: need tranni. |
| **LVCT** | To view clearance status of a trade: need tranni. If cage clears a trade for different net money, amount will show here. |
| **LVTH** | To view history of a specific trade: need tranni. |
| **LVSA** | To see salespersons name: need sales id code. |
| **LVCM** | To see all details of account setup: need cust #. |
| **LBCM** | To get an account number: need exact name of a/c. |
| **LVCC** | Once in a contract/trade, to 'summarize' each on and offside trade details to one line per security: need trade id first (via LVT), then 'LVCC /'. |
| **LBCI** | To see all default delivery / cash wire instructions for an account: need cust #. |
| **LVRR** | To view rate history for a variable rate contract: need contract id. |
| **LVFN** | To see where a pairoff payable / receivable is set to be sent to / come from: need pairoff number (starts w/ 'p'). |
| **LVSM** | To see if a security is already set up on MTS: need cusip. |
| **LVTO** | To see name of an MTS user: need operator id (5 digits). |
| **LVFH** | To see historical 'funds transfer's' on a contract level (i.e. all repricing's, pairoff's, and interest cleanups): need contract or trade id. |
| **LBSA** | To find a salesperson's id: need last or first name. |

**LBEX-LL 1175520**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# VIII.   CREDIT RISK MANAGEMENT

**LBEX-LL 1175521**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# CREDIT RISK MANAGEMENT

## Financing Haircuts, Credit Analyst Information, Credit Limits

### http://my.lehman.com/CRM/

Lehman Brothers has a website which provides haircut grids, credit analyst coverage, and credit limit information for financing trades. This site is accessible to any Lehman employee with an active Lehman Live UserID.

The information contained on these reports is of a highly sensitive nature and should be treated confidentially.

**LBEX-LL 1175522**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## CREDIT RISK MANAGEMENT



Use the Menu on the left to find your Credit Limits and Term
approved, haircut grids, and credit analyst coverage.

**LBEX-LL 1175523**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# CREDIT RISK MANAGEMENT



**F.I. Financing : All Activity**

Report Type: [All Activity ▼] [image] [-Spreadsheets- ▼]        All Activity (02 Feb 2005)

**Search By**

◉ Client Name   ○ Credit Analyst   ○ Legal Entity   ○ Product Group

[_____]   [Search]

Enter Partial or full name or Search expression ( Client name only)        CLU Help Guide

IF A NOTIONAL LIMIT IS IN **bold italic**, THEN A TEMPORARY LIMIT IS IN EFFECT.
FOR THESE CASES, PLEASE CALL FOR APPROVAL OF ANY ADDITIONAL
TRADES

Page 1 of 41                Next >>

| Client Name | Legal Entity | Product Group | Product SubGrp | Limit Excess | Available | Maturity Limit |
|---|---|---|---|---|---|---|
| 17TH STREET FUND | LBI | RE/RR | RREPO | | 24,599,000 | M03 |
| 314 COMMONWEALTH INC | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ABBEY NATIONAL SECURITIES INC | LBI | RE/RR | REPO | | 982,789,938 | M12 |
| ABITBOUL, JORGE MARCOS | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| | LBIE | N/A | DOLROL | | 457,731,925 | M01 |
| | LBI | RE/RR | REPO | | 985,000,000 | M12 |
| ABN AMRO BANK NV | LBIE | RE/RR | EMGRR | | 475,646,171 | M12 |
| | LBIE | RE/RR | REPO | | 4,407,496,827 | M12 |
| | LBIE | RE/RR | RREPO | | 1,317,845,689 | M12 |
| ABSA BANK LIMITED | LBIE | N/A | DOLROL | | 100,000,000 | M01 |
| ACE TEMPEST REINSURANCE LTD | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ACM MANAGED DOLLAR INCOME FUND | LBIE | RE/RR | EMGRR | | 18,511,380 | W01 |
| ADI CONVEX | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADI CREDIT ARBITRAGES | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADI HIGH YIELD FUND | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADOUM CORP SA | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ADVANTAGE NATIONAL BANK | LBI | RE/RR | RREPO | NO LINE | 0 | 0 |
| AFRICAN DEVELOPMENT BANK | LBI | RE/RR | REPO | | 91,500,000 | M03 |
| AGENCE FRANCE TRESOR | LBIE | RE/RR | REPO | | 2,000,000,000 | M12 |
| AHEAD HOLDINGS LLC | LBI | RE/RR | RREPO | NO LINE | 0 | 0 |
| AIG - FUND A | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| AIG INTERNATIONAL INC | LBIE | RE/RR | EMGRE | | 60,000,000 | M12 |

Done

Click on Client Limit Utilization for sub menu then click on F.I.
Financing to start search on client for their size limits,
availability and maturity limits.

**LBEX-LL 1175524**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## CREDIT RISK MANAGEMENT



Click on haircut grids then click on client category.  Haircut grid
will appear on excel spreadsheet.  These are INTERNAL ONLY
and not to be sent to any client under any circumstances.

**LBEX-LL 1175525**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## CREDIT RISK MANAGEMENT

| Fixed Income Financing | | | Fin. Inst., B/D, Insurance, Agencies/Govt. Entities/Inv. Advisors, Corporates | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Reverse Repo Haircuts | | | | | | | | | | |
| UNDERLYING ASSETS HAIRCUT MATRIX | | | Risk Factor | Global Financial Intermediary | | | Tier 1 | | | Tier 2 | | | Tier 3 | | | Tier 4 | | |
| | | | | Open | 1 Month | Term | Open | 1 Month | Term | Open | 1 Month | Term | Open | 1 Month | Term | Open | 1 Month | Term |
| | Corporate Bonds | A Rated - 5Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | A Rated - 10Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | A Rated - 30Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB+ Rated - 5Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB+ Rated - 10Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB+ Rated - 30Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB Rated - 5Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB Rated - 10Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB Rated - 30Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB- Rated - 5Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB- Rated -10Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BBB- Rated - 30Y | 6.40% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% |
| | | BB Rated - 5Y | 8.26% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 30.00% | 30.00% | 30.00% |
| | | BB Rated - 10Y | 8.26% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 30.00% | 30.00% | 30.00% |
| | | BB Rated - 30Y | 8.26% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 30.00% | 30.00% | 30.00% |
| | | B Rated | 8.26% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 30.00% | 30.00% | 30.00% |
| | | CCC Rated | 12.76% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 50.00% | 50.00% | 50.00% | N/A | N/A | N/A | N/A | N/A | N/A |
| | | CC Rated | 12.76% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 50.00% | 50.00% | 50.00% | N/A | N/A | N/A | N/A | N/A | N/A |
| | | C Rated | 12.76% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 40.00% | 50.00% | 50.00% | 50.00% | N/A | N/A | N/A | N/A | N/A | N/A |
| | | Defaulted & Non-Rated | 24.50% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | N/A | N/A | N/A | N/A | N/A | N/A |
| GCF Securities | | GCF Securities | N/A | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Unknown Product Type | | Other | N/A | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Lehman Brothers International (Europe) (LBIE) | | | | | | | | | | | | | | | | | | |
| | Government Bonds | 0-2 years, underlying asset maturity | 0.43% | 0.00% | 0.00% | 0.00% | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.75% | 0.75% | 0.75% |
| | | 2-7 years, underlying asset maturity | 0.93% | 0.00% | 0.00% | 0.00% | 0.50% | 0.50% | 0.50% | 0.75% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% | 1.25% | 1.25% | 1.25% |
| | | 7-10 years, underlying asset maturity | 2.23% | 0.00% | 0.00% | 0.00% | 0.75% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% | 1.50% | 1.50% | 1.50% | 2.00% | 2.00% | 2.00% |
| | | > 10 years, underlying asset maturity | 3.44% | 0.00% | 0.00% | 0.00% | 1.00% | 1.00% | 1.00% | 1.50% | 1.50% | 1.50% | 2.00% | 2.00% | 2.00% | 2.75% | 2.75% | 2.75% |
| | Government Agencies' | 0-2 years, underlying asset maturity | 0.88% | 0.00% | 0.00% | 0.00% | 0.50% | 0.50% | 0.50% | 0.75% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% | 1.75% | 1.75% | 1.75% |
| | | 2-7 years, underlying asset maturity | 1.27% | 0.00% | 0.00% | 0.00% | 0.75% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% | 1.50% | 1.50% | 1.50% | 2.25% | 2.25% | 2.25% |

Haircuts are based on a combination of the creditworthiness of the client and the characteristics of the bond. The tier of the client is determined by the Credit Analyst at the time client is approved to do repo.

LBEX-LL 1175526

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# CREDIT RISK MANAGEMENT

LEHMAN BROTHERS

Credit Risk Management

| Steve Simonte - Group Manager | | | | |
|---|---|---|---|---|
| **Industry** | **Primary Analyst** | **Telephone** | **Backup** | **Telephone** |
| Financial Institutions & PCS | Hector Krautz | 212-526-9760 | Scott Guinn<br>Robert Battoglia | 212-526-4226<br>212-526-2939 |
| Insurance and Municipals | Julia Nand | 212-526-8271 | Ana Arsov<br>Amar Patel | 212-526-4146<br>212-526-3334 |
| Hedge Funds | Jim Glen<br>Frank Baldi<br>Roger Tennent | 212-526-8864<br>212-526-3702<br>212-526-4625 | Robert Battoglia<br>Emilia Storch<br>Jonny Jacob | 212-526-2939<br>212-526-4039<br>212-526-4836 |
| Corporates | Daniel Goldhagen | 212-526-5046 | Kevin Chichester<br>Michael Pistilli | 212-526-7467<br>212-526-1203 |
| Investment Advisors & Mutual Funds | Vaughn Campos | 212-526-4133 | Chandra Belack<br>Gary Ross | 212-526-0702<br>212-526-3439 |
| Special Purpose Vehicles & CDOs | Martin Roberts | 212-526-7734 | Julia Nand | 212-526-8271 |
| Sovereigns | Mark Patrick | 212-526-5083 | Georgi Tsekov | 212-526-5561 |
| Latin America | David Sackett | 305-789-8734 | Mark Patrick | 212-526-5083 |

| Robert Lutey - Group Manager | | |
|---|---|---|
| **MPE** | **Analysts** | **Telephone** |
| Quantitative Analyst | Robert Lutey | 212-526-4136 |
| Quantitative Analyst | Eric Spray | 212-526-3309 |
| Quantitative Analyst | Shahram Alavian | 212-526-7741 |

| Eric Spray - Group Manager - Risk Reporting | | |
|---|---|---|
| **CREDIT RISK REPORTING** | **Name** | **Telephone** |
| Forex Settlement & Reporting | Richard Damm | 212-526-9984 |
| Credit Reporting | Marni Hyman | 212-526-2671 |
| Credit Reporting | Debra Stone | 212-526-4137 |
| Credit Reporting | Damian Ayers | 212-526-5935 |
| Credit Reporting | Robert Brega | 212-526-9169 |
| Credit Reporting | Amanda DiCarlo | 212-526-0247 |
| Credit Reporting | Carlos Mercado | 212-526-0250 |
| Credit Reporting | Michael Sulkowski | 212-526-3229 |
| Credit Reporting | Eugene Upshaw | 212-526-0483 |
| Credit Reporting | Sherry O'Connor | 212-526-5601 |
| Credit Reporting | Pisey Ada Khun | 212-526-2794 |

To find the appropriate Credit Analyst for repo approval, tier assignments and haircut inquiries refer to sub menu under Documents and click on Credit Analyst Coverage.

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## CREDIT RISK MANAGEMENT

To find haircut on EMG bonds go to sub menu under
Client Limit Utilization and click on F.I. Financing.
The following appears:



| Client Name | Legal Entity | Product Group | Product SubGrp | Limit Excess | Available | Maturity Limit |
|---|---|---|---|---|---|---|
| 17TH STREET FUND | LBI | RE/RR | RREPO | | 24,598,000 | M03 |
| 314 COMMONWEALTH INC | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ABBEY NATIONAL SECURITIES INC | LBI | RE/RR | REPO | | 982,789,938 | M12 |
| ABITBOUL, JORGE MARCOS | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ABN AMRO BANK NV | LBIE | N/A | DOLROL | | 457,731,925 | M01 |
| | LBI | RE/RR | REPO | | 985,000,000 | M12 |
| | LBIE | RE/RR | EMGRR | | 475,646,171 | M12 |
| | LBIE | RE/RR | REPO | | 4,407,496,827 | M12 |
| | LBIE | RE/RR | RREPO | | 1,317,845,689 | M12 |
| ABSA BANK LIMITED | LBIE | N/A | DOLROL | | 100,000,000 | M01 |
| ACE TEMPEST REINSURANCE LTD | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ACM MANAGED DOLLAR INCOME FUND | LBIE | RE/RR | EMGRR | | 18,511,380 | W01 |
| ADI CONVEX | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADI CREDIT ARBITRAGES | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADI HIGH YIELD FUND | LBIE | RE/RR | REPO | NO LINE | 0 | 0 |
| ADOUM CORP SA | LBI | RE/RR | REPO | NO LINE | 0 | 0 |
| ADVANTAGE NATIONAL BANK | LBI | RE/RR | RREPO | NO LINE | 0 | 0 |
| AFRICAN DEVELOPMENT BANK | LBI | RE/RR | REPO | | 91,500,000 | M03 |
| AGENCE FRANCE TRESOR | LBIE | RE/RR | REPO | | 2,000,000,000 | M12 |
| AHEAD HOLDINGS LLC | LBI | RE/RR | RREPO | NO LINE | 0 | 0 |

– 44 –

**LBEX-LL 1175528**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## CREDIT RISK MANAGEMENT

Drop arrow down where it displays Spreadsheets to Haircut worksheets. Green box below appears in excel. Search for counterparty, choose Lehman entity, find type of asset to be financed, choose EMG asset and Country. Answer appears in gray box below.



| | Lehman Brothers Fixed Income Financing |
| --- | --- |
| | HAIRCUT WORKSHEET |
| Counterparty Name (choose one) | |
| Counterparty Industry | |
| Credit Analyst | |
| Lehman Entity for Trade (choose one) | |
| Type of Asset to be Financed (choose one) | |
| If EMG Asset, Choose Country | |
| STANDARD REVERSE REPO HAIRCUT: | |

– 45 –

**LBEX-LL 1175529**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# IX.    LBIE / LBI TICKETS AND SETTLEMENT INSTRUCTION FOR ITS

**LBEX-LL 1175530**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# LBIE / LBI TICKETS AND SETTLEMENT INSTRUCTION FOR ITS

## Trade and Reprice Tickets
**(available in Excel format)**

*Please call the desk for excel file which are ticket templates.*

**Please make note if the ticket is for an LBI or an LBIE account by highlighting  all trades for LBI accounts as below:**

| LBI ACCOUNT NAME | |
|---|---|
| LBI ITS ACCOUNT NUMBER | |
| LBI ITS IR NUMBER | |

**As opposed to the below for an LBIE trade:**

| LBIE ACCOUNT NAME | |
|---|---|
| LBIE ITS ACCOUNT NUMBER | |
| LBIE ITS IR NUMBER | |

**LBEX-LL 1175531**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# LBIE / LBI TICKETS AND SETTLEMENT INSTRUCTION FOR ITS

# TICKET TEMPLATES

**New Ticket**

| TODAY'S DATE | 01/20/2005 |
|---|---|
| LBI ACCOUNT NAME | Banco XYZ |
| LBI ITS ACCOUNT NUMBER | 011-005555 |
| LBI ITS IR NUMBER | 12212 |
| FINANCING TYPE (RE or RR) | RR |
| SECURITY DESCRIPTION | COL, 9.75 4/09 |
| SECURITY ISIN NUMBER | US195325AT29 |
| NOMINAL AMOUNT(+ for RR - for RE) | 5,000,000 |
| TRADE DATE | 1/3/05 |
| START DATE | 01/05/2005 |
| END DATE | 01/25/2005 |
| FINANCING RATE | 2.000% |
| HAIRCUT | 35% |
| NET LOAN ON | $ 3,330,000.00 |
| START PRICE | $ 66.60 |
| DELIVERY INSTRUCTIONS | |
| | |
| SALES CREDITS  APPLY TO TERM TRADES ONLY | |
| STANDARD SALES CREDIT | 92.5 |
| MARK UP (eg. .05 = 5bp) | 0.25 |
| MARK UP CALCULATION | $ 462.50 |
| TOTAL SALES CREDIT UPON TERMINATION | $ 555.00 |

**Close Ticket**

| TODAY'S DATE | 01/20/2005 |
|---|---|
| LBI ACCOUNT NAME | |
| LBI ITS ACCOUNT NUMBER | |
| LBI ITS IR NUMBER | |
| TRADE REFERENCE NUMBER | |
| FINANCING TYPE (RE or RR) | |
| SECURITY DESCRIPTION | |
| SECURITY ISIN NUMBER | |
| NOMINAL AMOUNT(+ for RR - for RE) | |
| START DATE | |
| CLOSE DATE | |
| FINANCING RATE | |
| HAIRCUT | |
| NET LOAN ON (+ for RR - for RE) | $ - |
| START PRICE | #DIV/0! |
| ACCRUED INTEREST | $ - |
| TOTAL PRINCIPAL AND INTEREST | $ - |
| DELIVERY INSTRUCTIONS | |
| | |
| STANDARD SALES CREDIT | $ - |
| MARK UP (eg. .05 = 5bp) | |
| MARK UP CALCULATION | $ - |
| TOTAL SALES CREDIT UPON TERMINATION | $ - |

**REPRICE TICKET**

TODAY'S DATE — 01/13/2005

**EXISTING TRADE**

| LBI ACCOUNT NAME | |
|---|---|
| LBI ITS ACCOUNT NUMBER | |
| LBI ITS IR NUMBER | |
| TRADE REFERENCE NUMBER | |
| FINANCING TYPE (RE or RR) | |
| SECURITY DESCRIPTION | |
| SECURITY ISIN NUMBER | |
| NOMINAL AMOUNT(+ for RR - for RE) | |
| START DATE | |
| REPRICE DATE | |
| FINANCING RATE | |
| HAIRCUT | |
| NET LOAN ON (+ for RR - for RE) | |
| START PRICE | #DIV/0! |
| ACCRUED INTEREST | $ - |
| TOTAL PRINCIPAL AND INTEREST | $ - |
| DELIVERY INSTRUCTIONS | P/O VS REPO RE-PRICE |
| | |
| STANDARD SALES CREDIT | $ - |
| MARK UP (eg. .05 = 5bp) | 0.125 |
| MARK UP CALCULATION | $ - |
| TOTAL SALES CREDIT UPON TERMINATION | $ - |

**RE-PRICED TRADE**

| LBI ACCOUNT NAME | 0.00 |
|---|---|
| LBI ITS ACCOUNT NUMBER | 0 |
| LBI ITS IR NUMBER | |
| FINANCING TYPE (RE or RR) | |
| SECURITY DESCRIPTION | |
| SECURITY ISIN NUMBER | 0 |
| NOMINAL AMOUNT(+ for RR - for RE) | |
| REPRICE DATE | 01/00/1900 |
| END DATE | |
| FINANCING RATE | |
| HAIRCUT | |
| NEW LOAN AMOUNT (+ for RR - for RE) | |
| NEW PRICE | #DIV/0! |
| DELIVERY INSTRUCTIONS | P/O VS REPO RE-PRICE |

| TOTAL PRINCIPAL AND INTEREST ON EXISTING TRADE | $ - |
|---|---|
| NEW LOAN AMOUNT | $ - |
| CASH PAIR OFF PROCEEDS | $ - |
| PAIR OFF $ AMOUNT | $ - |
| LEHMAN OWES CLIENT IF POSITIVE | |
| CLIENT OWES LEHMAN IF NEGATIVE | |

– 48 –



CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## LBIE / LBI TICKETS AND SETTLEMENT INSTRUCTION FOR ITS

### Delivery Instructions for EMG Collateral

| | |
|---|---|
| LBI Euroclear number: | 22780<br>used when delivering bonds to and<br>from TMS acct to ITS/LBIE |
| LBIE Euroclear number: | 92904 |
| Cash Wire Instructions: | Citibank, N.A.<br>ABA 021000089<br>A/C 40610137<br>A/C LBIE |

### Settlement Terms

| | |
|---|---|
| EMG Cash trades | T + 3 |
| EMG Repo trades | T + 2   (also known as spot)<br>T + 1   (also known as tom &<br>should be ok'd by desk)<br>T       (same day or daylight must<br>be ok'd by desk) |
| EMG reprices for margin | T + 1 |
| EMG rerates | T + 2 |

Both sides must instruct and match at least 24 hours in advance.

– 49 –

**LBEX-LL 1175533**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# X.    DOMESTIC SETTLEMENT INSTRUCTION GUIDE

**LBEX-LL 1175534**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# DOMESTIC SETTLEMENT INSTRUCTION GUIDE

## Fixed Income
## Lehman Brothers

**Settlement Instructions**
*Delivery vs. Payment*

| Product | Wirable | Physical | Payment Instructions | Settlement Contact |
|---|---|---|---|---|
| Treasuries & Federal Agencies | ABA 021000021 JPMChase / Lehman | N/A | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-206-677 Attn: Lehman | Mike Maher 201-499-8397 |
| Money Markets: CP, CD, BA & Deposit Notes | Lehman Commercial Paper Inc. DTC # 636 | Chase Manhattan Bank 4 New York Plaza Ground Floor A/C Lehman Brothers NY, NY 10004 | Chase Manhattan Bank ABA #021000021 Attn: Outsourcing Dept #538 Sub Account 323-2-92666 | Maureen Duffy(DTC) 201-499-8296 Peter Borzi (physical) 201-499-8348 |
| Medium Term Notes: Auction Rate Securities (i.e., MMPs, SAVAs) | Lehman Brothers Inc. DTC # 636 | Chase Manhattan Bank 4 New York Plaza Ground Floor A/C Lehman Brothers NY, NY 10004 | Chase Manhattan Bank ABA #021000021 Attn: Outsourcing Dept #538 Sub Account 323-2-92666 | Maureen Duffy 201-499-8296 Peter Borzi (physical) 201 499-8348 |
| Corporate Bonds | Euroclear # 90014 DTC # 074 | DTCC NY WINDOW 55 Water Street 2nd Sub Level A/C Lehman Bothers NY, NY 10004 | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-27-969 Sub A/C 731-7084312 | Bill Gallagher (DTC) 201-499-8371 Peter Borzi (physical) 201 499-8348 |
| Municipal Bonds | Lehman Brothers Inc. DTC # 074 | DTCC WINDOW 55 Water Street 2nd Sub Level A/C Lehman Bothers NY, NY 10004 | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-27-969 Sub A/C 731-7084312 | Bill Gallagher (DTC) 201-499-8371 Peter Borzi (physical) 201 499-8348 |
| Preferred Stock | Lehman Brothers Inc. DTC # 074 | DTCC NY WINDOW 55 Water Street 2nd Sub Level A/C Lehman Bothers NY, NY 10004 | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-27-969 Sub A/C 731-7084312 | Bill Gallagher (DTC) 201-499-8371 Peter Borzi (physical) 201-499-8348 |
| Mortgages: GNMA: Pass-Through and REMIC | ABA 021000021 JPMChase/LMBS | N/A | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-206-677 Attn: Lehman | Anna Garner 201-499-8393 |
| FHLMC/FNMA/CMOs: Pass-Through and REMIC | ABA 021000021 JPMChase /LMBS or DTC # 636 | N/A | Chase NYC ABA 021000021 A/C Lehman Brothers Inc A/C 066-206-677 Attn: Lehman | Anna Garner (Fed) 201-499-8393 Maureen Duffy (DTC) 201-499-8396 |
| Private Label CMOs & Asset-Backed Securities | DTC # 636 | Chase Manhattan Bank 4 New York Plaza Ground Floor NY, NY 10004 | Chase Manhattan Bank ABA #021000021 Attn: Outsourcing Dept #538 Sub Account 323-2-92666 | Maureen Duffy(DTC) 201-499-8396 Peter Borzi (physical) 201-499-8348 |

**LBEX-LL 1175535**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# XI.    CAMEO AND MARGIN EXPOSURE REPORTS

LBEX-LL 1175536

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## Resolving Margin Calls

◆ Determining Cause of Exposure

◆ Resolving Margin Calls

◆ Repo trades are marked to market daily.

◆ Margin calls are expected to be met daily.

◆ The margin department contacts sales when there is an account which has exposure in excess of trigger amount.

◆ After sales receives margin notice they should run a trade exposure report in CAMEO to determine if the call is good.

◆ Sales should make sure the haircuts and mark to market prices are accurate. These are two variables which could cause a bad call.

◆ Some margin calls will be made direct from the margin department and other will be made from sales. Margin will decide which customers are directly contacted by their department.

◆ If sales is responsible for handling the margin call they must communicate with Margin and tell them how the call will be resolved (free collateral, reprice, cash collateral, etc.).

◆ The customer should be contacted by sales no later than 10:00AM and margin call should be met by 3PM the same day in MTS or can be same or next day for ITS or what is referenced in the GMRA (Global Master Agreement).

◆ The calls which are not met per the repurchase doc will be reported to Credit, the Trading Desk and Management. These actions could result in closing the trade or liquidation.

◆ Cameo can be requested by going to Lehman Live and typing TAC in Keyword box. Click on Make a Request.

◆ Find the application listed alphabetically, click and following instructions and submit.

**For Cameo training contact:**
**Kristin Desario**
212 526 7065

**LBEX-LL 1175537**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



## ** CAMEO View-Only User Manual **

### Lee Wigden (Updated 1/14/04)

**Background Info:**

CAMEO stands for Collateral And Margin Exposure Optimization, and is the official margin system of Lehman Brothers. It is used globally by Margin, Corporate Credit, Trading, Sales, and other Operations departments. Margin users have access to numerous margin-related tools within CAMEO, such as pricing, margin engines, contacts, margin calls, & statements. View only users, which include all other areas other than Margin, can view screens & run reports but can not affect any of the data or events within the system. Enhancements to CAMEO are constantly in progress, with new releases scheduled periodically. Summaries of new releases are provided by our CAMEO Technology group. This manual will help view-only users navigate through CAMEO. For more detailed explanations regarding specific reports or functions or new user access, please feel free to contact one of the margin managers or supervisors below.

**NY/ NJ CAMEO Contacts:**

◆ Counterparty Margin: Jeanette Keryc

– Fixed Income Margin: Kristin Desario

– Derivative Margin: Tara Baquero

◆ Retail PCS Margin: Chris Andersen / Angelo Corallo

◆ Futures Margin: Caesar Trelles

– CAMEO Tech: Email "CAMEO Technology"

**Other useful tips:**

◆ **Logging on:** Your user ID is your NT ID.

**LBEX-LL 1175538**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

◆ **Exporting to Excel:** Any area in CAMEO that contains a grid can be exported to MS Excel by selecting the grid and then clicking the Export to excel button on the top of the CAMEO screen.

◆ **Column Sorting:** To sort any grid in CAMEO click on the column header for an alpha-numeric sort.

**I. Client Search:** Enables user to search for an account via source system account number, account name, or legal counterparty name. (See screen print below)



◆ Client Search can be accessed by clicking on Client Search button on top of CAMEO screen.

◆ Enter in account number, name, or counterparty name in space provided. Legal Entity and System criteria are optional, but will limit the amount of records retrieved. (For source system, MTS is for FI-Financing, Options, & Forwards, ITS is for FI-Financing, and DEM is for derivative accounts.)

◆ Click on Find. Account should appear in grid.

◆ Highlight desired account and click on drill down to see account summary and trade level details. *(See section II below)*

**II. Client Drill Down:** Enables user to view counterparty trade level detail and exposures in specific margin centers (product types). Screen layouts differ for the various margin centers

**LBEX-LL 1175539**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

and include info relevant to the specific product type. e.g. FI-Financing, Derivatives, Futures, Retail PCS, Options, etc. (See screen shots A, B, & C below)

(a)     FI-Financing Drill Down Summary Tab:



(b)     Options Summary Tab:

**LBEX-LL 1175540**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



© Derivatives Summary tab:

**LBEX-LL 1175541**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



- Access **Client Drill Down** screen by clicking on **Drill Down** button from either Client Search or Client Exposure screens.

- Client Drill Down consists of several different tabs. Access to the tab you are interested in can be achieved by clicking on the tab header. The **Summary** tab offers account level exposure information. The **Transactions / Positions** tab contains trade level detail along with corresponding exposures on the trades. **Balances** shows any outstanding balances associated with account (if applicable). **Free Collateral** identifies any free collateral in the account used to offset margin exposure. The **Margin Call** tab will show any calls issued to the client/ sales.

## IV.    Counterparty Watchlists:

Enables user to identify to establish a "hot list" of his/ her own accounts. This is a useful tool because it helps the user focus just on accounts he/ she is interested in. There are many different reports and functions in CAMEO that can be run by Watchlist, including Exposure Query, Transaction Browser, and the FI-Financing Trade Exposure Report. The instructions included below demonstrate how a view-only user can set up their own personal watchlist.

1) Go to **TOOLS→ WATCHLIST**

2) When the Watchlist Maintenance box appears, select a Watchlist List Type of "Personal".

3) **FIND**; this will bring up any existing personal watchlists you have. (See diagram#1)

**LBEX-LL 1175542**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

Diagram#1:



4) To create a new one, click on the **NEW** button. The Watchlist Maintenance Detail box should then appear. (see diagram #2 below)

5) In **NAME**, type a name that is relevant to your watchlist.    For **TYPE** select "Personal"

6) On bottom of Watchlist Maintenance Detail screen where it says "Select a counterparty", enter an account number, account name, or legal counterparty name.

7) Click on the *"search"* button to the right. (This is the button with 3 dots). Entering in an account number is recommended when adding accounts to you watchlist. If you choose to enter in an account name or counterparty name, you do not have to enter in the entire name. CAMEO will search for the exact name from the Global Accounts database. (e.g. If you want to select Nomura Securities Intl Inc, you can enter in "Nomura Sec" and hit the find button)

– 59 –

**LBEX-LL 1175543**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

Diagram#2:



8) CAMEO will bring you to a **Client Search** screen, where you should highlight the exact client that you want to add to your watchlist.  Once you see the account that you want to add to your list, highlight the row and hit the **SELECT** button on the right side as seen in Diagram #3 below.

**LBEX-LL 1175544**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

Diagram#3:



9)  After selecting the exact counterparty/ account name, click on **ADD TO WATCHLIST** button, and the c/p name should appear in the grid. (as pictured in diagram# 2).

10) Continue this process until all of your desired counterparties are added to your list. Remember to hit SAVE when you are done. You can always go back into your list to edit it. Your watchlist is now ready and can be used throughout CAMEO (where applicable).

> *Tip on how to use your Watchlist:*

Click on **Exposure Query** button on top of CAMEO screen. Select your personal Watchlist from the drop down menu. Margin Center and Legal Entity criteria are optional, but can help you focus only on certain product types and counterparties. This screen is similar to Client Exposure screen in that it highlights margin exposure, liquidation value, pending margin calls, balances, etc. By highlighting a particular row and clicking drill-down you will be brought to drill down on the selected account.

**LBEX-LL 1175545**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



## IV.   Transaction Browser:

This is a powerful tool that enables user to query trades using a wide variety of selection criteria, including legal entity, source system, trade ID, watchlist, security ID, account, trading ledger, etc. Currently Trans Browser is functional with the Derivative, FI-Financing, Options, and Forwards margin centers.

*(In the example below, the query was performed using margin center = FI-Financing, Legal Entity = LBI, & ledger = 422)*

**LBEX-LL 1175546**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



## V.   Reports & Shredders:

There are many reports and shredders within CAMEO, most of which are geared towards margin related tasks, and others designed for pricing, trading, or other operational functions.   A report is displayed on a user friendly printable format; a shredder is raw data that can be exported to excel for further manipulation.   Reports and Shredders are broken down into different sub-categories by product type. Click on Reports or Shredders buttons on top of CAMEO screen to view selection of either reports or shredders. (See screen print below for Reports menu)

**LBEX-LL 1175547**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



◆ One report frequently used by Sales & Branch Ops Support for Repo is the FI- Financing Trade Exposure Report, which shows repo exposure for margined trades within an account   This report contains all trade attributes associated with the FI-Financing business.

- Please note that this report is intended for internal use only.  If your client or sales team would like to receive a daily, weekly, or monthly MTM statement for repo or other businesses, automated delivery from CAMEO can be arranged by the Margin Dept.

◆ To run the report, click on Reports button on the top of the CAMEO screen.

- Double click on the Fixed Income Financing Report folder;

- Single click on Trade Exposure Report.

- Fill in the appropriate selection criteria to the right:  source system, legal entity, account number. (See screen shot "a" below)

- Click on "search button" (button with 3 dots) to the right of account and select desired account.

- Click Run.  Report will take a few seconds to run.  (See screen shot "b" below)

  ◆ FIF Trade Exposure Report selection criteria:

**LBEX-LL 1175548**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



Sample Trade Exposure Report:

LBEX-LL 1175549

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.



◆ Paydown Report:

Illustrates how margin exposure on an MTS repo account is affected by monthly mortgage paydowns by showing the change in factor, face amount, and exposure on a trade and summary level.

To run report:

– Click on Reports button.

– Double click on FI-Financing folder and highlight "Paydown Report"

– Enter in run criteria in right hand side of screen. Then click run.

**LBEX-LL 1175550**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

## READING THE EXPOSURE REPORT

◆ To read the report use the headings at the top and read from top to bottom to identify specifics of trade. The post margin exposure if figured in the second column from right.

◆ Look at the example on the next 2 pages

◆ Gross Mkt Exp = Market value + cpn interest + (financing int + principal)

◆ * 17,389 = (-395,425 + - 74) + (11,077 + 401,911)

◆ * all the numbers are opposite on this report so the Gross Mkt Exp is neg 17,389

◆ Margin/Hrct Amt = principal * h/c

◆ -11,863 = -395,425 * .03

◆ Margin Val = Gross Mkt Exp + Margin/Hrct Amt

◆ 5,526 = 17,389 + (-11,863)

◆ PME = all the Margin Val added together compared to trigger

◆ 21,248  = 5,526 + 966 +14,756

◆ Although the Total Mrgn Val is a negative 21,248 there is no call since it is below the minimum (trigger) amount where margin is called

– 67 –

**LBEX-LL 1175551**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-LL 1175552

RUN DATE:   2/4/05  4:56:57PM
REPORT ID:  2/4/05  4:56:57PM

LEHMAN BROTHERS
*******CAMEO*******
Margin Exposure Report

| Account No | Sec Name | Coupon | Maturity Dt | ISIN/CUSIP | Pool No | Sec Code | BS PN/moody's Ratings | | Firm |
|---|---|---|---|---|---|---|---|---|---|
| Trade Date | Deal ID | hs CCY | Sett. CCY | Principal | Original Face | Financing Rate | MAR ON / HRCT | Fx Flag | Orig |
| O s Date | Deal Type | hs Mkt Px (clean) | B/S Trd Book Px | Market Value | Current Face | Financing Interest | C / T | Exception | Marg |
| O/f Date | Broker ID | hs Mkt Px (all in) | Sett. Mkt Px (all in) | Px Source | Factor | Coupon Interest | Fx Rate (T/D) | Paydown | Marg |
| Trd Days Left | | hs Trade Px | Sett. Trade Px | Px Date | | Pending Cpn Flag | Fx Rate (M/TM) | | (in C |

Client:  6806300          BONY ONLINE/23 (AS CUSTODIAN)                    LEM
              Sales ID:  Z49      Sales Person:  - SALES DESK 7-8129      Sales office:  LGSCNY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6806300 | US. TREASURY BOND | 8.125 | 15–Aug–2019 | 912810EE5 | | | AAA/AAA | | Z1E |
| | Z11C/890 | USD | | -395,455 | 290,000 | 8.2500 | 103.000 | | |
| 01-Feb-2005 | RE | 138.3333 | | 401,611 | 290,000 | -76 | 1 | | |
| 07-Feb-2005 | | | | EMM/CA18 | | 11,077 | | | |
| 1 | | 138.3333 | | 03-Feb-2005 | | | | | |

| 6806300 | US. TREASURY BOND | 8.125 | 15–Aug–2019 | 912810EE5 | | | AAA/AAA | | Z1E |
| | Z221120 | USD | | -157,274 | 100,000 | 2.2500 | 103.000 | | |
| 02-Feb-2005 | RE | 138.3333 | | 138,333 | 100,000 | -17 | 1 | | |
| 07-Feb-2005 | | | | EMM/CA18 | | 3,820 | | | |
| 1 | | 137.273 8 | | 03-Feb-2005 | | | | | |

| 6806300 | US. TREASURY BOND | 8.750 | 15–Aug–2020 | 912810EG0 | | | AAA/Aaa | | Z1E |
| | Z300A10 | USD | | -8,023,443 | 5,483,000 | 2.2500 | 103.000 | | |
| 05-Feb-2005 | RE | 144.9203 | | 8,058,029 | 5,483,000 | -2,481 | 1 | | |
| 07-Feb-2005 | | | | EMM/CA18 | | 223,423 | | | |
| 1 | | 144.3199 | | 03-Feb-2005 | | | | | |

                                       RT

                          TOTAL ORIGINAL          TOTAL PRINCIPAL          TOTAL FINANCE INT
                          TOTAL CURRENT FACE       TOTAL MARKET VAL         TOTAL CPN INTEREST

                          5,875,000               -8,558,344               -2,573

                          5,875,000               8,598,396                240,519

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

RUN DATE:   2/4/05  5:30:35PM                                                     LEHMAN BROTHERS
REPORT ID:  2/4/05  5:30:35PM                                                   *******CAMEO*******
                                                                              Margin Exposure Report

| Account No | Bea Name | Coupon | Maturity Dt | IBM/CUSIP | Pool No | Bea Code | S&P/Moody's Ratings | Firm |
|---|---|---|---|---|---|---|---|---|
| Trade Date | Deal ID | bs CCY | Sett. CCY | Principal | Original Face | Financing Rate | MARGIN / HPCT | Groß |
| On Date | Deal Type | bs Mkt Px (clean) | B/S Trd Book Px | Market Value | Current Face | Financing Interest | C / T | Px Flag | Man |
| Off Date | Broker ID | bs Mkt Px (all in) | Sett. Mkt Px (all in) | Px Source | Factor | Coupon Interest | Fx Rate (T/D) | Exception | Man |
| Trd Days Left | | bs Trade Px | Sett. Trade Px | Px Date | | Pending Ops Flag | Fx Rate (MTM) | Paydown | (In C |

Text Object

Client:  6806300        BONY ONLINE/25 (AS CUSTODIAN)                         LEH
              Sales ID:   Z49        Sales Person:   - SALES DESK 7-8129        Sales office:   LGSCNY

                                                                                         TOTAL I/G VAL (USD)
                                                                                         TOTAL HAIRCUT VALUE (USD)
                                                                                         TOTAL MRGN VALUATION (USD)
                                                                                         TRIGGER AMOUNT (USD)
***BONY ONLINE/25 (AS CUSTODIAN) - GRAND TOTAL:                                           TOTAL PMF (USD)

LBEX-LL 1175553

# PD 11

## Lehman Equities Report

## LEHMAN BROTHERS | Equities

# Risk Appreciation



### The Lehman Brothers Risk Culture

*"When we talk about risk management, it's not just about market risk and credit risk; it's also about reputational risk, people risk, client risk and corporate governance. It's about who we are, it's about branding —— it's about everything we do each day. We watch all of these risks very closely, making it a mission-critical priority to practice active and intelligent risk management at every level of the Firm. We rely on all employees to think before they act. This vigilance works because we treat everyone as a risk manager, guarding against inappropriate risk."*

- *Dick Fuld, Chairman and CEO (Lehman Brothers Quarterly, Fall/Autumn 2006)*

### Fostering A Culture of Risk Appreciation

- What is Risk Appreciation?
- How Does a Culture of Risk Appreciation Help the Firm Increase Revenues?
- How do We Foster Such a Culture?
- What is the Risk Appreciation Task Force?

### Risk Appreciation Tools

**Equities Senior Management is sponsoring the development of the following tools to help the Sales force undertake more effective risk management:**

- LPM Competency — at mid-year and year-end, each Sales professional will be evaluated against a new Risk Appreciation competency.
- Net Client Revenue — models are being developed to appropriately represent Risk Appreciation when calculating client revenue.
- Risk Appreciation Quarterly — this newsletter will showcase current topics and initiatives in Risk Appreciation.
- Training — a Risk Appreciation module is being developed in partnership with Lehman University.

### Distressed Counterparties

Distressed counterparties present a multitude of risks including possible litigation. You should be aware of the types of behavior that may indicate a counterparty is in need of closer scrutiny. If you observe suspicious client behavior, you should keep the information confidential and report it directly to your manager.

- Click here for the Q1 2008 Ris[...] Appreciation Quarterly
- Click here for the Q1 Risk Appreciation Survey
- Click here for the internal MiF[...] website
- Click here for the approval po[...] Algorithmic, Research-driven[...] Lehman Brothers-sponsored [...] Strategies

**Risk Appreciation Task For[...]**

**Adam M. Green** | Profile
Managing Director
Volatility Americas
+1 212 526 8885
adam.green@lehman.com

**Anthony Lombardo** | Profile
Managing Director
Equities Sales/Research/Admin/S[...]
+1 212 526 1260
alombard@lehman.com

**Edward J Peel** | Profile
Managing Director
Equities Sales/Research/Admin/S[...]
+44 20 710 32823
epeel@lehman.com

**Joseph V Parisi II** | Profile
Senior Vice President
Equities Sales/Research/Admin/S[...]
1-212-526-9098
jparisi@lehman.com

**Vicki Lou Pitcock** | Profile
Senior Vice President

**CONFIDENTIALITY TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.**

**LBEX-LL 605596**

Click here for a list of potential warning signs.

### Lehman Performance Management (LPM)

A Risk Appreciation competency has been included for the Equities Sales force. Each Sales professional will be reviewed and evaluated on this new competency at mid-year and year-end.

The new competency consists of the following criteria:

- **Awareness:** understands and appreciates the market, credit, legal and operational risks inherent in transactions.
- **Communication:** shares relevant information and proactively highlights key risks to partners in Trading and Control areas; highlights examples of good risk appreciation and disseminates best practices.
- **Client Skills:** negotiates transaction terms for optimum risk-reward profile; declining unfavorable transactions while working to preserve strong client relationships and ensuring they understand their true impact on the LEH P&L.
- **Shareholder/Manager Behavior:** deploys capital efficiently and in consideration of clients' historical trading impact and seeks to offset traders' positions; takes "ownership" of the risks as well as the rewards of transactions.

Click here to see a screen-shot of the 2007 LPM page.

### Net Client Revenue (NCR)

Revised Net Client Revenue models are currently being developed to better measure the risk and revenue associated with each transaction in order to more accurately assess the contribution of Equities Sales. A significant enhancement to the current methodology is the shift from ex poste theoretical models to ex ante expected models, i.e. models that predict the expected outcome at the time the trade is initially executed. New Net Client Revenue models are expected to be finalized and implemented by Fall 2007.

Click here to view the latest Net Client Revenue models.

### Risk Appreciation Quarterly

The Risk Appreciation Quarterly will showcase current topics and initiatives to assist managers in facilitating risk appreciation dialogues.  In addition, the Risk Appreciation Quarterly will highlight compliance and legal topics that relate to risk.

The following are recent Headlines from the Risk Appreciation Quarterly:

- BusinessWeek Article on Risk Management
- Wall Street Journal Article on Reg NMS
- Wall Street Technology Article on Instant Messaging

---

Volatility Americas
+1 212 526 3206
vicki.pitdock@lehman.com

**Joshua Levine**  | Profile
Vice President
Convertibles Product
+1 212 526 4545
jlevine@lehman.com

### Feedback

**Michael Davis**  | Profile
Volatility Americas
mdavis2@lehman.com

### Policies and Procedures

- Compliance and Regulation
- Corporate Advisory
- Transaction Management
- Client Onboarding
- Credit Limits
- Algorithmic, Research-Driven Lehman-Sponsored Index Ap Policy
- New Product Committee
- Global Principles Applicable Structured Investments
- Know Your Customer/Suitabil Policies and Procedures

### References

- Global Equities Sales Managem Offsite - Risk Appreciation (Ajay March 2006)

- Risk Appreciation - A Sales Pers (Adam Green, Anthony Lombard Peel, September 2006)

- Net Revenue Models for Equity (July 2007)

- Internal Use Only Communicati Reminder

**CONFIDENTIALITY TREATMENT REQUESTED BY LEHMAN BROTHERS HOLDINGS, INC.**

LBEX-LL 605597

## Training Program

**Risk Appreciation Training is currently under development in partnership with Lehman University. This training is intended to empower the Sales force with the tools needed to accomplish the broader Risk Appreciation mandate.**

The training format is envisioned as follows:

- **Participants:**  All Equities Sales Employees
- **Moderator:**  Leadership and Learning
- **Frequency:**  Quarterly
- **Launch:**  Spring 2008
- **Format:**  Modeled after Ethics seminar, e.g., primarily taught by the case method

**Click here** to view a sample case study

## Operational Risk and Resources

**The Sales Force is responsible for minimizing transaction and counterparty risks from the first step of client on-boarding to post-trade analytics. The Risk Appreciation Task Force is committed to educating the Sales Force on ways to limit exposure to Operational Risks.**

### Client On-Boarding
The Sales Force is responsible for client verification when on-boarding a new client to the Firm. This is essential for minimizing counterparty risk.  The Equities Client On-Boarding team was established to assist the Sales Force in the efficient coordination of the account verification process, including Anti-Money Laundering, Know Your Customer procedures and transaction documentation such as ISDA agreements. You can find out more about how to leverage this valuable resource via LehmanLive keyword: **EQCOB**, or by contacting **Erica Smoller Benjamin**.

### Confirmations
Outstanding confirmations expose the Firm to counterparty risk and are a focus of regulators. All counterparties are required to sign trade confirmations promptly following the execution of derivatives transactions. In order to ensure prompt execution of confirmations, trading should occur only where document templates have been agreed upon with the counterparty . Failure to promptly execute confirmations could result in counterparties being restricted from entering into future transactions.  Sales people can find out more about the Transaction Management Group (TMG) and mitigating transaction-specific legal and documentation risk at LehmanLive keyword: **TMG** or by contacting **Rob Guglielmo** or **Anatoly Kozlov**.

### Client Valuations
In accordance with Lehman Compliance policy, the Sales Force is not allowed to deliver security valuations to clients. Delivering inaccurate valuations creates risk and can result in litigation. The Client Valuations Group (CVG) was created to provide the necessary support and control for pricing and valuations that are sent to clients. This initiative is underway across all equity products. Please **e-mail** the Client Valuations Group to coordinate any valuation requests.

- Potential Early Warning Signs of Counterparty Distress
- Building a Culture of Risk Appre (Adam Green, Anthony Lombard Peel, May 2007)
- Sales Management, Risk Appre Action Steps

### Archive
- Risk Appreciation Quarterly, Q1
- Risk Appreciation Quarterly, Q2
- Risk Appreciation Quarterly, Q3
- Risk Appreciation Quarterly, Q1

**CONFIDENTIALITY TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.**

**LBEX-LL 605598**

**Credit Approval Policy**

The Sales Force is responsible for obtaining approval for credit risk when transacting with counterparties. Credit-sensitive transactions are authorized by Credit Risk Management (CRM), either through pre-approved counterparty limits and trade types, or on a trade-by-trade basis. Counterparty credit limits are available via LehmanLive, keyword: CreditLimits. Access to the credit limit sets is authorized via TAC and training can be provided by contacting one of the credit analysts listed in the CRM contact section on the site. The site is a valuable resource providing additional transparency around the existing approval process, specific counterparty exposure limits and CRM contact information.

**MiFID**

The Markets in Financial Instruments Directive (MiFID) became effective as of November 1st, 2007. MiFID, which replaces the Investment Services Directive of 1993, is the cornerstone of a larger plan to integrate financial trading and intermediation in the European Union, and is the biggest change ever in the structure of a major financial market. In short, MiFID is intended to transform the European Union into a single entity from a regulatory perspective. While the focus (particularly in the press) has been on Equities trading, MiFID covers all products, and brings more transactions under the umbrella of a single regulatory oversight. For more information, visit LehmanLive, keyword: MiFID for the internal MiFID website. Also, click here for a MiFID training webcast.

CONFIDENTIALITY TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-LL 605599

# PD 12

## Nov. 10, 2006 O'Meara Letter

# LEHMAN BROTHERS

CHRISTOPHER O'MEARA
CHIEF FINANCIAL OFFICER

November 10, 2006

Mr. John DeRosa
71 West Cedar Place
Ramsey, NJ 07446

Dear John:

We are delighted to confirm our offer of full-time employment for the Finance Division of
Lehman Brothers (the "Firm"). Your corporate title of Managing Director will be
submitted for official approval by the Executive Committee of our Board of Directors as
part of the next quarterly approval process. We expect your employment to commence on
or about January 17, 2007.

For the performance year 2007 (your start date through November 30, 2007), your
compensation will be as follows:

- Bi-weekly base salary of $200,000, payable in accordance with our customary
  payroll practices.

- A minimum bonus in the amount of $1,800,000, less applicable deductions,
  payable on or about January 31, 2008.

- You will also receive a special payment of $1,515,000 on or about February 15,
  2007, provided we have received your executed offer letter. This payment will
  become repayable in full should you resign or be terminated by the Firm for cause
  during 2007. The special payment described in this paragraph will not be
  considered part of your total compensation for purposes of the Firm's stock award
  program.

The foregoing salary will be paid for all periods of your active employment with the Firm
in performance year 2007. The bonus amount set forth above will be paid at the time and
in the amount stated except that it will not be payable if before the date of scheduled
payment, you have resigned, or have been terminated from the Firm because of
misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations,
or substantial and continuing failure to perform employment duties or obligations
satisfactorily. The bonus amount set forth above may be reduced in the event of an
approved leave of absence during performance year 2007.

LEHMAN BROTHERS INC

**LBEX-AM 023143**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

11/14/06
Page 2

All payments described in this letter will be subject to applicable payroll and income tax withholding and other applicable deductions.

At the Firm's discretion, a portion of your 2007 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees at your level. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

Your compensation for all periods after performance year 2007 will be determined at the Firm's discretion.

You will also be eligible to participate in the Firm's standard employee benefits program, which will be explained to you during your orientation session.

Please understand that the terms and conditions of your employment by our Firm are governed by standard Firm policies. Among other things, this means that this offer of employment is conditional upon the successful completion of a background investigation, including reference, credit, criminal and other checks, as well as on your satisfactorily meeting all pre-employment requirements, including passing a pre-employment drug screen and producing documentation to verify your identity and eligibility to work in the United States. Please contact Mindy Weiss of our Human Resources Department at (212) 320-7144 should you require any assistance with pre-employment processing.

Please understand that this letter is not a contract of continuing employment. Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time and for any reason, subject to any applicable notice requirement. Currently, the Firm's notice policy requires officers of the Firm to provide 30 days' advance written notice of resignation, and provides for 30 days' advance notice by the Firm to its officers in the event of an involuntary termination under certain circumstances. In making this offer of employment, the Firm has relied on your representations (a) that you are not currently party to any agreement or dispute or litigation that might impede your ability to accept this offer and perform the duties of this position and (b) that you are not subject to any non-competition arrangement or other restrictive covenants that might affect your employment by the Firm as contemplated by this letter.

You have advised us that you will forfeit certain Deutsche Bank stock awards as a result of your separation and subsequent employment by our Firm (the "Forfeited Awards"). Provided you comply with the documentation obligation set forth below, Lehman Brothers Holdings Inc. ("LBHI") will grant you an award of Special Restricted Stock Units ("Special RSUs"), with a market value at the time of the award equivalent to the value of

LEHMAN BROTHERS INC.

LBEX-AM 023144

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

11/14/06
Page 3

the Forfeited Awards. The valuation of the Forfeited Awards will be at the LBHI's
reasonable discretion. LBHI will make reasonable efforts to establish substantially similar
schedules for vesting and/or sales restrictions of your Special RSUs upon continued
employment which are consistent with the Forfeited Awards. It is your obligation to
provide LBHI with documentation reasonably deemed necessary by LBHI to verify and
evaluate the Forfeited Awards and to structure the Special RSU award. LBHI's Special
RSU award will be made as of your first day of employment with the Firm and will be
based on the closing price of LBHI common stock on the New York Stock Exchange on
that day. In the event you separate from the Firm's employment for any reason, you will
forfeit any Special RSUs which are not vested at the time of separation. Except as
provided under this paragraph with respect to (i) pricing of the special RSUs, (ii) schedules
for vesting and/or sales restrictions of you Special RSUs upon continued employment and
(iii) forfeiture of your unvested Special RSUs upon separation from the Firm's employment
for any reason, the terms of LBHI's standard stock award program (as set forth in the
award agreement for employees having your corporate title under LBHI's 2005 Stock
Award Program) will govern your award of Special RSUs.

If you agree with the terms outlined in this letter, please acknowledge the same by signing
the enclosed copy and returning it to me.

John, we look forward to your joining the Firm and we are sure that you will find many
opportunities to make a contribution to Lehman Brothers. Please feel free to contact me at
212-526-9295 with any additional questions or concerns.

Sincerely,

Accepted on this 27ᵗʰ day of ___NOVEMBER___, 2007

John DeRosa

LEHMAN BROTHERS INC.

**LBEX-AM 023145**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# PD 13

# Sept. 19, 2008 Amin Email

| | |
|---|---|
| From: | Amin, Kaushik [kamin@lehman.com]. | Sent:9/19/2008 11:34 AM. |
| To: | McDade, Bart [bmcdade@lehman.com]; Kirk, Alex [akirk@lehman.com]. |
| Cc: | . |
| Bcc: | . |
| Subject: | Effects on financial system and Lehman creditors of LBI filing for bankruptcy if employees do not show up for work. |

Vast majority of Lehman employees are employees of LBI, so they have been coming to work even with LBHI filing for bankruptcy

Once LBI files for bankruptcy, employees are not entitled to a paycheck unless approved by the bankruptcy court.

If that does not happen and employees do not show up for work:

(i) The financial system is very complex and requires very specialized skills, not only on finance, but also a deep understanding of the Lehman systems (Technology) to effect payments, settle trades, and even find out what securites we are long or short. Unlike a warehouse containing physical assets where you can just go in and look at what you have in the warehouse, at Lehman, you need to understand sophisticated systems to be able to figure out what assets you own or are short. Outside personnel cannot do this task in a short period of time.

(ii) Every day, Lehman makes hundreds of thousands of individual payments and receives similar amounts of payments. If we stop doing this task, large numbres of financial transactions will freeze and will create ripple effects and will drive other firms in to bankruptcy who will no longer be able to process their own transactions.

(iii) With no employees at Lehman safeguarding the firm's assets, much more of the assets will be seized and liquidated by counter-parties at fire-sale prices, leading to even more dramatic losses to our creditors.

(iv) In hundreds of thousands of transactions, LBI and LBHI are owed money by counter-parties and clients which they will pay if there is somebody at Lehman who will process these payments. This money will enhance the recovery for our creditors.

(v) We need employees (sales-people, traders, bankers, finance personnel, operations personnel) to work with clients to liquidate any transactions they have with Lehman in an orderly fashion to minimize the claims against Lehman. Again, this is to the benefit of creditors. These people also need to work with the clients who have our collateral to return any excess collateral.

FOIA CONFIDENTIAL TREATMENT REQUESTED
BY LEHMAN BROTHERS HOLDINGS INC.

LBHI_SEC07940_656489

# PD 14

## Sept. 16, 2008 Gregg Email

| | |
|---|---|
| **From:** | Gregg, Paul <paul.gregg@lehman.com> |
| **Sent:** | Tuesday, September 16, 2008 11:19 PM (GMT) |
| **To:** | Keavey, Peter <peter.keavey@lehman.com> |
| **Subject:** | Re: Barcap |

Just that the Barcap thing looked good. All US LBI employees will be part of the deal (that's us). LBCS will be left to go bankrupt.

---------------------------------

----- Original Message -----
From: Keavey, Peter
To: Gregg, Paul
Sent: Tue Sep 16 18:57:52 2008
Subject: Re: Barcap

The diplomatic reply would be. Is there anything to tell?

---------------------------------

----- Original Message -----
From: Gregg, Paul
To: Keavey, Peter
Sent: Tue Sep 16 17:47:09 2008
Subject: Barcap

Has anyone talked to you about it?

---------------------------------

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# <u>PD 15</u>

## Sept. 23, 2008 Binkley Email

**From:** Binkley, Tracy A
**Sent:** Tue, 23 Sep 2008 01:41:34 GMT
**To:** Berkenfeld, Steven
**CC:** Johnson, Jack
**Subject:** Re: confusion

The asset purchase agreement covers all capital markets emps in the US and those corp staff primarily supporting them. There was no judgment applied to anyone in FID, just active employment. (Performance of individuals did not come into play.) With Corporate groups, there was a decision to be made, based on role.

Hard to respond to her point about wanting to be given a choice, except to say that there was no time to go through that kind of process. And our responsibility to the Lehman estate governed our ability to be more flexible.

I'm copying Jack to ensure that this is correct and will feel appropriate for Martha.


---------------------------------

----- Original Message -----
From: Berkenfeld, Steven
To: Binkley, Tracy A; Collerton, Anthony J
Sent: Mon Sep 22 20:20:49 2008
Subject: FW: confusion


How do I respond to this?

_____
From:  Solinger, Martha
Sent:  Monday, September 22, 2008 8:11 PM
To:    Berkenfeld, Steven
Subject:    confusion

Steven--

As I think you know, I have stayed pretty calm during the brouhaha over the offers. But today I learned that Kenny Cohen and Paul Hughson, along with Joelle Halperin, basically the architects and managers of the 'toxic real estate' got offers from Barclays. Hard to square that those most responsible for where we are today got offers with their promised severance if it doesn't work and yet my team does not. And there is surely plenty of litigation coming Barclays' way so that they will have some need for folks. Surely, if so many offers could go out, my team could have had a choice to stay or go. A number of them would very much like to stay with their colleagues and work for the ongoing entity and remain concerned they have no option to do so.

Hope you get a chance to recover soon from the efforts you put in and realize that this is a fairly small issue

BCI-EX-(S)-00005498

in an enormous, chaotic mess, but this disparity of treatment did stop me in my tracks.

Martha

NOTE NEW ADDRESS
Privileged and Confidential--Attorney Work Product

Martha E. Solinger
Managing Director
Global Litigation, Insurance
 and Intellectual Property
1271 Ave. of the Americas- 44th Floor
New York, NY 10020
212-526-0456 (phone)
212-526-0940 (fax)

**HIGHLY CONFIDENTIAL**

**BCI-EX-(S)-00005499**

# **<u>PD 16</u>**

# **Aug. 28, 2008 Laut Email**

| From: | Kalaher, Kathleen <kathleen.kalaher@lehman.com> |
|---|---|
| Sent: | Friday, August 29, 2008 12:17 PM (GMT) |
| To: | Laut, Jessica <jessica.laut@lehman.com> |
| Cc: | Carine, Allyson <acarine@lehman.com> |
| Subject: | RE: LMT 2008-6 // LBSF Disclosure Agreement // Final |

Thanks for handling this last night!

-----Original Message-----
From: Laut, Jessica
Sent: Thursday, August 28, 2008 7:58 PM
To: 'DZawitz@MckeeNelson.com'; Kalaher, Kathleen
Subject: Re: LMT 2008-6 // LBSF Disclosure Agreement // Final

Sorry, hit send before I was finished....

Please replace the language of Annex A, in its entirety, with:

The Cap Counterparty. Lehman Brothers Special Financing Inc., a
Delaware corporation and a wholly-owned subsidiary of Lehman Brothers
Inc., is Lehman Brothers Inc.'s principal dealer in a broad range of OTC
derivative products including interest rate, currency, credit and
mortgage derivatives. Lehman Brothers Special Financing Inc. is not
independently rated, yet does benefit from a full and unconditional
guarantee by the Sponsor, which is currently rated "A" by S&P, "A+" by
Fitch, "AA(low)" by DBRS and "A2" by Moody's for long-term senior debt
and "A-1" by S&P, "F1" by Fitch, "R-1(middle)" by DBRS and "P-1" by
Moody's for short-term debt. There can be no assurance that such ratings
will be maintained.

Thank you.  With this change made, LBSF sig pgs are released from
escrow.

Any questions, please contact me.

Kindest-
Jessica

----------------------------
Jessica Laut
Lehman Brothers

----- Original Message -----
From: Zawitz, David <DZawitz@MckeeNelson.com>
To: Hitzmann, Michael  C; Stimola, Nicholas; Tie, Lei; Hedvat, Lauren;
Lechner, Scott; Gelber, Leslee; Lynn, Alicia; Laut, Jessica; Kalaher,
Kathleen; Bardos, Louis; Carla.S.Walker@wellsfargo.com
<Carla.S.Walker@wellsfargo.com>; amy.doyle@wellsfargo.com
<amy.doyle@wellsfargo.com>; jonathan.polking@alston.com
<jonathan.polking@alston.com>; bill.macurda@alston.com
<bill.macurda@alston.com>; brian.cox@alston.com <brian.cox@alston.com>
Cc: jjohnson@MckeeNelson.com <jjohnson@MckeeNelson.com>;
dkingsley@MckeeNelson.com <dkingsley@MckeeNelson.com>;
cchen-young@MckeeNelson.com <cchen-young@MckeeNelson.com>;
dzawitz@MckeeNelson.com <dzawitz@MckeeNelson.com>;
dzeller@MckeeNelson.com <dzeller@MckeeNelson.com>

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-DOCID 3620744

Sent: Thu Aug 28 19:44:24 2008
Subject: LMT 2008-6 // LBSF Disclosure Agreement // Final

Good evening,

Please find attached the final execution copy of the LBSF Disclosure
Agreement for LMT 2008-6, as well as a blackline marked against the
previous distribution. As we plan on printing the Prospectus Supplement
tonight, please confirm that you have released your signature pages from
escrow.

Please feel free to contact me with any questions.

Thanks,

David J. Zawitz
Law Clerk*
McKee Nelson LLP
1919 M Street, NW, Suite 200
Washington, DC 20036
Tel: 202-327-2057
Fax: 202-775-8586
* Admitted to practice law in New York only.
<<LBSF Disclosure Agreement (final blackline).pdf>> <<LBSF Disclosure
Agreement (final).pdf>>

Any advice contained in this e-mail (including any attachment that does
not expressly state otherwise) is not intended or written to be used and
cannot be used by any taxpayer for the purpose of avoiding United States
Federal tax penalties that may be imposed. If this advice is used to
promote, market, or recommend any transaction or investment, the advice
was written to support the promotion or marketing of the transaction or
matters addressed and each taxpayer should seek advice based on the
taxpayer's particular circumstances from an independent tax advisor.

─────────────────────

We hereby confirm that we are placing no limitation on any disclosure of
the tax treatment or tax structure that is the subject of any written
advice provided in this e-mail or any attachment.

─────────────────────

The information contained in this message may be privileged and
confidential and protected from disclosure. If the reader of this
message is not the intended recipient, or an employee or agent
responsible for delivering this message to the intended recipient, you
are hereby notified that any dissemination, distribution or copying of
this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to the
message and then delete the message from your computer.

─────────────────────

Notice required by law: This e-mail may constitute an advertisement or
solicitation under U.S. law, if its primary purpose is to advertise or
promote McKee Nelson LLP's products or services. You may choose not to
receive advertising and promotional messages from McKee Nelson LLP at
this e-mail address by forwarding this message to
noemailfrom@McKeeNelson.com. If you do so, the sender of this message

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

will be notified promptly, and messages designated as advertising or
promotion will be automatically blocked once necessary modifications to
our e-mail system have been completed. Our principal postal address is
1919 M Street NW Washington, DC 20036.  -MVIII.APR-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LBEX-DOCID 3620744

# PD 17

## LBHI 2007 Annual Report

10-K 1 a08-3530_110k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended November 30, 2007**

**OR**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from            to**

**Commission File Number 1-9466**

# Lehman Brothers Holdings Inc.
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **13-3216325** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **745 Seventh Avenue** | |
| **New York, New York** | **10019** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (212) 526-7000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.10 par value | New York Stock Exchange |
| Depositary Shares representing 5.94% Cumulative Preferred Stock, Series C | New York Stock Exchange |
| Depositary Shares representing 5.67% Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares representing 6.50% Cumulative Preferred Stock, Series F | New York Stock Exchange |
| Depositary Shares representing Floating Rate Cumulative Preferred Stock, Series G | New York Stock Exchange |
| 5.857% Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| Floating Rate Mandatory Capital Advantaged Preferred Securities of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series K, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series L, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.00% Trust Preferred Securities, Series M, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.24% Trust Preferred Securities, Series N, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 2.00% Medium Term Notes, Series H, Due March 3, 2009 Performance Linked to the Common Stock of Morgan Stanley (MS) | American Stock Exchange |
| 0.25% Medium Term Notes, Series I, Due February 16, 2012 Performance Linked to a Basket of Two Stocks | American Stock Exchange |
| 0.00% Medium Term Notes, Series I, Due May 15, 2010 Performance Linked to the Common Stock of General Electric Company (GE) | American Stock Exchange |
| Absolute Buffer Notes Due July 29, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E) | American Stock Exchange |
| Absolute Buffer Notes Due July 7, 2008, Linked to the Dow Jones EURO STOXX 50® Index (SX5E) | American Stock Exchange |
| Currency Basket Warrants Expiring February 13, 2008 | American Stock Exchange |
| Dow Jones Global Titans 50 Index ℠ SUNS® Stock Upside Note Securities Due February 9, 2010 | American Stock Exchange |
| Dow Jones Industrial Average SUNS® Stock Upside Note Securities Due April 29, 2010 | American Stock Exchange |

| | |
|---|---|
| Index-Plus Notes Due December 23, 2009, Performance Linked to the Russell 2000  INDEX (RTY) | American Stock Exchange |
| Index-Plus Notes Due March 3, 2010, Linked to the S&P 500® Index (SPX) | American Stock Exchange |
| Index-Plus Notes Due November 15, 2009, Linked to the Dow Jones STOXX 50® Index (SX5P) | American Stock Exchange |
| Index-Plus Notes Due September 28, 2009, Performance Linked to S&P 500® Index (SPX) | American Stock Exchange |
| | American Stock Exchange |
| Japanese Yen Linked Warrants Expiring June 20, 2008 | |
| Nasdaq-100® Index RANGERSSM Rebound Risk AdjustiNG Equity Range Securities Notes Due June 7, 2008 | American Stock Exchange |
| Nikkei 225SM Index SUNS® Stock Upside Note Securities Due June 10, 2010 | American Stock Exchange |
| S&P 500® Index Callable SUNS® Stock Upside Note Securities Due November 6, 2009 | American Stock Exchange |
| S&P 500® Index SUNS® Stock Upside Note Securities Due August 5, 2008 | American Stock Exchange |
| | American Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of 'accelerated filer and large accelerated filer' in Rule 12b-2 of the Exchange Act. (Check one): Large accelerated filer ☒  Accelerated filer ☐  Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the voting and nonvoting common equity held by non-affiliates of the Registrant at May 31, 2007 (the last business day of the Registrant's most recently completed second fiscal quarter) was approximately $37,489,482,000. As of that date, 510,895,095 shares of the Registrant's common stock, $0.10 par value per share, were held by non-affiliates. For purposes of this information, the outstanding shares of common stock that were and that may be deemed to have been beneficially owned by directors and executive officers of the Registrant were deemed to be shares of common stock held by affiliates at that date.

As of December 31, 2007, 530,588,207 shares of the Registrant's common stock, $.10 par value per share, were issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of Lehman Brothers Holdings Inc.'s Definitive Proxy Statement for its 2008 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated in Part III.

# LEHMAN BROTHERS HOLDINGS INC.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Available Information | | 2 |

**Part I**

| Item 1. | Business | 3 |
|---|---|---|
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 22 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 26 |

**Part II**

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
|---|---|---|
| Item 6. | Selected Financial Data | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 81 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 137 |
| Item 9A. | Controls and Procedures | 137 |
| Item 9B. | Other Information | 137 |

**Part III**

| Item 10. | Directors, Executive Officers and Corporate Governance | 138 |
|---|---|---|
| Item 11. | Executive Compensation | 138 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 138 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 138 |
| Item 14. | Principal Accountant Fees and Services | 138 |

**Part IV**

| Item 15. | Exhibits, Financial Statement Schedules | 139 |
|---|---|---|

| Signatures | 142 |
|---|---|
| Index to Consolidated Financial Statements and Schedule | F-1 |
| Schedule I—Condensed Financial Information of Registrant | F-2 |

**Exhibit Index**

**Exhibits**

## LEHMAN BROTHERS HOLDINGS INC.

### AVAILABLE INFORMATION

Lehman Brothers Holdings Inc. ("Holdings") files annual, quarterly and current reports, proxy statements and other information with the United States Securities and Exchange Commission ("SEC"). You may read and copy any document Holdings files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549, U.S.A. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330 (or 1-202-551-8090). The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. Holdings' electronic SEC filings are available to the public at http://www.sec.gov.

Holdings' public internet site is http://www.lehman.com. Holdings makes available free of charge through its internet site, via a link to the SEC's internet site at http://www.sec.gov, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. Holdings also makes available through its internet site, via a link to the SEC's internet site, statements of beneficial ownership of Holdings' equity securities filed by its directors, officers, 10% or greater shareholders and others under Section 16 of the Exchange Act.

In addition, Holdings currently makes available on http://www.lehman.com its most recent annual report on Form 10-K, its quarterly reports on Form 10-Q for the current fiscal year, its most recent proxy statement and its most recent annual report to stockholders, although in some cases these documents are not available on that site as soon as they are available on the SEC's site.

Holdings also makes available on http://www.lehman.com (i) its Corporate Governance Guidelines, (ii) its Code of Ethics (including any waivers therefrom granted to executive officers or directors) and (iii) the charters of the Audit, Compensation and Benefits, and Nominating and Corporate Governance Committees of its Board of Directors. These documents are also available in print without charge to any person who requests them by writing or telephoning:

<div align="center">

Lehman Brothers Holdings Inc.

Office of the Corporate Secretary

1271 Avenue of the Americas

42nd Floor

New York, New York 10019, U.S.A.

1-212-526-0858

</div>

In order to view and print the documents referred to above (which are in the .PDF format) on Holdings' internet site, you will need to have installed on your computer the Adobe® Acrobat® Reader® software. If you do not have Adobe Acrobat, a link to Adobe Systems Incorporated's internet site, from which you can download the software, is provided.

"ECAPS", "LehmanLive", "RANGERS" and "SUNS" are registered trademarks or service marks of Lehman Brothers Holdings Inc. in the United States and/or other countries. All other marks are the property of their respective owners.

<div align="center">-2-</div>

# LEHMAN BROTHERS HOLDINGS INC.

## PART I

---

## ITEM 1. BUSINESS

---

As used herein, "Holdings" or the "Registrant" means Lehman Brothers Holdings Inc., a Delaware corporation, incorporated on December 29, 1983. Holdings and its subsidiaries are collectively referred to as the "Company," "Lehman Brothers," the "Firm," "we," "us" or "our." Our executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A., and our telephone number is 1-212-526-7000.

### Forward-Looking Statements

Some of the statements contained or incorporated by reference in this Report, including those relating to the Company's strategy and other statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions, are forward-looking statements within the meaning of Section 21E of the Exchange Act. These statements are not historical facts but instead represent only management's expectations, estimates and projections regarding future events. Similarly, these statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include, but are not limited to, the risk factors discussed in Item 1A below and the factors listed in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Certain Factors Affecting Results of Operations" in Part II, Item 7, of this Report.

As a global investment bank, the nature of our business makes predicting future performance difficult. Revenues and earnings may vary from quarter to quarter and from year to year. Caution should be used when extrapolating historical results to future periods. Our actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements and, accordingly, readers are cautioned not to place undue reliance on such statements, which speak only as of the date on which they are made. We undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### Lehman Brothers

Lehman Brothers, an innovator in global finance, serves the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals worldwide. We provide a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. Our worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Firm, through predecessor entities, was founded in 1850.

Through our subsidiaries, we are a global market-maker in all major equity and fixed income products. To facilitate our market-making activities, we are a member of all principal securities and commodities exchanges in the United States, as well as FINRA (the Financial Industry Regulatory Authority, formed in 2007 by the consolidation of NASD, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. ("NYSE")), and we hold memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan, Singapore and Australian stock exchanges.

Through our investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, we continue to build on our client-flow business model, which is based on our principal focus of facilitating client transactions in all major global capital markets products and services. We generate client-flow revenues from institutional, corporate, government and high-net-worth clients by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and risks across different market cycles; (iii) originating loans for distribution to clients in the securitization or principals market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of our client-flow activities, we maintain inventory positions of varying amounts across a broad range of financial instruments. In addition, we also take proprietary trading and principal investment positions. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. We believe our client-flow orientation and the diversity of our business helps to mitigate overall revenue volatility. See Part I, Item 1A, "Risk Factors," in this Report for a discussion of certain material risks to our business, financial condition and results of operations.

We operate in three business segments (each of which is described below): Capital Markets, Investment Banking and Investment Management. Financial information concerning the Company for the fiscal years ended November 30, 2007,

-3-

## LEHMAN BROTHERS HOLDINGS INC.

2006 and 2005, including the amount of net revenues contributed by each segment in such periods, is set forth in the Consolidated Financial Statements and Notes thereto in Part II, Item 8, of this Report. Information with respect to our operations by business segment and net revenues by geographic area is set forth under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations—Business Segments" and "—Geographic Revenues" in Part II, Item 7, of this Report, and in Note 2 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

## Capital Markets

Capital Markets primarily represents institutional client-flow activities, including secondary trading, financing, mortgage origination and securitization, prime brokerage and research activities in fixed income and equity products. These products include a wide range of cash, derivative, secured financing and structured instruments and investments. We are a leading global market-maker in numerous equity and fixed income products, including U.S., European and Asian equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage- and asset-backed securities, preferred stock, municipal securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products. We are one of the largest investment banks in terms of U.S. and pan-European listed equities trading volume and maintain a major presence in over-the-counter U.S. stocks, major Asian large capitalization stocks, warrants, convertible debentures and preferred issues. In addition, the secured financing business manages our equity and fixed income matched book activities, supplies secured financing to institutional clients and provides secured funding for our inventory of equity and fixed income products.

We facilitate client transactions by serving as an agent, market-maker and/or intermediary in the global marketplace, including making available securities and other financial instruments and products to clients to adjust their portfolios and risks across different market cycles, enabling clients to sell large positions of securities through block trades and originating loans for distribution to clients through securitizations and/or syndications.

The Capital Markets segment also includes principal investing and proprietary trading activities including investments in real estate, private equity and other long-term investments.

Lehman Brothers combines the skills from the sales, trading and research areas of our Equities and Fixed Income Capital Markets businesses to serve the financial needs of our clients. This integrated approach enables us to structure and execute global transactions for clients and to provide worldwide liquidity in marketable securities.

*Equities Capital Markets.* The Equities Capital Markets business is responsible for our equities and equity-related operations and products worldwide. These products include listed and over-the-counter securities, American Depositary Receipts and convertibles, as well as equity options, futures, warrants and other derivatives. We make markets in equity and equity-related securities as well as take positions for our own account. We participate in global equity markets through our worldwide presence and membership in major stock and option exchanges. During 2007, we acquired the institutional equities business, including the institutional research group, of Brics Securities Limited, a brokerage firm in India. Equities Capital Markets is composed of Liquid Markets, Leveraged Businesses and Private Equity.

<u>Liquid Markets</u>. Liquid Markets consists of our Cash Trading, Flow Derivatives and Program Trading businesses, which also includes connectivity services. Cash trades are executed for clients in both conventional (calls to a sales person) or electronic fashion through external systems as well as our own execution management platform. These trades can be executed manually or via algorithmic trading strategies based on client needs. Our Flow Derivatives business facilitates client orders in listed options markets and vanilla over-the-counter options and derivatives. Program Trading specializes in execution of trades on baskets of stocks, which can be executed on an agency or principal basis. We deliver global electronic connectivity services to our clients, offering seamless electronic access to our trading desks and sources of liquidity around the world.

<u>Leveraged Businesses</u>. Leveraged Businesses include Structured Derivatives and Convertibles. Our Structured Derivatives business offers customized equity derivative products across a wide spectrum of equity-related assets globally, leveraging sales, trading and research into a global solution for the customer. We have experienced significant growth in a number of products, including Exchange Traded Funds (ETFs), options and warrants, spread-trading, agency/risk baskets, index rebalancing and other structured products. We are a leading participant in the development and trading of new equity derivative instruments. Our product development capabilities enable investors to take risk positions tailored to their specific needs or undertake sophisticated hedging and monetization strategies. The Convertibles business trades and makes markets in conventional and structured convertible securities.

<u>Private Equity</u>. The Equities Capital Markets segment also includes realized and unrealized gains and losses related to private equity principal investments. See "Investment Management—Asset Management—Private Equity" below.

## LEHMAN BROTHERS HOLDINGS INC.

Specialist Business. In December 2007, we acquired certain assets related to Van der Moolen Specialists, including its NYSE portfolio of listed company specialist's assignments and certain technology. As a result, Lehman Brothers Market Makers, a division of Lehman Brothers Inc., our U.S. registered broker dealer, acts as specialist for approximately 400 NYSE-listed issues and is the fourth-largest specialist firm on the NYSE.

**Fixed Income Capital Markets.** Lehman Brothers actively participates in key fixed income markets worldwide and maintains a 24-hour trading presence in global fixed income securities. We are a market-maker and participant in the new issue and secondary markets for, and take positions for our own account in, a broad variety of fixed income securities. During 2007, we acquired Grange Securities Limited, a full service Australian broker-dealer specializing in fixed income products. Fixed Income businesses include the following:

Government and Agency Obligations. Lehman Brothers is one of the leading primary dealers in U.S. government securities, participating in the underwriting of and market-making in U.S. Treasury bills, notes and bonds, and securities of federal agencies. We are also a market-maker in the government securities of all G-7 countries, and participate in other major European and Asian government bond markets.

Corporate Debt Securities and Loans. We make markets in fixed and floating rate investment grade debt worldwide. We are also a major participant in preferred stock and hybrid capital securities, including long-term and perpetual preferred stock and preferred securities, and auction rate securities.

Global Family of Indices. Lehman Brothers' Global Family of Indices provides comprehensive performance and risk measurements for the major bond markets. The Index Group produces some of the most widely followed benchmarks in the global debt markets.

High Yield Securities and Leveraged Bank Loans. We also make markets in non-investment grade debt securities. Through our high grade and high yield sales, trading and underwriting activities, we make commitments to extend credit in loan syndication transactions. We also provide contingent commitments to high-grade and high-yield counterparties related to acquisition financings.

Money Market Products. We hold leading market positions in the origination and distribution of medium-term notes and commercial paper. We are a dealer or agent for numerous active commercial paper and medium-term note programs on behalf of companies and government agencies worldwide.

Mortgage and Loan Origination and Mortgage- and Asset-Backed Securities. Lehman Brothers Bank, FSB ("LB Bank"), offers traditional and online mortgage banking services to individuals and institutions. Lehman Brothers Bankhaus AG ("Bankhaus"), a German bank, offers lending and real estate financing to corporate and institutional borrowers worldwide. We originate commercial and residential mortgage loans through LB Bank, Bankhaus and other subsidiaries in the U.S., Europe and Asia. We are a leading underwriter of and market-maker in residential and commercial mortgage- and asset-backed securities and are active in all areas of secured lending, structured finance and securitized products. We underwrite and make markets in the full range of U.S. agency-backed mortgage products, mortgage-backed securities, asset-backed securities and whole loan products. We are also a leader in the global market for residential and commercial mortgages (including multi-family financing) and leases and have an established private student loan origination platform. During the third and fourth quarters of 2007, we restructured our global residential mortgage origination business, including rescaling operations in the U.S. and U.K. due to market conditions and product revisions and closing BNC Mortgage LLC, our U.S. subprime origination platform, as well as our Korean mortgage business. In addition, in January 2008, we suspended our wholesale and correspondent lending activities at our Aurora Loan Services subsidiary ("Aurora"). We will continue to originate loans through Aurora's direct lending channel and will maintain Aurora's servicing business. For additional information, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Business Acquisitions, Business Dispositions and Strategic Investments—Business Dispositions," in Part II, Item 7, of this Report.

Lehman Brothers Commercial Bank ("LB Commercial Bank"), a Utah-chartered industrial loan company, issues certificates of deposit to institutions and conducts certain lending activities. During 2007, we acquired Capital Crossing Bank, a state-chartered, FDIC-insured commercial bank that originates small business loans.

Real Estate. In addition to our origination and securitization of commercial mortgages, we also invest in commercial real estate in the form of debt, joint venture equity investments and direct ownership interests. We have interests in properties throughout the world.

Municipal and Tax-Exempt Securities. Lehman Brothers is a major dealer in municipal and tax-exempt securities, including

general obligation and revenue bonds, notes issued by states, counties, cities and state and local governmental agencies, municipal leases, tax-exempt commercial paper and put bonds.

-5-

## LEHMAN BROTHERS HOLDINGS INC.

<u>Fixed Income Derivatives</u>. We offer a broad range of interest rate- and credit-based derivative products and related services. Derivatives' professionals are integrated into all of our Fixed Income areas in response to the worldwide convergence of the cash and derivative markets.

<u>Foreign Exchange</u>. Our global foreign exchange operations provide market access and liquidity in all currencies for spot, forward and over-the-counter options markets around the clock. We offer our clients execution, analysis and hedging capabilities, utilizing foreign exchange as well as foreign exchange options and other foreign exchange derivatives. We also provide advisory services to central banks, corporations and investors worldwide, structuring innovative products to fit their specific needs. We make extensive use of our global macroeconomics research to advise clients on the appropriate strategies to manage their interest rate and currency risk.

<u>Insurance</u>. We continue to build out our ability to provide financing, securitization and capital markets execution services for clients with insurance-related portfolios. During 2007, we acquired Congress Life Insurance Company, a life insurance company with licenses in 43 U.S. states, and a minority interest in Wilton Re Holdings Limited, a U.S. re-insurer that focuses on the reinsurance of mortality risk on life insurance policies.

<u>Commodities</u>. In 2005, Lehman Brothers established an energy trading business with global capability in power, natural gas and oil. The business includes futures, swaps, options and other structured products, as well as physical trading. We deliver energy and commodity risk solutions to customers around the globe, complementing the Firm's investment banking franchise in power and natural resources, as well as its global sales and distribution platform and capabilities in global trading, derivatives, research, finance and risk management. We are active in the markets for crude oil and refined products, electricity, natural gas, coal, emissions and precious and base metals, trading all major financial commodity products, including futures, swaps, options and structured products. We offer innovative commodity index solutions for investors seeking alternative ways to gain exposure to this asset class.

During 2007, we acquired Eagle Energy Partners I, L.P., a Texas-based energy marketing and services company that manages and optimizes supply, transportation, transmission, load and storage portfolios on behalf of wholesale natural gas and power clients. We also acquired a 56.5% controlling interest in SkyPower Corp., a Toronto-based early stage wind and solar power generation development company.

***Global Principal Strategies and Global Trading Strategies.*** Global Principal Strategies is a proprietary trading business that employs multiple strategies across global markets, including capital and credit arbitrage and aviation finance and private equity investment opportunities. Global Trading Strategies is a global proprietary multi-strategy value-oriented business whose investment strategies include merger arbitrage, distressed debt, special situations and private equity.

***Capital Markets Prime Services.*** The Capital Markets Prime Services group services clients in both Fixed Income and Equities Capital Markets and includes our Secured Financing, Prime Broker, Futures and Clearing and Execution businesses.

The Secured Financing business within Capital Markets engages in three primary functions: managing our equity and fixed income matched book activities, supplying secured financing to institutional clients and obtaining secured funding for our inventory of equity and fixed income products. Matched book funding involves borrowing and lending cash on a short-term basis to institutional clients and counterparties collateralized by marketable securities, typically government or government agency securities. We enter into these agreements in various currencies and seek to generate profits from the difference between interest earned and interest paid. Secured Financing works with our institutional sales force to identify clients that have cash to invest and/or securities to pledge to meet our financing and investment objectives and those of our clients. Secured Financing also coordinates with our Treasury group to provide collateralized financing for a large portion of our securities and other financial instruments owned. In addition to our activities on behalf of our U.S. clients, we are a major participant in the European and Asian repurchase agreement markets, providing secured financing for our clients in those regions. Secured Financing provides margin loans in all markets for client purchases of securities, as well as securities lending and short-selling facilitation.

The Prime Broker business engages in full operations, clearing and processing services for its hedge fund and other clients. Along with Secured Financing, it offers a full suite of prime brokerage products and services, including margin financing and yield enhancement through synthetic and traditional products, global securities lending (including eBorrow, our online securities lending tool), full-service global execution platforms and research teams, customized risk management solutions, introduction of clients to suitable institutional investors, portfolio accounting and reporting solutions and personalized client service.

Our Futures business executes and clears futures transactions for clients on an agency basis. The Clearing and Execution

business provides these services to broker-dealers and other clients that do not have the capacity themselves.

-6-

## LEHMAN BROTHERS HOLDINGS INC.

***Capital Markets Global Distribution.*** Our institutional sales organizations encompass distinct global sales forces that have been integrated into the Capital Markets businesses to provide investors with the full array of products offered by Lehman Brothers.

<u>Equities Sales</u>. Our Equities Capital Markets sales force provides an extensive range of services to institutional investors, focusing on developing long-term relationships through a comprehensive understanding of clients' investment objectives, while providing proficient execution and consistent liquidity in a wide range of global equity securities and derivatives.

<u>Fixed Income Sales</u>. Our Fixed Income Capital Markets sales force is one of the most productive in the industry, serving the investing and liquidity needs of major institutional investors by employing a relationship management approach that provides superior information flow and product opportunities for our clients.

***Research.*** Research at Lehman Brothers encompasses the full range of research disciplines, including fundamental, quantitative, economic, strategic, credit, relative value and market-specific analysis. To ensure in-depth expertise within various markets, Equity Research has established regional teams on a worldwide basis that are staffed with industry and strategy specialists. Fixed Income Research provides expertise in U.S., European and Asian government and agency securities, derivatives, sovereign issues, corporate securities, high yield, asset- and mortgage-backed securities, indices, emerging market debt and municipal securities.

## Investment Banking

Investment Banking provides advice to corporate, institutional and government clients throughout the world on mergers, acquisitions and other financial matters. Investment Banking also raises capital for clients by underwriting public and private offerings of debt and equity instruments. Our Investment Banking professionals are responsible for developing and maintaining relationships with these clients to gain a thorough understanding of their specific needs and for bringing together the full resources of Lehman Brothers to accomplish their financial and strategic objectives.

Investment Banking is comprised of Corporate Finance, Mergers & Acquisitions ("M&A") and Global Finance units that serve our corporate, institutional and government clients. The Corporate Finance unit is organized into global industry groups—Communications, Consumer/Retail, Financial Institutions, Financial Sponsors, Healthcare, Industrial, Media, Middle Markets, Natural Resources, Power, Real Estate and Technology—that include bankers who deliver industry knowledge and expertise to meet clients' objectives. M&A is comprised of Advisory and Restructuring groups. Global Finance serves our clients' capital-raising needs through specialized product groups in Equity Capital Markets, Debt Capital Markets, Leveraged Finance, Private Capital Markets and Risk Solutions. Bankers in these specialized product groups partner with industry coverage bankers in the global industry groups to provide comprehensive financial solutions for clients.

Lehman Brothers maintains investment banking offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

The high degree of integration among our industry, product and geographic groups has allowed us to become a leading source of "one-stop" financial solutions for our global clients.

***M&A Advisory.*** Lehman Brothers' global M&A Advisory group delivers strategic advisory services to companies worldwide. Our capabilities cover the entire spectrum of strategic alternatives available to clients, including acquisitions, divestitures, restructurings, leveraged buyouts, takeover defenses, special committee assignments and exclusive sales. Lehman Brothers' global team of M&A professionals works in partnership with industry coverage bankers, to provide strategic insight, tactical advice and execution capabilities in approaching clients' most challenging issues.

***Restructuring.*** Our Restructuring group provides full-service restructuring expertise on a global basis, including financing capabilities and traditional restructuring advice. The group provides advisory services to distressed companies, their creditors and potential purchasers, including providing out-of-court options for companies seeking to avoid bankruptcy, helping companies and creditors move efficiently through the bankruptcy process and advising strategic and financial buyers on the unique challenges of buying distressed and bankrupt companies. The Restructuring group has significant cross-border transaction expertise.

***Equity Capital Markets.*** Lehman Brothers is a leading underwriter in the global equity capital markets. Our capabilities include initial public offerings, follow-on offerings, monetizations, preferred stock, convertible securities, equity-linked securities, equity derivatives and share repurchases. We have a global team of equity product specialists who work closely with industry coverage bankers globally to develop solutions that meet our clients' needs.

***Debt Capital Markets.*** Lehman Brothers is also a leading underwriter in the global fixed income markets. The Firm takes a comprehensive approach, working closely with clients to develop and implement tailored solutions to specific

-7-

## LEHMAN BROTHERS HOLDINGS INC.

issues and problems. Our capabilities span the spectrum of fixed income products, including high grade and high yield debt, commercial paper, hybrid capital, government and agency securities, mortgage- and asset-backed securities and collateralized debt obligations, together with risk management and structured finance solutions. Our debt product specialists work closely with industry coverage bankers globally to originate, structure and market fixed income securities to investors.

*Leveraged Finance.* Our global Leveraged Finance group provides comprehensive financing solutions for below-investment grade clients across many industries through our leveraged loan, high yield bond, bridge financing and mezzanine debt products. Lehman Brothers provides "one-stop" leveraged financing solutions for corporate and financial acquirers and high yield issuers, including multi-tranche, multi-product acquisition financing. We have a leading leveraged loan and bond franchise.

*Private Capital Markets.* We have a dedicated Private Capital Markets group focused on raising capital in the private equity and debt markets. The Firm's Private Capital Markets professionals work closely with our industry coverage bankers to assist clients in establishing optimal capital structures. Clients range from pre-initial public offering companies to well-established corporations that span many industries. The Private Capital Markets group has experience in identifying sources, establishing structures and placing common stock, convertible preferred stock, preferred stock, subordinated and/or mezzanine debt and senior debt, as well as utilizing a variety of financing techniques, including private investments in public equity (PIPEs), securitizations, project financings and sale-leasebacks.

*Risk Solutions Group.* Our Risk Solutions group works with clients to identify and manage their interest rate, inflation, commodities and currency and commodity risks, among other risks. The group's solutions typically draw upon a range of swap and derivative products.

### Investment Management

Investment Management provides strategic investment advice and services to institutional and high-net-worth clients on a global basis.

Information with respect to changes in and composition of assets under management is set forth under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations—Business Segments—Investment Management" in Part II, Item 7, of this Report. Investment Management consists of our Asset Management and Private Investment Management businesses.

During 2007, we acquired H.A. Schupf, a high net worth boutique asset manager with approximately $2.3 billion in assets under management; LightPoint Capital Management LLC, a leveraged loan investment manager based in Chicago, Illinois, with approximately $3.2 billion in assets under management; Dartmouth Capital, a U.K.-based investment advisory firm with approximately $340 million in assets under advisory; and MNG Securities, an equity securities brokerage firm in Turkey. We also purchased an initial 20% interest and a subsequent 5% interest in both Spinnaker Asset Management Limited and Spinnaker Financial Services, part of Spinnaker Capital, an emerging markets investment management firm, and a 20% interest in the D.E. Shaw group, a global investment management firm.

*Asset Management.* Asset Management provides proprietary asset management products across traditional and alternative asset classes, through a variety of distribution channels, to individuals and institutions. It includes both the Neuberger Berman and Lehman Brothers Asset Management brands as well as our Private Equity business.

Neuberger Berman. Neuberger Berman has provided money management products and services to individuals and families since 1939. We acquired Neuberger Berman in October 2003.

Neuberger Berman's Private Asset Management business provides discretionary, customized portfolio management across equity and fixed income asset classes for high-net-worth clients. Experienced money managers, each with a distinct investment style and discipline, tailor investment strategies to fit clients' individual goals, financial needs and tolerance for risk.

The Neuberger Berman family of funds spans asset classes, investment styles and capitalization ranges. Its open-end mutual funds are available directly to investors or through distributors, and its closed-end funds trade on major stock exchanges. Neuberger Berman is also a leading sub-advisor of funds for institutional clients, including insurance companies, banks and other financial services firms. We serve as the investment advisor or sub-advisor for numerous defined contribution plans, and for insurance companies offering variable annuity and variable life insurance products, and we provide portfolio management through both mutual fund and separate account wrap programs.

## LEHMAN BROTHERS HOLDINGS INC.

<u>Lehman Brothers Asset Management</u>. Lehman Brothers Asset Management specializes in investment strategies for institutional and qualified individual investors. While our strategies are numerous and diverse, our managers share a dedication to investment discipline that includes quantitative screening, fundamental analysis and risk management.

Lehman Brothers Institutional Asset Management provides a full range of asset management products for pensions, foundations, endowments and other institutions. It offers strategies across the risk/return spectrum, in cash, fixed income, equity and hybrid asset classes. Our money market funds include cash, prime and government funds, as well as customized short-duration fixed income strategies and enhanced cash capabilities. Our longer-maturity fixed income products are available across a continuum of strategies, from indexed to actively managed portfolios, with varying levels of risk parameters geared toward our clients' particular requirements. Our equities strategies are based on fundamental research and quantitative analysis, with risk management incorporated throughout the investment process, using quantitative tools and adherence to sell-disciplines.

Lehman Brothers' Absolute Return Strategies platform provides a wide range of hedge fund products to institutions and qualified individual clients. It offers proprietary single-manager funds, proprietary multiple-manager funds of funds and third-party single-manager funds. Our proprietary single-manager funds cover a wide array of investment strategies across long/short equity, relative value, event-driven and directional trading styles. As a sponsor of commingled multiple-manager funds of unaffiliated hedge funds and customized accounts, Lehman Brothers offers access to a select universe of fund managers.

<u>Private Equity</u>. Private Equity provides opportunities in privately negotiated transactions across a variety of asset classes for institutional and high-net-worth individual investors. Our investment partnerships manage a number of private equity portfolios, with the Company's capital invested alongside that of our clients. Lehman Brothers creates funds, and through our Capital Markets business segment invests in asset classes in which we have strong capabilities, proprietary deal flow and an excellent reputation. Areas of specialty include Merchant Banking, Venture Capital, Real Estate, Credit-Related Investments, Infrastructure Investments and Private Fund Investments. We generally co-invest on a principal basis through our Capital Markets business segment in the investments made by the funds. The Private Fund Marketing Group focuses on raising capital for a limited number of high-quality private equity sponsors, providing them access to a well-diversified institutional global limited partner base.

***Private Investment Management.*** Private Investment Management provides traditional brokerage services and comprehensive investment, wealth advisory, trust and capital markets execution services to both high-net-worth individuals and small and medium size institutional clients, leveraging all the resources of Lehman Brothers.

<u>High Net Worth Clients</u>. For individuals needing such services, our investment professionals and strategists work together to provide asset allocation, portfolio strategy and manager selection, and integrate that advice with tax, trust and estate planning. Driven by our clients' goals for preserving and enhancing wealth across generations, we offer a wide range of investment opportunities including traditional and alternative investments. We are selective in creating our investment platform and look beyond proprietary products for opportunities. As needed, our tax and estate strategists integrate our clients' investment strategies with their overall tax and estate picture, recommending vehicles to minimize taxes and provide for future generations. Additionally, the Lehman Brothers Trust Company provides private clients with comprehensive trustee and executor services. We address the specific needs of corporate executives and business owners through diversification and liquidity strategies. Additionally, where appropriate we partner with professionals across the Firm to deliver corporate finance and real estate solutions to our clients.

<u>Institutional Clients</u>. For institutions, we leverage the Lehman Brothers Capital Markets franchise to provide brokerage and market-making services to small and mid-sized institutional clients in the fixed income and equities capital markets.

**Technology**

Our businesses and operations rely on the secure processing, storage and transmission of confidential and other information, and on the utilization of the internet. We have made substantial investments in our technology, and Lehman Brothers is committed to the continued development and use of technology throughout the Firm. Our technology initiatives are designed to enhance client service through increased connectivity and the provision of value-added, tailored products and services, improve our trading, execution and clearing capabilities, enhance risk management and increase our overall efficiency, productivity and control.

We have enhanced client service by providing clients with electronic access to our products and services through our *LehmanLive*® web site and other channels. In particular, we provide global electronic trading, analytics and information

distribution capabilities covering many of our fixed income, currency, commodity, equity and other products around the world.

-9-

## LEHMAN BROTHERS HOLDINGS INC.

Electronic commerce and technology have changed and will continue to change the ways that securities and other financial products are traded, distributed and settled. This creates both opportunities and challenges for our businesses. We remain committed to being at the forefront of technological innovation in the global capital markets. See Part I, Item 1A, "Risk Factors—Operational Risk," for a discussion of technology risks to which we are exposed.

### Corporate

Our Corporate division provides support to our businesses through the processing of certain securities and commodities transactions, receipt, identification and delivery of funds and securities, safeguarding of clients' securities, risk management, and compliance with regulatory and legal requirements. In addition, the Corporate division is responsible for technology infrastructure and systems development, information security, business continuity planning, treasury operations, financial reporting and business unit financial support, tax planning and compliance, internal audit, expense management, career development and recruiting and other support functions.

### Risk Management

A description of our Risk Management infrastructure and procedures is contained in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management" in Part II, Item 7, of this Report. Information regarding our use of derivative financial instruments to hedge interest rate, currency, security and commodity price and other market risks is contained in Notes 1, 3, 4, 6, 8 and 9 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

### Competition

All aspects of our business are highly competitive. Lehman Brothers competes in U.S. and international markets directly with numerous other firms in the areas of securities underwriting and placement, corporate finance and strategic advisory services, securities sales and trading, prime brokerage, research, foreign exchange and derivative products, asset management and private equity, including investment banking firms, traditional and online securities brokerage firms, mutual fund companies and other asset managers, investment advisers, venture capital firms, certain commercial banks, insurance companies and others. Our competitive ability depends on many factors, including our reputation, the quality of our services and advice, product innovation, execution ability, pricing, advertising and sales efforts and the talent of our personnel. See Part I, Item 1A, "Risk Factors – Competitive Environment," for a further discussion of the competitive risks to which we are exposed.

### Regulation

The financial services industry is subject to extensive regulation in the various jurisdictions in which we do business. Violation of applicable regulations can result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders, prohibitions from engaging in, or limitations or conditions on, some of our business activities, which could result in significant losses or reputational damage. We believe that we are in material compliance with applicable regulations.

Currently, U.S. and other international regulators are considering adopting a "mutual recognition" regulatory scheme to lower the barriers for financial institutions and markets seeking to conduct business in other jurisdictions. The objective is to provide investors with greater access to foreign investment opportunities while preserving important investor protection safeguards. Under "mutual recognition," non-U.S. financial intermediaries might be able to provide services to U.S. investors without registering in the U.S. so long as those intermediaries are supervised in an approved jurisdiction that offers comparable regulatory oversight and reciprocity to U.S. firms. U.S. regulators are also considering eliminating or loosening some of the restrictive requirements under Rule 15a-6, which sets forth a process by which a non-U.S. broker can access certain U.S. customers without full registration with the SEC. Both mutual recognition and Rule 15a-6 reform could prompt changes to the status of U.S. and non-U.S. entities through which the Firm conducts its business, how and by whom the Firm is regulated internationally, and how certain cross-border transactions are structured.

***U.S. Regulation.*** Holdings and its subsidiaries are subject to group-wide supervision and examination by the SEC as a Consolidated Supervised Entity ("CSE"). See "Capital Requirements" below and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Accounting and Regulatory Developments—Basel II" in Part II, Item 7, of this Report.

Lehman Brothers Inc. ("LBI"), Neuberger Berman, LLC ("NB LLC") and Neuberger Berman Management Inc. ("NBMI") are registered with the SEC as broker-dealers; Lehman Brothers OTC Derivatives Inc. ("LB OTC") is registered with the SEC as an OTC derivatives dealer; and LBI, NB LLC, NBMI, Lehman Brothers Asset Management LLC ("LBAM"), and certain other of our subsidiaries are registered with the SEC as investment advisers. As such, these entities are subject to regulation by

the SEC and by self-regulatory organizations, principally FINRA (which has been designated by the SEC as

-10-

## LEHMAN BROTHERS HOLDINGS INC.

LBI's, NB LLC's and NBMI's primary regulator), national securities exchanges such as the NYSE and the Municipal Securities Rulemaking Board, among others. Securities firms are also subject to regulation by state securities administrators in those states in which they conduct business. Various subsidiaries are registered as broker-dealers in all 50 states, the District of Columbia and the Commonwealth of Puerto Rico.

Broker-dealers are subject to regulations, including those contained in the Securities Act of 1933 and the Securities Exchange Act of 1934, and rules promulgated thereunder, that cover all aspects of the securities business, including sales practices, market making and trading among broker-dealers, publication of research, margin lending, use and safekeeping of clients' funds and securities, capital structure, recordkeeping and the conduct of directors, officers and employees.

Registered investment advisers are subject to regulations under the Investment Advisers Act of 1940. Such requirements relate to, among other things, recordkeeping and reporting requirements, disclosure requirements, limitations on agency cross and principal transactions between an adviser and advisory clients, as well as general anti-fraud prohibitions.

Certain investment funds that we manage are registered investment companies under the Investment Company Act of 1940. Those funds and the Lehman Brothers entities that serve as the funds' investment advisers are subject to that act and the rules thereunder, which, among other things, regulate the relationship between a registered investment company and its investment adviser and prohibit or severely restrict principal transactions and joint transactions.

LBI and NB LLC are also registered with the Commodity Futures Trading Commission (the "CFTC") as futures commission merchants, and NB LLC, LBAM and other subsidiaries are registered as commodity pool operators and/or commodity trading advisers. These entities are subject to regulation by the CFTC and various domestic boards of trade and other commodity exchanges. Our U.S. commodity futures and options business is also regulated by the National Futures Association, a not-for-profit membership corporation that has been designated as a registered futures association by the CFTC.

LB Bank, a federally chartered savings bank incorporated under the laws of the United States of America, is regulated by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation ("FDIC"). LB Commercial Bank is subject to regulation by the FDIC and the Utah Commissioner of Financial Institutions. Lehman Brothers Trust Company N.A., which holds a national bank charter, is regulated by the Office of the Comptroller of the Currency of the United States. Lehman Brothers Trust Company of Delaware, a non-depository limited purpose Delaware trust company, is subject to oversight by the State Bank Commissioner of the State of Delaware. These bodies regulate such matters as policies and procedures on conflicts of interest, account administration and overall governance and supervisory procedures.

Lehman Brothers Commodity Services Inc. ("LBCS") is authorized by the Federal Energy Regulatory Commission ("FERC") to sell wholesale physical power at market-based rates. As a FERC-authorized power marketer, LBCS is subject to regulation under the Federal Power Act and FERC regulations.

Our U.S. insurance subsidiaries are subject to state insurance regulation in the states in which they are domiciled and in the other states in which they are licensed.

***Non-U.S. Regulation.*** We do business in the international fixed income and equity markets and undertake international investment banking and investment management activities, principally through our regional headquarters in London and Tokyo. Lehman Brothers International (Europe) ("LB Europe") is an authorized investment firm in the United Kingdom and is a member of the London, Frankfurt, Paris and Milan exchanges, among others. The U.K. Financial Services and Markets Act 2000 (the "FSMA") and rules promulgated thereunder govern all aspects of the United Kingdom investment business, including regulatory capital, sales, research and trading practices, use and safekeeping of client funds and securities, record keeping, margin practices and procedures, approval standards for individuals, periodic reporting and settlement procedures. Pursuant to the FSMA, certain of our subsidiaries are subject to regulations promulgated and administered by the U.K.'s Financial Services Authority ("FSA").

The investment services that are subject to oversight by the FSA and other European regulators are regulated in accordance with European Union ("EU") directives requiring, among other things, customer protection requirements and conduct of business rules. These standards, requirements and rules are similarly implemented, under the same directives, throughout the EU and are broadly comparable in scope and purpose to the customer protection requirements imposed under the SEC and CFTC rules. Some EU directives also permit local regulation in each jurisdiction, including those in which we operate, to be more restrictive than the requirements of such directives.

The EU Markets in Financial Instruments Directive ("MiFID"), a major piece of legislation that updates and expands the current framework for regulating exchanges, multilateral trading facilities and investment firms on a pan-European basis, was

implemented in the U.K. and most other EU member states on November 1, 2007. MiFID facilitates cross-border

-11-

## LEHMAN BROTHERS HOLDINGS INC.

business by investment firms by generally establishing the regulatory regime of the member state in which an investment firm has its registered or head office as controlling the investment business of that firm. Once a firm has been authorized by its home member state, it will be able to use the MiFID passport to provide services to customers in other EU member states, which will be regulated by the home member state (whereas previously a service was regulated by the EU member state in which the service was provided). MiFID imposes a new set of organizational and conduct of business requirements on investment firms. Ongoing efforts by EU member countries to adopt national laws and regulations under MiFID could subject the Firm to new regulatory requirements in 2008.

Various Lehman Brothers subsidiaries are regulated by the banking and regulatory authorities of the other European countries in which we operate, including the German Federal Supervisory Authority for the Financial Service Industry (BaFin), the Commission Bancaire and other agencies in France, the Banca d'Italia and the Commissione Nazionale per le Società e la Borsa (CONSOB) in Italy, the Commission de Surveillance du Secteur Financier in Luxembourg and the Swiss Federal Banking Commission, as well as by the European securities, derivatives and commodities exchanges of which they are members. The rules and requirements of these European regulators and exchanges are broadly comparable to the rules and the requirements of the U.S. regulators and exchanges.

Lehman Brothers Japan Inc. ("LB Japan") is a registered securities company in Japan and a member of the Tokyo Stock Exchange Inc., the Osaka Securities Exchange Co., Ltd., the Jasdaq Securities Exchange Inc., the Tokyo Financial  Exchange Inc. and the Tokyo Commodity Exchange and, as such, is regulated by the Financial Services Agency, the Securities Exchange Surveillance Commission, the Japan Securities Dealers Association, the Financial Futures Association of Japan, the Tokyo Metropolitan Government and those exchanges.

Other Lehman Brothers subsidiaries in Asia are regulated by the Securities and Futures Commission in Hong Kong, the Monetary Authority of Singapore, the China Securities Regulatory Commission, the Korean Financial Supervisory Service, the Australian Securities and Investments Commission, the Securities and Exchange Board of India and the Reserve Bank of India, as well as by the Asian securities, derivatives and commodities exchanges of which they are members. The rules and requirements of these Asian regulators and exchanges are broadly comparable to the rules and the requirements of the U.S. regulators and exchanges.

In the Americas, LBI and certain other subsidiaries are regulated by the Ontario Securities Commission in Canada, and certain of our Bermuda-based insurance subsidiaries are regulated by the Bermuda Monetary Authority.

LBI, LB Europe, LB Japan and many of our other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, securities, derivatives and commodities exchanges and other self-regulatory organizations in numerous other countries in which we do business.

*Research.* The research areas of investment banks have been and remain the subject of regulatory scrutiny. The SEC, NYSE and NASD (now FINRA) have adopted rules imposing restrictions on the interaction between equity research analysts and investment banking personnel at member securities firms. Various non—U.S. jurisdictions have imposed both substantive and disclosure-based requirements with respect to research, and continue to consider additional regulation. In addition, we are a party to a settlement with certain federal and state securities regulators and self-regulatory organizations that imposes restrictions on the interaction between research and investment banking departments and requires us to fund the provision of independent research to our clients.

*Mortgage Lending.* We originate, purchase and securitize commercial and residential mortgage loans through LB Bank, Bankhaus and other subsidiaries in the U.S., Europe and Asia, and we are subject to an extensive body of U.S. federal and state mortgage laws and regulations, as well as laws and regulations in other countries, including the U.K., the Netherlands, Japan and South Korea. In recent years, individual cities and counties in the U.S. have begun to enact laws that restrict non-prime loan origination activities. The U.S. federal government is also considering legislative and regulatory proposals in this regard. In 2006, U.S. federal bank regulators issued interagency guidance applicable to federally chartered lenders such as LB Bank covering certain residential mortgage loan products, and are considering further proposals that cover topics related to loan terms and underwriting standards, risk management practices and consumer protection issues. It remains unclear how all these initiatives will be interpreted, what effect it will have on our business and whether it will change the overall competitive landscape in the mortgage industry.

In addition, the SEC and banking regulators are examining the disruption in the subprime mortgage market that began in the summer of 2007. Their efforts have focused on a wide range of issues, including the origination and securitization of mortgages, the sale of collateralized debt obligations and other securities backed by those mortgages, and valuation and pricing of those securities internally and for customers. In addition to reviewing the sales of subprime-backed securities to customers,

regulators have expressed interest in reviewing the proprietary positions taken by firms who have underwritten them, including broker-dealer exposure to subprime-backed securities, and capital treatment and

-12-

## LEHMAN BROTHERS HOLDINGS INC.

financial reporting, including off-balance sheet vehicles with subprime mortgage exposure. As the regulatory efforts are in their early stages, it is unclear what, if any, action will be taken.

***Hedge Fund Activities.*** In recent years, high-profile hedge fund failures and concerns about hedge fund transparency and systemic risk have brought increased regulatory attention to hedge funds as well as to their counterparties and other entities that service them. In addition to Lehman Brothers' proprietary funds, the Firm provides services and is a counterparty to unaffiliated hedge funds and is subject to regulation concerning all of these activities. We also have investments in a number of hedge fund managers. Because most hedge funds are not directly regulated, financial regulators in the U.S. and abroad are increasingly focused on counterparty credit risk management practices of other financial institutions as the optimal way to control hedge fund leverage and limit systemic vulnerabilities.

The U.S. Congress has been examining the adequacy of the existing regulatory structure and is considering whether to introduce legislation to require hedge funds to register with the SEC. The President's Working Group and central bankers abroad are working on a set of best practices for hedge funds. In addition to proposing new regulations extending anti-fraud protection to hedge fund investors and raising the eligibility threshold for investing in hedge funds, the SEC has created several "working groups" that focus specifically on hedge fund practices, including identifying and managing conflicts of interest, preventing and detecting insider trading, and valuation of hedge fund assets.

***Protection of Client Information.*** Many aspects of our business are subject to increasingly comprehensive legal and regulatory requirements concerning the use, safeguarding and disposal of certain client information, including those adopted pursuant to the Gramm-Leach-Bliley Act of 1999, the Fair and Accurate Credit Transactions Act of 2003 and a number of state data protection laws in the U.S., the EU Data Protection and Telecommunications Privacy Directives and member state implementations, and various laws in Asia, including the Japanese Personal Information Protection Law and the Hong Kong Personal Data (Privacy) Ordinance. We monitor these matters closely and adopt policies and procedures designed to comply with such requirements.

***Anti-Money Laundering.*** The USA PATRIOT Act of 2001 and various laws and regulations in the U.K, EU, Japan and other jurisdictions contain anti-money laundering and anti-terrorism requirements that mandate the implementation of various regulations applicable to financial services companies, including requirements for verifying client identity at account opening, conducting enhanced due diligence, monitoring client transactions and reporting suspicious activities, staff training and awareness, record keeping and making use of international findings. These laws and regulations seek to promote cooperation among financial institutions, regulators and law enforcement in identifying parties that may be involved in terrorism or money laundering. We have established policies, procedures and internal controls that are designed to comply with these laws and regulations.

***Judicial, Regulatory and Arbitration Proceedings.*** We are involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of our business. See Part I, Item 3, "Legal Proceedings," in this Report for information about certain pending proceedings.

### Capital Requirements

LBI, LB OTC, NB LLC, NBMI, LB Europe, LB Japan, LB Bank, LB Commercial Bank, Bankhaus and other regulated subsidiaries of Holdings are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate. In addition, our "AAA" rated derivatives subsidiaries (Lehman Brothers Financial Products Inc. and Lehman Brothers Derivative Products Inc.) are subject to capital targets established by various ratings agencies. The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict Holdings' ability to withdraw capital from certain subsidiaries, which in turn could limit its ability to commit capital to other businesses, meet obligations or pay dividends to shareholders. Further information about these requirements and restrictions is contained in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity, Funding and Capital Resources" in Part II, Item 7, of this Report and in Note 15 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

The SEC has granted us permission to operate under its CSE rule, a voluntary framework for comprehensive, group-wide risk management procedures and consolidated supervision of certain financial services holding companies. The rule allows LBI to use an alternative method, based on internal models, to calculate net capital charges for market and derivative-related credit risk. Under this rule, Lehman Brothers is subject to group-wide supervision and examination by the SEC and is subject to minimum capital requirements on a consolidated basis consistent with the Basel II Accord published by the Basel Committee on Banking Supervision. The CSE Rules are designed to minimize the duplicative regulatory requirements on U.S. securities firms resulting from the EU Directive (2002/87/EC) concerning the supplementary supervision of financial conglomerates

active in the EU. This Directive permits non-EU financial groups that conduct business through regulated financial entities in the EU to demonstrate that they are subject to equivalent

-13-

### LEHMAN BROTHERS HOLDINGS INC.

consolidated supervision at the ultimate holding company level; the FSA has determined that the SEC undertakes equivalent consolidated supervision for Lehman Brothers. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Accounting and Regulatory Developments—Basel II" in Part II, Item 7, of this Report for more information.

**Client Protection**

LBI and NB LLC are members of the Securities Investor Protection Corporation ("SIPC"). Clients of LBI and NB LLC are protected by SIPC against some losses. SIPC provides protection against lost, stolen or missing securities (except loss in value due to a rise or fall in market prices) for clients in the event of the failure of the broker-dealer. Accounts are protected up to $500,000 per client with a limit of $100,000 for cash balances. In addition to being members of SIPC, LBI and NB LLC carry excess SIPC protection, which increases each client's protection up to the net equity of the account, subject to terms and conditions similar to SIPC. Like SIPC, the excess coverage does not apply to loss in value due to a rise or fall in market prices. Certain of our non-U.S. broker-dealer subsidiaries participate in programs similar to SIPC in certain jurisdictions.

Deposits in LB Bank and LB Commercial Bank are insured by the FDIC, subject to applicable limits per depositor. Bankhaus participates in the German Depositors Protection Fund, which insures deposits from non-bank clients, with applicable limits per depositor.

**Insurance**

We maintain insurance coverage in types and amounts and with deductibles that management believes are customary for companies of similar size and engaged in similar businesses. However, the insurance market is volatile, and there can be no assurance that any particular coverage will be available in the future on terms acceptable to us.

**Employees**

As of November 30, 2007, Lehman Brothers employed approximately 28,600 persons. We consider our relationship with our employees to be good.

## ITEM 1A. RISK FACTORS

You should carefully consider the following risks and all of the other information set forth in this Report, including the Consolidated Financial Statements and the Notes thereto. If any of the events or developments described below were actually to occur, our business, financial condition, results of operations or cash flows could be materially adversely affected.

**Market Risk**

As a global investment bank, risk is an inherent part of our business. Our businesses are materially affected by conditions in the financial markets and economic conditions generally around the world. A favorable business environment is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. Slowing growth, contraction of credit, increasing energy prices, declines in business or investor confidence or risk tolerance, increases in inflation, higher unemployment, outbreaks of hostilities or other geopolitical instability, corporate, political or other scandals that reduce investor confidence in capital markets and natural disasters, among other things, can affect the global financial markets. In addition, economic or political pressures in a country or region may cause local market disruptions and currency devaluations, which may also affect markets generally. In the event of changes in market conditions, such as interest or foreign exchange rates, equity, fixed income, commodity or real estate valuations, liquidity, availability of credit or volatility, our businesses could be adversely affected in many ways, including those described below. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management—Market Risk" for a further discussion of the market risks to which we are exposed.

-14-

## LEHMAN BROTHERS HOLDINGS INC.

***Our Client-Flow Revenues May Decline in Adverse Market Conditions.*** Recently, the residential real estate market in the U.S. has experienced a significant downturn due to declining real estate values, substantially reducing mortgage loan originations and securitizations, and precipitating more generalized credit market dislocations and a significant contraction in available liquidity globally, which negatively impacted our revenues. These factors have continued into the beginning of fiscal 2008 and, combined with rising oil prices, declining business and consumer confidence and increased unemployment, have precipitated an economic slowdown and fears of a possible recession. Further declines in real estate values in the U.S. or elsewhere and continuing credit and liquidity concerns could further reduce our level of mortgage loan originations and securitizations and increase our mortgage inventory while adversely affecting its value. In addition, continued or further credit market dislocations or sustained market downturns may reduce client flow revenues and adversely affect the value of our inventory in other businesses.

Changes in interest rates, and in particular long-term rates, especially if such changes are rapid, may create a less favorable environment for certain of our businesses. Rising interest rates may cause a decline in our mortgage origination and securitization businesses in particular, as the volume of our origination and securitization activity may decline.

Our Investment Banking revenues, in the form of financial advisory and debt and equity underwriting fees, are directly related to the number and size of the transactions in which we participate and therefore were adversely affected in the latter half of 2007 by the mortgage and credit market dislocations, and may be further impacted by continued or further credit market dislocations or sustained market downturns.

Sustained market downturns or continued or further credit market dislocations and liquidity issues would also likely lead to a decline in the volume of capital market transactions that we execute for our clients and, therefore, to a decline in the revenues we receive from commissions and spreads earned from the trades we execute for our clients. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value of those portfolios, a market downturn that reduces the value of our clients' portfolios would reduce the revenues we receive from our asset management business. Heightened risk aversion among investors may cause them to shift their trading activity to higher quality and more liquid products, which are generally somewhat less profitable for us.

Even in the absence of a market downturn, below-market investment performance by our fund and portfolio managers could reduce Investment Management revenues and assets under management and result in reputational damage that might make it more difficult to attract new investors.

***We May Incur Losses Due to Fluctuations in Market Rates, Prices and Volatility.*** Market risk is inherent in our client-driven market-making transactions and proprietary trading and principal investment activities in equity and fixed income securities, commodities, currencies and derivatives and our mortgage and loan origination and syndication activities. Fluctuations in market rates, prices and volatility, especially if the changes are rapid and without warning, can adversely affect the market value of our long or short inventory and proprietary and principal positions and, to the extent that such positions are not adequately hedged, cause the Firm to incur losses. To the extent that we hold long inventory positions, a downturn in the market could result in losses from a decline in the value of those positions. On the other hand, to the extent that we have sold inventory short, an upturn in those markets could expose us to losses as we attempt to cover our short positions by acquiring assets in a rising market. The adverse conditions in the U.S. housing market, dislocations in the credit markets and corrections in certain asset-backed security market segments resulted in substantial valuation reductions in the past fiscal year, most significantly on mortgage- and real estate-related positions and lending obligations. Market credit spreads have recently gone from historically tight to historically wide levels, and a further widening of credit spreads or worsening of credit market dislocations or sustained market downturns could have additional negative effects on the value of our inventory.

In our market-making and specialist transactions, we maintain substantial inventory positions from time to time, acting as a financial intermediary for our clients, and we hold inventory positions in the normal course of business to allow clients to rebalance their portfolios and diversify risks across market cycles. Current NYSE rules generally require our specialist business to maintain orderly markets in the securities for which it is a specialist. Specialists are obligated to take positions in their issues counter to the direction of the market in order to minimize short-term imbalances in the market, involving risk of loss during periods of market fluctuation and volatility.

In our mortgage and loan origination and securitization businesses, we are also subject to risks from decreasing interest rates. Most residential mortgages and consumer loans provide that the borrower may repay them early. Borrowers often exercise this right when interest rates decline. As prepayments increase, the value of mortgages and other loans with prepayment features held in inventory prior to securitization generally will decrease, and to the extent that prepayment risk has not been hedged, prepayments may result in a loss.

We also maintain long and short positions through our other proprietary trading activities and make principal

-15-

## LEHMAN BROTHERS HOLDINGS INC.

investments (such as in real estate and real estate-related products and private equity), which are also subject to market risks. The value of these positions can be adversely affected by changes in market rates, prices and volatility. We have increased our proprietary trading and principal investing activities and expect to continue to do so, which increases our exposure to market risk.

On the other hand our client-flow and proprietary trading businesses generally depend on market volatility to provide trading and arbitrage opportunities, and a decline in volatility may reduce these opportunities and adversely affect the results of these businesses.

***Holding Large and Concentrated Positions May Expose Us to Losses.*** Concentration of risk may reduce revenues or result in losses in our market-making, specialist, block trading, underwriting, proprietary trading, principal investment and lending businesses in the event of unfavorable market movements even when economic and market conditions are generally favorable for others in the industry. We have committed substantial amounts of capital to these businesses, which often require us to take large positions in the securities of, or make large loans to, a particular issuer or issuers in a particular industry, country or region. Moreover, the trend in all major capital markets is towards larger and more frequent commitments of capital in many of these activities, and we expect this trend to continue. For example, large positions of securities are increasingly being sold in block trades rather than on a marketed basis, which could increase the risk that we may be unable to resell the securities at favorable prices. While our activities expose us to many different counterparties, we routinely execute a high volume of transactions with counterparties in the financial services industry, including brokers and dealers, commercial banks, investment funds and other institutional clients, resulting in significant credit concentration with respect to this industry. In the ordinary course of business, we may also be subject to a concentration of credit risk to a particular counterparty, borrower or issuer. Concentration of risk will increase as we expand our proprietary trading and principal investing activities or commit additional capital to facilitate client-driven business.

***Market Risk May Increase the Other Risks That We Face.*** In addition to the potentially adverse effects on our businesses described above, market risk could exacerbate other risks that we face. For example, if we were to incur substantial market risk losses, our need for liquidity could rise significantly, while our access to liquidity could be impaired. In addition, in conjunction with a market downturn, our clients and counterparties could incur substantial losses of their own, thereby weakening their financial condition and increasing our credit risk exposure to them.

## Credit Risk

***We May Incur Losses Associated with Our Credit Exposures.*** Credit risk represents the possibility a counterparty or an issuer of securities or other financial instruments we hold or a borrower of funds from us will be unable to honor its contractual obligations to us. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. Default risk may also arise from events or circumstances that are difficult to foresee or detect, such as fraud. Credit risk may arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to non-delivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit to our clients through bridge or margin loans or other arrangements. As a clearing member firm, we finance our client positions, and we could be held responsible for the defaults or misconduct of our clients. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management—Credit Risk" for a further discussion of the credit risks to which we are exposed. Our principal focus has been acting as an intermediary of credit. In recent years, we have expanded our activities associated with providing our clients access to credit and liquidity and have also expanded our swaps and derivatives businesses. The amount and duration of our credit exposures have been increasing, as has the diversity of the entities to which we have credit exposures. The extension and pricing of credit is subject to competitive pressure. In addition, corporate clients sometimes seek to require credit commitments from us in connection with investment banking and other assignments. Further, the recent widening of credit spreads and dislocations in the credit markets have in some cases made it more difficult to syndicate credit commitments to investors, and further widening of credit spreads or worsening of these dislocations could increase these difficulties, resulting in increased credit exposures.

***Defaults by Another Large Financial Institution Could Adversely Affect Financial Markets Generally.*** The commercial soundness of many financial institutions may be closely interrelated as a result of credit, trading, clearing or other relationships between the institutions. As a result, concerns about, or a default by, one institution could lead to significant market-wide liquidity problems, losses or defaults by other institutions. This is sometimes referred to as "systemic risk" and may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which we interact on a daily basis, and therefore could adversely affect Lehman Brothers.

-16-

# LEHMAN BROTHERS HOLDINGS INC.

**Liquidity Risk**

Liquidity, that is ready access to funds, is essential to our businesses. Financial institutions rely on external borrowings for the vast majority of their funding, and failures in our industry are typically the result of insufficient liquidity.

***An Inability to Access the Debt Markets Could Impair Our Liquidity.*** We maintain a liquidity pool available to Holdings that is intended to cover all expected cash outflows for one year in a stressed liquidity environment, which assumes, among other things, that during that year we cannot issue unsecured debt. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity, Funding and Capital Resources—Liquidity" for a discussion of our liquidity needs and liquidity management.

To the extent that a liquidity event lasts for more than one year, or our expectations concerning the market conditions that exist during a liquidity event, or our access to funds, prove to be inaccurate (*e.g.*, the level of secured financing "haircuts" (the difference between the market and pledge value of the assets) required to fund our assets in a stressed market event is greater than expected, or the amount of drawdowns under our commitments to extend credit in a stressed market environment exceeds our expectations), our ability to repay maturing indebtedness and fund operations could be significantly impaired. Even within the one-year time frame contemplated by our liquidity pool, we depend on continuous access to secured financing in the repurchase and securities lending markets, which could be impaired by factors that are not specific to Lehman Brothers, such as a severe disruption of the financial markets.

***Structured Instruments May Have Limited Liquidity.*** The financial instruments that we hold and the contracts to which we are a party are increasingly complex, as we employ structured products to benefit our clients and ourselves, and these complex structured products often do not have readily available markets to access in times of liquidity stress. The growth of our proprietary investing activities may lead to situations where the holdings of structured instruments represent a significant portion of specific markets, which could restrict liquidity for our positions. Further, our ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time.

***We Are a Holding Company and Are Dependent on Our Subsidiaries for Funds.*** Since Holdings is primarily a holding company, our cash flow and consequent ability to pay dividends and satisfy our obligations under securities we issue are dependent upon the earnings of our subsidiaries and the distribution of those earnings as dividends or loans or other payments by those subsidiaries to Holdings. Several of our principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. These regulatory rules, and certain covenants contained in various debt agreements, may restrict our ability to withdraw capital from our subsidiaries by dividends, loans or other payments. Further information about these requirements and restrictions is set forth in Note 15 to the Consolidated Financial Statements in Part II, Item 8, of this Report. Additionally, our ability to participate as an equity holder in any distribution of assets of any subsidiary upon liquidation is generally subordinate to the claims of creditors of the subsidiary.

**Credit Ratings**

Our borrowing costs and our access to the debt capital markets depend significantly on our credit ratings. A reduction in our long- or short-term credit ratings could increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements in derivative contracts and other secured funding arrangements. Credit ratings are also important to us when competing in certain markets, such as longer-term over-the-counter derivatives. Therefore, a substantial reduction in our credit ratings would reduce our earnings and adversely affect our liquidity and competitive position. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity, Funding and Capital Resources—Liquidity" and "—Credit Ratings" for additional information concerning our credit ratings.

**Risks Relating to Use of Estimates and Valuations**

We make various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in measuring fair value of certain financial instruments, accounting for identifiable intangible assets and goodwill, establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations, assessing our ability to realize deferred taxes and valuing equity-based compensation awards. Estimates are based on available information and judgment. Therefore, actual results could differ from our estimates and that difference could have a material effect on our consolidated financial statements.

Financial instruments and other inventory positions owned (including commitments and guarantees, but excluding real estate held for sale), and financial instruments and other inventory positions sold but not yet purchased, are presented at fair value,

with realized and unrealized gains or losses reflected in Principal transactions in our Consolidated Statement of

-17-

## LEHMAN BROTHERS HOLDINGS INC.

Income. We account for real estate held for sale at the lower of its carrying amount or fair value less cost to sell. In addition, certain long and short-term borrowing obligations, principally hybrid financial instruments, and certain deposits at U.S. banks, are reflected at fair value. Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. In particular, certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives have no direct observable levels, and their valuations require significant estimation and judgment and therefore are subject to significant subjectivity. Reliance on estimation and judgment increases in adverse market conditions with decreased liquidity, such as those experienced recently.

See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" and Notes 1 and 3 through 10 to the Consolidated Financial Statements in Part II, Item 8, of this Report for additional information concerning our use of estimates and valuation methodologies.

### Risks Relating to Off-Balance Sheet Entities

In the normal course of our business, we enter into various transactions with special purpose entities ("SPEs"). We do not consolidate certain SPEs in which we do not have a controlling financial interest as defined under applicable accounting standards. When we do not consolidate an entity, we either present our investment in the entity at fair value or apply the equity method of accounting. The assessment of whether the accounting criteria for consolidation are met requires management to exercise significant judgment. A determination of whether we have a controlling financial interest in an entity, and therefore our assessment of consolidation of that entity, is initially made at the time we become involved with the entity. If certain events occur that require us to re-assess our initial determination of non-consolidation or if our judgment of non-consolidation is in error, we could be required to consolidate the assets and liabilities of an SPE onto our consolidated balance sheet and recognize its future gains or losses in our consolidated statement of income. Further, existing accounting standards may be changed, or interpretations of those standards may change, in the future in a manner that requires or increases the risk of consolidation of some SPEs. Consolidation could affect the size of our consolidated balance sheet and related funding requirements, our financial and regulatory capital ratios and, if the SPE's assets include unrealized losses, could require us to recognize those losses.

In addition, we have various commitments to and obligations associated with SPEs, including liquidity commitments and funded loans to certain conduits and other SPEs, limited downside protection guarantees to investors in certain SPEs, obligations as a general partner and investment advisor to private equity and other investment partnerships, indemnification obligations to investors in certain securitization vehicles we sponsor with respect to customary representations and warranties we make about the assets of SPEs, proprietary investments and retained interests in various SPEs and others. For additional information about our consolidation accounting policies and transactions with SPEs, and events that may require us to re-assess our determination of non-consolidation, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Consolidation Policies" and "—Off-Balance-Sheet Arrangements—Special Purpose Entities" in Part II, Item 7, and Notes 1, 6 and 9 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

### Operational Risk

***Operational Risks May Disrupt Our Businesses, Result in Losses or Reputational Damage or Limit Our Growth.*** We face operational risk arising from errors made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. Derivative contracts are not always confirmed by the counterparties on a timely basis; while the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. Our businesses are highly dependent on our ability to process, on a daily basis, a large number of transactions across numerous and diverse markets in many currencies and the transactions we process have become increasingly complex. Consequently, we rely heavily on our financial, accounting and other data processing systems. If any of these systems do not operate properly or are disabled, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage. The inability of our systems to accommodate an increasing volume of complex transactions could also constrain our ability to expand our businesses. In recent years, we have substantially upgraded and expanded the capabilities of our data processing systems and other operating technology, and we expect that we will need to continue to upgrade and expand in the future to avoid disruption of, or constraints on, our operations.

-18-

## LEHMAN BROTHERS HOLDINGS INC.

Our businesses and operations rely on the secure processing, storage and transmission of confidential and other information, and, increasingly, on the internet. We routinely transmit and receive personal, confidential and proprietary information by email and other electronic means. We have made available to clients and counterparties certain secure transmission capabilities; however, our clients and counterparties do not always choose to avail themselves of these capabilities. We take extensive protective measures for our computer systems, internet sites, software and networks to protect against vulnerabilities to unauthorized access, computer viruses, denial of service attacks or other events that could have a security or business impact. If, nevertheless, such events should occur, they could result in significant losses or reputational damage. We are exposed to similar risks arising from the interception of personal, confidential or proprietary information sent to or received from, or the misuse or mishandling thereof by, vendors, service providers and other third parties who may receive such information from us, and our ongoing efforts to improve security over email and encrypted file transfers and to ensure that these third parties have appropriate controls in place may not be successful.

We also face the risk of operational or business failure of any of the clearing agents or other financial intermediaries or data providers we use, and as our interconnectivity with our clients grows, we face higher levels of operational risk that could adversely affect our ability to effect transactions, service our clients and manage our exposure to risk.

When we originate or purchase residential mortgage loans, we rely heavily upon information supplied by third parties, including the information contained in the loan application, property appraisal, title information and employment and income documentation. If any of this information is intentionally or negligently misrepresented, whether by the loan applicant, the mortgage broker, another third party or one of our employees, and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected and/or be unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation. While relevant laws may not explicitly hold the originating lenders responsible for the legal violations of mortgage brokers, increasingly federal and state agencies have sought to impose such assignee liability.

In addition, despite the contingency plans we have in place, our ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports our businesses and the communities in which we are located. This may include a disruption involving electrical systems, communications, transportation or other services used by Lehman Brothers or third parties with which we conduct business, terrorist activities or disease pandemics. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management" in Part II, Item 7, of this Report for a description of our Risk Management infrastructure and procedures.

***Acquisitions or Joint Ventures Could Present Unforeseen Integration Obstacles or Costs.*** Acquisitions and joint ventures involve a number of risks and present financial, managerial and operational challenges, including difficulty with integrating personnel and financial and other systems, hiring additional management and other critical personnel and increasing the scope, geographic diversity and complexity of our operations. In addition, we may not realize the anticipated benefits from an acquisition, and we may be exposed to additional liabilities of any acquired business.

**Legal, Regulatory and Reputational Risk**

We face the risk of litigation and intervention by regulatory authorities in all jurisdictions in which we conduct our businesses. Among other things, we could be subjected to judgments or fines, be prohibited from engaging in some of our business activities or be subjected to limitations or conditions on our business activities, all of which could result in significant losses or reputational damage.

***We Face Significant Litigation Risks in Our Businesses.*** The volume of litigation against financial services firms and the amount of damages claimed have increased over the past several years. We are exposed to potential liability as an underwriter under securities or other laws for materially false or misleading statements made in connection with securities and other transactions, potential liability for the "fairness opinions" and other advice we provide to participants in corporate transactions and disputes over the terms, conditions and risks of trading arrangements. We also face the possibility that counterparties will claim that we improperly failed to tell them of the risks or that they were not authorized or permitted to enter into these transactions with us and that their obligations to Lehman Brothers are not enforceable. In our Investment Management segment, we are exposed to claims against us for recommending investments that are not consistent with a client's investment objectives or engaging in unauthorized or excessive trading. The downturn in the mortgage and mortgage-backed securities markets may result in increased claims of this type, and during a prolonged market downturn, we would expect these claims to further increase. We are also subject to claims arising from disputes with employees for alleged discrimination or harassment, among other things. These risks often may be difficult to assess or quantify, and their existence and magnitude often remain unknown for substantial periods of time. We incur significant legal expenses every year in defending against litigation, and we expect to continue to do so in the future. See Part I, Item 3, "Legal Proceedings" for a discussion of some of the legal and regulatory

## LEHMAN BROTHERS HOLDINGS INC.

matters in which we are currently involved.

***Extensive Regulation of Our Businesses Limits Our Activities and May Subject Us to Significant Penalties.*** Lehman Brothers, as a participant in the financial services industry, is subject to extensive regulation under both federal and state laws in the U.S. and under the laws of the many global jurisdictions in which we do business. We are also regulated by a number of self-regulatory organizations. The industry has experienced increased scrutiny from a variety of regulators, including the SEC, FINRA and state attorneys general. Over the last several years, penalties and fines sought by regulatory authorities in our industry have increased substantially, and certain regulators have been more likely to commence enforcement actions.

The requirements imposed by our regulators are designed to ensure the integrity of the financial markets and to protect customers and other third parties who deal with Lehman Brothers. Consequently, these regulations often serve to limit our activities, including through net capital, customer protection and market conduct requirements. If we were found to have breached certain of these rules or regulations, we could face the risk of significant intervention by regulatory authorities in all jurisdictions in which we conduct our businesses, including extended investigation and surveillance activity, adoption of costly or restrictive new regulations and judicial or administrative proceedings that may result in substantial penalties. Among other things, we could be fined or prohibited from engaging in some of our business activities.

Additional legislation and regulations, changes in rules imposed by regulatory authorities, self-regulatory organizations and exchanges or changes in the interpretation or enforcement of existing laws and rules may adversely affect our business and profitability. Our business may be materially affected not only by regulations applicable to us as an investment bank, but also by regulations of general application, including existing and proposed tax legislation and other governmental regulations and policies (including the interest rate and monetary policies of the Federal Reserve Board and other central banks) and changes in the interpretation or enforcement of existing laws and rules that affect the business and financial communities.

In emerging markets in particular, we may be subject to risks of possible nationalization, expropriation, price controls, capital controls, currency exchange controls and other restrictive governmental actions. In many countries, the laws and regulations applicable to the securities and financial services industries are uncertain and evolving, and it may be difficult for us to determine the exact requirements of local laws in every market. We are also subject to greater risk in these jurisdictions that transactions we structure might not be legally enforceable in all cases. In addition, in conducting business in these jurisdictions, we are often faced with the challenge of ensuring that our activities are also consistent with U.S. or other laws with extra-territorial application, such as the USA PATRIOT Act and the U.S. Foreign Corrupt Practices Act. Our failure to comply with such laws could result in significant losses or reputational damage.

In the past several years, intensified scrutiny of the energy market by federal, state and local authorities and the public has resulted in increased regulatory and legal proceedings involving electricity, natural gas and other energy commodities merchants. Our business and reputation may be adversely affected by legal and regulatory proceedings arising out of our energy commodities activities.

We are subject to the income tax laws of the jurisdictions in which we have business operations. These tax laws are complex and may be subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. We must make judgments and interpretations about the application of these inherently complex tax laws when determining the provision for income taxes. We are subject to contingent tax risk that could adversely affect our results of operations, to the extent that our interpretations of tax laws are disputed upon examination or audit, and are settled in amounts in excess of established reserves for such contingencies. See Part I, Item 1, "Business—Regulation" for a further discussion of the regulatory environment in which we conduct our businesses.

***Our Mortgage Origination Business is Subject to Special Litigation and Regulatory Risks.*** The laws and regulations of the various jurisdictions in which we conduct our mortgage lending business are complex, frequently changing and, in some cases, in direct conflict with each other. In particular, this business is subject to various laws, regulations and guidance that restrict non-prime loan origination or purchase activities. Some of these laws and regulations provide for assignee liability for warehouse lenders, whole loan buyers and securitization trusts. In addition, the downturn in the U.S. residential real estate market has resulted in increased regulatory scrutiny, and may result in increased complaints and claims, relating to non-prime mortgage origination practices, and further difficulties in the mortgage markets could result in increased exposure to liability, including possible civil and criminal liability, demands for indemnification or loan repurchases from purchasers of our loans (including securitization trusts), class action lawsuits or administrative enforcement actions. Moreover, our customer base and counterparties in this business are substantially different from the high-net-worth and institutional customers and counterparties of most of our other businesses, which presents a different litigation risk profile.

-20-

## LEHMAN BROTHERS HOLDINGS INC.

***Exposure to Reputational Risks Could Impact the Value of Our Brand.*** Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public, and is a key focus in our risk management efforts. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by employees in the financial services industry, and we run the risk that misconduct by our employees could occur. Misconduct by employees could include binding Lehman Brothers to transactions that exceed authorized limits or present unacceptable risks, or hiding from Lehman Brothers unauthorized or unsuccessful activities, which, in either case, may result in unknown and unmanaged risks or losses. Employee misconduct could also involve the improper use or disclosure of confidential information, which could result in regulatory sanctions and serious reputational or financial harm. It is not always possible to deter employee misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. In addition, in certain circumstances our reputation could be damaged by activities of our clients in which we participate, or of hedge funds or other entities in which we invest, over which we have little or no control.

***Potential Conflicts of Interest Are Increasing.*** As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, including those relating to our proprietary activities. For example, conflicts may arise between our position as a financial advisor in a merger transaction and a principal investment we hold in one of the parties to the transaction. In addition, hedge funds and private equity funds are an increasingly important portion of our client base, and also compete with us in a number of our businesses. In addition, the SEC, FINRA, other federal and state regulators and regulators outside the U.S., including in the U.K. and Japan, have increased their scrutiny of potential conflicts of interest. We have extensive procedures and controls that are intended to ensure that any potential conflicts of interest are appropriately addressed. However, properly dealing with conflicts of interest is complex and difficult, and our reputation could be damaged if we fail, or appear to fail, to deal appropriately with conflicts of interest and, it is possible that potential or perceived conflicts could give rise to litigation or enforcement actions.

## Competitive Environment

All aspects of our business are highly competitive. Our competitive success depends on many factors, including our reputation, the quality of our services and advice, intellectual capital, product innovation, execution ability, pricing, sales efforts, and the talent of our personnel. Many of our competitors have greater capital resources and greater geographic reach than we do, which enhances their competitive positions.

***We Face Increased Competition Due to a Trend Toward Consolidation.*** In recent years, there has been substantial consolidation and convergence among companies in the financial services industry. In particular, a number of large commercial banks, insurance companies and other broad-based financial services firms have established or acquired broker-dealers or have merged with other financial institutions. Many of these firms have the ability to offer a wide range of products, from loans, deposit-taking and insurance to brokerage, asset management and investment banking services, which may enhance their competitive position. They also have the ability to support investment banking and securities products with commercial banking, insurance and other financial services revenues in an effort to gain market share. These abilities have resulted in pricing pressure in our businesses. We have experienced intense price competition in some of our businesses in recent years. For example, equity and debt underwriting and trading spreads and fees for lending and other activities have been under competitive pressure for a number of years.

***Our Revenues May Decline Due to Competition from Alternative Trading Systems.*** Securities and futures transactions are now being conducted through the internet and other alternative, non-traditional trading systems, and it appears that the trend toward alternative trading systems will continue and probably accelerate. A dramatic increase in computer-based or other electronic trading may adversely affect our commission and trading revenues, including in our specialist business. The NYSE's adoption of its hybrid market for trading securities may increase pressure on our Equities business as customers execute more of their NYSE-related trades electronically. We have invested significant resources into the development of electronic trading systems and expect to continue to do so, but there is no assurance that the revenues generated by these systems will yield an adequate return on our investment, particularly given the relatively lower commissions arising from electronic trades.

***Our Ability to Retain Our Key Employees is Critical to the Success of Our Business.*** Our people are our most important resource. Our ability to continue to compete effectively in our businesses will depend upon our ability to attract top talent and retain and motivate our existing employees while managing compensation costs.

-21-

## LEHMAN BROTHERS HOLDINGS INC.

**Risk Management**

We have devoted significant resources to develop our risk management policies and procedures and expect to continue to do so in the future. Although we deploy various risk mitigation and risk monitoring techniques, they are subject to judgments as to the timing and duration of their application. Additionally, no risk management procedure can anticipate every market event, and our hedging strategies and other risk management techniques may not be fully effective in mitigating our risk exposure in all market environments or against all types of risk, including risks that are unidentified or unanticipated. Some of our methods of managing risk are based upon our use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. The models that we use to assess and control our risk exposures reflect historical correlations among prices of various asset classes or other market indicators, and in times of market stress or other unforeseen circumstances there may be material changes in correlations between asset classes. In the past, including during the recent mortgage and credit market downturn, these types of market movements have at times limited the effectiveness of our hedging strategies and have caused us to incur significant losses, and they may do so in the future. An increase in volatility would increase our measured risk, which might cause us to reduce certain of our business activities. In such circumstances, we may not be able to reduce our positions or our exposure in a timely, cost-effective way or in a manner sufficient to offset the increase in measured risk. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events, and these policies and procedures may not be fully effective. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management" for a discussion of the policies and procedures we use to identify, monitor and manage the risks we assume in conducting our businesses.

**Risks Relating To New Business Initiatives and New Markets**

A number of our recent and planned business initiatives and expansions of existing businesses may bring us into contact, directly or indirectly, with new markets and new asset classes and with entities and individuals that are not within our traditional client base. For example, we have expanded our businesses and investments in emerging markets such as Russia, the Middle East, India, Turkey and China, have increased our activities in the markets for derivatives, commodities and foreign exchange and have begun providing loans to small and mid-sized businesses and students. In addition, we are increasingly offering complex structured products and alternative investments to a wider investor base, both directly and through third-party distribution channels. These business activities expose us to new and enhanced risks, including increased credit-related and operational risks, regulatory risks and reputational concerns. As our business expands into new markets and new geographical regions, we will face competitors with more experience and more established relationships with clients, regulators and industry participants in the relevant market, which could adversely affect our ability to expand.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

Our world headquarters is a 1,050,000 square-foot owned office tower at 745 Seventh Avenue in New York City. We also lease approximately 2,370,000 square feet of office space in the New York metropolitan area. In addition to our offices in the New York area, we have offices in approximately 31 principal locations in the Americas.

Our European headquarters is an 820,000 square-foot leased facility in the Canary Wharf development, east of the City of London. In addition to our European headquarters, we have an additional 16 principal locations in Europe and the Middle East.

Our Asian headquarters is located in approximately 275,000 square feet of leased office space in the Roppongi Hills area of central Tokyo, Japan. We lease office space in ten other principal locations in the Asia Pacific region.

In addition to our principal locations listed above, we occupy space in various other facilities. Including the locations noted above, we lease approximately 5,570,000 square feet in the Americas, 1,375,000 square feet in Europe and the Middle East and 1,165,000 square feet in Asia Pacific.

All three of our business segments (as described herein) use the occupied facilities described above. We believe that the facilities we occupy are adequate for the purposes for which they are used, and the occupied facilities are well maintained.

## LEHMAN BROTHERS HOLDINGS INC.

Additional information with respect to facilities and lease commitments is set forth under the caption "Lease Commitments" in Note 9 to the Consolidated Financial Statements in Part II, Item 8, of this Report.

## ITEM 3. LEGAL PROCEEDINGS

We are involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of our business. Such proceedings include actions brought against us and others with respect to transactions in which we acted as an underwriter or financial advisor, actions arising out of our activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities and commodities firms, including us.

Although there can be no assurance as to the ultimate outcome, we generally have denied, or believe we have a meritorious defense and will deny, liability in all significant cases pending against us, including the matters described below, and we intend to defend vigorously each such case. Based on information currently available, we believe the amount, or range, of reasonably possible losses in connection with the actions against us, including the matters described below, in excess of established reserves, in the aggregate, not to be material to the Company's consolidated financial condition or cash flows. However, losses may be material to our operating results for any particular future period, depending on the level of our income for such period.

### City of Cleveland v. Deutsche Bank Trust Company, et al.

On January 10, 2008, the City of Cleveland, Ohio filed a lawsuit in Cuyahoga County Common Pleas Court, captioned *City of Cleveland v. Deutsche Bank Trust Company, et al.,* against twenty-one financial services entities, including Holdings, seeking damages the City of Cleveland allegedly incurred relating to property foreclosures. The damages are claimed to be the result of the defendants' creation of a public nuisance in the City of Cleveland through their involvement as lenders and/or securitizers of sub-prime mortgages in the City of Cleveland. On January 16, 2008, the case was removed to the United States District Court for the Northern District of Ohio, and on January 17, 2008, the City of Cleveland filed a motion seeking an order remanding the case back to Common Pleas Court.

### First Alliance Mortgage Company Matters

During 1999 and the first quarter of 2000, LCPI provided a warehouse line of credit to First Alliance Mortgage Company ("FAMCO"), a subprime mortgage lender, and LBI underwrote the securitizations of mortgages originated by FAMCO. In March 2000, FAMCO filed for bankruptcy protection in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"). In August 2001, a class action (the "Class Action") was filed in the California Bankruptcy Court, on behalf of a class of FAMCO borrowers seeking equitable subordination of LCPI's (among other creditors') liens and claims. In October 2001, the complaint was amended to add LBI as a defendant and to add claims for aiding and abetting fraudulent lending activities by FAMCO and for unfair competition under the California Business and Professions Code. In August 2002, a Second Amended Complaint was filed which added a claim for punitive damages and extended the class period from May 1, 1996 until FAMCO's bankruptcy filing. The complaint sought actual and punitive damages, the imposition of a constructive trust on all proceeds paid by FAMCO to LCPI and LBI, disgorgement of profits and attorneys' fees and costs.

The United States District Court for the Central District of California (the "California District Court") withdrew the reference to the California Bankruptcy Court. A class was certified in November 2002, and subsequently amended, to certify the Class Action as being brought on behalf of a class of all persons who acquired mortgage loans from FAMCO from 1999 through March 31, 2000, which were used as collateral for FAMCO's warehouse credit line with LCPI or were securitized in transactions underwritten by LBI. The trial began in February 2003.

In June 2003, the California District Court dismissed plaintiffs' claim for punitive damages. Also in June 2003, the jury rendered its verdict, finding LBI and LCPI liable for aiding and abetting FAMCO's fraud. The jury found damages of $50.9 million and held the Lehman defendants responsible for 10% of those damages. In July 2003, the California District Court entered findings of fact and conclusions of law relating to all claims still pending and holding that any transfers to LCPI were not fraudulent and its liens were not avoidable, nor was equitable subordination of amounts owed by FAMCO to LCPI at the time of the Chapter 11 filing warranted. Judgment was entered in November 2003 on the jury verdict. On December 8, 2006, the United States Court of Appeals for the Ninth Circuit issued a decision on the appeals of all parties, affirming the jury verdict on liability, rejecting all plaintiffs' claims for further relief, vacating the damages verdict and remanding the matter for further proceedings on the proper calculation of "out of pocket" damages rather than the higher benefit of the bargain damages

upon which the jury based its verdict. The parties to the Class Action have entered into a settlement agreement, which was presented to the California District Court for preliminary approval on January 28, 2008.

**IPO Allocation Cases**

*Securities Action.* LBI was named as a defendant in numerous purported securities class actions that were filed between March and December 2001 in the United States District Court for the Southern District of New York (the "New York District Court"). The actions, which allege improper initial public offering ("IPO") allocation practices, were brought by persons who, either directly or in the aftermarket, purchased IPO securities during the period between March 1997 and December 2000. The plaintiffs allege that LBI and other IPO underwriters required persons receiving allocations of IPO shares to pay excessive commissions on unrelated trades and to purchase shares in the aftermarket at specified escalating prices. The plaintiffs, who seek unspecified compensatory damages, claim that these alleged practices violated various

-23-

## LEHMAN BROTHERS HOLDINGS INC.

provisions of the federal securities laws, specifically Sections 11, 12(a)(2) and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act.

Plaintiffs filed 310 actions, each relating to a distinct offering, which actions were consolidated for pretrial purposes before a single judge. LBI is named as a defendant in 83 of those cases. For pretrial coordination purposes, the parties also designated certain focus cases, which were to be used as guidance for decisions in all cases. On October 13, 2004, the New York District Court granted plaintiffs' motion for certification of a class of investors in each of six focus cases. On appeal to the United States Court of Appeals for the Second Circuit  (the "Second Circuit"), the court, on December 5, 2006, overturned the decision below, set forth the standards for class certification and concluded that classes could not be certified based on the facts alleged by plaintiffs. On June 6, 2007, the Second Circuit denied plaintiffs' petition for rehearing and rehearing *en banc* of that decision. Upon remand to the New York District Court, on August 14, 2007, the plaintiffs filed amended complaints.

*Issuer Action.*  In April 2002, a suit was filed in Delaware Chancery Court by Breakaway Solutions Inc. ("Breakaway"), which names LBI and two other underwriters as defendants (the "Delaware Action"). The complaint purported to be brought on behalf of a class of issuers who issued securities in IPOs through at least one of the defendants during the period January 1998 through October 2000 and whose securities increased in value 15% or more above the original price within 30 days after the IPO. It alleged that defendants under-priced IPO securities and allocated those under-priced securities to certain favored customers in return for alleged arrangements with the customers for increased commissions on other transactions and alleged tie-in arrangements. The complaint asserted claims for breaches of contract, of the implied covenant of good faith and fair dealing and of fiduciary duty, and for indemnification or contribution and unjust enrichment or restitution. Relief sought included class certification, injunctive relief, an accounting and declarations requiring defendants to indemnify Breakaway in the pending consolidated IPO securities class actions, and compensatory damages. In August 2004, the court denied defendants' motion to dismiss. On motion by defendants, the court reconsidered its prior decision and, by order dated December 8, 2005, dismissed all but Breakaway's claim for breach of fiduciary duty.

In September 2005, Breakaway commenced an individual action in the New York State Supreme Court, New York County, naming the same defendants (the "New York Action"). This action alleges that LBI, as a co-manager of Breakaway's initial public offering and in conjunction with the other underwriter defendants, breached a fiduciary duty to Breakaway and breached the covenant of good faith and fair dealing implied in the underwriting agreement among Breakaway and the underwriters by allegedly under-pricing Breakaway's shares in the IPO.

On January 11, 2008, the parties settled both the Delaware Action and the New York Action and filed stipulations of dismissal in both actions.

### IPO Fee Litigation

*Harold Gillet, et al. v. Goldman Sachs & Co., et al.; Yakov Prager, et al. v. Goldman, Sachs & Co., et al.; David Holzman, et al. v. Goldman, Sachs & Co., et al.* Beginning in November 1998, four purported class actions were filed in the New York District Court against in excess of 25 underwriters of IPO securities, including LBI. The cases were subsequently consolidated into *In re Public Offering Antitrust Litigation.* Plaintiffs, alleged purchasers of securities issued in certain IPOs, seek compensatory and injunctive relief for alleged violations of the antitrust laws based on the theory that the defendants fixed and maintained fees for underwriting certain IPO securities at supra-competitive levels. In February 2001, the New York District Court granted defendants' motion to dismiss the consolidated amended complaint, concluding that the purchaser plaintiffs lacked standing under the antitrust laws to assert the claims. On appeal, the Second Circuit reversed and remanded the case to the New York District Court for further proceedings, including potential dismissal of the claims based on additional arguments raised in the motion to dismiss. The New York District Court, in an order dated February 24, 2004, dismissed plaintiffs' claims for monetary damages allowing only their claims for injunctive relief to proceed. Further activity in this case is stayed pending resolution of class certification issues in the following case.

*In re Issuer Plaintiff Initial Public Offering Fee Antitrust Litigation.* In April 2001, the New York District Court consolidated four actions pending before the court brought by bankrupt issuers of IPO securities against more than 20 underwriter defendants (including LBI). In July 2001, the plaintiffs filed a consolidated class action complaint seeking unspecified compensatory damages and injunctive relief for alleged violations of the antitrust laws based on the theory that the defendant underwriters fixed and maintained fees for underwriting certain IPO securities at supra-competitive levels. Two of the four original plaintiffs subsequently withdrew their claims**.** The remaining plaintiffs filed a motion for class certification, which the New York District Court denied in an order, dated April 19, 2006. On September 11, 2007, the Second Circuit reversed the New York District Court's denial of class certification and remanded the case to the New York District Court for further proceedings to determine if the case may proceed as a class action.

## LEHMAN BROTHERS HOLDINGS INC.

*Mirant Corporation Securities Litigation*

In November 2002, an amended complaint was filed in the United States District Court for the Northern District of Georgia, Atlanta Division, and captioned *In re Mirant Corporation Securities Litigation*. The action is brought on behalf of a purported class of investors who purchased the securities of Mirant Corporation ("Mirant") during the period from September 26, 2000 and September 5, 2002. Plaintiffs name Mirant, various officers and directors, Mirant's former parent, The Southern Company, along with its officers and directors, LBI, as a member of the underwriting syndicate, and eleven other underwriters of Mirant's IPO of common stock in September 2000. The underwriters are contractually entitled to customary indemnification from Mirant, but Mirant filed for bankruptcy protection in July 2003. The IPO raised approximately $1.467 billion, of which Lehman Brothers' underwriting share was 9%. Against the underwriters, plaintiffs allege violations of Section 11 of the Securities Act. The complaint alleges that the prospectus and registration statement for the offering contained false and misleading statements or failed to disclose material facts concerning, among other things, Mirant's alleged misconduct in energy markets in the State of California, the accounting for Mirant's interest in a United Kingdom-based company, Western Power Distribution, and other accounting issues. The complaint seeks class action certification, unspecified damages and costs. Partially dispositive motions are pending.

*Research Analyst Independence Litigations*

Since the announcement of the global regulatory settlement regarding alleged research analyst conflicts of interest at various investment banking firms in the United States, including LBI, in April 2003 (the "Global Settlement"), a number of purported class actions were filed relating to such alleged conflicts. Three consolidated actions had been filed against LBI in federal court, two of which have since been dismissed, which are specific to LBI's research of particular companies. The actions allege conflicts of interest between LBI's investment banking business and research activities and seek to assert claims pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder. In the remaining pending action, relating to RSL Communications, plaintiffs have filed an amended consolidated complaint, containing essentially the same allegations as the original complaints, but adding two other investment banks as defendants (Fogarazzo, et al. v. Lehman Brothers Inc., et al.). On July 27, 2005, the New York District Court granted plaintiffs' motion for class certification. On January 26, 2007, the Second Circuit accepted the defendants' appeal, vacated the decision below and remanded the case to the New York District Court in light of the decision in the IPO Allocation Securities Action case discussed above. On June 29, 2007, the New York District Court stayed all proceedings in the case pending the Second Circuit's decision in *In re Salomon Analyst Metromedia*, which raises similar legal issues.

In June 2003, a purported derivative action, *Bader and Yakaitis P.S.P. and Trust, et al. v. Michael L. Ainslie, et al.*, relating to the Global Settlement was filed in New York State Supreme Court, New York County. The suit names Holdings and its then sitting Board of Directors (the "Board") as defendants and contends that the Board should have been aware of and prevented the alleged misconduct that resulted in the Global Settlement. In December 2003, plaintiffs filed an amended complaint, reiterating the allegations concerning the alleged failure to detect and prevent conduct resulting in the Global Settlement, and adding allegations concerning the alleged failure to detect and prevent conduct relating to purportedly improper IPO allocation practices, discussed more fully above under the heading "IPO Allocation Cases."

*Short Sales Related Litigation*

*In re Short Sale Antitrust Litigation*. Commencing in April 2006, LBI was named as a defendant in putative class actions relating to short selling filed in the New York District Court. In December 2006, the court ordered that the actions be consolidated and renamed the *In re Short Sale Antitrust Litigation*. By January 2007, only one plaintiff, Electronic Trading Group, remained in the case (after earlier-named plaintiffs dropped out). A second amended complaint was filed, purportedly on behalf of those who had paid certain fees to broker dealers in connection with borrowing securities against 17 broker-dealers and other unnamed defendants, including LBI. The complaint asserted four causes of action: violations of Section 1 of the Sherman Act, breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and unjust enrichment. Plaintiff sought injunctive relief and unspecified trebled compensatory and punitive damages. On December 20, 2007, the New York District Court granted defendants' motion to dismiss the second amended complaint. On January 18, 2008, plaintiffs filed a notice of appeal of the New York District Court decision with the United States Court of Appeals for the Second Circuit.

*Avenius, et al. v. Banc of America Securities LLC, et al.* In June 2006, LBI was named as a defendant in an action filed by 40 shareholders of Novastar Financial, Inc. ("NFI") against 11 broker-dealers and other unnamed defendants in the Superior Court of California for San Francisco County ("California Superior Court"). The action alleges that the broker-dealers participated in an illegal stock market manipulation scheme that involved accepting orders for purchases, sales and short sales of NFI stock with no intention of covering such orders with borrowed stock or stock issued by NFI. Plaintiffs claim that this scheme caused distortions with regard to the nature and amount of active trading in NFI stock, thereby causing its share price

to decline. The complaints assert causes of action under California Corporations Code

-25-

## LEHMAN BROTHERS HOLDINGS INC.

Sections 25400, et seq. and California Business and Professions Code Sections 17200, et seq. and 17500, et seq. The actions seek unspecified damages. On September 14, 2007, plaintiffs filed an amended complaint to, among other things, assert claims for conversion and trespass to chattels, in addition to the causes of action previously asserted.

*Overstock.com, Inc., et al. v. Morgan Stanley & Co., Inc., et al.* On September 14, 2007, LBI was named as a defendant in an amended complaint filed by Overstock.com, Inc. ("Overstock") and seven of its shareholders against 11 broker-dealers and other unnamed defendants in the California Superior Court. The allegations are similar to those in the *Avenius* action described above. Plaintiffs claim that this scheme caused distortions with regard to the nature and amount of active trading in Overstock stock, thereby causing its share price to decline. The complaints assert the same causes of action as the *Avenius* complaint.

### Wright et al. v. Lehman Brothers Holdings Inc. et al.

In August 2005, A. Vernon Wright and Dynoil Refining LLC sued Holdings (who was subsequently dropped as a defendant), LBI and two current and one former LBI employee, in Los Angeles Superior Court (the "Wright action"). Plaintiffs claimed negligence, breach of contract, breach of duties of good faith and fair dealing and of fiduciary duty, interference with prospective business advantage and misappropriation of trade secrets. Plaintiffs alleged that Wright provided Lehman Brothers with confidential information that Wright, along with certain Chinese interests, intended to buy Unocal, which Lehman Brothers allegedly did not keep confidential, preventing Wright from executing his plan. In his complaint, plaintiffs sought $9.2 billion, the alleged value of the U.S. assets plaintiffs say they would have acquired. On January 10, 2008 the parties entered into a confidential settlement, and the Court dismissed the action.

In March 2006, Carlton Energy Group, Muskeg Oil Co and Newco filed a similar suit against Holdings (again, later dropped), LBI and three LBI employees in state court in Harris County, Texas. The three plaintiff entities are owned or controlled by Thomas O'Dell and Daniel Chiang, erstwhile business partners of Vernon Wright. The claims and allegations asserted in this action are similar to those asserted in the Wright action. Plaintiffs sought unspecified damages**.** Pursuant to a confidential settlement agreement, on October 18, 2007, the plaintiffs filed a stipulation of voluntary dismissal.

### In re Lehman Brothers Holdings, Inc. Derivative Litigation

Beginning in mid-April 2007, three purported shareholder derivative actions were filed against Holdings (as a nominal defendant) and certain of its current and former officers and directors in the New York District Court, all relating to Holdings' historical stock option granting processes. The cases were captioned: *Garber v. Fuld, et al.*; *Staehr v. Fuld, et al.*; and *Locals 302 & 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust v. Fuld, et al*. An additional plaintiff, Saginaw Police & Fire Pension Board, intervened in the *Garber* action. On October 3, 2007, the court consolidated the above actions, appointed Plaintiffs Garber and the Saginaw Police & Fire Pension Board as lead plaintiffs, and re-captioned the action  *In re Lehman Brothers Holdings, Inc. Derivative Litigation.*

On or about January 3, 2008, lead plaintiffs filed a Consolidated Complaint and a motion to join the International Brotherhood of Electrical Workers Local No. 38 Pension Fund as an additional plaintiff. The Consolidated Complaint, purportedly brought on behalf of Holdings, alleges state law claims for breach of fiduciary duty, gross mismanagement, misappropriation and/or waste of corporate assets, unjust enrichment, misrepresentation and fraudulent concealment, and invalidation of certain stock options and restricted stock units.

The Consolidated Complaint alleges that stock options and restricted stock units granted by Holdings between 1997 and 2002 were backdated and issued in violation of Holdings' stock option plans. The Consolidated Complaint further alleges that Holdings' financial statements for the years 1997 through the present misstated Holdings' financial results by failing to properly report compensation expense and tax liabilities attributable to stock options and restricted stock units granted between 1997 and 2002. The Consolidated Complaint seeks damages from the individual defendants and various types of equitable and injunctive relief, including rescission of all unexercised stock options and restricted stock units granted in the time frame, return of certain incentive-based or equity-based compensation, and imposition of a constructive trust and attachment of assets.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

-26-

## LEHMAN BROTHERS HOLDINGS INC.

### PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Holdings' common stock, par value $0.10 per share, is listed on the New York Stock Exchange. As of December 31, 2007, there were 530,588,207 shares of our common stock outstanding and approximately 23,200 holders of record. On January 28, 2008, the last reported sales price of our common stock was $60.63. The table below shows the high and low sale prices for the common stock for each fiscal quarter within the two most recent fiscal years:

**Price Range of Common Stock**

|  | Low Sale Price | High Sale Price | Dividends |
|---|---|---|---|
| **Fiscal 2007:** | | | |
| Fourth Quarter | $ 51.59 | $ 67.73 | $ 0.15 |
| Third Quarter | $ 49.06 | $ 82.05 | $ 0.15 |
| Second Quarter | $ 68.07 | $ 79.21 | $ 0.15 |
| First Quarter | $ 72.26 | $ 86.18 | $ 0.15 |
| **Fiscal 2006:** | | | |
| Fourth Quarter | $ 63.04 | $ 78.89 | $ 0.12 |
| Third Quarter | $ 58.37 | $ 69.48 | $ 0.12 |
| Second Quarter | $ 62.82 | $ 78.85 | $ 0.12 |
| First Quarter | $ 62.14 | $ 74.79 | $ 0.12 |

In January 2008, our Board of Directors increased the fiscal 2008 annual common stock dividend rate to $0.68 per share from an annual dividend rate of $0.60 per share in fiscal 2007 and $0.48 per share in fiscal 2006. Dividends on the common stock are generally payable, following declaration by the Board of Directors, in February, May, August and November. The above table and common stock dividend per share rates have been adjusted to reflect the April 28, 2006 2-for-1 stock split.

-27-

## LEHMAN BROTHERS HOLDINGS INC.

The table below sets forth information with respect to purchases made by or on behalf of Holdings or any "affiliated purchaser" (as defined in Rule 10b-18(a)(3) under the Securities Exchange Act of 1934, as amended), of our common stock during the quarter ended November 30, 2007.

**Issuer Purchases of Equity Securities**

| | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Month 1 (September 1, 2007 – September 30, 2007) | | | | |
| Common stock repurchases[1] | 223 | | 223 | |
| Employee transactions[2] | 41,292 | | 41,292 | |
| Total | 41,515 | $ 55.64 | 41,515 | 62,208,454 |
| Month 2 (October 1, 2007 – October 31, 2007) | | | | |
| Common stock repurchases[1] | 14,900 | | 14,900 | |
| Employee transactions[2] | 355,501 | | 355,501 | |
| Total | 370,401 | $ 62.70 | 370,401 | 61,838,053 |
| Month 3 (November 1, 2007 – November 30, 2007) | | | | |
| Common stock repurchases[1] | 83,800 | | 83,800 | |
| Employee transactions[2] | 4,791,483 | | 4,791,483 | |
| Total | 4,875,283 | $ 62.46 | 4,875,283 | 56,962,770 |
| Total (September 1, 2007 – November 30, 2007) | | | | |
| Common stock repurchases[1] | 98,923 | | 98,923 | |
| Employee transactions[2] | 5,188,276 | | 5,188,276 | |
| Total | 5,287,199 | $ 62.43 | 5,287,199 | 56,962,770 |

[1] We have an ongoing common stock repurchase program, pursuant to which we repurchase shares in the open market. As previously announced, in January 2007 our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock, for the management of the Firm's equity capital, including offsetting dilution due to employee stock awards. This authorization superseded the stock repurchase program authorized in January 2006. The number of shares authorized to be repurchased in the open market is reduced by the actual number of Employee Offset Shares (as defined below) received.

[2] Represents shares of common stock withheld in satisfaction of the exercise price of stock options and tax withholding obligations upon option exercises and conversion of restricted stock units (collectively, "Employee Offset Shares").

In January 2008, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of the Firm's equity capital, including consideration of dilution due to employee stock awards. This resolution supersedes the stock purchase program authorized in 2007.  For more information about the repurchase program and employee stock plans, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity, Funding and Capital Resources—Equity Management" in Part II, Item 7, and Note 11 to the Consolidated Financial Statements in Part II, Item 8, in this Form 10-K, and Notes 10 and 12 to the Consolidated Financial Statements in Part II, Item 8, and "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" in Part III, Item 12, of this Form 10-K.

## LEHMAN BROTHERS HOLDINGS INC.

**ITEM 6. SELECTED FINANCIAL DATA**

| | As of or for the Year Ended November 30, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2004** | **2003** |
| Consolidated Statement of Income (in millions) | | | | | |
| Total revenues | $ 59,003 | $ 46,709 | $ 32,420 | $ 21,250 | $ 17,287 |
| Interest expense | 39,746 | 29,126 | 17,790 | 9,674 | 8,640 |
| Net revenues | 19,257 | 17,583 | 14,630 | 11,576 | 8,647 |
| Non-interest expenses: | | | | | |
| Compensation and benefits | 9,494 | 8,669 | 7,213 | 5,730 | 4,318 |
| Non-personnel expenses[(1)] | 3,750 | 3,009 | 2,588 | 2,309 | 1,716 |
| Real estate reconfiguration charge | — | — | — | 19 | 77 |
| Total non-interest expenses | 13,244 | 11,678 | 9,801 | 8,058 | 6,111 |
| Income before taxes and cumulative effect of accounting change | 6,013 | 5,905 | 4,829 | 3,518 | 2,536 |
| Provision for income taxes | 1,821 | 1,945 | 1,569 | 1,125 | 765 |
| Dividends on trust preferred securities[(2)] | — | — | — | 24 | 72 |
| Income before cumulative effect of accounting change | 4,192 | 3,960 | 3,260 | 2,369 | 1,699 |
| Cumulative effect of accounting change | — | 47 | — | — | — |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 | $ 2,369 | $ 1,699 |
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 | $ 2,297 | $ 1,649 |
| Consolidated Statement of Financial Condition (in millions) | | | | | |
| Total assets | $ 691,063 | $ 503,545 | $ 410,063 | $ 357,168 | $ 312,061 |
| Net assets[(3) (10)] | 372,959 | 268,936 | 211,424 | 175,221 | 163,182 |
| Long-term borrowings[(2) (4)] | 123,150 | 81,178 | 53,899 | 49,365 | 35,885 |
| Preferred securities subject to mandatory redemption[(2)] | — | — | — | — | 1,310 |
| Total stockholders' equity | 22,490 | 19,191 | 16,794 | 14,920 | 13,174 |
| Tangible equity capital[(5) (10)] | 23,103 | 18,567 | 15,564 | 12,636 | 10,681 |
| Total long-term capital[(6)] | 145,640 | 100,369 | 70,693 | 64,285 | 50,369 |
| Per Common Share Data (in millions, except per share amounts)[(7)] | | | | | |
| Earnings per share: | | | | | |
| Basic | $ 7.63 | $ 7.26 | $ 5.74 | $ 4.18 | $ 3.36 |
| Diluted | $ 7.26 | $ 6.81 | $ 5.43 | $ 3.95 | $ 3.17 |
| Weighted average common shares outstanding: | | | | | |
| Basic | 540.6 | 543.0 | 556.3 | 549.4 | 491.3 |
| Diluted | 568.3 | 578.4 | 587.2 | 581.5 | 519.7 |
| Dividends declared and paid per common share | $ 0.60 | $ 0.48 | $ 0.40 | $ 0.32 | $ 0.24 |
| Book value per common share[(8)] | $ 39.44 | $ 33.87 | $ 28.75 | $ 24.66 | $ 22.09 |
| Selected Data | | | | | |
| Leverage ratio[(9)] | 30.7x | 26.2x | 24.4x | 23.9x | 23.7x |
| Net leverage ratio[(10)] | 16.1x | 14.5x | 13.6x | 13.9x | 15.3x |
| Employees | 28,556 | 25,936 | 22,919 | 19,579 | 16,188 |
| Assets under management (in billions) | $ 282 | $ 225 | $ 175 | $ 137 | $ 120 |
| Financial Ratios | | | | | |
| Compensation and benefits/net revenues | 49.3% | 49.3% | 49.3% | 49.5% | 49.9% |
| Pre-tax margin | 31.2% | 33.6% | 33.0% | 30.4% | 29.3% |
| Return on average common stockholders' equity[(11)] | 20.8% | 23.4% | 21.6% | 17.9% | 18.2% |
| Return on average tangible common stockholders' equity[(11)] | 25.7% | 29.1% | 27.8% | 24.7% | 19.2% |

# LEHMAN BROTHERS HOLDINGS INC.

**Notes to Selected Financial Data:**

(1)     Non-personnel expenses exclude real estate reconfiguration charges of $19 million and $77 million for the years ended November 30, 2004 and 2003, respectively.

(2)     We adopted FIN 46(R) effective February 29, 2004, which required us to deconsolidate the trusts that issued the preferred securities. Accordingly, at and subsequent to February 29, 2004, preferred securities subject to mandatory redemption were reclassified to junior subordinated notes, a component of long-term borrowings. Dividends on preferred securities subject to mandatory redemption, which were presented as Dividends on trust preferred securities in the Consolidated Statement of Income through February 29, 2004, are included in Interest expense in periods subsequent to February 29, 2004.

(3)     We calculate net assets by excluding from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. We believe net assets to be a more useful measure of our assets than total assets because it excludes certain low-risk, non-inventory assets. Net assets as presented are not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of presentation.

|  | At November 30, | | | | |
| In millions | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Total assets | $ 691,063 | $ 503,545 | $ 410,063 | $ 357,168 | $ 312,061 |
| Cash and securities segregated and on deposit for regulatory and other purposes | (12,743) | (6,091) | (5,744) | (4,085) | (3,100) |
| Collateralized lending agreements | (301,234) | (225,156) | (189,639) | (174,578) | (142,218) |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) | (3,256) | (3,284) | (3,561) |
| Net assets | $ 372,959 | $ 268,936 | $ 211,424 | $ 175,221 | $ 163,182 |

(4)     Long-term borrowings exclude borrowings with remaining contractual maturities within twelve months of the financial statement date.

(5)     We calculate tangible equity capital by including stockholders' equity and junior subordinated notes (at November 30, 2003, preferred securities subject to mandatory redemption), and excluding identifiable intangible assets and goodwill. See "MD&A—Liquidity, Funding and Capital Resources—Balance Sheet and Financial Leverage" for additional information about tangible equity capital. We believe tangible equity capital to be a more meaningful measure of our equity base as it includes instruments we consider to be equity-like due to their subordinated nature, long-term maturity and interest deferral features and excludes assets we do not consider available to support our remaining net assets (see note 3 above). These measures may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.

|  | At November 30, | | | | |
| In millions | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Total stockholders' equity | $ 22,490 | $ 19,191 | $ 16,794 | $ 14,920 | $ 13,174 |
| Junior subordinated notes (subject to limitation) (a) (b) | 4,740 | 2,738 | 2,026 | 1,000 | 1,068 |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) | (3,256) | (3,284) | (3,561) |
| Tangible equity capital | $ 23,103 | $ 18,567 | $ 15,564 | $ 12,636 | $ 10,681 |

(a)     Preferred securities subject to mandatory redemption at November 30, 2003.

(b)     Our definition for tangible equity capital limits the amount of junior subordinated notes and preferred stock included in the calculation to 25% of tangible equity capital. The amount excluded was approximately $237 million at November 30, 2007. No amounts were excluded in prior periods.

(6)     Total long-term capital includes long-term borrowings (excluding any borrowings with remaining contractual maturities within twelve months of the financial statement date) and total stockholders' equity and, at November 30, 2003, preferred securities subject to mandatory redemption. We believe total long-term capital is useful to investors as a measure of our financial strength.

(7)     Common share and per share amounts have been retrospectively adjusted to give effect for the 2-for-1 common stock split, effected in the form of a 100% stock dividend, which became effective April 28, 2006.

(8)     The book value per common share calculation includes amortized restricted stock units granted under employee stock award programs, which have been included in total stockholders' equity.

(9)     Leverage ratio is defined as total assets divided by total stockholders' equity.

(10)     Net leverage ratio is defined as net assets (see note 3 above) divided by tangible equity capital (see note 5 above). We believe net leverage based on net assets and tangible equity capital to be a more meaningful measure of leverage as net assets excludes certain low-risk, non-inventory assets and we believe tangible equity capital to be a more meaningful measure of our equity base. Net leverage as presented is not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of presentation.

-30-

## LEHMAN BROTHERS HOLDINGS INC.

(11)   Return on average common stockholders' equity is computed by dividing net income applicable to common stock for the period by average common stockholders' equity. Return on average tangible common stockholders' equity is computed by dividing net income applicable to common stock for the period by average tangible common stockholders' equity. Average tangible common stockholders' equity equals average total common stockholders' equity less average identifiable intangible assets and goodwill. We believe tangible common stockholders' equity is a meaningful measure because it reflects the common stockholders' equity deployed in our businesses. Average common stockholders' equity, Average identifiable intangible assets and goodwill and Average tangible common stockholders' equity are calculated as:

| | As of or for the Year Ended November 30, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **In millions** | | **2007** | | **2006** | | **2005** | | **2004** | **2003** |
| Net income applicable to common stock | $ | 4,125 | $ | 3,941 | $ | 3,191 | $ | 2,297 | $ | 1,649 |
| | | | | | | | | | |
| Average stockholders' equity | $ | 20,910 | $ | 17,971 | $ | 15,936 | $ | 14,059 | $ | 9,899 |
| Less: average preferred stock | | (1,095) | | (1,095) | | (1,195) | | (1,217) | | (838) |
| Average common stockholders' equity | $ | 19,815 | $ | 16,876 | $ | 14,741 | $ | 12,842 | $ | 9,061 |
| Less: average identifiable intangible assets and goodwill | | (3,756) | | (3,312) | | (3,272) | | (3,547) | | (471) |
| Average tangible common stockholders' equity | $ | 16,059 | $ | 13,564 | $ | 11,469 | $ | 9,295 | $ | 8,590 |
| Return on average common stockholders' equity | | 20.8% | | 23.4% | | 21.6% | | 17.9% | | 18.2% |
| Return on average tangible common stockholders' equity | | 25.7% | | 29.1% | | 27.8% | | 24.7% | | 19.2% |

-31-

**LEHMAN BROTHERS HOLDINGS INC.**

| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS |
|---|---|

### Contents

Management's Discussion and Analysis of Financial Condition and Results of Operations

| | |
|---|---|
| Introduction | 33 |
| Forward-Looking Statements | 33 |
| Executive Overview | 33 |
| Certain Factors Affecting Results of Operations | 36 |
| Critical Accounting Policies and Estimates | 38 |
| Consolidated Results of Operations | 42 |
| Business Segments | 46 |
| Geographic Revenues | 54 |
| Liquidity, Funding and Capital Resources | 56 |
| Contractual Obligations and Lending-Related Commitments | 65 |
| Off-Balance-Sheet Arrangements | 66 |
| Risk Management | 69 |
| 2-for-1 Stock Split | 76 |
| Accounting and Regulatory Developments | 76 |
| Effects of Inflation | 80 |

# LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

## Introduction

Lehman Brothers Holdings Inc. ("Holdings") and subsidiaries (collectively, the "Company," the "Firm," "Lehman Brothers," "we," "us" or "our") serves the financial needs of corporations, governments and municipalities, institutional clients and high net worth individuals worldwide with business activities organized in three segments, Capital Markets, Investment Banking and Investment Management. Founded in 1850, Lehman Brothers maintains market presence in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates in a network of offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region. We are a member of all principal securities and commodities exchanges in the U.S., and we hold memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

This Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") should be read together with the Consolidated Financial Statements and the accompanying Notes contained in this Annual Report on Form 10-K for the fiscal year ended November 30, 2007 (the "Form 10-K"). Unless specifically stated otherwise, all references to the years 2007, 2006 and 2005 in this MD&A refer to our fiscal years ended November 30, 2007, 2006 and 2005, or the last day of such fiscal years, as the context requires. All share and per share amounts have been retrospectively adjusted for the two-for-one common stock split, effected in the form of a 100% stock dividend, which became effective April 28, 2006. For additional information, see "2-for-1 Stock Split" in this MD&A and Note 10, "Stockholders' Equity," to the Consolidated Financial Statements.

## Forward-Looking Statements

Some of the statements contained in this MD&A, including those relating to our strategy and other statements that are predictive in nature, that depend on or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended. These statements are not historical facts but instead represent only management's expectations, estimates and projections regarding future events. Similarly, these statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include, but are not limited to, market risk, investor sentiment, liquidity risk, credit ratings changes, credit exposure and operational, legal, regulatory and reputational risks. For further discussion of these risks, see "Certain Risk Factors Affecting Results of Operations" below as well as "Risk Factors" in Part I, Item 1A in this Form 10-K.

As a global investment bank, the nature of our business makes predicting future performance difficult. Revenues and earnings may vary from quarter to quarter and from year to year. Caution should be used when extrapolating historical results to future periods. Our actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements and, accordingly, readers are cautioned not to place undue reliance on such statements, which speak only as of the date on which they are made. We undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## Executive Overview[1]

### Summary of Results

On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.[2]

---

[1]    Market share, volume and ranking statistics in this MD&A were obtained from Thomson Financial, an operating unit of The Thomson Corporation.

[2]    The 2006 results included an after-tax gain of $47 million ($0.08 per diluted common share) from the cumulative effect of an accounting change for equity-based compensation resulting from the Company's adoption of Statement of Financial Accounting Standards ("SFAS") No. 123 (revised), *Share-Based Payment* ("SFAS 123(R)"). For additional information, see Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial

Statements.

-33-

### LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

2007 net revenues were $19.3 billion, which exceeded the prior year record level by 10% and represents the fifth consecutive year of record net revenues. The second half of the 2007 fiscal year presented some of the most challenging mortgage and credit markets experienced in almost a decade, particularly in the U.S. Record net revenues were reported in each of our three business segments and in both the Europe and the Middle East and Asia-Pacific geographic segments. Pre-tax margin for the 2007 fiscal year was 31.2%, compared to 33.6% and 33.0% reported in 2006 and 2005, respectively. Full year return on average common stockholders' equity[1] was 20.8%, 23.4% and 21.6% for 2007, 2006 and 2005, respectively. Return on average tangible common stockholders' equity was 25.7%, 29.1% and 27.8% in full years 2007, 2006 and 2005, respectively.

<u>2007 vs. 2006</u>. In 2007, Capital Markets segment net revenues increased 2% to a record $12.3 billion from $12.0 billion in 2006. Capital Markets—Equities, operating in a favorable environment of strong customer-driven activity and favorable global equities markets, reported net revenues of $6.3 billion in 2007, a 76% increase from $3.6 billion in 2006. These record results in the Equities component of our Capital Markets business segment were offset by a decrease in Capital Markets—Fixed Income's net revenues which declined 29% to $6.0 billion in 2007 from $8.4 billion in 2006. This decline corresponds to the deterioration throughout the fiscal year in the U.S. residential mortgage sector and the follow-on dislocation in the broader credit markets that occurred later in the fiscal year. Investment Banking segment net revenues increased 24% to $3.9 billion in 2007 from $3.2 billion in 2006, representing record Debt and Equity underwriting-related activities as well as record Advisory Services revenues. These results reflect the significant progress made in building market share in the areas of mergers and acquisitions ("M&A") and high yield offerings as well as the development of a broader range of geographic and client bases. Investment Management segment net revenues increased 28% to $3.1 billion in 2007 from $2.4 billion in 2006, reflecting record net revenues in both Asset Management and Private Investment Management and our continued expansion of this business segment globally. For the fiscal year, assets under management ("AUM") of $282 billion increased 25% from 2006 from both net inflows and asset appreciation. Non—U.S. net revenues increased 49% to $9.6 billion in 2007 from $6.5 billion in 2006, representing 50% and 37% of total net revenues in the 2007 and 2006 periods, respectively.

<u>2006 vs. 2005</u>. Net revenues increased 20% in 2006 from 2005. Capital Markets segment net revenues increased 22% to $12.0 billion in 2006 from $9.8 billion in 2005. Capital Markets—Equities net revenues rose 44% to $3.6 billion in 2006 from $2.5 billion in 2005, driven by solid client—flow activity in the cash and prime services businesses. Capital Markets—Fixed Income net revenues increased 15% to $8.4 billion in 2006 from $7.3 billion in 2005 due to broad-based strength across products and regions. Investment Banking segment net revenues increased 9% to $3.2 billion in 2006 from $2.9 billion in 2005, reflecting strength in each business. Investment Management segment net revenues increased 25% to $2.4 billion in 2006 from $1.9 billion in 2005, reflecting growth in alternative investment offerings and an increase in equity-related activity. In 2006, AUM increased 29% to $225 billion from $175 billion in 2005. Non–U.S. net revenues increased 21% to $6.5 billion in 2006 from $5.4 billion in 2005, representing 37% of total net revenues for both the 2006 and 2005 periods.

While we generated record operating results in 2007, our business, by its nature, does not produce predictable earnings. Our results in any given period can be materially affected by conditions in global financial markets and economic conditions generally. For a further discussion of factors that may affect our future operating results, see "Certain Factors Affecting Results of Operations" below as well as "Risk Factors" in Part I, Item 1A in this Form 10-K. For a detailed

---

[1]    Return on average common stockholders' equity and return on average tangible common stockholders' equity are computed by dividing net income applicable to common stock for the period by average common stockholders' equity and average tangible common stockholders' equity, respectively. We believe average tangible common stockholders' equity is a meaningful measure because it reflects the common stockholders' equity deployed in our businesses. Average tangible common stockholders' equity equals average common stockholders' equity less average identifiable intangible assets and goodwill and is computed as follows:

| In millions | Year Ended November 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 |
| Average stockholders' equity | $ 20,910 | $ 17,971 | $ 15,936 |
| Less: average preferred stock | (1,095) | (1,095) | (1,195) |
| Average common stockholders' equity | $ 19,815 | $ 16,876 | $ 14,741 |
| Less: average identifiable intangible assets and goodwill | (3,756) | (3,312) | (3,272) |
| Average tangible common stockholders' equity | $ 16,059 | $ 13,564 | $ 11,469 |
| Return on average common stockholders' equity | 20.8% | 23.4% | 21.6% |
| Return on average tangible common stockholders' equity | 25.7% | 29.1% | 27.8% |

-34-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

discussion of results of operations by business segments and geographic regions, see "Business Segments" and "Geographic Revenues."

### Business Environment

As an investment banking, securities and investment management firm, our businesses are materially affected by conditions in the global financial markets and worldwide economic conditions. A favorable business environment is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. These factors provide a positive climate for our investment banking activities, for many of our capital markets trading businesses and for wealth creation, which contributes to growth in our asset management business. For a further discussion of how market conditions can affect our business, see "Certain Factors Affecting Results of Operations" below as well as "Risk Factors" in Part I, Item 1A in this Form 10-K. A further discussion of the business environment in 2007 and economic outlook for 2008 is set forth below.

The global market environment was generally favorable for our businesses for the first half of the 2007 fiscal year. These favorable conditions resulted from a number of factors: strong equity markets, continued strong gross domestic product in most major economies, tightening credit spreads, minimal interest rate actions by major central banks, active trading volumes, and strong M&A and underwriting activities driven by favorable interest rate and credit spread environments. During the second half of the 2007 fiscal year, the global economy was impacted by the deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became worse than most observers expected and dislocations began to occur beyond the residential mortgage component of credit markets. Also during the latter part of the 2007 fiscal year, risk aversion escalated following rating agency downgrades of certain structured assets which, in part, led to many market participants re-pricing assets and taking large write-downs. Central banks sought to prevent a more serious downturn by central bank interest rate and liquidity actions. Our fiscal year ended with dislocated inter-bank markets, constrained bank balance sheets and credit uncertainty regarding monoline issuers and structured investment vehicles.

The global fixed income environment was characterized by spreads tightening in the first half of the year and, conversely, unprecedented spread widening in the second half of the year. Global high yield and high grade spread indices ended our fiscal year up 209 and 86 basis points, respectively, compared to the end of our 2006 fiscal year. Global equity markets rose over the fiscal year; however, many equity markets experienced high volatility in the second half of the year. Globally, corporate activity levels in completed and announced M&A transactions were up compared to our last fiscal year. In addition, equity underwriting activity remained solid, particularly in convertibles; but debt underwriting activity declined, particularly in leveraged finance during the second half of the 2007 fiscal year.

Global economic growth was approximately 3.4% for calendar year 2007 and is forecasted to be lower for calendar year 2008. Our forecast differs by geographies: our growth assumptions for the Americas and Eurozone are lower than those for Asia and other territories. Our growth outlook is dependent on how extended and severe the credit dislocation may be, results from fiscal and monetary policy actions, accessibility of new sources of liquidity and oil prices leveling or continuing to increase. The underpinnings of these growth assumptions also form our view on prospective Investment Banking activity. We expect M&A volumes to decline in 2008 by approximately 20% as compared to 2007 and believe that (i) strategic buyers will continue to account for a larger proportion of overall deal volume, (ii) stock will become prominent in transactions and (iii) cross-border and international activity will continue to increase. If the anticipated higher volatility in global equity markets is realized in calendar 2008, we expect equity issuance will be down compared to 2007. Equity capital markets experienced a 17% return in 2007 in local currency terms, and we expect lower returns in 2008. We expect global fixed income origination to decline in 2008 as a result of lower volumes of securitizations and M&A financings. Fixed income capital markets are expected to continue to face uncertainties in the 2008 calendar year.

In the U.S., economic growth showed signs of strength at the beginning of our fiscal year, driven by higher net exports and consumption levels, among other indicators, but the pace of growth slowed in the latter half. Over the twelve-month period, the U.S. housing market weakened, business confidence declined, and, in the last six months of the year, consumer confidence dropped. The labor market followed the same trajectory, showing signs of deterioration in the second half of the period as unemployment levels increased modestly and payroll data showed some signs of weakness. Responding to concerns over liquidity in the financial markets and inflationary pressures, the U.S. Federal Reserve reduced rates three times during the calendar year and made an additional inter-meeting rate cut in January 2008, and most observers anticipate additional reductions will occur in the early part of our 2008 fiscal year. Long-term bond yields declined, with the 10-year Treasury note yield ending our fiscal year down 52 basis points at 3.94%. The S&P 500 Index, Dow Jones Industrial Average and NASDAQ composites were up 5.7%, 9.4%, and 9.4%, respectively, from November 2006 levels. The current high levels of U.S. home

inventories suggest that an extended period of construction declines and housing price cuts will

-35-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

combine with tighter credit conditions and increasing oil prices to slow down consumer spending. We believe those conditions will continue to strain the capital markets, particularly the securitized products and residential housing components. We also believe that those conditions will stress other components of the capital markets, such as commercial real estate. We believe these impediments will decrease the U.S. growth rate in 2008.

In Eurozone countries and the U.K., economic growth continued in the second half of the 2007 fiscal year, although it was modest compared to the first half. Business activity reflected a slight tapering at the end of the fiscal year. Unemployment levels declined over the fiscal year, and inflationary pressures appeared contained. The European Central Bank increased rates twice during our fiscal year and is forecasted to hold those levels through the early part of our 2008 fiscal year. The Bank of England (the "BOE") increased rates three times during our fiscal year, and in December 2007 the BOE began to ease with a rate reduction. Further rate reductions are anticipated in the early part of the 2008 calendar year. The Bund and Gilts 10-year yields were 4.13% and 4.64%, respectively, at the end of our 2007 fiscal year compared to 3.70% and 4.51%, respectively, at the end of our 2006 fiscal year. Equity indices and volatility for continental Europe and the U.K. were up compared to levels at the end of our 2006 fiscal year. At the end of our 2007 fiscal year, stresses in the banking system, particularly in the U.K, were causing bank credit conditions to tighten. We believe that those tighter conditions, lower anticipated world growth and a stronger Euro will combine to slow regional growth for our upcoming 2008 fiscal year.

In Japan, real gross domestic product growth decelerated, unemployment levels modestly decreased and deflation eased during our 2007 fiscal year. The Bank of Japan increased its rates in early 2007 and held those rates for the remainder of our fiscal year, and is anticipated to continue to do so into our 2008 fiscal year. The yield on the 10-year Japanese government bond fell 18 basis points to 1.48% at the end of our 2007 fiscal year. The Nikkei 225 equity index was 3.6% lower at the end of our fiscal year than its level at the end of our 2006 fiscal year. Residential and non-residential construction spending is decreasing, and the recovery in the corporate sector during the period has yet to have an effect on wages and consumption, thus increasing the risk of a possible recession. Elsewhere in Asia, however, equity markets broadly ended our fiscal year higher compared to the prior period. We expect three trends to emerge in China's economy in 2008: (i) GDP growth to fall on an annual basis for the first time in six years; (ii) inflation to increase over the long-term; and (iii) overcapacity concerns to shape central bank actions. During 2008, we expect India to exhibit many of the same characteristics that Japan, South Korea and China did during their economic takeoffs: GDP accelerating, investment and savings rates surging and the economy rapidly opening up. Effects from the region's dependency on exports and severe overcapacity may exacerbate the regional growth slowdown predicted for 2008.

## Certain Factors Affecting Results of Operations

We are exposed to a variety of risks in the course of conducting our business operations. These risks, which are substantial and inherent in our businesses, include market, liquidity, credit, operational, legal and regulatory risks. A summary of some of the significant risks that could affect our financial condition and results of operations includes, but is not limited to the items below. For a discussion of how management seeks to manage these risks, see "Risk Management" in this MD&A. For a further discussion of these and other important factors that could affect our business, see "Risk Factors" in Part I, Item 1A in this Form 10-K.

### Market Conditions and Market Risk

Global financial markets and economic conditions materially affect our businesses. Market conditions may change rapidly and without forewarning. We believe a favorable business environment for our businesses is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. The converses of these factors, individually or in their aggregate, have resulted in or may result in unfavorable or uncertain market and economic conditions for our businesses. The effects on our businesses may include the following:

- We are exposed to potential changes in the value of financial instruments caused by fluctuations in interest rates, exchange rates, equity and fixed income securities and commodities and real estate prices, credit spreads, liquidity volatility, overall market activity or other conditions. We may incur losses as a result of changes in market conditions, especially if the changes are rapid and without warning, as these fluctuations may adversely impact the valuation of our trading and inventory positions and principal investments.

- Market fluctuations and volatility may reduce our or our customers' willingness to enter into new transactions.

Conversely, certain of our trading businesses depend on market volatility to provide trading and arbitrage opportunities, and decreases in volatility may reduce these opportunities and adversely affect these businesses.

-36-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

Any change in volume of executed transactions impacts both our costs incurred and revenues received from those trades.

- Although we deploy various risk mitigation and risk monitoring techniques, they are subject to judgments as to the timing and duration of their application. Additionally, no risk management procedure can anticipate every market event and the existence of risk management in our businesses does not provide complete assurance against incurring losses. Increased market volatility directly impacts our measurement of risks. Increases to our measured risk may cause us to decrease our proprietary positions or certain business activities. In such circumstances, we may not be able to reduce our positions or our exposure in a timely, cost-effective way or in a manner sufficient to offset the increase in measured risk. For additional discussion on risk mitigation and risk monitoring techniques, see "Risk Management" in this MD&A.

- Declines in the size and number of underwritings and M&A transactions may have an adverse impact on our results of operations and, if we are unable to reduce expenses, our profit margins. An overall decrease in global markets' appetites for transactions may also impact our ability to syndicate various loan or equity commitments we have made. Additionally, pricing and other competitive pressures may adversely affect revenues for our Investment Banking segment.

- Asset valuations of our clients' portfolios are impacted by changes in equity market conditions or interest rates. In turn, our fees for managing those portfolios are also affected. Changing market conditions may cause investors to change their allocations of investments in our funds or other products. Our asset management business operates in a highly competitive environment. Changes in our asset management business' performance could result in a decline in AUM and in incentive and management fees.

### Credit Risk

We are exposed to the potential for credit-related losses that can occur as a result of an individual, counterparty or issuer who owes us money, securities or other assets being unable or unwilling to honor its contractual obligations. We are also at risk that our rights against any individual, counterparty or issuer may not be enforceable in all circumstances. Additionally, deterioration in the credit quality of third parties whose securities or obligations we hold could result in losses or adversely affect our ability to otherwise use those securities or obligations for liquidity purposes. The amount and duration of our credit exposures have been increasing over the past several years, as have the number and range of the entities to which we have credit exposures. Although we regularly review credit exposures to specific clients and counterparties and to specific industries, countries and regions that we believe may present credit concerns, new business initiatives may cause us to transact with a broader array of clients, with new asset classes and in new markets. In addition, the recent widening of credit spreads and dislocations in the credit markets have in some cases made it more difficult to syndicate credit commitments to investors, and further widening of credit spreads or worsening of these dislocations could increase these difficulties, resulting in increased credit exposures.

### Liquidity Risk

While our liquidity strategy seeks to ensure that we maintain sufficient liquidity to meet all of our funding obligations in all markets, our liquidity could be impaired by an inability to access secured and/or unsecured debt markets, an inability to access funds from our subsidiaries, an inability to sell assets or unforeseen outflows of cash or collateral. This situation may arise due to circumstances that we are unable to control, such as a general market disruption or an operational problem that affects third parties or us. As we continue to employ structured products to benefit our clients and ourselves, the financial instruments that we hold and the contracts to which we are a party are becoming increasingly complex and these complex structured products often do not have readily available markets to access in times of liquidity stress. Growth of our principal investing activities could further restrict liquidity for these positions. Further, our ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time.

Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger provisions under certain bilateral provisions in some of our trading and collateralized financing contracts that could permit counterparties to terminate contracts or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

-37-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**Operational Risk**

Operational risk is the risk of loss resulting from inadequate or failed internal or outsourced processes, people, infrastructure and technology, or from external events. Our businesses are dependent on our ability to process, on a daily basis, a large number of transactions across numerous and diverse markets. These transactions have become increasingly complex and often must adhere to requirements unique to each transaction, as well as legal and regulatory standards. Although contingency plans exist, our ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports our business.

**Legal, Regulatory and Reputational Risk**

The securities and financial services industries are subject to extensive regulation under both federal and state laws in the U.S. as well as under the laws of all of the other jurisdictions in which we do business. We are subject to regulation in the U.S. by governmental agencies including the SEC and Commodity Futures Trading Commission, and outside the U.S. by various international agencies including the Financial Services Authority in the United Kingdom and the Financial Services Agency in Japan. We also are regulated by a number of self-regulatory organizations such as the Financial Industry Regulatory Authority ("FINRA") (formed in 2007 by the consolidation of NASD, Inc., and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. ("NYSE")), the Municipal Securities Rulemaking Board and the National Futures Association, and by national securities and commodities exchanges. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees.

The scrutiny of the financial services industry has increased over the past several years, which has led to increased regulatory investigations and litigation against financial services firms. Legislation and rules adopted both in the U.S. and around the world have imposed substantial new or more stringent regulations, internal practices, capital requirements, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking employees and money laundering. The trend and scope of increased regulatory compliance requirements have increased costs.

Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public, and is a key focus in our risk management efforts. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by employees in the financial services industry, and we run the risk that misconduct by our employees could occur, resulting in unknown and unmanaged risks or losses. Employee misconduct could also involve the improper use or disclosure of confidential information, which could result in regulatory sanctions and serious reputational or financial harm. In addition, in certain circumstances our reputation could be damaged by activities of our clients in which we participate, or of hedge funds or other entities in which we invest, over which we have little or no control.

We are involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of our business, including actions brought against us and others with respect to transactions in which we acted as an underwriter or financial advisor, actions arising out of our activities as a broker or dealer in securities and actions brought on behalf of various classes of claimants against many securities firms and lending institutions, including us. See Part I, Item 1A, "Business—Regulation" and Part I, Item 3, "Legal Proceedings" in this Form 10-K for more information about legal and regulatory matters.

---

**Critical Accounting Policies and Estimates**

The following is a summary of our critical accounting policies that may involve a higher degree of management judgment and in some instances complexity in application. For a further discussion of these and other accounting policies, see Note 1 "Summary of Significant Accounting Policies," to our Consolidated Financial Statements.

**Use of Estimates**

In preparing our Consolidated Financial Statements and accompanying notes, management makes various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in:

- measuring fair value of certain financial instruments;

- accounting for identifiable intangible assets and goodwill;

-38-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

- establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations;

- assessing our ability to realize deferred taxes; and

- valuing equity-based compensation awards.

Estimates are based on available information and judgment. Therefore, actual results could differ from our estimates and that difference could have a material effect on our Consolidated Financial Statements and notes thereto.

**Consolidation Policies**

The assessment of whether accounting criteria for consolidation of an entity is met requires management to exercise judgment. We consolidate the entities in which the Company has a controlling financial interest. We determine whether we have a controlling financial interest in an entity by first determining whether the entity is a voting interest entity (sometimes referred to as a non-VIE), a variable interest entity ("VIE") or a qualified special purpose entity ("QSPE").

*Voting Interest Entity.* Voting interest entities are entities that have (i) total equity investment at risk sufficient to fund expected future operations independently and (ii) equity holders who have the obligation to absorb losses or receive residual returns and the right to make decisions about the entity's activities. In accordance with Accounting Research Bulletin ("ARB") No. 51, *Consolidated Financial Statements*, and Statement of Financial Accounting Standards ("SFAS") No. 94, *Consolidation of All Majority-Owned Subsidiaries*, voting interest entities are consolidated when the Company has a controlling financial interest, typically more than 50 percent of an entity's voting interests.

*Variable Interest Entity.* VIEs are entities that lack one or more voting interest entity characteristics. The Company consolidates VIEs in which it is the primary beneficiary. In accordance with Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 46-R, *Consolidation of Variable Interest Entities (revised December 2003)—an interpretation of ARB No. 51* ("FIN 46(R)"), we are the primary beneficiary if we have a variable interest, or a combination of variable interests, that will either (i) absorb a majority of the VIEs expected losses, (ii) receive a majority of the VIEs expected residual returns, or (iii) both. To determine if we are the primary beneficiary of a VIE, we review, among other factors, the VIE's design, capital structure, contractual terms, which interests create or absorb variability and related party relationships, if any. Additionally, we may calculate our share of the VIE's expected losses and expected residual returns based upon the VIE's contractual arrangements and/or our position in the VIE's capital structure. This type of analysis is typically performed using expected cash flows allocated to the expected losses and expected residual returns under various probability-weighted scenarios.

*Qualified Special Purpose Entity.* QSPEs are passive entities with limited permitted activities. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-a replacement of FASB Statement No. 125* ("SFAS 140"), establishes the criteria an entity must satisfy to be a QSPE, including types of assets held, limits on asset sales, use of derivatives and financial guarantees, and discretion exercised in servicing activities. In accordance with SFAS 140 and FIN 46(R), we do not consolidate QSPEs.

For a further discussion of our involvement with VIEs, QSPEs and other entities see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

*Equity-Method Investments.* Entities in which we do not have a controlling financial interest (and therefore do not consolidate) but in which we exert significant influence (generally defined as owning a voting interest of 20 percent to 50 percent, or a partnership interest greater than 3 percent) are accounted for either under Accounting Principles Board Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock* or SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"). For further discussion of our adoption of SFAS 159, see "Accounting and Regulatory Developments—SFAS 159" below.

*Other.* When we do not consolidate an entity or apply the equity method of accounting, we present our investment in the entity at fair value. We have formed various non-consolidated private equity or other alternative investment funds with third-party investors that are typically organized as limited partnerships. We typically act as general partner for these funds, and when third-party investors have (i) rights to either remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights, we do not consolidate these partnerships in accordance with Emerging Issue Task Force ("EITF") No. 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited*

*Partnership or Similar Entity When the Limited Partners Have Certain Rights* ("EITF 04-5").

A determination of whether we have a controlling financial interest in an entity and therefore our assessment of consolidation of that entity is initially made at the time we become involved with the entity. Certain events may occur which

-39-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

cause us to re-assess our initial determination of whether an entity is a VIE or non-VIE or whether we are the primary beneficiary if the entity is a VIE and therefore our assessment of consolidation of that entity. Those events generally are:

- The entity's governance structure is changed such that either (i) the characteristics or adequacy of equity at risk are changed, or (ii) expected returns or losses are reallocated among the participating parties within the entity.

- The equity investment (or some part thereof) is returned to the equity investors and other interests become exposed to expected returns or losses.

- Additional activities are undertaken or assets acquired by the entity that were beyond those anticipated previously.

- Participants in the entity acquire or sell interests in the entity.

- The entity receives additional equity at risk or curtails its activities in a way that changes the expected returns or losses.

**Valuation of Financial Instruments**

We measure Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased at fair value. We account for Real estate held for sale at the lower of its carrying amount or fair value less cost to sell. Both realized and unrealized gains or losses from Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased are reflected in Principal transactions in the Consolidated Statement of Income.

We adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), in the first quarter of 2007. SFAS 157 defines fair value, establishes a framework for measuring fair value, establishes a fair value hierarchy based on the inputs used to measure fair value and enhances disclosure requirements for fair value measurements. Additionally and also in the first quarter of 2007, we adopted SFAS 159, and applied this option to certain hybrid financial instruments not previously accounted for at fair value under SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140*, as well as certain deposit liabilities at our U.S. banking subsidiaries.

SFAS 157 defines "fair value" as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, or an exit price. The degree of judgment utilized in measuring the fair value of financial instruments generally correlates to the level of pricing observability. Financial instruments with readily available active quoted prices or for which fair value can be measured from actively quoted prices in active markets generally have more pricing observability and less judgment utilized in measuring fair value. Conversely, financial instruments rarely traded or not quoted have less observability and are measured at fair value using valuation models that require more judgment. Pricing observability is impacted by a number of factors, including the type of financial instrument, whether the financial instrument is new to the market and not yet established, the characteristics specific to the transaction and overall market conditions generally.

The overall valuation process for financial instruments may include adjustments to valuations derived from pricing models. These adjustments may be made when, in management's judgment, either the size of the position in the financial instrument or other features of the financial instrument such as its complexity, or the market in which the financial instrument is traded (such as counterparty, credit, concentration or liquidity) require that an adjustment be made to the value derived from the pricing models. An adjustment may be made if a trade of a financial instrument is subject to sales restrictions that would result in a price less than the computed fair value measurement from a quoted market price. Additionally, an adjustment from the price derived from a model typically reflects management's judgment that other participants in the market for the financial instrument being measured at fair value would also consider such an adjustment in pricing that same financial instrument.

We have categorized our financial instruments measured at fair value into a three-level classification in accordance with SFAS 157. Fair value measurements of financial instruments that use quoted prices in active markets for identical assets or liabilities are generally categorized as Level I, and fair value measurements of financial instruments that have no direct observable levels are generally categorized as Level III. The lowest level input that is significant to the fair value measurement of a financial instrument is used to categorize the instrument and reflects the judgment of management. Financial assets and liabilities presented at fair value in Holdings' Condensed Consolidated Statement of Financial Condition generally are categorized as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

-40-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

The types of assets and liabilities carried at Level I fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain hybrid financial instruments, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

Financial assets and liabilities presented at fair value and categorized as Level III are generally those that are marked to model using relevant empirical data to extrapolate an estimated fair value. The models' inputs reflect assumptions that market participants would use in pricing the instrument in a current period transaction and outcomes from the models represent an exit price and expected future cash flows. Our valuation models are calibrated to the market on a frequent basis. The parameters and inputs are adjusted for assumptions about risk and current market conditions. Changes to inputs in valuation models are not changes to valuation methodologies; rather, the inputs are modified to reflect direct or indirect impacts on asset classes from changes in market conditions. Accordingly, results from valuation models in one period may not be indicative of future period measurements. Valuations are independently reviewed by employees outside the business unit and, where applicable, valuations are back tested comparing instruments sold to where they were marked.

During the 2007 fiscal year, our Level III assets increased, ending the year at 13% of Financial instruments and other inventory positions owned, measured at fair value and with our derivatives on a net basis. The increase in Level III assets resulted largely from the reclassification of approximately $11.4 billion of mortgage and asset-backed securities, including approximately $5.3 billion in U.S. subprime residential mortgage-related assets, previously categorized as Level II assets into the Level III category. This reclassification generally occurred in the second half of 2007, reflecting the reduction of liquidity in the capital markets that resulted in a decrease in the observability of market prices. Approximately half of the residential mortgage-related assets that were classified as Level III at the end of the 2007 fiscal year were whole loan mortgages. In particular, the decline in global trading activity impacted our ability to directly correlate assumptions in valuation models used in pricing mortgage-related assets, including those for cumulative loss rates and changes in underlying collateral values to current market activity. Additionally and during the fiscal year, the increase of assets characterized as Level III was also attributable to the acquisition of private equity and other principal investment assets, funded lending commitments that had not been fully syndicated at the end of the fiscal year as well as certain commercial mortgage-backed security positions.

For a further discussion regarding the measure of Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased at fair value, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

**Identifiable Intangible Assets and Goodwill**

Determining the carrying values and useful lives of certain assets acquired and liabilities assumed associated with business acquisitions— intangible assets in particular— requires significant judgment. At least annually, we are required to assess whether goodwill and other intangible assets have been impaired by comparing the estimated fair value, calculated based on price-earnings multiples, of each business segment with its estimated net book value, by estimating the amount of stockholders' equity required to support each business segment. Periodically estimating the fair value of a reporting unit and carrying values of intangible assets with indefinite lives involves significant judgment and often involves the use of significant estimates and assumptions. These estimates and assumptions could have a significant effect on whether or not an impairment charge is recognized and the magnitude of such a charge. We completed our last impairment test on goodwill and other intangible assets as of August 31, 2007, and no impairment was identified.

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**Legal, Regulatory and Tax Proceedings**

In the normal course of business, we have been named as a defendant in a number of lawsuits and other legal and regulatory proceedings. Such proceedings include actions brought against us and others with respect to transactions in which we acted as an underwriter or financial advisor, actions arising out of our activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities firms, including us. In addition, our business activities are reviewed by various taxing authorities around the world with regard to corporate income tax rules and regulations. We provide for potential losses that may arise out of legal, regulatory and tax proceedings to the extent such losses are probable and can be estimated. Those determinations require significant judgment. For a further discussion, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

**Consolidated Results of Operations**

**Overview**

The following table sets forth an overview of our results of operations in 2007:

| In millions | Year Ended November 30, | | | Percent Change | |
| | 2007 | 2006 | 2005 | 2007/ 2006 | 2006/ 2005 |
|---|---|---|---|---|---|
| Net revenues | $ 19,257 | $ 17,583 | $ 14,630 | 10% | 20% |
| Income before taxes | $ 6,013 | $ 5,905 | $ 4,829 | 2 | 22 |
| Net income[(1)] | $ 4,192 | $ 4,007 | $ 3,260 | 5 | 23 |
| Earnings per diluted common share | $ 7.26 | $ 6.81 | $ 5.43 | 7% | 25% |
| Annualized return on average common stockholders' equity | 20.8% | 23.4% | 21.6% | | |
| Annualized return on average tangible common stockholders' equity | 25.7% | 29.1% | 27.8% | | |

[(1)] Net income in 2006 included an after-tax gain of $47 million, or $0.08 per diluted common share, as a cumulative effect of an accounting change associated with our adoption of SFAS 123(R), on December 1, 2005.

**Net Revenues**

| In millions | Year Ended November 30, | | | Percent Change | |
| | 2007 | 2006 | 2005 | 2007/ 2006 | 2006/ 2005 |
|---|---|---|---|---|---|
| Principal transactions | $ 9,197 | $ 9,802 | $ 7,811 | (6)% | 25% |
| Investment banking | 3,903 | 3,160 | 2,894 | 24 | 9 |
| Commissions | 2,471 | 2,050 | 1,728 | 21 | 19 |
| Interest and dividends | 41,693 | 30,284 | 19,043 | 38 | 59 |
| Asset management and other | 1,739 | 1,413 | 944 | 23 | 50 |
| Gross revenues | $ 59,003 | $ 46,709 | $ 32,420 | 26% | 44% |
| Interest expense | 39,746 | 29,126 | 17,790 | 36 | 64 |
| Net revenues | $ 19,257 | $ 17,583 | $ 14,630 | 10% | 20% |
| Net interest revenues | $ 1,947 | $ 1,158 | $ 1,253 | 68% | (8)% |
| Principal transactions, commissions and net interest revenues | $ 13,615 | $ 13,010 | $ 10,792 | 5% | 21% |

***Principal Transactions, Commissions and Net Interest Revenue.*** In both the Capital Markets segment and the Private Investment Management business within the Investment Management segment, we evaluate net revenue performance based on the aggregate of Principal transactions, Commissions and Net interest revenue (Interest and dividends revenue net of Interest expense). These revenue categories include realized and unrealized gains and losses, commissions associated with client transactions and the interest and dividend revenue and interest expense associated

-42-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

with financing or hedging positions. Interest and dividends revenue and Interest expense are a function of the level and mix of total assets and liabilities (primarily financial instruments owned and sold but not yet purchased, and collateralized borrowing and lending activities), prevailing interest rates and the term structure of our financings. Caution should be used when analyzing these revenue categories individually because they may not be indicative of the overall performance of the Capital Markets and Investment Management business segments. Principal transactions, Commissions and Net interest revenue in the aggregate rose 5% in 2007 from 2006 and 21% in 2006 from 2005.

2007 vs. 2006. Principal transactions revenue decreased 6% in 2007 from 2006, primarily as a result of negative valuation adjustments made on certain components of our Fixed Income inventory during the second half of the 2007 fiscal year. Although we employ risk mitigation strategies for certain inventory positions, correlations broke down, particularly in the latter parts of the fiscal year, resulting in a higher degree of risk incurred. With respect to Capital Markets—Fixed Income customer flow revenues, heightened risk aversion among investors caused many to shift their trading activity to higher quality and more liquid products, which are generally less profitable for the Firm. The negative adjustments and the effects of this shift on our margin were partially offset by record revenues within Capital Markets—Equities. The comparative increase in Equities' Principal transactions revenue was a result of higher customer activities, increase in market volatility and higher revenues from principal and proprietary trading strategies, especially in the international markets. Commission revenues rose 21% in 2007 from 2006. The increase in 2007 reflected growth in institutional commissions on higher global trading volumes. Net interest revenue increased 68% in 2007 from 2006 reflecting changes in both financing rates and yield curves between the periods. Interest and dividends revenue and Interest expense rose 38% and 36%, respectively, in 2007 from 2006. The comparative increase in Interest and dividend revenues and Interest expense was attributable to the steepening of the yield curve and the growth of certain assets and liabilities on our balance sheet.

2006 vs. 2005. Principal transactions revenue improved 25% in 2006 from 2005, driven by broad based strength across fixed income and equity products. Within Capital Markets, the notable increases in 2006 were in credit products and commercial mortgages and real estate. The 2006 increase in net revenues from Equities Capital Markets reflected higher client trading volumes, increases in financing and derivative activities and higher revenues from proprietary trading strategies. Principal transactions revenue in 2006 also benefited from increased revenues associated with certain structured products meeting the required market observability standard for revenue recognition. Commission revenues rose 19% in 2006 from 2005, reflecting growth in institutional commissions on higher global trading volumes, partially offset by lower commissions in our Investment Management business segment, as certain clients transitioned from transaction-based commissions to a traditional fee-based schedule. Net interest revenue declined 8% in 2006 from 2005 as a result of a change in the mix of asset composition, an increase in short-term U.S. financing rates, and a flattened yield curve. Interest and dividends revenue and Interest expense rose 59% and 64%, respectively, in 2006 from 2005. The increase in Interest and dividend revenues and Interest expense was attributable to higher short-term interest rates coupled with higher levels of certain interest- and dividend-earning assets and interest-bearing liabilities.

***Investment Banking.*** Investment banking revenues represent fees and commissions received for underwriting public and private offerings of fixed income and equity securities, fees and other revenues associated with advising clients on M&A activities, as well as other corporate financing activities.

2007 vs. 2006. Investment banking revenues rose to record levels in 2007, increasing 24% from 2006. Record Global Finance—Debt revenues increased 9% from 2006. Leveraged finance revenues were at all time highs, resulting from a very strong first half of the year, which was partially offset by a decline in the second half of the year. Global Finance—Equity net revenues increased 25% compared to 2006 led by exceptional derivative activity as well as strong initial public offering ("IPO") revenue in the first half of the fiscal year. Record Advisory Services revenues increased 45% from 2006, as our completed transaction volume increased 124% for the same period. Included in Investment banking revenue are client-driven derivative and other capital markets-related transactions with Investment Banking clients, which totaled approximately $541 million for 2007, compared to approximately $304 million for 2006.

2006 vs. 2005. Investment banking revenues rose in 2006, increasing 9% from 2005. Global Finance—Debt 2006 net revenues increased 9% from 2005, reflecting significant growth in global origination market volumes. Global Finance—Equity net revenues decreased 1% compared to 2005, despite increased global origination market volumes. Advisory Services net revenues increased 20% from 2005, reflecting higher completed global M&A transaction volumes. Client-driven derivative and other capital markets-related transactions with Investment Banking clients totaled approximately $304 million for 2006, compared to approximately $308 million for 2005.

***Asset Management and Other.*** Asset management and other revenues primarily result from asset management activities in the Investment Management business segment.

-43-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

2007 vs. 2006. Asset management and other revenues rose 23% in 2007 from 2006. The growth in 2007 primarily reflected higher asset management fees attributable to the growth in AUM and management and incentive fees.

2006 vs. 2005. Asset management and other revenues rose 50% in 2006 from 2005. The growth in 2006 primarily reflected higher asset management fees attributable to the growth in AUM, a transition to fee-based rather than commission-based pricing for certain clients, as well as higher private equity management and incentive fees.

**Non-Interest Expenses**

| | | | | | Percent Change | |
| | Year Ended November 30, | | | 2007/ | 2006/ |
| In millions | 2007 | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|---|
| Compensation and benefits | $ 9,494 | $ 8,669 | $ 7,213 | 10% | 20% |
| Non-personnel expenses: | | | | | |
| Technology and communications | 1,145 | 974 | 834 | 18 | 17 |
| Brokerage, clearance and distribution fees | 859 | 629 | 548 | 37 | 15 |
| Occupancy | 641 | 539 | 490 | 19 | 10 |
| Professional fees | 466 | 364 | 282 | 28 | 29 |
| Business development | 378 | 301 | 234 | 26 | 29 |
| Other | 261 | 202 | 200 | 29 | 1 |
| Total non-personnel expenses | $ 3,750 | $ 3,009 | $ 2,588 | 25% | 16% |
| Total non-interest expenses | $ 13,244 | $11,678 | $ 9,801 | 13% | 19% |
| Compensation and benefits/Net revenues | 49.3% | 49.3% | 49.3% | | |
| Non-personnel expenses/Net revenues | 19.5% | 17.1% | 17.7% | | |

Non-interest expenses were $13.2 billion, $11.7 billion and $9.8 billion in 2007, 2006 and 2005, respectively. A substantial portion of our non-interest expenses is compensation-related, and a significant portion of our compensation expense represents discretionary bonuses which are impacted by levels of business activity and the structure of our share-based compensation programs. Remaining non-interest expense categories are largely variable, and are expected to change over time with revenue levels, business activity mix and employee headcount levels.

***Compensation and benefits.*** Compensation and benefits totaled $9.5 billion, $8.7 billion and $7.2 billion in 2007, 2006, and 2005, respectively. Compensation and benefits expense includes both fixed and variable components. Fixed compensation consists primarily of salaries, benefits and amortization of previous years' deferred equity awards. Variable compensation consists primarily of incentive compensation and commissions. Compensation and benefits expense as a percentage of net revenues was 49.3% for 2007, 2006 and 2005. Employees totaled approximately 28,600, 25,900 and 22,900 at November 30, 2007, 2006 and 2005, respectively.

2007 vs. 2006. Headcount increased 10% in 2007 from 2006, reflecting the increased levels of business activity across the Firm as well as our continued investments in the growth of the franchise, particularly in non–U.S. regions. In connection with the announced restructuring of the Firm's global residential mortgage origination business, employee levels were reduced by approximately 1,900 in the 2007 fiscal year. Fixed compensation in 2007 was 20% greater than 2006 as result of the overall increase in employees. Fixed compensation was approximately $4.6 billion and $3.9 billion in 2007 and 2006, respectively. The 2007 fixed compensation amount of approximately $4.6 billion includes approximately $1.3 billion of amortization expense for stock awards granted in prior periods. Variable compensation was 1% greater in 2007 than 2006.

2006 vs. 2005. Headcount increased 13% in 2006 from 2005, reflecting the increased levels of business activity across the Firm as well as our continued investments to grow the franchise, particularly in non–U.S. regions. Correlated to the increase in employees, fixed compensation in 2006 was 21% greater than 2005. Fixed compensation was approximately $3.9 billion and $3.2 billion in 2006 and 2005, respectively. The 2006 fixed compensation amount of approximately $3.9 billion includes approximately $1.0 billion of amortization expense for stock awards granted in prior periods. The increased level of revenue from 2005 to 2006 resulted in comparatively higher incentive compensation expense. Variable compensation was 20% greater in 2006 than 2005.

***Non-personnel expenses.*** Non-personnel expenses totaled $3.8 billion, $3.0 billion and $2.6 billion in 2007, 2006 and 2005, respectively. Non-personnel expenses as a percentage of net revenues were 19.5%, 17.1%, and 17.7% in 2007, 2006, and 2005, respectively.

<u>2007 vs. 2006</u>. Technology and communications expenses rose 18% in 2007 from 2006, reflecting increased costs from the continued expansion and development of our Investment Management platforms and infrastructure. Brokerage, clearance and distribution fees rose 37% in 2007 from 2006, primarily due to higher transaction volumes in Equities Capital Markets

-44-

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

and Investment Management products. Occupancy expenses increased 19% in 2007 from 2006, primarily due to increased space requirements from the increased number of employees. Professional fees and business development expenses increased 27% in 2007 on higher levels of business activity and increased costs associated with recruiting, consulting and legal fees. In 2007, Other non-personnel expenses included approximately $62 million associated with the restructuring of the Firm's global residential mortgage origination business.

2006 vs. 2005. Technology and communications expenses rose 17% in 2006 from 2005, reflecting increased costs from the continued expansion and development of our Capital Markets platforms and infrastructure. Brokerage, clearance and distribution fees rose 15% in 2006 from 2005, primarily due to higher transaction volumes in certain Capital Markets and Investment Management products. Occupancy expenses increased 10% in 2006 from 2005, primarily due to increased space requirements from the increased number of employees. Professional fees and business development expenses increased 29% in 2006 on higher levels of business activity and increased costs associated with recruiting, consulting and legal fees.

**Income Taxes**

The provision for income taxes totaled $1.8 billion, $1.9 billion and $1.6 billion in 2007, 2006 and 2005, respectively. The provision for income taxes resulted in effective tax rates of 30.3%, 32.9% and 32.5% for 2007, 2006 and 2005, respectively. The decrease in the effective tax rate in 2007 compared to 2006 was primarily due to a more favorable mix of earnings, which resulted in lower tax expense from foreign operations as compared to the U.S. statutory rate. The increases in the effective tax rates in 2006 and 2005 compared with the prior years were primarily due to an increase in the level of pretax earnings, which minimizes the impact of certain tax benefit items, and in 2006 a net reduction in certain benefits from foreign operations, partially offset by a reduction in state and local taxes due to favorable audit settlements in 2006 and 2005.

**Business Acquisitions, Business Dispositions and Strategic Investments**

*Business Acquisitions.* During the fiscal year, we completed the business acquisitions listed below. As a result of these acquisitions, the additions to goodwill and intangible assets were approximately $860 million.

- Eagle Energy Partners I, L.P., a Texas-based energy marketing and services company that manages and optimizes supply, transportation, transmission, load and storage portfolios on behalf of wholesale natural gas and power clients.

- Capital Crossing Bank, a state-chartered, FDIC-insured commercial bank that originates small business loans.

- A controlling interest in SkyPower Corp., a Toronto-based early stage wind and solar power generation development company. SkyPower Corp. is consolidated in our results of operations.

- The final contingent payment under a 2004 deferred transaction agreement was made for the remaining 50% of Lehman Brothers Alternative Investment Management ("LBAIM"), which manages fund of hedge fund portfolios and investment products for institutional and high-net-worth private clients. LBAIM was previously consolidated in Holdings' results of operations.

- Grange Securities Limited, a full service Australian broker-dealer specializing in fixed income products.

- LightPoint Capital Management LLC, a leveraged loan investment manager based in Chicago, Illinois, with approximately $3.2 billion in AUM.

- The institutional equities business, including the institutional research group, of Brics Securities Limited, located in India.

- H.A. Schupf, a high net worth asset manager with approximately $2.3 billion in AUM.

- Congress Life Insurance Company, a life insurance company with licenses in 43 U.S. states.

- Dartmouth Capital, a U.K.-based investment advisory firm with approximately $340 million in assets under advisory.

- MNG Securities, an equity securities brokerage firm in Turkey.

A portion of the consideration paid to shareholders of certain entities described above consisted of shares of Holdings' common stock. For more information, see Part II, Item 2, "Unregistered Sales of Equity Securities and Use of Proceeds" in the Quarterly Reports on Form 10-Q for the quarters ended August 31, 2007 and May 31, 2007.

-45-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

***Business Dispositions.*** During the fiscal year, we completed the business dispositions listed below.

- Within Capital Markets we disposed of Neuberger Berman's correspondent clearing business, which decreased our goodwill and intangible assets by approximately $26 million. The gain on sale was not material.

- We incurred non-personnel costs of approximately $62 million, including a goodwill write-down of approximately $27 million, and approximately $30 million of severance expense (reported in Compensation and benefits), in connection with the announced restructuring of the Firm's global residential mortgage origination business, including the closure of BNC Mortgage LLC, our U.S. subprime residential mortgage origination platform, the rescaling of operations in the U.S. and U.K. due to market conditions and product revisions and the closure of our Korean mortgage business. The non-personnel costs were approximately $22 million after-tax and were generally associated with terminated leases.

- Lehman Brothers Bank disposed of a leasing subsidiary, Dolphin Capital Corp., acquired in the acquisition of Capital Crossing. The transaction was an asset sale and amounts were transferred at approximately book value.

***Strategic Investments.*** During the fiscal year, we made the following strategic investments.

- Acquired a 20% interest in the D.E. Shaw group, a global investment management firm.

- Purchased an initial 20% interest and a subsequent 5% interest in both Spinnaker Asset Management Limited and Spinnaker Financial Services, part of Spinnaker Capital, an emerging markets investment management firm.

- Purchased a minority interest in Wilton Re Holdings, a U.S. re-insurer that focuses on the reinsurance of mortality risk on life insurance policies.

Subsequent to the fiscal year ended November 30, 2007, we acquired certain assets of Van der Moolen Specialists, including its book of NYSE-listed securities, staff and certain technology. We and certain other broker-dealers entered into a joint-venture and invested in TradeWeb Markets LLC, an electronic securities trading platform owned by Thomson Financial. In addition, in January 2008, we sold our 20% interest in Marble Bar Asset Management LLP, an investment management firm.

In January 2008, we announced the suspension of our wholesale and correspondent mortgage lending activities at our Aurora Loan Services subsidiary. We will continue to originate loans through Aurora's direct lending channel and will maintain Aurora's servicing business. As a result of these suspension activities, we estimate that we will incur one-time expenses, after tax, of approximately $40 million for severance and facilities exit costs.

## Business Segments

Our operations are organized into three business segments:

- Capital Markets;

- Investment Banking; and

- Investment Management.

These business segments generate revenues from institutional, corporate, government and high net worth individual clients across each of the revenue categories in the Consolidated Statement of Income. Net revenues and expenses contain certain internal allocations, such as funding costs, that are centrally managed.

-46-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

*Segment Operating Results*

| In millions | 2007 | 2006 | 2005 | Percent Change 2007/2006 | Percent Change 2006/2005 |
|---|---|---|---|---|---|
| **Capital Markets** | | | | | |
| Net revenues | $ 12,257 | $ 12,006 | $ 9,807 | 2% | 22% |
| Non-interest expense | 8,058 | 7,286 | 6,235 | 11 | 17 |
| Income before taxes | $ 4,199 | $ 4,720 | $ 3,572 | (11)% | 32% |
| **Investment Banking** | | | | | |
| Net revenues | $ 3,903 | $ 3,160 | $ 2,894 | 24% | 9% |
| Non-interest expense | 2,880 | 2,500 | 2,039 | 15 | 23 |
| Income before taxes | $ 1,023 | $ 660 | $ 855 | 55% | (23)% |
| **Investment Management** | | | | | |
| Net revenues | $ 3,097 | $ 2,417 | $ 1,929 | 28% | 25% |
| Non-interest expense | 2,306 | 1,892 | 1,527 | 22 | 24 |
| Income before taxes | $ 791 | $ 525 | $ 402 | 51% | 31% |
| **Total** | | | | | |
| Net revenues | $ 19,257 | $ 17,583 | $ 14,630 | 10% | 20% |
| Non-interest expense | 13,244 | 11,678 | 9,801 | 13 | 19 |
| Income before taxes | $ 6,013 | $ 5,905 | $ 4,829 | 2% | 22% |

*(Year Ended November 30,)*

The below charts illustrate the percentage contribution of each business segment to our total net revenues.





## Capital Markets

Our Capital Markets segment is divided into two components:

*Fixed Income* – We make markets in and trade municipal and public sector instruments, interest rate and credit products, mortgage-related securities and loan products, currencies and commodities. We also originate mortgages and we structure and enter into a variety of derivative transactions. We also provide research covering economic, quantitative, strategic, credit, relative value, index and portfolio analyses. Additionally, we provide financing, advice and servicing activities to the hedge fund community, known as prime brokerage services. We engage in certain proprietary trading activities and in principal investing in real estate that are managed within this component.

*Equities* – We make markets in and trade equities and equity-related products and enter into a variety of derivative transactions. We also provide equity-related research coverage as well as execution and clearing activities for clients. Through our capital markets prime services, we provide prime brokerage services to the hedge fund community. We also engage in proprietary trading activities and private equity and other related investments.

-47-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

The following table sets forth the operating results of our Capital Markets business segment.

*Capital Markets Results of Operations*

| | | | | Percent Change | |
|---|---|---|---|---|---|
| | Year Ended November 30, | | | 2007/ | 2006/ |
| In millions | 2007 | 2006 | 2005 | 2006 | 2005 |
| Principal transactions | $ 8,400 $ | 9,285 $ | 7,393 | (10)% | 26% |
| Commissions | 1,752 | 1,420 | 1,132 | 23 | 25 |
| Interest and dividends | 41,648 | 30,264 | 18,987 | 38 | 59 |
| Other | 97 | 105 | 33 | (8) | 218 |
| Total revenues | 51,897 | 41,074 | 27,545 | 26 | 49 |
| Interest expense | 39,640 | 29,068 | 17,738 | 36 | 64 |
| Net revenues | 12,257 | 12,006 | 9,807 | 2 | 22 |
| Non-interest expenses | 8,058 | 7,286 | 6,235 | 11 | 17 |
| Income before taxes | $ 4,199 $ | 4,720 $ | 3,572 | (11)% | 32% |

The following table sets forth net revenues for the two components of our Capital Markets business segment.

*Capital Markets Net Revenues*

| | | | | Percent Change | |
|---|---|---|---|---|---|
| | Year Ended November 30, | | | 2007/ | 2006/ |
| In millions | 2007 | 2006 | 2005 | 2006 | 2005 |
| Fixed Income | $ 5,977 $ | 8,447 $ | 7,334 | (29)% | 15% |
| Equities | 6,280 | 3,559 | 2,473 | 76 | 44 |
| | $ 12,257 $ | 12,006 $ | 9,807 | 2% | 22% |

<u>2007 vs. 2006.</u> Net revenues totaled $12.3 billion and $12.0 billion in 2007 and 2006, respectively. Overall growth in 2007 Capital Markets' net revenues was driven by net revenues from the Equities component of Capital Markets and a higher contribution from non-U.S. regions, partially offset by declines in net revenues for the Fixed Income component of Capital Markets. Capital Markets net revenues in 2007 include approximately $1.3 billion of gains on debt liabilities which we elected to fair value under SFAS 157 and SFAS 159.

Net revenues in Capital Markets—Fixed Income of $6.0 billion for 2007, decreased 29% compared with $8.4 billion in 2006. Capital Markets—Fixed Income sales credit volumes were $4.8 billion, increasing 40% compared with $3.4 billion in 2006.

The businesses within the Fixed Income component of Capital Markets were the most affected by the market dislocations, risk repricing and de-levering that took place during the second half of the fiscal year. The adverse conditions in the U.S. housing market, changes in the credit markets and continued correction in leveraged loan pricing and certain asset-backed security market segments were generally responsible for the negative variance in Capital Markets—Fixed Income revenues between the benchmark periods. The negative valuation adjustments resulting from the impact of adverse market conditions were partially mitigated by the economic risk management strategies we employed as well as valuation changes on certain debt liabilities and realized gains from the sale of certain leveraged lending positions in the fourth quarter.

The table below presents certain components that generally contributed to the decline of Capital Markets—Fixed Income revenues in 2007 from 2006. These components are presented on a gross basis, as well as a net basis. The net impact represents the revenue impact from the components after adjusting for the impact of certain economic risk management strategies. Caution should be utilized when evaluating the amounts in the following table as they represent only certain components of revenue associated with the general business activities described.

-48-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

| Gain/(Loss) | Year Ended November 30, 2007 | | | |
|---|---|---|---|---|
| In billions | Gross | | Net[1] | |
| Residential mortgage-related positions | $ | (4.7) | $ | (1.3) |
| Commercial mortgage-related positions | | (1.2) | | (0.9) |
| Collateralized debt and lending obligation positions[2] | | (0.6) | | (0.2) |
| Municipal positions | | (0.2) | | — |
| High-yield contingent acquisition loans and facilities[3] | | (1.0) | | (0.4) |
| Valuation of debt liabilities[4] | | 0.9 | | 0.9 |
| | $ | (6.8) | $ | (1.9) |

[1]  The net impact represents the remaining impact from the components after deducting the impact of certain economic risk management strategies. The gross impact excludes any effect of economic risk management strategies.

[2]  These valuation adjustments substantially relate to asset-backed collateralized debt obligations including warehoused positions.

[3]  Includes approximately $0.3 billion of realized gains from the sale of certain leveraged lending positions that were recognized in our fiscal fourth quarter. The net amount includes certain transaction fees earned, in addition to the impact of certain economic risk management strategies.

[4]  Represents the amount of gains on debt liabilities allocated to Capital Markets—Fixed Income and for which we elected to fair value under SFAS 157 and SFAS 159. These gains represent the effect of changes in our credit spread and exclude any Interest income or expense as well as any gain or loss from the embedded derivative components of these instruments. Changes in valuations are allocated to the businesses within Capital Markets—Fixed Income in relation to the cash generated by, or funding requirements of, the underlying positions.

Capital Markets—Equities net revenues of $6.3 billion for 2007, increased 76% compared with $3.6 billion in 2006. These results reflected the higher revenue levels reflecting the broader customer franchise developed globally. Capital Markets—Equities sales credit volumes were $3.7 billion, increasing 53% compared with $2.4 billion in 2006. Global market trading volumes rose 29% in 2007 compared to 2006.

The increase in Capital Markets—Equities net revenues reflected increased performance during the fiscal year across all products, with the exception of convertibles, driven by record customer activity and profitable principal trading and investing strategies. Global equity markets advanced year over year. In the latter half of our 2007 fiscal year, volatility was at higher levels relative to the comparable 2006 period. The volatility in the global equity markets led investors to employ risk mitigation strategies, driving global market demand for and strong customer activity in cash and derivative products. 2007 revenues in convertibles declined compared to 2006, mainly due to unprofitable proprietary trading strategies in certain sectors. Capital Markets—Equities prime services' net revenues increased compared to those in the 2006 fiscal year. At the end of the 2007 fiscal year, the number of our prime brokerage services clients increased 20% to 630 from the end of the 2006 fiscal year. Correspondingly, overall client balances were 30% higher at the end of the 2007 fiscal year also compared to balances at the end of the 2006 fiscal year. Capital Markets—Equities revenues in the 2007 fiscal year include gains of approximately $700 million from private equity and other principal investments, including our investment in GLG Partners LP, as well as approximately $400 million in allocated gains from valuation changes in certain of our debt liabilities carried at fair value pursuant to SFAS 157 and SFAS 159.

Net interest revenues for the Capital Markets segment in 2007 increased 68% compared to 2006, primarily attributable to higher short-term U.S. financing rates and a change in the mix of asset composition. Interest and dividends revenue rose 38% in 2007 compared to 2006, and interest expense rose 36% in 2007 compared to the corresponding 2006 period. Non-interest expenses for 2007 increased 11%. Technology and communications expenses increased due to the continued expansion and development of our business platforms and infrastructure. Brokerage, clearance and distribution fees rose primarily due to higher transaction volumes across most Capital Markets products. Professional fees and business development expenses increased due to global growth of the business segment. For the Capital Markets segment, Income before taxes for 2007 decreased 11% compared with 2006 and, correspondingly, pre-tax margins in 2007 were 34% compared to 39% in 2006. During 2007, we announced steps to restructure our residential mortgage origination business, which is a component of our securitized products business within Capital Markets—Fixed Income. See "Business Acquisitions and Dispositions—Business Dispositions" above. The costs associated with these steps are included in the above non interest expenses.

<u>2006 vs. 2005</u>. Capital Markets net revenues increased to $12.0 billion in 2006 from $9.8 billion in 2005, reflecting record performances in both Fixed Income and Equities. On strong performances across most products, Capital Markets—Fixed Income net revenues increased 15% in 2006 from 2005 and Capital Markets—Equities net revenues increased 44% over the same period. Income before taxes totaled $4.7 billion and $3.6 billion in 2006 and 2005, respectively, up 32%. Pre-tax margin

was 39% and 36% in 2006 and 2005, respectively.

Our Capital Markets—Fixed Income net revenues grew to a record $8.4 billion in 2006, an increase of 15% from 2005. This growth was attributable to strong client-flow activity and profitable trading strategies, leading to record revenues in

-49-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

most products. The products that contributed most to the increase in revenues year over year included credit, commercial mortgages and real estate and prime brokerage, partially offset by strong, but lower revenues in both interest rate products and residential mortgages.

Capital Markets—Equities net revenues increased 44% to a record level in 2006 on strong client-flow and robust global trading volumes. Global equity indices were up 14% in local currency terms for 2006, helped by strong earnings reports, lower energy prices and the end to the interest rate tightening cycle by central banks. Substantially all equity products in 2006 surpassed their 2005 performance, including gains in cash products, prime brokerage, equity derivatives, convertibles and proprietary and principal activities.

Net interest revenues decreased 4% in 2006 from 2005, primarily due to higher short-term U.S. interest rates, a flattened yield curve and a change in mix of asset composition. Interest and dividends revenue and Interest expense increased 59% and 64%, respectively, in 2006 from 2005 as a result of higher short-term interest rates coupled with higher levels of interest- and dividend-earning assets and interest-bearing liabilities. Non-interest expenses increased to $7.3 billion in 2006 from $6.2 billion in 2005. The growth in Non-interest expenses reflected higher compensation and benefits expense related to improved performance as well as increased technology, occupancy and communications expenses attributable to continued investments in trading platforms, integration of business acquisitions, and higher brokerage and clearance costs and professional fees from increased business activities.

### Investment Banking

We take an integrated approach to client coverage, organizing bankers into industry, product and geographic groups within our Investment Banking segment. Business services provided to corporations and governments worldwide can be separated into:

*Global Finance* – We serve our clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products.

*Advisory Services* – We provide business advisory services with respect to mergers and acquisitions, divestitures, restructurings and other corporate activities.

The following table sets forth the operating results of our Investment Banking segment.

### *Investment Banking Results of Operations*[1]

| | Year Ended November 30, | | | Percent Change | |
| | | | | 2007/ | 2006/ |
| In millions | 2007 | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|---|
| Global Finance—Debt | $ 1,551 | $ 1,424 | $ 1,304 | 9% | 9% |
| Global Finance—Equity | 1,015 | 815 | 824 | 25 | (1) |
| Advisory Services | 1,337 | 921 | 766 | 45 | 20 |
| Total revenues | $ 3,903 | $ 3,160 | $ 2,894 | 24% | 9% |
| Non-interest expenses | 2,880 | 2,500 | 2,039 | 15 | 23 |
| Income before taxes | $ 1,023 | $ 660 | $ 855 | 55% | (23)% |

---

[1] Investment banking revenues are net of related underwriting expenses.

-50-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

The following table sets forth our Investment Banking transaction volumes.[1] These volumes do not always directly correlate to Investment Banking revenues because they do not necessarily correspond to the amount of securities actually underwritten and only include certain reported underwriting activity and because revenue rates vary among transactions.

| In millions | Year Ended November 30, | | | Percent Change | |
| | | | | 2007/ 2006 | 2006/ 2005 |
| | 2007 | 2006 | 2005 | | |
|---|---|---|---|---|---|
| Global Finance—Debt | $368,422 | $438,026 | $398,955 | (16)% | 10% |
| Global Finance—Equity | 29,646 | 28,306 | 24,314 | 5 | 16 |
| Advisory Services—Completed | 849,265 | 378,448 | 313,667 | 124 | 21 |
| Advisory Services—Announced | 793,685 | 533,238 | 419,082 | 49 | 27 |

<u>2007 vs. 2006.</u> Investment Banking net revenues totaled $3.9 billion and $3.2 billion in 2007 and 2006, respectively, an increase of 24% in 2007 from 2006, reflecting record revenues for Global Finance—Debt, Global Finance—Equity and Advisory Services and a generally higher level of cross-border and international business activity. Non-interest expenses rose 15% in 2007 from 2006. This increase was attributable to an increase in compensation and benefits expense related to an increased number of employees and higher Non-personnel expenses. Income before taxes increased 55% in 2007 to $1.0 billion from $660 million in 2006, and, correspondingly, pre-tax margins in 2007 were 26% compared to 21% in 2006.

Global Finance—Debt origination net revenues were $1.6 billion in 2007, increasing 9% from 2006. These results were driven, in part, by revenues from leveraged finance which had a record first half of 2007 but fell significantly in the latter half of 2007 as a number of financial sponsor-related transactions were cancelled or delayed, particularly in the leveraged loan market. These conditions also caused certain lending commitments to be executed at lower fee levels. Publicly reported global debt origination market volumes decreased 3% in 2007 over 2006, with our origination market volumes decreasing 16% over the same period. Our debt origination fee backlog of $141 million at November 30, 2007 decreased 43% from November 30, 2006. Debt origination backlog may not be indicative of the level of future business due to the frequent use of the shelf registration process and changes in overall market conditions. For the calendar year 2007, our market ranking for publicly reported global debt origination was sixth with a 5.4% share, down from a rank of fourth with a 6.2% share in calendar year 2006.

Global Finance—Equity net revenues increased 25% in 2007 to a record $1.0 billion from 2006 revenues of $815 million, consistent with a 23% increase in industry-wide global equity origination market volumes. The increase in 2007 net revenues also included strong, customer-driven derivative-related activity, which more than doubled from 2006 levels. On a sequential year basis, net revenues associated with private placement transactions and accelerated stock repurchases increased 72%. IPO net revenues increased 38% compared to the 2006 fiscal year and IPO net revenues increased within all geographic segments. Our IPO market volume for 2007 increased 17% compared to fiscal year 2006, slightly lower than the 19% market increase. Our equity-related fee backlog (for both filed and unfiled transactions) at November 30, 2007 was approximately $316 million, up 11% from November 30, 2006; however, that measure may not be indicative of the level of future business depending on changes in overall market conditions. For the calendar year 2007, our market ranking for publicly reported global equity origination was ninth with a 3.0% share, consistent with our rank in calendar year 2006 during which we had a 3.5% market share.

Advisory Services revenues were a record $1.3 billion in 2007, up 45% from then-record revenues in 2006. Industry-wide completed and announced transaction volumes increased 32% and 27%, respectively, in 2007 from 2006, while our completed and announced volumes increased 124% and 49%, respectively, in the same comparative period. Our global market share for publicly reported completed and announced transactions increased to 21% and 17%, respectively, for calendar 2007, up 16% for both measures, in calendar year 2006. Our M&A fee backlog at November 30, 2007 was $374 million, up 54% from November 30, 2006; however, that measure may not be indicative of the level of future business depending on changes in overall market conditions. For the calendar year 2007, our market ranking for completed transactions was sixth with a 20.9% share, up from a rank of seventh with a 15.8% share in calendar year 2006. Our market

---

[1]     Debt and equity underwriting volumes as reported by Thomson Financial, an operating unit of The Thomson Corporation., are based on full credit for single-book managers and equal credit for joint-book managers. Debt underwriting volumes include both publicly registered and Rule 144A issues of high grade and high yield bonds, sovereign, agency and taxable municipal debt, non-convertible preferred stock and mortgage- and asset-backed securities. Equity underwriting volumes include both publicly registered and Rule 144A issues of common stock and convertibles. Because publicly reported debt and equity underwriting volumes do not necessarily correspond to the amount of securities actually underwritten and do not include certain private placements and other transactions, and because revenue rates vary among transactions, publicly reported debt and equity underwriting volumes

may not be indicative of revenues in a given period. Additionally, because Advisory Services volumes are based on full credit to each of the advisors in a transaction, and because revenue rates vary among transactions, Advisory Services volumes may not be indicative of revenues in a given period.

-51-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

ranking for announced transactions was ninth with a 17.3% share, down from a rank of eighth with a 15.5% share in calendar year 2006.

2006 vs. 2005. Investment banking revenues totaled $3.2 billion and $2.9 billion in 2006 and 2005, respectively, representing a 9% increase from the prior fiscal year. Non-interest expenses rose 23% in 2006 from 2005, attributable to an increase in compensation and benefits expense related to an increased number of employees and higher revenues, as well as higher non-personnel expenses from increased business activity. As a result, income before taxes declined 23% in 2006 to $660 million from $855 million in 2005.

Global Finance—Debt revenues were a record $1.4 billion in 2006, increasing 9% over 2005 as investors took advantage of continued low interest rates, tight credit spreads and a flattened yield curve. Revenues also increased significantly over 2005 on relatively flat volumes due to higher margins on several large transactions. Partially offsetting these factors was a lower level of client-driven derivative and other capital markets–related transactions with our investment banking clients which totaled $222 million in 2006, compared with $318 million in 2005. Publicly reported global debt origination market volumes increased 17% in 2006 over 2005, with our origination market volumes increasing 8% over the same period. Our debt origination fee backlog of $245 million at November 30, 2006 increased 13% from November 30, 2005. For the calendar year 2006, our market ranking for publicly reported global debt originations was fourth with a 6.2% share, down from a rank of third with a 6.7% share in calendar year 2005.

Global Finance—Equity revenues declined 1% in 2006 to $815 million from record 2005 revenues, despite a 35% increase in industry-wide global equity origination market volumes. Revenues in 2006 reflected strength in IPO activities, offset by lower revenues from the Asia region, which benefited from several large transactions in 2005. Our IPO market volume for 2006 increased 25% from fiscal year 2005, compared to the overall market's increase of 63%. Our equity-related fee backlog (for both filed and unfiled transactions) at November 30, 2006 was approximately $286 million. Our market share for publicly reported global equity underwriting transactions decreased to 3.5% in calendar 2006 from 4.8% for calendar year 2005.

Advisory Services revenues were $921 million in 2006, up 20% from 2005. Industry-wide completed and announced transaction volumes increased 31% and 34%, respectively, in 2006 from 2005, while our completed and announced volumes increased 21% and 27%, respectively, from the same comparative period. M&A volumes rose during the period due to increasing equity markets, strong corporate profitability and balance sheets, and available capital raised by financial sponsors. Our global market share for publicly reported completed transactions increased to 15.8% for calendar 2006, up from 13.4% in calendar year 2005. Our M&A fee backlog at November 30, 2006 was $243 million down 1% from November 30, 2005.

**Investment Management**

The Investment Management business segment consists of:

*Asset Management* – We provide customized investment management services for high net worth clients, mutual funds and other small and middle market institutional investors. Asset Management also serves as general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

*Private Investment Management* – We provide investment, wealth advisory and capital markets execution services to high net worth and middle market institutional clients.

-52-

## LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following table sets forth the operating results of our Investment Management segment.

*Investment Management Results of Operations*

| | | | | | Percent Change | |
|---|---|---|---|---|---|---|
| | | Year Ended November 30, | | | 2007/ 2006 | 2006/ 2005 |
| In millions | | 2007 | 2006 | 2005 | | |
| Principal transactions | $ | 797 | $ 517 | $ 418 | 54% | 24% |
| Commissions | | 719 | 630 | 596 | 14 | 6 |
| Interest and dividends | | 45 | 20 | 56 | 125 | (64) |
| Asset management and other | | 1,642 | 1,308 | 911 | 26 | 44 |
| Total revenues | | 3,203 | 2,475 | 1,981 | 29 | 25 |
| Interest expense | | 106 | 58 | 52 | 83 | 12 |
| Net revenues | | 3,097 | 2,417 | 1,929 | 28 | 25 |
| Non-interest expenses | | 2,306 | 1,892 | 1,527 | 22 | 24 |
| Income before taxes | $ | 791 | $ 525 | $ 402 | 51% | 31% |

The following table sets forth our Asset Management and Private Investment Management net revenues.

*Investment Management Net Revenues*

| | | | | | Percent Change | |
|---|---|---|---|---|---|---|
| | | Year Ended November 30, | | | 2007/ 2006 | 2006/ 2005 |
| In millions | | 2007 | 2006 | 2005 | | |
| Asset Management | $ | 1,877 | $ 1,432 | $ 1,026 | 31% | 40% |
| Private Investment Management | | 1,220 | 985 | 903 | 24 | 9 |
| | $ | 3,097 | $ 2,417 | $ 1,929 | 28% | 25% |

The following table sets forth our AUM by asset class.

*Composition of Assets Under Management*

| | | | | | Percent Change | |
|---|---|---|---|---|---|---|
| | | At November 30, | | | 2007/ 2006 | 2006/ 2005 |
| In billions | | 2007 | 2006 | 2005 | | |
| Equity | $ | 107 | $ 95 | $ 75 | 13% | 27% |
| Fixed income | | 75 | 61 | 55 | 23 | 11 |
| Money markets | | 66 | 48 | 29 | 38 | 66 |
| Alternative investments | | 34 | 21 | 16 | 62 | 31 |
| | $ | 282 | $ 225 | $ 175 | 25% | 29% |

The following table sets forth a summary of the changes in our AUM.

*Changes in Assets Under Management*

| | | | | | Percent Change | |
|---|---|---|---|---|---|---|
| | | Year Ended November 30, | | | 2007/ 2006 | 2006/ 2005 |
| In billions | | 2007 | 2006 | 2005 | | |
| Opening balance | $ | 225 | $ 175 | $ 137 | 29% | 28% |
| Net additions | | 41 | 35 | 26 | 17 | 35 |
| Net market appreciation | | 16 | 15 | 12 | 7 | 25 |
| Total increase | | 57 | 50 | 38 | 14 | 32 |
| Assets Under Management | $ | 282 | $ 225 | $ 175 | 25% | 29% |

<u>2007 vs. 2006.</u> Investment Management net revenues ended the fiscal year up 28% compared to 2006, as Asset Management

and Private Investment Management both achieved record results in 2007. Non-interest expense of $2.3 billion for 2007 increased 22% compared with 2006, resulting from higher levels of discretionary compensation resulting from increased net revenues and numbers of employees. Non-personnel expenses also increased, primarily due to higher brokerage, clearing, exchange and distribution fees. The continued expansion of this business platform globally contributed to the comparative increases in Non-interest and Non-personnel expenses. Income before taxes of $791 million increased 51% compared with 2006. In part, this increase was reflective of higher pre-tax margins associated with revenue generated

-53-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

from minority stake investments in alternative asset managers. Pre-tax margins in 2007 were 26% compared to 22% in 2006.

Asset Management net revenues of $1.9 billion in 2007 increased by 31% from 2006, reflecting significantly higher management fees, principally due to strong growth in AUM, and higher incentive fees. During the fiscal year, AUM increased $57 billion or 25% to approximately $282 billion. 72% of the increase was a result of net inflows across all asset categories.

Private Investment Management net revenues of $1.2 billion increased 24% in 2007 from 2006, driven both by higher equity-related activity, especially within the volatility and cash businesses, and higher fixed income-related activity, especially in credit products, securitized products and global rates business. Fixed income-related activity in the second half of the fiscal year slowed as clients became less active in fixed income-related products as a result of higher volatility in the global markets and credit concerns in certain asset classes.

2006 vs. 2005. Net revenues totaled $2.4 billion and $1.9 billion in 2006 and 2005, respectively, representing a 25% increase, as both Asset Management and Private Investment Management achieved then record results in 2006. Non-interest expenses totaled $1.9 billion and $1.5 billion in 2006 and 2005, respectively. The 24% increase in Non-interest expense was driven by higher compensation and benefits associated with a higher level of earnings and headcount, as well as increased Non-personnel expenses from continued expansion of the business, especially into non–U.S. regions. Income before taxes increased 31% in 2006 to $525 million from $402 million in 2005. Pre-tax margin was 22% and 21% in 2006 and 2005, respectively.

Asset Management net revenues of $1.4 billion in 2006 increased by 40% from 2005, driven by a 29% increase in AUM and strong revenues from our growing alternative investment offerings, which contributed higher incentive fees in 2006 compared to 2005. AUM increased to a record $225 billion at November 30, 2006, up from $175 billion at November 30, 2005, with 70% of the increase resulting from net inflows.

Private Investment Management net revenues of $985 million increased 9% in 2006 from 2005, driven by higher equity-related activity, especially within the volatility and cash businesses. Fixed income-related activity was relatively flat in 2006 compared to 2005 as a result of clients' asset reallocations into equity products.

## Geographic Revenues

We organize our operations into three geographic regions:

- Europe and the Middle East, inclusive of our operations in Russia and Turkey;

- Asia-Pacific, inclusive of our operations in Australia and India; and

- the Americas.

Net revenues presented by geographic region are based upon the location of the senior coverage banker or investment advisor in the case of Investment Banking or Asset Management, respectively, or where the position was risk managed within Capital Markets and Private Investment Management. Certain revenues associated with U.S. products and services that result from relationships with international clients have been classified as international revenues using an allocation process. In addition, expenses contain certain internal allocations, such as regional transfer pricing, which are centrally managed. The methodology for allocating the firm's revenues and expenses to geographic regions is dependent on the judgment of management.

-54-

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following presents, in management's judgment, a reasonable representation of each region's contribution to our operating results.

**Geographic Operating Results**

| In millions | Year Ended November 30, | | | Percent Change | |
| --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2005 | 2007/ 2006 | 2006/ 2005 |
| Europe and the Middle East | | | | | |
| Net revenues | $ 6,296 | $ 4,536 | $ 3,601 | 39% | 26% |
| Non-interest expense | 4,221 | 3,303 | 2,689 | 28 | 23 |
| Income before taxes | 2,075 | 1,233 | 912 | 68 | 35 |
| Asia-Pacific | | | | | |
| Net revenues | 3,145 | 1,809 | 1,650 | 74 | 10 |
| Non-interest expense | 1,831 | 1,191 | 872 | 54 | 37 |
| Income before taxes | 1,314 | 618 | 778 | 113 | (21) |
| Americas | | | | | |
| U.S. | 9,634 | 11,116 | 9,270 | (13) | 20 |
| Other Americas | 182 | 122 | 109 | 49 | 12 |
| Net revenues | 9,816 | 11,238 | 9,379 | (13) | 20 |
| Non-interest expense | 7,192 | 7,184 | 6,240 | — | 15 |
| Income before taxes | 2,624 | 4,054 | 3,139 | (35) | 29 |
| Total | | | | | |
| Net revenues | 19,257 | 17,583 | 14,630 | 10 | 20 |
| Non-interest expense | 13,244 | 11,678 | 9,801 | 13 | 19 |
| Income before taxes | $ 6,013 | $ 5,905 | $ 4,829 | 2% | 22% |

The below charts illustrate the contribution percentage of each geographic region to our total net revenues.

  

<u>2007 vs. 2006</u>. Non-Americas net revenues rose 49% in 2007 from 2006 to a record $9.4 billion, representing 49% of total net revenues in 2007 and 36% in 2006. The increase in 2007 net revenues was due to the continued growth in Capital Markets as well as the continued expansion of our Investment Management business in both the Europe and the Middle East and the Asia-Pacific regions. Non-U.S. net revenues represented 50% and 37% of total net revenues for the 2007 and 2006 fiscal years.

Net revenues in Europe and the Middle East rose 39% in 2007 from 2006, reflecting record performance in Capital Markets—Equities, Investment Banking and Investment Management. In Capital Markets—Equities, higher revenues were driven by improved risk and trading strategies, as well as record customer flow activity, increased volume and gains from principal investment activities. In Investment Banking, higher net revenues reflected record results in leveraged finance revenue and advisory revenue, as well as equity origination. In Investment Management, higher net revenues reflected a significant increase in AUM. Income before taxes for Europe and the Middle East increased 68%.

Net revenues in Asia-Pacific rose 74% in 2007 from 2006, reflecting strong performance in all business segments. Capital Markets results were driven by strong performances in execution services and volatility based upon strong customer-demand as Asian equity markets outperformed other regions in the fiscal year. Investment Banking results were driven by strong IPO

activity and debt-related transactions. Investment Management results are reflective of our continued development of this business segment in this geographic sector. Income before taxes for Asia-Pacific increased 113%.

-55-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

<u>2006 vs. 2005.</u> Non–Americas net revenues rose 21% in 2006 from 2005 to $6.3 billion, representing 36% of total net revenues both in 2006 and 2005. The increase in 2006 net revenues was due to the continued growth in Capital Markets as well as the continued expansion of our Investment Management business in both Europe and Asia. Net revenues in Europe and the Middle East rose 26% in 2006 from 2005, reflective of higher revenues in Capital Markets, growth in Investment Management and strong results in Investment Banking. In Capital Markets—Fixed Income, higher revenues were driven by credit products, securitized products and our real estate business. In Capital Markets—Equities, higher net revenues reflect strong results in equity derivatives and equity prime brokerage services. Income before taxes for Europe and the Middle East increased 35%. Net revenues in Asia-Pacific rose 10% in 2006 from 2005, reflective of higher revenues in Capital Markets and the growth in Investment Management, partially offset by declining revenues in Investment Banking. Capital Markets net revenues increased in 2006 primarily from strong performances in commercial mortgages and real estate, equity derivatives and improved equity trading strategies, partially offset by lower revenues from interest rate products. Income before taxes for Asia-Pacific decreased 21%.

## Liquidity, Funding and Capital Resources

We establish and monitor compliance with guidelines for the level and composition of our liquidity pool and asset funding, the makeup and size of our balance sheet and the utilization of our equity.

During the latter half of our 2007 fiscal year, the global capital markets experienced a significant contraction in available liquidity as the adverse market environment experienced in our third quarter continued into our fourth quarter and deteriorated further in November 2007. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly U.S. subprime residential mortgages and structured credit products, remained thinly traded throughout this period. Notwithstanding these global market conditions, we ended the period with a very strong liquidity position. At November 30, 2007, our liquidity pool was approximately $35 billion, up from approximately $31 billion at November 30, 2006 and down slightly from approximately $36 billion at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-term borrowings, excluding borrowings with remaining contractual maturities within twelve months of the financial statement date, and total stockholders' equity) was at approximately $146 billion at the end of 2007 fiscal year, up from approximately $100 billion at November 30, 2006 and $142 billion at the end of the third quarter of the 2007 fiscal year. Also during 2007, Holdings' and LBI's credit ratings were upgraded by two credit rating agencies.

### Liquidity

*Liquidity pool.* We maintain a liquidity pool available to Holdings that covers expected cash outflows for twelve months in a stressed liquidity environment. In assessing the required size of our liquidity pool, we assume that assets outside the liquidity pool cannot be sold to generate cash, unsecured debt cannot be issued, and any cash and unencumbered liquid collateral outside of the liquidity pool cannot be used to support the liquidity of Holdings. Our liquidity pool is sized to cover expected cash outflows associated with the following items:

- The repayment of approximately $21.5 billion of unsecured debt, which is all of the unsecured debt maturing in the next twelve months issued by Holdings and our unregulated entities, excluding approximately $3.7 billion of structured note self-funding trades that are measured at fair value and managed by business units through matched, unencumbered asset portfolios outside of Holdings' liquidity pool. Our regulated entities each maintain their own liquidity pool sized to cover the repayment of the approximately $2.3 billion in aggregate of unsecured debt maturing in the next twelve months issued by those regulated entities.

- The funding of commitments to extend credit made by Holdings and certain unregulated subsidiaries based on a probabilistic model. The funding of commitments to extend credit made by our regulated subsidiaries (including our banks) is covered by the liquidity pools maintained by these regulated subsidiaries. For additional information, see "Contractual Obligations and Lending-Related Commitments" below and Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

- The anticipated impact of adverse changes on secured funding – either in the form of a greater difference between the market and pledge value of assets (also known as "haircuts") or in the form of reduced borrowing availability.

- The anticipated funding requirements of equity repurchases as we manage our equity base (including offsetting the dilutive effect of our employee incentive plans). See "Equity Management" below.

In addition, the liquidity pool is sized to cover the impact of a one notch downgrade of Holdings' long-term debt ratings, including the additional collateral that would be required to be posted against derivative contracts and other

-56-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

secured funding arrangements. See "Credit Ratings" below.

The liquidity pool is invested in liquid instruments, including cash equivalents, G-7 government bonds and U.S. agency securities, investment grade asset-backed securities and other liquid securities that we believe have a highly reliable pledge value. We calculate our liquidity pool on a daily basis.

Our estimated values of the liquidity pool and other unencumbered (*i.e.*, unpledged) asset portfolios available are:

| | At November 30, | |
|---|---|---|
| **In billions** | **2007** | **2006** |
| Unregulated | | |
| Holdings liquidity pool at pledge value | $ 34.9 | $ 31.4 |
| Other unencumbered assets at market value | 63.2 | 39.4 |
| | 98.1 | 70.8 |
| Regulated [1] | | |
| Unencumbered assets held by bank entities at market value[2] | 33.2 | 22.3 |
| Unencumbered assets held by non-bank entities at market value | 62.3 | 50.8 |
| | 95.5 | 73.1 |
| Total | $ 193.6 | $ 143.9 |

[1]  Our regulated subsidiaries, such as our U.S. and non-U.S. broker-dealers and bank entities, maintain their own liquidity pools to cover their stand-alone expected annualized cash funding needs in a stressed liquidity environment. Unencumbered assets in regulated entities are generally restricted from transfer and therefore considered not available to support the liquidity needs of Holdings' or other unregulated entities.

[2]  Our deposit-taking bank entities consist of two U.S. institutions and one in Germany.

***Funding of assets.*** We fund assets based on their liquidity characteristics, and utilize cash capital[1] to provide financing for our long-term funding needs. Our funding strategy incorporates the following factors:

- Liquid assets (*i.e.*, assets for which we believe a reliable secured funding market exists across all market environments including government bonds, U.S. agency securities, corporate bonds, asset-backed securities and equity securities) are primarily funded on a secured basis.

- Secured funding "haircuts" are funded with cash capital.

- Illiquid assets (*e.g.*, fixed assets, intangible assets and margin postings) and less liquid inventory positions (*e.g.*, derivatives, private equity investments, certain corporate loans, certain commercial mortgages and real estate positions) are funded with cash capital.

- Certain unencumbered assets that are not part of the liquidity pool irrespective of asset quality are also funded with cash capital. These assets are typically unencumbered because of operational and asset-specific factors (*e.g.*, securities moving between depots). We do not assume a change in these factors during a stressed liquidity event.

As part of our funding strategy, we also take steps to mitigate our main sources of contingent liquidity risk as follows:

- Commitments to extend credit – Cash capital is utilized to cover a probabilistic estimate of expected funding of commitments to extend credit. For a further discussion of our commitments, see "Contractual Obligations and Lending-Related Commitments" in this MD&A and Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

- Ratings downgrade – Cash capital is utilized to cover the liquidity impact of a one-notch downgrade on Holdings. A ratings downgrade would increase the amount of collateral to be posted against our derivative contracts and other secured funding arrangements. For a further discussion of credit ratings and the potential impacts of ratings downgrades, see "Credit Ratings" below.

- Client financing – We provide secured financing to our clients typically through repurchase and prime broker agreements. These financing activities can create liquidity risk if the availability and terms of our own secured borrowing agreements adversely change during a stressed liquidity event and we are unable to reflect these changes in

our client financing agreements. We mitigate this risk by entering into term secured borrowing

---

1    Cash capital consists of stockholders' equity, the estimated sustainable portion of core deposit liabilities at our bank subsidiaries, and liabilities
with remaining term of one year or more.

-57-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

agreements, in which we can fund different types of collateral at pre-determined collateralization levels, and by maintaining liquidity pools at our regulated broker-dealers.

Our policy is to operate with an excess of long-term funding sources over our long-term funding requirements ("cash capital surplus"). We seek to maintain a cash capital surplus at Holdings of at least $2.0 billion. As of November 30, 2007, our cash capital surplus at Holdings increased to $8.0 billion, up from $6.0 billion at November 30, 2006. Additionally, at November 30, 2007 and 2006, our cash capital surplus in our regulated entities was approximately $12.6 billion and $10.0 billion, respectively.

We hedge the majority of foreign exchange risk associated with investments in subsidiaries in non-U.S. dollar currencies using foreign currency-denominated long-term debt and forwards.

***Diversification of funding sources.*** We seek to diversify our funding sources. We issue long-term debt in multiple currencies and across a wide range of maturities to tap many investor bases, thereby reducing our reliance on any one source.

- During 2007, we issued $86.3 billion of long-term borrowings. Long-term borrowings (less current portion) increased to $123.2 billion at November 30, 2007, up from $81.2 billion at November 30, 2006 principally to support the growth in our assets as well as to pre-fund a portion of our 2008 maturities. The weighted-average maturities of our long-term borrowings were 7.1 and 6.3 years at November 30, 2007 and 2006, respectively.

- We diversify our issuances geographically to minimize refinancing risk and broaden our debt-holder base. As of November 30, 2007, 54% of our long-term debt was issued outside the United States. In comparison, as of November 30, 2006, 49% of our long-term debt was issued outside the United States.

- In order to minimize refinancing risk, we establish limits (stated as percentages of outstanding long-term borrowings) on our long-term borrowings anticipated to mature within any quarterly (12.5%), half-year (17.5%) and full-year (30.0%) interval. At November 30, 2007, those limits were $15.4 billion, $21.6 billion and $37.0 billion, respectively. If we were to operate with debt above these levels, we would not include the additional amount as a source of cash capital.

- We typically issue in sufficient size to create a liquid benchmark issuance (*i.e.*, sufficient size to be included in the Lehman Bond Index, a widely used index for fixed income asset managers).

Long-term debt is accounted for in our long-term-borrowings maturity profile at its contractual maturity date if the debt is redeemable at our option. Long-term debt that is repayable at par at the holder's option is included in these limits at its earliest redemption date. Extendible issuances (which mature on an initial specified maturity date, unless the debt holders elect to extend the term of the note for a period specified in the note) are included in these limits at their earliest maturity date.

-58-

## LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

The quarterly long-term borrowings maturity schedule over the next five years at November 30, 2007 is as follows:

**Long-Term Borrowings Maturity Profile Chart**[1]



[1]   Included in long-term debt is $5.1 billion of certain hybrid financial instruments with contingent early redemption features linked to market prices or other triggering events (*e.g.*, the downgrade of a reference obligation underlying a credit—linked note). In the above maturity table, these notes are shown at their contractual maturity. In determining the cash capital value of these notes, however, we excluded the portion reasonably expected to mature within twelve months ($2.2 billion) from our cash capital sources at November 30, 2007.

- We use both committed and uncommitted bilateral and syndicated long-term bank facilities to complement our long-term debt issuance. In particular, Holdings maintains a $2.0 billion unsecured, committed revolving credit agreement with a syndicate of banks that expires in February 2009. In addition, we maintain a $2.5 billion multi-currency unsecured, committed revolving credit facility ("European Facility") with a syndicate of banks for Lehman Brothers Bankhaus AG ("Bankhaus") and Lehman Brothers Treasury Co. B.V. that expires in April 2010. Our ability to borrow under such facilities is conditioned on complying with customary lending conditions and covenants. We have maintained compliance with the material covenants under these credit agreements at all times. We draw on both of these facilities from time to time in the normal course of conducting our business. As of November 30, 2007, there were no outstanding borrowings against either Holdings' credit facility or the European Facility.

- We have established a $2.4 billion conduit that issues secured liquidity notes to pre-fund high grade loan commitments. This is fully backed by a triple-A rated, third-party, one-year revolving liquidity back stop, which we have in turn fully backed. This conduit is consolidated in Holdings' results of operations.

- We participate in an A-1/P-1-rated multi-seller conduit. This multi-seller issues secured liquidity notes to provide financing. We use this conduit for purposes of funding a portion of our contingent acquisition commitments. At November 30, 2007, we were contingently committed to providing $1.6 billion of liquidity if the conduit is unable to remarket the secured liquidity notes upon their maturity, generally, one year after a failed remarketing event. This conduit is not consolidated in Holdings' results of operations.

-59-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

- We own three bank entities: Lehman Brothers Bank, a U.S.-based thrift institution, Lehman Brothers Commercial Bank, a U.S.-based industrial bank, and Bankhaus. These regulated bank entities operate in a deposit-protected environment and are able to source low-cost unsecured funds that are primarily term deposits. These bank entities are generally insulated from a company-specific or market liquidity event, thereby providing a reliable funding source for their mortgage products and selected loan assets and increasing our consolidated funding diversification. Overall, these bank entities have raised $29.4 billion and $21.4 billion of customer deposit liabilities as of November 30, 2007 and 2006, respectively.

- Bank facilities provide us with further diversification and flexibility. For example, we draw on our committed syndicated credit facilities described above on a regular basis (typically 25% to 50% of the time on a weighted-average basis) to provide us with additional sources of long-term funding on an as-needed basis. We have the ability to prepay and redraw any number of times and to retain the proceeds for any term up to the maturity date of the facility. As a result, we see these facilities as having the same liquidity value as long-term borrowings with the same maturity dates, and we include these borrowings in our reported long-term borrowings at the facility's stated final maturity date to the extent that they are outstanding as of a reporting date.

*Funding action plan.* We have developed and regularly update a Funding Action Plan, which represents a detailed action plan to manage a stress liquidity event, including a communication plan for regulators, creditors, investors and clients. The Funding Action Plan considers two types of liquidity stress events—a Company-specific event, where there are no issues with overall market liquidity and a broader market-wide event, which affects not just our Company but the entire market.

In a Company-specific event, we assume we would lose access to the unsecured funding market for a full year and have to rely on the liquidity pool available to Holdings to cover expected cash outflows over the next twelve months.

In a market liquidity event, in addition to the pressure of a Company-specific event, we also assume that, because the event is market wide, additional counterparties to whom we have extended liquidity facilities draw on these facilities. To mitigate the effect of a market liquidity event, we have developed access to additional liquidity sources beyond the liquidity pool at Holdings, including unutilized funding capacity in our bank entities and unutilized capacity in our bank facilities. See "Funding of assets" above.

We perform regular assessments of our funding requirements in stress liquidity scenarios to best ensure we can meet all our funding obligations in all market environments.

*Legal entity structure.* Our legal entity structure can constrain liquidity available to Holdings. Some of our legal entities, particularly our regulated broker-dealers and bank entities, are restricted in the amount of funds that they can distribute or lend to Holdings. For a further discussion, see Note 15, "Regulatory Requirements," to the Consolidated Financial Statements.

Certain regulated subsidiaries are funded with subordinated debt issuances and/or subordinated loans from Holdings, which are counted as regulatory capital for those subsidiaries. Our policy is to fund subordinated debt advances by Holdings to subsidiaries for use as regulatory capital with long-term debt issued by Holdings having a maturity at least one year greater than the maturity of the subordinated debt advance.

## Credit Ratings

During the 2007 calendar year, Holdings' and LBI's credit ratings were upgraded by two of the rating agencies. Like other companies in the securities industry, we rely on external sources to finance a significant portion of our day-to-day operations. The cost and availability of unsecured financing are affected by our short-term and long-term credit ratings. Factors that may be significant to the determination of our credit ratings or otherwise affect our ability to raise short-term and long-term financing include our profit margin, our earnings trend and volatility, our cash liquidity and liquidity management, our capital structure, our risk level and risk management, our geographic and business diversification, and our relative positions in the markets in which we operate. Deterioration in any of these factors or combination of these factors may lead rating agencies to downgrade our credit ratings. This may increase the cost of, or possibly limit our access to, certain types of unsecured financings and trigger additional collateral requirements in derivative contracts and other secured funding arrangements. In addition, our debt ratings can affect certain capital markets revenues, particularly in those businesses where longer-term counterparty performance is critical, such as over-the-counter ("OTC") derivative transactions, including credit derivatives and interest rate swaps.

-60-

### LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

The current ratings of Holdings and LBI short- and long-term senior borrowings are as follows:

**Credit Ratings**

| | Holdings | | LBI | |
|---|---|---|---|---|
| | Short-term | Long-term | Short-term | Long-term |
| Standard & Poor's Ratings Services | A-1 | A+ | A-1+ | AA- |
| Moody's Investors Service | P-1 | A1 | P-1 | Aa3 |
| Fitch Ratings | F-1+ | AA- | F-1+ | AA- |
| Dominion Bond Rating Service Limited[1] | R-1 (middle) | AA (low) | R-1 (middle) | AA |

[1] On December 21, 2007, Dominion Bond Rating Service Limited upgraded Holdings' long-term senior borrowings rating to AA (low) from A (high) and upgraded LBI's long-term senior borrowings rating to AA from AA (low).

At November 30, 2007, counterparties had the right to require us to post additional collateral pursuant to derivative contracts and other secured funding arrangements of approximately $2.4 billion. Additionally, at that date we would have been required to post additional collateral pursuant to such arrangements of approximately $0.1 billion in the event we were to experience a downgrade of our senior debt rating of one notch and a further $4.6 billion in the event we were to experience a downgrade of our senior debt rating of two notches.

**Cash Flows**

Cash and cash equivalents of $7.3 billion at November 30, 2007 increased by $1.3 billion from $6.0 billion at November 30, 2006, as net cash provided by financing activities of $48.6 billion was offset by net cash used in operating activities of $45.6 billion and net cash used in investing activities of $1.7 billion.

**Balance Sheet**

*Assets.* The assets on our balance sheet consist primarily of Cash and cash equivalents, Financial instruments and other inventory positions owned, and collateralized agreements. At November 30, 2007, our total assets increased by 37% to $691.1 billion from $503.5 billion at November 30, 2006, due to an increase in secured financing transactions and net assets. Net assets at November 30, 2007 increased $104.0 billion from the prior year due to increases across most inventory categories, as well as an increase in customer secured receivables, as we continued to grow the Firm. Our calculation of Net assets excludes from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. We believe net assets to be a more useful measure of our assets than total assets because it excludes certain low-risk, non-inventory assets. Our calculation of Net assets may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.

At November 30, 2007 and 2006 our total and net assets were comprised of the following items:

**Net Assets**

| | At November 30, | |
|---|---|---|
| In millions | 2007 | 2006 |
| Total assets | $ 691,063 | $ 503,545 |
| Cash and securities segregated and on deposit for regulatory and other purposes | (12,743) | (6,091) |
| Collateralized lending agreements | (301,234) | (225,156) |
| Identifiable intangible assets and goodwill | (4,127) | (3,362) |
| Net assets | $ 372,959 | $ 268,936 |

Included within Net assets are real estate held for sale, certain high yield instruments and private equity and other principal investments.

*Real estate held for sale.* We invest in real estate through direct investments in equity and debt. We record real estate held for sale at the lower of its carrying amount or fair value less cost to sell. The assessment of fair value less cost to sell generally requires the use of management estimates and generally is based on property appraisals provided by third parties and also

incorporates an analysis of the related property cash flow projections. We had real estate investments of approximately $21.9 billion and $9.4 billion at November 30, 2007 and 2006, respectively. Because portions of these assets have been financed on a non-recourse basis, our net investment position was limited to $12.8 billion and $5.9 billion at November 30, 2007 and 2006, respectively.

-61-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

***High yield instruments.*** We underwrite, syndicate, invest in and make markets in high yield corporate debt securities and loans. We define high yield instruments as securities of or loans to companies rated BB+ or lower or equivalent ratings by recognized credit rating agencies, as well as non-rated securities or loans that, in management's opinion, are non-investment grade. High yield debt instruments generally involve greater risks than investment grade instruments and loans due to the issuer's creditworthiness and the lower liquidity of the market for such instruments, generally. In addition, these issuers generally have relatively higher levels of indebtedness resulting in an increased sensitivity to adverse economic conditions. We seek to reduce these risks through active hedging strategies and through the diversification of our products and counterparties.

High yield instruments are carried at fair value, with unrealized gains and losses reflected in Principal transactions in the Consolidated Statement of Income. Our high yield instruments at November 30, 2007 and 2006 were as follows:

|  | At November 30, | |
|---|---|---|
| **In millions** | **2007** | **2006** |
| Bonds and loans in established trading markets | $   31,457 | $   11,481 |
| Bonds and loans held awaiting securitization and/or syndication | 157 | 4,132 |
| Bonds and loans with little or no pricing transparency | 1,118 | 316 |
| High yield instruments | 32,732 | 15,929 |
| Credit risk hedges[1] | (2,337) | (3,111) |
| High yield position, net | $   30,395 | $   12,818 |

[1]    Credit risk hedges represent financial instruments with offsetting risk to the same underlying counterparty, but exclude other credit and market risk mitigants which are highly correlated, such as index, basket and/or sector hedges.

The increase in high-yield positions from 2006 to 2007 is primarily from funded lending commitments that have not been syndicated. At November 30, 2007 and 2006, the largest industry concentrations were 26% and 20%, respectively, and were in the finance and insurance industry classifications. The largest geographic concentrations at November 30, 2007 and 2006 were 66% and 53%, respectively, in the Americas. We mitigate our aggregate and single-issuer net exposure through the use of derivatives, non-recourse financing and other financial instruments.

***Private equity and other principal investments.*** Our Private Equity business operates in six major asset classes: Merchant Banking, Real Estate, Venture Capital, Credit-Related Investments, Private Funds Investments and Infrastructure. We have raised privately-placed funds in these asset classes, for which we act as a general partner and in which we have general and in many cases limited partner interests. In addition, we generally co-invest in the investments made by the funds or may make other non-fund-related direct investments. At November 30, 2007 and 2006, our private equity related investments totaled $4.2 billion and $2.1 billion, respectively. The real estate industry represented the highest concentrations at 41% and 30% at November 30, 2007 and 2006, respectively, and the largest single investment was approximately $275 million and $80 million, at those respective dates.

Our private equity investments are measured at fair value based on our assessment of each underlying investment, incorporating valuations that consider expected cash flows, earnings multiples and/or comparisons to similar market transactions, among other factors. Valuation adjustments, which usually involve the use of significant management estimates, are an integral part of pricing these instruments, reflecting consideration of credit quality, concentration risk, sale restrictions and other liquidity factors. For additional information about our private equity and other principal investment activities, including related commitments, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

### Equity Management

The management of equity is a critical aspect of our capital management. Determining the appropriate amount of equity capital base is dependent on a number of variables, including the amount of equity needed given our estimation of risk in our business activities, the capital required by laws or regulations, leverage thresholds required by the consolidated supervised entity ("CSE") rules and credit rating agencies' perspectives of capital sufficiency.

We continuously evaluate deployment alternatives for our equity with the objective of maximizing shareholder value. In periods where we determine our levels of equity to be beyond those necessary to support our business activities, we may return capital to shareholders through dividend payments or stock repurchases.

We maintain a common stock repurchase program to manage our equity capital. In January 2007, our Board of Directors

authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings common stock for the management of our equity capital, including offsetting dilution due to employee stock awards. This authorization superseded the stock repurchase program authorized in 2006. Our stock repurchase program is effected through

-62-

## LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

open-market purchases, as well as through employee transactions where employees tender shares of common stock to pay for the exercise price of stock options and the required tax withholding obligations upon option exercises and conversion of restricted stock units ("RSUs") to freely-tradable common stock.

Over the course of our 2007 fiscal year, we repurchased through open-market purchases or withheld from employees for the purposes described above approximately 43.0 million shares of our common stock at an aggregate cost of approximately $3.2 billion, or $73.85 per share. During 2007, we issued 15.4 million shares resulting from employee stock option exercises and another 24.5 million shares were issued out of treasury stock to an irrevocable grantor trust that holds shares for issuance to employees in satisfaction of restricted stock units granted under the Firm's equity compensation plans (the "RSU Trust").

In January 2008, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of the Firm's equity capital, including consideration of dilution due to employee stock awards. This resolution supersedes the stock repurchase program authorized in 2007.

### Capital Ratios

***Leverage Ratios.*** The relationship of assets to equity is one measure of a company's capital adequacy. Generally, this leverage ratio is computed by dividing assets by stockholders' equity. We believe that a more meaningful, comparative ratio for companies in the securities industry is net leverage, which is the result of net assets divided by tangible equity capital.

Our net leverage ratio is calculated as net assets divided by tangible equity capital. We calculate net assets by excluding from total assets: (i) cash and securities segregated and on deposit for regulatory and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. We believe net leverage based on net assets to be a more useful measure of leverage, because it excludes certain low-risk, non-inventory assets and utilizes tangible equity capital as a measure of our equity base. We calculate tangible equity capital by including stockholders' equity and junior subordinated notes and excluding identifiable intangible assets and goodwill. We believe tangible equity capital to be a more meaningful measure of our equity base for purposes of calculating net leverage because it includes instruments we consider to be equity-like due to their subordinated nature, long-term maturity and interest deferral features and we do not view the amount of equity used to support identifiable intangible assets and goodwill as available to support our remaining net assets. These measures may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.

-63-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**Tangible Equity Capital and Capital Ratios**

| In millions | At November 30, | | | |
| --- | --- | --- | --- | --- |
| | **2007** | | **2006** | |
| Total stockholders' equity | $ | 22,490 | $ | 19,191 |
| Junior subordinated notes [1], [2] | | 4,740 | | 2,738 |
| Identifiable intangible assets and goodwill | | (4,127) | | (3,362) |
| Tangible equity capital | $ | 23,103 | $ | 18,567 |
| Total assets | $ | 691,063 | $ | 503,545 |
| Leverage ratio | | 30.7x | | 26.2x |
| Net assets | $ | 372,959 | $ | 268,936 |
| Net leverage ratio | | 16.1x | | 14.5x |

[1]    See Note 8, "Borrowings and Deposit Liabilities," to the Consolidated Financial Statements.

[2]    Our definition for tangible equity capital limits the amount of junior subordinated notes and preferred stock included in the calculation to 25% of tangible equity capital. The amount excluded was approximately $237 million in 2007 and no amount was excluded in 2006.

Included below are the changes in our tangible equity capital at November 30, 2007 and 2006:

**Tangible Equity Capital**

| In millions | At November 30, | | | |
| --- | --- | --- | --- | --- |
| | **2007** | | **2006** | |
| Beginning tangible equity capital | $ | 18,567 | $ | 15,564 |
| Net income | | 4,192 | | 4,007 |
| Dividends on common stock | | (351) | | (276) |
| Dividends on preferred stock | | (67) | | (66) |
| Common stock open-market repurchases | | (2,605) | | (2,678) |
| Common stock withheld from employees [1] | | (573) | | (1,003) |
| Equity-based award plans [2] | | 2,829 | | 2,396 |
| Net change in junior subordinated notes included in tangible equity [3] | | 2,002 | | 712 |
| Change in identifiable intangible assets and goodwill | | (765) | | (106) |
| Other, net [4] | | (126) | | 17 |
| Ending tangible equity capital | $ | 23,103 | $ | 18,567 |

[1]    Represents shares of common stock withheld in satisfaction of the exercise price of stock options and tax withholding obligations upon option exercises and conversion of RSUs.

[2]    This represents the sum of (i) proceeds received from employees upon the exercise of stock options, (ii) the incremental tax benefits from the issuance of stock-based awards and (iii) the value of employee services received — as represented by the amortization of deferred stock compensation.

[3]    Junior subordinated notes are deeply subordinated and have a long-term maturity and interest deferral features and are utilized in calculating equity capital by leading rating agencies.

[4]    Other, net for 2007 includes a $67 million net increase to Retained earnings from adoption of SFAS 157 and SFAS 159 and a $210 million decrease to Accumulated other comprehensive income/(loss) from the adoption of SFAS 158. See "Accounting and Regulatory Developments" below for additional information. Other, net for 2006 includes a $6 million net decrease to Retained earnings from the initial adoption of under SFAS 155 and SFAS No. 156, *Accounting for Servicing of Financial Assets—an amendment of FASB Statement No. 140* ("SFAS 156").

***Primary Equity Double Leverage.*** Primary equity double leverage ratio is the comparison of Holdings' equity investments in subsidiaries to total equity capital (the sum of total stockholders' equity and junior subordinated notes). As of November 30, 2007, our equity investment in subsidiaries was $25.1 billion and our total equity capital calculated was $27.5 billion. We aim to maintain a primary equity double leverage ratio of 1.0x or below. Our primary equity double leverage ratio was 0.91x and 0.88x as of November 30, 2007 and 2006, respectively. We believe total equity capital to be a more meaningful measure of our equity than stockholders' equity because we consider junior subordinated notes to be equity-like due to their subordinated nature, long-term maturity and interest deferral features. We believe primary equity double leverage based on total equity capital to be a useful measure of our equity investments in subsidiaries. Our calculation of primary equity double leverage may not be comparable to other, similarly titled calculations by other companies as a result of different calculation methodologies.

Page 111 of 260
08-01420-scc    Doc 9250-2    Filed 06/26/14    Entered 06/26/14 18:39:19    Appendix
Documents 10 Through 27    Pg 204 of 642

-64-

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

---

**Contractual Obligations and Lending-Related Commitments**

**Contractual Obligations**

In the normal course of business, we enter into various contractual obligations that may require future cash payments. The following table summarizes the contractual amounts at November 30, 2007 in total and by remaining maturity, and at November 30, 2006. Excluded from the table are a number of obligations recorded in the Consolidated Statement of Financial Condition that generally are short-term in nature, including secured financing transactions, trading liabilities, deposit liabilities at our banking subsidiaries, commercial paper and other short-term borrowings and other payables and accrued liabilities.

| In millions | Expiration Per Period at November 30, | | | | Total Contractual Amount November 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2008** | **2009** | **2010-2011** | **2012-Later** | **2007** | **2006** |
| Long-term borrowings | $    — | $  25,023 | $  28,146 | $  69,981 | $  123,150 | $  81,178 |
| Operating lease obligations | 281 | 269 | 493 | 1,562 | 2,605 | 1,714 |
| Capital lease obligations | 74 | 99 | 206 | 2,597 | 2,976 | 3,043 |
| Purchase obligations | 316 | 10 | 9 | 13 | 348 | 783 |

For additional information about long-term borrowings, see Note 8, "Borrowings and Deposit Liabilities," to the Consolidated Financial Statements. For additional information about operating and capital lease obligations, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

Purchase obligations include agreements to purchase goods or services that are enforceable and legally binding and that specify all significant terms, including fixed or minimum quantities to be purchased, fixed, minimum or variable price provisions and the approximate timing of the transaction. Purchase obligations with variable pricing provisions are included in the table based on the minimum contractual amounts. Certain purchase obligations contain termination or renewal provisions. The table reflects the minimum contractual amounts likely to be paid under these agreements assuming the contracts are not terminated.

**Lending–Related Commitments**

The following table summarizes the contractual amounts of lending-related commitments at November 30, 2007 and 2006:

| In millions | Expiration Per Period at November 30, | | | | | Total Contractual Amount November 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2008** | **2009** | **2010-2011** | **2012-2013** | **Later** | **2007** | **2006** |
| Lending commitments | | | | | | | |
| High grade [1] | $  5,579 | $  1,039 | $  6,554 | $  10,411 | $  403 | $  23,986 | $  17,945 |
| High yield [2] | 4,051 | 411 | 2,103 | 4,850 | 2,658 | 14,073 | 7,558 |
| Contingent acquisition facilities | | | | | | | |
| High grade | 10,230 | — | — | — | — | 10,230 | 1,918 |
| High yield | 9,749 | — | — | — | — | 9,749 | 12,766 |
| Mortgage commitments | 5,082 | 670 | 1,378 | 271 | 48 | 7,449 | 12,162 |
| Secured lending transactions | 122,661 | 455 | 429 | 468 | 1,846 | 125,859 | 83,071 |

[1]   We view our net credit exposure for high grade commitments, after consideration of hedges, to be $12.2 billion and $4.9 billion at November 30, 2007 and 2006, respectively.

[2]   We view our net credit exposure for high yield commitments, after consideration of hedges, to be $12.8 billion and $5.9 billion at November 30, 2007 and 2006, respectively.

We use various hedging and funding strategies to actively manage our market, credit and liquidity exposures on these commitments. We do not believe total commitments necessarily are indicative of actual risk or funding requirements because the commitments may not be drawn or fully used and such amounts are reported before consideration of hedges.

***Lending commitments.*** Through our high grade (investment grade) and high yield (non-investment grade) sales, trading and

underwriting activities, we make commitments to extend credit in loan syndication transactions. These commitments and any related drawdowns of these facilities typically have fixed maturity dates and are contingent on certain representations, warranties and contractual conditions applicable to the borrower. We define high yield exposures as securities of or loans to companies rated BB+ or lower or equivalent ratings by recognized credit rating agencies, as well as non-rated securities or loans that, in management's opinion, are non-investment grade.

-65-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

We had commitments to high grade borrowers at November 30, 2007 and 2006 of $24.0 billion (net credit exposure of $12.2 billion, after consideration of hedges) and $17.9 billion (net credit exposure of $4.9 billion, after consideration of hedges), respectively. We had commitments to high yield borrowers of $14.1 billion (net credit exposure of $12.8 billion, after consideration of hedges) and $7.6 billion (net credit exposure of $5.9 billion, after consideration of hedges) at November 30, 2007 and 2006, respectively.

***Contingent acquisition facilities.*** We provide contingent commitments to investment and non-investment grade counterparties related to acquisition financing. We do not believe contingent acquisition commitments are necessarily indicative of actual risk or funding requirements as funding is dependent both upon a proposed transaction being completed and the acquiror fully utilizing our commitment. Typically, these commitments are made to a potential acquiror in a proposed acquisition, which may or may not be completed depending on whether the potential acquiror to whom we have provided our commitment is successful. A contingent borrower's ability to draw on the commitment is typically subject to there being no material adverse change in the borrower's financial condition, among other factors, and the commitments also generally contain certain flexible pricing features to adjust for changing market conditions prior to closing. In addition, acquirers generally utilize multiple financing sources, including other investment and commercial banks, as well as accessing the general capital markets for completing transactions. Therefore, our contingent acquisition commitments are generally greater than the amounts we expect we will ultimately fund. Further, our past practice, consistent with our credit facilitation framework, has been to syndicate acquisition financings to investors. The ultimate timing, amount and pricing of a syndication, however, is influenced by market conditions that may not necessarily be consistent with those at the time the commitment was entered. We provided contingent commitments to high grade counterparties related to acquisition financing of approximately $10.2 billion and $1.9 billion at November 30, 2007 and 2006, respectively, and to high yield counterparties related to acquisition financing of approximately $9.8 billion and $12.8 billion at November 30, 2007 and 2006, respectively.

***Mortgage commitments.*** Through our mortgage origination platforms we make commitments to extend mortgage loans. At November 30, 2007 and 2006, we had outstanding mortgage commitments of approximately $7.4 billion and $12.2 billion, respectively. These commitments included $3.0 billion and $7.0 billion of residential mortgages in 2007 and 2006 and $4.4 billion and $5.2 billion of commercial mortgages at 2007 and 2006. Typically, residential mortgage loan commitments require us to originate mortgage loans at the option of a borrower generally within 90 days at fixed interest rates. Consistent with past practice, our intention is to sell residential mortgage loans, once originated, primarily through securitizations. The ability to sell or securitize mortgage loans, however, is dependent on market conditions.

***Secured lending transactions.*** In connection with our financing activities, we had outstanding commitments under certain collateralized lending arrangements of approximately $9.8 billion and $7.5 billion at November 30, 2007 and 2006, respectively. These commitments require borrowers to provide acceptable collateral, as defined in the agreements, when amounts are drawn under the lending facilities. Advances made under these lending arrangements typically are at variable interest rates and generally provide for over-collateralization. In addition, at November 30, 2007, we had commitments to enter into forward starting secured resale and repurchase agreements, primarily secured by government and government agency collateral, of $70.8 billion and $45.3 billion, respectively, compared to $44.4 billion and $31.2 billion, respectively, at November 30, 2006.

For additional information about lending-related commitments, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

## Off-Balance-Sheet Arrangements

In the normal course of business we engage in a variety of off-balance-sheet arrangements, including certain derivative contracts meeting the FIN No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"), definition of a guarantee that may require future payments. Other than lending-related commitments already discussed above in "Lending-Related Commitments," the following table summarizes our off-balance-sheet arrangements at November 30, 2007 and 2006 as follows:

-66-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

| In millions | | Expiration Per Period at November 30, | | | | | Total Contractual Amount November 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2008 | 2009 | 2010-2011 | 2012-2013 | Later | 2007 | 2006 |
| Derivative contracts [1] | $ | 87,394 $ | 59,598 $ | 152,317 $ | 210,496 $ | 228,132 $ | 737,937 $ | 534,585 |
| Municipal-securities-related commitments | | 2,362 | 733 | 86 | 69 | 3,652 | 6,902 | 1,599 |
| Other commitments with variable interest entities | | 106 | 3,100 | 170 | 963 | 4,772 | 9,111 | 4,902 |
| Standby letters of credit | | 1,685 | 5 | — | — | — | 1,690 | 2,380 |
| Private equity and other principal investments | | 820 | 675 | 915 | 173 | — | 2,583 | 1,088 |

[1]  We believe the fair value of these derivative contracts is a more relevant measure of the obligations because we believe the notional amount overstates the expected payout. At November 30, 2007 and 2006, the fair value of these derivative contracts approximated $36.8 billion and $9.3 billion, respectively.

In accordance with FIN 45, the table above includes only certain derivative contracts meeting the FIN 45 definition of a guarantee. For additional information on these guarantees and other off-balance-sheet arrangements, see Note 9 "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

### Derivatives

Neither derivatives' notional amounts nor underlying instrument values are reflected as assets or liabilities in our Consolidated Statement of Financial Condition. Rather, the market, or fair values, related to derivative transactions are reported in the Consolidated Statement of Financial Condition as assets or liabilities in Derivatives and other contractual agreements, as applicable. Derivatives are presented on a net-by-counterparty basis when a legal right of offset exists, on a net-by-cross product basis when applicable provisions are stated in a master netting agreement; and/or on a net of cash collateral received or paid on a counterparty basis, provided a legal right of offset exists.

We enter into derivative transactions both in a trading capacity and as an end-user. Acting in a trading capacity, we enter into derivative transactions to satisfy the needs of our clients and to manage our own exposure to market and credit risks resulting from our trading activities (collectively, "Trading-Related Derivatives").

As an end-user, we primarily use derivatives to hedge our exposure to market risk (including foreign currency exchange and interest rate risks) and credit risks (collectively, "End-User Derivatives"). When End-User Derivatives are interest rate swaps they are measured at fair value through earnings and the carrying value of the related hedged item is adjusted through earnings for the effect of changes in the fair value of the risk being hedged. The hedge ineffectiveness in these relationships is recorded in Interest expense in the Consolidated Statement of Income. When End-User Derivatives are used in hedges of net investments in non-U.S. dollar functional currency subsidiaries, the gains or losses are reported within Accumulated other comprehensive income/(loss), net of tax, in Stockholders' equity.

We conduct our derivative activities through a number of wholly-owned subsidiaries. Our fixed income derivative products business is principally conducted through our subsidiary Lehman Brothers Special Financing Inc., and separately capitalized "AAA" rated subsidiaries, Lehman Brothers Financial Products Inc. and Lehman Brothers Derivative Products Inc. Our equity derivative products business is conducted through Lehman Brothers Finance S.A. and Lehman Brothers OTC Derivatives Inc. Our commodity and energy derivatives product business is conducted through Lehman Brothers Commodity Services Inc. In addition, as a global investment bank, we also are a market maker in a number of foreign currencies. Counterparties to our derivative product transactions primarily are U.S. and foreign banks, securities firms, corporations, governments and their agencies, finance companies, insurance companies, investment companies and pension funds. We manage the risks associated with derivatives on an aggregate basis, along with the risks associated with our non-derivative trading and market-making activities in cash instruments, as part of our firm wide risk management policies. We use industry standard derivative contracts whenever appropriate.

For additional information about our accounting policies and our Trading-Related Derivative activities, see Note 1, "Summary of Significant Accounting Policies," and Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

### Special Purpose Entities

We enter into various transactions with special purpose entities ("SPEs"). SPEs may be corporations, trusts or partnerships that are established for a limited purpose. There are two types of SPEs— QSPEs and VIEs.

-67-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

A QSPE generally can be described as an entity whose permitted activities are limited to passively holding financial assets and distributing cash flows to investors based on pre-set terms. Our primary involvement with QSPEs relates to securitization transactions in which transferred assets, including mortgages, loans, receivables and other financial assets, are sold to an SPE that qualifies as a QSPE under SFAS 140. In accordance with SFAS 140 and FIN-46(R), we do not consolidate QSPEs. We recognize at fair value the interests we hold in the QSPEs. We derecognize financial assets transferred to QSPEs, provided we have surrendered control over the assets.

Certain SPEs do not meet the QSPE criteria because their permitted activities are not limited sufficiently or the assets are non-qualifying financial instruments (*e.g.*, real estate). These SPEs are referred to as VIEs, and we typically use them to create securities with a unique risk profile desired by investors to intermediate financial risk or to invest in real estate. Examples of our involvement with VIEs include collateralized debt obligations, synthetic credit transactions, real estate investments through VIEs, and other structured financing transactions. Under FIN 46(R), we consolidate a VIE if we are the primary beneficiary of the entity. The primary beneficiary is the party that either (i) absorbs a majority of the VIEs expected losses; (ii) receives a majority of the VIEs expected residual returns; or (iii) both.

For a further discussion of our consolidation policies, see "Critical Accounting Policies and Estimates— Consolidation Accounting Policies" in this MD&A. For a further discussion of our securitization activities and our involvement with VIEs, see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

### Other Off-Balance-Sheet Exposure

***SIVs.*** A structured investment vehicle ("SIV") is an entity that borrows money in the form of commercial paper, medium-term notes or subordinated capital notes, and uses the proceeds to purchase assets, including asset-backed or mortgage-backed securities. We do not own, manage or sponsor any SIVs. Our SIV-related exposure is limited to that acquired through proprietary investments or trading activity, specifically:

- At November 30, 2007, we had approximately $75 million of balance sheet exposure representing the aggregate of a fully drawn liquidity loan to a SIV, and medium-term notes and commercial paper issued by SIVs bought in the primary or secondary markets.

- We have entered into derivative transactions to which SIVs are counterparties. The total notional amount of these derivative transactions was approximately $4.1 billion at November 30, 2007. We believe the fair value of these derivative transactions is a more relevant measure of the obligations because we believe the notional amount overstates the expected payout. At November 30, 2007, the fair value of these derivative contracts approximated $50 million. For a further discussion of derivative transactions, see Note 9, "Commitments, Contingencies and Guarantees— Other Commitments and Guarantees," to the Consolidated Financial Statements.

- Under resell or repurchase agreements, we have balance sheet exposure to commercial paper issued by SIVs. This exposure was approximately $14 million at November 30, 2007. For a further discussion of resell and repurchase agreements, see Note 5, "Securities Received and Pledged as Collateral," to the Consolidated Financial Statements.

- We manage certain private equity and other alternative investment funds which are not consolidated into our results of operations. At November 30, 2007, a small percentage of the assets within those funds have SIV-related exposure.

***Conduits.*** Conduits are entities established to convey financing. They are thinly capitalized SPE structures established on behalf of a sponsor or sponsors that purchase assets from multiple parties, funding those purchases by issuing commercial paper. Assets held in a conduit serve as collateral for the commercial paper issued by the conduit. We are a sponsor, guarantor, and/or liquidity and credit facility provider to certain conduits. Specifically:

- We make certain liquidity commitments and guarantees to commercial paper conduits in support of certain clients' secured financing transactions. These commitments and guarantees obligate us to provide liquidity to these conduits in the event the conduits cannot obtain funding in the market; however, our obligation is limited to the total amount required to fund our clients' assets in the conduit. At November 30, 2007, the amount of these commitments was approximately $1.4 billion. We believe our actual risk to be limited because these liquidity commitments are supported by high quality collateral. For a further discussion of derivative transactions, see Note 9, "Commitments, Contingencies and Guarantees— Other Commitments and Guarantees," to the Consolidated Financial Statements.

- We provide guarantees to investors in certain VIEs. These guarantees may include a guaranteed return of the investors' initial investment or of the investors' initial investment plus an agreed upon return depending on the terms. At November 30, 2007, these commitments were approximately $6.1 billion. We believe our actual risk to be limited because our obligations are collateralized by the VIEs' assets and contain significant constraints

-68-

## LEHMAN BROTHERS HOLDINGS INC.
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

under which downside protection will be available (*e.g.*, the VIE is required to liquidate assets in the event certain loss levels are triggered). For a further discussion, see Note 9, "Commitments, Contingencies and Guarantees— Other Commitments and Guarantees," to the Consolidated Financial Statements.

- We have established a $2.4 billion conduit that issues secured liquidity notes to pre-fund high grade loan commitments. This conduit is consolidated in Holdings' results of operations. This is fully backed by a triple-A rated, third-party, one-year revolving liquidity back stop, which we have in turn fully backed. This conduit is consolidated in Holdings' results of operations.

- We participate in an A-1/P-1-rated multi-seller conduit. This multi-seller issues secured liquidity notes to provide financing. Our intention is to utilize this conduit for purposes of funding a portion of our contingent acquisition commitments. At November 30, 2007, we were contingently committed to provide $1.6 billion of liquidity if the conduit is unable to remarket the secured liquidity notes upon their maturity, generally, one year after a failed remarketing event. This conduit is not consolidated in Holdings' results of operations. For a further discussion of derivative transactions, see Note 9, "Commitments, Contingencies and Guarantees—Other Commitments and Guarantees," to the Consolidated Financial Statements.

- As a dealer and agent in the commercial paper market, we hold a minimal amount in inventory from various conduit programs, including the multi-seller conduit discussed above. At November 30, 2007, the amount of commercial paper in our inventory from conduit programs in which we participate, as dealer and/or agent, was approximately $850 million.

## Risk Management

Our goal is to realize returns from our business commensurate with the risks assumed. Our business activities have inherent risks that we monitor, evaluate and manage through a comprehensive risk management structure. These risks include market, credit, liquidity, operational and reputational exposures, among others.

The bases of our risk control processes are:

- We establish policies to document our risk principles, our risk capacity and tolerance levels.

- We monitor and enforce adherence to our risk policies.

- We measure quantifiable risks using methodologies and models based on tested assumptions.

- We identify emerging risks through monitoring our portfolios, new business development, unusual or complex transactions and external events and market influences.

- We report risks to stakeholders.

### Risk Management Structure

While risk cannot be completely eliminated, we have designed our internal control environment to put appropriate risk mitigants in place. Our control processes separate the duties of risk management from revenue generation and effect management oversight of the risk management function.

Our overall risk limits and risk management policies, including establishment of risk tolerance levels, are determined by the Risk Committee. The Risk Committee, which includes management's Executive Committee, the Global Head of Risk Management and certain other members of senior management, reviews our risk exposures, position concentrations and risk-taking activities on a weekly basis, or more frequently as needed. Our Risk Committee allocates the usage of capital to each of our businesses and establishes trading and credit limits for counterparties with a goal to maintain diversification of our businesses, counterparties and geographic presence.

The Global Risk Management Division (the "Division") is independent of revenue-generation but maintains a presence in our regional trading centers as well as in key sales offices. The Division's role is to assist in explaining our risks and making them

clear to management and others. The organization of the Division reflects our integrated approach to risk management, bringing together the skill sets of credit, market, quantitative, sovereign and operational risk management groups.

-69-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**Market Risk**

Market risk is the potential change to the market value of our trading and investing positions. We assume market risk in our market-making, specialist, proprietary trading, investing and underwriting activities.

Market risk can result from changes in market variables, including:

- Changes in the level, slope or shape of yield curves (interest rates), widening or tightening of general spread levels (credit or credit-related spreads) and volatility of interest rates.

- Directional movements in prices and volatilities of individual equities, equity baskets and equity indices.

- Movement of domestic and foreign currency rates.

- Price movements of commodities such as electricity, natural gas, and oil.

- Changes in asset valuations.

Responsibility for defining and monitoring market risk tolerance levels is that of our Market Risk Management Department (the "MRM Department"). Based upon the MRM Department's established thresholds, management applies business judgment to mitigate these risks, managing our risk exposures by diversifying portfolios, limiting position sizes and establishing economic hedges. Both the MRM Department and management also rely upon the Quantitative Risk Management Department (the "QRM Department") to ensure that both quantifiable and unquantifiable risk is identified, assessed and managed.

Management and the MRM and QRM Departments use qualitative and quantitative risk measures and analyses such as sensitivity to changes in interest rates, prices, and implied volatilities. Stress testing, which measures the impact on the value of existing portfolios of specific changes in market factors for certain products, is performed with regularity. Scenario analyses, which estimate sensitivity to a set of predefined market and/or external events, are also conducted periodically. A statistical measure of the potential loss in the fair value of a portfolio due to adverse movements in underlying risk factors known as value-at-risk ("VaR") is also used to monitor and manage market risk.

*VaR.* We estimate VaR using a model that simulates the impact market risk factors would have on our portfolio. Our calculation of VaR is an approximation of earning and loss distributions our portfolio would realize if current market risks were observed in historical markets. Our method uses four years of historical data, weighted to give greater impact to more recent time periods in simulating potential changes in market risk factors, and estimates the amount that our current portfolio could lose with a specified degree of confidence, over a given time interval.

For the table below, a one-day time interval and a 95% confidence level were used. This means that there is a 1-in-20 chance that daily trading net revenue losses on a particular day would exceed the reported VaR.

In a historical simulation VaR, portfolio positions have offsetting risk characteristics, referred to as diversification benefit. We measure the diversification benefit within our portfolio by historically simulating how the positions in our current portfolio would have behaved in relation to each other as opposed to using a static estimate of a diversification benefit, which remains relatively constant from period to period. From time to time there will be changes in our historical simulation VaR due to changes in the diversification benefit across our portfolio of financial instruments.

VaR measures have inherent limitations including: historical market conditions and historical changes in market risk factors may not be accurate predictors of future market conditions or future market risk factors; VaR measurements are based on current positions, while future risk depends on future positions; and VaR based on a one-day measurement period does not fully capture the market risk of positions that cannot be liquidated or hedged within one day. VaR is not intended to capture worst case scenario losses and we could incur losses greater than the VaR amounts reported.

There is no uniform industry methodology for estimating VaR. Different assumptions concerning the number of risk factors, the duration of the time series and daily changes in these risk factors, as well as different methodologies could produce materially different results and therefore caution should be used when comparing VaR measures among comparable institutions.

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

**VaR - Historical Simulation**

| | Average VaR for Year Ended | | High/Low VaR for Year Ended November 30, | | | |
| | | | 2007 | | 2006 | |
| In millions | Nov 30, 2007 | Nov 30, 2006 | High | Low | High | Low |
|---|---|---|---|---|---|---|
| Interest rate risk | $    64 | $    35 | $    123 | $    33 | $    64 | $    23 |
| Equity price risk | 43 | 19 | 79 | 21 | 31 | 11 |
| Foreign exchange risk | 9 | 5 | 16 | 5 | 7 | 2 |
| Commodity risk | 7 | 4 | 16 | 4 | 11 | 1 |
| Diversification benefit | (32) | (21) | | | | |
| | $    91 | $    42 | $    155 | $    48 | $    74 | $    29 |

| | At | | | | |
| In millions | Nov 30, 2007 | Aug 31, 2007 | May 31, 2007 | Feb 28, 2007 | Nov 30, 2006 |
|---|---|---|---|---|---|
| Interest rate risk | $    96 | $    79 | $    51 | $    58 | $    48 |
| Equity price risk | 50 | 46 | 54 | 26 | 20 |
| Foreign exchange risk | 11 | 7 | 6 | 7 | 5 |
| Commodity risk | 13 | 8 | 7 | 5 | 6 |
| Diversification benefit | (46) | (40) | (31) | (21) | (25) |
| | $    124 | $    100 | $    87 | $    75 | $    54 |

| | Average VaR Three Months Ended | | | | |
| In millions | Nov 30, 2007 | Aug 31, 2007 | May 31, 2007 | Feb 28, 2007 | Nov 30, 2006 |
|---|---|---|---|---|---|
| Interest rate risk | $    89 | $    68 | $    54 | $    41 | $    41 |
| Equity price risk | 51 | 45 | 43 | 34 | 20 |
| Foreign exchange risk | 10 | 8 | 7 | 11 | 5 |
| Commodity risk | 11 | 8 | 6 | 5 | 5 |
| Diversification benefit | (37) | (33) | (32) | (28) | (23) |
| | $    124 | $    96 | $    78 | $    63 | $    48 |

The increase in both the period end and quarterly average historical simulation VaR was primarily due to increased market volatilities which increased the overall risk across multiple business segments. Coincident with the increased market volatilities across many asset classes was a reduction in diversification between the individual components of market risk.

As part of our risk management control processes, we monitor daily trading net revenues compared with reported historical simulation VaR as of the end of the prior business day. In the 2007 fiscal year, there were four days or 1.6% of days in the period, all occurring in the second half of the twelve month period, when our daily net trading loss exceeded our historical simulation VaR as measured at the close of the previous business day. This compares with an expectation that actual losses would exceed daily net trading losses on 5% of occasions using a 95% confidence level.

Real estate investments are not financial instruments and therefore not contemplated within the VaR calculation. We use stress testing to evaluate risks associated with our real estate portfolios. As of November 30, 2007, we had approximately $21.9 billion of real estate investments; however, our net investment at risk was limited to $12.8 billion as a portion of these investments have been financed on a non-recourse basis. As of November 30, 2007, we estimate that a hypothetical 10% decline in the underlying property values associated with the non-syndicated investments would have resulted in a net revenue loss of approximately $980 million.

**Credit Risk**

Credit risk represents the loss incurred as a result of failure by a client, counterparty or issuer to meet its contractual obligations. Credit risk is inherent in traditional banking products – loans, commitments to lend and contingent liabilities – and in "traded" products – derivative contracts such as forwards, swaps and options, repurchase agreements (repos and reverse repos), debt securities and securities borrowing and lending transactions.

Management and in particular our Credit Risk Management Department (the "CRM Department") define and monitor credit risk and exposure. The CRM Department approves counterparties, assigns internal risk ratings, and establishes credit limits, among other risk mitigation procedures. The CRM Department monitors and reviews counterparty risk ratings, current credit exposures and potential credit exposures across products and recommends valuation adjustments, when appropriate. Given market events or counterparties' changes in financial conditions, additional review and adjustment procedures may be undertaken. We also seek to reduce our current and potential credit exposures by

-71-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

entering into agreements that: offset receivables from and payables to a counterparty; obtain upfront or contingent collateral from counterparties; provide a third-party guarantee for a counterparty's obligations; and transfer our credit risk to third parties using structures or techniques such as credit derivatives. Working with the MRM Department, the CRM Department also participates in transaction approval, where the risks of the transaction on a stand-alone basis as well as our aggregate risk exposure to the obligor are considered.

***Credit Risk on Derivatives***. Derivatives are exchange traded or privately negotiated contracts that derive their value from an underlying asset. Derivatives are useful for risk management because the fair values or cash flows of derivatives can be used to offset the changes in fair values or cash flows of other financial instruments. In addition to risk management, we enter into derivative transactions for purposes of client transactions or establishing trading positions. The presentation of derivatives in our Consolidated Statement of Financial Position is net of payments and receipts and, in instances where management determines a legal right of offset exists as a result of a netting agreement, net-by-counterparty. Risk for an OTC derivative includes credit risk associated with the counterparty in the negotiated contract and continues for the duration of that contract.

The fair value of our OTC derivative assets at November 30, 2007 and 2006, was $41.3 billion and $19.5 billion, respectively; however, we view our net credit exposure to have been $34.6 billion and $15.6 billion at November 30, 2007 and 2006, respectively, representing the fair value of OTC derivative contracts in a net receivable position after consideration of collateral.

The following tables set forth the fair value of OTC derivative assets and liabilities by contract type and related net credit exposure, as of November 30, 2007 and November 30, 2006, respectively.

### Fair Value of OTC Derivative Contracts by Maturity

| In millions | November 30, 2007 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Less than 1 Year | 1 to 5 Years | 5 to 10 Years | Greater than 10 Years | Cross Maturity, Cross Product and Cash Collateral Netting [1] | OTC Derivatives | Net Credit Exposure |
| **Assets** | | | | | | | |
| Interest rate, currency and credit default swaps and options | $  4,814 | $  22,407 | $  13,915 | $  15,901 | $  (35,009) | $  22,028 | $  21,718 |
| Foreign exchange forward contracts and options | 2,940 | 432 | 390 | 166 | (1,449) | 2,479 | 1,954 |
| Other fixed income securities contracts[2] | 8,015 | 866 | 89 | 15 | (535) | 8,450 | 6,890 |
| Equity contracts | 4,615 | 2,469 | 629 | 2,470 | (1,826) | 8,357 | 4,043 |
| | $  20,384 | $  26,174 | $  15,023 | $  18,552 | $  (38,819) | $  41,314 | $  34,605 |
| **Liabilities** | | | | | | | |
| Interest rate, currency and credit default swaps and options | $  4,499 | $  12,355 | $  11,483 | $  11,873 | $  (29,295) | $  10,915 | |
| Foreign exchange forward contracts and options | 3,578 | 540 | 530 | 126 | (1,886) | 2,888 | |
| Other fixed income securities contracts[3] | 5,474 | 608 | 322 | 2 | (382) | 6,024 | |
| Equity contracts | 5,007 | 5,584 | 795 | 2,928 | (5,035) | 9,279 | |
| | $  18,558 | $  19,087 | $  13,130 | $  14,929 | $  (36,598) | $  29,106 | |

[1]    Cross-maturity netting represents the netting of receivable balances with payable balances for the same counterparty across maturity and product categories. Receivable and payable balances with the same counterparty in the same maturity category are netted within the maturity category when appropriate. Cash collateral received or paid is netted on a counterparty basis, provided legal right of offset exists. Assets and liabilities at November 30, 2007 were netted down for cash collateral of approximately $19.7 billion and $17.5 billion, respectively.

[2]    Includes commodity derivative assets of $1.5 billion.

[3]    Includes commodity derivative liabilities of $1.5 billion.

-72-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

| In millions | | Less than 1 Year | 1 to 5 Years | 5 to 10 Years | Greater than 10 Years | Cross Maturity, Cross Product and Cash Collateral Netting [1] | OTC Derivatives | Net Credit Exposure |
|---|---|---|---|---|---|---|---|---|
| **November 30, 2006** | | | | | | | | |
| **Assets** | | | | | | | | |
| Interest rate, currency and credit default swaps and options | $ | 1,514 $ | 7,332 $ | 10,121 $ | 8,792 $ | (19,125) $ | 8,634 $ | 8,848 |
| Foreign exchange forward contracts and options | | 2,560 | 472 | 62 | 43 | (1,345) | 1,792 | 1,049 |
| Other fixed income securities contracts[2] | | 4,305 | 3 | — | — | — | 4,308 | 3,856 |
| Equity contracts | | 3,142 | 2,741 | 870 | 362 | (2,376) | 4,739 | 1,854 |
| | $ | 11,521 $ | 10,548 $ | 11,053 $ | 9,197 $ | (22,846) $ | 19,473 $ | 15,607 |
| **Liabilities** | | | | | | | | |
| Interest rate, currency and credit default swaps and options | $ | 2,262 $ | 5,481 $ | 5,012 $ | 6,656 $ | (13,720) $ | 5,691 | |
| Foreign exchange forward contracts and options | | 3,204 | 883 | 240 | 33 | (2,215) | 2,145 | |
| Other fixed income securities contracts[3] | | 2,596 | 8 | — | — | — | 2,604 | |
| Equity contracts | | 3,375 | 3,736 | 1,377 | 260 | (4,004) | 4,744 | |
| | $ | 11,437 $ | 10,108 $ | 6,629 $ | 6,949 $ | (19,939) $ | 15,184 | |

[1]    Cross-maturity netting represents the netting of receivable balances with payable balances for the same counterparty across maturity and product categories. Receivable and payable balances with the same counterparty in the same maturity category are netted within the maturity category when appropriate. Cash collateral received or paid is netted on a counterparty basis, provided legal right of offset exists. Assets and liabilities at November 30, 2006 were netted down for cash collateral of approximately $11.1 billion and $8.2 billion, respectively.

[2]    Includes commodity derivative assets of $268 million.

[3]    Includes commodity derivative liabilities of $277 million.

Presented below is an analysis of net credit exposure at November 30, 2007 and 2006 for OTC contracts based on actual ratings made by external rating agencies or by equivalent ratings established and used by our CRM Department.

**Net Credit Exposure**

| Counterparty Risk Rating | S&P/Moody's Equivalent | Less than 1 Year | 1 to 5 Years | 5 to 10 Years | Greater than 10 Years | Total November 30, 2007 | November 30, 2006 |
|---|---|---|---|---|---|---|---|
| iAAA | AAA/Aaa | 5% | 5% | 6% | 8% | 24% | 14% |
| iAA | AA/Aa | 14 | 5 | 3 | 4 | 26 | 39 |
| iA | A/A | 10 | 5 | 6 | 16 | 37 | 31 |
| iBBB | BBB/Baa | 3 | 1 | 1 | 2 | 7 | 11 |
| iBB | BB/Ba | 2 | 1 | — | — | 3 | 4 |
| iB or lower | B/B1 or lower | 1 | 1 | 1 | — | 3 | 1 |
| | | 35% | 18% | 17% | 30% | 100% | 100% |

**Revenue Volatility**

The overall effectiveness of our risk management practices can be evaluated on a broader perspective when analyzing the distribution of daily net trading revenues over time. We consider net trading revenue volatility over time to be a comprehensive evaluator of our overall risk management practices because it incorporates the results of virtually all of our trading activities and types of risk.

The following table shows a measure of daily trading net revenue volatility, utilizing actual daily trading net revenues over the previous rolling 250 trading days at a 95% confidence level. This measure represents the loss relative to the median actual daily trading net revenues over the previous rolling 250 trading days, measured at a 95% confidence level.

-73-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

This means there is a 1-in-20 chance that actual daily trading net revenues would be expected to decline by an amount in excess of the reported revenue volatility measure.

| In millions | Average Revenue Volatility for Year Ended November 30, | | High/Low Revenue Volatility for Year Ended November 30, | | | | | |
| | | | 2007 | | 2006 | | | |
| | 2007 | 2006 | High | Low | High | Low | | |
|---|---|---|---|---|---|---|
| Interest rate risk | $ 38 | $ 25 | $ 75 | $ 27 | $ 28 | $ 23 |
| Equity price risk | 29 | 19 | 45 | 23 | 24 | 14 |
| Foreign exchange risk | 5 | 3 | 7 | 5 | 5 | 2 |
| Commodity risk | 3 | 1 | 5 | 2 | 4 | 2 |
| Diversification benefit | (27) | (13) | | | | |
| | $ 48 | $ 35 | $ 95 | $ 33 | $ 38 | $ 34 |

| In millions | At | | | | |
| | Nov 30, 2007 | Aug 31, 2007 | May 31, 2007 | Feb 28, 2007 | Nov 30, 2006 |
|---|---|---|---|---|---|
| Interest rate risk | $ 75 | $ 54 | $ 31 | $ 29 | $ 27 |
| Equity price risk | 44 | 34 | 25 | 25 | 24 |
| Foreign exchange risk | 6 | 6 | 5 | 5 | 5 |
| Commodity risk | 4 | 4 | 3 | 2 | 2 |
| Diversification benefit | (34) | (35) | (28) | (26) | (21) |
| | $ 95 | $ 63 | $ 36 | $ 35 | $ 37 |

| In millions | Average Revenue Volatility Three Months Ended | | | | |
| | Nov 30, 2007 | Aug 31, 2007 | May 31, 2007 | Feb 28, 2007 | Nov 30, 2006 |
|---|---|---|---|---|---|
| Interest rate risk | $ 58 | $ 35 | $ 31 | $ 28 | $ 27 |
| Equity price risk | 41 | 28 | 25 | 24 | 23 |
| Foreign exchange risk | 6 | 5 | 5 | 5 | 5 |
| Commodity risk | 4 | 4 | 3 | 2 | 2 |
| Diversification benefit | (34) | (28) | (27) | (24) | (21) |
| | $ 75 | $ 44 | $ 37 | $ 35 | $ 36 |

Average trading net revenue volatility measured in this manner was $48 million for the year ended November 30, 2007, a 37% increase from the comparable measure for the year ended November 30, 2006. The increase of this measurement in fiscal year 2007 was primarily driven by increased volatilities in overall markets.

The following chart sets forth the frequency distribution for daily trading net revenues for our Capital Markets and Investment Management business segments (including trading activity in the fixed income and equity markets undertaken on behalf of client investors and excluding any trading activity undertaken on behalf of those investors in private equity offerings) for the years ended November 30, 2007 and 2006:

-74-

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**



For the year ended November 30, 2007, the largest loss in daily trading net revenues on any single day was $137 million. For the year ended November 30, 2006, the largest loss in daily trading net revenues on any single day was $59 million.

**Liquidity Risk**

Liquidity risk is the potential that we are unable to:

- Meet our payment obligations when due;

- Borrow funds in the market on an on-going basis and at an acceptable price to fund actual or proposed commitments; or

- Liquidate assets in a timely manner at a reasonable price.

Management's Finance Committee is responsible for developing, implementing and enforcing our liquidity, funding and capital policies. These policies include recommendations for capital and balance sheet size as well as the allocation of capital to the business units. Management's Finance Committee oversees compliance with policies and limits with the goal of ensuring we are not exposed to undue liquidity, funding or capital risk.

Our liquidity strategy seeks to ensure that we maintain sufficient liquidity to meet all of our funding obligations in all market environments. That strategy is centered on five principles:

- Maintaining a liquidity pool that is of sufficient size to cover expected cash outflows for one year in a stressed liquidity environment.

- Relying on secured funding only to the extent that we believe it would be available in all market environments.

- Diversifying our funding sources to minimize reliance on any given provider.

- Assessing our liquidity at the legal entity level. For example, because our legal entity structure can constrain liquidity

available to Holdings, our liquidity pool excludes liquidity that is restricted from availability to Holdings.

- Maintaining a comprehensive funding action plan to manage a stress liquidity event, including a communication plan for regulators, creditors, investors and clients.

For further discussion of our liquidity positions, see "Liquidity, Funding and Capital Resources" in this MD&A.

-75-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**Operational Risk**

Operational risk is the risk of loss resulting from inadequate or failed internal processes, people and systems, or from external causes, whether deliberate, accidental or natural. Operational risk may arise from mistakes, intentional or otherwise, in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted. Our businesses are highly dependent on our ability to daily process a large number of transactions across numerous and diverse markets in many currencies, and these transactions have become increasingly complex. Consequently, we rely heavily on our financial, accounting and other data processing systems. In recent years, we have substantially upgraded and expanded the capabilities of our data processing systems and other operating technology, and we expect that we will need to continue to upgrade and expand in the future to avoid disruption of, or constraints on, our operations.

The Operational Risk Management Department is responsible for implementing and maintaining our overall global operational risk management framework, which seeks to minimize these risks through assessing, reporting, monitoring and mitigating operational risks.

We have a company-wide business continuity plan (the "BCP"). The BCP objective is to ensure that we can continue critical operations with limited processing interruption in the event of a business disruption. The business continuity group manages our internal incident response process and develops and maintains continuity plans for critical business functions and infrastructure. This includes determining how vital business activities will be performed until normal processing capabilities can be restored. The business continuity group is also responsible for facilitating disaster recovery and business continuity training and preparedness for our employees.

**Reputational and Other Risk**

We recognize that maintaining our reputation among clients, investors, regulators and the general public is critical. Maintaining our reputation depends on a large number of factors, including the selection of our clients and the conduct of our business activities. We seek to maintain our reputation by screening potential clients and by conducting our business activities in accordance with high ethical standards.

Potential clients are screened through a multi-step process that begins with the individual business units and product groups. In screening clients, these groups undertake a comprehensive review of the client and its background and the potential transaction to determine, among other things, whether they pose any risks to our reputation. Potential transactions are screened by independent committees in the Firm, which are composed of senior members from various corporate divisions of the Company including members of the Division. These committees review the nature of the client and its business, the due diligence conducted by the business units and product groups and the proposed terms of the transaction to determine overall acceptability of the proposed transaction. In so doing, the committees evaluate the appropriateness of the transaction, including a consideration of ethical and social responsibility issues and the potential effect of the transaction on our reputation.

We are exposed to other risks having an ability to adversely impact our business. Such risks include legal, geopolitical, tax and regulatory risks that may come to bear due to changes in local laws, regulations, accounting standards or tax statutes. To assist in the mitigation of such risks, we monitor and review regulatory, statutory or legal proposals that could impact our businesses. See "Certain Factors Affecting Results of Operations" above and "Risk Factors" in Part I, Item 1A in this Form 10-K.

**2-for-1 Stock Split**

On April 5, 2006, the stockholders of Holdings approved an increase in the Company's authorized shares of common stock to 1.2 billion from 600 million, and the Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend, for holders of record as of April 18, 2006, which was paid on April 28, 2006. On April 5, 2006, the Company's Restated Certificate of Incorporation was amended to effect the increase in authorized common shares.

**Accounting and Regulatory Developments**

The following summarizes accounting standards that have been issued during the periods covered by the Consolidated Financial Statements and the effect of adoption on our results of operations, if any, actual or estimated.

***SFAS 123(R).*** In December 2004, the FASB issued SFAS 123(R), which establishes standards of accounting for transactions in which an entity exchanges its equity instruments for goods and services and focuses primarily on accounting

-76-

**LEHMAN BROTHERS HOLDINGS INC.**
**Management's Discussion and Analysis of Financial Condition and Results of Operations**

for transaction in which an entity obtains employee services in share-based payment transactions. Two key differences between SFAS No. 123, *Accounting for Stock-Based Compensation*, and SFAS 123(R) relate to the attribution of compensation costs to reporting periods and accounting for award forfeitures. SFAS 123(R) generally requires the immediate expensing of equity-based awards granted to retirement-eligible employees or awards granted subject to substantive non-compete agreements be expensed over the non-compete period. SFAS 123(R) also requires expected forfeitures to be included in determining stock-based employee compensation expense. We adopted SFAS 123(R) as of the beginning of our 2006 fiscal year and recognized an after-tax gain of approximately $47 million as the cumulative effect of a change in accounting principle attributable to the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. For additional information, see Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial Statements.

**SFAS 155.** In February 2006, the FASB issued SFAS 155, which permits an entity to measure at fair value any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation. As permitted, we early adopted SFAS 155 in the first quarter of 2006. The effect of adoption resulted in a $24 million after-tax ($43 million pre-tax) decrease to opening retained earnings as of the beginning of our 2006 fiscal year, representing the difference between the fair value of these hybrid financial instruments and the prior carrying value as of November 30, 2005.

**SFAS 156.** In March 2006, the FASB issued SFAS 156, which permits entities to elect to measure servicing assets and servicing liabilities at fair value and report changes in fair value in earnings. As a result of adopting SFAS 156, we recognized an $18 million after-tax ($33 million pre-tax) increase to opening retained earnings in our 2006 fiscal year.

**SFAS 157.** In September 2006, the FASB issued SFAS 157. SFAS 157 defines fair value, establishes a framework for measuring fair value, outlines a fair value hierarchy based on inputs used to measure fair value and enhances disclosure requirements for fair value measurements. SFAS 157 does not change existing guidance as to whether or not an instrument is carried at fair value.

SFAS 157 also (i) nullifies the guidance in EITF No. 02-3, *Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* ("EITF 02-3") that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs; (ii) clarifies that an issuer's credit standing should be considered when measuring liabilities at fair value; (iii) precludes the use of a liquidity or block discount when measuring instruments traded in an active market at fair value; and (iv) requires costs related to acquiring financial instruments carried at fair value to be included in earnings as incurred.

We elected to early adopt SFAS 157 at the beginning of 2007 fiscal year and we recorded the difference between the carrying amounts and fair values of (i) stand-alone derivatives and/or certain hybrid financial instruments measured using the guidance in EITF 02-3 on recognition of a trading profit at the inception of a derivative, and (ii) financial instruments that are traded in active markets that were measured at fair value using block discounts, as a cumulative-effect adjustment to opening retained earnings. As a result of adopting SFAS 157, we recognized a $45 million after-tax ($78 million pre-tax) increase to opening retained earnings. For additional information regarding our adoption of SFAS 157, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

**SFAS 158.** In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Retirement Plans* ("SFAS 158"), which requires an employer to recognize the over- or under-funded status of its defined benefit postretirement plans as an asset or liability in its Consolidated Statement of Financial Condition, measured as the difference between the fair value of the plan assets and the benefit obligation. For pension plans the benefit obligation is the projected benefit obligation while for other postretirement plans the benefit obligation is the accumulated postretirement obligation. Upon adoption, SFAS 158 requires an employer to recognize previously unrecognized actuarial gains and losses and prior service costs within Accumulated other comprehensive income/(loss) (net of tax), a component of Stockholders' equity. In accordance with the guidance in SFAS No.158, we adopted this provision of the standard for the year ended November 30, 2007. The adoption of SFAS No.158 reduced Accumulated other comprehensive income/ (loss), by $210 million after-tax ($344 million pre-tax) at November 30, 2007.

**SFAS 159.** In February 2007, the FASB issued SFAS 159 which permits certain financial assets and financial liabilities to be measured at fair value, using an instrument-by-instrument election. The initial effect of adopting SFAS 159 must be accounted for as a cumulative-effect adjustment to opening retained earnings for the fiscal year in which we apply SFAS 159. Retrospective application of SFAS 159 to fiscal years preceding the effective date is not permitted.

We elected to early adopt SFAS 159 beginning in our 2007 fiscal year and to measure at fair value substantially all hybrid

financial instruments not previously accounted for at fair value under SFAS No. 155, as well as certain deposit liabilities

-77-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

at our U.S. banking subsidiaries. We elected to adopt SFAS 159 for these instruments to reduce the complexity of accounting for these instruments under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. As a result of adopting SFAS 159, we recognized a $22 million after-tax increase ($35 million pre-tax) to opening retained earnings as of December 1, 2006, representing the effect of changing the measurement basis of these financial instruments from an adjusted amortized cost basis at November 30, 2006 to fair value.

**SFAS 141(R).** In December 2007, the FASB issued SFAS No. 141(R), *Business Combinations* ("SFAS 141(R)"). SFAS 141 (R) expands the definition of transactions and events that qualify as business combinations; requires that the acquired assets and liabilities, including contingencies, be recorded at the fair value determined on the acquisition date and changes thereafter reflected in revenue, not goodwill; changes the recognition timing for restructuring costs; and requires acquisition costs to be expensed as incurred. Adoption of SFAS 141(R) is required for combinations after December 15, 2008. Early adoption and retroactive application of SFAS 141(R) to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

**SFAS 160.** In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interest in Consolidated Financial Statements* ("SFAS 160"). SFAS 160 re-characterizes minority interests in consolidated subsidiaries as non-controlling interests and requires the classification of minority interests as a component of equity. Under SFAS 160, a change in control will be measured at fair value, with any gain or loss recognized in earnings. The effective date for SFAS 160 is for annual periods beginning on or after December 15, 2008. Early adoption and retroactive application of SFAS 160 to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

**FIN 48.** In June 2006, the FASB issued FIN 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), which sets out a framework for management to use to determine the appropriate level of tax reserves to maintain for uncertain tax positions. This interpretation of SFAS No. 109, *Accounting for Income Taxes*, uses a two-step approach wherein a tax benefit is recognized if a position is more likely than not to be sustained, and the amount of benefit is then measured on a probabilistic approach, as defined in FIN 48. FIN 48 also sets out disclosure requirements to enhance transparency of an entity's tax reserves. We must adopt FIN 48 as of the beginning of our 2008 fiscal year. We estimate that the effect of adopting FIN 48 at the beginning of the first quarter of 2008 to be a decrease to opening retained earnings of approximately $190 million.

**SOP 07-1.** In June 2007, the AICPA issued Statement of Position ("SOP") No. 07-1, *Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies* ("SOP 07-1"). SOP 07-1 addresses when the accounting principles of the AICPA Audit and Accounting Guide Investment Companies must be applied by an entity and whether those accounting principles must be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. SOP 07-1 is effective for our fiscal year beginning December 1, 2008. We are evaluating the effect of adopting SOP 07-1 on our Consolidated Financial Statements.

**EITF Issue No. 04-5.** In June 2005, the FASB ratified the consensus reached in EITF 04-5 which requires general partners (or managing members in the case of limited liability companies) to consolidate their partnerships or to provide limited partners with either (i) rights to remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights. As the general partner of numerous private equity and asset management partnerships, we adopted EITF 04-5 effective June 30, 2005 for partnerships formed or modified after June 29, 2005. For partnerships formed on or before June 29, 2005 that had not been modified, we adopted EITF 04-5 as of the beginning of our 2007 fiscal year. The adoption of EITF 04-5 did not have a material effect on our Consolidated Financial Statements.

**FSP FIN 46(R)-6.** In April 2006, the FASB issued FASB Staff Position ("FSP") FIN 46(R)-6, *Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)* ("FSP FIN 46(R)-6"). This FSP addresses how a reporting enterprise should determine the variability to be considered in applying FIN 46(R) by requiring an analysis of the purpose for which an entity was created and the variability that the entity was designed to create. We adopted FSP FIN 46(R)-6 on September 1, 2006 and applied it prospectively to all entities in which we first became involved after that date. Adoption of FSP FIN 46(R)-6 did not have a material effect on our Consolidated Financial Statements.

**FSP FIN 39-1.** In April 2007, the FASB directed the FASB Staff to issue FSP No. FIN 39-1, *Amendment of FASB Interpretation No. 39* ("FSP FIN 39-1"). FSP FIN 39-1 modifies FIN No. 39, *Offsetting of Amounts Related to Certain Contracts*, and permits companies to offset cash collateral receivables or payables with net derivative positions under certain circumstances. FSP FIN 39-1 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted. FSP FIN 39-1 does not affect our Consolidated Financial Statements because it clarified the acceptability of existing market practice, which we use, of netting cash collateral against net derivative assets and liabilities.

-78-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

**FSP FIN 48-1.** In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 48-1, *Definition of "Settlement" In FASB Interpretation No. 48* ("FSP FIN 48-1"). Under FSP FIN 48-1, a previously unrecognized tax benefit may be subsequently recognized if the tax position is effectively settled and other specified criteria are met. We are evaluating the effect of adopting FSP FIN 48-1 on our Consolidated Financial Statements as part of our evaluation of the effect of adopting FIN 48.

**FSP FIN 46(R)-7.** In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 46(R)-7, *Application of FASB Interpretation No. 46(R) to Investment Companies* ("FSP FIN 46(R)-7"). FSP FIN 46(R)-7 makes permanent the temporary deferral of the application of the provisions of FIN 46(R) to unregistered investment companies, and extends the scope exception from applying FIN 46(R) to include registered investment companies. FSP FIN 46(R)-7 is effective upon adoption of SOP 07-1. We are evaluating the effect of adopting FSP FIN 46(R)-7 on our Consolidated Financial Statements.

**SAB 108.** In September 2006, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin ("SAB") No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 specifies how the carryover or reversal of prior-year unrecorded financial statement misstatements should be considered in quantifying a current-year misstatement. SAB 108 requires an approach that considers the amount by which the current-year statement of income is misstated ("rollover approach") and an approach that considers the cumulative amount by which the current-year statement of financial condition is misstated ("iron-curtain approach"). Prior to the issuance of SAB 108, either the rollover or iron-curtain approach was acceptable for assessing the materiality of financial statement misstatements. SAB 108 became effective for our fiscal year ended November 30, 2006. Upon adoption, SAB 108 allowed a cumulative-effect adjustment to opening retained earnings at December 1, 2005 for prior-year misstatements that were not material under a prior approach but that were material under the SAB 108 approach. Adoption of SAB 108 did not affect our Consolidated Financial Statements.

**SAB 109.** In November 2007, the SEC issued SAB No. 109, *Written Loan Commitments Recorded at Fair Value Through Earnings* ("SAB 109"). SAB 109 supersedes SAB No. 105, *Loan Commitments Accounted for as Derivative Instruments* ("SAB 105"), and expresses the view consistent with the guidance in SFAS 156 and SFAS 159, that the expected net future cash flows related to the associated servicing of the loan should be included in the measurement of all written loan commitments that are accounted for at fair value through earnings. SAB 105 also expressed the view that internally-developed intangible assets (such as customer relationship intangible assets) should not be recorded as part of the fair value of a derivative loan commitment. SAB 109 retains that view and broadens its application to all written loan commitments that are accounted for at fair value through earnings. Adoption of SAB 109 did not have a material affect on our Consolidated Financial Statements.

**Effect of Adoption.** The table presented below summarizes the impact of adoption from the accounting developments summarized above on our results of operations, if any, actual or estimated:

| In millions | Date of Adoption | Accumulated Other Comprehensive Income/ (Loss) | | Retained Earnings | | Net Income | |
|---|---|---|---|---|---|---|---|
| **Year Ended November 30, 2006** | | | | | | | |
| SFAS 123(R) | December 1, 2005 | | | | | $ | 47 |
| SFAS 155 | December 1, 2005 | | $ | (24) | | | |
| SFAS 156 | December 1, 2005 | | | 18 | | | |
| **Year Ended November 30, 2007** | | | | | | | |
| SFAS 157 | December 1, 2006 | | | 45 | | | |
| SFAS 158 | November 30, 2007 | $ | (210) | | | | |
| SFAS 159 | December 1, 2006 | | | 22 | | | |
| **Estimated Impact to Year Ended November 30, 2008** | | | | | | | |
| FIN 48 | December 1, 2007 | | | (190) | | | |

**The ASF Framework.** On December 6, 2007, the American Securitization Forum ("ASF"), working with various constituency groups as well as representatives of U.S. federal government agencies, issued the *Streamlined Foreclosure and Loss Avoidance Framework for Securitized Subprime Adjustable Rate Mortgage Loans* (the "ASF Framework"). The ASF Framework provides guidance for servicers to streamline borrower evaluation procedures and to facilitate the use of foreclosure and loss prevention efforts in an attempt to reduce the number of U.S. subprime residential mortgage borrowers who might default in the coming year because the borrowers cannot afford to pay the increased loan interest rate after their

U.S. subprime residential mortgage variable loan rate resets. The ASF Framework requires a borrower and its U.S. subprime residential mortgage variable loan to meet specific conditions to qualify for a modification under which the qualifying borrower's loan's interest rate would be kept at the existing rate, generally for five years following an upcoming reset period.

-79-

## LEHMAN BROTHERS HOLDINGS INC.
### Management's Discussion and Analysis of Financial Condition and Results of Operations

The ASF Framework is focused on U.S. subprime first-lien adjustable-rate residential mortgages that have an initial fixed interest rate period of 36 months or less, are included in securitized pools, were originated between January 1, 2005 and July 31, 2007, and have an initial interest rate reset date between January 1, 2008 and July 31, 2010 (defined as "Segment 2 Subprime ARM Loans" within the ASF Framework).

On January 8, 2008, the SEC's Office of Chief Accountant (the "OCA") issued a letter (the "OCA Letter") addressing accounting issues that may be raised by the ASF Framework. Specifically, the OCA Letter expressed the view that if a Segment 2 Subprime ARM Loan is modified pursuant to the ASF Framework and that loan could legally be modified, the OCA will not object to continued status of the transferee as a QSPE under SFAS 140. Concurrent with the issuance of the OCA Letter, the OCA requested the FASB to immediately address the issues that have arisen in the application of the QSPE guidance in SFAS 140. Any loan modifications we make in accordance with the ASF Framework will not have a material affect on our accounting for U.S. subprime residential mortgage loans nor securitizations or retained interests in securitizations of U.S. subprime residential mortgage loans.

*Basel II.* As of December 1, 2005, Holdings became regulated by the SEC as a CSE. This supervision imposes group-wide supervision and examination by the SEC, minimum capital requirements on a consolidated basis and reporting (including reporting of capital adequacy measurement consistent with the standards adopted by the Basel Committee on Banking Supervision) and notification requirements.

The Basel Committee on Banking Supervision published an updated framework to calculate risk-based capital requirements in June 2004 ("Basel II"). In September 2006, U.S. federal bank regulators announced their intent to implement Basel II in the U.S. On December 10, 2007, the U.S. federal bank regulators published final rules implementing the Basel II framework for the calculation of minimum capital requirements. Within the minimum capital requirements, or "first pillar" of Basel II, the federal rules deal only with the capital risk or banking book component. U.S. federal bank regulators have indicated that final rules to update market risk or trading book rules will be issued in the near future.

Basel II is meant to be applied on a consolidated basis for banking institutions or bank holding companies that have consolidated total assets of $250 billion or more and/or consolidated total on-balance-sheet foreign exposure of $10 billion or more. Basel II provides two broad methods for calculating minimum capital requirements related to credit risk (i) a standardized approach that relies heavily upon external credit assessments by major independent credit rating agencies; and (ii) an internal ratings-based approach that permits the use of internal rating assessments in determining required capital.

The time frame in which Basel II requirements would become effective for U.S. banking institutions or bank holding companies is contemplated to be (i) one or more years of parallel calculation, in which an entity would remain subject to existing risk-based capital rules but also calculate its risk-based capital requirements under the new Basel II framework; and (ii) two or three transition years, during which an entity would be subject to the new framework and an entity's minimum risk-based capital would be subject to a floor.

The Basel II framework is anticipated to impact our minimum capital requirements and reporting (including reporting of capital adequacy measurements) as a CSE.

## Effects of Inflation

Because our assets are, to a large extent, liquid in nature, they are not significantly affected by inflation. However, the rate of inflation affects such expenses as employee compensation, office space leasing costs and communications charges, which may not be readily recoverable in the prices of services we offer. To the extent inflation results in rising interest rates and has other adverse effects on the securities markets, it may adversely affect our consolidated financial condition and results of operations in certain businesses.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations—Risk Management" in Part II, Item 7, in this Form 10-K is incorporated herein by reference.

## LEHMAN BROTHERS HOLDINGS INC.

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

(a)    Financial Statements

Management's Assessment of Internal Control over Financial Reporting    82

Report of Independent Registered Public Accounting Firm
    on Internal Control over Financial Reporting    83

Report of Independent Registered Public Accounting Firm    84

Consolidated Financial Statements

Consolidated Statement of Income—
Years Ended November 30, 2007, 2006 and 2005    85

Consolidated Statement of Financial Condition—
November 30, 2007 and 2006    86

Consolidated Statement of Changes in Stockholders' Equity—
Years Ended November 30, 2007, 2006 and 2005    88

Consolidated Statement of Cash Flows—
Years Ended November 30, 2007, 2006 and 2005    90

Notes to Consolidated Financial Statements    92

(b)    Condensed unconsolidated financial information of Holdings and notes thereto are set forth in Schedule I beginning on Page
F-2 in this Form 10-K and are incorporated herein by reference. Holdings has issued a full and unconditional guarantee of certain outstanding and future debt securities of its wholly-owned subsidiary, Lehman Brothers Inc. Condensed consolidating financial information pursuant to Rule 3-10(c) of Regulation S-X is set forth in Note 8 of the notes to such condensed unconsolidated financial information in Schedule I.

## LEHMAN BROTHERS HOLDINGS INC.

### Management's Assessment of Internal Control over Financial Reporting

The management of Lehman Brothers Holdings Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control system is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and the preparation of published financial statements in accordance with generally accepted accounting principles. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of November 30, 2007. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control–Integrated Framework*. Based on our assessment we believe that, as of November 30, 2007, the Company's internal control over financial reporting is effective based on those criteria.

-82-

# LEHMAN BROTHERS HOLDINGS INC.

### Report of Independent Registered Public Accounting Firm

**To The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.**

We have audited Lehman Brothers Holdings Inc.'s (the "Company") internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Assessment of Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007 of the Company and our report dated January 28, 2008 expressed an unqualified opinion thereon.

*Ernst & Young LLP*

New York, New York
January 28, 2008

-83-

## LEHMAN BROTHERS HOLDINGS INC.

### Report of Independent Registered Public Accounting Firm

**To The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.**

We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the "Company") as of November 30, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2007. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

*Ernst & Young LLP*

New York, New York
January 28, 2008

-84-

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Income**

|  | Year Ended November 30, | | |
| In millions, except per share data | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Revenues** | | | |
| Principal transactions | $ 9,197 | $ 9,802 | $ 7,811 |
| Investment banking | 3,903 | 3,160 | 2,894 |
| Commissions | 2,471 | 2,050 | 1,728 |
| Interest and dividends | 41,693 | 30,284 | 19,043 |
| Asset management and other | 1,739 | 1,413 | 944 |
| Total revenues | 59,003 | 46,709 | 32,420 |
| Interest expense | 39,746 | 29,126 | 17,790 |
| Net revenues | 19,257 | 17,583 | 14,630 |
| **Non-Interest Expenses** | | | |
| Compensation and benefits | 9,494 | 8,669 | 7,213 |
| Technology and communications | 1,145 | 974 | 834 |
| Brokerage, clearance and distribution fees | 859 | 629 | 548 |
| Occupancy | 641 | 539 | 490 |
| Professional fees | 466 | 364 | 282 |
| Business development | 378 | 301 | 234 |
| Other | 261 | 202 | 200 |
| Total non-personnel expenses | 3,750 | 3,009 | 2,588 |
| Total non-interest expenses | 13,244 | 11,678 | 9,801 |
| Income before taxes and cumulative effect of accounting change | 6,013 | 5,905 | 4,829 |
| Provision for income taxes | 1,821 | 1,945 | 1,569 |
| Income before cumulative effect of accounting change | 4,192 | 3,960 | 3,260 |
| Cumulative effect of accounting change | — | 47 | — |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 |
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 |
| | | | |
| Earnings per basic common share: | | | |
| Before cumulative effect of accounting change | $ 7.63 | $ 7.17 | $ 5.74 |
| Cumulative effect of accounting change | — | 0.09 | — |
| Earnings per basic common share | $ 7.63 | $ 7.26 | $ 5.74 |
| | | | |
| Earnings per diluted common share: | | | |
| Before cumulative effect of accounting change | $ 7.26 | $ 6.73 | $ 5.43 |
| Cumulative effect of accounting change | — | 0.08 | — |
| Earnings per diluted common share | $ 7.26 | $ 6.81 | $ 5.43 |
| | | | |
| Dividends paid per common share | $ 0.60 | $ 0.48 | $ 0.40 |

See Notes to Consolidated Financial Statements.

-85-

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Financial Condition**

| In millions | November 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Assets** | | |
| Cash and cash equivalents | $ 7,286 | $ 5,987 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 12,743 | 6,091 |
| Financial instruments and other inventory positions owned (includes $63,499 in 2007 and $42,600 in 2006 pledged as collateral) | 313,129 | 226,596 |
| Collateralized agreements: | | |
| Securities purchased under agreements to resell | 162,635 | 117,490 |
| Securities borrowed | 138,599 | 107,666 |
| Receivables: | | |
| Brokers, dealers and clearing organizations | 11,005 | 7,449 |
| Customers | 29,622 | 18,470 |
| Others | 2,650 | 2,052 |
| Property, equipment and leasehold improvements (net of accumulated depreciation and amortization of $2,438 in 2007 and $1,925 in 2006) | 3,861 | 3,269 |
| Other assets | 5,406 | 5,113 |
| Identifiable intangible assets and goodwill (net of accumulated amortization of $340 in 2007 and $293 in 2006) | 4,127 | 3,362 |
| Total assets | $ 691,063 | $ 503,545 |

See Notes to Consolidated Financial Statements.

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Financial Condition—(Continued)**

| | November 30, | |
|---|---|---|
| In millions, except share data | 2007 | 2006 |
| **Liabilities and Stockholders' Equity** | | |
| Short-term borrowings and current portion of long-term borrowings | | |
| (including $9,035 in 2007 and $6,064 in 2006 at fair value) | $ 28,066 | $ 20,638 |
| Financial instruments and other inventory positions sold but not yet purchased | 149,617 | 125,960 |
| Collateralized financings: | | |
| Securities sold under agreements to repurchase | 181,732 | 133,547 |
| Securities loaned | 53,307 | 23,982 |
| Other secured borrowings | | |
| (including $9,149 in 2007 and $0 in 2006 at fair value) | 22,992 | 19,028 |
| Payables: | | |
| Brokers, dealers and clearing organizations | 3,101 | 2,217 |
| Customers | 61,206 | 41,695 |
| Accrued liabilities and other payables | 16,039 | 14,697 |
| Deposit liabilities at banks | | |
| (including $15,986 in 2007 and $14,708 in 2006 at fair value) | 29,363 | 21,412 |
| Long-term borrowings | | |
| (including $27,204 in 2007 and $11,025 in 2006 at fair value) | 123,150 | 81,178 |
| Total liabilities | 668,573 | 484,354 |
| Commitments and contingencies | | |
| **Stockholders' Equity** | | |
| Preferred stock | 1,095 | 1,095 |
| Common stock, $0.10 par value: | | |
| Shares authorized: 1,200,000,000 in 2007 and 2006; | | |
| Shares issued: 612,882,506 in 2007 and 609,832,302 in 2006; | | |
| Shares outstanding: 531,887,419 in 2007 and 533,368,195 in 2006 | 61 | 61 |
| Additional paid-in capital [1] | 9,733 | 8,727 |
| Accumulated other comprehensive loss, net of tax | (310) | (15) |
| Retained earnings | 19,698 | 15,857 |
| Other stockholders' equity, net | (2,263) | (1,712) |
| Common stock in treasury, at cost [1] | | |
| (80,995,087 shares in 2007 and 76,464,107 shares in 2006) | (5,524) | (4,822) |
| Total common stockholders' equity | 21,395 | 18,096 |
| Total stockholders' equity | 22,490 | 19,191 |
| Total liabilities and stockholders' equity | $ 691,063 | $ 503,545 |

[1]   Balances and share amounts at November 30, 2006 reflect the April 28, 2006 2-for-1 common stock split, effected in the form of a 100% stock dividend.

See Notes to Consolidated Financial Statements.

-87-

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Changes in Stockholders' Equity**

| In millions | Year Ended November 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| **Preferred Stock** | | | |
| 5.94% Cumulative, Series C: | | | |
| Beginning and ending balance | $ 250 | $ 250 | $ 250 |
| 5.67% Cumulative, Series D: | | | |
| Beginning and ending balance | 200 | 200 | 200 |
| 7.115% Fixed/Adjustable Rate Cumulative, Series E: | | | |
| Beginning balance | — | — | 250 |
| Redemptions | — | — | (250) |
| Ending balance | — | — | — |
| 6.50% Cumulative, Series F: | | | |
| Beginning and ending balance | 345 | 345 | 345 |
| Floating Rate (3% Minimum) Cumulative, Series G: | | | |
| Beginning and ending balance | 300 | 300 | 300 |
| Total preferred stock, ending balance | 1,095 | 1,095 | 1,095 |
| **Common Stock, Par Value $0.10 Per Share** | | | |
| Beginning and ending balance | 61 | 61 | 61 |
| **Additional Paid-In Capital** | | | |
| Beginning balance | 8,727 | 6,283 | 5,834 |
| Reclass from Common Stock Issuable and Deferred Stock Compensation under SFAS No. 123(R) | — | 2,275 | — |
| RSUs exchanged for Common Stock | (580) | (647) | 184 |
| Employee stock-based awards | (832) | (881) | (760) |
| Tax benefit from the issuance of stock-based awards | 434 | 836 | 1,005 |
| Amortization of RSUs, net | 1,898 | 804 | — |
| Other, net | 86 | 57 | 20 |
| Ending balance | 9,733 | 8,727 | 6,283 |
| **Accumulated Other Comprehensive Income/(Loss), net of tax** | | | |
| Beginning balance | (15) | (16) | (19) |
| Translation adjustment, net [1] | (85) | 1 | 3 |
| Adoption of SFAS No. 158 [2] | (210) | — | — |
| Ending balance | $ (310) | $ (15) | $ (16) |

[1]  Net of income tax benefit/(expense) of $2 in 2007, ($2) in 2006 and ($1) in 2005.

[2]  Net of income tax benefit of $134.

See Notes to Consolidated Financial Statements.

-88-

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Changes in Stockholders' Equity—(Continued)**

| | Year Ended November 30, | | |
|---|---|---|---|
| In millions | 2007 | 2006 | 2005 |
| **Retained Earnings** | | | |
| Beginning balance | $ 15,857 | $ 12,198 | $ 9,240 |
| Cumulative effect of accounting changes[1] | 67 | (6) | — |
| Net income | 4,192 | 4,007 | 3,260 |
| Dividends declared: | | | |
| 5.94% Cumulative, Series C Preferred Stock | (15) | (15) | (15) |
| 5.67% Cumulative, Series D Preferred Stock | (11) | (11) | (11) |
| 7.115% Fixed/Adjustable Rate Cumulative, Series E Preferred Stock | — | — | (9) |
| 6.50% Cumulative, Series F Preferred Stock | (22) | (22) | (22) |
| Floating Rate (3% Minimum) Cumulative, Series G Preferred Stock | (19) | (18) | (12) |
| Common Stock | (351) | (276) | (233) |
| Ending balance | 19,698 | 15,857 | 12,198 |
| **Common Stock Issuable** | | | |
| Beginning balance | — | 4,548 | 3,874 |
| Reclass to Additional paid-in capital under SFAS 123(R) | — | (4,548) | — |
| RSUs exchanged for common stock | — | — | (832) |
| Deferred stock awards granted | — | — | 1,574 |
| Other, net | — | — | (68) |
| Ending balance | — | — | 4,548 |
| **Common Stock Held in RSU Trust** | | | |
| Beginning balance | (1,712) | (1,510) | (1,353) |
| Employee stock-based awards | (1,039) | (755) | (676) |
| RSUs exchanged for common stock | 534 | 587 | 549 |
| Other, net | (46) | (34) | (30) |
| Ending balance | (2,263) | (1,712) | (1,510) |
| **Deferred Stock Compensation** | | | |
| Beginning balance | — | (2,273) | (1,780) |
| Reclass to additional paid-in capital under SFAS 123(R) | — | 2,273 | — |
| Deferred stock awards granted | — | — | (1,574) |
| Amortization of RSUs, net | — | — | 988 |
| Other, net | — | — | 93 |
| Ending balance | — | — | (2,273) |
| **Common Stock In Treasury, at Cost** | | | |
| Beginning balance | (4,822) | (3,592) | (2,282) |
| Repurchases of common stock | (2,605) | (2,678) | (2,994) |
| Shares reacquired from employee transactions | (573) | (1,003) | (1,163) |
| RSUs exchanged for common stock | 46 | 60 | 99 |
| Employee stock-based awards | 2,430 | 2,391 | 2,748 |
| Ending balance | (5,524) | (4,822) | (3,592) |
| Total stockholders' equity | $ 22,490 | $ 19,191 | $ 16,794 |

[1] The aggregate adoption impact of SFAS No. 157 and SFAS No. 159 are reflected for the year ended November 30, 2007. The aggregate adoption impact of SFAS No. 155 and SFAS No. 156 are reflected for the year ended November 30, 2006.

See Notes to Consolidated Financial Statements.

-89-

**LEHMAN BROTHERS HOLDINGS INC.**
**Consolidated Statement of Cash Flows**

| In millions | Year Ended November 30, | | |
| --- | --- | --- | --- |
| | **2007** | **2006** | **2005** |
| **Cash Flows From Operating Activities** | | | |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 |
| Adjustments to reconcile net income to net cash used in operating activities: | | | |
| Depreciation and amortization | 577 | 514 | 426 |
| Non-cash compensation | 1,791 | 1,706 | 1,055 |
| Cumulative effect of accounting change | — | (47) | — |
| Deferred tax provision/(benefit) | 418 | (60) | (502) |
| Tax benefit from the issuance of stock-based awards | — | — | 1,005 |
| Other adjustments | (114) | 3 | 173 |
| Net change in: | | | |
| Cash and securities segregated and on deposit for regulatory and other purposes | (6,652) | (347) | (1,659) |
| Financial instruments and other inventory positions owned | (78,903) | (46,102) | (36,652) |
| Resale agreements, net of repurchase agreements | 3,039 | 6,111 | (475) |
| Securities borrowed, net of securities loaned | (1,608) | (18,383) | (5,165) |
| Other secured borrowings | 3,964 | (4,088) | 11,495 |
| Receivables from brokers, dealers and clearing organizations | (3,556) | 5 | (4,054) |
| Receivables from customers | (11,152) | (5,583) | 354 |
| Financial instruments and other inventory positions sold but not yet purchased | 23,415 | 15,224 | 14,156 |
| Payables to brokers, dealers and clearing organizations | 884 | 347 | 165 |
| Payables to customers | 19,511 | 9,552 | 4,669 |
| Accrued liabilities and other payables | 302 | 2,032 | (801) |
| Other receivables and assets and minority interests | (1,703) | (1,267) | 345 |
| Net cash used in operating activities | (45,595) | (36,376) | (12,205) |
| **Cash Flows From Investing Activities** | | | |
| Purchase of property, equipment and leasehold improvements, net | (966) | (586) | (409) |
| Business acquisitions, net of cash acquired | (965) | (206) | (38) |
| Proceeds from sale of business | 233 | — | — |
| Net cash used in investing activities | (1,698) | (792) | (447) |
| **Cash Flows From Financing Activities** | | | |
| Derivative contracts with a financing element | 242 | 159 | 140 |
| Tax benefit from the issuance of stock-based awards | 434 | 836 | — |
| Issuance of short-term borrowings, net | 3,381 | 4,819 | 84 |
| Deposit liabilities at banks | 7,068 | 6,345 | 4,717 |
| Issuance of long-term borrowings | 86,302 | 48,115 | 23,705 |
| Principal payments of long-term borrowings, including the current portion of long term borrowings | (46,255) | (19,636) | (14,233) |
| Issuance of common stock | 84 | 119 | 230 |
| Issuance of treasury stock | 359 | 518 | 1,015 |
| Purchase of treasury stock | (2,605) | (2,678) | (2,994) |
| Retirement of preferred stock | — | — | (250) |
| Dividends paid | (418) | (342) | (302) |
| Net cash provided by financing activities | 48,592 | 38,255 | 12,112 |
| Net change in cash and cash equivalents | 1,299 | 1,087 | (540) |
| Cash and cash equivalents, beginning of period | 5,987 | 4,900 | 5,440 |
| Cash and cash equivalents, end of period | $ 7,286 | $ 5,987 | $ 4,900 |

**Supplemental Disclosure of Cash Flow Information (in millions):**
Interest paid totaled $39,454, $28,684 and $17,893 in 2007, 2006 and 2005, respectively.
Income taxes paid totaled $1,476, $1,037 and $789 in 2007, 2006 and 2005, respectively.

See Notes to Consolidated Financial Statements.

-90-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Contents**

| Note 1 | Summary of Significant Accounting Policies | 92 |
|---|---|---|
| Note 2 | Business Segments and Geographic Information | 101 |
| Note 3 | Financial Instruments and Other Inventory Positions | 103 |
| Note 4 | Fair Value of Financial Instruments | 106 |
| Note 5 | Securities Received and Pledged as Collateral | 110 |
| Note 6 | Securitizations and Special Purpose Entities | 110 |
| Note 7 | Identifiable Intangible Assets and Goodwill | 113 |
| Note 8 | Borrowings and Deposit Liabilities | 115 |
| Note 9 | Commitments, Contingencies and Guarantees | 119 |
| Note 10 | Stockholders' Equity | 122 |
| Note 11 | Earnings per Common Share | 124 |
| Note 12 | Shared-Based Employee Incentive Plans | 124 |
| Note 13 | Employee Benefit Plans | 128 |
| Note 14 | Income Taxes | 132 |
| Note 15 | Regulatory Requirements | 134 |
| Note 16 | Quarterly Information (unaudited) | 135 |

-91-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

## Note 1 Summary of Significant Accounting Policies

**Description of Business**

Lehman Brothers Holdings Inc. ("Holdings") and subsidiaries (collectively, the "Company," the "Firm," "Lehman Brothers," "we," "us" or "our") serves the financial needs of corporations, governments and municipalities, institutional clients and high net worth individuals worldwide with business activities organized in three segments, Capital Markets, Investment Banking and Investment Management. Founded in 1850, Lehman Brothers maintains market presence in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Firm is headquartered in New York, with regional headquarters in London and Tokyo, and operates in a network of offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region. We are a member of all principal securities and commodities exchanges in the U.S., and we hold memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

**Basis of Presentation**

The Consolidated Financial Statements are prepared in conformity with U.S. generally accepted accounting principles and include the accounts of Holdings, our subsidiaries, and all other entities in which we have a controlling financial interest or are considered to be the primary beneficiary. All material inter-company accounts and transactions have been eliminated upon consolidation. Certain prior-period amounts reflect reclassifications to conform to the current year's presentation.

On April 5, 2006, the stockholders of Holdings approved an increase of its authorized shares of common stock to 1.2 billion from 600 million, and the Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend, that was effected on April 28, 2006. All share and per share amounts have been retrospectively adjusted for the increase in authorized shares and the stock split. For additional information about the stock split, see Note 11, "Earnings per Common Share," and Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial Statements.

**Use of Estimates**

In preparing our Consolidated Financial Statements and accompanying notes, management makes various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in:

- measuring fair value of certain financial instruments;

- accounting for identifiable intangible assets and goodwill;

- establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations;

- assessing our ability to realize deferred taxes; and

- valuing equity-based compensation awards.

Estimates are based on available information and judgment. Therefore, actual results could differ from our estimates and that difference could have a material effect on our Consolidated Financial Statements and notes thereto.

**Consolidation Policies**

The Consolidated Financial Statements include the accounts of Holdings and the entities in which the Company has a controlling financial interest. We determine whether we have a controlling financial interest in an entity by first determining whether the entity is a voting interest entity (sometimes referred to as a non-VIE), a variable interest entity ("VIE") or a qualified special purpose entity ("QSPE").

*Voting Interest Entity.* Voting interest entities are entities that have (i) total equity investment at risk sufficient to fund expected future operations independently; and (ii) equity holders who have the obligation to absorb losses or receive residual returns and the right to make decisions about the entity's activities. In accordance with Accounting Research Bulletin ("ARB")

No. 51, *Consolidated Financial Statements,* and Statement of Financial Accounting Standards ("SFAS") No. 94, *Consolidation of All Majority-Owned Subsidiaries*, voting interest entities are consolidated when the Company has a controlling financial interest, typically more than 50 percent of an entity's voting interests.

***Variable Interest Entity.*** VIEs are entities that lack one or more voting interest entity characteristics. The Company consolidates VIEs in which it is the primary beneficiary. In accordance with Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 46-R, *Consolidation of Variable Interest Entities (revised December 2003)—an interpretation of*

-92-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

*ARB No. 51* ("FIN 46(R)"), we are the primary beneficiary if we have a variable interest, or a combination of variable interests, that will either (i) absorb a majority of the VIEs expected losses; (ii) receive a majority of the VIEs expected residual returns; or (iii) both. To determine if we are the primary beneficiary of a VIE, we review, among other factors, the VIE's design, capital structure, contractual terms, which interests create or absorb variability and related party relationships, if any. Additionally, we may calculate our share of the VIE's expected losses and expected residual returns based upon the VIE's contractual arrangements and/or our position in the VIE's capital structure. This type of analysis is typically performed using expected cash flows allocated to the expected losses and expected residual returns under various probability-weighted scenarios.

*Qualified Special Purpose Entity.* QSPEs are passive entities with limited permitted activities. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-a replacement of FASB Statement No. 125* ("SFAS 140"), establishes the criteria an entity must satisfy to be a QSPE, including types of assets held, limits on asset sales, use of derivatives and financial guarantees, and discretion exercised in servicing activities. In accordance with SFAS 140 and FIN 46(R), we do not consolidate QSPEs.

For a further discussion of our involvement with VIEs, QSPEs and other entities see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

*Equity-Method Investments.* Entities in which we do not have a controlling financial interest (and therefore do not consolidate) but in which we exert significant influence (generally defined as owning a voting interest of 20 percent to 50 percent, or a partnership interest greater than 3 percent) are accounted for either under Accounting Principles Board ("APB") Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock* or SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"). For further discussion of our adoption of SFAS 159, see "Accounting and Regulatory Developments—SFAS 159" below.

*Other.* When we do not consolidate an entity or apply the equity method of accounting, we present our investment in the entity at fair value. We have formed various non-consolidated private equity or other alternative investment funds with third-party investors that are typically organized as limited partnerships. We typically act as general partner for these funds, and when third-party investors have (i) rights to either remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights, we do not consolidate these partnerships in accordance with Emerging Issue Task Force ("EITF") No. 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights* ("EITF 04-5").

A determination of whether we have a controlling financial interest in an entity and therefore our assessment of consolidation of that entity is initially made at the time we become involved with the entity. Certain events may occur which cause us to re-assess our initial determination of whether an entity is a VIE or non-VIE or whether we are the primary beneficiary if the entity is a VIE and therefore our assessment of consolidation of that entity. Those events generally are:

- The entity's governance structure is changed such that either (i) the characteristics or adequacy of equity at risk are changed, or (ii) expected returns or losses are reallocated among the participating parties within the entity.

- The equity investment (or some part thereof) is returned to the equity investors and other interests become exposed to expected returns or losses.

- Additional activities are undertaken or assets acquired by the entity that were beyond those anticipated previously.

- Participants in the entity acquire or sell interests in the entity.

- The entity receives additional equity at risk or curtails its activities in a way that changes the expected returns or losses.

**Currency Translation**

Assets and liabilities of subsidiaries having non–U.S. dollar functional currencies are translated at exchange rates at the applicable Consolidated Statement of Financial Condition date. Revenues and expenses are translated at average exchange rates during the period. The gains or losses resulting from translating non-U.S. dollar functional currency into U.S. dollars, net of hedging gains or losses, are included in Accumulated other comprehensive income/(loss), net of tax, a component of

Stockholders' equity. Gains or losses resulting from non-U.S. dollar currency transactions are included in the Consolidated Statement of Income.

**Revenue Recognition Policies**

***Principal transactions.*** Realized and unrealized gains or losses from Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased, as well as the gains or losses

-93-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

from certain short- and long-term borrowing obligations, principally certain hybrid financial instruments, and certain deposit liabilities at banks that we measure at fair value are reflected in Principal transactions in the Consolidated Statement of Income.

*Investment banking.* Underwriting revenues, net of related underwriting expenses, and revenues for merger and acquisition advisory and other investment banking-related services are recognized when services for the transactions are completed. In instances where our Investment Banking segment provides structuring services and/or advice in a capital markets-related transaction, we record a portion of the transaction-related revenue as Investment Banking fee revenues.

*Commissions.* Commissions primarily include fees from executing and clearing client transactions on equities, options and futures markets worldwide. These fees are recognized on a trade-date basis.

*Interest and dividends revenue and interest expense.* We recognize contractual interest on Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased, excluding derivatives, on an accrual basis as a component of Interest and dividends revenue and Interest expense, respectively. We account for our secured financing activities and certain short- and long-term borrowings on an accrual basis with related interest recorded as interest revenue or interest expense, as applicable. Contractual interest expense on all deposit liabilities and certain hybrid financial instruments are recorded as a component of Interest expense.

*Asset management and other.* Investment advisory fees are recorded as earned. In certain circumstances, we receive asset management incentive fees when the return on assets under management exceeds specified benchmarks. Incentive fees are generally based on investment performance over a twelve-month period and are not subject to adjustment after the measurement period ends. Accordingly, we recognize incentive fees when the measurement period ends.

We also receive private equity incentive fees when the returns on certain private equity or other alternative investment funds' investments exceed specified thresholds. Private equity incentive fees typically are based on investment results over a period greater than one year, and future investment underperformance could require amounts previously distributed to us to be returned to the funds. Accordingly, we recognize these incentive fees when all material contingencies have been substantially resolved.

**Income Taxes**

We account for income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes*. We recognize the current and deferred tax consequences of all transactions that have been recognized in the financial statements using the provisions of the enacted tax laws. Deferred tax assets are recognized for temporary differences that will result in deductible amounts in future years and for tax loss carry-forwards. We record a valuation allowance to reduce deferred tax assets to an amount that more likely than not will be realized. Deferred tax liabilities are recognized for temporary differences that will result in taxable income in future years. Contingent liabilities related to income taxes are recorded when probable and reasonably estimable in accordance with SFAS No. 5, *Accounting for Contingencies*.

For a discussion of the impact of FIN 48, *Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109* ("FIN 48"), see "Accounting and Regulatory Developments—FIN 48" below.

**Share-Based Compensation**

On December 1, 2003, we adopted the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS 123"), using the prospective adoption method. Under this method of adoption, compensation expense was recognized over the related service periods based on the fair value of stock options and restricted stock units ("RSUs") granted for fiscal 2004 and fiscal 2005. Under SFAS 123, stock options granted in periods prior to fiscal 2004 continued to be accounted for under the intrinsic value method prescribed by APB No. 25, *Accounting for Stock Issued to Employees*. Accordingly, under SFAS 123 no compensation expense was recognized for stock option awards granted prior to fiscal 2004 because the exercise price equaled or exceeded the market value of our common stock on the grant date.

On December 1, 2005, we adopted SFAS No. 123 (revised 2004), *Share-Based Payment* ("SFAS 123(R)") using the modified-prospective transition method. Under this transition method, compensation cost recognized during fiscal 2006 includes: (i) compensation cost for all share-based awards granted prior to, but not yet vested as of, December 1, 2005, (including pre-fiscal-2004 options) based on the grant-date fair value and related service period estimates in accordance with the original provisions of SFAS 123; and (ii) compensation cost for all share-based awards granted subsequent to December 1, 2005, based

on the grant-date fair value and related service periods estimated in accordance with the provisions of SFAS 123(R). Under the provisions of the modified-prospective transition method, results for fiscal 2005 were not restated.

SFAS 123(R) clarifies and expands the guidance in SFAS 123 in several areas, including how to measure fair value and how to attribute compensation cost to reporting periods. Changes to the SFAS 123 fair value measurement and service

-94-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

period provisions prescribed by SFAS 123(R) include requirements to: (i) estimate forfeitures of share-based awards at the date of grant, rather than recognizing forfeitures as incurred as was permitted by SFAS 123; (ii) expense share-based awards granted to retirement-eligible employees and those employees with non-substantive non-compete agreements immediately, while our accounting practice under SFAS 123 was to recognize such costs over the stated service periods; (iii) attribute compensation costs of share-based awards to the future vesting periods, while our accounting practice under SFAS 123 included a partial attribution of compensation costs of share-based awards to services performed during the year of grant; and (iv) recognize compensation costs of all share-based awards (including amortizing pre-fiscal-2004 options) based on the grant-date fair value, rather than our accounting methodology under SFAS 123 which recognized pre-fiscal-2004 option awards based on their intrinsic value.

Prior to adopting SFAS 123(R) we presented the cash flows related to income tax deductions in excess of the compensation cost recognized on stock issued under RSUs and stock options exercised during the period ("excess tax benefits") as operating cash flows in the Consolidated Statement of Cash Flows. SFAS 123(R) requires excess tax benefits to be classified as financing cash flows. In addition, as a result of adopting SFAS 123(R), certain balance sheet amounts associated with share-based compensation costs have been reclassified within the equity section of the balance sheet. This change in presentation had no effect on our total equity. Effective December 1, 2005, Deferred stock compensation (representing unearned costs of RSU awards) and Common stock issuable are presented on a net basis as a component of Additional paid-in capital. See "Accounting and Regulatory Developments—SFAS 123(R)" below for a further discussion of SFAS 123(R) and the cumulative effect of this accounting change recognized in fiscal 2006.

**Earnings per Share**

We compute earnings per share ("EPS") in accordance with SFAS No. 128, *Earnings per Share*. Basic EPS is computed by dividing net income applicable to common stock by the weighted-average number of common shares outstanding, which includes RSUs for which service has been provided. Diluted EPS includes the components of basic EPS and also includes the dilutive effects of RSUs for which service has not yet been provided and employee stock options.

**Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned, excluding real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased are carried at fair value. Real estate held for sale is accounted for at the lower of its carrying amount or fair value less cost to sell. For further discussion of our financial instruments and other inventory positions, see Note 3, "Financial Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

Firm-owned securities pledged to counterparties who have the right, by contract or custom, to sell or repledge the securities are classified as Financial instruments and other inventory positions owned and are disclosed as pledged as collateral. For further discussion of our securities received and pledged as collateral, see Note 5, "Securities Received and Pledged as Collateral," to the Consolidated Financial Statements.

We adopted SFAS No. 157, *Fair Value Measurements* ("SFAS 157") effective December 1, 2006. SFAS 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When observable prices are not available, we either use implied pricing from similar instruments or valuation models based on net present value of estimated future cash flows, adjusted as appropriate for liquidity, credit, market and/or other risk factors.

Prior to December 1, 2006, we followed the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, *Brokers and Dealers in Securities*, when determining fair value for financial instruments, which permitted the recognition of a discount to the quoted price when determining the fair value for a substantial block of a particular security, when the quoted price was not considered to be readily realizable (*i.e.*, a block discount).

For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

***Derivative financial instruments.*** Derivatives are financial instruments whose value is based on an underlying asset (*e.g.*, Treasury bond), index (*e.g.*, S&P 500) or reference rate (*e.g.*, LIBOR), and include futures, forwards, swaps, option contracts, or other financial instruments with similar characteristics. A derivative contract generally represents a future commitment to exchange interest payment streams or currencies based on the contract or notional amount or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Over-the-counter ("OTC") derivative products are

privately-negotiated contractual agreements that can be tailored to meet individual client needs and include forwards, swaps and certain options including caps, collars and floors. Exchange-traded derivative products are standardized contracts transacted through regulated exchanges and include futures and certain option contracts listed on an exchange.

-95-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

Derivatives are recorded at fair value and included in either Financial instruments and other inventory positions owned or Financial instruments and other inventory positions sold but not yet purchased in the Consolidated Statement of Financial Condition. Derivatives are presented net-by-counterparty when a legal right of offset exists; net across different products or positions when applicable provisions are stated in a master netting agreement; and/or net of cash collateral received or paid on a counterparty basis, provided legal right of offset exists.

We enter into derivative transactions both in a trading capacity and as an end-user. Acting in a trading capacity, we enter into derivative transactions to satisfy the needs of our clients and to manage our own exposure to market and credit risks resulting from our trading activities (collectively, "Trading-Related Derivatives"). For Trading-Related Derivatives, margins on futures contracts are included in receivables and payables from/to brokers, dealers and clearing organizations, as applicable.

As an end-user, we primarily use derivatives to hedge our exposure to market risk (including foreign currency exchange and interest rate risks) and credit risks (collectively, "End-User Derivatives"). When End-User Derivatives are interest rate swaps they are measured at fair value through earnings and the carrying value of the related hedged item is adjusted through earnings for the effect of changes in the risk being hedged. The hedge ineffectiveness in these relationships is recorded in Interest expense in the Consolidated Statement of Income. When End-User Derivatives are used in hedges of net investments in non-U.S. dollar functional currency subsidiaries, the gains or losses are reported within Accumulated other comprehensive income/(loss), net of tax, in Stockholders' equity.

Prior to December 1, 2006, we followed EITF Issue No. 02-3, *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* ("EITF 02-3"). Under EITF 02-3, recognition of a trading profit at inception of a derivative transaction was prohibited unless the fair value of that derivative was obtained from a quoted market price supported by comparison to other observable inputs or based on a valuation technique incorporating observable inputs. Subsequent to the inception date ("Day 1"), we recognized trading profits deferred at Day 1 in the period in which the valuation of the instrument became observable. The adoption of SFAS 157 nullified the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs. For further discussion of our adoption of SFAS 157, see "Accounting and Regulatory Developments—SFAS 157" below.

***Securitization activities.*** In accordance with SFAS 140, we recognize transfers of financial assets as sales, if control has been surrendered. We determine control has been surrendered when the following three criteria have been met:

- The transferred assets have been isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership (*i.e.*, a true sale opinion has been obtained);

- Each transferee (or, if the transferee is a QSPE, each holder of its beneficial interests) has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or holder) from taking advantage of its right to pledge or exchange and provides more than a trivial benefit to the transferor; and

- The transferor does not maintain effective control over the transferred assets through either (i) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity or (ii) the ability to unilaterally cause the holder to return specific assets.

-96-

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

**Collateralized Lending Agreements and Financings**

Treated as collateralized agreements and financings for financial reporting purposes are the following:

- *Repurchase and resale agreements.* Securities purchased under agreements to resell and securities sold under agreements to repurchase are collateralized primarily by government and government agency securities and are carried net by counterparty, when permitted, at the amounts at which the securities subsequently will be resold or repurchased plus accrued interest. We take possession of securities purchased under agreements to resell. The fair value of the underlying positions is compared daily with the related receivable or payable balances, including accrued interest. We require counterparties to deposit additional collateral or return collateral pledged, as necessary, to ensure the fair value of the underlying collateral remains sufficient.

- *Securities borrowed and securities loaned.* Securities borrowed and securities loaned are carried at the amount of cash collateral advanced or received plus accrued interest. We value the securities borrowed and loaned daily and obtain additional cash as necessary to ensure these transactions are adequately collateralized. When we act as the lender of securities in a securities-lending agreement and we receive securities that can be pledged or sold as collateral, we recognize an asset, representing the securities received and a liability, representing the obligation to return those securities.

- *Other secured borrowings.* Other secured borrowings principally reflect transfers accounted for as financings rather than sales under SFAS 140. Additionally, Other secured borrowings includes non-recourse financings of entities that we have consolidated because we are the primary beneficiaries of such entities.

**Long-Lived Assets**

Property, equipment and leasehold improvements are recorded at historical cost, net of accumulated depreciation and amortization. Depreciation is recognized using the straight-line method over the estimated useful lives of the assets. Buildings are depreciated up to a maximum of 40 years. Leasehold improvements are amortized over the lesser of their useful lives or the terms of the underlying leases, which range up to 30 years. Equipment, furniture and fixtures are depreciated over periods of up to 10 years. Internal-use software that qualifies for capitalization under AICPA Statement of Position 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*, is capitalized and subsequently amortized over the estimated useful life of the software, generally three years, with a maximum of seven years. We review long-lived assets for impairment periodically and whenever events or changes in circumstances indicate the carrying amounts of the assets may be impaired. If the expected future undiscounted cash flows are less than the carrying amount of the asset, an impairment loss is recognized to the extent the carrying value of the asset exceeds its fair value.

**Identifiable Intangible Assets and Goodwill**

Identifiable intangible assets with finite lives are amortized over their expected useful lives, which range up to 15 years. Identifiable intangible assets with indefinite lives and goodwill are not amortized. Instead, these assets are evaluated at least annually for impairment. Goodwill is reduced upon the recognition of certain acquired net operating loss carryforward benefits.

**Cash Equivalents**

Cash equivalents include highly liquid investments not held for resale with maturities of three months or less when we acquire them.

**Accounting and Regulatory Developments**

The following summarizes accounting standards that have been issued during the periods covered by the Consolidated Financial Statements and the effect of adoption on our results of operations, if any, actual or estimated.

***SFAS 123(R).*** In December 2004, the FASB issued SFAS 123(R) which established standards of accounting for transactions in which an entity exchanges its equity instruments for goods and services and focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. Two key differences between SFAS 123 and SFAS 123(R) relate to attribution of compensation costs to reporting periods and accounting for award forfeitures. SFAS 123(R) generally requires the immediate expensing of equity-based awards granted to retirement-eligible

employees or awards granted subject to substantive non-compete agreements to be expensed over the non-compete period. SFAS 123(R) also requires expected forfeitures to be included in determining stock-based employee compensation expense. We adopted SFAS 123(R) as of the beginning of our 2006 fiscal year and recognized an after-tax gain of approximately $47 million as the cumulative effect of a change in accounting principle attributable to the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. For additional information, see "Share-

-97-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

Based Compensation" above and Note 12, "Share-Based Employee Incentive Plans," to the Consolidated Financial Statements.

**SFAS 155.** In February 2006, the FASB issued SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments— an amendment of FASB Statements No. 133 and 140* ("SFAS 155"), which permits an entity to measure at fair value any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation. As permitted, we early adopted SFAS 155 in the first quarter of 2006. The effect of adoption resulted in a $24 million after-tax ($43 million pre-tax) decrease to opening retained earnings as of the beginning of our 2006 fiscal year, representing the difference between the fair value of these hybrid financial instruments and the prior carrying value as of November 30, 2005.

**SFAS 156.** In March 2006, the FASB issued SFAS No. 156, *Accounting for Servicing of Financial Assets— an amendment of FASB Statement No. 140* ("SFAS 156"), which permits entities to elect to measure servicing assets and servicing liabilities at fair value and report changes in fair value in earnings. As a result of adopting SFAS 156, we recognized an $18 million after-tax ($33 million pre-tax) increase to opening retained earnings in our 2006 fiscal year.

**SFAS 157.** In September 2006, the FASB issued SFAS 157. SFAS 157 defines fair value, establishes a framework for measuring fair value, outlines a fair value hierarchy based on inputs used to measure fair value and enhances disclosure requirements for fair value measurements. SFAS 157 does not change existing guidance as to whether or not an instrument is carried at fair value.

SFAS 157 also (i) nullifies the guidance in EITF 02-3 that precluded the recognition of a trading profit at the inception of a derivative contract, unless the fair value of such derivative was obtained from a quoted market price or other valuation technique incorporating observable inputs; (ii) clarifies that an issuer's credit standing should be considered when measuring liabilities at fair value; (iii) precludes the use of a liquidity or block discount when measuring instruments traded in an active market at fair value; and (iv) requires costs related to acquiring financial instruments carried at fair value to be included in earnings as incurred.

We elected to early adopt SFAS 157 at the beginning of our 2007 fiscal year and we recorded the difference between the carrying amounts and fair values of (i) stand-alone derivatives and/or certain hybrid financial instruments measured using the guidance in EITF 02-3 on recognition of a trading profit at the inception of a derivative, and (ii) financial instruments that are traded in active markets that were measured at fair value using block discounts, as a cumulative-effect adjustment to opening retained earnings. As a result of adopting SFAS 157, we recognized a $45 million after-tax ($78 million pre-tax) increase to opening retained earnings. For additional information regarding our adoption of SFAS 157, see Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

**SFAS 158.** In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Retirement Plans* ("SFAS 158"), which requires an employer to recognize the over- or under-funded status of its defined benefit postretirement plans as an asset or liability in its Consolidated Statement of Financial Condition, measured as the difference between the fair value of the plan assets and the benefit obligation. For pension plans, the benefit obligation is the projected benefit obligation; while for other postretirement plans the benefit obligation is the accumulated postretirement obligation. Upon adoption, SFAS 158 requires an employer to recognize previously unrecognized actuarial gains and losses and prior service costs within Accumulated other comprehensive income/(loss) (net of tax), a component of Stockholders' equity. In accordance with the guidance in SFAS No. 158, we adopted this provision of the standard for the year ended November 30, 2007. The adoption of SFAS No. 158 reduced Accumulated other comprehensive income/ (loss), by $210 million after-tax ($344 million pre-tax) at November 30, 2007.

**SFAS 159.** In February 2007, the FASB issued SFAS 159 which permits certain financial assets and financial liabilities to be measured at fair value, using an instrument-by-instrument election. The initial effect of adopting SFAS 159 must be accounted for as a cumulative-effect adjustment to opening retained earnings for the fiscal year in which we apply SFAS 159. Retrospective application of SFAS 159 to fiscal years preceding the effective date is not permitted.

We elected to early adopt SFAS 159 beginning in our 2007 fiscal year and to measure at fair value substantially all hybrid financial instruments not previously accounted for at fair value under SFAS No. 155, as well as certain deposit liabilities at our U.S. banking subsidiaries. We elected to adopt SFAS 159 for these instruments to reduce the complexity of accounting for these instruments under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. As a result of adopting SFAS 159, we recognized a $22 million after-tax increase ($35 million pre-tax) to opening retained earnings as of December 1, 2006, representing the effect of changing the measurement basis of these financial instruments from an adjusted amortized cost basis at November 30, 2006 to fair value.

**SFAS 141(R).** In December 2007, the FASB issued SFAS No. 141(R), *Business Combinations* ("SFAS 141(R)"). SFAS 141 (R) expands the definition of transactions and events that qualify as business combinations; requires that the acquired

-98-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

assets and liabilities, including contingencies, be recorded at the fair value determined on the acquisition date and changes thereafter reflected in revenue, not goodwill; changes the recognition timing for restructuring costs; and requires acquisition costs to be expensed as incurred. Adoption of SFAS 141(R) is required for combinations after December 15, 2008. Early adoption and retroactive application of SFAS 141(R) to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

***SFAS 160.*** In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interest in Consolidated Financial Statements* ("SFAS 160"). SFAS 160 re-characterizes minority interests in consolidated subsidiaries as non-controlling interests and requires the classification of minority interests as a component of equity. Under SFAS 160, a change in control will be measured at fair value, with any gain or loss recognized in earnings. The effective date for SFAS 160 is for annual periods beginning on or after December 15, 2008. Early adoption and retroactive application of SFAS 160 to fiscal years preceding the effective date are not permitted. We are evaluating the impact of adoption on our Consolidated Financial Statements.

***FIN 48.*** In June 2006, the FASB issued FIN 48, which sets out a framework for management to use to determine the appropriate level of tax reserves to maintain for uncertain tax positions. This interpretation of SFAS 109 uses a two-step approach wherein a tax benefit is recognized if a position is more likely than not to be sustained, and the amount of benefit is then measured on a probabilistic approach, as defined in FIN 48. FIN 48 also sets out disclosure requirements to enhance transparency of an entity's tax reserves. We must adopt FIN 48 as of the beginning of our 2008 fiscal year. We estimate that the effect of adopting FIN 48 at the beginning of the first quarter of 2008 to be a decrease to opening retained earnings of approximately $190 million.

***SOP 07-1.*** In June 2007, the AICPA issued Statement of Position ("SOP") No. 07-1, *Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies* ("SOP 07-1"). SOP 07-1 addresses when the accounting principles of the AICPA Audit and Accounting Guide Investment Companies must be applied by an entity and whether those accounting principles must be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. SOP 07-1 is effective for our fiscal year beginning December 1, 2008. We are evaluating the effect of adopting SOP 07-1 on our Consolidated Financial Statements.

***EITF Issue No. 04-5.*** In June 2005, the FASB ratified the consensus reached in EITF 04-5 which requires general partners (or managing members in the case of limited liability companies) to consolidate their partnerships or to provide limited partners with either (i) rights to remove the general partner without cause or to liquidate the partnership; or (ii) substantive participation rights. As the general partner of numerous private equity and asset management partnerships, we adopted EITF 04-5 effective June 30, 2005 for partnerships formed or modified after June 29, 2005. For partnerships formed on or before June 29, 2005 that had not been modified, we adopted EITF 04-5 as of the beginning of our 2007 fiscal year. The adoption of EITF 04-5 did not have a material effect on our Consolidated Financial Statements.

***FSP FIN 46(R)-6.*** In April 2006, the FASB issued FASB Staff Position ("FSP") FIN 46(R)-6, *Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)* ("FSP FIN 46(R)-6"). This FSP addresses how a reporting enterprise should determine the variability to be considered in applying FIN 46(R) by requiring an analysis of the purpose for which an entity was created and the variability that the entity was designed to create. We adopted FSP FIN 46(R)-6 on September 1, 2006 and applied it prospectively to all entities in which we first became involved after that date. Adoption of FSP FIN 46(R)-6 did not have a material effect on our Consolidated Financial Statements.

***FSP FIN 39-1.*** In April 2007, the FASB directed the FASB Staff to issue FSP No. FIN 39-1, *Amendment of FASB Interpretation No. 39* ("FSP FIN 39-1"). FSP FIN 39-1 modifies FIN No. 39, *Offsetting of Amounts Related to Certain Contracts*, and permits companies to offset cash collateral receivables or payables with net derivative positions under certain circumstances. FSP FIN 39-1 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted. FSP FIN 39-1 does not affect our Consolidated Financial Statements because it clarified the acceptability of existing market practice, which we use, of netting cash collateral against net derivative assets and liabilities.

***FSP FIN 48-1.*** In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 48-1, *Definition of "Settlement" In FASB Interpretation No. 48* ("FSP FIN 48-1"). Under FSP FIN 48-1, a previously unrecognized tax benefit may be subsequently recognized if the tax position is effectively settled and other specified criteria are met. We are evaluating the effect of adopting FSP FIN 48-1 on our Consolidated Financial Statements as part of our evaluation of the effect of adopting FIN 48.

***FSP FIN 46(R)-7.*** In May 2007, the FASB directed the FASB Staff to issue FSP No. FIN 46(R)-7, *Application of FASB*

*Interpretation No. 46(R) to Investment Companies* ("FSP FIN 46(R)-7"). FSP FIN 46(R)-7 makes permanent the temporary deferral of the application of the provisions of FIN 46(R) to unregistered investment companies, and extends the scope exception from applying FIN 46(R) to include registered investment companies. FSP FIN 46(R)-7 is effective upon

-99-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

adoption of SOP 07-1. We are evaluating the effect of adopting FSP FIN 46(R)-7 on our Consolidated Financial Statements.

***SAB 108.*** In September 2006, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin ("SAB") No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 specifies how the carryover or reversal of prior-year unrecorded financial statement misstatements should be considered in quantifying a current-year misstatement. SAB 108 requires an approach that considers the amount by which the current-year statement of income is misstated ("rollover approach") and an approach that considers the cumulative amount by which the current-year statement of financial condition is misstated ("iron-curtain approach"). Prior to the issuance of SAB 108, either the rollover or iron-curtain approach was acceptable for assessing the materiality of financial statement misstatements. SAB 108 became effective for our fiscal year ended November 30, 2006. Upon adoption, SAB 108 allowed a cumulative-effect adjustment to opening retained earnings at December 1, 2005 for prior-year misstatements that were not material under a prior approach but that were material under the SAB 108 approach. Adoption of SAB 108 did not affect our Consolidated Financial Statements.

***SAB 109.*** In November 2007, the SEC issued SAB No. 109, *Written Loan Commitments Recorded at Fair Value Through Earnings* ("SAB 109"). SAB 109 supersedes SAB No. 105, *Loan Commitments Accounted for as Derivative Instruments* ("SAB 105"), and expresses the view, consistent with the guidance in SFAS 156 and SFAS 159, that the expected net future cash flows related to the associated servicing of the loan should be included in the measurement of all written loan commitments that are accounted for at fair value through earnings. SAB 105 also expressed the view that internally-developed intangible assets (such as customer relationship intangible assets) should not be recorded as part of the fair value of a derivative loan commitment. SAB 109 retains that view and broadens its application to all written loan commitments that are accounted for at fair value through earnings. Adoption of SAB 109 did not have a material affect on our Consolidated Financial Statements.

***Effect of Adoption.*** The table presented below summarizes the impact of adoption from the accounting developments summarized above on our results of operations, if any, actual or estimated:

| In millions | Date of Adoption | Accumulated Other Comprehensive Income/ (Loss) | Retained Earnings | Net Income |
|---|---|---|---|---|
| **Year Ended November 30, 2006** | | | | |
| SFAS 123(R) | December 1, 2005 | | | $ 47 |
| SFAS 155 | December 1, 2005 | $ | (24) | |
| SFAS 156 | December 1, 2005 | | 18 | |
| **Year Ended November 30, 2007** | | | | |
| SFAS 157 | December 1, 2006 | | 45 | |
| SFAS 158 | November 30, 2007 | $ (210) | | |
| SFAS 159 | December 1, 2006 | | 22 | |
| **Estimated Impact to Year Ended November 30, 2008** | | | | |
| FIN 48 | December 1, 2007 | | (190) | |

***The ASF Framework.*** On December 6, 2007, the American Securitization Forum ("ASF"), working with various constituency groups as well as representatives of U.S. federal government agencies, issued the *Streamlined Foreclosure and Loss Avoidance Framework for Securitized Subprime Adjustable Rate Mortgage Loans* (the "ASF Framework"). The ASF Framework provides guidance for servicers to streamline borrower evaluation procedures and to facilitate the use of foreclosure and loss prevention efforts in an attempt to reduce the number of U.S. subprime residential mortgage borrowers who might default in the coming year because the borrowers cannot afford to pay the increased loan interest rate after their U.S. subprime residential mortgage variable loan rate resets. The ASF Framework requires a borrower and its U.S. subprime residential mortgage variable loan to meet specific conditions to qualify for a modification under which the qualifying borrower's loan's interest rate would be kept at the existing rate, generally for five years following an upcoming reset period. The ASF Framework is focused on U.S. subprime first-lien adjustable-rate residential mortgages that have an initial fixed interest rate period of 36 months or less, are included in securitized pools, were originated between January 1, 2005 and July 31, 2007, and have an initial interest rate reset date between January 1, 2008 and July 31, 2010 (defined as "Segment 2 Subprime ARM Loans" within the ASF Framework).

On January 8, 2008, the SEC's Office of Chief Accountant (the "OCA") issued a letter (the "OCA Letter") addressing accounting issues that may be raised by the ASF Framework. Specifically, the OCA Letter expressed the view that if a

Segment 2 Subprime ARM Loan is modified pursuant to the ASF Framework and that loan could legally be modified, the OCA will not object to continued status of the transferee as a QSPE under SFAS 140. Concurrent with the issuance of the OCA Letter, the OCA requested the FASB to immediately address the issues that have arisen in the application of the QSPE guidance in SFAS 140. Any loan modifications we make in accordance with the ASF Framework will not have a

-100-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

material affect on our accounting for U.S. subprime residential mortgage loans nor securitizations or retained interests in securitizations of U.S. subprime residential mortgage loans.

**Basel II**. As of December 1, 2005, Holdings became regulated by the SEC as a consolidated supervised entity ("CSE"). This supervision imposes group-wide supervision and examination by the SEC, minimum capital requirements on a consolidated basis and reporting (including reporting of capital adequacy measurement consistent with the standards adopted by the Basel Committee on Banking Supervision) and notification requirements.

The Basel Committee on Banking Supervision published an updated framework to calculate risk-based capital requirements in June 2004 ("Basel II"). In September 2006, U.S. federal bank regulators announced their intent to implement Basel II in the U.S. On December 10, 2007, the U.S. federal bank regulators published final rules implementing the Basel II framework for the calculation of minimum capital requirements. Within the minimum capital requirements, or "first pillar" of Basel II, the federal rules deal only with the capital risk or banking book component. U.S. federal bank regulators have indicated that final rules to update market risk or trading book rules will be issued in the near future.

Basel II is meant to be applied on a consolidated basis for banking institutions or bank holding companies that have consolidated total assets of $250 billion or more and/or consolidated total on-balance-sheet foreign exposure of $10 billion or more. Basel II provides two broad methods for calculating minimum capital requirements related to credit risk (i) a standardized approach that relies heavily upon external credit assessments by major independent credit rating agencies; and (ii) an internal ratings-based approach that permits the use of internal rating assessments in determining required capital.

The time frame in which Basel II requirements would become effective for U.S. banking institutions or bank holding companies is contemplated to be (i) one or more years of parallel calculation, in which an entity would remain subject to existing risk-based capital rules but also calculate its risk-based capital requirements under the new Basel II framework; and (ii) two or three transition years, during which an entity would be subject to the new framework and an entity's minimum risk-based capital would be subject to a floor.

The Basel II framework is anticipated to impact our minimum capital requirements and reporting (including reporting of capital adequacy measurements) as a CSE.

---

**Note 2 Business Segments and Geographic Information**

---

**Business Segments**

We organize our business operations into three business segments: Capital Markets, Investment Banking and Investment Management.

Our business segment information for the periods ended in 2007, 2006 and 2005 is prepared using the following methodologies and generally represents the information that is relied upon by management in its decision-making processes:

- Revenues and expenses directly associated with each business segment are included in determining income before taxes.

- Revenues and expenses not directly associated with specific business segments are allocated based on the most relevant measures applicable, including each segment's revenues, headcount and other factors.

- Net revenues include allocations of interest revenue, interest expense and revaluation of certain long-term and short-term debt measured at fair value to securities and other positions in relation to the cash generated by, or funding requirements of, the underlying positions.

- Business segment assets include an allocation of indirect corporate assets that have been fully allocated to our segments, generally based on each segment's respective headcount figures.

**Capital Markets**. Our Capital Markets segment is divided into two components:

*Fixed Income* – We make markets in and trade municipal and public sector instruments, interest rate and credit products, mortgage-related securities and loan products, currencies and commodities. We also originate mortgages and we structure and

enter into a variety of derivative transactions. We also provide research covering economic, quantitative, strategic, credit, relative value, index and portfolio analyses. Additionally, we provide financing, advice and servicing activities to the hedge fund community, known as prime brokerage services. We engage in certain proprietary trading activities and in principal investing in real estate that are managed within this component.

-101-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

*Equities* – We make markets in and trade equities and equity-related products and enter into a variety of derivative transactions. We also provide equity-related research coverage as well as execution and clearing activities for clients. Through our capital markets prime services, we provide prime brokerage services to the hedge fund community. We also engage in certain proprietary trading activities and private equity and other related investments.

**Investment Banking.** We take an integrated approach to client coverage, organizing bankers into industry, product and geographic groups within our Investment Banking segment. Business activities provided to corporations and governments worldwide can be separated into:

*Global Finance* – We serve our clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products.

*Advisory Services* – We provide business advisory services with respect to mergers and acquisitions, divestitures, restructurings, and other corporate activities.

**Investment Management.** The Investment Management business segment consists of:

*Asset Management* – We provide customized investment management services for high net worth clients, mutual funds and other small and middle market institutional investors. Asset Management also serves as general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

*Private Investment Management* – We provide investment, wealth advisory and capital markets execution services to high net worth and middle market institutional clients.

**Business Segments**

| In millions | Capital Markets | Investment Banking | Investment Management | Total |
|---|---|---|---|---|
| **At and for the year ended November 30, 2007** | | | | |
| Gross revenues | $ 51,897 | $ 3,903 | $ 3,203 | $ 59,003 |
| Interest expense | 39,640 | — | 106 | 39,746 |
| Net revenues | 12,257 | 3,903 | 3,097 | 19,257 |
| Depreciation and amortization expense | 432 | 48 | 97 | 577 |
| Other expenses | 7,626 | 2,832 | 2,209 | 12,667 |
| Income before taxes | $ 4,199 | $ 1,023 | $ 791 | $ 6,013 |
| Segment assets (in billions) | $ 680.5 | $ 1.4 | $ 9.2 | $ 691.1 |
| **At and for the year ended November 30, 2006** | | | | |
| Gross revenues | $ 41,074 | $ 3,160 | $ 2,475 | $ 46,709 |
| Interest expense | 29,068 | — | 58 | 29,126 |
| Net revenues | 12,006 | 3,160 | 2,417 | 17,583 |
| Depreciation and amortization expense | 377 | 42 | 95 | 514 |
| Other expenses | 6,909 | 2,458 | 1,797 | 11,164 |
| Income before taxes | $ 4,720 | $ 660 | $ 525 | $ 5,905 |
| Segment assets (in billions) | $ 493.5 | $ 1.3 | $ 8.7 | $ 503.5 |
| **At and for the year ended November 30, 2005** | | | | |
| Gross revenues | $ 27,545 | $ 2,894 | $ 1,981 | $ 32,420 |
| Interest expense | 17,738 | — | 52 | 17,790 |
| Net revenues | 9,807 | 2,894 | 1,929 | 14,630 |
| Depreciation and amortization expense | 308 | 36 | 82 | 426 |
| Other expenses | 5,927 | 2,003 | 1,445 | 9,375 |
| Income before taxes | $ 3,572 | $ 855 | $ 402 | $ 4,829 |
| Segment assets (in billions) | $ 401.9 | $ 1.2 | $ 7.0 | $ 410.1 |

-102-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Net Revenues by Geographic Region**

We organize our operations into three geographic regions:

- Europe and the Middle East, inclusive of our operations in Russia and Turkey;

- Asia-Pacific, inclusive of our operations in Australia and India; and

- the Americas.

Net revenues presented by geographic region are based upon the location of the senior coverage banker or investment advisor in the case of Investment Banking or Asset Management, respectively, or where the position was risk managed within Capital Markets and Private Investment Management. Certain revenues associated with U.S. products and services that result from relationships with international clients have been classified as international revenues using an allocation process. In addition, expenses contain certain internal allocations, such as regional transfer pricing, which are centrally managed. The methodology for allocating the firm's revenues and expenses to geographic regions is dependent on the judgment of management.

The following presents, in management's judgment, a reasonable representation of each region's contribution to our operating results.

**Geographic Operating Results**

| | | Year Ended November 30, | |
|---|---|---|---|
| In millions | 2007 | 2006 | 2005 |
| **Europe and the Middle East** | | | |
| Net revenues | $ 6,296 | $ 4,536 | $ 3,601 |
| Non-interest expense | 4,221 | 3,303 | 2,689 |
| Income before taxes | 2,075 | 1,233 | 912 |
| **Asia-Pacific** | | | |
| Net revenues | 3,145 | 1,809 | 1,650 |
| Non-interest expense | 1,831 | 1,191 | 872 |
| Income before taxes | 1,314 | 618 | 778 |
| **Americas** | | | |
| U.S. | 9,634 | 11,116 | 9,270 |
| Other Americas | 182 | 122 | 109 |
| Net revenues | 9,816 | 11,238 | 9,379 |
| Non-interest expense | 7,192 | 7,184 | 6,240 |
| Income before taxes | 2,624 | 4,054 | 3,139 |
| **Total** | | | |
| Net revenues | 19,257 | 17,583 | 14,630 |
| Non-interest expense | 13,244 | 11,678 | 9,801 |
| Income before taxes | $ 6,013 | $ 5,905 | $ 4,829 |

**Note 3 Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased were comprised of the following:

| | Owned | | Sold But Not Yet Purchased | |
|---|---|---|---|---|
| In millions | Nov 30, 2007 | Nov 30, 2006 | Nov 30, 2007 | Nov 30, 2006 |
| Mortgage and asset-backed securities | $ 89,106 | $ 57,726 | $ 332 | $ 80 |
| Government and agencies | 40,892 | 47,293 | 71,813 | 70,453 |
| Corporate debt and other | 54,098 | 43,764 | 6,759 | 8,836 |
| Corporate equities | 58,521 | 43,087 | 39,080 | 28,464 |
| Real estate held for sale | 21,917 | 9,408 | — | — |

| | | | |
|---|---|---|---|
| Commercial paper and other money market instruments | 4,000 | 2,622 | 12 | 110 |
| Derivatives and other contractual agreements | 44,595 | 22,696 | 31,621 | 18,017 |
| | $ 313,129 | $ 226,596 $ | 149,617 $ | 125,960 |

-103-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

***Mortgage and asset-backed securities.*** Mortgage and asset-backed securities include residential and commercial whole loans and interests in residential and commercial mortgage-backed securitizations. Also included within Mortgage and asset-backed securities are securities whose cash flows are based on pools of assets in bankruptcy-remote entities, or collateralized by cash flows from a specified pool of underlying assets. The pools of assets may include, but are not limited to mortgages, receivables and loans.

It is our intent to sell through securitization or syndication activities, residential and commercial mortgage whole loans we originate, as well as those we acquire in the secondary market. We originated approximately $47 billion and $60 billion of residential mortgage loans in 2007 and 2006, respectively, and approximately $60 billion and $34 billion of commercial mortgage loans in 2007 and 2006, respectively.

Balances reported for Mortgage and asset-backed securities include approximately $12.8 billion and $5.5 billion in 2007 and 2006, respectively, of loans transferred to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The securitization vehicles issued securities that were distributed to investors. We do not consider ourselves to have economic exposure to the underlying assets in those securitization vehicles. For further discussion of our securitization activities, see Note 6, "Securitizations and Special Purpose Entities," to the Consolidated Financial Statements.

In 2007 and 2006, our inventory of Mortgage and asset-backed securities, excluding those that were accounted for as financings rather than sales under SFAS 140, generally included the following types of assets:

| In millions | November 30, 2007 | | November 30, 2006 |
|---|---|---|---|
| **Residential and Asset Backed:** | | | |
| Whole loans | $ | 19,587 | $ | 18,749 |
| Securities[1] | | 16,488 | | 7,923 |
| Servicing | | 1,183 | | 829 |
| Other | | 86 | | 16 |
| | $ | 37,344 | $ | 27,517 |
| **Commercial:** | | | |
| Whole loans | $ | 26,200 | $ | 22,426 |
| Securities[2] | | 12,180 | | 1,948 |
| Other | | 558 | | 351 |
| | $ | 38,938 | $ | 24,725 |
| Total | $ | 76,282 | $ | 52,242 |

[1] Includes approximately $7.1 billion of investment grade retained interests in securitizations and approximately $1.6 billion of non-investment grade retained interests in securitizations at November 30, 2007. Includes approximately $5.3 billion of investment grade retained interests in securitizations and approximately $2.0 billion of non-investment grade retained interests in securitizations at November 30, 2006.

[2] Includes approximately $2.4 billion of investment grade retained interests in securitizations and approximately $0.03 billion of non-investment grade retained interests in securitizations at November 30, 2007. Includes approximately $0.6 billion of investment grade retained interests in securitizations at November 30, 2006.

-104-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

In 2007 and 2006, our portfolio of U.S. subprime residential mortgages, a component of our Mortgage and asset-backed securities inventory, were:[1]

| In millions | | November 30, 2007 | | November 30, 2006 |
|---|---|---|---|---|
| U.S. residential subprime mortgages | | | | |
| Whole loans[1] | $ | 3,226 | $ | 4,978 |
| Retained interests in securitizations | | 1,995 | | 1,817 |
| Other | | 55 | | 54 |
| Total | $ | 5,276 | $ | 6,849 |

[1]    Excludes loans which were accounted for as financings rather than sales under SFAS 140 which were approximately $2.9 billion and $3.0 billion at November 30, 2007 and 2006, respectively.

***Government and agencies.*** Included within these balances are instruments issued by a national government or agency thereof, denominated in the country's own currency or in a foreign currency (*e.g.*, sovereign) as well as municipals.

***Corporate debt and other.*** Longer-term debt instruments, generally with a maturity date falling at least a year after their issue date, not issued by governments and may or may not be traded on major exchanges, are included within this component.

Non-derivative, physical commodities are reported as a component of this line item and were approximately $308 million in 2007. In 2006, we did not have any non-derivative, physical commodities.

***Corporate equities***. Balances generally reflect held positions in any instrument that has an equity ownership component, such as equity-related positions, public ownership equity securities that are listed on public exchanges, private equity-related positions and non-public ownership equity securities that are not listed on a public exchange.

***Real estate held for sale***. Real estate held for sale of $21.9 billion and $9.4 billion at November 30, 2007 and 2006, respectively, reflects our investments in parcels of land and related physical property. We invest in entities whose underlying assets are Real estate held for sale. We consolidate those entities in which we are the primary beneficiary in accordance with FIN 46(R). We do not consider ourselves to have economic exposure to the total underlying assets in those entities. Our net investment positions related to Real estate held for sale, excluding the amounts that have been consolidated but for which we do not consider ourselves to have economic exposure, was $12.8 billion and $5.9 billion at November 30, 2007 and 2006, respectively.

***Commercial paper and other money market instruments.*** Commercial paper and other money market instruments include short-term obligations, generally issued by financial institutions or corporations, with maturities within a calendar year of the financial statement date. These instruments may include promissory notes, drafts, checks and certificates of deposit.

***Derivatives and other contractual agreements.*** These balances generally represent future commitments to exchange interest payment streams or currencies based on contract or notional amounts or to purchase or sell other financial instruments or physical assets at specified terms on a specified date. Both over-the-counter and exchange-traded derivatives are reflected.

The following table presents the fair value of Derivatives and other contractual agreements at November 30, 2007 and 2006. Assets included in the table represent unrealized gains, net of unrealized losses, for situations in which we have a master netting agreement. Similarly, liabilities represent net amounts owed to counterparties. The fair value of derivative contracts represents our net receivable/payable for derivative financial instruments before consideration of securities collateral. Asset and liabilities are presented below net of cash collateral of approximately $19.7 billion and $17.5 billion, respectively, at November 30, 2007 and $11.1 billion and $8.2 billion, respectively, at November 30, 2006.

---

1    We generally define U.S. subprime residential mortgage loans as those associated with borrowers having a credit score in the range of 620 or lower using the Fair Isaac Corporation's statistical model, or having other negative factors within their credit profiles. Prior to its closure in our third quarter, we originated subprime residential mortgage loans through BNC Mortgage LLC ("BNC"), a wholly-owned subsidiary of our U.S. regulated thrift Lehman Brothers Bank, FSB. BNC served borrowers with stronger qualifying credit profiles but also served borrowers with stronger credit history as a result of broker relationships or product offerings and such loans are also included in our subprime business activity. For residential mortgage loans purchased from other mortgage originators, we use a similar subprime definition as for our origination activity. Additionally, second lien loans are included in our subprime business activity.

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Fair Value of Derivatives and Other Contractual Agreements**

| In millions | Nov 30, 2007 | | Nov 30, 2006 | |
| --- | --- | --- | --- | --- |
| | Assets | Liabilities | Assets | Liabilities |
| Over-the-Counter: [1] | | | | |
| Interest rate, currency and credit default swaps and options | $ 22,028 | $ 10,915 | $ 8,634 | $ 5,691 |
| Foreign exchange forward contracts and options | 2,479 | 2,888 | 1,792 | 2,145 |
| Other fixed income securities contracts (including TBAs and forwards) | 8,450 | 6,024 | 4,308 | 2,604 |
| Equity contracts (including equity swaps, warrants and options) | 8,357 | 9,279 | 4,739 | 4,744 |
| Exchange Traded: | | | | |
| Equity contracts (including equity swaps, warrants and options) | 3,281 | 2,515 | 3,223 | 2,833 |
| | $ 44,595 | $ 31,621 | $ 22,696 | $ 18,017 |

[1]    Our net credit exposure for OTC contracts is $34.6 billion and $15.6 billion at November 30, 2007 and 2006, respectively, representing the fair value of OTC contracts in a net receivable position, after consideration of collateral.

At November 30, 2007, our Derivatives and other contractual agreements include approximately $1.5 billion of both commodity derivative assets and liabilities. At November 30, 2006, our commodity derivative assets and liabilities were $268 million and liabilities of $277 million, respectively.

**Concentrations of Credit Risk**

A substantial portion of our securities transactions are collateralized and are executed with, and on behalf of, financial institutions, which includes other brokers and dealers, commercial banks and institutional clients. Our exposure to credit risk associated with the non-performance of these clients and counterparties in fulfilling their contractual obligations with respect to various types of transactions can be directly affected by volatile or illiquid trading markets, which may impair the ability of clients and counterparties to satisfy their obligations to us.

Financial instruments and other inventory positions owned include U.S. government and agency securities, and securities issued by non-U.S. governments, which in the aggregate represented 6% and 9% of total assets at November 30, 2007 and 2006, respectively. In addition, collateral held for resale agreements represented approximately 24% and 23% of total assets at November 30, 2007 and 2006, respectively, and primarily consisted of securities issued by the U.S. government, federal agencies or non-U.S. governments. Our most significant industry concentration is financial institutions, which includes other brokers and dealers, commercial banks and institutional clients. This concentration arises in the normal course of business.

**Note 4 Fair Value of Financial Instruments**

Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased, are presented at fair value. In addition, certain long and short-term borrowing obligations, principally certain hybrid financial instruments, and certain deposit liabilities at banks, are presented at fair value.

Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the Consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value. Hierarchical levels – defined by SFAS 157 and directly related to the amount of subjectivity associated with the inputs to fair valuation of these assets and liabilities – are as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

-106-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The types of assets and liabilities carried at Level I fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain hybrid financial instruments, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

**Fair Value on a Recurring Basis**

Assets and liabilities measured at fair value on a recurring basis are categorized in the tables below based upon the lowest level of significant input to the valuations.

| | Assets at Fair Value as of November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Level I | Level II | Level III | Total |
| Mortgage and asset-backed securities[1] | $    240 | $  63,672 | $  25,194 | $  89,106 |
| Government and agencies | 25,393 | 15,499 | — | 40,892 |
| Corporate debt and other | 324 | 50,692 | 3,082 | 54,098 |
| Corporate equities | 39,336 | 11,054 | 8,131 | 58,521 |
| Commercial paper and other money market instruments | 4,000 | — | — | 4,000 |
| Derivative assets[2] | 3,281 | 35,742 | 5,572 | 44,595 |
| | $  72,574 | $  176,659 | $  41,979 | $  291,212 |

[1]   Includes loans transferred to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The securitization vehicles issued securities that were distributed to investors. We do not consider ourselves to have economic exposure to the underlying assets in those securitization vehicles. The loans are reflected as an asset within Mortgages and asset-backed positions and the proceeds received from the transfer are reflected as a liability within Other secured borrowings. These loans are classified as Level II assets.

[2]   Derivative assets are presented on a net basis by level. Inter- and intra-level cash collateral, cross-product and counterparty netting at November 30, 2007 was approximately $38.8 billion.

| | Liabilities at Fair Value as of November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Level I | Level II | Level III | Total |
| Mortgage and asset-backed positions | $    — | $    332 | $    — | $    332 |
| Government and agencies | 67,484 | 4,329 | — | 71,813 |
| Corporate debt and other | 22 | 6,737 | — | 6,759 |
| Corporate equities | 39,080 | — | — | 39,080 |
| Commercial paper and other money market instruments | 12 | — | — | 12 |
| Derivative liabilities[1] | 2,515 | 26,011 | 3,095 | 31,621 |
| | $  109,113 | $  37,409 | $  3,095 | $  149,617 |

[1]   Derivative liabilities are presented on a net basis by level. Inter- and intra-level cash collateral, cross-product and counterparty netting at November 30, 2007 was approximately $36.6 billion.

**Level III Gains and Losses**

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income. Net realized gains associated with Level III financial instruments were approximately $1.3

billion for the fiscal year ended November 30, 2007. The net unrealized loss on Level III non-derivative financial instruments was approximately $2.5 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. The net unrealized gain on Level III derivative financial

-107-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

instruments was approximately $1.6 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized gains from equity and interest rate-related derivative positions. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

The table presented below summarizes the change in balance sheet carrying values associated with Level III financial instruments during the fiscal year ended November 30, 2007. Caution should be utilized when evaluating reported net revenues for Level III Financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions | Mortgage and asset-backed positions | Corporate debt and other | Corporate equities | Net derivatives | Total |
|---|---|---|---|---|---|
| Balance at December 1, 2006 | $ 8,575 | $ 1,924 | $ 2,427 | $ 686 | $ 13,612 |
| Net Payments, Purchases and Sales | 6,914 | 472 | 4,567 | 376 | 12,329 |
| Net Transfers In/(Out) | 11,373 | 567 | 687 | (90) | 12,537 |
| Gains/(Losses)[1] | | | | | |
| Realized | 995 | 110 | 309 | (78) | 1,336 |
| Unrealized | (2,663) | 9 | 141 | 1,583 | (930) |
| Balance at November 30, 2007 | $ 25,194 | $ 3,082 | $ 8,131 | $ 2,477 | $ 38,884 |

[1]     Realized or unrealized gains/(losses) from changes in values of Level III Financial instruments represent gains/(losses) from changes in values of those Financial instruments only for the period(s) in which the instruments were classified as Level III.

The table presented below summarizes the change in balance sheet carrying value associated with Level III financial instruments during each quarterly period in the 2007 fiscal year. Caution should be utilized when evaluating reported net revenues for Level III financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions | Mortgage and asset-backed positions | Corporate debt and other | Corporate equities | Net derivatives | Total |
|---|---|---|---|---|---|
| Balance at December 1, 2006 | $ 8,575 | $ 1,924 | $ 2,427 | $ 686 | $ 13,612 |
| Net Payments, Purchases and Sales | 2,349 | 428 | 210 | 283 | 3,270 |
| Net Transfers In/(Out) | 137 | — | — | — | 137 |
| Gains/(Losses)[1] | | | | | |
| Realized | 176 | 19 | 21 | 7 | 223 |
| Unrealized | (80) | 13 | 13 | 158 | 104 |
| Balance at February 28, 2007 | 11,157 | 2,384 | 2,671 | 1,134 | 17,346 |
| Net Payments, Purchases and Sales | 1,677 | 50 | 972 | (6) | 2,693 |
| Net Transfers In/(Out) | (101) | 95 | 352 | 39 | 385 |
| Gains/(Losses) [1] | | | | | |
| Realized | 274 | 31 | 5 | 48 | 358 |
| Unrealized | (131) | (11) | 135 | 65 | 58 |
| Balance at May 31, 2007 | 12,876 | 2,549 | 4,135 | 1,280 | 20,840 |
| Net Payments, Purchases and Sales | 1,674 | (299) | 446 | (59) | 1,762 |
| Net Transfers In/(Out) | 9,856 | (144) | 232 | (160) | 9,784 |
| Gains/(Losses) [1] | | | | | |
| Realized | 210 | 7 | 37 | (4) | 250 |
| Unrealized | (825) | 19 | 62 | 543 | (201) |
| Balance at August 31, 2007 | 23,791 | 2,132 | 4,912 | 1,600 | 32,435 |
| Net Payments, Purchases and Sales | 1,213 | 292 | 2,939 | 157 | 4,601 |
| Net Transfers In/(Out) | 1,480 | 615 | 103 | 31 | 2,229 |
| Gains/(Losses) [1] | | | | | |
| Realized | 255 | 47 | 227 | (166) | 363 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Unrealized | | | (1,545) | | (4) | (50) | | 855 | (744) |
| Balance at November 30, 2007 | $ | 25,194 | $ | 3,082 | $ | 8,131 | $ | 2,477 | $ 38,884 |

(1)    Realized or unrealized gains/(losses) from changes in values of Level III Financial instruments represent gains/(losses) from changes in values of those Financial instruments only for the period(s) in which the instruments were classified as Level III.

-108-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Fair Value Option**

SFAS 159 permits certain financial assets and liabilities to be measured at fair value, using an instrument-by-instrument election. Changes in the fair value of the financial assets and liabilities for which the fair value option was made are reflected in Principal transactions in our Consolidated Statement of Income. As indicated above in the fair value hierarchy tables and further discussed in Note 1, "Summary of Significant Accounting Policies, Accounting and Regulatory Developments—SFAS 159," we elected to account for the following financial assets and liabilities at fair value:

*Certain hybrid financial instruments*. These instruments are primarily structured notes that are risk managed on a fair value basis and within our Capital Market activities and for which hedge accounting under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, had been complex to maintain. Changes in the fair value of these liabilities, excluding any Interest income or Interest expense, are reflected in Principal transactions in our Consolidated Statement of Income. We calculate the impact of our own credit spread on hybrid financial instruments carried at fair value by discounting future cash flows at a rate which incorporates observable changes in our credit spread. The estimated changes in the fair value of these liabilities were gains of approximately $1.3 billion, attributable to the widening of our credit spreads during fiscal year 2007. As of November 30, 2007, the aggregate principal amount of hybrid financial instruments classified as short-term borrowings and measured at fair value exceeded the fair value by approximately $152 million. Additionally and as of November 30, 2007, the aggregate principal amount of hybrid financial instruments classified as long-term borrowings and measured at fair value exceeded the fair value by approximately $2.1 billion.

*Other secured borrowings.* Certain liabilities recorded as Other secured borrowings include the proceeds received from transferring loans to securitization vehicles where such transfers were accounted for as secured financings rather than sales under SFAS 140. The transferred loans are reflected as an asset within Mortgages and asset-backed positions and also accounted for at fair value and categorized as Level II in the fair value hierarchy. We do not consider ourselves to have economic exposure to the underlying assets in these securitization vehicles. The change in fair value attributable to the observable impact from instrument-specific credit risk was not material to our results of operations.

*Deposit liabilities at banks*. We elected to account for certain deposits at our U.S. banking subsidiaries at fair value. The change in fair value attributable to the observable impact from instrument-specific credit risk was not material to our results of operations. As of November 30, 2007, the difference between the fair value and the aggregate principal amount of deposit liabilities at banks carried at fair value was not material.

Liabilities for which the fair value option was elected are categorized in the table below based upon the lowest level of significant input to the valuations.

| In millions | At Fair Value as of November 30, 2007 | | | |
| --- | --- | --- | --- | --- |
| | Level I | Level II | Level III | Total |
| Certain hybrid financial instruments: | | | | |
| Short-term borrowings | — | $   9,035 | — | $   9,035 |
| Long-term borrowings | — | $ 27,204 | — | $ 27,204 |
| Other secured borrowings | — | $   9,149 | — | $   9,149 |
| Deposit liabilities at banks | — | $ 15,986 | — | $ 15,986 |

**Fair Value on a Nonrecurring Basis**

The Company uses fair value measurements on a nonrecurring basis in its assessment of assets classified as Goodwill and other inventory positions classified as Real estate held for sale. These assets and inventory positions are recorded at fair value initially and assessed for impairment periodically thereafter. During the fiscal year ended November 30, 2007, the carrying amount of Goodwill assets were compared to their fair value. No change in carrying amount resulted in accordance with the provisions of SFAS No. 142, *Goodwill and Other Intangible Assets*. Additionally and on a nonrecurring basis during the fiscal year ended November 30, 2007, the carrying amount of Real estate held for sale positions were compared to their fair value less cost to sell. No change in carrying amount resulted in accordance with the provisions of SFAS No. 66, *Accounting for Sales of Real Estate*, SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets*, and other relevant accounting guidance. The lowest level of inputs for fair value measurements for Goodwill and Real estate held for sale are Level III.

For additional information regarding Goodwill, see Note 7, "Identifiable Intangible Assets and Goodwill," to the Consolidated Financial Statements. For additional information regarding our inventory of Real estate held for sale, see Note 3, "Financial

Instruments and Other Inventory Positions," to the Consolidated Financial Statements.

-109-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Valuation Techniques**

In accordance with SFAS 157, valuation techniques used for assets and liabilities accounted for at fair value are generally categorized into three types:

*Market Approach.* Market approach valuation techniques use prices and other relevant information from market transactions involving identical or comparable assets or liabilities. Valuation techniques consistent with the market approach include comparables and matrix pricing. Comparables use market multiples, which might lie in ranges with a different multiple for each comparable. The selection of where within the range the appropriate multiple falls requires judgment, considering both quantitative and qualitative factors specific to the measurement. Matrix pricing is a mathematical technique used principally to value certain securities without relying exclusively on quoted prices for the specific securities but comparing the securities to benchmark or comparable securities.

*Income Approach.* Income approach valuation techniques convert future amounts, such as cash flows or earnings, to a single present amount, or a discounted amount. These techniques rely on current market expectations of future amounts. Examples of income approach valuation techniques include present value techniques; option-pricing models, binomial or lattice models that incorporate present value techniques; and the multi-period excess earnings method.

*Cost Approach.* Cost approach valuation techniques are based upon the amount that, at present, would be required to replace the service capacity of an asset, or the current replacement cost. That is, from the perspective of a market participant (seller), the price that would be received for the asset is determined based on the cost to a market participant (buyer) to acquire or construct a substitute asset of comparable utility.

The three approaches described within SFAS 157 are consistent with generally accepted valuation methodologies. While all three approaches are not applicable to all assets or liabilities accounted for at fair value, where appropriate and possible, one or more valuation techniques may be used. The selection of the valuation method(s) to apply considers the definition of an exit price and the nature of the asset or liability being valued and significant expertise and judgment is required. For assets and liabilities accounted for at fair value, excluding Goodwill and Real estate held for sale, valuation techniques are generally a combination of the market and income approaches. Goodwill and Real estate held for sale valuation techniques generally combine income and cost approaches. For the fiscal year ended November 30, 2007, the application of valuation techniques applied to similar assets and liabilities has been consistent.

**Note 5 Securities Received and Pledged as Collateral**

We enter into secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs. We receive collateral in connection with resale agreements, securities borrowed transactions, borrow/pledge transactions, client margin loans and derivative transactions. We generally are permitted to sell or repledge these securities held as collateral and use them to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions.

At November 30, 2007 and 2006, the fair value of securities received as collateral that we were permitted to sell or repledge was approximately $798 billion and $621 billion, respectively. The fair value of securities received as collateral that we sold or repledged was approximately $725 billion and $568 billion at November 30, 2007 and 2006, respectively.

We also pledge our own assets, primarily to collateralize certain financing arrangements. These pledged securities, where the counterparty has the right by contract or custom to sell or repledge the financial instruments, were approximately $63 billion and $43 billion at November 30, 2007 and 2006, respectively. The carrying value of Financial instruments and other inventory positions owned that have been pledged or otherwise encumbered to counterparties where those counterparties do not have the right to sell or repledge, was approximately $87 billion and $75 billion at November 30, 2007 and 2006, respectively.

**Note 6 Securitizations and Special Purpose Entities**

Generally, residential and commercial mortgages, home equity loans, municipal and corporate bonds, and lease and trade receivables are financial assets that we securitize through SPEs. We may continue to hold an interest in the financial assets securitized in the form of the securities created in the transaction, including residual interests ("interests in securitizations") established to facilitate the securitization transaction. Interests in securitizations are presented within Financial instruments and other inventory positions owned (primarily in mortgages and asset-backed securities and government and agencies) in the

Consolidated Statement of Financial Condition. For additional information regarding the accounting for securitization

-110-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

transactions, see Note 1, "Summary of Significant Accounting Policies— Consolidation Accounting Policies," to the Consolidated Financial Statements.

For the periods ended November 30, 2007 and 2006, we securitized the following financial assets:

| In millions | Year Ended November 30, | |
| --- | --- | --- |
| | **2007** | **2006** |
| Residential mortgages | $ 100,053 | $ 145,860 |
| Commercial mortgages | 19,899 | 18,961 |
| Municipal and other asset-backed financial instruments | 5,532 | 3,624 |
| Total | $ 125,484 | $ 168,445 |

At November 30, 2007 and 2006 we had approximately $1.6 billion and $2.0 billion, respectively, of non-investment grade interests from our securitization activities.

The table below presents: the fair value of our interests in securitizations at November 30, 2007 and 2006; model assumptions of market factors, sensitivity of valuation models to adverse changes in the assumptions, as well as cash flows received on such interests in the securitizations. The sensitivity analyses presented below are hypothetical and should be used with caution since the stresses are performed without considering the effect of hedges, which serve to reduce our actual risk. We mitigate the risks associated with the below interests in securitizations through various risk management dynamic hedging strategies. These results are calculated by stressing a particular economic assumption independent of changes in any other assumption (as required by U.S. GAAP). In reality, changes in one factor often result in changes in another factor which may counteract or magnify the effect of the changes outlined in the table below. Changes in the fair value based on a 10% or 20% variation in an assumption should not be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear.

**Securitization Activity**

| Dollars in millions | November 30, 2007 | | | | | | November 30, 2006 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Residential Mortgages | | | | | | Residential Mortgages | | | | | |
| | Investment Grade[1] | | Non-Investment Grade | | Other[2] | | Investment Grade[1] | | Non-Investment Grade | | Other[2] | |
| Interests in securitizations (in billions) | $ | 7.1 | $ | 1.6 | $ | 2.6 | $ | 5.3 | $ | 2.0 | $ | 0.6 |
| Weighted-average life (years) | | 9 | | 4 | | 6 | | 5 | | 6 | | 5 |
| Average constant prepayment rate | | 12.4% | | 17.0% | | — | | 27.2% | | 29.1% | | — |
| Effect of 10% adverse change | $ | 55 | $ | 8 | $ | — | $ | 21 | $ | 61 | $ | — |
| Effect of 20% adverse change | $ | 111 | $ | 10 | $ | — | $ | 35 | $ | 110 | $ | — |
| Weighted-average credit loss assumption | | 0.5% | | 2.4% | | 0.7% | | 0.6% | | 1.3% | | — |
| Effect of 10% adverse change | $ | 107 | $ | 104 | $ | 6 | $ | 70 | $ | 109 | $ | — |
| Effect of 20% adverse change | $ | 197 | $ | 201 | $ | 12 | $ | 131 | $ | 196 | $ | — |
| Weighted-average discount rate | | 7.7% | | 19.4% | | 7.3% | | 7.2% | | 18.4% | | 5.8% |
| Effect of 10% adverse change | $ | 245 | $ | 53 | $ | 84 | $ | 124 | $ | 76 | $ | 13 |
| Effect of 20% adverse change | $ | 489 | $ | 102 | $ | 166 | $ | 232 | $ | 147 | $ | 22 |

[1] The amount of investment-grade interests in securitizations related to agency collateralized mortgage obligations was approximately $2.5 billion and $1.9 billion at November 30, 2007 and 2006, respectively.

[2] At November 30, 2007, other interests in securitizations included approximately $2.4 billion of investment grade commercial mortgages, approximately $26 million of non-investment grade commercial mortgages and the remainder relates to municipal products. At November 30, 2006, other interests in securitizations included approximately $0.6 billion of investment grade commercial mortgages.

-111-

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

**Cash flows received on interests in securitizations**

| | November 30, 2007 | | | November 30, 2006 | | |
| | Residential Mortgages | | | Residential Mortgages | | |
| In millions | Investment Grade | Non-Investment Grade | Other | Investment Grade | Non-Investment Grade | Other |
|---|---|---|---|---|---|---|
| | $    898 | $    633 | $    130 | $    664 | $    216 | $    59 |

*Mortgage servicing rights*. Mortgage servicing rights ("MSRs") represent the right to future cash flows based upon contractual servicing fees for mortgage loans and mortgage-backed securities. Our MSRs generally arise from the securitization of residential mortgage loans that we originate. MSRs are presented within Financial instruments and other inventory positions owned on the Consolidated Statement of Financial Condition. Effective with the adoption of SFAS 156 as of the beginning of our 2006 fiscal year, MSRs are carried at fair value, with changes in fair value reported in earnings in the period in which the change occurs. At November 30, 2007 and 2006, the Company had MSRs of approximately $1.2 billion and $829 million, respectively. Our MSRs activities for the year ended November 30, 2007 and 2006 are as follows:

| | Year Ended November 30, | |
| In millions | 2007 | 2006 |
|---|---|---|
| Balance, beginning of period | $829 | $561 |
| Additions, net | 368 | 507 |
| Changes in fair value: | | |
| Paydowns/servicing fees | (209) | (192) |
| Resulting from changes in valuation assumptions | 195 | (80) |
| Change due to SFAS 156 adoption | — | 33 |
| Balance, end of period | $1,183 | $829 |

The determination of MSRs fair value is based upon a discounted cash flow valuation model. Cash flow and prepayment assumptions used in our discounted cash flow model are: based on empirical data drawn from the historical performance of our MSRs; consistent with assumptions used by market participants valuing similar MSRs; and from data obtained on the performance of similar MSRs. These variables can, and generally will, vary from quarter to quarter as market conditions and projected interest rates change. For that reason, risk related to MSRs directly correlates to changes in prepayment speeds and discount rates. We mitigate this risk by entering into hedging transactions.

The following table shows the main assumptions used to determine the fair value of our MSRs at November 30, 2007 and 2006, the sensitivity of our MSRs' fair value measurements to changes in these assumptions, and cash flows received on contractual servicing:

| | At November 30, | |
| Dollars in millions | 2007 | 2006 |
|---|---|---|
| Weighted-average prepayment speed (CPR) | 24.5% | 31.1% |
| Effect of 10% adverse change | $    102 | $    84 |
| Effect of 20% adverse change | $    190 | $    154 |
| Discount rate | 6.5% | 8.0% |
| Effect of 10% adverse change | $    20 | $    17 |
| Effect of 20% adverse change | $    39 | $    26 |
| | | |
| Cash flows received on contractual servicing | $    276 | $    255 |

The above sensitivity analysis is hypothetical and should be used with caution since the stresses are performed without considering the effect of hedges, which serve to reduce our actual risk. These results are calculated by stressing a particular economic assumption independent of changes in any other assumption (as required by U.S. GAAP). In reality, changes in one factor often result in changes in another factor which may counteract or magnify the effect of the changes outlined in the above table. Changes in the fair value based on a 10% or 20% variation in an assumption should not be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear.

***Non-QSPE activities***. We have transactional activity with SPEs that do not meet the QSPE criteria because their permitted activities are not limited sufficiently or the assets are non-qualifying financial instruments (*e.g.*, real estate). These SPEs issue credit-linked notes, invest in real estate or are established for other structured financing transactions designed to meet clients' investing or financing needs.

-112-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

A collateralized debt obligation ("CDO") transaction involves the purchase by an SPE of a diversified portfolio of securities and/or loans that are then managed by an independent asset manager. Interests in the SPE (debt and equity) are sold to third party investors. Our primary role in a CDO is to act as structuring and placement agent, warehouse provider, underwriter and market maker in the related CDO securities. In a typical CDO, at the direction of a third party asset manager, we will temporarily warehouse securities or loans on our balance sheet pending the sale to the SPE once the permanent financing is completed. At November 30, 2007 and 2006, we owned approximately $581.2 million and $55.1 million of equity securities in CDOs, respectively. Because our investments do not represent a majority of the CDOs' equity, we are not exposed to the majority of the CDOs' expected losses. Accordingly, we are not the primary beneficiary of the CDOs and therefore we do not consolidate them.

As a dealer in credit default swaps, we make a market in buying and selling credit protection on single issuers as well as on portfolios of credit exposures. We mitigate our credit risk, in part, by purchasing default protection through credit default swaps with SPEs. We pay a premium to the SPEs for assuming credit risk under the credit default swap. In these transactions, SPEs issue credit-linked notes to investors and use the proceeds to invest in high quality collateral. Our maximum potential loss associated with our involvement with such credit-linked note transactions is measured by the fair value of our credit default swaps with such SPEs. At November 30, 2007 and 2006, respectively, the fair values of these credit default swaps were $3.9 billion and $155 million. The underlying investment grade collateral held by SPEs where we are the first-lien holder was $15.7 billion and $10.8 billion at November 30, 2007 and 2006, respectively.

Because the investors assume default risk associated with both the reference portfolio and the SPEs' assets, our expected loss calculations generally demonstrate the investors in the SPEs bear a majority of the entity's expected losses. Accordingly, we generally are not the primary beneficiary and therefore do not consolidate these SPEs. In instances where we are the primary beneficiary of the SPEs, we consolidate the SPEs. At November 30, 2007 and 2006, we consolidated approximately $180 million and $718 million of these SPEs, respectively. The assets associated with these consolidated SPEs are presented as a component of Financial instruments and other inventory positions owned, and the liabilities are presented as a component of Other secured borrowings.

We also invest in real estate directly through consolidated subsidiaries and through VIEs. We consolidate our investments in real estate VIEs when we are the primary beneficiary. We record the assets of these consolidated real estate VIEs as a component of Financial instruments and other inventory positions owned, and the liabilities are presented as a component of Other secured borrowings. At November 30, 2007 and 2006, we consolidated approximately $9.8 billion and $3.4 billion, respectively, of real estate-related investments. After giving effect to non-recourse financing, our net investment position in these consolidated real estate VIEs was $6.0 billion and $2.2 billion at November 30, 2007 and 2006, respectively.

The following table summarizes our non-QSPE activities at November 30, 2007 and 2006:

| In millions | | At November 30, | |
| --- | --- | --- | --- |
| | | 2007 | 2006 |
| Credit default swaps with SPEs | $ | 3,859 | $ 155 |
| Value of underlying investment-grade collateral | | 15,744 | 10,754 |
| Value of assets consolidated | | 180 | 718 |
| Consolidated real estate VIEs | | 9,786 | 3,380 |
| Net investment | | 6,012 | 2,180 |

In addition to the above, we enter into other transactions with SPEs designed to meet clients' investment and/or funding needs. For further discussion of our SPE-related and other commitments, see Note 9, "Commitments, Contingencies and Guarantees," to the Consolidated Financial Statements.

## Note 7 Identifiable Intangible Assets and Goodwill

For the years ended November 30, 2007, 2006 and 2005, aggregate amortization expense for intangible assets, primarily customer lists, was approximately $47 million, $50 million, and $49 million, respectively. Estimated amortization expense for each of the years ending November 30, 2008 through 2012 are as follows:

| In thousands | 2008 | 2009 | 2010 | 2011 | 2012 |
| --- | --- | --- | --- | --- | --- |
| Estimated amortization expense | $ 52,636 | $ 41,283 | $ 39,760 | $ 38,369 | $ 37,531 |

-113-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

**Identifiable Intangible Assets**

| In millions | November 30, 2007 | | November 30, 2006 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Amortizable intangible assets: | | | | |
| Customer lists | $      580 | $      143 | $      504 | $      110 |
| Other | 98 | 65 | 82 | 51 |
| | $      678 | $      208 | $      586 | $      161 |
| Intangible assets not subject to amortization: | | | | |
| Mutual fund customer-related intangibles | $      395 | | $      395 | |
| Trade name | 125 | | 125 | |
| | $      520 | | $      520 | |

The changes in the carrying amount of goodwill for the years ended November 30, 2007 and 2006 are as follows:

**Goodwill**

| In millions | Capital Markets | Investment Management | Total |
|---|---|---|---|
| Balance (net) at November 30, 2005 | $      187 | $      2,083 | $      2,270 |
| Goodwill acquired | 116 | — | 116 |
| Purchase price valuation adjustment | 25 | 6 | 31 |
| Balance (net) at November 30, 2006 | 328 | 2,089 | 2,417 |
| Goodwill acquired | 593 | 168 | 761 |
| Goodwill disposed | (53) | — | (53) |
| Purchase price valuation adjustment | 12 | — | 12 |
| Balance (net) at November 30, 2007 | $      880 | $      2,257 | $      3,137 |

-114-

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

**Note 8 Borrowings and Deposit Liabilities**

Borrowings and deposit liabilities at banks at November 30, 2007 and 2006 consisted of the following:

| In millions | At November 30, | | | |
|---|---|---|---|---|
| | 2007 | | 2006 | |
| **Short-term borrowings** | | | | |
| Unsecured | | | | |
| Current portion of long-term borrowings | $ | 16,801 | $ | 12,878 |
| Commercial paper | | 3,101 | | 1,653 |
| Other[1] | | 7,645 | | 5,880 |
| Secured | | 519 | | 227 |
| Total | $ | 28,066 | $ | 20,638 |
| Amount carried at fair value[2] | $ | 9,035 | $ | 6,064 |
| Weighted-average contractual interest rate | | 4.54% | | 5.39% |
| | | | | |
| **Deposit liabilities at banks** | | | | |
| Time deposits | | | | |
| At U.S. banks | $ | 16,189 | $ | 14,592 |
| At non-U.S. banks | | 10,974 | | 5,621 |
| Savings deposits | | | | |
| At U.S. banks | | 1,556 | | 1,199 |
| At non-U.S. banks | | 644 | | — |
| Total | $ | 29,363 | $ | 21,412 |
| Amount carried at fair value[2] | $ | 15,986 | $ | 14,708 |
| Weighted-average contractual interest rate | | 4.67% | | 4.66% |
| | | | | |
| **Long-term borrowings** | | | | |
| Senior notes | $ | 108,914 | $ | 75,202 |
| Subordinated notes | | 9,259 | | 3,238 |
| Junior subordinated notes | | 4,977 | | 2,738 |
| Total[3] | $ | 123,150 | $ | 81,178 |
| Amount carried at fair value[2] | $ | 27,204 | $ | 11,025 |
| Weighted-average contractual interest rate[4] | | 4.38% | | 4.32% |

[1] Principally certain hybrid financial instruments with maturities of less than one year and zero-strike warrants.

[2] Certain borrowings and deposit liabilities at banks are carried at fair value in accordance with SFAS 155, SFAS 157 and SFAS 159. For additional information, see Note 1, "Summary of Significant Accounting Polices," and Note 4, "Fair Value of Financial Instruments," to the Consolidated Financial Statements.

[3] In accordance with SFAS No. 107, "*Disclosures about Fair Value of Financial Instruments,*" the carrying amount of our total long-term borrowings can be approximated at fair value using a discounted cash flow valuation model with inputs of quoted market prices for similar types of borrowing arrangements. The estimated fair value of our long-term borrowings at November 30, 2007 was approximately $4.8 billion less than the carrying amount. The estimated fair value of our long-term borrowings at November 30, 2006 was approximately $250 million more than the carrying amount.

[4] Weighted-average contractual interest rates for U.S.-dollar denominated obligations were 5.30% and 5.21% at November 30, 2007 and 2006, respectively. Weighted-average contractual interest rates for non-U.S.-dollar denominated obligations were 3.42% and 3.15% at November 30, 2007 and 2006, respectively.

-115-

**LEHMAN BROTHERS HOLDINGS INC**
Notes to Consolidated Financial Statements

**Maturity Profile**

The maturity dates of long-term borrowings are as follows:

| | U.S. Dollar | | Non-U.S. Dollar | | Total | |
|---|---|---|---|---|---|---|
| In millions | Fixed Rate | Floating Rate | Fixed Rate | Floating Rate | Nov 30, 2007 | Nov 30, 2006 |
| Maturing in fiscal 2008 | — | — | — | — | — $ | 17,892 |
| Maturing in fiscal 2009 | $ 2,369 $ | 14,121 $ | 429 $ | 8,104 $ | 25,023 | 13,583 |
| Maturing in fiscal 2010 | 3,754 | 4,845 | 1,663 | 3,269 | 13,531 | 7,744 |
| Maturing in fiscal 2011 | 2,215 | 3,315 | 1,798 | 7,287 | 14,615 | 12,412 |
| Maturing in fiscal 2012 | 4,636 | 2,605 | 3,234 | 7,513 | 17,988 | 4,409 |
| December 1, 2012 and thereafter | 18,414 | 7,805 | 8,782 | 16,992 | 51,993 | 25,138 |
| | $ 31,388 $ | 32,691 $ | 15,906 $ | 43,165 $ | 123,150 $ | 81,178 |

At November 30, 2007, $863 million of outstanding long-term borrowings are repayable at par value prior to maturity at the option of the holder. These obligations are reflected in the above table as maturing at their put dates, which range from fiscal 2009 to fiscal 2022, rather than at their contractual maturities, which range from fiscal 2013 to fiscal 2031. In addition, $20.2 billion of long-term borrowings are redeemable prior to maturity at our option under various terms and conditions. These obligations are reflected in the above table at their contractual maturity dates, which range from fiscal 2009 to fiscal 2054, rather than at their call dates which range from fiscal 2009 to fiscal 2027. Extendible debt structures totaling approximately $5.4 billion are shown in the above table at their earliest maturity dates, which range from fiscal 2009 to fiscal 2013. Extendible debt matures on an initial specified maturity date unless the debt holders elect to extend the term of the note for a period specified in the note.

Included in long-term borrowings is $5.1 billion of certain hybrid financial instruments with early redemption features linked to market prices or other triggering events (*e.g.*, the downgrade of a reference obligation underlying a credit–linked note). In the above maturity table, these notes are shown at their contractual maturity dates.

At November 30, 2007, our U.S. dollar and non–U.S. dollar debt portfolios included approximately $12.9 billion and $16.9 billion, respectively, of certain hybrid financial instruments for which the interest rates and/or redemption values are linked to the performance of an underlying measure (including industry baskets of stocks, commodities or credit events). Generally, such notes are issued as floating rate notes or the interest rates on such index notes are effectively converted to floating rates based primarily on LIBOR through the use of derivatives.

**End–User Derivative Activities**

We use a variety of derivative products including interest rate and currency swaps as an end-user to modify the interest rate characteristics of our long-term borrowings portfolio. We use interest rate swaps to convert a substantial portion of our fixed-rate debt to floating interest rates to more closely match the terms of assets being funded and to minimize interest rate risk. In addition, we use cross–currency swaps to hedge our exposure to foreign currency risk arising from our non–U.S. dollar debt obligations, after consideration of non–U.S. dollar assets that are funded with long-term debt obligations in the same currency. In certain instances, we may use two or more derivative contracts to manage the interest rate nature and/or currency exposure of an individual long-term borrowings issuance.

-116-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

End–User Derivative Activities resulted in the following mix of fixed and floating rate debt:

**Long-Term Borrowings After End–User Derivative Activities**

| In millions | | November 30, | |
| --- | --- | --- | --- |
| | | 2007 | 2006 |
| U.S. dollar: | | | |
| Fixed rate | $ | 1,096 $ | 942 |
| Floating rate | | 81,762 | 57,053 |
| Total U.S. dollar | | 82,858 | 57,995 |
| Weighted-average effective interest rate | | 5.18% | 5.60% |
| Non–U.S. dollar: | | | |
| Fixed rate | | 269 | 645 |
| Floating rate | | 40,023 | 22,538 |
| Total Non-U.S. dollar | | 40,292 | 23,183 |
| Weighted-average effective interest rate | | 4.15% | 3.51% |
| Total | $ | 123,150 $ | 81,178 |
| Weighted-average effective interest rate | | 4.83% | 5.00% |

**Junior Subordinated Notes**

Junior subordinated notes are notes issued to trusts or limited partnerships (collectively, the "Trusts") and qualify as equity capital by leading rating agencies (subject to limitation). The Trusts were formed for the purposes of: (i) issuing securities representing ownership interests in the assets of the Trusts; (ii) investing the proceeds of the Trusts in junior subordinated notes of Holdings; and (iii) engaging in activities necessary and incidental thereto. The securities issued by the Trusts are comprised of the following:

| In millions | | November 30, | |
| --- | --- | --- | --- |
| | | 2007 | 2006 |
| Trust Preferred Securities: | | | |
| Lehman Brothers Holdings Capital Trust III, Series K | $ | 300 $ | 300 |
| Lehman Brothers Holdings Capital Trust IV, Series L | | 300 | 300 |
| Lehman Brothers Holdings Capital Trust V, Series M | | 400 | 399 |
| Lehman Brothers Holdings Capital Trust VI, Series N | | 225 | 225 |
| Lehman Brothers Holdings Capital Trust VII | | 1,000 | — |
| Lehman Brothers Holdings Capital Trust VIII | | 500 | — |
| Euro Perpetual Preferred Securities: | | | |
| Lehman Brothers U.K. Capital Funding LP | | 256 | 231 |
| Lehman Brothers U.K. Capital Funding II LP | | 369 | 329 |
| Enhanced Capital Advantaged Preferred Securities (ECAPS®): | | | |
| Lehman Brothers Holdings E-Capital Trust I | | 255 | 296 |
| Enhanced Capital Advantaged Preferred Securities (Euro ECAPS®): | | | |
| Lehman Brothers U.K. Capital Funding III L.P. | | 577 | 658 |
| Lehman Brothers U.K. Capital Funding IV L.P. | | 295 | — |
| Lehman Brothers U.K. Capital Funding V L.P. | | 500 | — |
| | $ | 4,977 $ | 2,738 |

-117-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The following table summarizes the key terms of Trusts with outstanding securities at November 30, 2007:

**Trust-Issued Securities**

| November 30, 2007 | Issuance Date | Mandatory Redemption Date | Redeemable by Issuer on or after |
|---|---|---|---|
| Holdings Capital Trust III, Series K | March 2003 | March 15, 2052 | March 15, 2008 |
| Holdings Capital Trust IV, Series L | October 2003 | October 31, 2052 | October 31, 2008 |
| Holdings Capital Trust V, Series M | April 2004 | April 22, 2053 | April 22, 2009 |
| Holdings Capital Trust VI, Series N | January 2005 | January 18, 2054 | January 18, 2010 |
| Holdings Capital Trust VII | May 2007 | June 1, 2043[1] | May 31, 2012 |
| Holdings Capital Trust VIII | May 2007 | June 1, 2043[1] | May 31, 2012 |
| U.K. Capital Funding LP | March 2005 | Perpetual | March 30, 2010 |
| U.K. Capital Funding II LP | September 2005 | Perpetual | September 21, 2009 |
| Holdings E-Capital Trust I | August 2005 | August 19, 2065 | August 19, 2010 |
| U.K. Capital Funding III LP | February 2006 | February 22, 2036 | February 22, 2011 |
| U.K. Capital Funding IV LP | January 2007 | Perpetual | April 25, 2012 |
| U.K. Capital Funding V LP | May 2007 | Perpetual | June 1, 2012 |

[1]    Or on such earlier date as we may elect in connection with a remarketing.

The trust preferred securities issued by Holdings Capital Trust VII and Holdings Capital Trust VIII were issued together with contracts to purchase depositary shares representing our Non-Cumulative Perpetual Preferred Stock, Series H and Series I, respectively, with an aggregate redemption value of $1.5 billion. The stock purchase date is expected to be on or around May 31, 2012, but could occur on an earlier date or be deferred until as late as May 31, 2013 in certain circumstances.

**Credit Facilities**

We use both committed and uncommitted bilateral and syndicated long-term bank facilities to complement our long-term debt issuance. In particular, Holdings maintains a $2.0 billion unsecured, committed revolving credit agreement with a syndicate of banks which expires in February 2009. In addition, we maintain a $2.5 billion multi-currency unsecured, committed revolving credit facility ("European Facility") with a syndicate of banks for Lehman Brothers Bankhaus AG ("Bankhaus") and Lehman Brothers Treasury Co. B.V. which expires in April 2010. Our ability to borrow under such facilities is conditioned on complying with customary lending conditions and covenants. We have maintained compliance with the material covenants under these credit agreements at all times. We draw on both of these facilities from time to time in the normal course of conducting our business. As of November 30, 2007, there were no outstanding borrowings against either Holdings' credit facility or the European Facility.

-118-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

## Note 9 Commitments, Contingencies and Guarantees

In the normal course of business, we enter into various commitments and guarantees, including lending commitments to high grade and high yield borrowers, private equity investment commitments, liquidity commitments and other guarantees.

### Lending–Related Commitments

The following table summarizes the contractual amounts of lending-related commitments at November 30, 2007 and 2006:

| In millions | 2008 | 2009 | 2010-2011 | 2012-2013 | Later | 2007 | 2006 |
|---|---|---|---|---|---|---|---|
| | | | Expiration Per Period at November 30, | | | Total Contractual Amount November 30, | |
| Lending commitments | | | | | | | |
| High grade | $ 5,579 | $ 1,039 | $ 6,554 | $ 10,411 | $ 403 | $ 23,986 | $ 17,945 |
| High yield | 4,051 | 411 | 2,103 | 4,850 | 2,658 | 14,073 | 7,558 |
| Contingent acquisition facilities | | | | | | | |
| High grade | 10,230 | — | — | — | — | 10,230 | 1,918 |
| High yield | 9,749 | — | — | — | — | 9,749 | 12,766 |
| Mortgage commitments | 5,082 | 670 | 1,378 | 271 | 48 | 7,449 | 12,162 |
| Secured lending transactions | 122,661 | 455 | 429 | 468 | 1,846 | 125,859 | 83,071 |

We use various hedging and funding strategies to actively manage our market, credit and liquidity exposures on these commitments. We do not believe total commitments necessarily are indicative of actual risk or funding requirements because the commitments may not be drawn or fully used and such amounts are reported before consideration of hedges.

***Lending commitments.*** Through our high grade (investment grade) and high yield (non-investment grade) sales, trading and underwriting activities, we make commitments to extend credit in loan syndication transactions. These commitments and any related drawdowns of these facilities typically have fixed maturity dates and are contingent on certain representations, warranties and contractual conditions applicable to the borrower. We define high yield exposures as securities of or loans to companies rated BB+ or lower or equivalent ratings by recognized credit rating agencies, as well as non-rated securities or loans that, in management's opinion, are non-investment grade.

We had commitments to high grade borrowers at November 30, 2007 and 2006 of $24.0 billion (net credit exposure of $12.2 billion, after consideration of hedges) and $17.9 billion (net credit exposure of $4.9 billion, after consideration of hedges), respectively. We had commitments to high yield borrowers of $14.1 billion (net credit exposure of $12.8 billion, after consideration of hedges) and $7.6 billion (net credit exposure of $5.9 billion, after consideration of hedges) at November 30, 2007 and 2006, respectively.

***Contingent acquisition facilities.*** We provide contingent commitments to investment and non-investment grade counterparties related to acquisition financing. We do not believe contingent acquisition commitments are necessarily indicative of actual risk or funding requirements as funding is dependent upon both a proposed transaction being completed and the acquiror fully utilizing our commitment. Typically, these commitments are made to a potential acquiror in a proposed acquisition, which may or may not be completed depending on whether the potential acquiror to whom we have provided our commitment is successful. A contingent borrower's ability to draw on the commitment is typically subject to there being no material adverse change in the borrower's financial condition, among other factors, and the commitments also generally contain certain flexible pricing features to adjust for changing market conditions prior to closing. In addition, acquirers generally utilize multiple financing sources, including other investment and commercial banks, as well as accessing the general capital markets for completing transactions. Therefore, our contingent acquisition commitments are generally greater than the amounts we ultimately expect to fund. Further, our past practice, consistent with our credit facilitation framework, has been to syndicate acquisition financings to investors. The ultimate timing, amount and pricing of a syndication, however, is influenced by market conditions that may not necessarily be consistent with those at the time the commitment was entered. We provided contingent commitments to high grade counterparties related to acquisition financing of approximately $10.2 billion and $1.9 billion at November 30, 2007 and 2006, respectively, and to high yield counterparties related to acquisition financing of approximately $9.8 billion and $12.8 billion at November 30, 2007 and 2006, respectively.

***Mortgage commitments.*** Through our mortgage origination platforms we make commitments to extend mortgage loans. At

November 30, 2007 and 2006, we had outstanding mortgage commitments of approximately $7.4 billion and $12.2 billion, respectively. These commitments included $3.0 billion and $7.0 billion of residential mortgages in 2007 and 2006 and $4.4 billion and $5.2 billion of commercial mortgages at 2007 and 2006. Typically, residential mortgage loan

-119-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

commitments require us to originate mortgage loans at the option of a borrower generally within 90 days at fixed interest rates. Consistent with past practice, our intention is to sell residential mortgage loans, once originated, primarily through securitizations. The ability to sell or securitize mortgage loans, however, is dependent on market conditions.

*Secured lending transactions.* In connection with our financing activities, we had outstanding commitments under certain collateralized lending arrangements of approximately $9.8 billion and $7.5 billion at November 30, 2007 and 2006, respectively. These commitments require borrowers to provide acceptable collateral, as defined in the agreements, when amounts are drawn under the lending facilities. Advances made under these lending arrangements typically are at variable interest rates and generally provide for over-collateralization. In addition, at November 30, 2007, we had commitments to enter into forward starting secured resale and repurchase agreements, primarily secured by government and government agency collateral, of $70.8 billion and $45.3 billion, respectively, compared to $44.4 billion and $31.2 billion, respectively, at November 30, 2006.

## Other Commitments and Guarantees

The following table summarizes other commitments and guarantees at November 30, 2007 and 2006:

| | | | Expiration Per Period at November 30, | | | Total Contractual Amount November 30, | |
|---|---|---|---|---|---|---|---|
| In millions | 2008 | 2009 | 2010-2011 | 2012-2013 | Later | 2007 | 2006 |
| Derivative contracts[1] | $ 87,394 | $ 59,598 | $ 152,317 | $ 210,496 | $ 228,132 | $ 737,937 | $ 534,585 |
| Municipal-securities-related commitments | 2,362 | 733 | 86 | 69 | 3,652 | 6,902 | 1,599 |
| Other commitments with variable interest entities | 106 | 3,100 | 170 | 963 | 4,772 | 9,111 | 4,902 |
| Standby letters of credit | 1,685 | 5 | — | — | — | 1,690 | 2,380 |
| Private equity and other principal investments | 820 | 675 | 915 | 173 | — | 2,583 | 1,088 |

[1] We believe the fair value of these derivative contracts is a more relevant measure of the obligations because we believe the notional amount overstates the expected payout. At November 30, 2007 and 2006, the fair value of these derivatives contracts approximated $36.8 billion and $9.3 billion, respectively.

*Derivative contracts.* Under FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"), derivative contracts are considered to be guarantees if such contracts require us to make payments to counterparties based on changes in an underlying instrument or index (*e.g.*, security prices, interest rates, and currency rates) and include written credit default swaps, written put options, written foreign exchange and interest rate options. Derivative contracts are not considered guarantees if these contracts are cash settled and we cannot determine if the derivative counterparty held the contracts' underlying instruments at inception. We have determined these conditions have been met for certain large financial institutions. Accordingly, when these conditions are met, we have not included these derivatives in our guarantee disclosures.

At November 30, 2007 and 2006, the maximum payout value of derivative contracts deemed to meet the FIN 45 definition of a guarantee was approximately $737.9 billion and $534.6 billion, respectively. For purposes of determining maximum payout, notional values are used; however, we believe the fair value of these contracts is a more relevant measure of these obligations because we believe the notional amounts greatly overstate our expected payout. At November 30, 2007 and 2006, the fair value of such derivative contracts approximated $36.8 billion and $9.3 billion, respectively. In addition, all amounts included above are before consideration of hedging transactions. We substantially mitigate our risk on these contracts through hedges, using other derivative contracts and/or cash instruments. We manage risk associated with derivative guarantees consistent with our global risk management policies.

*Municipal-securities-related commitments.* At November 30, 2007 and 2006, we had municipal-securities-related commitments of approximately $6.9 billion and $1.6 billion, respectively, which are principally comprised of liquidity commitments related to trust certificates backed by high grade municipal securities. We believe our liquidity commitments to these trusts involve a low level of risk because our obligations are supported by high grade securities and generally cease if the underlying assets are downgraded below investment grade or upon an issuer's default. In certain instances, we also provide credit default protection to investors, which approximated $468 million and $48 million at November 30, 2007 and 2006, respectively.

***Other commitments with VIEs.*** We make certain liquidity commitments and guarantees to VIEs. We provided liquidity commitments of approximately $1.4 billion and $1.0 billion at November 30, 2007 and 2006, respectively, which represented our maximum exposure to loss, to commercial paper conduits in support of certain clients' secured financing

-120-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

transactions. However, we believe our actual risk to be limited because these liquidity commitments are supported by over-collateralization with investment grade collateral.

In addition, we provide limited downside protection guarantees to investors in certain VIEs by guaranteeing return of their initial principal investment. Our maximum exposure to loss under such commitments was approximately $6.1 billion and $3.9 billion at November 30, 2007 and 2006, respectively. We believe our actual risk to be limited because our obligations are collateralized by the VIEs' assets and contain significant constraints under which downside protection will be available (*e.g.*, the VIE is required to liquidate assets in the event certain loss levels are triggered).

We participate in an A-1/P-1-rated multi-seller conduit. This multi-seller issues secured liquidity notes to provide financing. Our intention is to utilize this conduit for purposes of funding a portion of our contingent acquisition commitments. At November 30, 2007, we were contingently committed to provide $1.6 billion of liquidity if the conduit is unable to remarket the secured liquidity notes upon their maturity, generally, one year after a failed remarketing event. This conduit is not consolidated in Holdings' results of operations.

***Standby letters of credit.*** At November 30, 2007 and 2006, respectively, we had commitments under letters of credit issued by banks to counterparties for $1.7 billion and $2.4 billion. We are contingently liable for these letters of credit which are primarily used to provide collateral for securities and commodities borrowed and to satisfy margin deposits at option and commodity exchanges.

***Private equity and other principal investments.*** At November 30, 2007 and 2006, we had private equity and other principal investment commitments of approximately $2.6 billion and $1.1 billion, respectively, comprising commitments to private equity partnerships and other principal investment opportunities. It has been our past practice to distribute and syndicate certain of these commitments to our investing clients.

***Other.*** In the normal course of business, we provide guarantees to securities clearinghouses and exchanges. These guarantees generally are required under the standard membership agreements, such that members are required to guarantee the performance of other members. To mitigate these performance risks, the exchanges and clearinghouses often require members to post collateral.

In connection with certain asset sales and securitization transactions, we often make customary representations and warranties about the assets. Violations of these representations and warranties, such as early payment defaults by borrowers, may require us to repurchase loans previously sold, or indemnify the purchaser against any losses. To mitigate these risks, to the extent the assets being securitized may have been originated by third parties, we generally obtain equivalent representations and warranties from these third parties when we acquire the assets. We have established reserves which we believe to be adequate in connection with such representations and warranties.

In the normal course of business, we are exposed to credit and market risk as a result of executing, financing and settling various client security and commodity transactions. These risks arise from the potential that clients or counterparties may fail to satisfy their obligations and the collateral obtained is insufficient. In such instances, we may be required to purchase or sell financial instruments at unfavorable market prices. We seek to control these risks by obtaining margin balances and other collateral in accordance with regulatory and internal guidelines.

Certain of our subsidiaries, as general partners, are contingently liable for the obligations of certain public and private limited partnerships. In our opinion, contingent liabilities, if any, for the obligations of such partnerships will not, in the aggregate, have a material adverse effect on our Consolidated Statement of Financial Condition or Consolidated Statement of Income.

In connection with certain acquisitions and strategic investments, we agreed to pay additional consideration contingent on the acquired entity meeting or exceeding specified income, revenue or other performance thresholds. These payments will be recorded as amounts become determinable. Had the determination dates been November 30, 2007 and 2006, our estimated obligations related to these contingent consideration arrangements would have been $420 million and $224 million, respectively.

**Income Taxes**

We are under continuous examination by the Internal Revenue Service (the "IRS"), and other tax authorities in major operating jurisdictions such as the United Kingdom and Japan, and in various states in which the Company has significant operations, such as New York. The Company regularly assesses the likelihood of additional assessments in each tax

jurisdiction and the impact on the Consolidated Financial Statements. Tax reserves have been established, which we believe to be adequate with regards to the potential for additional exposure. Once established, reserves are adjusted only when additional information is obtained or an event requiring a change to the reserve occurs. Management believes the resolution

-121-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

of these uncertain tax positions will not have a material impact on the financial condition of the Company; however resolution could have an impact on our effective tax rate in any reporting period.

We have completed the appeals process with respect to the 1997 through 2000 IRS examination. Although most issues were settled on a basis acceptable to us, two issues remain unresolved and will carry into litigation with the IRS. Based on the strength of its positions, we have not reserved any part of these issues. The aggregate tax benefits previously recorded with regard to these two issues is approximately $185 million.

The IRS has recently begun an examination with respect to our 2001 through 2005 tax years. The audit is in its initial stages and no adjustments have been proposed. We believe we are adequately reserved for any issues that may arise from this audit. The two issues from the 1997 through 2000 cycle which we plan to litigate also have an impact on the 2001 through 2005 tax years. The aggregate tax benefit previously recorded with regard to these two issues is approximately $500 million.

**Litigation**

In the normal course of business we have been named as a defendant in a number of lawsuits and other legal and regulatory proceedings. Such proceedings include actions brought against us and others with respect to transactions in which we acted as an underwriter or financial advisor, actions arising out of our activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities firms, including us. We provide for potential losses that may arise out of legal and regulatory proceedings to the extent such losses are probable and can be estimated. Although there can be no assurance as to the ultimate outcome, we generally have denied, or believe we have a meritorious defense and will deny, liability in all significant cases pending against us, and we intend to defend vigorously each such case. Based on information currently available, we believe the amount, or range, of reasonably possible losses in excess of established reserves not to be material to the Company's Consolidated Financial Condition or Cash Flows. However, losses may be material to our operating results for any particular future period, depending on the level of income for such period.

**Lease Commitments**

Total rent expense for 2007, 2006 and 2005 was $250 million, $181 million and $167 million, respectively. Certain leases on office space contain escalation clauses providing for additional payments based on maintenance, utility and tax increases.

Minimum future rental commitments under non-cancelable operating leases (net of subleases of approximately $325 million) and future commitments under capital leases are as follows:

**Minimum Future Rental Commitments Under Operating and Capital Lease Agreements**

| In millions | Operating Leases | Capital Leases |
|---|---:|---:|
| Fiscal 2008 | $ 281 | $ 74 |
| Fiscal 2009 | 269 | 99 |
| Fiscal 2010 | 251 | 101 |
| Fiscal 2011 | 242 | 105 |
| Fiscal 2012 | 227 | 108 |
| December 1, 2012 and thereafter | 1,335 | 2,489 |
| Total minimum lease payments | $ 2,605 | $ 2,976 |
| Less: Amount representing interest | | 1,534 |
| Present value of future minimum capital lease payments | | $ 1,442 |

## Note 10 Stockholders' Equity

On April 5, 2006, our Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend that was effected on April 28, 2006. Prior period share and earnings per share amounts have been restated to reflect the split. The par value of the common stock remained at $0.10 per share. Accordingly, an adjustment from Additional paid-in capital to Common stock was required to preserve the par value of the post-split shares.

**Preferred Stock**

Holdings is authorized to issue a total of 24,999,000 shares of preferred stock. At November 30, 2007, Holdings had 798,000 shares issued and outstanding under various series as described below. All preferred stock has a dividend preference over Holdings' common stock in the paying of dividends and a preference in the liquidation of assets.

-122-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

On March 28, 2000, Holdings issued 5,000,000 Depositary Shares, each representing 1/100th of a share of Fixed/Adjustable Rate Cumulative Preferred Stock, Series E ("Series E Preferred Stock"), $1.00 par value. The initial cumulative dividend rate on the Series E Preferred Stock was 7.115% per annum through May 31, 2005. On May 31, 2005, Holdings redeemed all of its issued and outstanding shares of Series E Preferred Stock, together with accumulated and unpaid dividends.

The following table summarizes our outstanding preferred stock at November 30, 2007:

| Series | Depositary Shares | Shares Issued and Outstanding | Dividend Rate | Earliest Redemption Date | Redemption Value |
|--------|-------------------|-------------------------------|---------------|--------------------------|------------------|
| C | 5,000,000 | 500,000 | 5.94% | May 31, 2008 | 250,000,000 |
| D | 4,000,000 | 40,000 | 5.67% | August 31, 2008 | 200,000,000 |
| F | 13,800,000 | 138,000 | 6.50% | August 31, 2008 | 345,000,000 |
| G | 12,000,000 | 120,000 | one-month LIBOR + 0.75%[1] | February 15, 2009 | 300,000,000 |

(1)  Subject to a floor of 3.0% per annum.

The Series C, D, F and G Preferred Stock rank equally as to dividends and upon liquidation, dissolution or winding up and have no voting rights except as provided below or as otherwise from time to time required by law. If dividends payable on any of the Series C, D, F or G Preferred Stock or on any other equally-ranked series of preferred stock have not been paid for six or more quarters, whether or not consecutive, the authorized number of directors of the Company will automatically be increased by two. The holders of the Series C, D, F or G Preferred Stock will have the right, with holders of any other equally-ranked series of preferred stock that have similar voting rights and on which dividends likewise have not been paid, voting together as a class, to elect two directors to fill such newly created directorships until the dividends in arrears are paid.

**Common Stock**

Dividends declared per common share were $0.60, $0.48 and $0.40 in 2007, 2006 and 2005, respectively. During the years ended November 30, 2007, 2006 and 2005, we repurchased or acquired, pursuant to our stock repurchase program, shares of our common stock at an aggregate cost of approximately $3.2 billion, $3.7 billion and $4.2 billion, respectively, or $73.85, $69.61, and $51.59 per share, respectively. These shares were acquired in the open market and from employees who tendered mature shares to pay for the exercise cost of stock options or for statutory tax withholding obligations on restricted stock unit ("RSU") issuances or option exercises. For additional information, see Note 12, "Share-Based Employee Incentive Plans—Stock Repurchase Program," to the Consolidated Financial Statements.

Changes in the number of shares of common stock outstanding are as follows:

| | Year Ended November 30, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| Shares outstanding, beginning of period | 533,368,195 | 542,874,206 | 548,318,822 |
| Exercise of stock options and other share issuances | 17,056,454 | 22,374,748 | 53,142,714 |
| Shares issued to the RSU Trust | 24,500,000 | 21,000,000 | 22,000,000 |
| Treasury stock acquisitions | (43,037,230) | (52,880,759) | (80,587,330) |
| Shares outstanding, end of period | 531,887,419 | 533,368,195 | 542,874,206 |

In 1997, we established an irrevocable grantor trust (the "RSU Trust") to provide common stock voting rights to employees who hold outstanding RSUs and to encourage employees to think and act like owners. In 2007, 2006 and 2005, we transferred 24.5 million, 21.0 million and 22.0 million treasury shares, respectively, into the RSU Trust. At November 30, 2007, approximately 72.5 million shares were held in the RSU Trust with a total value of approximately $2.3 billion. These shares are valued at weighted-average grant prices. Shares transferred to the RSU Trust do not affect the total number of shares used in the calculation of basic and diluted earnings per share because we include amortized RSUs in the calculations. Accordingly, the RSU Trust has no effect on total equity, net income, book value per share or earnings per share.

-123-

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

---

**Note 11 Earnings per Common Share**

**Earnings per Common Share**

| | | November 30, | | | | |
|---|---|---|---|---|---|---|
| In millions, except per share data | | 2007 | | 2006 | | 2005 |
| **Numerator:** | | | | | | |
| Net income | $ | 4,192 | $ | 4,007 | $ | 3,260 |
| Less: Preferred stock dividends | | 67 | | 66 | | 69 |
| Numerator for basic earnings per share–net income applicable to common stock | $ | 4,125 | $ | 3,941 | $ | 3,191 |
| **Denominator:** | | | | | | |
| Denominator for basic earnings per share–weighted-average common shares | | 540.6 | | 543.0 | | 556.3 |
| Effect of dilutive securities: | | | | | | |
|   Employee stock options | | 23.6 | | 29.1 | | 25.4 |
|   Restricted stock units | | 4.1 | | 6.3 | | 5.5 |
| Dilutive potential common shares | | 27.7 | | 35.4 | | 30.9 |
| Denominator for diluted earnings per share–weighted-average common and dilutive potential common shares [(1)] | | 568.3 | | 578.4 | | 587.2 |
| Basic earnings per common share | $ | 7.63 | $ | 7.26 | $ | 5.74 |
| Diluted earnings per common share | $ | 7.26 | $ | 6.81 | $ | 5.43 |

[(1)] Anti-dilutive options and restricted stock units excluded from the calculations of diluted
earnings per share      13.7      4.4      8.7

On April 5, 2006, our Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend that was effected on April 28, 2006. See Note 10, "Stockholders' Equity," for additional information about the stock split.

---

**Note 12 Share-Based Employee Incentive Plans**

We adopted the fair value recognition provisions for share-based awards pursuant to SFAS 123(R) effective as of the beginning of the 2006 fiscal year. For a further discussion, see Note 1, "Summary of Significant Accounting Policies– Accounting and Regulatory Developments," to the Consolidated Financial Statements.

We sponsor several share-based employee incentive plans. Amortization of compensation costs for grants awarded under these plans was approximately $1.3 billion, $1.0 billion and $1.1 billion during 2007, 2006 and 2005, respectively. The total income tax benefit recognized in the Consolidated Statement of Income for these plans was $515 million, $421 million and $457 million for 2007, 2006 and 2005, respectively. Not included in the $1.3 billion of 2007 amortization expense is $514 million of stock awards granted in December 2007, which were accrued as compensation expense in fiscal 2007.

At November 30, 2007, unrecognized compensation cost related to non-vested stock option and RSU awards totaled $2.0 billion. The cost of these non-vested awards is expected to be recognized over the next 9.0 years over a weighted-average period of 3.8 years.

Below is a description of our share-based employee incentive compensation plans.

**Share-Based Employee Incentive Plans**

We sponsor several share-based employee incentive plans. The total number of shares of common stock remaining available for future awards under these plans at November 30, 2007, was 82.3 million (not including shares that may be returned to the Stock Incentive Plan (the "SIP") as described below, but including an additional 0.4 million shares authorized for issuance under the Lehman Brothers Holdings Inc. 1994 Management Ownership Plan (the "1994 Plan") that have been reserved solely for issuance in respect of dividends on outstanding awards under this plan). In connection with awards made under our share-based employee incentive plans, we are authorized to issue shares of common stock held in treasury or newly-issued shares.

***1994 and 1996 Management Ownership Plans and Employee Incentive Plan.*** The 1994 Plan, the Lehman Brothers Holdings

Inc. 1996 Management Ownership Plan (the "1996 Plan") and the Lehman Brothers Holdings Inc. Employee Incentive Plan (the "EIP") all expired following the completion of their various terms. These plans provided for the issuance of RSUs, performance stock units, stock options and other share-based awards to eligible employees. At November 30, 2007, awards with respect to 605.6 million shares of common stock have been made under these plans, of which 130.3 million are outstanding and 475.3 million have been converted to freely transferable common stock.

-124-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

***Stock Incentive Plan.*** The SIP has a 10-year term ending in May 2015, with provisions similar to the previous plans. The SIP authorized the issuance of up to the total of (i) 95.0 million shares (20.0 million as originally authorized, plus an additional 75.0 million authorized by the stockholders of Holdings at its 2007 Annual Meeting), plus (ii) the 33.5 million shares authorized for issuance under the 1996 Plan and the EIP that remained unawarded upon their expiration, plus (iii) any shares subject to repurchase or forfeiture rights under the 1996 Plan, the EIP or the SIP that are reacquired by the Company, or the award of which is canceled, terminates, expires or for any other reason is not payable, plus (iv) any shares withheld or delivered pursuant to the terms of the SIP in payment of any applicable exercise price or tax withholding obligation. Awards with respect to 51.1 million shares of common stock have been made under the SIP as of November 30, 2007, 50.4 million of which are outstanding.

***1999 Long-Term Incentive Plan.*** The 1999 Neuberger Berman Inc. Long-Term Incentive Plan (the "LTIP") provides for the grant of restricted stock, restricted units, incentive stock, incentive units, deferred shares, supplemental units and stock options. The total number of shares of common stock that may be issued under the LTIP is 15.4 million. At November 30, 2007, awards with respect to approximately 13.7 million shares of common stock had been made under the LTIP, of which 3.2 million were outstanding.

**Restricted Stock Units**

Eligible employees receive RSUs, in lieu of cash, as a portion of their total compensation. There is no further cost to employees associated with RSU awards. RSU awards generally vest over two to five years and convert to unrestricted freely transferable common stock five years from the grant date. All or a portion of an award may be canceled if employment is terminated before the end of the relevant vesting period. We accrue dividend equivalents on outstanding RSUs (in the form of additional RSUs), based on dividends declared on our common stock.

For RSUs granted prior to 2004, we measured compensation cost based on the market value of our common stock at the grant date in accordance with APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and, accordingly, a discount from the market price of an unrestricted share of common stock on the RSU grant date was not recognized for selling restrictions subsequent to the vesting date. For awards granted beginning in 2004, we measure compensation cost based on the market price of our common stock at the grant date less a discount for sale restrictions subsequent to the vesting date in accordance with SFAS 123 and SFAS 123(R). The fair value of RSUs subject to post-vesting date sale restrictions are generally discounted by three to eight percent for each year based upon the duration of the post-vesting restriction. These discounts are based on market-based studies and academic research on securities with restrictive features. RSUs granted in each of the periods presented contain selling restrictions subsequent to a vesting date.

The fair value of RSUs converted to common stock without restrictions for the year ended November 30, 2007 was $1.2 billion. Compensation costs previously recognized and tax benefits recognized in equity upon issuance of these awards were approximately $760 million.

The following table summarizes RSU activity for 2007 and 2006:

|  | Unamortized | Amortized | Total Number of RSUs | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|
| Balance, November 30, 2005 | 48,116,384 | 72,301,290 | 120,417,674 $ | 38.35 |
| Granted | 8,251,700 | — | 8,251,700 | 71.41 |
| Canceled | (2,244,585) | (72,424) | (2,317,009) | 43.81 |
| Exchanged for stock without restrictions | — | (25,904,367) | (25,904,367) | 28.93 |
| Amortization | (19,218,999) | 19,218,999 | — |  |
| Balance, November 30, 2006 | 34,904,500 | 65,543,498 | 100,447,998 $ | 43.37 |
| Granted | 38,839,114 | — | 38,839,114 | 68.92 |
| Canceled | (4,720,625) | 1,079,269 | (3,641,356) | 51.27 |
| Exchanged for stock without restrictions | — | (17,716,614) | (17,716,614) | 31.51 |
| Amortization | (34,166,465) | 34,166,465 | — |  |
| Balance, November 30, 2007 | 34,856,524 | 83,072,618 | 117,929,142 $ | 53.33 |

-125-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

The above table excludes approximately 49.7 million RSUs which were granted to employees on December 7, 2007, including approximately 11.3 million RSUs awarded to retirement eligible employees and expensed in fiscal 2007 and approximately 38.4 million RSUs awarded to employees and subject to future vesting provisions.

Of the approximately 117.9 million RSUs outstanding at November 30, 2007, approximately 83.1 million were amortized and included in basic earnings per share. Approximately 16.5 million of RSUs outstanding at November 30, 2007 will be amortized during 2008, and the remainder will be amortized subsequent to 2008.

The above table includes approximately 5.8 million RSUs awarded to certain senior officers, the terms of which were modified in 2006 (the "Modified RSUs"). The original RSUs resulted from performance stock units ("PSUs") for which the performance periods have expired, but which were not previously converted into RSUs as their vesting was contingent upon a change in control of the Company or certain other specified circumstances as determined by the Compensation and Benefits Committee of the Board of Directors (the "CIC RSUs"). On November 30, 2006, with the approval of the Compensation and Benefits Committee, each executive agreed to a modification of the vesting terms of the CIC RSUs to eliminate the change in control provisions and to provide for vesting in ten equal annual installments from 2007 to 2016, provided the executive continues to be an employee on the vesting date of the respective installment. Vested installments will remain subject to forfeiture for detrimental behavior for an additional two years, after which time they will convert to common stock on a one-for-one basis and be issued to the executive. The Modified RSUs will vest (and convert to common stock and be issued) earlier only upon death, disability or certain government service approved by the Compensation and Benefits Committee. Dividends will be payable by the Corporation on the Modified RSUs from the date of their modification and will be reinvested in additional RSUs with the same terms.

Also included in the previous table are PSUs for which the number of RSUs to be earned was dependent on achieving certain performance levels within predetermined performance periods. During the performance period, these PSUs were accounted for as variable awards. At the end of the performance period, any PSUs earned converted one-for-one to RSUs that then vest in three or more years. At November 30, 2006, all performance periods have been completed and any PSUs earned have been converted into RSUs. The compensation cost for the RSUs payable in satisfaction of PSUs is accrued over the combined performance and vesting periods.

## Stock Options

Employees and Directors may receive stock options, in lieu of cash, as a portion of their total compensation. Such options generally become exercisable over a one- to five-year period and generally expire five- to ten years from the date of grant, subject to accelerated expiration upon termination of employment.

We use the Black-Scholes option-pricing model to measure the grant date fair value of stock options granted to employees. Stock options granted have exercise prices equal to the market price of our common stock on the grant date. The principal assumptions utilized in valuing options and our methodology for estimating such model inputs include: (i) risk-free interest rate - estimate is based on the yield of U.S. zero coupon securities with a maturity equal to the expected life of the option; (ii) expected volatility - estimate is based on the historical volatility of our common stock for the three years preceding the award date, the implied volatility of market-traded options on our common stock on the grant date and other factors; and (iii) expected option life - estimate is based on internal studies of historical and projected exercise behavior based on different employee groups and specific option characteristics, including the effect of employee terminations. Based on the results of the model, the weighted-average fair value of stock options granted were $24.94, $15.83 and $13.24 for 2007, 2006 and 2005, respectively. The weighted-average assumptions used for 2007, 2006 and 2005 were as follows:

### Weighted Average Black-Scholes Assumptions

|  | Year Ended November 30, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Risk-free interest rate | 4.72% | 4.49% | 3.97% |
| Expected volatility | 25.12% | 23.08% | 23.73% |
| Annual dividends per share | $    0.60 | $    0.48 | $    0.40 |
| Expected life | 7.0 years | 4.5 years | 3.9 years |

The valuation technique takes into account the specific terms and conditions of the stock options granted including vesting period, termination provisions, intrinsic value and time dependent exercise behavior.

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The following table summarizes stock option activity for 2007 and 2006:

**Stock Option Activity**

| | Options | Weighted-Average Exercise Price | Expiration Dates |
|---|---|---|---|
| Balance, November 30, 2005 | 101,750,326 $ | 31.36 | 12/05—11/15 |
| Granted | 2,670,400 | 66.14 | |
| Exercised | (22,453,729) | 28.38 | |
| Canceled | (570,626) | 31.63 | |
| Balance, November 30, 2006 | 81,396,371 $ | 33.32 | 12/06—05/16 |
| Granted | 10,200 | 72.07 | |
| Exercised | (15,429,250) | 28.86 | |
| Canceled | (371,778) | 31.64 | |
| Balance, November 30, 2007 | 65,605,543 $ | 34.39 | 01/08—04/17 |

The total intrinsic value of stock options exercised in 2007 was approximately $711 million for which compensation costs previously recognized and tax benefits recognized in equity upon issuance totaled approximately $238 million. Cash received from the exercise of stock options in 2007 totaled approximately $443 million.

The table below provides additional information related to stock options outstanding:

| | Outstanding at Nov. 30, | | | Options Exercisable at Nov. 30, | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Number of options | 65,605,543 | 81,396,371 | 101,750,326 | 51,748,377 | 54,561,355 | 52,638,434 |
| Weighted-average exercise price | $ 34.39 $ | 33.32 $ | 31.36 $ | 30.24 $ | 30.12 $ | 27.65 |
| Aggregate intrinsic value (in millions) | $ 1,867 $ | 3,284 $ | 3,222 $ | 1,676 $ | 2,376 $ | 1,861 |
| Weighted-average remaining contractual terms in years | 4.00 | 4.84 | 5.46 | 3.70 | 4.25 | 4.58 |

At November 30, 2007, the number of options outstanding, net of projected forfeitures, was approximately 65 million shares, with a weighted-average exercise price of $34.19, aggregate intrinsic value of approximately $1.8 billion, and weighted-average remaining contractual terms of 3.97 years.

At November 30, 2007, the intrinsic value of unexercised vested options was approximately $1.7 billion for which compensation cost and tax benefits expected to be recognized in equity, upon issuance, are approximately $508 million.

**Restricted Stock**

In addition to RSUs, we also continue to issue restricted stock to certain Neuberger employees under the LTIP. The following table summarizes restricted stock activity for 2007, 2006 and 2005:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Balance, beginning of year | 671,956 | 1,042,376 | 1,541,692 |
| Granted | — | 43,520 | 15,534 |
| Canceled | (4,444) | (6,430) | (37,446) |
| Exchanged for stock without restrictions | (311,892) | (407,510) | (477,404) |
| Balance, end of year | 355,620 | 671,956 | 1,042,376 |

At November 30, 2007, there were 355,620 shares of restricted stock outstanding. The fair value of the 311,892 shares of restricted stock that became freely tradable in 2007 was approximately $23 million.

**Stock Repurchase Program**

We maintain a common stock repurchase program to manage our equity capital. Our stock repurchase program is effected through open-market purchases, as well as through employee transactions where employees tender shares of common stock to pay for the exercise price of stock options and the required tax withholding obligations upon option exercises and conversion

of RSUs to freely-tradable common stock. In January 2007, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of our equity capital, including offsetting dilution due to employee stock awards. This authorization superseded the stock repurchase program authorized in 2006. During 2007, we repurchased approximately 34.6 million shares of our common stock through open-market purchases at an aggregate cost of approximately $2.6 billion, or $75.40 per share. In addition, we withheld approximately 8.5 million shares of common stock from employees at an equivalent cost of approximately

-127-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

$573 million. At November 30, 2007, approximately 57 million shares remained available for repurchase under this authorization.

In January 2008, our Board of Directors authorized the repurchase, subject to market conditions, of up to 100 million shares of Holdings' common stock for the management of the Firm's equity capital, including consideration of dilution due to employee stock awards. This resolution supersedes the stock repurchase program authorized in 2007.

## Note 13 Employee Benefit Plans

We provide both funded and unfunded noncontributory defined benefit pension plans for the majority of our employees worldwide. In addition, we provide certain other postretirement benefits, primarily health care and life insurance, to eligible employees. We use a November 30 measurement date for our plans.

In September 2006, the FASB issued SFAS 158, which requires an employer to recognize the over- or under-funded status of its defined benefit postretirement plans as an asset or liability in its Consolidated Statement of Financial Condition, measured as the difference between the fair value of the plan assets and the benefit obligation. For pension plans, the benefit obligation is the projected benefit obligation. For other postretirement plans, the benefit obligation is the accumulated postretirement obligation. Upon adoption, SFAS 158 requires an employer to recognize previously unrecognized actuarial gains and losses and prior service costs within Accumulated other comprehensive income/(loss) (net of tax), a component of Stockholders' equity. We adopted this provision of SFAS 158 for the year ended November 30, 2007.

The following table illustrates the incremental effect of the application of SFAS 158 on the Consolidated Statement of Financial Condition at November 30, 2007:

| In millions | Before Application of SFAS 158 | SFAS 158 Adoption Adjustments | After Application of SFAS 158 |
|---|---|---|---|
| Prepaid pension cost | $ 662 | $ (351) | $ 311 |
| Deferred tax assets | 3,183 | 137 | 3,320 |
| Total Assets | 691,277 | (214) | 691,063 |
| Liability for pension and postretirement benefits | 123 | (7) | 116 |
| Deferred tax liabilities | 1,008 | 3 | 1,011 |
| Total Liabilities | 668,577 | (4) | 668,573 |
| Accumulated other comprehensive income/(loss) | (100) | (210) | (310) |
| Total Stockholders' Equity | $ 22,700 | $ (210) | $ 22,490 |

The minimum pension liability of $24 million was eliminated with the adoption of SFAS 158.

-128-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The following table provides a summary of the changes in the plans' benefit obligations, fair value of plan assets, and funded status and amounts recognized in the Consolidated Statement of Financial Condition for our U.S. and non-U.S. defined benefit pension and postretirement benefit plans:

**Defined Benefit Plans**

| In millions | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. | | Non–U.S. | | | |
| November 30, | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|---|---|
| **Change in benefit obligation** | | | | | | |
| Benefit obligation at beginning of year | $ 1,168 | $ 1,017 | $ 514 | $ 399 | $ 61 | $ 60 |
| Service cost | 54 | 47 | 7 | 8 | 1 | 1 |
| Interest cost | 67 | 61 | 26 | 20 | 3 | 3 |
| Plan amendments and curtailments | (3) | 3 | (11) | — | — | — |
| Actuarial loss/(gain) | (177) | 69 | (71) | 37 | (6) | 2 |
| Benefits paid | (32) | (29) | (9) | (7) | (6) | (5) |
| Foreign currency exchange rate changes | — | — | 28 | 57 | — | — |
| Benefit obligation at end of year | 1,077 | 1,168 | 484 | 514 | 53 | 61 |
| **Change in plan assets** | | | | | | |
| Fair value of plan assets at beginning of year | 1,147 | 1,030 | 494 | 378 | — | — |
| Actual return on plan assets, net of expenses | 94 | 96 | 28 | 43 | — | — |
| Employer contribution | — | 50 | 48 | 26 | 6 | 5 |
| Benefits paid | (32) | (29) | (12) | (6) | (6) | (5) |
| Foreign currency exchange rate changes | — | — | 30 | 53 | — | — |
| Fair value of plan assets at end of year | 1,209 | 1,147 | 588 | 494 | — | — |
| Funded/(underfunded) status [1] | 132 | (21) | 104 | (20) | (53) | (61) |
| Unrecognized net actuarial loss/(gain) [1] | | 455 | | 161 | | (9) |
| Unrecognized prior service cost/(benefit) [1] | | 30 | | 1 | | (1) |
| Prepaid/(accrued) benefit cost [1] | | $ 464 | | $ 142 | | $ (71) |
| Accumulated benefit obligation–funded plans | $ 947 | $ 1,020 | $ 457 | $ 490 | | |
| Accumulated benefit obligation–unfunded plans | 63 | 76 | 12 | — | | |

[1]    In accordance with SFAS 158, the funded/(underfunded) status was recognized in the Consolidated Statement of Financial Condition at November 30, 2007 and Unrecognized net actuarial gain/(loss) and Unrecognized prior service cost/(benefit) was recognized in the Consolidated Statement of Stockholders' Equity at November 30, 2007.

**Weighted-Average Assumptions Used to Determine Benefit Obligations**

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. | | Non-U.S. | | | |
| November 30, | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|---|---|
| Discount rate | 6.66% | 5.73% | 5.00% | 4.82% | 6.45% | 5.70% |
| Rate of compensation increase | 5.00% | 5.00% | 4.60% | 4.30% | | |

The following table presents the pre-tax net actuarial loss/(gain) and prior service cost/(benefit) recognized in accumulated other comprehensive income/(loss) at November 30, 2007:

| In millions | Pension Benefits | | Other Postretirement Benefits |
| | U.S. | Non–U.S. | |
|---|---|---|---|
| Net actuarial loss/(gain) | $ 238 | $ 94 | $ (16) |

| Prior Service cost/(benefit) | | 27 | | — | | | (1) |
|---|---|---|---|---|---|---|---|
| Total | $ | 265 | $ | 94 | | $ | (17) |

-129-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The following table presents the estimated pre-tax net actuarial loss/(gain) and estimated prior service costs/(credits) that will be amortized from accumulated other comprehensive income/(loss) into net periodic cost/(income) and recorded into the Consolidated Statement of Income in fiscal 2008:

| | Pension Benefits | | Other Postretirement |
|---|---|---|---|
| In millions | U.S. | Non-U.S. | Benefits |
| Net actuarial loss/(gain) | $ 10 | $ 4 | $ (1) |
| Prior Service cost/(benefit) | $ 4 | $ — | $ (1) |

**Components of Net Periodic Cost**

| | Pension Benefits | | | | | | Postretirement | | |
|---|---|---|---|---|---|---|---|---|---|
| In millions | U.S. Pensions | | | Non–U.S. | | | Benefits | | |
| November 30, | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Service cost | $ 57 | $ 49 | $ 42 | $ 7 | $ 8 | $ 7 | $ 1 | $ 2 | $ 2 |
| Interest cost | 67 | 61 | 56 | 26 | 20 | 19 | 4 | 3 | 3 |
| Expected return on plan assets | (86) | (76) | (74) | (37) | (26) | (24) | — | — | — |
| Amortization of net actuarial loss | 26 | 30 | 33 | 11 | 10 | 11 | — | — | — |
| Amortization of prior service cost | 4 | 4 | 3 | — | 1 | 1 | (1) | (1) | (1) |
| Net periodic cost | $ 68 | $ 68 | $ 60 | $ 7 | $ 13 | $ 14 | $ 4 | $ 4 | $ 4 |

**Weighted-Average Assumptions Used to Determine Net Periodic Cost for the Years Ended November 30,**

| | Pension Benefits | | | | | | Postretirement | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. Pensions | | | Non-U.S. | | | Benefits | | |
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Discount rate | 5.73% | 5.98% | 5.90% | 5.00% | 4.82% | 4.80% | 5.70% | 5.70% | 5.90% |
| Expected return on plan assets | 7.50% | 7.50% | 8.50% | 7.50% | 6.57% | 6.96% | | | |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 4.60% | 4.30% | 4.30% | | | |

**Return on Plan Assets**

***U.S. and non–U.S. Plans.*** Establishing the expected rate of return on pension assets requires judgment. We consider the following factors in determining these assumptions:

- The types of investment classes in which pension plan assets are invested and the expected compounded return we can reasonably expect the portfolio to earn over appropriate time periods. The expected return reflects forward-looking economic assumptions.

- The investment returns we can reasonably expect our active investment management program to achieve in excess of the returns expected if investments were made strictly in indexed funds.

- Investment related expenses.

We review the expected long-term rate of return annually and revise it as appropriate. Also, we periodically commission detailed asset/liability studies to be performed by third-party professional investment advisors and actuaries. These studies project stated future returns on plan assets. The studies performed in the past support the reasonableness of our assumptions based on the targeted allocation investment classes and market conditions at the time the assumptions were established.

**Plan Assets**

Pension plan assets are invested with the objective of meeting current and future benefit payment needs, while

-130-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

minimizing future contributions.

***U.S. plans.*** Plan assets are invested with several investment managers. Assets are diversified among U.S. and international equity securities, U.S. fixed income securities, real estate and cash. The plan employs a mix of active and passive investment management programs. The strategic target of plan asset allocation is approximately 65% equities and 35% U.S. fixed income. The investment sub-committee of our pension committee reviews the asset allocation quarterly and, with the approval of the pension committee, determines when and how to rebalance the portfolio. The plan does not have a dedicated allocation to Lehman Brothers common stock, although the plan may hold a minimal investment in Lehman Brothers common stock as a result of investment decisions made by various investment managers.

***Non–U.S. plans.*** Non–U.S. pension plan assets are invested with several investment managers across a range of different asset classes. The strategic target of plan asset allocation is approximately 75% equities, 20% fixed income and 5% real estate.

Weighted-average plan asset allocations were as follows:

| | U.S. Plans | | Non–U.S. Plans | |
| --- | --- | --- | --- | --- |
| | Nov 30, 2007 | Nov 30, 2006 | Nov 30, 2007 | Nov 30, 2006 |
| Equity securities | 76% | 72% | 69% | 72% |
| Fixed income securities | 24 | 23 | 14 | 14 |
| Real estate | — | — | 4 | 5 |
| Cash | — | 5 | 13 | 9 |
| | 100% | 100% | 100% | 100% |

**Expected Contributions for the Fiscal Year Ending November 30, 2008**

We do not expect it to be necessary to contribute to our U.S. pension plans in the fiscal year ending November 30, 2008. We expect to contribute approximately $8 million to our non–U.S. pension plans in the fiscal year ending November 30, 2008.

**Estimated Future Benefit Payments**

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

| | Pension | | |
| --- | --- | --- | --- |
| In millions | U.S. | Non–U.S. | Postretirement |
| Fiscal 2008 | $ 37 | $ 7 | $ 6 |
| Fiscal 2009 | 41 | 7 | 5 |
| Fiscal 2010 | 43 | 7 | 5 |
| Fiscal 2011 | 46 | 7 | 5 |
| Fiscal 2012 | 51 | 8 | 5 |
| Fiscal 2013—2017 | 308 | 42 | 24 |

**Postretirement Benefits**

Assumed health care cost trend rates were as follows:

| | November 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Health care cost trend rate assumed for next year | 9% | 9% |
| Rate to which the cost trend rate is assumed to decline (the ultimate trend rate) | 5% | 5% |
| Year the rate reaches the ultimate trend rate | 2012 | 2011 |

-131-

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

A one-percentage-point change in assumed health care cost trend rates would be immaterial to our other postretirement plans.

### Note 14 Income Taxes

We file a consolidated U.S. federal income tax return reflecting the income of Holdings and its subsidiaries. The provision for income taxes consists of the following:

**Provision for Income Taxes**

| In millions | November 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Current: | | | |
| Federal | $ 121 | $ 1,024 | $ 1,037 |
| State | 50 | 91 | 265 |
| Foreign | 1,232 | 890 | 769 |
| | 1,403 | 2,005 | 2,071 |
| Deferred: | | | |
| Federal | 405 | (80) | (634) |
| State | 23 | (22) | (59) |
| Foreign | (10) | 42 | 191 |
| | 418 | (60) | (502) |
| Provision for income taxes | $ 1,821 | $ 1,945 | $ 1,569 |

Income before taxes included $6.8 billion, $2.7 billion and $1.9 billion that also were subject to income taxes of foreign jurisdictions for 2007, 2006 and 2005, respectively.

The income tax provision differs from that computed by using the statutory federal income tax rate for the reasons shown below:

**Reconciliation of Provision for Income Taxes to Federal Income Taxes at Statutory Rate**

| In millions | November 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Federal income taxes at statutory rate | $ 2,104 | $ 2,068 | $ 1,690 |
| State and local taxes | 48 | 45 | 134 |
| Tax-exempt income | (114) | (125) | (135) |
| Foreign operations | (225) | (17) | (113) |
| Other, net | 8 | (26) | (7) |
| Provision for income taxes | $ 1,821 | $ 1,945 | $ 1,569 |

The provision for income taxes resulted in effective tax rates of 30.3%, 32.9% and 32.5% for 2007, 2006 and 2005, respectively. The decrease in the effective tax rate in 2007 compared to 2006 was primarily due to a more favorable mix of earnings which resulted in lower tax expense from foreign operations as compared to the U.S. statutory rate. The increases in the effective tax rates in 2006 and 2005 compared with the prior years were primarily due to an increase in level of pretax earnings which minimizes the impact of certain tax benefit items, and in 2006 a net reduction in certain benefits from foreign operations, partially offset by a reduction in state and local taxes due to favorable audit settlements in 2006 and 2005.

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

In 2007, we recorded an income tax benefit of $2 million, and in 2006 and 2005 we recorded income tax charges of $2 million and $1 million, respectively, from the translation of foreign currencies, which was recorded directly in Accumulated other comprehensive income/(loss). Income tax benefits related to employee stock compensation plans of approximately $434 million, $836 million and $1.0 billion in 2007, 2006 and 2005, respectively, were allocated to Additional paid-in capital.

Deferred income taxes are provided for the differences between the tax bases of assets and liabilities and their reported amounts in the Consolidated Financial Statements. These temporary differences will result in future income or deductions for income tax purposes and are measured using the enacted tax rates that will be in effect when such items are expected to reverse.

Net deferred tax assets are included in Other assets in the Consolidated Statement of Financial Condition. At November 30, 2007 and 2006, deferred tax assets and liabilities consisted of the following:

### Deferred Tax Assets and Liabilities

| In millions | November 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Deferred tax assets: | | |
| Liabilities and other accruals not currently deductible | $ 161 | $ 415 |
| Deferred compensation | 1,930 | 1,657 |
| Unrealized investment activity | — | 251 |
| Foreign tax credit carryforwards | 246 | 214 |
| Foreign operations (net of associated tax credits) | 1,049 | 709 |
| Net operating loss carryforwards | 75 | 64 |
| Other | 132 | 91 |
| Total deferred tax assets | 3,593 | 3,401 |
| Less: valuation allowance | (273) | (5) |
| Total deferred tax assets, net of valuation allowance | 3,320 | 3,396 |
| Deferred tax liabilities: | | |
| Excess tax over financial depreciation, net | (104) | (103) |
| Acquired intangibles | (369) | (384) |
| Unrealized investment activity | (375) | — |
| Pension and retirement costs | (104) | (192) |
| Other | (59) | (47) |
| Total deferred tax liabilities | (1,011) | (726) |
| Net deferred tax assets | $ 2,309 | $ 2,670 |

We have permanently reinvested earnings in certain foreign subsidiaries. At November 30, 2007, $4.3 billion of accumulated earnings were permanently reinvested. At current tax rates, additional Federal income taxes (net of available tax credits) of approximately $1.1 billion would become payable if such income were to be repatriated.

We have approximately $215 million of Federal net operating loss carryforwards that are subject to separate company limitations. Substantially all of these net operating loss carryforwards begin to expire between 2023 and 2026. At November 30, 2007, $5 million of the deferred tax asset valuation allowance relates to Federal net operating loss carryforwards of an acquired entity that is subject to separate company limitations. If future circumstances permit the recognition of the acquired tax benefit, goodwill will be reduced. The remaining deferred tax asset valuation allowance of $268 million relates to losses from foreign legal entities in which the prospect of future profitability does not meet the more likely than not recognition threshold.

We are under continuous examination by the IRS, and other tax authorities in major operating jurisdictions such as the United Kingdom and Japan, and in various states in which the Company has significant operations, such as New York. The Company regularly assesses the likelihood of additional assessments in each tax jurisdiction and the impact on the Consolidated Financial Statements. Tax reserves have been established, which we believe to be adequate with regards to the potential for additional exposure. Once established, reserves are adjusted only when additional information is obtained or an event requiring a change to the reserve occurs. Management believes the resolution of these uncertain tax positions will not have a material impact on the financial condition of the Company; however resolution could have an impact on our effective tax rate in any one particular period.

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

We have completed the appeals process with respect to the 1997 through 2000 IRS examination. Although most issues were settled on a basis acceptable to us, two issues remain unresolved and will carry into litigation with the IRS. Based on the strength of its positions, we have not reserved any part of these issues. The aggregate tax benefits previously recorded with regard to these two issues is approximately $185 million.

The IRS has recently begun an examination with respect to the 2001 through 2005 tax years. The audit is in its initial stages and no adjustments have been proposed. We believe we are adequately reserved for any issues that may arise from this audit. The two issues from the 1997 through 2000 cycle which we plan to litigate also have an impact on the 2001 through 2005 tax years. The aggregate tax benefit previously recorded with regard to these two issues is approximately $500 million.

## Note 15 Regulatory Requirements

For regulatory purposes, Holdings and its subsidiaries are referred to collectively as a CSE. CSEs are supervised and examined by the SEC, which requires minimum capital standards on a consolidated basis. At November 30, 2007, Holdings was in compliance with the CSE capital requirements and had allowable capital in excess of the minimum capital requirements on a consolidated basis.

In the United States, Lehman Brothers Inc. ("LBI") and Neuberger Berman, LLC ("NB LLC") are registered broker-dealers in the U.S. that are subject to SEC Rule 15c3-1 and Rule 1.17 of the Commodity Futures Trading Commission, which specify minimum net capital requirements for the registrants. LBI and NB LLC have consistently operated with net capital in excess of their respective regulatory capital requirements. LBI has elected to calculate its minimum net capital in accordance with Appendix E of the Net Capital Rule which establishes alternative net capital requirements for broker-dealers that are part of CSEs. In addition to meeting the alternative net capital requirements, LBI is required to maintain tentative net capital in excess of $1 billion and net capital in excess of $500 million. LBI is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of November 30, 2007, LBI had net capital of approximately $2.7 billion, which exceeded the minimum net capital requirement by approximately $2.1 billion. As of November 30, 2007, NB LLC had net capital of approximately $188 million, which exceeded the minimum net capital requirement by approximately $183 million.

Lehman Brothers International (Europe) ("LB Europe"), a United Kingdom registered broker-dealer and subsidiary of Holdings, is subject to the capital requirements of the Financial Services Authority ("FSA") in the United Kingdom. Financial resources, as defined, must exceed the total financial resources requirement of the FSA. At November 30, 2007, LB Europe's financial resources of approximately $16.2 billion exceeded the minimum requirement by approximately $3.8 billion. Lehman Brothers Japan ("LB Japan"), a regulated broker-dealer, is subject to the capital requirements of the Financial Services Agency in Japan and the Bank of Japan. At November 30, 2007, LB Japan had net capital of approximately $1.3 billion, which was approximately $748 million in excess of Financial Services Agency in Japan's required level and approximately $512 million in excess of Bank of Japan's required level.

Lehman Brothers Bank, FSB ("LB Bank"), our thrift subsidiary, is regulated by the Office of Thrift Supervision. Lehman Brothers Commercial Bank ("LB Commercial Bank"), our Utah industrial bank subsidiary is regulated by the Utah Department of Financial Institutions and the Federal Deposit Insurance Corporation. LB Bank and LB Commercial Bank exceeded all regulatory capital requirements and are considered to be well capitalized as of November 30, 2007. Bankhaus is subject to the capital requirements of the Federal Financial Supervisory Authority of the German Federal Republic. At November 30, 2007, Bankhaus' financial resources exceeded its minimum financial resources requirement.

Certain other subsidiaries are subject to various securities, commodities and banking regulations and capital adequacy requirements promulgated by the regulatory and exchange authorities of the countries in which they operate. At November 30, 2007, these other subsidiaries were in compliance with their applicable local capital adequacy requirements.

In addition, our "AAA" rated derivatives subsidiaries, Lehman Brothers Financial Products Inc. ("LBFP") and Lehman Brothers Derivative Products Inc. ("LBDP"), have established certain capital and operating restrictions that are reviewed by various rating agencies. At November 30, 2007, LBFP and LBDP each had capital that exceeded the requirements of the rating agencies.

The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict Holdings' ability to withdraw capital from its regulated subsidiaries, which in turn could limit its ability to pay dividends to shareholders. Holdings fully guarantees the payment of all liabilities, obligations and commitments of certain of its subsidiaries.

## LEHMAN BROTHERS HOLDINGS INC.
### Notes to Consolidated Financial Statements

**Note 16 Quarterly Information (unaudited)**

The following table presents unaudited quarterly results of operations for 2007 and 2006. Certain amounts reflect reclassifications to conform to the current period's presentation. These quarterly results reflect all normal recurring adjustments that are, in the opinion of management, necessary for a fair presentation of the results. Revenues and net income can vary significantly from quarter to quarter due to the nature of our business activities.

**Quarterly Information (unaudited)**

| In millions, except per share data | | For the Quarter Ended | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Nov 30, 2007 | | Aug 31, 2007 | | May 31, 2007 | | Feb 28, 2007 |
| Total revenues | $ | 14,890 | $ | 14,739 | $ | 15,579 | $ | 13,795 |
| Interest expense | | 10,500 | | 10,431 | | 10,067 | | 8,748 |
| Net revenues | | 4,390 | | 4,308 | | 5,512 | | 5,047 |
| Non-interest expenses: | | | | | | | | |
| Compensation and benefits | | 2,164 | | 2,124 | | 2,718 | | 2,488 |
| Non-personnel expenses | | 996 | | 979 | | 915 | | 860 |
| Total non-interest expenses | | 3,160 | | 3,103 | | 3,633 | | 3,348 |
| Income before taxes | | 1,230 | | 1,205 | | 1,879 | | 1,699 |
| Provision for income taxes | | 344 | | 318 | | 606 | | 553 |
| Net income | $ | 886 | $ | 887 | $ | 1,273 | $ | 1,146 |
| Net income applicable to common stock | $ | 870 | $ | 870 | $ | 1,256 | $ | 1,129 |
| Earnings per common share: | | | | | | | | |
| Basic | $ | 1.60 | $ | 1.61 | $ | 2.33 | $ | 2.09 |
| Diluted | $ | 1.54 | $ | 1.54 | $ | 2.21 | $ | 1.96 |
| Weighted-average common shares: | | | | | | | | |
| Basic | | 542.6 | | 540.4 | | 538.2 | | 540.9 |
| Diluted | | 563.7 | | 565.8 | | 568.1 | | 575.4 |
| Dividends per common share | $ | 0.15 | $ | 0.15 | $ | 0.15 | $ | 0.15 |
| Book value per common share (at period end) | $ | 39.44 | $ | 38.29 | $ | 37.15 | $ | 35.15 |

-135-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

| In millions, except per share data | For the Quarter Ended | | | |
|---|---|---|---|---|
| | Nov 30, 2006 | Aug 31, 2006 | May 31, 2006 | Feb 28, 2006 |
| Total revenues | $ 13,160 | $ 11,727 | $ 11,515 | $ 10,307 |
| Interest expense | 8,627 | 7,549 | 7,104 | 5,846 |
| Net revenues | 4,533 | 4,178 | 4,411 | 4,461 |
| Non-interest expenses: | | | | |
| Compensation and benefits | 2,235 | 2,060 | 2,175 | 2,199 |
| Non-personnel expenses | 809 | 751 | 738 | 711 |
| Total non-interest expenses | 3,044 | 2,811 | 2,913 | 2,910 |
| Income before taxes and cumulative effect of accounting change | 1,489 | 1,367 | 1,498 | 1,551 |
| Provision for income taxes | 485 | 451 | 496 | 513 |
| Cumulative effect of accounting change | — | — | — | 47 |
| Net income | $ 1,004 | $ 916 | $ 1,002 | $ 1,085 |
| Net income applicable to common stock | $ 987 | $ 899 | $ 986 | $ 1,069 |
| Earnings per common share: | | | | |
| Basic | $ 1.83 | $ 1.66 | $ 1.81 | $ 1.96 |
| Diluted | $ 1.72 | $ 1.57 | $ 1.69 | $ 1.83 |
| Weighted-average common shares: | | | | |
| Basic | 539.2 | 540.9 | 545.1 | 546.2 |
| Diluted | 573.1 | 573.3 | 582.8 | 584.2 |
| Dividends per common share | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.12 |
| Book value per common share (at period end) | $ 33.87 | $ 32.16 | $ 31.08 | $ 30.01 |

-136-

## LEHMAN BROTHERS HOLDINGS INC.

---

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

---

None.

---

**ITEM 9A.    CONTROLS AND PROCEDURES**

---

Our management, with the participation of the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings (its principal executive officer and principal financial officer, respectively), evaluated our disclosure controls and procedures as of the end of the fiscal year covered by this Report.

Based on that evaluation, the Chairman and Chief Executive Officer and the Chief Financial Officer have concluded that, as of the end of the fiscal year covered by this Report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by Holdings in the reports filed or submitted by it under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and include controls and procedures designed to ensure that information required to be disclosed by Holdings in such reports is accumulated and communicated to our management, including the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings, as appropriate to allow timely decisions regarding required disclosure.

Management's annual report on internal control over financial reporting and the attestation report of our independent registered public accounting firm are contained in Part II, Item 8, of this Report and are incorporated herein by reference. There was no change in our internal control over financial reporting that occurred during the fourth fiscal quarter of 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

---

**ITEM 9B.    OTHER INFORMATION**

---

None.

-137-

---

## LEHMAN BROTHERS HOLDINGS INC.

### PART III

---

## ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

---

Information relating to Directors of the Registrant is set forth under the captions "Nominees for Election as Directors," "Committees of the Board of Directors" and "Other Matters—Procedures for Recommending Director Candidates to the Nominating and Corporate Governance Committee" in the Proxy Statement, and information relating to Executive Officers of the Registrant is set forth under the caption "Executive Officers of the Company" in the Proxy Statement, and is incorporated herein by reference.

Information relating to beneficial ownership reporting compliance by Directors and Executive Officers of the Registrant pursuant to Section 16(a) of the Exchange Act is set forth under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in the Proxy Statement, and is incorporated herein by reference.

We have a Code of Ethics which is applicable to all Directors, officers and employees of the Company, including the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings (its principal executive officer and principal financial and accounting officer, respectively). The Code of Ethics is available on the Corporate Governance page of the Company's web site at www.lehman.com/shareholder/corpgov/. A copy of the Code of Ethics will be provided without charge to any person who requests it by writing to the address or telephoning the number indicated under "Available Information" on page 2. We will disclose on our web site amendments to or waivers from our Code of Ethics applicable to Directors or Executive Officers of Holdings, including the Chairman and Chief Executive Officer and the Chief Financial Officer, in accordance with all applicable laws and regulations.

---

## ITEM 11.  EXECUTIVE COMPENSATION

---

Information relating to executive compensation is set forth under the captions "Compensation of Directors," "Compensation and Benefits Committee Interlocks and Insider Participation," "Compensation Discussion and Analysis," "Compensation and Benefits Committee Report" and "Compensation of Executive Officers" in the Proxy Statement and is incorporated herein by reference.

---

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

---

Information relating to security ownership of certain beneficial owners and management is set forth under the captions "Security Ownership of Principal Stockholders" and "Security Ownership of Directors and Executive Officers" in the Proxy Statement and is incorporated herein by reference.

Information regarding shares of our common stock authorized for issuance under equity compensation plans is set forth under the caption "Proposal 3—Amendment to the 2005 Stock Incentive Plan—Equity Compensation Plan Information" in the Proxy Statement and is incorporated herein by reference.

---

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

---

Information relating to certain relationships and related transactions is set forth under the caption "Certain Transactions and Agreements with Directors and Executive Officers" in the Proxy Statement and is incorporated herein by reference.

Information relating to the Company's Board of Directors and Director independence is set forth under the captions "Proposal 1—Election of Directors" and "Director Independence" in the Proxy Statement and is incorporated herein by reference.

---

## ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

---

Information relating to fees paid to our independent registered public accounting firm and certain related matters is set forth under the caption "Ernst & Young LLP Fees and Services" in the Proxy Statement and is incorporated herein by reference.

-138-

## LEHMAN BROTHERS HOLDINGS INC.

### PART IV

---

**ITEM 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

---

1. <u>Financial Statements</u>:

The Financial Statements and the Notes thereto and the Report of Independent Registered Public Accounting Firm thereon included in this Report  are listed on page F-1.

2. <u>Financial Statement Schedules</u>:

The financial statement schedule and the notes thereto filed as a part hereof are listed on page F-1.

3. <u>Exhibits</u>:

| Exhibit No. | |
|---|---|
| 3.01 | Restated Certificate of Incorporation of the Registrant dated October 10, 2006 *(incorporated by reference to Exhibit 3.04 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended August 31, 2006)* |
| 3.02 | Certificate of Designations with respect to Registrant's Non-Cumulative Perpetual Preferred Stock, Series H, amended as of December 21, 2006 *(incorporated by reference to Exhibit 3.01 to the Registrant's Current Report on Form 8-K filed with the SEC on May 23, 2007)* |
| 3.03 | Certificate of Designations with respect to Registrant's Non-Cumulative Perpetual Preferred Stock, Series I *(incorporated by reference to Exhibit 3.02 to the Registrant's Current Report on Form 8-K filed with the SEC on May 23, 2007)* |
| 3.04 | By-Laws of the Registrant, amended as of November 8, 2007 *(incorporated by reference to Exhibit 3.01 to the Registrant's Current Report on Form 8-K filed with the SEC on November 15, 2007)* |
| 4.01 | Standard multiple series indenture provisions with respect to the senior and subordinated debt securities *(incorporated by reference to Exhibit 4(a) to Post-Effective Amendment No. 1 to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-16141))* |
| 4.02 | Indenture with respect to senior debt securities *(incorporated by reference to Exhibit 4(b) to Post-Effective Amendment No. 1 to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-16141))* |
| 4.03 | First Supplemental Indenture with respect to senior debt securities *(incorporated by reference to Exhibit 4(m) to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-25797))* |
| 4.04 | Second Supplemental Indenture with respect to senior debt securities *(incorporated by reference to Exhibit 4(e) to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-49062))* |
| 4.05 | Third Supplemental Indenture with respect to senior debt securities *(incorporated by reference to Exhibit 4(f) to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-46146))* |
| 4.06 | Fourth Supplemental Indenture with respect to senior debt securities *(incorporated by reference to Exhibit 4(f) to Registrant's Registration Statement on Form 8-A filed with the SEC on October 7, 1993)* |
| 4.07 | Fifth Supplemental Indenture with respect to the senior debt securities *(incorporated by reference to Exhibit 4(h) to Post-Effective Amendment No. 1 to the Registrant's Registration Statement on Form S-3 (Reg. No. 33-56615))* |
| 4.08 | Sixth Supplemental Indenture with respect to the senior debt securities *(incorporated by reference to Exhibit 4 (h) to the Registrant's Registration Statement on Form S-3 (No. 333-38227))* |
| 4.09 | Indenture with respect to subordinated debt securities *(incorporated by reference to Exhibit 2 to the Registrant's Registration Statement on Form 8-A filed with the SEC on February 8, 1996)* |
| 4.10 | First Supplemental Indenture with respect to subordinated debt securities *(incorporated by reference to Exhibit 3 to the Registrant's Registration Statement on Form 8-A filed with the SEC on February 8, 1996) The other instruments defining the rights of holders of the long-term debt securities of the Registrant and its subsidiaries are omitted pursuant to section (b)(4)(iii)(A) of Item 601 of Regulation S-K. The Registrant hereby agrees to furnish copies of these instruments to the Securities and Exchange Commission upon request.* |
| 10.01 | Tax Allocation Agreement between Shearson Lehman Brothers Holdings Inc. and American Express Company *(incorporated by reference to Exhibit 10.2 to the Registrant's Transition Report on Form 10-K for the eleven months ended November 30, 1994)* |
| 10.02 | Amended and Restated Agreements of Limited Partnership of Shearson Lehman Hutton Capital Partners II *(incorporated by reference to Exhibit 10.48 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1988)* |

## LEHMAN BROTHERS HOLDINGS INC.

10.03    Amended and Restated Agreement of Limited Partnership of Lehman Brothers Capital Partners III, L.P. *(incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 1995)*

10.04    Agreement of Limited Partnership of Lehman Brothers Capital Partners IV, L.P. *(incorporated by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 1997)*

10.05    Purchase and Sale Agreement dated as of October 19, 2001, between MSDW 745, LLC, as seller, and LB 745 LLC, as purchaser *(incorporated by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 2001)*

10.06    Amendment to Purchase and Sale Agreement dated as of the October 19, 2001, between MSDW 745, LLC, as seller, and LB 745 LLC, as purchaser *(incorporated by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 2001)*

10.07    JV Option Agreement dated November 19, 1998, between Rock-Forty-Ninth LLC and LB 745 LLC (as assignee of MSDW 745, LLC) *(incorporated by reference to Exhibit 10.17 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 2001)*

10.08 †    Lehman Brothers Inc. Executive and Select Employees Plan *(incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1 (Reg. No. 33-12976))*

10.09 †    1999 Neuberger Berman Inc. Directors Stock Incentive Plan *(incorporated by reference to Exhibit 10.1 to Neuberger Berman Inc.'s Registration Statement on Form S-1 (Reg. No. 333-84525))*

10.10 †    Amendment No. 1 to the 1999 Neuberger Berman Inc. Directors Stock Incentive Plan *(incorporated by reference to Exhibit 10.17 to Neuberger Berman Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2000)*

10.11 †*    1999 Neuberger Berman Inc. Long-Term Incentive Plan, restated as of November 8, 2007

10.12 †    Neuberger Berman Inc. Wealth Accumulation Plan, Amended and Restated as of September 1, 2000 *(incorporated by reference to Exhibit 10.21 to Neuberger Berman Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2000)*

10.13†    Neuberger Berman Inc. Employee Stock Purchase Plan, Amended and Restated as of September 1, 2000 *(incorporated by reference to Exhibit 10.22 to Neuberger Berman Inc.'s Annual Report on Form 10-K, for the year ended December 31, 2000)*

10.14 †*    Lehman Brothers Holdings Inc. 1994 Management Ownership Plan, as amended through November 8, 2007

10.15 †*    Lehman Brothers Holdings Inc. 1996 Management Ownership Plan, as amended through November 8, 2007

10.16 †*    Form of Agreement evidencing a grant of Restricted Stock Units to Executive Officers under the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan

10.17 †*    Form of Agreement evidencing a grant of Nonqualified Stock Options to Executive Officers under the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan

10.18 †    Lehman Brothers Holdings Inc. Short-Term Executive Compensation Plan, as amended through February 19, 2003 *(incorporated by reference to Exhibit 10.07 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 2002)*

10.19 †*    Amended and Restated Lehman Brothers Holdings Inc. Employee Incentive Plan, as amended through November 8, 2007

10.20 †*    Form of Agreement evidencing a grant of Restricted Stock Units to Directors pursuant to the Lehman Brothers Holdings Inc. Employee Incentive Plan

10.21 †*    Form of Agreement evidencing a grant of Nonqualified Stock Options to Directors pursuant to the Lehman Brothers Holdings Inc. Employee Incentive Plan

10.22 †    Lehman Brothers Supplemental Retirement Plan, as amended through November 8, 2007 *(incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the SEC on November 15, 2007)*

10.23 †    Lehman Brothers Holdings Inc. Retirement Plan for Non-Employee Directors *(incorporated by reference to Exhibit 10.28 to the Registrant's Annual Report on Form 10-K for the fiscal year ended November 30, 2004)*

10.24†    Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended through November 8, 2007 *(incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the SEC on November 15, 2007)*

10.25 †    Form of Agreement evidencing a Grant of Restricted Stock Units to Executive Officers under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended *(incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the SEC on November 15, 2007)*

-140-

## LEHMAN BROTHERS HOLDINGS INC.

10.26 †    Form of Agreement evidencing a grant of Restricted Stock Units to Executive Officers under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended *(incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the SEC on December 6, 2007)*

10.27 †    Form of Agreement evidencing a grant of Nonqualified Stock Options to Executive Officers under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended *(incorporated by reference Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the SEC on November 15, 2007)*

10.28 †*   Form of Agreement evidencing a grant of Restricted Stock Units to Directors under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended

10.29 †*   Form of Agreement evidencing a grant of Nonqualified Stock Options to Directors under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended

10.30 †*   Base Salaries of Named Executive Officers of the Registrant

10.31 †    Compensation for Non-Management Directors of the Registrant *(incorporated by reference to Exhibit 10.05 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2006)*

10.32 †    Lehman Brothers Holdings Inc. Amended and Restated Deferred Compensation Plan for Non-Employee Directors *(incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the SEC on June 10, 2005)*

11.01      Computation of Per Share Earnings *(omitted in accordance with section (b)(11) of Item 601 of Regulation S-K; the calculation of per share earnings is set forth in Part II, Item 8, in Note 11 to the Consolidated Financial Statements (Earnings Per Common Share))*

12.01*     Computations in support of ratios of earnings to fixed charges and to combined fixed charges and preferred stock dividends

21.01*     List of the Registrant's Subsidiaries

23.01*     Consent of Ernst & Young LLP

24.01*     Powers of Attorney

31.01*     Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) and 15d-14(a)

31.02*     Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) and 15d-14(a)

32.01*     Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Enacted by Section 906 of the Sarbanes-Oxley Act of 2002 *(This certification is being furnished and shall not be deemed "filed" with the Commission for purposes of Section 18 of the Exchange Act, or otherwise subject to the liability of that section, and shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the Registrant specifically incorporates it by reference.)*

32.02*     Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Enacted by Section 906 of the Sarbanes-Oxley Act of 2002 *(This certification is being furnished and shall not be deemed "filed" with the Commission for purposes of Section 18 of the Exchange Act, or otherwise subject to the liability of that section, and shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the Registrant specifically incorporates it by reference.)*

---

\*  Filed/furnished herewith.

†  Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form 10-K pursuant to Item 15(b) of Form 10-K.

-141-

# LEHMAN BROTHERS HOLDINGS INC.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |
|---|---|
|  | LEHMAN BROTHERS HOLDINGS INC. (REGISTRANT) |
| January 29, 2008 | By:   /s/ ERIN M. CALLAN |
|  | Erin M. Callan Chief Financial Officer, Controller and Executive Vice President |

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ RICHARD S. FULD, JR. <br> Richard S. Fuld, Jr. | Chief Executive Officer and Chairman of the Board of Directors (principal executive officer) | January 29, 2008 |
| /s/ ERIN M. CALLAN <br> Erin M. Callan | Chief Financial Officer, Controller and Executive Vice President (principal financial and accounting officer) | January 29, 2008 |
| /s/ MICHAEL L. AINSLIE <br> Michael L. Ainslie | Director | January 29, 2008 |
| /s/ JOHN F. AKERS <br> John F. Akers | Director | January 29, 2008 |
| /s/ ROGER S. BERLIND <br> Roger S. Berlind | Director | January 29, 2008 |
| /s/ THOMAS H. CRUIKSHANK <br> Thomas H. Cruikshank | Director | January 29, 2008 |
| /s/ MARSHA JOHNSON EVANS <br> Marsha Johnson Evans | Director | January 29, 2008 |
| /s/ SIR CHRISTOPHER GENT <br> Sir Christopher Gent | Director | January 29, 2008 |
| /s/ ROLAND A. HERNANDEZ <br> Roland A. Hernandez | Director | January 29, 2008 |
| /s/ HENRY KAUFMAN <br> Henry Kaufman | Director | January 29, 2008 |
| /s/ JOHN D. MACOMBER <br> John D. Macomber | Director | January 29, 2008 |

-142-

**LEHMAN BROTHERS HOLDINGS INC. and SUBSIDIARIES**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SCHEDULE**

|  | Page |
|---|---|
| **Financial Statements** | |
| Management's Assessment of Internal Control over Financial Reporting | 82 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 83 |
| Report of Independent Registered Public Accounting Firm | 84 |
| Consolidated Financial Statements | |
| Consolidated Statement of Income— Years Ended November 30, 2007, 2006 and 2005 | 85 |
| Consolidated Statement of Financial Condition— November 30, 2007 and 2006 | 86 |
| Consolidated Statement of Changes in Stockholders' Equity— Years Ended November 30, 2007, 2006 and 2005 | 88 |
| Consolidated Statement of Cash Flows— Years Ended November 30, 2007, 2006 and 2005 | 90 |
| Notes to Consolidated Financial Statements | 91 |
| **Financial Statement Schedule** | |
| Schedule I—Condensed Financial Information of Registrant | F-2 |

F-1

**Schedule I**

**LEHMAN BROTHERS HOLDINGS INC.**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
Statement of Income
(Parent Company Only)

| In millions | Year Ended November 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Interest and dividends | $ 11,994 | $ 6,518 | $ 3,336 |
| Principal transactions and other | (1,270) | 630 | 631 |
|    Total revenues | 10,724 | 7,148 | 3,967 |
| Interest expense | 13,013 | 7,439 | 4,144 |
|    Net revenues | (2,289) | (291) | (177) |
| Equity in income of subsidiaries | 6,090 | 4,613 | 3,836 |
| Non-interest expenses | 734 | 867 | 1,038 |
| Income before taxes and cumulative effect of accounting change | 3,067 | 3,455 | 2,621 |
| Provision/(benefit) for income taxes | (1,125) | (527) | (639) |
| Income before cumulative effect of accounting change | 4,192 | 3,982 | 3,260 |
| Cumulative effect of accounting change | — | 25 | — |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 |
| Net income applicable to common stock | $ 4,125 | $ 3,941 | $ 3,191 |

See Notes to Condensed Financial Information of Registrant.

F-2

**Schedule I**

**LEHMAN BROTHERS HOLDINGS INC.**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
Statement of Financial Condition
(Parent Company Only)

| | November 30, | |
|---|---|---|
| In millions, except share data | 2007 | 2006 |
| **Assets** | | |
| Cash and cash equivalents | $ 2,218 | $ 3,435 |
| Cash segregated and on deposit for regulatory and other purposes | 12 | 51 |
| Financial instruments and other inventory positions owned: | | |
| (including $15,874 in 2007 and $9,575 in 2006 pledged as collateral) | 34,221 | 17,866 |
| Receivables and accrued interest | 659 | 591 |
| Other assets | 7,032 | 4,354 |
| Due from subsidiaries | 144,176 | 95,640 |
| Equity in net assets of subsidiaries | 25,058 | 19,333 |
| Total assets | $ 213,376 | $ 141,270 |
| **Liabilities and Stockholders' Equity** | | |
| Short-term borrowings and current portion of long-term borrowings | | |
| (including $1,819 in 2007 and $2,295 in 2006 at fair value) | $ 16,574 | $ 10,721 |
| Financial instruments and other inventory positions sold but not yet purchased | 3,020 | 92 |
| Collateralized financing | 9,451 | 6,136 |
| Accrued liabilities and other payables | 3,641 | 2,286 |
| Due to subsidiaries | 70,861 | 45,389 |
| Long-term borrowings (including $5,371 in 2007 and $864 in 2006 at fair value) | 87,339 | 57,455 |
| Total liabilities | 190,886 | 122,079 |
| Commitments and contingencies | | |
| **Stockholders' Equity** | | |
| Preferred stock | 1,095 | 1,095 |
| Common stock, $0.10 par value: | | |
| Shares authorized: 1,200,000,000 in 2007 and 2006; | | |
| Shares issued: 612,882,506 in 2007 and 609,832,302 in 2006; | | |
| Shares outstanding: 531,887,419 in 2007 and 533,368,195 in 2006 | 61 | 61 |
| Additional paid-in capital[1] | 9,733 | 8,727 |
| Accumulated other comprehensive loss, net of tax | (310) | (15) |
| Retained earnings | 19,698 | 15,857 |
| Other stockholders' equity, net | (2,263) | (1,712) |
| Common stock in treasury, at cost[1]: 80,995,087 shares in 2007 and 76,464,107 shares in 2006 | (5,524) | (4,822) |
| Total common stockholders' equity | 21,395 | 18,096 |
| Total stockholders' equity | 22,490 | 19,191 |
| Total liabilities and stockholders' equity | $ 213,376 | $ 141,270 |

[1]    Balances and share amounts at November 30, 2006 reflect the April 28, 2006 2-for-1 common stock split, effected in the form of a 100% stock dividend.

See Notes to Condensed Financial Information of Registrant.

F-3

**Schedule I**

**LEHMAN BROTHERS HOLDINGS INC.**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
Statement of Cash Flows
(Parent Company Only)

| In millions | Year Ended November 30, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| **Cash Flows From Operating Activities** | | | |
| Net income | $ 4,192 | $ 4,007 | $ 3,260 |
| Adjustments to reconcile net income to net cash used in operating activities: | | | |
| Equity in income of subsidiaries | (6,090) | (4,613) | (3,836) |
| Depreciation and amortization | 197 | 164 | 115 |
| Deferred tax provision | 177 | 250 | 39 |
| Tax benefit from the issuance of stock-based awards | — | — | 1,005 |
| Non-cash compensation | 1,791 | 1,706 | 1,055 |
| Cumulative effect of accounting change | — | (25) | — |
| Other adjustments | 12 | 16 | 22 |
| Net change in: | | | |
| Cash segregated and on deposit for regulatory and other purposes | 39 | (3) | (48) |
| Financial instruments and other inventory positions owned | (11,827) | 6,013 | (15,284) |
| Financial instruments and other inventory positions sold but not yet purchased | 2,928 | (146) | 64 |
| Collateralized agreements and collateralized financing, net | 3,315 | (7,022) | 12,775 |
| Other assets and payables, net | (2,254) | (1,677) | (1,039) |
| Due to/from affiliates, net | (23,064) | (21,542) | 1,553 |
| Net cash used in operating activities | (30,584) | (22,872) | (319) |
| **Cash Flows From Investing Activities** | | | |
| Dividends received | 3,024 | 2,974 | 2,394 |
| Capital contributions from/to subsidiaries, net | (2,262) | (1,348) | (1,272) |
| Purchase of property, equipment and leasehold improvements, net | (504) | (331) | (243) |
| Business acquisitions, net of cash acquired | — | — | — |
| Net cash provided by investing activities | 258 | 1,295 | 879 |
| **Cash Flows From Financing Activities** | | | |
| Tax benefit from the issuance of stock-based awards | 434 | 836 | — |
| Issuance of short-term borrowings, net | 2,345 | 295 | 231 |
| Issuance of long-term borrowings | 49,793 | 30,231 | 11,862 |
| Principal payments of long-term borrowings, including the current portion of long-term borrowings | (20,883) | (8,020) | (8,239) |
| Issuance of common stock | 84 | 119 | 230 |
| Issuance of treasury stock | 359 | 518 | 1,015 |
| Purchase of treasury stock | (2,605) | (2,678) | (2,994) |
| (Retirement)/issuance of preferred stock | — | — | (250) |
| Dividends paid | (418) | (342) | (302) |
| Net cash provided by financing activities | 29,109 | 20,959 | 1,553 |
| Net change in cash and cash equivalents | (1,217) | (618) | 2,113 |
| Cash and cash equivalents, beginning of period | 3,435 | 4,053 | 1,940 |
| Cash and cash equivalents, end of period | $ 2,218 | $ 3,435 | $ 4,053 |

**Supplemental Disclosure of Cash Flow Information (in millions):**
Interest paid totaled $12,532, $7,937 and $4,563 in 2007, 2006 and 2005, respectively.

Income taxes received totaled $1,169, $1,602 and $1,876 in 2007, 2006 and 2005, respectively.

See Notes to Condensed Financial Information of Registrant.

F-4

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

## Note 1 Basis of Presentation

The condensed financial information of Lehman Brothers Holdings Inc. ("Holdings, " "we," "us" or "our") should be read in conjunction with the Consolidated Financial Statements of Lehman Brothers Holdings Inc. (collectively, the "Company") and the notes thereto. Certain prior period amounts reflect reclassifications to conform to the current period's presentation. Equity in net assets of subsidiaries is accounted for in accordance with the equity method of accounting. The presented, condensed financial information contain certain allocations that are reasonable in management's judgment.

## Note 2 Financial Instruments and Other Inventory Positions

Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased are recorded at fair value and were comprised of the following:

| In millions | Owned | | | Sold But Not Yet Purchased | | |
|---|---|---|---|---|---|---|
| | Nov 30, 2007 | | Nov 30, 2006 | Nov 30, 2007 | | Nov 30, 2006 |
| Mortgage and asset-backed securities | $ | 20,104 | $ 16,311 | $ — | $ | — |
| Real estate held for sale | | 5,214 | — | — | | — |
| Commercial paper and other money market instruments | | 1,004 | 101 | — | | — |
| Corporate equities | | 553 | 290 | — | | — |
| Corporate debt and other | | 420 | 157 | — | | — |
| Government and agencies | | 1 | — | — | | — |
| Derivatives and other contractual agreements | | 6,925 | 1,007 | 3,020 | | 92 |
| | $ | 34,221 | $ 17,866 | $ 3,020 | $ | 92 |

## Note 3 Fair Value of Financial Instruments

Financial instruments and other inventory positions owned, excluding Real estate held for sale, and Financial instruments and other inventory positions sold but not yet purchased, are presented at fair value. In addition, certain long and short-term borrowing obligations, principally certain hybrid financial instruments, are presented at fair value.

Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the Condensed Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value. Hierarchical levels – defined by SFAS 157 and directly related to the amount of subjectivity associated with the inputs to fair valuation of these assets and liabilities – are as follows:

Level I – Inputs are unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

The types of assets and liabilities carried at Level I fair value generally are G-7 government and agency securities, equities listed in active markets, investments in publicly traded mutual funds with quoted market prices and listed derivatives.

Level II – Inputs (other than quoted prices included in Level I) are either directly or indirectly observable for the asset or liability through correlation with market data at the measurement date and for the duration of the instrument's anticipated life.

F-5

## LEHMAN BROTHERS HOLDINGS INC.
### NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT
#### (Parent Company Only)

Fair valued assets and liabilities that are generally included in this category are non-G-7 government securities, municipal bonds, certain hybrid financial instruments, certain mortgage and asset backed securities, certain corporate debt, certain commitments and guarantees, certain private equity investments and certain derivatives.

Level III – Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Generally, assets and liabilities carried at fair value and included in this category are certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives.

**Fair Value on a Recurring Basis**

Assets and liabilities measured at fair value on a recurring basis are categorized in the tables below based upon the lowest level of significant input to the valuations.

| | At November 30, 2007 | | | |
|---|---|---|---|---|
| In millions | Level I | Level II | Level III | Total |
| Financial instruments and other inventory positions owned: | | | | |
| Mortgages and asset-backed securities | $ — | $ 14,903 | $ 5,201 | $ 20,104 |
| Commercial paper and other money market instruments | 1,004 | — | — | 1,004 |
| Corporate equities | 164 | 212 | 177 | 553 |
| Corporate debt and other | — | 420 | — | 420 |
| Government and agencies | — | 1 | — | 1 |
| Derivative assets | 13 | 6,858 | 54 | 6,925 |
| | $ 1,181 | $ 22,394 | $ 5,432 | $ 29,007 |
| Financial instruments and other inventory positions sold but not yet purchased: | | | | |
| Derivative liabilities | — | 3,019 | 1 | $ 3,020 |
| | $ — | $ 3,019 | $ 1 | $ 3,020 |
| Liabilities carried at fair value: [1] | | | | |
| Short-term borrowings | — | $ 1,819 | — | $ 1,819 |
| Long-term borrowings | — | $ 5,371 | — | $ 5,371 |

[1]   In accordance with our adoption of SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140* ("SFAS 155"), SFAS 157, and SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"), we also measure certain non-inventory liabilities at fair value.

**Level III Gains and Losses**

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions and other in the Condensed Statement of Income. Net realized gains associated with Level III financial instruments were approximately $345 million for the fiscal year ended November 30, 2007. The net unrealized loss on Level III non-derivative financial instruments was approximately $273 million for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions. The net unrealized loss on Level III derivative financial instruments was approximately $15 million for the fiscal year ended November 30, 2007. Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

F-6

# LEHMAN BROTHERS HOLDINGS INC.
## NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### (Parent Company Only)

The table presented below summarizes the change in balance sheet carrying values associated with Level III financial instruments during the fiscal year ended November 30, 2007. Caution should be utilized when evaluating reported net revenues for Level III Financial instruments. The values presented exclude economic hedging activities that may be transacted in instruments categorized within other fair value hierarchy levels. Actual net revenues associated with Level III financial instruments inclusive of hedging activities could differ materially.

| In millions Year ended November 30, 2007 | Balance December 1, 2006 | Periodic Payments, Purchases, Sales, Net | Net Transfers In/(Out) | Gains/(Losses) [1] | | Balance November 30, 2007 |
|---|---|---|---|---|---|---|
| | | | | Realized | Unrealized | |
| Mortgages and asset-backed positions | $ 2,618 | $ 1,309 | $ 1,227 | $ 346 | $ (299) | $ 5,201 |
| Corporate equities | — | 14 | 137 | — | 26 | 177 |
| Derivatives, net | 1 | 68 | — | (1) | (15) | 53 |
| | $ 2,619 | $ 1,391 | $ 1,364 | $ 345 | $ (288) | $ 5,431 |

[1] Realized or unrealized gains/ (losses) from changes in values of Level III Financial instruments represent gains/ (losses) from changes in values of those Financial instruments only for the period(s) in which the instruments were classified as Level III.

**Note 4 Borrowings**

Total borrowings consist of the following:

| In millions | November 30, | |
|---|---|---|
| | 2007 | 2006 |
| **Short-term borrowings** | | |
| Unsecured | | |
| Current portion of long-term borrowings | $ 12,106 | $ 8,598 |
| Commercial paper | 3,101 | 1,432 |
| Other short-term debt | 1,367 | 691 |
| Total | $ 16,574 | $ 10,721 |
| Amount carried at fair value [1] | $ 1,819 | $ 2,295 |
| Weighted-average contractual interest rate | 5.03% | 5.77% |
| **Long-term borrowings** | | |
| Senior notes | $ 75,048 | $ 53,718 |
| Subordinated notes | 12,291 | 3,737 |
| Total | $ 87,339 | $ 57,455 |
| Amount carried at fair value [1] | $ 5,371 | $ 864 |
| Weighted-average contractual interest rate [2] | 5.26% | 4.77% |

[1] Borrowings are carried at fair value in accordance with SFAS 155 and SFAS 159. For additional information, Note 3, "Fair Value of Financial Instruments," to the Condensed Financial Information.

[2] Weighted-average contractual interest rates for U.S.-dollar denominated obligations were 5.64% and 5.46% at November 30, 2007 and 2006, respectively. Weighted-average contractual interest rates for non-U.S.-dollar denominated obligations were 4.61% and 3.83% at November 30, 2007 and 2006, respectively.

F-7

## LEHMAN BROTHERS HOLDINGS INC.
### NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT
#### (Parent Company Only)

**Maturity Profile**

The maturity dates of long-term borrowings are as follows:

| In millions | U.S. Dollar | | Non–U.S. Dollar | | Total | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Floating Rate | Fixed Rate | Floating Rate | Nov 30, 2007 | Nov 30, 2006 |
| Maturing in fiscal 2008 | — | — | — | — | — | $ 13,090 |
| Maturing in fiscal 2009 | $ 1,560 | $ 11,676 | $ 237 | $ 2,314 | $ 15,787 | 8,977 |
| Maturing in fiscal 2010 | 3,610 | 3,242 | 1,270 | 743 | 8,865 | 4,892 |
| Maturing in fiscal 2011 | 2,196 | 2,400 | 1,356 | 4,839 | 10,791 | 9,962 |
| Maturing in fiscal 2012 | 4,640 | 1,949 | 3,121 | 5,676 | 15,386 | 3,794 |
| December 1, 2012 and thereafter | 18,200 | 6,062 | 4,702 | 7,546 | 36,510 | 16,740 |
| | $ 30,206 | $ 25,329 | $ 10,686 | $ 21,118 | $ 87,339 | $ 57,455 |

At November 30, 2007, there is one obligation in the amount of $745 million of outstanding long-term borrowings that is repayable at par value prior to maturity at the option of the holder. The obligation is reflected in the above table as maturing at its put date, which is in fiscal 2012, rather than at its contractual maturity of fiscal 2022. In addition, approximately $13.0 billion of long-term borrowings are redeemable prior to maturity at our option under various terms and conditions. These obligations are reflected in the above table at their contractual maturity dates, which range from fiscal 2009 to fiscal 2054, rather than at their call dates which range from fiscal 2009 to fiscal 2027. Extendible debt structures totaling approximately $2.3 billion are shown in the above table at their earliest maturity dates, which range from fiscal 2009 to fiscal 2013. Extendible debt matures on an initial specified maturity date unless the debt holders elect to extend the term of the note for a period specified in the note.

At November 30, 2007, our U.S. dollar and non-U.S. dollar debt portfolios included approximately $5.2 billion and $14 million, respectively, of certain hybrid financial instruments for which the interest rates and/or redemption values are linked to the performance of an underlying measure (including industry baskets of stocks, commodities or credit events). Generally, such notes are issued as floating rate notes or the interest rates on such index notes are effectively converted to floating rates based primarily on LIBOR through the use of derivatives.

**End–User Derivative Activities**

We use a variety of derivative products including interest rate and currency swaps as an end-user to modify the interest rate characteristics of our long-term borrowings portfolio. We use interest rate swaps to convert a substantial portion of our fixed-rate debt to floating interest rates to more closely match the terms of assets being funded and to minimize interest rate risk. In addition, we use cross-currency swaps to hedge our exposure to foreign currency risk arising from our non-U.S. dollar debt obligations, after consideration of non-U.S. dollar assets that are funded with long-term debt obligations in the same currency. In certain instances, we may use two or more derivative contracts to manage the interest rate nature and/or currency exposure of an individual long-term borrowings issuance.

End–User Derivative Activities resulted in the following mix of fixed and floating rate debt:

**Long-Term Borrowings After End–User Derivative Activities**

| In millions | November 30, | |
|---|---|---|
| | 2007 | 2006 |
| U.S. dollar obligations: | | |
| Fixed rate | $ 5,727 | $ 875 |
| Floating rate | 66,283 | 47,950 |
| Total U.S. dollar obligations | 72,010 | 48,825 |
| Non–U.S. dollar obligations | 15,329 | 8,630 |
| | $ 87,339 | $ 57,455 |

The weighted-average effective interest rates after end-user derivative activities on U.S. dollar, non-U.S. dollar, and total borrowings were 5.15%, 4.22%, and 4.99%, respectively, at November 30, 2007. The weighted-average effective interest rates

after end-user derivative activities on U.S. dollar, non-U.S. dollar, and total borrowings were 5.63%, 3.67%, and 5.34%, respectively, at November 30, 2006.

F-8

## LEHMAN BROTHERS HOLDINGS INC.
## NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### (Parent Company Only)

**Credit Facilities**

We use both committed and uncommitted bilateral and syndicated long-term bank facilities to complement our long-term debt issuance. In particular, Holdings maintains a $2.0 billion unsecured, committed revolving credit agreement with a syndicate of banks which expires in February 2009. Our ability to borrow under such facilities is conditioned on complying with customary lending conditions and covenants. We have maintained compliance with the material covenants under these credit agreements at all times. We draw on these facilities from time to time in the normal course of conducting our business. As of November 30, 2007, there were no borrowings against these facilities.

## Note 5 Guarantees

We guarantee certain long-term borrowings issued by subsidiaries totaling $34.2 billion and $21.7 billion at November 30, 2007 and 2006, respectively. In addition, we guarantee certain liquidity facilities and certain subsidiaries' derivative and other obligations.

## Note 6 Related Party Transactions

In the normal course of business, we engage in various securities trading and financing activities with many of our subsidiaries (the "Related Parties"). Included within non-interest expenses are management fees associated with affiliate services provided, of $0, $251 million and $423 million in 2007, 2006 and 2005, respectively. Various charges, such as compensation and benefits, occupancy, administration and computer processing are allocated among the Related Parties, based on specific identification and other allocation methods.

We and our subsidiaries raise money through short- and long-term funding in capital markets, which is used to fund the operations of certain of our wholly-owned subsidiaries. We believe amounts arising through related party transactions, including those allocated expenses referred to above, are reasonable and approximate the amounts that would have been recorded if we operated as an unaffiliated entity.

Amounts outstanding to and from Related Parties are reflected in the Statement of Financial Condition as set forth below:

| | Nov 30, 2007 | | Nov 30, 2006 | |
|---|---|---|---|---|
| **In millions** | **Assets** | **Liabilities** | **Assets** | **Liabilities** |
| Cash on deposit with affiliates | $ — | $ — | $ 270 | $ — |
| Derivative and other contractual agreements | 6,943 | 70 | 1,009 | 12 |
| Advances from/to subsidiaries | 117,410 | 54,515 | 78,047 | 34,427 |
| Securities purchased/sold under agreements to resell/repurchase | 26,766 | 16,346 | 17,593 | 10,962 |
| Other assets | 216 | — | — | — |
| Payables to brokers, dealers and clearing organizations | — | 282 | — | — |
| Long-term borrowings | — | 230 | — | 722 |

Dividends declared to us by our subsidiaries and affiliates were approximately $3.0 billion, $3.0 billion and $2.4 billion in 2007, 2006 and 2005, respectively.

Certain covenants contained in various debt agreements may restrict our ability to withdraw capital from our regulated subsidiaries, which in turn could limit our ability to pay dividends to shareholders. At November 30, 2007, approximately $10.1 billion of net assets of subsidiaries were restricted as to the payment of dividends to us.

## Note 7 Condensed Consolidating Financial Statement Schedules

LBI had approximately $0.8 billion of debt securities outstanding at November 30, 2007 that were issued in registered public offerings and were therefore subject to the reporting requirements of Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 ("the Exchange Act"). Holdings has fully and unconditionally guaranteed these outstanding debt securities of LBI (and any debt securities of LBI that may be issued in the future under these registration statements), which, together with the information presented within this note, allows LBI to avail itself of an exemption provided by SEC rules from the requirement to file separate LBI reports under the Exchange Act. For further discussion on the regulatory requirements of our subsidiaries,

see Note 15 to the 2007 Consolidated Financial Statements included in this Form 10-K for

F-9

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

a discussion of restrictions on the ability of Holdings to obtain funds from its subsidiaries by dividend or loan.

In 2006, certain wholly-owned subsidiaries of LBI were sold to Holdings at their then carrying values as part of a corporate restructuring. In accordance with Statement SFAS 141, *Business Combinations,* the accompanying condensed consolidating financial statements report the results of operations of LBI excluding the results of these entities. As a result, LBI's net income for the year ended November 30, 2006 does not include approximately $99 million earned by these entities through September 2006 when they were transferred. In addition, LBI's opening retained earnings for the year ended November 30, 2006 was reduced by approximately $229 million, representing the carrying value of these transferred entities at November 30, 2005. In addition, this sale has been retrospectively applied in the condensed consolidating financial statements as of and for the year ended November 30, 2005.

The following schedules set forth our condensed consolidating statements of income for the years ended November 30, 2007, 2006 and 2005; our condensed consolidating balance sheets at November 30, 2007 and 2006, and our condensed consolidating statements of cash flows for the years ended November 30, 2007, 2006 and 2005. In the following schedules, "Holdings" refers to the unconsolidated balances of Holdings, "LBI" refers to the unconsolidated balances of Lehman Brothers Inc. and "Other Subsidiaries" refers to the combined balances of all other subsidiaries of Holdings. "Eliminations" represents the adjustments necessary to eliminate inter-company transactions and our investments in subsidiaries.

**Condensed Consolidating Statement of Income**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|
| **Year Ended November 30, 2007** | | | | | |
| Net revenues | $ (2,289) | $ 2,016 | $ 19,530 | $ — | $ 19,257 |
| Equity in net income of subsidiaries | 6,090 | 1,726 | — | (7,816) | — |
| Total non-interest expenses | 734 | 2,184 | 10,326 | — | 13,244 |
| Income before taxes | 3,067 | 1,558 | 9,204 | (7,816) | 6,013 |
| Provision/(benefit) for income taxes | (1,125) | (243) | 3,189 | — | 1,821 |
| Net income | $ 4,192 | $ 1,801 | $ 6,015 | $ (7,816) | $ 4,192 |
| **Year Ended November 30, 2006** | | | | | |
| Net revenues | $ (291) | $ 6,483 | $ 11,391 | $ — | $ 17,583 |
| Equity in net income of subsidiaries | 4,613 | 523 | — | (5,136) | — |
| Total non-interest expenses | 867 | 4,252 | 6,559 | — | 11,678 |
| Income before taxes and cumulative effect of accounting change | 3,455 | 2,754 | 4,832 | (5,136) | 5,905 |
| Provision/(benefit) for income taxes | (527) | 875 | 1,597 | — | 1,945 |
| Income before cumulative effect of accounting change | 3,982 | 1,879 | 3,235 | (5,136) | 3,960 |
| Cumulative effect of accounting change | 25 | 22 | — | — | 47 |
| Net income | $ 4,007 | $ 1,901 | $ 3,235 | $ (5,136) | $ 4,007 |
| **Year Ended November 30, 2005** | | | | | |
| Net revenues | $ (177) | $ 4,394 | $ 10,413 | $ — | $ 14,630 |
| Equity in net income of subsidiaries | 3,836 | 688 | — | (4,524) | — |
| Total non-interest expenses | 1,038 | 3,138 | 5,625 | — | 9,801 |
| Income before taxes | 2,621 | 1,944 | 4,788 | (4,524) | 4,829 |
| Provision/(benefit) for income taxes | (639) | 491 | 1,717 | — | 1,569 |
| Net income | $ 3,260 | $ 1,453 | $ 3,071 | $ (4,524) | $ 3,260 |

F-10

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

**Condensed Consolidating Balance Sheet at November 30, 2007**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---:|---:|---:|---:|---:|
| **Assets** | | | | | |
| Cash and cash equivalents | $  2,218 | $    356 | $    6,205 | $    (1,493) | $    7,286 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 12 | 7,986 | 4,745 | — | 12,743 |
| Financial instruments and other inventory positions owned | 34,221 | 85,617 | 262,753 | (69,462) | 313,129 |
| Collateralized agreements | — | 177,499 | 123,735 | — | 301,234 |
| Receivables and other assets | 7,691 | 18,325 | 48,363 | (17,708) | 56,671 |
| Due from subsidiaries | 144,176 | 81,078 | 658,244 | (883,498) | — |
| Equity in net assets of subsidiaries | 25,058 | 1,491 | 78,655 | (105,204) | — |
| Total assets | $  213,376 | $  372,352 | $  1,182,700 | $  (1,077,365) | $  691,063 |
| **Liabilities and stockholders' equity** | | | | | |
| Short-term borrowings and current portion of long-term borrowings | $  16,574 | $    936 | $    13,020 | $    (2,464) | $  28,066 |
| Financial instruments and other inventory positions sold but not yet purchased | 3,020 | 52,422 | 155,352 | (61,177) | 149,617 |
| Collateralized financing | 9,451 | 118,912 | 134,733 | (5,065) | 258,031 |
| Accrued liabilities and other payables | 3,641 | 24,801 | 70,262 | (18,358) | 80,346 |
| Due to subsidiaries | 70,861 | 165,607 | 567,840 | (804,308) | — |
| Deposit liabilities at banks | — | — | 29,584 | (221) | 29,363 |
| Long-term borrowings | 87,339 | 5,228 | 111,151 | (80,568) | 123,150 |
| Total liabilities | 190,886 | 367,906 | 1,081,942 | (972,161) | 668,573 |
| Total stockholders' equity | 22,490 | 4,446 | 100,758 | (105,204) | 22,490 |
| Total liabilities and stockholders' equity | $  213,376 | $  372,352 | $  1,182,700 | $  (1,077,365) | $  691,063 |

F-11

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

**Condensed Consolidating Balance Sheet at November 30, 2006**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 3,435 | $ 534 | $ 4,369 | $ (2,351) | $ 5,987 |
| Cash and securities segregated and on deposit for regulatory and other purposes | 51 | 3,256 | 2,784 | — | 6,091 |
| Financial instruments and other inventory positions owned | 17,866 | 73,885 | 173,839 | (38,994) | 226,596 |
| Collateralized agreements | — | 149,288 | 75,868 | — | 225,156 |
| Receivables and other assets | 4,945 | 12,998 | 27,911 | (6,139) | 39,715 |
| Due from subsidiaries | 95,640 | 66,074 | 434,208 | (595,922) | — |
| Equity in net assets of subsidiaries | 19,333 | 1,267 | 43,532 | (64,132) | — |
| Total assets | $ 141,270 | $ 307,302 | $ 762,511 | $ (707,538) | $ 503,545 |
| **Liabilities and stockholders' equity** | | | | | |
| Short-term borrowings and current portion of long-term borrowings | $ 10,721 | $ 538 | $ 9,412 | $ (33) | $ 20,638 |
| Financial instruments and other inventory positions sold but not yet purchased | 92 | 58,393 | 104,910 | (37,435) | 125,960 |
| Collateralized financing | 6,136 | 89,512 | 80,909 | — | 176,557 |
| Accrued liabilities and other payables | 2,286 | 18,893 | 44,599 | (7,169) | 58,609 |
| Due to subsidiaries | 45,389 | 130,145 | 376,137 | (551,671) | — |
| Deposit liabilities at banks | — | — | 23,786 | (2,374) | 21,412 |
| Long-term borrowings | 57,455 | 5,821 | 62,626 | (44,724) | 81,178 |
| Total liabilities | 122,079 | 303,302 | 702,379 | (643,406) | 484,354 |
| Total stockholders' equity | 19,191 | 4,000 | 60,132 | (64,132) | 19,191 |
| Total liabilities and stockholders' equity | $ 141,270 | $ 307,302 | $ 762,511 | $ (707,538) | $ 503,545 |

F-12

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

**Condensed Consolidating Statement of Cash Flows for the Year Ended November 30, 2007**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | |
| Net income | $ 4,192 | $ 1,801 | $ 6,015 | $ (7,816) | $ 4,192 |
| Adjustments to reconcile net income to net cash provided by/(used in) operating activities: | | | | | |
| Equity in income of subsidiaries | (6,090) | (1,726) | — | 7,816 | — |
| Depreciation and amortization | 197 | 36 | 344 | — | 577 |
| Non-cash compensation | 1,791 | — | — | — | 1,791 |
| Deferred tax provision/(benefit) | 177 | (327) | 568 | — | 418 |
| Other adjustments | 12 | 26 | (144) | (8) | (114) |
| Net change in: | | | | | |
| Cash and securities segregated and on deposit for regulatory and other purposes | 39 | (4,730) | (1,961) | — | (6,652) |
| Financial instruments and other inventory positions owned | (11,827) | (11,731) | (85,275) | 29,930 | (78,903) |
| Financial instruments and other inventory positions sold but not yet purchased | 2,928 | (5,971) | 50,200 | (23,742) | 23,415 |
| Collateralized agreements and collateralized financing, net | 3,315 | 1,189 | 5,956 | (5,065) | 5,395 |
| Other assets and payables, net | (2,254) | 919 | 4,798 | 823 | 4,286 |
| Due to/from affiliates, net | (23,064) | 20,458 | (32,333) | 34,939 | — |
| Net cash provided by/(used in) operating activities | (30,584) | (56) | (51,832) | 36,877 | (45,595) |
| **Cash Flows from Investing Activities** | | | | | |
| Dividends received/(paid) | 3,024 | 148 | (3,172) | — | — |
| Purchase of property, equipment and leasehold improvements, net | (504) | (47) | (415) | — | (966) |
| Business acquisitions, net of cash acquired | — | — | (965) | — | (965) |
| Proceeds from sale of business | — | — | 233 | — | 233 |
| Capital contributions from/to subsidiaries, net | (2,262) | — | 2,262 | — | — |
| Net cash provided by/(used in) investing activities | 258 | 101 | (2,057) | — | (1,698) |
| **Cash Flows from Financing Activities** | | | | | |
| Derivative contracts with a financing element | — | — | 242 | — | 242 |
| Tax benefit from the issuance of stock-based awards | 434 | — | — | — | 434 |
| Issuance of short-term borrowings, net | 2,345 | 97 | 3,370 | (2,431) | 3,381 |
| Deposit liabilities at banks | — | — | 4,915 | 2,153 | 7,068 |
| Issuance of long-term borrowings | 49,793 | 13 | 85,340 | (48,844) | 86,302 |
| Principal payments of long-term borrowings, including the current portion of long-term borrowings | (20,883) | (333) | (38,142) | 13,103 | (46,255) |
| Issuance of common stock | 84 | — | — | — | 84 |
| Issuance of treasury stock | 359 | — | — | — | 359 |
| Purchase of treasury stock | (2,605) | — | — | — | (2,605) |
| Dividends paid | (418) | — | — | — | (418) |
| Net cash provided by/(used in) financing activities | 29,109 | (223) | 55,725 | (36,019) | 48,592 |
| Net change in cash and cash equivalents | (1,217) | (178) | 1,836 | 858 | 1,299 |
| Cash and cash equivalents, beginning of period | 3,435 | 534 | 4,369 | (2,351) | 5,987 |
| Cash and cash equivalents, end of period | $ 2,218 | $ 356 | $ 6,205 | $ (1,493) | $ 7,286 |

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

**Condensed Consolidating Statement of Cash Flows for the Year Ended November 30, 2006**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | |
| Net income | $   4,007 | $   1,901 | $   3,235 | $   (5,136) | $   4,007 |
| Adjustments to reconcile net income to net cash provided by/(used in) operating activities: | | | | | |
|    Equity in income of subsidiaries | (4,613) | (523) | — | 5,136 | — |
|    Depreciation and amortization | 164 | 51 | 299 | — | 514 |
|    Non-cash compensation | 1,706 | — | — | — | 1,706 |
|    Deferred tax provision/(benefit) | 250 | (346) | 36 | — | (60) |
|    Cumulative effect of accounting change | (25) | (22) | — | — | (47) |
|    Other adjustments | 16 | 15 | (28) | — | 3 |
|    Net change in: | | | | | |
|      Cash and securities segregated and on deposit for regulatory and other purposes | (3) | (450) | 106 | — | (347) |
|      Financial instruments and other inventory positions owned | 6,013 | (17,937) | (22,538) | (11,640) | (46,102) |
|      Financial instruments and other inventory positions sold but not yet purchased | (146) | 4,162 | (952) | 12,160 | 15,224 |
|      Collateralized agreements and collateralized financing, net | (7,022) | (4,116) | (5,222) | — | (16,360) |
|      Other assets and payables, net | (1,677) | (2,538) | 13,176 | (3,875) | 5,086 |
|      Due to/from affiliates, net | (21,542) | 20,832 | (15,876) | 16,586 | — |
| Net cash provided by/(used in) operating activities | (22,872) | 1,029 | (27,764) | 13,231 | (36,376) |
| | | | | | |
| **Cash Flows from Investing Activities** | | | | | |
| Dividends received/(paid) | 2,974 | (1,124) | (1,850) | — | — |
| Purchase of property, equipment and leasehold improvements, net | (331) | (33) | (222) | — | (586) |
| Business acquisitions, net of cash acquired | — | — | (206) | — | (206) |
| Capital contributions from/to subsidiaries, net | (1,348) | (100) | 1,448 | — | — |
| Net cash provided by/(used in) investing activities | 1,295 | (1,257) | (830) | — | (792) |
| | | | | | |
| **Cash Flows from Financing Activities** | | | | | |
| Derivative contracts with a financing element | — | — | 159 | — | 159 |
| Tax benefit from the issuance of stock-based awards | 836 | — | — | — | 836 |
| Issuance of short-term borrowings, net | 295 | 123 | 4,434 | (33) | 4,819 |
| Deposit liabilities at banks | — | — | 5,198 | 1,147 | 6,345 |
| Issuance of long-term borrowings | 30,231 | 516 | 39,809 | (22,441) | 48,115 |
| Principal payments of long-term borrowings, including the current portion of long-term borrowings | (8,020) | (324) | (19,071) | 7,779 | (19,636) |
| Issuance of common stock | 119 | — | — | — | 119 |
| Issuance of treasury stock | 518 | — | — | — | 518 |
| Purchase of treasury stock | (2,678) | — | — | — | (2,678) |
| Dividends paid | (342) | — | — | — | (342) |
| Net cash provided by financing activities | 20,959 | 315 | 30,529 | (13,548) | 38,255 |
| Net change in cash and cash equivalents | (618) | 87 | 1,935 | (317) | 1,087 |
| Cash and cash equivalents, beginning of period | 4,053 | 447 | 2,434 | (2,034) | 4,900 |

| | | | | | |
|---|---|---|---|---|---|
| Cash and cash equivalents, end of period | $ 3,435 | $ 534 | $ 4,369 | $ (2,351) | $ 5,987 |

F-14

**LEHMAN BROTHERS HOLDINGS INC.**
**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**(Parent Company Only)**

**Condensed Consolidating Statement of Cash Flows for the Year Ended November 30, 2005**

| In millions | Holdings | LBI | Other Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | |
| Net income | $ 3,260 | $ 1,453 | $ 3,071 | $ (4,524) | $ 3,260 |
| Adjustments to reconcile net income to net cash provided by/(used in) operating activities: | | | | | |
| Equity in income of subsidiaries | (3,836) | (688) | — | 4,524 | — |
| Depreciation and amortization | 115 | 48 | 263 | — | 426 |
| Deferred tax provision/(benefit) | 39 | (102) | (439) | — | (502) |
| Tax benefit from the issuance of stock-based awards | 1,005 | — | — | — | 1,005 |
| Non-cash compensation | 1,055 | — | — | — | 1,055 |
| Other adjustments | 22 | 33 | 118 | — | 173 |
| Net change in: | | | | | |
| Cash and securities segregated and on deposit for regulatory and other purposes | (48) | (1,215) | (396) | — | (1,659) |
| Financial instruments and other inventory positions owned | (15,284) | (8,382) | (22,712) | 9,726 | (36,652) |
| Financial instruments and other inventory positions sold but not yet purchased | 64 | 20,564 | 2,384 | (8,856) | 14,156 |
| Collateralized agreements and collateralized financing, net | 12,775 | (21,038) | 14,118 | — | 5,855 |
| Other assets and payables, net | (1,039) | 3,543 | (4,332) | 2,506 | 678 |
| Due to/from affiliates, net | 1,553 | 5,745 | (10,573) | 3,275 | — |
| Net cash provided by/(used in) operating activities | (319) | (39) | (18,498) | 6,651 | (12,205) |
| **Cash Flows from Investing Activities** | | | | | |
| Dividends received/(paid) | 2,394 | (259) | (2,135) | — | — |
| Purchase of property, equipment and leasehold improvements, net | (243) | (31) | (135) | — | (409) |
| Business acquisitions, net of cash acquired | — | (5) | (33) | — | (38) |
| Capital contributions from/to subsidiaries, net | (1,272) | — | 1,272 | — | — |
| Net cash provided by/(used in) investing activities | 879 | (295) | (1,031) | — | (447) |
| **Cash Flows from Financing Activities** | | | | | |
| Derivative contracts with a financing element | — | — | 140 | — | 140 |
| Issuance of short-term borrowings, net | 231 | (174) | 27 | — | 84 |
| Deposit liabilities at banks | — | — | 8,238 | (3,521) | 4,717 |
| Issuance of long-term borrowings | 11,862 | 500 | 17,332 | (5,989) | 23,705 |
| Principal payments of long-term borrowings, including the current portion of long-term borrowings | (8,239) | (102) | (6,717) | 825 | (14,233) |
| Issuance of common stock | 230 | — | — | — | 230 |
| Issuance of treasury stock | 1,015 | — | — | — | 1,015 |
| Purchase of treasury stock | (2,994) | — | — | — | (2,994) |
| Retirement of preferred stock | (250) | — | — | — | (250) |
| Dividends paid | (302) | — | — | — | (302) |
| Net cash provided by financing activities | 1,553 | 224 | 19,020 | (8,685) | 12,112 |

| | | | | | |
|---|---|---|---|---|---|
| Net change in cash and cash equivalents | | 2,113 | (110) | (509) | (2,034) | (540) |
| Cash and cash equivalents, beginning of period | | 1,940 | 557 | 2,943 | — | 5,440 |
| Cash and cash equivalents, end of period | $ 4,053 | $ 447 | $ 2,434 | $ (2,034) | $ 4,900 |

F-15

## EXHIBIT INDEX

| EXHIBIT NO. | EXHIBIT |
|---|---|
| 10.11 | 1999 Neuberger Berman Inc. Long-Term Incentive Plan, restated as of November 8, 2007 |
| 10.14 | Lehman Brothers Holdings Inc. 1994 Management Ownership Plan, as amended through November 8, 2007 |
| 10.15 | Lehman Brothers Holdings Inc. 1996 Management Ownership Plan, as amended through November 8, 2007 |
| 10.16 | Form of Agreement evidencing a grant of Restricted Stock Units to Executive Officers under the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan |
| 10.17 | Form of Agreement evidencing a grant of Nonqualified Stock Options to Executive Officers under the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan |
| 10.19 | Amended and Restated Lehman Brothers Holdings Inc. Employee Incentive Plan, as amended through November 8, 2007 |
| 10.20 | Form of Agreement evidencing a grant of Restricted Stock Units to Directors pursuant to the Lehman Brothers Holdings Inc. Employee Incentive Plan |
| 10.21 | Form of Agreement evidencing a grant of Nonqualified Stock Options to Directors pursuant to the Lehman Brothers Holdings Inc. Employee Incentive Plan |
| 10.28 | Form of Agreement evidencing a grant of Restricted Stock Units to Directors under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended |
| 10.29 | Form of Agreement evidencing a grant of Nonqualified Stock Options to Directors under the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended |
| 10.30 | Base Salaries of Named Executive Officers of the Registrant |
| 12.01 | Computation in support of ratios of earnings to fixed charges and to combined fixed charges and preferred stock dividends |
| 21.01 | List of the Registrant's Subsidiaries |
| 23.01 | Consent of Ernst & Young LLP |
| 24.01 | Powers of Attorney |
| 31.01 | Certification of Chief Executive Officer Pursuant to Rule 13a-14(a) and 15d-14(a) |
| 31.02 | Certification of Chief Financial Officer Pursuant to Rule 13a-14(a) and 15d-14(a) |
| 32.01 | Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Enacted by Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.02 | Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Enacted by Section 906 of the Sarbanes-Oxley Act of 2002 |

Printed with soy ink on recycled paper.



# PD 18

# Transcript of April 16, 2013 Hearing on Motion to Approve LBI-LBHI Settlement Agreement

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01420-jmp

4

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6

7   In the Matter of:

8

9   LEHMAN BROTHERS INC.,

10              Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17

18                  April 16, 2013

19                  10:02 AM

20

21  B E F O R E :

22  HON JAMES M. PECK

23  U.S. BANKRUPTCY JUDGE

24

25

1   Hearing re:  Motion Pursuant to Federal Rule of Bankruptcy

2   Procedure 9019 for Entry of Orders Approving Settlement

3   Agreement Among the Trustee, LBIE (In Administration) and

4   the LBIE Joint Administrators and Expunging Duplicative

5   Claims [ECF No. 5787]

6

7   Hearing re:  Motion Pursuant to Federal Rule of Bankruptcy

8   Procedure 9019 for Entry of Order Approving Settlement

9   Agreement Between the Trustee and the LBHI Entities [ECF No.

10  5874]

11

12  Hearing re:  Second Motion for Order Approving the Trustee's

13  Allocation of Property, as supplemented [ECF Nos. 4760,

14  5058, 5685, 5790]

15

16  Hearing re:  Notice of Presentment of Stipulation and Order

17  Resolving Limited Objection of Repo Claimants to Second

18  Motion for Order Approving Trustee's Allocation of Property

19  [ECF No. 5997]

20

21  Hearing re:  notice of Presentment of Stipulation and Order

22  Resolving Limited Objection of Liberty View to Motion

23  Pursuant to Federal Rule of Bankruptcy Procedure 9010 for

24  Entry of Orders, Approving Settlement Agreement Among the

25  Trustee, LBIE (In Administration) and the LBIE Joint

08-01420-sccc Doc 6192450 Filed 04/06/14 Entered 04/06/26/14 13:39:19 Main Appendix Document Documents 10 Through 245 Pg 357 of 642

Page 3

1    Administrators and Expunging Duplicative Claims [ECF No.

2    5998]

3

4    Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

5    Strategic Partners, L.P.'s Motion for Limited Intervention

6    in the Contested Matter Concerning the Trustee's

7    Determination of Certain Claims of Lehman Brothers Holdings

8    Inc. and Certain of Its Affiliates [ECF No. 4634]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorney for the Debtor

 4        767 Fifth Avenue

 5        New York, NY 10153-0119

 6

 7   BY:  RICHARD P. KRASNOW, ESQ.

 8

 9   HUGHES HUBBARD

10        Attorneys for the SIPA Trustee

11        One Battery Park Plaza

12        New York, NY 10004-1482

13

14   BY:  JAMES B. KOBAK, JR., ESQ.

15        JAMES W. GIDDENS, ESQ.

16        SHARAD J. KHEMANI, ESQ.

17

18   SECURITIES INVESTOR PROTECTION CORPORATION

19        Attorney for SIPC

20        805 15th Street, N.W.

21        Suite 800

22        Washington, D.C. 20005-2215

23

24   BY:  KENNETH J. CAPUTO, ESQ.

25
```

```
 1   LINKLATERS LLP

 2        Attorney for Lehman Brothers International (Europe)

 3        1345 Avenue of the Americas

 4        New York, NY 10105

 5

 6   BY:  JAMES R. WARNOT, JR., ESQ.

 7

 8   DAVIS POLK & WARDWELL LLP

 9        Attorneys for Lehman Brothers International (Europe)

10        450 Lexington Avenue

11        New York, NY 10017

12

13   BY:  TIMOTHY GRAULICH, ESQ.

14        JAMES MILLERMAN III, ESQ.

15        ERIKA D. WHITE, ESQ.

16

17   BOIES SCHILLER & FLEXNER LLP

18        Attorney for Barclays

19        10 North Pearl Street

20        4th Floor

21        Albany, NY 12207

22

23   BY:  TRICIA J. BLOOMER, ESQ.

24

25
```

Page 6

1    MORRISON & FOERSTER LLP

2         Attorney for BRM Group Ltd.

3         1290 Avenue of the Americas

4         New York, NY 10104-0050

5

6    BY;  NORMAN S. ROSENBAUM, ESQ.

7

8    DEBEVOISE & PLIMPTON LLP

9         Attorney for Ross Financial Corporation

10        919 Third Avenue

11        New York, NY 10022

12

13   BY:  MICHAEL E. WILES, ESQ.

14

15   MORGAN, LEWIS & BOCKIUS LLP

16        Attorney for Lehman Brothers International (Europe)

17        101 Park Avenue

18        New York, NY 10178

19

20   BY:  ROBERT MENDELSON, ESQ.

21

22

23

24

25

```
 1   LOWENSTEIN SANDLER

 2        Attorney for Liberty View Funds

 3        1251 Avenue of the Americas

 4        New York, NY 10020

 5

 6   BY:  MICHAEL S. ETKIN, ESQ.

 7

 8   BROWN RUDNICK LLP

 9        Attorneys for Providence TMT

10        Seven Times Square

11        New York, NY 10036

12

13   BY:  DAVID J. MOLTON, ESQ.

14        HOWARD S. STEEL, ESQ.

15

16   PAUL HASTINGS LLP

17        Attorney for CarVel Investments UK Limited

18        75 East 55th Street

19        New York, NY 10022

20

21   BY:  BRYAN R. KAPLAN, ESQ.

22

23

24

25
```

1  MILBANK, TWEED, HADLEY & MCCLOY LLP

2      Attorney for the Official Committee

3      One Chase Manhattan Plaza

4      New York, NY 10005-1413

5

6  BY:  ERIC K. STODOLA, ESQ.

7

8  ALSO PRESENT TELEPHONICALLY:

9  HAMISH ANDERSON

10 CLAUDIA TOBLER

11 MITCHELL SOCKETT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE COURT:  Be seated, please, good morning.

3           MR. KOBAK:  Good morning, Your Honor, James Kobak,

4    Hughes Hubbard & Reed for the SIPA trustee.

5           Your Honor, the first three items on your calendar

6    today are three interrelated motions, which are probably the

7    most important in the history of this case, or at least the

8    SIPA case, and probably in the history of any SIPA case.

9    Because these motions are interrelated we would like to

10   presently them together if that's acceptable to Your Honor.

11          THE COURT:  That's perfectly acceptable.

12          MR. KOBAK:  All three together are designed to

13   permit when they are final and all conditions are fulfilled

14   and assuming all goes according to plan, 100 percent

15   distribution on allowed customer claims, as well as an

16   appreciable general estate with appropriate reserves or

17   amounts set aside for undecided customer claims and for

18   Barlays claims, and I'll get to that in a moment.

19          They also resolve some of the most complex and

20   challenging issues in this or any other estate involving

21   asserted claims in the tens of billions of dollars.

22          The LBIE and LBHI motions are cross-conditioned on

23   one another and conditioned on the allocation motion being

24   approved largely for that reason.

25          Denial or changes to any one, such as allocation,

1    will trigger termination rights in the LBIE and LBHI

2    agreements.  Terminating those agreements would require

3    determination of complex claims that we've been dealing with

4    for several years for many billions of dollars making

5    anything approaching 100 percent distribution impossible.

6            The orders sought by way of overview are three;

7    approval of both the LBIE and LBHI final agreements dealing

8    with virtually all claims between the respective estates and

9    establishing amounts and means of satisfaction of their

10   customer claims and freeing up billions of dollars of

11   reserve.

12           In addition to distribution for U.S. customers

13   effecting these settlements allows distribution to

14   underlying claimants to be paid in the proceedings involving

15   those affiliates, especially the underlying hedge funds in

16   the UK.

17           In that connection the order requires the

18   duplicate hedge fund claims filed with the LBI trustee be

19   expunged here and the claims be channeled to the UK where

20   they belong.  These claims are asserted potentially in the

21   billions of dollars, perhaps as much as 12- or $13 billion

22   on their face at least, and if there are not expunged there

23   is no possibility of 100 percent distribution.  And again,

24   it's a condition to all the other deals.

25           The third piece of the puzzle is a requested order

1    for allocation of property as between customer property and

2    general estate property and related relief.  This is

3    designed to achieve 100 percent distribution to customers as

4    long as the LBIE and LBHI deals are approved and become

5    effective, duplicate claims are expunged, and the other

6    expectations and conditions to the order are met.

7           This motion also defines what property will be

8    available to distribute to customers.

9           We contemplate in-kind distribution to the extent

10    possible with cash in lieu based on filing date values in

11    cases where shares are not held -- were not held by LBI on

12    the filing date.

13           Corollary to that principal is that postpetition

14    dividends and interest will follow the customer property

15    which the trustee is able to return.  In some cases the

16    trustee does not have specific shares and never had them,

17    and in those cases claims will be satisfied in full through

18    cash in lieu of distributions based on the value of the

19    position on the filing date.

20           Again, this method of distribution is a material

21    part of the other agreements and those agreements are

22    conditioned on this order being entered.

23           This treatment is also the correct and most

24    practicable way of dealing with these issues.

25           I should say that although there were a number of

1    reservations and objections to parts of the relief we spent

2    a lot of time with claimants -- or with objectors and

3    there's really I believe, according to my score card, only

4    one outstanding objection, and that's the Wind Trust

5    objection, which really doesn't go to the settlements as a

6    whole but rather the way Wind Trust claim is treated, and

7    I'll get to that later in my remarks.

8            But essentially all the other responses we

9    received have either been dealt with or involve reservation

10   of rights, and I'll try to go through my remarks and explain

11   the status of that because I know it gets a little

12   complicated.

13           At the end, assuming Your Honor is inclined to

14   approve the orders, my colleague, Mr. Khemani, can go

15   through them one by one if that's helpful.  I don't know if

16   that will be necessary or not, but he's prepared to do that

17   if it will help.

18           With that overview I propose to outline for a few

19   minutes each of the principal proposed orders and indicate

20   opposition or reservation where any remains.

21           To the extent we get into particular details on

22   some issues or individual pieces they may be addressed by

23   other members who are more knowledgeable on these particular

24   points of our legal team if that's acceptable to the Court.

25   I'm not -- since we do not have any opposition I'm not

1   really sure that will be necessary.

2           I note that my partner, Mr. Kiplok and Mr. Amat

3   from LBIE Administration submitted declarations on the LBIE

4   motion and they are present in court.

5           The LBHI transaction, the declarant, Mr. Kiplok,

6   again is present, along with the trustee's special counsel,

7   Mr. Lee.

8           Representative of Deloitte and estate employees

9   who submitted declarations and did the work supporting

10  allocation and related matters are also present.  I think

11  they take up one of the rows in the back of the courtroom.

12          Our UK counsel Norton Rose is on the phone I

13  believe since there is an interplay between this proceeding

14  and the UK proceedings that are integral to approval and

15  there is a hearing scheduled in the English High Court for

16  May 1st.

17          As Your Honor knows SIPC has been involved at all

18  stages of negotiations of these agreements, and in the

19  property allocation efforts in which it has of course a keen

20  interest, it supports the relief requested and Mr. Caputo is

21  in court today as well and prepared to speak I believe after

22  I am done.

23          I'm sure counsel for LBHI and LBIE will address

24  issues affecting their settlements to the extent necessary.

25          Another important and knowledgeable constituency,

1    the ad hoc committee, has also filed a statement in support

2    of the two settlement motions with the two other affiliates.

3            Again, there's no objections to the substance of

4    any of these agreements as a whole.  To the extent there

5    were objections they were largely limited to objections or

6    reservations of rights seeking to reserve points on issues

7    limited to the objectors, and as I said, most of those have

8    been worked out.

9            I'd like to start chronologically with LBHI if

10   that's acceptable to the Court.

11           THE COURT:  That's acceptable.

12           MR. KOBAK:  We announced agreement in principal a

13   little over a year ago, it was always contingent on

14   finalization of the agreement with LBIE and appropriate

15   allocation of property and it is now finalized, though

16   again, it's contingent on those other orders also being

17   approved.

18           The agreement resolves a resolution of

19   substantially all intercompany claims between the parties,

20   including the resolution of some 630 claims by LBHI and

21   affiliated companies originally asserted for almost

22   $20 billion as customer claims and over 50 general creditor

23   claims originally asserted for approximately $22 billion.

24           As reflected in the papers the agreements are a

25   product of over three years of reconciliations between

```
 1    professionals involving exchange of thousands of pages of

 2    documents and computerized and other information and

 3    substantial arms length negotiation.

 4         The parties and their professionals met at least

 5    once or twice a week for more than two years to clarify the

 6    relevant amounts and relationships.

 7         The resulting resolution allows approximately

 8    $2.3 billion of customer claims, including approximately I

 9    think the figure is 121- or $122 billion of postpetition

10    dividends and interest to be paid immediately -- or to be

11    paid upon approval.

12         This figure includes the over --

13         THE COURT:  I think you may have misspoken there

14    because that sounded like an awful lot of money to me.  I

15    think you said --

16         MR. KOBAK:  A million, I'm sorry.  I'm sorry.

17         THE COURT:  I think you said 122 billion and

18    that's a lot of money in this case.

19         MR. KOBAK:  I'm sorry.  That's -- even in this

20    case that's a lot of money.  It's $121 million.

21         THE COURT:  Okay.

22         MR. KOBAK:  This figure includes over $500 million

23    Woodlands claim that the Court may recall was resolved back

24    in November of 2009.

25         In all cases of allowed customer claims the nature
```

1    of the relationship involved property that was held in a

2    customer capacity in its many cases for underlying clients

3    primarily by LBSF and LOTSI (ph) and the amounts involved --

4    allowed are consistent with LBI's books and records and

5    other information and consistent with customer treatment

6    under SIPA.

7            The general creditor claim resolution is based on

8    a similar process.  The amounts allowed, while large, are

9    consistent with the books and records and include claims

10   disallowed as customer claims that we classified to general

11   creditor status.  They involve disallowance in whole or in

12   part for subordination of nearly $25 billion of original or

13   reclassified claims.

14           Because the LBHI affiliates claims are likely to

15   be such a substantial portion of the general creditor claims

16   the trustee has entered a cooperation agreement and protocol

17   with them and with LBIE, which the Court has approved, and

18   looks forward to their assistance in processing general

19   creditor claims as proficiently as possible.

20           The question in this and all the other orders is

21   whether the trustee has made a showing of reasonable

22   settlement based on reasonable arms length process of

23   reconciliation, analysis, and negotiation, and I believe

24   that showing has been made in the Kiplok declaration.

25           The process involved experienced counsel and

1    professionals and it reached an appropriate more than

2    reasonable determination which avoids years of litigation

3    and will allow distributions to the over 400 customers and

4    literally many thousand general creditors and other

5    potentially affected parties served with this motion who

6    essentially have not objected.

7              FirstBank Puerto Rico filed a limited objection

8    and reservation of rights.  Didn't object to the settlement

9    as a whole, but rather wished to confirm statements in our

10   9019 motion as applicable to them.

11             So to that end I can state on the record that

12   FirstBank Puerto Rico is an excluded duplicate claimant as

13   defined in paragraph 40 of the settlement motion.

14             Its customer claim is a disputed customer claim,

15   and the number of that claim is 80000325.  Not the amount of

16   the claim, but its claim number.

17             The trustee will continue to reserve an amount

18   sufficient to provide pari passu treatment for that claim

19   with other allowed customer claims in the event that the

20   claim ultimately is allowed as a customer claim.  Although

21   the trustee does dispute it.

22             Three parties with claims in the proceeding for

23   return of specific property based on dealings with LOTSI or

24   LBSF filed limited objections.

25             The settlement agreement with LBHI actually

1    specifies how these claims will be treated and preserves the

2    claimants ultimate right to be heard on application by the

3    trustee should the claimant be dissatisfied with its

4    treatment.

5            After discussion with the parties two of the three

6    objections have been withdrawn.  There's a Ross financial

7    and the Mazzattas as a result of the language modification

8    which appears in the revised proposed order filed Friday

9    with our omnibus reply papers as Exhibit B and it appears in

10   paragraph 9.

11           The other party, BRM, filed a reservation of

12   rights, not an objection.  We understand they don't want to

13   -- they don't wish to withdraw that reservation of rights,

14   but neither we nor LBHI believe that their rights are in any

15   way affected by anything in any of the orders.

16           There's also an amendment concerning R-3 which has

17   been filed on the docket, and we and the other parties ask

18   to have that so entered.  It essentially clarifies one

19   aspect of the deal concerning certain R-3 property which if

20   it is transferred to us by LBIE it basically goes to LBHI

21   under the agreement as part of the allowed claim.  So it

22   really -- it doesn't alter the terms of the agreement, it

23   just clarifies it.

24           The final objection or reservation of right which

25   we received was from a Mr. Littlefield which -- who filed a

1    letter which does not really appear to relate to this motion

2    or seek modification or other relief related to it.

3            So I think I'll turn to the LBIE agreement.  This

4    agreement is also the product of substantial reconciliation

5    efforts and arms length negotiation over the period of the

6    last four years.

7            Dedicated teams of lawyers and professionals met

8    frequently in New York and London and had weekly or more

9    frequent phone calls.  These continued even when it appeared

10   for a time that a meeting of the minds consistent with the

11   needs of all the fiduciaries and their constituents might

12   not be possible and litigation continued.  That litigation,

13   which was becoming very expensive and time consuming and

14   would become even more so had it had to continue, is

15   suspended in favor of this agreement.  But if the order

16   cannot be approved it likely would have to be resumed.

17           And I should note that substantial litigation with

18   LBHI would also have had to be commenced and might have to

19   be commenced if the agreement with them were not to be

20   consummated.

21           The LBIE agreement for which we seek approval

22   resolves a series of difficult and unprecedented issues of

23   law and fact, including a key issue of how the LBIE omnibus

24   accounts, which are described at paragraphs 14 to 17 of the

25   Kiplok declaration, should be treated in a SIPA liquidation.

1          These accounts were undisclosed omnibus clearing

2     accounts maintained for LBIE customers entering

3     (indiscernible - 00:17:30) for their individual accounts on

4     LBIE's books in the UK for stocks traded on U.S. exchanges

5     and held in U.S. depositories, such as DTCC.

6          The parties have come to agree that the correct

7     treatment of these omnibus accounts under SIPA is as a

8     unitary customer account with property returned to LBIE for

9     distribution to its underlying customers.

10          The property to be returned is based on what was

11     in LBI's accounts on the filing date.  It allowed -- we also

12     include postpetition DNI (ph) in this case, several hundred

13     millions of dollars, but not billions.

14          Allowance was conditioned on LBIE using this

15     property for distribution to its customers.  LBIE has had a

16     robust process of dealing with its customers, and its plan

17     to distribute property to its customers has already received

18     a very high percentage of agreement from those customers,

19     which LBIE's counsel may wish to describe.

20          The settlement is conditioned on an order also

21     being entered in the English High Court, and that hearing is

22     scheduled for May 1st.

23          The result, thanks to the Court's oversight and

24     encouragement, is an unprecedented and a positive result on

25     both sides of the Atlantic despite all the difficulties and

1    uncertainties caused by different legal regimes, different

2    filing dates, and sheer size and complexity.

3              As I mentioned before a corollary to the necessary

4    treatment of the customer omnibus account is that the LBIE

5    customer claims will be satisfied for the UK procedure and

6    duplicative or protective files which -- protective claims

7    which have been filed here must be expunged.  This is as it

8    should be and must be.

9              These people were UK customers who entered

10   transactions typically controlled by UK margin rules, there

11   were approximately 200 filed claims in this proceeding often

12   indicating in their claim forms that they were filed largely

13   as a protective measure.

14             It is a condition of all the transaction that

15   these claims be channeled exclusively through the UK, these

16   duplicate claims total many billions of dollars, and do not

17   belong here in any event.

18             The claims to be expunged are listed in Schedule

19   2.05 to the proposed settlement agreement.

20             And I should note that we made one modest

21   adjustment to correct a scriveners error in footnote 3 of

22   that schedule which applies to King Street.

23             I want to be clear that what we refer to as

24   duplicate claims are those that reflect direct customer

25   account relations with LBIE and not LBI as reflected on the

08-01420-cscc Doc 61250 Filed 04/06/21 Entered 04/06/21 13:39:19 Main Document
Documents 10 Through 45 Pg 22 of 745 Pg 376 of 642

Page 22

 1    books of both entities and the location of properties.

 2         Some claimants had other different relationships

 3    with LBI directly, and those relationships are not to be

 4    expunged or impacted by the requested order.  They have been

 5    dealt with as claims in the SIPA claims process and allowed

 6    or disputed as required.

 7         QVT filed a limited objection to assure its

 8    already allowed separate claim based on a separate

 9    relationship with LBI has been preserved and we have

10    confirmed with them how this account is treated, so their

11    limited objection has been withdrawn.

12         We had similar questions from Providence, which

13    also filed a limited objection, and that objection has been

14    withdrawn.

15         In addition to the customer omni accounts I've

16    just described the agreement with LBIE resolved other omni

17    account claims of billions of dollars of asserted customer

18    claims as well as billions of general creditor claims.

19    Again, the resolution involved unsettled legal questions and

20    factual questions.

21         We agreed, consistent with the needs of LBIE for

22    its underlying customers and based on extensive analysis of

23    the books and records, to allow a customer claim for

24    $500 million out of an amount claimed of nearly $9 billion.

25    That's in addition to the omnibus claim I described earlier.

08-01420-scc Doc 12250 Filed 04/06/21 Entered 04/06/21 15:13:39 Main Document
Documents 10 Through 45 Pg 23 of 745 Pg 377 of 642

Page 23

1    This means that in all more than $15 billion of

2    asserted customer claims have been disallowed or reclassed

3    to general creditor.  General creditor claims have been

4    allowed in the amount of $4 billion, which is less than half

5    of the amount of the asserted house proprietary claim, and

6    approximately 25 percent of all the claims asserted by LBIE

7    apart from those allowed as customer claims.

8    Of the 200 duplicate claimants and all the other

9    parties notified of this settlement not one objects to

10    settlement or expungement.

11    One, Liberty View objected to the timing, but did

12    not dispute the need for expungement, and we have filed on

13    presentment and ask Your Honor to enter today an order

14    approving a stipulation withdrawing that objection.  There

15    is no pending objection to the motion to approve the LBIE

16    settlement.

17    Barclays had objected to the LBIE settlement as

18    well as allocation, but as I will discuss in that context

19    that objection has now been withdrawn.

20    We believe there is a clear record from the

21    uncontested papers that the iridium (ph) and other

22    reasonableness factors are more than satisfied given the

23    complexity of the underlying facts and issues, the

24    experience of all the professionals involved, the rigorous

25    process of investigation, negotiation, litigation, and the

1   results achieved, and we think that's confirmed by the

2   absence of any objections from the hundreds of customers and

3   duplicate claimants and thousands of general creditors who

4   received notice of this application.

5          The final order of this trio of interrelated

6   orders is the allocation order on which as I mentioned all

7   the other agreements are conditioned and is needed to pay

8   100 percent customer claims and identify the property which

9   can be returned to customers, where possible.

10         This involves a proposed allocation of

11   approximately 8,000 (indiscernible - 00:24:31) representing

12   14.7 billion shares and $4.1 billion of cash, and they are

13   billions in this case, to customer property indicating very

14   specifically the property to be allocated customer property.

15         Another approximately 3.3 billion of property is

16   allocated to the general estate sufficient to allow some

17   distribution on claims.

18         And as Your Honor knows we're now moving forward

19   on the general creditor side to determine claims.  I think

20   yesterday we filed our fifty-fifth omnibus motion in that

21   connection.

22         The motion leaves reserves of over $5 billion for

23   Barclays claims.  Barclays had filed an objection to the

24   amount of the reserve.  Based on discussions with Barclays

25   the amount has been increased slightly by approximately

08-01420-scc Doc 6125-0 Filed 04/06/12 Entered 04/06/12 14:33:19 Main Document Documents 10 Through of 745 Pg 379 of 642

Page 25

1    $85 million on account of claims they have and we filed

2    amendments reflecting that and some other language with

3    Barclays, and we've also filed an amendment to the schedule

4    to the allocation order which shows the effect on the

5    general estate assets which are slightly reduced to

6    correspond to the increase in the reserve.

7          The motion begins -- the allocation motion begins

8    with allocating core segregated customer property.  That's

9    the great bulk of what is being allocated.  It adds other

10   items that we now know should have been segregated.  This is

11   consistent with SIPA principals, and particularly Section

12   78LLL(4), and the reasons are fully set forth in the motion

13   and previously approved by Your Honor at the time of the

14   first allocation motion.

15         The property is described in the schedule annexed

16   to the revised proposed order which we filed with the Court

17   yesterday.

18         The only parties with objections to this motion as

19   a whole were the repo claimants and Barclays.  The repo

20   claimants have pending customer claims which were argued

21   recently before Your Honor.  They wanted assurance nothing

22   in the order would prejudice them if they prevail.  After

23   discussions we entered a stipulation with them Friday, which

24   again is being presented to Your Honor to so order, and this

25   limited objection and reservation have been withdrawn.

1          In addition to the reserve I described earlier

2     Barclays originally asked for a reservation of rights and

3     some other language about post-filing DNI, that language --

4     that issue has actually been superseded by what's now in the

5     allocation and other orders.

6          Over the weekend we agreed among all the parties

7     to language to preserve their rights without affecting the

8     finality of the allocations and the settlement agreements

9     for our distributions in satisfying claims.  And that's

10    reflected in the revised allocation and LBIE orders which we

11    filed last night I believe.

12         We also filed yesterday an agreement -- a

13    stipulation with respect to the conditions under which part

14    of the Barclays reserve representing the $769 million and

15    the 15C33 account could be released under the orders now

16    being appealed to the Second Circuit, and that is being

17    presented to Your Honor on April 22nd I believe to be so

18    ordered.  And Barclays has now withdrawn its objections.

19         Claren Road had filed a limited objection at

20    earlier stages of this motion and wish to see orders on the

21    proposed -- on the second allocation.  It has informed us I

22    believe as of a little while ago that it does not wish to

23    pursue that objection.

24         Final piece of all these orders is the cash in

25    lieu piece.  This is to confirm or approach the postpetition

08-01420-scc Doc 61250 Filed 04/06/14 Entered 04/06/14 13:39:19 Main Document
Documents 10 Through 45 Pg 27 of 745 Pg 381 of 642

Page 27

```
1    dividends and interest.  The details are set forth in

2    paragraph 16 to 29 of our February 26 allocation

3    application.

4            Where property was in LBI's and therefore the

5    trustee's possession, customer, and this includes LBIE and

6    LBHI for whom it is a key condition to the deal postpetition

7    income, if any, follows the property.  In some says trustee

8    never had the shares and claimants remedy as I said at the

9    outset is cash in lieu as of the filing date.

10           The great majority of claims will be satisfied by

11   in-kind distribution.  All others have accepted these

12   principals.

13           And I was informed a little while ago that the one

14   claimant who objected to the fact that they weren't

15   receiving postpetition income has now withdrawn that

16   objection.  So there's no longer any objection to the

17   allocation motion.

18           The final item I should call to Your Honor's

19   attention is one change we made to accommodate the U.S.

20   Attorney.  This is letting three little words "or regulatory

21   approvals" -- oh, I am -- omitting three little words "or

22   regulatory approvals" in the proposed orders approving the

23   LBIE and LBHI settlements, and this appears in Exhibit E,

24   paragraph 17 to our reply, and Exhibit G, paragraph 4 to our

25   reply.
```

1          The U.S. Attorney was served the papers and called

2     after receiving them with respect to any effect on the

3     government's possible rights.

4          This change is to accommodate those concerns and

5     make clear that no public regulatory approval authority is

6     compromised.

7          The U.S. Attorney's Office has otherwise indicated

8     it has no other objection to anything else in the allocation

9     or other proposed orders.

10          And unless Your Honor has questions that concludes

11     my presentation.

12          THE COURT:  Thank you, Mr. Kobak for that

13     presentation.  I do have one question, which is how you

14     intend to deal with the evidentiary record in support of

15     these motions.

16          MR. KOBAK:  I was going to suggest in fact to ask

17     the Court to receive into evidence each of the declarations

18     and the exhibits thereto as the factual record in support of

19     the motion.

20          As I've indicated, no party at this point has

21     objected to these motions as a whole or expressed any wish

22     to examine or cross-examine the witnesses.

23          THE COURT:  That's fine.  I'm prepared to do that.

24          Let me simply inquire, is there any party who

25     objects to the admission of the declarations and related

1    exhibits?  There's no objection, they're all admitted.

2              MR. KOBAK:  Thank you, Your Honor.

3         (SPIA Exhibits were admitted)

4              MR. CAPUTO:  Good morning, Your Honor, Kenneth

5    Caputo on behalf of the securities Investor Protection

6    Corporation.

7              Your Honor, I think it's very significant that I

8    stand before the Court today a little more than four and a

9    half years since the commencement of the SIPA liquidation of

10   LBI and we have not a single objecting party to the

11   culmination of what is without a doubt some very arduous and

12   significant work by all of the parties present in the court

13   to the achievement of these motions and the settlement

14   agreements.

15             Each of the parties have been represented at the

16   highest level of the profession.  LBHI and its significant

17   team under Mr. Krasnow, the LBIE team which is present in

18   the court, and the trustee's team.  And every party has come

19   to this matter with the highest degree of concern for their

20   client and for the customers and for the creditors of LBI.

21             And what we stand before the Court today ready to

22   enter into, should the Court will willing to, is to carry

23   this matter forward to a culmination where public customers

24   of LBI will have received all of the properties that they

25   should have received on the filing date.  That's an

1    achievement that I don't think anybody in their right mind

2    would have properly said four and a half years ago.

3         A 100 percent distribution to customers, the

4    resolution of the most complex claims in the largest SIPA

5    liquidation of a broker dealer in the history of the United

6    States and the world, the resolution of those claims between

7    the parties, a significant achievement for the general

8    estate of the debtor as well, and it eliminates, as

9    Mr. Kobak pointed out, the need for potentially costly and

10   time consuming litigation.

11        The allocation motion carries forward SIPA's

12   principals of distribution of property on a pro rata fashion

13   and with a hundred percent distribution.  That truly is a

14   significant and applaudable achievement.

15        As the Court well knows, Your Honor, SIPC seeks to

16   effect SIPA's mandate to protect customers in the event of a

17   financial failure of a broker dealer, and together the

18   settlement agreements pending before the Court and the

19   motions do further that mandated of investor protection by

20   providing for the full protection of LBI's customers.

21        The settlement agreements and the motions also

22   provide a significant benefit to LBI's estate as a whole as

23   there will be a not insignificant contribution to the

24   general estate of the debtor.

25        The settlement agreements, Your Honor, are fair,

1     they're equitable, they serve the best interest of the

2     estate, and they meet the tests for approval under

3     Bankruptcy Rule 9019 here in the Southern District of New

4     York.

5              The allocation motion seeks to properly effect the

6     distribution provisions in SIPA and return property to

7     claims in accordance with the law.

8              SIPC has been engaged in this process as you know,

9     Your Honor, from its origin, and we support the motions, we

10    support the settlement agreements, we urge the Court to

11    enter the orders today.

12             Thank you, Your Honor.

13             THE COURT:  Thank you.

14             MR. KRASNOW:  Good morning, Your Honor, Richard

15    Krasnow, Weil, Gotshal & Manges on behalf of the LBHI

16    entities, those are the parties whose claims are being

17    allowed and who are otherwise subject to the terms of the

18    settlement agreement.

19             Your Honor, I'll be brief, I don't want to repeat

20    everything that everybody has said.

21             I would simply note, Your Honor, that we believe

22    that from the perspective of the LBHI entities, from the

23    perspective of LBI, the trustee, the stakeholders in the LBI

24    estate, our stakeholders, our settlement, and we believe the

25    LBIE settlement as well represents not the lowest range of

1    reasonableness but the highest range of reasonableness.

2              These settlements, along with the proposed

3    allocation as has been noted, will result in not only all

4    customers with allowed claims having their claim satisfied

5    in full, but also something that I think few expected might

6    occur or would occur at the outset of these proceeds some

7    four years ago, which is also a distribution to unsecured

8    creditors.

9              Under the totality of all those circumstances we

10   join with the trustee, with SIPC, and with others in

11   requesting that the Court approve not only our settlement

12   but the other matters before the Court.

13             Thank you.

14             THE COURT:  Thank you, Mr. Krasnow.

15             MR. WARNOT:  Good morning, Your Honor, James

16   Warnot of Linklaters on behalf of LBIE.

17             It has been a very hard process and there was a

18   point in time at which we had a bit of a log jam because of

19   the -- we called it the mismatched problem between the

20   securities that were available and the securities that we

21   believed the LBI customers were entitled to, and I'm

22   speaking on behalf of the omnibus claim.

23             And what broke the log jam was a plan that was

24   conceived whereby we would be able to take the assets

25   without the need to get releases from underlying customers,

1    liquidate the assets, calculate best claims, we called them

2    as described more fully in the papers, and put that proposal

3    out to a vote to the constituency in the UK.

4              And I'm pleased to report that there was

5    overwhelming acceptance in that vote, approximately the 95

6    percent by best claim value.  There was not a single no

7    vote.  So the other five percent is basically those who

8    didn't accept the so-called omnibus settlement agreement or

9    those who abstained to vote to amend the CRA.

10             Of the duplicative claimants whose claims will be

11   expunged if Your Honor approves the order who received an

12   offer to participate in this program there was only one non-

13   acceptor in a very de minimis amount.

14             Based upon the values as of November 12 -- and you

15   know, this will change as time goes by depending on the

16   market, it's probably better than this right now -- the

17   anticipated payment for the so-called best claim is in the

18   90 to 95 percent range.  And for those whose best claim is

19   the 919 value and there's a deficit to that they will have

20   an unsecured claim for the balance.

21             Now there is a cap on that, but based on current

22   situation the total value of those unsecured claims is way

23   under the cap.  So we don't anticipate based on current

24   values that that cap will come into play.

25             The anticipated payment right now -- or I should

 1   say the reported payment by the press for unsecured claims

 2   is in excess of par.  And in LBIE's most report it has a

 3   high low and it's -- again, it's consistent with what's

 4   being reported in the press.  And in fact there has already

 5   been a 25 percent distribution that has been made on the

 6   unsecured claims in the LBIE proceeding.

 7          So this will apply to the piece of the claim

 8   that's less than 919, in other words the five to TEN

 9   percent, and also for duplicate claimants who have unsecured

10   claims into LBIE such as those with rehypothicated assets.

11   So all in all a very good result for the creditors.

12          Now this of course is all dependent upon this

13   settlement being approved such that the omnibus assets can

14   in fact be distributed to LBIE.

15          So for these reasons and all the reasons that have

16   already been set forth by the other parties and in the

17   papers we would support approval of the settlement and urge

18   the Court to enter the orders.

19          THE COURT:  Thank you.

20          MR. GRAULICH:  Good morning, Your Honor, Timothy

21   Graulich of Davis Polk & Wardwell also on behalf of LBIE.

22          I will be very, very brief today given both the

23   comprehensive comments that have preceded me, plus the

24   relatively uncontested nature of the proceedings this

25   morning.

```
 1            But I did want to take the opportunity to sort of

 2       join the chorus of support of the three orders that have

 3       been submitted to Your Honor this morning.

 4            As Your Honor noted earlier and as I believe

 5       Mr. Kobak did as well, this is a case of sort of large

 6       numbers, and I just want to talk about a number that

 7       actually is large even by Lehman standards, because there

 8       are frankly some very large numbers that often come up in

 9       the context of either hearings and negotiations where they

10       being rounding errors despite the fact that they are in fact

11       very large numbers.  And that number I just wanted to start

12       with is $38 billion.  $38 billion is the amount of claims

13       that have reciprocally been asserted on behalf of LBIE

14       against LBI and LBI against LBIE in the UK.

15            This settlement agreement between LBIE and LBI

16       resolves comprehensively all of that -- all of those claims.

17       As has been eluded to, you know, these claims largely came

18       to be during what has been referred to as the fog of Lehman,

19       the sort of Lehman (indiscernible - 00:42:46).

20            THE COURT:  I'm the one who referred to it as

21       that.

22         (Laughter)

23            MR. GRAULICH:  Your Honor, it's a very good

24       comment that's why I brought it up.

25            And during that -- that fog literally obscured
```

Page 36

1    thousands of transactions between the two parties.  In an

2    effort to try and unravel those transactions dedicated teams

3    spent literally years in attempting to do that, and that is

4    just the factual level to it.  The fact is, is that these

5    transactions raised numerous unique questions of law and

6    issues of first impression, all of which if they needed to

7    be litigated would have consumed considerable judicial

8    resources and resources of two estates that frankly have

9    fiduciary duties to move on and to make distribution their

10   respective constituencies.

11         And so, you know, based upon -- based upon the

12   issues between the parties I would just like to second

13   Mr. Krasnow, that this is not anywhere near the lowest rung

14   on the range of reasonableness, this is sort of a textbook

15   example of multiple fiduciaries that have potentially

16   divergent interests in the sense that they have different

17   constituencies that they need to represent, and in some

18   instances under different legal regimes, but with a common

19   interest to progress each others states for their respective

20   benefits.

21         And based upon that if that was the only

22   settlement we would still be here urging Your Honor for --

23   for approval even if it was just the LBIE settlement, which

24   we believe is very much -- satisfies the 9019 standards.

25         But what the trustee has achieved here is much

1    more than that.  It's a -- it is in addition to the

2    settlement with LBIE, it's the settlement with LBHI, it's

3    the allocation of $25 billion of property and allocating and

4    among reserves in the customer estate and the general

5    estate, which basically provides a frame work -- a plan of

6    liquidation if you will for this -- for this -- for these

7    estates.

8            And so it is sort of somewhat -- well, it's

9    extraordinarily noteworthy what the trustee has been able to

10   achieve here that we now have a path forward for

11   distributions.  Not only customer distributions, but equally

12   importantly distributions to the general estate.

13           With respect to the LBHI settlement we have been

14   kept abreast as appropriate by both LBHI and the trustee all

15   along the way with respect to that settlement.  We are

16   satisfied that that -- that that settlement represents a

17   fair exercise of the debtor's business judgment, that it is

18   an appropriate settlement, that it's in the best interest of

19   the estate and ought to be approved.

20           And with respect to allocation if Your Honor would

21   recall I've appeared at this podium several times

22   challenging the trustee's previous efforts to allocate.  Not

23   only the timing but the sort of methodology.

24           We are very comfortable, the trustee has worked

25   together with us and LBHI cooperatively with respect to

1  allocation, we are satisfied that the proposed allocation is

2  consistent with the principals of SIPA, and we urge the

3  Court to approve the sort of three orders that have been

4  presented this morning.

5           THE COURT:  Thank you.

6           MR. GRAULICH:  Thank you.

7           THE COURT:  Is there anyone else who wishes to be

8  heard at this point?

9           MS. BLOOMER:  Good morning, Your Honor, Tricia

10  Bloomer from Boies Schiller representing Barclays.

11           I am in 100 percent agreement with everything that

12  was described today, and frankly had no intention on

13  addressing the Court, but I did want for the purposes of a

14  clear record to clarify one point that was raised earlier.

15           The reserve under the revised allocation order for

16  Barclays was described as having been increased by

17  85 million.  The increase was by 862 million, and you'll see

18  that from the papers.

19           Substantively the reserves that the LBI trustee

20  has established have only gone up by the 85 million, and

21  that is because a separate reserve that's described in the

22  papers as a dedicated reserve can be counted towards the

23  additional increase on the Barclays side.

24           So the papers make that clear, I just wanted for

25  the purpose of a clear record to make sure that I corrected

1    what was said earlier about the total amount of the Barclays

2    reserve.

3              THE COURT:  All right, thank you.

4              MS. BLOOMER:  Thank you.

5              MR. ROSENBAUM:  Good morning, your Honor, Norm

6    Rosenbaum, Morrison & Foerster for BRM Group Ltd.

7              Your Honor it sounds like we are the one

8    outstanding reservation of rights to the proposed changes to

9    the order except both to BRM and we look forward to working

10   with LBHI and LOTSI on the resolution of the duplicate

11   claim.

12             Thank you.

13             THE COURT:  Okay.  Mr. Kobak, you had mentioned

14   during your initial presentation that there was one objector

15   that remained, and I believe that was in reference to the

16   cash in lieu calculation.

17             MR. KOBAK:  That was Wind Trust on the cash in

18   lieu.  I was informed while I was speaking that they've

19   withdrawn their objection.

20             THE COURT:  That's a good thing.

21        (Laughter)

22             THE COURT:  Is there anyone else?

23             Mr. Kobak, you're standing, do you want to make a

24   final statement?

25             MR. KOBAK:  I would just -- I'm jumping to the

Page 40

1 conclusion that you might approve the orders today, and I

2 did want to say a few things.

3    I would like and more important to thank and more

4 important the trustee has asked me to thank SIPC and the

5 regulators for their oversight and insights throughout this

6 process.  We'd like to thank the administrators and the LBHI

7 affiliates and their counsel and professionals for their

8 diligence, professionalism, and flexibility during

9 exhaustive and exhausting arguments, analysis, and

10 negotiations in the sometimes grueling hours, days, and even

11 weeks we were forced to speak -- to spend with one another.

12  (Laughter)

13    MR. KOBAK:  And to speak with one another.

14    And I think I speak for them, the trustee, and

15 probably every person in this room in thanking the Court for

16 its supervision over the process in the largest SIPA case

17 and largest bankruptcy in history, and its encouragement for

18 all of us to continue working together creatively and

19 pragmatically to find solutions to unprecedented problems

20 and issues.

21    The Court was patient with us when it needed to

22 be, and on one or two occasions expressed some impatience

23 when that was needed, and it got us to keep working and get

24 to what I think is a good result for all the estates, and

25 from our perspective most important for our customers.

 1          Thank you.

 2          THE COURT:  Thank you, Mr. Kobak.

 3          I guess the final words this morning will be mine.

 4          I want to congratulate everyone involved in this

 5     truly extraordinary process.  It's just about four and a

 6     half years since the LBI case ended up in a SIPA proceeding.

 7     It happened on September 19, the very same day that we had

 8     an unprecedented sale hearing in this courtroom.

 9          It is in part for that reason somewhat appropriate

10     that this becomes the very last hearing to take place in

11     this courtroom before it is redecorated.

12          (Laughter)

13          THE COURT:  That is occurring notwithstanding

14     sequestration as a result of some money that was set aside

15     some years ago for that purpose.  So this is the last

16     hearing that will take place here in this 1980's vintage

17     room.

18          It has been for me an extraordinary privilege to

19     preside over both the LBHI Chapter 11 cases and the LBI SIPC

20     case.  I say this not as if it is over, because it's not,

21     but I recognize that the interrelated settlements that have

22     been presented today on a consensual basis are truly

23     remarkable and represent a comprehensive consensual

24     resolution of one of the most complex matters ever to be

25     resolved in history frankly, at least in the commercial

1    sense.

2          One of the other notable aspects of this is that

3    this is a cross-border problem, one in which no courts

4    communicated with each other, we had no court to court

5    communication, we had no need for coordination at that

6    level.  Rather this is an example of pure negotiation with

7    the avoidance of litigation risk, cost, and uncertainty

8    driving a very creative outcome.

9          So I congratulate all of you who are involved.

10          These related orders will all be entered today,

11    and I wish your well.

12    Thank you.

13    (A chorus of thank you)

14    (Whereupon, these proceedings concluded at 10:55 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 43

```
1                      E X H I B I T S

2    PARTY     NO    DESCRIPTION              ID.        EVID.

3    SPIA            All Declarations and

4                    Exhibits                --          29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 44

1                      I N D E X

2

3                      RULINGS

4                                              Page        Line

5   All Related Orders Entered                  41          3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T I O N

 2

 3    I, Dawn South, certify that the foregoing transcript is a

 4    true and accurate record of the proceedings.

 5

 6

 7

 8

 9    AAERT Certified Electronic Transcriber CET**D-408

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date:  April 17, 2013

17

18

19

20

21

22

23

24

25
```

# **PD 19**

## **Order commencing LBI's liquidation**

**'08 CIV 8119**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,

        v.

LEHMAN BROTHERS INC.

        Defendant.

Civil Action No. 08-__

## ORDER COMMENCING LIQUIDATION[1]

On the Complaint and Application of the Securities Investor Protection Corporation

("SIPC"), it is hereby:

      I.     ORDERED, ADJUDGED and DECREED that the customers of the

defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities

Investor Protection Act of 1970, as amended ("SIPA"). 15 U.S.C. §78aaa et seq.

      II.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is

appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties

and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP

is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the

Court in the amount of $100,000.00.

---

1.  The "LBI Liquidation Order"

III.    ORDERED that all persons and entities are notified that, subject to the other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate as a stay of:

A.    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding;

B.    the enforcement against LBI or against property of the estate of a judgment obtained before the commencement of this proceeding;

C.    any act to obtain possession of property of the estate or property from the estate;

D.    any act to create, perfect or enforce any lien against property of the estate;

E.    any act to create, perfect or enforce against property of LBI any lien to the extent that such lien secures a claim that arose before the commencement of this proceeding;

F.    any act to collect, assess or recover a claim against LBI that arose before the commencement of this proceeding;

G.    the setoff of any debt owing to LBI that arose before the commencement of this proceeding against any claim against LBI; and

H.    the commencement or continuation of a proceeding before the United States Tax Court concerning LBI's tax liability for a taxable period the Bankruptcy Court may determine.

IV.    ORDERED that all persons and entities are stayed, enjoined and restrained from directly or indirectly removing, transferring, setting off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets or property owned, controlled or in the possession of LBI, including but not limited to the books and records of LBI, and customers' securities and credit balances, except for the purpose of effecting possession and control of said property by the Trustee.

V.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize, conserve or liquidate LBI or its property and any other suit against any receiver, conservator or trustee of LBI or its property, is stayed.

VI.    ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from enforcing liens or pledges against the property of LBI and from exercising any right of setoff, without first receiving the written consent of SIPC and the Trustee.

VII.    ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing of, securities collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

under a securities lending agreement, without first receiving the written consent of SIPC and the Trustee.

    VIII.   ORDERED that the stays set forth in paragraphs three – six shall not apply to:

    A.    any suit, action or proceeding brought or to be brought by the United States Securities and Exchange Commission ("Commission"), the Commodity Futures Trading Commission ("CFTC"), or any self-regulatory organization of which LBI is now a member or was a member within the past six months; or

    B.    the exercise of a contractual right of a creditor to liquidate, terminate, or accelerate a securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, or master netting agreement, as those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more of such contracts or agreements, or to foreclose on any cash collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements; or

    C.    the exercise of a contractual right of any securities clearing agency to cause the liquidation of a securities contract as defined in 11 U.S.C. §741(7) and the contractual right of any derivatives clearing organization to cause the liquidation of a commodity contract as defined in 11 U.S.C. §761(4); or

D.    the exercise of a contractual right of any stockbroker or financial

institution, as defined in 11 U.S.C. §101, to use cash or letters of credit

held by it as collateral, to cause the liquidation of its contract for the loan

of a security to LBI or for the pre-release of American Depository

Receipts or the securities underlying such receipts; or

E.    the exercise of a contractual right of any "repo" participant, as defined in

11 U.S.C. §101, to use cash to cause the liquidation of a repurchase

agreement, pursuant to which LBI is a purchaser of securities, whether or

not such repurchase agreement meets the definition set forth in 11 U.S.C.

§101(47); or

F.    the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

in respect of (i) any extension of credit for the clearance or settlement of

securities transactions or (ii) any margin loan, as each such term is used in

11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a

contractual right as such term is used in 11 U.S.C. §556 in respect of any

extension of credit for the clearance or settlement of commodity contracts

by a commodity broker as defined in 11 U.S.C. §101(6).  As used herein,

"securities clearing bank" refers to any financial participant, as defined in

11 U.S.C. §101(22A), that extends credit for the clearance or settlement of

securities transactions to one or more Primary Government Securities

Dealers designated as such by the Federal Reserve Bank of New York

from time to time; or

G.   the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by a person (or such person's agent) in respect of securities that were sold

to such person by LBI pursuant to a repurchase transaction (as such term

is used in 11 U.S.C. §741(7) and regardless of whether such transaction is

a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with

LBI that is subject to a Custodial Undertaking in Connection With

Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such

person (or such person's agent); or

H.   the exercise of a contractual right, as such term is used in 11 U.S.C. §555,

by the Federal Reserve Bank of New York; or

I.   any setoff or liquidating transaction undertaken pursuant to the rules or

bylaws of any securities clearing agency registered under section 17A(b)

of the Securities Exchange Act of 1934, 15 U.S.C.§78q-1(b), or any

derivatives clearing organization registered under section 5b of the

Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under

instructions from and on behalf of such a securities clearing agency or

derivatives clearing organization; or

J.   any settlement transaction undertaken by such securities clearing agency

using securities either (i) in its custody or control, or (ii) in the custody or

control of another securities agency with which it has a Commission

approved interface procedure for securities transactions settlements,

provided that the entire proceeds thereof, without benefit of any offset, are

promptly turned over to the Trustee; or

K.    any transfer or delivery to a securities clearing agency or derivatives

clearing organization by a bank or other depository, pursuant to

instructions given by such clearing agency or derivatives clearing

organization, of cash, securities, or other property of LBI held by such

bank or depository subject to the instructions of such clearing agency or

derivatives clearing organization and constituting a margin payment as

defined in 11 U.S.C. §741(5); or

IX.    ORDERED that the stays set forth in paragraphs three – seven above shall

not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17),

362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or

any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including

without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section

78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or

rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the

transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among

Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC

and (ii) September 24, 2008;

X.    ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is

authorized to operate the business of LBI to: (a) conduct business in the ordinary course until

6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of

securities, commodities futures and option transactions, and obtaining credit and incurring debt

in relation thereto; (b) complete settlements of pending transactions, and to take other necessary

and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly transfer of customer accounts and related property.

XI.    ORDERED that the Clerk of the Court is directed to immediately open the docket in this proceeding and that this Order be entered on the docket immediately.

XII.    ORDERED that the Clerk of the Court is directed to produce seventy-five (75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto the docket.

XIII.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation proceeding is removed to the United States Bankruptcy Court for the Southern District of New York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry on the docket.

XIV.    ORDERED that the Trustee is authorized to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI, and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the Trustee, and the Trustee may designate such of his representatives who shall be authorized to have access to such property.

Date:    September 19, 2008

_____
UNITED STATES DISTRICT JUDGE

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
DEPUTY CLERK

# **PD 20**

# **Order Herein Approving Asset Purchase Agreement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

                    Plaintiff,

        v.

LEHMAN BROTHERS INC.

                    Debtor.

Adversary Proceeding No.

08-1420 (JMP)

**ORDER APPROVING, AND INCORPORATING BY REFERENCE FOR THE**
**PURPOSES OF THIS PROCEEDING, AN ORDER AUTHORIZING THE SALE OF**
**PURCHASED ASSETS AND OTHER RELIEF IN THE LEHMAN BROTHERS**
**HOLDINGS, INC. CHAPTER 11 PROCEEDING**

James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.

("LBI"), having determined that the terms of the order in the related Chapter 11 Case No. 08-

13555 (JMP) approving the sale of the purchased assets in Lehman Brothers Holdings, Inc.

("LBHI") (the "Sale Order"), and the sale and purchase agreement, insofar as they affect LBI,

are in the best interests of LBI's customers, creditors, and of the LBI estate, and SIPC having

agreed to and consented to entry of this Order, the Court hereby approves that order and that

agreement for purposes of this proceeding, and incorporates that order by reference into this

proceeding.  For purposes of the findings of fact, conclusions of law and relief granted in the

Sale Order, LBI shall be deemed to be included in the definition of the Debtors.

The Court further orders that, pursuant to Federal Rules of Bankruptcy Procedure 7062,

9014, 6004(h), and 6006(d), this Order shall be effective upon entry.


Dated:  New York, New York
        September 19, 2008


                            _s/ James M. Peck_____
                            HONORABLE JAMES M. PECK
                            UNITED STATES BANKRUPTCY JUDGE

# PD 21

# Order in Chapter 11 Proceeding Approving Asset Purchase Agreement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                    :
In re                                               :     **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*        :     **08-13555 (JMP)**
                                                    :
          **Debtors.**                              :     **(Jointly Administered)**
                                                    :
----------------------------------------------------------------x

**ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004**
**AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF**
**PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER**
**INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008, among the Debtors,

Lehman Brothers Inc. ("LBI" and, collectively with the Debtors, the "Seller") and Barclays

Capital, Inc. (the "Purchaser"), collectively with that First Amendment Clarifying Asset

Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and

supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be

subsequently modified or amended or clarified, the "Purchase Agreement"); (B) establishing

sales procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of

---

[1]   Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the
      Agreement.

certain of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims,

encumbrances and interests  and the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Contracts") relating to the Purchased Assets  to the

Purchaser or the Successful Bidder(s); and upon the Court's consideration of the Motion and the

record of the Sale Hearing held on September 19, 2008 with respect to the Motion, including the

testimony and evidence admitted at the Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

<p style="text-align:center">THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:</p>

A.    **Jurisdiction and Venue**.    This Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.  The statutory predicates for the relief sought in the

Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006

and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules").

C.    **Notice**.  As evidenced by the affidavits of service filed with this Court and

based upon the representations of counsel at the Sale Hearing and as approved under the Order

(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to

Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting

the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-

Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and

the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the

Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement  (the "Sale"),

<p style="text-align:center">2</p>

including the assumption and assignment of the Contracts and Cure Amounts with respect

thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances of the Debtors' chapter 11 cases; (iv) good cause exists to shorten the

applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice

periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or

the Sale (including the assumption and assignment of the Contracts), is or shall be required.

        D.     **Irreparable Harm.**     The Debtors' estates will suffer immediate and

irreparable harm if the relief requested in the Motion is not granted on an expedited basis

consistent with the provisions set forth herein and the Purchase Agreement, particularly given the

wasting nature of the Purchased Assets.

        E.     **LBI.**  LBI is the subject of a proceeding under the Securities Investors

Protection Act of 1970 ("SIPA") which was filed on September 19, 2008. The Purchase

Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of

this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the

extent applicable, has the same material terms as this Order and is otherwise in form and

substance reasonably satisfactory to the Purchaser. As part of that transfer, the Depository Trust

Clearing Corporation ("DTCC") informed the Purchaser and LBI on Wednesday, September 17,

2008, that the Purchaser would be required to assume the liabilities associated with the accounts

maintained by LBI at the DTCC and its subsidiaries -- The Depository Trust Company ("DTC"),

the National Securities Clearing Corporation ("NSCC"), and the Fixed Income Clearing

Corporation ("FICC") – in their entirety and irrespective of whether the assets or liabilities in a

particular account were the subject of the Purchase Agreement or were owned by LBI or an

affiliate of LBI.  The Purchaser agreed to do so upon the terms and conditions specified in the

Purchase Agreement, as amended.

F.       **Opportunity to Object**.  A reasonable opportunity to object and to be

heard with respect to the proposed Sale, the Motion and the relief requested therein has been

given, in light of the exigent circumstances in these cases, to all interested persons and entities,

including the following:  (i) the Office of the United States Trustee, (ii) counsel for the

Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors (the "Committee"),

(iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to

have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all

non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date

Contracts"), (vii) the United States Attorney's office, (viii) the United States Department of

Justice, the Securities and Exchange Commission, (ix) the Securities Investor Protection

Corporation, (x) the Internal Revenue Service, (xi) all persons, if any, who have filed objections

to the Sale Motion; and (xiii) all persons who have filed a notice of appearance in the chapter 11

cases.

G.       **Corporate Authority**.   The Debtors (i) have full corporate power and

authority to execute the Purchase Agreement and all other documents contemplated thereby and

the Debtors' sale of the   Assets has been duly and validly authorized by all necessary corporate

action, (ii) have all of the corporate power and authority necessary to consummate the

transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action

necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

provided for in the Purchase Agreement, are required for the Debtors to consummate such transactions.

H.    **Sale in Best Interests**.  Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I.    **Business Justification**.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of an order approving the Purchase Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of  the transactions set forth in the Purchase Agreement.

J.    **Arm's-Length Sale**.  The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  The Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

K.    **Good Faith Purchaser**.  The Purchaser is a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,

entitled to all of the protections afforded thereby.  The Purchaser has proceeded in good faith in all respects in connection with this proceeding.

        L.      **Highest and Best Offer**. The Purchase Agreement constitutes the highest and best offer for the Purchased  Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

        M.      **Consideration**.  The consideration constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  The Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases.  No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates.  Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

        N.      **Free and Clear**.  Except to the extent that certain intellectual property rights may be owned by entities other than the Seller, the Debtors and LBI are the sole and lawful owners of the Purchased Assets.  The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the

Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the

Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances,

obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or

nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that

purport to give to any party a right or option to effect any forfeiture, modification or termination

of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the

Debtors' business prior to the Closing Date.  For avoidance of doubt, all Interests shall attach to

the proceeds ultimately attributable to the property against or in which such Interests are

asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the

same order of priority, which such Interests now have against the Purchased Assets or their

proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable,

may possess with respect thereto.  Further, the assumption and assignment of any Closing Date

Contracts is likewise free and clear of all Interests.  Notwithstanding the foregoing, as of the

Closing Date, all obligations to The Options Clearing Corporation ("OCC") with respect to

Purchased Assets that are within the possession or control of OCC shall have been assigned to

the Purchaser, and the Purchaser shall have assumed all of such obligations including, without

limitation, all obligations with respect to short option positions, futures contracts, and stock loan

or borrow positions that are transferred to the accounts of Purchaser at OCC as of the Closing

Date in accordance with the Purchase Agreement.  From and after the Closing Date, all

securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC

shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC

including, without limitation, the security interests and setoff rights of OCC with respect thereto.

       O.      **Free and Clear Findings Needed by Purchaser**. The Purchaser asserts that it would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) to the Purchaser and the assumption and assignment of the Contracts to the Purchaser was not free and clear of all Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

       P.      **No Liability Findings Needed by Purchaser**. Purchaser asserts that it will not consummate the transactions contemplated by the Purchase Agreement unless the Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability.

       Q.      **Satisfaction of 363(f) Standards**. The Sellers may sell the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) free and clear of any Interests of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. The person or entity with any Interest in the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller): (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money

satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the

Bankruptcy Code.  Those holders of Interests who did not object to the Motion are deemed,

subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section

363(f)(2).  All holders of Interests are adequately protected by having their Interests attach to the

proceeds ultimately attributable to the Purchased Assets (except to the extent that certain

intellectual property rights may be owned by entities other than the Seller) against or in which

such Interests are asserted, subject to the terms of such Interests, with the same validity, force

and effect, and in the same order of priority, which such Interests now have against the

Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or

their estates, as applicable, may possess with respect thereto.

R. **No Fraudulent Transfer**.  The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors of Seller under the Bankruptcy

Code and under the laws of the United States, any state, territory, possession, or the District of

Columbia.  Neither Debtors nor Purchaser is entering into the transactions contemplated by the

Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent

conveyance and fraudulent transfer claims.

S. **No Successor Liability**.  Except for the Assumed Liabilities, the transfer

of the Purchased Assets (except to the extent that certain intellectual property rights may be

owned by entities other than the Seller) to the Purchaser under the Purchase Agreement shall not

result in (i) the Purchaser having any liability or responsibility for any claim against the Debtors

or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to

the Debtors except as is expressly set forth in the Purchase Agreement.  Without limiting the

effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the

9

Purchased Assets(except to the extent that certain intellectual property rights may be owned by entities other than the Seller) from the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions, including, without limitation, any successor liability.

    T. **Cure/Adequate Assurance**.  The assumption and assignment of the Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The Debtors have:  (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A).  The Purchaser's promise to pay the Cure Amounts (as defined below) and to perform the obligations under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any objections to the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled.  Any objections to the Cure Amounts (as defined below) are resolved as set forth herein.  All counterparties to Closing Date Contracts shall have until

October 3, 2008 (the "Cure Amount Objection Deadline") to file an objection to the cure

amounts of their respective Closing Date Contracts (including as to the identity of such

contracts) identified on http: //chapter 11.epiqsystems.com/Lehman (the "Website") (the "Cure

Amounts"). To the extent that any counterparty does not object to its Cure Amount by the Cure

Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To

the extent any objections to Cure Amounts are timely filed, the Debtors, Purchaser and the

counterparty shall meet and confer in good faith to attempt resolve any such objection without

Court intervention. If the objecting party and the Purchaser determine that the objection cannot

be resolved without judicial intervention, then such dispute will be determined by the Court upon

written application by either party on 20 (twenty) days notice, with any response due to such an

application 15 (fifteen) days after such application is filed. The Purchaser shall pay any Cure

Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty

consents in writing to the Cure Amount, (ii) the date on which the counterparty is deemed to

have consented, or (iii) the date on which the Court enters an order determining the Cure

Amount after the notice and hearing procedure set forth above. The procedures with respect to

assumption, assignment and cure of the Contracts that are the subject of the Purchaser's

designation rights (the "Designated Contracts") will be set forth in one or more separate orders

of the Court which will be entered at a later date or dates.

U.    **Prompt Consummation**. The Sale must be approved and consummated

promptly in order to preserve the viability of the businesses subject to the sale as going concerns,

to maximize the value of the estates. Time is of the essence in consummating the Sale.

V.    **Personally Identifiable Information**.  The Sale may include the transfer

of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A).  No

Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because

Purchaser has agreed to adhere to any such privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted**.    The Motion and the relief requested therein is

GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**.  Any objections to the entry of this Order or the

relief granted herein and requested in the Motion that have not been withdrawn, waived, or

settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and

overruled on the merits with prejudice.

3.    **Approval**.  The Purchase Agreement and all of the terms and conditions

thereto are hereby approved.  The Debtors are hereby authorized and directed to (1) execute the

Purchase Agreement, along with any additional instruments or documents that may be

reasonably necessary or appropriate to implement the Purchase Agreement, provided that such

additional documents do not materially change its terms; (2) consummate the Sale in accordance

with the terms and conditions of the Purchase Agreement and the other agreements contemplated

thereby; and (3) take all other and further actions as may be reasonably necessary to implement

the transactions contemplated by the Purchase Agreement.

4.    **Free and Clear**.  Except as expressly provided for in the Purchase

Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors

are authorized and directed to transfer the Purchased Assets (except to the extent that certain

intellectual property rights may be owned by entities other than the Seller) to the Purchaser and,

as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets
(except to the extent that certain intellectual property rights may be owned by entities other than
the Seller) free and clear of all Interests of any kind or nature whatsoever, including but not
limited to the Liens and Excluded Liabilities, with all such Interests to attach to the proceeds
ultimately attributable to the property against or in which such Interests are asserted, subject to
the terms of such Interests, with the same validity, force and effect, and in the same order of
priority, which such Interests now have against the Purchased Assets or their proceeds, subject to
any rights, claims and defenses the Debtors or their estates, as applicable, may possess with
respect thereto.

5.     **Valid Transfer**.  As of the Closing Date, (a) the transactions
contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and
transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such
Purchased Assets (except to the extent that certain intellectual property rights may be owned by
entities other than the Seller) free and clear of all Interests and Excluded Liabilities and (b) the
Purchase Agreement and the transactions and instruments contemplated hereby shall be
specifically performable and enforceable against and binding upon, and not subject to rejection
or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with
respect thereto.

6.     **General Assignment**.  On the Closing Date, this Order shall be construed
and shall constitute for any and all purposes a full and complete general assignment, conveyance
and transfer of the Sellers' interests in the Purchased Assets.  Each and every federal, state, and
local governmental agency or department is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

7.    **Injunction**.  Except as expressly permitted by the Purchase Agreement or by this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Interests or Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets, such persons' or entities' Interests or Claims.  Following the Closing Date, no holder of an Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

8.      **Release of Interests**.  This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.      **Direction to Release Interests**.   On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.      **No Successor Liability**.  Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets,

having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.

11.    **Examples of No Successor Liability**.  Without limiting the effect or scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date.

12.    **Assumption and Assignment of Contracts**.  In accordance with Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts, including customer account agreements, to which they are a party to the Purchaser.  All counterparties to Closing Date Contracts shall have until the Cure Amount Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity

of such contracts).  To the extent that any counterparty does not object to its Cure Amount by the

Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser.  To

the extent any objections are timely filed, the Debtors, Purchaser and the counterparty shall meet

and confer in good faith to attempt resolve any such objection without Court intervention.  If the

objecting party and the Purchaser determine that the objection cannot be resolved without

judicial intervention, then such dispute will be determined by the Court upon written application

by either party on 20 (twenty) days notice, with any response due to such an application 15

(fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon

as reasonably practicable after (i) the date on which the contracting counterparty consents in

writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented,

or (iii) the date on which the Court enters an order determining the Cure Amount after the notice

and hearing procedure set forth above.  The procedures with respect to assumption, assignment

and cure of the Designated Contracts will be set forth in one or more separate orders of the Court

which will be entered at a later date or dates.

13.    **Bankruptcy Code Sections 365(b)(1) and 365(f)(2).**  The requirements

of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with

respect to the Closing Date Contracts.

14.    **Binding Effect of Order**.  This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.    **Ipso Facto Clauses Ineffective**.  Upon the Debtors' assignment of the Contracts to the Purchaser under the provisions of this Sale Order and any additional order contemplated by the Purchase Agreement, no default shall exist under any Closing Date Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a default by the Purchaser under such Closing Date Contract or otherwise take action against the Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Closing Date Contract.

16.    **Binding on Successors**.  The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all creditors of (whether known or unknown) and holders of equity interests in either Debtor, Purchaser and its respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

17.    **Bankruptcy Code Section 363(n)**.  The consideration provided by Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

18.    **Good Faith**.  The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

19.    **Fair Consideration**.  The consideration provided by the Purchaser to the Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Debtors' interest in the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia; provided that nothing in the foregoing shall waive or compromise any claim of a creditor, including a non -debtor affiliate to seek relief against any estate or any person other than the Purchaser, arising out of or related to flows of funds to and from the Debtors prior to entry of this Order.

20.    **Retention of Jurisdiction**.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the

Designated Contracts.

21.    **Retention of Rights By the Government**.  Nothing in this Order or in the

Purchase Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a

governmental unit under police and regulatory statutes or regulations that any entity would be

subject to as the owner or operator of property after the date of entry of this Order; or (ii) should

be construed to give Purchaser any more protection against any government unit than it is

otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to

create for any governmental unit any substantive right that does not already exist under law.

22.    **Surrender of Possession**.  All entities that are currently, or on the Closing

Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an

interest hereby are directed to surrender possession of the Purchased Assets either to (i) the

Debtors or LBI  before the Closing Date, or (ii) to Purchaser on the Closing Date.

23.    **Fees and Expenses**.  Any amounts payable by the Debtors under the

Purchase Agreement or any of the documents delivered by the Debtors in connection with the

Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,

shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and

Competing Bid Order, entered on September 17, 2008, without further order of this Court, shall

be an allowed administrative claim in an amount equal to such payments in accordance with

sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided

in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified or

otherwise affected by any reorganization plan for the Debtors, except by an express agreement

with Purchaser, its successors, or assigns.

24.    **Sale Proceeds**.  Any and all valid and perfected Interests in Purchased Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order of priority, and with the same validity, force and effect which they now have against such Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any limitations on the use of such proceeds pursuant to any provision of this Order, except as required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Debtors without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

25.    **Non-material Modifications**.  The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.

26.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order.

27.    **Failure to Specify Provisions**.  The failure specifically to include any

particular provisions of the Purchase Agreement in this Order shall not diminish or impair the

effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be

authorized and approved in its entirety; provided, however, that this Order shall govern if there is

any inconsistency between the Purchase Agreement (including all ancillary documents executed

in connection therewith) and this Order.  Likewise, all of the provisions of this Order are

nonseverable and mutually dependent.

28.    **Further Notice to Lienholders**.  The Debtors, at the Debtors' expense,

shall provide additional notice to any additional lienholders identified after the Debtors obtain

additional lien searches (such searches shall be done in a manner to the reasonable satisfaction of

the Purchaser).   If additional lienholders are identified after the Debtors' additional searches,

then such additional lienholders identified will be sent notice of the relief granted in the Sale

Motion and will be given 15 (fifteen) days after such notice to file an objection to the 11 U.S.C.

§ 363(f) relief provided herein.   If after such notice, any objections are filed, the Debtors and the

Purchaser will have 15 (fifteen) days to respond to such objections and such objections will be

set for hearing and determined by this Court.

29.    **No Stay of Order**.  Notwithstanding the provisions of Interim Bankruptcy

Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order

shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable

immediately upon entry.  Time is of the essence in closing the transactions referenced herein,

and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk

its appeal being foreclosed as moot.

30.    **Allocation**.  The consideration received by Seller pursuant to the Purchase Agreement on account of the Lehman headquarters at 745 Seventh Avenue in New York City, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center (collectively, the "Real Estate Assets") shall become property of the LBHI estate. The rights of all parties in interest in respect of the proper allocation of proceeds received by the Seller on account of the Purchased Assets other than the Real Estate Assets are reserved, as among each Seller (and without impairing or affecting in any way Purchaser's rights under the Purchase Agreement), subject to the further order of the Court. The Debtors shall seek an order approving such allocation, on notice to the SIPA Trustee and the Committee, in the event of any dispute regarding such allocation.

31.    **Preservation of Certain Records**. Subject to further order of the Court, the Seller and the Purchaser are hereby ordered to take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, the books and records and any other documentation, including tapes or other audio or digital recordings and data in or retrievable from computers or servers, relating to or reflecting the records held by it or its Affiliates relating to the Business, including the accounts, property and trading records of the customers of the Seller.  In addition, the Debtors and Committee shall promptly identify reasonable procedures for preserving information in the Seller or Purchaser's possession related to potential tax or financial audits of, government investigations of, or claims against Seller, as well as any claims that the Debtors may have against third parties, and the Seller and Purchaser shall maintain and reserve such information, subject to further order of the Court until the consummation of any chapter 11 plan for the Debtors.

32.     Notwithstanding anything to the contrary set forth in this order, this order does not (i) alter the rights of parties to "forward contracts," "securities contracts," "repurchase agreements," "commodity contracts," "swap agreements," "master netting agreements" (each as defined in the Bankruptcy Code) from exercising their rights pursuant to the "financial contract safe harbor" provisions of the Bankruptcy Code, including without limitation those set forth in sections 555, 556, 559, 560, 561 and 562 or (ii) affect any right of JPMorgan under or with respect to any securities contract, commodities contract, forward contract, repurchase agreement, swap agreement or master netting agreement (each as defined in the Bankruptcy Code) to exercise any contractual right (as defined in the relevant section of the Bankruptcy Code) of a kind described in section 362(b)(6), (7), (17), or (27), 362(o), 555, 556, 559, 560 or 561 of the Bankruptcy Code.

33.     Nothing in this order or actions taken pursuant to this Order shall undermine any obligations of the Debtors or the SIPA Trustee to comply with the rules of the Chicago Mercantile Exchange.

.

Dated:  New York, New York
          September 19, 2008

                              *s/ James M. Peck*
                              HONORABLE JAMES M. PECK
                              UNITED STATES BANKRUPTCY JUDGE

# PD 22

# Stipulation and Agreed Order Resolving FirstBank Motion for Reconsideration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————
                                                     :
In re:                                               :
                                                     :
LEHMAN BROTHERS INC.,                                :        Case No. 08-01420 (JMP) SIPA
                                                     :
                              Debtor.                :
                                                     :
———————————————————————

## STIPULATION AND AGREED ORDER RESOLVING MOTION OF FIRSTBANK PUERTO RICO FOR RECONSIDERATION, PURSUANT TO SECTION 502(j) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9024, OF THE <u>SIPA TRUSTEE'S DENIAL OF FIRSTBANK'S CUSTOMER CLAIM [Dkt. #5197]</u>

This Stipulation and Agreed Order (the "<u>Stipulation</u>") is made and entered into on the date hereof, through the signatures of their undersigned counsel, by and between: FirstBank Puerto Rico ("<u>FirstBank</u>") and James W. Giddens (the "<u>Trustee</u>," and together with FirstBank, the "<u>Parties</u>"), as Trustee for the above-referenced liquidation proceeding (the "<u>SIPA Proceeding</u>") of Lehman Brothers Inc. ("<u>LBI</u>") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*. ("<u>SIPA</u>") pending in the above-referenced court (the "<u>Bankruptcy Court</u>").

**RECITALS:**

A.     On August 1, 2012, FirstBank filed its motion [Dkt. #5197] (the "<u>FirstBank Motion</u>") in the SIPA Proceeding for an Order: (1) pursuant to Section 502(j) of the Bankruptcy Code and Bankruptcy Rule 9024, for reconsideration of the Trustee's letter determination dated September 15, 2010 (the "<u>Denial Notice</u>") denying FirstBank's claim numbered 800003257 (the "<u>Customer Claim</u>"); and (2) confirming FirstBank's right, pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule 9014-1, to intervene in the contested matter initiated by the Objection of Lehman Brothers Holdings Inc. and Certain of Its Affiliates to the

Trustee's Determination of Claims, dated September 28, 2011 [Dkt. #4584] (the "Customer Claim Objection"), for the limited purpose of preserving FirstBank's Customer Claim.

      B.      The Trustee filed his opposition to the FirstBank Motion on August 8, 2012 [Dkt. #5215]. FirstBank filed its reply brief on August 13, 2012 [Dkt. #5224].

      C.      The portion of the FirstBank Motion seeking to intervene in the Customer Claim Objection was resolved by agreement with the Trustee, in connection with the Trustee's motion filed in the SIPA Proceeding on February 26, 2013 [Dkt. #5784] (the "Trustee Motion") for approval of a settlement agreement dated February 21, 2013 between the Trustee and the LBHI Entities (as defined in the Trustee Motion). On April 3, 2013 [Dkt. #5929], FirstBank filed its limited objection and reservation of rights with respect to the Trustee Motion.

      D.      At a hearing on the Trustee Motion on April 16, 2013, the Trustee announced on the record his agreement that: (1) FirstBank is an "Excluded Duplicate Claimant" as defined in Paragraph 40 of the Trustee Motion; and (2) FirstBank's Customer Claim is a disputed customer claim and the Trustee will continue to reserve an amount sufficient to provide *pari passu* treatment with other allowed customer claims in the event that First Bank's Customer Claim is subsequently allowed as a customer claim.

      E.      The Trustee Motion was approved by the Bankruptcy Court on April 16, 2013 [Dkt. #6020].

F.      FirstBank and the Trustee have agreed to resolve the remaining request

for relief in the FirstBank Motion, seeking reconsideration of the Denial Notice, pursuant to the

terms and conditions set forth in this Stipulation.

**NOW, THEREFORE,** in consideration of the mutual covenants, promises and

obligations set forth herein, and other good and valuable consideration, the sufficiency of which

is hereby acknowledged, the Parties agree as follows:

**STIPULATION:**

1.      As contemplated by the Trustee Motion, the Trustee will file a motion to

uphold the Denial Notice and expunge FirstBank's Customer Claim and any objection by

FirstBank related thereto (the "Motion to Expunge").

2.      The Motion to Expunge will address the merits of FirstBank's Customer

Claim, including, but not limited to, the Trustee's position that FirstBank's Customer Claim is

not entitled to customer status under SIPA, such that the Bankruptcy Court's ruling on the

Motion to Expunge will determine the merits of FirstBank's Customer Claim against LBI.  The

Parties agree that such ruling will be the final, binding determination of whether or not FirstBank

is allowed a SIPA customer claim or general unsecured claim against LBI, subject to the appeal

rights set forth below.

3.      The Trustee agrees not to raise, in the Motion to Expunge or otherwise, as

a basis for objecting to FirstBank's Customer Claim, the timing or method of FirstBank's

transmission of its objection to the Trustee's Denial Notice.

- 3 -

4.      FirstBank agrees to dismiss the FirstBank Motion with prejudice, by filing a notice of withdrawal within five (5) business days after the Trustee's filing of the Motion to Expunge.

5.      The Parties will try to agree on a mutually acceptable briefing schedule for the Motion to Expunge and such schedule shall be subject to Bankruptcy Court approval.  Any disputes regarding the briefing schedule will be resolved by the Bankruptcy Court.

6.      This Stipulation is subject to the following conditions related to discovery:

a.      The Parties will seek to modify the Confidentiality Stipulation and Protective Order dated April 5, 2011 (the "Discovery Stipulation"), as entered in the adversary proceeding styled *FirstBank Puerto Rico v. Barclays Capital Inc.*, Adv. No. 10-04103, in the Bankruptcy Court (the "Adversary Proceeding"), to permit FirstBank and the Trustee to have access to and use, for purposes of prosecuting and defending against the Motion to Expunge, certain Discovery Materials and documents (as defined in the Discovery Stipulation) and other information produced in the Adversary Proceeding, whether produced by a Party (as defined in the Discovery Stipulation) or a non-Party.  Any such Discovery Materials, documents and other information as to which the Bankruptcy Court has approved the Parties' access and use in connection with the Motion to Expunge, pursuant to an agreed order with the consent of Barclays Capital Inc. or as otherwise ordered by the Bankruptcy Court, are referred to herein as "Selected Discovery Materials."

b.      The Trustee will consent to such modification (and to modification of any other confidentiality restrictions, if any), to permit FirstBank's and the Trustee's access to and use of any Selected Discovery Materials, including any Selected Discovery Materials

produced by Barclays Capital Inc. or its affiliates that the Trustee has designated as "Confidential" or "Highly Confidential" pursuant to the Discovery Stipulation.

    c.  The modification of the Discovery Stipulation shall be in such form as may be agreed to by FirstBank, the Trustee and Barclays Capital Inc. or as may otherwise be approved by the Bankruptcy Court, which shall be filed in the Adversary Proceeding, or in the SIPA Proceeding in the event the Adversary Proceeding is closed, and may be filed more than once for different selections of Selected Discovery Materials.

    d.  Except as so modified, the Discovery Stipulation shall apply to any Selected Discovery Materials.  For purposes of clarification, FirstBank and the Trustee may use any Selected Discovery Materials to prosecute and defend against the Motion to Expunge, but such use shall be subject to any confidentiality, sealing requirements and other restrictions set forth in the Discovery Stipulation.

    e.  In the event FirstBank seeks additional discovery for the Motion to Expunge beyond the Selected Discovery Materials, it will do so with the agreement of the Trustee or will move for permission from the Bankruptcy Court.  The Trustee reserves the right to object to any such motion.

    7.  The Parties preserve their respective rights to appeal or seek reconsideration of any determination by the Bankruptcy Court on the Motion to Expunge.

    8.  The terms of this Stipulation shall become effective upon its execution and delivery by both Parties and its approval by the Bankruptcy Court.

    9.  Each person who executes this Stipulation on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation on behalf of such Party.

10. The covenants, conditions, provisions and agreements contained in this Stipulation shall bind and inure to the benefit of the Parties hereto and their respective legal representatives, successors and assigns.

11. This Stipulation may be executed in counterparts and all of the counterparts, taken together, constitute a single agreement. The facsimile or PDF image of an originally signed signature page shall serve as, and constitute, an originally executed copy of such signature page.

12. Each of the Parties (a) acknowledges and agrees that this Stipulation constitutes a binding contract between the Parties, enforceable according to its terms; (b) consents to the jurisdiction of the Bankruptcy Court with respect to any action to interpret or enforce the terms and provisions of this Stipulation; and (c) expressly waives any right to commence any such action in another forum.

Dated: New York, New York
   May 17, 2013

| HUGHES HUBBARD & REED LLP | K&L GATES LLP |
|---|---|
| By: /s/ Sarah L. Cave | By:  /s/ Robert Honeywell |
| James B. Kobak, Jr.<br>Sarah L. Cave<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 837-6000<br>Facsimile: (212) 422-4726<br>Email: kobak@hugheshubbard.com<br>Email: cave@hugheshubbard.com<br>*Attorneys for James W. Giddens,*<br>*Trustee for the SIPA Liquidation of*<br>*Lehman Brothers Inc.* | Richard S. Miller (RM–2428)<br>Robert T. Honeywell (RH–7684)<br>Brian D. Koosed (BK–5067)<br>599 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 536-3922<br>Facsimile: (212) 536-3901<br>Email: Richard.Miller@klgates.com<br>Email: Robert.Honeywell@klgates.com<br>Email: Brian.Koosed@klgates.com<br><br>*Attorneys for FirstBank Puerto Rico* |

**SO ORDERED:**

Dated: New York, New York
   May 31, 2013



/s/ James M. Peck
_____
Honorable James M. Peck
United States Bankruptcy Judge

# PD 23

## Barclays Decision

FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| FIRSTBANK PUERTO RICO, | : | Adv. Proc. No. 10-04103(JMP) |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| BARCLAYS CAPITAL INC., | : |  |
| Defendant. | : |  |

------------------------------------------------------------------x

## MEMORANDUM DECISION DENYING MOTION FOR SUMMARY JUDGEMENT OF FIRSTBANK PUERTO RICO AND GRANTING MOTION FOR SUMMARY JUDGMENT OF BARCLAYS CAPITAL INC.

DICKSTEIN SHAPIRO LLP
*Attorneys for FirstBank Puerto Rico*
1633 Broadway
New York, New York 10019

> Jeffrey A. Mitchell, Esq.
> Judith R. Cohen, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Barclays Capital Inc.*
One Liberty Plaza
New York, New York 10006

> Lindsee P. Granfield, Esq.
> Boaz S. Morag, Esq.

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

Plaintiff FirstBank Puerto Rico ("FirstBank") wants its property back.  It complains that certain securities pledged more than ten years before the bankruptcy to Lehman Brothers Special Financing, Inc. ("LBSF") to secure a routine interest rate swap agreement were transferred from its swap counterparty to LBSF's broker-dealer affiliate Lehman Brothers Inc. ("LBI") and then sold by LBI to Barclays Capital Inc. ("Barclays") when these securities were swept into and became part of the complex sale of financial assets to Barclays that occurred with such amazing speed immediately after commencement of these bankruptcy cases.  FirstBank has sued Barclays for the return of the pledged securities.

FirstBank asserts that LBI had no right to sell property it did not own and also argues that these securities were not within the category of assets acquired by Barclays under the language of the relevant transaction documents and, accordingly, are not entitled to benefit from the protections of the bankruptcy court order approving the sale (the "Sale Order").  FirstBank is not the first Lehman counterparty to seek relief from the Sale Order on legal or equitable grounds. Like others that previously have presented similar arguments, its attempts to distance itself from the impact of the Sale Order are unpersuasive.

FirstBank has tried to distinguish its claims against Barclays and to treat them as if they are not directly related to the Lehman bankruptcy cases.  Perhaps for that reason, Plaintiff initially commenced its lawsuit against Barclays in the United States District Court for the Southern District of New York (the "District Court").  Case No. 09-cv-10317, ECF No. 1.  In its six-count complaint filed on December 21, 2009, FirstBank seeks to recover twenty securities with identified CUSIP numbers (the "Disputed Securities") originally deposited with LBSF

under the terms of a governing ISDA Master Agreement with an attached Schedule and Credit

Support Annex ("CSA") (collectively, the "Swap Agreement").

The Disputed Securities were pledged in connection with the Swap Agreement but did

not remain with LBSF. At various times, they were transferred to other holders as a result of

intervening repurchase agreement transactions that were permissible under the Swap Agreement.

Such transfers by means of repos are consistent with routine financing practices on Wall Street.

After the Disputed Securities were in LBI's control, they ended up being packaged with a

multitude of other similar securities and were included in the vast pool of financial assets

subsequently acquired by Barclays pursuant to the Sale Order. This pooling occurred without

regard to or consideration of the ownership claims of FirstBank. The factual background section

of this decision sets forth in more detail the circumstances that led to inclusion of the Disputed

Securities in the assets acquired by Barclays.

The litigation seeking to recover the Disputed Securities proceeded for a period of time in

the District Court before being referred to this Court. On May 3, 2010, the District Court granted

in part and denied in part Barclays' motion to dismiss the FirstBank complaint. Case No. 09-cv-

10317, ECF No. 22. Following the District Court's ruling, the surviving claims include unjust

enrichment, constructive trust/accounting, and conversion. Four months later, the District Court

granted a motion by Barclays to refer the litigation to the bankruptcy court, holding that the

dispute is a core proceeding. Case No. 09-cv-10317, ECF No. 44. The District Court found that

because the Sale Order "ostensibly transferred the collateral at issue from Lehman to [Barclays]

[,] … any remaining rights that [FirstBank] has in the collateral would need to be determined by

analyzing the [e]ffect" of the Sale Order. Id at 2.

Following transfer to this Court, this litigation has taken on the character of a Lehman-related adversary proceeding. The parties completed discovery and have fully briefed and argued their cross-motions for summary judgment. The arguments presented focus particular but not exclusive attention on the question identified by the District Court – the impact of the Sale Order on FirstBank's ability to recover the Disputed Securities from Barclays.

Despite FirstBank's ardent advocacy of its position, such advocacy has its limits. The Court finds, just as it has in other similar cases involving challenges to the protections of the Sale Order, that Barclays is immune from attack and has no obligation to return the Disputed Securities to FirstBank. This result is mandated by the inescapable conclusion that the Disputed Securities properly fit within the definition of Purchased Assets (i.e., the assets acquired by Barclays) under the terms of the APA and Clarification Letter (each as defined below).[1] FirstBank strains to argue otherwise, but is unable to counter the preclusive effect of the Sale Order when read in conjunction with these transaction documents. For the reasons stated, Barclays is entitled to the entry of judgment in its favor, and the motion of FirstBank is denied.

### Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," and the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a); *see NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Redd v. Wright*, 597 F.3dd 532, 535-36 (2d Cir. 2010)). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *See NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 178 (2d Cir. 2008) (citing *Liberty Lobby*,

---

[1] In ruling on the motion to dismiss, the District Court, as it was required to do under Federal Rule of Civil Procedure 12(b)(6), assumed as true FirstBank's allegation that the Disputed Securities were not Purchased Assets.

4

477 U.S. at 255; *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)).

In determining whether to grant a motion for summary judgment, the court is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006)

(quoting *Liberty Lobby*, 477 U.S. at 249 (internal quotation marks omitted)). Here, the Motion

for Summary Judgment presented by Barclays easily satisfies this strict standard.

### *Factual Background*

Because this is a core proceeding, prior rulings of this Court made in connection with

these chapter 11 cases and the liquidation of LBI under the Securities Investor Protection Act

("SIPA") constitute the law of the case. *See Term Loan Holder Comm. v. Ozer Group, L.L.C. (In

re Caldor Corp.)*, 303 F.3d 161, 168 n.13 (2d Cir. 2002) (noting that a "'case' triggered by a

bankruptcy petition is an 'umbrella litigation often covering numerous actions that are related

only by the debtor's status as a litigant[,]'" while the term "proceeding," as used in the

bankruptcy context, "embraces all controversies determinable by the court of bankruptcy and all

the matters of administration arising during the pendency of the case") (*citing Sonnax Indus. v.

Tri Component Prods. Corp. (In re Sonnax Indus.)*, 907 F.2d 1280, 1283 (2d Cir. 1990); 2

Collier on Bankruptcy ¶ 301.03 (15th ed. rev. 2001) (internal parenthetical omitted))). The

undisputed facts relevant to the current dispute are derived from the parties' submissions in

connection with this adversary proceeding and the content of earlier proceedings and decisions

of the Court.[2]

---

[2] In particular, the Court looks to *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011), the opinion that resolved challenges by LBHI and the SIPA Trustee (defined below) to the amount of consideration received for assets transferred to Barclays under the September 18 Repurchase Agreement (defined below) and the integrity of various aspects of the sale to Barclays. Also relevant to the analysis is the Court's unpublished Memorandum Decision in adversary proceeding number 08-01633 (JMP), *Evergreen Solar, Inc. v. Barclays PLC et al.* [ECF No. 47], 2011 Bankr. LEXIS 629 (Bankr. S.D.N.Y. Feb. 22, 2011), granting defendants' motions to

On January 16, 1997, FirstBank and LBSF entered into the Swap Agreement. Stip. ¶ 2, Exs. 1, 2.[3] Lehman Brothers Holdings Inc. ("LBHI") guaranteed LBSF's obligations under the Swap Agreement. Stip. ¶ 2. The parties amended the applicable ISDA Master Agreement as of June 19, 2008. Stip. ¶ 4. Pursuant to the CSA and in order to provide agreed credit support, FirstBank was required to post specified types of collateral to secure all of its obligations under the Swap Agreement. Stip. Ex. 3 (CSA).

As of September 15, 2008, the collateral posted by FirstBank to LBSF as Secured Party under the CSA consisted of positions in twenty-three securities with identified CUSIP numbers (the "Posted Collateral"), including the twenty Disputed Securities. Stip. ¶¶ 6, 7. Under paragraph 6(c) of the CSA, LBSF was permitted to use the Posted Collateral, provided that "the Secured Party [was] not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date [had] occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party." Stip. ¶ 9, Ex. 3 ¶ 6(c). Specifically, LBSF, as Secured Party under the CSA, had "the right to … sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption by [FirstBank]." Stip. Ex. 3 ¶ 6(c).

---

dismiss plaintiff's amended complaint seeking to recover certain shares of plaintiff's own common stock that plaintiff claimed had been transferred improperly to Barclays under the Sale Order.
Barclays and the SIPA Trustee appealed certain aspects of the Court's ruling in *In re Lehman Brothers Holdings Inc.*, but no party pursued an appeal of the Court's denial of Rule 60(b) relief. Accordingly, that aspect of the decision is final.
The District Court affirmed the Court's opinion in part with respect to assets that had been in dispute between Barclays and the SIPA Trustee and reversed in part as to issues not relevant to this adversary proceeding. *See Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.)*, 478 B.R. 570 (S.D.N.Y. 2012). Appeals from the District Court's decision are pending before the Second Circuit. *See In re Lehman Brothers Holdings Inc.*, Court of Appeals Nos. 12-2322, 12-2328, 12-2657. The Second Circuit has scheduled oral argument on these matters for May 29, 2013.
[3] References to "Stip." are to the parties' Stipulations of Fact. Adv. Proc. No. 10-4103, ECF No. 19.

As was permitted under the terms of the CSA, between February 6, 2008 and September 12, 2008, LBI acquired the Disputed Securities in a series of open repurchase transactions with LBSF (the "LBSF-LBI Repos").  Stip. ¶ 12.  The LBSF-LBI Repos were governed by a Master Repurchase Agreement (the "Lehman MRA") under which title to the Disputed Securities passed to LBI.  BCI Facts[4] ¶ 25; Stip. Ex. 6 ¶ 8.  The Lehman MRA further provided that, subject to certain limitations, "nothing in this Agreement shall preclude [LBI] from engaging in repurchase transactions with the [Disputed Securities] or otherwise pledging or hypothecating the [Disputed Securities]."  Id.

Under the terms of the Lehman MRA, LBSF had the right (but not the obligation) to repurchase the Disputed Securities.  To that end, the Lehman MRA included a close-out provision requiring LBSF to tender the defined Repurchase Price in immediately available funds.  BCI Facts ¶ 29; Stip. Ex. 6 ¶¶ 2(o), 3(c), 7.  LBI documented the LBSF-LBI Repos in its stock ledger for U.S. dollar-denominated fixed-income instruments and in trade confirmations provided to LBSF stating that LBI had bought the Disputed Securities from LBSF and listing the prices paid by LBI to LBSF in immediately available funds.  Stip. ¶¶ 11, 12; Stip. Exs. 5, 6, 40; BCI Facts ¶¶ 19 n.3, 21, 24.

On September 15, 2008, LBSF failed to make a net payment due under the Swap Agreement, and this failure to pay constituted an event of default.  Stip. ¶ 32, Ex. 9.  On that same day, LBHI and certain of its subsidiaries[5] each filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Filing for relief under the Bankruptcy Code was an event of default under the Swap Agreement.  Stip. Ex. 9.  By virtue of

---

[4] All references to "BCI Facts" are to Barclays Capital Inc.'s Statement of Undisputed Facts Pursuant to Local Rule 7056-1 in Support of Its Motion for Summary Judgment.  Adv. Proc. No. 10-4103, ECF No. 18.

[5] LBSF is a subsidiary of LBHI, but did not file its own chapter 11 petition until October 3, 2008.  Stip. ¶ 26.  At times, the Court refers to LBHI together with its debtor and non-debtor subsidiaries and affiliates as "Lehman."

this event of default, LBSF's right to use the Posted Collateral under the CSA terminated on September 15, 2008 (the "Collateral Use Cutoff Date"). Stip. ¶ 9. Accordingly, the LBSF-LBI Repos, all of which occurred prior to the Collateral Use Cutoff Date, constituted permissible exercises of the right of LBSF as swap counterparty to dispose of the Posted Collateral "free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption by [FirstBank]." Stip. ¶¶ 9, 12, Ex. 3 ¶ 6(c).

Following the LBHI bankruptcy filing, the New York Fed provided financing to LBI through a series of short-term funding agreements (collectively, the "Fed Repo") that enabled LBI to continue operating as a broker-dealer for a limited period of time. *In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170. The terms of the Fed Repo required LBI to post collateral to the New York Fed. Id. Upon subsequently learning that LBHI, LBI and Barclays contemplated entering into a transaction (the "Sale Transaction") for the acquisition of Lehman's North American broker-dealer and investment banking operations, the New York Fed became insistent that it be immediately relieved of its short-term financing role for LBI and that Barclays take on the role of providing such financing. Id.

Barclays assumed this role under an agreement with the New York Fed (the "Take-Out Agreement") that was signed on September 17, 2008. In the Take-Out Agreement, Barclays agreed to step into the shoes of the New York Fed and to purchase all assets that were included within the Fed Repo. *In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170 n. 13. On the morning of September 18, 2008, an unwinding of the Fed Repo took place, and the New York Fed returned to LBI all securities that had been pledged as collateral (including the Disputed Securities). Stip. ¶ 19. LBI held the Disputed Securities in an account identified as the "LBSF Collateral Repo Account" and designated them as having been received under a reverse repo on

8

its books and records.  FirstBank Resp. BCI Facts ¶¶ 25, 26.[6]  LBI then entered into a separate

repurchase transaction with Barclays (the "September 18 Repurchase Agreement") under which

Barclays advanced approximately $45 billion in cash to LBI in exchange for the transfer of a

diversified inventory of financial assets that included the Disputed Securities.  Stip. ¶ 20.

On September 19, 2008, the District Court entered an Order regarding liquidation of LBI,

appointed a trustee for LBI (the "SIPA Trustee") and referred the LBI liquidation to this Court.

Adv. Proc. No. 08-01420, ECF No. 1.  Later that same day, the Court conducted a hearing (the

"Sale Hearing") to consider approval of the proposed sale to Barclays on an emergency basis.

The Sale Hearing was an exceptional event in the history of insolvency law and was held jointly

in both the LBHI chapter 11 case and the SIPA liquidation that had been commenced just hours

before the start of the Sale Hearing.[7]

The Sale Hearing extended into the early morning hours of September 20.  At the

conclusion of the Sale Hearing, the Court approved the acquisition by Barclays and entered the

Sale Order dated as of September 19, 2008.[8]  Stip. ¶ 23, Ex. 8.  In the Sale Order, the Court

found, among other things, that Barclays was a "good faith Purchaser" and had "proceeded in

good faith in all respects in connection with" the Sale Transaction.  Stip. Ex. 8 ¶ K.  The Sale

Order also provided that the transfer of the Purchased Assets would "be a legal, valid and

effective transfer of the Purchased Assets … free and clear of all Liens, claims … or interests of

any kind or nature whatsoever … ."  Stip. Ex. 8 ¶ N.

---

[6] References to "FirstBank Resp. BCI Facts" are to Plaintiff's Responses to Barclays Capital Inc.'s Statement of
Undisputed Facts Pursuant to Local Rule 7056-1 in Support of its Motion for Summary Judgment and Statement of
Additional Material Facts.  Adv. Proc. No. 10-4103, ECF No. 41.

[7] As of the date of the Sale Hearing, the Sale Transaction had been memorialized in an asset purchase agreement,
dated as of September 16, 2008 (the "APA").  *Evergreen Solar,* 2011 Bankr. LEXIS 629, at *10.

[8] On October 17, 2008, Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd.,
BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks prosecuted an appeal of the
Sale Order in the District Court.  On March 13, 2009, the District Court issued its Opinion & Order affirming the
Sale Order.  District Court Case No. 08-cv-08869, ECF No. 18; District Court Case No. 08-cv-08914, ECF No. 19.

After entry of the Sale Order, on September 22, 2008, Barclays, LBHI, LBI and LB 745

LLC filed on the docket of the LBHI bankruptcy case a letter agreement dated as of September

20, 2008 purporting to clarify, modify and supplement the terms and conditions set forth in the

APA (the "Clarification Letter").[9]  Stip. ¶ 24.  The Clarification Letter provided that the rights

and obligations of the parties under the Fed Repo would terminate, and all securities held by

Barclays under the September 18 Repurchase Agreement would be deemed part of the Purchased

Assets.  *Evergreen Solar*, 2011 Bankr. LEXIS 629, at *10.  The Clarification Letter also

provided that the Purchased Assets would include "the securities owned by LBI and transferred

to [Barclays] or its Affiliates under the [September 18] Repurchase Agreement … as specified on

Schedule A previously delivered by Seller and accepted by [Barclays]."  Morag Decl.[10] Ex. 22 ¶

1(a)(ii)(A).  Schedule A includes CUSIP numbers and par values for the Disputed Securities.

Stip. ¶ 22.

On September 29, 2008, Barclays and Lehman filed a joint motion for authorization to

file Schedule A under seal.  Stip. ¶ 28.  In that motion, Barclays and Lehman stated that they

were "willing to provide the Schedules to creditors who sign a confidentiality agreement."  Id.

The Court granted the sealing motion and issued an order to that effect dated December 17,

2008; Schedule A was filed under seal on December 18, 2008.  Id.  Thus, information regarding

the Disputed Securities was available to any interested party, including FirstBank, provided that

the party seeking discovery entered into a confidentiality agreement.

FirstBank attempted through counsel to learn the location of its collateral from Lehman

and its counsel following LBSF's filing of its chapter 11 petition.  BCI Facts ¶ 54.  From

---

[9] The Clarification Letter was not formally approved, but the Court has determined that it is enforceable nonetheless.
*In re Lehman Brothers Holdings Inc.*, 445 B.R. at 151.
[10] References to "Morag Decl." are to the Declaration of Boaz S. Morag in Support of Barclays' Motion for
Summary Judgment dated September 13, 2012.  Adv. Proc. No. 10-4103, ECF No. 16.

approximately March 31, 2009 through July 23, 2009, FirstBank and Lehman personnel engaged

in a closeout process of the Swap Agreement.  The parties exchanged data and analyses; this

exchange culminated in FirstBank's being informed by Lehman that (i) the Posted Collateral had

been rehypothecated and was no longer under Lehman's control, (ii) Lehman was crediting a

portion of the Posted Collateral against the net termination amount owed by FirstBank to LBSF

and (iii) FirstBank would need to file a claim "against the estate" as to the excess collateral.  BCI

Facts ¶¶ 55-60; Morag Decl. Ex. 57.

As part of this process, Lehman also informed FirstBank that if it wished to argue that it

should "become senior to the other creditors with respect to [its] excess collateral," it would need

to file a motion with the Court.  Morag Decl. Ex. 58.  Inexplicably, FirstBank elected not to

participate in the chapter 11 cases.  It has not filed a proof of claim against its counterparty,

LBSF, or LBSF's guarantor, LBHI.[11]  BCI Facts ¶ 76.  FirstBank also has not filed any motion in

the LBSF or LBHI bankruptcy cases relating to treatment of its excess collateral.  Id.  This

failure by FirstBank to assert any claims against the chapter 11 debtors is remarkable in light of

the facts noted below indicating institutional knowledge concerning the location of the Disputed

Securities approximately two months prior to the bar date for filing proofs of claim.

The meeting minutes from the July 14, 2009 FirstBank Management Investment and

Asset Liability Committee reflect that FirstBank learned from JPMorgan Chase and understood

at least as early as that date that its "collateral was transferred to Barclays on September 18,

2008."  BCI Facts ¶ 64.  Around the same time, FirstBank's general counsel was informed by

counsel to the SIPA Trustee that three of the 23 CUSIPS constituting the Posted Collateral had

---

[11] FirstBank filed a customer claim against LBI identifying the Purchased Collateral among the securities it sought
to recover.  BCI Facts ¶ 69.  The SIPA Trustee denied the claim as duplicative.  Id. ¶ 72.  The Court is aware that
FirstBank's customer claim against LBI is subject of a separate litigation; that litigation is not currently before the
Court.

been transferred to a BlackRock entity, and not to Barclays.[12]  Id.  On July 24, 2009, FirstBank

filed a Rule 2004 Motion seeking discovery as to its collateral; the motion was adjourned

without date after FirstBank obtained information as to the location of its property.  Case No. 08-

13555, ECF Nos. 4485, 5085.

FirstBank has not asserted any claim against BlackRock or any other third party that may

have received any of the posted CUSIPs that were not subject to the LBSF-LBI Repos.  BCI

Facts ¶ 77.  On April 15, 2010, FirstBank received an attachment to a pleading filed by Barclays

in this litigation in the District Court that revealed relevant excerpts from Schedule A.  BCI Facts

¶ 43; Stip. ¶ 28.  Prior to that date, FirstBank did not have formal notice that the Disputed

Securities were listed on Schedule A.  Stip. ¶ 29.

### Discussion

The definition of the term Purchased Assets is an issue of central importance in the

hundreds of pages of briefing submitted and the more than two hours of oral argument presented

in connection with this dispute.  Properly applying that definition is the dispositive factor in

determining whether transfer of the Disputed Securities to Barclays now can be effectively

challenged.

The Court has no difficulty in finding that the Disputed Securities properly are

catalogued as Purchased Assets.  This is true notwithstanding the various transfers that allowed

these CUSIPs claimed by FirstBank to be swept into the September 18 Repurchase Agreement

and listed on Schedule A.  The transfers that allowed the Disputed Securities to be captured by

---

[12] FirstBank has stipulated that it is not pursuing any claims against Barclays as to any securities other than those
that constitute Posted Collateral that Barclays received from LBI or LBHI (or any of their subsidiaries or affiliates)
under the APA, the Clarification Letter, Schedule A or otherwise.  Stip. ¶ 30.  FirstBank quarrels, however, with
Barclays' assertion that Barclays received the Disputed Securities and no other securities that comprised the Posted
Collateral.  FirstBank relies on an e-mail from a Barclays employee stating "We hold the following collateral" and
listing all 23 of the securities included within the Posted Collateral.  FirstBank Br. Opp'n 20; Stip. ¶ 36, Ex. 12.
Because this adversary proceeding is governed by the Sale Order, any statements made in emails are irrelevant and
have no bearing on the outcome.

the Fed Repo and then by the September 18 Repurchase Agreement with Barclays were all ordinary course securities transactions that took place prior to the Collateral Use Cutoff Date. These transactions included permitted internal repos within Lehman that moved the securities from LBSF to LBI and additional transfers involving LBI that took place in connection with the financing of LBI's operations by the New York Fed and ultimately by Barclays. In a domain of swaps and repos where assets are used routinely for financing purposes unless prohibited by contract, the fact that the Disputed Securities in question permissibly moved from one legal entity to another to secure short term financing for Lehman's broker dealer business is not the least bit surprising. In this setting, the fact that these securities ended up in Barclays' hands at a time of financial crisis is not actionable due to the protections afforded by the Sale Order to Barclays as purchaser of Lehman's assets.

FirstBank misreads the Clarification Letter in arguing that the Disputed Securities should be deemed excluded from the sale to Barclays. That argument disregards both the literal text of the Clarification Letter and the resolution of other similar disputes. The Court previously has determined in a different context that Barclays, LBHI and LBI expressly contemplated that the securities received by Barclays under the terms of the September 18 Repurchase Agreement would be treated as Purchased Assets. *See In re Lehman Brothers Holdings Inc.*, 445 B.R. at 170-72 (describing negotiation of September 18 Repurchase Agreement and noting that, under the terms of the Clarification Letter "all securities and other assets held by [Barclays] under the [September 18 Repurchase Agreement]" were to be deemed Purchased Assets and, accordingly, "all of the collateral pledged in connection with the September 18 Repurchase Agreement … was transferred to Barclays"); *Evergreen Solar*, 2011 Bankr. LEXIS, at *10 ("The Clarification Letter specifically provided that the rights and obligations of the parties under the [September 18

Repurchase Agreement]… would terminate, and all securities held by Barclays under the [September 18 Repurchase Agreement] would be deemed part of the Purchased Assets").

Regardless of the Court's earlier interpretations of the Clarification Letter noted above, the Disputed Securities indisputably are Purchased Assets. Consistent with controlling language of the Swap Agreement, these securities permissibly were allowed to migrate from LBSF to LBI pursuant to the LBSF-LBI Repos. Importantly, the individual securities at issue were all identified by CUSIP number and placed within the designated pool of financial assets that was transferred to Barclays in accordance with the Sale Order. Stip. ¶ 20. All of these assets were in the acquired pool, and there appears to be no basis to distinguish their treatment as Purchased Assets in light of the very same reasoning stated in this Court's decision in *Evergreen Solar*. The securities, quite simply, were freely transferable.

Despite the high hurdle presented by this precedent, FirstBank urges that the Disputed Securities should be deemed Excluded Assets rather than Purchased Assets because (i) Barclays did not purchase the derivatives business of LBSF, (ii) FirstBank's account with LBSF was not transferred to Barclays in connection with the Sale Transaction and (iii) the definition of "Excluded Contract" in the Clarification Letter covers, *inter alia*, "any ISDA Master Agreement." FirstBank Br. Supp. 14-18. However, these arguments are flawed and miss the explicit language in the Clarification Letter that plainly defines the securities in question as Purchased Assets.

In addition to deeming all securities held by Barclays under the September 18 Repurchase Agreement to be Purchased Assets, the Clarification Letter expressly carves out the securities listed on Schedule A (including the Disputed Securities) from the definition of Excluded Assets. Thus, the language as written takes pains to make clear that the assets on

14

Schedule A may not be classified as Excluded Assets.  Paragraph 1(c) of the Clarification Letter specifically provides that "[t]he following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, *other than those subject to the [September 18 Repurchase Agreement] … .*"  Morag Decl. Ex. 22 ¶ 1(c) (emphasis added).  This language, fairly read, simply does not allow for the result-driven interpretation proposed by FirstBank.  The Disputed Securities are Purchased Assets, and this is true despite FirstBank's ongoing claim to an ownership interest.

Asserting ownership with respect to the book entry mortgage-backed securities at issue here is not the same as a claim for the return of a unique asset such as a Picasso painting.  This dispute may seem to be about specified or traceable property, but it is really about money.  In practical terms, FirstBank is pursuing a claim against Barclays for money damages associated with the default of LBSF under the Swap Agreement in failing to deliver the Disputed Securities to FirstBank as pledgor, but that claim cannot be made against Barclays because of the provisions of the Sale Order.

Oddly, FirstBank's most direct claim for recovery is one that it knowingly chose not to make: a proof of claim against LBSF based on its breach of the Swap Agreement in failing to return the Disputed Securities.  *See Hennequin v. Clews*, 111 U.S. 676, 682 (1884) (noting that a creditor who holds collateral is bound by its contract "to return it when its purpose as security is fulfilled; but if [it] fails to do so, it is only a breach of contract …").  If such a claim had been made, damages presumably would be calculated in an amount equal to the market value of these securities.  *See, e.g., Carco Group, Inc. v. Maconachy*, 383 F. App'x 73, at *3 (2d Cir. 2010) (explaining that, in an action for breach of contract, "general damages seek to compensate the

plaintiff for 'the value of the very performance promised,' often determined by the market value of the good or service to be provided" (*quoting Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000))).

As to the claims of FirstBank, Barclays is off the hook. The Sale Order provides that Barclays is "entitled to all of the benefits and protections afforded by Bankruptcy Code Section 363(m)." Stip. Ex. 8 ¶ 18. Section 363(m) gives purchasers of a debtor's assets an "assurance of finality" with respect to "who has rights to estate property." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) (citations omitted); *see also Lawrence v. Wink*, 293 F.3d 615, 622 (2d Cir. 2002) (noting the Second Circuit's reluctance to "open the floodgates to future litigation attacking the final orders of sale in bankruptcy court proceeding, a forum where finality of court orders is particularly important") (citations omitted); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (conclusion to uphold terms of sale under Section 363(m) "furthers the policy of finality in bankruptcy sales"); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002) (stating that a bankruptcy sale order may be collaterally attacked only "within the tight limits" of Federal Rule of Civil Procedure 60(b)).

Paragraph 7 of the Sale Order enjoins the assertion of any claims against Barclays relating to or arising out of its purchase of the Purchased Assets and provides that:

> [e]xcept as expressly permitted by the [APA] or by this Sale Order, all persons and entities … holding Interests or Claims of any kind or nature whatsoever against or in [Lehman] or [Lehman's] interests in the Purchased Assets … arising under or out of, in connection with, or in any way relating to, [Lehman], the Purchased Assets, the operation of [Lehman's] businesses before the Closing Date or the transfer of [Lehman's] interests in the Purchased Assets to [Barclays], shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against [Barclays] … such persons' or entities' Interests or Claims.

Stip. Ex. 8 ¶ 7.

16

The Sale Order also includes specific findings by the Court that LBI had "all of the … authority necessary to consummate" the Sale Transaction.  Stip. Ex. 8 ¶ G.  Given the important policy of finality in bankruptcy sales, the Sale Order channels a remedy for parties like FirstBank who claim an interest in the Purchased Assets.  In particular, "all such Claims and Interests … shall be, and hereby are transferred and attached to [Lehman's] interests in the Sale proceeds."  Stip. Ex. 8 ¶ 7.

Therefore, FirstBank's claims against Barclays are prohibited by the Sale Order.  That unambiguous final order was structured purposefully to protect the purchaser from claims such as these.  Barclays purchased the Disputed Securities in good faith and has the right to retain them.  They fit the definition of Purchased Assets, and Barclays is expressly entitled to rely on all of the immunities and protections of the Sale Order.

There is no need to address at length certain other arguments presented by the parties with respect to the Disputed Securities – the argument that Barclays is protected by Article 8 of the Uniform Commercial Code and the contention of FirstBank that the Posted Collateral was not property of the Lehman estate.[13]  Because the Court finds that the Sale Order bars FirstBank's claims, it follows that there is no issue for trial and that Barclays is entitled to judgment as a matter of law with respect to the surviving claims.

---

[13] The question of ownership of the Disputed Securities is a red herring.  Regardless of the validity of FirstBank's claims to the Disputed Securities, LBI had the legal right to unrestricted use of these securities by reason of the Lehman MRA.  It was proper under the circumstances to include them in the Fed Repo.  Eventually, the Disputed Securities were transferred to Barclays under the terms of the September 18 Repurchase Agreement.  Barclays, as purchaser, was entitled to rely on the APA, the Clarification Letter, the content of Schedule A and the Sale Order.  FirstBank's articulation of an adverse ownership claim to collaterally attack the finality of this sale is plainly not permitted under the Sale Order.

*Conclusion*

Barclays' Motion for Summary Judgment is granted, and FirstBank's Motion for

Summary Judgment is denied.  Barclays is directed to submit an order consistent with this

Memorandum Decision.

SO ORDERED.


Dated: New York, New York
　　　 May 10, 2013

　　　　　　　　　　　　　　　 ___*s/ James M. Peck*_____
　　　　　　　　　　　　　　　 Honorable James M. Peck
　　　　　　　　　　　　　　　 United States Bankruptcy Judge

# PD 24

## Barclays Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| | 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS, INC., et al., | Jointly Administered |
| Debtors. | |
| FIRSTBANK PUERTO RICO, | Adversary Proc. No. |
| Plaintiff, | 10-04103 (JMP) |
| - against - | |
| BARCLAYS CAPITAL INC., | |
| Defendant. | |

### ORDER DENYING MOTION OF FIRSTBANK PUERTO RICO FOR SUMMARY JUDGMENT, GRANTING MOTION OF BARCLAYS CAPITAL INC. FOR SUMMARY JUDGMENT, AND SETTING BRIEFING SCHEDULE FOR MOTION OF <u>BARCLAYS CAPITAL INC. FOR CIVIL CONTEMPT SANCTIONS</u>

Upon the motion, dated September 13, 2012, of FirstBank Puerto Rico

("FirstBank") for summary judgment (the "FirstBank Summary Judgment Motion") and all

supporting papers filed therewith (ECF Nos. 23-26, 29, 33); upon the opposition of Barclays

Capital Inc. ("Barclays"), dated October 15, 2012 (ECF Nos. 35-38, 44-48); upon the reply in

further support, dated November 21, 2012 (ECF Nos. 52, 56-57, 60);

Upon the motion, dated September 13, 2012, of Barclays for summary judgment

(the "Barclays Summary Judgment Motion") and all supporting papers filed therewith (ECF Nos.

15-18, 32); upon the opposition of FirstBank, dated October 15, 2012 (ECF Nos. 39-41, 49);

upon the reply in further support, dated November 21, 2012 (ECF Nos. 53-55, 61, 63-65);

Upon the Stipulations of Fact, dated September 10, 2012 (ECF No. 19); and upon

a hearing having been held on January 16, 2013 to consider the relief requested in the FirstBank

Summary Judgment Motion and the Barclays Summary Judgment Motion (ECF No. 66); and

after due deliberation and for the reasons stated by the Court in its Memorandum Decision

Denying Motion For Summary Judgment Of FirstBank Puerto Rico And Granting Motion For

Summary Judgment Of Barclays Capital Inc. entered on May 10, 2013 (ECF No. 67), it is hereby

ORDERED that the FirstBank Summary Judgment Motion is denied and the

Barclays Summary Judgment Motion is granted; and it is further

ORDERED that, in accordance with the Stipulation Adjourning Contempt Motion

Deadlines entered by the Court on October 10, 2012 (ECF No. 34), and the agreement of the

parties, FirstBank shall file papers in opposition to the motion of Barclays for civil contempt

sanctions against FirstBank for willful violation of the Sale Order (the "Contempt Motion")

(ECF Nos. 20-22) on or before June 28, 2013; Barclays shall file its reply papers, if any, in

further support of the Contempt Motion on or before August 5, 2013; and a hearing on the

Contempt Motion will be held at a date and time to be determined before the undersigned at the

United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton

Custom House, One Bowling Green, New York, New York, 10004, Room 601.

**Dated: May 23, 2013**
**New York, New York**

                                        **/s/ James M. Peck**
                                        _____
                                        **Hon. James M. Peck**
                                        **United States Bankruptcy Judge**

3

# PD 25

**Trustee's Motion to Approve LBI-LBHI Settlement**

James B. Kobak, Jr.
Jeffrey M. Greilsheimer
Shannon F. Green
Susan M. Vignola
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
Email:  kobak@hugheshubbard.com
          greilshe@hugheshubbard.com
          greens@hugheshubbard.com
          vignola@hugheshubbard.com

          -and-

Kenneth E. Lee
LEVINE LEE LLP
570 Lexington Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 223-4400
Facsimile:  (212) 223-4425
Email:  klee@levinelee.com

*Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>          LEHMAN BROTHERS INC.,<br><br>                                        Debtor. | Case No. 08-01420 (JMP) SIPA |

**NOTICE OF MOTION PURSUANT TO FEDERAL
RULE OF BANKRUPTCY PROCEDURE 9019 FOR ENTRY
OF ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN
THE TRUSTEE AND THE LBHI ENTITIES**

**PLEASE TAKE NOTICE** that on February 26, 2013, James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa *et seq*., by and through his undersigned counsel, filed a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement and compromise entered into by the Trustee and the LBHI Entities (the "Motion")[1], and that a hearing to consider the Motion, if necessary, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on April 16, 2013 at 10:00 a.m. (prevailing Eastern time) or as soon thereafter as counsel may be heard (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to entry of the order must (i) be in writing; (ii) state the names and addresses of the responding parties and the nature of the claims or interests of such parties; (iii) state with particularity the legal and factual bases of such responses; (iv) conform to the Bankruptcy Rules and local bankruptcy rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399, by registered users of the Court's Electronic Case Files system, and by all other parties in interest, on a 3.5-inch disk or CD-ROM, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format no later than April 3, 2013 at 4:00 p.m. (prevailing Eastern time) (the "Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York

---

1. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement attached to the Motion as Exhibit A.

10004, Attn: James B. Kobak, Jr., Esq. and Jeffrey M. Greilsheimer, Esq.; (b) Securities Investor

Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, District of Columbia

20005, Attn: Kenneth J. Caputo, Esq.; (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New

York, New York 10153, Attn: Lori R. Fife, Esq. and Maurice Horwitz, Esq. with a courtesy copy

to the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York

10004, Courtroom 601.

  **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Motion, the Trustee may, on or after the Response Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which may be entered with no further notice or opportunity to be heard offered to any

party.

Dated:     New York, New York
           February 26, 2013

HUGHES HUBBARD & REED LLP

By:  /s/ James B. Kobak, Jr.
       James B. Kobak, Jr.
       Jeffrey M. Greilsheimer
       Shannon F. Green
       Susan M. Vignola
     One Battery Park Plaza
     New York, New York 10004
     Telephone:  (212) 837-6000
     Facsimile:  (212) 422-4726
     Email:  kobak@hugheshubbard.com
          greilshe@hugheshubbard.com
          greens@hugheshubbard.com
          vignola@hugheshubbard.com

-and-

By:  /s/ Kenneth E. Lee
       Kenneth E. Lee
     570 Lexington Avenue, 7th Floor
     New York, New York 10022
     Telephone:  (212) 223-4400
     Facsimile:  (212) 223-4425
     Email:  klee@levinelee.com

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman*
*Brothers Inc.*

| | |
|---|---|
| **Hearing Date:** | **April 16, 2013 at 10:00 a.m. (prevailing Eastern Time)** |
| **Response Deadline:** | **April 3, 2013 at 4:00pm (prevailing Eastern Time)** |

James B. Kobak, Jr.
Jeffrey M. Greilsheimer
Shannon F. Green
Susan M. Vignola
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: kobak@hugheshubbard.com
　　　　greilshe@hugheshubbard.com
　　　　greens@hugheshubbard.com
　　　　vignola@hugheshubbard.com

　　　　　　-and-

Kenneth E. Lee
LEVINE LEE LLP
570 Lexington Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
Email: klee@levinelee.com

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| 　　　　LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| 　　　　　　　　　　　　　　　Debtor. | |

**MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY**
**PROCEDURE 9019 FOR ENTRY OF ORDER APPROVING**
**SETTLEMENT AGREEMENT BETWEEN THE TRUSTEE AND THE LBHI ENTITIES**

James W. Giddens (the "Trustee"), as Trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] by and through his undersigned counsel, hereby files this motion (the "Motion") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a settlement agreement dated February 21, 2013, attached hereto as Exhibit A (the "Settlement Agreement") between the Trustee and the LBHI Entities[2] (each a "Party" and collectively "the Parties") of all claims between LBI and the LBHI Entities as described below.

## I.  PRELIMINARY STATEMENT

1.  The Parties have achieved a settlement that is in the best interests of LBI's customers and the LBI estate. The Settlement Agreement resolves the LBHI Entities' multi-billion-dollar customer claims. Together with the Trustee's settlement with Lehman Brothers International (Europe) ("LBIE") and the Second Motion for Order Approving the Trustee's Allocation of Property (the "Second Allocation Motion"), the Settlement Agreement will allow the Trustee to make distributions that satisfy customer claims in full.[3] The Settlement Agreement also allows the Trustee to move forward to provide a meaningful return to general creditors, and avoids the need for costly litigation that would significantly delay and impede the Trustee's ability to make distributions.

---

1.  SIPA appears at 15 U.S.C. § 78aaa. For convenience, subsequent references to SIPA will omit "15 U.S.C."

2.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement attached hereto as Exhibit A.

3.  The Trustee has initiated a comprehensive review and reconciliation of all general creditor claims and filed a motion for approval of general creditor settlement procedures, which the Trustee has negotiated with LBHI and LBIE as part of an LBI estates protocol (the "LBI Estates Protocol"), that, in addition to the settlement procedures, provides for information sharing and cooperation among the Trustee, LBHI and LBIE. The Trustee is submitting a notice of presentment of proposed order for approval of these settlement procedures concurrently herewith.

2.     The Trustee's Settlement Agreement with the LBHI Entities is the result of years of good faith negotiation and account reconciliation between the Trustee's professionals and the LBHI Entities and their professionals.  The Settlement Agreement resolves customer and general creditor claims collectively asserted against LBI seeking tens of billions of dollars in securities and cash arising from the LBHI Entities' proprietary accounts at LBI, intercompany accounts, third party collateral accounts, repurchase and reverse repurchase transactions, derivatives, claims assigned to the LBHI Entities by third parties, claims for which LBHI is subrogated to a claim of JPMorgan Chase Bank, N.A., and other transactions.  The Trustee challenged the validity, propriety, valuation and classification of the LBHI Entities' claims during the negotiations with the LBHI Entities.  Ultimately, the Trustee and the LBHI Entities were able to consider the asserted claims, counterclaims and related defenses and were able to reach an economic resolution of factual and legal issues which is embodied in the Settlement Agreement.

3.     Following from years of diligent effort, the Trustee's settlement with the LBHI Entities is an essential step in the Trustee's effort to make as substantial a distribution to customers as possible, as soon as possible.  Along with the claims of LBIE (which are the subject of a separate settlement and related motion for approval), the claims asserted by the LBHI Entities are by far the largest claims submitted in the SIPA proceeding.  The elimination of the uncertainty and need for a multi-billion-dollar reserve through the settlement with the LBHI Entities greatly enhances the Trustee's ability to make a substantial distribution to customers.

4.     To avoid the expense and uncertainty of litigation, the parties have agreed to resolve their respective claims in accordance with the terms set forth in the Settlement Agreement.  The compromises embodied in the Settlement Agreement are a reasonable

resolution of the claims between the parties. If approved, the Settlement Agreement will result

in, *inter alia*, allowed net equity customer claims for the LBHI Entities in the aggregate amount

of $2,320,056,346.00 as of the LBI Filing Date; an allowed priority unsecured claim for LBHI in

the amount of $240,000,000.00; allowed non-priority general unsecured creditor claims for the

LBHI Entities in the aggregate amount of $13,983,800,000.00, comprised of allowed non-

priority general unsecured creditor claims for the LBHI Entities of $12,483,000,000.00 and an

allowed non-priority general unsecured creditor claim in the amount of $1,500,000,000.00 in

satisfaction of all claims for which LBHI is subrogated to a claim of JPMorgan Chase Bank,

N.A. or any of its affiliates ("JPM") against LBI; and allowed subordinated claims for the LBHI

Entities in the aggregate amount of $14,188,924,097.00. The allowed claim amounts represent a

substantial reduction from the total aggregate amounts claimed by the LBHI Entities against the

LBI estate. The settlement is the result of extensive due diligence by the parties and arm's

length, good faith negotiations, and it resolves all claims between the Trustee and the LBHI

Entities with appropriate allowances by both parties commensurate with the approach taken by

the Trustee in settling claims by and against LBI's former affiliates. Without the Settlement

Agreement, there is a risk that the Trustee will be unable to satisfy customer claims in full.

     5.     As mentioned above and discussed in greater detail below, the Parties

engaged in extensive claims reconciliation efforts through which the Parties were able to

substantially reduce their respective asserted claims and narrow the scope of factual and legal

issues that the Parties were able to consensually resolve in the Settlement Agreement. With

respect to the customer claims asserted by the LBHI Entities, the extensive and diligent

reconciliation efforts undertaken by the Trustee's and the LBHI Entities' professionals resulted

in the Parties agreeing that over half the amount of customer claims asserted by the LBHI

Entities were subordinated pursuant to valid and enforceable subordination agreements. This amount is included within the $14,188,924,097.00 of allowed subordinated claims being granted to the LBHI Entities in the Settlement Agreement.

6. Through the proposed settlement, the remaining asserted customer claims will be settled for allowed customer claims in the aggregate amount of $2,320,056,346.00, which settlement amount takes into account additional agreed claim reductions as a result of further claim reconciliations between the Parties, valuation adjustments, the LBHI Entities' consensual reclassification to general unsecured creditor treatment of claims that they acknowledged were not entitled to customer status, and the settlement and compromise of various complex factual and legal issues pertaining to the remaining asserted claims, including, *inter alia*, issues arising under SEC Rule 15c3-3, the proper application of and interplay between setoff and recoupment doctrines and the net equity rule in connection with the LBHI Entities' and LBI's respective claims against one another, and whether accounts containing pledged collateral custodied at LBI on behalf of the LBHI Entities should be afforded customer treatment.

7. Many of the LBHI Entities' asserted customer claims relate to their proprietary assets held at LBI that were not protected by SEC Rule 15c3-3 — the rule that protects customer assets in the event a broker-dealer is liquidated. LBI was not required to — and did not — segregate and account for these assets under Rule 15c3-3 in the ordinary course of business. Accordingly, if the LBHI Entities prevailed on those customer claims, the Trustee would not have resources available to pay LBI's customers in full. By contrast, if the Settlement Agreement and its necessary preconditions are effectuated, all customers will be made whole, the LBHI Entities will be granted allowed customer claims in the amount of $2,320,056,346.00 on

their substantial asserted customer claims (an amount that will allow for a 100% distribution on all allowed customer claims), and significant value will be available for the general estate.

8.     Indeed, the Settlement Agreement provides important benefits to general creditors.  By reducing the balance of the LBHI Entities' asserted general and reclassified general unsecured claims to a total allowed priority unsecured claim of $240,000,000.00 and total general unsecured claims of $13,983,800,000.00, the Settlement Agreement permits a meaningful dividend to all other general estate creditors.

9.     The resolution of the LBHI Entities' claims brings certainty to the LBI estate.  The Settlement Agreement avoids years of potential litigation between LBI and the LBHI Entities that would delay distributions to customers and general creditors and avoids millions in professional fees to all parties that would arise from the litigation.  This settlement, coupled with resolution of the claims asserted by LBIE, gives the Trustee the ability to promptly make full distributions on allowed customer claims.  In light of the Settlement Agreement, the Trustee already has initiated a comprehensive review and reconciliation of all general creditor claims and has commenced filing objections to invalid general creditor claims against the LBI estate.[4] These are critical steps in the Trustee's plan to bring the LBI liquidation to its conclusion.

10.     The Parties have worked diligently since 2009 to reconcile the tens of thousands of transactions between LBI and the LBHI Entities as part of the effort to resolve LBI's and the LBHI Entities' respective claims against each other.  The Trustee engaged in this process with the goal of negotiating a resolution of the claims that would allow the Trustee to

---

4.     The status of the Trustee's motion for approval of general creditor objection and settlement procedures, which the Trustee has negotiated with LBHI and LBIE as part of an LBI Estates Protocol, is discussed *supra* fn. 3.

return property to LBI's customers.  Ultimately, the Parties' substantial, arm's length efforts have culminated in the execution of the Settlement Agreement — a definitive solution that maximizes value for LBI's customers and creditors.

## II.    JURISDICTION AND VENUE

11.    On September 19, 2008 (the "Filing Date"), Hon. Gerard E. Lynch, Judge of the United States District Court for the Southern District of New York, entered an Order Commencing Liquidation (the "LBI Liquidation Order," Docket No. 1) pursuant to the provisions of SIPA in the case captioned *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-CIV-8119 (GEL).

12.    The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee for the liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); and (ii) removed this case to this Court pursuant to SIPA § 78eee(b)(4), in the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP).

13.    Following removal to this Court for all purposes as required for SIPA cases by § 78eee(b)(4), this Court has "all of the jurisdiction, powers, and duties conferred by [SIPA] upon the court to which the application for the issuance of the protective decree was made."  SIPA § 78eee(b)(4).

14.    Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa.

## III.    BACKGROUND

### A.    The Relationship Between LBI And The LBHI Entities

15.    LBI was the principal U.S. broker-dealer and the primary entity through which the corporate entities comprising Lehman Brothers (collectively, the "Lehman Group") offered U.S. customers prime brokerage services.  These services included clearing trades,

maintaining custody of securities, providing margin financing, borrowing stock to cover short sales, and providing cash and position reports. LBI had many subsidiaries, which in turn, were regulated by a variety of organizations and engaged in a variety of financing, banking, and investment activities. All of LBI's subsidiaries were transferred to a non-Debtor LBHI subsidiary prior to the commencement of the SIPA proceeding. LBI subsidiaries included Debtors Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Financial Products Inc. ("LBFP"), and Lehman Brothers Derivative Products Inc. ("LBDP"), along with those entities' subsidiaries. (Declaration of Christopher K. Kiplok in Support of Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry Of Order Approving Settlement Agreement Between The Trustee And The LBHI Entities dated February 26, 2013 ("Kiplok Decl.") at ¶ 11.)

16.     Debtor LBHI, a U.S. entity, is the former parent company of both LBI and the remaining Debtors. LBHI's principal business was overseeing the Lehman enterprise, including the Lehman enterprise's activities in Capital Markets, Investment Banking and Investment Management. LBHI directly or indirectly held the equity in each of the Debtors as well as all non-debtor Lehman entities, managed the cash flows of Lehman entities and derived liquidity from cash generated by the Lehman subsidiaries. (Kiplok Decl. ¶ 12.)

17.     The LBHI Entities, along with LBHI, engaged in a broad range of complex transactions among the entities comprising the Lehman Group, including with LBI, ranging from the origination and trading of secured and unsecured loans, including commercial loan and mortgage loan origination, lending, trading and servicing activities, trading in "over-the-counter" (OTC) and equity derivative products, and commodities trading, among other things. (Kiplok Decl. ¶ 13.)

18.     Because none of the LBHI Entities were fully registered broker-dealers, certain of them settled many of their own customers' and counterparties' transactions through LBI and used LBI's custodial services in connection with their operations to hold collateral pledged to them by their contract counterparties pursuant to and in accordance with underlying agreements with those counterparties.  (Kiplok Decl. ¶ 14.)

19.     As the Court is aware, commencing on September 15, 2008 and periodically thereafter, the Debtors commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code, captioned *In re Lehman Brothers Holdings Inc., et al., Debtors*, Case No. 08-13555 (JMP) (Jointly Administered).

20.     On December 6, 2011, this Court approved and entered an order confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Docket No. 23023] (the "Plan"), in the Chapter 11 Cases.  The Plan became effective on March 6, 2012.

### 1.     The LOTC And LBSF Accounts

21.     Prior to Lehman's failure, LOTC and LBSF were the entities through which Lehman Brothers engaged in certain derivatives trades with the outside public.  The transactions were governed by standard International Swap Dealers Association Master Agreements.[5]  Pursuant to their agreements with LOTC and LBSF, counterparties posted securities as collateral to secure their obligations to LOTC and LBSF in connection with the underlying trades.  LOTC and LBSF, in turn, employed LBI to hold the collateral assets during

---

5.   LBSF and LOTC's counterparties (as relates to these accounts) were individuals, trusts, investment vehicles and
     some smaller institutions.

the pendency of the derivative trades in designated accounts (the "Collateral Accounts").

(Kiplok Decl. ¶ 15.)

### a. The LBSF Accounts

22.    With respect to the Collateral Accounts maintained on behalf of LBSF, LBI sent LBSF statements showing the collateral held, and noting that the account was a "Pledge Account for LBSF."  Although the LBSF Collateral Accounts were generally intended to allow LBSF to rehypothecate the posted collateral, a small subset of the accounts were coded as "customer" on LBI's books and records and protected under SEC Rule 15c3-3.  LBSF often did rehypothecate or otherwise remove the securities held in the accounts prior to the commencement of the SIPA proceeding.  For accounts where LBSF used, and withdrew, the collateral prior to the commencement of the SIPA proceeding, no value is being afforded to LBSF in this settlement, as the assets were withdrawn prior to the Trustee's appointment.  For accounts protected under SEC Rule 15c3-3, the Settlement Agreement allows the claims for these accounts as Customer Claims.  The remaining LBSF accounts, which were not protected under SEC Rule 15c3-3, are being allowed as subordinated claims, to the extent of LBSF's net equity.  (Kiplok Decl. ¶ 16.)

23.    LBSF is being allowed a subordinated claim based on valid and enforceable subordination agreements that LBSF entered into with LBI,  in the amount of $8,640,462,498.00, which includes certain claims allowed in respect of Collateral Accounts.

### b. The LOTC Accounts

24.    The Collateral Accounts LBI maintained on behalf of LOTC were labeled to indicate that LBI was holding the assets as custodian.  For the purposes of complying with the SEC's customer protection rules, the LOTC collateral accounts fell into one of three categories: (1) accounts on LBI's books and records, and segregated and/or included in the customer reserve

10

formula pursuant to SEC Rule 15c3-3; (2) segregated pursuant to a special agreement between

LBI and LOTC; or (3) no customer protection treatment by LBI.  Statements from LBI relating

to the LOTC Collateral Accounts sent to LOTC's counterparties stated that LBI held the

collateral as custodian for LOTC.  (Kiplok Decl. ¶ 17.)

       25.    In addition to the Collateral Accounts, LOTC maintained certain

proprietary accounts at LBI that were coded on LBI's books and records as proprietary accounts

of an introducing broker ("PAIB").  These accounts, which contained cash and securities, were

included in the PAIB reserve formula pursuant to PAIB requirements.  The Settlement

Agreement treats these accounts as customer accounts to the extent of LOTC's net equity,

because they were included in the PAIB customer protection scheme.  (Kiplok Decl. ¶ 18.)

       26.    Under the Settlement Agreement, LOTC's claims are being afforded

customer treatment with respect to (a) those Collateral Accounts that were reserved for or

segregated under 15c3-3 or by contract, and (b) those accounts that were reserved for under

PAIB, and the property contained therein.  With respect to the remaining LOTC Collateral

Accounts (the "Disputed LOTC Accounts"), LOTC contended that customer treatment should be

afforded notwithstanding that the accounts were neither segregated nor included in the customer

reserve formula pursuant to SEC Rule 15c3-3.  The Trustee disputed LOTC's contention that

customer treatment was appropriate under the circumstances.  To resolve the dispute related to

the Disputed LOTC Accounts, the Settlement Agreement allows LOTC a customer claim with

respect to certain of the remaining Collateral Accounts, and the remaining Disputed LOTC

Accounts are treated as general unsecured creditor claims.  (Kiplok Decl. ¶ 19.)

       27.    The Settlement Agreement provides for different treatment of the

Disputed LOTC Accounts and similar LBSF Collateral Accounts, in light of the significant debit

balances owed by LBSF to LBI and the fact that LOTC, unlike LBSF, was not party to a

subordination agreement with LBI. (Kiplok Decl. ¶ 20.)

### 2. Other LBHI Entities' Accounts

28. LBI maintained certain accounts on behalf of LBHI, Lehman Syndicated

Loans Inc., Lehman Brothers PA LLC, and Lehman Housing Capital Inc. that held cash and/or

securities, were reserved for under the SEC Rule 15c3-3 formula, and were coded as "customer"

on LBI's books and records. These accounts did not hold intercompany balances. Under the

Settlement Agreement the LBHI Entities are being afforded customer treatment for claims with

respect to those accounts that were reserved for under 15c3-3, and the property contained therein.

(Kiplok Decl. ¶ 21.)

29. LBI maintained certain accounts on behalf of Lehman Pass-Through

Securities Inc. ("LPTSI") that held illiquid securities. Although these accounts were neither

coded as "customer" on LBI's books and records, nor reserved for under the SEC Rule 15c3-3

formula, the LBHI Entities have argued that this was in error, and that LPTSI should be treated

as a customer of LBI with respect to those accounts and the property contained therein. The

Trustee has considered LPTSI's arguments, and, as part of the Settlement Agreement, has agreed

to afford customer treatment to LPTSI for the claims relating to these assets. (Kiplok Decl. ¶

22.)

30. In addition to the accounts described above, the LBHI Entities had

numerous other accounts at LBI, including intercompany accounts and accounts through which

the LBHI Entities engaged in proprietary transactions, intercompany accounts, foreign exchange

transactions, over-the-counter derivatives transactions, repurchase and reverse repurchase

transactions, and fixed income and equity trading, through which receivables and payables

related to numerous types of securities and non-securities related activity were booked. The

settlement treats these claims as unsecured general creditor claims.  Although claims related to these accounts were filed as customer claims, based on further investigation of the accounts through the claims reconciliation process, the LBHI Entities concurred with the Trustee's determination that the claims were not entitled to customer status.  (Kiplok Decl. ¶ 23.)

### B.   The LBHI Entities' Claims

31.   Between January and May 2009, the LBHI Entities submitted over 600[6] customer claims asserting that they were entitled to SIPA "customer" status with respect to billions of dollars in cash and securities based on, *inter alia,* proprietary transactions they conducted through accounts at LBI, intercompany accounts, third party collateral accounts, foreign exchange transactions, over-the-counter derivatives transactions, repurchase and reverse repurchase transactions, and fixed income and equity trading.  (Kiplok Decl. ¶ 24.)

32.   Between August 31 and September 17, 2010, based on limited information, the Trustee issued Notices of Determination with respect to the majority of the LBHI Entities' claims, denying certain customer claims and reclassifying them to general creditor status, denying nearly five hundred claims and reclassifying them to subordinated status, and denying other customer claims because the claimed accounts carried balances in favor of LBI (not the claimant), or were otherwise not entitled to recovery.  With respect to several additional customer claims, the Trustee informed the Debtors that he lacked sufficient information regarding the claimed account(s) to support a finding that the account qualifies for

---

6.   Of the customer claims submitted by the LBHI Entities, several relate to entities that are no longer under the control of the LBHI Entities.  These claims, reflected on Schedule A to the Settlement Agreement as excluded claims, are not subject to or covered by the Settlement Agreement.  (Kiplok Decl. ¶ 25.)

customer status, and requested additional information and/or documentation (the "Deficiency

Letters"). The Debtors subsequently provided the Trustee with additional information. (Kiplok

Decl. ¶ 26.)

33. On November 5, 2010 the Trustee issued amended Notices of

Determination with respect to several hundred customer claims with a claimed value of

approximately $11.36 billion that the Parties agreed were subject to subordination agreements.

These claims are allowed as subordinated claims in the Settlement Agreement. It is not currently

anticipated that any distribution will be made on account of allowed subordinated claims.

(Kiplok Decl. ¶ 27.)

34. On September 28, 2011, the Debtors timely objected to over two hundred

Notices of Determination and Deficiency Letters issued by the Trustee. (*See* Objection of

Lehman Brothers Holdings Inc. and Certain of Its Affiliates to the Trustee's Determination of

Claims (the "Objection," Docket No. 4584).) Notwithstanding the filing of the Objection in

which

the Debtors reserved their rights to file supplemental briefing should the Trustee's determination

of their asserted claims be litigated, the Parties continued to engage in good faith negotiation and

claim reconciliation regarding the factual and legal issues that impacted the remaining asserted

customer claims. The Objection has been pending since the time of its filing and no further

pleadings were filed by either Party in respect of the Objection. (Kiplok Decl. ¶ 28.)

### 1. The Debtors' General Creditor Claims

35. During May and June 2009, the LBHI Entities also submitted over fifty

General Claims asserting that they were entitled to general creditor status with respect to billions

of dollars in cash and securities and additional unliquidated amounts based on, *inter alia*,

intercompany balances, tax liability, pension settlement, audit contributions, repayment of

advanced funds, restricted stock awards, SEC lending funds, intercompany note interest, repurchase and reverse repurchase transactions, derivatives, and other transactions. (Kiplok Decl. ¶ 29.)

## 2. Related Claims

36. On January 30, 2009, R3 Capital Partners Master L.P. ("R3") submitted a customer claim, which it subsequently assigned to LBHI (the "R3 Claim"). R3's account at LBI held, *inter alia,* five securities (the "R3 Securities"). The Trustee issued a Notice of Determination, dated September 10, 2010, denying the R3 Claim on the basis of a negative net equity cash balance, and issued a demand letter to R3, dated February 2, 2011, for the cash balance. R3 did not timely file any written opposition to the Trustee's Notice of Determination. LBHI argued that R3 had failed to inform LBHI of the Notice of Determination, and presented the Trustee with additional information about the relationship between Lehman and R3. To resolve the factual and procedural dispute arising out of the R3 Claim, the Parties have agreed that the R3 Claim will be treated as an allowed customer claim only to the extent that the Trustee recovers the R3 Securities. Additionally, the Trustee has agreed to enter into a mutual release of all claims with R3. (Kiplok Decl. ¶ 30.)

37. On March 16, 2010, pursuant to the CDA among JPMorgan Chase Bank, N.A. and the Debtors, LBHI acquired the JPM Subrogated Claim against LBI. The JPM Subrogated Claim was originally asserted as a secured claim to the extent of collateral held by JPM, and transferred to LBHI pursuant to the CDA. That claim has been settled by allowing a $1,500,000,000.00 general unsecured creditor claim to LBHI. However, LBHI retains the right to reconvey the claim, and if it does so, the recipient will not be limited to the $1,500,000,000.00 general unsecured creditor claim. To the extent that the JPM Subrogated Claim is reconveyed by LBHI, LBHI is to indemnify the LBI Trustee for any distributions in excess of what would be

made on the $1,500,000,000.00 allowed general unsecured creditor claim (the "Indemnification"). LBHI will establish a cash reserve to secure its Indemnification obligation. (Kiplok Decl. ¶ 31.)

      **C.    The LOTC And LBSF Counterparties' Duplicate Claims**

      38.    Nineteen counterparties of LOTC and LBSF (the "Duplicate Claimants") have filed claims against LBI with respect to Collateral Accounts that were also claimed against LBI by LOTC or LBSF, as applicable. Certain of the claims asserted by the Duplicate Claimants are with respect to accounts that are included in the allowed claims of LOTC and LBSF under the Settlement Agreement (the "Duplicate Claims"). Certain Duplicate Claimants have also filed claims in the Chapter 11 Cases against LOTC and LBSF with respect to the assets they have claimed against LBI. (Kiplok Decl. ¶ 32.)

      39.    The Trustee sent each Duplicate Claimant a Notice of Determination stating the claim was duplicative of a claim filed by LOTC or LBSF, and was subject to the terms of the Notice of Determination of the LOTC or LBSF claim. Six Duplicate Claimants filed objections in response to the denial of these claims. (Kiplok Decl. ¶ 33.)

      40.    The Settlement Agreement contains a mechanism for resolution of the Duplicate Claims. Claims filed by Duplicate Claimants against LBI as to which the claimed assets are not included in the allowed claims of LOTC or LBSF under the Settlement Agreement (the "Excluded Duplicate Claimants") will be the subject of a separate objection and motion to expunge by the Trustee. LBSF concurs with the Trustee that for accounts that did not contain assets when the SIPA Proceeding began, no recovery is available, and such accounts are not included within LBSF's allowed claim or covered by the Settlement Agreement. On August 1, 2012, Duplicate Claimant First Bank of Puerto Rico filed a Motion for Reconsideration and Intervention in connection with its claim relating to such an account. (Kiplok Decl. ¶ 34.)

### D.    LBI's Claims In The Chapter 11 Cases

41.    On November 2, 2009, the Trustee timely submitted a claim in the Debtors' Chapter 11 Cases and, with the agreement of the Debtors, amended his claim on November 26, 2010.  The Trustee sought recovery of cash and securities relating to proprietary accounts, intercompany accounts, third party collateral accounts, repurchase and reverse repurchase transactions, derivatives, failed trades and other transactions.   (Kiplok Decl. ¶ 35.)

### E.    LBI's Claims Against Non-Debtors Controlled By LBHI

42.    The Trustee sought to recover the amounts due to LBI under two payment-in-kind notes and security agreements entered into between Lehman ALI and LBI on September 19, 2008 immediately prior to the commencement of the SIPA Proceeding (the "PIK Notes"). Pursuant to the PIK Notes, LBI transferred certain of its direct subsidiaries and intellectual property to Lehman ALI, and Lehman ALI agreed to pay to LBI an amount equal to the fair market value of the stock and other equity ownership interests of the transferred subsidiaries and intellectual property as of the LBI Filing Date plus interest.  As part of the Settlement Agreement, the PIK Notes are being settled at an amount of $350,000,000.00 and assigned to certain of the LBHI Entities in lieu of cash distributions from the LBI estate on a portion of their allowed customer claims for cash.  (Kiplok Decl. ¶ 36.)

43.    The Trustee also sought to recover balances due from Non-Debtors controlled by LBHI.  (Kiplok Decl. ¶ 37.)

### F.    The Parties' Reconciliation Process

44.    Since 2009, the Trustee has engaged in an extensive dialogue and information exchange with the LBHI Entities to develop and share information relevant to the administration of the respective estates and to determine claims that LBI and the LBHI Entities have asserted.  The Parties have exchanged information in support of their respective claims

through in-person meetings, teleconferences, email, and both formal and informal document

discovery.  In particular, additional information provided by the LBHI Entities assisted the

Trustee's professionals in reconciling the LBHI Entities' claims to LBI's books and records by

providing more specific information about the claims, including:  account numbers, account

names, identifying securities by CUSIP or ISIN, specifying cash positions on an account-by-

account basis, and supplementing the pricing information for claimed positions.  The information

exchange allowed the Trustee's and the LBHI Entities' professionals to reconcile the tens of

thousands of account positions in the claims between LBI and the LBHI Entities – a process that

involved weekly status calls and frequent in-person meetings.  (Kiplok Decl. ¶ 38.)

45.     The LBHI Entities and the Trustee were able to reconcile and agree on the

values of many positions claimed by each party.  However, the LBHI Entities also claimed

hundreds of illiquid securities positions and other financial products, which have not been valued

by the Trustee.  Nonetheless, the Parties were able to substantially reduce their asserted claims

against each other through the reconciliation process, thus narrowing and focusing the factual

and legal issues that are the subject of settlement and compromise in the Settlement Agreement.

(Kiplok Decl. ¶ 39.)

46.     Although the Parties were able to make substantial progress, significant

disputes involving complex factual and legal issues remained, including the propriety of

amendments, proper valuation of unpriced securities, the proper application of setoff,

applicability of certain subordination agreements separate from those pursuant to which the

Parties had previously agreed to subordinate approximately $11.36 billion in asserted customer

claims, evidence of subordination in LBI's books and records, and appropriate claims

classification under SIPA for securities, cash, and other assets claimed by the LBHI Entities. (Kiplok Decl. ¶ 40.)

47.     Ultimately, the Parties' substantial, arm's length efforts culminated in the execution of the Settlement Agreement — a definitive resolution of the disputes that maximizes value and is in the best interests of both the LBI and the LBHI Entities' estates.  (Kiplok Decl. ¶ 41.)

### G.     The Securities Investor Protection Act

48.     "'The principal purpose' of SIPA is 'to protect investors against financial losses arising from the insolvency of their brokers.'"  *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) (citation omitted); *accord SIPC v. Barbour*, 421 U.S. 412, 413 (1975) (SIPC "was established by Congress . . . for the purpose, *inter alia*, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit."); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry." (citations omitted)).

### 1.     "Customer" Claims

49.     SIPA defines a customer as:

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

SIPA § 78*lll*(2).  As acknowledged by courts in the Second Circuit, the purpose of the "customer" provisions of SIPA is to protect those who have entrusted cash and/or securities to a

broker-dealer — *i.e.*, to protect the custody aspect of a claimant's relationship with the broker-dealer. *See*, *e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 236 (2d Cir. 2011).

50.     The Trustee's determination of customer claims is entitled to deference. *See id.* at 238 & n.7 ("We have no reason to doubt that a reviewing court could and should accord a degree of deference to such an exercise of discretion so long as the method chosen by the trustee . . . is not clearly inferior to other methods under consideration."); *accord Extra One, L.P. v. Schachter (In re 105 E. Second St. Assocs.)*, No. 98 CIV. 2118(HB), 1999 WL 179371, *4 (S.D.N.Y. Mar. 31, 1999) ("A trustee may not be held responsible for mistakes in judgment where the judgment was discretionary and exercised reasonably under the circumstances."); *Camp v. Morey (In re Gov't Sec. Corp.)*, 107 B.R. 1012, 1021 (S.D. Fla. 1989) (trustee's procedure was "reasonable" given the circumstances of the liquidation); *In re Bell & Beckwith*, 77 B.R. 606, 615-16 (Bankr. N.D. Ohio 1987) (approving trustee's exercise of discretion regarding settlement).

### 2.     "Customer Property"

51.     The Trustee has an express statutory duty to "deliver securities to or on behalf of customers to the maximum extent practicable." SIPA § 78fff-1(b)(1). SIPA contemplates two separate categories of estate property: "customer property" and the debtor's general estate. SIPA § 78lll(4). Customer property — *i.e.*, cash and securities (except "customer name securities" delivered to the customer) "at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property" — is accounted for and distributed to customers in a manner that is separate and distinct from the debtor's general estate. *Id.*

52.     As set forth in the Trustee's Second Supplement to Second Allocation Motion, settlement with the LBHI entities, will permit the distribution of customer property to

satisfy 100% of the net equity claims of customers. (Second Supplement to Second Allocation Motion ¶ 1.)

### 3.     The LBI General Estate

53.     As a result of the Settlement Agreement and the benefits that it achieves for general creditors, the Trustee has good reason to believe that there will be a significant distribution of the LBI general estate. Accordingly, in keeping with SIPA and section 704(a)(5) of the Bankruptcy Code, the Trustee has initiated a comprehensive review and reconciliation of all general creditor claims filed in this proceeding to determine the validity and actual allowed amounts of such claims. To date, the Trustee already has filed twenty-nine omnibus objections to general creditor claims. (*See* Docket Nos. 5380, 5389, 5396, 5421, 5443, 5451, 5465, 5479, 5507, 5520, 5543, 5549, 5566, 5569, 5602, 5612, 5619, 5644, 5650, 5656, 5661, 5684, 5699, 5730, 5732, 5746, 5754, 5775, 5776.) In the interest of reducing the administrative and financial burden imposed on the Court and the LBI estate and expediting the process, the Trustee already has moved for approval of general creditor settlement procedures that the Trustee negotiated with LBHI and LBIE as part of the LBI Estates Protocol. In addition to the settlement procedures, the LBI Estates Protocol provides for information sharing and cooperation among the Trustee, LBHI and LBIE. The Trustee is submitting a notice of presentment of proposed order for approval of these settlement procedures concurrently herewith. (Kiplok. Decl. ¶ 42.)

## IV.    THE SETTLEMENT AGREEMENT[7]

54.    The Settlement Agreement clears the path for the Trustee to make 100% distributions to LBI's customers and to have a meaningful general estate.  The Settlement Agreement provides a final resolution of all legal and factual issues between the two estates.  The reconciliation process allowed for the significant reduction of the LBHI Entities' asserted customer and general creditor claims from their asserted values.  The Settlement Agreement also provides a mechanism, subject to judicial oversight, for resolution of the Duplicate Claims.  (*See* ¶ 56, *infra*.)  Further, by settling these claims, the Trustee is able to avoid the expense and delay that would be associated with litigation and the need to reserve for possible unfavorable outcomes of that litigation when making distributions.  Thus, the Settlement Agreement benefits the customers and creditors of LBI by significantly reducing the outstanding claims against LBI's customer and general estates, and will aid the Trustee in making distributions.  (Kiplok Decl.    ¶ 43.)

### B.    The Principal Terms Of The Settlement Agreement[8]

55.    The LBHI Entities have the following allowed claims and distributions under the Settlement Agreement:

- With respect to the LBHI Entities' Allowed Customer Claims, which will receive the same treatment as other customer claims allowed against the LBI estate, the LBHI Entities will receive allowed customer claims against LBI (valued as of September 19, 2008) for:

---

7.  The precise terms of the Parties' agreement are reflected in the Settlement Agreement, attached hereto as Exhibit A.

8.  The summary of the Settlement Agreement's terms herein is qualified in its entirety by the Settlement Agreement, and in the event of any conflict between the Settlement Agreement and this Motion, the terms of the Settlement Agreement shall govern.

o       Cash and securities in the aggregate amount of $2,320,056,346.00 valued as of the LBI Filing Date (Settlement Agreement §2.02(a)(i)); and

o       199 unpriced securities including the R3 Securities (the Additional Customer Claim Securities) *Id.*;[9]

- The LBHI Entities will receive the following distributions in respect of their Allowed Customer Claims:

o       Securities held in LBHI Entity Settlement Accounts specified on Schedules O and P of the Settlement Agreement, as such securities are affected by Corporate Actions after January 23, 2013 (Settlement Agreement §2.02(a)(iii)(1));

o       Cash in the aggregate amount of $1,977,423,118.00, as specified on Schedule Q of the Settlement Agreement (Settlement Agreement §2.02(a)(iii)(2));

o       Specified Post-Petition Filing Receipts consisting of:

        o       Post-Petition D&I in the amount of $122,196,399.00 for the period September 19, 2008 through December 31, 2012, plus the amount of Post-Petition D&I that would be distributed pursuant to the Post-Filing Income Methodology and Allocation Order to each of the LBHI Entities for the period January 1, 2013 through January 23, 2013, plus an amount equal to Post-Petition D&I actually credited to the LBHI Entity Settlement Accounts on or after January 24, 2013 with respect to the securities carried therein from time to time (Settlement Agreement § 2.02(a)(ii)(2)(A)); and

        o       Corporate Action Receipts received by LBI or the Trustee on or after January 1, 2013 through January 23, 2013 and all Corporate Action Receipts actually credited to the LBHI Entity Settlement Accounts on or after January 24, 2013 with respect to those securities carried therein from time to time (Settlement Agreement § 2.02(a)(ii)(2)(B));

---

9. The Additional Customer Claim Securities were assigned no value in the reconciliation process.

    o     Assignment of LBI's rights under the PIK Notes settled at $350,000,000.00 under the Settlement Agreement to the Agreed PIK Notes Settlement Payees in lieu of $350,000,000.00 of cash distributions to be made by the LBI estate in partial satisfaction of the cash portion of the Allowed Customer Claims of the Agreed PIK Notes Settlement Payees (Settlement Agreement §§ 2.01(b)(i), 2.02(a)(i));

- The LBHI Entities will receive an allowed claim at a level of priority equivalent to the priority afforded a taxing authority in the amount of $240,000,000.00 and, in turn, will be responsible for all Group Taxes (Settlement Agreement §§ 2.02(b)(i), 8.01);

- The LBHI Entities will receive allowed general unsecured creditor claims against LBI, which will receive the same treatment as other general unsecured claims allowed against the LBI estate, in the aggregate amount of $12,483,800,000.00, plus a $1,500,000,000.00 allowed general unsecured claim in satisfaction of all claims for which LBHI is subrogated to a claim of JPMorgan Chase Bank, N.A. or any of its affiliates ("JPM") against LBI and LBHI is obligated to provide the Indemnification (Settlement Agreement § 2.02(b)(ii));

- The LBHI Entities will receive allowed subordinated claims in the aggregate amount of $14,188,924,097.00 to be paid from the LBI General Estate if, and only to the extent that, there remain assets in the LBI General Estate after full satisfaction of all senior claims (Settlement Agreement § 2.02(c));

- LBCS will receive a Disputed Amended Claim Adjustment in the form of a cash payment in the amount of $32,000,000.00 as well as an allowed general unsecured claim in the amount of $920,000,000.00, which is included in the aggregate amount of allowed general unsecured claims reflected in the preceding paragraph (Settlement Agreement § 2.02(b)(iv));

- The LBHI Entities will receive a cash payment of $27,072,889.00 and an assignment of LBI's right to the Agreed LBI Non-Debtor Receivables Settlement Payment in an amount of $8,000,000.00 in satisfaction of an allowed administrative claim of $35,072,889.00 to resolve the LBHI Entities' assertions that (1) LBI received funds from third parties after the commencement of the SIPA Proceeding related to transactions between an LBHI Entity and such third party and (2) under the documents governing the transaction, LBI had no entitlement to, or proprietary interest in, the funds received from such third party. (Settlement Agreement Art. IX.); and

- The Settlement Agreement will become effective when its stated conditions to effectiveness are satisfied or waived (except as to Section

8.03(b) of the Settlement Agreement relating to group tax information to be provided, which shall be effective as of the Execution Date), including: (a) the Trustee obtains Bankruptcy Court Approval; (b) the LBI-LBIE Settlement Agreement becomes effective (unless the only reason the LBI-LBIE Settlement Agreement has not become effective is that the Settlement Agreement between the Trustee and the LBHI Entities is not effective); (c) the Trustee obtains a final order from the Court approving the allocation of sufficient cash and securities as Customer Property to allow for a 100% distribution on account of the customer claims allowed in the SIPA Proceeding; and (d) the Trustee obtains a final order from the Court approving the distribution to the LBHI Entities of the cash and securities as set forth in Section 2.02(a)(iii) and Schedules O, P and Q attached to the Settlement Agreement in satisfaction of their Allowed Customer Claims. (Settlement Agreement Art. XII.)

56.    The Settlement Agreement also provides that the Trustee shall withhold distributions on that portion of LOTC and LBSF's allowed claims as to which a Duplicate Claim has been asserted until such time that: (i) LOTC or LBSF, as applicable, withdraws its portion of its allowed customer or general unsecured claim related to the Allowed Duplicate Claim Account, (ii) the Duplicate Claim Counterparty withdraws its customer claim related to such Duplicate Claim Account, (iii) LOTC or LBSF and such Duplicate Claim Counterparty provide the LBI Trustee with a written agreement allocating such Allowed Customer Claim or Allowed General Unsecured Claim, or (iv) in the event that LOTC or LBSF, as applicable, and the Duplicate Claim Counterparty are unable to resolve the Duplicate Claim, the Trustee seeks judicial resolution as to the allowance of the Duplicate Claims, including through objection, interpleader or other proceeding, in his sole discretion but after consultation with LOTC or LBSF, as applicable, and the Bankruptcy Court enters a Final Order resolving the Trustee's application. (Settlement Agreement Art. XI)

57.    The Settlement Agreement eliminates the Trustee's exposure to the Duplicate Claims resolved thereunder and preserves the rights of those counterparties of LOTC and LBSF with Duplicate Claims until such Duplicate Claims are resolved under the mechanism

provided for in the Settlement Agreement. Excluded Duplicate Claimants are not impacted by the Settlement Agreement, but will be the subject of a future objection and motion to expunge by the Trustee. (Kiplok Decl. ¶ 44.)

58.     The Settlement Agreement provides LBCS with an allowed claim of $32,000,000.00, in addition to its allowed general unsecured claim of $920,000,000.00, in the form of a Disputed Amended Claim Adjustment to resolve the dispute between LBCS and the Trustee that LBCS timely asserted certain claims related to exchange traded derivatives as customer claims. The claims resolved through the Disputed Amended Claim Adjustment are such that recovery on such claims, even if successfully litigated by LBCS, is uncertain. The Disputed Amended Claim Adjustment enables the Parties to avoid litigation regarding the underlying claims and eliminates the uncertainty as to recovery on such claims. (Kiplok Decl. ¶ 45.)

59.     The Settlement Agreement also provides LBI allowed, non-priority, unsecured claims against the Debtors totaling $12,734,067.00. (Settlement Agreement § 2.01(a), Schedule E.) In addition, the Parties are exchanging mutual full releases of all other claims against each other, including claims relating to extended liens, tax liability, and avoidance actions. (Settlement Agreement §§ 3.01-3.02, 6.01-6.02, Art. VII.)

60.     The Settlement Agreement further provides that all Extended Lien Claims of any Person, other than the Parties, with respect to an LBHI Extended Lien Asset or an LBI Extended Lien Asset that is not asserted prior to the Court's Order becoming a Final Order shall be deemed waived, and all distributions to the LBHI Entities and the Trustee on Allowed Claims under the Settlement Agreement shall be made free and clear of any Extended Lien Claim. (Settlement Agreement § 3.03(a).)

61.     Except as provided for in Section 3.03 of the Settlement Agreement,

nothing in the Settlement Agreement affects the rights of Persons who are not Parties to the

Settlement Agreement (including Duplicate Claimants), other than with respect to the ability of

all such Persons to bring derivative claims on behalf of one or more of the Parties against another

Party, such non-direct, derivative claims having been expressly released under the terms of the

Settlement Agreement.  (Settlement Agreement §§ 6.01-6.02.)

62.     Each of the releases provided for in the Settlement Agreement, which

include, *inter alia*, releases of Causes of Action that allege alter ego, veil piercing, enterprise

liability or similar theories of liability or that otherwise seek to disregard the corporate form of

LBI and LBHI and Causes of Action brought directly, indirectly, derivatively, representatively or

in any other capacity, (i) is essential to administering the LBI estate, (ii) is an integral element of

the Settlement Agreement and/or to its effectuation, (iii) confers material benefits on, and is in

the best interests of, the LBI estate, and (iv) is important to the overall objectives of the

Settlement Agreement.  (Kiplok Decl. ¶ 46.)

63.     Thus, if the Settlement Agreement is approved, all that will remain will be

the Trustee's obligation to make distributions on account of the claims allowed pursuant to the

Settlement Agreement and Debtors' obligation to make distributions in accordance with the Plan.

## V.      BASIS FOR RELIEF

### A.      Bankruptcy Rule 9019

64.     Under Bankruptcy Rule 9019, a court may approve a settlement if it is fair

and equitable and in the best interests of the estate.  *See Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In

determining whether a settlement meets this standard, a court should be apprised of all "factors

relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id.* As a

general matter, "[s]ettlements and compromises are favored in bankruptcy as they minimize

costly litigation and further parties' interests in expediting the administration of the bankruptcy

estate." *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10,

2012); *see Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating

LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy

because they "help clear a path for the efficient administration of the bankrupt estate").

   65. "A decision to either accept or reject a [particular] compromise or

settlement is within the sound discretion of the Court." *Vaughn v. Drexel Burnham Lambert

Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y.

1991) (citations omitted). It is appropriate for the Court to "consider the opinions of the trustee

or debtor and their counsel that a settlement is fair and equitable." *Nellis v. Shugrue*, 165 B.R.

115, 122 (S.D.N.Y. 1994) (affirming bankruptcy court's approval of settlement agreement)

(citations omitted). Deference should be given to an agreement reached "in light of the general

public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr.

S.D.N.Y. 1998) (approving settlement agreement and overruling objections thereto) (citation

omitted); *see also Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are

favored").

   66. In determining whether to approve a settlement, the Court need not assess

"the minutia of each and every claim." *Shugrue*, 165 B.R. at 123. Rather, the Court should

"canvass the issues and see whether the settlement falls below the lowest point in the range of

reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)

(quotation omitted); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in

making the determination of reasonableness, the court need not conduct a "mini-trial" on the

merits). In evaluating the necessary facts, a court may credit the opinion of the debtor, parties to

the settlement, and their professionals. *See In re Purofied Down Prods. Corp.*, 150 B.R. at 522-

23; *In re Chemtura Corp.,* 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *see also MF Global Inc.,*

2012 WL 3242533, at *5 (recognizing that although courts have the discretion to approve

settlements, the business judgment of the debtor in recommending a settlement should be

considered).

> 67.     In the Second Circuit, courts evaluate whether a proposed settlement is in

the best interests of the estate and fair and equitable by applying the seven factors set forth in *In*

*re Iridium Operating LLC*. *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC*

(*In re Charter Commc'ns*), 419 B.R. 221, 252-53 (Bankr. S.D.N.Y. 2009) (citing *In re Iridium*

*Operating LLC*, 478 F.3d at 462), *appeal dismissed sub nom. R2 Invs., LDC v. Charter*

*Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d

476 (2d Cir. 2012). Those factors are:

> 1.     the balance between the litigation's possibility of success and the
>         settlement's future benefits;

> 2.     the likelihood of complex and protracted litigation, with its
>         attendant expense, inconvenience, and delay, including the
>         difficulty in collecting on the judgment;

> 3.     the paramount interests of the creditors, including each affected
>         class's relative benefits and the degree to which creditors either do
>         not object to or affirmatively support the proposed settlement;

> 4.     whether other parties in interest support the settlement;

> 5.     the competency and experience of counsel supporting, and the
>         experience and knowledge of the bankruptcy court judge
>         reviewing, the settlement;

> 6.     the nature and breadth of releases to be obtained by officers and
>         directors; and

7.     the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d at 462 (quotations omitted).[10]

68.     In SIPA liquidations, courts in the Second Circuit have applied the *Iridium* analysis in determining whether a settlement falls within the range of reasonableness prescribed by Bankruptcy Rule 9019. *See Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 487-88 (S.D.N.Y. 2012); *In re MF Global Inc.*, 2012 WL 3242533, at *6-7.

69.     As set forth below, all the *Iridium* factors weigh decisively in favor of this Court's approval of the Settlement Agreement.

## VI.     THE SETTLEMENT AGREEMENT IS FAIR AND EQUITABLE AND IN THE BEST INTEREST OF THE LBI ESTATE AND ALLOWS THE TRUSTEE TO FULFILL HIS DUTIES TO CUSTOMERS AND CREDITORS AS CONTEMPLATED BY SIPA

### A.     The Settlement Agreement Is In The Best Interests Of The LBI Estate

70.     The Settlement Agreement is the product of extensive arm's length negotiations between the Trustee and the LBHI Entities, represents the Parties' good faith compromise of their disputes, and achieves a resolution in the best interests of the LBI estate.

#### 1.     The Benefits Of The Settlement Agreement Greatly Outweigh The Possibility Of Success In Litigation

71.     The benefits of the Settlement Agreement greatly outweigh the possibility of success in litigation between the Trustee and the LBHI Entities (and the prospects to LBI's other customers and creditors of a loss by the Trustee).  Indeed, the Settlement Agreement —

---

10. In this liquidation, the Trustee also has "the authority to compromise and settle any disputed customer claim at any time, with the approval of SIPC, without further order of this Court."  Order Approving Form and Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Creditors; and Fixing Interim Reporting Pursuant to SIPA, Docket No. 241.

together with the LBIE Settlement and the Second Allocation Motion — achieves the Trustee's

ultimate goal of assuring a fair result both for the LBHI Entities and the LBI estate and

permitting a 100% distribution to customers as well as a significant distribution to general

creditors.  The Settlement Agreement further allows this distribution on a timely basis rather than

at the end of litigation between the Trustee and the LBHI Entities, the outcome of which is

uncertain due in large part to the inherent complexity of the transactions between LBI and the

LBHI Entities and the issues of first impression central the parties' disputes including, *inter alia,*

the issues arising under SEC Rule 15c3-3, the proper application of and interplay between setoff

and recoupment doctrines and the net equity rule, and whether pledged collateral custodied at a

broker-dealer gives rise to a customer claim.  (Kiplok Decl. ¶ 47.)

> **2.** **The Settlement Agreement Preserves Value In The LBI Estate For General Creditors**

72.     The Settlement Agreement also allows the Trustee to make a meaningful

distribution to general creditors by significantly reducing the LBHI Entities' asserted claims and

avoiding the cost, uncertainty and delay of litigation.  (Kiplok Decl. ¶ 48.)

> **3.** **Other Parties In Interest Support The Settlement**

73.     LBIE and SIPC have already authorized the Trustee's counsel to indicate

that they support the Settlement Agreement and recognize its paramount importance to the

Trustee's ability to make 100% distributions on all allowed customer claims and progress to

resolving general creditor claims.  (Kiplok Decl. ¶ 52.)

> **4.** **The Parties Are Represented By Sophisticated And Experienced Professionals**

74.     The Parties are represented by highly regarded law firms and financial

advisors with significant relevant experience in SIPA liquidations and Chapter 11

reorganizations.  The Parties' professionals also fully understand the difficulties of successfully

concluding a SIPA liquidation of this size and complexity and the potential consequences to customers and general creditors and the estate if this Settlement Agreement is not consummated. (Kiplok Decl. ¶ 49.)

75.     Notably, the Trustee and the LBHI Entities themselves are also sophisticated and experienced in high-stakes, commercial negotiations. *See*, *e.g.*, *In re Charter Communications*, 419 B.R. at 256 ("parties to the [s]ettlement themselves are sophisticated and experienced in high-stakes negotiations," a factor which favors approval). In addition to this liquidation, the Trustee has been appointed by the Federal District Court to serve as trustee in the liquidations of MF Global, Inc., Weis Securities, Hanover Square, A.R. Baron & Co., Inc., and New Times Securities Services, Inc. As a result, the Trustee has significant experience in analyzing the facts, legal principles, and practical aspects of the SIPA liquidation and claims process as well as litigating and negotiating complex SIPA customer and creditor disputes. (Kiplok Decl. ¶ 8.) Likewise, the LBHI Entities and their professionals have significant experience in corporate insolvency.

76.     The Trustee has hired experienced and highly qualified legal, accounting, and other professionals, all of whom have significant relevant experience with complex insolvencies. The Trustee has retained, among others, Hughes Hubbard & Reed LLP ("Hughes Hubbard"), Levine Lee LLP ("Levine Lee"), Deloitte & Touche LLP, and Deloitte Tax LLP (subsidiaries of Deloitte LLP, and referred to collectively as "Deloitte"):

- Hughes Hubbard:  Hughes Hubbard brings over 40 years of experience in administering and liquidating financial institutions under SIPA and enjoys a preeminent national and international reputation in this field. In the last decade alone, the Trustee and Hughes Hubbard, in consultation with SIPC, have administered three other SIPA liquidations.

- Levine Lee:  Levine Lee was co-founded in 2011 by former Hughes Hubbard partner Kenneth Lee, who has represented the Trustee in the

SIPA proceeding since 2008.  The firm's lawyers, throughout their careers, have had extensive experience in handling significant complex business litigation matters.

- <u>Deloitte</u>:  Deloitte offers a broad range of financial advisory services and is known as one of the premier, "Big Four" accounting firms.

(Kiplok Decl. ¶ 9.)

77.    The Trustee's professionals played major roles in the negotiation and evaluation of the Settlement Agreement.  (Kiplok Decl. ¶ 10.)  In addition to a variety of professionals at Alvarez and Marsal and former Lehman personnel, the LBHI Entities have retained Weil Gotshal & Manges LLP, all of whom provided advice in connection with the Settlement Agreement.  These firms are well-respected in a variety of complex commercial practice areas.

### 5.    The Releases In The Settlement Agreement Are Reasonable And Necessary

78.    Pursuant to the Settlement Agreement, the Parties provide for general releases of claims against each other (including with respect to the Parties' administrators, members, partners, directors, officers, employees, agents, advisors, or representatives).  These releases are reasonable in scope and necessary to accomplish the certain resolution of LBI's and the LBHI Entities' claims against each other.  (Kiplok Decl. ¶ 50.)

### 6.    The Settlement Agreement Is The Product Of Arm's Length Negotiation

79.    The Settlement Agreement was negotiated at arm's length and in good faith throughout the course of the Parties' discussions.  It represents the Parties' compromise of their disputes with the principal goal of reaching a cooperative and consensual result that would provide the best outcome for the Parties' respective estates.  The Settlement Agreement is the product of the efforts by the Parties that began in 2009 to reconcile the tens of thousands of

account positions in the claims between LBI and the LBHI Entities, and to define and discuss

LBI's and the LBHI Entities' respective claims.  This process has progressed to negotiation

sessions which have required numerous in person meetings of the Parties' lawyers, accountants,

and other professionals over the past two years.  (Kiplok Decl. ¶ 51.)

80.     Accordingly, the Trustee respectfully submits that the settlements and

compromises embodied in the Settlement Agreement are appropriate in light of the relevant

factors, are fair and equitable, fall well within the range of reasonableness, and represent a

benefit to LBI's customers, creditors, and all parties in interest.  For these reasons, the Settlement

Agreement should be approved.

## VII.    NOTICE

81.     The Trustee has provided notice of the Motion pursuant to the Amended

Case Management Order entered in this proceeding (Docket No. 3466).

## VIII.   NO PRIOR REQUEST

82.     No previous request for the relief sought herein has been made to this

Court or any other court.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court (i) enter the

proposed Order in the form attached as Exhibit B approving the Settlement Agreement and

(ii) grant such additional and further relief as the Court deems just and proper.

Dated:    New York, New York
          February 26, 2013

    HUGHES HUBBARD & REED LLP

    By: /s/ James B. Kobak, Jr.
        James B. Kobak, Jr.
        Jeffrey M. Greilsheimer
        Shannon F. Green
        Susan M. Vignola
    One Battery Park Plaza
    New York, New York 10004
    Telephone:  (212) 837-6000
    Facsimile:  (212) 422-4726
    Email:  kobak@hugheshubbard.com
        greilshe@hugheshubbard.com
        greens@hugheshubbard.com
        vignola@hugheshubbard.com

    -and-

    LEVINE LEE LLP

    By: /s/Kenneth E. Lee
        Kenneth E. Lee
    570 Lexington Avenue, 7th Floor
    New York, New York 10022
    Telephone: (212) 223-4400
    Facsimile:  (212) 223-4425
    Email:  klee@levinelee.com

    *Attorneys for James W. Giddens, Trustee for*
    *the SIPA Liquidation of Lehman Brothers*
    *Inc.*

# EXHIBIT A

EXECUTION COPY

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is made and entered into as of February 21, 2013 among the LBI Trustee and the LBHI Entities.[1]  The LBI Trustee and the LBHI Entities, upon becoming signatories to this Agreement, shall each be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "**Chapter 11 Cases**");

WHEREAS, on September 19, 2008, the Honorable Gerard E. Lynch, District Judge of the United States District Court for the Southern District of New York, entered the LBI Liquidation Order which, among other things, (i) appointed the LBI Trustee as trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA and (ii) removed the case to the Bankruptcy Court pursuant to section 78eee(b)(1) of SIPA (the "**SIPA Proceeding**");

WHEREAS, certain of the LBHI Entities filed proofs of claim against LBI in the SIPA Proceeding;

WHEREAS, the LBI Trustee filed proofs of claim against certain of the LBHI Entities on behalf of LBI;

WHEREAS, pursuant to an order entered by the Bankruptcy Court on December 6, 2011 [ECF No. 23023], the Bankruptcy Court confirmed the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated December 5, 2011 [ECF No. 6039] (the "**Plan**"), which Plan became effective on March 6, 2012; and

WHEREAS, the LBI Trustee and the LBHI Entities desire to resolve all disputes and issues among them so as to avoid extensive, uncertain and expensive litigation;

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I
DEFINITIONS

SECTION 1.01.    *Definitions*.  Except as otherwise specified herein the following terms have the respective meanings set forth below for all purposes of this Agreement:

---

[1] Unless otherwise specified or defined herein, capitalized terms shall have the respective meanings ascribed to such terms in Section 1.01 of this Agreement.

**"A&M"** means Alvarez and Marsal North America, LLC, in its role on behalf of the LBHI Entities and their estates.

**"Additional Customer Claim Securities"** means the securities, including the R3 Securities, identified on Schedule O.

**"Affiliate"** has the meaning ascribed to it in section 101(2) of the Bankruptcy Code.

**"Agreed LBI Non-Debtor Receivables"** has the meaning set forth in Section 2.01(b) hereof.

**"Agreed LBI Non-Debtor Receivables Settlement Payment"** has the meaning set forth in Section 2.01(b) hereof.

**"Agreed PIK Notes Settlement Obligations"** has the meaning set forth in Section 2.01(b)(i) hereof.

**"Agreed PIK Notes Settlement Payees"** has the meaning set forth in Section 2.01(b)(i) hereof.

**"Agreement"** has the meaning set forth in the Preamble hereof.

**"Allowed Customer Claims"** has the meaning set forth in Section 2.02(a)(i) hereof.

**"Allowed General Unsecured Claims"** has the meaning set forth in Section 2.02(b)(ii) hereof.

**"Allowed Misdirected Wires Administrative Claim"** has the meaning set forth in ARTICLE IX hereof.

**"Bankruptcy Code"** has the meaning set forth in the Recitals hereof.

**"Bankruptcy Court"** has the meaning set forth in the Recitals hereof.

**"Bankruptcy Court Approval"** means the entry of a Final Order by the Bankruptcy Court in the SIPA Proceeding in form and substance acceptable to the Parties (i) authorizing the LBI Trustee to execute and deliver this Agreement, perform all of his obligations hereunder and comply with the terms of this Agreement, and (ii) approving the terms of the Agreement.

**"Barclays Litigation"** means the adversary proceeding before the Bankruptcy Court styled *James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. v. Barclays Capital Inc.*, Case No. 09-01732 (JMP) and all appeals related thereto.

**"Barclays Transaction"** means the transaction pursuant to that certain Asset Purchase Agreement, dated as of September 16, 2008 among LBI, LBHI, LB 745 and BCI, to the extent amended, supplemented or clarified by (i) that certain First Amendment thereto dated as of September 19, 2008 among LBI, LBHI, LB 745 and BCI, and/or (ii) that certain letter agreement dated as of September 20, 2008 among the LBI Trustee, LBHI, LB 745 and BCI. and/or the following orders of the United States Bankruptcy Court, Southern District of New York: (i) Order under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of

2

Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 19, 2008 (Docket No. 08-13555, ECF No. 258), and (ii) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding, dated September 19, 2008 (Docket No. 08-01420, ECF No. 3).

**"Business Day"** means any day that is not a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are closed in, the State of New York.

**"Causes of Action"** means all manners of action, causes of action, judgments, executions, debts, liabilities, demands, rights, damages, costs, expenses, and Claims of every kind, nature, and character whatsoever.

**"CDA"** means that certain Collateral Disposition Agreement among JPMorgan Chase Bank, N.A. and the Debtors dated March 16, 2010, and approved by the Bankruptcy Court by an order entered on March 24, 2010 [ECF No.7785] as the same shall have been or shall be modified or amended from time to time.

**"CDA Collateral Ownership Stipulation"** means that certain Stipulation and Agreed Order Confirming Determination of Securities Collateral Under Collateral Disposition Agreement dated March 8, 2012, and approved by the Bankruptcy Court on March 23, 2012 [ECF No. 27151].

**"CDA Notice Waiver Stipulation"** means, collectively, that certain Stipulation and Agreed Order Waiving Certain Notice Requirement Pursuant to Order Approving the Collateral Disposition Agreement dated February 10, 2012, and approved by the Bankruptcy Court on February 27, 2012 [ECF No. 25828] and that certain Second Stipulation and Agreed Order Waiving Certain Notice Requirement Pursuant to Order Approving the Collateral Disposition Agreement dated August 2, 2012 and approved by the Bankruptcy Court on August 15, 2012 [ECF No. 30050].

**"CDA Order"** means that certain Bankruptcy Court order entered on March 24, 2010 [ECF No.7785] approving the CDA.

**"Chapter 11 Cases"** has the meaning set forth in the Recitals.

**"Citigroup Entities"** means Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., Citibank Japan Ltd., Citibank Europe PLC, Citibank International PLC, Citigroup Pty Limited, Banco De Chile, Banco Nacional De Mexico SA, Citibank Del Peru Sa, Bank Handlowy, Zao Kb Citibank, Citibank AS, Citibank Maghreb.

**"Claim"** has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

**"CNS Proceeds"** has the meaning set forth in Article X hereof.

**"Controlled Entity Joinder"** has the meaning set forth in Section 19.02 hereof.

3

"**Corporate Action Receipts**" means cash (including principal payments), securities or other property (including stock dividends, but excluding cash dividends or interest) received by LBI or the LBI Trustee as a result of Corporate Actions in respect of the securities that are included in the Allowed Customer Claims.

"**Corporate Actions**" means maturities, redemptions, mergers, reclassifications, reorganizations, calls or other like corporate actions.

"**Customer Name Securities**" has the meaning ascribed to it in section 78lll(3) of SIPA.

"**Customer Property**" is the property so designated by Final Order of the Bankruptcy Court on motion of the LBI Trustee.

"**Debtor**" means each of the Parties hereto that commenced Chapter 11 Cases, identified on Schedule B annexed hereto.

"**Debtor-Controlled Entity**" means (i) each of the Non-Debtors and (ii) each Affiliate of the Debtors that is directly or indirectly managed or controlled by a Debtor as of the Execution Date that is identified on Schedule B annexed hereto and is a signatory to this Agreement as of the Execution Date, or subsequent thereto becomes a signatory to this Agreement by executing a Controlled Entity Joinder pursuant to Section 19.02 hereof.

"**Disputed Amended Claim Adjustment**" shall mean $32,000,000.00.

"**Duplicate Claim Accounts**" means the accounts identified on Schedule C annexed hereto that are subject to Duplicate Claims.

"**Duplicate Claim Counterparties**" means counterparties to transactions with LBSF or LOTC, as applicable, that filed Duplicate Claims.

"**Duplicate Claims**" means customer or general unsecured creditor claims filed against LBI by counterparties of LOTC and LBSF with respect to accounts that are included, respectively, in the LOTC Allowed Customer Claims, LBSF Allowed Customer Claims, LOTC Allowed General Unsecured Claims and LBSF Allowed General Unsecured Claims.

"**Effective Date**" has the meaning set forth in ARTICLE XII hereof.

"**Encumbrance**" means any interest of any Person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, option, restriction, right of first refusal, third-party right or interest, other encumbrance or security interest or arrangement of any kind, or another type of preferential arrangement (including a title transfer or retention arrangement) having similar effect and any agreement or obligation to create or grant any of the aforesaid.

"**Excess Asserted JPM Subrogated Claim**" has the meaning set forth in Section 2.02(b)(ii)(1)(B) hereof.

4

**"Excluded Claims"** means the proofs of claims listed on Schedule A annexed hereto that are not subject to this Agreement.

**"Execution Date"** means the date this Agreement is executed by all Parties who are not Non-Signing Controlled Entities.

**"Extended Lien Asset"** means any securities, money or other asset held by a Holding Affiliate that are subject to an Extended Lien Provision.

**"Extended Lien Claim"** means a Claim based on an Extended Lien Provision to recover an Extended Lien Asset.

**"Extended Lien Claimant"** means any Lehman Entity that may assert, and/or have, a Security Interest in one or more Extended Lien Assets held by or for a Holding Affiliate.

**"Extended Lien Provision"** means a term of an agreement between a Holding Affiliate and an Ownership Claimant that confers a Security Interest in respect of securities, money or other assets in relation to debts owed by such Ownership Claimant to such Holding Affiliate and any other Lehman Entity.

**"Final Order"** means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) that is in full force and effect, (ii) is not reversed or vacated and (iii) as to which the time to appeal, petition for certiorari, seek a new trial under Rule 59 of the Federal Rules of Civil Procedure, or analogous rule under the Federal Rules of Bankruptcy Procedure, and move for reargument or rehearing has expired and (1) as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or (2) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been timely sought, such appeal, writ of certiorari, or reargument or rehearing shall have been withdrawn, denied or resolved by the highest court to which such order was appealed or from which certiorari, rehearing or reargument was sought and the time to further appeal, petition for certiorari or move for reargument or rehearing has expired; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable law, may be filed with respect to such order shall not prevent such order from being a Final Order.

**"Group"** means (i) for U.S. federal income Tax purposes, any affiliated group of corporations within the meaning of section 1504 of the Tax Code, or (ii) for state or local income and franchise Tax purposes, any group of corporations that filed (or was required to file) as a combined, unitary or consolidated group under state or local Tax laws, in each case for a taxable period during which both LBI and at least one LBHI Member were members (but only for taxable years through the taxable year that includes the deconsolidation contemplated by Section 8.05 hereof).

**"Group Taxes"** means any Taxes of a Group for which the members of the Group each have liability for the amount of such Taxes under Treasury Regulation § 1.1502-6 or any comparable provision of state or local law, and shall include any income or franchise Taxes filed on the basis of a Group Tax Return even if the applicable taxing authority determines that filing on such basis was improper.

**"Group Tax Return"** means any return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Group Taxes, including any schedule or attachment thereto or amendment thereof, and including any claim for a Group Tax refund.

**"Holding Affiliate"** means a Lehman Entity that holds assets for the benefit of one or more other Lehman Entities.

**"Indemnification Reserve"** has the meaning set forth in Section 2.02(b)(ii)(1)(A) hereof.

**"Insolvency Filing Time"** means the time at which a Lehman Entity commenced an insolvency, bankruptcy, administration, liquidation, winding-up, receivership or similar proceeding in such Lehman Entity's relevant jurisdiction (or the time at which such a proceeding was commenced in relation to such Lehman Entity), whether by the filing of one or more petitions or papers (including a petition under chapter 11 of the Bankruptcy Code), by the entry of an order for relief, by obtaining an order of a court of competent jurisdiction, or otherwise.

**"Interim Distribution"** means any distribution made by the LBI Trustee on allowed customer claims in advance of a final distribution by the LBI Trustee on all allowed customer claims.

**"JPM"** means JPMorgan Chase Bank, N.A.

**"JPM Entity"** means JPM or any of its Affiliates.

**"JPM Allowed Subrogated Claim"** means a $1,500,000,000.00 Allowed Unsecured General Claim against LBI in satisfaction of the JPM Subrogated Claim.

**"JPM Subrogated Claim"** means all claims for which LBHI is subrogated to a claim of any JPM Entity against LBI, to the extent of the payments made by LBHI or applied from LBHI's property to such claim of such JPM Entity pursuant to the CDA.

**"LBCC"** means Lehman Brothers Commercial Corporation.

**"LBCS"** means Lehman Brothers Commodity Services Inc.

**"LBHI"** means Lehman Brothers Holdings Inc.

**"LBHI Allowed Priority Claim"** has the meaning set forth in Section 2.02(b)(i) hereof.

**"LBHI Customer Claimants"** has the meaning set forth in Section 2.02(a)(i) hereof.

**"LBHI Entities"** means, collectively, the Debtors and Debtor-Controlled Entities, including the Non-Debtors, (individually, each an "LBHI Entity") identified on Schedule B annexed hereto that are signatories to this Agreement as of the Execution Date or subsequent thereto become signatories to this Agreement by executing a Controlled Entity Joinder.

**"LBHI Entity Allowed Claims"** means Allowed Customer Claims, the LBHI Allowed Priority Claim, Allowed General Unsecured Claims, the Disputed Amended Claim Adjustment, the

Allowed Misdirected Wires Administrative Claim, and LBHI Entity Allowed Subordinated Claims, collectively.

**"LBHI Entity Allowed Subordinated Claims"** has the meaning set forth in Section 2.02(c)(i) hereof.

**"LBHI Entity Extended Lien Asset"** means any Extended Lien Asset in respect of which LBHI is an Ownership Claimant.

**"LBHI Entity Non-Party Claim"** means any Claim of an LBHI Entity against any Person other than an LBHI Entity Released Party.

**"LBHI Entity Released Party"** means each of the following Persons: (i) LBI, (ii) the LBI Trustee, (iii) all past and present professionals and advisors of LBI and the LBI Trustee, respectively, and (iv) all successors, assigns, heirs, and personal representatives, and all past and present officers, directors, agents, representatives, consultants, financial advisors, accountants and attorneys, of each Person referred to in this definition, each of the foregoing solely in their respective capacity as such, except to the extent that any of the foregoing Persons referred to in this definition was an employee of a Lehman Entity and is obligated to either LBHI or LBI on a promissory note, in which case such Person shall not be an LBHI Entity Released Party.

**"LBHI Entity Releasing Party"** means (i) each LBHI Entity, each on behalf of itself, its estate, and any Person that may succeed to any Causes of Action of such LBHI Entity or its estate or that may seek to bring any Causes of Action through or on behalf of such LBHI Entity or its estate either derivatively or otherwise, and (ii) A&M, and any Person that may succeed to any Causes of Action of A&M or that may seek to bring Causes of Action through or on behalf of A&M either derivatively or directly.

**"LBHI Entity Retained Subrogation Claim"** means a claim of an LBHI Entity against LBI or the LBI Trustee, whether based on subrogation, reimbursement or contribution for an amount paid by such LBHI Entity to a Non-Party in respect of an obligation of LBI or the LBI Trustee to the Non-Party to the extent that: (1) LBI's or the LBI Trustee's obligation to the Non-Party is an allowed direct, non-derivative, claim in the SIPA Proceeding; (2) the amount paid by the LBHI Entity to the Non-Party together with any consideration paid to the Non-Party by LBI, the LBI Trustee, and any other obligor equals the full distribution to which the Non-Party is entitled on such Non-Party's allowed claim in the SIPA Proceeding; and (3) LBI and the LBI Trustee have no obligation to make further distributions to such Non-Party on such Non-Party's allowed claim. LBI and the LBI Trustee's liability in respect of an LBHI Entity Retained Subrogation Claim shall not exceed the aggregate amount that LBI or the LBI Trustee would distribute on account of such Non-Party's allowed claim minus any distribution(s) made, or to be made, by LBI or the LBI Trustee to such Non-Party.

**"LBHI Entity Settlement Accounts"** means one or more separate securities, brokerage or deposit accounts or sub-accounts, as applicable, that the LBI Trustee established on January 23, 2013, into which the LBI Trustee deposited the securities specified on Schedule O and Schedule P, as such securities are affected by Corporate Actions after January 23, 2013.

**"LBHI Entity Subordinated Claimants"** has the meaning set forth in Section 2.02(c)(i) hereof.

**"LBHI Filing Date"** means September 15, 2008, the date on which LBHI commenced a voluntary case under chapter 11 of the Bankruptcy Code.

**"LBHI Member"** means each of LBHI and any of its Affiliates (or any predecessors thereof) other than LBI.

**"LBHI Unsecured Claimants"** has the meaning set forth in Section 2.02(b)(ii) hereof.

**"LBI"** means Lehman Brothers Inc.

**"LBI Allowed Claims"** has the meaning set forth in Section 2.01(b)(i) hereof.

**"LBI Allowed Debtor Claims"** has the meaning set forth in Section 2.01(a) hereof.

**"LBI CDA Collateral"** means LBI assets transferred to LBHI pursuant to the CDA, the identification of which was confirmed by the CDA Collateral Ownership Stipulation.

**"LBI CDA Receipts"** has the meaning set forth in Section 2.02(b)(ii)(1)(D).

**"LBI-Citi Action"** has the meaning set forth in Article VII.

**"LBIE"** means Lehman Brothers International (Europe).

**"LBI Extended Lien Asset"** means any Extended Lien Asset in respect of which LBI is an Ownership Claimant.

**"LBI Filing Date"** means September 19, 2008, the date on which the SIPA Proceeding was commenced.

**"LBI Fund of Customer Property"** means the pool of assets that are part of the estate of LBI constituting Customer Property.

**"LBI General Estate"** means the pool of assets that are part of the estate of LBI that are not allocated to the LBI Fund of Customer Property.

**"LBI-LBIE Settlement Agreement"** means that certain Settlement Agreement made and entered into as of February 21, 2013 by and among the LBI Trustee and LBIE, by its Joint Administrators and the Joint Administrators, as such agreement may be amended, modified or supplemented, provided that LBHI consents to any material amendments, modifications or supplementation.

**"LBI Liquidation Order"** means the Order Commencing Liquidation, entered September 19, 2008, by the Honorable Gerard E. Lynch, District Judge of the United States District Court for the Southern District of New York, pursuant to the provisions of SIPA in the case captioned SIPC vs. LBI, Case No. 08-CIV-8119 (GEL).

**"LBI Non-Party Claim"** means any Claim of LBI or the LBI Trustee against any Person other than an LBI Released Party.

8

**"LBI Released Party"** means each of the following Persons: (i) each LBHI Entity, (ii) A&M, (iii) all past and present professionals and advisors of the LBHI Entities and A&M, respectively, and (iv) all successors, assigns, heirs, and personal representatives, and all past and present officers, directors, agents, representatives, consultants, financial advisors, accountants and attorneys, of each Person referred to in this definition, each of the foregoing solely in their respective capacity as such, except to the extent that any of the foregoing Persons referred to in this definition was an employee of a Lehman Entity and is obligated to either LBHI or LBI on a promissory note, in which case such Person shall not be an LBI Released Party.

**"LBI Releasing Parties"** means the LBI Trustee, on behalf of himself, LBI or its estate, and any Person that may succeed to any Causes of Action of the LBI Trustee, LBI or its estate, or that may seek to bring any Causes of Action through or on behalf of the LBI Trustee, LBI or its estate, either derivatively or otherwise.

**"LBI Retained Subrogation Claim"** means (a) a claim of the LBI Trustee against any Debtor, whether based on subrogation, reimbursement or contribution for an amount paid by LBI or the LBI Trustee in respect of a claim or obligation of such Debtor to a Non-Party to the extent that: (1) such Debtor's obligation to the Non-Party is an allowed direct, non-derivative, claim in the Debtor's Chapter 11 Case; (2) the amount paid by LBI or the LBI Trustee to the Non-Party together with any consideration paid to the Non-Party by the Debtor and any other obligor equals the full distribution to which the Non-Party is entitled on such Non-Party's allowed claim in the Debtor's Chapter 11 Case; and (3) the Debtor has no further liability to such Non-Party in connection with such Non-Party's allowed claim in the Debtor's Chapter 11 Case; or (b) a claim of the LBI Trustee against any Non-Debtor whether based on subrogation, reimbursement or contribution for an amount paid by LBI or the LBI Trustee in respect of a direct, non-derivative, claim of such Non-Party against such Non-Debtor. A Debtor's liability in respect of an LBI Retained Subrogation Claim shall not exceed the aggregate amount that such Debtor would distribute on account of such Non-Party's allowed claim minus any distribution(s) made, or to be made, by the Debtor to such Non-Party. A Non-Debtor's liability in respect of an LBI Retained Subrogation Claim shall not exceed the aggregate amount owed by such Non-Debtor minus any payment(s) to such Non-Party made to retire such obligation.

**"LBI Trustee"** means James W. Giddens, solely in his capacity as trustee in the liquidation proceeding of LBI pursuant to SIPA and any successor.

**"LBPA"** means Lehman Brothers PA LLC.

**"LBSF"** means Lehman Brothers Special Financing Inc.

**"LBSF Allowed Customer Claims"** means the Allowed Customer Claims of LBSF.

**"Lehman ALI"** means Lehman ALI Inc.

**"Lehman Entity"** means any entity that was directly or indirectly owned or controlled by LBHI on the LBHI Filing Date.

**"LOTC"** means Lehman Brothers OTC Derivatives Inc.

9

**"LOTC Allowed Customer Claims"** means the Allowed Customer Claims of LOTC.

**"LPS Trust Claims"** has the meaning set forth in the UK Settlement Agreement.

**"LPTSI"** means Lehman Pass-Through Securities Inc.

**"Non-Debtors"** means each of the Affiliates of LBHI identified on Schedule B annexed hereto.

**"Non-LBHI JPM Subrogated Claim Holder"** means any JPM Entity or other Person to whom LBHI conveys or reconveys the JPM Subrogated Claim, in whole or in part, or to whom any interest in the JPM Subrogated Claim is granted.

**"Non-Party"** means a Person who is not a Party.

**"Non-Signing Controlled Entities"** has the meaning set forth in Section 19.02 hereof.

**"Ownership Claimant"** means a Lehman Entity that has asserted a claim for securities or money held in an account under its name at a Holding Affiliate.

**"Person"** means an individual, partnership, government entity, corporation, limited liability company, limited liability partnership or any other entity.

**"PIK Note (Acquired Stock)"** means that certain payment-in-kind note and security agreement entered into between Lehman ALI and LBI on September 19, 2008 immediately prior to the commencement of the SIPA Proceeding in exchange for which LBI transferred certain of its direct subsidiaries to Lehman ALI and under which Lehman ALI agreed to pay LBI an amount equal to the fair market value of the stock and other equity interests of the transferred subsidiaries as of the LBI Filing Date and other value to be determined at a later date, the payment and performance of which were secured by the grant of a first priority lien on and security interest in the PIK Note (Acquired Stock) Collateral.

**"PIK Note (Acquired Stock) Collateral"** means the "Acquired Stock" and "Proceeds of the Acquired Stock," each as defined in the PIK Note (Acquired Stock).

**"PIK Note (IP)"** means that certain payment-in-kind note and security agreement entered into between Lehman ALI and LBI on September 19, 2008 immediately prior to the commencement of the SIPA Proceeding in exchange for which LBI transferred certain intangible intellectual property assets, including 7 patent applications and 20 trademarks, to Lehman ALI and under which Lehman ALI agreed to pay to LBI an amount equal to the fair market value of such intellectual property as of the LBI Filing Date and other value to be determined at a later date, the payment and performance of which were secured by the grant of a first priority lien on and security interest in the PIK Note (IP) Collateral.

**"PIK Note (IP) Collateral"** means the "Acquired Assets" and "Proceeds of the Acquired Assets," each as defined in the PIK Note (IP).

**"PIK Notes"** means, collectively, the PIK Note (Acquired Stock) and the PIK Note (IP).

**"PIK Notes Collateral"** means, collectively, the PIK Note (Acquired Stock) Collateral and the PIK Note (IP) Collateral.

**"Plan"** has the meaning set forth in the Recitals hereof.

**"Post-Filing Income Methodology and Allocation Order"** has the meaning set forth in Section 2.02(a)(ii)(2)(A) hereof.

**"Post-Petition D&I"** means interest payments and cash dividends received by LBI or the LBI Trustee after the LBI Filing Date with respect to the securities identified on Schedules O and P.

**"Proprietary Interest"** means any proprietary interest whatsoever (whether at law or in equity, and whether as trustee, beneficiary, absolute owner or otherwise).

**"R3"** means R3 Capital Partners Master L.P.

**"R3 Securities"** means the securities designated as R3 Securities on Schedule O that were included in the customer claims filed by R3 against LBI, which R3 assigned to LBHI pursuant to that certain Assignment of Claims Agreement, dated October 17, 2008, between R3 and LBHI, as well as any such securities that the LBI Trustee may obtain possession of after the Effective Date.

**"Realization Report"** has the meaning set forth in Section 8.03(b) hereof.

**"Released SIPC Persons"** means SIPC and all past and present advisors and professionals of SIPC and all successors, assigns, heirs, and personal representatives, and all past and present officers, directors, agents, representatives, consultants, financial advisors, accountants and attorneys, of each Person referred to in this definition, each of the foregoing solely in their respective capacity as such, except to the extent that any of the foregoing Persons referred to in this definition was an employee of a Lehman Entity and is obligated to either LBHI or LBI on a promissory note, in which case such Person shall not be a Released SIPC Person.

**"Sealed Information"** has the meaning set forth in Section 4.01(a) hereof.

**"Security Interest"** means any legal, equitable, contractual or possessory interest (or equivalent under any relevant legal system) of a Person in an Extended Lien Asset that is in the nature of a lien, pledge, charge or other right that encumbers or restricts the entitlement of the owner or holder of such Extended Lien Asset until one or more obligations owed to such Person are discharged in full.

**"SIPA"** means the Securities Investor Protection Act of 1970, as amended.

**"SIPA Proceeding"** has the meaning set forth in the Recitals hereof.

**"SIPC"** means the Securities Investor Protection Corporation.

**"Specified Post-Filing Receipts"** has the meaning set forth in Section 2.02(a)(ii)(2) hereof.

11

**"Specified Post-Filing Receipts Distributions"** has the meaning set forth in Section 2.02(a)(ii)(1) hereof.

**"Structured Securities"** means, collectively, the certain (i) structured notes issued by Lehman Brothers Treasury Co, B.V., (ii) certificates and warrants issued by Lehman Brothers Securities N.V., (iii) structured notes issued by LBHI, (iv) structured notes issued by Lehman Brothers Bankhaus A.G., (v) structured securities issued by Lehman Brothers (Luxembourg) S.A. (in liquidation), (vi) certificates issued by Lehman Brothers Finance S.A., (vii) any notes issued by any Lehman Entity under any notes program, including the European Medium Term Note Program and (viii) any securities issued by any Lehman Entity substantially similar to any of the foregoing.

**"Subordinated Claim"** means an allowed Claim against LBI that is either contractually or by operation of law subordinated in priority to other allowed Claims against LBI.

**"Surviving Contracts"** means all agreements between or among any of the Debtors during their respective Chapter 11 Cases, on the one hand, and LBI or the LBI Trustee, on the other hand, that (i) were entered into on or after September 19, 2008 or (ii) are set forth on Schedule D annexed hereto.

**"Tax Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**"Taxes"** means (i) all federal, state, local, or foreign taxes, levies, duties, or assessments of any kind whatsoever, including gross income, net income, gross receipts, profits, windfall profits, sales, use, occupation, value-added, ad valorem, transfer, recording, license, franchise, withholding, payroll, employment, excise, estimated, stamp, premium, capital stock, production, net worth, alternative or add-on minimum, business and occupation, disability, severance, or real or personal property taxes, in each case imposed or required to be withheld by any governmental authority having jurisdiction over the assessment, determination, collection, or other imposition of any of the foregoing; and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority or paid in connection with any item described in clause (i) hereof.

**"Tax Return"** means any return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof, and including any claim for a Tax refund.

**"Tax Return Information"** has the meaning set forth in Section 8.03(b) hereof.

"**Transition Services Agreement**" means that certain Transition Services Agreement, dated as of June 2, 2010, between LBHI and the LBI Trustee.

**"UK Settlement Agreement"** means that certain settlement agreement, dated as of October 24, 2011, by and among the Debtors, the LBLIS Group Entities, the UK Administration Companies, the UK Liquidation Companies and the Other UK Affiliates (all as defined in the UK Settlement Agreement) which was approved by the Bankruptcy Court pursuant to an order entered on December 6, 2011, confirming the Plan [ECF No. 23023].

**"US Avoidance Action"** means (i) any and all actions under US Bankruptcy Law seeking the avoidance of a transfer or obligation, including under chapter 5 of the Bankruptcy Code; and (ii) any similar actions under applicable law.

**"US Bankruptcy Law"** means the Bankruptcy Code and SIPA.

SECTION 1.02. *Other Definitional and Interpretive Provisions*. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings utilized herein are included for convenience of reference only and shall in no way affect the construction, meaning or interpretation hereof. References to Articles, Sections and Schedules are to Articles, Sections and Schedules of this Agreement unless otherwise specified. All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Words importing a gender include every gender. The word "or" shall not be exclusive. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. References to "writing", "written" and comparable terms shall be deemed to refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to after, from or through any date mean, unless otherwise specified, after and including, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law. References to "third parties" shall be deemed to refer to Persons that are not LBI, the LBI Trustee or the LBHI Entities. References to any agreement shall be deemed to refer to such agreement as amended, supplemented or otherwise modified from time to time. References to "$" shall mean U.S. dollars.

## ARTICLE II
### SETTLEMENT OF CLAIMS

SECTION 2.01. *LBI Claims Against LBHI Entities.*

(a) *Against Debtors*. On the Effective Date, LBI shall have an allowed, non-priority, unsecured claim against the Debtors as set forth on Schedule E annexed hereto (the "**LBI Allowed Debtor Claims**") in the aggregate amount of $12,734,067.00. LBI shall be entitled to receive distributions on account of the LBI Allowed Debtor Claims in accordance with the applicable terms and provisions of the Plan with respect to allowed, non-priority, unsecured claims against the Debtors.

(b) *Against Non-Debtors*. Each applicable Non-Debtor listed on Schedule F annexed hereto hereby acknowledges its indebtedness, as of the Effective Date, to LBI in the amount set forth opposite such Non-Debtor's name in Schedule F (the "**Agreed LBI Non-Debtor Receivables**") totaling $15,212,659.00. The Agreed LBI Non-Debtor Receivables shall

13

be settled for a one-time payment of $8,000,000.00 in immediately available funds within thirty (30) days of the Effective Date in full and final satisfaction of the applicable Non-Debtors' aggregate obligations with respect to the Agreed LBI Non-Debtor Receivables (the "**Agreed LBI Non-Debtor Receivables Settlement Payment**"). LBI and the LBI Trustee hereby assign their rights, interests in, and entitlement to receive the Agreed LBI Non-Debtor Receivables Settlement Payment to the LBHI Entities listed, and in the amounts listed, on Schedule G annexed hereto, in partial satisfaction of the Allowed Misdirected Wires Administrative Claim.

(i)    *PIK Notes.* As of the Effective Date, (i) all obligations of Lehman ALI to LBI under the PIK Notes shall be settled in consideration for the settlement amount of $350,000,000.00 (the "**Agreed PIK Notes Settlement Obligations**" and collectively with the LBI Allowed Debtor Claims and the Agreed LBI Non-Debtor Receivables, the "**LBI Allowed Claims**"), (ii) the LBI Trustee and LBI shall assign all rights related to the Agreed PIK Notes Settlement Obligations and all other rights under the PIK Notes, including the security interest in the PIK Notes (Acquired Stock) Collateral granted by Lehman ALI to LBI pursuant to the PIK Note (Acquired Stock), to those LBHI Entities as set forth on Schedule N annexed hereto (the "**Agreed PIK Notes Settlement Payees**") based on each Agreed PIK Notes Settlement Payee's pro rata percentage of the cash component of the Agreed PIK Notes Settlement Payees' Allowed Customer Claims, (iii) said assignment shall be in partial satisfaction of the cash component of Allowed Customer Claims of such Agreed PIK Notes Settlement Payees as set forth in Section 2.02(a)(i), and the Agreed PIK Notes Settlement Payees shall accept said assignment as such partial satisfaction, (iv) the PIK Notes shall be amended and restated in the form of a single intercompany note from Lehman ALI to the Agreed PIK Notes Settlement Payees to evidence the Agreed PIK Notes Settlement Obligations (in the form to be mutually agreed between Lehman ALI and the Agreed PIK Notes Settlement Payees) and (v) LBI shall release its lien in and security interest in the PIK Note (IP) Collateral. LBI and the LBI Trustee (A) hereby authorize the Agreed PIK Notes Settlement Payees or their counsel to file on or after the Effective Date, any financing statements or amendment with respect thereto necessary to evidence the assigned security interest in the PIK Notes (Acquired Stock) Collateral, (B) hereby authorize Lehman ALI, or its counsel, to file on or after the Effective Date any UCC-3 termination statements (to the extent necessary to evidence the termination of its lien on and security interest in the PIK Note (IP) Collateral), (C) shall execute and deliver to Lehman ALI such documents as Lehman ALI shall reasonably request to evidence such termination and shall file a termination of security assignments with the U.S. Patent and Trademark Office (to the extent necessary to evidence the termination of its lien on and security interest in the PIK Note (IP) Collateral) and (D) shall deliver to LBHI, as a bailee for the Agreed PIK Notes Settlement Payees, the PIK Note (Acquired Stock) Collateral consisting of certificated securities identified on Schedule R (as defined under the Uniform Commercial Code as in effect in the State of New York) that previously were delivered to LBI or the LBI Trustee and can be located through a reasonably diligent search within five (5) Business Days after the Effective Date; provided that with respect to certificated securities identified on Schedule R that LBI and the LBI Trustee are unable to locate through such diligent search, LBI and the LBI Trustee shall deliver to LBHI within such five (5) Business Days period an executed affidavit of lost certificate substantially in the form annexed hereto as Schedule S. For all purposes related to this Agreement and distributions by the LBI Trustee or LBI, the Agreed PIK Notes Settlement Obligations shall be deemed to have a value of $350,000,000.00 without regard to the magnitude or timing of payments by Lehman ALI in respect of the Agreed PIK Notes Settlement Obligations, the actual

14

value of the PIK Notes Collateral or the perfection of any lien on a security in the PIK Notes
Collateral.

(c)     *No Objections, Challenges or Defenses.*  The LBI Allowed Claims shall
not be subject to objections, challenges or defenses, whether by way of netting, set off,
recoupment, counterclaim or otherwise, or any claim under section 510 of the Bankruptcy Code
or otherwise which would have the effect of reducing or subordinating such claims to the claims
of other general creditors of the applicable LBHI Entity.

SECTION 2.02.     *LBHI Entities' Claims Against LBI.*

(a)     *LBHI Entities' Customer Claims.*

(i)     *Allowed Claims.*  On the Effective Date, the LBHI Entities
identified on Schedule H annexed hereto (the "**LBHI Customer Claimants**") shall have allowed
customer claims against LBI for:  (1) cash and securities in the aggregate amount of
$2,320,056,346.00 valued as of the LBI Filing Date, each applicable LBHI Customer Claimant
having an allowed customer claim in the amount specified on Schedule H, and (2) the Additional
Customer Claim Securities identified on Schedule O (the "**Allowed Customer Claims**").  As set
forth in detail in Section 2.02(a)(iii) of this Agreement, the LBI Trustee shall distribute to the
LBHI Customer Claimants the securities specified on Schedules O and P (as such securities are
affected by Corporate Actions after January 23, 2013) and the cash amounts specified on
Schedule Q annexed hereto on account of the Allowed Customer Claims.  Dollar amounts
corresponding to the securities that make up the Allowed Customer Claims are based on the
value of such securities as of the LBI Filing Date.  For all purposes related to this Agreement and
distributions by the LBI Trustee or LBI, the assignment of the Agreed PIK Notes Settlement
Obligations pursuant to this Agreement shall be deemed to constitute a distribution of
$350,000,000.00 to the Agreed PIK Notes Settlement Payees in partial satisfaction of the cash
portions of such entities' Allowed Customer Claims (in the respective amounts set forth opposite
such Agreed PIK Notes Settlement Payees' names as specified in Schedule N annexed hereto),
without regard to the magnitude or timing of payments by Lehman ALI in respect of the Agreed
PIK Notes Settlement Obligations, the actual value of the PIK Notes Collateral, the perfection of
any lien on or security interest in the PIK Notes Collateral, or any other fact, event or
circumstance.

(ii)     *Specified Post-Filing Receipts.*

(1)     In addition to the distributions described in Section
2.02(a)(iii), the LBI Trustee shall make one or more distributions in respect of the
Specified Post-Filing Receipts (the "**Specified Post-Filing Receipts Distributions**")

(2)     The "**Specified Post-Filing Receipts**" means, and will
consist of (and only of), the following:

(A)     The amount of Post-Petition D&I to be distributed
to each of the LBHI Entities pursuant to a Final Order entered by the Bankruptcy
Court substantially in the form annexed hereto as Schedule T (the "**Post-Filing
Income Methodology and Allocation Order**"), which (without duplication),

15

subject to the effects of any depository, or other intermediary, corrections, adjustments, chargebacks, reconciliations or the like, shall be comprised of:

(i) the sum of $122,196,399.00, which the Parties agree reflects the Parties' mutual calculation of the amount of Post-Petition D&I for the period September 19, 2008 through (and including) December 31, 2012, as stated in Schedule L; plus

(ii) the amount of Post-Petition D&I that would be distributed Pursuant to the Post-Filing Income Methodology and Allocation Order to each of the LBHI Entities for the period commencing (and including) January 1, 2013 through (and including) January 23, 2013; plus

(iii) an amount equal to all Post-Petition D&I actually credited to the LBHI Entity Settlement Accounts on or after January 24, 2013 with respect to the securities carried therein, from time to time (it being acknowledged by the Parties that the LBI Trustee commenced the segregation on January 23, 2013 (i.e., prior to the Execution Date)).

(B) The following Corporate Action Receipts, after reflecting the effects of any depository, or other intermediary, corrections, adjustments, chargebacks, reconciliations or the like:

(i) all Corporate Action Receipts received by LBI or the LBI Trustee on or after January 1, 2013 through (and including) January 23, 2013; plus

(ii) all Corporate Action Receipts actually credited to the LBHI Entity Settlement Accounts on or after January 24, 2013 with respect to those securities carried therein from time to time (it being acknowledged by the Parties that the LBI Trustee commenced the segregation on January 23, 2013 (i.e., prior to the Execution Date)).

(C) To the extent that, for any period of time on or after January 24, 2013, any particular security listed on Schedule O or Schedule P was not or is not carried in an LBHI Entity Settlement Account, the amount of Post-Petition D&I or Corporate Action Receipts in relation to such security received by LBI or the LBI Trustee during such period of time, as determined in good faith by the LBI Trustee (which determination shall be final and binding absent manifest error).

(3) Notwithstanding anything in this Agreement to contrary, the LBHI Entities shall have the right, and shall be given the opportunity, to review and audit Post-Petition D&I and Corporate Action Receipts except such receipts covered by Section 2.02(a)(ii)(2)(A)(iii) and Section 2.02(a)(ii)(2)(B)(ii); provided, however, that the Bank of New York shall remain subject to audit by the LBHI Entities or the LBI Trustee.

16

(4)     For the avoidance of doubt, the Post-Petition D&I is a separate pool of property distinct from the LBI Fund of Customer Property.  For the avoidance of doubt, Corporate Action Receipts are part of the LBI Fund of Customer Property and shall be paid from such fund.

(iii)     *Distributions.*  Subject to the LBI Trustee obtaining a Final Order, substantially in the form annexed hereto as Schedule T, allocating cash and securities to the LBI Fund of Customer Property in an amount that would enable the LBI Trustee to effect a 100% distribution on Allowed Customer Claims, and except as provided in Section 2.02(a)(i), the LBHI Customer Claimants shall receive distributions on their Allowed Customer Claims from the LBI Fund of Customer Property in the amounts and quantities, respectively, of cash and securities as follows:

(1)     the securities held in the LBHI Entity Settlement Accounts specified on Schedule O and Schedule P, as such securities are affected by Corporate Actions after January 23, 2013;

(2)     the cash distributions specified on Schedule Q, which include cash in lieu of certain securities; and

(3)     to the extent not duplicative of the distributions set forth in Section 2.02(a)(iii)(1)-(2), the Specified Post-Filing Receipts Distributions.

To the extent the LBI Trustee makes an Interim Distribution after the Effective Date, the LBI Trustee agrees to include the Allowed Customer Claims in such Interim Distribution in a manner consistent with other allowed customer claims.  To the extent the LBI Trustee makes any Interim Distribution prior to the Effective Date, within thirty (30) Business Days following the Effective Date, the LBI Trustee shall make a distribution to the LBHI Customer Claimants that is the same as the distribution that the LBHI Customer Claimants would have received in respect of their Allowed Customer Claims as if such Allowed Customer Claims had been agreed to and allowed as of the date of the relevant distribution.  Distributions by the LBI Trustee of the cash and securities referenced in this Section 2.02(a)(iii) shall be made to the LBHI Entities in the amounts and quantities, respectively, as specified in Schedule O, Schedule P and Schedule Q, or as otherwise instructed by the LBHI Entities in a manner consistent with the requirements of ARTICLE XXII.  Except as otherwise specified herein, distributions on account of Allowed Customer Claims shall be made in a manner consistent with all other claims of similar classification.

(b)     *LBHI Entities' Unsecured Claims.*

(i)     *Allowed Priority Claims.*  On the Effective Date, LBHI shall have an allowed claim against LBI in the amount of $240,000,000.00 at a level of priority equivalent to the priority afforded a taxing authority under section 507(a)(8) of the Bankruptcy Code (the "**LBHI Allowed Priority Claim**").

(ii)     *Allowed General Unsecured Claims.*  On the Effective Date, the LBHI Entities identified on Schedule I annexed hereto (the "**LBHI Unsecured Claimants**")

17

shall have allowed, non-priority, general unsecured claims against LBI in the aggregate amount of $13,983,800,000.00, each applicable LBHI Unsecured Claimant having an allowed general unsecured claim in the amount set forth opposite such LBHI Unsecured Claimant's name, as specified in Schedule I (the "**Allowed General Unsecured Claims**").

(1)     *JPM Subrogated Claim*.  LBHI and the other LBHI Entities hereby settle the JPM Subrogated Claim in exchange for the LBI Trustee allowing the JPM Allowed Subrogated Claim as part of the Allowed General Unsecured Claims against LBI (provided, however, that for the avoidance of doubt such settlement shall not be binding upon the JPM Entities in the event of the reconveyance of the JPM Subrogated Claim pursuant to the provisions set forth below).  LBI hereby waives any claim concerning (a) the manner in which LBHI has liquidated the LBI CDA Collateral, and (b) any right to any proceeds of the LBI CDA Collateral.  Nothing in this Agreement is intended to affect the rights, if any, of a Non-LBHI JPM Subrogated Claim Holder in the LBI CDA Collateral.  The LBI Trustee's rights under the CDA and the CDA Order (as each has been modified by the CDA Notice Waiver Stipulation) or otherwise to receive reports or information concerning the LBI CDA Collateral, the application thereof to the JPM Subrogated Claim or any other assets held by LBHI pursuant to the CDA are expressly reserved; provided, however, that after the Effective Date, reports with respect to the application of all proceeds of LBI CDA Collateral shall instead be reports of the use of proceeds of the LBI CDA Collateral to satisfy any obligation, including but not limited to any distribution of the proceeds of LBI CDA Collateral to LBHI's creditors, which LBHI may deliver to LBI within twenty (20) days following such use or distribution of such proceeds.  The LBI Trustee expressly transfers all rights in the LBI CDA Collateral to LBHI.

(A)     *Conditions for Reconveyance of JPM Subrogated Claim*.  LBHI may reconvey the JPM Subrogated Claim only if LBHI has provided for or simultaneously with such reconveyance shall provide for a reserve of immediately available funds in an amount not less than the Indemnification Amount (the "**Indemnification Reserve**"), as defined in Section 2.02(b)(ii)(1)(C).  The Indemnification Reserve shall be a cash reserve, but shall not be required to be maintained in a separate account.

(B)     *Reconveyance of JPM Subrogated Claim*.  To the extent the JPM Subrogated Claim is conveyed or reconveyed to a Non-LBHI JPM Subrogated Claim Holder, (x) LBHI shall transfer to each Non-LBHI JPM Subrogated Claim Holder an amount equal to its respective portion of (i) any distribution received by LBHI in respect of the JPM Allowed Subrogated Claim and (ii) its respective portion of any proceeds and distributions received by LBHI with respect to the LBI CDA Collateral prior to the date of the conveyance or reconveyance of such portion of the JPM Subrogated Claim to such Non-LBHI JPM Subrogated Claim Holder (provided, however, that the amounts distributed to such Non-LBHI JPM Subrogated Claim Holder pursuant to clauses (B)(x)(i) and (ii) shall not in the aggregate exceed the amount required to satisfy the remaining portion of the JPM Subrogated Claim held by such Non-LBHI JPM Subrogated Claim Holder), (y) LBI shall not contest such $1,500,000,000.00 allowed general unsecured claim and (z) in the event any one or more of the Non-LBHI JPM Subrogated Claim Holders assert and are allowed, in the aggregate,

18

additional secured or unsecured claims against LBI in the SIPA Proceeding or any other proceeding with respect to the JPM Subrogated Claim (with LBHI having asserted that such holder would not have the right to assert any secured claim) beyond the JPM Allowed Subrogated Claim (an "**Excess Asserted JPM Subrogated Claim**") and are allowed an Excess Asserted JPM Subrogated Claim, LBHI agrees to indemnify and hold harmless LBI and the LBI Trustee for any distribution made by LBI or the LBI Trustee to the Non-LBHI JPM Subrogated Claim Holders on such additional allowed Excess Asserted JPM Subrogated Claim (i.e., in excess of the distributions afforded to the JPM Allowed Subrogated Claim).  LBHI's indemnity obligations to LBI and the LBI Trustee shall be deemed post-petition administrative claims pursuant to Bankruptcy Code Sections 503(b)(1) and 507(a)(2) against LBHI.

(C)     *Procedure for Indemnification.*  In the event the JPM Subrogated Claim is conveyed or reconveyed to one or more Non-LBHI JPM Subrogated Claim Holders and LBI or the LBI Trustee receives written notice of the assertion of a deficiency claim in respect of the JPM Subrogated Claim or any portion thereof, the LBI Trustee shall promptly notify LBHI in writing of the assertion of such claim.  Failure or delay in notifying LBHI shall not relieve LBHI of any of its obligations under Section 2.02(b)(ii)(1) above with respect to such claim unless, and only to the extent that, the defense of such claim or any of LBHI's rights or obligations is materially prejudiced by such failure.  The LBI Trustee shall contest and defend such claim; provided, however, that (i) the LBI Trustee shall consult with LBHI regarding the proceeding related to such claim on an ongoing basis, (ii) LBI and the LBI Trustee will support any application by LBHI to participate in the defense against and objection to such claim at its own expense, including any objection that LBHI alone interposes, (iii) LBI and the LBI Trustee shall provide LBHI on a confidential basis with drafts of all notices, pleadings, and other papers to be filed or served in such proceeding by LBI and the LBI Trustee (and allow LBHI a reasonable opportunity to comment on such drafts before filing or serving such drafts), (iv) LBI and the LBI Trustee shall promptly provide copies to LBHI of all notices, pleadings, and other papers filed or served in such proceeding, and (v) LBI and the LBI Trustee shall cooperate in good faith with LBHI to the full extent reasonably possible to minimize LBHI's indemnification obligation with respect to an allowed Excess Asserted JPM Subrogated Claim.  Any consensual resolution of the JPM Subrogated Claim reached by the LBI Trustee shall be subject to LBHI's approval.  LBHI, at its own expense, shall cooperate and provide support to the LBI Trustee in connection with the defense of such claim.

(1)     *Indemnification Amount.*  The Indemnification Amount shall initially be not less than the product of (i) $3,378,022,749.00 less (x) any proceeds and distributions realized from the LBI CDA Collateral after the Execution Date and (y) any reduction to the JPM Subrogated Claim as a result of litigation (e.g., resulting from LBHI's deficiency claims objection in the Chapter 11 Cases with respect to the JPM Entities' clearance claim) or settlement, and (ii)

19

the LBI Trustee's good faith estimate of general unsecured creditor distributions from LBI, based on the assumption that the LBI Trustee will reach a successful resolution of all disputed matters.

(2)     *Reduction of Indemnification Amount.*  The Indemnification Amount may be reduced (a) to the extent that such reductions are used to fulfill LBHI's indemnification obligation to the LBI Trustee in respect of the Excess Asserted JPM Subrogated Claim, (b) to satisfy any obligation to the Non-LBHI JPM Subrogated Claim Holders arising out of the resolution of such Excess Asserted JPM Subrogated Claim; (c) to account for the proceeds of any additional distributions on or proceeds of the liquidation of LBI CDA Collateral that are used to satisfy any obligation that reduces the aggregate outstanding amount of the JPM Subrogated Claim that would be transferred to Non-LBHI JPM Subrogated Claim Holders (such adjustment to the Indemnification Amount shall be limited to an adjustment of the calculation in Section 2.02(b)(1)(C)(1)(i)); (d) to the extent of any further reduction to the JPM Subrogated Claim as a result of litigation (e.g., resulting from LBHI's deficiency claims objection in the Chapter 11 Cases with respect to the JPM Entities' clearance claim) or settlement; (e) if the LBI Trustee consents to such reduction (such adjustment to the Indemnification Amount shall be limited to an adjustment of the calculation in Section 2.02(b)(1)(C)(1)(i)); or (f) the LBI Trustee reduces his good faith estimate of general unsecured creditor distributions from LBI.  The LBI Trustee will re-evaluate and, if appropriate, recalculate his estimate of general unsecured creditor distributions from LBI referenced in Section 2.02(b)(1)(C)(1)(ii) every six (6) months commencing six (6) months after the day that the Indemnification Reserve is established, and in any event within thirty (30) Business Days after entry of a Final Order that resolves a material disputed matter with respect to the LBI General Estate.

(3)     *LBHI Reporting Obligation.*  LBHI shall provide the LBI Trustee access to sufficient information to confirm that the Indemnification Reserve is fully provided for.

(4)     *Dispute as to Indemnification Amount.*  LBHI may seek a judicial determination from the Bankruptcy Court in the Chapter 11 Cases that the LBI Trustee's estimate of general unsecured creditor distributions from LBI was not a good faith estimate based on the assumptions in Section 2.02(b)(ii)(1)(C)(1)(ii); provided, however, (a) that LBHI shall first meet and confer with the LBI Trustee, and (b) that during the pendency of such judicial determination or settlement thereof, the Indemnification Reserve is maintained as calculated pursuant to Section 2.02(b)(ii)(1)(C)(1)(ii).

(D)  *Post-Filing Receipts on LBI CDA Collateral.*  The LBI Trustee shall deliver to LBHI receipts of principal, interest, dividends or other distributions derived from the LBI CDA Collateral (the "**LBI CDA Receipts**") that were received after the commencement of the SIPA Proceeding to the extent not already transferred or reduced to the possession and control of LBHI or JPM or applied to the JPM Subrogation Claim.  Such LBI CDA Receipts shall be delivered to LBHI within five (5) Business Days of the Effective Date, provided that the LBI Trustee is aware that such receipts are LBI CDA Receipts and the LBI Trustee retains possession of such LBI CDA Receipts.  If the LBI Trustee receives LBI CDA Receipts after the Execution Date, which the LBI Trustee is aware are derived from the LBI CDA Collateral or the LBI Trustee becomes aware after the Effective Date that previously received receipts are LBI CDA Receipts, and the LBI Trustee retains possession of such LBI CDA Receipts, the LBI Trustee shall deliver such LBI CDA Receipts to LBHI within five (5) Business Days of the LBI Trustee becoming aware that such receipts are LBI CDA Receipts.  If there is a dispute as to whether a receipt is an LBI CDA Receipt, the LBI Trustee shall not be required to deliver the receipt to LBHI unless such dispute is resolved in LBHI's favor.  Notwithstanding the foregoing, the LBI Trustee, however, shall have no obligation to deliver LBI CDA Receipts deposited in JPM account 066206677 or similar JPM accounts into which LBI CDA Receipts were received before or after the Effective Date and such LBI CDA Receipts have not been retained by the LBI Trustee; provided, however, the LBI Trustee (i) shall periodically notify LBHI of any LBI CDA Receipts that the LBI Trustee is aware are deposited in such accounts, specifying the accounts into which such receipts were deposited and (ii) authorizes LBHI, at LBHI's sole cost and expense, to obtain reasonable information from JPM to determine whether LBI CDA Receipts have been or are subsequently deposited in such accounts.

(iii)  *Distributions.*  The LBHI Allowed Priority Claim shall be paid from the LBI General Estate in a manner consistent with all other allowed unsecured claims against the LBI General Estate of the same or equivalent priority.  The Allowed General Unsecured Claims shall be paid from the LBI General Estate in a manner consistent with all other allowed general unsecured claims against the LBI General Estate.

(iv)  *Disputed Amended Claim Adjustment.*  The LBI Trustee disputes that LBCS timely asserted certain claims related to exchange traded derivatives as customer claims.  To resolve their dispute, the LBI Trustee and LBCS agree that the LBI Trustee shall pay LBCS the Disputed Amended Claim Adjustment as a stand-alone one-time cash payment within two (2) Business Days of the date on which the LBI Trustee makes an initial distribution on account of the Allowed Customer Claims.

(c)  *LBHI Entities' Subordinated Claims.*

(i)  *Allowed Claims.*  On the Effective Date, the LBHI Entities identified on Schedule J annexed hereto (the "**LBHI Entity Subordinated Claimants**") shall have allowed Subordinated Claims against LBI in the respective amounts specified in Schedule J (the "**LBHI Entity Allowed Subordinated Claims**"), totaling $14,188,924,097.00.

21

(ii) *Distributions.* The LBHI Entity Allowed Subordinated Claims shall be paid from the LBI General Estate (i) if and only to the extent there remain assets in the LBI General Estate after full satisfaction of all senior claims, as provided for in the governing documents, and (ii) in a manner consistent with all other allowed Subordinated Claims against the LBI General Estate.

(d) *No Objections, Challenges or Defenses.* The LBHI Entity Allowed Claims shall not be subject to objections, challenges or defenses, whether by way of netting, set off, recoupment, counterclaim or otherwise, or, with the exception of the LBHI Entity Allowed Subordinated Claims, any claim under section 510 of the Bankruptcy Code, section 78lll(2)(c)(ii) of SIPA or otherwise which would have the effect of subordinating such claims to the claims of other general creditors.

SECTION 2.03. *Expungement and Disallowance of Claims.* Other than as provided for in Sections 2.01 and 2.02, all proofs of claim filed by the LBHI Entities against LBI and all proofs of claims filed by the LBI Trustee on behalf of LBI against the LBHI Entities shall be expunged, disallowed and released in accordance with ARTICLE VI. For the avoidance of doubt, the provisions of this Section 2.03 and ARTICLE VI do not apply to the Excluded Claims or to the Parties' claims and obligations under this Agreement. Furthermore, notwithstanding anything in this Agreement to the contrary, none of the Claims that were assigned by LBI or the LBI Trustee in connection with the Barclays Transaction are the subject of, or are covered by, any of the provisions of this Agreement, including, but not limited to, this Section 2.03 and the release provisions in Section 6.01.

**ARTICLE III**
EXTENDED LIENS

SECTION 3.01. *LBI Trustee's Release of Extended Liens.* The LBI Trustee:

(a) Waives and releases any Extended Lien Claim, and any right and entitlement that LBI or the LBI Trustee may have based on any Extended Lien Provision, over any LBHI Entity Extended Lien Asset; and

(b) Covenants and agrees that he shall not, on behalf of himself, LBI or for the benefit of another Person, apply or exercise, or seek the application or exercise of any Extended Lien Provision or right of set-off or counterclaim or any similar or analogous procedure or right in respect of any LBHI Entity Extended Lien Asset.

SECTION 3.02. *LBHI Entities' Release of Extended Liens.* Each of the LBHI Entities:

(a) Waives and releases any Extended Lien Claim, and any right and entitlement that any of the LBHI Entities may have based on any Extended Lien Provision, over any LBI Extended Lien Asset; and

(b) Covenants and agrees that it shall not, on behalf of itself or for the benefit of another Person apply or exercise, or seek the application or exercise of any Extended Lien Provision or right of set-off or counterclaim or any similar or analogous procedure or right in respect of any LBI Extended Lien Asset.

22

SECTION 3.03.    *Valid Extended Lien Provision.*

(a)    *LBHI Extended Lien Asset.*  Notwithstanding Section 3.01(b), if (i) a
Person other than LBI or the LBI Trustee asserts that it has an Extended Lien Claim in respect of
an LBHI Entity Extended Lien Asset, and (ii) the Bankruptcy Court enters a Final Order
modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to allow the
enforcement of such Extended Lien Claim against an LBHI Entity Allowed Claim, then the LBI
Trustee shall follow any Final Order of the Bankruptcy Court resolving a dispute between the
LBHI Entity and the Person asserting the Extended Lien Claim or, in the alternative, follow the
joint instruction of the LBHI Entity and the Person asserting the Extended Lien Claim.
Notwithstanding the foregoing, subject to approval of the Bankruptcy Court, all Extended Lien
Claims not asserted prior to entry of the Final Order of the Bankruptcy Court approving this
Agreement shall be deemed waived and the LBI Trustee shall make distributions to the LBHI
Entities free and clear of any Extended Lien Claim in accordance with each Final Order of the
Bankruptcy Court approving distributions by the LBI Trustee.

(b)    *LBI Extended Lien Asset.*  Notwithstanding Section 3.02(b), if:  (i) a
Person other than an LBHI Entity asserts that it has an Extended Lien Claim in respect of an LBI
Extended Lien Asset, and (ii) with respect to any Debtor, the Bankruptcy Court enters a Final
Order modifying or lifting the automatic stay pursuant to section 362 of the Bankruptcy Code to
allow the enforcement of such Extended Lien Claim against an LBI Allowed Claim, then the
LBHI Entities shall follow any Final Order of the Bankruptcy Court resolving a dispute between
the LBI Trustee and the Person asserting the Extended Lien Claim or, in the alternative, follow
the joint instruction of the LBI Trustee and the Person asserting the Extended Lien Claim.
Notwithstanding the foregoing, subject to approval of the Bankruptcy Court, all Extended Lien
Claims not asserted prior to entry of the Final Order of the Bankruptcy Court approving this
Agreement shall be deemed waived and the LBHI Entities shall make distributions to the LBI
Trustee free and clear of any Extended Lien Claim.

## ARTICLE IV
### COVENANTS, REPRESENTATIONS & WARRANTIES

SECTION 4.01.    *Covenants, Representations & Warranties by the LBI Trustee.*  In
order to induce the LBHI Entities to enter into and perform their obligations under this
Agreement, the LBI Trustee hereby covenants, represents, warrants and acknowledges as
follows:

(a)    *Bankruptcy Court Approval.*  As promptly as possible following the
Execution Date, the LBI Trustee shall file a motion seeking Bankruptcy Court Approval.  The
LBI Trustee shall at all times make reasonable efforts to secure Bankruptcy Court Approval.  In
connection with the foregoing, the LBI Trustee (i) shall first file a motion seeking permission of
the Bankruptcy Court to file Schedule O and Schedule P under seal (the "**Sealed Information**"),
and (ii) may file this Agreement with the Bankruptcy Court, with the Sealed Information
redacted (except to the extent the Bankruptcy Court otherwise directs).  The LBHI Entities shall
join and support the LBI Trustee's motion seeking permission of the Bankruptcy Court to file the
Sealed Information under seal.

23

(b)    *Authority*.  Subject to Bankruptcy Court Approval, (i) the LBI Trustee has the power and authority to execute, deliver and perform his obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery and performance of this Agreement by the LBI Trustee and the consummation of the transactions contemplated herein have been duly authorized by all necessary actions on the part of the LBI Trustee and no other proceedings on the part of the LBI Trustee are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(c)    *Validity*.  Subject to Bankruptcy Court Approval, this Agreement has been duly executed and delivered by the LBI Trustee and constitutes the legal, valid and binding agreement of the LBI Trustee, enforceable against the LBI Trustee in accordance with its terms.

(d)    *Authorization of Governmental Authorities and Creditors*.  Subject to Bankruptcy Court Approval, no action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the LBI Trustee pursuant to this Agreement, other than as provided herein.

(e)    *No Reliance Other Than Express Representations, Warranties & Covenants*.  The LBI Trustee: (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, (iv) acknowledges that he has entered into this Agreement voluntarily and of his own choice and not under coercion or duress, and (v) has independently and without reliance upon any LBHI Entity, A&M or any of their respective Affiliates or any officer, employee, agent or representative thereof, and based on such information as the LBI Trustee has deemed appropriate, made his own analysis and decision to enter into this Agreement, provided, that the LBI Trustee has relied upon the express representations, warranties and covenants of the LBHI Entities in this Agreement.  The LBI Trustee acknowledges that, except for the representations and warranties referred to in the proviso to the preceding sentence, the LBHI Entities have not made and do not make (and hereby expressly disclaim) any other representations and warranties, express or implied, written or oral, to the LBI Trustee.

(f)    *Title; No Prior Transfer of Claims*.

(i)    As of the Execution Date, LBI owns and has good title to any Claims it may have against the LBHI Entities, including all Claims released hereunder, free and clear of any and all participations or Encumbrances created or incurred by or against the LBI Trustee and has not transferred or assigned to any other person any of such Claims that are the subject of this Agreement, in whole or in part.

(ii)    After the Effective Date, the LBI Trustee may convey, transfer, assign (by contract or by operation of law) or participate the LBI Allowed Claims, or any rights or interests arising thereunder, in whole or in part; provided, that any such conveyance, transfer, assignment or participation is consummated pursuant to a written agreement (in form and substance satisfactory to the LBHI Entities) that provides that the terms and provisions of this

24

Agreement shall be binding in all respects upon such transferees, and any successor transferees, and shall govern their acts as though they were parties hereto.

SECTION 4.02.    *Covenants, Representations & Warranties by the LBHI Entities.*  In order to induce the LBI Trustee to enter into and perform his obligations under this Agreement, each LBHI Entity hereby covenants, represents, warrants and acknowledges as follows:

(a)    *Authority.*  The LBHI Entities have the power and authority to execute, deliver and perform their obligations under this Agreement, and to consummate the transactions contemplated herein.  The execution, delivery and performance of this Agreement by the LBHI Entities and the consummation of the transactions contemplated herein have been duly authorized by all necessary actions on the part of the LBHI Entities and no other proceedings on the part of the LBHI Entities are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    *Validity.*  This Agreement has been duly executed and delivered by the LBHI Entities and constitutes the legal, valid and binding agreement of each LBHI Entity, enforceable against each LBHI Entity in accordance with its terms.

(c)    *Authorization of Governmental Authorities and Creditors.*  No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by any LBHI Entity pursuant to this Agreement, other than as provided herein.

(d)    *No Reliance Other Than Express Representations, Warranties & Covenants.*  Each LBHI Entity (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, (iv) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress, and (v) has independently and without reliance upon the LBI Trustee or any of the LBI Trustee's or LBI's respective Affiliates or any officer, employee, agent, counsel or other representative thereof, and based on such information as each LBHI Entity has deemed appropriate, made its own analysis and decision to enter into this Agreement, provided, that each LBHI Entity has relied upon the express representations, warranties and covenants of the LBI Trustee in this Agreement.  Each LBHI Entity acknowledges that, except for the representations and warranties referred to in the proviso to the preceding sentence, the LBI Trustee has not made and does not make (and hereby expressly disclaims) any other representations and warranties, express or implied, written or oral, to any LBHI Entity.

(e)    *LBHI Representation Concerning the JPM Subrogated Claim.*  LBHI represents and warrants that the JPM Subrogated Claim has been reduced from $6,344,403,970.00 to $4,878,022,749.00 through the liquidation of part of the LBI CDA Collateral.

25

(f)     *Title; No Prior Transfer of Claims.*

(i)     As of the Execution Date, each LBHI Entity owns and has good title to any Claims it may have against LBI, including all Claims released hereunder, free and clear of any and all participations or Encumbrances created or incurred by or against such LBHI Entity and has not transferred or assigned to any other person any of such Claims that are the subject of this Agreement, in whole or in part.

(ii)     After the Effective Date, any LBHI Entity may convey, transfer, assign (by contract or by operation of law) or participate any LBHI Entity Allowed Claims, or any rights or interests arising thereunder, in whole or in part; provided, that any such conveyance, transfer, assignment or participation is consummated pursuant to a written agreement (in form and substance satisfactory to the LBI Trustee) that provides that the terms and provisions of this Agreement shall be binding in all respects upon such transferees, and any successor transferees, and shall govern their acts as though they were parties hereto.

## ARTICLE V
### SURVIVING CONTRACTS

Unless expired or terminated pursuant to their own terms, or as otherwise agreed between the parties thereto (or where LBI is a party thereto, the LBI Trustee and the other party or parties thereto), the Surviving Contracts shall survive the execution, consummation or termination of this Agreement, and the Debtors shall not reject any Surviving Contracts pursuant to sections 365 or 1123(b)(2) of the Bankruptcy Code.  Any claims that arise from the rejection of any prepetition contracts between any of the LBHI Entities and LBI will be deemed to be satisfied in full under this Agreement.

## ARTICLE VI
### RELEASES

SECTION 6.01.   *LBI Trustee Release.*

(a)     Effective upon the occurrence of the Effective Date, except with respect to (1) the LBI Allowed Claims and any rights (including distribution entitlements) in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the rights and performance of obligations under the Surviving Contracts, (4) the LBI Retained Subrogation Claim, and (5) the performance of the obligations set forth in this Agreement, and in consideration of and in exchange for the foregoing, including the mutual release provisions of this ARTICLE VI, each LBI Releasing Party hereby irrevocably releases, discharges and acquits, fully and forever, each LBI Released Party from any and all Causes of Action of every kind, nature, character and description whatsoever, including, but not limited to, any Causes of Action that allege alter ego, veil piercing, enterprise liability, or similar theories of liability or that otherwise seek to disregard the corporate form of LBI or LBHI, whether accrued or unaccrued, known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, certain or contingent, now held or subsequently acquired through assignment, operation of law or otherwise, whether based on contract, federal, state, local, statutory or common law or any other law, rule or regulation of any jurisdiction, or otherwise, that have been or could have been or might hereafter be asserted in any action, suit or proceeding, whether

26

directly, indirectly, derivatively, representatively or in any other capacity, in law or in equity, against any LBI Released Party, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including, without limitation, (i) any administrative expense claim arising under applicable US Bankruptcy Law, (ii) any US Avoidance Action, (iii) any right of subrogation other than the LBI Retained Subrogation Claim, (iv) any claim based upon, arising from, or related to Structured Securities, including any LPS Trust Claims asserted by LBIE on behalf of its Affiliates or third parties (except to the extent that such claim is assigned to LBIE under the LBI-LBIE Settlement Agreement), and (v) any Claim based upon any Extended Lien Provision. The release in this Section 6.01 by the LBI Releasing Parties shall be a waiver and relinquishment, to the fullest extent permitted by law, of all provisions, laws and rules limiting relinquishment of unknown or unsuspected claims, including the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR"

and all provisions, rights and benefits of any similar statute or common law rule of any other jurisdiction. Nothing in this Agreement shall operate as a release or waiver of any LBI Non-Party Claim. Nothing in this Agreement shall operate as a release or waiver of any direct, non-derivative, claim that a customer or creditor of LBI has against any of the LBHI Entities, including claims based upon securities that have been or will be distributed by the LBI Trustee to LBI's customers and creditors. Nothing in this Agreement shall impair the LBI Trustee's right to receive payments from Persons who are indenture trustees or similar Persons (but not including LBIE) of funds that were distributed by the Debtors on account of claims of such Persons allowed in the Chapter 11 Cases.

(b)     The LBI Trustee shall execute and deliver to R3 a general release in a form that is mutually acceptable to the LBI Trustee and R3, provided that R3 executes and delivers to the LBI Trustee a general release in a form that is mutually acceptable to the LBI Trustee and R3.

SECTION 6.02.   *LBHI Entities' Releases.*

(a)     Effective upon the occurrence of the Effective Date, except with respect to (1) the LBHI Entity Allowed Claims and any rights (including distribution entitlements) in respect thereof, (2) any Claims assigned by the LBHI Entities to LBIE pursuant to the UK Settlement Agreement, (3) the JPM Allowed Subrogated Claim, (4) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (5) the rights and performance of obligations under the Surviving Contracts, (6) the LBHI Entity Retained Subrogation Claim, and (7) the performance of the obligations set forth in this Agreement, and in consideration of and in exchange for the foregoing, including the mutual release provisions of this ARTICLE VI, each LBHI Entity Releasing Party hereby irrevocably releases, discharges and acquits, fully and forever, each LBHI Entity Released Party from any and all Causes of Action of

27

every kind, nature, character and description whatsoever, including, but not limited to, any Causes of Action that allege alter ego, veil piercing, enterprise liability, or similar theories of liability or that otherwise seek to disregard the corporate form of LBI or LBHI, whether accrued or unaccrued, known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, certain or contingent, now held or subsequently acquired through assignment, operation of law or otherwise, whether based on contract, federal, state, local, statutory or common law or any other law, rule or regulation of any jurisdiction, or otherwise, that have been or could have been or might hereafter be asserted in any action, suit or proceeding, whether directly, indirectly, derivatively, representatively or in any other capacity, in law or in equity, against any LBHI Entity Released Party, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including, without limitation, (i) any administrative expense claim arising under applicable US Bankruptcy Law, (ii) any US Avoidance Action, (iii) any right of subrogation other than the JPM Subrogated Claim and the LBHI Entity Retained Subrogation Claim, and (iv) any Claim based upon any Extended Lien Provision. The release in this Section 6.02 by the LBHI Entity Releasing Parties shall be a waiver and relinquishment, to the fullest extent permitted by law, of all provisions, laws and rules limiting relinquishment of unknown or unsuspected claims, including the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR"

and all provisions, rights and benefits of any similar statute or common law rule of any other jurisdiction. Nothing in this Agreement shall operate as a release or waiver of any LBHI Entity Non-Party Claim.

(b)     Each LBHI Releasing Party, other than LBHI, contingent only upon receiving a distribution from the LBI Trustee of all the cash and securities in respect of such party's Allowed Customer Claims as provided for in this Agreement, hereby remises, releases, and forever discharges each Released SIPC Person of and from any and all claims or causes of action arising out of or relating to such party's claims against LBI, the circumstances that gave rise to the claims against LBI, any account(s) the LBHI Releasing Party had with LBI, and any other transactions or dealings with LBI or any entity or other person affiliated with LBI relating to the claims against LBI, which the LBHI Releasing Party now has, or hereafter can, shall, or may have, for or by any reason of any cause, matter, or thing whatsoever, prior to and including the date of execution hereof.

(c)     LBHI hereby remises, releases, and forever discharges each Released SIPC Person of and from any and all claims or causes of action arising out of or relating to LBHI's claims against LBI, the circumstances that gave rise to the claims against LBI, any account(s) LBHI had with LBI, and any other transactions or dealings with LBI or any entity or other person affiliated with LBI relating to the claims against LBI, which LBHI now has, or hereafter can, shall, or may have, for or by any reason of any cause, matter, or thing whatsoever, prior to and including the date of execution hereof.

28

(d)     Each Released SIPC Person is an intended third-party beneficiary of this Agreement.

# ARTICLE VII
## CITIGROUP

The LBI Trustee has asserted claims against the Citigroup Entities in the action captioned *Lehman Brothers Inc. v. Citibank, N.A. et al.*, Adv. Proc. No. 11-01681 (JMP) (the "**LBI-Citi Action**").  The LBI Trustee agrees that, to the extent that LBI is entitled to any recovery from the Citigroup Entities, such recovery shall be obtained exclusively through the LBI-Citi Action.  To the extent that either LBCC or LBSF obtains a recovery from the Citigroup Entities, such recovery shall inure exclusively to the benefit of LBCC or LBSF, respectively, and LBI shall not directly participate in such recovery.

# ARTICLE VIII
## TAXES

SECTION 8.01.    *Group Tax Liabilities; Indemnification.*

(a)     LBHI shall indemnify and hold LBI and the LBI Trustee harmless against all Group Taxes (with respect to any past, current or future taxable year), regardless of whether such Taxes are shown as due and payable on a filed Group Tax Return, and any and all reasonable costs and expenses associated with a contest with a taxing authority with respect to Group Taxes (except as contemplated by Section 8.04).  LBI and the LBI Trustee shall be responsible for all other Taxes incurred by LBI.

(b)     The indemnification of LBI and the LBI Trustee provided in this Section 8.01 shall be treated as a post-petition administrative claim pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).  LBI and the LBI Trustee shall provide LBHI written notice and reasonable substantiation of any indemnified Group Taxes LBI is required to pay no later than the later of (i) forty-five (45) days prior to any such payment or (ii) five (5) Business Days after becoming aware of such obligation; provided, however, that LBI and the LBI Trustee shall not pay any Group Taxes without LBHI's prior written consent (which shall not be unreasonably withheld or delayed) unless LBI or the LBI Trustee is legally required to pay such Taxes at such time without any right to defer or delay payment.  LBHI shall promptly reimburse LBI and the LBI Trustee for their respective payment of any indemnified Group Taxes under this Section 8.01; provided further, however, that upon the written request of LBI and the LBI Trustee reasonably in advance of the date on which LBI or the LBI Trustee would be required to make a distribution to a taxing authority on an allowed claim (including an allowed administrative claim) in the SIPA Proceeding for indemnified Group Taxes (which request shall certify the amount of the allowed claim, the amount of the upcoming distribution to which the claim is entitled and which LBI or the LBI Trustee would be required to pay, and the date set for the distribution), LBHI shall, prior to the date set for the distribution, pay directly to the taxing authority, or to LBI or the LBI Trustee for distribution to such taxing authority, the amount the taxing authority would otherwise receive in the distribution from LBI or the LBI Trustee, which amount shall be in lieu of such distribution and applied in satisfaction (in whole or in part, as applicable) of the allowed claim.  If LBHI pays to LBI or the LBI Trustee on behalf of a taxing

29

authority any amount on account of an allowed claim of such taxing authority under this Section 8.01, LBI and the LBI Trustee shall remit such amounts to the applicable taxing authority.

SECTION 8.02.    *Tax Assets; Refunds.*  LBI shall not be entitled to (i) any Group Tax refund or equivalent credit for any taxable period or (ii) any compensation from, or claim against, any LBHI Member with respect to the use or absorption by such entity or any other member of the Group of any net operating losses, capital losses, foreign tax credits or other Group Tax assets attributable to LBI.  To the extent that any Group Tax refund is received by LBI, the LBI Trustee shall promptly notify, and transfer such Group Tax refund to, LBHI.

SECTION 8.03.    *Group Tax Filings, and Tax Proceedings.*

(a)    LBHI shall have exclusive control over (i) the preparation and filing of all Group Tax Returns (including amended Group Tax Returns), including any tax elections of or relating to the Group, and any extensions and estimated payment statements required as part of a taxable year's filing process, and (ii) the administration and defense of any audit, investigation, litigation or other Tax proceeding relating to Group Taxes, including with respect to the settlement and resolution thereof; and in furtherance thereof, the LBI Trustee shall not take an inconsistent position in connection with, or relating to, such Group Tax Returns or Tax proceedings.  LBHI shall owe no duty to LBI in respect of the exercise of such control (including with respect to any elections LBHI makes under applicable Treasury Regulations with respect to the subsidiaries that were the subject of the PIK Notes transaction); provided, however, that LBHI (x) shall not claim a worthless stock deduction under section 165 of the Tax Code with respect to its stock in LBI, but may elect to reattribute a portion of any net operating loss carryforwards under Treasury Regulation § 1.1502-36(d) in an amount not to exceed the excess of LBI's net operating loss carryforwards as of the date of deconsolidation over $3,000,000,000.00, and (y) subject to clause (x), shall elect to reduce its tax basis under Treasury Regulation § 1.1502-36(d) to the extent that LBI otherwise would be required to reduce its tax attributes under that section.

(b)    Within sixty (60) days of the Execution Date in the case of each taxable year ending December 31, 2008 through December 31, 2011, and within sixty (60) days prior to the due date for the filing of any Group Tax Return for a subsequent taxable year (determined taking into account any available extensions), the LBI Trustee shall provide to LBHI (to the extent not previously provided) the following information ("**Tax Return Information**"), based upon the information available at such time:  (i) the LBI balance sheet with respect to such year prepared for the purposes of other filings in the SIPA Proceeding, (ii) the realization report with respect to such year that describes the cumulative changes in LBI's accounts since the commencement of the SIPA Proceeding (along with supporting "Great Plains General Ledger" entries) prepared for the purposes of other filings in the SIPA Proceeding, and promptly provide any subsequent updates thereto with respect to such year (the "**Realization Report**"), and (iii) the aggregate amount of dividend and interest proceeds for the period from September 19, 2008 through December 31, 2011 and for each taxable year following 2011 the aggregate amount of dividend and interest proceeds for such year.  The Parties acknowledge that with respect to periods through December 31, 2011, the LBI Trustee has heretofore provided the required Tax Return Information as such existed as of June 19, 2012, other than the Great Plains General Ledger Entries.  With respect to each taxable year ending after December 31, 2011 for

30

which a Group Tax Return is due, the LBI Trustee shall, on or about (but no later than) the 1st day of the third month (*i.e.,* March 1st, assuming no change in the taxable year) following the end of the taxable year, provide to LBHI good faith estimates of the Tax Return Information for such preceding taxable year, based upon the information available to the LBI Trustee at such time. For purposes of the preceding sentence, the LBI Trustee shall have no affirmative duty to perform additional research, analysis, or compilation services with respect to the information on hand (but to the extent any such research, analysis, or compilation has been done, shall take such information into account).

(c)      The LBI Trustee shall promptly notify LBHI in the event he or LBI receives any correspondence from a taxing authority with respect to any Group Taxes, and provide LBHI a copy of such correspondence.

SECTION 8.04.   *Cooperation; Retention.*

(a)      *Cooperation and Access to Information.*  The LBI Trustee and LBHI shall fully and promptly cooperate with each other, and provide reasonable access to information in such party's possession (including reasonable access to its accountants and financial records), to the extent the other reasonably so requests, in connection with the preparation, filing, examination and defense of any Tax Returns (including any schedules, consents, elections, information statements or claims for refund), whether or not a Group Tax Return, and any other Tax proceedings (including audits, investigations, litigations or other Tax proceedings, and also including, in the event LBHI determines to make an election relating to a Group Tax Return consistent with the provisions of this ARTICLE VIII that requires the signed consent of LBI, the LBI Trustee executing such consent). The reasonable costs and expenses incurred by each Party in connection with complying with this Section 8.04(a) (including the fees of any outside advisors) shall be borne by such Party; provided, however, that the requesting Party shall reimburse the other Party for any reasonable out-of-pocket costs and expenses incurred (including the reasonable fees of any outside advisors) in complying with such request but (i) only with respect to, and to the extent, the information sought requires the other Party or its advisors to re-formulate any existing information in a form or manner that such Party would not otherwise have been required to do for any other purpose not relating to Taxes and (ii) only if, prior to incurring such amounts, the other Party provides the requesting Party with an estimate of the out-of-pocket costs and expenses expected to be incurred (it being understood that the estimate shall not be a limitation on the actual amount to be reimbursed).

(b)      *Retention.*  The LBI Trustee shall retain all materials (including all books and records, accounting information, financial statements, returns, supporting schedules, work papers, correspondence, and other documents) in its possession relating to Group Tax Returns until after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such returns and other documents relate; provided, however, whether before or after such period, if the LBI Trustee intends to destroy any such material records or documents, the LBI Trustee shall provide LBHI with reasonable advance notice and the opportunity to copy or take possession of such records and documents. LBHI shall retain all materials (including all books and records, accounting information, financial statements, returns, supporting schedules, work papers, correspondence, and other documents) in its possession relating to all Tax Returns of which LBI is a joint filer or other Tax

31

Returns LBI reasonably selects on the basis that it has potential liability therefor (and so informs LBHI in writing within three months after the Execution Date), in each case until after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such returns and other documents relate; provided, however, whether before or after such period, if LBHI intends to destroy any such material records or documents, LBHI shall provide the LBI Trustee with reasonable advance notice and the opportunity to copy or take possession of such records and documents.

(c)     *Tax Preparation Assistance.*  To the extent that the LBI Trustee specifically requests assistance from LBHI in addition to the provision of information and the retention of materials as described in Section 8.04(a) and Section 8.04(b) and, with respect to assistance more than two years after the Effective Date, LBHI chooses to provide such assistance, the LBI Trustee will reimburse LBHI for any reasonable costs incurred in the provision of such assistance in accordance with the provisions of Section 4.01(a) and Exhibit C of the Transition Services Agreement (it being understood that the LBI Trustee is under no obligation to request such assistance and, two years following the Effective Date, LBHI is under no obligation to provide such assistance).  For purposes of this Section 8.04(c), the definition of "Service Charges" in the Transition Services Agreement will govern the determination and calculation of such costs.

SECTION 8.05.    *Deconsolidation, and Transfer of Remaining Stock of LBI.*

(a)     LBHI and the LBI Trustee shall mutually cooperate and work towards the deconsolidation or other removal of LBI from each Group for U.S. federal, state and local income tax purposes as soon as practicable by transferring 21 percent of its stock in LBI to an unrelated third party or, if the foregoing becomes impracticable, in a manner reasonably determined by LBHI, subject to the approval of the LBI Trustee (which shall not be unreasonably withheld or delayed).  With respect to periods ending on or prior to the date of such transfer, the parties shall continue to file Group Tax Returns with respect to federal income tax, the State of Florida, New York State and New York City.

(b)     Subject to any transfer of the stock of LBI in furtherance of the deconsolidation of LBI pursuant to Section 8.05(a) or with the prior approval of the LBI Trustee, LBHI shall not transfer its remaining common stock in LBI to a Person to whom the stock would not be wholly reattributed to LBHI (or LBHI's stockholders) under the constructive ownership rules of Section 382 and the Treasury Regulations thereunder, except in connection with the final (or close to final) transfer, sale or other disposition of LBHI's assets (whether to creditors, a liquidating trust, an unrelated third party or otherwise).

SECTION 8.06.    *Allocation Between Principal and Interest.*

(a)     Except to the extent otherwise required by law, any payments made by a party pursuant to this Agreement on account of any claim shall be allocated first to the principal portion of such claim and only thereafter, to the extent such principal portion has been satisfied in full, to any portion representing previously accrued but unpaid interest on such claim.

(b)     Lehman ALI and LBI hereby agree that the $350,000,000.00 settlement amount in respect of the PIK Notes provided for under Section 2.01(b)(i) of this Agreement is inclusive of any interest due thereunder. Accordingly, for federal, state and local income tax purposes, the $350,000,000.00 settlement amount will be treated as $256,000,000.00 of principal and $94,000,000.00 of capitalized interest.

SECTION 8.07.     *Exclusivity.*  Notwithstanding anything to the contrary in this Agreement, this ARTICLE VIII shall exclusively govern the treatment of any Group Taxes among the LBHI Entities, on the one hand, and LBI, on the other hand.

## ARTICLE IX
## MISDIRECTED WIRES

The LBI Trustee shall fix and allow in the amount of $35,072,889.00 (the "**Allowed Misdirected Wires Administrative Claim**") an administrative expense claim to resolve the LBHI Entities' assertions that (1) LBI received funds from third parties after the commencement of the SIPA Proceeding related to transactions between an LBHI Entity and such third party and (2) under the documents governing the transaction, LBI had no entitlement to, or proprietary interest in, the funds received from such third party. The Allowed Misdirected Wires Administrative Claim shall be satisfied (i) in part through the assignment of the $8,000,000.00 Agreed LBI Non-Debtor Receivables Settlement Payment as specified in Section 2.01(b) of this Agreement and (ii) in part through a payment of $27,072,889.00 by the LBI Trustee within ten (10) Business Days of the Effective Date to the LBHI Entities listed on Schedule K annexed hereto, in the amounts specified.

## ARTICLE X
## PROCEEDS FROM SALE OF CUSTOMER NAME SECURITIES

To the extent the LBI Trustee, as of the Effective Date, holds or thereafter obtains proceeds from the sale of Customer Name Securities registered in the name of an LBHI Entity ("**CNS Proceeds**") and prior to the applicable claims bar date established in the SIPA Proceeding such LBHI Entity claimed such Customer Name Securities, the LBI Trustee shall pay the amount of such CNS Proceeds to the applicable LBHI Entity within twenty (20) Business Days of the receipt or awareness of possession of such CNS Proceeds.

## ARTICLE XI
## DUPLICATE CLAIMS

LOTC and LBSF shall work with Duplicate Claim Counterparties to resolve Duplicate Claims such that either LOTC or LBSF, as applicable, or the Duplicate Claim Counterparties will withdraw their customer claim to the Duplicate Claim Accounts. The LBI Trustee shall withhold distributions on that portion of LOTC Allowed Customer Claims, LOTC Allowed General Unsecured Claims and LBSF Allowed Customer Claims that are subject to a Duplicate Claim until such time that (i) LOTC or LBSF, as applicable, withdraws its portion of its Allowed Customer Claim or Allowed General Unsecured Claim related to the Duplicate Claim Account, (ii) the Duplicate Claim Counterparty withdraws its customer claim related to such Duplicate Claim Account, (iii) LOTC or LBSF and such Duplicate Claim Counterparty provide the LBI

33

Trustee with a written agreement (in form and substance reasonably acceptable to the LBI Trustee) allocating such Allowed Customer Claim or Allowed General Unsecured Claim or (iv) in the event that LOTC or LBSF, as applicable, and the Duplicate Claim Counterparty are unable to resolve the Duplicate Claim, the LBI Trustee seeks judicial resolution as to the allowance of the Duplicate Claims, including through objection, interpleader or other proceeding, in his sole discretion but after consultation with LOTC or LBSF, as applicable, and the Bankruptcy Court enters a Final Order resolving the LBI Trustee's application.

## ARTICLE XII
### EFFECTIVENESS OF AGREEMENT

Except as to Section 8.03(b) hereof, which shall be effective as of the Execution Date, this Agreement shall become effective when the last of the following conditions to effectiveness are satisfied or, where permitted herein, waived (the "**Effective Date**"):

(a)     The LBI Trustee obtains Bankruptcy Court Approval;

(b)     The effectiveness of the LBI-LBIE Settlement Agreement; provided that if the only reason the LBI-LBIE Settlement Agreement has not become effective is that this Agreement is not effective, then this condition shall be deemed satisfied;

(c)     The LBI Trustee obtains a Final Order, substantially in the form annexed hereto as Schedule T, approving the allocation of sufficient cash and securities as Customer Property to allow for a 100% distribution on account of the customer claims allowed in the SIPA Proceeding; and

(d)     The LBI Trustee obtains a Final Order approving the distribution to the LBHI Entities of the cash and securities as set forth in Section 2.02(a)(iii) and Schedules O, P and Q hereof in satisfaction of their Allowed Customer Claims.

## ARTICLE XIII
### TERMINATION

SECTION 13.01.  *Automatic Termination.*  This Agreement shall automatically terminate three (3) Business Days after the entry of a Final Order denying Bankruptcy Court Approval.

SECTION 13.02.  *The LBI Trustee's Right to Terminate.*  Solely prior to the Effective Date, the LBI Trustee, in his sole discretion, shall have the right to terminate this Agreement by written notice to the LBHI Entities consistent with ARTICLE XXII hereof if there is a material breach of the representations, warranties or covenants of any of the LBHI Entities hereunder, and the relevant LBHI Entity fails to cure such breach within ten (10) Business Days following receipt of written notice of such breach from the LBI Trustee.

SECTION 13.03.  *The LBHI Entities' Right to Terminate.*  Solely prior to the Effective Date, the LBHI Entities, in their sole discretion, shall have the right to terminate this Agreement by written notice from LBHI to the LBI Trustee consistent with ARTICLE XXII hereof if there is a material breach of the representations, warranties or covenants of the LBI Trustee hereunder,

34

and the LBI Trustee fails to cure such breach within ten (10) Business Days following receipt of written notice of such breach from LBHI.

SECTION 13.04. *Effect of Termination.* In the event that this Agreement is terminated in accordance with its terms, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement, shall have any *res judicata* or collateral estoppel effect or be of any force or effect. Each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed (except as to this Section) and the Parties hereto shall be automatically relieved of any further obligations hereunder; provided that Section 13.04 of this Agreement shall survive any termination of this Agreement. Except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties' rights and remedies and the Parties hereby reserve all Claims, defenses and positions that they may have with respect to each other.

## ARTICLE XIV
### VENUE AND CHOICE OF LAW

SECTION 14.01. *Venue.* To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any other state or federal court located within the County of New York in the State of New York having proper jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement with the Bankruptcy Court or with any other federal court located within the County of New York in the State of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to service of process in the manner provided for notices in ARTICLE XXII hereof. Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.

SECTION 14.02. *Choice of Law.* This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and US Bankruptcy Law, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or US Bankruptcy Law.

35

## ARTICLE XV
### CONSTRUCTION

This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

## ARTICLE XVI
### NON-SEVERABILITY

Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

## ARTICLE XVII
### BINDING EFFECT; SUCCESSOR AND ASSIGNS; ASSIGNMENT

Any declaration or statement of the LBI Trustee shall only be made in his capacity and function as the LBI Trustee and shall in no circumstance be construed as being a declaration or statement of the LBI Trustee on his own and personal behalf. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement may not be assigned by any Party without the prior written consent of the other Parties and any purported assignment in violation hereof shall be of no force or effect.

## ARTICLE XVIII
### ENTIRE AGREEMENT

This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof. This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written agreements between the Parties concerning the subject matter hereof. The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein.

## ARTICLE XIX
### AMENDMENTS; NO ORAL MODIFICATIONS

SECTION 19.01. This Agreement may not be modified or amended except by a writing signed by a duly authorized representative of each affected Party hereto. No waiver of any provision of this Agreement shall be valid unless in writing signed by the waiving Party. No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach. No failure or delay by any Party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

SECTION 19.02. The LBHI Entities who are not signatories to this Agreement as of the Execution Date (the "**Non-Signing Controlled Entities**") may be added to this Agreement at any time after the Execution Date by executing an amendment to this Agreement, substantially in the form annexed hereto as Schedule M (the "**Controlled Entity Joinder**"). The Debtors agree

36

to use their best efforts to cause the LBHI Entities that are Non-Signing Controlled Entities to execute the Controlled Entity Joinder. The LBHI Entities shall not enter into any transaction pursuant to which a Non-Signing Controlled Entity ceases to be controlled by the LBHI Entities without such Non-Signing Controlled Entity executing the Controlled Entity Joinder.

## ARTICLE XX
### NO ADMISSION OF LIABILITY

Each Party acknowledges that this Agreement effects a settlement of potential claims, counterclaims and factual disputes that are in whole or in part denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing.

## ARTICLE XXI
### COUNTERPARTS

This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart. A copy or a facsimile of a signature shall be binding upon the signatory as if it were an original signature.

## ARTICLE XXII
### NOTICES

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

If to the LBI Trustee at:

    Hughes Hubbard & Reed LLP
    One Battery Park Plaza
    New York, New York 10004
    Attn: James B. Kobak, Jr. and Jeffrey M. Greilsheimer
    Email: kobak@hugheshubbbard.com
        greilshe@hugheshubbard.com

If to any of the LBHI Entities at:

    1271 Avenue of the Americas, 40th Floor
    New York, New York 10020
    Attn: Daniel J. Ehrmann
    Facsimile: (646) 834-0874
    Email: dehrmann@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153
    Attn: Lori R. Fife
    E-mail:lori.fife@weil.com

or to such other address(es) as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

## ARTICLE XXIII
### COOPERATION

Subject to applicable data privacy restrictions, confidentiality obligations owed to third parties and other applicable restrictions on their respective ability to provide information, the LBI Trustee and the Debtors agree to use reasonable efforts to provide one another information relating to the SIPA Proceeding and the Chapter 11 Cases, respectively, in order to assist each other in resolving claims of Affiliates and other creditors and otherwise concluding the administration of their respective bankruptcy cases; provided that (i) any information supplied by either the LBI Trustee or any of the Debtors pursuant to this ARTICLE XXIII shall be supplied on the terms that the providing party incur no obligation or liability to the receiving party in connection therewith, and (ii) the obligation to cooperate set forth in this ARTICLE XXIII shall not require either the LBI Trustee or any Debtor, as applicable, to expend any funds which it considers unreasonable or unduly burdensome. Nothing in this ARTICLE XXIII shall require the LBI Trustee or any Debtor, as applicable, to act in any manner that it considers, in its sole discretion, to be adverse to its interests or inconsistent with its fiduciary duties.

## ARTICLE XXIV
### EXPENSES

Except as set forth in Article VIII and in the Surviving Contracts, the fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, shall be paid by such Party.

## ARTICLE XXV
### NO PERSONAL LIABILITY

The LBI Trustee and A&M act as agents for and on behalf LBI and the LBHI Entities, respectively, and neither they, their firm, member, partners, directors, officers, employees, agents, and their representatives or other professional advisors shall incur any personal liability whatsoever in respect of any of the obligations undertaken by LBI or any of the LBHI Entities, or in respect of any failure on the part of LBI or any of the LBHI Entities to observe, perform or comply with any such obligation. The exclusion of liability set forth in this ARTICLE XXV shall arise and continue notwithstanding the termination of the agency of the LBI Trustee or

A&M and shall operate as a waiver of any claims in tort as well as under the laws of contract and any claims otherwise at law or in equity. The Persons identified in this ARTICLE XXV are express third-party beneficiaries hereunder and may enforce and rely on this paragraph to the same extent as if they or it were a party hereto. Each Party accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the Persons described in this Article and, to the extent any such personal liability existed, each Party explicitly waives any and all potential rights and Claims against all of the aforementioned Persons. Any Claim by a Party against the LBI Trustee or LBI arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of LBI. Any Claim by a Party against A&M as agent for an LBHI Entity, or against such LBHI Entity arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of such LBHI Entity.

## ARTICLE XXVI
### DISTRIBUTION INSTRUCTIONS

The LBHI Entities shall provide instructions with respect to the delivery of the distributions contemplated herein to the LBI Trustee, in a form suitable to the LBI Trustee, prior to the Effective Date. The failure of the LBHI Entities to provide such instructions shall not constitute a breach of this Agreement. If the LBHI Entities fail to provide delivery instructions prior to the Effective Date, then the LBI Trustee's time to make any distribution contemplated by this Agreement shall be extended by the number of days after the Effective Date that such instructions are received by the LBI Trustee.

## ARTICLE XXVII
### TIMING OF DISTRIBUTIONS

Although the LBI Trustee will endeavor to cause distributions to the LBHI Entities to be made within the time periods specified herein, notwithstanding anything to the contrary in this Agreement, it shall not be a breach of this Agreement, if the LBI Trustee completes such distributions within sixty (60) days of each specified date for wire transfers or one hundred eighty (180) days of each specified date for the delivery of securities.

## ARTICLE XXVIII
### NO EXTENSION OF BAR DATES

Nothing in this Agreement shall be construed to extend or have the effect of extending any claims bar dates that are applicable in the Chapter 11 Cases and the SIPA Proceeding.

## ARTICLE XXIX
### WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION

THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS ARTICLE XXIX IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

## ARTICLE XXX
### NON-DISCLOSURE

Unless otherwise agreed by the Parties, no Party shall disclose the terms of this Agreement, or this Agreement itself, until a motion with the Bankruptcy Court seeking Bankruptcy Court Approval has been filed by the LBI Trustee in the SIPA Proceeding. Notwithstanding the foregoing, any Party to this Agreement may disclose this Agreement in conjunction with the filing of a motion with the Bankruptcy Court for approval of this Agreement.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**LBI TRUSTEE:**

James W. Giddens, solely in his capacity as
trustee for the SIPA liquidation of Lehman
Brothers Inc., without personal liability


_____
James W. Giddens

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Lehman Brothers Holdings Inc.

By: _____
      Name:  Daniel Ehrmann
      Title:   Senior Vice President

Lehman Brothers Special Financing Inc.

By: _____
      Name:  Daniel Ehrmann
      Title:   President and Chief Operating Officer

ARS Holdings II LLC
BNC Mortgage LLC
Bromley LLC
CES Aviation II LLC
CES Aviation III LLC
CES Aviation IV LLC
CES Aviation IX LLC
CES Aviation LLC
CES Aviation V LLC
CES Aviation VI LLC
CES Aviation VII LLC
CES Aviation X LLC
CES Aviation XI LLC
CES Aviation XII LLC
CES Aviation XIII LLC
CES Aviation XIV LLC
CES Aviation XV LLC
Cohane Rafferty, LLC
Diogenes Management Company Inc.
DL Mortgage Corp.
E-Valuate GP, LLC (f/k/a E-Valuate II GP, LLC)
GA Dekalb Inc.
Industrial Holdings Corporation
Jet Partners, LLC
LB 2080 Kalakaua Owners LLC
LB 745 LLC

LB Burrage House Inc.
LB Funding Corp. II
LB Hercules Holdings LLC
LB I Group Inc.
LB Preferred Somerset LLC
LB Private Wealth Management, Inc. (f/k/a Executive Monetary Management)
LB PWC, LLC (f/k/a Sage Partners LLC)
LB Renar LPGA Inc.
LB Rose Ranch LLC
LB Somerset LLC
LCPI Properties Inc.
Lehman ABS Corporation
Lehman ALI Inc.
Lehman Brothers Asset Management Inc.
Lehman Brothers Bancorp Inc.
Lehman Brothers Commercial Corporation
Lehman Brothers Commodity Services Inc.
Lehman Brothers Communications Associates Inc.
Lehman Brothers Derivative Products Inc.
Lehman Brothers Financial Products Inc.
Lehman Brothers Futures Asset Management Corp.
Lehman Brothers International Services Inc.
Lehman Brothers Investment Holding Company Inc.
Lehman Brothers MBLP, Inc.
Lehman Brothers Merchant Banking Advisors II Inc.
Lehman Brothers MLP Opportunity Associates LLC
Lehman Brothers OTC Derivatives Inc.
Lehman Brothers Overseas Inc.
Lehman Brothers PA LLC
Lehman Brothers Private Fund Management GP, LLC (f/k/a Lehman Crossroads Investment Company GP, LLC)
Lehman Brothers Private Funds Investment Company LP, LLC
Lehman Brothers Venture Associates Inc.
Lehman CMBS Funding Inc.
Lehman CMO Inc.
Lehman Commercial Paper Inc.
Lehman Housing Capital Inc.
Lehman Investments Inc.
Lehman Pass-Through Securities Inc.
Lehman Residential Opportunities Corp.
Lehman Syndicated Loan Inc.
LIBRO Holdings I Inc.
LUBS Inc.
LW-LP Inc.
Merit LLC
MMP Funding Corp.

PAMI Statler Arms LLC
Picnic II Inc.
Principal Transactions II Inc.
Property Asset Management Inc.
Real Estate Private Equity Inc.
RIBCO LLC
RIBCO SPC, Inc.
Select Asset Inc.
Structured Asset Securities Corporation II
Structured Assets Securities Corporation
West Dover, LLC
Wharf Reinsurance Inc.
Woodlands Commercial Corporation

By:
      Name:  Daniel Ehrmann
      Title:   Vice President


ARS Holdings I LLC
Clarks Summit I, LLC
Equity Strategies Loan LLC
Laminar Holdings LLC
LB 745 Leasco I LLC
LB 745 Leasco II LLC
Lehman Brothers Venture Associates V LLC
REPE LBREP II LLC
Tax Exempt Affordable Mortgage Acceptance Company LLC
W 6 Holdings LLC

By:
      Name:  Daniel Ehrmann
      Title:   Authorized Signatory


The Main Office Management Company, LP (f/k/a The Main Office Management Company II LP)

By:  The Main Office Management Company GP, LLC, its general partner

By:
      Name: Daniel Ehrmann
      Title:  Vice President

CA II LP (f/k/a Capital Analytics II, LP)

By:  CA II GP LLC, its general partner

By: _____
Name: Daniel Ehrmann
Title:  Vice President


E-Valuate, LP (f/k/a E-Valuate II, LP)

By:  E-Valuate GP, LLC, its general partner

By: _____
Name: Daniel Ehrmann
Title:  Vice President


Able Health Ventures LLC
Royalty Asset Investment, LLC

By:  LB I Group Inc., its managing member

By: _____
Name: Daniel Ehrmann
Title:  Vice President


Lehman Brothers Private Fund Advisers, LP (f/k/a Lehman Crossroads Investment Advisers, LP)

By:  Lehman Brothers Private Fund Advisers GP, LLC, its general partner

By: _____
Name: Daniel Ehrmann
Title:  Vice President

LBK Ribco L.P.

By: LB I Group Inc., its general partner

By: _____
    Name: Daniel Ehrmann
    Title: Vice President


LPJ Aircraft Finance LLC

By: Lehman Commercial Paper Inc., its managing member

By: _____
    Name: Daniel Ehrmann
    Title: Vice President


Lehman Brothers European Mezzanine Associates 2003 Ltd.
Lehman Brothers Offshore Communications Associates Ltd.
Global Commercial Real Estate (Cayman) Inc.
Stockholm Investments Ltd.
Lehman Brothers Global Services Ltd.

By: _____
    Name: Daniel Ehrmann
    Title: Director


Lehman Scottish Finance L.P.

By: Property Asset Management Inc., its general partner

By: _____
    Name: Daniel Ehrmann
    Title: Vice President

East Dover Limited

By: _____
     Name: Daniel Ehrmann
     Title:  Director and Duly Authorized Officer


Luxembourg Residential Properties Loan Finance S.a.r.l.
Nopelo Mexico S. de R.L. de C.V.

By: _____
     Name: Daniel Ehrmann
     Title:  Manager


Lehman VIP Investment LDC

By:     LB I Group Inc., a Deemed Director

     By: _____
         Name: Daniel Ehrmann
         Title:  Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

314 Commonwealth Ave. Inc.
745 Special Assets LLC
Appalachian Asset Management Corp.
Area GP Corporation
Brookwood Energy & Properties Inc.
CA II GP LLC (f/k/a Capital Analytics II GP LLC)
Canope Credit Corp.
CES Aviation VIII LLC
DA Group Holdings Inc.
LB Hercules Agency, Inc. (f/k/a Neuberger & Berman Agency, Inc.)
LB Hercules Art Advisory Services Inc. (f/k/a Neuberger Berman Art Advisory Services Inc.)
LB Hercules Investment Services LLC (f/k/a Neuberger Berman Investment Services LLC)
LB Hercules Technology Management LLC (f/k/a Neuberger Berman Technology Management LLC)
LB Markets LLC
LBAC Holdings I Inc.
LCCI GP LLC (f/k/a Lehman Crossroads Corporate Investors GP, LLC)
LCCI II GP LLC (f/k/a Lehman Crossroads Corporate Investors II GP, LLC)
Lehman Brothers Europe Inc.
Lehman Brothers Global Infrastructure Associates Holdings L.L.C.
Lehman Brothers Investments Japan Inc.
Lehman Brothers Loan Opportunity Associates (Cayman) LLC
Lehman Brothers Loan Opportunity Associates Holdings LLC (f/k/a Lehman Brothers Loan Opportunity Associates LLC)
Lehman Brothers/MBGP Inc.
Lehman Brothers Merchant Banking Partners II Inc.
Lehman Brothers Private Fund Advisers GP, LLC (f/k/a Lehman Crossroads Investment Advisers GP LLC)
Lehman Brothers Private Funds Investment Company GP, LLC
Lehman Brothers U.K. Holdings (Delaware) Inc.
Lehman Brothers/FW Inc.
Lehman Brothers/Rosecliff Inc.
Lehman Housing Lending Corp.
Lehman Risk Advisors Inc.
Lehman/SDI Inc.
Lehman Structured Securities Corp.
Lehman Syndicated Loan Funding Inc.
Lehman VIP Holdings Inc.
Leveraged Loan Trading Holdings Inc.
NJ Somerset Inc.
PAMI Harbor Park Inc.
Pentaring Inc.

Peterborough 850 LLC
Picnic 1 Inc.
Real Estate Private Equity Inc.
Security Assurance Advisers GP, LLC (f/k/a Security Assurance Advisers II GP, LLC)
Stamford Investment Realty Inc.
Tallus Inc.
The Main Office Management Company GP, LLC (f/k/a The Main Office Management
Company II GP, LLC)

By:

     Name:  Daniel Ehrmann
     Title:   Vice President


Clarks Summit I, LLC
LB Hercules Asset Management, LLC (f/k/a Neuberger Berman Asset Management, LLC)
LB Hyderabad Investments I LLC
Lehman Brothers Special Lending LLC
Lehman Brothers Venture Associates 2003 LLC
Lehman Brothers Venture Associates II LLC
Lehman Wealth Services Holdings LLC
REPE LBREM LLC (f/k/a PAMI LBREM LLC)
REPE LBREP III LLC

By:

     Name:  Daniel Ehrmann
     Title:   Authorized Signatory


LCCI LP (f/k/a Lehman Crossroads Corporate Investors LP)

By:   LCCI GP LLC, its general partner

     By:

          Name: Daniel Ehrmann
          Title:  Vice President

LCCI II LP (f/k/a Lehman Crossroads Corporate Investors II LP)

By:  LCCI II GP LLC, its general partner

By:  _____
     Name: Daniel Ehrmann
     Title:  Vice President


Lehman Brothers Private Fund Management LP (f/k/a Lehman Crossroads Investment Company LP)

By:  Lehman Brothers Private Fund Management GP, LLC, its general partner

By:  _____
     Name: Daniel Ehrmann
     Title:  Vice President


Security Assurance Advisers, LP (f/k/a Security Assurance Advisers II, LP)

By:  Security Assurance Advisers GP, LLC, its general partner

By:  _____
     Name: Daniel Ehrmann
     Title:  Vice President


Lehman Brothers Asset Securitization LLC

By:  Lehman Commercial Paper Inc., its managing member

By:  _____
     Name: Daniel Ehrmann
     Title:  Vice President

Revival Fund Management Korea LLC

By:  Revival Fund Management LLC, its managing member

     By:  Principal Transactions Inc., its sole member

        By: _____
           Name: Daniel Ehrmann
           Title:  Vice President

LB Investments (UK) Limited
Lehman Brothers Opportunity Holdings Inc.
Lehman Brothers (Cayman Islands) Ltd.
Lehman Brothers Latin America Limited
Lehman Brothers Offshore Partners II Ltd.
Lehman Brothers Offshore Partners Ltd.
Lehman Risk Services (Bermuda) Ltd.
O.M.B. Limited Partner Ltd.

By: _____
       Name:  Daniel Ehrmann
       Title:   Director


Lehman Brothers Hong Kong Olympus Funding LP

By:   LBQ Hong Kong Services Ltd., trustee of the general partner

    By: _____
         Name: Daniel Ehrmann
         Title:  Director


Mansfield II SARL

By:   314 Commonwealth Ave., Inc., majority shareholder

    By: _____
         Name: Daniel Ehrmann
         Title:  Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Global Taiwan Investments Ltd

By:

Name:   Daniel Ehrmann
Title:   Vice President


CJC Investments Inc.
Thai Investor I Inc.
Thai Investor II Inc.
Thai Investor III Inc.
Thai Investor IV Inc.
Thai Investor V Inc.
Thai Investor VI Inc.
Thai Investor VII Inc.
Thai Investor VIII Inc.
Thai Investor IX Inc.
Thai Investor X Inc.
Falcon Holdings II Inc.
Global Korea Investments Ltd
Eagle Investors I Inc
Eagle Investors II Inc
Eagle Investors III Inc
Eagle Investors IV Inc
Eagle Investors V Inc
Eagle Investors VI Inc
Eagle Investors VII Inc
Eagle Investors VIII Inc
Eagle Investors IX Inc
Eagle Investors X Inc
GKI Korea Limited
Lehman Brother ASEAN Opportunity Ltd.
Japan Hospitality Management Inc.
Eagle Holdings II Inc
Falcon Holdings III Inc.
Falcon Holdings IV Inc.
GKI Commercial Real Estate 2 Ltd.
Lehman Brothers Asian Investments Limited
TSAF Investor I Inc.
TSAF Investor II Inc.
TSAF Investor III Inc.

TSAF Investor IV Inc.
TSAF Investor V Inc.
TSAF Investor VI Inc.
TSAF Investor VII Inc.
TSAF Investor VIII Inc.
TSAF Investor IX Inc.
TSAF Investor X Inc.
SOGKI Inc.
SOGKI Management Inc.
GKI Korea Management Limited
GTI Taiwan Limited
Revival Holdings Limited

By:

      Name: Daniel Ehrmann
      Title:  Director


Japan TK Investor I LLC


By:  Japan TK Investor I (Cayman) Holdings Inc., its managing member

By:

      Name: Daniel Ehrmann
      Title:  Director

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Opal Finance Holdings Ireland Ltd.

By: ______________________

Name: John Shanahan

Title: Director

[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (RELEASING ENTITIES) – SHANAHAN]

Maewha K-Stars Limited

By: _____

Name: Paul Forgue

Title: Director

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Palarp Asset Management Company Limited
Lehman Brothers South East Asia Investments Pte. Ltd.
Karaboon Company Limited
Quanta Asset Company Limited
Japan Real Estate Investment Partnership Inc.
Lehman Brothers HY Opportunities Korea Inc.
Y.K. Marlin International
Japan Investment Partnership Holdings Inc.
L.B.D. Y.K.
Japan Investment Partnership Inc.

By: _____
　　　Name: Paul Forgue
　　　Title:　Director


Y.K. Duckhorn

By: _____
　　　Name:　Paul Forgue
　　　Title:　　Authorized Signatory


[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (RELEASING ENTITIES)–FORGUE]

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Lehman Brothers (Thailand) Limited

By: _____

Name: William J. Fox

Title: Director

By: _____

Name: Paul Forgue

Title: Director

[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (RELEASING ENTITIES)– FOX]

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Y.K.Birch
Keian Y.K.
Y.K. Meisho Estate
Y.K.Elmwood
L.B.E. Y.K.
Y.K.Reindeer
Y.K.Superior
Y.K.Yellowtail International
Y.K. Alfonsino International
Y.K.Louise


_L. Oxley_

Name:  Lauren Oxley
Title:  Liquidator


[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (RELEASING ENTITIES)– EHRMANN]

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Asia Indo Opportunity I Ltd.
Capital Growth Investments Ltd.
LB India Holdings Mauritius II Ltd.
LB India Holdings Mauritius III Ltd.

By: _____

    Name: William J. Fox
    Title: Director

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Lehman Brothers Private Equity Advisers LLC

By: _____

    Name:    William J. Fox
    Title:    Executive Vice President and Chief Financial Officer

LB India Holdings Mauritius I Ltd.
Lehman Brothers Opportunity Ltd.
LB Investment Management Company Ltd. (f/k/a Lehman Brothers India Holdings Cayman II)

By: _____

    Name:    William J. Fox
    Title:    Director

[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (SETTLEMENT ENTITIES) – FOX]

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

LBTC Transfer Inc.

By: _____
    Name: William J. Fox
    Title:   Executive Vice President and Chief Financial Officer

[SIGNATURE PAGE TO SETTLEMENT AGREEMENT (RELEASING ENTITIES) – FOX]

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the
date first written above.

Saijai Asset Company Limited

By: _____
     Name: Pardorn Suchiva
     Title:  Director

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the date first written above.

Phuket Capital Resort Co., Ltd

By: _____

      Name: Benyapa Paisarnkool
      Title:  Liquidator

Schedule A
EXCLUDED CLAIMS

| **Claimant** | **Claim Number** |
|---|---|
| Eagle Energy Management. LLC | 900006447 |
| LB (Luxembourg) Equity Finance SA | 900006724 |
| LB (Luxembourg) Equity Finance SA | 900006725 |
| LBC YK | 5436 |
| Lehman Brothers Finance (Japan) Inc. | 5421 |
| Neuberger Berman LLC | 900006500 |
| Neuberger Berman LLC | 900006501 |
| Neuberger Berman LLC | 900006502 |
| Neuberger Berman LLC | 900006503 |
| Neuberger Berman LLC | 900006504 |
| Neuberger Berman LLC | 900006505 |
| Neuberger Berman LLC | 900006506 |
| Neuberger Berman LLC | 900006507 |
| Neuberger Berman LLC | 900006508 |
| Neuberger Berman LLC | 900006509 |
| Neuberger Berman LLC | 900006510 |
| Neuberger Berman LLC | 900006512 |
| Neuberger Berman LLC | 900006513 |
| Neuberger Berman LLC | 900006514 |
| Neuberger Berman LLC | 900006515 |
| Neuberger Berman LLC | 900006516 |
| Neuberger Berman LLC | 900006517 |

| Claimant | Claim Number |
|----------|--------------|
| Neuberger Berman LLC | 900006518 |
| Neuberger Berman LLC | 900006519 |
| Neuberger Berman LLC | 900006520 |
| Neuberger Berman LLC | 900006521 |
| Neuberger Berman LLC | 900006522 |
| Neuberger Berman LLC | 900006523 |
| Neuberger Berman LLC | 900006524 |
| Neuberger Berman LLC | 900006525 |
| Neuberger Berman LLC | 900006526 |
| Neuberger Berman LLC | 900006527 |
| Neuberger Berman LLC | 900006528 |
| Neuberger Berman LLC | 900006529 |
| Neuberger Berman LLC | 900006530 |
| Neuberger Berman LLC | 900006531 |
| Neuberger Berman LLC | 900006532 |
| Neuberger Berman LLC | 900006427 |
| 737 Portfolio Trust | 5435 |

Schedule B
DEBTOR, NON-DEBTOR AND DEBTOR-CONTROLLED ENTITIES

| **Debtors** |
|---|
| BNC Mortgage LLC |
| CES Aviation IX LLC |
| CES Aviation LLC |
| CES Aviation V LLC |
| East Dover Limited |
| LB 2080 Kalakaua Owners LLC |
| LB 745 LLC. |
| LB Preferred Somerset LLC |
| LB Rose Ranch LLC |
| LB Somerset LLC |
| Lehman Brothers Commercial Corporation |
| Lehman Brothers Commodity Services Inc. |
| Lehman Brothers Derivative Products Inc. |
| Lehman Brothers Financial Products Inc. |
| Lehman Brothers Holdings Inc. ("LBHI") |
| Lehman Brothers OTC Derivatives Inc. ("LOTC") |
| Lehman Brothers Special Financing Inc. ("LBSF") |
| Lehman Commercial Paper Inc. |
| Lehman Scottish Finance L.P. |
| Luxembourg Residential Properties Loan Finance S.a.r.l. |
| Merit LLC |
| PAMI Statler Arms LLC |

| Debtors |
|---|
| Structured Assets Securities Corporation |


| Non-Debtors |
|---|
| Able Health Ventures LLC |
| ARS Holdings I LLC |
| ARS Holdings II LLC |
| Bromley LLC |
| CA II LP (f\k\a Capital Analytics II LP) |
| CES Aviation II LLC |
| CES Aviation III LLC |
| CES Aviation IV LLC |
| CES Aviation VI LLC |
| CES Aviation VII LLC |
| CES Aviation X LLC |
| CES Aviation XI LLC |
| CES Aviation XII LLC |
| CES Aviation XIII LLC |
| CES Aviation XIV LLC |
| CES Aviation XV  LLC |
| Clarks Summit I, LLC |
| Cohane Rafferty, LLC |
| Diogenes Management Company Inc. |

| **Non-Debtors** |
|---|
| DL Mortgage Corp. |
| Equity Strategies Loan LLC |
| E-Valuate GP, LLC (f/k/a E-Valuate II GP, LLC) |
| E-Valuate LP, LLC (f/k/a E-Valuate II LP, LLC) |
| GA Dekalb Inc. |
| Global Commercial Real Estate (Cayman) Inc. |
| Industrial Holdings Corporation |
| Jet Partners LLC |
| Laminar Holdings LLC |
| LB 745 Leasco I LLC |
| LB 745 Leasco II LLC |
| LB I Group Inc. |
| LB Burrage House Inc. |
| LB Funding Corp. II |
| LB Hercules Holdings LLC |
| LB Investment Management Company Ltd. (f/k/a Lehman Brothers India Holdings Cayman II) |
| LB Private Wealth Management, Inc. (f/k/a Executive Monetary Management Inc.) |
| LB PWC, LLC (f\k\a Sage Partners LLC) |
| LB Renar LPGA Inc. |
| LBK Ribco LP |
| LCPI Properties Inc. |
| Lehman ABS Corporation |
| Lehman ALI  Inc |

| **Non-Debtors** |
| --- |
| Lehman Brothers Asset Management Inc. |
| Lehman Brothers Bancorp Inc. |
| Lehman Brothers Communications Associates Inc |
| Lehman Brothers European Mezzanine Associates 2003 Ltd |
| Lehman Brothers Futures Asset Management Corp. |
| Lehman Brothers Global Services Ltd. |
| Lehman Brothers India Holdings Mauritius I Ltd. |
| Lehman Brothers International Services Inc. |
| Lehman Brothers Investment Holding Company Inc. |
| Lehman Brothers MBLP, Inc. |
| Lehman Brothers Merchant Banking Advisors II Inc. |
| Lehman Brothers MLP Opportunity Associates LLC |
| Lehman Brothers Offshore Communications Associates Ltd. |
| Lehman Brothers Opportunity Ltd. |
| Lehman Brothers Overseas Inc. |
| Lehman Brothers PA LLC |
| Lehman Brothers Private Equity Advisers LLC |
| Lehman Brothers Private Fund Management GP, LLC (f/k/a/ Lehman Crossroads Investment Company GP) |
| Lehman Brothers Private Funds Investment Company LP |
| Lehman Brothers Venture Associates Inc. |
| Lehman Brothers Venture Associates V LLC |
| Lehman CMBS Funding Inc. |
| Lehman CMO Inc. |

| Non-Debtors |
| --- |
| Lehman Brothers Private Fund Advisors, LP (f/k/a Lehman Crossroads Investment Advisors, LP) |
| Lehman Housing Capital Inc. |
| Lehman Investments Inc |
| Lehman Pass-Through Securities Inc. |
| Lehman Residential Opportunities Corp. |
| Lehman Syndicated Loan Inc. |
| Lehman VIP Investment LDC |
| LIBRO Holdings I Inc. |
| LPJ Aircraft Finance LLC |
| LUBS Inc. |
| LW-LP Inc. |
| MMP Funding Corp. |
| Nopelo Mexico Srl De Cv |
| Picnic II Inc. |
| Principal Transactions II Inc. |
| Property Asset Management Inc. |
| Real Estate Private Equity Inc. |
| REPE LBREP II LLC (f/k/a/PAMI LBREP II LLC) |
| RIBCO LLC |
| RIBCO SPC, INC. |
| Royalty Asset Investment, LLC |
| Select Asset Inc. |
| Stockholm Investments Ltd |

| Non-Debtors |
| --- |
| Structured Asset Securities Corporation II |
| Tax Exempt Affordable Mortgage Acceptance Company LLC |
| The Main Office Management Company LP (FKA The Main Office Management Company II LP) |
| W 6 Holdings LLC |
| West Dover, LLC |
| Wharf Reinsurance Inc |
| Woodlands Commercial Corporation |

| Debtor-Controlled Entities |
| --- |
| 314 Commonwealth Ave. Inc. |
| 745 Special Assets LLC |
| Acadia RJV, LLC |
| Appalachian Asset Management Corp. |
| Area GP Corporation |
| Asia Indo Opportunity I Ltd |
| Brookwood Energy & Properties Inc. |
| CA II GP LLC (f/k/a Capital Analytics II GP LLC) |
| Canope Credit Corp. |
| Capital Growth Investments Ltd. |
| CES Aviation VIII LLC |
| CJC Investments Inc. |

| Debtor-Controlled Entities |
|---|
| Clarks Summit I, LLC |
| DA Group Holdings Inc. |
| Eagle Holdings II Inc |
| Eagle Investors I Inc |
| Eagle Investors II Inc |
| Eagle Investors III Inc |
| Eagle Investors IV Inc |
| Eagle Investors V Inc |
| Eagle Investors VI Inc |
| Eagle Investors VII Inc |
| Eagle Investors VIII Inc |
| Eagle Investors IX Inc |
| Eagle Investors X Inc |
| Falcon Holdings II Inc. |
| Falcon Holdings III Inc. |
| Falcon Holdings IV Inc. |
| GKI Commercial Real Estate 2 Ltd. |
| GKI Korea Limited |
| GKI Korea Management Limited |
| Global Korea Investments Ltd |
| Global Taiwan Investments Ltd |
| GTI Taiwan Limited |
| HY Investments (Ireland) Limited |

| **Debtor-Controlled Entities** |
|---|
| Japan Hospitality Management Inc. |
| Japan Investment Partnership Holdings Inc. |
| Japan Investment Partnership Inc. |
| Japan Real Estate Investment Partnership Inc. |
| Japan TK Investor I LLC |
| Karaboon Company Limited |
| Keian Y.K. |
| L.B.D. Y.K. |
| L.B.E. Y.K. |
| LB Funding Bv |
| LBAC Holdings I Inc. |
| LB Helsinki Holdings S.a.r.l. |
| LB Hercules Agency, Inc. (f/k/a Neuberger & Berman Agency, Inc.) |
| LB Hercules Art Advisory Services Inc. (f/k/a Neuberger Berman Art Advisory Services Inc.) |
| LB Hercules Asset Management, LLC (f/k/a Neuberger Berman Asset Management, LLC) |
| LB Hercules Investment Services LLC (f/k/a Neuberger Berman Investment Services LLC) |
| LB Hercules Technology Management LLC (f/k/a Neuberger Berman Technology Management LLC) |
| LB Hyderabad Investments I LLC |
| LB India Holdings Mauritius II Ltd |
| LB India Holdings Mauritius III Ltd |
| LB Investments (UK) Limited |
| LB Markets LLC |
| LBSP Holding (Ireland) I Plc. |

| **Debtor-Controlled Entities** |
|---|
| LBSP Limited |
| LBTC Transfer Inc. |
| LCCI GP LLC (f/k/a Lehman Crossroads Corporate Investors GP, LLC) |
| LCCI II GP LLC (f/k/a Lehman Crossroads Corporate Investors II GP, LLC) |
| LCCI II LP (f/k/a Lehman Crossroads Corporate Investors II LP) |
| LCCI LP (f/k/a Lehman Crossroads Corporate Investors LP) |
| Lehman Brothers ASEAN Opportunity Ltd. |
| Lehman Brothers (Thailand) Limited |
| Lehman Brothers Asian Investments Limited |
| Lehman Brothers Asset Securitization LLC |
| Lehman Brothers (Cayman Islands) Ltd |
| Lehman Brothers Europe Inc. |
| Lehman Brothers Global Infrastructure Associates Holdings LLC |
| Lehman Brothers Hong Kong Olympus Funding LP |
| Lehman Brothers HY Opportunities Korea Inc. |
| Lehman Brothers Investments Japan Inc |
| Lehman Brothers Latin America Limited |
| Lehman Brothers Loan Opportunity Associates (Cayman) LLC |
| Lehman Brothers Loan Opportunity Associates Holdings LLC (f/k/a Lehman Brothers Loan Opportunity Associates LLC) |
| Lehman Brothers/MBGP Inc. |
| Lehman Brothers Merchant Banking Partners II Inc. |
| Lehman Brothers Offshore Partners II Ltd. |
| Lehman Brothers Offshore Partners Ltd. |

| Debtor-Controlled Entities |
|---|
| Lehman Brothers Opportunity Holdings Inc. |
| Lehman Brothers Private Fund Advisers GP, LLC (f/k/a Lehman Crossroads Investment Advisers GP LLC) |
| Lehman Brothers Private Fund Management LP (f/k/a Lehman Crossroads Investment Company LP) |
| Lehman Brothers Private Funds Investment Company GP, LLC |
| Lehman Brothers Southeast Asia Investments Pte. Ltd. |
| Lehman Brothers Special Lending LLC |
| Lehman Brothers U.K. Holdings (Delaware) Inc. |
| Lehman Brothers Venture Associates 2003 LLC |
| Lehman Brothers Venture Associates II LLC |
| Lehman Brothers/FW Inc. |
| Lehman Brothers/Rosecliff Inc. |
| Lehman Housing Lending Corp. |
| Lehman Risk Advisors Inc. |
| Lehman Risk Services (Bermuda) Ltd. |
| Lehman/SDI Inc. |
| Lehman Structured Securities Corp. |
| Lehman Syndicated Loan Funding Inc. |
| Lehman VIP Holdings Inc. |
| Lehman Wealth Services Holdings LLC |
| Leveraged Loan Trading Holdings Inc. |
| Maewha K-Stars Ltd |
| Mansfield II SARL |

| **Debtor-Controlled Entities** |
|---|
| NJ Somerset Inc. |
| Novacorp Realty/GP Inc. |
| O.M.B. Limited Partner Ltd. |
| Opal Finance Holdings Ireland Ltd. |
| Palarp Asset Management Company Limited |
| PAMI Harbor Park Inc. |
| Pentaring Inc. |
| Peterborough 850 LLC |
| Phuket Capital Resort Co, Ltd |
| Picnic 1 Inc. |
| Quanta Asset Company Limited |
| Real Estate Private Equity Inc. |
| REPE LBREM LLC (f/k/a PAMI LBREM LLC) |
| REPE LBREP III LLC |
| Revival Fund Management Korea LLC |
| Revival Holdings Limited |
| Saijai Asset Company Limited |
| Security Assurance Advisers GP, LLC (f/k/a Security Assurance Advisers II GP, LLC) |
| Security Assurance Advisers, LP (f/k/a Security Assurance Advisers II, LP) |
| SOGKI Inc. |
| SOGKI Management Inc. |
| Stamford Investment Realty Inc. |
| Tallus Inc. |

| Debtor-Controlled Entities |
|---|
| Thai Investor I Inc. |
| Thai Investor II Inc. |
| Thai Investor III Inc. |
| Thai Investor IV Inc. |
| Thai Investor V Inc. |
| Thai Investor VI Inc. |
| Thai Investor VII Inc. |
| Thai Investor VIII Inc. |
| Thai Investor IX Inc. |
| Thai Investor X Inc. |
| The Main Office Management Company GP, LLC (f/k/a The Main Office Management Company II GP, LLC) |
| TSAF Investor I Inc. |
| TSAF Investor II Inc. |
| TSAF Investor III Inc. |
| TSAF Investor IX Inc. |
| TSAF Investor V Inc. |
| TSAF Investor IV Inc. |
| TSAF Investor VI Inc. |
| TSAF Investor VII Inc. |
| TSAF Investor VIII Inc. |
| TSAF Investor X Inc. |
| Y.K. Alfonsino International |
| Y.K. Duckhorn |

| **Debtor-Controlled Entities** |
| --- |
| Y.K. Marlin International |
| Y.K. Meisho Estate |
| Y.K.Birch |
| Y.K.Elmwood |
| Y.K.Louise |
| Y.K. Pluto Realty |
| Y.K.Reindeer |
| Y.K.Superior |
| Y.K.Yellowtail International |

Schedule C
DUPLICATE CLAIM ACCOUNTS

| **LBHI Entity Claimant** | **Duplicate Claim Counterparty** | **Account Number** |
|---|---|---|
| Lehman Brothers Special Financing Inc. | DCI LLC as Agent for GIC | |
| Lehman Brothers Special Financing Inc. | Ross Financial Corporation | |
| Lehman Brothers OTC Derivatives Inc. | BRM Group Ltd. | |
| Lehman Brothers OTC Derivatives Inc. | Frank M Paris | |
| Lehman Brothers OTC Derivatives Inc. | Harry C Moore Tst May 19,1986 | |
| Lehman Brothers OTC Derivatives Inc. | Jason J Wallace | |
| Lehman Brothers OTC Derivatives Inc. | Louise Beale | |
| Lehman Brothers OTC Derivatives Inc. | Marie Papillon | |
| Lehman Brothers OTC Derivatives Inc. | Mark Mazzatta& Michelle Mchugh-Mazzatta | |
| Lehman Brothers OTC Derivatives Inc. | Robert A Meister | |
| Lehman Brothers OTC Derivatives Inc. | Robert A Schoellhorn Trust | |
| Lehman Brothers OTC Derivatives Inc. | Stephen & Elizabeth Mackenzie | |

Schedule D
SURVIVING CONTRACTS

1.  ALL AGREEMENTS (INCLUDING STIPULATIONS) INVOLVING ONE OR MORE OF THE LBHI ENTITIES AND THE LBI TRUSTEE THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT IN THE SIPA PROCEEDING AND/OR THE CHAPTER 11 CASES

2.  ASSIGNMENT AGREEMENT, DATED SEPTEMBER 14, 2010, BETWEEN JAMES W. GIDDENS, TRUSTEE FOR SIPA LIQUIDATION OF LEHMAN BROTHERS INC. AND LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

3.  LETTER AGREEMENT, DATED NOVEMBER 4, 2011 AMENDING ASSIGNMENT AGREEMENT, DATED SEPTEMBER 14, 2010, BETWEEN JAMES W. GIDDENS, TRUSTEE FOR SIPA LIQUIDATION OF LEHMAN BROTHERS INC. AND LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

4.  DATA SHARING AGREEMENT BETWEEN JAMES W. GIDDENS, AS TRUSTEE FOR THE LIQUIDATION OF LEHMAN BROTHERS INC UNDER THE SECURITIES INVESTOR PROTECTION ACT AND LEHMAN BROTHERS HOLDINGS INC., DATED FEBRUARY 12, 2009

5.  LBI ESTATES PROTOCOL, DATED AS OF FEBRUARY 20, 2013, AMONG JAMES W. GIDDENS, AS TRUSTEE FOR THE LIQUIDATION OF LEHMAN BROTHERS INC., LEHMAN BROTHERS HOLDINGS, INC. AND LEHMAN BROTHERS INTERNATIONAL (EUROPE)

Schedule E
ALLOWED LBI CLAIMS AGAINST THE DEBTORS

| **Debtor against which Claim is Allowed** | **Amount of Allowed Claim (USD)** | **Classification of Claim under Plan** |
|---|---|---|
| Lehman Brothers Derivative Products Inc. | 10,000,000 | 4B |
| Lehman Brothers Financial Products Inc. | 721,553 | 4B |
| BNC Mortgage LLC | 966,092 | 4B |
| CES Aviation LLC | 470,254 | 4B |
| CES Aviation V LLC | 289,347 | 4B |
| CES Aviation IX LLC | 286,821 | 4B |
| **Total** | 12,734,067 | |

Schedule F
AGREED LBI RECEIVABLES FROM NON-DEBTORS

| Non-Debtor | Amount of LBI Receivables (USD) |
|---|---|
| Able Health Venture LLC | 60,959 |
| ARS Holdings I LLC | 395,120 |
| ARS Holdings II LLC | 428,611 |
| CA II LP (f\k\a Capital Analytics II LP) | 205,392 |
| CES Aviation II LLC | 269,735 |
| CES Aviation III LLC | 499,792 |
| CES Aviation IV LLC | 353,526 |
| CES Aviation VI LLC | 383,210 |
| CES Aviation VII LLC | 623,808 |
| CES Aviation X LLC | 81,902 |
| CES Aviation XI LLC | 327,940 |
| CES Aviation XII LLC | 311,458 |
| CES Aviation XIII LLC | 501,984 |
| CES Aviation XIV LLC | 283,323 |
| CES Aviation XV LLC | 243,940 |
| Diogenes Management Company Inc. | 95,499 |
| Dl Mortgage Corp. | 36,484 |
| E-Valuate GP, LLC (f/k/a E-Valuate II GP, LLC) | 413,043 |
| E-Valuate LP, LLC (f/k/a E-Valuate II LP, LLC) | 11,736 |
| GA Dekalb Inc. | 508,697 |
| Industrial Holdings Corporation | 11,918 |

| Non-Debtor | Amount of LBI Receivables (USD) |
|---|---|
| LB Burrage House Inc. | 244,573 |
| Lehman Brothers Private Funds Investment Company LP, LLC | 241,935 |
| LB Private Wealth Management, Inc. (f\k\a Executive Monetary Management Inc.) | 1,377,870 |
| LB PWC, LLC (f\k\a Sage Partners LLC (SAGNB)) | 202,014 |
| LB Renar LPGA Inc. | 244,211 |
| LBK Ribco LP | 7,796 |
| Lehman Brothers Bancorp Inc. | 20,000 |
| Lehman ABS Corporation | 103,325 |
| Lehman Brothers Communications Associates Inc | 34,668 |
| Lehman Brothers European Mezzanine Associates 2003 Ltd | 33,246 |
| Lehman Brothers India Holdings Mauritius I | 4,250,000 |
| Lehman Brothers MBLP, Inc. | 33,318 |
| Lehman Brothers Merchant Banking Advisors II Inc. | 130,194 |
| Lehman Brothers MLP Opportunity Associates LLC | 34,755 |
| Lehman Brothers Offshore Communications Associates Ltd. | 7,986 |
| Lehman Brothers Opportunity Ltd. | 10,000 |
| Lehman Brothers Private Equity Advisers LLC | 11,263 |
| Lehman Brothers Private Fund Management Company GP, LLC (f/k/a Lehman Crossroads Investment Company GP, LLC) | 14,283 |
| Lehman Brothers Venture Associates Inc. | 45,800 |
| Lehman Brothers Venture Associates V LLC | 10,943 |
| Lehman CMBS Funding Inc. | 6,385 |
| Lehman Cmo Inc. | 6,250 |

| Non-Debtor | Amount of LBI Receivables (USD) |
|---|---|
| LIBRO Holdings I Inc. | 493,585 |
| LUBS Inc. | 306,516 |
| LW-LP Inc. | 20,228 |
| MMP Funding Corp. | 73,180 |
| Nopelo Mexico Srl De Cv | 15,310 |
| REPE LBREP II LLC (f/k/a/PAMI LBREP II LLC) | 227,113 |
| RIBCO SPC, Inc. | 6,445 |
| Royalty Asset Investment, LLC | 7,576 |
| Select Asset Inc | 6,341 |
| Structured Asset Securities Corporation II | 23,705 |
| Tax Exempt Affordable Mortgage Acceptance Company LLC | 350,996 |
| The Main Office Management Company LP (f\k\a The Main Office Management Co II LP) | 445,096 |
| W 6 Holdings LLC | 48,924 |
| Wharf Reinsurance Inc | 68,752 |
| **Total** | 15,212,659 |

Schedule G
AGREED LBI NON-DEBTORS RECEIVABLE SETTLEMENT PAYMENT ASSIGNEE

| Non-Debtor | Amount of LBI Receivables (USD) |
|---|---|
| Lehman Brothers Commercial Corporation | 7,501,385 |
| Lehman Brothers Special Financing Inc. | 498,615 |
| **Total** | 8,000,000 |

Schedule H
LBHI ENTITY ALLOWED CUSTOMER CLAIMS AGAINST LBI

| LBHI Entity | Amount of Allowed Customer Claims (USD) |
|---|---|
| Lehman Brothers OTC Derivatives Inc. | 1,329,000,000 |
| Woodlands Commercial Corporation | 523,056,346 |
| Lehman Brothers Special Financing Inc. | 210,000,000 |
| Lehman Brothers Holdings Inc. | 177,000,000 |
| Lehman Pass-Through Securities Inc. | 49,515,928 |
| Lehman Syndicated Loans Inc. | 17,100,000 |
| Lehman Brothers PA LLC | 13,136,732 |
| Lehman Housing Capital Inc. | 1,247,340 |
| **Total** | 2,320,056,346 |

Schedule I
LBHI ENTITY ALLOWED GENERAL UNSECURED CLAIMS AGAINST LBI

| **LBHI Entity** | **Allowed General Claims (USD)** |
|---|---:|
| East Dover Limited | 9,237,182 |
| LB 745 LLC | 8,166,956 |
| Lehman Brothers Commercial Corporation | 733,000,000 |
| Lehman Brothers Commodity Services Inc. | 920,000,000 |
| Lehman Brothers Holdings Inc | 10,216,372,800 |
| Lehman Brothers Holdings Inc (JPM Subrogated Claim) | 1,500,000,000 |
| Lehman Brothers OTC Derivatives Inc. | 178,000,000 |
| Lehman Commercial Paper Inc. | 56,000,000 |
| Structured Asset Securities Corporation | 7,573,516 |
| Bromley LLC | 13,948,785 |
| Clarks Summit I, LLC | 399,797 |
| Cohane Rafferty, LLC | 3,689,746 |
| Equity Strategies Loan LLC | 59,583 |
| Global Commercial Real Estate (Cayman) Inc. | 183,951 |
| Jet Partners LLC | 16,229,729 |
| Laminar Holdings LLC | 3,309,401 |
| LB 745 Leasco I LLC | 16,827,089 |
| LB 745 Leasco II LLC | 16,460,612 |
| LB Investment Management Company Ltd (f/k/a Lehman Brothers India Holdings Cayman II) | 82,812,466 |
| LCPI Properties Inc. | 332,353 |

| LBHI Entity | Allowed General Claims (USD) |
|---|---|
| Lehman ALI  Inc | 95,075 |
| Lehman Brothers Asset Management Inc | 13,348,266 |
| Lehman Brothers Futures Asset Management Corp. | 3,053,839 |
| Lehman Brothers Global Services Ltd. | 2,911,009 |
| LB Hercules Holdings LLC | 21,800,250 |
| Lehman Brothers International Services Inc. | 71,400 |
| Lehman Brothers Investment Holding Company Inc. | 632,166 |
| Lehman Brothers Overseas Inc. | 216,510 |
| Lehman Brothers PA LLC | 5,400,000 |
| Lehman Brothers Private Fund Advisors, LP (f/k/a Lehman Crossroads Investment Advisors, LP) | 60,000 |
| Lehman Housing Capital Inc. | 4,354,925 |
| Lehman Investments Inc. | 11,505,614 |
| Lehman Pass-Through Securities Inc. | 58,271,950 |
| Lehman Residential Opportunities Corp. | 1,818,401 |
| Lehman VIP Investment LDC | 10,059,204 |
| LPJ Aircraft Finance LLC | 11,602,647 |
| Picnic II Inc. | 2,000,000 |
| Principal Transactions II Inc. | 6,611,607 |
| Property Asset Management Inc | 1,934,310 |
| Real Estate Private Equity Inc. | 260,000 |
| RIBCO LLC | 26,915,598 |
| Stockholm Investments Ltd | 2,177,869 |

| LBHI Entity | Allowed General Claims (USD) |
|---|---|
| West Dover, LLC | 16,095,394 |
| **Total** | 13,983,800,000 |

Schedule J
ALLOWED SUBORDINATED CLAIMS AGAINST LBI[1]

| Claimant | Allowed Amount (USD) |
|---|---|
| LB I Group Inc. | 746,010,459 |
| Lehman Brothers Commercial Corporation | 3,300,171,192 |
| LB Funding Corp. II | 1,502,279,948 |
| Lehman Brothers Special Financing Inc. | 8,640,462,498 |
| **Total** | 14,188,924,097 |

---

[1] Included in the amounts above are subordinated claims previously allowed in the SIPA Proceeding pursuant to certain Letters of Determination issued by the LBI Trustee, dated November 5, 2010.

Schedule K
ALLOWED MISDIRECTED WIRES ADMINISTRATIVE CLAIM AGAINST LBI

| **LBHI Entity** | **Amount (USD)** |
|---|---|
| Lehman Brothers Commercial Corporation | 11,252,078 |
| Lehman Brothers Special Financing Inc. | 4,918,473 |
| Lehman Pass-Through Securities Inc. | 10,902,338 |
| **Total** | 27,072,889 |

Schedule L
AGREED POST PETITION DIVIDENDS AND INTEREST TO BE PAID BY LBI

| **LBHI Entity** | **Amount (USD)** |
|---|---|
| Lehman Brothers Holdings Inc. | 28,860 |
| Lehman Brothers Holdings Inc. as assignee for R3 | 2,006,628 |
| Lehman Brothers OTC Derivatives Inc. | 9,892,821 |
| Lehman Brothers Special Financing Inc. | 21,940,022 |
| Lehman Pass-Through Securities Inc. | 87,556,719 |
| Woodlands Commercial Corporation | 771,349 |
| **Total** | 122,196,399 |

Schedule M
CONTROLLED ENTITY JOINDER

AMENDMENT TO SETTLEMENT AGREEMENT

Pursuant to Section 19.02 of that certain Settlement Agreement, dated February 21, 2013, between the LBI Trustee and the LBHI Entities (the "Settlement Agreement")[1], the undersigned (the "Joining Entity"), hereby agrees to join and be party to the Settlement Agreement as an LBHI Entity Releasing Party and an LBI Released Party for the sole purpose of providing and receiving the mutual releases set forth in Sections 6.01 and 6.02 of the Settlement Agreement. The Joining Entity agrees to be bound only by the terms of the Settlement Agreement set forth in Sections 6.01 and 6.02 thereof and any terms and provisions incorporated by reference in those sections of the Settlement Agreement.

[NAME OF ENTITY]

_____

By:
Title:

---

[1] Unless otherwise specified or defined herein, capitalized terms shall have the respective meanings ascribed to such terms in Section 1.01 of the Settlement Agreement.

Schedule N
Agreed PIK Notes Settlement Payees

| Agreed PIK Notes Settlement Payee | Amount (USD) |
|---|---:|
| Lehman Brothers OTC Derivatives Inc. | 280,000,000 |
| Lehman Brothers Special Financing Inc. | 35,000,000 |
| Lehman Brothers Holdings Inc. | 35,000,000 |
| **Total** | 350,000,000 |

Schedule O
ADDITIONAL CUSTOMER CLAIM SECURITIES

# [TO BE FILED UNDER SEAL]

Schedule P
CUSTOMER CLAIM SECURITIES INCLUDED IN $2,320,056,346.00 VALUATION

# [TO BE FILED UNDER SEAL]

Schedule Q
DISTRIBUTION OF CASH IN RESPECT OF
LBHI ENTITY ALLOWED CUSTOMER CLAIMS

| **LBHI Entity** | **Amount (USD)** |
|---|---|
| Lehman Brothers Holdings Inc. | 140,508,775 |
| Lehman Brothers Holdings Inc. as assignee for R3 | 69,390 |
| Lehman Brothers OTC Derivatives Inc. | 1,106,526,226 |
| Lehman Brothers PA LLC | 20,211,288 |
| Lehman Brothers Special Financing Inc. | 138,726,544 |
| Lehman Housing Capital Inc. | 1,247,340 |
| Lehman Pass Through Securities Inc. | 30,606,765 |
| Lehman Syndicated Loans Inc. | 17,100,000 |
| Woodlands Commercial Corporation | 522,426,790 |
| **Total** | 1,977,423,118 |

Schedule R

CERTIFICATED SECURITIES DELIVERED TO LBI OR THE LBI TRUSTEE

Stock certificates issued by the following entities:

1. Lehman Brothers (Israel) Inc.
2. Lehman Brothers Derivative Products Inc.
3. Lehman Brothers Financial Products Inc.
4. Lehman Brothers Investment Holding Company Inc.
5. Lehman Brothers Overseas Inc.
6. Lehman Brothers Special Financing Inc.
7. Lehman Commercial Paper Inc.
8. Lehman Realty & Development Corp.
9. RIBCO SPC, Inc.
10. Lehman Brothers International Services Inc.
11. Lehman Brothers Holdings International Inc.
12. LB Leasing Inc.
13. FRAH Special Services Inc.
14. LB I Group Inc.
15. MBR/GP Corp.
16. Lehman Brothers Europe Inc.
17. Lehman Brothers Finance (Japan) Inc.

Schedule S
AFFIDAVIT OF LOST CERTIFICATE

STATE OF New York        )
                         :   ss.:
COUNTY OF New York       )

AFFIDAVIT OF LOST CERTIFICATE

The undersigned, being duly sworn, hereby declares that:

1.      On September 19, 2008, the Honorable Gerard E. Lynch, District Judge of the United States District Court for the Southern District of New York, entered the LBI Liquidation Order which, among other things, (i) appointed James W. Giddens as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI") pursuant to the Securities Investor Protection Act of 1970, as amended ("SIPA"), and (ii) removed the SIPA liquidation proceeding of LBI to the United States Bankruptcy Court for the Southern District of New York pursuant to section 78eee(b)(1) of SIPA.

2.      I am the court-approved trustee for the liquidation of the business of LBI, and I am acting solely in that capacity (and not individually) in giving this affidavit for the benefit of Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers OTC Derivatives Inc. ("LOTC", with each of LBHI, LBSF and LOTC, an "Assignee" and together, the "Assignees").

3.      The possessory collateral described in the chart below along with their corresponding transfer powers (collectively, the "Collateral") were delivered to LBI to be held as collateral security under that certain PIK Note and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), dated as of September 19, 2008 and executed by Lehman ALI Inc. ("Obligor") in favor of LBI.

**Stock Certificates:**

| Issuer | Certificate No. | Registered Owner | Number and Class of Equity Interest |
|--------|-----------------|------------------|-------------------------------------|
|        |                 |                  |                                     |

4.      I have no knowledge of the whereabouts of the Collateral. The Collateral cannot be located at the offices of LBI and is therefore assumed to have been lost, misplaced or destroyed and cannot now be produced.

5.      LBI has not nor do I have actual knowledge (after reasonably diligent search) of anyone who has, sold, assigned, pledged, transferred, deposited under any agreement or hypothecated the Collateral or any interest therein, or signed any power of attorney or any authorization respecting the same that is now outstanding and in force, or otherwise disposed of

the same, except as provided in the Settlement Agreement by and among LBI, the Assignees and the Obligor, among others, dated as of February 21, 2013.

6. If LBI should find or recover the Collateral, I shall promptly and without consideration surrender the Collateral to or at the direction of LBHI (or its counsel).

7. The LBI estate will indemnify, defend and hold harmless each Assignee from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges and expenses of any kind which may at any time be imposed on, incurred by or asserted against such Assignee in any way relating to or arising out of the loss, misplacement or destruction of the applicable Collateral.

8. This affidavit shall be governed by the law of the State of New York.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the date first written above.

> JAMES W. GIDDENS, AS TRUSTEE FOR THE LIQUIDATION OF LEHMAN BROTHERS, INC.

By:_____
    Name:
    Title:

Sworn to and subscribed
before me this _____ day
of _____, 2013.

_____

Schedule T

FORM OF POST-FILING INCOME METHODOLOGY AND ALLOCATION ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

    LEHMAN BROTHERS INC.,            Case No. 08-1420 (JMP) SIPA

                  Debtor.

### ORDER GRANTING TRUSTEE'S SECOND
### MOTION FOR ORDER APPROVING THE
### <u>TRUSTEE'S ALLOCATION OF PROPERTY</u>

        Upon consideration of the Second Motion for Order Approving the Trustee's Allocation of Property, filed Dec. 1, 2011, and the exhibits thereto, Docket No. 4760 (the "Second Allocation Motion"), the Affidavit of Daniel T. McIsaac, executed on Dec. 1, 2011, and the exhibits thereto, Docket No. 4761, the Declaration of Leonard J. Legotte, executed on Nov. 30, 2011, and the exhibit thereto, Docket No. 4763, the Declaration of Gabriela Huaman, executed on Dec. 1, 2011, and the exhibit thereto, Docket No. 4765, the Declaration of Kleber Rodriguez, executed on Nov. 30, 2011, and the exhibits thereto, Docket No. 4762, and the Declaration of Moshe Sinensky, executed on Dec. 1, 2011, Docket No. 4764; the Statement in Further Support of the Second Motion for Order Approving the Trustee's Allocation of Property, filed Apr. 30, 2012, Docket No. 5058 (the "Update to Second Allocation Motion"), the Supplemental Declaration of Gabriela Huaman, executed on Apr. 28, 2012, and the exhibit thereto, Docket No. 5061, the Supplemental Declaration of Moshe Sinensky, executed on Apr. 27, 2012, Docket No. 5060, and the Declaration of Marlo Karp, executed on Apr. 28, 2012, Docket No. 5059; the Supplement to the Second Motion For Order Approving the Trustee's Allocation of Property, filed Jan. 31, 2013, Docket No. 5685, and the exhibits thereto (the

"Supplement to Second Allocation Motion"), the Declaration of Daniel T. McIsaac in Support of

Supplement to Second Allocation Motion, executed on Jan. 30, 2013, Docket No. 5686, the

Second Supplemental Declaration of Moshe Sinensky in Support of Supplement to Second

Allocation Motion, executed on Jan. 31, 2013, Docket No. 5688, and the Second Supplemental

Declaration of Gabriela Huaman in Support of Supplement to the Second Allocation Motion,

executed on Jan. 31, 2013, and the exhibit thereto, Docket No. 5687; and the Second Supplement

to Second Motion for Order Approving the Trustee's Allocation of Property, filed _____,

and the exhibits thereto (the "Second Supplement to Second Allocation Motion"); and it

appearing that due and proper notice of the Second Allocation Motion, the Update to Second

Allocation Motion, the Supplement to Second Allocation Motion, and the Second Supplement to

Second Allocation Motion, and the relief requested therein has been given in accordance with

this Court's Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules

1015(c) and 9007 Implementing Certain Notice and Case Management Procedures and Related

Relief, dated Nov. 7, 2008 (the "Case Management Order"), and that no other or further notice

needs to be given; and the Court having considered the Second Allocation Motion, the Update to

Second Allocation Motion, the Supplement to Second Allocation Motion, and the Second

Supplement to Second Allocation Motion, and the supporting affidavits, declarations, and

representations of counsel to James W. Giddens, as trustee for the liquidation of Lehman

Brothers Inc. ("LBI" or "Debtor") (the "Trustee"), regarding discussions with parties-in-interest

who have either filed objections to the Second Allocation Motion or whose time to object has

been extended by agreement of the Trustee (the "Interested Parties"), responsive pleadings, the

arguments of counsel and the record in this case; and the Trustee having provided notice to the

Interested Parties regarding this Order; and the Court having determined that the legal and

factual bases set forth in the record establish just cause for the relief granted herein, and

consistent with the Order Approving Trustee's Motion for Allocation of Property of the Estate, dated Mar. 2, 2010 (the "First Allocation Order") and the legal principles set forth therein; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY**:

ORDERED that the relief requested in the Second Allocation Motion, the Update to Second Allocation Motion, the Supplement to Second Allocation Motion, and the Second Supplement to Second Allocation Motion be, and is hereby, granted, as provided herein;

### A.    Pre-Petition Property

ORDERED that, consistent with SIPA § 78*lll*(4), the Trustee is authorized to allocate free and clear to the fund of customer property those securities, cash, or cash equivalents shown as "Core Customer" on Exhibit A hereto, together with any proceeds from redemption or maturity of, or other realizations of principal of, such securities received by the Trustee, or increase in value derived to date or in the future from such items; and it is further

ORDERED that pursuant to SIPA § 78*lll*(4), the Trustee is authorized to allocate free and clear to the fund of customer property securities or cash corresponding to failures by LBI to comply with its obligations under applicable laws, rules and regulations to set aside or hold property for the benefit of customers, shown as "Compliance Issues" on Exhibit A hereto, together with any proceeds from redemption or maturity of, or other realizations of principal of, such securities received by the Trustee, or increase in value derived to date or in the future from such items; and it is further

ORDERED that the property allocated to the fund of customer property hereunder and any proceeds thereof are allocated free and clear of any liens, claims or interests other than the claims and interests of customers holding

allowed customer claims under SIPA and shall be used exclusively to satisfy allowed customer claims unless and until such claims have been satisfied in full, in which event, any customer property that is not used to satisfy allowed customer claims shall be allocated to the general estate of LBI; and it is further

ORDERED that the Trustee is authorized to allocate property, other than customer property (as that term is defined in SIPA § 78*lll*(4)), reserves, and cash dividends and interest received by the LBI estate subsequent to September 19, 2008 (the "Filing Date") with respect to securities in the LBI estate ("Post-Petition D&I"[1]), free and clear to the general estate of LBI; and it is further

ORDERED that the Trustee is authorized to allocate to the general estate of LBI on the same terms: (i) other property hereafter recovered by the Trustee that is not customer property; and (ii) such property allocated to the fund of customer property, if any, that is not needed to satisfy allowed customer claims pursuant to SIPA § 78fff-2(c); and it is further

ORDERED that the Trustee is authorized to distribute customer property to customers with allowed claims as follows, except as otherwise provided for in or contemplated by the Settlement Orders (defined below): (i)(x) to the extent that the Trustee has securities to deliver in respect of customers' allowed claims, the Trustee will deliver those securities in satisfaction of the customers' allowed claims; (y) to the extent that the Trustee does not have securities to deliver in

---

[1]. Post-Petition D&I does not include amounts received in connection with redemptions and maturities (or other realizations of principal) or amounts earned on the Trustee's investments. (See Decl. of Gabriela Huaman in Support of Second Mot. for Order Approving Trustee's Allocation of Property of the Estate, executed on Dec. 1, 2011, Docket No. 4765, ¶¶ 4, 7, 23; Supp. Decl. of Gabriela Huaman in Support of Second Mot. for Order Approving Trustee's Allocation of Property, executed on Apr. 28, 2012, Docket No. 5061, ¶¶ 5, 15; Second Supp. Decl. of Gabriela Huaman in Support of Second Mot. for Order Approving Trustee's Allocation of Property ¶ 4 & Ex. A.)

respect of customers' allowed claims due to such securities having matured or redeemed (including as a result of corporate actions and the like such as mergers) since the Filing Date, or to the extent that the Trustee has such securities to deliver but otherwise has realized the principal of such securities since the Filing Date, the Trustee will deliver proceeds of the foregoing actually received by the LBI estate in satisfaction of the customers' allowed claims; and (z) to the extent that the Trustee does not have securities to deliver in respect of customers' allowed claims (except for the reasons described in clause (y)), the Trustee will deliver cash equal to the Filing Date value of the securities in satisfaction of the customers' allowed claims (all of the foregoing (x), (y) and (z) as determined after giving effect to all corporate actions (including without limitation stock dividends) and the like that have occurred since the Filing Date); and (ii) the Trustee will distribute cash to customers with allowed claims for cash; and it is further

**B.**   **Post-Petition D&I**

**ORDERED** that the Trustee is authorized to (i) treat Post-Petition D&I, in amounts not to exceed the Post-Petition D&I actually received by the LBI estate with respect to the to-be-delivered (or redeemed or matured) securities described in the immediately preceding paragraph of this Order (or, to the extent applicable, with respect to the direct or indirect predecessors to such securities back to the Filing Date in relation to all corporate actions and the like that have occurred since the Filing Date) (the "Customer-Allocated D&I"), for all purposes free and clear of any liens, claims or interests other than the claims and interests of distributee claimants, and, except as otherwise provided for in or contemplated by

the Settlement Orders (defined below), (ii) distribute the Customer-Allocated D&I
on a priority basis to the customer claimants receiving in-kind delivery of
securities (or cash proceeds of matured or redeemed securities) pursuant to the
immediately preceding paragraph of this Order; and it is further

**ORDERED** that property distributed to customers hereunder shall be subject to
applicable withholding taxes, if any, but the LBI estate shall not otherwise be subject to tax with
respect to such property; and it is further

**ORDERED** that nothing herein shall or shall be deemed to: (i) adjudicate or impair
rights as among claimants, or as between claimants and third parties, with respect to property
distributed hereunder; (ii) adjudicate the appropriate allocation and disposition of Post-Petition
D&I related to securities allocated to the fund of customer property that are not distributed to
customers hereunder; (iii) alter rights as among the Trustee, Lehman Brothers International
(Europe) (in Administration) ("LBIE"), and Lehman Brothers Holdings Inc. and affiliated
debtors as set forth in (x) the Order Approving Settlement Agreement Between the Trustee,
Lehman Brothers International (Europe) (in Administration) and the LBIE Administrators,
Docket No. ____ (the "LBIE Settlement Approval Order") and (y) the Order Approving
Settlement Agreement Between the Trustee and the LBHI Entities, Docket No. ____
(collectively, the "Settlement Orders"); or (iv) affect the right of LBIE to assert, in the event that
the LBIE Settlement Approval Order is not entered, that property held by third-party custodians
pursuant to tri-party custody agreements should be treated differently from other property, or the
Trustee's right to oppose any such assertions; and it is further

**ORDERED** that nothing in the Second Allocation Motion, the Update to Second
Allocation Motion, the Supplement to Second Allocation Motion, the Second Supplement to

Second Allocation Motion, or this Order shall affect the Trustee's ongoing obligation to maintain

a reserve for the Trustee's litigation with Barclays Capital, Inc. and Barclays Bank PLC

(collectively, "Barclays"),[2] which reserve is currently in the amount of $4.6 billion, nor the

Trustee's agreement with Barclays that, pending final determination of said litigation, he will

also reserve for any property not accounted for in the current $4.6 billion reserve and recovered

by the Trustee from third parties that Barclays claims constitutes property held to secure

obligations under the exchange-traded derivatives that were transferred to Barclays Capital Inc.

in the sale of assets pursuant to the Sale Orders;[3] and it is further

     **ORDERED** that, upon approval by the Court of paragraph four of the LBIE Settlement

Approval Order, the Trustee shall establish and maintain a reserve in the amount of $777 million

as shown on Exhibit A hereto and in accordance with said paragraph four of the LBIE Settlement

Approval Order; and it is further

     **ORDERED** that any stay of this Order provided by the Bankruptcy Rules (including

Bankruptcy Rule 6004) shall not be applicable to this Order, and this Order shall be effective and

enforceable immediately upon entry; and it is further

     **ORDERED** that the Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order; and it is further

---

[2].     This litigation is in connection with: (i) the Trustee's Motion for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated Sept. 15, 2009, Docket No. 1682; (ii) the Trustee's adversary complaint and amended adversary complaint against Barclays, dated Nov. 16, 2008 and July 15, 2011, respectively, Adv. Proc. 09-01732 Docket Nos. 1, 11; and (iii) Barclays' Motion to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated Jan. 29, 2010, Docket No. 2581. The Court's decision on these motions has been appealed. See In re Lehman Brothers Inc., Nos. 11-6052, 11-6053 (S.D.N.Y.) and In re Lehman Brothers Holdings Inc., Nos. 12-2322, 12-2328, 12-2657, 12-2933 (2d Cir.).

[3].     The Sale Orders are: (i) Order under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated Sept. 19, 2008 (Case No. 08-13555 Docket No. 258); and (ii) Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings, Inc. Chapter 11 Proceedings, dated Sept. 19, 2008 (Docket No. 3).

**ORDERED** that this Order shall be effective and enforceable immediately upon entry

and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated: New York, New York
_____ \_\_\_\_\_, 2013

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A TO FORM ORDER

### Proposed Allocation of Trustee-Controlled Property ($25,666[1])

| Allocation Item | Customer | Remaining |
|---|---|---|
| Barclays Appeal Reserve — $4,600[2] | | $21,066 |
| Reserve for Third Party Contingent Liability — $777[3] | | $20,289 |
| Post-Petition Dividends & Interest — $1,727[4] | | $18,562 |

**Customer Items**

   Core Customer

| | | |
|---|---|---|
| Securities | $10,396 | |
| Cash | $1,691 | |
| OCC Securities | $467 | |

   Compliance Issues

| | | |
|---|---|---|
| Uncured Shortfalls from First Allocation Motion | $63[5] | |
| Suspense Account Debits | $1,811 | |
| Unprotected Customer Property | $383 | |
| Shortfall Securities | $193 | |
| Money Market Fund Reversal | $180 | |

---

[1]. In millions, as of March 30, 2012. (See Seventh Interim Report.)

[2]. Held in reserve pending outcome of Trustee's appeal from Judgment on Appeal from Bankruptcy Court Decision, filed July 16, 2012, Barclays Capital Inc. v. Giddens (In re Lehman Brothers Inc.), Nos. 11-CV-6052 (KBF) & 11-CV-6053 (KBF) (S.D.N.Y.).

[3]. In accordance with and subject to approval of paragraph four of the Proposed Order Approving Settlement Agreement Between The Trustee, Lehman Brothers International (Europe (In Administration) ("LBIE") And The LBIE Administrators, this amount will be set aside for the Dedicated Reserve (as that term is defined in the settlement agreement (the "Settlement Agreement") made and entered into as of February [ ], 2013 by and among the Trustee, LBIE, and the LBIE administrators), solely for payment to LBIE and/or Barclays (as that term is defined in the Settlement Agreement), in accordance with and subject to the terms of the Settlement Agreement. The Dedicated Reserve shall be reduced and/or eliminated solely in accordance with and subject to the terms of the Settlement Agreement.

[4]. This amount excludes dividends and interest received in connection with the Trustee's investments.

[5]. This amount takes into account the reserve requirement as originally calculated together with Court-approved compliance issues identified in the First Allocation Motion as well as recoveries and corrections related to those compliance issues. (See Second Allocation Motion ¶¶ 23, 67, 70, 107.)

**Totals**                                  **$15,185**         **$3,377**

# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

      LEHMAN BROTHERS INC.,

                   Debtor.

Case No. 08-01420 (JMP) SIPA

---

### [PROPOSED] ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN THE TRUSTEE AND THE LBHI ENTITIES

Upon the motion dated February 26, 2013 (the "Motion")[1] of James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), seeking, *inter alia*, entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the settlement and compromise (the "Settlement Agreement") entered into by the Trustee and the LBHI Entities (collectively, the "Parties"), dated as of February 21, 2013; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with SIPA § 78eee(b)(4); and venue being proper before this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa; and

Upon consideration of the Motion, any objections thereto, briefs and arguments of counsel; and due and proper notice of the Motion having been provided, including in accordance with the Amended Case Management Order, to all parties in interest, and it appearing that the notice of the Motion is sufficient, adequate, and timely under the circumstances of this case and that no other or further notice need be provided; and a reasonable opportunity to object or be

---

1.   Capitalized terms not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

heard regarding the Motion having been given to all such parties; and a full and fair opportunity

having been afforded to litigate all issues raised in all objections, or which might have been

raised; and all objections having been withdrawn or overruled;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The Parties have engaged in substantial information exchange and reconciliation with respect to

the disputes being settled pursuant to the Settlement Agreement.

B. In evaluating the reasonableness of the settlement, the Court has taken into consideration the

Motion, as well as the supporting documentation and other evidence supplied by the Trustee.

C. After careful consideration of the record, the Court finds that the settlement of the Parties'

disputes, including claims asserted by the Parties against each other in their respective

bankruptcy and SIPA liquidation proceedings, as reflected in the Settlement Agreement is fair

and within the range of reasonableness.  The Court has canvassed the issues to evaluate the

reasonableness of the settlement and finds that:

    a)    a full litigation of the disputes resolved by the Settlement Agreement
would be extremely complex, protracted and expensive, and would
significantly delay the Trustee's ability to make distributions to customers
and creditors of the LBI estate and to complete this SIPA liquidation;

    b)    the Settlement Agreement is in the best interests of the LBI estate and its
customers and creditors, is supported by good business reasons, and
enables the Trustee to successfully complete his administration of this
SIPA liquidation;

    c)    both the Trustee's counsel and the LBHI Entities' counsel have substantial
experience and are competent in advising on complex bankruptcy and
litigation matters and in negotiating commercial resolutions thereof; and

    d)    the Settlement Agreement was negotiated, proposed, and entered into by
the Trustee and the LBHI Entities without collusion, in good faith, and
from arm's length bargaining positions.

D. Each of the releases provided for in the Settlement Agreement, which include, among other

things, releases of Causes of Action that allege alter ego, veil piercing, enterprise liability or

similar theories of liability or that otherwise seek to disregard the corporate form of LBI and

LBHI and Causes of Action brought directly, indirectly, derivatively, representatively or in any

other capacity, (i) is within the Court's jurisdiction, (ii) is essential to administering the LBI

estate, (iii) is an integral element of the Settlement Agreement and/or to its effectuation, (iv)

confers material benefits on, and is in the best interests of, the LBI estate, and (v) is important to

the overall objectives of the Settlement Agreement.

E.  The Settlement Agreement reflects an integrated and comprehensive settlement of disputes

between the Parties, including claims asserted, or that could have been asserted, by the Parties

against each other in their respective bankruptcy and SIPA liquidation proceedings, and each

component and protection contained therein and in this Order, including the releases, is an

integral part thereof.  The entry of this Order as a Final Order as described in the Settlement

Agreement is necessary for the Settlement Agreement to become effective and achieve its goals,

which are in the best interest of the LBI estate.

F.  The Settlement Agreement brings certainty to the LBI estate and will permit the Trustee to

effectively complete the SIPA liquidation proceeding of LBI.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Motion is GRANTED.

2.  Any objections to the Motion that have not otherwise been withdrawn or resolved are overruled.

3.  The Settlement Agreement, including all of its terms, covenants, waivers, releases, assignments,

distributions, conditions, and the rights, duties and obligations of the Parties set forth therein, is

approved in its entirety and shall become effective on the Effective Date as set forth in the

Settlement Agreement.

4.  The Parties are authorized to execute, deliver and carry out all transactions and perform all actions contemplated by the Settlement Agreement in its entirety and are further authorized to take any necessary or appropriate steps to effectuate and implement the Settlement Agreement in accordance with its terms.  No consents or regulatory approvals are required to implement the Settlement Agreement, this Order, or the relief provided herein.

5.  Upon the occurrence of the Effective Date:

   a.  The LBHI Entities and the Trustee shall have allowed claims against each other in the amounts, classifications and priorities set forth in and subject to the terms of the Settlement Agreement.

   b.  The Trustee is authorized and directed to make the distributions to the LBHI Entities of the cash and securities specified in the Settlement Agreement in respect of the LBHI Entity Allowed Claims in accordance with and subject to the terms of the Settlement Agreement.

   c.  All proofs of claim filed by the LBHI Entities against LBI and all proofs of claims filed by the LBI Trustee on behalf of LBI against the LBHI Entities, other than as allowed pursuant to the terms of the Settlement Agreement, and all other claims between the Parties not expressly allowed or preserved in the Settlement Agreement shall be expunged, disallowed, and released in accordance with the terms of the Settlement Agreement.

   d.  The releases set forth in the Settlement Agreement, which include the release of, among other things, Causes of Action that allege alter ego, veil piercing, enterprise liability or similar theories of liability or that otherwise seek to disregard the corporate form of LBI and LBHI and Causes of Action brought directly, indirectly, derivatively,

representatively or in any other capacity, are approved and, except as otherwise expressly provided in the Settlement Agreement, shall be effective upon the occurrence of the Effective Date.

e. In accordance with and subject to the terms of the Settlement Agreement, the Parties are permanently enjoined from pursuing in any manner any Claims released pursuant to the Settlement Agreement.

f. Unless otherwise provided for in the Settlement Agreement, all provisions of the Settlement Agreement shall be binding on the Parties.

g. The Objection filed by the LBHI Entities on September 28, 2011 (ECF No. 4584) to the Trustee's determination of their claims shall be deemed withdrawn.

h. The Trustee shall promptly file on the Court's docket notice of the Effective Date.

6. The distributions to be made by the Trustee in respect of the LBHI Entity Allowed Claims in accordance with and subject to the terms of the Settlement Agreement will be a legal, valid, and effective transfer of all of the legal, equitable and beneficial right, title and interest of LBI and the Trustee in those assets, and free and clear of all liens, claims, and encumbrances.

7. All Extended Lien Claims of any Person, other than the Parties, with respect to an LBHI Extended Lien Asset or an LBI Extended Lien Asset that are not asserted prior to this Order becoming a Final Order shall be deemed waived and all distributions to the LBHI Entities and the Trustee on Allowed Claims under the Settlement Agreement shall be free and clear of any Extended Lien Claim.

8. Except as provided for in the preceding paragraph of this Order and Section 3.03 of the Settlement Agreement, nothing in this Order or in the Settlement Agreement affects the rights of Persons who are not Parties to the Settlement Agreement (including Duplicate Claimants, as

defined in the Motion), other than with respect to the ability of all such Persons to bring

derivative claims on behalf of one or more of the Parties against another Party, such non-direct,

derivative claims being expressly released under the terms of the Settlement Agreement.

9.  The failure to specifically include any particular provision of the Settlement Agreement in this

Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the Trustee's implementation of the transactions contemplated in the Settlement

Agreement be approved in its entirety.

10. All Persons are prohibited and enjoined from taking any action to adversely affect or interfere

with the ability of the Parties to transfer property and claims pursuant to and subject to the terms

of the Settlement Agreement.

11. In the event of any conflict between the Settlement Agreement and this Order, the terms of the

Settlement Agreement shall govern.

12. Nothing contained in any subsequent settlement, or in any other order, decision, or judgment, nor

any act of any Party, shall alter, conflict with, or derogate from the provisions of the Settlement

Agreement or this Order, except pursuant to (i) a successful appeal or certiorari from this Court

or (ii) an order of this Court approving an amendment or modification to the Settlement

Agreement as agreed by the Parties in accordance with the Settlement Agreement's terms.

13. The Court shall retain jurisdiction to hear and determine all matters arising from or related to this

Order.

14. This Order shall be effective and enforceable immediately upon entry and shall constitute a final

order within the meaning of 28 U.S.C. § 158(a).  To the extent applicable, Bankruptcy Rule

6004(h) is hereby waived.


Dated: New York, New York
_____, 2013


_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

# **PD 26**

# **FirstBank's Limited Objection**

K&L GATES LLP
*Attorneys for FirstBank Puerto Rico*
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile:  (212) 536-3901
Richard S. Miller
Robert T. Honeywell
Brian D. Koosed

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— :
                                                      :
In re:                                                :
                                                      :
LEHMAN BROTHERS INC.,            :        Case No. 08-01420 (JMP) SIPA
                                                      :
                              Debtor.          :
                                                      :
————————————————————:

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF**
**FIRSTBANK PUERTO RICO WITH RESPECT TO MOTION PURSUANT TO**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR ENTRY OF**
**ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN**
**THE TRUSTEE AND THE LBHI ENTITIES [Dkt. #5784]**

FirstBank Puerto Rico ("FirstBank"), by and through its undersigned counsel, hereby

submits this limited objection and reservation of rights with respect to the motion filed herein on

February 26, 2013 [Dkt. #5784] (the "Trustee Motion"), by James W. Giddens (the "Trustee"),

as Trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI") under the Securities

Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*. ("SIPA"), for approval of a settlement

agreement dated February 21, 2013, attached as Exhibit A to the Trustee Motion (the "Settlement

Agreement"), between the Trustee and the LBHI Entities (as defined in the Trustee Motion), as

follows:[1]

1.    FirstBank previously filed herein its motion, dated August 1, 2012 [Dkt. #5197], for an Order: (1) pursuant to Section 502(j) of the Bankruptcy Code and Bankruptcy Rule 9024, for reconsideration of the Trustee's September 15, 2010 letter determination denying FirstBank's customer claim under SIPA, numbered 800003257 (the "Customer Claim"); and (2) confirming FirstBank's right, pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule 9014-1, to intervene in the contested matter initiated by the customer claim objection filed by the LBHI Entities, dated September 28, 2011 [Dkt. #4584], for the limited purpose of preserving FirstBank's Customer Claim (the "FirstBank Motion").  FirstBank filed a reply, dated August 13, 2012 [Dkt. #5224], in further support of the FirstBank Motion, and it has since been adjourned by agreement with the Trustee.[2]  As set forth in the FirstBank Motion, FirstBank asserts a claim for customer priority under SIPA for approximately $61.5 million, based on government securities that FirstBank entrusted to LBI for safekeeping and for use as collateral for swap transactions with LBSF.

2.    FirstBank has no objection to the Settlement Agreement, based on the Trustee's representations in the Trustee Motion that (i) FirstBank's Customer Claim against LBI is not covered by or impacted by the Settlement Agreement, and (ii) the settlement will provide no consideration to LBSF or other LBHI Entities with respect to the assets covered by FirstBank's Customer Claim.  *See* Trustee Motion, at ¶¶ 40, 57; Kiplok Decl. ¶¶ 34, 44. FirstBank files this limited objection solely to reserve its rights with respect to its prosecution of the FirstBank Motion.

---

[1] Capitalized terms used but not defined herein have the meaning set forth in the Trustee Motion.

[2] The FirstBank Motion is currently scheduled for the hearing on April 24, 2013 [Dkt. #5827].

3.    The Trustee Motion states that FirstBank is a "Duplicate Claimant" – *i.e.*, a counterparty to LOTC or LBSF that filed a claim against LBI with respect to a Collateral Account that was also claimed against LBI by LOTC or LBSF, as applicable. *See* Trustee Motion, at ¶¶ 38-40; Kiplok Decl., at ¶¶ 32-34.[3]

4.    The Trustee Motion further treats FirstBank as an "Excluded Duplicate Claimant," whom the Trustee states is "not impacted by the Settlement Agreement, but will be the subject of a future objection and motion to expunge by the Trustee." *See* Trustee Motion, at ¶ 57; Kiplok Decl., at ¶ 44. As the Trustee states:

> Claims filed by Duplicate Claimants against LBI as to which the claimed assets are not included in the allowed claims of LOTC or LBSF under the Settlement Agreement (the "Excluded Duplicate Claimants") will be the subject of a separate objection and motion to expunge by the Trustee. LBSF concurs with the Trustee that for accounts that did not contain assets when the SIPA proceeding began, no recovery is available, and such accounts are not included within LBSF's allowed claim or covered by the Settlement Agreement. On August 1, 2012, Duplicate Claimant First Bank of Puerto Rico filed a Motion for Reconsideration and Intervention in connection with its claim relating to such an account.

*See* Trustee Motion, at ¶ 40; Kiplok Decl., at ¶ 34.

5.    The Trustee is thus representing to the Court that "such accounts" – *i.e.*, accounts which the Trustee alleges did not contain assets when this SIPA proceeding began – are not being included in LBSF's allowed claim and are not covered by the Settlement Agreement. The Trustee is also clearly stating its belief that FirstBank's Customer Claim relates to "such an account." By the Trustee's own definition, FirstBank is an "Excluded Duplicate Claimant"

---

[3] This is consistent with the Trustee's denial notice, dated September 15, 2010, which denied FirstBank's Customer Claim on the basis that it was allegedly a "duplicate and/or amendment" of a customer claim filed by LBSF (number 900006430). *See* FirstBank Motion, at ¶ 61.

because its Customer Claim involves assets that are not being included in the allowed claim of
LBSF under the Settlement Agreement.[4]

6.     FirstBank reserves its right to contest the Trustee's determination that
FirstBank's Customer Claim is duplicative of any claims filed against LBI by LBSF or any other
LBHI Entity.  As set forth in the FirstBank Motion, FirstBank has a customer priority claim
against LBI that is distinct in both amount and legal basis from any claims asserted (or
assertable) by LBSF or any other LBHI Entity against LBI.

7.     FirstBank further reserves its right to contest the Trustee's suggestion
(Trustee Motion at ¶ 40) that if a customer's collateral account with LBI "did not contain assets
when the SIPA proceeding began," then no recovery is available in a SIPA proceeding.  As is
well established, the basis of a customer claim in a SIPA proceeding is the customer's net equity
balance in its securities account with the insolvent broker-dealer – *i.e.*, the customer's account
balance as of the SIPA filing – and *not* whether the broker-dealer still has the actual securities on
hand.  *See* SIPA, 15 U.S.C. at § 78fff-2(c)(1)(B) (customer property is to be distributed ratably to
customers on the basis of their respective "net equities"); § 78lll(11) (defining "net equity" as
"the dollar amount of the account or accounts of a customer," determined by calculating "the
sum which would have been owed" to the customer if the broker-dealer had liquidated "all
securities positions" of the customer on the SIPA filing date, less any debt owed by the customer
to the broker-dealer).

---

[4] This exclusion of FirstBank's claim from the settlement is confirmed by the terms of the Settlement Agreement.
The Settlement Agreement contains no definition of "Excluded Duplicate Claimants."  But it defines "Duplicate
Claim Accounts," "Duplicate Claim Counterparties" and "Duplicate Claims" – all cross-referenced to a dozen
"Duplicate Claim Accounts" listed on Schedule C – and provides for procedures for the resolution of "Duplicate
Claims" in Article XI of the Settlement Agreement.  FirstBank is not listed on such Schedule C, so its Customer
Claim is not one of the "Duplicate Claims" covered by the Settlement Agreement.

8.      A SIPA proceeding is often triggered by precisely the situation where a broker-dealer does *not* have the securities on hand to satisfy all of its customers' net equity balances.  SIPA thus requires that distributions be made *pro rata* out of the pool of available customer property, regardless of whether the broker-dealer has previously used or disposed of any securities related to any particular customer accounts.  *See In re MF Global Holdings Ltd.*, 2013 WL 139594 at *1 (S.D.N.Y. Jan. 11, 2013), *citing Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 88 (S.D.N.Y. 2011) (SIPA trustee creates "a pool of assets" to pay customers ratably based on their net equity claims).  The SIPA statute expressly takes into account the possibility that a broker-dealer might have sold or otherwise disposed of a customer's securities, and grants "customer" status regardless of any such transfers.  *See* FirstBank Motion, at ¶¶ 115-116 (SIPA definition of "customer" includes any person with a claim arising out of the sale or conversion of securities entrusted to a broker-dealer for safekeeping or as collateral security; SIPA definition of "customer property" includes proceeds of any securities held in a customer's securities account that were transferred by the broker-dealer).

9.      In the prosecution of the FirstBank Motion, FirstBank will prove: (a) that it held a "securities account" at LBI, as defined in the New York UCC, that was maintained by LBI in the name of FirstBank and with an account number unique to FirstBank; (b) that FirstBank deposited its securities into such account for safekeeping and as collateral security; (c) that the net equity balance of such securities account at LBI at the time this SIPA proceeding began was approximately $61.5 million; and (d) that FirstBank is entitled to a SIPA customer claim against LBI in that amount.

WHEREFORE, FirstBank respectfully requests that the Court, if it approves the Trustee Motion, confirm that: (i) FirstBank is an "Excluded Duplicate Claimant" (as defined in the Trustee Motion); (ii) neither FirstBank nor its Customer Claim against LBI is covered by or impacted by the Settlement Agreement; (iii) the Settlement Agreement does not, and shall not, provide any consideration to LBSF or other LBHI Entities with respect to the assets covered by FirstBank's Customer Claim; and (iv) the terms of the Settlement Agreement, and any legal conclusions and factual statements made by the Trustee in the Trustee Motion in support thereof (including without limitation in the Trustee Motion at ¶¶ 38-40 and the Kiplok Decl. at ¶¶ 32-34), are without prejudice to First Bank's right to prosecute its Customer Claim and the FirstBank Motion; and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 3, 2013

                      Respectfully submitted,

                      K&L GATES LLP

                      By:    /s/ Richard S. Miller

                      Richard S. Miller (RM–2428)
                      (Richard.Miller@klgates.com)
                      Robert T. Honeywell (RH–7684)
                      (Robert.Honeywell@klgates.com)
                      Brian D. Koosed (BK–5067)
                      (Brian.Koosed@klgates.com)
                      599 Lexington Avenue
                      New York, New York  10022
                      Telephone:  (212) 536-3922
                      Facsimile:  (212) 536-3901

                      *Attorneys for FirstBank Puerto Rico*

# PD 27

# Order Approving LBI-LBHI Settlement Agreement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>      LEHMAN BROTHERS INC.,<br><br>                    Debtor. | Case No. 08-01420 (JMP) SIPA |

## ORDER APPROVING SETTLEMENT AGREEMENT
## BETWEEN THE TRUSTEE AND THE LBHI ENTITIES

Upon the motion dated February 26, 2013 (the "Motion")[1] of James W. Giddens

(the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI")

under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), seeking, *inter*

*alia*, entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") approving the settlement and compromise entered into by the Trustee and

the LBHI Entities (collectively, the "Parties"), dated as of February 21, 2013 (as amended by

Amendment #1 to Settlement Agreement dated April 15, 2013, the "Settlement Agreement");

and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with SIPA § 78eee(b)(4); and venue being proper before this Court pursuant to SIPA

§ 78eee(a)(3) and 15 U.S.C. § 78aa; and

Upon consideration of the Motion, any objections thereto, briefs and arguments of

counsel; and due and proper notice of the Motion having been provided, including in accordance

with the Amended Case Management Order, to all parties in interest, and it appearing that the

---

1. Capitalized terms not defined herein shall have the meanings ascribed to them in the Settlement Agreement (defined below).

notice of the Motion is sufficient, adequate, and timely under the circumstances of this case and

that no other or further notice need be provided; and a reasonable opportunity to object or be

heard regarding the Motion having been given to all such parties; and a full and fair opportunity

having been afforded to litigate all issues raised in all objections, or which might have been

raised; and all objections having been withdrawn or overruled;

## IT IS HEREBY FOUND AND DETERMINED THAT:

A. The Parties have engaged in substantial information exchange and reconciliation with respect to the disputes being settled pursuant to the Settlement Agreement.

B. In evaluating the reasonableness of the settlement, the Court has taken into consideration the Motion, as well as the supporting documentation and other evidence supplied by the Trustee.

C. After careful consideration of the record, the Court finds that the settlement of the Parties' disputes, including claims asserted by the Parties against each other in their respective bankruptcy and SIPA liquidation proceedings, as reflected in the Settlement Agreement is fair and within the range of reasonableness.  The Court has canvassed the issues to evaluate the reasonableness of the settlement and finds that:

  a)    a full litigation of the disputes resolved by the Settlement Agreement would be extremely complex, protracted and expensive, and would significantly delay the Trustee's ability to make distributions to customers and creditors of the LBI estate and to complete this SIPA liquidation;

  b)    the Settlement Agreement is in the best interests of the LBI estate and its customers and creditors, is supported by good business reasons, and enables the Trustee to successfully complete his administration of this SIPA liquidation;

  c)    both the Trustee's counsel and the LBHI Entities' counsel have substantial experience and are competent in advising on complex bankruptcy and litigation matters and in negotiating commercial resolutions thereof; and

  d)    the Settlement Agreement was negotiated, proposed, and entered into by the Trustee and the LBHI Entities without collusion, in good faith, and from arm's length bargaining positions.

D. Each of the releases provided for in the Settlement Agreement, which include, among other

things, releases of Causes of Action that allege alter ego, veil piercing, enterprise liability or

similar theories of liability or that otherwise seek to disregard the corporate form of LBI and

LBHI and Causes of Action brought directly, indirectly, derivatively, representatively or in any

other capacity, (i) is within the Court's jurisdiction, (ii) is essential to administering the LBI

estate, (iii) is an integral element of the Settlement Agreement and/or to its effectuation, (iv)

confers material benefits on, and is in the best interests of, the LBI estate, and (v) is important to

the overall objectives of the Settlement Agreement.

E. The Settlement Agreement reflects an integrated and comprehensive settlement of disputes

between the Parties, including claims asserted, or that could have been asserted, by the Parties

against each other in their respective bankruptcy and SIPA liquidation proceedings, and each

component and protection contained therein and in this Order, including the releases, is an

integral part thereof. The entry of this Order as a Final Order as described in the Settlement

Agreement is necessary for the Settlement Agreement to become effective and achieve its goals,

which are in the best interest of the LBI estate.

F. The Settlement Agreement brings certainty to the LBI estate and will permit the Trustee to

effectively complete the SIPA liquidation proceeding of LBI.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED.

2. Any objections to the Motion that have not otherwise been withdrawn or resolved are overruled.

3. The Settlement Agreement, including all of its terms, covenants, waivers, releases, assignments,

distributions, conditions, and the rights, duties and obligations of the Parties set forth therein, is

approved in its entirety and shall become effective on the Effective Date as set forth in the Settlement Agreement.

4.  The Parties are authorized to execute, deliver and carry out all transactions and perform all actions contemplated by the Settlement Agreement in its entirety and are further authorized to take any necessary or appropriate steps to effectuate and implement the Settlement Agreement in accordance with its terms.  No consents are required to implement the Settlement Agreement, this Order, or the relief provided herein.

5.  Upon the occurrence of the Effective Date:

    a.  The LBHI Entities and the Trustee shall have allowed claims against each other in the amounts, classifications and priorities set forth in and subject to the terms of the Settlement Agreement.

    b.  The Trustee is authorized and directed to make the distributions to the LBHI Entities of the cash and securities specified in the Settlement Agreement in respect of the LBHI Entity Allowed Claims in accordance with and subject to the terms of the Settlement Agreement.

    c.  All proofs of claim filed by the LBHI Entities against LBI and all proofs of claims filed by the LBI Trustee on behalf of LBI against the LBHI Entities, other than as allowed pursuant to the terms of the Settlement Agreement, and all other claims between the Parties not expressly allowed or preserved in the Settlement Agreement shall be expunged, disallowed, and released in accordance with the terms of the Settlement Agreement.

    d.  The releases set forth in the Settlement Agreement, which include the release of, among other things, Causes of Action that allege alter ego, veil piercing, enterprise liability or

similar theories of liability or that otherwise seek to disregard the corporate form of LBI

and LBHI and Causes of Action brought directly, indirectly, derivatively,

representatively or in any other capacity, are approved and, except as otherwise expressly

provided in the Settlement Agreement, shall be effective upon the occurrence of the

Effective Date.

e.  In accordance with and subject to the terms of the Settlement Agreement, the Parties are

permanently enjoined from pursuing in any manner any Claims released pursuant to the

Settlement Agreement.

f.  Unless otherwise provided for in the Settlement Agreement, all provisions of the

Settlement Agreement shall be binding on the Parties.

g.  The Objection filed by the LBHI Entities on September 28, 2011 (ECF No. 4584) to the

Trustee's determination of their claims shall be deemed withdrawn.

h.  The Trustee shall promptly file on the Court's docket notice of the Effective Date.

6.  The distributions to be made by the Trustee in respect of the LBHI Entity Allowed Claims in

accordance with and subject to the terms of the Settlement Agreement will be a legal, valid, and

effective transfer of all of the legal, equitable and beneficial right, title and interest of LBI and

the Trustee in those assets, and free and clear of all liens, claims, and encumbrances.

7.  All Extended Lien Claims of any Person, other than the Parties, with respect to an LBHI

Extended Lien Asset or an LBI Extended Lien Asset that are not asserted prior to this Order

becoming a Final Order shall be deemed waived and all distributions to the LBHI Entities and

the Trustee on Allowed Claims under the Settlement Agreement shall be free and clear of any

Extended Lien Claim.

8. Except as provided for in the preceding paragraph of this Order and Section 3.03 of the Settlement Agreement, nothing in this Order or in the Settlement Agreement affects the rights of Persons who are not Parties to the Settlement Agreement (including Duplicate Claimants, as defined in the Motion), other than with respect to the ability of all such Persons to bring derivative claims on behalf of one or more of the Parties against another Party, such non-direct, derivative claims being expressly released under the terms of the Settlement Agreement.

9. If the parties agree or in the event that (a) LOTC or LBSF, as applicable, and a Duplicate Claim Counterparty are unable to resolve a Duplicate Claim, and (b) the Bankruptcy Court determines by a Final Order that the claim of a Duplicate Claim Counterparty, and not a claim of LOTC or LBSF, should be allowed in respect of a Duplicate Claim Account (the "Allowed Duplicate Claim"), then, notwithstanding any provision in the Settlement Agreement or this Order to the contrary, the portion of the LOTC or LBSF Allowed Customer Claim or Allowed General Unsecured Claim that relates to the Allowed Duplicate Claim, and any associated distribution, shall be accordingly reduced.

10. The failure to specifically include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Trustee's implementation of the transactions contemplated in the Settlement Agreement be approved in its entirety.

11. All Persons are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Parties to transfer property and claims pursuant to and subject to the terms of the Settlement Agreement.

12. In the event of any conflict between the Settlement Agreement and this Order, the terms of the Settlement Agreement shall govern.

6

13. Nothing contained in any subsequent settlement, or in any other order, decision, or judgment, nor any act of any Party, shall alter, conflict with, or derogate from the provisions of the Settlement Agreement or this Order, except pursuant to (i) a successful appeal or certiorari from this Court or (ii) an order of this Court approving an amendment or modification to the Settlement Agreement as agreed by the Parties in accordance with the Settlement Agreement's terms.

14. The Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

15. This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).  To the extent applicable, Bankruptcy Rule 6004(h) is hereby waived.

**Dated: April 16, 2013**
**New York, New York**

**/s/ James M. Peck**
_____
**Hon. James M. Peck**
**United States Bankruptcy Judge**