Richard S. Miller
Robert T. Honeywell
K&L GATES LLP
599 Lexington Ave.
New York, NY 10022
Tel: 212-536-3900
Fax: 212-536-3901
richard.miller@klgates.com
robert.honeywell@klgates.com

Richard A. Kirby
K&L GATES LLP
1601 K Street N.W.
Washington, DC 20006
Tel: 202-778-9000
Fax: 202-778-9100
richard.kirby@klgates.com

*Attorneys for FirstBank Puerto Rico*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                       :

In re:                                :
                                       :

LEHMAN BROTHERS INC.,      :      Case No. 08-01420 (SCC) SIPA
                                       :

           Debtor.              :
———————————————————————:

## FIRSTBANK PUERTO RICO'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER EXPUNGING FIRSTBANK PUERTO RICO'S CUSTOMER CLAIM

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................1

II.    REPLY ARGUMENT ........................................................................3

    A.    The Trustee Does Not Dispute Two of the Three Elements of the "Customer" Definition in SIPA. ................................................................3

    B.    FirstBank Satisfies the Remaining Element – "Securities Account" – Because LBI Continuously Recognized FirstBank as the Owner of the Long Securities Positions in LBI's Records. ................................................................4

        1.    LBI Served as a Securities Intermediary with Respect to FirstBank's Securities Collateral at all Times. ................................................................4

        2.    LBI, as a Securities Intermediary, Held FirstBank's Securities Collateral in the Pledge Account for the Benefit of Two Parties: First Bank as Owner and LBSF as Secured Party. ................................10

        3.    LBI Maintained a Securities Account for FirstBank Based on Long Positions Credited to the FirstBank Pledge Account. ................................11

        4.    FirstBank's Property Interests Are Governed by State Law, Which Do Not Conflict with SIPA ................................12

    C.    The Use of the Collateral by LBI and LBSF Has No Impact on FirstBank's Net Equity Claim. ................................14

    D.    FirstBank Is Not Collaterally Estopped by the *Barclays* Decision. ................20

    E.    The Trustee's Remaining Arguments Are Without Merit, and Any "Factual Disputes" Are Immaterial. ................................21

        1.    The Pledge Account Was Not Created Solely "For" LBSF; In Fact, LBSF Waived "Customer" Status. ................................21

        2.    Allowing FirstBank's SIPA Claim Would Not Require the LBI SIPA Estate to Pay "Twice" for FirstBank's Securities. ................................23

        3.    The Trustee Has Not Raised Any Genuine Dispute as to Any Material Fact. ................................24

            a.    Standard for Responses to a Rule 7056-1 Statement of Undisputed Facts. ................................24

            b.    Summary of the Trustee's Alleged Fact Disputes. ................................25

III.    CONCLUSION......................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    348 B.R. 99 (Bankr. S.D.N.Y. 2006)........................................................................30

*In re Crystal Apparel, Inc.*,
    220 B.R. 806 (Bankr. S.D.N.Y. 1998)..............................................................24, 32

*In re Fibremark, Inc.*,
    339 B.R. 321 (Bankr. D. Vt. 2006)........................................................................30

*Hahn v. Sargent*,
    523 F.2d 461 (1st Cir. 1975)..................................................................................25

*Harbinger Capital P'Ship LLC v. Ergen* (*In re Lightsquared, Inc.*),
    504 B.R. 321 (Bankr. S.D.N.Y. 2013)..................................................................12

*In re Lehman Bros. Holdings Inc*,
    492 B.R. 191 (Bankr. S.D.N.Y. 2013)............................................................19, 20

*In re Lehman Bros. Holdings Inc.*,
    439 B.R. 811 (Bankr. S.D.N.Y. 2010)..................................................................30

*In re Lehman Bros. Inc.*,
    462 B.R. 53 (Bankr. S.D.N.Y. 2011)......................................................................6

*In re Lehman Bros., Inc.*,
    492 B.R. 379 (Bankr. S.D.N.Y. 2013), aff'd, 506 B.R. 346 (S.D.N.Y. 2014) ........................6

*In re Lehman Bros. Secs. and ERISA Litig.*,
    2012 WL 983561 (S.D.N.Y. 2012)......................................................................31

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)..................................................................................24

*Miner v. Clinton County, N.Y.*,
    541 F.3d 464 (2d Cir. 2008)..................................................................................24

*Picard v. Merkin* (*In re Bernard L. Madoff Invest. Secs. LLC*),
    Ch. 11 Case No. 08–99000 (SMB), Adv. Nos. 08–01789 (SMB), 09–01182
    (SMB), 2014 WL 3908211 (Bankr. S.D.N.Y. Aug. 12, 2014)................................12

*SEC v. F.O. Baroff Co., Inc.*,
  497 F.2d 280 (2d Cir. 1974) ....................................................................................6

*SIPC v. Executive Secs. Corp.*,
  423 F. Supp. 94 (S.D.N.Y. 1976) ............................................................................6

*In re Tikijian*,
  76 B.R. 304 (Bankr. S.D.N.Y. 1987) ....................................................................25

*In re Weiss-Wolf, Inc.*,
  60 B.R. 969 (Bankr. S.D.N.Y. 1986) ....................................................................25

**Statutes**

15 U.S.C. § 78fff-1 ....................................................................................................23

15 U.S.C. § 78*lll* .....................................................................................3, 14, 15, 18

N.Y. UCC § 8-102 ...........................................................................................4, 8, 10

N.Y. UCC § 8-106 ....................................................................................................10

N.Y. UCC § 8-501 ...........................................................................................8, 11, 18

N.Y. UCC § 8-503 .........................................................................................13, 15, 16

N.Y. UCC § 8-504 ....................................................................................................13

N.Y. UCC § 8-506 ......................................................................................................4

N.Y. UCC § 8-509 ....................................................................................................13

N.Y. UCC § 9-102 ......................................................................................................9

**Other Authorities**

17 C.F.R. § 15c3-3 ....................................................................................................11

Fed. R. Civ. Proc. 56(c)(1) .......................................................................................32

Local Bankruptcy Rule 7056 .........................................................................10, 24, 32

## I.    INTRODUCTION[1]

There are two primary reasons why FirstBank Puerto Rico ("FirstBank") was a "customer" of Lehman Brothers Inc. ("LBI") pursuant to SIPA and is entitled to a customer claim as a matter of law:

First, FirstBank delivered securities with a face value of approximately $220 million (and a market value of approximately $64 million on the SIPA Filing Date) into an account with LBI for LBI to hold in custody as a securities intermediary.  When collateral is deposited with a securities intermediary, there are *two* entitlement holders:  the secured party to the extent of its security interest, and the owner as to the pledged collateral net of whatever is due to the secured party.  The "securities intermediary" acts as an *intermediary* between these two parties, holding the collateral for the two of them as their respective interests may be from time to time.  Contrary to the Trustee's assertions, LBSF's interest in the collateral as a secured party does not affect FirstBank's ownership interest in its securities positions.

Second, the fact that a secured party repledges or resells collateral does not remove the securities position from the account with the securities intermediary.  It simply creates an obligation of somebody else – recorded as a "short" position – to deliver the securities or their equivalent back into the securities account.  The situation is similar to that of a bank.  When a customer deposits money in its account, the bank does not hold the funds it receives.  It lends them or otherwise invests them.  However, the fact that the bank no longer has the cash does not mean that the account balances are no longer owned by the depositor, or have been reduced to zero: the bank remains obligated to deliver cash to the depositor when the depositor requests it.

---

[1] Capitalized terms used but not defined herein have the meaning set forth in FirstBank's Memorandum in Support of Its Motion for Summary Judgment and Opposition to Trustee's Motion for an Order Expunging FirstBank Puerto Rico's Customer Claim, dated July 25, 2014 [ECF. No. 9483] ("FBPR Mot.").

1

This is consistent with the standard practice among broker-dealers and financial institutions to pledge securities and give the secured party the right to repledge or sell the collateral.  As of November 30, 2007, LBI itself had pledged $53 billion of its own securities to third parties, describing them in its financial statements as: "*pledged securities, where the counterparty has the right by contract or custom to sell or repledge*" the securities.  Declaration of Robert Honeywell in Support of FirstBank's Motion for Summary Judgment [ECF No. 9485] ("Honeywell Dec."), Ex. A at 28; *id.*, Ex. L at 13.  If the Trustee is correct that repledging or sale of securities collateral means the pledgor is no longer entitled to the value of its securities collateral, billions of dollars of assets that have been pledged with a right to repledge or sell are at risk.

LBI's course of dealing in handling FirstBank's securities collateral confirms that LBI at all times recognized FirstBank as the owner of the collateral.  The facts in the record – that LBSF, together with LBI, repledged or sold FirstBank's securities collateral while at all times LBI maintained long securities positions in its records for FirstBank's collateral and sent monthly statements to FirstBank listing them as "COLLATERAL HELD BY LEHMAN" – confirms that LBI followed the standard industry practice.

LBI always recognized FirstBank as the owner of the long positions, and recognized LBSF as only a secured creditor.  As of the SIPA Filing Date, LBSF's security interest did not exceed $2.5 million, and it later waived even that secured claim by agreement with the Trustee. Stip. ¶¶ 47, 56.  FirstBank is entitled to a SIPA customer claim for the balance of the long positions in LBI's records as of the SIPA Filing Date.  Its motion for summary judgment should be granted.

## II.    REPLY ARGUMENT

### A.    The Trustee Does Not Dispute Two of the Three Elements of the "Customer" Definition in SIPA.

The Trustee concedes two of the three elements required to establish that FirstBank is a customer of LBI.  The customer definition of SIPA requires that (1) the securities were received, acquired, or held by LBI in the ordinary course of its business as a broker or dealer, (2) from or for the securities account of the person delivering them, and (3) for certain purposes ("for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer").  *See* 15 U.S.C. § 78*lll* (2) (2000).  The Trustee challenges only the second element, and disputes that FirstBank had a "securities account" at LBI.  *See* Trustee's Memorandum of Law in Further Support of His Motion for an Order Expunging FirstBank Puerto Rico's Claim and in Opposition to FirstBank Puerto Rico's Motion for Summary Judgment [ECF No. 9699], ¶ 17 ("Tr. Reply").

As discussed below, it is undisputed on this record that LBI maintained a securities account to hold FirstBank's securities collateral and recognized FirstBank as having an ownership interest in the account at all times (in addition to LBSF's security interest).  LBI maintained a "securities account" for FirstBank as a matter of law.  FirstBank is thus entitled to SIPA customer status.

The Trustee also does not dispute that FirstBank can satisfy the customer definition even if LBI was acting as LBSF's agent in its dealings with FirstBank.  *See* FBPR Mot. at 66 (citing 15 U.S.C. § 78*lll* (2) (2000)).  Regardless of whether LBI was an agent of LBSF for the purpose of perfecting LBSF's securities interest in the account holding FirstBank's securities, LBI acknowledged *both* FirstBank and LBSF as having interests in the account.  The three parties were in a typical tripartite control arrangement for a securities account under UCC Article 8,

3

where LBI was a securities intermediary owing duties to both the debtor (FirstBank) and the

secured party (LBSF) to account for their respective interests in the account.  FirstBank entrusted

its securities to LBI for safekeeping in its role as securities intermediary, and LBI treated

FirstBank as the owner of those securities at all times.

**B.      FirstBank Satisfies the Remaining Element – "Securities Account" – Because LBI
         Continuously Recognized FirstBank as the Owner of the Long Securities Positions
         in LBI's Records.**

**1.      LBI Served as a Securities Intermediary with Respect to FirstBank's Securities
         Collateral at all Times.**

The CSA, the SACA and the New York UCC establish that both FirstBank and LBSF

had interests and rights to the collateral posted by FirstBank and delivered to LBI, with LBI

serving as the "securities intermediary" between the parties.[2]  A "securities intermediary" is "(i)

a clearing corporation, or (ii) a person, including a bank or broker, that in the ordinary course of

business maintains securities accounts for others and is acting in that capacity."  N.Y. UCC § 8-

102(a)(14).  A securities intermediary owes duties to both the "debtor," or owner of the

securities, *see* FBPR Mot. at 44-45 (citing provisions of N.Y. UCC Art. 8, part 5, supplemented

by SEC and Treasury regulations), and the secured party.  *E.g.*, N.Y. UCC § 8-506.  The

securities intermediary in a secured swap transaction serves in a tripartite arrangement as a

clearing broker in possession of the pledgor's securities.  *See* FBPR Mot. at 67-68 (collecting

cases).[3]

---

[2] The SACA states, "The Custodian is a 'securities intermediary' (within the meaning of Section
8-102(a)(14) of the UCC)."  Ex. SF5 § 1.02(b)(i)

[3] It has long been the SEC's position that a claimant is a customer of the clearing broker
(regardless of the "introducing" role of another entity), for purposes of both SIPA and the SEC's
customer protection rules, because the clearing broker is in *possession* of the customer's
securities.  *See* FBPR Mot. at 66-69 (collecting cases).  The Trustee does not address this
authority, and thus fails to recognize that LBI served precisely this role in the tripartite

The CSA, governed by New York law, contemplated precisely this arrangement between LBI, the securities intermediary; LBSF, the secured party; and FirstBank, the debtor and owner of the securities. *See* FBPR Mot. at 36-47. The CSA is silent on LBI's precise role, naming it only in connection with the address for transfers of securities, and not as a "Custodian." *See* Ex. SF3 ¶ 13(*l*)(ii); ¶ 13(i).[4] Moreover, there was no written contract between LBI and FirstBank. The Court must therefore look to LBI's course of dealing and industry practice (or "usage of trade") to determine the nature of the legal and commercial relationship between LBI and FirstBank – and specifically whether LBI maintained a "securities account" for FirstBank. New York law applies because of the location of LBI's offices. *See* FBPR Mot. at 37-40.

The evidence in the record of LBI's course of dealing, coupled with standard industry practice in the broker-dealer industry, shows that there is no genuine issue of material fact that LBI maintained a "*securities account*" for FirstBank. LBI at all times treated FirstBank as the owner of the securities collateral that it had delivered to LBI, and reflected that ownership interest as long positions in LBI's records and monthly statements sent to FirstBank. The evidence is undisputed that LBI:

- Established a separate securities account in its stock record: account #5797550, named the "FirstBank Pledge Account for LBSF";

- Credited all of FirstBank's securities deliveries to LBI as long positions in that account;

---

arrangement. *See also* SSF ¶ 18 (LBI held or "cleared" Fed-eligible securities for LBSF, which had no ability to clear or receive any type of collateral).

[4] The Trustee admits that LBI was not "initially" appointed as a "Custodian" for LBSF under the CSA. The Trustee suggests that LBSF subsequently appointed LBI as such a "Custodian," but provides no evidence of such an appointment. *See infra* at II.E.3.b.

- Recorded FirstBank's securities deliveries as deposited in a segregated LBI "safekeeping" account at Chase (coded "CMW SFKP" or "SFKP CMW" in LBI's stock record) (i.e., after their initial delivery to LBI's general settlement account);[5]

- Maintained those long positions in its stock record (coded as "L SFKP CMW") at all times, through and including the SIPA Filing Date and notwithstanding various rehypothecations and sales of FirstBank's securities;

- Prepared and sent monthly statements to FirstBank, through and including September 1, 2008 – a few weeks before the SIPA Filing Date – which listed all of the long positions in

---

[5] This delivery of collateral by FirstBank to LBI for safekeeping constitutes the "entrustment" factor described in the cases relied on by the Trustee.  In the *Repo Decision*, the claimant banks had sold the securities to LBI with the right to repurchase them at a later date: LBI "acquired full legal title over the securities," and the claimants retained only the right to receive economic benefits such as coupon interest.  *See* 506 B.R. 346, 349 (S.D.N.Y. 2014).  Moreover, LBI did not hold the securities delivered by the claimants in a custody account; the claimants only had a "delivery-versus-payment" (or "DVP") account at LBI, which involved no retention of securities at LBI but, to the contrary, provided for immediate settlement of any securities owed to the claimants' own custodial banks.  *See id.*  Thus, the District Court (and Judge Peck earlier) described the claimants' rights vis a vis LBI as purely contractual and granted them an unsecured claim rather than a customer claim under SIPA.  *Id.* at 356.

The *TBA Decision* similarly found a lack of entrustment, noting that the TBA contracts "never involved the delivery or entrustment of any property to LBI."  462 B.R. 53, 58 (Bankr. S.D.N.Y. 2011).  Like the repo transactions, the TBA claimants' rights to receive were "ordinary breach of contract claims."  *Id.* at 58.  In neither case did LBI indicate that it held any securities in custody for the claimants.  *See id.* at 62; *Repo Decision*, 492 B.R. at 386.  Here, LBI *did* indicate that it was holding FirstBank's securities collateral in custody, and its conduct was precisely the "sort of custodial relationship with LBI that is essential to customer status under SIPA."  *See TBA Decision*, 462 B.R. at 58 (emphasis added).

The cases cited by the Trustee and SIPC in their opening briefs, suggesting that entrustment must be coupled with "purchasing" or "trading" in securities for purposes of SIPA customer status, are distinguishable on their facts.  *See* Trustee's Motion for an Order Expunging FirstBank's Claims [ECF No. 9248] ("Tr. Mot.") at ¶ 76; Memorandum of Law of SIPC In Support of Trustee's Motion for an Order Denying Claim of FirstBank of Puerto Rico [ECF No. 9245] at 4.  Those cases involved the courts distinguishing between cases in which claimants *had* entrusted their securities with broker-dealers, who then held them in custody and acknowledged the securities as the claimants' property, on the one hand, with cases in which financial counterparties engaged in standard arm's length financing transactions with no expectation of a custodial relationship (for example, securities lending).  *E.g.*, *SIPC v. Executive Secs. Corp.*, 423 F. Supp. 94, 98 (S.D.N.Y. 1976) (analyzing transaction in which claimants were "securities lenders"); *SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 281-82 (2d Cir. 1974) (same).  In all of the cases, the courts emphasized the *custodial* element as the critical feature of SIPA customer status.  *See* FBPR Mot. at 70-71.

a "Collateral Data" section and expressly described them as "COLLATERAL HELD BY LEHMAN";[6] and

- Publicly referred to LBSF's over-the-counter ("OTC") derivatives business as its own business and OTC derivatives clients as its own clients.

When LBI later entered into a "Securities Account Control Agreement" (or "SACA") with LBSF in 2002 – over five years after the LBSF-FirstBank CSA (in 1997) and almost three years after FirstBank's first delivery of securities collateral to LBI (in 1999), *see* Stip. ¶¶ 20-26, 43 – the terms of the SACA ratified LBI's prior course of dealing in holding FirstBank's securities collateral. Specifically, the SACA expressly ratified the applicability of N.Y. UCC Article 8 to the FirstBank Pledge Account (#5797550), and to numerous other securities accounts to which LBI had credited derivatives collateral posted by other LBSF counterparties.[7] It also expressly ratified LBI's role as a securities intermediary under N.Y. UCC Article 8 as to all of those securities accounts. Ex. SF5, § 1(b)(i).

A careful reading of other SACA provisions demonstrates that LBI repeatedly *confirmed* the tripartite custodial relationship among LBI (as securities intermediary), FirstBank (as owner or "Debtor"), and LBSF (as secured party). Consistent with such a tripartite arrangement, LBI acknowledged the rights of FirstBank and other "Debtors" with respect to the "Accounts" to

---

[6] The Trustee makes much of the fact that the monthly statements were captioned as being "FROM" LBSF, but does not dispute that LBI employees prepared and transmitted all of the statements and, moreover, that LBSF had no offices or employees. *See* SSF ¶¶ 120-136; *infra* at II.E.3.b. The direct involvement of LBI employees in preparing and delivering the statements to FirstBank is part of LBI's course of dealing for purposes of whether it maintained a "securities account" for FirstBank.

[7] At the time the SACA was entered into in 2002, the list of those accounts (Schedule I to the SACA) was at eighty-seven (87) LBSF counterparties, or "Debtors." When LBI and LBSF later amended the SACA in 2005, the list had grown to 384 "Debtors." *See* SSF ¶ 102. This is further evidence that LBI received and held derivatives collateral like FirstBank's in the ordinary course of its business as a broker, for purposes of the first element of the SIPA "customer" definition. *See supra* at II.A.

7

which their securities collateral had been credited by LBI (all listed in Schedule I by "Debtor"

name and account number):

- The SACA states that LBI credited the Accounts by book entry for the collateral posted by the "Debtors," and that its purpose is to "ensure the perfection and priority" of LBSF's interest in the Accounts and all property credited to them.   Ex. SF5 at Recitals 3, 5.

- Such property includes any "security entitlements" credited to the Accounts, which are treated as "financial assets" under N.Y. UCC Article 8.  *Id.* at § 2.[8]

- The SACA confirms that "Debtors" like FirstBank might themselves issue entitlement orders to LBI regarding their Accounts.  *Id.* at § 3(b) (providing that, only after LBSF instructs LBI that it is exercising exclusive control over one or more Accounts must LBI "cease complying with the related Debtor's (or Debtors') entitlement orders and other instructions with respect thereto.").[9]

- The SACA specifically acknowledges the property interests of FirstBank and other "Debtors" in their respective Accounts.  Section 8 of the SACA begins "Except for the claims and interest of the Secured Party **and of the respective Debtors** in the Accounts, the Custodian does not know of any claim to, or interest in, any Account or in any financial asset credited thereto."  *Id.* at § 8 (emphasis added).  It further requires LBI to promptly give notice of any such adverse claim to "the Secured Party **and the related Debtor**."  *Id.* (emphasis added).

- The SACA's termination provision eviscerates the Trustee's argument that only LBSF had an interest in the Accounts.  Section 10 of the SACA provides that "[t]he obligations of the Custodian to the Secured Party pursuant to this Agreement with respect to each Account shall continue in effect until the security interest of the Secured Party in an Account has been terminated pursuant to the terms of the relevant Underlying Agreement and the Secured Party has notified the Custodian of such termination pursuant to Section

---

[8]  Under Article 8 of the N.Y. UCC, a "security entitlement" expressly includes any book-entry credits to a securities account.  N.Y. UCC § 8-501(b)(1)-(2).  It also includes any credits that a broker-dealer was legally obligated to make to a securities account, including by SEC or Treasury regulation.  *Id.* at § 8-501(b)(3).  A "security entitlement" is defined as "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5" (i.e., in § 8-501 et seq.).  *Id.* at § 8-102(a)(17).

[9] Entitlement orders are notifications "communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder **has a security entitlement**."  N.Y. UCC § 8-102(a)(9) (emphasis added).

8

4 above." *Id.* at § 10. If the Trustee is correct, if LBSF notified LBI that LBSF's security interest in an Account had terminated, unless the related Debtor had an entitlement as to such Account, when LBI received the notice from LBSF *nobody* would have an interest in the Account. This illogical result confirms that FirstBank and other "Debtors" maintained interests in their respective Accounts *in addition to* LBSF's rights as a secured creditor.[10]

The various SACA provisions described above are senseless unless they are recognized as evidencing LBI's acknowledgement that FirstBank was the owner of all of the securities collateral that it delivered to LBI, and of all of the securities positions ("security entitlements") credited in LBI's stock record with regard to such deliveries. Simply put, "collateral" is owned by the pledgor, not the secured creditor with a lien in it. *See* FBPR Mot. at 40; *see also* N.Y. UCC § 9-102(12) ("collateral" includes "property subject to a security interest"); *id.* § 9-102(28) ("debtor" is "person having an interest, other than a security interest or other lien, in the collateral").[11]

In sum, LBI confirmed in the SACA that it recognized *two* entitlement holders with security entitlements in the Pledge Account: FirstBank and LBSF. As explained in Part II.B.2 below, the fact that *LBSF* has an interest in the account as the secured party does not affect *FirstBank's* interest in the account as the "Debtor" and owner of the securities.

---

[10] Likewise, FirstBank and the Trustee have stipulated that the market value of FirstBank's securities collateral as of the SIPA Filing Date was approximately $64 million, and that LBSF's secured claim against the collateral did not exceed $2.5 million (which it later waived). Stip. ¶¶ 43, 47, 56. This raises the question of who owned the unencumbered balance of the collateral (approximately $61.5 million) as of the SIPA Filing Date. Under the Trustee's logic, nobody did.

[11] In addition, the CSA expressly provided that FirstBank retained several rights consistent with its ownership interest in its securities collateral. *See* FBPR Mot. at 7-8.

9

2. **LBI, as a Securities Intermediary, Held FirstBank's Securities Collateral in the Pledge Account for the Benefit of Two Parties: First Bank as Owner and LBSF as Secured Party.**

The Trustee sets up a false dichotomy by arguing that the Pledge Account was "held in trust for the benefit of [LBSF] as 'entitlement holder.'"  Tr. Reply at ¶ 9 (quoting Ex. SF5 § 1(a)).  LBSF being an entitlement holder to the securities account, and FirstBank being an entitlement holder in the securities account, are not mutually exclusive.

The UCC expressly contemplates arrangements in which a third party acts as a securities intermediary for securities collateral:

> A person may have an interest in a security entitlement, and may even have the right to give entitlement orders to the securities intermediary with respect to it, even though the person is not the entitlement holder. . . .  [T]he control provisions in Section 8-106 and the related provisions in Article 9 are designed to facilitate transactions in which **a person who holds securities through a securities account uses them as collateral in an arrangement where the securities intermediary has agreed that if the secured party so directs the intermediary will dispose of the positions. In such arrangements, the debtor remains the entitlement holder but has agreed that the secured party can initiate entitlement orders**. . . .

N.Y. UCC § 8-102, official cmt. ¶ 7 (discussing definition of entitlement holder) (emphasis added).  LBSF and FirstBank both had interests in the Pledge Account:  FirstBank owned the collateral as a "debtor" under N.Y. UCC Article 8 (which LBI does not and cannot dispute), and LBSF maintained a security interest as a secured party.  To insist, as the Trustee does, that LBSF is an entitlement holder is nonresponsive to the issue of whether FirstBank was *also* an entitlement holder with respect to its securities collateral.  As a debtor and owner of the securities, FirstBank was an entitlement holder regardless of LBSF's status.[12]

---

[12] The Trustee's attempt to confer exclusive rights to the FirstBank Pledge Account – and SIPA "customer" status – on LBSF based on the "in trust for" language in the SACA, *see* Trustee's Objection and Response to FirstBank Puerto Rico's Local Bankruptcy Rule 7056-1 Statement ("Tr. Obj."), is also misplaced.  The "trust" phrase appears only in the SACA, so it must be interpreted in light of the purpose and express provisions of the SACA, which was to perfect LBSF's security interest in the referenced securities accounts.  It did not – and cannot as a matter

### 3. LBI Maintained a Securities Account for FirstBank Based on Long Positions Credited to the FirstBank Pledge Account.

A securities account under the N.Y. UCC is "an **account** to which a **financial asset** is or may be **credited** in accordance with **an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights** that comprise the financial asset." FBPR Mot. at 38 (quoting N.Y. UCC § 8-501(a) (emphasis added)).

As a matter of law, LBI maintained a "securities account" for FirstBank under this plain definition. LBI "undertook to treat" FirstBank as the owner of the long positions credited to the "FirstBank Pledge Account for LBSF" (#5797550). It maintained those long positions in its records at all times, through and including the SIPA Filing Date, and sent monthly statements to FirstBank listing all of the long positions as "COLLATERAL HELD BY LEHMAN." The long positions, "financial asset[s]" under the N.Y. UCC and the SACA,[13] were credited to the Pledge Account.[14] The long positions mean "ownership," as confirmed by the Trustee's own regulatory witness, SSF ¶ 51, and necessarily refer to FirstBank rather than LBSF, which did not own the securities and whose interest in them extended only to its security interest. *See supra* Part II.B.1.

The SACA itself – part of LBI's course of dealing – ratifies this principle. The very title of the document acknowledges that the arrangement relates to a "Securities Account." The

---

of basic contract interpretation – confer any legal status on LBSF beyond that. Certainly, it cannot alter FirstBank's rights because it was not a party to the SACA.

[13] Ex. SF5 § 2.

[14] And in any case, LBI was required by SEC and Treasury regulations to credit the positions to FirstBank, which made the positions a security entitlement held by FirstBank. N.Y. UCC § 8-501(b)(3). FirstBank fits the plain definition of "customer" under SEC Rule 15c3-3, and Treasury regulations regarding a broker-dealer's custody of government securities also incorporate such definition. FBPR Mot. at 51-55.

document repeatedly then refers to the "Accounts" being addressed, listing on a schedule the various entities posting collateral credited to such "Accounts," including FirstBank.

The Trustee's unsupported conclusory assertion that the FirstBank Pledge Account (#5797550) was owned exclusively by LBSF, *infra* at II.E.3.b, does not create a genuine issue of material fact in the face of the evidence – of LBI's course of dealing, in broker-dealer industry practice, and in the words of the SACA – that LBI treated  FirstBank as an entitlement holder and as the owner of the long positions in the Pledge Account.  LBI thus maintained a "securities account" for FirstBank under Article 8 of the N.Y. UCC and for purposes of the SIPA "customer" definition.

### 4.    FirstBank's Property Interests Are Governed by State Law, Which Do Not Conflict with SIPA

SIPC incorrectly argues that an inconsistency exists between the "securities account" requirement in SIPA and the recognition of a securities account in Article 8 of the N.Y. UCC. There is no inconsistency between the two complementary statutory regimes, and the "conflict" suggested by SIPC is manufactured.  *Property* rights in a SIPA proceeding like a bankruptcy proceeding are governed by state law.  FBPR Mot. at 37 n.12.  Indeed these principles are recognized by the very comment that SIPC relies upon.  *See* Memorandum of Law of SIPC in Further Support of Trustee's Mot. for an Order Denying the Claim of FirstBank Puerto Rico and in Opposition to FirstBank's Mot. for Summ. J. [ECF No. 9685] ("SIPC Reply") at 7 n.7 (N.Y. UCC Article 8 "simply deals with the mechanisms by which interests in securities are transferred and the rights and duties of those who are involved in the transfer process.").  *See also* FBPR Br. at 36-37 & n.12 (collecting cases); *Harbinger Capital P'Ship LLC v. Ergen* (*In re Lightsquared, Inc.*), 504 B.R. 321, 335-36 (Bankr. S.D.N.Y. 2013) (claim must be allowed under Bankruptcy Code unless "estopped under non-bankruptcy law"); *Picard v. Merkin* (*In re Bernard L. Madoff*

12

*Invest. Secs. LLC*), Ch. 11 Case No. 08–99000 (SMB), Adv. Nos. 08–01789 (SMB), 09–01182 (SMB), 2014 WL 3908211, at *27 (Bankr. S.D.N.Y. Aug. 12, 2014) (extending analysis to claims asserted in a SIPA case).  A property interest in a securities account, which is the foundation for whether the procedural protections apply, is necessarily a state law determination that complements SIPA.

The portions of the N.Y. UCC cited by SIPC do not implicate property rights, but rather the procedural aspects of federal bankruptcy law.  This makes perfect sense.  In a SIPA proceeding, a securities owner cannot demand that securities entitlements be returned on demand without threatening the statutory scheme or the orderly administration of the broker-dealer's estate.  When the N.Y. UCC discusses yielding to SIPA, it does so in this context.  *See* SIPC Reply at 7-8 (quoting N.Y. UCC § 8-503, official cmt. ¶ 1 ("[A]pplicable insolvency law governs how the various parties having claims against the firm are treated.  For example, the distributional rules for stockbroker liquidation proceedings under the Bankruptcy Code and Securities Investor Protection Act ….")).

The N.Y. UCC elsewhere confirms that Article 8 is *supplemented* by federal regulatory law on the duties of broker-dealers.  N.Y. UCC § 8-509; *see also id.* at § 8-504, official cmt. ¶ 5 ("Broker-dealers registered under the federal securities laws are subject to detailed regulation concerning the safeguarding of customer securities"); FBPR Mot. at 51-55 (Treasury regulations under the Government Securities Act of 1986 apply the SEC customer protection rules to *all* fully paid government securities held in custody by a registered broker-dealer).

In other words, the state law and federal regimes are complementary of each other, as part of a consistent legal and regulatory regime to protect the owners of securities held in custody

13

by broker-dealers.  SIPC's attempt to locate a conflict of laws where there is none should be

rejected.

**C.**     **The Use of the Collateral by LBI and LBSF Has No Impact on FirstBank's Net Equity Claim.**

FirstBank's net equity claim is not reduced by the short positions in LBI's stock record,

because it owes no debt to LBI.  The short positions in the FirstBank Pledge Account

(#5797550) are *not* FirstBank's positions.[15]

Net equity for a customer claim under SIPA is determined by "(A) calculating the sum

which would have been owed by the debtor to such customer if the debtor had liquidated, by sale

or purchase on the filing date, all securities positions of such customer (other than customer

name securities reclaimed by such customer); minus (B) any indebtedness of such customer to

the debtor on the filing date . . ."[16] FBPR Mot. at 57 (quoting 15 U.S.C. § 78*lll* (11) (2000)).

FirstBank has a claim for the value of its long securities positions, and owes no debt to LBI.[17]

*See id.*

The Trustee's argument that FirstBank has no claims to the securities positions

recognized by LBI because the securities were rehypothecated and sold ignores the undisputed

meaning of the term long positions versus the short positions.  "[T]he long positions reflect

---

[15] It is also undisputed that FirstBank had no notice of any rehypothecations and sales of the securities it delivered to LBI, which were recorded as short positions in the Pledge Account, or of any adverse claims against the securities.  SSF ¶¶ 105-107.

[16] Credits may be applied to the net equity claim under paragraph (C) of this statute, but FirstBank's claim includes no such credit.  *See* 15 U.S.C. § 78*lll* (11)(C) (2000).

[17] FirstBank did owe a relatively small sum to LBSF as of the SIPA Filing Date (approximately $2.5 million, Stip. ¶ 47), but that affected the respective interests of FirstBank and LBSF in the securities positions in the FirstBank Pledge Account, not whether FirstBank was the owner of those securities positions.  In any case, LBSF subsequently waived any secured claim against the account and any securities positions or related property interest in them.  Stip. ¶ 56.

ownership and short positions reflect location of each security."  Ex. PD5, ¶ 9; *see also* Tr. Mot. at ¶ 63 n.20 ("The long positions represent the deposits into the Pledge Account; the short positions correspond to *LBSF's* use of the Posted Collateral").  The short positions indicate that LBSF incurred a debt, not FirstBank, the "customer."  *See* 15 U.S.C. § 78*lll* (11)(B) (2000)).

LBI did not reduce the long positions in the Pledge Account when the securities were rehypothecated or sold.  LBI instead created short positions in the Pledge Account, which represent a receivable and reflect the obligation of *other* parties to return the securities to the Pledge Account: namely, (1) LBSF, in the case of repos that transferred FirstBank's securities to the "LBSF Collateral Repo Account" (account #4947410) in connection with LBI-LBSF Repo Transactions, *see* Exs. SF11-SF17; and (2) other derivatives counterparties, in the case of rehypothecations of FirstBank's securities to the pledge accounts of those counterparties, *see* Exs. SF8-10.  *See also* Honeywell Dec., Ex. A (Expert Report of Esther Mills, CPA ("Mills Report")), Part V.A.3, *discussed at* FBPR Mot. at 65-66.  The short positions do not represent a debt of FirstBank and are irrelevant to a net equity determination under SIPA.

The Trustee's and SIPC's arguments fundamentally mischaracterize the nature of the modern indirect holding system for securities.  This system is grounded on the use of "security entitlements" under UCC Article 8 – i.e., interests in *securities positions* – and not on the physical location of *securities*.  Each securities position represents a legal obligation of the securities intermediary to all persons with an interest ("security entitlements") in that position. As the official commentary to UCC § 8-503 states:

> The traditional Article 8 rules on certificated securities were based on the idea that a paper certificate could be regarded as a nearly complete reification of the underlying right.  The rules on transfer and the consequences of wrongful transfer could then be written using the same basic concepts as the rules for physical chattels.  ….**Those concepts do not work for the indirect holding system. A security entitlement is not**

> **a claim to a specific identifiable thing; it is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary. The idea that discrete objects might be traced through the hands of different persons has no place in the Revised Article 8 rules for the indirect holding system.** The fundamental principles of the indirect holding system rules are that an entitlement holder's own intermediary has the obligation to see to it that the entitlement holder receives all of the economic and corporate rights that comprise the financial asset, and that the entitlement holder can look only to that intermediary for performance of the obligations.

N.Y. UCC § 8-503, official cmt. ¶ 2 (emphasis added).

The accounting treatment of the transactions detailed in the Mills Report explains this basic feature of the indirect holding system, which the Trustee and SIPC strain to ignore. The industry practice described in the report shows what is commonly understood in the broker-dealer industry: broker-dealers are obligated for the *securities positions* in their records, but are free to use the referenced *securities* as part of their business model subject to any limits imposed by securities regulators.

As described in the Mills Report, the system of pledges of securities with the right to repledge or sell is an essential part of the securities finance market in the United States. If a financial institution wants to borrow from another financial institution (whether in a repo transaction, a normal secured loan or another form of secured borrowing transaction), it is standard practice for the borrowing institution to deliver securities to the lending institution as collateral. Lending institutions frequently finance their own activities through loans from other financial institutions, and re-pledge the securities in which they are holding liens (with a right to re-re-pledge or sell them) in order to secure their own borrowings. If the law were as the Trustee claims it is, the transactions described above, which are standard securities financing arrangements, would be hugely dangerous for almost everybody involved.

16

The Trustee's and SIPC's arguments to the contrary – i.e., that sales and rehypothecations of securities collateral held in custody wipe out the claims of the pledgors – would put billions of dollars of pledged securities assets at risk.  Shortly before this proceeding was commenced, LBI itself had approximately *$53 billion* of its own securities pledged to third parties with a right to repledge or sell.  *See* FBPR Mot. at 64 (citing SSF ¶ 73).  LBI was not unique in this regard.  The chart below shows the amounts that, at December 31, 2013, five major financial institutions had (1) borrowed on the security of their *own* securities, which were pledged to others with a right to rehypothecate or sell; and (2) borrowed on the security of securities they did not own, but that they had the right to rehypothecate or sell:

| Broker-Dealer SEC X-17A-5 (or 10-K where noted)[18] | Securities Assets Owned, Pledged with a Right to Rehypothecate or Sell (in *billions*) | Securities Assets Not Owned, Received with a Right to Rehypothecate or Sell (in *billions*) |
|---|---|---|
| Morgan Stanley & Co. LLC | $61.3  billion (Pg. 3) | $381.1 billion received, of which $309.6 billion sold or repledged (Note 5, Pg. 24) |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | $24.9 billion (Pg. 2) | $386.1 billion received, of which $221.3 billion sold or repledged (Note 7, Pg. 28) |
| Citigroup Global Markets, Inc. | $17.8 billion (Pg. 3) | $221 billion received (no figure for sold or repledged) (Note 11, Pg. 44)[19] |

---

[18] Declaration of Robert T. Honeywell in Support of FirstBank Puerto Rico's Reply Memorandum in Support of Its Motion for Summary Judgment On and Opposition to Trustee's Motion for an Order Expunging FirstBank Puerto Rico's Customer Claim, dated Sept. 5, 2014, and submitted to the Court in connection herewith, at Exhibits "A"-"E".

[19] The Citigroup filing does not state a figure for the amount of securities it received from others that it then sold or repledged, but states that it was a "substantial portion," which it used for "repurchase agreements, securities sold, not yet purchased, securities borrowings and loans, pledges to clearing organizations, segregation requirements under securities laws and regulations and bank loans."  *Id.*

| J.P. Morgan Securities LLC | $12.4 billion (Pg. 2) | $451 billion received, of which $395 billion sold or repledged (Note 16, Pg. 33) |
| The Goldman Sachs Group, Inc. (10-K) | $62.3 billion (Pg. 125) | $608.4 billion received, of which $450.1 billion sold or repledged (Note 9, Pg. 177) |

Like FirstBank's securities collateral, the securities listed in the third column were owned by other entities and in the custody of the broker-dealers indicated, but were subject to standard rehypothecation and sale rights. Under the Trustee's and SIPC's interpretation of SIPA, the estate of an insolvent broker-dealer would not need to honor these ownership interests for its customers in a SIPA proceeding – *including* any securities owned by a broker-dealer that were held in custody by another broker-dealer with rehypothecation and sale rights. If that were the law, it is hard to imagine that anyone would pledge securities with a right to repledge or sell them, and therefore the entire system of securities finance transactions would have to change.

To read SIPA as advocated by the Trustee and SIPC, netting long positions of a customer by short positions of *third parties*, would eviscerate the purpose of the SIPA statute: to protect the *owners* of securities held in custody by a broker-dealer, regardless of what the broker-dealer might do with those securities. Their position also ignores the plain language of SIPA. If, as the Trustee argues, Congress intended to reduce or eliminate any net equity in a securities account because of sales or rehypothecations of those securities by others, it could have defined net equity to refer to the securities themselves rather than securities *positions*. Congress did not, and instead made clear that: (1) SIPA "customers" include those with claims "arising out of sales or conversions of such securities," 15 U.S.C. § 78*lll* (2) (2000); and (2) "customer property" includes the proceeds of any such transfers or sales. *Id.* at § 78*lll* (4).

The N.Y. UCC likewise recognizes a security entitlement regardless of the location of the security.  N.Y. UCC § 8-501(c) (once a person acquires a security entitlement, "a person has a security entitlement even though the securities intermediary does not itself hold the financial asset"); *id.* official cmt. ¶ 2 ("[O]nce a securities intermediary has acknowledged that it is carrying a position in a financial asset for its customer or participant, the intermediary is obligated to treat the customer or participant as entitled to the financial asset.").  Thus the federal and state regimes for customer protection – UCC Article 8, SEC Rule 15c3-3, Treasury GSA regulations (as to government securities), and SIPA – complement each other rather than conflict.

In addition to conflating "securities" with "securities positions," the Trustee also conflates LBI's distinct roles in the movement of FirstBank's securities.  LBI wore two hats with respect to FirstBank's securities: as discussed above, it served as a "securities intermediary" while holding the securities collateral received from FirstBank in custody; *and from time to time* it played a distinct role as a repo counterparty to LBSF, acquiring the securities in the LBI-LBSF Repo Transactions.  That LBSF from time to time, and particularly in the final months of its existence, pledged securities to LBI in its *proprietary capacity* and LBI re-pledged the securities to obtain last-ditch financing from third parties, the FRBNY and Barclays, and then finally transferred them in an asset sale to Barclays, *see* Stip. ¶¶ 36-42 and Tables "A"-"D", is irrelevant to LBI's obligations as a broker-dealer acting as a *custodian* and *securities intermediary*.  LBSF could have pledged the FirstBank securities to Morgan Stanley, to Goldman Sachs, to Merrill Lynch, or to any of dozens of other financial institutions.  The fact that LBSF pledged them to LBI has no effect on LBI's obligations as a securities intermediary with regard to the securities positions in its records.

19

As discussed in the next section, LBI's second role as seller of the securities was the subject of the *Barclays* decision and has no bearing on FirstBank's customer claim.

**D.    FirstBank Is Not Collaterally Estopped by the *Barclays* Decision.**

In the *Barclays* decision, the validity of FirstBank's SIPA customer claim was "the subject of a separate litigation" which was "not currently before the Court." *Barclays Decision*, 492 B.R. 191, 198 n.11 (Bankr. S.D.N.Y. 2013). Nevertheless, the Trustee continues to argue that this "Court's prior findings establish that LBSF and LBHI are the only two parties from whom FirstBank could recover the Posted Collateral (or its value)." Tr. Reply at ¶ 2. The "findings" relied upon by the Trustee are as follows:

- LBI acquired the securities "in a series of open repurchase transactions with LBSF" "between February 6, 2008 and September 12, 2008," *id.* at 195;

- LBSF properly sold the securities to LBI, who acquired them "free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption by [FirstBank]," *id.* at 196; and

- LBI's subsequent disposal of the securities was proper. *See id.* at 201 n.13 ("Regardless of the validity of FirstBank's claims to the Disputed Securities, LBI had the legal right to unrestricted use of these securities by reason of the Lehman MRA.").

Tr. Reply at 3 (quoting *Barclays Decision*, 492 B.R. at 195, 196, 201 n.13).

Far from dictating the outcome of this proceeding, these conclusions by the Court are wholly irrelevant to FirstBank's customer claim. LBI's acquisition of the securities in a series of open repurchase transactions says nothing about the underlying long positions. The evidence clearly shows that most of FirstBank's securities were transferred from the FirstBank Pledge Account (#5797550) to the LBSF Collateral Repo Account (#4947410), *then* sold to LBI proprietary accounts (coded as "FIRM" in LBI's stock record), *then* transferred to third-party lenders, the FRBNY, and ultimately Barclays. Exs. SF11-SF17; Stip. ¶¶ 36-39, 41-42, and Tables "A"-"C". The balance of FirstBank's securities were rehypothecated to other derivatives

20

counterparties and never returned.  Stip. ¶¶ 40 and Table "D".  LBI recorded all of these transfers

in its stock record for the FirstBank Pledge Account, but *never* eliminated the long positions

representing the original deposits by FirstBank.  Exs. SF7-SF17; Stip. ¶¶ 28-30, 32.

   These various subsequent transfers of FirstBank's securities are thus irrelevant to the net

equity determination of FirstBank's SIPA claim.  *See supra* Part II.C.[20]  The Trustee's collateral

estoppel argument should be rejected, and its additional grounds for denying FirstBank customer

protection are unpersuasive.

### E.    The Trustee's Remaining Arguments Are Without Merit, and Any "Factual Disputes" Are Immaterial.

   Other arguments by the Trustee as to why he is entitled to disallow FirstBank's customer

claim are unpersuasive.  We address them seriatim.

#### 1.   The Pledge Account Was Not Created Solely "For" LBSF; In Fact, LBSF Waived "Customer" Status.

   The Trustee argues that the Pledge Account was created solely "for" LBSF and,

implicitly, that LBSF is the "customer" referenced by the "CUST" coding on the Pledge

Account (#5797550) and other derivative collateral accounts.  *See* Tr. Reply at ¶ 9.  As stated

above, LBI recognized the securities entitlements of both FirstBank (as owner/debtor) and

LBSF (as secured party), and LBSF's "customer" status (if any) does not foreclose another

entitlement holder from also having a customer interest in the securities account.  *See supra* Part

II.B.1-2.

---

[20] Likewise, if LBSF had transferred FirstBank's securities to a party *other than* LBI – for example, in repo transactions with Goldman Sachs – the long positions would remain on LBI's records and it would remain liable for those in this SIPA proceeding.  The identity of LBI, in its proprietary capacity, as the repo counterparty of LBSF is irrelevant to LBI's liability for the underlying long positions that it maintained in the FirstBank Pledge Account as a securities intermediary and custodian.

In addition, although not necessary for a finding that FirstBank is the customer of the

Pledge Account, the Trustee's position is inconsistent with the evidence in the record.  Many

subsidiaries of LBI, including LBSF, waived customer treatment under SIPA and SEC customer

protection rules through subordination agreements with LBI.  Honeywell Dec., Ex. C at ¶ 69 &

n.39; *id.* at Exs. D-F.  The Trustee's own regulatory witness testified that LBI employees

applied this waiver when they first created securities accounts, coding them as either

"customer" or "non-customer":

> To effectuate the correct allocation to customers for purposes of Rule
> 15c3-3 segregation and the Reserve Account requirements, LBI's
> automated systems depended on correct coding of an account as
> "customer" or "noncustomer" at the time of account creation.  Thus, when
> LBI employees established customer accounts, they would assign account
> numbers that would instruct LBI's automated systems to include debits
> and credits and the corresponding securities as customer in the Rule 15c3-
> 3 reserve computation, and otherwise to distinguish them from non-
> customer accounts.  **Included as non-customers were LBI affiliates that
> had signed subordination agreements**, and LBI affiliates that had not
> (some of which may be customers, depending on the circumstances).

Ex. PD4 (October 6, 2009 McIsaac Affidavit), at ¶ 36 (emphasis added; footnote omitted).

Therefore, LBSF could not have been the "customer" recognized in the coding of the Pledge

Account as "CUST."[21]

---

[21] The SACA, which addressed LBSF's rights as a secured party under the New York UCC, says
nothing of whether LBSF is a "customer" for either SEC or SIPA purposes, or otherwise.  The
SACA fails to address the issue at all, and the "in trust" language cited by the Trustee affected
only LBSF's rights as a secured party.  *See supra* at II.B.1.  Therefore, the SACA does not (as
the Trustee argues) supersede the subordination agreement, because there are no conflicting
provisions between the two documents.  *See* Tr. Reply at ¶ 9 n.7.  Moreover, the Trustee has
represented to this Court, in a pleading filed in this SIPA proceeding, that LBSF *was*
subordinated and had no rights to "customer" protection under either SEC Rule 15c3-3 or SIPA.
Honeywell Dec., Ex. C at ¶ 69 & n.39.

But even assuming, *arguendo*, that LBSF was a "customer," LBI's course of dealing (including
the provisions of the SACA) supports the conclusion that there were two customers: LBSF to the
extent of its security interest, and FirstBank to the extent of its ownership in the collateral it
deposited with LBI.

**2. Allowing FirstBank's SIPA Claim Would Not Require the LBI SIPA Estate to Pay "Twice" for FirstBank's Securities.**

The Trustee argues that FirstBank, not the unsecured creditors, would receive a windfall if the customer claim were allowed.  The Trustee alleges that LBI – and its successor SIPA insolvency estate – would be paying for FirstBank's securities "twice," first when LBI acquired most of FirstBank's securities from LBSF in LBI-LBSF Repo Transactions, and then again by paying FirstBank its SIPA customer claim for the same securities.  Tr. Reply at ¶ 23.

Initially, this overlooks the fact that Barclays paid for the securities when it purchased LBI's assets, leaving LBI as the beneficiary of the proceeds.  LBI in effect paid for FirstBank's securities when it acquired them from LBSF in the LBI-LBSF Repo Transactions.  But Barclays then paid LBI for those securities when it acquired the repo position from the FRBNY and then accepted the LBI assets in satisfaction of LBI's obligations with regard to the repo transaction.  Stip. ¶¶ 39, 41.  Therefore, what LBI paid LBSF in the repo transactions was repaid to LBI by the proceeds of the Barclays sale, which became property of the LBI SIPA estate as of the SIPA Filing Date.  Accordingly, recognizing FirstBank's customer claim will not require LBI to pay for the securities "twice."  It will simply require the Trustee to pay the claim out of the pool of customer property available to the Trustee, including the Barclays sale proceeds.

The Trustee's argument also fundamentally misconstrues its duties in administering LBI's SIPA estate.  The Trustee has three duties with respect to SIPA customer claims: (1) collect "customer property," which includes the proceeds of customer securities sold to others (including the proceeds of the sale of FirstBank's securities to Barclays);[22] (2) determine the

---

[22] This Court expressly ruled that any claims in assets sold in the Barclays sale attached to the sale proceeds.  Ex. PD21 (Chapter 11 sale order), at ¶ 21 (interests in purchased assets of the "Debtors" attach to the proceeds); Ex. PD20 (SIPA sale order), at 1 (LBI a "Debtor" for purposes of the Chapter 11 sale order).  Any proceeds of assets held by LBI and sold to Barclays, including FirstBank's securities, thus became part of the "customer property" held by LBI.

allowable "customer" claims, based on their securities positions at LBI; and (3) pay those

allowed "customer" claims *pro rata* out of "customer property," until they are paid in full. 15

U.S.C. § 78fff-1.  The Trustee himself extensively described his duties in these terms in his

motions to the Court to allocate the property in his custody.  *See, e.g.,* Honeywell Dec., Ex. C at

¶¶ 45-50.  As the Trustee has stated: "Customer Property is accounted for and distributed to

customers in a manner that is separate and distinct from the debtor's General Estate."  *Id.* at ¶ 46.

FirstBank is merely noting that LBI's *customer property* – including the proceeds of FirstBank's

securities sold to Barclays – must first be used to pay *customers* in full, prior to releasing such

property to LBI's general creditors.  This is a basic requirement of SIPA.

FirstBank, as a customer with security entitlements that LBI recognized, should have its

claim paid from *any* customer property held by the Trustee, as required by SIPA.  Paying a

customer claim is not "paying twice."  It is the Trustee's statutory duty.

### 3.  The Trustee Has Not Raised Any Genuine Dispute as to Any Material Fact.

Finally, the Trustee provides an extensive response to FirstBank's Rule 7056-1 Statement

of Undisputed Facts, in an attempt to create the appearance of material fact disputes and prevent

summary judgment in favor of FirstBank.  Of the 148 fact statements offered by FirstBank in its

Rule 7056-1 Statement, the Trustee asserts that 123 of them are disputed.  *See generally* Tr. Obj.

Despite the volume and detail of the Trustee's responses, there are no material facts in

dispute.

### a.  Standard for Responses to a Rule 7056-1 Statement of Undisputed Facts.

The Trustee's objections to FirstBank's Rule 7056-1 statement raise "disputes" that are

either not material, or not genuine disputes.  A fact at issue is only material "when it might affect

the outcome of the suit under governing law."  *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471

(2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.

2007)). A fact is in dispute only when "the opposing party submits evidence such that would require a trial to resolve the differences." *In re Crystal Apparel, Inc.*, 220 B.R. 806, 812 (Bankr. S.D.N.Y. 1998) (citing *In re Tikijian*, 76 B.R. 304, 313 (Bankr. S.D.N.Y. 1987); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

The issues raised by the Trustee (and summarized below) do not preclude the Court from granting FirstBank's motion, because "a factual issue that is not necessary to the decision is not material and a motion for summary judgment may be granted without regard to whether it is in dispute." *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 974-75 (Bankr. S.D.N.Y. 1986).

### b. Summary of the Trustee's Alleged Fact Disputes.

The Trustee's responses – or alleged fact disputes – and FirstBank's replies can be summarized as follows:

1) Trustee's Claim: *The FirstBank Pledge Account was owned exclusively by LBSF, and LBSF was the sole "customer" and "entitlement holder."*[23]

FirstBank's Reply: The Trustee ignores undisputed evidence that FirstBank was also an entitlement holder with respect to the securities positions in the FirstBank Pledge Account, which represented the securities that FirstBank delivered to LBI. The Trustee offers no evidence to contradict FirstBank's evidence that it was both a "customer" and an "entitlement holder."

The undisputed evidence includes:

(a)     LBSF waived "customer" status under both SEC customer protection rules and SIPA, through a subordination agreement with LBI. FBPR Mot. at 12-13; *supra* at II.E.1.

(b)     FirstBank and LBSF were *both* "entitlement holders" with respect to the Pledge Account: FirstBank as an owner of the long positions credited to the Pledge Account based on its securities deliveries to LBI; and LBSF as a secured creditor with a security interest in those positions. FBPR Mot. at 40-47; *supra* at II.B.1.

---

[23] Tr. Obj. ¶¶ 41-43, 49, 51, 53-54, 68, 86, 97, 137.

    (c)      Long positions in LBI's stock record reflected *ownership* of a security, and short positions reflected only the *location* of that security.  SSF ¶ 51.[24]

Even assuming, *arguendo*, that LBSF was a "customer" of LBI with respect to the Pledge Account, this is not material to whether FirstBank was *also* a "customer" of LBI with respect to the long positions in the account.  FBPR Mot. at 32-59; *supra* at II.B.2.

    2)   <u>Trustee's Claim</u>:  *FirstBank was not a customer of LBI, but was exclusively a "client" of LBSF.*[25]

<u>FirstBank's Reply</u>:  The evidence shows that FirstBank was *both* a "customer" of LBI with respect to the long positions in the Pledge Account, *and* a derivatives counterparty of LBSF under the CSA.  This evidence includes the monthly MTM Statements sent to FirstBank, which showed one account number for its derivatives transactions with LBSF (#052394FFED).  Exs. SF18-SF19.  The Pledge Account in LBI's stock records, reflecting FirstBank's deliveries of its

---

[24] The sole evidence cited by the Trustee to dispute this statement (the deposition testimony of James Hraska, a former LBI employee, Tr. Obj. ¶ 51) states the <u>opposite</u> of the Trustee's position with respect to the long positions for FirstBank's securities deliveries: that the long positions represent "an obligation on the books and records of FirstBank."  Ex. SF30, 194:5-196:25.  The fact statement proposed by FirstBank is a near verbatim quote of testimony of the Trustee's own regulatory witness (Daniel McIsaac).  SSF ¶ 51.

The Trustee also attempts to dispute that the collateral listed in the monthly MTM Statements reflected the long positions in LBI's stock record, citing the MTM Statements and stock records in the evidence.  Tr. Obj. ¶ 137, citing Exs. SF18-SF19 and SF7-SF17.  The Trustee provides no evidence to contradict the overwhelming evidence of such a correspondence.  SSF ¶¶ 41, 50, 51, 134-136.  *See also* Stip., Table "A" at nn. 7-8 (explaining the terms "Security" and "Quantity" in the MTM Statements); Declaration of Jeffrey M. Greilsheimer, dated June 26, 2014 [ECF No. 9248] ("Greilsheimer Dec."), Ex. A (SIPA customer claim filed by LBSF), at 11-12, 48, 59 (cover page ¶ 9) (listing all of FirstBank's securities collateral in the name of "FIRSTBANK OF PUERTO RICO" and linking it to both the account number on the first page of each MTM Statement (#052394FFED) and the account number in LBI's stock record (#5797550); also stating that the data was based on "raw data" in Lehman's "Legacy Data Systems").

[25] Tr. Obj. ¶¶ 49, 54, 137.

securities collateral to LBI, had a different account number (#5797550).  Exs. SF7-SF17.[26]  The

Trustee offers no evidence to support that FirstBank contracted away customer treatment.

Moreover, any purported waiver of FirstBank's legal status as a "customer" – whether based on

its dealings with LBSF or otherwise – is void as a matter of law.  FBPR Mot. at 51-52.

3) <u>Trustee's Claim</u>: *FirstBank fails to identify the segregated "safekeeping" account at Chase holding FirstBank's securities collateral; LBI used a non-segregated "LYC" account at Chase for "settling" collateral posted to LBSF, including FirstBank's securities.*[27]

<u>FirstBank's Reply</u>:  The Trustee offers no evidence to support his claim or to contradict

FirstBank's evidence.  FirstBank extensively describes the evidence showing that FirstBank's

securities were first delivered to: (1) a general LBI settlement account at Chased for fixed

income products (with the wire instruction "LEHMAN"); then routed to (2) a segregated

"safekeeping" account at Chase for derivatives products (with the wire instruction

"LBDPCOL"), which LBI coded in its stock record as "SFKP CMW" or "CMW SFKP."  SSF ¶¶

11, 13-16, 35-37, 55-69.  In addition, the Trustee has stipulated that after delivery pursuant to the

CSA, all of FirstBank's securities were deposited in a Chase account coded in LBI's stock record

as a "safekeeping" account.  Stip. ¶¶ 27-30, 32; Ex. SF 7.  The Trustee's own witnesses (Mr.

Legotte and the Trustee's own regulatory witness, Daniel McIsaac) testified in other declarations

to this Court that the "safekeeping" designation for that Chase account ("SFKP CMW" or

"CMW SFKP") meant that it was a segregated account.  SSF ¶¶ 64 n. 13, 65.

---

[26] Other evidence submitted by the Trustee further shows the dual status of FirstBank: The SIPA customer claim filed by LBSF lists all of FirstBank's pledged securities with the "Account Name" of "FIRSTBANK OF PUERTO RICO," and provides both an LBSF account number (#052394FFED) *and* the LBI account number for the Pledge Account (#5797550).  *See* Greilsheimer Dec., Ex. A, at 48. The claim also stated that this data was based on "raw data" in Lehman's "Legacy Data Systems").  *Id.* at 59 (cover page ¶ 9)

[27] Tr. Obj. ¶¶ 14, 37-38, 42, 49-50, 55, 57-61, 63, 65-66, 137.

When FirstBank's securities were *later* used in LBI-LBSF Repo Transactions, they were routed to the non-segregated "LYC" account at Chase (with the wire instruction "LBRDC"), which the Trustee has stipulated was a "clearance box" used for collateral pledged to LBSF. Stip. ¶ 31.  *See also* Honeywell Dec., Ex. I (Chase Account List), at JPM-EXAMINER00006151_000003 (showing wire instructions for the "LYC" account).  The Trustee's description of the "LYC" account as a "settlement" account is consistent with its use for LBI-LBSF Repo Transactions.  The securities were first moved from: (1) the segregated "safekeeping" account, to (2) the non-segregated "LYC" account, then to (3) a proprietary "clearance box" at Chase for LBI (referred to as the "LFN" account).  With respect to LBI-LBSF repos that used FirstBank's securities, this movement was tracked in LBI's stock record as movement from the FirstBank Pledge Account (#5797550), to the "LBSF Collateral Repo Account (#4947410), to LBI's proprietary account (coded "FIRM").  SSF ¶ 57 n. 10; Exs. SF11-SF17, SF27; Stip. ¶¶ 29-33.[28]

_____

[28]  The Trustee's implication that the "LYC" account *was* the "safekeeping" account shown in LBI's stock record (coded as "SFKP CMW") is not supported by any evidence in the record. The Trustee relies on two pieces of evidence: (i) a Chase record showing an LBI-LBSF Repo Transaction (Ex. SF27, Stip. ¶ 29(iv)); and deposition testimony by one of the Trustee's fact witnesses (Mr. Legotte - Honeywell Dec., Ex. B at 65:14-66:8).  Neither contradicts the description above of the use of the various Chase accounts. The Chase transaction record (Ex. SF27) shows only the movement of securities from the "LYC" to the "LFN" account, in an LBI-LBSF Repo Transaction.  Mr. Legotte's testimony only addresses the seizure of securities from the "LYC" account near the time of the SIPA Filing Date.  Neither disputes that FirstBank's securities were *initially* deposited into a segregated "safekeeping" account at Chase (coded "SFKP CMW" or "CMW SFKP" in LBI's stock records).  Moreover, as noted above, the Trustee's own witnesses (Mr. Legotte and Mr. McIsaac) testified to this Court that the "safekeeping" designation for that Chase account ("SFKP CMW" or "CMW SFKP") meant that it was a segregated account.  SSF ¶¶ 64 n. 13, 65.

In any case, the later movement of FirstBank's securities out of that segregated account to the non-segregated "LYC" account and beyond is irrelevant to FirstBank's SIPA customer claim. As FirstBank has shown, its customer claim is based on *securities positions* as of the SIPA Filing Date, not on whether the *securities* themselves had been transferred elsewhere.  FBPR Mot. at 56-59; *supra* at II.C.

4) <u>Trustee's Claim</u>:  *Although LBSF did not initially appoint LBI as a "Custodian" under the CSA, it subsequently made such an appointment*.[29]

   <u>FirstBank's Reply</u>:  The Trustee offers no evidence to support his claim or to contradict FirstBank's evidence.  The CSA expressly provided that the custodian appointment provision was not "initially" applicable for either LBSF or FirstBank.  The CSA did provide that a "Custodian" could later be appointed by notice to the other party.  It is undisputed that FirstBank never received any such notice.  SSF ¶¶ 7, 9-10, 28-34.  The only reference to LBI as a "Custodian" is in the SACA, which expressly provided that LBI was a securities intermediary under the N.Y. UCC.  Ex. SF5, § 1(b)(i).

5) <u>Trustee's Claim</u>:  *LBSF issued various "instructions" to LBI to exercise its rights with regards to FirstBank's securities collateral*.[30]

   <u>FirstBank's Reply</u>:  The Trustee offers no evidence to support his claim or to contradict FirstBank's evidence.  The Trustee does not dispute that LBSF had no offices or employees.  Tr. Obj. at ¶¶ 118-19.  Therefore, there were no LBSF personnel to issue any instructions.  The evidence shows that all aspects of LBSF's derivatives business, including the custody and use of collateral posted by LBSF counterparties, was controlled by LBI personnel.[31]

---

[29] Tr. Obj. ¶¶ 10-12, 30.

[30] Tr. Obj. ¶¶ 16, 18, 37, 41, 53, 94, 106.

[31] The Trustee goes so far as to misquote a passage from the MTM Statements, to suggest that LBSF was involved in the collateral valuations provided in the statements.  Tr. Obj. ¶ 124 (quoting a passage on securities valuations in the MTM Statements – "any theoretical or actual internal valuation employed by [LBSF] for our own purposes" – and stating that the bracketed text was in the original ("alterations in original")).  In fact, the original text was different and did not include the bracketed text.  *See* Exs. SF18-SF19.

6) <u>Trustee's Claim</u>:  *Various LBI business and accounting practices, and broker-dealer industry practices, are irrelevant to FirstBank's SIPA customer claim.*[32]

<u>FirstBank's Reply</u>:  To the contrary, all of the evidence of LBI's course of dealing and industry practice (or "usage of trade") is relevant to LBI's "agreement" (as defined in the N.Y. UCC) to treat FirstBank as the owner of the long positions in the FirstBank Pledge Account (#5797550).  This "agreement" is in turn relevant to whether LBI maintained a "securities account" for FirstBank, for purposes of the N.Y. UCC and the SIPA "customer" definition.  The evidence establishes as a matter of law that LBI maintained such a "securities account" for FirstBank.  *See supra* Part II.B.[33]

7) <u>Trustee's Claim</u>:  *The conclusions of Anton Valukas, the Chapter 11 Examiner, are not admissible evidence.*[34]

<u>FirstBank's Reply</u>:  This is incorrect as a matter of law.  *See In re Fibremark, Inc.*, 339 B.R. 321, 325-327 (Bankr. D. Vt. 2006) (an examiner's conclusions and recommendations are admissible as an expert opinion and helpful to the court in understanding facts, but are not intended to establish evidence); *see also In re Adelphia Commc'ns Corp.*, 348 B.R. 99, 107 & n.19 (Bankr. S.D.N.Y. 2006) (citing *Fibremark* and analogizing examiner to "a court-appointed expert").  In addition, both this Court and the District Court have cited the Examiner Report in proceedings related to Lehman Brothers.  *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 814

---

[32] Tr. Obj. ¶¶ 47-48, 74-80, 83-84, 86.

[33] The Trustee attempts to dispute part of the evidence of LBI's course of dealing – that LBI's business in fixed income derivative products was one of its largest businesses – by disputing a description of such business in an SEC report, which referred to it as a "Lehman" business.  Tr. Obj. ¶ 85.  The Trustee's own investigation report to the Court described fixed income derivatives products as *LBI's* business, conducted through LBSF.  SSF ¶ 70.  The only reasonable inference is that the SEC report was describing the same LBI business.

[34] Tr. Obj. ¶ 119.

(Bankr. S.D.N.Y. 2010) (citing the Examiner Report); *In re Lehman Bros. Secs. and ERISA Litig.*, 2012 WL 983561 at *2 (S.D.N.Y. 2012) (citing the Examiner Report).[35]

8) <u>Trustee's Claim</u>:  *The phrase "FirstBank's securities collateral" is disputed as used to apply to securities posted by FirstBank as collateral.*[36]

<u>FirstBank's Reply</u>:  This claim is not a material dispute, and is frivolous.  The fact statements in which this phrase is used, SSF ¶¶ 106-108, 134, show that the phrase refers to the securities posted by FirstBank under the CSA and delivered to LBI's settlement account at Chase.  The Trustee has stipulated that LBI received and held all of FirstBank's 23 FNMA and GNMA securities as collateral under the CSA.  Stip. ¶¶ 27, 43.

9) <u>Trustee's Claim</u>:  *The use of various dating phrases ("executed," "entered into," "amended" or "dated") to refer to certain contracts is disputed, when such contracts were dated "as of" such dates.*[37]

<u>FirstBank's Reply</u>:  This is not a material dispute.  It is undisputed that the contracts referenced in those statements were entered into (or in one case, amended) as of the dates indicated.

---

[35] In disputing the Examiner's conclusion, the Trustee adds a statement that the Court "has recognized that LBI and LBSF are separate entities."  Tr. Obj. ¶ 119; *see also* Tr. Reply, ¶ 12 n. 10.  Contrary to the Trustee's assertions, FirstBank is *not* trying to ignore the corporate separateness of LBI and LBSF.  FirstBank has proven that LBI's course of dealing with FirstBank's securities collateral involved only LBI personnel who managed and controlled all aspects of the holding and use of that collateral.  This course of dealing is part of the evidence of LBI's "agreement" that FirstBank was the owner of the collateral, for purposes of the "securities account" definition in the N.Y. UCC and the SIPA "customer" definition.

[36] Tr. Obj. ¶¶ 106-108, 134.

[37] Tr. Obj. ¶¶ 1, 28, 88.

10) <u>Trustee's Claim</u>:  *FirstBank's descriptions of various text in documents offered in evidence are disputed*.[38]

    <u>FirstBank's Reply</u>:  This is not a material dispute.  The Trustee provides his own quotations and paraphrasing of the same text, but offers no evidence that FirstBank's descriptions are inaccurate.  The documents speak for themselves.

11) <u>Trustee's Claim</u>:  *Various additional facts dispute FirstBank's fact statements*.[39]

    <u>FirstBank's Reply</u>:  The Trustee repeatedly violates Federal Rule of Civil Procedure 56(c)(1) and Local Rule 7056-1(c) by adding additional irrelevant facts to his responses.  The Trustee makes no effort to show how these additional facts are germane to any issue before the Court, or how they create a material factual dispute of the evidence proffered by FirstBank.

    In sum, the Trustee submits no "evidence such that would require a trial to resolve the differences."  *In re Crystal Apparel, Inc.*, 220 B.R. at 812.  The Trustee's attempt to manufacture factual disputes when there are none material to FirstBank's SIPA customer claim should not be countenanced by the Court.  The only element of FirstBank's customer claim that the Trustee contests is whether LBI maintained a "securities account" for FirstBank.  The Trustee offers no evidence to contradict FirstBank's evidence that it did.

### III.    CONCLUSION

    For the foregoing reasons and the reasons stated in FirstBank's Memorandum in Support of its Motion for Summary Judgment and Opposition to the Trustee's Motion to Expunge, the Court should award FirstBank a SIPA customer claim for the full amount of the net equity in its

---

[38] Tr. Obj. ¶¶ 3-6, 9, 22, 24, 56, 58, 95-99, 104, 124-125.

[39] Tr. Obj. ¶¶ 10, 12, 14-15, 18, 22-24, 26-27, 29, 35-36, 38-42, 49-53, 56, 61, 66-68, 70-71, 81-83, 85, 87, 89, 93-94, 98, 101, 103, 105-107, 110, 113-115, 117, 119-132, 134-137, 140-141, 144, 148.

account as of the filing date of this SIPA proceeding.  The motion of the Trustee to expunge the

FirstBank SIPA customer claim should be denied**.**

DATED this 5th day of September, 2014.


By:  /s/Robert T. Honeywell
Richard S. Miller (RM–2428)
Robert T. Honeywell (RH–7684)
K&L GATES LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 536-3922
Facsimile:  (212) 536-3901
Email:  richard.miller@klgates.com
Email:  robert.honeywell@klgates.com

Richard A. Kirby
K&L GATES LLP
1601 K Street N.W.
Washington, DC 20006
Tel: 202-778-9000
Fax: 202-778-9100
Email:  richard.kirby@klgates.com

*Attorneys for FirstBank Puerto Rico*