Hearing Date and Time:  December 10 at 10:00 a.m. (Prevailing Eastern Time)
Response Date and Time:  October 31 at 4:00 p.m. (Prevailing Eastern Time)

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

      LEHMAN BROTHERS INC.,

                      Debtor.

                Case No. 08-01420 (SCC) SIPA

---

### NOTICE OF TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR PROOF OF CLAIM OF RALPH HARARY (CLAIM NO. 8002386)

    **PLEASE TAKE NOTICE** that on October 10, 2014, James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. (the "Debtor" or "LBI"), under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), by and through his undersigned counsel, filed an objection to general creditor claim number 8002386, filed by Ralph Harary (the "Objection").

    **PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will be held, if necessary, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 623, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **December 10, 2014 at 10:00 a.m. (Prevailing Eastern Time)** or as soon thereafter as counsel may be heard (the "Hearing").

    **PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must:  (i) be in writing; (ii) state the name and address of the responding party and nature of the

claim or interest of such party; (iii) state with particularity the legal and factual bases of such response; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in accordance with General Order M-399 by registered users of the Court's Electronic Case Filing system, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format no later than **October 31, 2014 at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York 10004, Attn: Meaghan C. Gragg, Esq.; (b) the Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (c) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq., with a courtesy copy to the chambers of the Honorable Shelley C. Chapman, Courtroom 623, One Bowling Green, New York, New York, 10004.

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Objection, which may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
October 10, 2014

HUGHES HUBBARD & REED LLP

By: /s/ James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Robert B. Funkhouser
Meaghan C. Gragg
Jordan E. Pace
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail: kobak@hugheshubbard.com

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

**Hearing Date and Time:  December 10, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time:  October 31, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:(212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re: | |
|---|---|
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| Debtor. | |

## THE TRUSTEE'S OBJECTION TO THE GENERAL CREDITOR
## <u>PROOF OF CLAIM OF RALPH HARARY (CLAIM NO. 8002386)</u>

# TABLE OF CONTENTS

RELIEF REQUESTED..........................................................................................................1

JURISDICTION AND VENUE .............................................................................................2

BACKGROUND ....................................................................................................................2

BACKGROUND OF THE CLAIM........................................................................................4

THE CLAIM SHOULD BE DISALLOWED AND EXPUNGED .........................................5

    I.        MOST OF THE CLAIMS ARE TIME-BARRED ...........................................6

      A.     The Federal Securities Fraud Claim Is Time-Barred ......................................6

      B.     The Negligence Claim Is Time-Barred..........................................................7

    II.       THE CLAIM FOR COMMON LAW FRAUD IS LEGALLY
            INSUFFICIENT...............................................................................................8

      A.     The Claim Is Not Pled with Particularity as Required by Rule 9(b) .............8

      B.     The Claim Does Not Allege Any Misrepresentation or Culpable Omission.................9

    III.      THERE IS NO PRIVATE RIGHT OF ACTION BASED ON NASD/FINRA
            RULES...........................................................................................................11

RESERVATION OF RIGHTS .............................................................................................12

NOTICE................................................................................................................................12

NO PRIOR RELIEF REQUESTED .....................................................................................12

CONCLUSION.....................................................................................................................13

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660
(Bankr. S.D.N.Y. Feb. 20, 2007) ......................................................................5

*Arnold v. KPMG LLP*, 334 F. App'x 349 (2d Cir. 2009) ......................................................7

*Asbestosis Claimants v. U.S. Lines Reorg. Trust (In re U.S. Lines, Inc.)*, 262 B.R. 223
(S.D.N.Y. 2001), *aff'd sub nom. In re U.S. Lines, Inc.*, 318 F.3d 432 (2d Cir. 2003)..............6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................10

*Atmosphere Sciences, LLC v. Schneider Adv. Techs., Inc.*, No. 12 Civ. 3223 (SAS), 2012
U.S. Dist. LEXIS 135099 (S.D.N.Y. Sept. 19, 2012) ...................................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................9

*In re Brill*, 318 B.R. 49 (Bankr. S.D.N.Y. 2004) ...........................................................6

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir. 1993).....................................7

*Coleman & Co. Sec., Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288 (S.D.N.Y.
2002) ................................................................................................................7

*In re DJK Residential LLC*, 416 B.R. 100 (Bankr. S.D.N.Y. 2009)............................8, 9

*Fulton County Employees Ret. Sys v. MGIC Inv. Corp.*, 675 F.3d 1047 (7th Cir. 2012)..............10

*In re Hess*, 404 B.R. 747 (Bankr. S.D.N.Y. 2009) ........................................................6

*Johnston v. Norton*, No. 92 Civ. 6844 (CSH), 1993 U.S. Dist. LEXIS 16000 (S.D.N.Y.
Nov. 8, 1993) ...................................................................................................8

*Kosovich v. Metro Homes, LLC*, No. 09 Civ. 6992 (JSR), 2009 U.S. Dist. LEXIS 121390
(S.D.N.Y. Dec. 30, 2009), *aff'd on other grounds*, 405 F. App'x 540 (2d Cir. 2010) .............9

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413 (1996)...........................................10, 11

*Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Brothers
Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012)..............................................9

*Louros v. Kreicas*, 367 F. Supp. 2d 572 (S.D.N.Y. 2005) ...............................................7

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 Civ. 8472 (JFK),
2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. June 26, 2008) .........................................8

*In re Oneida Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon Co. v. Oneida Ltd.*, No. 09 Civ. 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010) ............................................................................................................5

*In re Rockefeller Ctr. Props.*, 272 B.R. 524 (Bankr. S.D.N.Y. 2000) .............................................5

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..........................................................................8

*Weinraub v. Glen Rauch Secs., Inc.*, 399 F. Supp. 2d 454 (S.D.N.Y. 2005), *aff'd*, 180 F. App'x 233 (2d Cir. 2006) ............................................................................................11

*Wendt v. Bent Pyramid Prods., LLC*, 108 A.D.3d 1032 (4th Dep't 2013) ...................................11

STATUTES AND RULES

11 U.S.C. § 502 ...........................................................................................................1, 5, 6

11 U.S.C. § 558 ...................................................................................................................6

15 U.S.C. § 78aa ...............................................................................................................2

15 U.S.C. § 78eee ............................................................................................................2

15 U.S.C. § 78fff ..............................................................................................................1

15 U.S.C. § 78fff-1 ..........................................................................................................1

15 U.S.C. § 78j .................................................................................................................7

15 U.S.C. § 78u-4 ............................................................................................................9

26 U.S.C. § 1042 ..............................................................................................................4

28 U.S.C. 1658 .................................................................................................................7

N.Y. C.P.L.R. 214 ............................................................................................................7

Fed. R. Bankr. P. 7009 ....................................................................................................8

Fed. R. Bankr. P. 9014 ....................................................................................................8

Fed. R. Civ. P. 8 ..............................................................................................................9

Fed. R. Civ. P. 9 ..............................................................................................................8

REGULATIONS

17 C.F.R. § 240.10b-5 ......................................................................................................7

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business

of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as

amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] by and through his undersigned counsel,

respectfully represents as follows:

## **RELIEF REQUESTED**

1.       The Trustee files this Objection (the "Objection") pursuant to section 502(b) of

title 11 of the United States Code (the "Bankruptcy Code"), as made applicable to this

proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, seeking disallowance and

expungement of the general creditor claim filed by Ralph Harary (the "Claimant" or "Mr.

Harary"), represented by claim number 8002386 (annexed hereto as Exhibit A) (the "Claim").

The Trustee's proposed order (the "Proposed Order") is annexed hereto as Exhibit C.

2.       The Claim arises out of a portfolio of securities and interest rate swaps assembled

by or for the Claimant in late 2002 and early 2003.  The Claimant alleges that LBI is liable for

unsuitable, negligent, and fraudulent recommendations and representations regarding the

portfolio.

3.       The Trustee's counsel have reviewed the Claim and determined that there is no

basis for LBI to be liable.  The securities in the portfolio were purchased outside of the

limitations period for federal securities fraud and negligence, making those claims time-barred.

Moreover, the Claim fails to properly plead common law fraud based on any alleged

---

1.   For convenience, subsequent references to SIPA may omit "15 U.S.C."

representations made by LBI or its employees, and the Claim makes clear that the

representations were not false when allegedly made.

4.      Accordingly, the Trustee requests that the Claim be disallowed and expunged in

its entirety.

## JURISDICTION AND VENUE

5.      Following removal to this Court for all purposes as required for SIPA cases by

section 78eee(b)(4) of SIPA, this Court has "all of the jurisdiction, powers, and duties conferred

by [SIPA] upon the court to which application for the issuance of the protective decree was

made."  SIPA § 78eee(b)(4).

6.      Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and 15 U.S.C.

§ 78aa.

## BACKGROUND

7.      On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch,

United States District Court, Southern District of New York, entered the Order Commencing

Liquidation (the "LBI Liquidation Order," ECF No. 1) pursuant to the provisions of SIPA in the

case captioned *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, Case No. 08-

CIV-8119 (GEL).  The LBI Liquidation Order, *inter alia*, (i) appointed the Trustee for the

liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; and (ii) removed the

case to this Court for all purposes as required in SIPA cases by section 78eee(b)(4) of SIPA, in

the case captioned *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (the "SIPA

Proceeding").

8.      On November 7, 2008, the Court entered the Order Approving Form and Manner

of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for

Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Other

Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Claims Process Order," ECF No.

241).  Beginning on December 1, 2008, consistent with SIPA section 78fff-2(a)(1), the Trustee

mailed more than 905,000 claims packages with filing information to former LBI customers and

other potential claimants (the "Claims Process Notice") and posted claims filing information on

the Trustee's website (www.lehmantrustee.com) and SIPC's website (www.sipc.org).  The

Trustee also published notice of the claims process in *The New York Times*, *The Wall Street

Journal*, and *The Financial Times*.

9.      Pursuant to SIPA § 78fff-2(a)(3) and the Customer Claims Process Order,

customer claims seeking maximum protection under SIPA must have been received by the

Trustee on or before January 30, 2009.  All customer claims and general creditor claims must

have been received by the Trustee by June 1, 2009 and no claims of any kind will be allowed

unless received by the Trustee on or before June 1, 2009 (the "Pre-Filing Bar Date").  In addition

to the Pre-Filing Bar Date, on September 19, 2013, the Bankruptcy Court entered an order (the

"Administrative Bar Date Order") that established October 31, 2013 (the "Administrative Bar

Date") as the deadline to file a proof of claim for administrative expense claims against the LBI

estate, as further described in the Administrative Bar Date Order, with respect to such

administrative expenses arising between September 19, 2008 and August 31, 2013.  The

Administrative Bar Date has now passed.  A copy of the Customer Claims Process Order was

made publicly available at www.lehmantrustee.com.  The Trustee's website allowed claimants

filing electronically to upload documents as part of their claim submission and thereby comply

with the instructions to include supporting documentation set forth in the Proof of Claim.

## BACKGROUND OF THE CLAIM[2]

10.     In August 2002, Claimant Ralph Harary sold his stock in Jacques Moret, Inc. to the company's employee stock ownership plan.  (*See* Letter from Lloyd S. Clareman to SIPA Trustee, Jan. 29, 2009 (the "First Claim Letter") at 1, annexed as Exhibit 1 to the Declaration of Jordan E. Pace (the "Pace Decl."), annexed hereto as Exhibit B; Letter from Lloyd S. Clareman to Benjamin Galynker, June 23, 2014 (the "Second Claim Letter") at 1, annexed as Exhibit 2 to the Pace Decl.)  Under the Internal Revenue Code, the Claimant would be able to defer recognition of any taxable gain on the sale so long as he invested in Qualified Replacement Property.  ("QRP," defined in 26 U.S.C. § 1042(c)(4)).  *See* 26 U.S.C. § 1042.

11.     In approximately October 2002, Allen Reichman ("Mr. Reichman") of "Lehman Brothers" allegedly recommended a QRP portfolio "consisting of fixed-rate bonds paired with an interest rate swap."  (Second Claim Letter at 2.)  Mr. Reichman also allegedly represented certain other features of the recommended portfolio, including its performance relative to other portfolios and the ability to borrow on margin against 95% of the value of portfolio.  (*Id.*)

12.     Between November 2002 and July 2003, Mr. Reichman allegedly made further recommendations and purchased, on the Claimant's behalf, certain securities to create a portfolio consisting of fixed-rate bonds coupled with swaps.  (*Id.* at 3.)  "Lehman or a Lehman entity . . . acted as the counterparty for the swaps."  (*Id.*)  The Claimant then took out a margin loan of approximately 95% of the value of his QRP.  (*Id.*)  As part of this process, the Claimant signed a Client Agreement for each of two accounts (the "Accounts") set up for the portfolio.  (*See* Client

---

2.  The facts recited herein are allegations taken from the Claim and letters submitted by the Claimant in support of the Claim, unless otherwise indicated. The Trustee reserves all rights to challenge the veracity and relevance of any of these facts.

Agreements, annexed as <u>Exhibits 3 & 4</u> to the Pace Decl.; Form of Client Agreement LBF

(4/02), annexed as <u>Exhibit 5</u> to the Pace Decl.)

13.    According to the Claimant, "there were no problems . . . until late 2007." (Second

Claim Letter at 3.) In October 2007, "as conditions in the credit markets deteriorated," Lehman

allegedly informed the Claimant of problems with his portfolio. (*Id.*) For various reasons,

Lehman allegedly reduced the amount of margin it was willing to lend to the Claimant—from

95% down to 80%—and made a margin call. (*Id.* at 3-4.)

14.    In late 2007, the Claimant allegedly terminated the swaps in his portfolio and

made a payment of $3.8 million to Lehman in respect of the termination. (*Id.* at 4.) In March

2008, the Claimant transferred his QRP portfolio to UBS. (*Id.*)

15.    The Claimant did not file suit or initiate any other dispute resolution proceeding

prior to the Filing Date. On or about January 29, 2009, the Claimant filed the Claim, seeking

$3.8 million in damages.[3]

## THE CLAIM SHOULD BE DISALLOWED AND EXPUNGED

16.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is

asserted, the claimant has the burden to demonstrate the validity of the claim. *See In re Oneida*

*Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon Co. v. Oneida*

*Ltd.*, No. 09 Civ. 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010); *In re*

*Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr.

S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y.

2000). Moreover, section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a

---

3.    The Court has capped the Claimant's maximum potentially allowed claim at $3.8 million. (*See* Order, entered
July 30, 2014 (ECF No. 9520), Sched. C at C-92.)

claim may not be allowed to the extent that "such claim is unenforceable against the debtor and

property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

17.     The Claim seeks damages of $3.8 million based on allegations of federal

securities fraud (unsuitability), negligence, and common law fraud (misrepresentation).  As each

of these claims is insufficient as a matter of law, the Claim should be disallowed and expunged

in its entirety.

## I.     MOST OF THE CLAIMS ARE TIME-BARRED

18.     LBI is not liable to the Claimant because the statute of limitations on the

unsuitability and negligence claims expired before LBI's Filing Date and the Claimant had not

previously commenced any action.  A claim rendered unenforceable by the statute of limitations

is not allowable under Bankruptcy Code sections 502(b)(1) and 558.  *In re Hess*, 404 B.R. 747,

749 (Bankr. S.D.N.Y. 2009).  Section 558 provides that the estate "shall have the benefit of any

defense available to the debtor as against any entity other than the estate, including statutes of

limitation . . . ."  11 U.S.C. § 558.  As a result, "the plain language of §§ 502(b)(1) and 558

indicates that if the applicable state statute of limitations bars enforceability of a claim, it is not

allowable."  *In re Hess*, 404 B.R. at 749 (chapter 13 debtor entitled to assert statute of limitations

defense); *accord Asbestosis Claimants v. U.S. Lines Reorg. Trust (In re U.S. Lines, Inc.)*, 262

B.R. 223 (S.D.N.Y. 2001) (plan trustee entitled to assert statute of limitations defense), *aff'd sub

nom. In re U.S. Lines, Inc.*, 318 F.3d 432 (2d Cir. 2003); *In re Brill*, 318 B.R. 49, 53 (Bankr.

S.D.N.Y. 2004) (trustee entitled to assert statute of limitations defense).

### A.     The Federal Securities Fraud Claim Is Time-Barred

19.     On its face, the "[C]laim arises from an unsuitable recommendation by [LBI]."

(First Claim Letter at 1.)  Unsuitability is a form of federal securities fraud under Section 10(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.

§ 240.10b-5.  *See Louros v. Kreicas*, 367 F. Supp. 2d 572, 585 (S.D.N.Y. 2005) (citing *Brown v.*

*E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993)).  Actions alleging violations of

Section 10(b) and Rule 10b-5 must be commenced within the shorter of two years from

discovery or five years from the alleged violation.  28 U.S.C. § 1658(b).  The accrual date is "the

date the parties have committed themselves to complete the purchase or sale transaction."

*Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009) (internal citation omitted).  The

Claimant alleges that the securities at issue were purchased between November 2002 and July

2003, more than five years before the Filing Date.  (Second Claim letter at 3.).  Accordingly, the

Claim is time-barred to the extent it claims unsuitability.

**B.    The Negligence Claim Is Time-Barred**

20.    The Claimant also alleges that LBI's alleged recommendation was negligent.

(First Claim Letter at 1.)  Under New York law, claims of negligence are subject to a three-year

statute of limitations.  N.Y. C.P.L.R. 214(4).  The accrual date is the date of injury.  *Coleman &*

*Co. Sec., Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 303 (S.D.N.Y. 2002).  In the

context of unsuitability, a claim for negligence accrues when the claimant purchases and receives

allegedly unsuitable securities.  *See id.* ("Respondents were injured as of the dates of purchase—

May 1994 through March 1995—when they received shares in private, start-up companies that

were risky and illiquid instead of investments that were safe and secure.").  Again, the Claim

arises from securities allegedly purchased between November 2002 and July 2003, more than

three years before the Filing Date.  (Second Claim Letter at 3.)  Accordingly, the Claim is time-

barred to the extent it claims negligence.

## II.    THE CLAIM FOR COMMON LAW FRAUD IS LEGALLY INSUFFICIENT

### A.    The Claim Is Not Pled with Particularity as Required by Rule 9(b)

21.    The Claim relies on factual allegations that are vague, generalized, and that do not

meet the requisite pleading standard.  "In determining whether a party has met their burden in

connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set

forth in the Federal Rules of Civil Procedure," including Rule 9.  *In re DJK Residential LLC*, 416

B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009); *see also* Fed. R. Bankr. P. 7009 & 9014(c) (applying

Rule 9 to contested matters in bankruptcy proceedings).  Rule 9(b) requires that, "[i]n alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake."  Fed. R. Civ. P. 9(b).  This heightened pleading requirement applies not only to strict

fraud claims but also to any other claim based on allegations of fraudulent conduct, however

denominated.  *See Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (noting that Rule

9(b) "is not limited to allegations styled or denominated as fraud or expressed in terms of the

constituent elements of a fraud cause of action"); *see also In re Merrill Lynch & Co., Inc.*

*Research Reports Sec. Litig.*, No. 02 Civ. 8472 (JFK), 2008 U.S. Dist. LEXIS 53923, at *22

(S.D.N.Y. June 26, 2008) (applying Rule 9(b) to non-fraud claims that "indisputably [were]

based on plaintiffs' allegations of Defendant's fraudulent conduct"); *Johnston v. Norton*, No. 92

Civ. 6844 (CSH), 1993 U.S. Dist. LEXIS 16000, at *61 (S.D.N.Y. Nov. 8, 1993) (dismissing

negligent misrepresentation claim based on same allegations as deficient Section 10(b) fraud

claim).

22.    The claim for common law fraud is based on alleged misrepresentations and must

be supported by factual allegations specifying "the fraudulent content of the speech, the time and

place at which the statements were made, and the identity of individuals making the fraudulent

statements." *Atmosphere Sciences, LLC v. Schneider Adv. Techs., Inc.*, No. 12 Civ. 3223 (SAS),

8

2012 U.S. Dist. LEXIS 135099, at *18 (S.D.N.Y. Sept. 19, 2012) (internal quotation marks and

citation omitted). The claim must also specify the "precise content of the alleged misstatements."

*Kosovich v. Metro Homes, LLC*, No. 09 Civ. 6992 (JSR), 2009 U.S. Dist. LEXIS 121390, at *9

(S.D.N.Y. Dec. 30, 2009), *aff'd on other grounds*, 405 F. App'x 540 (2d Cir. 2010).  The Claim

does not provide the required level of detail with respect to any alleged misrepresentation,

instead merely alleging that some vaguely described misrepresentations were made at some point

during the ten-month period between October 2002 and July 2003.  (*See* Second Claim Letter at

2-3.)  There is no specificity as to where, to whom, or by what means the alleged

misrepresentations were made.  There are no allegations as to the precise content of the alleged

misrepresentations.  Accordingly, the Claim is legally insufficient to the extent it claims common

law fraud.[4]

### B.    The Claim Does Not Allege Any Misrepresentation or Culpable Omission

23.    As noted above, courts look to the Federal Rules of Civil Procedure in

determining whether a proof of claim is sufficient.  *In re DJK Residential LLC*, 416 B.R. at 106.

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This standard "requires more than labels and

conclusions"; it requires the claimant to provide "enough facts to state a claim to relief that is

plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  To show

facial plausibility, each claimant must plead "factual content that allows the court to draw the

---

4.    Moreover, claims alleging federal securities fraud must state with particularity the "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Brothers Holdings Inc.)*, 469 B.R. 415, 434 (Bankr. S.D.N.Y. 2012); *In re DJK Residential LLC*, 416 B.R. at 107.  The allegations of the Claim do not meet this standard, so the portion of the Claim alleging federal securities fraud is improperly pled in addition to being time-barred.

reasonable inference that the [debtor] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

24.     Among the essential elements of a common law fraud claim is misrepresentation or omission of a material fact. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). This element is lacking from the Claim because the two supposed misrepresentations were not false. First, the alleged misrepresentation that the Claimant would be allowed to take out a margin loan at 95% of the value of the collateral (*see* Second Claim Letter at 5) was not false because, as the Claimant admits, he was allowed to take out "the maximum margin loan, approximately 95% of the QRP collateral value" (*id.* at 3). When LBI allegedly made a margin call and reduced the amount of allowable margin *several years later* in October 2007 (*id.* at 3-4), LBI was acting within its rights under the margin agreement section of the Client Agreement. (*See* Form of Client Agr. ¶ 16 ("The minimum and maximum amount of any particular loan may be established by you in your discretion . . . and you may change such minimum and maximum amounts from time to time."), ¶ 17 ("I understand that you may demand full payment of the balance due . . . at your sole option, at any time and whether or not such demand is made for your protection.").) The Claimant cannot claim fraud based on LBI's exercise of a contractual provision to which the Claimant agreed.

25.     Second, the alleged misrepresentation that the recommended portfolio would replicate a different structure (*see* Second Claim Letter at 5) was not false when made because, as the Claimant admits, there were no issues for several years until "conditions in the credit markets deteriorated" in October 2007 (*id.* at 3). In other words, the QRP portfolio performed as allegedly promised, until the subprime crisis hit. The Claimant cannot claim fraud based on LBI's failure to foresee the subprime crisis. *See Fulton County Employees Ret. Sys v. MGIC Inv.*

*Corp.*, 675 F.3d 1047 (7th Cir. 2012) (the failure to defendant's failure to foresee the subprime

crisis, including its failure to foresee margin class, could not constitute fraud).  Moreover, there

is no allegation as to how another structure would have performed.  Thus, the Claimant has not

alleged a misrepresentation.

26.    Third, the Claimant cannot claim fraud based on the alleged failure to disclose

any financial incentives for whatever Lehman entity was the swap counterparty.  (*Cf. id.* at 5.)

The Claimant has not alleged any facts establishing either that a counterparty has a duty to

disclose incentives when entering into an arm's-length transaction such as a swap or that there

was a conflict of interest.  As such, the essential element of a misrepresentation or an omission is

lacking.  Moreover, there are no allegations that, if true, would establish LBI's knowledge of the

falsity of any misrepresentation or the need to correct an omission, which is another essential

element of common law fraud.  *See Lama Holding*, 88 N.Y.2d at 421.

27.    Because the Claim fails to allege these essential elements, it is insufficient as a

matter of law to the extent it claims common law fraud.

## III.    THERE IS NO PRIVATE RIGHT OF ACTION BASED ON NASD/FINRA RULES

28.    The Claimant alleges that LBI was negligent because it allegedly violated a

standard of care based on NASD/FINRA's unsuitability rule.  (Second Claim Letter at 4.)  This

is insufficient as a matter of law because the rules of self-regulatory organizations like NASD

and FINRA do not confer a private right of action and cannot serve as the basis for an actionable

standard of care.  *See, e.g., Weinraub v. Glen Rauch Secs., Inc.*, 399 F. Supp. 2d 454, 462

(S.D.N.Y. 2005) ("Weinraub cannot state a valid cause of action based on violations of New

York Stock Exchange and NASD rules and guidelines, as these rules confer no private right of

action." (footnote omitted)), *aff'd*, 180 F. App'x 233 (2d Cir. 2006); *Wendt v. Bent Pyramid*

*Prods., LLC*, 108 A.D.3d 1032, 1033 (4th Dep't 2013) (citing *Weinraub* and dismissing a negligent supervision claim because FINRA rules do not impose a duty of care sufficient to support a state law private right of action).  Absent an actionable standard of care that was allegedly violated, the claim for negligence is insufficient as a matter of law.

### RESERVATION OF RIGHTS

29.    The Claim may be objectionable on a number of additional grounds.  The Trustee reserves all rights to object on any other basis to the Claim or any portion of the Claim for which the Court does not grant the relief requested herein.

### NOTICE

30.    Notice of this Objection has been provided to:  (i) the Claimant via first-class mail; and (ii) the list of parties requesting notice of pleadings in accordance with the Court's Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(a) and 9007 Implementing Certain Notice and Case Management Procedures and Related Relief entered by the Court on July 13, 2010 (ECF No. 3466), and will be immediately available for inspection upon filing with the Court  at the Trustee's website, www.lehmantrustee.com.  The Trustee submits that no other or further notice need be provided.

### NO PRIOR RELIEF REQUESTED

31.    No previous request for the relief requested herein has been made by the Trustee to this or any other Court.

## CONCLUSION

32.     For the reasons stated herein, the Trustee respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.


Dated: New York, New York
        October 10, 2014

                                            HUGHES HUBBARD & REED LLP


                                            By: _/s/ James B. Kobak, Jr._____
                                                James B. Kobak, Jr.
                                                Christopher K. Kiplok
                                                Robert B. Funkhouser
                                                Meaghan C. Gragg
                                                Jordan E. Pace
                                            One Battery Park Plaza
                                            New York, New York 10004
                                            Telephone: (212) 837-6000
                                            Facsimile:  (212) 422-4726
                                            E-mail: kobak@hugheshubbard.com

                                            *Attorneys for James W. Giddens,
                                            Trustee for the SIPA Liquidation of
                                            Lehman Brothers Inc.*

**EXHIBIT A**

**CUSTOMER CLAIM FORM LEHMAN BROTHERS INC. FILING CONFIRMATION**

Your customer claim form in the SIPA liquidation of Lehman Brothers Inc. was successfully filed on Please print this page as proof of your filing.

| Claim Number |
| --- |
| 800002386 |

| First Name | Middle Name | Last Name |
| --- | --- | --- |
| RALPH | | HARARY |

| Business Name | Representative Name |
| --- | --- |
| | |

**Mailing Address**

C/O JAQUES MORET INC
1411 BROADWAY
NEW YORK, NY  100183496
UNITED STATES

### Item 1

| LBI owes me a credit or cash in the amount of: |
| --- |
| $3,800,000.00 |

| I owe LBI a debit or cash in the amount of: |
| --- |
| $0.00 |

| Debit balance to be paid: |
| --- |
| $0.00 |

### Item 2

| LBI owes me securities: |
| --- |
| No |

| LBI owes me securities: |
| --- |
| No |

### Item 3

| Claim based on a commodity futures account: |
| --- |
| No |

| Amount of Claim: |
| --- |
| $0.00 |

| Basis of Claim: |
| --- |

| Claim has been estimated: |
| --- |
| Yes |

**Items 4 - 11**

| 4. Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | No |
| --- | --- |
| 5. Has there been any change in your account since September 19, 2008? | No |
| 6. Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI?<br><br>The claim is filed on behalf of Ralph Harary, a customer of Lehman Brothers Inc.  Account statements for two accounts are attached to the supporting documentation as Attachments 2 and 3. | Yes |
| 7. Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s). | No |
| 8. Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI? | No |
| 9. Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming. | No |
| 10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers. | No |
| 11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker. | No |

**Preparer and Signature Information**

| |
| --- |

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS INC.,

Debtor.

Case No. 08-01420 (SCC) SIPA

## DECLARATION OF JORDAN E. PACE
## IN SUPPORT OF THE TRUSTEE'S OBJECTION TO THE GENERAL
## CREDITOR PROOF OF CLAIM OF RALPH HARARY (CLAIM NO. 8002386)

Pursuant to 28 U.S.C. § 1746, I, Jordan E. Pace, hereby declare as follows:

1.      I am an attorney duly admitted to practice in this Court and an associate at the law firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens, trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI").  I submit this declaration in support of the Trustee's Objection to the General Creditor Proof of Claim of Ralph Harary (Claim No. 8002386) (the "Objection").[1]

2.      Attached hereto as Exhibit 1 is a true and correct copy of a letter dated January 29, 2009, from Lloyd S. Clareman to the Trustee, that was submitted by the Claimant in support of the Claim.  Account statements originally attached to the letter have been omitted.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a letter dated June 23, 2014, from Lloyd S. Clareman to Benjamin Galynker, that was submitted by the Claimant in support of the Claim.

---

1.   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

4.    Attached hereto as Exhibits 3 and 4 are true and correct copies of signature pages of Client Agreements for accounts maintained by the Claimant at LBI, which were obtained from LBI's electronic files.  Having reviewed the account documents maintained by LBI in its electronic files for numerous accounts, I understand that LBI often retained only the signature page where an agreement was on one of LBI's standard forms.  The Client Agreements are on form "LBF (4/02)."

5.    Attached hereto as Exhibit 5 is a true and correct copy of form "LBF (4/02)" that was obtained from LBI's electronic files.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 10, 2014.

_____/s/ Jordan E. Pace_____
Jordan E. Pace

**EXHIBIT 1**

LLOYD S. CLAREMAN
A PROFESSIONAL CORPORATION
ATTORNEY AT LAW
121 EAST 61ST STREET
NEW YORK, NEW YORK 10065

E-MAIL ADDRESS:
LLOYD.CLAREMAN@CLAREMAN.COM

TELEPHONE (212) 751-1585
TELECOPIER (212) 838-0814

January 29, 2009

**Filed Electronically**
SIPA Trustee
c/o Lehman Brothers Inc. Claims Processing
Epiq Bankruptcy Solutions
10300 SW Allen Blvd
Beaverton, OR 97005

     Re:   *Claim of Ralph Harary, Former Customer*

Dear Sir or Madam:

     I am the attorney for claimant Ralph Harary, whose accounts at Lehman Brothers included nos. ████4759 and ████8901██. It is possible that additional accounts were maintained in Mr. Harary's name for related purposes but I'm sure Lehman's records will be cross-referenced to so indicate. I am enclosing herewith a monthly account statement from each of the referenced accounts just to ensure that you will be able to locate the full records of these accounts.

     This claim was under investigation by me at the time that Lehman filed for bankruptcy protection. In accordance with the automatic stay provisions triggered by that filing, this claim is being filed with you instead of with FINRA.

     This claim arises from an unsuitable recommendation by Lehman to claimant Ralph Harary, that he restructure an existing transaction involving the sale of over $50 million worth of the stock of Mr. Harary's closely held apparel company, Jacques Moret, Inc. ("Moret") to the Moret employee stock option plan ("ESOP"). Lehman's advice, which was entirely unsuitable and therefore either fraudulent or negligent, has cost Mr. Harary millions of dollars. The transaction at issue is a relatively complex one, but the problem with Lehman's

SIPA Trustee
January 29, 2009
Page 2

advice is clear:  even though claimant already had in place a perfectly sound and
suitable transactional structure that was implemented through UBS (another
broker-dealer), Lehman solicited the claimant to swap out of the UBS structure
in favor of a Lehman-designed scheme that Lehman claimed was better.
Lehman represented to the claimant that it could deliver all the characteristics of
the existing UBS structure, but Lehman further claimed that it had the ability to
offer more attractive terms because of its ability to execute this complex
transaction in a slightly different way.  This advice was profoundly erroneous.
Claimant relied on Lehman's advice and swapped out of the UBS transaction.

The results to the customer of following Lehman's advice have proven to
be financially catastrophic.  The synthetic instrument manufactured by Lehman
did not perform in the same manner as the traditional floating rate notes
("FRN's") that Lehman caused Mr. Harary to replace.  Moreover, Lehman
represented that an important advantage of its structure, compared to UBS's, was
that the margin lending limits would be greater at Lehman because Lehman
would hold the collateral in a bank affiliate.  However, without the customer's
authorization, Lehman transferred the collateral to the broker-dealer, thereby
substantially increasing the margin pressure on the account and eliminating the
prime alleged advantage of the Lehman structure.  Lehman told the customer,
after the fact, that it had taken this unauthorized step because it did not have the
"internal controls" to handle the collateral at the bank, as represented.

I am enclosing herewith an opinion from Prairie Capital Advisors, Inc., a
firm that specializes in ESOP transactions of the type at issue, regarding the
improper nature of Lehman's advice and conduct, and the resulting damages
incurred by Mr. Harary.  These damages include but are not limited to the
$3,800,000 loss occasioned by the need to unwind the swap when Lehman's
structure failed to perform as represented and had to be moved out of Lehman.
What has not been quantified to date are the considerable profits that Lehman
obtained by selling the defective swap (for which Lehman was the counterparty)
and by causing the sale of the pre-existing collateral under the UBS structure and
the purchase of new collateral, all through Lehman.  Those profits should be
disgorged as part of this claim.  There are also tax, interest, and opportunity
costs that have not yet been quantified.

SIPA Trustee
January 29, 2009
Page 3

Please let me know if there is any further information that you require.
Thank you for anticipated attention to this claim.

Respectfully yours,

Lloyd S. Clareman

Attachments:
    1. Prairie Capital opinion letter
    2. Ralph Harary account statement for account ████4759
    3. Ralph Harary account statement for account ████8901

# ATTACHMENT 1

prairie capital
advisors, inc.

January 29, 2009

Mr. Lloyd S. Clareman
Attorney at Law
121 East 61st Street
New York, New York 10065

Re:    Moret Group/Ralph Harary ESOP Transaction with Lehman Brothers

Dear Mr. Clareman:

Per our engagement we have reviewed the information that was supplied to us regarding the structure used to initiate and maintain the selling shareholder's (Ralph Harary's) Qualified Replacement Property (QRP) portfolio associated with the Moret Group ESOP transaction. With regard to the implementation of an appropriate actively managed QRP investment strategy asset quality and investment longevity are paramount due to the long term nature and leverage attributes associated with such a strategy.

It is our opinion that the QRP structure that was proposed and subsequently implemented by Lehman Brothers was an unsuitable investment recommendation based on the client's specific requirements associated with the pursuit of a QRP investment strategy. It is our understanding that Lehman Brothers secured the business through the presentation of certain yield enhancements without fully exposing the additional risk associated with such a strategy. Additionally, the presentation of this strategy allowed Lehman Brothers to secure the QRP business at a time when another investment firm was already engaged in the implementation of a widely utilized QRP strategy. We find that the strategy proposed and implemented by Lehman Brothers placed the client in a position of undue risk relative to the primary objectives of an active QRP strategy. These actions likely enriched Lehman Brothers through the additional fees and the asset pricing associated with the pursuit of such a strategy. Issues related to the strategy are as follows:

**Structural Issues**

The structure that was utilized by Lehman Brothers in the satisfaction of the QRP requirements of section 1042 contained inherent risks that extended beyond the normal QRP practices at the time the strategy was implemented. Active QRP portfolio strategies have historically utilized high quality, floating rate notes (FRN) to satisfy the QRP requirement. FRN are generally issued by highly rated (AAA or AA) Fortune 100 Companies and are structured to be held for long durations because pursuant to the tax code, once purchased, the holder is prohibited from selling the security without adverse tax consequences. Additionally, in order to monetize the investment, the holders of FRN generally margin the notes. Considering the duration of the instrument and the holder's intent to margin the securities, the FRN's are designed to trade at par value. Due to the quality of the FRN credit ratings as well as the variable interest rate characteristics of the securities, FRN generally do not deviate from par value.

Lehman Brothers attempted to synthetically replicate a floating rate note structure through the use of Corporate Backed Trust Certificates (Trust) which contained a highly rated fixed rate note and a swap instrument. The securities were sold as a synthetic alternative to traditional FRN which were to be held to the maturity of the underlying securities.

Oakbrook Terrace Tower ■ One Tower Lane ■ Suite 2210 ■ Oakbrook Terrace, IL 60181
630.443.9933 ■ f 630.443.9227 ■ www.prairiecap.com

Mr. Lloyd S. Clareman
January 29, 2009
Page 2

The Trust securities contained multiple layers of risk, counterparty and otherwise, that are not inherent in the traditional FRN structure. This additional risk would likely be expected due to the superior yield of these securities and as such the investment advisor should have cautioned the investor particularly given the anticipated holding period of suitable securities. The additional risk allowed for the generation of enhanced relative cash flows which extended beyond the traditional FRN structure. Lehman Brothers enhanced its structure by allowing the client to borrow against the trust instrument through a margin loan with Lehman Bank. The bank allowed the client to borrow 95.0% against the Trust while traditional brokerage firms, who are subject to margin loan regulations, would only allow the client to borrow approximately 88.0% against the Trust. Subsequent to the transaction, Lehman Brothers told the client it could no longer provide a margin loan through Lehman Bank due to a "lack of internal controls" at the bank regarding interest calculations. Without the client's approval, the securities had been moved to Lehman Brokerage, and Lehman Brothers demanded a margin call for the difference between the bank's lending percentage and the brokerage regulated percentage.

An FRN should be immune to changes in the interest rate environment. However, due to the Trust security containing two different holdings there is a risk that a fixed rate note and a pay floating swap will not necessarily move in perfect tandem as interest rates fluctuate. This potentially creates a spread in the value attributes of the underlying securities and thus an increase or decline in the pricing of the trust security around par. It is not clear that Lehman properly disclosed the risk associated with the swap to the client.

Traditional FRN losses are limited to the value of the security alone. In the instance of the Trust securities, losses could be realized not only with the underlying bond, but also with the swap allowing for greater loss potential and a much riskier investment given the importance of principal protection in an active QRP structure. There are a number of factors that extend beyond interest rate movements and credit risk which affect the pricing of the swap. Accordingly, considering the holder's intent to margin the FRN, the Trust Securities structured by Lehman exposed the holder to margin calls when the bond and swap did not move in perfect tandem.

## Lehman Specific Issues

The transaction structure that was proposed by Lehman Brothers provided a large profit opportunity and conflict with regard to the objectivity of the investment recommendation particularly given the long term investment horizon generally associated with an active QRP strategy.

There was a lack of clarity with regards to the pricing of the underlying securities held in the trust making the determination of pricing of the Lehman issued securities difficult. The pricing of the Trust securities lacked transparency given that the Trust securities and the underlying swaps and notes were not traded in an active market.

The swap spread provided an attractive yield for Lehman Brothers, who was the swap counter party. As an example in November 2002, the rate associated with the swap was 1.932 (3-month LIBOR + 50bps) vs. the 7.000% fixed payment associated with the GEI note. This 5.068% spread would have generated a $608,160 annual profit should rates remain constant (which is unlikely in the long run). That being said, while there is risk inherent on the pay floating swap, in the 10 years leading up to the transaction there were only two times when this pay floating swap would have turned negative – during one month in 1994 and during an eight month period in 2000. It is difficult to price the value of the swap at the time of the transaction due to the lack of futures pricing detail in 2002; however it is safe to say that on a present

Mr. Lloyd S. Clareman
January 29, 2009
Page 3

value basis the value of the swap was significant. These structural issues permeate all of the Trust securities that were sold to the client.

The Trust structure also presented problems in that there was a reporting requirement associated with them. In the case of the GEI Trust security, as a non publicly traded subsidiary, GEI had no requirement to comply with the reporting requirement. This eventually created a problem with the GEI Trust security that is not normally seen in QRP structures and represents an additional risk factor that the client was fortunate to avoid.

Based on the Trust structure Lehman was intertwined in the transaction on multiple levels – issuer, lender, swap counterparty, and investment manager – presenting potential profit that put them in a position of greater conflict than would normally be seen in most QRP structures.

The utilization of a Lehman controlled bank to extend greater degrees of leverage provided additional benefits to the structure (95.0% margin vs. 88.0% margin at a brokerage house as noted earlier) however forcing the movement of the margin relationship back to the broker not only caused a large margin call but was a significant modification to the value proposition that was sold to the client. Citing the lack of "internal controls" as the justification was particularly concerning given that Lehman could reduce their own risk profile at will based on the demand note structure used within Lehman Bank.

## Damages

Based on the recommendations of Lehman Brothers, the lack of suitability of the structure and the inability to achieve the return expectations associated with the proposed structure we find that the damages to the client, Ralph Harary, associated with the failure of the Lehman Brothers structure to be as follows:

- The client's loss of $3,800,000 which was used to pay off the swap agreements imbedded in the Trust structure.
- The client's investment opportunity loss associated with the $3,800,000 pay off of the swap agreements.
- The client's opportunity loss on $1,000,000 which was used to pay down the margin loan with Lehman Bank due to the deterioration in value of the underlying QRP, less the margin interest that would have been paid in order to keep the securities intact.
- The client's cost to liquidate securities needed to a prematurely cover the initial margin call, which triggered capital gains tax and limited the investment potential of the liquidated assets.
- A claim for legal, professional and Lehman Brothers fees generated and incurred from the beginning of the transaction to date due to the inappropriate and complex nature of some of the investment instruments.
- A claim on the potential benefits to Lehman Brothers achieved through the pricing of the Trust securities that were sold to the client at par. Pricing of the notes and the swap instrument held within the Trust lacked transparency and the lack of a ready market provided for potential profiteering beyond industry norms.

Prairie Capital Advisors, Inc. was retained by the client in 2008 to review the Lehman Brothers structure in order to opine on the suitability of the structure for QRP purposes. Both Robert J. Gross and David M. Diehl reviewed the documentation and structure. Robert J. Gross is a Senior Managing Director and Co-Founder of Prairie Capital Advisors, Inc. He has worked with ESOPs for over 25 years and holds a Bachelor's degree and a Masters in Business Administration from University of Wisconsin Whitewater.

Mr. Lloyd S. Clareman
January 29, 2009
Page 4

Robert often lectures on the topic of ESOPs, is a member and Past Chairman of the The ESOP Association's Valuation Committee and has acted as an expert witness regarding numerous ESOP related matters. David M. Diehl is a Director with Prairie Capital Advisors, Inc. David has worked with ESOPs for over 9 years and holds a Bachelors degree from Indiana University Bloomington as well as a Masters in Business Administration from Northwestern University (Kellogg). David is also a CFA charterholder. Prairie Capital Advisors, founded in 1996, is primarily focused on serving the investment banking and ownership transition needs of privately held business owners. Over 60% of the firms business entails working with ESOP related business. Prairie Capital Advisors currently has over 140 ESOP clients and is engaged on roughly 15 ESOP related transactions annually.

Sincerely,

*Prairie Capital Advisors, Inc.*

Prairie Capital Advisors, Inc.

**EXHIBIT 2**

LLOYD S. CLAREMAN

A PROFESSIONAL CORPORATION
ATTORNEY AT LAW
121 EAST 61ST STREET
NEW YORK. NEW YORK 10065

E-MAIL ADDRESS:
LLOYD.CLAREMAN@CLAREMAN.COM

TELEPHONE (212) 751-1585
TELECOPIER (212) 838-0814

June 23, 2014

**Via Email**
Benjamin Galynker, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

Re:    *Lehman Brothers/Ralph Harary Claim No. 8002386*

Dear Ben:

I am writing in response to your email and our subsequent telephone conversations in which you identified certain aspects of my client Ralph Harary's claim as to which the Trustee was interested in receiving additional information. I understood you to state that you wanted to receive more information concerning the timeline of events; who at Lehman was involved; the computation of damages; what the applicable standard of care is with regard to the negligence claim and how we would establish it; and more particularized allegations concerning the claim of fraud. I will endeavor to provide that information in this letter.

As I'm sure you understand, we have not had the benefit of any discovery with respect to Lehman's documents concerning the transactions at issue, and the information set forth in this letter obviously reflects only the information that is currently known to the claimant or that is a matter of logical inference; accordingly we reserve the right to supplement our allegations based on information that we may eventually obtain from Lehman, or pursuant to our further investigation and analysis. Documents reflecting Lehman's remuneration for the portfolio it recommended to Mr. Harary (including in particular for the implementation and termination of the swaps, which it did not disclose), and its contemporaneous internal communications concerning the design of that portfolio (including risks and potential benefits to the firm and to the customer, respectively), would be of particular relevance. With that caveat, Mr. Harary responds as follows to the request of counsel for the Trustee for additional information concerning his claim:

**Relevant Timeline:**

August 2002: Ralph Harary sold his ownership interest in Jacques Moret to the company Employee Stock Ownership Plan ("ESOP") pursuant to Section 1042 of the tax code. Mr.

Benjamin Galynker, Esq.
June 23, 2014
Page 2

Harary worked with Keith Mericka and Andy Byer at UBS on the initial planning and effectuation of this sale, and had been receiving and following UBS's recommendations regarding the structure of a Qualified Replacement Property ("QRP") portfolio which would be purchased with the proceeds of Mr. Harary's sale. Mr. Harary had the investment objectives for his QRP portfolio that were typical of someone who engages in this type of transaction: safety of principal was critical; the assets needed to be held long-term until his death, so that his heirs could receive the benefit of a step-up in basis; and the securities needed to be of high quality not only from the standpoint of safety of principal, but also so that they could serve as collateral supporting a margin loan, for liquidity purposes, to the maximum extent possible.

October 2002 (approx.): Allen Reichman of Lehman Brothers solicited Gary Herwitz, an accountant for Harary whom Reichman had met socially in the town where they both lived, to let him recommend an alternative QRP portfolio that Reichman claimed would have advantages over the portfolio being recommended by UBS. UBS was suggesting a market-conventional structure using floating rate notes. Lehman, through Reichman, recommended a different structure featuring the inclusion of a synthetic purported substitute for floating rate notes, consisting of fixed-rate bonds paired with an interest rate swap whereby the fixed rate interest on an underlying bond would be swapped with a counterparty – which turned out to be a Lehman subsidiary – in exchange for a payment tied to LIBOR plus a spread. Reichman claimed that the fixed-rate/swap structure would perform identically to a floating rate note, but would enhance the interest rate return sufficiently to eliminate the "negative carry," i.e., the small differential between the yield of a floating rate note tied to LIBOR, and the interest rate at which banks would extend margin loans on the collateral (also tied to LIBOR). Reichman further claimed that because Lehman Brothers had a bank subsidiary, Lehman would be able to provide more liquidity (approximately 95% of the collateral value) than other brokerage firms, which generally offered loan to value percentages of about 88%. Reichman induced this transaction with those two specific representations, and failed to identify or advise Harary about any scenarios in which these representations could potentially prove to be untrue; despite the fact that Reichman and Lehman knew, or should have known, that one or both of these crucial features could unravel under adverse market conditions in the future. Given the very long term nature of a QRP portfolio, a financial advisor in the position of Lehman and Reichman must foresee the possibility, indeed the likelihood, that adverse market conditions will be encountered at some point during the holding period; and the advisor therefore has a duty to recommend a suitable portfolio that will perform acceptably under those circumstances since the portfolio cannot be altered later without incurring significant adverse tax consequences. Instead of recommending a suitable portfolio of conventional, high quality floating rate instruments, with adequate diversification as to issuer and sector, and instead of warning Harary about risks that should have been foreseeable (to experts in the field) of a synthetic structure, utilizing only two issuers from the financial services sector to collateralize a high loan-to-value margin loan, Reichman and Lehman emphasized the potential advantages of the structure they recommended (elimination of the negative carry and the high loan-to-value capability of Lehman Bank), and omitted to disclose material information about its potential disadvantages, specifically the vulnerability of

2

Benjamin Galynker, Esq.
June 23, 2014
Page 3

this structure, compared with a market-conventional, diversified floating-rate portfolio, to adverse market conditions.

November 2002 – July 2003:  Reichman and Lehman recommended to Harary, and executed, the purchase of over $40 million worth of specific securities (featuring fixed rate bonds coupled with swaps) comprising the QRP portfolio.  Approximately half of the QRP would be held in a Lehman account that was pledged as collateral for a loan taken by the ESOP to finance the purchase of Harary's ownership interest, and thus could not serve as collateral for a margin loan to Harary; and the other roughly half would be in a Lehman account that Harary could use to support a personal margin loan.  The holdings in each account consisted of the following: for the pledged account, $15 million face amount of American General Trust (an AIG company); $5 million of Citigroup; and $4.5 million of GE Global Insurance; and for the Harary margin account, $12.275 million of Citigroup, and $7.5 million of GE Global Insurance.  The foregoing fixed rate bonds recommended by Lehman had swap agreements associated with them as underlying securities.  The swap agreements were an integral part of Lehman's recommendation and were structured by Lehman.  Pursuant to the Lehman-directed structure, Lehman or a Lehman entity (e.g., Lehman Brothers Derivative Products, Inc.) acted as the counterparty for the swaps.  At no time during the discussion of the proposed transaction, or thereafter, did Mr. Reichman disclose Lehman's financial gain for effecting a swap in conjunction with the sale of fixed rate notes to Harary, which is believed to have been substantially higher than what Lehman's compensation would have been for the sale of conventional floating rate notes of equal value; or that this enhanced compensation had the inherent potential to, and in fact did, create a conflict of interest that impacted Reichman's and Lehman's recommendation to Harary of the fixed rate/swap combination.  As had been proposed by Lehman from the outset, Harary took out the maximum margin loan, approximately 95% of the QRP collateral value in his margin account, from Lehman Bank.  Despite the unsuitably high level of risk to Harary embedded within this complex Lehman-recommended portfolio and loan structure, there were no problems that resulted in any injury until late 2007.

October 2007:  In October 2007, as conditions in the credit markets deteriorated, Harary was informed by Lehman that significant problems had developed with respect to his QRP portfolio and the margin loan associated with it.  By this time, Reichman had departed from Lehman, and Seth Michaels had taken charge of the relationship for the firm.  In a meeting attended by Gary Herwitz on behalf of Mr. Harary in October 2007, Mr. Michaels, acting for Lehman, stated that (1) Lehman Bank lacked the internal controls to monitor the collateral for Mr. Harary's margin loan; that one of the issuers, GE Global Insurance, was not Sarbanes-Oxley compliant; and that accordingly the loan would have to be moved from the bank to the Lehman Brothers brokerage firm which could only lend at 80% loan to value versus 95% through Lehman Bank (thereby rendering illusory one of the key representations made by Lehman and Reichman in inducing Harary to enter into the Lehman-designed structure); (2) the value of the underlying collateral had fallen, and the swap values were working against Harary as well; and (3) that as a result of these factors, Lehman was making a massive margin call on Harary in

3

Benjamin Galynker, Esq.
June 23, 2014
Page 4

excess of $5 million and thus a very large amount of additional collateral was needed in Harary's account in order to avoid a sell-out that would generate a major tax liability.

Late 2007: Approximately $5 million in additional securities were deposited to Harary's account at Lehman as collateral, and guarantees obtained from family members, to forestall a margin sellout. Ultimately, these added securities were sold and the proceeds were used to terminate the swaps in the margin account, for which a payment of $3.8 million was made to Lehman, and the balance credited against the margin loan.

March 2008: Amid ongoing demands by Lehman for additional collateral and threats to liquidate Harary's account (in the form of margin calls), as reflected in the attached letter from Michaels to Harary dated March 7, 2008, the QRP portfolio was transferred to UBS.


**Damages:**

The damages sustained by Harary include, at a minimum, the $3.8 million payment made to Lehman to terminate the swaps in the margin account, plus the opportunity cost on those funds. Damages can also be measured by the difference between the value that a suitable, conventional QRP portfolio would have, compared to the value of the QRP portfolio recommended and sold to Harary by Reichman and Lehman. In addition, any profits or compensation taken by Lehman and its registered representatives (including but not limited to Reichman) in connection with these transactions should be disgorged as damages. As stated previously, discovery from Lehman is required with respect to its remuneration, in particular its profits from the swaps as well as markup on the sale of the bonds.


**Negligence Issues:**

You questioned what the applicable standard of care is, and whether Harary would rely on anything or anyone besides the Prairie Capital letter attached to the claim to establish the standard of care in the industry. Please be advised that in addition to relying upon Prairie Capital's letter, Harary expects to rely on expert opinion to be furnished by Robert Bozza of Bates Group LLC. Mr. Bozza has extensive experience in Section 1042 ESOP transactions of the type that Mr. Harary engaged in, and is highly familiar with the applicable standard of care in the industry that a brokerage firm or registered representative is required to exercise when recommending a QRP portfolio in the context of this type of transaction. That standard is fundamentally tied to the NASD's (now FINRA's) suitability rule, which sets the baseline standard of care for every recommendation made by a registered person to a customer. In light of the investment objectives of Mr. Harary as noted at the outset of this response (objectives which were not only expressed to Mr. Reichman but which were moreover typical of a business owner who enters into this type of transaction, and therefore were known or should have been

4

Benjamin Galynker, Esq.
June 23, 2014
Page 5

known to Mr. Reichman and Lehman, who held themselves out as being capable and experienced in this area), the QRP portfolio that Reichman and Lehman recommended and implemented was unsuitable and therefore below the standard of care that was and is applicable in the industry. A suitable QRP portfolio is designed, above all, to retain its value, and not generate margin calls or other financial stresses, for the remainder of the customer's lifetime. The portfolio recommended by Reichman and Lehman did not meet that test, whereas a conventional structure, in line with industry norms (*i.e.,* floating rate notes issued by a number of top-tier credits, without swaps and with less concentration risk) would have done so.

The negligence claim did not accrue until October 2007, when the margin call and associated injury first occurred. Harary's claim against Lehman for negligence was timely filed within three years of accrual.

**Fraud Issues**:

As set forth above, Lehman (through Reichman) affirmatively misrepresented that the fixed rate/swap structure would replicate a floating rate note in all material respects by providing stability in collateral value, and misrepresented Lehman's ability to maintain a margin loan at or close to 95% loan to value through its Bank subsidiary. The falsity of those representations was first discovered by Harary in October 2007, and this claim was brought within two years of discovery of the fraud.

As also discussed above, Reichman and Lehman failed to disclose the financial incentives that they had to recommend the fixed rate/swap structure over the conventional floating rate note structure, or the conflict of interest created by that differential in revenue and its tendency to cause Reichman and Lehman to recommend, at the customer's risk and expense, a structure that was more beneficial to them than to the customer. As noted, Harary still does not know the amount of revenue earned by Lehman on these transactions but suspects and believes that it was much larger than the revenue that would have been earned on a conventional portfolio; and that this undisclosed revenue differential is, at least in large part, the reason for Reichman and Lehman's improper recommendation. The failure to disclose this conflict of interest or the underlying facts concerning remuneration that led to it operated as a fraud upon Mr. Harary. Although, as noted, the extent of Lehman's remuneration for recommending and implementing this damaging structure is still unknown, Mr. Harary brought this claim within two years of being put on notice that he had been misled by Lehman and Reichman.

\*\*\*

I hope the foregoing is responsive to your inquiry. I would be pleased to discuss these issues or any other aspects of the claim with you further, if that would assist in your evaluation.

Benjamin Galynker, Esq.
June 23, 2014
Page 6

Sincerely,

Lloyd S. Clareman

Enclosure

6

# LEHMAN BROTHERS

SETH MICHAELS
SENIOR VICE PRESIDENT
EQUITY FINANCE

March 7, 2008

Mr. Ralph Harary
c/o Jaques Moret Inc.
1411 Broadway
New York, N.Y. 10018

Re: Notice of Margin Call / Account Liquidation

Mr. Ralph Harary
c/o Jaques Moret Inc.
1411 Broadway
New York, N.Y. 10018

Re: Notice of Margin Call / Account Liquidation

Dear Mr. Harary:

Your representatives have indicated to us a course of action that will result in the movement of your accounts and loans to another financial institution, commencing start of business Tuesday March 11, 2008. The course of action includes the immediate additional pledge or transfer of assets held by Joseph Harary in a UBS brokerage account to Lehman Brothers.

Your representatives further indicated that the financial institutions you are considering have granted all requisite credit approvals; that there would be no delay in commencing the transfer of your accounts and loans; and you have received proper legal, tax and financial counsel regarding the transfers and the specific steps required by you to effect the transfers.

Notwithstanding market conditions, we will accommodate this last attempt to resolve this matter. However, should the transfer process not commence by start of business March 11, 2008 or should there be any delay in effecting the complete transfer, we will immediately take steps to cure the margin deficiency, including liquidation of your accounts and the guarantors' accounts to satisfy any indebtedness owed by you to us.

By copy of this letter, we are also notifying Jack Beyda, Alan Sassoon, Joseph Harary and the trustee Irwin Luxenberg, who have guaranteed the accounts.

LEHMAN BROTHERS INC
745 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TEL 212-526-5440 FAX 212-519-1098
EMAIL SMICHAELS@LEHMAN COM

Mr. Ralph Harary
March 7, 2008
Page 2

You may contact me at 212-526-5440 with any questions you may have or to coordinate
providing your Lehman Brothers Investment Representative instructions to effect the transfers.

Sincerely,

Seth Michaels
Senior Vice President


cc:    Brian Snarr
       Jack Beyda
       Alan Sassoon
       Joseph Harary
       Irwin Luxenberg

**EXHIBIT 3**

# LEHMAN BROTHERS

P.O. Box 2016
Jersey City, NJ 07303-2016

## Client Agreement

Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about your new account. Read the information carefully and retain it for future reference.

| Account Number | | | | | |
|---|---|---|---|---|---|
| Branch | Account  4 7 5 9 | T | C | IR | |

Account Title / Name  *Ralph Harary*

Account Title / Name

Mailing Address  *c/o JACQUES MORET INC 1411 BROADWAY N.Ye. N.Y. 10018*

**A. Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my correct taxpayer identification number or if not, then the number I have entered above (and to the right) is my correct tax identification number, and I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). *Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certification required to avoid backup withholding.*

For those exempt from backup withholding (see instructions on page 4) write the word "EXEMPT" here:_____

**B. Client Acknowledgement.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).* I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.

| 1. Account Owner's Signature (Please sign in box)  *Ralph Harary* | Date  2/24/03 | 2. Account Owner's Signature (Please sign in box) | Date |
|---|---|---|---|
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

**C. Name Disclosure.** *Please indicate your choice as the release or withholding of your name, address and securities positions to issuing corporations.*

☐ YES, I do want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").

☑ NO, I do not want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").

**D. Cash Investment Agreement.** Lehman will be authorized (but not required) to invest or "sweep" available cash in your account into the Lehman Bank Cash Deposit Accounts "Cash Deposits" or a money fund *unless* you elect otherwise below. If you want to choose a particular money market fund or you do *not* want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of cash investment, please contact your Investment Representative. *(Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a cash investment sweep for your account.)*

☑ YES, I want the cash balances in my account automatically swept into a cash investment of my choice.

☐ NO, I do not want cash balances in my account automatically swept into a cash investment.

**E. Joint Account With Rights of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Agreement As Tenants in Common in addition to this Client Agreement. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).*

**F. Margin Account Agreement.** *Complete this section only if you accept the margin agreement described in paragraph 16 through 19 of this agreement. In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement. By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others. If this is a joint account, all parties must sign.*

| 1. Account Owner's Signature (Please sign in box) | Date | 2. Account Owner's Signature (Please sign in box) | Date |
|---|---|---|---|
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number | | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |
|---|---|---|---|---|

LBF (4/02)

1

**EXHIBIT 4**

## LEHMAN BROTHERS
P.O. Box 2016
Jersey City, NJ 07303-2016

### Client Agreement

Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about your new account. Read the information carefully and retain it for future reference.

Account Number
Branch | Account | T | Lc | IR
8 9 0 1 1

Account Title / Name
Ralph Harary

Account Title / Name
Pledged Collateral Acct FBO JP Morgan Chase

Mailing Address
C/O Jacques Moret Inc.
1411 Broadway 8th Fl New York, NY 10018

**A. Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my current taxpayer identification number or if not, then the number I have entered below (and to the right) is my correct tax identification number, and I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividend, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certification required to avoid backup withholding.

For those exempt from backup withholding (see instructions on page 4) write the word "EXEMPT" here:_____

**B. Client Acknowledgment.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3862). I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.

| 1. Account Owner's Signature (Please sign in box) | Date | 2. Account Owner's Signature (Please sign in box) | Date |
|---|---|---|---|
| Ralph Harary | 11/14/06 | | |
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

**C. Name Disclosure.** Please indicate your choice as the release or withholding of your name, address and securities positions to issuing corporations.
- ☐ YES, I do want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").
- ☒ NO, I do not want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").

**D. Cash Investment Agreement.** Lehman will be authorized (but not required) to invest or "sweep" cash in your account into the Lehman Bank Cash Deposit Accounts "Cash Deposits" or a money fund unless you elect otherwise below. If you want to choose a particular money market fund or you do not want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of cash investment, please contact your Investment Representative. (Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a cash investment sweep for your account.)
- ☒ YES, I want the cash balances in my account automatically swept into a cash investment of my choice.
- ☐ NO, I do not want cash balances in my account automatically swept into a cash investment.

**E. Joint Account With Rights of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Agreement As Tenants in Common in addition to this Client Agreement. Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3862).

**F. Margin Account Agreement.** Complete this section only if you accept the margin agreement described in paragraph 16 through 19 of this agreement. In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement. By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others. If this is a joint account, all parties must sign.

| 1. Account Owner's Signature (Please sign in box) | Date | 2. Account Owner's Signature (Please sign in box) | Date |
|---|---|---|---|
| | | | |
| 3. Account Owner's Signature (Please sign in box) | Date | 4. Account Owner's Signature (Please sign in box) | Date |

Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |
|---|---|---|---|

LBF (4/02)

**EXHIBIT 5**

# LEHMAN BROTHERS

P.O. Box 2016
Jersey City, NJ 07303-2016

## Client Agreement

**Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about your new account. Read the information carefully and retain it for future reference.**

| Account Number | | | | | |
|---|---|---|---|---|---|
| Branch | Account | | T | C | IR |

Account Title / Name

Account Title / Name

Mailing Address

**A. Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my current taxpayer identification number or if not, then the number I have entered below (and to the right) is my correct tax identification number, and I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividend, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). *Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certification required to avoid backup withholding.*

For those exempt from backup withholding (see instructions on page 4) write the word "EXEMPT" here:_____

**B. Client Acknowledgment.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).* **I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.**

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |

**C. Name Disclosure.** *Please indicate your choice as the release or withholding of your name, address and securities positions to issuing corporations.*
- ☐ YES, I do want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").
- ☐ NO, I do not want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").

**D. Cash Investment Agreement.** *Lehman will be authorized (but not required) to invest or "sweep" cash in your account into the Lehman Bank Cash Deposit Accounts "Cash Deposits" or a money fund unless you elect otherwise below. If you want to choose a particular money market fund or you do not want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of cash investment, please contact your Investment Representative. (Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a cash investment sweep for your account.)*
- ☐ YES, I want the cash balances in my account automatically swept into a cash investment of my choice.
- ☐ NO, I do not want cash balances in my account automatically swept into a cash investment.

**E. Joint Account With Rights of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Agreement As Tenants in Common in addition to this Client Agreement. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).*

**F. Margin Account Agreement.** *Complete this section only if you accept the margin agreement described in paragraph 16 through 19 of this agreement. In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement.* **By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others.** *If this is a joint account, all parties must sign.*

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |

*Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner*

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |
|---|---|---|---|

LBF (4/02)

In consideration of Lehman accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by your internal records. Throughout this agreement, "I", "me", "we", and "us" refer to the client and all others who are legally obligated on my accounts. "You" and "your" refer to Lehman , its subsidiaries, parents and their officers, directors, agents and/or employees.

**1. MY REPRESENTATIONS.** I represent that I am of the age of majority according to the laws of my place of residence. I further represent that I am not an employee of any exchange or the National Association of Security Dealers, Inc. ("NASD"), or of a member firm of any exchange of the NASD or of a bank, trust company, insurance company, registered investment company or registered investment advisory firm unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no person other than those signing this agreement have an interest or beneficial ownership in my account. I understand that Lehman is prohibited under the NASD's "Free Riding and Withholding Interpretation" from selling securities in certain public offerings to persons restricted by such rules. To my best knowledge, I am not presently restricted, and if I become so restricted I agree to notify you promptly.

I represent that the financial information and investment objectives provided to you accurate in all material respects and that I will promptly inform you of any material changes in my financial or other circumstances, including my investment objectives.

**2. DEFINITION OF "PROPERTY".** In this agreement the word "property" means securities of all kinds, certificates of deposit, commercial paper, monies, cash deposits, options, commodities and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

**3. ORDERS, EXECUTIONS, DELIVERIES, SETTLEMENTS AND ORAL AUTHORIZATIONS.** In giving orders to sell, I will inform you which sales are "short" and which are "long" sales. A "short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is my representation that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver it to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand or notice, sell all securities or other property held by you in any of my accounts and any resulting loss will be charged to my account. Unless I direct that an order to purchase or sell securities be executed on a specified exchange or market and you agree to such execution, you will, at your sole discretion and without prior notification to me, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal agency basis. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my account.

**4. OPTION POSITIONS-MARGIN DEPOSITS.** I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions, and risks, as set forth in the Characteristics and Risks of Standardized Options booklet and applicable supplements which you agree to furnish me prior to the transactions. I understand clients' short options positions are assigned on an automated random basis. All short options positions can be assigned at any time including the day written. I agree that solely for purposes of entering into options positions, you may treat my account as a margin account: except that you may not pledge, repledge, hypothecate or re- hypothecate my property in your possession or under your control unless I execute the margin agreement provided herein. I also agree not to exceed the position or exercise limits set by the options exchange, either acting alone or in concert with others.

**5. NOTICE TO EXERCISE OPTIONS.** If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercises for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent specific instructions from me to that effect. If it would not be profitable for my account due to the commissions expenses, it may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

**6. IMPARTIAL LOTTERY ALLOCATION SYSTEM; CALL FEATURES.** When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features may, may not be disclosed on a trade confirmation. It is my obligation to review all prospectuses and offering statements I may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may form time to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. I understand that you are not obligated to notify me of such published calls, nor will you tender any securities on my behalf.

**7. RESTRICTIONS ON TRADING; TERMINATION.** I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts and refuse to enter into any transaction with me. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

**8. TRANSFER OF FUNDS BY WIRE.** By giving you instructions to transfer funds by wire from my accounts to any bank or other entity, I agree to provide you with an accurate account number designating the account to receive such funds. I acknowledge that the bank or other receiving entity may be under no obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the account number provided by me. I agree to indemnify and hold you harmless from and against all liabilities arising form the provision by me of an inaccurate account number.

**9. TRANSFER OF EXCESS FUNDS; EXCHANGE RATE FLUCTUATIONS.** You may transfer excess funds (also caked "free credit balances") between any of my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If you effect any transactions for me requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to my account.

**10. PRINCIPAL, INTEREST AND DIVIDEND PAYMENTS.** With respect to principal and interest payments on debt instruments, you may credit my account with principal and interest due on the payment dates and are entitled to recover any such payments from me if the same are not actually received by you from the trustee or payment agent. You may redeem my money market cash deposit investment without notice, to the extent necessary to satisfy any debits arising in any of my accounts. I acknowledge that interest will not be paid to me on credit balances in any of the accounts unless specifically agreed to by you in writing. You are not required to remit interest or dividends to me on a daily basis.

**11. FEES AND CHARGES.** I understand that you may impose various service charges and other fees relating to my account as well as charge commissions and other fees for execution of transactions to purchases and sell securities, options or other property, and I agree to pay such charges, commissions and fees at your prevailing rates. I also understand that such charges, commissions and fees may be changed from time to time without notice to me and I agree to be bound thereby. I may be subject to an administrative fee on any of my accounts which produce insufficient commission revenue for any calendar year and you will notify me prior to applying the fee. I agree to pay a late charge, to the extent permitted by law, if I purchase securities on a cash basis and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in your disclosure statement and may be charged from the settlement date to the date of payment.

**12. ACCURACY OF REPORTS; COMMUNICATIONS.** Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days after mailing by you to me. If I fail to receive a confirmation within ten days from the date of a transaction in my account, I agree to notify you immediately in writing. Until you have received notice in writing from me of a different address, communications mailed to me at the address specified by me shall be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

**13. INTRODUCED ACCOUNTS.** If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to your execution, clearing and bookkeeping of transactions in my account.

**14. SECURITY INTEREST.** As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between us, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts including individual, multiple owner or commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or however arising and without regard to whether on not you have made loans with respect to such property. You are authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open options, commodity futures or forward contracts or redeem money market or cash deposit investments in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, you shall have the discretion to determine the amount, order and manner of property to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances other than your security interest.

**15. LIQUIDATION OF COLLATERAL OR ACCOUNT.** You may sell any or all property held in any of my accounts and cancel and open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection or in the event you fail to make payment for low balance as set forth in Paragraph 17 hereof. In such events you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices by you shall invalidate this waiver by me. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any remaining deficiency in any of my accounts.

**MARGIN AGREEMENT; PARAGRAPHS 16 THROUGH 19 APPLY ONLY TO MARGIN ACCOUNTS.**

**16. MARGIN LOANS.** From time to time you may, at your discretion, make loans to me for the purpose of purchasing, carrying, or trading in securities ("Margins Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account. The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

**17. PAYMENT OF LOANS ON DEMAND.** I agree to pay ON DEMAND any balance owing on any of my accounts, including interest, commissions and late charges and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges at your sole option, at any time and whether or not such demand is made for your protection. I understand that all loans made are not for any specific term or duration but are due and payable at your discretion upon demand for payment made to me. I agree that all

payments received for my accounts including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in any of my accounts.

**18. MAINTENANCE OF COLLATERAL. I** understand that the securities or other instruments ("securities") in my Margin Account may be carried as general loans and may be pledged, hypothecated or otherwise used by you in a *financing transaction (collectively "pledge(d)")* separately or in common with other properties. I understand that I may not be entitled to vote the securities in my Margin Account during any period in which they have been pledged by you. In addition, while I will receive an amount equal to any dividends or other distributions in respect of such securities, I understand that the actual dividend or other distributions will be made to the entity to whom the securities have been pledged. The pledge by you may secure your indebtedness equal to or greater than the amount owed to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, the NYSE, the American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations of regulatory agencies under whose jurisdiction you are subject  and your own minimum house margin maintenance requirements. If I no longer maintain a debit balance or an indebtedness to you, you will fully segregate all securities in my accounts in your safekeeping or control (directly or through a clearing house) and/or deliver them upon my request.

**19. INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your current disclosure statement, which by this reference is herein specifically incorporated. By entering into any transactions with you after I receive your current disclosure statement, I acknowledge that I have read and agree to its terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balance will include accrued interest I have not paid form prior interest periods, if any. Thus, to the extent permitted by applicable law you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not deem any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payments have become available to you.

**20. CREDIT AND BUSINESS CONDUCT INFORMATION AND INVESTIGATION. I** authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct.

**21. JOINT ACCOUNTS; DESIGNATION OF TENANCY.**

a. If this is a Joint Account, we agree that each of us shall have the authority on behalf of the account to buy, sell (including short sales) and otherwise deal in, through you as brokers or dealers, securities, options or other property on margin or otherwise: to receive for the account, confirmations, statements and communications of every kind: to receive for the account and to dispose of money, securities and other property: to make, terminate, or modify for the account, agreements relating to these matters or waive any of the provisions of such agreements: and generally to deal with you as if each of us alone were the account owner, all without notice to all account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for his account.

b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, or any of us or all securities or other property in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally or to third parties. You shall be under no obligation to inquire into the purpose of such demand for delivery of securities, property, or payment of monies, and you shall not be bound to see to the application or disposition of the said securities, property, and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including the giving or cancellation of orders and the withdrawal or transfer of monies, securities or other property.

c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, retain such portion of the account and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the descendant. This provision shall not release the descendent's estate from any liability provided for in this agreement

e. It is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless a separate  Tenancy-in-Common form is properly completed. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as therefore held, without in any manner releasing the descendent's estate from the liability, unless properly designated as a Tenancy-in-Common.

**22. ARBITRATION**

- Arbitration is final and binding on the parties.
- The parties are waiving their right to seek remedies in court, including the right to a jury trail.
- Pre-arbitration discovery is generally more limited than and different from court proceedings.
- The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity: or (2) with respect to transactions of any kink executed by, through or with you, your officers, directors, agents and/or employees: or (3) relating to my transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from the inception of such account: or (4) with respect to this agreement or any other agreements entered into with your relating to my accounts, or the breach thereof, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as I elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, or who is a member of a putative class action, until: (i) the class certification is denied: (ii) the class action is decertified or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle me to obtain arbitration of claims that would be barred by the relevant statues of limitations is such claim were brought in a court of competent jurisdiction. If at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statue of limitations or other time bar, any party to this agreement may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. I expressly agree that any issues relating to the application of a stature of limitations or other time bar are referable to such court.

**23. GOVERNING LAW AND APPLICABLE REGULATIONS.** this agreement, including the arbitration provisions in paragraph 22, shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. All transactions entered into under this agreement shall be subject any applicable constitution, rules, regulations, customs and usages of the exchange or market and it clearinghouse, if any, where such transactions are executed by Lehman or its agents and to all applicable laws, rules, regulations of governmental authorities and SROs (collectively the "Rules"). Any reference to such Rules in this agreement shall in no way be construed to create a cause of action arising from any violation of such Rules. If any Rule is enacted that would be inconsistent with any of the provisions of this agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this agreement shall remain in full force and effect.

**24. BINDING EFFECT; ASSIGNMENT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and/or conservators("successors"). In the event of my death, incompetency, or disability., whether or not any successors of my estate and property shall have qualified or been appointed, you continue to operate as though I were alive and competent and you may liquidate my account as described in Paragraph 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise (and you may transfer my accounts to any such successor and assigns at your discretion).

**25. WAIVER NOT IMPLIED.** Your failure to insist any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

**26. NO ORAL MODIFICATION/ EFFECT ON PRIOR AGREEMENTS.** No modification of this agreement shall be effective unless in writing and executed by you and me. The signing of this agreement supersedes any prior agreement (except those governing transactions in my commodity accounts) made with you or any of your predecessors or assignors. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**27. FOREIGN SECURITIES.** If my account contains securities issued by a foreign issuer, I acknowledge that you are acting solely as a custodian with respect to such securities and have no obligation to provide me with any proxies, annual statements or other disclosures from the issuer of facilitate my participation in any rights offer or other transaction that the issuer may conduct with or offer to holders of its securities.

**28. NOTICES;** You will endeavour to notify me in advance of any call in my Margin Account and to provide and to provide various other notices relating to activities in my account. But, I understand that you reserve the right to take any necessary or appropriate action with respect to my accounts permitted by this Agreement and/or required by law or regulation without prior notice to me in advance of any such action, I acknowledge and consent that you may, from time to time, monitor and/or electronically record conversations between me/us and your employees or agents for the purpose of quality assurance, employee training and the mutual protection of both of us. Any such recordings may be offered by you as evidence in any arbitration or other proceedings relating this agreement.

# IMPORTANT TAX INFORMATION

Under the Interest and Dividend Tax Compliance Act of 1983 you (as a payee) are required to provide us with correct Taxpayer Identification Number (TIN). If you are an individual, your TIN is your Social Security Number. If you do not provide us with your correct TIN you may be subject to a $50 penalty to the I.R.S. and backup withholding tax, at a rate of 31% on all dividends, interest and other payments made by us to you after January 1, 1984. Even though our records indicate a TIN for your account, you must use the attached form to certify the number at it appears on our files or to furnish us with your correct TIN.

## Instructions

*(Section references are to the Internal Revenue Code.)*

**Purpose of Form.** A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions you made to an individual retirement arrangement (IRA). Use Form W-9 to furnish) your correct TIN to the requester (the person asking you to furnish your TIN), and, when applicable, (1) to certify that the TIN you are furnishing is correct (or that you are waiting for a number to be issued), (2) to certify that you are not subject to backup withholding and (3) to claim exemption from backup withholding if you are an exempt payee. Furnishing your TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding. *Note: If a requester gives you a form other than a W-9 to request your TIN, you must use the requester's form.*

**How to Obtain a TIN.** If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals) from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for business and other entities), from your local Internal Revenue Service office.

To complete Form W-9, if you do not have a TIN, write "Applied For" in the space for the TIN in Part 1, sign and date the form, and give it to the requester. Generally, you will then have 60 days to obtain a TIN and furnish it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN to the requester. For reportable interest or dividend payments, the payer must exercise one of the following options concerning backup withholding during the 60-day period. Under option (1), a payer must backup withhold on any withdrawals you make from your account after 7 business days after the requester receives this form back from you. Under option (2), the payer must backup withhold on any reportable interest or dividend payments made to your account, regardless of whether you made any withdrawals. The backup withholding under option (2) must begin no later than 7 business days after the requester receives this form back. Under option (2) the payer is required to refund the amounts withheld if your certified TIN is received within the 60-day period and your were not subject to backup withholding during that period. *Note; Writing "Applied For" on the form means that you have already applied for a TIN OR that you intend to apply for one in the near future. As soon as you receive your TIN, complete another Form W-9, including your TIN, sign and date the form, and give it to the requester.*

**What is Backup Withholding?** Persons making certain payments to you are required to withhold and to pay the IRS 31% of such payments under certain conditions. This is called "backup withholding". Payments that could be subject to backup withholding include interest, dividends, broker and barter transactions, rents, royalties, non-employee compensation, and certain payments from fishing boat operators, but don note include real estate transactions.

If you give the requester your correct TIN, make the appropriate certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

(1)   You do not furnish your TIN to the requester, or
(2)   IRS notifies the requester that you furnished an incorrect TIN, or
(3)   You are notified by the IRS that you are subject to backup withholding because you failed to report all your interest and dividends on your tax return (for the interest and dividend accounts only), or
(4)   You fail to certify to the requester that you are not subject to backup withholding under (3) above (for interest and dividend accounts opened after 1983 only), or
(5)   You fail to certify your TIN. This applies only to interest, dividend, broker, or barter exchange accounts opened after 1983, or broker accounts considered inactive in 1983.

For other payments, you are subject to backup withholding only if (1) or (2) above applies. Certain payees and payments are exempt from backup withholding and information reporting. See Payees and Payments Exempt From Backup Withholding, and Exempt Payees and Payments under Specific Instructions, below, if you are an exempt payee.

**Payees and Payments Exempt From Backup Withholding.** The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in (1) through (13), and a person registered under the Investment Advisors Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except that a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter

exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1)   A corporation.
(2)   An organization exempt from tax under section 501(a), or an individual retirement plan (IRA), or a custodial account under 403(b)(7).
(3)   The United States or any or its agencies or instrumentalities.
(4)   A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities.
(5)   A foreign government or any of its political subdivisions, agencies or instrumentalities.
(6)   An international organization or any of its instrumentalities.
(7)   A foreign central bank of issue.
(8)   A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
(9)   A futures commission merchant registered with the Commodity Future Trading Commission.
(10)  A real estate investment trust.
(11)  An entity registered at all times during the tax year under the Investment Company Act of 1940.
(12)  A common trust fund operated by a bank under section 584(a).
(13)  A financial institution.
(14)  A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc. Nominee List.
(15)  A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends generally not subject to backup withholding also include the following:

- Payments to nonresident aliens subject to withholding under section 1441.
- Payments to partnerships not engaged in a trade or business in the U.S. and that have at least one nonresident partner.
- Payments of patronage dividends not paid in money.
- Payments made by certain foreign organizations.
- Payments of interest generally not subject to backup withholding include the following:
- Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct TIN to the payer.
- Payments of tax-exempt interest (including exempt-interest dividends under section 852).
- Payments described in section 6049(b)(5) to nonresident aliens.
- Payments on tax-free covenant bonds under section 1451.
- Payments made by certain foreign organizations.
- Mortgage interest paid by you.

Payments that are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050A, and 6050N, and the regulations under such sections.

## Penalties

**Failure to Furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Failure To Include Certain Items on Your Tax Return. – If you fail to properly include on your tax return certain items reported to the IRS, such failure will be treated as being due to negligence, and you will be subject to a penalty of 5% on any part of an underpayment of tax attributable to that failure unless there is clear and convincing evidence to the contrary.

**Civil Penalty for False Information With Respect To Withholding.** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.

**Criminal Penalty for Falsifying Information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

### Specific Instructions

Name. If you are an individual, generally provide the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage, without informing the Social Security Administration of the name change, please enter your first name and both the last name shown on your social security card and your new last name.

### Signing the Certification.

(1) Interest, Dividend, and Barter Exchange Accounts Opened Before 1984 and Broker Accounts That Were Considered Active During 1983. – You are not required to sign the certification: however, you may do so. You are required to provide your correct TIN.

(2) Interest, Dividend, Broker and Barter Exchange Accounts Opened After 1983, and Broker Accounts That Were Considered Inactive During 1983. – You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item (b) in the certification before signing the form.

(3) Real Estate Transactions. – You must sign the certification. You may cross out item (b) of the certification if you wish.

(4) Other Payments. – You are required to furnish your correct TIN, but you are not required to sign the certification unless you have been notified of an incorrect TIN. Other payments include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services, payments to a non-employee for services (including attorney and accounting fees), and payments to certain fishing boat crew members.

(5) Mortgage Interest Paid by You, Acquisition or Abandonment of Secured Property, or IRA Contributions. – Your are required to furnish your correct TIN, but you are not required to sign the certification.

(6) Exempt Payees and Payments. – If you are exempt from backup withholding, you should complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "EXEMPT" in the block in Part II, sign and date the form. If you are a nonresident alien or foreign entity not subject to backup withholding, give the requester a completed Form W-8, Certificate of Foreign Status.

(7) TIN "Applied For." – Follow the instructions under How To Obtain a TIN, above, sign and date this form. You must provide a TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

### What Name and Number To Give The Requester

(1) List first and circle the names of the person whose number you furnish.

(2) Circle the minor's name and furnish the minor's social security number.

(3) Show the name of the owner.

(4) List first and circle the name of the legal trust, estate, or pension trust.

Note: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.

# LEHMAN BROTHERS

P.O. Box 2016
Jersey City, NJ 07303-2016

## Client Agreement

**Before you sign this agreement, read it thoroughly and return this completed and signed agreement to Lehman Brothers at the address on the left side of this page. Subsequently you will receive literature containing important information about your new account. Read the information carefully and retain it for future reference.**

| Account Number | | | | | |
|---|---|---|---|---|---|
| Branch | Account | | T | C | IR |

Account Title / Name

Account Title / Name

Mailing Address

**A.  Tax Certification.** Under penalties of perjury, I certify that the number shown below (and to the left) is my current taxpayer identification number or if not, then the number I have entered below (and to the right) is my correct tax identification number, and I am not subject to backup withholding because (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividend, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). *Note: You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. The Internal Revenue Service does not require your consent to any provisions of this document other than the certification required to avoid backup withholding.*

For those exempt from backup withholding (see instructions on page 4) write the word "EXEMPT" here: _____

**B.  Client Acknowledgment.** I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 21. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).* **I (We) acknowledge that I (we) have received a copy of the agreement which contains a pre-dispute arbitration clause at Paragraph 22; I (We) have read it and agree to its terms.**

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |

**C.  Name Disclosure.** *Please indicate your choice as the release or withholding of your name, address and securities positions to issuing corporations.*
- ☐ YES, I do want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").
- ☐ NO, I do not want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers, Inc. ("Lehman").

**D.  Cash Investment Agreement.** *Lehman will be authorized (but not required) to invest or "sweep" cash in your account into the Lehman Bank Cash Deposit Accounts "Cash Deposits" or a money fund unless you elect otherwise below. If you want to choose a particular money market fund or you do not want available cash swept into a money market fund, please indicate below. If you wish to discuss or change your choice of cash investment, please contact your Investment Representative. (Note to Wisconsin residents: You must indicate below specifically whether or not you wish to have a cash investment sweep for your account.)*
- ☐ YES, I want the cash balances in my account automatically swept into a cash investment of my choice.
- ☐ NO, I do not want cash balances in my account automatically swept into a cash investment.

**E.  Joint Account With Rights of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account With Rights of Survivorship. If you and the other account owners wish to establish a Tenancy in Common instead, each of you must execute a Joint Account Supplement agreement as Tenants in Common in addition to this Client Agreement. *Note: Texas residents must execute a Texas Joint Account Supplement agreement (form 3882).*

**F.  Margin Account Agreement.** Complete this section only if you accept the margin agreement described in paragraph 16 through 19 of this agreement. *In consideration of your opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 16 through 19 of this agreement.* **By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others.** *If this is a joint account, all parties must sign.*

| 1. Account Owner's Signature *(Please sign in box)* | Date | 2. Account Owner's Signature *(Please sign in box)* | Date |
|---|---|---|---|
| 3. Account Owner's Signature *(Please sign in box)* | Date | 4. Account Owner's Signature *(Please sign in box)* | Date |

*Note for joint accounts: The Social Security Number of this account is the number of the client whose name appears first in the account title. Do not enter the number of any other account owner*

| The Social Security Number or Tax Identification Number on Lehman Brothers' records is | Taxpayer Identification Number | The Social Security Number or Tax Identification Number shown to the left is incorrect. The CORRECT number is | Taxpayer Identification Number |
|---|---|---|---|

LBF (4/02)

In consideration of Lehman accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by your internal records. Throughout this agreement, "I", "me", "we", and "us" refer to the client and all others who are legally obligated on my accounts. "You" and "your" refer to Lehman , its subsidiaries, parents and their officers, directors, agents and/or employees.

**1. MY REPRESENTATIONS.** I represent that I am of the age of majority according to the laws of my place of residence. I further represent that I am not an employee of any exchange or the National Association of Security Dealers, Inc. ("NASD"), or of a member firm of any exchange of the NASD or of a bank, trust company, insurance company, registered investment company or registered investment advisory firm unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no persons other than those signing this agreement have an interest or beneficial ownership in my account. I understand that Lehman is prohibited under the NASD's "Free Riding and Withholding Interpretation" from selling securities in certain public offerings to persons restricted by such rules. To my best knowledge, I am not presently restricted, and if I become so restricted I agree to notify you promptly.

I represent that the financial information and investment objectives provided to you accurate in all material respects and that I will promptly inform you of any material changes in my financial or other circumstances, including my investment objectives.

**2. DEFINITION OF "PROPERTY".** In this agreement the word "property" means securities of all kinds, certificates of deposit, commercial paper, monies, cash deposits, options, commodities and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

**3. ORDERS, EXECUTIONS, DELIVERIES, SETTLEMENTS AND ORAL AUTHORIZATIONS.** In giving orders to sell, I will inform you which sales are "short" and which are "long" sales. A "short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The designation of a sale order as "long" is my representation that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver it to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand or notice, sell all securities or other property held by you in any of my accounts and any resulting loss will be charged to my account. Unless I direct that an order to purchase or sell securities be executed on a specified exchange or market and you agree to such execution, you will, at your sole discretion and without prior notification to me, execute the order on the over-the-counter market in any location or on any exchange, including a foreign exchange where such security is traded, either on a principal agency basis. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my account.

**4. OPTION POSITIONS-MARGIN DEPOSITS.** I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions, and risks, as set forth in the Characteristics and Risks of Standardized Options booklet and applicable supplements which you agree to furnish me prior to the transactions. I understand clients' short options positions are assigned on an automated random basis. All short options positions can be assigned at any time including the day written. I agree that solely for purposes of entering into options positions, you may treat my account as a margin account; except that you may not pledge, repledge, hypothecate or re- hypothecate my property in your possession or under your control unless I execute the margin agreement provided herein. I also agree not to exceed the position or exercise limits set by the options exchange, either acting alone or in concert with others.

**5. NOTICE TO EXERCISE OPTIONS.** If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercises for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent specific instructions from me to that effect. If it would not be profitable for my account due to the commissions expenses, it may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

**6. IMPARTIAL LOTTERY ALLOCATION SYSTEM; CALL FEATURES.** When you hold on my behalf bonds or other securities in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange, Inc. ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

For debt securities, call or other redemption features, in addition to those disclosed on the trade confirmation, may exist. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity, or before the first scheduled call dates. The existence of sinking funds, or other special mandatory redemption features may, may not be disclosed on a trade confirmation. It is my obligation to review all prospectuses and offering statements I may receive, and to understand the risks of extraordinary calls or early redemptions, which may affect yield. Issuers may form time to time publish notices of offers to redeem debt securities within limited time, price and tender parameters. I understand that you are not obligated to notify me of such published calls, nor will you tender any securities on my behalf.

**7. RESTRICTIONS ON TRADING; TERMINATION.** I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts and refuse to enter into any transaction with me. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

**8. TRANSFER OF FUNDS BY WIRE.** By giving you instructions to transfer funds by wire from my accounts to any bank or other entity, I agree to provide you with an accurate account number designating the account to receive such funds. I acknowledge that the bank or other receiving entity may be under no obligation to verify the identity of the beneficiary of the funds transfer and may rely exclusively upon the account number provided by me. I agree to indemnify and hold you harmless from and against all liabilities arising form the provision by me of an inaccurate account number.

**9. TRANSFER OF EXCESS FUNDS; EXCHANGE RATE FLUCTUATIONS.** You may transfer excess funds (also caked "free credit balances") between any of my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If you effect any transactions for me requiring a foreign currency, any profit or loss as a result of a fluctuation in the applicable exchange rate will be charged or credited to my account.

**10. PRINCIPAL, INTEREST AND DIVIDEND PAYMENTS.** With respect to principal and interest payments on debt instruments, you may credit my account with principal and interest due on the payment dates and are entitled to recover any such payments from me if the same are not actually received by you from the trustee or payment agent. You may redeem my money market cash deposit investment without notice, to the extent necessary to satisfy any debits arising in any of the accounts unless specifically agreed to by you in writing. You are not required to remit interest or dividends to me on a daily basis.

**11. FEES AND CHARGES.** I understand that you may impose various service charges and other fees relating to my account as well as charge commissions and other fees for execution of transactions to purchases and sell securities, options or other property, and I agree to pay such charges, commissions and fees at your prevailing rates. I also understand that such charges, commissions and fees may be changed from time to time without notice to me and I agree to be bound thereby. I may be subject to an administrative fee on any of my accounts which produce insufficient commission revenue for any calendar year and you will notify me prior to applying the fee. I agree to pay a late charge, to the extent permitted by law, if I purchase securities on a cash basis and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in your disclosure statement and may be charged from the settlement date to the date of payment.

**12. ACCURACY OF REPORTS; COMMUNICATIONS.** Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days after mailing by you to me. If I fail to receive a confirmation within ten days from the date of a transaction in my account, I agree to notify you immediately in writing. Until you have received notice in writing from me of a different address, communications mailed to me at the address specified by me shall be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

**13. INTRODUCED ACCOUNTS.** If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to your execution, clearing and bookkeeping of transactions in my account.

**14. SECURITY INTEREST.** As security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between us, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts including individual, multiple owner or commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or however arising and without regard to whether on not you have made loans with respect to such property. You are authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open options, commodity futures or forward contracts or redeem money market or cash deposit investments in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, you shall have the discretion to determine the amount, order and manner of property to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances other than your security interest.

**15. LIQUIDATION OF COLLATERAL OR ACCOUNT.** You may sell any or all property held in any of my accounts and cancel and open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection or in the event you fail to make payment for low balance as set forth in Paragraph 17 hereof. In such events you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices by you shall invalidate this waiver by me. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any remaining deficiency in any of my accounts.

**MARGIN AGREEMENT; PARAGRAPHS 16 THROUGH 19 APPLY ONLY TO MARGIN ACCOUNTS.**

**16. MARGIN LOANS.** From time to time you may, at your discretion, make loans to me for the purpose of purchasing, carrying, or trading in securities ("Margins Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account. The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

**17. PAYMENT OF LOANS ON DEMAND.** I agree to pay ON DEMAND any balance owing on any of my accounts, including interest, commissions and late charges and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges at your sole option, at any time and whether or not such demand is made for your protection. I understand that all loans made are not for any specific term or duration but are due and payable at your discretion upon demand for payment made to me. I agree that all

payments received for my accounts including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in any of my accounts.

**18. MAINTENANCE OF COLLATERAL.** I understand that the securities or other instruments ("securities") in my Margin Account may be carried as general loans and may be pledged, hypothecated or otherwise used by you in a *financing transaction (collectively "pledge(d)")* separately or in common with other properties. I understand that I may not be entitled to vote the securities in my Margin Account during any period in which they have been pledged by you. In addition, while I will receive an amount equal to any dividends or other distributions in respect of such securities, I understand that the actual dividend or other distributions will be made to the entity to whom the securities have been pledged. The pledge by you may secure your indebtedness equal to or greater than the amount owed to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, the NYSE, the American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations of regulatory agencies under whose jurisdiction you are subject  and your own minimum house margin maintenance requirements. If I no longer maintain a debit balance or an indebtedness to you, you will fully segregate all securities in my accounts in your safekeeping or control (directly or through a clearing house) and/or deliver them upon my request.

**19. INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your current disclosure statement, which by this reference is herein specifically incorporated. By entering into any transactions with you after I receive your current disclosure statement, I acknowledge that I have read and agree to its terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balance will include accrued interest I have not paid form prior interest periods, if any. Thus, to the extent permitted by applicable law you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not deem any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payments have become available to you.

**20. CREDIT AND BUSINESS CONDUCT INFORMATION AND INVESTIGATION.** I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct.

**21. JOINT ACCOUNTS; DESIGNATION OF TENANCY.**

a. If this is a Joint Account, we agree that each of us shall have the authority on behalf of the account to buy, sell (including short sales) and otherwise deal in, through you as brokers or dealers, securities, options or other property on margin or otherwise; to receive for the account, confirmations, statements and communications of every kind; to receive for the account and to dispose of money, securities and other property; to make, terminate, or modify for the account, agreements relating to these matters or waive any of the provisions of such agreements; and generally to deal with you as if each of us alone were the account owner, all without notice to all account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for his account.

b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all securities or other property in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally or to third parties. You shall be under no obligation to inquire into the purpose of such demand for delivery of securities, property, or payment of monies, and you shall not be bound to see to the application or disposition of the said securities, property, and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including the giving or cancellation of orders and the withdrawal or transfer of monies, securities or other property.

c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, retain such portion of the account and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the descendant. This provision shall not release the descendent's estate from any liability provided for in this agreement

e. It is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless a separate Tenancy-in-Common form is properly completed. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as therefore held, without in any manner releasing the descendent's estate from the liability, unless properly designated as a Tenancy-in-Common.

**22. ARBITRATION**

- **Arbitration is final and binding on the parties.**
- **The parties are waiving their right to seek remedies in court, including the right to a jury trial.**
- **Pre-arbitration discovery is generally more limited than and different from court proceedings.**
- **The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity; or (2) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees: or (3) relating to my transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from the inception of such account: or (4) with respect to this agreement or any other agreements entered into with your relating to my accounts, or the breach thereof, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as I elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, or who is a member of a putative class action, until: (i) the class certification is denied: (ii) the class action is decertified or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle me to obtain arbitration of claims that would be barred by the relevant statues of limitations is such claim were brought in a court of competent jurisdiction. If at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this agreement may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. I expressly agree that any issues relating to the application of a stature of limitations or other time bar are referable to such court.

**23. GOVERNING LAW AND APPLICABLE REGULATIONS.** this agreement, including the arbitration provisions in paragraph 22, shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. All transactions entered into under this agreement shall be subject any applicable constitution, rules, regulations, customs and usages of the exchange or market and it clearinghouse, if any, where such transactions are executed by Lehman or its agents and to al applicable laws, rules, regulations of governmental authorities and SROs (collectively the "Rules"). Any reference to such Rules in this agreement shall in no way be construed to create a cause of action arising from any violation of such Rules. If any Rule is enacted that would be inconsistent with any of the provisions of this agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this agreement shall remain in full force and effect.

**24. BINDING EFFECT; ASSIGNMENT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and/or conservators("successors"). In the event of my death, incompetency, or disability, whether or not any successors of my estate and property shall have qualified or been appointed, you continue to operate as though I were alive and competent and you may liquidate my account as described in Paragraph 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise and you may transfer my accounts to any such successor and assigns at your discretion.

**25. WAIVER NOT IMPLIED.** Your failure to insist any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

**26. NO ORAL MODIFICATION/ EFFECT ON PRIOR AGREEMENTS.** No modification of this agreement shall be effective unless in writing and executed by you and me. The signing of this agreement supersedes any prior agreement (except those governing transactions in my commodity accounts) made with you or any of your predecessors or assignors. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**27. FOREIGN SECURITIES.** If my account contains securities issued by a foreign issuer, I acknowledge that you are acting solely as a custodian with respect to such securities and have no obligation to provide me with any proxies, annual statements or other disclosures from the issuer of facilitate my participation in any rights offer or other transaction that the issuer may conduct with or offer to holders of its securities.

**28. NOTICES;** You will endeavor to notify me in advance of any call in my Margin Account and to provide and to provide various other notices relating to activities in my account. But, I understand that you reserve the right to take any necessary or appropriate action with respect to my accounts permitted by this Agreement and/or required by law or regulation without prior notice to me in advance of any such action, I acknowledge and consent that you may, from time to time, monitor and/or electronically record conversations between me/us and your employees or agents for the purpose of quality assurance, employee training and the mutual protection of both of us. Any such recordings may be offered by you as evidence in any arbitration or other proceedings relating this agreement.

# IMPORTANT TAX INFORMATION

Under the Interest and Dividend Tax Compliance Act of 1983 you (as a payee) are required to provide us with correct Taxpayer Identification Number (TIN). If you are an individual, your TIN is your Social Security Number. If you do not provide us with your correct TIN you may be subject to a $50 penalty to the I.R.S. and backup withholding tax, at a rate of 31% on all dividends, interest and other payments made by us to you after January 1, 1984. Even though our records indicate a TIN for your account, you must use the attached form to certify the number at it appears on our files or to furnish us with your correct TIN.

**Instructions**

*(Section references are to the Internal Revenue Code.)*

**Purpose of Form.** A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, or contributions you made to an individual retirement arrangement (IRA). Use Form W-9 to furnish your correct TIN to the requester (the person asking you to furnish your TIN), and, when applicable, (1) to certify that the TIN you are furnishing is correct (or that you are waiting for a number to be issued), (2) to certify that you are not subject to backup withholding and (3) to claim exemption from backup withholding if you are an exempt payee. Furnishing your TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding. *Note: If a requester gives you a form other than a W-9 to request your TIN, you must use the requester's form.*

**How to Obtain a TIN.** If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals) from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for business and other entities), from your local Internal Revenue Service office.

To complete Form W-9, if you do not have a TIN, write "Applied For" in the space for the TIN in Part 1, sign and date the form, and give it to the requester. Generally, you will then have 60 days to obtain a TIN and furnish it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN to the requester. For reportable interest or dividend payments, the payer must exercise one of the following options concerning backup withholding during the 60-day period. Under option (1), a payer must backup withhold on any withdrawals you make from your account after 7 business days after the requester receives this form back from you. Under option (2), the payer must backup withhold on any reportable interest or dividend payments made to your account, regardless of whether you made any withdrawals. The backup withholding under option (2) must begin no later than 7 business days after the requester receives this form back. Under option (2) the payer is required to refund the amounts withheld if your certified TIN is received within the 60-day period and your were not subject to backup withholding during that period. *Note: Writing "Applied For" on the form means that you have already applied for a TIN OR that you intend to apply for one in the near future. As soon as you receive your TIN, complete another Form W-9, including your TIN, sign and date the form, and give it to the requester.*

**What is Backup Withholding?** Persons making certain payments to you are required to withhold and to pay the IRS 31% of such payments under certain conditions. This is called "backup withholding". Payments that could be subject to backup withholding include interest, dividends, broker and barter transactions, rents, royalties, non-employee compensation, and certain payments from fishing boat operators, but don note include real estate transactions.

If you give the requester your correct TIN, make the appropriate certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will not be subject to backup withholding if:

(1) You do not furnish your TIN to the requester, or
(2) IRS notifies the requester that you furnished an incorrect TIN, or
(3) You are notified by the IRS that you are subject to backup withholding because you failed to report all your interest and dividends on your tax return (for the interest and dividend accounts only), or
(4) You fail to certify to the requester that you are not subject to backup withholding under (3) above (for interest and dividend accounts opened after 1983 only), or
(5) You fail to certify your TIN. This applies only to interest, dividend, broker, or barter exchange accounts opened after 1983, or broker accounts considered inactive in 1983.

For other payments, you are subject to backup withholding only if (1) or (2) above applies. Certain payees and payments are exempt from backup withholding and information reporting. See Payees and Payments Exempt From Backup Withholding, and Exempt Payees and Payments under Specific Instructions, below, if you are an exempt payee.

**Payees and Payments Exempt From Backup Withholding.** The following is a list of payees exempt from backup withholding and for which no information reporting is required. For interest and dividends, all listed payees are exempt except item (9). For broker transactions, payees listed in (1) through (13), and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if made to payees described in items (1) through (7), except that a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

(1) A corporation.
(2) An organization exempt from tax under section 501(a), or an individual retirement plan (IRA), or a custodial account under 403(b)(7).
(3) The United States or any or its agencies or instrumentalities.
(4) A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities.
(5) A foreign government or any of its political subdivisions, agencies or instrumentalities.
(6) An international organization or any of its instrumentalities.
(7) A foreign central bank of issue.
(8) A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
(9) A futures commission merchant registered with the Commodity Future Trading Commission.
(10) A real estate investment trust.
(11) An entity registered at all times during the tax year under the Investment Company Act of 1940.
(12) A common trust fund operated by a bank under section 584(a).
(13) A financial institution.
(14) A middleman known in the investment community as a nominee or listed in the most recent publication of the American Society of Corporate Secretaries, Inc. Nominee List.
(15) A trust exempt from tax under section 664 or described in section 4947.

Payments of dividends and patronage dividends generally not subject to backup withholding also include the following:

- Payments to nonresident aliens subject to withholding under section 1441.
- Payments to partnerships not engaged in a trade or business in the U.S. and that have at least one nonresident partner.
- Payments of patronage dividends not paid in money.
- Payments made by certain foreign organizations.
- Payments of interest generally not subject to backup withholding include the following:
- Payments of interest on obligations issued by individuals. Note: You may be subject to backup withholding if this interest is $600 or more and is paid in the course of the payer's trade or business and you have not provided your correct TIN to the payer.
- Payments of tax-exempt interest (including exempt-interest dividends under section 852).
- Payments described in section 6049(b)(5) to nonresident aliens.
- Payments on tax-free covenant bonds under section 1451.
- Payments made by certain foreign organizations.
- Mortgage interest paid by you.

Payments that are not subject to information reporting are also not subject to backup withholding. For details, see sections 6041, 6041A(a), 6042, 6044, 6045, 6049, 6050A, and 6050N, and the regulations under such sections.

**Penalties**

**Failure to Furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Failure To Include Certain Items on Your Tax Return. – If you fail to properly include on your tax return certain items reported to the IRS, such failure will be treated as being due to negligence and you will be subject to a penalty of 5% on any part of an underpayment of tax attributable to that failure unless there is clear and convincing evidence to the contrary.

**Civil Penalty for False Information With Respect To Withholding.** If you make a false statement with no reasonable basis that results in no imposition of backup withholding, you are subject to a penalty of $500.

**Criminal Penalty for Falsifying Information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Specific Instructions**

Name. If you are an individual, generally provide the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage, without informing the Social Security Administration of the name change, please enter your first name and both the last name shown on your social security card and your new last name.

**Signing the Certification.**

(1)  Interest, Dividend, and Barter Exchange Accounts Opened Before 1984 and Broker Accounts That Were Considered Active During 1983. – You are not required to sign the certification: however, you may do so. You are required to provide your correct TIN.

(2)  Interest, Dividend, Broker and Barter Exchange Accounts Opened After 1983, and Broker Accounts That Were Considered Inactive During 1983. – You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item (b) in the certification before signing the form.

(3)  Real Estate Transactions. – You must sign the certification. You may cross out item (b) of the certification if you wish.

(4)  Other Payments. – You are required to furnish your correct TIN, but you are not required to sign the certification unless you have been notified of an incorrect TIN. Other payments include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services, payments to a non-employee for services (including attorney and accounting fees), and payments to certain fishing boat crew members.

(5)  Mortgage Interest Paid by You, Acquisition or Abandonment of Secured Property, or IRA Contributions. – Your are required to furnish your correct TIN, but you are not required to sign the certification.

(6)  Exempt Payees and Payments. – If you are exempt from backup withholding, you should complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "EXEMPT" in the block in Part II, sign and date the form. If you are a nonresident alien or foreign entity not subject to backup withholding, give the requester a completed Form W-8, Certificate of Foreign Status.

(7)  TIN "Applied For." – Follow the instructions under How To Obtain a TIN, above, sign and date this form. You must provide a TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not furnish a TIN to a payer. Certain penalties may also apply.

**What Name and Number To Give The Requester**

(1)  List first and circle the names of the person whose number you furnish.

(2)  Circle the minor's name and furnish the minor's social security number.

(3)  Show the name of the owner.

(4)  List first and circle the name of the legal trust, estate, or pension trust.

Note: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.



CLIENT'S COPY
(KEEP FOR YOUR RECORDS)

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) SIPA |
| Debtor. | |

## [PROPOSED] ORDER GRANTING THE TRUSTEE'S OBJECTION TO THE PROOF OF CLAIM OF RALPH HARARY (CLAIM NO. 8002386)

Upon the objection dated October 10, 2014 (the "Objection"),[1] of James W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. (the "Debtor" or "LBI") under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), seeking entry of an order, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA, seeking to disallow and expunge the general creditor claim represented by number 5973 (the "Claim") filed by Ralph Harary, as more fully described in the Objection; and due and proper notice of the Objection having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Objection is in the best interests of LBI, its estate, its customers and creditors, and all parties in interest and that the legal and factual bases set forth in the Objection establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the relief requested in the Objection is granted; and it is further

---

1.    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

**ORDERED** that, pursuant to section 502(b) of the Bankruptcy Code, the Claim is

disallowed and expunged in its entirety with prejudice; and it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.


Dated: New York, New York
          _____ __, 2014

_____
HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE