MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 554-7800
Fax: (212) 554-7700

THOMPSON COBURN LLP
1909 K Street, N.W., Suite 600
Washington, DC 20006
Telephone: (202) 585-6900
Fax: (202) 585-6969

Attorneys for Claimants General Ore International
Corporation Limited, Neu Holdings Corporation n/k/a
Neu Holdings U.S. Corporation, Neu Foundation of California,
Amy Patricia Neu and Janice K. Moss

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>    LEHMAN BROTHERS INC.,<br><br>        Debtor. | Case No. 08-01420 (SCC) SIPA |

**SURREPLY IN OPPOSITION TO THE TRUSTEE'S**
**TWO HUNDRED SIXTIETH OMNIBUS OBJECTION**
**TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT REGARDING CLAIMANTS' CLAIMS ......................2

     A.     The Determination of General, Unsecured Claims In A SIPA Proceeding.......................................................................................................2

     B.     Duties and Obligations Giving Rise to a "Claim" ...................................................3

     C.     The Allowance and Disallowance of Claims..........................................................6

II.    LBI's Common Law Duty to Honor Claimants' ACcount Transfer Instructions.....................................................................................................................8

III.   LBI'S COMMON LAW DUTY TO HONOR CLAIMANTS' ACCOUNT TRANSFER INSTRUCTIONS WAS NOT "SUPPLANTED"—BUT RATHER WAS "SUPPLEMENTED"—BY NEW YORK'S ENACTMENT OF THE 1994 AMENDMENTS TO ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE................................................................................................10

     A.     The Purpose and Effect of the 1994 Amendments to Article 8 of the UCC ......................................................................................................................11

     B.     The Trustee's Erroneous Attempt To Portray the 1994 Amendments To Article 8 As Effectuating A Sweeping Abrogation of the Common Law Duties Owing By A Brokerage Firm to Its Customers...................................17

IV.   LBI's STATUTORY DUTY UNDER UCC Section 8-508 TO HONOR CLAIMANTS' ACCOUNT TRANSFER REQUESTS DID NOT INSTANTANEOUSLY EVAPORATE UPON THE COMMENCEMENT OF LBI'S SIPA PROCEEDING.......................................................................................20

     A.     Article 8's Deference to the Distributional Rules Applicable In An Insolvency Proceeding Has No Relevance to the Claims Allowance Issues Currently Before the Court........................................................................20

     B.     The Trustee's Post-Filing Duties and Responsibilities Are Not Relevant to the Determination of Claimants' Right To Assert Claims Against LBI's Estate ...................................................................................................23

     C.     Constitutional Concerns Implicated By The Trustee's Construction of LBI's Duties to Claimants Under NY UCC Section 8-508 ...................................26

V.     CONCLUSION....................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All Blacks, B.V. v. Gruntruck*, 199 B.R. 970 (W.D. Wash. 1996) ....................................4

*Bissell v. Merrill Lynch & Co., Inc.*, 937 F. Supp. 237 (S.D.N.Y. 1996) *aff'd* 157 F.3d 138 (2nd Cir. 1998) ...................................................................................................9

*Bononi v. Bayer Employers Fed. Credit Union*, 407 B.R. 684 (Bankr. W.D. Pa. 2009) .....................................................................................................................25

*Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171 (2nd Cir. 2007) ........................25

*Carval Investors UK Limited v. Giddens (In re Lehman Brothers Inc.)*, 506 B.R. 346 (S.D.N.Y. 2014) ...............................................................................................8

*Cohen v. de la Cruz*, 118 S.Ct. 1212 (1998) ...............................................................3

*Conway v. Icahn & Co., Inc.*, 16 F.3d 504 (2nd Cir. 1994) .........................................10

*Exchange National Bank of Chicago v. Wyatt*, 517 F.2d 453 (2nd Cir. 1975) ..............26

*Federal Communications Commission v. Nextwave Personal Communications Inc.*, 123 S.Ct. 832 (2003) ................................................................................3

*Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.),* 504 B.R. 321 (Bankr. S.D.N.Y. 2013) ...............................................................1, 6, 8

*Hawes v. Birkholz*, 114 N.Y.S. 765 (N.Y. Sup. 1908) .................................................10

*In re Allen Care Centers, Inc.*, 163 B.R. 180 (Bankr. D. Oregon 1994) ......................26

*In re Bell & Beckwith*, 821 F.2d 333 (6th Cir. 1987) ..................................................23

*In re Bradlees Stores, Inc.,* 2003 WL 76990 (S.D.N.Y. January 9, 2003) ..................5, 24

*In re Computer Learning Centers, Inc.*, 298 B.R. 569 (Bankr. E.D. Va. 2003) ..........4, 24

*In re Stangis*, 67 B.R. 243 (Bankr. D. Minn. 1986) ....................................................25

*The Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933 (2nd Cir. 1998) ...............................................................................................9

*Matter of Ross*, 18 B.R. 364 (S.D.N.Y. 1982) *aff'd sub. nom. Regan v. Ross*, 691 F.2d 81 (2nd Cir. 1982) ...........................................................................................27

*Ohio v. Kovacs*, 105 S.Ct. 705 (1984) ...................................................................4

*Pension Benefit Guaranty Corporation v. Oneida Ltd.*, 562 F.3d 154 (2nd Cir. 2009) ...................................................................................................................4

*Picard v. Merkin* ......................................................................................................6

*Raleigh v. Illinois Department of Revenue*, 120 S.Ct. 1951 (2000)..........................4

*Riverwood International Corporation v. Olin Corporation (In re Manville Forest Products Corporation)*, 225 B.R. 862 (Bankr. S.D.N.Y. 1998) ................................5

*Rush v. Oppenheimer & Co., Inc.*, 681 F. Supp. 1049 (S.D.N.Y. 1988) ...................8

*Saboundijan v. Bank Audi (USA)*, 157 A.D.2d 278, 556 N.Y.S.2d 258 (N.Y.A.D. 1 Dept. 1990) ......................................................................................................10

*Securities and Exchange Commission v. Credit Bancorp Ltd*, 2000 WL 1752979 (S.D.N.Y. November 29, 2000) *aff'd* 290 F.3d (2nd Cir. 2002)...............11, 18, 22

*Securities and Exchange Commission v. Talley Industries, Inc.*, 399 F.2d 396 (2nd Cir. 1968) ..........................................................................................................9

*Travelers Casualty & Surety Co. of America v. Pacific Gas and Electric Co.*, 127 S.Ct. 1199 (2007) ...............................................................................................27

*Wongco v. Federated Department Stores, Inc. (In re R. H. Macy & Co., Inc.)*, 283 B.R. 140 (S.D.N.Y. 2002) ....................................................................................5

**Statutes and Constitutional Provisions:**

U.S Constitution, Art. I, Sec. 8, clause [4].............................................................26

11 U.S.C. §101.....................................................................................................3, 5

11 U.S.C. §105.....................................................................................................3, 5

11 U.S.C. §502............................................................................................... *passim*

11 U.S.C. §726...........................................................................................................3

15 U.S.C. §§78aaa.....................................................................................................2

15 U.S.C. §78fff............................................................................................. *passim*

NY UCC §1-103........................................................................................................17

NY UCC §8-503..................................................................................14, 15, 20, 21

NY UCC §8-508 ...................................................................................................... *passim*

NY UCC §9-509 .................................................................................................. 16, 22

1997 N.Y. Laws 566, §29 ........................................................................................ 11

UCC §8-509 ............................................................................................................ 19

Article 8 of the Uniform Commercial Code ......................................................... *passim*

**Rules**

Federal Rule of Bankruptcy Rule 7012 ................................................................ 1, 2

Federal Rule of Bankruptcy Rule 9014 ..................................................................... 1

**Other Authorities**

C. Bjerre and S. Rocks, *The ABCs of the UCC (Article 8: Investment Securities)*
 (2nd Ed. ABA 2004) ......................................................................................... 11

C. Tabb, *The Law of Bankruptcy* §5.5 at 414 (2nd Ed. 2009) .......................... 26

7A *Hawkland UCC Series* §8-504:01 (Rev. Ed. 2015) ...................................... 14

*Restatement (Third) of Agency*, §8.09(2) (2006) ............................................. 10

## SURREPLY IN OPPOSITION TO THE TRUSTEE'S
## TWO HUNDRED SIXTIETH OMNIBUS OBJECTION
## TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

Claimants General Ore International Corporation Limited, Neu Holdings Corporation n/k/a Neu Holdings U.S. Corporation, Neu Foundation of California, Amy Patricia Neu and Janice K. Moss (collectively, the "Claimants"), by and through their attorneys, Thompson Coburn LLP and Moses & Singer LLP, submit this Surreply: (a) to *The Trustee's Reply In Further Support of Two Hundred Sixtieth Omnibus Objection to General Creditor Claims (No Liability Claims)(Docket No. 11285)* (the "Reply") filed on behalf of James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of Lehman Brothers, Inc. ("LBI" or the "Debtor"); and (b) in further opposition to the *Trustee's Two Hundred Sixtieth Omnibus Objection to General Creditor Claims* (No Liability Claims)(Docket No. 9605)(the "Objection").

Claimants were granted leave to submit this Surreply pursuant to an oral ruling made by the Court at a so-called "Sufficiency Hearing"[1] conducted on February 19, 2015 (the "Initial Sufficiency Hearing"), at which the Court heard oral argument from counsel regarding the Trustee's contention that Claimants' Claims should be disallowed in their entirety under the standards for "failure to state a claim" incorporated in Federal Rule of Bankruptcy Procedure 7012.[2] *Cf. Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.),* 504 B.R. 321,

---

[1] Pursuant to this Court's *Order Establishing Claims Hearing Procedures And Alternative Dispute Resolution Procedures For General Creditor Claims Pursuant To Section 105 Of The Bankruptcy Code, Bankruptcy Rule 9014, And General Order M-452* (Docket No. 7351)("Procedural Order Regarding General Creditor Claims"), the Trustee is authorized to require general creditor claimants with contested claims (such as Claimants) to defend their claims at a "Sufficiency Hearing," a term which is defined as a "non-evidentiary hearing to address the legal sufficiency of the particular Contested Claim and whether the Contested Claim states a claim against the LBI estate under Bankruptcy Rule 7012." *Claims Hearing and ADR Procedures,* ¶3 (attached as Exhibit 1 to the Court's Procedural Order Regarding General Creditor Claims).

[2] At the Initial Sufficiency Hearing, the Court raised certain concerns regarding the amounts of damages set forth in Claimants' original proofs of claim—*i.e.,* Claim Nos. 5644, 5645 5649, 5650 and 5750 (collectively, the "Original Proofs of Claim")—and directed Claimants to file amended proof of claims. Claimants have since prepared amended proofs of claim reducing the amounts that they are seeking to recover so to respond to those concerns

335 (Bankr. S.D.N.Y. 2013)(wherein this Court held that dismissal for failing to state a claim under Bankruptcy Rule 7012 "is only appropriate when it appears beyond doubt that the [claimant] can prove no set of facts which would entitle him or her to relief.")(citations and quotations omitted).

## I. PRELIMINARY STATEMENT REGARDING CLAIMANTS' CLAIMS

1.      Claimants seek the allowance of general, unsecured claims against the estate of Lehman Brothers, Inc. ("LBI") for the damages Claimants sustained as a result of the breach and nonperformance of LBI's pre-filing duty and obligation to transfer Claimants' brokerage accounts to other, designated brokerage firms.

### A.      Manner for Determining General, Unsecured Claims In A SIPA Proceeding

2.      Although the Securities Investors Protection Act, 15 U.S.C. §§78aaa *et seq.* ("SIPA") governs the recognition and discharge of "customer claims" filed in these proceedings,[3] SIPA generally defers to the provisions of the Bankruptcy Code with respect to the allowance of general, unsecured claims. *See* 15 U.S.C. §78fff(b)(providing that to the extent not inconsistent with the provisions of SIPA, a SIPA proceeding "shall be conducted in accordance with, and as though it were being conducted under Chapters 1, 3 and 5 and subchapters 7 of title 11."); 15 U.S.C. §78fff(e)(providing that the assets of the "general estate" in a SIPA proceeding—*i.e,* those assets not consisting of "customer property"—shall be distributed in

---

raised by the Court. Claimants are filing these amended proofs of claims (collectively, the "Amended Proofs of Claim" or the "Claims") simultaneously herewith.      These Amended Proofs of Claim are based on the same substantive theories of recovery as the Original Proofs of Claim.  Therefore, the Surreply proceeds as if the Trustee's Objection and Reply had been directed to these newly filed claims.

[3] *See generally* 15 U.S.C. §§78fff-2(a)(2)(directing customers to file written statement of their customer claims); 78fff-2(b)(directing a SIPA trustee to discharge customer claims "in so far as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee"); and 78lll(2)(defining who qualifies as a "customer" for purposes of SIPA).

accordance with the distributional scheme set forth in 11 U.S.C. §726, which is expressly framed in terms of those claims "allowed" under 11 U.S.C. §502); *see also* Trustee's Objection, ¶1 (providing that the Trustee's Objection to Claimants' Claims is being made under 11 U.S.C. §502(b) "as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA").

3.     Accordingly, this Court's determination regarding the allowance or disallowance of Claimants' Claims should be made in the same manner in which such determinations are made with respect to general, unsecured claims asserted in traditional bankruptcy proceedings.

**B.     Duties and Obligations Giving Rise to a "Claim"**

4.     It is well-established that as used in the Bankruptcy Code, the term "claim" is intended to have the "'broadest available definition.'" *Federal Communications Commission v. Nextwave Personal Communications Inc.*, 123 S.Ct. 832, 839 (2003)(*quoting Johnson v. Home State Bank*, 111 S.Ct. 2150, 2154 (1991)).

5.     Specifically, Bankruptcy Code Section 105(a) defines the term "claim" as a: "(A) *right to payment*, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a *right to payment*, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. §101(5)(emphasis added).

6.     As the U.S. Supreme Court has repeatedly made clear, for purposes of the foregoing definition, the term "right to payment" means "nothing more or less than an *enforceable obligation*." *Cohen v. de la Cruz*, 118 S.Ct. 1212, 1216 (1998)(*quoting*

*Pennsylvania Department of Public Welfare v. Davenport*, 110 S.Ct. 2126, 2131 (1990))(emphasis added).

7.      Whether or not a debtor is subject to an "enforceable obligation" is a function of applicable, non-bankruptcy law, which, in most instances, will be applicable state law. *Raleigh v. Illinois Department of Revenue*, 120 S.Ct. 1951, 1955 (2000)("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."); *Pension Benefit Guaranty Corporation v. Oneida Ltd.*, 562 F.3d 154, 157 (2nd Cir. 2009)(To determine whether a claimant has a valid claim in bankruptcy, "we look to the substantive non-bankruptcy law that gives rise to the debtor's obligation.").

8.      In order to qualify as a "claim" under the Bankruptcy Code, an "enforceable obligation" may consist not only of an express obligation to pay money but also an obligation to perform some act or duty—at least, in those instances in which the nonperformance of such act or duty gives rise to a right to monetary damages. *See, e.g.*, *Ohio v. Kovacs*, 105 S.Ct. 705, 707 (1984)("a right to performance" [can] be a claim [under the Bankruptcy Code]" even if it does not "arise from a contractual arrangement."); *All Blacks, B.V. v. Gruntruck*, 199 B.R. 970, 975 (W.D. Wash. 1996)(debtor musicians' ongoing obligation to perform under a non-assumable recording contract gave rise to a "claim" in bankruptcy, because there is "no meaningful distinction between financial obligations and obligations to perform, [for,] [i]n both situations, the debtors are under a liability that threatens their ability to move forward financially."); *In re Computer Learning Centers, Inc.*, 298 B.R. 569, 574-5 (Bankr. E.D. Va. 2003)(the nonperformance of a Chapter 7 educational institution's ongoing statutory duty to maintain certain educational records for so many years after the institution's closure gave rise to "claim"

in favor of the California Bureau for Private Postsecondary and Vocational Education, for "if the Bureau did not have a claim it would be left without any recourse.").

9.  Moreover, because the Bankruptcy Code's definition of "claim" expressly embraces obligations that are "unliquidated," "contingent" and/or "unmatured," it is also well-established that a pre-petition obligation may give rise to a claim in bankruptcy even if the debtor's breach or nonperformance of that obligation does not occur until after the petition date. *See, e.g., In re Bradlees Stores, Inc.,* 2003 WL 76990 (S.D.N.Y. January 9, 2003)(Chapter 11 debtor's post-petition cancellation of purchase orders that it had submitted to a vendor prior to bankruptcy gave rise to a pre-petition claim in favor of the vendor); *Wongco v. Federated Department Stores, Inc. (In re R. H. Macy & Co., Inc.),* 283 B.R. 140, 146 (S.D.N.Y. 2002)("a creditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the Bankruptcy Code.")(citations and quotations omitted); *Riverwood International Corporation v. Olin Corporation (In re Manville Forest Products Corporation),* 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998)("Because contingent and unmatured rights of payment are "claims" under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within Section 101(5)(A) of the Code.").

10. In the instant matter, LBI's pre-filing receipt of the Automated Customer Account Transfers ("ACATS") submitted on behalf of the Claimants triggered enforceable common law and statutory obligations[4] on the part of LBI to transfer Claimants' brokerage accounts in

---

[4] As more fully set forth in their Amended Proofs of Claim, Claimants maintain that pursuant to their brokerage account agreements with LBI, LBI may also have had an express contractual obligation to transfer Claimants' brokerage accounts in accordance with Claimants' instructions. The foregoing agreements, however, were executed (at least, in some cases) more than 15 years ago. Consequently, Claimants either no longer have copies of said agreements or fear that the copies that they do have are incomplete. As a result of the "Temporary Litigation

accordance with the explicit instructions contained within those ACATS. As of the filing date,[5]

these obligations remained contingent and unmatured. Ultimately, however, the decision was

made that the foregoing obligations should not be fulfilled or otherwise honored. Consequently,

Claimants sustained certain damages for which they are entitled to assert claims against LBI's

estate.

### C.    The Allowance and Disallowance of Claims

11.    As this Court has previously recognized and held, a claim must be "allowed" in a

bankruptcy proceeding unless there is some express basis for disallowing the claim under

Bankruptcy Code Section 502(b). *See Harbinger Capital Partners LLC v. Ergen (In re*

*LightSquared Inc.),* 504 B.R. 321, 340 (Bankr. S.D.N.Y. 2013)("This reading of Section

502(b)—that if a claim is not subject to disallowance for any of the reasons specified therein, it

must be allowed—is not only consistent with the statute but also with the overarching principle

that the Code should not be employed to void parties' rights under applicable nonbankruptcy law

in the absence of specific direction from Congress."); *see also Picard v. Merkin (In re Bernard*

*L. Madoff Investment Securities, LLC*, 515 B.R. 117, 157 (wherein Bankruptcy Judge Stuart

Bernstein expressly adopted and applied this Court's ruling in *LightSquared* to certain claims

asserted in a SIPA proceeding and noted that the correctness of this Court's *LightSquared*

holding was subsequently confirmed by the U.S. Supreme Court's ruling in *Law v. Siegel*, 134

---

Injunction" implemented pursuant to this Court's Procedural Order Regarding General Creditor Claims, Claimants have been precluded from seeking the formal production of complete copies of the foregoing agreements from LBI and/or the Trustee. *See* Procedural Order Regarding General Creditor Claims, p.2 (imposing Temporary Litigation Injunction). Accordingly, Claimants have expressly reserved in their Amended Proofs of Claim—and expressly reserve herein—their right to also pursue the allowance and recovery of their Claims under any applicable breach of contract theory.

[5] 15 U.S.C. §78fff(b) generally equates the "filing date" of a SIPA proceeding with the term "petition date" as used in the Bankruptcy Code.    Accordingly, both terms are used interchangeably herein.

S.Ct. 1188 (2014)(wherein the High Court held that a bankruptcy court's equitable powers can only be exercised within the confines of the Bankruptcy Code)).

12.    In the instant matter, the only basis under Bankruptcy Code Section 502 that the Trustee has invoked for disallowing Claimants' Claims is subparagraph (b)(1), which provides that a claim shall not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. §502(b)(1); *see* Trustee's Objection, ¶16.

13.    Specifically, the Trustee contends that notwithstanding its pre-filing receipt of Claimants' ACATS, LBI was not subject to any "enforceable obligation" under applicable non-bankruptcy law to honor Claimants' account transfer requests.  The Trustee bases the foregoing contention on an elaborate, tripartite argument.  First, the Trustee disavows any common law duty on the part of LBI to honor Claimants' ACATS requests.  He does this by advancing the following two, alternative assertions: (i) brokers have no common law duty to honor a customer's account transfer request; (ii) even if brokers may have, at one time, owed a common law duty to honor a customer's account transfer request, this common law duty was completely "supplanted" by New York's adoption of the 1994 revisions to Article 8 of the Uniform Commercial Code ("UCC"). *See* Trustee's Reply, ¶¶15-18.  Next, the Trustee denies that LBI owed any statutory obligation to honor Claimants' ACATS requests because while NY UCC §8-508 generally imposes a duty on a broker to honor its customer's account transfer requests, the Trustee maintains that under the provisions of Article 8 of the UCC, the foregoing statutory duty instantaneously ceases to exist when LBI became the subject of a SIPA Proceeding.  *See* Trustee's Reply, ¶¶13-14.

14.     As more fully set forth below, each of the above-referenced assertions is erroneous. Thus, it is evident that the Trustee has failed to advance any legitimate basis for disallowing Claimants' Claims under Bankruptcy Code Section 502(b).  Accordingly, Claimants' Claims should (and, in accordance with this Court's holding in *LightSquared*, must) be allowed.

## II.    LBI'S COMMON LAW DUTY TO HONOR CLAIMANTS' ACCOUNT TRANSFER INSTRUCTIONS

15.     It is well-established under New York common law that even in the case of a "non-discretionary" brokerage account (that is, a brokerage account in which the customer does not confer upon the broker authority and discretion over the customer's investment selections), a broker still owes a common law fiduciary duty to its customer with respect those "affairs entrusted to the broker." *Rush v. Oppenheimer & Co., Inc.*, 681 F. Supp. 1049, 1055 (S.D.N.Y. 1988).  As U.S. District Judge Denise Cote explained earlier in these proceedings:

> A fiduciary relationship between a customer and a broker-dealer ordinarily arises because the customer makes a transfer of cash or securities to the broker-dealer.  With that transfer, the customer becomes vulnerable and will suffer a loss if the broker-dealer appropriates the money or becomes insolvent.  The customer thus places trust and confidence in the broker-dealer to properly manage his cash or securities, giving rise to a fiduciary duty for the broker-dealer to act loyally for the customer's benefit.
>
> The scope of the fiduciary duty varies with the nature the broker-dealer relationship.  There is a general fiduciary duty in discretionary brokerages accounts, but a more limited one in non-discretionary accounts.

*Carval Investors UK Limited v. Giddens (In re Lehman Brothers Inc.)*, 506 B.R. 346, 353, n.4 (S.D.N.Y. 2014)(citations omitted).

16.     In his Reply, the Trustee contends that a broker's common law fiduciary duty with respect to a customer with a non-discretionary brokerage account is limited solely to executing buy and/or sell orders initiated by the customer.  Trustee's Reply, ¶17.  Although case

law recognizes the latter circumstances as one example of when a broker owes a fiduciary duty to a customer with a non-discretionary brokerage account, it is clear that such circumstances do not occupy the entire universe of a broker's common law fiduciary duties to such a customer. *Cf. The Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2nd Cir. 1998)("*For example* . . . a broker on a nondiscretionary account has the duty to execute requested trades.")(emphasis added).

17.     As noted above, the common law fiduciary duty of a broker extends to any and all "affairs entrusted to the broker." *Bissell v. Merrill Lynch & Co., Inc.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996) *aff'd* 157 F.3d 138 (2nd Cir. 1998). Admittedly, in the context of a non-discretionary brokerage account, the "scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Bissell*, 937 F. Supp. at 246 (citations and quotations omitted). It defies common sense, however, to assert—as the Trustee does in his Reply—that for purposes of the foregoing principle, the term "transaction" is necessarily restricted to the processing of buy and sell orders and does not encompass other, relevant instructions that a broker may receive from a customer, such as instructions that the customer's brokerage account be transferred to another brokerage firm. *Cf. Securities and Exchange Commission v. Talley Industries, Inc.*, 399 F.2d 396, 402 (2nd Cir. 1968)(the word "transaction" is "not a technical term" and embraces any activity "to prosecute negotiations; to carry on business; [or] to have dealings.")(citations and quotations omitted)). Indeed, under the Trustee's reading of the common law, an investor's initial selection of a brokerage firm is a potentially irreversible, lifetime decision, for once the investor opens an account with a particular broker, the broker can, with impunity and in perpetuity, refuse to transfer the account to another brokerage firm.

- 9 -

18.     As is well-established, even in the context of a non-discretionary account, "[t]he relationship between a stockbroker and its customer is that of principal and agent . . ." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 510 (2nd Cir. 1994); *Saboundijan v. Bank Audi (USA)*, 157 A.D.2d 278, 283, 556 N.Y.S.2d 258, 260-1 (N.Y.A.D. 1 Dept. 1990)(same). Under common law principles of agency, it is axiomatic that an agent is obligated to comply with any lawful instructions that it receives from its principal regarding those matters falling within the scope of the agent's responsibilities. *See generally Hawes v. Birkholz*, 114 N.Y.S. 765, 776 (N.Y. Sup. 1908)(That . . . suit . . . will lie against an agent for damages directly caused by his violations of his principal's instructions is elementary."); *Restatement (Third) of Agency*, §8.09(2) (2006)("An agent has a duty to comply with all lawful instructions received from the principal").

19.     Accordingly, as of the commencement of the SIPA Proceeding, LBI, as Claimants' agent, clearly had a common law fiduciary duty to honor Claimants' explicit instructions to transfer their brokerage accounts to those brokerage firms specified by the Claimants.   As this duty was never performed, Claimants are entitled under applicable nonbankruptcy law to assert monetary claims against LBI's estate for the resulting damages that they sustained.

**III.    LBI'S COMMON LAW DUTY TO HONOR CLAIMANTS' ACCOUNT TRANSFER INSTRUCTIONS WAS NOT "SUPPLANTED"—BUT RATHER WAS "SUPPLEMENTED"—BY NEW YORK'S ENACTMENT OF THE 1994 AMENDMENTS TO ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE**

20.     As an alternative to his argument that brokers never had any common law duty to honor a customer's account transfer request, the Trustee maintains that even if such a duty may have, at one time, existed, this duty was completely "supplanted" by New York's enactment of the 1994 amendments to Article 8 of the Uniform Commercial Code. *See* Trustee's Reply, ¶¶15-16.

21.     The Trustee attempts to find support for the latter assertion in *Securities and Exchange Commission v. Credit Bancorp Ltd*, 2000 WL 1752979, (S.D.N.Y. November 29, 2000) *aff'd* 290 F.3d (2nd Cir. 2002), a case involving a federal receivership action in which the court held that under the 1994 amendments to Article 8, a group of investors was precluded from attempting to utilize common law bailment principles to extract certain securities from the receivership estate. *Id.*

22.     To understand why the Trustee's reliance on the above-referenced authorities is misplaced and why these authorities afford no support to the Trustee's contentions regarding the alleged abrogation of LBI's common law duty to honor Claimants' account transfer instructions, it is helpful to briefly examine the purpose and effect of the 1994 Amendments to Article 8.

### A.     The Purpose and Effect of the 1994 Amendments to Article 8 of the UCC

23.     The 1994 Amendments to Article 8—which were   adopted   by   New   York effective as of October 10, 1997[6]—were proposed primarily to address the fact that in actual practice, the U.S. securities industry had migrated away from a so-called "direct holding" system—upon which the prior versions of Article 8 were premised—to an "indirect holding" system.    *See generally* C. Bjerre and S. Rocks, *The ABCs of the UCC (Article 8: Investment Securities)*, pp. 1-4 (2nd Ed. ABA 2004)("Bjerre & Rocks").

24.     Under a direct holding system, the ultimate beneficial owner of a security ordinarily has a direct relationship with the issuer of the security.   Typically, this relationship is evidenced by the issuer's direct issuance of a certificate to the beneficial owner and/or the

---

[6] *See* 1997 N.Y. Laws 566, §29.

recordation of the beneficial owner's ownership interest on the issuer's books and records.

Graphically,[7] the direct holding system can be depicted as follows:



25.    In contrast, under the indirect holding system, a beneficial owner is not issued a stock certificate nor does such owner otherwise maintain any direct relationship with the issuer. Instead, the beneficial owner's only relationship is with its own brokerage firm, which itself directly or indirectly holds (typically, through a centralized clearinghouse nominee known as "Cede & Co.") a fungible allotment of securities which it internally allocates among its various brokerage customers (*i.e.,* the beneficial owners) and its own proprietary holdings (if any) in the applicable securities.  As one group of Article 8 scholars describes:

> [In the case of the indirect holding system,] physical certificates are still issued but tend not to be in the hands of the ultimate beneficial owners.  Instead, they are immobilized with a clearing corporation, and registered in the name of the clearing corporation (or, for administrative reasons, the clearing corporation's nominee).  The clearing corporation for most publicly traded corporate equity securities, corporate debt securities, and municipal debt securities is The Depository Trust Company (DTC), and DTC's nominee is typically Cede & Co.  The certificates are often in "jumbo" form, evidencing for [e]xample, [10,000] or more shares of common stock or $100 million of debt with a single certificate, and the certificates neither move nor change registration despite the high volume of trades affecting them.  Instead, the clearing corporation's books indicate the ownership interests of the brokers or banks that are its members,

---

[7] The diagram presented herein is an adaptation of a figure set forth in Bjerre & Rocks, p. 4.

and the records of those intermediaries, in turn, indicate the ownership interests of their customers, *i.e.*, lower-tier intermediaries, or, at the bottom of the chain, the actual investors. The identities of the investors need not be, and generally are not, known to the issuer.

Bjerre & Rocks, p. 3.

Graphically,[8] the indirect holding system can be depicted as follows:



---

[8] The diagram presented herein is an adaptation of a figure set forth in Bjerre & Rocks, p. 5.

26.     Under the direct holding system, a brokerage customer's property interests in its securities is generally understood to be rooted in "common law bailment concepts; that is, the customer [is] regarded as the owner and the intermediary [is] regarded as a bailee who [holds] property of the customer." 7A *Hawkland UCC Series* §8-504:01 (Rev. Ed. 2015).

27.     The drafters of the 1994 Amendments to Article 8 recognized, however, that while "ownership and bailment concepts may . . . provide[] an adequate basis for analysis of some of the aspects of the two-party relationship between an intermediary and its customers, these concepts [a]re entirely inadequate to describe the complex relationships in the modern multi-tiered system of holding through securities intermediaries." *Id.* Specifically, in the indirect holding system, there is no "reified object" with respect to which a customer or lower-tier intermediary can attempt to establish a traditional bailment interest. *See* Official Comment 2 to NY UCC §8-503("The traditional Article 8 rules . . . were based on the idea of that a paper certificate could be regarded as a nearly complete reification of the underlying right.").

28.     Accordingly, rather than "trying to squeeze the analysis of property interest of a person who holds securities through an intermediary into old legal concepts, such as bailment," the drafters of the 1994 Amendments developed a "*sui generis* form of property interest" known as a "security entitlement." J. Rogers, *Policy Perspectives on Revised U.C.C. Article 8*, UCLA Law Rev. 1431, 1496 (June 1996)("Rogers"). Under the "security entitlement" construct, the property interests of a brokerage customer (or, in the parlance of Article 8, an "entitlement holder") are not defined in terms of rights and interests in a particular, identifiable asset. Instead, the proverbial "bundle of sticks" held by a brokerage customer/entitlement holder are framed in terms of a series of statutory duties and obligations owed to the broker customer/entitlement holder by its brokerage firm (or, in the parlance of the Article 9, the "securities intermediary.").

Rogers, at 1470, 1496. These statutory duties and obligations are set forth in Sections 8-503 through 8-508 of the UCC, and include, among other things, the duty of a "securities intermediary" to "act at the direction of an entitlement holder . . . to cause . . . [the] securities account of the entitlement holder [to be transferred to] another securities intermediary." NY UCC §8-508.

29. The drafters' decision to re-define the property rights of a brokerage customer/entitlement holder in the indirect holding system in terms of a series of statutory duties and obligations owing by the securities intermediary is memorialized in NY UCC Section 8-503(c). Specifically, the latter provision provides that "an entitlement holder's *property interest* with respect to a particular financial asset may be enforced against the securities intermediary *only* by exercise of the entitlement holder's rights under Section 8-505 through 8-508." (emphasis added). As one of the Official Comments to NY UCC 8-503 goes on to explain:

> Although this section recognizes that the entitlement holders of a securities intermediary have a *property interest* in the financial assets held by the intermediary, the incidents of this *property interest* are established by the rules of Article 8, not by common law property concepts. . . [The latter] concepts do not work for the indirect holding system. A security entitlement is not a claim to a specific identifiable thing; it is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary.

NY UCC §8-508, Official Comment 2 (emphasis added); *see also* Bjerre & Rocks, p. 41 (the duties set forth in UCC §§8-503 through 8-508 are "designed to pass through to the entitlement holder the rights generally associated with direct ownership of the financial assets").[9]

---

[9] As one Article 8 scholar explains, "[o]ne of the principal advantages of the security entitlement structure [and the series of statutory duties and obligations comprising that structure] is that it makes clear a basic feature of the indirect holding system—that an entitlement holder's *property interest* can be asserted directly only against the entitlement holder's own intermediary. The principle that an entitlement holder can look only to its own intermediary is not really a creation of Revised Article 8. Revised Article 8 only gives legal recognition to the factual realities of the modern securities holding system. In a multi-tiered system, only a person's own intermediary

30.     While the drafters of the 1994 Amendments to Article 8 clearly set out to re-define the nature of the property interest held by a brokerage customer/entitlement holder under the indirect holding system, it is equally clear that in doing so, they did not intend to disturb or impair in any way those common law rights and duties otherwise existing between a broker and its customer, including, in particular, those duties that a broker owes to its customer under common law agency principles (*e.g.,* the common law duty of an agent to carry-out the lawful instructions of its principal).

31.     As John Rogers, the Official Reporter for the 1994 amendments to Article 8, expressly cautioned:

> [O]ne must be careful to avoid a distorted perspective on what Revised Article 8 is and is not designed to do. Revised Article 8 is not . . . a comprehensive body of private law governing the relationship between brokers and their customers. Nor is Article 8 a body of regulatory law to police against improper conduct by brokers or other intermediaries. Many, if not most, aspects of the relationship between brokers and customers are *governed by the common law of contract and agency,* supplemented or supplanted by federal and state regulatory law. *Revised Article 8 is not intended to take the place of this body of private and regulatory law.*

Rogers, at 1496 (emphasis added); *see also* Official Comment 1 to NY UCC Section 9-509 ("This Article is not a comprehensive statement of the law governing the relationship between broker-dealers or other securities intermediaries and their customers. *Most of the law governing that relationship is the common law of contract and agency,* supplemented or supplanted by regulatory law.")(emphasis added).

---

knows anything about that person's interest. Each intermediary knows only the identity of its own customers and the extent of their positions. An upper-tier intermediary has no way of knowing anything about its customer's customers." Rogers, at 1455 (emphasis added).

32.     Thus, while one of the "property interests" that a brokerage customer/entitlement holder in the indirect holding system now enjoys is the statutory right to insist that its broker/securities intermediary transfer the customer/entitlement holder's brokerage account to another broker/securities intermediary in accordance with the requirements of NY UCC Section 8-508, this statutory right does not displace the broker's common law duty as an agent to carry-out the lawful instructions of its customers.   On the contrary, the two sets of rights and corresponding duties sit side-by-side next to one another and, in circumstances such as the present case, provide brokerage customers such as the Claimants with two, complementary grounds for recovery.   *Cf.* NY UCC §1-103(b)("Unless displaced by the particular provisions of this act, principles of law and equity, including . . . the law relative to . . . principal and agent . . . supplement its provisions."); Official Comment 2 to NY UCC §1-103 ("The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law . . . and relies on those bodies of law to supplement its provisions in many important ways.").

### B.     The Trustee's Erroneous Attempt To Portray the 1994 Amendments To Article 8 As Effectuating A Sweeping Abrogation of the Common Law Duties Owing By A Brokerage Firm to Its Customers

33.     In his Reply, the Trustee gives no recognition to the 1994 Amendments' targeted focus in re-defining the "property interests" held by brokerage customers/entitlement holders under the indirect holding system.   Instead, the Trustee attempts to characterize the 1994 Amendments to Article 8 as ushering in a wholesale abrogation of the common law duties owed by a broker to its customer, including the common law duty of a broker to comply with its customer's account transfer instructions.   Trustee's Reply, ¶¶15-16.

34. The Trustees attempts to draw support for the latter characterization from *Securities and Exchange Commission v. Credit Bancorp Ltd*, 2000 WL 1752979 (S.D.N.Y. November 29, 2000) *aff'd* 290 F.3d (2nd Cir. 2002).

35. As referenced above, the *Credit Bancorp* case concerned a federal receivership action that the Securities and Exchange Commission (the "SEC") had filed against an investment firm named Credit Bancorp. Prior to the commencement of the foregoing action, Credit Bancorp had operated a "Ponzi scheme" in which the scheme's victims furnished Credit Bancorp with various securities holdings and other assets, which Credit Bancorp then used (at least, in part) to generate distributions to earlier investors. *Credit Bancorp*, 2000 WL 1752979, 9-11.

36. During the course of the proceedings, the court-appointed receiver in *Credit Bancorp* proposed a plan to distribute on a pro-rata basis among all of the Ponzi victims the few, remaining securities and related assets still held by Credit Bancorp. *Id.*, at 31-34. In response to this proposal, one group of investors ("SECO")—in a blatant attempt to jump ahead of its fellow victims—contended that under common law bailment principles, it had a superior property interest in certain securities that it could purportedly establish (through tracing) were still within Credit Bancorp's possession. *Id.*, at 23-4. Based upon its allegedly superior property interest under common law bailment principles, SECO insisted that the foregoing securities not be subjected to pro-rata distribution among all of Credit Bancorp's victims but, instead, be returned directly to SECO. *Id.*

37. Rejecting the foregoing argument, U.S. District Judge Robert Sweet determined that the relationship between SECO and Credit Bancorp was subject to the indirect holding systems provisions added to Article 8 of the UCC by the 1994 Amendments and that under the foregoing provisions, SECO was precluded from asserting a common law bailment interest in the

- 18 -

securities at issue. *Id.*, at 21, 24-5. Specifically, Judge Sweet observed that "[u]nder Revised Article 8 of the U.C.C. . . . the *property rights* of securities holders over assets held by securities intermediaries are defined by Article 8 rather than by common law." *Id.* at 24 (emphasis added).

38.     While the foregoing ruling was undoubtedly correct, it does not in any way support the Trustee's broad contention that the 1994 Amendments to Article 8 effectuated an abrogation of the duties owing by LBI to Claimants under common law principles of agency. Indeed, Judge Sweet made clear that his decision was based solely upon the new notions of a customer's or investor's "property interests" that were introduced by the 1994 Amendments to Article 8.  Thus, in concluding that SECO's common law bailment theory had been abrogated by Revised Article 8, Judge Sweet expressly noted that this conclusion was in no way "based on any assumption that Article 8 completely supplants the common law as it pertains to the relationship between securities intermediaries and their customers." *Id.*  To reinforce the latter point, Judge Sweet cited to the language in Official Comment to UCC Section 8-509 that "[t]his Article is not a comprehensive statement of the law governing the relationship between securities intermediaries and their customers . . . [and that] [m]ost of the law governing that relationship is the common law of contract and agency . . ." *Id.*

39.     In the light of the foregoing, it is evident that LBI's common law duty to honor Claimants' account transfer requests remained intact as of the filing date and, under established precedent, entitles Claimants to assert claims against LBI's estate for the damages that resulted from the nonperformance of this duty.

## IV. LBI'S STATUTORY DUTY UNDER UCC SECTION 8-508 TO HONOR CLAIMANTS' ACCOUNT TRANSFER REQUESTS DID NOT INSTANTANEOUSLY EVAPORATE UPON THE COMMENCEMENT OF LBI'S SIPA PROCEEDING

40.     As noted above, the Trustee asserts in his Reply that Claimants are also precluded from asserting claims under NY UCC Section 8-508 against LBI's estate. *See* Trustee's Reply, ¶¶12-14.   Although he makes this assertion, the Trustee does not deny that prior to the commencement of the instant SIPA Proceeding, LBI had an express statutory obligation under NY UCC §8-508 to transfer Claimants' brokerage accounts in accordance with Claimants' account transfer requests. *Id.* at ¶13.   Instead, the Trustee contends that this statutory obligation instantaneously ceased to exist upon the commencement of LBI's SIPA Proceeding. *Id.*, at ¶14.

### A.     Article 8's Deference to the Distributional Rules Applicable In An Insolvency Proceeding Has No Relevance to the Claims Allowance Issues Currently Before the Court

41.     In advancing the above position, the Trustee does not identify any provision either in SIPA or the Bankruptcy Code that provides for the invalidation or disallowance of those statutory duties provided for under NY UCC §8-508.   Instead, the Trustee attempts to support his position by citing to certain portions of the Official Comments to NY UCC Section 8-503.

42.     Specifically, the Trustee begins by referencing Official Comment 1 to NY UCC Section 8-503 and its discussion of subsection (b) of that Section.   Trustee's Reply, ¶14.   This subsection provides that "[a]n entitlement holder's property interest with respect to a particular financial asset . . . is a pro rata property interest in all interests in that financial asset held by the securities intermediary, without regard to the time the entitlement holder acquired the security entitlement or the time the securities intermediary acquired the interest in that financial asset." NY UCC §8-503(b).   In Official Comment 1, the drafters observe:

> Although this section describes the property interest of entitlement holders in the assets held by the intermediary, it does not

necessarily determine how property held by a failed intermediary will be distributed in insolvency proceedings. If the intermediary fails and its affairs are being administered in an insolvency proceeding, the applicable insolvency law governs *how the various parties having claims against the firm* are treated.

NY UCC §8-503, Official Comment 1 (emphasis added).

43.     The Trustee misconstrues the above language as depriving Claimants of an enforceable obligation under NY UCC Section 8-508. It is readily apparent, however, this language merely evidences the drafters' understanding and intent that in the event a securities intermediary becomes the subject of an insolvency proceeding, the distributional rules applicable in the insolvency proceeding take precedence over those distributional principles set forth in NY UCC Section 8-503(b). Thus, in no sense does the foregoing passage suggests that an entitlement holder who, outside the context of an insolvency proceeding, would have a monetary claim against its security intermediary under NY UCC Section 8-508 (or one of the other provisions of part 5 of Article 8) is somehow stripped of that claim in the intermediary's insolvency proceeding. On the contrary, the foregoing passage completely avoids the subject of claim allowance and, instead, merely references the point that in the event an intermediary becomes the subject of an insolvency proceeding, different distributional rules might apply to those "*parties having claims* against the [insolvent] firm." NY UCC §8-508, Official Comment 1 (emphasis added).

44.     Similarly, the Trustee also references Official Comment 2 to NY UCC Section 8-503, which states "[i]f the intermediary is in insolvency proceedings and can no longer perform in accordance with the ordinary Part 5 rules, the applicable insolvency law will determine how the intermediary's assets are to be distributed." Trustee's Reply, ¶14. Once again, the foregoing passage addresses the distributional rules—rather than the claim allowance rules—applicable in

an insolvency proceeding. As such, this passage is irrelevant to the question currently before the Court (*i.e.*, whether Claimants' Claims are, on their face, subject to disallowance as a matter of law).

45.    Continuing to disregard the important substantive distinctions between the above, two concepts—that is, distributional rules on the one hand and claims allowance considerations on the other—the Trustee goes on to suggest that just as Judge Sweet rejected the efforts of the unsuccessful litigant in *Credit Bancorp* to obtain relief under Article 8, so too should this Court reject Claimants' efforts to assert a claim under NY UCC §8-508. *See* Trustee's Reply, ¶14. In contrast to the Claimants in this case, however, the unsuccessful litigant in *Credit Bancorp* (*i.e.*, SECO) did not invoke the provisions of Article 8 merely for purposes of asserting a claim against the receivership estate. Instead, SECO sought to use Article 8—in addition to the common law (as described above)—to divest the receivership estate of certain assets so that SECO could avoid the less desirable outcome of having to participate along with its fellow Ponzi-scheme victims in the pro-rata distribution plan ultimately approved in the case. *See Credit Bancorp*, 2000 WL 1752979, at 23-4.

46.    Quite obviously, Claimants are not attempting to escape the pro-rata distribution process applicable in the instant proceeding. On the contrary, Claimants are merely seeking to vindicate their legitimate right to participate in that process.[10]

---

[10] While SECO's efforts in *Credit Bancorp* ultimately proved unsuccessful, it is interesting (if not ironic) to note for present purposes that the SEC receiver in the case went out of his way to point out that SECO was not without any recourse as it could still potentially pursue a monetary claim against Credit Bancorp. *Id.*, at 19, n.23.

**B.** **The Trustee's Post-Filing Duties and Responsibilities Are Not Relevant to the Determination of Claimants' Right To Assert Claims Against LBI's Estate**

47.     In addition to the Official Comments cited above, the Trustee also cites to NY UCC Section 8-509(a) in support of his contention that LBI's statutory duty to honor Claimants' account transfer requests ceased to exist immediately upon the commencement of LBI's SIPA Proceeding.   The foregoing provision provides that "[i]f the substance of a duty imposed upon a securities intermediary by Section 8-504 through 8-508 is the subject of other statute, regulation or rule, compliance with that statute, regulation, or rule satisfies the duty." NY UCC §8-509(a).

48.     As the Official Reporter for the 1994 Amendments to Article 8 explained, whether the statutory exoneration provided for in UCC Section 8-509(a) applies in a given situation:

> depends on whether the [purportedly superseding] regulation in question does [in fact] deal in a comprehensive fashion with the relevant Article 8 duty.   That is the point of the opening phrase of § 8-509, '[i]f the substance of a duty imposed by 8-504 through 8-508 is the subject of other statute, regulation, or rule . . .'  The fact that an intermediary has complied with such other regulations as may apply to it does not, in itself, mean that the intermediary has satisfied all of its duties under Article 8, for there may be aspects of the Part 5 duties that are not covered by other regulation.

Rogers, at 1504, n. 103.

49.     In the instant matter, the Trustee fails to cite to any provision either in SIPA, the Bankruptcy Code or any of the Rules promulgated by SIPC that purportedly prohibited him from honoring Claimants' pending ACATS requests.  *Cf.* 15 U.S.C. §78fff-2(e)(1)(which prohibits a

SIPA Trustee from completing an "executory" purchase or sale of securities with another broker or dealer who is acting its own behalf (as opposed to on behalf of a customer").[11]

50.     As Claimants have previously described,[12] following the commencement of LBI's SIPA Proceeding, the Trustee deliberately decided after a period of several days not to honor Claimants' pending ACATS requests but, instead, to reverse such requests so that Claimants' brokerage accounts could ultimately be transferred (without Claimants' consent and in direct contradiction to Claimants' pre-filing instructions) to Barclay Capital, Inc.

51.     As Claimants have repeatedly acknowledged, they have no basis to suggest that the Trustee's decision to undertake the foregoing measures constituted anything other than a proper exercise of his fiduciary duties to the estate as a whole.

52.     Under the provisions of Bankruptcy Code Section 502(b), however, the determination of whether a party has a claim—*i.e.,* an enforceable obligation—against a bankruptcy debtor is to be made "as of the date of the filing of the petition." 11 U.S.C. §502(b). Thus, the fact that a trustee's post-filing duties and responsibilities may prompt him or her to forgo the performance of certain outstanding, pre-petition obligations owing by the debtor does

---

[11]   Somewhat ironically, while it prohibits a SIPA Trustee from completing an "executory" sale or purchase of securities with another broker or dealer who is acting on its own behalf, SIPA goes on to expressly provide that in such circumstances, the other broker or dealer "shall be entitled to participate in the general estate as an unsecured creditor." 15 U.S.C. §78fff-2(e)(2); *see also In re Bell & Beckwith,* 821 F.2d 333, 339 (6th Cir. 1987)(wherein, in applying the latter provision, the court held that a group of brokers—whose pending purchase of certain securities from a SIPA debtor was cancelled by the SIPA trustee—should be allowed to assert unsecured claims against the debtor's general estate for their resulting damages). Thus, while there is nothing in SIPA that required the Trustee to dishonor Claimants' pending ACATS, the Trustee nevertheless maintains that Claimants should be left in a worse position than those parties whose pending transactions with a SIPA debtor must—under SIPA's express provisions—be cancelled by the SIPA Trustee immediately following the commencement of the SIPA proceeding. Specifically, whereas the latter parties are expressly entitled to file general, unsecured claims against the SIPA debtor's estate for their resulting damages, the Trustee maintains that Claimants should be completely deprived of any recovery from LBI's estate. Quite obviously, such an outcome would be unfair and inharmonious.

[12]   *See Claimants' Amended Response In Opposition to the Trustee's Two Hundred Sixtieth Omnibus Objection to General Creditor Claims (No Liability Claims)*(Docket No. 9890)(the "Response"), ¶¶25-36.

not render such obligations any less enforceable "as of the date of the filing of the petition." Indeed, trustees routinely decide not to perform enforceable obligations owing by a debtor as of the petition date—whether such obligations arise under an executory contract or in some other context. In such circumstances, the parties to whom such obligations are owed are entitled to assert an unsecured claim against the debtor's bankruptcy estate—that is, provided the nonperformance of the obligation gives rise to a right to monetary damages and the obligation is not subject to one of the statutory grounds for disallowance set forth in Bankruptcy Code Section 502(b). *See, e.g., In re Computer Learning Centers, Inc.*, 298 B.R. 569, 574-5 (Bankr. E.D. Va. 2003)(Chapter 7 trustee's nonperformance of a bankrupt educational institution's ongoing statutory duty to maintain certain educational records for so many years after the institution's closure gave rise to "claim" in favor of the California Bureau for Private Postsecondary and Vocational Education); *In re Bradlees Stores, Inc.,* 2003 WL 76990 (S.D.N.Y. January 9, 2003)(Chapter 11 debtor's post-petition cancellation of purchase orders that it had submitted to a vendor prior to bankruptcy gave rise to a pre-petition claim in favor of the vendor).

53.     The position being advanced by the Trustee in his Reply is not unlike the one espoused by the Chapter 7 trustee in *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171 (2nd Cir. 2007). Specifically, the latter case involved a pre-petition claim asserted by a creditor who, in conjunction with the resolution of a post-petition lawsuit that it had filed against the debtor, executed a general release in favor of debtor. *Id.*, at 178. Attempting to exploit the latter fact to obtain the disallowance of the creditor's claim against the bankruptcy estate, the trustee in *Flanagan* argued that "§502(b)(1) should be read to disallow not only claims that are unenforceable against the debtor at the time the bankruptcy petition is filed but also those claims that become unenforceable against the debtor over the course of the bankruptcy . . ." *Id.*, at 178.

54. Categorically rejecting the latter proposition, the Second Circuit in *Flanagan* declared:

> We think the trustee's interpretation of §502(b)(2) is an untenable reading of the statutory text because it ignores the provision's context within the Bankruptcy Code. Section 502(b) instructs the bankruptcy court to 'determine the amount of such claim . . .*as of the date of the filing* of the petition' except to the extent that 'such claim is unenforceable against the debtor.' 11 U.S.C. §502(b), (b)(1)(emphasis added). A plain reading of the statute thus suggests that the bankruptcy court should determine whether a creditor's claim is enforceable against the debtor as of the date the bankruptcy petition was filed. Were this Court to adopt the trustee's interpretation of §502(b)(1), we would be forced to conclude that all pre-petition unsecured claims are disallowed to the extent they did not represent non-dischargeable debts.

*Id.*, at 179; *see also Bononi v. Bayer Employers Fed. Credit Union*, 407 B.R. 684, 692 (Bankr. W.D. Pa. 2009)("The proper focus of the language regarding the disallowance of a claim under §502(b)(1) is on prepetition enforceability, not post-petition enforceability")(citations and quotations omitted); *In re Stangis*, 67 B.R. 243, 246 (Bankr. D. Minn. 1986)(same).

## C. Constitutional Concerns Implicated By The Trustee's Construction of LBI's Duties to Claimants Under NY UCC Section 8-508

55. To the extent that the Trustee is relying upon the provisions of Article 8 to argue that LBI's duties to Claimants under NY UCC Section 8-508 instantaneously evaporated upon the commencement of LBI's SIPA Proceeding, his argument must be recognized as not only lacking any statutory or other textual support but also being Constitutionally suspect.

56. Specifically, the U.S Constitution confers upon Congress the exclusive authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Constit., Art. I, Sec. 8, clause [4]. Under the latter Constitutional directive, it is well-established that states cannot create special legal rules that only come into effect in the event of a bankruptcy or a similar insolvency proceeding. *See, e.g., In re Allen Care Centers, Inc.*, 163 B.R. 180, 183

(Bankr. D. Oregon 1994)(regardless of whether their motives for doing so are of the highest order, states cannot enact laws that prefer certain unsecured creditors over others in the context of a bankruptcy proceeding). Instead, state statutes must remain "bankruptcy neutral." C. Tabb, *The Law of Bankruptcy* §5.5 at 414 (2nd Ed. 2009); *see also Matter of Ross*, 18 B.R. 364, 366 (S.D.N.Y. 1982) *aff'd sub. nom. Regan v. Ross*, 691 F.2d 81 (2nd Cir. 1982)("states are prohibited from interfering with the uniform nature of bankruptcy law.").

57. Clearly, the Trustee appears to run afoul of the foregoing principles by advancing a construction of UCC Section 8-508 under which entitlement holders are owed certain duties by their securities intermediaries outside of bankruptcy but such duties magically evaporate in the event the securities intermediary becomes the subject of a bankruptcy or SIPA proceeding.[13] Indeed, if accepted, such a construction would be tantamount to a state statute providing that outside of bankruptcy, a lessor of personal property is entitled to recover its common law damages in the event of a material breach by the lessee but, in the event the lessee becomes the subject of a bankruptcy proceeding, the lessor is not entitled to obtain any recovery.

58. The potential Constitutional infirmities identified above underscore the ultimate ineffectiveness of the Trustee's elaborate efforts to advance a construction of NY UCC Section

---

[13] While the instant proceedings were obviously commenced under SIPA rather the Bankruptcy Code, SIPA is recognized as having been enacted by Congress, at least, in part, pursuant to Congress' power to "establish uniform Laws on the subject of Bankruptcies throughout the United States." *See Exchange National Bank of Chicago v. Wyatt*, 517 F.2d 453, 460 (2nd Cir. 1975)("In enacting SIPA, Congress drew upon both the commerce power and the bankruptcy power."). Moreover, as noted above, SIPA expressly incorporates (in wholesale fashion) large portions of the Bankruptcy Code. *See* 15 U.S.C. §78fff(b)(providing that to the extent not inconsistent with the provisions of SIPA, a SIPA proceeding "shall be conducted in accordance with, and as though it were being conducted under Chapters 1, 3 and 5 and subchapters 7 of title 11."). Accordingly, Claimants maintain that the Constitutional mandate that state statutes remain "bankruptcy neutral" is every bit as compelling and applicable with respect to the instant proceeding as it is to a traditional bankruptcy proceeding.

8-508 which enables LBI's estate to escape responsibility to Claimants for LBI's undeniable failure to honor its pre-filing duty to transfer Claimants' brokerage accounts.[14]

## V.    CONCLUSION

59.    For all reasons set forth herein, in its Claimants' Response and on behalf of Claimants at the Initial Sufficiency Hearing, Claimants maintain that the *Trustee's Two Hundred Sixtieth Objection to General Creditor Claims* (No Liability Claims) as it relates to Claimants' claims should be overruled with prejudice, and Claimants' Amended Proofs of Claim should be allowed as general unsecured claims in the full face-amount asserted.

Dated: New York, New York
March 20, 2015

Respectfully submitted,

MOSES & SINGER LLP

By:    */s/ Mark N. Parry*
     Mark N. Parry
     Alan Kolod
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 554-7800
Fax: (212) 554-7700

-and-

---

[14] In addition to implicating the above-referenced Constitutional concerns, the Trustee's contentions regarding Claimants' lack of recourse under NY UCC §8-508 also appears to do violence to the established meaning and operation of Bankruptcy Code Section 502(b)(1)—which, as noted above, is the statutory provision upon which the Trustee ultimately relies in seeking the disallowance of Claimants' Claims. *See* Trustee's Objection, ¶16. Specifically, in *Travelers Casualty & Surety Co. of America v. Pacific Gas and Electric Co.*, 127 S.Ct. 1199, 1204 (2007), the U.S. Supreme Court held that Section 502(b)(1) is "most naturally understood to provide that . . . any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." In the instant matter, however, the Trustee is not relying on any defenses "available outside of the bankruptcy context" to challenge Claimants' right to recover under NY UCC §8-508. On the contrary, the Trustee challenges Claimants' right to recovery under NY UCC §8-508 solely on the basis of a bankruptcy-specific and bankruptcy-unique theory of defense, namely, that by virtue of the commencement of the instant SIPA Proceeding, the duties and obligations that LBI owed to Claimant under NY UCC §8-508 instantaneously evaporated as if they had never existed.

Warren L. Dean, Jr.
David D. Farrell
THOMPSON COBURN LLP
1909 K Street, N.W., Suite 600
Washington, DC 20006
Telephone: (202) 585-6900
Fax: (202) 585-6969

Attorneys for Claimants General Ore International
Corporation Limited, Neu Holdings Corporation
n/k/a Neu Holdings U.S. Corporation, Neu
Foundation of California, Amy Patricia Neu and
Janice K. Moss