**Hearing Date and Time:  April 22, 2015 at 10:00 a.m. (Prevailing Eastern Time)**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens, as trustee for
the SIPA liquidation of Lehman Brothers Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>　　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　　　Debtor. | Case No.  08-01420 (SCC) |

## PRE-HEARING BRIEF IN SUPPORT OF THE TRUSTEE'S AMENDED OBJECTION TO THE GENERAL CREDITOR PROOFS OF CLAIM FILED BY 1EE LLC, AS ASSIGNEE (CLAIM NO. 4856), WAYNE JUDKINS (CLAIM NO. 4470), RICHARD HAJDUKIEWICZ (CLAIM NO. 4725), AND J. ROBERT CHAMBERS (CLAIM NO. 6107)

## **<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................5

    As Part of the Transaction, Barclays Committed to Make
Bonus and Severance Payments to Former LBI Employees. ...............6

    Claimants Went to Barclays and Were Paid for Their Work at LBI. ................9

        Hoffman Was Paid His Entire LBI Bonus in Addition to
the Compensation He Received for His Work at Barclays....................9

        Judkins Was Paid His Entire LBI Bonus,
and He Incurred No Relocation Expenses. ..........................................14

        Chambers Was Paid Part of His LBI Bonus. ......................................15

        Hajdukiewicz Was Paid Part of His LBI Bonus. .................................17

    Claimants Agreed to Receive a Portion of Their Compensation in Equity Awards..........18

ARGUMENT ................................................................................................21

I.     Claimants Are Not Entitled to a Double Recovery........................................21

    A.    LBI Contracted with Barclays to Pay Bonuses to Former LBI
Employees...............................................................................................21

    B.    Barclays Satisfied LBI's Obligations to Claimants in Whole or in
Part. .......................................................................................................24

        1.    Barclays paid Hoffman the $83 million he was owed by
LBI. ...................................................................................................25

        2.    Barclays paid Judkins' bonus in full..............................................27

        3.    Barclays partially paid Chambers' and Hajdukiewicz's
bonuses.............................................................................................27

    C.    Claimants' Arguments for a Double Recovery Are Unavailing...........................28

        1.    The lack of an assumption or assignment of Claimants'
employment contracts does not entitle them to be paid
twice...................................................................................................28

i

## TABLE OF CONTENTS
### (Continued)

2.      Hoffman's notice argument is meritless. ..................................................29

3.      Hoffman's argument that he was
        not a "Transferred Employee" is frivolous. .............................................31

4.      Hoffman's judicial estoppel argument fails. ............................................32

II.     The Claims for Equity Award Compensation
        Must Be Subordinated Under Section 510(b). ..................................................35

        A.      The Portion of the Claims that Was Payable
                in RSUs Is Subject to Mandatory Subordination. ..................................36

        B.      LBI Exercised its Discretion to Pay Claimants Partially in RSUs........................38

                1.      LBI exercised its discretion to issue RSUs to Claimants.........................38

                2.      The Trustee cannot pay Claimants in cash. ................................39

        C.      Hoffman's Claim for Unissued Common Stock Allegedly
                Owed in Connection with RSUs Must Be Subordinated. .....................................40

III.    Judkins' Claims for a Discretionary Bonus, for Reimbursement of Closing Costs
        He Never Incurred, and for Reimbursement of a Home Equity Loan Are Baseless. ........40

        A.      Judkins Is Not Entitled to a Discretionary Bonus. ..................................40

        B.      Judkins Is Not Entitled to "Reimbursement"
                of Relocation Expenses that He Never Incurred. ...................................41

        C.      Judkins Has No Claim for Repaying His Home Equity Loan. .............................41

IV.     Chambers' Claims for 2009 and 2010 Bonuses
        and Salary Should Be Disallowed and Expunged. ............................................42

        A.      Chambers' Claim for 2009 and 2010 Bonuses and Salary Is
                Barred by the Section 502(b)(7) Cap on Employee Compensation
                Claims. ..........................................................................42

        B.      Chambers' Claim for 2009 and 2010 Bonuses and
                Salary Is Barred by the Terms of His Employment Agreement. .........................44

V.      Hajdukiewicz Released His Claims. .......................................................45

VI.     If Hoffman's Claim Is Not Disallowed and Expunged, It Is
        Subject to the Section 502(b)(7) Cap and to Equitable Subordination. ...................46

## TABLE OF CONTENTS
(Continued)

**Page**

A.    Hoffman's Claim Exceeds the Section 502(b)(7) Cap. ..........................................47

B.    Hoffman's Claim Is Subject to Equitable Subordination. ....................................47

CONCLUSION...................................................................................................................49

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) ................................................................33

*Armstrong v. Diamond Shamrock Corp.*, 455 N.E.2d 702 (Ohio Ct. App. 1982)........................23

*Arrowgrass Master Fund Ltd. v. Bank of New York Mellon*, 106 A.D.3d 582
  (1st Dep't 2013) ................................................................45

*Beck v. Manufacturers Hanover Trust Co.*, 125 Misc. 2d 771 (N.Y. Sup. Ct. 1984)...................29

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) .............................48

*Boss v. Advanstar Communications Inc.*, 911 F. Supp. 109 (S.D.N.Y. 1995) .............................24

*Bradwell v. GAF Corp.*, 954 F.2d 798 (2d Cir. 1992) ...................................................23

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977)...............22, 23

*DeRosa v. National Envelope Corp.*, 595 F.3d 99 (2d Cir. 2010) ..................................35

*Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313
  (S.D.N.Y. Sept. 30, 2003) ................................................................41

*Fitzpatrick v. American Int'l Grp., Inc.*, No. 10 Civ. 142 (MHD), 2013 WL 709048
  (S.D.N.Y. Feb. 26, 2013) ................................................................35

*Hall v. United Parcel Service of America, Inc.*, 76 N.Y.2d 27 (1990) ........................................41

*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272 (10th Cir. 1994)...........................................23, 24

*Holland v. Fahnestock*, 210 F.R.D. 487 (S.D.N.Y. 2002)..............................................23

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ......................................47

*In re AppliedTheory Corp.*, 312 B.R. 225 (S.D.N.Y. July 14, 2004) ..........................................43

*In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814 (S.D.N.Y. 2014) ......................................21

*In re Continental Airlines, Inc.*, 257 B.R. 658 (Bankr. D. Del. 2000)..........................................44

*In re CPT Corp.*, No. 4-90-5759, 1991 WL 255679 (Bankr. D. Minn. Nov. 26, 1991)...............43

*In re Dornier Aviation (North America), Inc.*, 305 B.R. 650 (E.D. Va. 2004)............................43

*In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006)............................................36

*In re LBHI*, 519 B.R. 47 (Bankr. S.D.N.Y. 2014) ..............................................................21, 36, 37

*In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) ........................8, 33, 34

*In re Lehman Bros. Holdings Inc.*, 456 B.R. 213 (Bankr. S.D.N.Y. 2011) ..............8, 9, 22, 33, 34

*In re Lehman Bros Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP)
   (Bankr. S.D.N.Y. May 18, 2011), ECF No. 7............................................................................33

*In re Lehman Bros Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP)
   (Bankr. S.D.N.Y. Sept. 7, 2011), ECF No. 26 .........................................................................34

*In re Lyondell Chem. Co.*, 542 F. App'x 41 (2d Cir. 2013)..........................................................39

*In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006)............................................................37

*In re MF Global Holdings, Ltd.*, No. 11-15059 (MG), 2014 WL 3882363
   (Bankr. S.D.N.Y. Aug. 6, 2014) ..............................................................................................37

*In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771 (S.D.N.Y. 1996) .....................................43

*In re Wireless Corporation, Inc.*, 384 B.R. 713 (Bankr. D. Del. 2008)........................................36

*In re WorldCom, Inc.*, 361 B.R. 675 (Bankr. S.D.N.Y. 2007)......................................................43

*Livernois v. Warner-Lambert Co.*, 723 F.2d 1148 (4th Cir. 1983)...............................................23

*Nappy v. Nappy*, 40 A.D.3d 825 (2d Dep't 2007) ........................................................................25

*New Hampshire v. Maine*, 532 U.S. 742 (2001)...........................................................................32

*RM Realty Holdings Corp. v. Moore*, 64 A.D.3d 434 (1st Dep't 2009).......................................25

*Schubert v. Lucent Technologies Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382
   (3d Cir. 2009)............................................................................................................................47

*SEC v. Albert & Maguire Secs. Co.*, 560 F.2d 569 (3d Cir. 1977)...............................................49

*Sporre S.A. de C.V. v. International Paper Co.*, No. 99 Civ. 2638 (HB), 1999 WL
   1277243 (S.D.N.Y. Dec. 30, 1999)..........................................................................................22

*Stone v. National Bank & Trust Co.*, 188 A.D.2d 865 (3d Dep't 1992).......................................45

*TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005) ...................................25

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005)..............................................32, 33

*William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519 (1927)..........................................25

**STATUTES**

11 U.S.C. § 502(b)(7) ................................................................................................. *passim*

11 U.S.C. § 507(a) .............................................................................................................17

11 U.S.C. § 510(b)...........................................................................................4, 35, 36, 37

11 U.S.C. § 510(c) .............................................................................................................47

15 U.S.C. § 78eee(b)(3) ......................................................................................................5

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

James W. Giddens (the "Trustee"), as trustee for the Securities Investor Protection Act

("SIPA") liquidation of Lehman Brothers Inc. ("LBI"), respectfully submits this pre-hearing

brief.

## PRELIMINARY STATEMENT

1.      Claimants Jonathan Hoffman (through his entity 1EE LLC), Wayne Judkins,

J. Robert Chambers, and Richard Hajdukiewicz are four of the former LBI employees who

directly benefitted from the sale of certain LBI assets to Barclays Capital Inc.  Like thousands of

other LBI employees, Claimants accepted Barclays' offer of employment, joined Barclays, and

were paid bonuses or severance by Barclays for their performance at LBI.  Of these thousands,

Claimants are among the 16 former LBI employees who ask the Court to ignore the substantial

benefits they received as a result of the sale, and to allow their claims against the LBI estate for

compensation that they have already been paid.  Discovery has confirmed, and the hearing will

establish, that there is no basis for Claimants' attempt at a double recovery, and a decision on

these four claims (which represent more than 80 percent of the total amount claimed by former

LBI employees who transferred to Barclays) will provide a sound basis for categorically

addressing the Trustee's objections to the remaining claims as well.

2.      ***Claimants Are Seeking to Be Paid Twice.***  When LBI's parent, Lehman Brothers

Holdings Inc. ("LBHI"), filed for bankruptcy on September 15, 2008, LBI's customers, creditors,

and employees were confronted with unprecedented uncertainty and financial chaos.  In an

attempt to mitigate at least some of the potentially massive losses, LBHI and LBI transferred

parts of LBI's business to Barclays pursuant to an Asset Purchase Agreement (the "APA")

executed on September 16, 2008.  The Court held a hearing (the "Sale Hearing") on

September 19 – mere hours after the commencement of LBI's SIPA liquidation proceeding – and approved the transaction with Barclays on September 20. The transaction closed on September 22.

3.      A key element of the sale, one emphasized at the Sale Hearing and in subsequent decisions by the Court, was that LBI contracted for Barclays to offer employment to LBI's employees and to pay those employees bonuses and severance based on their performance at LBI. This arrangement benefitted all concerned: the employees benefitted because LBI arranged for them to keep their jobs in the midst of the financial crisis and for Barclays to pay them bonuses or severance in real dollars (a benefit unavailable to LBI's other creditors); Barclays benefitted by ensuring that LBI's employees would come to work at Barclays after the acquisition; and LBI and its creditors benefitted by arranging for the payment of compensation obligations that otherwise would have resulted in claims against the LBI estate.

4.      Each Claimant had an employment contract with LBI that provided for a guaranteed bonus to be paid at the end of the 2008 fiscal year. As a result of the liquidation and the Barclays transaction, Claimants joined Barclays and were paid either bonuses or severance based on their performance at LBI. Nonetheless, Claimants do not merely seek allowed claims for any portions of their guaranteed bonuses that Barclays may have failed to pay. Instead, they seek allowed claims for the full amount of their guaranteed LBI bonuses, *including amounts that they have already been paid*. Accordingly, Claimants do not seek to be placed in the position they would have been in had LBI not failed; they seek a windfall in the form of a double recovery that would make them better off than if there had been no bankruptcy.

5.      Claimants Hoffman and Judkins seek their full guaranteed bonuses even though Barclays fully paid them these amounts. For example, the sale worked exactly as it was intended

2

to for Hoffman – one of the highest-paid employees at Lehman Brothers.  He was due an

$83 million bonus from LBI, and Barclays agreed to and did pay him this $83 million (in

addition to tens of millions of dollars that he earned for his performance at Barclays).  Hoffman

argues he is entitled to claim the $83 million – an amount equal to one percent of all assets in

LBI's general estate – a second time because he entered into an employment agreement with

Barclays that he claims compensated him solely for work performed for Barclays, rather than for

LBI.  The record, including the contemporaneous documents and testimony, demonstrate that

this is simply not so.

6.      It was no coincidence that Barclays agreed to pay Hoffman the same $83 million

that he was owed by LBI.  Rather, the evidence shows that Hoffman sought – and Barclays

agreed to pay – $83 million specifically to compensate him for the bonus he earned at LBI, and

that Hoffman separately was paid tens of millions of dollars for his performance at Barclays.  As

Barclays' Michael Keegan put it, the $83 million was paid ███████████████████

████████████████████████████████████████        (Keegan Dep.

207:11-22; *see id*. at 128:4-13 ███████████████████████████

████████████████████████████).)[1]  There is no

basis for Hoffman's claim for a double recovery (and, as explained below, even if there was

some legal basis for the claim, it would be subject to the section 502(b)(7) cap and equitable

subordination).

7.      Similarly, Claimants Chambers and Hajdukiewicz were terminated by Barclays in

the weeks after the sale and received special lump sum payments in lieu of a bonus.  The record

---

1.   References to "_____ Dep." and "Trustee's Ex. __" are to the deposition transcripts and Trustee's trial exhibits, respectively, that will be delivered to the Court on April 15, 2015.

shows that these payments were compensation for Claimants' service at LBI.  While the payments did not equal the amount of Claimants' guaranteed bonuses, and thus there may be a remainder that could lead to an allowed claim (depending on the equity award and waiver issues addressed below), Claimants cannot simply claim their full guaranteed bonuses as though they received nothing at all.  Instead, these special payments must be taken into account in reducing the amounts claimed.

8.      In sum, Claimants seek a windfall second recovery at the direct expense of LBI creditors who have little hope of seeing their claims paid in full even once.  Nothing in the law or the record permits Claimants to be paid twice.

9.      ***Claims for Equity Compensation Must Be Subordinated.***  In addition to failing to account for the amounts that they were already paid, Claimants fail to account for the fact that they agreed that a substantial portion of their bonuses would be granted in the form of conditional equity awards, namely Restricted Stock Units ("RSUs").  This Court has twice before addressed claims by former LBHI and LBI employees for compensation that was to be granted in RSUs and has twice concluded that such claims must be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The Court's prior decisions are equally applicable here, where the plain terms of Claimants' contracts and the Lehman Equity Award Program make clear that specified percentages of their bonuses were to be paid in RSUs.  These claims must therefore be subordinated, as must Hoffman's claim for unliquidated damages related to previously-issued RSUs.

10.     ***The Claims Have Additional Deficiencies.***  There are several additional deficiencies with the claims.  In addition to seeking the guaranteed bonus that he already received in full, Claimant Judkins seeks an additional discretionary bonus of between $1.2 and

4

$1.6 million.  However, Judkins has no entitlement to any bonus that was not guaranteed in writing.  Similarly, Judkins claims that he was promised certain home relocation benefits in connection with the sale of his home in Maryland.  However, Judkins never sold his home and thus never incurred any of the expenses that he claims should be "reimbursed."  Nor is there any basis for Judkins' attempt to hold LBI liable for a home equity loan he took out on his home.

11.    Claimant Chambers similarly seeks amounts that he did not earn through his claim for an additional $20.4 million in post-2008 wages and bonuses.  This claim for 2009 and 2010 compensation is disallowed by section 502(b)(7) of the Bankruptcy Code's cap on claims for damages arising from the termination of an employment agreement.  Moreover, Chambers is not entitled to these amounts because the clear terms of his LBI employment agreement required that Chambers be actively employed by LBI to receive them.

12.    Finally, Claimant Hajdukiewicz released his claim against LBI as part of the waiver that he signed in connection with his termination by Barclays.  ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████    While other employees terminated by Barclays specifically reserved their rights to bring a claim against LBI, Hajdukiewicz did not, and, accordingly, his claim must be disallowed.

### BACKGROUND

13.    On September 15, 2008, LBHI filed for bankruptcy.  Four days later, on September 19 (the "Filing Date"), the District Court entered the Order Commencing Liquidation of LBI (LBI ECF No. 1).  That order, *inter alia*, (i) appointed the Trustee for the liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); and (ii) removed the case to this Court for all purposes.

5

**As Part of the Transaction, Barclays Committed to Make**
**Bonus and Severance Payments to Former LBI Employees.**

14.    On September 16, 2008, LBHI, LBI, LB 745 LLC, and Barclays agreed to the

APA, pursuant to which Barclays purchased most of the assets related to LBI's North American

capital markets and investment banking business and received a transfer of 72,000 customer

accounts.

15.    Lehman's failure had put the livelihoods of thousands of LBI employees at risk.

*See* Sept. 19, 2008 Hearing Tr. 60:4-16 (LBHI ECF No. 318) ("Sale Hearing Tr.") ("[The APA]

affects directly the 25,000 employees whose future became extremely clouded because of the

events of last weekend . . . .  If it's not approved . . . [t]he unemployment rolls for the

metropolitan area will increase dramatically." (Miller)).  The APA squarely addressed this risk

by conditioning the sale on Barclays' commitment to offer employment to each LBI employee

who worked in the acquired business, and to make certain payments to the employees who

accepted Barclays' offer.  (Trustee's Ex. 1 § 9.1.)  The LBI employees who accepted Barclays'

offer of employment were defined to be "Transferred Employees."  (*Id.*)

16.    Barclays further agreed in the APA to pay bonuses to the Transferred Employees

for their work at LBI in 2008.  In particular, the APA required that Barclays pay each

Transferred Employee a bonus "in respect of the 2008 Fiscal Year that, in the aggregate, are

equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable

for incentive compensation (but not base salary)."  (*Id.* § 9.1(c).)

17.    Barclays also agreed to pay severance to Transferred Employees whom it

terminated prior to December 31, 2008 "at levels that are no less favorable than such levels as

the Transferred Employee would have been entitled to receive pursuant to the provisions of

6

[Lehman's] severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing."  (*Id*. § 9.1(b).)

18.     On September 19, the Court held the Sale Hearing, during which the parties and the Court highlighted these contractual commitments regarding LBI's former employees.  LBHI lawyer Harvey Miller advised Judge Peck, Lehman's regulators, hundreds of creditors, and the press that, under the APA, "the jobs of thousands of employees would be saved and [the employees] will be entitled to substantial benefits from Barclays in the form of compensation, bonuses and severance payments that *are based upon the employee's prior performance while with Lehman*."  Sale Hearing Tr. 101:23-102:2 (emphasis added); *id*. at 99:22-25 (Barclays was going to "assume exposure for the employees that accept offers of employment . . . an exposure of approximately two billion dollars").  Accordingly, Miller represented that the sale would "preserve[] approximately nine to ten thousand jobs for [Lehman's] employees and *avoid[] significant costs and claims that would have resulted if there were mass layoffs and a cessation of operations*."  *Id*. at 144:25-145:4 (emphasis added).

19.     After the Sale Hearing ended in the early morning hours of September 20, the Court approved the APA.  This approval was based on, among other things, the Court's finding that "[a]pproving the transaction secures[,] whether for ninety days or for a lifelong career[,] employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy."  *Id*. at 250:23-251:3.

20.     As the Court later noted:

> Knowing that approval of the transaction would save a multitude of financial sector jobs probably was the most significant single factor influencing the Court's thinking when it considered the sale. *The transaction included offers of employment to most members of*

> *the Lehman work force* that not only helped these individuals at a
> most difficult time on Wall Street, but also unquestionably was
> good for the estate, brokerage customers and the general economy.
> *A going concern sale to Barclays also was the one way to
> eliminate claims of employees for lost wages and benefits.*

*In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 154 (Bankr. S.D.N.Y. 2011) (the "*Lehman Rule
60(b) Opinion*") (emphasis added).

21.     The sale closed on September 22, 2008, and Barclays subsequently paid bonuses
to former LBI employees who stayed at Barclays.  As Barclays executive Michael Keegan
testified, Barclays paid 2008 bonuses to former LBI employees based on the work they had
performed for LBI.  (Keegan Dep. 19:12-21:12 (Barclays paid former Lehman employees
bonuses to compensate them ███████████████████ .)

22.     As for former LBI personnel whom Barclays terminated before paying 2008
bonuses, Barclays paid severance based on Lehman's severance plan (and, in doing so, gave the
employees credit for the time they had worked at Lehman).  (Kurman Dep. 34:21-35:4, 40:8-13.)
In addition, and on top of the severance, Barclays also made "special lump sum payments" in
lieu of a bonus to the Lehman personnel it terminated.  (*Id*. at 34:10-35:4, 43:4-13.)  These
payments were intended to compensate the employees for their 2008 bonuses and were based on
a percentage of their 2007 LBI bonuses (10 percent for employees below the managing director
level and 20 percent for managing directors, up to a $1 million cap).  (*Id*. at 49:9-21.)  The
terminated employees who received severance and payments in lieu of bonus executed a waiver
releasing any claims arising out of their employment with Barclays or Lehman.  (*Id*. at 38:12-
39:12.)

23.     As the Court has held, Barclays' assumption and payment of bonus obligations
means that "Lehman no longer has any ongoing liabilities to the Transferred Employees for
bonus compensation."  *In re Lehman Bros. Holdings Inc.*, 456 B.R. 213, 219 (Bankr. S.D.N.Y.

2011) (the "*LBHI Summary Judgment Opinion*"); *see id.* at 217 (Barclays' assumption and

payment of compensation obligations benefitted Lehman by allowing for "the corresponding

extinguishment from [Lehman's] balance sheet of all such liabilities").

**Claimants Went to Barclays and Were Paid for Their Work at LBI.**

24.     Each of the Claimants is a former LBI employee who accepted Barclays' offer of

employment and was paid his LBI bonus in whole or in part.

**Hoffman Was Paid His Entire LBI Bonus in Addition to
the Compensation He Received for His Work at Barclays.**

25.     Hoffman was a proprietary trader who was one of the three highest paid Lehman

employees in 2007, and was owed the most compensation of any Lehman employee in 2008.

(*See* Hoffman Dep. 317:9-13.)  Hoffman had employment agreements with LBI for the years

2007 and 2008 that provided ███████████████████████████████████████

██████████████████████████ (Trustee's Ex. 5 at 1; Trustee's Ex. 6 at 1.) ██████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

(Trustee's Ex. 5 at 5; Trustee's Ex. 6 at 5.) ███████████████████████████████████

████████████████████████ (*See infra* ¶¶ 65-66.)

26.     ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

(Trustee's Ex. 5 at 2; Trustee's Ex. 6 at 2.) █████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████  (*Id.*)

9

27.     (*Id.*)

28.    When Lehman failed, Hoffman was owed approximately $83 million between the second installment of his 2007 bonus ($7.7 million) and his full 2008 bonus ($75.3 million).[2]

29.    Following the sale of LBI's business to Barclays, Hoffman agreed to join Barclays.  But, before joining, Hoffman required Barclays to commit contractually to paying him the $83 million that he was owed by LBI.  While Barclays initially was reluctant to agree to pay such a large amount of money, Barclays ultimately agreed to pay Hoffman the $83 million he was owed by LBI, in addition to separately paying him for his performance going forward at Barclays.

30.    Although Hoffman claims that the $83 million Barclays paid him was not related to the $83 million LBI owed him, the record makes clear that, as Barclays' Michael Keegan testified, Barclays paid Hoffman ████████████████████████████████ ████████████████████████ (Keegan Dep. 207:11-22; *see also* Trustee's

---

2.    The exact amount owed to Hoffman was $83,052,100.  Hoffman's claim is for $83,998,440, but he failed to make two required deductions in calculating this amount.  ████████████████████████ ██████████████ Once these deductions are made, the amount owed is $83,052,100.  In his negotiations with Barclays, Hoffman admitted that he was owed $83 million, not $84 million.  (*See infra* ¶¶ 30-33.)

Ex. 34 (Barclays ████████████████████████████████████████████).)  Thus,

Keegan's reaction upon learning about Hoffman's claim against LBI ████████████

████████████  (Keegan Dep. 142:16-21.)

31.     Even Hoffman admitted that it was part of his "negotiating strategy" to tell

Barclays that his "legacy compensation" from LBI was a "morale issue" that Barclays would

have to address for him to join them.  (Hoffman Dep. 262:19-263:12, 330:6-14, 314:23-315:7,

347:10-14.)  Thus, Hoffman admitted that it was "not a pure coincidence" that he demanded

$83 million.  (*Id.* at 347:10-14.)

32.     Indeed, recordings of conversations with Barclays' employees that Hoffman made

without their knowledge or consent confirm it was clear to everyone at the time that the

$83 million Barclays paid was meant to make Hoffman whole for the $83 million he was owed

by LBI.  (Hoffman Dep. 302:24-304:3; Trustee's Exs. 19-20, 22-29.)  During one recorded

conversation, Hoffman said that he was going to ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████  (Trustee's Exs.

28, 29.)  Hoffman explained that if ████████████████████████████████████████

████████████████████████████████  (Trustee's Exs. 28, 29.)

33.     In another recording, Hoffman discussed with Keegan the $83 million he was

owed, and the form and timing in which it would have been paid.  Keegan explained that

Barclays tried to make sure they were ████████████████████████████████

████████████████████  (Trustee's Exs. 22, 23.)  ████████████████████████

████████████████████████████  (Trustee's Exs. 22, 27.)  During

that same conversation, Barclays' Eric Bommensath unequivocally told Hoffman that he ███████

███████████████ (Trustee's Exs. 22, 26.)  Thus, as Keegan testified, ███████████

████████████████████████████████████████████████████

████████████████ (Keegan Dep. 127:23-128:13.)

34.    Following Barclays' agreement to pay him the $83 million he was owed by LBI,
Hoffman entered into an employment agreement with Barclays on October 3, 2008.  (Trustee's
Ex. 7.) ███████████████████████████████████████

███████████████████████████ (*Id*. at 1.)

35.    In addition to paying him the $83 million, Hoffman's agreement with Barclays
essentially replicated his contract with LBI. ███████████████████████

██████████████████████████████ (Trustee's. Exs. 5-7;
Hoffman Dep. 197:14-199:4.) ███████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████ (Trustee's Exs. 5-7; Hoffman Dep. 215:23-216:6.)  In fact,
Hoffman's Barclays agreement was more favorable than his LBI contract, ███████████

████████████████████████████████

███████████████████████████████

36.    Separate from – and in addition to – his compensation for his performance at
Barclays ████████████████████████, Hoffman's Barclays agreement
provided for him to be paid the $83 million he was owed by LBI. ███████████████

████████████████████████████████████████

12

██████████████████████████████████████████████ (Trustee's Ex. 7 at 1.)

██████████████████████████████████████████████ (*Id.*)

37.    ██████████████████████████████████████████

██████████████████████████████████████████ (*Id.*)  As

Keegan testified, this provision was intended to replicate the provisions in his LBI contract under

which ████████████████████████████████████████████

██████████████████████ (Keegan Dep. 57:18-59:20.) █████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ (Trustee's Ex. 7 at 2; Trustee's Ex. 6 at 2-3.)

38.    The difference between the ████████████████████ and the $83 million

that Hoffman was owed by LBI left Hoffman with, as he put it, ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ (Trustee's Ex. 7 at 4.)  In other words,

Hoffman received $13 million more than he would have earned under his core deal with

Barclays.

39.    Thus, Barclays paid Hoffman the $83 million that he alleges he was owed for his

pre-acquisition services for LBI.  In fact, Hoffman received more cash from Barclays for his

performance at LBI than he would have been paid had he continued working for LBI: █

██████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

40.    Hoffman assigned his claim to 1EE LLC, a limited liability company that Hoffman formed, because he did not want anyone who might search for his name on the Internet to find that he had filed the claim.  (Hoffman Dep. 25:20-25, 27:12-28:7.)  In addition to the performance bonuses that Hoffman already was paid, he also seeks unliquidated damages arising from LBHI's failure to issue securities in connection with Equity Awards granted to Hoffman during the years 2003 through 2008.  (Trustee's Ex. 36 at 3.)

**Judkins Was Paid His Entire LBI Bonus,**
**and He Incurred No Relocation Expenses.**

41.    Judkins was a proprietary trader who joined LBI in early 2008.  Judkins entered into an employment agreement with LBI for the year 2008 that provided for him to receive a $200,000 annual salary and a minimum bonus of $800,000.  The agreement also stated that, in connection with his move from Maryland to New York, Judkins would be provided "relocation assistance in accordance with the Firm's policy."  (Trustee's Ex. 15 at 3.)

42.    In his claim, Judkins alleges that he is entitled to between $1,200,000 and $2,800,000, including his $800,000 guaranteed bonus and up to $1,600,000 for a non-guaranteed, discretionary bonus.  In support of his claim for a discretionary bonus beyond what he was guaranteed in his contract, Judkins claims he was told that, if he performed well, he would receive additional bonus compensation.  He concedes that there is no written promise of any bonus beyond the $800,000 guaranteed in his agreement.  (Judkins Dep. 20:22-21:2.)

43.    After the Barclays acquisition, Judkins accepted an offer of employment from Barclays.  Barclays' offer provided that Judkins would receive the same $200,000 annual salary he had received from LBI.  (Trustee's Ex. 17 at 1.)  The offer also provided that Barclays would pay Judkins a 2008 bonus of $800,000, the same amount as his LBI bonus.  (*Id.*)  If Judkins were terminated without cause, he would receive any unpaid portion of his 2008 bonus in cash.  (*Id.*)

14

On January 14, 2009, Barclays notified Judkins that he was being terminated, and, in February 2009, Barclays paid Judkins $800,000 in cash.

44.     Judkins also seeks $400,000 in relocation expenses connected to the sale of his home in Maryland.  However, Judkins never sold his home – indeed, he still owns it today – and so he has not incurred any of the costs he claims.  (Judkins Dep. 122:5-7.)

45.     For the first time in discovery, Judkins also claimed that LBI is liable to pay him more than $840,000 in connection with a home equity loan he took out.  In June 2008, Judkins took out a loan from Prudential Relocation, Inc. in the amount of $840,000 pursuant to an equity loan note.  LBI did not sign the note, and LBI is not referenced therein.  (Trustee's Ex. 67.)  The loan was to be repaid from the proceeds of the sale of Judkins home in Maryland.  (*Id.*)  As noted above, however, Judkins never sold his home.  After he failed to repay the loan, Prudential brought a lawsuit against Judkins and he repaid the loan.  (Judkins Dep. 124:13-25.)[3]

**Chambers Was Paid Part of His LBI Bonus.**

46.     Chambers was a proprietary trader who had worked at LBI since 1994.  Chambers had an employment agreement with LBI for the 2007 fiscal year, and one that covered the 2008 through 2010 fiscal years.  Under both agreements, ███████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

47.     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

_____

3.   Judkins asserts that LBI was responsible for the loan based on a separate contract between LBI and Prudential wherein LBI retained Prudential to provide relocation services for its employees and agreed to pay Prudential for any equity loans that its employees failed to repay.  After repaying Prudential for a loan, LBI would be subrogated to the rights of Prudential against the employee and assume complete responsibility for collecting the loan.  (Trustee's Ex. 68 at 4.)

fill me in



(Trustee's Ex. 11 at 1-2.)

48. ████████████████████████████████████████

████████████████████████████ (Trustee's Ex. 12 at 2.)

49.    Between the second installment of his 2007 bonus ($1.6 million) and his 2008

bonus ($41.5 million), Chambers was owed approximately $43 million when Lehman failed.[4]

50. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (Trustee's Ex. 12 at 1.)

(*Id.*)  In his claim, Chambers seeks $20 million for 2009 and 2010

performance bonuses and $400,000 for 2009 and 2010 salary.

51.    Barclays offered Chambers continued employment upon acquiring LBI's

business, and Chambers accepted.  Indeed, Chambers agrees that he "was transferred to Barclays

in connection with the sale."  (Chambers Resp. ¶ 13, LBI ECF No. 11393.)

---

4.    The exact amount is $43,153,810.67.  Chambers alleges that he was owed $44,033,233.66, but he fails to make
certain required deductions for his 2008 bonus. ████████████████████████████

████████████████  (Trustee's Ex. 12.)  The total 2008 compensation for Chambers' traders (Guy Hoffman,
Kyle Kettler, and Mathew Verghese) was $1,200,000, and Chambers' salary was $200,000.  Though Chambers
has deducted part of his salary and his traders' total compensation, he has not deducted $879,422.99, failing to
deduct any amounts paid by Barclays or by LBI in equity awards prior to the transfer.  Moreover, Kettler and
Verghese have also asserted claims against LBI for their guaranteed bonuses (Chambers Dep. 69:24-70:23);
thus, as Chambers has admitted, he and Kettler and Verghese are separately claiming the same amounts.
(Chambers Dep. 71:11-21.)

52.    Chambers subsequently was terminated by Barclays and entered into a Severance

Agreement and General Waiver and Release dated December 5, 2008.  This agreement provided

that Barclays would pay Chambers ███████ severance (the amount of severance to which he

would have been entitled under the Lehman severance plan, *see* Kurman Dep. 52:13-16), and

would also pay him a ████████████████████████ (Trustee's Ex. 14 at 1.)

53.    ████████████████████████████████████

███████████ (*Id.* at 3.)

**Hajdukiewicz Was Paid Part of His LBI Bonus.**

54.    ████████████████████████████████████

██████████████████████████ (Trustee's Ex. 8 at 1.)

55.    In his claim, Hajdukiewicz seeks $1,600,000 based on his bonus and asserts that

the entire amount is entitled to priority status pursuant to sections 507(a)(4) and (5) of the

Bankruptcy Code.[5]

56.    Barclays offered Hajdukiewicz continued employment upon acquiring LBI's

business, and Hajdukiewicz accepted.

57.    Hajdukiewicz subsequently was terminated by Barclays and entered into a

Severance Agreement and General Waiver and Release dated October 14, 2008.  This agreement

provided that Barclays would pay Hajdukiewicz ████████████ (the amount of severance

---

5.    Hajdukiewicz recently attempted to amend his claim to assert a claim for $1,910,000, but that amendment is
      barred by the Court's Order Pursuant to Sections 105(a), 502(a), 502(c) and 726 of the Bankruptcy Code and
      Bankruptcy Rule 3009 (i) Establishing a Final Reserve for Secured, Administrative and Priority Claims,
      (ii) Allowing Certain Secured, Administrative and Priority Claims and Related Relief, which was entered on July 2, 2014
      (LBI ECF No. 9273), and by the Order Pursuant to Sections 105(a), 502(a), 502(c) and 726 of the Bankruptcy
      Code and Bankruptcy Rule 3009 (i) Capping the Maximum Allowable Amounts, and Establishing an Interim
      Distribution Fund, for Unsecured Claims, (ii) Allowing Certain Unsecured Claims, (iii) Authorizing the Trustee
      to Make a First Interim Distribution to Allowed Unsecured Creditors with a Record Date of July 15, 2014, and
      Related Relief, which was entered on July 30, 2014 (LBI ECF No. 9520).

17

to which he would have been entitled under the Lehman severance plan, *see* Kurman Dep. 48:18-

22), and would also pay him ████████████████████████████ (20 percent of his 2007

bonus) on or about February 22, 2009.  (Trustee's Ex. 10 at 1.)

     58.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

(*Id*. at 3.)

**Claimants Agreed to Receive a Portion of Their Compensation in Equity Awards.**

     59.    Prior to the liquidation, LBI's practice was to pay its employees partially in

conditional equity awards.  The issuance of these equity awards was governed by Lehman's

equity award program.

     60.    On June 19, 2008, LBHI's Compensation and Benefits Committee exercised its

discretion to determine that equity awards would be issued pursuant to the 2008 Equity Award

Program in the form of RSUs, and approved the terms of and eligibility criteria for such awards.

(Trustee's Ex. 74 at 2.)  On July 1, 2008, the Committee approved the table to be used in

calculating Lehman employees' 2008 equity awards.  (Trustee's Ex. 75 at 3.)

     61.    On July 1, 2008, Lehman issued its 2008 Equity Award Program.  The 2008

Equity Award Program provided that, "[a]s in prior years, 100% of the 2008 equity award will be

in the form of Restricted Stock Units ('RSUs')."  (Trustee's Ex. 2 at 4.)

     62.    The RSUs represented a contingent right to receive LBHI stock after three years,

and an employee's rights in the RSUs vested over the course of three years.  (*Id*.)  An employee

who was terminated for cause forfeited all outstanding RSUs, an employee who resigned

generally forfeited all unvested RSUs, and an employee who was terminated without cause was

18

generally permitted to retain unvested RSUs only if he or she signed a release agreement.  (*Id.*
at 9-10.)

63.      The 2008 Equity Award Program further provided that an employee's 2008 equity
award "will be calculated based on your 2008 total compensation and the 2008 Equity Award
Schedule." (*Id.* at 8.)  The 2008 Equity Award Schedule, which was attached as Exhibit B to the
2008 Equity Award Program, detailed the percentage of each employee's compensation –
including bonus compensation – that would be paid in equity awards.  (Trustee's Ex. 2 at 12.)

64.      Under the 2008 Equity Award Program, employees who were terminated prior to
the grant date generally would not receive any year-end equity award, except that, "[i]n case of
termination of employment of production-based employees or individuals with a written
compensation guarantee, any year-end equity awards will be treated in accordance with the
relevant plan provisions or terms of the written compensation guarantee." (*Id.* at 8.)[6]

65.      

(Trustee's Ex. 6 at 1-2; *see also* Trustee's Ex. 15 at 1;
Trustee's Ex. 12 at 2; Trustee's Ex. 8 at 1-2.)

(Trustee's Ex. 6 at 3; Trustee's Ex. 12 at 2.)[7]

---

6.   LBI's liquidation proceeding commenced before Lehman set a grant date for 2008 year-end equity awards.

7.

(Trustee's Ex. 11 at 2.)

66. 

67.    Judkins and Hajdukiewicz each also received a schedule that specified the percentage of their 2008 total compensation that was payable in RSUs.  Lehman explained in an email to them that it was "required to set the equity award schedule (the 'deferral schedule') that determines the percentage of total compensation that will be paid in conditional equity awards instead of cash" and that "[a]ttached to this email is a grid that will apply to all RSUs that you receive under the 2008 Equity Award Program."  Pursuant to the attached grid, $240,000 of Judkins' total compensation and $919,200 of Hajdukiewicz's total compensation was to be paid in RSUs.  (Trustee's Ex. 9.)

68.    All of the Claimants were financial industry professionals who knew what they were signing up for when they agreed to be paid partially in RSUs.  Indeed, all of the Claimants received RSUs before the commencement of LBI's liquidation proceeding.  Hoffman was a long-term Lehman employee who received RSUs year after year, ████████████████████ ████████████████████████ (Trustee's Exs. 39, 40.)  Chambers likewise routinely received RSUs during his 14 years at Lehman.  (*See* Trustee's

20

Ex. 60.)  And Judkins and Hajdukiewicz each received RSUs in July 2008 as an advance on their

year-end bonuses.  (Trustee's Exs. 58, 69.)[8]

## ARGUMENT

69.     Because the Trustee's Amended Objection refuted at least one of the claims'

essential allegations, Claimants bear the burden of demonstrating that the claims are valid.  *See*

*In re LBHI*, 519 B.R. 47, 53-54 (Bankr. S.D.N.Y. 2014) ("Once the objecting party has met its

initial burden, it is up to the claimant to 'prove by a preponderance of the evidence that under

applicable law the claim should be allowed.'" (quoting *In re Arcapita Bank B.S.C.(c)*, 508 B.R.

814, 817 (S.D.N.Y. 2014)).  Claimants cannot meet their burden.

## I.     Claimants Are Not Entitled to a Double Recovery.

70.     In the APA, LBI contracted – to the benefit of its employees – for Barclays to pay

bonuses or severance to those employees who transferred to Barclays in connection with the sale.

Each of the Claimants transferred to Barclays in connection with the sale and each was paid all

or part of their guaranteed bonuses.  Claimants are not entitled to seek a double recovery from

the LBI estate of amounts that already have been paid by Barclays.

### A.     LBI Contracted with Barclays to Pay Bonuses to Former LBI Employees.

71.     As detailed above, as part of the sale, LBI contracted with Barclays to pay

bonuses and severance to LBI employees who transferred to Barclays.  (*See supra* ¶¶ 14-19.)

Thus, the parties represented at the Sale Hearing that Barclays was going to "assume exposure

for the employees that accept offers of employment" and that those employees would "be

entitled to substantial benefits from Barclays in the form of compensation, bonuses and

---

8.     ███████████████████████████████████████████████████████████  (Trustee's Ex. 8 at 2.)

severance payments that are based upon the employee's prior performance while with Lehman."
Sale Hearing Tr. 99:22-25, 101:23-102:2. And the Court understood that Barclays' assumption
and satisfaction of these compensation obligations would lead to the "corresponding
extinguishment from [Lehman's] balance sheet of all such liabilities." *LBHI Summary Judgment
Opinion*, 456 B.R. at 219.

72. To be clear, for those LBI employees who, like Claimants, had a contractual
entitlement to bonus compensation, the assumption by Barclays of LBI's compensation
obligation did not alone extinguish LBI's potential liability on the contracts. Instead, LBI
delegated its contractual obligation to pay compensation, thus remaining liable if Barclays failed
to pay. The delegation of LBI's obligations to Barclays was consistent with New York law,
under which it is "well settled" that contractual duties may be delegated. *Sporre S.A. de C.V. v.
International Paper Co.*, No. 99 Civ. 2638 (HB), 1999 WL 1277243, at *4 (S.D.N.Y. Dec. 30,
1999). Notwithstanding the delegation, LBI remained liable to Claimants to the extent that
Barclays failed to pay their bonuses. *See Contemporary Mission, Inc. v. Famous Music Corp.*,
557 F.2d 918, 924 (2d Cir. 1977) (delegation "does not relieve the delegant of the ultimate
responsibility to see that the obligation is performed," and "the delegant remains liable" to the
extent that the delegate fails to perform).

73. To the extent that Barclays paid Claimants, however, LBI's liability was
discharged. As Justice Byron White explained while sitting by designation in the Tenth Circuit:

> Ordinary principles of contract law recognize that an obligor may
> effectively delegate performance to another who is willing to
> perform the delegated duty, though the obligor remains liable as
> surety unless the obligee consents to the delegation. *Consequently,
> if the delegate performs the duty, the duty is discharged, and
> obligor owes obligee nothing.*

22

*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1274 (10th Cir. 1994) (emphasis added, internal

quotation marks and citations omitted); *see Contemporary Mission*, 557 F.2d at 924

(performance by the delegate discharges the delegant's obligation); *Holland v. Fahnestock*,

210 F.R.D. 487, 499 (S.D.N.Y. 2002) (noting that "the obligee is entitled to only one

performance" (citation omitted)).

74.      In other cases where the seller of a business delegated employee compensation

liabilities to the purchaser, courts have held that performance by the purchaser relieves the seller

of liability.  In *Headrick*, for example, the purchaser took over the defendant's operations and

hired the defendants' employees, who "accepted [from the delegate] all the vacation pay due

them."  24 F.3d at 1274-75, 1278.  After certain employees nonetheless sued the seller for

accrued vacation benefits, the Tenth Circuit held that it would "sidetrack ordinary contract law"

to require the defendant "to pay its employees for accrued vacation time which has already been

paid in full by the delegate."  *Id*. at 1278-79, n.11.

75.      Similarly, in *Armstrong v. Diamond Shamrock Corp.*, the defendant sold one of

its divisions, and the sale contract required the purchaser to offer employment to the defendant's

employees and "to provide the same personnel benefits afforded by defendant."  455 N.E.2d 702,

703 (Ohio Ct. App. 1982).  Certain employees sued the defendant for vacation pay, despite

having "received all their previously accrued but unused paid vacation time from [the

purchaser]."  *Id*. at 704.  The court found that the employees' "rights have been fully satisfied."

*Id*. at 705; *see Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir. 1992) ("[I]n the context of a

sale of a business where the buyer retains the former owner's employees, it would give a

windfall to award severance pay to employees who were never out of work."); *Livernois v.

Warner-Lambert Co.*, 723 F.2d 1148, 1150-51, 1155-57 (4th Cir. 1983) (where contract for sale

of business required purchaser to offer "comparable" benefits to the seller's employees, the seller would be responsible for making severance payments to any employee who was subsequently terminated by the purchaser, but the seller's liability would be reduced by the amount of any severance paid by the purchaser); *Boss v. Advanstar Communications Inc.*, 911 F. Supp. 109, 112 (S.D.N.Y. 1995) (awarding severance pay to employee who transferred from seller to purchaser in connection with sale of business would "risk giving a windfall to an employee who did not change her job and who was not out of work").

76.    The same is true here.  LBI delegated employee compensation obligations to Barclays, and is no longer liable to the extent that Barclays satisfied those obligations.  To accept Claimants' arguments would provide them a windfall and, as Justice White observed, contradict "[o]rdinary principles of contract law." *Headrick*, 24 F.3d at 1274.  Accordingly, the LBI estate is not liable for amounts that Claimants already received from Barclays.

**B.      Barclays Satisfied LBI's Obligations to Claimants in Whole or in Part.**

77.    There is no dispute that, after the sale, Barclays offered employment to each of the Claimants, each of the Claimants joined Barclays, and each of the Claimants received payments from Barclays.  What Claimants dispute is that the payments had anything to do with LBI and the work Claimants performed for LBI.  The record, however, provides no support for Claimants' position.  Instead, the evidence unequivocally shows that Barclays paid Claimants for their LBI bonuses and, consequently, the LBI estate is no longer liable for those amounts.

78.    The crux of Claimants' position is that their agreements with Barclays do not explicitly state that the amounts paid will satisfy claims against LBI, and therefore, according to Claimants, the amounts cannot have been related to Claimants' work at LBI.  This is wrong as a matter of fact and law.

24

79.    Claimants joined Barclays as part of a larger transaction pursuant to which Barclays agreed to continue their employment and pay their bonuses.  The context of the overall transaction cannot be ignored when construing the purpose of the payments that Barclays made to Claimants.  *See, e.g.*, *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927) ("The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed."); *RM Realty Holdings Corp. v. Moore*, 64 A.D.3d 434, 436 (1st Dep't 2009) (same); *Nappy v. Nappy*, 40 A.D.3d 825, 826 (2d Dep't 2007) (same).  And Claimants' agreements with Barclays must be read together with the APA that documented the sale those agreements were designed to implement.  *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (finding that "writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were executed on different dates and were not all between the same parties").

80.    Contrary to Claimants' position, the record leaves no room for disputing that the amounts paid by Barclays were meant to compensate Claimants for their work at LBI.

### 1.    Barclays paid Hoffman the $83 million he was owed by LBI.

81.    As described above, the record is clear that it was more than an astounding coincidence that Hoffman was owed $83 million and that Barclays agreed to pay Hoffman $83 million on top of his separate compensation for trading at Barclays.  (*See supra* ¶¶ 29-39.) Instead, Barclays █████████████████████████████████ (Trustee's Ex. 34), or, as Barclays' Michael Keegan put it, █████████████████████ ████████████████████████████████████████████ (Keegan Dep. 207:11-22).

82.     Hoffman argues that the timing of and conditions on the payments from Barclays – *i.e.*, that the Special Awards were to be paid over the course of three years, that Hoffman could forfeit any unpaid awards if he resigned or was terminated for cause, and that a portion of the awards could be reduced if he lost money for Barclays – precluded those payments from satisfying LBI's bonus obligations.  (1EE Resp. ¶ 27, LBI ECF No. 11130.)

83.     None of this helps Hoffman, however, because he willingly accepted those conditions in order to receive the $83 million in real dollars.  Having received the $83 million, Hoffman cannot now be heard to complain that he was somehow aggrieved by the minimal conditions he had to meet.

84.     Moreover, his agreement with LBI imposed similar timing and performance conditions on his bonus.  Indeed, Barclays' payment of the $83 million was structured to match and, in fact, exceed the payments Hoffman would have received from LBI.  ████████████████

████████████████████████████████████████████████████████████

████████████████     (*See supra* ¶¶ 59-66.)  ████████████████████████████████     (*See supra* ¶ 35.)  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████     (*See id.*)  ████████████████████████

████████████████████████████████████████████████████████

████████████████████     (*See supra* ¶ 37.)

85.     Thus, the 2008 bonus due to Hoffman under his agreement with LBI was payable over time and was contingent on his employment status and performance just like the payments

he received from Barclays.  Indeed, Hoffman ended up receiving more cash more quickly than he would have received from a solvent LBI.  (*See supra* ¶¶ 35-39.)[9]

### 2.    Barclays paid Judkins' bonus in full.

86.    Judkins was guaranteed an $800,000 bonus for 2008 by LBI, and he received an $800,000 bonus for 2008 from Barclays after transferring to Barclays as part of the sale.  The context of the transaction and Judkins' transfer to Barclays provides ample evidence that Barclays' $800,000 payment satisfied LBI's bonus obligation to Judkins.  (*See supra* ¶ 43.)

87.    Judkins performed the vast majority of his work in 2008 for LBI, spending only a couple of months at Barclays.  (*See id.*)  It strains credulity for Judkins to claim that Barclays paid him an $800,000 2008 bonus for the short amount of time he spent at Barclays in 2008.  Instead, the $800,000 was Judkins' guaranteed bonus for the entire 2008 performance year.  Because Barclays fully paid him this amount, he has no claim against LBI for the same 2008 bonus.

### 3.    Barclays partially paid Chambers' and Hajdukiewicz's bonuses.

88.    Chambers and Hajdukiewicz received $1 million and $422,000, respectively, from Barclays in special lump sum payments.  While both deny that the special lump sum payments they received had anything to do with LBI, the record refutes their position.

89.    The special lump sum payments and other severance payments Chambers and Hajdukiewicz received are directly related to their time at LBI and to Barclays' commitment in

---

9.    Hoffman suggests that the $83 million Barclays paid him should be ignored because he agreed to be paid some of it after the March 15, 2009 bonus payment date referenced in the APA.  (1EE Resp. ¶ 44.)  Of course, Hoffman cannot complain about timing that he agreed to with Barclays after he already received the $83 million.  In any event, whether the timing of Barclays' payments strictly complied with section 9.1(c) of the APA may be relevant in a claim between LBI and Barclays but it has no bearing on the validity of Hoffman's claim seeking the $83 million he was already paid.  And, of course, Hoffman suffered no damages as a result of his receipt of $53 million after March 15, 2009, as Barclays still satisfied his claim in full well before the LBI estate began making any distributions to general creditors.

the APA to pay compensation to LBI employees.  (*See supra* ¶¶ 15-23.)  For example, Chambers received ████████████████████ – exactly what he was entitled to under the LBI severance plan for his 14 years at LBI.  (*See supra* ¶ 52.)  Similarly, Hajdukiewicz received the same ███████████████ that he was entitled to under the LBI severance plan.  (*See supra* ¶¶ 57-58.)

90.    Barclays' Head of Employee Relations, Mark Kurman, confirmed that Barclays paid Chambers a $1 million special lump sum payment (the amount of Barclays' cap on such payments) in lieu of Chambers' 2008 bonus, and paid Hajdukiewicz a $422,000 special lump sum payment (20 percent of his 2007 bonus) in lieu of Hajdukiewicz's 2008 bonus.  (*See supra* ¶¶ 22, 52, 57.)

91.    Furthermore, the Chambers release and the Hajdukiewicz release provided that each of them released Barclays ████████████████████████████████████ ████████████████████████████████████████ (Trustee's Ex. 10 at 3 (emphasis added); Trustee's Ex. 14 at 3 (emphasis added).)  This express reference to their employment with LBI belies any contention that the severance and special lump sum payments they received had no connection to their work for LBI.  Rather, the special lump sum payments were made in lieu of a 2008 bonus.

### C.    Claimants' Arguments for a Double Recovery Are Unavailing.

92.    Wanting to be paid twice, Claimants offer various arguments for ignoring the payments they received for their work at LBI.  All of these arguments lack merit.

#### 1.    The lack of an assumption or assignment of Claimants' employment contracts does not entitle them to be paid twice.

93.    Claimants make much of the fact that their contracts were not assumed or assigned to Barclays.  (*See, e.g.*, 1EE Resp. ¶¶ 29-30.)  They complain that, without such an

assumption and their consent to it, the LBI estate remains liable for the contractual obligations. These arguments miss the point.

94.     The Trustee does not dispute that LBI did not assign specific employment contracts to Barclays.  But this does not mean that Claimants can be paid twice.  The fact that LBI delegated its obligations to Barclays, rather than assigning individual employment contracts to Barclays, simply meant that the LBI estate remained liable for any damages caused by a breach of Claimants' LBI employment agreements – but there were no damages to the extent that Barclays paid Claimants what they were owed.

95.     Thus, Claimants did not need to consent to the delegation of LBI's obligation to pay their bonuses because LBI remained liable to the extent that Barclays failed to pay Claimants what they were owed.  *See Beck v. Manufacturers Hanover Trust Co.*, 125 Misc. 2d 771, 779 (N.Y. Sup. Ct. 1984) ("While a delegation of a duty of payment does not necessarily require the obligee's consent, it does not discharge the original obligor.").  But the fact that LBI remained potentially liable for any shortfall does not mean that Claimants can claim their bonuses against LBI as though they received nothing from Barclays.

**2.    Hoffman's notice argument is meritless.**

96.     Hoffman suggests that the delegation of LBI's bonus obligations to Barclays violated due process because Hoffman did not receive formal notice of the sale.  (1EE Resp. ¶¶ 62-63.)  But Hoffman and the other Claimants can hardly claim to have been unaware of the sale, which was the subject of intense media coverage before being approved during perhaps the most well-publicized Sale Hearing in history.  Indeed, Hoffman personally received the relevant provisions of the APA prior to the Sale Hearing.  (Trustee's Ex. 45.)

97.     In any event, Hoffman's notice argument is a red herring; it is irrelevant whether Hoffman received formal notice, because the sale did not purport to "extinguish[] the Claim."

29

(1EE Resp. ¶ 62.)  To the contrary, Hoffman – and the other Claimants – was among the primary

beneficiaries of the sale.

98.    Absent the sale, Claimants would have lost their jobs and been left with nothing

but a claim against the LBI estate – a claim that would be paid years later if at all, and that at the

time appeared unlikely ever to be paid even in part.  July 30, 2014 Hearing Tr. 20:20-25 (LBI

ECF No. 9881) (noting that "the notion that there would ever be anything for unsecured creditors

was not something that I think many folks contemplated" (Chapman, J.)).

99.    The sale replaced that uncertainty with a promise by Barclays – a solvent entity –

that it would offer continued employment to Claimants and LBI's other employees, that it would

pay them bonuses (in 100-cent dollars), and that it would give any employees whom it

terminated the same severance and benefits that they would have received from LBI (again, in

100-cent dollars).  (*See supra* ¶¶ 15-22.)

100.    No other unsecured creditor received a similar guarantee of even partial payment.

And, unlike other creditors, Claimants did not have to wait for the Trustee to marshal assets and

the claims process to finish; they were paid by Barclays in the ordinary course.

101.    In conferring these benefits on Claimants, the sale cost them nothing.  To the

extent that Barclays failed to comply with its obligation to pay them, Claimants would have the

same claim against LBI that they would have had absent the sale.  To the extent that Barclays

paid Claimants what LBI owed them, they would end up with 100-cent dollars instead of a

bankruptcy claim.

102.    That is exactly what happened with Hoffman, yet he now urges the Court to

disregard the sale, after he reaped its benefits, and permit him to claim his $83 million bonus as

though he was never paid by Barclays.  Nothing in the due process clause or the Bankruptcy

Code permits such an inequitable result.

### 3.    Hoffman's argument that he was not a "Transferred Employee" is frivolous.

103.    In another attempt to distract from the reality that he was already paid in full,

Hoffman claims that he should be allowed a double recovery because he was not a "Transferred

Employee," that "Barclays' offer of employment in connection with the sale was rejected by

Hoffman," and that Hoffman joined Barclays "separate and apart from the employee transfer

process contemplated by the APA."  (1EE Resp. ¶ 55.)  There is no support in the record for

Hoffman's argument.

104.    First, Hoffman's position cannot be squared with the plain language of the APA,

which defined the "Transferred Employees" to include any employee "who accepts [Barclays']

or one of its subsidiaries' offer of employment."  (Trustee's Ex. 1 § 9.1(a).)  It is undisputed that

Hoffman accepted an employment offer from Barclays, and nothing in the APA suggests that he

somehow lost his status as a Transferred Employee by negotiating with Barclays on the precise

terms of his employment for less than two weeks before doing so.

105.    Second, Hoffman's employment with Barclays ███████████████████████

███████ – the day that the Barclays sale closed.  (Trustee's Ex. 7 at 1.)  Moreover, it is plain that

Barclays agreed to pay Hoffman the $83 million that he was owed by LBI.  Hoffman can offer

no support in law or the record for his argument that the fact that Barclays contractually

committed to him to pay him this amount somehow entitles him to claim the same amount from

LBI.  As Keegan said when describing his surprise upon learning about Hoffman's claim,

█████████████████████████    (Keegan Dep. 142:16-21.)

31

### 4.    Hoffman's judicial estoppel argument fails.

106.    Hoffman argues that the Trustee should be judicially estopped from objecting to Hoffman's claim based on statements that a different party – LBHI – made in a different litigation.  (1EE Resp. ¶¶ 32-46.)  This argument fails on multiple grounds.

107.    "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted).  Courts consider three factors in determining whether to apply the doctrine of judicial estoppel:

- "First, a party's later position must be clearly inconsistent with its earlier position."

- "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled."

- "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 147 (2d Cir. 2005) (quoting *New Hampshire*, 532 U.S. at 750-51.

108.    First, the Trustee's current position is not clearly inconsistent with any prior position he has asserted.  Hoffman conflates LBI and LBHI by claiming that "Lehman" previously made statements that are inconsistent with the Trustee's position.  (*See* 1EE Resp. ¶¶ 32-46.)  In fact, Hoffman does not point to a single inconsistent statement made by the Trustee or LBI; all of the statements to which he refers were made by LBHI, which is a different entity in a different insolvency proceeding.

32

109.    Hoffman tries to get around this fundamental defect in his argument by claiming that LBHI was seeking relief for, and took positions on behalf of, LBI.  (1EE Resp. ¶ 42.)  While irrelevant, this is also wrong.  LBHI, the Trustee, and Barclays were involved in a sprawling litigation over numerous categories of assets and liabilities, and LBHI sought $13 billion in monetary relief, which included relief related to certain "Disputed Assets" (that were expressly claimed by the Trustee) as well as relief related to bonus obligations and various other claims. But LBHI was clear that its employee bonus claim sought a recovery only for LBHI itself, not for the LBI estate.  *See* LBHI Summary Judgment Motion ¶ 54, *In re Lehman Bros. Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP) (Bankr. S.D.N.Y. May 18, 2011), ECF No. 7 (LBHI's claim against Barclays for failure to pay bonuses sought "an award of damages *to LBHI* of approximately $500 million" (emphasis added)).[10]

110.    Second, far from adopting LBHI's position, the Court ruled against LBHI *twice* on its employee bonus claim.  *See Lehman Rule 60(b) Opinion*, 445 B.R. at 176; *LBHI Summary Judgment Opinion*, 456 B.R. at 219-20.  This alone precludes Hoffman's judicial estoppel argument.  *See Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999) ("In this Circuit, judicial estoppel applies only when a tribunal in a prior *separate* proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision.").  The Second Circuit has held that judicial estoppel applies only "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  *Uzdavines*, 418 F.3d at 148.  LBHI failed to recover

---

10.  Indeed, it was precisely because the Trustee understood that LBHI sought recovery only for itself that the Trustee sought, based on the information available at the time, to reserve his rights by joining in LBHI's Rule 60(b) motion to the extent Barclays was found to have failed to pay bonuses and generally incorporating by reference LBHI's discussion of Barclays' failure to do so – but without taking any specific position on the payments to Hoffman.  (*See* Trustee's Rule 60(b) Motion at 2 n.1 (LBI ECF No. 1682).)  After the Rule 60(b) trial, the Trustee did not join in LBHI's summary judgment motion on the bonus claim issue.

anything in the prior proceeding, and thus the Trustee certainly derived no benefit from the

positions that LBHI unsuccessfully took.  Accordingly, there is no risk of inconsistent results,

much less a certain impact on judicial integrity.

111.    Hoffman argues that judicial estoppel is warranted because he says the Court

adopted LBHI's position by stating in the Rule 60(b) opinion that "Barclays paid approximately

$1.5 billion in bonuses to Transferred Employees."  (1EE Resp. ¶ 39.)  Even setting aside the

outcome-determinative fact that LBHI *lost*, and that the Court therefore could not have relied on

any statement regarding Hoffman to benefit LBHI (much less the Trustee), Hoffman's argument

is wrong.

112.    First, the Court did not say anything about Hoffman or the payments he received.

Moreover, the reference upon which Hoffman relies was not a factual finding, but rather was

contained in a section of the Court's opinion concerning the "Background of Movants' 60(b)

Claims."  *Lehman Rule 60(b) Opinion*, 445 B.R. at 168, 174; *see also* Sept. 7, 2011 Hearing Tr.

16:13-22, *In re Lehman Bros. Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP)

(Bankr. S.D.N.Y. Sept. 7, 2011), ECF No. 26 ("The opinion, unlike some other opinions, does

not have a findings of fact section . . . . I did not, in effect, pick up and adopt the proposed

findings of fact of the parties." (Peck, J.)).

113.    Indeed, the Court subsequently expressly rejected an argument by LBHI that it

had made a finding concerning the amount of Barclays' bonus payments, and explained that it

had merely "assumed" a number consistent with the position LBHI urged before ruling against

LBHI.  *LBHI Summary Judgment Opinion*, 456 B.R. at 219; *see also id*. at 217 ("Lehman in this

instance has misconstrued the meaning of the 60(b) Opinion and has identified findings of the

Court that, quite simply, were not made and that the Court never had any intention of making.").

Making an assumption to show that the proponent's argument fails regardless is a far cry from adopting a party's position.[11]

114.    Finally, no unfairness or prejudice to Hoffman is presented by the Trustee's reliance on the evidence that shows Barclays paid Hoffman the $83 million that LBI owed him. *See DeRosa v. National Envelope Corp.*, 595 F.3d 99, 105 (2d Cir. 2010) (no judicial estoppel where "nothing [plaintiff] said caused any discernible prejudice to [defendant] or amounted to an affront to the integrity of the district court").  Indeed, the inequitable result would be to preclude the Trustee from contesting Hoffman's attempt to be paid the $83 million for a second time, at the expense of LBI's creditors, based on LBHI's views in a different proceeding.

115.    Hoffman alternatively argues that the Trustee should be deemed to have made an "admission" that a portion of Barclays' payments to Hoffman were unrelated to his 2008 bonus. (1EE Resp. ¶ 46.)  Again, this argument fails because the statements at issue were made by LBHI, not LBI.  In any event, given the overwhelming evidence that Barclays paid Hoffman the $83 million to make him whole for what he was owed by LBI, even if this were an admission by the Trustee, it would not justify allowing Hoffman's claim.  *See Fitzpatrick v. American Int'l Grp., Inc.*, No. 10 Civ. 142 (MHD), 2013 WL 709048, at *47 (S.D.N.Y. Feb. 26, 2013) (admission "not conclusive in the face of record evidence suggesting the contrary").

## II.    The Claims for Equity Award Compensation Must Be Subordinated Under Section 510(b).

116.    Section 510(b) of the Bankruptcy Code requires that a claim "for damages arising from the purchase or sale of" a security of the debtor or an affiliate of the debtor "shall be

---

11.    Further, while LBHI argued that a portion of the payments made to Hoffman by Barclays were not bonus payments under the APA, LBHI did not contest that $30 million of Hoffman's payments from Barclays were in fact for LBI performance and were bonus payments under the APA.

subordinated to all claims or interests that are senior to or equal the claim or interest represented

by such security."  A portion of any compensation owed to Claimants was to be paid in RSUs

pursuant to Lehman's equity award program and the parties' agreements, and that portion is

subject to mandatory subordination under section 510(b).

> **A.    The Portion of the Claims that Was Payable
> in RSUs Is Subject to Mandatory Subordination.**

117.    To the extent that the claims are for the portion of Claimants' compensation that

was payable in RSUs, they seek "damages arising from the purchase of" a security of an affiliate

of LBI.  11 U.S.C. § 510(b); *see* Order Granting Certain Trustee's Objections to Employee

Claims, Feb. 10, 2015 (LBI ECF No. 11272); *In re LBHI*, 519 B.R. 47 (Bankr. S.D.N.Y. 2014).

118.    "[C]ourts routinely have held that employees who received equity awards as part

of their compensation purchased those securities with their labor."  *In re LBHI*, 519 B.R. at 60;

*see also In re Enron Corp.*, 341 B.R. 141, 151 (Bankr. S.D.N.Y. 2006) ("While it is true that the

Claimants did not purchase the stock options on the open market, they nonetheless exchanged

value for the options:  here, their labor.  Such exchange falls under a broad reading of the term

'purchase.'"); *In re Wireless Corporation, Inc.*, 384 B.R. 713, 718 (Bankr. D. Del. 2008)

("Courts interpreting section 510(b) have read the term 'purchase' broadly and have included

within its scope grants of stock and stock options as compensation.").

119.    Here, ██████████████████████████████████████████████

██████████████████████████████████████  (*See supra* ¶¶ 59-68.)  By agreeing to this

term, Claimants "voluntarily . . . accepted as a condition of their employment that part of their

total compensation was to be paid in [equity awards]."  *In re LBHI*, 519 B.R. at 61.

120.    Moreover, the fact that Claimants did not actually receive their RSUs is

immaterial to the subordination analysis.  As the Second Circuit has held, a claim based on a

debtor's failure to issue securities "'arises from' the purchase of the debtor's stock within the

meaning and purpose of section 510(b)." *In re Med Diversified, Inc.*, 461 F.3d 251, 253 (2d Cir.

2006).

121.    In both LBI's SIPA proceeding and in LBHI's bankruptcy proceeding, this Court

addressed circumstances nearly identical to those at issue here in holding that claims brought by

former employees based on their ownership of or right to receive RSUs were subject to

subordination under section 510(b).  *See* Jan. 22, 2015 Hearing Tr. 64:10-66:18 (LBI ECF

No. 11362); *In re LBHI*, 519 B.R. at 60-61, 63-68.  In both of these proceedings, certain

claimants argued that they were asserting claims for unpaid wages rather than claims for

damages arising out of the purchase of a security.  *See In re LBHI*, 519 B.R. at 63-65.  In

rejecting this argument, the Court explained that, to the extent that any of the claimants "did not

receive RSUs in 2008, the Court finds that such employee's claim amounts to one for RSUs that

were not issued.  Courts have extended section 510(b) to claims relating to a failure to issue

equity."  *Id*. at 64 n.18.  The Court also recognized that it would be a "rather absurd result" if

"somebody who worked for Lehman for 20 years and had a huge amount of RSUs would get . . .

nothing, but someone who worked for Lehman for a year and had an accrued but unclaimed right

to receive RSUs would receive cash."  Jan. 22, 2015 Hearing Tr. 65:10-15 (LBI ECF No.

11362); *see also In re MF Global Holdings, Ltd.*, No. 11-15059 (MG), 2014 WL 3882363

(Bankr. S.D.N.Y. Aug. 6, 2014) (reclassifying as equity and subordinating claim for failure to

pay bonus payable in RSUs).

122.    As in the Court's previous decisions in this proceeding and in the LBHI

proceeding, and as in Judge Glenn's decision in *MF Global*, the claims here for compensation

that was to be granted in RSUs must be subordinated under section 510(b).

**B.** **LBI Exercised its Discretion to Pay Claimants Partially in RSUs.**

123.     Claimants attempt to escape this result by asserting that LBI never exercised its

discretion to pay Claimants in RSUs prior to the Filing Date and could not do so after the Filing

Date.  The first assertion is wrong and the second is irrelevant.

**1.** **LBI exercised its discretion to issue RSUs to Claimants.**

124.     

(*See supra* ¶ 65.)

LBI exercised that discretion by issuing schedules that specified the percentage of Claimants'

total compensation that was payable in equity awards and by issuing its 2008 Equity Award

Program.

125.     

(*See supra* ¶ 66.)[12]  The other two Claimants – Judkins and

Hajdukiewicz – received an email advising them of the percentage of their 2008 total

compensation that would be paid in equity awards.  (*See supra* ¶ 67.)  These schedules

documented LBI's election to pay the specified percentages of Claimants' compensation in

equity awards.

126.     Moreover, the 2008 Equity Award Program – which was adopted by LBHI's

Compensation and Benefits Committee (*see supra* ¶ 60) – provided that equity awards "*will be* in

the form of Restricted Stock Units ('RSUs')" and "*will be* calculated based on your total

compensation and the 2008 Equity Award Schedule."  (Trustee's Ex. 2 at 4, 8 (emphases

---

12.  Indeed, Hoffman admitted during his negotiations with Barclays that

(Trustee's Exs. 22, 24.)

38

added).)  The 2008 Equity Award Schedule then listed the percentage of each employee's

compensation – including bonus compensation – which "will be" paid in RSUs.  (*Id*. at 12.)

127.    The 2008 Equity Award Program provided that RSUs "will" be issued, thereby

using language that was definitive, not conditional.  Because the equity award portions of

Claimants' bonuses were to be issued "pursuant to [LBI's] Equity Award Program," the issuance

of a program with definitive terms governing the RSUs to be issued confirms that LBI exercised

its discretion to make part of Claimants' compensation payable in RSUs.

### 2.  The Trustee cannot pay Claimants in cash.

128.    Claimants argue that "LBI may not seek to enforce its discretionary ability to pay

some of the 2008 bonus in worthless and inadequate equity awards instead of with consideration

equal to its obligations."  (1EE Resp. ¶ 68.)  This argument presumes that, after the Filing Date,

LBI had the option to pay Claimants in either cash or RSUs.  That is not true.

129.    After the commencement of LBI's liquidation proceeding, LBI was unable to

issue RSUs to Claimants – just like it was unable to satisfy its obligations in cash.  Having

entered liquidation, LBI could make no payment – whether in cash, equity, or anything else – on

pre-petition, unsecured claims such as those asserted by Claimants.  The only remedy that any

pre-petition, unsecured creditor had against LBI was to seek an allowed claim.  *See In re*

*Lyondell Chem. Co.*, 542 F. App'x 41, 42 (2d Cir. 2013) (creditor in bankruptcy "is left with

only a distribution under the plan of the pro rata value of the claim").

130.    The amount of Claimants' allowed claims will be the same regardless of whether

it is a claim for failure to pay cash or failure to issue RSUs.  To the extent that Claimants were

entitled to RSUs, they have a claim for damages based on LBI's failure (and inability) to issue

those RSUs.  Accordingly, Claimants will receive an allowed claim (albeit a subordinated one) in

the dollar amount of RSUs to which they were entitled – not an allowed claim for $0.  The

amount of distributions that Claimants ultimately receive, on the other hand, will be based on the

assets available to the LBI estate and on Congress' determination of the relative priority afforded

to different types of claims.

### C.    Hoffman's Claim for Unissued Common Stock Allegedly Owed in Connection with RSUs Must Be Subordinated.

131.    Hoffman seeks unliquidated damages arising out of the failure to issue stock

related to RSUs he was granted prior to 2008.  However, he acknowledges that this Court's

precedent in the *LBHI* decision, discussed *supra*, compels the subordination of this portion of his

claim.  (*See* 1EE Resp. ¶ 75.)  As there is no reason to depart from this precedent here, this

portion of the claim should be subordinated.[13]

### III.    Judkins' Claims for a Discretionary Bonus, for Reimbursement of Closing Costs He Never Incurred, and for Reimbursement of a Home Equity Loan Are Baseless.

132.    Besides the bonus he was already paid, Judkins also seeks an additional,

discretionary bonus, reimbursement of closing costs he never incurred on a house he never sold,

and reimbursement for the repayment of a loan that he took out.  None of these elements is

allowable.

### A.    Judkins Is Not Entitled to a Discretionary Bonus.

133.    Based on his "very successful" 2008, the "typical payout for a team like [his],"

and his estimate of how the bonus pool should have been divided, Judkins claims that he should

have received a bonus of "between $2,000,000.00 and $2,400,000.00" – $1.2 to $1.6 million

more than his guaranteed minimum bonus.  (Judkins Resp. 2-3, LBI ECF No. 11186.)

---

13.  Hoffman has neither liquidated this portion of his claim nor explained why LBI would be liable to him for any failure to issue common stock in connection with the RSUs.  Therefore, the Trustee reserves all rights to object to the validity or value of this portion of Hoffman's claim.

134.    An employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.  *Hall v. United Parcel Service of America, Inc.*, 76 N.Y.2d 27, 36 (1990).  The Lehman Employee Handbook states that "[b]onuses are not guaranteed unless otherwise agreed upon in writing, *and are determined at the full discretion of senior Firm management*." (Trustee's Ex. 3 at 7 (emphasis added).)

135.    The only written guarantee of a bonus that Judkins received from LBI was the $800,000 guaranteed under his LBI employment agreement.  Thus, any bonus above that amount was discretionary and cannot be claimed by Judkins.  *See Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313, at *12 (S.D.N.Y. Sept. 30, 2003) (plaintiff not entitled to bonus where employee handbook characterized bonus as discretionary).

**B.    Judkins Is Not Entitled to "Reimbursement" of Relocation Expenses that He Never Incurred.**

136.    While Judkins is seeking $400,000 in closing costs, including legal fees and broker costs, for the sale of his home, Judkins has admitted that he has incurred no such expenses because he had not sold his home as of the Filing Date.  (Trustee's Ex. 66.)  In fact, today – over six years after the Filing Date – Judkins still owns the home.  (Judkins Dep. 49:24-50:5.) Judkins cannot assert a claim for closing costs that have yet to be incurred for a sale that has not happened.

**C.    Judkins Has No Claim for Repaying His Home Equity Loan.**

137.    Judkins took out a home equity loan with Prudential Relocation and was subsequently compelled to make repayment on that loan.  Now, Judkins asserts that he is entitled to a claim against LBI for the amounts that he borrowed and repaid.  There is no basis for this claim, made for the first time in discovery.

41

138.     LBI is not a party to the Judkins Equity Loan Note and is not liable to Judkins for

amounts associated with that note.  Further, while Judkins asserts that LBI is liable to him

pursuant to the Relocation Services Agreement between LBI and Prudential, that is false.  Under

the Relocation Services Agreement, LBI agreed to indemnify *Prudential Relocation* for Judkins'

failure to repay his loan, and LBI would then have a claim against Judkins for the amount it

repaid.  (Trustee's Ex. 68 at 4.)  There is nothing in the Relocation Services Agreement, or

anything else, that provides a basis for Judkins to recover the amount of his loan from LBI.

**IV.    Chambers' Claims for 2009 and 2010 Bonuses
         and Salary Should Be Disallowed and Expunged.**

139.     Chambers' claims for $400,000 in 2009 and 2010 wages and $20 million in 2009

and 2010 bonuses are precluded by both the Bankruptcy Code and the terms of Chambers'

agreement with LBI.

**A.     Chambers' Claim for 2009 and 2010 Bonuses and Salary Is
         Barred by the Section 502(b)(7) Cap on Employee Compensation Claims.**

140.     Section 502(b)(7) of the Bankruptcy Code caps claims "for damages resulting

from the termination of an employment contract" at "the compensation provided by such

contract, without acceleration, for one year following . . . the date of the filing of the petition"

plus "any unpaid compensation due under such contract, without acceleration, on [the date of the

filing of the petition]."  11 U.S.C. § 502(b)(7).  This provision caps Chambers' claim for

damages based on the termination of his LBI employment agreement at the amount of

compensation provided by the agreement for one year following the Filing Date – *i.e.*, it

precludes him from claiming his 2009 or 2010 compensation.

141.     Chambers denies that the section 502(b)(7) cap is applicable, arguing that his

salary and bonuses are "unpaid, pre-Filing Date debt which should be paid in full."  (Chambers

Resp. ¶ 33.)  Chambers is wrong.  His salary and bonuses were not "due" on the Filing Date

"without acceleration," as required by section 502(b)(7); instead, the amount he was owed could

have been reduced if he subsequently lost money, or forfeited altogether if he resigned or was

terminated for cause prior to the dates at which the respective bonuses became due under the

agreement.  (*See supra* ¶¶ 46-50.)  Chambers essentially asks this court to read these conditions

out of his employment agreement and to accelerate the payment of his bonuses to the Filing

Date.  *See In re Dornier Aviation (North America), Inc.*, 305 B.R. 650, 653-56 (E.D. Va. 2004)

(finding that the section 502(b)(7) cap applies to liquidated damages for amounts that "become

due by virtue of the termination" and noting that "[t]o conclude otherwise, would effectively

erase the phrase 'without acceleration' from the statute and impermissibly redraw the line

Congress carefully drew between capped and uncapped contract termination claims"); *In re CPT

Corp.*, No. 4-90-5759, 1991 WL 255679, at *5 (Bankr. D. Minn. Nov. 26, 1991) (section

502(b)(7) limits claims for "liquidat[ed] future amounts that would have been due had the

contract not been terminated").

142.    Indeed, Chambers' claim for tens of millions of dollars in compensation that his

employment contract provided for him to receive over the course of three years is precisely the

type of claim that Congress intended section 502(b)(7) to cap.  *See*, *e.g.*, *In re Dornier Aviation*,

305 B.R. at 653 (the purpose behind section 502(b)(7) is to "protect bankrupt estates from large,

sometimes exorbitant claims by employees for damages resulting from the termination of an

employment contract" (internal quotation marks omitted)); *In re AppliedTheory Corp.*, 312 B.R.

225, 246 n.94 (S.D.N.Y. July 14, 2004) (section 502(b)(7) is "indicative of the Congress's effort

to regulate the extent to which employee contract claims could recover from the estate at the

expense of other creditors" (quoting *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 776

(S.D.N.Y. 1996))); *In re WorldCom, Inc.*, 361 B.R. 675, 683 (Bankr. S.D.N.Y. 2007) (section

43

502(b)(7) is intended "to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owners-managers who had been able to exact favorable terms of tenure and salaries while the business prospered"); *In re Continental Airlines, Inc.*, 257 B.R. 658, 665 (Bankr. D. Del. 2000) ("The central purpose of that section [502(b)(7)] is to strike a balance between creditors with long-term employment contracts resulting in large unsecured claims and other unsecured creditors, all of whom seek payment of their claims from a pool of assets which is often too meager.").

143.    Absent the commencement of LBI's liquidation proceeding, and provided that Chambers continued to work for LBI and adhere to the terms of his agreement, the "compensation provided by [Chambers'] contract, without acceleration, for one year following" the Filing Date would have been limited to one year's salary, his 2007 bonus, and his 2008 bonus. Those amounts represent, therefore, his maximum claim under section 502(b)(7). Thus, Chambers has a maximum claim for approximately $15 million in cash and $28 million in equity awards. Section 502(b)(7) does not permit Chambers to add to that claim 2009 and 2010 bonuses that he would have been paid more than a year after the Filing Date.

### B. Chambers' Claim for 2009 and 2010 Bonuses and <u>Salary Is Barred by the Terms of His Employment Agreement.</u>

144.    █████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ (Trustee's Ex. 12 at 1-2.) ███

██████████████████████████████████████████

███████████████████████████████████████████

(*Id.* at 2.)

145.    As he must, Chambers concedes that, after LBI's failure and his transfer to

Barclays, he was not employed as contemplated by his LBI agreement and that he was not

actively employed by LBI.  (Chambers Dep. 79:19-80:7.)  Accordingly, he was not entitled to

any further salary or to 2009 and 2010 bonuses under the unambiguous terms of his employment

agreement.

## V.    Hajdukiewicz Released His Claims.

146.    In connection with Barclays' termination of his employment, Hajdukiewicz

agreed to                                                                         (Trustee's Ex. 10

(emphasis added).)

147.    LBI was Barclays' "predecessor" as Hajdukiewicz's employer and as the owner

of the business in which Hajdukiewicz was employed.  Thus, the Hajdukiewicz release

unambiguously released LBI from                                                             And because

Hajdukiewicz's claim is entirely premised on his employment and the cessation of his

employment with LBI, the release precludes his claim in its entirety.  *See Stone v. National*

*Bank & Trust Co.*, 188 A.D.2d 865, 867 (3d Dep't 1992) (dismissing employee's claims because

employee previously released the defendant corporation).

148.    Hajdukiewicz protests that LBI was not Barclays' predecessor, relying on the rule

that a purchaser of assets is not generally liable for the seller's liabilities.  (Hajdukiewicz Resp.

¶ 29, LBI ECF No. 11092.)  But this principle of successor liability is inapposite because

*See Arrowgrass Master Fund Ltd.*

45

*v. Bank of New York Mellon*, 106 A.D.3d 582, 583 (1st Dep't 2013) (release of "all"

predecessors not limited to corporate predecessors).

149.    There is no dispute that Barclays took over LBI's business and hired LBI's

employees, including Hajdukiewicz.  Indeed, Barclays even agreed to assume certain LBI

liabilities, including certain liabilities to employees.  In those respects, LBI undoubtedly was

Barclays' predecessor.

150.    Hajdukiewicz also argues that the release's specific reference to "Lehman

Brothers" somehow indicates that LBI was not covered by the release.  (Hajdukiewicz Resp.

¶ 31.)  To the contrary, ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ (*See supra* ¶¶ 58, 91.)

151.    LBI was specifically mentioned because it was the only one of Barclays'

divisions, affiliates, predecessors, successors, and assigns to have employed Hajdukiewicz.

Indeed, there is no dispute that the only other entity to be specifically referenced as having

employed Hajdukiewicz – Barclays – was covered by the release.

152.    If the parties had not intended to include LBI in the release, it would have been

easy enough for them to say that. █████████████████████████████

███████████████████████ (*See supra* ¶ 53.)  Because Hajdukiewicz did not

do so, he agreed to release his claims against LBI.

**VI.    If Hoffman's Claim Is Not Disallowed and Expunged, It Is
         Subject to the Section 502(b)(7) Cap and to Equitable Subordination.**

153.    Even if Hoffman's claim were otherwise allowable, the Trustee would seek both

to cap it pursuant to section 502(b)(7) and to equitably subordinate it.

### A.     Hoffman's Claim Exceeds the Section 502(b)(7) Cap.

154.    As discussed *supra* ¶¶ 140-42, section 502(b)(7) caps claims for damages based on the termination of an employment agreement at the amount of compensation provided by the agreement for one year following the Filing Date. In Hoffman's case, absent the commencement of LBI's liquidation proceeding and provided that he had continued to adhere to the relevant provisions of his contract, he would have earned one year's salary, the second installment of his 2007 bonus, and the first installment of his 2008 bonus during that one-year period. The sum of these amounts thus represent the maximum amount of Hoffman's claim under section 502(b)(7). As the second installment of Hoffman's 2008 bonus was subject to his 2009 performance and would not have been due within one year of the Filing Date, that amount cannot be included when calculating the maximum amount of Hoffman's claim.

### B.     Hoffman's Claim Is Subject to Equitable Subordination.

155.    Section 510(c)(1) of the Bankruptcy Code provides that a court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. 11 U.S.C. § 510(c).

156.    The purpose of equitable subordination is "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Schubert v. Lucent Technologies Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009). In order to fulfill this purpose, a bankruptcy court may consider whether "notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share pro rata with the other claimants of equal status." *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 67 (Bankr. S.D.N.Y. 2007).

47

157.    Generally, a claim will be equitably subordinated where:  (1) the claimant engaged in inequitable conduct; (2) the misconduct results in injury to the creditors of the bankrupt or confers an unfair advantage on the claimant; and (3) equitable subordination of the claim would not be inconsistent with the provisions of the Bankruptcy Act.  *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

158.    Hoffman's claim fits these criteria.  Hoffman exploited the liquidation and the Barclays transaction, which LBI entered into largely for the benefit of its employees, to obtain the $83 million that LBI owed him (not to mention the tens of millions of dollars that he separately received for his trading at Barclays).  Indeed, Hoffman admitted that getting Barclays to pay this amount that was owed based on his work at Lehman was his "negotiating strategy."  (Hoffman Dep. 222:13-25, 223:8-224:3; *see also* Trustee's Exs. 28, 29 (Hoffman stating that ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████).)

159.    Having committed in the sale to offer employment and pay bonuses to LBI's employees, Barclays agreed to pay Hoffman the amount he was owed by LBI.  Allowing Hoffman to now disregard the transaction that positioned him to extract his $83 million from Barclays and to recover these funds a second time from LBI would be inequitable and would injure LBI's creditors by draining the funds available to pay their still unsatisfied claims.

160.    Under no set of circumstances would Hoffman have been able to claim $83 million from LBI and get paid the same $83 million by Barclays had LBI not failed.  He should not be permitted to take advantage of the failure and resulting sale to receive far more than he would have as a general creditor of LBI, then disregard it to enlarge his recovery beyond

what it would have been even had LBI survived. *See SEC v. Albert & Maguire Secs. Co.*, 560 F.2d 569, 572 (3d Cir. 1977) (under principles of equitable subordination, bank with potential general creditor claim against estate not entitled to customer priority on customer claim that was assigned to it and arose out of the same facts because otherwise the bank "would have received a greater recovery on its claim than it would have as a general creditor").

## CONCLUSION

For the reasons stated herein, and to be shown at the Merits Hearing, the Trustee requests entry of an order disallowing and expunging the claims filed by Judkins and Hajdukiewicz; disallowing and expunging Hoffman's claim except to the extent that it asserts a claim based on previously-issued RSUs; subordinating the portion of Hoffman's claim not disallowed and expunged; disallowing and expunging Chambers' claim except to the extent it seeks the portion of his 2007 and 2008 bonuses not previously paid by LBI or Barclays; and subordinating the allowed portion of Chambers' claim to the extent it seeks amounts payable in RSUs.

Dated:    New York, New York
          April 10, 2015

                                        HUGHES HUBBARD & REED LLP

                                        By: /s/ Savvas A. Foukas
                                            James B. Kobak, Jr.
                                            Savvas A. Foukas
                                            Samuel C. McCoubrey
                                            Gregory C. Farrell
                                            Karen M. Chau
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Telephone:  (212) 837-6000
                                        Facsimile:  (212) 422-4726
                                        Email:  savvas.foukas@hugheshubbard.com

                                        *Attorneys for James W. Giddens,*
                                        *as trustee for the SIPA liquidation*
                                        *of Lehman Brothers Inc.*

49