**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>    Debtor. | Chapter 11<br><br>Case No. 08-01420 (SCC) |

**MEMORANDUM DECISION SUSTAINING TRUSTEE'S OBJECTION TO PROOF OF CLAIM NUMBER 8002386 FILED BY RALPH HARARY**

A P P E A R A N C E S :

HUGHES HUBBARD & REED, LLP
One Battery Park Plaza
New York, NY 10004
By:     Stuart N. Mitchell, Esq.
        Karen M. Chau, Esq.
        Erin E. Diers, Esq.

*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

LLOYD S. CLAREMAN, ATTORNEY AT LAW
121 East 61st Street
New York, NY 10065
By:     Lloyd S. Clareman, Esq.

*Attorney for Ralph Harary*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

　　　　Before the Court is the objection (the "Objection") of James W. Giddens (the "Trustee"),

as trustee for the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor

Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA") seeking entry of an

order, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"),

as made applicable to this proceeding pursuant to sections 78fff(b) and 78fff-1(a) of SIPA,

seeking to disallow and expunge the general creditor claim represented by number 8002386 (the "Claim") filed by Ralph Harary [ECF No. 10142].

The Claim arises out of a portfolio of securities and interest rate swaps assembled for Mr. Harary in 2002 and 2003 (the "Portfolio"), allegedly by Allen Reichman, an employee of LBI, to constitute qualified replacement property ("QRP") for tax purposes. In late 2007, following a margin call, Mr. Harary terminated the swaps in the Portfolio and made a $3.8 million payment to LBI in respect of the termination. In the Claim, Mr. Harary alleges that LBI[1] made unsuitable, negligent, and fraudulent recommendations and representations regarding the Portfolio and contends that, as a result of such recommendations and representations, he has claims for negligence and common-law fraud against LBI and is entitled to damages of not less than $3.8 million. The Trustee argues that because (i) Mr. Harary's claim for negligence is time-barred and (ii) his claim for common-law fraud is insufficient as a matter of law, the Claim should be disallowed and expunged.

In response to the Objection, Mr. Harary filed the Memorandum of General Creditor Ralph Harary in Response to Trustee's Objection to Proof of Claim No. 8002386 [ECF No. 10439]. The Trustee filed a further reply in support of the Objection [ECF No. 11689] and the Court heard oral argument on the Objection on April 8, 2015.

**BACKGROUND**

In August 2002, claimant Ralph Harary sold stock in Jacques Moret Inc. to Jacques Moret Inc.'s employee stock ownership plan. First Claim Letter[2] at 1. Pursuant to 26 U.S.C. §

---

[1] Mr. Harary does not precisely specify which Lehman entity he is referring to in his Claim; instead he refers to "Lehman" and "Lehman Brothers." Presumably Mr. Harary and the Trustee were able to agree that these references to "Lehman" and "Lehman Brothers" were meant to refer to LBI, the broker-dealer in the Lehman family of entities. Accordingly, the Court will treat references to "Lehman" and to "Lehman Brothers" in the Claim as references to LBI unless context dictates otherwise.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection. The First Claim Letter was filed contemporaneously with the Claim, on January 29, 2009. At the Trustee's request for additional

2

...

1042, taxpayers who sell stock to employee stock plans are permitted to defer recognition of gain on such sale if, amongst other requirements, the taxpayer purchases QRP (as defined in 26 U.S.C. § 1042(c)(4)) within the "replacement period" defined in 26 U.S.C. § 1042(c)(3). *See* 26 U.S.C. § 1042(a). Mr. Harary alleges that, following the sale of his stock, he entered into a transaction structure implemented by UBS that was suitable for meeting the requirements to defer gain on the sale of such stock under 26 U.S.C. § 1042, which structure included investment into a portfolio of securities qualifying as QRP; such portfolio allegedly consisted chiefly of long-term floating-rate notes (the "UBS Portfolio").[3]

In October 2002, Allen Reichman of LBI[4] allegedly recommended the Portfolio to Mr. Harary as a replacement for the UBS Portfolio. The Portfolio, which qualified as QRP, consisted of fixed-rate bonds paired with interest rate swaps and was meant to mimic the performance of floating-rate notes.[5] Mr. Reichman allegedly represented that the Portfolio would "perform identically to a floating rate note, but would enhance the interest rate return sufficiently to eliminate the 'negative carry'."[6] Mr. Reichman also allegedly represented that, "because Lehman Brothers had a bank subsidiary," Mr. Harary would have the ability to borrow on margin against 95% of the value of the Portfolio, allegedly a higher margin percentage than UBS was offering.[7] Despite the fact that, Mr. Harary, relying in part on a report of Prairie Capital Advisors, Inc., attached to the First Claim Letter, now characterizes the Portfolio's composition of securities consisting of fixed-rate notes and interest rate swaps as "unconventional" and

---

information on the Claim, Mr. Harary's attorney, Lloyd S. Clareman, sent the Second Claim Letter to the Trustee on June 23, 2014.

[3] *See* First Claim Letter at 1-2; Response at 1-2.
[4] The Claim does not specify precisely which Lehman entity Mr. Reichman worked for; presumably it was LBI.
[5] *See* Second Claim Letter at 2; Response at 2.
[6] Second Claim Letter at 2.
[7] *Id.*

containing "an unsuitably high level of risk,"[8] Mr. Harary opted to invest in the Portfolio. Between November 2002 and July 2003, Mr. Reichman purchased more than $40 million worth of securities comprising the Portfolio on Mr. Harary's behalf.[9] In connection with investing in the Portfolio, Mr. Harary signed client agreements for each of two accounts set up for the Portfolio.[10] Mr. Harary also took out a margin loan, in the amount of 95% of the value of the Portfolio (the "Margin Loan"), from "Lehman Bank" (presumably Lehman Brothers Bank, FSB).[11]

The Claim alleges that there were no issues with the Portfolio until October 2007, when LBI informed Mr. Harary that significant problems had developed with respect to the Portfolio and the Margin Loan.[12] In October 2007, LBI allegedly informed Mr. Harary that:

- The Margin Loan would have to be moved from Lehman Bank to LBI because (i) Lehman Bank lacked the internal controls to monitor the collateral for the Margin Loan (i.e., the Portfolio) and (ii) one of the issuers of the securities comprising the Portfolio was not Sarbanes-Oxley compliant;
- LBI could offer a margin loan in the amount of only 80% of the value of the Portfolio, as opposed to the 95% offered by Lehman Bank; and
- The value of the fixed-rate bonds in the Portfolio had fallen and the interest rate swaps in the portfolio were working against Mr. Harary.

*See* Second Claim Letter at 3-4.

Allegedly as a result of these developments, LBI informed Mr. Harary that it was making a margin call in excess of $5 million on his accounts.[13] In "Late 2007" Mr. Harary met the margin call, and avoided a sale of the Portfolio, which would have had adverse tax consequences for Mr. Harary, by adding approximately $5 million worth of additional securities

---

[8] Second Claim Letter at 3.
[9] *Id.*
[10] Objection Ex. B (Pace Declaration), Ex. 3-4.
[11] Second Claim Letter at 3.
[12] *Id.*
[13] Second Claim Letter at 4.

4

to his LBI account and obtaining guarantees from family members.[14] The Claim alleges that the additional securities were ultimately liquidated; $3.8 million of the proceeds were used to terminate the interest rate swaps in the Portfolio and the balance of the proceeds was credited against the Margin Loan.[15] In March 2008, allegedly under threat of further margin calls, Mr. Harary transferred the Portfolio to UBS.[16]

**STANDARD**

The Objection triggered a "Sufficiency Hearing," as defined in the Court's September 26, 2013 Order Establishing Claims Hearing Procedures and Alternative Dispute Resolution Procedures for General Creditor Claims Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-452 [ECF No. 7351]. Pursuant to that order, all hearings "to address the legal sufficiency of [a] particular Contested Claim and whether the Contested Claim states a claim against the asserted Debtor under Bankruptcy Rule 7012" shall be "Sufficiency Hearings," unless the Trustee serves the holder of a contested claim with (a) a Notice of ADR Procedure or Notice of Consolidated ADR Procedures or (b) a Notice of Merits Hearing. Id. Ex. A, ¶ 5(a). The standard of review for a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim.

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), permits a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief may be granted. In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-

---

[14] *Id.*
[15] *Id.*
[16] *Id.*

56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  To survive a challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555.  The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted).

A court may dismiss a complaint unless a plaintiff pleads "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  Therefore, the appropriate inquiry "is not whether a plaintiff is likely to prevail, but whether [he] is entitled to offer evidence to support [his] claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citations omitted).

## DISCUSSION

As described in this Memorandum Decision, the Court sustains the Objection.  Even after accepting the truth of all assertions of fact in the proofs of claim and drawing all reasonable inferences in Mr. Harary's favor, Mr. Harary is unable to support claims based on theories of negligence and common-law fraud.  Mr. Harary's negligence claim, if he has one, is time-barred and he fails to state a claim for common-law fraud.  Accordingly, the Claim fails to state a claim upon which relief may be granted under the applicable standard.

### The Negligence Claim

Mr. Harary contends that Mr. Reichman's alleged recommendation, in 2002, to exchange the UBS Portfolio, which contained conventional floating-rate notes, for the Portfolio, which contained securities consisting of fixed-rate notes and interest rate swaps designed to mimic the

6

performance of floating-rate notes, was a departure from securities industry practice. Response at 11. Mr. Harary further asserts that, under *Trimarco v. Klein*, 436 N.E.2d 502 (N.Y. 1982), a departure from industry practice is evidence of negligence.

The Trustee does not attack the merits of Mr. Harary's negligence claim but contends that, even if Mr. Harary has a claim for negligence, such claim is time-barred under New York's three-year statute of limitations for negligence claims. N.Y. C.P.L.R. § 214(4). The parties agree that a claim for negligence accrues at the date of injury but disagree as to when an injury occurs in the context of a negligence claim based on the purchase and receipt of allegedly unsuitable securities. The Trustee argues that the injury is sustained at the time the securities are purchased and that, accordingly, Mr. Harary's claim for negligence, if he has one, accrued between November 2002 and July 2003, when LBI purchased the securities comprising the Portfolio for Mr. Harary's accounts. Mr. Harary contends that his claim for negligence only accrued in October 2007, when LBI informed him of the problems with the Portfolio and pending margin call.

In support of his position that the injury, and thus the claim for negligence, accrues at the time of the purchase and receipt of allegedly unsuitable securities, the Trustee cites to *Coleman & Co. Securities, Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288 (S.D.N.Y. 2002) and *Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996). In each case, the court, applying New York law, found that the claim for negligence accrued on the date the allegedly unsuitable securities were purchased. *Coleman & Co*, 236 F. Supp. 2d at 303 ("Respondents were injured as of the dates of purchase…when they received shares in private, start-up companies that were risky and illiquid instead of investments that were safe and secure") (citation omitted); *Butala*,

7

916 F. Supp. at 317 ("…the plaintiffs' injuries occurred at the time the limited partnership interests were purchased").

Mr. Harary attempts to distinguish these cases by arguing that in *Coleman & Co.* and *Butala* the plaintiffs did not claim absence of injury at the time of the purchase, in contrast to the situation here, where Mr. Harary has alleged no injury at the time of the purchase of the securities comprising the Portfolio, and no injury at all until October 2007. *See* Response at 12-13. In support of his own position, that his claim for negligence did not accrue until the Portfolio lost value and the problems with the Margin Loan arose, Mr. Harary cites to *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289 (N.Y. 1993).

Mr. Harary's attempts to distinguish *Coleman & Co.* and *Butala* fail and *Kronos, Inc.* does not support his position. The courts' holdings in *Coleman & Co.* and *Butala*, that the plaintiffs' negligence claims accrued at the time of the purchase of securities, are not dependent on the fact that the plaintiffs did not claim absence of injury at the time of sale. In *Coleman & Co.*, the statement quoted by Mr. Harary in the Response that "[r]espondents do not cite any evidence of losses, nor do they suggest that they were injured until the securities lost value" is followed by a citation to *Butala* with the explanatory parenthetical "(rejecting argument that claim did not accrue until damages 'crystallized')," *Coleman & Co.*, 236 F. Supp. at 303, indicating that, even if the plaintiffs in *Coleman & Co.* had made the argument that Mr. Harary makes here - that they were not injured until the securities lost value - it would have been rejected by the court. In fact, as *Coleman & Co.* indicates, the court in *Butala* considered and rejected just such an argument:

> The plaintiffs' argument that their cause of action did not accrue until their damages were ascertainable is premised on a misunderstanding of the difference between when an injury occurs and when the damages resulting from that injury are fully quantifiable… The plaintiffs allege that these investments were

8

fraudulent from their inception. Consequently, the plaintiffs were injured when they purchased them.

*Butala*, 916 F. Supp. at 317.

The *Butala* court's reasoning is applicable here as well. Mr. Harary has alleged that the securities comprising the Portfolio were unsuitable from the moment they were purchased. Consequently, his alleged injury occurred, and thus his claim for negligence accrued, at the time of the purchase of such securities, between November 2002 and July 2003. *Kronos, Inc.* does not change this result. *Kronos, Inc.* involved a claim for interference with contractual relations. As damages sustained by the plaintiff is an element of such claim, the court stated the general proposition that "…the claim is not enforceable until damages are sustained. Thus, in its present posture, this action is time-barred only if plaintiff's complaint must be read to allege damages arising prior to [three years before the complaint was filed]." *Kronos, Inc.*, 612 N.E.2d at 292. Unlike in an action for interference with contractual relations, in an action for negligence based on unsuitability, injury is incurred at the time of the purchase of allegedly unsuitable securities under New York law, even if damages are not ascertainable. *See e.g.*, *Butala*, 916 F. Supp. at 317; *Pautienis v. Legacy Capital Corp.*, 36 A.D.3d 462, 463 (N.Y. App. Div. 1st Dep't 2007); *Cator v. Bauman*, 39 A.D.3d 1263, 1264 (N.Y. App. Div. 4th Dep't 2007). Here, Mr. Harary has alleged that the securities comprising the Portfolio were unsuitable from the date of purchase. Thus, Mr. Harary's claim for negligence accrued at the date of the purchase of such securities, between November 2002 and July 2003. The claim for negligence is therefore time-barred.

**The Common-Law Fraud Claim**

To state a claim for common-law fraud under New York law, a party must allege (1) a misrepresentation or a material omission of fact which was false and known to be false by the defendant, (2) such misrepresentation made for the purpose of inducing the other party to rely

9

upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury. *Emps.' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co.*, 814 F. Supp. 2d 344, 351 (S.D.N.Y. 2011). Even assuming, *arguendo*, that Mr. Harary's allegations satisfy the first, second, and fourth elements of a claim for common-law fraud, the allegations do not satisfy the third element, justifiable reliance by Mr. Harary on the alleged misrepresentations or material omissions allegedly made by Mr. Reichman in selling Mr. Harary the Portfolio, and therefore fail.

Mr. Harary contends that his common-law fraud claim arises out of Mr. Reichman's alleged misrepresentations that (i) the securities in the Portfolio would replicate a floating-rate note in all material respects and (ii) LBI would maintain a margin loan at or close to 95% of the value of the Portfolio through Lehman Bank in perpetuity. *See* Second Claim Letter at 5. An investor, even an unsophisticated investor,[17] may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth. *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993). An investor in securities cannot justifiably rely on oral statements from a seller when such statements are contradicted in the written offering materials for such securities. *See e.g.*, *Iconix Brand Grp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 505 F. App'x 14 (2d Cir. 2012); *Brown*, 991 F. 2d at 1032-33; *Good Hill Partners L.P. ex rel. Good Hill Master Fund, L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 517, 520 (S.D.N.Y. 2008).

Here, Mr. Harary could not have justifiably relied on either of Mr. Reichman's alleged misrepresentations. First, the alleged misrepresentation that the securities comprising the

---

[17] It is not clear whether or not Mr. Harary is a sophisticated investor. While selling a successful business for millions of dollars and investing millions of dollars of such proceeds in tax-advantaged property can be argued to suggest sophistication, the Court has presumed that Mr. Harary is an unsophisticated investor for purposes of its analysis.

10

Portfolio would perform identically to floating-rate notes is contradicted by the written offering prospectuses for such securities. For example, the prospectus supplement for the Series Repackaged American General Floating Rate Trust Certificates, Series 2003-1 discloses that the security consists of certificates in a trust that (i) holds 7.5% notes due 2025 issued by American General Corporation and (ii) has entered into an interest rate swap with Lehman Brothers Derivative Products Inc. Diers Decl. Ex. 1 at S-10. The prospectus supplement, under the heading "RISK FACTORS" describes risks of holding a certificate, including how holding the trust certificates is different than directly holding a note issued by a typical issuer and how the inclusion of the interest rate swap may affect a certificateholder's return as compared to the return that a direct holder of a note issued by a typical issuer may receive. *See* Diers Decl. Ex. 1 at S-11-S-13. Accordingly, while the intention of the certificates may have been to mimic the performance of a directly-held floating-rate note issued by a typical issuer, no reasonable investor reviewing these offering materials, and others like them for the securities comprising the Portfolio, could fail to appreciate that the certificates issued by the trusts were not identical to floating-rate notes. Accordingly, Mr. Harary could not justifiably rely on Mr. Reichman's alleged representation that the securities comprising the Portfolio would perform identically to floating-rate notes issued by a typical issuer. *See Brown*, 991 F.2d at 1033.

Second, the alleged misrepresentation that LBI would maintain a margin loan at or close to 95% of the value of the Portfolio through Lehman Bank is contradicted by Mr. Harary's client agreement with LBI, which states "[t]he minimum and maximum amount of any particular loan may be established by [LBI] in [its] discretion regardless of the amount of collateral delivered to [LBI] and [LBI] may change such minimum and maximum amounts from time to time." Pace Decl. Ex. 5, Form of Client Agreement ¶ 16. Accordingly, LBI was simply exercising its

contractual rights, which had been disclosed to Mr. Harary and to which Mr. Harary had agreed, when it reduced the amount of the margin loan it was willing to extend to Mr. Harary below 95% of the value of the Portfolio.  Thus, Mr. Harary, with the minimal diligence of reading the LBI customer agreement, could have discovered that Mr. Reichman's alleged representation that LBI would maintain a margin loan at or close to 95% of the value of the Portfolio through Lehman Bank was not absolute and was instead subject to the continuing discretion of LBI.  Accordingly, Mr. Harary could not justifiably rely on Mr. Reichman's alleged representation that LBI would maintain a margin loan at or close to 95% of the value of the Portfolio through Lehman Bank in perpetuity, *see Brown*, 991 F.2d at 1033, and he therefore fails to state a claim for common-law fraud.

**CONCLUSION**

For the reasons stated, the Objection is sustained.  The Trustee is directed to submit an order consistent with this memorandum decision.

Dated: June 2, 2015
New York, New York

/S/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE