THOMPSON & KNIGHT LLP
Jennifer A. Christian
900 Third Avenue, 20th Floor
New York, NY 10022-4728
Telephone: (212) 751-3001
Facsimile: (212) 751-3113

*Attorneys for J. Robert Chambers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ————————————————X | | |
| **In re** | : | |
| | : | |
| **LEHMAN BROTHERS, INC.** | : | |
| | : | **Case No. 08-01420 (SCC) SIPA** |
| **Debtor.** | : | |
| ————————————————X | | |

**J. ROBERT CHAMBERS' PROPOSED FINDINGS OF FACT AND**
**POST-TRIAL BRIEF WITH RESPECT TO TRUSTEE'S**
**AMENDED OBJECTION TO THE GENERAL CREDITOR**
**PROOFS OF CLAIM FILED BY 1EE, LLC, AS ASSIGNEE (CLAIM NO. 4856),**
**WAYNE JUDKINS (CLAIM NO. 4470), RICHARD HAJDUKIEWICZ (CLAIM NO.**
**4725), AND J. ROBERT CHAMBERS (CLAIM NO. 6107)**

# TABLE OF CONTENTS

Page

I.   FINDINGS OF FACT ..........................................................................................1

  A.   GENERAL BACKGROUND ...................................................................... 1

  B.   PROOF OF CLAIM .................................................................................... 1

  C.   THE 2007 BONUS ...................................................................................... 2

  D.   THE 2008 BONUS ...................................................................................... 3

  E.   THE DEDUCTIONS .................................................................................. 6

  F.   THE 2008 AGREEMENT IS A MULTI-YEAR CONTRACT ............................ 8

  G.   EQUITY AWARDS - THE 2008 AGREEMENT AND LBI'S ABILITY
       TO SELECT PAYMENT METHOD AFTER THE END OF THE
       PERFORMANCE YEAR ........................................................................... 9

  H.   STATUS OF CHAMBERS' EMPLOYMENT ................................................ 14

  I.   THE SALE TO BARCLAYS ....................................................................... 15

  J.   CHAMBERS' AGREEMENT WITH BARCLAYS........................................... 16

  K.   THE APA AND RELATED MATTERS ........................................................ 19

II.  BRIEF ..........................................................................................................20

  A.   Chambers' Claims Are Entirely Cash Claims And No Portion Is Amenable
       to Subordination ................................................................................. 20

  B.   Chambers Was Not Granted And Does Not Hold RSUs On Account Of
       Any Portion Of His 2008 ..................................................................... 20

  C.   LBI Never Exercised Its Discretion to Designate Any Portion Of
       Chambers 2007 and 2008 Compensation For Payment In Restricted Stock
       Units   22

  D.   Plan Limitations On Trustee's Discretion............................................. 24

  E.   LBHI Compensation Committee Reduced Maximum Possible Equity
       Award for Bonus-Eligible Employees from a Maximum of 65% to a
       Maximum of 50% Prior To The Filing Date ....................................... 25

514738 000002 14951832.3

F.    The Special Lump Sum Payment Was Not Made On Account of
       Chambers' 2008 Bonus ......................................................................................... 26

G.    Chambers Never Consented To Discharge LBI Of Its Obligations Under
       The Agreements ................................................................................................... 28

H.    The Trustee Mischaracterizes the LBHI Adversary. Moreover Statements
       Made In The LBHI Adversary Proceeding Can Have No Impact On
       Chambers' Claims Against LBI ........................................................................... 30

I.     The Section 502(b)(7)(A) Cap  Is Inapplicable Because Chambers' Claims
       Are Not For *"Damages" "Resulting From"* The Termination Of An
       Employment Contract .......................................................................................... 33

J.     The 2008 Bonus Deductions ............................................................................... 35

III.    JOINDER AND RESERVATION OF RIGHTS .............................................................. 36

514738 000002 14951832.3

J. Robert Chambers ("Chambers") respectfully submits the following proposed findings of fact and brief in connection with the contested claims merits hearing held on April 22-24, 2015 with respect to the Trustee's Amended Objection (the "Objection") [Docket No. 10685] to the General Creditor Proofs of Claim Filed By 1EE LLC, *As Assignee* (Claim No. 4856), Wayne Judkins (Claim No. 4470), Richard Hajdukiewicz (Claim No. 4725), and J. Robert Chambers (Claim No. 6107).

## I.    FINDINGS OF FACT[1]

### A.    GENERAL BACKGROUND

1.     Chambers joined Lehman Brothers Inc. ("LBI") in December 1994 and was continuously employed by LBI for 14 years. *April 22, 2015 Hr'g Tr. 131:5-6.*

2.     In 2007 and 2008, Chambers, a proprietary trader, was the Managing Director of the Lehman Energy Fund (the "Fund"). April 22, 2015 Hr'g Tr. 131:15-17.  He had a team, which, for most of 2008, consisted of 3 investment professionals in addition to himself. *Chambers Trial Exh. 1, at Attachment; Chambers Trial Exh. 8.*  The entire team worked out of an LBI branch office in Houston, Texas.  *April 22, 2015 Hr'g Tr. 131:20-21.*

3.     The Fund loaned money to small energy companies and secondarily made equity investments and purchased bonds and loans of energy companies. April 22, 2015 Hr'g Tr. 131:24-132:1. Chambers and his team were paid bonuses out of the profits they earned, to the extent there were profits. *April 22, 2015 Hr'g Tr. 150:21-24.*

4.     Chambers was employed by LBI pursuant to written contracts starting in or around 2002. April 22, 2015 Hr'g Tr. 133:8.

### B.    PROOF OF CLAIM

---

[1] Any findings of fact that are actually conclusions of law shall be deemed to be conclusions of law and any conclusions of law that are actually findings of fact shall be deemed to be findings of fact.

5.      Chambers timely filed a proof of claim in this case which was amended and superseded by claim no. 6107. *Chambers Trial Exh. 1.*

6.      The claim is for the aggregate sum of $64,433,233.99 for: (a) the unpaid second installment of Chambers' 2007 bonus ($1,647,061), Chambers' 2008 bonus (after all required deductions, $42,386,172.99), Chambers' guaranteed minimum 2009 bonus ($10,000,000) and 2009 base salary ($200,000), and Chambers' 2010 guaranteed minimum bonus ($10,000,000) and 2010 base salary ($200,000). *Chambers Trial Exh. 1 and April 22, 2015 Hr'g Tr. 133:25-134:4.*

7.      Chambers' claim was calculated based on his 2007 and 2008 employment agreements with LBI. TR: 134:9-11.

8.      LBI owes Chambers $64,433,233.99 under the 2007 and 2008 Agreements.

## C.    THE 2007 BONUS

9.      Chambers and LBI are parties to a letter agreement dated March 5, 2007, as updated on November 26, 2007 (the "2007 Agreement"), which sets forth the terms of Chambers' employment and compensation for the performance year from December 1, 2006 through November 30, 2007 (the "2007 Performance Year"). *Chambers Trial Exh. 2.*

10.     Pursuant to the 2007 Agreement, LBI agreed to pay Chambers, among other things, a "Performance Bonus" for the 2007 Performance Year (the "2007 Bonus"), which was to be paid in two installments. *Chambers Trial Exh. 2.* While the first installment was paid to Chambers, the second installment (the "Unpaid 2007 Bonus"), which was earned for services rendered in 2007, remained unpaid as of the Filing Date (defined below) as, per the 2007 Agreement, it was payable on or about the day Lehman was to pay its 2008 bonuses. *Chambers Trial Exh. 2 and 9.* The Unpaid 2007 Bonus was not a part of Chambers' 2008 Bonus (defined below). *Chambers Trial Exh. 2.*

-2-

11.     The Trustee has u disputed the amount of the Unpaid 2007 Bonus -- $1,647,061, or that LBI owes Chambers the amount of the Unpaid 2007 Bonus. *See generally, Chambers Trial Exh. 9.*

12.     As of the Filing Date, Chambers' entitlement to the Unpaid 2007 Bonus under the was fully vested. RFA No. 7.

## D.     THE 2008 BONUS

13.     Chambers and LBI are parties to a letter agreement dated June 20, 2008, as revised July 9, 2008 (the "2008 Agreement" and, together with the 2007 Agreement, the "Agreements"), which sets forth the terms of Chambers' employment and compensation for multiple years – specifically, the 2008, 2009 and 2010 "Performance Years" (as defined therein). *Chambers Trial Exh. 3. April 22, 2015 Hr'g Tr. 135:8-10.*

14.     Pursuant to the 2008 Agreement, LBI agreed to pay Chambers, among other things, a "Performance Bonus" for the 2008 (the "2008 Bonus"), 2009 (the guaranteed minimum, the "2009 Bonus") and 2010 (the guaranteed minimum, the "2010 Bonus") Performance Years (as defined in the 2008 Agreement). *Chambers Trial Exh. 3.* None of the bonuses provided for under the 2008 Agreement were to be paid in installments. *Chambers Trial Exh. 3.*

15.     During the negotiation of the 2008 Agreement, LBI and Chambers discussed a 40% cap on restricted stock units that could be used as payment. *April 22, 2015 Hr'g Tr. 146:5-20.* Ultimately, however, LBI told Chambers that it could not deviate from the 2008 equity award program terms then in effect for employees at Chambers' level to agree to a different restricted stock unit deferral schedule and when Chambers entered into the 2008 Agreement with LBI on July 9, 2008, he was provided with the Summary of Material Terms then in effect for Bonus-Eligible Employees. *Chambers Trial Exhibit 4; April 22, 2015 Hr'g Tr. 135:11-136:1; 146:5-20.* At the time the Schedule was provided to Chambers, no one knew what his total compensation

-3-

for 2008 was going to be because the bonus calculation was performed after the end of Lehman's

fiscal year (November 30). The caps on the Schedule increased based on increased total

compensation, with the highest cap being 65%. *Chambers Trial Exh. 4, p.3.* But no one knew

what the final cap would ultimately be as that was set by the LBHI Compensation Committee.

16.     Chambers did <u>not</u> have a guaranteed minimum bonus for 2008 like some

members of his team. *Chambers Trial Exh. 3; Trustee Exh. 65 and 73.* He was only entitled to a

bonus in 2008 <u>if</u> the Fund were profitable at the end of the Performance Year. *Chambers Trial*

*Exh. 3.*

17.     In at least 2007 and 2008, Chambers was a Bonus-Eligible Employee. *Chambers*

*Trial Exh. 2* (p.2 "If your employment ends after the First Payout Date, but before the Second

Payout Date…the second installment (if any) will be deemed part of your total compensation for

the 2008 Performance Year and, notwithstanding anything to the contrary in the Equity Award

Program, with respect to the making of awards to terminated bonus-eligible employees…";

*Chambers Trial Exh. 4* (page 1 --"Summary of Select Material Terms for Bonus-Eligible

Employees (on or after July 1, 2008)", page 4 – "2008 Equity Award Schedule (For Bonus-

Eligible Employees Hired On Or After July 1, 2008)).

18.     Chambers' bonus, and, therefore, his total compensation, was only calculable

after the end of Lehman's fiscal year, which was generally November 30. *Chambers Trial Exh.*

*3; April 22, 2015 Hr'g Tr. 136:2-14.*

19.     On September 15, 2008, Lehman Brothers Holdings Inc. ("<u>LBHI</u>") filed for

chapter 11 bankruptcy relief. *Chambers Trial Exh. 17.*

20.     On September 15, 2008, Chambers was told by his supervisor at LBI that the

performance year under his contract was being stopped and the Fund's net profit would be

-4-

determined through September 12, 2008 instead of going on to the normal end of Lehman's fiscal year. *Chambers Trial Exh. 5.*

21.    On September 17, 2008, the New York Stock Exchange suspended trading in Lehman stock and proceeded to delist the stock. *Chambers Trial Exh. 17.*

22.    On September 19, 2008 (the "Filing Date"), the United States District Court for the Southern District of New York entered an order commencing LBI's liquidation under SIPA and removing the case to this Court. *LBI Docket No. 1; March 19, 2015 Dep. Tr. (Kiplok) 18:14-17.*

23.    As of the Filing Date, the work of Chambers and his team in the 2008 Performance Year through September 12, 2008 yielded a net profit of $171,627,000. *See Chambers Trial Exh. 5 & 6; Chambers Dep. TR: 148:3-22.* The net profit is the gross investment income from all of the Fund's investments, minus a short term interest carry, minus an allocation of long term capital charge, minus direct and indirect variable expenses. *April 22, 2015 Hr'g Tr. 148:16-22.*

24.    The Trustee has not disputed the calculation of net profit. *Trustee's Pre-Trial Brief, Docket No. 11762 at p. 16.*

25.    The net profit of the Fund was the bonus pool that came to Chambers' group. *April 22, 2015 Hr'g Tr. 148:16-22, 150:21-24.*

26.    Chambers' 2008 bonus was then calculated by taking 25% of the net profit and deducting certain other charges. *Chambers Trial Exh. 3 at page 4 and April 22, 2015 Hr'g Tr. 149:3-16.*

27.    25% of the net profits of $171,627,000 is $42,906,750. *April 22, 2015 Hr'g Tr. 149:22-150:9.*

514738 000002 14951832.3

28.    The Trustee has not disputed the 25% calculation. *Trustee's Pre-Trial Brief, Docket No. 11762 at page 16.*

## E.    THE DEDUCTIONS

29.    Chambers' team was compensated with salaries that ranged from $150,000 to $200,000 per year and LBI provided certain guaranteed minimum bonus amounts to certain team members, other than Chambers, to ensure they would receive a bonus even if the Fund were not profitable. *Trustee Exhs. 65 and 73; April 22, 2015 Hr'g Tr. 150:21-24.*

30.    Chambers' 2008 Agreement provides at page 4:

    (a)    For each of the 2008, 2009, and 2010 Performance Years, the "Performance Bonus" means the "Performance Pool" less an amount equal to the sum of (i) [Chambers'] paid salary for the applicable Performance Year and (ii) all or a portion (as determined by the Global Head of Fixed Income Division in his/her reasonable discretion) of the Applicable Personnel Expense for the applicable Performance Year.

    (b)    "Applicable Personnel Expense" means "the aggregate total compensation of all Portfolio Employees."

    (c)    "Portfolio Employees" means those employees, other than J. Robert Chambers, working directly in support of the Lehman Energy Proprietary Portfolio."…

*Chambers Trial Exh. 3.*

31.    In calculating the claim, Chambers deducted from the $42,906,750 the salaries paid by *LBI*, during the *LBI* Performance Year, when such professionals were working *directly in support of* the Lehman Energy Proprietary Portfolio for himself and the other professionals in the group based on year-to-date salary information he obtained from the Lehman electronic systems in late 2008 which results in a $42,386,172.99 2008 bonus to Chambers. *Chambers Trial Exh. 3 and 8; TR148:18-149:21, 154:13-22.*

32.    The Trustee alleges that an additional aggregate amount of approximately $880,000 should be deducted from the $42,906,750 on account of the remainder of Chambers'

-6-

total salary for the year and the remainder of certain team members' total compensation, as well as deductions for any amounts paid by Barclays or by LBI in equity awards prior to the transfer of their employment to Barclays, thereby reducing the 2008 bonus owed to Chambers by such aggregate amount. *Trustee's Pre-Trial Brief, Docket No. 11762, at page 16, fn 4.*

33.    R. Kyle Kettler ("<u>Kettler</u>") and P. Mathew Verghese ("<u>Verghese</u>"), each members of Chambers' team, had written employment agreements for 2008 with LBI that included *guaranteed minimum* bonus amounts.  If the Fund were profitable, the guaranteed minimum bonus and any discretionary bonus were paid out of the profits. *April 22, 2015 Hr'g Tr. 150:17-24; 153:5-11..*  If the Fund were not profitable, LBI was obligated to pay the guaranteed minimum bonuses. *April 22, 2015 Hr'g Tr. 150:21-24.*  Kettler and Verghese each filed claims against LBI for the guaranteed minimum bonus amounts. *LBI Claim Nos. 1236 and 3674; TR:153:12-17.*

34.    Chambers does <u>not</u> have a legal obligation to pay <u>any</u> bonus, either guaranteed or discretionary, to Kettler, Verghese or any other team member, but he believes he has a moral obligation to pay them *discretionary* bonuses based on their efforts in the 2008 Performance Year, which amounts exceed the guaranteed minimum bonus amounts LBI was obligated to pay them. *April 22, 2015 Hr'g Tr. 150:8-153:11.*

35.    Chambers and his team are not seeking to double-dip against the estate; they are pursuing their individual contractual claims against the estate, none of which had been paid as of the Filing Date.  *April 22, 2015 Hr'g Tr. 152:9-154:12.*  Chambers indicated that he would deduct from the $42,906,750 the *i* claims of Kettler and Verghese for their guaranteed minimum bonuses. *April 22, 2015 Hr'g Tr. 153:5-154:5.*

36.     Subsequent to the trial, the Court approved two settlement stipulations granting (a) Kettler: (i) an allowed general unsecured claim in the amount of $239,362.50; (ii) an allowed priority claim in the amount of $10,950; and (iii) an allowed subordinated claim in the amount of $50,312.50, and (b) Verghese: (i) allowed general unsecured claim in the amount of $146,395; (ii) an allowed priority claim in the amount of $10,950; and (iii) an allowed subordinated claim in the amount of $12,040, on account of their LBI-guaranteed minimum bonuses. *LBI Docket Nos. 12191 and 12192; LBI Claim Nos. 1236 and 3674.*

37.     Guy Hoffman, the third member of Chambers' team, did not file a claim against LBI in this case.

38.     As of the Filing Date, Chambers' entitlement to his 2008 bonus under the 2008 Agreement was fully vested. *Trustee's Response to RFA No. 12.*

**F.     THE 2008 AGREEMENT IS A MULTI-YEAR CONTRACT**

39.     In July 2008, LBI agreed to pay Chambers a base salary of $200,000 and guaranteed minimum bonus amounts of $10,000,000 for each of 2009 and 2010. *Chambers Trial Exh. 3.*

40.     The 2008 Agreement called for minimum bonus payments of $10 million for each of 2009 and 2010 because Lehman had asked Chambers to increase the amount of capital that the Fund was investing up to $3 billion.  In order to do so, Chambers needed to increase the number of investment professionals on his team to invest all of that capital, and because Chambers' bonus was based on a percentage of the profits, if any, he could not get people to come work for him without some kind of guaranteed bonus provided to them in the event the Fund were not profitable. *April 22, 2015 Hr'g Tr. 132:10-18.*

41.    In the time between July 2008 and September 2008, Chambers did in fact hire an additional investment professional, Phil Pace ("Pace").  Pace was hired in mid-September 2008. *April 22, 2015 Hr'g Tr. 132:19-25.*

42.    As of the Filing Date, LBI was contractually obligated to Chambers for the salary and guaranteed minimum bonus amounts for 2009 and 2010.  *Chambers Trial Exh. 3.*

## G.    EQUITY AWARDS - THE 2008 AGREEMENT AND LBI'S ABILITY TO SELECT PAYMENT METHOD AFTER THE END OF THE PERFORMANCE YEAR

43.    Chambers' 2008 Agreement provides him with, among other things, a 2008 base salary of $200,000 and a 2008 bonus. *Chambers Trial Exh. 3, p. 1 and p.4 Exh. A; April 22, 2015 Hr'g Tr. 139:21-22.*  The 2008 Agreement provides that "[a]t the Firm's discretion, a portion of your total compensation for the 2008, 2009, and 2010 Performance Years…will be payable in conditional equity awards pursuant to the Firm's Equity Award Program…as then generally in effect for employees at your level."  *Chambers Trial Exh. 3, p.2.*

44.    The 2008 Bonus was for a certain value, a certain percentage of the profits of the Fund, and once calculated, the LBHI Compensation Committee could decide how much they wanted to pay Chambers in cash and how much they wanted to pay him in stock, if any. However, the value on the date of payment would always be the same. *April 22, 2015 Hr'g Tr. 139:21-140:3, 142:11-143:2; 145:18-146:2.*

45.    Chambers' 2008 Agreement also provides:

> "The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, or any other Firm-sponsored program will be established by the Firm from time to time in its discretion.  With respect to your total compensation for the 2008 and 2009 Performance Years only, the deferral and delivery schedule for the portion of your total compensation payable in conditional equity awards shall be as set forth in the attached Summary of Select Material Terms."

*Chambers Trial Exh. 3, p.2.*

-9-

46.     The 2008 Equity Award Program Summary of Select Material Terms for Bonus-Eligible Employees (on or after July 1, 2008) provided to Chambers when he entered into his 2008 Agreement provides on the front cover:

> THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. This Summary of Select Material Terms is intended to provide a summary overview of the 2008 Equity Award Program.  All terms and conditions of the 2008 Equity Award Program, once finalized, are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus.  In the event of any conflict between the plan documents and the information  in this document, the plan documents will govern.

Chambers Trial Exh. 4.

47.     The Summary of Select Material Terms is merely a summary of the controlling plan document, provided to illustrate what LBHI intended at that particular point in time to issue in 2008 (after the July awards had been issued to certain employees, not Chambers, whose total compensation had not yet been determined), subject to finalization of the compensation awards by the Committee, if and when they acted by making the decision to finalize it.  *April 22, 2015 Hr'g Tr. 140:12-141:18; 144:9-13; 146:15-20; 171:3-5.*

48.     Chambers would not know what amount of his total compensation would be paid in conditional equity awards until (a) after the end of the performance period, when his total compensation was calculated, and (b) the Compensation Committee of the LBHI Board of Directors had finalized the equity award schedules and determined what the stock price would be for the grant of restricted stock units. *Chambers Trial Exh. 3 and 4; April 22, 2015 Hr'g Tr. 145:5-17.*  Therefore, before the Performance Year ended, it was impossible to tell where his compensation fell on the interim schedules associated with the Equity Award Program.

-10-

49.    LBI never notified Chambers that it was exercising its discretion under the 2008 Agreement to pay any specific portion of Chambers' 2008 total compensation in RSUs. *April 22, 2015 Hr'g Tr. 140:7-11.*

50.    Chambers was never granted any restricted stock units on account of any of his 2008 compensation.  *April 22, 2015 Hr'g Tr. 155:10-156:9.*

51.    The controlling legal documents are LBHI's 2005 Stock Incentive Plan and the 2005 Stock Incentive Plan Prospectus. *Chambers Trial Exh. 4, cover page.*

52.    The 2005 Stock Incentive Plan provides in relevant part:

- The Committee is authorized to construe, interpret, implement and administer the Plan and any Award, to establish, amend and rescind any rules and regulations relating to the Plan and each Award and to make any other determinations that it deems necessary or desirable for the administration of the Plan or with respect to any Award…Any decision of the Committee, in the construction, interpretation, implementation, and administration of the Plan or any Award, as described herein shall lie within its sole and absolute discretion and shall be final, conclusive and binding on all parties concerned (including, but not limited to, Participants and their beneficiaries or successors).

*Chambers Trial Exh. 11 at p. 14, para 4B; Chambers Trial Exh.14, para 4B.*

- No Participant or other Person shall have any claim to be granted any Awards.

*Chambers Trial Exh. 11 at p. 20, para 10; Chambers Trial Exh. 14 at p. 12, para 10.*

- No Participant may be granted Options, Stock Appreciation Rights or Other Stock-Based Awards covering in excess of four million shares in any fiscal year of the Company.

*Chambers Trial Exhs. 11 at p. 13, para 3(a); Chambers Trial Exh. 14 at para 3(a).*

- The total number of share that may be issued under the Plan is one hundred and forty-five (145) million…

*Chambers Trial Exhs. 11 at p. 13, para 3(a); Chambers Trial Exh. 14 at para 3(a).*

53.    On September 3, 2008, prior to Lehman's collapse, the LBHI Compensation Committee resolved to reduce the maximum percentage of total compensation awarded as equity

which may be granted to bonus-eligible employees as part of the 2008 Equity Award Program for the full fiscal year from a maximum of 65% to a maximum of between 40 and 50 percent. *Chambers Trial Exh. 15.* The Compensation Committee also resolved that the new summary table of equity deferral would supersede the July Summary Table, the one provided to Chambers when he entered into the 2008 Agreement. *Chambers Trial Exh. 15.* The September 3, 2008 Committee minutes were approved by Unanimous Written Consent in December 2008. *Chambers Trial Exh. 15.*

54. It was very common that Lehman would update the equity award schedules. Sometimes they would change the schedules multiple times during the year. *April 22, 2015 Hr'g Tr. 142:11-144:21.*

55. The LBHI Compensation Committee could have and did, in fact, establish a grant date earlier than in the fourth quarter of 2008. *April 22, 2015 Hr'g Tr. 144:11-15.*

56. The LBHI Compensation Committee made various changes to the equity award program in 2008, each time making clear in the minutes of the meeting that no employee had any right to any conditional equity awards until actually granted. *Chambers Trial Exh. 15, June 19, 2008 minutes, p.2, last para.*

57. The LBHI Compensation Committee set a grant date in July 2008 to issue restricted stock units to many Lehman employees to serve as an advance on their 2008 compensation  The LBHI Compensation Committee made it very clear that nothing in the July 2008 resolution granting the July awards "shall limit the Committee's ability or authority to modify the [equity deferral levels] so communicated up through and including such date as such levels shall be finally determined by the Committee during the fourth quarter of Holdings' 2008 fiscal year;…" *Chambers Trial Exh. 15, July 1, 2008 minutes, p.3.*

514738 000002 14951832.3

58.     Chambers did not receive any restricted stock units in July 2008 as an advance on his 2008 compensation.  April 22, 2015 Hr'g Tr. 144:11-13.

59.     LBI never elected to pay a portion of Chambers' 2008 bonus in restricted stock units.  April 22, 2015 Hr'g Tr. 141:12-18; 156:6-9.

60.     On September 15, 2008, the share price of LBHI common stock was 21 cents. Based on a share price of 21 cents and restricted stock units utilizing a maximum of 4 million shares, the maximum amount that LBI could have elected for such payment was $840,000. *Chambers Trial Exhs. 18 and 14; April 22, 2015 Hr'g Tr. 156:10-157:20.*

61.     As of the September 19, 2008, the Filing Date of this case, the share price of LBHI common stock was 22 cents per share.  Based on a share price of 22 cents and restricted stock units utilizing a maximum of 4 million shares, the maximum amount that LBI could have elected for such payment was $880,000.  *Chambers Trial Exhs. 18 and 14.*

62.     Additionally, the number of shares attributable to the Plan was substantially less than the total number of LBHI's outstanding shares.  *Chambers Trial Exhs. 16, 14 and 11.*  At 21 cents per share and assuming a 65% of total compensation, LBHI would have needed approximately 150 million shares to compensate Chambers.  The Plan did not have enough shares to issue to Chambers alone, let alone other employees.  *Chambers Trial Exh. 11 at p.13, para 3(a).*

63.     Minutes of the LBHI Compensation Committee show that in March 2008, LBHI resolved to increase the number of shares of LBHI's common stock with respect to which awards may be granted under the Plan by 50 million shares to 145 million shares.  Such minutes were approved at the April 14, 2008 meeting of the Committee. *Chambers Trial Exh. 11 at p.3 and Chambers Trial Exh. 12 at p.1.*

514738 000002 14951832.3

64.     Minutes of the LBHI Compensation Committee from April 14, 2008 show that the Committee was concerned that LBHI would have an insufficient number of shares for year-end equity awards and it discussed alternative forms of compensation. *Chambers Trial Exh. 12 at p. 5 ("Alternatives to Annual Employee Equity Award Program").*

65.     The Trustee's understanding of a grant date under the Equity Award Program is "the date on which the awards would be…determined fixed…". *March 19, 2015 Dep. Tr. (Kiplok) 84:6-13.*

66.     The Trustee's understanding of how the price is struck with respect to any award given would be "…you have to look at the schedules and the percentages to get to the number of shares to equate to the dollar amount." *March 19, 2015 Dep. Tr. (Kiplok). 84:14-20.*

67.     If no grant date were set, it would not be possible to determine the number of RSUs to be delivered. *March 19, 2015 Dep. Tr. (Kiplok) 92:16-25.*

68.     The LBHI Compensation Committee never determined a "Year-end Grant Date," as defined in the 2008 Equity Award Program documents, for 2008 or any subsequent year. *Trustee's Response to RFA No. 17.*

## H.     STATUS OF CHAMBERS' EMPLOYMENT

69.     As of the Filing Date, Chambers was actively employed by LBI. *Trustee's Response to RFA No. 2.*

70.     Chambers' employment with LBI was not terminated for "cause," as that term is used in the Agreements, in 2007 or 2008. *Trustee's Response to RFA No. 3.*

71.     Chambers never resigned his employment with LBI in 2007 or 2008. *Trustee's Response to RFA No. 4.*

## I.    THE SALE TO BARCLAYS

72.    Chambers received an email message sent on behalf of Bob Diamond, Rich Ricci and Bart McDade on September 20, 2008 that provided, in relevant part:

> Once everyone joins Barclays Capital, we will start a fair and equitable process to review our combined organization and ensure we have the best person in every seat. We expect this process to be completed by year end. For those employees who do not receive a role, we commit to providing severance support, as well as bonus consideration for their contributions in 2008.

*Chambers Trial Exh. 23.*

73.    LBI sold its investment banking and capital markets operations and infrastructure, except for certain "Excluded Assets" and "Excluded Liabilities" to Barclays Capital Inc. ("Barclays") on or around September 22, 2008 (the "Sale") pursuant to the terms of an asset purchase agreement (the "APA"). *Trustee's Response toRFA No. 1.*

74.    Chambers was told very early on that Barclays was: (i) not interested in continuing his business or hiring him as an employee; (ii) was not buying the Fund, that it would remain with the Lehman Brothers estate; (iii) was not interested in his contract and that the amounts due to him under his employment agreements, including his 2008 bonus, were Lehman Brothers' obligation. *April 22, 2015 Hr'g Tr. 158:2-159:3; 161:20-162:14.*

75.    In September 2008, in connection with the Sale, Barclays offered at-will employment via a blast email to certain LBI employees, including Chambers because he was employed in the Fixed Income Division that part of the purchase. *Chambers Trial Exh. 24; TR: 159:4-23.*

76.    Chambers did not respond to the Barclays' email offer of employment right away because he was very concerned about the impact accepting the offer would have on his LBI contract and he wanted to make sure that he did not do anything to impact his claims against Lehman in any way. *April 22, 2015 Hr'g Tr. 159:24-160:8.*

-15-

77.    Chambers stood ready to provide his personal services consistently with the wishes and interests of LBI after the Sale as neither the Fund, nor any position therein, was included in the Sale.   Chambers reported to the Houston, Texas LBI branch office, which remained with the estate after the Sale, shortly after September 22, 2008 (after hurricane damage was remedied), he took direction at that time from estate representatives, and he had continued conversations with borrowers who had been loaned money.   *Chambers Tr. at 75:23-77:8; 119:21-120:7; April 22, 2015 Hr'g Tr. 160:9-19.*

## J.    CHAMBERS' AGREEMENT WITH BARCLAYS

78.    In early December 2008, Barclays contacted Chambers to discuss his termination from Barclays and a severance package, however, they told him that he must click yes to the blast email offer of employment from September 2008 to see the severance package.   April 22, 2015 Hr'g Tr. 163:2  -164:11

79.    On December 5, 2008, Chambers replied to the blast email from September 2008 indicating his intent to accept Barclays' offer of severance, subject to review of the proposed waiver and general release by his attorneys, and expressly stating that he wanted to add a proviso to the waiver and general release that it would not serve to release any claims he may have against Lehman. *See Chambers Trial Exh. 30; April 22, 2015 Hr'g Tr. 166:17-167:5.*

80.    Chambers met with a legacy Barclays representative, Roger Jenkins, in late November 2008 and Jenkins specifically told Chambers that Barclays would not pay him his Lehman bonus – that it was an obligation of Lehman. *April 22, 2015 Hr'g Tr. 161:20-162:14.*

81.    Barclays offered Chambers severance and did not offer to pay Chambers any portion of his 2008 LBI bonus.  *April 22, 2015 Hr'g Tr. 167:6-168:15.*  Barclays told Chambers that the proposed  special lump sum payment of $1 million was severance and that it was "free money" because they wanted him to sign a waiver of claims that he may have against Barclays in

-16-

connection with severing him. They also said that the amount was based on his years of service and title and one million dollars was the cap. *April 22, 2015 Hr'g Tr. 167:11-168:15; 169:9-16.*

82.    Chambers was provided with a copy of the Disclosure Information Provided Pursuant to the Older Worker's Benefit Protection Act with the proposed Separation Agreement and he was the first person listed on exhibit one to that document, with the job title "desk manager", age 41. *April 22, 2015 Hr'g Tr. 168:19-22; 170:19-171:2.*

83.    On January 16, 2009, Chambers entered into a Separation Agreement and General Waiver and Release with Barclays (the "Separation Agreement") pursuant to which Barclays agreed to pay Chambers a salary and benefits for a limited period of time plus a special lump sum payment of $1,000,000, less certain deductions. *Chambers Trial Exh. 32.*

84.    No Lehman entity is a party to the Separation Agreement. *Chambers Trial Exh. 32.*

85.    Chambers' 2008 LBI bonus is not referenced anywhere in the Separation Agreement. *Chambers Trial Exh. 32.*

86.    Chambers negotiated for the inclusion of the following paragraph in the Separation Agreement, at the Waiver and General Release made a part thereof, at paragraph 3, to make sure that the payments Barclays made to him under the Separation Agreement did not have any affect on the claims he had against LBI:

> For the avoidance of doubt, notwithstanding any other provision of this Waiver and General Release, nothing in this Waiver and General Release, or in the Separation Agreement to which it is attached, releases, discharges, or limits any claim, right or cause of action I have or may assert against Lehman Brothers Inc. or any other Lehman Brothers entity by reason of my employment with Lehman Brothers Inc., the termination of that employment, or for any other reason.

*Chambers Trial Exh. 32; TR: 169:17-170:18.*

514738 000002 14951832.3

87.    All payments made by Barclays to Chambers under the Separation Agreement were severance payments.

- *Chambers Trial Exh. 27* ("Subject: Severance for new hire Prop Traders" – "We have a small group of people on proprietary trading contracts who, when we apply our severance formulas to their bonus estimated for 2008…produce very large special separation payments (up to $8mm).  We've honestly never had a situation quite like this – we haven't terminated prop traders who were doing well and producing lots of revenues – so where we've had to term them before they had much smaller projected comp.  Propose that we mechanically cap the special separation payments at $1mm – simply to avoid these very high payments."; "The most obvious case is Robert Chambers");

- *Chambers Trial Exh. 28* ("Subject: RE Rob Chambers and team" - "For Rob, his package is still on hold, but I did confirm that the severance cap of the $1m is for the special payment, not including the standard severance calculation."; "For Robert Chambers, he already knows that there isn't a role for him/his team.  His area is a bit of an anomaly"… "On the severance issue, Robert didn't want to accept our offer in case that it had an impact on his claim with Alvarez – he had notified both Mary Pat and Jack Johnson about this, but now that he knows it will mean no *severance*, he is reconsidering…"

88.    Mark Kurman ("Kurman"), the Barclays representative who had general oversight over the process of which transferred Lehman employees would be asked to leave Barclays and related logistics, never communicated to Chambers that the special lump sum payment of $1,000,000 made pursuant to the Separation Agreement was a payment in lieu of his 2008 LBI bonus. *April 24, 2015 April 22, 2015 Hr'g Tr. 35:5-11.*

89.    Kurman was not aware of any document that was provided to Chambers that said that the special lump sum payment of $1,000,000 was a discretionary enhancement in lieu of his 2008 LBI bonus.  *April 24, 2015 April 22, 2015 Hr'g Tr. 35:12-16.*

90.    Barclays' records indicate the reason for Chambers' termination by Barclays was "Redundancy" and the termination date was February 28, 2009.  *Chambers Trial Exh. 34.*

91.    Barclays' business records describe Chambers' earnings of $1,154,357.69 from Barclays as "Severance." *Chambers Trial Exh. 35.*

-18-

92.     Kurman was not personally involved in any of the discussions regarding Chambers' termination or severance. *April 24, 2015 April 22, 2015 Hr'g Tr. 46:13-14.*

**K.     THE APA AND RELATED MATTERS**

93.     Chambers never consented to discharge LBI of its obligations under his employment agreements.

94.     The amount of the Special Lump Sum payment made by Barclays to Chambers under the Separation Agreement materially varied from Chambers' 2008 bonus amount. *Trustee's Response to RFA No. 41.*

95.     Chambers is a "Transferred Employee" under the terms of the APA.

96.     The APA contains two separate and distinct provisions regarding Barclays' obligation to pay (1) severance, and (2) 2008 bonuses to Transferred Employees (§§ 9.1(b) and 9.1(c)). *Chambers Trial Exh. 21.*

97.     Neither the Trustee, on behalf of LBI, nor LBI assumed the Agreements pursuant to section 365 of the Bankruptcy Code. *Trustee's Response to RFA No. 26.*

98.     Barclays did not accept an assignment of the Agreements. *Trustee's Response to RFA No. 29.*

99.     Article IX of the APA does not provide for the express assumption by Barclays of the Agreements. *Trustee's Response to RFA No. 31.*

100.    There is no language in the APA assuming all of LBI's executory contracts. *Trustee's Response to RFA No. 32.*

101.    The APA did not grant third-party beneficiary status to Chambers. *Trustee's Response to RFA No. 33.*

102.    Chambers did not release his claims against LBI pursuant to the APA. *Trustee's Response to RFA No. 34.*

514738 000002 14951832.3

103.    The Trustee stipulated with Barclays that once 2008 bonus claims are allowed, the Trustee can pursue Barclays for the full amount of that claim. *Chambers Trial Exh. 37.*

104.    The Trustee has entered into a tolling agreement with Barclays with respect to the 2008 bonus claims issue under the APA. *Chambers Trial Exh. 38.*

## II.    **BRIEF**

### A.    **CHAMBERS' CLAIMS ARE ENTIRELY CASH CLAIMS AND NO PORTION IS AMENABLE TO SUBORDINATION**

1.    The 2008 Agreement provides that LBI could, "at the firm's discretion," award a portion of Chambers' bonus in conditional equity awards "pursuant to the Firm's Equity Award Program." FOF¶ 15, 43.

### B.    **CHAMBERS WAS NOT GRANTED AND DOES NOT HOLD RSUS ON ACCOUNT OF ANY PORTION OF HIS 2008**

2.    This Court's decision cited in the Objection, *In re Lehman Bros. Holdings, Inc.,* No. 08-13555 (SCC) (Bankr. S.D.N.Y. Nov. 3, 2014) (ECF No. 46797) (the "LBHI RSU Decision") addresses the claims of restricted stock unit ("RSU") *holders*, *i.e.*, individuals that were paid in the form of RSUs or had fully accrued RSU claims as of September 15, 2008. *See LBHI RSU Decision*, 519 B.R. 47 at page 63("…the RSU Claimants' argument that they have claims for alternative performance ignores the fact that Lehman already paid them the compensation they were due in the form of RSUs.  Once those RSUs were paid, as they were here, the RSU Claimants had no right to any other mode of performance – in the form of cash or otherwise.  The RSU Claimants' rights were solely limited to the delivery of LBHI common stock"); *see also* 519 B.R. at 59 ("each of the RSU Claimants seeks an allowed claim in a cash amount equivalent to the amount of RSUs due to him/her as of September 15, 2008.").

3.    Chambers was not issued RSUs on account of any of the claims he is pursuing here  FOF¶ 50 (no year end grant date; not a holder of RSU) and, as such, there were no set

-20-

amount of RSUs or shares tied to Chambers' 2008 compensation.    Therefore, Chambers did not have any security and he did not take on the risk and expectations of a shareholder and the *Med Diversified* case, 461 F.3d 251, 256 (2d Cir. 2006) does not apply here.    Chambers could not have participated in the benefits and risks of owning RSUs.    He was a creditor of LBI unless and until he received a grant of RSUs.

4.    While holders of RSUs bore the risk of the RSUs becoming worthless, until RSUs were granted the risk remained with LBI.    LBI bargained for the flexibility to later determine whether it wanted to pay a portion of Chambers' total compensation in conditional equity awards.    FOF¶ 51-52 Until there was a grant of restricted stock units, all of the benefits and risks remained with LBI – such as the risk that LBHI might fail and LBI would not be able to take advantage of its equity payment option.    Chambers beared the risk of a creditor until he received a grant.

5.    There are a number of reasons why LBI might want the flexibility to later determine whether it wanted to pay a portion of Chambers' compensation in conditional equity awards and then ultimately decide not to exercise its discretion to pay a portion of total compensation in conditional equity awards.    For example, the granting of such awards could dilute equity, management might have felt the equity was undervalued, there could be tax considerations, reasons based on the capital structure of Lehman, competitive reasons to retain talent, or there could have been regulatory concerns.    For whatever reason, LBI wanted to retain flexibility and the Trustee cannot now, retroactively, make an election that LBI did not timely make.

6.    Moreover, Footnote 18 of the LBHI RSU Decision, relied on by the Trustee in the Objection, does not address the situation here either.    Footntote 18 provides that "[t]o the extent

that any of the RSU Claimants was a commission-based employee who did not receive RSUs in 2008, the Court finds that such employee's claim amounts to one for RSUs that were not issued." *Id*. at 64 n.18.  Commission-based employees accrued their right to receive RSUs monthly under the terms of the 2008 Equity Award Program.  Chambers was not a commission-based employee.  Rather, he was a "bonus-eligible" employee whose awards would be determined in the fourth quarter of the year, after the close of Lehman's Performance Year.   Such equity awards could not be quantified until a year-end grant date  Thus, Chambers is unlike the former employees whose claims were addressed in the LBHI RSU Decision.

7.     The Agreements are governed by New York law.  The contract construction questions of (i) whether LBI exercised its discretion to pay a portion of Chambers' compensation in RSUs, (ii) whether exercising its discretion would satisfy the duty of good faith and fair dealing, and (iii) whether LBI could exercise its discretion if there was not going to be payment, but merely claims against an estate, and LBHI did not have sufficient shares available for LBI to pay in RSUs, must first be answered before even reaching the bankruptcy issue of subordination under Section 510(b) of the Code.

**C.     LBI NEVER EXERCISED ITS DISCRETION TO DESIGNATE ANY PORTION OF CHAMBERS 2007 AND 2008 COMPENSATION FOR PAYMENT IN RESTRICTED STOCK UNITS**

8.     While portions of Chambers' 2007 and 2008 compensation may have conceivably been payable in RSUs, LBI never exercised its discretion to pay <u>any</u> portion of such compensation in RSUs after the end of the performance period (September 15, 2008) and before the Filing Date (September 19) and there was no year-end grant of RSUs.  FOF¶ 59.  Therefore, Chambers' claim is not a claim based on a security, which renders inapposite the Trustee's reliance on *In re Enron Corp.,* 341 B.R. 141, 145 (Bankr. S.D.N.Y. 2006) where claimants were seeking to recoup damages suffered in connection with their "ownership of employee stock

options" and *In re MF Global Holdings, Ltd.,*, No. 11-15059 (MG), 2014 WL 3882363 (Bankr.

S.D.N.Y. Aug. 6, 2014) where claimant had been <u>granted</u> restricted stock units.

9.      Moreover, payment always was subject to LBI being able to deliver a package of

cash and RSUs that had a total market value at the time of the payment that equaled the total

compensation due.  FOF¶ 44.  LBI could not <u>designate</u> any portion of Chambers' 2007 or 2008

compensation for payment in restricted stock units because LBHI filed for bankruptcy on

September 15, 2008, the day Chambers was told to determine the Funds not profit.  FOF¶ 20.

With LBHI in chapter 11, there was not going to be any determination of employee

compensation payable in RSUs.   Therefore, Chambers never even had the possibility of

<u>entitlement</u> to RSUs with respect to his 2008 compensation.   LBHI's stock was delisted shortly

after the bankruptcy filing. FOF¶ 21.  Moreover, the Schedules in the Equity Award Program

would not even be finalized until after the performance period ended, the book was valued and

Chambers' total compensation was calculated.  Only then could it be determined what level of

the waterfall Chambers would fall under.  FOF¶ 18, 20.

10.     The 2005 Stock Incentive Plan, the controlling legal document for the Equity

Award Program, refutes the Trustee's argument that Chambers had an entitlement to RSUs.

FOF¶52.  PLAN at para 10.  The Compensation Committee minutes also refute the Trustee's

argument:  FOF¶56

11.       JUNE 19, 208 WHEREAS & RESOLUTION

12.     In fact, Lehman, in the Plan and Compensation Committee resolutions went to

great effort to make it clear that until an RSU was actually granted, no employee had any right or

legitimate expectation to be granted RSUs.  FOF¶ 56, 57.

13.     Furthermore, Chambers' agreements were with LBI, not LBHI.  Any discretion exercised in "issuing" schedules and "issuing" the 2008 Equity Award Program was exercised by the LBHI Compensation Committee  in connection with the program itself and the form of conditional equity awards that it determined to utilize that year.  FOF¶ 52.  LBI did not exercise any discretion in connection with the Agreements prior to the Filing Date.  FOF¶ 58, 59, 68.

14.     The Trustee is trying to retroactively, seven years after the fact, act on behalf of the LBHI Compensation Committee.  Not only does the Trustee not have the authority to do this, because if he steps into the shoes of the Debtor and has no more rights then the Debtor, <u>but</u> even before the Filing Date, LBI could not do it because such actions were within the sole province of the LBHI Compensation Committee. FOF¶ 52.

## D.     PLAN LIMITATIONS ON TRUSTEE'S DISCRETION

15.     Even if the Court were to find that LBI had made the election to pay a portion of Chambers' compensation, the 2005 Stock Incentive Plan has two limitations that limit LBI's discretion.  The first is a limit to the number of LBHI shares attributed to the Plan to be utilized in connection with the equity awards.  FOF¶ (95 million).  The number of share for the Plan appears to have been increased in or about March 2008 by 50 million, an indicator that there was an insufficient number of shares available for anticipated awards for the year.  FOF¶ 52, 63.  With only, at most, 145 million shares reserved for the Plan in the middle of 2008, there was nowhere near enough shares to pay Chambers, alone, let alone any other employees, as 65% of Chambers' claim, based on a share price of 21 cents, would have required approximately 150 million shares.  Plus, the 145 million number does not account for the millions of shares that had already been allocated out of the 145 million for prior awards.

16.     The second is a limit on the maximum number of shares that could be awarded to any participant in one year – 4 million.  FOF¶ 52.  The relevant timeframe for establishing how

-24-

much of the claim was designated for payment in RSUs starts with September 15, 2008, the day

Chambers' performance period was ended and ends with September 19, 2008, the Filing Date of

this case.  Regardless of which percentage cap applies, therefore, **the maximum dollar amount**

**of Chambers' compensation that could have been designated for payment to Chambers in**

**RSUs was no more than $880,000**.  FOF¶ 53, 64.

17.    Compensation Committee minutes from April 2008 prove that the Committee was

concerned about the possibility of there being insufficient shares for the year-end equity award

programs and discussed deferred compensation alternatives.   In face, during 2008, LBHI

authorized changes to the deferred compensation program for certain key employees from stock

deferred to cash deferred.   For instance, in the September 3, 2008 Committee minutes, the

Committee granted certain employees interest bearing notes to be awarded on the equity award

grant date.  FOF¶ 64 **[Jen Need to expand a FOF¶)**

## E.    LBHI COMPENSATION COMMITTEE REDUCED MAXIMUM POSSIBLE EQUITY AWARD FOR BONUS-ELIGIBLE EMPLOYEES FROM A MAXIMUM OF 65% TO A MAXIMUM OF 50% PRIOR TO THE FILING DATE

18.    The evidence proves that the LBHI Compensation Committee reduced the

maximum percentage of equity-based deferred compensation for bonus-eligible employees like

Chambers to not less than 40% or granted than 50% of total compensation.  FOF¶ 53.  Notably,

the Compensation Committee resolved to make this reduction supersede the July Summary Table

for equity awards that was provided to Chambers when he entered into his 2008 Agreement, as

the program that was in place at the time.  FOF¶ 53.  Chambers was always subject to the Plan

that all bonus-eligible employees were subject to.  The Plan explicitly makes this change binding

on all parties, including LBI.

19.    Additionally, it would be inconsistent with the duty of good faith and fair dealing

to permit LBI to satisfy its contractual obligations by retroactively electing to pay a portion fo

-25-

Chambers' compensation in RSUs.   *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389-90

(1995) (citations omitted); *see also City of New York v. 611 West 152nd Street, Inc.*, 273 A.D.2d

125, 126, 710 N.Y.S.2d 36 (1st Dep't 2000).   A party in breach of a contract that provides for

alternative performances to satisfy an obligation cannot satisfy such obligations by providing

worthless performance.   *See Schwan-Stabilo Cosmetics GMbH & Co. v. PacificLink Int'l Corp.*,

401 F.3d 28, 34 (2d Cir. 2005) ("having breached the provision, defendants may not now rely on

a contractual clause that would allow them effectively to avoid paying for their breach.")

20.     Finally, the rationale for subordinating a portion of Chambers' 2008 bonus claim

does not exist here because other creditors would not be prejudiced by allowing the claim in full.

FOF¶ 103.   The Trustee asserts that Barclays agreed to pay 2008 bonuses of Transferred

Employees.   The Trustee admits that Chambers was a Transferred Employee under the APA.

Furthermore, the Trustee stipulated with Barclays that once 2008 bonus claims are allowed, the

Trustee can pursue Barclays for the full amount of that claim.   FOF¶ 103.   The Trustee has

entered into a tolling agreement with Barclays with respect to the 2008 bonus claims issue under

the APA.   FOF¶ 104.

**F.   THE SPECIAL LUMP SUM PAYMENT WAS NOT MADE ON ACCOUNT OF
CHAMBERS' 2008 BONUS**

21.     Nowhere in the Separation Agreement between Chambers and Barclays is there

any indication that the special lump sum payment was being made to satisfy or reduce an

obligation owed by LBI to Chambers. FOF¶85   The Separation Agreement is clear that it "is an

agreement… concerning [Mr. Chambers'] separation from employment by Barclays Capital."

Chambers' 2008 Lehman bonus is not referenced anywhere in the Separation Agreement and no

Lehman entity is a party to the Separation Agreement nor a third-party beneficiary of the

Separation Agreement.   FOF¶84.   Under New York law, the parties' intent to benefit a third

party must be shown on the face of the agreement." *John St. Leasehold LLC v. FDIC*, No. 94-797, 1996 U.S. Dist. LEXIS 19050, at *29 (S.D.N.Y. Dec. 20, 1996). Since the Separation Agreement on its face says it will not affect Chambers' claims against LBI, the Separation Agreement and any testimony concerning it are <u>not</u> relevant to this matter. FOF¶86.

22.     However, to the extent the Court finds the Separation Agreement and any evidence related thereto relevant and not parol evidence, the evidence shows that Barclays representatives told Chambers that his LBI bonus was Lehman's obligation, and that Barclays was offering him severance in connection with his termination from Barclays, not any portion of his 2008 LBI bonus. FOF¶78,81,87.

23.     Contemporaneous emails exchanged among Barclays personnel at the time the Agreement was being negotiated prove that the $1,000,000 lump sum payment made to Chambers was additional severance, in addition to standard severance. These emails further support Chambers' understanding of the payment based on conversations he had with Barclays' human resources personnel at the time. FOF¶87.

24.     Mark Kurman, the Barclays representative who had general oversight over the process of which transferred Lehman employees would be asked to leave Barclays and related logistics, never communicated to Chambers that the special lump sum payment of $1,000,000 was a payment in lieu of his 2008 LBI bonus. FOF¶88. Moreover, Kurman was not aware of any document that was provided to Chambers that said that the special lump sum payment was a discretionary enhancement in lieu of his 2008 bonus. FOF¶89. In fact, Kurman was not personally involved in any of the internal discussions about Chambers' termination. FOF¶92.

25.     Barclays now argues that the $1,000,000 special lump sum payment was a "discretionary enhancement in lieu of a bonus." A special lump sum payment "instead of" a

bonus is not a partial payment of a bonus.  As detailed above, Barclays told Chambers it was not

paying his 2008 LBI bonus.  FOF¶72 As detailed above, Barclays told Chambers it was not

paying his 2008 LBI bonus.  FOF¶74, 80.

26.     Barclays' own business records contradict its position that the $1,000,000 was for

something other than severance.  FOF¶90-91.

27.     Barclays had two separate obligations to the Trustee under the APA – one to pay

severance and one to pay 2008 bonuses. FOF¶96.

28.     Barclays wanted Chambers to release any claims he might have against them,

which may include OWBPA claims, WARN Act claims, etc.  FOF¶82.  Chambers was willing to

release Barclays in exchange for the severance he was offered, so long as it had no impact on his

claims against Lehman. FOF¶81, 86.

29.     Moreover, Chambers' 2007 and 2008 bonuses were fully vested and not damages

claims.  Therefore, Chambers is under no duty to mitigate such claims.  FOF¶12, 38.

30.     Finally, the Trustee has not argued that Chambers released all or a portion of his

claims against LBI pursuant to the terms of the Separation Agreement.  To the contrary, the

Trustee has acknowledged the LBI Claims Carveout included in the Waiver and General

Release.

## G.     CHAMBERS NEVER CONSENTED TO DISCHARGE LBI OF ITS OBLIGATIONS UNDER THE AGREEMENTS

31.     It is black letter law that the delegation of a duty does not discharge the delegating

party's performance obligation unless the obligee consents to a novation.  *See Contemporary*

*Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977) ("The act of delegation

…does not relieve the delegant of the ultimate responsibility to see that the obligation is

performed.  If the delegate fails to perform, the delegant remains liable*")*; *Holland v. Fahnestock*

*& Co.,* 210 F.R.D. 487, 490 (S.D.N.Y. 2002) ("To discharge the duty of the delegating party, assent by the obligee to release the delegating party, in exchange for the new liability of the delegate, is required."); *Restatement (Second) of Contracts* § 318(3).

32.    Further, mere consent to an assignment or delegation, without more, does not release the assignor of its obligations. *See, e.g., Holland v. Fahnestock & Co.*, 210 F.R.D. 487 (S.D.N.Y. 2002) ("[T]o establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement."); *Mandel v. Fischer*, 613 N.Y.S.2d 381, 382 (1st Dep't 1994) ("[A]n assignment does not release the assignor of its obligations under the assigned contract absent an express agreement to that effect or one that can be implied from facts other than the other contracting party's mere consent to the assignment.").

33.    It is undisputed that the 2007 Agreement and the 2008 Agreement each established binding obligations for LBI to pay Chambers' bonuses and salary. Whatever may have been in the APA and any related agreements between Lehman and Barclays, neither LBI nor any other party ever communicated to Chambers that LBI was purporting to divest itself of its contractual obligations to Chambers, as an employee. On the contrary, the LBI Claims the Waiver and General Release in carveout in the Separation Agreement clearly is a reservation of rights against a non-party to that agreement – LBI. FOF¶ 86. Consequently, Chambers cannot have consented in any way to the discharge of LBI of its obligation to pay his bonuses and salary. The Trustee may proceed against Barclays to enforce the APA and seek 100 cent dollars from Barclays for the 2008 Bonus and Chambers urges the Trustee to assert such claims against Barclays. FOF¶103 & 104.

**H.    THE    TRUSTEE    MISCHARACTERIZES    THE    LBHI    ADVERSARY.
MOREOVER    STATEMENTS    MADE    IN    THE    LBHI    ADVERSARY
PROCEEDING CAN HAVE NO IMPACT ON CHAMBERS' CLAIMS AGAINST
LBI**

34.    *Lehman Brothers Holdings, Inc. v. Barclays Capital, Inc. (In re Lehman Brothers
Holdings Inc.)*, 456 B.R. 213 (Bankr. S.D.N.Y. 2011), (the "LBHI Adversary Decision"), cited in
the Objection, has no bearing on the issues presented in the Objection.  Chambers was not a
party to that litigation.[2]  It is axiomatic that a party not party to a litigation is not bound by any
judgment in that litigation.  *See Hansberry v. Lee*, 311 U.S. 32, 40 (1940) ("[i]t is a principle of
general application in Anglo-American jurisprudence that one is not bound by a judgment *in
personam* in a litigation in which he is not designated as a part.").  Additionally, the LBHI
Adversary Decision never purports to rule on Chambers' claims in this case against LBI.

35.    The Trustee mischaracterizes the LBHI Adversary.  In fact, in the Stipulation and
Order Amending the Trustee's Adversary Complaint ("2008 Bonus Order") signed by Judge
Peck on July 15, 2011 (*LBI* Adv. Proc. No. 09-01732, Docket No. 9), the Trustee admitted he
had not yet determined which employees had not been paid their 2008 bonuses.  The parties
stipulated and agreed that the Trustee could bring those claims without prejudice once he
determined which employees were still owed 2008 bonuses.

36.    The LBHI Adversary Decision is consistent with the 2008 Bonus Order.  In the
litigation underlying the LBHI Adversary Decision, the Trustee sought payment for the
difference between the amount Barclays had actually paid in 2008 bonuses and the estimated
total amount for bonuses assumed under the APA.  The Court in that decision simply determined
that, as between LBHI and Barclays, LBHI had no right to recover because LBHI had failed to

---

[2] Nor was LBI.  LBHI was the named party in the litigation and a finding that LBHI did not have "any ongoing
liabilities to the Transferred Employees" is not relevant to LBI or LBI's obligations to Chambers.

514738 000002 14951832.3

prove that it had been damaged since, at least as of that date, it had not actually paid out any bonuses which Barclays had agreed to satisfy. *See* 456 B.R. at 218-219.

37.    The structure of the LBHI Adversary Decision and the 2008 Bonus Order expressly contemplate that Lehman could have been compelled to satisfy employee bonus claims (all of which had been filed and were pending at the time of Judge Peck's decision) such as Chambers' bonus claim, and that upon making such a showing, Lehman would presumably have had the right to recover such payments from Barclays, the party that had agreed to pay that obligation under the APA.   However, inasmuch as the rights of employees with bonus claims were not before the Court, Judge Peck had no occasion to adjudicate the rights of the employees and to bind employees such as Chambers.    Accordingly, reliance on the LBHI Adversary Decision is entirely misplaced.

38.    Chambers' claim is somewhat unique.  If Barclays is obligated to the Trustee to pay the 2008 Bonus, the 2008 Bonus should be paid in 100 cent dollars by Barclays.  If Barclays is not obligated to pay the 2008 Bonus, the claim remains a general unsecured claim against LBI. If Barclays is obligated to the Trustee to pay the 2008 Bonus, then payment of such bonus will not reduce the estate, as the Trustee is entitled to full indemnification from Barclays.[3]  As such, subordination of any portion of such claim does not satisfy the purpose of Section 510(b) of the Bankruptcy Code, which is to prevent dilution of unsecured creditors, and it is not required here. *See Rombo v. DuFrayne  (In Re Med Diversified),* 461 F.3d 251, 259 (2d Cir. 2006) (citations omitted).

---

[3] *See Coreth v. Barclays Capital Inc.* (*In re Lehman Bros. Holdings Inc.)* 479 B.R. 268, 278 FN(3) (S.D.N.Y. 2012) ("Under § 9.1(c) of the APA, Barclays also agreed to "pay each Transferred Employee an annual bonus … in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to [Barclays] on September 16, 2008…" (APA § 9.1(c).) However, Bam does not contend that she is entitled to her guaranteed minimum bonus pursuant to this provision. (Nov. 22, 2011 Oral Arg. Tr. ("Tr.") at 42.)  Moreover, this is also a promise by Barclays to Lehman rather than the assumption of a Lehman contract.").

39.     Additionally, it is inequitable for the Trustee to argue that any portion of the 2008 Bonus should be subordinated.  The Trustee has not supplied the parties or the Court with any evidence showing that any 2008 bonus claims of Transferred Employees were reduced by any *Lehman* equity awards before payment was made by Barclays.  In fact, Barclays was provided various spreadsheets from Lehman which showed the full dollar amount of Chambers' 2008 Bonus Claim (albeit in an estimated amount of approximately $39.3 million).  *Chambers Trial Exh. 10.*  Such amount was not shown as reduced or to be reduced by any Lehman equity awards.

40.     Thus, the proper treatment for the Chambers claim is allowance in full. Thereafter, the Trustee[4] may, if he so determines, proceed against Barclays[5] to enforce the APA. If Barclays pays Chambers his 2008 Bonus, then his 2008 Bonus claim will have been paid in full by a third-party, relieving the LBI estate of a $42 million obligation and such payment by Barclays will not have diminished the estate.  This is the outcome that is contemplated in the Barclays sale order and the 2008 Bonus Order.[6]  The 2008 Bonus Order provided:

> In the event it is determined that there are valid Employee Claims and as a result the Trustee brings a claim against Barclays for failure to pay bonus amounts under the APA, *the recovery sought by the Trustee in any such claim shall be the **allowed amount** of the Employee Claims*.  If it is determined that there are no valid Employee Claims, the Trustee shall not file any claim against Barclays in connection with Barclays' alleged failure to pay bonus amounts under the APA. [emphasis added].

2008 Bonus Order ¶4.

---

[4] The Transferred Employees do not have standing to pursue claims against Barclays under the APA as it expressly provides that there are no third-party beneficiaries under the APA.  *APA* § 13.9.  The Trustee has advised counsel for Chambers that he has entered into a tolling agreement with Barclays to preserve his rights to pursue claims against Barclays for such employee bonuses.

[5] If Barclays indeed owes the bonuses, the Trustee has a fiduciary duty to investigate why Chambers was not paid and make a demand that Barclays pay the 2008 Bonus.

[6] If the original estimate of 2008 bonuses in the APA is correct, there are some $400 million in unpaid bonuses.

I.    **THE SECTION 502(B)(7)(A) CAP IS INAPPLICABLE BECAUSE CHAMBERS'
CLAIMS ARE NOT FOR *"DAMAGES" "RESULTING FROM"* THE
TERMINATION OF AN EMPLOYMENT CONTRACT**

41.    Section 502(b)(7) caps "claims[s] of an employee for damages resulting from the
termination of an employment contract." 11 U.S.C. § 502(b)(7). Those claims cannot exceed
"the compensation provided by such contract, without acceleration, for one year…[plus] any
unpaid compensation due under [the] contract, without acceleration…". 11 U.S.C. §
502(b)(7)(A). Additionally, the claims are capped at an amount equal to one year of
compensation under the contract from the earlier of (1) the date of the filing of the petition, or (2)
the termination date. *Id.*

42.    All of Chambers' claims are for unpaid, pre-Filing Date compensation owed as of
the Filing Date, without acceleration, which is not limited by Section 502(b)(7).[7] Specifically,
Chambers' 2008 Bonus was earned prior to the Filing Date during 2008 by his rendering of
services which ultimately resulted in an actual net profit to LBI of $171,627,000. FOF¶23. The
Trustee has already conceded that Chambers has a fully vested claim to his 2008 bonus. FOF¶38.
Furthermore, the 2007 Bonus was earned in the 2007 Performance Year and remained unpaid as
of the Filing Date. FOF¶12.

43.    Additionally, Chambers' 2009 and 2010 bonuses guaranteed minimum bonuses
were owed as of the Filing Date, without acceleration. LBI wanted Chambers to grow the Fund
to $3 billion and in order to do that he needed to be able to attract talent. FOF¶40. The minimum
guaranteed bonuses for 2009 and 2010 allowed him to do that. FOF¶41. He even hired an

---

[7] *See* 11 U.S.C. § 502(b)(7)(B). All of these claims constitute "wages" under the New York Labor Law Article 6.
Vested bonus payments fall within the definition of "wages" in § 190 of the Labor Law. *Giuntoli v. Garvin
Guybutler Corp.*, 726 F. Supp. 494, 509 (S.D.N.Y. 1989). "The dispositive factor in determining whether
compensation constitutes wages is not the labeling of the plan but whether the compensation is vested and
mandatory as opposed to discretionary and forfeitable." *Truelove v. Northeast Capital & Advisory Inc.*, 268 A.D.2d
648, 649 (N.Y. App. Div. 3d Dep't 2000). Here, Chambers' guaranteed 2009 and 2010 bonuses were not
discretionary; they were mandatory and vested.

additional investment professional within the short two-month timeframe between the time he entered into his 2008 Agreement and Filing Date. Therefore, Chambers' 2009 and 2010 compensation was earned prior to the Filing Date and is unpaid, pre-Filing Date compensation which is not limited by Section 502(b)(7). Furthermore, it is irrelevant that Chambers was not employed by LBI on the dates the payments were to be made. *See Tuttle v. Geo. McQuesten Co.*, 227 A.D.2d 754 (N.Y. App. Div. 3d Dep't 1996).

44.    Alternatively, if the Section 502(b)(7) cap is applicable, which Chambers disputes, the capped amount of Chambers' claims would be for the one year of compensation under the contract after the Filing Date, since Chambers was not terminated by LBI prior to the Filing Date. FOF¶69.  This amount would be $10,200,000 in the aggregate, which would be his base salary of $200,000 and guaranteed minimum bonus of $10,000,000 for the next Performance Year (2009). FOF¶39.  *See In re Tex. Wyo. Drilling, Inc.,* 486 B.R. 746, 757-58 (Bankr. N.D. Tex. 2013); *see also Young v. Condor Sys. (In re Condor Sys.)*, 296 B.R. 5, 12-13 (B.A.P. 9th Cir. 2003) ("That the term "compensation" in § 502(b)(7) is more comprehensive than mere wages, salaries, or commissions and extends to include benefits is apparent from the narrower and more precise terminology that Congress used when providing priority status for certain employee claims…").  This would be in addition to the $44,033,233.99 on account of Chambers' 2007 and 2008 claims.  FOF¶11 & 31.

45.    Additionally, whether or not Chambers was actively employed by LBI in 2009 and 2010 is irrelevant because LBI materially breached the Agreements.  LBI's breach cannot excuse the estate from liability under the Agreements.

## J.        THE 2008 BONUS DEDUCTIONS

46.        Chambers has accounted for all appropriate deductions based on the terms of his 2008 Agreement. FOF¶29-37

### III.    JOINDER AND RESERVATION OF RIGHTS

47.    Chambers joins in and adopts, to the extent not inconsistent herewith, all pleadings submitted by the other lead bonus claimants in connection with the Trustee's objection to their employee claims.  Chambers also reserves the right to amend, modify or supplement the facts and arguments set forth in this brief at or prior to the hearing and to respond to any other or further objections or arguments raised by the Trustee with respect to his claims.

WHEREFORE, Chambers respectfully requests that the Trustee's objections to his claims be overruled with prejudice, his claims be allowed in full as general unsecured claims and priority claims against LBI (as set forth in Claim No. 6107), and that the Court grant such other and further relief as it deems just and proper.

Dated: New York, New York
       June 10, 2015

THOMPSON & KNIGHT LLP

By: */s/ Jennifer A. Christian*

Jennifer A. Christian
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, NY 10022-4728
Telephone:  (212) 751-3001
Facsimile:  (212) 751-3113

*Attorneys for J. Robert Chambers*

-36-