Hearing Date and Time:                                    September 9, 2015, 10:00 am

DAVID J. HOFFMAN
Attorney at Law
One Whitehall Street
Suite 1825
New York, New York 10004
Tel: 917-701-3117
Email: djhoffman@djhoffmanlaw.com

Attorney for Hipotecas de America SA

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:
LEHMAN BROTHERS, INC.,                          Case No. 08-01420 (SCC) SIPA

                              Debtor.
--------------------------------------------------------X

# HIPOTECAS DE AMERICA, S.A.'S MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER REGARDING CERTAIN REPURCHASE CLAIMS

# TABLE OF CONTENTS

PROCEDURAL HISTORY .........................................................................1

PRIOR LITIGATION.................................................................................1

    I.   Hipotecas Claim is Distinguishable from the Failed Repo Claimants .............. 1

       A.   Hipotecas has Objected to the so-called "Test Case" Procedure .................... 2

    II.   The Courts have only Previously Considered Repos that Were Arm's Length Exchanges Between Institutional Parties................................................................. 3

    III.   The Second Circuit did not Disqualify Repo Participants from Customer Status ......................................................................................................................... 6

FACTS ........................................................................................................7

    IV.   LBI Solicited the Villamizar Family to Invest in a Diversified Portfolio....... 7

       A.   LBI Recommeded that the Villamizar Family Enter into Repo Transactions, and Recommended the Individual Securities ......................................................... 8

       B.   Hipotecas' Repos were the Economic Equivalent of a Margin Account ....... 10

       C.   Hipotecas Bought Bonds Through LBI, with LBI Acting as a Fiduciary..... 10

       D.   Hipotecas' Repo Account Statements Showed Securities Being Held at LBI 11

       E.   In September 2008, LBI Assured the Villamizar Family that its Repos were Safe in the Event of a Collapse of LBI ................................................................. 12

ARGUMENT .........................................................................................13

    V.   Hipotecas is a Customer Because it was in a Fiduciary Relationship with LBI 13

       A.   Hipotecas was in a One-Sided Relationship with LBI .................................. 14

       B.   Hipotecas Meets the Standard set forth in Baroff ........................................ 15

       C.   LBI Acted in a Fiduciary Capacity ............................................................... 16

    VI.   Hipotecas' Account Statements Support its Claim for Customer Status..... 18

    VII.   The Account Statements Gave Hipotecas the Legitimate Expectation that LBI Held the Bonds ................................................................................................. 19

       A.   Mr. Barreto Expressly Represented that Hipotecas' Bonds were Safe even in the Event of a Collapse of LBI ............................................................................. 21

       B.   LBI Internal Documents Suggest that Hipotecas Account could have been a Safekeeping Account ............................................................................................ 23

    VIII.   LBI's Stock Record for Hipotecas does not Show Third-Party Transactions23

IX.   Because Hipotecas' Account was in Economic Substance a Margin Account, it is Entitled to Customer Status ..................................................................... 24

X.   The Parties Ignored the Terms of the GMRA ................................................. 25

A.   The Confirmations did not Conform to the GMRA or Rule 10b-10 .............. 26

B.   Hipotecas' Transactions do not Accord with the Terms of the GMRA ......... 27

XI.   The Trustee Failed to Identify any Legal Standard by which the Motion should be Adjudicated ............................................................................................. 28

XII.   Customer Claims arising from Repurchase Agreements are Inherently Fact-Dependent ........................................................................................................ 28

XIII.   This Court should reject the Trustee's Characterization of the Previous Litigation as "Test Cases" ...................................................................................... 29

CONCLUSION ....................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 236 (2d Cir. 2011) ............... 18

In re ESM Gov't Sec., Inc., 812 F.2d 1374, 1376 (11th Cir. 1987) ...................... 13, 15

In re First Interregional Equity Corp., 227 B.R. 358, 370 (Bankr. D.N.J. 1998)...... 30

In re Klein, Maus & Shire, Inc., 301 B.R. 408, 420 (Bankr. S.D.N.Y. 2003)............. 22

In re Lehman Bros., 462 B.R. 53, 60-61 (Bankr. S.D.N.Y. 2011) .............................. 19

Levitin v. PaineWebber, Inc., 933 F. Supp. 325, 329 (S.D.N.Y. 1996)...................... 17

Resolution Trust Corp. v. Aetna Casualty & Sur. Co., 25 F.3d 570, 578 (7th Cir. Ill.
    1994)................................................................................................................ 25

Sandata Techs., Inc. v. Infocrossing, Inc., 2007 U.S. Dist. LEXIS 85176, *26
    (S.D.N.Y. 2007) .............................................................................................. 31

Schultz v. Omni Mut., Inc., 1993 U.S. Dist. LEXIS 18464, *5 (S.D.N.Y. 1993)........ 31

SEC v. F. O. Baroff Co., 497 F.2d 280, 283 (2d Cir. 1974) ....................................... 6, 7

SEC v. Goren, 206 F. Supp. 2d 344, 351 (E.D.N.Y. 2002)........................................... 18

Secs. Investor Prot. Corp. v. Exec. Secs. Corp., 556 F.2d 98, 99 (2d Cir. 1977) ........ 25

Sinclair v. SEC, 444 F.2d 399, 400 (2d Cir. 1971) ..................................................... 16

Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 416 (2001) ...................... 17

Stafford v. Giddens (In re New Times Sec. Servs.), 463 F.3d 125, 128 (2d Cir. 2006)
    ............................................................................................................................ 19

USA Network v. Jones Intercable, Inc., 729 F. Supp. 304, 315 (S.D.N.Y. 1990) ...... 22

## Rules

Rule 10b-10 ...................................................................................................... 20, 29

## PROCEDURAL HISTORY

The Trustee denied the timely-filed claim of Hipotecas de America, S.A. ("Hipotecas") (Claim #800003291), claiming $2,465,000 in net equity. (Decl. of David J. Hoffman, dated August 12, 2015, Ex. 1) That claim was denied by Notice of Trustee's Determination of Claim, dated October 2, 2009. (Hoffman Ex 2). Hipotecas timely filed its objection to that notice under SIPA in this proceeding on November 2, 2009 (Hoffman Ex. 3)(Docket #2023). Hipotecas submits this memorandum in opposition the Trustee's Motion for an Order Regarding Certain Repurchase Claims, dated June 3, 2015. That motion seeks to convert Hipotecas' claim into a general creditor claim. Hipotecas' claim arises out of securities subject to repurchase agreements or "repos".

## PRIOR LITIGATION

### I.   Hipotecas Claim is Distinguishable from the Failed Repo Claimants

This motion comes against the backdrop of the Trustee's litigation with three parties who had outstanding repurchase agreements, Hudson City, Westernbank, and Doral.[1] After initially meeting with an ad hoc group of claimants who had repurchase agreements outstanding on the filing date, the Trustee selected these three parties whose repurchase transactions were subject to versions of the Master Repurchase Agreement ("MRA"), to litigate against that resulted in the previous

---

[1] The three parties to the previous litigation are more particularly described as Hudson City Savings Bank ("Hudson City") and the Federal Deposit Insurance Corporation, as receiver of Westernbank Puerto Rico ("Westernbank"). Doral Bank and Doral Financial Corporation assigned their claims to CarVal Investors UK Limited, as manager of CVF Lux Master S.a.r.l., for the purposes of this memorandum referred to consistent with the Second Circuit as "Doral".

decisions of this Court, dated June 25, 2013, (Hoffman Ex. 4), the District Court,

dated February 28, 2014, (Hoffman Ex. 5)  and the Second Circuit, (Hoffman Ex. 6)

dated June 29, 2015, each of which confirmed the Trustee's determinations of claim.

On his initial motion in this Court, the Trustee's motion was supported by the

Declarations of Daniel McIsaac (Docket #5009), Leonard Legotte (Hoffman Ex.

7)(Docket #5010), Joseph De Stephan (Hoffman Ex. 8)(Docket #5012), and William

Burke (Hoffman Ex. 9)(Docket #5011).

### A.  Hipotecas has Objected to the so-called "Test Case" Procedure

Hipotecas has always objected to the Trustee's attempt to lump in Hipoteca's

claim – that of a family office investor customer of LBI's, which sought to invest in

the bond market and was steered by LBI into the Repurchase Agreements as a

supposed safe alternative to opening a margin account – with those claims of the

commercial banks like Doral that dealt in arm's length banking transactions,

offloading balance sheet liabilities, and subsequently seeking lost profits by trying

to shoehorn their way into the SIPA safety net to protect the retail customer.

Hipoteca is a family investor that lost real money; it never received any value for

the entering into the repo agreement.  It relied on LBI's assurances that its

investment was a protected investor asset.

To be sure, Hipotecas never entered into any stipulation permitting the

Trustee to dispose of its claim subject to the outcome of the adjudication of Doral's

fact pattern.  To the contrary, when Hipotecas raised its objection to Trustee's

proposed "test case" scenario using the commercial bank plaintiff, the District court

commended Hipoteca to go it alone if not content with the Trustee's route.  This objection follows.

Hipotecas repurchase agreement bears resemblance to Doral's in name only. The actual facts of Hipotecas investment that the Trustee seeks to bury with the instant motion and in spite of the Second Circuit's admonition that SIPA protection is a fact intensive inquiry – demonstrate that Hipoteca precisely fits the mold of the customer who entered into the agreement for the purposes of participating in the securities market and entrusted its investment to LBI, and thus is entitled to SIPA protection under the Second Circuit's recent holding.   Indeed, the Second Circuit has cautioned against a broad-brush approach to customer status, as "[w]hether a claimant qualifies as a customer is determined on a transaction-by-transaction basis." (Second Circuit, p. 10)(cite omitted).  As Hipotecas will show below, the facts supporting Hipotecas' claim should lead the Court to the conclusion that Hipoteca is a customer for the purposes of SIPA.  Hipotecas' claim arose in a factual setting with little or nothing in common with those of the unsuccessful claimants.

## II.    The Courts have only Previously Considered Repos that Were Arm's Length Exchanges Between Institutional Parties

The courts that heard the previous disputes were faced with repos that arose out of an arms-length exchange between institutional parties.  Hipotecas will show in detail below that its claims arose from a one-sided transfer to LBI, where LBI took on a fiduciary role, and where Hipotecas' statements indicated that its bonds were being held in safekeeping at LBI.  The Second Circuit described repurchase agreements as follows:

A repurchase agreement—commonly known as a 'repo'—involves a matched purchase and sale. First, the 'seller' agrees to sell assets, usually securities, to the "buyer" for a fixed price.1 Second, the buyer agrees to resell those same assets back to the seller at a later date and for a slightly higher price— hence the name 'repurchase agreement.'

Viewed from the seller's perspective, repos offer a mechanism for converting idle securities into liquid cash for a limited period. The seller can then employ that cash for investments or other purposes, before returning the cash to the buyer in exchange for the securities at the conclusion of the repo. Viewed from the buyer's perspective, repos provide an outlet for excess cash, and for the temporary acquisition of attractive securities. Moreover, because the resale price is higher than the original sale price, the buyer retains the difference—known as the 'repo rate'—as a fee for the transaction. When viewed from a buyer's perspective, the transaction is called a 'reverse repo.'

Second Circuit, p. 3-4.

This Court and the District Court described these transactions similarly.[2]

Thus, the repurchase agreements previously *sub judice* arose primarily for

---

[2] This Court described repurchase agreements as follows:

A repurchase transaction (or "repo") is a single transaction consisting of two related parts. The first step of the transaction involves a "Seller" who agrees to transfer securities (the"Purchased Securities") to a counterparty, the "Buyer," against the transfer of cash by the Buyer.  The second step is the simultaneous agreement by the Buyer to transfer back the securities to the Seller on the "Repurchase Date" (a specified future date), against the transfer of cash by the Seller back to the Buyer on the Repurchase Date. The market value of the Purchased Securities transferred to the Buyer in the first step of the transaction generally is higher than the value of the funds transferred to the Seller, with the difference in value being referred to as the "haircut."  The funds transferred back to the Buyer in the second step of the transaction include, in addition to the sum originallytransferred to the Seller, an amount representing a financing charge computed using an agreed interest rate, also known as a "repo rate." (Bankr., p. 5)

The District Court similarly described repurchase transactions:

A repurchase agreement is a financial transaction consisting of two steps. First, a seller (here, the Banks) delivers securities to a buyer (here, LBI) in exchange for a

4

borrowing (or lending) purposes between financial institutions.  As each decision defined it, in a repo transaction, the seller owns the securities at the outset of the transaction and exchanges those securities to the buyer, here LBI, in exchange for "liquid cash" (Second Cir., p.4), "a quantity of cash" (District Court, p. 4), or a "transfer of cash" (Bankr., p.5).   The Second Circuit pointed out that Doral "received cash in exchange for the securities… and was free to use that cash for its own purposes."  (Second Circuit, p. 5) The repos considered by the District Court "were not … one-sided transfers … the Banks conveyed the Purchased Securities in exchange for cash from LBI, subject to a haircut."  (District Court, p. 16) In his motion, the Trustee argues that "all of the Repurchase Claims involve 'bilateral delivery' repos [where] the Seller delivers the securities to the Buyer or its agent at the outset of the transactions against the transfer of cash." Memo, ¶15.  Hipotecas did not participate in any such repo.

Furthermore, each of the previous decisions assumed the existence of a term repo, which concludes with a fixed date and a fixed price – by referencing "a later date at a slightly higher price" (Second Circuit, p.4).   Here, Hipotecas' repos were so-called "open repos", with no fixed repurchase date or price.

The Second Circuit Held that Doral Did not Entrust Property to LBI

---

quantity of cash that is generally less than the value of the securities. This difference in value is referred to as the "haircut." Second, the parties agree that the buyer (LBI) will return those securities to the seller (Banks) on a future "repurchase date," in exchange for a cash payment from the seller (Banks) in the amount originally transferred, plus a financing charge, called a "repo rate."  (District Court, p. 4)

III.    <u>The Second Circuit did not Disqualify Repo Participants from Customer Status</u>

In upholding the lower court decisions confirming the Trustee's denial of customer status, the Second Circuit held to its previously articulated standard "'an investor must have "entrusted property to the broker-dealer"'". (Second Circuit, p. 10) quoting <u>SEC v. F. O. Baroff Co.</u>, 497 F.2d 280, 283 (2d Cir. 1974). Doral advanced a bare-bones argument that "repurchase agreements necessarily involve entrustment" and that its delivery of securities to LBI during the first phase of the repurchase agreements satisfied this standard. (Second Circuit, p. 13). The Second Circuit held that Doral's claim failed because, looking to the terms of the Master Repurchase Agreement ("MRA"), LBI acquired title to the securities to use as LBI saw fit; therefore Doral "did not entrust anything to [LBI]". (Second Circuit, p. 14). Thus, Doral's failed argument was that its entry into the repo agreements with LBI, standing alone, gave rise to customer status.

In reaffirming its holding requiring "entrustment" in <u>Baroff</u>, , the Second Circuit held that the relationship between investor's relationship "must bear 'the indicia of the fiduciary relationship between a broker and his public customer.'" (Second Circuit, p. 16) quoting <u>Baroff</u>, 497 F.2d at 284. Relying on that venerable precedent, the Second Circuit offered "several examples" that would satisfy the fiduciary aspect of the entrustment required: "(1) selling the assets for the customer; (2) using the assets as collateral to make margin purchases of other securities for the customer; or (3) otherwise using the assets 'to facilitate securities trading by' the customer." (Second Circuit, p. 14) citing <u>Baroff</u>, 497 F.2d at 284.

6

The Second Circuit declared this list to be "by no means exhaustive". (Second Circuit, p. 14.) Hipotecas' participation in the LBI repos fits all three of these criteria.

The Second Circuit thus held that a claimant who can meet the criteria set forth in <u>Baroff</u> can meet the SIPA definition of customer. The court did not hold repurchase agreements necessarily trump the claimant, where the claimant can otherwise meet the standards set forth in <u>Baroff</u>.

**FACTS**

## IV.    <u>LBI Solicited the Villamizar Family to Invest in a Diversified Portfolio</u>

The Villamizar family came to LBI in January 2008, when members of the family attended a presentation of LBI investment advisors in New York specifically tailored to the interests of the family. (Villamizar Decl. ¶5-6, Barreto Decl. ¶9)[3] The family's contact with LBI was Mauricio Barreto, a retail financial advisor working out of the Miami office. (Villamizar Decl. ¶3-5)    Mr. Barreto partnered with Ivan Palacino, another LBI broker. (Villamizar Decl. ¶26-27) During that presentation, the LBI team undertook a detailed analysis of the family's investment goals, risk tolerances, and other considerations to outline a detailed investment strategy that would meet the investment goals of the family. (Villamizar Decl. ¶6-8,

---

[3] "Villamizar Decl. ¶ __" refers to the declaration of Alejandro Villamizar dated August 13, 2015 filed in support of Hipotecas' Memorandum in Opposition to the Trustee's Motion for an Order Regarding Certain Repurchase Claims, dated June 3, 2015. "Baretto Decl.   ¶ __" refers to the declaration of Mauricio Barreto dated August 11, 2015 submitted in support of Hipotecas' Memorandum in Opposition to the Trustee's Motion for an Order Regarding Certain Repurchase Claims, dated June 3, 2015.

Barreto Decl. ¶9)  The team's detailed presentation included a PowerPoint slide-show detailing the components of a proposed portfolio.  (Id.)

LBI followed up on that meeting with contacts between Alejandro Villamizar and Mr. Barreto, who would be the family's contact person with LBI.  (Villamizar Decl. ¶9-12, Barreto Decl. ¶10-13)  Following that meeting, on January 23, 2008 Mr. Barreto forwarded to Mr. Villamizar a version of that 32-page slide show entitled "The Villamizar Family, Portfolio Advisory: Asset Allocation.[4]  (Villamizar Decl. ¶9, Barreto Decl. ¶10)  LBI proposed that the Villamizar family invest $7 million in a diversified portfolio, including a $2.1 million "fixed income" or bond portion, (Villamizar Decl. Ex. 2, p. 12), as well as equity and hedge fund investments.   The Villamizar family wished to invest in bonds using some margin so as to purchase an amount of bonds greater than their initial cash contribution.  (Villamizar Decl. ¶11-12, Barreto Decl. ¶10-11)  Hipotecas is a personal holding company whose beneficiaries are members of the Villamizar family that the family ultimately used as a vehicle to make their investments at LBI.  (Id. at ¶9)

### A.  LBI Recommended that the Villamizar Family Enter into Repo Transactions, and Recommended the Individual Securities

The Villamizar family ended up with repo positions specifically as a result of advice it received from LBI.  (Villamizar Decl. ¶11-13, Barreto Decl. ¶11-12) As the discussions continued, LBI revised its proposal and recommended that instead of

---

[4] In that email chain, an LBI Investment Representative named Daniela Garces requested that Andrew Fulton and Christopher Toomey to "Please send us the new asset allocation for the Villamizar Family."  To which Mr. Fulton responded: "Please find the updates attached. I shifted the assets slightly fom equity to fixed income to being him back in line with his risk appetite."  (Villamizar Decl. Ex. 2).

opening a margin account to purchase bonds, that the same goal be accomplished

through the mechanism of repurchase agreement. (Id.) On February 14, 2008 at

1:19 PM, Mr. Villamizar received an email from Mr. Barreto including an attached

Excel spreadsheet entitled "HypotecasdeAmericatrade Idea2.xls". (Villamizar Decl.

¶9, Ex. 2) In that attachment, Mr. Barreto set forth a recommended portfolio of

corporate bonds from emerging countries (in Latin America) that would comprise

and replace the fixed income portion of the original proposal. (Id.) Mr. Barreto set

forth the terms of the bonds of eight companies, setting forth the country of origin,

an abbreviated name of the company, CUSIP number, LBI's recommendation on

each bond (such as "outperform" or "buy"), etc. for each bond. (Id.) Hipotecas would

eventually purchase seven of the eight recommended bonds. (Id.) In that proposal,

the "haircut" is designated as 35%, i.e., Hipotecas would supply 65% of the purchase

price in cash. (Villamizar Decl. ¶10) Each bond was to be purchased in a nominal

amount of $500,000, and as can be seen from the proposal, some were trading above

or below that price. (Id., Ex. 3) For each bond, the market price[5] is noted on the

line listed as "asset". (Id.) Subtracted from that is the 35% margin, which is listed

as a "liability". (The net of asset and liability are listed as "equity/carry". To the

right of the "equity/carry" line the spreadsheet lists the coupon payments associated

with each bond. Below the "equity/carry" line is the "net cash flow", which initially

is the same as the "equity/carry" line in parentheses. Therefore, Hipotecas would be

paying approximately that amount in cash (depending on the then-current market

price) for each bond. Later in the day on February 14, 2008, LBI revised its

---

[5] Equal to $500,000 x (price/100)

proposal and lowered the total investment to $6 million and the fixed income

portion to $1.545 million.  (Id.)  Hipotecas deposited $6 million with LBI on

February 15, 2008.  (Villamizar Decl. ¶13)

### B.  Hipotecas' Repos were the Economic Equivalent of a Margin Account

LBI presented the repo investments to Mr. Villamizar as a safe yet less

expensive way to accomplish the same economic goals that the family had, namely

investing in bonds, and enjoying their expected yields and appreciation.  (Villamizar

Decl. ¶11-12)  Neither the Villamizar family nor its company Hipotecas had a need

for financing or to obtain cash from LBI.  (Id.)  Just as with a margin account,

Hipotecas would pay interest on the amount that the purchase price of the

securities exceeded its cash contribution.  (Barreto Decl. ¶21-24).  The financing

rate for the repos – 3.7% -was low enough that the coupon payments from the bonds

were sufficient to cover the interest costs on the margin.  (Id.)  The repos were

"open repos", not term repos, meaning that the repo was terminable at will by

Hipotecas.  (Id.)  Open repos have neither a predetermined repurchase date nor

predetermined price for the reversal of the repo.  (Villamizar Decl. ¶28)

### C.  Hipotecas Bought Bonds Through LBI, with LBI Acting as a Fiduciary

Hipotecas purchased six bonds in March 2008.  The first six companies were:

EEB International, Ltd., a Colombian electricity distribution company, TGI

International, Ltd., a Colombian gas company, Axtel S.A.B. de C.V., a Mexican

telecommunications company, Centrais Electrica Brasileiras, S.A., a Brazilian

electric company, Isa Capital do Brasil, S.A., a Brazilian electric utility holding

company, and Bancolombia, S.A., a Colombian bank.  (Villamizar Decl. ¶14)  None of the bonds were US Treasury bonds or agency bonds.  (Id.)

LBI assigned separate account numbers to Hipotecas' cash, equity, hedge fund, and repo investments and Hipotecas began to receive monthly statements from LBI for each of the accounts.   (Villamizar Decl. ¶13, Ex. 4)  Acting on behalf of Hipotecas, LBI deducted cash to purchase each of the bonds from Hipotecas cash account.   In March 2008, LBI deducted a total of $2,045,583.61 from Hipotecas cash account for the purpose of purchasing the bonds. (Id. ¶15)   In April 2008, the seventh position, in Cemex, was added to Hipotecas' account. (Id. ¶16)  In April 2008, LBI deducted $312,653.25 from Hipotecas cash account to purchase the Cemex bond.  (Id.)  Together with the purchase of the Cemex bond in April 2008, LBI took $2,357,959.95 from Hipotecas to purchase bonds.  (Id.)

Mr. Villamizar received confirmations showing that Hipotecas purchased the bonds with the notations that "You [Hipotecas] Bought" each of the bonds and that "Lehman Brothers, Inc. acted as agent for both you and its affiliate Lehman Brothers International (Europe) on this transaction." (Id. ¶18)  Mr. Villamizar also received confirmations for each of the repo transactions, sometimes multiple confirmations, expressly stating that LBI was acting as its agent in the transaction.[6]

### D. Hipotecas' Repo Account Statements Showed Securities Being Held at LBI

---

[6] Although these were corrected, in some cases months after the transaction had been consummated, below we will show that such belated confirmations are not effective.

11

The statements for each of Hipotecas accounts – its cash account, equity, hedge funds, and repos, were identical in format and in the explanatory notes. (Villamizar Decl. ¶20-24)  Just as the account statements for the equity and hedge fund investments did, each statement – designated as a "Brokerage Account" – including each one that Hipotecas received for its repo account - stated: "Clients funds and securities are held at Lehman Brothers."  (Id.)  Each monthly statement for Hipotecas repo account bore a section labeled "Holdings" under which each of the aforementioned bonds was listed, together with its current value, and the current outstanding margin credit.  (Id.)  Each shows a positive "closing portfolio value", which in August 2008 equaled $2,172,593.54.  ADD

During the operation of its accounts, Hipotecas continued to consult with Mr. Barreto and Mr. Palacino, LBI's brokers.   (Villamizar Decl. ¶26-27)  Mr. Barreto gave reports on the performance of the portfolio.  (Barreto Decl. ¶30-32)  In August 2008, pursuant to his brokers' advice, Mr. Villamizar sold Hipotecas' position in Cemex, as reflected on the statement and by receiving a confirmation stating that "You [Hipotecas] Sold".  (Villamizar Decl. ¶23, Barreto Decl. ¶28 )

### E.  In September 2008, LBI Assured the Villamizar Family that its Repos were Safe in the Event of a Collapse of LBI

As the turmoil in the markets began to mount in September 2008, the solvency of LBI and its parent company was openly being questioned in the marketplace.  Due to these concerns, Mr. Villamizar met with Mr. Barreto to discuss the safety of Hipotecas' investments.  (Villamizar Decl. ¶26-28, Barreto Decl. ¶30-32)  In mid-September, shortly before the ultimate collapse of LBI, Mr.

Barreto assured Mr. Villamizar that Hipotecas' accounts, including its repo account, were safe even in the event of a failure of LBI.   (Id.)  Because Hipotecas repos were open repos, Mr. Villamizar could have ordered the sale of all the securities, just as he had recently done in the case of the Cemex bond.  (Barreto Decl. ¶28)  Due to the assurances that Mr. Villamizar received from LBI's representative, Mr. Villamizar did not pull Hipotecas' investments from LBI.  (Villamizar Decl. ¶26-28, Barreto Decl. ¶30-32)  Of course, on September 15, 2008, LBI's parent company entered bankruptcy and this SIPA proceeding commenced.  At no time did Hipotecas ever withdraw or receive any distribution of funds or securities from LBI.  (Villamizar Decl. ¶28)

On the following Monday, all of Hipotecas' investments, except the repos, had been transferred to Barclays. (Id. ¶29)

## ARGUMENT

## V.   Hipotecas is a Customer Because it was in a Fiduciary Relationship with LBI

Hipotecas should be granted customer status because its relationship with LBI was fiduciary, not debtor-creditor and its statements indicated that the bonds subject to repo were being held at LBI.  The Second Circuit contrasted customers whose relationship with their broker had fiduciary elements from "'an ordinary debtor-creditor relationship.'" (Second Circuit, p. 17) quoting In re ESM Gov't Sec., Inc., 812 F.2d 1374, 1376 (11th Cir. 1987). In this dichotomy, Hipotecas relationship with LBI bore little resemblance to a debtor-creditor relationship.  Where Doral "received cash in exchange for the securities, and was free to use that cash for its

own purposes", Second Circuit, p.5, Hipotecas received nothing.  Here, LBI was
essentially holding both ends of the repo, both the cash and the securities.  Put
another way, if a repo is an exchange of cash for securities, and Hipotecas received
nothing in exchange for its cash contribution in excess of $2 million, LBI had to be
holding something that belonged to Hipotecas.

The distinction is clear considering the difference in the claims that
Hipotecas is making.  Hipotecas lost approximately $2 million, which was the cash
that it put in to buy bonds that were worth approximately $3 million.  Doral was
seeking lost profits, as the securities had appreciated and it "stood to profit if it had
repurchased the securities at the agreed-upon price." (Second Circuit, p.6)
According to the Declaration of Mr. Legotte, Doral Financial lost $17.4 million on a
repo of securities valued at $207 million, and Doral Bank lost $26.6 million on a
repo of securities valued at $343 million.  Legotte Decl. ¶¶54-55.

## A.  Hipotecas was in a One-Sided Relationship with LBI

The "two-sided" (District Court, p. 16) relationship of the previous claimants
to LBI defeated their claims for customer status; Hipotecas' one-sided relationship
supports its claim for customer status.  As the District Court noted, a one-sided
transfer of cash or securities to the broker-dealer gives rise to a fiduciary
relationship because "the customer becomes vulnerable and will suffer a loss if the
broker-dealer appropriates the money or becomes insolvent…[t]he customer thus
places trust and confidence in the broker-dealer…giving rise to a fiduciary duty".
(Id.)  The Second Circuit reaffirmed that "'it is the act of entrusting the cash to the
debtor for the purpose of effecting securities transactions that triggers the customer

14

status provisions.'" (Second Circuit, p. 17) quoting <u>ESM</u>, 812 F.2d at 1376.   Here,

unlike Doral, on February 15 2008, Hipotecas entrusted to LBI $6 million in cash,

which LBI used to purchase the bonds, i.e., LBI effected securities transactions on

Hipotecas' behalf.  (Barreto Decl. ¶15)   Therefore, from that date, Hipotecas had

customer status, and because, unlike Doral and the others, it never received

anything in return, that status did not end.

### B.  Hipotecas Meets the Standard set forth in <u>Baroff</u>

Hipotecas also meets the three, non-exhaustive grounds, derived from <u>Baroff</u>,

upon which the claimant attains customer status.  Those are where the broker is:

"(1) selling the assets for the customer; (2) using the assets as collateral to make

margin purchases of other securities for the customer; or (3) otherwise using the

assets 'to facilitate securities trading by' the customer."  (Second Circuit, p. 14).  As

to the first ground, the selling of securities, LBI did so with respect to the Cemex

bond.  (Villamizar Decl. ¶22).  Furthermore, because these bonds were subject to

what was essentially a margin debit, Hipotecas had no way to exit the repo other

than through a sale of the bonds, through LBI, on the open market.  As to the

second and third examples, the repo trades themselves were a margin transaction

that represented new participation in the securities market. Setting the Cemex

trade aside, Hipotecas put up approximately $2 million in order to buy

approximately $3 million in bonds.  (Villamizar Decl. ¶10)  In order to make this

trade possible, LBI required Hipotecas to enter into the repurchase agreements.

Unlike Doral, who owned its bonds before entering the repo, Hipotecas bought the

bonds for that express purpose and also was able to enjoy the economic benefits of margin through the mechanism of the repo trades.

### C.  LBI Acted in a Fiduciary Capacity

In addition, the record reveals that Hipotecas enjoyed a fiduciary relationship with LBI in several aspects that were not present for the previous claimants.  The first instance was when Hipotecas deposited $6 million with LBI from which the bonds were purchased.  As pointed out above, that transfer of cash made LBI a fiduciary of Hipotecas.  A second indisputable occasion on which LBI was burdened with fiduciary duties is when LBI bought the bonds.  The bond-purchase confirmations state unambiguously that "You [Hipotecas] Bought" the listed securities and that "Lehman Brothers, Inc. acted as agent for both you and its affiliate Lehman Brothers International (Europe) on this transaction."  (Villamizar Decl. ¶18).  Likewise, the identical wording appears on the confirmation when Hipotecas sold its Cemex bond.  (Villamizar Decl. ¶22).  In executing these purchases and sale on behalf of Hipotecas, LBI "was obligated as a matter of fiduciary duty to use due diligence to obtain the best available price …upon execution of orders placed by them for purchase or sale of securities."  Sinclair v. SEC, 444 F.2d 399, 400 (2d Cir. 1971).   The sale of the Cemex bond shows that LBI actually sold a security belonging to Hipotecas, LBI did not merely pay it an amount in cash equal to its value.  (Villamizar Decl. ¶¶22-25)

Furthermore, the purchases and sale are intimately intertwined with the repurchase agreement.  LBI only deducted 65% of the purchase price of the bonds from Hipotecas cash account.  (Villamizar Decl. ¶10)  For example, the Cemex bond

16

had a value of $481,005.00 when purchased, but LBI only deducted 65% of the purchase price from Hipotecas' cash account, namely $312,653.25, the remainder of the purchase price being contingent upon the repo.  Therefore, LBI and Hipotecas were already committed to the repo, yet LBI was acting in a fiduciary capacity within that relationship.

Together with these fiduciary duties that LBI undertook on behalf of Hipotecas, LBI's initial repo confirmations (in some cases restated multiple times) state that LBI "Lehman Brothers, Inc. acted as agent for both you and its affiliate Lehman Brothers International (Europe) on this transaction."  (Villamizar Decl. ¶18-20)  Later – in some cases months later - LBI issued purported confirmations specifying that it was "acting as principal".  (Id.)  By that time, the horse was already out of the barn.  Rule 10b-10 renders these belated confirmations nullities, because it "requires broker-dealers to provide customers with a written confirmation at or before completion of a securities transaction."  Levitin v. PaineWebber, Inc., 933 F. Supp. 325, 329 (S.D.N.Y. 1996).  Correctly identifying the role of the broker is crucial, as "[t]he confirmation must contain information such as … whether the broker-dealer is acting as agent for the customer".  Id.  It is, of course, black letter law that an agent is the fiduciary of her principal. Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 416 (2001).  So, when LBI reported that it acted in this role, it shows that the relationship between LBI and Hipotecas had the necessary fiduciary aspects, rather than that of an arms-length debtor-creditor relationship.

17

In addition, the example that Second Circuit set out to show that Doral's repurchase agreement LBI negated a fiduciary relationship is absent here. The Second Circuit noted that if the market price of the securities was below the agreed repurchase price on the repurchase date, LBI could act against Doral and force it to repurchase the securities at the higher, contractual price. Such action is counter to a fiduciary duty because "completing the sale would inflict a net loss on Doral". That could not have happened to Hipotecas because its repos were open repos, with no agreed repurchase price and no set term. As demonstrated by the Cemex bond, Hipotecas' (and LBI's) only way out of the repos was to sell the bonds on the open market with LBI acting as a fiduciary for Hipotecas.

## VI.    Hipotecas' Account Statements Support its Claim for Customer Status

Hipotecas' account statements support finding customer status under SIPA. As the Second Circuit has confirmed, statements are evidence of customer status, even where there are no securities actually in the account. For example, in Bernard L. Madoff Inv. Sec. LLC, the Second Circuit held that "the BLMIS customer statements confirm that the BLMIS claimants are properly treated as customers with claims for securities". In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 236 (2d Cir. 2011); SEC v. Goren, 206 F. Supp. 2d 344, 351 (E.D.N.Y. 2002)("[r]eceipt of…. share purchase confirmations and monthly statements is sufficient to establish that the Claimants hold securities claims…"). Just as such statement can support customer status, they can also belie it. Indeed, in this case, this Court has resorted to the customer account statements twice to deny customer status to both the previous claimants and the TBA claimants. In the TBA case, in

denying customer status, this Court held that "the account statements demonstrate that the [TBA claimants] engaged in various transactions with respect to TBAs and that, at relevant times, no TBAs were being held by LBI in the accounts of the Representative Claimants." <u>In re Lehman Bros.</u>, 462 B.R. 53, 60-61 (Bankr. S.D.N.Y. 2011). With respect to the previous claimants here, the Court stated that there was "no substitute for an account statement that includes an inventory of securities actually held by a broker-dealer for its customer." (Bankr., p. 15). Because the previous repo claimants "have no such account statements, and there is no way to ignore or navigate around this missing possessory requirement for customer status." (Bankr., p. 17)

## VII.    <u>The Account Statements Gave Hipotecas the Legitimate Expectation that LBI Held the Bonds</u>

Here, Hipotecas statements gave rise to its legitimate expectation that its account held securities on the filing date. As the Second Circuit has held, "[i]t is a customer's legitimate expectations on the filing date…that determines the availability, nature, and extent of customer relief under SIPA." <u>Stafford v. Giddens (In re New Times Sec. Servs.)</u>, 463 F.3d 125, 128 (2d Cir. 2006). Each of the statements that Hipotecas received for its repo account stated that: "Clients funds and securities are held at Lehman Brothers." (Villamizar Decl. ¶22-24) The "Holdings" section listed each of the bonds. Furthermore, Hipotecas' statements for each month from March through August, indicate a quantity of securities purchased and a quantity sold. The statements from April through August state the following quantities of securities purchased by Hipotecas, respectively: $670,184.63 (when

19

the Cemex position added), $189,050.23, $191,148.54, $170,151.50, and $339,

386.07, and the following quantities sold, respectively:  $333,782.00, $149, 987.73,

$171,775.00, $153,551.24, and $612, 873.80 (when the Cemex position sold).

(Villamizar Decl. ¶23)   Summing up the purchases and sales of securities reported

in Hipotecas statements reveals that Hipotecas was a net buyer of securities to the

tune of $2,183,534.81, which roughly agrees with the value in Hipotecas' account as

of August 31, 2008 of $2,172,593.54.  (Id.)

Comparison of these statements with those of the failed claimants shows that

Hipotecas' differ in ways that support customer status.  In the Trustee's motion in

the previous litigation Mr. Legotte offered an in depth analysis of Hudson City's,

Westernbank's, and Doral's account statements, described why they demonstrated

that their accounts held no securities, and helpfully contrasted those statements

with an example that showed that LBI held securities.  Legotte Decl. ¶¶43-50.

Applying the analysis of Mr. Legotte to Hipotecas' statements, reveals that

Hipotecas' statements indicated that LBI was holding the bonds.  While Hipotecas'

statements were similar, but not identical, in format to those address by Mr.

Legotte, Hipotecas' resembled those that where the statement indicated that LBI

held securities, rather than where it did not.  In the previous litigation, the

statement's "Portfolio Details" section "would report all assets, if any, held by LBI

with respect to the account."  Legotte Decl. ¶40.   Specifically, the explanatory notes

describe the Portfolio Details section as a "Listing of all assets held at Lehman

Brothers".  (Hoffman Decl. Ex. 10, showing Exhibit 49, a representative Doral

20

statement submitted by with Mr. Legotte's declaration).  Mr. Legotte expressly linked this description of "assets held at Lehman Brothers" to safekeeping: "If LBI held any client assets in safekeeping, this would be recorded in the Portfolio Details section."  Legotte Decl. ¶40.  As noted by Mr. Legotte, if LBI held no client securities, the relevant section of the statement would be omitted. Legotte Decl., ¶44.  Because the statements of the failed claimants lacked a "Portfolio Details" section listing "assets held at Lehman Brothers", Mr. Legotte opined that "LBI did not hold any securities for the Repo Claimants."  Legotte Decl. ¶46.  Helpfully, Mr. Legotte also included an "MTS client's Client Statement containing a Portfolio Details section", Legotte Decl. ¶44, i.e., one showing that LBI held assets belonging to the client.  Hoffman Decl. Ex. 57.  Under the Portfolio Details header of that statement, it says "[t]his section shows the holdings in your account".  Clearly, the "Portfolio Details" section is the equivalent of the "Holdings" section that appears on Hipotecas' statements.

Hipotecas submits that its statements, bearing the words "Clients funds and securities are held at Lehman Brothers" and clearly containing a section labeled "Holdings", listing an actual inventory of securities, resemble the statements that Mr. Legotte identifies as qualifying for customer status, rather than those of the failed claimants whose statements listed no holdings.  (Villamizar Decl. ¶23).

### A. Mr. Barreto Expressly Represented that Hipotecas' Bonds were Safe even in the Event of a Collapse of LBI

Hipotecas had legitimate expectations that LBI was holding the repo bonds in safekeeping not only because of the statements, but also because Mr. Barreto

expressly informed Mr. Villamizar that Hipotecas' repo account would be safe, even

in the event of a collapse of LBI and its parent company. (Id. ¶¶26-28).

Furthermore, although the GMRA provides that LBI may be entitled to

rehypothecate the bonds, there is no express prohibition on LBI holding them. It

may also be true that LBI did not have the duty to inform the previous claimants

when or if it rehypothecated their bonds; however, once LBI began sending

statements indicating to Hipotecas that it was holding its securities, LBI was

constrained correct that misimpression or to actually hold the securities in

safekeeping. USA Network v. Jones Intercable, Inc., 729 F. Supp. 304, 315

(S.D.N.Y. 1990)(where party made "affirmative misrepresentations … [t]hese

representations gave rise to a duty … to correct the mis-impressions it had

created").

The fact that Hipotecas' securities may not have actually been held in

safekeeping does not alter the outcome here. Even where the broker engages in

malfeasance or even criminal acts, a statement showing a legitimate expectation of

securities held at the debtor on the filing date gives rise to customer status. See,

e.g., In re Klein, Maus & Shire, Inc., 301 B.R. 408, 420 (Bankr. S.D.N.Y. 2003)

("[t]he fact that the property is missing, perhaps due to unauthorized trading, does

not affect 'customer' status"). It would be a perverse result if Hipotecas would enjoy

customer status if LBI had embezzled the funds and provided it with the

statements it received, but not where the statements simply incorrectly reported

the custody of its securities.

### B. LBI Internal Documents Suggest that Hipotecas Account could have been a Safekeeping Account

Hipotecas legitimate expectations were also reasonable based upon LBI's internal documents and correspondence.  Apparently, at least some of LBI's professionals believed that Hipotecas repo account was properly a safekeeping account.  As certain account opening documents clearly indicate, Hipotecas repo account was, at least for a time, identified as a "safekeeping" rather than a "DVP" account.   Hoffman Decl. Ex. 12.  Furthermore, the title of an incomplete email chain produced by the Trustee refers to "HIPOTECAS DE AMERICA LBIE SAFEKEEP TRADES".   Hoffman Decl. Ex. 13.  The existence of these mentions of safekeeping shows that Hipotecas should be permitted discovery.

## VIII.   LBI's Stock Record for Hipotecas does not Show Third-Party Transactions

The stock record for Hipotecas' account is also distinguishable from those of the previous claimants.  As described by Mr. Legotte, the securities record is "[o]ne of a broker-dealer's principal records" and is called the "stock record" even though "it might include bonds as well as stocks."   Legotte Decl. ¶25.  In the previous motion, the Trustee relied on the declarations of Mr. Legotte and William Burke.  Each of these witnesses referred to a recording system known as "MTS", which was not used for Hipotecas' account, Barreto Decl. ¶17, whose stock records are in a similar but not identical format.   In the previous motion, Mr. Legotte explained the "long" position denoted "the quantity of the security coming in to LBI from a counterparty who was identified on the stock record" and that "the manner in which LBI decided to use that security was reflected on the stock record by a

corresponding "short" position that identified the LBI account or counterparty with which the security was located." Legotte Decl. ¶27.   As did Mr. Legotte, Mr. Burke declared "LBI recorded the quantities of securities it received from its counterparties to reverse repo transactions as 'RR'".  Burke Decl. ¶14.  LBI coded the short position for the repoed securities "typically [as] 'RE' (repo transaction), or 'CP' (collateral pledge), or 'TRI' (tri-party repo transaction)", with those transactions denoting that the securities had been hypothecated away from the firm.  (Id.)

In the stock record for each of the three previous claimants, which are entitled "Security Summary by Product", but referred to by these witnesses as the "stock report", each security shows both an "RR" and a "TRI".  Hoffman Decl. Ex. 14. As explained in the declaration of Mr. Burke, these designations mean that LBI accepted the securities on a repo basis and used them to enter into repos with unrelated third parties in the cases of Westernbank and Hudson City, and an unrelated third-party collateral pledge in the case of Doral.  Burke Decl. ¶¶21-23.

The stock record for Hipotecas – which is actually called the "Stock Record", unlike those of the previous claimants - bears none of these codes or symbols. Hoffman Decl. Ex. 15.   There is no "RR", neither the codes "TRI", "RE", or "CP" appear on the stock record.  There are no transactions listed on the right hand side of the page, unlike the other claimants.

## IX.   Because Hipotecas' Account was in Economic Substance a Margin Account, it is Entitled to Customer Status

Because Hipotecas' repos were the economic equivalent of a margin account, Hipotecas is entitled to customer status.   Both the Trustee and SIPC have

consistently urged the courts to look to the economic substance of the repurchase

transaction to determine customer status.   As the Trustee argued to the Second

Circuit, "A repo is in economic substance a loan secured by a pledge of collateral…

[the Second Circuit]  has repeatedly recognized that a repo is the economic

equivalent of a secured lending transaction." Hoffman Decl. Ex. 16.   Likewise, the

SIPC argued that "Doral, which received cash in exchange for securities delivered to

LBI, and which is akin to a secured lender, is not included within the protections

afforded 'customers' under SIPA."  Hoffman Decl. Ex. 17.  This reasoning was

adopted by the District Court, which found that the repos "are akin to the secured

loans that were denied 'customer' status in <u>Secs. Investor Prot. Corp. v. Exec. Secs.

Corp.</u>, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam)." (District Court, p. 18)

See <u>Resolution Trust Corp. v. Aetna Casualty & Sur. Co.</u>, 25 F.3d 570, 578 (7th Cir.

Ill. 1994)("… [w]hether a particular repurchase transaction is in economic substance

more like a sale or more like a loan depends on the structure of that transaction…").

Hipotecas submits that the dichotomy posited by the District Court, "whether repos

are better understood as purchases and sales of securities or as loans secured by the

securities", (District Court, p. 19) does not describe Hipotecas account.  Indeed, if

one were to inquire as to the economic substance of Hipotecas transactions or what

they were "akin to", that substance is nothing more than a margin account of the

type routinely qualifying for customer status under SIPA.

## X.    The Parties Ignored the Terms of the GMRA

The Trustee asks this Court to deny Hipotecas' claim for customer status

based on language in the Master Repurchase Agreement at issue in the previous

litigation, notwithstanding the fact that the only agreement that could conceivably

apply here is a different one, the GMRA, governed by English law.  First, it is not

clear the extent to which the GMRA applies to Hipotecas' repos because LBI did not

sign the GMRA until April 11, 2008, until after Hipotecas' repos were in place.

Villamizar Decl. ¶14, Ex. 6

### A. The Confirmations did not Conform to the GMRA or Rule 10b-10

Furthermore, even if governed by the GMRA, echoing Rule 10b-10, the

GMRA provides that each transaction "shall promptly deliver to the other party

confirmation of the transaction", GMRA 3(b).   (Id.)  Section 3 of the GMRA provides

that the confirmation "may be in the form of Annex II hereto or may be in any other

form to which the parties agree".  The confirmations are conclusive evidence of the

terms of any repurchase agreement under the GMRA, as the confirmation "shall,

together with the GMRA, constitute prima facie evidence of the terms agreed

between Buyer and Seller for that Transaction, unless objection is made with

respect to the Confirmation promptly after receipt thereof. In the event of any

conflict between the terms of such Confirmation and this Agreement, the

Confirmation shall prevail in respect of that Transaction and those terms only."

Inspecting the form of confirmation in Annex II, the contractual confirmation

provides that:

> This Confirmation supplements and forms part of, and is subject to,
> the Global Master Repurchase Agreement as entered into between us
> as of [ ] as the same may be amended from time to time (the
> "Agreement"). All provisions contained in the Agreement govern this
> Confirmation except as expressly modified below. Words and phrases
> defined in the Agreement and used in this Confirmation shall have the
> same meaning herein as in the Agreement.

26

Id.

In his motion, the Trustee has provided no evidence that Hipotecas agreed to any other form of confirmation other than that provided in Annex II for repos subject to the GMRA.  The confirmations that Hipotecas received did not conform to this format and did not bear any indication that the transactions were subject to the GMRA, as provided in the contractual confirmation.  Hipotecas received one-page confirmations that are cryptic in their details, in contrast to the five-page letter that served as the confirmation for Hudson City.  Hoffman Decl. Ex. 18.  Indeed, the Supplemental Terms or Conditions amended the GMRA to provide that "3(b). both Seller and Buyer to deliver Confirmation".  Villamizar Decl. Ex 6.  That provision appears to have been ignored, yet such confirmations would conclusively provide the terms of the repo.

## B.  Hipotecas' Transactions do not Accord with the Terms of the GMRA

Furthermore, even if it were not so, the transactions entered into by Hipotecas diverge significantly from the factual scenario envisioned by the GMRA, and not only in its crucial provisions governing confirmations..  Section 3(c) of the GMRA states that "[o]n the Purchase Date for a Transaction, Seller shall transfer the Purchased Securities to Buyer or its agent against the payment of the Purchase Price by Buyer."  Likewise, Section 6(c) provides that "each Transaction transfer of Purchased Securities by Seller and payment of Purchase Price by Buyer against the transfer of such Purchased Securities shall be made simultaneously".  Provisions such show that the GMRA was intended to address situations such as those of Doral

27

and the other claimants, where an arms-length seller owns the securities before

entering the transaction and are exchanged for cash.   Section 9(g)(i) of the GMRA

provides that one party "is not relying on any advice (whether written or oral) of"

the other.  Here, LBI not only suggested that the Villamizar family enter into

repurchase agreements, but LBI suggested certain bonds, and passed along its in-

house ratings ("buy", etc.).  (Villazimar ¶¶11-12, Barreto Decl. ¶¶11-12)

## XI.    The Trustee Failed to Identify any Legal Standard by which the Motion should be Adjudicated

In his motion, the Trustee provides the Court with no legal standard, no

citation to any Federal Rule of Civil or Bankruptcy Procedure, and no guidance as

to how the motion should be evaluated.  Hipotecas suggests that even under the

standard most favorable to the Trustee, such as Federal Rule of Bankruptcy

Procedure 7056, which would normally apply only after a full factual record had

been developed, and by incorporation Federal Rule of Civil Procedure 56, that this

Court should grant Hipotecas customer status, or the motion should be denied to

allow Hipotecas to take discovery pursuant to Federal Rule of Civil Procedure 56(f).

## XII.    Customer Claims arising from Repurchase Agreements are Inherently Fact-Dependent

Repurchase claims are necessarily fact-dependent.  On their appeal to the

District Court, the three hand-selected claimants moved to have their appeal heard

directly by the Second Circuit.  Judge Cote ruled in the Trustee (and SIPC's) favor,

declaring that:  "the questions of whether the repurchase arrangement entered into

under the Agreements fits the definition of 'customer' status … and whether the

Banks' 'entrusted' securities to LBI such that customer status applies, are inquiries

28

heavily dependent on the particular facts of this case … and are thus inappropriate

for direct appeal." (quotes and cites omitted)(Order, dated September 18, 2013,

p.12)(Hoffman Decl. Ex. 19).  For its part, the Second Circuit avoided the Trustee's

suggested "test case" nomenclature entirely, and clearly, and properly, only ruled

upon the dispute before it, ruling that "[Doral] is not a customer for purposes of

SIPA".  (Second Circuit, p. 31)  Doral was permitted to develop a sufficient factual

record to fill an 18 volume appendix on its appeal.

### XIII.   This Court should reject the Trustee's Characterization of the Previous Litigation as "Test Cases"

All three Trustee-selected parties litigated before this Court and the District

Court, but only the Doral claim was litigated before the Second Circuit.  The

Trustee inappropriately refers to this previous litigation as "Test Cases", but this

designation is only a self-serving pronouncement of the Trustee.  As noted in the

attached declaration of the undersigned, Hipotecas has consistently objected to the

characterization of these claims as "test cases" or "representative", as the three

litigated claims have little or nothing in common with Hipotecas claims.  Indeed, it

appears the Trustee selected those claimants because their claims highlighted

aspects of repos that emphasized their loan-like qualities, their arms-length nature,

and the institutional character of the counterparties.  Hipotecas claim arises from a

very different factual environment that leads to the opposite outcome or at the

minimum should permit Hipotecas appropriate discovery before resolution of its

claim.

The Trustee is asking this Court to take an extreme action – to deny Hipotecas customer status without affording it the opportunity to take discovery. The Trustee's preferred "test case" method of litigating this case –imposing the result of the previous failed claimants on Hipotecas- violates Hipotecas' due process rights.   See, e.g., <u>In re First Interregional Equity Corp.</u>, 227 B.R. 358, 370 (Bankr. D.N.J. 1998)(in SIPA case, a "test case" procedure "raises possible due process concerns as well as leaving uncertain the stare decisis effect of such decisions…"). Hipotecas should have the opportunity to fully litigate its claim separately, as Judge Peck assured Hipotecas that it could do so on January 25, 2012.  Instead, the Trustee has stonewalled Hipotecas.  Although the Trustee has provided limited documentation –selected by the Trustee, not in response to any discovery request, as shown below, Hipotecas' not only differs in economic substance from the previous cases, but also its account documentation (statements, confirmations, etc.) differs significantly in both format and content from that of the previous claimants.  In effect, Hipotecas is being forced to litigate on the facts of the previous cases, for example, as set forth in the declarations of the Trustees witnesses, Leonard Legotte, William Burke, Joseph De Stephan, and Daniel McIsaac, without the opportunity to depose those witnesses.

Moreover, the Trustee's decision to proceed with this motion – without consulting or informing Hipotecas - and appropriate for himself the right to reply compromises the rights of Hipotecas.  It is undisputed that the claimant bears the burden of proof of customer status.  <u>Schultz v. Omni Mut., Inc.</u>, 1993 U.S. Dist.

30

LEXIS 18464, *5 (S.D.N.Y. 1993)("…the burden of proof regarding "customer status" ultimately rests with the claimant…").  In doing so, the Trustee will have the benefit of a reply, usurping Hipotecas right to have the last word where it has the burden of proof.  <u>Sandata Techs., Inc. v. Infocrossing, Inc.</u>, 2007 U.S. Dist. LEXIS 85176, *26 (S.D.N.Y. 2007)(party sought "to gain unfair advantage by…. having the last word when [the opposing party] did not have the same with respect to the issues on which it bears the burden of proof.")

<u>CONCLUSION</u>

The Court should either grant Hipotecas customer status for its claims or permit it to develop a proper factual record upon which this Court can decide the issue.

Dated:        New York, New York
              August 12, 2015

                              /s/_____
                              David J. Hoffman
                              Attorney at Law
                              One Whitehall Street
                              Suite 1825
                              New York, New York 10004
                              Tel: 917-701-3117
                              Email: djhoffman@djhoffmanlaw.com