<u>**FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (SCC) |
| Debtor. | |

**POST-TRIAL MEMORANDUM DECISION**
**GRANTING IN PART AND DENYING IN PART TRUSTEE'S AMENDED OBJECTION**
**TO THE GENERAL CREDITOR PROOFS OF CLAIM FILED BY**
<u>**CERTAIN FORMER EMPLOYEES OF LEHMAN BROTHERS INC.**</u>

A P P E A R A N C E S :

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
By:    James B. Kobak, Jr., Esq.
       Savvas A. Foukas, Esq.
       Samuel C. McCoubrey, Esq.
       Gregory C. Farrell, Esq.
       Karen M. Chau, Esq.

*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By:    Douglas P. Baumstein, Esq.
       Andrew C. Ambruoso, Esq.
       Spencer Willig, Esq.

THE LAW OFFICES OF THOMAS M. MULLANEY
489 Fifth Avenue, Suite 1900
New York, NY 10017
By:    Thomas M. Mullaney, Esq.

*Attorneys for 1EE LLC*

REID RODRIGUEZ & ROUSE, LLP
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
By:    Gregory L. Reid, Esq.

*Attorneys for Wayne Judkins*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    David J. Mark, Esq.
       Ross G. Shank, Esq.

*Attorneys for Richard Hajdukiewicz*

THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, NY 10022
By:    Jennifer A. Christian, Esq.
       Robert L. Paddock, Esq.

*Attorneys for J. Robert Chambers*

## TABLE OF CONTENTS

PROCEDURAL HISTORY ..................................................................................................3

LEGAL STANDARD .........................................................................................................6

FINDINGS OF FACT .........................................................................................................6

   I.   Background ..............................................................................................................6

     A.  The Asset Sale to Barclays Pursuant to the APA ...............................................6

     B.  Barclays Makes Bonus and Severance Payments to Former LBI Employees
         Pursuant to the APA............................................................................................9

     C.  Lehman's 2008 Equity Award Program ...........................................................12

  II.   The Claimants .......................................................................................................14

     A.  Claimant Jonathan Hoffman ............................................................................14

          1.  Mr. Hoffman's LBI Employment Agreements for 2007 and 2008 ...................15

          2.  The Calculation of Mr. Hoffman's 2008 Bonus .................................................17

          3.  Mr. Hoffman Negotiates the Terms of his Employment with Barclays .............20

          4.  Mr. Hoffman Secretly Records his Conversations with
              Messrs. Ricci, Keegan, Bommensath, and Gelband ..........................................23

          5.  Mr. Hoffman Commences Employment with Barclays
              and is Paid $83 Million ......................................................................................27

     B.  Claimant J. Robert Chambers ...........................................................................30

          1.  Mr. Chambers' 2007 Employment Agreement and 2007 Bonus.......................30

          2.  Mr. Chambers' 2008 Employment Agreement.................................................31

          3.  Mr. Chambers' 2008 Bonus ..............................................................................34

          4.  Mr. Chambers Accepts Employment with Barclays, is Terminated,
              and is Paid a $1 Million Lump-Sum Payment ...................................................36

     C.  Claimant Wayne Judkins ..................................................................................37

1. Mr. Judkins' 2008 Employment Agreement with LBI .......................................38

2. Barclays Paid Mr. Judkins the $800,000 he was Owed Under his 2008 Employment Agreement with LBI.....................................................................39

3. Mr. Judkins Did Not Incur Relocation Expenses in Connection with Selling his Home in Maryland ........................................................................40

4. Mr. Judkins' Home Equity Loan from Prudential ...............................................41

D. Claimant Richard Hajdukiewicz ...........................................................................42

1. LBI Does Not Exercise its Discretion to Pay a Portion of Mr. Hajdukiewicz's 2007 Bonus in the Form of Conditional Equity Awards ....................................43

2. Mr. Hajdukiewicz Participates in the July RSU Grant ........................................43

3. Mr. Hajdukiewicz Joins Barclays, is Terminated, Receives a Lump-Sum Payment, and Executes a Release .......................................................................44

III.   The Claims ..................................................................................................................46

IV.   The Trustee's Objections to the Claims .....................................................................47

DISCUSSION .......................................................................................................................48

A. LBI Delegated its Responsibility to Pay 2008 Bonuses to "Transferred Employees" ....................................................................................48

B. The Hoffman Claim ...............................................................................................52

1. Guaranteed Bonus Amount of $7,712,500 for LBI's Fiscal Year 2007 ...........53

2. Guaranteed Bonus Amount of $76,285,940 for LBI's Fiscal Year 2008 ........54

   i. LBI Delegated its Obligation to Pay Mr. Hoffman's 2008 Bonus to Barclays......................................................................................................54

   ii. Barclays Satisfied LBI's Obligation to Pay Mr. Hoffman's 2008 Bonus ................................................................................56

      a. The Trustee is Not Estopped......................................................................57

       b.   The Evidence Establishes that Barclays Paid Mr. Hoffman the Additional $83 Million with the Intent of Satisfying LBI's 2007 and 2008 Bonus Obligations to Mr. Hoffman ...............61

C.   The Chambers Claim .................................................64

   1.   Guaranteed Bonus Amount of $1,647,051 for LBI's Fiscal Year 2007 ..........65

      i.   LBI Did Not Exercise its Discretion to Pay a Portion of Mr. Chambers' 2008 Total Compensation in RSUs ...................................66

   2.   Guaranteed Bonus Amount of $42,386,172.99 for LBI's Fiscal Year 2008 ...............................................................71

      i.   The Calculation of Mr. Chambers' 2008 Bonus ..................................72

      ii.   Barclays Paid $1 Million of Mr. Chambers' 2008 Bonus on Behalf of LBI ...............................................................74

   3.   Salary and Bonus Claims of $20,400,000 for 2009 and 2010 ........................75

D.   The Judkins Claim ...............................................................76

   1.   Guaranteed Bonus Amount of $800,000 for LBI's Fiscal Year 2008 .............76

   2.   Discretionary Bonus for LBI's Fiscal Year 2008 .............................................78

   3.   Relocation Expenses .......................................................79

   4.   Prudential Home Equity Loan .......................................................80

E.   The Hajdukiewicz Claim .................................................80

      i.   Mr. Hajdukiewicz Did Not Release his Claim....................................81

      ii.   Mr. Hajdukiewicz was Paid $183,840 of his 2008 Bonus in the Form of RSUs in July 2008 .......................................................84

      iii.   Barclays Paid $422,000 of Mr. Hajdukiewicz's 2008 Bonus on Behalf of LBI .............................................................85

CONCLUSION.....................................................................87

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

In the early morning hours of September 20, 2008, five days after Lehman Brothers filed

for chapter 11 protection, Lehman's sale of the bulk of its North American operations to

Barclays Capital gained court approval.  As was widely recognized at the time, the most

compelling human dimension of the sale was the commitment by Barclays to employ thousands

of former Lehman employees.  In some cases these so-called "transferred employees" went on to

have substantial and lucrative tenures at Barclays.  For others, there was not a long-term

opportunity in the Barclays organization, and they were let go.

A key component of Barclays' obligations to these transferred employees was the

payment of bonus compensation on account of their prior employment by Lehman.  In this

contested matter, the Court must decide whether four former Lehman employees are entitled to

receive payment from the Lehman Brothers estate on account of their claims for bonuses, even

though they received substantial sums from Barclays.  The Trustee maintains that they are

seeking to be paid twice and their claims must be disallowed to the extent of the sums they

received from Barclays; the claimants disagree, insisting they seek no more than what they

earned and are owed.

More specifically, before the Court is the amended objection (the "Objection") of James

W. Giddens (the "Trustee"), as trustee for the liquidation of Lehman Brothers Inc. ("LBI") under

the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA")

seeking entry of an order, pursuant to section 502(b) of title 11 of the United States Code (the

"Bankruptcy Code"), as made applicable to this proceeding pursuant to sections 78fff(b) and

78fff-1(a) of SIPA, to disallow and expunge (i) the general creditor claim represented by number

4856, filed by 1EE LLC, as assignee of Jonathan Hoffman[1] (the "Hoffman Claim"); (ii) the

general creditor claim represented by number 4470, filed by Wayne Judkins (the "Judkins

Claim"); (iii) the general creditor claim represented by number 4725, filed by Richard

Hajdukiewicz (the "Hajdukiewicz Claim"); and (iv) the general creditor claim represented by

number 6107, filed by J. Robert Chambers (the "Chambers Claim" and, collectively with the

Hoffman Claim, the Judkins Claim, and the Hajdukiewicz Claim, the "Claims") [ECF No.

10685].

Prior to the initiation of this proceeding on September 19, 2008 (the "Filing Date"), each

of Messrs. Hoffman, Judkins, Hajdukiewicz, and Chambers (collectively, the "Claimants") was

employed at LBI.  Following the Filing Date, each of the Claimants accepted employment with

Barclays Capital Inc. ("Barclays").  During their employment at LBI, each of the Claimants

worked pursuant to a written employment agreement that called for various forms of

compensation, including non-discretionary bonuses.  The entirety of the Hoffman Claim and the

Hajdukiewicz Claim and the majority of the Judkins Claim and the Chambers Claim are for non-

discretionary bonuses in respect of LBI's fiscal years 2007 and/or 2008.  The bonuses were owed

in accordance with the terms of the Claimants' respective written employment agreements with

LBI and were not paid by LBI.  In addition to claims for non-discretionary bonuses in respect of

LBI's fiscal years 2007 and/or 2008, each of the Judkins Claim and the Chambers Claim

includes claims for other amounts purportedly due under their respective employment

agreements.

The Objection seeks the disallowance or reduction of each of the Claims.  First, with

respect to LBI's obligation to pay non-discretionary bonuses to each of the Claimants, the

Trustee contends that such obligation was satisfied, either in full or in part, by Barclays.  The

---

[1] *See* n. 45, *infra*.

Trustee further contends that, to the extent a Claimant's claim for a non-discretionary bonus was not satisfied in full by Barclays, a portion of such bonus was to be paid in LBHI restricted stock units ("RSUs"). Accordingly, the Trustee contends that each of the Claimants' claims for a non-discretionary bonus must be (i) reduced to the extent such claim has already been satisfied by Barclays and (ii) subordinated, pursuant to section 510(b) of the Bankruptcy Code, to the extent such bonus was to be paid in RSUs and was not already paid by Barclays. The Trustee further asserts that the additional amounts included in the Judkins Claim and the Chambers Claim are meritless. Finally, the Trustee argues that to the extent the Hajdukiewicz Claim (i) was not satisfied by Barclays and (ii) is not subject to subordination under section 510(b), Mr. Hajdukiewicz waived such claim against LBI pursuant to his severance agreement with Barclays.

For the reasons that follow, and as further detailed below, the Objection is granted in part and denied in part.

## **PROCEDURAL HISTORY**

On May 30, 2014, the Trustee filed his Two Hundred Thirty-Seventh Omnibus Objection to General Creditor Claims (the "Two Hundred Thirty-Seventh Omnibus Objection") seeking to disallow and expunge the claims identified on Exhibit A of the Two Hundred Thirty-Seventh Omnibus Objection in their entirety, including the Hoffman Claim and the Judkins Claim [ECF No. 9013]. On June 18, 2014, Mr. Judkins filed his response in opposition to the Two Hundred Thirty-Seventh Omnibus Objection [ECF No. 9185]. On August 22, 2014, 1EE LLC filed its response in opposition to the Two Hundred Thirty-Seventh Omnibus Objection with respect to the Hoffman Claim [ECF No. 9694].

On October 7, 2014, the Trustee filed his Two Hundred Sixty-Seventh Omnibus Objection to General Creditor Claims (the "Two Hundred Sixty-Seventh Omnibus Objection")

seeking to, among other things, disallow and expunge the claims identified on Exhibit A of the

Two Hundred Sixty-Seventh Omnibus Objection in their entirety, including the Hajdukiewicz

Claim [ECF No. 10097].  On October 27, 2014, Mr. Hajdukiewicz filed his response in

opposition to the Two Hundred Sixty-Seventh Omnibus Objection with respect to the

Hajdukiewicz Claim [ECF No. 10252].

On October 17, 2014, the Trustee filed his objection to the Chambers Claim (the

"Chambers Objection") [ECF No. 10194].  On November 13, 2014, Mr. Chambers filed his

response in opposition to the Chambers Objection [ECF No. 10435].

The Court held two status conferences, on November 7, 2014 and on December 10, 2014

(the "December 10 Status Conference"), with respect to the Trustee's objections to twenty-three

unresolved claims filed by former LBI employees, including the Claims, that the Trustee asserts

are similarly situated.  Prior to the December 10 Status Conference, the Trustee sent a letter to

the Court [ECF No. 10637] suggesting that the twenty-three pending employee claims would be

most efficiently resolved by litigating the Claims "in a coordinated fashion as test cases."  The

Trustee's letter attached a proposed scheduling order for a merits hearing on each of the Claims.

On December 30, 2014, the Court entered the Scheduling Order Regarding the Trustee's

Objection to Claim Nos. 4725, 4856, 4470, and 6107 [ECF No. 10780].  On March 18, 2015, the

Court entered the Second Scheduling Order Regarding the Trustee's Objection to Claim Nos.

4725, 4856, 4470, and 6107 [ECF No. 11513] further establishing a pre-trial schedule.

The Trustee filed the Objection on December 17, 2014 and each of the Claimants filed responses by January 23, 2015.[2] Following discovery, the Trustee and the Claimants submitted pre-hearing briefs on April 10, 2015.[3]

The Court conducted an evidentiary hearing on the Claims on April 22, 23, and 24, 2015 (the "Merits Hearing"). The Court heard live testimony from each of the four Claimants and from (i) Mr. Mark Kurman, a Barclays Managing Director who was employed as Barclays Director of Employee Relations for the Americas during the relevant time frame of September and October 2008; (ii) Mr. Michael Keegan, Barclays' Chief Operating Officer for the Americas, who was employed as the Head of Principal Credit Trading at Barclays during the relevant time frame of September and October 2008; and (iii) Mr. Kaushik Amin, LBI's Global Head of Liquid Markets during the relevant time frame of September and October 2008 and Mr. Hoffman's supervisor at LBI prior to the Filing Date. Each of the Trustee and the Claimants introduced voluminous exhibits during the Merits Hearing. In addition, the Trustee and Mr. Hoffman played audio recordings of conversations and meetings between Mr. Hoffman and various parties during September 2008 that Mr. Hoffman secretly taped.

Following the Merits Hearing, the Trustee and the Claimants each submitted post-trial proposed findings of fact[4] and conclusions of law[5] and replies to the post-trial proposed findings

---

[2] ECF Nos. 11130 (Mr. Hoffman), 11186 (Mr. Judkins), 11092 (Mr. Hajdukiewicz), 11093 (Mr. Chambers). 1EE LLC/Mr. Hoffman was granted an extension of time, from January 21, 2015 to January 23, 2015, to file its response by the So Ordered Stipulation Extending 1EE's Time to File Response to Trustee's Amended Objection, dated January 21, 2015 [ECF No. 11091].

[3] ECF Nos. 11759 (Mr. Judkins), 11762 (the Trustee), 11771 (Mr. Hoffman), 11764 (Mr. Hajdukiewicz), 11766 (Mr. Chambers).

[4] ECF Nos. 12246 (the Trustee), 12247 (Mr. Hoffman), 12249 (Mr. Judkins), 12250 (Mr. Hajdukiewicz), 12252 (Mr. Chambers) (the "Chambers Post-Trial Br.").

[5] ECF Nos. 12245 (the Trustee) (the "Trustee Post-Trial Br."), 12248 (Mr. Hoffman) (the "Hoffman Post-Trial Br."), 12249 (Mr. Judkins) (the "Judkins Post-Trial Br."), 12251 (Mr. Hajdukiewicz) (the "Hajdukiewicz Post-Trial Br."), 12252 (Chambers Post-Trial Br.).

of fact and conclusions of law.[6]  The Court heard closing arguments from the Trustee and the

Claimants on July 21, 2015.

## LEGAL STANDARD

A properly-filed proof of claim comprises "prima facie evidence of the validity and

amount of the claim,"  Fed. R. Bankr. P. 3001(f), and is "deemed allowed, unless a party in

interest . . . objects,"  11 U.S.C. § 502(a).  An objecting party "bears the initial burden of

production and must provide evidence showing the claim is legally insufficient" under section

502 of the Bankruptcy Code.  *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014)

(citation omitted).  Once the objecting party has met its initial burden, it is up to the claimant to

"prove by a preponderance of the evidence that under applicable law the claim should be

allowed."  *Id.* (citation omitted).

## FINDINGS OF FACT[7]

## I.    BACKGROUND

### A.    The Asset Sale to Barclays Pursuant to the APA

1.    On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI"), the holding

company for the group of entities organized to form Lehman Brothers, then the United States'

fourth-largest investment bank (such entities and LBHI, collectively, "Lehman"), filed for

bankruptcy.  On September 19, 2008, the District Court for the Southern District of New York

---

[6] ECF Nos. 12460 (Mr. Judkins) (the "Judkins Post-Trial Reply Br."), 12461 (the Trustee) (the "Trustee Post-Trial Reply Br."), 12462 (Mr. Hajdukiewicz) (the "Hajdukiewicz Post-Trial Reply Br."), 12473 (Mr. Hoffman), 12476 (Mr. Chambers) (the "Chambers Post-Trial Reply Br.").

[7] Having considered the voluminous evidence, testimonial and documentary, including all exhibits admitted into evidence, as well as the parties' post-trial proposed findings of fact and briefs, and mindful that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)), and having conducted an independent analysis of the law and the facts, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

commenced this proceeding against LBI, Lehman's broker-dealer and a wholly-owned

subsidiary of LBHI and referred the proceeding to this Court.  The contracts of many Lehman

employees were between LBI and the employee, even if such employees were not engaged in the

operations of a broker-dealer or worked with a different Lehman entity altogether.  Accordingly,

LBHI's bankruptcy and the subsequent commencement of this proceeding against LBI threw the

professional futures and continued employment of thousands of Lehman employees, including

the Claimants, into uncertainty.[8]

2.        On September 16, 2008, LBHI, LBI, LB 745 LLC, and Barclays entered into an

asset purchase agreement (the "APA") pursuant to which Barclays agreed to purchase the

majority of the assets related to Lehman's North American capital markets and investment

banking businesses.[9]

3.        The APA addressed the uncertainty confronting Lehman employees by

incorporating Barclays' commitment to offer employment to each LBI employee who worked in

the acquired business and to make certain payments to employees who accepted Barclays'

offer.[10]  The LBI employees who accepted Barclays' offer of employment were defined in the

APA to be "Transferred Employees."[11]

4.        Specifically, the APA provided for Barclays to "pay each Transferred Employee

an annual bonus . . . in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount

to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive

---

[8] *In re Lehman Bros. Holdings Inc.* Case No. 08-13555, Sept. 19, 2008 Tr. 60:4-16 (LBHI ECF No. 318) ("Sale Hearing Tr.") [Miller] ("[The APA] affects directly the 25,000 employees whose futures became extremely clouded because of the events of last weekend . . . .  If it's not approved . . . . [t]he unemployment rolls for the metropolitan area will increase dramatically . . . .").

[9] *See* Trustee Ex. 1 (APA).

[10] Trustee Ex. 1 (APA), § 9.1.

[11] Each LBI employee "who accepts [Barclays'] offer of employment" was defined to be a "Transferred Employee." *Id.* § 9.1(a).

compensation (but not base salary)." [12] This was Barclays' undertaking to pay Transferred

Employees bonus amounts owed to them by LBI.

5.        The APA also provided that Barclays would pay severance to Transferred

Employees whom it terminated before December 31, 2008 "at levels that are no less favorable

than such levels as the Transferred Employee[s] would have been entitled to receive pursuant to

the provisions of [Lehman's] severance plans or agreements covering such Transferred

Employee[s] as in effect immediately prior to the Closing." [13]

6.        During the highly publicized hearing on approval of the sale (the "Sale Hearing"),

the parties and the Court highlighted these contractual commitments regarding LBI's former

employees.  As lead LBHI lawyer, the late Harvey Miller, emphasized, "the jobs of thousands of

employees would be saved and [the employees] will be entitled to substantial benefits from

Barclays in the form of compensation, bonuses and severance payments that are based upon the

employee's prior performance while with Lehman." [14]

7.        The Court did indeed approve the APA, finding that "[a]pproving the transaction

secures[,] whether for ninety days or for a lifelong career[,] employment for 9,000 employees at

Lehman, and holds together an operation the value of which is really embedded in the talent of

the employees, their knowledge, their relationship, their expertise and their ability to create value

to the economy." [15]

8.        As the Court later noted:

---

[12] *Id.*; see also Apr. 24 Tr. at 108:11-22 [Keegan] ("It was a liability we assumed from Lehman Brothers, it was a bonus pool. . . . [W]e had undertakings to pay that out to employees, based on that assumption . . . .").

[13] Trustee Ex. 1 (APA) § 9.1(b).

[14] Sale Hearing Tr. at 101:23-102:2; *see also id*. at 99:22-25 (Barclays was going to "assume exposure for the employees that accept offers of employment . . . an exposure of approximately two billion dollars.").

[15] *Id.* at 250:23-251:3.

Knowing that approval of the transaction would save a multitude of financial sector jobs probably was the most significant single factor influencing the Court's thinking when it considered the sale.    The transaction included offers of employment to most members of the Lehman work force that not only helped these individuals at a most difficult time on Wall Street, but also unquestionably was good for the estate, brokerage customers and the general economy.    A going concern sale to Barclays also was the one way to eliminate claims of employees for lost wages and benefits . . . .[16]

9.        Indeed, Judge Peck observed that he "viewed . . . the transaction as it was being developed in those early days of the bankruptcy case, as being to some extent[] employee-driven. . . .  And from the estate's perspective, I viewed it as avoided claims; claims that might otherwise have been asserted against the estate that were taken away by *Barclays' assumption of all of the obligations associated with the employees*."[17]

## B.        Barclays Makes Bonus and Severance Payments to Former LBI Employees Pursuant to the APA

10.        Following the approval of the APA, and pursuant to the APA, Barclays offered employment to LBI's employees.[18]  On September 20, 2008, Barclays executives Bob Diamond and Rich Ricci and former Lehman executive Bart McDade sent an email to former LBI employees informing them that they would "soon receive an offer to join Barclays Capital."[19] The email informed former LBI employees that those who did not "receive a role" at Barclays going forward would be provided "severance support, as well as bonus consideration for their

---

[16] *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 154 (Bankr. S.D.N.Y. 2011) (emphasis added).

[17] *In re Lehman Bros. Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP) (Bankr. S.D.N.Y.), Sept. 7, 2011 Tr. at 10:24-11:8, [ECF No. 26].

[18] Apr. 24 Tr. at 16:16-17 [Kurman] ("Virtually everyone from Lehman in the U.S. was offered the opportunity to initially join Barclays.").

[19] Trustee Ex. 54 (September 20, 2008 email from "Dear Colleague" re: Message from Bob Diamond, Rich Ricci and Bart McDade).

contributions in 2008."[20]  The email also stated Barclays' intention to form a bonus pool to pay

2008 bonus compensation to former LBI employees.[21]

11.      Thereafter, on September 22, 2008, Michael Evans, Global Head of Human

Resources for Barclays, sent by email an employment offer to former LBI employees.[22]  The

email stated that "[i]n the next week or so, you will receive additional details concerning your

employment if . . . any special arrangements apply to your situation."[23]

12.      For those former LBI employees whom Barclays hired but then terminated in the

months after the transaction closed, Barclays paid severance based upon Lehman's severance

plan, under which the amount of severance depended on the employee's years of service and

corporate title.[24]  As Mark Kurman, Barclays' Manager of Employee Relations for the Americas,

testified, Barclays gave the former LBI employees credit for the length of time that the

employees worked for LBI in calculating severance.[25]

13.      In addition to severance, Barclays also paid special lump sum payments in lieu of

a 2008 bonus to certain former LBI employees.[26]  As Mr. Kurman testified, Barclays did not

typically make such payments to terminated employees, but made these "enhancement[s] in lieu

---

[20] *Id.*

[21] *Id.* ("We also want to provide clarity around the 2008 year-end compensation process.  It is our intention to create a discretionary bonus pool for those employees joining Barclays Capital.").

[22] Trustee Ex. 55 (September 22, 2008 email from "Barclays Capital Employment Offer" re: Your Employment Offer).

[23] *Id.*

[24] Apr. 24 Tr. at 19:9-22:19 [Kurman] (Barclays paid severance to the former LBI employees that it terminated based on Lehman's severance plan).

[25] *Id.* at 22:15-19 [Kurman] (Q:  "In calculating the amount of severance that was paid to the former Lehman employees who were terminated, before the end of 2008, did Barclays apply these guidelines?"  A:  "Yes, we did."), 23:24-24:3 [Kurman] (Q:  "For those former Lehman employees terminated after December 31, 2008, did Barclays consider their time spent working at Lehman Brothers, for purposes of calculating their severance?"  A:  "Yes, their length of service, yes.").

[26] *Id.* at 24:4-10 [Kurman] (Aside from the severance payments, Barclays also offered an enhanced payment "in lieu of bonus" to the terminated former LBI employees.).

of bonus" to former LBI employees "to provide some recognition for their contributions at Lehman, prior to joining Barclays."[27]  Barclays calculated the amount of each terminated Transferred Employee's enhanced payment in lieu of bonus pursuant to a formula based upon the employee's LBI bonus and title at LBI.[28]  Former LBI employees who were Managing Directors at LBI received twenty percent of the amount of their 2007 bonus.[29]  For those below the title of Managing Director, Barclays paid them ten percent of the amount of their 2007 bonus.[30]  Barclays applied a $1 million cap as the maximum amount of enhanced payment in lieu of bonus a terminated Transferred Employee could receive.[31]

14.     Further, consistent with Lehman's longstanding policy, Barclays required the former LBI employees to sign a waiver in order to receive payments in connection with their termination.[32]

### C.     Lehman's 2008 Equity Award Program

15.     In years prior to the bankruptcy, Lehman utilized and disseminated an employee handbook which provided, among other things, that "[a]t the Firm's option, a portion of [an employee's] total compensation (combined base salary, bonus and other compensation) may be

---

[27] *Id.* at 24:4-25:17 [Kurman].

[28] *Id.* at 24:18-25:1 [Kurman].

[29] *Id.* at 24:20-22 [Kurman] (There "was a 20 percent calculation, based on prior year's bonus for managing directors.").

[30] Apr. 24 Tr. at 24:22-24 [Kurman] ("There was a ten percent calculation based on prior year's bonus at Lehman for people below the title of managing director.").

[31] *Id.* at 24:24-25:1 [Kurman] ("[T]here was a cap of a million dollars on whatever the number produced by the percentage was, regardless what the comp was.").

[32] Trustee Ex. 3 (Lehman Brothers Employment Handbook) at LBI_BONUS_CLAIMS_0000412 (In order to receive severance or any other separation payments, "an employee must sign a separation agreement . . . that includes a waiver of any claims the employee may have against [LBI]."); Apr. 24 Tr. at 22:20-23:8 [Kurman] (Q: "When Barclays terminated the former Lehman employees, did it require them to sign a waiver in order to receive severance pay?"  A:  "Yes.").

payable in the form of equity, including restricted stock units or options, pursuant to the Firm's stock award program."[33]

16.     Lehman's stock award program was referred to as the Equity Award Program and was governed by LBHI's 2005 Stock Incentive Plan, as amended on November 8, 2007, and the accompanying prospectus (together, the "Plan Documents").[34]

17.     The Equity Award Program was overseen and administered by the Compensation and Benefits Committee of LBHI's Board of Directors (the "LBHI Compensation Committee").[35]

18.     In its July 1, 2008 meeting, the LBHI Compensation Committee determined to issue RSUs to certain Lehman employees that "would operate like an advance on the 2008 year-end award" (the "July RSU Grant").[36]  Accordingly, a grant date of July 1, 2008 was established and RSUs were priced at $20.96, the closing price of LBHI stock on July 1, 2008.[37]  Also on July 1, 2008, the LBHI Compensation Committee resolved that the number of RSUs to be granted pursuant to the 2008 Equity Award Program would be determined in accordance with the schedule attached to the minutes as Exhibit 1 (the "RSU Schedule").[38] Lehman employees earning 2008 total compensation of $2,500,000 or more could receive up to 65% of their 2008 total compensation in the form of RSUs.[39]

---

[33] *See* Trustee Ex. 3 (Lehman Brothers Employment Handbook).

[34] *See* Chambers Ex. 13 (Prospectus for Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan); Chambers Ex. 14 (Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended November 8, 2007).

[35] Chambers Ex. 14 (Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended November 8, 2007) at ¶¶ 2(i), 4.

[36] Chambers Ex. 15 (2008 LBHI Compensation Committee Minutes) July 1, 2008 Minutes at 2.

[37] *See* Trustee Ex. 58 (Personnel file of Mr. Hajdukiewicz); Trustee Ex. 69 (Personnel file of Mr. Judkins).  Both exhibits report a grant price of $20.96 in respect of the July RSU Grant.

[38] Chambers Ex. 15 (LBHI Compensation Committee Meeting Minutes) July 1, 2008 Minutes at 3.

[39] Chambers Ex. 15 (LBHI Compensation Committee Meeting Minutes) July 1, 2008 Minutes at 3.

19.    The LBHI Compensation Committee made clear that neither the July RSU Grant nor the RSU Schedule were to confer on any employee rights or entitlements to a grant of RSUs at the end of Lehman's 2008 fiscal year:

> RESOLVED, that nothing in the foregoing resolutions is intended to, and shall not, confer upon any employee any right to any discretionary bonus with respect to [LBHI]'s fiscal year ending November 30, 2008 or any grant of any equity award apart from the July RSUs; it being understood that the sole purpose of the foregoing resolution determining the [RSU Schedule] is to permit the communication of the overall deferral levels of the 2008 Equity Award Program as is currently being anticipated at the present time to [Lehman]'s employees without conferring any binding right or entitlement related thereto . . . . [40]

20.    The LBHI Compensation Committee's resolutions were summarized in the 2008 Equity Award Program Summary of Select Material Terms for Bonus-Eligible Employees (on or after July 1, 2008) (the "2008 Equity Award Program Summary").[41] The 2008 Equity Award Program Summary was distributed to certain Lehman employees, including the Claimants.  The 2008 Equity Award Program Summary also provided (i) a disclaimer on the front cover that it was intended for informational purposes only; (ii) that the terms and conditions of the 2008 Equity Award Program, once finalized, would be subject to the Plan Documents; and (iii) that, in the event of conflict between the Plan Documents and the 2008 Equity Award Program Summary, the Plan Documents would control.[42]

21.    In its September 3, 2008 meeting, the LBHI Compensation Committee amended the RSU Schedule and reduced the maximum percentage of an employee's total compensation that could be paid in RSUs from 65% of 2008 total compensation, as set forth in the July 1, 2008

---

[40] Chambers Ex. 15 (LBHI Compensation Committee Meeting Minutes) July 1, 2008 Minutes at 3.

[41] Chambers Ex. 4 (2008 Equity Award Program Summary).

[42] *See* Chambers Ex. 4 (2008 Equity Award Program Summary) at 1.

13

RSU Schedule, to 50% of 2008 total compensation.[43]  The September 3, 2008 minutes included

the same resolution quoted in paragraph 19, *supra*, making clear that the RSU Schedule was not

to confer on Lehman employees any rights or entitlement to a year-end grant of RSUs.

22.     The LBHI Compensation Committee never determined a "Year-end Grant Date,"

as defined in the 2008 Equity Award Program documents, for 2008 or any subsequent year.[44]

## II.     THE CLAIMANTS

### A.     Claimant Jonathan Hoffman

23.     1EE LLC ("1EE") is an entity formed by Mr. Jonathan Hoffman for the purpose

of asserting the Hoffman Claim.[45]  1EE shall be referred to herein as "Mr. Hoffman."

24.     Mr. Hoffman was a proprietary trader at LBI and held the title of Managing

Director.[46]  Mr. Hoffman had worked at LBI since 1994 and had worked since at least 2001

pursuant to a series of annual employment agreements.[47]

25.     By all accounts, Mr. Hoffman was a gifted trader who generated billions of

dollars in profits for Lehman over the course of his employment by, as he describes it, trading

"interest rate products, mainly government bonds from, broadly speaking, developed

countries."[48]

---

[43] Chambers Ex. 15 (LBHI Compensation Committee Meeting Minutes) September 3, 2008 Minutes at 2.

[44] *See* Kiplok Dep. Tr. 96:5-11 ("Q: But the trustee has no information whatsoever based on Lehman's books and records that there was ever a grant date established, is that right?  A:  When, for 2008?  Q: For 2008.  A: That's correct.").

[45] Hoffman Dep. Tr. at 25:20-26:5 (Q: "This was an LLC that you formed for the purpose of holding the bankruptcy claim, right?" A: "Yes.").  Mr. Hoffman testified that he assigned his claim to 1EE to make it harder to "Google" him and find out that he had filed his claim.  *See* Apr. 23 Tr. at 211:8-12 [Hoffman] (Q: "But you didn't want people to Google you and find out that you had filed this claim, right."  A: "If it made it that much harder to Google me, then so be it.").

[46] Apr. 23 Tr. at 14:11-20, 23:18-21 [Hoffman].

[47] Apr. 23 Tr. at 13:18-14:7, 16:11-16 [Hoffman].

[48] Apr. 23 Tr. at 14:11-20 [Hoffman].

26.     Mr. Hoffman's trading performance was buoyed by the dislocated and volatile markets of 2007 and 2008.  As Mr. Hoffman described it, "they were challenging markets to trade and make sense of, so if you knew what to do, it could be very lucrative."[49]  Asked if he had the experience to know what to do, Mr. Hoffman answered, "I did."[50]

### 1.     Mr. Hoffman's LBI Employment Agreements for 2007 and 2008

27.     Mr. Hoffman was highly compensated by LBI.  For the years 2007 and 2008, Mr. Hoffman had employment agreements with LBI that provided him with a $200,000 annual salary and an annual bonus based on his trading performance.[51]  Pursuant to these agreements, Mr. Hoffman's bonus would be equal to twelve percent of the first $25 million in "net profit" (as defined in the agreement) he generated and fourteen percent of net profit above $25 million, less his salary.[52]

28.     As was the case in prior years, Mr. Hoffman's 2008 employment agreement provided that part of his total compensation for 2008 could, at LBI's discretion, be paid in conditional equity awards.[53]  Pursuant to schedules attached to his 2008 employment agreement with LBI, Mr. Hoffman agreed that up to fifty percent of his 2008 total compensation could, at LBI's discretion, be payable in the form of equity awards.[54]

---

[49] Apr. 23 Tr. at 28:5-10 [Hoffman].

[50] Apr. 23 Tr. at 28:11-13 [Hoffman].

[51] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 1; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 1.

[52] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 5; Trustee's Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 5.

[53] Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 1-2 ("At [LBI's] discretion, a portion of your total compensation for the Performance Year (including the full Performance Bonus) will be payable in conditional equity awards (Restricted Stock Units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program or other Firm-sponsored programs that may be established by the Firm from time to time and as then generally in effect for employees at your level."); Apr. 23 Tr. at 155:10-13 [Hoffman] (Q:  "And every year you were at the firm, there was equity, right?"  A:  "The prior years I'd been in the firm, there was always equity.").

[54] Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 7 (Schedule attached to Mr. Hoffman's 2008 employment agreement providing – given Mr. Hoffman's corporate title and the amount of his 2008 total compensation – for 50

29.      Mr. Hoffman's bonus for 2007 and for 2008 was to be paid in two installments, with the second installment serving as a so-called "clawback" that could be withheld if he lost money for LBI in the subsequent year.[55]  The first installment of Mr. Hoffman's performance bonus was equal to 75 percent of his total performance bonus, including all the conditional equity awards, less his salary of $200,000.[56]  The first installment would be paid when LBI paid its bonuses for the fiscal year in which the bonus was earned.[57]  For example, the first installment of Mr. Hoffman's 2007 bonus was paid in early 2008 when LBI paid 2007 performance bonuses.[58]

30.      The second installment of Mr. Hoffman's performance bonus consisted of the remaining cash portion of Mr. Hoffman's bonus.[59]  The second installment would be paid when LBI paid its bonuses for the subsequent fiscal year.[60]  Thus, the second installment of Mr.

---

percent of Mr. Hoffman's 2008 total compensation to be payable, at the discretion of LBI, in the form of conditional equity awards).

[55] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 1-2; Trustee's Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 1-2; Apr. 23 Tr. at 154:12-23 [Hoffman] (Q: "And the second installment was a clawback, right?" A: "Yes." Q: "And, by that, that means that the installment wasn't paid until the following year and could be lost depending on your trading performance in that year, right?" A: "If I was employed trading, yes." Q: "Right, you couldn't make 100 million one year, lose 100 million the second year, and walk away with the first year's performance bonus whole, right?" A: "That's right.").

[56] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2; Trustee's Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2; Apr. 23 Tr. at 154:24-155:9 [Hoffman] (Q: "And I think, as we talked about before, you talked about it on direct, the way the installments worked for someone at your compensation level, under your contract, was that all of your equity would be paid in the first installment, right?" A: "Yes." Q: "Half of your cash in the first installment, and then the second installment was all cash, right?" A: "If there was equity, it would be in the first installment. The second would be all cash.").

[57] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2-3; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2-3); Apr. 23 Tr. at 17:4-9 [Hoffman] (Q: "And when would that – when would you have received the performance bonus based on your net profitability?" A: "This is for 2007, I would receive a first installment in early 2008 and second installment in early 2009.").

[58] Apr. 23 Tr. at 18:10-15 [Hoffman].

[59] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2.

[60] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2.

Hoffman's 2007 bonus had not been paid as of the Filing Date.[61]  The second installment of Mr.

Hoffman's 2007 bonus would have been paid when LBI paid its 2008 bonuses, in early 2009,

and the second installment of his 2008 bonus would have been paid when LBI paid its 2009

bonuses, in early 2010.

31.    Mr. Hoffman's employment agreements also contained provisions specifying the

circumstances in which he would receive his bonuses if his employment with LBI ended.[62]  The

agreements provided that if Mr. Hoffman resigned or was terminated for cause before payment

of the first installment of his bonus, he would not receive any portion of the bonus.[63]  If Mr.

Hoffman was terminated for cause after payment of the first installment but before payment of

the second installment, he would not receive the second installment.[64]

### 2.    The Calculation of Mr. Hoffman's 2008 Bonus

32.    When LBI entered into liquidation, Mr. Hoffman was owed $7,712,500 in cash

for the second installment of his 2007 bonus.[65]

33.    The Trustee asserts that Mr. Hoffman was owed a total amount of $75,339,600 in

cash and RSUs on account of his 2008 bonus, though in his proof of claim Mr. Hoffman asserts

---

[61] Apr. 23 Tr. at 18:10-19 [Hoffman].

[62] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2-3; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2-3.

[63] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 2 ("If your employment ends before the First Payout Date, your Performance Bonus (if any) will be calculated as follows:  If you resigned or were terminated by the Firm with cause, you will not receive any portion of the Performance Bonus."); Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2 (same).

[64] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 3 ("If your employment ends after being paid the First Installment but before the Second Payout Date, your entitlement to the Performance Bonus (if any) will be determined as follows:  If you were terminated by the Firm with cause, you will not receive the Second Installment, and the portion of your Performance Bonus already awarded in equity under the Firm's Equity Award Program will be treated as prescribed by the terms of that Program."); Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 3 (same).

[65] Trustee Ex. 40 (Mr. Hoffman's 2007 LBI Total Compensation Statement) (reflecting that second installment of the 2007 performance bonus was $7,712,500); Trustee Ex. 36 (1EE LLC's Proof of Claim) at LBI_BONUS_CLAIMS_0000063 (claiming $7,712,500 for the second installment of Mr. Hoffman's 2007 bonus).

that this aggregate notional amount is $76,285,940.66.[66]  Subsequent to the Merits Hearing, in

his post-trial proposed findings of fact, Mr. Hoffman revised his assertion of this amount

downward, to $76,124,408, to take into account his base salary.[68]

34.    The calculation of Mr. Hoffman's 2008 bonus begins with his net profit for the

2008 fiscal year.[69]  Under his employment agreement, "Net Profit" was defined as "Pre-

Compensation Profit," which in turn was defined as "Gross Revenue of the Proprietary Portfolio,

less Brokerage and Execution Charges, Net Sales Credits, Short Term Interest Carry, Long Term

Interest Allocation and Incremental Expenses."[70]  LBI's books and records reflect that Mr.

Hoffman's Net Profit for 2008 was $543,140,000.71.  Mr. Hoffman claims that the proper Net

Profit for 2008 is $548,471,000, an amount that does not include a deduction of $5,331,000 for

brokerage charges reflected on LBI's books and records.[72]  Mr. Hoffman contends that brokerage

charges were already deducted from the $548,471,000 but, at his deposition, he admitted that he

did not know for certain.[73]  At the Merits Hearing, he initially claimed that brokerage charges

were already deducted from the $548,471,000 but conceded that he was "not sure" if you had to

---

[66] *See* Trustee Ex. 36 (1EE LLC's Proof of Claim) at LBI_BONUS_CLAIMS_0000064.

[67] *See* Trustee Ex. 36 (1EE LLC's Proof of Claim) at LBI_BONUS_CLAIMS_0000064.

[68] *See* 1EE LLC's Proposed Findings of Fact [ECF No. 12247] at ¶ 21.

[69] Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 1 ("[T]he 'Net Profit' of the 'Proprietary Portfolio' (each as defined in Exhibit A) for the period equal to the Performance Year (the 'Performance Period') will be multiplied by the 'Performance Bonus Percentage' (as defined in Exhibit A), and then reduced by the total base salary paid to you for the Performance Year.").

[70] *Id.* at 5.

[71] *See* Trustee Ex. 41 (Mr. Hoffman's LBI profit and loss statement as of September 12, 2008).

[72] *See id.*

[73] Hoffman Dep. Tr. at 107:25-109:23 (Q:  "Ok.  And so I guess I want to understand why you believe that the first column has the fourth column."  A:  "I'd ask product control, because it's not my spreadsheet, but that was my recollection."  Q:  "So you have no way of knowing one way or the other yourself, sitting here today?"  A:  "Sitting here today, no.  I would suggest looking at supporting document as to the P&L and trying to break down how these numbers are calculated.  I think there is other – there is more comprehensive P&Ls you may have.  I don't have them in front of me.").

"walk out this . . . five million number."[74]  It is undisputed that, in 2007, brokerage charges were

deducted on the same schedule in calculating Mr. Hoffman's 2007 bonus.[75]  The weight of the

evidence supports the conclusion that the brokerage charges of $5,331,000 must be deducted

from Net Profit for the purpose of calculating Mr. Hoffman's 2008 bonus.

35.      Accordingly, Mr. Hoffman's 2008 bonus amount should be calculated as follows:

| | |
|---|---|
| 12% of $ 25,000,000 – | $ 3,000,000 |
| 14% of $518,140,000 – | $72,539,600 |
| | $75,539,600[76] |

The $75,539,600 is then reduced by Mr. Hoffman's 2008 salary of $200,000, resulting in a 2008

bonus of $75,339,600 in total.[77]  Thus, on the Filing Date, the total amount owed to Mr. Hoffman

by LBI was $83,052,100 ($7,712,500 for the second installment of his 2007 bonus and

$75,539,600 for his 2008 bonus).

36.      Of the $83,052,100, Mr. Hoffman would have received $7,712,500 in cash for the

second installment of his 2007 bonus in early 2009, with the 2008 bonus payable in (i) a first

installment totaling $62,289,075, in some combination (at LBI's discretion) of cash and RSUs in

early 2009 and (ii) $18,884,900 in cash, which he would have received in early 2010, assuming

he traded profitably.

### 3.      Mr. Hoffman Negotiates the Terms of his Employment with Barclays

---

[74] Apr. 23 Tr. at 180:9-183:15 [Hoffman] ("I'm not sure if you would then walk out this other five million number. But I wouldn't dispute that, if $105,000 was invoice brokerage that was not taken out, I wouldn't argue that it should come out.").

[75] Trustee Ex. 52 (Nov. 30, 2007 P&L Statement for Mr. Hoffman) at 2; Apr. 23 Tr. at 175:3-7 [Hoffman] (Q: "Okay.  And, in fact, in calculating your total compensation for 2007, both the numbers – the brokerage and the long-term debt – were taken out to arrive at your total compensation, right?"  A:  "Yes.").

[76] Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 5.

[77] *Id.* at 1 (Mr. Hoffman's performance bonus includes subtracting "the total base salary paid to you for the Performance Year."); Apr. 23 Tr. at 177:20-22 [Hoffman] (Q:  "And then from that we'd subtract your $200,000 salary."  A:  "That's true.").

37.    Mr. Hoffman did not respond to Barclays' initial email offer of employment on September 21, 2008 – he neither accepted it nor declined it.  Mr. Hoffman also did not attend work on September 22, 2008, which attendance would have represented acceptance of Barclays' initial email offer.[78]  He ultimately did accept Barclays' offer of employment after having a series of discussions with Barclays executives.[79]

38.    When Lehman filed for bankruptcy, Mr. Hoffman's primary concern was that he would not be paid the approximately $83 million he had earned in LBI bonuses.[80]  Given his concerns that he would not be able to collect on his claim, Mr. Hoffman wrote to Mr. James Veale at Credit Suisse concerning his situation: "Just plain sux [sic].  No way to sugar coat it . . . . i [sic] am pretty bummed, no comp for 2 years plus all the lost stock, never really had years like these last 2 before.  I've probably been paid 2% for my career."[81]

39.    Mr. Hoffman wanted to be paid the approximately $83 million for the work he had performed at LBI in 2007 and 2008, and he made that abundantly clear to Barclays.[82]  As Mr. Keegan testified, Mr. Hoffman stressed that he wanted Barclays to pay him what he was

---

[78] April 23 Tr. at 75:11-13 [Hoffman].

[79] April 23 Tr. at 76:6-12 [Hoffman] (detailing that Mr. Hoffman never responded to Barclays' email offer of employment); Hoffman Dep. Tr. 20:16-25 (Q:  "After Lehman went bankrupt, you went to Barclays at some point; is that right?"  A:  "I worked for Barclays."  Q:  "You didn't work anywhere else in between Lehman and Barclays, did you?"  A:  "I didn't work anywhere else.").

[80] Apr. 23 Tr. at 184:9-20 [Hoffman] (Q:  "You were concerned that you weren't going to be paid the $83 million that you were expecting, right?"  A:  "I was concerned that I was owed money by an entity that had just filed bankruptcy."  Q:  "And, in particular, what you were concerned about was that you were looking at not having $83 million that you had been counting on to that point, right?"  A:  "Among other things, yes."  Q:  "And that was probably your primary concern?"  A:  "Fair to say."), 187:9-12 [Hoffman] (Q:  "Right.  What you were really worried about and concerned about was the $83 million, right?"  A:  "As it related to what I had earned from Lehman, that was my concern.").

[81] 1EE Ex. 29 (E-mail dated September 18, 2008).

[82] Apr. 23 Tr. at 190:14-191:16 [Hoffman] (Q:  "What you're talking about is getting paid $83 million based on the work you had done at Lehman, right?  That['s] what you wanted.  You didn't want to have to earn it in the future with some 25 percent that you could have gotten from Millennium.  You wanted $83 million paid to you from what you had done before, right?"  A:  "I wanted to get paid for the work, the contracts 2007-2008."  Q:  "The work you had done at Lehman.  That's what you wanted to get paid for, right?"  A:  "Yes.").

owed by LBI and that "in order for him to talk to us, we had to address that issue."[83]  Indeed, Mr.

Hoffman testified that he told Barclays he was "looking for $83 million to come to work here"

because "it was no secret to them that I had lost $83 million."[84]  It was "not a pure coincidence"

that he demanded $83 million from Barclays;[85] it was, in fact, part of his "negotiating

strategy."[86]

40.    At the Merits Hearing, Mr. Hoffman testified that he wanted Barclays to "assume

his contract," though he was unable to explain exactly what that meant to him.  In response to

questions from his counsel, Mr. Hoffman testified that his understanding was that if Barclays

"assumed" his contract, then "I would've gotten 27 million in cash in February of '09 . . . they

would've owed $84 million.  It just would've been over whatever the prescribed payments

were."[87]  In response to questions from the Trustee's counsel, Mr. Hoffman testified that when

he told Barclays he wanted it to "assume his contract," what he wanted was for Barclays to pay

him the $83 million "under the schedule that he had with Lehman" and without him having to

work for Barclays.[88]  Mr. Hoffman conceded, however, that he would have been satisfied if he

was given the $83 million he was owed even if his contract was not assumed.[89]

---

[83] Apr. 24 Tr. at 60:3-17 [Keegan].

[84] Apr. 23 Tr. at 79:25-80:11 [Hoffman].

[85] Hoffman Dep. Tr. 347:10-17 (Q:  "It is just a coincidence that you picked 83 and 83 is what you were owed?"  A:  "It was a negotiating strategy.  So it is not a pure coincidence.  But it is not –"  Q:  "Not a coincidence, you picked it because it was what you were owed by Lehman?"  A:  "It was a negotiating strategy."); Apr. 23 Tr. at 226:10-14 [Hoffman] (Q:  "It wasn't a coincidence that that was the number you talked about and that ended up in your contract[?]"  A:  "There's a couple of reasons.  I thought I could get it, but I won't say it's a coincidence.").

[86] Apr. 23 Tr. at 192:6-8 [Hoffman]; Hoffman Dep. Tr. 330:6-11 (Q:  "Whose idea was it to get to 83 million?"  A:  "I – it's possible, I suspect that that was my negotiating ploy was to say, hey, look, get me to 83 million, this is what was required.").

[87] Apr. 23 Tr. at 94:18-95:8 [Hoffman].

[88] *Id.* at 197:21-201:2 [Hoffman] (Q:  "Well, I guess I don't want to assume anything.  I want to understand what you wanted when you were telling Barclays and telling us that what you wanted was the assumption of your contract.  You wanted, I guess it sounds like, to be able to not trade at all, and just get $83 million paid to you under the terms – under the schedule that you had with Lehman.  That's basically it?  Didn't have to trade for Barclays at

21

41.    In addition to discussing employment with Barclays, Mr. Hoffman discussed employment with a number of other firms between September 16, 2008 and October 3, 2008.[90] In discussions with these potential employers, Mr. Hoffman continued to employ his negotiating strategy of demanding $83 million.[91]  Although a number of the firms with which Mr. Hoffman met expressed interest in hiring him, and Mr. Hoffman asserts that he could have secured a formal offer from multiple firms, none of his discussions progressed to a formal offer of employment and none of the firms expressed a willingness to guarantee him the $83 million he was seeking.[92]

42.    Mr. Hoffman testified that, shortly after the sale, he met with Barclays executive Eric Bommensath, who told him initially that Barclays would not pay him the $83 million he was owed by LBI.[93]  However, Mr. Hoffman subsequently met with Barclays' Rich Ricci and Michael Keegan to discuss further what Mr. Hoffman termed his "legacy compensation

---

all?"  A:  "No.  I didn't have to trade for Barclays at all."  Q:  "Okay."  A:  "It doesn't mean I may have; I may not have.  But I didn't have to."  Q:  "Okay.  That's what you mean by 'assume the contract.'  Right?"  A:  "Yes.").

[89] Apr. 23 Tr. at 130:3-12 [Hoffman] (Q:  "Right, but I mean, I'm saying that you've emphasized repeatedly that you wanted the contract assumed.  You wanted the contract assumed.  But you agree with me that if the check had been pushed across the table at you because someone had said to you, 'Now, you know, it's lawyer stuff, assumption's really complicated.  Here's the money, John, we're good, right?'  You would've – that would've been fine with you and you would've gotten over . . . [?]"  A:  "If someone gave me $83 million, yes.").

[90] *See* Apr. 23 Tr. at 50:9-64:5 [Hoffman].

[91] *See* Apr. 23 Tr. at 56:6-11 [Hoffman] ("Well, Mike was aware of what I was looking for.  And $83 million seemed like a reasonable thing to ask for, frankly, in light of things we talked about and in light of the fact that it was obviously on the table, because I had just lost $83 million and that's what I was looking for to go to work.")

[92] *See* Apr. 23 Tr. at 50:9-64:5 [Hoffman].

[93] Apr. 23 Tr. at 245:5-14 [Hoffman] (Q:  "Okay.  And you talked a little bit about that Mr. Bommensath in the street corner conversation that was the first time you had met Mr. Bommensath, right?"  A:  "Yes."  Q:  "And basically the first thing he told you was that they're not paying you that money, right?  They don't owe you the money."  A: "You don't owe me the money.  Lehman owes me the money and he's not sure he wants to be in a proprietary business, but he'd like to have a conversation.").

issues,"[94] and he also had further discussions with Mr. Bommensath as the negotiations

progressed.

### 4. Mr. Hoffman Secretly Records his Conversations with Messrs. Ricci, Keegan, Bommensath, and Gelband

43.    Mr. Hoffman recorded his meetings and conversations with Messrs. Ricci,

Keegan, Bommensath, and Gelband without their knowledge or consent.[95]  When asked why, he

said that he did so as a note-taking technique.[96]  Mr. Hoffman testified that he made the secret

recordings, rather than actually take notes, because he had never seen someone take notes in a

work environment.[97]  Mr. Hoffman testified that he could not recall whether this was the first

time he had ever secretly recorded conversations.[98]  Mr. Hoffman's testimony on the reasons for

making the secret recordings was dubious at best.

44.    The recorded conversations leave no doubt that Mr. Hoffman was focused on

Barclays agreeing to pay him the $83 million he was owed by LBI in addition to paying him

separately for his trading performance at Barclays.  For example, in a September 23, 2008

meeting with Michael Gelband, an ex-Lehman employee, Mr. Hoffman explained:

> You know, my lawyer look [sic] at it, whatever you can do to preserve your
> claim, you have to separate correctly, deal with Barclays correctly, you know.
> Anyone could owe you money at any time.  And, you know, any good lawyer will
> tell you, one entity's bankrupt; one isn't.  Who do you want?  You know.  *We*

---

[94] *Id.* at 83:23-84:17 [Hoffman] (detailing that after he met with Eric Bommensath his next meeting was with Barclays executive Rich Ricci), 115:1-13 [Hoffman] (Michael Keegan was the "direct negotiator for Barclays"); Trustee's Ex. 20 (Transcript of excerpt from 1EE_0000086) (Mr. Hoffman explaining to Rich Ricci that he has "legacy compensation issues that are substantial"); Apr. 23 Tr. at 92:24-93:4 [Hoffman] (referring to "legacy compensation issues" as the $83 million owed to him by LBI).

[95] Apr. 23 Tr. at 211:8-212:5 [Hoffman].

[96] *Id.* (Q: "I guess, if I understood your testimony correctly, you said it was a—the way that you were taking notes? Is that right?"  A: "Yes.").

[97] Hoffman Dep. Tr. at 306:23-307:3 (Q: "Couldn't you have just taken a notepad out and taken notes as the meeting is happening?"  A: "I've never seen it done in a work environment like that."); Apr. 23 Tr. at 212:15-213:6 [Hoffman].

[98] Apr. 23 Tr. at 211:21-212:5 [Hoffman] (Q: "So it's possible you had previously decided to take notes using a secret recorder; you just don't recall whether or not that's the case?"  A: "That's what I'm saying.").

> *could talk about Lehman all day, Barclays has money. You've got to try to get money from Barclays through the negotiation or they may feel in the back of their minds, we're not in the clear with this guy,* although we'll say we are. But, do you know what I mean. *They'll have legacy issues with something at Lehman. You can't get away from it.* That's just, you know. I would, you know. So they may feel like, well, we'll offer him a good deal, because it will satisfy any potential down the road that, you know, he tries to *make it a legacy issue about what he's owed before.* All that does is make it hard for me to, you know, *if I wasn't owed any money, it would be easier.* I'll say what can you do for me, no thanks, I'm leaving.[99]

Mr. Hoffman conceded that his reference to what he was "owed" was to the $83 million that he was owed by LBI.[100]

45.     Mr. Hoffman also recorded a September 23, 2008 meeting with Barclays executive Rich Ricci, during which Mr. Hoffman explained to Mr. Ricci that he had "legacy compensation issues that are substantial,"[101] referring again to the $83 million that he was owed by LBI.[102] Mr. Ricci responded:  "I hear you on the comp.  And I think if we were to move forward we're going to have to figure something out, because we want you motivated."[103]

46.     On September 26, 2008, Mr. Ricci sent Mr. Keegan an email asking if Mr. Keegan was "committed to [Mr. Hoffman's] prop bus[iness] going forward?  I assume yes."[104] Mr. Keegan responded "[i]f we can work out the cy pay issue, yes."[105]  Mr. Keegan testified that

---

[99] Trustee Ex. 29 (Transcript of excerpt from 1EE_0000087) (emphasis added).

[100] Apr. 23 Tr. at 217:3-9 [Hoffman] (Q:  "Okay perfect.  So, when you said right at the end of that that if I wasn't owed any money it would be easier, the money that you were owed that you're talking about is the $83 million that you were owed by LBI, right?"  A:  "It's the money I was owed from my 2007 and '08 compensation agreements with LBI.").

[101] Trustee Ex. 20 (Transcript of excerpt from 1EE_0000086).

[102] Apr. 23 Tr. at 224:11-15 [Hoffman] (Q:  "Right.  What – instead you told him the legacy compensation issues that are substantial and the legacy compensation issues are the $83 million, right, that you were owed by LBI?"  A: "The money that I was owed, yes.").

[103] Trustee Ex. 20 (Transcript of excerpt from 1EE_0000086).

[104] Trustee Ex. 30 (E-mails between Messrs. Keegan and Ricci, dated September 26, 2008, regarding Mr. Hoffman).

[105] *Id.*

the "cy pay issue" (*i.e.*, the current year pay issue) that needed to be worked out was the $83 million that Mr. Hoffman was owed by LBI.[106]

47.    A few days later, Mr. Keegan sent Mr. Bommensath and Barclays executive Jerry del Missier the following email with a proposal for compensating Mr. Hoffman for the $83 million he was owed by LBI:

> As discussed under his agreement with Leh J. Hoffman would [have] been owed a total of $83m for his year to date earnings, 25% of which would have been subject to a one year claw back (20.75m) and 50% would have been in 5 year stock ($41.5m). My recommendation for Jon is we pay John (sic) $30m of his total bonus this year (25% in year BC vest stock) and defer an additional $40 for which vests prorata if Jon is still an employee in Feb 28, 2010 and 2011. Going forward his existing core deal would be restored (12% of first 25 of net revenues and 14% above 25m) with elimination of the claw back. Additionally for the remainder of calendar 08 we would pay Jon at a rate of 25% of net revenues earned and realized by the bonus payment date in February of 09.[107]

Mr. Keegan testified that "the structure of the payouts that I proposed in my initial offer to [Mr. Hoffman] was structured to try to match the payouts that he would have received under the Lehman Brothers contract for the $83 million dollars."[108]

48.    Mr. Hoffman discussed this proposal with Mr. Keegan and Mr. Bommensath during an October 2, 2008 meeting that Mr. Hoffman secretly recorded.[109] During this meeting, Mr. Hoffman asked for more time to make "the rest of the money that I seem to be out," referring to the short time frame in Mr. Keegan's initial offer for him to make up the difference between the $83 million he was owed by LBI and the $70 million in fixed payments Barclays

---

[106] Apr. 24 Tr. at 61:24-62:12 [Keegan] (Q: "And the current year pay issue meaning?" A: "It was 2008. Meaning his accrued to 2008, under his Lehman contract." Q: "So is it – in other words, that's the $83 million dollars he was owed by Lehman?" A: "Yes.").

[107] Trustee Ex. 31 (E-mail, dated September 30, 2008, from Mr. Keegan to Messrs. Bommensath and del Missier regarding Mr. Hoffman).

[108] Apr. 24 Tr. at 97:15-21 [Keegan].

[109] Trustee Ex. 22 (Audio file of October 3, 2008 conversation between Messrs. Keegan, Bommensath, and Hoffman).

was offering.[110] Mr. Hoffman's concern was addressed by extending the elevated payout period

to up to two years and capping the maximum amount Mr. Hoffman could earn under the elevated

payout percentage at $13 million.[111]

49.     In the same conversation, Mr. Hoffman and Mr. Keegan discussed the form and

timing in which the $83 million would have been paid by LBI[112] because Barclays was

attempting to structure its payment of the $83 million to match what he would have received

from LBI.[113] Mr. Hoffman acknowledged that Barclays had structured the deal to match the

payments that he would have received from LBI.[114]

50.     In the same recorded conversation, Mr. Bommensath – who had previously told

Mr. Hoffman that Barclays would not pay him the $83 million he was owed by LBI – told Mr.

Hoffman that he had "evolved from the first thing [he] told [him]."[115] Mr. Bommensath told Mr.

Hoffman that "we tried to respect you.  Not to have you have the pressure to try to remake it, *you*

*earned it Johnny.  Okay?  You earned it.  All right?  You earned that money, it's yours*."[116]  Mr.

---

[110] Trustee Ex. 23 (Transcript of excerpt from 1EE_0000088 (audio recording of the meeting)); Apr. 23 Tr. at 125:9-14 [Hoffman] (Q:  "When you said, 'The rest of the money I seem to be out,' what was that referring to?" A: "I had asked for $83 million.").

[111] Apr. 24 Tr. at 66:4-15 [Keegan] (Barclays addressed Mr. Hoffman's concern "with the short time frame that we were giving him to earn the 13 million" by giving him "for an initial period of time until he earned the 13 million, an[] open ended contract in terms of time, at a 20 percent payout, capped it at 13, however, so he couldn't earn more than 13, and we put the claw backs back in, the 20 million claw back.").

[112] Trustee Ex. 24 (Transcript of excerpt from 1EE_0000088).

[113] Trustee Ex. 23 (Transcript of excerpt from 1EE_0000088) ("I tried to make sure in how you would have got paid from Lehman that we're giving you that, we're not giving you less money than you would otherwise have from Lehman.").

[114] Trustee Ex. 27 (Transcript of excerpt from 1EE_0000088) ("I think it's, you know, but I do think in general the pieces are probably more thought out than I thought they were in talking to you.  Do you know what I mean?  In other words, you structured it trying to be more cognizant of some sort of payout.  Matching payouts and . . . .").

[115] Trustee Ex. 26 (Transcript of excerpt from 1EE_0000088) (emphasis supplied).

[116] Trustee Ex. 26 (Transcript of excerpt from 1EE_0000088).

26

Keegan, who was present during this recorded conversation, testified that he understood Mr.

Bommensath to be referring to the $83 million Mr. Hoffman was owed by LBI.[117]

51.    The evidentiary record is clear that Barclays ultimately agreed to pay Mr.

Hoffman the $83 million he was owed by LBI.[118]  Mr. Keegan explained that the significance of

the $83 million aggregate number in Mr. Hoffman's Barclays contract was that it "was what

Jonathan would have been due under his contract with Lehman Brothers."[119]  As Mr. Keegan

testified, "Jonathan was asking us to make him whole for what he thought he was entitled to

from Lehman Brothers, which we ultimately believe we did."[120]

### 5.    Mr. Hoffman Commences Employment with Barclays and is Paid $83 Million

52.    Following Barclays' agreement to pay Mr. Hoffman the $83 million that he was

owed by LBI, Mr. Hoffman entered into an employment agreement with Barclays on October 3,

2008.[121]  The agreement listed Mr. Hoffman's starting date at Barclays as September 22, 2008,

the same day that the sale pursuant to the APA had closed.[122]

53.     In addition to paying him the $83 million he was owed by LBI, Mr. Hoffman's

employment agreement with Barclays essentially replicated other key terms of his agreement

---

[117] Apr. 24 Tr. at 96:8-22 [Keegan] (Q:  "What money did you understand Mr. Bommensath to be talking about?"  A:  "That was the $83 million bonus that would have been accrued to Jonathan under Lehman's contract at the time of bankruptcy.").

[118] Id. at  96:19-22 [Keegan] (Q:  "And did Barclays agree to pay him that money?"  A:  "In the format that ultimately the contract was structured, yes.").

[119] *Id.* at 69:10-16 [Keegan] (Q:  "And again, what was the significance of the $83 million?"  A:  "It was what Jonathan would have been due under his contract with Lehman Brothers, had Lehman Brothers not filed bankruptcy and Jonathan finished the year at the performance level he had achieved at the time of the bankruptcy.").

[120] *Id.* at 118:6-19 [Keegan] (quoting Mr. Keegan's March 27, 2015 deposition transcript).

[121] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement).

[122] *See id.* at 1 ("Your employment commenced on September 22, 2008.").

with LBI.[123]  The Barclays agreement provided that he would receive the same $200,000 base

salary he had earned at LBI.[124]  It also provided that Mr. Hoffman would receive an annual bonus

based on the same formulas that were used in his LBI agreements – twelve percent of net profits

up to $25 million and fourteen percent of net profits above $25 million.[125]  The Barclays

agreement was actually more favorable for Mr. Hoffman than his LBI agreement had been as it

called for his annual bonus to be paid in a single installment and it provided that Mr. Hoffman

would be paid 75 percent of the bonus amount in cash rather than 50 percent.[126]

54.    In addition to the foregoing terms of his "core" compensation, Mr. Hoffman's

agreement with Barclays provided that he would receive "Special Awards" of $70 million, of

which $30 million was to be paid in February 2009, $20 million was to be paid in February 2010,

and $20 million was to be paid in February 2011.[127]  These awards were to be paid 75 percent in

cash and 25 percent in equity.[128]

---

[123] *See id.*; Apr. 24 Tr. at 64:21-65:3 [Keegan] (Q:  "So when you referred to the existing core deal –"  A:  "It's his contract that was in place at the time of Lehman's bankruptcy."  Q:  "And when you said here that the core deal would be restored, what did you mean by that?"  A:  "I meant we would just give him the same terms under a Barclays contract.").

[124] Trustee Ex. 5 (Mr. Hoffman's 2007 LBI agreement) at 1; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 1; Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 1; Hoffman Dep. Tr. at 197:14-199:4 (Q:  "And your compensation in the next section down, it says your base pay – base salary will be paid at the rate of 200,000 per year, correct?"  A:  "Yes."  Q:  "And that's the same salary you had at Lehman, right?"  A:  "Yes.").

[125] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 4; Apr. 24 Tr. at 67:2-68:17 [Keegan] (Q:  "And was that the same as was the case in Mr. Hoffman's LBI contract?"  A:  "It's extremely similar, yes."  Q:  "Okay.  Is there any difference that you're aware of?"  A:  "Not that I'm aware of."); Hoffman Dep. Tr. 215:23-216:6 (testifying that the percentages in his Barclays agreement "look[] to be the same" as those in his LBI agreements).

[126] Apr. 23 Tr. at 247:13-248:9 [Hoffman] (Q:  "What I'm saying is that instead of having two installments you got one, right?"  A:  "There was one installment."); Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 1 (providing for Mr. Hoffman's performance bonus and special awards to be split between cash and equity with the equity portion equal to "25% of each of the Performance Bonus and Special Awards").

[127] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 1.

[128] *Id.* (providing for Mr. Hoffman's performance bonus and special awards to be split between cash and equity with the equity portion equal to "25% of each of the Performance Bonus and Special Awards").

55.     If Mr. Hoffman incurred trading losses at Barclays in 2009 or 2010, Barclays could reduce the "Special Awards" to be paid in 2010 (on account of 2009 performance) and 2011 (on account of 2010 performance) by up to $10 million each.[129]  This provision was intended to replicate the 25% second installment/clawback feature of his LBI agreement, under which Mr. Hoffman could "lose" $18.9 million based upon his future performance.[130]  Similarly, the "Special Awards" would not be paid if Mr. Hoffman resigned or was terminated for cause, just as Mr. Hoffman's 2008 performance bonus under his LBI agreement would not be paid if he resigned or was terminated for cause before it was paid.[131]

56.     Vis-a-vis the $83 million number Mr. Hoffman had been discussing with Barclays, the $70 million in "Special Awards" left a $13 million "shortfall" which was addressed by providing for Mr. Hoffman to receive an increased performance percentage from the twelve/fourteen percent arrangement to 20 percent of net profits until Mr. Hoffman received the remaining $13 million of the $83 million.[132]  Thus, in total, Mr. Hoffman was to receive $83 million in addition to his core "go forward" deal with Barclays.[133]

---

[129] *Id.*

[130] Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 2; Apr. 24 Tr. at 66:4-15 [Keegan] (stating that Barclays "put the . . . 20 million claw back" from Mr. Hoffman's 2008 LBI agreement back in Mr. Hoffman's Barclays agreement).

[131] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 2; Trustee Ex. 6 (Mr. Hoffman's 2008 LBI agreement) at 3.

[132] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 2; Apr. 24 Tr. at 68:5-69:16 [Keegan] (Q: "Okay, and []is that the 13 million, so in other words, it would only apply until he earned 13 million more than he would have earned under his core deal?"  A:  "Yeah, that was intended for when—yeah, the fixed payments plus the 13 million to come to the 83 million.").

[133] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 2; Apr. 24 Tr. at 68:5-69:16 [Keegan].

57.    In all, Mr. Hoffman received $100 million in compensation for his trading performance at Barclays during 2008 to 2010, in addition to the $83 million in Special Awards and increased profit sharing he received from Barclays on account of his LBI bonuses.[134]

58.    Mr. Keegan testified that he was "surprised" when he learned about Mr. Hoffman's claim because, he explained, "he was due $83 million from Lehman and we paid it to him."[135]

### B.  Claimant J. Robert Chambers

59.    Mr. Chambers joined LBI in December 1994 and was continuously employed by LBI for fourteen years.[136]   Mr. Chambers was employed by LBI pursuant to written contracts commencing in or around 2002.[137]

60.    In 2007 and 2008, Mr. Chambers, a proprietary trader, was the portfolio manager of the Lehman Energy Fund (the "Fund").[138]   Mr. Chambers and his team worked out of an LBI branch office in Houston, Texas.[139]   The Fund loaned money to small energy companies and secondarily made equity investments and purchased bonds and loans of energy companies.[140]

### 1.  Mr. Chambers' 2007 Employment Agreement and 2007 Bonus

61.    For LBI's 2007 fiscal year, Mr. Chambers had a written employment agreement with LBI that provided for him to receive $200,000 in base salary and a performance bonus

---

[134] Trustee Ex. 7 (Mr. Hoffman's Barclays Employment Agreement) at 2.

[135] Apr. 24 Tr. 100:19 [Keegan]; *see also id.* at 101:3-4 [Keegan] ("I thought we paid him the $83 million dollars, yes.").

[136] Apr. 22 Tr. 131:5-6 [Chambers].

[137] Apr. 22 Tr. 133:8 [Chambers].

[138] Apr. 22 Tr. 131:15-17 [Chambers].

[139] Apr. 22 Tr. 131:20-21 [Chambers].

[140] Apr. 22 Tr. 131:24-132:1 [Chambers].

based on the net profits generated by the Fund during that fiscal year.[141]  Specifically, Mr.

Chambers' 2007 bonus was equal to twelve percent of the first $25 million in net profits the

Fund generated and fourteen percent of net profits above $25 million, less his salary.[142]

62.    Mr. Chambers' 2007 bonus was to be paid in two installments.[143]  The first

installment was to be paid at the time that LBI paid its performance bonuses for the 2007 fiscal

year (in early 2008) and would be equal to 75 percent of the total performance bonus less the

salary he received for the year.[144]  The second installment, the remaining 25 percent, would be

paid at the time LBI paid its bonuses for the 2008 fiscal year (in early 2009).[145]

63.    It is undisputed that the second installment of Mr. Chambers' 2007 bonus was

$1,647,061, to be paid in cash.[146]  For purposes of Lehman's 2008 Equity Award Program, the

second installment of Mr. Chambers' 2007 bonus was to be considered part of his total

compensation for the 2008 fiscal year.[147]

## 2.    Mr. Chambers' 2008 Employment Agreement

64.    On July 9, 2008, Mr. Chambers entered into an agreement with LBI that covered

his compensation for management of the Fund for 2008, 2009, and 2010.[148]

65.    As was the case for Mr. Chambers' 2007 LBI employment agreement, Mr.

Chambers' 2008 LBI employment agreement provided that he would receive a $200,000 base

---

[141] Trustee Ex. 11 (Mr. Chambers' 2007 LBI Employment Agreement) at 1, 5.

[142] *Id.* at 5.

[143] *Id.* at 1-2.

[144] *Id.*

[145] *Id.* at 2, 6.

[146] Trustee Ex. 59 (Mr. Chambers' Proof of Claim) at LBI_BONUS_CLAIMS_0000089; Trustee Ex. 60 (2007 Total Compensation Statement for J. Robert Chambers).

[147] Trustee Ex. 11 (Mr. Chambers' 2007 LBI Employment Agreement) at 2 ("The Second Installment will be considered part of your total compensation for the 2008 Performance Year for purposes of the Equity Award Program, except as otherwise specifically provided in this letter.").

[148] Trustee Ex. 12 (Mr. Chambers' 2008 LBI Employment Agreement).

salary.[149]  This $200,000 base salary would be paid to him only for periods in which he was

actively employed by LBI.[150]  If Mr. Chambers' employment with LBI ended for any reason

during the 2008, 2009, or 2010 fiscal years, then his salary payments would cease at that time as

well.[151]  Mr. Chambers understood at the time he entered into this contract that he would not be

paid salary for periods during which he was not employed at LBI.[152]

66.     Mr. Chambers' 2008 LBI employment agreement also provided that he was

eligible for a performance bonus for the 2008, 2009, and 2010 fiscal years.[153]  For the 2008 fiscal

year, the agreement provided for Mr. Chambers to receive his performance bonus out of a

"performance pool," which would be equal to 25 percent of the net profit of the Fund.[154]  Mr.

Chambers' 2008 bonus would be paid in a single installment and was equal to the performance

pool minus (i) Mr. Chambers' $200,000 salary for the 2008 fiscal year and (ii) the 2008 total

compensation of the employees of the Fund.[155]

67.     For the 2009 and 2010 fiscal years, the agreement provided that the performance

pool would be an amount equal to the greater of "(i) the Net Profit of the [Fund] for the

applicable Performance Period, multiplied by the Performance Bonus Percentage; and (ii)

---

[149] *Id.* at 1.

[150] *Id.* ("The above salary will be paid for all periods of your active employment with the Firm.").

[151] *Id.* at 1-2. ("If you resign for any reason or are terminated by the Firm with 'Cause' . . . your salary payments will end at that time . . . . If your employment is terminated by the Firm without Cause . . . your salary payments will end at that time . . . .").

[152] April 22 Tr. at 184:18-21 [Chambers] (Q:  "And you understood that you wouldn't be paid salary under this contract, if your employment with Lehman was terminated, right?"  A:  "That's correct.").

[153] Trustee Ex. 12 (Mr. Chambers' 2008 LBI Employment Agreement) at 1.

[154] *Id.* at 4; April 22 Tr. at 148:23-149:16 [Chambers].

[155] Trustee Ex. 12 (Mr. Chambers' 2008 LBI Employment Agreement) at 4.

$10,000,000, prorated for the applicable Performance Period (if less than the full Performance Year)."[156]

68.   At LBI's discretion, a portion of Mr. Chambers' total compensation for the 2008, 2009, and 2010 fiscal years would be paid in the form of conditional equity awards.[157]  Mr. Chambers' 2008 LBI employment agreement further provided that the deferral and delivery schedule for the amount of his 2008 total compensation payable in conditional equity awards would be as set forth in a schedule from the 2008 Equity Award Program Summary, attached to his agreement.[158]  The schedule provided that for employees with total compensation above $2.5 million – which would include Mr. Chambers – "$1,500,000 plus 90 [percent] of 2008 [total compensation] above $2,500,000 up to a maximum of 65 percent of [2008 total compensation]" would be payable in the form of conditional equity awards.[159]

69.   The agreement states that "[i]n no event will you be eligible for any Performance Bonus with respect to a [fiscal year] in which you were not employed as contemplated by this letter."[160]

70.   Mr. Chambers did not work for LBI during the 2009 or 2010 fiscal years.[161]  In his testimony at the Merits Hearing, Mr. Chambers acknowledged that he understood at the time

---

[156] *Id.*

[157] Trustee Ex. 12 (Mr. Chambers' 2008 LBI Employment Agreement) at 2 ("At the Firm's discretion, a portion of your total compensation for the 2008, 2009, and 2010 performance years (including any Performance Bonus) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program or other Firm-sponsored programs that may be established by the Firm from time to time and as then generally in effect for employees at your level.").

[158] Trustee Ex. 12 (Mr. Chambers' 2008 Employment Agreement) at 2.

[159] Trustee Ex. 13 (Mr. Chambers' Summary of Select Material Terms) at 3.

[160] *Id.* at 2.

[161] Chambers Dep. Tr. at 79:19-22 (Q:  "Do you consider yourself to have been actively employed by LBI following your acceptance of Barclays' employment offer?"  A:  "No, I do not.").

he entered into his employment agreement that he would not be paid bonuses for years that he was not employed by LBI.[162]

### 3.   Mr. Chambers' 2008 Bonus

71.   As of September 12, 2008, the date on which Mr. Chambers was instructed to stop trading, the Fund had net profits of $171,627,000 for fiscal year 2008, and the performance pool was thus $42,906,750.[163]

72.   Besides Mr. Chambers, the Fund had three other employees during the 2008 fiscal year – Kyle Kettler, Mathew Verghese, and Guy Hoffman.[164]  Mr. Kettler's 2008 total compensation was to be at least $500,000, comprised of $150,000 in base salary and a $350,000 guaranteed bonus.[165]  Mr. Verghese's 2008 total compensation was also to be at least $500,000, comprised of $175,000 in base salary and a $325,000 guaranteed bonus.[166]  Mr. Guy Hoffman's 2008 total compensation was to be $200,000, comprised entirely of his base salary.  LBI did not pay any of Messrs. Kettler and Verghese's 2008 bonuses, nor did LBI pay any salary to Messrs. Kettler, Verghese, or Hoffman after the Filing Date.

73.   With respect to compensation for fiscal year 2008, as of the Filing Date:

- LBI had paid Mr. Chambers $146,153.89 in salary and $0 in bonus;
- LBI had paid Mr. Kettler $100,384.60 in salary and $0 in bonus;
- LBI had paid Mr. Verghese $127,884.63 in salary and $0 in bonus; and
- LBI had paid Mr. Guy Hoffman $146,153.89 in salary.[167]

---

[162] April 22 Tr. at 185:12-18 [Chambers] (Q:  "And so, at the time that you entered into this contract, you understood that if you were terminated, you would not be entitled to receive bonus payments for years after you were terminated, right?"  A:  "I understood that I would not receive the performance bonus, if I were terminated, correct.").

[163] *Id.* at 148:12-15, 149:22-150:9 [Chambers].

[164] Trustee Ex. 59 (Mr. Chambers' Proof of Claim) at LBI_BONUS_CLAIMS_0000089; Trustee Ex. 65 (Mr. Verghese's LBI Employment Agreement); Trustee Ex. 73 (Mr. Kettler's LBI Employment Agreement).

[165] Trustee Ex. 73 (Mr. Kettler's LBI Employment Agreement).

[166] Trustee Ex. 65 (Mr. Verghese's LBI Employment Agreement).

[167] Chambers Ex. 8 (Lehman Energy Proprietary Portfolio Personnel Expenses).

74.     Following the sale to Barclays, Mr. Kettler and Mr. Verghese became Transferred Employees and were paid a salary by Barclays.[168] Mr. Kettler and Mr. Verghese were both subsequently terminated, and on December 5, 2008, both entered into separation agreements with Barclays.[169] Barclays paid Mr. Verghese $140,240 and Mr. Kettler $35,000 as special lump-sum payments in lieu of their LBI bonuses.[170]

75.     Mr. Kettler and Mr. Verghese each filed a claim against LBI for their respective guaranteed bonuses.[171] Mr. Kettler's claim has been allowed in the amount of $300,625, of which $10,950 was allowed as a priority claim, $50,312.50 was allowed as a subordinated claim, and the remainder was allowed as a general unsecured claim.[172] Mr. Verghese's claim has been allowed in the amount of $169,385, of which $10,950 was allowed as a priority claim, $12,040 was allowed as a subordinated claim, and the remainder was allowed as a general unsecured claim.[173]

---

[168] Trustee Ex. 71 (Mr. Verghese's Barclays Separation Agreement); Trustee Ex. 72 (Mr. Kettler's Barclays Separation Agreement); April 22 Tr. at 177:12-17 [Chambers] (Q: "And you also understand that Mr. Kettler and Mr. Verghese were both paid by Barclays in 2008 as well, right?" A: "I understand that they received salary from Barclays, as did I, starting from some time in late September.").

[169] Trustee Ex. 71 (Mr. Verghese's Barclays Separation Agreement); Trustee Ex. 72 (Mr. Kettler's Barclays Separation Agreement).

[170] Trustee Ex. 71 (Mr. Verghese's Barclays Separation Agreement) at 1; April 24 Tr. at 30:2-14 [Kurman] (Q: "And do you see in paragraph three, that Mr. Verghese also received a special lump-sum payment of $140,240?" A: "Yes, I do." Q: "And what would your understanding be of what that special lump-sum payment represents?" A: "Again, whether you fit the 10 percent category or the 20 percent category, the prior year's bonus—that was the enhancement in lieu of bonus."). Trustee Ex. 72 (Mr. Kettler's Barclays Settlement Agreement) at 1; April 24 Tr. at 32:17-33:2 [Kurman] (Q: "Okay. And would that be the enhancement in lieu of bonus to Mr. Kettler?" A: "That is correct.").

[171] April 22 Tr. at 153:12-19 [Chambers] (Q: "Do you know if those individuals are pursuing claims against Lehman Brothers?" A: "They are pursuing claims against Lehman Brothers[.]" Q: "And for the amounts that they're guaranteed bonuses?" A: "There are minimum guaranteed bonus, yes.").

[172] Stipulation and Order Regarding Proof of Claim of R. Kyle Kettler [ECF No. 12191].

[173] Stipulation and Order Regarding Proof of Claim of P. Mathew Verghese [ECF No. 12192].

### 4. Mr. Chambers Accepts Employment with Barclays, is Terminated, and is Paid a $1 Million Lump-Sum Payment

76.     Following the commencement of LBI's SIPA proceeding, Mr. Chambers was offered employment by Barclays.[174]  Mr. Chambers ultimately accepted Barclays' offer on December 5, 2008.[175]  Virtually simultaneously with his acceptance of Barclays' offer, Mr. Chambers was terminated by Barclays.[176]  Mr. Chambers and Barclays entered into a separation agreement, which included a general waiver and release, dated December 5, 2008.[177]  With the proposed separation agreement, Mr. Chambers was provided with a copy of the Disclosure Information Provided Pursuant to the Older Worker's Benefit Protection Act, and he was the first person listed on exhibit one to that document, with the job title "desk manager, age 41."[178]

77.     Pursuant to the separation agreement, Barclays paid Mr. Chambers 42 weeks of severance in accordance with Lehman's severance policy and after taking into account the years of Mr. Chambers' service at LBI.[179]  Mr. Chambers admitted that Barclays told him that the severance he was being paid was on account of the years he worked at LBI.[180]

---

[174] April 22 Tr. at 186:17-20 [Chambers] (Q: "And then, around the time of the bankruptcy, you said that you also received an email from Barclays, offering you employment, correct?"  A: "Yes.").

[175] Id. at 166:17-18; Trustee Ex. 64 (December 5, 2008 email from Mr. Chambers to "acceptbarclaysoffer@lehman.com").

[176] April 22 Tr. at 166:17-167:15 [Chambers].

[177] Trustee Ex. 14 (Mr. Chambers' Barclays Separation Agreement).

[178] April 22 Tr. at 168:19-22; 170:19-171:2 [Chambers].

[179] Id. at 1; Apr. 24 Tr. at 26:21-27:11 [Kurman] (Q: "And do you see from this agreement, that Mr. Chambers received 42 weeks of severance pay?"  A: "Yes, I see that."  Q: "Can you tell me how that was calculated, sir?"  A: "The formula in the Lehman handbook, that we just looked at a moment ago, would dictate how many weeks he received."  Q: "And did that severance pay account for Mr. Chambers' time at Lehman Brothers?"  A: "Yes, it did.").

[180] Apr. 22 Tr. at 191:6-13 [Chambers] (Q: "And under your severance – and Barclays told you, as you mentioned, Barclays told you that they calculated the amount of severance based on years of service, right?"  A: "That's what they told me."  Q: "And that was years of service with Lehman Brothers, right?"  A: "That's what they told me.").

78.     Barclays also paid Mr. Chambers a $1 million lump-sum payment.[181]  Barclays executive Mark Kurman testified that the $1 million enhanced payment was to compensate Mr. Chambers for his 2008 service at LBI.[182]  At the Merits Hearing, Mr. Chambers admitted that Barclays told him the $1 million payment was calculated based on his pre-acquisition work at LBI.[183]

79.     Before executing the separation agreement and waiver and general release, Mr. Chambers negotiated with Barclays to include language in the release providing that:

> For the avoidance of doubt, notwithstanding any other provision of this Waiver and General Release, nothing in this Waiver and General Release, or in the Separation Agreement to which it is attached, releases, discharges, or limits any claim, right, or cause of action I have or may assert against Lehman Brothers Inc. or any other Lehman Brothers entity by reason of my employment with Lehman Brothers Inc., the termination of that employment, or for any other reason.[184]

### C. Claimant Wayne Judkins

80.     Mr. Judkins was a proprietary trader at LBI and held the title of Senior Vice President at the time of Lehman's bankruptcy.[185]  Mr. Judkins began his employment with LBI in January 2008, trading U.S. government 10-year and 30-year bonds.[186]

### 1.      Mr. Judkins' 2008 Employment Agreement with LBI

---

[181] Trustee Ex. 14 (Mr. Chambers' Barclays Separation Agreement) at 1.

[182] Apr. 24 Tr. at 27:12-28:2 [Kurman] (Q:  "Do you see that there's a reference there to a million dollar special lump-sum payment?"  A:  "Yes."  Q:  "Could you tell me what that special lump-sum payment represents?"  A: "That is the enhancement in lieu of bonus for the prior year's service at Lehman.").

[183] Apr. 22 Tr. at 191:14-25 [Chambers] (Q:  "And under your severance agreement with Barclays, Barclays also gave you a million dollars, right?"  A:  "That is correct."  Q:  "And you testified that they told you that the million dollars was based on your title, your time of service, your years of service, and that it was the cap, the most amount that they would pay you, right?"  A:  "That's what they told me at the time."  Q:  "And you knew that years of service referred to your years of service at Lehman Brothers, right?"  A:  "That is correct.").

[184] Trustee Ex. 14 (Mr. Chambers' Barclays Separation Agreement) at 3.

[185] Trustee Ex. 66 (Mr. Judkins' Proof of Claim) at LBI_BONUS_CLAIMS_0000042 (Mr. Judkins was a "Senior Trader in the Fixed Income Division" and his title was Senior Vice President).

[186] Apr 22. Tr. at 228:15-229:1.

81.    Mr. Judkins had a written employment agreement for LBI's 2008 fiscal year[187] which provided for a base salary of $200,000 and a "minimum bonus in the amount of $800,000" for the 2008 fiscal year.[188]  Mr. Judkins' employment agreement provided that, at LBI's discretion, a portion of his 2008 total compensation would be payable to him in the form of conditional equity awards pursuant to the 2008 Equity Award Program.[189]  Mr. Judkins received a grant of RSUs with a value equal to $48,000 – 20 percent of the equity portion of his compensation guarantee – pursuant to the July RSU Grant.[190]

82.    While Mr. Judkins claims he was told that, if he performed well, he would receive additional bonus compensation, he admits that the $800,000 bonus was the only bonus guaranteed to him in writing.[191]  It was LBI's written bonus policy that bonuses were "not guaranteed unless otherwise agreed upon in writing" and were "determined at the full discretion of senior [Lehman] management."[192]  Mr. Judkins conceded that any bonus amounts for the 2008 fiscal year that he may have been awarded above the $800,000 minimum guarantee would have been determined at the discretion of LBI's management.[193]  Thus, as Mr. Judkins admitted, LBI

---

[187] Trustee Ex. 15 (Mr. Judkins' LBI Employment Agreement).

[188] *Id.* at 1.

[189] Trustee Ex. 15 (Mr. Judkins' LBI Employment Agreement) at 1 ("At the Firm's discretion, a portion of your 2008 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees with your position and corporate title.").

[190] Trustee's Ex. 69 (Mr. Judkins' Human Resources File) at 30-31 (recording that on July 1, 2008, Mr. Judkins received a grant of 2,290.08 RSUs with a grant price of $20.96, a total of $48,000).

[191] April 22 Tr. at 254:17-20 [Judkins] (Q:  "And that minimum $800,000 bonus, that was the only bonus amount that was guaranteed to you in writing, right?"  A: "Yes.").

[192] Trustee Ex. 3 (Lehman Brothers Employee Handbook) at LBI_BONUS_CLAIMS_0000378.

[193] Apr. 22 Tr. at 254:21-24 [Judkins] (Q:  "Any bonus amount above the $800,000 would have been determined in the discretion of LBI management, correct?"  A: "Yes.").

could have decided to pay him only an $800,000 bonus for the 2008 fiscal year no matter how well he performed during the year.[194]

> ### 2.    Barclays Paid Mr. Judkins the $800,000 he was Owed Under his 2008 Employment Agreement with LBI

83.    Following LBI's bankruptcy, Mr. Judkins accepted Barclays' offer of employment.[195]  Barclays provided Mr. Judkins with a written employment contract that provided for him to receive the same total compensation from Barclays as he would have received from LBI for 2008.  Thus, under Mr. Judkins' agreement with Barclays, he was entitled to receive $200,000 in base salary and an $800,000 bonus for 2008.[196]

84.    The bonus compensation that Barclays agreed to pay Mr. Judkins was for 2008, and not for any period after that.[197]  Although Mr. Judkins testified that his agreement with Barclays prohibited him from working elsewhere for three months after his employment terminated,[198] his understanding was incorrect – such agreement did not prohibit Mr. Judkins from being employed by Barclays' competitors for any period after his employment terminated; rather, it provided only that he could not solicit Barclays' employees or companies engaged in business with Barclays for a three month period.[199]

---

[194] Judkins Dep. Tr. at 46:14-17 (Q:  "And they could have decided to pay you only 800,000 dollars no matter how high your P&L was for the year, is that correct?"  A:  "Yes.").

[195] April 22 Tr. at 257:15-20 [Judkins] (Q:  "After Lehman filed for bankruptcy, Barclays offered you employment, correct?"  A:  "Yes."  Q:  "And you ultimately accepted Barclays' offer, right?"  A:  "Yes.").

[196] Trustee Ex. 17 (Mr. Judkins' Barclays Employment Agreement).

[197] *Id.*; Judkins Dep. Tr. 104:7-17 (Q:  "And that was for the 2008 performance year, correct?"  A:  "Yes."  Q:  "It wasn't for 2009 performance or anything thereafter?"  A:  "No.  If you wanted to have me in 2009, you had to pay me for 2008."); Apr. 22 Tr. at 260:15-20 [Judkins] (Q:  "What I'm trying to ask you is, this says for October 6th, 2008, we, Barclays, are giving you $660,000 for the performance year 2008.  What does 'for performance year 2008' refer to?"  A:  "That refers to the period from October to December 31st, 2008.").

[198] April 22 Tr. at 258:19-259:2 [Judkins] (Q:  "It wasn't for 2009 or any point after 2008[?]"  A:  "Well, actually, it is, but it says on the next page, it's basically they can hold me for another three months beyond that date.").

[199] Trustee Ex. 17 (Mr. Judkins' Barclays Employment Agreement) at 2 ("[F]or a period of three months after the expiration of your Notice Period, you shall not . . . induce, solicit or entice . . . any employee of Barclays . . . to

85.    Barclays paid Mr. Judkins a bonus for the 2008 fiscal year of $800,000, all in cash, in February 2009.[200]

### 3.    Mr. Judkins Did Not Incur Relocation Expenses in Connection with Selling his Home in Maryland

86.    In connection with accepting his position at LBI, Mr. Judkins relocated from Maryland to New York.[201]  To facilitate Mr. Judkins' relocation, LBI agreed to provide Mr. Judkins with relocation assistance in accordance with LBI's Executive Relocation and Home Sale Policy (the "Relocation Policy").[202]

87.    The Relocation Policy provided for certain entitlements for employees who owned their primary residence and were asked to relocate.[203]  The Relocation Policy provided that a "third-party relocation firm will assist you in selling your former residence."[204]  Provided that the employee engaged the services of Lehman's designated third-party relocation firm, Prudential Relocation ("Prudential"), the Relocation Policy provided for Lehman to be billed directly "for all reasonable and customary closing costs incurred in the sale of your former residence."[205]  The Relocation Policy explicitly stated that "[u]pon termination of your employment for any reason, any remaining relocation benefits will cease immediately."[206]

---

terminate his or her employment . . . [or] any . . . business entity to terminate or modify its business relationship with Barclays . . . .").

[200] April 22 Tr. at 249:13-16 [Judkins] (Q: "Okay, $800,000, I believe.  And do you recall whether you were told – do you recall when you received that bonus?"  A: "At the end of February 2009."), 261:18-20 [Judkins] (Q: "And you received the entire amount in cash, right?"  A: "Yes.").

[201] Id. at 262:13-17 [Judkins].

[202] Trustee Ex. 15 (Mr. Judkins' LBI Employment Agreement) at 2 ("In connection with your relocation to New York, you will be provided relocation assistance in accordance with the Firm's policy.").

[203] Trustee Ex. 4 (Executive Relocation and Home Sale Policy) at 6.

[204] Id.

[205] Id.

[206] Id. at 7.

88.      Although Mr. Judkins otherwise qualified for the benefits of the Relocation

Policy, he did not sell his home in Maryland.[207]  The costs Mr. Judkins claims in connection with

the sale of his home in Maryland are not actual costs but are instead costs Mr. Judkins claims he

would incur were he to sell his Maryland home.[208]  Mr. Judkins and his family still use his

Maryland home as a vacation home.[209]

### 4.      Mr. Judkins' Home Equity Loan from Prudential

89.      Pursuant to LBI's relocation services agreement with Prudential, LBI employees

who relocated and had owned their former residence were eligible to receive a home equity loan

from Prudential under certain circumstances.[210]  Upon the sale of the LBI employee's former

residence, Prudential would deduct the amount of the loan from the proceeds of the sale of the

residence.[211]  The relocation services agreement provided that if the employee failed to repay the

loan to Prudential within 120 days after receiving the loan, LBI would pay Prudential the amount

of the loan.[212]  In the event that LBI were to pay back a loan on behalf of one of its employees,

LBI would be "subrogated to the rights of Prudential against the Employee and [would] assume

complete responsibility for collecting the [Equity Loan]."[213]

---

[207] Apr. 22 Tr. at 264:3-5 (Q: "But you never sold your Maryland home, correct?"  A: "Correct.").

[208] Apr. 22 Tr. at 271:16-19 (Q:  "So the amount of your claim is an estimate of costs that you would incur if you did sell your house in Maryland, correct?"  A: "Yes.").

[209] Apr. 22 Tr. at 267:6-19 (Q: "But you testified that you haven't actually sold your home in Maryland, is that correct?"  A: "Right . . . . So we looked at the value of the home and said, 'It's significantly down.  I'm not going to go incur $300,000 in expenses that won't be reimbursed.  We'll just keep it as a second home.'").

[210] Trustee Ex. 68 (Relocation Services Agreement between Lehman Brothers Inc. and Prudential Relocation, Inc., dated March 14, 2006) at 4.

[211] *Id.*

[212] *Id.*

[213] *Id.*

90.    Mr. Judkins obtained an $840,000 home equity loan from Prudential (the "Equity Loan").[214]  The Equity Loan was intended to be an advance on the equity in his Maryland home and was to be repaid from the proceeds of the sale of the home.[215]  Mr. Judkins did not sell his Maryland home and he did not pay back the Equity Loan, causing Prudential to sue him.[216]  After Prudential brought its suit, Mr. Judkins paid back the Equity Loan.[217]

### D. Claimant Richard Hajdukiewicz

91.    Mr. Hajdukiewicz entered into an employment agreement with LBI dated September 14, 2007 that provided for him to join LBI as Head of Metals, Mining and Industrial Sales, North America in the Fixed Income Division.[218]  Mr. Hajdukiewicz held the title of Managing Director.[219]

92.    For the 2007 fiscal year, Mr. Hajdukiewicz's employment agreement provided for him to receive a base salary of $200,000 and a 2007 performance bonus of $2.11 million.[220]  For the 2008 fiscal year, his employment agreement provided for the same $200,000 salary with a minimum bonus in the amount of $1.91 million.[221]

---

[214] Apr. 22 Tr. at 263:16-24 [Judkins]; Trustee's Ex. 67 (Prudential Equity Loan Note) at 1 ("Prudential Relocation hereby loans You the sum of $840,000 . . . .").

[215] April 22 Tr. at 263:25-264:6 [Judkins] (Q:  "And the loan was [a]n advance on the home – on the equity in your Maryland home, correct?"  A:  "Yes."  Q:  "I think you testified earlier that you were supposed to pay the loan back out of the proceeds from the sale of your Maryland home, correct?"  A:  "Yes."); Trustee's Ex. 67 (Prudential Equity Loan Note) at 1 ("Prudential Relocation will deduct the Equity Loan amount from your gross equity, which will constitute repayment of your Equity Loan.").

[216] April 22 Tr. at 266:13-21 [Judkins].

[217] *Id.*

[218] Trustee Ex. 8 (Mr. Hajdukiewicz's LBI Employment Agreement) at 1.

[219] Apr. 22 Tr. at 197:25-198:2 [Hajdukiewicz].

[220] Trustee Ex. 8 (Mr. Hajdukiewicz's LBI Employment Agreement) at 1; Apr. 22 Tr. at 198:13-19 [Hajdukiewicz].

[221] Trustee Ex. 8 (Mr. Hajdukiewicz's LBI Employment Agreement) at 1; Apr. 22 Tr. at 198:18-19 [Hajdukiewicz].

93.     Mr. Hajdukiewicz's employment agreement provided for him to receive a portion

of his 2007 and 2008 total compensation in the form of conditional equity awards.[222]

### 1.   LBI Does Not Exercise its Discretion to Pay a Portion of Mr. Hajdukiewicz's 2007 Bonus in the Form of Conditional Equity Awards

94.     Mr. Hajdukiewicz commenced his employment with LBI on December 18, 2007.

In early 2008, Mr. Hajdukiewicz received his 2007 bonus from LBI entirely in cash.  When Mr.

Hajdukiewicz questioned Lehman's Human Resources department as to why his 2007 bonus did

not include any conditional equity awards, Mr. Hajdukiewicz received the following response:

> In order to receive equity in a given year, you must be employed by Lehman
> before the grant date.  The grate date is set by the executive compensation
> committee each year.  This year, it was December 8, 2007.  Your start date at
> Lehman was December 18, 2007.  We do not have any discretion over this.[223]

### 2.   Mr. Hajdukiewicz Participates in the July RSU Grant

95.      On July 3, 2008, LBI informed Mr. Hajdukiewicz, via email, that he would

receive a grant of RSUs in July 2008 that he could think of as a 20 percent advance on his 2008

year-end equity award.[224]  The RSU Schedule, reflecting the resolutions of the LBHI

Compensation Committee, was attached to the e-mail.[225]

96.     For Managing Directors with 2008 total compensation between $2,000,000 and

$2,499,999 – which included Mr. Hajdukiewicz – the RSU Schedule attached to the July 3, 2008

---

[222] Trustee Ex. 8 (Mr. Hajdukiewicz's LBI Employment Agreement) at 1-2 ("At the Firm's discretion, a portion of your 2007, 2008 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units, options, and/or other equity-based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees with your position and corporate title."); Apr. 22  Tr. at 199:11-15, 206:9-12 [Hajdukiewicz].

[223] Hajdukiewicz Ex. 3 (E-mail from Kimmy Gardner to Richard Hajdukiewicz, dated February 11, 2008) at 1-2.

[224] *Id.* ("You can think of this July award as an 'advance' against your 2008 year-end equity awards.  For people like you who are on a 2008 compensation guarantee, this July award represents 20% of the equity portion of your 2008 compensation guarantee.").

[225] Trustee Ex. 9 (July 3, 2008 email from "Your Benefits and Life Balance" re: 2008 Equity Award Program) ("Attached to this email is a grid that will apply to all RSUs that you receive under the 2008 Equity Award Program.").

e-mail provided that "$840,000 plus 72 [percent] of 2008 [total compensation] over $2.0 million" would be payable in the form of RSUs.[226]

97.     Consistent with the July 3, 2008 e-mail and the RSU Schedule, Mr. Hajdukiewicz's LBI personnel file reflects that he received a grant of RSUs, with a grant date of July 1, 2008 and a grant price of $20.96, with a value of $183,840, equal to 20 percent of the equity portion of his compensation guarantee.[227]  Mr. Hajdukiewicz does not recall receiving a grant of RSUs in July 2008.[228]

### 3.     Mr. Hajdukiewicz Joins Barclays, is Terminated, Receives a Lump-Sum Payment, and Executes a Release

98.     Following the Filing Date, Barclays offered Mr. Hajdukiewicz employment.[229] Mr. Hajdukiewicz accepted Barclays' employment offer,[230] but within a week of accepting, he learned that it was unlikely that he would continue to have a position at Barclays.[231]  Barclays subsequently terminated Mr. Hajdukiewicz, and the two parties entered into a separation agreement and general waiver and release, dated October 14, 2008.[232]

---

[226] *Id.* at 3.

[227] Trustee Ex. 58 (Mr. Hajdukiewicz's Human Resources File) at 37-39 (recording that on July 1, 2008, Hajdukiewicz received a grant of 8,770.99 RSUs with a grant price of $20.96, a total of $183,840).

[228] Apr. 22 Tr. at 213:5-7; 215:6-9 [Hajdukiewicz].

[229] Trustee's Exs. 54-55 (E-mails from Barclays to Lehman employees regarding Barclays employment offer); Apr. 22 Tr. at 216:7-9 [Hajdukiewicz].

[230] Apr. 22 Tr. at 216:20-217:5 [Hajdukiewicz].

[231] Trustee Ex. 56 (E-mails, dated September 26, 2008, between Mr. Hajdukiewicz, Carlos Fierro, and Skip McGee); Apr. 22 Tr. at 217:6-218:4 [Hajdukiewicz].

[232] Trustee Ex. 10 (Mr. Hajdukiewicz's Barclays Separation Agreement); Apr. 22 Tr. at 218:5-219:9 [Hajdukiewicz].

99.    Pursuant to the separation agreement, Barclays paid Mr. Hajdukiewicz 26 weeks of severance in accordance with Lehman's severance policy and taking into account Mr. Hajdukiewicz's years of service at LBI.[233]

100.    Barclays also paid Mr. Hajdukiewicz a $422,000 enhanced payment in lieu of a bonus based on the work he had performed for Lehman Brothers.[234]   The $422,000 payment, which constituted 20% of his 2007 LBI bonus amount, was calculated pursuant to Barclays' formula for calculating special lump sum payments to Managing Directors.[235]

101.    The waiver and general release Mr. Hajdukiewicz signed stated that:

In exchange for the payments and benefits set forth in my Separation Agreement, I hereby release Barclays Capital (the "Bank"), and all of its past and/or present divisions, affiliates, parents, subsidiaries, officers, directors, stockholders, trustees, employees, agents, representatives, administrators, attorneys, insurers, fiduciaries, *predecessors*, successors and assigns, in their individual and/or representative capacities (hereinafter collectively referred to as "the Barclays Group"), from any and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims and demands of any kind whatsoever ("Claims") which I or my heirs, executors, administrators, successors and assigns ever had, now have or may have against the Barclays Group, whether known or unknown to me, by reason of my employment and/or cessation of my employment, with the Bank *or with Lehman Brothers*, or otherwise involving facts which occurred on or prior to the effective date of this Waiver and General Release, except to the extent that any such Claim concerns an allegation that the Bank has failed to make the payment(s) set forth above.[236]

---

[233] Trustee Ex. 10 (Mr. Hajdukiewicz's Barclays Separation Agreement) at 1; Apr. 22 Tr. at 219:10-222:1 [Hajdukiewicz]; Apr. 24 Tr. at 33:9-19 [Kurman] (Q:  "And do you see from this agreement, that Mr. Hajdukiewicz received 26 weeks of severance pay?"  A:  "Yes, I do."  Q:  "Could you please tell me what that 26 weeks was based upon?"  A:  "The same referenced Lehman severance policy.").

[234] Trustee Ex. 10 (Mr. Hajdukiewicz's Barclays Separation Agreement) at 1; Apr. 24 Tr. at 33:20-34:10 [Kurman] (Q:  "Do you also see that Mr. Hajdukiewicz received a special lump-sum payment of $422,000?"  A:  "Yes, I do." . . . Q:  "And finally, sir, is that special lump-sum payment also an enhancement in lieu of bonus?"  A:  "Yes, it is.").

[235] Apr. 22 Tr. at 223:13-18 [Hajdukiewicz]; Apr. 24 Tr. at 33:24-34:7 [Kurman] (Q:  "What does that special lump-sum payment represent?"  A:  "Depending on his title, that's either 10 or 20 percent of his prior year's bonus agreement."  Q:  "And if I represented to you that Mr. Hajdukiewicz was a managing director, would you be able to tell me the percentage?"  A:  "That would be 20 percent then, of his prior year's bonus.").

[236] Trustee Ex. 10 (Mr. Hajdukiewicz's Barclays Separation Agreement) at 3.

102.    In connection with his separation agreement, Barclays provided Mr.

Hajdukiewicz, who was 53 years old at the time, with a copy of Disclosure Information Provided

Pursuant to the Older Workers Benefit Protection Act.[237]

## III.    THE CLAIMS

103.    The entirety of the Hoffman Claim and the Hajdukiewicz Claim and the majority

of the Judkins Claim and Chambers Claims are for non-discretionary bonuses in respect of LBI's

fiscal years 2007 and 2008, as the case may be, pursuant to employment agreements with LBI.

104.    In addition to his claim for a non-discretionary bonus allegedly owed to him in

respect of LBI's fiscal years 2007 and 2008, Mr. Chambers asserts that, pursuant to his

employment agreement, LBI owes him a $200,000 salary and a "guaranteed" $10 million bonus

for each of LBI's fiscal years 2009 and 2010.

105.    In addition to his claim for a non-discretionary bonus in respect of LBI's fiscal

year 2008, Mr. Judkins also asserts claims for (i) a discretionary bonus in respect of LBI's fiscal

year 2008; (ii) relocation expenses purportedly owed him under the terms of his employment

agreement; and (iii) reimbursement of the Equity Loan.

106.    Specifically, the Claims are as follows:

- The Hoffman Claim asserts that Mr. Hoffman is entitled to (i) a guaranteed bonus amount of $7,712,500 for LBI's fiscal year 2007, as provided for in his 2007 employment agreement; (ii) a guaranteed bonus amount of $76,285,940 for LBI's fiscal year 2008, as provided for in his 2008 employment agreement; and (iii) an unliquidated damages claim for LBI's alleged failure to deliver 783,475 restricted stock units ("RSUs") and 84,477 options to purchase LBHI stock.[238]

- The Chambers Claim asserts that Mr. Chambers is entitled to (i) a guaranteed bonus amount of $1,647,061 for LBI's fiscal year 2007, as provided for in his 2007 employment agreement; (ii) a guaranteed bonus amount of $42,386,172.99 for LBI's fiscal year 2008, as provided for in his employment agreement for

---

[237] Trustee Ex. 10 (Mr. Hajdukiewicz's Barclays Separation Agreement).

[238] *See* Trustee Ex. 36 (1EE Proof of Claim).

LBI's fiscal years 2008-2010; (iii) a guaranteed bonus amount of $10,000,000 for LBI's fiscal year 2009, allegedly provided for in his employment agreement for LBI's fiscal years 2008-2010; (iv) a base salary of $200,000 for LBI's fiscal year 2009, allegedly as provided for in his employment agreement for LBI's fiscal years 2008-2010; (v) a guaranteed bonus amount of $10,000,000 for LBI's fiscal year 2010, allegedly as provided for in his employment agreement for LBI's fiscal years 2008-2010; and (vi) a base salary of $200,000 for LBI's fiscal year 2010, allegedly as provided for in his employment agreement for LBI's fiscal years 2008-2010.[239]

- The Judkins Claim asserts that Mr. Judkins is entitled, pursuant to his 2008 employment agreement, to (i) a total bonus amount of between $2,000,000 and $2,400,000, of which $800,000 was guaranteed, for LBI's fiscal year 2008; (ii) relocation expenses of $400,000 in connection with Mr. Judkins' relocation from Easton, MD to New York to accept employment with LBI; and (iii) reimbursement of a home equity loan in the amount of $840,000.[240]

- The Hajdukiewicz Claim asserts that Mr. Hajdukiewicz is entitled to a guaranteed bonus of $1,610,000 for LBI's fiscal year 2008, as provided for in his 2008 employment agreement.[241]

## IV. The Trustee's Objections to the Claims

107.    In general terms, the Objection seeks to reduce or eliminate the amounts claimed in respect of LBI's obligation to pay the Claimants non-discretionary bonuses for LBI's fiscal years 2007 and 2008.

108.    The Trustee argues that LBI delegated such obligation to Barclays and that Barclays satisfied, in full or in part, LBI's obligation to pay such non-discretionary bonuses.

109.    The Trustee argues further that, if, after taking into account Barclays' payments as delegee, LBI still owes amounts in respect of its obligation to pay non-discretionary bonuses to each of the Claimants in respect of LBI's fiscal years 2007 and 2008, a percentage of each of such bonuses was to be paid in RSUs and that therefore, in accordance with the previous

---

[239] *See* Chambers Ex. 1 (Mr. Chambers' Proof of Claim).

[240] *See* Trustee Ex. 66 (Mr. Judkins' Proof of Claim).

[241] *See* Trustee Ex. 57 (Mr. Hajdukiewicz's Proof of Claim).

decision of this Court,[242] any such portion of the Claims to be paid in RSUs must be subordinated pursuant to section 510(b) of the Bankruptcy Code.

110.    The Objection also sets forth the following claim-specific arguments.

111.    First, with respect to the Hoffman Claim, the Trustee argues that to the extent such claim (i) was not satisfied by Barclays and (ii) is not subject to subordination under section 510(b), it should be equitably subordinated based on Mr. Hoffman's behavior following the Filing Date.

112.    Second, the Trustee argues that, to the extent the Hajdukiewicz Claim (i) was not satisfied by Barclays and (ii) is not subject to subordination under section 510(b), Mr. Hajdukiewicz waived such claim against LBI pursuant to his severance agreement with Barclays.

113.    Finally, the Objection further asserts that the additional claims raised by the Judkins Claim and by the Chambers Claim are meritless.

## DISCUSSION

As the Trustee's Objection to each of the Claims is premised on the assertion that LBI delegated its obligation to pay Claimants' LBI bonuses to Barclays pursuant to the APA, the Court will begin by determining whether LBI delegated such obligation and, if so, will determine the scope of the delegation.  Then, as the remainder of the Objection to each Claim is dependent on the particular facts of each such Claim, the Court will address each Claim in turn.

### A.  LBI Delegated its Responsibility to Pay 2008 Bonuses to "Transferred Employees"

The Trustee asserts that section 9.1(c) of the APA is the mechanism by which LBI delegated to Barclays its responsibility to pay bonuses to the Claimants.  That section provides, in relevant part:

---

[242] *In re Lehman Brothers Holdings Inc.*, 519 B.R. 47 (Bankr. S.D.N.Y. 2014).

On or after the Closing, [Barclays] shall, or shall cause its subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses") in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 . . . .  Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices . . . .[243]

Citing two opinions by this Court (the Hon. James M. Peck, presiding), the Trustee contends that the parties and this Court understood this language to effect a delegation of LBI's bonus obligations to Transferred Employees to Barclays.  *See In re Lehman Brothers Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) ("A going concern sale to Barclays also was the one way to eliminate claims of employees for lost wages and benefits."); *In re Lehman Brothers Holdings Inc.*, 456 B.R. 213, 219 (Bankr. S.D.N.Y. 2013) ("Lehman no longer has any ongoing liabilities to the Transferred Employees for bonus compensation.").  The Trustee acknowledges that LBI did not assign, and that Barclays did not assume, the employment contracts of the Transferred Employees and he also acknowledges that LBI remains liable to the extent that Barclays did not pay the Transferred Employees.  *See Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99 Civ. 2638 (HB), 1999 WL 1277243, at *4 (S.D.N.Y. Dec. 30, 1999).  However, to the extent that Barclays did pay bonus amounts to the Claimants, the Trustee contends that, under *Headrick v. Rockwell International Corp.*, 24 F.3d 1272 (10th Cir. 1994) and *Contemporary Mission Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977), LBI's liability to the Claimants is discharged to the extent of payments made by Barclays.

---

[243] Trustee Ex. 1(APA) § 9.1(c).

49

Mr. Hoffman contends that LBI could not and did not delegate its obligations to Transferred Employees to Barclays, for a number of reasons.[244]  First, citing also to *Contemporary Mission*, Mr. Hoffman asserts that, because the APA does not confer benefits upon the Claimants, LBI could not delegate its obligation to Transferred Employees without the consent of the Transferred Employees receiving delegated performance (which consent it did not receive).  Second, Mr. Hoffman urges that the delegation is actually an assignment that cannot have effect because Barclays never expressly "assumed" an obligation to pay Mr. Hoffman, and section 2.4(d) of the APA provides that all liabilities not expressly assumed by Barclays under Article 9 of the APA are deemed excluded.  Mr. Hoffman also notes that the APA provides that Barclays is only liable on contracts that are "Purchased Contracts" and that Mr. Hoffman's contract was not a Purchased Contract.  Third, Mr. Hoffman argues that a delegation cannot be accomplished without the consent of the delegate and that Barclays did not consent to a delegation.  Finally, Mr. Hoffman argues that, because the timing and structure of Barclays' payments to Mr. Hoffman were different from the timing and structure of the payments LBI owed to Mr. Hoffman, the delegation fails because it does not meet *Contemporary Mission*'s requirement that the duties delegated not differ materially from the duties of the primary obligor.

Each of Mr. Hoffman's arguments is inapposite or incorrect.  First, LBI's delegation did not require the consent of Transferred Employees.  *Contemporary Mission* does not, as Mr. Hoffman contends, stand for the proposition that delegation requires the consent of the party receiving performance.  In support of his contention, Mr. Hoffman cites to language from *Contemporary Mission* stating that "[n]o one can assign his liabilities under a contract without

---

[244] *See* Hoffman Post-Trial Br. ¶¶ 26-30.  While each Claimant argues that the APA did not effect a delegation of LBI's obligations, Mr. Hoffman's brief addresses each of the arguments made by the various Claimants and also includes arguments not made by other Claimants.  Accordingly, the Court will address only Mr. Hoffman's brief here.

the consent of the party to whom he is liable."[245]  That language is irrelevant here; the Trustee

concedes that LBI did not *assign* its liabilities to Barclays and indeed further concedes that it

remains liable for any amounts owed to the Claimants that Barclays did not pay, subject to its

own defenses.  New York courts have found, in accordance with the Restatement (Second) of

Contracts, that "[w]hile a delegation of a duty of payment does not necessarily require the

obligee's consent, it does not discharge the original obligor."  *Beck v. Mfrs. Hanover Trust Co.*,

125 Misc. 2d 771, 779 (N.Y. Sup. Ct. 1984) (quoting Restatement (Second) of Contracts).

This distinction, between an assignment of liability and a delegation of liability, also

answers Mr. Hoffman's second argument.  While Mr. Hoffman is correct that certain provisions

of the APA limited the liabilities Barclays would assume pursuant to the APA, these limitations

do not apply to a delegation, where there is no assumption of liability for the delegated

obligation.

Mr. Hoffman's third argument also fails.  Barclays did consent to the delegation; by

signing the APA, and accepting the language of Section 9.1(c), Barclays evidenced its agreement

to accept the delegation agreed to therein.

Fourth and finally, the duty LBI delegated to Barclays pursuant to Section 9.1(c) of the

APA – the obligation to pay Transferred Employees 2008 LBI bonuses – was identical to LBI's

obligation; there was no variance in the duty delegated.  While there may have been some

variance between the timing and structure of the LBI obligations to Transferred Employees and

the Barclays payments to Transferred Employees, such variance is relevant to the question of

whether Barclays satisfied the delegated obligation.

The Court finds that the plain language Section 9.1(c) of the APA evidences LBI's

delegation of its obligations to pay the Transferred Employees bonuses in respect of LBI's 2008

---

[245] Hoffman Post-Trial Br. ¶ 27 (quoting *Contemporary Mission*, 557 F.2d at 924).

fiscal year and Barclays' acceptance of such delegation.  Importantly, the scope of LBI's

delegation to Barclays is limited solely to what is provided for in section 9.1(c) of the APA.

That section provides only that Barclays shall "pay each Transferred Employee an annual bonus

in respect of the 2008 Fiscal Year."  Thus, a payment from Barclays to a Claimant will only be

within the scope of the delegation, and thus discharge LBI's liability to such Claimant, if (i) the

Claimant is a Transferred Employee and (ii) the payment is made in respect of a bonus for LBI's

fiscal year 2008.

### B.  The Hoffman Claim

The Hoffman Claim asserts that Mr. Hoffman is entitled to:

- a guaranteed bonus amount of $7,712,500 for LBI's fiscal year[246] 2007, as provided for in his 2007 employment agreement;
- a guaranteed bonus amount of $76,285,940 for LBI's fiscal year 2008, as provided for in his 2008 employment agreement; and
- an unliquidated damages claim for LBI's alleged failure to deliver 783,475 RSUs and 84,477 options to purchase LBHI stock.[247]

The Trustee contends that, with respect to Mr. Hoffman's bonus claims, (i) Barclays, as

LBI's delegate, satisfied the entirety of the approximately $83 million of LBI's bonus obligations

to Mr. Hoffman; (ii) the Hoffman Claim overstates the amount of the 2008 bonus Mr. Hoffman

to which Mr. Hoffman would have been entitled by approximately $1 million; (iii) to the extent

that Barclays did not satisfy any portion of Mr. Hoffman's 2008 bonus claim, 50% of such bonus

would have been payable in RSUs and therefore must be subordinated pursuant to section 510(b)

of the Bankruptcy Code; and (iv) Mr. Hoffman's bonus is subject to the cap imposed by section

502(b)(7) of the Bankruptcy Code limiting the amount of claims arising from termination of

---

[246] At all relevant times, LBI utilized a fiscal year that ran from December 1 to November 30.

[247] *See* Trustee Tr. Ex. 36 (1EE Proof of Claim).  Mr. Hoffman appears to have abandoned his claim for unliquidated damages for LBI's alleged failure to deliver 783,475 RSUs and 84,477 options to purchase LBHI stock, perhaps in recognition that such claim is foreclosed by this Court's decision in *In re Lehman Brothers Holdings Inc.*, 519 B.R. 47 (Bankr. S.D.N.Y. 2014).

employment. The Trustee also contends that Mr. Hoffman's claim for damages on account of

undelivered RSUs and options to purchase LBHI stock must be subordinated pursuant to section

510(b) of the Code. Finally, the Trustee asserts that, to the extent any portion of the Hoffman

Claim is allowed by the Court, such allowed amount should be equitably subordinated. The

Court will address each aspect of the Hoffman Claim in turn.

### 1.   Guaranteed Bonus Amount of $7,712,500 for LBI's Fiscal Year 2007

There is no dispute that, as of the Filing Date, pursuant to Mr. Hoffman's 2007

employment agreement, LBI was obligated to pay Mr. Hoffman $7,712,500, in cash.[248] There is

also no dispute that Mr. Hoffman included the amount of his 2007 bonus in the $83 million that

he was seeking to recover when negotiating his employment in the days after the Filing Date.[249]

The Trustee's Objection does not distinguish between Mr. Hoffman's 2007 and 2008 bonuses;

that is, the Trustee contends that, because Barclays paid Mr. Hoffman $83 million on account of

LBI's bonus obligations to him as of the Filing Date, the Hoffman Claim for bonus

compensation, whether for 2007 or for 2008, must be reduced by the same $83 million.[250]

While the Court has found as a matter of fact that Barclays structured Mr. Hoffman's

employment agreement with Barclays to pay him the $83 million he was owed by LBI,[251]

Barclays' payment releases LBI from its liability only if Barclays made such payments as LBI's

delegate. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994) ("If the

delegate performs the duty, the duty is discharged, and the obligor owes the obligee nothing.")

(internal citations and quotation omitted). As described above, the scope of LBI's delegation to

---

[248] FoF ¶ 32.

[249] FoF ¶ 39.

[250] *See* Trustee Post-Trial Br. ¶¶ 23-29.

[251] FoF ¶ 47.

Barclays was limited to payments of bonuses (i) to Transferred Employees and (ii) in respect of a

bonus for LBI's fiscal year 2008.  Therefore, LBI's obligation to pay Mr. Hoffman's 2007 bonus

was outside the scope of the delegation to Barclays and LBI remains liable for such obligation.

As the Trustee has not disputed that Mr. Hoffman is entitled to a 2007 bonus in the amount of

$7,712,500, in cash, the Court finds that the portion of the Hoffman Claim related to Mr.

Hoffman's 2007 bonus will be allowed.

### 2.    Guaranteed Bonus Amount of $76,285,940 for LBI's Fiscal Year 2008

#### i.    *LBI Delegated its Obligation to Pay Mr. Hoffman's 2008 Bonus to Barclays*

The Trustee contends that LBI delegated its obligation to pay Mr. Hoffman's 2008 bonus

to Barclays.  Again, the scope of LBI's delegation to Barclays was limited to payments of

bonuses (i) to Transferred Employees and (ii) in respect of a bonus for LBI's fiscal year 2008.

Mr. Hoffman's 2008 bonus is indisputably in respect of a bonus for LBI's fiscal year 2008.

Thus, if Mr. Hoffman is a Transferred Employee (as defined in the APA), LBI did indeed

delegate to Barclays its obligation to pay Mr. Hoffman's 2008 bonus.

Mr. Hoffman argues, unpersuasively, that LBI did not delegate to Barclays its obligation

to pay him his 2008 bonus because he was not a Transferred Employee.  Section 9.1(a) defines a

Transferred Employee as:

> Each Offeree (*i.e.*, all active Lehman employees employed in connection with the
> business Barclays was purchasing, unless identified to Barclays) who accepts
> [Barclays'] or one of its subsidiaries' offer of employment, together with each
> person whose employment transfers to [Barclays] automatically by operation of
> law.

Section 9.1(a) of the APA further provides that:

> An Offeree who performs work at his then applicable place of employment on the
> first Business Day immediately following the Closing shall be deemed for all
> purposes of [the APA] to have accepted [Barclays'] or one of its subsidiaries'

54

offer of employment and shall be deemed to be a Transferred Employee for all purposes of [the APA].

Thus, the APA provided two ways for a former LBI employee such as Mr. Hoffman to become a Transferred Employee. First, the LBI employee could accept Barclays' offer of employment or, second, the LBI employee could simply perform work at his place of employment on September 22, 2008, the first business day following the closing of the APA.

Mr. Hoffman argues that because he did not promptly or otherwise accept Barclays' "blast email" offer of employment and did not perform work on September 22, 2008, he does not meet the APA's definition of a Transferred Employee. It is undisputed that Mr. Hoffman did not perform work at his place of employment on September 22, 2008;[252] accordingly, Mr. Hoffman could not have become a "deemed" Transferred Employee. It is equally undisputed, however, that Mr. Hoffman accepted an offer of employment from Barclays on October 3, 2008 and commenced employment with Barclays, becoming as of that moment a Transferred Employee pursuant to the plain meaning of the first sentence of Section 9.1(a) of the APA.[253]

Mr. Hoffman attempts to evade this inconvenient truth by seizing on the fact that Section 9.1(a) of the APA, prior to introducing the concept of a Transferred Employee, provides that Barclays must make offers of employment to Offerees, an obligation Barclays fulfilled in the first instance by sending the so-called blast email to Lehman employees on September 21, 2008. Mr. Hoffman therefore asserts that the *only* "offer of employment" that, if accepted, would make the Offeree a Transferred Employee is the blast email offer of employment, which offer Mr. Hoffman did not accept.[254] This is pure nonsense.

---

[252] FoF ¶ 37.

[253] FoF ¶ 52.

[254] Hoffman Post-Trial Br. ¶ 19.

The APA's definition of Transferred Employee provides, simply, that an Offeree "who accepts [Barclays'] or one of its subsidiaries' offer of employment" is a Transferred Employee. The definition does not state that only one specific offer of employment will, if accepted, render an Offeree a Transferred Employee. Had Lehman and Barclays wished to provide that only the acceptance of the offer of employment referenced in Section 9.1(a), the so-called blast e-mail, would be sufficient to render an Offeree a Transferred Employee, it would have been easy to do so. However, Lehman and Barclays did not choose to add such limiting language and Mr. Hoffman has offered no reasoning, other than perhaps proximity in the document, for why the Court should read such language into the APA now. Accordingly, the Court finds that (i) Mr. Hoffman's acceptance, contractually and by his conduct, of Barclays' October 3, 2008 offer of employment was sufficient to bring him within the definition of a Transferred Employee under the APA and (ii) pursuant to Section 9.1(c) of the APA, LBI delegated to Barclays its obligation to pay Mr. Hoffman's 2008 bonus.

### ii.    *Barclays Satisfied LBI's Obligation to Pay Mr. Hoffman's 2008 Bonus*

Mr. Hoffman's employment agreement with Barclays essentially replicated the salary and performance bonus terms of his 2008 LBI employment agreement.[255]  By the Barclays employment agreement, Barclays agreed to pay Mr. Hoffman $70 million in "Special Awards" and an enhanced percentage of his trading profits until he earned an incremental $13 million.[256] The Trustee contends that Barclays added this $83 million to what was essentially a continuation of Mr. Hoffman's LBI employment agreement in order to satisfy LBI's bonus obligations to Mr. Hoffman – and that he is not entitled to be paid twice.[257]

---

[255] *See* FoF ¶ 47.

[256] *See* FoF ¶¶ 47-49.

[257] *See* Trustee Post-Trial Br. ¶ 25.

Mr. Hoffman disputes the Trustee's contention, on several grounds.  He seeks to characterize the $83 million paid by Barclays as wholly unrelated to his past performance at LBI; rather, he says it was paid to "respect [him]" for his abilities.[258]  Mr. Hoffman also posits that the Trustee should be judicially estopped from arguing that the $83 million paid to him by Barclays satisfied some or all of LBI's obligation because LBHI has previously taken the position before the Court that such payments were unrelated to LBI's bonus obligation.[259]  Neither argument is persuasive.

### a.   The Trustee is Not Estopped

Judicial estoppel is a narrowly-tailored and infrequently invoked principle that only applies if (i) a party's later position is "clearly inconsistent" with its earlier position; (ii) the party's former position has been adopted in some way by the court in the earlier proceeding; and (iii) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.  *Adelphia Recovery Trust v. HSBC Bank USA, Nat'l Assoc. (In re Adelphia Recovery Trust)*, 634 F.3d 678, 695 (2d Cir. 2011) (internal citations omitted).  Mr. Hoffman argues that LBI should be judicially estopped from arguing that Barclays satisfied LBI's 2008 bonus obligation to Mr. Hoffman because, in two separate litigation proceedings against Barclays that were before the Court in 2010 and 2011, LBHI took the position that Barclays' payments to Mr. Hoffman were not in the nature of a bonus for his 2008 performance at Lehman, and, in Mr. Hoffman's view, the Court adopted such position.[260]

In order to determine whether or not judicial estoppel applies here, it is necessary to delve into some of the litigation history to which Mr. Hoffman refers.  In 2010, each of the Trustee,

---

[258] 1EE Proposed Findings of Fact ¶ 150; Hoffman Post-Trial Br. ¶ 14.

[259] *See* Hoffman Post-Trial Br. ¶¶ 33-38.

[260] *Id.*

LBHI, and the Official Committee of Unsecured Creditors (the "Movants") separately moved for

relief under Federal Rule of Civil Procedure 60(b) from the Court's order approving the sale to

Barclays pursuant to the APA (collectively, the "Rule 60(b) Motions"). Each of the Movants

also filed an adversary complaint against Barclays, each of which included counts that, to some

extent, overlapped with one or more of the Rule 60(b) Motions. By stipulation of the parties, the

Court ruled on such overlapping counts, along with the Rule 60(b) Motions, in *In re Lehman*

*Brothers Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (the "Rule 60(b) Decision").

Count II of LBHI's adversary complaint asserted that, because Barclays had paid less than the $2

billion estimated for 2008 bonuses on the schedule referred to in Section 9.1(c) of the APA, it

had not fully performed on its obligation to Lehman to pay 2008 bonuses to Transferred

Employees pursuant Section 9.1(c) of the APA and thus owed damages. The Trustee did not

make a similar assertion in his adversary complaint. Count II of LBHI's adversary complaint

was not resolved in the Rule 60(b) Decision.[261]

        LBHI's Rule 60(b) Motion asserted that Barclays engaged in misconduct following the

closing of the sale, citing as evidence LBHI's contention that Barclays had paid less than the $2

billion estimated for 2008 bonuses on the schedule referred to in Section 9.1(c) of the APA. In

defending against those assertions, Barclays offered a spreadsheet produced by Paul Exall (the

"Exall Spreadsheet"), the Barclays executive in charge of monitoring compensation paid to

Transferred Employees, purporting to list $1.951 billion in payments to Transferred Employees

for their pre-acquisition services, including $53 million in bonus payments to Mr. Hoffman. In

its post-trial proposed findings of fact in that matter, LBHI stated that Mr. Exall admitted during

the trial that the payments to Mr. Hoffman were not in the nature of a bonus for his 2008

---

[261] *See* Rule 60(b) Decision at 167 (listing counts of adversary complaints that were to be resolved; Count II of the
LBHI adversary complaint is not included).

performance at Lehman and cited to the portion of the trial transcript containing the purported admission.[262]  In the Rule 60(b) Decision, in a section entitled "The Rule 60(b) Standard and Background of Movants' 60(b) Claims," Judge Peck discussed the Exall Spreadsheet and noted, "Several entries on the spreadsheet, however, do not relate to bonuses."[263]  Judge Peck followed that sentence with multiple citations to the trial transcript, including the portion that LBHI argued contained Mr. Exall's admission that the $53 million in payments to Mr. Hoffman were not in the nature of a bonus for his 2008 performance at Lehman.[264]  Judge Peck ultimately denied the Rule 60(b) Motions in the Rule 60(b) Decision.[265]

Following the Rule 60(b) Decision, LBHI moved for summary judgment on Count II of its adversary complaint, asserting damages for Barclays' alleged failure to pay the entirety of the $2 billion estimated for 2008 Lehman bonuses on the schedule referred to in Section 9.1(c) of the APA.[266]  Barclays cross-moved for summary judgment.  In its motion, LBHI reasserted its position that the $53 million in payments to Mr. Hoffman listed on the Exall Spreadsheet were not in the nature of a bonus for Mr. Hoffman's 2008 performance at Lehman[267] and further argued that Judge Peck had found, in the Rule 60(b) Decision, that Barclays had paid only $1.5 billion, a number arrived at by subtracting, among other non-bonus payments, the $53 million in

---

[262] *See* 1EE Ex. 058 (LBHI Proposed Findings of Fact in connection with its Rule 60(b) Motion) ¶ 367.

[263] Rule 60(b) Decision at 174.

[264] Rule 60(b) Decision at 174-75.

[265] Rule 60(b) Decision at 205 ("The sale process may have been imperfect, but it was still adequate under the exceptional circumstances of Lehman Week.  Especially due to the procedural and substantive importance of maintaining the finality of orders approving the sale of assets under Section 363(b) of the Bankruptcy Code, based on the evidence justice does not require relief from the Sale Order under Rule 60(b).").

[266] 1EE Ex. 060 (LBHI's Memorandum of Law in Support of its Motion for Summary Judgment on Count II of its Adversary Complaint Against Barclays Capital Inc.).

[267] 1EE Ex. 060 (LBHI's Memorandum of Law in Support of its Motion for Summary Judgment on Count II of its Adversary Complaint Against Barclays Capital Inc.) ¶ 30.

payments to Mr. Hoffman from the total $1.951 billion listed in the Exall Spreadsheet.[268]  At oral

argument on LBHI's motion for summary judgment, Judge Peck confirmed that he did not view

his statements in the section of the Rule 60(b) Decision entitled "The Rule 60(b) Standard and

Background of Movants' 60(b) Claims" to constitute findings of fact, stating, "it's in

background, words that I took from the record.  Every word I take from the record I don't view

as my words, nor do I view that as my finding."[269]  Judge Peck ultimately denied LBHI's motion

for summary judgment and granted Barclays' cross-motion.[270]

        The foregoing litigation history reflects that none of the elements required to apply

judicial estoppel is present here.  First, and most importantly, Mr. Hoffman seeks judicial

estoppel on the basis of a position taken by LBHI, not by the Trustee on behalf of LBI.  As has

been made clear throughout these cases, LBHI and LBI are separate estates and separate entities

and the actions of one cannot automatically be attributed to the other.  Accordingly, the positions

taken by LBHI with respect to Barclays' payments to Mr. Hoffman cannot be attributed to LBI

or to the Trustee.  In fact, the litigation history explicitly demonstrates that the Trustee did not

join LBHI's arguments or adopt them as his own.  The Trustee filed his own Rule 60(b) Motion

and did not at any point in the Rule 60(b) litigation join LBHI's Rule 60(b) Motion.[271]  Further,

---

[268] *See* 1EE Ex. 60 (LBHI's Memorandum of Law in Support of its Motion for Summary Judgment on Count II of its Adversary Complaint Against Barclays Capital Inc.) ¶ 46 ("The Court expressly found that . . . '[i]n the end, subtracting out all non-bonus payments, Barclays paid approximately $1.5 billion in bonuses to Transferred Employees.'").

[269] Sept. 7, 2011 Tr. 13:13-15, *Lehman Bros. Holdings Inc. v. Barclays Capital, Inc.*, No. 09-01731 (JMP) (Bankr. S.D.N.Y. Sept. 7, 2011), [ECF No. 26].

[270] *See In re Lehman Brothers Holdings Inc.*, 456 B.R. 213 (Bankr. S.D.N.Y. 2011).

[271] *See* Rule 60(b) Decision at 163-68 (procedural history).  Mr. Hoffman erroneously asserts that the Trustee and LBHI acted as joint movants.  Hoffman Post-Trial Br. ¶ 35.  While the Trustee joined LBHI's motion for an order authorizing discovery from Barclays under Federal Rule of Bankruptcy Procedure 2004, he did not join LBHI's Rule 60(b) Motion.  *See* Rule 60(b) Decision at 165-66.

the Trustee filed his own post-trial brief in support of his Rule 60(b) Motion.[272]  The Trustee's

brief did not in any way join or mention the arguments made by LBHI with respect to Mr.

Hoffman or the Exall Spreadsheet.[273]  Finally, following the Rule 60(b) Decision, the Trustee did

not join or otherwise participate in LBHI's motion for summary judgment on Count II of its

adversary proceeding.  Accordingly, the Trustee's position here is not clearly inconsistent with

his earlier position, nor does it assert two separate positions.  Thus, the first and third elements

required to apply judicial estoppel are not present here.

The second element, adoption by the Court, is also not present.  Judge Peck made clear

that his statements in the background section of the Rule 60(b) Decision, including the citation to

Mr. Exall's testimony with respect to Barclays' payments to Mr. Hoffman, were not adopted by

the Court as its findings of fact.  Further, Judge Peck denied LBHI's Rule 60(b) Motion and

Count II of LBHI's adversary proceeding.  Thus, no court has adopted LBHI's position with

respect to the nature of Barclays' payments to Mr. Hoffman.  Accordingly, the Trustee is not

estopped from asserting that Barclays paid Mr. Hoffman's 2008 bonus on behalf of LBI.

### b. The Evidence Establishes that Barclays Paid Mr. Hoffman the Additional $83 Million with the Intent of Satisfying LBI's 2007 and 2008 Bonus Obligations to Mr. Hoffman

Following the Filing Date, Mr. Hoffman was understandably concerned that LBI would

not be able to satisfy the approximately $83 million of bonus compensation he was owed for his

work in 2007 and 2008.[274]  Mr. Hoffman further testified that he had been relying on his bonus

compensation to counterbalance the approximately $60 million decrease in value that his LBHI

equity had suffered prior to the Filing Date in 2008; as Mr. Hoffman put it, his bonus

---

[272] Case No. 08-01420 [ECF No. 3911].

[273] *See id.*

[274] *See* FoF ¶ 38.

compensation and the reduced value of his LBHI equity holdings "seemed to balance in my own personal balance sheet."[275]  Accordingly, as part of his negotiating strategy in late September 2008, Mr. Hoffman made clear to Barclays, and to other potential employers, that he was seeking to recoup the approximately $83 million that he would not be receiving from LBI.[276] Specifically, in his negotiations with Barclays, Mr. Hoffman made clear, time and again, that he was focused on obtaining the approximately $83 million he had earned for 2007 and 2008 and that he would have preferred if Barclays had just assumed that liability.[277]

Notwithstanding the undeniable interest in his services, only Barclays put forward a definitive offer to structure Mr. Hoffman's compensation to allow him to recoup that approximately $83 million.[278]  In fact, as Mr. Keegan testified, Barclays structured Mr. Hoffman's employment agreement specifically to allow him to recover the approximately $83 million owed to him from his time at LBI.[279]  While other Barclays employees may have, in the heat of negotiations with Mr. Hoffman, characterized the $83 million in payments as a "retention tool" designed to "respect" and "motivate" Mr. Hoffman,[280] Barclays itself has consistently taken the position that the $83 million paid to Mr. Hoffman above and beyond the replication of his core LBI deal was on account of LBI's obligations to Mr. Hoffman for the 2007 and 2008 fiscal years.[281]  Thus, the evidence shows that Mr. Hoffman negotiated for the payment of approximately $83 million that he would have received had LBI continued as a going concern

---

[275] Apr. 23 Tr. 141:17-23 [Hoffman].

[276] FoF ¶¶ 39.

[277] FoF ¶¶ 39-01.

[278] *See* FoF ¶ 37.

[279] FoF ¶ 47.

[280] *See* Hoffman Post-Trial Br. ¶ 14.

[281] *See* Trustee Ex. 34 (e-mail among Barclays' HR professionals stating that Barclays had "assumed" LBI's $83 million obligation to Mr. Hoffman and delivered it to him in the form of the special awards and increased profit percentage up to an incremental $13 million).

and Barclays, alone among market participants and potential employers, was willing to offer it to him.  Although the timing and structure of the $83 million payment provided for in Mr. Hoffman's Barclays employment agreement varied slightly from the timing and structure of the approximately $83 million he would have received had LBI continued as a going concern, these variances do not alter the conclusion: Mr. Hoffman sought $83 million from his post-LBI employer in order to be made whole for his lost LBI bonuses and to balance his personal balance sheet, and Barclays gave it to him.

The Court finds that the $83 million Barclays paid to Mr. Hoffman above and beyond the replication of his core LBI deal was intended to satisfy LBI's obligation to pay Mr. Hoffman his 2007 and 2008 bonus in respect of work performed by him while at LBI.  Such payment fully satisfies LBI's obligation to pay Mr. Hoffman's 2008 bonus,[282] which, as discussed above, was the only obligation LBI delegated to Barclays.[283]  Accordingly, the Trustee's objection to the portion of the Hoffman Claim seeking an allowed claim in the amount of $76,285,940 on account of Mr. Hoffman's 2008 bonus is sustained.

In accordance with the foregoing, the Court finds that the Hoffman Claim should be allowed in the amount of $7,712,500.[284]  The Court further finds, in accordance with its comments on the record during closing arguments,[285] that there is nothing in this record, including the facts giving rise to Mr. Hoffman's claim and his behavior in negotiating for

---

[282] While the Court finds that Mr. Hoffman's 2008 bonus is properly calculated as $75,539,600, FoF ¶ 35, the $83 million paid by Barclays on account of LBI's obligation to pay Mr. Hoffman's 2008 bonus satisfies even the $76,285,940 shown on the Hoffman Claim, rendering such finding moot.

[283] As the Court finds that the portion of the Hoffman Claim for Mr. Hoffman's 2008 bonus has been satisfied in full, it is not necessary to reach the Trustee's argument that such claim is subject to the section 502(b)(7) cap.

[284] For the reasons stated in the Court's decision in *In re Lehman Brothers Holdings Inc.*, 519 B.R. 47 (Bankr. S.D.N.Y. 2014), the portion of the Hoffman Claim for RSUs and options to purchase LBHI Stock is subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

[285] Jul. 21 Tr. at 81:6-8.

employment with Barclays following the Filing Date, that persuades the Court that any portion of such allowed amount should be equitably subordinated.

### C. The Chambers Claim

As described more fully above, the Chambers Claim asserts that Mr. Chambers is entitled to guaranteed bonuses for 2007 and 2008, calculated based on the Fund's performance during those years. The Chambers Claim also asserts that Mr. Chambers is entitled to purportedly guaranteed salaries and minimum bonuses for 2009 and 2010, despite Mr. Chambers' acknowledgment that the Fund was not operating and Mr. Chambers was not employed by LBI during 2009 and 2010.

The Trustee does not dispute the amount of Mr. Chambers' 2007 bonus but contends that, as Mr. Chambers' 2007 bonus was considered part of his 2008 total compensation for purposes of Lehman's 2008 Equity Award Program, 65% of Mr. Chambers' 2007 bonus is payable in RSUs and therefore such amount must be subordinated pursuant to section 510(b) of the Bankruptcy Code.

With respect to the 2008 bonus, the Trustee contends that, taking into account Mr. Chambers' $200,000 salary, and the $1.2 million in total compensation of Messrs. Kettler, Verghese, and Guy Hoffman, Mr. Chambers' 2008 bonus is properly calculated as $41,506,750. The Trustee argues that this amount should be further reduced by the $1 million lump-sum Barclays paid to Mr. Chambers, which the Trustee contends was paid in respect of the bonus obligation LBI delegated to Barclays. The Trustee further asserts that, as with his 2007 bonus, 65% of Mr. Chambers' 2008 bonus (whether reduced by the $1 million lump-sum payment from Barclays or not) is payable in RSUs and therefore must be subordinated pursuant to section

64

510(b).  The Trustee also contends that Mr. Chambers' claim for his 2008 bonus is subject to the

cap imposed by section 502(b)(7) of the Bankruptcy Code.

Finally, the Trustee contends that Mr. Chambers' claims for 2009 and 2010 salary and

bonus compensation are foreclosed by the terms of his 2008 employment agreement and by

section 502(b)(7) of the Bankruptcy Code.  The Court will address each portion of the Chambers

Claim in turn.

### 1.    Guaranteed Bonus Amount of $1,647,051 for LBI's Fiscal Year 2007

The sole question with respect to Mr. Chambers' 2007 bonus is whether any part of it is

payable in RSUs and therefore subject to subordination under section 510(b) of the Bankruptcy

Code.  Mr. Chambers' 2008 employment agreement provided that, at LBI's discretion, a portion

of his 2008 total compensation could be payable in RSUs or other forms of equity pursuant to

Lehman's 2008 Equity Award Program.  As Mr. Chambers' 2008 employment agreement

provided that, for purposes of Lehman's 2008 Equity Award Program, his 2007 bonus would be

considered part of his 2008 total compensation; if LBI exercised its discretion to pay a portion of

Mr. Chambers' 2008 total compensation in RSUs, such exercise of discretion would also affect

Mr. Chambers' 2007 bonus.

### i.    *LBI Did Not Exercise its Discretion to Pay a Portion of Mr. Chambers' 2008 Total Compensation in RSUs*

Mr. Chambers' 2008 employment agreement with LBI stated: "At the Firm's

discretion, a portion of your total compensation for [applicable year or years] Performance Year

(including any Performance Bonus) will be payable in conditional equity awards . . . pursuant to

the Firm's Equity Award Program . . . as generally in effect for employees at your level."  As

65

Mr. Chambers points out in his brief, by its terms, the agreement required LBI to exercise its

discretion in order to make a portion of Mr. Chambers' 2008 total compensation payable in

RSUs.[286]  Mr. Chambers argues that LBI never exercised such discretion and, thus, section

510(b) of the Bankruptcy Code is inapplicable.[287]

As described above, through its administration of the Lehman Equity Award Program,

the LBHI Compensation Committee was vested with the Firm's discretion to pay a portion of

Lehman employees' compensation, including LBI employees such as Mr. Chambers, in

conditional equity awards.[288] The evidence establishes that, if the LBHI Compensation

Committee did not exercise its discretion to pay a portion of an employee's total compensation in

RSUs or other conditional equity awards, as was the case, for example, with Mr. Hajdukiewicz's

2007 bonus, such employee would be paid entirely in cash.[289]  Therefore, to the extent the LBHI

Compensation Committee did not exercise its discretion to pay Mr. Chambers in conditional

equity awards, the entirety of his 2008 total compensation, including the remaining portion of his

2007 bonus, would be payable in cash.

The Trustee contends that the LBHI Compensation Committee exercised its discretion

with respect to all of the Claimants when it issued the RSU Schedules, which were attached to

the employment agreements of Mr. Chambers and Mr. Hoffman and e-mailed to Mr. Judkins and

Mr. Hajdukiewicz.[290]  The Trustee asserts that the percentage of each Claimant's 2008 total

compensation identified on the RSU Schedule as payable in RSUs represents a claim for

unissued RSUs that must be subordinated pursuant to section 510(b) of the Bankruptcy Code and

---

[286] *See* Chambers Post-Trial Br. ¶ 8.

[287] *See id.* at ¶¶ 8-13.

[288] *See* FoF ¶¶ 15-17.

[289] *See* FoF ¶¶ 94.

[290] *See* Trustee Post-Trial Br. at ¶¶ 51-54.

66

*In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006).  The Trustee further argues that Mr.

Chambers (and the other Claimants), by agreeing to be paid partially in RSUs at the LBHI

Compensation Committee's discretion, took on the risk and reward expectations of a shareholder

with respect to that portion of their compensation, placing them in a similar position as the

claimants in *O'Donnell v. Tristar Esperanza Properties, LLC (In re Tristar Esperanza

Properties, LLC)*, 782 F.3d 492 (9th Cir. 2015) and *KIT Digital, Inc. v. Invigor Group Ltd. (In re

KIT Digital, Inc.)*, 497 B.R. 170 (Bankr. S.D.N.Y. 2013), whose claims were subordinated.[291]

Finally, the Trustee submits that the Claimants' situation is not different from that of

commission-based Lehman employees, whose claims for unissued RSUs the Court has

previously subordinated.[292]

 This much is clear: LBI, or, more accurately, the LBHI Compensation Committee, did

not exercise its discretion to pay any portion of Mr. Chambers' 2008 total compensation in

RSUs.  Issuing the RSU Schedule did not, as the Trustee contends, operate as an exercise of the

LBHI Compensation Committee's discretion.  In fact, as Mr. Chambers notes in his brief,[293] the

LBHI Compensation Committee passed a resolution at the July 1, 2008 meeting – the same

meeting in which the LBHI Compensation Committee resolved to issue the RSU Schedule and

make the July RSU Grant – that makes clear that (i) the LBHI Compensation Committee retained

its discretion to grant RSUs with respect to an employee's 2008 year-end bonus and (ii) issuing

the RSU Schedule was not to be understood as an exercise of its discretion in that regard:

> RESOLVED, that nothing in the foregoing resolutions is intended to, and shall
> not, confer upon any employee any right to any discretionary bonus with respect
> to Holdings' fiscal year ending November 30, 2008 or any grant of any equity
> award apart from the July RSUs; it being understood that the sole purpose of the

---

[291] *See* Trustee Post-Trial Reply Br. at ¶¶ 32-33.

[292] Trustee Post-Trial Br. ¶ 32 (citing *In re Lehman Bros. Holdings Inc.*, 519 B.R. at 64, n.18).

[293] *See* Chambers Post-Trial Br. ¶ 11.

foregoing resolution determining the [RSU Schedule] is to permit the communication of the overall deferral levels of the 2008 Equity Award Program as is currently anticipated at the present time to the Firm's employees without conferring any binding right or entitlement related thereto . . . .[294]

The disclaimer on the front cover of the 2008 Equity Award Program Summary, in which the RSU Schedule was disseminated, further reflected the LBHI Compensation Committee's resolution.[295] The resolution was again reiterated at the LBHI Compensation Committee's September 3, 2008 meeting.[296] As Mr. Chambers notes, in the same September 3, 2008 meeting, the LBHI Compensation Committee resolved to reduce the maximum percentage of 2008 total compensation that could be paid in RSUs from 65% to 50%, further demonstrating that the RSU Schedule issued in July 2008 was meant only to be a statement of how the LBHI Compensation Committee then *anticipated* it would exercise its discretion.[297]

Moreover, as Mr. Chambers argues in his brief, neither he nor any of the other Claimants, had taken on the risks and rewards of shareholders as of the Filing Date.[298] The Court agrees. In fact, as the LBHI Compensation Committee's July 1, 2008 and September 3, 2008 resolutions make clear, as of the Filing Date, no Lehman employee had any legal right to receive RSUs. Rather, the Claimants were eligible to receive a number of RSUs determined by dividing the percentage of 2008 total compensation that the LBHI Compensation Committee, in its discretion, determined would be payable in RSUs by the closing price of LBHI common stock on the Year-end Grant Date to be selected by the LBHI Compensation Committee. Until the LBHI Compensation Committee selected a Year-end Grant Date, thereby converting a percentage of

---

[294] FoF ¶ 19.

[295] FoF ¶ 20.

[296] FoF ¶ 21.

[297] *Id. See also* Chambers Post-Trial Br. ¶¶ 17-19.

[298] *See* Chambers Post-Trial Br. ¶¶ 3-4.

2008 total compensation into an entitlement to a fixed number of RSUs, the reward of an

increase in LBHI's stock price would not accrue to Claimants as it would to an LBHI

shareholder.  Instead, an increase in LBHI's stock price simply meant that, when the LBHI

Compensation did select a Year-end Grant Date, the grant price would be higher and the

Claimant would therefore receive fewer RSUs.[299]

  *Tristar* and *KIT Digital* are each distinguishable.  In *Tristar*, the Ninth Circuit held that a

member of an LLC who converted her claim to debt prior to the LLC's bankruptcy was

nonetheless subject to subordination under section 510(b) of the Bankruptcy Code.   In reaching

that conclusion, the court examined the law on subordination outside of the Ninth Circuit,

including citing to *In re MarketXT Holdings Corp.*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007), and

concluded, "[t]hese cases suggest that to be subject to subordination, the claimant must, at the

very least, enjoy the rights and privileges of equity ownership on the date of the bankruptcy

petition (citation omitted)."[300]  The *Tristar* court declined to follow that principle, noting, "[the

Ninth Circuit] rejected that principle . . . holding that a claimant who bargained for an equity

position was subject to subordination, even though he never enjoyed the benefits of equity

ownership."[301]  The holding in *Tristar* is inconsistent with the law in this Circuit, which

contemplates only two rationales for mandatory subordination under section 510(b): either the

claimant (1) took on the risk and return expectations of a shareholder, rather than a creditor, or

(2) seeks to recover a contribution to the equity pool relied upon by creditors in deciding whether

to extend credit to the debtor.  *MedDiversified,* 461 F.3d at 256; *see also KIT Digital*, 497 B.R. at

183 (applying *MedDiversified*).

---

[299] As of the Filing Date, the LBHI Compensation Committee had not yet selected a Year-end Grant Date for fiscal
year 2008.  FoF ¶ 22.

[300] 782 F.3d at 496.

[301] *Id.*

*KIT Digital* is distinguishable on its facts.  In *KIT Digital*, Judge Gerber held that a contractual claim to receive additional shares of stock in the debtor that could have, at the sole discretion of the debtor, been satisfied with cash instead of shares of stock, was subject to mandatory subordination under section 510(b).  *KIT Digital*, 497 B.R. at 183.  Judge Gerber reasoned that the option of the debtor to satisfy its obligation to the claimant in cash, rather than stock, did not change the fact that the claimant had bargained for stock and therefore assumed the risk and return expectations of a shareholder.  *Id.* at 185.  Judge Gerber distinguished the two cases upon which the claimants relied, *In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008) and *CIT Group v. Tyco International Ltd. (In re CIT Group)*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011), by noting that the claimants in each case, unlike the claimants in *KIT Digital*, did not have a contractual entitlement to receive stock.  *KIT Digital*, 497 B.R. at 185.  Here, unlike the claimants in *KIT Digital*, the Claimants had an entitlement to cash that could be satisfied in RSUs rather than an entitlement to stock that could be satisfied in cash.  The Claimants had no entitlement to RSUs and thus had not taken on the risk and return expectations of a shareholder.

The Trustee's final argument on this issue is also unpersuasive; the nature of Mr. Chambers' bonus entitlement is distinct from that of commission-based Lehman employees, whom the Court previously held had a claim, albeit a subordinated one, for unissued RSUs. Lehman's commission-based employees were classified as "production based" for purposes of the 2008 Equity Award Program and, in accordance with such classification, were compensated partially in cash and partially in an accrual towards a year-end equity award with each pay period.[302]  In other words, Lehman commission-based employees became entitled to RSUs with

---

[302] Chambers Ex. 2 (2008 Equity Award Program Summary), at n.2.

each pay period.  By contrast, as Mr. Chambers emphasizes, he was a bonus-eligible employee, not a production-based employee.[303]  Accordingly, he did not have any entitlement to RSUs until the LBHI Compensation Committee decided to exercise its discretion.

Therefore, because LBI, through the LBHI Compensation Committee, had not, as of the Filing Date, exercised its discretion to pay Mr. Chambers, or any other Lehman bonus-eligible employee, a portion of their 2008 total compensation in RSUs, no portion of Mr. Chambers' 2008 total compensation was payable in RSUs as of the Filing Date.  Accordingly, no portion of Mr. Chambers' 2008 total compensation, including his claim for a 2007 bonus, will be subordinated pursuant to section 510(b).[304]

## 2.  Guaranteed Bonus Amount of $42,386,172.99  for LBI's Fiscal Year 2008

The Trustee concedes that Mr. Chambers is entitled to a claim for his 2008 bonus but contends that such claim is overstated because it fails to deduct (i) the full compensation paid to employees of the Fund and (ii) the $1 million lump-sum Mr. Chambers received from Barclays.[305]

### i.    The Calculation of Mr. Chambers' 2008 Bonus

Pursuant to his 2008 employment agreement, Mr. Chambers' 2008 bonus was to be calculated as 25% of the Fund's net profits, "the performance pool," less (i) Mr. Chambers' 2008

---

[303] *See* Chambers Post-Trial Reply Br. ¶ 8.

[304] Because LBI, through the LBHI Compensation Committee, did not exercise its discretion to pay any portion of the Claimants' 2008 total compensation in RSUs, it need not address the argument, advanced primarily by Messrs. Hoffman and Chambers, that no portion of the Claims should be subordinated under section 510(b) because, even had LBI, through the LBHI Compensation Committee, exercised its discretion to pay Claimants a percentage of their 2008 total compensation in RSUs, it could not have delivered a number of RSUs sufficient to satisfy its obligation to the Claimants, given the value of LBHI stock following the Filing Date.

[305] The Trustee also argues that, like Mr. Chambers' 2007 bonus, 65% of his 2008 bonus was payable in RSUs and is therefore subject to mandatory subordination pursuant to section 510(b).  For the reasons discussed in Section C.1.i, no portion of Mr. Chambers' 2008 total compensation, including his 2008 bonus, was payable in RSUs.

salary and (ii) the 2008 total compensation paid to the employees of the Fund.[306]  It is undisputed

that the 2008 performance pool was $42,906,750.[307]  It is also undisputed that, as of the Filing

Date, LBI had paid Mr. Chambers and the Fund employees a total of $520,577.01 in

compensation.[308]  The Chambers Claim reduces the performance pool by this amount to arrive at

its claimed amount for Mr. Chambers' 2008 bonus – $42,386,172.99.  The Trustee contends,

however, that the performance pool should be reduced by Mr. Chambers' full $200,000 salary

for 2008 and the 2008 guaranteed salaries and bonuses of the Fund's employees, whether paid by

LBI or not – *i.e.*, that Mr. Chambers' claim for a 2008 bonus should be calculated by subtracting

$1.2 million from the performance pool, resulting in a claim of $41,506,750, before application

of the Trustee's remaining defenses.[309]

The Trustee cites no authority for the inequitable proposition that Mr. Chambers' claim

for his 2008 bonus must be reduced by amounts that were neither paid by LBI nor paid on LBI's

behalf.  However, the evidence at the Merits Hearing revealed that more than just the

$520,577.01 LBI had paid to Mr. Chambers and the Fund employees as of the Filing Date has

been paid, either by LBI or on LBI's behalf, to employees of the Fund.  Such amounts must be

deducted from Mr. Chambers' claim for a 2008 bonus pursuant to his 2008 employment

agreement.

First, Mr. Kettler and Mr. Verghese each accepted employment with Barclays and

became Transferred Employees, meaning that LBI delegated its obligation to pay their 2008

---

[306] FoF ¶ 66.

[307] FoF ¶ 71.

[308] *See* FoF ¶ 73.

[309] Trustee's Proposed Findings of Fact ¶ 79.

guaranteed bonuses to Barclays.[310]  The Trustee introduced the testimony of Mr. Kurman of

Barclays that Barclays had made payments of $140,240 to Mr. Kettler and $35,000 to Mr.

Verghese in lieu of their 2008 bonuses.[311]  The testimony of Mr. Kurman was sufficient to meet

the Trustee's burden of proof with respect to such amounts and shift the burden to Mr.

Chambers, who did not offer any evidence to the contrary.  Accordingly, Mr. Chambers' claim

for his 2008 bonus will be reduced by the total lump-sum payment of $175,240 that Barclays

made to Mr. Kettler and Mr. Verghese in lieu of their 2008 bonuses.

Second, Mr. Kettler and Mr. Verghese have been awarded allowed claims against LBI on

account of their 2008 guaranteed bonuses in the amounts of $300,625 and $169,385,

respectively.[312]  Mr. Chambers testified that, to replicate what would have happened with his

2008 bonus had LBI remained a going concern and Messrs. Kettler and Verghese had been paid

from the Fund's performance pool, and to avoid a "double-dip," his 2008 bonus should be

reduced by the amount of Messrs. Kettler and Verghese's allowed claims.[313]  Accordingly, such

amounts will be subtracted from Mr. Chambers' claim for his 2008 bonus.

Finally, although each of Mr. Chambers, Mr. Kettler, and Mr. Verghese were paid a

salary by Barclays, LBI did not delegate to Barclays its 2008 base salary obligations to

Transferred Employees; in fact, Section 9.1(c) of the APA expressly excludes base salary from

the scope of the delegation.  Therefore, Mr. Chambers' 2008 bonus will not be reduced by any

salary that he, Mr. Kettler, or Mr. Verghese was paid by Barclays in 2008.

---

[310] FoF ¶ 74; Section A, *supra*.

[311] FoF ¶ 74.

[312] *See* FoF ¶ 75.

[313] *See* Apr. 22 Tr. 153:16-154:1 [Chambers] (Q: "And if those claims became allowed claims against Lehman
Brothers, would you take a deduction from your bonus pool amount for the amount of that allowed claim?"  A:
"We've offered that to the Trustee, I think, to reduce our claim by the amount of any allowed claim by the guys that
worked with me."  Q: In other words, to replicate what would have [happened] had all this not happened."  A:
"Right.  I'm not trying to double-dip there.").

In accordance with the above, Mr. Chambers' 2008 bonus is properly calculated as $41,740,922.69.

### ii.    Barclays Paid $1 Million of Mr. Chambers' 2008 Bonus on Behalf of LBI

Mr. Chambers received and accepted an offer of employment from Barclays.[314] Accordingly, Mr. Chambers was a Transferred Employee and, pursuant to the APA, LBI delegated to Barclays its 2008 bonus obligation to Mr. Chambers.  Mr. Chambers was terminated and entered into a separation agreement with Barclays on the same day he accepted Barclays' offer of employment – December 5, 2008.[315]  Mr. Chambers' separation agreement provided for severance payments in accordance with Lehman's severance policy and a $1 million lump-sum payment above and beyond the severance called for by Lehman's severance policy.[316]  Relying on the testimony of Mr. Kurman of Barclays that this $1 million lump-sum payment was to compensate Mr. Chambers for his 2008 service at LBI,[317] the Trustee argues that such payment was in partial satisfaction of Mr. Chambers' 2008 bonus.  In response, Mr. Chambers suggests that the lump-sum payment may have been in exchange for Mr. Chambers' release of Barclays from any claims he may have had in connection with the termination of his employment, including potential claims under the Older Workers Benefits Protection Act or the WARN Act.[318]  The Court finds that Mr. Kurman's testimony is sufficient to meet the Trustee's burden of proof on this issue, particularly given that Mr. Chambers has offered no evidence to the contrary or in support of his contention.

---

[314] FoF ¶ 76.

[315] *Id.*

[316] FoF ¶¶ 77-78.

[317] FoF ¶ 78.

[318] *See* Chambers Post-Trial Br. ¶ 28.

Accordingly, the Court finds that Barclays paid $1 million of Mr. Chambers' 2008 bonus on behalf of LBI and that the allowed amount of Mr. Chambers' claim for his 2008 bonus will be reduced from $41,740,922.69 to $40,740,922.69.  Because, for the reasons discussed above in reference to Mr. Chambers' 2007 bonus, LBI did not exercise its discretion to pay any portion of Mr. Chambers' 2008 total compensation in RSUs, no portion of Mr. Chambers' claim for his 2008 bonus will be subordinated pursuant to section 510(b).

### 3.   Salary and Bonus Claims of $20,400,000 for 2009 and 2010

Mr. Chambers' 2008 employment agreement provided that, if his employment with LBI ended for any reason during the 2008, 2009, or 2010 fiscal years, then his salary payments would cease at that time as well.[319]  Similarly, Mr. Chambers' 2008 employment agreement provided that "[i]n no event will you be eligible for any Performance Bonus with respect to a Performance Year in which you were not employed as contemplated by this letter."[320]  Mr. Chambers understood that if he was not employed by LBI during the 2009 or 2010 fiscal years he would not be eligible for a salary or bonus in respect of such year or years.[321]  Because Mr. Chambers was not employed by LBI at any time in 2009 or 2010,[322] his claim for a 2009 salary and bonus and a 2010 salary and bonus is therefore foreclosed by the terms of his employment agreement and the portion of the Chambers Claim asserting such amounts will be disallowed.[323]

In accordance with the foregoing, the Court finds that the Chambers Claim will be allowed in the amount of $40,740,922.69.

### D.  The Judkins Claim

---

[319] FoF ¶ 65.

[320] FoF ¶ 69.

[321] FoF ¶¶ 65, 70.

[322] FoF ¶ 70.

[323] There is thus no need to address the Trustee's section 502(b)(7) argument with respect to such amounts.

As described more fully above, the Judkins Claim asserts claims for (i) a guaranteed 2008 bonus of $800,000; (ii) a discretionary 2008 bonus in the amount of between $1,200,000 and $1,600,000; (iii) relocation expenses of $400,000 in connection with Mr. Judkins' relocation from Maryland to New York to accept employment with LBI; and (iv) reimbursement of a home equity loan in the amount of $840,000.  The Court will address each aspect of the Judkins Claim in turn.

### 1.  Guaranteed Bonus Amount of $800,000 for LBI's Fiscal Year 2008

Pursuant to his employment agreement with LBI, Mr. Judkins was owed an $800,000 guaranteed bonus for the 2008 fiscal year.[324]  Mr. Judkins accepted Barclays' offer of employment following LBI's bankruptcy and entered into an employment agreement with Barclays in October 2008.[325]  In accepting Barclays' offer of employment, Mr. Judkins became a Transferred Employee for purposes of the APA; accordingly LBI delegated to Barclays its obligation to pay Mr. Judkins' 2008 bonus.[326]  Mr. Judkins' employment agreement with Barclays entitled him to receive an $800,000 bonus for the 2008 fiscal year.[327]  In February 2009, Mr. Judkins received an $800,000 cash bonus from Barclays for fiscal year 2008.[328]

The Trustee contends that this $800,000 cash bonus from Barclays satisfied LBI's obligation to pay Mr. Judkins his 2008 bonus, arguing that it strains credulity to conclude that Barclays would have paid Mr. Judkins an $800,000 cash bonus in recognition of his approximately three months working at Barclays in 2008 before the conclusion of his

---

[324] FoF ¶ 81.

[325] FoF ¶ 83.

[326] *See* Trustee Ex. 1 (APA), §§ 9.1(a), 9.1(c); Section A, *supra*.

[327] FoF ¶ 83.

[328] FoF ¶ 85.

employment there.[329]  Mr. Judkins asserts, on the other hand, that the bonus from Barclays was unrelated to his time at LBI, pointing to trading profits, in an unspecified amount, that Mr. Judkins purportedly generated for Barclays during his three months of employment.  He also contends that a clause in his Barclays employment agreement that prevented him from soliciting Barclays customers for three months following his departure from Barclays somehow supports his position.[330]

The Court agrees with the Trustee and declines to conclude that Barclays would have guaranteed and then paid Mr. Judkins an $800,000 bonus for his work from October-December 2008.  Indeed, LBI had guaranteed Mr. Judkins $800,000 for his work for the entirety of the year 2008, and Mr. Judkins did not introduce any evidence demonstrating superior performance during his brief tenure at Barclays consistent with awarding him a full year's bonus for a quarter of a year's work.  The Court concludes that the Trustee has successfully shifted the burden to Mr. Judkins to prove that the $800,000 cash payment he received from Barclays in February 2009 was not on account of his 2008 LBI bonus.

By merely pointing to a non-solicitation clause in his Barclays employment agreement and purported trading profits generated for Barclays in 2008, Mr. Judkins has failed to meet his burden on this issue.  Simply put, the non-solicitation agreement in his Barclays employment agreement, a standard clause in numerous employment agreements that do not come with guaranteed bonuses, does not explain an $800,000 bonus.  Second, there is no evidence of Mr. Judkins' trading record at Barclays from October-December 2008 that would enable the Court to conclude the bonus was on account of superior performance at Barclays.  Accordingly, the Court finds that the $800,000 cash payment Mr. Judkins received from Barclays in February 2009 was

---

[329] Trustee Post-Trial Br. ¶ 30.

[330] *See* Judkins Post-Trial Reply Br. at 3.

in satisfaction of LBI's obligation to pay him an $800,000 guaranteed bonus for LBI's 2008

fiscal year.

### 2.  Discretionary Bonus for LBI's Fiscal Year 2008

It is undisputed that LBI's written bonus policy was that bonuses were "not guaranteed

unless otherwise agreed upon in writing" and "[were] determined at the full discretion of senior

[Lehman] management."[331]  Mr. Judkins conceded at the Merits Hearing that he understood

LBI's policy meant that he could be paid nothing beyond his $800,000 guaranteed bonus, no

matter how well he performed.[332]  Mr. Judkins further acknowledged, in his post-trial brief, the

well-settled New York rule that "[a]n employee's entitlement to a bonus is governed by the

terms of the employer's bonus plan."[333]

While Mr. Judkins' 2008 trading performance at LBI may have merited a discretionary

bonus had LBI remained a going concern and granted discretionary bonuses, LBI's written bonus

policy made clear that no employee, including Mr. Judkins, had an *entitlement* to a discretionary

bonus.  The clear and unambiguous terms of the LBI bonus policy govern here.  Mr. Judkins'

claim for a 2008 discretionary bonus will be disallowed.[334]

### 3.    Relocation Expenses

Mr. Judkins' LBI employment agreement provided that he was eligible for relocation

assistance under the terms of the Relocation Policy furnished by Lehman.[335]  The Relocation

Policy provided for Lehman to be billed directly "for all reasonable and customary closing costs

---

[331] FoF ¶ 82.

[332] *Id.*

[333] Judkins Post-Trial Br. at 8 (quoting *Hall v. United Parcel Serv. of Am., Inc.*, 555 N.E.2d 273, 279 (N.Y. 1990)).

[334] As the Court finds that Barclays satisfied LBI's obligation to pay Mr. Judkins' entitlement to his 2008 bonus in full, the Trustee's argument that any allowed portion of Mr. Judkins' 2008 bonus was payable in RSUs and therefore must be subordinated under section 510(b), is moot.

[335] FoF ¶ 86.

incurred in the sale of your former residence."[336]  The Relocation Policy explicitly stated that "[u]pon termination of your employment for any reason, any remaining relocation benefits will cease immediately."[337]

Although Mr. Judkins "relocated" from Maryland to New York to join LBI, he did not sell his residence in Easton, Maryland, which he continues to use as a vacation home.[338]  In fact, the relocation expenses the Judkins Claim asserts are the estimated costs that Mr. Judkins *would have* incurred had he sold his Maryland home.[339]  Thus, Mr. Judkins did not suffer costs "incurred in the sale of [his] former residence" – in short, no such costs exist because the Maryland residence is not in fact his "former" residence.  Accordingly, Mr. Judkins' asserted relocation expenses do not qualify for reimbursement under the Relocation Policy and will therefore be disallowed.

### 4.    Prudential Home Equity Loan

During the course of discovery, Mr. Judkins asserted for the first time his purported entitlement to reimbursement for the $840,000 Equity Loan he had obtained from Prudential.[340]  Although LBI's agreement with Prudential provided that LBI would act, in essence, as a guarantor of Mr. Judkins' obligations on the Equity Loan, LBI was not in fact a party to the Equity Loan and did not have any obligations to Mr. Judkins in connection with the Equity Loan.[341]  As the Trustee asserts, the portion of the Judkins Claim seeking reimbursement of the

---

[336] FoF ¶ 87.

[337] *Id.*

[338] FoF ¶ 88.

[339] *Id.*

[340] FoF ¶ 90.

[341] *See* FoF ¶¶ 89, 90.

Equity Loan must fail, both on the merits and because it was not timely asserted in the Judkins Claim. The Court agrees.

In accordance with the foregoing, the entirety of the Judkins Claim will be disallowed.

### E. The Hajdukiewicz Claim

The Hajdukiewicz Claim asserts that Mr. Hajdukiewicz is entitled to a guaranteed bonus of $1,610,000 for LBI's fiscal year 2008, as provided for in his 2008 employment agreement.[342] The Trustee contends, first, that Mr. Hajdukiewicz released his claim against LBI when he signed the release included in his severance agreement with Barclays. The Trustee further contends that, if Mr. Hajdukiewicz did not release his claim against LBI, it must be reduced by (i) $183,840 which the Trustee asserts Mr. Hajdukiewicz received in the form of RSUs in July 2008 as part of the July RSU Grant and (ii) a $422,000 payment Barclays made to Mr. Hajdukiewicz upon his termination from Barclays, which payment the Trustee submits was made in partial satisfaction of LBI's obligation to pay Mr. Hajdukiewicz's 2008 bonus. For the reasons stated below, the Court finds that (i) Mr. Hajdukiewicz did not release his claim against LBI; (ii) Mr. Hajdukiewicz was paid $183,840 of his 2008 bonus in the form of RSUs in July 2008; and (iii) the Hajdukiewicz Claim was partially satisfied by the $422,000 cash payment Barclays made to Mr. Hajdukiewicz upon his termination.

### i. *Mr. Hajdukiewicz Did Not Release his Claim*

As part of his separation from Barclays, Mr. Hajdukiewicz signed a waiver and general release in favor of Barclays that provided as follows:

> In exchange for the payments and benefits set forth in my Separation Agreement, I hereby release Barclays Capital (the "Bank"), and all of its past and/or present divisions, affiliates, parents, subsidiaries, officers, directors, stockholders,

---

[342] On October 20, 2014, Mr. Hajdukiewicz attempted to amend his claim to assert a claim in the amount of $1,910,000, *see* Hajdukiewicz Ex. 9, but such amendment is barred by the Court's July 2, 2014 Order [ECF No. 9273].

trustees, employees, agents, representatives, administrators, attorneys, insurers, fiduciaries, predecessors, successors and assigns, in their individual and/or representative capacities (hereinafter referred to as the "Barclays Group"), from any and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims and demands of any kind whatsoever ("Claims") which I or my heirs, executors, administrators, successors and assigns ever had, now have or may have against the Barclays Group, whether known or unknown to me, by reason of my employment and/or cessation of my employment, with the Bank or with Lehman Brothers, or otherwise involving facts which occurred on or prior to the effective date of this Waiver and General Release, except to the extent that any such Claim concerns an allegation that the Bank has failed to make the payment(s) set forth above.[343]

The Trustee argues that the effect of this language is that Mr. Hajdukiewicz released his claim against LBI. The Trustee contends that LBI was Barclays' predecessor as Mr. Hajdukiewicz's employer and as the owner of the business in which Mr. Hajdukiewicz was employed and that the reference to claims "by reason of my employment and/or cessation of my employment . . . with Lehman Brothers" encompasses his entitlement, if any, to a 2008 bonus from LBI.[344]

Mr. Hajdukiewicz, not surprisingly, asserts that LBI is not a predecessor of Barclays because Barclays purchased LBI's assets and therefore is not a successor of LBI.[345] The Trustee concedes that a purchaser of assets is not generally liable for the seller's liabilities, but asserts that this principle is inapposite because Mr. Hajdukiewicz agreed to release "all" of Barclays' predecessors, in any context, and did not limit the release to only those predecessors whose liabilities Barclays assumed.[346] The Trustee thus contends that "predecessor" should be read broadly to include LBI, citing to *Arrowgrass Master Fund Ltd. v. Bank of New York Mellon*, 106

---

[343] FoF ¶ 101.

[344] *See* Trustee Post-Trial Br. ¶¶ 75-77.

[345] *See* Hajdukiewicz Post-Trial Br. ¶¶ 27-28.

[346] *See* Trustee Post-Trial Br. ¶ 76.

A.D.3d 582 (N.Y. App. Div. 1st Dep't 2013) as an example of a case in which a New York court interpreted the term "predecessor" to include more than just a corporate predecessor.[347]

In *Arrowgrass*, a noteholder sued a predecessor indenture trustee for breach of fiduciary duty in connection with an intercreditor agreement. The noteholders were bound by a release executed by the successor indenture trustee that released the "2015 Note Trustees" and each of their "predecessors" from "all" challenges to the subject intercreditor agreement, but argued that they could nonetheless bring suit against the predecessor indenture trustee. The court found that "predecessors" in the context of the release encompassed the predecessor indenture trustee, interpreting predecessor to mean, in accordance with Black's Law Dictionary, "[o]ne who precedes another in an office or positions."[348] The court reasoned that "[c]ertainly, if the parties intended the release not to cover the 2015 Note Trustees' predecessors (*i.e.*, defendant) they would not have used the word 'all,' which we view as broadly releasing '*all* challenges to the December 20, 2007 Intercreditor Agreement . . . . [t]hus, in the context of this broad release, it makes perfect sense that 'predecessor' means Wilmington's predecessor as trustee (*i.e.*, defendant) and not just the corporate predecessor."[349]

The Court declines to extend the broad reading the *Arrowgrass* court gave the word "predecessor" beyond the rather unique context of predecessor and successor indenture trustees and to the instant facts. Rather, the Court finds that the word "predecessor" in the context of Mr. Hajdukiewicz's release is limited to Barclays' corporate predecessors. A previous employer such as LBI is not a subsequent employer's predecessor "in office" in the way that a predecessor indenture trustee is a subsequent indenture trustee's predecessor "in office." While a successor

---

[347] *Id.*

[348] 106 A.D.3d at 583.

[349] 106 A.D.3d at 583 (citations omitted).

indenture trustee generally assumes the same rights and duties as a predecessor indenture trustee, including becoming party to the same agreements, a subsequent employer does not necessarily assume the same rights and duties with respect to the employee.  Here, Barclays did not assume or become party to LBI's employment agreement with Mr. Hajdukiewicz but instead entered into a new employment agreement, with terms different from the terms that governed his employment by LBI.

Even if the meaning of the word "predecessor" were ambiguous, as urged by Mr. Hajdukiewicz,[350] such ambiguity could not be resolved by finding that Barclays and Mr. Hajdukiewicz intended the use of the word to effect the release of LBI.  There is no evidence whatsoever suggesting that there was any bargaining or discussion between Barclays and Mr. Hajdukiewicz with respect to releasing LBI and the attendant loss of Mr. Hajdukiewicz's claim. The Court finds that Mr. Hajdukiewicz did not release the Hajdukiewicz Claim.

### ii.    Mr. Hajdukiewicz was Paid $183,840 of his 2008 Bonus in the Form of RSUs in July 2008

On July 3, 2008, Mr. Hajdukiewicz received an e-mail from Lehman stating that "part of your 2008 equity award will take the form of a July RSU Grant.  You can think of that July award as an 'advance' against your 2008 year-end equity award."[351]  Consistent with that e-mail, Mr. Hajdukiewicz's LBI personnel file shows that Mr. Hajdukiewicz received in July 2008 an award of RSUs (8,770.99 RSUs at the July 2008 grant price of $20.96, worth $183,840) as an advance on his 2008 bonus.[352]

---

[350] *See* Hajdukiewicz Post-Trial Br. ¶ 29.

[351] FoF ¶ 95.

[352] FoF ¶ 97.

Mr. Hajdukiewicz argues that the evidence presented by the Trustee, the July 3, 2008 e-mail and Mr. Hajdukiewicz's personnel file, are insufficient to establish that Mr. Hajdukiewicz in fact received RSUs as part of the July RSU Grant, as alleged by the Trustee.  Mr. Hajdukiewicz testified that he does not recall receiving any such award and the Trustee's introduction of his personnel file at the Merits Hearing did not refresh his recollection. Subsequent to the Merits Hearing, Mr. Hajdukiewicz objected to the introduction of his personnel file into evidence[353] on the grounds that the Trustee failed to establish its relevance.

To the extent that Mr. Hajdukiewicz's personnel file does not speak for itself, it is nonetheless relevant in that it corroborates the statement in the July 3, 2008 e-mail that indicates that Mr. Hajdukiewicz was to receive RSUs as part of the July RSU Grant.  The Court finds that the July 3, 2008 e-mail and Mr. Hajdukiewicz's personnel file are sufficient to meet the Trustee's burden of demonstrating that Mr. Hajdukiewicz received an award of $183,840 worth of RSUs as part of the July RSU Grant as an advance on his 2008 bonus, thereby shifting the burden of proof to Mr. Hajdukiewicz.  As Mr. Hajdukiewicz has not introduced any evidence indicating that he did not receive such award, he has failed to meet his burden.  Accordingly, the Court finds that the Hajdukiewicz Claim should be reduced by $183,840, the amount of Mr. Hajdukiewicz's 2008 bonus that he received in the form of RSUs in July 2008.

### iii.    Barclays Paid $422,000 of Mr. Hajdukiewicz's 2008 Bonus on Behalf of LBI

Pursuant to his separation agreement with Barclays, Mr. Hajdukiewicz received, in addition to severance, a special lump sum payment of $422,000 upon his termination by Barclays

---

[353] *See* ECF No. 11992 at 5-6.

shortly after accepting Barclays' offer of employment.[354]  The Trustee argues that this payment

satisfied $422,000 of LBI's obligation, if any, to Mr. Hajdukiewicz.  Mr. Hajdukiewicz contends

that the Trustee has failed to meet his burden of proof to link the lump sum payment from

Barclays to LBI's obligation to Mr. Hajdukiewicz, asserting that it is far more plausible that the

lump sum payment was in exchange for the release of any claims Mr. Hajdukiewicz may have

had against Barclays in connection with the termination of his employment, including potential

Old Workers Benefit Protection Act claims.[355]

        Mr. Hajdukiewicz accepted Barclays' offer of employment and became a Transferred

Employee under the APA.[356]  Accordingly, if Barclays made a payment to Mr. Hajdukiewicz in

respect of LBI's obligation to pay Mr. Hajdukiewicz's 2008 bonus, such payment must be

deducted from the Hajdukiewicz Claim.  In support of his position, the Trustee relies upon the

testimony of Mr. Kurman of Barclays, who testified that the lump sum payment was calculated

to be 20% of Mr. Hajdukiewicz's 2007 bonus and that such payment was made in lieu of a 2008

bonus.[357]  As was the case with respect to the Chambers Claim, discussed in Section C, *supra*,

the Court finds that Mr. Kurman's testimony that Barclays paid Mr. Hajdukiewicz the $422,000

to partially satisfy his 2008 LBI bonus is sufficient to establish this fact, and Mr. Hajdukieiwcz

has introduced no evidence to the contrary.  As with the Chambers Claim, Mr. Hajdukiewicz's

suggestion that Barclays would pay him $422,000 for a release of any claims against Barclays

that would have accrued in the short tenure of his Barclays employment is unsubstantiated.

Therefore, the Court finds that the Hajdukiewicz Claim should be reduced by $422,000.

---

[354] FoF ¶ 100.

[355] *See* Hajdukiewicz Post-Trial Reply Br. ¶¶ 6-8.

[356] FoF ¶ 98.

[357] *See* Trustee's Post-Trial Br. ¶ 33.

85

In accordance with the foregoing, the Court finds that the Hajdukiewicz Claim will be allowed in the amount of $994,160. [358]

---

[358] The Trustee also argues that LBI exercised its discretion to pay 50% of Mr. Hajdukieiwicz's 2008 bonus in RSUs and that 50% of his claim must therefore be subordinated pursuant to section 510(b). For the reasons stated in Section C.1.i, above (discussing Mr. Chambers' claim), the Court has found that LBI, or more accurately the LBHI Compensation Committee, did not exercise its discretion to pay any portion of 2008 bonuses owed to LBI employees, including Mr. Hajdukiewicz, in RSUs.

## <u>CONCLUSION</u>

For the foregoing reasons, the Objection is GRANTED in part and DENIED in part.  The Claims shall be resolved as follows:

- The Hoffman Claim shall be allowed in the amount of $7,712,500, of which $10,950 shall be allowed as a section 507(a)(4) priority claim, with the remainder allowed as a general unsecured claim;

- The Chambers Claim shall be allowed in the amount of $40,740,922.69, of which $10,950 shall be allowed as a section 507(a)(4) priority claim, with the remainder allowed as a general unsecured claim;

- The Judkins Claim shall be disallowed in its entirety and expunged from the claims register; and

- The Hajdukiewicz Claim shall be allowed in the amount of $994,160, of which $10,950 shall be allowed as a section 507(a)(4) priority claim, with the remainder allowed as a general unsecured claim.

The parties are directed to submit an order consistent with this decision.

Dated: October 8, 2015
New York, New York

/S/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE